**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | |
|---|---|
| NANCY MARTIN and | ) |
| MARY BETH BRACKIN, | ) |
| | ) |
|     PLAINTIFFS | ) |
| | ) |
| Vs | ) |
| | ) |
| CITY OF DOTHAN, JUDGE ROSE | ) |
| EVANS-GORDON, in her individual capacity; | ) |
| | ) |
|     DEFENDANTS | ) |
| | ) |
| _____ | ) |

## AFFIDAVIT OF MARY BETH BRACKIN

1.    My name is Mary Beth Brackin. I am one of the Plaintiffs in **the** action against the City of Dothan which bears my name and Nancy Martin.

2.    I initially started working for the City of Dothan as a City Magistrate on May 1, 1992. The Magistrate's office was under the direction of the City Manager at the time with the Court Clerk serving as the Administrative head of the Office with the City Manager serving as the Department **H**ead or Appointing Authority.

3.    In addition to the Court Clerk there were three Magistrates, including myself, and one support staff. Things remained generally uneventful during my first tenure as Magistrate.

1

Court business was handled by two appointed attorneys, Michel Brown and Douglas Bates, each serving two year terms as Municipal Judge. I received mostly positive evaluations during my initial tenure. I never received any discipline notices and left in good standing.

4. In August 1995, I applied for and was transferred to a position with the Dothan City Police Department as a secretary, principally responsible **in**puting the arrest reports from the City Jail.  I was to remain in this position until my return to the City Magistrate's office in 2001. While with the police I obtained glowing evaluations and **was never** subject to any discipline. I never received any discipline notice and left in good standing.

5. On April 22, 2001 I was transferred back to the **Magistrate's** Office**,** taking the place of former City Magistrate Lynn Scibert. Prior to my return the Magistrates Office had been reorganized. It was no longer under the umbrella of the City Manager but had received its own designation a part of the Judicial Department. Gone were the two part time appointed Municipal Judges and in their place was a full time appointed Judge which became the Department Head (Appointing

Authority). The person occupying this title upon my return was Judge Rose Evans-Gordon.

6.    Approximately two weeks after my return to the Magistrates office, Lavera McClain was hired. I had reservations about Ms. McClain's hire, not because she was an African American but because she had a reputation while working at the City Jail for making numerous filing and data entry errors. I know this for a fact, for when I worked as a secretary for the City Police I had to input into the computer Lavera's arrest reports and noted a large amount of errors. I believe that Lavera was disciplined because of her error rate.    This propensity for errors continued after Lavera followed me to the Magistrate's office.

7.    Later that year, during the month of December, 2001 Eunice Knight, another African-American, was hired as a Magistrate. Ms. Knight and Ms. McClain immediately became close friends. This friendship extended to Judge Gordon and before long the three were frequently going out to lunch together, or at least leaving together at lunch time and returning together after the time set for lunch.

8.      On November, 5, 2001 Judge Gordon's administrative assistant, Michelle Sellers, appeared in my office and presented me with a "formal notification of an administrative investigation". The notice informed me that I had made "inappropriate remarks" in the presence of a bondsman. I was also accused of making an after hour telephone call to this same bondsman. I was told that under the penalty of insubordination, which could lead to job loss, I must submit to an "administrative interview" with two members of the Dothan Police Department, Internal Affairs Division, Sgt. Gray and Sgt. Coleman. My **i**nterview with these officers resulted **in** an interrogation during which I was barked at and my credibility was called into question. I was informed that the investigation was to determine whether I had questioned the competency of another attorney. When I responded that I had only met this attorney one time and had nothing but praise for him, the questioning expanded to whether I had problems with other court officials. I felt that in a circular way my interrogators were attempting to imply that if I had problems with other staff that it was more likely than not that I disparaged the attorney.

9.      My recollection of the events which le**d** to Judge Gordon requesting an Internal Affairs investigation of me **is as** follows:  On or about September 25, 2001**,** a female came to the office. I was to later learn that her name was Kimberly Rapelje. She was accompanied by another female and bondsman Andrew Turner. Ms. Rapelje, who was obviously intoxicated when she visited me, informed me that she was not satisfied with her appointed Defense attorney. She stated that she did not want him to represent her anymore. I explained to her that she needed to go back and tell the Judge what she told me. I also told her that the City had two more Public Defender attorneys and that she could ask the Judge to have her case placed on one of their dockets. The bondsman who was with her was on his cell phone the entire time that I was speaking to her. I was subsequently summoned into the Judge**'s** breakroom by Judge Gordon and I explain**ed** the same thing to her. Not being satisfied with my explanation**,** the Judge initiated an Internal Affairs investigation.

