**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | |
|---|---|
| NANCY MARTIN and | ) |
| MARY BETH BRACKIN, | ) |
| | ) |
|     PLAINTIFFS | ) |
| | ) |
| vs | ) Case No. 1:05-CV-1175-MEF |
| | ) |
| CITY OF DOTHAN, JUDGE ROSE | ) |
| EVANS-GORDON, in her individual capacity; | ) |
| | ) |
|     DEFENDANTS | ) |
| | ) |
| _____ | ) |

**PLAINTIFF BRACKIN'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. STATEMENT OF THE CASE

Mrs. Brackin seeks partial summary judgment on three issues which are ripe for adjudication. These issues are: (a) whether she is entitled to a declaration that her rights protected by the first and fourteenth amendments to the United States constitution were violated by the defendants suspending her employment and placing her on probation for engaging in protective speech ; (b) whether she is entitled to a declaration that her rights protected by the first and fourteenth amendments to the United States constitution were violated by the defendants terminating her employment for engaging in protested association; and, (c) whether she is entitled to a declaration that her substantive and procedural due process rights protected by the fourteenth amendments to the United States constitution were violated by the defendants first

1

suspending, then terminating,  her for engaging in protected activity and doing so  in a procedurally defective manner.  Every adverse administrative action taken against Mr. Brackin was the direct, though not sole, result of a coercive Internal Affairs investigation[1]. Therefore, each of Mrs. Brackin's claims has police Internal Affairs investigations as a backdrop.

## II. STATEMENT OF THE FACTS

### A. Second Internal Affairs Investigation.[2]

On January 7, 2004 while Mrs. Brackin was manning the front intake desk, Mr., Theron Fondren, a defendant arrested for allegedly failing to comply with a Court Referral Program approached Mrs. Brackin with Harrison Farr his Court Referral Officer (CRO) in toe, Mr. Fondren requested to speak with Mary Beth. Mrs. Brackin acknowledged that she was the person he was seeking.         ( Brackin's Affidavit at 11-12, Exhibit 1.-- Fondren's Internal Affairs transcript pp 6-7).  Mrs. Brackin had no prior acquaintance with Mr. Fondren. ( Brackin's Affidavit at 11, Exhibit 2.  Brackin's deposition excerpts  p.  342)

Mr. Fondren had with him an invoice from a towing company which exhibited a bill of $158.90. (Exhibit 3). Mr. Fondren proceeded to explained to Mrs. Brackin that

---

[1] Mrs. Brackin, as does her co-plaintiff, Nancy Martin, asserts that race was an impermissible factor  in Defendants' adverse employment decision, but she is not seeking summery disposition of her discrimination claims.

[2] The first Internal Affairs investigation directed towards Mrs. Brackin occurred in November 2001and involved an allegation that she discussed a Public Defender's skill and judgment with a defendant and advised her that she could get another attorney. For the reasons stated herein, if such assertions were true, such speech would be protected but since there was no formal disciplinary action as a result of this investigation, and it was not t made a part of Mrs. Brackin's Second Amended Complaint, the facts of this investigation are omitted.

he had been wrongfully arrested. He sought advice from her on how he may proceed and to whom he should speak to get reimburse for his towing fee. (Brackin's Affidavit at 11)

As stated above Mr. Fondren's arrest was due to an outstanding alias warrant issued for his failure to complete CRP. He had been previously found guilty in 2001 of a public intoxication charge, and as part of his probation, he was required to successfully complete the City's Court Referral Program.  Though he had completed all of the required classes, one of the city's magistrates had issued an alas warrant of arrest prior to his returning the Certificate of Completion. When he submitted the Certificate, the warrant was never recalled and remained in the system notwithstanding his compliance. When he was stopped several years later, for improper lights and a seat belt violation, the officer discovered the warrant and arrested him. (Exhibit 1. -- Fondren's Internal Affairs transcript  pp 2-4).

Mr. Fondern desired reimbursement from the City for his towing fee. After listening to his story Mrs. Brackin referred him to the City Clerk. In response to his inquiry what he should tell her, Brackin responded to tell her what you have told me-- that you were wrongfully arrested, and tell her why.  Brackin's Affidavit at 11, Exhibit 4.--Brackin's March 22, 2004 Internal Affairs transcript pp 2-4).

Mr. Fondren on January 7, 2004 presented his bill to the City Clerk with a note stating that he had been wrongfully arrested and that she could ask Mrs. Brackin and Mr. Farr for confirmation. (Exhibit 5.; Exhibit 1 (Fondren's Internal; Affairs  transcript

p. 7). When the City Attorney's office received Mr. Foundren's claim, D. Kevan Kelly, City Attorney, sent a Memo to John White, Police Chief, directing that he investigate Mr. Fondren's damage claim. (Exhibit 6). Judge Gordon was contacted by Internal Affairs, gave her implicit consent to the investigation, and issued a letter dated March 22, 2004 directing Mrs. Brackin to cooperate fully in the investigation (Exhibit 7.).

While Mr. Fondren admitted that Mrs. Brackin had directed him to the City Clerk's office for the processing of his claim[3], he would not affirm whether she had informed him that he was wrongfully arrested:

> GC     Did Ms. Brackin say anything to you about being falsely arrested or being arrested in error or anything of that nature? That you were?
>
> TF     I can't remember. Now Harrison said that it was just a computer problem or something like that. The records didn't get back to the police department or in the computer something like that.
>
> GC     Right, ok and but Ms. Brackin never said anything about your being falsely arrested? Say that there was, that you were arrested in error? She ever say that to you?
>
> TF     I don't know if she said that but that was, that was understood from her conversation with Harrison Farr
>
> GC:  Um, Ok Ms. Brackin ever say anything to you about ah, filing this claim?
>
> TF:  Other than I thing she referred me to the City Clerk's Office. Somebody at the City Clerk's Office gave me the number of, of the Kevin Kelly.
>
> GC: OK

---

[3] Defendant Gordon in her deposition admitted that such limited advice was permissible. See Exhibit 8 Gordon's deposition excerpts at 119. See also Exhibit 9-- Personnel Board Hearing Transcript at 223.

TF:  And I talked to Kevin Kelly and he referred me to Nick Monday.

GC:  Right. OK but Ms. Brackin never said anything about you being falsely arrested? Say that there was, that you were arrested in error? She ever say that to you?

TF:  I don't know if she said that but that was, that was understood from her conversation with Harrison Farr.

GC:  Un Huh. OK. Ah did she ever say anything to you about filing a suit against the city?

TF:  No.

