1   A.   Yes.

2   Q.   Do you know what, if anything, she did when
3        you brought those to her?

4   A.   I don't -- I don't recall.  I mean, I don't
5        know if she talked with the people or she
6        passed it along to the judge.  I don't know.

7   Q.   There was a time in 2004 that you were
8        disciplined and suspended; is that correct?

9   A.   Yes.

10  Q.   Let me show you -- and that involves an
11       individual named Mr. Fondren; does that name
12       mean anything to you?

13  A.   Yes.

14  Q.   Did you know a Mr. Fondren?

15  A.   I -- I don't know of him personally.  I know
16       that he was a defendant.

17  Q.   A defendant in your municipal court?

18  A.   Yes.

19  Q.   And do you remember having any interaction or
20       conversations with him?

21  A.   Yes.

22  Q.   And tell me what you remember.

23  A.   He came -- I was working downstairs, and he

Page 148

1     came into the office and asked to speak to
2     Mary Beth Brackin.  And told him that I was
3     she.  And he said that he needed some
4     information and was sent because he was
5     falsely arrested.
6  Q. And falsely arrested for what?
7  A. I don't recall.  He just -- he just said that
8     he needed to know what to do about it, that
9     his vehicle was towed, and he wanted to know
10    what he needed to do.
11 Q. And what did you tell him?
12 A. I told him that he had to go to the city
13    clerk's office.
14 Q. And was anyone present when this conversation
15    took place with Mr. Fondren?
16 A. I understand that -- I believe Lavera was
17    working in the back at the warrant windows,
18    which is a pretty good distance from the front
19    window.
20 Q. Anybody else present?
21 A. I don't recall.  I don't remember.
22 Q. Did you ever tell Mr. Fondren that he had been
23    falsely arrested?

Page 149

1  A.  No, I did not tell him he had been. I told --
2  Q.  You told him what?
3  A.  I told him that if he wanted to file for that,
4      he needed to go to city clerk's office and
5      that's what he needed to tell them as to the
6      reason why he was there.
7  Q.  Were you aware that Mr. Fondren ever filed a
8      complaint or complained about you to the City?
9  A.  I don't know.
10             MR. JAFFREE: I'm sorry. Was your
11                 question never or did?
12             MS. NELSON: Ever.
13             MR. JAFFREE: Oh, I'm sorry.
14  A.  I don't recall if he did.
15  Q.  And were you ever advised that he had filed a
16      complaint with the City?
17             MR. JAFFREE: Against her? I'm
18                 trying to -- are you saying a
19                 complaint against her?
20             MS. NELSON: I just said a complaint
21                 against the City.
22             MR. JAFFREE: Oh, just general
23                 complaint.

**FREEDOM COURT REPORTING**

Page 156

```
 1    A.    I'm -- they could have.  I don't recall.  I
 2          don't recall all the questions that were
 3          asked.
 4    Q.    That a lot of it stemmed on what --
 5    A.    Yes.
 6    Q.    -- you told him?
 7    A.    Yes.
 8    Q.    Did you tell him he had been falsely
 9          arrested?  I'm not saying that you said it.  I
10          said the nature of the questions involved,
11          what you told him and whether or not you --
12    A.    Right.
13    Q.    -- told him --
14    A.    Correct.
15    Q.    -- he had been falsely arrested or wrongly
16          arrested.  And the questions stemmed around
17          whether or not you told him --
18    A.    Yes.
19    Q.    -- to go sue the City or file a lawsuit
20          against the City or a claim against the city;
21          is that correct?
22    A.    Yes.
23    Q.    And you're saying in the investigation, you
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 157

```
 1         denied saying that?
 2    A.   I just told him that I did not tell him, you
 3         should sue the city and that what you were
 4         falsely arrested.  I said, this is what you
 5         need to tell, as far as going to the city's
 6         clerk office, this is the reason why you're
 7         there, is that you were falsely arrested based
 8         on his testimony, not that I said he was.
 9    Q.   Do you have any reason to
10         believe that -- strike that.
11              Do you know why that investigation came
12         about?
13    A.   No, I do not.
14    Q.   Do you know if Judge Gordon had anything to do
15         with that investigation?
16    A.   I don't know.  I don't -- I don't recall I --
17         if I was told.
18    Q.   Do you know if Judge Gordon had anything to do
19         with the prior internal investigation that you
20         talked about involving that Ms. Ralpeje?
21    A.   I think she did.
22    Q.   And why do you think that?
23    A.   Well, she is my department head.  If there was
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 342

1  A.  Yes.
2  Q.  So she could have taken the time to ask you
3      your version of events?
4  A.  Yes.
5          MS. NELSON: Object to the form.
6  Q.  How long do think it would have taken for you
7      to tell her your version of events?
8          MS. NELSON: Object to the form.
9  A.  Not long.
10 Q.  Like how long?
11 A.  I -- I don't know.  I mean, I don't --
12     depending on how she would ask me if she would
13     ask me questions or if I were just to tell to
14     her what happened.  I don't know how long it
15     would take.  It wouldn't take long.
16 Q.  This is the Fondren, right, the Fondren case,
17     the Fondren matter, the second interrogation?
18 A.  Yes.  Yes.
19 Q.  Now, did Mr. Fondren come to you on that day?
20 A.  Yes, he did.
21 Q.  Did you know Mr. Fondren prior to his coming
22     to you?
23 A.  No, I did not.