GORDON'S  DEPOSITION EXCERPTS EXHIBET  8

## Date of hire

7   Q.   When were you initially hired into that
18        position?
19   A.   December of 1999?
20   Q.   You're not sure?
21   A.   Not sure.  December or November of 1999.
22   Q.   Prior to ascending or getting appointed to the
23        position of judge of municipal court, did you
0006

## Prior Job

**0006**
**1        occupy any other positions?**
**2    A.  I did.**
**3    Q.  And what was your most recent position that**
**4        you occupied prior to becoming a judge?**
**5    A.  Prior to becoming a judge, I was an assistant**
**6        attorney general in the Attorney General's**
**7        Office in Montgomery, Alabama.**
**8    Q.  And from when to when did you occupy that**
**9        position?**
**10   A.  From approximately October 1987.  And that's**
**11       an approximation.**
**12   Q.  And until you got hired?**
**13   A.  I did.**
**14   Q.  And what was your principal job**
**15       responsibilities as assistant attorney**
**16       general?**

**0010**
**1        position 13 years.**
**2    A.  I did.**
**3    Q.  From when to when?**
**4    A.  Approximately 13 years.  It's from September**
**5        or October of 1987 until November or December,**
**6        1999.**

## Legal Education Background

**3    Q.  And where did you go after you left Fisk?**
**14   A.  Tulane University School of Law, New Orleans,**
**15       Louisiana.**

16  Q.  And did you matriculate through Tulane?
17  A.  I did.
18  Q.  And did you get a JD?
19  A.  I did.
20  Q.  Did you get any advanced degree beyond a JD?
21  A.  I did.
22  Q.  What advanced degree did you get?
23  A.  I did a major course of study at Ely Broad
0018
1       School of Management at the University of
2       Michigan, public policies and procedures
3       toward my master's.
4   Q.  And did you obtain a master's in that?
5   A.  I did not.
6   Q.  How many years did you spend at Tulane Law
7       School?
8   A.  Three or four.  I graduated in 1984 -- '87,
9       three years.
10  Q.  Was that in New Orleans?

--

Created: Act No. 273, Amended: Act No. 92-442  I guess, if it was in New Orleans at the time
18      you went, I guess that's the critical part of
19      this question.  I'm glad, as well, that it
20      still is.
21          Did you take and successfully pass the
22      Louisiana Bar?
23  A.  I did not take the Louisiana Bar.
0019
1   Q.  Well, let's get back to your law school
2       career.  Do you recall any of the courses that
3       you took in law school?
4   A.  Contracts.  What you take in law school:
5       criminal procedure, criminal law, contracts.
6   Q.  Did you take any public administration law?
7   A.  Constitutional law.  Public administration
8       law?
9   Q.  Yes.
10  A.  No, I -- there was -- I worked at -- no.
11  Q.  Any law --
12  A.  I don't -- I don't remember.
13  Q.  Any law dealing with government service?
14  A.  I don't -- no.  If I did, I don't remember
15      specifically.
16  Q.  But you did take constitutional law?
17  A.  I'm sure as part of my core classes I did.

18   Q.   And was that perhaps a year course -- a
19        year-long course?
20   A.   I don't remember whether it was a year or
21        semester.
22   Q.   And did your constitutional law course have a
23        both criminal and civil component?
0020
 1   A.   I don't remember.  Criminal law,
 2        constitution -- I don't remember.
 3   Q.   You don't remember?
 4   A.   Huh-uh (negative response).
 5             MS. NELSON:  Say yes or no.
 6   A.   Yes -- no, I don't remember.
 7   Q.   You don't recall taking any courses or
 8        studying any cases dealing with constitutional
 9        law on the criminal side?
10   A.   Not specifically, no.
11   Q.   All right.  Do you remember studying any First
12        Amendment jurisprudence?
13   A.   Not specifically.
14             MS. NELSON:  Again, I'm going to object to
15                this line of questioning.  If you're
16                trying to question her about courses
17                that she took in 1987 about
18                constitutional law -- the law is what
19                it is -- to try to get her to say that
20                she can, you know, interpret questions
21                of law in this case, I'm going to
22                object to.
23             MR. JAFFREE:  Okay.  I took -- I was in
0021
 1                law school in 1970, and I sort of
 2                remember my constitutional law
 3                question.  But if you don't, fine.
 4             MS. NELSON:  The Constitution, as I
 5                understand it, the Supreme Court
 6                interprets that.  And it -- their
 7                interpretation changes from year to
 8                year as to what the law is.  So you
 9                know, I'm objecting to this line of
10                questioning.
11             MR. JAFFREE:  Sometimes they even go back.
12             MS. NELSON:  Yeah.
13             MR. JAFFREE:  And go back to what it was
14                before.
15             MS. NELSON:  They do.

**Free Speech Knowledge**

Q.  Did you realize from your constitutional law
5       course that people have first amendment rights
6       to allow them to engage in certain protected
7       speech?
8           MS. NELSON:  Object to the form.
9   A.  And, you know, again I have to say, no.
10  Q.  No?
11  A.  Not from my constitutional law course, I
12      wouldn't -- I don't remember that.
13  Q.  You don't recall any constitutional law
14      courses dealing with protected speech?
15  A.  Not specifically.
16  Q.  Okay.  Did your constitutional law cover the
17      Constitution?  Did it cover, let's say, the
18      First Amendment of the Constitution?
19  A.  I can only assume, and you want me to say yes
20      or no.  So --
21  Q.  Your best guess.
22  A.  I don't remember.
23  Q.  As your best guess, do you think your
0023
1       constitutional law class covered the First
2       Amendment?
3   A.  I'd hate to guess.  You know, I don't --
4   Q.  You'd hate to guess?
5   A.  I don't remember specifically.
6   Q.  Do you remember specifically whether or not
7       your constitutional law course covered the
8       freedom of association?
9   A.  No, I don't remember specifically.
10  Q.  Well, irrespective of what you remember about
11      your constitutional law class that may have
12      been -- you said in 1980 -- have your fairly
13      life-long experience working in the legal
14      profession taught you anything about First
15      Amendment jurisprudence?
16  A.  No.
17  Q.  All right.  Do you know that there is a right
18      to free speech?
19  A.  Yes.
20  Q.  Do you know that this is a right that
21      government-sector employees have?
22          MS. NELSON:  Object to the form.

23    A.   And not specifically.  I know it's right
0024
 1        that -- that's in the Bill of Rights as a part
 2        of the Constitution.  But, no.
 3    Q.   And do you --
 4    A.   I don't know what rights government-sector
 5        employees have.

Q.   So you may have been a licensed attorney for
21        the last 20 years?
22    A.   Approximately.
23    Q.   Have you lost that license for any reason?
0027
 1    A.   No.
 2    Q.   So as far as you know, you're still a licensed
 3        attorney?
 4    A.   Yes.
 5    Q.   And as a licensed attorney, are you instructed
 6        to know some law?
 7    A.   By whom?
 8    Q.   By you.
 9    A.   I mean, am I expected by whom to know some
10        law?  I don't understand the question.  I'm
11        sorry.
12    Q.   Well, let's just say, if the general public
13        was aware that you had passed the bar exam and
14        you had practiced law for 20 years, that the
15        general public would expect you to know some
16        law?

**Judge denied similarity with the Civil Services Act**

**PAGE 58**

Q.   Are you're familiar with the City of Dothan
10        Civil Service Act?
11    A.   No.
12    Q.   Huh?
13    A.   No.
14    Q.   You're not familiar with this Civil Service
15        Act?
16    A.   No.  I mean, I'm familiar with the name, Civil
17        Service Act, but not the -- what it -- I'm not
18        familiar with the specifics of the City of
19        Dothan's Civil Service Act.

### Knowledge That Mary was in the classified service

Q.  Well, are you familiar with Ms. Mary Brackin?
14   A.  Familiar?
15   Q.  Are you familiar with Ms. Mary Brackin, the
16      plaintiff here next to me?
17   A.  No.
18   Q.  Excuse me.  You didn't mean to say no.  Do you
19      know Mary Brackin, the plaintiff, next to me?
20   A.  Do I know her?
21   Q.  Have you ever heard of her?
22   A.  Yes.
23   Q.  Okay.  And you know that she was a civil
0062
 1      service employee in the classified service?
 2   A.  Yes.
 3   Q.  And you did have some role in bringing about
 4      the termination of Ms. Brackin's employment
 5      with the City of Dothan?
 6   A.  Yes.  And her hiring.
 7   Q.  Pardon?
 8   A.  And her hiring, also.

### Recognize that the City Manager is the ultimate authority

**PAGE 62**
Q.  Now, this section says, appointing authority
13      is the one that should bring about the
14      discharge of a civil service employee.  So in
15      that context, would you agree that you are the
16      appointing authority?
17        MS. NELSON:  Object to the form.
18   A.  In that context, I always thought the city
19      manager was the ultimate authority.  But I'm a
20      department head and she was in my department,
21      so yes –

### All memo's to Nancy

Q.  All memos, notes, letters written by Judge
23      Gordon concerning Martin's job performance.
0087
 1      Do I have everything you have there?
 2        MS. NELSON:  Yes.
 3        MR. JAFFREE:  There are no other memos

4          other than what y'all have provided to
5          me?
6          MS. NELSON:  Correct.
7     Q.   Okay.  All memos, notes, letters written by
8          Judge Gordon concerning Brackin's job
page 87

9
performance.  Do I have all of that?
10          MS. NELSON:  That would be in the
11          personnel file.  We've produced all of
12          that.
13    Q.   All memos, notes, letters received by Judge
14         Gordon concerning Plaintiff Martin's job
15         performance, anything that you received from
16         other third parties.
17          MS. NELSON:  That would be in her file.
18          We've produced all that we have -- all
19          we have on Nancy Martin.
20    Q.   Well, I didn't see any letters that you had
21         received from anybody else.  But, okay.  I got
22         all of my stuff with me.

## Role of the Administrator
**PAGE  91**

Q.  Do you wear two hats?
3     A.   When we have a court administrator, I -- I
4          mean, we have a court administrator position
5          whose job is administrate -- I'm making that
6          word up -- the magistrates' office.  But I
7          directly supervise the court administrator.
8          The court administrator supervises the
9          magistrates when we have that position
10         filled.  So on a day-to-day basis, I
11         do not -- I cannot literally physically
12         supervise the magistrates' office.


**PAGE 92**
10    Q.   Well, when you have a person serving as
11         administrator for the magistrate office, do
12         you get involved in the day-to-day activities
13         of the magistrates?
14    A.   No.
15    Q.   Do you get involved in the job assignments?

16   A.  No.

## Relationship between the City Police and the Judicial Department

16   Q.  Is the municipal court an adjunct of the city
17         police department?
18   A.  No.
19   Q.  Is the city police department an adjunct of
20         municipal court?
21   A.  No.
22   Q.  Are they two separate independent bodies?
23   A.  Yes.  By law they have to be separate.
0095
 1   Q.  Is part of the reason they're separate is
 2         because you're required to be an independent
 3         arbiter?
 4            MR. JAFFREE:  Object to the form.
 5   Q.  Do you understand my question?
 6   A.  I do but I don't -- no.  I don't know.
 7   Q.  I'm sorry?
 8   A.  I don't know.
 9   Q.  You don't know what?
10   A.  I don't know why the -- why they're -- I mean,
11         I guess on some level I know why.  But we're
12         just separate entity just like we're a
13         separate entity from the public utilities.
14         We're a separate entity from recreation.
15         We're just two separate departments.  We don't
16         have any of the same personnel in common.
17   Q.  Okay.  In your capacity as municipal judge, do
18         you have to be impartial and cannot show
19         deference to the police department?
20   A.  Yes.
21   Q.  Do the city police department have any role in
22         deciding discipline for the Judicial
23         Department's employees?
0096
 1   A.  No, not ultimately.
 2   Q.  Do they have any role?
 3   A.  No.


## Organizational structure of the Judicial Department

PAGE 99

14  Q.  Okay.  What is the organizational structure of
15       the Dothan Municipal Court?
16  A.  I guess it would be presiding judge, court
17       administrator, magistrates, clerks.

## Administrator discretion

**PAGE 100**

1   Q.  Well, when you have an administrator, do you
12       sort of allows them discretion to make
13       decisions as to what to do?
14  A.  Yes.
15  Q.  Is that true independent of who happens to be
16       functioning as the administrator at any
17       particular time?
18  A.  Yes.
19  Q.  So you generally don't second guess what the
20       administrator is trying to do?
21  A.  No.

**PAGE 101**

6   Q.  Well, when you hire an administrator, do you
7        sort of see them to be your shadow person to
8        do whatever it is you want them to do, or do
9        you let them function independently?
10          MS. NELSON:  Object to the form.
11  A.  If I hire them to be the administrator, I
12       expect them to act independently.  I
13       mean -- yeah.  I don't expect them to do what
14       I want them to do.

**PAGE 102**

5   Q.  Well, the decision with respect to discipline,
6        a subordinate employee, and you and the
7        administrator differ on what discipline should
8        be netted out, who would generally prevail in
9        those disagreements.
10  A.  I -- generally, absent any -- I would let them
11       do it, because they're over there with them,
12       they know the facts.  They know, you know,
13       what's going on.  And I can't imagine that I
14       would, you know, not defer if there was just a
15       -- if there wasn't a problem.

16  Q.  Okay.
17  A.  I normally wouldn't even know unless they
18      brought it to me.
19  Q.  In your position as municipal judge, who do
20      you answer to?
21  A.  Administrative Office of Courts.
22  Q.  And who is that?
23  A.  Governing body of judicial systems in the

### Belong to a 100 percent black organization

Q.  Well, what social organizations do you belong
22      to?
23  A.  Oh, Lord.  Delta Sigma Theta Sorority.
0105
 1  Q.  Is that a female organization?
 2  A.  It is.
 3  Q.  Males are excluded?
 4  A.  Yeah.
 5  Q.  Black or white organization?
 6  A.  I don't know that it's been characterized.  I
 7      think it's multiethnic.
 8  Q.  You are of the one -- the group that you
 9      belong to is mostly black, mostly white, or
10      mixed?
11  A.  Mostly black.
12  Q.  Would you say 95 percent black?
13  A.  Yes.
14  Q.  Maybe 99 percent black?
15  A.  The one -- the Dothan chapter?
16  Q.  Yeah?
17  A.  100 percent black.
18  Q.  100 percent black.  What other organizations
19      do you belong to?

### Never thought about free speech

15  Q.  How would you define -- as an attorney, how
16      would you define free speech?
17      MS. NELSON:  Object to the form.
18  A.  I've never thought about it.  I mean, freedom
19      of speech.  I've never thought about it.  I
20      don't have a definition.
21  Q.  Well, do you think government employees should
22      be entitled to some free speech rights?
23      MS. NELSON:  Object to the form, what she

0112
1        thinks.
2  A.  And not just government employees.  I know
3    citizens have a right of free speech whether
4    they're government employees or not.  As a
5    citizen of the United States, you have a right
6    of speech.

**However, will not lose their rights once they become government employed**

PAGE 115
4  Q.  Let me ask this:  Once a person become a
5    government employee, do you think they lose
6    their constitutional rights?
7     MS. NELSON:  Object to the form as to what
8      she thinks.
9  A.  The constitutional rights as a citizen of the
10   United States?
11  Q.  Yeah.
12  A.  No.
13  Q.  Once they become an employee.
14  A.  I don't think they lose their constitutional
15   rights.

16  Q.  Should their rights be limited because they
17   become a government employee?
18     MS. NELSON:  Object to the form.
19  A.  Their constitutional rights as citizens of the
20   United States?
21  Q.  Yeah.  Their constitutional rights as citizens
22   of the United States?
23  A.  No.  I don't think just because they're
0116
1    employed that they should lose their rights as
2    citizens of the United States.
3  Q.  Do you think free speech liberties are
4    fundamental in our society?
5     MS. NELSON:  Object to the form.  It calls
6      for legal conclusion.
7  Q.  Do you think that free speech is a fundamental
8    right?
9     MS. NELSON:  Object to the form.  Same
10     objection.
11  Q.  Do you understand what I mean?
12  A.  A fundamental right?

