30

1  conduct an investigation.
2  Q    Can you cite those cases?
3  A    If I can have a copy of the personnel rules.
4  I don't know the numbers off the top of my head.
5  Q    Could you ask your counsel for a copy of it?
6  MR. WHITE:  I don't have one, if you have got
7  one.
8  A    It would be Section 11-60, reporting illegal
9  or suspected activity involving City employees.
10 Q    Illegal --
11 A    Or suspected activity.
12 Q    My guess is suspected illegal activity?
13 A    It doesn't say that. It says reporting
14 illegal or suspected activity.
15 Q    How do you interpret suspected activity?
16 MR. WHITE:  I object. She stated and the
17 document speaks for itself.
18 MR. JAFFREE:  I am asking her how she
19 interprets it.
20 MR. WHITE:  It is irrelevant.
21 MR. JAFFREE:  She has the role of interpreting
22 regulations.
23 Q    How do you interpret it?
24 MR. WHITE:  I object. She has given you what
25 you asked for.

38

1    A    She was terminated based on the two charges.
2    Q    If you can, answer yes or no.
3         MR. WHITE: Can you let her answer the
4              question? That is the third time she
5              said what the charge is. Read it again
6              if he wants it.
7    Q    Can you answer yes or no?
8         MR. WHITE: We are not going to do that.
9    Q    Is the ticket-fixing a part of the charge that
10   resulted in her termination?
11   A    I can't answer that question.
12   Q    Okay. Let's move on to the next issue.
13        She was accused of talking to an employee. Can you
14   point to me the regulation that prohibits one employee
15   from talking to another employee?
16   A    We do not have a regulation that prohibits one
17   employee from talking to another employee.
18   Q    If you do not have a regulation --
19   A    We do have a regulation that defines
20   insubordination.
21   Q    Does insubordination mean that anything that
22   you tell somebody, that they have to do whether or not
23   it is lawful or not?
24   A    Ms. Brackin had been directed by her
25   department head, as had all of the other employees of

that division, to not have contact with Ms. Turner.

Q   By what authority did the plaintiff authority make that direction?

A   Because there was an investigation going on. It is standard operating procedure.

Q   Where is that procedure found, that standard operating procedure?

A   Let me rephrase that. It is good management practice if you have an investigation.

Q   So it is not standard operating procedure?

A   No. I rephrased it. You are right.

Q   So does that directive include that if you pass her on the street and say, hi, you have violated that directive?

A   If Judge Gordon directed the employees of that division to have no contact with Ms. Turner, then I would say, yes, that would constitute it.

Q   Even if Judge Gordon didn't have authority to make that declaration, it would still cover it?

A   Yes.

Q   So it doesn't matter whether or not a person has the authority to ask somebody to do something, they are going to do it regardless?

MR. WHITE: I am going to object to the relevance. We are talking about a

71

## EXAMINATION

BY MR. JAFFREE:

    Q    How do you pronounce your last name again?

    A    Duhaime.

    Q    As a police officer, on your patrol, you come into traffic violations quite frequently; is that correct?

    A    Yes, sir.

    Q    You have discretion whether to give a ticket or not?

    A    Yes, sir.

    Q    Complete discretion?

    A    Yes, sir.

    Q    So you can see somebody is speeding and decide you don't want to give a speeding ticket?

    A    That's right.

    Q    The effect on that person that you see speeding that you decide not to give a speeding ticket in terms they get off, in a sense, is the same if you did it after you swore to the ticket, isn't it?

    A    How do you pronounce your last name?

    Q    Jaffree.

    A    Mr. Jaffree, I did not understand a thing you just said. If you could reword that or maybe speak up, I couldn't understand you.

75

1  to me.
2    Q    And, therefore, putting void in that was
3  consistent with what you had already told Ms. Turner
4  that it was okay to do?  You told her it was okay?
5    A    You asked if I said this was my handwriting?
6    Q    You said it is not yours.  Follow me if you
7  can.
8    A    I will try.
9    Q    When you told her it was okay, send me the
10 tickets back, mail them back, this is your testimony,
11 you, in essence, said it was okay to just void that
12 because the ticket was going to be voided out?
13   A    Right.
14   Q    Basically, that notation of void reflects the
15 reality that existed at the time; correct?
16   A    Right.
17   Q    You voided out the ticket, they put void there
18 so they would show it was a voided ticket; correct?
19   A    I understand what you are saying.
20   Q    Now, what is that called, that document?
21   A    This is a UTC transmittal form for municipal
22 court.
23   Q    You don't know what happens to that
24 transmittal form once you turn it in, do you?
25   A    No.

