# EXHIBIT 14

SGT. GRAY'S DEPO

```
Q.   Do you have any idea pursuant to what
11          authority police internal affairs investigated
12          the fire department for a non-criminal
13          activity?
14   A.   My police chief assigned that investigation to
15        me and Corporal Frank Reeves, so that's pretty
16        much the authority that I followed.
17   Q.   So the authority -- whatever the police chief
18        decides to assign you, that's the authority?
19   A.   That's -- that's the -- whose -- under whose
20        authority I investigated that case.
21   Q.   Did you give the people that you investigated
22        at the fire department the garrity notice?
```

PAGE 28

```
10   A.   The judge is not my department head.  I get my
11        orders and directions from my department head
12        or my supervisors.  Judge Gordon did not come
13        directly to me and ask me to investigate.
14   Q.   Can you read what you said there?
15   A.   "The judge asked for an investigation from the
16        chief because he has the investigators that
17        can actually look into something and has time
18        to actually look into it."
19   Q.   Now, can I assume from your statement that
20        somebody communicated to you that the judge
21        had asked the chief to conduct an
22        investigation?
23   A.   Yes.
0043
 1   Q.   Who told you that?
 2        MS. NELSON:  If you know.
 3   A.   I'm -- it had to have been from the chief.
```

PAGE 43

```
Q.   Do you know pursuant to what authority the
18        judge initiated this investigation?
19        MS. NELSON:  Object to the form.
20   A.   No.
```

PAGE 46

```
12   Q.   All right.  Let me ask you this:  Do you know
13        for a fact -- I'm sorry.  Let me back up.
14            What chief told you to conduct this
15        investigation; what was the name of that
16        chief?
17   A.   John White.
18   Q.   All right.  Do you know what independent facts
19        that Judge White (sic) had concerning the
20        incident that you was investigating prior to
21        your initiating the investigation?
22   A.   No, I don't know the facts that he had.  He
23        did direct me to talk to the judge about the
0049
 1        investigation.  He directed me.
 2   Q.   So you did, at some point, talk to the judge?
 3   A.   Yes.
 4   Q.   Did you make a transcript of that discussion?
 5   A.   No.
 6   Q.   Why not?
 7   A.   I just didn't.
 8   Q.   All right.  Do you recall what the judge may
 9        have said to you?
10   A.   Yes.  That when it had come to her attention
11        that Mary Beth Brackin possibly made
12        statements to a defendant in a criminal case
13        in her court, that her attorney that was
14        representing her was basically incompetent --
15        and those aren't the words that she used.
16        Those are what I'm paraphrasing.
17   Q.   Well, don't paraphrase.  What were the words
18        she used?
19   A.   I can't -- I don't remember the exact words.
20   Q.   Oh, okay.
21   A.   Just that there was some possible misconduct
22        from Mary Beth Brackin, insinuating that
23        Ms. Ralpeje may want to seek another attorney
0050
 1        because of her attorney giving her some
 2        information that she thought wasn't good.
PAGE 50  3      Q.   So in essence, your investigation was to see
 4        if Mary Brackin had bad mouthed another
 5        attorney -- I'm sorry -- an attorney, not
 6        another attorney, an attorney?
```

```
 7              MS. NELSON:  Object to the form.
 8     A.   Giving legal advice to a defendant of a case
 9          when her job description didn't reflect that
10          that was one of her duties.
11     Q.   What was the legal advice she had given?
12     A.   Now, you said that's what the allegations
13          were, and that's what I was told to
14          investigate.  So --
15     Q.   But what was the legal advice that she had
16          allegedly gave to Ms. Ralpeje?
17     A.   Just a second.
18              MS. NELSON:  He's reviewing --
19              MR. JAFFREE:  Sure.
20              MS. NELSON:  -- a memo he did like six
21                 years ago.
22              MR. JAFFREE:  But he indicated he had
23                 reviewed some of this record.
0051
 1              MS. NELSON:  But he said not necessarily
 2                 this one.
 3              MR. JAFFREE:  Well, he said not
 4                 necessarily the transcript.
 5              MS. NELSON:  Well, you didn't ask him
 6                 about the memo.  Anyway, he can --
 7              MR. JAFFREE:  Well, I didn't know his
 8                 review was limited because I thought
 9                 that --
10              MS. NELSON:  Well, you didn't ask him.
11              MR. JAFFREE:  If he was prepared, he would
12                 be reviewing what I may cover.
13              MS. NELSON:  You know, he can sit here and
14                 review it all day if he needs to.
15     A.   Specifically, that a magistrate which was to
16          be Mary Brackin told Ms. Ralpeje that she
17          should ask for another lawyer because they had
18          many complaints about Shaun, referring to
19          Attorney Shaun McGhee, and the first thing she
20          should do is get rid of Shaun.
