## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| NANCY MARTIN and, | ) |
| MARY BETH BRACKIN, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:05-CV-1172-MEF |
| | ) |
| CITY OF DOTHAN and JUDGE | ) |
| ROSE EVANS-GORDON, | ) |
| | ) |
|     Defendants. | ) |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This action is a reverse discrimination suit brought by two white former employees of the City of Dothan's Judicial Department, Mary Beth Brackin, who was employed as a Magistrate, and Nancy Martin, who was employed as the Municipal Court Administrator.

The City's Judicial Department consists of the Municipal Court and the Magistrate's Office. The Municipal Court has jurisdiction over offenses such as traffic violations, domestic violence, driving under the influence, driving without insurance, and certain drug and drug paraphernalia charges. The Presiding Judge of the Municipal Court is also the Department Head of the Judicial Department. Under the supervision of the Presiding Judge/Department Head is the position of

Municipal Court Administrator, who in turn supervises the Magistrates. The Municipal Court Administrator is responsible for supervising the preparation and scheduling of cases to be tried in the Municipal Court. Additionally, the Administrator is responsible for the issuance of warrants and collection of revenues from fines and court costs. The Court Administrator must possess the ability to establish and maintain an effective working relationship with the Presiding Judge, the City prosecutors, the public defenders, other attorneys in the City, City employees, City officials and the public to include maintaining a positive image for the Judicial Department. The Municipal Court Administrator is also responsible for supervising the Magistrates, who attend to the day to day tasks necessary for the Judicial Department and Municipal Court to operate.

In December of 1999, Judge Rose Evans-Gordon was appointed as the Municipal Court Judge for the City of Dothan. Judge Gordon is African-American. Brackin, who is white, was selected by Judge Gordon as a Magistrate in April 2001,[1] and Martin, also white, was hired by Judge Gordon as the Municipal Court Administrator in January 2004.[2] Brackin was terminated by Judge Gordon in May 2005 for having two Major Offenses (as defined by the City's Personnel Rules) within a 24 month period. Martin, a probationary employee, was terminated by Judge Gordon in October 2004, nine months after

---

[1] Brackin had worked for the City in the Police Department since 1995.

[2] Martin did not actually start work until a month later, on February 16, 2004.

Judge Gordon had hired her, for unsatisfactory work performance during her probationary period. Both Brackin and Martin claim that their discharges were discriminatory based on their race (white).

In addition to her claim of discrimination under Title VII, Brackin has alleged claims of violations of freedom of speech, freedom of association, procedural due process, substantive due process, retaliation, and false imprisonment. She is bringing these claims against both the City of Dothan, and except for the discrimination and retaliation claims, against Judge Gordon in her individual capacity. Martin has alleged claims of discrimination and retaliation against the City, and violation of freedom of speech, negligence, and breach of contract against both the City and Judge Gordon (in her individual capacity).

For the reasons discussed below, all of these claims are due to be dismissed.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Judge Gordon & Kai Davis

Defendant Judge Gordon, who is African-American, has been the presiding Municipal Court Judge for the City of Dothan since December 1999. (Gordon depo., p. 5:13-19). Prior to that time she had served as an attorney in the Attorney General's office. (Gordon depo., p. 6:3-11). Since her appointment as Municipal Court Judge, Judge Gordon has hired or selected (for those who were already employed by the City but in a different position or department) 14 employees as

Magistrates.  (Davis Aff. ¶ 16).  Ten have been Caucasian and four have been African-American.  (Davis Aff. ¶ 16).  Judge Gordon has also hired or promoted three individuals to the position of Municipal Court Administrator, including Nancy Martin.  (Davis Aff. ¶ 16).  All three have been white.  (Davis Aff. ¶ 16).

Kai Davis, who is white, is the Personnel Director for the City of Dothan. (Davis Aff., ¶ 1).  Davis has been the Personnel Director during the entire time at issue in this litigation.

## B.    The City of Dothan Personnel Rules and Regulations

All City employees are provided with the City's Personnel Rules and Regulations.  The Rules serve as a guide in administrative action concerning various personal activities of the city. Employees are expected to comply with the provisions of the Rules and Regulations. (Gordon depo., Pl. Ex. 4, City of Dothan Personnel Rules and Regulations ("Personnel Rules", p. 1; Sec. 3-10(1)).  Under the Rules, offenses for which employees may be disciplined, are classified as 'Minor,' 'Major,' and 'Intolerable.'  (Personnel Rules, Sec. 3-20(1) – 3-20(3)). Major offenses are defined as "offenses that are extremely serious in nature but not so serious that a discharge is required upon committing the first such offense." (Personnel Rules, Sec. 3-20(2).  The first Major offense committed shall result in a "final warning" and a suspension without pay for between one and twenty days. (Personnel Rules, Sec. 3-20(2)(a)).  "Violation of any subsequent 'Major' offense

within two years shall be grounds for discharge." (Id.) The Personnel Rules also contain a 'Schedule of Disciplinary Penalties' that, while not all inclusive, identifies infractions that fall into each classification of offense. (Personnel Rules, Sec. 3-40 – 3-44). One infraction identified as a Major Offense is, "Action(s), or lack of action(s) that could endanger the life or health of self or others, that could cause undue financial loss to the City, negligence in carrying out assigned tasks or duties or responsibilities of one's position." (Personnel Rules, Sec. 3-42(6)). Insubordination is identified as another Major Offense. (Personnel Rules, Sec 3-42(14)). The Personnel Rules also provide for due process and a grievance procedure for disciplined employees. (Personnel Rules, Regulation V). The Personnel Rules also provide for a working test or probation period for each classified employee. Employees who prove unsatisfactory during this period may be removed by their Department Head. Subject to the approval of the Personnel Director. (Personnel Rule, Sec. 2-80(1).

## C.    Mary Beth Brackin

Plaintiff Mary Beth Brackin, who is white, had worked in the City's police department and was selected to become a Magistrate for the City in April 2001. (Backin depo., p. 85:12-14). Brackin was selected by Judge Gordon. (Brackin depo., p. 85:15-18; 231:2-4; Gordon aff., ¶ 14). Judge Gordon selected Brackin and another candidate named Michelle Bryan (who is also white) as Magistrates

over Eunice Knight in the Spring of 2001 even though both Brackin and Bryan were ranked lower than Knight on the employment register maintained by the Personnel Director. (Davis Aff., ¶ 14).[3]  Knight is African-American. (Id.)

Problems with Brackin's dealings with others were noted not long into her employment in the Magistrate's Office.  Brackin received an evaluation in December 2001 from Donna Nicholson (white), her supervisor at the time. (Brackin depo., pp. 107:6-108:3; Def. Ex. 14).  Brackin's performance in the area of "Dealing with the Public" was rated as unsatisfactory.  (Brackin depo., p. 109:20-110:3).  The comments to the evaluation specifically noted complaints from attorneys regarding the manner in which Brackin spoke to them.  (Brackin depo., p. 109:20-110:3; Def. Ex. 14).  The evaluation contained several recommendations for improvement, such as "realizing that tone of voice and attitude are important in conveying messages."  (Brackin depo., p. 112:10-14). Another recommendation raised was for Brackin to "know the limits of advising public of their rights and giving them the information they need to make decisions affecting their case."  (Brackin depo., p. 111:21-112:2).  Nicholson also noted that Brackin "does need to realize that the manner in which she sometimes talks to people can be considered argumentative or abrasive.  She needs to improve in this area."  (Brackin depo., p. 113:11-14).

---

[3] Ms. Knight was eventually hired in December 2001.  (Davis Aff., ¶ 14).

As Brackin noted, this unsatisfactory rating most likely stemmed from an incident involving a municipal court defendant named Kimberly Ralpeje. (Brackin depo., p. 110:15-111:1). It had been reported by Ralpeje to Gordon that Brackin had made disparaging comments to Ralpeje about the City's Public Defender, and also allegedly called one of the witnesses to these comments, a bail bondsman, at home asking if he would change his testimony about these comments. (Gordon Aff., Ex. E; Gordon depo., p. 143:1-20). Judge Gordon was concerned about the alleged misconduct, and did request an investigation be conducted by Internal Affairs because the investigation involved witnesses who were not employees of the City of Dothan. (Gordon depo., p. 144:1-4). An investigation was conducted and witnesses were interviewed, and a report was submitted to Judge Gordon. (Gordon Aff., Ex. E). Brackin denied making any disparaging comments about the Public Defender, and although she admitted calling the witness at home, denied that she asked him to change his story. (Gordon Aff., Ex. E). Brackin was not disciplined for this incident.

In 2004, however, Brackin was disciplined and placed on a 10-day suspension. (Brackin depo., p. 147:7-9). As background, during the prior year all employees in the Judicial Department, including Brackin, received a memo from Judge Gordon, the Department Head, that stated,

> The City Manager has stressed the significance of <u>diplomatically</u> referring those citizens making allegations of liability on the part of

> the City to the City Clerk's Office <u>without commenting on the possibility of liability.</u>
>
> Again, Mr. Rubin directs that citizens inquiring about reimbursement from the City for perceived liability on the City's part be directed to the City Clerk's Office and that <u>no comment</u> be made regarding the possible liability.

(Brackin depo., p. 143:10-14, Def. Ex. 21)(emphasis in original).  Subsequent to the dissemination of this memo, on or about January 7, 2004 a municipal court defendant named Theron Fondren filed a handwritten claim with the City Clerk in which he stated that he had been wrongfully arrested.  (Kelly Aff. ¶ 2, Ex. A; Gordon Aff. Ex. A, "Fondren Investigation").  Fondren further stated that "Mary Beth at the magistrates office can confirm this, she also said I should see you about getting my towing fee reimbursed $158.90."  (Gordon Aff. Ex. A, Bates Page No. 1300).  After receiving Fondren's letter from the City Clerk, the City Attorney asked the Police Chief to investigate Fondren's claims.  (Kelly Aff., ¶ 2; Gordon Aff. Ex. A, Bates Page No. 1298).

The Chief assigned the investigation to his Internal Affairs Division[4].  In the course of this Internal Affairs investigation the investigator learned from Magistrates Lavera McClain and Eunice Knight that Brackin had told Fondren that

---

[4] Section 11-60 of the Personnel Rules provide that Internal Affairs investigations may be conducted where there is illegal or suspected activity by the city employee. (Gordon Depo. Pl. Ex. 4)

the City would be liable for falsely arresting him. (Gordon Aff. Ex A) (Fondren Investigation, Bates Page No. 1293).

Brackin was directed to meet with the investigator who interviewed Brackin and recorded that Brackin did not recall making a statement to Fondren about being falsely arrested, "but was not sure." (Gordon Aff. Ex. A, Bates Page No. 1294). The investigator also noted that when asked again later in the interview whether she had made any statements in front of co-workers about telling Fondren the City was liable and he should file suit, Brackin answered "I don't remember." (Gordon Aff. Ex. A, Bates Page No. 1294). The investigator concluded and reported in a memorandum that

> Mary Beth Brackin has possibly violated a Major Offense under the personnel Rules and Regulations, Section 3-42.(6), **Actions or lack of actions that could cause undue financial loss to the City. Negligence in carrying out assigned tasks or duties or responsibilities of one's position.**
>
> Upon these findings it is believed that Personnel Rule Section 3-42.(6) was violated and this complaint is sustained.

(Gordon Aff. Ex. A, Bates Page No. 1294)(emphasis in original).[5] A copy of this report and memorandum was given to Judge Gordon. (Gordon Aff., ¶ 6). Because

---

[5] As a side note, the investigator also found that Fondren had not been wrongly arrested. The warrant had been issued for Fondren's failure to complete a court referral program he had been sentenced to following a previous arrest. The investigation revealed that Fondren did not complete the program until five months <u>after</u> the arrest warrant was issued, and did not submit the referral completion paperwork to the court until a week after the arrest that led to this incident. (Gordon Aff. Ex. A, Bates Page No. 1297)

the evidence indicated that Brackin had made statements to Fondren suggesting to him that the City was liable, Judge Gordon completed a Disciplinary Action Report on Brackin's conduct, and presented it to her on April 22, 2004. (Brackin depo., p. 151:2-152:5; Def. Ex. 24). The Report noted that,

> on or about the 7th day of January, you advised Mr. Theron Fondren . . . that he was wrongly arrested and that another employee was negligent regarding his case. This is directly insubordinate to a memorandum dated January 8, 2003 from Judge Gordon directing all Judicial Department Personnel that any citizen wishing to file suit against the City should be directed to the City Clerk's Office **without comment upon possible liability.** You acknowledged the receipt of this memorandum during the investigation of this incident. This is in violation of City of Dothan Personnel Rules and Regulations Section 3-42(6) action(s) or lack of action(s), that could cause undue financial loss to the City, and Section 3-42(14), insubordination. As you are aware, this is not the first instance of allegations of this nature against you, although no disciplinary action was taken regarding that incident. . . These violations constitute a major category offense which imposes a one to twenty day suspension without pay. Further, any other major violation occurring within two (2) years of this date, shall result in discharge.

(Brackin depo., Def. Ex. 24). Brackin was placed on a ten day suspension on April 26, 2004. (Brackin depo., p. 152:8-11; Def. Ex. 25). Although she had the right to grieve or appeal her suspension, she did not. (Davis Aff. ¶ 9-10).

Eleven months after this suspension, in March 2005, a defendant named Bradley Phelps appeared before Judge Gordon's Court on an arrest warrant. In Court, Bradley Phelps alleged that Mary Turner, another Magistrate in the Department, had "fixed" a ticket for him, and then reinstated the ticket and issued

an arrest warrant after Bradley Phelps failed to complete repairs to Turner's personal property. (Gordon Aff., Ex. B ("Bradley Phelps Investigation"). Because of the seriousness of these accusations, Judge Gordon notified the Personnel Director and the Acting Chief of Police. Gordon also contacted the City Attorney. Thereafter, Internal Affairs initiated an investigation. (Gordon Aff., ¶ 5, Ex. B, Bates Page No.). Turner was placed on administrative leave during this investigation. Gordon depo., Ex. B, Bates Page No. 1439).

In conjunction with their investigation into possible criminal conduct, the investigators asked Judge Gordon that no one contact Turner while the investigation was pending. (Gordon depo., p. 311:11-12; Gray depo., p. 105:3-15; 112:9-15). Judge Gordon's understanding was that they did not want anyone calling Turner or colluding with her. (Gordon depo., p. 314:1-3). Judge Gordon accordingly informed the Judicial Department staff on March 10, 2005, that they were not to contact Turner while the investigation was being conducted. (Brackin depo., p. 208:22-209:19; Gordon depo., p. 329:15-17, Pl. Ex. 7; Smith Affidavit, ¶ 3). The investigating officer testified that it was akin to "invoking the rule" in a court case. (Gray depo., p. 113:4-8). Mary Turner's office was secured and her computer frozen so no one could tamper with her computer. (Gordon depo., p. 319:17-23; 320:1-6.) Judge Gordon even noted in a memo to her file that she "instructed these employees to strictly refrain from any contact with Ms. Turner

while the internal investigation conducted by the Dothan Police Department was underway." (Gordon depo., Pl. Ex. 7). (The investigation was completed on or about May 2, 2005. (Gray depo., p. 118:14-18; p.120:10-21)). As Judge Gordon testified, the 'no-contact' prohibition was not expected to last indefinitely. (Gordon depo., p. 342:2-4). Judge Gordon even instructed Brackin and the other Magistrates that if they wanted to contact Turner after hours, to let Judge Gordon know. (Gordon depo., p. 330:11-15, 335:15-18). In fact, Brackin specifically admitted that she understood the restriction "to be while we were at work or while I was working." (Brackin depo., p. 316:2-3). However, Brackin ignored this clear restriction from Judge Gordon and called Turner on the telephone from work to supposedly ask about a "show cause" issue at work. (Brackin depo., p. 210:20-211:18). (Gordon Aff., Ex. D, Bates Page No. 1305, 1341).

