# FREEDOM COURT REPORTING

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3               SOUTHERN DIVISION
 4
 5   NANCY MARTIN and
 6   MARY BETH BRACKIN,
 7        Plaintiffs,
 8   vs.        CASE NO. 1:05-CV-1172-MEF
 9   CITY OF DOTHAN and
     JUDGE ROSE EVANS-GORDON,
10
     Defendants.
11
12
13
         * * * * * * * * * * *
14
         DEPOSITION OF NANCY MARTIN, taken pursuant
15
to stipulation and agreement before Sherry McCaskey,
16
Certified Court Reporter and Commissioner for the
17
State of Alabama at Large, in the Dothan Civic
18
Center, 126 N. Andrews Street, Dothan, Alabama, on
19
Monday, October 29, 2007, commencing at
20
approximately 9:05 a.m.
21
         * * * * * * * * * * *
22
23
```

## Page 2

```
 1              APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   ISHMAEL JAFFREE, ESQUIRE
     Jaffree Law
 4   951 Government Street
     Suite 415
 5   Mobile, Alabama 36604
 6   FOR THE DEFENDANTS:
 7   CAROL SUE NELSON, ESQUIRE
     Maynard, Cooper & Gayle
 8   Attorneys at Law
     2400 Amsouth/Harbert Plaza
 9   1901 Sixth Avenue North
     Birmingham, Alabama  35203
10
11      * * * * * * * * * * *
12
13         EXAMINATION INDEX
14   NANCY MARTIN
15     BY MS. NELSON          4
       BY MR. JAFFREE       335
16     BY MS. NELSON        345
       BY MR. JAFFREE       346
17
18
        * * * * * * * * * * *
19
20
21
22
23
```

## Page 3

```
 1              STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of NANCY MARTIN is taken pursuant to the
 5   Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Sherry McCaskey,
 7   Certified Court Reporter and Commissioner for the
 8   State of Alabama at Large, without the formality of
 9   a commission; that objections to questions other
10   than objections as to the form of the questions need
11   not be made at this time but may be reserved for a
12   ruling at such time as the deposition may be offered
13   in evidence or used for any other purpose as
14   provided for by the Federal Rules of Civil
15   Procedure.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that said deposition may be introduced at the
19   trial of this case or used in any manner by either
20   party hereto provided for by the Federal Rules of
21   Civil Procedure.
22
23
```

## Page 4

```
 1              NANCY MARTIN
 2        The witness, having first been duly sworn
 3   to speak the truth, the whole truth, and nothing but
 4   the truth, testified as follows:
 5              EXAMINATION
 6   BY MS. NELSON:
 7   Q.  Ms. Martin, my name is Carol Sue Nelson.  We
 8       met earlier, but just for the Record, I want
 9       to introduce myself.
10   A.  Okay.
11   Q.  I'm going to be asking you some questions
12       today about your claims against the City and
13       Judge Gordon.  Have you ever had your
14       deposition taken before?
15   A.  No.
16   Q.  As you know, you've been placed under oath.
17       If you do not understand a question, please
18       let me know and I'll try to rephrase it.  And,
19       otherwise, I'll assume that you do understand
20       me and will be answering truthfully.  Is that
21       understood?
22   A.  That's understood.
23   Q.  And as you know, the court reporter here is
```

1 (Pages 1 to 4)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1    taking everything down, so instead of nodding
2    or uh-huh and huh-uh, if you'll just speak up
3    and say yes or no or answer the question so
4    she can take down what your testimony is.
5    A.   Okay.
6    Q.   If you need a break at any time, let me know.
7        If there is a question on the table, though, I
8        would ask you to answer that. We'll be taking
9        a lunch break, if we need to go into the
10       afternoon. But, otherwise, just let me know
11       if you need a break, and we can certainly do
12       that.
13           Now, are you currently taking any
14       medications that would prohibit you from
15       truthfully answering questions today?
16   A.   Not that I'm aware of. No.
17   Q.   Are you under -- are you taking any -- are you
18       on any medications right now?
19   A.   Yes.
20   Q.   Can you tell me what that is?
21   A.   I'm taking a half of a pain pill for my foot
22       injury for the pain of my foot injury.
23   Q.   Is this the injury you sustained at --

Page 6

1    A.   Two weeks ago at Georgia Pacific.
2    Q.   And I may ask you a little bit about that in a
3        minute. But this was a work-related injury --
4    A.   Yes, it was.
5    Q.   -- at work? And you hurt your foot?
6    A.   I fractured the top of my foot, fractured the
7        bridge of my nose. And my knee is -- it
8        didn't break it or bust it. It's just all --
9        pulled the skin off of it. And I have a --
10       had a contusion of my head.
11   Q.   I'm sorry. Were you hospitalized for this?
12   A.   I was taken to the emergency room and treated
13       and released.
14   Q.   And I gather this resulted from some type of
15       fall at work?
16   A.   From a fall at Georgia Pacific's guesthouse
17       that I oversee.
18   Q.   Georgia Pacific is where you currently work?
19   A.   That's right.
20   Q.   And where is that located?
21   A.   Cedar Springs, Georgia.
22   Q.   How far is that from Dothan?
23   A.   About 29 miles from where I live.

Page 7

1    Q.   And where do you live?
2    A.   408 Christopher Drive in Dothan.
3    Q.   I'm sorry. You said you were on some pain
4        medication?
5    A.   Not continually. Just when I -- when I -- I
6        was on it for days, but that -- I stopped
7        taking it full-time about a week ago, just
8        occasionally.
9    Q.   Okay. And do you know the name of that
10       medication?
11   A.   Lortab.
12   Q.   Any other medications that you are on?
13   A.   No.
14   Q.   The emergency room that you went to, where was
15       that?
16   A.   Southeast Alabama Medical Center.
17       I'm sorry. I am on high blood pressure
18       medicine. I have high blood pressure.
19   Q.   And how long have you been on that?
20   A.   Probably for two or three years.
21   Q.   Are you under the care of a doctor --
22   A.   Yes.
23   Q.   -- with that?

Page 8

1    A.   Yes.
2    Q.   And who is that?
3    A.   Dr. Wes Nelson.
4    Q.   Is he here in Dothan?
5    A.   Yes. West Main Street.
6    Q.   And what about, did you see a doctor for your
7        fall or --
8    A.   Yes. I was referred to an orthopedic doctor
9        at Southern Bone and Joint here in Dothan.
10   Q.   And who was that?
11   A.   Dr. Bret Simpson.
12   Q.   Any other doctors that you see?
13   A.   Only the emergency room doctor.
14   Q.   Okay. Do you remember who that was?
15   A.   I think his name was Dr. Michael -- well,
16       actually, he's a physician's assistant,
17       Dr. Michael Shivers or Michael Shivers I
18       believe.
19   Q.   And do you trade at one particular pharmacy?
20   A.   Usually, Rite-Aid. Most of all mine are done
21       at Rite-Aid or through mail order through my
22       prescription drug company.
23   Q.   And who is your prescription drug company?

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1　A.　Caremark.
2　Q.　Caremart?
3　A.　Caremark.
4　Q.　Caremark? I'm sorry. And is that through
5　　　your company?
6　A.　Yes.
7　Q.　Any particular Rite-Aid that you go to?
8　A.　It's on West Main. It's beside Bruno's or
9　　　behind Bruno's -- Southern Market.
10　　　(Defendants' Exhibit 1 was marked
11　　　for identification.)
12　Q.　I'm going to show you what I have marked as
13　　　Defendants' Exhibit 1.
14　　　MR. JAFFREE: I don't think she got that.
15　　　I got it yesterday. I was going to
16　　　say, I don't think she got it, but she
17　　　knows about it.
18　Q.　Ms. Martin, that is -- that's not even a
19　　　signed copy. I just -- I sent that notice
20　　　of -- it's called a Notice of Deposition that
21　　　I did send to your lawyer.
22　A.　Okay.
23　Q.　Have you seen that or something similar to

Page 10

1　　　that before?
2　A.　I haven't seen this one. I did see the one
3　　　that you sent for I believe --
4　Q.　A prior occasion --
5　A.　Right.
6　Q.　-- when we had to reschedule?
7　A.　Right.
8　Q.　And in that particular notice, I asked if you
9　　　could bring some documents with you. And I
10　　　just wanted to go over that request. First of
11　　　all, I asked if you had any documents that
12　　　either the City provided to you or Judge
13　　　Gordon provided to you that you had. Do you
14　　　have anything like that with you here today?
15　A.　You're talking about just the first --
16　Q.　The first one. The first --
17　A.　I --
18　Q.　Well, let me ask you. You've got a stack of
19　　　documents; is that correct?
20　A.　Right.
21　Q.　And I also asked you if you had any writings,
22　　　notes, diaries, calendars?
23　A.　Yeah.

Page 11

1　Q.　Do --
2　A.　This is what I have.
3　Q.　Everything you have in response to this
4　　　request is before you?
5　　　MR. JAFFREE: You have a calendar?
6　　　THE WITNESS: Yeah. I do right here.
7　A.　Well, there's more than that if she wants all
8　　　this because I didn't have a copier that would
9　　　copy. But basically this is -- I mean, you
10　　　already have. I prepared from our Complaint
11　　　and from the Second Amended Complaint by
12　　　reviewing those for this deposition.
13　Q.　And right here, you --
14　A.　Right. I reviewed those.
15　Q.　I don't need that then.
16　A.　This was given to me by the judge sometime --
17　Q.　I'm going to mark that as Defendants'
18　　　Exhibit --
19　A.　But I don't have a copy of that.
20　　　MR. JAFFREE: Can you identify what judge
21　　　you're referring to for the Record?
22　A.　Judge Gordon.
23　　　MR. JAFFREE: Are we on the Record or not?

Page 12

1　　　MS. NELSON: Yes, we're on the Record, but
2　　　I'm going to ask her --
3　Q.　I'll get you copies but right now, so we can
4　　　identify what we're talking about, or if you
5　　　want me to, I can pencil it in and substitute
6　　　it.
7　A.　Oh, no. That's fine. I just don't have
8　　　another copy of that.
9　　　(Defendants' Exhibit 2 marked for
10　　　identification.)
11　Q.　So you gave me what I've marked as Defendants'
12　　　Exhibit 2.
13　A.　Yes, ma'am.
14　Q.　It's called -- and upon it, it says, "Rating
15　　　Guides-Judicial Department." And it's a
16　　　seven-page document. And can you tell me what
17　　　this is?
18　A.　It's a guide of job duties, responsibilities
19　　　of each -- some of the positions in the
20　　　magistrates' office. The position that I was
21　　　hired for, municipal court administrator,
22　　　it -- they did not have the tasks list. It
23　　　had never been done. And the judge, when we

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  were doing my first evaluation in April, she
2  requested that maybe I could come up with a
3  draft of the responsibilities because that's
4  really the job position I was supposed to be
5  rated on.
6  Q.  I'm sorry.  What job position were you
7      supposed to be rated on?
8  A.  Municipal court administrator.
9  Q.  Did you come up with such?
10 A.  Well, this writing is what -- some of the
11     notes that I had jotted down.  And then I
12     did -- I don't know the date, but I did in a
13     memo form or e-mail form did submit a draft to
14     her of what I thought was the basic task list
15     for court administrator.
16 Q.  I may ask you more about this in a moment.
17     What other documents did you bring?
18 A.  I have this that I do have a copy of.  This is
19     actually the original that Fran Bailey, a
20     clerk typist that was in the municipal
21     magistrates' office, after she -- she resigned
22     in July.  After my termination, she brought
23     this by my house, said she found it in her

Page 14

1  notes.  It's a record of where Eunice Knight
2  mostly, Lavera McClain mostly, one time Mary
3  Turner, and a couple of times Tonya Minifield
4  continued to go in and out a door that they
5  were -- they had been told not to go in and
6  out of for security and safety reasons.
7      And I had done a memo about that.  And I
8  had discussed it after the memo with Eunice
9  and Lavera and Tonya, and I did talk to Mary
10 Turner and tell her I didn't want that to
11 happen again because it was a safety issue.
12 But they continued to go in and out, and that
13 just details a certain time period when Fran
14 kept up with it.  But Fran typed that herself.
15 Q.  I'm going to mark this as Exhibit 3.
16     (Defendants' Exhibit 3 was marked
17     for identification.)
18     And I may ask you more about it, but
19     you're saying Fran gave this to you at your
20     home after you left --
21 A.  After I was terminated.  Yeah.
22 Q.  -- or were terminated from the City.
23     And you were terminated in --

Page 15

1  A.  October.
2  Q.  -- near or about October of 2004; is that
3      correct?
4  A.  Right.
5  Q.  Do you know when she would have brought this
6      to you?
7  A.  We had lunch probably about two months
8      after -- a month or two after I left the
9      City.  And she came to my house.
10 Q.  Well, had you asked her to keep track of --
11 A.  No, I hadn't.
12 Q.  -- the door usage?
13 A.  No, I hadn't.
14 Q.  And she's got dates ranging from June 28th '04
15     through July 15th '04; is that correct?
16 A.  Right.
17 Q.  And do you know how she recorded or kept track
18     of these dates?
19 A.  By -- she could see the entrance and exit to
20     the doors.
21 Q.  I mean, this is what she told you?
22 A.  Right.
23 Q.  Did you ask her to do this?

Page 16

1  A.  No, I didn't.  You've already asked me that
2      question.
3  Q.  And do you know why she did this?
4  A.  Because she knew that I was having a problem
5      getting Lavera and Eunice to obey the rules
6      and policies that I had for the magistrates'
7      office.
8  Q.  And what else do you have?
9  A.  Just -- I had prepared for this deposition
10     from your answer to my EEOC charge, which I
11     assume you have a copy of.  And I have
12     prepared for my deposition with my response to
13     the City of Dothan Employee Disciplinary
14     Action that I had attached the day I had
15     submitted the day I had my due process hearing
16     after my termination.
17 Q.  You're right.  I do have a copy of the
18     position statement -- the letter to the EEOC,
19     but I'm going to mark --
20     MR. JAFFREE:  I don't know if this is the
21     appropriate time or --
22 A.  I don't --
23     MR. JAFFREE:  -- wait --

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  A.  Yeah, I do have a copy of that.
2      MR. JAFFREE: -- until later. But she
3      also has notes from where we prepared
4      her for this deposition. And we
5      consider that our work product.
6      (Defendants' Exhibit 4 was marked
7      for identification.)
8  **Q.  Well, first of all, I'm just identifying**
9  **these -- Exhibit 4, the response to the City**
10 **during your due process hearing; is that**
11 **correct?**
12 A.  That's it.
13     MS. NELSON: Mr. Jaffree, you're saying
14     she made notes while you talked or she
15     brought you notes.
16     MR. JAFFREE: She made notes.
17     THE WITNESS: I made notes.
18     MR. JAFFREE: That's what she's looking at
19     now.
20     MS. NELSON: Well, I would ask her to
21     testify from memory. I mean, if she's
22     relying on those to testify, I mean, I
23     would want to see them. I'm not

Page 18

1      trying to --
2      MR. JAFFREE: She can testify from memory,
3      but she may need to refer to those
4      notes to refresh her recollection.
5      After her recollection had been
6      refreshed, then she could speak from
7      her memory.
8      MS. NELSON: Well, again, I'm not trying
9      to invade on attorney/client privilege
10     but if --
11     MR. JAFFREE: Well, you seem to be
12     knocking around the door.
13     MS. NELSON: Well, you're the one that
14     told me about these notes. And if
15     she's going to sit there and look at
16     them, I feel like I'm entitled to see
17     them.
18     MR. JAFFREE: I don't know of any rule
19     that suggests that you're entitled to
20     do that. I mean, these are notes from
21     her thoughts as we were talking and
22     trying to recollect what happened.
23     And these notes may very well include

Page 19

1      some of my trial strategy, so I don't
2      see how you can invade that.
3      MS. NELSON: Well, I'm just trying to get
4      the facts, and if she's looking at
5      notes -- we'll cross that path --
6      MR. JAFFREE: These are not my facts. I
7      wasn't there. So it's not that I have
8      put ideas in her head. I wouldn't do
9      that, ethically or morally. But these
10     notes may include litigation
11     strategies. I don't think she's going
12     to have to refer to these notes very
13     often. She's got scribbles and
14     everything else stuck in there.
15 **Q.  How many pages of notes do you have,**
16 **Ms. Martin?**
17 A.  One.
18 **Q.  Do you feel like you have to refer to those**
19 **notes to answer my questions?**
20 A.  Not all of them, no.
21 **Q.  And you have like -- I'm not trying to get**
22 **your attorney's advice or any discussion with**
23 **your attorney. Do you have dates or names on**

Page 20

1  **that pad?**
2  A.  I have two or three dates -- couple of dates,
3      yes.
4  **Q.  Names?**
5  A.  I have two or three names, yes.
6  **Q.  Do you have any trial strategies written down**
7  **on that document?**
8      MR. JAFFREE: Look, I'm going to object to
9      what's on that document. These are
10     her notes written after the fact, was
11     not drafted while she was employed,
12     part of our discussion. And I told
13     her, this is something you need to
14     remember so you need to write it
15     down. That's how some of these notes
16     occurred. This is all part of the
17     attorney/client privilege
18     communication. I don't see how this
19     is relevant to anything. You can ask
20     her questions related to facts of this
21     case, I have no problem with that. If
22     you want to examine some of the --
23     MS. NELSON: Well, I assure you, I'm going

5 (Pages 17 to 20)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1　　　to ask her --
2　　MR. JAFFREE: -- with respect to --
3　　MS. NELSON: I'm going to spend all day
4　　　asking her about this case, but I just
5　　　feel like I'm entitled --
6　　MR. JAFFREE: So you've gone from a half a
7　　　day now to all day? I'm just trying
8　　　to provide some levity.
9　　MS. NELSON: Well, I'm going to reserve
10　　　the right to continue to ask about her
11　　　notes.
12　**Q. And would ask that you testify from your**
13　　**memory, Ms. Martin.**
14　　　**I also asked if you had any tape**
15　　**recordings or video recordings of any time you**
16　　**worked for the City or about this case. Do**
17　　**you have anything like that in your**
18　　**possession?**
19　A. No, I didn't.
20　**Q. I'm sorry?**
21　A. No, I don't.
22　**Q. Do you have calendars or diaries?**
23　A. I do have one calendar that there are a few

Page 22

1　　notes in before August. But mostly the things
2　　start August on when Kai Davis advised me to
3　　start keeping notes on that. And I would need
4　　you to copy that.
5　**Q. This will be Defendants' Exhibit Number 5.**
6　　**And I will get copies and mark it maybe**
7　　**perhaps -- get copies at a break.**
8　　　**And also tax returns. Did you bring any**
9　　**tax returns?**
10　A. I brought W2 forms, and I brought the last pay
11　　stub I could find from this year.
12　　MR. JAFFREE: Let me, for the Record, say
13　　　that this may be a contentious area as
14　　　well. Her husband absolutely refused
15　　　to have his income -- his employment
16　　　history brought into this litigation.
17　　　He said, he's not a party and didn't
18　　　feel that it was relevant. And I
19　　　question the relevance of any income
20　　　related to her husband.
21　A. Except -- can I --
22　　MR. JAFFREE: Go ahead.
23　A. -- interrupt?

Page 23

1　　　Except for one year that I could not find
2　　just W2 forms on. And my only choice was to
3　　have him to agree to submit the income tax
4　　return for that one year. But the others are
5　　my W-2s.
6　　MR. JAFFREE: Well, I told you, you may
7　　　can black out his information. You
8　　　didn't do that on that one?
9　　THE WITNESS: I couldn't black his out
10　　　because it was a joint return.
11　**Q. Did you file a return for --**
12　A. We haven't filed a return for 2006 yet.
13　**Q. And why is that?**
14　A. Because we just haven't filed a return for
15　　2006 yet.
16　**Q. Have you requested an extension?**
17　A. Of course.
18　**Q. And --**
19　　MR. JAFFREE: Is her return for 2006
20　　　relevant to this inquiry?
21　　THE WITNESS: My W-2s are in there for
22　　　2006.
23　**Q. Well, again I would --**

Page 24

1　　MS. NELSON: Yes, they're relevant.
2　**Q. I don't mind you striking out your husband's**
3　　**income, but I would ask that -- I mean, I have**
4　　**a W2 from 2005 from Movie Gallery, but I don't**
5　　**know that that's the extent of your earnings.**
6　　**I'd like to see the tax returns and --**
7　A. Well, I can't strike out my husband's income
8　　because our accountant uses a computer program
9　　that totals in wages and earnings column. I
10　　think you'll see on that one that it totals
11　　both of ours together. It doesn't list them
12　　separately.
13　**Q. Well, again, I mean, I'm not going to stop the**
14　　**deposition for it, and I'm going to ask you**
15　　**about this down the road, but I feel like I**
16　　**have the right to obtain that.**
17　　　**I'm going to mark --**
18　　MR. JAFFREE: You, of course, can ask her
19　　　questions about her income.
20　　MS. NELSON: And I will.
21　**Q. I'm going to mark as Defendants' Exhibit 6**
22　　**which is --**
23　　MR. JAFFREE: She is under oath.

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  Q.  — a W-2 from Legal Services for 2002, a 2003
2       form 1040 income tax return for Jim Martin and
3       Nancy Martin, a 2004 W-2 from the City of
4       Dothan for Nancy Martin, a State of Alabama
5       Department of Industrial Relations form for
6       unemployment compensation for 2004 for Nancy
7       Martin, a 2005 W-2 for Nancy Martin from Movie
8       Gallery, a State of Alabama Unemployment
9       Compensation form for Nancy Martin for 2005,
10      2006 W-2 from Movie Gallery for Nancy Martin,
11      a 2006 W2 for Nancy Martin from Manpower
12      International, 2006 W-2 for Nancy Martin from
13      Belk, Inc., and appears to be a
14      Georgia-Pacific printout of earnings.
15            (Defendants' Exhibit 6 was marked
16            for identification.)
