# FREEDOM COURT REPORTING

## Page 201

1  to do the evaluation to begin with because I
2  hadn't been there the whole year.
3      And she said, well -- she told me Lavera
4  had never gotten a bad evaluation, and she
5  asked me if I had reviewed the previous couple
6  of years.
7      And I told her that I had and they
8  appeared to be almost carbon copies of each
9  other; same comments almost, same markings and
10  everything.
11      But that wasn't -- I didn't observe the
12  behavior or the work product during that time,
13  but I did review them because she had asked me
14  to.
15      She said that she had talked to some other
16  people, and they had recommended that she ask
17  me to reconsider what I had put on the
18  evaluation.
19  Q. Did she tell you who she had talked to?
20  A. Not at that time.
21  Q. And when she asked you to reconsider, what did
22      you say?
23  A. I told her that for days I had agonized over

## Page 202

1  doing that evaluation. I had put an awful lot
2  of time in it, was not -- I don't -- I didn't
3  like to do evaluations on people that were
4  low, unsatisfactory, but that's how I saw the
5  work that she was doing. And I had to rate
6  her the way I saw it.
7      And she again kept, well, just take it
8  home overnight and just review it again and,
9  you know, see if there isn't some area that
10  you could reconsider and -- and all, just take
11  it home with you.
12      And then she said, this is not a threat,
13  but I'm reminding you that you are still on
14  probation.
15  Q. And was anybody present when she allegedly
16      made that comment?
17  A. I told you before that it was just she and I.
18      MR. JAFFREE: Well, it's not an allegation
19          on her part; it's a fact on her part.
20  Q. Okay. So did you take it home?
21  A. Yes, I did.
22  Q. Did she ever tell you who she had talked to?
23  A. At a later date.

## Page 203

1  Q. When you took it home, did you -- strike that.
2      Did you ever reconsider the evaluation?
3  A. I did.
4  Q. Did the judge ever tell you the implications
5      it could have on Lavera?
6  A. She did during that conversation that we had
7  when she asked me to take it home and
8  reconsider. I was not aware of that when I
9  did the evaluation. I did not know that it
10  was time for a raise for Lavera until she said
11  that. That didn't have anything to do
12  with -- it was not a consideration when I did
13  her evaluation because I didn't know about it.
14      I took it home and agonized some more over
15  it. But because my job had been threatened
16  and I needed to work, I changed enough to make
17  it a satisfactory evaluation because I felt
18  forced to, to keep my job.
19  Q. You testified you didn't know that it was time
20      for a raise for Lavera. What do you think the
21      purpose of an evaluation is if a raise or
22      something --
23  A. You don't always get a raise with an

## Page 204

1  evaluation.
2  Q. You're a brand-new supervisor --
3      MR. JAFFREE: Are you arguing with the
4          witness again?
5      MS. NELSON: I'm not arguing with the
6          witness.
7      MR. JAFFREE: She said she didn't know.
8      MS. NELSON: And I'm asking her.
9  Q. You were a brand-new supervisor and you didn't
10      even take the time to learn enough about an
11      evaluation that could have a tremendous impact
12      on somebody's job and affect their pay?
13  A. That doesn't change how they're performing.
14  Q. Would it --
15      MR. JAFFREE: Well, maybe in some circles
16          it does.
17  Q. Would it have affected your decision if you
18      had known the pay implications?
19  A. No. Because my evaluation was based on her
20      performance.
21  Q. That you'd observed for --
22  A. And I didn't see --
23  Q. -- a few weeks or months?

51 (Pages 201 to 204)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 205

1  A.  That was not my fault. I was made to do the
2      evaluation.
3  Q.  When did you learn who the other people that
4      had been involved in the decision to ask you
5      to reconsider this evaluation?
6  A.  The names were --
7  Q.  I said when did you learn?
8  A.  Oh. Around July the 19th when I called a
9      meeting or asked Kai if she and I and the
10     judge could meet because there was so many
11     problems going on.
12         MR. JAFFREE: Can we take a break?
13         MS. NELSON: Yeah, we can.
14         (Brief recess)
15         (Defendants' Exhibit 16 was marked
16          for identification.)
17 Q.  Let me show you Defendants' Exhibit 16 and ask
18     you if that's a copy of Ms. Lavera McClain's
19     2004 evaluation that we've been discussing.
20         MR. JAFFREE: This is not the first one.
21         MS. NELSON: Just let her answer.
22 A.  No. It's not the first one.
23         MR. JAFFREE: Excuse me. You're

Page 206

1      saying, that we've been discussing.
2      We've been discussing the first one.
3      Now, this is the first one.
4          MS. NELSON: You don't know what it is.
5      You haven't seen it. Let her say what
6      it is.
7          MR. JAFFREE: Well, you said, there's been
8      two evaluations. I'm trying to --
9          MS. NELSON: No. We've talked about the
10     first one. Just let me ask her
11     questions, Mr. Jaffree.
12 Q.  Tell me what that is?
13 A.  Well, it --
14 Q.  Is it the first and the second one?
15 A.  Yes, it is.
16 Q.  Okay. Thank you.
17 A.  Yes, it is.
18 Q.  It is.
19 A.  Is that what you asked me?
20 Q.  Just trying to ask you to help me identify.
21     You filled it out; is that correct?
22 A.  Right.
23         MR. JAFFREE: First and the second.

Page 207

1  A.  The first and the second time.
2  Q.  That is the first and the second?
3  A.  Right. Right. It is the first and the
4      second.
5  Q.  Thank you.
6          So apparently, there are some blocks on
7      there that look like they've been scratched
8      out and an X mark put in another place?
9  A.  Right.
10 Q.  So basically, when you did -- you testified
11     that you reconsidered and changed some marks.
12     You did it on the first one you filled
13     out -- when I say -- you took the evaluation,
14     and took that same evaluation, marked through
15     it on some places and made a new mark or new X
16     or something. Is that correct?
17         I'm not trying to put words in your
18     mouth. You used the same form, so to speak,
19     or --
20 A.  I didn't --
21 Q.  When you revised it?
22 A.  Something you said about reconsidered. I was
23     made to change it on threat of losing my job.

Page 208

1          MR. JAFFREE: I never got this document.
2  Q.  And that's your perception of what had
3      occurred.
4          Could the judge just have not have
5      overridden your recommendation and changed it
6      herself?
7  A.  I don't know. If she could have, looks like
8      she would have instead of threatening me.
9  Q.  Can you tell from looking at Defendants'
10     Exhibit Number 16 which areas you changed?
11 A.  I changed Task 2.
12 Q.  And what is Task 2?
13 A.  Occasionally does -- well, my comments are --
14     I don't have the -- there's a separate sheet
15     that actually has the -- what I was --
16 Q.  Is that what you gave me earlier?
17 A.  -- the rating. It's another sheet that goes
18     to this I think.
19 Q.  Would this be the rating guide that you gave
20     me in Defendants' Exhibit 2?
21 A.  It's that -- it's actually another sheet.
22     Like this part right here (indicating),
23     section two, this gives what you're actually

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 209

1  rating. But on the first part, I seem to
2  recall there was another sheet that you went
3  by because where it just said Task 1 at the
4  comments? But let me see that.
5  Q. I'm showing you what you gave to me,
6      Defendants' Exhibit 2.
7  A. Yes, this could be it, there's ten tasks. So
8      you --
9  Q. I'm just trying to understand what you
10     changed.
11 A. Okay. I changed Task 2 from a one to a two
12     rating, from unsatisfactory to satisfactory.
13 Q. And Task 2 deals with?
14 A. "Issuing warrants of arrest or summons by
15     determining probable cause, sets appropriate
16     bond amounts on warrants, and process the
17     warrant or summons to the computer and forward
18     to the police department for execution or
19     service."
20 Q. What else did you change?
21 A. In Section 2, I changed number four, Safety
22     Conscientiousness from non-applicable to a
23     two, to a three. I changed --

Page 210

1  Q. You felt like she was not safety
2      conscientious?
3  A. Actually, that's something that's not ever
4      rated for some reason, so I had put
5      non-applicable. And then changed it to a two
6      to add points as I was requested and then
7      changed it to a three to add enough points to
8      get her to the satisfactory level.
9  Q. That was the safety issue?
10 A. Yes.
11 Q. Anything else you changed?
12 A. I changed number five, Quantity of Work, from
13     an unsatisfactory one to a satisfactory two.
14     And it -- I think just from looking at this
15     copy -- I can't tell for sure but I -- but it
16     is evident that I changed those.
17 Q. All right. Then did you ever discuss this
18     Defendants' 16 with Lavera McClain?
19 A. I was told by Personnel to discuss it with her
20     after she returned and after they sent it back
21     to me.
22 Q. When did she return -- return from leave?
23 A. Yes.

Page 211

1  Q. Do you know when she returned?
2  A. Maybe end of May, first of June.
3  Q. Did you tell her any of the conversations
4      between you and Judge Gordon?
5  A. The conversation between us? No. What
6      I -- no, I didn't tell her the whole
7      conversation, no.
8  Q. What did you tell her?
9  A. I told her that that was not the original
10     evaluation that I had done on her, that the
11     judge had requested that I change the original
12     evaluation. And I told her that it was
13     against what I believed in doing, and that I
14     wouldn't do it again. And we went over the
15     whole evaluation.
16 Q. Did she ask you questions or disagree with the
17     evaluation?
18 A. Oh, yes. Yes, she did. She said that she'd
19     always received high evaluations, and I told
20     her that I had, in fact, reviewed a couple.
21     And they seemed to be almost carbon copies of
22     each other and that I was rating -- had rated
23     her on what I had observed.

Page 212

1  Q. Did she comment that she had been on a leave a
2      good portion of that time?
3  A. Good portion of what time?
4  Q. That you had supervised her.
5  A. The period for which I was evaluating her --
6          MR. JAFFREE: Well, wait a minute. Let me
7      -- let me object --
8  A. -- was not during that period.
9          MR. JAFFREE: -- because you keep -- I'm
10     sorry. I'm going to object. They
11     keep distorting the Record, but she
12     came back on July. And the period
13     that she was evaluated was on April
14     the 28th. And so the six weeks
15     sort of more after than before. And
16     you keep indicating that --
17         MS. NELSON: I object to your testimony.
18     You don't know when she came back.
19         MR. JAFFREE: Well, I know when she signed
20     this.
21         MS. NELSON: Well, that's not when she
22     came back. I mean, you don't know
23     that's when she came back.

53  (Pages 209 to 212)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 213

1  A.  No.  She signed that when Personnel sent it
2     over to me to review with her.
3  Q.  My question is, did Lavera McClain express any
4     concern to you that your evaluation of her was
5     based on a very limited time frame in which
6     you had personally worked with her or observed
7     her work?
8  A.  I don't recall those comments because that
9     leave time was not included in this particular
10    evaluation time.
11 Q.  Did you get involved in approving her leave of
12    absence?  I'm talking about Lavera McClain.
13 A.  I'm not sure.
14 Q.  Did you ever take a leave of absence or time
15    off from work?
16 A.  Yes, I did.  It wasn't a leave of absence.
17 Q.  Did you take time off from work?
18 A.  Yes.
19 Q.  And do you know how much time you took off?
20 A.  Not specifically, no.  Not in total number,
21    no.
22 Q.  Do you know if you ever took time off that you
23    had not worked there long enough to earn?

### Page 214

1  A.  The only time off I could take was with
2     judge's approval.  And she approved it, I took
3     it.
4  Q.  And she approved your time off, didn't she?
5  A.  Yes, she did.
6  Q.  Back to this desk and furniture for your
7     office, did you pick that out?
8  A.  Yes, I did.
9  Q.  And did you make certain requests to have that
10    approved to furnish your office?
11 A.  I'm sorry?
12 Q.  That's a bad question.  Strike that.  Did you
13    select your furniture and furnishings for your
14    office and then request to have it approved?
15 A.  I still don't understand your question.
16 Q.  Did you just go out and go shopping for
17    furniture one day and tell the judge, this is
18    what you wanted to buy?
19 A.  No.  The judge insisted that I have new
20    furniture, even though I told her that the
21    furniture that was in there was perfectly
22    fine.
23 Q.  But then you went out on your own and --

### Page 215

1  A.  No, I did not.  Michelle Sellers got a book
2     from Houston -- Hudson Supply Company where
3     they had -- where they usually ordered
4     furniture from.  She gave the book to me and
5     she said look through this and see if there's
6     any furniture that you like in there.
7  Q.  And did you pick some out?
8  A.  Yes, I did.  And she ordered it.
9  Q.  Okay.  Did you have a budget?
10 A.  Nobody gave me a budget.  They told me what I
11    wanted.  They also -- Judge told me that if I
12    wanted wall hangings, whatnots, that they
13    would reimburse me for that.  She gave me no
14    amount.
15 Q.  And did you go shopping for accessories, I'll
16    call them?
17 A.  Yes, I did.
18 Q.  And do know how much money you spent on
19    furnishing your office?
20 A.  No, I don't.
21 Q.  Michelle Sellers, did she ever sit in on any
22    of your job interviews when you were first
23    interviewing for your job as court

### Page 216

1     administrator?
2  A.  She -- I don't recall whether she was or not.
3  Q.  She could have?
4  A.  Possible.
5  Q.  Okay.  What about Kevan Kelly; do you remember
6     him sitting in?
7  A.  No, I don't.
8  Q.  Do you know Kevan Kelly?
9  A.  Yes, I do.
10 Q.  And what's your relationship with Kevan Kelly?
11 A.  Just met him when I started working in court.
12 Q.  And he's the city attorney; is that correct?
13 A.  Yes.
14 Q.  Do you know if Kevan Kelly has made any
15    complaints about you?
16 A.  Can't imagine that he did.  We talked all the
17    time, every time I was over at the court.  He
18    never mentioned to me he had a complaint.  I
19    was never provided a complaint.
20 Q.  You mentioned earlier, as you said, you were a
21    probationary employee for the first 12 months
22    of your employment, though I realize you
23    didn't work the full 12 months.  But you were

54  (Pages 213 to 216)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 217

1    a probationary employee during the time you
2    worked --
3    A. Right.
4    Q. -- for the City; is that correct?
5    A. That's correct.
6         (Defendants' Exhibit 17 was marked
7         for identification.)
8    Q. And I'm going to show you what's Defendants'
9    Exhibit Number 17. And did Judge Gordon
10   evaluate your performance while you were there
11   the first three months?
12   A. Yes, she did.
13   Q. And I'm going to show what I've marked as
14   Defendants' Exhibit 17. Is that the
15   evaluation you received?
16        (Brief pause)
17   Q. Do you recognize that?
18   A. Let me finish reading it, please.
19   Q. Okay.
20        (Brief pause)
21   A. Yes.
22   Q. And I'm sorry. You signed -- did Judge Gordon
23   review that with you?

Page 218

1    A. Yes, she did.
2    Q. And you signed it on April 24 -- excuse me --
3    April 21st, 2004?
4    A. Yes.
5    Q. Now, going back to something earlier you
6    testified to, you said you did not know the
7    individuals that Judge Gordon had discussed
8    Ms. McClain's evaluation with until you and
9    the judge and Kai Davis met. Was that your
10   testimony?
11   A. Yes.
12   Q. And when did that occur?
13   A. I think July the 19th, 2004.
14   Q. And how is it that you remember that date so
15   specifically; is that one of the dates on your
16   calendar or --
17   A. Not sure. Because I had such a hard time
18   getting that meeting.
19   Q. Hard time doing what now?
20   A. Getting the meeting.
21   Q. Getting the meeting?
22   A. Yes.
23   Q. Okay. And what do you mean by having a "hard

Page 219

1    time" getting the meeting set up?
2    A. Well, I had tried to contact Kai Davis in
3    personnel to talk to her about I thought that
4    because of all the problems that were going on
5    that I was going to see if she would meet with
6    the judge and I to see if we could work some
7    of them out.
8    Q. Let me stop you right there. Tell me, what
9    problems were going on?
10   A. Well, things went downhill with me and the
11   judge after I did the unsatisfactory
12   evaluation with Lavera. Things were never the
13   same after that.
14   Q. Again, I just -- the date -- just so we can
15   clarify the time frame we're talking about.
16   The date that the evaluation on Lavera was
17   first done by you was when?
18   A. About a week or two I believe after mine was
19   done.
20   Q. It was in April I believe you testified
21   earlier, April of 2004?
22   A. Yes, I believe so.
23   Q. Okay. You testified there were -- what

Page 220

1    problems were going on?
2    A. Well, there were numerous errors being
3    committed still by Eunice and Lavera, that
4    every time I would try to talk to the judge
5    about them, bring them to her attention, she
6    say -- she'd say, everybody makes mistakes.
7         And I told her that I understood that
8    everybody made mistakes, but there were
9    numerous, numerous mistakes being made, and
10   that at some point, these should start slowing
11   down, that the other magistrates were not
12   making all -- near as many mistakes.
13        And I had tried to talk to the judge about
14   this. She just always made excuses. Valerie
15   Harris, the city auditor, had called me and
16   said that she was so tired of the mistakes
17   that Lavera and Eunice were making, and that
18   she had approached the judge before I began
19   work -- I don't know a date -- and asked her
20   to terminate them because of all the
21   continuing errors. And she didn't get
22   anywhere with the judge; Judge wouldn't hear
23   it. And Valerie Harris asked me to approach

55 (Pages 217 to 220)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 221

1    the judge and ask her to terminate them. And
2    I just told Valerie that I didn't think it
3    would do any good for me to approach the
4    judge.
5    Q.  Was anybody present when you had this
6        conversation?
7    A.  It was a phone conversation.
8    Q.  Okay.
9    A.  With Valerie Harris.
10   Q.  Had the judge talked to you about your
11       performance and some of your deficiencies?
12   A.  As -- when?
13   Q.  Before this meeting with Kai Davis?
14   A.  No.  We never had a counseling session other
15       -- and the only directive --
16   Q.  Did she ever call you in her office and talk
17       to you about your job?
18   A.  No.  If I was over in court, we talked about
19       specific things.  I had a lot of questions for
20       her about cases, but she never called me to
21       her office for a counseling session.
22   Q.  Did she ever talk to you about your
23       interaction with Ashton Ott?

Page 222

1    A.  She took up for Ashton when I -- I actually
2        called the judge after Ashton and I -- after
3        Ashton hung the phone up on me rudely.  And I
4        called the judge all upset because that had
5        happened and pretty much told the judge what
6        I'd said to her and thought the judge would
7        maybe mend things or whatever, you know, see
8        it from my side.  But she just said that that
9        situation never happened in court anyway.
10   Q.  Did the judge ever talk to you about any
11       complaints from the Bar of other lawyers?
12   A.  No, she did not.
13   Q.  Did she ever talk to you about your not
14       allowing attorneys to file motions in the
15       magistrates' office?
16   A.  No, she did not.
17   Q.  Did she ever talk to you about an issue where
18       a man had to drive all the way from Michigan?
19   A.  No, she did not.
20   Q.  Do you know what I'm talking about?
21   A.  You're reading from a document that I had
22       never seen and never knew anything about.
23   Q.  I'm talking about, do you recall a

Page 223

1    defendant --
2    A.  No, I don't.  I said, no, I didn't.
3    Q.  No.  You're saying --
4        MR. JAFFREE:  Let her finish the question.
5    Q.  Do you recall any incident about a defendant
6        having to drive from Michigan to Dothan,
7        regarding a case that he did not need to make
8        the trip for?
9    A.  No, I do not.
10   Q.  Did she ever talk to you about your lack of
11       knowledge of procedures in the magistrates'
12       office?
13   A.  No, she did not.
14   Q.  She didn't talk to you about your lack of
15       judgment or lack of supervisory skills?
16   A.  No, she did not.
17   Q.  Did she ever talk to you about the fact that
18       your evaluation of Lavera McClain was based on
19       information that you were getting from other
20       magistrates?
21   A.  No, she did not.
22   Q.  Was, in fact, some of the -- was the
23       evaluation you gave to Lavera McClain based on

Page 224

1    what Mary Brackin and Mary Turner had told you
2    about Lavera?
3    A.  No, it was not.  I've answered that question
4    before.
5    Q.  Did you --
6    A.  I based it on my observation.
7    Q.  -- rely on Mary -- did you rely on Mary Beth
8        Brackin and Mary Turner to do your job?
9    A.  I sure did not.
10   Q.  Who did you rely on to do your job?
11   A.  Me.
12   Q.  And how did you know what to do?
13   A.  I know how to be a supervisor, and that's what
14       I was hired to do.  However, I was not allowed
15       to supervise all of them.  I was never allowed
16       to supervise Lavera or Eunice because they
17       were untouchable.  But I was highly encouraged
18       to discipline the white magistrates.
19   Q.  Did you ever discipline the white magistrates
20       on your own?
21   A.  I wrote a memo to Michelle Bryan when the
22       cases were found, but I did discuss it with
23       the judge first to see what she thought about

56  (Pages 221 to 224)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 225

1    it.
2    Q.  Did you ever discipline Mary Beth Brackin,
3       other than for the incident that I asked you
4       about earlier regarding something that
5       occurred before you were here?
6    A.  No.
7    Q.  Did you ever —
8       MR. JAFFREE:  Let me object.  The question
9          suggests that there was a basis to
10         discipline her.
11   Q.  Did you ever feel there was a basis to
12      discipline Mary Beth Brackin?
13   A.  No, I didn't.
14        (Brief pause)
15   Q.  Were you aware of any complaints filed against
16      Mary Beth Brackin?
17   A.  Specific?  Do you have a name?
18   Q.  I'm asking you if you have a memory of any
19      complaints against her?
20   A.  I'm not sure.
21   Q.  Not sure?
22   A.  I kind of remember -- I believe there was -- I
23      believe this was -- not sure if this was

Page 226

1    during -- I believe it was during my tenure
2    that a police officer was encouraged by
3    Michelle Sellers to fill out a complaint
4    against Mary Beth.  The police officer told --
5    what Mary Beth told me was that the police
6    officer told her that he was encouraged to
7    complete it by Michelle Sellers.
8    Q.  And why do you think Michelle Sellers would
9       encourage a police officer to do that?
10   A.  Because she is on the same vendetta that the
11      judge was, to get rid of Mary Beth Brackin and
12      Mary Turner.
13   Q.  And what basis -- and what facts do you have
14      to support that the judge was -- and Michelle
15      were on such a vendetta?
16   A.  Well, from day one, interview one, I was told
17      about them.  That was -- that was not true.
18      They -- I never saw physical harm at all, was
19      never afraid of them.  They -- they're the
20      reason that I learned what I did as far as the
21      court system was concerned.  And
22      one -- Michelle made comments more than once
23      that -- that they -- that if they did

Page 227

1    something else, that we could terminate them.
2    And the judge --
3    Q.  She made this comment to you?
4    A.  Yes.  And the judge, in one of the interviews
5       or maybe subsequent meetings, said that she
6       should have already terminated Mary Beth and
7       Mary Turner and she was sure that they would
8       do something during my tenure so that I would
9       be able to terminate them.
10   Q.  And who was present when she said this?
11   A.  I'm not sure which meeting it was, so I
12      wouldn't know.  Me and the judge, possibly
13      Michelle Sellers, or if it was during an
14      interview.  I don't know which one.
15   Q.  Michelle Sellers is white; is that correct?
16   A.  Yes, it is.
17   Q.  Do you have any reason to think that Michelle
18      Sellers would have any racial animus toward
19      Mary Turner or Mary Beth Brackin --
20   A.  I know she --
21   Q.  -- or yourself?
22   A.  Or me?
23   Q.  Yes.

