# FREEDOM COURT REPORTING

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5
     NANCY MARTIN and
6    MARY BETH BRACKIN,
7         Plaintiffs,
8    vs.        CASE NO. 1:05-CV-1172-MEF
9    CITY OF DOTHAN and
     JUDGE ROSE EVANS-GORDON,
10
     Defendants.
11
12
13
14         * * * * * * * * * * *
15    DEPOSITION OF MARY ELIZABETH BRACKIN, taken
16    pursuant to stipulation and agreement before Sherry
17    McCaskey, Court Reporter and Commissioner for the
18    State of Alabama at Large, in the Dothan Civic
19    Center, 126 N. Andrews Street, Dothan, Alabama, on
20    Wednesday, October 10, 2007, commencing at
21    approximately 8:40 a.m.
22         * * * * * * * * * * *
23

**Page 2**

1         APPEARANCES
2    FOR THE PLAINTIFFS:
3    ISHMAEL JAFFREE, ESQUIRE
     Jaffree Law
4    951 Government Street
     Suite 415
5    Mobile, Alabama 36604
6    FOR THE DEFENDANTS:
7    CAROL SUE NELSON, ESQUIRE
     Maynard, Cooper & Gayle
8    Attorneys at Law
     2400 Amsouth/Harbert Plaza
9    1901 Sixth Avenue North
     Birmingham, Alabama 35203
10
     ALSO PRESENT:
11
     Judge Rose Evans-Gordon
12   Ms. Michelle Sellers
13        * * * * * * * * * * *
14
15        EXAMINATION INDEX
16
     MARY ELIZABETH BRACKIN
17
     BY MS. NELSON          4
18   BY MR. JAFFREE        314
     BY MS. NELSON        356
19   BY MR. JAFFREE        373
     BY MS. NELSON        379
20   BY MR. JAFFREE        381
     BY MS. NELSON        382
21   BY MR. JAFFREE        383
22
23

**Page 3**

1         STIPULATIONS
2         It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of MARY ELIZABETH BRACKIN is taken
5    pursuant to the Federal Rules of Civil Procedure and
6    that said deposition may be taken before Sherry
7    McCaskey, Certified Court Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission; that objections to
10   questions other than objections as to the form of
11   the questions need not be made at this time but may
12   be reserved for a ruling at such time as the
13   deposition may be offered in evidence or used for
14   any other purpose as provided for by the Federal
15   Rules of Civil Procedure.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that said deposition may be introduced at the
19   trial of this case or used in any manner by either
20   party hereto provided for by the Federal Rules of
21   Civil Procedure.
22         * * * * * * * * * * *
23

**Page 4**

1         (Witness waived right to read and
2    sign.)
3         MARY ELIZABETH BRACKIN
4    The witness, having first been duly sworn to
5    speak the truth, the whole truth and nothing but the
6    truth, testified as follows:
7         EXAMINATION
8    BY MS. NELSON:
9    Q.  Ms. Brackin, we met earlier off the Record,
10       but my name is Carol Sue Nelson.  I'm attorney
11       for the City of Dothan and also for Judge
12       Rose-Gordon.  I'm going to be asking you some
13       questions today about your claims against the
14       judge and the City.
15            If you do not understand me, please let me
16       know.  I'll be glad to rephrase.  Otherwise,
17       I'll assume that you do understand and are
18       answering truthfully.
19            Is that understood?
20   A.  Yes.
21   Q.  And we're both nodding our heads, but just
22       because the court reporter has to take
23       everything we say down, you need to speak up

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1    and answer as opposed to nodding or shaking
2    your head. Or even an uh-huh or huh-uh is
3    sometimes not intelligible on the Record. So
4    if you can say yes or no, I think we'll
5    understand each other.
6        Is that okay?
7  A. Yes.
8  Q. If you need to take a break, just let me
9    know. We'll, you know, probably take most of
10   the day today, but we'll take a break for
11   lunch for sure. But otherwise, if you need to
12   take a break, just let me know.
13       But if there's a question on the table,
14   meaning if I've posed you a question, I'd like
15   for you to answer before we take that break.
16  A. Sure.
17  Q. I'd also like to just, you know, remind
18   everybody here, and for the Record, that, you
19   know, there's a Protective Order in this case
20   by the judge of the court that we are not to
21   release or discuss any documents regarding any
22   personnel files or personnel matters or people
23   that we talk about. And that's to any person

Page 6

1    not a party to this case. And that's under
2    sanction of Court, so I just wanted to remind
3    us all about that.
4        Also, I'm going to be showing you some
5    exhibits, and I'm going to mark Exhibit 1 here
6    today, which is the document that I sent to
7    your lawyer asking you to be here today.
8        (Defendants' Exhibit 1 was marked
9        for identification.)
10  Q. We've had some difficulty scheduling this, and
11   through no one's fault. I'm not saying that.
12   I don't know if you've seen this particular
13   document, but it's a notice of your
14   deposition.
15       Have you seen this or something similar to
16   this?
17  A. Yes.
18  Q. Okay. And when I asked for you to be here
19   today, I also asked you if there were any
20   documents that you had in your possession that
21   you retained, that either were given to you by
22   the City of Dothan or Judge Gordon, or any
23   documents that might support your case or that

Page 7

1    you reviewed to prepare or your tax returns.
2    So let's just kind of take them -- did you
3    bring any documents with you today?
4  A. Yes.
5  Q. Okay. And do you have them with you, or does
6    your attorney have them?
7  A. I have them.
8  Q. And, again, any and all documents provided to
9    you by either the City or Judge Gordon, do you
10   have any of those documents with you?
11  A. The documents that I have are letters that
12   were -- or evaluations -- the copies of
13   evaluations that I made for myself.
14       MR. JAFFREE: Did you make me copies
15       of those documents?
16       THE WITNESS: I didn't get to make
17       copies of these.
18       MS. NELSON: Maybe at a break we can
19       get you copies of all of them.
20       If it's something I have a copy
21       of, I may --
22  A. Yeah. This should be in my personnel file.
23  Q. May be in your personnel file.

Page 8

1  A. Right. And then a letter dated November 5th,
2    2001.
3  Q. From whom is that?
4  A. From Judge Gordon.
5  Q. Would that be in your personnel file?
6  A. I don't know. I'm -- it should be. But I'm
7    not -- I don't know what's in my personnel
8    file.
9        MR. JAFFREE: Did she give you that
10       letter with coffee stains?
11       THE WITNESS: I don't know.
12       MR. JAFFREE: I don't know what kind
13       of stain that is.
14       THE WITNESS: I don't know.
15  Q. Okay. Anything else?
16  A. And then just copies of where I was served
17   with hearing notice.
18  Q. Regarding your discipline or termination?
19  A. Yes, ma'am. And that should be in my
20   personnel file. That is that. That is just
21   my administrative leave memo that --
22  Q. You were placed on leave?
23  A. -- was given to me.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  Q.  Okay.  I may come back and ask you about
2      these.
3  A.  Okay.
4  Q.  I'm just trying to get a handle on what --
5  A.  And then my termination.  And then another
6      copy where it was dated March 22nd of '04.
7  Q.  This involves a claim of false arrest by
8      Theron Fondren?
9  A.  Yes.
10 Q.  Okay.  And the other letters from the judge --
11     I'll ask you about and identify more
12     completely for the Record -- was in November
13     of 2001, involved remarks made in the presence
14     of a bondsman --
15 A.  Right.
16 Q.  -- during the course of a defendant with an
17     appeal bond.  Was this the -- I may not be
18     pronouncing it right.  Was the Ralpeje
19     matter?  Does that name mean anything to you?
20 A.  It does.  But I mean, I'm not sure if that was
21     the exact name for this.  But --
22 Q.  Thank you.
23 A.  And then this was dated December 30th of '99.

Page 10

1      That is in my file.  I don't know if that's in
2      my personnel file.  That's something from
3      Captain Jim Smith when he was employed with
4      the Dothan Police Department when I was still
5      working with them whenever I applied for a
6      position.
7  Q.  Okay.
8  A.  I don't know.  That may be in my personnel
9      file.
10 Q.  Yeah.  I'll ask you more about that, and I may
11     need to get copies.
12 A.  And I've got --
13 Q.  Before we do that, then do you have any other
14     -- then I asked you for any notes, diaries,
15     calendars?
16 A.  I don't have a diary.
17 Q.  Anything like that.  You've got a -- I don't
18     know if that's a checkbook or calendar out
19     there.  Does that have anything to do with
20     this case or is that -- you were just
21     looking --
22 A.  No.  This is just my -- to write down --
23 Q.  2007?

Page 11

1  A.  Yeah.  That's just to write down my personal
2      stuff.  This -- now, I did make copies of the
3      notes that I had taken on pieces of paper that
4      I had that I've made copies for you already.
5      But this is just one copy.
6  Q.  And this is my copy --
7  A.  Yes, ma'am.
8  Q.  -- of the handwritten notes?
9  A.  And then this is the copy of -- some of my tax
10     forms, because we have moved since then, so --
11     but I have already requested those that are
12     missing.  I've got 2000 and -- State of '03;
13     2005, a 1040, 2006 1040 and State.  But the
14     others I have requested copies of.
15 Q.  I just ask that you provide that to me when
16     you get them.
17 A.  Yeah.  It's going to take a couple of weeks I
18     think.
19 Q.  And any other documents that you would have
20     that would support your case or that you've
21     reviewed to prepare for today?
22 A.  This is just a copy of my transcript hearing
23     that I had back in '05.  I don't --

Page 12

1  Q.  That was your transcript hearing from your
2      Personnel Board hearing --
3  A.  Yes, ma'am.
4  Q.  -- following your termination?
5  A.  I know the City has a copy of that.  So I'm
6      not sure --
7  Q.  Can I just flip through it?
8  A.  Sure.
9  Q.  And just kind of refresh myself what --
10     MR. JAFFREE:  Do you have any notes
11         in there?
12     THE WITNESS:  There's some notes
13         written on my transcript from
14         me.
15     MS. NELSON:  Well, I just --
16     MR. JAFFREE:  I mean, the City has a
17         copy of that.
18     MS. NELSON:  Well, I'm just
19         checking.
20 Q.  I'm not looking at your notes.
21 A.  I just put it in a binder because it's --
22     since it was so thick.
23 Q.  Okay.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

|  | Page 13 |
|---|---|
| 1 | A. And then this is just a tablet for me to write |
| 2 | on today if I need it. |
| 3 | Q. The other notes you have there, is that |
| 4 | what -- |
| 5 | A. This is -- this is those copies. |
| 6 | Q. That you made copies? |
| 7 | A. Right. That's this right here (indicating). |
| 8 | MS. NELSON: We can go off a minute. |
| 9 | Q. Just a few more preliminaries, Ms. Brackin. |
| 10 | Well, first of all, will you state your full |
| 11 | name for the Record, please? |
| 12 | A. Mary Elizabeth Brackin. |
| 13 | Q. You know, again, I stated I'm going to be |
| 14 | asking you questions about your claims against |
| 15 | the City. |
| 16 | Are you currently under any type of |
| 17 | medication or any other substance that would |
| 18 | prevent you from answering my questions |
| 19 | truthfully? |
| 20 | A. No, ma'am. |
| 21 | Q. Or from preventing you from understanding my |
| 22 | questions? |
| 23 | A. No, ma'am. |

|  | Page 14 |
|---|---|
| 1 | Q. Are you under -- currently under the care of a |
| 2 | doctor? |
| 3 | A. Not other than just the annual checkups that |
| 4 | women receive. |
| 5 | Q. When you say -- kind of like your OB/GYN? |
| 6 | A. Yes, ma'am. |
| 7 | Q. Are you on any prescription medications? |
| 8 | A. Yes. |
| 9 | Q. Can you tell me what those are? |
| 10 | A. Effexor. |
| 11 | MR. JAFFREE: Let me object to that. |
| 12 | I'm not sure what, if anything, |
| 13 | has to do with your defense. |
| 14 | But just for the Record, I |
| 15 | object. |
| 16 | You can go ahead and |
| 17 | answer. |
| 18 | Q. Go ahead. |
| 19 | A. Effexor. |
| 20 | Q. And will you give me your Social Security |
| 21 | number, please? |
| 22 | A. ▨▨▨▨▨▨▨. |
| 23 | Q. And your date of birth? |

|  | Page 15 |
|---|---|
| 1 | A. ▨▨▨▨▨▨ |
| 2 | Q. And do you have an Alabama driver's license? |
| 3 | A. Yes, ma'am. |
| 4 | Q. Do you know what number that is? |
| 5 | A. Yes, ma'am. |
| 6 | Q. Give me that. |
| 7 | A. 5144702. |
| 8 | Q. And what is your current address? |
| 9 | A. 695 Sandstone Drive, Dothan, Alabama, 36303. |
| 10 | Q. And how long have you lived there? |
| 11 | A. Approximately one year. |
| 12 | Q. And where did you live prior to that? |
| 13 | A. We lived at 105 Cricket Court, same city and |
| 14 | zip. And we lived there for approximately two |
| 15 | years. |
| 16 | Q. When you say "we," are you married? |
| 17 | A. Oh, I'm -- yes. I'm sorry. |
| 18 | Q. And what is your husband's name? |
| 19 | A. Joseph Allen Houston Brackin. |
| 20 | Q. And how long have you been married to him? |
| 21 | A. Nineteen-plus years. |
| 22 | Q. Have you been married to anyone besides him? |
| 23 | A. Yes. |

|  | Page 16 |
|---|---|
| 1 | Q. And who were you married to prior to that? |
| 2 | A. Ronnie Allen Monday. |
| 3 | Q. And how long were you married to him? |
| 4 | A. Approximately one year. Maybe a year and a |
| 5 | few months. |
| 6 | Q. Any other marriages? |
| 7 | A. No, ma'am. |
| 8 | Q. Do you have any children? |
| 9 | A. Yes, I do. |
| 10 | Q. And how many children do you have? |
| 11 | A. Two. |
| 12 | Q. And what ages are they? Just give me their |
| 13 | names and ages. |
| 14 | A. Michael, he's 21, and Matthew is 13. |
| 15 | Q. Do they live with you? |
| 16 | A. Matthew does. |
| 17 | Q. And Michael's father is? |
| 18 | A. Ronnie Allen Monday. |
| 19 | Q. And Matthew's father is? |
| 20 | A. Joseph Brackin. |
| 21 | Q. And Mr. Monday, does he still live in the |
| 22 | city? |
| 23 | A. Yes. |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  Q. Is he employed?
2  A. I'm -- I'm not sure. I don't have much -- I
3     don't have any contact with him.
4  Q. And Mr. Brackin, is he employed?
5  A. Yes, he is.
6  Q. And where does he work?
7  A. City of Dothan.
8  Q. What does he do?
9  A. He is a firefighter.
10 Q. Firefighter?
11 A. Yes, ma'am.
12 Q. And how long has he been with the City of
13    Dothan?
14 A. Since August of '86. I believe that's right.
15 Q. Do you have any other relatives that live in
16    the city of Dothan or the southern part of
17    Alabama?
18 A. (Nods head in the affirmative.)
19 Q. How many? You're shaking your head yeah.
20 A. I have a huge family.
21 Q. The reason I ask, this is a -- you've asked
22    for a jury trial.
23 A. Right. Right.

Page 18

1  Q. And I'm entitled to know --
2  A. I have --
3  Q. -- relatives, so I'm trying to just --
4  A. Yes.
5  Q. Without being here all day --
6  A. I have three sisters and one brother that live
7     in Dothan.
8  Q. Are your parents living?
9  A. Just my mother. And my mother lives -- lives
10    here in Dothan, too.
11 Q. What's your mother's name?
12 A. Nell McKay Sizemore.
13 Q. Your father is deceased?
14 A. Yes, he is.
15 Q. And your sisters are?
16 A. Linda Collins.
17 Q. Where is she employed?
18 A. She's self-employed.
19 Q. With?
20 A. She does house cleaning.
21 Q. Okay. And your other sister?
22 A. Mona Moore.
23 Q. Is she employed?

Page 19

1  A. She is. She works at Budget cuts and also
2     Cloverdale United Methodist Church.
3  Q. In Montgomery?
4  A. No. In Dothan.
5  Q. That's in Dothan?
6  A. Montgomery has one, too.
7  Q. And do you have another sister?
8  A. Yeah. Debbie Batchelor.
9  Q. Is she employed?
10 A. Dothan Country Club in the golf shop.
11 Q. Did you say you have a brother?
12 A. I have a brother, Charles Sizemore, and he's
13    employed with Swedish Match.
14 Q. And what is that?
15 A. It's a cigar manufacturing company.
16 Q. And you say -- I take it you've got cousins,
17    aunts, uncles?
18 A. I've got several nieces and nephews, great
19    nieces, nephews.
20 Q. Anybody over the age of probably 18 or 19?
21 A. Oh, gosh. Yeah. Let's see.
22 Q. What I may ask you to do, if you could make a
23    list --

Page 20

1  A. If I could make a list of them. And that
2     way -- because there are several.
3  Q. Yeah. If you could make a list for me and
4     provide it to your attorney, just their
5     name -- by name, their relationship to you.
6     And, again, I'm only looking for somebody over
7     the age of 18, and just where they're
8     employed, if they're employed. And I think I
9     said how they are related to you.
10 A. Okay.
11 Q. For example, I take it, you've got
12    brothers-in-law and sisters-in-law?
13 A. In-laws included?
14 Q. In-laws included. I just don't want to put
15    your sister on the jury, you know.
16    Have you ever been arrested for anything?
17 A. No.
18 Q. Ever been convicted of anything?
19 A. Of a traffic ticket.
20 Q. What kind of traffic ticket?
21 A. Speeding.
22 Q. Was that here in the city of Dothan?
23 A. No, ma'am.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  Q. Where was that?
2  A. Montgomery.
3  Q. Have you ever filed for bankruptcy?
4  A. No, ma'am.
5  Q. Have you ever filed for unemployment
6     compensation?
7  A. Yes, ma'am.
8  Q. And how many times have you done that?
9  A. Let's see. Approximately three times in my
10    course of years of employment.
11 Q. Can you tell those?
12 A. I'm not --
13 Q. Which three times you remember, or roughly?
14 A. Roughly, of course, would be May of '05 when I
15    was discharged from the city of Dothan. And
16    approximately -- it was back in either the
17    late 80s or early 90s. I'm just not quite
18    sure of the year. Whenever --
19 Q. Before you started for Dothan?
20 A. Yes. But you're talking since?
21 Q. I'm talking about anytime.
22 A. Oh, anytime. And then September of '07.
23 Q. Which was just last month?

Page 22

1  A. Yes, ma'am.
2  Q. And, well, I'll ask you about that.
3     Apparently, you went on to another job and
4     then left that job. What job was that?
5        MR. JAFFREE: Excuse me. Went on
6     when?
7  Q. From the city of Dothan?
8  A. Yes.
9  Q. I'll ask you more about that later.
10 A. Okay.
11 Q. Have you ever filed bankruptcy?
12 A. No.
13 Q. Has your husband ever filed bankruptcy?
14 A. No.
15 Q. Have you ever been in the military?
16 A. No.
17 Q. Have you ever been known by any other name
18    than the name you've given me?
19 A. Well, Mary Monday from a previous marriage,
20    and then my maiden name is Sizemore.
21 Q. Are you member of any type of social club or
22    civic organization?
23 A. I am a member of the Daughters of the Nile

Page 23

1     Club here in Dothan. It's a part of the
2     Masonic organization.
3  Q. Daughters of the Nile?
4  A. Yes, ma'am.
5  Q. And how long have you been a member of that?
6  A. Couple of years.
7  Q. I'm somewhat --
8  A. Maybe more. I'm sorry.
9  Q. -- familiar with the Masons, but is this like
10    a group of women?
11 A. Yes, ma'am, it is.
12 Q. And what is your mission or purpose, or do you
13    do fundraisers or what?
14 A. Yes. We raise money for the Children's
15    Hospital for the Shriners Hospital, that sort
16    of thing.
17 Q. Any other type of civic activities?
18 A. No, ma'am.
19 Q. Your children. I guess Michael is grown.
20    Matthew, where does he go to school?
21 A. Wicksburg High School.
22 Q. And where is that? Is that a city?
23 A. It is -- no, ma'am. It's a Dothan address,

Page 24

1     but it's a county school. It's not a city
2     school, but it's in Houston County.
3  Q. Does he play ball or sports or anything?
4  A. Yes.
5  Q. Which sports does he play?
6  A. Football. Are you talking about for the
7     school?
8  Q. Yeah.
9  A. Or --
10 Q. Just school.
11 A. Okay. Well, he started this school year, so
12    he doesn't play any right now.
13 Q. Do you belong to a church?
14 A. Yes, I do.
15 Q. And what's the name of your church?
16 A. Lafayette Street United Methodist Church.
17 Q. And how long have you been going there?
18 A. Since 1988.
19 Q. Other than this lawsuit that you've filed
20    against the city of Dothan and Judge Gordon,
21    have you been involved as a named party or
22    plaintiff in any other lawsuit?
23 A. No, ma'am.

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1    MR. JAFFREE: Let me ask if you
2        could rephrase the question to
3        include lawsuits against the
4        city of Dothan because her
5        response is incorrect as given
6        since there was a administrative
7        lawsuit.
8    MS. NELSON: Well, I will follow up.
9    Q. You're talking about the appeals hearing or
10       the —
11   A. Oh, yes.
12       THE WITNESS: Is that —
13       MR. JAFFREE: Well —
14   A. I'm not understanding the question.
15   Q. Well, I mean, I'm just talking about — I'm
16       just asking best you understand, have you
17       ever — you filed also an appeal hearing with
18       the City; is that correct?
19   A. Yes.
20   Q. And then did you — you appeared before the
21       Personnel Board contesting your termination
22       from the city of Dothan; is that correct?
23   A. Correct.

