# FREEDOM COURT REPORTING

Page 201

1     So do you have any knowledge of Bradley
2     Phelps?
3   A. Not prior to her suspension because I found
4     all of that whenever we were going through the
5     hearings and stuff.
6   Q. Do you know Ashton Ott?
7   A. Yes.
8   Q. What's your relationship with Ashton Ott?
9   A. My relationship? I don't have a relationship
10     with her.
11   Q. How do you know her?
12   A. She was our city prosecutor for a while -- for
13     a time period.
14   Q. Did you interact with her when you were a
15     magistrate?
16   A. Yes.
17   Q. And how did the two of you get along?
18   A. Sometimes, we were okay. And then there were
19     times where I think she overstepped her
20     boundaries with telling me how to do my job.
21   Q. In what way?
22   A. Well, there was instances when she told me
23     that I shouldn't have issued a warrant or, you

Page 202

1     know, how to do something and not subpoena
2     this person or not to subpoena that person if
3     a case was set for trial.
4   Q. And you disagreed with her?
5   A. Well, if a case is set to trial, I'm supposed
6     to subpoena the witnesses and make sure that
7     the victim and witnesses are in court.
8   Q. So you did disagree with her?
9   A. I disagreed with some of the things, but I
10     didn't -- not everything.
11   Q. Did you report to her in any way?
12   A. Did I report to her?
13   Q. In a supervisory role?
14   A. I don't know what you -- what you -- what do
15     you mean?
16   Q. I mean, she was not your supervisor, was she?
17   A. No. No, no, no. No.
18   Q. Do you know if she ever made a complaint about
19     you to anyone?
20   A. I don't know if she did.
21   Q. Did you ever complain to anyone about her?
22   A. I complained to a Donna about an incident that
23     happened in the court room.

Page 203

1   Q. Donna Nicholson?
2   A. Nicholson.
3   Q. Anybody else?
4   A. I don't -- not that I can recall.
5   Q. Do you know how she and Nancy Martin got
6     along?
7   A. I don't know. I don't know.
8   Q. How often were you in the courtroom on a
9     weekly basis?
10   A. I wasn't in the courtroom that much because my
11     duties were more centered around working in
12     the office than working court. I did do
13     prisoners with Sarah, but that was whenever,
14     you know, we didn't hardly have anybody in the
15     courtroom other than the prisoners. Like we
16     had a public defender and a city prosecutor
17     and, of course, the judge. But most of the
18     time --
19   Q. Ashton Ott was the city prosecutor at one
20     time?
21   A. She was one of them. She was not the only
22     one, but she was one of them.
23   Q. Who were the others?

Page 204

1   A. Kevan Kelly was one.
2   Q. The people with the city attorney's office?
3   A. Yes.
4   Q. I know I'm jumping around, but you said you
5     really wasn't in the courtroom that much.
6     Which magistrates would generally be in
7     the courtroom more than others?
8   A. It depended on if they were assigned that.
9     Like I said, we kind of swapped around duties,
10     and part of that would be working court. Of
11     course, if you -- the more you worked court,
12     the less actual job -- other job duties that
13     you had inside the office because you were in
14     court more. So you wouldn't have that much
15     time to spend on working on your other
16     assigned duties. If some did have other
17     things, there were small things. But --
18   Q. That's what I'm trying to get a handle on:
19     Who was in the courtroom more -- which
20     magistrates were in the courtroom more than
21     others?
22   A. Well, we had Valarie Salvage, Michelle Bryan,
23     Eunice, Lavera, Sarah, and myself. I didn't

51 (Pages 201 to 204)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 205

1  work court that much, but I did do -- I did do
2  some.
3  Q.  Some?
4  A.  And then the other person would be in the
5  fines court where they collected the moneys
6  from court, so it just depended.
7  Q.  But you're saying there was like a rotation
8  system that everybody would have an
9  opportunity to learn --
10  A.  I think everybody had --
11  Q.  -- work court?
12  A.  And was proficient working in the courtroom.
13  Q.  And some people, though, would rotate and work
14  these other non-courtroom duties that you're
15  talking about.
16  A.  Right.
17  Q.  Back to Mary Turner.  There was a time period
18  where she was placed on leave.  Were you aware
19  of that?
20  A.  Yes.
21  Q.  Administrative leave.  And she was ultimately
22  terminated; were you aware of that?
23  A.  Yes.

Page 206

1  Q.  And how were you aware of that?
2  A.  We all knew that she was fired, I mean, when
3  she didn't show up for work.  But she also
4  told me that she was fired.
5  Q.  And when did she tell you that?
6  A.  I'm sure it was shortly afterwards.  I'm
7  not -- I don't remember the exact date.
8  Q.  And you said, the two of you were friends,
9  went to church together; is that correct?
10  A.  Yes, we were close friends.
11  Q.  Are you still close friends?
12  A.  Yes, we are.
13  Q.  Did you ever -- I asked about testimony.  Did
14  you ever testify in any hearing that she was
15  involved in -- criminal proceeding that she
16  was involved in?
17  A.  I didn't -- I didn't testify in a criminal
18  proceeding.  I'm not -- I don't think I
19  testified in her personnel hearing.  I think I
20  was listed as a witness, but I don't think I
21  was ever called.  I don't recall that.
22  Q.  Do you anticipate her being a witness on your
23  behalf in this case -- your case?

Page 207

1  A.  No.
2  Q.  And why is that?
3  A.  I just --
4        MR. JAFFREE:  Well, she don't make
5        the decision.
6        MS. NELSON:  I'm just asking her
7        factually.
8  Q.  To your knowledge.
9        MR. JAFFREE:  You're talking about
10        legal strategy.
11  Q.  Does Mary Turner have knowledge about facts
12  that support your case?
13  A.  I don't know if she does or not.
14  Q.  Well, she's listed in your initial disclosure,
15  so I have a right to ask what you think Mary
16  Turner knows about --
17        MR. JAFFREE:  You're asking if she's
18        going to call her as a witness.
19        That's not her prerogative.
20  Q.  Well, what does Mary Turner -- what knowledge
21  does she have about the allegations in your
22  case, this case that I'm questioning you
23  about?

Page 208

1  A.  I don't know if she has any.  I don't know
2  what Mary knows about this.
3  Q.  You were telling me earlier that Officer
4  Etress came over to the magistrate's office
5  to -- maybe I'm getting two things confused.
6  You said there was someone came to the
7  magistrate's office because there was some
8  concern that some information had been
9  released about Mary Turner?
10  A.  Yes.
11  Q.  Tell me what you told --
12  A.  Sergeant Keith Gray.
13  Q.  Sergeant Gray?
14  A.  Yes.
15  Q.  And do you know how it was that Sergeant Gray
16  came to come talk to the group?
17  A.  I don't know who advised him.  No.
18  Q.  To your knowledge, did -- do you have any
19  knowledge that Judge Gordon was in any way
20  involved in that?
21  A.  Well, she was in on the -- whenever we had a
22  meeting with everybody.  She was the one
23  that -- that told us that Mary was placed on

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 209

1  leave.
2  Q. That was a different time than when Keith Gray
3     came?
4  A. Yes.
5  Q. And Judge Gordon is the department head; is
6     that correct?
7  A. Yes.
8  Q. And what did Judge Gordon say to you and to
9     the group when she made a statement about
10    Mary?
11 A. She just said that Mary was on leave and she
12    didn't know all the particulars but she did
13    know it involved something with a traffic
14    ticket.
15 Q. What else did she say?
16 A. She just said that we were not supposed to go
17    in her office, and she assigned me Mary job
18    duties, to do the AWs. And she said, we were
19    not to have any contact with Mary Turner.
20         MR. JAFFREE: Can we go off the
21         Record?
22         (Brief recess)
23 Q. You were instructed not to have any contact

Page 210

1     with Mary Turner; is that correct?
2  A. That's correct.
3  Q. And all the magistrates were present?
4  A. Yes.
5  Q. Did anybody ask any questions, what does this
6     mean?
7  A. I don't -- I don't remember if they did. They
8     might have, but I don't -- I don't know who it
9     was or what the question would have been.
10 Q. And do you remember when that meeting was?
11 A. No. I don't -- I don't remember the date.
12 Q. Did you have any conversations with Mary
13    Turner?
14 A. Yes.
15 Q. And how many conversations did you have with
16    her?
17 A. I conversated with her at church. I was given
18    her assigned duties. And one particular duty
19    that she had was doing the show-cause
20    hearings. And I needed the form that she used
21    because there was quite a few that needed to
22    be done.
23         And I asked Michelle Sellers if she could

Page 211

1     get that for me, that it was on her desktop on
2     her computer. And she said, no, that we
3     couldn't go in her office.
4         And I said, well, can you get IT to
5     retrieve it and send it to me on my computer.
6         And she said, no.
7         And I said, well, I need that form.
8         And she said, well, you'll just have to
9     find a case that has it.
10        And I explained to her, that's very
11    difficult to do. It's kind of like finding a
12    needle in a haystack. You'd have to go
13    through every single case.
14 Q. And what form were you looking for?
15 A. It's a show-cause letter, the form that we for
16    the show-cause hearings.
17 Q. And so you picked up the phone and called?
18 A. So I called her and I asked her.
19        And she said that that was something that
20    Bettye King had made up when she was there,
21    and the only -- the original was on her
22    desktop on her PC.
23        And I said, okay, thank you. And that was

Page 212

1     that.
2  Q. And did you ever go to the judge and ask her
3     about whether it would be okay for you to call
4     Mary Turner?
5  A. No, I didn't.
6  Q. Mary Turner -- excuse me -- Judge Gordon said
7     nothing about calling Mary Turner if you
8     needed her help on how to process something,
9     did she?
10 A. No.
11 Q. She said, Do not talk to Mary Turner, period?
12 A. Well, I don't -- I don't think Judge Gordon
13    could say whenever I could or could not talk
14    to her when I was not on duty. So, you know,
15    I mean, I have Sunday School with this woman,
16    and I see her. We associate together. And
17    I -- you know, I spoke to her at church.
18 Q. And how many times did you speak to her at
19    church while she was suspended?
20 A. I don't know. I don't know. It -- you know,
21    we were there on Sunday and Wednesday. So
22    I -- I couldn't tell you.
23 Q. Does she go every Sunday and Wednesday?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 213

1  A.  She tries to.
2  Q.  Do you go every Sunday and Wednesday?
3  A.  I try to unless I'm sick or out of town.
4  Q.  And you earlier testified, you knew she was
5      terminated because she told you; is that
6      correct?
7  A.  Yes.
8  Q.  Did you talk to her about the reason she was
9      terminated?
10 A.  I'm sure we talked about it, but I don't
11     remember if she went into a lot of detail.  I
12     don't know.
13 Q.  And to your knowledge, did anyone else call
14     Mary Turner up and ask her about forms or how
15     to process something?
16 A.  Not to my knowledge.
17 Q.  I think you later said that subsequently --
18     Let me this:  Did you ever get your
19     show-cause letter?
20 A.  No.
21 Q.  Did you find the form?
22 A.  No.
23 Q.  Do you know Bettye King?

### Page 214

1  A.  She was not there anymore.
2  Q.  I know.  But do you know how you could reach
3      her?
4  A.  I didn't know --
5  Q.  Did you ask Michelle?
6  A.  I asked -- I didn't ask Michelle how to reach
7      Bettye King.  Michelle didn't offer to call
8      Bettye King.
9  Q.  Did you ask the judge?
10 A.  No.
11 Q.  Did you ask the judge about the show-cause
12     letter?
13 A.  No.
14 Q.  You were earlier testifying that Sergeant Gray
15     came to the magistrate's office to inquire
16     about who had released some information about
17     Mary Turner?
18 A.  Yes.
19 Q.  That's my terms.
20     Did he talk to the group as a whole?
21 A.  I think he did.  I'm not -- I'm not positive
22     on that.  I kind of -- I -- if I remember
23     correctly, he did.  But I do know that he

### Page 215

1      talked to each one of us individually or was
2      supposed to.  I know he talked to me.
3  Q.  To your knowledge, did he talk to others?
4  A.  I know that he talked to Sarah Fowler.
5  Q.  And how do you know that?
6  A.  Because I saw her going in there.
7  Q.  Do you know of anybody else he talked to?
8  A.  Not a personal knowledge, no.
9  Q.  But you had reason to believe he talked --
10 A.  I had reason to believe he talked to
11     everybody.
12 Q.  And what's your understanding of what he was
13     looking into?
14 A.  He was trying to find out who told the
15     information about Mary's investigation to the
16     public or to this -- I don't know if it was
17     Rickey Stokes or some other person.  But they
18     wanted to know.  They said that that
19     information had to come from our office, and
20     he was going to figure out which one of us did
21     it.
22 Q.  Who was Rickey Stokes?
23 A.  He is a bondsman.

### Page 216

1  Q.  Does he do anything else?
2  A.  I don't know.
3  Q.  Do you ever listen to the radio?
4  A.  He doesn't --
5  Q.  Does he have any other kind of job?
6  A.  I don't know.  He doesn't have a radio
7      program.
8  Q.  Ever heard him on talk radio?
9  A.  I've heard him years ago on talk radio, but I
10     don't listen to that.  So I don't know.  I
11     mean, I couldn't tell you if he still does
12     that, if that's your question.  I know he did
13     years ago.
14 Q.  Does he have --
15 A.  But I don't know if he still does.
16 Q.  Excuse me.  Does he have any type of web site?
17 A.  Oh, he does.  He does have a web site.  That's
18     correct.
19 Q.  And what's his web site?
20 A.  It's Rickey Stokes News dot com.
21 Q.  Is this a job for him?
22 A.  I don't know.  I don't know if he -- I don't
23     know if it's anybody elses, and he just does

54  (Pages 213 to 216)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 217

1    it for them. I don't know.
2    Q. And he's a bondsman; is that what you said?
3    A. Yes.
4    Q. What's the name of his bonding company?
5    A. I think it's A-Advantage bonding.
6    Q. Did you know him as a bondsman?
7    A. Yes.
8    Q. Has he still got this bonding company?
9    A. I assume.
10   Q. Tell me what kind of interaction you have with
11       the bonding company as a magistrate?
12   A. Oh, if there is question about a bond, if
13       they're going to make somebody's bond or how
14       much that person's bond is. If they had
15       somebody on bond and they failed to show up in
16       court, they would call to maybe get or apply
17       for a bondsman's process.
18   Q. A what process?
19   A. Bondsman's process.
20       We work with them. They'll be in the
21       courtroom to make sure their defendant show up
22       in court.
23   Q. As a magistrate, do you have any say in who a

Page 218

1    defendant selects as a bondsman if they're
2    arrested?
3    A. No. We tell them to go to the phone book, or
4       there is a listing at the jail.
5    Q. Does that occur with you or at the jail?
6    A. Well, sometimes, it's like if you've got a
7       person that is trying to get a person out of
8       jail, they'll come to our office if we're
9       opened and find out, what does it take for
10       them to get out of jail. And we'll tell them
11       what the bond is and that sort of thing, and
12       we'll tell them their options of making those
13       bonds.
14   Q. Okay. Now, to your knowledge, had -- when
15       Sergeant Gray was over there interviewing, he
16       was trying to determine who had revealed some
17       information about Mary Turner?
18   A. Correct.
19   Q. And, apparently, some information -- was the
20       information published through Rickey Stokes?
21   A. I learned after the fact that it was on his
22       web site. I know Ann Baxter had it pulled up
23       at her station, and she had asked if we had

Page 219

1    seen it.
2    Q. And was this before Sergeant Gray came in?
3    A. I don't know. I couldn't tell you. I did not
4       know that Sergeant Gray or anybody was
5       assigned to that until we had read that on
6       Rickey Stokes, and then we found -- I found
7       out what it was about whenever Officer Etress
8       questioned me. So we did not know other than
9       what Judge Gordon had told us as to why Mary
10       was placed on suspension.
11   Q. Did you release any information to the news or
12       Rickey Stokes about Mary Turner?
13   A. No, I did not.
14   Q. Do you know of anyone in the office that did?
15   A. No, I do not.
16   Q. You're saying that's what Sergeant Gray was
17       investigating?
18   A. That's what he was asking me.
19   Q. You don't know what he asked --
20   A. I don't know what he asked everybody else.
21   Q. In the course of that investigation, did he
22       ask you if you had released any information?
23   A. I don't know. He may have. It was taped. So

Page 220

1    you --
2    Q. Did he ask you if you talked to Mary Turner?
3    A. Not the first time he questioned me. I
4       believe it was the second time he questioned
5       me he asked me.
6    Q. I'm getting confused. He's questioned you how
7       many times?
8    A. Questioned me twice.
9    Q. Twice. And do you know the dates that he
10       questioned you?
11   A. I know that it was -- I believe it was the
12       next day that he questioned me the second time
13       after the first time he questioned me, but I
14       don't remember the dates -- exact dates.
15   Q. And was this done in your office or
16       magistrate's office?
17   A. It was done in the magistrate's office.
18   Q. Did you have an office?
19   A. Yes, I did.
20   Q. And he came to your office?
21   A. No. He was set up in the -- in a front room
22       that we had just used for general purposes.
23       It was not an office of anybody.

55  (Pages 217 to 220)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

1  Q.  Was anybody else present other than yourself
2      and Sergeant Gray?
3  A.  No.
4  Q.  And the first time he was over there, anybody
5      present besides yourself and Sergeant Gray?
6  A.  No.
7  Q.  To your knowledge, when he came back the
8      second time, did he talk to anybody else
9      besides yourself?
10 A.  I don't know.
11 Q.  You don't know?
12 A.  No.
13 Q.  And you're saying, you remember the second
14     time he asked you about --
15 A.  I believe that was when he asked me if I had
16     contacted Mary Turner.
17 Q.  And what did you tell him?
18 A.  I told him, yes.
19 Q.  And did you describe the circumstances that
20     you had talked to her?
21 A.  I probably it, but I don't remember exactly
22     everything that was said.
23 Q.  And do you remember when it was that you

Page 222

1      talked to Sergeant Gray the first and/or the
2      second time?
3  A.  I believe I've already told you, no, I don't.
4      I mean, I don't -- I don't remember the dates.
5  Q.  Do you know if he made any recommendation
6      about your employment or whether you had
7      violated any rule or protocol?
8  A.  He didn't tell me.
9  Q.  You don't know?
10 A.  I don't -- no.  I don't know.
11 Q.  And after that, were you charged with a major
12     offense for talking to Mary Turner when you
13     had been instructed not to?
14 A.  Yes.
15 Q.  And you were charged with insubordination; is
16     that correct?
17 A.  That's correct.
18 Q.  And I've showed you this Defendants' Exhibit
19     32 that we talked about with the Stephen
20     Phelps ticket.  Well, in addition to the
21     Stephen Phelps -- what I'm calling the Stephen
22     Phelps ticket we've just discussed, and the
23     writing through the transmittal sheet and

Page 223

1      writing "void" on there.  You were also, at
2      that same time, you were also charged with a
3      violation of Personnel Rule 3-42(14),
4      insubordination?
5  A.  That's not in addition to.  That is one of
6      two.  You had stated that first and then the
7      transmittal, and then you said, in addition to
8      this.
9  Q.  Well, I mean, I apologize.  Strike that.
10 A.  I'm sorry.
11 Q.  On the same date you were given notice of two
12     different charges against you?
13 A.  Correct.
14 Q.  Two different major offenses against you?
15 A.  Correct.
16 Q.  Maybe I said it confusingly.  One had to do
17     with the Stephen Phelps matter that we've
18     talked about?
19 A.  Correct.
20 Q.  The transmittal.  And then the second one had
21     to do with the insubordination?
22 A.  Correct.
23 Q.  And the charge was that you had willfully, by

Page 224

1      your own admission -- and I'm reading from the
2      charge now.
3  A.  Yes.
4  Q.  "That you willfully, by your own admission,
5      disobeyed a directive from your department
6      head to refrain from any contact with Mary
7      Turner during the police department
8      investigation of Mrs. Turner.  You admittedly
9      understood this directive and chose to
10     disregard it by calling Ms. Turner.  This is a
11     major offense."
12         That's what you were charged with?
13 A.  Correct.
14 Q.  Were you told by -- I'm backing up a little
15     bit.
16         When Judge Gordon met with the magistrates
17     and everybody was told to refrain from
18     contacting Mary Turner, were y'all told that a
19     police department investigation was going
20     on -- would be going on?
21 A.  I'm not sure.  I know that the judge said that
22     there was an investigation.
23 Q.  An investigation?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 225

1 A. But I don't -- I mean, she could have used
2 "police," but I don't recall the exact words.
3 (Defendant's Exhibit 33 was marked
4 for identification.)
5 Q. And I'm showing you Defendants' Exhibit 33.
6 You were placed on leave; is that contract?
7 A. Yes.
8 Q. As reflected on this document?
9 A. Yes.
10 (Defendants' Exhibit 37 was marked
11 for identification.)
12 Q. And then, Ms. Brackin, you were actually then
13 served with this Notice of Decision to
14 Terminate, which I've marked as Defendants'
15 Exhibit 37?
16 A. Yes.
17 Q. So you did receive a copy of it?
18 A. Yes.
19 Q. And you signed it; is that correct?
20 A. Yes, I did.
21 Q. And then you did file a -- you appealed your
22 termination; is that correct?
23 A. Yes, I did.

Page 226

1 Q. And we've talked a little bit about that. You
2 had a hearing before the Personnel Board, and
3 they basically upheld your termination; is
4 that correct?
5 A. Yes.
6 (Defendants' Exhibit 38 was marked
7 for identification.)
8 Q. And I'm going to show you what I've marked as
9 Defendants' Exhibit 38. Have you seen that?
10 A. Yes.
11 Q. A copy of the board's decision --
12 A. Yes.
13 Q. -- upholding termination?
14 It's dated August 19th, 2005?
15 A. Yes.
16 Q. And then you appealed again to the circuit
17 court?
18 A. Yes, I did.
19 Q. And Judge White reversed the decision?
20 A. Yes, he did.
21 Q. Did he issue an opinion or just --
22 A. Yes, he did.
23 Q. -- or a reversal?

