# FREEDOM COURT REPORTING

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                  SOUTHERN DIVISION
4
5
   NANCY MARTIN and
6  MARY BETH BRACKIN,
7        Plaintiffs,
8  vs.        CASE NO. 1:05-CV-1172-MEF
9  City of Dothan and
   JUDGE ROSE EVANS-GORDON,
10
   Defendants.
11
12
13
14        * * * * * * * * * * *
15        DEPOSITION OF ROSE EVANS-GORDON, taken
16  pursuant to stipulation and agreement before Sherry
17  McCaskey, Certified Court Reporter and Commissioner
18  for the State of Alabama at Large, in the Dothan
19  Civic Center, 126 N. Andrews Street, Dothan,
20  Alabama, on Tuesday, October 30, 2007, commencing at
21  approximately 9:00 a.m.
22        * * * * * * * * * * *
23
```

*CONFIDENTIAL*

**Page 2**

```
1              APPEARANCES
2  FOR THE PLAINTIFFS:
3  ISHMAEL JAFFREE, ESQUIRE
   Jaffree Law
4  951 Government Street
   Suite 415
5  Mobile, Alabama 36604
6  FOR THE DEFENDANTS:
7  CAROL SUE NELSON, ESQUIRE
   Maynard, Cooper & Gayle
8  Attorneys at Law
   2400 Amsouth/Harbert Plaza
9  1901 Sixth Avenue North
   Birmingham, Alabama 35203
10
11        * * * * * * * * * * *
12        EXAMINATINON INDEX
13  ROSE EVANS-GORDON
14     BY MR. JAFFREE        4
       BY MS. NELSON        481
15
16        * * * * * * * * * * *
17        STIPULATIONS
18     It is hereby stipulated and agreed by and
19  between counsel representing the parties that the
20  deposition of ROSE EVANS-GORDON is taken pursuant to
21  the Federal Rules of Civil Procedure and that said
22  deposition may be taken before Sherry McCaskey,
23  Certified Court Reporter and Commissioner for the
```

**Page 3**

```
1  State of Alabama at Large, without the formality of
2  a commission; that objections to questions other
3  than objections as to the form of the questions need
4  not be made at this time but may be reserved for a
5  ruling at such time as the deposition may be offered
6  in evidence or used for any other purpose as
7  provided for by the Federal Rules of Civil
8  Procedure.
9        It is further stipulated and agreed by and
10  between counsel representing the parties in this
11  case that said deposition may be introduced at the
12  trial of this case or used in any manner by either
13  party hereto provided for by the Federal Rules of
14  Civil Procedure.
15        * * * * * * * * * * *
16
17
18
19
20
21
22
23
```

**Page 4**