10.     Prior to the interrogation I was administered what the officers referred to as my "Garity Warning"**,** that if I refused to provide them with truthful information **it** could result in job

5

loss. Though no formal disciplinary action was taken, I was to learn later that though my immediate supervisor, Donna Nicholson was willing to give me the benefit of the doubt, Judge Gordon **was** not, and notwithstanding my denial, she instructed that a notation be placed in my personnel file, which indicated that the charges were true. Prior to my having to submit to a police investigation, I am not aware of any other employee having to submit to a similar interrogation by the city police for an alleged inappropriate comment about an appointed defense attorney.

11.     As time went on Lavera did not get any better with her propensity to make data entry errors. Her errors included, but **were** not limited to: not completing Alias Warrants of Arrest stamped on the Case Action Summary sheets; having complaints Nol Pros due to substantive information omitted from the C-63 Complaint forms; not closing out cases on the computer; wrongful procedure of the refunding of cash bonds; causing multiple checks to be written from the "Cash Bond Account"**;** sending out unsigned Alias Warrants of Arrest **and** issuing Alias Warrants of Arrest with no corresponding Order from the Judge**.**

12.    The most troubling of Lavera's errors, and the one which could potentially cause the City the greatest liability exposure, was her Warrant of Arrest errors. These errors can be classified in four categories**; first,** not **in**puting Court Referral Program completions, causing a wrongful, or potential wrongful arrest**; second**, Issuing duplicate "Alias Warrants of Arrest" for the same defendant at the same time (**Emmanuel Hooks January 8, 2005**); **third, n**ot recalling paid fines thereby allowing Alias Warrants of Arrest to remain outstanding**; fourth**, **n**ot completing the paperwork or **in**puting information in the computer tracking system when warrants are recalled leading to a wrongful arrest and/or re-arrest (**Crystal Gray-2001 and Christopher Carrol-2003**).

13.    From time to time our office functioned without an administrator. During these times I would frequently bring the above errors to the attention of Judge Gordon but she refused to take any administrative action.

14.    On December 1, 2004, it was brought to my attention that Lt. **C**liff Jarrett issued a memo to Capt. Givens in reference to a juvenile being arrested on an alias warrant (**AW**) issued by the Municipal Court. Judge Gordon asked me to look into this

and let her know who was responsible. After researching this incident, I told the Judge that Lavera had issued the warrant on Albert Christopher Walker MC03-2379 on February 2, 2004. Because Albert was a minor, the arrest writ should have never been issued. The Judge lost interest when she learned who was responsible and suggest that it wasn't very important.

15. **On most** of the above referenced errors I personally informed the Judge, especially when the Magistrate's office was between Administrators, yet she frequently would respond that "everybody makes mistakes". I do not suggest that only Lavera made mistakes**, but that** she made far more than other Magistrates and while others were called on the carpet for such mistakes, Lavera, and to a lesser extent Eunice Knight, were protected by the Judge for the mistakes that they made.

16. I had multiple jobs, principally **in**puting information into the computer, processing trial paperwork, preparing trial dockets, processing appeals and reconciling refunded cash bond repayments. I also assisted with the processing of jail bond paperwork.  I was responsible for the daily deposits, and worked the court room. It is **through** these vantage points

that I was able to observe the numerous mistakes that Lavera and Eunice made (most usually the former). I frequently had to correct their errors in order to complete my paperwork.

17. On one occasion where the judicial staff had a open meeting with Judge Gordon**, with** Personnel Director Kai Davis **present**, Lavera spoke to me in a loud, offensive and threatening manner. There was only one person between she and I and the very loud boisterous tone of her conversation was not necessary for her to be heard. Judge Gordon permitted her to continue to speak to me in this rude manner and did nothing. When I complained to the Judge about the manner in which Lavera was speaking to me the Judge ignored my complaint.

18. My main **complaint** with the Judge **is** not that she always wrongfully disciplined white employees but that she never disciplined the black staff or permitted others to do so. The black Magistrates appear**ed** to get a pass no matter what they did.