**Exhibit 1**.--Fondren's Internal Affairs transcript pp. 7-8)

Brackin affirmatively denied that she told Fondren that he had been wrongfully arrested or that the City was liable. ((Exhibit 2.--Brackin's deposition excerpts pp.  147-149, 156-157, Brackin's Affidavit at 11-12). Mr. Farr, the CR, was never interviewed. Notwithstanding that neither of the people who were positioned to know confirmed that Brackin commented on the City's liability, or that there had been a  wrongful arrest, Sergeant Coleman of the Internal Affairs Division  issued a "Report" on April 8, 2004 finding:

> It appears Ms. Brackin used poor judgment when instructing Mr. Fondren on how to file his reimbursement claim with the City of Dothan after a written directive was issued. She also admitted her actions to fellow co-workers, McClain and Knight. Based on the evidence, Mary Beth Brackin has possibly violated a Major Offense under the Personnel Rules and Regulations, Section 3-42. (6). <u>Actions or lack of actions that could cause undue financial loss to the City. Negligence in carrying out assigned tasks or duties or responsibilities of one's position.</u>

> **Upon these findings it is believed that Personnel Rule Section 3-42. (6) was violated and this complaint is sustained.[4]**

A copy of this Report and its attached statements was delivered to Judge Gordon. Judge Gordon directed Nancy Martin to draft a disciplinary report against Brackin which referred to matters which predated her ( Martin's ) employment. (Exhibit 10) On April 23, 2004 Judge Gordon issued a "Determination" resulting in Mrs. Brackin ten day suspension, without pay, and being placed on two year probation. ( Exhibit 11).

## B.  Third  Internal Affairs Investigation

On or about March 3, 2005 Judge Gordon caused the Internal Affairs Division to conduct a third investigation  this one was concerning whether Magistrate Mary Turner had fixed  Bradley Phelps'  traffic ticket in return for work done on her home.[5] During the investigation, Bradley's brother, Stephen, informed the investigator that Mrs. Turner had once, in November 2002, helped him with a ticket. This resulted in a collateral investigation regarding the processing of his brother's, Stephen Phelps, traffic ticket..(Exhibit 12). It was subsequently discovered that Stephen's ticket was never processed administratively. .

The following history of this ticket is provided as background in support of Brackin's procedural due process claim and not to advance an arbitrary or capricious

---

[4] Exhibit 24.
[5]  Mr. Turner was never formally charged with ticket fixing but improperly handling a record, a misdemeanors offense.

claim[6] though premising Brackin's job loss on the processing of this ticket was, under the facts of this case, both arbitrary and capricious. Among Brackin's, and other administrative staff, responsibilities included the processing of traffic tickets, several thousand each year. (Exhibit 8.--Gordon's deposition excerpts at 167.) In the normal course of processing traffic tickets, this presents few problems. There is, however, the occasional case where normal protocol is unavailing. Stephen's ticket was one such occasion.

The history of this traffic citation rests, in large measure, upon the memory of several people, each of whom had a hand in the processing this ticket. Memories fade after the passing of time, especially after the processing of thousands of tickets and criminal complaints. Brackin admitted that she didn't recall the specifics of this ticket since it had no particular import to her. (Exhibit 4.—Brackin's Internal Affairs transcript p 11).

On November 4, 2002 Officer Eric Duhaime, then employed by the City of Dothan Police Department, issued a citation for a speeding violation ( Exhibit 9 Personnel Board Hearing Transcript at 60.). Subsequent to issuing this ticket, Officer Duhaime delivered copies of this and other tickets to. Brackin. (Id at 62). After turning over his tickets, Officer Duhaime remembered receiving a telephone call from another Magistrate, Mary Turner. Mrs. Turner inquired whether he would be willing to void the ticket. Officer Duhaime's response was "I don't care" (Id. at 64).

---

[6] However, such claim is advance under a substantive due process analysis with respect to Brackin's job loss due to the placement of a single job related telephone call.

According to Officer Duhaime, the Magistrate who asked him to void the ticket also inquired whether he would come back to pick up the copies of the tickets that he had left at the Magistrate's office.  His response was to "just to send them to me in an office mail, that way I would have all of the copies, to include his." (Id. at 65). He subsequently received the copies in the mail. (Id).

Officer Duhaine in November 2002 was unaware that he lacked the discretion to void tickets or that he was violating any law. (Id. at 74-75). The Officer expected that the entire process would be voided when he requested the return of the tickets.

> Q.  When you told her it was okay, send me the ticket back, mail them back, this is your          testimony, you in essence, said it was okay to just void that because the ticket was going to be voided out?
>
>   A. Right.
>
> Q.  Basically, that notation of void reflects the reality that exists at the time correct.
>
>   A. Right.

**(Id. at 75).**

The record is silent on who retrieved the ticket, and/or who mailed the ticket to Officer Duhaine.  The only evidence which tie. Brackin to the ticket is that they were turned in to her and she printed "void" on the transmittal sheet. However, in spite of the fact that this ticket was processed in November 2002, and there was no evidence that Brackin did any thing to the ticket, the Internal Affairs investigator, Sgt. Keith Gray, after a vigorous interrogation of   Brackin, on May 2, 2005 issued a "Report" (Exhibit

13) which found that it was more likely than not that   Brackin had violated Section 3-42 (6) Negligence in carrying out assigned task. Without further review, Judge Gordon accepted this determination and listed it as a Major Offense occurring within two years of the time that Brackin was last placed on probation, and, therefore warranted termination. The Alabama Court of Civil Appeals subsequently threw out this offense finding that it did not occur within two years of the time that Brackin was placed on probation. As to the "negligent" transmittal entry, the Court of Appeals decision is the law of the case.

## C. Fourth Internal Affairs Investigation

Shortly after Internal Affair started its investigation of Turner, the officer assigned to the investigation, Sergeant Gray met with the Judge and suggested that she instruct the staff not to discuss the investigation with anyone. He also told her that no one was to contact Mrs. Turner during the investigation   The Judge so instructed the staff and later memorized her statement to them. In this memorization she claimed that she gave the staff the following directive:

> On or about March 10, 2005 at approximately 1100 hours I met with the staff of the Magistrates office in the presence of Michelle Sellers. All employees ere present except Ms. Mary Turner who was on administrative leave at the time. I instructed these employees to strictly refrain from any contact with Ms. Turner while the internal investigation conducted by the Dothan Police Department was underway. I further instructed that no discussion with anyone regarding this matt was to take place. I made no mention of what the allegations might be, nor did I mention any investigator by name, saying merely that investigators from the police Department would be conducting the inquiry and that the

employees of my department were to respond truthfully to any
question put to them by the investigating officer(s)[7].

When asked during his deposition whether there were any exceptions to this "no
contact "directive, he thought that it was all inclusive. (Exhibit 14 Gray's deposition
excerpts at 122). Further, any exceptions would be up to the Judge and must be
precleared through her. (Id at 123-124). He was aware at the time that Brackin and
Turner were close friends. (Id at 123).

Subsequent to Sergeant Gray's criminal investigation of Turner concerning the
alleged "fixed ticket" the following article appeared on Rickey Stokes' (a local
bondsman)  web site:

**Dothan Police Internal Affairs Conducting Investigation**

**DOTHAN:** Unconfirmed - the Dothan Police Department is currently
conducting internal affairs investigation into the Judicial Department
of the City of Dothan. Unconfirmed information is that Sgt. Keith
Gray is conducting the investigation.