13  Q.  Yeah.
14  A.  Is it a -- or the most fundamental right?
15  Q.  Well, one of the group of fundamental rights.
16  A.  Fundamental rights.
17  Q.  Do you think so?
18      MS. NELSON:  Object to the form.
19  A.  Yeah.  And I've had to think.  I would say
20      yes, I would think it would be.


**Citizen Has the right to know that they can seek recourse**

0119
1   Q.  Well, why not?  Why shouldn't the public know
2       that they have a right to seek recourse with
3       the City clerk?
4   A.  I think they should know they have a right to
5       seek recourse with the -- I think they have a
6       right to know they need to go -- if they have
7       a claim, they have to go to the City clerk's
8       office to file that claim.  Yeah, I think they
9       do have that right to know just that.  If you
10      have a claim, you need to go to the City
11      clerk's office and file it.


**But about wrong done to them**

8   Q.  Well, what if something wrong has been done,
19      do they have a right to know that something
20      wrong has been done to them by their
21      government?
22  A.  Generally?  I mean, like in the whole world?
23      I don't know.
0120
1   Q.  Well --
2   A.  Somebody has got to determine that there has
3       been a wrong.
4   Q.  Well, let's assume that there has been a wrong
5       and some government employee tells a consumer
6       citizen/defendant that there has been a wrong,
7       would that be something that that
8       citizen/consumer/defendant would have a right
9       to know or should have a right to know?
10      MS. NELSON:  Object to the form.  Right to
11          know by whom?

12   A.  And who said it was wrong, that person?
13   Q.  If they had been wronged, do they have a right
14       to know that they have been wronged?
15           MS. NELSON:  Object to the form.
16   Q.  Is that something that the consuming public
17       should know?  Do you have to wrestle with this
18       question?
19           MS. NELSON:  Well, you've got me confused
20               because I'm not sure what you're
21               talking about.  If you want to
22               specifically ask her about Mary Beth
23               Brackin's situation --
0121
1            MR. JAFFREE:  I'm asking her in general.
2            MS. NELSON:  You're asking her
3               hypothetical questions which I don't
4               even understand.
5    Q.  Well, do you understand the question?
6    A.  I mean, in the whole world?
7    Q.  Your attorney is trying to tell you that you
8        don't understand, but do you not understand
9        the question?
10   A.  No.  Because you're asking in the whole world
11       if a citizen has been wronged by the
12       government --
13   Q.  By his government.  Do you think --
14   A.  -- do they have a right to know?
15   Q.  As a general principle, is it a matter of
16       public concern to that citizen that his
17       government or her government has wronged them?
18           MS. NELSON:  Object to the form.
19   Q.  As a general principle.
20           MS. NELSON:  Right to know from whom?
21   Q.  Right to know from any member of government
22       telling that person that your government has
23       wronged you?
0122
1            MS. NELSON:  Object to the form.
2    Q.  The information of something they have a right
3        to know that the government has wronged them?
4            Now, the transcript is only going to show
5        a response.  The reality is that you're taking
6        a long time to respond.  And I'm asking
7        you -- I mean, you're taking a long time to
8        respond on most of these questions, a long
9        time.

10        But I'm asking you, is this something that
11        you're wrestling with in your own conscience?
12   A.   I just think it's a vague, hypothetical
13        question.
14   Q.   What's vague about that?
15        MS. NELSON:  I don't have a clue what
16           you're --
17   Q.   What's vague about the principle?  You think
18        the principle is vague?
19   A.   Whether or not a person had the right to know
20        that their government has wronged them.
21        MS. NELSON:  Object to the form. That is
22           so hypothetical, so not
23           understandable.
0123
1   A.   Wronged them how?
2   Q.   All right.  So let's be more specific as your
3        attorney suggested.
4   A.   Please.
5   Q.   What if a citizen had been wrongfully arrested
6        in the City of Dothan in the municipal court
7        or at least by process that was issued by the
8        municipal court, they were wrongfully arrested
9        by mistake, by error, no malice but just
10        wrongfully arrested?  Is that something that
11        is a matter of public concern, the fact that
12        they have been wrongfully arrested?
13        MS. NELSON:  Object to the form.
14   A.   I think it depends on --
15        THE WITNESS:  Do I answer?
16        MS. NELSON:  Yeah.
17   A.   I think it depends on how you define public
18        concern.  I mean, is it the concern of the
19        entire public that this person has been
20        wrongfully arrested and should this person go
21        out broadcasting to the entire world, hey,
22        this person has been wrongfully arrested?  I
23        don't know.  I don't know how what -- I don't
0124
1        know how you define public concern.
2   Q.   Let's assume --
3   A.   What is public concern, Mr. Jaffree?  How do
4        you define public concern?
5   Q.   Something the members of the public would have
6        a right to know, something that is of import
7        to members of the public.

```
 8   A.  So every claim that's filed against the City
 9        of Dothan by a citizen, an employee should go
10        tell everybody, hey, this person has been
11        wronged, they should have a right to do that?
12        Is that what you're asking me?
13   Q.  Well, that's not what I asked you.
14   A.  I don't know.  That's what I'm saying.  I
15        don't what you're asking me.
16   Q.  Let me see if this hypothetical one you're
17        going to have to wrestle with as well.
```

**Can tell them that they can get another public defender**

```
     (Brief recess)
0127
 1   Q.  What about informing a citizen that they could
 2        request the municipal judge to appoint another
 3        public defender; is that a matter of public
 4        concern that defendants should know?
 5   A.  That what?
 6           MS. NELSON:  Object to the form.
 7   Q.  That they can ask the judge to appoint another
 8        public defender, is that something that a
 9        defendant should know?
10           MS. NELSON:  Object to the form.
11   A.  If they can -- if they have a right to ask the
12        judge to use another public defender?
13   Q.  And if you tell them that is --
14   A.  And that's all they say?  You can ask the
15        judge to give you another public defender.
16        That's all.
17   Q.  If you tell them that, then that's okay?
18   A.  That's it, right.
19   Q.  So you're saying that that is a matter that
20        they should have a right to tell somebody?
21   A.  Yeah.
```

**Agree the merit system employees have a right to continued employment**

```
15   Q.  Goodness.  My opinion.  Okay.
16        Do you agree that merit system employees
17        have a property interest in continued
18        employment?
19           MS. NELSON:  Object to the form.  It calls
20           for legal conclusion and an opinion.
```

21    Q.  Do you know whether or not they have a
22        property interest in continuing employment?
23        If you know.
0130
 1    A.  I would agree, yes, that they do have a
 2        property interest.
 3    Q.  You agree.  Okay.  Good.
 4            And this right can only be taken for good
 5        cause shown?
 6            MS. NELSON:  Object to the form.
 7    A.  Do I agree that it can be only be taken with
 8        good cause shown?
 9    Q.  Yeah.
10    A.  Their property right -- their property
11        interest in employment can only been taken for
12        good cause shown.  I would agree with that.


**Admit that Mary was a merit system employee**

**PAGE 131**

11    Q.  Was Mary Brackin a merit system employee as
12        far as you know?
13    A.  Yes, as far as I know.


**Don't remember ever disciplining a black employee**

**PAGE 133**

12    Q.  Let's me ask you this:  Have you ever
13        disciplined a black employee?
14    A.  Specifically, a black employee?  I don't
15        remember.

**Don't remember if she ever sent a white a disciplinary memo**

13    Q.  Have you ever sent a memo or other written
14        document punishing some white employee for
15        something that they have done?
16    A.  I might have.  I -- I'm not -- I don't know.
17        I'm not --
18    Q.  You don't know whether you have or not?
19    A.  I don't remember every specific incident if I
20        did send a memo.

21    Q.  Do you remember any specific incident?
22    A.  No.
23    Q.  You don't remember any --
0136
1    A.  No.
2    Q.  -- specific incident?
3    A.  I don't remember any.
4    Q.  Okay.  Have you ever terminated a white
5        employee?
6    A.  Ever in life?
7    Q.  During the time that you was a municipal judge
8        with the City Of Dothan?
9    A.  Yes.


**Admitted that she asked for the . Ralpeje  investigation**


1    Q.  You're saying Ms. Ralpeje complained saying
2        what?
3    A.   She made allegations that she had been told by
4        a magistrate that we had had problems with a
5        public defender, that he wasn't any good, that
6        he should not have let her plead guilty to
7        that DUI.  And -- and she came back in the
8        open court in front of people, saying all
9        that.
10           And then we had a bondsman come up and
11       said that he felt threatened because
12       Ms. Brackin had called him at home the night
13       before and asked him to change his testimony
14       because she didn't say what he -- what --
15       anyway, he was upset because he wanted to know
16       how Ms. Brackin got his number at home to call
17       him.  And he wanted -- and he said that she
18       called him and asked him.  So those were
19       allegations that I asked for an investigator
20       to look into.
21           It also involved Ms. Ralpeje's mother or
22       her sister who was in the lobby also at the
23       time that Ms. Brackin talked to Ms. Ralpeje.
*******0144
1        And -- and I did ask for an investigator
2        because we needed their expertise in dealing
3        with witnessed who are not employees of the
4        City of Dothan.

**ALSO**

**0146**
1       record?
2   A.  I'm sure I did at some point.
3   Q.   Okay.  And if the record says that Ms. Ralpeje
4       did not say that, you're saying that she did?
5   A.   Yeah.  I was there.
6   Q.   And are you saying that Ms. Ralpeje's other
7       person who was with her said that as well?
8   A.   No, I didn't say what the other person said.
9       I said that the other person was in the -- the
10      bondsman and either her sister or her mother
11      were in the lobby with her.  And so because
12      they were -- the mother and the sister was
13      there, she was in -- she was part of the
14      investigation.  But I didn't do the
15      investigation.  No.  I asked for the
16      investigators to look into it.

**Report could have included a transcript**

   **PAGE 144**

9   A.  I think her supervisor got the results of the
10      investigation.
11  Q.   Okay.  Did you have an opportunity to review
12      the results of the investigation?
13  A.   I'm sure I did, but I don't remember
14      specifically.
15  Q.   And the results of the investigation would
16      have included the transcript of the
17      investigators?
18  A.   I'm not sure what all it included.
19  Q.   But it could have included the transcript?
20  A.   It could have.

23  Q.   Did you have an opportunity to observe the
**0146**
1       record?
2   A.  I'm sure I did at some point.

**Gave Betty the amount of discretion she wanted**

2   Q.   All right.  What amount of job performance

23      discretion did you permit Bettye King, the

0161

1      former administrator of the magistrates?

2  A.  What amount?

3  Q.  Yeah.

4  A.  In terms of percentages?  You said, what

5     amount?  A lot or little?

6  Q.  I don't mean amount in terms of percentage.  I

7     mean, what degree of job performance

8     discretion --

9  A.  I don't know.

10  Q.  -- you permitted Bettye King?

11  A.  Whatever degree of discretion she wanted.  I

12     mean, I -- you know, I try not to interfere

13     with the day-to-day -- the only way I knew

14     there was a problem over there is if somebody

15     came to me or it was brought to my attention.

16     I was not over there every day.  I did

17     not -- I could not physically be over there

18     every day.

**<span style="color:red">Can't recall asking Bettye King to redo an evaluation</span>**

15  Q.  Was Ms. King black or white?

16  A.  She was black.

17  Q.  Can you identify any occasion when you

18     requested that Ms. King change a performance

19     evaluation or any of the subcategories within

20     an evaluation?

21     MS. NELSON:  Object to the form.  I don't

22      understand what you just asked.

23     MR. JAFFREE:  I cannot believe counsel is

0164

1      having trouble understanding all these

2      questions before --

3     MS. NELSON:  I am having a very hard time

4      understanding your questions.

5  Q.  All right.  I'll try again.

6     Can you identify any occasion where you

7     requested that Ms. King change a performance

8     evaluation or any subcategory within the

9     evaluation?

10  A.  Can I remember a specific occasion?  No, I

11     cannot remember a specific occasion when I

12     informed -- asked Ms. Bettye King to change an

13     evaluation or a subcategory thereof

**Handle over 17,000 tickets per year**

3   Q.  -- when you told Nancy that?
4   A.  Well, we handle a large volume of paperwork,
5      approximately 15 to 17,000 tickets per year,
6      7,000 misdemeanors.  And there's a lot of
7      paperwork and a lot of loose paperwork, some
8      of it attached by gem clips.  And we were
9      having problems with -- you know, keeping
10     everything together.  So I really wanted her
11     to work on the filing system, on keeping
12     paperwork together, and on cross-training
13     magistrates.  And that's something that was in
14     place when she came, which I told her that we
15     wanted to do.
16   Q.  What was something that was in place?
**PAGE 167**

**Admit that she told Nancy that Mary under investigation.**

**PAGE 180**

11   Q.  Okay.  She also testified that you told her
12     that Mary Beth was under investigation for
13     something that she had told a defendant.
14      MS. NELSON:  Is that a question?
15      MR. JAFFREE:  Yeah.
16   Q.  Do you --
17   A.  I might have.
18   Q.  Do you dispute that you told her that?
19   A.  No, I don't dispute.
20   Q.  So you may have told her that Mary Beth was
21     under investigation?
22   A.  If she was at the time, yes.

**Could have told her that Sarah  Fowler was a follower of Mary**

17   Q.  She also testified during this meeting that
18     you told her that Sarah Fowler wouldn't
19     instigate anything on her own but she was a
20     follower of Mary -- Mary Turner and Mary

21     Brackin.
22        Could you have told her that?
23   A.  I don't remember telling her that
0182
1    specifically, no.

2   Q.  Could you have told her that, perhaps in --
3     not in those words but similar content?
4   A.  Possibly.
5   Q.  So you may have told her that?
6   A.  Possibly.
7   Q.  So if you had told her that Sarah Fowler was a
8     follower of Mary Turner and Mary Brackin, then
9     you may have told her something about Mary
10    Turner and Mary Brackin; is that correct?
11  A.  I don't know.  I mean, what I would have told
12    her is what their job duties were, how they
13    interacted in the office, because I was trying
14    to give her a feel of the whole office.  I
15    would have told her about every magistrate.  I
16    wouldn't have just sat there and said
17    something about three people –

**<span style="color:red">Dito With respect to Michelle Bryan</span>**

21   Q.  She didn't say it was just limited to three.
22     Now, with respect to Michelle Bryan, she
23    said you told her that she was in a hole with
0183
1    leave time, that she was out sick a lot, out
2    sick with her children.
3     Could you have told her that?
4  A.  Possibly.

**PAGE 183**

9   Q.  She also testified you told her that Michelle
10    was very cute and divorced.
11    Could you have told her that?
12    MS. NELSON:  When she did she testify to
13    this?  Object to the form.
14    MR. JAFFREE:  Well, I mean, look at the
15    transcript.  She did testify to that.
16  A.  "Very cute and divorced."  I don't know.
17    MS. NELSON:  You said yesterday.

18          MR. JAFFREE:  Well, I recall the
19             testimony.
20     Q.  Well, did you tell her that she was cute and
21        divorced?
22     A.  I don't -- I don't remember specifically
23        telling her that.


**PAGE 184**

7     Q.  -- she socialized a lot in the office and that
8        she talked on the phone with several police
9        officers, and was dating several.  This is her
10       testimony.
11          Did you tell her that?
12    A.  I don't -- that was kind of common knowledge
13       around the office.  I don't remember
14       specifically telling her that.
15    Q.  But it was so common, you knew about it,
16       right?
17    A.  Everybody knew about it.
18    Q.  Including you?
19    A.  Yes.
20    Q.  So you may have told her that?
21    A.  I don't remember -- I don't gossip like that
22       with somebody I've never met before.  No.