1       A    It says, On or about March 10, 2005, at
2  approximately 11:00 hours, I met with the staff of the
3  magistrates' office in the presence of Michelle Sellers.
4  All employees were present except Ms. Turner, who was on
5  administrative leave at the time.  I instructed these
6  employees to strictly refrain from any contact with
7  Ms. Turner while the internal investigation conducted by
8  the Dothan Police Department was underway.  I further
9  instructed that no discussion with anyone regarding this
10 matter was to take place.  I made no mention of what the
11 allegations might be, nor did I mention any investigator
12 by name, saying merely that investigators from the
13 police department would be conducting the inquiry and
14 that the employees of my department were to respond
15 truthfully to any questions put to them by the
16 investigating officers.
17      Michelle and I removed case files for open
18 municipal court cases from Ms. Turner's officer, so that
19 court operations could continue smoothly.  These files
20 were then assigned to another magistrate for processing.
21 All employees were instructed not to enter Ms. Turner's
22 office for any reason.
23           MR. WHITE:  We would offer City 5.
24           MR. JAFFREE:  Let me object to her being in
25                here.  She has been subpoenaed to appear

```
 1   the job?
 2       A   No.  We get a list of three people or four
 3   people or five people.  It doesn't have anything about
 4   their prior work history.  They are ranked one, two,
 5   three, four, five.  It doesn't say this person has been
 6   a magistrate twenty-five years, as had Eunice Knight
 7   when we hired her.  She had retired from being a
 8   magistrate in Abbeville and came to us.
 9       It didn't have this person is black, this person is
10   -- it might have black.  I don't know.  It is just a
11   list.
12       Q   Isn't it true that Eunice was not a magistrate
13   in Abbeville?
14       A   I have no way of knowing that.
15       Q   So your statement that she was a magistrate
16   for twenty-fives years is simply not true?
17       A   I thought she was.  Was she a court clerk?  I
18   am not sure.  But either way, I got her on a list from
19   the personnel department.  They would have rated her
20   qualifications for the job, not me.
21       Q   You were aware, were you not, that Lavera made
22   a lot of administrative mistakes?
23       A   No, I was not.
24       Q   And Eunice made a lot of administrative
25   mistakes?
```

1   A   Rapelje, Fondren, and this one.

2   Q   Now, in 2001, the investigation revealed a
3 statement by, I guess, the defendant and a statement by
4 Ms. Brackin, and those statements were divergent; is
5 that correct?

6   A   It is. But there were also other witnesses
7 other than Ms. Rapelje who told the investigators and me
8 that they heard Ms. Brackin make the statements.

9   Q   Who were these witnesses?

10  A   One was a bondsman who went with Ms. Rapelje
11 to make the appeal bond, and the other one was, I think,
12 Ms. Rapelje's sister.

13  Q   Were you aware that prior to this hearing, I
14 asked for copies of anything that involved that
15 investigation?

16  A   No, I was not.

17  Q   So you gave Ms. Brackin a negative report in
18 your evaluation of her on the basis of this
19 investigation; correct?

20  A   I think the court administrator at that time
21 was Donna Nicholson, and I think that Donna mentioned in
22 Mary Beth's evaluation that there had been an
23 investigation, but I did not do that.

24  Q   That wasn't per your instructions?

25  A   I wouldn't have instructed Donna what to put

```
                                                            223
```

1  his letter that Mary Beth Brackin told him -- the letter
2  said, Mary Beth Brackin told me I was wrongly arrested
3  and that I should get my money back.
4     Q    Was he wrongly arrested?
5     A    I don't think he was.  I don't remember.
6     Q    Did he get his money back?
7     A    I don't remember.
8     Q    So you don't know whether he was wrongfully
9  arrested or not?
10    A    I don't remember the outcome.
11    Q    If he was wrongfully arrested and she told him
12 he was wrongfully arrested, she merely told him the
13 truth; correct?
14    A    It was the implication of liability, if he was
15 wrongfully arrested and she told him that.
16    Q    If he was wrongfully arrested and put up a
17 cash bond, then he was entitled to get his money back;
18 correct?
19    A    Yes.
20    Q    So if he was wrongfully arrested, she told him
21 the truth; if he was entitled to get his money back, she
22 told him the truth, and she was suspended for telling
23 him the truth, she was suspended for telling him the
24 truth; is that your testimony?
25    A    No.

244

| | |
|---|---|
| 1 | to her case, not just information related |
| 2 | to discrimination.  Now, you have |
| 3 | far-fetched afield out there to do that, |
| 4 | and I think now it is time for you to |
| 5 | come in and get down to the business of |
| 6 | representing the client you have today |
| 7 | and the information of the allegations as |
| 8 | they have been made against her.  And |
| 9 | that is what the Board would like to |
| 10 | hear.  All of these things to do with |
| 11 | other employees, the Board can't consider |
| 12 | that with respect to whether or not Ms. |
| 13 | Brackin's case deserves to be |
| 14 | overturned. |
| 15 | MR. JAFFREE:  I respect the Board's position, |
| 16 | and I will try to stay away from that. |
| 17 | I just have a few more questions. |
| 18 | Q    Is there an internal memorandum discussing how |
| 19 | the transmittals are supposed to be handled once a |
| 20 | police officer calls and says, send back the ticket? |
| 21 | A    Not specifically. |
| 22 | Q    And, therefore, there are no guidelines? |
| 23 | A    Not internal.  In their magistrate handbook, |
| 24 | it tells them how a UTTC is supposed to be handled. |
| 25 | Q    It doesn't cover that situation, when a police |