21     Q.   That the first thing who should do is get rid
22          of Shaun?
23     A.   Ms. McGhee -- excuse me.  Ms. Ralpeje.
0052
 1     Q.   Ms. Ralpeje --
 2     A.   Yes.
 3     Q.   -- should get rid of Shaun.
```

```
 4              So the judge told you that she had heard
 5          that?
 6    A.    The judge advised me that -- that her
 7          employee, Ms. Brackin, made -- there were
 8          allegations that she made statements to
 9          Ms. Ralpeje that Mr. McGhee gave her some --
10          pretty much bad advice.  And that's not -- I'm
11          paraphrasing the words, that the allegations
12          were that Ms. Brackin overstepped her
13          authority as a magistrate by providing -- by
14          telling a defendant in a case that her counsel
15          was inadequate.
16    Q.    But that constitutes pretty much the bulk of
17          the discussion you had with Judge Gordon?
18    A.    That was the gist of it.
Q.    Well, we'll get into that in a minute, but let
 5          me go back again.
 6              Based on what the judge told you, as you
 7          have just stated, from your experience, which
 8          is quite lengthy as a member of the police
 9          force, is there a potential crime in any of
10          that allegation, a criminal activity in any of
11          that allegation?
12    A.    Not that I know of.  And that wasn't -- I
13          wasn't investigating it as a criminal
14          investigator.  I was investigating it as an
15          administrative investigator.
16    Q.    Do you know if prior to your discussion with
17          Ms. Brackin you gave her a garrity notice?
18    A.    I wouldn't have.
19    Q.    You wouldn't have?
20    A.    No.
21    Q.    Do you know if anyone gave her the garrity
22          notice?
23    A.    You're saying prior to an interview?
0055
 1    Q.    Yeah.  Just prior to your --
 2    A.    Prior to even talking to her?
 3    Q.    Prior to taking her statement, yeah.
 4    A.    Hold on.
 5    Q.    I'm not trying to trap you.  You did give her
 6          a garrity notice.
 7    A.    I would have.
 8              MS. NELSON:  Well, again, I'd object to
 9                  the form.  Do you know you did?
```

```
10              MR. JAFFREE:  Yeah.  It's part of the --
11              MS. NELSON:  It is?  Where?
12              MR. JAFFREE:  Right here (indicating).

 8   Q.   Do you remember what Ms. Brackin's position
 9        was with respect to the allegation that she
10        had accused an attorney of literally being
11        incompetent, and there's been several
12        complaints against this attorney?
13   A.   Yes.
14   Q.   She did deny the allegation, correct?
15   A.   Correct.
16   Q.   She also indicated that she hardly knew that
17        attorney, correct?
18   A.   No, that's incorrect.
19   Q.   That's not correct?
20   A.   No, sir.  She said that she thought that they
21        had a -- a very -- quote, unquote, had a very
22        good rapport with Mr. McGhee.
23   Q.   But she also said, quote, I'd only worked with
0061
 1        him one time in court, unquote.
 2              MS. NELSON:  What are you reading from?
 3              MR. JAFFREE:  Number 1281, page 6.
 4              MS. NELSON:  Page 6.
 5   Q.   Matter of fact, I did my statement a
 6        injustice.  To read the complete paragraph of
 7        what she said, that's even an injustice.  Let
 8        me read you a question of hers.
 9              "Okay.  And -- but do you know Shaun
10        McGhee?"
11              Answer:  "Yes."
12              That's Mary Beth's answer.
13              Here's your question -- I'm not -- not
14        your question.  This is Mr Coleman's question,
15        but you was there when Coleman was asking
16        these questions, correct?
17   A.   Yes, sir.
18   Q.   Mr. Coleman said, "Well, how long have you
19        known Shaun McGhee?"
20              Her response:  "I don't really -- I think
21        I was introduced to him, you know.  It was
22        either while we were in court and he -- right
23        before he became the public defender.  But as
0062
```

```
 1            far as -- I'd only worked with him one time in
 2            court."
 3               So based on --
 4            MS. NELSON:  Well, you're not going on
 5               to -- if you'd go on.
 6            MR. JAFFREE:  Well, I don't want to go on.
 7            MS. NELSON:  You don't want to go on?
 8               Okay.  Well, I'd ask that the Record
 9               be complete as to the rest of the
10               statement, that she had a good rapport
11               from him -- with him.
12            MR. JAFFREE:  Well, okay.  Since you
13               insist.
14     Q.   Mr. Coleman said, "Okay."
15            And Ms. Brackin said, "and I had a very
16          good rapport with him.  And, in fact, I told
17          Donna that, you know, he was going to be a --
18          be good for us, that he had done a real good
19          job."