At about the same period of time, the investigators investigating Bradley Phelps's ticket fixing learned that that his brother, Stephen Phelps, also had a ticket "fixed" by Mary Turner.[6] (Gordon Aff., Ex. B, Bates Page No. 1429, 1441). Accordingly, Internal Affairs expanded their investigation to look into any impropriety concerning Stephen Phelps's ticket. (Gordon Aff., Ex. C, "Stephen Phelps Investigation," Bates Page No. 1430). In the course of this investigation,

---

[6] Mary Turner was initially charged with Extortion, 2nd Degree, and Tampering with Government Records. She was indicted for tampering with Government Records See AlaCourt record on Mary Leon Turner. NC 2005-1649; CC 2005-001-1495. See Exhibit 11 to the Defendants' Evidentiary Submission.

the Uniform Traffic Citation "UTC" transmittal form listing Stephen Phelps ticket was examined. (Gordon Aff. Ex. C Stephen Phelps Investigation, Bates 1378-79; See UTC transmittal form, Brackin Depo., Def. Ex. 34). A UTC transmittal form is a form that the police officer fills out and gives to the Magistrate when he swears to the tickets the he has issued. The UTC transmittal form lists all the tickets the officer is presenting to the magistrate, including each ticket's UTC number and name of the person the ticket was issued to. (See UTC Form, Brackin Depo., Def. Ex. 34). The Magistrate signs the bottom of the form certifying that they had received all the tickets identified on the form. (Brackin depo., p. 189:12-16). The UTC Form on which Phelps ticket was listed was received by Brackin. (UTC Form, Brackin Depo., Def. Ex. 34). Brackin signed the form, certifying that she has received all the tickets listed on the form. (Brackin depo., p. 189:12-16):

> Q.    And once this is signed by you, you're certifying that you had these tickets and they had been sworn to and, therefore, they will be processed in the system, so to speak?

> A.    Yes.

 (Brackin depo., p. 189:12-16). Yet, at some time after she received the UTC form and sworn tickets from the police officer, Brackin drew a line through Stephen Phelps's entry and handwrote " -VOID- " over it. (UTC Form, Brackin Depo., Def. Ex. 34). Not only was this exceedingly improper, this was also a violation of State law, which requires that a ticket be *nolle prossed* by the judge once it has

been sworn to.  (Gordon depo., p. 480:12-14).

At the commencement of the investigation into the Phelps' tickets Brackin was presented with and signed a *Garrity* notice that informed her that she was to be questioned as part of an official administrative investigation,[7] and that she would be "asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office," and that if she refused to testify or answer questions related to her official duties or fitness for duty, she would be subject to departmental charges, which could include termination.  (Gordon  Depo Ex. C; Stephen Phelps Investigation, Bates Page No. 1408).   The notice also informed her that she was entitled to the right not to be compelled to incriminate herself, but required her to participate in the investigation of the Phelps' tickets. (Gordon Depo. Ex. C).  Brackin testified that Office Etress, the office investigating the incident involving Bradley Phelps's ticket, called her and asked her to come to his office to talk to him about the ticket.   (Brackin depo., p. 348:18 - 349:7). Brackin was also questioned twice by Sergeant Gray.  (Brackin depo. p. 218:14 – 220:8).   The meetings with Sergeant Gray took place in a front room in the magistrates' office that the office used for general purposes.  (Brackin depo., p. 220:15-23).   The second meeting with Sergeant Gray involved an inquiry into information about Mary Turner that had been released to a website blog

---

[7] See *Garrity v. State of New Jersey*, 385 U.S. 493 (1967)

maintained by Ricky Stokes.  (Gordon Depo Ex. D)  In at least one of the interviews, Brackin's husband sat in with her.  (Gordon Aff. Ex. C)  Stephen Phelps Investigation, Bates Page No. 1409).  Brackin admitted that she was free to leave the interviews, but that she was afraid she might lose her job if she did. (Brackin depo., p. 368:11-12).

Based the information gathered in the course of the Internal Affairs investigation into the fixing of the Phelps's tickets, the Internal Affairs investigation concluded that "it is more likely than not that Mary Elizabeth Brackin has violated the following:  MAJOR OFFENSE, Personnel Rule, Regulation III, Sec. 3-42(6), "Negligence in carrying out assigned tasks or duties or responsibilities of one's position."  (Gordon Aff. Ex. C, Bates Page No. 1379). The investigation report and conclusion was presented to and reviewed by Judge Gordon, Brackin's Department Head.  (Gordon Aff., ¶ 6).  The investigation also revealed that Brackin had violated the following:  MAJOR OFFENSE, Personnel Rule Sec. 3-42(14) "Insubordination".  (Gordon Aff Ex D, Bates 1305).  This report was presented to Judge Gordon.  (Gordon Aff. ¶ 6).

Because of Brackin's intentional phone call to Turner, Judge Gordon determined that Brackin

> violated the City of Dothan Personnel Rules and Regulations Section 3-42(14) insubordination; in that you willfully by your own admission disobeyed a directive from your Department Head to refrain from any contact with Ms. Mary Turner during the Police Department

> investigation of Ms. Turner.  You admittedly understood this directive and chose to disregard it by calling Ms. Turner.  This is a major offense.

(Brackin depo., Def. Ex. 32).  Additionally, based on Brackin's action in voiding out Stephen Phelps's ticket on the UTC transmittal form, Judge Gordon determined that Brackin had also

> violated the City of Dothan Personnel Rules and Regulations Section 3-42(6) negligence in carrying out assigned tasks or duties or responsibilities of one's position in that you failed to account for a uniform traffic citation issued by a Dothan Police Officer and which you affirmed receipt of in accordance with guidelines issued by the Alabama Administrative Office of Courts and usual and customary practice of the Dothan City Magistrates' Office.  This is a major offense.

(Brackin depo., Def. Ex. 32).  Because Brackin had committed two major offenses within a twenty-four month period, Brackin was recommended for dismissal.  (Brackin depo., Def. Ex. 32; ).  Brackin was given notice of these charges against her and was served with a notice of termination.  (Brackin depo., p. 223:11-224:13; 225:12-16).

Brackin appealed her termination to the City's Personnel Board, who upheld her termination.  (Brackin depo., p. 225:21-226:5).  Brackin then appealed her termination to the Circuit Court of Houston County.  (Brackin depo. p. 226:16-18).  The Circuit Court reversed the decision, and the City appealed the reversal to the Alabama Court of Civil Appeals.  (Brackin depo., p. 227:7-11; Def. Ex. 36; *City of Dothan v. Brackin,* 2006 WL 3526741 (Ala. Civ. App. 2006)).  The Court of Civil

Appeals reversed the Circuit Court's decision, finding that there was "substantial evidence indicating that Brackin was negligent in failing to account for a traffic ticket issued by a Dothan Police officer," and that "[t]he Circuit Court erred in concluding otherwise." *Brackin*, 2006 WL 3526741at *7. The Court of Civil Appeals also held that the "Circuit Court erred in determining that the Personnel Board was not presented with substantial evidence indicating that Brackin was insubordinate by conversing with Turner in violation of Judge Evans-Gordon's order." *Id.* at * 10. However, the Court of Civil Appeals interpreted the City's Personnel Rules to mean that the 24 month window for considering major offenses was based on when the act was committed, not when the employee was disciplined. *Id.* at 12-13. Because Brackin voided out Stephen Phelps's ticket in December 2002, which was more than 24 months before the Turner telephone call infraction, the Court remanded the case back to the City's Personnel Board for the Personnel Board to determine whether "Brackin committed the major offense of insubordination within 24 months after having been disciplined for a previous major offense on April 22, 2004," (which was the Fondven discipline) and whether that offense was sufficient to warrant Brackin's dismissal. *Id.* at *13. On remand, the Personnel Board found "sufficient evidence to uphold the charge of insubordination as brought by the department head," that this offense was the

second major offense by Brackin within a 24 month period, and upheld the decision to terminate her. (Brackin depo., p. 227:12-14; Def. Ex. 39).

**D.     Nancy Martin**

On September 5, 2003, Plaintiff Nancy Martin, who is white, applied for the position of the City of Dothan's Municipal Court Administrator. (Martin depo., Def. Ex. 7).  The Municipal Court Administrator is responsible for supervising the preparation and scheduling of cases to be tried in the Municipal Court. Additionally, the Administrator is responsible for the issuance of warrants and collection of revenues from fines and court costs.   The Municipal Court Administrator is also responsible for supervising the Magistrates.   The Court Administrator must possess the ability to establish and maintain an effective working relationship with the Presiding Judge, the City prosecutors, the public defenders, other attorneys in the City, City employees, City officials and the public to include maintaining a positive image for the Judicial Department.  This person must also have the ability to plan, assign and supervise the work of subordinates and treat them in a fair and impartial manner.  (Martin depo., Def. Ex. 8).

Martin was interviewed by Judge Gordon on two separate occasions, and was subsequently hired by Judge Gordon. (Martin depo., pp. 84:16-18, 93:18-19, 308:17:19; Gordon Aff., ¶ 14).  Judge Gordon hired Martin, who is white, over two other African-American candidates, including Eunice Knight.  (Davis Aff., ¶ 16).

While Martin's initial evaluation, which was done just two months after she started, was satisfactory, (Martin depo., Def. Ex. 17), Judge Gordon acknowledged that it became evident over time that Martin, who had no experience working in a magistrates' office, was not proficient in her duties, and really did not "grasp it." (Gordon depo., p. 266:11-12 – 267:8). These deficiencies became apparent to Judge Gordon over time. (Gordon depo., p. 68:15-16).

Some of the issues Judge Gordon had with Martin include an inability to get along with Ashton Ott, the City prosecutor, and not letting the magistrates bring cases over when Ott requested them. (Gordon depo., p. 398:3-12). In Gordon's opinion, Martin had an inability to work with Ott. (Gordon depo., p. 403:21-22). Martin argued with lawyers. (Gordon depo., 407:8-9). An attorney named Derek Yarborough complained about Martin prohibiting him from filing a motion. (Gordon depo., p. 409:22- 410:5). Other attorneys who complained about Martin included Tom Brantley, Kathleen Nemish, and Cliff Mendheim. (Gordon depo., p. 411:1; 411:3; 416:9-13). Judge Gordon received complaints from some of the black magistrates that they felt that Martin was being racially discriminatory towards them. (Gordon depo., p. 420:17-22; Eunice Knight depo., p. 29:17-20; 34:23; 35:1-19). Other magistrates, such as Ann Baxter and Valerie Savage (who are both white (Gordon depo., p. 423:16, 20)) complained about Nancy not knowing what she was doing, and that she was merely signing memos about

policies and procedures that Brackin would write. (Gordon depo., p. 421:3-10). Martin's own calendar reveals discord among the white Magistrates. (Martin depo., Def. Ex. 5, Sept. 30, 2004 entries (i.e. lost paperwork, shouting, Valerie Savages' threats to file a complaint if she has to do Mary Beth's way)). Judge Gordon was concerned that the office was deteriorating. (Gordon depo., p. 421:23-422:1). In fact, during Martin's term of employment every Magistrate except Brackin and Mary Turner complained about Martin. (Gordon depo., p. 424:17-21). Months into Martin's employment she still had not learned the computer system, or even how to just log on. (Gordon depo., p. 425:5-21). Another situation involved Martin granting leave to a white magistrate who had no accrued leave, in contravention of personnel rules, to go to a niece's hospital, while at the same time she denied leave for a black magistrate (who had accured leave to draw on) to go to the doctor and hospital with her daughter. (Gordon depo., p. 429:8-16). Another complaint Judge Gordon received involved Martin wanting to reprimand a black magistrate for changing a cash bond, but not wanting to reprimand a white magistrate who changed a bond the same day under the same circumstances. (Gordon depo., p. 429:18 – 430:2). Judge Gordon also received complaints from the police department about dockets not being posted, and about the general deterioration of the attitude of the magistrates office towards the police department. (Gordon depo., p. 433:1-20). The Chief of Police even complained

about the magistrates' refusal to assist the department and the deterioration of the magistrates' attitude under Martin.  (Gordon depo., p. 434:17-22)

Judge Gordon met with Martin prior to her termination about these concerns, including in June and July 2004.  (Gordon depo., p. 435:20-436:2).  As she recorded in her notes, Judge Gordon addressed the following deficiencies with Martin:

- Martin was unable to interact professionally with personnel from the various private attorneys' offices, the City's Attorney's office, and public defenders' offices, including refusing to allow an attorney to file a motion because the motion was late;

- Judge Gordon had instructed Martin to ensure that a warrant would not be issued for a Michigan defendant's arrest pursuant to an agreement reached between the defendant and the City, yet Martin directed the warrant be issued;

- Deterioration of the attitudes of the employees of the Magistrates' Office;

- Martin failed to re-assign Backin's duties when Brackin was out on suspension;

- Martin prepared an evaluation so negative that it would have deprived the employee of her pay increase, and which was in direct contrast to her previous evaluations received by the employee consistently rating her as above average, citing events of which she could have no personal knowledge.  Further, after being required to re-evaluate the employee, Martin told the employee that she had been forced to change the evaluation and it would not happen again.  Martin also falsely alleged that Judge Gordon had threatened her with termination if she did not give the employee a favorable review;

- Martin applied discipline and personnel rules in an arbitrary and capricious manner, and treating employees very differently when it comes to leave time;

- Martin engaged in a verbal altercation with a City prosecutor over a complaint made by another magistrate, and then refused to speak to the prosecutor in the courtroom or elsewhere afterwards;

- Martin failed to discipline a magistrate stockpiled case files in her office for several months, resulting in felony cases being dismissed, after being instructed to by Judge Gordon;

- Martin failed to recall a warrant after accepting money from the defendant for payment of a fine, causing the arrest of that defendant;

- Martin was unable to assist entering youthful offender defendants into the computer because she lacked even rudimentary understanding of the process; and

- Martin observed a magistrate "bellow" at another magistrate for a perceived error without intervening.

(Gordon depo., Pl. Ex. 9, 10). Kai Davis also participated in some meetings between Judge Gordon and Martin, in which Judge Gordon expressed her concerns about Martin's performance. (Davis Aff., ¶ 5). Davis's own notes from the meetings note that they discussed complaints against Martin, policies not being enforced, and inconsistencies in approving leaves of absence. (Davis Aff. ¶ 5; Ex. C). One of these meetings was on July 19, 2004 when many of the issues and deficiencies above were discussed. (Davis Aff. ¶ 5, Ex. C).

Martin herself admits that Judge Gordon spoke with her about some of these issues. For example, she admits that Judge Gordon spoke to her about the complaint received from the Chief of Police. (Martin depo., p. 345:19-21). She also admitted that Judge Gordon talked to her about her interaction with Ashton Ott, acknowledging that in a conversation with Judge Gordon about a heated

situation between her and Ott, Judge Gordon "took up for Ashton."  (Martin depo.,
p. 222:1).  Martin also admitted that Judge Gordon spoke to her about her treating
employees differently with regards to time off for medical issues, and letting an
employee with no accrued time take off.  (Martin depo., p. 238:9-10 ("[N]ever
once did the judge tell me I didn't have the authority to keep letting her be off.
Only after the fact did she tell me."))  In fact, Martin further admitted that in a
meeting with Kai Davis and Judge Gordon, "Kai said that she knew – we'd both
said there were problems.  So she asked me to start. . . Before I could get through
my part, the Judge interrupted and started going on about her side of things . . . ."
(Martin depo., p. 239:5-6).  She even admitted "[t]he Judge said she didn't know if
she could go forward from that point.  And I told her that I could, that I could put
the differences behind us . . . .", clearly indicating that Martin was aware of issues
the Judge had with her performance.  (Martin depo., p. 240:10-12).  Despite these
discussions, Martin's performance did not improve.  (Davis Aff., ¶ 6)

Based on the above issues with Martin's performance and lack of
improvement, Judge Gordon decided to not recommend Martin, a probationary
employee, for further employment.  (Martin depo., Def. Ex. 26).  On October 12,
2004 Martin was notified that she was being placed on administrative leave and
recommended for termination under Personnel Rule 3-43(17), "unsatisfactory work
performance during the probationary period," (Martin depo., Def. Ex. 29), and on

October 18 Martin was informed that her employment was being terminated. (Martin depo., Def. Ex. 31). Martin was provided notice of a Determination Hearing on October 12, 2004, and the Determination Hearing was held on October 13. (Martin depo., Def. Ex. 28, 31). Davis, in accordance with the City's Personnel Rules, approved Martin's termination based on Martin's inadequate job performance, and the fact that she had not improved after her deficiencies had been discussed with her. (Davis Aff., ¶ 6).