17  Q.  Would this be your earnings for --
18  A.  No. It's --
19  Q.  From what year?
20  A.  This year, last pay stub or the last one that
21      I could find.
22  Q.  That would reflect your earnings to date --
23  A.  Right.

Page 26

1  Q.  -- for 2007, Georgia-Pacific?
2       Which year-to-date is approximately
3       $40,522?  Does that sound right?
4  A.  Yes.
5  Q.  And what is your salary at Georgia-Pacific,
6       your annual salary?
7  A.  42,000.
8  Q.  And we'll come back to these.  Those are all
9       the documents you have in your possession that
10      respond to my --
11  A.  That's correct.
12  Q.  Just for the Record, will you give your full
13      name, please?
14  A.  Nancy Carol Martin.
15  Q.  And your Social Security number?
16  A.  ██████████
17       Excuse me just a minute.
18            (Witness conferred with her
19            counsel.)
20  Q.  Your date of birth?
21  A  ██████████
22  Q.  And do you have a driver's license?
23  A.  Yes, I do.

Page 27

1  Q.  Alabama driver's license?
2  A.  Yes.
3  Q.  Do you know your driver's license number?
4  A.  No, I don't.
5  Q.  And you gave me your address a moment ago, but
6       can you tell me that again?
7  A.  408 Christopher Drive, Dothan, Alabama.
8  Q.  And how long have you lived there?
9  A.  Oh, maybe about 11 years.
10  Q.  And do you reside there with anyone?
11  A.  My husband.
12  Q.  What's his name?
13  A.  Jim Reeves Martin, II.
14  Q.  All right.
15  A.  My daughter also resides there with me.
16  Q.  What's her name?
17  A.  Dawn, D-A-W-N, Fernandez.
18  Q.  And how old is she?
19  A.  She's 32.  It's a temporary arrangement.
20  Q.  Anyone else live there?
21  A.  My granddaughter, Chloe Smith.  She's 9.
22  Q.  Is she Dawn's daughter?
23  A.  Yes.  I'm sorry.

Page 28

1  Q.  Anyone else?
2  A.  That's it.
3  Q.  And prior to your 408 Christopher address,
4       where did you live?
5  A.  I lived in Carriage House Apartments on Daniel
6       Circle in Dothan.
7  Q.  And how long did you live there?
8  A.  Probably two to three years.
9  Q.  Prior to that?
10  A.  I lived on Aberdeen Drive in Dothan.
11  Q.  How long did you live there?
12  A.  Probably a year.
13  Q.  Are you from Dothan?
14  A.  Yes.
15  Q.  Born here?
16  A.  Yes.
17  Q.  And went to school here?
18  A.  Went to school at Midland City, Dale County
19      High School.
20  Q.  Now, other than Jim Martin, have you been
21      married to anyone else?
22  A.  Yes.
23  Q.  And how many times have you been married?

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

| Page 29 |
|---|
| 1     MR. JAFFREE: Well, I know all this is |
| 2          irrelevant to this litigation, but you |
| 3          can go ahead and answer the question. |
| 4   A. My first husband of 14 and a half years was |
| 5          Roy Hurst, H-U-R-S-T. |
| 6   Q. Roy Hurst? |
| 7   A. Uh-huh (positive response). And I was married |
| 8          very briefly to John Faison, F-A-I-S-O-N. |
| 9   Q. Okay. And then to Jim Martin? |
| 10  A. Yes. |
| 11  Q. And your marriage to Roy Hurst, how did that |
| 12         end? |
| 13  A. Divorce. |
| 14  Q. Did you have any children? |
| 15  A. Three. |
| 16  Q. What are their ages now? |
| 17  A. Dawn is 32. Chanda is 20 -- 28. |
| 18  Q. I'm sorry. What is her name? |
| 19  A. Chanda, C-H-A-N-D-A. |
| 20  Q. What's her last name? |
| 21  A. Le, L-E. |
| 22  Q. L-E? |
| 23  A. Uh-huh (positive response). And Brandon Hurst |

| Page 30 |
|---|
| 1          is 23. |
| 2   Q. And, approximately, when did you divorce Roy |
| 3          Hurst? |
| 4   A. In 1989. |
| 5   Q. And you married John Faison? |
| 6   A. Yes. |
| 7   Q. When did you marry him? |
| 8   A. Maybe around 1994. |
| 9   Q. And how long were you married to him? |
| 10  A. Seven months. |
| 11  Q. And why did that marriage end? |
| 12  A. Divorce. |
| 13  Q. You need to speak up. |
| 14  A. I'm sorry. |
| 15  Q. Do you have any children -- |
| 16  A. No. |
| 17  Q. -- with John Faison? |
| 18         Jim Martin, when did you marry him? |
| 19  A. In 1998. No, I'm sorry. 1997. |
| 20  Q. Any children with him? |
| 21  A. No. |
| 22  Q. This Roy Hurst, does he live in the Dothan |
| 23         area? |

| Page 31 |
|---|
| 1   A. He lives in Midland City. |
| 2   Q. And where is he employed? |
| 3   A. He's not. He's on disability. |
| 4   Q. Was he employed? |
| 5   A. Yes. |
| 6   Q. Where was he employed? |
| 7   A. For 30 years at Pemco Aerospace in Napier |
| 8          Field. |
| 9   Q. John Faison, does he still live in the area? |
| 10  A. Yes. |
| 11  Q. Is he employed? |
| 12  A. With the City of Dothan. |
| 13  Q. And what is his job? |
| 14  A. I think he works in the body shop. |
| 15  Q. And Jim Martin, is he employed? |
| 16  A. He is self-employed. |
| 17  Q. And what does he do? |
| 18  A. He owns Martin Environmental Services here in |
| 19         Dothan. |
| 20  Q. Your daughter Dawn, is she employed? |
| 21  A. Yes. |
| 22  Q. And where does she work? |
| 23  A. She's a pharmacy tech at Rite-Aid pharmacy. |

| Page 32 |
|---|
| 1          She's also a student. |
| 2   Q. Is she married? |
| 3   A. No. |
| 4   Q. Is she divorced? |
| 5   A. Yes. |
| 6   Q. Does her husband live here in the Dothan area? |
| 7   A. I'm not sure. No. |
| 8   Q. What's his name? |
| 9   A. Patrick Fernandez. |
| 10  Q. And Chanda Le, does she work? |
| 11  A. Yes. |
| 12  Q. Where does she work? |
| 13  A. At Southeast Alabama Medical Center. |
| 14  Q. What's her job? |
| 15  A. Radiology technician. |
| 16  Q. Okay. Is she married? |
| 17  A. Yes. |
| 18  Q. And what's her husband's name? |
| 19  A. Bill Le. |
| 20  Q. What does he do? |
| 21  A. He is -- he works with Toyota in Dothan as a |
| 22         parts -- he works in the parts department. |
| 23         That's all I know. |

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 33

1  Q.  And Brandon, does he work?
2  A.  He's in the Army.
3  Q.  Is he in the area?
4  A.  No. He's in Iraq.
5  Q.  Is he married?
6  A.  No.
7  Q.  Are your parents living?
8  A.  Yes.
9  Q.  What are their names?
10  A.  H. B. Green is my father. Evelyn Green is my
11      mother.
12  Q.  And they live in this area?
13  A.  They live in Midland City.
14  Q.  Does your dad work?
15  A.  They are both retired.
16  Q.  Did your dad work?
17  A.  Yes.
18  Q.  Where did he work?
19  A.  Michelin.
20  Q.  For most of his career?
21  A.  For 20 years he worked at Stephenson-Smith IGA
22      as the meat market manager and for the -- for
23      the last 20 at Michelin.

Page 34

1  Q.  Okay. Did your mom work?
2  A.  Only the last few years before she retired.
3      She worked at the Midland City Elementary
4      School in the lunchroom.
5  Q.  Do you have any brothers or sisters?
6  A.  I have a sister named Gail Besecker,
7      B-E-S-E-C-K-E-R.
8  Q.  Does she live in the area?
9  A.  In Kinsey.
10  Q.  Is that near here?
11  A.  Yes. It's just a small town.
12  Q.  Does she work?
13  A.  She works at the Southeast Alabama Medical
14      Center.
15  Q.  Is she married?
16  A.  No.
17  Q.  Do you have any other brothers or sisters?
18  A.  Yes. I have two brothers. One is Wesley
19      Green.
20  Q.  And what's the other one's name?
21  A.  Larry Green.
22  Q.  Do they both live in this area?
23  A.  Larry lives in Wicksburg, and Wesley is in the

Page 35

1      process of moving to Tifton, Georgia. Both
2      lives in the Slocomb area right now.
3  Q.  Is Wesley employed?
4  A.  Yes.
5  Q.  Where does he work?
6  A.  I'm not sure of the name of the company
7      because he just changed jobs to take a job
8      with a -- I'm not sure if it's a chemical
9      company or -- I'm not real sure.
10  Q.  Larry, is he married?
11  A.  Yes. Wesley?
12  Q.  Yes.
13  A.  Yes.
14  Q.  And what's his wife's name?
15  A.  Lorie Green.
16  Q.  Does she work?
17  A.  She just resigned her job to move, but she did
18      work.
19  Q.  Larry, where does he work?
20  A.  He owns Chapman Green Salon.
21  Q.  Is that like a --
22  A.  It's a hair salon.
23  Q.  And is he married?

Page 36

1  A.  Yes. Casey Green.
2  Q.  What does she do?
3  A.  She owns the hair salon with him.
4  Q.  Did you have another sister?
5  A.  Yes, I did. Her name is Connie Green -- or
6      Connie Williams.
7  Q.  Is she deceased?
8  A.  Yes, she is.
9  Q.  And when did she pass away?
10      MR. JAFFREE:  Is that question relevant to
11          the jury voir dire?
12      MS. NELSON:  You can make your objection.
13      MR. JAFFREE:  Let me object. I'm not
14          going to instruct her not to answer.
15          It's just that this has really gone
16          way up field.
17      MS. NELSON:  You can make your objection.
18  A.  I believe she passed away around 1990, 1992.
19  Q.  And what were the circumstances?
20  A.  I really don't know what this has to do with
21      this case, but she was murdered.
22  Q.  And by whom?
23  A.  By her boyfriend -- or ex-boyfriend.

9  (Pages 33 to 36)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 37

1   Q.  Do you know what his name was?
2   A.  Victor Newman.
3   Q.  Newland?
4   A.  Newman.
5   Q.  Newman.  Was he charged with murder or
6     convicted of anything?
7   A.  Yes.  Convicted of --
8   Q.  Convicted of what?
9   A.  I assume murder.  I can't remember.  He's
10     serving a life sentence without parole.
11   Q.  Does he have family in the area?
12   A.  I'm not -- I think maybe there is some family
13     in Midland City. I'm not sure.
14   Q.  Do you know where he worked or what he did?
15   A.  No.
16   Q.  Did your sister Connie have any children?
17   A.  Yes.  She had two.
18   Q.  And how old are the children?
19   A.  Now?
20   Q.  Now.
21   A.  One is probably -- the little girl -- the girl
22     is probably 19, 20.
23   Q.  What's her name?

Page 38

1   A.  Tamara Newman.
2   Q.  Is she employed?
3   A.  She's in the Air Force.
4   Q.  And the other child?
5   A.  Victor Newman, Jr.
6   Q.  And is he employed?
7   A.  I don't know.  I don't have any contact with
8     him.
9   Q.  Do you have contact with Tamara?
10   A.  Occasionally, not very often.
11   Q.  Any other relatives in the Dothan area?  Do
12     you have cousins?
13       You're smiling like you've got a lot of
14     relatives?
15   A.  I have lots.
16       MR. JAFFREE:  Did I ever give you that
17       list from --
18       MS. NELSON:  You sent me some names, yes.
19       MR. JAFFREE:  Mary's --
20       MS. NELSON:  Mary Brackin's relatives.
21   Q.  Well, let me ask you this:  Do you have -- I'm
22     trying not to stay here all day, but I'm just
23     trying to determine who's --

Page 39

1       MR. JAFFREE:  Well, I was thinking maybe I
2     can send you list of hers as well.
3   Q.  Well, just give me an idea.  Other than your
4     mom and dad, do they have brothers and sisters
5     here?
6   A.  Yes.
7   Q.  You're saying yes.  So, like, how many cousins
8     I assume you have here in town, in the area?
9     When I say "area," South Alabama, Dothan.
10   A.  I have many.
11   Q.  Okay.  Well, I may make the same request then
12     if you could provide your attorney with the
13     names of your cousins and their spouses and
14     where they work.
15       MS. NELSON:  I don't think you gave me
16       anything about their employment on the
17       other.
18   A.  Just cousins?
19       MR. JAFFREE:  I was going to ask her to
20       supplement -- Mary Brackin to
21       supplement the information that she's
22       already provided to counsel.
23   Q.  I'm really looking for anybody that's over the

Page 40

1     age of 18 that lives in the South Alabama
2     area, the names and over the age of 18?
3       MR. JAFFREE:  Whether they're dead or
4       not?
5       MS. NELSON:  Well --
6       MR. JAFFREE:  You don't have to answer
7       that.
8       MS. NELSON:  I have the right to know who
9       her relatives are and who may know her
10       or contact with her one way or the
11       other for jury purposes.
12   A.  You said a list and where they work.  Is that
13     what you asked for?
14   Q.  Yes.
15       Maybe you can identify them as your cousin
16     and aunts -- I mean, would your aunts and
17     uncles -- you could add aunts and uncles.
18     Their names were either -- your maiden name
19     was? I'm sorry.
20   A.  Green.
21   Q.  Green?
22   A.  Yes.
23   Q.  But if you could give me aunts, uncles,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  cousins, where they worked, I'd appreciate it;
2  and, again, I guess to the extent that nieces
3  and nephews are over the age of 19. You have
4  quite a -- how many are we talking about? Are
5  we talking about 20 -- 10, 20?
6  A. Nieces and nephews?
7  Q. No. Relatives.
8  A. Overall? No. We're talking about more than
9  20.
10  Q. Okay. My goodness. If you can do your best
11  to give me a list.
12  A. Okay.
13  Q. Have you ever been arrested for anything?
14  A. No, ma'am.
15  Q. Have you ever had a traffic ticket or anything
16  like that?
17  A. Yes, I have.
18  Q. Have you ever been convicted of any crime?
19  A. No.
20  Q. Have you ever filed for bankruptcy?
21  A. Yes.
22  Q. And when was that?
23  A. Probably around 1990.

Page 42

1  Q. You said you filed for bankruptcy in 1990?
2  A. 1990 or 1991. I'm not sure of the exact
3  date.
4  Q. And you know there are several types of
5  bankruptcy. Do you know what --
6  A. Chapter 7.
7  Q. Chapter 7?
8  A. Yes.
9  Q. And where was that where you filed?
10  A. Here in Dothan.
11  Q. And what was your name at the time?
12  A. Nancy Hurst.
13  Q. And have you filed for bankruptcy at any time
14  since then?
15  A. No, ma'am.
16  Q. And has that case been closed or --
17  A. Yes, many years ago.
18  Q. Have you ever served in the military?
19  A. No.
20  Q. How long has your son been in the military?
21  A. Four years.
22  Q. Other than this deposition that we're here
23  today -- I think I asked you this -- have you

Page 43

1  ever had a deposition taken?
2  A. I've never had a deposition taken. I have
3  taken depositions by non-stenographic means
4  before in my employment with Legal Services.
5  Q. When you say you've taken them, you mean, like
6  as a court reporter?
7  A. Right. Our clients could not afford court
8  reporters, so I videotaped their depositions
9  and recorded on audio also and transcribed
10  them.
11  Q. But I'm asking -- and I may ask you about that
12  later -- but right now asking about yourself
13  giving sworn testimony in a deposition.
14  You've never done that; is that correct?
15  A. No, ma'am.
16  Q. Have you ever been in a lawsuit before, other
17  than this one?
18  A. I did file just a small claims action over a
19  car accident to get the other party to pay for
20  the damages to my vehicle.
21  Q. Do you know the name of that person that you
22  filed against?
23  A. No, I don't.

Page 44

1  Q. Do you know when that was?
2  A. No.
3  Q. What was the outcome?
4  A. He was found guilty and a garnishment was --
5  MR. JAFFREE: I'm not sure he was found
6  guilty, probably more like liable.
7  A. Well, liable. Sorry. Liable. And there was
8  a garnishment issued on his wages.
9  Q. Has anyone ever sued you before?
10  A. No.
11  Q. Of course, when you were involved in your
12  divorces, there was legal action there; is
13  that correct?
14  A. They were uncontested. Yes.
15  Q. Did you file or --
16  A. I filed both times.
17  Q. Did you ever offer any testimony in those
18  cases?
19  A. No.
20  Q. Have you ever been a witness in a case where
21  you offered testimony?
22  A. In a lawsuit?
23  Q. Well, a lawsuit or any -- have you ever -- or

11 (Pages 41 to 44)

## FREEDOM COURT REPORTING

Page 45

1　a complaint against somebody or criminal
2　action or misdemeanor action?
3　A.　No.　The only testimony I've ever offered was
4　in a personnel board hearing.
5　Q.　What did that involve?
6　A.　It involved when Mary Beth Brackin had her
7　personnel board hearing.
8　Q.　And you testified there?
9　A.　Very briefly.
10　Q.　What was the nature of your testimony?
11　　　MR. JAFFREE:　Can you just, for my
12　purposes, explain what are you asking
13　her, the nature of her testimony?
14　Q.　What were you asked to testify about?
15　A.　My knowledge of the discriminatory action
16　being taken -- being done by Judge Gordon in
17　the magistrates' office.
18　Q.　And who questioned you about that?
19　A.　Ishmael Jaffree and Len White.
20　Q.　And were you under oath at that time?
21　A.　Yes, I was.
22　Q.　Have you ever filed criminal charges against
23　anyone?

Page 46

1　A.　No.
2　Q.　Have you ever made a complaint against anyone
3　with the police department?
4　A.　Not that I can recall.
5　Q.　Would you recall -- I mean, if you had to go
6　to the police and make a complaint, would you
7　not remember that?
8　A.　I may have -- I think I made -- yes, I did.
9　Many years ago, I made a complaint with the
10　police about harassing phone calls, harassing
11　communication.
12　Q.　And who was making these harassing phone
13　calls?
14　A.　Paul Shiver.
15　Q.　Who is that?
16　A.　I don't know.
17　Q.　Okay.　How did that -- did the police
18　investigate that?
19　A.　There was a trace put on my line -- phone
20　line.
21　Q.　Did they stop?
22　A.　Only after they traced the call and the
23　police -- as I remember, the police went to

Page 47

1　his house.　I can't recall -- I believe he was
2　arrested.　I'm not sure, it was so long ago.
3　Q.　Ever made any complaints against Roy Hurst?
4　A.　Yes, I did have a TRO against him.
5　Q.　What was that for?
6　A.　He had -- was after we separated before we
7　divorced, I believe.　I'm not sure if it was
8　before or after.　He was, what I call,
9　stalking me and the children and had attempted
10　to run me and the children off the road while
11　we were driving, continued to call me and call
12　me and threaten to kill his self and just kept
13　me and the kids upset all the time.
14　Q.　And you had a restraining order against him?
15　A.　Yes.
16　Q.　Did you have to go to court and offer any
17　testimony for that?
18　A.　I don't remember having to do that.
19　Q.　Did you file any complaints or charges against
20　John Faison?
21　A.　No.
22　Q.　Have you filed any charges or complaints
23　against Jim Martin?

Page 48

1　A.　Yes.
2　Q.　I thought I just asked you that a minute ago.
3　What did you --
4　A.　I just couldn't -- I just couldn't remember.
5　Q.　What kind of complaints have you filed against
6　Jim Martin?
7　A.　Domestic violence.
8　Q.　And when was this that you filed a complaint
9　against him?
10　A.　I believe it was in 2006, maybe end of May.
11　Q.　And what type of domestic violence did you
12　complain about?
13　　　MR. JAFFREE:　Again, let me object to the
14　relevance.　I'm not going to instruct
15　you not to answer, but this seems to
16　be so far removed from this case.
17　　　MS. NELSON:　Your objection is noted.
18　Q.　What type of domestic violence?
19　　　MR. JAFFREE:　Well, I'm not sure what
20　she's asking for, what type.
21　Q.　What had he done that caused you to file a
22　compliant against him?
23　A.　He had gotten extremely angry and had tried to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1      choke me and had thrown me across the room and
2      I hit the chest of drawers.
3    Q.   Did you call the police, file a complaint?
4    A.   I called the police.
5    Q.   Did that end up going to court?
6    A.   Yes, it did.
7    Q.   Did you have to testify there?
8    A.   No, I didn't. It was eventually dismissed.
9    Q.   Did he have to go to court?
10   A.   He went several times because it kept being
11      continued.
12   Q.   Did you testify against him?
13   A.   I never had to testify against him.
14   Q.   And why is that?
15   A.   Because there never was court.
16      MR. JAFFREE: She said the case got
17      dismissed.
18   Q.   Do you know why it was dismissed?
19   A.   No, I don't.
20   Q.   Did it have anything to do with that you
21      didn't testify?
22   A.   I think it had more to do with the police
23      officer didn't show up, I think.