Page 228

1    A.  Just that she goes along with the judge with
2       everything.
3          (Defendants' Exhibit 18 was marked
4          for identification.)
5    Q.  I'm going to show you what I've marked as
6       Defendants' Exhibit 18.  Is that the memo you
7       wrote to Mary Beth Brackin about the officer's
8       complaint about her?
9          (Brief pause)
10   A.  I believe, number one, this complaint was done
11      before I began work.
12   Q.  I'm asking, is that the memo that you wrote to
13      Mary Beth Brackin?
14   A.  At the instruction of the judge.  And I
15      believe that was the same complaint that
16      Michelle Sellers encouraged the police officer
17      to complete.
18   Q.  Isn't it true that when Mary Beth or Mary
19      Turner did something, you're the one that
20      didn't want to write them up; isn't that
21      correct?
22   A.  No, it is not.
23   Q.  So you do agree, they should have been written

57  (Pages 225 to 228)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 229

1  up for that?
2  A. No, I didn't say that. I wasn't there when it
3     happened. I shouldn't have had anything to do
4     with the writeup.
5  Q. Is it your testimony that Mary Beth Brackin
6     and Mary Turner, Sarah Fowler, Ann Baxter,
7     Valarie Savage never did anything that
8     warranted counseling or reprimand?
9  A. That's not my testimony.
10 Q. But the only time you would write them up is
11    only if the judge told you to write them up?
12 A. No, the judge didn't make me write up Michelle
13    Bryan. I conferred with her, but she did not
14    make me. I am in agreement that anytime I
15    tried to discipline Ms. McClain and Ms. Knight
16    that it was put a stop to by the judge.
17 Q. And when did you try to discipline them?
18 A. Well, Eunice was insubordinate to me a couple
19    of times. And I had actually written her up
20    for insubordination, took it over to the
21    judge. And the judge said, I'll sign it. And
22    I believe, in fact, she did sign it, however,
23    warned me that Eunice would probably see that

Page 230

1  as discriminatory treatment and would probably
2  file a claim of discrimination against me.
3  Q. When was she insubordinate to you?
4  A. She was insubordinate to me in court one day
5     when a defendant -- a person approached her
6     before court started and asked her to continue
7     a court date. And those things were only
8     supposed to be done on a court date after
9     George -- Judge convened court.
10       And I said something to her. And she
11    snapped back at me and said that I didn't have
12    the right to interfere, basically. That
13    wasn't her exact words. I don't remember her
14    exact records. And then when I did a memo to
15    her about many warrants that she had changed
16    the bond on without documentation and while
17    someone else was the magistrate on call for
18    which there was a policy for, she told me that
19    I didn't have the authority -- to my face she
20    told me that -- to say anything to her about
21    changing warrants. And then in a subsequent
22    staff meeting in front of the whole staff, she
23    told me I didn't have the authority.

Page 231

1  Q. The authority to do what?
2  A. To tell -- to tell her what to do with a bond.
3  Q. And who was present at that meeting?
4  A. The staff meeting?
5  Q. Yes.
6  A. I don't have a list but the majority of the
7     magistrates, clerks -- and clerks.
8  Q. Do you remember her writing you a memo about
9     that issue?
10 A. About that issue?
11 Q. Yes.
12 A. She may have. Not sure.
13 Q. Are you aware that Lavera and -- Lavera
14    McClain and Eunice Knight felt that you were
15    discriminating against them based on their
16    race?
17 A. Was I aware of it?
18 Q. Yes.
19 A. No.
20       (Defendants' Exhibit 19 was marked
21       for identification.)
22 Q. I'm going you show you what I've marked as
23    Defendants' Exhibit Number 19 and ask you if

Page 232

1  can recognize or identify that for me.
2       (Brief pause)
3  A. Yes.
4  Q. Is that memo about that particular testimony
5     you just gave me, or is this in relation to
6     anything else? Tell me what this memo is
7     about?
8  A. This memo is about Lavera not Eunice.
9  Q. Oh, I'm sorry. Okay. Do you know -- well,
10    tell me while I'm showing you that -- I
11    apologize. That is from Lavera?
12 A. Right.
13 Q. You're saying Eunice was the one you claim was
14    insubordinate.
15 A. Insubordinate.
16       So what was your question?
17 Q. My question is, tell me -- you've read this --
18    have you had a chance to read this memo from
19    Lavera?
20 A. Yes.
21 Q. And that's Defendants' Exhibit Number --
22 A. 19.
23 Q. -- 19?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 233

1    **Can you tell me the circumstances**
2    **surrounding that memo?**
3    A.    Yes.  Valarie Savage had provided me a
4       complaint in writing, and this is what Lavera
5       is responding to.  Valarie Savage did a
6       complaint that Lavera had changed a bond while
7       Valarie was on call.  Valarie was not at work
8       that day.  However, she had advised me that
9       she was still -- would be -- was the
10      magistrate on call and would be handling her
11      own call.  And Valarie complained about Lavera
12      changing this because there was a memo.  There
13      was a policy that only the magistrate on call
14      could change a bond.  And it -- if it was
15      changed by anyone, there had to be
16      documentation of the reason why.
17   Q.    Are you aware of any white magistrates who
18      **changed a bond when they were not on call?**
19   A.    I am aware of the one she lists here, Sarah
20      Fowler, that changed one.  However, Sarah
21      Fowler had contacted Valarie Savage and asked
22      her could she change it, because I talked to
23      Sarah myself.

Page 234

1    Q.    And if a magistrate is on call, they're not in
2       **the office; is that correct?**
3    A.    They could be in the office.  Most of the time
4       they are in the office except for on the
5       weekend.
6    Q.    Do you know when this occurred, this
7       **incident --**
8    A.    It was during the week.  Valarie was off, but
9       had let me know that as stated on the
10      schedule, she was the -- she was still the
11      magistrate on call.  That had not been
12      changed.  There was no substitute.
13   Q.    And based on that memo that Lavera wrote to
14      **you, she felt like you were holding her to a**
15      **different standard.**
16   A.    I don't know what she felt.
17   Q.    I guess the memo can speak for itself.
18      **Did you --**
19   A.    I guess that -- you know, Valarie Savage filed
20      a complaint, but I don't see a copy of her
21      complaint here.  I just see the one that
22      you're putting in from Lavera.
23   Q.    Was any disciplinary action taken?

Page 235

1    A.    Against who?
2    Q.    Toward anybody regarding this incident in
3       **Defendants' 19?**
4    A.    I did a -- I don't remember if I did a memo to
5       Lavera or just talked to her, reminding her of
6       the policy.
7    Q.    Did you ever deny Eunice Knight the right to
8       **be off when her daughter was sick?**
9    A.    She didn't tell me it was her daughter having
10      a biopsy.  And, no, I did not deny her.
11   Q.    Did you require her to provide different
12      **documentation than you did other white**
13      **magistrates?**
14   A.    No.  I originally said -- because she was so
15      rude and insubordinate to me when I was trying
16      to discuss this with her to figure out why she
17      couldn't come in after the doctor's
18      appointment and why she couldn't work the next
19      day, I try -- I first said, well, you'll need
20      to bring me a doctor's excuse, and then later
21      changed it, and put it on her leave form that
22      I changed it.  I marked that out.  Did not
23      require it.

Page 236

1    Q.    Now, how was she rude and insubordinate to
2       **you?**
3    A.    Because I was trying -- Eunice had been out a
4       lot on leave that I thought had been approved
5       previous to my coming there.  She had told me
6       that she was going to be out several
7       afternoons, several whole days over a several
8       weeks' period because she refereed basketball
9       games for playoffs for high school.  It was
10      already set up, so I assumed the judge had
11      approved it.  However, at a subsequent time
12      talking to the judge, the judge told me she
13      knew nothing about it.
14          Anyway, so -- and I had three magistrates
15      that were going to be off that Thursday and
16      Friday already, vacation.  And I told Eunice,
17      I said, this is a very bad time for you to be
18      off because of manning court on Thursday.  And
19      I needed her there.  And I asked her if she
20      could come in after the doctor's appointment.
21      And she said, no, that she might need to stay
22      with her daughter.  And then I asked her could
23      she come in on Friday because of the shortage,

59  (Pages 233 to 236)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 237

1  and she said, no, I may have to keep the
2  children.
3      But she never, at that time, never told me
4  the extent, what the appointment was for. If
5  she had told me it was a biopsy, it was a
6  serious matter with her daughter, I would have
7  approved the request. And we would have made
8  do with the people we had.
9  Q.  Have you allowed white employees to take off
10     without requiring a doctor's note?
11  A.  Michelle Bryan had a niece that was in
12     Children's Hospital in Birmingham. She called
13     me from there and said that her niece was not
14     expected -- might not live, and she and the
15     family were up there. And, also, her
16     grandmother in another town, which she was
17     going at some point to be by, was on her death
18     bed, expecting her not to live either.
19        She did have, I believe, a little bit of
20     leave. And I told her to keep me updated.
21     Every day that she called, I went over or
22     called and told the judge and Michelle. I was
23     not aware -- had not memorized the operations

Page 238

1  manual that said that I did not have the
2  authority to authorize leave that they -- that
3  someone didn't have.
4      And the judge -- Judge never, during those
5  days that I was notifying her that Michelle
6  had called and the niece was still bad and the
7  grandmother was still in bad shape, never once
8  did the judge tell me I didn't have the
9  authority to keep letting her be off. Only
10  after the fact did she tell me.
11  Q.  Go back to July 19th. You and the judge and
12     Kai Davis met; is that correct?
13  A.  Right.
14  Q.  Was anyone else present?
15  A.  I don't recall anyone else being present.
16  Q.  What occurred in that meeting?
17  A.  Well, I had previously talked to Kai about all
18     the problems. And I just wanted her to kind
19     of be a mediator I guess. I wanted to
20     work -- I mean, I could still work with the
21     judge, but I needed her to give me what she
22     had promised me when I started. And that's
23     100 percent backing and let me supervise

Page 239

1  everyone in the office fairly.
2      So we got together. The judge had been
3  over at Kai's office before they let me know
4  that she -- to come over. And so Kai said
5  that she knew there was -- we'd both said
6  there were problems. So she asked me to
7  start. And I just did a laundry list of the
8  issues that I had and asked the judge to give
9  me her cooperation.
10      Before I could get through my part, the
11  judge interrupted and started going on about
12  her side of things and just eventually threw
13  up her hands and said, I'm just tired of all
14  this, and walked out.
15  Q.  When she interrupted and gave her side, did
16     she let you know that she was having some
17     issues with you and your performance?
18  A.  She was answering what I was saying. It was
19     not a counseling session.
20  Q.  And that was also letting you know that she
21     had some issues with your performance; isn't
22     that true?
23  A.  I don't know --

Page 240

1  Q.  I don't care --
2  A.  -- about issues with performance.
3  Q.  -- what you call it.
4  A.  Well, I care what you call it because I never
5  had a counseling session. This was a talking
6  session that I requested, not the judge. And
7  we were just supposed to be talking things out
8  and come to some solution.
9      The judge said she didn't know if she
10  could go forward from that point. And I told
11  her that I could, that I could put the
12  differences behind us and work with her. But
13  I needed to be allowed to supervise, and I was
14  not being allowed to do so.
15  Q.  Again, the judge expressed that she had some
16     concern with your ability to run and manage
17     the office; is that true?
18  A.  No, that's not true. No.
19  Q.  The judge was completely pleased with
20     everything you were doing; is that true?
21  A.  We didn't talk about pleased or not pleased.
22      MR. JAFFREE: What answer are you trying
23         to solicit from this witness?

60  (Pages 237 to 240)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 241

```
1          MS. NELSON: I'm trying to get her to tell
2       me what occurred in the meeting.
3   A.  That's what I've done.
4   Q.  Well, you told me your side. I'm just trying
5       to get your understanding of what the judge
6       expressed to you or what Kai expressed to you.
7       Surely if the judge said she didn't know
8       if she could continue or interrupted and gave
9       her side, you had different sides to the
10      story, didn't you?
11  A.  That's always more than one side. Kai
12      interjected at times, too.
13  Q.  If Kai Davis is a witness in this case, do you
14      have any reason to think that she would
15      anything but truthful?
16  A.  Say that again.
17  Q.  Do you have any reason to believe that Kai
18      Davis would not tell the truth as to what
19      occurred at that meeting?
20  A.  I --
21          MR. JAFFREE: Well, I mean, that's a --
22          MS. NELSON: She can answer that.
23          MR. JAFFREE: I guess it depends on what
```

Page 242

```
1          Kai says.
2          MS. NELSON: Make your objection.
3   Q.  I'm asking, do you have any reason to believe
4       that Kai would not be truthful?
5   A.  I believe Kai would not be truthful.
6   Q.  And what do you base that on?
7   A.  I don't have facts. I have feelings.
8   Q.  Because you know she's going to testify
9       opposite from what you're saying; isn't that
10      true?
11          MR. JAFFREE: How would she know that?
12  A.  How would I know that?
13  Q.  Well, if you think she's going to say exactly
14      what you're saying, why would you question her
15      veracity?
16  A.  You're trying to confuse me. I've answered
17      your question.
18  Q.  You think Michelle Sellers would not be
19      truthful?
20  A.  Absolutely would not be truthful.
21  Q.  You think Judge Gordon would not be truthful?
22  A.  Absolutely would not be truthful.
23  Q.  You think Ashton Ott would not be truthful?
```

Page 243

```
1   A.  Absolutely not.
2          MR. JAFFREE: There's some people having
3       adjustment on both sides.
4   Q.  Ashton no longer works for the City, does she?
5   A.  I don't know. Yeah -- no, she doesn't.
6   Q.  You don't know?
7   A.  She doesn't. She works at --
8   Q.  Didn't you work with her at Movie Gallery?
9   A.  That's what I just said. Yes, she doesn't.
10  Q.  Well, after I questioned you about it.
11  A.  I forgot.
12          MR. JAFFREE: She corrected herself before
13      you questioned her about it.
14  A.  I don't keep up with people like that.
15  Q.  Did you have any part in Fran Bailey leaving
16      the employment of the City of Dothan?
17  A.  No, I did not.
18  Q.  Do you know why she left?
19  A.  Yes, I do.
20  Q.  And how do you know?
21  A.  She submitted her resignation in writing and
22      stated why.
23  Q.  And what did it say?
```

Page 244

```
1   A.  I don't know it word for word. I do know --
2   Q.  Just tell me your understanding of why Fran
3       Bailey left.
4   A.  My understanding of it is because she was
5       tired of the favoritism shown to certain
6       magistrates, and she was tired of dealing with
7       the same defendants over and over again.
8   Q.  The same criminal defendants?
9   A.  Yes.
10  Q.  Did you ever hear her make the statement that
11      she felt like she didn't have to be courteous
12      to a criminal defendant?
13  A.  No, I did not. Can't imagine Fran saying
14      that.
15  Q.  What defendants did she feel like she had to
16      deal with over and over again?
17  A.  The ones that were continually -- she told me
18      that were let go by the judge and continually
19      repeated the same charges or cases were reset
20      and reset or pay-bys were extended and
21      extended.
22  Q.  And who are you talking about?
23  A.  She did not give me names. You would have to
```

61 (Pages 241 to 244)

# FREEDOM COURT REPORTING

## Page 245

1    ask her.
2    Q.  And she's a clerk; is that correct?
3    A.  She was a clerk typist.
4    Q.  And what was her interaction with the criminal
5       defendants?
6    A.  Mostly by phone.
7    Q.  Had she been reprimanded or counseled in any
8       way?
9    A.  Not that I can recall.
10   Q.  Do you know who took her place?
11   A.  Actually, Melissa Woods took her place, and
12      then a new clerk typist was hired, Melanie
13      Walsh.
14   Q.  Did you hire Melanie?
15   A.  I recommended that she be hired.
16   Q.  And you can only make recommendations as to
17      hiring and firing?
18   A.  Yes.
19   Q.  Was she white or black?
20   A.  She was white.
21   Q.  And was she -- had she worked for the City or
22      did she apply from the outside?
23   A.  She was a city employee at the time.  She was

## Page 246

1    a city dispatcher.
2    Q.  Did you sit in on the interview?
3    A.  I did the interview.
4    Q.  You did?  Did you interview some others?
5    A.  Yes.
6    Q.  Do you remember how many people you
7       interviewed?
8    A.  Maybe five or six.
9    Q.  Were any of them black?
10   A.  I don't recall.  I interviewed people that
11      their application was sent to me from the
12      personnel department that had the
13      qualifications.
14   Q.  Other than Melanie Walsh, did you hire any
15      other employees or recommend the hiring of any
16      other employees when you were at the City?
17   A.  I think that's the only one.
18      MR. JAFFREE:  I'm beginning to wonder
19         whose race case is it.
20   Q.  Did you ever become aware of an issue
21      regarding a gift that was passed around the
22      office that was a black angel?
23   A.  A what?

## Page 247

1    Q.  A black angel.  Does that mean anything to
2       you?
3    A.  No, it doesn't.
4    Q.  Nobody has told you about that?
5    A.  No.  That's first I've heard of it.
6    Q.  Did you ever make a comment to the judge about
7       Get Out Bonding and why so many defendants
8       used Get Out Bonding?
9    A.  Yes, I did.
10   Q.  Tell me what you said.  First of all, is this
11      a conversation you had with Judge Gordon?
12   A.  Yes.
13   Q.  And was anyone else present?
14   A.  I don't recall.
15   Q.  Do you know when this was?
16   A.  I believe -- I'm pretty sure it was when Don
17      Thompson from Thompson Bonding met me at the
18      front door one morning to tell me about a
19      situation with Get Out Bonding and his
20      brother-in-law that had occurred the night
21      before.  But I don't recall the date.
22   Q.  I'm sorry.  Who was this now, Mr. Thompson?
23   A.  Don Thompson.

## Page 248

1    Q.  And who is he with?
2    A.  He owned Thompson Bonding.
3    Q.  And he made a comment to you about his
4       brother-in-law.
5    A.  Right, that had been arrested.
6    Q.  Okay.  And what did he say to you about his
7       brother-in-law?
8    A.  He said his brother-in-law had called him,
9       wanting him to bond him out of jail, but he
10      had a cash bond.  And his brother-in-law
11      was -- Don was going to go over and pay the
12      bond.
13      But before he could, the brother-in-law
14      called him back and said that someone had
15      changed the bond to a regular bond, and that
16      one of the personnel from Get Out Bonding was
17      hanging around the jail that night, and that
18      they -- this person told the brother-in-law
19      that he could only use them to be bonded out.
20      If he didn't use them, that he could stay in
21      jail.  And Don Thompson wanted me to check
22      into that.
23   Q.  Okay.  And are you friends with Don Thompson?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 249

1  A. No.
2  Q. Do you know Don Thompson?
3  A. Didn't till that day.
4  Q. Why did he come to you as opposed to going to
5     the jail?
6  A. I don't know.
7  Q. Does the magistrates' office have anything to
8     do with who a person that's been arrested and
9     that's in the jail uses as a bonding company?
10 A. We're -- we know of them, yes, because they
11    bond out the defendants.
12 Q. I'm talking about if it's Friday night and
13    somebody is arrested and they're down in the
14    jail and need a bonding company, the
15    magistrates' office doesn't have anything to
16    do with who they call, do they?
17 A. They have to do for -- with changing a bond if
18    their bond is changed from a cash to a
19    regular.
20 Q. And what did you tell Don -- what did you do
21    after you talked to Don Thompson?
22 A. I told him that I would have to let the judge
23    know about the situation and let her look into

Page 250

1     it and get back --
2  Q. So help me make sure I understand. His
3     brother-in-law had been arrested that night;
4     is that -- I mean, the night before he came --
5  A. Right.
6  Q. -- to see you? And some guy was hanging
7     around the jail from Get Out?
8  A. Right.
9  Q. Do you know who that was?
10 A. No, I don't the know the name.
11 Q. And there at the jail, he persuaded him --
12 A. No. He just told him that Get Out was his
13    only choice.
14 Q. You don't know who that person was?
15 A. No.
16 Q. And did he switch to Get Out?
17 A. Did he switch? He didn't have a choice if he
18    wanted to get out of jail.
19 Q. And why didn't he have a choice?
20 A. I've already answered that.
21 Q. Well, I'm sorry. I don't understand.
22 A. The personnel that was at the jail with Get
23    Out Bonding told him that he could not call

Page 251

1     another bonding company, that if he wanted to
2     be released from jail, that he would have to
3     use their company.
4  Q. Did you look into that?
5  A. I called the judge when I got into my office,
6     told her what was told me to me. She got
7     angry and said that she didn't believe
8     anything and that she would call Don Thompson
9     herself and straighten it out.
10 Q. To your knowledge, did she call Don Thompson?
11 A. She called me back later and told me that what
12    I said Don Thompson told me, that's not what
13    he told her, that he told her a completely
14    different story, and why did I lie.
15 Q. Do you know if he told her a different story?
16 A. I never talked to him again.
17 Q. You don't know?
18 A. No.
19 Q. Did you ever do anything to investigate Don
20    Thompson's complaint --
21 A. I --
22 Q. -- other than talk to the judge?
23 A. No, I didn't. Don't believe I did.

Page 252

1     (Brief pause)
2  Q. Any other issues about Get Out Bonding besides
3     that incident with Don Thompson and telling
4     the judge and you said the judge got angry?
5  A. Just that Sarah Fowler told me that she always
6     had problems getting the judge to do final
7     forfeitures on Get Out Bonding.
8        And also Mendheim -- and I can't remember
9     his first name -- that owned Mendheim Bonding
10    came into the magistrates' office one day to
11    find how much he owed for his defendants that
12    hadn't appeared. And he told me that he would
13    not pay that until the judge made Get Out
14    Bonding pay theirs, because in the past,
15    they -- the other bonding -- he had been made
16    to pay his, but Get Out Bonding had not been
17    made, and they were not closed down.
18 Q. And this was like double hearsay from Sarah
19    Fowler?
20 A. No. That was two separate things. I said,
21    first, that Sarah Fowler told me that she had
22    a problem getting the judge to close down Get
23    Out Bonding for non-payment of the defendants

63 (Pages 249 to 252)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 253

1   that didn't show up for the bond.
2 Q. But you had no independent, direct personal
3   knowledge of any of that, do you?
4 A. No. Because I wasn't allowed to do the
5   clerk's Revocation of Surety.
6 Q. And who did that?
7 A. Michelle Sellers, although the clerk of the
8   court is supposed to do it.
9     And then the other incident that I said
10   was when Mr. Mendheim -- and I can't remember
11   his first name, probably will come to me later
12   because I knew him before I started at the
13   City -- came to me to find out. And he just
14   said -- told me the previous problems. And he
15   says, I'm not paying my money until they do.
16     And I told him, I could not tell him what
17   other bonding companies paid or didn't pay.
18 Q. Did you know what other bonding companies paid
19   or didn't pay?
20 A. I was given the information. I -- it was
21   done -- it was a report.
22 Q. Other bonding companies had final forfeitures,
23   didn't they?