Page 26

1    Q. And you've also filed an appeal to the Circuit
2        Court of Houston County; is that correct?
3    A. Yes, ma'am.
4    Q. And that went all the way up to the Court of
5        Civil Appeals; is that correct?
6    A. That's correct.
7    Q. And the Court of Civil Appeals ultimately
8        upheld your termination; is that correct?
9        Okay.
10   A. Well —
11   Q. Well, strike that. You look puzzled. The
12       Court of Civil Appeals' decision, I noticed
13       you had that in your notebook.
14       Do you understand what they decided about
15       your case?
16   A. Yes.
17   Q. And what was that?
18   A. They overturned Judge White's decision from
19       the circuit court level and remanded it back
20       to the Personnel Board.
21   Q. And that's your understanding of that; is that
22       correct?
23   A. That's —

Page 27

1    Q. And the Personnel Board then upheld your
2        termination?
3    A. Yes.
4    Q. Is that correct?
5    A. Yes, they did.
6    Q. And did you take any further action in that
7        matter before the Personnel Board, up through
8        the Court of Civil Appeals, back down to Judge
9        White, and back to the Personnel Board?
10       Bottom line, your termination stood through
11       that process; is that correct?
12       You're looking at your lawyer.
13   A. Well, I'm just — I guess —
14   Q. You can answer me if you understand.
15   A. Okay.
16   Q. You filed with the Personnel Board —
17   A. Correct.
18   Q. — and contested your termination. The
19       Personnel Board upheld your termination; is
20       that correct?
21   A. Correct.
22   Q. You then filed a lawsuit or appealed that to
23       the Houston County Circuit Court?

Page 28

1    A. Correct.
2    Q. And Judge White was your judge?
3    A. Yes, he was.
4    Q. And what did you understand Judge White did?
5    A. Judge White overturned the personnel board's
6        decision and directed me back at my job and
7        back pay.
8    Q. And then Judge White's decision was appealed
9        to the Alabama Court of Civil Appeals; is that
10       correct?
11   A. Yes, ma'am.
12   Q. And I'm probably confusing this. And then the
13       Court of Civil Appeals overturned Judge White;
14       is that correct?
15   A. I believe that's correct. They — they
16       remanded it back to the Personnel Board
17       because there were things in there that should
18       not have been considered in the beginning. So
19       they remanded it back to the Personnel Board
20       to — to do — to base it solely on this.
21   Q. And that was based on whether a certain
22       discipline had — the underlying action had
23       occurred within a two-year period of your

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

```
1    termination?
2         I mean, do you understand what I'm talking
3    about?
4    A.  Yeah.
5         MR. JAFFREE:  Well, you're asking
6              her a legal conclusion.  And the
7              decision requires some
8              sophistication that she may not
9              can articulate.
10        MS. NELSON:  I'm just trying to get
11             her understanding of it.
12   Q.  So it was remanded to the Personnel Board; is
13       that correct?
14   A.  Yes.
15   Q.  And the Personnel Board upheld your
16       termination; is that correct?
17   A.  Yes, that's correct.
18   Q.  So we've talked about that.
19   A.  Okay.
20   Q.  If you want to call it, that lawsuit.  The
21       current lawsuit that I'm asking you questions
22       about that's in federal court --
23   A.  Correct.
```

Page 30

```
1    Q.  -- had you filed any other -- one other
2        thing:  You filed an EEOC charge against the
3        city of Dothan?
4    A.  Yes.
5    Q.  Are you aware of that?
6    A.  Yes.
7    Q.  Besides --
8    A.  I'm sorry.
9    Q.  -- any of that, have you filed any other
10       lawsuits where you were named a plaintiff or a
11       named party?
12   A.  No.
13   Q.  Now, we've talked about your divorce.  I mean,
14       that was a legal procedure.
15   A.  Right.  Yes.  But when you --
16   Q.  No other lawsuits that you're aware of that
17       you've been involved in?
18   A.  No, ma'am, not -- no, ma'am.
19   Q.  Have you ever been sued in a lawsuit where you
20       were named a defendant?
21   A.  No.
22   Q.  Automobile wreck or traffic incident, anything
23       like that?
```

Page 31

```
1    A.  No.  No, I haven't.  No.  No, ma'am.
2    Q.  Has a member of your family been sued?
3    A.  Not to my knowledge.  I don't -- I don't
4        know.  I mean, I can't speak for my -- my
5        family.  I don't know.
6    Q.  Well, I meant, your immediate family, your
7        husband.
8    A.  I mean, not my husband.  No.
9    Q.  Has your husband ever been a plaintiff in a
10       lawsuit?
11   A.  No, ma'am, not to my knowledge.
12   Q.  Have you ever given testimony besides your
13       Personnel Board hearing?  Have you ever given
14       testimony in a lawsuit?
15   A.  Lawsuit?  No, ma'am.
16   Q.  Have you ever had your deposition taken like
17       this before where a lawyer is asking you
18       questions about a lawsuit?
19   A.  Other than my appeal hearing?
20   Q.  Yes, other than your appeal hearing.
21   A.  Other than that appeal hearing.  No, not an
22       attorney, no.
23   Q.  When you say "not an attorney," who --
```

Page 32

```
1    A.  Well, you were asking me if -- if an -- based
2        on an attorney asked questions.  So I said,
3        no.
4    Q.  In a lawsuit?
5    A.  I'm just making sure that I'm understanding.
6    Q.  Well, have you ever given sworn testimony
7        before?
8    A.  Yes.
9    Q.  And where have you done that?
10   A.  I was actually a -- in my magistrate capacity
11       years ago when I issued a contempt complaint
12       for the judge.  But it was not Judge Gordon.
13       I had to, you know, testify to that, that
14       person did not show up in court.  And I have
15       sworn statements to the police department.
16   Q.  And those sworn statements would be regard to
17       what?
18   A.  In regards to some internal investigations
19       that were -- that -- that involved myself that
20       I had to give.  They asked me questions, and I
21       gave them answers to that.  But it was taped
22       and --
23   Q.  Were you under oath; is that your
```

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1    understanding?
2    A. I'm not sure if I was under oath. I do know
3    that I had to sign documentation to the effect
4    that, you know, if -- you know, if you lie or
5    whatever, you know, that's an ethics violation
6    to that sort or -- I'm not sure if I was
7    placed under oath.
8    Q. And this was done, you said, an internal
9    investigation. Are you familiar with the
10   Internal Affairs?
11   A. Yes.
12   Q. And Internal Affairs is a part of the police
13   department?
14   A. Of the Dothan Police Department.
15   Q. And you've worked in the police department,
16   haven't you?
17   A. Yes.
18   Q. What is your understanding of what Internal
19   Affairs does?
20   A. I did not work in that division, so I'm not
21   sure as far as what their actual job duties
22   are or when --
23   Q. You're not --

Page 34

1    A. I was not affiliated with that section.
2    Q. So you don't really know how they function?
3    A. No, ma'am.
4    Q. Or when they might do an investigation?
5    A. No, ma'am.
6    Q. I believe I asked you this: Have you ever
7    filed an EEOC charge against anyone else
8    besides the city of Dothan?
9    A. No, ma'am.
10   Q. Now, did you grow up in this area?
11   A. Yes, I did.
12   Q. Where were you born?
13   A. Ft. Benning, Georgia.
14   Q. And how long have you lived in the Dothan
15   area?
16   A. Approximately 35, 36 years.
17   Q. Did you go to high school in this area?
18   A. I did.
19   Q. Where?
20   A. Rehobeth High School.
21   Q. And Rehobeth is where?
22   A. It is -- it's Houston County. It's a county
23   school. It's not inside the city limits, but

Page 35

1    it does have a Dothan mailing address.
2    Q. And Rehobeth High, is that where you --
3    Rehobeth High School?
4    A. Yes.
5    Q. And following your -- you graduated; is that
6    correct?
7    A. Yes.
8    Q. And following graduation, did you have an
9    opportunity to take any other educational
10   courses or whether college or vocational
11   school or junior college or anything like
12   that?
13   A. Yes.
14   Q. And where was that?
15   A. I attended Riley Business College and their
16   computer program.
17   Q. And when was that?
18   A. Approximately '88, '89.
19   Q. Did you get a degree of any sort?
20   A. Just a Certificate of Completion.
21   Q. And then following Riley Business College, any
22   other educational training?
23   A. I was -- became a certified magistrate in June

Page 36

1    of '97.
2    Q. And tell me what was involved in becoming a
3    certified magistrate?
4    A. You attended four orientations on a day basis
5    up in Montgomery; and then after you completed
6    those and a test was involved, then you would
7    attend approximately four sessions at the
8    University of Alabama in Tuscaloosa at their
9    Continuing Education Building.
10   Q. And how long did it take you to get this
11   certification?
12   A. You have to do it in three years. I started
13   in May of '92, but I didn't actually start
14   going to some classes until after that. But
15   it's -- at that time, they actually -- I
16   believe you had four years to complete it.
17   I'm not sure. It's change.
18   Q. And does the City require this, or is this a
19   state law requirement?
20   A. It is a state. I mean, it's -- it's four.
21   You have to be a -- you have to be certified.
22   Yes.
23   Q. To hold the magistrate's position?

9 (Pages 33 to 36)

**Page 37**

1  A. Yes. The capacity.
2  Q. And do you know who did the training?
3  A. Different -- we had judges. We had court
4    clerks. We had Eric Locke who's a staff
5    attorney at AOC.
6  Q. That's Administrative Office of Courts?
7  A. Yes, ma'am.
8  Q. Did you receive any type of materials or
9    training materials or notebooks?
10 A. Yes.
11 Q. Do you still have those, or were they kept in
12   the magistrate's office?
13 A. I don't -- I don't think I took -- I may have
14   some, but it was just over previous years.
15 Q. Did the city of Dothan pay for that training?
16 A. Yes.
17 Q. And to your knowledge, are all the magistrates
18   required to be certified?
19 A. To my knowledge.
20 Q. And other than that training, any other type
21   of vocational, college, education?
22 A. Well, during my years with the City, they
23   would send us to computer classes that would

**Page 38**

1  include Microsoft Word or Power Point, Excel,
2  that sort of thing. But I don't recall the
3  dates or exactly when those happened.
4  Q. Now, what was the first -- after you graduated
5    from high school, what was the first
6    full-time job that you held?
7  A. Let's see. Oh, I was employed with -- at
8    time, it was called General Cigar Company, but
9    it's now Swedish Match.
10 Q. That's where your brother-in-law works?
11 A. My brother.
12 Q. Or your brother. And what was your job there?
13 A. I don't -- I don't remember what my actual
14   title was. I -- I worked in different areas.
15   I worked, actually, in the final end of
16   production, and then I was in an office
17   setting.
18 Q. How long did you work there?
19 A. Approximately, maybe to '88 or '89. I'm not
20   sure.
21 Q. When did you start?
22 A. I started, actually, full-time when I
23   graduated high school, but I actually had

**Page 39**

1  worked there during the summer, between my
2  junior and senior year in high school.
3  Q. And why did you leave there?
4  A. I got promoted -- well, it was a
5    promotion-type position with Riley College in
6    their accounting office.
7  Q. What was your job for Riley College?
8  A. I worked in accounts payable.
9  Q. Where is this located? Is this in Dothan?
10 A. Yes, ma'am. But they're no longer in
11   business. It's -- it -- their main office was
12   on Montgomery Highway.
13 Q. And why did you leave there?
14 A. I was laid off. They were cutting back due to
15   the budget.
16 Q. Who was your supervisor?
17 A. Oh, goodness. I can't remember my initial
18   supervisor that worked in the office with me.
19   I know that Peggy Rice was over, like,
20   the -- the administrative personnel.
21 Q. After you left Riley Business College, where
22   did you go to work?
23 A. Automated Control Systems. It's an

**Page 40**

1  engineering company.
2  Q. And what was your job there?
3  A. Office manager.
4  Q. And how long did you work there?
5  A. Approximately, a year maybe. I'm not sure.
6  Q. And why did you leave there?
7  A. They were cutting back to part-time, and I
8    needed full-time employment.
9  Q. Do you remember who your supervisor was there?
10 A. Gary McGowan.
11 Q. Did you ever work for a company called Whatley
12   White?
13 A. Yes.
14 Q. What did they do?
15 A. It's a trucking company.
16 Q. And what was your job there?
17 A. Accounts payable, I believe.
18 Q. And do you remember who your supervisor was?
19 A. Melissa. I'm not sure of her last name, but I
20   was -- my office was actually at Wallace
21   Supply Company. But it was owned by the same
22   individual, both businesses.
23 Q. Whatley Supply?

## FREEDOM COURT REPORTING

Page 41

1  A.  Yes.
2  Q.  Why did you leave there?
3  A.  The company went out of business.  They filed
4      Chapter 13 I believe.
5  Q.  After you left Automated Controls --
6  A.  Yes.
7  Q.  -- where did you go to work?
8  A.  I don't know -- I'm not sure if it was with
9      the city of Dothan at that point.  I'm not
10     sure.  I believe it was, but I can't --
11     without looking at --
12  Q.  Sure.
13  A.  -- some of my prior records, I'm not sure.
14  Q.  Are you currently?
15  A.  No, ma'am.
16  Q.  And where were you last employed?
17  A.  The Town of Newton.
18  Q.  And what was job there?
19  A.  Court clerk.
20  Q.  And how long did you work there?
21  A.  From approximately March of '06 to September
22     of '07.
23  Q.  And why did you leave there?

Page 42

1  A.  Laid off due to budget cuts.  The city clerk
2      is doing her position plus the court clerk's
3      position.
4  Q.  Who was your supervisor there?
5  A.  Jean Watson.
6  Q.  Is she the court clerk?
7  A.  She says the mayor.
8  Q.  Excuse me.  The mayor?
9  A.  Yes.
10  Q.  Jean Watson?  Okay.  And who's the city clerk?
11      Did you report to the city clerk?
12  A.  No.  I actually -- well, our municipal judge
13      was part-time.  But, mainly, I reported to
14      Jean.
15  Q.  Okay.  So it was after you left your job from
16      this Town of Newton that you filed for
17      unemployment compensation that I asked you
18      about the three --
19  A.  Yes.
20  Q.  You told me it was three times?
21  A.  Yes.
22  Q.  This was one of the --
23  A.  This was one.

Page 43

1  Q.  -- times when you filed?
2  A.  Yes.
3  Q.  Prior to the Town of Newton, were you
4      employed?
5  A.  With the City of Headland.
6  Q.  And what was your job with the City of
7      Headland?
8  A.  Same, court clerk/magistrate.
9  Q.  And who was your supervisor?
10  A.  Mayor Rueben Shelley.  I actually reported
11      more at that position to the municipal judge,
12      was Chris Capps.  He was pretty involved.
13  Q.  And why did you leave that job?
14  A.  Both Headland and Newton were both part-time
15      positions, and I was moving.  Newton, their
16      hours needed to upped to more hours, so I left
17      Headland.  Newton was closer to home where I
18      was moving to.  So I went to work for Newton
19      because it was going -- at that point, it was
20      going to either three or four days a week.
21      I'm not sure.
22  Q.  I'm a little confused.  You said you were
23      moving.  Were you moving addresses, or you're

Page 44

1      just --
2  A.  Yes.
3  Q.  You've recently moved?
4  A.  Well, I've been in my home now for
5      approximately a year.  Right.
6  Q.  And just to clarify to me, I know -- you moved
7      from where to where in this past year?
8  A.  We were living with my mother-in-law while the
9      house was being built, so I moved from there.
10  Q.  "There" being?  Where does your mother-in-law
11      live?
12  A.  2102 Hardwick Drive here in Dothan.
13  Q.  In Dothan?
14  A.  Yes.
15  Q.  Y'all were living with her, and you were
16      building as house?
17  A.  Yes.
18  Q.  And your new house is where?
19  A.  695 Sandstone.
20  Q.  In Dothan?
21  A.  Yes.
22  Q.  And you're saying Newton was closer?
23  A.  Newton was closer to driver than to Headland,

11  (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    and my hours -- Newton's hours were moved up.
2  **Q.**  **Moved up to what it's?**
3  A.  At first, they were -- I was only working
4    there two days a week.
5  **Q.**  **And then that changed to?**
6  A.  That changed to three days a week.
7  **Q.**  **But then they totally laid you off?**
8  A.  After -- after -- then I was -- I was going --
9    I was moving to fives days a week.  When that
10    job was opening up, the municipal judge at
11    that time, that asked me to come work there,
12    was advising me that that court would be
13    full-time.  They were hoping that would be a
14    full-time court soon.
15  **Q.**  **Okay.**
16  A.  So that did not happen, which that municipal
17    judge is no longer there.  They've had another
18    municipal judge come in.
19  **Q.**  **But is there someone doing the magistrate**
20    **work?**
21  A.  Yes.  That's the city clerk.  She's doing that
22    now.
23  **Q.**  **There's no part-time magistrate?**

Page 46

1  A.  No.  She actually -- she is a full-time
2    employee with Newton, so she is doing both
3    positions.
4  **Q.**  **But if they were looking to go from a**
5    **two-to-three-day-a-week magistrate to a**
6    **full-time magistrate, I'm still confused as to**
7    **how you came to be laid off.**
8  A.  I -- they -- it did not go to full-time.  I
9    guess with them being a small town, you know,
10    I was making good money.  So they just felt
11    like they needed to try to cut back.  So --
12  **Q.**  **Were you ever disciplined in any way while you**
13    **were at Newton?**
14  A.  No.  I mean, what do you mean "disciplined?"
15  **Q.**  **I mean, for either your performance or**
16    **committing some work-rule violation?**
17  A.  No.
18  **Q.**  **Reprimanded?**
19    **I mean, you're looking at me like --**
20  A.  Well, I'm just try to figure out what you're
21    talking -- what are you actually talking
22    about?  Written, as far as written up, that
23    sort of thing?

Page 47

1  **Q.**  **Well, written up, verbal, talked to about your**
2    **job performance, or if you weren't getting the**
3    **job done.  Did that have any bearing on your**
4    **leaving the Town of Newton?**
5  A.  The only thing I was told was that I was laid
6    off due to budget cuts, that the city clerk
7    would be doing both positions.
8  **Q.**  **Had you been given any type of verbal**
9    **reprimand or discipline?**
10  A.  The only thing, the mayor at some point in
11    time had asked me exactly what a court --
12    excuse me -- court clerk responsibilities are
13    because she was a part-time mayor.  She was
14    not familiar with exactly the full scope of a
15    magistrate and a court clerk.  So I explained
16    that to her.
17    And then she just -- she had a issue with
18    me making more money than the police chief
19    did, but that was, you know -- that was all
20    that was discussed verbally.  But nothing
21    about my -- you know, me not doing my job.
22  **Q.**  **It's your understanding that in your part-time**
23    **position, you made more money than the police**

Page 48

1    **chief of the City of Newton?**
2  A.  I did not know that when I was initially
3    hired, but she had brought that to my
4    attention.
5  **Q.**  **What about the City of Headland; were you ever**
6    **disciplined, reprimanded, verbally or written?**
7  A.  No.
8  **Q.**  **Did you ever work for the City of Headland and**
9    **the City of Newton at the same time?**
10  A.  Yes.  Yes.  They were both part-time
11    positions.
12  **Q.**  **And I believe you've provided me some -- your**
13    **tax returns?**
14    MR. JAFFREE:  I didn't get a copy of
15    stuff.
16    THE WITNESS:  I didn't make you a
17    copy of --
18    MR. JAFFREE:  No, no, no.  She had
19    asked.
20  **Q.**  **Were you paid hourly for the City of Newton?**
21  A.  Yes.
22  **Q.**  **You were paid hourly for the City of Headland?**
23  A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1  Q. Combined, the two jobs -- let me back up.
2     You worked for City of Headland for what
3     period of time?
4  A. October of '05 to approximately November of
5     '06.
6  Q. And what about the Town of Newton?
7  A. I think I -- March of '06 to September of '07.
8  Q. I'm sorry.
9  A. Yes.
10 Q. And what was your hourly rate of pay at the
11    City of Headland?
12 A. Fourteen-fifty an hour.
13 Q. About how many hours a week were you working
14    there?
15 A. Twenty-one.
16 Q. What was your hourly pay at the city -- you
17    call it the Town of Newton?
18 A. Yes. It's small.
19    It was $15 an hour.
20 Q. And how many hours were you working there?
21 A. To begin with, 16, and then it went up to 24.
22 Q. And these earnings would be reflected in the
23    tax returns that you've--

Page 50

1  A. Yes, ma'am.
2  Q. -- provided to me?
3  A. Those that I could find.
4  Q. And you've been unemployed since September; is
5     that correct?
6  A. September 13th.
7  Q. Are you seeking employment?
8  A. Yes, I am.
9  Q. And are you seeking employment in this field
10    of a municipal employee or being a magistrate?
11 A. If the position comes available, but I have
12    applied for a lot of things that I'm qualified
13    for.
14 Q. Where have you applied?
15 A. I've applied for -- I've gotten on the list
16    for state jobs, for City of Enterprise, city
17    of Dothan School System. I'm trying to think
18    of some other none-government places. I'm not
19    sure of the some of the other that -- but
20    I've -- I have applied for several state jobs
21    that I have taken tests for. And I'm on the
22    list.
23 Q. Would these be here in Dothan?