Page 227

1 A. He issued an opinion.
2 Q. Do you have a copy of that?
3 A. I don't know if I've got that with me or not.
4 THE WITNESS: Did you bring it?
5 MR. JAFFREE: I don't have a copy of
6 it with me.
7 Q. That's okay. And the case went up to the
8 Appellate Court. It was remanded back down to
9 the Personnel Board; is that your
10 understanding?
11 A. Yes.
12 Q. And then the Personnel Board upheld your
13 termination again; is that correct?
14 A. Yes. But they had to look at different --
15 they could not look at the totality of the
16 charges. They only had to look at a certain
17 part, was my interpretation.
18 Q. For instance, they could not look at the --
19 again, I'm not trying to draw a legal
20 conclusion. I'm just trying to get your
21 understanding.
22 A totality. Do you know which part they
23 were not supposed to look at?

Page 228

1 A. Yes, I do.
2 Q. Which part was that?
3 A. They were not supposed to take into
4 consideration the transmittal situation.
5 Q. Okay. What I'm calling the Stephen Phelps
6 transmittal form?
7 A. Yes.
8 (Defendant's Exhibit 39 was marked
9 for identification.)
10 Q. I'm showing you Defendants' 39, is another
11 board decision, dated January 8th, 2007.
12 Have you seen a copy of that?
13 A. I don't know if I got a copy of that or not.
14 THE WITNESS: Did you -- you might
15 not have sent me that.
16 A. I'm sure I did. I might have. They probably
17 sent one to me and my attorney, but I'm not
18 sure. But -- but I'm aware of it.
19 Q. Now, we talked -- you've held two jobs since
20 you left the City; is that correct, the City
21 of Headland?
22 A. Yes.
23 Q. And the city of --

57 (Pages 225 to 228)

# FREEDOM COURT REPORTING

Page 229

1   A.   Newton.
2   Q.   The Town of Newton.
3      You filed a charge of discrimination with
4   the Equal Employment Opportunity Commission;
5   is that correct?
6   A.   Yes.
7      (Defendants' Exhibit 40 was marked
8      for identification.)
9   Q.   And let me show you a copy of what appears to
10   be the charges that you filed with the Equal
11   Employment Opportunity Commission. Just take
12   a minute and see if you can just identify that
13   for me if that's what that document, Exhibit
14   40, is.
15      MR. JAFFREE: Before you answer, let
16      me see.
17   Q.   Ms. Brackin, Defendants' Exhibit 40, that's
18   your Charge of Discrimination with the EEOC
19   against the City of Dothan and Judge Gordon;
20   is that correct?
21   A.   Yes.
22   Q.   And you have signed this; is that correct?
23   A.   Yes.

Page 230

1   Q.   I want to go over some of your allegations and
2   ask you some questions about.
3   A.   Okay.
4   Q.   You stated that when you returned as a
5   magistrate in April of 2001 -- excuse
6   me -- prior to your transfer to the
7   magistrate's job in 2001, that Judge Gordon
8   who is black had been appointed as municipal
9   judge. So you knew she was in the office and
10   would be your supervisor, head of department,
11   when you applied for that job; is that
12   correct?
13   A.   That's correct.
14   Q.   And you said, "After her hire" -- talking
15   about Judge Gordon -- "she started to make
16   race-based decisions. She bumped two
17   prospective black magistrates candidates over
18   white candidates that were higher than they on
19   the employment roster."
20      Is that your allegation?
21   A.   Yes.
22   Q.   Is it your contention that you were bumped off
23   the roster in any way?

Page 231

1   A.   No.
2   Q.   In fact, Judge Gordon was the person that
3   hired you; is that correct?
4   A.   That's correct.
5   Q.   Who are you referring to that you contend that
6   she bumped?
7   A.   Well, I know that Wendy Jones was one. She
8   had actually work in that office since she had
9   applied for the job. I think -- I think that
10   was Wendy's last name. I'm not sure, but I
11   know -- I think she got married, though, since
12   then. So I'm not sure what her married name
13   is.
14   Q.   Wendy Jones and who?
15   A.   I'm not sure. I don't recall --
16   Q.   And how --
17   A.   -- who the other one was. I know that there
18   were some dispatchers that applied, but I'm
19   not sure what their names were.
20   Q.   And how is it -- what facts do you have to
21   support that they were bumped?
22   A.   Just by what I was told as who made the
23   positions, that whenever I found out about the

Page 232

1   position rankings, they -- I know that Wendy
2   wasn't hired or the dispatchers weren't
3   hired. So --
4   Q.   Who told you this?
5   A.   I don't -- I don't know if they -- they that
6   told me or if is was just talk amongst who all
7   made what on the score to the list and who was
8   where because I do know there was some city
9   employees that were already working with the
10   city that applied. I think there was an
11   in-house register and an outside register.
12   Q.   And who do you contend are the two magistrates
13   that were bumped over the white candidates?
14   A.   Lavera McClain and Eunice Knight.
15   Q.   And your only knowledge of this is just people
16   talking?
17   A.   I did not see anything from Personnel.
18   Q.   You don't have any really hard facts to
19   support this?
20   A.   I don't have anything from Personnel to show
21   you.
22   Q.   You just have what Wendy told you, and you
23   don't even know the other people's names?

58   (Pages 229 to 232)

# FREEDOM COURT REPORTING

Page 233

1    A.  Well, I don't know -- I know that a couple of
2       them were dispatchers, but I don't remember
3       exactly who they were.  But I'm sure that
4       Personnel would have that roster.
5    Q.  **You go on to say, "Regardless of their**
6       **shortcomings, Respondent Gordon refuses to**
7       **discipline or supervise or allow others to**
8       **supervise these black magistrates; is that**
9       **your contention?**
10   A.  Yes, it is.
11   Q.  **Now, how do you contend that she refused to**
12      **discipline them?**
13   A.  Well, I know that I've made her known of some
14      of the mistakes, criticals errors that they
15      had made, and she didn't do anything about
16      them.
17   Q.  **Is that what you've testified to earlier?**
18      MR. JAFFREE:  Well, I'm not sure.
19          Your question was limited
20          earlier.
21   A.  I don't think you've asked me.
22   Q.  **Well, I asked you about --**
23   A.  You asked me during a specific time.

Page 234

1       MR. JAFFREE:  That's right.  You
2          limited to the time, but you
3          never went back to the question.
4    Q.  **Well, tell me what the critical errors that**
5       **you contend they made.**
6    A.  Well, I'll refer to my notes, which you have.
7          On March the 17th, 2004, I received a
8       phone call from Rickey Stokes, who is the
9       bondsman, and advised me of a defendant who we
10      had entered under the wrong information.
11   Q.  **Let me stop you and try to see what you're**
12      **looking at here.**
13   A.  That may be it right there (indicating).
14   Q.  **Do you remember any of this short of reading**
15      **what you've written down?**
16   A.  This is it right here (indicating).
17         Yeah, I can tell you without looking at
18      it.
19      MR. JAFFREE:  Are you insisting that
20          she --
21      MS. NELSON:  I'm just wondering if
22          she can remember without --
23      THE WITNESS:  Oh, yes.

Page 235

1       MS. NELSON:  -- reading it.
2       MR. JAFFREE:  Tell her as much as
3          you can without reading it, and
4          then if you need to refer to
5          your notes, go ahead.
6    A.  Rickey called me and said that he had a
7       process showing where a Michael D. McCord was
8       needed to for a warrant or that there was a
9       warrant issued, and that they were fixing to
10      go get him.  And they noticed that he was
11      employed with the nuclear plant, and they
12      started looking at the date of birth.  And he
13      said, this is the not the right Michael
14      McCord.
15         So he came to the office and tried to talk
16      to Lavera about it.  And my office is not that
17      far from the front that you can't hear if
18      people raise their voice.  And Rickey was
19      trying to talk to Lavera about the situation,
20      and she told him that she did not have time,
21      that she had other things to do and didn't
22      have time to deal with him.
23         So when he went back to his office, he

Page 236

1    called me and said he needed some help.  So I
2    looked in the computer, and I saw that,
3    clearly, she had the warrant issued up under
4    the wrong Michael McCord.  So the judge knew
5    about it.  I don't know if Rickey went over
6    there and told her.  I -- to my understanding,
7    he filed a complaint in writing.  I have not
8    seen that.  That's just based on after the
9    fact that -- of what he told me.
10      And the judge called me from the courtroom
11   and said that clerical errors will happen and
12   not to make a big deal out of it, and that I
13   needed to delete it before I left work that
14   day and to fix it.
15   Q.  **Delete what?**
16   A.  To delete the information that was issued up
17      under the wrong Michael -- under the wrong
18      person and to fix it.
19   Q.  **I mean, was there more than one Michael Moore?**
20   A.  Michael McCord.
21   Q.  **Michael McCord?**
22   A.  Yes, there was.
23   Q.  **Had both been a defendant in the system?**

59 (Pages 233 to 236)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 237

1    A.  I assume if they were in there. I don't
2        know. One of them could've been a victim. I
3        don't know.
4    Q.  Same spelling and everything as far as you
5        know?
6    A.  They had a different middle name, different
7        date of birth. The age difference was quite
8        different.
9    Q.  And, again, Rickey Stokes, his involvement
10       with this was because he --
11   A.  The posted bond.
12   Q.  -- had the bond on one of these Michael
13       McCords?
14   A.  Yes.
15   Q.  And you wrote something down that you were
16       reading from that you produced to me. When
17       did you write this down?
18   A.  I'm sure it was not long after it happened.
19   Q.  Where did you keep this kind of stuff; did you
20       just --
21   A.  I had it at home. I wrote it at home.
22   Q.  I know. But did you keep the -- where, in a
23       book or a drawer or folder or file?

Page 238

1    A.  I had a folder that I kept some stuff in along
2        with my notices from my termination and that
3        sort of thing.
4    Q.  And just for the Record, you're referring to
5        your notes and I'm going to mark the Michael
6        McCord notes as Defendants' Exhibit 42. Okay?
7    A.  Okay.
8           (Defendants' Exhibit 42 was marked
9            for identification.)
10   Q.  So did you delete it from the system?
11   A.  Yes, I did.
12          And then there was printout on the HT
13       system that prints out of deleted files, so it
14       should be on there, if they kept it.
15   Q.  And you contend some action should have been
16       taken against -- is this Lavera?
17   A.  Yes.
18   Q.  You contend some action should have been
19       taken?
20   A.  Yes.
21   Q.  And what action do you contend should have
22       been taken?
23   A.  I don't know. I mean, that's not for me to

Page 239

1        decide, but I know she -- there should've been
2        some form of action taken.
3    Q.  Was Nancy Martin involved in this in any way?
4    A.  I paged her -- she was not there -- before I
5        did that to let her know since she was my
6        immediate supervisor. And I believe she was
7        in Kai Davis's office at the time. I'm not
8        sure. And she told me that since the judge
9        advised me to do that, that I needed to do it.
10   Q.  And you say if -- do you know why Rickey
11       Stokes called you?
12   A.  Because he knew that I was very efficient and
13       I would handle it, because Lavera would not
14       help him. And it needed to be done because if
15       the man arrested, he would've lost his job.
16   Q.  Did you see him interact with Lavera?
17   A.  No. I heard them.
18   Q.  And what did you hear?
19   A.  I just heard that -- I could tell that they
20       were talking loud enough to where I could hear
21       that they were conversing. And she just -- I
22       know I heard her say, I don't have time for
23       you; I've got other things to do Rickey. And

Page 240

1        she just walked away.
2    Q.  Is Rickey in the office a lot --
3    A.  I don't know.
4    Q.  -- in the magistrate's office a lot?
5    A.  He comes in there some.
6    Q.  Does he --
7    A.  I mean, I don't know how many times he does
8        with -- I mean, we have bondsmen that come in
9        there a lot, or we did. They would check on
10       cases.
11   Q.  Did you ever ask --
12          MR. JAFFREE: Let me object to the
13          relevance of this line of
14          questions. These designed to
15          explain away the facts that she
16          said.
17          MS. NELSON: Just make your
18          objection. I can ask my
19          question.
20          MR. JAFFREE: All right.
21   Q.  Had you ever had a bondsman come to you where
22       you were busy in the middle of something else
23       and you couldn't help them?

60 (Pages 237 to 240)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 241

1  A. Not to my knowledge.
2  Q. How often would you say Rickey Stokes was in
3     the office -- the magistrate's office?
4  A. I don't know, because I don't -- I didn't work
5     the front office every day, so I couldn't tell
6     you.
7  Q. Any other errors that you contend that Lavera
8     comitted that the judge refused to discipline
9     her on?
10 A. There was an incident in January of '05.
11    Well, we got also -- I'll go in order.  There
12    was the December of '04 where Lieutenant Cliff
13    Garrett, who was over the jail at the time,
14    issued memo a memo to Captain Givens regarding
15    a juvenile that had been arrested on a alias
16    warrant that the municipal court had issued.
17 Q. I'm going to stop you one more and ask, are
18    you looking at some notes you've made?
19 A. I'm -- I'm giving the dates, and then I'm -- I
20    haven't looked at it since I got the date and
21    what it was about.
22 Q. Okay.  Go ahead.
23 A. And the judge had -- the memo sent evidently

Page 242

1     to the judge because she wrote on there for me
2     to look into it.
3        So I looked into it, and I found where
4     Lavera had issued a warrant on a 17-year-old
5     person for failure to appear.  And I then told
6     the judge of what happened.
7  Q. And what happened?
8  A. That she issued the warrant on the juvenile
9     and he was arrested.
10 Q. You're not supposed to issue a warrant on a
11    juvenile?
12 A. Not for a misdemeanor, not for a Title 13.
13    Now, we do issue for the traffic violations
14    for Title 32, 16 and 17 year olds.  But,
15    normally, we do a show-cause hearing before
16    they issue warrants.
17 Q. Okay.
18 A. But this was an actual -- it was an actual
19    city ordinance violation I believe it was.
20    But that was still a misdemeanor charge.
21 Q. Judge asked you to look into it and you did?
22 A. Yes.  And then I reported back to her.
23 Q. What did you report?

Page 243

1  A. What I just stated, that Lavera had issued the
2     warrant, and he was arrested.
3  Q. Okay.  What was he arrested for?
4  A. I guess failure to appear.  It was an alias
5     warrant.  I'm not sure if it was for -- I
6     think it was for failure to appear.  I'm not
7     sure exactly.
8  Q. Is your testimony that you felt that action
9     should have been taken against Lavera?
10 A. Yes.
11 Q. And why is that?
12 A. Because she issued a warrant on a juvenile,
13    and it shouldn't have been.
14 Q. Anything else?
15 A. In January of '05, she issued -- on Emmanuel
16    Hooks.  She issued two alias warrants for the
17    same case, and he was arrested on both of
18    them.
19        MR. JAFFREE:  When you say "she,"
20           referring to who.
21        THE WITNESS:  Emmanuel was arrested
22           on both charges.
23        MR. JAFFREE:  No.  What she are you

Page 244

1     referring to?
2  A. Lavera issues alias warrants -- two alias
3     warrants for the same case at the same time.
4     And, therefore, he was arrested for both
5     charges.  And I did a release order for one to
6     release him on one charge, and he posted a
7     bond -- I don't know if he posted the bond or
8     if he was a prisoner -- on the other.  But I
9     wrote a note to the judge, advising her of
10    what happened.  He could have been a prisoner
11    and -- I'm just not sure.  I don't remember.
12 Q. There were two charges?
13 A. No.  There was one -- she issued two alias
14    warrants for the same thing for the same case
15    at the same day, same time, everything.  She
16    duplicated the warrant, and he was arrested on
17    both.
18 Q. Could the system somehow have duplicated it,
19    duplicated the warrant?
20 A. Not without you telling it to.
21 Q. And where do you have to -- is this a --
22 A. You have to tell it to print.
23 Q. Print?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 245

1  A. Yes.
2  Q. She could've hit print twice?
3  A. She could have. But you sit there, and when
4      you issue your alias warrants, you've got your
5      warrants in one stack and you've got your
6      paperwork that you just issued them from. And
7      you have to write the alias warrant number and
8      the date on the paperwork. So if you've got
9      one case, you should have one warrant if it's
10     done properly.
11  Q. And he proceeded to be arrested --
12  A. For one charge.
13  Q. -- at least under one of them.
14      And you've made some notes on this; is
15      that correct?
16  A. Yes.
17  Q. Both on the December 1st, '04 and Emmanuel
18      Hooks you just told me about.
19          (Defendants' Exhibit 43 was marked
20          for identification.)
21  Q. I've marked that as Defendants' 43 --
22  A. Yes.
23  Q. -- that you gave me.

Page 246

1          Anything else?
2  A. I know that I was in Nancy's office. I'm not
3      sure when it was. I know that Valarie Savage
4      and Michelle Bryan has been complaining about
5      some clerical errors in the computer that they
6      had made, she and Eunice both.
7  Q. Wait. Let me make -- Valarie Savage and --
8  A. And Michelle Bryan.
9  Q. -- were complaining?
10  A. Had complained -- made complaints about Lavera
11      and Eunice's clerical errors in the computer.
12      And at first, they were fixing them, but they
13      said, it was just getting to be too many and
14      they should fix them themselves so they
15      can -- they'll know what they're doing, that
16      hopefully they won't repeat themselves.
17  Q. Now --
18  A. And I was in Nancy's office when they did
19      that.
20  Q. You just heard them complaining?
21  A. They had cases in their hand that they were
22      giving to Nancy at the time.
23  Q. And what kind of clerical errors are you

Page 247

1      talking about?
2  A. They had wrong codes key in the computer for
3      the trial type, wrong dates, that sort of
4      thing.
5  Q. And these are like keying errors?
6  A. Yes.
7  Q. Are you aware of others having some keying
8      errors?
9  A. I'm sure, but I was just present --
10  Q. You were just present at the time?
11  A. -- at that time.
12  Q. Are you aware of any other magistrates that
13      may have issued two alias warrants for the
14      same case?
15  A. I don't know. I just happened to come across
16      that. I don't -- I don't deal -- I don't go
17      around looking to see. I'm not aware of any.
18      There may have been, but I did not aware -- I
19      was not aware.
20  Q. Are you aware of any other warrants being
21      issued on a juvenile?
22  A. We do have the ones that we issue for issue
23      citations on 16 and 17 year olds, but that's

Page 248

1      rare. Like I said, we normally have a
2      show-cause hearing first.
3  Q. Are you aware of any warrants being issued for
4      something that's not a traffic citation?
5  A. Not to my knowledge, not that I've come across
6      or was asked to check into.
7  Q. This was just one became aware of?
8  A. Through the judge.
9  Q. How many cases go through that office in a
10      given year?
11  A. Oh, thousands.
12  Q. Maybe like 20, over 20,000?
13  A. Possible?
14  Q. Thirty?
15  A. I don't know. I'm not sure of the
16      figures -- any of the figures.
17      Now, I was working in the courtroom at one
18      particular time, and there was a mistake on
19      the case that the judge had in front of her.
20      And she asked me, what was wrong with it and
21      who did it.
22      And I told her, it was Eunice.
23      And she said, well, just fix it for me.

62  (Pages 245 to 248)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 249

1  So she was aware of -- I don't -- I don't
2  know what that was, but I -- I do remember
3  that.
4  Q. Was it a clerical-type mistake?
5  A. Yes.
6  Q. Any other situations you can think of?
7  A. Not right now.
8  Q. Any of these other things you've written down
9  didn't have anything to do with mistakes?
10 A. No. Oh, wait a minute. Yes, I do. I'm
11 sorry.
12 In March of '05, there was a defendant by
13 the name of Crystal Gray.
14      MR. JAFFREE: Pause for a second.
15 She's looking for a document.
16      THE WITNESS: Oh, I'm sorry.
17      MS. NELSON: I'm trying to listen.
18 Q. Go ahead and tell me about it.
19 A. On -- Eunice recalled an alias warrant on
20 March the 5th that she did not insure that the
21 original came back from the jail. And that's
22 one of the things that when you recall a
23 warrant, you make sure that you get that

Page 250

1  original warrant back from the jail.
2  And there have been times when we were
3  told, you go over there and you get the
4  original warrant, if you don't get it back.
5  She did not insure that, and that
6  defendant was arrested approximately a month
7  and a month and a half later on that AW.
8  Q. Give me that persons' name.
9  A. Excuse me?
10 Q. Do you remember that person's name?
11 A. Crystal Gray.
12 So I allowed her to sign her own bond.
13 Q. Crystal Gray?
14 A. Uh-huh (positive response)
15 So I let her sign her own bond, and the
16 judge was noticed.
17 Q. That was on Defendants' Exhibit Number 20.
18 (Brief recess)
19 Q. You were talking about Crystal Gray, and it
20 was contained on Defendants' Exhibit 20.
21 And when did you make that note? You have
22 it on a sticky note.
23 A. Yeah. I don't know. I can't tell you exactly

Page 251

1  when I wrote it, but it was after the fact.
2  Q. You mean, after the lawsuit?
3  A. No, not after the lawsuit.
4  Q. After your termination?
5  A. No. I made notes pretty often whenever
6  something that, you know, that happened like
7  that. And some of them, you know, we remember
8  just by the name. If it's somebody that was
9  arrested wrongly, that's just something that
10 should not happen.
11 Q. Anything else? What's on this little sticky
12 note you gave me?
13 A. That's just where I cited during my personnel
14 ruling -- my Personnel Hearing with the
15 Personnel Board, I had cited Section 3-10 in
16 the City of Dothan Personnel Rules that
17 disciplinary actions were not consistent in
18 our department, based on that being a
19 personnel rule.
20 Q. What being a personnel rule?
21 A. That discipline should be consistent within a
22 department for everybody. And I was just
23 citing that that did not -- that was not.