```
1        (Witness waived right to read and
2        sign.)
3             ROSE EVANS-GORDON
4     The witness, having first been duly sworn
5  to speak the truth, the whole truth and nothing but
6  the truth, testified as follows:
7             EXAMINATION
8  BY MR. JAFFREE:
9  Q.  Could you state your full name for the
10     Record?
11  A.  Rose Evans-Gordon.
12  Q.  Have you ever been known by any other name?
13  A.  No.
14  Q.  Do you have a maiden name?
15  A.  Evans.
16  Q.  Oh, okay.  Have you ever --
17     MR. JAFFREE:  By the way, do we agree on
18        the normal stipulations?
19     MS. NELSON:  Yes.
20  Q.  Have you ever sat for a deposition before?
21  A.  Not as a witness, no.
22  Q.  Have you ever administered a deposition
23     before?
```

1 (Pages 1 to 4)



# FREEDOM COURT REPORTING

Page 5

1  A.  Yes.
2  Q.  Are you familiar with the purposes of a
3     deposition?
4  A.  Yes.
5  Q.  You understand, of course, that if I say
6     anything that you don't understand or that's
7     not clear, you can ask me to restate it or
8     rephrase it, and I'll do my best to do so.
9  A.  Yes.
10 Q.  Where are you currently employed?
11 A.  City of Dothan.
12 Q.  In what capacity?
13 A.  Presiding judge of the City of Dothan's
14    Municipal Court.
15 Q.  And how long have you held that position?
16 A.  I think this will be my eighth year.
17 Q.  When were you initially hired into that
18    position?
19 A.  December of 1999?
20 Q.  You're not sure?
21 A.  Not sure.  December or November of 1999.
22 Q.  Prior to ascending or getting appointed to the
23    position of judge of municipal court, did you

Page 6

1     occupy any other positions?
2  A.  I did.
3  Q.  And what was your most recent position that
4     you occupied prior to becoming a judge?
5  A.  Prior to becoming a judge, I was an assistant
6     attorney general in the Attorney General's
7     Office in Montgomery, Alabama.
8  Q.  And from when to when did you occupy that
9     position?
10 A.  From approximately October 1987.  And that's
11    an approximation.
12 Q.  And until you got hired?
13 A.  I did.
14 Q.  And what was your principal job
15    responsibilities as assistant attorney
16    general?
17 A.  It varied.
18 Q.  Well, can you give me some examples of what
19    you did?
20 A.  For example, for a couple of years, I was
21    assigned to the Public Service Commission to
22    represent the using and consuming public's
23    interest at the commission.  I -- I wrote

Page 7

1     briefs.  I represented state officials sued in
2     their official capacities.  It -- it varied.
3     It depended on what division I was assigned
4     to.  I did a lot of administrative work for
5     boards and agencies.
6  Q.  And did you do any civil work?
7  A.  It was all civil.
8  Q.  Okay.  Did you appear in court --
9  A.  I did.
10 Q.  -- as opposed to administrative bodies?
11 A.  Yes.
12 Q.  What type of court cases did you handle?
13 A.  Primarily, any case against a state official
14    sued in his official capacity, that I was
15    assigned to.  That's what the Attorney
16    General's Office is, the -- the State's
17    attorney.  So any official that was sued in
18    his official capacity, I represented them if
19    that case was assigned to me.
20 Q.  Can you think of any case in particular that
21    you represented a public official?
22 A.  Innumerable.  Prison wardens.  I can't
23    possibly because I was there almost 13 years,

Page 8

1     I think.  So over the course of that 13 years,
2     I -- I went from department -- I mean, just
3     depended on what I was assigned.  I had no
4     control over my assignments.
5  Q.  So would you say that you was well-grounded in
6     public service jurisprudence?
7        MS. NELSON:  Object to the form.  I don't
8           know if I understand it but you can
9           answer.
10       MR. JAFFREE:  You found some problem with
11          the form?
12       MS. NELSON:  Yes.
13 Q.  Do you know what well-versed means?
14 A.  I do.
15 Q.  Do you know what public service means?
16 A.  Public service, I think, is up to
17    interpretation.
18 Q.  How do you interpret it?
19 A.  Public service is the work of the public good,
20    basically.
21 Q.  Okay.  In case there was some ambiguity, are
22    you well-versed in government employment
23    litigation?

2 (Pages 5 to 8)



# FREEDOM COURT REPORTING

Page 9

1    A.  No.
2    Q.  Well, you said you represented public
3        officials.
4    A.  They were not necessarily employment issues of
5        a government official.  There might have been
6        liability issues or policy, procedure, not
7        necessarily employment issues.
8    Q.  Did you handle any cases --
9    A.  No.
10   Q.  -- involving employment issues?
11   A.  None that I can remember specifically.
12   Q.  So if a governmental official was sued in his
13       official capacity and it was an employment
14       action or civil rights action dealing with
15       employment, you wouldn't have represented that
16       person?
17   A.  They had in-house lawyers.  For example, the
18       Alabama Department of Corrections, they had
19       in-house lawyers who represented the
20       commissioner specifically.  So, no, is the
21       answer.  I mean, none that I can think of
22       specifically.
23   Q.  Okay.  Well, you said you occupied that

Page 10

1        position 13 years.
2    A.  I did.
3    Q.  From when to when?
4    A.  Approximately 13 years.  It's from September
5        or October of 1987 until November or December,
6        1999.
7    Q.  In addition to representing governmental
8        officials on the civil side, did you do
9        anything on the criminal side?
10   A.  No.
11   Q.  So you have no criminal law experience at all?
12   A.  Well, I mean, I do but I don't -- I didn't
13       represent criminal defendants.  I -- I've
14       written briefs.
15   Q.  On behalf of who?
16   A.  The State of Alabama.
17   Q.  In criminal cases?
18   A.  No, not -- I mean, not specifically criminal
19       cases.  I guess appeals, criminal appeals.
20       But I never went to court.
21   Q.  You've written criminal appellate briefs?
22   A.  Right.
23   Q.  Many, few?

Page 11

1    A.  Few, very few.
2    Q.  Do you recall any that you've written?
3    A.  No.  Very early in my tenure there, I was
4        assigned to criminal appeals.
5    Q.  Well, during your 13 years with the Attorney
6        General's Office, did you engage in any
7        private practice?
8    A.  No.
9    Q.  Now, prior to your appointment as an assistant
10       attorney general -- is it appropriate to refer
11       to that as an appointment?
12   A.  It was not an appointment.  It was an
13       employment.  I was not a -- it was not an
14       appointment.
15   Q.  Was it a competitive position?
16   A.  I applied.
17   Q.  Was it a merit system --
18   A.  It was.
19   Q.  So then you was a merit system employee?
20   A.  I was.
21   Q.  Did you have certain rights and
22       responsibilities as a merit system employee?
23       MS. NELSON:  Object to the form.

Page 12

1    A.  As a -- as an -- as an employee I -- I
2        assume.  Whatever was --
3    Q.  You want me to be a little bit more specific?
4    A.  Well, whatever was given, you know, to
5        employees.  I'm not -- I'm not -- I don't
6        know.
7    Q.  Well, in your view as a merit system employee,
8        would you have the right to continue
9        employment absent good cause shown?
10       MS. NELSON:  Object to the form.
11   A.  I'm not sure I understand the question.
12   Q.  Okay.  Did you feel that, as a merit system
13       employee, you could only be terminated for
14       cause?
15   A.  Did I feel --
16   Q.  Did you feel --
17   A.  -- as a merit system employee?
18   Q.  -- as a merit system employee that you're
19       going to be terminated for cause?
20   A.  Did I feel that?  No.  I -- I mean, I always
21       thought Alabama was an at-will state.  So I
22       never -- I never thought about it, so I never
23       felt about it.  I don't know.



# 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



# FREEDOM COURT REPORTING

## Page 13

1  Q. You did say you was a merit system employee?
2  A. Yes.
3  Q. And you felt that you could be terminated at
4     will?
5  A. I always thought -- you know, I've always
6     heard Alabama is an at-will employment state.
7     I mean, that's just --
8  Q. Did you think that term to be absolute?
9  A. I didn't -- I didn't care.
10     MS. NELSON: Object to the form.
11  A. I mean, I don't know. I never thought about
12     it. I always heard, Alabama is an at-will
13     employment state. And that's just -- I never
14     thought about it.
15  Q. Did you think when you was an assistant
16     attorney general that if your appointing
17     authority or your superior decided to
18     terminate your services, they had to give you
19     any notice?
20  A. I never thought about it. I mean, I -- I
21     assumed.
22  Q. Did you think you had a right to some kind of
23     hearing?

## Page 14

1     MS. NELSON: I object to the form, what
2     she thinks.
3  A. Yeah. And I never thought about it. I
4     never -- I never thought about it.
5     MR. JAFFREE: Well, I shouldn't ask her
6     what she thinks?
7     MS. NELSON: That's right. You can ask
8     her what she knows.
9  Q. Are you capable of thinking?
10  A. No.
11     MS. NELSON: Object to the form.
12  A. Let's put some levity in here as you said
13     yesterday.
14  Q. Well, did you know that you had a right to a
15     hearing if your superior decided to take some
16     adverse action against you?
17  A. If I say no, I didn't know that. I never
18     thought about it. I was never put in that
19     situation. I never looked into what my rights
20     were as a merit system employee. I never
21     looked into it.
22  Q. So for the 13 years of --
23  A. I never thought about it.

## Page 15

1  Q. -- your employment, you never knew that you
2     had any rights?
3  A. I never thought about it.
4  Q. Well, did you get any kind of operations
5     manual or employee handbook or --
6  A. Probably 13 years -- I mean, in 1999 when I
7     was hired, I probably did.
8  Q. I'm not talking 1999; we're talking about
9     1987.
10  A. 1987, even longer, I probably did.
11  Q. Okay. Do you know that merit system employees
12     have a property right interest in continued
13     employment?
14  A. No.
15     MS. NELSON: Object to the form.
16  Q. You don't know that?
17  A. I don't know that for a fact. I'd have to
18     research it. But, no, I don't know that.
19  Q. Do you know that as a legal scholar?
20  A. No, I don't know that.
21  Q. Well, let's talk about your educational
22     background.
23  A. Please.

## Page 16

1  Q. Excluding primary and secondary school, did
2     you go to college anywhere?
3  A. I did.
4  Q. Where?
5  A. Fisk University in Nashville, Tennessee.
6  Q. What did you major in?
7  A. Political science and public administration.
8  Q. You majored in both --
9  A. I did.
10  Q. -- courses?
11     Were you proficient in your public
12     administration courses?
13  A. I assume; I graduated.
14  Q. You passed your public administration courses?
15  A. I did.
16  Q. Did you do fairly well in those courses?
17  A. I assume. I was salutatorian of my class.
18  Q. Was that course of study rigorous?
19  A. I assume. I didn't have anything to compare
20     it to.
21  Q. Public administration, does that relate at all
22     to the rights of public officials?
23  A. I -- I'm sure that's some of the course of

4 (Pages 13 to 16)



# FREEDOM COURT REPORTING

Page 17

1  study.

2  Q. And did you discuss the role of public

3  officials in the government square?

4  A. If it did, it was 28 years ago.

5  Q. So you have no recollection of what you may

6  have learned in that course?

7  A. Not specifically, no.

8  Q. Okay. Now, after you successfully or rather

9  poorly matriculated through Fisk, having

10  majored in public administration and political

11  science, did you go anywhere else?

12  A. I did.

13  Q. And where did you go after you left Fisk?

14  A. Tulane University School of Law, New Orleans,

15  Louisiana.

16  Q. And did you matriculate through Tulane?

17  A. I did.

18  Q. And did you get a JD?

19  A. I did.

20  Q. Did you get any advanced degree beyond a JD?

21  A. I did.

22  Q. What advanced degree did you get?

23  A. I did a major course of study at Ely Broad

Page 18

1  School of Management at the University of

2  Michigan, public policies and procedures

3  toward my master's.

4  Q. And did you obtain a master's in that?

5  A. I did not.

6  Q. How many years did you spend at Tulane Law

7  School?

8  A. Three or four. I graduated in 1984 -- '87,

9  three years.

10  Q. Was that in New Orleans?

11  A. It was. It is.

12  Q. Well, I just wanted to make sure it was?

13  A. No. I'm glad it still is because of the

14  storm.

15  Q. Well, I understand.

16  A. I wasn't being sarcastic.

17  Q. I guess, if it was in New Orleans at the time

18  you went, I guess that's the critical part of

19  this question. I'm glad, as well, that it

20  still is.

21      Did you take and successfully pass the

22  Louisiana Bar?

23  A. I did not take the Louisiana Bar.

Page 19

1  Q. Well, let's get back to your law school

2  career. Do you recall any of the courses that

3  you took in law school?

4  A. Contracts. What you take in law school:

5  criminal procedure, criminal law, contracts.

6  Q. Did you take any public administration law?

7  A. Constitutional law. Public administration

8  law?

9  Q. Yes.

10  A. No, I -- there was -- I worked at -- no.

11  Q. Any law --

12  A. I don't -- I don't remember.

13  Q. Any law dealing with government service?

14  A. I don't -- no. If I did, I don't remember

15  specifically.

16  Q. But you did take constitutional law?

17  A. I'm sure as part of my core classes I did.

18  Q. And was that perhaps a year course -- a

19  year-long course?

20  A. I don't remember whether it was a year or

21  semester.

22  Q. And did your constitutional law course have a

23  both criminal and civil component?

Page 20

1  A. I don't remember. Criminal law,

2  constitution -- I don't remember.

3  Q. You don't remember?

4  A. Huh-uh (negative response).

5      MS. NELSON: Say yes or no.

6  A. Yes -- no, I don't remember.

7  Q. You don't recall taking any courses or

8  studying any cases dealing with constitutional

9  law on the criminal side?

10  A. Not specifically, no.

11  Q. All right. Do you remember studying any First

12  Amendment jurisprudence?

13  A. Not specifically.

14      MS. NELSON: Again, I'm going to object to

15  this line of questioning. If you're

16  trying to question her about courses

17  that she took in 1987 about

18  constitutional law -- the law is what

19  it is -- to try to get her to say that

20  she can, you know, interpret questions

21  of law in this case, I'm going to

22  object to.

23      MR. JAFFREE: Okay. I took -- I was in



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1     law school in 1970, and I sort of
2     remember my constitutional law
3     question. But if you don't, fine.
4     MS. NELSON: The Constitution, as I
5     understand it, the Supreme Court
6     interprets that. And it -- their
7     interpretation changes from year to
8     year as to what the law is. So you
9     know, I'm objecting to this line of
10    questioning.
11    MR. JAFFREE: Sometimes they even go back.
12    MS. NELSON: Yeah.
13    MR. JAFFREE: And go back to what it was
14    before.
15    MS. NELSON: They do.
16    MR. JAFFREE: Back to --
17    MS. NELSON: It's ever changing and
18    evolving, isn't it?
19    MR. JAFFREE: Well, that's a nice
20    theological --
21    MS. NELSON: It is. We could debate this
22    all day.
23    MR. JAFFREE: Maybe philosophical debate

Page 22

1     between us, but this is my witness
2     here. And I'd like to ask her some
3     questions along this line.
4    Q. Did you realize from your constitutional law
5     course that people have first amendment rights
6     to allow them to engage in certain protected
7     speech?
8     MS. NELSON: Object to the form.
9    A. And, you know, again I have to say, no.
10    Q. No?
11    A. Not from my constitutional law course, I
12    wouldn't -- I don't remember that.
13    Q. You don't recall any constitutional law
14    courses dealing with protected speech?
15    A. Not specifically.
16    Q. Okay. Did your constitutional law cover the
17    Constitution? Did it cover, let's say, the
18    First Amendment of the Constitution?
19    A. I can only assume, and you want me to say yes
20    or no. So --
21    Q. Your best guess.
22    A. I don't remember.
23    Q. As your best guess, do you think your

Page 23

1     constitutional law class covered the First
2     Amendment?
3    A. I'd hate to guess. You know, I don't --
4    Q. You'd hate to guess?
5    A. I don't remember specifically.
6    Q. Do you remember specifically whether or not
7    your constitutional law course covered the
8    freedom of association?
9    A. No, I don't remember specifically.
10    Q. Well, irrespective of what you remember about
11    your constitutional law class that may have
12    been -- you said in 1980 -- have your fairly
13    life-long experience working in the legal
14    profession taught you anything about First
15    Amendment jurisprudence?
16    A. No.
17    Q. All right. Do you know that there is a right
18    to free speech?
19    A. Yes.
20    Q. Do you know that this is a right that
21    government-sector employees have?
22    MS. NELSON: Object to the form.
23    A. And not specifically. I know it's right

Page 24

1     that -- that's in the Bill of Rights as a part
2     of the Constitution. But, no.
3    Q. And do you --
4    A. I don't know what rights government-sector
5    employees have.
6    Q. And do you know that the rights of free speech
7    includes the right to speak about matters of
8    public concern?
9    MS. NELSON: Object to the form. And
10    you're asking her a legal question.
11    MR. JAFFREE: Should I apologize for that.
12    MS. NELSON: I said, I just object. It's
13    a --
14    Q. Well, let me ask you this.
15    MS. NELSON: I mean, you're trying to
16    quote her the law --
17    Q. Let me ask you this.
18    MS. NELSON: -- without any
19    qualifications. I just object to the
20    form. You can ask her if she knows.
21    MR. JAFFREE: Well, I thought she said
22    that --
23    Q. Did you finish law school?


## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



# FREEDOM COURT REPORTING

Page 25

1    A.  I did.
2    Q.  Did you obtain a degree, a juris doctorate in
3        law?
4    A.  I did.
5        MS. NELSON:  You've asked her that.
6        MR. JAFFREE:  You said no qualifications.
7        I just wanted to make sure that I
8        understood her qualification.
9    Q.  Did you subsequently take and pass some state
10       bar examination?
11   A.  I did.  Yes.
12   Q.  Were you required as part of passing that
13       examination to be schooled in at least some
14       state's body of law?
15   A.  Yes.
16   Q.  And you did pass, right?
17   A.  Yes.
18   Q.  And whose bar did you pass?
19   A.  Alabama.
20   Q.  Did you take any other bar from any other
21       state?
22   A.  I did not.  No.  No.
23   Q.  So you've only been licensed to practice in

Page 26

1        Alabama?
2    A.  Yes.  I've only been in Alabama.
3    Q.  Well, that's not totally true.  You at least
4        spent some time in New Orleans.
5    A.  I mean, not after I passed --
6    Q.  I'm just commenting.
7    A.  -- to take the bar.
8    Q.  Yeah, I'm just commenting.
9    A.  I've only lived in Alabama since I finished
10       law school.
11   Q.  Have you at any time from the time you -- by
12       the way, when did you pass the bar exam?
13   A.  If I graduated in May of '87, then June, July,
14       August.  I guess I would have gotten the
15       results in September of '87.
16   Q.  So --
17   A.  No, no, no.  Because I started work in
18       October.  Yeah, September or October '87.  I
19       don't know.
20   Q.  So you may have been a licensed attorney for
21       the last 20 years?
22   A.  Approximately.
23   Q.  Have you lost that license for any reason?

Page 27

1    A.  No.
2    Q.  So as far as you know, you're still a licensed
3        attorney?
4    A.  Yes.
5    Q.  And as a licensed attorney, are you instructed
6        to know some law?
7    A.  By whom?
8    Q.  By you.
9    A.  I mean, am I expected by whom to know some
10       law?  I don't understand the question.  I'm
11       sorry.
12   Q.  Well, let's just say, if the general public
13       was aware that you had passed the bar exam and
14       you had practiced law for 20 years, that the
15       general public would expect you to know some
16       law?
17       MS. NELSON:  Object to the form.  You can
18       answer.
19   A.  Yeah.  I don't know what he's going for.  I
20       don't under the question.
21   Q.  Well, let me ask you --
22   A.  I mean, I don't -- okay.  I don't remember the
23       specific courses I took in law school nor the

Page 28

1        specifics.  So I would -- I would lie if I
2        said I did.
3    Q.  You have a judicial position?
4    A.  I do.
5    Q.  And in that position, are you required to
6        dispense law?
7    A.  Dispense law?
8        MS. NELSON:  Object to the form.
9    A.  Okay.  Yes.
10   Q.  Okay.  So is it correct to assume --
11   A.  I don't dispense law.
12   Q.  -- that you should know some law as a judge?
13   A.  Yes.
14   Q.  Okay.  Now, let me ask you this:  Would you
15       agree that since you are an attorney and have
16       been so in good standing for a long time and,
17       further, since you are a judge who, as part of
18       your responsibilities, is dispensing law, that
19       you should not be judged like a layperson
20       appointing authority who is not schooled in
21       the law, that you should be judged by a higher
22       standard?  Would you agree with that?
23       MS. NELSON:  Object to the form.  Judged

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1    by whom?
2  A.  And/or what? No. Because there are certain
3    areas of the law, for example, property law,
4    that I've never practiced, never researched,
5    never -- copyright law, never practiced, never
6    researched, never -- so it would be unfair to
7    judge me on those, even though I've been to
8    law school. Intellectual property law, I've
9    never practiced.
10     So no, I don't think I should be judged by
11    a higher standard if I've never studied that
12    body of law just because I went to law school.
13  Q.  However, you have the capacity to understand
14    certain areas of the law that you don't
15    specialize in; is that correct?
16     MS. NELSON: Object to the form.
17  A.  Do I have the capacity to understand it? I --
18    I don't know. I don't know. I've never
19    tried.
20  Q.  You don't know whether you have the capacity
21    to understand certain areas of the law?
22  A.  Certain areas. I think all areas if I have
23    opportunity to learn it and research it.

Page 30

1  Q.  So in First Amendment jurisprudence you should
2    be considered a neophyte?
3  A.  Yes.
4     MS. NELSON: Object to the form.
5     THE WITNESS: I'm sorry, Carol Sue.
6     MS. NELSON: I'm just objecting to form.
7     You can answer.
8  A.  Yes, I would be a neophyte because I've never
9    dealt with it.
10  Q.  And in public service litigation, you should
11    be considered a neophyte?
12     MS. NELSON: Object to the form.
13  A.  Yes. Because I don't know what public service
14    litigation is.
15     MS. NELSON: Nor do I.
16  Q.  And civil rights litigation, you should also
17    be considered a neophyte?
18     MS. NELSON: Object to the form. She's a
19     municipal court judge. She said
20     she -- I don't know that she ever said
21     she's a civil rights lawyer.
22     MR. JAFFREE: Well, I'm asking her.
23  Q.  Do you know any civil rights law?

Page 31

1  A.  It's -- yeah.
2  Q.  Would you consider yourself a neophyte?
3     MS. NELSON: Object to the form.
4  A.  A neophyte?
5     MS. NELSON: What do you mean by that?
6     THE WITNESS: New to the law of -- new I
7     guess.
8     MR. JAFFREE: What does a neophyte mean to
9     you?
10     MS. NELSON: Well, you asked the
11     question. What do you -- what are you
12     asking her, is she a neophyte?
13     MR. JAFFREE: Well, is this witness unable
14     to understand what that term is?
15  A.  I am. Could you define it for me, please.
16  Q.  Some person with no knowledge, no skills, just
17    a babe in the woods as far as the subject is
18    concerned.
19     Would you like a clearer definition?
20     MS. NELSON: And what -- your question is
21     what? Is she -- with that -- with
22     your definition, is she a neophyte as
23     to what?

Page 32

1     THE WITNESS: Civil rights. I'm sorry.
2     MS. NELSON: Civil Rights law?
3     MR. JAFFREE: Yeah, that's my question.
4     MS. NELSON: What kind of Civil Rights?
5     MR. JAFFREE: Do you want to be the
6     witness?
7     MS. NELSON: Well, I mean, there are a lot
8     of civil rights out there. I'm trying
9     to get you -- to understand what your
10     asking her and why.
11  Q.  Title VII litigation. Would you be a neophyte
12    in Title VII litigation?
13  A.  Yes.
14  Q.  Would you be a neophyte in 1981, 1983
15    litigation?
16  A.  I hate to say I'm neophyte. I mean, I've --
17    I've, of course, represent -- yes, I will be a
18    neophyte in that, yes.
19  Q.  All right. How did you learn about the
20    judgeship opening?
21  A.  A lady named Carol Jean Smith.
22  Q.  Who is she?
23  A.  She was an assistant attorney general in the

8 (Pages 29 to 32)



# FREEDOM COURT REPORTING

Page 33

1     Attorney General's office in 19 -- for several
2   years, I'm sure, but in 1998 or '99 when I
3   heard about it.
4 **Q. She told you about there was a position**
5   **available?**
6 A. She did.
7 **Q. Was this --**
8 A. Yes. I'm sorry.
9 **Q. What was I getting ready to ask you?**
10 A. No. They told me to say yes or no, and I said
11   she did.
12     MS. NELSON: That's fine.
13 **Q. Okay. I thought you was anticipating my**
14   **question.**
15     **Do you know who was in the running for**
16   **this position prior to you're being hired in**
17   **that position?**
18 A. No.
19 **Q. Was it another black female that was**
20   **considered as far as you know?**
21 A. As far as I know now. I didn't know then who
22   was in the running.
23 **Q. But you do know now. Do you know what her**

Page 34

1   **name was?**
2 A. Yes.
3 **Q. What's her name?**
4 A. Kalia Lane.
5 **Q. Kalia Lane?**
6 A. Yes.
7 **Q. And she was considered for the position?**
8 A. That's my understanding.
9 **Q. Now, did you learn about it at the time she**
10   **was being considered or after she had been**
11   **rejected?**
12     MS. NELSON: She just answered that. You
13     can answer again.
14 A. Did I -- did I learn about her?
15 **Q. Yeah. Now that you know that she was applying**
16   **for the position and --**
17 A. Right.
18 **Q. -- was seriously considered, at the time you**
19   **learned about it, was it during the time she**
20   **was being considered or subsequent to her**
21   **consideration? If you know.**
22 A. Yeah, I don't know.
23 **Q. All right. So this -- I forgot what you said**

Page 35

1   **her name was -- this person that works in your**
2   **same department told you about a job opening?**
3 A. Carol Jean Smith. Yes, she did. She wasn't
4   in my department. But, yes, she did tell me
5   about the --
6 **Q. And then you applied for it?**
7 A. I did.
8 **Q. How?**
9 A. I don't remember. When you say "how," I
10   think -- I assume I sent a resume. I don't
11   remember. I really don't. I've thought about
12   it several times, and I don't remember.
13 **Q. In response to my request for production, did**
14   **you have to look back through your documents**
15   **and see if you sent a resume or an application**
16   **or anything?**
17 A. I mean, I don't -- I don't know. I don't -- I
18   wouldn't have kept it. If I sent them a
19   resume, I would have just sent them a standard
20   copy of my resume at the time and a cover
21   letter.
22 **Q. So you don't know how the City learned about**
23   **your interest in the job?**

Page 36

1 A. No, I don't know specifically how. I assume
2   they got my letter and my resume.
3 **Q. Okay. Well, do you know when you sent that**
4   **letter or resume or other document?**
5 A. No, not specific dates, I don't.
6 **Q. Is it possible that you didn't send anything?**
7 A. I don't think that's possible, but I --
8 **Q. But you don't know?**
9     MS. NELSON: I think she's asked and
10     answered.
11 A. Yeah. I don't think -- how would they know me
12   if I didn't send a resume?
13 **Q. Well, you could have sent a letter.**
14 A. Well, you said that I didn't send anything.
15   So no, I don't think that's possible.
16 **Q. You could have made a phone call.**
17 A. No, I don't think that's possible.
18 **Q. Somebody could have selected you as opposed to**
19   **you selecting them?**
20     MS. NELSON: Object to the form. Is that
21     a question?
22     MR. JAFFREE: She asked me a question.
23     I'm responding. I'm giving her



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1        hypotheticals.
2    A. I don't know how they would know me. I didn't
3    live here.
4    Q. Okay. Well, so somehow you submitted
5        something --
6    A. Right.
7    Q. -- I guess for they --
8    A. I know I did. I don't know what.
9    Q. -- learned about you somehow.
10        And then what happened?
11   A. I was interviewed and --
12   Q. I mean, you submitted something; you was
13       interviewed. Did anybody contact you?
14   A. Yes, somebody contacted me, I'm sure.
15   Q. Who contacted you?
16   A. I don't remember.
17   Q. Was it a male, female?
18   A. I don't remember.
19   Q. Was it the mayor of the city?
20   A. I don't remember who contacted me to meet.
21   Q. Or was it somebody who was in a position to
22       contact you and talk to you about this
23       position?

Page 38

1        MS. NELSON: She said she didn't remember.
2    A. Yeah, I don't remember who I -- I really don't
3    remember who I talked to.
4        MR. JAFFREE: Well, maybe she remember the
5        status of the person.
6    Q. Or somebody contacted you?
7    A. I don't remember them so I can't remember
8    their status. Somebody contacted --
9    Q. You're quite sure that it wasn't a maintenance
10       worker that contacted you?
11   A. I don't know.
12   Q. All right. Well, what did they tell you when
13       they contacted you?
14   A. I don't remember. I -- I don't remember. I
15   mean, I just assume it's just set up an
16   interview, like when you apply for a job and
17   people call and say, we have you scheduled for
18   interview.
19   Q. Do you generally have difficulty with your
20       memory?
21       MR. JAFFREE: Object to the form.
22   A. Yes, as I get older, Mr. Jaffree.
23   Q. Let me ask you the question that your counsel

Page 39

1    has been asking my clients. I try to avoid
2    some of the preliminary stuff.
3        But are you on any medication that would
4        affect your memory?
5    A. Not that I'm aware.
6    Q. Do you have any disability that would affect
7        your memory?
8    A. Age.
9    Q. Or affect your ability to answer truthfully to
10       the questions I'm going to ask you?
11   A. Age is the only thing.
12   Q. Are you on any kind of drugs or alcohol or
13       anything would affect your answering
14       truthfully to the questions I'm going to ask
15       you?
16   A. No.
17   Q. So other than age, you don't think there's
18       anything else that would affect your memory
19       that would cause you not to be able to respond
20       to the questions I'm going to ask you?
21   A. Stress.
22   Q. Are you under stress, now?
23   A. Yes.

Page 40

1    Q. Why are you under stress?
2    A. Because I don't understand your questions.
3    Q. Okay. I'm sorry. Well, I'm probably older
4        than you.
5        Anyway, so somebody called you. And did
6        they ask you to come in for an interview?
7    A. Yes.
8    Q. And do you remember when you came in for the
9        interview?
10   A. Not the specific date, no, sir, I don't.
11   Q. Do you remember what month it was?
12   A. No, sir, I don't.
13   Q. Do you remember what year it was?
14   A. 1999.
15   Q. Good. Now, do you remember what season of the
16       year it was?
17   A. No, sir, I don't.
18   Q. Spring, fall, winter?
19   A. I feel bad, but I really don't.
20   Q. Let me see if I can help you. You think you
21       may have started sometime in November of 1999.
22   A. Right. Yes.
23   Q. How many months was it before you started?



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  A. That what?
2  Q. That you came in for an interview.
3  A. How many months before? I mean, if -- if I
4     say two or three, I would be lying because
5     I -- I mean, I wouldn't be lying. I don't
6     know.
7  Q. I'm not going to consider you're lying.
8     MS. NELSON: If you remember.
9  Q. Give me your best guess.
10 A. I don't remember. I -- I sent in a resume.
11    They called me and said you have an
12    interview. And I came.
13 Q. All right. Do you remember who you
14    interviewed before?
15 A. I interviewed -- no. I interviewed -- no.
16    Now, I can tell you, they were employees of
17    the City of Dothan. I don't specifically
18    remember who they were now, like, you know --
19 Q. Do you know how long the interview process
20    took?
21 A. The entire interview process or each
22    interview?
23 Q. How many interviews did you submit to?

Page 42

1  A. I think about three.
2  Q. Well, what about the first one, any idea how
3     long it took?
4  A. No idea how long it took.
5  Q. Any idea what questions they asked you?
6  A. They asked -- they had my resume. They asked
7     me about stuff that was on my resume, and they
8     just asked me questions about my legal
9     experience and, you know, what I -- why did I
10    want the job.
11 Q. But did you tell them that you were a neophyte
12    in municipal law?
13 A. I don't remember.
14 Q. How many of these people that you don't
15    remember were there that were asking you the
16    questions on the first interview?
17 A. Approximately three or four.
18 Q. Okay. How long after the first interview did
19    you submit to a second interview?
20 A. Very shortly thereafter, within a matter of
21    weeks. I don't -- no, I don't remember
22    specifically.
23 Q. Do you remember, was it different people on

Page 43

1     the second interview committee or the same
2     people or --
3  A. I think it was a combination of people that I
4     had met and maybe some new people that --
5  Q. How many --
6  A. I don't remember.
7  Q. How many on the second interview committee,
8     any idea?
9  A. I saw three or four people.
10 Q. Did they ask you any different questions?
11 A. No. And in fact --
12 Q. Same questions?
13 A. Well, yeah. I think that some of the people
14    that I met the second time, I had not met in
15    the first interview. So I'm sure we did go
16    back over the -- and the all questions were
17    about my resume and why did I want the job and
18    that type stuff.
19 Q. Did you think you submitted to a third
20    interview?
21 A. Yes, I do.
22 Q. And how long was that after the second
23    interview?

Page 44

1  A. Very shortly thereafter. I mean, it -- they
2     all went very quickly.
3  Q. So all three of the interviews were very close
4     together, compressed?
5  A. Yes.
6  Q. To the best of your recollection?
7  A. Yes. Thank you.
8  Q. And do you remember who it was that
9     administered the third interview?
10    MS. NELSON: Object to the form.
11    "Administered?"
12 Q. Do you understand what I mean by administered?
13    It's not a term of art. If it will be
14    helpful, I will say, who participated in the
15    third? I'm not trying to use words to trick
16    you. Who participated in the third
17    interview?
18 A. Me and about three or four other people.
19 Q. Same people?
20 A. I don't remember.
21 Q. Same questions?
22 A. I think so.
23 Q. So pretty much three times you submitted to

11  (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    interviews, it was some of the same people and
2    they kept repeating the questions that they
3    asked you?
4    A.   To the best of my memory.
5    Q.   Does that seem odd to you?
6    A.   No.
7    Q.   Does it seem redundant?
8    A.   No.  I mean, all --
9    Q.   Does that seem meaningless?
10   A.   -- basically the same thing.  No.
11   Q.   Well, when did you discover that you had the
12       position?
13   A.   When somebody called me or sent me a letter.
14       I don't -- I mean, I was notified that I had
15       it -- that I had it.  I don't remember how.
16   Q.   All right.  Let me shift gears here, and I'll
17       get back to that, because I don't want to go
18       too far afield before I -- let me see if I
19       could give the court reporter more work to do.
20       MR. JAFFREE:  And I'm apologizing on the
21       Record for the lack of professionalism
22       in my Notice of a Deposition.  When
23       you're rushing and doing three things

Page 46

1    at the same time and don't have a
2    secretary, sometimes you have to
3    improvise and compromise on your time.
4    But anyway, be that as it may.
5    Q.   Did anyone give you a copy or tell you about a
6        notice of this deposition?
7    A.   Yes.  Why?
8    Q.   And did they indicate that there was a series
9        of documents that you were supposed to bring
10       with you?
11   A.   Yes.
12   Q.   Well, let's go over them.  Number one on this
13       notice was a memo dated somewhere around
14       December the 1st from Lieutenant Cliff
15       Garrett.  Did you bring that?
16   A.   No.
17       MS. NELSON:  If I could state for the
18       Record, you did send me an e-mail
19       notice.  I did provide it to the
20       judge, ask her to look for these
21       documents.  I did want to serve you
22       with just some general objections.
23       But you can ask her about each one.

Page 47

1    But, you know, I do have documents
2    that she was able to locate that you
3    asked for that was -- but they're not
4    otherwise objectionable.  But with
5    that, we'll go forward.
6    Q.   Was there a reason you didn't bring with you
7        this memo dated December the 1st from
8        Lieutenant Garrett?
9    A.   We couldn't find one.
10   Q.   You couldn't find one?
11   A.   No.
12   Q.   Did you contact Lieutenant Garrett and ask him
13       if he had a copy of his memo?
14   A.   No.
15   Q.   Did you contact Captain John Gardner --
16       MS. BRACKIN:  Givens.
17       MR. JAFFREE:  Givens?  It's not Gardner?
18       MS. BRACKIN:  Captain Givens.
19   Q.   It that the reason because there was no letter
20       to John Gardner?
21   A.   We couldn't find a memo from Lieutenant Cliff
22       Garrett to a Captain John Gordon -- Gardner.
23   Q.   So it may have been a misprint on a name

Page 48

1    there.  Okay.
2        What about letters sent to you by Fran
3        Bailey when she resigned?
4    A.   I didn't -- I didn't have one.
5    Q.   Do you remember Nancy discussing that letter
6        yesterday during her deposition?  Nancy said
7        she looked at it and Ms. Bailey shared her a
8        copy?
9        MS. NELSON:  There was one in her
10       personnel file that I produced to you,
11       but I don't know that Judge Gordon had
12       a copy of it.
13   Q.   You want to look at it, Judge?
14       (Witness looked at document.)
15   Q.   Did you -- did you have a copy of this letter
16       that she said that she addressed to Nancy
17       concerning her resignation plans?
18   A.   No.
19   Q.   Well, if Nancy testified yesterday that
20       Ms. Bailey said part of the reason why she was
21       resigning was because of the disparate
22       treatment between magistrates, would you be in
23       a position to dispute that testimony?

12  (Pages 45 to 48)



# FREEDOM COURT REPORTING

Page 49

1    MS. NELSON: Object to the form. And I
2        don't believe that was her testimony.
3        But you can answer.
4    Q.  Well, if that was her testimony, would you be
5        in a position to dispute that?
6    A.  Do I dispute it? Is that your question?
7    Q.  Yeah.
8    A.  Would I be in a position to --
9    Q.  One of the reasons that Fran Bailey indicated
10       that she was resigning was because of
11       disparate treatment that she was --
12   A.  That she was subjected to, or somebody else
13       was subjected to?
14   Q.  Well, that she experienced?
15       MS. NELSON: Object to the form.
16   A.  That I treated her differently than another
17       similarly situated typist clerk?
18   Q.  No.  The disparate treatment of magistrates?
19   A.  She wasn't a magistrate.
20   Q.  Well, maybe she observed magistrates?
21   A.  I don't --
22   Q.  Was she in a position to observe magistrate
23       treatment?

Page 50

1    A.  I don't -- I don't -- she was a clerk typist.
2        She was a file clerk.
3    Q.  And my question, was she in a position to
4        observe magistrates?
5    A.  Physically or assigned to a position or --
6    Q.  Well, I mean, did she work along with them;
7        did they work in the same physical --
8    A.  Location?
9    Q.  -- place?
10   A.  Yes.
11   Q.  Were they working in close proximity to each
12       other?
13   A.  They were all in the same office.
14   Q.  Could they observe each other on a regular
15       basis?
16   A.  Yes.
17   Q.  Okay.  So you think that Ms. Bailey may not
18       have been in a position to observe magistrates
19       being treated differently?
20       MS. NELSON: Object to the form.
21   A.  I do -- yes. I do object to that or dispute
22       that she could observe them treating
23       differently because I didn't treat them

Page 51

1    differently.
2        MR. JAFFREE: Is this the defendants'
3        response to request number two? Is
4        that submitted as defendants'
5        response?
6    MS. NELSON: Well, you asked for a letter
7        sent to Judge Gordon by Fran Bailey
8        and -- upon her resignation. And to
9        my knowledge, that is a letter to
10       Judge Gordon.
11   MR. JAFFREE: Can you mark this as
12       Plaintiffs' Exhibit 1? I guess I
13       should mark it, shouldn't I?
14   MS. NELSON: I think it will go faster if
15       you marked it.
16       (Plaintiffs' Exhibit 1 was marked
17       for identification.)
18   MR. JAFFREE: And at least for the Record,
19       Plaintiffs' Exhibit 1 is a letter
20       dated July 15th, '07, from Fran Bailey
21       to Defendant Judge Gordon.
22   Q.  Item number three, I asked for, was all memos
23       issued by you to the Judicial Department

Page 52

1    and/or staff during the period of April the
2    1st, 2001, until December the 31st, 2005.
3        Did you produce the memos that were
4    sent to -- well, were there any missing, memos
5    that you could have --
6    MS. NELSON: Well, I'm about to provide to
7        you --
8    MR. JAFFREE: Well, while you were doing
9        that, I was just trying to ask this
10       witness --
11   MS. NELSON: Oh, excuse me.
12   MR. JAFFREE: -- if she recalls whether or
13       not some was missing from the group
14       that's she's given me.
15   A.  Not specifically.
16   MS. NELSON: I'll object to the form.
17       Missing from what? You don't even
18       know what's she's giving you.
19   MR. JAFFREE: Well, I'm asking her, is the
20       memo -- what she's giving me complete,
21       or if there's some memos that she
22       issued to the staff that she don't
23       have anymore.



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



Page 53

1  MS. NELSON: And how do you -- you're
2    assuming --
3  MR. JAFFREE: I'm not assuming anything.
4    I'm asking. I mean, maybe she would
5    know that there are some memos that
6    somehow got destroyed or that she
7    can't find or don't have. I'm asking
8    her the question. I mean, she's
9    competent to the extent that she knows
10   whether or not any of the memos that
11   she issued to the staff are not
12   included in this group she's giving
13   me.
14 Q. You are competent to answer that, aren't you?
15   MS. NELSON: Well, and I'm -- and if I
16   could just state for the Record, some
17   memos have been provided in the
18   documents I've previously given to
19   you. I mean, she made search of
20   other --
21 MR. JAFFREE: Not many.
22 MS. NELSON: -- memos but --
23 MR. JAFFREE: I mean, those boxes of

Page 54

1    documents that took me forever to go
2    through don't have very many memos.
3  MS. NELSON: Well, within personnel files,
4    there are memos. There are memos. I
5    mean, she made a diligent search of
6    memos that she could locate or could
7    be located. Now, whether it covers
8    every --
9  MR. JAFFREE: Can I get her to testify to
10   that?
11 MS. NELSON: You can. If you're asking --
12 MR. JAFFREE: I mean, your attorney is
13   trying --
14 MS. NELSON: -- it a way that assumes
15   she --
16 MR. JAFFREE: I have so many -- I have to
17   admire your attorney.
18   (Court reporter interrupted for
19    clarification.)
20 MR. JAFFREE: We're ignoring your
21   difficulty, and I apologize for that,
22   at least on my part.
23 Q. I appreciate your attorney trying to be very

Page 55

1    diligent and doing a very good job in helping
2    you. But if I could get a response to my
3    question:
4      Are you aware of any memos that you have
5    submitted to the staff that's not included
6    with this group that you've given me?
7  A. No.
8  Q. Okay.
9      (Plaintiffs' Exhibit 2 was marked