19. On March 17, 2004 Ricky Stokes**,** a local bondsman and owner of A-Advantage Bonding**,** called me on the telephone and advised me that we (the Judicial Department) had a

defendant who we had listed under the wrong information. If let uncorrected it could result in a wrongful arrest. He said that he had attempted to discuss this case with Lavera who blew him off, telling him that she didn't have time to discuss the matter with him. I looked into the matter and discovered that we had issued an arrest warrant for a Michael D. McCord and not Michael W. McCord. Lavera had made the wrongful entry and that is the reason that Mr. Stokes contacted her first. Only the name was similar. Nothing else in their respective profile was similar. I recalled the writ. Judge Gordon called me, apparently having received word from Mr. Stokes, and told me that clerical errors will happen and not to make a big deal out of it. She then instructed me to "delete" the file before I leave and fix it. I paged Nancy Martin, the new Administrator, and told her what had happen. She instructed me to do as the Judge instructed and destroy the record.

20.     Lavera's and Eunice's close relationship with Judge Gordon, and her protection of them from job related complaints, created no small amount of resentment from other Magistrates, who would from time to time discuss these frustrations with me and I them.

21.     On or about January 4, 2004, while I was working the downstairs window, Theron Fondren came to the window and asked for me directly. Prior to this visit I had no knowledge of Mr. Fondren. Mr. Fondren asked to speak to me by name, I identified myself. He presented to me a bill from a towing company). This bill was for the amount of $158.90. Mr. Fondren informed me that he had been wrongfully arrested and he was seeking reimbursement for the towing fee. He also informed me that he had posted a bond. I advised him to go to the City Clerk's office. He then asked me what he should tell them. I told him that to tell the Clerk what he had told me, that he had been wrongfully arrested and that he was seeking reimbursement for the towing fee.  I **do not recall speaking** to anyone after my discussion with Fondren nor did I look up his case. Had I done so, I would have discovered the circumstances of his arrest and the name of the Magistrate who processed the arrest warrant.

22.     I learned   after I sat for my deposition in this case that Lavera and Eunice stated that I told Mr. Fondren that Ann Baxter was incompetent and had caused his arrest and that he should sue the City. I emphatically deny that I ever told them

any such thing. There is no way I would have accused Ann when she had nothing to do with Mr. Fondren's arrest and had she, I would have not disparaged her to a member of the public. I also would not have encouraged a wrongfully arrested defendant to sue the City. Mr. Fondren only wanted reimbursement for his towing fee. I understand that the City did reimburse this amount. I am not aware of any other claim Mr. Fondren has made against the City. In hindsight, since the subsequent investigation into this matter was supposed to remain confidential, **I do not know how Eunice and Lavera became involved**. Most certainly had they informed Judge Gordon that I disparaged another employee and/or encouraged a defendant to sue the City, the Judge would have, at a minimum, spoken to me about it. Judge Gordon, prior to the below referenced letter, never spoke to me about this.

23.     On March 22, 2004**,** Judge Gordon gave me a letter formally notifying me that I was being investigated by Internal Affairs pursuant to a false arrest claim brought by Theron Fondren. I was directed to report to Sgt. Gary **Coleman** and Sgt. Ray

Owens of the Dothan Police Department at 2:00p.m. that same day.

24.    At approximately 2:00 p.m. on March 22, 2004**,** I met with Sgt. **Coleman**. After **again providing me with** the Garity Notice, **they told me** that I was the suspect in this investigation. I was asked directly if I had ever told Mr. Fondren that he had been falsely arrested. I replied that I had not. I explained that it was Mr. Fondren who had stated that he had been falsely arrested. I only told him where he could go to file a claim. Sgt. **Coleman** also asked if I told him that the City was liable. Again I denied this as well.

25.    Notwithstanding my denials, and without telling me what statements, if any, Mr. Fondren had made that I first brought up the false arrest issue, or the liability of the City, one month later, on April 21, 2004 I was given a notice that on January 7, 2004, I had advised Mr. Fondren that he was wrongly arrested and that another employee was negligent regarding his case. Despite my protest to the contrary a  hearing was scheduled for  April 23, 2004**.**  I was given another notice that effective April 26, 2004 I would be placed on unpaid suspension for 10 days.