**NOTE**: Gray recently made racial discrimination allegations against
the City of Dothan. Confidential sources have indicated some
reverse racial discrimination might be on going within the Judicial
Department.

Sources have said the investigation is concerning allegations that a
ticket was dismissed in exchange for some work to be done on a
municipal court employee's residence. When the work was not
performed, warrants were issued and the person arrested.

Judge Gordon nor the employee which is under investigation has
been asked about this. Dothan Police Chief John Powell was just
sworn in on Tuesday afternoon and we have not spoken with him
concerning the investigation. Dothan City Manager Mike West is in
Washington D.C. this week and we have not contacted him
concerning this investigation. However, unnamed sources have

---
[7] Exhibit 15

confirmed that the investigation is on-going.

The Judicial Department is under the supervision and control of Dothan Municipal Judge Rose Gordon. The department has been the center of problems over the past couple of years. The department has been unable to keep someone as the Municipal Court Administrator for any period of time.

The most recent Municipal Court Administrator was Dothan resident Nancy Martin. She came to the magistrate office from Legal Services. Martin remained in her position for six months and, according to sources, was making very significant progress in the Dothan Magistrate's Office. The office was becoming efficient and organized. When the six months was up, Gordon gave Martin a unsuccessful review and Martin's employment was terminated. Sources have said Gordon's review was that Martin made decisions without consultation and input from Gordon. Some sources say that Martin was putting Gordon's pet employees to work and they were constantly complaining to the Judge, and that is the reason for the bad review and termination.

Keep watching for more articles as the information develops.

Date of this item added :

2005-03-16

Immediately after this article's publication, Internal Affairs open up a fresh investigation to get to the bottom of who leaked to Rickey. Officer Gray interviewed each member of the judicial staff save Judge Gordon and Michelle Sellers. Each of the staff members was provided some variant of the following preliminary statement by Sergeant Gray:

This investigation is being conducted solely to identify who may have released any information regarding the investigation of Mary Turner.

Sergeant Gray acknowledged that any employee who spoke about the investigation among themselves or to other third parties had violated the Judge's directive. (Id at 99 and 111). Gray's investigation reveled that many of the judicial staff violated the "non disclosure" portion of Gordon's March 10, directive, Gray so informed the Judge, no administrative action was taken.. (Id. at 96, 100, Exhibit 8-- Gordon's deposition excerpts at  346-358). Though the exclusive purpose of Gray's investigation was to learn who had violated the Judge's non disclosure directive, and several of the staff did, Sergeant Gray did not acknowledge, in his Investigative Report, that these employees had committed insubordination. (Id at 100).

When Sergeant Gray spoke with Brackin she admitted that she had contacted Mary Turner for the purpose of obtaining a template for contacting defendants. Brackin had inherited most of Turner's duties during her absence. This admitted limited contact had nothing to do with the criminal investigation or the leak of information concerning the investigation. (Brackin Affidavit at 16). To Sergeant Gray in the first instance, and Judge Gordon later, the "why" of the contact didn't matter, it was enough that contact had been made. Indeed as late as October 30, 2007 when Judge Gordon sat for her deposition she did not know what Mrs. Brackin communicated to Mrs. Turner, nor had she ask her:

```
0345
1   A.  No.
2        MS. NELSON:  Object to the form.  That was
3           not the testimony.
4   Q.  You didn't adopt their recommendation?
5   A.  No.  I mean, I would have -- I would have
```

```
6        looked at their report, but I would not
7        necessarily have adopted the recommendation
8        that she be terminated.
9    Q.  Well, do you know for a fact whatever contact
10       Ms. Brackin had with Ms. Turner, whether or
11       not that interfered with the police
12       investigation?
13   A.  Do I know for a fact?
14   Q.  Uh-huh (positive response).
15   A.  No.  I don't know what she communicated to
16       Ms. Turner.
17   Q.  Did the police share with you the results of
18       their complete investigation?
19   A.  I'm sure they did.
```

(Exhibit 8.--Gordon's deposition excerpts at  p. 345)

Judge Gordon adopted Sergeant Gray's findings that  Brackin had violated her  no

contact directive[8] with no further review or an examination of the record to determine if

---

[8] Of course Judge Gordon  vociferously  disputed that she adopted Sergeant Gray's no contact suggestion:

```
19   A.  I'm reticent about saying it was my no-contact
20       directive.  I didn't -- you know, it wasn't at
21       my behest or my initiation.  I simply did what
22       the investigators told me was necessary at the
23       time.  So I don't --
0332
1    Q.  Well, you adopted that no-contact directive,
2        didn't you?
3          MS. NELSON:  Object to the
4            characterization.  She said she --
5            adopt, she never said she adopted it.
6          MR. JAFFREE:  I'm asking her.
7          MS. NELSON:  She said she communicated it.
8          MR. JAFFREE:  I'm asking her.
9    A.  I communicated it.
10   Q.  Did you adopt their no-contact directive to
11       you as your no-contact directive?
12          MS. NELSON:  Object to the form.  She's
13            testified as to what she did.
14          THE WITNESS:  Right.
15   Q.  There's -- no, no.  Right?  Yes or no, did you
16       adopt their no-contact directive --
17          MS. NELSON:  Object to the form.
18   Q.  -- as your no-contact directive?
19   A.  I wouldn't say I adopted it.  But, you know,
20       they're criminal investigators.  If they come
```

21      in there and say, go tell them not to talk to
22      Mary, not to come to that computer, I wouldn't
23      have said, no, I'm not going to do that.
0333
 1   Q.  Did you --
 2   A.  So I did not adopt it.  I'd simply
 3      communicated the no-contact order that was
 4      communicated to me by the criminal
 5      investigators.
 6   Q.  Did you initiate --
 7   A.  I did not.
 8   Q.  Well, can I finish my question?
 9       Did you initiate any disciplinary action
10      because your no-contact directive was
11      breached?
12   A.  Did I initiate any disciplinary action because
13      "the" no-contact order was breached?
14   Q.  Yeah, because the no-contact order was
15      breached?
16   A.  I don't remember.
17   Q.  Did you charge somebody with insubordination
18      because the no-contact order was breached?
19   A.  Yes.