Well --
0185
1     A.  No.
2     Q.  If Nancy --
3     A.  No.
4     Q.  So you didn't tell her that?
5     A.  In her interview, Mr. Jaffree, I told her all
6        that in her job interview?
7     Q.  Well, I'm telling you what Nancy says.
8     A.  I'm asking.  No, I did not, in a job
9        interview.
10    Q.  No.  She didn't say interview.
11    A.  That's what you said.
12    Q.  She said in a subsequent meeting, she said she
13       came in two or more times subsequently --
14       subsequent to her being hired but before she
15       actually put boots in the ground to start

16      working physically in the facility, she said
17      she met with you and you told her this, one on
18      one, no committee, just you and her, mono to
19      mono.
20          Do you remember her testimony?
21  A.  No.
22  Q.  You don't remember her testimony?
23  A.  No, not specifically.
0186
1  Q.  She also testified that you would have to deal
2      with her dating and cut down on her
3      socialization -- socializing.
4          Could you have told her that?
5      MS. NELSON:  You're talking still in the
6          time before she was hired?
7      MR. JAFFREE:  Yeah.  She was hired but
8          before she started working.
9      MS. NELSON:  You said, before she "put
10         boots in the ground."  I have no idea
11         what that means.  You're saying,
12         before she was hired or after she --
13     MR. JAFFREE:  I said more than just boots
14         in the ground.  I said boots in the
15         ground and started working at the
16         facility.
17     MS. NELSON:  Before -- so you're asking
18         her, did she say -- we're talking
19         about a time frame before she started
20         working at the facility.
21     MR. JAFFREE:  Subsequent to her hire but
22         before her start date.
23  A.  So what was she doing?
0187
1  Q.  At any time, do you recall telling Nancy to
2      cut down on Michelle Bryan's socialization --
3      socializing with men?
4  A.  I don't specifically remember that, but I
5      remember that that was a problem during that
6      time.
7  Q.  Do you generally remember telling Nancy that?
8  A.  No, but I remember -- no.  I don't remember
9      saying, Nancy --
10  Q.  So it was a problem?
11  A.  Yes.

**PAGE 188**

6   Q.  So she could have gotten this information from
7       Valarie Savage?
8   A.  Right.  Or just -- I don't know.
9   Q.  Or she could have gotten it from you; you're
10      not sure?
11  A.  I don't know.
12  Q.  She could have gotten it from you?
13  A.  I don't -- I don't think so.

### Ann Baxter

16  Q.  And then she went on to Ann Baxter, and she
17      said you mentioned that she was nice and would
18      do anything for you, but she had problems
19      balancing money.
20          Now, could you have told her that Ann
21      Baxter, sweet person, but had problems
22      balancing money?  Could you have told her
23      that?
0192
1   A.  I'm not sure.

15  Q.  With respect to Ann Baxter, I think she also
16      said that she makes numerous mistakes in
17      computer entry.
18          Did you tell her that?
19      MS. NELSON:  Are we talking about Ann --
20      MR. JAFFREE:  Ann Baxter.
21      MS. NELSON:  Ann Baxter?  So your question
22          is, did the judge --
23  Q.  Tell Nancy that, that Ann Baxter makes
0194
1       numerous mistakes in computer entry?
2   A.  I don't know.  I remember telling her that
3       there were a lot of computer problems.  And
4       Ann -- because Ann was working the window, she
5       had to bear the brunt of it.
6   Q.  So you may have told her that part?
7   A.  That they had computer problems, yes

Q.  Tell Nancy that, that Ann Baxter makes
0194
1       numerous mistakes in computer entry?
2   A.  I don't know.  I remember telling her that
3       there were a lot of computer problems.  And

4     Ann -- because Ann was working the window, she
5     had to bear the brunt of it.
6  Q.  So you may have told her that part?
7  A.  That they had computer problems, yes.
8  Q.  So you may have told her that.
9  A.  That they had computer problems.
10  Q.  Do you recall telling her that, or you may
11    have told her that?
12  A.  I may have told her they had computer
13    problems.
14  Q.  So you can't dispute that?
15  A.  No, that they had -- were having computer
16    problems.  No.
17  Q.  So we're parsing out what you may have told
18    and not told her about Ann.
19      She also stated that you told her that Ann
20    was, at that time, being investigated by
21    Valerie Harris.
22      Are you familiar with Valerie Harris?
23  A.  I'm am.  She was an internal auditor doing the
0195
1    liaison between the computer system and us.
2    The city manager appointed her.  So Valarie
3    Savage might have been working on the computer
4    problem errors that Ann was having.
5  Q.  Is it conceivable that Valerie may have
6    been -- Valerie Harris, that is, may have been
7    investigating --
8  A.  Computer problems.
9  Q.  -- Ann Baxter?
10  A.  Computer problems.  Ann bore the brunt of it
11    because she worked the window.  She worked the
12    window, so she was the one entering.  And so
13    she had more computer errors.
14  Q.  Well, my question is, whatever Ms. Harris was
15    investigating, it could have involved Ann
16    Baxter?
17  A.  It could have.  Yes, it could have, and
18    computer errors.
19  Q.  So you could have -- and you may have told
20    Nancy that?
21  A.  Right.

20      MR. JAFFREE:  I don't remember either now.
21      Let me move on.
22  Q.  Do you recall telling Nancy that Ann Baxter

23    had a lot of money?
0198
1   A.  I don't know how I would have known that.  No,
2    I don't recall telling her that.
3   Q.  Did you know that Ann Baxter had a lot of
4    money?
5   A.  No.
6   Q.  Did you know Ann Baxter owned a real estate
7    company?
8   A.  I know she had previously.
9   Q.  Did you tell Nancy that she had owned a real
10    estate company?
11   A.  I'm not sure.  I don't recall.
12   Q.  Did you know that Ann Baxter inherited land
13    from a family member?
14   A.  I don't -- I don't know.  No.  I don't --
15    didn't know Ann that well -- I mean, to know
16    all that.
17   Q.  Well, do you know that now?
18   A.  No.  I know that she owned a real estate
19    company before.
20   Q.  What about inherited money from a family
21    member; did you know that?
22   A.  No.
23   Q.  You don't know that now?  So you didn't tell
0199
1    Nancy that?
2   A.  I don't think so.

**Color of Magistrates that Judge bad mouthed**

0200
1   A.  To the beginning of your list.  You asked me
2    about -- who?  Mary Beth is white.  Mary
3    Turner is white.  Ann Baxter is white.  Who
4    else you asked me about?
5      MS. NELSON:  Sarah Fowler.
6   A.  Sarah Fowler is white.  The office was --
7      MS. NELSON:  Michelle Bryan.
8   A.  -- predominantly white.  Michelle Bryan.
9   Q.  All right.  Now, would you agree that if
10    Nancy's version is correct, then you said
11    something negative about each of those people?
12      MS. NELSON:  Object to the form.
13   A.  If Nancy's version were correct, yeah.
14   Q.  So you gave her sort of a negative picture of

15    each of these white --
16        MS. NELSON:  Object to the form.  She's
17          just denied most everything you've
18          asked her about.
19  Q.  My question is, if Nancy's version is correct,
20      you gave her a negative view of each of these
21      white magistrates.
22        MS. NELSON:  Object.
23  Q.  Is that correct?
0201
1         MS. NELSON:  That's totally not the
2           testimony and hypothetical.
3  A.  If Nancy's version were correct, but it's not
4      correct.
5  Q.  Now, do you remember what Nancy stated that
6      you told her about Lavera?
7  A.  No, I don't.
8  Q.  She said that you highly praised Lavera, that
9      she was a good magistrate.
10  A.  I thought Valarie is the best magistrate we've
11       ever had, and she didn't say I said that.
12  Q.  That she previously worked at the jail, very
13       well liked, knowledgeable.

### New office configuration acknowledgement

12  Q.  Do you remember how the office assignments
13       were configured?
14  A.  Yes.
15  Q.  Let me -- remember yesterday when Nancy
16       testified that Fran gave her something?
17        MS. NELSON:  Again, you're producing a
18           document that should have been
19           produced yesterday when I deposed.
20        MR. JAFFREE:  Well, Nancy said she didn't
21           have that document yesterday.  She had
22           it at home, but didn't have it with
23           her.
0206
1         MS. NELSON:  Okay.  Well, I again reserve
2           the right to question her not only on
3           some other things that have come up
4           but also as to Plaintiffs' Exhibit
5           Number 5.
6         MR. JAFFREE:  Talking about some other
7           thing that came up.  Because it's only

```
8          one thing other than that document
9          that came up.
10         MS. NELSON:  Well, the other documents you
11            continue to produce that she didn't
12            produce yesterday.
13         MR. JAFFREE:  Well, that's so funny.  The
14            second document.
15  Q.  But let me ask you to look at what is -- what
16      did I say -- Plaintiffs' Exhibit 5 and ask you
17      if you can identify that document.
18  A.  Yes.
19  Q.  You have seen that document before, haven't
20      you?
21  A.  Yes -- no, no, I've not seen this document
22      before.
23  Q.  Well, how can you identify it?
0207
1   A.  I mean, no.  You said -- I meant this.  Can I
2       identify these offices?  Yes.
3   Q.  Well, before I get to the offices, have you
4       ever seen that document before?
5   A.  Have I ever seen this document before?  Not
6       that -- I can't remember.
7   Q.  All right.  Your counsel, I'm sure, will stop
8       me if I'm incorrect.  But did you hear Nancy
9       testifying that that document was circulated
10      around the office so the people would know
11      where their offices were?
12  A.  No.  I -- I did hear her testify to that.
13  Q.  Are you in a position to dispute that
14      testimony that a document --
15  A.  No.
16  Q.  -- was circulated?
17  A.  No, I'm not.
18  Q.  So it could have been that document?
19  A.  It could have been, but I don't know.
20  Q.  Do you remember her testifying that Fran came
21      by after she had resigned, sometime later
22      perhaps even after Nancy had unceremoniously
23      had been separated from --
0208
1          MS. NELSON:  Object to the form.
2   Q.  -- her office and gave that to Nancy?
3   A.  Do I remember Nancy saying that?
4   Q.  Testifying.  Yeah.
5   A.  Yes, I do.
```

6  Q.  And you see Fran's name on there, right?
7  A.  Yes.
8  Q.  Okay.  Well, does that diagram depict, based
9      on information you have available to you, a
10     rough sketch of what that office looked like?
11  A.  As much as I can --
12  Q.  Now, let me draw your attention --
13     MS. NELSON:  Well, I'm not sure she
14         answered that.
15  A.  Yeah.  As much as I can determine, it's a
16     really rough draft.
17  Q.  I accept that as an answer.  Let me move on to
18     the next question

## Judge responsible for office assignment

22  Q.  So who was responsible for office assignments?
23  A.  I was.  Lavera was over the -- well, I was.
0212
1  Q.  Did you send Lavera out as your emissary to
2     tell other staff members that is the office
3     assignment?
4     MS. NELSON:  Object to the form.
5  Q.  Do you understand the question?
6  A.  Yes, I do.  But, no, I did not send her as my
7     emissary.  She was in charge of the physical
8     move.  Mary Beth, your client was in charge of
9     moving the files.
10  Q.  So are you saying that because she was in
11     charge of the --
12  A.  Mary Beth --
13  Q.  -- physical move, she had to tell people where
14     their offices are going to be located?
15  A.  She had to tell them -- yes.  So they would
16     know where to -- to take -- to put their
17     stuff.

## Deny punishing Mary T by not giving her an office

14  Q.  Do you remember Nancy's testimony that you was
15     punishing Mary Turner for some altercation she
16     had had with Kai Davis at some meeting?  Do
17     you remember Nancy's testimony to that?
18  A.  Yes.
19  Q.  She testified that you told her that?

20  A.  Yes.
21  Q.  Did you tell Nancy that you was punishing Mary
22      Turner by not giving her an office in
23      retaliation for what she may have done or not
0217
1       done with respect to Kai Davis?
2   A.  No.
3   Q.  Didn't tell Nancy that?
4   A.  No.

## Dispute that special effort was made to give Tonia office

9       MS. NELSON:  Object to the form, comment.
10  Q.   Now, do you remember Nancy also testifying
11      that you had it as one of your priorities to
12      insure that the new person, Tonya Minifield --
13      is that her last name -- get a nice office?
14          Now you'd had an administrator on board
15      that, according to you, have discretion and a
16      whole host of things.  Did you direct Nancy to
17      give Tonya Minifield a nice office?
18          MS. NELSON:  Object.  Not so much to that
19          question but to all the prior
20          commentary before.
21  A.  I guess my point is, we gave Valarie a bigger
22      office.
23  Q.  Do you understand the question?
0218
1           MS. NELSON:  He asked about Tonya.  Ask
2           the direct question about Tonya.  Did
3           you direct Tonya -- what was the
4           question?
5   A.  No, I did not direct Nancy to give --
6           MR. JAFFREE:  Do you want to take over my
7           chair now and ask her?
8           MS. NELSON:  No.  But you just go into
9           this long commentary, which I don't
10          agree with and that is not a
11          question.  But it finally led to a
12          question which was, did she direct
13          Tonya and something.
14  Q.  Did you recommend Tonya for any particular
15      office?
16  A.  No.
17  Q.  Did you tell Nancy that you wanted Tonya to
18      have an office?

19   A.  An office?
20   Q.  Yeah, any office?
21   A.  Any office?
22   Q.  Any office.
23   A.  Yes, I'm sure did.  I don't know.
0219
 1   Q.  Did you recommend an office --
 2   A.  No.
 3   Q.  -- for Tonya?
 4        Did you suggest that you wanted her to
 5      have an office to which she would be pleased?
 6   A.  No.
 7   Q.  Well, what exactly did you tell Nancy with
 8      respect to Tonya's office, to the best of your
 9      recollection?
10   A.  I don't remember anything specific about
11      Tonya's -- giving Tonya a special office or an
12      office.  There were office -- there was office
13      space back by the kitchen that was not being
14      used.  It's a huge office.  I think
15      Valarie has -- so I said, you know, you
16      wouldn't have put -- if I had brought Tonya in
17      and put her in that huge office, then they
18      would have really complained.  So we put
19      Valarie in the huge office in the back and
20      gave her Valarie's other office.
21   Q.  Why did you busy yourself with what kind of
22      office Tonya got?
23   A.  Because we were renovating -- the offices
0220
 1      weren't complete.  The building was in the
 2      process of being renovated.  We had to go back
 3      to the commission and ask them to let us
 4      continue on with the building.  You see, we
 5      had run out of space.  We had to go back to
 6      them and ask them to let us continue on
 7      renovating.


**Tonya color**

v0221
 1   A.  No, I -- yes, I dispute that.  I'm sorry.
 2   Q.  Well, was Tonya white or black?
 3   A.  Black.
 4   Q.  And she was new; is that correct?

5   A.   New in terms of -- I don't understand the
6        question.

**COMPLAINTS NEED TO BE IN COLOR**

23    Q.   You do acknowledge that you asked that
0222
1        complaints be put in writing?
2   A.   I told -- yes, I said that they need to be in
3        writing.
4   Q.   Do you also acknowledge that you said
5        complaints that's not in writing wouldn't be
6        given any serious consideration?
7   A.   I don't remember saying that.
8   Q.   Could you have said that?
9   A.   To whom?
10  Q.   To Nancy.
11  A.   I don't remember specifically saying that, but
12       I would have preferred that they be in
13       writing.
14  Q.   You'd have preferred that they be in writing?
15  A.   Yeah.  If they gave me a serious complaint, of
16       course.  But, yeah, needed to be -- I would
17       prefer in writing.

**Deny that Nancy asked to sit in on Tonya's interview**

4   A.   Tonya had been interviewed before we ever
5        hired Nancy.
6   Q.   So you dispute Nancy's contention that she
7        wanted to sit in on the interview with Tonya?
8   A.   I dispute that Nancy ever asked me could she
9        sit in on an interview with Tonya, and I said,
10       no, you can't.
11  Q.   Well, I guess if Tonya was already hired
12       before you interviewed Nancy --
13  A.   She was already interviewed.
14  Q.   Interviewed.  Did you have any subsequent

20  Q.   So Nancy is making up this business about
21       wanting to be in on the interview with Tonya?
22  A.   Nancy is lying if she said that I told her,
23       no, you cannot sit in on this interview.  I
0224

**Ricky Stokes complaint**

Do we have one

9     on that A-Advantage Bonding Company Complaint?

10       (Brief pause)

11  Q.  I noticed that Nancy wasn't asked all of that

12     yesterday.  But I'm curious how she would

13     respond if she was asked.

14  A.  I am, too.

15     MS. NELSON:  What number are you marking

16      now?

17     MR. JAFFREE:  Number 6.  I'm sorry.

18      (Plaintiffs' Exhibit 6 was marked

19       for identification.)