20            Now, you understand, she's referring to
21          the one time she saw him, correct?
22            MS. NELSON:  Object to the form.
23     A.   Not to twist everything up, but according to
0063
 1          what you just read, it says that when she met
 2          him, it was in court.  This document doesn't
 3          say how long they may have known each other,
 4          and it doesn't give a specific date on when
 5          they were in court when they met.  So I cannot
 6          assume just by this document that this is the
 7          first time they met because that's not what it
 8          says as far as how long they've known each
 9          other.
10     Q.   Well, do you generally get introduced to
11          people that you have known for a long time?
12            MS. NELSON:  Object to the form.
13     Q.   As far as you know, the term, I was introduced
14          to him?
15     A.   To answer your question, no.


     Q.  But, also, the part of my question dealt with
13            her saying that Ms. Brackin had said, we had
14            numerous complaints against him.  You won't
```

```
15          find that at all in her testimony.
16     A.   That's correct.
PAGE 66 17    Q.   There's Donna Grumbach was right next to her
18          who didn't confirm any of that either.
19              MS. NELSON:  Are you testifying,
20                 Mr. Jaffree?
21              MR. JAFFREE:  Well, I'm asking him if --
22              MS. NELSON:  Is that a question?
23     Q.   Do you agree that Donna Grumbach did not
0067
 1          confirm any of that allegation about the
 2          incompetence or numerous complaints?
 3     A.   She did not.

Q.   Do you remember doing an investigation because
 7          there was a statement on Rickey Stokes' web
 8          site indicating that an internal affairs --
 9          some type of investigation was being conducted
10          on Mary Turner?
11     A.   Yes.
12     Q.   Who initiated that investigation that you were
13          involved in?
14     A.   That would have came -- as I said, our
15          investigations, if it came from a different
16          department, would come from the department
17          head or his designee.  I believe this one came
18          from --
19              MS. NELSON:  He's referring to his memo to
20                 chief of police regarding this
21                 investigation.
22     A.   Chief Powell was the one that advised me to
23          begin the investigation as it relates to the
0075
 1          unlawful or -- or the unauthorized release of
 2          information and involving Mary Turner, the
 3          same thing -- same thing you're talking about.
 4     Q.   What supposedly was the scope of that
 5          investigation?
 6              MS. NELSON:  Which investigation are we
 7                 talking about?
 8              MR. JAFFREE:  The investigation we were
 9                 just talking about, the one
10                 involving --
11              MS. NELSON:  Mary Turner?
12              MR. JAFFREE:  Well, no.  I'm talking about
```

```
13                  the one involving the release of
14                  information concerning Mary Turner.
15          MS. NELSON:  Well, it's hard, you know,
16                  just to make a gigantic leap -- as you
17                  call the being pregnant and having the
18                  baby, it's hard to make a leap to like
19                  the second baby, what you're asking
20                  him to do.
21          MR. JAFFREE:  With the --
22          MS. NELSON:  I mean, I know you're trying
23                  to speed things along.
0076
 1     Q.   The release of information concerning
 2          Ms. Turner, what was supposed to be the scope
 3          of that investigation?
 4     A.   The magistrates' office had been advised by
 5          Judge Gordon to not release any information to
 6          anyone regarding the Mary Turner investigation
 7          where she was put on administrative leave.
 8          After the judge advised her employees of that,
 9          there was, indeed, a leak of that
10          investigation to a -- the media which was
11          known as Rickey Stokes or The Houston, which I
12          think is the name of his paper, but it goes
13          through -- Rickey Stokes is the -- I think the
14          principal in that business.
15     Q.   Okay.  So what was supposed to be the scope of
16          that investigation?
17     A.   The -- who released the information as far as
18          the investigation on Mary Turner was the scope
19          because the judge -- the judge had already
20          directed the employees not to --
21     Q.   So you were trying to --
22          MS. NELSON:  Well, you're cutting him
23                  off.  Not to --


 Q.   So you were trying to --
22          MS. NELSON:  Well, you're cutting him
23                  off.  Not to --
0077
 1          MR. JAFFREE:  I'm sorry.
 2          MS. NELSON:  Let him finish what her
 3                  directives were.
 4     A.   Not to release information, not to talk about
```

```
 5          the investigation of Mary Turner.  And after
 6          that directive was given by the judge, someone
 7          evidently did, which was on Rickey Stokes' web
 8          site.
 9     Q.   So the mischief thought to be pursued in that
10          that investigation was, who released the
11          information?
12              MS. NELSON:  Object to your form, again,
13                  as -- with your mischief.  I don't
14                  know what you mean by "mischief."