Martin has alleged that Judge Gordon retaliated against her by not allowing her to perform her duties by not permitting her "to make assignments effecting the black magistrates <u>after</u> she complained about Defendant Gordon's discriminatory practices. (Second Amend. Compl. ¶ 181 (emphasis added)). However, this allegation contradicts her own sworn statements to the U.S. Equal Employment Opportunity Commission. As Martin stated in her sworn Charge of Discrimination,

> On September 23, 2004, I made revised job assignments giving two black Magistrates what I viewed as very minor additional job duties. . . These Magistrates complained to Judge Gordon. I was subsequently warned by the Judge not to make new job assignments without first running the changes through her.

 (Martin depo., Def. Ex. 33, page 3, ¶ I). In response to the complaints from the two black Magistrates Martin had singled out, Judge Gordon sent Martin asking Martin to refrain from making changes to the magistrate's assigned duties until

Judge Gordon and Martin had a chance to discuss the matter, since they had previously decided to rotate all Magistrate assignments and would therefore be changing all magistrates' duty assignments shortly. (Martin depo., Def. Ex. 25). Martin received these instructions from Judge Gordon on September 28, 2004. (Martin depo., Def. Ex. 25). In response to this memo, Martin then states in her Charge of Discrimination,

> On September 29, 2004, because I was upset about the memo the Judge had done to me regarding the minor job duty changes and also about a wrongful arrest handled very inconsistent of the policy and procedure by Lavera and Eunice, I went to talk to the Personnel Director. I advised the Personnel Director that I had been telling her that the problems in the Magistrates Office were not racially motivated because I wanted to get along with the Judge and because I feared I would lose my job. I told her that I was admitting to her on that date that I believed the problems in the Magistrates Office were racially motivated by the Judge showing favoritism to the black Magistrates.

(Martin depo., Def. Ex. 33, page 3, ¶ J (emphasis added). Thus, despite her representations to this Court to the contrary, Martin's previous sworn testimony is that she specifically did not complain about discrimination until after Judge Gordon became involved in her attempt to assign the black Magistrates additional duties. Moreover, Kai Davis denies that Martin ever complained to her that Gordon was discriminating against her or that Martin complained that Judge Gordon's actions were racially motivated. Notwithstanding this, it is undisputed

that Davis never informed Gordon that Martin complained of race discrimination. (Davis Aff. ¶ 8).

Judge Gordon hired both Brackin and Martin, and was the decisionmaker for both Brackin and Martin's termination. (Gordon Aff., ¶ 8, 9, 14). Furthermore, Judge Gordon hired Melanie Walsh to replace Brackin and Michelle Sellers to replace Martin. (Gordon Aff. ¶ 12, 13). Both Walsh and Sellers are white. (Id.) Race was simply not a factor in the decision to discipline or terminate Brackin or Martin. (Gordon Aff., ¶ 8, 9).

## III.   **LEGAL ANALYSIS**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment when the pleadings and supporting materials demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case, and on which the plaintiff will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A plaintiff cannot defeat a properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings. *See Anderson*, 477 U.S. at 248. A mere

"scintilla" of evidence supporting the plaintiff's position is not enough to survive summary judgment; the plaintiff must produce evidence so a jury could reasonably find for him. *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)(citing *Anderson*, 477 U.S. at 242).

Summary judgment in this case is proper because neither Brackin nor Martin can establish by substantial evidence any of their claims against the City or against Judge Gordon.

**A.    Judge Gordon is Entitled to Qualified Immunity, Therefore, Plaintiffs' Claims Against Her are Due to be Dismissed**

Brackin and Martin have asserted claims against Judge Gordon in her individual capacity under Counts One, Two, Three, Four, Five, Seven, Eleven, Twelve, Sixteen and Seventeen.  However, Judge Gordon is entitled to qualified immunity with respect to these alleged acts and, as such, Plaintiffs' claims against Judge Gordon in her individual capacity are due to be dismissed.

The defense of qualified immunity affords public officials broad protections from the rigors, intrusion, and expense associated with defending against unwarranted civil rights actions. Most importantly, qualified immunity shields government officials from liability for damages arising from conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985).  Qualified immunity not only

provides a defense to liability, it also gives a public official immunity from suit itself. *See Mitchell*, 472 U.S. at 526. For example, the defense of qualified immunity extends to insulate public officials from the burdens associated with engaging in discovery. *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996); *see also* Anderson v. Creighton, 483 U.S. 635, 646 n. 6 (1987) ("One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from . . . discovery . . . .").

Critical public policy considerations, such as the "social costs [associated with claims against public officials] including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office," serve as the cornerstone, courts have created the qualified immunity defense to serve three (3) critical purposes: (1) to "protect[ ] the public from unwarranted timidity on the part of public officials by . . . contributing to principled and fearless decision-making;" (2) "to ensure that talented candidates are not deterred by the threat of damages suits from entering public service;" and (3) to avoid distracting public employees from their duties. *Richardson v. McKnight*, 521 U.S. 399, 408-411 (1997) (internal citations omitted).

As a consequence of the critical public policy considerations underlying the doctrine of qualified immunity, "courts should think long and hard before stripping

defendants of immunity." *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994). Qualified immunity for government officials is the usual rule, and "only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Id.* All but the plainly incompetent and those who knowingly violate the law are shielded and are immune from suit. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Hunter v. Bryant*, 502 U.S. 224, 229 (1991); *Leeks v. Cunningham*, 997 F.2d 1330, 1333 (11th Cir. 1993).

To defeat a motion for summary judgment based on qualified immunity, a plaintiff must show that the defendants are not entitled to qualified immunity as a matter of law or that genuine issues of material fact exist so that the determination of whether the defendants are entitled to qualified immunity are only properly determined after findings of fact have been made by the jury. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir. 1988). The test for whether a governmental defendant is entitled to qualified immunity in her individual capacity is as follows:

> (1) the defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred;
>
> (2)    Once the defendant public office satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions violated clearly established constitutional law or a federal statute.

*Rich,* 841 F.2d at 1563-64. If the Plaintiff proves a violation of a constitutional or statutory right, the court must determine whether the defendant's conduct was nonetheless "objectively reasonable" in light of that right. *Johnson v. City of Ft. Lauderdale,* 126 F.3d 1372, 1378 (11th Cir. 1997)(citations omitted). If the court concludes that "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances, summary judgment for the defendant is appropriate. *Id.*

In *Johnson,* the court granted summary judgment based on the defense of qualified immunity even though the defendants conceded the right to be free from workplace discrimination and harassment on the basis of race and the right to be free from retaliation were clearly established. *Johnson,* 126 F.3d at 1379. The Court held that the defendants conduct in terminating the plaintiff's employment was "objectively reasonable" since it was also based on adequate lawful motives as well—specifically the plaintiff's admitted failure to obey a direct order and repeated lies during his disciplinary hearing. *Id.* ("Even assuming that the defendants acted with some discriminatory or retaliatory motives in demoting and discharging Johnson, the law did not clearly establish that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined Johnson in the same manner. We, therefore, reverse the district court's denial of summary judgment on Johnson's §1981 and §1983 claims."); *see also*

*Foy v. Holston,* 94 F.3d 1528 (11th Cir. 1996)("At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage."); *Cason Enterprises, Inc. v. Metropolitan Dade County,* 20 F.Supp.2d 1331, 1341-42 (S.D.Fla. 1998)(holding the record established substantial lawful motives for the actions taken and granting summary judgment in favor of the individual defendants based on qualified immunity).

In the present case, Judge Gordon is entitled to qualified immunity. Judge Gordon, as the Municipal Court Judge and Department Head, was acting within the scope of her discretionary authority in issuing directives to her department, contacting the Personnel Director, Police Chief, and City Attorney about allegations of ticket fixing by a Magistrate, disciplining and terminating Brackin and Martin.  (Gordon Aff., ¶7); *see also Courson v. McMillan*, 939 F.2d 1479, 1486-1487 (11th Cir. 1991). Further, Brackin and Martin are unable to demonstrate that Judge Gordon's alleged conduct was objectively unreasonable since it was based on sufficient lawful motives—specifically, Brackin's violation of personnel rules 3-42(6) ("lack of actions that could endanger the life or health to self or others or that could cause undue financial loss to the city and/or negligence carrying out assigned tasks or duties or responsibilities of one's position,"); her major offense of violating a Dothan personnel rule and regulation in the handling

of a traffic ticket by striking through and writing "void" on a ticket listed on a Uniform Traffic Citation transmittal form, (Brackin depo., p. 195:1-7; 187:9-188:18); Brackin's act of insubordination in "willfully, by [her] own admission, disobey[ing] a directive from [her] department head to refrain from any contact with Mary Turner during the police department investigation of Mrs. Turner." (Brackin depo., pp. 222:11-17; 223:11-224:13); and Martin's job performance issues as a probationary employee.  Therefore, Judge Gordon is entitled to qualified immunity and all claims asserted against her are due to be dismissed.

**B.    Defendants Are Entitled to Summary Judgment on Plaintiff Brackin's Claims**

    **1.    Brackin's First Amendment Freedom of Speech Claim (Count One) Fails As She Did Not Engage In Protected Speech**

Brackin alleges that the City and Judge Gordon violated first amendment freedom of speech rights by disciplined her for "instructing a citizen where he could go to submit a claim against the City." (Second Amend. Compl. ¶ 97).  This claim fails as to Judge Gordon because of qualified immunity and fails as to both Defendants on the merits.

This claim is based on an incident that occurred in 2004.  (Brackin depo., p. 147).  As background, during the prior year all employees in the Judicial Department, including Brackin, received a memo that stated,

> The City Manager has stressed the significance of <u>diplomatically</u> referring those citizens making allegations of liability on the part of

the City to the City Clerk's Office <u>without commenting on the possibility of liability.</u>

Again, Mr. Rubin directs that citizens inquiring about reimbursement from the City for perceived liability on the City's part be directed to the City Clerk's Office and that <u>no comment</u> be made regarding the possible liability.

(Brackin depo., p. 143, Def. Ex. 21)(emphasis in original).

In early 2004, Theron Fondren filed a handwritten claim with the City Clerk in which he stated that he had been wrongfully arrested. He then stated, "Mary Beth at the magistrates office can confirm this, she also said I should see you about getting my towing fee reimbursed $158.90." (Kevan Kelly Aff.; Ex. A). The City Attorney then asked the Police Chief to investigate Fondren's claims. (Kevan Kelly Aff.; Ex. B). In the course of his investigation, the investigator learned from both Lavera McClain and Eunice Knight (also Magistrates) that Brackin had told Fondren that the City would be liable for falsely arresting him. (Gordon Aff.; Ex. A, Fondren Investigation, Bates Page Nos. 1031ac, 1031ad, and 1031ak). The investigator subsequently interviewed Brackin, and in this interview, Brackin said she did not recall making a statement to Fondren about being falsely arrested, "but was not sure." Later in the same interview, after the investigator asked again whether she had made any statements in front of co-workers about telling Fondren the City was liable and he should file suit, Brackin answered "I don't remember."

(Gordon Aff.; Ex. A, Fondren Investigation, Bates Page Nos. 1294).    The

investigator concluded and reported in a memorandum that:

> Mary Beth Brackin has possibly violated a Major Offense under the
> personnel Rules and Regulations, Section 3-42.(6), **Actions or lack of
> actions that could cause undue financial loss to the City.
> Negligence in carrying out assigned tasks or duties or
> responsibilities of one's position.**
>
> Upon these findings it is believed that Personnel Rule Section 3-42.(6)
> was violated and this complaint is sustained.

(Gordon Aff., Ex. A, Fondren Investigation, Bates Page No. 1294)(emphasis in

original).[8]    A copy of this report and memorandum was given to Judge Gordon.

(Gordon Aff. ¶ 6).    Because the evidence indicated that Brackin had made

statements to Fondren suggesting the City was liable in direct violation of the

directive not to comment on the possibility of liability, Judge Gordon completed a

Disciplinary Action Report in Brackin's conduct, and presented it to her on April

22, 2004.  (Brackin depo., p. 151:21-152:5; Def. Ex. 24).  The Report noted that:

> On or about the 7th day of January, you advised Mr. Theron Fondren .
> . . that he was wrongly arrested and that another employee was
> negligent regarding his case.  This is directly insubordinate to a
> memorandum dated January 8, 2003 from Judge Gordon directing all
> Judicial Department Personnel that any citizen wishing to file suit
> against the City should be directed to the City Clerk's Office **without**

---

[8] The investigator also found that Fondren had not been wrongly arrested.  The warrant had been
issued for Fondren's failure to complete a court referral program he had been sentenced to
following a previous arrest.  The investigation revealed that Fondren did not complete the
program until five months <u>after</u> the arrest warrant was issued, and did not submit the referral
completion paperwork to the court until a week after the arrest that led to this incident.  *See*
Kevan Kelly Aff.; Ex. B.

> **comment upon possible liability.** You acknowledged the receipt of
> this memorandum during the investigation of this incident. This is in
> violation of City of Dothan Personnel Rules and Regulations Section
> 3-42(6) action(s) or lack of action(s), that could cause undue financial
> loss to the City, and Section 3-42(14), insubordination. As you are
> aware, this is not the first instance of allegations of this nature against
> you, although no disciplinary action was taken regarding that incident.
> . . These violations constitute a major category offense which imposes
> a one to twenty day suspension without pay. Further, any other major
> violation occurring within two (2) years of this date, shall result in
> discharge.

(Brackin depo., Def. Ex. 24). As a result of this incident, Brackin was placed on a

ten day suspension. (Brackin depo., p. 152.) Brackin alleges that this suspension

violated her first amendment right to freedom of speech. (Second Amend. Compl.

¶ 97).

"[A] public employee's right to freedom of speech is not absolute." *Bryson*

*v. Cuty of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)(citation omitted).

Brackin's speech is constitutionally protected only if it satisfies both elements of

the test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968) and

refined in *Connick v. Myers*, 461 U.S. 138 (1983)(the "*Pickering-Connick* test")."

*Maggio v. Sipple*, 211 F.3d 1346, 1351 (11th Cir. 2000).

> The first [element of the test] requires determining whether the
> employee spoke as a citizen on a matter of public concern. If the
> answer is no, the employee has no First Amendment cause of action
> based on his or her employer's reaction to the speech. If the answer is
> yes, then the possibility of a First Amendment claim arises. The
> question becomes whether the relevant government entity had an
> adequate justification for treating the employee differently from any
> other member of the general public. This consideration reflects the

importance of the relationship between the speaker's expressions and employment.