Page 50

1    Q.   Any other complaints against Jim Martin?
2    A.   No.
3    Q.   Have you two ever separated?
4    A.   Yes, we have.
5    Q.   Are you currently separated?
6    A.   No.
7    Q.   And when were you separated?
8    A.   We were separated from the end of May till
9      February of this year.
10   Q.   Is there any other police reports or
11      complaints or charges that you've made against
12      anyone?
13   A.   I don't think so.
14   Q.   Are you a member of any --
15      MR. JAFFREE: You can ask your question.
16      And then can we take a five minute
17      break?
18      MS. NELSON: We can break.
19      (Brief recess)
20   Q.   Are you a member of a church --
21   A.   Yes.
22   Q.   -- in the area? Where do you go to church?
23   A.   I'm a member of Bethlehem Baptist Church.

Page 51

1    Q.   And where is that?
2    A.   I believe it has a Dothan address, but I'm not
3      sure what that is. Bethlehem Road I believe.
4    Q.   Are you a member of any -- is it in Dothan?
5    A.   It's out -- well, it's -- a little bit out of
6      Dothan, towards Midland City.
7    Q.   How far is Midland City from Dothan?
8    A.   About 15, 20 minutes I guess.
9    Q.   How about do you -- are you a member of any
10      type of civic organizations or social clubs?
11   A.   No.
12   Q.   What do you do in your spare time when you are
13      not working?
14   A.   My husband and I ride motorcycles. I read a
15      lot. And I spend time with my grandchildren.
16   Q.   Do you have your own motorcycle?
17   A.   My husband.
18   Q.   Speak up a little bit.
19      Are you a member of any type of motorcycle
20      riding club?
21   A.   No.
22   Q.   When you ride, you ride with him?
23   A.   Yes.

Page 52

1    Q.   You don't have your own motorcycle; is that
2      correct?
3    A.   No.
4    Q.   You said grandchildren; how many grandchildren
5      do you have?
6    A.   Three.
7    Q.   I'm sorry. I think I registered one. Your
8      other two are -- was Chloe --
9    A.   Chloe is the one that lives with me with her
10      mother. My other daughter Chanda has two
11      children.
12   Q.   And where do they live?
13   A.   With Chanda in Dothan.
14   Q.   How old are they?
15   A.   3 and 9.
16   Q.   But as far as other activities -- I mean, as
17      far as going to a gym or anything like that,
18      do you belong to anything like that?
19   A.   No.
20   Q.   Other than the EEOC charge that you filed in
21      the case against the City that we are here for
22      today, have you filed any other EEOC charges?
23   A.   No.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  Q.  Tell me where you went to high school.
2  A.  Dale County High in Midland City.
3  Q.  And did you graduate?
4  A.  Yes.
5  Q.  What year was that?
6  A.  1974.
7  Q.  And following graduation from high school, did
8     you go on to take any other courses or college
9     or training?
10  A.  Not right following high school.  I married.
11     Later I went back and got my B.S. degree in
12     business administration at Troy State in
13     Dothan. It's Troy University now.
14  Q.  What year was that?
15  A.  I think I graduated from there in 1999 I
16     believe.
17  Q.  And that was a B.S.?
18  A.  Yes, it was.
19  Q.  Four years?
20  A.  Four years.
21  Q.  In business administration?
22  A.  Right.
23  Q.  Is that correct?  Okay.

Page 54

1  A.  I also had -- completed a certification
2     program for paralegal at Troy Continuing
3     Education.
4  Q.  And when was that?
5  A.  I believe that was -- year I completed was
6     1994.
7  Q.  All right.  Any other training or
8     certifications that you have?
9  A.  Well, I've had tons of trainings but not
10     certifications.  No.
11  Q.  Trainings like on-the-job training or --
12  A.  Well, you know, just like SkillPath seminars,
13     training, things like that.
14  Q.  What is SkillPath?
15  A.  It's a company that puts on trainings and
16     seminars for anyone to attend.
17  Q.  So you said right after you graduated from
18     high school, then what was the first -- you
19     said you married?
20  A.  Right.
21  Q.  What was the first job you held, full-time
22     job?
23  A.  Full-time would have been with Legal Services.

Page 55

1  Q.  Okay.  And when did you go to work for Legal
2     Services?
3  A.  No, no, that's not right.  Full-time would
4     have been First Alabama Bank, which is now
5     Regions Bank.
6  Q.  Well, let me back up.  I mean, when you were
7     in high school, did you work some part-time
8     jobs?
9  A.  Yes, I did.
10  Q.  Just briefly, where did you work?
11  A.  I worked at Hardee's.  I worked at Davis
12     Theaters.  And then after -- after I married,
13     I worked part-time at Penney's.
14  Q.  And what was your job there?
15  A.  I worked in advertising department as an
16     assistant.
17  Q.  Was that here in Dothan?
18  A.  Yes.
19  Q.  And how long did you work there?
20  A.  Maybe a year and then was laid off.
21  Q.  Laid off?
22  A.  Yes.
23  Q.  And after Penney's, where did you work?

Page 56

1  A.  I believe First Alabama Bank was next.
2  Q.  Do you know about what year this was?
3  A.  Probably -- maybe 1976, around that time.
4  Q.  And what was your job at First Alabama Bank?
5  A.  I began as a teller; moved up as the secretary
6     to the director of marketing and personnel.
7  Q.  And how long did you work there?
8  A.  Five years.
9  Q.  And who was the head of marketing and
10     personnel?
11  A.  Betty Elsworth, E-L-S-W-O-R-T-H.
12  Q.  And was that here in Dothan?
13  A.  Yes.
14  Q.  And why did you leave First Alabama Bank?
15  A.  Betty Elsworth left, and I just wasn't happy
16     with the direction.  I guess we were kind of
17     in limbo with no director.  And a friend of
18     mine told me about a legal secretary job
19     available with a private attorney in Dothan,
20     and I applied for it.
21  Q.  Did you leave voluntarily?
22  A.  Yes.
23  Q.  You were saying when Betty Elsworth left,

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1    nobody replaced her?
2    A. Not for some time, no.
3    Q. Who did you report to after she left?
4    A. I don't recall.
5    Q. Do you know how long you stayed after she
6        left?
7    A. Maybe a couple of months, two or three
8        months. I'm not sure.
9    Q. Were you ever disciplined or reprimanded when
10       you worked for First Alabama Bank?
11   A. Not to my knowledge.
12   Q. You said you heard about a job at a private
13       law firm?
14   A. Uh-huh (positive response).
15   Q. And what was the name of the firm?
16   A. Hardwick, Hause, and Segrest.
17   Q. And did you go to work there?
18   A. Yes, I did.
19   Q. And what year was this?
20   A. I'm not sure.
21   Q. And what was your job there?
22   A. Legal secretary.
23   Q. And did you work for a particular lawyer?

Page 58

1    A. Yes. I worked for Jerry Segrest.
2    Q. Anyone else?
3    A. No.
4    Q. Okay. What types of duties did you have?
5    A. Making appointments, typing letters, legal
6        documents, billing clients, receiving payments
7        from clients, filing documents with court.
8    Q. How long did you work there?
9    A. A year.
10   Q. And why did you leave?
11   A. I was pregnant and didn't want to be under
12       that kind of pressure.
13   Q. What type of pressure were you under?
14   A. It was just very stressful.
15       MS. NELSON: Off the Record.
16       (Off-the-Record discussion)
17       MS. NELSON: Back on the Record.
18   Q. So getting pregnant with which child?
19   A. My son.
20   Q. So what year was that? Give me a reference
21       anyway.
22   A. He was born in February of '84.
23   Q. So this was around '83?

Page 59

1    A. Yes, I believe. No -- yes.
2    Q. So you left because you were pregnant. You
3        had a child. Did you go back to work after
4        that?
5    A. I actually went back to work part-time before
6        I had the child, and it was less stressful. I
7        went to work part-time for SouthTrust Bank.
8    Q. Here in Dothan?
9    A. Yes.
10   Q. And what was your job there?
11   A. I was a secretary/teller.
12   Q. And who was your supervisor?
13   A. Ronnie Owens.
14   Q. Owen?
15   A. Owens.
16   Q. Okay. And what was his job?
17   A. He was the branch manager.
18   Q. What branch was this?
19   A. The West Main branch.
20   Q. And how long did you stay there?
21   A. A year and a half.
22   Q. Did your job change any?
23   A. I actually did both. I was a teller two days

Page 60

1    and a secretary one day.
2    Q. Were you ever disciplined or reprimanded while
3        you were there?
4    A. No.
5    Q. And why did you leave?
6    A. Because I wanted to work full-time again, and
7        I was offered a job by Legal Services.
8    Q. When did you go to work for Legal Services?
9    A. November of '84.
10   Q. Was that here in Dothan?
11   A. Yes, it was.
12   Q. Do they still have an office here?
13   A. Yes, they do.
14   Q. And how long did you work for Legal Services?
15   A. For almost 20 years.
16   Q. What was your job there?
17   A. I was executive secretary.
18   Q. The entire time?
19   A. No. I started as a legal secretary, was
20       promoted to executive.
21   Q. And when were you promoted?
22   A. I don't recall the year. After I had been
23       there about nine or ten years.

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1   Q.  What is the difference between a legal
2       secretary and an executive secretary?
3   A.  A legal secretary, I typed letters and court
4       documents and drafted legal documents.  As an
5       executive secretary, it was somewhat like an
6       officer manager.  I was over other
7       administrative staff and --
8   Q.  How many -- I'm sorry.  Go ahead.  I was going
9       to say how -- you said you were over
10      administrative staff?
11  A.  Uh-huh (positive response).  It varied from
12      year to year.
13  Q.  The other staff would include what type of
14      employees?
15  A.  Legal secretaries, receptionists.
16  Q.  How many legal secretaries were there besides
17      yourself?
18  A.  When I first took over -- well, I
19      oversaw -- we had the Dothan office and we had
20      a Troy satellite office.  Also there was a
21      legal secretary and receptionist there.  And
22      there was a receptionist in Dothan and
23      three -- three maybe legal secretaries in

Page 62

1       Dothan.
2   Q.  And who did you report to when you
3       first -- who hired you?
4   A.  Steve Caley.
5   Q.  Spell that?
6   A.  C-A-L-E-Y.
7   Q.  Was he a lawyer?
8   A.  Yes.
9   Q.  Is that who you reported to?
10  A.  Yes.
11  Q.  And how long did you report to Steve Caley?
12  A.  Till he left, but I don't know how many years
13      that was.  I don't recall.
14  Q.  Approximately?
15  A.  Maybe -- I don't know.  Six years.
16  Q.  Who did you report to after he left?
17  A.  In the interim, I reported to Mike Miskowic,
18      M-I-S-K-O-W-I-C.
19  Q.  Was he a lawyer there?
20  A.  Yes.
21  Q.  And how long did you report to Mike Miskowic?
22  A.  A few months maybe.
23  Q.  And then who did you report to?

Page 63

1   A.  Ishmael Jaffree.
2   Q.  That's your attorney here today; is that
3       correct?
4   A.  Yes, it is.
5   Q.  And what was Mr. Jaffree's title?
6   A.  Managing attorney.
7   Q.  And how long did you report to him?
8   A.  Till I left in 2004.
9   Q.  So approximately how long did you report to
10      him?
11          MR. JAFFREE:  Let's stipulate that it was
12          14 years.  Okay?
13          MS. NELSON:  Well, I'm asking her to
14          testify, please.
15          MR. JAFFREE:  She doesn't recall.
16  A.  No, I do recall.  Probably at least 12, 13,
17      something like that.
18  Q.  And this was -- the whole time, you worked in
19      the Dothan office?
20  A.  Yes.
21  Q.  And besides Mr. Jaffree, how many other
22      attorneys where there in the office?
23  A.  At what point?  I mean, when I first started

Page 64

1       there, there was a lot more attorneys there
2       then.  Then over the years, there became less
3       attorneys because of budget cuts.
4   Q.  Well, I don't -- not having worked there,
5       that's what I was trying to understand.
6   A.  There might have been -- when I started there,
7       there was probably seven or eight attorneys.
8   Q.  And so within the last five years that you
9       worked there, how many attorneys were there?
10  A.  Four or five.
11  Q.  And did Legal Services -- did you in any way
12      report to somebody in Montgomery or --
13  A.  Not directly, no.  The managing attorney
14      reported to the central office.
15  Q.  Was the central office in Montgomery?
16  A.  Yes, it was.
17  Q.  Are there offices around the state?
18  A.  Around the country.  Yes.
19  Q.  Alabama --
20  A.  Yes.
21  Q.  Is there like Alabama Legal Services?
22  A.  Yes.
23  Q.  Is that correct?  And are there a number of

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 65

1    offices around the state of Alabama that
2    report to Alabama Legal Services?
3    A.  Yes.
4    Q.  Do you know how many offices there are?
5    A.  No, I don't.
6    Q.  I mean, did you ever have any interaction with
7    any other offices in the state of Legal
8    Services?
9    A.  At trainings.
10   Q.  Okay.
11   A.  Very, very little otherwise.
12   Q.  Did you go to Montgomery for training?
13   A.  I went -- yes, I did go sometimes, yes.
14   Q.  While you worked at Legal Services, were you
15   ever reprimanded or disciplined in any way?
16   A.  I remember being reprimanded one time.  We had
17   a new attorney there that was having problems
18   preparing a certain legal document.  And I had
19   been there for quite awhile.  And I thought I
20   was assisting him in preparing it by showing
21   him ones we had done before and, you know,
22   suggesting.  But he went to the senior staff
23   attorney and told him that I was trying to

Page 66

1    tell him how to practice law, and the senior
2    staff attorney wrote me up.
3    Q.  Who was that?
4    A.  Mike Miskowic.  Oh, you mean, the person that
5    wrote me up?
6    Q.  Yes, the person who wrote you up.
7    A.  Mike Miskowic.
8    Q.  Did you disagree with that writeup?
9    A.  Yes, I did.
10   Q.  And why is that?
11   A.  Because I was only assisting.  I wasn't trying
12   to tell him how to practice law.
13   Q.  What types of cases did Legal Services handle?
14   A.  Social Security disability, unemployment,
15   housing, family law.
16   Q.  When you say "family law" --
17   A.  Uncontested divorces, custody.
18   Q.  And why did you leave Legal Services?
19   A.  For what I thought was a great career move to
20   the City of Dothan.
21   Q.  And so you left Legal Services and went to
22   work for the City of Dothan; is that correct?
23   A.  Yes, I did.

Page 67

1    Q.  And what job did you accept at the City of
2    Dothan?
3    A.  Municipal court administrator.
4    Q.  And tell me how you learned about that job.
5    A.  In the newspaper.
6    Q.  And was it just an ad in the --
7    A.  Yes.
8    Q.  -- classified --
9    A.  It was in the Dothan Eagle.
10   Q.  -- section?
11   A.  Classified employment ad.
12   Q.  And I gather you applied for that job; is that
13   correct?
14   A.  Yes, I did.
15   Q.  I'm going to give you your calendar back.
16   A.  Thank you.
17   Q.  We tried to make copies best we could.  I'm
18   marking as Exhibit 5, which I think I may have
19   already done, just what you've given me.  And
20   I may reserve the right to have to refer to
21   your actual original calendar because I don't
22   know how well it copied after, you know,
23   having to open the spiral pages.  That was

Page 68

1    just one of the housekeeping notes.
2         (Defendants' Exhibit 5 was marked
3         for identification.)
4    Q.  Now, when you saw the ad in the paper -- in
5    the Dothan Eagle about the job at the City,
6    what -- for court administrator; is that
7    correct?
8    A.  Uh-huh (positive response).
9    Q.  What did you do?  I mean, did you come down
10   here to the Civic Center?  Did you come down
11   here?  Did you call anybody?
12   A.  I came down here and picked up the application
13   to complete.
14   Q.  In the personnel office?
15   A.  Yes, I believe so.
16   Q.  And did you complete that and turn it back in?
17   A.  Yes, I did.
18   Q.  Do you know who you turned it back in to?
19   A.  No, I don't.  In the personnel office.
20   Q.  Do you remember when you saw the ad in the
21   paper what was in that ad?
22   A.  I believe -- I believe it had something in it
23   about you would be overseeing the municipal

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  court's magistrates' office, supervising
2  magistrates and clerks, be responsible for the
3  traffic tickets that came in, for the fines
4  that were collected, administrative duties.  I
5  can't recall everything that it said.
6  Q.  Okay.
7  A.  I believe it said something about education
8  you had to have and experience.
9  Q.  When you turned your application in, did you
10  talk to anyone or they said they would set up
11  an interview?
12  A.  I don't recall being told that.
13  Q.  Okay.  I'll mark that as Defendants' Exhibit 7
14  and ask you if you can look at that, please,
15  and tell me if you can identify that as your
16  application to the City.
17          (Defendants' Exhibit 7 was marked
18          for identification.)
19  A.  Yes.
20  Q.  You indicated under your education that you
21  had been to Wallace Community College?
22  A.  I did my general studies there and transferred
23  to Troy to complete my degree.

Page 70

1  Q.  When you say "general studies," the --
2  A.  The first couple of years.  I didn't get a
3  degree there.  My intention was not to get a
4  two-year degree.  It was to get a four-year
5  degree.
6  Q.  So you're saying that transferred --
7  A.  Right.
8  Q.  -- to Troy State --
9  A.  Right.
10  Q.  -- to get your degree?
11  A.  Yes.
12  Q.  I had asked you about some other employment.
13  You also listed that you have worked at Ramsey
14  Youth Services?
15  A.  That was part-time while I was employed with
16  Legal Services.  I answered the phone in
17  addition to my full-time job.
18  Q.  Did you work -- what hours of the day did you
19  work for Ramsey Youth Services?
20  A.  I usually worked the weekends, sometimes one
21  or two nights a week after my -- from about
22  5:30 till 9, 9:30.
23  Q.  What was your salary at Legal Services -- your

Page 71

1  annual salary?
2  A.  When I left?
3  Q.  Yes.
4  A.  I believe it was 27,000.
5  Q.  I'm also looking on your application that you
6  worked for Charter Woods Behavioral Health?
7  A.  Part-time in addition to my full-time.
8      Actually, Charter Woods was what -- was what
9      it was called before it was Ramsey.
10  Q.  I see.  So this was part-time receptionist?
11  A.  Right.
12  Q.  On the weekends primarily?
13  A.  Right.
14  Q.  And you've also listed McRae's --
15  A.  Part-time.
16  Q.  -- where you worked.  That was part-time work?
17  A.  Right.  During Christmas.
18      (Brief pause)
19  Q.  You listed references as Linda Lund; is that
20  correct?
21  A.  Yes.
22  Q.  Who is Linda?
23  A.  She was an attorney at Legal Services at one

Page 72

1  time.
2  Q.  Daphne Rudicell?
3  A.  She was also an attorney at Legal Services but
4  is in private practice now.
5  Q.  And Ted Gashaw?
6  A.  He was my supervisor when I worked for First
7  Alabama Bank.
8  Q.  And Mary Jarrett?
9  A.  She's a personal friend of mine that owns
10  Print Services of Dothan.
11      (Defendants' Exhibit 8 was marked
12      for identification.)
13  Q.  Let me show you what I've marked as
14  Defendants' Exhibit 8 and ask if you can
15  identify that for me, please.
16      What are you laughing about?
17  A.  That he almost fell.
18  Q.  Oh.
19      That first page is a job announcement for
20  the court administrator in September of 2003.
21  Is that the job you applied for?
22  A.  It could be.  I don't remember it saying three
23  years to complete the Alabama Court Clerks and

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1    Magistrates Association Certification
2    Program. I thought it said two years, but
3    other than that, it could be.
4    **Q. Was it your understanding that you were**
5    **supposed to complete a certification program?**
6    A. Yes.
7    **Q. And did you work toward completing that**
8    **certification program once you were hired?**
9    A. I had only been able to do -- there were four
10   orientation sessions before I was terminated.
11   **Q. And how many orientation sessions had you**
12   **done?**
13   A. There was only four, and I had completed the
14   four.
15   **Q. Did you obtain an interview for consideration**
16   **for the job of court administrator?**
17   A. Yes, I did.
18       MR. JAFFREE: Point of clarification. Is
19       that an exhibit that you're
20       introducing as a document she
21       received?
22       MS. NELSON: No. It's a document that I
23       asked her about.

Page 74

1        MR. JAFFREE: Okay.
2        MS. NELSON: It's my deposition. You can
3        ask your questions later on.
4        MR. JAFFREE: Well, no, I'm asking you the
5        question. I was trying to get a point
6        of information as to if that was a
7        document that she allegedly received.
8    **Q. Well, your attorney, apparently, is trying to**
9    **testify for you. Did you ever receive a**
10   **document --**
11       MR. JAFFREE: I'm not.
12   **Q. -- called a position announcement?**
13   A. Not --
14   **Q. But you saw this --**
15   A. Not that one.
16   **Q. But you saw a position announcement, did you?**
17   A. Yes.
18   **Q. And you also saw the job description of what**
19   **the --**
20   A. Yes.
21   **Q. -- job entailed?**
22       And where did you receive that, through
23   your interview? Was it posted on the

Page 75

1    personnel department? Did Personnel give it
2    to you?
3    A. It was in the newspaper or -- no. It was on
4    the web site.
5    **Q. So you could go on www.dothan.org or something**
6    **of that nature and pull up the job posting?**
7    A. Yes, I believe.
8    **Q. And what the job entailed?**
9    A. Yes, ma'am.
10   **Q. And while you may not have seen this actual**
11   **Exhibit 8 that's in my hand, what I've showed**
12   **you was virtually what you saw on the**
13   **Internet; is that correct, the posting?**
14       MR. JAFFREE: If you know.
15   A. I don't know. I -- I would have to read that
16   whole thing to know.