Page 254

1 A. Yeah.
2 Q. Other bonding companies have gone out of
3   business, haven't they?
4 A. Not -- not -- the only one that couldn't do
5   bonds when I was there was when Get Out
6   Bonding didn't pay theirs, and they were
7   finally -- bonds were not taken from them.
8 Q. You're saying, that's the only one that you
9   know of that --
10 A. Right.
11 Q. -- went out of business?
12 A. Right. I -- to my knowledge.
13 Q. Did Mendheim have -- do you -- Mendheim?
14 A. Mendheim, M-E-N-D-H-E-I-M, I believe.
15 Q. Are they still in -- did they remain in
16   business while you were there?
17 A. Yes.
18 Q. Did they owe money or have final -- have
19   forfeitures?
20 A. They were never closed down. They eventually
21   paid or had the defendant show up.
22 Q. Do you know A Advantage Bonding?
23 A. A Advantage? Yes.

Page 255

1 Q. Have they ever been shut down?
2 A. I don't know.
3     (Brief interruption)
4 Q. The only conversation you had with Judge
5   Gordon about Get Out was the incident that you
6   mentioned or just testified to regarding Don
7   Thompson; is that correct?
8 A. No.
9 Q. Okay. I'm sorry. I thought -- what other
10   conversations --
11 A. The other was that I had been told by Valarie
12   Savage that Get Out Bonding bonded out more
13   defendants than any other bonding company
14   because they hung around the jail a lot. So I
15   ran a report giving the bonding companies and
16   how many they bonded out.
17 Q. How did you run a report?
18 A. From the court system.
19 Q. Okay.
20 A. And it was significantly higher, the number,
21   for Get Out Bonding than the other bonding
22   companies.
23 Q. Okay.

Page 256

1 A. And when I asked the judge about Get Out
2   Bonding and why they bonded out more
3   defendants, she got very angry and said she
4   was tired of hearing about Get Out Bonding.
5 Q. When did this occur in relationship to the
6   incident regarding Don Thompson?
7 A. After.
8 Q. Like how much after?
9 A. I don't remember.
10 Q. You don't know whether it was a week or a
11   month?
12 A. No.
13 Q. Don't know if is was April or May?
14 A. No. I believe it was later than those months.
15   Can't be sure.
16 Q. It was your understanding that Get Out Bonding
17   got more bonds because they hung around the
18   jail?
19 A. I didn't observe it. I was told that. I
20   didn't hang out at the jail.
21 Q. Did Judge Gordon have anything to do with what
22   bonding company a criminal defendant who was
23   in jail selected to issue a right to bond?

64 (Pages 253 to 256)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1  A. I don't know. Did she? Maybe. That would be
2    a question for her.
3  Q. Well, do you have any reason to think that she
4    did?
5  A. She could have.
6  Q. But you don't know. You don't have facts to
7    support that, do you?
8  A. No. And she doesn't have the facts to say she
9    didn't.
10 Q. The jail is -- she is not over the jail, is
11   she?
12 A. No. But she has a connection with the jail.
13 Q. Well, what is her --
14 A. Well, the defendants --
15 Q. Her connection to the jail is what?
16 A. -- from her courtroom are in that jail. She
17   is great friends with the warden -- at the
18   time, the warden at the jail, one of them.
19   And Lavera had previously worked at the jail,
20   and they were great friends, the judge and
21   Lavera. And she was great friends with the
22   owners of Get Out Bonding.
23 Q. Who?

Page 258

1  A. I can't remember their name.
2  Q. And who was great friends?
3  A. The judge.
4  Q. And how do you know that?
5  A. Because I observed it in court.
6  Q. And what did you observe?
7  A. I observed that Get Out Bonding personnel was
8    allowed to sit at a front table where, really,
9    bondsmen were not supposed to be sitting and
10   that they were in conversation with the judge
11   a lot.
12 Q. Do you have any other facts that support your
13   testimony that the judge has absolutely
14   anything to do --
15 A. No.
16 Q. -- with what bonds are written in the jail?
17 A. No.
18 Q. It's all supposition, assumption; isn't that
19   correct?
20   MR. JAFFREE: I think --
21   MS. NELSON: Let me ask my question. You
22     can state your objection.
23 A. No, it's not.

Page 259

1    MR. JAFFREE: Well --
2  A. No.
3  Q. Well, then, what's it based on besides what
4    you just testified to?
5  A. What I testified to?
6  Q. You're looking at your --
7  A. I'm not looking at my notes. I hadn't hardly
8    looked at them the whole time.
9  Q. You're saying because Lavera used to work in
10   the jail, because the judge knows the warden,
11   because the judge let a bondsman at Get Out
12   sit on the front row. Those are the three
13   things I heard.
14   MR. JAFFREE: Well, you also heard, the
15     judge getting very upset when she
16     mentioned anything adverse about Get
17     Out Bonding. You want to throw that
18     in?
19 Q. And the judge got upset and said, she didn't
20   have any control over that, didn't she?
21   Didn't he tell you, she didn't have
22   control over --
23 A. No. She did not.

Page 260

1    MR. JAFFREE: I thought her testimony was
2    --
3  A. I didn't testify to that. No, she didn't.
4  Q. So those four things. Anything else that you
5    have that would support the judge had anything
6    to do with a defendant in jail using Get Out
7    Bonding?
8  A. No. Well, there is one other incident that I
9    can't prove because there's nothing in
10   writing. It's just something that I
11   overheard. And, basically, I can figure out
12   what happened, but I can't prove it.
13 Q. And what is that?
14 A. That I questioned -- I called Warden Grubbs to
15   question why -- who had changed a bond because
16   it only said, "per Judge Gordon." Didn't say
17   why. And I called and asked her who had
18   called to have the bond changed. And she said
19   she didn't know, that all -- all she had
20   was -- she believed the judge called because
21   it had "per Judge Gordon."
22   And I walked from my office after that
23   conversation into Lavera's office to discuss

65  (Pages 257 to 260)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 261

1  something with her, and she was on the phone
2  with someone. And her cell phone started
3  ringing. And when she picked the cell phone
4  up, the person at the other end, who of course
5  I can't identify, on the phone was talking
6  very loud and said, I overheard, court
7  administrator, go talk to the judge.
8      And Lavera on her end said, I was on my
9  way over there anyway, I'll tell the judge,
10  which led me to believe there was -- when I
11  questioned the bond, the warden called
12  Lavera. Lavera went to Judge, told her I was
13  questioning why bonds were being changed.
14 **Q. Again, this is just your supposition of what**
15 **had occurred?**
16  A. Makes a lot of sense.
17 **Q. But it is your supposition?**
18      MR. JAFFREE: It's a term --
19  A. It's not supposition.
20      MR. JAFFREE: It's a term of inference.
21  A. I overheard.
22      MR. JAFFREE: An inference on facts, not a
23      supposition.

Page 262

1 **Q. And who was this bond -- what defendant was**
2 **this bond on?**
3  A. I don't remember. There were so many bonds
4  changed.
5 **Q. You're making some very serious allegations**
6 **here.**
7  A. I know I am. If you -- if y'all had provided
8  what we asked for in documents, maybe I could
9  tell you.
10 **Q. When did you talk to Warden Grubbs about this**
11 **issue?**
12  A. I can't possibly remember the date.
13 **Q. What kind of bond had she changed?**
14  A. Who?
15 **Q. You said you talked to Warden Grubbs.**
16  A. She didn't change -- I didn't say she changed
17  a bond. I was trying to find out from her if
18  she knew who had called, if it was a
19  magistrate, if it was Judge Gordon.
20 **Q. The bond had been changed from what to what?**
21  A. I don't know. I mean, cash to regular,
22  regular to cash. It's been -- I can't -- in
23  any imagination, me or anyone else, remember

Page 263

1  every bond, every date.
2 **Q. And --**
3      MR. JAFFREE: Let me --
4 **Q. -- the bond had been changed from --**
5      MR. JAFFREE: Let me object to this line
6      of questioning. She said it was her
7      supposition. She couldn't prove
8      it. You insisted on asking her what
9      was it. She didn't want to talk about
10      it. She talks about it, and then you
11      accuse her of making some serious
12      accusations.
13      MS. NELSON: Well, they are serious
14      accusations.
15      MR. JAFFREE: Well, they're --
16      MS. NELSON: And I have a right to stay
17      here to midnight if I want to and ask
18      her about them. She can't back them up
19      for anything.
20      MR. JAFFREE: She didn't make accusation.
21      She's just simply saying there are
22      some dots that could be connected.
23      MS. NELSON: She's making serious

Page 264

1  accusations not only here, but I've
2  read -- and I haven't even gotten to
3  that yet. And I mean very serious
4  accusations. She can't back them up.
5  I think she's opening up herself for
6  exposure.
7 **Q. I want to know --**
8      MR. JAFFREE: Right here in this
9      deposition?
10      THE WITNESS: Yeah. That's what it
11      sounded like to me.
12 **Q. I want to know who -- what criminal defendant**
13 **this bond was changed on that you remembered**
14 **this so well, but you can't even remember who**
15 **it was.**
16  A. As I stated before, there is no way, as many
17  court documents, as many defendants, as many
18  bonds. And I told you that I could not -- I
19  didn't have documentation to prove it.
20 **Q. Why did you call Warden Grubbs?**
21  A. Because there was -- had been a habit of a lot
22  of bonds being changed that just had on them
23  "per Judge Gordon." And they -- if the

66 (Pages 261 to 264)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

|  | Page 265 |
|---|---|
| 1 | judge -- I even asked the judge then. I asked |
| 2 | her, I said, did you call and change a warrant |
| 3 | on so-and-so date, which I knew the date at |
| 4 | the time because it had just happened. |
| 5 | And she said, no, I did not call. |
| 6 | And I said, well, it's my understanding |
| 7 | that if it has your signature, it should only |
| 8 | be called in by you. |
| 9 | And she said, that's correct. |
| 10 | However, there was numerous bonds that had |
| 11 | been changed that had "per Judge Gordon" that |
| 12 | I didn't believe were being changed per Judge |
| 13 | Gordon. |
| 14 | **Q. You're saying it would say "per Judge Gordon"** |
| 15 | **but not have her signature?** |
| 16 | A. Right. Right. It was written by -- in by a |
| 17 | warden or whoever was there at the time. And |
| 18 | there would be no documentation as to why it |
| 19 | was changed. |
| 20 | **Q. So best of your knowledge, the "per Judge** |
| 21 | **Gordon" would be written by the jail or the** |
| 22 | **warden, not anybody in the magistrates'** |
| 23 | **office?** |

|  | Page 266 |
|---|---|
| 1 | A. Yes. But it would be written there when they |
| 2 | were told to put "per Judge Gordon." |
| 3 | **Q. When who was told?** |
| 4 | A. When the warden was told by someone to change |
| 5 | it. And I was just trying to find out. If |
| 6 | the judge didn't call and have them change it |
| 7 | to "per Judge Gordon," who did? |
| 8 | **Q. Now, do you know Warden Grubbs?** |
| 9 | A. Only -- I met her when I started working |
| 10 | there. |
| 11 | **Q. Now, are you making an accusation that she had** |
| 12 | **a relationship with Get Out Bonding?** |
| 13 | A. That's not what I said. |
| 14 | **Q. I'm just asking.** |
| 15 | A. That's not what I said. |
| 16 | **Q. Okay. After that, was there any more** |
| 17 | **discussion about Get Out Bonding?** |
| 18 | A. Only when the final forfeitures were supposed |
| 19 | to be done. And I had read the Alabama Code |
| 20 | or something that stated that the court -- |
| 21 | clerk of the court was supposed to do the |
| 22 | Revocation of Surety. And I got the -- Sarah |
| 23 | Fowler sent me the list of the two companies |

|  | Page 267 |
|---|---|
| 1 | that hadn't paid. And that was Mendheim |
| 2 | Bonding and Get Out. |
| 3 | Michelle Sellers asked me to send that |
| 4 | list to her and on -- with the list, I wrote |
| 5 | Michelle Sellers a note that said something |
| 6 | like, am I -- aren't I supposed to be doing |
| 7 | this process, please let me know if I am. |
| 8 | **Q. You thought you were supposed to be doing it?** |
| 9 | A. Yes. That's the statutes or code says, that |
| 10 | it's to be done by the clerk of the court. |
| 11 | **Q. And you're the clerk of the court?** |
| 12 | A. Yeah, I was. |
| 13 | **Q. Would you have known what to do?** |
| 14 | A. Sure. |
| 15 | **Q. And how would you know? Would you ask --** |
| 16 | A. It's a form. |
| 17 | **Q. -- Mary Beth or Mary Turner?** |
| 18 | A. No. I probably would have asked Sarah who |
| 19 | knows all about it. |
| 20 | **Q. Was, to your knowledge, Michelle Sellers ever** |
| 21 | **the clerk of the court?** |
| 22 | A. I'm sorry? |
| 23 | **Q. Was Michelle Sellers ever the clerk of the** |

|  | Page 268 |
|---|---|
| 1 | court? |
| 2 | A. Yes. But she wasn't at that time. |
| 3 | **Q. Following your meeting with the judge and Kai** |
| 4 | **Davis, did the three of y'all ever have any** |
| 5 | **other meetings?** |
| 6 | A. No. |
| 7 | **Q. Did the judge ever meet with you after that** |
| 8 | **meeting to discuss your job duties or how you** |
| 9 | **were running the office?** |
| 10 | A. No. I talked -- |
| 11 | THE WITNESS: Well, yeah. She said all |
| 12 | three of us, though. |
| 13 | MR. JAFFREE: Oh, okay. |
| 14 | A. I met with Kai after that another time. |
| 15 | **Q. Your attorney was showing you your calendar.** |
| 16 | **And when did you meet with Kai Davis after** |
| 17 | **that? You're referring to Defendants' Exhibit** |
| 18 | **5?** |
| 19 | A. Yes, I am. |
| 20 | On September the 29th. |
| 21 | **Q. And I've tried to copy this. But, again, I'm** |
| 22 | **on a page that -- the 29th falls in the middle** |
| 23 | **of the calendar.** |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 269

1    You have a note --
2    MR. JAFFREE: Well, you need to get a good
3    copy. Do you want to do this again or
4    something?
5    MS. NELSON: Well, I'm trying to see if I
6    can read it.
7    Q. Talked to Kai Davis -- you're right. Tell me
8    what it says. I may need to get a better
9    copy, like the 29th of September.
10   A. Well, first it says, "talked to Judge about
11   memo she did to me. Talked to Kai about
12   favoritism" --
13   Q. Let me stop you. The memo the judge did to
14   you, did she give you a memo?
15   A. Yes. It was about me changing the job
16   duties. And when I did, Eunice and Lavera
17   sent me a memo and copied the judge, saying
18   they were protesting the additional job
19   duty -- minor job duties I had added to their
20   list.
21   Q. Okay. So you talked to the judge before you
22   went to see Kai?
23        (Brief pause)

Page 270

1    Q. Do you remember what you did first, talked to
2    the judge or talked to Kai?
3    A. Talked to the judge.
4    Q. And then you went to see Kai?
5    A. Yes.
6    Q. And why did you go see Kai?
7    A. And then it says, "Talked to Kai about
8    favoritism, cases not properly done, wrongful
9    arrests, cash bond not handled right. Kai
10   said to first let Judge know about Gregory
11   Powe case. And she told me to keep a
12   calendar. She will do some looking into the
13   favoritism shown."
14   Q. That's what I can't read. "She will do some
15   looking" --
16   A. In -- "She will do some looking into" -- "she
17   will do some looking into things," is what it
18   says.
19   Q. "Looking into things?" Okay.
20        And then the next day, on the 30th, can
21   you tell me what those entries say?
22   A. "Called to request Judge to call me. Never
23   returned call. Called Michelle and asked her

Page 271

1    if I could come over and talk to her tomorrow
2    about some things I need help on. Said yes.
3    Eunice told me her cousin was killed and might
4    be out Tuesday."
5        And in parentheses, I've got "Michelle and
6    Mary." But I don't know what that's about. I
7    don't recall that.
8    Q. So based on -- back on the 29th, you said, Kai
9    said to let Judge know about the Powe case --
10   A. Yes.
11   Q. -- and to keep a calendar?
12        You had been keeping a calendar, hadn't
13   you, or did you --
14   A. A little bit. And then I went --
15   Q. You went back and started writing in things?
16   A. I had -- on this -- on this month, I did.
17   Q. Month of September?
18   A. Yes.
19   Q. Did you talk to the judge about the Powe case?
20   A. Yes, I did.
21   Q. And when did you do that?
22   A. After I talked to Kai sometime.
23   Q. Well, you said you talked to Kai about that on

Page 272

1    the 29th, so you're saying it would be after
2    the 29th?
3    A. Yes.
4    Q. And what did you tell the judge about the Powe
5    case?
6    A. I told her that I had understood that there
7    had been a wrongful arrest and that Mary
8    Turner had brought it to my attention because
9    she got it from the jail for bonds Powe
10   paid -- posted. And she had a receipt for
11   bond money on a Gregory Powe posted by Larry
12   Pike, but there was no money there.
13   Q. Okay.
14   A. So we looked for the paperwork; couldn't find
15   it.
16   Q. And then what happened?
17   A. I started searching and investigating. And
18   Mary called the jail to find out why there was
19   a receipt and no money and found out the
20   defendant was released. And then I asked
21   Eunice, I believe, for the paperwork because
22   she was the magistrate on call. And in the
23   paperwork it stated that Eunice had released

68 (Pages 269 to 272)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 273

1  because Lavera had not attached a CRO
2  certificate to his case and closed it out some
3  months previously. So he was wrongfully
4  arrested. And she --
5  Q. Let me stop you. How do you know Lavera
6  didn't attach it?
7  A. Because there's case notes in the court
8  system.
9  Q. And do you have any knowledge that Lavera
10  didn't attach it?
11  A. It wasn't attached. They faxed it over again.
12  Q. Do you have any facts that support that
13  Lavera -- I'm sorry -- Eunice did anything --
14  strike that.
15      Is your testimony that Eunice or Lavera
16  should have attached that paperwork?
17  A. It's my testimony that Lavera should attach
18  the CRO certificate to keep from an alias
19  warrant being issued for his arrest. In --
20  Q. My question is, how do you know Lavera was
21  supposed to do that and didn't do that?
22  A. In the case notes on the court system, there
23  were notes that one of the magistrates -- I

Page 274

1  think Lavera, I'm not positive -- had put in
2  there that said, LM -- for Lavera McClain --
3  failed to attach CRO certificate to paperwork
4  when received.
5  Q. But you're not sure about that?
6  A. I -- I didn't say I wasn't sure. I said that
7  that's what the case notes said.
8  Q. And the case notes are what now?
9  A. They're in the court system. They're entered
10  in a case on a court system.
11  Q. On a docket?
12  A. On the case. When you go to the screen and
13  you pull up a case, there is places you can
14  enter case notes on.
15  Q. Okay. And I believe in your -- I'm looking
16  for the document that you submitted to me
17  earlier as part of your -- did you attach the
18  Powe documentation as part of your --
19      MR. JAFFREE: I don't think so.
20  A. No, I don't have the Powe documentation.
21      MR. JAFFREE: Well, I have some Powe
22  documentation that came in discovery
23  requests. I think that's the only

Page 275

1  documentation that I have, even though
2  I've requested it and a lot of other
3  documentation for defendants. But I
4  will address that later.
5  Q. Did you submit any of that to the City in your
6  response to your termination?
7  A. I don't -- what do you mean? Submit what?
8  Q. Did you respond to the City when you were
9  terminated, or did your --
10  A. Yes, I did.
11  Q. -- attorney do that?
12  A. I did that.
13  Q. And did you submit any documentation about the
14  Powe issue in that case?
15  A. I didn't have the documentation. I stated
16  what happened.
17  Q. Do you know if the City reviewed that or --
18  A. Reviewed what?
19  Q. The Powe issue.
20      MR. JAFFREE: How would she be in the
21      position to know that?
22      MS. NELSON: I'm just asking.
23  Q. Do you know?

Page 276

1  A. No. I do know that before I was terminated
2  and after I brought it to the attention of the
3  judge and she basically said that wasn't my
4  concern, that at a later date, I looked for
5  the paperwork to see how it had been handled
6  after it was none of my -- none of my
7  concern.
8      And it had been filed away incomplete. No
9  disposition had been entered. Money had
10  not -- there was still money owed on the court
11  costs or something was still showing
12  outstanding. And it had been filed away in
13  closed files. And I got it and wrote a note
14  to Eunice and asked her to finalize the case.
15  Q. All right. And when did you write her a note
16  to finalize the case?
17  A. The -- whenever I pulled it from the closed
18  files. What Eunice had done wrong was she had
19  returned -- she had not run the bond money
20  through the court system. And she returned
21  cash money to the Surety who had specifically
22  marked on the form that the money was only to
23  be returned to him.

69  (Pages 273 to 276)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 277

1 Q. And it's your understanding that Eunice gave
2 the money to Mr. Powe?
3 A. Yes.
4 Q. And do you know why she did that?
5 A. I don't know.
6 Q. You don't know?
7 A. Huh-uh (negative response). I just know it
8 wasn't run through the court system as is
9 every amount money for a bond is supposed to
10 be. And she should not have given the money
11 back to the defendant when there was a Surety
12 that marked only return to him.
13 Q. Again, you don't know the circumstances --
14 A. I know that there --
15 Q. -- under which that happened?
16 A. -- is a form that states, and that is a policy
17 and procedure. And if it says return only to
18 defendant -- I mean, to the Surety, that is
19 who you return it to.
20   And so if it was none of my concern, no
21 one ever explained to me.
22 Q. So you're saying when you talked to the judge
23 about it, that was her reply, that it was not

## Page 278

1 your concern?
2 A. That it had already -- it had been taken care
3 of and it was not really any of my concern.
4 Q. Now, you also testified earlier that there had
5 been some changes in the job duties of Eunice
6 and Lavera; is that correct?
7 A. There had been job -- minor job changes done
8 in the majority of the magistrates at the same
9 time.
10 Q. And did you send them a notification of that?
11 A. Did I send who a notification?
12 Q. The magistrates that you had changed their job
13 duties?
14 A. Yes, I did. There was very minor job duty
15 changes.
16 Q. What were the changes in their job duties?
17 A. I had --
18   MR. JAFFREE: If you can recall without
19   looking at your -- the memo.
20 A. I don't have the memo.
21   MS. NELSON: Well, I'm just remembering
22   from -- I have the right to ask her if
23   she remembers it before showing her

## Page 279

1 the document.
2 MR. JAFFREE: Well, I'm asking if she
3 could recall without looking at it.
4 MS. NELSON: Oh, okay. Yeah.
5 MR. JAFFREE: Would you prefer to look at
6 it first?
7 THE WITNESS: Yeah, I'd prefer to.
8 MS. NELSON: Well, I'm asking her if she
9 can recall before looking at it.
10 MR. JAFFREE: The document is going to
11 speak for itself for changes. I mean,
12 what does it say, I gotcha? If you've
13 got the document, show her the
14 document.
15 MS. NELSON: I'm asking her to tell me
16 what she remembers.
17 A. I remember adding a docket one day I believe
18 to Lavera. I added -- it was -- Mary Beth had
19 been doing it. It wasn't an assigned job
20 duty, but I made it an assigned job duty to
21 Mary Beth to review the obituaries and close
22 cases accordingly. I added to Mary Turner I
23 believe posting cash bonds. I believe I

## Page 280

1 added --
2 Q. I'm listening. I'm sorry.
3 A. I believe I added something to Tonya. Not
4 sure -- I'm not sure what, but I do believe I
5 added some minor job change to her.
6 Q. Anybody else that you remember changing; any
7 other magistrates that you changed their job
8 duties?
9 A. I think I changed -- I think I did some
10 adjustment to probably just about every one of
11 the magistrates. I took a duty away from
12 Sarah and away from Valarie because they were
13 overloaded and Eunice and Lavera seemed to
14 have extra time. And I think I -- I might
15 have changed, like, backup -- from a secondary
16 person to a backup on a warrant window or a
17 front window for Ann, and maybe I did that on
18 Tonya also.
19 Q. Do you have a copy of the memo that you sent
20 to them; is that something you've produced to
21 me?
22 A. No.
23 Q. Do you have a copy of it anywhere?