Page 51

1  A. Yes. Or surrounding. For the state jobs, you
2     put surrounding counties, too, that you'd be
3     willing to work in. So --
4  Q. I'm going to show you what I've marked as
5     Defendants' Exhibit Number 2 which appears to
6     be a resume' prepared by you.
7        (Defendants' Exhibit Number 2 was
8        marked for identification.)
9  Q. Have you had a chance to look at it? Does
10    that appear to be your resume', Ms. Brackin?
11 A. Yes.
12 Q. And that goes through a period of time for
13    when you worked for Automated Control System;
14    is that correct?
15 A. Yes.
16 Q. Best of your knowledge, does that accurately
17    reflect the jobs that you held --
18 A. Yes, if the -- yes.
19 Q. -- up until that time which appears
20    to be -- to your knowledge, was that the
21    resume' you provided when you interviewed with
22    the city of Dothan?
23 A. I'm -- to the best of my knowledge.

Page 52

1  Q. After Automated Control, I believe you
2     testified that you thought you went to work
3     for the city of Dothan?
4  A. Yes.
5  Q. Do you remember filling out an application at
6     the City?
7  A. I'm sure I did. It was required.
8  Q. Do you remember what job you were seeking?
9  A. Magistrate, if I'm correct.
10 Q. Do you remember who you interviewed with?
11 A. Gayle Schwarz.
12 Q. Who is Gayle Schwarz?
13 A. She was the court clerk at the time.
14 Q. Let me show you what I'll marked as
15    Defendants' Exhibit 3 which is an application
16    for the city of Dothan. If you'd take a
17    minute just to look at that.
18       (Defendants' Exhibit 3 was marked
19       for identification.)
20       (Brief pause)
21 Q. Ms. Brackin, that Exhibit 3, is that your
22    application --
23 A. Yes.

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1   Q.   -- to the city of Dothan?
2   A.   Yes.
3   Q.   Do you recall when you first started working
4        there, what year that was?
5   A.   May of '92.
6   Q.   And do you know how you came to apply for a
7        job with the city of Dothan?
8   A.   I -- there was an opening, or it was announced
9        or -- I'm not sure. So it must have been a
10       job that was posted. I don't recall now.
11  Q.   Was your husband working at the time --
12  A.   Yes.
13  Q.   -- at the city of Dothan?
14  A.   Uh-huh (positive response).
15  Q.   In the fire department?
16  A.   Yes.
17  Q.   Has he always worked in the fire department?
18  A.   Yes.
19  Q.   I may have asked you this: What is his rank?
20  A.   He's a fire sergeant.
21  Q.   Sergeant?
22  A.   Sergeant.
23  Q.   And then you said you interviewed with Gayle

Page 54

1        Schwarz?
2   A.   To the best of my knowledge. I know she was
3        my supervisor, so I'm -- I'm just not sure. I
4        don't remember back that far.
5   Q.   You were hired; is that correct?
6   A.   Yes.
7   Q.   And how many other magistrates were there at
8        that time?
9   A.   There was Shirley Thomas and Kevin Sorrells.
10       And then Gayle, of course, was a
11       magistrate/court clerk.
12  Q.   Was there a municipal court judge at that
13       time?
14  A.   We had two part-time judges.
15  Q.   Do you remember who they where?
16  A.   Mike Brown and Doug Bates.
17  Q.   You say "part-time." Did they do other
18       things?
19  A.   They were -- they had their own --
20  Q.   Did they practice law?
21  A.   Yes, ma'am.
22  Q.   Did they practice law?
23  A.   Yes, sir.

Page 55

1   Q.   Doug Brown?
2   A.   Doug Bates.
3   Q.   Bates and --
4   A.   And Mike Brown.
5   Q.   Mike Brown.
6   A.   Mike Brown was the presiding judge.
7   Q.   Do you know if you've ever -- at that point,
8        did you receive training, or was it on-the-job
9        training to be a magistrate?
10  A.   It was basically on-the-job training.
11  Q.   Do you when you started your training through
12       the -- to get your certificate that we talked
13       about earlier?
14  A.   No, I don't recall the first actual time I
15       started going.
16  Q.   To you remember being given an employee
17       handbook of employee rules and regulations?
18  A.   I don't recall at that point. No.
19           (Defendants' Exhibit 4 was marked
20           for identification.)
21  Q.   Do you ever recall being given one? I'll show
22       you what I've marked as Defendants' Exhibit 4.
23       Is that your signature?

Page 56

1   A.   Yes.
2   Q.   This says, you received a copy of the
3        handbook?
4   A.   Yes.
5   Q.   Does that refresh your memory?
6   A.   Yes. Well, I'm -- I'm sure, you know, I
7        received it if I signed that.
8   Q.   Are you aware that the City has policies and
9        procedures dealing with like, for example,
10       drug testing?
11  A.   Yes.
12  Q.   Do you recall receiving --
13  A.   Yes.
14  Q.   -- that?
15           (Defendants' Exhibit 5 was marked
16           for identification.)
17  Q.   And I'll show you Defendants' Exhibit 5.
18       Is that your signature?
19  A.   Yes, it is.
20  Q.   And that certifies that you have received a
21       copy of the City's Drug Testing Procedures?
22  A.   Correct.
23  Q.   Have you ever been drug tested?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1  A.  With my initial employment, I believe, with
2      the City I was. Yes.
3  Q.  **Not since then?**
4  A.  But not -- no, ma'am.
5           MR. JAFFREE:  Let me stop.  One of
6               those documents from '92; the
7               other one is from '96.  Your
8               question suggests that she
9               received both of those documents
10              at.
11          MS. NELSON:  My question doesn't
12              reflect anything like that.  I
13              mean, you can ask the questions.
14              I'm just asking her to identify
15              a document.  I mean, they speak
16              for themselves.
17          MR. JAFFREE:  I think the tenure of
18              your question suggests that got
19              both of those documents when she
20              became employed.
21          MS. NELSON:  You can refer that if
22              you want.
23  Q.  **You said you first reported to Gayle Schwarz;**

Page 58

1      **is that correct?**
2  A.  Yes.
3  Q.  **What how long did you report to her?**
4  A.  I was in that division until, approximately, I
5      believe August of '95.
6  Q.  **And what position was that?**
7  A.  That I was in prior to that or after?
8  Q.  **Yeah.  You said you were in that position till**
9      **August.**
10 A.  In that division.  I was in that division
11     until August of '95.
12 Q.  **What division was that?  That's what I'm**
13     **trying to get an understanding.**
14 A.  Well, it's -- we were under the -- we worked
15     under the city manager at that time, but we
16     were Municipal Court.  We did not have our
17     own.
18 Q.  **Your own what?**
19 A.  Like they do now.  The Judicial Department has
20     their own department.  At that particular
21     time, we were listed as administrative up
22     under the city manager.
23 Q.  **Okay.  And you said that was until August of**

Page 59

1      '95.
2  A.  Yes, ma'am.
3  Q.  **What happened in August of '95?**
4  A.  I went to work as a secretary with the Dothan
5      Police Department.
6  Q.  **Let me back up.  What were your duties from**
7      **'92 to '95 when you worked under Gayle**
8      **Schwarz?**
9  A.  Magistrate.
10 Q.  **I know.  Give me some idea of what you did.**
11 A.  That encompasses swearing the officers to
12     traffic tickets and on the arrest -- issuing
13     warrants of arrest on complaints by civilians
14     and officers, taking in moneys for fines and
15     costs, working in the courtroom, working in
16     the fines room, accepting bonds, approving
17     bonds, issuing subpoenas?
18 Q.  **How often was court held when there were the**
19     **two part-time judges?**
20 A.  Let's see.  We had Monday, Tuesday, and
21     Thursday.
22 Q.  **Were you ever evaluated while you were**
23     **under -- like get an employee evaluation by**

Page 60

1      **Gayle Schwarz?**
2  A.  Yes.  If it.  I'm not sure if she did them or
3      Judge Brown did them at the time.  I'm not
4      sure.
5  Q.  **Did you consider yourself reporting to Gayle**
6      **Schwarz or to Judge Brown?**
7  A.  Gayle Schwarz was our immediate supervisor.
8           (Brief pause)
9           (Defendants' Exhibit 6 was marked
10              for identification.)
11 Q.  **I'm going to show you what I've marked as**
12     **Defendants' Exhibit 6, Ms. Brackin.  This is a**
13     **performance evaluation.**
14          **Is that the evaluation you received --**
15 A.  Yes.
16 Q.  **-- from Gayle Schwarz?**
17 A.  Yes.
18 Q.  **Do you have any reason to question anything**
19     **that she put in that evaluation?**
20          MR. JAFFREE:  Before you answer
21              that, you need to examine
22              everything in there, in detail.
23 Q.  **Did you have a chance to make a comment on**

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  that evaluation?
2  A. Yes.
3  Q. And what was your comment?
4  A. "Concur."
5  Q. Concur?
6  A. Concur. Uh-huh (positive response).
7      MR. JAFFREE: So she doesn't have to
8      answer the prior question?
9      MS. NELSON: Well, she can if she
10     wants to.
11     MR. JAFFREE: So are you still
12     expecting her to answer, or are
13     you satisfied with the concur?
14     MS. NELSON: Well, I'm satisfied
15     with the concur. I'm just
16     trying to move along here.
17 Q. Were you generally evaluated annually each
18     year?
19 A. After -- I think when you're on probation,
20     it's -- you get evaluated more. But after
21     you're off probation, I think it's once a
22     year. I'm not sure.
23 Q. And this was done in April of 1993; is that

Page 62

1  correct?
2  A. Right.
3      (Defendants' Exhibit 7 was marked
4      for identification.)
5  Q. And then let me show you one that you were
6      evaluated in about April -- well, looks like
7      May of 1994. That's Defendants' Exhibit 7.
8      Just a take a minute to look at that.
9      (Brief pause)
10 Q. That is your 1994 evaluation; is that correct?
11 A. Yes.
12 Q. Did you make a comment on that one?
13 A. Yes.
14 Q. And your comment was?
15 A. "Concur."
16     (Defendants' Exhibit 8 was marked
17     for identification.)
18 Q. And I'm going to show you what appears to be
19     your May of 1995 evaluation, which is
20     Defendants' Exhibit Number 8. Take a moment
21     to look at that.
22     (Brief pause)
23 Q. Is that your May of 1995 evaluation?

Page 63

1  A. Yes.
2  Q. Did you have an opportunity to make a comment
3      there?
4  A. Yes.
5  Q. And what was your comment?
6  A. "Concur."
7  Q. Those were fill out by whom?
8  A. The evaluation?
9  Q. Yes. I'm sorry. Who completed the
10     evaluation?
11 A. Gayle. It was Gayle Kellenberger, but it was
12     the same -- she was married at that time.
13 Q. Did Gayle ever speak to you about problems
14     that you had communicating with the public and
15     other employees?
16 A. The -- what was written in there. You know,
17     she went over the evaluation with me.
18 Q. Okay. She states here that "she" -- and she's
19     referring to you -- "is currently showing some
20     problems in the area of communication with the
21     public and other employees along with a
22     sometime poor attitude."
23     MR. JAFFREE: Is that a question or

Page 64

1      is that a statement?
2      MS. NELSON: That's a quote from
3      Gayle, her supervisor.
4  Q. I'm saying, did she discuss that with you?
5  A. She went over the evaluation with me. I don't
6      recall everything that was said in May of
7      '95. But I mean, if it's -- you know, she
8      went over that with me.
9  Q. And then she -- I'm quoting. "I feel that
10     this is an area that needs to be worked on
11     before a major complaint is received."
12     Do you remember her mentioning that you
13     to?
14 A. I don't recall.
15 Q. Do you remember any complaints at that time
16     that had been made about you?
17 A. No.
18 Q. Do you remember any employees that you were
19     having difficulty in communicating with or
20     getting along with?
21 A. No.
22 Q. Do you remember having any complaints from the
23     public or attorneys or anybody in the

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  courtroom, attending municipal court, that had
2  complaints about you?
3  A.  No.
4  Q.  Do you know what she was referring when she
5  said that you sometimes had a poor attitude?
6  A.  No.
7  Q.  Now, I believe you testified earlier that it
8  was in about '95 that you went to the police
9  department?
10  A.  Yes, ma'am.
11  Q.  Tell me the circumstances that you went to the
12  police department to work.
13  A.  Well, I had a -- a small child.  And we were
14  on call at that time.  Gayle was on call
15  during the week, and we would rotate
16  weekends.  And since there was few of us, that
17  meant our call was -- was quite often.  And
18  then our call went to where Gayle wasn't going
19  to be on call, so we had to be on call a week
20  at the time.  And with my --
21  Q.  Let me stop you and make sure.  I'm just
22  trying to understand.
23  It was you and Gayle, and who were the

Page 66

1  other magistrates in the office?
2  A.  Kevin and then in '95 at this point it was
3  Mary Turner.
4  Q.  Kevin Sorrell?
5  A.  Kevin Sorrells.
6  Q.  Sorrells?
7  A.  Yes.
8  Q.  And did all four of y'all rotate this call?
9  A.  We did, but it got to where Gayle would take
10  it during the week.  But then she got to where
11  she didn't take it at all.  So it was left
12  up -- oh, and Shirley.  I think Shirley Thomas
13  was still there.  I know that she retired, but
14  I'm not sure what year she retired in.  I'm
15  not sure.
16  Q.  Okay.  But did Kevin Sorrells, Mary Turner,
17  and Shirley take call also?
18  A.  Yes.
19  Q.  Anyway, you were telling me why you wanted to
20  go to the police department.
21  A.  And my husband is a shift worker.  He's on 24
22  and off 48.  So it was -- with a small child,
23  it was just hard to be on call.  So it would

Page 67

1  be to where I'd have to go spend the night
2  with my in-law in case I would get called out
3  because I couldn't take the baby with me.  So
4  it was just better for me to go to where I was
5  eight to five.  You know, if I worked court,
6  it would be to where sometimes I wouldn't get
7  out of there until six or seven at night.
8  Q.  Okay.
9  A.  So for my situation at the time with my
10  family, it was better for me to do that.
11  Q.  Back to what I was asking you about earlier,
12  the comments and evaluations, were some of the
13  communication issues or attitudes issues with
14  other employees.  Did you and Kevin Sorrells
15  have any disagreements or inability to get
16  along?
17  A.  No.
18  Q.  Did you and Mary Turner have disagreements or
19  inability to get along?
20  A.  No.
21  Q.  You mentioned Shirley Thomas?
22  A.  Uh-huh (positive response).
23  Q.  Did you and Shirley Thomas have any

Page 68

1  disagreements or --
2  A.  No.
3  Q.  -- inability to get along?
4  A.  No.
5  Q.  What about you and Gayle?
6  A.  No, not to my knowledge.
7  Q.  Do you know if Kevin Sorrells ever made any
8  complaints about you?
9  A.  Not to my knowledge.  I don't know.
10      MR. JAFFREE:  Let me --
11      MS. NELSON:  You can state your
12      objection.  I have a right to
13      question her.
14      MR. JAFFREE:  Well, I understand
15      that, but your questions are not
16      specific as to time, place, or
17      circumstances.
18      MS. NELSON:  I'm talking about in --
19      MR. JAFFREE:  The rest of the world
20      or just --
21      MS. NELSON:  I'm talking about
22      within 1995, the time frame that
23      she was noted in her evaluation

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1　　　　as having some issues with her
2　　　　employees.
3　　　　MR. JAFFREE: I'm not sure you made
4　　　　that clear.
5　　　　MS. NELSON: I think I did. But
6　　　　thank you. I'll try to do that
7　　　　in the future.
8　Q.　I'm talking about around the 1995 time frame
9　　　　when, in Exhibit 18, your supervisor Gayle
10　　　Schwarz had indicated some issues that are
11　　　written here in your evaluation. That's the
12　　　time frame I'm talking about.
13　　　　　To your knowledge, were you and Kevin
14　　　Sorrells friends?
15　A.　We worked together. We were co-workers. I
16　　　mean, yes, we --
17　Q.　Did you know him outside of the work force?
18　A.　As far as doing things? Is that what you're
19　　　talking about?
20　Q.　Yeah.
21　A.　I mean, I knew him outside the workforce.
22　　　But, I mean, did we?
23　Q.　Did y'all socialize; did y'all go to church

Page 70

1　　　together?
2　A.　No. No.
3　Q.　What about Mary Turner; did and you Mary get
4　　　along? Were y'all -- any reason that she
5　　　would have complained about you?
6　A.　Not to my knowledge. I don't --
7　Q.　Were y'all friends?
8　A.　Yes.
9　Q.　Were you friends outside of the work place?
10　A.　Yes.
11　Q.　Do you go to church together?
12　A.　We did. She was a member of the church that I
13　　　went to.
14　Q.　And was this the Methodist church?
15　A.　Yes.
16　Q.　Cloverdale Methodist?
17　A.　Lafayette Street United Methodist. My sister
18　　　worked at Cloverdale.
19　Q.　I'm sorry. I'm getting my churches confused.
20　　　You go to Lafayette?
21　A.　Lafayette United Methodist Church, yes.
22　Q.　And how long have you known Mary Turner?
23　A.　Since she started -- well, let's see. Our

Page 71

1　　　church was very big. I would say when she
2　　　started with the City because she didn't
3　　　attend church a whole lot whenever I was
4　　　there. Or if she did, I didn't see her
5　　　because we're -- we had quite a bit in our
6　　　congregation, so there would've been times
7　　　when I didn't see her. But I actually met her
8　　　whenever she started working with us for the
9　　　City.
10　Q.　Besides church, did you and Mary socialize?
11　A.　Not -- not during that time, no. Not in '95.
12　　　I mean, we -- you know, if things were going
13　　　on at church, of course. But not --
14　Q.　But later did you become as friends --
15　A.　Yes.
16　Q.　-- and socialize?
17　A.　Sure.
18　Q.　And do you still go to Lafayette United
19　　　Methodist Church?
20　A.　Yes.
21　Q.　Does Mary still go there?
22　A.　Yes.
23　Q.　What about Shirley Thomas? I'm talking about

Page 72

1　　　1995 now.
2　A.　Yeah.
3　Q.　Were you friends outside of the workplace?
4　A.　No.
5　Q.　Did you go to church with Shirley?
6　A.　No.
7　Q.　Ever become friends with Shirley?
8　A.　Yes. My family knew her husband.
9　Q.　Ever socialize with her outside the workplace?
10　A.　Not -- no. Not unless it was a work-related
11　　　function.
12　Q.　Okay. How did you come to get your job in the
13　　　police department?
14　A.　It -- there was a job opening, and I applied
15　　　for it.
16　Q.　I mean, is it a posting process?
17　A.　Yes. Yes, ma'am.
18　Q.　Did you have to take any kind of test or
19　　　anything like that?
20　A.　I'm not sure. I know that that changed over
21　　　the course of the years that you didn't have
22　　　to take a test, but I'm not sure if I did.
23　Q.　You filled out an application?

18 (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1  A. Yes.
2        (Defendants' Exhibit 9 was marked
3        for identification.)
4  Q. Let me show you what I've marked as
5     Defendants' Exhibit Number 9, and ask you if
6     you could identify that for me, please. Is
7     that your application to the police
8     department?
9        MR. JAFFREE: Can I see 8 for a
10       minute?
11       Thank you.
12 Q. Ms. Brackin, Number 9, does that appear to be
13    your application to work in the police
14    department at the city of Dothan in 1995?
15 A. Yes.
16 Q. Do you remember interviewing for this job?
17 A. I don't recall the interview. I'm sure I was,
18    but I don't recall.
19 Q. And the job you were applying for is
20    secretary?
21 A. Yes.
22 Q. And did you get this job?
23 A. Yes.

Page 74

1  Q. And did that result in any pay change for you?
2  A. I'm not sure. It may be listed on there. I'm
3     not sure.
4  Q. And you were more interested in -- I think you
5     said "stable work hours?"
6  A. Right. Right.
7  Q. So you became a secretary in the police
8     department?
9  A. Yes.
10 Q. And what department were you working in?
11 A. The records division.
12 Q. And who was your supervisor?
13 A. Well, we had different -- like immediate and
14    then we had a captain over our division.
15 Q. Who was your immediate?
16 A. Immediate? When I first got hired, at the
17    time, it was Lieutenant Jim Smith. But then
18    he got promoted to captain, but he was the
19    captain over our division.
20 Q. And is he the one that evaluated you in the
21    police department?
22 A. I don't -- I don't remember. I mean, he might
23    have. It could have been the -- a sergeant.