Page 252

1  Q. Are you aware of any other employee that had
2  committed insubordination?
3  A. Insubordination? Not to my -- I mean, you're
4  going to have to give me an example, because
5  insubordination is kind of broad, I think, as
6  far as what that means.
7  Q. Are you aware of anyone else who had told an
8  individual that he had been falsely arrested
9  and to sue the City?
10 A. Are you talking about the incident with me?
11 Is that what you're talking about?
12 Q. Besides you?
13 A. Oh, I don't know.
14      MR. JAFFREE: Excuse my.
15 A. I don't know how I would know that.
16      MR. JAFFREE: You're asking her a
17 fact -- her testimony was that
18 she didn't tell him he was
19 falsely arrested and to sue the
20 City. And you asked her, do you
21 know of a situation where
22 somebody else said they were
23 falsely arrested and sue the

63 (Pages 249 to 252)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 253

1    City. That was not her
2    testimony.
3  Q. Do you know of anyone who --
4  A. Not to my knowledge.
5        MR. JAFFREE: Wait a minute. She
6        didn't ask the question.
7        THE WITNESS: Well, I know what
8        she's talking about. I mean,
9        she's going to ask it again.
10       MR. JAFFREE: Well, hopefully,
11       she'll ask it the right way.
12 Q. Do you know if anyone told the defendant
13    they had been falsely arrest and then told
14    theme to file a claim or a suit against the
15    City?
16 A. Not to my knowledge.
17 Q. Do you know of anyone who has signed a uniform
18    ticket transmittal form swearing that they
19    received all the tickets and then struck a
20    line through and written "void" on a ticket?
21 A. I haven't seen that personally, no.
22       (Defendants' Exhibit 44 was marked
23       for identification.)

Page 254

1  Q. Just for the Record, I've marked that other
2     sticky note as Defendants' Exhibit 44 --
3  A. Okay.
4  Q. -- where you cited that --
5  A. Yes.
6  Q. -- rule to the Personnel Board.
7  A. Yes.
8  Q. And just following on these notes, I think
9     I've asked you about those.
10       I'm back to the EEOC charge. You're
11    talking about the move to the new facilities.
12    I assume you're talking about the new
13    magistrate's office.
14       You alleged that "Judge Gordon permitted
15    black magistrates to assign themselves premium
16    offices, notwithstanding that other white
17    magistrates had more seniority."
18       Is that your contention?
19 A. Yes.
20 Q. And who do you contend was allowed to assign
21    themselves the premium offices?
22 A. I believe Lavera McClain was the one that was
23    going around and assigning offices and telling

Page 255

1    us where our offices were.
2  Q. And say you believe that?
3  A. That's what was -- that's how it was put to
4     me. She said --
5  Q. By whom?
6  A. Lavera.
7  Q. Do you know who actually made the decision to
8     assign offices?
9  A. No, I do not.
10 Q. That's just your perception or your --
11 A. Well, if she said, this is where our offices
12    are, then I assume that's where she put it.
13 Q. To your knowledge, was Lavera involved with
14    the actual physical move of the offices?
15 A. Yes, she was.
16 Q. Were you involved in the physical move of the
17    offices in any way?
18 A. We all moved. We all helped in moving, but
19    she was the one that was in charge of making
20    sure things were packed up and telling us
21    where our offices were and that sort of thing
22    and making sure that we had people to move us
23    and all that.

Page 256

1  Q. Do you feel like this was an inappropriate
2     assignment to give that assignment to Lavera?
3  A. I feel like that the offices should have been
4     assigned maybe in a seniority basis instead of
5     what she wanted people to have.
6  Q. "She" being who?
7  A. Lavera.
8  Q. But you don't know for sure -- you don't know
9     that Lavera made the decision as to whose
10    office would be where, do you?
11 A. Shy didn't say that somebody else did.
12 Q. You just testified, you don't know who made
13    the decision.
14 A. No. She -- I said that based on what she told
15    and showed us, it was coming from her.
16 Q. She was the messenger?
17 A. She -- well, that's not -- that's not what she
18    said she was. She did not say, I'm coming to
19    you as a messenger and somebody said this is
20    your office. She was stating to us that this
21    is where your office is. She didn't say she
22    was the messenger.
23 Q. I'm just saying, you're just assuming that she

64   (Pages 253 to 256)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1    made the decision; you don't have any facts --
2    A.  My testimony.
3    Q.  -- to support that, other than your perception
4        because she told you where the offices were
5        going to be?
6    A.  Well, it didn't come from Judge Gordon, and it
7        didn't come from our court administrator.
8    Q.  And how do you know that?  Did it come from
9        their mouths?
10   A.  That's right.
11   Q.  Okay.  Thank you.
12       And, again, you said, "This not-too-subtle
13       preference toward black magistrates would be
14       tolerable but for the rigid discipline imposed
15       by Judge Gordon against the white
16       magistrates."
17       What rigid discipline are you talking
18       about?
19   A.  Well, I think over the time that I was there,
20       that her discipline that she -- the things
21       that have happened to me and some mistakes
22       were made by other blacks.  And they did not
23       get -- they did not get disciplined at all.

Page 258

1    Q.  And you equate their mistakes to the mistakes
2        that you have made?
3        MR. JAFFREE: Define "equate,"
4            because if you're saying, the
5            mistakes were more serious, then
6            I think she can acknowledge
7            that.
8        MS. NELSON: No.  She understands my
9            question.  You can object to my
10           form.
11   A.  Reask the question.
12   Q.  I said, do you equate the conduct that you
13       claim the blacks were engaged in, do you
14       equate that to the offenses that you were
15       charged with and disciplined for?
16   A.  That I was allegedly charged with, that I was
17       charged with.  Yes.  Having somebody falsely
18       arrested, making the errors that were made, I
19       sure do.  That was negligence.
20   Q.  And you said white employees made errors and
21       mistakes?
22   A.  Yes.
23   Q.  Do you contend they should have been likewise

Page 259

1    disciplined?
2    A.  Sure.
3    Q.  Now, you mentioned Lavera and Eunice.  Were
4        there any other black magistrates at the time?
5    A.  Tonya Minifield had been hired.
6    Q.  Do you content that Tonya --
7    A.  I do not --
8    Q.  -- should have been disciplined?
9    A.  I did not come across anything that she had --
10       that she had made mistakes on.  I did not have
11       any incidents where she had had any mistakes.
12       I'm not saying she didn't, but I did not come
13       in contact with them.
14   Q.  You go on to say that "Judge Gordon terminated
15       or caused the resignation of no less of eight
16       white magistrates since her term of
17       employment."
18       What eight people are you talking about?
19   A.  I know that Donna Nicholson was fired.  Debbie
20       Irby quit because she was fixing to be fired.
21       Cheryl Maray quit.  Kim Phillips quit.  Kevin
22       Sorrells was fired.  Mary Turner and myself
23       and Nancy.  I don't know how many that is.

Page 260

1    Fran Bailey quit.
2    Q.  Do you know why each of the individuals -- I
3        mean, I know you know your own situation.  Do
4        you know why -- I've asked you this before --
5        why Donna Nicholson was terminated?
6        I've asked you that, haven't I?
7    A.  Yes.  And Donna told me --
8    Q.  Only what Donna told you?
9    A.  Right.
10   Q.  You don't really know the circumstances of
11       all --
12   A.  I did not see her paperwork.  No.  But based
13       on what she told me.
14   Q.  Or why Kevin Sorrells was terminated?
15   A.  No.
16   Q.  Do you know why Nancy Martin was terminated?
17   A.  I believe for not having proper supervision.
18       I'm not sure.
19   Q.  You don't really know, do you?
20   A.  I have seen it, but I don't recall what it
21       said.
22   Q.  Seen what?
23   A.  Her termination paperwork.

65  (Pages 257 to 260)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 261

1 Q. Besides the paperwork, I'm talking about all
2    the facts and circumstances for which she was
3    terminated?
4 A. No.
5 Q. Debbie Irby, you know said, she was about to
6    be terminated. Do you know why she was
7    terminated?
8 A. It was involving the incident with Donna
9    Nicholson.
10 Q. But you don't really know the facts and
11    circumstances regarding all that, do you?
12 A. Well, she told me that she was going to quit
13    because she knew she was going to be fired
14    anyway. I mean, I --
15 Q. Other than what she told you.
16 A. I'm trying to answering what you're asking me,
17    so I don't -- seeing any paperwork, no. Just
18    based on her telling me what happened.
19 Q. Well, I'm talking about your own personal
20    knowledge of the facts and the circumstances,
21    not what -- not hearsay, not what she told
22    you.
23 A. Well, if she told me, that's -- I mean, that

Page 262

1    was --
2 Q. That's the gospel, isn't it?
3 A. No. I'm just saying --
4    MR. JAFFREE: I'm going to object.
5    Argumentative. And a charge of
6    discrimination with the EEOC, it
7    put down, prior to discovery,
8    what they believe to be the
9    facts. And as soon as they can
10    rely on a principal to tell
11    those facts and state those
12    facts. They're not the
13    employer. They don't have
14    access to all the information
15    prior to discovery and even
16    after discovery. Well, you're
17    asking her --
18    MS. NELSON:
19 Q. You're just going by what Debbie Irby told
20    you?
21    MR. JAFFREE: You're arguing with
22    this witness about what she
23    knows.

Page 263

1    MS. NELSON: I do not mean to be
2    arguing with the witness. I'm
3    trying to just understand what
4    factual basis she has, aside
5    from what a person told her
6    happened.
7 Q. Fran Bailey, do you know the circumstances of
8    her leaving?
9 A. I know that she was going to school, but I
10    knew -- do know that she filed a memo with the
11    judge and with the personnel department before
12    she left about things that she observed and
13    how she felt things were in that office. And
14    I do know that she was summoned over to the
15    judge's office as a result of that memo
16    because she told me.
17 Q. But other than what she told you, you don't
18    have any independent knowledge of such memo
19    or --
20 A. I did not see the memo, but I do know that
21    it's in her file. It should be. And she also
22    has a copy.
23 Q. Have you seen that memo?

Page 264

1 A. I probably did, but I don't recall. I
2    don't -- I don't remember if she ever showed
3    it to me or not. She just was telling me.
4 Q. And what did it allegedly say?
5 A. Just about how she could tell people were
6    getting treated differently in the office and
7    that mistakes that were being made, and that
8    sort of thing, from being a clerk.
9 Q. I wrote Donna, Kevin, Debbie. Mary Turn,
10    we've talked about. Nancy, Fran. Anybody
11    else? Yourself.
12 A. Kim Phillips and Cheryl Maray.
13 Q. Do you know the circumstances of Kim Phillips
14    leaving?
15 A. Just tired of the mess going on, just certain
16    people not being accountable for their
17    mistakes.
18 Q. Certain people, would that include Ann Baxter
19    or --
20 A. I don't know.
21 Q. -- white individuals?
22 A. I don't know.
23 Q. Could?

66 (Pages 261 to 264)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 265

1  A. It could be. Yes. I don't know.
2  Q. And Cheryl Maray, do you know the
3      circumstances of her leaving?
4  A. The same. Well, I know that -- I think that
5      she went to another job, but it was -- she
6      just couldn't do it anymore. She said she
7      couldn't --
8  Q. And it's based on what she told you?
9  A. Yes.
10 Q. Besides yourself, do you know any other whites
11     who have been disciplined?
12 A. After -- since this has happened, I do believe
13     I've come to hear that Ann Baxter was
14     disciplined, I believe, for some money
15     situation with her moneys.
16 Q. And how did you learn that?
17 A. I think Nancy and I had talked about that
18     after the fact. I'm not sure if she was or
19     not.
20 Q. Anyone else?
21 A. Well, other than Mary?
22 Q. Well, Mary --
23 A. Yeah. Well, you're asking any other white.

Page 266

1      That's what I'm saying. I don't know. Not to
2      my knowledge, I don't know. And myself.
3  Q. You also contend that Judge Gordon
4      "manufactured reasons to terminate" you. Is
5      that your contention?
6  A. I believe that, like I testified earlier,
7      there were some things that she could have
8      handled internally instead of having the
9      internal investigations. And, you know, I --
10 Q. Like what?
11 A. I think so.
12     Well, the first internal investigation. I
13     testified earlier, she should have handled
14     that internally.
15 Q. With Ralpeje?
16 A. Yes.
17 Q. Now, Judge Gordon is on the bench a good bit
18     of the time, isn't she?
19 A. I assume. I know that they have court certain
20     times of the day.
21 Q. So your contention that Judge Gordon would
22     have the time to go out and conduct
23     investigations with bondsmen and defendants

Page 267

1      and individuals in the community and all the
2      people in the department?
3  A. She didn't have court on Fridays, and she
4      didn't have court the last week of every
5      month. So I would think that she would have
6      time. Yes. She had an assistant.
7  Q. What about the -- other than that first
8      incident, you think she should have
9      investigated all that?
10 A. I think that she should have let me know what
11     was going on prior to it just being thrown at
12     me. I think that I would've at least -- I
13     deserved that much, that she should've let me
14     know what was going on.
15     And I think by her telling me when I made
16     her aware of mistakes that were happening with
17     Lavera and Eunice, just brushing it off like
18     they were -- everybody makes mistakes, and to
19     just fix it, and not make a big deal out of
20     it.
21 Q. You said she "instructed Nancy Martin to keep
22     a close eye on" you?
23 A. Yes.

Page 268

1  Q. "And two other white magistrate."
2  A. Yes.
3  Q. Is that your testimony?
4  A. Yes.
5  Q. And what do you base that on?
6  A. Nancy.
7  Q. Nancy told you that?
8  A. Yes.
9  Q. "And at the same time, implying that she
10     should take a blind eye on what black
11     magistrates were doing."
12     What do you have to base that on?
13 A. Nancy.
14 Q. Nancy. That was Nancy's comment?
15 A. Yes.
16 Q. Okay. And then you state, "The black
17     magistrates have not been subject to
18     discipline, yet at least two have committed
19     offenses which would warrant discipline."
20     Is that the same thing that you were
21     talking about?
22 A. Yes. Yes.
23 Q. Then you went on to say, despite "the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 269

1    directive from Judge Gordon not to speak to a
2    white employee," which is Mary Turner?
3  A.  Yes.
4  Q.  That you said, "Judge Gordon was unpersuaded
5    that there was an employment imperative that
6    required contact with this person."
7       But you never really talked to Judge
8    Gordon about your alleged need to talk to Mary
9    Turner, did you?
10  A.  No.  But I felt like, you know, why -- why did
11    she give me Mary Turner's job duties?  Why
12    would she even do that?  Why wouldn't she give
13    them to somebody else?
14  Q.  And because she gave you the job duties and
15    had specifically told you not to contact her,
16    you felt like it was okay to contact her?
17  A.  I assumed she meant about the investigation
18    because if I go to church with somebody or I'm
19    walking down the street and see her, I have
20    First Amendment rights to speak to someone and
21    not have to be told, no, you can't speak to
22    that person.
23  Q.  Even when that person has been charged with a

Page 270

1    criminal offense, is under criminal
2    investigation?
3  A.  Yes.
4  Q.  But you didn't contact her just to speak to
5    her or going to church or down the street; you
6    picked up the phone and called her --
7  A.  I did because I did not get any cooperation
8    out of Michelle Sellers.
9  Q.  Now, to your knowledge, did the submit any
10    information to the EEOC to support your
11    claims?
12  A.  I'm not sure.
13  Q.  Your lawyer -- I'm not going to ask you what
14    you and your has lawyer talked about or did.
15       You don't know that you did anything?
16  A.  Not to my knowledge.
17  Q.  To your knowledge, did the EEOC ever rule one
18    way or the other against you or you or --
19  A.  I'm not sure if they sent -- they could have.
20    I don't remember if I -- I haven't looked at
21    that.
22       (Defendants' Exhibit 41 was marked
23       for identification.)

Page 271

1  Q.  I'm showing you Defendants' Exhibit 41. It's
2    a letter to your lawyer. I was just going to
3    ask if you ever saw that?
4  A.  He probably sent me a copy of that.
5       MR. JAFFREE:  And I may not have.  I
6    don't know.
7  A.  Yeah.  I'm not sure.
8  Q.  Are you aware that your lawyer requested
9    what's called a Right to Sue move forward
10    without a decision being reached at the EEOC
11    level?
12  A.  I'm --
13  Q.  You don't know?
14  A.  I'm not sure.  He could have.
15  Q.  Now, you and Ms. Martin have filed this
16    lawsuit together; is that correct?
17  A.  That's correct.
18  Q.  Was she terminated before you were?
19  A.  Yes.
20  Q.  So she was not involved in your termination in
21    any way?
22  A.  She -- she was told to -- on my evaluation
23    that she did, she had to discipline me, but

Page 272

1    she wasn't here when the incident happened.
2    She didn't want to, but she was directed to do
3    that.
4  Q.  And she's told you this?
5  A.  Yes.  She didn't feel like that she since she
6    was not here for the incident, that it -- she
7    shouldn't handle it.
8  Q.  And we're talking now about the --
9  A.  The 2004.
10  Q.  The Fondren --
11  A.  Yes.
12  Q.  -- issue?
13  A.  Yes.
14  Q.  And you're saying she had to fill out your
15    evaluation alluding to that?
16  A.  She did my -- yes.  She showed me that
17    earlier.
18  Q.  And she just felt like she wasn't here --
19  A.  I think she notated on the evaluation that she
20    put she was not here during the incident.
21    So --
22  Q.  You're saying it probably took her -- she
23    probably did get here until, I think you said,

68  (Pages 269 to 272)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 273

1     the first quarter of 2004?

2 A. I'm not sure when she started. I believe

3     that -- I know that she was there whenever I

4     came back from my suspension because she and I

5     both were summoned to the judge's office.

6 Q. And you're referring to another note --

7 A. Yes.

8 Q. -- you have here?

9 A. Yes.

10 Q. And I'm going mark this as Defendants' Exhibit

11     45.

12         (Defendants' Exhibit 45 was marked

13         for identification.)

14 Q. And, so, your notes -- you were pointing to

15     your notes, and y'all were summoned to the

16     judge's office for what?

17 A. The judge just -- the judge needed to speak to

18     me and was pretty much asking me if -- if I

19     wanted my job, if I wanted to work there, and

20     that, you know, if I didn't want to be there,

21     to let her know, and that I needed to take

22     responsibility for that incident. And I was

23     very uneasy about that situation. I almost

Page 274

1     felt like she wanted me to quit.

2 Q. When you came back from your suspension, were

3     you threatening or uneasy to other people

4     there?

5 A. No. It was the day I came back.

6 Q. Were you resentful toward the judge for

7     suspending you?

8 A. No. I didn't have any contact with the judge

9     when I got back until we had this meeting.

10 Q. What about with Michelle Sellers; were you

11     resentful to her in any way?

12 A. I don't know. I don't recall if I was.

13 Q. Could have been?

14 A. I could have been.

15 Q. And Michelle Sellers is sitting in here.

16 A. Uh-huh (positive response).

17 Q. She's the court administrator now. She's

18     white; is that correct?

19 A. Yes.

20 Q. And why were you resentful to Ms. Sellers?

21 A. I didn't say I was.

22         MR. JAFFREE: She didn't say she

23         was. She said she could've

Page 275

1     been.

2 Q. You said you could've been?

3 A. I could've been, but I don't recall.

4 Q. Well, why do you think you could have been?

5 A. I don't -- I don't know. I could've been

6     short with her, but I don't know if I was or

7     not. I mean, I don't -- I can't answer that

8     if I don't recall if I did.

9 Q. If you don't remember but said, you could

10     have, you yourself could've been displaying

11     some uneasiness or ill-will toward others in

12     the office, resentment, so to speak, about

13     your suspension?

14 A. I was probably silent. I probably was not

15     real sociable.

16 Q. And maybe not helpful to others in the office?

17 A. I don't know about that.

18 Q. Could that have been the reason perhaps Judge

19     wanted to talk to you?

20 A. That was not -- that was not talked about in

21     this meeting. That's not what she stressed to

22     me.

23 Q. But you told her you wanted your job?

Page 276

1 A. Sure. I was very good at my job, very

2     efficient.

3 Q. Did you ever complain to anybody about -- did

4     you ever come -- you said you never talked to

5     Kai Davis?

6 A. I couldn't go to her. If I went to her, I

7     would be going over -- stepping over

8     supervisors, and you can't -- from what I

9     understand, you cant do that.

10 Q. It's your understanding, you can't go to

11     Personnel?

12 A. Without going through your proper channels

13     first. You have to advise your supervisors of

14     what you're doing.

15 Q. And where did you get that from?

16 A. I -- it's just what -- I don't know. I guess

17     that's just the way it was -- I've always

18     perceived it to be.

19 Q. So you've never reported to anyone that you

20     felt that the judge was treating your

21     differently because of your race?