10     for identification.)
11 Q. So now, in item number four, I asked for a
12   series of documents. And I may have asked for
13   these same documents in our request for
14   production. If I can get to item number four
15   since we're talking about request for
16   production, Judge Gordon, were you aware that
17   on or about December the 25th, I forwarded to
18   your attorney a request for production of
19   documents?
20   MS. NELSON: I'm not sure what you're
21     showing her.
22     (Brief pause)
23   MS. NELSON: You're showing her a request

Page 56

1    of documents propounded to the
2    Defendant City of Dothan?
3  MR. JAFFREE: Yes. I'm asking her, was
4    she aware that I propounded a request
5    for those documents.
6  MS. NELSON: Again, I don't know. It's to
7    the City. I don't know if she -- do
8    you know?
9  MR. JAFFREE: I'm --
10 MS. NELSON: Yeah.
11 Q. The City doesn't have any fingers and arms, so
12   the City asked somebody. So I'm going to ask
13   you some questions about that.
14   MS. NELSON: Well, number one, I don't
15     know -- you didn't get an answer from
16     her if she was aware that that had
17     been propounded to the City.
18 Q. Well, were you?
19 A. No.
20 Q. You never saw that document before?
21 A. No.
22 Q. Do you know from your own knowledge who with
23   the City responded to that?

14 (Pages 53 to 56)



Page 57

1  A. No.
2  Q. I know they responded through the attorney.
3     Well, do you know who the appointed authority
4     is for the magistrates' office?
5  A. Point of authority for the --
6  Q. The appointing authority. Who is the
7     appointing authority for the magistrates'
8     office?
9  A. I don't understand the question.
10    MS. NELSON: The appointing authority?
11    MR. JAFFREE: Yeah, the appointing
12    authority.
13 Q. Are you familiar with that term, "appointing
14    authority?"
15 A. Magistrates aren't appointed. They're
16    employed.
17 Q. Who is the appointing authority? Are you the
18    appointing authority? Is that a title you
19    occupy, appointing authority?
20 A. No.
21 Q. You don't occupy that title?
22 A. I don't -- we don't appoint magistrates.
23    They're employed. It's not an appointment.

Page 58

1  Q. Do the personnel rules refer to an appointing
2     authority?
3     MS. NELSON: If you know.
4  A. I don't know. I don't know if -- if the
5     personnel rules refer to an appointing
6     authority, no.
7  Q. You don't.
8     (Brief pause)
9  Q. Are you familiar with the City of Dothan
10    Civil Service Act?
11 A. No.
12 Q. Huh?
13 A. No.
14 Q. You're not familiar with this Civil Service
15    Act?
16 A. No. I mean, I'm familiar with the name, Civil
17    Service Act, but not the -- what it -- I'm not
18    familiar with the specifics of the City of
19    Dothan's Civil Service Act.
20 Q. Let me show you what it says about Section 21
21    of the Civil Service Act. And can you read
22    the first sentence of that section?
23 A. First sentence of Section 21, Discharges?

Page 59

1  Q. Yeah.
2  A. "The appointing authority may discharge an
3     employee in the classified service whenever he
4     considers the good of the service and the
5     welfare of the City will be best served,
6     thereby, by making" --
7  Q. Can you stop right there?
8  A. I didn't finish the sentence.
9  Q. Well, go ahead. I'm sorry.
10 A. "Thereby, by making and filing in his office
11    an order to that effect, together with the
12    reason defined for the discharge. However,
13    the power to discharge shall not be
14    capriciously or arbitrarily exercised in any
15    case."
16 Q. Okay. Can you stop now, or are you still
17    reading the sentence.
18 A. Well, you asked me to read the first sentence
19    and --
20 Q. Well, I'm --
21 A. -- I've not finished the sentence.
22 Q. But I'm empowering you to not have to read the
23    whole sentence?

Page 60

1  A. Okay.
2  Q. Okay? Now, if I could have the document
3     back.
4     MS. NELSON: Can I see just what you're
5     showing her here?
6     (Brief recess)
7     MR. JAFFREE: I don't have time for
8     counsel to read the whole document.
9     MS. NELSON: Well, I mean, you're showing
10    her a document that I'm not sure what
11    is. It says Civil Service Act, but I
12    have no idea if it's --
13    MR. JAFFREE: Are you not familiar with
14    that act --
15    MS. NELSON: Well, I don't know if --
16    MR. JAFFREE: -- that's been part of this
17    case the whole time?
18    MS. NELSON: I don't know that you've ever
19    asked me to produce it. I don't know
20    if this is the one -- if this is the
21    most current one.
22    MR. JAFFREE: Well, I mean, sanction me --
23    MS. NELSON: Or the one in effect nor or

15 (Pages 57 to 60)



# FREEDOM COURT REPORTING

Page 61

1    at the time.
2    MR. JAFFREE: Well, sanction me if somehow
3    I'm misleading -- giving people wrong
4    information.
5    MS. NELSON: Well, I have a right to look
6    to see what you're showing her.
7  Q. But let me ask you this: Having read that,
8    are you now familiar with the term "appointing
9    authority?"
10 A. No.
11 Q. You're still not familiar with that term?
12 A. I -- I didn't read it in context.
13 Q. Well, are you familiar with Ms. Mary Brackin?
14 A. Familiar?
15 Q. Are you familiar with Ms. Mary Brackin, the
16    plaintiff here next to me?
17 A. No.
18 Q. Excuse me. You didn't mean to say no. Do you
19    know Mary Brackin, the plaintiff, next to me?
20 A. Do I know her?
21 Q. Have you ever heard of her?
22 A. Yes.
23 Q. Okay. And you know that she was a civil

Page 62

1    service employee in the classified service?
2  A. Yes.
3  Q. And you did have some role in bringing about
4    the termination of Ms. Brackin's employment
5    with the City of Dothan?
6  A. Yes. And her hiring.
7  Q. Pardon?
8  A. And her hiring, also.
9  Q. Well, I didn't ask you that, but thanks for
10    that information.
11 A. Okay.
12 Q. Now, this section says, appointing authority
13    is the one that should bring about the
14    discharge of a civil service employee. So in
15    that context, would you agree that you are the
16    appointing authority?
17    MS. NELSON: Object to the form.
18 A. In that context, I always thought the city
19    manager was the ultimate authority. But I'm a
20    department head and she was in my department,
21    so yes --
22 Q. You mean, this is the first —
23 A. -- in that context.

Page 63

1  Q. As we sit here now, this is the first time
2    that you realized that you was considered an
3    appointing authority?
4  A. No. In this context. I've never seen this
5    document before.
6  Q. Well, on what context did you think you was an
7    appointing authority?
8  A. I never -- I just always thought of myself as
9    a department head. If that's another term
10    for -- is appointing authority another term
11    for department head?
12 Q. Well, what do you think?
13 A. I don't know. Does it define it in here,
14    appointing authority?
15    MS. NELSON: I don't think it does.
16 Q. Well, take my -- Judge, take my word you are
17    appointing authority.
18    MS. NELSON: Take your word that she's the
19    appointing authority?
20    MR. JAFFREE: Yeah. I think there's no
21    dispute on this.
22    MS. NELSON: Well, I think --
23    MR. JAFFREE: I think your counsel can

Page 64

1    stipulate to this.
2    MS. NELSON: Well, in the act --
3    MR. JAFFREE: Otherwise, the --
4    MS. NELSON: -- you're showing us does
5    define the appointing authority as
6    department head, but you're just
7    picking out one --
8    MR. JAFFREE: Well, because I didn't think
9    we was going to get stuck on that
10    word. I just thought we all knew that
11    she was appointing authority. I mean,
12    I hope we don't have to go down this
13    road for everything.
14 Q. So now let me get back to the question I was
15    asking you about appointing authority. As the
16    appointing authority, would you be in charge
17    of the magistrates' office?
18 A. Yes. As department head.
19 Q. Okay. Would these documents that I asked for
20    in my request for production be under your
21    department?
22    MS. NELSON: She doesn't even know what
23    you asked for. And many of them deal

16 (Pages 61 to 64)



# FREEDOM COURT REPORTING



Page 65

1  with personnel files. And no, they're
2  not in her department.
3  MR. JAFFREE: Well, can she say that, or
4  do you want change seats?
5  MS. NELSON: Well, she said she had not
6  seen this. You can take one by one
7  and ask her.
8  MR. JAFFREE: Let me -- if --
9  Q. Let me ask you this: Were you made aware,
10  either by your attorney or someone else by --
11  MS. NELSON: And I'm going to object to
12  any discussion that she may have had
13  with her attorney.
14  MR. JAFFREE: Well, you can object to any
15  discussions. Some discussions are
16  relevant.
17  Q. Were you aware from anyone that, as part of my
18  request for production, I asked for production
19  of resumes and applications for the employment
20  and acceptance/rejection notices of all other
21  associated -- and all other associated
22  documents of persons considered for the
23  position currently occupied by Defendant Judge

Page 66

1  Gordon during the period that Defendant Gordon
2  was considered for the position?
3  A. No, I was not aware of that.
4  Q. Do you know who I should hold responsible for
5  that -- not giving me those documents?
6  A. No, I don't.
7  Q. So somebody else with the City was responsible
8  for producing that information that didn't,
9  but somebody should be held accountable,
10  right, because I don't have these documents?
11  MS. NELSON: I objected to them, and she
12  doesn't have those documents.
13  Q. All right. Now, I asked for the resumes of
14  other applicants for employment and acceptance
15  and rejection notices and all other associated
16  documents of all persons considered for the
17  position of municipal judge for the City of
18  Dothan during the period that Kalia Spears
19  Lane was considered for the position.
20  Did anybody tell you that I wanted those
21  documents?
22  A. No.
23  Q. Do you know who is responsible for producing

Page 67

1  those documents and didn't?
2  MS. NELSON: Object to the form.
3  A. No.
4  (Brief pause)
5  Q. Number four, I asked for -- to produce the
6  complete personnel file of Defendant Judge
7  Gordon. That's you, correct?
8  A. Yes.
9  Q. In reference to personnel files, include
10  application for employment, any rating system
11  employed by the City, any term where she's
12  placed on the list of persons eligible for
13  consideration, and all performance evaluations
14  and all job-related memos, notes given to her
15  and/or prepared in reference to some aspects
16  of her employment, personnel action notices,
17  disciplinary notices, termination notices,
18  promotion notices, rate of pay notices, et
19  cetera.
20  Now, do you -- were you --
21  MS. NELSON: That has been produced.
22  MR. JAFFREE: Well, some of it. I don't
23  have any list of -- I don't have any

Page 68

1  rating system of the people that was
2  considered and placed on that list.
3  MS. NELSON: Well, we produced all we had.
4  MR. JAFFREE: Okay. Fine.
5  Q. Number five, I said, produce complete
6  personnel files of all employees who Defendant
7  Gordon recommended for employment termination
8  regardless of whether or not they were
9  actually terminated during inclusive period
10  beginning with the date of Defendant Gordon's
11  hire as a municipal judge up to and including
12  the dates that these requests are being
13  answered.
14  MS. NELSON: We have produced you every
15  magistrates' file.
16  Q. Was that production request presented to your
17  attention?
18  A. To my --
19  Q. To your attention, this number five?
20  A. I wouldn't have their personnel files. No.
21  Q. Your office doesn't maintain the personnel
22  files?
23  A. No.

17 (Pages 65 to 68)



# FREEDOM COURT REPORTING



Page 69

1  Q.  Number nine. It says, produce all written
2      documents regardless of whether these
3      documents were given to the City of Dothan
4      employees -- City of Dothan employees which
5      informed and/or referenced the informing of
6      such employees that the restrictions on
7      contacting former Magistrate Mary Turner has
8      been lifted.
9          Did you produce those documents?
10     MS. NELSON: I have responded to all of
11         that that was, again, given to
12         the City.
13     MR. JAFFREE: I didn't get a response to
14         number nine.
15     MS. NELSON: Yes, you -- well, I didn't
16         know we were going to go over this
17         today. If we can take a break and I
18         can go get my file. I did respond to
19         all of that. Do you have my
20         responses?
21     MR. JAFFREE: For this request for
22         production? No, I don't think so.
23          You want to -- can we do this at

Page 70

1      lunchtime; you get your files and
2      we'll talk about this?
3      MS. NELSON: Well, it's just ridiculous to
4          go over this witness -- you're reading
5          document requests which were
6          propounded to the City, which I have
7          either answered or filed objections.
8          And I couldn't even hear -- understand
9          what you were asking her.
10     MR. JAFFREE: Here's my problem. I just
11         got these documents, I think, last
12         Friday. And it took me until Sunday
13         night to finish them. And all kind of
14         documents are missing. And I'm trying
15         to see if this witness have these
16         documents. I mean these
17         are -- well --
18     MS. NELSON: I don't understand. You say
19         documents are missing. They've either
20         been produced or objected to or don't
21         exist. I mean, you may be asking --
22     MR. JAFFREE: Well, I'm going to find out
23         from this witness whether or not they

Page 71

1      exist.
2  Q.  Let me ask you this with respect to nine.
3      MS. NELSON: She doesn't even know what
4          nine is.
5  Q.  All right. Look at nine.
6      MS. NELSON: Well, let me look at it
7          first. Again, I'd like to have my
8          objections in front of me.
9      MR. JAFFREE: Well, I'll suspend this, and
10         we'll resume this at lunchtime when
11         you have your objections. Okay?
12     MS. NELSON: To my knowledge, we have
13         answered that.
14     MR. JAFFREE: Well, let me ask the judge
15         about this.
16 Q.  Did you submit a letter telling people that
17     the restrictions for contacting Ms. Turner had
18     been lifted?
19     MS. NELSON: No. You're just -- without
20         any context.
21 Q.  Do you need context for that, Judge?
22     MS. NELSON: I would like to have the
23         benefit of my responses but -- which

Page 72

1      you're not --
2      MR. JAFFREE: Well, I've agreed to resume
3          this after lunch so you can have the
4          benefit of your responses.
5      MS. NELSON: That's fine.
6      MR. JAFFREE: Okay?
7  Q.  Let me go back to this request for production
8      of documents. Did you bring with you all
9      documents pertaining to Crystal Gray?
10     MS. NELSON: We do. I have them here.
11 Q.  Emmanuel Hooker?
12     MS. NELSON: We do.
13 Q.  Michael McCord? There's two Michael McCords,
14     one B. and one D.
15     MS. NELSON: We brought all dealing with
16         Michael McCord that we had -- Michael
17         D. McCord.
18     MR. JAFFREE: Well, I also asked for
19         Michael B. McCord.
20     MS. NELSON: There were none.
21 Q.  Do you know what happened to the documents
22     dealing with Michael B. McCord?
23     MS. NELSON: There were none.

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1    MR. JAFFREE: What do mean, "there were
2    none?"
3    MS. NELSON: I'm telling you, there were
4    none. There are no documents.
5    MR. JAFFREE: Okay.
6    Q. What about Albert Christopher Walker?
7    MS. NELSON: I have objected, and I would
8    ask that we strike and seal his name.
9    He is youthful offender status, and
10    we're not going to produce or discuss
11    him. And I've asked that --
12    MR. JAFFREE: Well, excuse me. But this
13    is one that we claim that somebody
14    caused arrest of I believe.
15    MS. NELSON: I don't care. He's youthful
16    offender.
17    MR. JAFFREE: And shouldn't have been.
18    Are you going to stipulate that there
19    was a wrongful arrest of this
20    individual?
21    MS. NELSON: No, I am not.
22    MR. JAFFREE: Then I would like to see his
23    file.

Page 74

1    MS. NELSON: Well, I'm sorry. I've
2    objected, and you'll have to take it
3    up with the judge.
4    Q. All right. What about Shaun McGhee?
5    MS. NELSON: Shaun McGhee is a public
6    defender.
7    MR. JAFFREE: And your point is what?
8    MS. NELSON: And we're not producing all
9    files on a public -- all files on a
10    public defender. No.
11    Q. All right. Otha Lee June?
12    MS. NELSON: There is no -- we could not
13    find an Otha Lee June.
14    Q. What about Mark Cromer?
15    MS. NELSON: Yes, we have Mark Cromer.
16    Q. And Christopher Candl?
17    MS. NELSON: We could not locate a
18    Christopher Candl, C-A-N-D-L.
19    MR. JAFFREE: Could you locate anyone with
20    a name similar to that? You don't
21    have to answer that.
22    Q. What about Thomas Blunt?
23    MS. NELSON: Could not locate any files on

Page 75

1    Thomas Blunt.
2    Q. Okay. And John Powe?
3    MR. JAFFREE: I think y'all submitted some
4    Powe file.
5    MS. NELSON: We have submitted a Powe
6    file. I think it was Ronald Powe.
7    Q. Okay. Now, number five. All documents
8    received by Judge Gordon and/or anyone acting
9    on -- on or for her behalf from each of the
10    Dothan city police officers who questioned,
11    interviewed staff concerning any matter that
12    Ms. Brackin was disciplined about or otherwise
13    Ms. Brackin was question by a Dothan police
14    officer while she was a Dothan city employee.
15    MS. NELSON: We have produced all of that
16    previously.
17    MR. JAFFREE: Is that from the production
18    that you gave me, that --
19    MS. NELSON: Yes.
20    MR. JAFFREE: -- document?
21    Q. I asked for your Attachment 1, 2, and 3.
22    MS. NELSON: We have produced that.
23    MR. JAFFREE: You produced that

Page 76

1    previously?
2    MS. NELSON: Yes.
3    Q. Okay. Copies of the Dothan Personnel Rules
4    and Regulations that were in effect during the
5    employment of the plaintiffs.
6    MR. JAFFREE: Now, you question whether or
7    not the rules that I gave was correct.
8    MS. NELSON: Well, that was the Civil
9    Service Act. I did make a -- I do
10    have a copy. The personnel department
11    is the person who has custody and
12    control of these rules and
13    regulations. Judge Gordon doesn't.
14    But I will provide you a copy of
15    that. I believe your witnesses have
16    testified -- your plaintiffs have
17    testified that they have that -- had
18    those.
19    MR. JAFFREE: Well, I'm not sure they
20    testified that they had them still
21    with them.
22    MS. NELSON: Okay.
23    MR. JAFFREE: You have that?

19 (Pages 73 to 76)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



Page 77

1    MS. NELSON: Yes, sir, we do.
2    MR. JAFFREE: Let me do this. Can you --
3        let me go back, and I should have did
4        this -- number four, to the extent you
5        have documents to number four, can I
6        bundle them and call -- mark them as
7        Plaintiffs' Exhibit 3?
8    MS. NELSON: You can.
9        (Brief pause)
10   MR. JAFFREE: You said you had the rules;
11       that's number seven?
12   MS. NELSON: You're marking those?
13   MR. JAFFREE: Yeah.
14   MS. NELSON: What number?
15   MR. JAFFREE: Number 4. Number 3 was
16       this -- these defendants to the extent
17       that you produced them.
18 **Q.  What about number eight, Judge Gordon's**
19   **January the 8th public relations memo sent to**
20   **the staff?**
21   MS. NELSON: That's been produced in
22       previous documents.
23   MR. JAFFREE: I'm not sure I've seen

Page 78

1        that. You mean that pile of
2        documents? I'm sure I saw that. Do
3        you have another copy of it?
4    MS. NELSON: Not with me. I'm pretty sure
5        it's attached to --
6    MR. JAFFREE: I'm going to --
7    MS. NELSON: I know it's attached to one
8        of Ms. --
9    MR. JAFFREE: I'm going to --
10   MS. NELSON: -- Brackin's disciplinary
11       actions.
12   MR. JAFFREE: All right. Okay.
13 **Q.  Number nine, Judge Gordon's March the 17th**
14   **letter concerning no contact with Ms. Turner.**
15   MS. NELSON: That's also been produced.
16 **Q.  What about A-Advantage Bonding, Inc., April**
17   **the 6th, 2004 letter?**
18   MS. NELSON: We could not find any such
19       letter.
20   MR. JAFFREE: You couldn't find any such
21       letter?
22   MS. NELSON: Correct.
23   MR. JAFFREE: I found some stuff that

Page 79

1        Nancy had given to me probably two
2        years ago.
3    MS. NELSON: Well, if you found stuff --
4        let me say this: If you're going to
5        use stuff that she gave to you that I
6        didn't get to question her about, I'm
7        going to keep her deposition open to
8        reserve the right to question her.
9    MR. JAFFREE: Well, you can question her
10       about this, but this is -- you want to
11       look at this? And this is the thing
12       that you said you couldn't find.
13   MS. NELSON: Well, it looks like we
14       probably couldn't find it because she
15       took it with her.
16   MR. JAFFREE: No, she did not. That's her
17       copy. Several people had a copy of
18       that if you notice.
19   MS. NELSON: Well, it's interesting that I
20       asked her for any documents that she
21       had to support her claim and --
22   MR. JAFFREE: Well, she -- hold up.
23   MS. NELSON: I've made it clear --

Page 80

1    MR. JAFFREE: I forgot that I had that.
2    MS. NELSON: Well, I reserve the right
3        to --
4    MR. JAFFREE: Because I've got -- I mean
5        there's a whole "googobs" of stuff in
6        this case. And when I was going
7        through this stuff last night --
8        because I'd asked Nancy if she had
9        that document because I thought I saw
10       it once. And she didn't have it. And
11       she remembered the date. And I had
12       it.
13   MS. NELSON: Well, you have it, and looks
14       like it's an original with original
15       signatures. All I can tell you --
16   MR. JAFFREE: Well, it's original to
17       Nancy.
18   MS. NELSON: But we made an attempt -- an
19       effort to find this and did not have
20       it. And she should've produced this
21       yesterday and --
22   MR. JAFFREE: There was no intent to --
23       because we was clear on existence of

20  (Pages 77 to 80)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  that document, and several people had
2  copies of it.
3  MS. NELSON: Well, you don't know that.
4  It has that several people are listed
5  on here, but you have no evidence
6  anybody else had a copy of it.
7  MR. JAFFREE: You want to let the judge
8  see it to see if she'd recognize that
9  document?
10  MS. NELSON: Sure. I mean, that's your
11  right to ask her about it. Are you
12  marking this or --
13  MR. JAFFREE: Well, I will since y'all
14  couldn't find your copy. And you
15  claimed you didn't --
16  MS. NELSON: I don't have a copy.
17  MR. JAFFREE: Well, okay. Fine.
18  (Brief pause)
19  MR. JAFFREE: If we could have somebody
20  make a copy of that, including Nancy's
21  note, I'd like to move on to these
22  other documents so that we could move
23  along. And you could -- the judge

Page 82

1  could read that at her leisure.
2  MS. NELSON: Okay. I mean -- do you -- do
3  you --
4  THE WITNESS: I don't know what to say.
5  MS. NELSON: Well, do you --
6  MR. JAFFREE: Well, I didn't ask you to
7  say anything.
8  MS. NELSON: -- want to make a copy and
9  move on?
10  MR. JAFFREE: Yeah.
11  MS. NELSON: Okay.
12  MR. JAFFREE: Y'all didn't have a copy of
13  that. But -- okay.
14  Q.  What about number eleven?
15  MR. JAFFREE: And I'm going to mark it --
16  MS. NELSON: You want us to make a copy?
17  MR. JAFFREE: If somebody could make a
18  copy and I'm going to mark -- I'll
19  stick that to the original to mark --
20  A.  But that's the original.
21  Q.  Well, that's Nancy's original. There were
22  several originals.
23  MS. NELSON: That's your testimony,

Page 83

1  Mr. Jaffree. You don't know that.
2  A.  I'm trying to figure out --
3  MR. JAFFREE: What now?
4  MS. NELSON: I didn't have a chance to
5  question her about this. You're
6  trying to testify that this is her
7  copy.
8  MR. JAFFREE: Well, I see several --
9  copies sent to several people on the
10  document itself.
11  MS. NELSON: I know, but that doesn't mean
12  it was actually done. You're just
13  assuming that because it has -- it's
14  addressed to several people. You
15  don't have any evidence that it went
16  to all these people.
17  MR. JAFFREE: Well, I don't have any
18  evidence that it didn't.
19  MS. NELSON: That's true. And I haven't
20  had a chance to question Ms. Martin on
21  this, and so I do want to reopen her
22  deposition. Now, we can get it copied
23  and just want to point for Record that

Page 84

1  that is the original that was stamped
2  in by Nancy Martin.
3  MR. JAFFREE: Well, I don't know if it was
4  stamped in by Nancy Martin or stamped
5  in by somebody.
6  THE WITNESS: She signed it.
7  MS. NELSON: She signed it, it appears.
8  It had an "NM."
9  MR. JAFFREE: Yeah.
10  THE WITNESS: Can we get her back today to
11  --
12  MR. JAFFREE: I don't know if we could get
13  her back today.
14  Q.  But let me go to number 11. All written
15  reports to the personnel director concerning
16  any deficiencies in Nancy's job performance
17  during her working test period.
18  MS. NELSON: And that's been provided.
19  MR. JAFFREE: What documents are those?
20  MS. NELSON: I'm sorry?
21  MR. JAFFREE: What documents was those you
22  said had been provided? I'm talking
23  about correspondence to the personnel

21  (Pages 81 to 84)





# FREEDOM COURT REPORTING

Page 85

1  director. I mean, I got three, I
2  think, documents to the personnel
3  director. Is that what you are
4  talking about? The same things that
5  were part of her attachments,
6  Attachment 1, 2, and 3. The same
7  thing was sort of reproduced and sent
8  to the personnel director.
9  MS. NELSON: That we have produced her
10  file, that we produced it in the EEOC
11  documents we produced yesterday.
12  There are multiple documents to the
13  personnel director about Nancy's
14  deficiencies.
15  MR. JAFFREE: All right.
16  Q.  What about number twelve, the civil service
17  rating list for these three individuals?
18  MS. NELSON: Judge does not have that.
19  That's maintained by the personnel
20  office.
21  Q.  Okay. All right. What about -- by the way,
22  Judge, did you make any attempts to get this
23  from the personnel office?

Page 86

1  MS. NELSON: She can't produce what she
2  does not have custody and control
3  over.
4  Q.  Is that your testimony, that you couldn't get
5  access to this?
6  MS. NELSON: I'm telling you. She doesn't
7  have custody and control over ratings,
8  do you, Judge --
9  THE WITNESS: No.
10  MS. NELSON: -- over the registers?
11  THE WITNESS: I never even see them. All
12  that's Personnel.
13  Q.  Number thirteen, Judge Gordon's November and
14  December of 2003 memos to the staff regarding
15  changing cash bonds. Did you produce that?
16  A.  I -- I don't even know the memos.
17  MS. NELSON: I don't know if we were -- if
18  there is a memo, we couldn't find any
19  such memo.
20  MR. JAFFREE: Couldn't find such memos for
21  number thirteen.
22  Q.  All memos, notes, letters written by Judge
23  Gordon concerning Martin's job performance.

Page 87

1  Do I have everything you have there?
2  MS. NELSON: Yes.
3  MR. JAFFREE: There are no other memos
4  other than what y'all have provided to
5  me?
6  MS. NELSON: Correct.
7  Q.  Okay. All memos, notes, letters written by
8  Judge Gordon concerning Brackin's job
9  performance. Do I have all of that?
10  MS. NELSON: That would be in the
11  personnel file. We've produced all of
12  that.
13  Q.  All memos, notes, letters received by Judge
14  Gordon concerning Plaintiff Martin's job
15  performance, anything that you received from
16  other third parties.
17  MS. NELSON: That would be in her file.
18  We've produced all that we have -- all
19  we have on Nancy Martin.
20  Q.  Well, I didn't see any letters that you had
21  received from anybody else. But, okay. I got
22  all of my stuff with me.
23  All memos, letters, notes received,

Page 88

1  written by -- received -- but I'm not going to
2  hold you to number eighteen because there was
3  a repeat of a word that made that sentence not
4  legible.
5  All documents Judge Gordon submitted when
6  she applied for the position of municipal
7  judge for the City of Dothan. That's the very
8  three notes we were discussing earlier. What
9  did you submit when you applied for the
10  position?
11  MS. NELSON: And she's testified to that,
12  and we've produced her personnel
13  file. So that's all the documents we
14  have, is what we've produced.
15  MR. JAFFREE: And number 20 is the one you
16  object to, the documents submitted by
17  other applicants?
18  MS. NELSON: Correct. And, certainly,
19  Judge Gordon doesn't have that.
20  MR. JAFFREE: Well, you're doing a lot of
21  testifying for Judge Gordon.
22  MS. NELSON: Well, why would she have
23  those?

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  THE WITNESS: Well, I wouldn't have the
2  documents of other applicants.
3  MS. NELSON: Well, we're hashing out a
4  document request that I have filed
5  objections to and I'm just trying
6  to --
7  THE WITNESS: I probably sent them to
8  Personnel if they applied.
9  MS. NELSON: You can ask her does she have
10  copies of any applications submitted
11  by anybody else that applied for her
12  job after 1999. I mean, you can ask
13  her that.
14  A. They wouldn't have sent the applications to me
15  because I wouldn't have been even hired. I
16  wasn't even here. It would have gone to
17  Personnel. I'm assuming. I don't know where
18  it went.
19  Q. Okay. All right. Now, let me get back to
20  where I left off at with questions.
21  Were you informed by anyone that these
22  interviews -- all right. Were you informed by
23  anyone at the interview that you was taking

Page 90

1  was just pro forma and that you already had
2  the position?
3  A. No, not to my knowledge.
4  Q. Now, what is the scope of your administrative
5  duties when you're serving as the
6  administrator of the magistrates' office?
7  MS. NELSON: Object to the form.
8  Q. Do you understand the question? Did you
9  understand the question?
10  MS. NELSON: Are you asking what her
11  duties are?
12  Q. Yeah. The scope of your administrative -- I
13  assume you have a judicial hat and a
14  administrative hat. Your judicial hat is when
15  you're sitting on the bench as the judge and
16  you have an administrative hat when you were
17  administrating over the magistrates'
18  department, what is the scope --
19  MS. NELSON: Object to the form.
20  Q. What is the scope of your administrative
21  duties?
22  MS. NELSON: You can ask her if she wore
23  two hats, but to assume -- and you're

Page 91

1  assuming she wears two hats.
2  Q. Do you wear two hats?
3  A. When we have a court administrator, I -- I
4  mean, we have a court administrator position
5  whose job is administrate -- I'm making that
6  word up -- the magistrates' office. But I
7  directly supervise the court administrator.
8  The court administrator supervises the
9  magistrates when we have that position
10  filled. So on a day-to-day basis, I
11  do not -- I cannot literally physically
12  supervise the magistrates' office.
13  Q. So it's your testimony when you have a person
14  functioning as the administrator of the
15  magistrates, then your only role is to
16  supervise the administrator?
17  A. Not my role, but my primary role as far
18  as -- you know, I don't -- I'm not over there
19  day to day. The court administrator would be
20  over there. So that's not my only role. I --
21  I sign -- that's not my only role.
22  Q. Well, what other role do you have when you
23  have a court administrator?

Page 92

1  A. Well, I'm the department head, so there are
2  certain things that only I can approve,
3  certain purchases over a certain amount,
4  travel requests. There are certain things
5  that only I can sign as a department head.
6  But the court administrator coordinates all
7  that. They just submit the paperwork to me
8  for my ultimate signature as department head,
9  but it's under their recommendation.
10  Q. Well, when you have a person serving as
11  administrator for the magistrate office, do
12  you get involved in the day-to-day activities
13  of the magistrates?
14  A. No.
15  Q. Do you get involved in the job assignments?
16  A. No.
17  Q. Do you get involved in time and attendance or
18  approving leave?
19  MS. NELSON: I'm sorry. Time and
20  attendance and what?
21  MR. JAFFREE: Approving leave.
22  A. I sign the payroll that they submit. But as
23  far as their time cards, I never see their

23 (Pages 89 to 92)




# FREEDOM COURT REPORTING

Page 93

1 time cards. I never see what they put on
2 their time cards. I don't know if they're
3 there on a day-to-day basis or not because I'm
4 in another building. But, now, I do sign the
5 ultimate payroll that goes over to -- or comes
6 over here for them to get paid, but it's just
7 a document. I doesn't have any specifics on
8 it.
9 Q. What is the scope of your judicial duties for
10 serving as municipal judge?
11 A. I preside over the City of Dothan Municipal
12 Court which -- that's what I do.
13 Q. And that consists of what? What do you do,
14 other than preside?
15 A. That's what I do. I preside over the City of
16 Dothan's Municipal Court.
17 Q. You couldn't break down what your job duties
18 are, other than just preside over the court?
19 A. Well, I laugh --
20 MS. NELSON: Tell him what you do. I
21 mean --
22 THE WITNESS: He's been there several
23 times. He knows what I do.

Page 94

1 A. I mean, you do. What I --
2 Q. I haven't been there several times.
3 A. I mean, I -- I preside -- you've been there
4 before. I mean, I preside over the City of
5 Dothan Municipal Court. I hold court. We
6 have trials. We have arraignments. We have
7 prisoners. We do CRO revocations. We do
8 everything that a court -- everything the name
9 entitles. We have court. We have full court
10 three and a half days a week. We have
11 revocations, and we do bondsmen forfeitures
12 one day a month. We do CRO revocations. We
13 do prisoners. We do determination hearings.
14 We do probation revocation hearings. Just the
15 extent of what a municipal court does, I do.
16 Q. Is the municipal court an adjunct of the city
17 police department?
18 A. No.
19 Q. Is the city police department an adjunct of
20 municipal court?
21 A. No.
22 Q. Are they two separate independent bodies?
23 A. Yes. By law they have to be separate.

Page 95

1 Q. Is part of the reason they're separate is
2 because you're required to be an independent
3 arbiter?
4 MR. JAFFREE: Object to the form.
5 Q. Do you understand my question?
6 A. I do but I don't -- no. I don't know.
7 Q. I'm sorry?
8 A. I don't know.
9 Q. You don't know what?
10 A. I don't know why the -- why they're -- I mean,
11 I guess on some level I know why. But we're
12 just separate entity just like we're a
13 separate entity from the public utilities.
14 We're a separate entity from recreation.
15 We're just two separate departments. We don't
16 have any of the same personnel in common.
17 Q. Okay. In your capacity as municipal judge, do
18 you have to be impartial and cannot show
19 deference to the police department?
20 A. Yes.
21 Q. Do the city police department have any role in
22 deciding discipline for the Judicial
23 Department's employees?

Page 96

1 A. No, not ultimately.
2 Q. Do they have any role?
3 A. No.
4 Q. These duties that you have as sort of the
5 super administrator of the magistrate office,
6 have these duties changed during the -- or
7 since the time Ms. Martin and Ms. Brackin were
8 employed? Or are they pretty much the same
9 now as they was then?
10 A. I don't understand the question.
11 Q. When you function as the -- as I call it, your
12 administrator hat being the super
13 administrator over the magistrates, the roles
14 that you just articulated that you have, did
15 you have those same roles when Ms. Martin and
16 Ms. Brackin were employed?
17 A. Yes.
18 Q. What percentage of your time do you think you
19 were spending on the administrative duties
20 during the tenure of Ms. Brackin and
21 Ms. Martin?
22 MR. JAFFREE: Object to the form. They
23 were there at different times, Martin



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING




Page 97

1    and Brackin were.
2  Q.  Well, let's first talk about Ms. Martin.  What
3    percentage of your time was spent on
4    administrative duties during the tenure of
5    Ms. Martin?
6  A.  I -- I have no point of reference.
7  Q.  Is the bulk of your time during her tenure
8    spent wearing your judicial hat?
9  A.  Yes.
10 Q.  90 percent, would you say?
11 A.  95.
12 Q.  95 percent.
13    And what about during the tenure of
14   Ms. Brackin when you had an administrator
15   during that period of time -- when you had an
16   administrator during the time she was
17   working?  Same 95 percent, perhaps?
18     MS. NELSON:  Object to the form.
19 A.  I spend most of my time in court.  So if 95
20   percent of my time is spent in court, yes.
21 Q.  All right.  When you don't have an
22   administrator function as the two-layer head
23   of the magistrates, what percentage of your

Page 98

1    time do you spend with the administrative
2    function of your job?
3      MS. NELSON:  Object to the form.
4  Q.  Do you understand the question?
5  A.  Well, I'd still say about five.  Whether I
6    have an administrator or not, approximately 90
7    to 95 percent of my time is in court, court
8    hours, court scheduled hours.  So I'd still
9    say maybe 5 or 10 percent.  I mean, I --
10 Q.  So is it safe to assume that when you don't
11   have an administrator, the magistrates are
12   sort of running themselves?
13     MS. NELSON:  Object to the form.
14 Q.  You understand the question?
15 A.  I wouldn't agree with that, no.
16 Q.  Well, who is supervising them when they don't
17   have an administrator?
18 A.  I am.
19 Q.  You supervising them 5 percent of the time?
20 A.  I thought you meant over there in the office.
21   In their office.  I supervise them -- I mean,
22   100 percent of the time they can come -- you
23   know, I did everything I still did.  Nothing

Page 99

1    changed as far as my duties whether or not
2    they had an administrator.  I still would
3    ultimately, you know, have to sign the
4    payroll, have to work out, you know, anything
5    they had going on.
6  Q.  But didn't do any --
7  A.  I wasn't in their office, no.
8  Q.  In their office day to day?
9  A.  No.
10 Q.  So they sort of supervised themselves when
11   they don't have an administrator?
12 A.  I guess it depends on what you mean by
13   supervise.  They all had assigned duties.
14 Q.  Okay.  What is the organizational structure of
15   the Dothan Municipal Court?
16 A.  I guess it would be presiding judge, court
17   administrator, magistrates, clerks.
18 Q.  Okay.  Do you know what the statute or
19   ordinance is that authorized your position as
20   a municipal judge?
21     MS. NELSON:  I'm sorry.  I don't
22     understand what you said.
23 Q.  Do you know the statute or ordinance that

Page 100

1    authorized your position as municipal judge?
2  A.  I don't know the specific statute number.
3  Q.  Well, could you tell me --
4  A.  No.  I don't have an answer to that question.
5  Q.  When you have an administrator for the
6    magistrate office, what degree of
7    administrative discretion do you permit this
8    person to have?
9      MS. NELSON:  In general or as any
10     particular time?
11 Q.  Well, when you have an administrator, do you
12   sort of allows them discretion to make
13   decisions as to what to do?
14 A.  Yes.
15 Q.  Is that true independent of who happens to be
16   functioning as the administrator at any
17   particular time?
18 A.  Yes.
19 Q.  So you generally don't second guess what the
20   administrator is trying to do?
21 A.  No.
22 Q.  In your view, any administrator that you hire,
23   should they be an adjunct of you to do your

25  (Pages 97 to 100)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1   bidding?
2       MS. NELSON: Object to the form. I have
3       no idea what you're talking about.
4   Q.  Do you know what I'm talking about?
5   A.  No.
6   Q.  Well, when you hire an administrator, do you
7       sort of see them to be your shadow person to
8       do whatever it is you want them to do, or do
9       you let them function independently?
10      MS. NELSON: Object to the form.
11  A.  If I hire them to be the administrator, I
12      expect them to act independently. I
13      mean -- yeah. I don't expect them to do what
14      I want them to do.
15  Q.  If you and one of your hired administrators
16      disagrees on a substantive matter, who
17      prevails?
18  A.  It depends on what it is.
19  Q.  Can you give some examples of when you would
20      permit them to prevail and examples of when
21      you would make the decision?
22  A.  I can't think of any.
23  Q.  Just if you can, but you can't come up with an

Page 102

1       example.
2   A.  I don't know what that allow me to prevail
3       as -- somebody -- I don't know. I don't
4       understand the question.
5   Q.  Well, the decision with respect to discipline,
6       a subordinate employee, and you and the
7       administrator differ on what discipline should
8       be netted out, who would generally prevail in
9       those disagreements?
10  A.  I -- generally, absent any -- I would let them
11      do it, because they're over there with them,
12      they know the facts. They know, you know,
13      what's going on. And I can't imagine that I
14      would, you know, not defer if there was just a
15      -- if there wasn't a problem.
16  Q.  Okay.
17  A.  I normally wouldn't even know unless they
18      brought it to me.
19  Q.  In your position as municipal judge, who do
20      you answer to?
21  A.  Administrative Office of Courts.
22  Q.  And who is that?
23  A.  Governing body of judicial systems in the

Page 103

1       state of Alabama. I guess I would directly
2       answer to the City of Dothan Commission. But
3       they don't -- I mean, as far as who does our
4       ultimate -- I guess that would be
5       Administrative Office of Courts. It's who we
6       report to. We report all our dispositions,
7       our case numbers, everything goes to them.
8   Q.  Is that in Montgomery?
9   A.  Yes.
10  Q.  Well, who supervises you locally?
11  A.  Supervises me? I guess that would be the
12      Commission.
13  Q.  Who is responsible for your evaluation?
14  A.  The city manager does our annual review, I
15      guess, as a department head.
16  Q.  So he does your evaluation?
17  A.  Yes. He does my annual review.
18  Q.  Is he in a position to know what you do?
19  A.  Is he in a position to know what I do?
20      MS. NELSON: You're talking about the city
21      manager?
22      MR. JAFFREE: Yeah.
23      MS. NELSON: If you know.

Page 104

1   Q.  Well, you're pausing without an answer. Do
2       you know the answer to that, whether he's in a
3       position or not?
4       MS. NELSON: Well, obviously, she
5       confused. Do you understand his
6       question?
7       THE WITNESS: I don't.
8   A.  I mean, is he in a position to know what I do
9       physically, like every day what I do or what I
10      do --
11  Q.  On how well you do your job. Is he in any
12      position to know?
13  A.  I would think so.
14  Q.  How often does he come over to your court to
15      observe you perform?
16  A.  Pretty often. I mean, he'll pop in and pop
17      out. But I don't think it's -- yeah.
18      He'll -- pretty often. I don't have a number.
19  Q.  And what's his name?
20  A.  Mike West. But now -- yeah, Mike West.
21  Q.  Well, what social organizations do you belong
22      to?
23  A.  Oh, Lord. Delta Sigma Theta Sorority.



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1 Q. Is that a female organization?
2 A. It is.
3 Q. Males are excluded?
4 A. Yeah.
5 Q. Black or white organization?
6 A. I don't know that it's been characterized. I
7    think it's multiethnic.
8 Q. You are of the one -- the group that you
9    belong to is mostly black, mostly white, or
10   mixed?
11 A. Mostly black.
12 Q. Would you say 95 percent black?
13 A. Yes.
14 Q. Maybe 99 percent black?
15 A. The one -- the Dothan chapter?
16 Q. Yeah?
17 A. 100 percent black.
18 Q. 100 percent black. What other organizations
19   do you belong to?
20 A. Social organizations. That would exclude
21   professional organizations. That's about it
22   socially.
23 Q. How do you feel about belonging to an

Page 106

1    exclusively black organization?
2       MS. NELSON: Object to the form.
3 A. How do I feel? I've never thought about it.
4    I go to an exclusively black church. It's not
5    something I chose. It's just that's the
6    organization's makeup.
7 Q. What about BASA; were you a member of BASA at
8    any time?
9 A. I was.
10 Q. Is that an exclusively black organization?
11 A. No.
12 Q. BASA permits non-blacks?
13 A. At Tulane it did.
14 Q. How many non-blacks did BASA have at Tulane
15   when you was there?
16 A. I don't have a number but there were ethnic --
17   other ethnicities included.
18 Q. Well, how many Caucasians?
19 A. But they were called the Minority Law Students
20   Association.