26.     **On the Monday I returned** from serving the 10 day suspension, I was summoned to Judge Gordon's office. Nancy, the Administrator**,** was also summoned. The Judge informed me that if I didn't want to work there to let her know right then. I viewed this as a threat and it suggested to me that Judge Gordon wanted me to quit, **that she desired I no longer remain employed by** the City. I told her that I enjoyed my job, that I was very good at it and that I I had no desire to quit my job. She then stated to me that I needed to take responsibility for the incident which **led** to my suspension.  I then left and returned to my duty station.

27.     During the course of my employment I became close friends with Mary Turner, a fellow Magistrate. This friendship extended beyond the work place. We attended the same church. We spoke to each other almost daily over the telephone. We visited each other's homes. Our famil**ies** met each other. We attended social events together. We shopped together. We faxed and sent email messages to each other. We enjoyed each others company. Judge Gordon was aware of our close relationship, as were the other members of the Judicial Department.

28.    Shortly after March 10, 2004, Officer Etress with the Dothan **P**olice **D**epartment questioned me about a traffic ticket issued against Stephen Phelps in November, 2002. One week later Sergeant Gray also questioned me about the same ticket. However, it wasn't until late in the interrogation that **he specifically informed me of** the nature of his investigation and that I was the subject of the investigation. He started by asking me general traffic ticket input procedure as if he was attempting to get general information. Only later did he attempt to infer that I had deliberately failed to process Stephen Phelps**'** traffic ticket.

29.    I explained to Sergeant Gray that I did not specifically recall that ticket but if I placed "void" on the transmittal it was because I did not have the ticket when I was **in**puting the ticket into the computer. Further since my name did not appear on the ticket I did not know for sure whether I ever had the ticket. I further explained that at times I and other **Magistrate's** take the **Officer's word** that the tickets listed on the **officer's** transmittal sheet are actually being submitted with the sheet. Both I and other Magistrates **sometimes** take the Officer's oath on all of his traffic citations at the same

time without going through each one, one at a time. Because of the vigor of his interrogation, I got the impression that he did not believe me.

30.     On March 10, 2004**,** I attended a meeting called by Judge Gordon. She informed the staff that there was an internal affairs investigation involving Mary Turner. She didn't tell me any of the details about the investigation. She told us that during the course of the investigation that we were to make no contact with Mary Turner. She also told us that we were not to talk about the investigation with anyone. She did not tell us to contact her if we needed to make contact with Mary.

31.     Judge Gordon assigned me most of Mary Turner's job duties. **There was a show-cause form notifying defendants of their failure to comply with the court**. No one in our office knew where this form was. One day I called Mary to request where I could retrieve the form. Because this was a public **service** type call and not about the investigation, I did not feel that it violated Judge Gordon's instruction.

32.     **Due to our close friendship, a**nything other than a very brief restriction on my contacting Mary Turner would be upsetting. Mary and I have been close friends for a long time. We talk

16

on the telephone daily**,** visit each **other's homes** frequently. Our families go out socially **and attend** social events **together**. We shop together. We attend the same church and worship together.  We share the most intimate detail of each other**'s** lives.  **I was never given any idea how long the no contact restriction would last**. I am advised that to this day, Judge Gordon has not formally lifted the restriction.

33. On or about March 13, 2007, Rickey Stokes ran an article on his web page that stated that the Internal Affairs was investigating a member of the Magistrates office. Shortly after this article appeared Sergeant Gray interviewed me yet a third time. This time he informed me that the purpose of his interview was to determine who leaked information concerning the Internal Affairs investigation of Mary Turner. I assured him that I did not. **The next day, Sgt. Gray questioned me again and** asked if I had spoken to Mary. I acknowledge**d** the one conversation reference above. The interview ended shortly thereafter.

34. Judge Gordon never spoke to me concerning my conversation with Mary**,** Stephen Phelps**'** 2002 ticket**,** or the transmittal sheet which I marked. However, on April 29, 2005 I received

a Discipline Action Report notifying me that **I was terminated** for negligence concerning my involvement with Mr. Phelps' 2002 ticket and for insubordination for contacting Mary Turner.

Further affiant sayeth nothing.

Done this _____day of November, 2007

_____
Mary Beth Brackin

Appeared before me a Notary was Mary Beth Brackin  who stated the above under Oath and under the penalty of perjury

_____
My commission expires_____