22   Q.  If you didn't adopt it, why did you discipline
23      somebody for its breach?
0335
 1   A.  Because it was in place at the time.  I
 2      communicated it.  And I told them, you know,
 3      do not contact Mary.  And I told them that the
 4      investigators said, you know, not to contact
 5      Mary, it was an investigation.
 6          And your client, Mary Beth Brackin, said,
 7      why are you looking at me?
 8          I said, because I know that you and she
 9      are friends, and if you want to contact her,
10      let me know.  I told Mary Beth that in front
11      of every magistrate.  And every one of them
12      will tell you that I told her that because she
13      was the only one that spoke out and said, why
14      are you looking at me.
15          I said, because I know you and Mary are
16      friends.  And if you want to contact her, let
17      me know.
18          And she didn't say a word.
19   Q.  Did you expect staff, including Ms. Brackin,
20      to use their own discretion on what contacts
21      with Ms. --
22   A.  No.
23   Q.  -- Turner was permissible?
0336
 1   A.  No.  It was clear that they were not to
 2      contact her or go in her office.
 3   Q.  Did you intend your directive to be all
 4      inclusive, sweeping, and cover the universe of

the record supported his findings[9]. In essence she abdicated her responsibility as

Department Head;

### PAGE 358

### 10    Q.   Well, are you soliciting that the report just

---

```
5       possible contacts?
6    A.  No.  That's why I gave her the option of
7       contacting her after hours.
8    Q.  Did you say, no, that she was free to contact
9       her after hours?
10   A.  She never asked.
11   Q.  Was she free to contact her after hours?
12   A.  If she had asked, possibly.
```

[9]Exhibit 75 Gordon's Deposition  at 344-45.

```
11   Q.  Did the police report that you received
12      recommend that you terminate Ms. Brackin?
13   A.  I don't remember specifically.
14   Q.  Did you do any further or make any further
15      inquiry after you received the police report
16      to make an independent assessment of whether
17      or not Ms. Brackin should be terminated?
18   A.  Which -- Ms. Brackin's termination?  No, I did
19      not do any further investigation of the facts
20      of any investigation.  I didn't go behind them
21      and investigate any more.  No.
22   Q.  So if they recommended termination, you
23      adopted their recommendation?
0345
1    A.  No.
2         MS. NELSON:  Object to the form.  That was
3            not the testimony.
4    Q.  You didn't adopt their recommendation?
5    A.  No.  I mean, I would have -- I would have
6       looked at their report, but I would not
7       necessarily have adopted the recommendation
8       that she be terminated.
9    Q.  Well, do you know for a fact whatever contact
10      Ms. Brackin had with Ms. Turner, whether or
11      not that interfered with the police
12      investigation?
13   A.  Do I know for a fact?
14   Q.  Uh-huh (positive response).
15   A.  No.  I don't know what she communicated to
16      Ms. Turner.
17   Q.  Did the police share with you the results of
18      their complete investigation?
19   A.  I'm sure they did.
```

```
11      had a narrative of the police and no
12      documents?
13   A.  Let me be honest with you.  I don't
.        remember
14      seeing this.  I thought there were like --
15      MS. NELSON:  This is being Plaintiffs'
16      Exhibit 8?
17   A.  -- disks or something but not this.
18          MS. NELSON:  Have you not seen --
19   A.  If there was, I didn't look at it.  I'm
20      sorry.  I just looked at the report.  I didn't
21      read the individual interviews or anything
22      like that.
23   Q.  So you just took the police officer's word and
0359
1       made a decision on the basis of what the
2       police officer told you without reading any
3       testimony itself?
4    A.  Well, the results of their investigation
5       revealed that -- whatever.  Yes.  I just
6       looked at that.  I didn't go back and look any
7       further at the investigation.
```

(Exhibit 75 Gordon's Deposition p. 358-59)

During her deposition the Judge equivocated on whether the no contact mandate was all inclusive. She suggested that after-hours contact may have been permitted if pre-clearance was obtained. Gordon was of the opinion that the Internal Affairs investigators had to make the call on exceptions. Sergeant Gray on the other hand stated that any exception was the judge's call. The problem with this possible exception was that it was inconsistent with the stated purpose of the no contact—keeping Mary Turner from instructing staff to delete records from the computer. (Exhibit 14--Gray's deposition excerpts at 112, 123-124, Exhibit 8--Gordon's deposition excerpts at 318-326, 326, 329-330, 332-336). Sergeant Gray stated Judge Gordon was notified in May, 2005 that Turner's investigation was complete. In her deposition, Judge Gordon could

not recall whether she ever notified the staff that the no contact directive had been lifted.(Id at 340-342)

## III. LEGAL ANALYSIS.

### A. *Summary Judgment Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1259 (11th Cir. 2004) (citing *Allen v. TysonFoods,* 121 F.3d 642,646 (llth Cir. 1997); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,248 (1986)). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* A court must decide ""whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

The moving party bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 323 (1986).     Where the nonmoving party bears the burden of proof at trial, the moving party may discharge its "initial responsibility" by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437-38 ( 11th Cir. 1991). To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must then come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. Atlanta,* 2 F.3d 1112, 1116 (11th Cir. 1993). On summary judgment, "the district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences ... in his favor." *Four Parcels,* 941 F.2d at 1428.

### B. Argument Presented

#### 1. Suspension/Probation; Free Speech Implicated

In Count One of Plaintiffs' Complaint, Mrs. Brackin seeks recourse from a first amendment free speech violation.  Brackin was suspended for 10 days without pay for statements that she made to a City defendant, Theron Fondern who had approached her seeking relief for what he considered to be a wrongful arrest by the City police and their subsequent towing away his motor vehicle. He was only seeking reimbursement of the towing fee.

To determine whether Brackin has an actionable claim for the infringement of her first amendment free speech rights, the Court must determine

first, based upon "the content, form, and context of the statements that she made to Fondren, as revealed by the whole record,"[ See *Connick v. Myers,* 461 U.S. 138, 147-148,(1983)] whether she was speaking "as a citizen upon matters of public concern." Id. at 147. The Supreme Court has distinguished between disciplinary actions taken by a public employer that require judicial scrutiny to ensure "that citizens are not deprived of fundamental rights by virtue of working for the government," and disciplinary actions for which public employers enjoy wide latitude in managing their offices. Id. "To be protected, the speech must be on a matter of public concern . . . ." *Waters v. Churchill,* 511 U.S. 661, 668 (1994).

If a court determines the speech to be on a matter of public concern, then the court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). In addition, "the employee's interest in expressing herself on [the] matter must not be outweighed by any injury the speech could cause" to that interest. *Waters v. Churchill*, supra at 668. This, at a minimum, requires an examination into the content of the speech. When comparing the interest of both Brackin in delivering the speech and the receiver in obtaining it with the interest

of the City ( the $158.90 damage claim) the balance must be struck in favor of the speech maker.[10]

As this Court noted in its Memorandum and Order issued on October 27, 2006,  "A government employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social, or other concern to the community' quoting *Connick v. Myers* supra at 146. Of course each case must be accessed on its on merit and the balancing is fact specific, focusing both on the nature of the employee's speech at issue and the nature and extent of the disruption it causes.  *Bryson v. City of Waycross*, 888 F.2d 1562, 1565-67 (11th Cir. 1989).

Brackin informed Fondern that he could file a claim with the City Clerk if he felt that he was wrongfully arrested and because of such arrest he suffered damages. It could hardly be doubted that citizens have an interest in knowing that if they have a grievance against the City that these grievances can be addressed. That interest extends to being provided the procedures necessary for addressing them. Any interest that the City has in keeping this information from its citizenry must pale in the face of the overwhelming need for the citizens to be able to petition their government for relief. The City has not articulated a comparable countervailing interest.