20     THE WITNESS:  Can we take one second?

21     MR. JAFFREE:  Yeah.

22      (Brief recess)

23  Q.  Let me show you what is marked as Plaintiffs'

0231

1     Exhibit 6, and ask you, prior to today, have

2     you ever seen that document?

3  A.  I don't remember specifically seeing this

4     document, no.

5  Q.  But you could have seen it?

6  A.  It says on here that Nancy called me to

7     discuss the complaint.  And that might be

8     where my knowledge of it comes from.  I don't

9     remember specifically seeing this.  And it

10     looks like the original.  So I don't remember

11     seeing it.  No.  Specifically, no.

12  Q.  Well, if that was the original, who would it

13     come to first?  I mean, the envelope would

14     have been sent to who?

15  A.  I'm not sure.

16     MS. NELSON:  You assume there is an

17      envelope.  I object to the form.

18  A.  Yeah.  I really don't know.

19  Q.  Okay.  Well, did Nancy bring the facts of that

20     to your attention?

21  A.  She said she did.  I know that there was a

22     complaint by Advantage about bond -- about

23     bonding stuff.  But also he complained about

0232

1     the court docket, so it would have been

2     forwarded to her because all these were things

3     under her purview, the docket and -- you know,

4     she was their supervisor.  And he said -- it

5      says here he gave her a copy.
6   Q.  Do you remember Ms. Brackin's testimony that
7      she talked to you about that complaint as
8      well?
9   A.  I don't remember her testimony saying that,
10     and I don't know when she would have had
11     occasion to talk to me about it.
12  Q.  And because that somebody from A-1 had
13     contacted her since Lavera didn't have the
14     time to fool with it?
15         MS. NELSON:  Object to the form.
16  A.  Not specifically.
17  Q.  Do you dispute Nancy's note that's on there?
18  A.  That she called me?
19  Q.  Well, you want to read the entirety of the
20     note?
21         MS. NELSON:  Well, why don't you read the
22         note.
23  A.  "Complaint filed by Rickey Stokes.  Nancy
0233
1      called judge to discuss complaint.  What would
2      happen now?  Judge laughed and said nothing
3      would be done because Rickey was always
4      causing trouble.  She said I should just not
5      worry about the complaint."
6   Q.  Is that something that you would have
7      remembered had you said?
8   A.  Yeah.  I would have forwarded it to Nancy to
9      handle.  This was her department.  She's the
10     supervisor.
11  Q.  Did you recommend that Nancy -- well, let's
12     back up because maybe Nancy didn't have the
13     authority to do this.
14         Did you consider having the police
15     department internal affairs do an
16     investigation?
17  A.  Of?
18  Q.  Of Rickey's complaint.
19  A.  No.  I mean, I would have forwarded it to
20     Nancy who was the supervisor at that time to
21     handle.
22  Q.  Would you have made a recommendation?
23  A.  That what?
0234
1   Q.  That internal affairs do an investigation?
2   A.  I don't see where -- would I have made a -- if

3    I had gotten this letter -- if I had gotten
4    this complaint, would I have asked internal
5    affairs to investigate it?
6  Q.  Well, what if you had got a complaint that
7    says Lavera refused to act on it and didn't
8    care whether or not somebody was being
9    wrongfully arrested or not?
10    MS. NELSON:  Object to the form.
11  Q.  Would that have triggered --
12  A.  It's just hypothetical.
13  Q.  Would that have triggered an internal
14    investigation?  Well, it's not hypothetical
15    when somebody testifies to that.
16  A.  That somebody was wrongfully arrested and
17    Lavera said she didn't care?
18  Q.  Didn't have time to deal with it.
19  A.  I don't think that was her testimony.  She
20    said he could have been.  Somebody could have
21    been wrongfully arrested.
22  Q.  Okay.  Somebody could have been, but she
23    didn't -- she didn't want to intercede to
0235
1    prevent that from happening.  Apparently, the
2    only thing that prevented it from happening is
3    Mary Brackin's intervention, correct?
4    MS. NELSON:  Object to the form.
5  A.  Well, that's what Mary Brackin says.
6  Q.  But do you dispute what Mary Brackin said?
7  A.  That she's the only thing that prevented this
8    person from -- I have no personal knowledge of
9    this.
10  Q.  Do you dispute that Mary Brackin said she
11    talked to you about this and you said
12    something to the effect that --
13    MS. NELSON:  Talked to her about what,
14      now?  There are about five things on
15      this exhibit.
16  Q.  Talked to you about the fact that you came to
17    Lavera and she didn't want to bother with it?
18    MS. NELSON:  Wait.  That who came to
19      Lavera?
20    MR. JAFFREE:  Someone from A-1 came to
21      Lavera complaining, maybe Rickey
22      Stokes came to her directly.
23    MS. NELSON:  And what's your question; did
0236

1           the judge know about this?
2    Q.  Well, she testified that she talked to you
3        about that.  Do you dispute that?
4    A.  I don't remember specifically.
5    Q.  So she could have?
6    A.  I mean, yeah, she could have but --
7    Q.  And she's testified that you blew her off.
8    A.  Who?
9    Q.  Mary Brackin testified that you blew her off.
10       MS. NELSON:  Object to the form.  And the
11           testimony was not stated that way.
12   Q.  Could you have blown her off?
13       MS. NELSON:  Object to the form.
14   A.  Not if somebody was about to get wrongly
15       arrested.  I mean, I would have told her to
16       look into it, find out what's going on.
17   Q.  But you wouldn't --
18   A.  That's not something I would have encouraged.
19   Q.  You wouldn't care that --
20   A.  Yes, I would have cared.
21   Q.  -- Lavera didn't care about it?
22   A.  Yes, I would have cared.  If there was a
23       possibility that somebody could have got
0237
1        arrested, booked, charged, yes, I would have
2        cared.
3    Q.  Okay.  Do you recall Nancy testifying that you
4        told her you wasn't going to do anything about
5        it because this bonding company was always
6        causing problems?
7    A.  I remember her testifying to that.
8    Q.  Do you dispute you told her that?
9    A.  I -- yes.  Because I think I would have
10       forwarded it to her to handle --
11   Q.  And that --
12   A.  -- if I'd gotten it.
13   Q.  And that Lavera does a good job.  I'm sorry.
14       I'm talking over you.
15       Also, that Lavera does a good job handling
16       alias warrants and that this company wasn't
17       worth giving a second glance to?
18   A.  No, I dispute saying this company is not worth
19       giving a second glance to.
20   Q.  Do you remember Nancy's testimony with respect

levera executes warrants

**PAGE 243**

5      or not.

6   Q.  Did Sergeant Woodruff ever complain to you?

7   A.  I know there was a computer problem with the

8      warrants.  I don't remember specifically

9      because she executes warrants.  And that's her

10      connection to them.

**<span style="color:red">Dispute that she took side of Lavera in who shoultke over in her absence</span>**

   Q.  Now, Lavera came to you and complained about

**0244**

1      that, correct?

2   A.  I don't remember that.

3   Q.  Could that have happened?

4   A.  I don't remember it if she did.

5   Q.  Do you remember talking to Nancy about this?

6   A.  Not specifically, no.

7   Q.  You don't recall telling Nancy that she really

8      should let Eunice and Tonya take over?

9   A.  No.  I remember it was Nancy's policy that

10      each person had to get somebody to cover for

11      them.  If they did not, she -- they were to be

12      disciplined.

13   Q.  Yeah.

**<span style="color:red">Don't recal incident with Nancy and Eunance memo</span>**

**0250**

1   A.  I don't remember what happened.

2   Q.  Do you remember that sometime in July of 2004,

3      Nancy sent a memo to Eunice regarding a bond

4      changing procedure, that Eunice was very

5      angry, and she went to you?  Sorry.  Back up.

6      That she sent Nancy a memo saying that Nancy

7      didn't have the authority to change bond

8      procedure.  Nancy thought this memo was

9      insubordinate and discussed it with you, and

10      you felt that it was not insubordinate because

11      this was something new and Eunice was the

12      first one that she had sent a memo to.  So you

13      put a stop to any insubordination.

14      MS. NELSON:  I'll object to the form and

15        assumes facts not in evidence.

16   Q.  Well, do you remember that factual situation?

17   A.  No.  No.
18   Q.  But did it happen?
19   A.  I don't remember.  But she --
20   Q.  Could have happened?
21        MS. NELSON:  What happened?  I'm not sure
22           what you're asking.
23   Q.  Could it have happened that Nancy came to you
0251
1       about a memo that she received from Eunice
2       that she thought was insubordination because
3       Eunice had told Nancy that she don't have the
4       authority to do what Nancy was trying to do,
5       and Nancy consulted with you about whether or
6       not this memo was insubordinate.  And you said
7       no.
8           Could that have happened?
9    A.  That's not what she testified to yesterday.
10       She said I signed it.
11   Q.  Well, did that happen as a fact.
12   A.  I don't -- no.  I don't remember that.
13   Q.  So it could have happened?
14        MS. NELSON:  I object to what could have
15           happened.  She said she didn't
16           remember it happening.
17   Q.  Well, see, your attorney didn't ask her every
18       question.  Your attorney has left off some
19       stuff.  I deliberately because of the lateness
20       of the day didn't cover a whole bunch of
21       things I was going to cover.
22           But I'm asking you, could that have
23       happened?
0252

**Don't remember if Nancy spoke about Eunice and Leavea mistakes**

19   Q.  Well, okay.  Fine.
20           She also testified that she talked to you
21       about the numerous mistakes that Eunice and
22       Lavera makes, and I think she misspoke talking
23       about a hundred times more than.  But that was
0253
1       sort of a term of emphasis as opposed to a
2       term of fact.  But numerous times about the
3       errors that they made, and you indicated that
4       everybody makes mistakes.
5        MS. NELSON:  Object to the form.

6  Q.  Did you ever have that conversation with her
7      about not wanting to hear about mistakes that
8      Eunice and Lavera makes because everybody
9      makes mistakes?
10  A.  I don't remember specifically.

## Admit door incident

11  Q.  Do you remember the discussion that she had
12      with you about she felt that Eunice and Lavera
13      were being insubordinate because she did a
14      memo telling them not to use a certain door
15      for security reasons and they continued to do
16      it; and she discussed this with you as
17      insubordinate and you thought it was silly and
18      not insubordinate.
19          Did you have that discussion with her
20      about the use of the wrong door?  Did you have
21      that discussion?
22  A.  I want to answer truthfully.  Yes, I had a
23      discussion with her about the door.  And I
0254
1      told her to write them up if they continued to
2      go out the door, but she also had to write all
3      the other magistrates up that were going out
4      the door.
5  Q.  You didn't tell her that you thought --
6  A.  No.
7  Q.  -- this was silly?
8  A.  I -- I thought it was silly, but I supported
9      her in it.  No, I did not tell her that.
10  Q.  Well, you didn't tell her it was silly but you
11      thought it was silly?

## Lavera evaluation dispute

14  Q.  Let's back up for a second.  And I'm sure you
15      remember this.  Nancy was instructed to do an
16      evaluation of Lavera, and you expressed
17      displeasure with the markings and comments
18      that Nancy had made on the evaluation,
19      correct?
20  A.  Displeasure.  I don't -- I don't know that it
21      was displeasure.  I was concerned.

22   Q.  You was happy?
23   A.  I was -- I was reticent.  I was concerned.
0256
1   Q.  Concerned.  Is that the word you feel
2       comfortable with, concerned?
3   A.  Yes.
4   Q.  And that before you would sign off on this,
5       you went to two other people?  Who did you go
6       to?
7   A.  Three people.
8   Q.  Who did you go to?
9   A.  The personnel department.
10   Q.  Let me stop you.  Who in the personnel
11       department did you go to?
12   A.  We were all together.
13   Q.  Oh, all three of you together?
14   A.  I asked them to help me look over it.
15   Q.  You asked them as a committee to help you look
16       over --
17   A.  No.  We always go to Personnel about personnel
18       issues.  Any issue, we go to Personnel.
19   Q.  Who is "we" you're referring to?
20   A.  I say "we."  I can't say for all department
21       heads, but I do.
22   Q.  On this occasion, who did you go to first?
23   A.  Personnel.
0257
1   Q.  I don't know what that means.
2   A.  The personnel department.
3   Q.  I don't know what that means.
4   A.  I can't be clearer.
5   Q.  Yes, you can.
6       MS. NELSON:  There's a personnel
7          department for the City of Dothan.
8          How much clearer --
9   Q.  Who?  The personnel department is a who?
10       MS. NELSON:  Who in the personnel
11          department?
12   Q.  The personnel department is a who.  Okay.
13       What individual in the "who" personnel
14       department did you go to?
15   A.  If I remember correctly, it was Martha
16       McClain.
17   Q.  Who is she?
18   A.  She is in the personnel department.
19   Q.  In what capacity?

20   A.  I'm not sure her title.
21   Q.  Now, what day-to-day responsibility does
22        Martha McCain have over -- what is Eunice's
23        last name -- I mean, Lavera's last -- Lavera
0258
1        McCain?  I'm suddenly drawing a blank.  Well,
2        what day-to-day responsibility does Ms. McCain
3        have on Lavera's job?
4   A.  None.
5   Q.  What day-to-day observation does Ms. McCain
6        have on Lavera's job performance?
7   A.  None.
8   Q.  Well, what was is the rationale of going to
9        Ms. McCain --
10             MS. NELSON:  It's McClain, isn't it?
11   Q.  Ms. McClain.  I'm sorry.  Ms. McClain to get
12        an assessment of an evaluation of something
13        that she would have no role in evaluating and
14        no ability to observe?
15             MS. NELSON:  I object to the form.  It
16                assumes facts not in evidence.  And
17                she's never testified or you haven't
18                let her testify as to why she went to
19                Personnel.
20   Q.  Well, you want to testify as to why you went
21        to McCain?
22             MS. NELSON:  McClain.
23   Q.  Ms. McClain.
0259
1   A.  Are you asking me to?
2   Q.  Well, yeah.
3   A.  Because it was a personnel issue.  And any
4        time we have issues of personnel matters that
5        we don't understand -- and I say "we" as a
6        totality, as the department head.  And anytime
7        with personnel -- I have a personnel issue,
8        then I go to Personnel to try to get an answer
9        as to form, as to whether it's the correct way
10        to do things, anything involving a personnel
11        issue.
12   Q.  What was the personnel issue at play here?
13   A.  Well, there was several.  It seemed that
14        Nancy -- a lot of her comments were based on
15        third-party stuff that happened before she
16        came.
17   Q.  Which comments?

18    A.   Well, I asked her about the computer errors.
19         And she said, well, I understand Lavera chose
20         to take vacation instead of getting computer
21         training.
22         And I said, well, Nancy, how would you
23         know that?  You weren't here.
0260
1          That was before she was hired.
2     Q.   Well, that's --
3     A.   Hearsay.
4     Q.   -- a process question.
5          MS. NELSON:  You're asking her what she
6              disputed, and she's trying to tell you
7              from what she --
8          MR. JAFFREE:  Well, please let me finish.
9              We're talking about apples and oranges
10             here.  One thing is that she commented
11             about some errors, and then she
12             commented that maybe the errors came
13             about because of lack of computer
14             training.  But she don't need to know
15             that Lavera didn't have computer
16             training in order to observe computer
17             errors.
18    Q.   Is that correct?
19    A.   I don't know.
20         MS. NELSON:  You asked her to explain why
21             she took issue with some of the marks
22             on the evaluation, and she's trying to
23             tell you.
0261
1          MR. JAFFREE:  No.  She's telling me things
2              that --
3          MS. NELSON:  You don't like what she's
4              telling you, so you're trying to
5              change her testimony and put words in
6              her mouth.
7          MR. JAFFREE:  I don't have anything
8              against what she is telling me except
9              that the question on the floor was,
10             what is it that she didn't know that
11             resulted in the markings.  The
12             markings of errors is something that
13             she could have known without having
14             knowledge that Lavera went to computer
15             training.