15              MR. JAFFREE:  Well, I like that word.
16              MS. NELSON:  Well, you must because you
17                  used it many times yesterday.  But, I
18                  mean, if you could say like --
19              MR. JAFFREE:  I used it twice.
20              MS. NELSON:  -- what was the --
21              MR. JAFFREE:  What's wrong with --
22              MS. NELSON:  -- purpose of the
23                  investigation.  I mean, mischief
0078
 1                  connotes some --
 2              MR. JAFFREE:  Well, let me ask this
 3                  witness --
 4              MS. NELSON:  I'll ask that you use another
 5                  word besides mischief.
 6              MR. JAFFREE:  I will if the witness
 7                  doesn't understand what I mean by the
 8                  word.
 9     A.   Specifically, what are you talking about as
10          far as mischief is concerned?
11     Q.   Well, I'll --
12              MS. NELSON:  Reason, purpose, why did you
13                  do this, you know.  Let's just talk on
14                  plain words.
15     Q.   The purpose of this --
16              MR. JAFFREE:  Well, it's plain English to
17                  me.
18     Q.   But the purpose of this investigation was to
19          find out who released information; is that
20          correct?
21     A.   Yes, sir.
22     Q.   And that was supposed to be the scope of the
23          investigation?
0079
 1     A.   Of this investigation?  Yes, sir.
```

```
 2    Q.    That was your charge?
 3    A.    Yes, sir.
 4    Q.    What, if any, criminal statutes may have been
 5          implicated by the release of this information?
 6    A.    I don't know of any that would have been
 7          criminal.
 8    Q.    This wasn't criminal at all?
 9              MS. NELSON:  Object to the form.  He
10                 didn't say that.
11              MR. JAFFREE:  Well, he sort of said
12                 something like that.  That's what I
13                 heard.
14              MS. NELSON:  Well, I'll ask that his
15                 testimony stand instead of your
16                 paraphrasing what he said.  He said he
17                 didn't know of any.
18    Q.    I'll live with your response.  I have a
19          feeling if it was up to opposing counsel, I
20          wouldn't get a chance to ask you anything.
21    A.    I enjoy talking to you.
22    Q.    Thank you.
23              So did you talk to people to find out who
0080
 1          exposed the very information that the judge
 2          warned them not to disclose?
 3    A.    Yes, sir.
 4    Q.    Prior to talking to people, did you talk to
 5          the judge?
 6    A.    Yes, sir.
 7    Q.    Was that discussion recorded?
 8    A.    No, sir.
 9    Q.    Why did you care who released information to
10          the media?
11              MS. NELSON:  Object to the form.  I don't
12                 know that he ever testified that he
13                 did care.
14    Q.    Well, did you care?
15              MS. NELSON:  He was doing his job.
16              MR. JAFFREE:  Well, he didn't indicate
17                 that he didn't care.
18    Q.    I mean, did you care?
19              MS. NELSON:  Care in what --
20    A.    I don't -- I don't have any -- I didn't have
21          any personal feelings.  And if that's what you
22          mean by "care," I didn't have any personal
```

```
23          feelings on who did it.  It was a directive
0081
 1          that wasn't followed that I was told to
 2          investigate, and that was it.
23      Q.  Just so we're clear, is the publication of
0086
 1          this information on the web site that
 2          triggered this investigation, the
 3          investigation we was talking about, that
 4          caused you to go out and interview other
 5          members of the judicial department?
 6      A.  That's correct.
 7      Q.  Did you interview any members of the police
 8          force?


12      Q.  You may have been subsequently informed that
13          it was on the web site?
14      A.  Yes, sir.
15      Q.  And the new investigation was to find out who
16          leaked it?
17      A.  Yes.
18      Q.  That was your charge?
19      A.  Yes, sir.
20      Q.  And you told the people that you was
21          investigating it, and this was your charge?
22      A.  Uh-huh (positive response).
23              MS. NELSON:  You need to say yes or no so
0095


 3      Q.  Now, in order for this to get on a web site,
 4          somebody must have told somebody about
 5          information concerning the investigation.
 6              Are you following me?
 7      A.  Yes, sir.
 8      Q.  Is that correct?
 9      A.  I'm following you.
10      Q.  Somebody must have told somebody.  When you
11          interviewed people, did you ask them if they
12          talked to anybody about what the judge had
13          told them not to talk about?
14      A.  Yes.
15      Q.  Because if they talked to somebody about what
16          the judge had told them not to talk about,
```

```
17            then they did something in violation of the
18            judge's directive; is that correct?
19    A.    The judge directed them not to talk about the
20            case.