*Garcetti v. Ceballos* 126 S.Ct. 1951, 1958 (2006)(citations omitted). Brackin's claim does not even get past the first element because she did not speak as a citizen on a matter of public concern. As noted below, she did not speak as a citizen, but as an employee of the City in carrying out her duties. However, even if she had spoken as a citizen on a matter of public concern, her claim would still fail on the second element, as the City had an adequate justification for treating Brackin differently from any other member of the general public.

First, Brackin's comments to Fondren are not protected because she did not speak "*as a citizen* on a matter of public concern. *D'Angelo v. School Bd. of Polk County, Fla*. 497 F.3d 1203, 1210 (11th Cir. 2007)(emphasis in original)(quotations omitted.) It cannot be disputed that Brackin's comments were not made as a citizen, but rather as an employee pursuant to her official duties. In fact, that was the City's issue: that Brackin's comments made in her capacity as an employee of the City could be held to be an admission by the City. The Supreme Court has clearly held that "when public employees make statements pursuant to their official duties, the employees are <u>not</u> speaking as citizens for First Amendment purposes, <u>and the Constitution does not insulate their communications from employer discipline</u>." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958 (2006). "[T]he First Amendment does not prohibit managerial discipline based on an

employee's expressions <u>made pursuant to official responsibilities</u>." *Id.* (emphasis added). Brackin's statement to Fondren "is not protected by the First Amendment because [she] did not speak as a citizen, as required by *Garcetti.*" *D'Angelo v. School Bd. of Polk County, Fla.* 497 F.3d 1203, 1210 (11th Cir. 2007).

Even though her claim fails on this first point which precludes the need for any further analysis, it is worth noting that her claim also fails on the second point, that is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti,* 126 S.Ct. at 1958. "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech <u>that has some potential to affect the entity's operations</u>. *Id.* (emphasis added). "Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* It cannot be denied that Brackin's comments had the potential of causing the City to incur legal and financial liability, and had the potential to affect the City's operations (which, in fact, it did, as evidenced by the complaint filed by Fondren). (Gordon Aff.; Ex. A) As such, the City certainly had adequate justification for

treating Brackin differently than the general public.  Accordingly, Brackin's claim fails on the second point, as well as the first.

The undisputed evidence shows that Brackin did not speak as a citizen on a matter of public concern.  Moreover, the City had adequate justification for treating Brackin differently than the general public.  Accordingly, Brackin's first claim is due to be dismissed.

### 2. The City's Temporary Directive to All Magistrates to Not Contact Another Magistrate While That Magistrate Was Under Police Investigation Was Not Overbroad and, Therefore, Brackin's First Amendment Freedom of Speech Claim (Count Two) Fails as a Matter of Law

In Count Two of her Complaint, Brackin alleges that "a prior restraint upon Mrs. Brackin to have no contact with Mrs. Turner for an indefinite period of time during a police investigation" violated her First Amendment rights. (Second Amend. Compl. ¶ 102).  While this Court has held that "there is no way [Brackin] can prevail on her freedom of speech claim as to her phone call to Turner," it stated that Brackin might be making a facial challenge to the regulation, claiming that it is unconstitutionally overbroad."  (Doc. #42, Memorandum Order and Opinion, p. 11-12).

In March 2005, the City Police Department investigated Magistrate Turner for an alleged ticket fixing scheme.  (Gordon Aff.; Ex. B, Bradley Phelps investigation).    Turner    was    placed    on    administrative    leave    during    this

investigation.  (Brackin depo., p. 205:17-20; Gordon Aff., Ex. B, Bradley Phelps investigation).  It was not known at the time who else in the department might have been involved, and in conjunction with their criminal investigation of potential criminal conduct, the investigators asked Judge Gordon that no one contact Turner while the investigation was pending.  (Gordon depo., p. 311:11-12; Gray depo., p. 105:3-15; 112:9-15).  Judge Gordon's understanding was that they did not want anyone calling Turner or colluding with her.  (Gordon depo., p. 314:1-3).  In fact, Turner's computer was frozen and all files removed from her office.  (Smith Aff., ¶ 3, 4).  Judge Gordon accordingly informed the Judicial Department staff that they were not to contact Turner while the investigation was being conducted.  (Brackin depo., p. 209:16-19; Gordon depo., p. 329:15-17; Gordon depo., Pl. Ex. 7).[9]  Judge Gordon even noted in a memorandum that she "instructed these employees to strictly refrain from any contact with Ms. Turner while the internal investigation conducted by the Dothan Police Department was underway."[10]  (Gordon depo., Pl. Ex. 7).  The 'no-contact' prohibition was not expected to last indefinitely.  (Gordon depo., p. 342:2-4).[11]

---

[9] Judge Gordon informed them if they needed to contact Turner after hours to let her know. (Gordon depo., p. 330:9-15).

[10] Judge Gordon informed Brackin and the other Magistrates that if they wanted to contact Turner after hours, to let her know.  (Gordon depo., p. 330:11-15, 335:15-18).  In fact, Brackin specifically admitted that she understood the restriction "to be while we were at work or while I was working."  (Brackin depo., p. 316:2-3).

[11] The investigation was completed on or about May 2, 2005.  (Gray depo., p. 118:14-18).

"It has long been a tenet of First Amendment law that in determining a facial challenge to a statute [here the directive], if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Bishop v. Aronov,* 926 F.2d 1066, 1071 (11th Cir. 1991)(quoting *American Booksellers v. Webb*, 919 F.2d 1493, 1499 -1500 (11th Cir. 1990) (other citations omitted). "Since the overbreadth doctrine in effect requires courts to evaluate the *potential* reach of a statute, *conceivable* sets of circumstances, and *possible* direct and indirect burdens on speech, the Supreme Court has noted that the overbreadth doctrine is 'strong medicine' that should be employed only with hesitation, and then only as a last resort." *American Booksellers v. Webb*, 919 F.2d 1493, 1499 - 1500 (11th Cir. 1990)(internal quotations and citations omitted.)

The instruction to not have any contact with Turner arose out of the police department's concern for collusion in an investigation of possible criminal activity. (Gordon depo., p. 314:1-3). Turner, a magistrate, was being investigated for fixing tickets, and it was not known who else in the department might be involved in fixing ticket. (Gordon Aff., Ex. B, Bradley Phelps Investigation). Obviously, in light of the fact that others in the office might be involved in Turner's scheme, the City had a legitimate reason to prohibit them from speaking with Turner during the course of the investigation. It is undisputed that Gordon's restriction was not indefinite, but rather was only while the investigation was ongoing. (Gordon depo.,

p. 329, 342; Gordon depo., Pl. Ex. 7).  The restriction at issue was reasonably narrow.  In fact, the investigation concluded on May 2, 2005.  (Gray depo., p. 118:14-18).  "It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld."  *American Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990)(citing *Erznoznik v. City of Jacksonville,* 422 U.S. 205 (1975); *Broadrick v. Oklahoma,* 413 U.S. 601 (1973)).  Furthermore, Brackin specifically admitted that she understood the restriction "to be while we were at work or while I was working."  (Brackin depo., p. 316).  Accordingly, Judge Gordon's restriction was not overly broad, and any claim alleging that it was must fail.

> **3.    Brackin's Relationship with Turner Is Not Protected by the Constitution, Thus, Her First Amendment Freedom of Association Claim (Count Three) Must Be Dismissed**

Brackin's third claim is that the City violated her First Amendment right to freedom of association when it instructed her not to associate with Turner while Turner was under possible criminal investigation.  As noted above, the restriction was only for the period of time while the investigation was being conducted. Further, Judge Gordon testified repeatedly that she also advised Brackin that if she wanted to socialize with Turner outside of work to simply let Judge Gordon know, and Judge Gordon would clear it through the investigators.  (Gordon depo., pp.

330:9-15, 335:8-18, 336:6-14, 340:4-7.)  It is undisputed that Brackin never asked to be able to contact Turner after hours.  (Gordon depo., p. 335:15-18, 336:6-14). Regardless, Brackin's claim fails as a matter of law because Brackin's relationship with Turner does not rise to the level of relationship protected by the Constitution, and does not survive the *Pickering* balancing test used to evaluate such claims.

To begin with, Brackin claims that "Defendant Gordon's March 10 prior restraint mandate was overbroad and not narrowly tailored to achieve any legitimate governmental end."  (Second Amend. Compl. ¶ 108).  To the extent Brackin is claiming that Judge Gordon's restriction is subject to strict scrutiny, she is incorrect.  The Eleventh Circuit has specifically stated that a strict scrutiny review of a government employee's freedom of intimate association claim is <u>not</u> the appropriate standard.  *Shahar v. Bowers*,  114 F.3d 1097, 1102 (11th Cir. 1997). The appropriate test is the *Pickering* balancing test.  *Id.* at 1103.  In other words, did the City's interest in preventing collusion between a suspect and potential witnesses during an investigation of criminal activity occurring within the Judicial Department outweigh Brackin's personal association interests.  *Id. at*  1110. Clearly, the City's interest in preventing collusion during a criminal investigation outweighs Brackin's desire to socialize with Turner.

However, the court does not even reach the *Pickering* balancing test because Brackin's  association  with  Turner  is  not  a  relationship  protected  by  the

Constitution.  To succeed on this claim, Brackin must first demonstrate that she had a constitutional right and that [she] suffered an adverse employment action for exercising the right. *Davis v. Phenix City, Alabama* 2007 WL 1857263, *11 (M.D.Ala. 2007)(citing *Chesser v. Sparks,* 248 F.3d 1117, 1124 (11th Cir.2001)). Only then does the Court reach the *Pickering* balancing test.    *Id.*    The constitutional right to association protects two different forms of association: "intimate association" and "expressive association."  *McCabe v. Sharrett,* 12 F.3d 1558, 1562 (11th Cir. 1994).  Brackin's association with Turner does not rise to the level of either form.

The right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family-marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. *See Roberts v. United States Jaycees,* 468 U.S. 609 (1984).   Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships, such as "relative smallness" and "seclusions from others in critical aspects of the relationship." *McCabe,* 12 F.3d at 1562-63. The right of expressive association is the freedom to associate for the purpose of engaging in those activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion. *Roberts,* 468 U.S. at 618.  Brackin does not specify whether her association with

Turner is allegedly protected as a right of intimate association (other than calling her a close friend) or expressive association. Regardless of what type of claim it is, it fails as a mater of law.

Plaintiff Brackin describes her relationship with Turner as "very close friends who frequently socialized after work hours." Second Amended Complaint, ¶108. This is not the type of "intimate relationship" that is protected by the First Amendment. *See Fagan v. City of Marco Island,* 2005 U.S. Dist. LEXIS 36389, *15 (M.D. Fl. 2005)("Fagan described his relationship with Pollara as merely that of a former employer, not a relationship resembling a family relationship, and therefore is not a relationship protected by the right of intimate association"); *Brown v. Pulaski County Bd. of Educ.,* 2007 U.S. Dist. LEXIS 12258, *28-29 (M.D. Ga. 2007) (holding that the friendship between plaintiff, a resource coordinator for the school district, and a school board member was not protected under the First Amendment and therefore plaintiff failed to establish a freedom of association claim); *see also Asko v. Bartle,* 762 F.Supp. 1229, 1232 (E.D. Pa. 1991) ("retaliation based on friendship and professional association "may be reprehensible, but it does not impair a constitutional right"); *Ortiz v. San Miguel County,* 955 F.Supp. 1338 (D.N.M. 1996) (holding county employee's personal friendship with former members of the County's Commissioners Board was not the type of intimate relationship protected by the First Amendment and granting

summary judgment on plaintiff's freedom of association claim); *Rode v. Dellarciprete,* 845 F.2d 1195, 1204-1205 (3rd Cir. 1988) (friendship between brother-in-law and sister-in-law not protected as intimate human relationship); *Cipp v. Unified School Dist. No. 501,* 882 F.2d 1547 (10th Cir. 1989) (holding head custodian's close personal relationship with school principal was not the type of association that the First Amendment shelters from government action and reasoning that the "intimate human relationships" protected by the Constitution "have [generally] involved familial settings not present in the case before us."). Brackin's relationship with Turner falls far short of the required level of intimate relationship protected by the First Amendment.

Brackin's association with Turner also fails to qualify as an "expressive relationship." An 'expressive relationship' is a relationship "for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion," i.e. "where the purpose for the association is to engage in activities independently protected by the First Amendment." *Fagan v. City of Marco Island*, 2005 WL 1667662 *6 (M.D.Fla.). Just as in *McKinney v. Orange County, Florida* 2007 WL 2119388, *6 (M.D.Fla. 2007), Brackin's relationship with Turner is one of "'casual, social interaction,' which is the type of 'generalized social association' <u>that is not protected by the First Amendment</u>. *McKinney v. Orange County, Florida* 2007

WL 2119388, *6 (M.D.Fla. 2007)(citing *City of Dallas v. Stanglin,* 490 U.S. 19, 25 (1989) (Freedom of association is defined as something more than "generalized ... 'social association.'").  Brackin's social relationship with Turner is simply not a relationship that would qualify as an "expressive relationship."

Because Brackin's relationship was neither an intimate or expressive relationship, the relationship at issue is not one covered within the protections of the First Amendment, and her claim must fail as a matter of law.  *Cummings v. DeKalb County*,  24 F.3d 1349, 1354 (11th Cir. 1994).

**4.    Brackin's Procedural Due Process Claim (Count Four) Fails as a Matter of Law Because the Internal Affairs Investigations Did Not Result in a Deprivation of a Property Interest**

Brackin complains that the investigations conducted within the Judicial Department by members of the Internal Affairs department of the City's police department violated her procedural due process rights.  (Second Amend. Compl. ¶ 111-114).  To make a procedural due process claim, Brackin must show a deprivation of a property interest, and that such a deprivation occurred without a proper procedure.  Her claim fails because she cannot show a deprivation of a property interest.

"There are two questions in the analysis of a procedural due process claim. Did the plaintiff have a property interest of which he was deprived of by state action?  If so, did the plaintiff receive sufficient process regarding that

deprivation?" *Ross v. Clayton County, Georgia*, 173 F.3d 1305, 1307 (11th Cir. 1999). "A plaintiff who asserts that a procedural due process violation has occurred, <u>bears the initial burden of establishing that a protected property interest exists</u>." *Smith v. City of Unadilla*, 510 F. Supp. 2d 1335 (M.D.Ga. 2007). Brackin cannot establish that a protected property interest exists. The only supposed property interests Brackin alleges she was deprived of is that she "has been caused to suffer adverse job consequences as a direct result of these interrogations." However,

> [p]roperty interests are not created by the United States Constitution but are defined by existing rules or understandings that stem from an independent source such as state law and arise only where the plaintiff demonstrates a legitimate claim of entitlement. Moreover, a public employee enjoys a property interest in his or her employment only if he or she has an expectation of continued employment created by legislation, contract, or policy. There must be a state statute or ordinance that creates a public employment contract, or there must be some clear practice or mutual understanding that an employee can be terminated or transferred only for cause. If the employee holds his position only at the "will" of the employer, there is no property interest in continued employment.

*Douglas v. Evans*, 916 F.Supp. 1539, 1547 (M.D.Ala. 1996)(internal quotations and citations omitted). Brackin did not have "an expectation of continued employment created by legislation, contract or policy." *Id.* "A state [or City] employee that may be discharged at will under state law has no property interest in his or her job." *Nicholson v. Gant*, 816 F.2d 591, 597 n.8 (11th Cir. 1987)(quoting *Thompson v. Bass*, 616 F.2d 1259, 1265 (11th Cir. 1980). "Under Alabama law, a

state employee [and similarly, a City employee] must demonstrate that his employment is "permanent" or terminable only "for cause" to demonstrate a constitutionally cognizable property interest." *Shows v. Morgan*, 40 F.Supp.2d 1345, 1356 (M.D. Ala. 1999).