17   **Q. Okay.**
18       MR. JAFFREE: I think it would be more
19       than that. She'd have to recall
20       everything she saw on the Internet
21       site.
22   A. I'm not sure. I know I couldn't recall
23   everything that was listed on that.

Page 76

1        MR. JAFFREE: I mean, other than match it
2        up. And seems like she'd have to do
3        that.
4    **Q. Well, I'm not asking you to match up every**
5    **single -- but for the most part, you had**
6    **access to the posting and to the definition of**
7    **the job and examples of work and what the**
8    **experience and qualifications were; is that**
9    **correct?**
10   A. I have knowledge -- some knowledge -- memory
11   of what was posted on the web site on that
12   date. Not saying that that is what was
13   posted.
14   **Q. "That" being Exhibit 8?**
15   A. Right.
16       MR. JAFFREE: Would you like to read that
17       to see --
18       THE WITNESS: I still wouldn't recall all
19       of it.
20       MR. JAFFREE: -- the contents in case
21       somehow they're going to use something
22       that's in there in some mysterious way
23       as to you're assenting to something.

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1    I mean, if you want to read that --
2    she would have the opportunity to read
3    that, correct? You don't have a
4    problem with this witness reading that
5    document?
6    MS. NELSON: I don't have a problem with
7    her reading it. She said she saw
8    something on the web site. She
9    doesn't know if she got this
10    particular document.
11    MR. JAFFREE: Well, I think if you're
12    going to ask her questions about that
13    document, she should have an
14    opportunity to examine it since she
15    acknowledged having not receiving it.
16    MS. NELSON: I did give it to her and
17    asked her to look at it.
18    MR. JAFFREE: But you asked her to look at
19    it like you were asking her to look at
20    a funny page. I mean, this is a
21    substantive document here.
22    MS. NELSON: She can look at it all day.
23    I'm just asking what she remembers.

Page 78

1    She's telling me she remembers. She
2    got on the web site. She saw the
3    posting. She can't remember
4    everything that she saw.
5    Q. Ms. Martin --
6    MR. JAFFREE: Let me ask you.
7    MS. NELSON: It's my deposition.
8    MR. JAFFREE: Yeah. I understand that.
9    MS. NELSON: You can state your
10    objections.
11    MR. JAFFREE: Well, this is a bit more
12    than an objection. If you're going to
13    ask her some specific questions about
14    this document or something that's
15    contained in this document, I'd like
16    for her to have an opportunity to read
17    this. If you are not, then I guess
18    you won't have to. But there are
19    several pages here, substantive
20    information, a lot of different
21    provisions and --
22    MS. NELSON: And I think you're trying to
23    testify for your client. You can ask

Page 79

1    her questions. I have asked her --
2    MR. JAFFREE: I'm not trying to be
3    clever. I'm just trying to say,
4    there's a lot here. And if you're
5    going to ask her specific questions
6    about this, I think she should be
7    given opportunity to review it. Is
8    that unreasonable?
9    MS. NELSON: She's had every opportunity
10    to review it.
11    THE WITNESS: No, I have not.
12    MS. NELSON: Well, we can sit here and
13    look through it.
14    MR. JAFFREE: That's not necessary unless
15    you're going to ask her specific
16    questions about it.
17    Q. When you got on the Internet and looked at the
18    job, tell me what you remember seeing.
19    A. I can't tell you word for word what I
20    remembered seeing, and this document may not
21    have what I saw.
22    Q. But it could; you just don't know?
23    A. But this was printed probably recently.

Page 80

1    Q. Do you know what -- when you say it was
2    printed recently, why do you say that?
3    A. Because it looks like -- it looks new.
4    Q. Do you --
5    A. I do -- I don't believe this was in blue print
6    when I saw it on the Internet. This is a new,
7    printed document. It might be the same -- it
8    might be --
9    Q. It might be the same thing you saw --
10    A. Might be, but I can't say that it is.
11    Q. All right. Do you have any reason to believe
12    that that date of the court administrator on
13    September 15, 2003, is erroneous as the
14    closing date for that job?
15    A. It could be correct.
16    Q. Do you have any reason to believe that the job
17    announcement that you were seeking interest in
18    was Job Number 013-03-01?
19    A. I'm not sure that that was the position
20    number. I can't say.
21    Q. But do you have any reason to say that it's
22    not?
23    A. Other than --

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1    MR. JAFFREE: She has no reason to say
2        either way. That's what she's
3        saying. She don't remember that.
4  Q. Would you --
5    MS. NELSON: Well, she's trying to point
6        out that it's a newly printed
7        document.
8  Q. Would you have any reason to believe that the
9      personnel office would not keep an accurate
10     file of the documents they had on their system
11     regarding this particular posting?
12    MR. JAFFREE: That's beyond her
13        providence.
14    MS. NELSON: I'm asking --
15    MR. JAFFREE: She doesn't know anything
16        about the personnel office.
17  Q. Well, I'm asking, do you have any reason to
18     believe that they would not keep an accurate
19     records of that particular job and that job
20     posting?
21  A. Given my experience with the friendship of Kai
22     Davis and Judge Gordon, yes, I do have
23     suspicion that it could've been doctored or

Page 82

1    whatever.
2  Q. So it's your testimony that this document I'm
3      showing you regarding the job posting and the
4      job description could have been doctored,
5      based on a friendship between Judge Gordon and
6      Kai Davis; is that your testimony?
7  A. It could have been.
8  Q. But you don't have any proof of that?
9  A. You don't have any proof it wasn't.
10  Q. I'm asking you the questions here. This
11     document was not altered, number one. And I'm
12     asking you, if you're making a serious
13     allegation, what proof you have to support
14     that?
15    MR. JAFFREE: What allegation? She didn't
16        make an allegation.
17  A. I didn't make an allegation.
18    MR. JAFFREE: She said she doesn't know.
19  A. That was my answer to your question.
20  Q. And I'm asking you, what proof do you have?
21  A. That it was altered?
22  Q. Yes.
23  A. I don't have any. I didn't say I had proof.

Page 83

1    MR. JAFFREE: You're arguing with this
2        witness. You asked her to verify the
3        authenticity of a document that's
4        she's in no position to verify.
5    MS. NELSON: No, I'm not asking her. I'm
6        asking her if she can remember when
7        she looked on the Internet
8        seeing -- I'm on page two of this
9        particular document -- examples of
10        work being performed.
11  Q. Do you recall any of those items being there?
12    MR. JAFFREE: Let the Record reflect that
13        the witness is reading the document.
14    THE WITNESS: The second page of the
15        document.
16        (Brief pause)
17  Q. Do you recognize those?
18  A. A few of them. I'm not sure about all of
19     them.
20  Q. Okay. Thank you. And when you filled out
21     your application, Defendants' Exhibit Number
22     7, do you know if any other documents would
23     have been given to you at that time about the

Page 84

1    job you were seeking?
2  A. There could have been a -- I guess the copy of
3     the ad or the job description given to me.
4     I'm not sure.
5  Q. I was asking about the interview. You said
6     you interviewed; is that correct?
7  A. Yes.
8  Q. How many interviews did you have?
9  A. I recall two.
10  Q. Okay. The first one, do you recall when that
11     was?
12  A. I think sometime in December of '03.
13  Q. Okay. You actually applied -- let me show you
14     here.
15  A. I saw it. I believe in September.
16  Q. September of '03. Okay. Do you remember who
17     you interviewed with that first time?
18  A. Judge Gordon, Kai Davis, and I believe Jim
19     Smith.
20  Q. Okay. And where did this interview occur?
21  A. I believe in some office here in the Civic
22     Center. I'm not positive.
23  Q. Do you know how long the interview lasted?

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1    A.  Forty-five minutes to an hour maybe.
2    Q.  Do you know -- can you remember what occurred
3        in the interview?  Describe for me the
4        interview that you can remember.
5    A.  I remember the judge going over the duties.  I
6        remember her questioning me about my
7        education, my employment, why I wanted to
8        leave Legal Services to take the job at the
9        City.  And I well remember her telling me
10       three magistrates that I would have to look
11       out for that could actually do physical harm
12       to me.
13   Q.  And she said that in the presence of yourself
14       and Kai Davis and Jim Smith?
15   A.  Yes.  She was telling me about all the
16       problems in the magistrates' office.
17   Q.  What problems did she tell you?
18   A.  Well, basically that there were three problem
19       employees.  One would cause me all kind of
20       problems -- or two would cause me all kind of
21       problems.  And the other one was just a
22       follower.  She didn't really instigate
23       anything.  She was a follower.

Page 86

1    Q.  And who were the two that you claim would
2        cause all kind of problems?
3            MR. JAFFREE:  Are you asking her from this
4        interview?
5            MS. NELSON:  Yeah.  From the interview.
6        We were talking about the interview.
7            Yes.
8    Q.  I'm asking, what two people were you told
9        would cause you problems?
10   A.  They were not named at that first interview.
11   Q.  Did you not ask questions about that?
12   A.  About the problems?
13   Q.  Yes.
14   A.  Yeah, I'm sure I did.
15   Q.  But you don't remember?
16   A.  I basically listened a lot because Kai and the
17       judge were talking and must have reminded me
18       ten times that I would have to able to stand
19       up to these three and that I'd have to watch
20       my back the whole time, that they would appear
21       to be my friends, but then would sabotage me
22       afterwards as they had done to her.
23   Q.  Done to who?

Page 87

1    A.  To the judge, Judge Gordon.
2    Q.  And she said that?
3    A.  Yeah.
4    Q.  What did Kai Davis say?
5    A.  Kai agreed with her.  Said that she -- said
6        that they were problems.  They'd had problems
7        for a while with these and that they hoped
8        that hiring someone from the outside as
9        myself, that I could come in, not being
10       involved in the problems could take control
11       and supervise everyone.  And the Judge pledged
12       me 100 percent support, that she would not
13       interfere with my management of the
14       magistrates' office, that she did not have
15       time to hold court sessions and manage that
16       office.  And she would turn it completely over
17       to me.
18   Q.  Had you ever had any experience working with
19       magistrates before?
20   A.  No, I had not.
21   Q.  Had you had any experience working in
22       municipal court before?
23   A.  No, I hadn't.

Page 88

1    Q.  And it's your testimony, that first interview,
2        three people were mentioned but no names; is
3        that correct?
4    A.  Right.
5    Q.  Did Kai Davis or Judge Gordon make any
6        comments about any concerns or problems in the
7        magistrates' office just in general without
8        identifying any people?
9    A.  In general?
10   Q.  Yes.
11   A.  Yes.
12   Q.  Do you remember what was said there?
13   A.  Not as much about that as the three that I
14       should look out for.  But, yes, that there had
15       been a history of paperwork missing, a lot of
16       errors being made.  They did tell me they had
17       just gone to a new court system, but I
18       wouldn't be -- I wouldn't have as much
19       training on it as the others had had because
20       they had been trained by the -- the company
21       HTE.
22   Q.  You said, "new court system."  New computer --
23   A.  New computer system.  I'm sorry.

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1 Q. I'm sorry. The new computer system was HTE?
2 A. Yes.
3 Q. And I'm sorry. I was writing down court
4    system. But, anyway, we were talking about a
5    new computer system and that something was --
6    you were telling me something about training.
7 A. That I would not receive as much training as
8    they had on it because they had
9    gone through two, three weeks of training, but
10    she would try to get me some training on it.
11 Q. Was it your understanding that they were
12    having some problems or issues with this new
13    computer system?
14 A. Yes.
15 Q. Did Jim Smith say anything in the interview?
16 A. I -- he didn't say a whole lot. He did make
17    some comment when I left the interview because
18    he kind of walked out the same time I did. If
19    I understood right, he said, run while you
20    can.
21 Q. Did you ask him what he meant by that?
22 A. No, because I was walking out the door. And
23    he was just saying, bye, have a good day. And

Page 90

1    then he said, you know, run while -- I think
2    he said, run while you can. That's the best I
3    understood it. He was walking, I guess, back
4    wherever, and I was leaving.
5 Q. Did you know Jim Smith?
6 A. Only had heard of him. Didn't know him.
7 Q. Did you ask questions during the interview?
8 A. Did I ask questions?
9 Q. Yes.
10 A. I'm sure I asked about benefits and salary and
11    probably about the setup of the office and
12    things like that.
13 Q. Did you have any concerns since you had no
14    experience or training with magistrates or
15    municipal court as to your ability to do the
16    job?
17 A. Not really. I had legal experience. I had
18    supervisory experience. And that is what the
19    judge stressed to me, that I just needed to
20    be -- supervise, that I didn't have to work
21    court. She didn't even want me worrying about
22    that. All she wanted me to worry about was
23    overseeing the magistrates and the clerks and

Page 91

1    getting the office back basically in one
2    accord. There was a lot of dissension.
3    MR. JAFFREE: I think this witness made a
4      misstatement.
5    MS. NELSON: You know, you have the chance
6      to question her.
7    MR. JAFFREE: Well, write down something
8      that she didn't intend. But fine.
9 Q. Do you know Kai Davis?
10 A. Yes.
11 Q. And how do you know Kai Davis?
12 A. We went to school together.
13 Q. At?
14 A. Dale County.
15 Q. Are you and Kai Davis friends?
16 A. We were not great friends, no. Not close
17    friends.
18 Q. Do you know if other people were interviewing
19    for the job?
20 A. I assume so.
21 Q. You do not know any of them?
22 A. I don't know for a fact.
23 Q. Do you know who had held the job prior to you?

Page 92

1 A. Bettye King.
2 Q. Did you know Bettye King?
3 A. No.
4 Q. Did you know who held the job prior to Bettye
5    King?
6 A. Donna Nicholson.
7 Q. Do you know Donna Nicholson?
8 A. I do -- I do now. I didn't then.
9 Q. You do now?
10 A. Right. Well, Donna called me while -- not
11    long after I was employed with the City, and
12    she worked for an attorney that I was really
13    good friends with.
14 Q. What did she call you about?
15 A. She called to see how I was doing and said
16    that she'd help me if she could.
17 Q. And who was she working for?
18 A. She was working for Will Matthews.
19 Q. Did you need her help?
20 A. No.
21 Q. Do you know why she left?
22 A. Only hearsay.
23 Q. And what did you hear?

23 (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  A. I heard she was terminated; something about
2  somebody took a vacation or something and
3  didn't report the hours right. I'm not sure.
4  Q. I mean, other than what she told you, you
5  don't have any personal knowledge --
6  A. She didn't tell me that.
7  Q. -- of what actually occurred?
8  A. She didn't tell me that. I heard it.
9  Q. Well, even what you heard, who did you hear it
10  from?
11  A. From Sarah Fowler.
12  Q. Okay. You said you had a second interview; is
13  that correct?
14  A. Uh-huh (positive response).
15  Q. Do you know when that was?
16  A. No, I don't. I believe it was sometime also
17  in December.
18  Q. And who was present at the second interview?
19  A. Judge Gordon, Kathleen Nemish.
20  Q. And yourself?
21  A. Yes.
22  Q. Who was Kathleen Nemish?
23  A. She was a -- I'm not sure if she was just a

Page 94

1  court-appointed attorney, or if she was
2  a -- I'm not sure. I don't recall right now.
3  Q. Had you ever worked with her?
4  A. Had I ever worked with her? No.
5  Q. Did you work with her after you were hired?
6  A. I had conversed with her maybe on the phone or
7  in court. I'm not sure.
8  Q. But you don't know what her job was or role
9  was?
10  A. No.
11  Q. Tell me where the second interview occurred.
12  A. I believe it was in the same office as before.
13  Q. And do you know about how long this interview
14  lasted?
15  A. I don't recall.
16  Q. Do you remember what was discussed in this
17  interview?
18  A. Some of the same things that was discussed in
19  the first, just not as much.
20  Q. "Some of the same things," meaning?
21  A. Of duties. I remember the judge going over
22  with Kathleen what I told her about my
23  experience, education. The judge brought up

Page 95

1  again the three that caused the trouble, all
2  the problems that had been in the magistrates'
3  office for some time.
4  Q. Did she identify these three people at this
5  time?
6  A. Yes.
7  Q. And who were the three?
8  A. Mary Turner, Mary Beth Brackin, and Sarah
9  Fowler. But it was in a subsequent meeting
10  before I started that she went over -- the
11  Wednesday before I began work on, I believe,
12  February the 16th, the judge had asked me to
13  come in. And we sat down, and she began to
14  tell me something about each magistrate.
15    And she started with Mary Turner. And she
16  told me that Mary Turner was a big
17  troublemaker, that she kept something going in
18  the magistrates' office at -- all the time,
19  that she had had an incident with Kai Davis
20  recently, which is one of the reasons -- the
21  big reason that she didn't have an office.
22  She had a cubby hole, and it was punishment.
23    Then she went on to say that her

Page 96

1  counterpart was Mary Beth Brackin, who they
2  were friends. She said that Mary Beth had
3  been -- recently created a situation for the
4  City; supposedly had advised a defendant that
5  if he had an issue with the City, that he
6  should take it to the city clerk. Said that I
7  would have to review that material, that
8  incident, after I started and would have to
9  write her up disciplinary action.
10    Then she said Sarah Fowler is the one that
11  is the follower, that she would never
12  instigate anything on her own, that she wasn't
13  strong enough to stand up to Mary Beth and
14  Mary Turner, and she just went along with
15  them.
16    She told me about Mary -- I'm sorry --
17  Michelle Bryan. She said she was very young,
18  very pretty, was divorced, socialized a lot on
19  the telephone, and had police officers in her
20  office a lot socializing, and was dating
21  several police officers, and that I would
22  really have to cut down on her socializing.
23    She then told me about Valarie Savage, a

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 97

1  friend of Michelle Bryan's. Said that Valarie
2  had a very poor attitude, was -- had
3  previously worked for Judge Steensland at the
4  Houston County Court, and had been let go
5  there. She told me she had been sleeping with
6  prisoners while employed at Houston County and
7  could possibly be doing the same thing here at
8  Dothan. She told me I would have to watch out
9  for her, that she, too, could cause me a lot
10  of problems, very outspoken.
11      She then told me about Ann Baxter who she
12  said was -- had a problem balancing her money,
13  that she had recently come up $500 short in
14  her money drawer. And the judge said she
15  believed that Ann had stolen the money, and
16  she didn't know why because Ann had inherited
17  money; she was rich and owned a real estate
18  company. And that was another incident that I
19  would have to be involved in the disciplinary
20  action. And she would get those -- that
21  information to me at a later time.
22      And she identified -- excuse me -- she
23  identified all of these magistrates at a later

Page 98

1  time. I found out that they were all white.
2  Then she told me about Eunice Knight and
3  Lavera McClain. She said that Eunice was very
4  quiet, basically stayed in her office and did
5  her work and didn't cause any problems.
6      And then Lavera McClain, she said that she
7  trusted Lavera, that -- to never -- that she
8  would never sabotage her as the others did.
9  She said Lavera worked very hard handling all
10  of her duties, and that Eunice and Lavera
11  would be very helpful to me and I should ask
12  for their help.
13      She told me about -- of course, in the
14  interview, she'd already gone over that they
15  were in the process of a move. I believe on
16  either this date or the date I came in for my
17  drug test, TB test, et cetera, either one of
18  those, that she took me over to the old office
19  that they were moving from and showed me. And
20  there was only a couple of magistrates over
21  there at the time. She told me that they were
22  -- would be -- they had -- were in the process
23  of moving, would be in the new office -- were

Page 99

1  in the new office at this meeting by that
2  time. She put Lavera in charge of the move.
3  The offices, Lavera had assigned.
4      And, basically, told me about, you know,
5  the court sessions, what days. Said that, you
6  know, that I would help her with court, but I
7  would not work court. I would not actually do
8  the computer, that magistrates were assigned
9  to do that. But I just came over to see that
10  everything was going smoothly or to get things
11  for her and make sure the fines room was quiet
12  and check with the magistrate in the fines
13  room occasionally.
14  Q. I'm sorry. The fines room?
15  A. Uh-huh (positive response).
16  Q. What is a fines room?
17  A. Where the fines were paid by defendants.
18  Q. Let me back up. I was asking you about the
19      second interview, and you started telling me a
20      story about things said after -- on February
21      16th. I was going back through that second
22      interview with Judge Gordon, Kathleen Nemish,
23      and yourself.

Page 100

1      Do you remember anything else that
2      occurred in that interview before you were
3      hired?
4  A. Only thing I remember is, it really bothered
5      me that she just kept on warning me about the
6      damage that could be done to me. And I've
7      just never been afraid of anybody, and I just
8      wasn't afraid -- you know, I just didn't know
9      why that just kept being stressed. I couldn't
10      believe that -- that two, three ladies could
11      do me physical harm. But, in fact, that is --
12      the talk of all of that, when I weighed it
13      against the money that was being offered, that
14      is, in fact, why I turned the position down
15      the first time it was offered.
16  Q. When were you -- when did you first turn it
17      down?
18  A. Sometime after the second interview, sometime
19      in December.
20  Q. And who actually offered you the job?
21  A. I believe -- I'm pretty sure it was Michelle
22      Sellers that made the phone call to me.
23  Q. And do you remember what was said?

25 (Pages 97 to 100)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1    A.  She said that they'd like to offer me the
2        position for municipal court administrator.
3        She told me the salary.
4    Q.  What was the salary?
5    A.  Seems like maybe 29,000 or something like
6        that.