70 (Pages 277 to 280)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 281

1  A.  No.
2          (Defendants' Exhibit 20 was marked
3          for identification.)
4  Q.  I'm going to show you what I've marked as
5      Defendants' Exhibit Number 20. Is that a
6      memorandum to you from Lavera?
7  A.  Yes.
8  Q.  And that's Defendants' Exhibit 20; is that
9      correct?
10 A.  Yes.
11 Q.  And that was in response to your job changes?
12 A.  Yes.
13         (Defendants' Exhibit 21 was marked
14         for identification.)
15 Q.  And then I'm showing you Defendants' Exhibit
16     Number 21, which is a personal memo to you
17     from Eunice Knight; is that correct?
18 A.  Yes.
19 Q.  And that was in response to your memo
20     regarding job changes?
21 A.  Yes.
22         (Defendants' Exhibit 22 was marked
23         for identification.)

Page 282

1  Q.  And then Defendants' Exhibit 22, is that your
2      memo back to -- so is that to Eunice about the
3      job changes?
4  A.  Yes.
5          (Defendants' Exhibit 23 was marked
6          for identification.)
7  Q.  And I'll show you Defendants' Exhibit Number
8      23, which appears to be your memo back to
9      Lavera about the job changes; is that correct?
10 A.  Yes.
11         (Brief pause)
12         (Defendants' Exhibit 24 was marked
13         for identification.)
14 Q.  Let me show you Defendants' Exhibit Number
15     24. Do you recognize that?
16 A.  Yes, I do.
17 Q.  Is that a memo you prepared?
18 A.  It was an e-mail.
19 Q.  That's an e-mail?
20 A.  Yes.
21 Q.  To the judge?
22 A.  Yes.
23 Q.  Had she asked you to explain why you were

Page 283

1      making changes or --
2  A.  Actually, because Eunice and Lavera copied her
3      on their complaints instead of just coming to
4      me with it, just sending the memo to me as
5      their direct supervisor, I thought I should
6      explain to the judge after I received theirs.
7      I was doing this e-mail. And instead of
8      sending an e-mail, I printed it out and took
9      it over with a note I believe and -- but I
10     finished this. The judge had already done a
11     memo to me before I could give this to her.
12     But I still gave it to her.
13 Q.  And the memo to you from the judge, what did
14     it say?
15 A.  Please refrain from making additional job duty
16     changes without consulting me, something to
17     that effect.
18         MS. NELSON: Is that 24?
19         MR. JAFFREE: Yeah.
20         (Defendants' Exhibit 25 was marked
21         for identification.)
22 Q.  And I'm going to show you Defendants' Exhibit
23     25. Is that the memo the judge gave to you?

Page 284

1  A.  Yes.
2  Q.  Did she talk to you about any of this, the
3      judge, that is?
4  A.  What do you mean, talk to me?
5  Q.  Well, did she just hand you the memo, or did
6      y'all talk about this whole issue about the
7      reassignment of duties?
8  A.  We talked. I believe we talked. I'm not -- I
9      don't know when. I -- I know that she gave me
10     this. I was working on my e-mail to her,
11     explaining it since they copied her. And,
12     basically, if we talked, it would have been
13     the same thing that I put in there.
14 Q.  Do you remember y'all discussing the fact that
15     you were going to rotate duties every 90 days
16     or every three months?
17 A.  We never had that agreement of a specific time
18     period that I recall.
19 Q.  You say you didn't have an agreement, but
20     y'all had talked about --
21 A.  We had talked about --
22 Q.  -- rotating?
23 A.  -- rotating duties every two to three months,

71  (Pages 281 to 284)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 285

1    no specific 90 days. And besides the fact,
2    these were minor job changes. I had done
3    minor job changes before, and nothing had ever
4    been said about it. And I didn't consult the
5    judge at that time because I was the
6    supervisor. And it was how many days short of
7    90 days anyway?
8  Q. I don't know.
9  A. Two or three.
10 Q. How many was it?
11 A. Two or three.
12 Q. How do you know that?
13 A. Because I know when I made the last.
14 Q. And when was that?
15 A. The --
16 Q. And you're referring back to Number 5.
17 A. The June 28th, July, August, September.
18 Q. But you were looking on June 28th on your
19    calendar?
20 A. The major -- no. I was trying to see a date
21    of June, but it's not on there. My
22    calendar -- I do not have that on my
23    calendar. I -- well, I do, too.

Page 286

1  Q. What are you looking at now?
2  A. I sent a memo out on the 10th.
3  Q. Of what?
4  A. June. Advising of the change of job duties,
5    of the cross-training, and that several
6    magistrates were being changed all around and
7    attached the job duties, and told them it
8    would go into effect June the 28th.
9  Q. And do you have that memo?
10 A. No, I don't.
11 Q. And this was one of the entries you went back
12    in and wrote after you met with Kai Davis?
13 A. No, I don't think so. I think I had already
14    written that.
15 Q. You could have?
16 A. I said no.
17 Q. You said, no, you think you could have written
18    that?
19 A. Most of these in the front of the calendar, I
20    had already written in when I did the memos.
21    But the memo I did for the magistrates with
22    the attached job duties you should have.
23    MR. JAFFREE: Shouldn't the magistrates

Page 287

1    have these memos?
2    THE WITNESS: Yes, each one of them.
3    MR. JAFFREE: I didn't get any of these
4    memos in the submissions that I got.
5    THE WITNESS: Each magistrate had a book
6    of memos.
7  Q. And then after you received the memo from the
8    judge, asking you to refrain from reassigning
9    job duties, what did you do?
10 A. I was upset.
11 Q. Well, did you go see her? Did you go to talk
12    to her about it?
13 A. At that time, the judge was not really talking
14    to me a whole lot, so I don't know. She
15    wasn't returning phone calls. She was having
16    Michelle Sellers call me. I do have notation
17    on the 29th that I talked to the judge about
18    the memo she did to me. So I guess I did.
19 Q. I'm looking at September 30th now, and then
20    next to it, which is a blank block and another
21    blank block. Did that happen on October 1st
22    and 2nd, or did all of your entries here apply
23    to September 30th?

Page 288

1  A. I'm sorry?
2  Q. Do you see what I'm talking about? I'm
3    looking at September 30th, and then the month
4    ends. And then you've got two blocks filled
5    in, which normally would be October 1st,
6    October 2nd. But all that writing is next to
7    September 30th.
8       My question is, did you make that entry,
9    or you're saying all this occurred on
10    September 30th?
11 A. Yes.
12 Q. Look with me. It says you --
13 A. Wait a minute. No.
14 Q. No?
15    MR. JAFFREE: If you recall.
16    (Brief pause)
17 A. I don't recall.
18 Q. There is an entry that says, "Talk to Judge
19    and Michelle about whether to write Michelle
20    B. up for paperwork and Mary for shouting at
21    Ann." You brought that to the judge's
22    attention?
23 A. What?

72  (Pages 285 to 288)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 289

1  Q.  About whether to write Michelle B. up for
2      paperwork and Mary for shouting.
3  A.  No, I didn't bring that to the judge's
4      attention. She had already told -- she had
5      told me about the shouting, and I had
6      explained to her that it wasn't as she heard
7      it. But she insisted that I write Mary up.
8  Q.  Then why did you say, I talked to her about
9      whether to write them up and --
10 A.  Because I went --
11 Q.  -- the judge said yes.
12 A.  -- back to talk to her about Michelle Bryan
13     because I was still having a problem with
14     having already done a memo and -- and Mary for
15     shouting. I wanted to get some assistance in
16     what I was supposed to be writing up.
17 Q.  Then next block, "Valarie said she would file
18     a complaint if she has to do things Mary
19     Beth's way. I told her we're going to do
20     it" --
21 A.  "The way it was when I came. She is not
22     happy."
23 Q.  So Valarie and Mary Beth were having

Page 290

1      disagreements?
2  A.  Valarie and others had disagreements quite
3      often.
4  Q.  And what kind of complaint was she going to
5      file if she had to do it --
6  A.  I don't know.
7  Q.  -- Mary Beth's way?
8  A.  I don't know.
9  Q.  She didn't agree with Mary Beth, did she?
10 A.  Sometimes she didn't. Sometimes they worked
11     together well.
12 Q.  Did you write her up?
13 A.  For what?
14 Q.  Not doing it Mary Beth's way when you told her
15     she was going to have to.
16 A.  She did after I told her she was going to.
17     She did do it Mary Beth's way.
18 Q.  What was she complaining about the way Mary
19     Beth -- what was Mary Beth's way?
20 A.  I -- I don't recall.
21 Q.  Well, I'm looking at the 7th about a leave
22     request. Is that your leave request?
23 A.  Yes.

Page 291

1  Q.  You had plans to go to --
2  A.  I had called for days because I had submitted
3      a leave request, and the judge never would
4      rule on it, would never approve it, disapprove
5      it, would never call me about it to my
6      knowledge. And I finally took a copy of the
7      leave to the judge and asked her to sign it if
8      she was going to approve it.
9  Q.  Did she approve it?
10 A.  Yes.
11 Q.  You said -- I'm looking on, like, the 3rd of
12     October. "Valarie came in mad and stayed mad
13     that way." Was she still mad at Mary Beth?
14 A.  No, she had her days.
15 Q.  On the 5th, "Talked to Martha in Personnel,
16     Kai was out, whether to write MB" -- I assume
17     that's Mary Beth?
18 A.  Michelle Bryan.
19 Q.  Michelle. I'm sorry. Michelle Bryan for lost
20     paperwork.
21 A.  Yes.
22 Q.  "Said would do it because Judge said to?"
23 A.  Uh-huh (positive response).

Page 292

1  Q.  You were asking Personnel to do it?
2  A.  No. I was going to talk to Kai about it
3      because I still -- even after talking with the
4      judge, I just didn't think it was right to
5      write her up in a disciplinary action when I
6      had told her and written up the memo on her.
7      So I asked -- talked to Martha McClain in
8      Kai's absence, explained the situation, and
9      asked her what should I do. And she told me
10     that I should do what the judge said do. And
11     that's what I did.
12 Q.  You also say that "Ann screwed up on warrant
13     from complaint and put" --
14 A.  Complainant.
15 Q.  -- "complainant" -- excuse me -- "in for
16     suspect. The complainant was arrested. Told
17     Judge. She didn't know what to do."
18 A.  Told Judge and the judge said she didn't know
19     what to do about it.
20 Q.  Did the judge tell you to write Ann up, or did
21     she leave that up to you?
22 A.  When she answered -- said she didn't know what
23     to do. She was the judge. If she didn't know

73  (Pages 289 to 292)

## FREEDOM COURT REPORTING

Page 293

1    what to do, I certainly didn't. Besides, I
2    didn't have time to write her up after that
3    anyway. I was gone, terminated.
4    **Q. That was on the 5th; is that correct?**
5    A. Yes.
6    **Q. You learned on the 12th about your**
7    **Determination Hearing?**
8    A. I was given the notice on the 12th, yes.
9    **Q. And then you had a Determination Hearing on**
10   **the 13th?**
11   A. Right.
12   **Q. And your notes say that "me, Elston, Jim, MS,**
13   **Judge." Tell me who all was there.**
14   A. Elston Jones was EEOC officer -- EEO officer.
15   Me, Jim, my husband, Michelle Sellers, Judge,
16   and Martha McClain.
17   **Q. And then you were actually terminated on the**
18   **18th; is that correct? I mean, excuse me, of**
19   **October?**
20   A. Right.
21   **Q. Let me ask you a little bit about that in a**
22   **minute. While we've got the calendar out --**
23       MR. JAFFREE: Before you -- I promise you

Page 294

1    two minutes.
2       MS. NELSON: We can take a quick break.
3       (Brief recess)
4       (Defendants' Exhibit 27 was marked
5       for identification.)
6    **Q. Defendants' Exhibit 27, is that -- we talked**
7    **about your getting notice on October 12th of**
8    **your Determination Hearing. Did you receive**
9    **that memo?**
10   A. Yes.
11      (Defendants' Exhibit 28 was marked
12      for identification.)
13   **Q. And this may have been attached. I'm going to**
14   **show you Defendants' Exhibit 28, which I guess**
15   **also more specifically notifies you of the**
16   **hearing -- the Determination Hearing?**
17   A. Yes.
18      (Defendants' Exhibit 29 was marked
19      for identification.)
20   **Q. Defendants' Exhibit 29, again, basically just**
21   **stating that your work performance was**
22   **unsatisfactory during your probationary**
23   **period. Was that provided to you and that's**

Page 295

1    **your signature?**
2    A. I'm not sure why it says "refused to sign."
3    **Q. Have you seen that, though?**
4    A. Yes. Is this all of this document? I guess
5    it is.
6       (Defendants' Exhibit 30 was marked
7       for identification.)
8    **Q. I'm showing you Defendants' Exhibit 30, which**
9    **is your -- called "Due Process Interview**
10   **Questions."**
11      MR. JAFFREE: Did you sign this, or did
12      you refuse to sign it.
13      THE WITNESS: I thought I refused to sign
14      it, but I might have signed it.
15      MS. NELSON: It's my turn to ask
16      questions.
17      MR. JAFFREE: Well, I'm just trying to get
18      some clarity.
19      MS. NELSON: Well, you'll have that
20      chance.
21   **Q. Have you seen Defendants' Exhibit 30,**
22   **Ms. Martin?**
23   A. I don't recall seeing it. It might have been

Page 296

1    read to me.
2    **Q. Just to clarify, I'm going back to 29. It**
3    **looks like it says -- there's a place that has**
4    **a signature and then it says "refused to**
5    **sign." Did you sign it, Defendants' Exhibit**
6    **29 or --**
7    A. That is my signature. I believe I -- I think
8    I refused to sign it to begin with. Not
9    positive. But then I think it was explained
10   that it just basically said that I --
11   **Q. You didn't necessarily agree with it but --**
12   A. No, no, no.
13   **Q. -- you did get it?**
14   A. Right. Right.
15      (Defendants' Exhibit 31 was marked
16      for identification.)
17   **Q. And then Defendants' Exhibit 31 is the actual**
18   **decision to terminate your employment?**
19   A. Yes.
20      (Defendants' Exhibit 26 was marked
21      for identification.)
22   **Q. Let me show you Defendants' Exhibit 26 and ask**
23   **you if you have seen that document.**

74 (Pages 293 to 296)

# FREEDOM COURT REPORTING

Page 297

1  A.  No.  These were not attached to the document
2      that I received.
3  Q.  I mean, you have seen the performance
4      evaluation?
5  A.  Yes.  But I have not -- I was not given those.
6  Q.  The attachments --
7  A.  Were not there.
8          (Defendants' Exhibit 32 was marked
9              for identification.)
10 Q.  And this may be a more complete copy, but this
11     is Defendants' Exhibit 32.  It's basically the
12     same evaluation as 26, but it's also signed by
13     Kai Davis and -- did you have an opportunity
14     to sign that but refused to sign?
15 A.  Yes.
16 Q.  And then after that, you filed a response,
17     which I believe you provided to me which is
18     marked as Defendants' 4; is that correct?
19 A.  I filed this during my Due Process Hearing
20     instead of orally telling this -- my response.
21 Q.  Did you prepare all of that?
22 A.  I -- under the direction of my attorney, I
23     did.  Not my attorney now.

Page 298

1  Q.  Who was your attorney at the time?
2  A.  The attorney that told me what to put in there
3      was Charles Decker, D-E-C-K-E-R.
4          MR. JAFFREE:  I would have kept some of
5          that out.
6  Q.  Is Mr. Decker currently practicing?
7  A.  Now?
8  Q.  Yes.
9  A.  I'm not sure.  He was suspended.
10 Q.  And I believe -- I didn't want to --
11         MR. JAFFREE:  He was?
12 Q.  But his license has been suspended?
13 A.  Yeah.  I read a notice that he was suspended.
14         MR. JAFFREE:  Do you know for what?  I
15         would remember him.
16 Q.  And we could take an hour going over this.
17 A.  But, basically, it's all been gone over.
18 Q.  Did Mr. Decker prepare this?
19 A.  No.  He told me what to put in it.  I prepared
20     it.
21 Q.  Is there anything in here that's not truthful?
22 A.  No.
23 Q.  Well, did he -- well, I don't want to get in

Page 299

1      the attorney/client privilege?
2          MR. JAFFREE:  Well, he's not quite the
3          attorney now.  I would have
4          discouraged her from putting some of
5          that stuff in there.
6          MS. NELSON:  The part where she accuses
7          the judge of illegal activity?
8          MR. JAFFREE:  It's not relevant to her
9          claim.  I wouldn't have put that in.
10         But I've talked to her about that.
11             I'm only making that clear for
12         the Record since she said it was under
13         advice of counsel that she --
14         THE WITNESS:  I made that clear.  I said
15         not my attorney now.
16             (Brief pause)
17 Q.  I'll come back to this.  I think I've asked --
18     gone over most of this.
19         You also filed a charge of discrimination
20     with the EEOC; is that correct?
21 A.  Yes.
22 Q.  Were you represented by Mr. Decker at the
23     time?

Page 300

1  A.  No.
2          MR. JAFFREE:  Let me object for the
3          Record.  The charge is not relevant
4          evidence to these proceedings and
5          pending relevant matter in court.
6          MS. NELSON:  Well, then are you dropping
7          all of your discrimination claims.
8          MR. JAFFREE:  No, I'm not.  I'm just
9          simply saying the charge itself has
10         got to be a right to sue.  But the
11         charge itself is not relevant and not
12         evidence.
13         MS. NELSON:  You stated your objection.
14         MR. JAFFREE:  Nor is the EEOC findings.
15         MS. NELSON:  Make your objection.
16         MR. JAFFREE:  You don't dispute that, do
17         you?
18         MS. NELSON:  I dispute that.
19         MR. JAFFREE:  Oh, the EEOC findings are
20         relevant?  Okay.  I don't think the
21         Court will even permit them to be
22         introduced as evidence.
23             (Defendants' Exhibit 33 was marked

75 (Pages 297 to 300)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 301

1      for identification.)
2   Q.  Ms. Martin, is this a copy of -- Defendants'
3      Exhibit 33, is that a copy of your EEOC charge
4      that you filed against the City?
5   A.  That appears to be a copy of it.
6   Q.  Is that your signature on the charge?
7   A.  Yes.
8   Q.  And was that statement in your charge made
9      under oath?
10  A.  Yes.
11      MR. JAFFREE:  Wait a minute.  I'm not sure
12      these charges were done under oath,
13      but they could be.
14      MS. NELSON:  Let the witness answer,
15      please.
16  Q.  The answer is yes, it is under oath, isn't
17      it?  You were swearing to --
18  A.  Yes.
19  Q.  -- the statements made therein?
20      MR. JAFFREE:  Some is under penalty of
21      perjury.  I don't know if it's under
22      oath.
23      MS. NELSON:  It is signed under penalty of

Page 302

1      perjury --
2      MR. JAFFREE:  Yes.
3      MS. NELSON:  -- as opposed to under oath.
4      Okay.
5      MR. JAFFREE:  She's -- so I guess --
6      MS. NELSON:  Well, what does the document
7      say?
8      MR. JAFFREE:  Well, the document says that
9      she signed both of these under oath.
10      She has to do that.
11      THE WITNESS:  Who is that notary?  I don't
12      recognize it.
13      MR. JAFFREE:  I don't know.  It wasn't me.
14      THE WITNESS:  There's not a seal and
15      that's not this person's handwriting,
16      so I don't know if I swore to it or
17      not.
18      MR. JAFFREE:  Do you think after the fact
19      somebody notarized it?
20  Q.  Well, you did say, "I swear and affirm that I
21      have read the above-referenced charge, and it
22      is true to the best of my knowledge,
23      information, and belief."  Is that correct?

Page 303

1   A.  Yes.
2   Q.  And you also signed that "I declare under
3      penalty of perjury that the foregoing is true
4      and correct."  Is that true?  Is that where
5      you signed there?
6   A.  Yes.
7   Q.  Again, I know the hour is getting late, and
8      I've asked you about a lot of this.  And I'm
9      trying not to be repetitive.  A lot of this I
10      think we've talked about.
11      I'm not sure we talked about this:  You
12      claim that a new black magistrate was offered
13      a position with the office and Judge Gordon
14      pressured you to assign this new employee one
15      of the better offices.
16      Are you talking about Tonya Minifield?
17  A.  Yes.
18  Q.  And what office was she assigned?
19  A.  She -- we had to -- we kind of renovated one
20      of the offices further down the hall and moved
21      Valarie Savage in that office and moved Tonya
22      Minifield in Valarie's office.
23  Q.  Do you contend that's a better office?