Page 75

1     I'm not sure.
2  Q. Do you remember what sergeant you would have
3     reported to?
4  A. I know we had a few. We had a Ron Harden. We
5     had Anthony Westbury. I know at one point
6     when Lieutenant Smith made captain, we had
7     Lieutenant Roy Woodham was the supervisor.
8  Q. Woodham?
9  A. Yes, ma'am.
10 Q. And what were your -- just generally, what
11    were your duties as a secretary in the records
12    division of the police department.
13 A. Oh, we were responsible for, of course,
14    receiving phone calls from the public, and we
15    sold accident -- incident/offense reports to
16    the public. We also were responsible for
17    keying in the arrests and incident/offense --
18    accident -- not accident reports, but other
19    types of reports into the computer. And then
20    I also assisted Tonya Anderson who was the
21    payroll clerk for the police department with
22    payroll and accounts payable.
23 Q. Did you continue to have any interaction with

Page 76

1     the magistrate's office while you worked --
2  A. Well, their office was actually inside the
3     same area that ours was for -- I'm not sure
4     for how long. And then they moved over to the
5     Civic Center.
6  Q. So let me make sure I understand this. The
7     police department is -- we're in the Civic
8     Center --
9  A. Correct.
10 Q. -- today?
11 A. Correct.
12 Q. And I may be turned around, but the police
13    department is across the street?
14 A. Yes.
15 Q. Housed in it's own building facility?
16 A. Yes.
17 Q. Is that correct?
18 A. Yes.
19 Q. And at that time the magistrate's office was
20    contained in the police department building;
21    is that correct?
22 A. Yes, it was.
23 Q. And is the actual municipal courtroom in the

19 (Pages 73 to 76)

## FREEDOM COURT REPORTING

Page 77

1  police department building?
2  A. Yes, it is.
3  Q. Was it at that time?
4  A. Yes.
5  Q. So when I asked the question, was there any
6      interaction, really, the police department and
7      the magistrate's office were right there
8      together --
9  A. Yes.
10 Q. -- in the same building?
11 A. Yes.
12 Q. How many stories is the building?
13 A. It's, I believe, two.
14 Q. Two stories.
15 A. Well, actually just the -- it's not a full two
16     story, but it's got the jail and the patrol
17     room downstairs.
18 Q. But your office and the magistrate's office
19     was upstairs?
20 A. Yes. But when you walk in the front door,
21     you're on that floor level. I know, it's kind
22     of --
23 Q. And you were -- how long did you stay in the

Page 78

1  police department?
2  A. I believe I went back into the magistrate's
3      office in April of '01.
4  Q. And I'm just asking you if you know from
5      memory, because I know you really weren't
6      working in the department, who the
7      magistrates -- did Kevin Sorrells stay over
8      there as a magistrate?
9  A. He stayed in the magistrate's office. But
10     like I said, I'm not sure how long after I
11     went to work in the police department; the
12     magistrate's office moved to the Civic Center.
13 Q. Oh, okay. You don't know when that was?
14 A. No, ma'am, I don't.
15 Q. And that's the building we're in?
16 A. Yes.
17 Q. Did the jail -- excuse me. Did the courtroom
18     stay over there at the police department?
19 A. Yes, it did.
20 Q. Did Gayle Schwarz remain as the head of the
21     magistrate's office while you were gone, to
22     your knowledge?
23 A. Yes. And then I believe someone else -- when

Page 79

1  she left, there was another one that received
2  that position.
3  Q. Do you know who that was?
4  A. Donna Nicholson.
5  Q. Did you ever work for Donna Nicholson?
6  A. Yes.
7  Q. So Donna -- when you went -- and I'll ask you
8      about that in a minute. But Donna Nicholson
9      was the head of the magistrate's office when
10     you went back to the magistrate's office; is
11     that correct?
12 A. Yes.
13 Q. Now, why is it you applied to go back to the
14     magistrate's office?
15 A. For -- I -- I kept up my certification even
16     while I was in the police department, so I
17     just enjoyed the work and wanted to be back in
18     that capacity.
19 Q. Were you ever disciplined or reprimanded,
20     either verbally or in writing, while you were
21     at the police department?
22 A. No, not to my.
23 Q. So you had your magistrate certification as of

Page 80

1  1995?
2  A. '97.
3  Q. But you went to the -- I'm getting confused.
4      You went to the police department in '95?
5  A. Yes, ma'am.
6  Q. But you're saying, while you were at the
7      police department, you --
8  A. I kept up my magistrate's --
9  Q. -- had schooling?
10 A. And I was certified in June of '97.
11 Q. And the City paid for that?
12 A. No.
13 Q. Well, you weren't in the magistrate's office
14     at the time.
15 A. Right.
16 Q. You did it on your own?
17 A. I paid for that myself. Yes, ma'am.
18 Q. And your schooling was -- I mean, did you take
19     it online, by --
20 A. No.
21 Q. -- correspondence; did you have to go
22     somewhere?
23 A. I had to go.

20  (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  Q.  Go where?
2  A.  To Tuscaloosa.
3  Q.  Tuscaloosa.  But you became officially
4     certified in '97; is that correct?
5  A.  Yes.
6  Q.  Okay.  You said Gayle left.  Mary Turner, she
7     was still over there while you were at the
8     police department?
9  A.  Yes.
10 Q.  Mary Turner was still in the magistrate's
11    office?
12 A.  Yes.
13 Q.  -- while you were at the police department?
14 A.  Uh-huh (positive response).
15 Q.  Shirley Thompson, was still there while you
16    were at the police department?
17 A.  I'm not sure because she -- she retired.  I'm
18    not sure what year Shirley retired in.
19 Q.  Did Mary Turner, in any way, try to persuade
20    you to come back to the magistrate's office?
21 A.  Not to my -- I mean, no.  I did that myself.
22 Q.  And when you came back to the magistrate's
23    office, do you know what year that was?

Page 82

1  A.  2001
2  Q.  And at that time, had there been some changes,
3     to your knowledge, in the magistrate's office?
4  A.  What do you mean, "changes?"  As far as what?
5  Q.  Well, that's what I'm asking you.
6  A.  I mean, I don't --
7  Q.  Were Doug Bates and Mike Brown still part-time
8     municipal judges?
9  A.  No.  No.
10 Q.  You mentioned one time that the magistrate's
11    division was under the city manager.  I'm just
12    asking, were you aware of any changes that had
13    taken place in either the organization of the
14    magistrate's office or what department -- was
15    its own department; did it have its own judge?
16 A.  Yes.
17 Q.  Tell me what your understanding was about
18    that?
19 A.  It was known as the Judicial Department, and
20    they had a full-time judge.
21 Q.  And that's Judge Gordon?
22 A.  Yes.
23 Q.  Who is sitting here, whom you have sued in

Page 83

1     this case; is that correct?
2  A.  Yes.
3  Q.  Did you have to make an application to go back
4     to the magistrate's office?
5  A.  Yes.
6  Q.  Was there a vacancy posted?
7  A.  There was a job posted.
8  Q.  Do you know any other people that bid on this
9     job?
10 A.  Not to my -- I'm not sure.  I know -- I think
11    that the roster was for two years.  I'm not
12    sure.  I knew that Lavera had applied for the
13    job.
14 Q.  Talking about Lavera McClain?
15 A.  Yes.  And -- what was her name?  She was in
16    the magistrate's -- or used to be in the --
17    Wendy.  I'm not sure what Wendy's last name,
18    but she was -- she had worked in the
19    magistrate's office at one time.  I'm sure if
20    she went to dispatch during this time or not.
21    But I -- I know that she applied, but I'm not
22    sure if it was this time or not.  I know that
23    she had applied for the job.

Page 84

1  Q.  Do you remember interviewing for the
2     magistrate's job when you applied to go back?
3  A.  I interviewed, but I don't recall, you know,
4     what date or anything.
5  Q.  Who did you interview with?
6  A.  I believe it was Judge Gordon.  And I'm not
7     sure if Donna was there or not.  I'm -- I'm
8     not sure.
9  Q.  Donna Nicholson?
10 A.  Yes.
11       (Defendants' Exhibit 10 was marked
12       for identification.)
13 Q.  Let me show you Defendants' Exhibit Number 10,
14    and ask if you can -- it's entitled
15    Application for City of Dothan Employment.
16    And just ask if you can identify if that was
17    your application to go back to the
18    magistrate's office.
19       (Brief pause)
20 A.  Yes.
21 Q.  This may be a good time just to take a quick
22    break.
23 A.  Please.

21  (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1    (Brief recess)
2    Q.  We're back on the Record, Ms. Brackin.  I was
3       asking you about Defendants' Exhibit 10, your
4       application to go back to the magistrate's
5       office.  And that's your signature; is that
6       correct, on the --
7    A.  Yes.
8    Q.  -- back, page 6?
9        And it's dated December 4th, 2000; is that
10      correct?
11   A.  Yes.
12   Q.  And do you know approximately when you went
13      back to the magistrate's office?
14   A.  I believe it was in April of 2001.
15   Q.  And Judge Gordon would have been the
16      individual selecting you to go back; is that
17      your understanding?
18   A.  That's my understanding.
19   Q.  Now, one of the documents you produced to me
20      today, I'm going to mark as Defendants'
21      Exhibit 11.
22       (Defendants' Exhibit 11 was marked
23        for identification.)

Page 86

1    Q.  And ask if you can -- it's a letter from
2       Captain Jim Smith to Judge Gordon.
3    A.  Yes.
4    Q.  Is that correct?
5    A.  Uh-huh (positive response).
6    Q.  And that's dated December 30th, 1999?
7    A.  Yes.
8    Q.  Can you tell me what this is?
9    A.  It's a letter of recommendation.
10   Q.  On your behalf -- I mean, recommending you for
11      the municipal court administrator?
12   A.  Yes.
13   Q.  Now, this was a year prior to your going back
14      to the magistrate's job; is that correct?
15   A.  Yes.
16   Q.  All right.  I'm looking at Defendants' Exhibit
17      11.
18       Were you seeking the job of municipal
19      court administrator?
20   A.  I think I had applied, yes.  I'm not sure.
21   Q.  And do you remember interviewing for that job?
22   A.  I don't -- I don't recall.  I mean, I -- I
23      don't remember.

Page 87

1    Q.  Do you know who got that job?
2    A.  I'm not sure if that's when Gayle had left and
3       Donna got that position.  I'm not -- I'm --
4       I'm just not sure.
5    Q.  But Donna Nicholson was the municipal court
6       administrator when you moved back over
7       there --
8    A.  Yes.
9    Q.  -- in 2001?
10   A.  Yes.
11   Q.  What made you choose to go back to the
12      magistrate's office?
13   A.  Just enjoyed being in that capacity and
14      enjoyed the work.
15   Q.  Did it result in any pay change for you?
16   A.  I believe it did.  I believe it was a pay
17      increase because it -- yeah.  It was a step up
18      as far as the classifications between a
19      secretary and a magistrate, were in different
20      classifications.
21   Q.  Higher grade or --
22   A.  Yes.
23   Q.  -- higher class?

Page 88

1        Now, when you went back to the
2       magistrate's office in 2001 -- I'm just trying
3       to understand -- at that point the
4       magistrate's office was here in the Civic
5       Center.
6    A.  Yes.
7    Q.  And things had changed from when you were
8       there before from the standpoint that there
9       was now a Judicial Department; is that
10      correct?
11   A.  Yes.
12   Q.  And Judge Gordon was head of that department;
13      is that correct?
14   A.  Correct, to my knowledge.
15   Q.  She was a full-time municipal court judge?
16   A.  Yes.
17   Q.  Judge Bates or Judge Brown, did they continue
18      in any capacity?
19   A.  At times, I think, whenever she was -- she had
20      to recuse herself, they would act -- they
21      would fill in.
22   Q.  And there was also a municipal court
23      administrator.  Was that a new function, or

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1　was that what Gayle Schwarz had been?
2　A.　That's -- that was pretty much -- the title
3　　had just changed.  But that was --
4　Q.　Do you know that or just your understanding?
5　A.　That's just my understanding.
6　Q.　You don't really know for sure --
7　A.　No.  I mean, I wouldn't --
8　Q.　-- what changes were made?
9　A.　Well, Gayle was the immediate supervisor.  And
10　　then when Donna got the job she was the
11　　immediate supervisor.  So -- but the titles
12　　were different.
13　Q.　And I'm just saying, you don't personally know
14　　if there were any changes in their duties or
15　　responsibilities?
16　A.　No.
17　Q.　When you went back over to the -- that's my
18　　phrase.  When you went back over, back to the
19　　magistrate's office, the judicial office, who
20　　were the magistrates at that time?
21　A.　Mary Turner, Sarah Fowler, Ann Baxter.
22　　Valerie Savage, and Debbie Irby, I believe.
23　Q.　What were your job duties when you went back?

Page 90

1　A.　I'm not -- I mean, I don't -- I don't remember
2　　specifically what I was doing.  I did a number
3　　of things.
4　Q.　Can you tell me what they were?
5　A.　Specifically, which function?  I mean, I -- we
6　　would all do, like, different -- I mean, we
7　　would all work the window.  We would take fine
8　　money.  We would swear, do warrants.  I mean,
9　　we all did.
10　Q.　You all did --
11　A.　We kind of.
12　Q.　-- similar duties?
13　A.　Yes.  Yes.
14　Q.　Did you rotate duties?
15　A.　Sometimes we did if we needed to help somebody
16　　if they were behind or if we needed to -- you
17　　know, if they were out, you know, we would --
18　　we would pick up what they did or --
19　Q.　Did some magistrates focus more on one duty as
20　　opposed to another?
21　A.　Yeah.  Some had specific areas that they were
22　　given responsibility over.
23　Q.　Can you give me some examples there?  Did you

Page 91

1　have responsibility --
2　A.　Well --
3　Q.　-- over a certain area?
4　A.　At the time I was actually hired I don't
5　　remember what my actual, main function was.
6　　But I know that after that, like I would
7　　have the -- at some point in time, I was
8　　responsible for all the trials.  I was
9　　responsible for the appeals, the daily
10　　deposits of the moneys.  Gosh, let's see.
11　Q.　Did y'all have like a --
12　A.　Prisoners.  That sort of thing.
13　Q.　When you say "prisoners," what do you mean?
14　A.　We do -- we do the prisoners once a week.
15　Q.　What does that mean?
16　A.　The people that were still in jail that had
17　　not made bond.  And Sarah Fowler was the main
18　　person in charge of that, but I would help her
19　　out and get the paperwork prepared.  And we
20　　would go work to do the prisoner paperwork.
21　　The judge would see the prisoners.
22　Q.　You and Sarah had not worked together before
23　　at the magistrate's office; is that correct?

Page 92

1　A.　Yeah.  Now, she was -- she was hired I believe
2　　before I left in '95.  I'm not sure.  I'm --
3　　I'm just not -- I'm not sure if she was there
4　　when I left in '95.
5　Q.　Did you have any issues with Sarah Fowler?
6　A.　No, not to my knowledge.
7　Q.　Did she ever make complaints about you?
8　A.　Not to knowledge.
9　Q.　Were y'all friends outside of the workplace?
10　A.　Uh-huh (positive response).
11　Q.　Did y'all go to church together?
12　A.　No.
13　Q.　Did she go to the Daughters of the Nile?
14　A.　No.
15　Q.　What about Ann Baxter?
16　　　MR. JAFFREE:  Again, you may think
17　　　you're very clear in terms of
18　　　what time period you're talking
19　　　about, but you haven't been.
20　　　When you asked her about Sarah,
21　　　she said she may have started
22　　　working before she left.  I
23　　　mean, that would've be in

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1       perhaps early '95. And then you
2       asked her about, ever have any
3       issues. So I don't know if
4       you're talking about '95 or back
5       in 2001 when she returned to
6       work. And the same with this
7       other magistrate you just
8       asked. I'm not sure what time
9       period you're talking about
10      unless you're talking about her
11      entire period of employment with
12      the City.
13  Q. Do you know Ann Baxter?
14  A. Yes.
15  Q. Were you went back to the magistrate's office
16     in 2001, Ann Baxter was there; is that
17     correct? You just gave me her name as being
18     there.
19  A. Yes.
20  Q. Did she have any areas that she was
21     responsible for?
22  A. I'm sure she did.
23  Q. Do you now what they were?

Page 94

1  A. No.
2  Q. Did you know Ann Baxter before that time
3     frame?
4  A. No.
5  Q. And in 2001 when you went back, did you and
6     Ann Baxter have any issues or any inability to
7     work together in the workplace?
8  A. Well, we worked together. I mean, I don't
9     know of anything that would have prevented us
10     from doing that.
11  Q. Were you ever critical of her work?
12  A. As far as to who? I mean, by telling her
13     or --
14  Q. Her or anybody about her work performance?
15  A. Not that I can recall. I mean, I don't --
16  Q. Did you have any issues with Sarah -- at that
17     time in 2001, any issues with Sarah Fowler's
18     work?
19  A. That I recall. No.
20  Q. What about Valerie Savage, any issues with her
21     work?
22  A. Not that I recall.
23  Q. Debbie Irby, any issues with her work

Page 95

1     performance?
2  A. I believe Debbie worked -- I'm not sure if
3     Debbie worked nights or not. I don't -- I
4     didn't work that close with Debbie. I
5     don't -- I don't recall anything with Debbie.
6  Q. But Mary Turner, did you have any issues with
7     her work performance?
8  A. With her work performance?
9  Q. Yes.
10  A. I don't -- I mean, I don't know all of
11     everybody's work performance as far as -- you
12     know, I mean, if people -- if they made
13     errors, I brought it to their attention. But
14     as far as their work performance, I didn't --
15     I didn't critique what their work performance
16     was.
17  Q. That was not your job, was it?
18  A. No. I mean, I --
19  Q. And you don't always know what these
20     individuals were doing on a given time period,
21     do you, as far as what work duties they were
22     doing, what work they were performing?
23  A. Well, not during the day, but we all -- we had

Page 96

1     a schedule of who was responsible for certain
2     assigned tasks. So like if I knew that I had
3     a question about an appeal, I knew that
4     Valerie at some point in time did appeals so I
5     could go ask her something, if that's what
6     you're referring to.
7  Q. But you were not their supervisor, were you?
8  A. No. No.
9  Q. Did the department have any type of computer
10     system that they worked with?
11  A. We, at the time when I went back, we were
12     still using the same system that we had in '92
13     when we started.
14  Q. What was that?
15  A. It was a program that one of the city
16     programers came up with. I mean, I don't --
17  Q. Did it have a name?
18  A. I don't know. It was -- it was a
19     special -- nobody else had it. It was our
20     special program for the municipal court.
21  Q. I'm not a technology person?
22  A. I know.
23  Q. But what did it do for the department?

24 (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1    A.  It held all the files as far as the computer
2        files of all the actions with the municipal
3        court.  I -- that's where we got our dockets
4        from and if you needed to look up cases.
5    Q.  Did that change at some point?
6    A.  Yes.
7    Q.  And when did that change?
8    A.  I'm not sure when we started to implement the
9        new computer system. I'm not sure when that
10       date was.
11   Q.  Did the new system have a name?
12   A.  It was HTE.
13   Q.  Did you have any role in --
14   A.  Yes.
15   Q.  -- that new computer system?
16           MR. JAFFREE:  Let her finish her
17           question.
18           THE WITNESS:  Oh, okay.  I'm sorry.
19   Q.  Yeah.  Did you have any role in that new
20       computer system being put into effect?
21   A.  Yes.
22   Q.  And what was your role?
23   A.  I was actually asked by Tim Stewart to -- they

Page 98

1        needed a magistrate to kind of not -- well, I
2        guess to be the one to work with, to make sure
3        that the -- everything from the old system
4        transferred to the new system as far as asking
5        questions about magistrate duties and the
6        functions of what, you know, a case had in
7        tune of the new computer system and that sort
8        of thing and working with the programmers that
9        came from Washington and --
10   Q.  Now, who is Tim Stuart?
11   A.  He is the IT department head.
12   Q.  And the programmers were from Washington,
13       D.C.?
14   A.  State of Washington.
15   Q.  Washington state.
16           And I take, a lot of information has to be
17       keyed into the computer?
18   A.  Yes.
19   Q.  And who did that?
20   A.  What information?
21   Q.  Okay.  That's what I'm trying to -- lots of
22       information, obviously?
23   A.  Yes. Yes.