22 A. Nancy knew about it. And she also can see by

23     the treatment that was being -- how it was

69 (Pages 273 to 276)

# FREEDOM COURT REPORTING

Page 277

1    treated in the office, and she said, she went
2    to Kai Davis. As a supervisor, she could see
3    what was going on, so she advised Kai Davis of
4    what was going on.
5    Q. But you weren't present?
6    A. No.
7    Q. And you don't know what conversation went on
8        between she and Kai Davis?
9    A. Not a -- not.
10   Q. And if Kai David said differently, would
11       you --
12   A. That would be her testimony.
13   Q. -- belive -- you just don't know what went on
14       with Kai Davis?
15   A. Well, she's representing the City. So I would
16       I think that, you know, she would -- she would
17       be on the City's side.
18   Q. Well, you're just assuming that?
19   A. Right. Right. Because you asked me.
20   Q. Did you ever go to the EEO officer?
21   A. No. I don't even know if we had one at the
22       time. I don't know if we did.
23   Q. Just sort of as a cleanup thing, on this same

Page 278

1        Defendants' Exhibit 45 that you had written
2        that note about --
3    A. Yes.
4    Q. -- seeing the judge?
5    A. Uh-huh (positive response.)
6    Q. You had copied --
7    A. Yeah. I was just saving paper.
8    Q. -- another note about January 2004. "A
9        gentleman came and asked to speak to Mary Beth
10       Brackin. Was this --
11   A. Yes. That was the --
12   Q. That's the Fondren matter?
13   A. Fondren, yes.
14   Q. I was just trying to clarify that was.
15   A. Yes.
16   Q. But I think I've asked you about that.
17   A. Yes, you did.
18       (Defendants' Exhibit 46 was marked
19       for identification.)
20   Q. And just for the Record, since I've introduced
21       everything else under the sun, to your
22       knowledge, is this Number 46 a copy of Judge
23       White's order on appeal where you appealed

Page 279

1        your board decision?
2        (Brief pause)
3        MR. JAFFREE: In the interest of
4        time, we'll stipulate that's
5        Judge White's decision.
6    Q. Okay. I'm not going to ask you about it.
7        Thank you.
8        Just on more question, and then we'll take
9        a break. And maybe I can -- I'm going to ask
10       her about the complaint which is probably most
11       of the stuff we've got --
12       MR. JAFFREE: That can take forever.
13       MS. NELSON: Well, you're the one
14       that drafted a 39-page
15       complaint.
16       MR. JAFFREE: I thought we were
17       going to go through the
18       complaint earlier.
19       MS. NELSON: I'm going to be done in
20       the time I told you. I told you
21       it would take about six hours.
22       (Off-the-Record discussion)
23   Q. Just one other quick question. You know,

Page 280

1    you've testified before the board hearing,
2    and, you know, you said you had to answer some
3    questions with the internal investigation.
4        Is it your testimony that you gave
5    truthful responses to the questions asked of
6    you in the Personnel Board Hearing and any
7    questions asked of you during the Internal
8    Affairs investigation?
9    A. Yes.
10       MS. NELSON: Why don't we take about
11       a 15-minute break?
12       (Brief recess)
13   Q. Ms. Brackin, your lawyer, on your behalf, I
14       assumed he prepared a complaint that was filed
15       in federal court. Have you seen that?
16   A. The second amended complaint.
17   Q. Seconded amended complaint?
18   A. Yes.
19   Q. I understand that's what's in effect at this
20       time.
21       I'm looking at Number 16 -- you may have
22       covered this -- on page five. You claim you
23       received exemplary -- excuse me --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 281

1  satisfactory to exemplary annual evaluations.
2  We reviewed most of those. There were, even
3  through Donna Nicholson's evaluations of you,
4  some issues regarding your attitude that we've
5  discussed; isn't that true?
6  A. This is -- I think 16 relates to my first
7  tenure with the magistrate's office.
8  Q. Your first tenure; is that right?
9  THE WITNESS: Is that right?
10 A. This is not --
11 Q. Excuse me. I'm sorry.
12 A. Yeah.
13 Q. Even your first tenure, Gayle Schwarz even
14 noted some issues of attitude and treatment
15 toward the public that we've covered?
16 A. Yes.
17 Q. And it's your testimony, you're not aware of
18 any discipline that you received in the police
19 department --
20 A. No.
21 Q. -- when you were there?
22 Again, we could be here all night.
23 A. Yes.

Page 282

1  Q. I think you've talked, Number 19, about the
2  issue with Shaun, the public defender; that's
3  Shaun McGhee --
4  A. Yes.
5  Q. -- we talked about.
6  What information do you have that -- do
7  you know for a fact that it was Judge Gordon
8  that instructed the police department to
9  conduct a closed-door, rigorous investigation?
10 A. Well, she was the one that drew up the letter
11 that I was to report to them.
12 Q. But all you know is what the letter stated --
13 A. Yes.
14 Q. -- asking you to --
15 A. Yes.
16 Q. -- cooperate with them?
17 Are you aware that Internal Affairs gives
18 something when they looked into something
19 called a Guaranty Instruction; does that mean
20 anything to you?
21 A. No.
22 Q. You never worked with Internal Affairs?
23 A. No.

Page 283

1  Q. You don't really know how they conduct
2  investigations?
3  A. No.
4  Q. And, again, by number 22, I think you
5  testified, you really don't know how Internal
6  Affairs operates or when they're used or for
7  all the things they're utilized for?
8  A. No, I do not.
9  Q. Number 24, 25 deals with the Fondren issue
10 which I think we've discussed in length.
11 A. Yes.
12 Q. So I don't need to revisit that.
13 You even cite the judge's memo that I
14 think I asked you about.
15 Paragraph 28, we're still talking about
16 the Fondren matter through here. That 28, 29,
17 30, that deals with the matter we've looked
18 into about the claim that you had told a
19 defendant that he was wrong to be arrested.
20 A. Yes.
21 Q. And that was investigated.
22 A. Yes.
23 Q. You're stating that Judge Gordon asked you to

Page 284

1  sign the form to consent to interrogation?
2  A. Yes.
3  Q. Or was that Internal Affairs?
4  A. Judge Gordon submitted the letter to me.
5  Q. Asking you to report?
6  A. Yes.
7  Q. To report to them?
8  A. Yes.
9  Q. Now, when you say, you reported to an
10 interrogation room, where did you actually
11 report?
12 A. Well, it was the chief's conference room, but
13 they used that for multiple --
14 MR. JAFFREE: What -- nothing.
15 Q. You said you got the results four and a half
16 months later; is that your testimony?
17 A. Yes.
18 Q. Do you know, during this time, was Internal
19 Affairs investigating this?
20 A. I don't know.
21 Q. Just know it took some time?
22 A. Yes.
23 Q. And you don't know the reason for the delay?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 285

1   A. No.
2   Q. And Number 32, that deals with the testimony
3       you've given, that, basically, Ms. Martin had
4       just come board, but she was still involved in
5       the administration of the discipline?
6   A. Yes.
7   Q. And I think I've talked to you about that.
8       I'm not trying -- I'm trying to move along and
9       not repeat everything we've gone over.
10          And it's your testimony under 35 that you
11      could not appeal that suspension or seek due
12      course of that suspension?
13  A. Yes.
14  Q. And Number 37, talking about Rickey Stokes --
15  A. Yes.
16  Q. -- lodging the complaint against Lavera.
17  A. Yes.
18  Q. Is this what you testified to earlier --
19  A. Yes.
20  Q. -- about Mr. McCord?
21  A. Yes.
22          (Brief pause)
23  Q. Now, in Number 43, you make allegations

Page 286

1       regarding a defendant appearing on a speeding
2       ticket, and that it was his opinion that it
3       was resolved by the intervention of Mary
4       Turner. And you went on to state certain
5       things, that the Ticket -- basically, that she
6       put the ticket back on the trial docket
7       because he had failed to complete the repair
8       work on her roof at home.
9           Do you have personal knowledge of that?
10  A. I don't recall.
11  Q. You go on to say in 44, you really weren't
12      involved in that but --
13  A. Right. I don't --
14  Q. You weren't accused of having involvement in
15      that.
16  A. Right. I don't -- I don't know.
17  Q. Do you have knowledge that because of the
18      seriousness of all of that allegation against
19      Ms. Turner by this Defendant Phelps, that the
20      matter was turned over to the police
21      department?
22  A. After the fact. Yes.
23  Q. And we've talked -- go on to Number 46,

Page 287

1       talking about the directive, the meeting with
2       Judge Gordon, not to have any contact with
3       Mary Turner.
4   A. Yes.
5   Q. And you testified about doing her job duties
6       and the Rickey Stokes store and the
7       investigation after that. You just told the
8       investigator that you had talked to her.
9           Talked about Eric -- 52, 53, Corporal
10      Duhaime's involvement as you stated. I think
11      we've talked about that.
12          Your appeal.
13          And then I wanted to ask you
14      about -- well, 65, you talk about testimony I
15      believe we've covered as far as Lavera McClain
16      and Eunice Knight being negligent, carrying
17      out their assignments but not disciplined.
18      You've given me those instances that you've
19      claimed.
20  A. That's just -- yes, that's -- that's the ones
21      that I have personnel knowledge of that I can
22      remember.
23  Q. Okay. And then the rest goes on to -- just

Page 288

1   claims by Ms. Martin.
2       Do you have any -- strike that.
3       One of Ms. Martin's claims is that she
4       claimed that Get Out Bonding got preferential
5       treatment by Judge Gordon. Do you have any --
6   A. What number are you on?
7   Q. I'm on number 92, something that's not
8       involved in yours?
9   A. Oh.
10  Q. But do you have any facts that would support
11      an allegation that Get Out Bonding got
12      preferential treatment?
13  A. I don't have any facts personally.
14  Q. Your contention is that you have been
15      disciplined and terminated because of your
16      race; is that correct?
17  A. That's correct.
18  Q. And are you making any other? And that -- I
19      take it, you're claiming that -- are you
20      claiming that were retaliated against?
21  A. Well, I was -- I was singled out I believe.
22  Q. Because of your race?
23  A. Yes.

72  (Pages 285 to 288)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 289

1  Q. You never complained about race discrimination
2     to anyone, did you?
3  A. I complained to Judge Gordon about the
4     mistakes about, but I did not complain to her
5     about her discriminating against me.
6  Q. And you didn't go to Personnel or the EEO
7     officer?
8  A. No. I don't -- I -- I don't even know if we
9     had one at the time. I know we did, but I
10    don't know if we did at that time.
11 Q. And you didn't complain about retaliation in
12    your EEOC charge, did you?
13 A. I don't remember. We'd have to look at that
14    again.
15 Q. I'll show you Defendants' Exhibit 40. You
16    checked race discrimination.
17 A. Right.
18 Q. In the body of your complaint, you don't
19    complain about retaliation?
20 A. No.
21       MR. JAFFREE: I'm not sure there's
22    an EEOC -- let me see. I'm not
23    sure there's an EEOC retaliation

Page 290

1     filed in the complaint.
2     (Off-the-Record discussion)
3     MS. NELSON: I'm not sure that a
4        section 1981, 1983 claim exists
5        by law, but that's between you
6        and me to hash out.
7  Q. And you further content that your
8     constitutional rights were violated; is that
9     one of your contentions?
10 A. I believe so. I was told not to speak with
11    someone, and I feel like that was a violation
12    of Freedom of Speech.
13       MR. JAFFREE: Let me -- and I should
14    have done this earlier, but it's
15    better late than never.
16       You're asking her to claim
17    her relief. All of this is
18    legal stuff. You're asking her
19    to comment on the law, and she's
20    not competent to do that. She
21    doesn't even know all the legal
22    claims she has. I probably
23    don't know all the legal claims

Page 291

1     she has. And I'm going to
2     object to the question on the
3     basis that it covers a province
4     that she's not capable of
5     dealing with.
6       MS. NELSON: So noted. But I can,
7     at least, try to ask her facts
8     that would support what appear
9     to be her claims.
10      MR. JAFFREE: Well, I think you've
11    already asked facts that tend to
12    support her claims or not,
13    depending on your perspective.
14 Q. Do you now contend that -- one of your claims
15    appears to be false imprisonment. Are you
16    aware that you're making a claim of false
17    imprisonment?
18 A. Where are you at so I can --
19 Q. I'm on page 29.
20      MS. NELSON: Look at this. Maybe
21    you and can clarify this. She's
22    making a retaliation claim for
23    exercising in her free speech

Page 292

1     and association rights. That's
2     your retaliation.
3       MR. JAFFREE: I think so, yeah, not
4     based on Title VII.
5       MS. NELSON: I understand. Okay.
6     I'm with you.
7  Q. Are you making a -- on page 29, your attorney,
8     on your behalf, makes a claim of false
9     imprisonment?
10 A. Yes.
11 Q. And, again, while you may not understand all
12    the elements of false imprisonment, you
13    basically stated that this is -- you
14    were -- this was based on the fact that you
15    were questioned by the police in these
16    Internal Affairs investigations; is that
17    correct?
18 A. Yes.
19      MR. JAFFREE: Paragraph 152 comes
20    from the case, so that's what
21    she's basing it on.
22    (Brief pause)
23 Q. I'm on like paragraph 158. I think you're

73 (Pages 289 to 292)

# FREEDOM COURT REPORTING

Page 293

1  stating multiple actions based on conduct
2  that --
3      MR. JAFFREE: Which paragraph are
4      you on?
5      MS. NELSON: I'm just reading
6      through here.
7      MR. JAFFREE: Which paragraph are
8      you on?
9      (Off-the-Record discussion)
10 Q.  I think we've basically covered most of the
11     factual issues.
12     Tell me, how do you contend that you have
13     been damaged as a result of your termination?
14 A.  Well, I've been damaged financially.
15 Q.  You were earning -- approximately, what were
16     your wages?
17 A.  When I left the City? I believe it was -- and
18     I'm not sure on this. It might have been
19     right at $16 an hour. I'm not sure if that's
20     right or not. I believe so.
21 Q.  Did you have benefits?
22 A.  Yes. I have not touched my RSA retirement.
23     It's still there. I was vested with the City,

Page 294

1      been employed for 13 years.
2  Q.  Did you have health insurance?
3  A.  I have it with my husband.
4  Q.  Your husband? You still have that through
5      your husband?
6  A.  But I had it with me, you know, and it was
7      paid for. So now he's having to pay for that.
8  Q.  But you still have the benefit of it?
9  A.  I still have the health insurance. Yes.
10 Q.  How much money were you paying, or was the
11     City paying --
12 A.  I think the employee part --
13     (Court reporter interrupted for
14     clarification.)
15 Q.  How much were you paying when you were
16     employed, and what's the premium now for your
17     coverage?
18 A.  I'm not sure what the employee part was, if
19     you were a city employee for yourself because
20     I was not listed under the family coverage.
21     It might have been $10 a pay period. I'm not
22     sure.
23 Q.  You had coverage, and he had coverage?

Page 295

1  A.  Yes.
2  Q.  And now you're under his family coverage?
3  A.  Correct.
4  Q.  And you know what -- you have your wages when
5      you worked for Headland and Newton?
6  A.  Yes.
7  Q.  Did you have any benefits there?
8  A.  No.
9  Q.  And you said you didn't had not been under a
10     doctor's care, other than your regular OB/GYN?
11 A.  That's correct.
12 Q.  And you're on one medication?
13 A.  Yes.
14 Q.  And what is that?
15 A.  Effexor.
16 Q.  And what is that?
17 A.  It's a type of anxiety drug.
18 Q.  And how long have you been on that?
19 A.  I'm not sure. I know it was during my time
20     that I went back to the magistrate's office, I
21     believe.
22 Q.  What's your doctor's name, the one that
23     prescribed that?

Page 296

1  A.  The one that prescribed that?
2  Q.  Yes.
3  A.  Robert Cleveland.
4  Q.  Is he your OB/GYN?
5  A.  He is.
6  Q.  Cleveland?
7  A.  Yes.
8  Q.  Is he really the only doctor you've seen in
9      the last five years?
10 A.  Other than if I was sick, I will go to medical
11     doctor. Family is Rodney Beauchamp.
12 Q.  Beauchamp?
13 A.  B-E-A-U-C-H-A-M-P.
14 Q.  And what pharmacies do you trade with?
15 A.  Doctors Center Pharmacy.
16 Q.  Sorry?
17 A.  Doctors Center Pharmacy.
18 Q.  Doctors Center. Anywhere else?
19 A.  No.
20 Q.  During the time you were employed in the
21     magistrate's office, were you ever going
22     around recording employees --
23 A.  No, I was not.

74  (Pages 293 to 296)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 297

1  Q. -- with a tape recorder? No?
2  A. The only time I had a tape recorder is in that
3     meeting that we had.
4  Q. What meeting, now, is this?
5  A. That we -- that you have on exhibit -- I'm not
6     sure what number is where -- where personnel
7     director, Kai, was there and the judge when we
8     all had a meeting. And Lavera was talking
9     very loud and rude.
10 Q. Do you have a tape recording of that?
11 A. No. It was taken up.
12 Q. Did someone take it away from you?
13 A. Yes.
14 Q. Who was that?
15 A. Michelle Sellers.
16 Q. Did the people know they were being recorded?
17 A. Some did.
18 Q. And who knew?
19 A. I'm not sure who all knew. I -- I don't
20    know. I mean, there was -- there was a lot of
21    us in there. I'm not sure.
22 Q. And why were you recording it?
23 A. I just wanted it on record as what was being

Page 298

1     said in there.
2  Q. And why is there?
3  A. So nothing could be -- well, in case something
4     happened that I needed, you know, to use it.
5     If it was involving something that -- just
6     like what happened where I was mistreated and
7     nothing was done.
8  Q. And, again, I know we've been through a lot.
9     Y'all were meeting with Kai Davis as a group?
10 A. And the judge --
11 Q. In the judge's office?
12 A. -- as a group.
13    No. It was in our break room area over
14    here at this two-story building.
15 Q. And what were you meeting over?
16 A. I can't remember. I don't know. I don't know
17    if it was after the fact that Donna had left
18    and we didn't have a court administrator at
19    the time. I'm not sure. It was just --
20 Q. There was friction in the office?
21 A. Well, I'm sure. The morale was not that good,
22    so I don't -- you know, I don't remember what
23    the actual gist of the meeting was about. You

Page 299

1     know, we could've covered several things.
2  Q. So it was shortly after you had been back?
3  A. No.
4  Q. What date --
5  A. No. This was --
6        MR. JAFFREE: Let me. I tried to
7        see where this was going, but
8        I'm going to object to the
9        relevance. I'm not going to
10       instruct you to answer. This is
11       not --
12       MS. NELSON: It's just discovery.
13       I'm trying to --
14       MR. JAFFREE: But it's not part of
15       any defense that I know of, but
16       that was not the basis for a
17       decision.
18       MS. NELSON: Well, she's going
19       around running a tape recorder
20       of people. I'm just -- when
21       Donna Nicholson was there? I'm
22       just trying to --
23 A. No. I don't think Donna was there.

Page 300

1  Q. After she left?
2  A. I think it was after she left. And I wasn't
3     running around. This was one incident, and it
4     was taken up.
5  Q. And I'm trying to figure out what --
6  A. So it's not something --
7  Q. -- date this occurred.
8  A. I don't know. I don't remember.
9  Q. Was Bettye King there?
10 A. I don't know. She could have been, but I
11    don't -- I don't think we had a court
12    administrator. It might have been the time in
13    between Donna and Bettye. I'm just not sure.
14 Q. Have you ever reported to a black manager
15    before Judge Gordon?
16 A. Before Judge Gordon?
17 Q. Yeah.
18 A. Trying to think. I don't believe so. I'm
19    trying to think of my past jobs. I don't -- I
20    don't believe so. And I know that we had some
21    in the police department that would get
22    promoted and we'd get a new sergeant, but I
23    don't think any of them were black.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 301

1  Q.  You didn't report to them, did you?  You
2     didn't report to a black manager?
3  A.  I don't believe so.
4  Q.  Did you resent having to report to a black
5     manger?
6  A.  No, I did not.
7  Q.  Did you resent having to work with black
8     employees?
9  A.  No.
10  Q.  Was any of the reason you were meeting with
11     Kai Davis -- that's why I'm just trying to
12     figure out why you were meeting.
13  A.  I don't know.  This meeting was called, I'm
14     assuming by the judge.  I don't know, and I
15     don't why Kai Davis was there.  I don't know.
16  Q.  But you felt compelled to tape record it?
17  A.  Well, I just wanted that whatever was going to
18     be said, you know, on file.  I mean, I -- I
19     just felt like that I -- I needed to do that.
20  Q.  And what has been your relationship with
21     Michelle Sellers or your relationship when you
22     worked there; did the two of you get along?
23  A.  Sometimes.

Page 302

1  Q.  But sometimes you didn't?
2  A.  No.  She was not in our chain of command, but
3     she, at times, was very belittling and also
4     instructing us to do things that we didn't
5     feel like were appropriate regarding cases,
6     our magistrate duties that she was not
7     experienced in.
8  Q.  Was she your supervisor at some point in time?
9  A.  Some point in time she was, but not -- not
10     most of the time.
11  Q.  And you resented having to take instruction
12     from her?
13  A.  No, I didn't resent that.  I didn't resent it,
14     no.
15  Q.  You didn't agree with what she was instructing
16     you to do?
17  A.  Well, at some -- not -- not during the
18     particular time that she was maybe our
19     supervisor.  I mean, I just know there were
20     times.  I don't know the dates or anything
21     or -- but I know that there were times that,
22     you know, because she wasn't experienced in
23     magistrate duties, that she would not

Page 303

1     understand by doing that to that or something
2     that it would not -- it's not the proper way
3     to do it.
4  Q.  Did you feel like you knew more than anybody
5     else in the office?
6  A.  I don't feel like I knew more than anybody
7     else, but I know that I've trained -- I
8     trained several of the people in that office.
9     And I knew that several people came to me when
10     they had questions, and I was given a little
11     bit more responsibility than others.  I didn't
12     feel like I knew more than they did.
13  Q.  You said sometimes she was belittling.  Do you
14     feel like your tone of voice and conduct was
15     often belittling to others?
16  A.  I don't know how they took it.  I mean, I
17     don't know how it was received or if it, you
18     know -- I don't know.
19  Q.  Now, we've been over a lot of stuff, and I'm
20     trying to wrap up.  But I'm just asking if
21     we've gone over all your claims that you're
22     making against the City and the judge and if
23     you've got any other evidence or information

Page 304

1     that would support your claims of race
2     discrimination?
3     MR. JAFFREE:  I'm not sure you've
4        covered her claims of
5        association, free association
6        claim, did you?
7  Q.  Your association.  I assume you're talking
8     about with Mary Turner?
9  A.  He asked the question.  I'm not sure.
10  Q.  Do you know what -- are you claiming free
11     association?
12  A.  Yes.
13     MR. JAFFREE:  She may not know she
14        is, but she is.
15  A.  I'm sorry.  I wasn't really paying attention
16     because I knew he was talking to you.  I'm not
17     sure.
18  Q.  And what facts do you have to support your
19     free association claim?
20  A.  What facts?
21  Q.  Yes.
22  A.  Well, I just don't -- I don't think that
23     someone has a right to tell you that you can't

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 305

1 socialize with someone away from the job.
2 It -- you know, that's just -- that's just
3 hard for me to believe when you've got a First
4 Amendment Freedom of Speech, and I want to
5 associate with the Pope, and, you know,
6 whoever. I should be -- that's my prerogative
7 to do that. I don't -- if -- if I'm going to
8 church that Sunday and she's in my Sunday
9 School class and we're discussing something,
10 I -- I'm going to be able to sit there and
11 talk to her or speak to her. I don't --
12 nobody should be allowed to tell me that I'm
13 not allowed to speak to somebody.
14 Q. Even if it's your supervisor at your job who's
15 asking you not to communicate with an
16 individual that's under police investigation
17 for a criminal offense?
18 A. She should not have a right to tell me, away
19 from my job, whether I can socialize or speak
20 to someone.
21 Q. Okay.
22 MR. JAFFREE: Your supervisor is not
23 God?