21 Q. How many Caucasians did BASA have when you was
22   at Tulane?
23 A. I don't know.

Page 107

1 Q. Isn't true they didn't have any Caucasian in
2    their membership?
3 A. I don't know that to be true.
4 Q. Well, doesn't BASA stand for Black American
5    Law Student Association?
6 A. It does. Well, we were MLSA, Minority Law
7    Students Association.
8 Q. They changed from BASA to Minority?
9 A. At Tulane.
10 Q. Okay. Do you view yourself as an American
11   first or an African-American?
12      MS. NELSON: Object to the form.
13 A. I never thought about it.
14 Q. Well, if you think about it now, how do you
15   view yourself?
16 A. American.
17 Q. What about African-American; is that
18   secondary?
19 A. I just -- I never I think about it.
20 Q. Okay. Would you say that you have a race
21   consciousness?
22      MS. NELSON: Object to the form.
23 A. A race -- a consciousness of what my race is?

Page 108

1 Q. Yeah. Race consciousness. Are you familiar
2    with that term?
3 A. I'd ask you to be more specific. I'm very
4    conscious of what my race is, yes, that I am
5    black. Yes, I'm conscious of that. Yes, I'm
6    conscious of the fact that I'm black.
7 Q. Were you aware when you first became the
8    magistrate for this city that there had not
9    been any prior black judges in the city?
10 A. No.
11 Q. Were you aware subsequent to your becoming a
12   magistrate that there's never been any black
13   judges in the city?
14 A. I've never been a magistrate.
15 Q. I'm sorry. Let me rephrase my question. Were
16   you aware when you became the municipal judge,
17   there had never been a black judge in this
18   city, is what I intended to say?
19 A. Black judge in this whole city, was I aware of
20   that? No.
21 Q. Were you subsequently made aware of that?
22 A. I mean, I've never asked. No.
23 Q. Okay. Were you aware when you became

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1    municipal judge that there wasn't any
2    African-American magistrates employed in the
3    magistrate office?
4    A. Once I started to --
5    Q. Yeah. Once you started working, were you
6       aware --
7    A. I saw that there were none, yes.
8    Q. You could visibly see that?
9    A. Yes.
10   Q. Were you aware that there had never been any?
11   A. No.
12   Q. Did you subsequently become aware that there
13      had never been any?
14   A. No. I don't know that there have never been
15      any before I came in life. You know, I don't
16      know.
17   Q. Do you remember testifying anywhere that there
18      had never been any African-American in the
19      City of Dothan; do you remember testifying to
20      that?
21   A. No, not specifically. I don't know through my
22      tenure.
23   Q. Yeah. Were you determined to change that

Page 110

1    result?
2    A. No.
3    Q. Did you change that result?
4    A. The fact that there were never any
5       magistrates -- black magistrates?
6    Q. The fact that there wasn't any.
7    A. Did I change it?
8       MS. NELSON: You mean, did she hire any?
9    A. Right. Did I hire any black people to be a
10      magistrate?
11   Q. However you had to change it, did you change
12      the fact that wasn't any African-American
13      magistrates in the City of Dothan?
14   A. I guess I did.
15   Q. You're not sure?
16   A. I mean, I hired people that -- you know, off
17      of a register that were black. But it wasn't
18      an intentional I'm going to change the fact.
19      It's just people who are on a register.
20      Did I change that? Yes.
21      MS. NELSON: You're okay to say --
22      THE WITNESS: I was just trying to say yes
23      or no.

Page 111

1       MS. NELSON: As long as your answer is
2       understood.
3    Q. You want to change an answer?
4    A. (Witness shakes head in the negative.)
5    Q. You testified earlier that you never had any
6       Title VII litigation -- I'm sorry -- Title VII
7       classes in school, right?
8    A. No, I did not testify to that.
9    Q. How would you define free speech?
10      MS. NELSON: Object to the form. Object
11      to this line of inquiry.
12      MR. JAFFREE: How would --
13      MS. NELSON: It calls for a legal
14      conclusion.
15   Q. How would you define -- as an attorney, how
16      would you define free speech?
17      MS. NELSON: Object to the form.
18   A. I've never thought about it. I mean, freedom
19      of speech. I've never thought about it. I
20      don't have a definition.
21   Q. Well, do you think government employees should
22      be entitled to some free speech rights?
23      MS. NELSON: Object to the form, what she

Page 112

1    thinks.
2    A. And not just government employees. I know
3       citizens have a right of free speech whether
4       they're government employees or not. As a
5       citizen of the United States, you have a right
6       of speech.
7    Q. You think do? You think citizens have a right
8       to free speech?
9       MS. NELSON: You asked her what she
10      thought; that's what she said.
11   Q. I'm was just saying, do citizens generally
12      have a right to free speech?
13   A. Yes.
14   Q. And that's true in the private sector as well?
15      MS. NELSON: Private sector of what?
16   A. Citizens not employees.
17   Q. Well, what about non-government employees; do
18      you think they have a right to free speech?
19      MS. NELSON: Object to the form.
20   A. And I've never thought about it.
21   Q. Well, do you think that a government
22      employee's free speech rights, to the extent
23      they exist, should be broadly or narrowly

28 (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1  construed?
2      MS. NELSON: Object to the form, object to
3      what she thinks, and object to your
4      asking for a legal opinion.
5      MR. JAFFREE: I'm asking for a legal
6      opinion from an attorney.
7      MS. NELSON: Well, an attorney who does
8      not specialize or has testified that
9      she is not a constitutional law judge
10     or a constitutional law attorney. So
11     I object to this line of inquiry.
12     You're seeking a legal conclusion from
13     the witness.
14     MR. JAFFREE: I'm not sure you have to be
15     that sophisticated to know the answers
16     to those questions. I'm just not
17     convinced that you have to be that
18     sophisticated or like grounded in
19     constitutional jurisprudence to answer
20     to those questions.
21  MS. NELSON: That's your opinion.
22  MR. JAFFREE: Well, that's your opinion.
23  MS. NELSON: Can you cite the latest five

Page 114

1      Supreme Court cases issued by the
2      Roberts court on free speech?
3      MR. JAFFREE: I don't know them or profess
4      to be able to. But I'm not your
5      witness.
6      MS. NELSON: You brought this case
7      alleging on constitutional rights, and
8      you don't know?
9      MR. JAFFREE: I'm not your witness.
10  Q. Do you think that free speech for government
11     employees should be narrowly or broadly
12     construed?
13     MS. NELSON: Object to the form and object
14     to what she thinks.
15  A. And I've never thought about it.
16  Q. Well, if you take a moment to think about it,
17     what do you think?
18     MS. NELSON: Object to what she thinks.
19  A. I -- I -- it takes more than a moment for me
20     to think about it because I'm sure that there
21     are schools of thought on both sides, those
22     who think they should be narrowly construed
23     and those that think they should be broadly

Page 115

1      construed. So I would like to know the nature
2      of the debate on both sides before I make a
3      decision as to which side I would choose.
4  Q. Let me ask this: Once a person become a
5      government employee, do you think they lose
6      their constitutional rights?
7      MS. NELSON: Object to the form as to what
8      she thinks.
9  A. The constitutional rights as a citizen of the
10     United States?
11  Q. Yeah.
12  A. No.
13  Q. Once they become an employee.
14  A. I don't think they lose their constitutional
15     rights.
16  Q. Should their rights be limited because they
17     become a government employee?
18     MS. NELSON: Object to the form.
19  A. Their constitutional rights as citizens of the
20     United States?
21  Q. Yeah. Their constitutional rights as citizens
22     of the United States?
23  A. No. I don't think just because they're

Page 116

1      employed that they should lose their rights as
2      citizens of the United States.
3  Q. Do you think free speech liberties are
4      fundamental in our society?
5      MS. NELSON: Object to the form. It calls
6      for legal conclusion.
7  Q. Do you think that free speech is a fundamental
8      right?
9      MS. NELSON: Object to the form. Same
10     objection.
11  Q. Do you understand what I mean?
12  A. A fundamental right?
13  Q. Yeah.
14  A. Is it a -- or the most fundamental right?
15  Q. Well, one of the group of fundamental rights.
16  A. Fundamental rights.
17  Q. Do you think so?
18     MS. NELSON: Object to the form.
19  A. Yeah. And I've had to think. I would say
20     yes, I would think it would be.
21  Q. Well, what about the freedom of association;
22     do you think that should be a fundamental
23     right as well?

29  (Pages 113 to 116)





# FREEDOM COURT REPORTING




Page 117

1    MS. NELSON: Object to the form.
2  A. Fundamental meaning incontrovertible, that you
3     have this no matter what?
4  Q. Meaning those groups of rights that --
5  A. Are fundamental.
6  Q. -- those groups of rights that a civilized
7     society should have and should observe, are
8     those rights without which a civilized society
9     could not long exist?
10    MS. NELSON: Object to the form.
11 A. Yeah. I've never thought about it.
12 Q. But when you think about it in that context,
13    do you think the right to free speech is
14    fundamental?
15    MS. NELSON: Object to the form.
16 A. To whom?
17 Q. To the individual speaking.
18    MS. NELSON: Object to the form.
19 A. I guess it would depend on the individual.
20    You know, I've not thought about it.
21 Q. Okay. In your opinion, if an employee of the
22    City of Dothan tells a consumer or a defendant
23    that they can seek recourse with the City

Page 118

1     clerk if they have a claim, that that would be
2     a matter of public concern?
3     MS. NELSON: Object to the form.
4  Q. Do you understand the question?
5  A. No. Could you just repeat it. I was thinking
6     about social organizations. I'm sorry.
7  Q. Do you think that if a government employee
8     tells a citizen that if they have a claim
9     against the City, they could seek recourse by
10    filing that claim with the City clerk, that
11    that's a matter of public concern?
12    MS. NELSON: Object to the form.
13 A. Do I think that if all they told them is that
14    you need to go to the City clerk's office? Is
15    that your question? If that's all they said
16    to the person, if you have a claim, you need
17    to go to the City clerk's office?
18    MS. NELSON: That's not his --
19    THE WITNESS: Right. That wasn't his
20       question.
21 A. So, no.
22 Q. It's not a matter of public concern?
23 A. No.

Page 119

1  Q. Well, why not? Why shouldn't the public know
2     that they have a right to seek recourse with
3     the City clerk?
4  A. I think they should know they have a right to
5     seek recourse with the -- I think they have a
6     right to know they need to go -- if they have
7     a claim, they have to go to the City clerk's
8     office to file that claim. Yeah, I think they
9     do have that right to know just that. If you
10    have a claim, you need to go to the City
11    clerk's office and file it.
12 Q. What about the right to know that something
13    wrong has been done to them by their
14    government? Do they have a right to know
15    that?
16 A. Well, who determines whether something wrong
17    has been done by their government?
18 Q. Well, what if something wrong has been done,
19    do they have a right to know that something
20    wrong has been done to them by their
21    government?
22 A. Generally? I mean, like in the whole world?
23    I don't know.

Page 120

1  Q. Well --
2  A. Somebody has got to determine that there has
3     been a wrong.
4  Q. Well, let's assume that there has been a wrong
5     and some government employee tells a consumer
6     citizen/defendant that there has been a wrong,
7     would that be something that that
8     citizen/consumer/defendant would have a right
9     to know or should have a right to know?
10    MS. NELSON: Object to the form. Right to
11       know by whom?
12 A. And who said it was wrong, that person?
13 Q. If they had been wronged, do they have a right
14    to know that they have been wronged?
15    MS. NELSON: Object to the form.
16 Q. Is that something that the consuming public
17    should know? Do you have to wrestle with this
18    question?
19    MS. NELSON: Well, you've got me confused
20       because I'm not sure what you're
21       talking about. If you want to
22       specifically ask her about Mary Beth
23       Brackin's situation --

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1      MR. JAFFREE: I'm asking her in general.

2      MS. NELSON: You're asking her

3      hypothetical questions which I don't

4      even understand.

5  Q.  Well, do you understand the question?

6  A.  I mean, in the whole world?

7  Q.  Your attorney is trying to tell you that you

8      don't understand, but do you not understand

9      the question?

10  A.  No. Because you're asking in the whole world

11      if a citizen has been wronged by the

12      government --

13  Q.  By his government. Do you think --

14  A.  -- do they have a right to know?

15  Q.  As a general principle, is it a matter of

16      public concern to that citizen that his

17      government or her government has wronged them?

18      MS. NELSON: Object to the form.

19  Q.  As a general principle.

20      MS. NELSON: Right to know from whom?

21  Q.  Right to know from any member of government

22      telling that person that your government has

23      wronged you?

Page 122

1      MS. NELSON: Object to the form.

2  Q.  The information of something they have a right

3      to know that the government has wronged them?

4      Now, the transcript is only going to show

5      a response. The reality is that you're taking

6      a long time to respond. And I'm asking

7      you -- I mean, you're taking a long time to

8      respond on most of these questions, a long

9      time.

10      But I'm asking you, is this something that

11      you're wrestling with in your own conscience?

12  A.  I just think it's a vague, hypothetical

13      question.

14  Q.  What's vague about that?

15      MS. NELSON: I don't have a clue what

16      you're --

17  Q.  What's vague about the principle? You think

18      the principle is vague?

19  A.  Whether or not a person had the right to know

20      that their government has wronged them.

21      MS. NELSON: Object to the form. That is

22      so hypothetical, so not

23      understandable.

Page 123

1  A.  Wronged them how?

2  Q.  All right. So let's be more specific as your

3      attorney suggested.

4  A.  Please.

5  Q.  What if a citizen had been wrongfully arrested

6      in the City of Dothan in the municipal court

7      or at least by process that was issued by the

8      municipal court, they were wrongfully arrested

9      by mistake, by error, no malice but just

10      wrongfully arrested? Is that something that

11      is a matter of public concern, the fact that

12      they have been wrongfully arrested?

13      MS. NELSON: Object to the form.

14  A.  I think it depends on --

15      THE WITNESS: Do I answer?

16      MS. NELSON: Yeah.

17  A.  I think it depends on how you define public

18      concern. I mean, is it the concern of the

19      entire public that this person has been

20      wrongfully arrested and should this person go

21      out broadcasting to the entire world, hey,

22      this person has been wrongfully arrested? I

23      don't know. I don't know how what -- I don't

Page 124

1      know how you define public concern.

2  Q.  Let's assume --

3  A.  What is public concern, Mr. Jaffree? How do

4      you define public concern?

5  Q.  Something the members of the public would have

6      a right to know, something that is of import

7      to members of the public.

8  A.  So every claim that's filed against the City

9      of Dothan by a citizen, an employee should go

10      tell everybody, hey, this person has been

11      wronged, they should have a right to do that?

12      Is that what you're asking me?

13  Q.  Well, that's not what I asked you.

14  A.  I don't know. That's what I'm saying. I

15      don't what you're asking me.

16  Q.  Let me see if this hypothetical one you're

17      going to have to wrestle with as well.

18      MS. NELSON: Well, I'm going to --

19      THE WITNESS: Do you have the Fondren

20      investigation stuff? Can we see that?

21      MS. NELSON: The Fondren stuff?

22      THE WITNESS: Yes.

23      MR. JAFFREE: We're going to get to the

31 (Pages 121 to 124)





Page 125

1 Fondren stuff in a minute.
2 MS. NELSON: Well, you're engaging her --
3 I wish you would just get to the
4 Fondren stuff. You're engaging her in
5 a dialect to try to show your claims,
6 to engage her into legal issues and
7 questions which you would not allow me
8 to question your plaintiffs on
9 about --
10 MR. JAFFREE: My clients are neophytes.
11 MS. NELSON: -- Constitution --
12 MR. JAFFREE: I mean, they have no
13 schooling and -- the little smattering
14 of law they know is what they got from
15 the municipal office, which on --
16 MS. NELSON: Well, the fact that the
17 judge --
18 MR. JAFFREE: -- which on the total scheme
19 of things is not very much.
20 MS. NELSON: Well, still doesn't mean you
21 can question her on all theories of
22 constitutional law.
23 MR. JAFFREE: I suspect that a review in

Page 126

1 court would say that I could treat a
2 sitting judge who has several years of
3 law school who's been an attorney for
4 years is different.
5 MS. NELSON: I disagree. The facts are --
6 you can ask her the facts of this
7 case. The facts are what they are.
8 You can argue all day wether it's
9 public concern, whether the City had
10 business reason -- justifiable reasons
11 for placing certain restraints in
12 effect. And we can argue with the
13 courts all day long. But to ask this
14 judge hypotheticals for the rest of
15 this morning is inappropriate, and I'm
16 going to continue to object.
17 MR. JAFFREE: I'm moving.
18 MS. NELSON: And we can be here until the
19 cows come home.
20 MR. JAFFREE: Well, I'm not going to wait
21 until the cows come home because I'm
22 going to move on.
23 (Brief recess)

Page 127

1 Q. What about informing a citizen that they could
2 request the municipal judge to appoint another
3 public defender; is that a matter of public
4 concern that defendants should know?
5 A. That what?
6 MS. NELSON: Object to the form.
7 Q. That they can ask the judge to appoint another
8 public defender, is that something that a
9 defendant should know?
10 MS. NELSON: Object to the form.
11 A. If they can -- if they have a right to ask the
12 judge to use another public defender?
13 Q. And if you tell them that is --
14 A. And that's all they say? You can ask the
15 judge to give you another public defender.
16 That's all.
17 Q. If you tell them that, then that's okay?
18 A. That's it, right.
19 Q. So you're saying that that is a matter that
20 they should have a right to tell somebody?
21 A. Yeah.
22 Q. In your opinion, do employees give up their
23 right to free speech and association when they

Page 128

1 enter the public square?
2 MS. NELSON: Object to the form.
3 A. No.
4 Q. How do you define due process?
5 MS. NELSON: Object to the form. It calls
6 for legal conclusion.
7 A. Generally?
8 Q. Yeah. Generally, how do you define that?
9 A. Due process. Just a -- you know, a mechanism
10 by which a person is afforded a hearing on an
11 issue.
12 Q. Are you familiar with substantive due process?
13 A. Somewhat, yes.
14 Q. How do you define substantive due process?
15 MS. NELSON: Object to the form. Calls
16 for legal conclusion.
17 MR. JAFFREE: She said she's familiar.
18 Q. How do you define it?
19 MS. NELSON: Object to the form. She said
20 generally.
21 A. Yeah. Generally, just due process, just the
22 ability of a person to have a -- to be heard
23 on an issue.





# FREEDOM COURT REPORTING

Page 129

1  Q. Well, isn't substantive due process a little
2  bit something more than that?
3  A. If that's how you define it. I don't know.
4  That's what I think it is.
5  Q. If I tell you that, in my view, substantive
6  due process means that there's some things
7  people shouldn't lose a property interest
8  regardless of what kind of procedure of
9  process is afforded them.
10  Would you agree that this --
11  MS. NELSON: Object to the form.
12  A. No.
13  Q. You don't agree to that? Okay.
14  A. I would agree that that's your opinion.
15  Q. Goodness. My opinion. Okay.
16  Do you agree that merit system employees
17  have a property interest in continued
18  employment?
19  MS. NELSON: Object to the form. It calls
20  for legal conclusion and an opinion.
21  Q. Do you know whether or not they have a
22  property interest in continuing employment?
23  If you know.

Page 130

1  A. I would agree, yes, that they do have a
2  property interest.
3  Q. You agree. Okay. Good.
4  And this right can only be taken for good
5  cause shown?
6  MS. NELSON: Object to the form.
7  A. Do I agree that it can be only be taken with
8  good cause shown?
9  Q. Yeah.
10  A. Their property right -- their property
11  interest in employment can only been taken for
12  good cause shown. I would agree with that.
13  Yes.
14  Q. All right. I also asked you about substantive
15  rights, and you sort of disagreed with the
16  substantive rights of municipal employees.
17  A. No.
18  MS. NELSON: I object.
19  A. With your definition.
20  MS. NELSON: I object to the
21  characterization of her comment.
22  MR. JAFFREE: Well, I'm asking.
23  Q. In addition to procedural rights that a merit

Page 131

1  system employee may have in challenging an
2  employment termination decision, does she or
3  he have any substantive rights?
4  MS. NELSON: Object to the form.
5  A. Anywhere in the world or in the city of
6  Dothan?
7  Q. In the city of Dothan.
8  MS. NELSON: Object to the form.
9  A. Yeah. I don't know. I'm not familiar with
10  what rights are afforded.
11  Q. Was Mary Brackin a merit system employee as
12  far as you know?
13  A. Yes, as far as I know.
14  MS. NELSON: Object. When you say "merit
15  system," what do you mean?
16  MR. JAFFREE: In the classified
17  system a --
18  MS. NELSON: Classified, non-probationary
19  employee?
20  MR. JAFFREE: Yeah, classified,
21  non-probationary employee.
22  MS. NELSON: Okay.
23  A. Yes.

Page 132

1  MS. NELSON: That's what you mean by merit
2  employee?
3  MR. JAFFREE: Well, yes. But they
4  generally mean that the -- they are --
5  MS. NELSON: Who is "they?"
6  MR. JAFFREE: Courts. They generally
7  classify merit system employees, are
8  employees that after they have gone
9  through their probationary period can
10  only be terminated for cause.
11  MS. NELSON: Is that your -- that's
12  your --
13  MR. JAFFREE: That's my opinion of the
14  law.
15  MS. NELSON: -- opinion.
16  MR. JAFFREE: Prove me wrong.
17  Q. Anyway, starting with the first day of your
18  hire, ending with the last day of Mary
19  Brackin's employment, can you identify all the
20  employees that you have disciplined in any
21  manner?
22  A. No.
23  Q. You can't identify them?

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1    A. No, I can't identify every employee that I've
2        disciplined since Mary Beth was hired till
3        today, because I don't know when Mary Beth was
4        hired and it covers along time span.
5    Q. All right. Well, let's say since she was
6        rehired in 2001, up to the time that she was
7        terminated, do you know all the employees that
8        you have terminated?
9    A. Terminated?
10   Q. I'm sorry. You have disciplined.
11   A. No.
12   Q. Let's me ask you this: Have you ever
13       disciplined a black employee?
14   A. Specifically, a black employee? I don't
15       remember.
16   Q. Have you ever disciplined specifically a white
17       employee?
18   A. It depends on what you mean by "discipline."
19       Do you mean a personnel writeup, a memo like
20       Nancy did, or e-mail. She said that was
21       discipline when she e-mailed somebody. So --
22   Q. Well, how do you define discipline?
23   A. No. How do you define it? Because I've got

Page 134

1        to answer your question.
2    Q. I'm asking you the question: How do you
3        define discipline?
4    A. How do I define discipline? When I whip my
5        children. I'm sorry. But that's what I think
6        of as discipline.
7    Q. As far as an employee of the City of Dothan in
8        the Judicial Department, how do you define
9        discipline?
10   A. How do I define discipline? I mean, I guess
11       it could be any number of means: verbal
12       counseling, writeup, e-mail.
13   Q. Okay.
14   A. Let me think of all the forms of discipline:
15       verbal counseling, write-ups, e-mails, memos.
16   Q. So it's your testimony that Nancy's testimony
17       that she sent a memo to an employee is a form
18       of discipline?
19   A. That was Nancy's testimony. I agree with
20       that.
21   Q. Is that your view, that that's a form of
22       discipline?
23   A. It depends on what the memo says. If it --if

Page 135

1        it counsels them on something they did and
2        punishes them in some way for their actions.
3        Yes.
4    Q. The memo's got to punish them?
5    A. For it to be discipline.
6    Q. Have you ever sent a memo punishing some black
7        employee for something that they did?
8    A. Have I ever sent a memo -- I'm not -- I might
9        have.
10   Q. Do you know whether you have?
11   A. No, I don't know whether I have or not
12       specifically.
13   Q. Have you ever sent a memo or other written
14       document punishing some white employee for
15       something that they have done?
16   A. I might have. I -- I'm not -- I don't know.
17       I'm not --
18   Q. You don't know whether you have or not?
19   A. I don't remember every specific incident if I
20       did send a memo.
21   Q. Do you remember any specific incident?
22   A. No.
23   Q. You don't remember any --

Page 136

1    A. No.
2    Q. -- specific incident?
3    A. I don't remember any.
4    Q. Okay. Have you ever terminated a white
5        employee?
6    A. Ever in life?
7    Q. During the time that you was a municipal judge
8        with the City Of Dothan?
9    A. Yes.
10   Q. Do you know the names of the black employees
11       that you have terminated since you have been a
12       municipal judge with the City of Dothan?
13   A. No, I don't.
14   Q. You don't know the names of the employees that
15       you have terminated since you have been a
16       municipal judge with the City of Dothan?
17   A. Do I know each and every name?
18   Q. Well, first, do you know each and every name?
19       MS. NELSON: Each and every name of what?
20       MR. JAFFREE: Of the employees that she
21       has terminated since she's been a
22       municipal judge with the City of
23       Dothan.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**



# FREEDOM COURT REPORTING

### Page 137

1    MS. NELSON: Any names is what you're
2    asking?
3    MR. JAFFREE: Well, first, she asked me
4    each and every name.
5    MS. NELSON: Each and every name?
6    MR. JAFFREE: So I'm asking her a
7    question.
8  **Q. Do you know each and every name?**
9    MS. NELSON: Just right here from memory?
10   MR. JAFFREE: Well, from however.
11 **Q. Do you know each and every name?**
12 A. I'm not sure that if I gave you a list, it
13    would be all inclusive.
14 **Q. Well, can you give me a list?**
15 A. Of every employee that's been terminated by
16    the City of Dothan.
17 **Q. By you?**
18 A. By me.
19 **Q. By your hand, by your instigation?**
20    MS. NELSON: Object to the form.
21 A. By my instigation?
22    MS. NELSON: Object to the form.
23 **Q. That you had some involvement in the**

### Page 138

1    termination of this employee that was employed
2    with the Judicial Department during your
3    tenure for the City of Dothan?
4  A. Well, there was one employee that was
5    terminated for testing positive for drugs.
6  **Q. Who was that?**
7  A. I don't remember her name. Allison. But I
8    don't remember her last name.
9    There was another employee who
10   falsified --
11 **Q. Well --**
12 A. No. I've got to tell you why because I don't
13   --
14 **Q. Well, if you insist on telling me why, go**
15    **ahead.**
16 A. There was another employee who was terminated
17   for falsifying a time card, putting down time,
18   saying that she was here for a week when she
19   was not.
20 **Q. Who is that?**
21 A. I don't remember. That would be Debbie Irby.
22   Then her supervisor --
23 **Q. Well, excuse me. Let me stop you for a**

### Page 139

1    second. Debbie Irby wasn't terminated, was
2    she?
3  A. Well, she was allowed to resign, so strike her
4    through as a terminated employee.
5  **Q. But you was going to terminate her?**
6  A. I don't remember. I -- I was just including
7    her in the list.
8  **Q. Okay.**
9  A. She resigned so I didn't -- that -- that
10   wasn't the question. I guess if that's what
11   you're saying.
12 **Q. Anyone else associated with Debbie on this**
13    **time card thing?**
14 A. Well, maybe they didn't -- I can't give you a
15   list of people who were terminated, then,
16   because some of them might have resigned.
17 **Q. Anyone else associated with Debbie Irby**
18    **dealing with that time card?**
19 A. Whether they were terminated or resigned? Is
20   that what you're asking me?
21 **Q. Yeah, terminated or resigned associated with**
22    **Debbie?**
23 A. So we're adjusting the question now to

### Page 140

1    employees that were either terminated or
2    resigned? I can include either category?
3  **Q. Well, that you caused to resign.**
4    MS. NELSON: Object to the form.
5  A. I didn't -- no.
6  **Q. Well, then let's just limit it to terminated**
7    **then. Okay? Terminated. You're the one that**
8    **gave me Debbie Irby's name. But, fine, we'll**
9    **strike her.**
10 A. You said she resigned.
11 **Q. Well, I just wanted to clarify that because**
12    **the Record is going to suggest that she**
13    **resigned.**
14 A. Yeah.
15 **Q. But who were you involved with that was**
16    **terminated?**
17 A. I guess terminated would be the employee who
18   testified -- who tested positive for drugs.
19   Whether she was terminated or resigned, I
20   don't remember.
21 **Q. But Allison may have resigned?**
22 A. The employee who falsified her time card and
23   somebody turned it in to Personnel. The

35 (Pages 137 to 140)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 141

1 supervisor who signed the time card that was
2 falsified might have been terminated or
3 resigned. I'm not sure.
4 Q. Who was that?
5 A. Who?
6 Q. Are we talking about Debbie Irby, or are we
7   talking about somebody else?
8    MS. NELSON: You're asking who was Debbie
9      Irby's supervisor? Is that who --
10 A. Donna Nicholson was Debbie Irby's --
11 Q. So you terminated Donna Nicholson?
12 A. I'm not sure whether she was terminated or
13   resigned.
14 Q. Can we stop at Donna Nicholson a minute? And
15   let me ask you, Donna Nicholson is the one
16   that was involved in placing a adverse entry
17   in the evaluation of Mary Brackin I think in
18   2001; is that correct?
19 A. I don't remember.
20 Q. And do you remember the incident involving
21   Ms. Ralpeje? Do you remember Ms. Ralpeje?
22 A. I remember the name Ralpeje.
23 Q. And do you remember initiating an internal

Page 142

1   affairs investigation of Ms. Ralpeje?
2    MS. NELSON: Object to the form.
3 A. Of allegations made by a bondsman and
4   Mrs. Ralpeje?
5 Q. Well, let's back up. Ms. Ralpeje didn't make
6   any accusation did she?
7    MS. NELSON: Object to the form.
8 A. Ralpeje?
9 Q. Ms. Ralpeje did not make any allegation, did
10   she?
11 A. She did about --
12 Q. Well, the record says that she didn't make any
13   allegation.
14    MS. NELSON: Well, I thought you were
15      asking this witness as to the Ralpeje
16      incident?
17    MR. JAFFREE: We're getting to that.
18    MS. NELSON: And you're not letting her
19      tell what happened. You're trying to
20      tell her how to testify.
21    MR. JAFFREE: Well, she's saying
22      something, I'm trying to get some
23      clarity.

Page 143

1 Q. You're saying Ms. Ralpeje complained saying
2   what?
3 A. She made allegations that she had been told by
4   a magistrate that we had had problems with a
5   public defender, that he wasn't any good, that
6   he should not have let her plead guilty to
7   that DUI. And -- and she came back in the
8   open court in front of people, saying all
9   that.
10    And then we had a bondsman come up and
11   said that he felt threatened because
12   Ms. Brackin had called him at home the night
13   before and asked him to change his testimony
14   because she didn't say what he -- what --
15   anyway, he was upset because he wanted to know
16   how Ms. Brackin got his number at home to call
17   him. And he wanted -- and he said that she
18   called him and asked him. So those were
19   allegations that I asked for an investigator
20   to look into.
21    It also involved Ms. Ralpeje's mother or
22   her sister who was in the lobby also at the
23   time that Ms. Brackin talked to Ms. Ralpeje.

Page 144

1   And -- and I did ask for an investigator
2   because we needed their expertise in dealing
3   with witnessed who are not employees of the
4   City of Dothan.
5 Q. We'll talk about this investigation later.
6 A. That's the whole gist of it.
7 Q. But did you get the results of the
8   investigation?
9 A. I think her supervisor got the results of the
10   investigation.
11 Q. Okay. Did you have an opportunity to review
12   the results of the investigation?
13 A. I'm sure I did, but I don't remember
14   specifically.
15 Q. And the results of the investigation would
16   have included the transcript of the
17   investigators?
18 A. I'm not sure what all it included.
19 Q. But it could have included the transcript?
20 A. It could have.
21 Q. Now, the transcript says that Ms. Ralpeje did
22   not say that, did not make a complaint about
23   Ms. Brackin --

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING



Page 145

1  A.  She did not make a complaint about
2     Ms. Brackin; she made a complaint about her
3     public defender.
4  Q.  Well, she didn't make a complaint that
5     Ms. Brackin had said anything bad about her
6     public defender.
7  A.  She did say that --
8  Q.  Well, the record --
9  A.  -- in open court.
10 Q.  The record says that she didn't say that.
11    MS. NELSON:  What record are you talking
12    about?
13    MR. JAFFREE:  The transcript.
14    MS. NELSON:  You're saying that
15    Ms. Brackin said she didn't say that.
16    MR. JAFFREE:  Ms. Brackin said she didn't
17    say that?  I'm saying that Ms. Ralpeje
18    said she didn't say that.
19    MS. NELSON:  Do you have the record you
20    could show the judge?
21    MR. JAFFREE:  Well, the record will be
22    produced.  But I'm trying to --
23 Q.  Did you have an opportunity to observe the

Page 146

1     record?
2  A.  I'm sure I did at some point.
3  Q.  Okay.  And if the record says that Ms. Ralpeje
4     did not say that, you're saying that she did?
5  A.  Yeah.  I was there.
6  Q.  And are you saying that Ms. Ralpeje's other
7     person who was with her said that as well?
8  A.  No, I didn't say what the other person said.
9     I said that the other person was in the -- the
10    bondsman and either her sister or her mother
11    were in the lobby with her.  And so because
12    they were -- the mother and the sister was
13    there, she was in -- she was part of the
14    investigation.  But I didn't do the
15    investigation.  No.  I asked for the
16    investigators to look into it.
17 Q.  Now, the person that was involved was
18    Shaun -- Shaun is it?  Is that his name,
19    Shaun?
20 A.  Which person?
21 Q.  The public defender.
22 A.  Was Shaun McGhee.
23 Q.  Shaun McGhee.

Page 147

1  A.  More than likely.
2  Q.  And at that time, Shaun McGhee was engaged to
3     Michelle Sellers?
4  A.  At some point.  I'm not sure that at that time
5     they were.
6  Q.  But he could have been engaged to Michelle?
7  A.  Could have.
8  Q.  And Michelle Sellers took an active role in
9     this case, didn't she?
10 A.  I don't think so.
11 Q.  You don't think so?
12 A.  No.
13 Q.  Do you think Michelle Sellers was trying to
14    come up with theories on how Mary Beth could
15    be punished?
16 A.  No.
17 Q.  She wasn't?
18 A.  The bondsman is what prompted the
19    investigation of Mary Beth because he -- he
20    was complaining about how did she get his
21    number as if she had used court documents to
22    get his number.
23    And Ms. Ott who was a prosecutor at that

Page 148

1     time said that we need to look into it in case
2     he brought some kind of action.  He was very
3     upset when he came in --
4  Q.  Is your testimony --
5  A.  -- because he said that Mary Beth called him
6     at home and threatened -- not threatened.  He
7     felt threatened because she asked him to
8     change his testimony.
9  Q.  And, you know, Mary Beth disagreed with --
10 A.  Yeah, I do.
11 Q.  -- with that statement?
12 A.  I know that.
13 Q.  All right.  As a matter of fact, the only one
14    that makes the statement about something that
15    Mary Beth may have said adverse to a --
16    concerning a public defender was the bondsman;
17    isn't that correct?
18 A.  No.  Ms. Ralpeje said that when she came back
19    to court.
20 Q.  And isn't it also correct that the public
21    defender had only been in court just one
22    previous time; and, therefore, Ms. Brackin
23    would have no knowledge of any bad performance

37  (Pages 145 to 148)



# FREEDOM COURT REPORTING

## Page 149

1  of him. Is that correct?
2  A. No, I don't agree with that. I think Shaun
3    had been there before.
4  **Q. Well, what if the record shows that he hasn't**
5  **been there before?**
6  A. I don't know. But I just think -- I don't
7    remember him --
8  **Q. Here's the point I'm trying to get at: Do you**
9  **recall having a debate on this issue with**
10  **Debbie -- Donna Nicholson and you wanted Donna**
11  **to strongly discipline Ms. Brackin? Do you**
12  **remember that?**
13  A. No.
14  **Q. And she said no, she don't think that she**
15  **should discipline her, and you insisted pretty**
16  **much. You don't remember that dialogue?**
17  A. No. She was not disciplined for that, was
18    she?
19  **Q. Well --**
20    MS. NELSON: No, she wasn't.
21    THE WITNESS: No, I didn't prevail if
22    that's what he's saying.
23  **Q. Well, no, you didn't prevail.**

## Page 150

1  A. Well, you said, would I overrule her?
2  **Q. But shortly thereafter, Donna got fired. Now,**
3  **let's talk about this firing.**
4  **Isn't it true that Donna got fired merely**
5  **because she was giving an employee comp time**
6  **but the employee had worked -- but hadn't**
7  **worked the week that she was claiming, but**
8  **giving her comp time for the next week? Isn't**
9  **that true?**
10  A. That's not my understanding.
11  **Q. And isn't it also true that you told Donna**
12  **that had she asked you, you would have**
13  **approved it, but since she didn't ask you in**
14  **advance that she was being fired?**
15  A. No. Can I answer your question, Mr. Jaffree.
16  **Q. This is not true?**
17  A. That is not true.
18    One of the employees in the magistrates'
19    office who did not like Donna and Debbie
20    copied the time cards where Debbie put that
21    she was here Monday, Tuesday, Wednesday,
22    Thursday, where she put eight hours. She
23    didn't put comp time. She put that she was

## Page 151

1  there working. She was gone to her brother's
2    wedding in Wisconsin or somewhere.
3    One of their friends sent it over to
4    Personnel. It never came through me.
5    Personnel called and said, we've got a time
6    card for a woman saying she worked a week, her
7    supervisor signed it knowing she was not there
8    that week, and you need to address it. And
9    they called me over. I didn't know anything
10    about it.
11  **Q. And you're saying it didn't have anything to**
12  **do with comp time; is that your testimony?**
13  A. With what?
14  **Q. With comp time, that she was getting paid**
15  **for --**
16  A. Not that I --
17  **Q. comp time.**
18  A. If it did, I don't see --
19    MS. NELSON: What is comp time.
20  A. -- why they would've fired -- why they
21    fired -- comp time.
22    MR. JAFFREE: What is comp time?
23    MS. NELSON: Yes.

## Page 152

1    MR. JAFFREE: Are you familiar with the
2    word "comp time?"
3    MS. NELSON: I want to know what you meant
4    by it.
5    MR. JAFFREE: To compensate her for her
6    time that she had worked one week and
7    she's claiming it another week.
8  A. Well, she should have put it on that week.
9    She shouldn't have put that she worked Monday,
10    January 28th, eight hours; Tuesday, January
11    29th, eight hours; Wednesday, January -- and
12    if -- that implies that she worked those three
13    days. And her supervisor signed it saying she
14    was there those three days. When they found
15    out that it wasn't, they said her time card
16    was falsified.
17  **Q. Okay. But you summarily terminated her,**
18  **right?**
19  A. No.
20    MS. NELSON: Object to the form.
21  A. I did not summarily. We had a hearing. She
22    had a hearing. She could have appealed it. I
23    mean, they -- she had due process.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 153

1    Remember when you were asking me about due
2  process?  Remember you were asking me about
3  due process?  She had all the due process that
4  the civil rights thing you're -- everything
5  that Civil Service Act affords her, she had
6  it.  And she chose -- she did not appeal it.
7  **Q.  But the bottom line is that --**
8  A.  If she felt wronged, she should've appealed
9     it.  She had recourse.
10  **Q.  You was angry with her because --**
11  A.  No.
12  **Q.  -- she did not discipline --**
13  A.  No, I was not angry with her.
14  **Q.  Well, let me finish the question.**
15  A.  I've never been angry with her.
16  **Q.  She did not discipline --**
17  A.  No.
18  **Q.  -- Ms. Brackin?**
19  A.  No.  No.  Because if I -- I could have
20     disciplined her if I thought she needed it if
21     I wanted to overrule her.
22  **Q.  Did you say Ms. Brackin's friend copied the**
23  **    time card?**

Page 154

1  A.  I said one of Donna and Debbie's friends in
2     the magistrates' office sent it over to
3     Personnel.  One of their friends who knew that
4     she wasn't there that week.  We had no way of
5     knowing that -- who was there.
6  **Q.  Okay.  I sort of got stuck with Donna.**
7  **    Can you think of any other employees?  And**
8  **    then I'm going to break.  Any other employees**
9  **    that you terminated?**
10  A.  No.
11  **Q.  So possibly Allison, may have resigned or may**
12  **    have been terminated; Debbie Irby, who may**
13  **    have resigned or may have been terminated; and**
14  **    Donna is the only ones you can recall?**
15  A.  And you said resigned or terminated.
16  **Q.  Well, I think you said they may have**
17  **    resigned.  But can you recall anybody else**
18  **    that you caused to be to terminated?**
19  A.  That I caused to be terminated?
20  **Q.  Yeah.**
21     MS. NELSON:  Object to the form.
22  **Q.  Well, so far, you've given me one name.**
23  A.  Employees who were terminated during my

Page 155

1  tenure?
2  **Q.  Yeah.**
3  A.  Kevin Sorrells was terminated.
4  **Q.  Did you play a role in that?**
5  A.  I'm sure I did as department head.  He was a
6     probational employee who other magistrates
7     told me they were afraid of because he threw
8     temper tantrums, threw files, threw a book and
9     hit the window.
10  **Q.  If I asked you specifics about --**
11  A.  Told me he was going to make me fire him.
12  **Q.  Hold on.  Hold on.  If I asked you specifics**
13  **    about these throwing books and temper**
14  **    tantrums --**
15  A.  I've seen him throw a fit.  Mary Beth has,
16     too.
17  **Q.  You can't provide any specifics, could you?**
18  A.  Yeah.  I've seen Kevin throw files when he got
19     mad and --
20  **Q.  Were there any memos concerning his file**
21  **    throwing?**
22  A.  I don't know if there were or not.  He was on
23     probation.

Page 156

1  **Q.  But if there were, I should have them, right?**
2  A.  I don't know.  If it's in his personnel file.
3  **Q.  Then I should have it.**
4  A.  I don't know.
5  **Q.  Is that correct?**
6  A.  I don't maintain personnel files.
7  **Q.  All right.  Who else?**
8  A.  Who was terminated?  Nancy Martin was
9     terminated.
10  **Q.  And the two Marys, correct?**
11  A.  Mary -- Mary Turner was terminated.  Mary Beth
12     Brackin.
13  **Q.  Anyone else?**
14  A.  Not that I can think of.  I'm sure there are
15     others, but I can't think of them right now.
16  **Q.  Some others that you may have caused the**
17  **    termination?**
18  A.  There might have been.
19     They caused their own termination by their
20     actions.  Their actions caused their
21     termination.  I didn't do any of it.
22  **Q.  How do I get a list of these people who was**
23  **    terminated by you?**

39 (Pages 153 to 156)



Page 157