---

[10]  This is true even if the potential liability of the City was much greater than the $158.90 towing fee. The City does not have a great interest in evading responsibility for its own negligence.

It is no defense that only Fondren was made aware of, and could benefit from the content of Brackin's speech. The Court noted specifically in *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 916 (11th Cir. 1993), that public awareness of the problem was not necessary to satisfy the public concern requirement. See also *Morgan v. Ford*, 6 F.3d 750, 754 n.5 (11th Cir. 1993) ("[A] court cannot determine that an utterance is not a matter of public concern solely because the employee does not air the concerns to the public."); and, *Deremo v. Watkins*, 939 F.2d 908, 911 n.3 (11th Cir. 1991) (stating that an employee's effort to communicate her concerns to the public is a relevant, but not dispositive, element in the public concern analysis).

Similarly, the public ( Fondren) had an interest in knowing that because of defective procedures and/or malfeasance on the part of City employees there is a heighten risk that citizens will be falsely or otherwise wrongfully arrested. This is true even if the risk assessment is a matter of opinion or speculation.  As the Court noted in *Stanley v. City of Dalton, Georgia*, 219 F.3d 1280, 219 F.3d 1280 (11th Cir. 2000)] the fact that the speech may be speculation does not rob it of the protection.

Brackin's suspension notice (Exhibits 10 and 11) informed her that she was faced with suspension not only because she had informed Fondren that he had been "wrongfully arrested" but also that another employee was negligent.

Though there is no evidence in the record that she actual informed him of this, if she did, her statements still would have been protected speech.

Brackin was charged with what she allegedly told Fondren, not what she may have told a co-worker. Fondren was never asked whether Brackin commented on the staff member who caused his purported "wrongful arrest" or whether she told him that the City was liable. He responded negatively when asked whether Brackin encouraged him to sue the City. Brackin has denied that she informed him of anything more than his right to seek recourse, and, where he should go to file such a claim. However, even if the evidence was undisputed that she had informed him that he was wrongfully arrested, and that a City employee negligently caused his arrest, these statements too would be protected speech.

If Brackin was in error in informing Fondren that he had been falsely arrested, the speech, if sincerely believed, would be protected. As noted in *Stanley v. City of Dalton, Georgia*, 219 F.3d 1280, 1289 (11th Cir. 2000) the fact that the speech may be speculation does not rob it from the protection.

In *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir.1989) the Court recognized that where the state denies discharging the employee because of speech, a four-stage analysis has evolved. At the first stage, the court determines the threshold issue raised in *Pickering*, whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." The court examines the content, form, and context of the employee's

speech to determine whether it addresses a matter of public concern. Second, if the speech addresses a matter of public concern, the court then applies the second prong of *Pickering*, the balancing test, weighing the employee's first amendment interests against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." The context and circumstances of the employee's speech must be considered. If the public employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a "substantial part" in the government's decision to demote or discharge the employee. See *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274,284 (1977). Fourth, if the employee prevails by showing that the speech was a substantial motivating factor in the state's employment decision; the state must prove by a preponderance of the evidence that "it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 286. This fourth stage has been referred to as a "but for" test; the employer must show that "its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 249 (1989). Here, there was no "other reason". The speech itself was the "sole" reason for the adverse employment action.

If the City prevails in convincing the Court that it suspended Brackin,, in part, because of her disparagement of other co-workers, then that too is subject

to a balancing analysis. In *Maples v. Martin*, 858 F.2d 1546, 1553 (11th Cir.1988), the Court found protected speech Plaintiff's criticism of the curriculum, inadequate facilities, low faculty to student ratio, poor performance of graduates on a licensing exam, the ability of his department to prepare students for professional careers, and the status of accreditation. See also *Eiland v. City of Montgomery*, 797 F.2d 953, ( 11th Cir.1986) ( a co-worker criticism case.) and , *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996) (finding a police officer's complaints to officials, including the Alabama Bureau of Investigation, regarding police misconduct to be a matter of public concern).

The Plaintiff in *Eiland* supra posted a humorous poem in three locations in the police station criticizing Mayor Emory Folmar and his police bodyguards. The district court determined that to the extent the poem criticized Mayor Folmar, it was constitutionally protected speech, but to the extent that it criticized the police bodyguards, it was not. In reversing the district court, and finding all of the speech protected, the Eleventh Circuit stated:

> Once this factor is recognized, we conclude that a higher showing of potential disruption was required than was shown here in order to conclude that the appellee's interests outweighed the appellant's interests in his constitutionally protected speech. The unequivocal testimony adduced at trial was that the poem had only two potentially disrupting consequences. The first was that it precipitated an investigation into who was responsible for it comprising a sum total of approximately four to six hours work by two

> officers. This work was of the sort the officers might otherwise undertake, …, and we perceive this effect to be of minor consequence. The second consequence was the possibility that the speech was perceived as exhibiting a general disrespect for fellow officers. This concern is associated with the paramilitary nature of a police department and the need to preserve departmental respect and discipline. But the need for discipline as an abstract concern should not be allowed to overshadow individual interests in free speech unless the department's "true interest" in suppressing the speech in this regard can be isolated and verified.(citations omitted).

Id at 958-59

Neither the City nor Judge Brackin has articulated a reason why the interest of the employer outweighs the interest of Brackin in informing the public of their rights and/or the wrongs that has been committed against them or, correspondingly the right of the public to know. The Defendants have not thus far relied on a countervailing superior interest but instead have argued that the speech itself was not protected. Brackin is entitled to recover on Count One of her Second Amended Complaint.

2. **Restraint Upon Association**

Brackin was caused to suffer grievous job loss because she did not comply with Judge Gordon's directive to have no contact with Mary Turner. Count Three of her Second Amended Complaint seeks recourse from this action, which Brackin claims infringed upon her associational rights protected by the first and fourteenth amendments to the United States Constitution.

There is no serious dispute that Mrs. Brackin and Turner were close personal friends. Their relationship can be considered "intimate" in a non physical manner. It extended far beyond the confines of the workplace. They communicated with each other on a regular basis. Frequent visitation was the norm. They went to social affairs together. They shopped together. They shared confidences. They worshiped together. In short their relationship can not be considered causal. (Brackin Affidavit at 16-17, Exhibit 8 Gordon's deposition excerpts at 335).

There is a factual dispute regarding whether Judge Gordon on March 10, 2005 informed the staff that after-hour contacts with Turner may be permitted if prior approval was sought. However, Gordon wouldn't emphatically commit that such approval would have been granted if requested. (Exhibit 8 Gordon's deposition excerpts at 336).  However such pre-clearance capability does not reduce the chill or the infringement of the right.

Unlike free speech interest, there is no need for Brackin to establish a reasonable inference that the association claims implicated matters of public concern. Associational activity need not relate to matters of public concern for first amendment protections to apply. *Hatcher v. Board of Public Education and Orphanage*, 809 F.2d 1546, 1558 (11th Cir. 1987) (holding Connick inapplicable to freedom of association claims).