16   A.  Well, Nancy didn't -- she wasn't proficient.
17       She didn't know what they did.  I didn't
18       understand how she could grade someone on
19       something she did not know how to do herself.
20       And I asked her about that.
21           And she said, well, Mary Beth said that
22       this is the way you're supposed to do it.
23           And I said, Nancy, you cannot base an
0262
1        evaluation on hearsay.
2    Q.  Well --
3    A.  You cannot do that.  And I told -- I asked
4        her, I said, have you looked at her other
5        evaluations?  Have you -- you know, she graded
6        her so far down that she would not have gotten
7        a promotional raise.  And I knew that it was
8        appealable.  I knew that anything based on
9        hearsay would be appealed.  And to me, that
10       was a personnel issue.  I really was trying to
11       guide her, you know, just talk to her and say,
12       how do you do that.
13   Q.  I'm a little confused on the hearsay part with
14       respect to --
15   A.  She kept saying what Mary Beth and --
16   Q.  Well, hold on.  With respect to a -- for
17       instance, if something was supposed to be done
18       a certain way and Nancy feels that the way
19       that's been told to her makes sense but Lavera
20       was not doing it that way, I don't know how
21       that's a hearsay question.
22           But at the time you assigned Nancy to do
23       this task, you were aware, were you not, of
0263
1        limitations that Nancy had?
2    A.  I mean, she implied that she -- no.  I
3        was -- I was not aware of all the limitations
4        that Nancy had when I hired her.
5    Q.  Well, I mean, what prior magistrate experience
6        did Nancy have at the time you hired her?
7    A.  I don't know.  She implied that she'd been to
8        court, that she'd done all this stuff for
9        Legal Services and that she had all this
10       experience with court and -- and, you know --
11   Q.  Well, how --
12   A.  She implied that she --
13   Q.  What does Legal Services have to do with

14    municipal court?
15    A.  I don't know.
16    Q.  I mean, do you have any reason to think that
17        Legal Services get involved in municipal
18        court?
19    A.  I had no reason to think she would lie.  Not
20        specifically municipal court.  She just said
21        court.
22    Q.  Well, let's be practical here.  By that time,
23        you had been the judge of municipal court for
0264


**The length of time it took to learn about Nancy's inefficncies**

0266
1    A.  I guess the answer is yes.
2    Q.  Are you now, just so we're clear on the
3        Record, trying to change issues and say Nancy
4        was dishonest in her application and that can
5        be a legitimate basis for the separation?  Are
6        you trying to advance that theory.
7    A.  No -- I'm -- I'm -- yeah.  I am, yeah.
8    Q.  Oh, now you're trying --
9    A.  No.  I'm saying she was misleading in her
10        experience and that it showed after she'd been
11        there for about a month, that she just wasn't
12        proficient in what she was doing.
13    Q.  So after she'd been there a month, you're
14        quite --
15    A.  Approximately.
16    Q.  Approximately a month.  You're quite certain
17        of this?
18    A.  Approximately.  No, I'm not certain of the
19        time.
20    Q.  But it was quite evident quite early?
21    A.  No, at first she --
22    Q.  So now it wasn't evident quite early, it just
23        blossomed later?
0267
1            MS. NELSON:  She's trying to answer your
2            question.  She said she didn't know
3            the approximate time.
4    Q.  I mean, was it within the first two months
5        somehow you was able to tell?

6   A.   She never did grasp it.
7   Q.   Or the first three months?
8   A.   Never grasped it.  But basically --
9   Q.   So you was able to tell the deficiencies
10       immediately?
11  A.   No, not immediately.
12            MS. NELSON:  Object to the form.
13  Q.   Well, how long does it take you to grasp the
14       deficiencies if you couldn't do it within the
15       first three months?
16            MS. NELSON:  Object to the form.
17  A.   I don't remember how long it took to notice
18       that she was not proficient.
19  Q.   Well, pretty much from day one she wasn't
20       efficient.
21  A.   Is that your statement or --
22  Q.   Is that your statement?
23  A.   No, that's not my statement.
0268
1   Q.   What's your statement?
2            MS. NELSON:  Y'all are just sort of
3              talking among each other.  Ask her
4              questions.  Ask her a question,
5              please.
6            MR. JAFFREE:  I'm asking her a question.
7   Q.   Was she deficient from day one or not?
8   A.   No.
9   Q.   So she --
10  A.   She might have been.  I just didn't notice it.
11  Q.   So she blossomed into a deficiency.  Can you
12       live with that statement?
13  A.   No.
14            MS. NELSON:  Object to form.
15  A.   Her deficiencies were revealed as time went
16       on.
17  Q.   I see.  It took you awhile to notice it.  Is
18       that your testimony?
19  A.   They were revealed over time.
20  Q.   It took you awhile to notice it?
21  A.   No, they were revealed over time.
22  Q.   But until they was revealed, they were
23       concealed?
0269


**Specific complaints of Nancy's evaluation**

0272
1    Q.   I see.  So the old evaluations would be old
2         people that's not in the office anymore.
3    A.   No.  But they'll be written, documentary
4         evidence of that employee.  I mean, she's
5         listening to what -- she said they told her
6         that Lavera chose to take vacation instead of
7         going to computer training.  She had no
8         first-hand knowledge of that.  She wasn't
9         employed there.  She said that they told her
10        that Lavera left the office and was on the
11        phone all the time when she was gone.  And I
12        said, Nancy, you can't use that.
13   Q.   Did those comments come out in the evaluation,
14        that you're on the phone all the time?  Was
15        part of evaluation?  I didn't get a copy of
16        that evaluation.
17   A.   I just remember her saying that they told her
18        that when she was gone --
19        MS. NELSON:  Well, just a minute, now.
20          For the Record, Mr. Jaffree, you do
21          have that evaluation.  And that
22          evaluation, I questioned your client
23          about yesterday.
0273
1        MR. JAFFREE:  Well, let me look.  It is
2          conceivable that I have -- I got so
3          much stuff.
4        MS. NELSON:  Well, I just wanted to make
5          it very clear; you do have that
6          evaluation.  Don't say that I didn't
7          provide it to you.
8        MR. JAFFREE:  I will dig through this
9          stuff to see.  I certainly didn't spot
10         that one because I was trying to look
11         for it.
12   Q.   But be that as it may, who else did you talk
13        to in addition to the person at personnel?
14        MS. NELSON:  Would you like to see the
15          evaluation?  Would that help you?  It
16          seems like you have memory enough to
17          tell.
18   A.   Yeah.  Yeah, I remember that it was -- we were
19        in -- it was after department -- it was a
20        department head meeting.  I don't know why we

21      were all in there together.  But the
22      acting -- it was the city manager at the time,
23      Jerry Corbin was there.  Martha McClain from
0274
 1      personnel and John White who was the chief of
 2      police.
 3         And I was asking, how do you handle this
 4      evaluation where the employee -- what I told
 5      you.  I was really trying to give guidance
 6      on -- you know, I really was looking at it
 7      more like helping her because I knew it would
 8      be appealed if it was all based on third-hand
 9      knowledge.
10  Q.  And you knew this based on Lavera's prior
11      propensity for appealing?
12  A.  No.  I just knew that that was --
13  Q.  You speculated or was it based on your
14      friendship with Lavera?
15  A.  No.  I just knew that she couldn't base an
16      evaluation on -- on what somebody told her
17      happened before she got employed.
18  Q.  How would Lavera, independent of talking to
19      you, know that she had based that evaluation
20      on what other people have said?

**Motivation for questioning evaluation**

17  A.  No.  It was his -- I was asking him a
18      general -- I was asking them, how you handle
19      a -- the situation.  I didn't want to change
20      her evaluation.  That was her evaluation of
21      Lavera, but I wanted to give her guidance on
22      what she could and could not use.  And I
23      didn't know how to do that.
0277
 1  Q.  You was determined that that evaluation not
 2      stand; is that correct?
 3  A.  No.  Because I could have just not signed it.
 4      I could have not agreed with it.  I had that
 5      liberty to do that.
 6  Q.  Well, why didn't you just not sign it?
 7  A.  Well, because I wanted -- Nancy was her
 8      supervisor.  I didn't want to overrule her.  I
 9      just wanted to give her guidance on what she
10      could and could not use as an exact -- Nancy

11     was new to evaluating people.
12  Q.  Okay.  Now, were you satisfied with Nancy's
13     modification of the evaluation?
14  A.  I -- I must have been.  I don't remember.
15  Q.  Now, which part of it -- the modified version
16     was not based on hearsay?
17  A.  I don't remember.
18  Q.  So even the modified version could have been
19     tainted with hearsay; is that your testimony?
20  A.  I don't -- I don't remember.  I don't know.
21  Q.  You don't know.  But you was satisfied with
22     the modified evaluation and you signed it
23     correctly; is that correct?
0278

## Dispute the threat of job loss

  Q.  If she testifies that you didn't get her to
22     change any other evaluation from any other
23     magistrate, would you be in a position to
0284
1     dispute that?
2  A.  I don't think I got her to change this.  I
3     just asked her to review it and use her
4     knowledge, not just what somebody -- not use
5     what somebody told her.
6  Q.  Do you remember her testimony that you said,
7     this is not a threat, but you are still
8     probationary?
9  A.  I don't -- I heard her say that yesterday.
10  Q.  Now, you see if you could go home, study this,
11     and bring me back something different.
12       MS. NELSON:  Is your question, does she
13        remember Ms. Martin making that
14        statement?
15  Q.  Well, did you tell her that?
16  A.  No.
17  Q.  Did you tell anything closely approximated to
18     that?
19  A.  No.  I -- I had a memo saying could you review
20     this or -- could you review this --
21  Q.  So her memory of that conversation and your
22     memory of that conversations differs?
23  A.  I never threatened her, if that's what she
0285

1     says, I threaten her with her job.  That's
2     what she said yesterday.
3  Q.  Well, you told her that this is not a threat
4     but --
5  A.  That's what she says.
6  Q.  Do you dispute that?
7  A.  I do.
8  Q.  You didn't say that?  Didn't say anything like
9     that?
10  A.  I could -- yeah.  I dispute threatening her
11     with her job if she did not change Lavera
12     McClain's evaluation.
13  Q.  And she changed that evaluation, didn't she?
14  A.  Yeah, she did.
15  Q.  And felt bad about it in the process, didn't
16     she?

16     she?
17  A.  I'm --
18      MS. NELSON:  Object to the form.
19  A.  I'm not aware that she felt bad about it.
20  Q.  Well, according to you, did she not talk to
21     Lavera about it afterwards?
22  A.  No.  She told Lavera that she was threatened
23     if she didn't change it.
0286
1  Q.  She told Lavera that?
2  A.  And I objected to her telling another
3     employee --
4  Q.  That she'd been threatened?
5  A.  Yes.
6  Q.  I see.
7  A.  I thought it was unprofessional.
8  Q.  Even if true?
9  A.  Unprofessional.  It wasn't true.  I never
10     threatened her with her job.
11  Q.  Well, did you bring an action against Nancy
12     for insubordination for telling another
13     employee a lie that allegedly you had
14     threatened her when, in fact, you hadn't
15     threatened?
16      MS. NELSON:  Object to form.
17  A.  I don't know if it was insubordination, but
18     I -- I remember being upset about her lying
19     about that.
20  Q.  Well, what do you call that when some employee

```
21        tells another employee that you threatened
22        them of termination unless they
23        changed evaluation.
0287
 1   A.  I don't think that's insubordination.
 2   Q.  Well, what do you call it?
 3   A.  Lying.  She lied.  I never threatened her with
 4        her job if she didn't change the evaluation.
 5        As the reviewing authority, if I had not
 6        signed the evaluation, she would have had
 7        to -- it wouldn't have gone through anyway.
 8        So I wouldn't have to threatened her with her
 9        job.
10   Q.  Let me try to move away from that evaluation.
```

**Dispute I am black and protected comment and watch white magistrates**

```
16   Q.  In your response to interrogatory number one,
17        you deny that you ever mentioned to Ms. Martin
18        that because you was black that city officials
19        would not do anything to you.
20            Could you have said something that
21        Ms. Martin could have misinterpreted to be
22        that kind of comment?
23   A.  No.
0290
 1   Q.  Did you ever have a conversation with
 2        Ms. Martin where you told her that because you
 3        are black and a woman that the City wouldn't
 4        take any action against you?
 5   A.  No.
 6   Q.  You do know that Ms. Martin have said that,
 7        correct?
 8   A.  Yes.
 9   Q.  Ms. Martin also testified that she was
10        instructed that whenever a white magistrate
11        would do something to cause somebody to be
12        wrongfully arrested, you insisted that she
13        have a meeting with them but you made light of
14        it when people were wrongfully arrested by
15        black magistrates.
16            Do you dispute that?
17   A.  Yes.
18   Q.  That's not true?
19   A.  No, that is not true.
20   Q.  You did not put her on or instruct her to look
```

21     out for white magistrates making errors that
22     could result in somebody's wrongful arrest?
23     Is that a yes or no?
0291
 1   A.  I did not tell Nancy Martin to only look at
 2     the white people.


## DISPUTE I AM A TRAITOR COMMENT

17   A.  No, I don't feel that.
18   Q.  Well, if you don't feel that, then to what
19     were you referring when you mentioned in Sarah
20     Fowler's presence that I was being a traitor?
21   A.  That was a mischaracterization.
22     MS. NELSON:  Object to the form.
23   Q.  A mischaracterization of what?
0292
 1  A.  Of a statement.
 2  Q.  Well, what was her statement?
 3  A.  Hers or mine?
 4  Q.  What was her statement?
 5  A.  I don't know.
 6     MS. NELSON:  Sarah Fowler's statement?
 7  Q.  Yeah.  What was Sarah Fowler's statement?
 8  A.  You just said she said I said that you were a
 9     traitor.
10   Q.  Yeah.  But you said she misunderstood you.
11   A.  She -- I wasn't talking about you.
12   Q.  You weren't talking about me at all?
13   A.  No.
14   Q.  You was talking about somebody else being a
15     traitor?
16   A.  I was.
17   Q.  I see.  And so she just assumed you was
18     talking about me?
19   A.  Yes.
20   Q.  However, the discussion on the table was about
21     me?
22   A.  It was not about you.
23   Q.  Well, isn't it true that one of the
0293
 1     attorneys -- and it could have been Shaun --
 2     told you that he had seen me in Judge
 3     Anderson's courtroom or office, somewhere, and
 4     at that time, you made the statement so the

5    way when he said that he seen me --

6  A.  Do you want me to tell you what happened?

7      MS. NELSON:  I'm not sure if he's got a

8        question on the table or not.

9  Q.  Well, isn't that when the statement was made,

10    when he mentioned that?

11  A.  No.

12  Q.  So Sarah Fowler was lying about you?

13  A.  I don't know about what part.  I -- I can tell

14    you what happened but --

15  Q.  Accusing me of being the traitor.

16  A.  Yes.  She -- yes.  I never accused you of

17    being a traitor, never.

18  Q.  Okay.  I'm willing to allow you to tell me now

19    since you didn't try to clear that up before

20    you could --

21      MS. NELSON:  I don't know that she's had

22        any other time to clear it up before.

23        I'm not sure what the question is.

0294

1      MR. JAFFREE:  Well, you may have had

2        opportunities to clear this up.  You

3        had opportunities to clear it up in

4        your interrogatory response to

5        question number one.

6      MS. NELSON:  She respond -- if you asked

7        the question, she responded.

8  Q.  Well, would you like to clear up how --

9    somehow she mischaracterized your statement of

10    the traitor?

11      MS. NELSON:  I object to the form.  You

12        can ask her what she said.

13  Q.  Well, what did you say?

14  A.  I was talking to -- we were in court and --

15    well, we weren't in court.  We were in the

16    courtroom.  It was after court.  And Derrick

17    Yarbrough came in and said that he had seen

18    you and Judge Anderson talking and laughing at

19    the courthouse.

20      And I said, let me call him and tell him

21    something.  And I called Judge Anderson's

22    secretary, Amanda, and she answered the phone

23    and said Judge was out.

0295

1      And I said, well, you tell him the next

2    time that woman is out there marching around

3     with that sign about Judge Anderson hates old
4     people, I'm going to be out there with her
5     because he's a traitor.
6   Q.  See, I --
7   A.  And Sarah took that and told you what Mary
8     Beth or somebody -- and then you took it and
9     put it in all the writings that I called you a
10     traitor.  And that never happened.
11  Q.  So Ms. Fowler just sort of --
12  A.  Heard one end of a conversation.