21    Q.    Did you --
22                MS. NELSON:  Are you finished?
23    A.    That's correct.
0096
 1    Q.    Did you discover, in talking to members of the
 2            judicial department staff that some members
 3            had, in fact, talked to people?
 4    A.    Yes.
 5    Q.    Did you interview these people that they said
 6            they had talked to, to see if they had, in
 7            turn, talked to any people?
 8    A.    Did I interview the people that were alleged
 9            to have received the information?
10    Q.    Yeah.
11    A.    Then, no.
12    Q.    Well, if you was trying to track down who gave
13            information to Rickey Stokes and anybody who
14            had the information, either firsthand,
15            secondhand, or thirdhand, could have given
16            that information to Rickey Stokes, did you not
17            feel the need to talk to the people that they
18            had talked to?
19    A.    No.
20    Q.    Didn't find any need?
21    A.    No.
22    Q.    Why not?
23    A.    If an employee told me that they spoke to
0097
 1            someone else about the investigation, that
 2            individual is not the focus of the directive
 3            that the judge gave or the investigation.
 4            That's someone that's on the outside that was
 5            told by a magistrate something -- something
 6            that was going on.
 7    Q.    So you didn't care that Rickey Stokes had the
 8            information; you were only concerned with
 9            whether or not somebody in the magistrates'
10            office gave that information?
11                MS. NELSON:  Object to whether he cared or
12                    not --
13    Q.    Is that correct?
```

```
14          MS. NELSON:  -- as to his -- your
15              interpretation of your question about
16              whether or not he cared.  It's an
17              improper question.
18   Q.   Is that correct?
19   A.   I don't have any personal feelings about that
20        -- the release of that information.  My charge
21        was to investigate who may have leaked the
22        information as it came out of the magistrates'
23        office.
0098
1    Q.   So your concern was not whoever gave the
2         information to Rickey Stokes; your concern was
3         whether or not somebody from the magistrates'
4         office gave the information to Rickey Stokes?
5    A.   My investigation was to who leaked the
6         information, and it was dealing with the
7         magistrates that were under -- that had
8         asked -- been asked questions by internal
9         affairs in regards to the release of that --
10        that information.  So the information that was
11        on the web site was being I guess -- I was I
12        directed to investigate the persons out of the
13        magistrates' office who could have possibly
14        leaked that information to the web site.
15   Q.   Well, in your opinion, anyone from the
16        magistrates' office that talked to anyone
17        about the investigation, would they be in
18        violation of the judge's direction not to talk
19        to anyone?
20   A.   If the judge -- the judge directed them not to
21        speak to anybody about that investigation,
22        then that's correct.  It -- that was her
23        directive?
0099

0099
1    Q.   So everyone who spoke to someone was in
2         violation of the judge's directive?
3    A.   The judge's directive was clear.  And --
4    Q.   Well, did you realize at the time you was
5         talking to the members of the judge's staff,
6         or if there's any ambiguity, the members of
7         the judicial department who admitted that they
8         had spoken to someone, that they had violated
```

```
 9              the judge's directive?
10    A.   Yes, I knew at the time.
11    Q.   Did you recommend any kind of disciplinary
12         action because these people had violated the
13         judge's directive?
14    A.   I don't recommend discipline in this -- I did
15         not recommend discipline in this case.
16    Q.   Did you point out any type of the personnel
17         policy rules that may have been violated with
18         respect to the people who had communicated
19         information to someone about an investigation
20         was ongoing?
21    A.   That was a mouthful.  Could you say that
22         again, please?
23    Q.   Did you recommend in your report what
0100
 1         personnel rules may have been violated by the
 2         people who provided information to third
 3         parties in violation of the judge's directive?
 4              (Brief pause)
 5    A.   I told the judge that employees had spoke
 6         about this case to spouses, things of that
 7         nature; I did tell her that had occurred.


A.   With regards to this investigation, the judge,
11         basically, told me during the allegation what
12         the offense was and -- which I explained to
13         you earlier, which was Ms. Brackin giving what
14         she termed to be legal advice to Ms. Ralpeje.
15    Q.   Well, what major offense was that?
16    A.   And so that was -- that was just -- that was
17         the charge to -- to find out.  So there was
18         already -- I was told what the allegations
19         were.  So after I just found the facts, I
20         didn't have to rewrite what her --
21    Q.   Oh, she'd given you a personnel rule violation
22         in that case?  And we're talking about the
23         2001 case, right?  She had already given you a
0108
 1         personnel violation?
 2              MS. NELSON:  Object to form.  That's not
 3                 what he testified to.
 4              MR. JAFFREE:  Well, I'm trying to find
 5                 out.
```

```
 6   Q.   What are you testifying to?  What did she give
 7        you?