Brackin's employment was not terminable only for cause. Ala Code § 11-44E-180 states that "Subject to the provisions of any civil service or merit system applicable to the City . . . any officer or employee or a head of any office, department or agency, may be removed by the city manager or other appointing officer at any time, and the decision of the city manager, or other appointing officer shall be subject to appeals therefrom, if any are provided by applicable law." The City of Dothan Civil Service Act § 21 states that, "The Appointing Authority may discharge an employee in the Classified Service, whenever he considers the good of the service and the welfare of the city will be best served thereby . . . however, the power to discharge shall not be capriciously or arbitrarily exercised in any case . . . ."[12] Thus, Brackin held her employment at the will of the

---

[12] The fact that an appointing authority's termination decision simply cannot be arbitrary or capricious does not rise to the level of creating a property right. *White v. Florida Highway Patrol, Div. of Florida Dept. of Highway Safety & Motor Vehicles,* 928 F.Supp. 1153, 1158 (M.D.Fla.,1996)(Plaintiff, whose discharge was subject to review to ensure it was not arbitrary or capricious, did not have a property interest in his employment.) "The provision of a grievance procedure alone will not establish that the employee can only be discharged for cause." *Baxter v. Fulton-DeKalb Hosp. Authority*, 764 F.Supp. 1510, 1518 (N.D.Ga. 1991)(citing *Adams v. Bainbridge-Decatur County Hospital Authority,* 888 F.2d 1356, 1365 (1989)).

City, and has no property interest in continued employment.[13]  Because she has no property interest, she cannot maintain a claim for violation of procedural due process.

However, even assuming for the sake of argument that she can show a property interest in her employment, her procedural due process claim pertaining to the investigations still fails.  First, the Eleventh Circuit has held that <u>district courts lack subject matter jurisdiction over  alleged federal due process violations by a municipality where the aggrieved persons have the right to bring their grievance to the state's circuit court</u>.  *Gainer v. City of Winter Haven, Fla*. 170 F.Supp.2d 1225, 1234 (M.D.Fla.,2001)(citing *Boatman v. Town of Oakland,* 76 F.3d 341, 346 (11th Cir.1996).  Not only did Brackin have such a right, she utilized that right in appealing her termination to the Houston Circuit Court, Case Number CV-05-5144.  In fact, her appeal went all the way to the Alabama Court of Civil Appeals.  (*City of Dothan v. Brackin*, 959 So.2d 678 (Ala. Civ. App. 2006)).  Accordingly, there is no subject matter jurisdiction to hear Backin's procedural due process claim.

---

[13] The termination provision in the City's Civil Service Act stands in sharp contrast to that of the Rules of the State Personnel Board governing state employees, which *were* found to create a property interest in *Thompson v. Bass*, 616 F.2d 1259, 1265 (11th Cir. 1980).  As *Thompson* noted, the Personnel Board Rules clearly state, "The appointing authority may remove any permanent employee of the classified service <u>for cause only</u>."  (Rules of the Personnel Board, Rule XII, section 2(a), as quoted in *Thompson*, 616 F.2d at 1265 (emphasis added)).

Additionally, while information learned in the course of two of the Internal Affairs investigations did lead to Judge Gordon's decision to suspend (following Fondren) and terminate (following another) her, Brackin cannot point to any property interest arising from the investigations themselves that require procedural due process. It is well established that a public employee can be required to cooperate and submit to questioning in the course of an official investigation or risking losing their employment, whether it be conducted by the police department or some other appointed authority. (See *Garrity v. State of New Jersey*, 385 U.S. 493 (1967); *Gardner v. Broderick*, 392 U.S. 273 (1968); *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation of City of New York*, 392 U.S. 280 (1968). Even if it was not well-established law, as stated above, being questioned during an investigation is not a deprivation of a property right. Plus, it should be noted that Brackin was presented with and signed a "*Garrity* notice" that informed her of her rights and responsibilities, including specifically informing her that any statements she gave <u>could not</u> be used against her in a criminal proceeding. (Fondren Investigation, Phelps Investigation-Ex. A, B, & C to Gordon Aff.). Thus, the only deprivation Brackin can possibly point to are the employment actions taken against her, and it cannot be disputed that she was given notice and an opportunity to be heard with regards to both her suspension and her termination. For example, her suspension notice clearly stated "you are hereby advised that if

you are dissatisfied with this decision to discipline, you have available to you the procedures for review and/or appeal as provided by the Civil Service Act of Dothan, as amended, and the Personnel Rules and Regulations." (Brackin depo., Def. Ex. 25). Further, Brackin signed a certification stating that,

> I hereby certify I have received a copy of this decision to discipline from my department head or his/her designated representative. I understand that should I wish to appeal my department head's disciplinary decision I must file a written notice with my department head and the Personnel Board within the time period specified in the Personnel Rules and Regulations, Section 3-50, Appeal of Disciplinary Action. Personnel Form # 152 – City of Dothan Appeal Form may be used to initiate an appeal of disciplinary action.

*Id.* Brackin chose not to contest her suspension via grievance or appeal, which she clearly had a right to do. (Davis Aff. ¶ 10) With regards to Brackin's termination, she appealed it from the Personnel Board up through the Alabama Court of Civil Appeals. (Brackin depo., p. 25:15-23, 29). A person "will not have suffered a violation of her procedural due process rights 'unless and until the [City] refuses to make available a means to remedy the deprivation.'" *Price v. City of Ormond Beach*, 2006 WL 1382096 *4 (M.D. Fla. 2006)(quoting *MicKinney v. Pate*, 20 F.3d 1550, 1563 (11th Cir. 1994)). "[P]rocedural due process violations do not even exist unless no adequate state remedies are available." *Cotton v. Jackson*, 216 F.3d 1331, 1331 n.2 (11th Cir. 2000).

Thus, Brackin's claim fails because she cannot point to a deprivation of a property right suffered by being required to answer questions in the

investigations.[14]   Even taking into account her later suspension and termination,

which were separate events distinct from the investigations, her claim still fails

because Brackin does not have a property interest in her employment.

Furthermore, even if her suspension and discharge did impact a protected property

right, she was provided ample procedural due process.  Accordingly, this claim is

due to be dismissed.

> **5.    Brackin's Substantive Due Process Claim (Count Five) Fails as a Matter of Law Because the Internal Affairs Investigations Did Not Invade Upon Any Fundamental Right**

Likewise, Brackin's claim of a substantive due process violation fails

because the investigations she complains of did not impinge upon any

'fundamental right'- "that is, rights that are 'implicit in the in the concept of

ordered liberty."   *Shows v. Morgan*, 40 F.Supp.2d 1345, 1356 (M.D. Ala.

1999)(citations omitted).   In her fifth claim, Brackin complains that "on no less

than 4 separate occasions Defendant Gordon has used her influence as a sitting

Municipal Judge to solicit Defendant Dothan Police Department to investigate and

interrogate Mrs. Brackin for non-criminal alleged job infractions,"[15] and that "on at

least two of these occasions Mrs. Brackin has been caused to suffer adverse job

consequences as a direct result of these interrogations."  (Second Amend. Compl.

---

[14] Questioning that *Garrity, Gardner*, and their progeny have held to be permissible.  See *Garrity v. State of New Jersey*, 385 U.S. 493 (1967); *Gardner v. Broderick*, 392 U.S. 273 (1968).

[15] It should be noted that the Dothan Police Department is not a defendant. See Compl. ¶¶ 7-10.

¶¶ 115-116).  Brackin alleges that these specific acts violated her substantive due process rights.  (Second Amend. Compl. ¶ 118).

There is no constitutional right to be free from being questioned during an investigation, much less a 'fundamental right.'  If that were the case, no officer or government official would ever be able to question any witness, person of interest, or suspect without violating their substantive due process rights.  The constitution provides for the right against self-incrimination, but does not provide for a right not to be questioned at all.  This is made clear in *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation of City of New York*, 392 U.S. 280 (1968).  In fact, in *Uniformed Sanitation Men,* the Supreme Court held that public employees who after being given immunity, still refused to answer questions based on their Fifth Amendment right could be terminated without any violation of the Constitution.

Even if Brackin is arguing that the fundamental right at issue is not a right to be free from questioning, but rather that her employment rights were violated, her substantive due process claim still fails.  The Eleventh Circuit is clear that public employment is "not subject to substantive due process protection."  *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994).

Because the investigations did not impinge on any fundamental right, and because employment claims are not subject to substantive due process protection, Brackin's claim of a substantive due process violation fails.

**6.    Brackin's Procedural Due Process Claim in Count Six of Her Complaint  Fails On Multiple Grounds**

Brackin's sixth claim alleges that her due process rights were violated because: (1) "the City's attorney had access to and consulted the transcripts of Mrs. Gordon and the witnesses during the Personnel Board hearing on her termination"; and (2) the City allegedly refused to release the transcripts and other specific documents despite Brackin's counsel's written request.  (Second Amend. Compl. ¶ 121, 123).

This claim fails for four reasons.  First, as detailed in response to Brackin's fourth claim, above, there is no subject matter jurisdiction to hear a procedural due process claim when Brackin had the ability to have her grievance heard in state circuit court.   *Gainer v. City of Winter Haven, Fla*.  170 F.Supp.2d 1225, 1234 (M.D.Fla.,2001)(citing *Boatman v. Town of Oakland,* 76 F.3d 341, 346 (11th Cir.1996).  Indeed, Brackin utilized these rights in appealing her termination to the Houston Circuit Court, Case Number CV-05-5144.  In fact, her post-termination appeals went all the way to the Alabama Court of Civil Appeals.  (*City of Dothan v. Brackin*, 959 So.2d 678 (Ala. Civ. App. 2006)).[16]   Accordingly, there is no subject matter jurisdiction to hear Backin's procedural due process claim.

---

[16] The City appealed to the Alabama Court of Civil Appeals, after the Houston Circuit Court reversed the decision of the Personnel Board upholding Brackin's termination.  On appeal to the Court of Civil Appeals, the Appeals Court reversed the Circuit Court and remanded the Circuit Court's decision.  *City of Dothan v. Brackin*, 959 So.2d 678 (Ala. Civ. App. 2006). (See Brackin depo., Def. Ex. 36).

Second, as noted above in Section 4, because the City was <u>not</u> restricted to terminating Brackin only for cause, she did not have a protected property interest in her employment and therefore cannot point to a property interest that mandated procedural due process protection. *Douglas v. Evans*, 916 F.Supp. 1539, 1547 (M.D.Ala. 1996).

Third, ignoring the first two points which are fatal to Brackin's claim, she <u>was</u> provided with proper procedural due process. Brackin and her attorney were provided with all information that was provided to the Personnel Board. (Davis Aff. ¶ 11). No internal affairs documents were introduced or presented to the Board during the hearing or relied upon by the board. Moreover, the Personnel Rules only set forth a procedure for subpoenaing witnesses which the Board complied with. Brackin and her attorney not only had the ability to request witnesses be subpoenaed for her appeal hearing, but in fact did so, and all witnesses Brackin requested to be subpoenaed were subpoenaed and appeared. (Davis Aff, ¶ 11). Brackin and her attorney were also free to speak with and interview any potential witnesses, including those whose interview transcripts she sought. To succeed on this claim, Brackin "must show that [the post-termination procedures] contain a defect so serious that we can characterize the procedures as fundamentally unfair, a defect so basic that we are forced to conclude that the deprivation occurred without due process." *Daniels v. Williams*, 474 U.S. 327, 341

(U.S. 1986).   Brackin simply cannot do so.   Furthermore, it is undisputed that Brackin received notice of the charges against her, had a predetermination hearing, received a complete copy of her personnel file and a full explanation of the Appeal Hearing process. She further had the right to call unlimited witnesses.  This is all the process plaintiff is due under the federal Constitution.  *Frizzell v. Autauga County Board of Ed.,* 972 F.Supp. 564, 565 (N.D. Ala. 1997).  "[T]here is no constitutional right to pre-hearing discovery in administrative proceedings. *Delavan v. Board of Dental Examiners of Alabama*, 620 So.2d 13, 16 (Ala.Civ.App.,1992)(citations omitted).

   For all of the above reasons, this claim should be dismissed.

### 7.    Brackin's Termination Did Not Violate Substantive Due Process Rights (Count Seven)

   In her seventh count, Brackin alleges that "Defendant Gordon terminated Mrs. Brackin for making a single contact with her friend and coworker in violation of this Defendant's directive," and that "this act constituted a substantive due process violation because it resulted in the deprivation of a property interest for an improper motive."  (Second Amend. Compl. ¶¶ 125, 127).  Brackin's claim fails for two reasons.  First, as stated above, "an employee with a protected interest in his job may not maintain a substantive due process claim arising out of his termination."  *Bussinger v. City of New Smyrna Beach,* 50 F.3d 922, 925 (11th Cir. 1995)(citation omitted).   Therefore, to the extent Brackin is claiming that her

termination was a substantive due process violation (which, by virtue of her statement that "this act [i.e., her termination] constituted a substantive due process violation," this is what she is claiming), her claim fails.

Second, to the extent Brackin is claiming that her substantive due process claim is derived from an alleged freedom of speech violation, the Court has already found that the speech at issue was not protected by the first amendment. (Doc. # 42, Memorandum Opinion and Order, p. 11). Because the speech was not protected, she cannot claim a violation of a fundamental right, which is required to show a substantive due process violation. *Shows v. Morgan*, 40 F.Supp.2d 1345, 1356 (M.D. Ala. 1999)(citations omitted).

Accordingly, Brackin's seventh claim is due to be dismissed.

**8.    Plaintiff's Title VII Claim Fails Because Cannot Establish a *Prima Facie* Case of Race Discrimination.[17]**

Brackin brings this claim under Title VII of the Civil Rights Act of 1964, and alleges that "there are circumstances which give rise to an inference that racial discrimination played a part in the City's decision to terminate [Brackin's] employment" (Second Amend. Compl. ¶ 131). Brackin also alleges that "the

---

[17] Brackin captioned her eighth claim "Racial Discrimination, 42 U.S.C. § 1983." (Compl. p. 24). However, count nine has an identical heading, and the first full paragraph under count eight states "This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq." (Compl. ¶ 129). Accordingly, Defendants consider the heading of count eight to be a clerical error, and consider count eight to be an allegation of a violation of Title VII.

reason given for terminating Mrs. Brackin, negligence and insubordination, was a pretext for unlawful discrimination . . . ." (Second Amend. Compl. ¶ 132).

A plaintiff establishes a *prima facie* case of race discrimination by showing: (1) she belongs to a protected category; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Burke-Fowler v. Orange City, Fl.*, 2006 WL 122357 (11th Cir. 2006) (*citing EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)); *Holifield v. Reno*, 115 F. 3d 1555, 1562 (11th Cir. 1997) citing *McDonnell Douglas Corp.*, 411 U.S. 792, 802 (1973). If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason(s) for the challenged employment action sufficient to "allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257.

Once a defendant produces a legitimate, non-discriminatory reason for its decision, the presumption of discrimination created by *McDonnell Douglas* "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 & n.10 (U.S. 1981). At that point, "the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext."

*Id.* Significantly, the plaintiff always bears the "ultimate burden of persuasion" - *i.e.*, that the plaintiff's race was the reason for the challenged employment decisions. *St. Mary's Honor Center v. Hicks*, 509 U.S. 499 (1993).