7    Q.  And this was after the second interview; is
8        that correct?
9    A.  I believe so, yes.
10   Q.  And what did you tell her?
11   A.  I told her that I had thought about it. I had
12       also -- I just told her I'd thought about it
13       and I wanted a certain amount of money. I
14       believe I told her an amount, 32, 33,000, that
15       I would take it for, that that just wasn't
16       enough money at 29 or whatever the figure was
17       considering all the problems that there seemed
18       to be.
19   Q.  Okay. And do you remember what Michelle
20       Sellers said to you?
21   A.  Yeah. She said that she would check with the
22       judge, but the only time they went above that
23       salary, it had to be approved by the

Page 102

1        commission in special circumstances.
2    Q.  Okay. So was there a time they came back to
3        you or did you come back to them?
4    A.  No. I had actually forgotten about it. And I
5        got a call, I believe, in first of January from
6        Michelle Sellers. And she said -- told me who
7        she was, and she said that -- that I had given
8        them a figure before of what I would come to
9        work at the City for but they couldn't
10       remember that figure, and was I still
11       interested, and if so, would I give her that
12       figure again for the salary.
13   Q.  Did you?
14   A.  Yes, I did.
15   Q.  And was that 32,000?
16   A.  I think it was 33.
17   Q.  32 or 33?
18   A.  32 or 33. Yes.
19   Q.  And then what happened?
20   A.  She said, I'll get back with you.
21       And I did get a call back from her saying
22       that they were going to put it before the
23       commission, and they would like me to take the

Page 103

1        job if they could get the salary approved.
2        And I told her I would.
3    Q.  You told them you would if they could get it
4        approved?
5    A.  Right.
6    Q.  Were you still working for Legal Services?
7    A.  Yes, I was.
8    Q.  And do you know if they got that salary
9        approved?
10   A.  Yes.
11   Q.  Now, did you know Michelle Sellers?
12   A.  No.
13   Q.  Did you ever meet her during this interview
14       process?
15   A.  I know I met her in subsequent meetings
16       after -- after these conversations. I don't
17       recall meeting her before in the interviews.
18   Q.  And so your initial contact with her was by
19       telephone?
20   A.  Right.
21   Q.  Do you know what her job duties were at that
22       time?
23   A.  At that time, I believe she was an

Page 104

1        administrative assistant to the judge.
2    Q.  So after you told them that you would take the
3        job if the commission would approve that
4        salary increase, what happened then?
5    A.  I was told to come take a drug test, fill out
6        paperwork, do a TB test. Did all that. I
7        gave -- told them I'd have to give Legal
8        Services a month's notice because I had been
9        there a length of time. And we agreed on a
10       start date.
11       However, the judge wanted me to take part
12       in a weekend training that she said HTE was
13       coming here to do some training. And she
14       wanted to put me on payroll as of January the
15       16th, I believe, so I could be paid for coming
16       to that training. But then my actual start
17       date wouldn't be till February the 16th.
18   Q.  Did you go to that HTE training?
19   A.  I did.
20   Q.  Did you get paid for that?
21   A.  Yes.
22   Q.  So it was like in January that to get you on
23       the payroll, you had to come in and fill out

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  some more paperwork and get your drug test --
2  A.  Right.
3  Q.  -- and stuff like that?
4  A.  Right.
5  Q.  And you think that was like January 16th?
6  A.  It was before -- I mean, when I was put on
7      payroll I believe was January 16th.
8  Q.  Okay.
9          (Defendants' Exhibit 9 was marked
10         for identification.)
11 Q.  I'm going to show you what I've marked as
12     Defendants' Exhibit 9.  Is that your
13     signature, Ms. Martin?
14 A.  Yes, it is.
15 Q.  And is that just a -- did you receive an
16     employee handbook?
17 A.  Yes, I did.
18 Q.  And you signed that, indeed, on January the
19     16th of 2004; is that correct?
20 A.  Yes.
21         (Defendants' Exhibit 10 was marked
22         for identification.)
23 Q.  And I'm just showing you another document,

Page 106

1  looks like, signed on that same date,
2  Defendants' 10.  Is that your signature?
3  A.  Yes, it is.
4  Q.  And that's just an acknowledgment of receiving
5      some computer policies and procedures; is that
6      correct?
7  A.  Yes, ma'am.
8  Q.  Okay.  And was it on this -- about the same
9      date that you got your drug test -- did your
10     drug test?
11 A.  I'm not sure.  I think that was -- I'm not
12     sure if it was that day or before.
13 Q.  That day or around that time?
14 A.  Could have been before.
15 Q.  Okay.
16 A.  Somewhere in there.
17 Q.  And I'm sorry.  Just to clarify, the
18     HTE -- the computer training was like on a
19     weekend following January 16th, 2004; is that
20     what you testified?
21 A.  It was on a Saturday, Sunday, and a Monday.
22 Q.  Do you remember the dates?
23 A.  It had -- I assume it was the 17th, 18th, and

Page 107

1  19th maybe.  I'm not positive.
2  Q.  And then it was actually the -- around
3      February the 16th that you started?
4  A.  Right.
5  Q.  Is that correct?
6  A.  Physically started, yes.
7  Q.  Now, I'm a little confused about what you were
8      telling me earlier.  When you started on
9      February the 16th, had the magistrates'
10     office -- was in the process of moving or had
11     moved?
12 A.  It had moved.
13 Q.  So you did not get involved in the moving
14     process?
15 A.  No.
16 Q.  At all?
17 A.  No.
18 Q.  And do you have any personal knowledge of or
19     about the move, or did you witness the move in
20     any shape, form, or fashion?
21 A.  The only thing I saw was when the judge took
22     me to the old office, there was a couple --
23     well, there was a clerk typist there packing

Page 108

1  up boxes.  It was like they were in the
2  process of packing to move and all.
3  Q.  Was this before the 16th or on the 16th.
4  A.  Of February?
5  Q.  Of February, yes.
6  A.  It was before.  It was before I started.
7  Q.  That's where I got a little confused.  You
8      stopped by before you started or --
9  A.  The judge -- the judge and I met a couple of
10     times before I started work.  I came to do --
11     some reason February the 10th sticks in my
12     mind that maybe that's when I came and had the
13     drug test or the TB test.  And then I had to
14     come back and have the TB test read, and the
15     judge had asked me to stop by her office when
16     I did this and we talked.
17 Q.  And you're saying at one of those times you
18     saw -- this was at the old --
19 A.  Right.  Right.
20 Q.  -- office and some people were still packing
21     up some boxes?
22 A.  Yeah.
23 Q.  Did you ever see the new office before you

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 109

1  actually started?
2  A.  From the outside.
3  Q.  And as I understand it, they moved literally
4     from the -- the magistrates' office was in the
5     police department where the courthouse is; is
6     that the municipal court?
7  A.  It was in a building beside the municipal
8     building.  It was in a, like, a white
9     office -- white building beside it.  It wasn't
10    in the police department.
11 Q.  Was it part of the courtroom?
12 A.  No.
13 Q.  But right -- but near there?
14 A.  Yeah.  But it wasn't attached to the courtroom
15    in any way.
16 Q.  Gotcha.  Okay.  And your statement earlier
17    that you said Lavera was -- I assume you're
18    talking about Lavera McClain?
19 A.  McClain.
20 Q.  I think you testified was over the move.
21 A.  That's what the judge said.  She had put her
22    in charge of the move.
23 Q.  And you made some statement about Lavera

Page 110

1  assigning offices?
2  A.  That's what Fran Bailey told me, that she
3     assigned offices.  I believe the judge also
4     told me that.
5  Q.  And now, Fran Bailey is?
6  A.  She was a clerk typist.  She resigned in July
7     of '04.
8  Q.  Okay.  So you're saying Fran Bailey told you
9     that, that Lavera was assigning offices?
10 A.  Right.  She's also the one that later brought
11    me the diagram of the offices that Lavera had
12    given each of them a copy -- each of the --
13    the personnel a copy.
14 Q.  And when did she bring you this diagram?
15 A.  I've already answered that.
16 Q.  I don't remember.
17    MR. JAFFREE:  Answer it again.
18 A.  After I was terminated, we had lunch about a
19    couple of months afterwards, and she brought
20    me the diagram.  She had shown it to me while
21    I was employed.
22 Q.  Well, I'm sorry.  Either I didn't understand
23    that part of it -- I mean, you gave me a

Page 111

1  document --
2  A.  That's the one she brought to me.  No --
3  Q.  Defendants' Exhibit 3, which is sort of a time
4     line that --
5  A.  No, not that.  I'm sorry.  She did bring
6     me -- and I didn't bring it with me, but she
7     did bring me a diagram of the offices along
8     with this.
9  Q.  With Defendants' Exhibit 3?
10 A.  Right.  She brought me that document and the
11    diagram of the offices that she had shown me
12    while I was employed.  It was, according to
13    her, a diagram that Lavera McClain had drawn
14    out assigning offices.
15 Q.  I mean, all you know was what Fran told you
16    that that diagram represented?
17 A.  All I know -- no.
18 Q.  All you know is what Fran told you.  I mean,
19    do you know who prepared that diagram?
20 A.  I -- Fran told me that Lavera did.  Mary Beth
21    Brackin told me that each -- that she had
22    received one also, that each of the -- each of
23    the personnel had received a copy of it

Page 112

1  because the offices were numbered and labeled
2  where they would be.
3  Q.  Okay.  Other than what you've heard through
4     Fran or the other magistrates, do you have
5     personal knowledge as to who assigned the
6     offices?
7  A.  Other than the judge telling me that Lavera
8     assigned the offices.
9  Q.  And the judge told you this when?
10 A.  During one of our conversations before I
11    started.
12 Q.  Now, did you have an office?
13 A.  Yes.
14 Q.  And where was your office?
15 A.  Kind of -- kind of in the middle.  The office
16    was kind of -- had a hallway going -- like a
17    square with my office was kind of in the
18    middle.  The clerk typist area was in the
19    middle.
20 Q.  Did you have any complaints about your office?
21 A.  No.  Except for wanting a window, and it
22    didn't have a window.
23 Q.  Did you also have the opportunity to obtain

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 113

1    some new furniture?
2  A.  Yes, I did, at the insistence of the judge.
3  Q.  **Did you not want new furniture?**
4  A.  It wasn't necessary, and I continued to tell
5    her it wasn't necessary. There was almost new
6    furniture in there.
7  Q.  **Did you feel like she was going out of her way**
8    **to get you some new furniture?**
9  A.  I felt like I was being bought.
10  Q.  **That you were being bought?**
11  A.  Uh-huh (positive response), basically.
12  Q.  **Because you got new furniture?**
13  A.  Uh-huh (positive response).
14  Q.  **You have to say yes or no.**
15  A.  Yes.
16  Q.  **Did you ever -- did you get any type of**
17    **computer or laptop?**
18  A.  I got a computer like everyone else did. I
19    requested a laptop but was denied one.
20  Q.  **And why did you want a laptop?**
21  A.  Because I was working a lot of overtime hours
22    and wanted to be able to spend some time at --
23    more time at home. And I could do some work

## Page 114

1    at home and at least be there with my husband.
2  Q.  **Do you know of anybody else that had a laptop**
3    **issued by the City in that office?**
4  A.  In the -- in that office -- in my office? No.
5  Q.  **What would you have been allowed -- I'm not**
6    **sure I understand. If you had a laptop, what**
7    **would you be able to do at home that you**
8    **couldn't do at work?**
9  A.  Well, I would be connected -- networked to the
10    City main frame and all. I could look at
11    dockets to see that they were all together. I
12    could do reports. I could do correspondence.
13  Q.  **Did you do dockets? I mean, that was part of**
14    **your job, was doing dockets?**
15  A.  No, I didn't do them. I did print them
16    sometimes, though. And I did check to see
17    that the cases were on the correct docket,
18    were set for the right day.
19  Q.  **Were you given -- were there any security**
20    **issues involved in allowing you to have access**
21    **to the City's main frame on a laptop at your**
22    **house?**
23  A.  Not that I was aware of.

## Page 115

1  Q.  **Do you know what this computer you requested**
2    **cost?**
3  A.  No, I didn't.
4  Q.  **Do you know why you were denied this computer?**
5  A.  No, I don't.
6  Q.  **Well -- and who did you make the request of?**
7  A.  To Judge Gordon.
8  Q.  **Well, if she was trying to buy you, why didn't**
9    **she buy you this computer that you wanted so**
10    **badly?**
11  A.  I didn't request a computer right away.
12  Q.  **Do you know when you requested it?**
13  A.  I don't remember.
14  Q.  **How many magistrates -- when you started on**
15    **February 16, how many magistrates did you**
16    **supervise?**
17  A.  There was eight magistrates, two clerk
18    typists, and two temporaries at the time.
19    There was a vacancy for another magistrate
20    that the judge told me about during either one
21    of my interviews or a subsequent meeting. I
22    asked to be allowed to participate in the
23    interviews. And she said, no, that since I

## Page 116

1    hadn't started yet, that she would handle
2    that.
3  Q.  **Okay.**
4  A.  I do believe that she already had someone
5    picked out for that position.
6  Q.  **Okay. Do you know when the interviews were**
7    **conducted?**
8  A.  In -- end of January, first of February I
9    believe.
10  Q.  **Do you know who all was considered for that**
11    **position?**
12  A.  No, I don't.
13  Q.  **Do you know who all were interviewed?**
14  A.  No, I don't.
15  Q.  **And do you know who was hired?**
16  A.  Yes, I do.
17  Q.  **Who was hired?**
18  A.  Tonya Minifield who was black.
19  Q.  **Do you have a problem with black employees**
20    **being hired?**
21  A.  I sure don't. I have supervised black
22    employees before then, and I'm still
23    supervising them right now.

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1 Q. Do you know how Tonya Minifield did in her
2 interview?
3 A. No, I don't. I know she was a friend of
4 Eunice and Lavera.
5 Q. And how do you know that?
6 A. Because I was told that by her, that she knew
7 them.
8 Q. She knew them?
9 A. She was acquaintances with them.
10 Q. And, again, you don't know who else was
11 interviewed, who else was considered, how
12 Tonya did on the interview, how anybody else
13 did on the interview, do you?
14 A. No.
15 Q. So it's your -- did you -- and this all
16 occurred before you actually started, that she
17 was hired?
18 A. I was already an employee.
19 Q. Were you receiving a paycheck?
20 A. I believe I was an employee. I believe I had
21 already -- I believe these -- these people
22 were interviewed after I had become a City
23 employee, not started the job.

Page 118

1 Q. Okay.
2 A. And I did request -- since I would be
3 supervising this position also, I did request
4 to be in on the interviews and have some input
5 into that.
6 Q. Okay. Do you know where Tonya -- are you
7 familiar with a register?
8 A. Yes, I am.
9 Q. Do you know where Tonya was on the register?
10 A. No, I don't. All I know is what the judge
11 told me, that Tonya was hired because she was
12 already a magistrate working for Midland
13 City. However, Tonya had very little
14 experience, except for entering tickets. And
15 that was it.
16 Q. Do you feel like Tonya should not have been
17 hired?
18 A. I -- there -- I don't know. I don't know
19 if -- there -- if there were more qualified
20 applicants, she shouldn't have been hired.
21 Q. But you don't know, do you?
22 A. No. I wasn't provided the list or had -- I
23 wasn't allowed to take part in any of it.

Page 119

1 Q. Other than attending the HTE training, were
2 you expected to do anything for the City until
3 you started on February the 16th of 2004?
4 A. No.
5 Q. Once you started working, where was -- excuse
6 me. Strike that.
7 What were your initial duties when you
8 started working as court administrator?
9 A. Supervising.
10 Q. And what does that mean?
11 A. It means assessing, by my own observation, the
12 employees; learning their strengths and their
13 weaknesses; providing constructive criticism;
14 meeting with them about what they need to
15 improve on. It means --
16 Q. Well, let me stop and ask you, what were you
17 observing?
18 A. Their work.
19 Q. And tell me what their work consisted of.
20 A. Each magistrate supposedly had assigned
21 duties. The judge had given me a list of the
22 assigned duties. And I say "supposedly"
23 because when I first began, I met with all of

Page 120

1 the employees as a group and then asked them
2 to make an appointment with me to meet
3 individually. I gave them a list -- a copy of
4 the list judge had provided me of the duties,
5 and most of them told me they were shocked
6 because they didn't know that that -- some of
7 the duties were their assigned duties. They
8 had never seen that list before.
9 Q. What duties had they never seen before?
10 A. I don't recall. Each magistrate had a list of
11 duties.
12 Q. Well, that's what I'm trying to get an idea.
13 What type of duties?
14 A. Well, I can't state specifically each one. I
15 can remember some of what some of them did. I
16 know that Mary Turner worked the front window
17 and had a little desk around the corner from
18 there with no office.
19 Q. What does that mean, working the front window?
20 A. It means that she took -- we had a front
21 window that two magistrates worked taking
22 payments for tickets.
23 Q. Who was the other person that worked --

30 (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1  A.  Ann Baxter.
2  Q.  Is that pretty much what they did?
3  A.  Pretty much. Well, they did some other minor
4     duties, but pretty much their main
5     responsibility was manning the front window.
6  Q.  And that meant, like for example, if I had a
7     speeding ticket and I was going to pay my
8     fine?
9  A.  Well, if it was a fine that you could pay
10    without going to court, they took it.
11 Q.  So literally, I mean, like -- it was like a
12    payment window and I give them either a check
13    or money?
14 A.  Right.
15 Q.  And they would give me a receipt?
16 A.  Right.
17 Q.  They'd have to account for the money?
18 A.  Right.
19 Q.  It was like a cashier --
20 A.  Right.
21 Q.  -- type position?
22 A.  Right. They also did warrants.
23 Q.  And what does that mean?

Page 122

1  A.  They worked the warrant window when people
2     came in and had a complaint for harassment,
3     harassing communication, domestic violence,
4     they had -- they had to sit down with this
5     person and take their statement under oath and
6     get all the details about the occurrence and
7     determine probable cause; and if there was
8     probable cause, issue a warrant for an arrest
9     of the person that committed the incident.
10 Q.  So Mary Turner and Ann Baxter did a lot of
11    this?
12 A.  A lot of it. Actually, all the magistrates --
13    magistrates could do the warrant window.
14 Q.  Is the warrant window the same as the front
15    window?
16 A.  It was a side window. There was a hallway
17    beside the front window that they could go in,
18    and there was two little windows there that
19    the person could actually sit down in the
20    hallway. There was a window there that the
21    magistrate could talk to them from the other
22    side.
23 Q.  Now, what are some other duties that

Page 123

1     magistrates do?
2  A.  Michelle Bryan worked court.
3  Q.  What does that mean?
4  A.  She entered -- as the judge heard cases, she
5     entered the orders that the judge issued into
6     the computer system. She looked up cases that
7     a defendant may had -- have had previously
8     when the judge was hearing their plea. They
9     set hearings -- she set hearings in court for
10    later dates. She did the 6A and 6B notices
11    which is when someone doesn't show up for
12    court, they send a 6A notice resetting it
13    again. And a 6B is a warrant.
14 Q.  Did anybody besides Michelle do this?
15 A.  Yes. Valarie Savage worked court.
16 Q.  Anybody else?
17 A.  Well, at some time, Mary Beth and Mary Turner
18    weren't working court when I started. I think
19    they had been banished by the judge from the
20    courtroom, so Michelle and Valarie were
21    watching -- were working court. Eunice worked
22    court.
23 Q.  What's Michelle's race?

Page 124

1  A.  I'm sorry?
2  Q.  What's Michelle's race?
3  A.  White.
4  Q.  What's Valarie Savage's race?
5  A.  White.
6  Q.  Why do you -- you said you think they had been
7     banned from court?
8  A.  Mary Beth and Mary Turner because --
9  Q.  You said you think they had been banned from
10    court. You gave some testimony a minute ago
11    that they had been banned from court.
12 A.  Mary Turner and Mary Beth. That's why -- they
13    had worked court, but they had been -- the
14    judge didn't like them working court I believe
15    because they questioned things about
16    defendants or there was some -- they didn't
17    get along with the judge, something. The
18    judge was always writing them up for stuff.
19    This is what Mary Beth and Mary Turner told
20    me. So --
21 Q.  But you don't know that, do you; you just know
22    what they told you?
23 A.  No. I do know that the judge told me that she

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1  had put them out of working court. She didn't
2  want them in the courtroom working. However,
3  they did work it later.
4  Q. And when did the judge tell you that she
5     didn't want them working court?
6  A. I believe the first interview or a subsequent
7     meeting. I can't remember.
8  Q. But you're saying they went back in the
9     courtroom?
10 A. Mary Beth and -- did assist Sarah with
11    prisoners because we -- I was trying to do
12    cross-training, and people's job duties
13    changed during my tenure there to cross-train.
14 Q. There was cross-training going on?
15 A. Not at the time I got there. When I got
16    there, each magistrate only knew their
17    particular job duty. If somebody was out,
18    nobody knew what to do.
19 Q. And you're saying -- so when had this
20    cross-training idea come up?
21 A. When I got there.
22 Q. And what was the plan for cross-training?
23 A. I asked the judge if we could -- if I could

Page 126

1  change the duties and let them be trained in
2  other duties so if someone was out that
3  another person would know how to do their
4  job. And the judge agreed that that would be
5  a good idea. But she asked me not to change
6  them right to begin with, for me to get in
7  there and kind of get used to the procedures
8  and the people and observe. And then in
9  April, I was allowed to change the job
10 duties. Well, actually, I changed them a
11 little bit because Lavera McClain had to be
12 out for surgery. And I temporarily shifted
13 her duties to Mary Turner.