Page 304

1   A.  It's a better office than the one that I would
2      have put her in, yes.
3   Q.  And where would you have put her?
4   A.  In the office that Mary -- the smaller office
5      that Mary Turner was in.
6      (Brief pause)
7   Q.  In this charge, you claim when you met with
8      Kai Davis that you believe the problems in the
9      magistrates' office were racially motivated.
10      Did you tell her that?
11  A.  Did I tell who?
12  Q.  Kai Davis.
13  A.  Yes, I did.
14  Q.  You didn't write that on your calendar, did
15      you?
16      MR. JAFFREE:  Wait.  Yes, she did.
17      MS. NELSON:  Please let me question the
18      witness and refrain from testifying
19      for her.
20      MR. JAFFREE:  But you said she didn't.
21  Q.  Did you use the term "racially motivated" in
22      your calendar?
23  A.  I'd have to look at it.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 305 | Page 307 |
|---|---|
| 1    MS. NELSON: Mr. Jaffree, please -- <br> 2  A.  It doesn't matter. I don't have to write <br> 3     everything in the calendar like I wrote it in <br> 4     there. I didn't write everything I told Kai. <br> 5  Q.  **You're saying, that's the first time you ever** <br> 6     **made a claim that the actions in the** <br> 7     **magistrates' office were racially motivated?** <br> 8  A.  That's the first time I made a claim to Kai <br> 9     Davis. <br> 10 Q.  **Did you make the claim to Judge Gordon?** <br> 11 A.  Huh? <br> 12 Q.  **Did you make such a claim to Judge Gordon --** <br> 13 A.  I don't recall -- <br> 14 Q.  **-- that her conduct was racially motivated?** <br> 15 A.  I don't recall making that comment to Judge <br> 16    Gordon. I do recall making comment to Judge <br> 17    Gordon about her showing favoritism. <br> 18    (Brief pause) <br> 19 Q.  **And did you receive a notice from the EEOC** <br> 20    **dismissing your EEOC charge?** <br> 21 A.  I received a right-to-sue letter. <br> 22 Q.  **Well, did that right to sue, as you call it,** <br> 23    **basically state that the EEOC was -- could** | 1  A.  Monitor a case? <br> 2  Q.  **Did you ever read on the Internet or the** <br> 3     **newspaper or become aware of a case in** <br> 4     **Birmingham?** <br> 5  A.  Yes. <br> 6  Q.  **And how did you become aware of that case?** <br> 7  A.  I don't recall. I did a lot of searches, <br> 8     Internet searches. <br> 9  Q.  **And that was while you were still working for** <br> 10    **the City, wasn't it?** <br> 11 A.  Not that I recall. <br> 12 Q.  **And if some -- a copy of some information was** <br> 13    **left in your office that you had copied some** <br> 14    **information about the black judge in** <br> 15    **Birmingham, would that have been done by you?** <br> 16 A.  I can't say that it was. <br> 17 Q.  **But it could have been?** <br> 18 A.  I don't think so, no. <br> 19 Q.  **So were you thinking about suing the City** <br> 20    **while you were still working?** <br> 21 A.  No, I wasn't. I had hoped very much to keep <br> 22    my job, even to -- during the so-called Due <br> 23    Process Hearing, was hoping for a miracle. |
| **Page 306** | **Page 308** |
| 1     find no violation of the statute and dismissed <br> 2     your charge, Defendants' Exhibit 34. <br> 3        MR. JAFFREE: You don't have to use that <br> 4        term "dismissed." <br> 5  Q.  **Did you get a copy of that, Ms. Martin,** <br> 6     **Exhibit 34?** <br> 7  A.  I believe I did. My attorney got it. I <br> 8     assume I got it, too. <br> 9  Q.  **Where you filed a lawsuit in federal court; is** <br> 10    **that correct?** <br> 11 A.  That's correct. <br> 12 Q.  **When did you and Mary Beth Brackin -- did** <br> 13    **y'all get together and decide this was** <br> 14    **something y'all were going to pursue against** <br> 15    **the City?** <br> 16 A.  After she was terminated. <br> 17 Q.  **Did she approach you about suing the City?** <br> 18 A.  I don't recall. <br> 19 Q.  **Do you know when she was terminated?** <br> 20 A.  No. <br> 21 Q.  **Did you ever monitor a case in Birmingham that** <br> 22    **involves a black judge being sued for** <br> 23    **discrimination?** | 1  Q.  **And what kind of miracle were you hoping for?** <br> 2  A.  That the judge would realize that all she was <br> 3     saying was a bunch of lies and that she had <br> 4     not done my evaluations as she should have <br> 5     done. She had skipped one. And that as long <br> 6     as I was performing the way she wanted me to, <br> 7     to write up the white magistrates and favor <br> 8     the black ones and not do -- be able to <br> 9     supervise them at all, then I was fine. <br> 10       But after that -- when I start enforcing <br> 11    things and disciplining consistently, or try <br> 12    to, then she had tried to -- was on the course <br> 13    of termination of me. <br> 14       In fact, I believe that she had planned to <br> 15    terminate me before I ever went on vacation <br> 16    and just didn't follow through. <br> 17 Q.  **And this is the same judge that had hired you** <br> 18    **just nine months earlier; is that correct?** <br> 19 A.  That's right. <br> 20 Q.  **And did you think that Judge Gordon was a good** <br> 21    **judge?** <br> 22 A.  No, I didn't. <br> 23 Q.  **Well, why did you want to keep working for** |

77  (Pages 305 to 308)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

| Page 309 |
|---|

1  her?
2  A.  I needed to work.  It was a good job.  I liked
3  my job.  It was very interesting.  I was
4  learning a lot, wanted to learn more.
5      I quit a job at Legal Services after being
6  there 20 years because I wanted more
7  supervisory, more management responsibility
8  and couldn't obtain that there.  And I left
9  and came to the City and virtually did my job
10  but had it -- had my life destroyed by Judge
11  Gordon because I wouldn't show favoritism.
12  Q.  When you left the City, whether to go on
13      vacation or at the time you were terminated,
14      did you leave stacks and stacks of tickets in
15      your office where balances were still due
16      and --
17  A.  I can't imagine that I did.  But if I did,
18  there was a reason for it being there.  I must
19  have been working on them.
20  Q.  Now, after you left the City, did you
21      go -- did you get unemployment?
22  A.  Yes, I did.
23  Q.  And do you know approximately how much you

| Page 310 |
|---|

1  got?
2  A.  I think I got the max of -- maybe it was 290 a
3  week but tax -- I had tax -- federal taxes
4  taken out.
5  Q.  Did you obtain other employment after you left
6      the City?
7  A.  Not for about ten months or so, no.
8  Q.  Did you seek other employment?
9  A.  Yes, I did.
10  Q.  And where did you seek employment?
11  A.  I would have to give you a list.  Probably 50
12  or 60 places.
13  Q.  Were people in Dothan hiring?
14  A.  Not at what I was making.
15  Q.  Well, I would ask if you could provide your
16      attorney a list of where you looked for
17      employment.
18      What employment did you obtain after you
19      left the City?
20  A.  With Movie Gallery as an HR coordinator.
21  Q.  And when did you go to work for Movie Gallery?
22  A.  I believe it was in August of --
23  Q.  2005?

| Page 311 |
|---|

1  A.  -- 2005.
2  Q.  And how long did you work there?
3  A.  I worked there till, I believe, October,
4  November of 2006.
5  Q.  And why did you leave?
6  A.  My position was eliminated because of the
7  merger -- positions were being eliminated --
8  mine was one -- because of the merger or the
9  purchase of Hollywood Video by Movie Gallery.
10  Q.  Who was your supervisor?
11  A.  Emily Bush.
12  Q.  And after you left Movie Gallery -- what was
13      your salary at Movie Gallery?
14  A.  I believe it was $14 an hour.
15  Q.  And did you obtain employment after Movie
16      Gallery?
17  A.  Yes, I did.
18  Q.  And where was that?
19  A.  At Georgia-Pacific through Manpower temporary
20  services.
21  Q.  Is that where you work now?
22  A.  Yes.  Except for I'm a permanent employee now
23    of Georgia-Pacific.

| Page 312 |
|---|

1  Q.  When did you go to work for Georgia-Pacific
2      through Manpower?
3  A.  The end of November 2006.
4  Q.  And how long did you work there through
5      Manpower?
6  A.  Until February the 5th of this year, 2007.
7  Q.  And you're now full-time with Georgia-Pacific?
8  A.  Yes.
9  Q.  And what is your job title there?
10  A.  Human Resources Coordinator.
11  Q.  And what are your duties?
12  A.  I do salary administration.  I set up and sit
13  in on some salaried interviews.  I do the
14  setup of hourly employment ads and set up
15  interviews and sit on a selection interview
16  team for interviewing hourly employees and
17  recommending hire -- people to hire.  I input
18  into our computer system all new hires,
19  salaried and hourly.  I oversee the contracted
20  janitorial service for the whole mill.  I
21  oversee Georgia-Pacific's guest house and --
22  Q.  What is that; is that where you fell?
23  A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 313

1  Q.  What's the guest house?
2  A.  It's just a huge house, lodge-like, that's on
3      several acres where we have employee events,
4      training. There's a picnic pavilion. There's
5      a smaller house on the grounds.
6  Q.  And how did you fall?
7  A.  I was down at the guest house with three other
8      people. There's a large room that was made
9      into a conference room where we hold big
10     events and trainings. There's a back door.
11     We were all three walking out the back door to
12     go to the shed to look for some more tables
13     and chairs.
14         When you walk out the back door, there's a
15     flat -- well, it's not flat. It's a flagstone
16     patio. And then there's a concrete handicap
17     ramp that's -- declines right beside it.
18     However, there was -- there's never been rails
19     put up. And when I walked out, I glanced back
20     over my shoulder to see if the door closed,
21     and my foot twisted off the flat below to the
22     incline. And I fell on my right knee and my
23     face.

Page 314

1  Q.  And I trust they're processing it as a
2      workers' comp claim?
3  A.  Yes, it is.
4  Q.  And how many employees does Georgia-Pacific
5      have at that plant?
6  A.  About 576.
7  Q.  And I may have asked this: Who do you report
8      to?
9  A.  Right now, our new HR leader is Carl, C-A-R-L,
10     Schreier, S-C-H-R-E-I-E-R.
11 Q.  And your current salary, I believe you said,
12     is $42,000?
13 A.  Right.
14 Q.  And in light of that, do you desire to work
15     for the City of Dothan?
16 A.  Yes.
17 Q.  And why is that?
18 A.  Because most of my career is in legal. And I
19     believe that given -- if I'd been given the
20     proper chance and evaluations, supervision,
21     that I would be a great court administrator
22     and court clerk.
23         And when I took the job, I planned to stay

Page 315

1      there and retire there. I had no intentions
2      of leaving.
3  Q.  So you would take a $10,000 cut in pay?
4  A.  There wouldn't be a $10,000 cut in pay. The
5      salary is actually higher now than it was when
6      I was the court administrator because the
7      position was upgraded sometime after I left.
8  Q.  And how do you know that?
9  A.  Because it was in the Dothan Eagle.
10 Q.  But other than that, you don't have any
11     personal knowledge of that; is that correct,
12     other than the reading it in the paper?
13 A.  Yeah, in print.
14 Q.  How do you contend you've been damaged as a
15     result of losing your job at the City?
16 A.  I have suffered emotional stress, stress on my
17     marriage, income loss, embarrassment, had to
18     give up certain things I was used to with my
19     salary.
20 Q.  What was that?
21 A.  Had to cut off my cell phone, couldn't afford
22     it. And my husband had to take over -- well,
23     virtually all the bills. We had -- before

Page 316

1      that I had shared the burden of the bills with
2      him. I was unable on unemployment to pay our
3      household bills. It was very hard for me to
4      get a job again. I spent countless hours
5      doing resumes, cover letters, sitting for
6      interviews. Was offered a job once
7      until -- well, I told him about the
8      leaving -- how I left the City. He asked me.
9      I told him. But he talked to someone -- I
10     don't know who -- and called me back later and
11     said, he'd offered the position to someone
12     else.
13 Q.  Did you try to go back to Legal Services?
14 A.  I did interview with them. The pay was much,
15     much lower. I could not live off of the pay.
16 Q.  So you turned them down?
17 A.  Yes.
18 Q.  Your husband, who does he work for?
19 A.  He's self-employed.
20         I lost my insurance. We had to pay $600 a
21     month for COBRA coverage.
22 Q.  Do you have insurance now?
23 A.  Yes, I do.

79 (Pages 313 to 316)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 317

1  Q. Were you hospitalized during the time period
2     that you were unemployed?
3  A. No, I wasn't.
4  Q. Did you incur any medical bills during the
5     time you were not employed?
6  A. I -- I would have to look at my medical
7     records at home.
8  Q. Now, in your -- you've said you read or
9     reviewed your Second Amended Complaint; is
10    that correct?
11 A. Yes.
12 Q. I'm going through, but I think a good bit of
13    this I have already asked you about. Just
14    bear with me.
15       (Brief pause)
16 Q. I'm on number 83, page 16. You make the
17    contention that Get Out Bonding appeared to
18    get preferential treatment from Defendant
19    Gordon. Defendants bonded by this outfit
20    appeared to get lesser sentences and have
21    their charges dropped with more frequency than
22    other bonders.
23       Do you have any evidence to support that

Page 318

1     allegation or appearance?
2  A. Just from what I've already told you.
3  Q. Or that Get Out was frequently not required to
4     pay their forfeitures. Do you have any
5     evidence or facts, other than what you've
6     testified to?
7  A. No.
8        (Brief pause)
9  Q. You were making claims of race discrimination
10    and constitutional claims. Do you understand
11    what claims you are making --
12 A. Yes.
13 Q. -- in this case?
14       And how do you feel your constitutional
15    rights have been violated?
16    MR. JAFFREE: You're asking her for a
17       legal conclusion.
18    MS. NELSON: Well, I realize it borders on
19       that but I just want her understanding
20       of that.
21    MR. JAFFREE: Well, I think it's a little
22       bit more than border. She's not an
23       attorney, but if you know the answer.

Page 319

1  A. As listed.
2  Q. As listed? What does that mean? You don't
3     really understand the --
4  A. I didn't say that. I said as listed in here.
5  Q. Well, I'm asking you to give me some
6     understanding, if you do have an
7     understanding, other than what's on paper.
8     MR. JAFFREE: It is highly unlikely that
9        she has a sophistication to understand
10       constitutional law and how the facts
11       of her case may intertwine with that
12       law. So if --
13    THE WITNESS: That's why I have an
14       attorney.
15    MR. JAFFREE: It you don't know just --
16 A. I understand basic.
17 Q. You are claiming that you were terminated
18    because of your race, white?
19 A. Yes.
20 Q. Do you know who replaced you in your job?
21 A. Yes, I do.
22 Q. And who is that?
23 A. Michelle Sellers.

Page 320

1  Q. And her race is white. I think we've
2     established that; is that correct?
3  A. Yes.
4  Q. Can you name any employee -- white employee
5     who you contend was treated differently than
6     you were?
7     MR. JAFFREE: You mean white employee?
8  Q. Excuse me. Black employee who was treated
9     differently than you?
10 A. My position was that I was the only one.
11 Q. You also have a claim of retaliation. Do you
12    understand that claim?
13 A. Retaliation?
14 Q. Yes.
15    MR. JAFFREE: What are you looking at?
16 A. Where are you at?
17 Q. I'm on page 35.
18    MR. JAFFREE: I mean, her response to that
19       one may suffer from the same thing as
20       the constitutional response.
21    MS. NELSON: The retaliation claim, can I
22       just confirm with you, Ishmael, that
23       under 40 -- it's under 42, 1983

80  (Pages 317 to 320)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 321

1    through 19 -- I'm just not sure that I
2    understand your claim. I'm on page
3    35.
4        MR. JAFFREE: I'd have to look and read
5        this whole thing in context. It may
6        be because she protested something as
7        made unlawful. And as a result of
8        that, she was terminated, even under
9        1983.
10    MS. NELSON: 1981 and 1983.
11    MR. JAFFREE: Yeah.
12    MS. NELSON: I'm just trying to make sure
13        I understand your claim.
14  Q.  Are you aware you have a claim of negligence,
15        Ms. Martin? Can you tell me how --
16  A.  Yes. I understand that.
17  Q.  -- that the -- or Judge Gordon or the City has
18        been negligent towards you?
19  A.  You're talking about actually Count 16. It
20        says Count 14 starts on page 35.
21  Q.  Yeah.
22  A.  And 36.
23  Q.  What's Count 14?

Page 322

1    A.  I think it --
2        MR. JAFFREE: Do I have these things
3        numbered wrong?
4    A.  I think it was numbered wrong. But it says --
5        I renumbered mine, anyway.
6        That as a probationary employee, it's set
7        out that I was supposed to be evaluated every
8        three months, four times in the 12-month
9        period.
10  Q.  And where does it say that?
11  A.  You would have to get the --
12  Q.  I'm just saying, what's your understanding of
13        where it says that?
14  A.  It's in the City's Personnel Rules and
15        Regulations, Section 2-80.
16        And she had a duty to point out my
17        deficiencies and provide me with a reasonable
18        opportunity to cure those deficiencies. She
19        didn't do that. If she had have done my
20        evaluations as she should have, she might
21        could have done that. But she didn't.
22        She did not do one that was due on 7/26 I
23        believe. And I asked about when it was going

Page 323

1    to be done. I even asked Kai in Personnel had
2    it been submitted without me knowing it, and
3    she said no, it had never been turned in.
4  Q.  But you knew from your meeting with the judge
5        and your meeting with Kai that there were
6        concerns about your ability to --
7  A.  No.
8        MR. JAFFREE: That's your statement.
9  A.  That's your statement, not mine. I was not
10        made aware of deficiencies. There were no
11        counseling sessions, and I was not made aware
12        of deficiencies. And if -- like I say, if the
13        judge wanted to do it the right way, she
14        would've done an evaluation on the date that
15        she was supposed to.
16  Q.  And that's your testimony -- that's your
17        understanding of the rule?
18  A.  And then I suffered injury from that because I
19        lost the job.
20  Q.  Well, we've been over this testimony in -- can
21        you at least agree that you and the judge were
22        not seeing eye to eye when you met with Kai
23        Davis?

Page 324

1        MR. JAFFREE: That's a broad question.
2        MS. NELSON: State your objection.
3        MR. JAFFREE: I mean, it's too broad for
4        her to answer. I mean --
5  Q.  You understand that, don't you?
6        MR. JAFFREE: Eye to eye on what?
7  Q.  That y'all were --
8        MR. JAFFREE: It could mean job
9        performance. Eye to eye on how she
10        sees black employees versus white
11        employees. Eye to eye on whether or
12        not polices of administrator's office
13        should be followed.
14  Q.  You knew the judge was not satisfied with your
15        performance, didn't you, when you met with Kai
16        Davis --
17  A.  No, I didn't.
18  Q.  -- in the summer?
19  A.  No, I didn't.
20        MR. JAFFREE: Well, I mean, for her to say
21        yes, eye and eye and you interpret it
22        that way, that's not what she meant.
23  Q.  You thought you were doing a great job as far

81  (Pages 321 to 324)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 325

1  as you knew?
2  A.  Yes.  I thought I was doing a great job.
3  Q.  And how did you get that impression?
4  A.  It was limited to the great job I could do by
5     restraining.
6  Q.  You didn't know what you were doing, did you?
7  A.  Yes, I did know what I was doing.  I knew what
8     I was doing about the supervision.
9  Q.  How can you supervise a group of people if you
10    don't even know what it is they're doing to
11    supervise?
12  A.  I did know what they were doing.
13  Q.  And how did you what they were doing?
14  A.  I was learning.  The judge hired me, knowing
15    that I was not a magistrate.  She hired me,
16    knowing my background totally, my work
17    experience, everything.  She wouldn't have
18    hired me if, in fact, she made that decision
19    if she didn't think I could do the job.
20  Q.  Do you feel like you misrepresented anything
21    to her in the interview process?
22  A.  No, I don't.  But I feel she misrepresented
23    things to me.

Page 326

1  Q.  And if she feels that you misrepresented
2     things to her, y'all, in essence weren't
3     seeing eye to eye, were you?
4  A.  What she promised me in the interview and
5     after that was 100 percent support and I had
6     total supervision and management rights.
7     That's not what I got.  And we also talked
8     about that we might not always see eye to eye
9     and we might not always agree, but she stated
10    she would back me 100 percent.
11  Q.  No matter what you did?
12  A.  I'm not -- you're putting words in my mouth.
13    I said she would back me and she would not
14    interfere with my management.
15  Q.  You have a breach of contract.  What contract
16    do you contend has been breached?
17    MR. JAFFREE:  Again --
18    MS. NELSON:  I'm just asking her.
19    MR. JAFFREE:  -- requires a legal
20      conclusion based on state law and
21      state court interpretations of that
22      law.
23  Q.  Other than your lawyer's testifying for you --

Page 327

1  A.  I believe it's stated right here in
2     writing that the --
3  Q.  What contract did you have?
4  A.  -- defendant owed me.  Yes, breach of
5     contract.  State claim?
6  Q.  Did you have a contract with the City?
7  A.  Yes.  I was hired, and I was told I would have
8     evaluations every three months and
9     deficiencies would be pointed out to me on
10    those evaluations.
11  Q.  And who told you that?
12  A.  And this -- City's Personnel Rules and
13    Regulations, Section 280, and Judge Gordon and
14    Kai Davis.
15    MR. JAFFREE:  The defense had an
16      opportunity to attack some of these
17      claims early on, and I guess they did.
18    MS. NELSON:  You're talking about a Motion
19      to Dismiss?
20    MR. JAFFREE:  Well --
21    MS. NELSON:  They will be dealt with in a
22      summary judgment, I assure you.
23    MR. JAFFREE:  Well, I'm sure they're going

Page 328

1  to revisit it again.  But I said, the
2  City has not clearly attacked some of
3  these claims as they could.
4    MS. NELSON:  If you can give me a minute.
5    Y'all want to take a quick break?  I
6    think I'm about done.
7    (Brief recess)
8  Q.  Ms. Martin, I know it's been a long day.  I
9     know we've been over a lot of testimony and
10    I've asked you a lot of questions.  But based
11    on your claims of discrimination and
12    retaliation against the City or Judge Gordon,
13    are there any other claims or facts to support
14    your claim that I have not asked you about?
15  A.  I would have to read through everything I've
16    got.
17    MR. JAFFREE:  There may be.
18  A.  There could be.  But I'd have to spend hours
19    reading through my complaint.
20  Q.  I'm talking about the things I've asked you
21    and the things you know that you're
22    complaining about, is there anything that --
23    MR. JAFFREE:  Can I help?