Page 99

1    Q.  And different people had different
2        responsibilities in inputting information; is
3        that correct?
4    A.  Yes.
5    Q.  Did you have responsibilities to key in
6        information?
7    A.  Yes.
8    Q.  And just can you -- I'm trying to understand.
9        Tell the types of information you would've
10       keyed in.
11   A.  I would issue the subpoenas if cases were set
12       for trial.  If I was working the front window,
13       I took in fine money from people paying their
14       tickets or paying on a case that they owed
15       money on.
16   Q.  So was that more like a cashier function?
17   A.  No.  You had to be a magistrate to take --
18       because you're taking a guilty plea from a --
19       from a defendant.  You would have to actually
20       be in the magistrate capacity to take fine and
21       costs money.
22   Q.  I understand that.  But then they could
23       actually be paying -- if I got a speeding

Page 100

1        ticket, say, I could come to the magistrate
2        window --
3    A.  And if you wished to plead guilty --
4    Q.  -- and pay my fine?
5    A.  Plead guilty.
6    Q.  Well, just pay; I'm pleading guilty?
7    A.  Yes.  Yes.
8    Q.  You take my money?
9    A.  Yes.
10   Q.  I mean, that's what I'm asking.  Is there a
11       cash register there?  I mean, is there a --
12   A.  It was done on a computer, and there was a
13       receipt -- receipt printer that's attached to
14       the computer.
15   Q.  And you're keying that information in the
16       system also?
17   A.  Yes.
18   Q.  And could be making change?
19   A.  Yes.
20   Q.  And that's called the front window?
21   A.  Yes.  That's what we refer to it as.
22   Q.  Is that a place you generally worked?
23   A.  We would rotate.  We had different times that

25 (Pages 97 to 100)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1  we would rotate and work the front window.
2  **Q. I was, again, trying to get ideas of**
3  **information that's keyed in the system. It**
4  **could be anything from keying in the payment**
5  **of a fine to --**
6  A.  Well, from the -- from the initial time
7  whenever the magistrate receives the ticket,
8  that ticket is keyed in. We have a person
9  responsible for keying in the tickets, that
10  would assign them case numbers. Then we have
11  somebody also keying in cases that if they
12  were arrested on. So there was just different
13  processes that a case would take. But,
14  initially, it started off with a complaint
15  that was keyed into the computer. And then
16  the process would go from there.
17  **Q. And how long did it take for this new HTE**
18  **system to be implemented?**
19  A.  To -- actually to where we were live on that
20  system from the old system?
21  **Q. Yes.**
22  A.  Is that what you're talking about? I'm not --
23  I'm not sure. I would have to actually -- you

Page 102

1  know, we -- we would probably need to talk to
2  the IT department about that. I'm not --
3  **Q. It could've been months or weeks or --**
4  A.  I think it was months. I'm not sure how
5  many. I mean, it could've been two or three.
6  It could've been more than that. I'm just not
7  sure. I don't remember when we went live.
8  **Q. And you don't know the exact date the change**
9  **was made?**
10  A.  No.
11  **Q. Was there training done?**
12  A.  Yes.
13  **Q. And of training done?**
14  A.  Yes.
15  **Q. Did it take some time to -- strike that.**
16  **Did you have any issues with this newt HTE**
17  **system?**
18  A.  There was some -- some things that as far as
19  to where it would work better for our routine
20  with a case. We had to get them to kind of
21  tweak a few things.
22  **Q. Any problems with the system or --**
23  A.  We had some issues with some things, but they

Page 103

1  were eventually worked out.
2  **Q. You went back to the magistrate's office in**
3  **2001. On Defendants' Exhibit 11, you told me**
4  **you had expressed interest in a municipal**
5  **court administrator job.**
6  **Are there any other jobs that you sought**
7  **after 1999? Did you seek -- that's a bad**
8  **question. Strike that.**
9  **After 2001 you moved back to the**
10  **magistrate's office. Did you ever seek any**
11  **other job positions at the City of Dothan?**
12  A.  I -- not -- I don't recall. Not to my
13  knowledge. I mean, if I did, I don't
14  remember.
15  **Q. You said Donna Nicholson was there when you**
16  **went back to the magistrate's office in 2001;**
17  **is that correct?**
18  A.  Yes.
19  **Q. And there was a time that she left; is that**
20  **your understanding, that she left the**
21  **employment of the City of Dothan?**
22  A.  Yes.
23  **Q. Do you know why she left?**

Page 104

1  A.  She was terminated.
2  **Q. Do you know why, I mean?**
3  A.  From what I understand, it had something to do
4  with allowing a magistrate to take leave and
5  it was not on her -- I don't want to say time
6  card but --
7  **Q. But you don't really know, do you, why she**
8  **left? I mean, you said, it was your**
9  **understanding, but do you have personal**
10  **knowledge as to why she was terminated?**
11  A.  From what Donna told me.
12  **Q. What Donna herself told you?**
13  A.  Yes.
14  **Q. But that's all you know, is what Donna told**
15  **you?**
16  A.  Yes.
17  **Q. Did that leave a vacancy in her position as**
18  **municipal court administrator?**
19  A.  Yes.
20  **Q. Did you ever seek that job --**
21  A.  No.
22  **Q. -- again?**
23  A.  No.

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 105 |
|---|

1  Q.  And who took her place?
2  A.  Bettye King.
3  Q.  And how long – did you report to Bettye King?
4  A.  Yes.
5  Q.  And how long did you report to Bettye King?
6  A.  I don't -- I'm not sure when Bettye left. I
7      don't -- I don't remember.
8  Q.  Did --
9  A.  I don't think she was there very long.
10         (Defendants' Exhibit 12 was marked
11         for identification.)
12  Q.  Switching gears just a moment here.
13      I'm going to show you what I've marked as
14      Defendants' Exhibit Number 12. Is that your
15      signature, Ms. Brackin?
16  A.  Yes.
17  Q.  And can you tell me your understanding of what
18      that is?
19  A.  It's -- it's the Certification of
20      Understanding for the Position of Magistrate.
21  Q.  In essence, did you sign that when you applied
22      to go back to the magistrate's office?
23  A.  Yes.

| Page 106 |
|---|

1  Q.  In essence -- and I'm just trying to move
2      things along, your understanding that you knew
3      you had to get certified, or may be you were
4      certified?
5  A.  I was already certified.
6  Q.  That's what I --
7  A.  Right. Right.
8         (Defendants' Exhibit 13 was marked
9         for identification.)
10  Q.  I'll show you Defendants' Exhibit Number 13.
11  A.  Right.
12  Q.  Is that your certification?
13  A.  Yes.
14  Q.  So I just wanted to -- this is your
15      certification that you are a certified
16      municipal court clerk/magistrate?
17  A.  Yes.
18  Q.  And you obtained that in June of '97?
19  A.  Yes.
20  Q.  I think you testified to that previously. You
21      got that while you were at the police
22      department?
23  A.  Yes.

| Page 107 |
|---|

1  Q.  When you signed Defendants' Number 12, that
2      you knew you had a certain time to get
3      certified, you were actually certified?
4  A.  Yes. Yes.
5  Q.  I just wanted to clarify that.
6      Were you ever evaluated in a performance
7      evaluation by Donna Nicholson?
8  A.  Yes.
9         (Defendants' Exhibit 14 was offered
10        and admitted into evidence.)
11  Q.  I'll mark, for the Record, Defendants' Exhibit
12      14 and ask if you can identify that for me,
13      please.
14        Brief pause)
15  Q.  Is that your signature on the last page of
16      that evaluation?
17  A.  Yes.
18  Q.  And that was -- excuse me for looking over
19      here. Your evaluating supervisor is -- is
20      that Donna Nicholson's --
21  A.  Yes.
22  Q.  -- signature?
23  A.  Yes, it is.

| Page 108 |
|---|

1  Q.  And she completed that on about August 1 of
2      2001; is that correct?
3  A.  Yes.
4  Q.  And you had been in the department at that
5      time about four months?
6  A.  Yes.
7  Q.  And did you have a chance to comment on your
8      performance review?
9  A.  Yes.
10  Q.  And what did you write?
11  A.  "I concur."
12        MR. JAFFREE: You like that word.
13  Q.  When you wrote, I guess -- I mean, had --
14      Donna Nicholson had signed up at the top page
15      in July 27th, 2001?
16  A.  Right.
17  Q.  And Judge Gordon had commented -- made some
18      written comments on August 1; is that correct?
19  A.  Yes.
20  Q.  Do you know about when Donna Nicholson left?
21  A.  No, I do not remember.
22  Q.  Do you know if she evaluated you on more than
23      one occasion?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1    A. Yes.
2         (Defendants' Exhibit 15 was marked
3         for identification.)
4    Q. I'm going to show you another evaluation,
5    which I've marked as Defendants' Exhibit
6    Number 15, and ask if you can identify that
7    for me, please.
8         (Brief pause)
9    Q. Is that your evaluation, Ms. Brackin,
10   for -- that was given to you in November of
11   2001?
12   A. Yes.
13   Q. And, again, I think you testified earlier
14   because you were deemed still -- you had just
15   gone back to the magistrate's office. Is it
16   your understanding that because of that, you
17   were evaluated your first year more frequently
18   than after being in the position for a while?
19   A. Yes.
20   Q. I'm looking at number eight here. It's called
21   Dealing with the Public, and the comment is,
22   "Recently there have been complaints from
23   attorneys regarding the way they were talked

Page 110

1    to by Mary Beth." And you received a one,
2    which is unsatisfactory; is that correct?
3    A. Yes.
4    Q. Did Donna discuss that with you during this
5    evaluation?
6    A. Nothing other than what she wrote on there, to
7    my knowledge. That's -- that's all I recall.
8    I don't recall her mentioning any specific.
9    Q. Did you ask her about that?
10   A. No.
11   Q. Were you not concerned that you had received
12   an unsatisfactory in that area?
13   A. I know that that was after my first internal
14   investigation.
15   Q. Okay. And your first internal investigation
16   referring to the -- I'm calling the Ralpeje?
17   A. Yes.
18   Q. And that's R-A-L-P-E-J-E --
19   A. Yes.
20   Q. -- matter?
21   I mean, do you think that had something to
22   do with a complaint that had been received?
23   A. I think giving me the unsatisfactory, that had

Page 111

1    an influence on it.
2    Q. Are you aware of any attorneys that complained
3    about you?
4    A. No.
5    Q. Now, I'm looking on the third page of this
6    evaluation, and it's a typed page. At the
7    top, it says, "November 14th, 2001." It's
8    signed by Donna Nicholson and yourself; is
9    that correct?
10   A. Yes.
11   Q. And it says that Donna -- these have been
12   discussed with plans established for
13   improvement; is that correct?
14   A. Yes.
15   Q. One of the areas for improvement was
16   "interaction with co-workers and the public;"
17   is that correct?
18   A. Yes.
19   Q. Did Donna discuss that with you?
20   A. It -- she discussed that with me, yes.
21   Q. And to "know the limits of advising public of
22   their rights and giving them the information
23   they need to make decisions affecting their

Page 112

1    case;" is that correct?
2    A. Yes.
3    Q. And y'all discussed that?
4    A. That's what she has on there.
5    Q. Well, I mean, do you remember discussing that?
6    A. I don't remember discussing it in detail with
7    her. I know that -- I feel like because of
8    the outcome of the internal that that's --
9    that's what the reprimand was for.
10   Q. And there were recommendations for
11   improvement. And the first one is
12   "realization that tone of voice and attitude
13   are important in conveying messages?"
14   A. Yes.
15   Q. Do you remember her discussing your tone of
16   voice and your attitude?
17   A. I don't remember discussing it in detail.
18   Q. Did you ever ask her what she meant?
19   A. I don't recall if I did. I don't -- I don't
20   remember.
21   Q. And the second one was "develop the ability to
22   give defendants all necessary information
23   regarding the charges against them, the court

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1    processes, and their options without appearing
2    to make suggestions or helping to make
3    decisions for them."
4        Do you remember her discussing that with
5    you?
6    A. She didn't -- I don't remember the detail, but
7    we were -- we did go over that.
8    Q. And then I'm on the next-to-the-last page
9    where Donna has written that Mary Beth is a
10   good dependable worker who is very efficient.
11   She does need to realize that the manner in
12   which she sometimes talks to people can be
13   considered argumentive or abrasive. She needs
14   to improve in this area.
15        You saw that on the evaluation; is that
16   correct?
17   A. Yes.
18   Q. And did you question her in any way about that
19   or what she meant?
20   A. No, not -- not to my knowledge. I don't
21   recall if -- you know, if I did.
22   Q. Did you and Donna have any disagreement
23   between the two of you as to the inability to

Page 114

1    get along?
2    A. Not to my knowledge.
3    Q. And I think this is Judge Gordon's writing,
4    something to the same effect about
5    your -- "the manner in which she sometimes
6    talks to people can be considered
7    argumentative and abrasive. With the
8    exception of this area, Mary Beth will make
9    one of the best of magistrates we have.
10   Unfortunately, this job requires constant
11   interaction with co-workers, the public, and
12   other. This area is so important to what we
13   do that if Mary Beth does not improve in this
14   area, I would not be able to recommend
15   retention."
16        Do you remember writing that?
17   A. I didn't write that.
18   Q. I said, do you remember Judge Gordon writing
19   that?
20   A. I don't -- Judge Gordon did not go over this
21   with me. I don't -- I don't --
22   Q. You don't remember seeing that?
23   A. I mean, I saw that, but I don't remember her

Page 115

1    writing it.
2    Q. Okay. Her writing. Okay. And, again, I may
3    have asked you this. You had a chance to
4    offer a comment, and what did you put?
5    A. I put "concur."
6    Q. Now, you just testified that before receiving
7    this evaluation, that I think one of the
8    internal investigations had taken place?
9    A. Yes.
10   Q. And I have used the name Ralpeje. I keep
11   saying it the wrong way I think. But do you
12   recognize that name?
13   A. Yes.
14   Q. And who is Ralpeje?
15   A. She had some cases in the Municipal Court of
16   Dothan.
17   Q. And did you ever have any interaction with
18   her?
19   A. Yes.
20   Q. And do you remember whether or not she was
21   represented by counsel when she was in
22   municipal court?
23   A. When she was actually in court that day?

Page 116

1    Q. Yeah. Now, "that day." I'm like your lawyer
2    now.
3    A. I don't --
4    Q. Let's talk about when we're talking about. Do
5    you remember a time that she was in court that
6    led to an investigation regarding some
7    comments made by you?
8    A. Yes.
9    Q. Do you remember about when that was?
10   A. It was the -- the actual incident, I think,
11   happened in September of '01. The actual
12   incident was September 25th, 2001.
13   Q. And what are you referring to -- you're
14   referring to a letter that you produced to me?
15   A. Yes.
16   Q. I'm going to mark that as Defendants' Exhibit
17   Number 16.
18        (Defendants' Exhibit 16 was marked
19        for identification.)
20   Q. That's a letter that you produced to me.
21   That's to you from Judge Gordon; is that
22   correct?
23   A. Yes.

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  Q. Tell me what you remember about that day.
2     Ms. Ralpeje was in court?
3  A. I was working -- at this time, the offices had
4     moved to another location, and it was where
5     the magistrates' offices were upstairs. And
6     our window that was opened to the public was
7     downstairs.
8        And on that particular day, I was working
9     downstairs at the window. And she, along with
10    a bondsman and her mother came in, and the
11    bondsman was on his cellular phone.
12 Q. The bondsman's name was Mr. Turner; is that
13    correct?
14 A. Yes.
15 Q. What bonding company was he with?
16 A. I'm not sure. I don't remember.
17       He was on the phone with his -- or was on
18    his cellular phone during our conversation --
19    my conversation with the defendant. And her
20    mother was sitting down in one of our chairs
21    in the lobby.
22 Q. And the defendant being?
23 A. The defendant stated that she had just come --

Page 118

1  Q. The defendant is Ms. Ralpeje?
2  A. Yes.
3        She stated that she had just come from
4     court and she was not satisfied with her
5     public defender and how he represented her.
6     And I advised her that she needed to go back
7     to the courtroom and talk to the judge and ask
8     the judge if she can get other counsel, that
9     we have two other public defenders.
10 Q. And you knew the public defender, didn't you?
11 A. No, I -- we don't -- all we have in the
12    computer is public defender. We don't know.
13    It could be any one of the three that's over
14    there.
15 Q. It's your testimony you didn't know who her
16    public defender was?
17 A. At the -- at the time she was speaking to me?
18 Q. Yes.
19 A. I don't if I -- if I knew his actual name or
20    not.
21 Q. Do you know Shaun McGhee?
22 A. Yes.
23 Q. And you knew that Shaun McGhee was her lawyer

Page 119

1     at that time, didn't you?
2  A. I don't recall if I knew for sure it was him
3     or if it was another public defender.
4        MR. JAFFREE: Excuse me. Is this
5        cross, or are you asking her
6        questions?
7        MS. NELSON: I'm asking her
8        questions. Yeah. It's all
9        across if you ask me.
10       MR. JAFFREE: Okay. Because it
11       sounds like you were
12       cross-examining her.
13       MS. NELSON: Well, I hope that's
14       what I'm doing.
15       MR. JAFFREE: But she indicated that
16       she wasn't sure who the public
17       defender was. You said you know
18       it was so-and-so.
19 Q. Well, you made negative comments about Shaun
20    McGhee to Ms. Ralpeje, didn't you?
21 A. No, I did not.
22 Q. And Mr. Turner heard those comments, didn't
23    he?

Page 120

1  A. He -- he claims he did, but I did not say
2     that. I would not say --
3  Q. Say what?
4  A. Whatever she claimed I said. I would not say
5     anything negative about a public defender. I
6     would not do that.
7  Q. And you didn't tell her that Shaun --
8     something to the effect that Shaun McGhee was
9     not a good lawyer, that he shouldn't have
10    entered a plea for her, or she should get a
11    new lawyer?
12 A. No, ma'am.
13 Q. Nothing of that nature?
14 A. I did not -- I did not speak in critical
15    regard to him.
16 Q. But you know for a fact that she made a
17    complaint or Mr. Turner reported that you had
18    made derogatory comments about Mr. McGhee?
19 A. That's what was told to me whenever I went for
20    my internal.
21 Q. How did you know that your comments were being
22    investigated?
23 A. I got a phone call. I'm not sure if it was

30 (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1   that day or the next day or what. I got a
2   phone call from Sergeant Gray that asked me
3   if -- let me look at my notes.
4   Q. So I can be with you, what are you referring
5       to here, these notes you gave me?
6   A. Yes.
7   Q. Can you show me what you are referring to?
8   A. It looks like this (indicating).
9           (Defendants' Exhibit 17 was marked
10              for identification.)
11  Q. I'm going to mark this, what you're looking at
12      as Defendants' Exhibit 17. And I've got two
13      pages?
14  A. Yeah. Front and back. Yes.
15  Q. So you're referring to some notes,
16      Ms. Brackin?
17  A. Yes.
18  Q. And when did you prepare these notes?
19  A. I prepared them after this happened.
20  Q. And what did you prepare them?
21  A. Prepare them in?
22  Q. It's a notebook?
23  A. It's paper that I had or whatever I had

Page 122

1   available at home to write on.
2   Q. So you just went home that night and wrote
3       this down?
4   A. It might have been night. It could've been
5       couple days later.
6   Q. Okay. Go ahead.
7   A. So what was the question.
8   Q. The question was, how did you -- how were you
9       advised that, you know, this incident was
10      being investigated.
11  A. Sergeant Keith Gray called me. I was working
12      in my office, and he said, I needed to come to
13      the chief's conference room for an internal
14      investigation.
15  Q. Okay. And what did you say?
16  A. I asked him what it was about.
17  Q. And what did he say?
18  A. He said, "The judge didn't talk to you about
19      it?"
20          And I said, "No, she didn't."
21          And he then said he would call me back.
22  Q. So just tell me what happened.
23  A. I was called over to the judge's office, and

Page 123

1   she told me that I was being internally
2   investigated for this incident.
3   Q. Now what incident did she tell you about?
4   A. For the alleged complaint that -- the Ralpeje
5       incident.
6   Q. Okay. Do you know who made that complaint,
7       whether it was Ralpeje --
8   A. No, I don't.
9   Q. Or Mr. Turner, the bondsman?
10  A. No, I do not.
11  Q. Or if it was all of them?
12  A. I don't know.
13  Q. But you knew it was about that incident?
14  A. Yes.
15  Q. And if you'll continue. You said the judge
16      said you were -- that incident was being
17      investigated.
18  A. Internally investigated. And then I went back
19      to my office, and Michelle Sellers brought
20      over a paper for me to sign, which is this one
21      (indicating), Exhibit 16. And I -- I would
22      report to the chief's conference room on a
23      date and time, and I told her that I was not

Page 124

1   signing just yet until I glanced over it,
2   looked over it good. And she told me that if
3   I didn't, I would be insubordinate.
4   Q. Okay. So did you go sign it?
5   A. I signed it, yes.
6   Q. Okay. I'm going to look at your sheet here.
7   A. Okay.
8   Q. Now, the front page is -- you wrote "9/25/01;"
9       is that correct?
10  A. Uh-huh (positive response).
11  Q. But the back page has got November 2001?
12  A. Right.
13  Q. Now, I thought it was your testimony that you
14      went home after and filled this out?
15  A. Well, it could've been -- it could've been
16      after. I said it could've been after that.
17      It could have a few days the later. It
18      could've been later. I don't remember when I
19      actually wrote it.
20  Q. But you wrote it after you were aware that the
21      matter was going to be investigated?
22  A. Yes. Internally investigated.
23  Q. So on this date, 9/25/01, did you know you

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1  were being investigated?
2  A. No.
3  Q. You're saying that date represents --
4  A. That's the date the incident happened.
5  Q. It's your testimony you wrote this after you
6  knew about the investigation?
7  A. The internal -- when I was going to be
8  internally investigated.
9  Q. Okay. And Number 16, which is the letter you
10  gave me, is the letter from Judge Gordon that
11  you were -- the matter was going to be
12  investigated, and you were supposed to report
13  to Sergeant Gray and Sergeant Coleman for
14  administrative interviews?
15  A. Yes.
16  Q. And you signed the bottom of it; is that
17  correct?
18  A. Yes.
19  Q. And were you interviewed?
20  A. Yes, I was.
21  Q. By whom?
22  A. Sergeant Gray and Sergeant Coleman.
23  Q. And did they ask you questions?

Page 126

1  A. Yes.
2  Q. Do you remember -- did it involve the Ralpeje
3  issue?
4  A. Yes.
5  Q. Did it involve making statements about Shaun
6  McGhee?
7  A. Yes.
8  Q. Did they, in any way, state that complaints
9  had been made about what you had said about
10  Shaun McGhee?
11  A. I don't recall all of what was said in that.
12  I asked for copies of what happened during
13  that, and I never received anything. I can
14  remember that they were questioning me and
15  pretty much trying to get me to agree with
16  what they had complained about.
17  Q. Did you ever have any discussions with Shaun
18  McGhee about the complaint that had been made
19  against you?
20  A. If I did, I don't recall. I don't recall.
21  Q. Did you ever have any discussions with
22  Mr. Turner about what he had overheard you
23  say?