Page 306

1 THE WITNESS: That's correct.
2 Q. And that's your freedom of association claim?
3 A. That's --
4 Q. Okay. Do you have any other evidence that
5 would support your claims that you've been
6 discriminated against or treated differently
7 because of your race by Judge Gordon?
8 A. Just that it's -- it's very blatant that I was
9 disciplined for any little thing and was
10 internally investigated at times that I
11 shouldn't have been. And we've got Eunice and
12 Lavera who made just negligent errors with
13 people getting wrongfully arrested, which
14 violates their rights. And they're put in
15 jail, and they shouldn't have been. And
16 that's just something that when you first
17 become a magistrate, when I was up under Gayle
18 Schwarz, that was something that you just did
19 not allow to happen. And they were not
20 disciplined? So I -- I feel like that that's
21 just -- it's blatant.
22 Q. Okay. I think we've talked about that.
23 Anything else?

Page 307

1 A. I -- I can't think of anything right now.
2 MS. NELSON: Let me just have two
3 seconds outside with my client.
4 Q. Before we do that, really, you know, you've
5 given me all the documents that you have in
6 your possession that would support your claim?
7 A. Yes.
8 Q. And you or your attorney has given me a list
9 of people that might have knowledge about your
10 case. Most of them I think we've talked
11 about. Donna Snell?
12 A. That's Donna Nicholson. She's a Snell now.
13 Q. Thank you.
14 Gary -- we're have not talked about Gary
15 Shirah. What knowledge would he have about
16 your claims and your case?
17 A. I know he was a former magistrate. I don't
18 think we mentioned him. He now works in the
19 business license division.
20 Q. And what knowledge would he have about --
21 A. I'm not sure, other than that -- errors that
22 were made.
23 Q. Jerry Corbin? What knowledge would he have

Page 308

1 about your claims?
2 THE WITNESS: I think he was for
3 Nancy, wasn't he, on Nancy's --
4 A. I'm not sure. I think he was the acting city
5 manager at some point in time.
6 Q. You know if he had any involvement in any
7 matters or discipline affecting you?
8 A. I'm not sure. I think he -- I'm not sure if
9 he was acting city manager or not. I -- I
10 don't know.
11 Q. Mike West? Would he have any knowledge about
12 the claims you're making against the City?
13 A. I'm not sure. He was -- he's just a city
14 manager. I don't know.
15 Q. Kalia Spears Lane, would she have any
16 knowledge about the claims you're making?
17 A. I'm not sure.
18 Q. I'm just asking.
19 A. Well, I mean, I don't know because I don't
20 know if this is including Nancy's witnesses or
21 not.
22 Q. I'm just asking --
23 A. Oh, for me?

77  (Pages 305 to 308)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 309

1  Q. I'm just asking for your case?
2  A. Not to my knowledge. No.
3  Q. Mike Etress, we talked about him.
4  A. Yes, we did.
5  Q. Steve Parrish?
6  A. I don't think so. He might have been the
7      captain over CID. I'm not sure. I don't -- I
8      don't think he has anything to do -- he might
9      have been involved in Mary's criminal stuff.
10     I'm not sure.
11 Q. Don Thompson?
12 A. I think that's Nancy's witness. I don't think
13     he has anything to do with mine.
14 Q. Rickey Stokes?
15 A. We talked about him.
16 Q. I think you've told me everything that Rickey
17     Stokes may have knowledge about in your case?
18 A. Yes.
19 Q. Tim Dickerson?
20 A. He's another bondsman.
21 Q. Would he have any knowledge?
22 A. I don't think about mine, no.
23 Q. And then there's some municipal defendants

## Page 310

1      listed here, Michael Rudnick?
2  A. I don't know unless it was some that show
3      where errors were made. I'm not sure.
4  Q. Carmen Caster?
5  A. I don't know. We'll just have to pull the
6      file. I'm mean, I'm not sure.
7  Q. I'm just asking you if you know.
8  A. I mean, the names are familiar.
9  Q. Donald Earl Hauser?
10 A. Hauser.
11 Q. Hauser? You don't know?
12 A. I don't know.
13 Q. Cecil Eubanks?
14 A. I don't know.
15 Q. James Richard Culver?
16 A. That names rings a bell. I mean, could be,
17     you know, some error that they made. I'm not
18     sure. We'd just have to pull the paperwork
19     and look at it.
20 Q. Christopher Lee Carroll?
21 A. It sounds familiar.
22 Q. Malcolm Rescoe Davis?
23 A. I'm not sure about that one.

## Page 311

1  Q. Jerry Jessie?
2  A. I don't know.
3  Q. You've got to speak up.
4  A. I don't -- I'm sorry. I don't know. I don't
5      --
6  Q. Well, your attorney must have gotten these
7      from somewhere. I'm just --
8  A. Well, I mean, it could be for Nancy's stuff,
9      too. I don't know.
10 Q. I'm just asking if you know. Janasky Boykin?
11 A. Boykin, that's sounds familiar.
12 Q. But nothing that you can --
13 A. Well, I mean, we'd have to -- those are just
14     names that stand out that we'd have to pull
15     the paperwork to see. I mean, I couldn't
16     really tell you for sure.
17 Q. "Stand out" that what?
18 A. Well, I mean, they could've been falsely
19     arrested. I'm not sure.
20 Q. Tarael Steven?
21 A. The name doesn't do anything.
22 Q. Gregory Powe?
23 A. I do believe he was falsely arrested. I'm not

## Page 312

1      sure if that's the one that was with the cash
2      bond incident or not. I'm not sure.
3  Q. What cash bond incident?
4      MR. JAFFREE: Yeah, what cash bond
5      incident?
6  Q. What cash bond incident?
7  A. I think that's with Nancy's.
8      MR. JAFFREE: That's Nancy's?
9      THE WITNESS: I think so.
10 Q. Well, do you have knowledge of it?
11 A. Well, it's what they told me. I mean, you
12     know.
13 Q. Who told you what?
14 A. I don't -- but I'm not going to say that
15     that's the person for sure because I know that
16     there was an incident with a cash bond that --
17     when Michelle Bryan was going into the
18     courtroom in the side door one day, she -- and
19     this is her telling me.
20 Q. Okay.
21 A. She said that Judge Gordon -- in her office
22     was Judge Gordon, Eunice, a grandmother I
23     think -- it may have been the mother. And

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

|  | Page 313 |
|---|---|
| 1 | then the defendant had been arrested, and he |
| 2 | shouldn't have been. And there was -- she |
| 3 | posted a cash bond for him to get out. And |
| 4 | she wanted to know how to get her cash bond |
| 5 | money back. So that -- I'm not sure if that's |
| 6 | the one, if it was Gregory Powe or not. I |
| 7 | don't know. |
| 8 | Q. And who do you -- you don't know really why |
| 9 | he's listed? |
| 10 | A. He could be because of that. I'm not sure. |
| 11 | Q. And who are you claiming was involved in that |
| 12 | cash bond? |
| 13 | A. Eunice Knight. |
| 14 | Q. And other than what you've heard, you really |
| 15 | don't have any personal knowledge about it? |
| 16 | A. Not other than what Michelle told me. |
| 17 | Q. Michelle Bryan? |
| 18 | A. Yes. |
| 19 | Q. And Theron Fondren, we've talked about him? |
| 20 | A. Yes. |
| 21 | MS. NELSON: If you could give us |
| 22 | just a second, or we can step |
| 23 | out or y'all can step out. |

|  | Page 314 |
|---|---|
| 1 | MR. JAFFREE: We'll step out. |
| 2 | (Brief pause) |
| 3 | MS. NELSON: Okay. I believe that's |
| 4 | all I have right now. |
| 5 | EXAMINATION |
| 6 | BY MR. JAFFREE: |
| 7 | Q. You testified on direct or from the questions |
| 8 | that counsel for the City asked you that you |
| 9 | and Mary Turner were friends; is that correct? |
| 10 | A. Yes. |
| 11 | Q. Would you characterize yourself as close |
| 12 | friends? |
| 13 | A. Yes. |
| 14 | Q. And what do you mean by that. |
| 15 | A. Well, we not only went to church together, |
| 16 | we -- we'd go out to eat lunch together. We |
| 17 | socialized away from work. We -- we'd go to |
| 18 | each other's house for supper or dinner. We'd |
| 19 | go to her sister's house. She has a pool, and |
| 20 | we've had some parties or, you know, get |
| 21 | togethers over there. So there's just, you |
| 22 | know -- we'd go shopping together. |
| 23 | Q. Did y'all socialize on a regular basis? |

|  | Page 315 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. During the time you were employed with the |
| 3 | City? |
| 4 | A. Yes. |
| 5 | Q. Did you feel that a person acting as an |
| 6 | administrative supervisor had the right to |
| 7 | literally tell you not to make contract with |
| 8 | somebody who was a close friend? |
| 9 | A. I don't think she has a right to. |
| 10 | Q. To comply with her directive, do not contact |
| 11 | this person for an indefinite time, would that |
| 12 | have frustrated your rights to socialize with |
| 13 | this person? |
| 14 | Do you understand the question? |
| 15 | A. No. I'm sorry. Repeat. |
| 16 | Q. Listen carefully. |
| 17 | A. It's been a long day. |
| 18 | Q. For someone to tell you not to make any |
| 19 | contact with Mary Turner, would that have |
| 20 | frustrated your right to socialize with |
| 21 | Ms. Turner and have a relationship with her? |
| 22 | A. Yes. |
| 23 | Q. Did you interpret the no contact to be, don't |

|  | Page 316 |
|---|---|
| 1 | contact her for any reason? |
| 2 | A. I understood it to be while we were at work or |
| 3 | while I was working. |
| 4 | Q. And did you think that contact was limited |
| 5 | just to any matter relating to the |
| 6 | investigation? |
| 7 | A. Yes. I thought it meant about the |
| 8 | investigation that was going on. |
| 9 | Q. Were you in a position to notify Ms. Turner of |
| 10 | anything that could be useful to her with |
| 11 | respect to the investigation? |
| 12 | A. No. |
| 13 | MS. NELSON: Object to the form. |
| 14 | MR. JAFFREE: Thanks. |
| 15 | Q. Now, you stated earlier that the two black |
| 16 | magistrates, Lavera and -- |
| 17 | A. Eunice. |
| 18 | Q. -- Eunice made mistakes. |
| 19 | A. Yes. |
| 20 | Q. Data entry mistakes and mistakes on forms. |
| 21 | And I think in response to the question, you |
| 22 | said, other people may have made mistakes. |
| 23 | Could you compare the mistakes that Eunice |

79 (Pages 313 to 316)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 317 |
|---|

1    and Lavera made with respect to the other
2    magistrates' mistakes?
3    A.  Well, I don't know if they had mistakes where
4    people were falsely arrested, the other
5    magistrates.  I don't know.  But I know that,
6    you know, there might have been some clerical
7    data entry or -- I don't know that as far as
8    personal knowledge.  But --
9    Q.  Do you know whether or not Eunice and Lavera
10    made numerous mistakes?
11    A.  Yes, I do.
12    Q.  Were you present during the testimony of the
13    auditor with respect to the mistakes that she
14    discovered?
15    A.  Yes, I was.
16    Q.  And I think you testified earlier that at some
17    point the judge told you that anybody makes
18    errors?
19    A.  Yes.
20    Q.  When she terminated you for allegedly making a
21    data entry error, did she tell you that
22    everybody makes mistakes?
23           MS. NELSON:  Object to the form.

| Page 318 |
|---|

1    A.  No.
2    Q.  On speaking about that data entry -- let me
3    see what exhibit that is.  I think Exhibit
4    34.  Now, I notice here on Exhibit 34 next to
5    Stephen Phelps' name, there is no case number
6    indicated; is that correct?
7    A.  That's correct.
8    Q.  Now, why was there no case number indicated?
9    A.  Because I didn't have the ticket.
10    Q.  All right.  And you said, sometimes because of
11    how busy magistrates are, you have the
12    officers swear to these transmittals before
13    you go through and compare the tickets with
14    the entries that the officer made; is that
15    correct?
16    A.  Yes.
17    Q.  Would you say that's unique to you or other
18    magistrates did the same thing?
19    A.  I have -- I have witnessed other magistrates
20    do the same thing.
21    Q.  Were you ever given a directive of what to do
22    when you're busy and the police officers give
23    you these things with the tickets whether or

| Page 319 |
|---|

1    not you should rely on what they say or stop
2    what you're doing and go through them ticket
3    by ticket?
4    A.  I don't think there's anything that states
5    that we must sit there and compare both the --
6    the transmittal to the tickets and vice versa.
7    Q.  All right.  Was it your testimony that when
8    you started matching the tickets with the
9    names on this transmittal, you found a ticket
10    missing?
11    A.  Yes.
12    Q.  And I think it was your testimony that prior
13    to putting "void" in, you made a contact with
14    Officer Duhaime, is it?
15    A.  Duhaime.
16    Q.  And asked him, what's with this ticket?
17           MS. NELSON:  Object to the form.
18    A.  Yes.
19    Q.  And the officer stated --
20    A.  That he voided the ticket.
21    Q.  Now, did you have any reason to believe at
22    that time -- this was back in 2002 -- that a
23    police officer didn't have a right to void a

| Page 320 |
|---|

1    ticket?
2    A.  Ask that again, please.
3    Q.  Did you have any reason to believe in 2002
4    that a police officer didn't have a right to
5    void a ticket?
6    A.  No.
7    Q.  Now, when you said, voided, you didn't see the
8    ticket, did you?
9    A.  No, I did not.
10    Q.  You know if he wrote "void" on it or not?
11    A.  No.
12    Q.  If he voided the ticket but didn't write
13    "void" on it, you would have no way of
14    knowing?
15    A.  That's right.
16    Q.  So this entry that you made was based purely
17    on what he said?
18    A.  Correct.
19           MS. NELSON:  Object to the form.
20    Q.  Now, you were shown Exhibit Number 31 for
21    category of major offenses, and you were
22    accused of committing a major offense because
23    you put void in this column to reflect what

80  (Pages 317 to 320)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 321

1  the officer told you, correct?
2  A. Correct.
3  Q. Do you see anything on Exhibit 31 that
4  suggests that if you negligently or carelessly
5  put a data entry in, that you have committed a
6  major offense?
7      MS. NELSON: Object to the form.
8      (Brief pause)
9  A. No.
10 Q. Let me ask you this: Your putting void on
11 this transmittal form, would that be
12 considered a data entry?
13     Do you understand? Is void an indication
14 of a status?
15     MS. NELSON: Object to the form.
16 Q. Do you understand the question?
17 A. No, I'm sorry.
18 Q. All these items on here, on this form, is that
19 considered data entries?
20     Do you understand what a data entry is?
21 A. My keying it into the computer? Is that --
22 Q. Well, not necessarily keyed into the
23 computer.

Page 322

1  A. I'm sorry.
2  Q. But do you know what data is?
3  A. Yes. It's information.
4  Q. Information?
5  A. Right.
6  Q. Do all these numbers represent information?
7  A. Yes.
8  Q. Does this voided represent information?
9  A. Yes.
10 Q. So these entries represent information,
11 correct?
12 A. Correct.
13 Q. Data, correct?
14 A. Correct.
15 Q. They are entered on something, right?
16 A. Correct.
17 Q. So these would've been considered data
18 entries?
19     MS. NELSON: Object to the form.
20 A. Correct.
21 Q. Correct? Okay. So this is a representation
22 of a data entry?
23 A. Yes.

Page 323

1  Q. And you got accused of negligently putting
2  that data entry in?
3  A. Yes.
4  Q. And you said that you don't see on Exhibit 31
5  where any of these things for negligently
6  putting any data entry in is a major offense?
7  A. That's correct.
8  Q. But let's assume that it is. Do you know for
9  a fact that Lavera put in negligent data
10 entries on anything, a computer or form or
11 anything?
12 A. Yes.
13 Q. Do you know for a fact whether Eunice has ever
14 committed a data entry error?
15 A. Yes.
16 Q. Do you know if the judge -- the defendant, the
17 judge here, was aware that Eunice had
18 committed a data entry error?
19 A. Yes.
20 Q. Do you know for a fact whether the judge was
21 aware that Lavera had committed a data entry
22 error?
23 A. Yes.

Page 324

1  Q. Okay. Do you know whether or not Lavera has
2  ever been suspended for ten days?
3  A. No.
4  Q. Do you know for a fact whether Eunice has ever
5  been suspended for ten days?
6  A. No.
7  Q. You don't or they were not?
8  A. To my knowledge, they were not.
9  Q. You mean, from the time you were there?
10 A. Right.
11 Q. Would you have known it if they were suspended
12 for ten days?
13 A. Sure I would have.
14 Q. So to your knowledge, neither one of them were
15 suspended for ten days?
16 A. That's correct.
17 Q. All right. During the time you were there,
18 were either of them terminated for putting in
19 a negligent data entry?
20 A. No.
21 Q. As far as you know, were either of them
22 disciplined in any manner for putting in a
23 negligent data entry?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 325

1  A. No.
2  Q. If you were terminated for putting in a
3     negligent data entry and if they didn't
4     receive any discipline at all for putting in a
5     negligent data entry, would you say that you
6     were treated differently than they?
7  A. Yes.
8  Q. Were you, Eunice, and Lavera all magistrates?
9  A. Yes.
10 Q. With the same status?
11 A. Yes.
12 Q. Same job duties --
13 A. Yes.
14 Q. -- responsibilities?
15    Were they of the same racial group as you?
16    Do you understand about racial?
17    Were they of a different race?
18 A. Yes.
19 Q. So these two were black individuals or
20    African-American?
21 A. Yes.
22 Q. These same African-Americans committed the
23    same category of offense that you did,

Page 326

1     correct?
2  A. Yes.
3     MS. NELSON: Object to the form.
4  Q. Well, did they -- as far as you know, did each
5     commit a data entry error?
6  A. Yes.
7     MS. NELSON: Object to the form.
8  Q. And they were treated differently; is that
9     correct?
10 A. Yes.
11 Q. Is that discrimination in your mind?
12 A. Yes, it is.
13 Q. Now, do you know for a fact whether or not the
14    two of them were treated differently than
15    other whites that worked in that department?
16    Do you understand the question?
17 A. I'm sorry.
18 Q. Maybe I need to rephrase my questions. Do you
19    know if Lavera and Eunice were treated
20    differently than other white magistrates?
21 A. Yes.
22    MS. NELSON: Object to the form.
23 Q. Are you aware of another black magistrate that

Page 327

1     got hired?
2  A. Yes.
3  Q. Are you familiar with any incidents where the
4     Defendant Judge Gordon went out of her way to
5     benefit this black magistrate that got hired?
6     MS. NELSON: I'm sorry. Say that
7     again.
8  Q. Do you know of any incident where the
9     defendant judge went out of her way to benefit
10    this black magistrate that was hired?
11 A. All I know is from what Nancy has talked to me
12    about since we've been terminated from the
13    City.
14 Q. And what magistrate are you referring to?
15 A. Tonya Minifield.
16 Q. Do you know anything with respect to finding
17    Tonya an office when she first got hired?
18 A. Yes.
19 Q. And what do you know?
20 A. Well, I know that they -- they moved some
21    magistrates around, and we actually asked the
22    city manger from what I -- or, well, I say
23    we. I say judge; I guess the department

Page 328

1     head -- asked to -- because the building that
2     they're currently in, we only had so much
3     office space out of that building. So in
4     order to acquire additional room, it had to be
5     approved through the city manager. And I
6     understand that Valarie was moved to that
7     office, and I'm not sure if Michelle Bryan was
8     moved to Valarie's old office of if Tonya got
9     Valarie's old office. But I do know that they
10    made an office for her.
11 Q. Was she high on the seniority roster, Tonya?
12    Do you understand the question?
13 A. That I'm not sure of.
14 Q. We're talking about Tonya?
15 A. Yes.
16 Q. Do you understand what I mean by, high on the
17    seniority roster? I'm talking about between
18    the magistrates that were currently working --
19 A. Oh, okay. I'm sorry.
20 Q. -- do you know if she was higher on the
21    seniority?
22 A. No. She was -- she was on the bottom.
23 Q. She was the lowest thing on the totem pole?