```
1   A.  I don't know.
2   Q.  You don't know how I could get your list?
3   A.  No.
4   Q.  And you don't know how many there have been?
5   A.  No.
6   Q.  You have no way of finding out, let's say, at
7       lunchtime how many people you have caused the
8       termination of?
9   A.  Not at lunchtime, no.
10  Q.  It would take you longer than that?
11  A.  Possibly.  Yes, it would take longer than
12      lunch.
13      MS. NELSON:  You've asked this question in
14      discovery, Mr. Jaffree.
15      MR. JAFFREE:  Yeah.  And what response did
16      I get?
17      MS. NELSON:  I've responded to it.
18      MR. JAFFREE:  Well, I'm not sure she have
19      given me all the names.  Well, she
20      don't recall.
21      MS. NELSON:  Well, you're asking her
22      cold.  I mean, she's been judge for a
23      number of years.  She's trying to give
```

Page 158

```
1       you a best answer.  I've given you
2       written responses.
3   Q.  I don't have any other questions right now.
4       We could break.  And I'll move on.  I
5       apologize for getting into this dialogue with
6       you about Ms. Nichols.  I just want to clarify
7       the one point of comp time, and you're
8       disputing that comp time?
9   A.  I'm not -- no, I'm not disputing comp time as
10      a premise.  I'm just not --
11      MS. NELSON:  She's testified that she was
12      terminated for falsification on time
13      cards.
14  A.  And that she had all the due process afforded
15      her by the Civil Service Act.
16  Q.  One point.  Everybody that you have terminated
17      so far has been Caucasian; is that correct?
18  A.  I'm not sure.  Not -- they might have been.
19  Q.  Is there any possibility that somebody who was
20      not Caucasian was terminated by you?
21  A.  I've not thought about the ethnicity of the
22      people that were terminated.
23  Q.  You're not aware of their --
```

Page 159