The Constitution accords protection to two different forms of association, "intimate association" and "expressive association." *Roberts v. United States Jaycees*,

468 U.S. 609, 617-18, (1984); *City of Dallas v. Stanglin*, 490 U.S. 19, 23-25, 109 (1989). *Roberts* teaches that the right of intimate association--the freedom to choose to enter into and maintain certain intimate human relationships--is protected from undue governmental intrusion as a fundamental aspect of personal liberty. *Roberts*, 468 U.S. at 617-20,

The right of expressive association--the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion etc. --is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms. Id. at 617-18, 622.

The concept of "liberty," embodied in the Constitution, includes a right to freely associate with whom one pleases. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the `liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). As such, this constitutional right may be limited only when "a compelling state interest in the regulation of a subject within the State's constitutional power to regulate exists." *NAACP v. Button*, 371 U.S. 415, 438, (1963).  Generally, when a governmental action burdens fundamental constitutional right, the action is subjected to the strictest of scrutiny and is therefore deemed to infringe those rights unless shown to be narrowly tailored to serve a compelling government interest. *Austin v. Michigan*

27

*Chamber of Commerce*, 494 U.S. 652, 666,  (1990); *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979). There was no narrowly tailoring here.

Judge Gordon's "have no contacts with" instruction was as broad as it was definitive. If the purpose was to prevent file tampering, as claimed, then it was not narrowly tailored. If there was an articulated or unarticulated after-hours exception then such exception would swallowed the purpose. Judge Gordon, acting in her administrative capacity, simply had no authority to order   Brackin to cease all contact with her friend.

The right to association protects the close ties between individuals from inappropriate interference by the power of the state. *Roberts* supra at 619.  The right to intimate association "reflects the realization that individuals draw much of their emotional enrichment from close ties with others," ties that allow for the cultivation and transmittal of shared beliefs. *Id.* at 619.

It is no defense that Brackin's relationship with Turner was not that of a spouse or family member. The Supreme Court has declined to restrict the right to intimate association to the family context. Instead of adopting a categorical approach, the Court has instructed that relationships must be "locate[d] . . . on a spectrum from the most intimate to the most attenuated of personal attachments." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987). Criteria used to measure the strength

of an association's interest in intimacy include "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." *Id.*

Any restriction on Bracken's right to associate with Turner, should have been closely drawn in order to avoid unnecessary abridgement of associational freedoms. *Elrod v. Burns*, 427 U.S. 347, 362-63 (1976). The restriction here was not closely drawn to effectuate a legitimate governmental purpose; therefore, Brackin has established her right to the relief sought and the question of her termination for impermissible contact is ripe for summary disposition.

**2. Procedural Due Process**

**(A). Partial Decisionmaker**

Count Four of Brackin's Second Amended Complaint asserts a claim premised, in part, upon the financial loss which she suffered a result of the forced 10 day uncompensated suspension which occurred as a direct and proximate result of the coercive, unwarranted and unofficially approved police interrogation to which she was subjugated in violation of procedural due process. This claim is now ripe for adjudication.

To prevail, Brackin must establish that she had a property right entitlement to continued employment. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972). "State law determines whether a public employee has a property interest in his or her job." *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir.1991). Under Alabama law, a public employee generally has no protectable property interest unless he or she is

employed under a civil service system, which allows termination only for cause. *Brock v. DeBray* 679 So.2d 673, 676; (Ala. 1996). );   See also *Ross v. Clayton County, Ga*., 173 F.3d 1305, 1307 (11th Cir. 1999) ("Generally, a public employee has a property interest in continued employment if state law or local ordinance in any way limits the power of the appointing body to dismiss an employee." (citation and internal quotation omitted)[11].   There is no dispute here that Brackin was in the City's classified service at the time of her termination, and, as such, she was entitled to some measure of due process prior to the loss of a job related benefit. The question then becomes, what process was due?

Similar to the reasoning in  *Goss v. Lopez*, 419 U.S. 565, 574 (1975), an employee facing a deprivation of his property rights must be afforded due process. (fn19) Id. at 579. A fair hearing in a fair tribunal is a basic requirement of due process. *In re Murchison*, 349 U.S. 133, 136 (1955). The decision-maker who presides over the hearing must be impartial. (fn20); *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir.1994) (en banc).   Indeed an impartial decision-maker is a basic constituent of minimum due process. *Davis v. Monroe County Bd. of Educ*. 120 F.3d 1390,1393, n20 (11th Cir 1997).

Sergeant Gary S. Coleman, of the  Internal Affairs Division of the City Police Department, conducted the interrogation of Brackin, interviewed all other witnesses,

---

[11] In her October 30, 2007 deposition, Judge Gordon admitted that  Brackin was a merit system employee in the classified service and as such had a property right in continued employment (See Exhibit 8 Gordon's Deposition at 61, 129 and 131).

and, gave his report and recommendations to his police Chief who provided the

"complete report" to Judge Gordon[12]. Sergeant Colman wrote in his report:

> **It appears Ms. Brackin used poor judgment when instructing Mr. Fondren on how to file his reimbursement claim with the City of Dothan after a written directive was issued. She also admitted her actions to fellow co-workers, McClain and Knight. Based on the evidence, Mary Beth Brackin has possibly violated a Major Offense under the Personnel Rules and Regulations, Section 3-42. (6). <u>Actions or lack of actions that could cause undue financial loss to the City. Negligence in carrying out assigned tasks or duties or responsibilities of one's position.</u>**
>
> **Upon these findings it is believed that Personnel Rule Section 3-42. (6) was violated and this complaint is sustained.[13]**

Sergeant Coleman was given the sole responsibility for determining whether .

Brackin informed a citizen that he had been wrongfully arrested. It was this same police

officer who identified which "Major Infraction", occurred. Sergeant Coleman's

articulated rule violation was adopted unquestionably and without further review by

Judge Gordon[14]. In essence it was Sergeant Coleman who was the fault finding

decision-maker whose  decision let to the suspension of Brackin and her being placed

on two year probation. Sergeant Coleman became not only an instrument in the

administrative disciplinary procedure, but the ultimate fact-finder and decision-maker.

This is not a *Nash v. Auburn University*, 812 F.2d 655 (11th Cir. 1987) type case where

the decision-maker only had "some knowledge" of the facts based upon his

---

[12] Exhibit 16.

[13] Exhibit 17.

[14] Judge Gordon's "notice of Charges" delivered to Mrs. Brackin stated, in part, that "you (Brackin) advised Mr. Theron Fondren … that he was wrongly arrested and that another employee was negligent regarding his case….This is in violation of City of Dothan Personnel Rules and Regulations Section 3-42(6) action(s) or lack of action(s) that could cause undue financial loss to the City, and Section 3-42(14), insubordination." Exhibit 11.