## March 10 2005  meeting

11  Q.  I have a series of questions relating to
12     pages.  I don't know where I got this from.
13     And in benefit to you, I'm not asking you
14     these questions that I've got pages numbers on
15     because I don't know what that relates to.
16        Now, let me ask you this:  On or about
17     March the 10th of 2004 -- or was it 2005?  I
18     think -- it may have been 2005.  Did you tell
19     the staff to make no contact with Mary Turner?
20        MS. NELSON:  Again I would -- you're
21        asking 2004, 2005?  Would you put this
22        in some context?
23  Q.  Let me see here.  It was in 2005, on or about
0311
1     March 10th, 2005, did you have a meeting with
2     your staff where you told them to make no
3     contact with Mary Turner?
4   A.  I don't remember the specific date.
5   Q.  All right.  Well, do you recall ever having a
6     meeting with the staff where you told them to
7     make no contact -- have no contact with Mary
8     Turner?
9   A.  I remember the investigators going up to the
10     office with us and telling us to inform them
11     to not mess with the computer, not contact her
12     for a short period of time because they were
13     trying to control the computer system and
14     access to her office.
15  Q.  Did you do anything to suggest that this was
16     limited to a short period of time?
17  A.  Well, I told them that they were right in
18     the -- we were investigating -- I don't know

19     because I was trying to be protective.  I
20     don't know what I told them, but it was
21     certainly for a short period of time, to not
22     contact her, not touch the computer until we
23     let them know.  They were trying to get in
0312
1     touch with Tim Stewart to freeze her computer
2     so that they couldn't change anything.
3  Q.  Let me show you this.  Let me -- this is not
4     necessarily the best copy, but we'll call this
5     Plaintiffs' Exhibit 5 --
6        MS. NELSON:  Well, don't put it -- you're
7           putting it over my sticker.  That was
8           my -- also -- I'm sorry.  I already
9           had that sticker on it.
10        MR. JAFFREE:  I done forgot where this
11           came from.  This came from somewhere.
12             (Plaintiffs' Exhibit 7 was marked
13                for identification.)
14  Q.  Let me show you what's been marked as
15     Plaintiffs' 7 and see if you can recognize
16     that document.
17        COURT REPORTER:  Mr. Jaffree, was that 7?
18        MR. JAFFREE:  Yes, 7.
19        COURT REPORTER:  Because you said 5 first,
20           and then you said 7.
21        MR. JAFFREE:  Well, I'm sorry.  Yeah, it
22           said 5 on there, but it was 7.
23  Q.  Do you recognize that document?
0313
1  A.  Yes.
2  Q.  Is there anywhere on that document where you
3     make reference to a short period of time?
4  A.  No.  But I think -- that was my understanding,
5     that it was just until they could get control
6     of the computer system in her office.
7  Q.  Control of the computer system.
8  A.  Of the -- of her computer so nobody could go
9     in and change anything.
10  Q.  So they should limit their contact for the
11     time it took them to get the control of the
12     computer?
13        MS. NELSON:  Well, I think Number 7 can
14           speak for itself.  It says "while the
15           internal investigation conducted by
16           the Dothan Police Department was

```
17        underway."
18  Q.  So it was broader that just simply control of
19      the computer?
20  A.  Among other things, the investigation.  They
21      wanted to -- they wanted to freeze her
22      computer.  They're trying to get in touch with
23      Tim Stewart to freeze the computer.  They were
0314
1       investigating these complaints, and they
2       didn't want anybody calling her or colluding
3       with her, is my understanding.  So they just
4       said, no exact.  It was the -- the internal --
5       the investigators told us to go tell them to
6       not contact her.
```

**By what authority do not contact**

```
 A.  Among other things, the investigation.  They
21      wanted to -- they wanted to freeze her
22      computer.  They're trying to get in touch with
23      Tim Stewart to freeze the computer.  They were
0314
1       investigating these complaints, and they
2       didn't want anybody calling her or colluding
3       with her, is my understanding.  So they just
4       said, no exact.  It was the -- the internal --
5       the investigators told us to go tell them to
6       not contact her.
7   Q.  But by what authority did the investigators
8       have to tell you to tell your staff not to
9       contact Ms. Martin?
10          MS. NELSON:  If you know.
11  Q.  If you know, by what authority?
12  A.  Yeah.  I don't know.  They were investigators,
13      and I didn't question their investigation at
14      that point.
15  Q.  Did these people control your office?
16  A.  No.
```

**DO NOT DISCUSS INVEWSTIGATION**

**PAGE 316**
```
10  Q.  Did you give this to staff?  All right.
11          You also said that you instructed them
12      that "no discussion with anyone regarding this
13      matter was to take place."
```

14       Do you remember telling them that as well,
15    no discussion with anybody?
16  A.  I don't remember specifically but possibly, if
17    that's what the memo said.

## LENGTH OF DO NOT CONTACT MANDATE

21       Could you identify with me in detail what
22    mischief you thought to prevent with your
23    directive that the staff was not to contact
0317
1    Mary Turner?
2    MS. NELSON:  Object to the form.  She's
3     already answered the question.  I
4     object to the term.
5    MR. JAFFREE:  She's not answered that
6     question.
7    MS. NELSON:  Yes, she has.  She said the
8     investigators instructed --
9    MR. JAFFREE:  Can you let her --
10    MS. NELSON:  She's answered the question.
11    MR. JAFFREE:  She haven't answered the
12     question.
13    MS. NELSON:  If you would listen, she has
14     answered the question.
15  Q.  Let me ask you this:  Other than some
16    investigator, who was it that told you this?
17  A.  I don't remember specifically.  There were two
18    investigators I think at the time.  And I
19    don't remember which of them said it.
20  Q.  Some investigator told you -- came out and
21    told you, instruct the staff -- instruct your
22    staff to have no contact with Mary Turner?
23  A.  Yes.  I was in the courtroom, and they came in
0318
1    and said, we need to get control of the
2    office --
3    MS. NELSON:  Say who "they" is.
4  A.  The investigators.  It was either Keith
5    Gray --
6    MS. NELSON:  From the police department.
7  A.  From the police department.  Keith Gray, Ray
8    Owens or one of those two.
9  Q.  What limitation did they put on this no
10    contact?

11   A.   Just that what -- well, it was my
12        understanding -- and I think I conveyed
13        that -- that it was until they could get
14        control of the computer system because I put
15        in there, nobody was to go in her office.
16        They were investigating the allegation that
17        there had been ticket fixing in the office,
18        and they didn't want anybody colluding with
19        anyone else.
20   Q.   Well, when did they get control of the
21        computer system?
22   A.   I don't know at what point.
23   Q.   Well, let's –


**DO NOT DISCUSS TO PROTECT MARY REPRETATION**

 7   Q.   Well, when did they tell you that the
 8        investigation was complete?
 9   A.   I don't remember, but I even told them that
10        day that if they wanted to talk with Mary
11        after hours to let me know, and I would ask
12        the investigators how to handle that.  I
13        didn't know.  I wasn't trying to tell them not
14        to ever associate with her, just while the --
15        the criminal was going on.
16   Q.   You haven't answered my question.  When did
17        they tell you their investigation was
18        complete?
19   A.   I don't remember the date.
20   Q.   Did they ever tell you their investigation was
21        complete?
22   A.   I'm sure at some point they said, it's okay.
23   Q.   Did you have a meeting with the staff telling
0321
 1        them that the investigation is complete and
 2        now you can contact Mary?
 3   A.   I don't remember.
 4   Q.   Well, how would the staff know when it's okay
 5        to contact Mary?
 6   A.   Well, it would have been communicated to them
 7        in some way.
 8   Q.   Well, did you communicate it to them in some
 9        way?
10   A.   I'm sure -- I don't remember because Mary was
11        eventually charged with criminal charges and

12    everything else transpired.

13  Q.  If somebody says you never communicated to

14    them in some way that the investigation was

15    over, would you be in a position to dispute

16    that?

17  A.  That I never communicated --

18  Q.  You never communicated to them that the

19    investigation was over.

20  A.  I would dispute that.  I mean, I -- nobody

21    ever came and asked me, could they contact

22    Mary and I said, no, you're -- no.  So I would

23    dispute that.

0322

1  Q.  So you did tell them at some point the

2    investigation was over?

3  A.  I just don't remember specifically how it

4    happened.

5  Q.  Well, is that something you would remember?

6  A.  There was so much going on that -- during that

7    time, and we were trying to be protective of

8    Mary because they were simply allegations at

9    that point.

10  Q.  Protective of Mary?

11  A.  Yeah.  Because there was a lot of rumor and

12    allegation.  And I just asked them not to talk

13    about it.

14  Q.  How would Mary be placed in jeopardy by

15    somebody talking to Mary?

16  A.  No.  The rumors and the allegations.  Nobody

17    knew for sure, and it was just allegation.

18  Q.  Answer my question.

19  A.  I just asked them to stop talking about it.

20  Q.  Answer my question:  How would Mary be harmed

21    by somebody talking to Mary?

22  A.  How would she be harmed?

23  Q.  You said you wanted to protect Mary.  Are we

0323

1    talking about Mary Turner?

2  A.  I wanted to protect her reputation and her

3    character.  At that point, it was just simply

4    allegations.  We didn't know if they were true

5    or not, and I didn't think they should be

6    running around talking about it.

7  Q.  So that's why you didn't want staff to talk

8    to --

9  A.  No.  I did that at the behest of the

10      investigators.
11   Q.  Did you not want staff to talk to each other
12      as well?
13   A.  No.  I think I said other -- talking about it.
14      I meant generally.
15   Q.  All right.  But were you trying to protect
16      Mary by telling staff, have no contact with
17      her?

## MORE ON NO CONTACT

4    A.  Well, I -- I was in my mind trying to tell
5       them to stop talking about -- it was just
6       simply allegations going around.
7    Q.  I'm a little bit confused.  How many people in
8       addition to yourself knew that there was a
9       criminal investigation going on?
10   A.  How many people?  I have no way of knowing
11      because once I met with Personnel, the legal
12      department, and the police chief, that was the
13      extent of my -- I never got back involved with
14      it.
15   Q.  Well, do you know whether --
16   A.  So I don't know who they told.
17   Q.  Do you know whether Mary knew that there was a
18      criminal investigation going -- Mary Turner
19      knew that there was a criminal investigation
20      going on concerning her?
21   A.  No, I don't know.
22   Q.  Do you know if any of the other magistrates
23      knew that there was a criminal investigation
0325
1       going on concerning Mary?
2    A.  Do I have personal knowledge that they knew?
3    Q.  Yeah, personal knowledge.
4    A.  I have no personal knowledge that they knew.
5    Q.  Well, if they didn't know a criminal
6       investigation was going on, what could they
7       possibly tell Mary in contacting Mary that
8       would interfere with the criminal
9       investigation?
10   A.  You want me to answer it?
11   Q.  Well, if you can.
12   A.  Well, there was a lot of allegations, rumors
13      just going around that Mary Turner was in

14          trouble because this guy had come in, talking
15          about fixing tickets.  Just -- I guess it was
16          just a normal leak, but nothing had been
17          substantiated.  I never told them about the
18          allegations, but I knew there was a lot of
19          whispering and rumors going on.  And for that
20          reason, I asked them to not to --
21              MS. NELSON:  Let her answer.
22              MR. JAFFREE:  Well, I'm stopping her
23                  because she's not answering my
0326
1                  questions.
2              MS. NELSON:  You don't like what she has
3                  to say.  That's the reason you're
4                  stopping her.
5              MR. JAFFREE:  But she's not answering my
6                  question.  I asked her, what could
7                  they tell Mary that would interfere
8                  with the investigation.  I'm trying to
9                  find out.  If they didn't know
10                  anything and if Mary --
11              MS. NELSON:  She didn't know what they
12                  knew.  They could do a lot.
13              MR. JAFFREE:  Well, tell -- I want her to
14                  tell me a lot of what they could do
15                  that interfered with the
16                  investigation.
17     A.  Well, if they contacted Mary, she could tell
18          them to go in the computer and delete the
19          files of the other Phelps boy's tickets who --
20          that had been --
21     Q.  She didn't know what the investigation was
22          about.
23     A.  I don't know whether --
0327
1              MS. NELSON:  How do you know that?
2     A.  -- she knew.
3              MS. NELSON:  There's no testimony to that.
4              MR. JAFFREE:  Do you have your records?
5              MS. NELSON:  You're trying to testify on
6                  her behalf.  There's absolutely no
7                  evidence in this proceeding that she
8                  didn't know what was going on.
9              MR. JAFFREE:  Assuming --
10              MS. NELSON:  She knew full well what she
11                  was being suspended for.

12        MR. JAFFREE:  Assuming these documents are
13          true--
14        MS. NELSON:  What documents, Mr. Jaffree?
15        MR. JAFFREE:  The documents that I'm
16          looking at.  Let me move on because I
17          don't want to --
18        MS. NELSON:  Mary Turner was ultimately
19          indicted of a criminal offense.  And
20          as I understand it, entered a -- had
21          some kind of deferred prosecution or
22          something.  But she was under criminal
23          investigation for a very serious
0328
1          charge.
2        MR. JAFFREE:  It's in the record that she
3          was charged with a misdemeanor and not
4          found guilty of any misdemeanor.  But
5          be that as it may, we're talking about
6          a single ticket.
7        MS. NELSON:  This all your
8          characterization.
9        MR. JAFFREE:  Well, how many tickets are
10          we talking about.  I thought we was
11          talking about a single traffic ticket.
12          We're not talking about any espionage
13          or forgery or whatever she was charged
14          with that --
15        THE WITNESS:  Extortion.
16        MS. NELSON:  She was charged with
17          extortion.
18        MR. JAFFREE:  Yeah.  But she wasn't
19          charged with extortion.  She just
20          simply wasn't.  That's not true.
21          That's not part of the record.  You
22          can't find a record where she was
23          charged with extortion.  She wasn't.
0329
1          And if I have to prove -- present a
2          document to establish that, I will.
3          Since I represented her, I know.
4              But, anyway, be that as it may, I
5          want to go on.
6    Q.  Did you explain to the staff why this
7        no-contact directive was important?
8          MS. NELSON:  I think asked and answered.
9    Q.  Can you answer the question, yes or no?

10   A.  Why I thought it was important or why it was
11      important?
12   Q.  Why the no-contact directive was important?
13      Did you explain to them why it was important?
14   A.  It was important -- no, I didn't -- I don't
15      know if I said why it was important.  I just
16      told them that we were not to contact Mary
17      pending this investigation.
18   Q.  So you didn't tell them why it was important.
19   A.  And if they wanted to talk with her after
20      hours to let me know, and I would ask how they
21      needed to do that.
22   Q.  Did you place any limits on this prohibition?
23   A.  Limits such as?
0330
1       MS. NELSON:  Asked and answered.
2       MR. JAFFREE:  That's not asked --
3   Q.  Did you place any limits on the prohibition,
4      no contact?  Were there any limits to it, or
5      was it absolute, don't contact her in church,
6      don't say hello?
7   A.  I told --
8       MS. NELSON:  Asked and answered.
9   A.  I told them if they wanted to talk
10      with -- contact her -- no.  I didn't tell them
11      not to go to church or after hours.  I told
12      them they could talk with her after hours, let
13      me know, and I'd find out -- you know, tell
14      the investigators, they go to church with them
15      or whatever.
16   Q.  Well, you'd have to consult with the
17      investigators before they would be permitted
18      to talk to them after hours?
19   A.  No.  I -- I just told them to let me know if
20      they wanted to talk with her after hours.  I
21      didn't know how to handle that.
22   Q.  I read everybody's transcript.  I don't
23      remember anybody saying that you told them
0331
1      that they could talk to her after hours if
2      they contact you and get clearance.  I don't
3      recall --
4       MS. NELSON:  I don't know whose transcript
5       you are even talking about.
6       MR. JAFFREE:  All the magistrates'.
7       MS. NELSON:  There's no testimony in this

8      case about any magistrates.