 8   A.   As I've just stated, she said that I needed to
 9        look into allegations that Mary Beth Brackin
10        was giving legal advice to Ms. Ralpeje, a
11        defendant in a criminal case.  So I just
12        investigated the allegations and gave her the
13        facts of the allegations.
14   Q.   But, here, you felt you needed to do more?
15             MS. NELSON:  "Here," you're referring to
16                the --
17   A.   This is a release of --
18             MS. NELSON:  Insubordination by Mary Beth
19                Brackin.
20   Q.   I'm a little -- excuse me.  If you was
21        investigating the release of information, what
22        does Mary Beth talking to Mary Turner have to
23        do with the release of information?  Because
0109
 1        that was your investigation.  What
 2        does -- you're looking at the release of
 3        information, and then you talk about some
 4        contact.  What does that have to do with
 5        release of information?
 6             MS. NELSON:  Again, object to the form.
 7                He stated that the release of
 8                information started the investigation.
 9             MR. JAFFREE:  Can I ask him?
10             MS. NELSON:  Yes, you can.
11             MR. JAFFREE:  Now, I know how bad you want
12                to infiltrate this Record with your
13                comments, but if I could just hear
14                from him.
15             MS. NELSON:  I'm just trying to keep a
16                clean record, and you're inferences
17                and testimony and confusion --
18             MR. JAFFREE:  Well, I'm asking him.
19             MS. NELSON:  -- have done nothing to allow
20                the Record to be clear.
21   Q.   If your charge was who leaked information,
22        does Mary Beth Brackin speaking to Mary Turner
23        have anything to do with who leaked
0110
 1        information?
 2   A.   I would consider that leaking information.
```

```
 3   Q.   Oh, you would?
 4   A.   Mary Beth Brackin was interviewed like
 5        everybody else was.  She released information,
 6        talking to Mary Turner about the investigation
 7        when she was directed not to by the judge.
 8   Q.   Well, what about all these other people who
 9        released information?  Well let's not -- let's
10        not worry about them.
11             Have you -- and I guess you have answered
12        this, but since the departure of Mary Brackin,
13        have you been called upon to investigate any
14        other employee of the judicial department?
15   A.   Not to my knowledge.
16   Q.   Now, can you tell me pursuant to what
17        authority -- but, first, two questions then
18        I'm through.
19             Do you know who instructed the judge to
20        tell her employees to have no contact with
21        Mary Turner?
22   A.   I had a conversation with her about that.
23   Q.   Okay.  Can you tell me pursuant to what
0111
 1        authority can the internal affairs department
 2        instruct a citizen not to contact another
 3        citizen?  What authority?
 4            MS. NELSON:  Object to the form.  It
 5                was --
 6   Q.   You said you did it, so I'm trying to find out
 7        what authority.
 8            MS. NELSON:  Object to form.  It was not
 9                citizen to citizen.
10            MR. JAFFREE:  Excuse me.
11   Q.   Is Mary Brackin a citizen?
12   A.   Yes.  And she's also employed by the City of
13        Dothan which would make her a governmental
14        employee up under the City of Dothan's
15        umbrella.  And under that is why they were
16        directed to not speak to one another during an
17        ongoing investigation.
18   Q.   Well, I'm trying to find out by what authority
19        do you have to tell one employee to make no
20        contact with another employee?
21   A.   And I don't quite understand your word or your
22        definition of what authority, but my police --
23        I was working under the authority of the
```

```
0112
 1              police chief at the time.
 2      Q.      So other than the police chief, can you point
 3              to me anything that gives the police chief the
 4              authority to tell somebody from another
 5              department not to communicate or not to make
 6              contact with a person in that department?
 7      A.      The judge is actually who told them that.
 8      Q.      The judge told them that.
 9      A.      I talked to the judge about having the
10              employees not make contact with Ms. Turner in
11              reference to this ongoing investigation that
12              we had.  The judge directed her people in her
13              department --
14      Q.      I see.


19      Q.      Did the chief instruct you to tell the judge
20              to have her people make no contact with
21              Ms. Turner?
22      A.      No.
23      Q.      You did this on your own initiative?
0113
 1      A.      Yes.


11                  Did you indicate to the judge how long
12              this no-contact directive should stay in
13              place?
14      A.      I just said during the investigation, while it
15              was ongoing.
16      Q.      Did you advise the judge when the
17              investigation had been completed?
18      A.      She did receive a report.
19      Q.      From whom?
20      A.      It would have come from the chief of police,
21              I'm assuming.
22                  Which investigation are you referring to?
23      Q.      Well, we're talking about the investigation of
0116
 1              the ticket, the investigation that the judge
 2              had told them to make no contact, during that
 3              investigation.