First, the fact that the same person, Judge Gordon, was the decisionmaker for both Brackin's hiring and her termination casts great doubt on any alleged claim of discrimination.  (Brackin depo., p. 85:12-18, 231:2-4).  Many courts, including the Eleventh Circuit, have found that such a situation creates a great hurdle to arguing discrimination.  "[C]laims that employer animus exists in termination but not in hiring seem irrational. . . It hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."  *Dingman v. Delta Health Group, Inc.*  26 F.Supp.2d 1349, 1355 (S.D.Fla. 1998)(quoting *Proud v. Stone*, 945 F.2d 796, 797-98 (4th Cir. 1991)).  According to the Eleventh Circuit, the fact that the same person who hired an employee participates in the decision to terminate that same employee infers "that no discriminatory animus motivated [Defendant's] actions." *Williams v. Vitro Services Corp.* 144 F.3d 1438, 1443 (11th Cir. 1998)(citing *Buhrmaster v. Overnite Transp. Co.,* for the principle that "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle

applies regardless of whether the class is age, race, sex, or some other protected classification."  61 F.3d 461, 464 (6th Cir. 1995)).

     i.    <u>Plaintiff's *Prima Facie* Case Fails as a Matter of Law Because She Cannot Identify Any Similarly Situated Employee that Was Treated More Favorably</u>

On top of this great hurdle that Brackin faces in advancing her claim, her claim fails on the third element of the *prima facie* case – she cannot show that the City treated similarly situated employees outside her protected category more favorably.  The Eleventh Circuit does not require that comparators be identical, but they must be similar enough to be *nearly* identical, and they must be "similarly situated in all relevant aspects."  *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting *Holified v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  The overwhelming number of the Eleventh Circuit decisions require the conduct of the comparators to be *the same or similar*, or *nearly identical*.  A few examples should suffice:

- "A plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if he shows . . . 'that the misconduct for which he was discharged was *nearly identica*l to that whom the employer retained.'"  *Nix v. WLCY Radio/Rahall* Communications, 738 F.2d 1181, 1185 (11th Cir. 1984)(quoting *Davin v. Delta Air Lines, Inc.,* 678 F.2d 567, 570 (5th Cir. 1982))(emphasis added);

- "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved on or accused of *the same or similar conduct* and are disciplined in different ways."  *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)(quoting

*Jones v. Bessemer Carray Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir. 1998))(emphasis added);

- "Appellant has failed to meet her burden of pointing to a [comparator] who engaged in *the same or similar misconduct.*" *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999)(emphasis added); "In order to satisfy the similar offenses prong, the comparator's misconduct must be *nearly identical* to the plaintiff's in order "to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Id.*(citing *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999))(emphasis added);

- "This court has 'consistently held that a plaintiff for misconduct makes out a prima facie case of discriminatory discharge if she shows that she is a member of a protected class, that she was qualified for the job from which she was fired, and that the misconduct for which she was discharged *was nearly identical* to that engaged in by [an employee outside the protected class] whom [the employer] retained." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002)(quoting *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984))(emphasis added);

- "In determining whether [other residents] are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved on or accused *of the same or similar conduct* and are disciplined in different ways." *Maynard v. Bd. of Regents of the Universities of Fla. Dept. of Ed.*, 342 F.3d 1281, 1289 (11th Cir. 2003)(quoting *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir. 1998))(emphasis added).

Looking at the comparators that the Eleventh Circuit has struck down in these and other cases, regardless of whether "similarly situated" is characterized as "nearly identical," "the same" or just "similar," it is clear that the test is very specific. For example, in *Maniccia v. Brown*, the plaintiff was discharged for violating four different policies.   171 F.3d 1364, 1366 (11th Cir. 1999). In examining plaintiff's comparators, the court determined that while each

comparator had violated at least one of the same policies that plaintiff had violated, none had violated all four as plaintiff had. This difference was enough for the court to find the comparators were not similarly situated. *Id.* at 1369. In *Abel v. Dubberly*, an employee was discharged for taking money from the register and leaving a $10.00 IOU. 210 F.3d 1334 (11th Cir. 2000). The employee identified a comparator who had been accused of taking money but was not discharged. The court found that "a key difference is readily apparent between [plaintiff] and the purported comparator. Whereas [plaintiff] has always freely admitted having taken the $10.00 from the cash register, the other employee has never confessed to taking county funds for personal use; at worst, the would-be comparator has admitted to temporarily misplacing the funds." *Id.* at 1338. The difference between having confessed and not having confessed between two employees accused of taking money was enough of a difference for the court to find the second employee was not "similarly situated" and was not a sufficient comparator. In *Silvera v. Orange County School Bd.*, the Board discovered two of its employees had arrest records. One employee, with four previous arrests, was terminated, while the other, with two previous arrests, was not. 244 F.3d 1253 (11th Cir. 2001). Even though both had arrests for lewd assault on a child, the court held they were not similarly situated *because the number of arrests between the two was different. Id.* at 1260. The fact that these comparators were all struck on relatively minor distinctions

indicates that the Eleventh Circuit expects a very close degree of similarity and looks to the specifics of the terminated employee's actions.

The comparators Brackin points to fall far short of that degree of similarity. In 2004, Brackin was suspended for a major offense, a violation of City of Dothan Personnel Rules and Regulations Section 3-42(6) action(s) or lack of action(s), that could cause undue financial loss to the City, and Section 3-42(14), insubordination. (Brackin depo., Def. Ex. 24). Her termination was for having two major offenses within a twenty four month period. (Brackin depo., Def. Ex. ). She actually has had three major offenses. These include a violation of Rule 3-42(6), a major offense of violating a Dothan personnel rule and regulation in the handling of a traffic ticket, arising from Brackin's striking through and writing "void" on a ticket listed on a Uniform Traffic Citation transmittal form. (Brackin depo., p. 195:1-4, 187-88:2-18). She was disciplined for this offense on April 29, 2005. (Brackin depo., Def. Ex. 32). The second, for which she was also disciplined on April 29, 2005, involved a charge of insubordination, in that she "willfully, by [her] own admission, disobeyed a directive from your department head to refrain from any contact with Mary Turner during the police department investigation of Mrs. Turner. You admittedly understood this directive and chose to disregard it by calling Mrs. Turner. This is a major offense," and was the reason for the insubordination offense. (Brackin depo., pp. 222:11-14, 224:4-13). And the third,

for which she was disciplined on April 23, 2004, was the Fondren incident, in which she was disciplined for a violation of City of Dothan Personnel Rules and Regulations Section 3-42(6) action(s) or lack of action(s), that could cause undue financial loss to the City, and Section 3-42(14), insubordination. (Brackin depo., Def. Ex. 24). Even though the Court of Civil Appeals discounted the UTC Transmittal void offense, she still had two major offenses in a 24 month period.

Brackin tries to suggest that she was discriminated against by pointing to two African-American comparators, Lavera McClain and Eunice Knight. These comparators, however, were guilty of nothing more than, in Brackin's own words, "different clerical errors, computer errors, paperwork errors." (Brackin depo., p. 135:3-9). The evidence further reveals that virtually all magistrates committed clerical or data entry errors and the Department's HTE computer system was fraught with problems. Brackin has specifically testified that nothing in the City's list of major offenses suggests that negligently or carelessly entering a data entry is a major offense. (Brackin depo., p. 321:3-9). Furthermore, Brackin herself admitted that she was never disciplined for clerical errors:

> Q.    Were you ever disciplined for errors?
> A.    For errors?
> Q.    Yes, for errors.
> A.    For clerical errors?
> Q.    Yeah.
> A.    Not to my knowledge.

(Brackin depo., p. 141:5-10).

Some of the specific infractions Brackin alleges the two comparators committed were: a) issuing a warrant under the wrong Michael McCord when there were two Michael McCords in the computer system (Brackin depo., p. 236-37:1-14); b) issuing a warrant on a 17-year-old person for failure to appear[18] (Brackin depo., p. 242:3-20); c) mistakenly duplicating an alias warrant, resulting in two warrants being issued for the same case at the same time; d) clerical type mistakes, such as keying errors (Brackin depo., pp. 246:2-5, 247-249); and e) not insuring that an original warrant came back from the jail when an alias warrant was recalled.  (Brackin depo., p. 249:19-250:7).

Even accepting these allegations as true, the conduct alleged is not in any way similar to Brackin's conduct of striking through and writing "void" for a ticket on a Uniform Traffic Citation (UTC) transmittal form, which conduct violated state law, telling a citizen-defendant that they had been falsely arrested and that they should file a claim or suit against the city in direct violation of a Department directive, or calling the subject of an investigation into possible criminal activity after being specifically instructed not to.  The call for which she was terminated for was a call she admitted to and was made from work about a work-related issue.

---

[18] According to Brackin, they do issue warrants for traffic violations for a "Title 32" violation for 16 and 17 year- olds after a show-cause hearing, but not for a "Title 13" violation.  (Brackin depo., p. 242:12-17).

It is undisputed that <u>no</u> other employee called Mary Turner while Judge Gordon's directive prohibiting contact with Turner was in force.  (Brackin depo., p. 213:13-16).  Brackin also is not aware that Eunice Knight or Lavera McClain ever struck through a UTC transmittal form indicating that a ticket should be voided.  (Brackin, depo., p. 359:12-23).  In fact, she does not know of anyone who has signed a uniform ticket transmittal form swearing that they received all the tickets and then struck a line through and wrote "void" on one of the tickets.  (Brackin depo., p. 253:17-21).  Nor does she know of anyone who told a defendant that they had been falsely arrested and that they should file a claim or suit against the City, the conduct that resulted in her April suspension in 2004.  (Brackin depo., p. 253:12-16).  Brackin's conduct is simply not "*nearly identical* to that whom the employer retained." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002).  As such, she cannot show the third element of her *prima facie* case, and her claim must fail.

ii.    <u>Even if this Court Finds that Plaintiff Established a *Prima Facie* Case, Which She Has Not, Plaintiff Failed to Show That Defendants' Legitimate Nondiscriminatory Reasons Are Pretextual</u>

Even if Brackin could establish a *prima facie* case, the evidence shows the City has advanced a legitimate, non-discriminatory reason for the termination, the fact that she committed two major offenses within a twenty-four month period. (Brackin depo., Def. Ex. 32; ).  Brackin must therefore show that these articulated

reasons are a mere pretext for discrimination.    *Holifield v. Reno*, 115 F. 3d 1555, 1565 (11th Cir. 1997).  The City certainly had a legitimate basis for its decisions: her suspension in 2004, which she did not contest, was the result of a thorough investigation which determined that Brackin had violated the directive (which she admitted receiving) to not comment publicly on the City's liability. (Gordon Aff. Ex. A).  She herself admitted violating a directive from Judge Gordon to not speak with Mary Turner while Turner was under investigation, and she admitted lining through and writing void on a sworn ticket listed on a Uniform Traffic Citation (UTC) transmittal form (which negated the ticket).  Brackin simply cannot point to any evidence suggesting that these legitimate reasons are a pretext for discrimination, especially in light of the fact that the person Judge Gordon selected to replace Brackin was white.  (Davis Aff. ¶ 16.)[19]  Finally, Brackin's claim fails for the overarching reason that she admitted, under oath, in her appeal hearing before the Dothan Personnel Board that her discipline was <u>not</u> based on her race.

> Q.    Are you saying that this [the termination decision] had to do with your race rather than your conduct?
>
> A.    I am not disputing that I did not call her [Turner].  I am just saying that for the reason why I called her, I don't feel like I should - -

---

[19] *See Hammons v. Wallace,* 2006 U.S. App. LEXIS 6396, *11 (11th Cir. 2006) (affirming summary judgment on white female's race discrimination claim because plaintiff could not establish a prima face case as she failed to demonstrate that she was replaced by someone outside her protected class or that she was treated less favorably than a similarly-situated individual outside her protected class).

> Q.   Let me ask you one more time.  What I am asking you is: Do you believe the decision to discipline you was motivated out of race rather than what you did?
>
> **A.   Out of race, no.**

(Transcript, City of Dothan Personnel Board, Appeal Hearing of Mary Beth Brackin, p. 173) (emphasis added).  Hence, because Brackin cannot establish a *prima facie* case of discrimination nor show the City's legitimate reasons for its actions were a pretext for discrimination, this claim must fail.

### 9.   Plaintiff's § 1983 Claim (Count Nine) Against the City Must Be Dismissed

Brackin brings a discrimination claim under § 1983 alleging that "racial discrimination played a part in the City's decision to terminate her employment" and that the reason for her termination "was a pretext for unlawful discrimination. (Second Amend. Compl. ¶¶ 142-43).  Brackin also complains of "intentional and discriminatory conduct of the City's supervisory employee. . . ."  (Second Amend. Compl. ¶ 149.)

Despite any claim to the contrary, local government entities, such as the City of Dothan, sued pursuant to §1983, may not be held liable under a theory of *respondeat superior. See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978). Instead, in order to state a cause of action against the City, Brackin must allege that the acts complained of were in furtherance of an official policy or custom of the City. *See e.g.*, *Monell*, 436 U.S. at

694; *Polk County v. Dodson*, 454 U.S. 312, 326 (1981), *Hammer v. Hillsborough County Board of County Commissioners*, 927 F. Supp. 1540, 1546 (M.D. Fla. 1996). To establish a custom, Brackin must show a persistent and widespread practice. *Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir. 1994). Brackin cannot establish that her termination were in furtherance of any official policy or custom of the City.  Accordingly, this claim fails.  Brackin cannot establish that the acts of alleged discrimination she allegedly endured were in furtherance of any official policy or custom of the City. In the absence of any evidence that the alleged discrimination she allegedly endured was the result of any policy or custom of the City, Plaintiff's §1983 claim against the City of Dothan must therefore be dismissed. *See Hammer*, 927 F. Supp. at 1546.[20]

---

[20] Moreover, Judge Gordon is not a final decision-maker with respect to establishing municipal policy, and therefore the City of Dothan cannot be held liable for her decision to terminate Brackin's employment. Judge Gordon's decision to terminate Brackin's employment was subject to meaningful administrative review by the City of Dothan Personnel Board. *See Kamensky v. Dean,* 148 Fed.Appx. 878 (11th Cir. 2005)(unpublished)(holding employee failed to prove that the supervisor was in effect the final policymaker regarding her termination as required to hold the county liable where county board reviewed the decision); *Quinn v. Monroe County,* 330 F.3d 1320 (11th Cir. 2003)(holding that Monroe County could not be held liable under §1983 for the County Administrative decision to terminate Plaintiff's employment because he did not possess final policymaking authority where Career Service Council had authority to review termination appeals and reinstate employees); *Hill v. Clifton,* 74 F.3d 1150, 1152 (11th Cir. 1996)(holding the city could not be held liable under §1983 because the police chief who terminated officer did not have final policy making authority). The Personnel Board has the authority to review termination appeals and reinstate employees with full compensation. Here, Plaintiff presented witnesses and exhibits in her defense at the appeal hearing. After all the evidence was considered, the Personnel Board affirmed the decision to terminate Plaintiff's employment. Gordon does not possess final authority to establish municipal policy with respect to termination decisions, therefore, the City of Dothan cannot be held liable under §1983.

### 10.    Brackin's Retaliation Claim Under 42 U.S.C. § 1983 (Count Ten) Fails as a Matter of Law Because She Was Not Subjected to Any Adverse Employment Action

In her tenth claim, Brackin alleges that she "was terminated in retaliation for exercising free speech and free association rights . . . ." (Second Amend. Compl. ¶ 151.)  In its Opinion, the Court has ruled that Brackin cannot make a retaliation claim based on her termination for her phone conversation with Turner.  (Doc. #42, Memorandum Order and Opinion, p. 15).  Her remaining retaliation claim is now due to be dismissed.[21]  First, as discussed above in Count 3, Brackin did not engage in protected activity as her relationship/association with Turner is not the type of relationship protected by the Constitution.  Even assuming *arguendo* that she did engage in protected activity, this claim still fails as she cannot show any adverse action was taken against her because of her association with Turner.  It is undisputed that Brackin was never disciplined in any way for associating with Turner.  The only discipline she received arising from Judge Gordon's instructions pertaining to Turner was the result of Brackin's phone call with Turner.  It is undisputed that her association with Turner, other than the one phone call at issue,

---

[21] In order to demonstrate a *prima facie* case of retaliation under §1981 or §1983, Brackin must demonstrate (1) that she engaged in statutorily protected activity (emphasis added), (2) that she was subject to an adverse employment action, and (3) that the adverse action was causally related to her protected activity. *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *cert. denied*, 532 U.S. 1076 (2001). Thereafter, the City must articulate a legitimate, nonretaliatory reason for its action, at which point Martin must demonstrate that the reason offered by the City is merely pretext for unlawful retaliation. *Pennington v. City of Huntsville*, 261 F.3d 1261, 1266 (11th Cir. 2001); *Olmstead v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998); *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).

was never a consideration or factor in any decision involving Brackin.  Because she cannot point to any adverse action arising from her associating with Turner, Brackin's claim of retaliation fails.  *Stavropoulos v. Firestone*, 361 F.3d 610, 618 (11th Cir. 2004).