14 Q. Let me back up. When was Lavera out for
15    surgery?
16 A. Sometime during April.
17 Q. Do you know how long she was out?
18 A. About six weeks.
19 Q. What were her duties at that time, Lavera?
20 A. I believe she was doing the bondsman
21    processes, forfeitures. She did a -- put
22    together a docket for one of the court -- one
23    week of court. She did alias warrants.

Page 127

1  Q. Did other people do those things?
2  A. Those job duties?
3  Q. Yes.
4  A. No, not at that time.
5  Q. Nobody else did alias warrants?
6  A. Not the kind she did, not for the particular
7     situations that she did.
8  Q. And what situation was that?
9  A. That she had particular types of cases that
10    she did. Like when the judge ordered a alias
11    warrant in court, she would stamp it with that
12    and sign it, and those would go, I believe, to
13    Lavera, and she would enter the alias warrant
14    in the system to be printed out to take.
15 Q. And you're saying no one else did that?
16 A. They did it on other cases.
17 Q. I'm not following you, though. What kind of
18    other cases?
19 A. Well, Michelle -- Valarie did -- some of
20    them -- Michelle, Valarie, Eunice did some,
21    but it was pertaining to the cases of the
22    court that they worked.
23 Q. And you said Lavera did dockets and nobody

Page 128

1  else did that?
2  A. Yeah. They had their own dockets to do, yes.
3  Q. So other people did dockets?
4  A. Right.
5  Q. And if somebody was going to be out, was it
6     your responsibility to get those duties
7     covered?
8  A. It was their responsibility to get those
9     duties covered. I issued a memo to that
10    effect.
11 Q. Is that not something a manager should do, is
12    to make sure work tasks are covered or
13    reassigned?
14 A. If I've issued a directive that, if you're
15    going be out, to have your duties covered,
16    then they are directed to have their duties
17    covered. And I -- when I did a memo, I said,
18    if you have a problem with getting someone to
19    cover your duties, please let me know.
20 Q. And what if somebody was unexpectedly ill;
21    would you cover their duties?
22 A. I would have someone cover it. I did have to
23    find someone, a volunteer to work court one

32 (Pages 125 to 128)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 129

1  day because someone called in sick at the last
2  minute.
3  Q.  As a supervisor, it was your philosophy to
4      say, if somebody is going to be out, they got
5      to find somebody else to do their job?
6  A.  They were -- they were grown people. Yes. I
7      oversaw them, but they had a directive to do
8      it.
9  Q.  Who was going to -- if they asked Jane Doe to
10     do their job, who was going to do Jane Doe's
11     job?
12 A.  She did both, or they asked somebody, usually,
13     that -- if it was working court that day and
14     they were supposed to be in court, they would
15     ask somebody that wasn't working court that
16     day. And if there was a problem with getting
17     somebody, then I would have to assign someone.
18 Q.  Did anybody have a problem in getting somebody
19     to cover their assignments?
20 A.  I don't recall there being a problem. I take
21     that back. There was one situation. Michelle
22     Bryan either called in sick or was going to a
23     training, and she did not get somebody to

## Page 130

1  cover court. So that morning, I asked for
2  volunteers. And no one seemed to want to work
3  court. Michelle had not gotten someone to
4  cover. And so I just told them that if
5  somebody didn't volunteer, I would appoint
6  someone. And then someone did volunteer.
7      Michelle wrote me an e-mail saying she
8  didn't know she had to cover her -- if she was
9  going to a training, she assumed that one of
10 the others would just cover it. And I let her
11 know that, again, that she is responsible, and
12 if she couldn't get anybody, to let me know,
13 that I didn't want to be in that situation
14 again.
15 Q.  Did you write her up for this?
16 A.  No. I had a -- I talked to her about it. I
17     did an e-mail back to her.
18     MS. NELSON: Do y'all want to take a lunch
19     break?
20     MR. JAFFREE: Yeah, if we could.
21     (Lunch recess)
22 Q.  Ms. Martin, do you remember that line of
23     questioning about Michelle?

## Page 131

1  A.  Uh-huh (positive response).
2  Q.  When you said you had talked to her and
3      e-mailed her, do you remember what you
4      e-mailed her?
5  A.  Yes. She had -- I e-mailed her
6      that -- because she had said something in her
7      e-mail about she thought we were friends. And
8      I explained to her the difference in my
9      position, that I could be friends but it
10     couldn't go to the point that I couldn't
11     supervise people. And I tried to explain that
12     to her, that that was totally separate from
13     being friends. And I told her that she had --
14     as I had instructed, she had to cover her
15     duties.
16 Q.  And her primary duties at that time were what?
17 A.  I believe, at that time, it was mostly working
18     court all day on Tuesday, half a day on
19     Wednesday maybe, and a half a day on Thursday.
20 Q.  And was this before you went to the
21     cross-training process that we talked about
22     earlier?
23 A.  I don't recall the date.

## Page 132

1  Q.  Okay. Were you and Michelle Bryan friends?
2  A.  Not great friends. She had a lot of interests
3      that I had, as did some of the other ones.
4  Q.  Those interests being motorcycles?
5  A.  No. We both had children. We talked about
6      that. She had -- her mother had some health
7      problems that she shared with me. Just --
8  Q.  Did y'all socialize together?
9  A.  I went to lunch with her and Valarie Savage
10     two or three times while I was there.
11 Q.  Even after work, did you socialize with her?
12 A.  Not that I recall.
13 Q.  You said she and some others had some similar
14     interests that you did. What others had
15     similar interests to you?
16 A.  I had some similar interests with Eunice. We
17     both had played softball for years and
18     actually played on opposing teams at times. I
19     had similar -- some similar interests with
20     Mary Beth Brackin. Her --
21 Q.  I'm sorry. Go ahead.
22 A.  Because she had children, basically. I had
23     some similar interests with Valarie Savage.

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1  We had -- one of my best friends is -- was --
2  is a cousin of hers. And I knew some of her
3  family, like her aunt and my -- well, my
4  friend's mother was her aunt. And she had
5  children.
6  **Q. Did you ever socialize with Mary Beth or**
7  **Valarie or Eunice outside of the**
8  **office -- outside of work -- after work?**
9  A. After work?
10 **Q. After work.**
11 A. Not that I recall.
12 **Q. Okay. Did you go to lunch with Mary Beth or**
13 **Valarie?**
14 A. Yes.
15 **Q. Back to this idea of cross-training, were you**
16 **aware that there had been discussions about**
17 **cross-training before you ever started working**
18 **for the City of Dothan?**
19 A. No, I wasn't. It was never mentioned to me.
20 **Q. Okay. Did you ever provide any assistance in**
21 **the way of money or clothing to Michelle**
22 **Bryan?**
23 A. Money or clothing?

Page 134

1  **Q. Yes.**
2  A. It -- I don't really recall. It's possible
3  that I did give her some hand-me-downs, some
4  clothes that I had that I had outgrown or
5  whatever. I don't -- I could have done that.
6  I --
7  **Q. Did you ever loan her money?**
8  A. I never loaned her any money. I might --
9  **Q. Did you give her money?**
10 A. I might have not -- I might have given her
11 some to give to her family or something when
12 her niece died. I don't know. I don't really
13 recall.
14 **Q. What were your normal hours of work?**
15 A. They were supposed to be from eight to five I
16 believe, but I ended up working late a lot of
17 days, came in on the weekend some.
18 **Q. When you worked late, what were you doing?**
19 A. What was I doing?
20 **Q. Yes.**
21 A. Some of my duties like some reports or --
22 **Q. What kind of reports?**
23 A. I had to do the -- I -- I didn't to begin

Page 135

1  with, but I did -- I had to do the state
2  treasurer's report. I --
3  **Q. And what is that?**
4  A. It's a report that goes once a month to the
5  state treasurer for the amount of fines and
6  costs collected by the municipal court.
7  **Q. Okay.**
8  A. I had cases -- we had lost paperwork that I
9  stayed to search for sometimes. Others stayed
10 also with me to search for it.
11 **Q. Like?**
12 A. Lost cases that were set for court hearing on
13 a docket.
14 **Q. And how often did you have to stay doing that?**
15 A. Well, we were missing cases about every week.
16 **Q. When you say, "missing cases," the paperwork**
17 **was lost?**
18 A. Paperwork was misplaced. It was either
19 misfiled or laying in somebody's office.
20 And --
21 **Q. But you're saying that happened periodically?**
22 A. Well, about once a week when there was court
23 being -- the weeks court was held.

Page 136

1  **Q. How many cases go through a court a year?**
2  A. I think the previous year there had been
3  12,000 tickets maybe and -- I don't know --
4  three, four, 5,000 other types.
5  **Q. What would the other types be; were they**
6  **misdemeanor-type, non-traffic?**
7  A. Right, non-traffic.
8  **Q. How many magistrates were -- strike that.**
9  **Was there lost paperwork by a person that**
10 **was responsible for it or something just**
11 **didn't get in a file or was anybody written up**
12 **for this?**
13 A. Are you talking about a specific -- I mean, a
14 lot of people had paperwork in their office
15 that they might -- might have forgot was
16 there, might have got buried. I did do a memo
17 to Michelle Bryan when she realized that some
18 cases that she had in her possession got
19 buried, lost during a move from the original
20 office to the new one.
21 **Q. Did that result in some cases having to be**
22 **dismissed?**
23 A. I don't know that for a fact.

34 (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1  Q.  You said you sent her a memo.  Did you --
2  A.  I brought the --
3  Q.  -- reprimand her, or was it a --
4  A.  Not -- I --
5  Q.  -- disciplinary action?
6  A.  Well, it was a -- I think it was a
7     disciplinary action, but it was a memo that
8     went in her file to begin with because I
9     brought this to the attention of the judge and
10    showed her a list of the cases.  And to begin
11    with, it just -- I guess the judge just
12    glanced at it or whatever.  It wasn't a real
13    big deal.  And the judge and I discussed what
14    to do, and we agreed that I would do a memo to
15    her and let her know, you know, that -- not --
16    to know where the files are at all times.  So
17    I did a memo to her, explaining that I was
18    putting it in her file and all and told her
19    she had to be a lot more careful with cases.
20       And then sometime later, Ashton Ott, the
21    city prosecutor found out about these cases
22    and said I -- said something about some of
23    them would have been companion cases, felonies

Page 138

1     that they lost the opportunity to prosecute.
2     I never was given any paperwork proving that
3     or anything.
4  Q.  Proving what?
5  A.  That those cases, in fact, were lost -- I
6     mean, they couldn't prosecute them for a
7     felony.  She didn't identify which ones or
8     whatever.
9  Q.  "She" being Ashton?
10 A.  Ashton.
11       And at that point, the judge contacted me
12    and told me I needed to write Michelle Bryan
13    up a disciplinary action.  And I was
14    uncomfortable doing that because I had already
15    done the memo to her that the judge and I had
16    agreed on.  And, you know, I brought that to
17    the judge's attention that I had already done
18    the memo.  And she said because Ashton was
19    really upset about it and because they'd found
20    out that it was connected to some felony
21    cases, companion cases, whatever, that I had
22    to do a disciplinary action on her.  And I did
23    that.

Page 139

1        But right before I left, I was working on
2     three disciplinary actions that I had been
3     instructed to do by the judge.  And
4     Michelle --
5  Q.  Let's stick with just this one right now.
6  A.  Okay.  Well, Michelle was one of them.  And a
7     week before I was terminated, I had personally
8     taken the writeup over to the judge for her
9     review.  She was not there.  I laid it on her
10    desk, and that's the last I saw of it or the
11    last I heard of it till -- never mind.
12 Q.  Until what?
13 A.  Till I read in some of the -- or heard in the
14    personnel hearing of Mary Beth that I had
15    never done the writeup, refused to do it,
16    which is totally a lie.
17 Q.  You're saying, Mary Beth -- who --
18 A.  It was either during --
19 Q.  Mary Beth Brackin said --
20 A.  Mary Beth Brackin's personnel -- no.  Mary
21    Beth didn't say.
22 Q.  Who said?
23 A.  Judge, Judge Gordon, either testifying during

Page 140

1     Mary Beth Brackin's personnel board hearing or
2     in some responsive pleading that was filed by
3     you or Len White or whoever, the judge said in
4     there that I refused or never did the
5     disciplinary writeup.
6  Q.  On Michelle?
7  A.  On Michelle.
8  Q.  But you're not sure where that comes from;
9     it's something you read or saw.
10 A.  Well, I'm sure it's in some of the --
11 Q.  Court paperwork?
12 A.  Yes.  Don't know which one, but it -- it is in
13    there.
14 Q.  And when you did the memo to Michelle before
15    Ashton Ott -- let me back up.  Ashton Ott, at
16    the time, was with the City's attorney's
17    office; is that correct?
18 A.  Right.
19 Q.  And she was a City prosecutor; is that
20    correct?
21 A.  Right.
22 Q.  When you first did that memo before Ashton Ott
23    got involved, is it fair to say you didn't

35  (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 141

1　know all the facts or the seriousness of what
2　Michelle had done; is that correct?
3　A. I don't think anybody knew the seriousness at
4　that time.
5　Q. And then once Ashton got involved in her role
6　as City attorney and prosecutor, it came to
7　everyone's attention how serious the situation
8　was, that Michelle had kept all of those files
9　in her office or had left all that in her
10　office; is that correct?
11　A. She didn't keep those in her office. She
12　wasn't aware they were in there.
13　Q. Well, that's your terminology. They were in
14　her office. What were they — is that
15　correct?
16　A. I don't know if they were in her office. She
17　told me that they were buried in the move, and
18　while looking for other missing paperwork, she
19　found them, and let me know about it.
20　Q. And then once she let you know, what did you
21　do with them?
22　A. I took them to the judge and explained the
23　situation.

## Page 142

1　Q. Now, you said, there were two other situations
2　that you were in the process of doing a
3　disciplinary action on someone.
4　A. Right.
5　Q. Is that correct?
6　A. Yes.
7　Q. Who were the other two?
8　A. Mary Turner and Ann Baxter.
9　Q. Okay. Why were you doing a disciplinary
10　action on Mary Turner?
11　A. That's a good question. There was a -- loud
12　voices kind of -- I don't even call it a
13　confrontation. I was there in the hallway
14　between Mary Turner and Ann Baxter about some
15　case -- don't know what case, don't recall --
16　where they raised their voices at each other
17　and I went -- I was sitting in my office and
18　saw them and heard it, went out there to see
19　what was going on. And by that time, some of
20　the other magistrates had gathered there. And
21　I told them -- I asked them what the problem
22　was. And both of them said, nothing, we do
23　this all the time. You know, we raise our

## Page 143

1　voice at each other. Mary says something. I
2　say something back.
3　　And I said, well, I don't want it
4　happening out here in the hallway or anything,
5　and y'all just need to cool it.
6　　Then to be sure that there really wasn't
7　something going on, when they got back to
8　their offices, I went and talked to Ann Baxter
9　privately and asked her if I -- if she needed
10　me to take it up with the judge, if she needed
11　me to -- if she thought it was worth
12　disciplinary action of Mary, was more than
13　what they had told me in the hallway. I
14　wanted it from her one on one.
15　　And she just laughed and said, no, Mary
16　and I have been doing this for years.
17　Q. And as their supervisor, you thought that was
18　appropriate conduct?
19　A. I didn't see it as a big deal because others
20　in the office raise their voices, too.
21　Q. Did you ever see Mary Turner throw or become
22　angry and throw a stack of warrants all over
23　the floor?

## Page 144

1　A. I don't recall that.
2　Q. Isn't that something you might remember if you
3　saw it?
4　A. Yes, if I saw it. I guess I didn't see it.
5　Q. You've never heard of her doing that?
6　A. No.
7　Q. Do you think that would warrant disciplinary
8　action?
9　A. Not necessarily.
10　Q. Have you ever supervised anybody before?
11　A. I think I've answered that already.
12　Q. Who —
13　A. And I still supervise to this day.
14　Q. Who did you supervise at Legal Services, how
15　many people?
16　A. Like I said, at different times, I supervised
17　different numbers of people.
18　Q. Like two secretaries and a receptionist?
19　A. To begin with, I supervised a legal secretary
20　in Troy, a receptionist in Troy, a
21　receptionist in Dothan, and three or four
22　legal secretaries.
23　Q. Did you fill out their evaluations?

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1   A. Yes, I did.
2   Q. Could you hire and fire them?
3   A. I could recommend.
4   Q. And you thought it was normal conduct for
5       people to be yelling and screaming in the
6       office?
7   A. It wasn't quite like that.
8   Q. Does the public come in the magistrates'
9       office?
10  A. Not in that particular place.
11  Q. And where did this take place?
12  A. In the hallway.
13  Q. Did the public see it or hear it?
14  A. They couldn't see it.
15  Q. Could they hear it?
16  A. I don't know. Undoubtedly, according to the
17      judge, a trustee heard it because that's who
18      she claims told her about it. But I don't
19      recall seeing a trustee there at that time.
20  Q. So the two other instances -- was Mary
21      Turner and -- the situation you described
22      involved two other people?
23  A. Right. And I was made to write Mary Turner up

Page 146

1   and that -- and that disciplinary action, I
2   did against -- I mean, I -- the judge told me
3   to and I did it. And that's the second one
4   that I laid on her desk about a week before I
5   was terminated. And I never heard anything
6   else about it. And the judge disputes -- also
7   makes mention that I refused to do the
8   disciplinary action.
9   Q. And your --
10  A. Which those would be on my computer -- you
11      know, should still be on there.
12  Q. The judge's disputing it, your reference point
13      there comes from what?
14  A. From the same thing as the other I told you.
15  Q. Either the hearing or --
16  A. Hearing or --
17  Q. -- something you read in --
18  A. -- reading somewhere in some of these
19      documents. Yes.
20  Q. -- court documents?
21      Now, did you know Ashton Ott before this
22      issue with Michelle Bryan and the documents
23      came up?

Page 147

1   A. Did I know her? I had met her over in court.
2   Q. Or interacted with her?
3       How frequently was she in court?
4   A. Quite frequently.
5   Q. Quite frequently?
6   A. Uh-huh (positive response).
7   Q. And how often were you in the courtroom?
8   A. To begin with, not a whole lot. I mean, maybe
9       once a week.
10  Q. And did that become more frequent?
11  A. When we -- when I changed job duties of some
12      of the magistrates and the -- and two new ones
13      started working court, I was over there more
14      in case they needed assistance or I could
15      get -- so I could get someone to assist them.
16      And I ended up -- there were a lot of -- some
17      days there were a lot more cases on the
18      docket. If there was going to be 600 people,
19      meant there was going to be a lot of people
20      in the fines room. And I would stay over
21      there to make sure -- help the magistrate keep
22      that in order.
23  Q. Who were the two new ones?

Page 148

1   A. Lavera McClain and Eunice Knight. Well, not
2   really -- Eunice had worked one part of court,
3   but she hadn't worked with traffic court.
4   Q. Newton court?
5   A. Right.
6   Q. And was this part of this cross-training?
7   A. Yes.
8   Q. And isn't it true that y'all were actually
9       rotating duties periodically for everybody to
10      learn all aspects of the magistrates' job?
11  A. Right.
12  Q. And was it like a 90 day or --
13  A. No, it wasn't. There was no agreed-upon time
14      period. We said every two to three months.
15  Q. Every two to three months. Okay. And who is
16      "we?"
17  A. Me and the judge, Judge Gordon.
18  Q. And, now, when the two of them were in court,
19      would you assist them if they needed help?
20  A. I took things to the fines room for them.
21      But, no, I wasn't trained to work the court
22      system in court.
23  Q. Did you ever make any decisions in the

37 (Pages 145 to 148)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 149

1  courtroom as to how attorneys could proceed or
2  how they had to conduct themselves in court?
3  A.  I'm not sure I understand your question.
4  Q.  Well, did you make any rules or policies or
5  procedures that affected attorneys filing
6  motions?
7  A.  I didn't make the policy.  Judge Gordon made
8  the policy, and I did the memo.  No, let me
9  take that back.  Judge Gordon did the memo.
10 Q.  What policy memo are you talking about?
11 A.  I'm talking about the one where -- there was
12 one where if the attorneys did not enter
13 appearance or if they wanted -- or if they
14 wanted to enter a plea or any motions, if that
15 was not done I believe seven days before the
16 court time, they had to bring it
17 over -- appear in court and bring it before
18 the judge after she convened court.
19 Q.  Did you ever refuse to let attorneys file
20 motions?
21 A.  No.
22 Q.  Did you ever get involved in attorneys
23 appearing and instruct them as to what order

Page 150

1  they could handle a particular case or submit
2  filings in a particular case that may have
3  been on the docket that day?
4  A.  No.  The memo directed that.
5  Q.  And what memo are you talking about?
6  A.  I'm talking about the same memo.
7  Q.  And what did it direct?
8  A.  Just what I told you, that attorneys are to go
9  before the judge after she convened court to
10 file those if they weren't filed in a timely
11 manner.  Actually, that wasn't a new memo.
12 That was a policy before I came.  It just
13 wasn't being enforced, as were many others not
14 enforced.
15 Q.  I'm still not sure I'm following you or that
16 we're on the same wavelength here.  Explain
17 this memo to me.
18 A.  Well, if -- if y'all had provided what we
19 asked for in documents, you could show it to
20 me, and I could tell you.  But you didn't.
21 Q.  Well --
22 A.  But there is a memo.
23 Q.  Well, I'm asking you to describe that memo.

Page 151

1  A.  I just -- I've already answered that
2  question.  I told you it was from the judge.