82  (Pages 325 to 328)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 329

1    MS. NELSON: No.
2  Q.  Are there facts that you are aware of that we
3       have not reviewed that would support your
4       claim of discrimination or retaliation
5       against --
6       MR. JAFFREE: I can help her refresh her
7           recollection if you would like. I
8           mean, do you want to know the facts or
9           do you want just to play gotcha?
10      MS. NELSON: Well, I want to know her
11          answer as opposed to yours. And then,
12          yeah, if you want to enlighten me that
13          you're making a claim that I hadn't
14          covered, I would like to know about
15          it.
16      MR. JAFFREE: I think she made a claim in
17          the complaint if I'm not mistaken that
18          the judge told her told her that since
19          she was black, nothing could be done
20          to her.
21          Is that in the complaint?
22      THE WITNESS: Yes.
23      MR. JAFFREE: It should be in your writeup

Page 330

1           there, you haven't covered that.
2       MS. NELSON: This is in her -- your
3           seconded amended complaint?
4       THE WITNESS: I'm not sure.
5       MR. JAFFREE: It's --
6   Q.  It's your contention that the judge made such
7       a statement to you?
8   A.  Yes.
9   Q.  And what did she say?
10  A.  She said -- I don't know word for word.
11      Basically, it was the City --
12  Q.  Can I stop you? Mr. Jaffree fusses at me
13      about this all the time. When are we talking
14      about that this comment was said?
15  A.  Was after Rickey Stokes filed his complaint
16      against Lavera.
17  Q.  This had to with what you testified, that two
18      defendants with the same name --
19  A.  Among other things, yes.
20  Q.  And so this was after Rickey Stokes had
21      complained?
22  A.  Right. We were discussing it. She
23      brushed -- I thought that -- that she got --

Page 331

1       she got a copy of that. Jerry Corbin did. I
2       was waiting for one of them really to do
3       something about the complaint. And I called
4       the judge and asked her what -- you know, had
5       she read it, what were we going to do about
6       it. And she just kind of laughed it off and
7       said, we're not going to do anything. Rickey
8       Stokes causes problems all the time, files
9       complaints with the City all the time.
10          And then later -- it could have been that
11      same day, might have been the next day -- I
12      discussed it with her again because Rickey
13      asked me -- called me and asked me had I --
14      had the judge read the complaint. I told him,
15      yes, and I would leave it up to her.
16          And he told me -- she -- when she and I
17      were talking then, she said that there was no
18      way the City was going to get rid of her
19      because she was a female, black judge and they
20      wouldn't be stupid enough to let her go.
21  Q.  And who was present when she --
22  A.  Me and the judge.
23  Q.  -- supposedly said that?

Page 332

1   A.  Me and Judge.
2   Q.  And where were you?
3   A.  In her office.
4   Q.  And this was talking about the Rickey Stokes
5       complaint?
6   A.  Right.
7   Q.  Why would she be talking about her job being
8       in jeopardy over the Rickey Stokes' complaint?
9   A.  Because Rickey Stokes is a bone of contention
10      for everybody -- for the judge and all.
11  Q.  For everybody?
12  A.  Not for everybody. For the judge.
13  Q.  Well, first you said "everybody."
14      MR. JAFFREE: She said the judge and all,
15          not everybody.
16  Q.  Do you know Rickey Stokes?
17  A.  I know him.
18  Q.  Do you know him outside of working for the
19      City of Dothan?
20  A.  I had met him before.
21  Q.  In what way?
22  A.  Socially. We were -- I just knew -- met him
23      one time, I believe, talked to him.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 333

1     The judge had told me about some things
2 that he done before in the magistrates'
3 office, that he'd bring a recorder in and try
4 to record conversations he had. So when he
5 came over to introduce his self when I first
6 started working there, he walked in. And the
7 first thing I did was maybe ask him if he had
8 a recorder.
9     And he said no.
10     And I said don't ever bring one in here.
11 If you do, you'll being leaving. I won't be
12 talking to you.
13 Q. Okay. To your knowledge, was the judge's job
14   in jeopardy in any way over the Rickey Stokes'
15   letter or memo that you are talking about?
16 A. I don't know. I suppose from issues with
17   Rickey Stokes in the past, maybe she felt
18   threatened in some way. I don't know. I
19   wasn't there in the past.
20 Q. Do you know Rickey Stokes -- the number of
21   cases or claims or lawsuits he's been involved
22   in or the number of times he's been sued?
23 A. No.

Page 334

1 Q. Any other fact that you're aware of or that's
2   in your complaint that we haven't talked about
3   that would support your claim of
4   discrimination?
5     MR. JAFFREE: That you can think of right
6     now.
7 A. None I can I think of right now.
8 Q. Well, do you want to think about it a little
9   bit more, then, while I'm getting my documents
10   together?
11 A. I really want to go home. My foot is
12   swollen. It's killing me. I'm only supposed
13   to be working half days. I'm supposed to be
14   propping it up.
15 Q. Well, I believe that's all I have then, right
16   now.
17     MR. JAFFREE: Just a few bullet points.
18     Just a few. And I may supplement.
19     MS. NELSON: And I am going to object if
20     you start leading her like you did
21     before, but with that, I'm ready to go
22     here myself.
23     MR. JAFFREE: I want that with a

Page 335

1   declaration later.
2     EXAMINATION
3 BY MR. JAFFREE:
4 Q. Get Out Bonding, as far as you know, what
5   ethnic identity does the owner of that
6   operation have?
7     That's an awkward way of asking you that
8   question. Do you understand the question?
9 A. Say it again.
10 Q. Get Out Bonding, do you know if it's black or
11   white owned?
12 A. Black.
13 Q. Pardon?
14 A. Black.
15 Q. You stated earlier that the judge told you
16   that Mary Beth and Mary Turner, she should
17   have fired them a long time ago. Do you
18   recall when she made this statement?
19 A. I believe it was during an interview -- one of
20   the interviews.
21 Q. Well, let me see if I can help you. Do you
22   know if she made this statement concerning
23   anybody else that should have been fired?

Page 336

1 A. Valarie Savage.
2 Q. Again, think about the three people. Do you
3   remember when she could have made the
4   statement? You said she made it with respect
5   to three people.
6 A. The -- the statement of, she should have fired
7   them long ago?
8 Q. Yeah.
9 A. She made that during the -- about those three
10   during the subsequent meeting that we had
11   before I started working.
12 Q. You have already told me that.
13     At one time, I was going to go through
14   those exhibits and ask you questions, but I'm
15   not going to do it now in the interest of
16   time.
17     (Brief pause)
18 Q. This memo here to Kai Davis, dated June the
19   8th, dealing with employee counseling, did you
20   ever get this?
21 A. No, I didn't.
22 Q. What about this memo, again, interoffice memo
23   dated July the 8th to, again, Kai Davis? Did

84 (Pages 333 to 336)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 337

1    you ever get this?
2    A.  No, I didn't.
3    Q.  Those Attachments 1, 2, and 3, that were shown
4        to you in one of the exhibits, did you ever
5        get any of those attachments?
6    A.  No, I didn't.
7    Q.  Did the judge ever give you any memo
8        concerning negative aspects of your job?
9    A.  No, she didn't.
10   Q.  Did she previously call you in for a
11       counseling session about any negative aspects
12       of your job?
13   A.  No, she didn't.
14   Q.  And she made any number of some very serious
15       charges, such as you having somebody come from
16       out of state even though the matter had been
17       resolved.
18           Did she write you up for that?
19   A.  No.
20   Q.  Do you know anything about that?
21   A.  No.  Just generalizations.  There's no names
22       provided, no facts.
23   Q.  Did she ever give you written notice of any

Page 338

1    attorneys that had complained about you?
2    A.  No.
3    Q.  Any other staff member of your office that
4        have complained about you?
5    A.  No.
6    Q.  Did she ever tell you that Lavera and/or
7        Eunice had filed a discrimination complaint
8        with the personnel office, concerning you?
9    A.  No.
10   Q.  Did the judge ever personally accuse you of
11       discriminating against the black employees of
12       the office?
13   A.  No.
14   Q.  Have you ever previously been supervisor over
15       any black employees?
16   A.  Yes.
17   Q.  Has any black employee ever filed any charges
18       of discrimination against you?
19   A.  No.
20   Q.  Are you currently supervising any employees?
21   A.  Yes.
22   Q.  Have they filed any charges of discrimination
23       against you?

Page 339

1    A.  No.
2    Q.  Did the judge indicate to you in a very casual
3        and cavalier way that she wanted Tonya to have
4        a good office or --
5           MS. NELSON:  Object to the form.
6    Q.  Well, how did the judge tell you about her
7        interest in getting Tonya an office?
8           MS. NELSON:  Object to the form.
9    Q.  Well, did the judge tell you anything about
10       her interest in getting Tonya an office?
11   A.  Yes.
12   Q.  Exactly what did she tell you and how vigorous
13       was her discussion?
14   A.  She was very intent on giving Tonya a nice
15       office, even to the point of doing some
16       remodeling, if need be.
17   Q.  Did she follow up this conversation with any
18       other comments about Tonya getting an office?
19   A.  She continued to check with me about
20       what -- what I had come up with.  And I
21       expressed to her that I didn't think it would
22       be a good idea.  I wasn't in agreement of
23       giving her an office when Mary Turner didn't

Page 340

1    have an office at all until she took over
2    Lavera's duties.
3    Q.  Well, how much in the position of seniority
4        did Tonya have in the time that the judge was
5        interested in getting her a nice office?
6    A.  Say that again.
7           MS. NELSON:  Object to the form.
8    Q.  How much in the position seniority did Tonya
9        have at the time the judge expressed interest
10       in getting Tonya an office?
11   A.  She hadn't even started work at the City.
12   Q.  Did you ever receive a complaint from a
13       Sergeant Woodruff about the preparation of
14       alias warrants?
15   A.  Yes, I did.
16   Q.  Do you remember that complaint?
17   A.  Yes.  It was that 40 warrants were missing
18       that Eunice had taken over.  And Sergeant
19       Woodruff wasn't there, but the magistrates
20       were supposed to put warrants in her box.  And
21       Eunice had given them to Sergeant Tolbert.
22       And when I talked to Sergeant Tolbert -- well,
23       I talked to Eunice, and she talked to Sergeant

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 341 |
|---|
| 1  Tolbert. And he said he didn't know anything |
| 2  about warrants, couldn't find them. They |
| 3  looked for them. |
| 4      I talked to him, and he said that they |
| 5  could not find the warrants, didn't know where |
| 6  they were. And Sergeant Woodruff did a memo |
| 7  -- either in that memo or another one, asked |
| 8  that they be either found or reprinted for |
| 9  her. |
| 10 Q.  Did he express any complaints that he had had |
| 11     about Lavera? |
| 12 A.  Who? |
| 13 Q.  Sergeant Woodruff. |
| 14 A.  That's a she. |
| 15 Q.  I'm sorry. She. Did she complain? |
| 16 A.  About Lavera? |
| 17 Q.  Yeah. |
| 18 A.  Lavera or Eunice? Lavera? |
| 19 Q.  Lavera? |
| 20 A.  She said that -- she brought to my |
| 21     attention -- she brought me a stack of |
| 22     warrants that Lavera had done that contained |
| 23     numerous errors, and we went through them. I |

| Page 342 |
|---|
| 1  went through them, and some of them were court |
| 2  system errors, the HTE system. However, if |
| 3  Eunice -- I mean, Lavera had have proofread |
| 4  those, those could have been corrected. Some |
| 5  of the information was not the court system |
| 6  error. |
| 7  Q.  Did she make any statement about how long she |
| 8      had been complaining about Lavera's errors? |
| 9  A.  Said she'd been complaining about them for |
| 10     a -- previous to my being made court |
| 11     administrator, for some time. |
| 12 Q.  Did she indicate the results of those |
| 13     complaints? |
| 14 A.  They were ignored by the judge. |
| 15 Q.  Did you ever have an occasion to ask Mary |
| 16     Turner to take over Lavera's job when she was |
| 17     to leave out on extended sick leave? |
| 18 A.  Yes. I assigned temporarily to Mary Turner |
| 19     Lavera's job duties while she was out on |
| 20     leave. |
| 21 Q.  How did Lavera feel about this? |
| 22 A.  Lavera had actually let me -- she let me know |
| 23     that she had actually asked Eunice and Tonya |

| Page 343 |
|---|
| 1  to cover her job duties during that time. And |
| 2  I told her that, no, I was going to let Mary |
| 3  Turner take over, that Eunice -- I didn't want |
| 4  Eunice and Tonya doing it, that Mary had done |
| 5  some of this before. And she kept insisting |
| 6  that she would rather Eunice and Tonya do it. |
| 7  And I told her that I would make the |
| 8  assignment and I'd made it to Mary Turner. |
| 9  Q.  How would you describe her affect when she |
| 10     kept insisting? Do you understand what mean |
| 11     by "affect?" |
| 12     MS. NELSON: Object to the form. I sure |
| 13     don't. |
| 14 Q.  Was she pleased that you -- |
| 15 A.  Oh, no, she was not pleased at all. |
| 16 Q.  How would you describe her affect? |
| 17 A.  Very upset, angry. |
| 18 Q.  Do you know if any of this was mentioned to |
| 19     the judge about your decision to let Mary do |
| 20     it rather than Lavera and Tonya? |
| 21 A.  I don't recall. |
| 22 Q.  Do you remember sometime in July sending a |
| 23     memo to Eunice regarding bond changing |

| Page 344 |
|---|
| 1  procedure? |
| 2  A.  Yes, I do. |
| 3  Q.  Do you know how Eunice responded to that memo? |
| 4  A.  She took it to the judge. |
| 5  Q.  Did she say anything about your authority to |
| 6      tell her what to do? |
| 7  A.  Yes. She was very insubordinate, told me I |
| 8      didn't have the authority. And then in a |
| 9      staff meeting, also, told in front of everyone |
| 10     that I didn't have the authority to question |
| 11     her changing bonds. |
| 12 Q.  Did you talk to the judge about this? |
| 13 A.  Yes, I did. |
| 14 Q.  Did you explain to the judge about whether you |
| 15     thought it was insubordinate? |
| 16 A.  Yes, I did. |
| 17 Q.  And what was the judge's response? |
| 18 A.  That it wouldn't be good to write her up for |
| 19     insubordination because she could file a claim |
| 20     of discrimination against me. |
| 21 Q.  Was there ever any occasion where Judge Gordon |
| 22     expressed concern about white employees |
| 23     causing someone to get arrested wrongfully? |

86 (Pages 341 to 344)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 345

1    A.  That was always brought to my attention.
2    Q.  Were there any occasions when either Lavera
3         and Eunice had caused somebody to be
4         wrongfully arrested?
5    A.  Yes.
6    Q.  Do you know the names of any of the people
7         that she caused to be wrongfully arrested?
8    A.  Gregory Powe.
9    Q.  Anyone else?
10   A.  Christopher Carroll.
11   Q.  Anybody else that you remember off the top of
12        your head?
13   A.  Not at this time.
14   Q.  Okay. I'm going to stop it there. I could
15        have a thousand questions to ask you, but I'm
16        not.
17              EXAMINATION
18   BY MS. NELSON:
19   Q.  Did the judge ever tell you that the Police
20        Chief John White had complained about you?
21   A.  She did tell me that. However, it was right
22        after I'd had a conversation with Chief White,
23        had gone over to introduce myself again to him

Page 346

1         because I had met him previously and we had a
2         mutual friend.  And we had a great
3         conversation.  I offered all my support, and
4         we talked.  And he said he would help me any
5         way he could.  And I told him that I -- just
6         to let me know if I could help any way.  I was
7         never provided a written complaint.
8              MS. NELSON:  That's all I have.
9              EXAMINATION
10   BY MR. JAFFREE:
11   Q.  What did she say was the nature of Chief
12        White's complaint?
13   A.  She didn't give me details.  She just said
14        that he complained.
15   Q.  Do you recall whether you asked for details?
16   A.  I was astounded that there was a complaint,
17        considering just days before I had had a
18        conversation with him that went very well.
19   Q.  Maybe we can find out tomorrow what the nature
20        of the complaint was.  All right.  That's all
21        I have.
22              (Deposition concluded at 6:40 p.m.)
23

87  (Pages 345 to 346)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## A

Aberdeen 28:10
ability 90:15
185:6 240:16
323:6
able 73:9 86:18
113:22 114:7
227:9 308:8
above-referen...
302:21
absence 172:10
213:12,14,16
292:8
absolutely 22:14
242:20,22
243:1 258:13
accept 67:1
accepted 175:3
access 76:6
114:20
accessories
215:15
accident 43:19
accord 91:2
account 121:17
168:21
accountant 24:8
Accounting
167:20 173:3
173:16
accurate 81:9,18
accurately
174:13
accusation
263:20 266:11
accusations
177:1 263:12
263:14 264:1,4
accuse 263:11
338:10
accuses 299:6
accusing 177:15
acknowledged
77:15

acknowledgm...
106:4
acquaintances
117:9
acres 313:3
action 16:14
43:18 44:12
45:2,2,15 96:9
97:20 137:5,7
138:13,22
142:3,10
143:12 144:8
146:1,8 183:7
183:11 184:10
185:2,21
186:16,22
188:9 189:4,22
190:9 191:2
234:23 292:5
actions 139:2
305:6
activities 52:16
activity 299:7
actual 67:21
75:10 104:16
296:17
ad 67:6,11 68:4
68:20,21 84:3
add 40:17 210:6
210:7
added 269:19
279:18,22
280:1,3,5
adding 279:17
addition 70:17
71:7
additional 192:8
269:18 283:15
address 27:5
28:3 51:2
275:4
addressed 152:5
adjustment
243:3 280:10

administered
183:8,11,13
administration
53:12,21
312:12
administrative
61:7,10 69:4
104:1
administrator
12:21 13:8,15
67:3 68:6
72:20 73:16
80:12 101:2
119:8 157:20
170:21 171:18
173:11 191:5
191:23 192:19
216:1 261:7
314:21 315:6
342:11
administrator's
324:12
admit 197:5
admitted 196:23
ads 312:14
advance 176:1
Advantage
254:22,23
adverse 259:16
advertising
55:15
advice 19:22
299:13
advised 22:2
96:4 159:2
233:8
advising 164:7
286:4
Aerospace 31:7
affect 204:12
343:9,11,16
affirm 302:20
afford 43:7
315:21

afraid 100:7,8
226:19
afternoon 5:10
afternoons
236:7
age 40:1,2 41:3
ages 29:16
ago 6:1 7:7 27:5
42:17 46:9
47:2 48:2
124:10 165:2
335:17 336:7
agonized 201:23
203:14
agree 23:3 180:7
189:4 199:13
228:23 290:9
296:11 323:21
326:9
agreed 3:2,16
87:5 104:9
126:4 137:14
138:16 166:19
agreed-upon
148:13
agreement 1:15
229:14 284:17
284:19 339:22
ahead 22:22
29:3 61:8
132:21
Air 38:3
Alabama 1:2,17
1:18 2:5,9 3:8
7:16 25:4,8
27:1,7 32:13
34:13 39:9
40:1 55:4 56:1
56:4,14 57:10
64:19,21 65:1
65:2 72:7,23
266:19
alias 126:23
127:5,10,13

273:18 340:14
allegation 82:13
82:15,16,17
202:18 318:1
allegations
262:5
allegedly 74:7
202:15
allotted 151:18
allowed 114:5
115:22 118:23
126:9 161:16
163:1 224:14
224:15 237:9
240:13,14
253:4 258:8
allowing 114:20
222:14
altered 82:11,21
amended 11:11
317:9 330:3
amount 101:13
101:14 135:5
215:14 277:9
amounts 209:16
Amsouth/Har...
2:8
analyst 190:19
Andrews 1:18
and/or 338:6
angel 246:22
247:1
angry 48:23
143:22 251:7
252:4 256:3
343:17
animus 227:18
Ann 97:11,15,16
121:1 122:10
142:8,14 143:8
161:8 162:5
185:19 186:17
186:17 187:9
189:22 197:8

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 229:6 280:17 | 89:4 222:9 | **appreciate** 41:1 | 208:10 | 156:7,9 192:4 |
| 288:21 292:12 | 236:14 261:9 | 187:15 | **argue** 196:15 | 196:18 199:1 |
| 292:20 | 285:7 293:3 | **approach** | **arguing** 83:1 | 201:5,13,21 |
| **anniversary** | 322:5 | 220:23 221:3 | 177:5,9,11,14 | 203:7 205:9 |
| 191:11 | **Apartments** | 306:17 | 196:17 204:3,5 | 206:19 220:19 |
| **announcement** | 28:5 | **approached** | **Army** 33:2 | 220:23 225:3 |
| 72:19 74:12,16 | **apologize** 183:6 | 220:18 230:5 | **arraignment** | 230:6 233:21 |
| 80:17 | 232:11 | **appropriate** | 161:2 163:21 | 236:19,22 |
| **annual** 26:6 | **apparently** 74:8 | 16:21 143:18 | 163:22 164:22 | 239:6,8 256:1 |
| 71:1 | 207:6 | 178:23 190:11 | **arrangement** | 260:17 262:8 |
| **answer** 5:3,8 | **appeal** 185:5 | 209:15 | 27:19 | 265:1,1 267:3 |
| 16:10 19:19 | **appealed** 185:1 | **approval** 214:2 | **arrest** 122:8 | 267:18 270:23 |
| 29:3 36:14 | **appear** 86:20 | **approve** 104:3 | 209:14 272:7 | 272:20 276:14 |
| 40:6 48:15 | 149:17 151:18 | 291:4,8,9 | 273:19 | 282:23 291:7 |
| 82:19 110:17 | **appearance** | **approved** | **arrested** 41:13 | 292:7,9 299:17 |
| 194:1,3,5 | 149:13 318:1 | 101:23 103:1,4 | 47:2 160:19 | 303:8 314:7 |
| 205:21 240:22 | **APPEARAN...** | 103:9 214:2,4 | 198:8,21 248:5 | 316:8 317:13 |
| 241:22 301:14 | 2:1 | 214:10,14 | 249:8,13 250:3 | 322:23 323:1 |
| 301:16 318:23 | **appeared** | 236:4,11 237:7 | 273:4 292:16 | 328:10,14,20 |
| 324:4 329:11 | 151:11 201:8 | **approving** | 344:23 345:4,7 | 331:4,13,13 |
| **answered** 70:16 | 252:12 317:17 | 213:11 | **arrests** 270:9 | 341:7 342:23 |
| 110:15 144:11 | 317:20 | **approximately** | **Ashton** 137:20 | 346:15 |
| 151:1 177:22 | **appearing** | 1:20 26:2 30:2 | 138:9,10,18 | **asking** 4:11 21:4 |
| 177:23 224:3 | 149:23 | 62:14 63:9 | 140:15,15,22 | 43:11,12 45:12 |
| 242:16 250:20 | **appears** 25:13 | 191:20 192:3 | 141:5 146:21 | 48:20 63:13 |
| 292:22 | 282:8 301:5 | 309:23 | 154:17 156:7 | 74:4 76:4 |
| **answering** 4:20 | **applicants** | **April** 13:1 26:21 | 157:1 221:23 | 77:19,23 81:14 |
| 5:15 239:18 | 118:20 | 126:9,16 | 222:1,2,3 | 81:17 82:10,12 |
| **anybody** 39:23 | **application** | 181:12,14 | 242:23 243:4 | 82:20 83:5,6 |
| 68:11 100:7 | 68:12 69:9,16 | 182:4 184:5,6 | **Ashton's** 156:17 | 84:5 86:3,8 |
| 114:2 117:12 | 71:5 83:21 | 184:7,16 194:7 | **asked** 10:8,11,21 | 99:18 150:23 |
| 123:14,16 | 246:11 | 194:8,10,19,20 | 15:10 16:1 | 157:10,11 |
| 129:18 130:12 | **applied** 56:20 | 194:21 212:13 | 21:14 40:13 | 165:3 174:7 |
| 136:11 141:3 | 67:12 72:21 | 218:2,3 219:20 | 42:23 45:14 | 183:19 194:6 |
| 144:10 157:22 | 84:13 | 219:21 256:13 | 48:2 70:12 | 196:14,15,16 |
| 159:8,18 | **apply** 245:22 | **area** 22:13 30:23 | 73:23 77:17,18 | 196:20 197:17 |
| 161:10,23 | 287:22 | 31:9 32:6 33:3 | 79:1 83:2 | 204:8 225:18 |
| 164:20 166:23 | **appoint** 130:5 | 33:12 34:8,22 | 90:10 95:12 | 228:12 242:3 |
| 202:15 221:5 | **appointed** 172:9 | 35:2 37:11 | 108:15 115:22 | 263:8 266:14 |
| 235:2 265:22 | **appointment** | 38:11 39:8,9 | 120:1 125:23 | 275:22 279:2,8 |
| 280:6 335:23 | 120:2 235:18 | 40:2 50:22 | 126:5 129:9,12 | 279:15 287:8 |
| 345:11 | 236:20 237:4 | 112:18 202:9 | 130:1 142:21 | 292:1 318:16 |
| **anytime** 229:14 | **appointments** | **areas** 195:19 | 143:9 150:19 | 319:5 326:18 |
| **anyway** 58:21 | 58:5 | 197:20 199:8 | 154:18,20 | 335:7 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 349