Page 127

1  A. I -- if I did, I don't remember. I don't
2  remember.
3  Q. Did you ever call him at home about the
4  investigation?
5  A. I -- I don't remember. I mean, if I did, I
6  don't remember.
7  Q. Could have?
8  A. I just don't -- I don't remember. I mean, I
9  don't know -- probably know his home number.
10  If I -- you know, I don't know how I would
11  have gotten that.
12  Q. Was any action taken against you, disciplinary
13  action, as a result of this?
14  A. The only thing that I can say that I feel like
15  might have been was what my evaluation
16  resulted, in marking of my evaluation.
17  Q. And that was the evaluation that we just
18  discussed, which was Defendants' 15?
19  A. Yes.
20      (Brief pause)
21  Q. Do you know if Shaun McGhee continued to
22  represent Ms. Ralpeje --
23  A. I don't know.

Page 128

1  Q. -- after they came to your window?
2  A. I don't know.
3      (Defendants' Exhibit 18 was marked
4      for identification.)
5  Q. I'm going to show you what I marked as Defendants'
6  Exhibit 18 and ask you if you can identify
7  that, please, ma'am.
8      (Brief pause)
9  Q. Ms. Brackin, do you recognize that document?
10  A. Yes.
11  Q. It's another performance evaluation on
12  yourself; is that correct?
13  A. Yes.
14  Q. And did you sign that one?
15  A. Yes.
16  Q. It is dated February of 2002; is that correct?
17  A. That's correct.
18  Q. And you signed it; is that correct?
19  A. Yes.
20  Q. And, again, you had a change to comment on it,
21  and you used what terms?
22  A. "I concur."
23  Q. I concur?

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

| | Page 129 |
|---|---|
| 1 | Now, this one is not completed by Donna |
| 2 | Nicholson? |
| 3 | A. Yes. |
| 4 | Q. Had she left at that time? |
| 5 | A. I assume. |
| 6 | Q. Do you know, was it completed by Judge Gordon? |
| 7 | A. Yes. |
| 8 | Q. Do you remember Judge Gordon going over this |
| 9 | with you? |
| 10 | A. She -- I assume she did. |
| 11 | Q. Don't remember? |
| 12 | A. I don't recall. |
| 13 | Q. And it was a satisfactory review; is that |
| 14 | correct? |
| 15 | A. Yes. |
| 16 | Q. I'm trying to -- looks like "Mary Beth has had |
| 17 | some problems" -- anyone — "adjusting to a |
| 18 | new job?" |
| 19 | A. I don't know. I couldn't make that out. |
| 20 | MR. JAFFREE: Let me object to any |
| 21 | questions that you're going to |
| 22 | ask about that comment since |
| 23 | Ms. Brackin has said she doesn't |

| | Page 131 |
|---|---|
| 1 | her questions about that |
| 2 | notation after your conference |
| 3 | with several people to try to |
| 4 | figure out what it said. |
| 5 | MS. NELSON: Well, I can try to get |
| 6 | you a better quality. You're |
| 7 | right. If it's legible, I can |
| 8 | still ask her what she |
| 9 | remembers, even though she can't |
| 10 | read the writing. |
| 11 | MR. JAFFREE: You're asking her if |
| 12 | she remembers that statement, |
| 13 | which she said she didn't |
| 14 | understand. |
| 15 | Q. Do you remember the judge telling you that she |
| 16 | was hopeful that your attitude would continue |
| 17 | to improve as you worked on the job? |
| 18 | MR. JAFFREE: I think her testimony |
| 19 | was that she didn't remember |
| 20 | talking to the judge about that |
| 21 | evaluation. I think that was |
| 22 | her earlier testimony. |
| 23 | MS. NELSON: Well, I think she said |

| | Page 130 |
|---|---|
| 1 | understand it. And counsel is |
| 2 | asking questions I don't |
| 3 | understand. |
| 4 | MS. NELSON: Well, I'm just having a |
| 5 | hard time reading the -- it's |
| 6 | between the copy not being -- I |
| 7 | have the right to at least |
| 8 | question her once I can read |
| 9 | it. She might can remember it. |
| 10 | MR. JAFFREE: Well, she indicated |
| 11 | that she can't understand what |
| 12 | it is. |
| 13 | MS. NELSON: But if I'm able to read |
| 14 | it, she might have -- |
| 15 | MR. JAFFREE: But she may not. |
| 16 | MS. NELSON: Well, I have a right to |
| 17 | ask. Your objection is noted. |
| 18 | MR. JAFFREE: There's several people |
| 19 | reading this document, trying to |
| 20 | figure out what she said. |
| 21 | (Brief recess) |
| 22 | MR. JAFFREE: Again, just for the |
| 23 | Record, I object to you asking |

| | Page 132 |
|---|---|
| 1 | she was sure the judge reviewed |
| 2 | it with her, but she, you know, |
| 3 | didn't remember specifically. |
| 4 | Q. Is that what you said? |
| 5 | A. Yes. |
| 6 | Q. You were still in your probationary period at |
| 7 | this point, weren't you? |
| 8 | A. I'm not sure. What's the date. |
| 9 | Q. February 22, 2002? |
| 10 | A. I'm not sure if we six months or a year. I'm |
| 11 | not sure. |
| 12 | Q. If you it were a year, you were still in your |
| 13 | probationary period, weren't you? |
| 14 | A. Yes. |
| 15 | (Defendants' Exhibit 19 was offered |
| 16 | and admitted into evidence.) |
| 17 | Q. Let me show you what I've marked as |
| 18 | Defendants' Exhibit 19, which is another |
| 19 | performance evaluation. Ms. Brackin, do you |
| 20 | recognize that? Can you identify that? |
| 21 | (Brief pause) |
| 22 | Q. Is that your signature on the last page? |
| 23 | A. Yes. |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1　Q. And this is your performance evaluation for
2　　May of 2002; is that correct?
3　A. Yes.
4　Q. And at that point, you had been in the job
5　　approximately a year; is that correct?
6　A. Yes.
7　Q. Back in that job.
8　　And you received a satisfactory review; is
9　　that correct?
10　A. Yes.
11　Q. And the review was completed by Judge Gordon;
12　　is that correct?
13　A. That is her signature there, but, now, that's
14　　not her Xs on the boxes, I don't believe,
15　　because her markings are different than that.
16　　I mean, I'm just going by the way she's marked
17　　prior to. But I don't believe that's her --
18　Q. Whose Xs do you believe they are?
19　A. I don't know.
20　Q. Do you remember this being discussed with you?
21　A. I don't remember if was it. I -- I don't
22　　recall.
23　Q. And, again, I'll ask you: You had a chance to

Page 134

1　　comment and you concurred?
2　A. Yes.
3　Q. And, actually, judge said some very positive
4　　things: I'm very pleased with Mary Beth's
5　　progress is our group."
6　　　MR. JAFFREE: Is that a question, or
7　　　is a narrative?
8　　　MS. NELSON: If you'll let me ask my
9　　　question, I will.
10　　　MR. JAFFREE: Okay.
11　Q. Do you recall her stating that she was pleased
12　　with your progress?
13　A. I don't recall her stating that.
14　Q. Do you recall reading that, that you were --
15　A. I --
16　Q. Reading that?
17　A. Reading that, yes.
18　Q. Did you have any issues with Judge Gordon at
19　　this time?
20　A. What issues? What do you mean?
21　Q. Well, I'm asking you. Any disagreements with
22　　her?
23　A. There were situations where errors were being

Page 135

1　　made by the magistrates and she was not
2　　addressing.
3　Q. And what errors are you talking about?
4　A. There were errors that were made by Lavera
5　　McClain that she did not -- she did not
6　　address.
7　Q. Well, I'm try to get -- what errors?
8　A. They were just different clerical errors,
9　　computer errors, paperwork errors.
10　Q. And did you -- that she didn't address. Did
11　　she know about these errors?
12　A. What date are we talking about? What's the
13　　date of that evaluation?
14　Q. 2002.
15　A. I know that in a prior meeting, an open
16　　meeting, where the Judicial Department
17　　personnel director Kai Davis was present where
18　　Lavera was speaking to me in a loud and
19　　threatening manner. And there was only one
20　　person in between us, so there was no need for
21　　her to be that loud. And when I complained to
22　　the judge about the way that Laver had spoke
23　　to me and that I did not appreciate it,

Page 136

1　　nothing was done about my verbal complaint.
2　Q. Okay. You're reading from your notes?
3　A. Yes, ma'am.
4　Q. And you're referring to your notes. I'm going
5　　to mark your note that you produced to me as
6　　Defendants' Exhibit Number 20.
7　　　(Defendants' Exhibit 20 was marked
8　　　for identification.)
9　Q. Is that correct?
10　A. Yes.
11　Q. And what does this have to do with errors
12　　being made by --
13　A. Well, that was just an example. You were
14　　asking me about --
15　Q. I'm was asking you about errors being made.
16　　You're talking about clerical errors made by
17　　Lavera.
18　A. Well, I mean, they were numerous. I don't
19　　remember.
20　Q. Well, my question is, did you make -- how did
21　　you know about these alleged errors?
22　A. Because when you -- whenever you have things
23　　in the computer, our names were out there

34 (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1    besides whoever keyed that into the computer.
2  Q.  So this was like a keying error?
3  A.  There were -- there were data entry errors,
4    and there was also just different types
5    of -- of paperwork errors where maybe
6    something wasn't done right on the paperwork.
7  Q.  Like number not typed in correctly?
8  A.  No. I'm talking about paperwork, the actual
9    paperwork.
10  Q.  I know. But that's what I'm trying to
11    understand what you're talking about. What
12    kind of paperwork?
13  A.  Cases, case paperwork.
14  Q.  What kind of paperwork?
15  A.  On a defendant.
16  Q.  Like what?
17  A.  It would be their case action summary, the
18    warrants. It was just, you know -- I know
19    that there were -- there were several
20    different errors involving paperwork, so, I
21    mean, I can't be exact as far as which
22    particular incident. I just know that there
23    were numerous. And I know that the -- one of

Page 138

1    clerks in the office had -- had come across
2    several errors.
3  Q.  And what clerk was that?
4  A.  Cheryl Maray.
5  Q.  And what -- she's a clerk?
6  A.  Yes.
7  Q.  What kind of a clerk?
8  A.  That's just what her position was, a clerk in
9    our office. I think it's clerk typist or
10    judicial assistant. I'm -- I'm not sure.
11  Q.  And you didn't supervise Lavera?
12  A.  No.
13  Q.  When you learned about these alleged errors,
14    did you report them to someone?
15  A.  Whoever was our supervisor at the time.
16  Q.  Who was that?
17  A.  I don't know. I mean, I don't -- I don't
18    remember. I know their that there
19    were -- there were -- I know that there were
20    complaints made to Donna. And, also, even
21    after that, I knew that Bettye and Nancy had
22    complaints.
23  Q.  Bettye King would have been her supervisor?

Page 139

1  A.  Yes.
2  Q.  Do you know --
3  A.  But I'm not sure who was there at time.
4    That's what I'm saying. But I do know the
5    complaints were made them.
6  Q.  By yourself?
7  A.  Excuse me?
8  Q.  By yourself?
9  A.  Some were, yes.
10  Q.  But I'm asking -- that wasn't your own issue
11    or disagreement with Judge Gordon is that
12    Lavera was making errors and she didn't
13    address them?
14  A.  That -- which time frame are you talking
15    about?
16  Q.  Well, I was asking you about the document --
17    just in 2002.
18  A.  Just that there were -- there was
19    inconsistency within the department.
20  Q.  In what way?
21  A.  Of the -- of the disciplinary.
22  Q.  Okay. Did you ever make any errors?
23  A.  I'm sure I did, but I mean, I wasn't aware

Page 140

1    that -- they were not brought to my attention.
2  Q.  Did Mary Turner make some errors?
3  A.  I don't know. I'm sure she did.
4  Q.  Did Valarie Savage make some errors?
5  A.  I don't know. I mean, I don't know if anybody
6    else did. They -- they may have.
7  Q.  The only person that you knew made errors
8    was --
9  A.  I know Ann Baxter made some errors.
10  Q.  So you knew that Ann Baxter and Lavera McClain
11    made errors?
12  A.  At this particular date?
13  Q.  Yeah.
14  A.  I'm sure some other people did, but I don't
15    know. It depended on if I dealt with
16    something that I was -- that I was dealing
17    with. If I dealt with that paperwork and I
18    saw that there was an error, then I would know
19    if they made a mistake.
20  Q.  But the only ones you knew of that makes
21    mistakes were Lavera and Ann Baxter?
22  A.  I'm -- but like I said, I mean, I'm sure
23    others did. But I don't know if it, you

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 141 |
|---|

1    know --
2  **Q. Were others disciplined, to your knowledge,**
3    **for their errors?**
4  A. I don't know. I don't know.
5  **Q. Were you ever disciplined for errors?**
6  A. For errors?
7  **Q. Yes, for errors.**
8  A. For clerical errors?
9  **Q. Yeah.**
10 A. Not to my knowledge.
11        MR. JAFFREE: When you say "ever,"
12        are you talking about up until
13        the period of --
14        MS. NELSON: Ever.
15        MR. JAFFREE: -- of 2002?
16        MS. NELSON: Ever.
17        MR. JAFFREE: Because she was
18        terminated for an error.
19        THE WITNESS: Right.
20 A. I thought we were talking the -- during the
21    evaluation.
22 **Q. A clerical error? You were terminated for a**
23    **clerical error?**

| Page 142 |
|---|

1  A. I was -- I was terminated for making a major
2    violation within a two-year period.
3  **Q. But you were not terminated for a clerical**
4    **error, were you?**
5        MR. JAFFREE: For the data entry
6        error. Have you looked at the
7        record?
8        MS. NELSON: I know the record. I'm
9        asking her. I'll get into it.
10        MR. JAFFREE: So-called negligent
11        data entry error.
12 **Q. While we're on this meeting, Number 20, that**
13    **you've made a note about -- Defendants'**
14    **Exhibit 20, the one about an open meeting**
15    **where Kai Davis was there?**
16 A. Right.
17 **Q. Kai Davis is the personnel director; is that**
18    **correct?**
19 A. Yes.
20 **Q. And do you know why this meeting was being**
21    **held?**
22 A. I don't recall. I don't remember.
23 **Q. Did you have meetings with -- just one on one**

| Page 143 |
|---|

1    **with Kai Davis?**
2  A. Not to my -- I don't -- I don't recall if I
3    did or not. I don't think so, but I don't
4    recall.
5  **Q. Do you know if any complaints had been made**
6    **about you to Kai Davis?**
7  A. Not to my knowledge.
8        (Defendants' Exhibit 21 was marked
9        for identification.)
10 **Q. I'll show you what I've marked as Defendants'**
11    **Exhibit 21 and ask you to identify that.**
12        (Brief pause)
13 **Q. Do you recall receiving this memorandum?**
14 A. I have seen it before, yes.
15 **Q. And it's a memo issued by Judge Gordon to the**
16    **Judicial Department personnel. You were one**
17    **of those; is that correct?**
18 A. Yes.
19 **Q. And this was issued January 8th, 2003; is that**
20    **correct?**
21 A. Yes.
22 **Q. Do you remember getting one of these?**
23 A. I must have. I remember seeing it.

| Page 144 |
|---|

1  **Q. You remember seeing it?**
2  A. Yes.
3  **Q. And, of course, it's -- the subject is Public**
4    **Relations, but it was stressing the importance**
5    **of not commenting on the possibility of city**
6    **liability. Do you remember that?**
7  A. Yes.
8  **Q. And it also cited to Mr. Rubin. That was the**
9    **city manager; is that correct?**
10 A. Yes.
11 **Q. Do you remember why this came out, or was**
12    **there any kind of meeting held in conjunction**
13    **with the issuance of this memo?**
14 A. I don't recall what made that memo get issued.
15 **Q. You don't remember --**
16 A. I don't -- I don't --
17 **Q. -- any specific incident or concern to cause**
18    **this to be issued?**
19 A. I don't believe we were -- I was -- I was not
20    specifically told why it was issued.
21 **Q. Okay. And there's reference to a Ms. King.**
22    **That's Bettye King that was your supervisor at**
23    **the time?**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 145

1  A.  Yes.
2  Q.  She was the court administrator?
3  A.  Yeah, she was.
4  Q.  After Donna Nicholson?
5  A.  Yes.
6  Q.  Do you know why she left?
7  A.  I don't know. I don't know what her reason
8      for leaving was.
9  Q.  And after she left, do you know who the court
10     administrator was?
11 A.  Nancy Martin.
12 Q.  And do you know if Bettye King ever had the
13     opportunity to evaluate your performance?
14 A.  I'm -- she -- I'm sure she did, but I -- I
15     don't recall.
16         (Defendants' Exhibit 22 was marked
17         for identification.)
18 Q.  I'll show you what I've marked as Defendants'
19     Exhibit 22. Just ask if you can identify that
20     for me, please.
21         (Brief pause)
22 Q.  Do you recognize yes?
23 A.  Yes.

Page 146

1  Q.  And is that an evaluation given you by Bettye
2      King?
3  A.  Yes.
4  Q.  And you had the opportunity to comment; is
5      that correct.
6  A.  Yes.
7  Q.  And you put that --
8  A.  "I concur."
9  Q.  You concur. And that was dated April of 2003;
10     is that correct?
11 A.  Yes.
12 Q.  And this is also signed off by Judge Gordon?
13 A.  Yes.
14 Q.  To your knowledge? And I received a
15     satisfactory evaluation?
16 A.  Yes.
17 Q.  Do you have any issues or criticism of Bettye
18     King as a supervisor?
19 A.  Not -- not that I recall.
20 Q.  Did you ever -- these errors that you were
21     talking about that Lavera and Ann Baxter made,
22     and I guess you said others made, did you ever
23     bring those to the attention of Bettye King?

Page 147

1  A.  Yes.
2  Q.  Do you know what, if anything, she did when
3      you brought those to her?
4  A.  I don't -- I don't recall. I mean, I don't
5      know if she talked with the people or she
6      passed it along to the judge. I don't know.
7  Q.  There was a time in 2004 that you were
8      disciplined and suspended; is that correct?
9  A.  Yes.
10 Q.  Let me show you -- and that involves an
11     individual named Mr. Fondren; does that name
12     mean anything to you?
13 A.  Yes.
14 Q.  Did you know a Mr. Fondren?
15 A.  I -- I don't know of him personally. I know
16     that he was a defendant.
17 Q.  A defendant in your municipal court?
18 A.  Yes.
19 Q.  And do you remember having any interaction or
20     conversations with him?
21 A.  Yes.
22 Q.  And tell me what you remember.
23 A.  He came -- I was working downstairs, and he

Page 148

1      came into the office and asked to speak to
2      Mary Beth Brackin. And told him that I was
3      she. And he said that he needed some
4      information and was sent because he was
5      falsely arrested.
6  Q.  And falsely arrested for what?
7  A.  I don't recall. He just -- he just said that
8      he needed to know what to do about it, that
9      his vehicle was towed, and he wanted to know
10     what he needed to do.
11 Q.  And what did you tell him?
12 A.  I told him that he had to go to the city
13     clerk's office.
14 Q.  And was anyone present when this conversation
15     took place with Mr. Fondren?
16 A.  I understand that -- I believe Lavera was
17     working in the back at the warrant windows,
18     which is a pretty good distance from the front
19     window.
20 Q.  Anybody else present?
21 A.  I don't recall. I don't remember.
22 Q.  Did you ever tell Mr. Fondren that he had been
23     falsely arrested?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 149

1  A. No, I did not tell him he had been. I told --
2  Q. You told him what?
3  A. I told him that if he wanted to file for that,
4  he needed to go to city clerk's office and
5  that's what he needed to tell them as to the
6  reason why he was there.
7  Q. Were you aware that Mr. Fondren ever filed a
8  complaint or complained about you to the City?
9  A. I don't know.
10  MR. JAFFREE: I'm sorry. Was your
11  question never or did?
12  MS. NELSON: Ever.
13  MR. JAFFREE: Oh, I'm sorry.
14  A. I don't recall if he did.
15  Q. And were you ever advised that he had filed a
16  complaint with the City?
17  MR. JAFFREE: Against her? I'm
18  trying to -- are you saying a
19  complaint against her?
20  MS. NELSON: I just said a complaint
21  against the City.
22  MR. JAFFREE: Oh, just general
23  complaint.

## Page 150

1  A. Against the City?
2  Q. I said against the City?
3  A. Not to my knowledge. I don't know.
4  Q. Were you ever told that he informed the city
5  that you told him that he had been falsely
6  arrested and he should sue the City?
7  A. No. I don't recall saying that.
8  Q. Well, I understand. But were you ever
9  informed that he had made those statements to
10  the City about you?
11  A. I don't recall specifically what was said. I
12  do know that there was an internal
13  investigation done into that, but I don't
14  recall what all was said in there and who
15  filed for and for what reason. It was just
16  about that particular incident that happened.
17  Q. And, again, you were reprimanded; is that
18  correct?
19  A. Yes I was.
20  (Defendants' Exhibit 23 was marked
21  for identification.)
22  Q. I'm going to show you what I've marked as
23  Defendants' Exhibit Number 23.