82  (Pages 325 to 328)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## Page 329

1   A. Yes.

2   Q. And efforts were made to get her a nice

3      office?

4         MS. NELSON: Object to the form.

5   A. Yes.

6   Q. You're quite sure of that?

7   A. Yes.

8   Q. Can you think of any reason, other than she

9      was a minority, that efforts were made to get

10     her a good office?

11  A. Not to my knowledge. I know that Mary Turner

12     asked for an office, and she was told she

13     didn't need one.

14  Q. Mary Turner is what color?

15  A. White.

16       MS. NELSON: Object to the form.

17       Hearsay.

18       MR. JAFFREE: Mary Turner being

19     white is hearsay?

20  Q. Okay. All right.

21       MS. NELSON: No. That's not why I

22     was objecting.

23  Q. Y'all implemented a new commuter system; is

## Page 330

1     that correct?

2   A. Correct.

3   Q. And, so, when the system was just starting,

4     errors in data entry could be expected, right?

5   A. Sure.

6   Q. When did the system, you think, get

7     implemented?

8   A. I don't remember. I don't --

9   Q. Do you recall what year?

10  A. I know that we were over here at the two-story

11     building on the corner. But I'm not -- I know

12     that -- I'm not sure if Donna was here or

13     not.

14  Q. Let me ask you this: After the system had

15     been implemented and the people had an

16     opportunity to get familiar with the system,

17     were Eunice and Lavera still making data entry

18     errors?

19  A. Yes.

20      (Brief pause)

21  Q. Now, I noticed on Exhibit 15 and all other

22     exhibits dealing with employee job performance

23     evaluations, you indicated "concur" or "I

## Page 331

1     concur" and some variant of those terms on

2     every single one. Why did you do that?

3   A. I just -- that's just the word I used. I

4     didn't -- you know, I used that on all of

5     them.

6   Q. Did you intend by the use of that word to

7     agree with every entry that was on this

8     document?

9   A. No, not everything. And I felt like if I

10     wrote something that I didn't agree with,

11     I -- you know, it would be used against me.

12  Q. For instance, on Exhibit 15, on page 2, number

13     8, dealing with the public, it says, "Recently

14     there have been complaints from attorneys

15     regarding the way they were talked to by Mary

16     Beth."

17      Did you agree with that?

18  A. No, because I didn't never -- it wasn't

19     brought to my attention or who was

20     complaining.

21  Q. Did any attorney ever tell you that they

22     disliked the way you were speaking with them?

23  A. No.

## Page 332

1   Q. And in your opinion, did you ever speak in an

2     unprofessional to an attorney?

3   A. Not to my knowledge.

4   Q. Do you recall whoever was the evaluator, Donna

5     Nicholson, providing you with specificity as

6     to what attorneys had complained?

7   A. No.

8   Q. Did anybody ever show you a memo or letter

9     from an attorney, indicating a complaint?

10  A. No.

11  Q. So when you said you -- and all you said here

12     is "concur," you did not intend to concur with

13     this item here on page 2, item number eight?

14      MS. NELSON: Object to the form.

15  A. That's correct.

16      (Brief pause)

17  Q. Now, on Exhibit Number 7, you also -- did I

18     mention -- this is 7 I just mentioned --

19     concur. And it states here in Section 3 that

20     "she has corrected some problems she has had

21     in communication skills with dealing with the

22     public."

23      Did you concur that you had problems in

# FREEDOM COURT REPORTING

Page 333

1  your communication skills in dealing with the
2  public?
3  A. No.
4  Q. So when you concurred, you did not intend to
5  concur that you had problems —
6      MS. NELSON: Object to the form.
7  Q. — in dealing with the public?
8  A. That's correct.
9  Q. Did anybody explain to you what they meant by
10  problems with communication skills in dealing
11  with the public?
12  A. No.
13  Q. So you don't know what they were referring to?
14  A. No.
15  Q. And the same thing was mentioned in
16  Defendants' Exhibit Number 8. You said, "I
17  concur." And there's an entry here that "she
18  is currently showing some problems in the area
19  of communication with the public and other
20  employees along with some poor attitude."
21      Did you intend to concur with that
22  comment?
23  A. Well, I didn't — no. I mean, I disputed

Page 334

1  the — you know, I didn't agree with her — I
2  mean, with what she said.
3  Q. Okay. Well, did she indicate to you in detail
4  what kind of poor attitude you have?
5  A. No, not that I recall.
6  Q. What type of communications with the public
7  that you had?
8  A. Not that recall.
9  Q. Was there ever a performance plan drafted for
10  you to tell you how you should approach the
11  public versus the way you were approaching the
12  public?
13  A. I'm not sure if there was. I don't know.
14  Q. Was it ever given to you?
15  A. I don't — I don't recall one given to me.
16  Q. Try to stay awake a few more minutes.
17  A. Let me get some water.
18      (Brief interruption)
19  Q. Let me show you what's been marked by the
20  Defendant as Exhibit 16, this document right
21  here (indicating).
22      I think on direct testimony, you stated
23  that Ms. Sellers had informed you that if you

Page 335

1  didn't sign that document, you would be
2  considered insubordinate?
3  A. That's correct.
4  Q. Did Ms. Sellers present herself as an agent
5  for the Defendant Gordon?
6      Do you understand the question?
7  A. Yes.
8      MS. NELSON: Object to the form.
9  Q. Did you think that Ms. Sellers was providing
10  you this document on behalf of Judge Gordon?
11  A. Yes.
12  Q. Do you have reason to believe that Ms. Sellers
13  drafted this document and forged Judge
14  Gordon's name and submitted that on her own
15  behalf?
16  A. No.
17  Q. Do you think Ms. Sellers would have told you
18  that if you didn't sign that, you'd be
19  insubordinate without getting prior clearance
20  from Defendant Gordon to tell you that?
21  A. I would hope not. I don't know.
22  Q. So was it your opinion at the time that you
23  were required to sign that in order to keep

Page 336

1  your job?
2  A. Yes.
3  Q. Now, do you remember the first police
4  interrogation that you had?
5      MS. NELSON: Object to the form.
6  A. Yes.
7  Q. Or what the defense has referred to as, I
8  guess an investigation, but it was something
9  you were required to attend, correct?
10  A. Yes.
11  Q. And were one or two police officers present
12  when you first — at the first one you had?
13  A. Two.
14  Q. Do you remember when that was?
15  A. It was in November of 2001.
16  Q. And that was involving the alleged claim that
17  you referred to somebody as incompetent?
18      MR. JAFFREE: Object to the form.
19  A. I don't know about incompetent.
20  Q. Well, some public defender —
21  A. Yes.
22  Q. — as being incompetent or not knowing what
23  they were doing or something.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 337

1  A.  Yes.
2  Q.  There was an accusation made to that effect?
3  A.  Yes.
4  Q.  And during this police interrogation, did you
5      get the impression that officers involved were
6      attempting to get you to admit —
7  A.  Yes.
8  Q.  — that you had accused a public defender of
9      being incompetent?
10 A.  Yes.
11 Q.  And told the defendant to obtain the services
12     of somebody else?
13 A.  Yes.
14 Q.  Do you know if they presented the results of
15     their interrogation to Defendant Gordon?
16         MS. NELSON:  Object to the form.
17 A.  I'm not sure if they did or not.  I mean, it
18     was — I know that it was on my evaluation.  I
19     don't know what the outcome of that was.  I
20     don't know if — you know, I don't know.
21 Q.  Other than that police interrogation, did the
22     evaluator who placed that information on your
23     evaluation ask you for your side of the story?

Page 338

1          MS. NELSON:  I'm confused.  You're
2      asking her about what now?
3  Q.  We're talking about this first incident —
4  A.  Right.
5  Q.  — of police interrogation.
6  A.  Right.
7  Q.  And you provided the police with your side of
8      the story; is that correct?
9  A.  That's correct.
10 Q.  Then you subsequently saw that incident on an
11     evaluation?
12 A.  Correct.
13 Q.  And my question was, did the evaluator give
14     you an opportunity to give your side of the
15     story before they put that entry in the
16     evaluation?
17 A.  I don't know if Donna did or not.  She's the
18     one that evaluated me.  I'm not sure if she
19     asked me.
20 Q.  Do they generally have — the evaluators have
21     the evaluations done prior to talking to you?
22 A.  Yes.
23 Q.  So most of the entries are already in there

Page 339

1      when they talk to you?
2  A.  Yes.
3  Q.  So this entry concerning that event may have
4      already been placed on your evaluation form —
5  A.  Yes.
6  Q.  — before you got spoken to?
7  A.  Correct.
8  Q.  Okay.  And had Donna talked to you or whoever
9      was the evaluator — I don't want to go back
10     and try to retrieve that exhibit.  But had
11     Donna and whoever the evaluator had spoken to
12     you and got your version, your version doesn't
13     appear on the evaluation form, does it?
14 A.  No, it does not.
15 Q.  And there's no star indicating that you
16     dispute these facts?
17 A.  That's correct.
18 Q.  And I think you testified earlier that your
19     concurrence did not mean that you agreed with
20     those facts?
21 A.  That's correct.
22 Q.  The next police interrogation, do you know
23     what that was about?

Page 340

1  A.  Yes, I do.
2  Q.  What was that about?
3          MS. NELSON:  Object to the form.
4  A.  That was the Theron Fondren incident with —
5      an investigation with Sergeant Gary Coleman
6      and Sergeant Ray Owens.
7  Q.  Were you instructed by Defendant Gordon or her
8      agent or servant or employee to attend that
9      interrogation?
10 A.  Yes.
11 Q.  Were you required to — I'm not sure you
12     signed the form, but they gave you a form
13     telling you that you had to —
14 A.  Yes.
15 Q.  — attend that interrogation?
16 A.  Well, I signed the forms, too, at the
17     beginning of the interrogation for the police
18     department.
19 Q.  But you don't have access of those?
20 A.  I asked for copies of those, and I was never
21     presented with them.
22 Q.  Okay.  Did you feel, at that interrogation,
23     you were free to leave at any time without the

85  (Pages 337 to 340)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 341

1      loss of your job?
2   A.  No.
3   Q.  What about the first interrogation that you
4       testified to earlier; did you feel you were
5       free to leave there?
6   A.  No.
7   Q.  So you felt that if you left, there would be a
8       consequence?
9   A.  Sure.
10  Q.  So did you feel you were free to not answer
11      their questions?
12  A.  No.  I was told that I had to cooperate fully.
13  Q.  And if you didn't cooperate fully, what did
14      you think would happen?
15  A.  I would be fired.
16  Q.  Now, did the judge have any time in her busy
17      week in which to talk to you to ask you the
18      same questions that the police officers asked
19      you?
20  A.  She did not.
21  Q.  Did she have the time?
22  A.  I feel like she did, yes.
23  Q.  You said she's off on Fridays?

Page 342

1   A.  Yes.
2   Q.  So she could have taken the time to ask you
3       your version of events?
4   A.  Yes.
5       MS. NELSON:  Object to the form.
6   Q.  How long do think it would have taken for you
7       to tell her your version of events?
8       MS. NELSON:  Object to the form.
9   A.  Not long.
10  Q.  Like how long?
11  A.  I -- I don't know.  I mean, I don't --
12      depending on how she would ask me if she would
13      ask me questions or if I were just to tell to
14      her what happened.  I don't know how long it
15      would take.  It wouldn't take long.
16  Q.  This is the Fondren, right, the Fondren case,
17      the Fondren matter, the second interrogation?
18  A.  Yes.  Yes.
19  Q.  Now, did Mr. Fondren come to you on that day?
20  A.  Yes, he did.
21  Q.  Did you know Mr. Fondren prior to his coming
22      to you?
23  A.  No, I did not.

Page 343

1   Q.  Do you have any idea why he picked you out to
2       come visit?
3   A.  I don't know.
4   Q.  Did he mention you by name?
5   A.  Yes, he did.
6   Q.  Did you tell him at the time he mentioned you
7       by name, Mr. Fondren, guess what --
8       MS. NELSON:  Object to the leading.
9   Q.  Did you suggest to Mr. Fondren in any way that
10      he had been falsely arrested?
11  A.  No.
12  Q.  Did you know he had been falsely arrested?
13  A.  I don't remember.  I'm sure I --
14  Q.  Prior to his coming to you?
15  A.  Prior to?  No.  No.
16  Q.  How would you know?
17  A.  I didn't even know -- no.  He just came up to
18      me and asked me.
19  Q.  Prior to his coming to you, did you make a
20      telephone call to him and tell him you wanted
21      to see him?
22  A.  No.
23  Q.  So if the City's version of events is to

Page 344

1       believe Mr. Fondren came to you and you just
2       told him that he had been falsely arrested --
3       MS. NELSON:  Object to the form.
4   Q.  Correct?
5   A.  That's what they said, yes.
6   Q.  But your testimony was that he told you that
7       he was falsely arrested?
8   A.  Yes.
9   Q.  And did you tell this to the police officers
10      doing the investigations?
11  A.  Yes, I did.
12  Q.  Did you tell this to the judge?
13  A.  I'm not sure if we discussed -- I don't think
14      she went over that with me.  I'm not sure.
15  Q.  But four months later, you suddenly got notice
16      that you were being suspended?
17  A.  Correct.
18  Q.  And during the interim, you don't have any
19      recollection of anybody talking to you, other
20      than the police?  The police talked to you
21      during this interrogation?
22  A.  Correct.
23  Q.  And then four months later, you got a notice

86  (Pages 341 to 344)

# FREEDOM COURT REPORTING

Page 345

1  telling you that you had been terminated?
2  A. That's correct.
3       MS. NELSON: Object to the term
4       "terminated."
5  Q. I'm sorry. Suspended.
6       Did you lose income during the time you
7  were suspended?
8  A. Yes, I did.
9  Q. Were you humiliated during the time you were
10  suspended?
11       MS. NELSON: Object to leading.
12  A. I was upset.
13  Q. Did other people in your department know that
14  you were suspended?
15  A. I'm -- I'm sure they were. I mean, I'm sure
16  they did. I don't know. I mean, I don't know
17  what the judge told them or if anybody told
18  them anything.
19  Q. Now, after you returned back from your
20  suspension, did you immediately start working
21  or did you have to talk to the judge first?
22  A. I'm not sure if Nancy and I were told to go
23  there first thing or if it was during the

Page 346

1  course of the day. I'm not sure.
2  Q. It would either have been the first thing or
3  the course of the day?
4  A. Yes.
5  Q. Did the judge tell you that somebody was
6  dissatisfied with your attitude?
7  A. No.
8  Q. Did the judge initiate the conversation about
9  whether you wanted your job, or did you
10  initiate it?
11  A. She did.
12       (Brief pause)
13  Q. Okay. I'll direct your attention to
14  Defendants' Exhibit 30. Nancy Martin
15  completed this evaluation; is that correct?
16  A. That's correct.
17  Q. December 30?
18  A. Yes, sir.
19  Q. And she indicates here on the bottom of the
20  first page that this major offense that you
21  allegedly committed was not during her tenure?
22  A. Right.
23  Q. Is that correct?

Page 347

1  A. That's correct.
2  Q. So this marking that she gave you was not
3  something based on her direct knowledge?
4  A. That's correct.
5  Q. And on this next page, this item number eight,
6  dealing with the public, was based on that
7  same incident; is that correct?
8  A. I -- I assume that is. That's what I
9  understood.
10  Q. Well, I'll tell you what she said. "Mary Beth
11  deals with the public satisfactory from my
12  observation. She was determined to have
13  committed a major offense recently with regard
14  to dealing with dealing with a defendant and
15  what was said to him."
16       So she gave you a bad marking, again,
17  based on something that did not occur during
18  her tenure?
19  A. That's correct.
20  Q. So this would be a marking that somebody
21  instructed her to make?
22  A. I would think so because she -- she didn't
23  know about it.

Page 348

1  Q. Who would be in a position to instruct Nancy
2  to put anything on your evaluation?
3  A. I assumed it would be the department head.
4  Q. And who would that be?
5  A. Judge Gordon.
6  Q. Can you think of anyone else within the
7  magistrate's office of being in a position to
8  instruct Nancy to put some markings on your
9  evaluation?
10  A. No.
11  Q. So either she did it on her initiative or she
12  did it at the request of somebody in the
13  position to make that request, right?
14  A. Yes.
15  Q. And the only person that could have been was
16  the Defendant Gordon; is that correct?
17  A. That's correct.
18  Q. Now, you indicated an Officer Etress -- how do
19  you pronounce his name?
20  A. Which --
21  Q. He talked to you about this ticket, this --
22  A. Etress.
23  Q. Yeah, Etress. Did he talk to you in his

87 (Pages 345 to 348)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 349

1 office or what?
2 A. Yes, in his office.
3 Q. Who instructed you to go and talk to him?
4 A. I don't -- I'm not sure. I believe he called
5    and asked me to come to his office. I'm not
6    sure if he did or if Judge Gordon did. I'm
7    not sure. I don't remember.
8 Q. Did you consider that a form of interrogation?
9 A. Yes.
10 Q. Did Officer Etress tell you to answer his
11    questions?
12 A. I believe so.
13 Q. Did you feel you were free to leave at anytime
14    and not --
15 A. No.
16 Q. -- answer his questions?
17 A. No.
18 Q. Do you have an opinion as to the consequences
19    of what would happen had you left --
20 A. I --
21 Q. -- without his permission?
22 A. I would've been probably written up or
23    something else happen. I mean, I felt like I

Page 350

1    had to stay and do what he instructed.
2 Q. The ticket that he talked to you about, did
3    you have anything to do with that ticket?
4 A. No.
5 Q. That was the ticket that you had no knowledge
6    of, correct?
7 A. Correct.
8 Q. And you haven't been charged with anything
9    related to that ticket; is that correct?
10 A. That's correct.
11 Q. Now, sometime later, the police officers again
12    had you in for interrogation?
13 A. Yes.
14    MS. NELSON: Object to the form.
15 Q. And I think you testified about a lie
16    detector?
17 A. Yes.
18 Q. Exactly how did that come up?
19 A. I'm not -- you know, the only thing I know is
20    that Sergeant Gray was adamant that the leak
21    about Mary's investigation came from someone
22    in our office, and that his comment was that
23    if he felt like somebody was lying, he would

Page 351

1    administer a lie detector test and we could
2    not refuse.
3 Q. I see. And did he ask you during that
4    conversation about your -- any contact you had
5    had with Mary?
6 A. I don't remember if it was the first incident
7    or the second time. I think it was the second
8    time he questioned me that he asked me about
9    if I had any contact with Mary.
10 Q. You mentioned that he interrogated you a
11    second time the very next day?
12 A. I believe it was the next day.
13 Q. Was the purpose of this interrogation?
14 A. He asked me if I had any contact with Mary.
15 Q. Do you have any idea what would have motivated
16    him to ask you about Mary the very next day?
17 A. I don't know.
18 Q. Do you know if he asked anyone else about
19    Mary?
20 A. I don't know.
21 Q. Okay.
22 A. I don't know.
23 Q. And were you honest with him about your

Page 352

1    contacts with Mary?
2 A. Yes.
3 Q. And did you tell him the nature of the
4    contact?
5 A. Yes.
6 Q. Did your feel you had done anything wrong?
7 A. No.
8 Q. Subsequent to that conversation with -- was it
9    Officer Gray?
10 A. Yes.
11 Q. Did you talk with Defendant Gordon subsequent
12    to your conversation with Officer Gray?
13 A. Other than just that meeting that she had with
14    all of us.
15 Q. Well, that was prior to --
16 A. That was prior to that.
17 Q. But subsequent --
18 A. No. Well, other than -- other than putting me
19    on administrative leave.
20 Q. Did she have a discussion with you when she
21    put you on administrative leave?
22 A. She just told me -- handed me the memo and
23    told me to hand over my keys.

88  (Pages 349 to 352)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 353

1  Q.  She didn't ask you your version of events?
2  A.  No. No.
3  Q.  She didn't ask you, why did you feel the need
4      to talk to Mary?
5  A.  No.
6  Q.  She didn't ask you anything about the nature
7      of your conversation with Mary?
8  A.  No.
9  Q.  So she just said, you're summarily on
10     administrative leave?
11 A.  Yes.
12 Q.  Okay.  And were you subsequently notified that
13     you were terminated?
14 A.  Yes.
15 Q.  You were asked earlier about whether or not
16     you felt the white employees that commit
17     errors should be disciplined, and you said
18     yeah.  But as far as you know, white employees
19     that committed any kind of misconduct, have
20     they been disciplined?
21     MS. NELSON:  Object to the form.
22 A.  I'm sorry?
23 Q.  Are you aware of white employees who were

Page 354

1      accused of any kind of misconduct being
2      disciplined?
3  A.  Other than just what --
4  Q.  Do you understand the question?
5  A.  Ask me again.
6  Q.  Are you aware of any white employees who were
7      accused of misconduct being disciplined by
8      Defendant Gordon?
9  A.  No, not --
10 Q.  Listen to the question.
11     MS. NELSON:  You don't like her
12         answer.  Let her answer.
13     MR. JAFFREE:  Well, she's not
14         listening to the question.
15 Q.  Listen to the question.
16     MS. NELSON:  No.  You don't like her
17         answer, so you're trying to get
18         her to change it.
19     MR. JAFFREE:  Because, come on,
20         obviously she was disciplined,
21         so she's got to be aware.
22 A.  Oh, I'm sorry.
23     MS. NELSON:  If we're staying here

Page 355

1      at this late date to determine
2      she was disciplined, I think
3      we're beyond that.
4  Q.  Listen to the question.  Are you aware of any
5      white employees, any white magistrates or
6      other employees who were accused of misconduct
7      being disciplined by the defendant?
8  A.  Yes.
9  Q.  Are you aware of any blacks who were accused
10     of misconduct or errors being disciplined?
11 A.  No.
12     MR. JAFFREE:  And I'm through with
13         her.  I don't have any other
14         questions.  She's exhausted.
15 Q.  Your mind is drifting away from my questions.
16 A.  I thought you were talking about other than
17     me.  I'm sorry.
18 Q.  Or even other than you.
19 A.  Well, I knew --
20     MS. NELSON:  That's all you have?
21     MR. JAFFREE:  Yeah.
22         Not that she's all I
23         have.  It's all I'm going to get

Page 356

1      because I don't know what I'm
2      going to get out of her, if
3      she'd answer my question.
4      EXAMINATION
5  BY MS. NELSON:
6  Q.  He kept asking you about data entry errors
7      that Eunice and Lavera committed but were not
8      disciplined for.  Tell me all of the data
9      entry errors that they made.
10 A.  Well, I don't -- I mean, I've shared some of
11     them with you today.  I know that there were
12     other magistrates that complained.  I can't
13     tell you specifically which cases they were,
14     but I know that there were numerous mistakes.
15     I know that we had mistakes with the money
16     situation because Valarie Harris, the city
17     auditor, and I talked about that.  She made
18     the judge aware of some of those errors.
19 Q.  Were these like keying errors or entry errors?
20 A.  Both.  Yes.
21 Q.  Now, he showed you this transmittal form.  Why
22     do you void on a transmittal form; it's not a
23     keying error, is it?