```
1   A.  I -- if I --
2   Q.  -- ethnic identity?
3   A.  I probably would be if I had a specific name,
4       but I just -- I didn't -- I didn't base their
5       employment on their ethnicity.  It didn't play
6       any part in their termination.  It would have
7       been solely based on some action by them which
8       caused them to be terminated.  It was not
9       initiated because of their race or sex.
10      MR. JAFFREE:  Can we break now?
11      (Lunch recess)
12  Q.  Michelle Bryan, you're familiar with her,
13      aren't you?
14  A.  Yes.
15  Q.  She resigned and then withdrew her
16      resignation, but she wasn't permitted to
17      withdraw her resignation.
18      Do you know the circumstances surrounding
19      that?
20      MS. NELSON:  Object to form.  Assumes
21      facts not in evidence.
22  A.  I know that Michelle Bryan gave --
23      MR. JAFFREE:  From facts based on
```

Page 160

```
1       documents you gave me.
2   A.  I know she gave her resignation.  And, you
3       know, at that time Personnel was probably
4       notified.  All that went through our court
5       administrator.
6   Q.  You had no role to do in the denial of her
7       attempt to withdraw her resignation?
8   A.  Well, she -- she was resigned.  She gave
9       notice and resigned.
10  Q.  Yeah.  But then she gave notice of her intent
11      to rescind that resignation.
12  A.  Yeah.  I don't know.  I mean, I don't know
13      whether -- you know if Personnel had already
14      been notified, and the position was opened,
15      you know, she couldn't just rescind, I
16      assume.  But, again, you know, all that went
17      through our court administrator.  But once a
18      person resigns -- gives their notice that
19      they're leaving and we send it to Personnel,
20      they close it out.  You know, there's nothing
21      we can do about it.
22  Q.  All right.  What amount of job performance
23      discretion did you permit Bettye King, the
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1  former administrator of the magistrates?
2  A. What amount?
3  Q. Yeah.
4  A. In terms of percentages? You said, what
5  amount? A lot or little?
6  Q. I don't mean amount in terms of percentage. I
7  mean, what degree of job performance
8  discretion --
9  A. I don't know.
10  Q. -- you permitted Bettye King?
11  A. Whatever degree of discretion she wanted. I
12  mean, I -- you know, I try not to interfere
13  with the day-to-day -- the only way I knew
14  there was a problem over there is if somebody
15  came to me or it was brought to my attention.
16  I was not over there every day. I did
17  not -- I could not physically be over there
18  every day.
19  Q. How long was Bettye King the administrator of
20  the magistrates' office, do you know?
21  A. I'm not sure. About two years I think.
22  Q. And she preceded Nancy; is that correct?
23  A. Probably, yes.