31

participation in the investigation. Since the City provided Brackin   no additional meaningful review beyond the Appointing Authority stage,[15] the procedure offered Brackin prior to placing her on 10 day suspension and two year probation was woefully inadequate.  Brackin was not provided the "(b)asic fairness and integrity of the fact-finding process (which ) are the guiding stars".  *Boykins v. Fairfield Board of Education*, 492 F.2d 697, 701 (5th Cir. 1974), cert. denied, 420 U.S. 962, (1975. This failure to provide, as applied to the facts of  this case, for an impartial decision-maker who would, in a detached manner,   review all of the evidence,   was a denial of procedural due process.

### (B). Failure to Follow City's Regulations

Shortly after her appointment, Judge Gordon implemented a policy to use the city's police investigative unit as part of her office's disciplinary procedure. This in spite of her recognition that there is no formal role between the city police and the Judicial Department. (Exhibit 8--Gordon's deposition excerpts at 94).  The reason that she advanced was to insolate her from charges of bias. Yet it was she who  decided when and if an investigation was needed, the target of the investigation and whether to

---

[15] Section 22 of the Civil Services Act of the City of Dothan, which doesn't permits personal advocacy, provides:

> Section 22. SUSPENSIONS. An appointing Authority may, from time to time, suspend an employee without pay or other compensation, as punishment for improper behavior, but no employee may be suspended for a period or periods within the aggregate of more that [sic] 30 days in any year's service. A Suspension may be effected by serving written notice upon the employee together with a statement clearly setting forth the causes thereof; a copy of which must be forthwith mailed or delivered to the Director. The suspended employee may file with the Board and the Appointing Authority a written answer or explanation of the assigned charges and such answer shall be preserved as a part of the Public Record and the Board may, for cause shown, set aside such suspension order.

accept the investigative findings. Further, as the Appointing Authority (Department Head) she had the sole right and responsibility to make the ultimate call on whether and how discipline should be administered[16] The regulations Bork no role for the internal affairs in determining whether employees of another department has violated  non criminal administrative rules..

The lack of authority for Judge Gordon to use the city police as her investigating force for prospective administrative discipline cases is apparent  from a cursory reading of   Civil Service Act of the City of Dothan and its' implementing Rules and

---

[16]  Dothan's Civil Service Act Section 21   and Section 22 (footnote 4, above) vest in the Appointing Authority the sole discretion whether to administer discipline. Section 21 provides:

> Section 21. DISCHARGES. (I) The Appointing Authority may discharge an employee in the Classified Service, whenever he considers the good of the service and the welfare of the city will be best served    \ thereby, by making and filing in his office an order to that effect together with the reasons assigned for the discharge, however, the power to discharge shall not be capriciously or arbitrarily exercised in any case; a copy of such order and the reasons assigned shall be served upon each the employee and the Director before the effective date thereof; and a copy served upon the Director shall be filed and retained in this office as a Public Record. The discharged employee may, within ten days after receipt of the discharge notice, appeal the action of the Appointing Authority to the Board, by filing a written answer to the chairman with a demand for a hearing. It shall be the duty of the Board to fix a time and place for hearing on the appeal, and to give notice thereof to the employee and the Appointing Authority, which appeal shall be heard by the Board on a date not later than thirty days from the date the appeal is taken. The Personnel Board shall have the authority, after an appropriate hearing, and based upon a finding of the facts and applicable law involved, to reduce the severity of the disciplinary action taken by the Appointing Authority, and issue such orders and decrees with reference thereto as may be just and reasonable, and for the best interest of the City. The findings of fact by the Board, based upon its records, and the testimony taken before it, shall be conclusive if supported by substantial evidence. If the Appointing Authority is sustained by the Board, the discharge shall be final as of the date thereof; if the discharge is not sustained; the employee shall continue in the service of the City and shall be entitled to full compensation. (II) A person in the Classified Service may also be removed or disciplined in the following manner: Charges may be fifed with the Director by any officer, citizen, or taxpayer of the city and the Director shall, after an investigation, certify the charges filed, together with the results of his investigation, to the Personnel Board and said Board shall set a day for a public hearing on such charges. The Board shall on the date fixed receive testimony offered in support of and in denial of such charges      v and from such testimony make a finding of the facts and applicable law involved, in writing, and make such orders and decrees with reference thereto as may be just and reasonable and for the best interest of the city. The findings of fact by the Board, based upon its records and the testimony taken before it, shall be conclusive if supported by substantial evidence. (Ill) If a person in the Classified Service relies upon a direct order by a superior; (a) as a defense or excuse for the violation of any of the provisions of this Act or the Rules and Regulations adopted there under, or (b) an omission to observe the provisions of this Act or Rules and Regulations adopted there under, he must establish such direct order of a superior to the reasonable satisfaction of the Board.

Regulations. Initially, the Act vest in the Personnel Department the power to govern, supervise and control all individuals in the Classified Service[17].  Section 8 of the Act further empowers the Personnel Board to    (b) adopt rules and regulations for the administration of the provisions of this act and (j) to conduct hearings and render decisions, on charges preferred against persons in the classified service. Finally, the Act provides for discharges and suspensions by the Appointing Authority (here-- Judge Gordon), however such discharges, and suspensions, can not be arbitrarily or capriciously exercised. See Sections 21 and 22[18].  The Act contemplates that there must be some wrong-doing that is adverse to the City's (employer's) interest before discipline can be administered.

The Personnel Board Rules and Regulations provide the use of the Internal Affairs Division to conduct investigations of Departments other than the Police Department but in very limited circumstances, and only upon approval of the highest authority.  Section 11-60 of the Regulations provides:

**Reporting Illegal or Suspected Activity Involving City Employees:**

**.Sec. 11-60.  (1)  Any City employee becoming aware of or having any information regarding illegal activity in any City department shall immediately notify his/her respective department Head.**
**Sec. 11-60. (2) The Department Head receiving such information shall:**
**…. (If the information is of a non-criminal nature, the Department Head shall notify the City Manager and the**

---

[17] Section 5 provides: PURPOSES OF PERSONNEL DEPARTMENT. Said Personnel Department shall to the extent hereinafter provided, govern, supervise and control all individuals of the Classified Service, by Civil Service Rules and Regulations.
[18] See Footnotes 4 and  5 above.

> **Personnel Director, who shall evaluate the information and order or conduct an investigation if deemed necessary. The City Manager shall have the prerogative of utilizing the Police Department to assist with or conduct the investigation. In any event, a report shall be compiled by the investigating department and submitted to the City Manager and Personnel Director.**

The term "Suspected Activity" is not defined in the act. However, any reasonable reading in context suggest that it is intended to modify "Illegal" and cover those offenses thought (or suspected) to be criminal. Certainly the statute was intended to neither create a work force of whistle blowers for every conceivable personnel rule violation, nor employ the offices of City Manager and Internal Affairs for such violations. In any event, the City Manager must authorize every police investigation not involving criminal activity of departments other than the police department. This was not done here.