9      MR. JAFFREE:  All the magistrates'.

10      There's nothing to that effect.  So --

11      MS. NELSON:  That's your statement,

12      Mr. Jaffree.

13      MR. JAFFREE:  Well, fine.

14      MS. NELSON:  And I move to strike it.

15      MR. JAFFREE:  Fine.  Fine.  Fine.

16   Q.  Were you acting in your administrative or

17      judicial capacity when you issued your

18      no-contact directive?

19   A.  I'm reticent about saying it was my no-contact

20      directive.  I didn't -- you know, it wasn't at

21      my behest or my initiation.  I simply did what

22      the investigators told me was necessary at the

23      time.  So I don't --

0332

1   Q.  Well, you adopted that no-contact directive,

2      didn't you?

3      MS. NELSON:  Object to the

4      characterization.  She said she --

5      adopt, she never said she adopted it.

6      MR. JAFFREE:  I'm asking her.

7      MS. NELSON:  She said she communicated it.

8      MR. JAFFREE:  I'm asking her.

9   A.  I communicated it.

10   Q.  Did you adopt their no-contact directive to

11      you as your no-contact directive?

12      MS. NELSON:  Object to the form.  She's

13      testified as to what she did.

14      THE WITNESS:  Right.

15   Q.  There's -- no, no.  Right?  Yes or no, did you

16      adopt their no-contact directive --

17      MS. NELSON:  Object to the form.

18   Q.  -- as your no-contact directive?

19   A.  I wouldn't say I adopted it.  But, you know,

20      they're criminal investigators.  If they come

21      in there and say, go tell them not to talk to

22      Mary, not to come to that computer, I wouldn't

23      have said, no, I'm not going to do that.

0333

1   Q.  Did you --

2   A.  So I did not adopt it.  I'd simply

3      communicated the no-contact order that was

4      communicated to me by the criminal

5      investigators.

6   Q.  Did you initiate --
7   A.  I did not.
8   Q.  Well, can I finish my question?
9        Did you initiate any disciplinary action
10      because your no-contact directive was
11      breached?
12  A.  Did I initiate any disciplinary action because
13      "the" no-contact order was breached?
14  Q.  Yeah, because the no-contact order was
15      breached?
16  A.  I don't remember.
17  Q.  Did you charge somebody with insubordination
18      because the no-contact order was breached?
19  A.  Yes.
20  Q.  Was it because of your no-contact order was
21      breached or the police department's no-contact
22      order was breached?
23       MS. NELSON:  I object to the form.
0334
1   A.  And I think they're one in the same.  There
2       was a no-contact order in place.
3   Q.  So you adopted it?
4        MS. NELSON:  Object to the form.
5   Q.  So you adopted it?
6        MS. NELSON:  That's your characterization?
7        MR. JAFFREE:  Well, she said "one in the
8          same."  What does that mean?  What
9          does "one in the same" mean to you?
10       MS. NELSON:  It's one in the same.  Accept
11         her testimony.  And she's not saying
12         she adopted it.  Just ask her
13         factually what happened.  You don't
14         like what she says, and you just get
15         hung up on your version of the way you
16         want to hear it.
17  Q.  If you didn't --
18       MS. NELSON:  You can ask her factually
19         what happened.
20       MR. JAFFREE:  Wait a minute.  I'm asking
21         her.
22  Q.  If you didn't adopt it, why did you discipline
23      somebody for its breach?
0335
1   A.  Because it was in place at the time.  I
2       communicated it.  And I told them, you know,
3       do not contact Mary.  And I told them that the

4       investigators said, you know, not to contact
5       Mary, it was an investigation.


## AFTER HOUR CONTACTS

15          I said, because I know you and Mary are
16       friends.  And if you want to contact her, let
17       me know.
18          And she didn't say a word.
19    Q.  Did you expect staff, including Ms. Brackin,
20       to use their own discretion on what contacts
21       with Ms. --
22    A.  No.
23    Q.  -- Turner was permissible?
0336
1     A.  No.  It was clear that they were not to
2       contact her or go in her office.
3     Q.  Did you intend your directive to be all
4       inclusive, sweeping, and cover the universe of
5       possible contacts?
6     A.  No.  That's why I gave her the option of
7       contacting her after hours.
8     Q.  Did you say, no, that she was free to contact
9       her after hours?
10    A.  She never asked.
11    Q.  Was she free to contact her after hours?
12    A.  If she had asked, possibly.
13    Q.  Well, had she contacted --
14    A.  She said she didn't have any reason to.
15    Q.  Had she contacted you to contact her after
16       hours, would you have granted that contact?
17    A.  I don't know.  I mean, I -- I -- just --
18       supposition.
19        MS. NELSON:  Ms. Brackin was disciplined
20           for insubordination for a phone call
21           that she made during office hours,
22           which she's admitted to.  And the
23           judge has already dismissed that count
0337
1           in your case.  And so --
2        MR. JAFFREE:  Can I continue?
3        MS. NELSON:  -- we're beating a dead
4           horse.
5        MR. JAFFREE:  I appreciate your giving a

6         closing and an ultimate statement or

7         whatever kind of statement.

8    MS. NELSON:  I'm just telling you --

9    MR. JAFFREE:  But if I could go on.

10  Q.  Were there any time or date or circumstances,

11    exceptions to your directive?

12  A.  If they wanted to contact her after hours.

13    MS. NELSON:  Asked and answered.

14  Q.  Were you aware that Ms. Turner and Ms. Brackin

15    were close friends?

16    MS. NELSON:  Asked and answered or at

17      least answered.

18  Q.  Were you?

19  A.  I thought they were.

20  Q.  Okay.  Did you know that they visit each

21    other's homes?

22  A.  No, I didn't know that.

23  Q.  That they attended the same church?

0338

1  A.  No.  I thought Mary Beth went to a different

2    church.

3  Q.  They went out socially together?  Were you

4    aware of that?

5  A.  Mary Beth told me that Mary Turner's husband

6    had been having improper sexual advances with

7    a nephew --

8  Q.  I didn't ask you about any --

9  A.  -- and she wasn't comfortable being around

10    him.

11  Q.  I didn't ask you that.

12  A.  That's what I'm telling you.

13    MS. NELSON:  Well, you did.  You asked

14      her.

15  A.  That's why I laughed when you said --

16  Q.  I didn't ask you anything about her husband.

17    I asked you --

18  A.  No.  You said did they have social -- I'm

19    sorry -- did they have social contact.  So I

20    wouldn't think they would because Mary Beth

21    told me that Mary Turner's husband performed

22    fellatio on his 18-month-old nephew, and she

23    wasn't comfortable with her son being around

0339

1    him.

2  Q.  All right.

3  A.  That's what Mary Beth Brackin said.  So I

4        wouldn't think they would socialize.  But,
5        now, I don't know.
6   Q.  Were you aware that they frequently spoke to
7        each other on the phone when not at work?
8   A.  No, I was not aware of that.
9   Q.  Were you aware that they enjoyed the presence
10       of each other's company?
11          MS. NELSON:  Asked and answered.
12   A.  She told me she didn't like him around her
13       child since he liked to have sex with boys.
14   Q.  I wasn't talking about him.  I'm talking about
15       the two of them.
16   A.  I don't know.  I would think she wouldn't have
17       been comfortable with them around.
18   Q.  Would your knowledge of a close relationship
19       and a frequent non-work-related contact
20       between the two of them have made a difference
21       in your directive or how you would implement
22       it?
23   A.  I wasn't aware that there was one.
0340
1   Q.  But if you were aware that they had a close
2        relationship, would that have made
3        a difference in your directive?
4   A.  Well, that's why I gave her the option of
5        talking to her after hours.  I told her that
6        if she wanted to talk with them after hours,
7        let me know.
8   Q.  Given your understanding of the prohibition of
9        the state and understanding with the right
10       that all free citizens have to associate with
11       each other, do you think in hindsight that
12       your directive was overbroad?
13          MS. NELSON:  Object to the form.  Calls
14             for legal conclusions.
15   Q.  Do you understand what overbroad means?
16   A.  Yes.
17   Q.  Do you think that maybe in hindsight your
18       directive was overbroad?
19          MS. NELSON:  Object to the form.
20   A.  And it was not -- and I say it was not my
21       directive.  It was not -- I would have not
22       thought to just go up there and say, y'all
23       don't do this or y'all don't speak to
0341
1        anybody.  I was directed there was a criminal

```
2        investigation going and they didn't want them
3        colluding or tampering with evidence. And
4        that's what I communicated to them.
5   Q.  Now, did you testify already how you learned
6        that the police investigation was completed?
7   A.  I'm sure just I got the results -- no, I did
8        not testify to that. I don't remember.
9   Q.  Don't remember. So you don't know how you
10       learned that it was completed. When was it
11       completed?
12  A.  I don't remember specific dates.
13  Q.  You don't know who told it was completed?
```

**MORE AFTERHOUR CONTACTS OK**
**PAGE 374.**

```
4   Q.  Would participating with Ms. Turner in a Bible
5        study class during the prescriptive time have
6        been a violation of your no-contact directive?
7   A.  No, because it was after hours.
```

**ADOPTION OF POLICE INVESTIGATION NO FURTHER INQUIRY**

```
6   Q.  How was the staff to know when it was okay to
7        resume contact with Ms. Turner?
8   A.  I guess that they would have been told. I
9        don't remember how it happened.
10  Q.  They were expected to know by being told,
11       huh? Okay. But you don't know whether they
12       was told or not.
13          Now, do you know pursuant to what
14       authority the police officers interviewed the
15       staff concerning your no-contact directive?
16  A.  No, I don't.
17  Q.  I understand that there was some posting on a
18       web site of the fact that Ms. Turner was under
19       investigation; is that correct?
20  A.  I have no personal knowledge. I didn't see it
21       on the web site.
22  Q.  Is that posting the trigger for the decision
23       of police officers to interview your staff?
0343
1          MS. NELSON: If you know.
2   A.  I don't remember. I was not a part -- I was
3        not involved in that.
```

4   Q.  Was Officer Gray involved in that
5       interrogation of your staff?
6           MS. NELSON:  Object to the form.
7   A.  Was Officer Gray involved in the investigation
8       of Mary Turner's criminal complaint?
9   Q.  Well, you prefer that word rather than
10      interrogation?
11  A.  I don't know specifically which investigator
12      was -- there were two I think at the time.
13      I'm not sure which.
14  Q.  Did one of the police officers give you a
15      recommendation of what rule or regulation of
16      the personnel board that Ms. Turner -- I'm
17      sorry, strike that -- Ms. Brackin may have
18      violated by contacting Ms. Turner?
19  A.  It might have been a part of their findings
20      that -- in their investigation that these were
21      the Personnel Rules and Regulations that were
22      broken.
23  Q.  Do you know upon what authority does the
0344
1       police department have in informing you what
2       personnel rules have been broken by an
3       employee under your charge?
4   A.  I think that was just the result of their
5       investigation, that the results of their
6       investigation revealed that those rules had
7       been broken.  They did not dictate those
8       disciplinary charges to me.  They just
9       probably mentioned them in their investigative
10      report.
11  Q.  Did the police report that you received
12      recommend that you terminate Ms. Brackin?
13  A.  I don't remember specifically.
14  Q.  Did you do any further or make any further
15      inquiry after you received the police report
16      to make an independent assessment of whether
17      or not Ms. Brackin should be terminated?
18  A.  Which -- Ms. Brackin's termination?  No, I did
19      not do any further investigation of the facts
20      of any investigation.  I didn't go behind them
21      and investigate any more.  No.
22  Q.  So if they recommended termination, you
23      adopted their recommendation?
0345
1   A.  No.

2     MS. NELSON:  Object to the form.  That was
3        not the testimony.
4   Q.  You didn't adopt their recommendation?
5   A.  No.  I mean, I would have -- I would have
6       looked at their report, but I would not
7       necessarily have adopted the recommendation
8       that she be terminated.
9   Q.  Well, do you know for a fact whatever contact
10      Ms. Brackin had with Ms. Turner, whether or
11      not that interfered with the police
12      investigation?
13  A.  Do I know for a fact?
14  Q.  Uh-huh (positive response).
15  A.  No.  I don't know what she communicated to
16      Ms. Turner.
17  Q.  Did the police share with you the results of
18      their complete investigation?
19  A.  I'm sure they did.

## OTHER VIOLATORS OF DIRECTIVE

20  Q.  Okay.  Were you aware -- by the way, before I
21      ask you that question, let me back up.
22          You have a directive here that says, there
23      should be no contact with Ms. Turner.  You
0346
1       have another directive that says, there should
2       be no discussion with anyone regarding this
3       matter.  Is that correct?
4       MS. NELSON:  Again, the documents can
5          speak for themselves.
6       MR. JAFFREE:  But there's at --
7       MS. NELSON:  You only read parts of it.
8       MR. JAFFREE:  -- least two directives
9          there of the staff.
10         (Brief pause)
11  A.  That's what it says.  Yes, sir.
12  Q.  Were they both of equal weight or which one
13      was greater weight?
14      MS. NELSON:  This is so ridiculous.
15      MR. JAFFREE:  Excuse me.
16  Q.  Even though it's ridiculous, if you could
17      answer my question.
18  A.  I didn't weigh them.  I just simply, you know,
19      communicated what was told to me and asked
20      them to not do it.

21   Q.   When you got the police report, did you learn
22        that Eunice had communicated with a friend
23        about the investigation of Ms. Turner?
0347
 1   A.   I don't remember that specifically.
 2   Q.   Well, do you remember the police officer
 3        asking all of them had they communicated with
 4        someone about that investigation?
 5   A.   I wasn't present when they talked with them.
 6   Q.   But you got the report.  You said that, you
 7        got their report.
 8   A.   Well, I got the report of the investigation of
 9        Mary Beth -- I mean, Mary's criminal charges.
10        This is the investigation of -- I was aware
11        there was a separate investigation by the
12        police department of the leak.
13   Q.   Well, now, I'm not necessarily limiting it to
14        Mary's criminal investigation.  They was
15        investigating to determine who had contacted
16        Rickey Stokes and caused that --
17            MS. NELSON:  Are you testifying or is this
18             a question?
19            MR. JAFFREE:  She asked me a question and
20             I'm telling her.
21            MS. NELSON:  You're telling her -- you're
22             supposed to be asking her questions
23             and not telling her --
0348
 1            MR. JAFFREE:  Well, I'm telling her what
 2             investigation I'm talking about.
 3   A.   Do you have it, a copy of it?
 4   Q.   A copy of what?
 5   A.   Of what you're talking about.  You said
 6        they --
 7   Q.   There's a massive amount of documents.  But do
 8        you know from your experience whether or not
 9        the police department was investigating who
10        could have told Rickey Stokes that there was
11        an internal investigation going on?
12   A.   I remember there was an investigation by the
13        police department of --
14   Q.   And as part of that investigation --
15            MS. NELSON:  Just let her answer.
16   A.   I remember there was an investigation of that
17        by the police department.  Yes.
18   Q.   And as part of that investigation, they asked

19      each of them, who have they communicated with?
20          MS. NELSON:  Each of whom?
21  Q.  Each of your magistrates --
22          MS. NELSON:  If you know.
23  Q.  -- who they communicated with.
0349
1   A.  I don't -- no.  I mean, I remember vaguely
2       that there was an investigation, but I don't
3       -- I wasn't a part of it.  I wasn't there when
4       they talked with them or --
5   Q.  And Eunice said that she had told a friend in
6       addition to her daughter the details of the
7       investigation as part of their report?
8          MS. NELSON:  Object to the form.  Do you
9            know that?
10         THE WITNESS:  No.
11  Q.  In fairness, other ones said that they told
12      their husband or told their wife, but Eunice
13      is the only one that told some friend of hers
14      about the investigation.
15         MS. NELSON:  Object to the form.
16  Q.  It's in the record.  Do you dispute that's in
17      the record?
18         MS. NELSON:  What record?
19         MR. JAFFREE:  It's in the police
20            interrogation record.
21  Q.  Do you want me to pull the Eunice one out to
22      show you?
23  A.  I just don't know that specifically, but you
0350
1       say other people told other -- I don't know.
2       Did anybody else contact Mary Turner?
3   Q.  Well, we're not talking about Mary Turner
4       now.  We'll talking about whether or not they
5       told anyone about the investigation.  Your
6       directive says to talk to nobody about the
7       investigation.  And they talked to other
8       people about this investigation.  At least the
9       rest of them kept it within the family.
10      Eunice didn't keep it within the family?
11         MS. NELSON:  Object to the form.
12  Q.  She talked to other people.
13         MS. NELSON:  Object to the form.
14  Q.  Now, assuming that happened, would that have
15      been insubordination?
16  A.  Assuming that happened?