 4      A.      Oh, the release of information?
 5      Q.      No, not the release of information
```

```
 6          investigation.  We're talking about the ticket
 7          investigation.
 8              MS. NELSON:  Let's make the Record clear.
 9                 The Mary Turner ticket-fixing
10                 investigation.
11              MR. JAFFREE:  Well, yeah, but --
12              MS. NELSON:  After which Mary Turner was
13                 suspended.
14              MR. JAFFREE:  And after which it turned
15                 out there was no ticket fixing.
16              MS. NELSON:  And she was indicted.
17              MR. JAFFREE:  And she was not indicted for
18                 any ticket fixing.  It was a
19                 misdemeanor.
20              MS. NELSON:  Well, she was charged with
21                 extortion.
22              MR. JAFFREE:  She was not charged with
23                 extortion.  She was charged with
0117
 1                 something dealing with misapplying
 2                 records.  She was not charged with
 3                 extortion.
 4              MS. NELSON:  She was charged with a
 5                 criminal offense.
 6              MR. JAFFREE:  She was charged with a
 7                 misdemeanor.
 8              MS. NELSON:  Well, we could sit here and
 9                 banter back all day.
10              MR. JAFFREE:  I can prove my point.
11              MS. NELSON:  Let's make the Record clear,
12                 that the question on the table was
13                 what?
14              MR. JAFFREE:  The question on the table
15                 was --
16              MS. NELSON:  How long --
17      Q.  Did you inform her that the investigation was
18          complete?
19              MS. NELSON:  The investigation into the
20                 Mary Turner ticket fixing.
21      Q.  The investigation involving Mary Turner and
22          the ticket.  Did you inform the judge when
23          that investigation was complete?
0118
 1      A.  I prepared the report, and I submitted it to
 2          Chief John Powell.  And it was subsequently
```

```
 3           given to the judge.
 4    Q.    What was -- and this was involving the ticket?
 5    A.    That's what you -- you asked me about.
 6    Q.    Is that what you're talking about, is the one
 7           involving?
 8              MS. NELSON:  The Mary Turner ticket with
 9                  Bradley Phelps?
10    Q.    You prepared that report?
11    A.    Yes.
12    Q.    And did you tell her then that the
13           investigation was complete?
14    A.    I don't know if I told her it was complete.  I
15           submitted a report upon the completion of the
16           investigation.
17    Q.    Well, what date did you submit that report?
18    A.    On or about May the 2nd of 2005.
19    Q.    So there should have been no contact with
20           Ms. Turner from March the 10th until May the
21           2nd; is that correct?
22              MS. NELSON:  Object to the form.  He just
23                  said that's when he turned in the
0119
 1                  report.
 2    A.    I don't think that's correct.
 3    Q.    Well, that's what you implied, that she was
 4           notified that the investigation was complete
 5           when you turned in the report.  You turned in
 6           the report in May.  So it was your
 7           understanding, there should be no contact with
 8           Mary Turner until May?
 9    A.    The directive not to talk to Ms. Turner I
10           don't -- I'm not certain, but I don't believe
11           it came at the same time that this report
12           was --
13              MS. NELSON:  No.  We're confusing things.
14    Q.    Follow me carefully.  Do not talk to her
15           during investigation of the ticket.
16    A.    Pardon me?
17    Q.    The mandate was to not talk to Ms. Turner
18           during the investigation involving, as counsel
19           would say, ticket fixing?
20              MR. JAFFREE:  Did you like that?  I'll go
21                  along with the ticket fixing.
22              MS. NELSON:  I'll say ticket.  I just want
23                  to make sure what ticket and what
```

```
0120
 1                      investigation we're talking about.
 2                      And I think we've established that
 3                      took place on or about May the 10th.
 4             THE WITNESS:  Yeah, that's correct.
 5             MS. NELSON:  Of 2005.
 6             THE WITNESS:  That's correct.
 7             MS. NELSON:  Just trying to move things
 8                      along.
 9    A.   That's correct.
10    Q.   So the first word that the judge would have
11         had that the investigation was complete would
12         have been in May of 2005?
13             MS. NELSON:  Object to the form.  The
14                      internal affairs investigation?
15    Q.   Internal affairs investigation, May of 2005?
16    A.   That's correct, when my report was finished.
17    Q.   So your mandate would have been, nobody have
18         any contact with Mary Turner for two months?
19    A.   As it relates to the criminal -- excuse me,
20         not the criminal investigation, as it relates
21         to the investigation.
22    Q.   Well, do you know whether or not Mary Beth had
23         any contact with Mary Turner involving the
0121
 1         criminal investigation?
 2    A.   I don't know whether they had contact
 3         involving a criminal investigation or not.
 4    Q.   Well, there was --
 5    A.   They had contact during the administrative
 6         investigation.