### 11.    Brackin's False Imprisonment Claim (Count Eleven) Fails as a Matter of Law Because She Cannot Show Any Threat of Force (Express or Implied)

Brackin raises a claim of false imprisonment pertaining to three investigations conducted by the Internal Affairs of the Dothan Police Department that she was instructed to participate in (the Ralpeje, Fondren, and Phelps investigations).  She alleges that "Defendant Gordon's act of coercing [her] under the penalty of job loss to submit to a police interrogation in an interrogation room where she did not want to be, and was not free to leave without sanction, satisfies the tort of false imprisonment."  Ala. Code § 6-5-170 defines false imprisonment as "the unlawful detention of the person of another whereby he is deprived of his personal liberty."  For there to be a false imprisonment, "there must be some direct restraint of the person. . . . Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."  *Hardy v. Town of Hayneville* 50 F.Supp.2d 1176, 1192 (M.D.Ala.,1999)(quoting *Big B, Inc. v. Cottingham,* 634 So.2d 999, 1001

(Ala.1993)).  Plaintiff's claim fails because there was no threat of force.  The only "threat" Brackin faced was the supposed loss of her job if she walked out on the interview.  (Second Amend. Compl. ¶ 152; Brackin depo., p. 368:11-369:5).

> Q:    You were free to leave?
> A:    Yeah, if I wanted to lose my job.

(Brackin depo., p. 368:11-12).  In other words, the only "threat" Brackin faced if she left was that "I would've been probably written up or something else happen." (Brackin depo., p. 349:18-23).  There was no force or threat of force, and it is undisputed that Brackin was not physically restrained in any manner.  *McKinley v. PetSmart, Inc.*, 2006 U.S. Dist. LEXIS 44657 * 9 (M.D. Ala. 2006)(granting summary judgment on false imprisonment claim because Plaintiff "was not physically restrained in any way nor was he stopped from using the phone when he asked to do so." (emphasis added)).

While not previously addressed in Alabama, numerous other jurisdictions, with elements of false imprisonment similar or identical to Alabama's, have held that the threat of loss of employment does not constitute a "threat" for purposes of a false imprisonment claim: "The threat of job loss is insufficient to constitute a threat for purposes of false imprisonment." *Hart v. Seven Resorts Inc*. 190 Ariz. 272, *282, 947 P.2d 846, 856 (Ariz.App.Div. 1 1997)(citation omitted). "[F]inancial or economic restraint [is] not sufficient to constitute false

imprisonment," and a claim of false imprisonment fails "[w]ithout some evidence of physical restraint or fear of physical restraint . . . ." *Trahan v. Bellsouth Telecommunications, Inc.* 881 F.Supp. 1080, 1084 (W.D.La. 1995)(citing *Crossett v. Campbell*, 122 La. 659, 48 So. 141 (1908)). "Submission to the mere verbal direction of another, unaccompanied by force or threats of any character does not constitute false imprisonment." *Faniel v. Chesapeake and Potomac Tel. Co. of Maryland* 404 A.2d 147, 152 (D.C. 1979)(citing *Grayson Variety Store, Inc. v. Shaffer*, 402 S.W.2d 424, 425 (Ky.1966)). "Similarly, <u>fear of losing one's job, although a powerful incentive, does not render involuntary the behavior induced</u>." *Id.* (citing Prosser, Torts s 11, 106 (4th ed. 1971); *Moen v. Las Vegas International Hotel, Inc.*, 90 Nev. 176, 521 P.2d 370, 371 (1974)).

Brackin cannot maintain a false imprisonment claim simply because she was asked to participate in several investigations, some involving inappropriate or suspected criminal activity (Brackin depo., p. 366), and was informed that she could be subject to discipline, up to and including termination, if she did not.[22] Under Brackin's outlandish theory, an employee would be able to sue their employer for false imprisonment anytime an employer required employees to

---

[22] It should also be noted that requiring an employee to participate in an investigation upon threat of discharge has been recognized as permissible on numerous occasions. See *Garrity v. State of New Jersey*, 385 U.S. 493 (1967); *Gardner v. Broderick*, 392 U.S. 273 (1968).

participate in a workplace investigation. Such a position is simply devoid of common sense, and untenable.

## C. Defendant is Entitled to Summary Judgment on Plaintiff Martin's Claims

### 1. Martin Cannot Show Any Adverse Action Resulting from Any Alleged Protected Speech, Thus, Her First Amendment Freedom of Speech Claim (Count Twelve) Fails as a Matter of Law

In Martin's first claim, she alleges that she was terminated in part for "express[ing] her concern about whether Defendant Gordon was showing favoritism to one of the bonding outfits that operate in the City and service the bond requirements of defendants who appear before Dothan Municipal Court." (Second Amend. Compl. ¶¶ 154, 157). However, this claim fails for the simple reason that it is undisputed that her discharge was unrelated to any comments Martin might have made about the bonding company. Additionally, her claim fails because the speech she alludes to was not protected.

The first conversation Martin alleges she had with Judge Gordon about Get Out Bonding was about a complaint Martin received from the owner of another bonding company. (Martin depo., p. 248-50:8-18). The owner of the competing bonding company complained that his brother-in-law's bond was changed and Get Out Bonding supposedly told him (the brother-in-law) that Get Out Bonding was his only choice. (Martin depo., p. 249:12-250:19). Martin relayed the complaint to Judge Gordon. (Martin depo., p. 251:5-14). The second comment was Martin

asking Judge Gordon "why they [Get Out Bonding] bonded more defendants . . . ." (Martin depo., p. 256:1-4). It is undisputed that comments made by Martin regarding Get Out Bonding were not a factor in her termination (Gordon Aff., ¶ 10). Accordingly, she cannot show any adverse action resulting from her speech, and her claim must fail.

Ignoring that Martin has not suffered any injury arising from her speech, she cannot show that the speech at issue was protected. As noted in response to Count One above, "a public employee's right to freedom of speech is not absolute." *Bryson v. Cuty of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)(citation omitted). The Supreme Court has clearly held that "when public employees make statements pursuant to their official duties, the employees are <u>not</u> speaking as citizens for First Amendment purposes, <u>and the Constitution does not insulate their communications from employer discipline</u>." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958 (2006). Even ignoring the fatal fact that Martin was not disciplined based on any of these alleged comments, Martin's comments were made in the course of her official employment. "[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions <u>made pursuant to official responsibilities</u>." *Id.* (emphasis added). Martin's statements to Judge Gordon "is not protected by the First Amendment because [she] did not speak as a citizen, as

required by *Garcetti*." *D'Angelo v. School Bd. of Polk County, Fla.* 497 F.3d 1203, 1210 (11th Cir. 2007).

Martin's first alleged comments simply relayed a complaint that she received in the course of her employment and the second alleged comment was simply a question as to why Get Out Bonding bonded more defendants than the other companies. (Martin depo., p. 249-256:2-4). Neither comment is even remotely related to a matter of public concern.[23] Since Martin's comments were not on a matter of public concern, she "has no First Amendment cause of action based on . . . her employer's reaction to the speech." *Garcetti v. Ceballos* 126 S.Ct. 1951, 1958 (2006)(citations omitted). Therefore, because her speech was not protected, and because she has not suffered any injury stemming from her unprotected speech, her claim must fail.

### 2.    Martin Cannot Establish a *Prima Facie* Case of Race Discrimination (Count Thirteen)[24]

Martin, a probationary employee terminated approximately nine months after she was hired, alleges that she was terminated because of her race in violation

---

[23] Martin suggests in her complaint that her speech "was calculated to disclose wrongdoing, inefficiency, or other malfeasance on the part of governmental officials in the conduct of their official duties." (Compl. ¶ 155). However, Martin's first comment was simply relaying a complaint and her second did not allege any violation of any law, rule, or regulation, or any impropriety whatsoever.

[24] Due to a typographical error, this and the subsequent counts were incorrectly numbered in Plaintiffs' complaint. Defendants are referring to these counts according to the correct numbering.

of Title VII.   (Second Amend. Compl. ¶161-62).   It is undisputed that Judge Gordon, the decisionmaker in Martin's termination, was also the person who interviewed and hired Martin.  (Martin depo., pp. 84:16-19, 93:18-19, 308:17-19). In fact, Martin was hired over other black candidates for the job.  (Davis Aff., ¶ 16).  Just as with Brackin, this immediately creates a very high hurdle for Martin to overcome in alleging that her termination was discriminatory.  *See Dingman v. Delta Health Group, Inc.*  26 F.Supp.2d 1349, 1355 (S.D.Fla. 1998)(quoting *Proud v. Stone*, 945 F.2d 796, 797-98 (4th Cir. 1991)); *Williams v. Vitro Services Corp.* 144 F.3d 1438, 1443 (11th Cir. 1998).

As noted in response to Count Eight, above, a plaintiff establishes a *prima facie* case of race discrimination by showing: (1) she belongs to a protected category; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Burke-Fowler v. Orange City, Fl.*, 2006 WL 122357 (11th Cir. 2006) (*citing EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)); *Holifield v. Reno*, 115 F. 3d 1555, 1562 (11th Cir. 1997) citing *McDonnell Douglas Corp.*, 411 U.S. 792, 802 (1973). If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason(s) for the challenged employment action sufficient to "allow the trier of fact rationally to conclude that the employment

decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257.

Once a defendant produces a legitimate, non-discriminatory reason for its decision, the presumption of discrimination created by *McDonnell Douglas* "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 & n.10 (U.S. 1981). At that point, "the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext." *Id.* Significantly, the plaintiff always bears the "ultimate burden of persuasion" - *i.e.*, that the plaintiff's race was the reason for the challenged employment decisions. *St. Mary's Honor Center v. Hicks*, 509 U.S. 499 (1993).

    i.    <u>Martin's Claim Fails Because She Cannot Identify a Similarly Situated Comparator that Was Treated More Favorably</u>

Just as with Brackin's claims in Count Eight, Martin's claim of discrimination fails because she cannot point to any similarly situated comparator who was treated differently. While the law is more thoroughly discussed in Count Eight, above, the law is that "[i]n order to satisfy the similar offenses prong, the comparator's misconduct must be *nearly identical* to the plaintiff's in order to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Id.*(citing *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999))(emphasis added). First, Martin has not identified and

cannot identify a comparator that was similarly situated, nor treated differently. *Hammons v. Wallace,* 2006 U.S. App. LEXIS 6396, *11 (11th Cir. 2006)(plaintiff failed to identify similarly situated comparators where one comparator was not directly responsible for all of the areas in which problems had arisen that resulted in plaintiff's termination and second comparator was plaintiff's subordinate). Martin was terminated for unsatisfactory conduct during her probationary period. The following conduct formed the basis for Judge Gordon's decision to terminate Martin:

- Martin was unable to interact professionally with personnel from the various private attorneys' offices, the City's Attorney's office, and public defenders' offices, including refusing to allow an attorney to file a motion because the motion was late;

- Martin directed a warrant to be issued despite Judge Gordon's instruction to her to ensure that a warrant would not be issued for a Michigan defendant's arrest pursuant to an agreement reached between the defendant and the City;

- Deterioration of the attitudes of the employees of the Magistrates' Office;

- Martin failed to re-assign Brackin's duties when Brackin was out on suspension;

- Martin prepared an evaluation so negative that it would have deprived the employee of her pay increase, and which was in direct contrast to her previous evaluations received by the employee consistently rating her as above average, citing events of which she could have no personal knowledge.  Further, after being required to re-evaluate the employee, Martin told the employee that she had been forced to change the evaluation and it would not happen again.  Martin also falsely alleged that Judge Gordon had threatened her with termination if she did not give the employee a favorable review;

- Martin applied discipline and personnel rules in an arbitrary and capricious manner, and treated employees very differently with respect to leave time;

- Martin engaged in a verbal altercation with a City prosecutor over a complaint made by another magistrate, and then refused to speak to the prosecutor in the courtroom or elsewhere afterwards;

- Martin failed to discipline a magistrate who stockpiled case files in her office for several months, resulting in felony cases being dismissed, after being instructed to by Judge Gordon;

- Martin failed to recall a warrant after accepting money from the defendant for payment of a fine, causing the arrest of that defendant;

- Martin was unable to assist entering youthful offender defendants into the computer because she lacked even rudimentary understanding of the process; and

- Martin observed a magistrate "bellow" at another magistrate for a perceived error without intervening.

(Gordon depo., Pl. Ex. 9, 10). Accordingly, Martin cannot show a similarly situated comparator, whose offenses were nearly identical to Martin's, who was treated differently. Accordingly, she cannot establish a *prima facie* case of discrimination, and her claim must fail.

ii.  <u>Martin's Claim Fails Because She Has No Evidence of Pretext</u>

Even if Martin could show a *prima facie* case, the City has shown a legitimate, non-discriminatory reason for its action, i.e., that Martin proved to be unsatisfactory during her probationary period based on performance deficiencies. As such, the burden shifts to Martin to show that this reason is pretextual. "The pretext inquiry is concerned with the employer's *perception* of the employee's performance, not the employee's own beliefs." *Hankins v. AirTran Airways, Inc*. 237 Fed.Appx. 513, 522, (11th Cir. 2007)(Citing *Cooper v. Southern Co.,* 390 F.3d

695, 740 (11th Cir.2004)).    Martin cannot show any evidence suggesting that Judge Gordon did not *perceive* these problems in Martin's performance.  In fact, the undisputed evidence clearly shows that Judge Gordon discussed these concerns with Kai Davis, the City Personnel Director, and with Martin, on more than one occasion.  (Davis Aff., ¶ 5)  Martin cannot show that it was more likely that Judge Gordon's decision to terminate her probationary term of employment was actually motivated by a discriminatory motive, especially considering the undisputed fact that the person hired by Judge Gordon to replace Martin, Michelle Sellers Smith, Judge Gordon's Administrative Assistant and former Acting Court Clerk, was also white.    (Martin depo., p. 319:17-320:3; Davis Aff., ¶ 16).  In fact, Judge Gordon has hired or promoted three individuals to the position of Municipal Court Administrator during her tenure as Municipal Court Judge, including Nancy Martin.  (Davis Aff. ¶ 16).  All three have been white.  (Davis Aff. ¶ 16).

Martin simply cannot show pretext.  See *Hankins v. AirTran Airways, Inc*. 237 Fed.Appx. 513, 522(11th Cir. 2007); *Hammons,* 2006 U.S. App. LEXIS at *11 (affirming summary judgment on white female's race discrimination claim because plaintiff could not establish a *prima facie* case as she failed to demonstrate that she was replaced by someone outside her protected class or that she was treated less favorably than a similarly-situated individual outside her protected class).  For all

of the above reasons, Martin's claim of discrimination in violation of Title VII must fail.