3  Q.  Well, I don't understand it, so I want you to
4  expand on it.
5  A.  The judge did a memo to all magistrates,
6  clerks, everyone in the magistrates' office.
7  Actually, I believe the memo -- no, it didn't
8  just say magistrates.  It said to all
9  concerned parties.  And these were given
10 out -- this memo was given out when an
11 attorney appeared with a motion that was not
12 being timely filed and they were given this
13 document, letting them know that they either
14 have to be timely filed because it affects the
15 docket or -- and I believe it -- I'm pretty
16 sure it said, seven days before.  And if not,
17 they or someone from their office would have
18 to appear at their allotted court time for the
19 case and present the documents to the judge at
20 that time.
21 Q.  Okay.  And are you aware of any attorney being
22 affected by this memo?
23 A.  An attorney being affected?

Page 152

1  Q.  Yeah.
2      MR. JAFFREE:  I'm not sure the question is
3      clear.  It's too opaque.  Affected
4      how?  Because the memo wasn't
5      addressed to the attorney.
6  Q.  Well, did you interpret this memo -- well,
7      what if a motion was not timely filed, what
8      would happen?
9  A.  Just what I said.  They're supposed to go over
10     to the court and file it with the judge and
11     let her decide.  If they filed them timely,
12     they could be attached to the court paperwork,
13     entered in the computer system, and sent over
14     to the judge if there was time before the
15     court date.  If not, they were attached to the
16     paperwork and sent over with the court
17     docket.  If they weren't timely filed, they
18     had to go to court.
19 Q.  If it was not, in your eyes, timely filed,
20     would you refuse to take it?
21 A.  I would not take it in the magistrates'
22     office, no, because I was directed to send
23     them to court.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1 Q. Did you ever in court refuse to take a filing?
2 A. Did I?
3 Q. Yes.
4 A. No.
5 Q. Do--
6 A. If one was presented to me in court, that
7    was -- the court date, they were to go before
8    the judge.
9 Q. So you would not file it; you would tell them
10    to take it up with the judge?
11 A. I didn't file things in the courtroom.
12 Q. When you were in the courtroom, what were you
13    doing?
14 A. Sometimes I was observing the magistrates work
15    in court. Sometimes I was observing the
16    magistrate in the fines room. Sometimes I was
17    in the fines room, keeping the loud talk and
18    laughter and everything down. Sometimes I was
19    talking to attorneys that I knew.
20 Q. You were, in essence, trying to learn the job;
21    is that correct?
22 A. I was trying to learn the job, and I was also
23    observing the people that I supervised. I was

Page 154

1    not learning to work court because that was
2    not my job duty.
3 Q. But if you had to supervise those that worked
4    court and handle all the other things
5    magistrates do, weren't you expected to know
6    or learn what the job entails?
7 A. I was learning, but I wasn't expected to sit
8    down there and do it.
9 Q. Were you ever expected to interact with the
10    public?
11 A. Yes.
12 Q. And did you?
13 A. Many times.
14 Q. Were you expected to interact with the public
15    defender and the City attorney's office?
16 A. Sure.
17 Q. What was your relationship with Ashton Ott?
18 A. I thought it was pretty good until I asked her
19    not to demean, degrade the magistrates in open
20    court. I very nicely called and asked her not
21    to do that, to please call me and let me know
22    about the situation, and we could work out a
23    solution. And she ended up throwing a fit

Page 155

1    over the phone and hanging up on me, which was
2    very unprofessional.
3 Q. Who do you contend she was demeaning in open
4    court?
5 A. That particular time was Michelle Bryan and
6    Valarie Savage.
7 Q. Did you see this happen?
8 A. No, I didn't.
9 Q. And how do you know that this occurred?
10 A. They told me it did.
11 Q. What did they tell you?
12 A. They told me that she was -- she had an
13    outburst and said that the magistrates were so
14    stupid, that they had made error again, and
15    they couldn't do anything right.
16 Q. And this was just coming from Michelle and
17    Valarie; is that correct?
18 A. No. One of the police officers in court told
19    me also.
20 Q. Who was that?
21 A. Brad Baum.
22 Q. Who?
23 A. Brad Baum.

Page 156

1 Q. And what did he tell you?
2 A. He told me that there was outburst by her but
3    that there had been many degrading
4    magistrates.
5 Q. When you learned this, what did you do?
6 A. I told you. I picked up the phone, and I
7    called Ashton. And I asked her what happened,
8    and she said that she didn't do that. But I
9    asked her, I said, if you have a problem with
10    the magistrates, please call me and let's work
11    something out about it, instead of degrading
12    them in front of hundreds of defendants and
13    other attorneys and all.
14 Q. And your testimony is that she then hung up on
15    you?
16 A. She did hang up on me. She did hang up on me.
17 Q. And if Ashton's recollection of that event is
18    different, you would say she was not being
19    truthful?
20 A. I would say she's lying.
21 Q. Do you know if she's made complaints about
22    you?
23 A. Not to my knowledge.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1  Q.  Ashton is white; is that correct?
2  A.  Right.
3  Q.  What about the public defenders; what's your
4      relationship with the public defenders?
5  A.  Specific --
6      MR. JAFFREE:  Well, are there more than
7      one?
8  A.  Give me names.
9  Q.  How many public defenders do you know?
10 A.  Give me names of what you're asking.
11 Q.  I'm asking you, do you know the public
12     defenders for the City of Dothan?
13     MR. JAFFREE:  Let me object to the form of
14     the question.  It doesn't indicate at
15     what point in time does she know the
16     name of the public defenders, now,
17     then?
18     MS. NELSON:  Then when she worked with the
19     City of Dothan as court
20     administrator.
21 A.  I believe Shaun McGhee was one.
22 Q.  Anybody else?
23 A.  I think Ginger Emfinger or Scarborough or

Page 158

1      whatever.  She went by two different names.
2  Q.  You seem hesitant.  Did you not work with them
3      very often?
4  A.  I was over in court.  I didn't -- I mean, I
5      socialize with them.
6  Q.  Socialized meaning?
7  A.  I mean in court, talking to them.
8  Q.  What would you say your relationship with
9      Shaun McGhee was?
10 A.  I had a good relationship with Shaun McGhee.
11 Q.  What about Ginger?
12 A.  I thought I had a good relationship with
13     Ginger.
14 Q.  Are you aware of any complaints that they have
15     made against you?
16 A.  No.  I would love to see the written
17     complaints that were made against me, though.
18 Q.  Do you contend that every complaint has to be
19     in writing?
20 A.  I contend that the judge had a policy that
21     every complaint to her had to be in writing,
22     or she wouldn't entertain it.
23 Q.  And what do you base this on -- that statement

Page 159

1      on?
2  A.  The judge's telling me that.  And she advised
3      me that -- not to entertain complaints made to
4      me or she would prefer I didn't unless they
5      were made in writing.
6  Q.  Did the magistrates come and complain to you?
7  A.  Yeah, I have some written complaints.
8  Q.  I mean, did anybody ever complain to you
9      that's not in writing?
10 A.  Sure.
11 Q.  What did they complain to you about?
12 A.  About all the errors that they were having to
13     correct for Eunice and Lavera.
14 Q.  Is it your contention that only Eunice and
15     Lavera made errors?
16 A.  No, it's not my contention.  They certainly
17     weren't the only one that made errors.  They
18     just made a hundred times more than anybody
19     else did.
20 Q.  And how do you -- what do you base that on?
21 A.  Because I saw paperwork.  I pulled the
22     paperwork to look at it.  I looked it up in
23     the court system.  I checked everybody's,

Page 160

1      behind everybody.
2  Q.  And your testimony is they have a hundred
3      times more errors than anyone else?
4  A.  Right.
5  Q.  Did you keep documents of errors that were
6      made?
7  A.  At the time I was employed, yes.  Most of the
8      time, I would -- I wanted to ask them to
9      correct it, but the judge had told me that if
10     it's just simple errors and the person
11     complaining could make it as quick as they
12     could, they should just correct it.
13 Q.  What type of errors are we talking about?
14 A.  Not recalling -- well, recalling warrants in
15     the computer system.  Or these are the worst
16     ones, the very bad ones:  Recalling warrants
17     in the computer system but not getting the
18     warrant secured from the police department,
19     jail.  And people would be wrongly arrested
20     then because there would still be a warrant
21     out.  Errors such as no disposition code in
22     many cases where they'd worked court and just
23     hadn't followed up and done the paperwork.

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1   They filed them away unfinished. Court dates
2   set that should have been an arraignment was
3   set on traffic days.
4   Q.  Was the computer responsible for any of these
5       errors? Could the computer have been
6       responsible for any of these errors?
7   A.  Yes, it was responsible for a few.
8   Q.  Did Ann Baxter commit errors?
9   A.  Sure she did. I said all of them did.
10  Q.  Were hers a hundred times worse than anybody
11      else?
12  A.  Hers were -- no, not that much. She was the
13      next one that committed errors.
14  Q.  Did you ever write her up?
15  A.  No, I didn't. I didn't write Eunice and
16      Lavera up. I wasn't allowed to. They were
17      untouchable.
18  Q.  What did you want to write them up for?
19  A.  For all the errors that they were making.
20      They weren't -- it wasn't changing. You
21      expect over time the errors to lessen.
22  Q.  Well, you just told me about three. Are you
23      aware of anybody else that recalled a warrant

Page 162

1       in the computer system that somehow didn't get
2       communicated to the jail?
3   A.  Yeah.
4   Q.  Who?
5   A.  Ann. But she didn't do it near as many times
6       as Lavera and Eunice did it.
7   Q.  How many times did Lavera do it?
8   A.  I don't have a specific count.
9   Q.  How many times did Eunice do it?
10  A.  I don't have a specific count.
11  Q.  Did Valarie or Mary Beth or Mary Turner or
12      Michelle, did they recall any warrants in the
13      system that didn't get communicated to the
14      jail?
15  A.  I'm sure they -- maybe ever -- occasionally.
16      I don't know if they did it -- I don't
17      remember or recall if they did it while I was
18      there.
19  Q.  But feel like they did?
20  A.  They could have.
21  Q.  Did you write them up or try to write them up?
22  A.  No, because they didn't do it. They were --
23      why would I write one person up and not be

Page 163

1       allowed to write others up? That was unfair.
2   Q.  What about any other magistrate fail to enter
3       a disposition code besides Eunice or Lavera?
4   A.  I don't recall ever seeing one.
5   Q.  How many dispositions code errors did Eunice
6       make?
7   A.  I don't have a count. I don't have the
8       documents.
9   Q.  What about Lavera?
10  A.  Many.
11  Q.  What about setting the court date for -- I
12      think you said, setting a court date for a
13      time that something else was going on. I'm
14      sorry. You said there was another error that
15      they set a court --
16  A.  They would set court dates. They were not
17      paying attention or checking their work. They
18      had court dates -- people would print out on a
19      docket that their court date should actually
20      be on a traffic court. They would be on an
21      arraignment day, or vice versa.
22  Q.  Arraignment day. That's what I --
23  A.  Yeah.

Page 164

1   Q.  How many times did Lavera do this?
2   A.  Many.
3   Q.  How many is "many?"
4   A.  In fact their -- I did an -- I did an e-mail
5       to Lavera and Eunice because it kept happening
6       and kept happening. I did an e-mail to them,
7       advising that Valarie and I were having to
8       continually correct these dates and that they
9       should pay better attention and get them set
10      on the right court dates. And from then on, I
11      was going to be taking it back to them to
12      correct instead of us correcting them.
13  Q.  They were setting these dates because they
14      were the two people working court; is that
15      correct?
16  A.  Not always.
17  Q.  Who else was working court?
18  A.  The errors didn't always happen from working
19      court.
20  Q.  Did anybody else besides Eunice or Lavera make
21      a court date entry for a time when it was
22      arraignment day, for example?
23  A.  Could have, not -- not in the quantity that

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  Eunice and Lavera were doing.
2  Q.  But I think just a little while ago when I was
3     asking about who was working court, it was
4     primarily Eunice and Lavera when you were
5     there?
6  A.  At that particular time.
7  Q.  Is that correct?
8  A.  At that particular time, yes. They started
9     working court the end of June. Until that
10    time, the major court was worked by Valarie
11    Savage and Michelle Bryan.
12 Q.  Do you know how many errors they made?
13 A.  Very few during my tenure.
14 Q.  Are you aware that any attorneys or members of
15    the Bar in Dothan made complaints against you
16    or about you?
17 A.  No, I was never given any complaints that were
18    made against me. And if there were any made,
19    I was never provided anything. But if they
20    were made, it was because I was enforcing
21    policies that had not been enforced before.
22 Q.  And what policies were those? I know we've
23    talked about the memo -- I mean, about the

Page 166

1     motions not being timely filed. What other
2     policies are you talking about?
3  A.  Well, that was the main one. And then there
4     was a memo -- because the attorneys were bad
5     about coming up to the court magistrates
6     working court, wanting to get court documents
7     before court started. And that was put a stop
8     to. There was a memo directing them or
9     bondsmen not to come up and take paperwork --
10    case paperwork from the magistrate working
11    court, and they weren't happy about that
12    either.
13 Q.  Are these policies that you put out?
14 A.  Well, the first one we talked about was under
15    the judge's signature.
16 Q.  I'm talking about the memos regarding the
17    bondsmen and attorneys.
18 A.  It might have been under my signature, but it
19    was discussed with the judge and agreed to by
20    the judge. And it was copied to the judge.
21 Q.  When did you discuss this with the judge?
22 A.  Before I did the memo.
23 Q.  Was anybody else present?

Page 167

1  A.  I don't know. Can't recall. That was also --
2     part of that was also a policy before I came
3     there that just wasn't being enforced.
4  Q.  What part was that?
5  A.  The attorneys getting paperwork before court
6     started -- I mean, from the magistrates.
7  Q.  Did you ever keep any records regarding errors
8     made on -- where there may be -- where you're
9     posting moneys and needs to be a reversal or
10    improper handling of the moneys?
11 A.  Say that again.
12 Q.  Did you ever keep any records of magistrates
13    who were involved in, like, posting moneys
14    paid that were, say, wrongfully posted and
15    moneys had to be -- or the entry had to be
16    reversed?
17 A.  There was a lot of -- several things brought
18    to my attention on that, and I had to have
19    Valerie Harris, the city auditor, had to --
20    her with Accounting got involved with doing
21    some of those reversals because they were not
22    being done right.
23 Q.  Was this before you got there or after you got

Page 168

1     there?
2  A.  This was after I got there.
3  Q.  Well, I'm going to show you, for example --
4        (Defendants' Exhibit 11 was marked
5           for identification.)
6  Q.  I'm just going to show you what I've marked as
7     Defendants' Exhibit 11. Is that something you
8     can identify for me? Is that your writing?
9  A.  Where?
10 Q.  On that first page.
11 A.  No, it's not.
12 Q.  Do you know who did that?
13 A.  No, I don't. It's not my writing.
14 Q.  Do you know what that document is?
15 A.  Yeah. It's where a reversal was done. Could
16    have been --
17 Q.  You need to speak up. It's where a what is
18    done?
19 A.  A reversal.
20 Q.  And what is a reversal?
21 A.  When something is posted to the wrong account
22    or posted wrongly.
23 Q.  Did you keep -- have you ever seen this one

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1   before?
2   A.  No, I haven't.
3   Q.  And you don't know who did that?
4   A.  Kind of looks like Mary Beth Brackin's
5       writing, but I couldn't swear to that.  Don't
6       recognize the name at all.
7           (Defendants' Exhibit 12 was marked
8           for identification.)
9   Q.  Let me show you one that's marked Defendants'
10      Exhibit 12.  That's also a reversal; is that
11      correct?
12  A.  Yes.
13  Q.  Is any of that your writing?
14  A.  No, it's not.
15  Q.  Do you recognize whose that might be?
16  A.  I can just guess.  Could be Mary Beth
17      Brackin's, but I've never seen it.
18          (Defendants' Exhibit 13 was marked
19          for identification.)
20  Q.  Another one, Defendants' 13, is that a
21      reversal?
22  A.  Yes, it is.
23  Q.  Do you recognize that writing?

Page 170

1   A.  Can't say for sure.  It's not my writing.
2       MR. JAFFREE:  Let me, for the Record,
3       object to Defendants' 11, 12, or 13
4       being attached to the deposition for
5       any purpose.  The plaintiff/witness
6       cannot identify them.  She said that
7       they're not her writing and she don't
8       know when these was generated.  She
9       can't attest to the veracity of any of
10      these documents.
11          (Defendants' Exhibit 14 was marked
12          for identification.)
13  Q.  Let's me show you Defendants' Exhibit Number
14      14.  Is that also a reversal?
15  A.  Yes.
16  Q.  Do you recognize any writing on that document?
17  A.  No.  I wasn't even there that day, and it's
18      not my writing.  And I don't really know whose
19      it is.  I believe I was off that day.
20  Q.  Well, as manager of -- or as court
21      administrator, were you responsible for --
22      supervising the magistrates, we've established
23      that.  Are you charged with knowing if

Page 171

1   reversals take place in the office?
2       MR. JAFFREE:  Let me object to the form of
3       the question, the relevance of the
4       question, and the implication from the
5       question that these are reversals that
6       she should have known about.  This
7       witness don't know anything about
8       these reversals, whether or not they
9       was manufactured yesterday, at the
10      time of the report to have been
11      manufactured, who drafted them, or
12      anything.  So if you're going to
13      criticize her for --
14      MS. NELSON:  You stated your objection.
15      I'd ask you not to testify for her.
16      MR. JAFFREE:  Well, I'm not testifying.
17      I'm only --
18  Q.  As court administrator, it's your testimony
19      that you've never seen one of these documents?
20  A.  That's right.
21  Q.  You've never seen the form itself?
22  A.  Yeah, I've seen the form.
23  Q.  Are you charged with keeping track of how many

Page 172

1   reversals that somebody has been charged with
2       or made?
3   A.  Say that again.
4   Q.  Are you responsible for knowing if a
5       particular magistrate has posted -- wrongly
6       posted money that had to be reversed?
7   A.  I -- I can't say that I always knew, no.  And,
8       especially, the last one, I was on vacation at
9       the time and had appointed a magistrate in
10      charge in my absence.
11  Q.  Well, when you come back, isn't it your duty
12      to know what's going on in the office?
13  A.  Well, I really didn't have time when I came
14      back because I was pretty much terminated
15      after that time.
16  Q.  Well, I think one of those was dated in July.
17      You weren't terminated right after that, were
18      you?
19  A.  I never saw the document, though.  I can't do
20      anything about things I didn't see.
21  Q.  And why is it that you did not see it?
22  A.  I don't know.
23  Q.  Are you not responsible -- did you make an

43 (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 173

1    attempt to find out who had reversals and who
2    didn't?
3    A. Mostly if Accounting or Valerie Harris called
4    to let me know, yes.
5    Q. You said, you've seen this form. Tell me your
6    understanding of how this form is used?
7    A. I believe Mary Beth -- no. I don't know who
8    did -- whoever did the reversal had to fill
9    out a form that I believe went in with their
10   balancing sheet.
11   Q. And as court administrator, you don't know who
12   was responsible for doing reversals or keeping
13   up with that?
14   A. The -- each magistrate that did the wrong
15   would reverse it, unless it was so wrong that
16   Accounting or Valerie Harris had to get
17   involved as she did many times.
18   Q. But you're saying -- you said earlier a couple
19   times that Mary Beth might have, Mary Beth
20   might have. Was Mary Beth responsible for
21   keeping track of reversals?
22   A. She did the balancing of all the moneys.
23   Q. Best of your knowledge -- I know you're saying

## Page 174

1    you don't recognize this, you think it might
2    be Mary Beth. Are these forms something that
3    Mary Beth worked with or was responsible for?
4    A. I don't know that that's Mary Beth's writing.
5    Q. I'm not --
6    A. And I --
7    Q. I'm asking you, who's responsible for that?
8    A. I don't know. I -- I've never seen these
9    (indicating) particular documents. I've seen
10   a blank document. These could have been
11   generated, as my attorney said, at any time.
12   Q. Do you have reason to believe that Mary Beth
13   would not accurately fill one of those forms
14   out?
15   A. I can't testify to that because I don't know
16   that Mary Beth did that.
17   Q. Do you know what was done with these forms?
18   You said you've seen a blank one. Have you
19   ever filled one out?
20   A. Can't say I have or hadn't.
21   Q. Would you know how to fill one out?
22   A. Yeah. Looks pretty simple.
23   Q. Then what would you do with it?

## Page 175

1    A. I would think it -- it would go in with the
2    balancing paperwork for the fines and costs
3    that were accepted during the day on the
4    report.
5    Q. You would think, but that's what you don't
6    know?
7    A. I was only training to do that when I left. I
8    had done it a few times. Mary Beth was the
9    one that did the balance -- the overall office
10   balancing for most of the time that I was
11   there.
12   Q. How many dockets did you prepare when you were
13   there?
14   A. I didn't prepare dockets.
15   Q. Who did?
16   A. Valarie Savage and Mary Beth Brackin.
17   Q. And if Mary Beth was out, who would prepare
18   the docket?
19   A. Are you talking about a specific incident or
20   just in general?
21   Q. In general.
22   A. She usually had them posted before she was
23   out. They were usually posted two weeks in

## Page 176

1    advance.
2    Q. And if they weren't?
3    A. There never was a time that they weren't.
4    Q. It's your testimony that there was not a time
5    period when Mary Beth was out for two weeks
6    and court couldn't be held for two weeks
7    because --
8    A. That is my testimony.
9    Q. -- dockets weren't posted?
10   A. And anything else is a lie.
11      Now, do you want to ask me about the
12   specific incident when Mary Beth was out?