| | | | | |
|---|---|---|---|---|
| **aspects** 148:10 337:8,11 | 273:17 274:3 274:17 | 149:12,19,22 150:8 153:19 | **awkward** 335:7 **a.m** 1:20 | **Bailey** 13:19 110:2,5,8 |
| **assenting** 76:23 | **attached** 16:14 | 156:13 165:14 | ------- | 243:15 244:3 |
| **assessing** 119:11 | 109:14 152:12 | 166:4,17 167:5 | **B** | **balance** 175:9 |
| **assign** 129:17 | 152:15 170:4 | 222:14 338:1 | **B** 33:10 288:20 | **balances** 309:15 |
| 303:14 | 182:20 273:1 | **attorney's** 19:22 | 289:1 | **balancing** 97:12 |
| **assigned** 99:3,8 | 273:11,16 | 140:16 154:15 | **back** 26:8 53:11 | 173:10,22 |
| 110:3 112:5,8 | 286:7,22 | **attorney/client** | 55:6 58:17 | 175:2,10 |
| 119:20,22 | 294:13 297:1 | 18:9 20:17 | 59:3,5 67:15 | **banished** 123:19 |
| 120:7 279:19 | **attachments** | 299:1 | 68:16,18 86:20 | **Bank** 55:4,5 |
| 279:20 303:18 | 297:6 337:3,5 | **audio** 43:9 | 90:3 91:1 | 56:1,4,14 |
| 342:18 | **attack** 327:16 | **audit** 188:1,3,5 | 99:18,21 102:2 | 57:10 59:7 |
| **assigning** 110:1 | **attacked** 328:2 | 188:14 | 102:3,20,21 | 72:7 |
| 110:9 111:14 | **attempt** 173:1 | **auditor** 167:19 | 108:14 125:8 | **bankruptcy** |
| **assignment** | **attempted** 47:9 | 220:15 | 126:14 129:21 | 41:20 42:1,5 |
| 343:8 | **attend** 54:16 | **August** 22:1,2 | 130:17 133:15 | 42:13 |
| **assignments** | **attending** 119:1 | 285:17 310:22 | 140:15 143:2,7 | **banned** 124:7,9 |
| 129:19 | **attention** 137:9 | **aunt** 133:3,4 | 149:9 164:11 | 124:11 |
| **assist** 125:10 | 138:17 141:7 | **aunts** 40:16,16 | 172:11,14 | **Baptist** 50:23 |
| 147:15 148:19 | 163:17 164:9 | 40:17,23 | 183:18 210:20 | **Bar** 165:15 |
| 198:6,9,10,12 | 167:18 220:5 | **authenticity** | 212:12,18,22 | 222:11 |
| 198:13,19 | 272:8 276:2 | 83:3 | 212:23 214:6 | **base** 158:23 |
| **assistance** | 288:22 289:4 | **authority** | 218:5 230:11 | 159:20 242:6 |
| 133:20 147:14 | 341:21 345:1 | 230:19,23 | 238:11 248:14 | **based** 82:5 |
| 289:15 | **attest** 170:9 | 231:1 238:2,9 | 250:1 251:11 | 187:11,14 |
| **assistant** 8:16 | **attitude** 97:2 | 344:5,8,10 | 263:18 264:4 | 188:1 190:12 |
| 55:16 104:1 | **attorney** 19:23 | **authorize** 238:2 | 271:8,15 | 204:19 213:5 |
| **assisting** 65:20 | 39:12 56:19 | **available** 56:19 | 277:11 282:2,8 | 223:18,23 |
| 66:11 | 63:2,6 64:13 | 185:5 | 285:16 286:11 | 224:6 231:15 |
| **Association** 73:1 | 65:17,23 66:2 | **Avenue** 2:9 | 289:12 296:2 | 234:13 259:3 |
| **assume** 4:19 | 71:23 72:3 | **aware** 5:16 | 299:17 313:10 | 271:8 326:20 |
| 16:11 37:9 | 74:8 92:12 | 114:23 133:16 | 313:11,14,19 | 328:10 |
| 39:8 91:20 | 94:1 141:6 | 141:12 151:21 | 316:10,13 | **basic** 13:14 |
| 106:23 109:17 | 151:11,21,23 | 158:14 161:23 | 326:10,13 | 319:16 |
| 291:16 306:8 | 152:5 174:11 | 165:14 203:8 | **background** | **basically** 11:9 |
| **assumed** 130:9 | 216:12 268:15 | 225:15 231:13 | 325:16 | 85:18 86:16 |
| 236:10 | 275:11 297:22 | 231:17 233:17 | **backing** 238:23 | 91:1 98:4 99:4 |
| **assumption** | 297:23 298:1,2 | 233:19 237:23 | **backup** 196:6 | 113:11 132:22 |
| 258:18 | 299:3,15 306:7 | 246:20 307:3,6 | 280:15,16 | 207:10 230:12 |
| **assure** 20:23 | 310:16 318:23 | 321:14 323:10 | **bad** 160:16 | 260:11 276:3 |
| 327:22 | 319:14 | 323:11 329:2 | 166:4 201:4 | 284:12 294:20 |
| **astounded** | **attorneys** 2:8 | 334:1 | 214:12 236:17 | 296:10 297:11 |
| 346:16 | 63:22 64:1,3,7 | **awful** 202:1 | 238:6,7 | 298:17 305:23 |
| **attach** 273:6,10 | 64:9 149:1,5 | **awhile** 65:19 | **badly** 115:10 | 330:11 |

# FREEDOM COURT REPORTING

basis 225:9,11
226:13
basketball 236:8
Baum 155:21,23
Baxter 97:11
121:1 122:10
142:8,14 143:8
161:8 185:19
186:17,18
187:9 189:22
197:8 229:6
Baxter's 188:15
bear 317:14
bed 237:18
began 56:5
95:11,13
119:23 186:2
192:10 220:18
228:11
beginning
246:18
behavior 201:12
Behavioral 71:6
belief 302:23
believe 8:18
10:3 36:18
47:1,7 48:10
51:2,3 53:16
54:5 56:1 59:1
68:15,22,22
69:7 71:4 75:7
80:5,11,16
81:8,18 84:15
84:18,21 93:16
94:12 95:11
98:15 100:10
100:21 101:9
101:14 102:5
103:23 104:15
105:7 110:3
116:4,9 117:20
117:20,21
124:14 125:6
126:20 127:12

131:17 134:16
149:15 151:7
151:15 157:21
170:19 173:7,9
174:12 179:13
181:3 186:7
187:5,9 188:4
192:21 193:1
193:12 194:9
195:22 198:5
219:18,20,22
225:22,23
226:1 228:10
228:15 229:22
237:19 241:17
242:3,5 247:16
251:7,23
254:14 256:14
261:10 265:12
272:21 274:15
279:17,23,23
280:3,4 283:9
284:8 296:7
297:17 298:10
304:8 306:7
308:14 310:22
311:3,14
314:11,19
322:23 327:1
332:23 334:15
335:19
believed 97:15
211:13 260:20
Belk 25:13
belong 52:18
benefits 90:10
Besecker 34:6
best 41:10 67:17
90:2 133:1
173:23 199:21
200:2 265:20
302:22
Beth 1:6 45:6
95:8 96:1,2,13

111:20 123:17
124:8,12,19
125:10 132:20
133:6,12
139:14,17,19
139:20,21
140:1 162:11
169:4,16 173:7
173:19,19,20
174:2,3,12,16
175:8,16,17
176:5,12,14
179:14,18
181:17,19
184:6,9,15
193:1,8 197:10
198:9,10 199:1
224:7 225:2,12
225:16 226:4,5
226:11 227:6
227:19 228:7
228:13,18
229:5 267:17
279:18,21
289:23 290:9
290:19 291:13
291:17 306:12
335:16
Bethlehem
50:23 51:3
Beth's 174:4
289:19 290:7
290:14,17,19
better 164:9
269:8 303:15
303:23 304:1
Betty 56:11,15
56:23
Bettye 92:1,2,4
beyond 81:12
big 95:16,21
137:13 143:19
313:9
Bill 32:19

billing 58:6
bills 315:23
316:1,3 317:4
biopsy 235:10
237:5
Birmingham 2:9
237:12 306:21
307:4,15
birth 26:20
198:16
bit 6:2 51:5,18
78:11 126:11
237:19 271:14
293:21 317:12
318:22 334:9
black 23:7,9
116:18,19,21
245:19 246:9
246:22 247:1
303:12 306:22
307:14 308:8
320:8 324:10
329:19 331:19
335:10,12,14
338:11,15,17
blank 174:10,18
287:20,21
block 287:20,21
289:17
blocks 207:6
288:4
blood 7:17,18
blue 80:5
board 45:4,7
140:1 188:7,10
body 31:14
bond 209:16
230:16 231:2
233:6,14,18
248:9,10,12,15
248:15 249:11
249:17,18
253:1 256:23
260:15,18

261:11 262:1,2
262:13,17,20
263:1,4 264:13
270:9 272:11
276:19 277:9
343:23
bonded 248:19
255:12,16
256:2 317:19
bonders 317:22
bonding 247:7,8
247:17,19
248:2,16 249:9
249:14 250:23
251:1 252:2,7
252:9,14,15,16
252:23 253:17
253:18,22
254:2,6,22
255:12,13,15
255:21,21
256:2,4,16,22
257:22 258:7
259:17 260:7
266:12,17
267:2 317:17
335:4,10
bonds 254:5,7
256:17 258:16
261:13 262:3
264:18,22
265:10 272:9
279:23 344:11
bondsman
126:20 259:11
bondsmen 166:9
166:17 197:22
197:22 198:2
258:9
bone 8:9 332:9
book 215:1,4
287:5
border 318:22
borders 318:18

# FREEDOM COURT REPORTING

born 28:15 58:22
bothered 100:4
bought 113:9,10
box 340:20
boxes 108:1,21
boyfriend 36:23
Brackin 1:6 39:20 45:6 95:8 96:1 111:21 132:20 139:19 175:16 178:4 183:8 184:7,9,16 193:1,9 197:10 224:1,8 225:2 225:12,16 226:11 227:19 228:7,13 229:5 306:12
Brackin's 38:20 139:20 140:1 169:4,17 182:17
Brad 155:21,23
branch 59:17,18 59:19
Brandon 29:23 33:1
brand-new 204:2,9
breach 326:15 327:4
breached 326:16
break 5:6,9,11 6:8 22:7 50:17 50:18 130:19 205:12 294:2 328:5
Bret 8:11
bridge 6:7
Brief 50:19 71:18 83:16 182:15 186:11

205:14 217:16 217:20 225:14 228:9 232:2 252:1 255:3 269:23 282:11 288:16 294:3 299:16 304:6 305:18 317:15 318:8 328:7 336:17
briefly 29:8 45:9 55:10
bring 10:9 13:17 22:8 110:14 111:5,6,7 149:16,17 220:5 235:20 289:3 333:3,10
broad 324:1,3
brothers 34:5,17 34:18 39:4
brother-in-law 247:20 248:4,7 248:8,10,13,18 250:3
brought 13:22 15:5 17:15 22:10,10,16 94:23 110:10 110:19 111:2 111:10 137:2,9 138:16 167:17 272:8 276:2 288:21 341:20 341:21 345:1
Bruno's 9:8,9
brushed 330:23
Bryan 96:17 123:2 129:22 132:1 133:22 136:17 138:12 146:22 155:5 165:11 224:21 229:13 237:11

289:12 291:18 291:19
Bryan's 97:1
budget 64:3 215:9,10
building 109:7,8 109:9
bullet 334:17
bunch 308:3
burden 316:1 136:19 141:17
buried 136:16 136:19 141:17
Bush 311:11
business 53:12 53:21 254:3,11 254:16
bust 6:8
busy 197:8,11
buy 115:8,9 214:18
bye 89:23
B-E-S-E-C-K-... 34:7
B.S 53:11,17

---

### C

calendar 11:5 21:23 67:15,21 183:18 218:16 268:15,23 270:12 271:11 271:12 285:19 285:22,23 286:19 293:22 304:14,22 305:3
calendars 10:22 21:22
Caley 62:4,11
call 46:22 47:8 47:11,11 49:3 68:11 92:14 100:22 102:5 102:21 142:12

154:21 156:10 215:16 221:16 230:17 233:7 233:10,11,13 233:18 234:1 234:11 240:3,4 249:16 250:23 251:8,10 264:20 265:2,5 266:6 270:22 270:23 272:22 287:16 291:5 305:22 337:10
called 9:20 12:14 49:4 71:9 74:12 92:10,15 129:1 129:22 154:20 156:7 173:3 198:23 205:8 220:15 221:20 222:2,4 237:12 237:21,22 238:6 248:8,14 251:5,11 260:14,17,18 260:20 261:11 262:18 265:8 270:22,23 272:18 291:2 295:9 316:10 331:3,13
calls 46:10,13 287:15
car 43:19
carbon 201:8 211:21
care 7:21 240:1 240:4 278:2
career 33:20 66:19 314:18
careful 137:19
Caremark 9:1,3 9:4

Caremart 9:2
Carl 314:9
Carol 2:7 4:7 26:14
Carriage 28:5
Carroll 345:10
case 1:8 3:18,19 20:21 21:4,16 36:21 42:16 44:20 48:16 49:16 52:21 76:20 142:15 142:15 147:14 150:1,2 151:19 166:10 223:7 241:13 246:19 270:11 271:9 271:19 272:5 273:2,7,22 274:7,8,10,12 274:13,14 275:14 276:14 276:16 306:21 307:1,3,6 318:13 319:11
cases 44:18 66:13 114:17 123:4,6 127:9 127:16,18,21 135:8,12,15,16 136:1,18,21 137:10,19,21 137:23 138:5 138:21,21 147:17 160:22 221:20 224:22 244:19 270:8 279:22 333:21
Casey 36:1
cash 248:10 249:18 262:21 262:22 270:9 276:21 279:23
cashier 121:19

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

casual 339:2
cause 85:19,20
 86:2,9 97:9
 98:5 122:7,8
 209:15
caused 48:21
 95:1 345:3,7
causes 331:8
causing 344:23
cavalier 339:3
Cedar 6:21
cell 261:2,3
 315:21
Center 1:18
 7:16 32:13
 34:14 68:10
 84:22
central 64:14,15
certain 14:13
 65:18 101:13
 187:10 214:9
 244:5 315:18
certainly 5:11
 159:16 293:1
certificate 273:2
 273:18 274:3
certification
 54:1 73:1,5,8
certifications
 54:8,10
Certified 1:16
 3:7
cetera 98:17
chairs 313:13
chance 91:5
 194:23 200:5
 232:18 295:20
 314:20
Chanda 29:17
 29:19 32:10
 52:10,13
change 59:22
 126:1,5,9
 204:13 207:23

209:20 211:11
233:14,22
262:16 265:2
266:4,6 280:5
286:4
changed 35:7
 125:13 126:10
 147:11 203:16
 207:11 208:5
 208:10,11
 209:10,11,21
 209:23 210:5,7
 210:11,12,16
 230:15 233:6
 233:15,18,20
 234:12 235:21
 235:22 248:15
 249:18 260:15
 260:18 261:13
 262:4,13,16,20
 263:4 264:13
 264:22 265:11
 265:12,19
 278:12 280:7,9
 280:15 286:6
changes 278:5,7
 278:15,16
 279:11 281:11
 281:20 282:3,9
 283:1,16 285:2
 285:3
changing 161:20
 230:21 233:12
 249:17 269:15
 280:6 343:23
 344:11
Chapman 35:20
Chapter 42:6,7
characterizati...
 189:6
charge 16:10
 52:20 99:2
 109:22 172:10
 299:19 300:3,9

300:11 301:3,6
301:8 302:21
304:7 305:20
306:2
charged 37:5
 170:23 171:23
 172:1
charges 45:22
 47:19,22 50:11
 52:22 244:19
 301:12 317:21
 337:15 338:17
 338:22
Charles 298:3
Charter 71:6,8
check 99:12
 101:21 114:16
 121:12 248:21
 339:19
checked 159:23
checking 163:17
chemical 35:8
chest 49:2
Chief 345:20,22
 346:11
child 38:4 58:18
 59:3,6
children 29:14
 30:15,20 37:16
 37:18 47:9,10
 52:11 132:5,22
 133:5 237:2
Children's
 237:12
Chloe 27:21
 52:8,9
choice 23:2
 250:13,17,19
choke 49:1
Christmas 71:17
Christopher 7:2
 27:7 28:3
 345:10
church 50:20,22

50:23
Circle 28:6
circles 204:15
circumstances
 36:19 102:1
 197:13 233:1
 277:13
city 1:9 4:12
 10:12 14:22
 15:9 16:13
 17:9 21:16
 25:3 28:18
 31:1,12 33:13
 34:3 37:13
 51:6,7 52:21
 53:2 66:20,22
 67:1 68:5
 69:16 85:9
 92:11 96:4,5,6
 102:9 114:3,10
 117:22 118:13
 119:2 133:18
 137:21 140:19
 141:6 154:15
 157:12,19
 167:19 180:23
 181:2 184:22
 188:2,12 191:9
 216:12 217:4
 220:15 243:4
 243:16 245:21
 245:23 246:1
 246:16 253:13
 275:5,8,17
 301:4 306:15
 306:17 307:10
 307:19 309:9
 309:12,20
 310:6,19
 314:15 315:15
 316:8 321:17
 327:6 328:2,12
 330:11 331:9
 331:18 332:19

340:11
City's 114:21
 140:16 322:14
 327:12
civic 1:17 51:10
 68:10 84:21
Civil 3:5,14,21
claim 86:1 230:2
 232:13 299:9
 303:12 304:7
 305:6,8,10,12
 314:2 320:11
 320:12,21
 321:2,13,14
 327:5 328:14
 329:4,13,16
 334:3 344:19
claiming 319:17
claims 4:12
 43:18 145:18
 300:7 318:9,10
 318:11 327:17
 328:3,11,13
 333:21
clarification
 73:18
clarify 106:17
 219:15 296:2
clarity 295:18
classified 67:8
 67:11
clear 152:3
 199:19 299:11
 299:14
clearly 328:2
clerk 13:20 96:6
 107:23 110:6
 112:18 115:17
 192:9 245:2,3
 245:12 253:7
 266:21 267:10
 267:11,21,23
 314:22
clerks 69:2

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

72:23 90:23
151:6 192:2,3
231:7,7
**clerk's** 253:5
**clever** 79:3
**client** 78:23
**clients** 43:7 58:6
58:7
**close** 91:16
252:22 279:21
**closed** 42:16
252:17 254:20
273:2 276:13
276:17 313:20
**closing** 80:14
**clothes** 134:4
**clothing** 133:21
133:23
**club** 51:20
**clubs** 51:10
**COBRA** 316:21
**code** 160:21
163:3,5 266:19
267:9
**collected** 69:4
135:6
**college** 53:8
69:21
**column** 24:9
**come** 13:2,9
26:8 68:9,10
87:9 95:13
97:13 102:3,8
104:5,23
108:14 125:20
145:8 159:6
166:9 172:11
188:6,10 192:7
200:12 235:17
236:20,23
239:4 240:8
249:4 253:11
271:1 299:17
337:15 339:20

**comes** 140:8
146:13
**coming** 104:13
104:15 155:16
166:5 236:5
283:3
**commencing**
1:19
**comment** 89:17
202:16 212:1
227:3 247:6
248:3 305:15
305:16 330:14
**comments** 88:6
201:9 208:13
209:4 213:8
226:22 339:18
**commission** 3:9
102:1,23 104:3
**Commissioner**
1:16 3:7
**commit** 161:8
**committed**
122:9 161:13
178:13 220:3
**communicated**
162:2,13
**communication**
20:18 46:11
122:3
**Community**
69:21
**comp** 314:2
**companies**
253:17,18,22
254:2 255:15
255:22 266:23
**companion**
137:23 138:21
**company** 8:22
8:23 9:5 35:6,9
54:15 88:20
97:18 215:2
249:9,14 251:1

251:3 255:13
256:22
**compensation**
25:6,9
**complain** 48:12
159:6,8,11
341:15
**complainant**
292:14,15,16
**complained**
233:11 330:21
338:1,4 345:20
346:14
**complaining**
160:11 290:18
328:22 342:8,9
**complaint** 11:10
11:11 45:1
46:2,6,9 48:8
49:3 122:2
158:18,21
198:3 199:5
216:18,19
226:3 228:8,10
228:15 233:4,6
234:20,21
251:20 289:18
290:4 292:13
317:9 328:19
329:17,21
330:3,15 331:3
331:14 332:5,8
334:2 338:7
340:12,16
346:7,12,16,20
**complaints** 47:3
47:19,22 48:5
50:1,11 112:20
156:21 158:14
158:17 159:3,7
165:15,17
216:15 222:11
225:15,19
283:3 331:9

341:10 342:13
**complete** 68:13
68:16 69:23
72:23 73:5
191:6 226:7
228:17 297:10
**completed** 54:1
54:5 73:13
185:22 186:17
188:6 191:21
192:18
**completely**
87:16 240:19
251:13
**completing** 73:7
**compliant** 48:22
**computer** 24:8
88:22,23 89:1
89:5,13 99:8
106:5,18
113:17,18
115:1,4,9,11
123:6 146:10
152:13 160:15
160:17 161:4,5
162:1 209:17
312:18
**concern** 213:4
240:16 276:4,7
277:20 278:1,3
344:22
**concerned** 151:9
226:21
**concerning**
335:22 337:8
338:8
**concerns** 88:6
90:13 323:6
**concluded**
346:22
**conclusion**
318:17 326:20
**concrete** 313:16
**conduct** 143:18