## Page 151

1  (Brief pause)
2  Q. You were given notice of the charges against
3  you; is that correct?
4  A. Yes.
5  Q. And that's what Defendants' Number 23 is?
6  A. Yes.
7  Q. And I guess it's -- have you seen this
8  document before?
9  A. Yes.
10  Q. And I'm talking about notice of the charges.
11  It describes -- I guess the document can speak
12  for itself -- the incident regarding
13  Mr. Theron Fondren. And it points to the memo
14  that I showed you a moment ago about your
15  being directed not to comment on City
16  liability, which was Defendants' Exhibit
17  Number 21?
18  A. Yes.
19  (Defendants' Exhibit 24 was marked
20  for identification.)
21  Q. And then, ultimately, I'll show you
22  Defendants' Exhibit Number 24. That's the
23  actual discipline form regarding that

## Page 152

1  incident; is that correct?
2  A. Yes.
3  Q. And have you seen and received a copy of
4  that?
5  A. Yes.
6  (Defendants' Exhibit 25 was marked
7  for identification.)
8  Q. And then as a result thereof -- let me show you
9  Defendants' Exhibit Number 25 -- you were
10  given a ten-day suspension; is that correct?
11  A. Yes.
12  Q. Now, did you grieve this or appeal this
13  suspension in any way?
14  MR. JAFFREE: Excuse me. Unless I'm
15  wrong, there's no right to
16  grieve that --
17  MS. NELSON: I'm just asking --
18  MR. JAFFREE: -- unless you can show
19  me some document.
20  MS. NELSON: You're not being
21  deposed. I'm asking her.
22  MR. JAFFREE: Well, you may be
23  asking her something that she

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 153

1　didn't have a right to do so.
2　MS. NELSON: I'm asking her if she
3　did.
4　MR. JAFFREE: Fine.
5　A. No, I did not.
6　Q. Did you challenge this in any way?
7　A. No, I didn't.
8　Q. Question it in any way?
9　A. No.
10　Well, I questioned it in my internal. I
11　mean, I -- I stated that I did not do that.
12　Q. Your internal being?
13　A. The investigation.
14　Q. Okay. Investigation --
15　A. Prior to this.
16　Q. There was an investigation into this incident
17　regarding Mr. Fondren?
18　A. There was an internal investigation.
19　Q. And who conducted the investigation?
20　A. Sergeant Gary Coleman and Sergeant Ray Owens.
21　Q. And you're look at something there. What are
22　you looking at?
23　(Witness complied.)

## Page 154

1　Q. Is this the document you've produced to me?
2　A. Yes.
3　(Defendants' Exhibit 26 was marked
4　for identification.)
5　Q. This is Defendants' Exhibit Number 26. This
6　is a letter to you, Ms. Brackin; is that
7　correct?
8　A. Yes.
9　Q. Dated March 22, 2004?
10　A. Yes.
11　Q. From Judge Gordon, and it's notifying you of
12　an administrative investigation into a claim
13　of false arrest?
14　A. Yes.
15　Q. Brought by Theron Fondren which allegedly
16　occurred on January 1, 2004; is that correct?
17　A. Yes.
18　Q. And you were told to report to Sergeant
19　Coleman and Sergeant Owens for an
20　administrative interview, that you were
21　directed to cooperate; is that correct?
22　A. Yes.
23　Q. And so you did?

## Page 155

1　A. Yes.
2　Q. You did report?
3　A. Yes.
4　Q. Did they ask you questions?
5　A. Yes, they did.
6　Q. Did they inform you of what the investigation
7　was about?
8　A. I'm sure they did. I don't recall everything
9　that was said.
10　Q. Do you know who else might have been
11　interviewed?
12　A. No, I don't remember.
13　Q. And do you remember the type questions they
14　asked you?
15　A. They were asking me, you know, if I said this
16　and -- and why I said it and the -- the
17　circumstances surrounding it. And I,
18　basically, you know -- I did not tell him that
19　this is what you should do. I just was
20　directing him to the city clerk's office.
21　Q. Did they as you whether or not you had told
22　the man that he had been falsely arrested or
23　wrongfully arrested?

## Page 156

1　A. I'm -- they could have. I don't recall. I
2　don't recall all the questions that were
3　asked.
4　Q. That a lot of it stemmed on what --
5　A. Yes.
6　Q. -- you told him?
7　A. Yes.
8　Q. Did you tell him he had been falsely
9　arrested? I'm not saying that you said it. I
10　said the nature of the questions involved,
11　what you told him and whether or not you --
12　A. Right.
13　Q. -- told him --
14　A. Correct.
15　Q. -- he had been falsely arrested or wrongly
16　arrested. And the questions stemmed around
17　whether or not you told him --
18　A. Yes.
19　Q. -- to go sue the City or file a lawsuit
20　against the City or a claim against the city;
21　is that correct?
22　A. Yes.
23　Q. And you're saying in the investigation, you

39  (Pages 153 to 156)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 157

1     denied saying that?
2  A.  I just told him that I did not tell him, you
3     should sue the city and that what you were
4     falsely arrested. I said, this is what you
5     need to tell, as far as going to the city's
6     clerk office, this is the reason why you're
7     there, is that you were falsely arrested based
8     on his testimony, not that I said he was.
9  Q.  Do you have any reason to
10    believe that -- strike that.
11        Do you know why that investigation came
12    about?
13  A.  No, I do not.
14  Q.  Do you know if Judge Gordon had anything to do
15    with that investigation?
16  A.  I don't know. I don't -- I don't recall I --
17    if I was told.
18  Q.  Do you know if Judge Gordon had anything to do
19    with the prior internal investigation that you
20    talked about involving that Ms. Ralpeje?
21  A.  I think she did.
22  Q.  And why do you think that?
23  A.  Well, she is my department head. If there was

Page 158

1     a complaint made against me, I felt like as a
2     department head she should've handled that
3     within our department.
4  Q.  Handled it what way?
5  A.  She should have questioned me about it.
6  Q.  And not get anyone else involved?
7  A.  Well, I know the internal investigation was a
8     little bit harsh. I was treated like a
9     criminal, but I felt like that as she being my
10    department head, that she could have handled
11    the situation.
12  Q.  And why do you think you were treated like a
13    criminal?
14  A.  Well, I mean, just by the way they were
15    questioning me. It was very intimidating.
16  Q.  Do you know if any others were questioned?
17  A.  In the -- any others in that office?
18  Q.  In Ralpeje, do you know if anybody else was
19    questioned?
20  A.  I assume the others -- the people that were
21    involved in the incident were. But I -- I
22    don't for sure.
23  Q.  Do you know if the Fondren situation if any

Page 159

1     others were questioned?
2  A.  I'm sure they were, but I don't for sure. I
3     didn't never see any type of written
4     statements or any type of -- didn't get to
5     listen to any of the taped statements or
6     anything if they were. So I -- I couldn't
7     tell you for sure.
8  Q.  Do you know the role of Internal Affairs and
9     when they get involved in investigations?
10  A.  No.
11  Q.  Do you know any other people who have been
12    interviewed by Internal Affairs?
13  A.  What do you mean? In any division?
14  Q.  Yeah.
15  A.  I -- I don't know. I assume police officers.
16    I don't -- I don't know that for sure.
17  Q.  So you don't know who Internal Affairs may
18    have ever talked to or investigated?
19  A.  No. Not personal knowledge. No.
20  Q.  It's just your opinion that Judge Gordon
21    should've handled the Ralpeje issue herself?
22  A.  I felt like that she should have.
23  Q.  Now, when you were investigated — I mean,

Page 160

1     where did the interviews take place by — I'm
2     sorry. It was Sergeant Coleman and Sergeant
3     Owens?
4  A.  Second the time, yes.
5  Q.  Do you know those two men?
6  A.  Yes.
7  Q.  You probably worked with them over in the
8     police department, didn't you?
9  A.  I didn't work with them. We were -- we see
10    each other during the day. But --
11  Q.  But any agreements with them for any reason?
12  A.  Not to my knowledge, no.
13  Q.  To your knowledge, were they just doing their
14    job when they were asking questions?
15  A.  I assume they were, yes.
16        MR. JAFFREE: Let me object to the
17        question. She doesn't know
18        whether or not their job
19        involves investigating people in
20        the mayor's office or in any
21        department in the City or they
22        had a right to just interrogate
23        people in any division. I mean,

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1  she doesn't know that.
2  Do you?
3  MS. NELSON: Well, I'm just asking
4  her knowledge --
5  MR. JAFFREE: You said doing their
6  job.
7  Do you know if their job
8  consists of interrogations of
9  all over the city --
10 THE WITNESS: No.
11 MR. JAFFREE: -- regardless of
12 criminal matters.
13 MS. NELSON: It's my turn to her the
14 questions.
15 Q. Do they wear uniforms?
16 A. They -- I don't know if they do. I mean,
17 there were times I have seen them in uniform,
18 but as to the time --
19 Q. Well, you worked with the police department
20 for four years?
21 A. Right.
22 Q. Had you ever heard of Internal Affairs before?
23 A. I'm not sure when Internal Affairs started.

Page 162

1  They had not always had an Internal Affairs
2  Division.
3  Q. Was there Internal Affairs when you were
4  there?
5  A. I'm not sure. That I don't know because I
6  don't know when they started.
7  Q. So you don't know for sure.
8  Where were you -- where was the interview?
9  A. In the chief's conference room.
10 Q. And about how long did it last?
11 A. I don't know. I can't tell you how long it
12 lasted. I don't remember.
13 Q. And do you know if Sergeant Owens and/or
14 Sergeant Coleman made any recommendation to
15 the Judicial Department about what they
16 learned following the investigation into the
17 Fondren matter?
18 A. If they did, I don't recall. They didn't tell
19 me.
20 MS. NELSON: Okay. We'll take a
21 lunch break and maybe be back
22 about 1:15.
23 (Lunch recess)

Page 163

1  (Defendants' Exhibits 27, 28, 29
2  were marked for identification.)
3  MS. NELSON: I've marked for
4  identification, tax returns
5  Ms. Brackin brought.
6  Defendants' 27 is 2003 Alabama
7  return. Defendants' 28 is 2005
8  U.S. Tax Return. And
9  Defendants' Exhibit 29 is a 2006
10 U.S. Tax Return.
11 Q. And, Ms. Brackin, you're saying, you've
12 ordered your 2003 --
13 A. I'm --
14 Q. Wait a minute -- and 2004 U.S. tax returns?
15 A. Yes.
16 Q. And you'll provide those to me?
17 A. Yes, I will.
18 Q. And you did file those years?
19 A. Yes, I did.
20 Q. You'd be surprised people that don't
21 sometimes.
22 A. Well, that's one thing I do.
23 Q. Okay. I think before the break we had

Page 164

1  discussed to the Fondren matter and your
2  suspension. I think we've covered that.
3  Do you recall when Nancy Martin became
4  your supervisor?
5  A. Best of my knowledge, in the year 2004, I
6  believe.
7  Q. To your knowledge, did she have any magistrate
8  experience or court administration experience?
9  A. I knew that she had been with Legal Services
10 for a number of years, but as far as what her
11 experience was, I don't know.
12 Q. You don't know what her job was at Legal
13 Services?
14 A. No, ma'am.
15 Q. Did you, in any shape, form, or fashion, have
16 to train her as to what the magistrate duties
17 required?
18 A. She would ask me on occasion. Yes.
19 Q. Did she ever have an occasion to evaluate you?
20 A. I'm sure she did. I'm -- I'm -- I don't
21 remember.
22 Q. Again, you don't know at what point in 2004
23 she came on board?

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  A.  No, ma'am.  It could have been maybe within
2      the first quarter or first six months of
3      2004.  I'm just not -- I'm not quite sure of
4      the exact date.
5          (Defendants' Exhibit 30 was marked
6          for identification.)
7  Q.  Well, let me show you what I've marked as
8      Defendants' Exhibit Number 30, which is an
9      employee evaluation.  Is that something you
10     recognize?
11 A.  It looks an evaluation on myself.
12 Q.  Do you recognize that handwriting?
13 A.  Yes.
14 Q.  And whose is, to your knowledge?
15 A.  To my knowledge, it looks like Nancy's.
16 Q.  And I know you're flipping through it, but go
17     to the back page for me just to --
18         (Witness complied.)
19 Q.  Did you sign that, Ms. Brackin?
20 A.  Yes, I did.
21 Q.  And do you -- it's also signed by Nancy
22     Martin, I see, as your evaluating supervisor?
23 A.  Yes.

Page 166

1  Q.  And also by Judge Gordon; is that correct?
2  A.  Yes.
3  Q.  And that was in about May 17th of 2004; is
4      that correct?
5  A.  Yes.
6  Q.  And you got a chance to comment?
7  A.  Yes.
8  Q.  And you concurred; is that correct?
9  A.  Yes.
10 Q.  I'm not trying to testify for you.
11         Do you remember, now that you've seen
12     this, Nancy Martin reviewing this with you?
13 A.  I really don't recall my -- my going over
14     this.  I'm sure she did, but I don't recall
15     everything that was said.
16 Q.  Now, a couple places here you were rated
17     unsatisfactory.  Do you see that?  First page,
18     task number ten, that very last task dealing
19     with the public.  I mean, I'm just --
20 A.  Yes.
21 Q.  And it makes reference to your recent offense
22     that you were disciplined for regarding your
23     dealing with the defendant?

Page 167

1  A.  Yes.
2  Q.  And is it your understanding that that was the
3      Fondren incident that we recently just
4      discussed before the break?
5  A.  Yes.
6  Q.  To your knowledge, was Ms. Martin involved in
7      that in any way?
8  A.  She was not hired when that incident
9      occurred.  She was not employed.
10 Q.  Okay.  Now, when Ms. Martin became as your
11     supervisor, her title was court administrator;
12     am I saying that right?
13 A.  To my knowledge, yes.
14 Q.  Was she your immediate supervisor?
15 A.  Yes.
16 Q.  Do you know who hired her?
17 A.  I don't know exactly who hired her, no.
18 Q.  Did she, in turn, report to Judge Gordon?
19 A.  I'm -- to my knowledge.  I assume she was
20     since judge is our department head.
21 Q.  When she came on board, do you remember who
22     the other magistrates were in the office?
23 A.  Let's see.  Myself, Mary Turner, Ann Baxter,

Page 168

1      Lavera, Eunice, Sarah.  And we're talking
2      magistrates, right.
3  Q.  Yes.
4  A.  Valarie and Michelle Bryan.  And I believe
5      that's all of them.
6  Q.  Michelle Bryan?
7  A.  Yes, B-R-Y-A-N.
8  Q.  And do you know when Michelle was hired?
9  A.  No, I don't.
10 Q.  Do you know what her duties primarily were?
11 A.  Well, they changed because we would rotate
12     after so long.  So I'm -- we all had, you
13     know, the same duties eventually.  But I'm not
14     sure what her exact assignment was.
15 Q.  Do you know if she ever made errors in the
16     work that she did?
17 A.  Yes.
18 Q.  Now, you were telling me, physically, y'all
19     were located in the police department, and
20     then you moved here to the Civic Center.
21 A.  Yeah.
22 Q.  And then there was a time y'all moved again?
23 A.  Yes, ma'am.

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  Q.  First of all, where did you move to after the
2      Civic Center?
3  A.  There is a two-story building on the corner
4      of -- I believe it's Troy and North
5      St. Andrews. It's right between here and the
6      police department.
7  Q.  Okay.
8  A.  And we had offices on the upstairs floor, and
9      then the bottom floor, part of that, part of
10     that we had where the public would come in and
11     do their business.
12 Q.  Meaning come into the --
13 A.  Pay fines, if they wanted to take out a
14     warrant, that sort of thing.
15 Q.  Do you know how you came to get new office
16     space?
17 A.  Which location?
18 Q.  When you moved to Troy and North St. Andrews.
19     When you left the Civic Center, were you
20     needing additional office space?
21 A.  Yes.
22 Q.  Had you been trying to get additional office
23     space?

Page 170

1  A.  Yes. And they got -- the City leased that
2      space for us, and it was remodeled to better
3      fit us.
4  Q.  Do you know if Judge Gordon was instrumental
5      in obtaining new office space for the
6      department?
7  A.  I'm not -- I don't know -- I don't have any
8      knowledge of that. I don't know.
9  Q.  And do you know about when it was that the
10     magistrate's office moved?
11 A.  To that location?
12 Q.  To that location.
13 A.  No, ma'am I don't. I don't -- I know it was
14     after -- I don't remember being -- I -- I
15     started back in April of '01, and I don't
16     believe we were here at the Civic Center that
17     long before we moved over there. But I'm not
18     sure as to what date.
19 Q.  Okay. Now, do you know an individual named
20     Stephen Phelps?
21 A.  I don't know him.
22 Q.  Do you know of him?
23 A.  Of him?

Page 171

1  Q.  Yes.
2  A.  I know the name, but I don't know him.
3  Q.  How do you know that name?
4  A.  It was brought up in a hearing with the
5      Personnel Board.
6  Q.  But you're saying you never knew of that name
7      before? Strake that.
8      Well, what kind of hearing? What kind of
9      hearing before the Personnel Board?
10 A.  It was my termination hearing.
11 Q.  You're not talking about your appeals
12     hearing. When you were notified that you had
13     been terminated?
14 A.  The hearing that we had that I -- that I
15     appealed the judge's decision to the Personnel
16     Board. And there was a hearing.
17 Q.  But before you appealed the judge's decision,
18     were you ever informed that you had committed
19     any type of major offense as it pertained to
20     Stephen Phelps?
21 A.  I don't know if his name was mentioned. I
22     know that Officer Etress with the CID division
23     questioned me about a ticket that involved

Page 172

1      Mary Turner. So I don't know if that's the
2      one or not. I don't -- I don't remember if
3      the name was brought up. I'm not sure. It
4      could have been, but I'm not sure.
5  Q.  And to your knowledge, there was an
6      investigation going on as to certain activity
7      or conduct by Mary Turner; is that correct?
8  A.  When?
9  Q.  Well, you were just saying you were questioned
10     by -- I'm asking you.
11 A.  Yeah. When Officer Etress -- that's the
12     first -- that's the first I knew about it,
13     when I called over there as to what it was all
14     about because I had not know. I didn't know
15     beforehand.
16 Q.  And it's you understanding that you were
17     called over because they were investigating
18     Mary Turner?
19 A.  No. All I was told was to come over and that
20     Officer Etress needed to question me about an
21     incident and that I was to cooperate with him.
22 Q.  And Etress, is he with the police department?
23 A.  Yes.

43  (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 173

1    Q. Is he in Internal Affairs?
2    A. No, he's not.
3    Q. He's with CID?
4    A. He was not then. I don't know if he is now.
5    Q. At the time?
6    A. At the time, he was not.
7    Q. Do you remember what he was questioning you
8      about?
9    A. He was questioning me about a ticket that
10      involved Eric Duhaime and the voiding of that
11      ticket.
12    Q. Do you know who that ticket had been written
13      to?
14    A. I'm sure he might have said the name at the
15      time, but I don't remember the name that
16      was -- I mean, I do know now, but not at the
17      time that he was questioning me.
18    Q. You know now it was Stephen Phelps?
19    A. Yes.
20    Q. Do you know Stephen Phelps' brother, Bradley
21      Phelps?
22    A. I don't know him. I don't recall that name
23      and my dealings with him.

## Page 174

1    Q. To your knowledge, did Mary Turner know them?
2    A. After the fact --
3    Q. You learned?
4    A. -- I learned that she did.
5    Q. And you've also learned after the fact that
6      Mary Turner was being investigated and charged
7      with a criminal offense involving those two
8      individuals, aren't you?
9       MR. JAFFREE: Is that a question?
10   A. I'm sorry.
11       MR. JAFFREE: You asked her if she
12      also knew that Mary Turner --
13       MS. NELSON: I asked her if she
14      knows that Mary Turner
15      charged with a criminal offense
16      involving Stephen Phelps and
17      Bradley Phelps.
18   A. I know that after the fact that -- I know now
19      that she was charged, but I don't know the
20      full extent of what it was. I mean, I know
21      what the charge was, but I know that
22      that's -- I know that the grand jury changed
23      that.

## Page 175

1    Q. What was the charge?
2    A. She was arrested for the extortion, but the
3      grand jury did not find cause for extortion.
4    Q. And how do you know that?
5    A. Because she told me.
6    Q. Okay. And what did she tell you?
7    A. She told me that the grand jury didn't find
8      cause for extortion.
9    Q. And she was free to go?
10   A. No. That they had found grounds for a
11      misdemeanor.
12   Q. And when did she tell you this?
13   A. It was not -- it was after the fact that it
14      had happened. I don't remember when.
15   Q. Now, when an officer writes a traffic ticket,
16      he brings it into the magistrate's office to
17      swear in your presence or a magistrate's
18      presence; is that correct?
19   A. That's correct.
20   Q. And that's one of the duties that you do from
21      time to time?
22   A. Yes.
23   Q. And when he brings -- he/she brings in the

## Page 176

1      ticket to be sworn to, are you supposed to --
2      once the officer -- I mean, do you ask the
3      officer to raise their hand and swear to the
4      ticket?
5    A. Yes.
6    Q. And then tell me what transpires. I don't
7      deal in this court law.
8    A. We -- we go through the tickets, and we call
9      out the date and the name and the violation.
10      And we go through each one. And then I always
11      say at the end, "These occurred on the public
12      streets of Dothan within this jurisdiction."
13      Then I sign the transmittal and give his copy
14      back to him, the officer. He puts the ticks
15      on a transmittal form.
16   Q. An officer may be out working on a shift?
17   A. Right.
18   Q. And he may write more than one ticket?
19   A. Correct.
20   Q. And, so, say, he writes ten tickets on his
21      shift. And he has ten tickets that he's
22      supposed to bring to you; is that correct?
23   A. Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 177

1  Q.  And then he also brings a transmittal sheet
2      with the individual's he's given those
3      tickets; is that correct?
4  A.  Yes.
5  Q.  I'm saying he; it could be a she.
6          The officer fills out the transmittal
7      sheet?
8  A.  Yes.
9  Q.  And then comes to you or a magistrate.  And
10     does he give a package, or does he give you
11     one ticket at a time?  Or does he give you a
12     transmittal sheet and ten tickets?
13 A.  He gives -- he gives them the transmittal
14     sheet with the tickets.
15 Q.  And then tell me what the magistrate
16     is -- then asks him to swear?
17 A.  Yes.
18 Q.  Okay.  My question is, do you take each ticket
19     at a time or do you --
20 A.  Yes.
21 Q.  I'm not trying to put words in your mouth.
22 A.  No.  That's it.  You take each ticket at the
23     time, and then you sign the transmittal form.