89  (Pages 353 to 356)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 357

1   A.  A keying error?
2   Q.  A keying error, a data entry error?
3   A.  A data entry error?
4   Q.  Yeah, into a computer system?
5   A.  Well, it's -- I mean, I'm sorry.  I don't
6       understand the question.
7   Q.  You handwrote "void" on that transmittal sheet
8       and drew a line through it?
9   A.  Correct.
10  Q.  That was your -- with a pen or pencil with
11      your own handwriting?
12  A.  With a pen.
13  Q.  You were not keying into any type of data
14      entry system or computer or typewriter, were
15      you?
16  A.  I did not key that into -- that one into the
17      computer, no, because I did not have it.
18  Q.  And your attorney -- through your attorney's I
19      guess, more testimony than yours, tried to get
20      you to say that that is a data -- I'm pointing
21      to Defendants' 34 -- your striking through and
22      writing "void" by Stephen Phelps' name as a
23      data error.  Is that your -- you call that a

Page 358

1       data entry error?
2   A.  That's states what happened to that ticket.
3   Q.  And are you aware that your testimony today is
4       different than the testimony that you gave at
5       the Appeals Board Hearing before the Personnel
6       Board?
7   A.  No.
8           MR. JAFFREE:  Object.  You didn't
9           tell her how it's different,
10          other than stating it's
11          different.
12          MS. NELSON:  I don't have to tell
13          her anything.
14          MR. JAFFREE:  Well, you told her, it
15          was different.
16          MS. NELSON:  Well, I'm just asking
17          her if she's aware it's
18          different.
19  Q.  Are you aware of what Officer Duhaime's
20      testimony was in that hearing?
21  A.  I don't recall his testimony.
22  Q.  Do you have any reason to believe that he was
23      not being truthful at that hearing?

Page 359

1   A.  I don't know.  I mean, I don't -- I can't
2       testify as to whether he was truthful or not.
3       I can only testify as to what I know.
4   Q.  Would you say that hearing was a year or so
5       ago?
6   A.  It was in 2005.
7   Q.  Would you say your memory was better then than
8       it is now?
9   A.  I don't know.  I mean, I -- about this
10      particular incident?  It could be, and it
11      couldn't be.  I mean --
12  Q.  Are you aware that Eunice or Lavera ever
13      voided -- excuse me, ever struck through a UTC
14      transmittal form indicating that a ticket
15      should be void?
16  A.  No.
17  Q.  And the effect of writing "void" on this
18      transmittal form was that ticket was not
19      entered into the system and it's almost as if
20      that ticket did not exist; isn't that the
21      result of --
22  A.  Well, voided tickets do not get key in the
23      computer.  They don't get assigned a case

Page 360

1       number.
2           MR. JAFFREE:  Her testimony was the
3           ticket was not presented to be
4           keyed into the computer anyway.
5   Q.  And if Officer Duhaime testified that he gave
6       you the ticket, it's your testimony that he's
7       not being truthful?
8   A.  I did not have that ticket when -- when I
9       swore to this.
10  Q.  When did you remember, you did not have that
11      ticket?  You didn't remember that at the
12      Personnel Board hearing, did you?
13  A.  I don't know.  I don't -- I'd have to look
14      over --
15  Q.  Did you just remember that today?
16  A.  Do what now?
17  Q.  Did you just remember today that you didn't
18      have that ticket when you voided this
19      transmittal form?
20  A.  When I -- when I wrote "void" through there, I
21      did not have that ticket at that time when I
22      keyed them into the computer.
23  Q.  Because you'd given -- you had it and you had

90  (Pages 357 to 360)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 361

1    even sworn to it, hadn't you, and then you
2    gave it back to Duhaime, didn't you?
3    A.  No, ma'am.
4    Q.  Did you ever see that ticket?
5    A.  No, ma'am.  I didn't even sign the ticket, but
6    I'd sworn to it.  I mean, I didn't even have
7    it.
8    Q.  How do you know you didn't sign it?
9    A.  Because you showed it to me.  I mean, I was
10   showed (sic) it.  I showed -- it was shown to
11   me during the Personnel Board hearing.
12   Q.  And you don't know what Officer Duhaime's
13   testimony was in that regard?
14   A.  I don't recall.  I'd have to go back and read
15   it.  I don't recall.
16   Q.  Do you have any reason to believe he would not
17   be truthful?
18   A.  I don't know unless he was covering for
19   himself to where he didn't get in trouble.  I
20   don't know.
21   Q.  Do you know what contact Mary Turner may have
22   had with him about this ticket?
23   A.  Not other than what was presented at -- at my

Page 362

1    hearing.
2    Q.  Do you remember that part?
3    A.  No.  I'd have to go back and read it.  I mean,
4    I don't remember the whole -- the whole
5    story.
6    Q.  Now, you said -- and I asked you and your
7    attorney asked you that on all your
8    evaluations that I went through with you, you
9    concurred on the statements that were put in
10   there; is that correct?
11   A.  Yes.
12   Q.  And you did this whether it was Gayle Schwarz
13   or Donna Nicholson or Bettye King or Judge
14   Gordon; isn't that true?
15   A.  Yes.
16   Q.  And you had every opportunity to write down if
17   you disagreed or if you agreed or if you had a
18   question about it, didn't you?
19   A.  I had an opportunity to do that, yes.
20   Q.  And you chose to concur with what was written?
21   A.  Yes.  But that -- that doesn't mean I did not
22   dispute it verbally at the time.
23   Q.  "Dispute it verbally" meaning what?

Page 363

1    A.  When they were going over that with me as far
2    as maybe stating, you know, or by reading me
3    it, they didn't --
4    Q.  You're saying, you verbally disagreed with
5    them?
6    A.  I -- I could have.  I'm sure I did.  I
7    don't -- I wasn't told or shown anything that
8    if an attorney complained, I wasn't shown
9    anything where a attorney had complained.
10       I'm not going to sit there and say that,
11   yes, I agree with you stating that about that
12   attorney whenever I don't -- I -- I would've
13   said, no, I didn't agree.
14   Q.  Didn't you have an opportunity to ask Donna
15   about it, Gayle about it, Bettye about it, if
16   there was a negative remark on your
17   evaluation?
18   A.  I -- I could have.  I don't remember each and
19   every evaluation, what was said.
20   Q.  Well, you seem to be somebody that has strong
21   convictions or strong will, and if somebody
22   had put down something that was not true or
23   you disagree with, that you would let them

Page 364

1    know about it.
2    A.  Well, I -- I could have verbally, but I didn't
3    write it down on the actual evaluation.
4    Q.  And it wasn't true and it affected your
5    evaluation, you're telling me it wasn't
6    important enough to you to make more of an
7    issue of it?
8    A.  Well, it wouldn't change it.
9    Q.  How do you know?
10   A.  They can't change the evaluations.
11   Q.  How do you know?
12   A.  I don't -- I don't know of any being able.
13   Q.  You don't know.  Have you ever been a manager
14   for the City of Dothan?
15   A.  No.
16   Q.  So you don't know for a fact that they
17   couldn't change an evaluation, do you?
18   A.  I don't know.
19   Q.  When Officer Etress was talking to you about
20   a -- you were talking about a ticket.  Was
21   this a ticket involving Mary Turner and
22   Bradley Phelps?
23   A.  I don't -- I don't think it was him.  I think

91 (Pages 361 to 364)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 365

1    it was involving Stephen Phelps, if I'm -- if
2    I'm correct on it.
3    Q.  Etress talked to you about Stephen Phelps?
4    A.  I believe so, yes.
5    Q.  And did that ticket -- I'm sorry.  I thought
6       you said -- did he ask you about your
7       involvement with the Stephen Phelps' ticket;
8       was he talking to you about --
9    A.  Yes.
10    Q.  -- Defendants' 34?
11    A.  Yes.
12    Q.  Was he in any way asking you about Mary
13       Turner's involvement with the --
14    A.  Yes.
15    Q.  -- Stephen Phelps' ticket?
16    A.  From what recall.  I don't -- I mean, I don't
17       know of everything that was said.  But I'm --
18       I'm sure he did.  But I don't recall anything
19       that was said about that.  But I do know it
20       was about this incident.
21    Q.  And you're talking about Stephen Phelps?
22    A.  Yes.
23    Q.  Were you ever questioned about -- and I'm

Page 366

1    sorry.  I'm either saying it's Bradley Phelps
2       or Brady Phelps.  Were you ever questioned
3       about that?
4    A.  I don't believe I was.
5    Q.  And to your knowledge -- I mean, it was the
6       police department conducting an investigation
7       into some alleged criminal activity by Mary
8       Turner, is what started all this?
9    A.  When I went to Officer Etress, that's when I
10       learned that at that time.
11    Q.  And as an employee of the City who worked in
12       the magistrate's office who, I guess, had some
13       involvement with the Stephen Phelps' ticket
14       who knew Mary Turner and worked with Mary
15       Turner, did you have any reason to question
16       the City's ability or rationale or reason for
17       investigating a serious accusation like that?
18    A.  I'm sorry.  I don't understand.
19    Q.  Did you have any reason as an employee of the
20       city magistrate's office to question the City
21       looking into criminal activity -- alleged
22       criminal activity by your co-employee?
23    A.  Did I have any right to do that?

Page 367

1    Q.  Did you have any reason to question their
2       rationale for doing that?
3    A.  Well, I didn't question them on that.  I
4       don't -- I don't understand what you're
5       saying.
6    Q.  Well, according to your attorney, you were
7       held hostage and kept in a room and
8       interrogated and --
9    A.  Well, I wasn't allowed to leave.
10    Q.  Well, were you not expected as an employee of
11       the City who might have knowledge of either of
12       a crime being committed or some wrongdoing in
13       your department to cooperate and tell them
14       what you knew?
15    A.  Well, I did cooperate.
16    Q.  Okay.
17    A.  Yes.
18    Q.  I mean, you did have an option of leaving;
19       your option may have been lack of cooperation
20       and you might have lost your job.  Is that
21       what you're saying?
22    A.  Well, I -- that's what -- yes.  Because I was
23       told if I didn't cooperate with them or if I

Page 368

1    didn't sign something, I would be guilty of
2       insubordination.  So I knew that, you know, I
3       didn't want to lose my job.
4    Q.  In your mind, is that an unreasonable request?
5    A:  I think so.  I think it --
6    Q.  You felt like as an employee you should not
7       have to cooperate?
8    A.  No, not --
9    Q.  You didn't have to tell them what you knew?
10    A.  No.
11    Q.  You were free to leave?
12    A.  Yeah, if I wanted to lose my job.
13    Q.  Yeah.  But --
14    A.  I didn't want to lose my job.
15    Q.  Well, they weren't going to throw you in jail;
16       they weren't going to handcuff you, were they?
17    A.  They -- on the questioning and the way that
18       they were presenting themselves, it was as if
19       I was a criminal sitting in a chair and they
20       were just -- not badgering, but they were very
21       harsh with their tone and the way that they
22       were questioning me.
23       And, no, I could not leave because I had

92  (Pages 365 to 368)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 369

1    to answer and cooperate with them. So I felt
2    like I had to stay there --
3    **Q. Did you feel like that was an unreasonable --**
4    A. -- for my job.
5    **Q. -- request?**
6    A. The way that it went about, that first one,
7        yes, I do. I feel like that Judge Gordon
8        should have handled that.
9    **Q. The first one?**
10   A. I believe that she --
11   **Q. The one in 2001?**
12   A. Yes. But I also believe on the other one,
13       that it should have -- my department head
14       should've been able to call me in as her
15       employee and talk to me about a situation and
16       give --
17   **Q. I understand that you don't agree with the way**
18       **that it was handled, but are you aware that**
19       **other people were questioned?**
20   A. I assume some others were questioned.
21   **Q. And do you know how they were questioned?**
22   A. No.
23   **Q. If the same questions were asked, if they were**

Page 370

1        **called in, if they were told they had to**
2        **cooperate?**
3    A. I don't have any idea because I asked for
4        copies of things, but I was not given them.
5    **Q. Are you aware the City has a drug testing**
6        **policy, and if you're suspected of using**
7        **drugs, that you're expected to cooperate and**
8        **give a drug test or you're going to be fired?**
9        **Do you know that's the policy?**
10   A. I'm not sure if that's the policy, but I do
11       know that they can drug test you.
12   **Q. Well, do you think that's unreasonable?**
13   A. No.
14   **Q. They can send you for a drug test and tell you**
15       **to cooperate or you're going to be fired?**
16           MR. JAFFREE: Let me object. This
17           is entirely argumentative.
18           MS. NELSON: No, it's not.
19           MR. JAFFREE: She's telling you that
20           she thought it was unreasonable,
21           and you're trying to give her
22           some hypotheticals of what --
23           MS. NELSON: That's not a

Page 371

1        hypothetical. That's a policy
2        of the City.
3    **Q. Do you think the City can ask certain things**
4        **of its employees --**
5            MR. JAFFREE: Anyway.
6    **Q. -- to cooperate?**
7            MR. JAFFREE: I object to the
8            badgering of this witness,
9            trying to make her think like
10           you think, that there was
11           nothing wrong with the police
12           interrogating her by every time
13           a judge decides that they want
14           some information.
15           MS. NELSON: Well, you have no
16           evidence that it was the judge
17           that wanted that information,
18           number one, or who started the
19           investigations in the first
20           place.
21           MR. JAFFREE: Well, I think I do.
22           MS. NELSON: And, you know, your
23           view of the world is that nobody

Page 372

1        has to cooperate and a city
2        cannot have any rules.
3            MR. JAFFREE: That's not quite my
4            view of the world.
5            MS. NELSON: And she can ignore them
6            all she wants.
7            MR. JAFFREE: That's not quite my
8            view, but I'm just objecting for
9            the Record. Okay?
10           MS. NELSON: Okay. I believe that's
11           all I have.
12           MR. JAFFREE: I've got to cover this
13           one area that you just covered.
14           In cross-examination --
15           MS. NELSON: You don't get to
16           cross-examine your own witness
17           and you can't lead her.
18           MR. JAFFREE: But you said something
19           that's going to leave a
20           misleading impression, that she
21           gave a different statement than
22           she gave before.
23           MS. NELSON: She did.

93 (Pages 369 to 372)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 373

1  MR. JAFFREE: And I'm going to cover
2  that.
3  EXAMINATION
4  BY MR. JAFFREE:
5  Q. Is it possible that the -- that a police
6  officer could have left tickets, and before
7  you got them and examined them, one of the
8  tickets could have been retrieved by anybody
9  and given back to the police officer?
10  MS. NELSON: Object to the form.
11  That's so hypothetical.
12  MR. JAFFREE: That's hypothetical
13  and it may be likely what
14  happened her.
15  Q. If a police officer says that he left the
16  tickets, but at the time you examined them,
17  the ticket wasn't present, can those two
18  things both exist?
19  MS. NELSON: Object to the form.
20  There's no evidence that
21  occurred. That's totally
22  speculative.
23  MR. JAFFREE: Well, the evidence is

Page 374

1  that Mary Turner retrieved the
2  ticket and sent it back to the
3  police officer in an envelope.
4  That's the evidence. But the
5  question is whether she --
6  MS. NELSON: No, it's not the
7  evidence.
8  MR. JAFFREE: That is the evidence.
9  The evidence is Mary Turner sent
10  the tickets back to the police
11  officer in an envelope.
12  MS. NELSON: I object to your
13  testifying. That's not the
14  evidence.
15  MR. JAFFREE: Well, that's the
16  evidence that I know about in
17  this case. There's no evidence
18  that she sent the tickets back
19  to the police officer or he came
20  and got them back from her
21  physically.
22  MS. NELSON: But there is the
23  evidence that she had the

Page 375

1  ticket.
2  MR. JAFFREE: Well, there's no
3  evidence that she had the ticket
4  at the time she made this data
5  entry, and I contend that
6  putting any kind of entry on
7  this form is data.
8  MS. NELSON: You're not here
9  testifying today.
10  MR. JAFFREE: But my question is to
11  her:
12  Q. Are those two inconsistent, that he could've
13  left the ticket, but at the time you did these
14  entries, the ticket was no longer there?
15  MS. NELSON: Object to the form.
16  A. Yes.
17  Q. Are these tickets kept in a safe at all
18  times? So from the time an officer gives them
19  to you until the time you look at them and put
20  in the computer, they're in a safe and nobody
21  else can touch them?
22  A. No.
23  Q. Are they where other people who are employed

Page 376

1  with the magistrate's office can obtain access
2  to these tickets?
3  A. Yes.
4  Q. So if some magistrate wanted to come and rifle
5  through some tickets and pull one out, would
6  they have been able to do it?
7  MS. NELSON: Object to the form.
8  Q. You understand the question?
9  A. Yes.
10  Q. That could've happened, right?
11  A. Yes.
12  Q. And you testified earlier that not all the
13  times you're putting the data entry in at the
14  same time he hands you the ticket. If that
15  had happened, when you went to put this data
16  entry in, this ticket would've been present,
17  correct?
18  A. Correct.
19  MS. NELSON: Object to the form.
20  Q. So if you called him and asked him and he says
21  that he got the ticket or he had voided it
22  out, then your putting "void" is consistent
23  with what he said, right?

94 (Pages 373 to 376)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 377

1 A. Yes.
2 Q. So that could be consistent with his
3 testimony, that he left the tickets and
4 somebody sent them back to him, but you never
5 had the ticket when you put this entry in?
6 MS. NELSON: Object to form.
7 Q. You understand that?
8 A. Yes.
9 Q. And you understand how that could happen?
10 A. Yes.
11 Q. Would that be a difference in your testimony
12 from before?
13 A. No. Because at the time I had written that on
14 there, I did not have the ticket.
15 Q. If you had the ticket and the police officer
16 had not talked to you, would there have been
17 any reason for you to not go ahead and put it
18 in, and on the original, is there any
19 indication that the original was whited out?
20 A. No.
21 Q. So you're putting these numbers in, right?
22 A. Right.
23 Q. You know, you've got --

Page 378

1 A. Well, the tickets are not immediately keyed in
2 the system when an officer turns them in to
3 us.
4 Q. Yeah. Well, I understand that. But if you
5 keyed in these and if the officer -- nobody
6 had told you that they wanted the ticket back,
7 would there be any reason for you not to key
8 in that ticket if you had it?
9 Are you following me?
10 A. Right.
11 Q. So, now, you could have keyed it in and
12 whited out, but is there any evidence that was
13 presented to you that this entry had been
14 whited out and voided, written over it?
15 A. No.
16 Q. And can you generally tell if something is
17 whited out and you write "void" over it --
18 over Wite-Out?
19 A. If -- yeah, I mean, I would think so.
20 Q. I mean, most people can tell because the
21 Wite-Out distorts the words, right?
22 A. Yes.
23 Q. So absent of Wite-Out, at the time you put

Page 379

1 these entries in, there was no ticket?
2 A. That's correct.
3 Q. Because there would've been no reason for you
4 not to put the entry in, correct?
5 A. That's correct.
6 Q. Is that your testimony?
7 A. Yes.
8 Q. Are you comfortable with that testimony?
9 A. Yes.
10 MS. NELSON: Object to the form.
11 All that's hypothetical.
12 EXAMINATION
13 BY MS. NELSON:
14 Q. Do you have any evidence that you left the
15 tickets in a stack and somebody filtered
16 through them and took it out and wasn't there
17 when you did this?
18 A. There is a basket in the main area where we
19 put tickets that have to be keyed in, that we
20 put those in there.
21 Q. And it's your testimony that somebody rifled
22 through there and pulled that out, and that's
23 why you didn't have it?

Page 380

1 A. It could happen. I mean, I could've --
2 Q. But do you have any evidence that it did
3 happen?
4 MR. JAFFREE: It --
5 MS. NELSON: No. I'm asking her
6 questions now.
7 Q. You don't have any evidence that that happened
8 do you?
9 A. I -- I don't understand.
10 Q. It's just as possible that Mary Turner called
11 you and said, void that ticket --
12 A. No, ma'am.
13 Q. -- on Stephen Phelps?
14 A. No, ma'am.
15 MR. JAFFREE: That didn't happen.
16 A. No, that didn't happen.
17 MR. JAFFREE: Now, you're
18 speculating.
19 Q. How many times in your career as magistrate
20 have you ever, ever done this before?
21 A. I don't recall.
22 Q. And you're under oath. You've never done it
23 before, have you?