Page 162

1  Q. Did the magistrates' office have problems when
2  Bettye King was the administrator?
3      MS. NELSON: Object to the form.
4  A. Right.
5  Q. Right what, right what she did or right that
6  you object to the form?
7      MS. NELSON: Depending on what you meant
8      by problems. But if she understands,
9      she can answer it.
10  A. Yeah. It depends on what you mean by
11  problems.
12  Q. Did they have personnel problems in the
13  magistrate office when Bettye King was the
14  administrator?
15  A. And if I -- it just depends on what you mean
16  by -- you'd have to ask Bettye King
17  specifically.
18  Q. Were you aware of any problems in the
19  magistrate office when Bettye King was the
20  administrator?
21  A. Not specific problems. I mean, just a normal
22  course of business of running an office.
23  Q. Was it running quite well when she was the

Page 163

1  administrator?
2  A. As compared to what? I mean, we're a
3  bureaucracy, so we're always -- something is
4  always going on.
5  Q. Well, as compared to her predecessor?
6  A. Her predecessor being Donna?
7  Q. Was that her predecessor?
8  A. The person immediately preceding her. Yes, I
9  think Donna would be her predecessor. Just
10  nothing specific stands out with problems.
11  Q. Do you know why Ms. King left?
12  A. She told me for a better job and because she
13  was driving from Auburn to Dothan, three hours
14  each way every day, five days a week.
15  Q. Was Ms. King black or white?
16  A. She was black.
17  Q. Can you identify any occasion when you
18  requested that Ms. King change a performance
19  evaluation or any of the subcategories within
20  an evaluation?
21      MS. NELSON: Object to the form. I don't
22      understand what you just asked.
23      MR. JAFFREE: I cannot believe counsel is

Page 164

1  having trouble understanding all these
2  questions before --
3      MS. NELSON: I am having a very hard time
4      understanding your questions.
5  Q. All right. I'll try again.
6      Can you identify any occasion where you
7  requested that Ms. King change a performance
8  evaluation or any subcategory within the
9  evaluation?
10  A. Can I remember a specific occasion? No, I
11  cannot remember a specific occasion when I
12  informed -- asked Ms. Bettye King to change an
13  evaluation or a subcategory thereof.
14  Q. Is that something that you would normally
15  remember?
16  A. Not really because we have -- I mean, 12
17  evaluations three -- twice a year. That's 24
18  evaluations a year for the -- you know, for
19  the past eight years.
20  Q. A new non-tenured employee. Do you know what
21  that means, non-tenured employee?
22  A. No, I don't think so.
23      MS. NELSON: There's no such thing.

41 (Pages 161 to 164)



# FREEDOM COURT REPORTING



Page 165

1   Q.  A new non-permanent employee, non-merit system
2       employee, non-classified employee, how
3       frequently should they have evaluations done?
4           MS. NELSON:  Object to the form.
5   A.  Are you talking about probationary employees?
6   Q.  Yeah.
7   A.  Because I -- do we have a merit system here?
8       You keep saying "merit."  I'm confused.
9           MS. NELSON:  There is no merit.  That's
10          his term.
11  Q.  Or classified system.  Merit is a broad
12      category that covers people who have job
13      protection in the government sector.
14          MS. NELSON:  That's your term.
15  A.  I've never heard of --
16          MR. JAFFREE:  Do you dispute that term?
17          I'm doing the very thing I said I
18          wasn't going to do.
19  A.  I don't think the City of Dothan has a merit
20      system.
21  Q.  Regardless of whether you call it a merit
22      system or classified service system or a civil
23      service system.

Page 166

1   A.  Okay.
2   Q.  Whatever you call it, how frequently is a
3       probational employee evaluated?
4   A.  I don't think there's a set number of times.
5       And I don't think there is.  But I don't
6       know.  I'd have to refer to the Personnel
7       Rules and Regulations.
8   Q.  You not personally familiar with them?
9   A.  I'm familiar with them.  I'm just not familiar
10      with the specific number of times at this
11      point.
12  Q.  Nancy testified during her deposition that you
13      was present for, at least in part, yesterday
14      that during her initial or subsequent job
15      interview, you told her that there was
16      problems in the magistrate office.
17          Do you dispute that you told her that?
18  A.  No, I don't dispute that.
19  Q.  Have those problems been longstanding in the
20      magistrate office?
21  A.  It depends on which problems because I think I
22      was -- it depends on which problems.
23  Q.  Well, whatever problems you were referring

Page 167

1       to --
2   A.  When was I telling her?
3   Q.  -- when you told Nancy that?
4   A.  Well, we handle a large volume of paperwork,
5       approximately 15 to 17,000 tickets per year,
6       7,000 misdemeanors.  And there's a lot of
7       paperwork and a lot of loose paperwork, some
8       of it attached by gem clips.  And we were
9       having problems with -- you know, keeping
10      everything together.  So I really wanted her
11      to work on the filing system, on keeping
12      paperwork together, and on cross-training
13      magistrates.  And that's something that was in
14      place when she came, which I told her that we
15      wanted to do.
16  Q.  What was something that was in place?
17  A.  That we -- we had already talked about
18      cross-training before Nancy got there.
19  Q.  Who put it in place?
20  A.  We -- well, we developed the idea --
21  Q.  Who were "we?"
22  A.  -- when I say "in place."
23  Q.  Who were "we?"

Page 168

1   A.  The prior administrator and -- and I had
2       agreed that everybody needed to be
3       cross-trained because that was one of the
4       problems, that if one person wasn't there,
5       there was nobody trained to take her place.
6   Q.  Well, there was one more than one prior
7       administrator.  So are you talking about --
8   A.  I don't know which.  We had -- we had already
9       went --
10  Q.  You don't know if it was Bettye King or --
11  A.  I don't.
12  Q.  What's the other one's name?  I keep
13      forgetting her name.  What's the other
14      administrator prior to Bettye King; what's her
15      name?
16  A.  Prior to Bettye King would have been Donna
17      Nicholson.
18  Q.  So you don't know whether it was Donna that
19      started the policy of cross-training or
20      Bettye?
21  A.  No.  I don't -- I don't know under whose
22      tenure it actually started.  We had done it to
23      a limited extent, but not a formalized



42  (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1 written, you know, just let's-do-it-type
2 thing.
3 Q. So the problem with these files, they had
4 existed during Ms. King's administration?
5 A. It always exists just by the sheer volume of
6 paperwork we handle on a daily basis.
7 Q. So you thought it was a problem that would
8 always be there?
9 A. It would -- yeah, I think it will always be
10 there, but it can be managed better.
11 Q. She also testified that you had pointed out
12 three bad magistrates that she needed to watch
13 out for.
14     Do you remember that testimony?
15 A. I remember her testimony.
16 Q. Do you remember telling her that?
17 A. No. I don't remember specifically saying,
18 there are three bad magistrates that you have
19 to watch out for, and naming three people.
20 Q. So that would be a disputed --
21 A. That would be a lie, and it would be
22 unprofessional. And I would never do that as
23 a personnel administrator.

Page 170

1 Q. I don't understand what you mean by a lie.
2 A. It would be a lie that I said, Nancy, there
3 are three bad magistrates in that office that
4 I want you to write up and their names are. I
5 wouldn't do that.
6 Q. So it's your testimony that Nancy is lying --
7 A. Yes.
8 Q. -- when she say that?
9 A. It is my testimony that Nancy is lying when
10 she said that I told her that there were three
11 bad magistrates in the office and that I named
12 those three magistrates.
13 Q. You would agree with me that Nancy's version
14 and your version cannot stand in the same
15 sphere in perfect harmony?
16     MS. NELSON: Object to the form. As to
17     that particular testimony?
18 A. Nancy is lying. I never told her that.
19 Q. She also indicated that you told her one of
20 the three had assaulted a member of management
21 and that she better be careful because they
22 could assault her.
23     Do you dispute that you told her that?

Page 171

1     MS. NELSON: Object to the form.
2 A. Yes, that -- I deny that, that that -- telling
3 her that --
4     MS. NELSON: Okay. She'll pick it up.
5 Q. Do you recall telling her anything at first
6 about any magistrate during that first
7 interview?
8 A. I did not tell her anything adverse. I might
9 have told her the -- some facts but nothing
10 adverse like just intentionally negative about
11 anybody.
12 Q. Did you give her some negative facts during
13 that first interview about any magistrate?
14 A. I -- I -- no, I would not say negative facts.
15 Facts, period. It is what it is.
16 Q. Well, facts that wasn't pleasant?
17 A. I might have.
18 Q. So you might have told her some bad facts
19 about a magistrate during that --
20     MS. NELSON: Object to the form.
21 Q. -- initial interview?
22 A. No.
23     MS. NELSON: That's not her testimony.

Page 172

1 A. Right. No, I don't.
2 Q. What is her testimony?
3 A. My testimony is that -- that her first
4 interview was with a panel consisting of a
5 public defender, Kathleen Nemish; a city
6 prosecutor, Kevan Kelley; myself; and a police
7 captain.
8     And that I would not have sat in that
9 first interview in front of those people and
10 said, Nancy, and said the things that she said
11 I said.
12 Q. Let me stop --
13 A. It was a professional interview, focus on
14 Nancy's qualifications for the job, which I
15 now see she -- which I later found out she
16 misrepresented.
17 Q. I mean, you've certainly given me a lot of
18 unsolicited information right now. But if I
19 could get you back --
20 A. You only want to hear --
21 Q. -- to some questions that I want to give to
22 you.
23     You indicated that a police captain was in



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  on that interview?
2  A. Uh-huh (positive response).
3      MS. NELSON: You've got to say yes or no.
4  A. Yes.
5  Q. What role did the police captain play?
6  A. Just sitting in on the interview process
7     because that was one of the departments with
8     which we work.
9  Q. Well, didn't you testify earlier that the two
10     agencies were --
11  A. Separate.
12  Q. -- independent and separate --
13  A. Yes.
14  Q. -- because they needed to be?
15  A. Yeah. We also had a public defender who is a
16     separate entity, a city prosecutor that's a
17     separate entity --
18  Q. Who's that --
19  A. -- but we all have to interact with each
20     other.
21  Q. Whose idea was it to have a --
22  A. Panel?
23  Q. -- police captain --

Page 174

1  A. It was mine to have a panel.
2  Q. -- in on a -- I'm sorry. It was whose idea?
3  A. Mine, to have a panel rather than just --
4  Q. And whose idea was it to include in that panel
5     a police captain?
6  A. Mine I'm sure.
7  Q. Did anybody recommend that you do that?
8  A. No. Just like nobody recommended I get
9     somebody from Personnel or Legal. Those are
10     just people we had -- departments we had to
11     deal with.
12  Q. Is it safe to say, based on your testimony
13     that during this first interview, even though
14     it consisted of a panel, you may have given
15     some facts that was not favorable towards a
16     particular magistrate?
17  A. It is not safe to say that, no.
18  Q. But you may have given some facts about a
19     magistrate?
20     MS. NELSON: Asked and answered. That's
21     not her testimony.
22     MR. JAFFREE: I'm asking.
23     MS. NELSON: She said she gave some facts.

Page 175

1  Q. Facts about a magistrate?
2  A. About the magistrates' office.
3  Q. Did you give any facts about a magistrate?
4     I'm just trying to get clear what your
5     testimony is.
6     MS. NELSON: Asked and answered.
7  Q. And in spite of your attorney's --
8  A. And I continue to say, no.
9  Q. Pardon?
10  A. I continue to say no. I just don't think I
11     would do that.
12  Q. Well, let's talk about your second interview.
13     Did you tell her anything about three bad
14     magistrates during her second interview?
15  A. I just -- no. I just don't remember it being
16     as specific as Nancy would allege. No.
17  Q. Could it be that you told her that and you
18     just don't recall?
19  A. I would have recalled that.
20  Q. You would recall that?
21  A. Yes.
22  Q. Did you give her any facts about any
23     magistrate during that second interview?