Every document made available to Plaintiffs' counsel and all testimony elicited in this case, establish that the police investigations of Brackin were done either at the request of or with the support of Judge Gordon. The Chief of Police was merely an adjunct since he was the local police Department Head and it was through him that the Internal Affairs officers took their orders. The City Manager's hand was nowhere to be found in any of these investigations. There is no evidence that the City Manager authorized any of investigations made subject of Brackin's Complaint.

Procedural due process requires governmental agencies to follow their own rules. *Yesler Terrace Community Counsel v. Cisneros* 37 F.3d 442, 448 (9th Cir 1994) (citing

Morton v. Ruiz 415 U.S. 199, 235 (1974).   Courts often reverse or remand administrative decisions due to the Board's failure to follow its own regulations.   See, e.g. *Hudson v. Heckler*, 755 F.2d 781, 785 (11th Cir. 1985), *Abdulai v. INS* , 239 F.3d 542 (3d Cir. 2001) (reversing where Board's lack of explanation raised a serious question about whether its own rules were applied); Reid v. INS , 949 F.2d 287 (9th Cir. 1991) (reversing Board where it failed to follow its own regulations and provide notice of its decision to the parties); *Vargas v. INS* , 938 F.2d 358, 361 (2d Cir. 1991) (remanding where, inter alia , the Board acted inconsistently with the regulations); *Naderpour v. INS* , 52 F.3d 731 (8th Cir. 1995) (court reversed where Board misread its own regulation); *Andrasian v. INS* , 180 F.3d 1033, 1046 (9th Cir. 1999) (BIA's failure to follow its own regulations rendered its decision contrary to law); *Saakian v. INS* , 252 F.3d 21 (1st Cir. 2001) (remanding case where Board failed to apply its own rules to a claim of ineffective assistance of counsel).

There is not much Eleventh Circuit jurisprudence on when an administrative agency must follow its own rules and regulations. However*,   Port of Jacksonville Maritime AC Hoc Committee Inc. v. United States Coast Guard and Jacksonville Transportation Authority*, 788 F.2d 705, 708 (11th Cir.1986) offered some guidance on the question:

> As a general rule of administrative law "agencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as 'internal'." U.S. v. Caceres, 440 U.S. 741, 754 n. 18, 99 S. Ct. 1465, 1472 n. 18, 59 L. Ed. 2d 733 (1979), citing American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538-39, 90 S. Ct. 1288, 1292-93,

25 L. Ed. 2d 547 (1970). A framework governing review of an agency's deviation from its own regulations is given in American Farm Lines, 397 U.S. at 538-39, 90 S. Ct. at 1292-93: determine whether the regulation was intended 1) to require the agency to exercise its independent discretion, or 2) to confer a procedural benefit to a class to which complainant belongs, or 3) to be a "mere aid" to guide the exercise of agency discretion. If the first or second,(fn2) invalidate the action; if the third, a further determination must be made whether the complainant has been substantially prejudiced. If he has, invalidate the action; if not, affirm. See *Alamo Express, Inc.* v. U.S., 613 F.2d 96, 97-98 (5th Cir.1980); *Barnes Freight Line, Inc.* v. ICC, 569 F.2d 912, 921 (5th Cir.1978); *EEOC v. Airguide Corp.*, 539 F.2d 1038, 1042 & n. 6 (5th Cir.1976).

That the courts owe some deference to executive policy does not mean that the executive branch has unbridled discretion in creating and in implementing policy. Executive agencies must comply with the procedural requirements imposed by statute. See *Morton v. Ruiz*, 415 U.S. 199, (1974). Agencies must respect their own procedural rules and regulations. See id. at 234; see also *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981). And the policy selected by the agency must be a reasonable one in the light of the statutory scheme. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc Chevron*, 467 U.S. 837, 844 (1984). To this end, the courts retain the authority to check agency policymaking for procedural compliance and for arbitrariness.

Because Brackin first suffered the loss of two weeks pay, was placed on probation, and ultimately terminated because of the City's Judicial Department failure to follow its own rules governing who may authorize a police investigation, the third prong of *Port of Jacksonville* supra, is clearly met. All agency action stemming from

this breach is invalid and Mrs. Brackin is entitled to her judgment with respect to Count Four of her complaint.

### 3. Substantive Due Process

Counts Five and Seven alleges substantive due process violations. Count Five references the numerous police interrogations suffered by  Brackin,  one of which resulted in  suspension and probation for the exercise of free speech; another resulted in employment loss due to  her violating a due not contact directive. A directive  which frustrated her rights to associate and communicate with a close friend. Count Seven independently challenges the City's chill on her rights of association.

Due process provides two distinct guarantees: substantive due process and procedural due process. *Zinermon v. Burch*, 494 U.S. 113, 125,  (1990). Substantive due process includes both the protections of most of the Bill of Rights, as incorporated through the Fourteenth Amendment, and also the more general protection against "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." Id. (quoting *Daniels v. Williams*, 474 U.S. 327, 331, (1986)); see also Collins v. City of Harker Heights, 503 U.S. 115, 125, (1992). "Substantive due process rights are created by the Constitution, and 'no amount of process can justify [their] infringement.' *Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002).

Both of Brackin's first amendment claims; free speech and association have been found by the courts to be fundamental and 'implicit in the concept of ordered

libert(ies)" *Vinyard* supra, at 1356.  "(A)lthough a retaliatory discharge claim by a state employee involves the denial of the state-created benefit of employment, the right upon which a retaliatory government employment decision infringes is the [fundamental] right to free speech, not the right to a job." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995). Similarly**, f**reedom of association is a fundamental right that encompasses two forms, "intimate association" and "expressive association." *Gary v. City of Warner Robins, Georgia*, 311 F.3d 1334 (11th Cir. 2002).

To the extent that Brackin can prevail on her free speech and free association claims in subpart **1**.and **2 a**bove, she must prevail on her subjective due process claims. Additionally, the reasons advanced by the City justifying her termination (a single job related telephone call) is so arbitrary that pursuant to the standard articulated in *Zinermon,* supra substantive  due  process is implicated and she is entitled to relief on this basis alone.

Mrs. Brackin is entitled to summary judgment on her substantive due process claims.

**Conclusion**

For the reasons stated above, Mrs. Brackin is entitled to summary judgment on counts one, three, four, five, six, and seven with the amount of damages to be determined at a separate proceeding. Mrs. Brackin prays that the Court grant such relief.

Respectfully submitted

s/sIshmael Jaffree_____
Ishmael Jaffree (Jaff 002)
951 Government St. Blvd. Ste. 415
Mobile Alabama 36604
251-694-9090 Fax 251-694-9090

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November, 2007, I electronically filed the foregoing Memorandum in Support of Plaintiff Brackin's Motion For Partial Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing and a copy of such filing to the following:

s/s Ishmael Jaffree_____
Ishmael Jaffree

Carol Sue Nelson
Maynard, Cooper & Gale, P.C.
1901 6th Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203