17        MS. NELSON:  Object to the form.
18   Q.  Assuming that Eunice as she admitted in her
19      statement under oath --
20        MS. NELSON:  Object to the form.
21   Q.  Assuming that Eunice had talked to --
22   A.  I think all of them, not just Eunice.  You
23      said all of them admitted to talking to
0351
 1      somebody.
 2   Q.  Well, would that have been insubordination?
 3   A.  That all of them talked with someone?
 4   Q.  Uh-huh (positive response).
 5   A.  I think it would have been in violation of the
 6      spirit of the order.  Yeah.
 7   Q.  Yeah.  And none of them was terminated, were
 8      they?
 9   A.  Not -- no, not terminated.
10   Q.  None of them was warned that they had
11      committed a violation of a directive, were
12      they?
13   A.  Not that -- I don't -- I didn't know that.
14   Q.  Whatever police -- Sergeant Gray, the same one
15      who sort of was used as a reference for
16      Lavera, that same Sergeant Gray --
17        MS. NELSON:  Object to the form.  Object
18         to your testimony.  Objection to your
19         interjection of opinion.
20        MR. JAFFREE:  Am I wrong about it?
21   Q.  Have you looked at Lavera's application for
22      employment and who she put down as her
23      reference?
0352
 1   A.  No, I haven't.
 2   Q.  Well, it's Sergeant Gray.  You're familiar
 3      with Sergeant Gray --
 4        MS. NELSON:  I object to your continuing
 5         testifying.
 6   Q.  -- are you not?
 7   A.  He worked for the City of Dothan.
 8   Q.  You're quite familiar with him; is that not
 9      correct?
10   A.  No.  He works for the City of Dothan.  We're
11      not --
12   Q.  The two of you are friends?
13   A.  No, we're not friends.
14   Q.  All right.

15   A.   We don't socialize.  We don't go to the same
16        church.  We don't know the same people.
17   Q.   Sergeant Gray who did this internal
18        investigation was aware that people had
19        violated your directive, specifically Eunice?
20   A.   Now, you said everybody.
21   Q.   Yeah.  But Eunice violated by bringing in a
22        stranger.
23            MS. NELSON:  Object to the form.  Do you
0353
1            know what he's talking about?
2            THE WITNESS:  I -- just from what he's
3                talking about, no.
4    Q.   Do you dispute what I'm talking about?
5    A.   I don't remember saying that.
6    Q.   Do you dispute what I'm talking about?
7    A.   I don't dispute that she -- I have no way to
8        dispute that.  I don't know.  Do you have a
9        copy of it that I can see?
10   Q.   Yeah, I have a copy of it.
11   A.   Okay.  Can I -- did I sign it or --
12   Q.   Did you sign it?  No.  We're talking about her
13        testimony, who she admitted talking to.
14            MR. JAFFREE:  I guess we can take a break
15                and I'll find this for you.
16            (Brief recess)
17            (Plaintiffs' Exhibit 8 was marked
18                for identification.)
19   Q.   All right.  I'll point to you what I've marked
20        for identification purposes as Plaintiffs'
21        Exhibit 8 in response to the question about
22        Eunice.  And Officer Keith Gray made this
23        statement to Eunice.  I'll give you his
0354
1        statement and Eunice's response.
2            "Okay.  Um, since the judge gave everyone
3        the directive not to talk about it to anyone,
4        um, have you mentioned it, the investigation
5        to anyone?"
6            "I did mention it to a family member."
7        That's Eunice speaking.  I'm sorry.  Yeah,
8        Eunice speaking.
9            Officer Gray:  "Okay.  Who is that
10        member?"
11            Eunice:  "Ah, Melissa White."
12            Officer Gray:  "Who?"

13          Eunice:  "Melissa White."
14          Officer Gray:  "How is she related to
15      you?"
16          Eunice:  "Just a friend."
17          Officer Gray:  "Okay.  What contact, what
18      did you say?"
19          Eunice:  "Ah, I said that, ah, there was
20      an investigation going on, and it's about Mary
21      Turner in our office because she had did
22      something.  We wasn't sure what was it yet."
23          Officer Gray:  "Does Ms. White know
0355
1       Ms. Turner?"
2          Officer Gray (sic):  "No."
3          Officer Gray:  "Okay.  Did you" --
4          MS. NELSON:  Wait.  You're
5            mischaracterizing that.  You said
6            officer --
7          MR. JAFFREE:  This is Officer Gray: "Does
8            Ms. White know Ms. Turner?"
9              Eunice:  "No."
10         MS. NELSON:  Okay.  Eunice said no.
11         MR. JAFFREE:  I'm sorry.
12   Q.  Officer Gray:  "Okay.  Did you say anything to
13      anybody else?"
14          "I think I mentioned it to my daughter."
15          Officer Gray:  "How old is your daughter?"
16          Eunice:  "How old?  30."
17          And then it goes on.
18          Officer Gray:  "What is your daughter's
19      name."
20          Eunice:  "Claudette" --
21   A.  Can I not see it and read it myself?  It's for
22      me to --
23   Q.  -- "Hawthorne."
0356
1    A.  Read the rest of it.
2    Q.  Officer Gray:  "And just what did you tell
3      her?"
4          Eunice:  "I just told her that we were
5      having some problems in the office.  I didn't
6      mention any name."
7          Officer Gray:  "Okay.  Anyone else?"
8          Eunice:  "That's it."
9          Like I said, numerous employees discussed
10      this with people that could have discussed

11        this with people that could have led to Rickey
12        Stokes having information about this
13        investigation.  And that was the purpose of
14        this investigation, to find out how did Rickey
15        Stokes find out.  That was the sole purpose of
16        this internal affairs investigation.
17            MS. NELSON:  Object to the form.  Is that
18              a statement or --
19            MR. JAFFREE:  Well, there's all kind of
20              statements we can go through.  I'm
21              just saying that's the purpose.  Every
22              time they would give people their
23              yearly rules, they would say it's an
0357
1              investigation on who told.
2            MS. NELSON:  Object to the form and
3              statement.
4    Q.   My question is, would you agree that purely
5         based on your directive, the Exhibit 7 I
6         believe, that Eunice committed
7         insubordination?
8    A.   Based on what you're showing me today that I
9         don't remember seeing.  But I -- I guess I
10        made distinction -- I make the distinction
11        between contacting Mary Turner, the defendant
12        or the object of the investigation and
13        discussing having problems at the office with
14        a friend and a family member.
15   Q.   Well, I thought it was a little bit more than
16        a problem, it was saying that she was under
17        investigation, the very thing that you didn't
18        want people to know.  But if you want to say
19        that's a distinction, fine.
20   A.   Well, I mean, that's the distinction I will
21        make today.  I didn't make it at that time
22        because in the report -- where is the -- on
23        the report of the Mary Turner and Mary Beth
0358
1         investigation, I don't think it mentioned
2         that, that Eunice had talked -- said -- or
3         numerous people.
4    Q.   But the report submitted all of these
5         documents.  I mean, that was part of the
6         report.

**MAY HAVE HAD THE FULL REPORT BUT DID NOT LOOK AT IT JUST TOOK THE OFFICER'S WORD**

```
10   Q.  Well, are you soliciting that the report just
11        had a narrative of the police and no
12        documents?
13   A.  Let me be honest with you.  I don't remember
14        seeing this.  I thought there were like --
15             MS. NELSON:  This is being Plaintiffs'
16              Exhibit 8?
17   A.  -- disks or something but not this.
18             MS. NELSON:  Have you not seen --
19   A.  If there was, I didn't look at it.  I'm
20        sorry.  I just looked at the report.  I didn't
21        read the individual interviews or anything
22        like that.
23   Q.  So you just took the police officer's word and
0359
1         made a decision on the basis of what the
2         police officer told you without reading any
3         testimony itself?
4    A.  Well, the results of their investigation
5         revealed that -- whatever.  Yes.  I just
6         looked at that.  I didn't go back and look any
7         further at the investigation.
8    Q.  Would you agree that the results of that
9         investigation would reveal insubordination?
10             MS. NELSON:  Object to the form.  Could
11              you show her the report?
12   A.  And the other people's statements.
```

**SARAH FOWLER MADE CONTACT**

```
1    A.  Mary -- Mary Beth was the only person that
2         said she contacted Mary Turner, is my
3         understanding.
4    Q.  Well, that's not true either.
5    A.  Somebody else said they contacted her?
6    Q.  Do you remember Sarah Fowler saying that she
7         took Mary Turner out to lunch for her
8         birthday?  Do you remember that being in the
9         report?
10   A.  After the directive?
11   Q.  Yeah, after the directive.
12   A.  I didn't look at that.
```

13    Q.   Well, that's contacting Mary Turner.  That's
14        in the report as well.  But let's forget about
15        that right now.  Let's talk about this traffic
16        ticket right quick.

**AT THE TIME OF THE NO CONTACT DIRECTIVE MRS. TURNER HAD NOT
BEEN CHARGED WITH ANYTHING**

 A.   -- was terminated when she was criminally
0361
1        indicted I think for -- for the traffic
2        ticket.
3    Q.   Do you know if Ms. Turner was ultimately
4        charged with mishandling a traffic ticket, a
5        misdemeanor?
6    A.  I don't know what she was ultimately charged
7        with.
8    Q.   So you don't know.  At the time Ms. Turner was
9        investigated for that ticket, she had not been
10        charged with anything; is that correct?
11    A.   At the time she was investigated for it?
12    Q.   Yeah.  The investigation that you mentioned in
13        Exhibit 7, Ms. Turner hadn't been charged with
14        anything?
15        MS. NELSON:  Number 7 being?
16        THE WITNESS:  The memo about no contact.
17        MR. JAFFREE:  The memo that you no
18            contact.
19    A.   She hadn't been charged?

**DON'T KNOW WHO AUTHORIZED THE TURNER INVESTIGATION**

Q.  I'll pass it.
19            Do you know who was assigned to conduct an
20        investigation of Ms. Turner?
21    A.   Not specifically.
22    Q.   Did you play any role in the initiation of
23        this investigation?
0372
 1    A.   Other than calling them and telling them, no.


**DENY THAAT IT WAS HER DIRECTIVE**

**PAGE 374**

4   Q.  Sent her an e-mail, would that have been
15      sufficient contact to violate your directive?
16        MS. NELSON:  Again, object to the form.
17   A.  Right, and my directive.  It was a directive
18      of the investigators that they not -- I think
19      that needs to be clarified on the Record.  It
20      was not my directive.

23   A.  I communicated it to them through the
0375
1      investigators.
2   Q.  But it became your directive when you enforced
3      it, didn't it?
4        MS. NELSON:  Object to form.
5   A.  I communicated it to them.
6   Q.  But it became yours when you enforced it,
7      correct?
8   A.  I didn't -- I'm not saying I adopted or
9      initiated it.  I communicated it.
10   Q.  Somebody lost their livelihood as a result of
11      you enforcing that directive; is that correct?
12   A.  Somebody lost their livelihood as a result of
13      violating that directive, a choice they made.
14   Q.  Okay.  A choice.  All right.

## THE PEOPLE WHO VIOLATED THE DO NOT DISCUSS DIRECTIVE

13   A.  I think when I asked her not to talk with
14      anybody about it, I was trying to be
15      protective of Mary.  And I kind of meant,
16      gossiping with other people outside the
17      office.  But I tried to convey that as best I
18      could that -- and I told them that I was being
19      protective of Mary.  There was a lot of
20      allegations and rumors; let's not talk about
21      it.  And I meant, add fuel to the fire.  You
22      know, I really was trying to be protective of
23      her because there were merely allegations and
0377
1      no substantiated evidence of any wrongdoing by
2      her.
3   Q.  Melanie Wise spoke to her husband.  Was that a
4      violation of your directive?
5        MS. NELSON:  Object to the form.

6   A.  I -- no.  I think it's reasonable that they
7       would tell their spouses that something was
8       going on at work.
9   Q.  And so they should have just realized that
10      that was reasonable?
11          MS. NELSON:  Object to form.
12  A.  I think it's expected that they'll talk to
13      their husbands.  If they're -- if they're
14      down, their husband say, what's going on.  Oh,
15      we got an investigation at work.  I don't
16      think that violates the spirit of the order.
17      No, I don't.
18  Q.  And Ann spoke to her husband, so that didn't
19      violate it either?
20          MS. NELSON:  Object to the form.
21  A.  Do we know what she told her husband, or if
22      she said, we're having problems at work or
23      there's an investigation at work or one of my
0378
1       co-workers is in trouble?  We don't know what
2       she told them.  And I think it's expected that
3       they would to talk to something -- to their
4       spouses.
5   Q.  Let me just check these off.  Melissa Woods
6       talked to her husband; that's okay as well,
7       right?
8           MS. NELSON:  Object to the form.
9   A.  I'm not saying it's okay, but we don't -- do
10      we know what they told her?  She talked to
11      them --
12  Q.  About the investigation.
13          MS. NELSON:  Object to the form.  Do you
14          know if she talked to her husband?
15          THE WITNESS:  No.  No, I don't know that
16          she talked to her husband.
17  Q.  Now, let me discuss this case with Melissa.
18      You have a problem with that -- discussed the
19      investigation?
20          MS. NELSON:  Who's Melanie and who's
21          Melissa?
22  Q.  Do you know Melanie?
23  A.  Do I know Melanie?
0379
1   Q.  And Melissa Woods?
2   A.  Or Melissa Woods?
3   Q.  Well, Melanie discussed it with Melissa.  Was

4      that okay?
5   A.   I don't know that she did.
6   Q.   Okay.  But it's all in the police report?
7   A.   I don't know.  It might be in that stuff that
8        you have.
9   Q.   Well, either I'm making this up, or it's on
10       the police report.
11           Michelle Bryan discussed this with her
12       husband.  The same response?
13           MS. NELSON:  Object to the form.
14  A.   I don't know that she did.
15  Q.   Well, if she did, same response, it's okay to
16       discuss with your husband?
17  A.   I didn't say it was okay.  I said it's
18       expected that if something unusual --
19  Q.   Expected.
20  A.   -- is going on at the office for them to tell
21       their spouses.  Now, whether they went into
22       specific allegations, we don't know.
23  Q.   Well --
0380
1   A.   If they --
2   Q.   I'm sorry.  Go ahead.
3   A.   Well, you said discuss this.  So if said, our
4        office is in an uproar, then that's expected.
5        We don't know what they said.  So it depends
6        on what they communicated, if it was about the
7        investigation.  We don't know.  I had to work
8        over because I had to do somebody else's
9        duties because she's out on investigation.  We
10       don't know, Mr. Jaffree, so it would depend on
11       what I knew about the facts of that particular
12       incident.
13  Q.   Do you have any idea why Officer Gray, who was
14       conducting the investigation to see who may
15       have leaked this information to Rickey Stokes,
16       would not have questioned these people
17       thoroughly as to who they had talked to and
18       perhaps even talked to the people that they
19       talked to, to see if he could get to the
20       bottom of it of it?
21           MS. NELSON:  Object to form.
22  A.   No, I don't have any idea what he asked or --
23  Q.   Okay.  What exception does Eunice discussing
0381
1        with Melissa White -- by the way, are you

2     familiar with Melissa White?

3   A.  No.

4   Q.  So you don't know who she is?

5   A.  No.

6   Q.  What exception does Eunice discussing this

7     with her friend Melissa White does that fit

8     in?

9   A.  I don't - I don't make an exception.

10      MS. NELSON:  Object to the form.

11   Q.  No exception.

12   A.  I don't know what she told her friend.

13   Q.  Well, I read to you what she told her friend.

14   A.  I don't know what all she told her friend, and

15     I didn't know about it.  I didn't make an

16     exception.