 7    Q.   All right.  During the administrative.  Do you
 8         know if they -- do you know if Mary Beth
 9         contacted Mary Turner about the ticket
10         investigation?
11    A.   I know that Mary -- could you rephrase -- say
12         that again?
13    Q.   Let me ask it a different way:  Based on
14         information that you got from Mary Brackin,
15         what was the nature of her contact with Mary
16         Turner?
17    A.   She stated that she needed to obtain a
18         show-cause letter and get the, quote, unquote,
19         setup on it -- I believe were her words she
20         used -- in reference to a show-cause letter.
```

```
21    Q.    If that statement is true, then did that have
22          anything to do with contacting Mary Turner
23          about the investigation?
0122
 1          MS. NELSON:  Object to the form.
 2    A.    It doesn't have anything to do with contacting
 3          her about the investigation, but she wasn't
 4          supposed to contact with her.
 5    Q.    Well, did you expect your directive to be all
 6          inclusive to no-contact at any time for any
 7          reason?
 8    A.    During the course of the ongoing
 9          investigation -- let me refer back to the
10          directive that was given.
11                (Brief pause)
12    A.    Yes.  The directive was to strictly refrain
13          from any contact with Ms. Turner while the
14          internal affairs investigation was underway
15          and not to discuss with anyone the matter --
16          the matter of the investigation.
17    Q.    So that was all contact of any nature,
18          correct?
19    A.    It says, any contact.
20    Q.    Did you think through the consequences of your
21          suggestion when you made it to the judge?
22          MS. NELSON:  Object to the form.
23    A.    Was that a question?  I'm sorry.
0123
 1    Q.    Yeah.  Did you think through the consequences?
 2    A.    Through --
 3          MS. NELSON:  Object to the form.
 4    A.    What do you mean?
 5    Q.    Well, that you was -- wait a minute.  Let
 6          me -- since you haven't answered that yet, let
 7          me --
 8          MS. NELSON:  He doesn't understand you.
 9             He says, what do you mean.  I've
10             objected.
11    Q.    I'm going to replace it with another question
12          that may make it easier for you to understand.
13             Were you aware that Mary Beth and Mary
14          Turner were close friends?
15    A.    Yes.
16    Q.    That they socialized with each other?
17    A.    That, I don't know.
```

```
18   Q.   Did you expect that for the period of time it
19        took for the investigation to be completed,
20        Mary Beth and Mary Turner should cease having
21        any kind of social relationship with each
22        other?
23   A.   Well, if I recall right, the judge told them
0124
 1        that any contact with Mary Turner should go
 2        through her -- should go through her and would
 3        be approved by her.  So to me, with that
 4        stipulation there, that doesn't mean 100
 5        percent that it's no possibility whatsoever.
 6        She just needed to approve it as the
 7        investigation was ongoing.
 8   Q.   So every contact had to be precleared through
 9        the judge?
10   A.   Yes, if there was to be contact during this
11        investigation.
12   Q.   Even contact after hours?
13   A.   I'd have to make an assumption.  The directive
14        was for them not to have contact.  If they had
15        to do -- to have contact with her, contact the
16        judge pretty much for direction.
17   Q.   And if they were going to meet in church,
18        contact the judge?
19   A.   I'm not reading between any lines.  That was
20        just what was said.  And the interpretation of
21        that is, I guess, what you're asking for?
22   Q.   Uh-huh (positive response).
23            Now, have you ever given a non-police
0125
 1        officer employee of the City of Dothan that
 2        type of directive before?
 3            MS. NELSON:  What -- not to --
 4   Q.   To not contact their friends?
 5            MS. NELSON:  Object to the form.  Not to
 6            discuss an ongoing criminal
 7            investigation, not to contact somebody
 8            under suspicion?
 9            MR. JAFFREE:  Forget about the --
10            MS. NELSON:  No.  I think you need to ask
11            him --
12   Q.   Don't contact their friends?
13            MS. NELSON:  Object to the form.  That's
14            totally --
```

```
15    Q.   You bifurcated these statements that the judge
16         made.  You said, don't discuss the criminal
17         investigation.  No contact.  You made them two
18         separates things.
19              MS. NELSON:  The directive was not to have
20                  contact with your friends; it was to
21                  have contact with an employee who was
22                  under investigation.
23    Q.   But if the employee was their friend, no
0126
 1         contact would mean don't contact your friend.
 2              MS. NELSON:  Object to the form, if that's
 3                  a question.
 4    A.   As it relates to their friendship, I testified
 5         earlier that I don't have any knowledge
 6         whether they're close friends or just
 7         co-workers.
 8    Q.   Let me give you a hypothetical and see if you
 9         think the directive would apply to this.
10
```