### 3. Martin's 42 U.S.C. § 1983 Claims (Count Fourteen) Must Be Dismissed

This claim is due to be dismissed as a matter of law for the reasons laid out in detail in response to Count Nine, above.  Martin cannot point to any evidence establishing that the act of discrimination she allegedly suffered was in furtherance of any official policy or custom of the City. In the absence of any evidence that the alleged discrimination she allegedly endured was the result of any policy or custom of the City, Plaintiff's §1983 claim against the City of Dothan must be dismissed. *See Hammer v. Hillsborough County Board of County Commissioners*, 927 F. Supp. 1540, 1546 (M.D. Fla. 1996).  Furthermore, it is not enough merely to show the existence of a policy, but also that its application resulted in a deprivation of Martin's constitutional rights.  *Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir. 1994).  Because Martin was a probationary employee with no guarantee of employment, she had no property interest in her position and cannot point to the deprivation of any constitutional right.  *Shows v. Morgan*, 40 F.Supp.2d 1345, 1356 (M.D. Ala. 1999).  Thus, for these reasons and those expanded upon more fully in response to Count Nine, above, Martin's § 1983 claim of discrimination arising from her discharge must fail.

### 4. Martin's § 1983 Retaliation Claim (Count Fifteen) Fails as a Matter of Law Because She Cannot Establish a *Prima Facie* Case

Martin alleges that she "was not allowed to perform her duties as Administrator as performed by prior Administrators or permitted to make assignments effecting the black magistrates after she complained about Defendant Gordon's discriminatory practices." (Second Amend. Compl. ¶ 181). In order to demonstrate a *prima facie* case of retaliation under §1981 or §1983, Martin must demonstrate (1) that she engaged in statutorily protected activity (emphasis added), (2) that she was subject to an adverse employment action, and (3) that the adverse action was causally related to her protected activity. *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *cert. denied*, 532 U.S. 1076 (2001). Thereafter, the City must articulate a legitimate, nonretaliatory reason for its action, at which point Martin must demonstrate that the reason offered by the City is merely pretext for unlawful retaliation. *Pennington v. City of Huntsville*, 261 F.3d 1261, 1266 (11th Cir. 2001); *Olmstead v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998); *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).

Martin cannot establish a *prima facie* case of retaliation since she cannot show any of the three required elements. First, and most significantly, she never complained to Judge Gordon, the person she accuses of preventing her from making assignments effecting black magistrates, about race discrimination.

(Martin depo., p. 305:14-17). In fact, Martin admits that her complaint to Judge Gordon was not that her conduct was racially motivated but that Judge Gordon was showing favoritism. (Martin depo., p. 305:14-17). Nor did Martin complain to Kai Davis that Judge Gordon was discriminating against her or any of the other magistrates. (Davis Aff., ¶ 8). While Martin swears in her Charge of Discrimination that she complained to Kai Davis on September 29, 2004 that Judge Gordon was being discriminatory based on race, <u>she admits that this was the first time she complained of discrimination.</u> (Martin depo., Def. Ex. 33, page 3, ¶ J). While Defendants deny that Martin ever complained of discrimination, for summary judgment, Defendant will give benefit to Martin's testimony. Moreover, it is undisputed that LaVera McClain and Eunice Knight both complained to Judge Gordon and to Kai Davis that Nancy Martin was discriminating against them because of race. (Knight depo., p. 29:17-20; 34:23; 35:1-19; Davis Aff., ¶ 7). Notwithstanding this, it cannot be disputed that Gordon was not aware of any complaints made by Martin alleging that Judge Gordon was discriminating against any employee. (Gordon decl., ¶ 11; Davis Aff. ¶ 8). Thus, even if Martin engaged in statutorily protected activity, Judge Gordon was not aware of such a complaint.[25]

---

[25] Obviously, because Martin did not engage in any protected activity she cannot establish a causal connection between any protected activity and any alleged adverse employment action. To prove causation, Martin must prove, at a minimum, that the decision-maker was aware of the plaintiff's opposition before taking adverse employment action. *See Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)(the requirement of knowledge "rests upon common sense. A decision-maker cannot have been motivated to retaliate by

Because Martin did not engage in any protected activity she cannot establish a causal connection between the protected activity and any adverse action. Furthermore, the memo that Martin alleges was issued in retaliation for her protected activity was not issued until after the alleged protected activity. The memo asking her to refrain from making job changes was issued on September 28, 2004. (Martin depo., Def. Ex. 25). Yet according to Martin herself, she did not complain to Kai Davis until September 29, 2004, and specifically admits that she complained <u>after receiving the memo</u>. (Martin depo., Def. Ex. 33, page 3, ¶ J). Because the memo was issued prior to any alleged adverse action, it could not have been issued in retaliation for any alleged protected activity.[26] *See Weston-Brown v.*

---

something unknown to him."); *Bowen v. Jameson Hospitality,* 214 F.Supp.2d 1372, 1382 (11th Cir. 2002)(same). "It is insufficient to show that <u>someone</u> in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression." *Bass v. Bd. of County Comm., Orange County, Fla.*, 256 F.3d 1095, 1120 (11th Cir. 2001); *Harris v. Corrections Corp. of America,* 2005 U.S. App. LEXIS 11451, **8 (11th Cir. 2005)(plaintiff failed to prove *prima facie* case of retaliation where decision-maker was not aware plaintiff filed an EEOC charge); *Ramige v. McNeil Nutritionals, Inc.,* 2006 WL 2798774, *15 (S.D. Ala. 2006) ("The admissible, undisputed evidence shows that Ramige's job was eliminated as part of Tate & Lyle's bona fide, continuing reduction-in-force and that this decision was put in motion even before Tate & Lyle acquired the facility, much less before its decisionmaker had knowledge of Ramige's complaint against McNeil. To establish the causal connection element of a retaliation claim, Ramige must 'show that the decision maker was aware of the protected conduct at the time of the adverse employment action.'").

[26] Even if Martin did engaged in protected activity and this memo was issued after such protected activity, her retaliation claim still fails because this memo does not constitute an adverse employment action. "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White* 126 S.Ct. 2405, 2414 -2415 (U.S. 2006)(internal quotation omitted)("We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have

*Bank of America Corp.*, 167 Fed. Appx. 76 (11th Cir. 2006) ("However, when an

employer makes a tentative decision *before* protected activity occurs, the fact that

an employer proceeds with such a decision is *not* evidence of causation.") *citing*

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (per curiam); *Ramige v.*

*McNeil Nutritionals, Inc.,* 2006 U.S. Dist. LEXIS 73441(S.D. Ala. 2006) (granting

summary judgment on retaliation claim where plaintiff did not engage in protected

activity and decision to eliminate the plaintiff's job was put in motion before the

purchasing company acquired the facility much less before its decision-makers had

knowledge of the plaintiff's complaint against the selling company); *Pipkins v.*

*City of Temple Terrace,* 267 F.3d 1197, 1201 (11th Cir. 2001) (plaintiff cannot

prove causation where alleged adverse action commenced prior to any protected

expression); *Postell v. Greene County Hospital Authority,* 2007 U.S. Dist. LEXIS

46593, *19 (M.D. Ga. 2007) (granting summary judgment claim where alleged

retaliatory conduct occurred prior to complaints of discrimination); *Jackson v.*

*Lyons Falls Pulp Paper, Inc.,* 865 F. Supp. 87 (N.D.N.Y. 1994) ("The requisite

causal connection for retaliation claims may be established only if the protected

---

said, does not set forth 'a general civility code for the American workplace.'"). Further, "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces <u>injury</u> or <u>harm</u>." *Id.* at 2414. (emphasis added). A reasonable worker would not be dissuaded by a memo asking to refrain from making changes to assigned duties until the parties have a chance to discuss the matter in light of the fact that everyone's duties will be changing shortly anyway. This act simply cannot be considered an adverse action.

expression preceded the claimed retaliation."). Glaringly absent from Plaintiff's brief is *any* authority contradicting this bedrock legal principle.

Because Martin cannot show <u>any</u> of the required elements for a claim of retaliation, this claim must fail.

### 5. Martin's Negligence Claim (Count Sixteen) Fails as a Matter of Law

Martin has brought this count against both Judge Gordon and the City. She alleges that Judge Gordon owed her "a duty to point out her deficiencies and provide her a reasonable opportunity to cure those deficiencies" pursuant to Sec. 2-80 of the City's Personnel Rules and Regulations. In other words, Martin is alleging negligence per se. "This Court has stated that four elements are required for violation of a statute [or regulation] to constitute negligence per se: (1) The statute must have been enacted to protect a class of persons, of which the plaintiff is a member; (2) the injury must be of the type contemplated by the statute; (3) the defendant must have violated the statute; and (4) the defendant's statutory violation must have proximately caused the injury." *Parker Bldg. Services Co., Inc. v. Lightsey ex rel. Lightsey,* 925 So.2d 927, 931 (Ala. 2005)(citing *Fox v. Bartholf,* 374 So.2d 294, 295 (Ala.1979)). Martin, however, cannot show that Judge Gordon or the City violated the regulation at issue.

Sec. 2-80 of the City's Personnel Rules and Regulations states that, "Employees who prove unsatisfactory during the working test period may be

removed from the position by the Appointing Authority at any time during this period, subject to the approval of the Personnel Director; however, inadequate job progress and/or deficiencies must be pointed out to the employee and the employee must be given the opportunity to improve and/or correct the inadequacies and/or deficiencies before being removed from the position." The fact of the matter is that performance issues <u>were</u> discussed with and pointed out to Martin. For example, she admits that Judge Gordon spoke with her about a complaint about Martin received from the Chief of Police. (Martin depo., p. 345:19-21). She also admitted that Judge Gordon talked to her about her interaction with Ashton Ott, acknowledging that in a conversation with Judge Gordon about a situation between Martin and Ott, Judge Gordon "took up for Ashton." (Martin depo., p. 222:1-9). (Ashton Ott was the City Prosecutor. (Martin depo., p. 137:20-21). Martin also admitted that Judge Gordon spoke to her about Martin treating employees differently with regards to time off for medical issues, and letting an employee with no accrued time take off. (Martin depo., p. 238:1-10). "[N]ever once did the judge tell me I didn't have the authority to keep letting her be off. <u>Only after the fact did she tell me.</u>") In fact, Martin further admitted that in a meeting with Kai Davis and Judge Gordon, "Kai said that she knew – we'd both said there were problems. So she asked me to start. . . Before I could get through my part, the Judge interrupted and started going on about her side of things . . . ." (Martin

depo., p. 239:2-14). She even admitted "[t]he Judge said she didn't know if she could go forward from that point. And I told her that I could, that I could put the differences behind us . . . .", clearly indicating that she was aware of issues the Judge had with her performance. (Martin depo., p. 240:9-14).

Martin tries to play a game with semantics, claiming that she "never had a counseling session" based on a ridiculous position that this meeting was only "a talking session." (Martin depo., p. 240:4-8). However, this argument fails because the only requirement under the rules is that inadequate job progress and/or deficiencies "<u>be pointed out</u>" to the employee. (Gordon depo., Pl. Ex. 4, City of Dothan Personnel Rules and Regulations, Sec. 2-80). Martin has admitted that she had conversations with Judge Gordon about a complaint about her conduct, about her run-in with the City Prosecutor, about treating employees improperly regarding medical leave, and that she had at least one meeting with Kai Davis and Judge Gordon in which Kai said there were "problems" and during which Judge Gordon spoke to Martin about "her side of things." (Martin depo., pp. 345:19-23, 222:1-9, 238:11-22, 240:2-14). Judge Gordon noted in her files that she met with Martin on or about June 8, 2004 and expressed concern with several areas of concern with the Magistrate's Office and Martin's performance. (Gordon depo., Pl. Ex. 9, 10). Judge Gordon sent Kai Davis two memorandum on June 8 and July 8, 2004 outlining problems she was having with Martin. (Davis Aff. ¶ 5; Ex. A and B). On

July 19, 2004, Kai Davis met with Judge Gordon and Martin to discuss issues with Martin's performance and deficiencies in her performance. (Davis Aff., ¶ 5; Ex. C). The issues raised in Gordon's June 8th and July 8 memos were discussed during their meeting. (Davis Aff., ¶ 5; Ex. C). It simply cannot be disputed that deficiencies were "pointed out" to Martin. As such, she cannot allege a breach of Sec. 2-80 of the City's Personnel Rules and Regulations.

### 6. Plaintiff's Breach of Contract Claim (Count Seventeen) Fails as She Cannot Identify a Contract, Much Less Establish any Breach of Contract by the Defendants

The allegations in Martin's breach of contract claim are identical to her negligence claim in Count Sixteen, above. Specifically, she alleges that Judge Gordon and the City failed to meet the requirements of Sec. 2-80. She brings this claim against both Judge Gordon and the City.

In order to establish the elements of a breach-of-contract claim, Martin must show: (1) that a valid contract existed between her and Judge Gordon, and between her and the City; (2) that she performed under the contract; (3) that both Judge Gordon (for her to be liable) and the City (for the City to be liable) failed to perform under the contract; and (4) that she was damaged as a result. *Sullivan v. Eastern Health System, Inc.* 953 So.2d 355, 359 (Ala. 2006)(citations omitted.)

First, her claim against Judge Gordon fails because she cannot identify any contract that existed between Judge Gordon and herself. "No contract is formed

without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract." *Steiger v. Huntsville City Bd. of Educ.* 653 So.2d 975, 978 (Ala. 1995)(citing *Strength v. Alabama Department of Finance,* 622 So.2d 1283, 1289 (Ala.1993)). Martin cannot show any of these elements with regards to Judge Gordon with regards to the City Rules and Regulations. This claim should be dismissed against Judge Gordon due to the lack of existence of a contract between Judge Gordon and Martin.

Moreover, Martin cannot show the existence of a contract between she and the City. Martin was a probationary employee and could be removed for proving unsatisfactory during her probationary period.

Second, as noted above with regards to Martin's claim for negligence, even assuming she can show that Sec. 2.80 establishes a contract with Martin, her claim fails because she cannot show that either the City (or Judge Gordon) failed to perform under the contract. As noted above in response to Count Sixteen, Sec. 2.80 simply requires that Martin's deficiencies be "pointed out" to her, and Martin's testimony, in addition to that of Kai Davis and Judge Gordon, reflects that deficiencies <u>were</u> pointed out to her, and that she had an opportunity to improve. Accordingly, she cannot show that Judge Gordon or the City failed to perform under the contract, and this claim is due to be dismissed.

**D.    Plaintiffs' Punitive Damage Claim is Due to Be Stricken**

In Plaintiffs' Second Amended Complaint, Plaintiffs assert a claim for punitive damages. (Second Amended Complaint, Prayer for Relief, ¶F). Punitive damages are unavailable against the City of Dothan. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981) ("we hold that a municipality is immune from punitive damages under 42 U.S.C. §1983"); *Walters v. City of Atlanta,* 803 F.2d 1135, 1148 (11th Cir. 1986) (punitive damages under §1982 unavailable against municipality); *Harrelson v. Elmore County of Alabama,* 859 F.Supp. 1465, 1467 (M.D. Ala. 1994) (same); *Garrett v. Clarke County Board of Education,* 857 F.Supp. 949, 952 (S.D. Ala. 1994) (punitive damages unavailable against government entity under Title VII). As such, Plaintiff's punitive damage claim against the City is due to be stricken.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants are entitled to a complete summary judgment on all counts in Plaintiffs' Complaint and are due to be awarded attorneys' fees and costs.

Respectfully submitted,

s/ Theodore P. Bell

Carol Sue Nelson
Audrey Dupont
Theodore P. Bell
Attorneys for Defendants
City of Dothan and Judge Rose Evans-Gordon

**OF COUNSEL:**

MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
Suite 2400 AmSouth Harbert Plaza
Birmingham, Alabama 35203
(205) 254-1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Ishmael Jaffree, Esq.
951 Government Street
Mobile, AL 36604-244

_____/s Theodore P. Bell_____
OF COUNSEL