13   Because the last week of the month, court is
14   not held. So one of the weeks Mary Beth was
15   out, there was no court. So there was no
16   docket. And before she left, she had posted
17   the next two weeks' dockets. And I'm sure if
18   they haven't been destroyed, those dockets are
19   still in the magistrates' office.
20   Q. Ms. Martin, we're going to be here for a
21   while.
22   A. Yeah.
23   Q. And you can continue this sarcastic tone with

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 177

1  me and accusations of lying, and we'll just
2  stay here --
3          MR. JAFFREE: Hold it.
4  A.  I want you to give me names and --
5          MR. JAFFREE: One moment. You're arguing
6          --
7  Q.  It's my place to ask you questions. I can ask
8      my question any way I want to.
9          MR. JAFFREE: You're arguing with the
10         witness.
11         MS. NELSON: I am because she's arguing
12         with me.
13         MR. JAFFREE: She's not giving a --
14         MS. NELSON: She's arguing with me and
15         she's accusing --
16         THE WITNESS: No, I'm not.
17         MR. JAFFREE: She's not giving a sarcastic
18         tone. She's just simply explaining to
19         you what --
20         MS. NELSON: She is not, and you know it.
21         MR. JAFFREE: Well, no, I don't know it.
22         I mean, she says she have answered the
23         questions, and she have answered the

### Page 178

1      question. I mean, you can --
2          MS. NELSON: That's not what she said.
3  Q.  Okay. Tell me about this time that
4      Ms. Brackin posted documents -- the docket
5      sheet?
6  A.  I just told you. What else do you want to
7      know.
8  Q.  Well, when did this occur?
9  A.  Before she was suspended.
10 Q.  And you suspended her; is that correct?
11 A.  No. The judge suspended her. I was made to
12     do the writeup.
13 Q.  Do you know what offense she had committed?
14 A.  Don't know for a fact.
15 Q.  It involved conduct that occurred before you
16     got there; is that correct?
17 A.  Yes, it was.
18 Q.  Did you feel like it was inappropriate to
19     write her up for something that occurred when
20     you weren't there?
21 A.  Yes, I felt it was inappropriate. I wasn't
22     there, was not employed at that time, and it
23     was totally appropriate for the judge to do

### Page 179

1      that since she was supervising at that time.
2  Q.  You don't disagree with the writeup; you just
3      disagree with the fact you had to sign off on
4      it?
5  A.  I disagree with the writeup.
6  Q.  And why did you disagree with it if you
7      weren't even there?
8  A.  Because the judge gave me the material to
9      review, and I reviewed it.
10 Q.  What did you review?
11 A.  Documents.
12 Q.  What documents?
13 A.  Of what -- I believe what the defendant says
14     happened, what Mary Beth says happened. I was
15     told by the judge that there was -- or maybe I
16     was there when they did the -- I can't
17     remember -- the investigation. I'm not sure.
18     Mary Beth had a few investigations.
19 Q.  Do you know anything about this investigation
20     or who ordered it or prompted it?
21 A.  Only what I heard -- was told to me.
22 Q.  And you don't know personally for a fact, do
23     you, what happened?

### Page 180

1  A.  I know what I read in the documents and what I
2      was told.
3  Q.  And what were you told?
4  A.  That -- I don't even remember which one this
5      is, whether it's --
6  Q.  If you don't know which one is it, how do you
7      know whether you agree with it or not or think
8      it was inappropriate or not?
9  A.  Because I confused -- she had -- she was
10     investigated more than once.
11 Q.  When you were working there, how many times
12     was she investigated?
13 A.  One -- see, I don't remember if she was
14     investigated for this before I got there or
15     after. I know that I was in on one, which I
16     think is this one where I had to actually be
17     in to serve a -- be in there for her to sign a
18     document in the investigation. And then I
19     was -- then I left.
20 Q.  So that's the only one that you were even
21     involved in, this one particular one; and that
22     would have been in 2004 when you worked for
23     the City. Is that correct?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 181

1  A.  That I would have been there?
2  Q.  Yes, employed by City?
3  A.  Yes, I believe so.
4  Q.  And she was suspended for ten days at that
5      time; is that correct?
6  A.  That's right.
7  Q.  And it's your testimony that she had prepared
8      dockets, which covered the time for which she
9      had been suspended?
10 A.  Right.  There wasn't court one of those weeks.
11 Q.  And what week was that?
12 A.  That was the week of April the 26th.
13 Q.  And how do you recall so vividly that there
14     was no court the week of April 26 of 2004?
15 A.  Because it's one of those things that I
16     remember because the judge told me on May the
17     10th to have Mary Beth post dockets down in
18     the police room or something.  And when I went
19     to Mary Beth and told her to post the docket,
20     she said, I already posted those before I left
21     on suspension.  She posted the ones for that
22     week and the week before.
23 Q.  So May 10th -- the week before May 10th would

Page 182

1      be May 3rd?
2  A.  May 3rd.  Yeah, May 3rd.
3  Q.  I don't understand -- what happened the week
4      of April the 26th?
5  A.  There was no court.  It was the last week of
6      the month.  They didn't hold court the last
7      week of the month.  There were no dockets.
8  Q.  What about the docket for May the 3rd?
9  A.  I told you, she had already posted it.
10 Q.  And May 10th?
11 A.  And May 10th.
12 Q.  So normally, how far out does she post a
13     docket?
14 A.  Usually two weeks.
15        (Brief pause)
16 Q.  Let me show you what has been marked as
17     Defendants' Exhibit Number 24 to Ms. Brackin's
18     deposition and ask if you can identify this
19     for me, please, ma'am.  I think maybe this
20     should be attached to it, also.  Do you
21     recognize your signature on that, Ms. Martin?
22 A.  Yes, I do.
23        MS. NELSON:  And I would ask that y'all

Page 183

1      not talk while I'm questioning.
2         MR. JAFFREE:  Well, you wasn't
3      questioning.  That was a pregnant
4      pause.
5  Q.  If I could see that for a second.  I
6      apologize.  That's the only copy I have.
7         This is a disciplinary action report
8      administered to Ms. Brackin; is that correct?
9  A.  Yes.
10 Q.  And were you present when this disciplinary
11     action was administered to her?
12        MR. JAFFREE:  I'm not sure I understand
13     the question, "administered to her."
14     What does that mean?
15 Q.  When that document was given to her, were you
16     present?
17 A.  I don't recall because I don't have my
18     calendar from that far back.
19 Q.  Well, I'm just asking from your memory.  Were
20     you --
21        MR. JAFFREE:  If you remember.
22 Q.  Either you remember or you don't.  I mean, do
23     you remember if you were there?

Page 184

1  A.  I don't recall.
2  Q.  You don't recall?
3  A.  I don't recall.
4  Q.  Do you know -- well, I'll put it this way:
5      You signed it on April 22nd.  Judge Gordon
6      signed it on April 22nd.  And Mary Beth
7      Brackin signed it on April 22nd, according to
8      this document.
9         Do you remember Mary Beth Brackin
10     discussing this disciplinary action with you?
11        MR. JAFFREE:  Again, object to the form of
12     the question.  There's no specifics as
13     to time.  The two of them could have
14     discussed that document yesterday.
15 Q.  Well, have you discussed this with Mary Beth
16     Brackin, whether it was in April of 2004 or
17     yesterday?
18 A.  Yes.
19 Q.  And when did y'all discuss it?
20 A.  I don't recall.
21 Q.  Did you discuss it while you worked at the
22     city and you were her supervisor?
23 A.  Not that I recall.

46 (Pages 181 to 184)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 185

1 Q. Do you know if she ever grieved or appealed
2   her disciplinary action?
3 A. I don't recall.
4   MR. JAFFREE: For the Record, there is no
5   grievance or appeal available.
6   There's only an ability to make a
7   statement.
8   MS. NELSON: Well, that's your statement.
9   It's not testimony.
10   MR. JAFFREE: That's the rules.
11   MS. NELSON: No. There's --
12   MR. JAFFREE: Well, we'll show you the
13   rules tomorrow.
14   MS. NELSON: That's what I'm saying.
15   That's your statement. Is that an
16   objection?
17   MR. JAFFREE: We'll read the rules
18   tomorrow and see what it says.
19 Q. Did you ever discipline Ann Baxter?
20 A. I was in the middle of writing it up, her
21   disciplinary action, at the time I was
22   terminated; had not completed it.
23 Q. And what was this discipline for?

Page 186

1 A. It was for her drawer being short money, an
2   incident that happened before I began.
3 Q. And you're saying you were in the process of
4   writing her up when you were terminated?
5 A. Yes.
6 Q. And you were terminated when?
7 A. I was given the notice on 10/12 I believe. I
8   was officially terminated on 10/18.
9 Q. Of 2004?
10 A. Yes.
11   (Brief pause)
12   (Defendants' Exhibit 15 was marked
13   for identification.)
14 Q. I want to show you what I've marked as
15   Defendants' Exhibit Number 15 and ask if that
16   is not a disciplinary action that you gave to
17   Ann Baxter or that you completed on Ann
18   Baxter.
19   Is that your signature?
20 A. Yes.
21 Q. Does that refresh your recollection of giving
22   her a disciplinary action in March of 2004?
23 A. Yes. I was mistaken. I thought I was doing

Page 187

1   this one before I left.
2 Q. Was there another one when you left or that
3   was the one, you were just confused about the
4   time?
5 A. I believe there must -- I think there was
6   another one that I was working on but not -- I
7   know I was doing three. I had given two the
8   week before, and I was working on another one,
9   which I believe -- recall being on Ann Baxter
10   but not for certain.
11 Q. Was that based on something that occurred
12   while you were actually her supervisor?
13 A. I'm sorry?
14 Q. Was that writeup that you gave her based --
15   MS. NELSON: And I'd appreciate -- just
16   let her look at it without pointing
17   to --
18   MR. JAFFREE: I was pointing to the date.
19 Q. Did that occur at a time frame -- the conduct
20   for which she was written up, did that occur
21   at a time frame where you were not her
22   supervisor?
23 A. Yes, I was not her supervisor.

Page 188

1 Q. And was that based on an audit report done by
2   either the City Finance Department or some
3   type of financial audit?
4 A. I believe so.
5 Q. And do you know that -- by the time the audit
6   was completed, at that time, you had come on
7   board and was her supervisor. And is that the
8   reason you were involved in the writeup or the
9   disciplinary action?
10 A. I had come on board what? I didn't
11   understand.
12 Q. You had joined the City -- by the time the
13   results of that investigation took place or
14   the audit had taken place, you then had become
15   Ms. Baxter's supervisor; is that correct?
16 A. No. This is dated February the 4th. I
17   started February the 16th.
18 Q. And I'm saying, by the time she was
19   disciplined, you were her supervisor at that
20   time; is that correct?
21 A. Yes. I was made to write her up by the judge,
22   even though I wasn't there when it happened.
23 Q. But you were her supervisor at the time she

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  was written up; is that correct?
2  A.  Yes.
3  Q.  And you say it in a tone as if you did not
4  agree with the disciplinary action?
5      MR. JAFFREE:  Well, excuse me.  That's
6      your characterization.  She just said
7      she wasn't her supervisor.  So I
8      object to the form of the question
9      about her tone.
10     MS. NELSON:  You can object to the form.
11     Okay.  Thank you.
12     MR. JAFFREE:  I mean, the question is just
13     not correct.  You can't just interpret
14     her tone and then --
15     MS. NELSON:  I can interpret the tone all
16     I want to.
17     MR. JAFFREE:  -- say that she disagrees
18     with something because of her tone.
19 Q.  Well, I detect you disagree with it,
20     Ms. Martin.  Do I detect correctly?
21 A.  That I disagree with what?
22 Q.  This disciplinary action to Ann Baxter.
23 A.  What I most disagreed with was having to do it

Page 190

1   when I wasn't there when it happened.  It
2   should have been the current supervisor at the
3   time that -- when it happened.
4  Q.  And who was that?
5  A.  Judge Gordon.
6  Q.  Sorry?
7  A.  Judge Gordon.
8  Q.  And did Judge Gordon also sign off on this
9      disciplinary action?
10 A.  Yes.
11 Q.  So again, you felt like it was not appropriate
12     to discipline someone based on conduct that
13     maybe -- that had occurred prior to your
14     getting there, so to speak; is that correct?
15 A.  For something that I was not involved in, yes.
16 Q.  And what --
17 A.  For which I could only read what had happened.
18 Q.  So you don't know really what occurred and
19     what Valerie Harris, the internal analyst, was
20     reviewing; you don't have personal knowledge
21     of what had occurred that led to this?
22 A.  I didn't have personal knowledge.  All I had
23     was the judge gave me the documents to review,

Page 191

1   and I was told, I would have to prepare the
2   disciplinary action.
3  Q.  Okay.  Now --
4      MR. JAFFREE:  Hold on a second.
5  Q.  As court administrator, was one of your duties
6      to complete performance evaluations on
7      employees you supervised?
8  A.  Yes, it was.
9  Q.  Do you know -- as I understand at the City,
10     everybody gets evaluated, roughly, around
11     their job anniversary date?
12 A.  Unless you're probationary.
13 Q.  Unless your probationary?
14 A.  Yes.
15 Q.  It wasn't like December 20th everybody got
16     evaluated?
17 A.  No.
18 Q.  It rotated?
19 A.  Right.
20 Q.  So do you know approximately how many
21     employees you've completed employee
22     evaluations on when you were court
23     administrator?  How many -- you supervised

Page 192

1   magistrates and --
2  A.  Clerks.
3  Q.  Clerks.  Do you know approximately how -- I
4      may have asked this before.  I'm sorry if I
5      have.  About how many magistrates were there
6      at the time when you were there?
7  A.  When I was hired, there was eight.  Come -- on
8      March 1st, we had an additional one, Tonya.
9      There was two clerk typists when I started,
10     and there were two temporaries when I began.
11     We eventually lost the use of the
12     temporaries.
13 Q.  So we are talking about seven magistrates
14     and --
15 A.  Eight magistrates.
16 Q.  Eight magistrates.
17     Of those, do you know how many you
18     actually completed a performance evaluation on
19     while you were court administrator?
20 A.  I remember three.  Not positive.  More -- I
21     believe there was three.
22 Q.  Do you know who -- what three people that
23     would be?

48  (Pages 189 to 192)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 193

1  A. I believe one was Mary Beth Brackin. One was
2     Lavera McClain. Not sure about the other
3     one. For some reason, I'm thinking Mary
4     Turner or Sarah Fowler, one of them maybe.
5     Not positive. I do think there was a third
6     one, though. Could have been a fourth one. I
7     just don't remember.
8  Q. Okay. Do you know how you rated Mary Beth
9     Brackin on her performance evaluation?
10 A. Yeah.
11 Q. Did she receive satisfactory or --
12 A. I believe so.
13 Q. And what about Lavera McClain?
14 A. The original evaluation was unsatisfactory.
15 Q. And do you know when you filled that out on
16    Lavera, that evaluation? I'm sorry. Do you
17    know when you filled out the performance
18    evaluation on Lavera McClain?
19        MR. JAFFREE: Which one are you talking
20        about, the original one or the
21        subsequent one?
22        MS. NELSON: The original one.
23 A. Well, first, let me say --

Page 194

1  Q. Well, I'll just ask you to answer my
2     question.
3  A. I'm going to answer.
4        MR. JAFFREE: I think she was trying to
5        answer.
6  Q. I'm asking when did you fill --
7  A. In April.
8  Q. In April?
9  A. I believe so.
10 Q. Okay. April 2004?
11 A. Right.
12 Q. And, at that time, you had been there two
13    months?
14 A. Yes.
15 Q. And I think you testified earlier that Lavera
16    had been out on sick leave for about six to
17    eight weeks?
18 A. That was --
19 Q. In April?
20 A. -- end of April. She had her surgery on the
21    27th or 28th of April, dealing with that.
22 Q. So you were new to the job, learning the job,
23    and you had a chance to evaluate her less than

Page 195

1     two months, and you gave her an unsatisfactory
2     evaluation?
3  A. Right.
4  Q. And can you tell me why you did that?
5  A. Because she wasn't performing satisfactorily.
6     And, actually, first, I told judge that I
7     didn't feel I should be evaluating her because
8     I had not been there the full year that she
9     was being evaluated for. The judge insisted
10    that I do the evaluation, and I told her that
11    I would evaluate Lavera on my experience and
12    observation of her work. And that's what I
13    did.
14 Q. Okay. And then once you filled that out, who
15    did you give that to? Did you give that to
16    the judge or --
17 A. Yes. I took it to the judge because she has
18    to sign it.
19 Q. And did you -- do you remember what areas you
20    found her to be unsatisfactory in?
21 A. Number of errors, quality of work, how she
22    dealt with, I believe, the public. She was
23    kind of short, at times rude.

Page 196

1  Q. Tell me the times you've seen her interact
2     with the public?
3  A. I can't give you specifics. She interacted
4     with the public when she was in the fines
5     room, in court, at the front window, as a
6     backup working the front window, doing
7     warrants at the warrant window.
8  Q. Had you ever seen any other magistrate be
9     short or rude to anyone --
10 A. We're not talking -- we're talking about
11    Lavera's evaluation.
12 Q. That's right.
13 A. That doesn't include -- I wasn't --
14 Q. Ma'am, I'm asking you the questions. I'm not
15    asking you to sit here and argue with me. I'm
16    asking you --
17 A. I'm not arguing with you. I'm just saying
18    that -- we're talking. You asked me about
19    Lavera's evaluation.
20 Q. That's right. And I'm now asking you the
21    question, have you seen any other magistrate
22    be short or rude with the public?
23 A. Maybe short. Lavera herself admitted to me

49 (Pages 193 to 196)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

### Page 197

1      that she had a tendency to be short at times.
2    Q.  So are you referring --
3    A.  And she has a gruff voice.
4    Q.  Are you retracting the rude or just saying --
5    A.  No.  She didn't admit rude.  I said rude.
6    Q.  Who else have you seen be short with the
7         public?
8    A.  On a really busy day, I've seen Ann Baxter be
9         a little short working the front window.
10   Q.  How about Mary Beth Brackin?
11   A.  Yes, I've seen her on a busy day be short.
12        It's not uncommon sometimes, depending on the
13        circumstances.
14   Q.  Did you give her an unsatisfactory?
15   A.  I don't know.  If I had been provided the
16        documents, I could read it and tell you.
17   Q.  I'm just asking what you remember.
18   A.  I don't remember.  I don't have it in front of
19        me.
20   Q.  What other areas do you contend that Lavera
21        McClain was unsatisfactory in?
22   A.  In handling the bondsmen and bondsmen
23        processes.

### Page 198

1    Q.  What had she done to be unsatisfactory in
2         handling bondsmen?
3    A.  She was rude.  I had a complaint filed against
4         her by Rickey Stokes, in writing.  Actually
5         was sent to me, the judge, I believe Jerry
6         Corbin, that she would not assist him with a
7         defendant that was going -- would have been
8         wrongly arrested had he not have gone to Mary
9         Beth when Lavera wouldn't assist him --
10        refused to assist him and Mary Beth
11        straightened the matter out.
12   Q.  Assist him in what?
13   A.  Assist him in getting the documents corrected
14        or the right person.  The guy had -- two
15        people had the same name except for the middle
16        name was different and their birth dates were
17        wrong.  And Lavera had issued a warrant
18        against the wrong person.  And she refused to
19        assist Rickey Stokes in figuring it out,
20        getting it right, getting the right person
21        arrested, and the other dropped against the
22        one that she had wrongly issued a warrant
23        against.  She refused to, so he called Mary

### Page 199

1         Beth and asked her to look up the paperwork.
2    Q.  Did you witness all of this?
3    A.  Did I witness all of it?
4    Q.  Yes.
5    A.  No.  I had the complaint from him in writing.
6    Q.  You didn't witness any of it, did you?
7    A.  No.
8    Q.  Can you think of any other areas that you
9         found her to be unsatisfactory?
10   A.  Without looking at the document, I can't
11        recall word for word.
12   Q.  When you presented this evaluation to Judge
13        Gordon, what occurred?  Did she agree with
14        it?  Did she sign off on it?
15        MR. JAFFREE:  Are we talking about the
16             first or second evaluation?
17        MS. NELSON:  The first one.  We haven't
18             gotten to a second evaluation.
19        MR. JAFFREE:  I just want to be clear.
20        MS. NELSON:  So I'd ask --
21   A.  When I gave it to her, to the best of my
22        recollection, it was -- I gave it to her, and
23        I told her that I knew we would need to

### Page 200

1         discuss it because there were some low marks
2         on it.  We -- to the best of my recollection,
3         we didn't discuss it at that time in depth.  I
4         just told her that I was sure she would want
5         to discuss it with me after she had a chance
6         to review it.
7    Q.  And then did she discuss it with you?
8    A.  After she discussed it with two or three other
9         people, yes.
10   Q.  And when she discussed it with you, what was
11        said?
12        Let me ask you this:  Did she come to you
13        and ask if you could talk about it?  Tell
14        me what -- I mean, what happened, what she
15        said, where you were, who was present?
16   A.  It was just me and her in her office as I
17        recall it.
18   Q.  Okay.
19   A.  And she wanted to know why I had rated her the
20        way I did.  And I tried to explain again that
21        I was rating her just on the time that I had
22        been there, what I had seen, and had dealings
23        with her, and reminded her that I didn't want

50  (Pages 197 to 200)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**