145:4 149:2
178:15 187:19
190:12 305:14
**conducted** 116:7
**conference**
313:9
**conferred** 26:18
229:13
**confirm** 320:22
**confrontation**
142:13
**confuse** 242:16
**confused** 107:7
108:7 180:9
187:3
**connected** 114:9
138:20 263:22
**connection**
257:12,15
**Connie** 36:5,6
37:16
**conscientious**
210:2
**Conscientious...**
209:22
**consider** 17:5
**consideration**
73:15 203:12
**considered**
116:10 117:11
**considering**
101:17 346:17
**consisted** 119:19
**consistently**
308:11
**constitutional**
318:10,14
319:10 320:20
**constructive**
119:13
**consult** 285:4
**consulting**
283:16
**contact** 38:7,9

# FREEDOM COURT REPORTING

Page 354

| | | | | |
|---|---|---|---|---|
| 40:10 103:18 219:2 | 221:6,7 247:11 255:4 258:10 | 15:3,15 17:11 26:11 43:14 | **correctly** 189:20 **correspondence** | 80:12 87:15,22 88:17,22 89:3 |
| **contacted** | 260:23 339:17 | 44:13 52:2 | 114:12 | 90:15,21 94:7 |
| 138:11 233:21 | 345:22 346:3 | 53:23 63:3 | **cost** 115:2 | 97:4 99:5,6,7 |
| **contained** 78:15 | 346:18 | 64:23 66:22 | **costs** 135:6 | 101:2 109:6 |
| 341:22 | **conversations** | 67:13 68:7 | 175:2 276:11 | 119:8 121:10 |
| **contend** 155:3 | 103:16 112:10 | 71:20 75:13 | **could've** 81:23 | 123:2,9,12,15 |
| 158:18,20 | 211:3 255:10 | 76:9 77:3 | **counsel** 3:3,17 | 123:18,21,22 |
| 197:20 303:23 | 333:4 | 80:15 84:6 | 26:19 39:22 | 124:7,10,11,13 |
| 315:14 320:5 | **conversed** 94:6 | 88:3 93:13 | 299:13 | 124:14 125:1,5 |
| 326:16 | **convicted** 37:6,7 | 101:8 105:19 | **counseled** 245:7 | 126:22,23 |
| **contention** | 37:8 41:18 | 106:6 107:5 | **counseling** | 127:11,22 |
| 159:14,16 | **cool** 143:5 | 114:17 140:17 | 221:14,21 | 128:23 129:13 |
| 317:17 330:6 | **Cooper** 2:7 | 140:20 141:2 | 229:8 239:19 | 129:14,15 |
| 332:9 | **cooperation** | 141:10,15 | 240:5 323:11 | 130:1,3 131:18 |
| **contentious** | 239:9 | 142:5 153:21 | 336:19 337:11 | 135:6,12,22,23 |
| 22:13 | **coordinator** | 155:17 157:1 | **count** 162:8,10 | 136:1 140:11 |
| **contents** 76:20 | 310:20 312:10 | 159:13 160:9 | 163:7 321:19 | 146:20 147:1,3 |
| **context** 321:5 | **copied** 67:22 | 160:12 164:8 | 321:20,23 | 147:13 148:2,3 |
| **continually** 7:5 | 166:20 269:17 | 164:12,15 | **counterpart** | 148:4,18,21,22 |
| 164:8 244:17 | 283:2 284:11 | 165:7 169:11 | 96:1 | 149:2,16,17,18 |
| 244:18 | 307:13 | 178:10,16 | **countless** 316:4 | 150:9 151:18 |
| **continue** 21:10 | **copier** 11:8 | 180:23 181:5 | **country** 64:18 | 152:10,12,15 |
| 176:23 230:6 | **copies** 12:3 22:6 | 183:8 188:15 | **County** 28:18 | 152:16,18,23 |
| 241:8 | 22:7 67:17 | 188:20 189:1 | 53:2 91:14 | 153:1,6,7,15 |
| **continued** 14:4 | 201:8 211:21 | 189:13 190:14 | 97:4,6 | 154:1,4,20 |
| 14:12 47:11 | **copy** 9:19 11:9 | 206:21 207:16 | **couple** 14:3 20:2 | 155:4,18 |
| 49:11 113:4 | 11:19 12:8 | 216:12 217:4,5 | 57:7 70:2 | 157:19 158:4,7 |
| 339:19 | 13:18 16:11,17 | 227:15 228:21 | 98:20 107:22 | 159:23 160:22 |
| **continuing** 54:2 | 17:1 22:4 84:2 | 234:2 238:12 | 108:9 110:19 | 161:1 163:11 |
| 220:21 | 110:12,13 | 245:2 255:7 | 173:18 201:5 | 163:12,15,16 |
| **contract** 326:15 | 111:23 120:3 | 258:19 265:9 | 211:20 229:18 | 163:18,19,20 |
| 326:15 327:3,5 | 183:6 205:18 | 278:6 281:9,17 | **course** 23:17 | 164:10,14,17 |
| 327:6 | 210:15 234:20 | 282:9 293:4,18 | 24:18 44:11 | 164:19,21 |
| **contracted** | 268:21 269:3,9 | 297:18 299:20 | 98:13 261:4 | 165:3,9,10 |
| 312:19 | 280:19,23 | 302:23 303:4 | 308:12 | 166:5,6,6,7,11 |
| **control** 87:10 | 291:6 297:10 | 306:10,11 | **courses** 53:8 | 167:5 170:20 |
| 259:20,22 | 301:2,3,5 | 308:18 315:11 | **court** 1:1,16 3:7 | 171:18 173:11 |
| **contusion** 6:10 | 306:5 307:12 | 317:10 320:2 | 4:23 12:21 | 176:6,13,15 |
| **convened** | 331:1 | **corrected** | 13:8,15 43:6,7 | 181:10,14 |
| 149:18 150:9 | **Corbin** 198:6 | 198:13 243:12 | 47:16 49:5,9 | 182:5,6 191:5 |
| 230:9 | 331:1 | 342:4 | 49:15 58:7 | 191:22 192:19 |
| **conversation** | **corner** 120:17 | **correcting** | 61:3 67:3 68:6 | 196:5 215:23 |
| 203:6 211:5,7 | **correct** 10:19 | 164:12 | 72:20,23 73:16 | 216:11,17 |

# FREEDOM COURT REPORTING

221:18 222:9
226:21 230:4,6
230:7,8,9
236:18 253:8
255:18 258:5
261:6 264:17
266:20,21
267:10,11,21
268:1 273:7,22
274:9,10
276:10,20
277:8 300:5,21
306:9 314:21
314:22 315:6
326:21 342:1,5
342:10
**courteous**
244:11
**courthouse**
109:5
**courtroom**
109:11,14
123:20 125:2,9
147:7 149:1
153:11,12
257:16
**court's** 69:1
**court-appointed**
94:1
**cousin** 40:15
133:2 271:3
**cousins** 38:12
39:7,13,18
41:1
**cover** 128:19,21
128:22 129:19
130:1,4,8,10
131:14 316:5
343:1
**coverage** 316:21
**covered** 128:7,9
128:12,15,17
181:8 329:14
330:1

**created** 96:3
**crime** 41:18
**criminal** 45:1,22
244:8,12 245:4
256:22 264:12
**criticism** 119:13
**criticize** 171:13
**CRO** 273:1,18
274:3
**cross** 19:5
**cross-train**
125:13
**cross-training**
125:12,14,20
125:22 131:21
133:15,17
148:6 286:5
**cubby** 95:22
**cure** 322:18
**current** 190:2
314:11
**currently** 5:13
6:18 50:5
298:6 338:20
**custody** 66:17
**cut** 96:22 315:3
315:4,21
**cuts** 64:3
**C-A-L-E-Y** 62:6
**C-A-R-L** 314:9
**C-H-A-N-D-A**
29:19

---

**D**

**dad** 33:14,16
39:4
**Dale** 28:18 53:2
91:14
**damage** 100:6
**damaged** 315:14
**damages** 43:20
**Daniel** 28:5
**Daphne** 72:2
**date** 13:12 25:22

26:20 42:3
76:12 80:12,14
98:16,16
104:10,17
106:1,9 131:23
152:15 153:7
163:11,12,19
164:21 187:18
191:11 202:23
218:14 219:14
219:16 220:19
230:7,8 247:21
262:12 263:1
265:3,3 276:4
285:20 323:14
**dated** 172:16
188:16 336:18
336:23
**dates** 15:14,18
19:23 20:2,2
106:22 123:10
161:1 163:16
163:18 164:8
164:10,13
198:16 218:15
**dating** 96:20
**daughter** 27:15
27:22 31:20
52:10 235:8,9
236:22 237:6
**Davis** 22:2 55:11
81:22 82:6
84:18 85:14
87:4 88:5 91:9
91:11,15 95:19
218:9 219:2
221:13 238:12
241:13,18
268:4,16 269:7
286:12 297:13
304:8,12 305:9
323:23 324:16
327:14 336:18
336:23

**Dawn** 27:17
29:17 31:20
**Dawn's** 27:22
**day** 16:15 21:3,7
21:7 38:22
60:1 70:18
77:22 89:23
106:12,13
114:18 129:1
129:13,16
131:18,18,19
144:13 148:12
150:3 163:21
163:22 164:22
170:17,19
175:3 197:8,11
214:17 226:16
230:4 233:8
235:19 237:21
249:3 252:10
270:20 279:17
328:8 331:11
331:11
**days** 7:6 59:23
99:5 134:17
147:17 149:15
151:16 161:3
181:4 201:23
236:7 238:5
284:15 285:1,6
285:7 291:2,14
334:13 346:17
**dead** 40:3
**deal** 137:13
143:19 244:16
**dealing** 194:21
244:6 336:19
**dealings** 200:22
**deals** 209:13
**dealt** 195:22
327:21
**death** 237:17
**deceased** 36:7
**December** 84:12

93:17 100:19
191:15
**decide** 152:11
306:13
**decision** 204:17
205:4 296:18
325:18 343:19
**decisions** 148:23
**Decker** 298:3,6
298:18 299:22
**declaration**
335:1
**declare** 303:2
**declines** 313:17
**defendant** 96:4
123:7 179:13
198:7 223:1,5
230:5 244:12
254:21 256:22
260:6 262:1
264:12 272:20
277:11,18
317:18 327:4
**defendants** 1:10
2:6 9:10,13
11:17 12:9,11
14:16 17:6
22:5 24:21
25:15 68:2
69:13,17 72:11
72:14 83:21
99:17 105:9,12
105:21 106:2
111:3,9 124:16
156:12 168:4,7
169:7,9,18,20
170:3,11,13
182:17 186:12
186:15 205:15
205:17 208:9
208:20 209:6
210:18 217:6,8
217:14 228:3,6
231:20,23

# FREEDOM COURT REPORTING

Page 356

232:21 235:3
244:7,8,15
245:5 247:7
249:11 252:11
252:23 255:13
256:3 257:14
264:17 268:17
275:3 281:2,5
281:8,13,15,22
282:1,5,7,12
282:14 283:20
283:22 294:4,6
294:11,14,18
294:20 295:6,8
295:21 296:5
296:15,17,20
296:22 297:8
297:11,18
300:23 301:2
306:2 317:19
330:18
**defender** 154:15
**defenders** 157:3
157:4,9,12,16
**defense** 327:15
**deficiencies**
221:11 322:17
322:18 323:10
323:12 327:9
**definition** 76:6
**degrade** 154:19
**degrading** 156:3
156:11
**degree** 53:11
69:23 70:3,4,5
70:10
**demean** 154:19
**demeaning**
155:3
**denied** 113:19
115:4
**deny** 235:7,10
**department**
12:15 25:5

32:22 46:3
55:15 75:1
109:5,10
160:18 188:2
209:18 246:12
**depending**
197:12
**depends** 241:23
**deposition** 1:14
3:4,6,12,18
4:14 9:20
11:12 16:9,12
17:4 24:14
42:22 43:1,2
43:13 74:2
78:7 170:4
182:18 264:9
346:22
**depositions** 43:3
43:8
**depth** 200:3
**describe** 85:3
150:23 343:9
343:16
**described**
145:21
**description**
74:18 82:4
84:3
**desire** 314:14
**desk** 120:17
139:10 146:4
214:6
**destroyed**
176:18 309:10
**details** 14:13
122:6 346:13
346:15
**detect** 189:19,20
**Determination**
293:7,9 294:8
294:16
**determine** 38:23
122:7

**determining**
209:15
**diagram** 110:11
110:14,20
111:7,11,13,16
111:19
**diaries** 10:22
21:22
**died** 134:12
**difference** 61:1
131:8
**differences**
240:12
**different** 78:20
144:16,17
156:18 158:1
198:16 234:15
235:11 241:9
251:14,15
**differently**
320:5,9
**dire** 36:11
**direct** 150:7
253:2 283:5
**directed** 128:16
150:4 152:22
**directing** 166:8
**direction** 56:16
297:22
**directive** 128:14
129:7 221:15
**directly** 64:13
**director** 56:6,17
**disability** 31:3
66:14
**disagree** 66:8
179:2,3,5,6
189:19,21
211:16
**disagreed**
189:23
**disagreements**
290:1,2
**disagrees** 189:17

**disapprove**
291:4
**disciplinary**
16:13 96:9
97:19 137:5,7
138:13,22
139:2 140:5
142:3,9 143:12
144:7 146:1,8
183:7,10
184:10 185:2
185:21 186:16
186:22 188:9
189:4,22 190:9
191:2 234:23
292:5
**discipline**
185:19,23
190:12 224:18
224:19 225:2
225:10,12
229:15,17
**disciplined** 57:9
60:2 65:15
188:19
**disciplining**
308:11
**discouraged**
299:4
**discovery**
274:22
**discriminating**
231:15 338:11
**discrimination**
230:2 299:19
300:7 306:23
318:9 328:11
329:4 334:4
338:7,18,22
344:20
**discriminatory**
45:15 230:1
**discuss** 166:21
184:19,21

200:1,3,5,7
210:17,19
224:22 235:16
226:23 268:8
**discussed** 14:8
94:16,18
137:13 166:19
184:14,15
200:8,10 218:7
331:12
**discussing**
184:10 205:19
206:1,2 284:14
330:22
**discussion** 19:22
20:12 58:16
266:17 339:13
**discussions**
133:16
**Dismiss** 327:19
**dismissed** 49:8
49:17,18
136:22 306:1,4
**dismissing**
305:20
**dispatcher**
246:1
**disposition**
160:21 163:3
276:9
**dispositions**
163:5
**dispute** 300:16
300:18
**disputes** 146:6
**disputing**
146:12
**dissension** 91:2
**distorting**
212:11
**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**divorce** 29:13

# FREEDOM COURT REPORTING

30:2,12
divorced 32:4
47:7 96:18
divorces 44:12
66:17
docket 114:17
126:22 135:13
147:18 150:3
151:15 152:17
163:19 175:18
176:16 178:4
181:19 182:8
182:13 274:11
279:17
dockets 114:11
114:13,14
127:23 128:2,3
175:12,14
176:9,17,18
181:8,17 182:7
doctor 7:21 8:6
8:8,13
doctored 81:23
82:4
doctors 8:12
doctor's 235:17
235:20 236:20
237:10
document 12:16
20:7,9 65:18
73:20,22 74:7
74:10 77:5,10
77:13,21 78:14
78:15 79:20
80:7 81:7 82:2
82:11 83:3,9
83:13,15
105:23 111:1
111:10 151:13
168:14 170:16
172:19 174:10
180:18 183:15
184:8,14
199:10 208:1

222:21 274:16
279:1,10,13,14
295:4 296:23
297:1 302:6,8
documentation
230:16 233:16
235:12 264:19
265:18 274:18
274:20,22
275:1,3,13,15
documents 10:9
10:11,19 13:17
26:9 58:6,7
61:4,4 81:10
83:22 146:19
146:20,22
150:19 151:19
160:5 163:8
166:6 170:10
171:19 174:9
178:4 179:11
179:12 180:1
190:23 197:16
198:13 262:8
264:17 334:9
Doe 129:9
Doe's 129:10
doing 13:1 92:15
97:7 114:14
126:20 134:18
134:19 135:14
138:14 142:2,9
143:16 144:5
153:13 165:1
167:20 173:12
186:23 187:7
196:6 202:1,5
211:13 218:19
240:20 267:6,8
279:19 283:7
290:14 316:5
324:23 325:2,6
325:7,8,10,12
325:13 339:15

343:4
domestic 48:7
48:11,18 122:3
Don 247:16,23
248:11,21,23
249:2,20,21
251:8,10,12,19
252:3 255:6
256:6
Donna 92:6,7,10
door 14:4 15:12
18:12 89:22
247:18 313:10
313:11,14,20
doors 15:20
Dothan 1:9,17
1:18 6:22 7:2
8:4,9 16:13
25:4 27:7 28:6
28:10,13 30:22
31:12,19 32:6
32:21 38:11
39:9 42:10
51:2,4,6,7
52:13 53:13
55:17 56:12,19
59:8 60:10
61:19,22 62:1
63:19 66:20,22
67:2,9 68:5
72:10 97:8
133:18 144:21
157:12,19
165:15 223:6
243:16 310:13
314:15 315:9
332:19
dots 263:22
double 252:18
downhill 219:10
Dr 8:3,11,15,17
draft 13:3,13
drafted 20:11
61:4 171:11

drawer 97:14
186:1
drawers 49:2
drawn 111:13
drive 7:2 27:7
28:10 222:18
223:6
driver's 26:22
27:1,3
driving 47:11
dropped 198:21
317:21
dropping 300:6
drug 8:22,23
98:17 104:5
105:1 106:9,10
108:13
due 16:15 17:10
295:9 297:19
307:22 309:15
322:22
duly 4:2
duties 12:18
58:4 69:4 85:5
94:21 98:10
103:21 119:7
119:21,22
120:4,7,7,9,11
120:13 121:4
122:23 125:12
126:1,2,10,13
126:19 127:2
128:6,9,15,16
128:19,21
131:15,16
134:21 147:11
148:9 191:5
268:8 269:16
269:19 278:5
278:13,16
280:8 284:7,15
284:23 286:4,7
286:22 287:9
312:11 340:2

342:19 343:1
duty 125:17
154:2 172:11
269:19 278:14
279:20,20
280:11 283:15
322:16
D-A-W-N 27:17
D-E-C-K-E-R
298:3

**E**
Eagle 67:9 68:5
315:9
earlier 4:8 107:8
109:16 131:22
173:18 194:15
208:16 216:20
218:5 219:21
225:4 274:17
278:4 308:18
335:15
early 327:17
earn 213:23
earnings 24:5,9
25:14,17,22
education 54:3
69:7,20 85:7
94:23
EEO 293:14
EEOC 16:10,18
52:20,22
293:14 299:20
300:14,19
301:3 305:19
305:20,23
effect 128:10
283:17 286:8
eight 64:7
115:17 134:15
192:7,15,16
194:17
either 3:19
10:12 40:18

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

81:2 98:16,17
110:22 115:20
121:12 129:22
135:18 139:18
139:23 146:15
151:13 166:12
183:22 188:2
237:18 341:7,8
345:2
**Elementary**
34:3
**eliminated**
311:6,7
**Elston** 293:12
293:14
**Elsworth** 56:11
56:15,23
**embarrassment**
315:17
**emergency** 6:12
7:14 8:13
**Emfinger**
157:23
**Emily** 311:11
**emotional**
315:16
**employed** 20:11
31:2,4,6,11,15
31:20 35:3
38:2,6 70:15
92:11 97:6
110:21 111:12
160:7 178:22
181:2 317:5
**employee** 16:13
105:16 117:18
117:20,23
191:21 216:21
217:1 245:23
303:14 311:22
313:3 320:4,4
320:7,8 322:6
336:19 338:17
**employees** 61:14

85:19 116:19
116:22 119:12
120:1 191:7,21
237:9 246:15
246:16 312:16
314:4 324:10
324:11 338:11
338:15,20
344:22
**employment**
22:15 39:16
43:4 67:11
70:12 85:7
216:22 243:16
296:18 310:5,8
310:10,17,18
311:15 312:14
**encourage** 226:9
**encouraged**
224:17 226:2,6
228:16
**ended** 56:5
134:16 147:16
154:23
**ends** 288:4
**enforced** 150:13
150:14 165:21
167:3
**enforcing**
165:20 308:10
**enlighten** 329:12
**entailed** 74:21
75:8
**entails** 154:6
**enter** 127:13
149:12,14
163:2 274:14
**entered** 123:4,5
152:13 274:9
276:9
**entering** 118:14
**entertain** 158:22
159:3
**entire** 60:18

**entitled** 18:16
18:19 21:5
**entrance** 15:19
**entries** 270:21
286:11 287:22
**entry** 164:21
167:15 288:8
288:18
**Environmental**
31:18
**erroneous** 80:13
**error** 155:14
163:14 342:6
**errors** 88:16
159:12,15,17
160:3,5,10,13
160:21 161:5,6
161:8,13,19,21
163:5 164:18
165:12 167:7
195:21 220:2
220:21 341:23
342:2,8
**especially** 172:8
**ESQUIRE** 2:3,7
**essence** 153:20
326:2
**established**
170:22 320:2
**estate** 97:17
**et** 98:17
**ethically** 19:9
**ethnic** 335:5
**Eunice** 14:1,8
16:5 98:2,3,10
117:4 123:21
127:20 132:16
133:7 148:1,2
159:13,14
161:15 162:6,9
163:3,5 164:5
164:20 165:1,4
220:3,17
224:16 229:18

229:23 231:14
232:8,13 235:7
236:3,16
269:16 271:3
272:21,23
273:13,15
276:14,18
277:1 278:5
280:13 281:17
282:2 283:2
338:7 340:18
340:21,23
341:18 342:3
342:23 343:3,4
343:6,23 344:3
345:3
**evaluate** 194:23
195:11 217:10
**evaluated**
191:10,16
195:9 212:13
322:7
**evaluating** 195:7
212:5
**evaluation** 13:1
192:18 193:9
193:14,16,18
195:2,10
196:11,19
199:12,16,18
201:1,4,18
202:1 203:2,9
203:13,17,21
204:1,11,19
205:2,5,19
207:13,14
211:10,12,15
211:17 213:4
213:10 217:15
218:8 219:12
219:16 223:18
223:23 297:4
297:12 323:14
**evaluations**

144:23 191:6
191:22 202:3
206:8 211:19
308:4 314:20
322:20 327:8
327:10
**EVANS-GOR...**
1:9
**Evelyn** 33:10
**event** 156:17
**events** 313:3,10
**eventually** 49:8
192:11 239:12
254:20
**everybody** 148:9
160:1 191:10
191:15 220:6,8
332:10,11,12
332:13,15
**everybody's**
159:23
**everyone's**
141:7
**evidence** 3:13
300:4,12,22
317:23 318:5
**evident** 210:16
**exact** 42:2
230:13,14
**exactly** 242:13
339:12
**EXAMINATI...**
2:13 4:5 335:2
345:17 346:9
**examine** 20:22
77:14
**example** 121:6
164:22 168:3
**examples** 76:7
83:9
**excuse** 26:17
97:22 119:5
189:5 205:23
218:2 235:20