Page 178

1      And you hope that those tickets match that
2      transmittal form.  So, a lot of times,
3      officers don't have time for you to sit
4      there.  And if you've got, let's say, a whole
5      transmittal full, which we've had before, of
6      tick, especially if they were local impact,
7      and you've got a stack of tickets, we, as
8      magistrates and the officers also, a lot of
9      times don't have time to sit there and make
10     sure that John Doe -- this ticket here is
11     listed as John Doe on this transmittal.  We
12     have faith and trust in that officer that what
13     they've given us is on this transmittal form.
14     So once they're sworn to, we give them their
15     copy of the transmittal and they're on their
16     way.
17 Q.  When do you actually sign the ticket?
18 A.  Sometimes it's after they leave.
19 Q.  But sometimes when they're there?
20 A.  It depends.  Because like I said, if we
21     don't -- because they've already got their
22     copy.  A lot of the officers did not keep
23     their -- they don't wait for the magistrate to

Page 179

1      sign to get their copy.  They've already torn
2      off their copies.  And once you sign the
3      transmittal and give them their copy, they're
4      gone.
5  Q.  To you even bother to -- I mean, I take it,
6      you've done this a long time and you're pretty
7      meticulous about what you do.  Do you -- you
8      said you might not sign every ticket right
9      there and there, but do you at least see that
10     they match up?
11 A.  Sometimes and sometimes I don't.  It just
12     depends if we're -- if we're busy.  I've sworn
13     to tickets in the middle of a courtroom
14     before.  So if you've got court going on and
15     you're busy, I don't have time to sit there
16     and match them up.
17 Q.  What happens if they don't match up?
18 A.  I've actually had that happen before.  We've
19     had it to where I go -- if -- and that's --
20     there was a basket in what we call this huge
21     room upstairs, was like where we had our files
22     kept and where a lot of paperwork -- of
23     course, the case paperwork was kept.  And

Page 180

1      there was a basket where you put incoming
2      tickets with their transmittals that need to
3      be keyed in.  The clerks were supposed to do
4      them.
5          Sometimes they didn't get to them, because
6      there was a lot of tickets written.  If we, as
7      magistrates, had time, we would grab a stack
8      and key them in.  So when you go to key in
9      your tickets and you're keying them in, when
10     you get through keying them into the computer,
11     the computer assigns it a case number.
12         So you would take that case number and
13     transfer it to that transmittal sheet beside
14     the ticket information that the officer had
15     written down.  So when you finish keying my
16     tickets and you look at your transmittal sheet
17     and you say, Oh, well, I've got one here that
18     didn't have a case number, so where is it?
19         Sometimes it could be that it was a DUI
20     arrest, and the magistrate on call may have
21     sworn to that and keyed that in already; or
22     they were coming to make a bond for somebody
23     in jail and the ticket had to be already keyed

45 (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1    and the magistrate might not have written it
2    on the transmittal.
3    Q. You try to get to the bottom of it?
4    A. Yes.
5    Q. Try to track it down?
6    A. And there have been times, when officer -- Oh,
7    that's from another ticket book; let me see if
8    I've left it in there. And I have had some do
9    that. But they say, okay, I'll bring it by to
10   you, I forgot it. So that has happened.
11   Q. Well, do you remember one of the major
12   offenses that you were charged with prior to
13   your termination involved your handling of one
14   of those transmittal forms; are you aware of
15   that?
16   A. Yes. But that's also when the Court of Civil
17   Appeals said they could not look at that when
18   it was remanded back.
19   Q. I understand what the Court -- I've read the
20   Court's case, but I'm just asking you, you
21   were charged with that offense?
22   A. Yes.
23   Q. And it was a major offense?

Page 182

1    A. Yes.
2    Q. And --
3         MR. JAFFREE: You told her that it
4         was a major offense. You mean,
5         that she was charged with a
6         major offense or in terms of the
7         law is required is considered a
8         major offense.
9    Q. Are you aware that the Personnel Department
10   has -- you said that you'd gotten the employee
11   handbook?
12   A. Yes.
13   Q. And they have a table of offenses and
14   penalties that are listed in that handbook.
15   Are you familiar with that?
16   A. Yes.
17   Q. And some of them are major and some of them
18   are minor, that sort of thing?
19   A. Yes.
20        MR. JAFFREE: There's nothing about
21        an error in the entry of a
22        ticket being a major offense.
23        MS. NELSON: You'll have your chance

Page 183

1    to question.
2         MR. JAFFREE: You're telling this
3         witness that it's a major
4         offense and get her to agree
5         with you. And that's a legal
6         conclusion.
7         MS. NELSON: You can call it a legal
8         conclusion all you want. She's
9         charged with a major offense.
10        MR. JAFFREE: Yeah. You asked her
11        that, and that's fine. But if
12        you ask her, it was a major
13        offense, she bantered and said
14        yes, it was a major offense.
15        MS. NELSON: I'll ask that you not
16        testify for her.
17        MR. JAFFREE: I just want you to be
18        clear on your questions that
19        you're asking her, was she
20        charged with a major offense or
21        was it a major offense.
22        MS. NELSON: It was a major offense,
23        and the Court ruled it's a major

Page 184

1    offense.
2         MR. JAFFREE: Well, okay. I object
3         to you asking her a legal
4         conclusion.
5         (Defendants' Exhibit 31 was marked
6         for identification.)
7    Q. I'm going to show you what's marked as
8    Defendants' Exhibit 31, which is part of the
9    employee -- personnel rules and regulations.
10   Do you recognize that?
11   A. I -- I mean -- I'm sure it's in the personnel
12   rules, but I'm not familiar with it.
13   Q. Okay. But you did receive a handbook?
14   A. Yes.
15   Q. You testified to that?
16   A. Yes.
17   Q. And what I'm show you is a chart that has a --
18   at the top, there are certain offenses that
19   are called major offenses; is that correct?
20   A. Yes.
21   Q. And it's not on here, but there are certain
22   minor offenses. Are you familiar with that?
23   A. I know that there are minor offenses, yes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 185

1  Q. And you also know that there are some
2     intolerable offenses —
3  A. Right.
4  Q. — that the first time you commit them, you
5     can be terminated?
6  A. Correct.
7  Q. And 31 is a listing — a chart of major
8     offenses?
9  A. Yes.
10        (Defendants' Exhibit 32 was marked
11         for identification.)
12  Q. I'm go to show you what I've marked as
13     Defendants' Exhibit 32.
14        (Brief pause)
15  Q. Have you seen that document?
16  A. Yes.
17  Q. It's actually —
18  A. Yes.
19  Q. — several pages of the document?
20  A. Yes.
21  Q. And this document is a Notice of Determination
22     Hearing and Possible Disciplinary Action; is
23     that correct?

Page 186

1  A. Yes.
2  Q. And it has a notice of charges against you;
3     and on the third page, one of the charges
4     against you — I'm looking at the second
5     paragraph — dealt with failing to account for
6     a uniform traffic Citation. Do you see that?
7  A. I see that.
8  Q. Do you recall being charged with that?
9  A. I'm not sure what the actual charge was stated
10     as. If that's what it — if that's what's on
11     there. I don't remember the actual charge,
12     how it was worded.
13  Q. Well, were you ever questioned about that
14     charge in relation to the handling a ticket
15     which was issued to Stephen Phelps?
16  A. Yes, I was.
17  Q. And, in fact, you had — were you questioned
18     about your handling of the transmittal form on
19     a ticket issued to Stephen Phelps?
20  A. Yes.
21  Q. And, in fact, you had struck through and
22     voided the ticket issued to Stephen Phelps on
23     that transmittal form, didn't you?

Page 187

1  A. I did not —
2     MR. JAFFREE: The question was,
3     "voided the ticket?"
4  A. That is two different things. That's a correction.
5     MR. JAFFREE: That's a correction.
6     THE WITNESS: I know.
7     (Defendants' Exhibit 34 was marked
8      for identification.)
9  Q. This was Exhibit 2 in your Personnel hearing,
10     but I'm this as Defendants' Exhibit 34. I'm
11     show you what is a transmittal form which has
12     a signature on the bottom. Is that your
13     signature, Mr. Brackin?
14  A. Yes it is.
15  Q. Now, this is a UTC transmittal form?
16  A. Yes.
17  Q. With approximately 12 tickets on it. And this
18     was given to you by Officer Eric Duhaime.
19  A. Yes, that's the name on it.
20  Q. And on this particular transmittal form, a
21     Stephen Phelps — the line that has Stephen
22     Phelps and the ticket number and the date
23     issued, it has been struck through and "void"

Page 188

1     has been written on that line. Do you see
2     that?
3  A. Yes.
4  Q. And I believe you've testified previously in
5     your appeal hearing under oath that you struck
6     that line through there; is that correct?
7  A. Yes.
8  Q. And you're telling me here today, you did
9     strike that line through the?
10  A. Based on the officer's —
11  Q. I didn't ask you why yet.
12  A. Okay.
13  Q. And you wrote the word "void" —
14  A. Yes, I did.
15  Q. — under Case Number?
16  A. Yes, I did.
17  Q. And you do not deny doing that?
18  A. No.
19  Q. Had Officer Duhaime brought you — with this
20     transmittal form, did he bring you these 12
21     tickets that are listed on this form?
22  A. I did not have that ticket. No, ma'am.
23  Q. How do you know you did not have that ticket?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  A. Because when I went to key it into the
2  computer, I did not have it because I paged
3  him and asked him why it wasn't with the
4  transmittal. And he said he voided it.
5  Q. Now, when you signed it, you had — at the
6  bottom that you signed this, were you
7  certifying that you had received all these
8  tickets, didn't you?
9  A. Yes. And I did not verify that at the time
10  the officer was there with the tickets that he
11  turned into me.
12  Q. And once this is signed by you, you're
13  certifying that you had these tickets and they
14  had been sworn to and, therefore, they will be
15  processed in the system, so to speak?
16  A. Yes.
17  Q. And so when you struck through Mr. Phelps name
18  and wrote "void" on there, didn't that have
19  the effect of voiding the ticket against
20  Mr. Phelps?
21  A. No.
22  Q. And why is that?
23  A. Because that's just a form that we keep to

Page 190

1  where we have what that officer did to put the
2  case on that. The actual ticket was voided by
3  the officer.
4  Q. And how do you know that?
5  A. Because he told me that.
6  Q. And being the thorough magistrate you are,
7  just took his word on that and you just
8  wrote —
9  A. An officer has that right to do that.
10  Q. Have you ever written void on a UTC
11  transmittal form before ever?
12  A. I don't know. I've been doing this for a
13  number of years. It's possible.
14  Q. You never have, have you?
15  A. I don't know. It's possible, because if I
16  don't have that ticket when I go to key it in
17  or if there's an item left without a case
18  number, I called that officer to find out what
19  happened.
20  Q. And if he just says it void, it's void?
21  A. I don't — I don't care if he voids it or
22  nor. That's not my duty to question him why
23  he voided it. He has a right to void a

Page 191

1  traffic ticket.
2  Q. And once he's voided it, it would never get to
3  your attention at this UTC level, would it?
4  A. He might have forgotten to strike it off there
5  whenever he was swearing to the tickets. I
6  don't know that.
7  Q. Isn't it true that Mary Turner called you up
8  and told you to void that?
9  A. No, ma'am. No, ma'am. No, ma'am, she did
10  not. In fact, if you'll look at the ticket, I
11  didn't even sign it as swearing to it.
12  Q. I thought the ticket had been voided. If it's
13  been voided, where is the ticket?
14  A. The officer has the ticket.
15  Q. And if the officer voids the ticket, what's he
16  supposed to do to it?
17  A. I don't know. I don't know what their policy
18  is on their original tickets.
19  Q. Would he not write "void" on the ticket?
20  A. I don't know. I don't — each officer is
21  different. I don't know if that's what their
22  policy and procedure is or not. I don't know.
23  Q. And did he tell you why he voided the ticket?

Page 192

1  A. No, he did not.
2  Q. Did Mary Turner ask him to void the ticket?
3  A. That I can't — I don't have any knowledge of.
4  I don't know. All I I know is that I went to
5  key that ticket -- or I went to key the
6  tickets in, and that was left without a case
7  number. And I paged that officer, and that's
8  what the officer told me he did with the
9  ticket. So I just merely stated on the
10  transmittal what the officer said happened to
11  that particular ticket.
12  Q. He didn't tell you that Mary Turner told him
13  to pull that ticket and turn them all back in?
14  A. No, he did not. I don't question officers why
15  they void something. That's not up to me to
16  do.
17  Q. So if they voided something, you'd never even
18  see it, would you?
19  A. No.
20  Q. So you saw this one, so it hadn't been voided?
21  A. No, I didn't see that one. I didn't see that
22  one.
23       MR. JAFFREE: Let me object. You're

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

|  | Page 193 |
|---|---|
| 1 | turning this into |
| 2 | cross-examination like -- |
| 3 | MS. NELSON: Well, it is |
| 4 | cross-examination. What do you |
| 5 | think I'm doing here? |
| 6 | MR. JAFFREE: It's a deposition to |
| 7 | find out information, and you |
| 8 | won't take your answer for it. |
| 9 | You keep badgering her. She's |
| 10 | telling you the same answers, |
| 11 | and you're trying to get an |
| 12 | answer that you want. |
| 13 | MS. NELSON: I'm just trying to get |
| 14 | the truth. |
| 15 | MR. JAFFREE: You're harassing the |
| 16 | witness here. |
| 17 | THE WITNESS: Ma'am, I am telling |
| 18 | the truth. I told it then, and |
| 19 | I'm telling it now. |
| 20 | (Defendants' Exhibit 35 was marked |
| 21 | for identification.) |
| 22 | Q. I want to show you what's Defendants' Exhibit |
| 23 | Number 35. This is a copy of the ticket to |

|  | Page 194 |
|---|---|
| 1 | Stephen Phelps, written by Eric Duhaime. Do |
| 2 | you "void" on there anywhere? |
| 3 | A. No, ma'am. |
| 4 | Q. Do you think that Officer Duhaime is going to |
| 5 | support your testimony, that he told you to |
| 6 | void the ticket -- that he had voided the |
| 7 | ticket? |
| 8 | A. I don't know what Officer Duhaime would tell |
| 9 | you. I believe he testified at my hearing |
| 10 | that he voided the ticket. |
| 11 | MR. JAFFREE: I think that was |
| 12 | testimony. At best, you've got |
| 13 | a fact issue here. May be left |
| 14 | to a jury to determine who is |
| 15 | telling the truth. |
| 16 | MS. NELSON: Well, according to you, |
| 17 | we cant count this anyway. |
| 18 | MR. JAFFREE: According to me or |
| 19 | according to her testimony. |
| 20 | MS. NELSON: According to you. |
| 21 | MR. JAFFREE: I'm not quite sure the |
| 22 | status of that, but I'm not -- |
| 23 | Q. You were charged with this offense? Excuse |

|  | Page 195 |
|---|---|
| 1 | me. You were charged with a major offense of |
| 2 | violating a Dothan personnel rule and |
| 3 | regulation in the handling of that ticket; is |
| 4 | that correct? |
| 5 | A. Yes. |
| 6 | Q. That you 3-42(6); is that correct? |
| 7 | A. Yes. |
| 8 | Q. And you talked several times about the |
| 9 | Appellate Court of Appeals. I think I saw |
| 10 | you've got that opinion, but I've got it |
| 11 | here. Have you read that opinion? |
| 12 | A. Yes. It's been awhile back, but I read |
| 13 | it. |
| 14 | (Defendants' Exhibit 36 was |
| 15 | marked for identification.) |
| 16 | Q. I've probably marked this one up but -- |
| 17 | MR. JAFFREE: Let me, for the |
| 18 | Record -- |
| 19 | MS. NELSON: I'm just going to |
| 20 | introduce this. |
| 21 | MR. JAFFREE: I'm going to object to |
| 22 | any questions about that Court |
| 23 | of Appeal's opinion. It's |

|  | Page 196 |
|---|---|
| 1 | not relevant. It's not even the |
| 2 | same parties to the case, and |
| 3 | it's simply legal conclusions |
| 4 | judicial record. |
| 5 | MS. NELSON: It's very relevant. |
| 6 | It's the law of the case as it |
| 7 | pertains to -- |
| 8 | MR. JAFFREE: I don't think it's the |
| 9 | law of the case in the federal |
| 10 | court. |
| 11 | MS. NELSON: Well, it as, at least, |
| 12 | as to the charges against her. |
| 13 | So I mean, I just like -- |
| 14 | Q. You have read this. This is the Appellate |
| 15 | Court's ruling on -- |
| 16 | A. Yes. |
| 17 | Q. -- on your appeal of your termination before |
| 18 | the Dothan Personnel Board up through the |
| 19 | circuit court; is that correct? |
| 20 | A. Yes. |
| 21 | Q. I may have marked on this a little bit. I |
| 22 | would sort of like to give a clean copy. |
| 23 | But were you ever questioned by -- you |

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1    mentioned Officer Etress. Were you ever
2    questioned by the Department of Internal
3    Affairs as to the handling of the Stephen
4    Phelps ticket?
5    A.  I don't think so. I mean, I don't -- I don't
6    recall that. I think it was just Officer
7    Etress that questioned me.
8    Q.  Excuse me. Were you aware that -- do you know
9    if Eric Duhaime was questioned?
10   A.  I don't know.
11   Q.  Do you know if he was disciplined in any way?
12   A.  I'm not sure. I think there was something
13   about it mentioned in my hearing, but I'm not
14   sure what it was or if he was. I don't know.
15   Q.  Were you ever questioned by Internal Affairs
16   about Mary Turner?
17   A.  About what? About the ticket?
18   Q.  About --
19   A.  About this ticket?
20   Q.  About that ticket, abut any other issues
21   regarding Mary Turner?
22   A.  I haven't -- I don't believe I was internally
23   investigated about the Stephen Phelps ticket.

Page 198

1    But when was placed on administrative leave, I
2    don't know that Sergeant Keith Gray came over
3    to our office and said that Rickey Stokes or
4    somebody like that had found out about Mary's
5    suspension and had got -- I don't know if it
6    went to the media or where it was went. But
7    he said it had to have been somebody from our
8    office. So he started questioning us
9    individually, and that if we didn't cooperate,
10   that we could -- if he thought we were lying,
11   he could give us a lie detector. And if we
12   refused, we could be guilty of
13   insubordination.
14   Q.  And who said this to you?
15   A.  Sergeant Keith Gray.
16   Q.  Within anybody else present?
17   A.  No. Just he and I.
18   Q.  At that time, Mary Turner had been suspended?
19   A.  Yes.
20   Q.  Do you know what she had been suspended for?
21   A.  The only thing that we were told, Judge Gordon
22   told us that it had something to do with a
23   traffic ticket. And the only time I knew

Page 199

1    exactly what it was whenever Officer Etress
2    interviewed or questioned me. I didn't even
3    know who was assigned to her stuff.
4    Q.  Were you ever present in court when a Brady
5    (sic) Phelps was called to court and he
6    appeared with his lawyer; and they raised the
7    question as to whether Mary Turner was
8    supposed to have taken care of his ticket?
9    A.  I don't recall.
10   Q.  You've never heard that?
11        MR. JAFFREE:  The question was, were
12        you present in court?
13   A.  I don't recall if I was present in court at
14   the time. I've worked court several times, so
15   I couldn't tell you.
16   Q.  Was that discussed with Mr. Phelps came to
17   court and he and his lawyer made that known?
18   A.  I don't have -- I don't have any recollection
19   of that. I couldn't tell you if I was working
20   court or not.
21   Q.  I didn't say working court?
22   A.  You asked me if I was present in court when
23   that happened.

Page 200

1    Q.  Besides being present in court, was it
2    discussed among the magistrates that Brady
3    Phelps and come to court and raised that in
4    open court, whether Brady or his lawyer raised
5    it in open court that Mary Turner was supposed
6    to have taken care of his ticket?
7    A.  I don't recall that. I didn't know much about
8    any of that until we started -- that stuff
9    started coming out in my hearing.
10   Q.  And you didn't know that that had anything to
11   do with the reason that Mary Turner had been
12   suspended and terminated?
13   A.  I did when Officer Etress questioned me.
14   Q.  But prior to that --
15   A.  No.
16   Q.  -- you had no knowledge --
17   A.  No, ma'am.
18   Q.  -- of the Brady Phelps issue?
19   A.  No.
20        The Bradley Phelps or Brady Phelps?
21   Q.  Bradley. Bradley Phelps?
22   A.  No, I don't -- no.
23   Q.  If I've been saying Brady, I meant Bradley.

50 (Pages 197 to 200)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660