95 (Pages 377 to 380)

# FREEDOM COURT REPORTING

Page 381

1  A. I don't know. I -- I've -- I had -- I've
2     testified to the fact that if tickets are
3     missing when you're keying them in and you
4     don't have it, either the officer --
5  Q. You track that officer down, you find that
6     ticket, and you get to the bottom of this.
7     You've never voided -- there is never -- there
8     is not a transmittal form on record that
9     you've ever done this to, is there?
10 A. Not to my knowledge.
11          EXAMINATION
12 BY MR. JAFFREE:
13 Q. Have you seen all the transmittal forms?
14 A. No.
15          MS. NELSON: I said that she had
16             filled out, and she said, not to
17             her knowledge.
18 Q. Have you seen all the transmittal forms that
19    you have filled out?
20 A. No.
21 Q. Could you have possibly filled out one and
22    wrote "void" on it?
23 A. It could be possible. I mean, I'm don't --

Page 382

1     I'm not saying that it hasn't happened, but
2     I'm not seen that it has.
3          EXAMINATION
4  BY MS. NELSON:
5  Q. What do you mean, you've not seen every
6     transmittal form you filled out; you have to
7     sign them, don't you?
8  A. Ma'am, I have signed a lot of transmittal
9     forms over my years that I was employed. I'm
10    not --
11 Q. When do you sign this, when the officer gives
12    it to you -- gives you the ticket?
13 A. Yes.
14 Q. And you're certifying that you had all of
15    these tickets when you signed that, didn't
16    you?
17 A. I did not verify -- I know I signed that, but
18    I did not verify that I had the ticket which
19    matched the transmittal. That's something
20    that all magistrates -- I know that they have
21    not done.
22          MR. JAFFREE: Let me ask you this.
23          MS. NELSON: I'm still asking her

Page 383

1     questions.
2          MR. JAFFREE: Oh, okay.
3          MS. NELSON: I have no questions.
4          EXAMINATION
5  BY MR. JAFFREE:
6  Q. All right. Just one final question. Are you
7     required to sign the ticket when you put it in
8     the computer?
9  A. It should be signed when it's put in the
10    computer.
11 Q. Should it be signed by you if you put it in?
12 A. Yes. Well, not if you put it in. I mean, I
13    can key in other tickets that need to be keyed
14    in the system, but they were sworn to by other
15    magistrates.
16 Q. But the ticket is supposed to be signed by a
17    magistrate, right?
18 A. Yes.
19 Q. Was that ticket signed by a magistrate?
20 A. No.
21 Q. Which meant what?
22 A. That it wasn't sworn to. I mean, I
23    don't --

Page 384

1  Q. So when a ticket is signed by a magistrate,
2     that's when it's sworn to, right?
3          Is this the ticket here, Defendants'
4     Exhibit 35?
5  A. Yes.
6  Q. Where on Defendants' Exhibit 35 should a
7     magistrate sign?
8  A. There (indicating).
9  Q. Where it says, "verified and acknowledged
10    before me this date," judge, and a magistrate,
11    right?
12 A. Yes.
13 Q. And so for the ticket to be put into the
14    system, it's got to be signed by a magistrate?
15 A. Well, there were times that it's happened.
16    If -- if a -- if the magistrate forgets to
17    sign it, we'll get them to sign it, you know,
18    if we pulled the transmittal and found out who
19    swore to it. It should be signed.
20 Q. So there's no dispute this ticket was never
21    put into the system?
22 A. No, it was not.
23 Q. And you don't know whether or not the ticket

96 (Pages 381 to 384)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 385

1    was ever provided by Officer Duhaime or not,
2    do you?
3  A.  No, I don't.
4  Q.  Prior to your hearing, do you recall ever
5    seeing this ticket?
6  A.  No.  I mean, I don't recall seeing it.  For my
7    hearing?  Oh, well, during the investigation
8    part.
9  Q.  Yeah.
10  A.  Yeah.
11  Q.  Prior to your administrative hearing, do you
12    recall seeing that ticket?
13        I mean, is there anything about that
14    ticket that stands out, caused you to remember
15    it over the thousands of tickets --
16  A.  No.
17  Q.  -- that you processed?
18  A.  No.
19  Q.  But your signature is not on it?
20  A.  That's correct.
21        MR. JAFFREE:  I have nothing
22          further.
23

Page 386

1        MS. NELSON:  I have nothing.  Thank
2          you.
3        (Deposition concluded at 5:55 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| A | | | | |
|---|---|---|---|---|
| **ability** 112:21 366:16 | **activities** 23:17 **activity** 172:6 366:7,21,22 **actual** 33:21 38:13 55:14 76:23 91:5 116:10,11 118:19 137:8 151:23 186:9 186:11 190:2 204:12 242:18 242:18 255:14 298:23 364:3 **adamant** 350:20 **addition** 222:20 223:5,7 **additional** 169:20,22 328:4 **address** 15:8 23:23 35:1 135:6,10 139:13 **addresses** 43:23 **addressing** 135:2 **adjusting** 129:17 **administer** 351:1 **administration** 164:8 285:5 **administrative** 8:21 25:6 37:6 39:20 58:21 125:14 154:12 154:20 198:1 205:21 315:6 352:19,21 353:10 385:11 **administrator** 86:11,19 87:6 88:23 103:5 | 104:18 145:2 145:10 167:11 257:7 274:17 298:18 300:12 **admission** 224:1 224:4 **admit** 337:6 **admitted** 107:10 132:16 **admittedly** 224:8 **advise** 276:13 **advised** 118:6 122:9 149:15 208:17 234:9 239:9 277:3 **advising** 45:12 111:21 244:9 **Affairs** 33:10,12 33:19 159:8,12 159:17 161:22 161:23 162:1,3 173:1 197:3,15 280:8 282:17 282:22 283:6 284:3,19 292:16 **affiliated** 34:1 **affirmative** 17:18 **African-Amer...** 325:20 **African-Amer...** 325:22 **age** 19:20 20:7 237:7 **agent** 335:4 340:8 **ages** 16:12,13 **ago** 32:11 151:14 216:9 216:13 359:5 **agree** 126:15 183:4 302:15 | 331:7,10,17 334:1 363:11 363:13 369:17 **agreed** 3:2,16 339:19 362:17 **agreement** 1:16 160:11 **agreements** 160:11 **ahead** 14:16,18 122:6 235:5 241:22 249:18 377:17 **Alabama** 1:2,18 1:19 2:5,9 3:8 15:2,9 17:17 28:9 36:8 163:6 **alias** 241:15 243:4,16 244:2 244:2,13 245:4 245:7 247:13 249:19 **allegation** 230:20 286:18 288:11 **allegations** 207:21 230:1 285:23 **alleged** 123:4 136:21 138:13 254:14 269:8 336:16 366:7 366:21 **allegedly** 154:15 258:16 264:4 317:20 346:21 **Allen** 15:19 16:2 16:18 **allow** 233:7 306:19 **allowed** 250:12 254:20 305:12 305:13 367:9 **allowing** 104:4 | **alluding** 272:15 **amended** 280:16 280:17 **Amendment** 269:20 305:4 **Amsouth/Har...** 2:8 **Anderson** 75:20 **Andrews** 1:19 169:5,18 **and/or** 162:13 222:1 **Ann** 89:21 92:15 93:13,16 94:2 94:6 140:9,10 140:21 146:21 167:23 218:22 264:18 265:13 **announced** 53:8 **annual** 14:3 281:1 **annually** 61:17 **answer** 5:1,15 14:17 27:14 60:20 61:8,12 193:8,12 229:15 275:7 280:2 299:10 341:10 349:10 349:16 354:12 354:12,17 356:3 369:1 **answering** 4:18 13:18 261:16 **answers** 32:21 193:10 **Anthony** 75:5 **anticipate** 206:22 **anxiety** 295:17 **anybody** 19:20 64:23 94:14 140:5 148:20 158:18 198:16 |
| **able** 114:14 130:13 305:10 364:12 369:14 376:6 | | | | |
| **abrasive** 113:13 114:7 | | | | |
| **absent** 378:23 | | | | |
| **abut** 197:20 | | | | |
| **accepting** 59:16 | | | | |
| **access** 262:14 340:19 376:1 | | | | |
| **accident** 75:15 75:18,18 | | | | |
| **account** 186:5 | | | | |
| **accountable** 264:16 | | | | |
| **accounting** 39:6 | | | | |
| **accounts** 39:8 40:17 75:22 | | | | |
| **accurately** 51:16 | | | | |
| **accusation** 337:2 366:17 | | | | |
| **accused** 286:14 320:22 323:1 337:8 354:1,7 355:6,9 | | | | |
| **acknowledge** 258:6 | | | | |
| **acknowledged** 384:9 | | | | |
| **acquire** 328:4 | | | | |
| **act** 88:20 | | | | |
| **acting** 308:4,9 315:5 | | | | |
| **action** 27:6 28:22 127:12 127:13 137:17 185:22 238:15 238:18,21 239:2 243:8 | | | | |
| **actions** 97:2 | | | | |

# FREEDOM COURT REPORTING

203:3,14 210:5
215:7 216:23
219:4 220:23
221:1,4,8
264:10 276:3
303:4,6 317:17
332:8 333:9
344:19 345:17
373:8
**anymore** 214:1
265:6
**anytime** 21:21
21:22 349:13
**anyway** 66:19
194:17 261:14
360:4 371:5
**AOC** 37:5
**apologize** 223:9
**apparently** 22:3
218:19
**appeal** 9:17
25:17 26:1
31:19,20,21
96:3 152:12
188:5 196:17
278:23 285:11
287:12
**appealed** 27:22
28:8 171:15,17
225:21 226:16
278:23
**appeals** 25:9
26:5,7,12 27:8
28:9,13 91:9
96:4 171:11
181:17 195:9
358:5
**Appeal's** 195:23
**appear** 51:10
73:12 242:5
243:4,6 291:8
339:13
**APPEARAN...**
2:1

**appeared** 25:20
199:6
**appearing** 113:1
286:1
**appears** 51:5,19
62:18 229:9
291:15
**Appellate** 195:9
196:14 227:8
**application** 52:5
52:15,22 72:23
73:7,13 83:3
84:15,17 85:4
**applied** 10:5
50:12,14,15,20
72:14 79:13
83:12,21,23
84:2 86:20
105:21 230:11
231:9,18
232:10
**apply** 53:6
217:16
**applying** 73:19
**appointed** 230:8
**appreciate**
135:23
**approach**
334:10
**approaching**
334:11
**appropriate**
302:5
**approved** 328:5
**approving** 59:16
**approximately**
1:21 15:11,14
16:4 21:9,16
34:16 35:18
36:7 38:19
40:5 41:21
44:5 49:4 58:4
85:12 133:5
187:17 250:6

293:15
**April** 61:23 62:6
78:3 85:14
146:9 170:15
230:5
**area** 34:10,15,17
63:20 64:10
76:3 91:3
110:12 113:14
114:8,12,14
298:13 333:18
372:13 379:18
**areas** 38:14
90:21 93:20
111:15
**arguing** 262:21
263:2
**argumentative**
114:7 262:5
370:17
**argumentive**
113:13
**arrest** 9:7 59:12
59:13 154:13
180:20 253:13
**arrested** 20:16
101:12 148:5,6
148:23 150:6
155:22,23
156:9,15,16
157:4,7 175:2
218:2 239:15
241:15 242:9
243:2,3,17,21
244:4,16
245:11 250:6
251:9 252:8,19
252:23 258:18
283:19 306:13
311:19,23
313:1 317:4
343:10,12
344:2,7
**arrests** 75:17

**articulate** 29:9
**Ashton** 201:6,8
203:19
**aside** 263:4
**asked** 6:18,19
10:14 17:21
32:2,20 34:6
42:17 45:11
47:11 48:19
53:19 77:5
92:20 93:2,8
97:23 115:3
121:2 122:16
126:12 148:1
155:14 156:3
174:11,13
183:10 189:3
199:22 206:13
210:23 211:18
214:6 218:23
219:19,20
220:5 221:14
221:15 233:21
233:22,23
242:21 248:6
248:20 252:20
254:9 260:4,6
277:19 278:9
278:16 280:5,7
283:14,23
291:11 304:9
314:8 319:16
327:21 328:1
329:12 338:19
340:20 341:18
343:18 349:5
351:8,14,18
353:15 362:6,7
369:23 370:3
376:20
**asking** 4:12 6:7
13:14 25:16
29:5,21 31:17
32:1 57:14

67:11 78:4
82:5,12 85:3
98:4 100:10
119:5,7 130:2
130:23 131:11
134:21 136:14
136:15 139:10
139:16 142:9
152:17,21,23
153:2 155:15
160:14 161:3
172:10 181:20
183:19 184:3
207:6,17
219:18 252:16
261:16 262:17
265:23 273:18
282:14 284:5
290:16,18
303:20 305:15
308:18,22
309:1 310:7
311:10 338:2
356:6 358:16
365:12 380:5
382:23
**asks** 177:16
**assign** 101:10
254:15,20
255:8
**assigned** 96:2
199:3 204:8,16
209:17 210:18
219:5 256:4
359:23
**assigning**
254:23
**assignment**
168:14 256:2,2
**assignments**
287:17
**assigns** 180:11
**assistant** 138:10
267:6

# FREEDOM COURT REPORTING

Page 389

assisted 75:20
associate 212:16
305:5
association
292:1 304:5,5
304:7,11,19
306:2
assume 4:17
129:5,10
158:20 159:15
160:15 167:19
217:9 237:1
254:12 255:12
266:19 304:7
323:8 347:8
369:20
assumed 269:17
280:14 348:3
assuming
256:23 277:18
301:14
attached 100:13
attempting
337:6
attend 36:7 71:3
336:9 340:8,15
attended 35:15
36:4
attending 65:1
attention 48:4
95:13 140:1
146:23 191:3
304:15 331:19
346:13
attitude 63:22
65:5 112:12,16
131:16 281:4
281:14 333:20
334:4 346:6
attitudes 67:13
attorney 4:10
7:6 20:4 31:22
31:23 32:2
37:5 228:17

292:7 307:8
311:6 331:21
332:2,9 357:18
362:7 363:8,9
363:12 367:6
attorneys 2:8
64:23 109:23
111:2 331:14
332:6
attorney's 204:2
357:18
auditor 317:13
356:17
August 17:14
58:5,9,11,23
59:3 108:1,18
226:14
aunts 19:17
Automated
39:23 41:5
51:13 52:1
Automobile
30:22
available 50:11
122:1
Avenue 2:9
AW 250:7
awake 334:16
aware 30:5,16
56:8 82:12
111:2 124:20
139:23 149:7
181:14 182:9
197:8 205:18
205:22 206:1
228:18 247:7
247:12,17,18
247:19,20
248:3,7 249:1
252:1,7 267:16
271:8 281:17
282:17 291:16
323:17,21
326:23 353:23

354:6,21 355:4
355:9 356:18
358:3,17,19
359:12 369:18
370:5
awhile 195:12
AWs 209:18
A-Advantage
217:5
a.m 1:21
_____
B
baby 67:3
back 9:1 11:23
21:16 26:19
27:8,9 28:6,7
28:16,19 39:14
40:7 46:11
49:1 54:4 59:6
67:11 78:2
79:10,13,17
81:20,22 83:3
84:2,17 85:2,4
85:8,13,16
86:13 87:6,11
88:1 89:17,18
89:18,23 93:4
93:15 94:5
96:11 103:2,9
103:16 105:22
109:15 118:6
121:14 122:21
123:18 124:11
133:7 148:17
162:21 165:17
170:15 176:14
181:18 192:13
195:12 205:17
221:7 227:8
234:3 235:23
242:22 249:21
250:1,4 254:10
273:4 274:2,5
274:9 286:6

295:20 299:2
313:5 319:22
339:9 345:19
361:2,14 362:3
373:9 374:2,10
374:18,20
377:4 378:6
backing 224:14
bad 103:7
347:16
badgering 193:9
368:20 371:8
Bailey 260:1
263:7
ball 24:3
bankruptcy
21:3 22:11,13
bantered 183:13
base 28:20 268:5
268:12
based 28:21
32:1 157:7
188:10 236:8
251:18 256:14
260:12 261:18
265:8 292:4,14
293:1 320:16
347:3,6,17
basically 55:10
155:18 226:3
285:3 286:5
292:13 293:10
basing 292:21
basis 36:4 203:9
256:4 263:4
291:3 299:16
314:23
basket 179:20
180:1 379:18
Batchelor 19:8
Bates 54:16 55:2
55:3 82:7
88:17
Baxter 89:21

92:15 93:13,16
94:2,6 140:9
140:10,21
146:21 167:23
218:22 264:18
265:13
bearing 47:3
Beauchamp
296:11,12
becoming 36:2
beginning 28:18
340:17
behalf 86:10
206:23 280:13
292:8 335:10
335:15
believe 17:14
28:15 34:6
36:16 40:17
41:4,10 48:12
52:1 57:1 58:5
65:7 77:13
78:2,23 84:6
85:14 87:16,16
89:22 92:1
95:2 133:14,17
133:18 144:19
148:16 157:10
164:6 168:4
169:4 170:16
188:4 194:9
197:22 215:9
215:10 220:4
220:11 221:15
222:3 239:6
242:19 254:22
255:2 260:17
262:8 265:12
265:14 266:6
273:2 287:15
288:21 290:10
293:17,20
295:21 300:18
300:20 301:3

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

305:3 311:23
314:3 319:21
320:3 335:12
344:1 349:4,12
351:12 358:22
361:16 365:4
366:4 369:10
369:12 372:10
**belittling** 302:3
303:13,15
**belive** 277:13
**bell** 310:16
**belong** 24:13
**bench** 266:17
**benefit** 294:8
327:5,9
**benefits** 293:21
295:7
**Benning** 34:13
**best** 25:16 51:16
51:23 54:2
114:9 164:5
194:12
**Beth** 1:6 110:1
113:9 114:8,13
129:16 148:2
278:9 331:16
347:10
**Beth's** 134:4
**better** 67:4,10
102:19 131:6
170:2 290:15
359:7
**Bettye** 105:2,3,5
105:6 138:21
138:23 144:22
145:12 146:1
146:17,23
211:20 213:23
214:7,8 300:9
300:13 362:13
363:15
**beyond** 355:3
**bid** 83:8

**big** 71:1 236:12
267:19
**binder** 12:21
**Birmingham** 2:9
**birth** 14:23
235:12 237:7
**bit** 71:5 158:8
196:21 224:15
226:1 266:17
303:11
**black** 230:8,17
233:8 254:15
257:13 259:4
268:10,16
300:14,23
301:2,4,7
316:15 325:19
326:23 327:5
327:10
**blacks** 257:22
258:13 355:9
**blatant** 306:8,21
**blind** 268:10
**board** 12:2
25:21 26:20
27:1,7,9,16,19
28:16,19 29:12
29:15 31:13
164:23 167:21
171:5,9,16
196:18 226:2
227:9,12
228:11 251:15
254:6 279:1
280:1,6 285:4
358:5,6 360:12
361:11
**board's** 28:5
226:11
**body** 289:18
**bond** 9:17 91:17
180:22 217:12
217:13,14,15
218:11 237:11

237:12 244:7,7
250:12,15
312:2,3,4,6,16
313:3,4,12
**bonding** 117:15
217:4,5,8,11
288:4,11
**bonds** 59:16,17
218:13
**bondsman** 9:14
117:10,11
123:9 215:23
217:2,6 218:1
234:9 240:21
309:20
**bondsman's**
117:12 217:17
217:19
**bondsmen** 240:8
266:23
**book** 181:7
218:3 237:23
**born** 34:12
**bother** 179:5
**bottom** 27:10
125:16 169:9
181:3 187:12
189:6 328:22
346:19 381:6
**boundaries**
201:20
**boxes** 133:14
**Boykin** 311:10
311:11
**Brackin** 1:6,15
2:16 3:4 4:3,9
13:9,12 15:19
16:20 17:4
51:10 52:21
60:12 73:12
85:2 105:15
109:9 121:16
128:9 129:23
132:19 148:2

154:6 163:5,11
165:19 187:13
225:12 229:17
278:10 280:13
**Bradley** 173:20
174:17 200:20
200:21,21,23
201:1 364:22
366:1
**Brady** 199:4
200:2,4,18,20
200:23 366:2
**break** 5:8,10,12
5:15 7:18
84:22 162:21
163:23 167:4
279:9 280:11
298:13
**Brief** 52:20 60:8
62:9,22 84:19
85:1 107:14
109:8 127:20
128:8 130:21
132:21 143:12
145:21 151:1
185:14 209:22
250:18 279:2
280:12 285:22
292:22 314:2
321:8 330:20
332:16 334:18
346:12
**bring** 7:3 146:23
176:22 181:9
188:20 227:4
**brings** 175:16
175:23,23
177:1
**broad** 252:5
**brother** 18:6
19:11,12 38:11
38:12 173:20
**brothers-in-law**
20:12

**brother-in-law**
38:10
**brought** 48:3
95:13 123:19
140:1 147:3
154:15 163:5
171:4 172:3
188:19 331:19
**Brown** 54:16
55:1,4,5,6 60:3
60:6 82:7
88:17
**brushing** 267:17
**Bryan** 168:4,6
204:22 246:4,8
312:17 313:17
328:7
**budget** 19:1
39:15 42:1
47:6
**building** 36:9
44:16 76:15,20
77:1,10,12
78:15 169:3
298:14 328:1,3
330:11
**built** 44:9
**bumped** 230:16
230:22 231:6
231:21 232:13
**business** 35:15
35:21 39:11,21
41:3 169:11
307:19
**businesses** 40:22
**busy** 179:12,15
240:22 318:11
318:22 341:16
**B-E-A-U-C-H...**
296:13
**B-R-Y-A-N**
168:7

---

**C**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660