Page 176

1  A. A specific -- I would have -- no, not a
2     specific magistrate. No.
3  Q. You're very comfortable with your no position?
4  A. Pretty much so.
5  Q. Pretty much so. Okay.
6  A. Yes. I am very comfortable because at all
7     interviews there were other people.
8  Q. Okay. Now, were you also present when Nancy
9     testified that you subsequently told her
10     specifics about certain magistrates before she
11     started but after she was hired? Were you
12     present when she testified to that?
13  A. I was.
14  Q. And that she learned that it was Mary Turner
15     who had allegedly assaulted a person in
16     management. Prior to Nancy's hire, did Mary
17     Turner assault anyone in management?
18     MS. NELSON: Object to the form. Is
19     that -- object to the form. I'm not
20     sure that was in any testimony I heard
21     yesterday.
22  Q. She also testified that Mary Brackin and Mary
23     Turner were the two magistrates that caused

44 (Pages 173 to 176)



# FREEDOM COURT REPORTING



Page 177

1  the most trouble?
2      Do you recall that testimony?
3  A. That she testified that they were the two that
4  caused the most trouble?
5  Q. Yeah.
6  A. That she said that?
7  Q. That she said that you told her that?
8  A. Do I recall her saying that?
9  Q. Yeah.
10 A. Is that what you're asking?
11 Q. Well, forget about whether you recall her
12     saying that. Do you agree that you told her
13     that --
14 A. No.
15 Q. -- at a subsequent meeting?
16     Do you agree or disagree that you told her
17     that these two magistrates was attempting to
18     sabotage you?
19 A. I -- I just don't think -- no. I just don't
20     think I would have told Nancy that.
21 Q. You're not quite sure?
22 A. I'm quite sure. No, not at -- I'm hiring
23     somebody. I wouldn't just sit there and tell

Page 178

1  them that. That's somebody I've never met
2  before. No.
3  Q. So you're quite --
4  A. No.
5  Q. You're quite equivocal that you didn't tell
6     her that?
7  A. I -- no -- I mean, yes, I'm sure that I did
8     not tell her that.
9  Q. And that these two was also attempting to
10     sabotage prior administrators?
11 A. Were attempting to?
12 Q. Sure. Had attempted to sabotage prior
13     administrators?
14 A. They had attempted to sabotage prior
15     administrators. I don't know. No.
16 Q. You didn't --
17 A. I don't remember that.
18 Q. -- tell her that?
19 A. I don't remember saying that to her.
20 Q. You could have said that?
21 A. No. I don't see why I would have in an
22     interview -- on a job interview. No.
23 Q. Do you have a recollection that you didn't say

Page 179

1  it, or you just think you probably didn't say
2  it?
3  A. I don't -- I don't see where I would have said
4  it.
5  Q. Okay.
6  A. There were other people in the interview.
7  Q. Were these two magistrates attempting to
8     sabotage you?
9     MS. NELSON: Object to form.
10 A. I don't know.
11 Q. You don't know whether Mary Turner and Mary
12     Brackin was attempting to sabotage you?
13 A. I have no specific knowledge of Mary Turner
14     and Mary attempting to sabotage me.
15 Q. What about attempting to sabotage prior
16     administrators, do you have any knowledge of
17     that?
18 A. Not Bettye King.
19 Q. Well, what about the other administrator?
20 A. Donna Nicholson.
21 Q. Uh-huh (positive response). Do you think
22     those two tried to sabotage her?
23 A. I don't have any specific knowledge that they

Page 180

1  did.
2  Q. Okay. She also claims that you told her that
3     she had to be on the lookout for them, that
4     they would attempt bodily harm, and so she
5     needed to be careful?
6  A. That is a lie. I never told Mary -- Nancy
7     that Mary Turner and Mary Brackin would
8     attempt bodily harm on her.
9  Q. She also testified that you told her that --
10 A. I would never condone that.
11 Q. Okay. She also testified that you told her
12     that Mary Beth was under investigation for
13     something that she had told a defendant.
14     MS. NELSON: Is that a question?
15     MR. JAFFREE: Yeah.
16 Q. Do you --
17 A. I might have.
18 Q. Do you dispute that you told her that?
19 A. No, I don't dispute.
20 Q. So you may have told her that Mary Beth was
21     under investigation?
22 A. If she was at the time, yes.
23 Q. Had that investigation been completed by the

45 (Pages 177 to 180)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1   time Nancy was being interviewed?
2   A.   I don't remember. I think the result -- no, I
3   don't remember.
4   Q.   **If it had been completed, would you have told**
5   **her that she was under investigation?**
6   A.   If it had been completed, would I have told
7   her that it was still under investigation?
8   Q.   **Yeah. Was this told to Nancy during the**
9   **interview, that she was under investigation?**
10  A.   I don't know why I would if it had been
11  completed.
12  Q.   **All right. So you may have told her, or you**
13  **know that you did tell her that?**
14  A.   Well, if it had completed, I wouldn't tell
15  it's still going on. I would have no purpose
16  for doing that.
17  Q.   **She also testified during this meeting that**
18  **you told her that Sarah Fowler wouldn't**
19  **instigate anything on her own but she was a**
20  **follower of Mary -- Mary Turner and Mary**
21  **Brackin.**
22  **Could you have told her that?**
23  A.   I don't remember telling her that

Page 182

1   specifically, no.
2   Q.   **Could you have told her that, perhaps in --**
3   **not in those words but similar content?**
4   A.   Possibly.
5   Q.   **So you may have told her that?**
6   A.   Possibly.
7   Q.   **So if you had told her that Sarah Fowler was a**
8   **follower of Mary Turner and Mary Brackin, then**
9   **you may have told her something about Mary**
10  **Turner and Mary Brackin; is that correct?**
11  A.   I don't know. I mean, what I would have told
12  her is what their job duties were, how they
13  interacted in the office, because I was trying
14  to give her a feel of the whole office. I
15  would have told her about every magistrate. I
16  wouldn't have just sat there and said
17  something about three people --
18  Q.   **Well, no --**
19  A.   -- out of a whole office to a person I'd never
20  met before. No.
21  Q.   **She didn't say it was just limited to three.**
22  **Now, with respect to Michelle Bryan, she**
23  **said you told her that she was in a hole with**

Page 183

1   leave time, that she was out sick a lot, out
2   sick with her children.
3   **Could you have told her that?**
4   A.   Possibly.
5   Q.   **Would Nancy have known about that prior to her**
6   **employment with the City?**
7   A.   I don't know if she knew Michelle Bryan before
8   she came to the City or not.
9   Q.   **She also testified you told her that Michelle**
10  **was very cute and divorced.**
11  **Could you have told her that?**
12  MS. NELSON: When she did she testify to
13  this? Object to the form.
14  MR. JAFFREE: Well, I mean, look at the
15  transcript. She did testify to that.
16  A.   "Very cute and divorced." I don't know.
17  MS. NELSON: You said yesterday.
18  MR. JAFFREE: Well, I recall the
19  testimony.
20  Q.   **Well, did you tell her that she was cute and**
21  **divorced?**
22  A.   I don't -- I don't remember specifically
23  telling her that.

Page 184

1   Q.   **Well, was Michelle Bryan, in your view, cute?**
2   A.   No.
3   Q.   **In your view, was Michelle Bryan divorced?**
4   A.   I never thought she was divorced.
5   Q.   **She also testified that --**
6   A.   I thought she had a husband.
7   Q.   **-- she socialized a lot in the office and that**
8   **she talked on the phone with several police**
9   **officers, and was dating several. This is her**
10  **testimony.**
11  **Did you tell her that?**
12  A.   I don't -- that was kind of common knowledge
13  around the office. I don't remember
14  specifically telling her that.
15  Q.   **But it was so common, you knew about it,**
16  **right?**
17  A.   Everybody knew about it.
18  Q.   **Including you?**
19  A.   Yes.
20  Q.   **So you may have told her that?**
21  A.   I don't remember -- I don't gossip like that
22  with somebody I've never met before. No.
23  Q.   **Well --**

46 (Pages 181 to 184)



# FREEDOM COURT REPORTING

Page 185

1  A.  No.
2  Q.  If Nancy --
3  A.  No.
4  Q.  So you didn't tell her that?
5  A.  In her interview, Mr. Jaffree, I told her all
6      that in her job interview?
7  Q.  Well, I'm telling you what Nancy says.
8  A.  I'm asking.  No, I did not, in a job
9      interview.
10 Q.  No.  She didn't say interview.
11 A.  That's what you said.
12 Q.  She said in a subsequent meeting, she said she
13     came in two or more times subsequently --
14     subsequent to her being hired but before she
15     actually put boots in the ground to start
16     working physically in the facility, she said
17     she met with you and you told her this, one on
18     one, no committee, just you and her, mono to
19     mono.
20         Do you remember her testimony?
21 A.  No.
22 Q.  You don't remember her testimony?
23 A.  No, not specifically.

Page 186

1  Q.  She also testified that you would have to deal
2      with her dating and cut down on her
3      socialization -- socializing.
4          Could you have told her that?
5      MS. NELSON:  You're talking still in the
6      time before she was hired?
7      MR. JAFFREE:  Yeah.  She was hired but
8      before she started working.
9      MS. NELSON:  You said, before she "put
10     boots in the ground."  I have no idea
11     what that means.  You're saying,
12     before she was hired or after she --
13     MR. JAFFREE:  I said more than just boots
14     in the ground.  I said boots in the
15     ground and started working at the
16     facility.
17     MS. NELSON:  Before -- so you're asking
18     her, did she say -- we're talking
19     about a time frame before she started
20     working at the facility.
21     MR. JAFFREE:  Subsequent to her hire but
22     before her start date.
23 A.  So what was she doing?

Page 187

1  Q.  At any time, do you recall telling Nancy to
2      cut down on Michelle Bryan's socialization --
3      socializing with men?
4  A.  I don't specifically remember that, but I
5      remember that that was a problem during that
6      time.
7  Q.  Do you generally remember telling Nancy that?
8  A.  No, but I remember -- no.  I don't remember
9      saying, Nancy --
10 Q.  So it was a problem?
11 A.  Yes.
12 Q.  So you could have told Nancy that?
13 A.  Could I have told Nancy that, you need to stop
14     her from socializing?  I just don't remember
15     specifically.
16 Q.  Do you have any reason to believe that Nancy
17     would have had knowledge of Michelle's
18     socializing before she started working?
19 A.  You said she had started working.
20     MS. NELSON:  Well, if you're confused, ask
21     him to --
22 A.  Well, you said --
23 Q.  She was hired but hadn't started -- there was

Page 188

1      a month or more gap between the time she was
2      hired and the time she started.
3  A.  I don't know.  She said, she knew Valarie
4      Savage and her family, and Valarie and
5      Michelle Bryan were best friends.
6  Q.  So she could have gotten this information from
7      Valarie Savage?
8  A.  Right.  Or just -- I don't know.
9  Q.  Or she could have gotten it from you; you're
10     not sure?
11 A.  I don't know.
12 Q.  She could have gotten it from you?
13 A.  I don't -- I don't think so.
14 Q.  Well, but that part of her--
15 A.  I wouldn't gossip with Nancy.
16 Q.  Well, that part of her testimony could be
17     true?
18 A.  No.  No.
19 Q.  You want to say no now?
20 A.  Yeah, I want to say no.
21 Q.  You feel comfortable with no?
22 A.  Yeah.  Yes, I feel comfortable with no.  I
23     wouldn't sit there and gossip with an employee

47  (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1    that I had just --
2    Q.  She also stated that you wanted her -- that
3    she needed to look out for Valarie Savage,
4    that she had many problems in her previous
5    employment as secretary to Judge Steensland.
6        Do you know if Valarie Savage formerly
7    worked for Judge Steensland?
8    A.  I know she worked for a circuit judge, and I
9    vehemently deny ever telling her that or that
10   Valarie slept with prisoners.  I vehemently
11   deny that.
12   Q.  Well, I haven't got to that yet.
13   A.  I heard her say that yesterday.
14   Q.  But you do remember that testimony?
15   A.  I vehemently deny all statements she made
16   about Valarie Savage.
17   Q.  That her attitude was bad and that you should
18   have fired her a long time ago?
19   A.  Valarie is one of our most prized employees.
20   And I value her.
21   Q.  Are you disputing that testimony?
22   A.  I dispute that.  And I'm appalled that Nancy
23   would say that, and I hope she's not told her

Page 190

1    that.
2    Q.  Okay.  And that she has slept with inmates
3    apparently when she worked at Judge
4    Steensland's office, and that was one of the
5    reasons why they had to let her go?
6    A.  Well, why did I hire her if I knew all that?
7    Q.  Well --
8    A.  If I told her all that, but I hired her
9    anyway?
10   Q.  I'm not in your head.
11   A.  Well, it's just ludicrous, is all I'm saying.
12   I deny telling that.
13   Q.  So you deny -- you dispute that testimony?
14   A.  Yes, I dispute telling Nancy that.
15   Q.  Do you know how Nancy would have known that
16   Valarie Savage worked for Judge Steensland?
17   A.  She said that she and Valarie's family were
18   friends and that Valarie's aunt was her best
19   friend's mother; she knew members of her
20   family.
21   Q.  So you think maybe --
22   A.  Do you remember that testimony yesterday?
23   Q.  Do you think that Valarie may have told her

Page 191

1    that --
2    A.  She might have.
3    Q.  -- that she slept with inmates?
4    A.  She -- I don't know.  She might have.  I -- I
5    love Valarie.
6    Q.  Did you caution her that she could be sleeping
7    with inmates here in the municipal court
8    system?
9    A.  No, I did not tell her that.  I did not tell
10   Nancy that about Valarie Savage.
11   Q.  You dispute that?
12   A.  I dispute that vehemently,
13   V-E-H-E-M-E-N-T-L-Y.  Vehemently deny that.
14   Q.  And then she went on to --
15   A.  I'm sorry.
16   Q.  And then she went on to Ann Baxter, and she
17   said you mentioned that she was nice and would
18   do anything for you, but she had problems
19   balancing money.
20       Now, could you have told her that Ann
21   Baxter, sweet person, but had problems
22   balancing money?  Could you have told her
23   that?

Page 192

1    A.  I'm not sure.
2    Q.  Did Ann Baxter have problems balancing money?
3    A.  She had problems with the computer system that
4    was in place at the time.  I don't know if
5    Nancy might have misunderstood.
6    Q.  So you could have said something --
7    A.  About the computer system.
8    Q.  -- and Nancy misunderstood?
9    A.  Shy might have.
10   Q.  Could she have misunderstood what you said
11   about Valarie?
12   A.  Valarie.  I -- I -- not only did she
13   misunderstand that, I never would have sat
14   there in a professional job interview and
15   gossip and malign people.
16   Q.  So it's your testimony that Nancy just made
17   all this up out of whole cloth?
18   A.  No.  I think Nancy heard that from gossiping
19   in the office with Mary Beth and Mary Turner
20   and Valarie, whoever else she gossiped with.
21   Q.  Upon what do you premise your remarks, that
22   Nancy heard that from Mary Beth and Mary
23   Turner?

48  (Pages 189 to 192)



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 193

1   A. I said whoever she gossiped with.
2   Q. Well, you first said Mary Beth and Mary
3      Turner.
4   A. I said Mary Beth or whoever she gossiped with.
5   Q. Well, who all did Mary gossip with -- I'm
6      sorry -- Nancy gossip with?
7   A. It looks like everybody from what you're
8      saying.
9   Q. Well, based --
10  A. Because you sure knew a lot.
11  Q. Well, based on your personal knowledge, who
12     all does she gossip with?
13  A. I have -- I don't have no personal knowledge
14     of whom Nancy gossiped with.
15  Q. With respect to Ann Baxter, I think she also
16     said that she makes numerous mistakes in
17     computer entry.
18         Did you tell her that?
19     MS. NELSON: Are we talking about Ann --
20     MR. JAFFREE: Ann Baxter.
21     MS. NELSON: Ann Baxter? So your question
22         is, did the judge --
23  Q. Tell Nancy that, that Ann Baxter makes

Page 194

1      numerous mistakes in computer entry?
2   A. I don't know. I remember telling her that
3      there were a lot of computer problems. And
4      Ann -- because Ann was working the window, she
5      had to bear the brunt of it.
6   Q. So you may have told her that part?
7   A. That they had computer problems, yes.
8   Q. So you may have told her that.
9   A. That they had computer problems.
10  Q. Do you recall telling her that, or you may
11     have told her that?
12  A. I may have told her they had computer
13     problems.
14  Q. So you can't dispute that?
15  A. No, that they had -- were having computer
16     problems. No.
17  Q. So we're parsing out what you may have told
18     and not told her about Ann.
19         She also stated that you told her that Ann
20     was, at that time, being investigated by
21     Valerie Harris.
22         Are you familiar with Valerie Harris?
23  A. I'm am. She was an internal auditor doing the

Page 195

1      liaison between the computer system and us.
2      The city manager appointed her. So Valarie
3      Savage might have been working on the computer
4      problem errors that Ann was having.
5   Q. Is it conceivable that Valerie may have
6      been -- Valerie Harris, that is, may have been
7      investigating --
8   A. Computer problems.
9   Q. -- Ann Baxter?
10  A. Computer problems. Ann bore the brunt of it
11     because she worked the window. She worked the
12     window, so she was the one entering. And so
13     she had more computer errors.
14  Q. Well, my question is, whatever Ms. Harris was
15     investigating, it could have involved Ann
16     Baxter?
17  A. It could have. Yes, it could have, and
18     computer errors.
19  Q. So you could have -- and you may have told
20     Nancy that?
21  A. Right.
22  Q. Just like you have admitted that you told her
23     about this other investigation involving

Page 196

1      Ms. Brackin, you also could have told her
2      about the investigation involving Ann Baxter?
3   A. But what I told you about the investigation,
4      if it was closed, I would never have told her
5      it was ongoing. If it was closed, it was
6      over.
7   Q. Well, maybe it wasn't closed. I mean, this
8      was in December I guess or maybe in January.
9   A. Yeah, I don't.
10  Q. So maybe it wasn't closed?
11  A. But if I was trying to give her an overview of
12     the office, I might have said some of those
13     things.
14  Q. You might have said some of those things.
15  A. But Nancy has taken them and distorted them
16     for the purposes of this lawsuit. That's what
17     she's done.
18  Q. That's what you think, she's distorted them?
19  A. That's what I know. I was there.
20  Q. Haven't Nancy been consistent --
21  A. No.
22  Q. -- on what she saying?
23  A. No.

49 (Pages 193 to 196)



# FREEDOM COURT REPORTING



Page 197

1  Q.  Even prior to this lawsuit?
2  A.  No.
3  Q.  Well, I read this little laundry list of stuff
4     that she had --
5  A.  Nancy had.
6  Q.  -- before this lawsuit.
7     MS. NELSON:  Well, just let him ask the
8     questions.  I don't understand the
9     question, consistent with -- I'm
10    not --
11    MR. JAFFREE:  You don't understand what
12    question?
13    MS. NELSON:  I don't understand the
14    question.
15    MR. JAFFREE:  Which question, none of
16    them?
17    MS. NELSON:  About her being consistent.
18    With what, I'm not sure.  You were
19    trying to ask her.
20    MR. JAFFREE:  I don't remember either now.
21    Let me move on.
22 Q.  Do you recall telling Nancy that Ann Baxter
23    had a lot of money?

Page 198

1  A.  I don't know how I would have known that.  No,
2     I don't recall telling her that.
3  Q.  Did you know that Ann Baxter had a lot of
4     money?
5  A.  No.
6  Q.  Did you know Ann Baxter owned a real estate
7     company?
8  A.  I know she had previously.
9  Q.  Did you tell Nancy that she had owned a real
10    estate company?
11 A.  I'm not sure.  I don't recall.
12 Q.  Did you know that Ann Baxter inherited land
13    from a family member?
14 A.  I don't -- I don't know.  No.  I don't --
15    didn't know Ann that well -- I mean, to know
16    all that.
17 Q.  Well, do you know that now?
18 A.  No.  I know that she owned a real estate
19    company before.
20 Q.  What about inherited money from a family
21    member; did you know that?
22 A.  No.
23 Q.  You don't know that now?  So you didn't tell



Page 199

1     Nancy that?
2  A.  I don't think so.
3  Q.  So you don't know how Nancy got this
4     information?
5  A.  No.
6  Q.  So if Nancy says you told her, you would
7     dispute that?
8  A.  Pretty much, yes.
9  Q.  Now --
10 A.  I would dispute all of the stuff that she
11    said.
12 Q.  All of the magistrates that I have mentioned
13    so far that Nancy said you told her some
14    things about, were they white or black?
15 A.  Probably white because the majority --
16 Q.  You're not sure?
17 A.  -- of the office is white.
18 Q.  You're not sure?
19 A.  I'd have to go back through each one, but
20    probably, more than likely white.
21 Q.  Well, how far would you have to go back to
22    know whether or not the people I just
23    mentioned are white or black?

Page 200

1  A.  To the beginning of your list.  You asked me
2     about -- who?  Mary Beth is white.  Mary
3     Turner is white.  Ann Baxter is white.  Who
4     else you asked me about?
5     MS. NELSON:  Sarah Fowler.
6  A.  Sarah Fowler is white.  The office was --
7     MS. NELSON:  Michelle Bryan.
8  A.  -- predominantly white.  Michelle Bryan.
9  Q.  All right.  Now, would you agree that if
10    Nancy's version is correct, then you said
11    something negative about each of those people?
12    MS. NELSON:  Object to the form.
13 A.  If Nancy's version were correct, yeah.
14 Q.  So you gave her sort of a negative picture of
15    each of these white --
16    MS. NELSON:  Object to the form.  She's
17    just denied most everything you've
18    asked her about.
19 Q.  My question is, if Nancy's version is correct,
20    you gave her a negative view of each of these
21    white magistrates.
22    MS. NELSON:  Object.
23 Q.  Is that correct?

50 (Pages 197 to 200)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660