# FREEDOM COURT REPORTING



Page 201

1    MS. NELSON: That's totally not the
2        testimony and hypothetical.
3  A.  If Nancy's version were correct, but it's not
4        correct.
5  Q.  Now, do you remember what Nancy stated that
6        you told her about Lavera?
7  A.  No, I don't.
8  Q.  She said that you highly praised Lavera, that
9        she was a good magistrate.
10 A.  I thought Valarie is the best magistrate we've
11       ever had, and she didn't say I said that.
12 Q.  That she previously worked at the jail, very
13       well liked, knowledgeable.
14       Did you tell Nancy that about Lavera?
15 A.  I don't -- I don't remember what I would have
16       said.
17 Q.  Is that something that you thought about
18       Lavera at the time Nancy was employed?
19 A.  I wouldn't have said that she was most
20       knowledgeable because I think she was very new
21       then.
22 Q.  Well, I didn't say "most knowledgeable" but
23       very knowledgeable?

Page 202

1  A.  I don't think -- I wouldn't have said that. I
2        mean, because she was new. She was -- she had
3        just started.
4  Q.  How new is Lavera in January or February of
5        2004?
6  A.  I don't remember. But --
7  Q.  She wasn't that new, was she?
8  A.  I don't -- she was one of the newer ones, one
9        of the newer magistrates.
10 Q.  She wasn't that new in --
11       MS. NELSON: She said, she didn't know.
12 A.  And when I say "new" --
13       MR. JAFFREE: Well, if she didn't know,
14        how can she say she was new?
15 Q.  What is the basis of that statement?
16 A.  She was one of the newer ones. In terms of
17       all of the people you've named, she was one of
18       the newer ones. Michelle Bryan was a newer
19       one.
20 Q.  Well, do know whether or not that is something
21       that you would have said about Lavera at the
22       time?
23       MS. NELSON: Asked and answered.

Page 203

1  A.  That she worked in the jail. Parts of it,
2        yes. I think that --
3  Q.  So you may have told Nancy that?
4  A.  That she worked in the jail or --
5  Q.  Nancy couldn't think of anything negative you
6        said about Lavera.
7  A.  Nancy is trying to sue me for racial
8        discrimination. She wouldn't tell you
9        anything negative I said about Lavera.
10 Q.  Well, then, you're trying to defend a race
11       case, so you may be prone to say anything that
12       would benefit your defense; isn't that
13       correct?
14 A.  You're trying to defend a liar. I mean,
15       that's the reality of what we're dealing with,
16       Mr. Jaffree.
17 Q.  Yeah. I mean, I wasn't present so I -- I
18       don't have a dog in this fight in terms of who
19       is telling the truth or not because I wasn't
20       there. I'm only saying that you both have an
21       interest in trying to convey a certain point
22       of view.
23       You would agree with that, wouldn't you?

Page 204

1        MS. NELSON: Object to the form.
2  A.  No.
3  Q.  No, you don't agree with that? Okay. Now,
4        she testified that you said that Eunice Knight
5        was very good, very quiet, an efficient and
6        knowledgeable magistrate that wouldn't cause
7        any problems.
8        Did you feel that way about Eunice Knight
9        at the time Nancy was hired?
10 A.  I think possibly so.
11 Q.  She was quiet, good?
12 A.  Very quiet.
13 Q.  Very efficient and knowledgeable. So that's
14       something that you could have told Nancy at
15       the time?
16 A.  I could have said, quiet and -- yes.
17 Q.  What hue would you say Lavera and Eunice are?
18       MS. NELSON: What "hue?" I mean, what do
19        you mean by that?
20 Q.  Well, what race are they?
21 A.  African-American. Did I not say anything
22       about Tonya?
23       MS. NELSON: Let him ask the questions.



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 205

1  THE WITNESS: I'm sorry.
2  Q. Well, I think if I understand the
3  constellation of facts, Tonya wasn't employed
4  yet at that time.
5      Do you remember Nancy testifying that the
6  white employees was upset and complaining
7  about office assignments?
8  A. Yes.
9  Q. And they were upset and complaining about
10  office assignments; isn't that correct?
11  A. Not that I was aware.
12  Q. Do you remember how the office assignments
13  were configured?
14  A. Yes.
15  Q. Let me -- remember yesterday when Nancy
16  testified that Fran gave her something?
17      MS. NELSON: Again, you're producing a
18      document that should have been
19      produced yesterday when I deposed.
20      MR. JAFFREE: Well, Nancy said she didn't
21      have that document yesterday. She had
22      it at home, but didn't have it with
23      her.

Page 206

1      MS. NELSON: Okay. Well, I again reserve
2      the right to question her not only on
3      some other things that have come up
4      but also as to Plaintiffs' Exhibit
5      Number 5.
6      MR. JAFFREE: Talking about some other
7      thing that came up. Because it's only
8      one thing other than that document
9      that came up.
10      MS. NELSON: Well, the other documents you
11      continue to produce that she didn't
12      produce yesterday.
13      MR. JAFFREE: Well, that's so funny. The
14      second document.
15  Q. But let me ask you to look at what is -- what
16  did I say -- Plaintiffs' Exhibit 5 and ask you
17  if you can identify that document.
18  A. Yes.
19  Q. You have seen that document before, haven't
20  you?
21  A. Yes -- no, no, I've not seen this document
22  before.
23  Q. Well, how can you identify it?

Page 207

1  A. I mean, no. You said -- I meant this. Can I
2  identify these offices? Yes.
3  Q. Well, before I get to the offices, have you
4  ever seen that document before?
5  A. Have I ever seen this document before? Not
6  that -- I can't remember.
7  Q. All right. Your counsel, I'm sure, will stop
8  me if I'm incorrect. But did you hear Nancy
9  testifying that that document was circulated
10  around the office so the people would know
11  where their offices were?
12  A. No. I -- I did hear her testify to that.
13  Q. Are you in a position to dispute that
14  testimony that a document --
15  A. No.
16  Q. -- was circulated?
17  A. No, I'm not.
18  Q. So it could have been that document?
19  A. It could have been, but I don't know.
20  Q. Do you remember her testifying that Fran came
21  by after she had resigned, sometime later
22  perhaps even after Nancy had unceremoniously
23  had been separated from --

Page 208

1      MS. NELSON: Object to the form.
2  Q. -- her office and gave that to Nancy?
3  A. Do I remember Nancy saying that?
4  Q. Testifying. Yeah.
5  A. Yes, I do.
6  Q. And you see Fran's name on there, right?
7  A. Yes.
8  Q. Okay. Well, does that diagram depict, based
9  on information you have available to you, a
10  rough sketch of what that office looked like?
11  A. As much as I can --
12  Q. Now, let me draw your attention --
13      MS. NELSON: Well, I'm not sure she
14      answered that.
15  A. Yeah. As much as I can determine, it's a
16  really rough draft.
17  Q. I accept that as an answer. Let me move on to
18  the next question.
19      Let me draw your attention to that little
20  cubicle that got at seven. Do you see that?
21  A. Yeah.
22  Q. Do you see the seven?
23  A. Yes.

52  (Pages 205 to 208)



# FREEDOM COURT REPORTING



### Page 209

1  Q. Wouldn't you agree that in relationship to
2     some other offices, that's a little tiny, tiny
3     cubicle?
4  A. No.
5  Q. Okay. What about number six; would you agree
6     that number six in relationship to some other
7     offices is a tiny, tiny cubicle?
8  A. No. Their -- their offices -- I don't know
9     why they have them drawn like this other
10    than --
11 Q. What about number five?
12 A. No. Valarie's office is huge.
13    MS. NELSON: That's number five?
14    THE WITNESS: Yeah, it's huge.
15 Q. So you think that office is huge?
16 A. It is huge. You need to go over there.
17    Number seven, everybody in the office wanted
18    it because it's fully windowed --
19 Q. Well, I appreciate --
20 A. It's beautiful.
21 Q. -- your gratuitous information, but I
22    didn't -- I'm not asking what everybody
23    wants.

### Page 210

1  A. This isn't drawn to scale. It look -- just
2     because it's drawn like that doesn't mean --
3  Q. Let me ask you this: You see that North Oates
4     name down at the bottom?
5  A. Yes.
6  Q. Do you recognize that handwriting?
7  A. No?
8  Q. What about the E. Adams; do you recognize that
9     handwriting?
10 A. No.
11 Q. So you don't recognize the handwriting?
12 A. No, just not off the top of my head.
13 Q. Okay. Let me ask you this: Which office is
14    larger, office number one, that here seems to
15    be very large or office number six?
16 A. I don't know as far as measurements go. I've
17    not measured them, so I don't know. Which
18    appears on here, six appears, but I don't
19    know. I've never measured them. I don't
20    know.
21 Q. Well, if you had to guess --
22    MS. NELSON: I would ask her not to
23    guess.

### Page 211

1  Q. Well, can you give your opinion?
2  A. I just don't know. I don't have any way of
3     knowing. I didn't count them.
4  Q. So do you think office number one and two to
5     be the same size as office number six and
6     five?
7  A. I'm not sure. I'd have to go over there and
8     see. Sarah is number three. It looks like
9     it's the same size as one and two.
10 Q. Well, I haven't got to number three yet.
11 A. You don't want to.
12 Q. No, it's not that. It's that -- you only had
13    so many minorities when this office got
14    selected. And, therefore, somebody had to get
15    office number three or else I guess they
16    remain empty, huh?
17    Now, Nancy had testified that Lavera was
18    responsible for office assignments. And I
19    think you have proclaimed to the high heavens
20    that that's simply not true.
21 A. Right. Yes, I have denied that.
22 Q. So who was responsible for office assignments?
23 A. I was. Lavera was over the -- well, I was.

### Page 212

1  Q. Did you send Lavera out as your emissary to
2     tell other staff members that is the office
3     assignment?
4     MS. NELSON: Object to the form.
5  Q. Do you understand the question?
6  A. Yes, I do. But, no, I did not send her as my
7     emissary. She was in charge of the physical
8     move. Mary Beth, your client was in charge of
9     moving the files.
10 Q. So are you saying that because she was in
11    charge of the --
12 A. Mary Beth --
13 Q. -- physical move, she had to tell people where
14    their offices are going to be located?
15 A. She had to tell them -- yes. So they would
16    know where to -- to take -- to put their
17    stuff.
18 Q. So how did she know where --
19 A. Because we walked around with the -- the guy
20    that was doing the renovations. And I said,
21    let's put -- Mary Beth is up here --
22 Q. I need to stop you. When you say "we," who
23    all are you referring to?



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 213

1  A. It would have been my friend Rhonda, Michelle,
2     Lavera, Johnny, the guy that was doing the
3     renovations. We were picking out paint
4     colors. We were doing everything. I mean, we
5     were renovating the office.
6  Q. So in terms of the magistrate office, it was
7     just simply Lavera that was with you?
8  A. Well, Michelle. I guess -- yes, in terms of
9     the magistrates' office.
10 Q. And do you consider Michelle part of the
11    magistrates' office?
12 A. Well, I consider myself a part of it, too.
13    So, yes.
14 Q. So you and Michelle and Lavera was the only
15    ones associated with the magistrates' office
16    that was going around picking offices?
17 A. Or -- yeah, I was showing them where stuff
18    needed to go. Lavera did not assign offices.
19 Q. Upon what did you base your decision to give
20    Eunice office number one?
21 A. It was not based on -- I didn't base it on
22    ethnicity or --
23 Q. Well, upon what did you base it on?

Page 214

1  A. -- acoustics. I mean, just --
2  Q. I'm not asking you what didn't you base it on.
3     MS. NELSON: He's just saying how did you
4        determine.
5  A. I just -- I don't know. I just said, we need
6     -- this is --
7  Q. Just arbitrary?
8  A. It was very just --
9  Q. And the same thing --
10 A. Not designed.
11 Q. -- for office number two? What about number
12    two; that was arbitrary, too?
13    MS. NELSON: Object to the form. She
14       never said it was arbitrary. That was
15       your word.
16    MR. JAFFREE: Well, she said number one
17       was arbitrary.
18 A. Random. Random is a better word than
19    arbitrary.
20 Q. Office number one was random. Was office
21    number two random?
22 A. Yes.
23 Q. And it just so happens that Lavera and

Page 215

1     Eunice's office was next to each other
2     randomly?
3  A. Yes.
4  Q. And upon what basis was office number three
5     selected?
6  A. I was just -- I was going around. I didn't
7     give it any thought as to --
8  Q. No thought.
9  A. -- seniority or logistics or anything.
10 Q. Well, what about Mary Turner's lack of an
11    office; was that random?
12 A. Well, she did not have an office. She was
13    assigned to the front window, so that whole
14    area -- she had a rocking chair up there. She
15    had all kind of stuff but she didn't --
16 Q. That was suitable --
17 A. -- go into an office.
18 Q. Because she had a rocking chair, that would
19    make up for --
20 A. No. I mean, she made that little area --
21 Q. -- not having an office? I'm sorry. Because
22    she had a rocking chair, that would make up
23    for her not having an office?

Page 216

1  A. No. No.
2  Q. Was there a reason you mentioned a rocking
3     chair?
4  A. No. She -- she made her -- put all her stuff
5     up there. She was assigned to the front
6     window. That was her eight to five
7     assignment. So I mean, where would she have
8     gone to her office? She had every -- a desk
9     there.
10 Q. She didn't need an office; your statement was
11    that Mary Turner didn't need an office?
12 A. My statement was that she had an office, but
13    she had space.
14 Q. Do you remember Nancy's testimony that you was
15    punishing Mary Turner for some altercation she
16    had had with Kai Davis at some meeting? Do
17    you remember Nancy's testimony to that?
18 A. Yes.
19 Q. She testified that you told her that?
20 A. Yes.
21 Q. Did you tell Nancy that you was punishing Mary
22    Turner by not giving her an office in
23    retaliation for what she may have done or not

54  (Pages 213 to 216)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



**Page 217**

1  done with respect to Kai Davis?
2  A. No.
3  Q. Didn't tell Nancy that?
4  A. No.
5  Q. She made that up out of thin air?
6  A. I don't know where she got it from,
7    Mr. Jaffree.
8  Q. Polluted air perhaps?
9    MS. NELSON: Object to the form, comment.
10 Q. Now, do you remember Nancy also testifying
11   that you had it as one of your priorities to
12   insure that the new person, Tonya Minifield --
13   is that her last name -- get a nice office?
14   Now you'd had an administrator on board
15   that, according to you, have discretion and a
16   whole host of things. Did you direct Nancy to
17   give Tonya Minifield a nice office?
18   MS. NELSON: Object. Not so much to that
19     question but to all the prior
20     commentary before.
21 A. I guess my point is, we gave Valarie a bigger
22   office.
23 Q. Do you understand the question?

**Page 218**

1    MS. NELSON: He asked about Tonya. Ask
2      the direct question about Tonya. Did
3      you direct Tonya -- what was the
4      question?
5  A. No, I did not direct Nancy to give --
6    MR. JAFFREE: Do you want to take over my
7      chair now and ask her?
8    MS. NELSON: No. But you just go into
9      this long commentary, which I don't
10     agree with and that is not a
11     question. But it finally led to a
12     question which was, did she direct
13     Tonya and something.
14 Q. Did you recommend Tonya for any particular
15   office?
16 A. No.
17 Q. Did you tell Nancy that you wanted Tonya to
18   have an office?
19 A. An office?
20 Q. Yeah, any office?
21 A. Any office?
22 Q. Any office.
23 A. Yes, I'm sure did. I don't know.

**Page 219**

1  Q. Did you recommend an office --
2  A. No.
3  Q. -- for Tonya?
4    Did you suggest that you wanted her to
5    have an office to which she would be pleased?
6  A. No.
7  Q. Well, what exactly did you tell Nancy with
8    respect to Tonya's office, to the best of your
9    recollection?
10 A. I don't remember anything specific about
11   Tonya's -- giving Tonya a special office or an
12   office. There were office -- there was office
13   space back by the kitchen that was not being
14   used. It's a huge office. I think
15   Valarie has -- so I said, you know, you
16   wouldn't have put -- if I had brought Tonya in
17   and put her in that huge office, then they
18   would have really complained. So we put
19   Valarie in the huge office in the back and
20   gave her Valarie's other office.
21 Q. Why did you busy yourself with what kind of
22   office Tonya got?
23 A. Because we were renovating -- the offices

**Page 220**

1  weren't complete. The building was in the
2  process of being renovated. We had to go back
3  to the commission and ask them to let us
4  continue on with the building. You see, we
5  had run out of space. We had to go back to
6  them and ask them to let us continue on
7  renovating.
8  Q. Well, didn't you have an office that was sort
9    of unoccupied at the time?
10 A. Where?
11 Q. Well, I don't know. Nancy testified
12   about -- let's see. Oh, what about this area
13   designated as ten; could that be an office?
14   (Brief pause)
15 Q. Well, just so I'm clear, you did not dispute
16   that you had a discussion with Nancy about
17   where Tonya should be placed.
18 A. I dispute specifically about Tonya. The big
19   thing was getting additional renovations done
20   to the office. I don't see that I would have
21   taken time to go up there and say, give Tonya
22   a special office.
23 Q. Now, was --

55  (Pages 217 to 220)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

1  A. No, I -- yes, I dispute that. I'm sorry.
2  Q. Well, was Tonya white or black?
3  A. Black.
4  Q. And she was new; is that correct?
5  A. New in terms of -- I don't understand the
6     question.
7        MS. NELSON: Clarify your question. New
8        in terms of what?
9  Q. In terms of her seniority with respect to
10    other magistrates?
11  A. She was a newer employee, yes.
12  Q. Was it your policy that if any staff member
13    have a complaint against Nancy, they could
14    come directly to you?
15  A. No.
16  Q. What was the proper protocol?
17  A. I don't know that there was one. They try to
18     work it out with -- with their supervisor, I
19     would hope, before they would come to me.
20  Q. But you didn't have a protocol?
21  A. I asked that complaints be put in writing to
22     cut down on the ying-yang.
23  Q. You do acknowledge that you asked that

Page 222

1     complaints be put in writing?
2  A. I told -- yes, I said that they need to be in
3     writing.
4  Q. Do you also acknowledge that you said
5     complaints that's not in writing wouldn't be
6     given any serious consideration?
7  A. I don't remember saying that.
8  Q. Could you have said that?
9  A. To whom?
10  Q. To Nancy.
11  A. I don't remember specifically saying that, but
12     I would have preferred that they be in
13     writing.
14  Q. You'd have preferred that they be in writing?
15  A. Yeah. If they gave me a serious complaint, of
16     course. But, yeah, needed to be -- I would
17     prefer in writing.
18  Q. But the protocol is that they should go to
19     Nancy first?
20  A. Or whomever their supervisor was unless she
21     was in court.
22  Q. Now, Nancy had been hired but didn't start at
23     the time that you was interviewing Tonya,

Page 223

1     right?
2  A. No.
3  Q. No what?
4  A. Tonya had been interviewed before we ever
5     hired Nancy.
6  Q. So you dispute Nancy's contention that she
7     wanted to sit in on the interview with Tonya?
8  A. I dispute that Nancy ever asked me could she
9     sit in on an interview with Tonya, and I said,
10     no, you can't.
11  Q. Well, I guess if Tonya was already hired
12     before you interviewed Nancy --
13  A. She was already interviewed.
14  Q. Interviewed. Did you have any subsequent
15     interviews with Tonya?
16  A. I don't -- I don't think so. We had
17     interviewed her, and she was on the list.
18     She -- we interviewed more than one person
19     from that list.
20  Q. So Nancy is making up this business about
21     wanting to be in on the interview with Tonya?
22  A. Nancy is lying if she said that I told her,
23     no, you cannot sit in on this interview.  I

Page 224

1     never said that.
2  Q. Do you recall responding to anything saying
3     that Nancy had not just started and that's why
4     she was not in on an interview; do you recall
5     whether you responded --
6  A. No, I think --
7  Q. -- anywhere saying that?
8  A. No. What I think I -- my testimony was --
9     what I remember thinking was that Tonya had
10     been interviewed before Nancy was hired or
11     before she was -- she might have been hired to
12     do the weekend stuff when she would come in
13     on -- she was still full-time with Legal
14     Services Monday through Friday.
15        So she was working on the weekends with
16     HTE, who was coming down from Kentucky to meet
17     with her. And we had -- we had already
18     interviewed the candidates for magistrate
19     before she came on board full time is my
20     under -- is my recall.
21  Q. Well, could you be mistaken when you say that
22     there was no interviews of Tonya subsequent to
23     Nancy's interview?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



# FREEDOM COURT REPORTING

Page 225

1  A.  That I did not interview Tonya after Nancy was
2      hired?
3  Q.  After Nancy was interviewed.
4  A.  I don't recall that.
5      MS. NELSON:  After she was interviewed?
6  Q.  I think your testimony was after Nancy was
7      interviewed.
8  A.  Maybe after Nancy was interviewed but not
9      hired?
10 Q.  Well, I'm trying to see what your testimony
11     is.
12 A.  I'm confused about your question.
13 Q.  I don't want you to be confused.
14 A.  I am.
15 Q.  I'm not trying to lead you down a primrose
16     path.  I just want to see what your testimony
17     is.
18 A.  My testimony is that we'd already interviewed
19     Tonya before Nancy was hired or came on board
20     full-time.
21 Q.  But not necessarily before Nancy got
22     interviewed?
23     MS. NELSON:  Do we know when Nancy got

Page 226

1      interviewed?
2  Q.  Well, let's just assume that Nancy got
3      interviewed in December.
4      MS. NELSON:  Well, I don't want to assume
5      anything.
6  Q.  Well, do you know whether or not she was
7      interviewed before Nancy was interviewed?
8  A.  I don't know.
9  Q.  Now, you don't know.
10 A.  Before she was interviewed or hired?
11 Q.  Before Nancy was interviewed.
12 A.  I -- no.
13 Q.  So Nancy submitted to these two interviews
14     before groups of people before she was hired?
15     I think Nancy said she rejected the job when
16     it was first offered.  Do you dispute that?
17 A.  I don't dispute that.  I remember there was
18     something about she wanted more money.
19 Q.  Now, you mentioned something that sort of went
20     past me at the time you mentioned it, but
21     suddenly is waving a red flag.
22     MR. JAFFREE:  Sorry for the commentary.
23 Q.  But you said Nancy was not honest about her

Page 227

1      background or experience or something.  What
2      was Nancy not honest about during the
3      interview process?
4  A.  Not the interview process.  I just understood
5      Nancy that she -- her supervisory experience
6      at Legal Services --
7  Q.  What supervisory experience did Nancy indicate
8      that she had?
9  A.  She told me that she did everything, that you
10     didn't do anything, that you wouldn't fire
11     anybody, that she had to do everything in that
12     office.
13 Q.  She fired people as well?
14 A.  And that's why she left because she was tired
15     of doing everything.
16 Q.  Okay.  So you're saying that maybe she
17     embellished --
18 A.  Yes.
19 Q.  -- her role, or maybe she's telling the truth?
20 A.  Maybe she is.  That she had to do --
21 Q.  So upon what do you base your --
22 A.  Well, then we found out there was one
23     receptionist in the office, and I don't -- I

Page 228

1      think she embellished the extent of her
2      management experience because she was not
3      office manager.  She was executive secretary
4      by her own testimony --
5  Q.  Well, did she tell you --
6  A.  -- yesterday.
7  Q.  -- that she was executive secretary; do you
8      have her resume?
9  A.  No.  She said she was the office manager, is
10     what she told me.
11 Q.  Okay.  But did you get her resume and it say
12     office manager or executive secretary?
13 A.  I have not looked.
14 Q.  But if she said executive secretary, then --
15 A.  It would have led me to believe that she was
16     not the office manager.  There's a
17     distinction.
18 Q.  Did you -- you know that she was a secretary
19     of sorts and --
20 A.  She told me she was an office manager.
21 Q.  -- not an attorney, correct?
22 A.  She told me she was over the attorneys, that
23     she managed them.



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 229

1  Q.  You think a layperson can be over an office of
2     attorneys?
3  A.  She said she was the office manager, that she
4     managed the office.
5  Q.  Were you aware --
6  A.  That she assigned cases and that she fired
7     people.  That's what --
8  Q.  She told you that she assigned cases?
9  A.  Yes.  She said she fired people because you
10    wouldn't do it.  She had to go in there and do
11    it for you and that she had to do everything.
12 Q.  She told you that she fired people?
13 A.  Nancy told me all that.  She told me she
14    supervised the secretaries.  She supervised
15    the --
16 Q.  Well, did you consider --
17 A.  -- intake coordinator.
18 Q.  Did you consider contacting her current
19    employer and verifying what Nancy was saying?
20 A.  No, I believed her.
21 Q.  You believed that she was firing attorneys?
22 A.  No.  She had the hiring and firing of people.
23 Q.  Hiring and firing attorneys?

Page 230

1  A.  That what she said.
2  Q.  You believed that?
3  A.  Yeah.  Said she was an office manager.  She
4     said that you told her to do it because you
5     didn't want to do it.  She had to do
6     everything in that office.
7  Q.  Well, anyway, can we now move -- by the way,
8     can we get an identification?  Do we have one
9     on that A-Advantage Bonding Company Complaint?
10    (Brief pause)
11 Q.  I noticed that Nancy wasn't asked all of that
12    yesterday.  But I'm curious how she would
13    respond if she was asked.
14 A.  I am, too.
15    MS. NELSON:  What number are you marking
16    now?
17    MR. JAFFREE:  Number 6.  I'm sorry.
18    (Plaintiffs' Exhibit 6 was marked
19    for identification.)
20    THE WITNESS:  Can we take one second?
21    MR. JAFFREE:  Yeah.
22    (Brief recess)
23 Q.  Let me show you what is marked as Plaintiffs'

Page 231

1     Exhibit 6, and ask you, prior to today, have
2     you ever seen that document?
3  A.  I don't remember specifically seeing this
4     document, no.
5  Q.  But you could have seen it?
6  A.  It says on here that Nancy called me to
7     discuss the complaint.  And that might be
8     where my knowledge of it comes from.  I don't
9     remember specifically seeing this.  And it
10    looks like the original.  So I don't remember
11    seeing it.  No.  Specifically, no.
12 Q.  Well, if that was the original, who would it
13    come to first?  I mean, the envelope would
14    have been sent to who?
15 A.  I'm not sure.
16    MS. NELSON:  You assume there is an
17    envelope.  I object to the form.
18 A.  Yeah.  I really don't know.
19 Q.  Okay.  Well, did Nancy bring the facts of that
20    to your attention?
21 A.  She said she did.  I know that there was a
22    complaint by Advantage about bond -- about
23    bonding stuff.  But also he complained about

Page 232

1     the court docket, so it would have been
2     forwarded to her because all these were things
3     under her purview, the docket and -- you know,
4     she was their supervisor.  And he said -- it
5     says here he gave her a copy.
6  Q.  Do you remember Ms. Brackin's testimony that
7     she talked to you about that complaint as
8     well?
9  A.  I don't remember her testimony saying that,
10    and I don't know when she would have had
11    occasion to talk to me about it.
12 Q.  And because somebody from A-1 had
13    contacted her since Lavera didn't have the
14    time to fool with it?
15    MS. NELSON:  Object to the form.
16 A.  Not specifically.
17 Q.  Do you dispute Nancy's note that's on there?
18 A.  That she called me?
19 Q.  Well, you want to read the entirety of the
20    note?
21    MS. NELSON:  Well, why don't you read the
22    note.
23 A.  "Complaint filed by Rickey Stokes.  Nancy

58  (Pages 229 to 232)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 233

1  called judge to discuss complaint. What would
2  happen now? Judge laughed and said nothing
3  would be done because Rickey was always
4  causing trouble. She said I should just not
5  worry about the complaint."
6  Q. Is that something that you would have
7  remembered had you said?
8  A. Yeah. I would have forwarded it to Nancy to
9  handle. This was her department. She's the
10  supervisor.
11  Q. Did you recommend that Nancy -- well, let's
12  back up because maybe Nancy didn't have the
13  authority to do this.
14  Did you consider having the police
15  department internal affairs do an
16  investigation?
17  A. Of?
18  Q. Of Rickey's complaint.
19  A. No. I mean, I would have forwarded it to
20  Nancy who was the supervisor at that time to
21  handle.
22  Q. Would you have made a recommendation?
23  A. That what?

Page 234

1  Q. That internal affairs do an investigation?
2  A. I don't see where -- would I have made a -- if
3  I had gotten this letter -- if I had gotten
4  this complaint, would I have asked internal
5  affairs to investigate it?
6  Q. Well, what if you had got a complaint that
7  says Lavera refused to act on it and didn't
8  care whether or not somebody was being
9  wrongfully arrested or not?
10  MS. NELSON: Object to the form.
11  Q. Would that have triggered --
12  A. It's just hypothetical.
13  Q. Would that have triggered an internal
14  investigation? Well, it's not hypothetical
15  when somebody testifies to that.
16  A. That somebody was wrongfully arrested and
17  Lavera said she didn't care?
18  Q. Didn't have time to deal with it.
19  A. I don't think that was her testimony. She
20  said he could have been. Somebody could have
21  been wrongfully arrested.
22  Q. Okay. Somebody could have been, but she
23  didn't -- she didn't want to intercede to

Page 235

1  prevent that from happening. Apparently, the
2  only thing that prevented it from happening is
3  Mary Brackin's intervention, correct?
4  MS. NELSON: Object to the form.
5  A. Well, that's what Mary Brackin says.
6  Q. But do you dispute what Mary Brackin said?
7  A. That she's the only thing that prevented this
8  person from -- I have no personal knowledge of
9  this.
10  Q. Do you dispute that Mary Brackin said she
11  talked to you about this and you said
12  something to the effect that --
13  MS. NELSON: Talked to her about what,
14  now? There are about five things on
15  this exhibit.
16  Q. Talked to you about the fact that you came to
17  Lavera and she didn't want to bother with it?
18  MS. NELSON: Wait. That who came to
19  Lavera?
20  MR. JAFFREE: Someone from A-1 came to
21  Lavera complaining, maybe Rickey
22  Stokes came to her directly.
23  MS. NELSON: And what's your question; did

Page 236

1  the judge know about this?
2  Q. Well, she testified that she talked to you
3  about that. Do you dispute that?
4  A. I don't remember specifically.
5  Q. So she could have?
6  A. I mean, yeah, she could have but --
7  Q. And she's testified that you blew her off.
8  A. Who?
9  Q. Mary Brackin testified that you blew her off.
10  MS. NELSON: Object to the form. And the
11  testimony was not stated that way.
12  Q. Could you have blown her off?
13  MS. NELSON: Object to the form.
14  A. Not if somebody was about to get wrongly
15  arrested. I mean, I would have told her to
16  look into it, find out what's going on.
17  Q. But you wouldn't --
18  A. That's not something I would have encouraged.
19  Q. You wouldn't care that --
20  A. Yes, I would have cared.
21  Q. -- Lavera didn't care about it?
22  A. Yes, I would have cared. If there was a
23  possibility that somebody could have got

59 (Pages 233 to 236)



# FREEDOM COURT REPORTING

## Page 237

1  arrested, booked, charged, yes, I would have
2  cared.
3  Q. Okay. Do you recall Nancy testifying that you
4  told her you wasn't going to do anything about
5  it because this bonding company was always
6  causing problems?
7  A. I remember her testifying to that.
8  Q. Do you dispute you told her that?
9  A. I -- yes. Because I think I would have
10  forwarded it to her to handle --
11  Q. And that --
12  A. -- if I'd gotten it.
13  Q. And that Lavera does a good job. I'm sorry.
14  I'm talking over you.
15  Also, that Lavera does a good job handling
16  alias warrants and that this company wasn't
17  worth giving a second glance to?
18  A. No, I dispute saying this company is not worth
19  giving a second glance to.
20  Q. Do you remember Nancy's testimony with respect
21  to Don Thompson's complaint about Get Out
22  Bonding?
23  A. I remember her testimony, yes.

## Page 238

1  Q. And her testimony was that you said that he
2  was lying and that she shouldn't believe half
3  of what he had to say?
4  MS. NELSON: Object to the form. I don't
5  understand the question.
6  A. And I don't remember that being her
7  testimony. She said that I called him, and I
8  said that's not what he -- he didn't tell me
9  what she said, he said. But I don't remember,
10  but that wasn't her testimony yesterday.
11  Q. So you don't dispute her testimony from
12  yesterday?
13  A. You're mischaracterizing her testimony.
14  That's not what she testified to yesterday. I
15  remember what she said because I was kind of
16  astonished at it.
17  Q. Do you remember her testifying that she said
18  that Sarah complained that you would not
19  permit her to do final forfeitures against Get
20  Out Bonding?
21  A. I deny that. I don't -- I deny that.
22  Q. You dispute that.
23  A. I -- yes, I deny that. Dispute and deny that.

## Page 239

1  Q. Well, isn't it true that Get Out Bonding was
2  allowed to ride on several possible bond
3  forfeitures?
4  MS. NELSON: Object to the form.
5  A. I deny -- ride on them?
6  MS. NELSON: What do you mean by "ride."
7  Q. Well, I meant that steps were not taken to try
8  to forfeit the bond from Get Out Bonding quite
9  frequently?
10  A. The only time I -- no. I deny -- I mean, not
11  for any -- I mean, if there was a reason, yes,
12  like any other bonding company.
13  Q. Do you dispute that you treated Get Out
14  Bonding like a sacred cow?
15  A. I do dispute that. Yes, I dispute that.
16  Q. But you didn't give them preferential
17  treatment?
18  A. I deny giving Get Out Bonding preferential
19  treatment or any other bonding company in the
20  City of Dothan.
21  Q. Your attorney will stop me if I'm wrong, but I
22  think she have stipulated that you agreed that
23  staff had complained to you about Get Out

## Page 240

1  Bonding?
2  A. That staff had complained to me?
3  Q. That Nancy --
4  MS. NELSON: I never stipulated to that.
5  MR. JAFFREE: Well, I've got it in writing
6  something. I'll show it to you.
7  MS. NELSON: It's what Nancy --
8  MR. JAFFREE: I sent you an e-mail, and
9  you said something like we agree to
10  stipulate that they made complaints
11  about Get Out Bonding, something to
12  that effect.
13  MS. NELSON: I think I stipulated
14  something to the fact that Nancy
15  raised the question as to why so many
16  people in the jail were using Get Out
17  Bonding, something to that effect.
18  But you can ask the judge. I
19  didn't say -- I didn't stipulate to
20  any characterization as you just put
21  it.
22  Q. Was Get Out Bonding owned by a black person?
23  A. I think the owner was black, yes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



# FREEDOM COURT REPORTING

Page 241

1  Q.  What was the owner's name?
2  A.  I don't remember the owner's name.
3  Q.  Do you know the owner?
4  A.  No, I never met the owner.
5  Q.  Is that the only black bonding company in the
6      City of Dothan as far as you know?
7  A.  As far I know, yes -- no.  No.
8  Q.  It's not the only one?
9  A.  No.  Jan Bouier has been in business for 50
10     years.  B-O-U-I-E-R.  And he has a -- he's
11     black.
12 Q.  Isn't it true that you have heard rumors that
13     you and Get Out Bonding was in cahoots?
14 A.  Only from Nancy.
15 Q.  You've heard rumors from Nancy?
16 A.  No.  I heard her yesterday say we were in
17     cahoots.
18 Q.  Did you ever deny Sarah Fowler the right to do
19     final forfeitures against Get Out Bonding?
20 A.  I never denied Sarah the right to do -- I did
21     final forfeitures if Sarah couldn't do them.
22 Q.  And -- or whatever role she played in that.
23     And if she testifies differently, you'd

Page 242

1      dispute that testimony?
2  A.  I do dispute that.
3  Q.  Do you remember Nancy's testimony with respect
4      to Sergeant Woodruff?
5  A.  Yes.
6  Q.  What is your recollection of the testimony?
7  A.  Something about problems with the warrants
8      having to be -- no.  I don't remember.
9      Something about warrants taken to the jail,
10     and then the jail couldn't find them or
11     something.
12 Q.  This problem concerning Lavera, do you
13     remember that?
14 A.  I thought she said Eunice took 30 warrants to
15     the jail.  But, no, I don't remember anything
16     specific other than that.
17 Q.  Well, if Nancy testified that Sergeant
18     Woodruff complained about alias warrants for
19     court referral defendants who were not
20     compliant and that she had discussed this with
21     Lavera who was responsible but the problems
22     continued, would you dispute that Sergeant
23     Woodruff ever complained about Lavera?

Page 243

1  A.  To me?
2  Q.  To Nancy or you?
3  A.  I -- I don't remember specifically, no.  I
4      would not know whether she complained to Nancy
5      or not.
6  Q.  Did Sergeant Woodruff ever complain to you?
7  A.  I know there was a computer problem with the
8      warrants.  I don't remember specifically
9      because she executes warrants.  And that's her
10     connection to them.
11 Q.  Do you remember at my request -- but I could
12     be wrong about how this came about -- Nancy
13     talked yesterday about who would take over
14     Lavera's job duties when she had be on leave
15     for a hysterectomy?
16 A.  Yes, I remember her testimony about that
17     yesterday.
18 Q.  And that she had selected Mary Turner, and
19     Lavera was very upset over that.  I'm sorry.
20     Nancy selected Mary Turner, and Lavera wanted
21     Eunice and Tonya to take over.
22 A.  I remember her testimony about that.
23 Q.  Now, Lavera came to you and complained about

Page 244

1      that, correct?
2  A.  I don't remember that.
3  Q.  Could that have happened?
4  A.  I don't remember it if she did.
5  Q.  Do you remember talking to Nancy about this?
6  A.  Not specifically, no.
7  Q.  You don't recall telling Nancy that she really
8      should let Eunice and Tonya take over?
9  A.  No.  I remember it was Nancy's policy that
10     each person had to get somebody to cover for
11     them.  If they did not, she -- they were to be
12     disciplined.
13 Q.  Yeah.
14 A.  So if she had gotten somebody to cover for her
15     in accordance with Nancy's policy, I might not
16     have understood why Nancy would then want to
17     say no, you can't do that because she wanted
18     to discipline them if they were off and did
19     not get somebody to cover for them.
20     Did you remember her saying that
21     yesterday?
22 Q.  Well --
23 A.  So it was kind of different treatment when it

61 (Pages 241 to 244)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 245

1    came to that.
2  Q.  Well, I don't recall any discipline. I recall
3    her testimony was that she had selected Mary
4    Turner to do it. And Lavera was --
5       MS. NELSON: Well, Judge is right.
6      Nancy's testimony yesterday was that
7      if somebody was going to be out, she
8      expected that employee to arrange for
9      their own duties to be covered.
10     MR. JAFFREE: I remember her testimony.
11  Q.  But that's not my question. I remember your
12    counsel was just appalled that Nancy would do
13    that as opposed to make assignment herself.
14    But in this case, apparently, Nancy decided to
15    make the assignment herself.
16  A.  In this case, not in all the other ones, is
17    what she's saying.
18  Q.  Well, that's what I'm saying.
19  A.  So --
20  Q.  So Nancy shouldn't have done it in this case;
21    is that what you're saying?
22  A.  Did she do it in all other cases? In all
23    other cases, the person had to get somebody to

Page 246

1    cover for them.
2  Q.  Well, what is --
3  A.  That's your client's testimony.
4  Q.  And you're going to hear this again, but what
5    is the mischief in Nancy assigning someone to
6    take over Lavera's job while she was out with
7    her procedure as opposed to Lavera selecting
8    somebody? Well, what is the mischief in Nancy
9    doing that?
10     MS. NELSON: I object to the form. I have
11      no idea what you mean by "what is the
12      mischief."
13  Q.  Well, do you understand what I mean?
14  A.  Not as far as mischief, no.
15  Q.  Well, what do you think I mean?
16  A.  I don't know what you -- I don't know.
17      Nancy had a policy that if you were to be
18    out, you had to get somebody to cover your job
19    or --
20  Q.  I understand that.
21  A.  -- you will be disciplined.
22      Let me finish now because you asked.
23    That was her policy. If you were out and

Page 247

1    you didn't get somebody to cover, you were
2    disciplined. That was her policy, and I tried
3    to support her in that. And Carol Sue asked
4    her about that yesterday.
5      Now, Lavera was going to be out. She got
6    somebody to cover, whoever it was. But Nancy
7    said, no, you -- I'm going to assign who
8    replaces you. And so that -- everybody else
9    she -- I mean, it was a contradiction in her
10    policy. But I don't remember the --
11  Q.  Well, could it be a modification in her
12    policy? I mean, what point are you making
13    because of this --
14  A.  I'm not making -- I'm going by your client's
15    testimony.
16  Q.  Well, my client's testimony --
17  A.  I don't have any direct knowledge.
18  Q.  My client's testimony that her policy was
19    absolute, unequivocal, and never change,
20    immutable? Was that her testimony?
21  A.  I don't remember.
22  Q.  I don't remember either.
23  A.  Me either.

Page 248

1  Q.  But, certainly, was it her prerogative to
2    alter her policy?
3  A.  Yes, it was I guess.
4  Q.  And was it your prerogative to alter your
5    policy as well?
6  A.  I didn't alter it.
7  Q.  But if you had a policy, can you alter it?
8  A.  If -- generally?
9  Q.  Do you have the power to alter your own
10    policy?
11  A.  Anybody does, Mr. Jaffree.
12  Q.  Not quite anybody, but maybe their own policy
13    they did.
14  A.  Right. That's what you asked me, did I
15    have --
16  Q.  So there was no mischief to be prevented in
17    having Nancy change her mind, was there?
18     MS. NELSON: Object to the form. I still
19      have no idea what you mean.
20     MR. JAFFREE: You don't understand what
21      mischief mean?
22     MS. NELSON: I don't.
23     MR. JAFFREE: You don't have a clue? All



# FREEDOM COURT REPORTING

Page 249

1    right.
2    MS. NELSON: Well, I know maybe like
3    tomorrow night for trick-or-treat
4    there may be some mischief. But --
5  Q. But do you remember Nancy bringing to your
6    attention a complaint by Valarie Savage
7    against Lavera; this complaint took place on
8    or about April the 15th?
9  A. Not specifically.
10  Q. And that you took Lavera's side in the
11    complaint? It was dealing with some bonds --
12    changing bonds while Lavera was on call?
13  A. While she was on call? Is that a question?
14  Q. Do you remember that's her testimony that she
15    had complained? As a matter of fact, I think
16    Lavera did a memo objecting to the complaint,
17    but you subsequently took Lavera's side?
18  A. I don't remember that specifically, no.
19  Q. Would you dispute that that could have
20    happened?
21  A. I don't think I would have taken sides.
22    MS. NELSON: Object to the form. I'm not
23    clear about the question.

Page 250

1  A. I don't remember what happened.
2  Q. Do you remember that sometime in July of 2004,
3    Nancy sent a memo to Eunice regarding a bond
4    changing procedure, that Eunice was very
5    angry, and she went to you? Sorry. Back up.
6    That she sent Nancy a memo saying that Nancy
7    didn't have the authority to change bond
8    procedure. Nancy thought this memo was
9    insubordinate and discussed it with you, and
10    you felt that it was not insubordinate because
11    this was something new and Eunice was the
12    first one that she had sent a memo to. So you
13    put a stop to any insubordination.
14    MS. NELSON: I'll object to the form and
15    assumes facts not in evidence.
16  Q. Well, do you remember that factual situation?
17  A. No. No.
18  Q. But did it happen?
19  A. I don't remember. But she --
20  Q. Could have happened?
21    MS. NELSON: What happened? I'm not sure
22    what you're asking.
23  Q. Could it have happened that Nancy came to you

Page 251

1    about a memo that she received from Eunice
2    that she thought was insubordination because
3    Eunice had told Nancy that she don't have the
4    authority to do what Nancy was trying to do,
5    and Nancy consulted with you about whether or
6    not this memo was insubordinate. And you said
7    no.
8    Could that have happened?
9  A. That's not what she testified to yesterday.
10    She said I signed it.
11  Q. Well, did that happen as a fact.
12  A. I don't -- no. I don't remember that.
13  Q. So it could have happened?
14    MS. NELSON: I object to what could have
15    happened. She said she didn't
16    remember it happening.
17  Q. Well, see, your attorney didn't ask her every
18    question. Your attorney has left off some
19    stuff. I deliberately because of the lateness
20    of the day didn't cover a whole bunch of
21    things I was going to cover.
22    But I'm asking you, could that have
23    happened?

Page 252

1    MS. NELSON: I want to object to a
2    hypothetical question.
3  Q. But do you recall that; do you recall the
4    incident?
5  A. No. I heard her testify about it yesterday.
6  Q. All right. But do you recall Nancy ever
7    complaining to you about a memo that she
8    received from Eunice? Do you recall any
9    complaint like that?
10  A. Not specifically.
11  Q. So she could have?
12  A. Anything is possible. I don't remember her
13    specifically discussing a memo with me about
14    Eunice being insubordinate. But she said
15    yesterday that she did, and she that I upheld
16    her in it. She did not say that I put an end
17    to it. You said yesterday that I signed it.
18    I don't remember it, but that's what she said.
19  Q. Well, okay. Fine.
20    She also testified that she talked to you
21    about the numerous mistakes that Eunice and
22    Lavera makes, and I think she misspoke talking
23    about a hundred times more than. But that was

63 (Pages 249 to 252)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 253

1 sort of a term of emphasis as opposed to a
2 term of fact. But numerous times about the
3 errors that they made, and you indicated that
4 everybody makes mistakes.
5   MS. NELSON: Object to the form.
6 Q. Did you ever have that conversation with her
7   about not wanting to hear about mistakes that
8   Eunice and Lavera makes because everybody
9   makes mistakes?
10 A. I don't remember specifically.
11 Q. Do you remember the discussion that she had
12   with you about she felt that Eunice and Lavera
13   were being insubordinate because she did a
14   memo telling them not to use a certain door
15   for security reasons and they continued to do
16   it; and she discussed this with you as
17   insubordinate and you thought it was silly and
18   not insubordinate.
19     Did you have that discussion with her
20   about the use of the wrong door? Did you have
21   that discussion?
22 A. I want to answer truthfully. Yes, I had a
23   discussion with her about the door. And I

Page 254

1   told her to write them up if they continued to
2   go out the door, but she also had to write all
3   the other magistrates up that were going out
4   the door.
5 Q. You didn't tell her that you thought --
6 A. No.
7 Q. -- this was silly?
8 A. I -- I thought it was silly, but I supported
9   her in it. No, I did not tell her that.
10 Q. Well, you didn't tell her it was silly but you
11   thought it was silly?
12 A. I supported her in her rule about not going
13   out the back door.
14 Q. Isn't it true that during this conversation it
15   was just more than you and Ms. Martin present
16   but also Kai Davis was present? And Kai Davis
17   disagreed with you; she thought it was not
18   silly but as a practical reason for having one
19   door secured for security reasons, and that
20   you shouldn't have a policy of people going in
21   and out that door because there may be a
22   safety factor with other staff. So Kai didn't
23   agree with you at all that this was silly.

Page 255

1   Do you remember that discussion?
2   MS. NELSON: Object to the form.
3 A. I don't remember it.
4 Q. Do you remember Kai being present during this
5   discussion?
6 A. No, I don't.
7 Q. If Nancy stated that Kai was present, would
8   you be in a position to dispute that?
9 A. I don't remember.
10 Q. So they didn't get written up for
11   insubordination because of your intervention;
12   is that correct?
13 A. That's not correct. No.
14 Q. Let's back up for a second. And I'm sure you
15   remember this. Nancy was instructed to do an
16   evaluation of Lavera, and you expressed
17   displeasure with the markings and comments
18   that Nancy had made on the evaluation,
19   correct?
20 A. Displeasure. I don't -- I don't know that it
21   was displeasure. I was concerned.
22 Q. You was happy?
23 A. I was -- I was reticent. I was concerned.

Page 256

1 Q. Concerned. Is that the word you feel
2   comfortable with, concerned?
3 A. Yes.
4 Q. And that before you would sign off on this,
5   you went to two other people? Who did you go
6   to?
7 A. Three people.
8 Q. Who did you go to?
9 A. The personnel department.
10 Q. Let me stop you. Who in the personnel
11   department did you go to?
12 A. We were all together.
13 Q. Oh, all three of you together?
14 A. I asked them to help me look over it.
15 Q. You asked them as a committee to help you look
16   over --
17 A. No. We always go to Personnel about personnel
18   issues. Any issue, we go to Personnel.
19 Q. Who is "we" you're referring to?
20 A. I say "we." I can't say for all department
21   heads, but I do.
22 Q. On this occasion, who did you go to first?
23 A. Personnel.



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 257

1    Q.  I don't know what that means.
2    A.  The personnel department.
3    Q.  I don't know what that means.
4    A.  I can't be clearer.
5    Q.  Yes, you can.
6        MS. NELSON:  There's a personnel
7            department for the City of Dothan.
8            How much clearer --
9    Q.  Who?  The personnel department is a who?
10       MS. NELSON:  Who in the personnel
11           department?
12   Q.  The personnel department is a who.  Okay.
13       What individual in the "who" personnel
14       department did you go to?
15   A.  If I remember correctly, it was Martha
16       McClain.
17   Q.  Who is she?
18   A.  She is in the personnel department.
19   Q.  In what capacity?
20   A.  I'm not sure her title.
21   Q.  Now, what day-to-day responsibility does
22       Martha McCain have over -- what is Eunice's
23       last name -- I mean, Lavera's last -- Lavera

Page 258

1        McCain?  I'm suddenly drawing a blank.  Well,
2        what day-to-day responsibility does Ms. McCain
3        have on Lavera's job?
4    A.  None.
5    Q.  What day-to-day observation does Ms. McCain
6        have on Lavera's job performance?
7    A.  None.
8    Q.  Well, what was the rationale of going to
9        Ms. McCain --
10       MS. NELSON:  It's McClain, isn't it?
11   Q.  Ms. McClain.  I'm sorry.  Ms. McClain to get
12       an assessment of an evaluation of something
13       that she would have no role in evaluating and
14       no ability to observe?
15       MS. NELSON:  I object to the form.  It
16           assumes facts not in evidence.  And
17           she's never testified or you haven't
18           let her testify as to why she went to
19           Personnel.
20   Q.  Well, you want to testify as to why you went
21       to McCain?
22       MS. NELSON:  McClain.
23   Q.  Ms. McClain.

Page 259

1    A.  Are you asking me to?
2    Q.  Well, yeah.
3    A.  Because it was a personnel issue.  And any
4        time we have issues of personnel matters that
5        we don't understand -- and I say "we" as a
6        totality, as the department head.  And anytime
7        with personnel -- I have a personnel issue,
8        then I go to Personnel to try to get an answer
9        as to form, as to whether it's the correct way
10       to do things, anything involving a personnel
11       issue.
12   Q.  What was the personnel issue at play here?
13   A.  Well, there was several.  It seemed that
14       Nancy -- a lot of her comments were based on
15       third-party stuff that happened before she
16       came.
17   Q.  Which comments?
18   A.  Well, I asked her about the computer errors.
19       And she said, well, I understand Lavera chose
20       to take vacation instead of getting computer
21       training.
22       And I said, well, Nancy, how would you
23       know that?  You weren't here.

Page 260

1        That was before she was hired.
2    Q.  Well, that's --
3    A.  Hearsay.
4    Q.  -- a process question.
5        MS. NELSON:  You're asking her what she
6            disputed, and she's trying to tell you
7            from what she --
8        MR. JAFFREE:  Well, please let me finish.
9            We're talking about apples and oranges
10           here.  One thing is that she commented
11           about some errors, and then she
12           commented that maybe the errors came
13           about because of lack of computer
14           training.  But she don't need to know
15           that Lavera didn't have computer
16           training in order to observe computer
17           errors.
18   Q.  Is that correct?
19   A.  I don't know.
20       MS. NELSON:  You asked her to explain why
21           she took issue with some of the marks
22           on the evaluation, and she's trying to
23           tell you.

65  (Pages 257 to 260)



# FREEDOM COURT REPORTING

Page 261

1    MR. JAFFREE: No. She's telling me things
2        that --
3    MS. NELSON: You don't like what she's
4        telling you, so you're trying to
5        change her testimony and put words in
6        her mouth.
7    MR. JAFFREE: I don't have anything
8        against what she is telling me except
9        that the question on the floor was,
10       what is it that she didn't know that
11       resulted in the markings. The
12       markings of errors is something that
13       she could have known without having
14       knowledge that Lavera went to computer
15       training.
16   A.  Well, Nancy didn't -- she wasn't proficient.
17       She didn't know what they did. I didn't
18       understand how she could grade someone on
19       something she did not know how to do herself.
20       And I asked her about that.
21       And she said, well, Mary Beth said that
22       this is the way you're supposed to do it.
23       And I said, Nancy, you cannot base an

Page 262

1    evaluation on hearsay.
2    Q.  Well --
3    A.  You cannot do that. And I told -- I asked
4        her, I said, have you looked at her other
5        evaluations? Have you -- you know, she graded
6        her so far down that she would not have gotten
7        a promotional raise. And I knew that it was
8        appealable. I knew that anything based on
9        hearsay would be appealed. And to me, that
10       was a personnel issue. I really was trying to
11       guide her, you know, just talk to her and say,
12       how do you do that.
13   Q.  I'm a little confused on the hearsay part with
14       respect to --
15   A.  She kept saying what Mary Beth and --
16   Q.  Well, hold on. With respect to a -- for
17       instance, if something was supposed to be done
18       a certain way and Nancy feels that the way
19       that's been told to her makes sense but Lavera
20       was not doing it that way, I don't know how
21       that's a hearsay question.
22       But at the time you assigned Nancy to do
23       this task, you were aware, were you not, of

Page 263

1    limitations that Nancy had?
2    A.  I mean, she implied that she -- no. I
3        was -- I was not aware of all the limitations
4        that Nancy had when I hired her.
5    Q.  Well, I mean, what prior magistrate experience
6        did Nancy have at the time you hired her?
7    A.  I don't know. She implied that she'd been to
8        court, that she'd done all this stuff for
9        Legal Services and that she had all this
10       experience with court and -- and, you know --
11   Q.  Well, how --
12   A.  She implied that she --
13   Q.  What does Legal Services have to do with
14       municipal court?
15   A.  I don't know.
16   Q.  I mean, do you have any reason to think that
17       Legal Services get involved in municipal
18       court?
19   A.  I had no reason to think she would lie. Not
20       specifically municipal court. She just said
21       court.
22   Q.  Well, let's be practical here. By that time,
23       you had been the judge of municipal court for

Page 264

1    a few years; is that correct?
2    A.  Yes.
3    Q.  And for all practical purposes, you're the
4        only judge of municipal court; is that
5        correct?
6    A.  No.
7    Q.  For all practical purposes, you're the
8        principal judge?
9    A.  There are others.
10   Q.  Well, you're the only full-time judge --
11   A.  Yes.
12   Q.  -- of municipal court?
13   A.  Yes.
14   Q.  You have an opportunity to observe what
15       attorneys come over to municipal court?
16   A.  Yes.
17   Q.  You have an opportunity to observe what
18       support staff come over to municipal court?
19   A.  I don't know them all. No.
20   Q.  Other than for their own personal complaint or
21       ticket or misdemeanor, have you observed any
22       attorneys associated with Legal Services
23       litigating in municipal court?

66 (Pages 261 to 264)



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 265

1  A. I wouldn't know if they worked for --
2  Q. You wouldn't know. You wouldn't know if they
3     was with Legal Services or not?
4  A. Right.
5  Q. Did you have any reason to believe that Legal
6     Services attorneys are over there litigating
7     in municipal court?
8  A. I didn't know one way or the other.
9  Q. Had you observed Nancy coming over to
10    municipal court doing anything?
11 A. I don't remember.
12 Q. Upon what would you base your belief on that
13    Nancy had experience in municipal court?
14 A. Nancy said that she had extensive court
15    experience. She didn't necessarily say
16    municipal court.
17 Q. I see.
18 A. She said she went to court routinely and did
19    all this stuff for Legal Services.
20 Q. Well, could that be true and yet she lacked
21    the intimate knowledge of what goes on in a
22    day-to-day world of municipal court?
23    MS. NELSON: Object to the form.

Page 266

1  A. I guess the answer is yes.
2  Q. Are you now, just so we're clear on the
3     Record, trying to change issues and say Nancy
4     was dishonest in her application and that can
5     be a legitimate basis for the separation? Are
6     you trying to advance that theory.
7  A. No -- I'm -- I'm -- yeah. I am, yeah.
8  Q. Oh, now you're trying --
9  A. No. I'm saying she was misleading in her
10    experience and that it showed after she'd been
11    there for about a month, that she just wasn't
12    proficient in what she was doing.
13 Q. So after she'd been there a month, you're
14    quite --
15 A. Approximately.
16 Q. Approximately a month. You're quite certain
17    of this?
18 A. Approximately. No, I'm not certain of the
19    time.
20 Q. But it was quite evident quite early?
21 A. No, at first she --
22 Q. So now it wasn't evident quite early, it just
23    blossomed later?

Page 267

1     MS. NELSON: She's trying to answer your
2     question. She said she didn't know
3     the approximate time.
4  Q. I mean, was it within the first two months
5     somehow you was able to tell?
6  A. She never did grasp it.
7  Q. Or the first three months?
8  A. Never grasped it. But basically --
9  Q. So you was able to tell the deficiencies
10    immediately?
11 A. No, not immediately.
12    MS. NELSON: Object to the form.
13 Q. Well, how long does it take you to grasp the
14    deficiencies if you couldn't do it within the
15    first three months?
16    MS. NELSON: Object to the form.
17 A. I don't remember how long it took to notice
18    that she was not proficient.
19 Q. Well, pretty much from day one she wasn't
20    efficient.
21 A. Is that your statement or --
22 Q. Is that your statement?
23 A. No, that's not my statement.

Page 268

1  Q. What's your statement?
2     MS. NELSON: Y'all are just sort of
3     talking among each other. Ask her
4     questions. Ask her a question,
5     please.
6     MR. JAFFREE: I'm asking her a question.
7  Q. Was she deficient from day one or not?
8  A. No.
9  Q. So she --
10 A. She might have been. I just didn't notice it.
11 Q. So she blossomed into a deficiency. Can you
12    live with that statement?
13 A. No.
14    MS. NELSON: Object to form.
15 A. Her deficiencies were revealed as time went
16    on.
17 Q. I see. It took you awhile to notice it. Is
18    that your testimony?
19 A. They were revealed over time.
20 Q. It took you awhile to notice it?
21 A. No, they were revealed over time.
22 Q. But until they was revealed, they were
23    concealed?

67 (Pages 265 to 268)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 269

1      MS. NELSON: Object to the form.
2      MR. JAFFREE: I'm trying to find out what
3      this witness is saying.
4 A. Yes. Or hidden.
5 Q. Hidden. Hidden deficiencies. Okay.
6      So you went to personnel to ask them for
7      input in the evaluation. And who else did you
8      invite in for input?
9      MS. NELSON: Object to the form. Who
10      else -- I object to -- you know, I
11      don't know what you mean by "invite
12      in." Who did she go to besides
13      personnel?
14 Q. Would you like that question better; who did
15      you go to besides personnel?
16 A. Well, it's kind of a mischaracterization.
17 Q. I can borrow that question.
18 A. We were in the city manager's conference room,
19      and I asked for help, that I didn't know how
20      to address this personnel issue. I had a
21      supervisor that I thought was using hearsay
22      evidence in an evaluation who had not had a
23      long period of time to observe the person, who

Page 270

1      had no experience in what the person was
2      doing.
3 Q. Did you realize this before you went to these
4      people or after you met these people?
5 A. What?
6 Q. That you had a supervisor who was relying on
7      hearsay and was not in a position to give --
8 A. She told me.
9 Q. -- an evaluation?
10 A. I knew that before I went. I asked her why
11      did she grade them -- grade her like that.
12 Q. Well, if that's the case, help me here. Help
13      me see clearly. Why didn't you just take the
14      evaluation from her entirely and do it
15      yourself?
16 A. Because she was her supervisor.
17 Q. Well, she was her supervisor when you went to
18      these people seeking input.
19 A. On how to guide her into doing an evaluation
20      that was not based on hearsay using
21      her own -- using other tools.
22 Q. I'm a little bit confused because I know you
23      keep using the term "hearsay," but if she

Page 271

1      grabbed some old evaluations and looked at
2      them to somehow get some kind of direction,
3      would these old evaluations, based on your
4      experience as an attorney and a judge, be
5      hearsay?
6      MS. NELSON: Object to the form. There's
7      never been any testimony that --
8      MR. JAFFREE: That she asked her to go
9      look at old evaluations?
10 Q. You didn't testify to that?
11      MS. NELSON: Well, the judge never
12      testified that that was the hearsay,
13      that she went and looked at old
14      evaluations.
15 Q. I'm asking you, is that hearsay?
16 A. No. Well --
17 Q. You encouraged her to go look at old --
18 A. I found the totality of the circumstances --
19 Q. You was complaining about hearsay that she
20      relied on.
21 A. From people in the office.
22 Q. But you told her to go look at some hearsay.
23 A. From people in the office.

Page 272

1 Q. I see. So the old evaluations would be old
2      people that's not in the office anymore.
3 A. No. But they'll be written, documentary
4      evidence of that employee. I mean, she's
5      listening to what -- she said they told her
6      that Lavera chose to take vacation instead of
7      going to computer training. She had no
8      first-hand knowledge of that. She wasn't
9      employed there. She said that they told her
10      that Lavera left the office and was on the
11      phone all the time when she was gone. And I
12      said, Nancy, you can't use that.
13 Q. Did those comments come out in the evaluation,
14      that you're on the phone all the time? Was
15      part of evaluation? I didn't get a copy of
16      that evaluation.
17 A. I just remember her saying that they told her
18      that when she was gone --
19      MS. NELSON: Well, just a minute, now.
20      For the Record, Mr. Jaffree, you do
21      have that evaluation. And that
22      evaluation, I questioned your client
23      about yesterday.



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 273

1  MR. JAFFREE: Well, let me look. It is
2  conceivable that I have -- I got so
3  much stuff.
4  MS. NELSON: Well, I just wanted to make
5  it very clear; you do have that
6  evaluation. Don't say that I didn't
7  provide it to you.
8  MR. JAFFREE: I will dig through this
9  stuff to see. I certainly didn't spot
10  that one because I was trying to look
11  for it.
12  Q. But be that as it may, who else did you talk
13  to in addition to the person at personnel?
14  MS. NELSON: Would you like to see the
15  evaluation? Would that help you? It
16  seems like you have memory enough to
17  tell.
18  A. Yeah. Yeah, I remember that it was -- we were
19  in -- it was after department -- it was a
20  department head meeting. I don't know why we
21  were all in there together. But the
22  acting -- it was the city manager at the time,
23  Jerry Corbin was there. Martha McClain from

Page 274

1  personnel and John White who was the chief of
2  police.
3  And I was asking, how do you handle this
4  evaluation where the employee -- what I told
5  you. I was really trying to give guidance
6  on -- you know, I really was looking at it
7  more like helping her because I knew it would
8  be appealed if it was all based on third-hand
9  knowledge.
10  Q. And you knew this based on Lavera's prior
11  propensity for appealing?
12  A. No. I just knew that that was --
13  Q. You speculated or was it based on your
14  friendship with Lavera?
15  A. No. I just knew that she couldn't base an
16  evaluation on -- on what somebody told her
17  happened before she got employed.
18  Q. How would Lavera, independent of talking to
19  you, know that she had based that evaluation
20  on what other people have said?
21  MS. NELSON: Object to the form.
22  A. Because Nancy was clear that that's what she
23  was basing it on. She was not in charge --

Page 275

1  when she left somebody in charge, they were
2  doing this. And, you know, she -- she was
3  clear about that.
4  Q. But how would Lavera know that?
5  A. She said it -- I think, in the evaluation, she
6  said that they told her. She would have had
7  to go over the evaluation with Lavera.
8  Q. So that's what the said --
9  A. Yeah. I think on there it says something
10  about she -- they told her that she was making
11  personal phone calls. I don't know how it
12  came up in conversation. But I said --
13  Q. Well, I need --
14  A. -- you cannot base --
15  Q. I'd like to --
16  A. -- you cannot base it on -- on that.
17  Q. Well, okay. I'm going to try to get off of
18  this. But this committee that you went to,
19  did they --
20  MS. NELSON: Object to the form.
21  A. It was not a committee.
22  Q. Well, this group that you went to consisting
23  of the personnel director and who else?

Page 276

1  A. Personnel director was not there. I don't --
2  I don't remember her being there.
3  Q. Somebody in personnel. Who else?
4  MS. NELSON: She's testified who it was.
5  MR. JAFFREE: Well, I don't remember her
6  testimony.
7  Q. Can you tell me who else was there?
8  MS. NELSON: The city manager and the
9  chief of police.
10  Q. Okay. The chief of police was there? What
11  was the rationale for the chief of police
12  being --
13  A. He was a department head and he evaluated
14  people.
15  Q. I see. And he had a role in evaluating
16  Lavera?
17  A. No. It was his -- I was asking him a
18  general -- I was asking them, how you handle
19  a -- the situation. I didn't want to change
20  her evaluation. That was her evaluation of
21  Lavera, but I wanted to give her guidance on
22  what she could and could not use. And I
23  didn't know how to do that.



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 277

1  Q. You was determined that that evaluation not
2     stand; is that correct?
3  A. No. Because I could have just not signed it.
4     I could have not agreed with it. I had that
5     liberty to do that.
6  Q. Well, why didn't you just not sign it?
7  A. Well, because I wanted -- Nancy was her
8     supervisor. I didn't want to overrule her. I
9     just wanted to give her guidance on what she
10    could and could not use as an exact -- Nancy
11    was new to evaluating people.
12 Q. Okay. Now, were you satisfied with Nancy's
13    modification of the evaluation?
14 A. I -- I must have been. I don't remember.
15 Q. Now, which part of it -- the modified version
16    was not based on hearsay?
17 A. I don't remember.
18 Q. So even the modified version could have been
19    tainted with hearsay; is that your testimony?
20 A. I don't -- I don't remember. I don't know.
21 Q. You don't know. But you was satisfied with
22    the modified evaluation and you signed it
23    correctly; is that correct?

Page 278

1     MS. NELSON: She's looking at it. And if
2        you'd give her a chance to read over
3        it.
4        She's looking at Defendants'
5        Exhibit 16 to Nancy Martin's
6        deposition.
7        (Brief pause)
8  A. Now, what was your question, Mr. Jaffree?
9  Q. That you apparently was satisfied with the
10    changes that she made and you signed off on
11    it?
12 A. Yes, I assume.
13 Q. You were satisfied with the revisions and you
14    signed off on it?
15 A. I -- I don't know with the revisions. I just
16    signed off on what she told me she had
17    reviewed and could come up with, you know,
18    points to give her so that she wouldn't lose
19    her --
20 Q. You wanted some points, right? You wanted
21    Nancy to increase the points?
22 A. No. I wanted her to review the evaluation and
23    base it on her knowledge. Lavera had been out

Page 279

1     for surgery for eight weeks. Nancy had only
2     been employed a month before Lavera went out
3     or two months before. I mean, it just was a
4     lot of different things.
5        I wanted her to have a solid evaluation in
6     her hands when she did it. And I would
7     have done that with any employee if I thought
8     that, you know, there was a problem with it.
9     It wasn't because it was Lavera or because of
10    her race.
11 Q. Didn't Nancy do other people's evaluation on
12    or about the same time?
13 A. I don't know. If she did, we went over those,
14    too. I had to sign those, too.
15 Q. Sign, but did you go to a group with those?
16 A. I don't know if she had -- if I had problems
17    with it.
18 Q. And let's talk about this hearsay again
19    because was Nancy present when Ms. Brackin was
20    investigated for an incident of telling a
21    consumer something?
22    MS. NELSON: Object to the form.
23 A. Which --

Page 280

1  Q. Pardon?
2  A. Which time?
3  Q. The Fountain -- Fondren -- Founder, whatever
4     the name is?
5  A. I don't know that she was present. She was a
6     supervisor when the investigation was done --
7     was completed. She got the results of the
8     investigation as Nancy's supervisor -- I mean
9     as Mary Beth's supervisor.
10 Q. And so Nancy wasn't present when this incident
11    happened, so what Nancy put in was hearsay in
12    that evaluation; is that correct?
13    MS. NELSON: Object to the form.
14 Q. Ms. Brackin's evaluation.
15    MS. NELSON: She never -- we're not
16       talking about evaluation. We're
17       talking about a disciplinary action of
18       Mary Beth Brackin as opposed to an
19       evaluation for Lavera McClain over a
20       prior year's time period when she
21       hardly had the opportunity to evaluate
22       her.
23    MR. JAFFREE: We're also talking about she

70 (Pages 277 to 280)



# FREEDOM COURT REPORTING

Page 281

1    did an evaluation of Ms. Brackin, and
2    there was a entry put in about this
3    incident that she was wasn't present
4    for. Now, that incident was hearsay
5    because she was wasn't there when it
6    happened. And yet she put it in as if
7    somehow she knew about it.
8  A.  She got the results of the investigation. I
9    don't -- the incident might have happened.
10   But she -- as her supervisor, the results of
11   the investigation went to her.
12  Q.  Well, but she didn't interview anyone?
13       MS. NELSON: The discipline had taken
14       place. She was merely recording the
15       discipline.
16       MR. JAFFREE: Well, no, she was making a
17       statement of policy in that
18       evaluation. If you look at
19       Ms. Brackin's evaluation, she makes a
20       statement, positive statement. She
21       don't say as a result of an
22       investigation. She makes a positive
23       statement of a wrong that allegedly

Page 282

1    was committed.
2       MS. NELSON: I have no idea what you're
3       talking about.
4       MR. JAFFREE: I'm talking about
5       Ms. Brackin's evaluation.
6       Ms. Brackin's evaluation was done
7       fairly similar to the time that the
8       evaluation of -- matter of fact --
9       MS. NELSON: I would ask that you show
10      this witness the evaluation instead of
11      you sitting here testifying as to what
12      it purports to be.
13  Q.  Well, do you remember that evaluation; do you
14   remember a evaluation that she did --
15  A.  Not specifically.
16  Q.  -- of Ms. Brackin?
17  A.  Not specifically. I remember you mentioning
18   it.
19  Q.  All right. Well --
20  A.  Could you show it to me?
21  Q.  Well, not at this moment. But is it not true
22   that Ms. Martin did other people's
23   evaluations while -- while she was employed as

Page 283

1    the administrator?
2  A.  During her entire tenure or the first two
3    months she was employed?
4  Q.  Well, during her tenure?
5  A.  I'm sure she did.
6  Q.  But you did not intervene on any of these
7    other evaluations?
8  A.  I wouldn't say did I intervene. We -- we had
9    to go over each evaluation before she -- I
10   have to sign it as the reviewing authority.
11  Q.  You did not criticize her markings on any
12   other evaluation?
13  A.  I can't say that I did not. Not criticize.
14   But I might have asked her questions if she
15   graded really low. They like for us to give
16   specific examples of -- if you're going to
17   give somebody a one. Then you need to justify
18   why. So I might have asked her why did she
19   get one, did she have specific examples. I
20   was really trying to help Nancy be --
21  Q.  If she testifies that you didn't get her to
22   change any other evaluation from any other
23   magistrate, would you be in a position to

Page 284

1    dispute that?
2  A.  I don't think I got her to change this. I
3    just asked her to review it and use her
4    knowledge, not just what somebody -- not use
5    what somebody told her.
6  Q.  Do you remember her testimony that you said,
7    this is not a threat, but you are still
8    probationary?
9  A.  I don't -- I heard her say that yesterday.
10  Q.  Now, you see if you could go home, study this,
11   and bring me back something different.
12       MS. NELSON: Is your question, does she
13       remember Ms. Martin making that
14       statement?
15  Q.  Well, did you tell her that?
16  A.  No.
17  Q.  Did you tell anything closely approximated to
18   that?
19  A.  No. I -- I had a memo saying could you review
20   this or -- could you review this --
21  Q.  So her memory of that conversation and your
22   memory of that conversations differs?
23  A.  I never threatened her, if that's what she

71 (Pages 281 to 284)




Page 285

1     says, I threaten her with her job. That's
2     what she said yesterday.
3    Q. Well, you told her that this is not a threat
4     but --
5    A. That's what she says.
6    Q. Do you dispute that?
7    A. I do.
8    Q. You didn't say that? Didn't say anything like
9     that?
10    A. I could -- yeah. I dispute threatening her
11     with her job if she did not change Lavera
12     McClain's evaluation.
13    Q. And she changed that evaluation, didn't she?
14    A. Yeah, she did.
15    Q. And felt bad about it in the process, didn't
16     she?
17    A. I'm --
18     MS. NELSON: Object to the form.
19    A. I'm not aware that she felt bad about it.
20    Q. Well, according to you, did she not talk to
21     Lavera about it afterwards?
22    A. No. She told Lavera that she was threatened
23     if she didn't change it.

Page 286

1    Q. She told Lavera that?
2    A. And I objected to her telling another
3     employee --
4    Q. That she'd been threatened?
5    A. Yes.
6    Q. I see.
7    A. I thought it was unprofessional.
8    Q. Even if true?
9    A. Unprofessional. It wasn't true. I never
10     threatened her with her job.
11    Q. Well, did you bring an action against Nancy
12     for insubordination for telling another
13     employee a lie that allegedly you had
14     threatened her when, in fact, you hadn't
15     threatened?
16     MS. NELSON: Object to form.
17    A. I don't know if it was insubordination, but
18     I -- I remember being upset about her lying
19     about that.
20    Q. Well, what do you call that when some employee
21     tells another employee that you threatened
22     them of termination unless they
23     changed evaluation.

Page 287

1    A. I don't think that's insubordination.
2    Q. Well, what do you call it?
3    A. Lying. She lied. I never threatened her with
4     her job if she didn't change the evaluation.
5     As the reviewing authority, if I had not
6     signed the evaluation, she would have had
7     to -- it wouldn't have gone through anyway.
8     So I wouldn't have to threatened her with her
9     job.
10    Q. Let me try to move away from that evaluation.
11     THE WITNESS: Can we take a break?
12     (Brief recess)
13     MS. NELSON: If I could say one thing.
14     Please let my client answer the
15     question that's on the table before
16     her before you jump into another
17     question. I feel that the court
18     reporter is not being able to get down
19     her testimony accurately and
20     completely.
21     MR. JAFFREE: I'll try to be more careful
22     on that score.
23     All right. If we could resume.

Page 288

1    Q. Before I move on to another category, let me
2     ask, what role did Mr. Corbin have with city
3     magistrates?
4    A. He's the city manager. Nothing with the
5     day-to-day. He's our city -- the city manager
6     at the time.
7    Q. What other magistrate evaluation did you
8     permit either Mr. Corbin or the city manager
9     or anybody else to ever comment upon?
10    A. Anybody else. I don't -- none that I
11     remember.
12    Q. And Mary, she's in personnel; she's the one
13     that you said that you went to?
14    A. No.
15    Q. Is wasn't Mary?
16    A. No.
17    Q. What was the name?
18     MS. NELSON: Martha McClain.
19    Q. Martha. Have you ever sought Martha's
20     guidance on any other magistrate's evaluation?
21    A. On personnel issues. I -- I can't
22     specifically say evaluations. But anytime I
23     have a personnel issue -- not just Martha but



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 289

1  personnel in general, Kai, anyone in personnel
2  if we have a question.
3      I had never had a supervisor use stuff
4  that they learned before they were hired in an
5  evaluation, and I didn't know how to handle
6  it.
7  Q.  All right.  So this is the first for you,
8      right?
9  A.  For a supervisor to use what somebody told her
10     when she was not there or not hired.  Yes, I
11     had never encountered that before.
12 Q.  Okay.
13 A.  And I didn't know how to handle it.  And it
14     would have been the same if it was anybody's
15     evaluation.
16 Q.  In your response to interrogatory number one,
17     you deny that you ever mentioned to Ms. Martin
18     that because you was black that city officials
19     would not do anything to you.
20         Could you have said something that
21     Ms. Martin could have misinterpreted to be
22     that kind of comment?
23 A.  No.

Page 290

1  Q.  Did you ever have a conversation with
2      Ms. Martin where you told her that because you
3      are black and a woman that the City wouldn't
4      take any action against you?
5  A.  No.
6  Q.  You do know that Ms. Martin have said that,
7      correct?
8  A.  Yes.
9  Q.  Ms. Martin also testified that she was
10     instructed that whenever a white magistrate
11     would do something to cause somebody to be
12     wrongfully arrested, you insisted that she
13     have a meeting with them but you made light of
14     it when people were wrongfully arrested by
15     black magistrates.
16         Do you dispute that?
17 A.  Yes.
18 Q.  That's not true?
19 A.  No, that is not true.
20 Q.  You did not put her on or instruct her to look
21     out for white magistrates making errors that
22     could result in somebody's wrongful arrest?
23     Is that a yes or no?

Page 291

1  A.  I did not tell Nancy Martin to only look at
2      the white people.
3  Q.  Well, had you made such a comment, would that
4      reflect a race consciousness, evidence in a
5      premium on being black?
6      MS. NELSON:  Object to the form.
7  A.  No.  That would be ignorant.  I would never
8      say that.
9  Q.  Be ignorant?
10 A.  Ever say that.
11 Q.  Do you feel that black people have a duty to
12     defend each other since blacks for years were
13     sort of kept out of -- of certain professions
14     and certain fields, and once they get there,
15     blacks have a duty to look out for each other?
16      MS. NELSON:  Object to the form.
17 A.  No, I don't feel that.
18 Q.  Well, if you don't feel that, then to what
19     were you referring when you mentioned in Sarah
20     Fowler's presence that I was being a traitor?
21 A.  That was a mischaracterization.
22      MS. NELSON:  Object to the form.
23 Q.  A mischaracterization of what?

Page 292

1  A.  Of a statement.
2  Q.  Well, what was her statement?
3  A.  Hers or mine?
4  Q.  What was her statement?
5  A.  I don't know.
6      MS. NELSON:  Sarah Fowler's statement?
7  Q.  Yeah.  What was Sarah Fowler's statement?
8  A.  You just said she said I said that you were a
9      traitor.
10 Q.  Yeah.  But you said she misunderstood you.
11 A.  She -- I wasn't talking about you.
12 Q.  You weren't talking about me at all?
13 A.  No.
14 Q.  You was talking about somebody else being a
15     traitor?
16 A.  I was.
17 Q.  I see.  And so she just assumed you was
18     talking about me?
19 A.  Yes.
20 Q.  However, the discussion on the table was about
21     me?
22 A.  It was not about you.
23 Q.  Well, isn't it true that one of the



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 293

1    attorneys -- and it could have been Shaun --
2    told you that he had seen me in Judge
3    Anderson's courtroom or office, somewhere, and
4    at that time, you made the statement so the
5    way when he said that he seen me --
6  A.  Do you want me to tell you what happened?
7        MS. NELSON:  I'm not sure if he's got a
8        question on the table or not.
9  Q.  Well, isn't that when the statement was made,
10    when he mentioned that?
11 A.  No.
12 Q.  So Sarah Fowler was lying about you?
13 A.  I don't know about what part.  I -- I can tell
14    you what happened but --
15 Q.  Accusing me of being the traitor.
16 A.  Yes.  She -- yes.  I never accused you of
17    being a traitor, never.
18 Q.  Okay.  I'm willing to allow you to tell me now
19    since you didn't try to clear that up before
20    you could --
21        MS. NELSON:  I don't know that she's had
22        any other time to clear it up before.
23        I'm not sure what the question is.

Page 294

1        MR. JAFFREE:  Well, you may have had
2        opportunities to clear this up.  You
3        had opportunities to clear it up in
4        your interrogatory response to
5        question number one.
6        MS. NELSON:  She respond -- if you asked
7        the question, she responded.
8  Q.  Well, would you like to clear up how --
9    somehow she mischaracterized your statement of
10    the traitor?
11        MS. NELSON:  I object to the form.  You
12        can ask her what she said.
13 Q.  Well, what did you say?
14 A.  I was talking to -- we were in court and --
15    well, we weren't in court.  We were in the
16    courtroom.  It was after court.  And Derrick
17    Yarbrough came in and said that he had seen
18    you and Judge Anderson talking and laughing at
19    the courthouse.
20        And I said, let me call him and tell him
21    something.  And I called Judge Anderson's
22    secretary, Amanda, and she answered the phone
23    and said Judge was out.

Page 295

1        And I said, well, you tell him the next
2    time that woman is out there marching around
3    with that sign about Judge Anderson hates old
4    people, I'm going to be out there with her
5    because he's a traitor.
6  Q.  See, I --
7  A.  And Sarah took that and told you what Mary
8    Beth or somebody -- and then you took it and
9    put it in all the writings that I called you a
10    traitor.  And that never happened.
11 Q.  So Ms. Fowler just sort of --
12 A.  Heard one end of a conversation.
13 Q.  One end of a conversation and just assumed
14    that I was a traitor?
15 A.  No.  Well, I don't know what she assumed.
16 Q.  Did you consider me a traitor for representing
17    them?
18 A.  No.  That's your prerogative to do.
19 Q.  Well, what about an Oreo?
20        MS. NELSON:  A what?
21 Q.  An Oreo?
22 A.  What is that?  Spell it.
23 Q.  Well, I'll use it in a Native-American

Page 296

1    pollyins.  What about an Apple Indian; do you
2    consider me that?
3  A.  I've never heard the term before.
4  Q.  Oreo cookie is where there's brown on the
5    outside and white on the inside.  It's an
6    expression.
7  A.  I've never thought of that.
8  Q.  A non-endearing expression that's used for
9    black people.
10 A.  No, I've never thought of that.
11 Q.  Who have lost their moral compass and stopped
12    being black for all practical purposes.
13    You've never considered --
14        MS. NELSON:  Is this your testimony?
15 A.  No.
16        MR. JAFFREE:  Well, the question was
17        asked, what is it.  I'm trying to
18        explain especially if you're not
19        familiar with the jargon and what I
20        thought was so standard in the black
21        community that I'm surprised the judge
22        didn't understand what I was saying.
23        MS. NELSON:  Well, is your question, does

74  (Pages 293 to 296)



# FREEDOM COURT REPORTING

Page 297

1  the judge think that you're an Oreo?
2  MR. JAFFREE: Yeah.
3  Q. Well, do you?
4  MS. NELSON: I object to that. She can
5     answer. But what in the world does
6     that have to do with this case --
7  MR. JAFFREE: It has --
8  MS. NELSON: -- what she thinks of you?
9  MR. JAFFREE: It has everything to do with
10    her mindset.
11 MS. NELSON: With what?
12 MR. JAFFREE: Her mindset.
13 MS. NELSON: You know, Mr. Jaffree, she is
14    being sued personally by you and your
15    clients and is upset about it. So
16    if -- her mindset about you really is
17    irrelevant to this case. But I'm sure
18    y'all are not best friends. Is that a
19    fair statement?
20 MR. JAFFREE: I never knew it before this
21    case, and I guess I don't know it now.
22    But if, in fact --
23 MS. NELSON: And you want to know if she

Page 298

1  thinks that you're an Oreo. I just
2  think that's a question that's beyond
3  the scope of this lawsuit --
4  MR. JAFFREE: Well, it's not beyond the
5  scope.
6  MS. NELSON: -- and inappropriate to ask.
7  MR. JAFFREE: If, in fact, she perceives
8  me as a traitor --
9  MS. NELSON: She's already testified that
10 she didn't say that.
11 MR. JAFFREE: Yeah. I mean -- yeah. But
12 somebody else testified that she did
13 say that. But if, in fact, I have a
14 duty to follow up because it has an
15 impact on --
16 MS. NELSON: On what?
17 MR. JAFFREE: -- on evading the psyche.
18 MS. NELSON: Whose psyche?
19 MR. JAFFREE: Her psyche.
20 MS. NELSON: That doesn't have anything to
21 do with this case.
22 MR. JAFFREE: Oh, I disagree. I mean, I
23 just simply disagree. You must know

Page 299

1  how much a role --
2  MS. NELSON: If somebody personally sued
3     me, I might not have this fond, warm,
4     fuzzy feeling about them.
5  MR. JAFFREE: You must know what a role
6     motive plays in these cases. You must
7     know that. That requires evading the
8     psyche to determine motive.
9        Anyway, let me get to
10    interrogatory number seven.
11 MS. NELSON: Do you want to show her these
12    interrogatories.
13 MR. JAFFREE: I was looking for them, and
14    I can't find them. I don't have them
15    with me.
16 MS. NELSON: Well, what is it and I'll --
17 MR. JAFFREE: But the question would be
18    reflective of what she said in
19    interrogatory number seven.
20 Q. You denied in your response to interrogatory
21    number seven that you was made aware that
22    Magistrate McClain had made error entries
23    associated with process of writ of arrest.

Page 300

1  A. I said, no.
2  Q. Do you still dispute that you was made aware
3     of that?
4  A. "Errors associated with the processing of writ
5     of arrest."
6  Q. Do you know what writ of arrest are or alias
7     warrants or whatever?
8  A. That she had errors in processing?
9  Q. That she had made errors associated with
10    processing them. And you said that you was
11    not aware of that. Is that still your
12    testimony that you was not aware that
13    Ms. McCain had made errors?
14 A. Yeah. Not specifically that errors for the
15    processing of writ of arrest.
16 Q. Are you saying now you didn't understand the
17    question?
18 A. Well, I just -- I'm not aware of her errors
19    associated with processing of Writs of
20    Arrest.
21 Q. And nobody had told you about these errors?
22 A. Not processing Writs of Arrest.
23    Those -- well --

75 (Pages 297 to 300)





## FREEDOM COURT REPORTING

Page 301

1 Q. Well, how would you define a writ of arrest?
2 A. A writ of arrest is when I stamp a warrant for
3    failure to appear, and then I send it over to
4    the magistrates' office. I sign it and then
5    they execute it.
6 Q. Well, that's part of the processing, right,
7    the execution?
8 A. Right.
9 Q. That's part of the processing?
10 A. Right.
11 Q. Nobody never told you that Ms. McCain had
12    made -- strike that. Either Mary Brackin or
13    Nancy Martin never told you that Ms. McCain
14    made errors in processing these writs? They
15    never mentioned that to you?
16 A. Not -- not -- I -- not specifically. I mean,
17    processing Writs of Arrest, I stamp them.
18    If -- she wouldn't know whether the person was
19    there or not. If I called the docket, a
20    person wasn't there, I stamped it, signed it,
21    she executed it over in the office. She would
22    have no way of knowing whether I was right or
23    wrong about the person --

Page 302

1 Q. Well, we're not talking about your errors.
2 A. No. Well, I don't know how she could
3    have -- what errors she could have made other
4    than executing --
5 Q. Well, so you're saying nobody else told you.
6    Okay. Fine.
7       Ms. McCain is black; is that correct?
8 A. Miss who?
9 Q. Ms. McCain is black, Lavera?
10 A. McClain?
11 Q. McClain. I'm sorry.
12 A. Yes.
13 Q. All right. The same question was asked in
14    interrogatory number ten with respect to
15    Ms. Knight. And I guess the same answer,
16    right?
17 A. It is the way I interpret it because I don't
18    -- yeah, that same answer. Yes.
19 Q. Okay. Now, Ms. Knight is black as well,
20    right?
21 A. Yes.
22 Q. What is your practice on reviewing alias
23    warrants of arrest processed by magistrates?

Page 303

1 A. I don't know.
2    MS. NELSON: What do you mean by
3    "processed?"
4    MR. JAFFREE: Well, handled, whatever they
5    do to them.
6 Q. Do you ever review them? Do you have a policy
7    on reviewing these writs that somehow the
8    magistrates have to do something to?
9    MS. NELSON: Well, let's clarify for the
10    Record what we're talking about, "do
11    something to." I don't know what
12    you're talking about. She testified
13    that -- the judge said she will stamp
14    or execute the warrant.
15    MR. JAFFREE: And then send them to the
16    magistrate office.
17    MS. NELSON: And then let's talk about
18    what happens there.
19 Q. Do you review any of these warrants after they
20    have gone to magistrate office?
21 A. No.
22 Q. Okay. Had Mary Brackin ever told you anything
23    about data entry errors on the computer made

Page 304

1    by Ms. Knight?
2 A. "On a computer. I was informed by
3    Ms. Knight" --
4 Q. Well, we're not on the interrogatory anymore.
5    I'm asking you just a question off the
6    interrogatories.
7       I'm asking you have Mary ever told you
8    anything about data entry errors that was made
9    on the computer by Ms. Knight?
10    MS. NELSON: Well, that looks like an
11    interrogatory to me.
12 A. I said I was informed of it by Ms. Knight
13    during a time period the department was
14    changing computer systems.
15 Q. Well, what did she tell you -- what did
16    Ms. Knight tell you that Mary -- I'm sorry.
17    What did Mary tell you that Ms. Knight had
18    done?
19 A. Well, it wasn't just Ms. Knight. Those were
20    the -- the reversals. Mary Beth was the
21    cashier. She did all the reversals. And
22    every time she did a reversal, she would fill
23    out a form and -- on every magistrate and send

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 305

1 it over.
2 Q. So are you saying that Mary never told you
3    anything specific about Ms. Knight?
4 A. She might have but also specific to other
5    magistrates.
6 Q. I wasn't asking you about --
7 A. Not in a vacuum.
8 Q. I wasn't asking you about other magistrates.
9    I was just talking about Ms. Knight.
10 A. Well, I -- I would still have to say -- if I
11    said, no, I might be lying because she told me
12    about everybody's reversals.
13 Q. So you don't remember what she may have told
14    you -- you don't remember what she may have
15    told you about Ms. Knight; is that correct?
16    MS. NELSON: What was your question?
17 Q. Well, what did she tell you, and you said she
18    tell you about everybody.
19    Do you remember anything specific that she
20    told you about Ms. Knight making data entry
21    errors on the computer?
22 A. Not specifically, no.
23 Q. What about Nancy; did Nancy ever tell you

Page 306

1    about data entry errors made by Ms. Knight on
2    the computer?
3    MS. NELSON: I thought you just asked her
4    that.
5    MR. JAFFREE: Well, the first one was
6    Mary, what did Mary tell her. The
7    next one was, what did Nancy tell you.
8    MS. NELSON: Well, you're assuming she
9    told her something. Did you ask her
10    if Nancy told her anything? Based on
11    my questioning of Nancy yesterday, I'm
12    not sure she would know what a
13    computer error was.
14 Q. Did Nancy tell you anything about computer
15    errors that Ms. Knight was making?
16 A. Not that she had personal knowledge of. She
17    might have said that Mary Beth said they were
18    making errors.
19 Q. But she didn't tell you anything about her own
20    personal knowledge. All right.
21    Did Mary ever tell you anything about
22    computer errors being made by Ms. McCain?
23    MS. NELSON: McClain?

Page 307

1 Q. McClain.
2 A. She might have.
3 Q. Do you remember what it was she told you?
4 A. No.
5 Q. What about Nancy; have she ever told you
6    anything about computer errors made by
7    Ms. McClain?
8 A. She might have. I don't -- I don't -- not
9    specifically.
10 Q. You don't recall specifically.
11    Now, what did Mary tell you about data
12    entry errors on paperwork made by Ms. Knight?
13    I'm not talking about the computer now. I'm
14    talking about paperwork that she worked on,
15    the errors that Ms. Knight makes on
16    paperwork.
17    MS. NELSON: Again, assumes --
18 Q. That Mary told you.
19    MS. NELSON: You've not laid a proper
20    foundation.
21 Q. Well, has Mary ever told you about any errors
22    that Ms. Knight made dealing with the
23    paperwork you have to deal with? Mary ever

Page 308

1    mention it to you?
2 A. Over all the years she might have.
3 Q. But you don't remember anything specific?
4 A. I mean, not -- no, not just specific.
5 Q. And the same question with respect to Nancy.
6    MS. NELSON: Meaning did -- will you ask
7    the question, did Nancy make her
8    aware?
9 Q. Did Nancy make you aware of data entry errors
10    on paperwork that was made by Ms. Knight?
11 A. She might have over the years.
12    MS. NELSON: Nancy was only there nine
13    months.
14 Q. In your testimony on page 15 of Mary Beth's
15    hearing, you stated that you never said
16    everyone made errors. Is that still your
17    position, that you've never said that?
18 A. In response to a specific question by her?
19 Q. No. On page 15 during my questioning of you,
20    you stated that you never -- that you never
21    said that everyone makes errors. Is that your
22    position, that you never said that?
23 A. In life I've never said that or just in



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 309

1  response to Mary Beth specifically?
2  Q.  With respect to --
3      MS. NELSON: Could you show her the
4      testimony, please?
5      (Brief pause)
6      MR. JAFFREE: I'm not sure where I got
7      that page 15 from, page 15 of
8      something. But it may not be this
9      transcript here because I don't think
10     you was on page 15.
11 Q.  Well, let me ask the question in general. Do
12     you recall telling Nancy when she was
13     complaining about errors made by either Eunice
14     or Lavera that everyone makes errors?
15     MS. NELSON: Again, object to form. I'm
16     not sure there's any testimony that
17     Nancy made complaints about them
18     making errors.
19     MR. JAFFREE: Well, there was complaints.
20     There was a lot of testimony to that.
21     MS. NELSON: Well, the judge --
22     MR. JAFFREE: The judge can answer whether
23     or not she --

Page 310

1      MS. NELSON: -- does not recall.
2      MR. JAFFREE: -- ever told her that.
3  Q.  Do you know whether you told her that everyone
4      makes errors?
5  A.  I don't remember saying it in regard to a
6      specific matter.
7  Q.  In defense of either Eunice or Lavera --
8  A.  Or anyone.
9  Q.  -- but you said everybody make errors.
10 A.  I just -- not in relation to a specific thing.
11 Q.  I have a series of questions relating to
12     pages. I don't know where I got this from.
13     And in benefit to you, I'm not asking you
14     these questions that I've got pages numbers on
15     because I don't know what that relates to.
16     Now, let me ask you this: On or about
17     March the 10th of 2004 -- or was it 2005? I
18     think -- it may have been 2005. Did you tell
19     the staff to make no contact with Mary Turner?
20     MS. NELSON: Again I would -- you're
21     asking 2004, 2005? Would you put this
22     in some context?
23 Q.  Let me see here. It was in 2005, on or about

Page 311

1      March 10th, 2005, did you have a meeting with
2      your staff where you told them to make no
3      contact with Mary Turner?
4  A.  I don't remember the specific date.
5  Q.  All right. Well, do you recall ever having a
6      meeting with the staff where you told them to
7      make no contact -- have no contact with Mary
8      Turner?
9  A.  I remember the investigators going up to the
10     office with us and telling us to inform them
11     to not mess with the computer, not contact her
12     for a short period of time because they were
13     trying to control the computer system and
14     access to her office.
15 Q.  Did you do anything to suggest that this was
16     limited to a short period of time?
17 A.  Well, I told them that they were right in
18     the -- we were investigating -- I don't know
19     because I was trying to be protective. I
20     don't know what I told them, but it was
21     certainly for a short period of time, to not
22     contact her, not touch the computer until we
23     let them know. They were trying to get in

Page 312

1      touch with Tim Stewart to freeze her computer
2      so that they couldn't change anything.
3  Q.  Let me show you this. Let me -- this is not
4      necessarily the best copy, but we'll call this
5      Plaintiffs' Exhibit 5 --
6      MS. NELSON: Well, don't put it -- you're
7      putting it over my sticker. That was
8      my -- also -- I'm sorry. I already
9      had that sticker on it.
10     MR. JAFFREE: I done forgot where this
11     came from. This came from somewhere.
12     (Plaintiffs' Exhibit 7 was marked
13     for identification.)
14 Q.  Let me show you what's been marked as
15     Plaintiffs' 7 and see if you can recognize
16     that document.
17     COURT REPORTER: Mr. Jaffree, was that 7?
18     MR. JAFFREE: Yes, 7.
19     COURT REPORTER: Because you said 5 first,
20     and then you said 7.
21     MR. JAFFREE: Well, I'm sorry. Yeah, it
22     said 5 on there, but it was 7.
23 Q.  Do you recognize that document?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 313

1 A. Yes.
2 Q. Is there anywhere on that document where you
3 make reference to a short period of time?
4 A. No. But I think -- that was my understanding,
5 that it was just until they could get control
6 of the computer system in her office.
7 Q. Control of the computer system.
8 A. Of the -- of her computer so nobody could go
9 in and change anything.
10 Q. So they should limit their contact for the
11 time it took them to get the control of the
12 computer?
13 MS. NELSON: Well, I think Number 7 can
14 speak for itself. It says "while the
15 internal investigation conducted by
16 the Dothan Police Department was
17 underway."
18 Q. So it was broader that just simply control of
19 the computer?
20 A. Among other things, the investigation. They
21 wanted to -- they wanted to freeze her
22 computer. They're trying to get in touch with
23 Tim Stewart to freeze the computer. They were

Page 314

1 investigating these complaints, and they
2 didn't want anybody calling her or colluding
3 with her, is my understanding. So they just
4 said, no exact. It was the -- the internal --
5 the investigators told us to go tell them to
6 not contact her.
7 Q. But by what authority did the investigators
8 have to tell you to tell your staff not to
9 contact Ms. Martin?
10 MS. NELSON: If you know.
11 Q. If you know, by what authority?
12 A. Yeah. I don't know. They were investigators,
13 and I didn't question their investigation at
14 that point.
15 Q. Did these people control your office?
16 A. No.
17 Q. Okay. Can I see that document back again for
18 a minute? Now --
19 MS. NELSON: If I can state for the
20 Record, I mean, there was a police
21 department investigation --
22 MR. JAFFREE: I could care less --
23 MS. NELSON: -- of criminal activity going

Page 315

1 on.
2 You could care less?
3 MR. JAFFREE: I care less about that. I
4 care less about that. Let me -- these
5 people -- these police don't have any
6 authority to go in there and just
7 dictate who could talk to people.
8 MS. NELSON: When an employee of the City
9 of Dothan is under a criminal
10 investigation --
11 MR. JAFFREE: Yeah, yeah.
12 MS. NELSON: -- it's your position that
13 they cannot do that?
14 MR. JAFFREE: That's my position,
15 absolutely.
16 Q. All right. You also indicate -- by the way,
17 who did you write this for? Who were you
18 giving this to? By this, for the Record, I'm
19 talking about Plaintiffs' Exhibit Number 7?
20 A. I don't remember.
21 Q. Why did you write -- were you writing that for
22 yourself? Who was that intended for?
23 A. I don't remember why I did it.

Page 316

1 Q. Why the seven-day gap between the date that
2 that notation is done from the date that you
3 allegedly told the staff not to do this?
4 A. I don't remember.
5 Q. You don't know about that seven-day gap and
6 you don't know who this was for?
7 A. No.
8 Q. Did you give this to anybody?
9 A. I don't remember, honestly.
10 Q. Did you give this to staff? All right.
11 You also said that you instructed them
12 that "no discussion with anyone regarding this
13 matter was to take place."
14 Do you remember telling them that as well,
15 no discussion with anybody?
16 A. I don't remember specifically but possibly, if
17 that's what the memo said.
18 Q. Now, you remember, I told you, you were going
19 to hear this word again. And so I'm going to
20 say it now.
21 Could you identify with me in detail what
22 mischief you thought to prevent with your
23 directive that the staff was not to contact

79 (Pages 313 to 316)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 317

1    **Mary Turner?**
2    MS. NELSON: Object to the form. She's
3        already answered the question. I
4        object to the term.
5    MR. JAFFREE: She's not answered that
6        question.
7    MS. NELSON: Yes, she has. She said the
8        investigators instructed --
9    MR. JAFFREE: Can you let her --
10   MS. NELSON: She's answered the question.
11   MR. JAFFREE: She haven't answered the
12       question.
13   MS. NELSON: If you would listen, she has
14       answered the question.
15   **Q. Let me ask you this: Other than some**
16       **investigator, who was it that told you this?**
17   A. I don't remember specifically. There were two
18       investigators I think at the time. And I
19       don't remember which of them said it.
20   **Q. Some investigator told you -- came out and**
21       **told you, instruct the staff -- instruct your**
22       **staff to have no contact with Mary Turner?**
23   A. Yes. I was in the courtroom, and they came in

Page 318

1        and said, we need to get control of the
2        office --
3    MS. NELSON: Say who "they" is.
4    A. The investigators. It was either Keith
5        Gray --
6    MS. NELSON: From the police department.
7    A. From the police department. Keith Gray, Ray
8        Owens or one of those two.
9    **Q. What limitation did they put on this no**
10       **contact?**
11   A. Just that what -- well, it was my
12       understanding -- and I think I conveyed
13       that -- that it was until they could get
14       control of the computer system because I put
15       in there, nobody was to go in her office.
16       They were investigating the allegation that
17       there had been ticket fixing in the office,
18       and they didn't want anybody colluding with
19       anyone else.
20   **Q. Well, when did they get control of the**
21       **computer system?**
22   A. I don't know at what point.
23   **Q. Well, let's --**

Page 319

1    A. But it wasn't just the computer system. They
2        were investigating. It was a criminal
3        investigation.
4    **Q. Well, you just said it was until they could**
5        **get control of the computer system. You want**
6        **to back away from that testimony?**
7    MS. NELSON: She said that and other
8        things.
9    A. Yeah, other -- it was other --
10   **Q. Well, what other things? Tell me the whole**
11       **host of other things that they was concerned**
12       **about?**
13   A. I wasn't a part of criminal investigation.
14       They were concerned that a crime had been
15       committed. There were allegations --
16   MS. NELSON: You let her answer.
17   A. There were allegations that a magistrate had
18       extorted a defendant in our court, and they
19       wanted to -- they were investigating that.
20       And so they wanted me to tell them not to
21       contact Mary, not to go in her office and mess
22       with the computer.
23       I knew that one of the things they were

Page 320

1        doing was trying to get the computer. They
2        kept saying, we're trying to get the computer
3        so nobody can go in and change anything. They
4        were investigating. So it was my -- I didn't
5        think it was forever, just as long as they
6        were investigating.
7    **Q. Well, when did they tell you that the**
8        **investigation was complete?**
9    A. I don't remember, but I even told them that
10       day that if they wanted to talk with Mary
11       after hours to let me know, and I would ask
12       the investigators how to handle that. I
13       didn't know. I wasn't trying to tell them not
14       to ever associate with her, just while the --
15       the criminal was going on.
16   **Q. You haven't answered my question. When did**
17       **they tell you their investigation was**
18       **complete?**
19   A. I don't remember the date.
20   **Q. Did they ever tell you their investigation was**
21       **complete?**
22   A. I'm sure at some point they said, it's okay.
23   **Q. Did you have a meeting with the staff telling**

80  (Pages 317 to 320)



# FREEDOM COURT REPORTING

Page 321

1  them that the investigation is complete and
2  now you can contact Mary?
3  A. I don't remember.
4  Q. Well, how would the staff know when it's okay
5  to contact Mary?
6  A. Well, it would have been communicated to them
7  in some way.
8  Q. Well, did you communicate it to them in some
9  way?
10  A. I'm sure -- I don't remember because Mary was
11  eventually charged with criminal charges and
12  everything else transpired.
13  Q. If somebody says you never communicated to
14  them in some way that the investigation was
15  over, would you be in a position to dispute
16  that?
17  A. That I never communicated --
18  Q. You never communicated to them that the
19  investigation was over.
20  A. I would dispute that. I mean, I -- nobody
21  ever came and asked me, could they contact
22  Mary and I said, no, you're -- no. So I would
23  dispute that.

Page 322

1  Q. So you did tell them at some point the
2  investigation was over?
3  A. I just don't remember specifically how it
4  happened.
5  Q. Well, is that something you would remember?
6  A. There was so much going on that -- during that
7  time, and we were trying to be protective of
8  Mary because they were simply allegations at
9  that point.
10  Q. Protective of Mary?
11  A. Yeah. Because there was a lot of rumor and
12  allegation. And I just asked them not to talk
13  about it.
14  Q. How would Mary be placed in jeopardy by
15  somebody talking to Mary?
16  A. No. The rumors and the allegations. Nobody
17  knew for sure, and it was just allegation.
18  Q. Answer my question.
19  A. I just asked them to stop talking about it.
20  Q. Answer my question: How would Mary be harmed
21  by somebody talking to Mary?
22  A. How would she be harmed?
23  Q. You said you wanted to protect Mary. Are we

Page 323

1  talking about Mary Turner?
2  A. I wanted to protect her reputation and her
3  character. At that point, it was just simply
4  allegations. We didn't know if they were true
5  or not, and I didn't think they should be
6  running around talking about it.
7  Q. So that's why you didn't want staff to talk
8  to --
9  A. No. I did that at the behest of the
10  investigators.
11  Q. Did you not want staff to talk to each other
12  as well?
13  A. No. I think I said other -- talking about it.
14  I meant generally.
15  Q. All right. But were you trying to protect
16  Mary by telling staff, have no contact with
17  her?
18  A. No. I was following the directive of
19  the criminal investigators who were handling
20  that case.
21  Q. Well, what specifics in this Defendants' 7 was
22  designed to protect Mary?
23  MS. NELSON: I don't know that she ever

Page 324

1  testified to that.
2  MR. JAFFREE: She said she was trying to
3  protect Mary.
4  A. Well, I -- I was in my mind trying to tell
5  them to stop talking about -- it was just
6  simply allegations going around.
7  Q. I'm a little bit confused. How many people in
8  addition to yourself knew that there was a
9  criminal investigation going on?
10  A. How many people? I have no way of knowing
11  because once I met with Personnel, the legal
12  department, and the police chief, that was the
13  extent of my -- I never got back involved with
14  it.
15  Q. Well, do you know whether --
16  A. So I don't know who they told.
17  Q. Do you know whether Mary knew that there was a
18  criminal investigation going -- Mary Turner
19  knew that there was a criminal investigation
20  going on concerning her?
21  A. No, I don't know.
22  Q. Do you know if any of the other magistrates
23  knew that there was a criminal investigation

81 (Pages 321 to 324)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 325

1    going on concerning Mary?
2  A.  Do I have personal knowledge that they knew?
3  Q.  **Yeah, personal knowledge.**
4  A.  I have no personal knowledge that they knew.
5  Q.  **Well, if they didn't know a criminal**
6     **investigation was going on, what could they**
7     **possibly tell Mary in contacting Mary that**
8     **would interfere with the criminal**
9     **investigation?**
10  A.  You want me to answer it?
11  Q.  **Well, if you can.**
12  A.  Well, there was a lot of allegations, rumors
13     just going around that Mary Turner was in
14     trouble because this guy had come in, talking
15     about fixing tickets. Just -- I guess it was
16     just a normal leak, but nothing had been
17     substantiated. I never told them about the
18     allegations, but I knew there was a lot of
19     whispering and rumors going on. And for that
20     reason, I asked them to not to --
21     MS. NELSON: Let her answer.
22     MR. JAFFREE: Well, I'm stopping her
23     because she's not answering my

Page 326

1     questions.
2     MS. NELSON: You don't like what she has
3     to say. That's the reason you're
4     stopping her.
5     MR. JAFFREE: But she's not answering my
6     question. I asked her, what could
7     they tell Mary that would interfere
8     with the investigation. I'm trying to
9     find out. If they didn't know
10     anything and if Mary --
11     MS. NELSON: She didn't know what they
12     knew. They could do a lot.
13     MR. JAFFREE: Well, tell -- I want her to
14     tell me a lot of what they could do
15     that interfered with the
16     investigation.
17  A.  Well, if they contacted Mary, she could tell
18     them to go in the computer and delete the
19     files of the other Phelps boy's tickets who --
20     that had been --
21  Q.  **She didn't know what the investigation was**
22     **about.**
23  A.  I don't know whether --

Page 327

1     MS. NELSON: How do you know that?
2  A.  -- she knew.
3     MS. NELSON: There's no testimony to that.
4     MR. JAFFREE: Do you have your records?
5     MS. NELSON: You're trying to testify on
6     her behalf. There's absolutely no
7     evidence in this proceeding that she
8     didn't know what was going on.
9     MR. JAFFREE: Assuming --
10     MS. NELSON: She knew full well what she
11     was being suspended for.
12     MR. JAFFREE: Assuming these documents are
13     true--
14     MS. NELSON: What documents, Mr. Jaffree?
15     MR. JAFFREE: The documents that I'm
16     looking at. Let me move on because I
17     don't want to --
18     MS. NELSON: Mary Turner was ultimately
19     indicted of a criminal offense. And
20     as I understand it, entered a -- had
21     some kind of deferred prosecution or
22     something. But she was under criminal
23     investigation for a very serious

Page 328

1     charge.
2     MR. JAFFREE: It's in the record that she
3     was charged with a misdemeanor and not
4     found guilty of any misdemeanor. But
5     be that as it may, we're talking about
6     a single ticket.
7     MS. NELSON: This all your
8     characterization.
9     MR. JAFFREE: Well, how many tickets are
10     we talking about. I thought we was
11     talking about a single traffic ticket.
12     We're not talking about any espionage
13     or forgery or whatever she was charged
14     with that --
15     THE WITNESS: Extortion.
16     MS. NELSON: She was charged with
17     extortion.
18     MR. JAFFREE: Yeah. But she wasn't
19     charged with extortion. She just
20     simply wasn't. That's not true.
21     That's not part of the record. You
22     can't find a record where she was
23     charged with extortion. She wasn't.

82 (Pages 325 to 328)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 329

1    And if I have to prove -- present a
2    document to establish that, I will.
3    Since I represented her, I know.
4        But, anyway, be that as it may, I
5    want to go on.
6    Q.  Did you explain to the staff why this
7    no-contact directive was important?
8        MS. NELSON: I think asked and answered.
9    Q.  Can you answer the question, yes or no?
10   A.  Why I thought it was important or why it was
11   important?
12   Q.  Why the no-contact directive was important?
13   Did you explain to them why it was important?
14   A.  It was important -- no, I didn't -- I don't
15   know if I said why it was important. I just
16   told them that we were not to contact Mary
17   pending this investigation.
18   Q.  So you didn't tell them why it was important.
19   A.  And if they wanted to talk with her after
20   hours to let me know, and I would ask how they
21   needed to do that.
22   Q.  Did you place any limits on this prohibition?
23   A.  Limits such as?

Page 330

1        MS. NELSON: Asked and answered.
2        MR. JAFFREE: That's not asked --
3    Q.  Did you place any limits on the prohibition,
4    no contact? Were there any limits to it, or
5    was it absolute, don't contact her in church,
6    don't say hello?
7    A.  I told --
8        MS. NELSON: Asked and answered.
9    A.  I told them if they wanted to talk
10   with -- contact her -- no. I didn't tell them
11   not to go to church or after hours. I told
12   them they could talk with her after hours, let
13   me know, and I'd find out -- you know, tell
14   the investigators, they go to church with them
15   or whatever.
16   Q.  Well, you'd have to consult with the
17   investigators before they would be permitted
18   to talk to them after hours?
19   A.  No. I -- I just told them to let me know if
20   they wanted to talk with her after hours. I
21   didn't know how to handle that.
22   Q.  I read everybody's transcript. I don't
23   remember anybody saying that you told them

Page 331

1    that they could talk to her after hours if
2    they contact you and get clearance. I don't
3    recall --
4        MS. NELSON: I don't know whose transcript
5    you are even talking about.
6        MR. JAFFREE: All the magistrates'.
7        MS. NELSON: There's no testimony in this
8    case about any magistrates.
9        MR. JAFFREE: All the magistrates'.
10   There's nothing to that effect. So --
11       MS. NELSON: That's your statement,
12   Mr. Jaffree.
13       MR. JAFFREE: Well, fine.
14       MS. NELSON: And I move to strike it.
15       MR. JAFFREE: Fine. Fine. Fine.
16   Q.  Were you acting in your administrative or
17   judicial capacity when you issued your
18   no-contact directive?
19   A.  I'm reticent about saying it was my no-contact
20   directive. I didn't -- you know, it wasn't at
21   my behest or my initiation. I simply did what
22   the investigators told me was necessary at the
23   time. So I don't --

Page 332

1    Q.  Well, you adopted that no-contact directive,
2    didn't you?
3        MS. NELSON: Object to the
4    characterization. She said she --
5    adopt, she never said she adopted it.
6        MR. JAFFREE: I'm asking her.
7        MS. NELSON: She said she communicated it.
8        MR. JAFFREE: I'm asking her.
9    A.  I communicated it.
10   Q.  Did you adopt their no-contact directive to
11   you as your no-contact directive?
12       MS. NELSON: Object to the form. She's
13   testified as to what she did.
14       THE WITNESS: Right.
15   Q.  There's -- no, no. Right? Yes or no, did you
16   adopt their no-contact directive --
17       MS. NELSON: Object to the form.
18   Q.  -- as your no-contact directive?
19   A.  I wouldn't say I adopted it. But, you know,
20   they're criminal investigators. If they come
21   in there and say, go tell them not to talk to
22   Mary, not to come to that computer, I wouldn't
23   have said, no, I'm not going to do that.

83 (Pages 329 to 332)



# FREEDOM COURT REPORTING

Page 333

1  Q. Did you --
2  A. So I did not adopt it. I'd simply
3     communicated the no-contact order that was
4     communicated to me by the criminal
5     investigators.
6  Q. Did you initiate --
7  A. I did not.
8  Q. Well, can I finish my question?
9     Did you initiate any disciplinary action
10    because your no-contact directive was
11    breached?
12 A. Did I initiate any disciplinary action because
13    "the" no-contact order was breached?
14 Q. Yeah, because the no-contact order was
15    breached?
16 A. I don't remember.
17 Q. Did you charge somebody with insubordination
18    because the no-contact order was breached?
19 A. Yes.
20 Q. Was it because of your no-contact order was
21    breached or the police department's no-contact
22    order was breached?
23    MS. NELSON: I object to the form.

Page 334

1  A. And I think they're one in the same. There
2     was a no-contact order in place.
3  Q. So you adopted it?
4     MS. NELSON: Object to the form.
5  Q. So you adopted it?
6     MS. NELSON: That's your characterization?
7     MR. JAFFREE: Well, she said "one in the
8        same." What does that mean? What
9        does "one in the same" mean to you?
10    MS. NELSON: It's one in the same. Accept
11       her testimony. And she's not saying
12       she adopted it. Just ask her
13       factually what happened. You don't
14       like what she says, and you just get
15       hung up on your version of the way you
16       want to hear it.
17 Q. If you didn't --
18    MS. NELSON: You can ask her factually
19       what happened.
20    MR. JAFFREE: Wait a minute. I'm asking
21       her.
22 Q. If you didn't adopt it, why did you discipline
23    somebody for its breach?

Page 335

1  A. Because it was in place at the time. I
2     communicated it. And I told them, you know,
3     do not contact Mary. And I told them that the
4     investigators said, you know, not to contact
5     Mary, it was an investigation.
6     And your client, Mary Beth Brackin, said,
7     why are you looking at me?
8     I said, because I know that you and she
9     are friends, and if you want to contact her,
10    let me know. I told Mary Beth that in front
11    of every magistrate. And every one of them
12    will tell you that I told her that because she
13    was the only one that spoke out and said, why
14    are you looking at me.
15    I said, because I know you and Mary are
16    friends. And if you want to contact her, let
17    me know.
18    And she didn't say a word.
19 Q. Did you expect staff, including Ms. Brackin,
20    to use their own discretion on what contacts
21    with Ms. --
22 A. No.
23 Q. -- Turner was permissible?

Page 336

1  A. No. It was clear that they were not to
2     contact her or go in her office.
3  Q. Did you intend your directive to be all
4     inclusive, sweeping, and cover the universe of
5     possible contacts?
6  A. No. That's why I gave her the option of
7     contacting her after hours.
8  Q. Did you say, no, that she was free to contact
9     her after hours?
10 A. She never asked.
11 Q. Was she free to contact her after hours?
12 A. If she had asked, possibly.
13 Q. Well, had she contacted --
14 A. She said she didn't have any reason to.
15 Q. Had she contacted you to contact her after
16    hours, would you have granted that contact?
17 A. I don't know. I mean, I -- I -- just --
18    supposition.
19    MS. NELSON: Ms. Brackin was disciplined
20       for insubordination for a phone call
21       that she made during office hours,
22       which she's admitted to. And the
23       judge has already dismissed that count

84  (Pages 333 to 336)



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**


# FREEDOM COURT REPORTING

Page 337

1  in your case. And so --
2  MR. JAFFREE: Can I continue?
3  MS. NELSON: -- we're beating a dead
4  horse.
5  MR. JAFFREE: I appreciate your giving a
6  closing and an ultimate statement or
7  whatever kind of statement.
8  MS. NELSON: I'm just telling you --
9  MR. JAFFREE: But if I could go on.
10  Q. Were there any time or date or circumstances,
11  exceptions to your directive?
12  A. If they wanted to contact her after hours.
13  MS. NELSON: Asked and answered.
14  Q. Were you aware that Ms. Turner and Ms. Brackin
15  were close friends?
16  MS. NELSON: Asked and answered or at
17  least answered.
18  Q. Were you?
19  A. I thought they were.
20  Q. Okay. Did you know that they visit each
21  other's homes?
22  A. No, I didn't know that.
23  Q. That they attended the same church?

Page 338

1  A. No. I thought Mary Beth went to a different
2  church.
3  Q. They went out socially together? Were you
4  aware of that?
5  A. Mary Beth told me that Mary Turner's husband
6  had been having improper sexual advances with
7  a nephew --
8  Q. I didn't ask you about any --
9  A. -- and she wasn't comfortable being around
10  him.
11  Q. I didn't ask you that.
12  A. That's what I'm telling you.
13  MS. NELSON: Well, you did. You asked
14  her.
15  A. That's why I laughed when you said --
16  Q. I didn't ask you anything about her husband.
17  I asked you --
18  A. No. You said did they have social -- I'm
19  sorry -- did they have social contact. So I
20  wouldn't think they would because Mary Beth
21  told me that Mary Turner's husband performed
22  fellatio on his 18-month-old nephew, and she
23  wasn't comfortable with her son being around

Page 339

1  him.
2  Q. All right.
3  A. That's what Mary Beth Brackin said. So I
4  wouldn't think they would socialize. But,
5  now, I don't know.
6  Q. Were you aware that they frequently spoke to
7  each other on the phone when not at work?
8  A. No, I was not aware of that.
9  Q. Were you aware that they enjoyed the presence
10  of each other's company?
11  MS. NELSON: Asked and answered.
12  A. She told me she didn't like him around her
13  child since he liked to have sex with boys.
14  Q. I wasn't talking about him. I'm talking about
15  the two of them.
16  A. I don't know. I would think she wouldn't have
17  been comfortable with them around.
18  Q. Would your knowledge of a close relationship
19  and a frequent non-work-related contact
20  between the two of them have made a difference
21  in your directive or how you would implement
22  it?
23  A. I wasn't aware that there was one.

Page 340

1  Q. But if you were aware that they had a close
2  relationship, would that have made
3  a difference in your directive?
4  A. Well, that's why I gave her the option of
5  talking to her after hours. I told her that
6  if she wanted to talk with them after hours,
7  let me know.
8  Q. Given your understanding of the prohibition of
9  the state and understanding with the right
10  that all free citizens have to associate with
11  each other, do you think in hindsight that
12  your directive was overbroad?
13  MS. NELSON: Object to the form. Calls
14  for legal conclusions.
15  Q. Do you understand what overbroad means?
16  A. Yes.
17  Q. Do you think that maybe in hindsight your
18  directive was overbroad?
19  MS. NELSON: Object to the form.
20  A. And it was not -- and I say it was not my
21  directive. It was not -- I would have not
22  thought to just go up there and say, y'all
23  don't do this or y'all don't speak to



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 341

1  anybody. I was directed there was a criminal
2  investigation going and they didn't want them
3  colluding or tampering with evidence. And
4  that's what I communicated to them.
5  Q. Now, did you testify already how you learned
6  that the police investigation was completed?
7  A. I'm sure just I got the results -- no, I did
8  not testify to that. I don't remember.
9  Q. Don't remember. So you don't know how you
10  learned that it was completed. When was it
11  completed?
12  A. I don't remember specific dates.
13  Q. You don't know who told it was completed?
14     MS. NELSON: Asked and answered.
15  A. I think -- I think Mary Turner's husband wrote
16  me, telling me about other defendants to look
17  into that she might have fixed their tickets
18  for, and could we reopen it. And that's when
19  I knew that it was closed.
20  Q. Now, did you say you did or did not
21  communicate to staff after the investigation
22  was completed?
23     MS. NELSON: Object to the form.

Page 342

1  A. I don't remember specifically.
2  Q. Don't remember. Okay. Was the no-contact
3  prohibition expected to last indefinitely?
4  A. No.
5     MS. NELSON: Asked and answered.
6  Q. How was the staff to know when it was okay to
7  resume contact with Ms. Turner?
8  A. I guess that they would have been told. I
9  don't remember how it happened.
10  Q. They were expected to know by being told,
11  huh? Okay. But you don't know whether they
12  was told or not.
13     Now, do you know pursuant to what
14  authority the police officers interviewed the
15  staff concerning your no-contact directive?
16  A. No, I don't.
17  Q. I understand that there was some posting on a
18  web site of the fact that Ms. Turner was under
19  investigation; is that correct?
20  A. I have no personal knowledge. I didn't see it
21  on the web site.
22  Q. Is that posting the trigger for the decision
23  of police officers to interview your staff?

Page 343

1     MS. NELSON: If you know.
2  A. I don't remember. I was not a part -- I was
3  not involved in that.
4  Q. Was Officer Gray involved in that
5  interrogation of your staff?
6     MS. NELSON: Object to the form.
7  A. Was Officer Gray involved in the investigation
8  of Mary Turner's criminal complaint?
9  Q. Well, you prefer that word rather than
10  interrogation?
11  A. I don't know specifically which investigator
12  was -- there were two I think at the time.
13  I'm not sure which.
14  Q. Did one of the police officers give you a
15  recommendation of what rule or regulation of
16  the personnel board that Ms. Turner -- I'm
17  sorry, strike that -- Ms. Brackin may have
18  violated by contacting Ms. Turner?
19  A. It might have been a part of their findings
20  that -- in their investigation that these were
21  the Personnel Rules and Regulations that were
22  broken.
23  Q. Do you know upon what authority does the

Page 344

1  police department have in informing you what
2  personnel rules have been broken by an
3  employee under your charge?
4  A. I think that was just the result of their
5  investigation, that the results of their
6  investigation revealed that those rules had
7  been broken. They did not dictate those
8  disciplinary charges to me. They just
9  probably mentioned them in their investigative
10  report.
11  Q. Did the police report that you received
12  recommend that you terminate Ms. Brackin?
13  A. I don't remember specifically.
14  Q. Did you do any further or make any further
15  inquiry after you received the police report
16  to make an independent assessment of whether
17  or not Ms. Brackin should be terminated?
18  A. Which -- Ms. Brackin's termination? No, I did
19  not do any further investigation of the facts
20  of any investigation. I didn't go behind them
21  and investigate any more. No.
22  Q. So if they recommended termination, you
23  adopted their recommendation?

86 (Pages 341 to 344)



# FREEDOM COURT REPORTING

Page 345

1  A. No.

2      MS. NELSON: Object to the form. That was

3      not the testimony.

4  Q. You didn't adopt their recommendation?

5  A. No. I mean, I would have -- I would have

6      looked at their report, but I would not

7      necessarily have adopted the recommendation

8      that she be terminated.

9  Q. Well, do you know for a fact whatever contact

10     Ms. Brackin had with Ms. Turner, whether or

11     not that interfered with the police

12     investigation?

13 A. Do I know for a fact?

14 Q. Uh-huh (positive response).

15 A. No. I don't know what she communicated to

16     Ms. Turner.

17 Q. Did the police share with you the results of

18     their complete investigation?

19 A. I'm sure they did.

20 Q. Okay. Were you aware -- by the way, before I

21     ask you that question, let me back up.

22     You have a directive here that says, there

23     should be no contact with Ms. Turner. You

Page 346

1      have another directive that says, there should

2      be no discussion with anyone regarding this

3      matter. Is that correct?

4      MS. NELSON: Again, the documents can

5      speak for themselves.

6      MR. JAFFREE: But there's at --

7      MS. NELSON: You only read parts of it.

8      MR. JAFFREE: -- least two directives

9      there of the staff.

10     (Brief pause)

11 A. That's what it says. Yes, sir.

12 Q. Were they both of equal weight or which one

13     was greater weight?

14     MS. NELSON: This is so ridiculous.

15     MR. JAFFREE: Excuse me.

16 Q. Even though it's ridiculous, if you could

17     answer my question.

18 A. I didn't weigh them. I just simply, you know,

19     communicated what was told to me and asked

20     them to not do it.

21 Q. When you got the police report, did you learn

22     that Eunice had communicated with a friend

23     about the investigation of Ms. Turner?

Page 347

1  A. I don't remember that specifically.

2  Q. Well, do you remember the police officer

3      asking all of them had they communicated with

4      someone about that investigation?

5  A. I wasn't present when they talked with them.

6  Q. But you got the report. You said that, you

7      got their report.

8  A. Well, I got the report of the investigation of

9      Mary Beth -- I mean, Mary's criminal charges.

10     This is the investigation of -- I was aware

11     there was a separate investigation by the

12     police department of the leak.

13 Q. Well, now, I'm not necessarily limiting it to

14     Mary's criminal investigation. They was

15     investigating to determine who had contacted

16     Rickey Stokes and caused that --

17     MS. NELSON: Are you testifying or is this

18     a question?

19     MR. JAFFREE: She asked me a question and

20     I'm telling her.

21     MS. NELSON: You're telling her -- you're

22     supposed to be asking her questions

23     and not telling her --

Page 348

1      MR. JAFFREE: Well, I'm telling her what

2      investigation I'm talking about.

3  A. Do you have it, a copy of it?

4  Q. A copy of what?

5  A. Of what you're talking about. You said

6      they --

7  Q. There's a massive amount of documents. But do

8      you know from your experience whether or not

9      the police department was investigating who

10     could have told Rickey Stokes that there was

11     an internal investigation going on?

12 A. I remember there was an investigation by the

13     police department of --

14 Q. And as part of that investigation --

15     MS. NELSON: Just let her answer.

16 A. I remember there was an investigation of that

17     by the police department. Yes.

18 Q. And as part of that investigation, they asked

19     each of them, who have they communicated with?

20     MS. NELSON: Each of whom?

21 Q. Each of your magistrates --

22     MS. NELSON: If you know.

23 Q. -- who they communicated with.

87 (Pages 345 to 348)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 349

1  A. I don't -- no. I mean, I remember vaguely
2  that there was an investigation, but I don't
3  -- I wasn't a part of it. I wasn't there when
4  they talked with them or --
5  Q. And Eunice said that she had told a friend in
6  addition to her daughter the details of the
7  investigation as part of their report?
8      MS. NELSON: Object to the form. Do you
9      know that?
10     THE WITNESS: No.
11 Q. In fairness, other ones said that they told
12    their husband or told their wife, but Eunice
13    is the only one that told some friend of hers
14    about the investigation.
15     MS. NELSON: Object to the form.
16 Q. It's in the record. Do you dispute that's in
17    the record?
18     MS. NELSON: What record?
19     MR. JAFFREE: It's in the police
20     interrogation record.
21 Q. Do you want me to pull the Eunice one out to
22    show you?
23 A. I just don't know that specifically, but you

Page 350

1  say other people told other -- I don't know.
2  Did anybody else contact Mary Turner?
3  Q. Well, we're not talking about Mary Turner
4  now. We'll talking about whether or not they
5  told anyone about the investigation. Your
6  directive says to talk to nobody about the
7  investigation. And they talked to other
8  people about this investigation. At least the
9  rest of them kept it within the family.
10 Eunice didn't keep it within the family?
11     MS. NELSON: Object to the form.
12 Q. She talked to other people.
13     MS. NELSON: Object to the form.
14 Q. Now, assuming that happened, would that have
15    been insubordination?
16 A. Assuming that happened?
17     MS. NELSON: Object to the form.
18 Q. Assuming that Eunice as she admitted in her
19    statement under oath --
20     MS. NELSON: Object to the form.
21 Q. Assuming that Eunice had talked to --
22 A. I think all of them, not just Eunice. You
23    said all of them admitted to talking to

Page 351

1  somebody.
2  Q. Well, would that have been insubordination?
3  A. That all of them talked with someone?
4  Q. Uh-huh (positive response).
5  A. I think it would have been in violation of the
6  spirit of the order. Yeah.
7  Q. Yeah. And none of them was terminated, were
8  they?
9  A. Not -- no, not terminated.
10 Q. None of them was warned that they had
11    committed a violation of a directive, were
12    they?
13 A. Not that I -- I don't -- I didn't know that.
14 Q. Whatever police -- Sergeant Gray, the same one
15    who sort of was used as a reference for
16    Lavera, that same Sergeant Gray --
17     MS. NELSON: Object to the form. Object
18     to your testimony. Objection to your
19     interjection of opinion.
20     MR. JAFFREE: Am I wrong about it?
21 Q. Have you looked at Lavera's application for
22    employment and who she put down as her
23    reference?

Page 352

1  A. No, I haven't.
2  Q. Well, it's Sergeant Gray. You're familiar
3  with Sergeant Gray --
4      MS. NELSON: I object to your continuing
5      testifying.
6  Q. -- are you not?
7  A. He worked for the City of Dothan.
8  Q. You're quite familiar with him; is that not
9  correct?
10 A. No. He works for the City of Dothan. We're
11    not --
12 Q. The two of you are friends?
13 A. No, we're not friends.
14 Q. All right.
15 A. We don't socialize. We don't go to the same
16    church. We don't know the same people.
17 Q. Sergeant Gray who did this internal
18    investigation was aware that people had
19    violated your directive, specifically Eunice?
20 A. Now, you said everybody.
21 Q. Yeah. But Eunice violated by bringing in a
22    stranger.
23     MS. NELSON: Object to the form. Do you

88  (Pages 349 to 352)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



Page 353

1       know what he's talking about?

2      THE WITNESS: I -- just from what he's

3      talking about, no.

4  **Q.  Do you dispute what I'm talking about?**

5  A.  I don't remember saying that.

6  **Q.  Do you dispute what I'm talking about?**

7  A.  I don't dispute that she -- I have no way to

8      dispute that.  I don't know.  Do you have a

9      copy of it that I can see?

10  **Q.  Yeah, I have a copy of it.**

11  A.  Okay.  Can I -- did I sign it or --

12  **Q.  Did you sign it?  No.  We're talking about her**

13      **testimony, who she admitted talking to.**

14      MR. JAFFREE:  I guess we can take a break

15      and I'll find this for you.

16      (Brief recess)

17      (Plaintiffs' Exhibit 8 was marked

18      for identification.)

19  **Q.  All right.  I'll point to you what I've marked**

20      **for identification purposes as Plaintiffs'**

21      **Exhibit 8 in response to the question about**

22      **Eunice.  And Officer Keith Gray made this**

23      **statement to Eunice.  I'll give you his**

Page 354

1      **statement and Eunice's response.**

2      **"Okay.  Um, since the judge gave everyone**

3      **the directive not to talk about it to anyone,**

4      **um, have you mentioned it, the investigation**

5      **to anyone?"**

6      **"I did mention it to a family member."**

7      **That's Eunice speaking.  I'm sorry.  Yeah,**

8      **Eunice speaking.**

9      **Officer Gray: "Okay.  Who is that**

10      **member?"**

11      **Eunice: "Ah, Melissa White."**

12      **Officer Gray: "Who?"**

13      **Eunice: "Melissa White."**

14      **Officer Gray: "How is she related to**

15      **you?"**

16      **Eunice: "Just a friend."**

17      **Officer Gray: "Okay.  What contact, what**

18      **did you say?"**

19      **Eunice: "Ah, I said that, ah, there was**

20      **an investigation going on, and it's about Mary**

21      **Turner in our office because she had did**

22      **something.  We wasn't sure what was it yet."**

23      **Officer Gray: "Does Ms. White know**

Page 355

1      **Ms. Turner?"**

2      **Officer Gray (sic): "No."**

3      **Officer Gray: "Okay.  Did you"** --

4      MS. NELSON: Wait.  You're

5      mischaracterizing that.  You said

6      officer --

7      MR. JAFFREE: This is Officer Gray: "Does

8      Ms. White know Ms. Turner?"

9      Eunice: "No."

10      MS. NELSON: Okay.  Eunice said no.

11      MR. JAFFREE: I'm sorry.

12  **Q.  Officer Gray: "Okay.  Did you say anything to**

13      **anybody else?"**

14      **"I think I mentioned it to my daughter."**

15      **Officer Gray: "How old is your daughter?"**

16      **Eunice: "How old?  30."**

17      **And then it goes on.**

18      **Officer Gray: "What is your daughter's**

19      **name."**

20      **Eunice: "Claudette"** --

21  A.  Can I not see it and read it myself?  It's for

22      me to --

23  **Q.  -- "Hawthorne."**

Page 356

1  A.  Read the rest of it.

2  **Q.  Officer Gray: "And just what did you tell**

3      **her?"**

4      **Eunice: "I just told her that we were**

5      **having some problems in the office.  I didn't**

6      **mention any name."**

7      **Officer Gray: "Okay.  Anyone else?"**

8      **Eunice: "That's it."**

9      **Like I said, numerous employees discussed**

10      **this with people that could have discussed**

11      **this with people that could have led to Rickey**

12      **Stokes having information about this**

13      **investigation.  And that was the purpose of**

14      **this investigation, to find out how did Rickey**

15      **Stokes find out.  That was the sole purpose of**

16      **this internal affairs investigation.**

17      MS. NELSON: Object to the form.  Is that

18      a statement or --

19      MR. JAFFREE: Well, there's all kind of

20      statements we can go through.  I'm

21      just saying that's the purpose.  Every

22      time they would give people their

23      yearly rules, they would say it's an



89  (Pages 353 to 356)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



## FREEDOM COURT REPORTING

Page 357

1    investigation on who told.
2    MS. NELSON: Object to the form and
3    statement.
4    **Q. My question is, would you agree that purely**
5    **based on your directive, the Exhibit 7 I**
6    **believe, that Eunice committed**
7    **insubordination?**
8    A. Based on what you're showing me today that I
9    don't remember seeing. But I -- I guess I
10   made distinction -- I make the distinction
11   between contacting Mary Turner, the defendant
12   or the object of the investigation and
13   discussing having problems at the office with
14   a friend and a family member.
15   **Q. Well, I thought it was a little bit more than**
16   **a problem, it was saying that she was under**
17   **investigation, the very thing that you didn't**
18   **want people to know. But if you want to say**
19   **that's a distinction, fine.**
20   A. Well, I mean, that's the distinction I will
21   make today. I didn't make it at that time
22   because in the report -- where is the -- on
23   the report of the Mary Turner and Mary Beth

Page 358

1    investigation, I don't think it mentioned
2    that, that Eunice had talked -- said -- or
3    numerous people.
4    **Q. But the report submitted all of these**
5    **documents. I mean, that was part of the**
6    **report.**
7    MS. NELSON: Well, you can ask her that,
8    if the report submitted these
9    documents.
10   **Q. Well, are you soliciting that the report just**
11   **had a narrative of the police and no**
12   **documents?**
13   A. Let me be honest with you. I don't remember
14   seeing this. I thought there were like --
15   MS. NELSON: This is being Plaintiffs'
16   Exhibit 8?
17   A. -- disks or something but not this.
18   MS. NELSON: Have you not seen --
19   A. If there was, I didn't look at it. I'm
20   sorry. I just looked at the report. I didn't
21   read the individual interviews or anything
22   like that.
23   **Q. So you just took the police officer's word and**

Page 359

1    **made a decision on the basis of what the**
2    **police officer told you without reading any**
3    **testimony itself?**
4    A. Well, the results of their investigation
5    revealed that -- whatever. Yes. I just
6    looked at that. I didn't go back and look any
7    further at the investigation.
8    **Q. Would you agree that the results of that**
9    **investigation would reveal insubordination?**
10   MS. NELSON: Object to the form. Could
11   you show her the report?
12   A. And the other people's statements.
13   **Q. Well --**
14   A. That's kind of taken out of context.
15   **Q. That's taken out of context?**
16   A. I mean, where's the rest of it?
17   **Q. Well, your counsel have the rest of it. I'm**
18   **not going to go through all of that because I**
19   **need to try to get out of here. But, fine,**
20   **just say that there's a distinction. And**
21   **that's fine. And you didn't look at -- or**
22   **don't know if you looked at it or whatever.**
23   **That's fine.**

Page 360

1    A. Mary -- Mary Beth was the only person that
2    said she contacted Mary Turner, is my
3    understanding.
4    **Q. Well, that's not true either.**
5    A. Somebody else said they contacted her?
6    **Q. Do you remember Sarah Fowler saying that she**
7    **took Mary Turner out to lunch for her**
8    **birthday? Do you remember that being in the**
9    **report?**
10   A. After the directive?
11   **Q. Yeah, after the directive.**
12   A. I didn't look at that.
13   **Q. Well, that's contacting Mary Turner. That's**
14   **in the report as well. But let's forget about**
15   **that right now. Let's talk about this traffic**
16   **ticket right quick.**
17   MS. NELSON: Talk about what?
18   MR. JAFFREE: The traffic ticket.
19   **Q. Ms. Turner was investigated for her alleged**
20   **handling of a traffic ticket; is that correct?**
21   A. Ms. Turner --
22   **Q. Yeah, Ms. Turner.**
23   A. -- was terminated when she was criminally



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 361

1 indicted I think for -- for the traffic
2 ticket.
3 Q. Do you know if Ms. Turner was ultimately
4 charged with mishandling a traffic ticket, a
5 misdemeanor?
6 A. I don't know what she was ultimately charged
7 with.
8 Q. So you don't know. At the time Ms. Turner was
9 investigated for that ticket, she had not been
10 charged with anything; is that correct?
11 A. At the time she was investigated for it?
12 Q. Yeah. The investigation that you mentioned in
13 Exhibit 7, Ms. Turner hadn't been charged with
14 anything?
15     MS. NELSON: Number 7 being?
16     THE WITNESS: The memo about no contact.
17     MR. JAFFREE: The memo that you no
18        contact.
19 A. She hadn't been charged?
20 Q. At that time, she hadn't been charged with
21 anything, formally charged.
22     MS. NELSON: Criminally charged?
23     MR. JAFFREE: Criminally charged.

Page 362

1 Q. They was just doing an investigation,
2 A. That was the date of the investigation. So
3 no. That was the day the investigation
4 started.
5 Q. Was Ms. Turner clothed with a presumption of
6 innocence during that investigation as far as
7 you know in your capacity as a judge?
8 A. Was she clothed with a presumption of
9 innocence during the investigation?
10 Q. Yeah.
11 A. I -- I don't have any comment one way or the
12 other.
13 Q. So you don't know whether or not when people
14 are being investigated, they are presumed
15 innocent; you don't know that?
16 A. By whom?
17 Q. If that's your testimony, that's fine.
18     Well, is the term "innocent until proven
19 guilty" a two-penny catch phrase to you?
20     MS. NELSON: Object to the form. A
21        "two-penny catch phrase," I have no
22        idea what that means.
23 Q. Do you know what that means?

Page 363

1 A. Worth two pennies. I don't know, Mr. Jaffree.
2 Q. It's just a little simple expression that
3 means nothing.
4 A. I don't know.
5 Q. Let me ask you this: In your opinion in your
6 capacity as a judge and you handle criminal
7 cases, would police officers of internal
8 affairs division have a right to tell a
9 criminal suspect not to contact a particular
10 person?
11     MS. NELSON: If you know.
12 Q. If you know.
13 A. I don't know.
14 Q. You don't know.
15     Do you know, in your opinion, if a police
16 officer of internal affairs would have a right
17 to tell a witness not to contact a criminal
18 suspect?
19 A. Do I know if they have a right to do that?
20 Q. Police officer of internal affairs would tell
21 a witness, don't contact this criminal
22 suspect?
23 A. I don't know whether they have a right to do

Page 364

1 that or not.
2 Q. Don't know. Do government employees lose
3 these rights, assuming they do have rights,
4 when they accept government employment?
5     MS. NELSON: Object to the form.
6 Q. If you know.
7     MS. NELSON: Calls for a legal conclusion.
8 Q. If you know.
9 A. Whether government employees lose what right?
10 The right to --
11 Q. The right to either contact somebody when
12 they're being investigated or to be contacted
13 when somebody else is being investigated?
14 A. Do they lose that right? I don't know.
15 Q. Did Ms. Brackin have the right to contact
16 somebody who was being investigated on
17 criminal charges or be contacted by that
18 person who is being investigated on criminal
19 charges, as far as you know?
20     MS. NELSON: Object to the form.
21 A. A right?
22     MS. NELSON: Someone in her -- a co-worker
23        in her office?

91 (Pages 361 to 364)

# FREEDOM COURT REPORTING

Page 365

1  Q.  Yeah.  Well, co-worker in her office.
2      Co-worker in her office.  It doesn't matter,
3      unless you think it does matter.
4          MS. NELSON:  Object to the form.  If you
5          know.
6  Q.  Well, do you have an answer to that?
7  A.  I don't know.  I think that in -- in a
8      criminal investigation, they might have the
9      ability to say, don't do this while the
10     investigation is pending.
11 Q.  Fine, fine, fine.  Okay.
12     As a potential defendant, did Ms. Turner
13     have a right to contact potential witnesses on
14     her own behalf even if these witnesses were
15     co-workers?
16 A.  Did Ms. Turner have that right?
17 Q.  Yeah.  Does Ms. Turner have the right to
18     contact a potential witness, even if they were
19     co-workers, as far as you're concerned?
20 A.  A constitutional right?
21 Q.  Well, any kind of right?
22 A.  I don't know.
23 Q.  You don't know.  All right.  Well, if, in

Page 366

1      fact, they had a right, wouldn't you agree
2      that your directive as reflected in
3      Plaintiffs' Exhibit Number 7 frustrates this
4      cherished constitutional right?
5          MS. NELSON:  Object to the form.  It calls
6          for a legal conclusion.
7  A.  As the directive, I -- I don't -- I
8      don't -- no, I don't think it frustrates it.
9  Q.  Okay.  Fine.
10 A.  I think it was for a very limited period of
11     time for a specific purpose.
12 Q.  If an employee had been asked by Ms. Turner to
13     assist them or to speak out in her behalf
14     because she was being investigated for a
15     criminal charge and you had your directive in
16     place, would that employee have a choice of
17     putting that job in jeopardy or denying
18     assistance to Ms. Turner, that they do one or
19     the other?
20         MS. NELSON:  Object to the form.
21         Speculative.  Assumes facts not in
22         evidence.
23 Q.  Well, yes or no?

Page 367

1  A.  If they want to speak out on her behalf during
2      the investigation?
3  Q.  During your directive.
4  A.  I think they could have talked to the
5      investigators.
6  Q.  Well, I'm asking you, could they have talked
7      to Ms. Turner without subject -- subjecting
8      their employment and their livelihood to the
9      risk of loss based on your directive?
10 A.  After hours they could have talked with her.
11 Q.  After hours they could have talked with her.
12     So you had an after-hour exception.  Okay.
13         MS. NELSON:  Well, she's already testified
14         to that several times, that after
15         hours they could contact her and she
16         could then, in turn, check with the
17         investigators to determine the
18         parameters there.
19 Q.  All right.  Contact the investigators.  Did
20     you give them the names of the investigators?
21 A.  I told them to contact me.
22 Q.  Oh, contact you, not the investigators.
23         MS. NELSON:  Yeah, she's testified to that

Page 368

1      about three times.
2  Q.  Okay.  Should any public employee have to make
3      this choice or choose in between your
4      directive and coming to the assistance of a
5      person charged with a criminal offense?
6          MS. NELSON:  Object to the form.  Assumes
7          facts not in evidence.  She has not
8          been charged yet.  Calls for a legal
9          conclusion.
10 Q.  Well, should they?
11 A.  Can you ask that again?
12 Q.  Should any public employee have to make this
13     choice of coming to the assistance of a friend
14     being made the subject of investigation or
15     running the risk of losing their job by doing
16     so?
17         MS. NELSON:  Same objection.
18 Q.  Should a government employee have to face that
19     kind of choice?
20         MS. NELSON:  Same objection.
21 A.  Generally or specifically about this case?
22     That wasn't the choice about losing their
23     jobs.  I just asked them not to contact --

92 (Pages 365 to 368)

Page 369

1 Q. So they wouldn't have lost their job for
2    contacting her?
3 A. Well, I'm not saying they wouldn't have. But
4    I said, generally or specifically, in the
5    world or specifically about Mary Turner?
6 Q. Did you --
7 A. You said should any -- said any employee. I
8    don't know.
9 Q. But did you consider the sanction for
10   violating your directive can be the loss of a
11   job?
12 A. No. Insubordination is a major disciplinary
13   infraction. The only reason Mary Beth was
14   terminated was because she had had two. They
15   might have gotten a disciplinary infraction,
16   but not necessarily terminated if they didn't
17   have a prior.
18 Q. So had she not had any prior, she wouldn't
19   have been terminated?
20 A. I don't know that, but she did. So she was.
21 Q. Oh, so she may have still been terminated?
22 A. I don't know.
23 Q. Don't know.

Page 370

1 A. I didn't -- I didn't --
2 Q. Okay. Well, did you consider these value
3    choices that employees have to make when you
4    issued your directive?
5     MS. NELSON: Object to the form of the
6        question.
7 Q. Do you understand the question?
8 A. She said she contacted her solely about work.
9     MS. NELSON: And the judge has dismissed
10        this claim.
11 A. So I don't think it was a value choice. She
12   didn't -- she said, she didn't say anything
13   about contacting her personally. She said it
14   was solely about where -- about work.
15     MR. JAFFREE: I think it was the other
16        claim that got dismissed.
17     MS. NELSON: No. Well, you maybe need to
18        read the order.
19     MR. JAFFREE: What order?
20     MS. NELSON: The judge's order.
21     MR. JAFFREE: Which claim that got
22        dismissed that you're claiming?
23     MS. NELSON: Mary Brackin's claim

Page 371

1     regarding her contact with Mary
2     Turner.
3       MR. JAFFREE: Well, I'm not sure the
4         association claim has been dismissed.
5       I don't think so at all.
6 Q. Anyway, now that you've had time to think
7    about it, do you think that an employee should
8    be required to make those choices?
9       MS. NELSON: When has she had time to
10        think about it?
11      MR. JAFFREE: The last few years.
12      MS. NELSON: What choices? Whether to
13        comply with the work-related directive
14        while a criminal investigation is
15        ongoing?
16 Q. Do you understand the question?
17 A. No.
18 Q. I'll pass it.
19    Do you know who was assigned to conduct an
20   investigation of Ms. Turner?
21 A. Not specifically.
22 Q. Did you play any role in the initiation of
23   this investigation?

Page 372

1 A. Other than calling them and telling them, no.
2 Q. Do you remember who said what to you in
3    respect to no one having any contact with
4    Ms. Turner? Remember the names of who told
5    you anything?
6 A. One of the investigators said we needed to
7    tell them not to contact her, not to go into
8    her office, or touch her computer.
9 Q. Could you consult with your attorney and find
10   out who told you that?
11     THE WITNESS: Do you know who told me
12        that?
13     MS. NELSON: I think the witness needs to
14        testify from her own recollection.
15 Q. So you don't know who told you?
16 A. I just don't remember which investigator. One
17   of the assigned investigators told me.
18 Q. To your knowledge, did any of your staff have
19   any contact with Ms. Turner in a way that
20   interfered with the investigation?
21 A. To my knowledge -- direct knowledge, I don't
22   have any knowledge of any of my staff
23   contacting Mary Turner, other than Mary Beth

93 (Pages 369 to 372)



# FREEDOM COURT REPORTING

Page 373

1  Brackin.
2  Q.  And do you know that in view of the
3  investigation?
4  A.  I don't know.
5  Q.  Don't know.
6      Would a salutary hello in passing
7  Ms. Turner in the street been in violation of
8  your directive?
9      MS. NELSON: I'm sorry. I didn't
10     understand your question.
11     THE WITNESS: A salutary --
12 Q.  Salutary hello when passing Ms. Turner on the
13 street been violative of your directive?
14     MS. NELSON: Object to the form.
15 A.  Can I say or did I say, you can't speak to her
16 or -- may I see Exhibit 7.
17 Q.  No contact.
18     I don't have it. It's up there somewhere.
19 A.  No, I don't think that would have of the
20 directive.
21 Q.  So that wouldn't have violated it. Okay.
22 That's good.
23     Did the staff know that such limited

Page 374

1  contact was acceptable?
2      MS. NELSON: Object to the form.
3  A.  I don't know what they knew.
4  Q.  Would participating with Ms. Turner in a Bible
5  study class during the prescriptive time have
6  been a violation of your no-contact directive?
7  A.  No, because it was after hours.
8  Q.  After hours was okay.
9      What about sending Ms. Turner an e-mail?
10 Dependent upon the e-mail?
11 A.  I don't know.
12 Q.  You don't know?
13 A.  If they had sent her an e-mail --
14 Q.  Sent her an e-mail, would that have been
15 sufficient contact to violate your directive?
16     MS. NELSON: Again, object to the form.
17 A.  Right, and my directive. It was a directive
18 of the investigators that they not -- I think
19 that needs to be clarified on the Record. It
20 was not my directive.
21     MS. NELSON: You've clarified. He keeps
22     --
23 A.  I communicated it to them through the

Page 375

1  investigators.
2  Q.  But it became your directive when you enforced
3  it, didn't it?
4      MS. NELSON: Object to form.
5  A.  I communicated it to them.
6  Q.  But it became yours when you enforced it,
7  correct?
8  A.  I didn't -- I'm not saying I adopted or
9  initiated it. I communicated it.
10 Q.  Somebody lost their livelihood as a result of
11 you enforcing that directive; is that correct?
12 A.  Somebody lost their livelihood as a result of
13 violating that directive, a choice they made.
14 Q.  Okay. A choice. All right.
15     What about non-verbal communications such
16 as a hand wave or a handshake; would that have
17 been in violation--
18     MS. NELSON: Object to the form.
19 Q.  -- of your directive?
20 A.  I don't know how I would have known about it.
21 Q.  Well, if you had known about it, would that
22 have violated your directive?
23     MS. NELSON: Object to the form,

Page 376

1  hypothetical. Speculative.
2  A.  I don't know.
3  Q.  You don't know if that would've violated your
4  directive? Don't know? Okay.
5      Sarah admitted that she spoke to Mary
6  Brackin about the investigation. Was that a
7  violation of your no-contact -- I'm sorry --
8  no-communication directive?
9      MS. NELSON: Object to the form. Assumes
10     facts not in evidence.
11 Q.  Would it?
12     MS. NELSON: Object to the form.
13 A.  I think when I asked her not to talk with
14 anybody about it, I was trying to be
15 protective of Mary. And I kind of meant,
16 gossiping with other people outside the
17 office. But I tried to convey that as best I
18 could that -- and I told them that I was being
19 protective of Mary. There was a lot of
20 allegations and rumors; let's not talk about
21 it. And I meant, add fuel to the fire. You
22 know, I really was trying to be protective of
23 her because there were merely allegations and

94  (Pages 373 to 376)



# FREEDOM COURT REPORTING

Page 377

1    no substantiated evidence of any wrongdoing by
2    her.
3    Q. Melanie Wise spoke to her husband. Was that a
4       violation of your directive?
5       MS. NELSON: Object to the form.
6    A. I -- no. I think it's reasonable that they
7       would tell their spouses that something was
8       going on at work.
9    Q. And so they should have just realized that
10      that was reasonable?
11      MS. NELSON: Object to form.
12   A. I think it's expected that they'll talk to
13      their husbands. If they're -- if they're
14      down, their husband say, what's going on. Oh,
15      we got an investigation at work. I don't
16      think that violates the spirit of the order.
17      No, I don't.
18   Q. And Ann spoke to her husband, so that didn't
19      violate it either?
20      MS. NELSON: Object to the form.
21   A. Do we know what she told her husband, or if
22      she said, we're having problems at work or
23      there's an investigation at work or one of my

Page 378

1    co-workers is in trouble? We don't know what
2    she told them. And I think it's expected that
3    they would to talk to something -- to their
4    spouses.
5    Q. Let me just check these off. Melissa Woods
6       talked to her husband; that's okay as well,
7       right?
8       MS. NELSON: Object to the form.
9    A. I'm not saying it's okay, but we don't -- do
10      we know what they told her? She talked to
11      them --
12   Q. About the investigation.
13      MS. NELSON: Object to the form. Do you
14      know if she talked to her husband?
15      THE WITNESS: No. No, I don't know that
16      she talked to her husband.
17   Q. Now, let me discuss this case with Melissa.
18      You have a problem with that -- discussed the
19      investigation?
20      MS. NELSON: Who's Melanie and who's
21      Melissa?
22   Q. Do you know Melanie?
23   A. Do I know Melanie?

Page 379

1    Q. And Melissa Woods?
2    A. Or Melissa Woods?
3    Q. Well, Melanie discussed it with Melissa. Was
4       that okay?
5    A. I don't know that she did.
6    Q. Okay. But it's all in the police report?
7    A. I don't know. It might be in that stuff that
8       you have.
9    Q. Well, either I'm making this up, or it's on
10      the police report.
11         Michelle Bryan discussed this with her
12      husband. The same response?
13         MS. NELSON: Object to the form.
14   A. I don't know that she did.
15   Q. Well, if she did, same response, it's okay to
16      discuss with your husband?
17   A. I didn't say it was okay. I said it's
18      expected that if something unusual --
19   Q. Expected.
20   A. -- is going on at the office for them to tell
21      their spouses. Now, whether they went into
22      specific allegations, we don't know.
23   Q. Well --

Page 380

1    A. If they --
2    Q. I'm sorry. Go ahead.
3    A. Well, you said discuss this. So if said, our
4       office is in an uproar, then that's expected.
5       We don't know what they said. So it depends
6       on what they communicated, if it was about the
7       investigation. We don't know. I had to work
8       over because I had to do somebody else's
9       duties because she's out on investigation. We
10      don't know, Mr. Jaffree, so it would depend on
11      what I knew about the facts of that particular
12      incident.
13   Q. Do you have any idea why Officer Gray, who was
14      conducting the investigation to see who may
15      have leaked this information to Rickey Stokes,
16      would not have questioned these people
17      thoroughly as to who they had talked to and
18      perhaps even talked to the people that they
19      talked to, to see if he could get to the
20      bottom of it of it?
21         MS. NELSON: Object to form.
22   A. No, I don't have any idea what he asked or --
23   Q. Okay. What exception does Eunice discussing



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 381

1  with Melissa White -- by the way, are you
2  familiar with Melissa White?
3  A. No.
4  Q. So you don't know who she is?
5  A. No.
6  Q. What exception does Eunice discussing this
7  with her friend Melissa White does that fit
8  in?
9  A. I don't - I don't make an exception.
10  MS. NELSON: Object to the form.
11  Q. No exception.
12  A. I don't know what she told her friend.
13  Q. Well, I read to you what she told her friend.
14  A. I don't know what all she told her friend, and
15  I didn't know about it. I didn't make an
16  exception.
17  Q. Now, as you may know, Section 10 of the Dothan
18  Civil Rights Act requires that a civil service
19  rating list for rating job applicants be
20  maintained.
21  Do you know pursuant to that list what
22  place Lavera or Eunice -- what place they
23  occupied on that list, if you know?

Page 382

1  A. No, I don't.
2  Q. Did you report to the personnel director in
3  writing any deficiencies in Nancy's job
4  performance during her working test period as
5  required by Section 18 of the Dothan Civil
6  Service Act?
7  A. Yes, I did.
8  Q. How many times did you report to them?
9  A. I'm not sure. I spoke with Nancy in the
10  presence of Kai Davis. I went over each
11  perceived deficiency in her performance, each
12  allegation that was made against her. We
13  discussed in depth the problems, that I was
14  not pleased with the way the office was going,
15  that I felt the office was deteriorating under
16  her supervision, that there was a lot of
17  ying-yang and talking.
18  And she was very well aware that we --
19  that I was not happy with the way things were
20  going after our first counseling session in my
21  office and then my second one in Kai Davis's
22  office.
23  Q. Can I --

Page 383

1  A. And we did talk about those.
2  Q. Can I interrupt you for a second?
3  I guess the question was in writing, not
4  verbally. Did you communicate to the
5  personnel director in writing, as required by
6  Section 18, Nancy's deficiencies?
7  A. I remember doing a memo to Kai after our
8  second counseling session.
9  Q. Memo to Kai?
10  A. Kai, Jerry Corbin, the acting city manager.
11  Q. So if Nancy testified she didn't have any
12  verbal counseling sessions, she'd be lying
13  again, right?
14  A. Yes. We discussed the problems that we were
15  having that were exacerbated under her
16  supervision.
17  Q. Did you reduce these counseling sessions to
18  memos that you gave to Nancy?
19  A. I did -- no. I did not give them the second
20  time. I wrote a memo because I was advised
21  that I should write a memo, keeping track with
22  what I told her, in which Kai Davis was
23  present for the second, was not for the first.

Page 384

1  Q. You said you did not give Nancy a memo; is
2  that correct? That you didn't give her a memo
3  explaining to her --
4  A. No. I talked with her.
5  Q. -- the fruits of your discussion?
6  A. No. We talked in depth about everything that
7  I perceived that was wrong with the office and
8  that would've been in my chambers. Okay.
9  June 8th. Counseled her regarding several
10  areas of concern.
11  Q. If I could get you just to focus on my
12  question, have you seen this document here,
13  Attachment 1?
14  A. I'm sure I have.
15  (Brief pause)
16  Q. Is it necessary for you to read that entire
17  document in order for you to know whether
18  you've seen it?
19  A. If you're going to ask me about it, I'd like
20  to read it.
21  Q. Well, I'm going to ask you questions that
22  you're not going to need to read it for me to
23  ask you initially.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**



# FREEDOM COURT REPORTING

Page 385

1  MS. NELSON: Well, again, I think she has
2  the right to read it. This is about
3  events that happened over three years
4  ago.
5  Q. Your counsel haven't shown you these documents
6  recently?
7  MS. NELSON: I would object to her
8  testifying to anything as to what
9  she's communicated or done with her
10  counsel.
11  MR. JAFFREE: Well, if counsel showed her
12  a document, that's not communicating
13  with counsel.
14  MS. NELSON: That is a communication.
15  MR. JAFFREE: Counsel, if you say so.
16  (Brief pause)
17  MR. JAFFREE: Well, if she's going to read
18  the whole document, maybe I should
19  just let her read all three of them.
20  A. I read Attachment 1. And go ahead and read
21  the other two?
22  Q. Well, not yet. When was Attachment 1 drafted?
23  MS. NELSON: Is that a question?

Page 386

1  Q. When was Attachment 1 drafted?
2  MS. NELSON: Well, you didn't give her the
3  complete copy. It belongs to -- it
4  was an attachment to another document
5  that it was attached to.
6  I mean, if you know --
7  A. It's not dated. I don't remember what date.
8  Q. What document was that attached to?
9  MS. NELSON: Well, obviously, you
10  separated it from what it was attached
11  to.
12  MR. JAFFREE: I saw the EEOC charge that
13  it was attached to -- I mean, EEOC
14  response. It was part of the EEO
15  package.
16  Q. If you know, do you have any idea of -- first,
17  when was the documented drafted, do you know?
18  MS. NELSON: If you know.
19  A. I don't know because it's not dated. I'd be
20  lying if I tried to tell him a date. But I
21  think it was attached to her last evaluation
22  or --
23  Q. Well, last evaluation was when she was

Page 387

1  terminated.
2  A. Right. "It is with the utmost disappointment
3  I must decline to recommend Ms. Martin for
4  continued employment with the City of
5  Dothan."
6  Q. So that's Attachment 1, so I guess that would
7  come first over Attachment 2, maybe not. But
8  do you have any idea whether or not you
9  drafted that along with your evaluation or did
10  you draft that before?
11  A. Where is that -- it implied that it was
12  contemporaneous because "It is with utmost
13  disappointment that I must decline to
14  recommend her for continued employment with
15  the City of Dothan." So it implies it was
16  contemporaneous with my decision to not
17  recommend her for continued employment.
18  Q. Okay.
19  A. "I had fervently hoped that Ms. Martin would
20  be able to correct the shortcomings in her
21  supervisor style and rise to the difficult
22  task before her. However, it has become
23  painfully obvious that she cannot, and the

Page 388

1  reasons for this decision are as follows."
2  So it implies that it was either attached
3  to her termination or some other -- it's
4  Attachment 1.
5  Q. Do you know who you gave that to?
6  A. No. I think it was attached to her
7  termination -- her evaluation paperwork.
8  Q. All right. Let me show what is identified as
9  Attachment 2.
10  A. Okay. What about that? Do you want me to
11  read it?
12  Q. When was Attachment 2 drafted?
13  A. Looks like July -- yeah. That was the memo of
14  July 8th.
15  Q. If it was drafted, was it drafted on July 8th?
16  A. It says "as of this date, July 8th, my concern
17  is on the state of affairs at the" -- looks
18  like it was. I don't know.
19  "On or about June 8th, I met with her in
20  my chambers. I was sadly disappointed.
21  Further additional problems have become
22  apparent."
23  Q. What are you reading? Are you reading



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



Page 389

1    **Attachment 2?**
2  A.  Yes, sir.
3  **Q.  So you're saying this was done on what day, on**
4    **July the 8th?**
5  A.  I don't know.
6  **Q.  Although it mentions July the 8th, doesn't it?**
7    MS. NELSON:  Well, we've already provided
8      you with a memo that she did on July
9      8th about Ms. Martin's deficiencies.
10    MR. JAFFREE:  What -- you're talking about
11      the memo to -- which memo are you
12      referring to?
13    MS. NELSON:  To Kai Davis.  So it just
14      seems -- I mean, I'm not going to
15      testify. I know it's getting late in
16      the day.  I'm trying to move things
17      along.  It just seems to be a recap of
18      all the deficiencies that she had
19      incurred over her employment.
20  **Q.  Well, let me ask you this:  Did you give**
21    **Attachment 1 in any written form to Ms. Martin**
22    **at any time?**
23  A.  If it was a part of her evaluation, she had to

Page 391

1  I did one a month later, July 8th, it looks
2  like.
3  **Q.  Well, did you draft a letter to Kai Davis and**
4    **this attachment on the same day?**
5  A.  I don't know if this was attached to -- I
6    think I just made this Attachment 2, thinking
7    that this was the memo of July 8th.  I think
8    this is -- "Ms. Martin took it upon herself to
9    inform the employee."
10    And I think it's probably the same thing,
11    just a recap of what was in the -- all this
12    was attached to her final evaluation, just
13    recapping the memo of June 8th and July 8th of
14    2004.  These are my attachments to her final
15    evaluation.
16  **Q.  Do you know why the font is different on your**
17    **attachment versus a memo to --**
18  A.  Why the what is different?
19  **Q.  The font.**
20  A.  Because I probably just printed this one off
21    the computer, is what I'm thinking, when I was
22    doing it.  I had already sent her that memo,
23    and I'm assuming that when I did this, I just

Page 390

1    sign, is what I assume.
2  **Q.  Well, she says that the attachment wasn't part**
3    **of her evaluation, just wasn't.**
4  A.  I don't know.  I would have -- this -- I think
5    that's what it was attached to.
6  **Q.  Now, what about Attachment 2; did you give**
7    **Attachment 2 to -- to Ms. Martin?**
8  A.  I think it -- I don't know.  It would have
9    been attached to her evaluation -- her final
10    evaluation.
11  **Q.  But Attachment 2 was done before her final**
12    **evaluation. You said that it was dated July**
13    **the 8th.  So on or about July 8th, did you**
14    **give Ms. Martin a copy of this Attachment 2?**
15    MS. NELSON:  Object to the form.
16  A.  Right.  No.  It was a memo to Kai Davis.
17  **Q.  Was the memo to Kai Davis sort of identical to**
18    **this Attachment 2?**
19  A.  I think so.  I don't know.  I haven't read
20    it.  I haven't compared the two.
21  **Q.  Well, can you tell me, when did you do the**
22    **memo to Kai Davis?**
23  A.  I did one to Ms. Kai Davis June 8th, and then

Page 392

1    printed it off the computer.  It doesn't look
2    like the font is different to me.  Oh, yeah.
3    I think -- well, I think I just printed this
4    off the computer when I was doing her final
5    evaluation.
6    I had already sent these memos to Kai,
7    saying that I did counsel her, showing that I
8    had counseled.  And then when I got ready to
9    terminate her, I just made an attachment.
10  **Q.  Well, let's talk about this June the 8th memo**
11    **to Kai -- that you said you did to Kai.  You**
12    **didn't send this June 8th memo to Ms. Brackin,**
13    **did you?**
14  A.  No.
15    MS. NELSON:  You're talking about June
16      8th, the June 8th memo.
17    MR. JAFFREE:  Yeah, June 8th.
18  **Q.  Now, you say in that June the 8th, on or**
19    **about --**
20  A.  Why would I have sent it to Ms. Brackin?
21  **Q.  I'm sorry.  Ms. Martin.  I'm sorry.  I'm**
22    **getting my clients mixed up.**
23    **You didn't send this to Ms. Martin, did**



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 393

1    you, this memo dated June the 8th?
2    A.  It says, to Kai Davis.
3         MS. NELSON:  Can we get these marked so we
4         at least know what we're talking about
5         here?
6    MR. JAFFREE:  Okay.  Sure we can do that.
7    MS. NELSON:  I mean, I'll mark them if you
8         want me to.
9    MR. JAFFREE:  Yeah.
10   MS. NELSON:  Okay.  I'm going to mark the
11        June 8th memo as Plaintiffs' Exhibit
12        10.
13        (Plaintiffs' Exhibit 10 was marked
14        for identification.)
15   A.  That's June 8th memo to Kai Davis.
16   Q.  If you look at the June the 8th memo, you say,
17        "On or about the 8th of June, I called Nancy
18        Martin."
19        Were you not certain what date you called
20        Nancy?
21   A.  I just always say "on or about."  I mean,
22        that's just kind of something I do.
23   Q.  I mean, but if the memo is dated the 8th and

Page 394

1    you talked to Nancy on the 8th, why would you
2    say on or about June the 8th?
3    A.  I just said that.
4    Q.  Why not, "Today I talked to Nancy Martin?"
5         (Brief pause)
6    Q.  Now, if you look at that exhibit, you indicate
7         a complaint from Ms. Ott.  Was that complaint
8         in writing?
9    A.  No.  I said, "As you are aware from your
10        conversations with Ms. Ott."  I knew that
11        Ms. Ott had been over to Personnel to complain
12        about Ms. Martin's "sad inability to interact
13        professionally with personnel from that office
14        as well the" -- I knew that Ms. Ott had been
15        over to the -- to talk with her.  There
16        was -- not saying there was a complaint.
17   Q.  So there wasn't a complaint?
18   A.  Well, I mean -- no, I didn't say there was one
19        in here.  I said, "As you are aware from your
20        conversations with Ms. Ott, Ms. Martin
21        exhibits a sad inability to interact
22        professionally with personnel from that office
23        as well as defense attorneys which has carried

Page 395

1    over to the attitudes of personnel under
2    Ms. Martin's supervision."
3    Q.  Let's me stop you.  What did Ms. Ott say to
4         Kai Davis?
5    A.  I -- I -- it would be hearsay whatever she
6         said to her, but I knew that she had talked
7         with her about problems she was having with
8         Nancy.
9    Q.  All right.  I want you to define with
10        specificity the problems.
11   A.  That I observed?
12   Q.  The problems that Ms. Ott was having with
13        Nancy and the dates that these problems
14        occurred.
15   A.  Well, I don't know all the problems that they
16        had personally with each other.  That I
17        observed was several problems, that Nancy was
18        just very --
19   Q.  Give me the date that you first observed the
20        problem between Nancy and Ott.
21   A.  I don't know the date specifically.
22   Q.  Tell me the nature of the problem that you
23        first observed.

Page 396

1    A.  I don't know that it was the first, but I
2         witnessed Nancy coming over there and
3         screaming about the magistrates being
4         attacked, about an incident that never
5         happened.
6    Q.  And so you're talking about -- is that a
7         single incident that you remember now?
8    A.  You asked me -- I don't know -- I don't know
9         the first.  I can't put them in sequence, but
10        there were several.
11   Q.  Well, tell me, other than the screaming
12        incident about magistrates being
13        attacked -- and when did that happen?
14   A.  I don't know the date.
15   Q.  Can we assume that it was before June the 8th?
16   A.  I don't know if it had happened yet.  I don't
17        know.
18   Q.  All right.  So if we're not talking about that
19        incident because it may not have happened,
20        what incident are we talking about --
21   A.  Not because it may not have happened, because
22        we don't remember the specific date it
23        happened.



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 397 |
|---|

1  Q.  All right. You understand what I want. I
2      have to establish that stuff that you say is
3      not true. In order to establish that, I need
4      to know what happened.
5          MS. NELSON: Object to the form. To say
6          that stuff she's saying is not true?
7      MR. JAFFREE: I have to establish that as
8          a matter of law.
9          MS. NELSON: Why do you have to establish
10         that? Your goal is to get the facts.
11     MR. JAFFREE: No, no. I have to establish
12         that as a matter of law.
13 Q.  I have to establish that you --
14         MS. NELSON: Well, I resent that comment.
15         You have no basis --
16     MR. JAFFREE: You can resent it.
17         MS. NELSON: -- that this witness is not
18         telling the truth.
19     MR. JAFFREE: I'm only telling you what
20         the law requires me to establish.
21         MS. NELSON: The law established -- caused
22         you to establish --
23     MR. JAFFREE: A pretext. But I don't want

| Page 398 |
|---|

1      to argue with you. I'm trying to get
2      some --
3  Q.  Tell me, other than this unspecified date that
4      Ms. Martin was complaining about how Ms. Ott
5      was treating magistrates, what other specifics
6      you have observed?
7  A.  Between Ms. Ott and --
8  Q.  Ms. Martin.
9  A.  -- Ms. Martin. Just inability to get along.
10     You know, Ashton would call for cases. Nancy
11     wouldn't let the magistrates bring them over.
12     Ashton was the prosecutor. It was just a --
13 Q.  You said --
14         MS. NELSON: Let her testify. You asked
15         her. Let her testify.
16     MR. JAFFREE: I don't want her to get out
17         --
18         MS. NELSON: You don't want to hear what
19         she has to say.
20     MR. JAFFREE: I want to ask her
21         specifics.
22 A.  I didn't write the dates down. I was in
23     court.

| Page 399 |
|---|

1  Q.  Tell me the facts beyond --
2          MS. NELSON: She's trying to. You keep
3          interrupting her and won't let her.
4  Q.  I want to do these one at a time. Okay? The
5      first I want to know is, when did Ms. Ott call
6      for cases and Nancy wouldn't let cases come
7      down? When did that happen?
8  A.  The date?
9  Q.  Yeah.
10 A.  I don't know.
11 Q.  What did you do when that happened?
12 A.  I more than likely called and said, this is
13     the prosecutor; if she wants a case, let's
14     just bring it over and get it taken care of.
15 Q.  What case was it that the prosecutor was
16     asking for?
17 A.  More than one.
18 Q.  What month did this happen in?
19 A.  February. I don't know.
20 Q.  February.
21 A.  I don't know, honestly.
22 Q.  So you don't know. Was it prior to June -- I
23     mean -- I'm sorry. Yeah, June. Prior to June

| Page 400 |
|---|

1      8th?
2  A.  It must have been, some of the problems. But
3      I don't know specifically which.
4  Q.  So --
5  A.  I didn't stop during court to write down the
6      fact that Ashton called for a case, she was
7      the city attorney, and Nancy wouldn't let them
8      send it. I did not do that. I do not know
9      the dates. I just know that it was a
10     continuous problem with Nancy and --
11 Q.  Well, you see --
12         MS. NELSON: Please let her continue.
13 A.  -- and the prosecutor's office. It was.
14 Q.  I don't know what "continuous" mean. I need
15     some more definition.
16 A.  Well, your client said yesterday there were
17     numerous things she -- there were too many
18     cases. She didn't know the names or dates or
19     anything, and you accepted that.
20 Q.  I'm not -- hold on.
21 A.  So I'm saying the same thing, it was too
22     numerous.
23 Q.  Well, maybe your attorney accepted that.



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 401

1  A. No, you did, too.
2  Q. I had no role in accepting or not accepting.
3  A. Well --
4  Q. I'm trying to --
5  A. I don't know.
6  Q. -- get some specificity.
7  A. I don't know.
8  Q. You tell me "numerous."
9  A. Numerous.
10  Q. As a --
11    MS. NELSON: She said continuous and
12    numerous.
13  Q. As a judge, if somebody appears before your
14    court and they testified there had been
15    numerous problems with this person -- let's
16    say it's a spouse abuse case. Numerous --
17  A. I wouldn't make them tell me the dates.
18  Q. Numerous problems and they couldn't be
19    specific about anything --
20  A. Well, they can be --
21  Q. -- would you accept that?
22  A. -- specific about the incident if they just
23    said, I don't know the date, but I know he

Page 402

1    beat the hell out of me and I had a black eye
2    and had a broken arm, I would give that some
3    credibility.
4  Q. I will give that some credibility. I'm trying
5    to find out, what did you do when Nancy told
6    somebody that they're not going to bring some
7    files down, what did you do?
8    MS. NELSON: Asked and answered. She said
9    what she'd do.
10    MR. JAFFREE: What did she do.
11  A. Called the clerk's office and said, Ashton is
12    a prosecutor. Let's just get the cases
13    brought over and get them handled.
14  Q. All right. This happened sometime but you
15    don't when, sometime --
16  A. I don't know the specific date.
17    MS. NELSON: Asked and answered.
18  Q. All right. Now, that's one incident. What's
19    another incident?
20  A. Another incident is when she flew over into
21    the courtroom, saying that one of the
22    magistrates had called her and told her that
23    Ashton had threw a fit and disparaged the

Page 403

1    magistrates during court. And I told her,
2    that never happened. I was there. Now, if
3    she did it outside of court, no, but it did
4    not happen in court as they told her.
5  Q. Do you know when that happened?
6  A. And she -- she just threw a fit.
7  Q. Do you know when that happened?
8  A. No. Does she know?
9  Q. Did you do a memo to Nancy about that?
10  A. No.
11  Q. Did you do a memo to Nancy about the first
12    one?
13  A. No.
14  Q. All right. Now let's go the third one.
15  A. Only with Ms. Ott or with the other
16    attorneys?
17  Q. Ms. Ott. Right now with Ms. Ott?
18  A. Ms. Ott. Well, she was just very
19    unprofessional. She was mad with Ms. Ott I
20    guess because -- I don't know. I'm just
21    assuming. But it was just an inability to
22    work -- anything Ms. Ott called for, she just
23    resisted giving. And I tried to explain to

Page 404

1    her that these are the City's cases, if they
2    want to -- whatever they want to do with their
3    cases, you know, these are their cases to
4    prosecute or not.
5  Q. Other than this first incident --
6  A. The first three or four.
7  Q. Other than this incident, when did Ms. Ott
8    call for something and Nancy didn't give it to
9    her?
10    MS. NELSON: Object to the form.
11  A. Several times.
12  Q. How many times?
13    MS. NELSON: It's mischaracterizing her
14    testimony.
15  Q. How many times?
16  A. Numerous times.
17    MS. NELSON: Asked and answered.
18  Q. How many times that you're aware of?
19    MS. NELSON: Asked and answered.
20  A. I can't give you a number.
21  Q. More than ten?
22  A. I can't give you an answer.
23  Q. More than 15?

101 (Pages 401 to 404)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 405

1    A. If I say ten, and it was nine, I'd be lying.
2       So I can't give you an answer.
3    Q. Well, what does numerous mean to you?
4    A. A lot.
5    Q. What does a lot mean to you?
6    A. Many.
7    Q. More than five?
8    A. More than once.
9    Q. More than once but less than five?
10       (Brief pause)
11   Q. Aren't you just making this up out of whole
12      cloth?
13   A. No.
14   Q. All right. Well, what did you do --
15   A. Your clients are making all that up out of
16      whole cloth --
17   Q. What did you do --
18   A. -- trying to get a lawsuit.
19   Q. What did you do --
20       MS. NELSON: Object. Asked and answered.
21   Q. What did you do when Nancy just numerous times
22      denied response to Ms. Ott's request for
23      information?

Page 406

1    A. I told her the same thing the attorney at
2       Legal Services told her, that she wasn't a
3       lawyer and she couldn't tell them how to try
4       their cases.
5    Q. Are you not the appointing authority?
6    A. I'm the department head.
7    Q. All right. The appointing authority. Didn't
8       we agree to that earlier?
9        MS. NELSON: She's a department head. Go
10       ahead, please.
11   Q. You want a court to believe -- another
12      court -- that you observed numerous occasions
13      Ms. Martin, who's not a lawyer, telling
14      another lawyer that's assistant prosecutor
15      that I'm not going to give you documents that
16      you want and you did nothing but just talk to
17      her on the phone? Numerous occasions?
18   A. Well, she wouldn't say, I'm not going to give
19      them to you. The magistrate -- she would say,
20      well, it's not on the docket or, you know,
21      just -- it wasn't set for today. She just
22      didn't help us. Nancy never facilitated the
23      process. You know, once she came, it just --

Page 407

1       it deteriorated even more --
2    Q. When did you first --
3    A. -- because of her lack of knowledge and her
4       inflexibility and her reliance on people to
5       tell her what to do.
6    Q. When did --
7    A. She couldn't look up things in the computer.
8       She didn't know what they were doing. She
9       argued with lawyers. She -- you know, it was
10      just a constant source of problems. She was a
11      probationary employee. And I couldn't allow
12      it to go on.
13   Q. I understand what you're saying. I understand
14      your position on this.
15   A. I know, but you want me to know dates and
16      write -- stop court. You've been in court
17      when there were 300 people -- stop court and
18      write Nancy a memo every time I had to call up
19      there and ask for a ticket.
20   Q. Did any of this --
21   A. It's impractical. And I think a court would
22      understand that.
23   Q. Did any of this happen before you did Nancy's

Page 408

1       first evaluation?
2    A. I don't know.
3    Q. Could any of this -- could this attitude have
4       reflected itself when you did Nancy's first
5       evaluation?
6    A. I don't think so.
7    Q. So she changed?
8    A. I don't know.
9    Q. Well, either she changed or she didn't?
10   A. I don't remember.
11   Q. You don't remember whether she changed. Okay.
12      Now, do you remember any other incidents
13      involving Ms. Ott in addition to --
14   A. Not specifically.
15   Q. Nothing specific?
16   A. Ms. Ott does, though.
17   Q. Ms. Ott does but you don't. Okay. Fine. All
18      right.
19          Now, let's talk about these other
20      attorneys. Were there numerous attorneys that
21      have complaints of Nancy?
22   A. Not numerous. One, two, three, four.
23      Everybody was complaining that she wouldn't



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 409

1  let them file stuff, and she wanted them to
2  wait in line until their names were called and
3  she wouldn't give them a ticket.
4  **Q. All right. I don't want to just generalize.**
5  **Let's talk about the name of the first**
6  **attorney that complained.**
7  A. I -- I can't put them in sequence. I didn't
8  write down number one.
9  **Q. Then name me any attorney that complained.**
10 A. Any attorney that complained would be --
11     MS. NELSON: Besides Ashton Ott?
12 A. -- Ashton Ott.
13 **Q. Well, we've covered her.**
14 A. Write that down, though. She's one.
15 **Q. I've got that down.**
16 A. Ashton Ott, one. Derek Yarbrough.
17 **Q. Stop with Derrick. Hold up. Stop.**
18 **Yarbrough?**
19 A. Yes.
20 **Q. How do you spell that last name?**
21 A. I don't know.
22 **Q. Now, what did Derek Yarbrough complain about?**
23 A. That he went over there to file a motion and

Page 410

1  that she wouldn't let him file it. And that
2  he told her, she had -- she should let him
3  file it and let me rule on it as to whether it
4  was timely or not. And that -- they had just
5  complained, all of them.
6  **Q. Is this the one that she said she was**
7  **following your policy, the one that she talked**
8  **about yesterday?**
9  A. I don't know.
10     MS. NELSON: Object to the form.
11 **Q. Okay. When did Derek Yarbrough complain to**
12 **you?**
13 A. I don't remember the date.
14 **Q. Did he put this complaint in writing?**
15 A. No. None of them wanted to put it in writing
16 because they had to continue to work.
17 **Q. All right.**
18     MS. NELSON: Just let her answer, please.
19 A. Yeah. I mean, it was difficult because they
20 would all say, well, you know, they got to
21 continue working with them, so they don't want
22 to make a complaint.
23 **Q. Give me the name of another one.**

Page 411

1  A. Tom Brantley.
2  **Q. What did he complain about?**
3  A. Let me give you another one. Kathleen Nemish.
4  **Q. No, no, before you --**
5  A. I don't remember. Kathleen Nemish.
6  **Q. Hold on.**
7     MS. NELSON: Well, let -- while she's
8        thinking, let her give them to you.
9     MR. JAFFREE: I don't want them that way.
10       I want to know what Tom Brantley
11       complained about.
12 A. And I can't give them sequential.
13 **Q. What did he complain about?**
14 A. Just about her -- just about her office
15 policies, just her inflexibility. I don't
16 remember specifically.
17 **Q. You don't remember specifically. Don't**
18 **remember. Okay.**
19 A. I -- don't say don't remember specifically,
20 but about her office policies or --
21 **Q. I don't know what that means. I don't know**
22 **what office policy mean. I mean, that's not**
23 **telling me anything useful.**

Page 412

1     Brantley complaining about her office
2  policies tell me nothing. You don't remember
3  anything specific he complained about?
4  A. Specifically about Nancy's attitude and her
5  office policies.
6  **Q. What about her attitude?**
7  A. That her attitude was one of inflexibility,
8  that she didn't know what she was doing, and
9  that the office was not operating as smoothly
10 as it was before she came, that the lawyers
11 were complaining, and that it just been
12 deteriorating, that the attitudes of the
13 magistrates was bad.
14 **Q. Let me stop you. Did Thomas complain before**
15 **her first evaluation?**
16 A. I don't remember specifically.
17 **Q. Did Dennis -- Derek Yarbrough complain**
18 **before --**
19 A. I don't remember the dates.
20 **Q. What other attorney complained?**
21 A. Kathleen Nemish.
22 **Q. What did Kathleen complain about?**
23 A. Just the same thing, that -- well, we had a

103 (Pages 409 to 412)



# FREEDOM COURT REPORTING

### Page 413

1  specific incident where Kathleen had a client
2  who had sent in a completion of CRO, and he
3  was from Michigan. And the paperwork had
4  gotten separated from the file, similarly
5  to what -- well, I won't bring that up now.
6  The paperwork had got separated from the file,
7  but they knew that -- she knew that she had
8  turned it in.
9     So I took the case into the courtroom or
10 into my chambers to avoid a warrant being
11 issued. He called in. She told him they
12 hadn't received it and that he would have to
13 drive back here for court or get a warrant.
14 And I had specifically told Mary Turner not to
15 issue the warrant for him because we were
16 looking for his paperwork. Nancy instructed
17 Mary Turner, go ahead and issue the warrant.
18 Kathleen was trying to work it out for him.
19 And he ended up sending her roses in
20 gratitude. But, no, I don't know his name.
21 Q.  Did you --
22 A.  I did not write down the --
23 Q.  Let's me ask you this: Did you hear Nancy

### Page 414

1  tell Mary Turner not to -- to go ahead and
2  issue the warrant?
3  A.  She -- I think she wrote it on there.
4  Q.  She wrote it down where?
5  A.  Yeah, we knew that she did that.
6  Q.  No. I asked you did you --
7  A.  On the case action summary, we saw that.
8  Q.  How did you know that?
9  A.  We saw it. We saw it somewhere. We knew she
10 did it.
11 Q.  You saw where she said, issue the warrant?
12 A.  Well, she didn't even have the paperwork. I
13 put that on there because the paperwork was in
14 the courtroom, so she issued the warrant
15 without the paperwork.
16 Q.  And when was this?
17 A.  I don't know.
18 Q.  Well, since you got the -- you got documents
19 to support that. You could --
20 A.  We didn't -- we can't remember his name.
21 Q.  So you just --
22 A.  Again, 17,000 cases.
23 Q.  Let me ask you this: Do you have a statement

### Page 415

1  from Kathleen Nemish on this incident?
2  A.  No.
3  Q.  Do you know if your attorney have a statement
4     from Kathleen --
5  A.  No.
6  Q.  -- on this incident?
7  A.  They just complained.
8  Q.  Do you know if Thomas Brantley have a
9     statement --
10 A.  No.
11 Q.  -- concerning this incident?
12    What about Doug (sic) Yarbrough?
13 A.  No.
14 Q.  You got a statement from Doug Yarbrough?
15 A.  No.
16 Q.  Do you anticipate getting a statement from
17    Derek?
18 A.  I haven't thought about it. I didn't write
19    her up for that. I didn't discipline her for
20    that.
21 Q.  What about Thomas Brantley?
22 A.  I didn't discipline her for any of these
23    infractions because I could not remember the

### Page 416

1  names of them.
2  Q.  And did you talk to her about --
3  A.  I recommended her termination for a totality
4     of circumstances. So if you want to strike
5     these out, we've got other incidents.
6  Q.  I don't want to scratch these out.
7     Give me your names of other attorneys who
8     have complained.
9  A.  I can't remember. I think Cliff Mendheim
10    complained one day about having to stand in
11    court and wait until -- she wanted them to
12    only file their responses in alphabetical
13    order.
14 Q.  When did that happen?
15 A.  All the lawyers were complaining during court.
16 Q.  I'm not talking about all the lawyers. When
17    did Cliff complain?
18 A.  I didn't write it down.
19 Q.  Well, were you in court when she did this?
20    MS. NELSON: Did what?
21 A.  Yeah.
22 Q.  Have him stand --
23    MS. NELSON: In alphabetical order?



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 417

1  Q. -- for a long period of time in
2     alphabetical --
3  A.  Yeah, she wanted all of them to do that.
4  Q.  All right. Did you tell her to stop and not
5     have them stand in alphabetical order when
6     Cliff was in there?
7  A.  Well, she would say it's a policy that -- she
8     kept referring to the policy of filing it
9     seven days before or they had to come to
10    court. And what I told her that was
11    impractical to have them stand there and wait
12    until their next client was called; let's just
13    file them all at one time. And she felt that
14    I was overruling her policy. I wasn't. I
15    still said they had to be filed seven days or
16    come to court. I'm just saying, if you had a
17    Client Abernathy, you should not have to stand
18    there until your Client Zenith came up to file
19    both motions. Let's just get them -- you
20    know, we handle a lot of cases.
21 Q.  But you could stop that?
22 A.  And we're trying to get it facilitated.
23 Q.  Did you do --

Page 418

1  A.  Well, she felt like it was a violation of
2     her -- I wasn't trying to fire Nancy. If I
3     had been trying to, I would have written
4     everything up, wrote everything down. I was
5     trying to work with her and teach her because
6     I knew she didn't know.
7  Q.  Well, I mean --
8  A.  But Nancy didn't want to learn. She wanted to
9     enforce these crazy rules and, you know,
10    and --
11 Q.  Well, did you do a memo telling her that the
12    rules were crazy?
13 A.  No.
14 Q.  No memos. All right. So do you have a
15    statement from Cliff Mendheim?
16 A.  No. I'll ask them if they remember.
17 Q.  All right. So you don't have statements from
18    these people. You coming up -- you don't have
19    the dates. You didn't do memos, but we should
20    just believe you. Nancy said, believe me. I
21    mean --
22    MS. NELSON: Nancy would have no way to
23    know if these people complained if she

Page 419

1     was not present.
2     MR. JAFFREE: Nancy would say, nobody
3     never told me. This didn't happen.
4     Didn't happen. And I didn't make
5     anybody stand in line. I didn't have
6     anybody come from Mississippi or
7     Michigan because I issued -- she said
8     that yesterday.
9  A.  Nancy will say that she didn't talk about you
10    like a dog, but she did. I mean, she will say
11    that.
12 Q.  Well, I'm assuming that that's not --
13 A.  She's just lying.
14 Q.  -- at issue here, her talking about me.
15 A.  I know.
16 Q.  And that's not going to affect my
17    representation of Nancy.
18 A.  It shouldn't.
19 Q.  Well, I mean, it's not. So can you think of
20    any other attorneys --
21 A.  No.
22 Q.  -- that complained?
23 A.  Not off the top of my head, but I am sure

Page 420

1     there are others.
2  Q.  Now, in addition to attorneys --
3     THE WITNESS: Can we reserve the right to
4     supplement?
5     MS. NELSON: Sure.
6  Q.  What other complaints did you have about
7     Nancy?
8  A.  Anytime I tried to talk to Nancy about stuff
9     that I thought she needed -- about just
10    trying to help her, Nancy just -- she didn't
11    want to hear it. Nancy, she just knew it all
12    and --
13 Q.  Can you give me some specifics?
14 A.  Specifically --
15 Q.  What did you want to talk to her about and how
16    did Nancy respond?
17 A.  About -- well, and the black magistrates
18    complained that they thought that they were
19    being racially discriminated against. I never
20    had a white magistrate come to me and say, I
21    feel like I'm being discriminated against
22    ever. I had a -- well, and then the
23    magistrates came to me, complaining about

105 (Pages 417 to 420)



# FREEDOM COURT REPORTING

Page 421

1    Nancy. Let's put that in there. Valarie
2    Savage, Michelle Bryan came to my office.
3    Q.  What did Valarie Savage complain about?
4    A.  They said that Mary -- Nancy was letting Mary
5    Beth run the office, that Nancy didn't know
6    what she was doing, she was implementing all
7    Mary Beth's policies, that Mary -- they knew
8    for a fact that Mary Beth was writing the
9    memos about policies and procedures and Nancy
10   was merely signing them.
11   Q.  When did Valarie tell you this?
12   A.  What day was that on her calendar? June
13   something? She had it on her calendar that
14   Valarie complained that things weren't going
15   Mary Beth's way.
16   Q.  Well, since you was told that Mary Beth is
17   writing policy, I'm sure, especially since
18   Nancy was getting paid for being the
19   administrator, you did a memo to Nancy about
20   that?
21   A.  No. I called Nancy in my office, and that's
22   why she said about the racial discrimination.
23   I said, Nancy, everybody is complaining. You

Page 422

1    know, every -- this office is deteriorating.
2    You know, I wasn't trying to write Nancy up.
3    I guess I should have. I was trying to help
4    Nancy. I needed a court administrator.
5    Q.  Now, earlier you said you wanted people to put
6    their complaints in writing?
7    A.  I did. And that's why I didn't write her up
8    for it because they wouldn't put it in
9    writing. And if they had put it in writing, I
10   would have. But that's why I didn't.
11   Q.  But you're using it now. You wouldn't
12   consider it then because --
13   A.  I didn't consider it.
14   Q.  But now you're going to use it --
15   A.  As a totality of the circumstances --
16   Q.  As a totality?
17   A.  -- of why I was not recommending her for
18   rehire. But I never disciplined her for any
19   of these incidents. I never wrote her up.
20   Q.  You said "everyone." Name me everybody who
21   complained --
22   A.  Me. I'm complaining.
23   Q.  One moment. Excuse me.

Page 423

1    A.  The attorneys complained. The police officers
2    complained.
3    Q.  We'll get to the police --
4        MS. NELSON: Well, she's telling you.
5    Q.  Write that down.
6        MS. NELSON: Let her tell you.
7    Q.  But I want to talk about the staff.
8        MS. NELSON: Then you can come back to it.
9    Q.  You said the -- I guess you was talking about
10   everybody in the staff complained.
11   A.  Uh-huh (positive response).
12   Q.  Give me the names of who in the staff
13   complained.
14   A.  Ann Baxter, Valarie Savage.
15   Q.  I want you to pause.
16   A.  Ann Baxter is white.
17   Q.  Yeah, I understand that.
18   A.  Write that down.
19   Q.  I know that.
20   A.  Valarie Savage is white.
21   Q.  Please. Hold on. All right. Well, I'll put
22   them all down. Valarie.
23   A.  Valarie Savage is white. Ann Baxter is

Page 424

1    white. Michelle Bryan, her best friend,
2    complained with Valarie. Lavera and Eunice
3    claimed that they were being treated
4    differently because of their race, and they
5    went to Personnel and made a formal complaint
6    about being -- that they felt that they were
7    being treated differently.
8    Q.  I never got a copy --
9    A.  Tonya complained.
10   Q.  Stop for a second. I never got a copy of
11   their formal complaint from Personnel.
12   A.  Okay. Tonya complained.
13   Q.  Hold on.
14   A.  I don't know if it was in writing or not.
15   Q.  A formal complaint that wasn't in writing?
16   A.  Oh, I don't know. I don't know. Check.
17   Tonya complained that she was attacked by
18   Nancy because of something that she didn't
19   know. And Nancy told her she should know, and
20   she felt attacked. So that's all your
21   magistrates except Mary Beth and Mary Turner.
22   Q.  They didn't complain.
23   A.  And Sarah.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 425

1   Q.  And Sarah didn't complain.
2   A.  They never came to me and complained.
3   Q.  So they -- all right.  Now let's talk about
4       Ann Baxter.  When did she complain?
5   A.  Oh, over the course of -- they felt that Mary
6       Beth through -- Nancy through Mary Beth --
7       Nancy didn't know anything about the computer
8       system.  She didn't know how to go on the
9       computer system.  She never learned.  She
10      couldn't help me in court.
11          We were in sitting in court one day.  We
12      didn't have anybody to work court.  She had
13      been there months.  You asked when that
14      happened.  That was after the first
15      evaluation, but she never picked up.  She
16      never learned.  So I needed somebody to work
17      court.  She had been there six or seven
18      months.  She expected magistrates to be
19      proficient in the computer system, but she had
20      seven or eight months.  And she never even
21      learned how to log on.
22  Q.  All right.  But --
23  A.  So when she tells you --

Page 426

1   Q.  Over and above Nancy learning the computer
2       system, what did Ann Baxter complain about?
3   A.  That she was pointing out errors that Mary
4       Beth was giving her, those reversals, because
5       Mary Beth was the cashier.  And she had to
6       make the reversals.  And, also, Mary Beth had
7       the ability to go into the computer under
8       anybody's password and change things.
9   Q.  All right.
10  A.  And they were alleging that Mary Beth was
11      changing things in the computer under their
12      password.
13  Q.  Is Ann still an employee?
14  A.  Yes.
15  Q.  Do you have a statement from Ann?
16  A.  No.  Do you want me to get one?
17  Q.  Do you anticipate getting a statement from
18      Ann?
19  A.  I don't know what my lawyer anticipates.
20  Q.  You don't know what your lawyer anticipates?
21      And you've tried to get a statement from her.
22      Okay.
23          Now Valarie, what did she complain about?

Page 427

1       By the way, did Ann complain about anything
2       else?
3   A.  Not that -- specifically.  I reserve the right
4       to supplement as I think of it.
5   Q.  All right.  What did Valarie complain about?
6       By the way, do you know when Ann made her
7       complaint?
8   A.  Huh-uh (negative response).
9   Q.  Don't know.
10  A.  Valarie complained that --
11      MS. NELSON:  You've already testified some
12          about Valarie.
13      THE WITNESS:  Yeah.
14  A.  Well, she came over to my office and said that
15      they knew that Mary -- that Nancy was not
16      doing -- that Mary Beth was telling Nancy what
17      to do, that Mary -- Nancy was doing everything
18      Mary Beth told her, that Nancy had written --
19      Mary Beth had written a memo and that Nancy
20      had just signed it, that she was allowing Mary
21      Beth -- because she didn't know, she was being
22      held hostage by Mary Beth's knowledge and Mary
23      Turner's knowledge.

Page 428

1       They would put in here, the black
2       magistrates complained that even though they
3       were not allowed to go out the back door, that
4       Michelle Bryan -- you want to write that
5       down -- Valarie were putting a bucket in
6       another side door and going outside and
7       smoking to the point that the city manager
8       asked, why were they smoking so much.  And,
9       so, that -- they were being written up and
10      disciplined for going out the back door, but
11      there was another side door that was not the
12      front door.  But they weren't being --
13  Q.  Well, was the side door off limits as well?
14  A.  It was not the main door.  Yes.
15  Q.  And it was off limits as well?
16  A.  It was a security risk.  It has a fire thing
17      on it.  They would go out there and put a
18      bucket in it.  But, again, I wasn't up there.
19      Just like I didn't see Lavera and Eunice going
20      out the back door, I didn't see them doing
21      that.
22  Q.  All right.  So the two blacks complained about
23      these whites --



## FREEDOM COURT REPORTING

Page 429

1  A.  All kinds of stuff.
2  Q.  All kinds of stuff.
3  A.  A white magistrate being granted leave when
4      she did not have any.
5  Q.  Well, I understand about the leave.
6  A.  And -- well, let's write that down.  You asked
7      about who complained.
8      Lavera and Eunice complained that Michelle
9      Bryan was granted leave when she did not have
10     any in contravention of personnel rules and
11     regulations to go to a distant niece's
12     hospital when Eunice, who had leave, was
13     denied leave to go to the doctor and the
14     hospital --
15 Q.  I know about that incident.
16 A.  -- with her daughter.
17 Q.  All right.
18 A.  Okay.  Then there was another incident where
19     Lavera changed a cash bond, and she was
20     reprimanded or Nancy wanted to reprimand her.
21     But Sarah Fowler, who is white, changed a bond
22     the same day under the same circumstances when
23     Valarie was off -- out of work.  And Nancy --

Page 430

1      and she was not reprimanded.  Sarah Fowler was
2      not counseled about it.
3  Q.  So it's your position that Nancy was
4      discriminating against the black employees?
5  A.  No, I'm --that was their allegation.  That's
6      not my position.
7      MS. NELSON:  You were asking about what
8         magistrates complained about.
9      THE WITNESS:  Right.
10     MS. NELSON:  And she's telling you.
11 Q.  All right.  Well, I'm trying to hear -- is
12     that your position.
13 A.  That was not my position.  That was their
14     allegations.  That was not my position.
15 Q.  Do you think that allegation had merit?
16 A.  I didn't know.  I didn't -- I didn't want to
17     think that it did.
18 Q.  Did you look into it to see if it had merit?
19 A.  I referred them to Personnel because I didn't
20     to want to appear biased.
21 Q.  Well, did they file a formal complaint, or you
22     don't know if they filed a formal complaint?
23 A.  I don't know.  I know they did come over here

Page 431

1      and talk with Kai about it.
2  Q.  All right.  Now, what did Michelle Bryan
3      complain about?
4  A.  The same thing that Valarie did.  They were
5      together.
6  Q.  The two of them were together, came to your
7      office and complained?
8  A.  Uh-huh (positive response).
9  Q.  About that?
10 A.  What I said Valarie complained about.
11 Q.  So she didn't have an independent complaint,
12     just whatever Valarie -- and Valarie
13     complained about --
14 A.  Well, they felt that -- that Nancy didn't know
15     what she was doing, so she was allowing the
16     magistrates to -- to tell her what to do.
17 Q.  Now, did Tonya provide any specifics on this
18     attack that you talked about?
19 A.  Not -- well, she said that there was something
20     that Nancy gave her to do that she did not
21     know how to do, and when she attempted to tell
22     Nancy that, Nancy attacked -- she felt jumped
23     all over her, and it wasn't fair.

Page 432

1  Q.  Let me ask you this:  Did any of these
2      complaints occur prior to Nancy's first
3      evaluation?
4  A.  I don't think so.  I don't know.  I might have
5      just tried to work them out with her and
6      not -- because they weren't -- you know, I was
7      trying to work it out.  I wasn't trying to
8      write her.  I was trying to keep her.
9      MS. NELSON:  Just answer as best you can.
10     THE WITNESS:  I'm sorry.
11 Q.  You said police officers had complained as
12     well?
13     (Brief pause)
14     MS. NELSON:  He's asking about police
15        evaluations -- I mean, police
16        officer or police --
17 Q.  The police also complained?
18     MS. NELSON:  Police officer or police
19        chief?
20 Q.  Both police chief and police officers or just
21     police chief?
22 A.  I know there was one incident with a
23     lieutenant.

108 (Pages 429 to 432)

# FREEDOM COURT REPORTING

Page 433

1  Q.  What's his name?
2  A.  Martin, about the dockets not being posted.
3  Q.  What's his name?
4  A.  I don't know.  I think it's Lieutenant Martin.
5  Q.  What about the dockets not being posted?
6  A.  Well, it wasn't that.  Well, I'm not going to
7    say it wasn't that.  Mary Beth always said she
8    did post them.  It was a continuous --
9  Q.  Well, what did --
10  A.  That the -- that the dockets weren't being
11    posted, so the officers didn't know to be in
12    court.  And, also, that the magistrates were
13    refusing to give warrants.  It was generally
14    just about the way that the attitude at the
15    magistrates' office had deteriorated.
16  Q.  Deteriorated from how bad you told Nancy it
17    was when she came?
18  A.  No.  Not -- it wasn't bad as far as their
19    relationship, but their attitude toward --
20    toward the police department.
21  Q.  Did Officer Martin ever give a written
22    complaint?
23  A.  I don't think so.  I think I just talked to

Page 434

1    Mary.
2  Q.  Have you gotten a statement from him?
3  A.  It was Lieutenant Martin I think.  I don't
4    remember specifically which it was.
5  Q.  Now, you mentioned --
6  A.  Again, I didn't discipline her for any of
7    those.
8  Q.  Your attorney said yesterday there was
9    something about White -- suggested that
10    White -- Chief White had did a complaint?
11  A.  If I remember, he was just recounting some of
12    the problems his officers had had with
13    warrants.
14  Q.  Just recounting problems with warrants.
15  A.  Right.
16  Q.  What was the problem with warrants?
17  A.  I say with "warrants."  With the magistrates'
18    refusal to assist them or -- you know, not say
19    complained.  It was -- I don't know if it was
20    just specifically about attitude and -- and,
21    like I said, the attitude of magistrates just
22    kind of deteriorated under her.
23  Q.  So some vague magistrates not assist on the

Page 435

1    warrants.
2  A.  No.  I'm sure he was specific at the time.
3  Q.  But you don't remember any specifics?
4  A.  I remember about officers' complaints
5    about the magistrates' attitudes.
6  Q.  And you didn't write any of this up, did you?
7  A.  I didn't -- no.  I did not discipline her for
8    any of that because she was new, and I knew
9    that she was learning.  I tried to give her
10    the benefit of the doubt because of her
11    newness.  And I tried to give her the benefit
12    of the doubt because she did not have prior
13    magisterial knowledge.  I tried to work with
14    her.  I tried to help her.
15  Q.  Now, I'm sorry.  The reason that you never
16    gave Nancy any written notices of any of this
17    was what now?
18  A.  Any written notices of any of this?
19  Q.  Yeah.
20  A.  Well, we had two verbal counselings leading up
21    to her last evaluation.  Well, she was only
22    there nine months.  So it was -- we had two
23    verbal counselings, one in June, then a month

Page 436

1    later in July because I had given her a
2    month.  And then I don't know what happened.
3    And then August, September -- I don't
4    remember.
5  Q.  You know, in one of your statements, you said
6    that the defendants came to court, many of
7    them had to miss work and was unable to have
8    their trial.  And they had to have the trials
9    delayed.
10    Can you give me any names of defendants
11    whose trials was delayed?
12  A.  No.  We'd have to pull the docket.  When was
13    that, two thousand and something?  We'd have
14    to pull -- try to find those dockets.
15  Q.  Now, can you e-mail me or have your attorney
16    e-mail me the names of those defendants
17    whose --
18  A.  If we can find them.
19  Q.  -- trials was delayed?
20    MS. NELSON:  We'll discuss that, if she
21    has any recollection of it.
22    MR. JAFFREE:  So if I don't get anything,
23    can I assume that you couldn't find

109  (Pages 433 to 436)

# FREEDOM COURT REPORTING

| Page 437 |
|---|

1  them; is that what I should assume?
2  MS. NELSON: Well, you've made no formal
3  request for such, and I'm not going to
4  commit here now to go pull that
5  information.
6  MR. JAFFREE: She has mentioned them here
7  for the first time.
8  MS. NELSON: Well, a lot of things have
9  been mentioned for the first time.
10  Doesn't mean it's necessarily
11  something that we have to produce to
12  you.
13  Q. You indicated that Ms. Martin applied
14  discipline and personnel rules in a arbitrary
15  and capricious manner.
16  Were there anything other than what you've
17  told me that you're referring to?
18  A. Excuse me. Where are you reading from,
19  Mr. Jaffree?
20  Q. I'm not quite sure. On one of your things
21  here, you said Martin -- probably on your July
22  8th memo -- "Ms. Martin continues to apply
23  discipline and personnel rules in an arbitrary

| Page 438 |
|---|

1  and capricious manner."
2  MS. NELSON: Well, where are you reading
3  from?
4  THE WITNESS: He just said, he didn't
5  know.
6  MR. JAFFREE: I sort of incorporated this
7  in my notes. So my guess is it's on
8  the June -- I mean, July the 8th memo.
9  A. Well, I mentioned the one where the employee
10  was granted leave that did not have any in
11  violation of personnel rules and regulations.
12  MS. NELSON: The July memo that you're
13  looking at is dated -- is Plaintiff's
14  Exhibit Number 9.
15  A. And I did not write her up for that at that
16  time even though she did it in contravention
17  of personnel rules and regulations. She
18  should not have granted a magistrate who did
19  not have leave, leave without department head
20  approval. But what was more -- worse than
21  that was that the employee had no leave and it
22  was her husband's niece; but who had leave and
23  magistrate with a daughter who had leave and

| Page 439 |
|---|

1  she denied it.
2  Q. All right. Now, what magistrate didn't have
3  any leave?
4  A. Michelle Bryan.
5  MS. NELSON: We've already been over this.
6  Q. And I need to go back and cover -- got one
7  area to cover.
8  MS. NELSON: Are we getting close to being
9  done? It's almost --
10  MR. JAFFREE: I'm trying to -- almost
11  what?
12  MS. NELSON: It's almost six o'clock.
13  MR. JAFFREE: Are you serious, that late?
14  MS. NELSON: A quarter till six.
15  Q. I need to go back to this ticket.
16  Part of your reason for the termination of
17  Ms. Brackin was her allegedly not accounting
18  for a ticket by putting "void" on the
19  transmittal form within two years from being
20  placed on probation.
21  Do you agree that this ticket incident did
22  not happen within two years of her being
23  placed on probation?

| Page 440 |
|---|

1  MS. NELSON: I'm not sure what you're
2  talking about. I think you --
3  A. Well, we discovered --
4  Q. The transmittal issue, that did not occur
5  within two years of her being placed on
6  probation?
7  A. We discovered it within two years. We would
8  not have known if it hadn't come up in the
9  course of an investigation.
10  Q. But it didn't happen within two years, right?
11  A. It didn't, the conduct?
12  Q. The conduct didn't happen within two years?
13  A. That's my understanding.
14  MS. NELSON: Two years of her --
15  MR. JAFFREE: Being placed on probation.
16  Q. Well, isn't it true, that not only did you add
17  it, that that ticket thing was to try to find
18  some vehicle to justify terminating
19  Ms. Brackin?
20  MS. NELSON: Object to the form.
21  A. I didn't even know about the ticket. It was
22  discovered during an investigation of another
23  complaint. I didn't -- I didn't invent it.

110 (Pages 437 to 440)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 441

1    It was not a pretext for anything. It was
2    discovered by an independent investigator.
3  Q.  Isn't it true that but for Mary's discipline
4      before allegedly informing a defendant he had
5      been wrongfully arrested, the insubordinate
6      incident would not have been enough to
7      terminate her?
8      MS. NELSON: Object to the form.
9  Q.  Yes or no? Is that true or not?
10     MS. NELSON: I don't know what you're --
11 Q.  If it wasn't for that prior incident, the
12     insubordinate incident --
13     MS. NELSON: The Fondren incident. Can't
14     we just -- instead of reading your
15     notes, can't you just ask your
16     question? There was a Fondren
17     insubordination in two thousand --
18     MR. JAFFREE: Fondren. I don't know if
19     that was insubordination but the
20     Fondren incident --
21     MS. NELSON: That was an insubordination.
22 Q.  The Fondren incident, but for that, there
23     wouldn't have been a basis to terminate her

Page 442

1      because of her contact with Mary. Do you
2      agree with that? Or are you saying the Mary
3      incident alone is enough to terminate
4      Ms. Brackin's employment?
5  A.  It was a major violation. I don't know if it
6      was enough alone to violate -- to terminate
7      her.
8  Q.  Well, let me ask you this: With respect to
9      the Fondren incident, would you agree --
10 A.  I didn't initiate the Fondren investigation.
11     MR. JAFFREE: I'm rushing and I'm trying
12     to get everything done. I'm really
13     trying to rush out of here.
14 Q.  You stated before that Mary Beth told
15     Mr. Fondren that he had been wrongfully
16     arrested and that Mr. Fondren admitted that
17     Mary Beth told him that.
18     You haven't stated that? I've got some
19     records that --
20 A.  Well, that's what the -- the letter from
21     Mr. Fondren said.
22 Q.  Well, it doesn't say that, does it?
23 A.  Well, it says, On June 1st I was wrongfully

Page 443

1    arrested. Mary Beth can confirm this. "She
2    also said I should see you about getting my
3    towing fee." And this went to City's clerk's
4    office, and they sent it to an investigator.
5  Q.  I mean, does that say that Mary Beth told him
6      that he was wrongfully arrested?
7  A.  No. I think the investigation revealed that
8      she told them that.
9  Q.  Revealed that from Mary Beth's mouth?
10 A.  Well, Mary Beth, of course, said she didn't,
11     but everybody said she did.
12 Q.  Well, Mr. Fondren said she didn't; isn't that
13     correct?
14 A.  I don't remember.
15 Q.  If I stated that the record says that
16     Mr. Fondren said that she didn't tell him
17     that, would you agree that's what the record
18     says?
19     MS. NELSON: Object to the form. I think
20     the investigation itself reveals what
21     occurred. The investigation will
22     speak for itself.
23 Q.  Did you read that entire investigative report?

Page 444

1  A.  I'm sure I did.
2  Q.  If Mr. Fondren said that Mary Beth didn't tell
3      him that he had been wrongfully arrested and
4      then she says she didn't tell him, then upon
5      what basis are you making a claim that she
6      told him he was wrongfully arrested?
7      MS. NELSON: Object to the form. Object
8      that it's speculative. Assumes facts
9      not in evidence.
10 Q.  Well, I mean, if, in fact, the two of them --
11     MS. NELSON: Calls for -- it's a
12     hypothetical.
13 Q.  -- said that he was not wrongfully arrested?
14     And he certainly don't say it on this document
15     that she told me I was wrongfully arrested.
16 A.  That she can confirm that he was wrongfully
17     arrested.
18 Q.  But does it also say that --
19     MS. NELSON: The document can speak for
20     itself.
21 Q.  All right. Well, let's talk about this
22     document.
23     MS. NELSON: You can try to interpret it

111 (Pages 441 to 444)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 445

1    the way you want to.
2  Q. Do you know who Harrison Far is?
3  A. I think --
4  Q. Do you know that name Harrison Far, F-A-R?
5  A. I think he -- I could say, but I don't know
6    Harrison's last name.
7  Q. Well, what is the CRO; what does that stand
8    for?
9  A. Court referral officer.
10 Q. Is that part of the City of Dothan?
11 A. No.
12 Q. Who are they associated with?
13 A. There's a -- what is it -- Mandatory Treatment
14   Act that requires that any crime involving
15   drugs, alcohol, or domestic violence has to go
16   through a court-ordered --
17 Q. Is he saying that Mr. Far told him that he was
18   wrongfully arrested, according to your
19   interpretation of that letter?
20 A. It said, "Mary Beth at the magistrates' office
21   can confirm this.  She also said that I should
22   see you about my towing fee."
23 Q. And he also said Mr. Far can confirm that?

Page 446

1  A. My CRO -- he can confirm this.
2  Q. So what are they talking about?
3  A. I don't know.
4  Q. Well, you know what he was talking about with
5    Mary Beth but you don't know what he's talking
6    about with Mr. Far?
7  A. Well, he says, "I was wrongfully arrested on a
8    false warrant. Mary Beth at the magistrates'
9    office can confirm this."
10   So she must have told him.  She had to
11   tell him he had a false arrest.
12 Q. Well, maybe she confirmed that he was
13   wrongfully arrested.
14   MS. NELSON: I would object to you arguing
15     with the witness.  You're not showing
16     her -- you're showing her a letter
17     that can speak for itself.  You've got
18     a full investigative report that was
19     done by internal affairs at the
20     direction of the City's legal
21     department.
22 Q. Did internal affairs give you a copy of their
23   internal investigation?

Page 447

1  A. I don't know that they gave me a copy or that
2    they gave it -- we forwarded it to her -- she
3    had a supervisor -- direct supervisor at that
4    time, did she not?  Was not Donna Nicholson
5    her direct supervisor?  So she would have
6    gotten the results of the investigation.
7  Q. Let me ask: Did Mary Beth have a right to
8    tell Mr. Fondren that he was wrongfully
9    arrested if, in fact, he was?
10 A. Did she have a right to tell him he was
11   wrongfully -- I don't think Mary Beth could
12   determine what was wrongfully or not. I mean,
13   how -- who is she to determine --
14 Q. But if she could and she told him he was
15   wrongfully arrested, she has a right to do
16   it?
17   MS. NELSON: Object to the form.
18 A. I don't -- I don't think it's -- I don't know
19   she should comment on liability issues.
20 Q. Did he say anything about her commenting on
21   liability issues?
22   MS. NELSON: Object to the form. The
23     letter can speak for itself.

Page 448

1  Q. Does the letter say anything about her telling
2    him anything about a liability issue?
3  A. It says, she can -- "I was arrested wrongfully
4    on a false warrant. She said I should see you
5    about getting my towing fee reimbursed,
6    158.90." Mary Beth -- I don't know.
7  Q. You call that a liability issue?
8  A. I -- I took -- I looked at the totality of the
9    investigation report and made -- well,
10   actually, I think her supervisor did.
11 Q. Her supervisor did?
12 A. Uh-huh (positive response).
13 Q. Who was her supervisor at the time?
14 A. I don't remember.  Did she have a direct
15   supervisor, Donna Nicholson, at the time?
16   MS. NELSON: Do we have a date?
17 Q. I don't think so.
18   MR. JAFFREE: Yeah. 1/7/04.
19 Q. Remember?  This is the one that you had Nancy
20   write up?
21 A. Well, that she would have gotten the report
22   because she was her supervisor at the time.
23   The results didn't come in until Nancy was

112 (Pages 445 to 448)

# FREEDOM COURT REPORTING

Page 449

1    hired. She was her supervisor at the time.
2  Q. So if Nancy told you -- testified that you
3     told her to discipline her, Nancy would be
4     lying? You didn't tell her?
5  A. Well, I say that I gave -- sent it to Nancy
6     to -- for her actions, just like I did
7     anything else that came in, a complaint. She
8     was their supervisor.
9  Q. Did you instruct Nancy to discipline this
10    person?
11 A. I don't think -- I told her to review it for
12    her action. I'm not saying I would say,
13    Nancy, you write up her for that. She would
14    have gotten the results of the investigation.
15    It would have been her decision whether or not
16    to write her up.
17 Q. Well, would you agree that the results of the
18    investigation is, Mary Beth denied that she
19    told him that the City is liable, he didn't
20    mention anything about Mary Beth telling him
21    the City is liable?
22       MS. NELSON: Object to the form.
23 A. She didn't appeal it.

Page 450

1        MS. NELSON: Object to the form. Don't
2     argue with him. We're getting late in
3     the day. Why don't we take a --
4  Q. Nancy got terminated in part because she was
5     negligent and cannot assign tasks; is that
6     correct?
7        MS. NELSON: You're talking about Nancy?
8  Q. I'm sorry. Ms. Brackin.
9        MS. NELSON: I think the record -- I think
10       asked and answered. She had two
11       insubordinations within a two-year
12       period of time.
13 Q. One was negligent; is that right? She was
14    accused of being negligent?
15 A. No. I mean, she was accused, but she was
16    terminated because she had two major
17    disciplinaries for insubordination within a
18    two-year period.
19 Q. And one of them was being negligent --
20 A. And under the personnel rules and regulations,
21    if you have two major violations in a two-year
22    period, it's grounds for termination.
23 Q. All right. We're talking about negligence

Page 451

1    here. Was she accused of being negligent, yes
2    or no?
3  A. At some point?
4  Q. And isn't it true that, again -- get to
5     Officer Gray, who recommended what category of
6     offense she may have committed?
7  A. I -- I don't remember what investigator, but
8     they always said, we found grounds to believe
9     that personnel rule da-da-da has been
10    violated. That's just the basis of their
11    report, but it doesn't dictate.
12 Q. At the risk of hurting my case because of
13    time, I'm going to greatly shorten this, where
14    I need to go. And I've got "googobs" of
15    stuff, but I'm not going to go on with it.
16    But I just want to clarify certain things.
17       Upon what authority do you have city
18    police initiate internal affairs investigation
19    of your employees? Upon what authority?
20 A. There is --
21       MS. NELSON: Again, I object to the form.
22       I don't know that there is testimony
23       that she did that, other than perhaps

Page 452

1    the Ralpeje case.
2  Q. Upon what authority?
3        MS. NELSON: If you know.
4  A. Well, I don't know the authority. There --
5     when we need their expertise, when it involves
6     outside complainants. You know, they're
7     investigators. They're trained
8     investigators. And as a department head, I
9     was under the understanding that we could
10    utilize their expertise --
11 Q. Let's me --
12       MS. NELSON: Well, she's trying to answer.
13 A. But, again, I didn't instigate the Fondren.
14    That was instigated from another -- that was
15    not -- I did not use the police to initiate an
16    investigation of Theron Fondren.
17 Q. Who initiated the Fondren investigation?
18       MS. NELSON: If you know.
19 A. I don't know. I think it -- I don't know.
20       MS. NELSON: If you know.
21 A. Right. I don't know.
22 Q. Somebody under -- interrogated members of your
23    staff, and you don't know who started it?

113 (Pages 449 to 452)



# FREEDOM COURT REPORTING

Page 453

1  A. No. I --
2     MS. NELSON: I think the report would
3        speak to that, if you'd show it to
4        her.
5  Q. Well, I'm asking you if you know.
6     MS. NELSON: If you remember.
7  A. I mean, I know, but I don't remember.
8  Q. You know but you don't remember. Okay.
9  A. I think it came from the city clerk's Office,
10    did it not?
11 Q. City clerk. Okay.
12 A. I don't remember, Mr. Jaffree.
13 Q. With respect to the Ralpeje matter?
14    MS. NELSON: The what?
15    MR. JAFFREE: Ralpeje.
16    MS. NELSON: Ralpeje.
17    MR. JAFFREE: I'm torturing that name.
18 Q. Was there any criminal charges contemplated
19    that would trigger the garrity notice as far
20    as you know?
21    MS. NELSON: Again, object to the form.
22      There's no foundation as to her
23      knowledge of garrity.

Page 454

1  Q. Do you understand the question?
2     MS. NELSON: Object to the form.
3  Q. Ms. Martin was given a garrity notice when the
4     Ralpeje interrogation took place. Do you know
5     if --
6     MS. NELSON: Ms. Martin was not employed
7        when the Ralpeje case took place.
8     MR. JAFFREE: I'm sorry. Boy, I'm getting
9        my names mixed. Thanks for clearing
10       it up for the Record.
11 Q. Ms. Brackin was given a garrity notice when
12    the Ralpeje --
13    MS. NELSON: You can ask the witness if
14       she knows whether that happened. I'd
15       appreciate your not testifying as to
16       whether that happened or not.
17 Q. Do you know whether or not she was given a
18    garrity notice during that investigation?
19 A. I think I've seen one. I don't remember.
20 Q. Do you know any criminal charges that were
21    contemplated when she was given that notice?
22    MS. NELSON: If you know.
23 A. Well, we had a witness who was saying that he

Page 455

1  felt threatened because Mary Beth had called
2  him at home, and he didn't know how she got
3  her (sic) number. And he was concerned, you
4  know, about how Mary Beth might act
5  because -- you know, might treat him because
6  he had to work with her. And he didn't want
7  to get involved.
8     So I don't know. He could have said that,
9  you know, he felt threatened. It involved an
10 outside complainant coming in saying
11 some -- one of your city employees has gotten
12 my phone number. And -- well, he felt
13 threatened that she wanted him to say that he
14 didn't hear what she said or that's not what
15 she said.
16    And I thought that because he was making
17 those kinds of allegations that we should have
18 an outside, independent investigator who could
19 go talk to Ralpeje's mother, who could go out
20 and talk to this bondsman, you know, who could
21 talk to Mary Beth and be independent and
22 neutral.
23 Q. So you thought that there was a possibility of

Page 456

1  criminal charges against --
2  A. I didn't know. I didn't know what he might
3     say.
4  Q. Well, let's talk about --
5  A. He might bring charges against the City for
6     revealing his information --
7  Q. I'm talking about criminal charges.
8  A. -- that she used City sources --
9  Q. I'm talking about criminal --
10    MS. NELSON: She said, she didn't know.
11 A. I didn't know.
12 Q. All right. The Fondren matter, do you know
13    what criminal charges was contemplated or
14    likely with respect to the Fondren --
15    MS. NELSON: Object to the form.
16 Q. -- the Fondren --
17 A. I didn't --
18 Q. -- internal affairs?
19 A. I didn't initiate the Fondren investigation.
20 Q. Yeah. But you don't know about any likely
21    criminal charges?
22 A. No. I wasn't involved -- I mean, it went
23    through me.

114 (Pages 453 to 456)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING



Page 457

1　Q.　Now let's talk about the investigation with
2　　　Mr. Gray and who disclosed information to
3　　　Rickey Stokes.
4　　　　Do you know of any criminal charges that
5　　　was contemplated because somebody disclosed
6　　　information to Rickey Stokes?
7　　　MS. NELSON: If you know.
8　A.　I don't know, and I didn't initiate that
9　　　investigation.
10　Q.　You didn't initiate that investigation?
11　A.　No.
12　Q.　Who initiated that investigation with respect
13　　　to --
14　A.　I don't remember.  It would be in the report.
15　Q.　-- determine -- so whatever it says in the
16　　　report, that's the person who initiated the
17　　　investigation?
18　A.　More than likely.  Once I talk -- well, yeah,
19　　　more than likely.
20　Q.　But they gave the report to you after the
21　　　investigation was completed, the police
22　　　officers involved?
23　A.　I'm sure because there was not a court

Page 458

1　　　administrator at the time.
2　Q.　So it was done from some other department's
3　　　initiation but they gave their report to you?
4　A.　Because she was in my department.
5　Q.　I see.
6　　　MR. JAFFREE: Let me see if there's some
7　　　　question that I've just got to ask.
8　Q.　Did you receive any input from any third party
9　　　with your evaluation of Nancy?
10　　　MS. NELSON: Which evaluation?
11　Q.　The final evaluation.
12　　　MS. NELSON: Other than the complaints
13　　　　that she's talked about and her
14　　　　conversations with Kai Davis?
15　Q.　Yeah, other than that, any --
16　　　MS. NELSON: What third party?
17　Q.　-- input in the evaluation?
18　A.　I would have shown it to Personnel, but that's
19　　　about it.
20　　　(Brief pause)
21　Q.　By the way, just for the Record, I want to see
22　　　if you dispute this.  This is part of
23　　　Fondren's transcript, page 8.

Page 459

1　　　Mr. Coleman -- Officer Coleman asked
2　　Mr. Fondren, "Did Ms. Brackin say anything to
3　　you about being falsely arrested or being
4　　arrested in error or anything of that nature
5　　that you were" --
6　　　His response, "I can't remember now.
7　　Harrison said it was just a computer problem
8　　or something like that.  The record didn't get
9　　back to the police department or in the
10　　computer, something like that."
11　　　Mr. Coleman: "Right.  Okay.  But
12　　Ms. Brackin never said anything about you
13　　being falsely arrested -- say that you were
14　　arrested in error?  She ever say that to you?"
15　　　"I don't know if she said that, but that
16　　was -- that was understood through my
17　　conversation with Mr. Harrison Far."
18　　　Going on.
19　　　Mr. Coleman: "Did she give you any
20　　information as far as how to go about turning
21　　this in or filing this claim?"
22　　　Mr. Fondren: "I think she said go to city
23　　clerk's office."

Page 460

1　　　Coleman: "In any event, how did -- after
2　　you talked with Ms. Brackin, what did she tell
3　　you?"
4　　　Fondren:  "I believe she told me to go to
5　　the city clerk's office.  Somebody told me to
6　　go the city clerk's office."
7　　　Do you dispute that that's his testimony
8　　at his --
9　　　MS. NELSON: Object to the form.  I think
10　　　she testified that she didn't
11　　　interview him.
12　Q.　Did you have an opportunity to read His
13　　　testimony?
14　A.　I -- I don't remember.
15　Q.　He didn't say --
16　A.　I think -- I don't remember.
17　Q.　-- distinctly that she told him that he had
18　　　been falsely arrested, did he, based on that
19　　　testimony?
20　A.　Well, he kept saying, he didn't remember.  And
21　　　I thought the investigator said that he
22　　　thought that he was not being truthful or was
23　　　hesitant about being truthful.

115 (Pages 457 to 460)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 461

1  Q.  I see. So the investigator --
2  A.  Do you have the beginning of that
3     investigation?
4  Q.  But the investigator made an assumption that
5     he wasn't being truthful?
6  A.  No, not that he made the assumption that he
7     said that he wasn't.
8  Q.  Ms. Martin -- sorry -- Ms. Brackin said she
9     didn't tell them that and the investigator
10    just reached his own conclusion?
11       MS. NELSON:  Object to the form.
12 Q.  And you accepted the investigator's
13    conclusion?
14 A.  No.  I just looked at the results of the
15    investigation in it's totality.  I'm sure I
16    looked at everything.
17 Q.  But do you know what totality suggested
18    that --
19 A.  I'd have to read it.
20 Q.  -- in spite of his testimony, in spite of
21    Ms. Brackin's testimony, she told him he was
22    falsely arrested?
23 A.  I'd have to read it.

Page 462

1     MS. NELSON:  Object to the form.
2  Q.  You'd have to read and get the totality of
3     evidence that suggested that?
4  A.  Right.  And also give the investigator, you
5     know, some credibility for his investigative
6     technique.  And I just looked at everything.
7     I wasn't trying to write Mary Beth up.
8  Q.  So why not just let the investigator make the
9     decision; why not take yourself out of the
10    decision-making role altogether?
11       MS. NELSON:  Object to the form.
12 A.  Well --
13 Q.  Can you answer that?
14 A.  Because I was the department head.
15 Q.  I see.
16 A.  And the supervisor I assume.  Well, no, I
17    wasn't.
18       Didn't Nancy write her up on Fondren?  I
19    don't think I did -- I did the writeup.
20 Q.  Just so I'm clear, if Nancy said that whatever
21    she wrote was at your direction, would you
22    dispute that?
23       MS. NELSON:  I'd ask that you show her

Page 463

1     the -- I think it's getting late in
2     the day.  We're all tired.
3        MR. JAFFREE:  You could say that again.
4        MS. NELSON:  I would ask if you would show
5     her the writeup.  My recollection was
6     that it was a time frame in early 2004
7     perhaps that there was -- Nancy was
8     new.
9        MR. JAFFREE:  Maybe I'm finished going
10    over these, these productions.
11 Q.  Let me see if there's anything I need to ask
12    you about that I can't consult with your
13    attorney about.
14       Can I ask you:  Do you currently have a
15    affidavit or a declaration from anybody
16    concerning the facts of this case?
17 A.  No.
18 Q.  Well, if you don't currently have it, do you
19    contemplate receiving one from somebody within
20    the next two weeks concerning the facts of
21    this case?
22       MS. NELSON:  Object to the form.
23 A.  If -- if I -- if my lawyer asked me to.  I

Page 464

1     don't know.  I don't anticipate getting an
2     affidavit from anybody.
3  Q.  But you wouldn't be the one that would get it,
4     would you?  It would be your lawyer?
5        MS. NELSON:  I object to any
6     discussions or any attorney/client
7     privilege here.
8        MR. JAFFREE:  She said that she don't
9     anticipate getting it.  I'm just
10    trying to clarify that she is probably
11    not the one who would be getting it.
12 Q.  You stated before in your testimony that there
13    were no internal memo discussing how
14    transmittals are supposed to be handled once a
15    police officer calls and says, send back the
16    ticket.  And you said, no, there aren't any.
17       Is that still your position?
18 A.  I didn't -- I kind of got it.  About the
19    transmittals?
20 Q.  You stated in your testimony -- and that is
21    240.  Maybe I left off the two in these
22    numbers.  I was --
23 A.  My testimony where?



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



Page 465

1  Q.  At the administrative hearing.
2     MS. NELSON: For who?
3     MR. JAFFREE: Pardon?
4     MS. NELSON: What administrative hearing?
5     MR. JAFFREE: For Ms. Brackin.
6  Q.  I asked you on page 244: "Is there an
7     internal memorandum discussing how the
8     transmittals are supposed to be handled once a
9     police officer calls and says, send back the
10    ticket?"
11       And you said, "not specifically."
12       Is that still your position?
13 A.  That there are -- do I have any memos about
14    how transmittals to the State of Alabama are
15    to be handled when a police officer calls back
16    and says, send back the ticket?
17 Q.  Uh-huh (positive response).
18    MS. NELSON: Object to the form. A ticket
19       that's already been sworn to?
20    MR. JAFFREE: Well, I'm glad you mentioned
21       the "sworn to."
22 Q.  What does a ticket being sworn to mean to you?
23 A.  Well, once they swear to, it's a complaint.

Page 466

1     It has to go through the court system.
2  Q.  Does a magistrate have to sign this ticket?
3  A.  Does he have to sign the ticket?
4  Q.  Uh-huh (positive response). You see this --
5     MS. NELSON: Well, let her answer. Does
6        she have to sign it? What's your
7        question?
8  Q.  That's a interesting legal question and maybe
9     you could shed some light on it.
10    MS. NELSON: Are we leaving this other
11       question on the table here. I mean,
12       you're switching gears.
13    MR. JAFFREE: Which question?
14    MS. NELSON: The question you'd asked
15       about two minutes ago.
16    MR. JAFFREE: About what? Because I done
17       forgot. What question are we talking
18       about? Because I'm now on the
19       ticket. So what question --
20    MS. NELSON: You were asking the judge
21       about her policy about -- on what is a
22       person or magistrate supposed to do
23       with a ticket --

Page 467

1     MR. JAFFREE: I didn't ask her that.
2     MS. NELSON: -- once the police officer
3        says to send them back.
4     MR. JAFFREE: I didn't ask her that. I
5        asked her if -- if I read her
6        response.
7     MS. NELSON: I think the court reporter
8        could read back the statement but --
9     MR. JAFFREE: I know exactly what I said
10       because I read it right here. I asked
11       her is that still her answer, that
12       they don't have any internal
13       memorandum talking about what she
14       should do in situations like that.
15       But since you mentioned that --
16    MS. NELSON: And the situation -- and
17       that's when I asked, once the ticket
18       is turned into the magistrates'
19       office; is that correct?
20    MR. JAFFREE: Yeah. And then you changed
21       the subject.
22    MS. NELSON: No. I said, at that point
23       when it's sworn -- it's sworn to when

Page 468

1     it's turned in to the magistrates'
2     office. Is that what you're asking?
3     MR. JAFFREE: Yeah. That triggered the
4        change of direction here.
5  Q.  Let me ask this and then I'm going to get to
6     that. Do you know of any other situation ever
7     when a police officer called a magistrate and
8     said, send me back the ticket? That's a
9     unique occurrence, isn't it, as far as you
10    know?
11    MS. NELSON: Can I object to the form? I
12       don't know that there's any testimony
13       that the police officer called the
14       magistrate and said, send back the
15       ticket. I think the testimony was
16       kind of to the contrary, that Mary
17       Turner called the police officer
18       and --
19    MR. JAFFREE: You're right.
20 Q.  Do you know of any situation where a
21    magistrate have called a police officer and
22    the police officer said, send me back the
23    ticket, any other situation like that?

117 (Pages 465 to 468)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



# FREEDOM COURT REPORTING

Page 469

1    MS. NELSON: Object to the form. There's
2    not any. You say "any other."
3    There's not one. The testimony in
4    this case -- you're misrepresenting
5    the testimony in the case.
6    MR. JAFFREE: Well, what do you think is
7    the testimony in the case? You just
8    said Mary Turner called this officer,
9    right? And the officer said, okay,
10    just send me the ticket. And that's
11    the record.
12 Q. Assuming that that's the record, that the
13    office told a magistrate, okay --
14 A. After he had been in and sworn to the ticket
15    and left?
16 Q. After he had been in, do you know of any
17    situation where that have happened before?
18 A. Once he swore to the ticket --
19 Q. Yeah.
20 A. -- a magistrate called him and said, can you
21    get rid of this ticket? He said, yeah, just
22    send it to me?
23 Q. Yeah. Did --

Page 470

1 A. No, I don't.
2 Q. You don't. So this is a first time as far as
3    you know?
4 A. Those specific facts, yes.
5 Q. And that's probably why there's no policy on
6    this because it just haven't happened before,
7    right?
8 A. Well, no. The -- the -- there's state law and
9    state regulations -- AOC regulation that says
10    once a complaint is sworn to -- a ticket is
11    sworn to, it becomes a complaint. So we
12    didn't -- any internal policy we would have
13    had would have been superceded by state law
14    anyway.
15 Q. But you haven't trained your magistrates on
16    any state law dealing with that, have you?
17 A. AOC does. It's in their -- in their rule
18    book. They learn it.
19 Q. Do you know if Ms. Brackin had been trained on
20    that law?
21 A. Yes.
22 Q. She was trained in 2001?
23 A. In 2001?

Page 471

1 Q. Yeah. When this incident occurred.
2 A. I don't know specifically.
3    (Plaintiffs' Exhibit 12 was marked
4    for identification.)
5 Q. All right. Well, here, let me show you
6    Plaintiff's Exhibit 12 and ask you, verified
7    and acknowledged, that judge or magistrate,
8    what is that part for? You see that?
9 A. Judge or magistrate? Where is that, judge or
10    magistrate?
11    Oh, that's where they swear to it.
12 Q. No, she didn't swear to --
13    (Brief interruption)
14    MS. NELSON: We're about to get out of our
15    time limit here, Mr. Jaffree.
16    MR. JAFFREE: Well, as soon as I cover
17    this, I'm out of here.
18    MS. NELSON: I may have a couple of
19    questions just to clarify, but I'm
20    just saying, we need to move it on in
21    here.
22 Q. Now, did you have a chance --
23 A. She didn't sign it.

Page 472

1 Q. My question is -- and maybe you can shed some
2    light -- is the magistrate's signature or a
3    judge's signature necessary on that ticket?
4    MS. NELSON: Necessary for what?
5 Q. Necessary to put that ticket into the court
6    system?
7 A. If he swore to the ticket like she said he did
8    and like he said he did. I don't know that
9    that's a fatal error that she didn't sign it.
10 Q. But it could be?
11 A. I don't know that it is, no.
12 Q. And you don't know that it's not?
13 A. No. His testimony was I think that he swore
14    to it, he knew it was there, and he left
15    and --
16    (Plaintiffs' Exhibit 13 was marked
17    for identification.)
18 Q. Okay. All right. And in this Plaintiffs' --
19    what number is that, 12, 13 -- Plaintiffs'
20    Exhibit 13, this is not the original of that
21    transmittal sheet, but do you know if the
22    original had any Wite-Outs in it?
23 A. No, I don't know.

118 (Pages 469 to 472)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 473

1  Q.  Do you know for a fact at the time she
2      wrote -- Mary Brackin wrote "void," that she
3      had the ticket in front of her?
4  A.  Do I know that for a fact?
5  Q.  Yeah.
6  A.  No, I don't know it for a fact.
7  Q.  So if she testifies that she didn't have the
8      ticket in front of her when she wrote that
9      void in, that could have been correct
10     testimony?
11         MS. NELSON:  Object to the form.  I'm not
12         sure what you're asking.
13  Q.  Well, let me just see what we can agree on
14      since you're hesitating answering that
15      question.
16  A.  No, she signed that she -- that she had it.  I
17      mean, I don't know if she changed her mind.
18  Q.  Well, I'm asking you if you know for a fact
19      that she had the ticket --
20  A.  Only that she signed --
21  Q.  -- at the time --
22  A.  -- that she did.
23  Q.  -- at the time she wrote "void" in?  Do you

Page 474

1      know for a fact that at the time she wrote
2      that void in that she had the ticket?
3         MS. NELSON:  Asked and answered.  She said
4         she signed it --
5         MR. JAFFREE:  I didn't ask her had she
6         signed it.  I asked her if she knew
7         for a fact she had the ticket.
8  Q.  Well, I mean, you're talking to counsel, but
9      you're not answering my question.
10  A.  Well, yes, I think she had it because it had a
11      number.
12  Q.  My question is, at the time she wrote "void,"
13      do you know for a fact that she had the
14      ticket?
15  A.  Do I know for a fact that she had the ticket?
16      I don't know for a -- I wasn't there.  No.
17  Q.  All right.  Okay.  Then let me help you out a
18      little bit here.
19         Do you know if the officer giving her
20      these tickets and their being placed -- these
21      numbers then placed in the computer occurred
22      within the same five-minute span?
23  A.  No, I don't know.

Page 475

1  Q.  You don't.
2  A.  She wasn't terminated for that.
3  Q.  Okay.  This was part of the reason she was
4      terminated.
5  A.  She was not terminated for that.  She was
6      terminated for the two insubordinations within
7      a two-year period.
8  Q.  This was part of the reason she was
9      terminated.
10         MS. NELSON:  Well, if you add that one,
11         then that would have been --
12         THE WITNESS:  Three.
13         MS. NELSON:  -- three majors in a two-year
14         period.
15         MR. JAFFREE:  Okay.  If you call this a
16         major within, fine.  I mean, if you're
17         going to somehow twist logic to that
18         extent.
19         MS. NELSON:  Object to your statements
20         that --
21  Q.  Here's my question.  See if we can agree.
22      Mary Turner, according to the evidence we
23      have, contacted the officer, and the officer

Page 476

1      said, you can send the tickets back.
2         MS. NELSON:  You know you can ask this --
3         I'd appreciate your not testifying.
4         Ask this witness what she knows
5         instead of you testifying --
6  Q.  Do you know --
7         MS. NELSON:  -- and giving all these
8         hypotheticals --
9  Q.  Do you know --
10         MS. NELSON:  -- of what the evidence --
11  Q.  Do you know whether or not or do you have
12      reason to believe that Mary Turner contacted
13      the officer about this ticket?
14  A.  Only what -- what I've gleaned from the
15      investigation.
16  Q.  All right.  From the investigation --
17  A.  No first-hand knowledge.
18  Q.  From the investigation, does it appear that
19      Mary Turner asked the officer for the
20      ticket -- from the investigation, asked the
21      officer could he void the ticket?  Based on
22      your review of the investigation, does it
23      appear that Mary Turner asked the officer

119 (Pages 473 to 476)



## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 477

1    could he void the ticket?
2        MS. NELSON: If you know.
3    A. It appeared that that's what the investigator
4        found, just like in Fondren he found that --
5    Q. I'm not asking about Fondren. Does it appear
6        that the investigator found that the officer
7        told Mary Turner that she could send the
8        ticket back to him?
9    A. I mean, that was Mary's testimony I guess.
10   Q. Was that the officer's testimony as well?
11   A. That he told her, yeah, she could send it
12       back? I think -- yeah. Because I think he
13       was disciplined for that. He got a major
14       violation, too, for that.
15   Q. Does it appear from the investigation that the
16       ticket was returned to the officer?
17       MS. NELSON: What ticket?
18   Q. This ticket that was missing here, this ticket
19       of Steven Phelps?
20       MS. NELSON: What missing ticket are you
21       talking about?
22       MR. JAFFREE: The Steven Phelps speeding
23       ticket.

Page 478

1        MS. NELSON: You're talking about the
2        voided ticket that Mary Brackin
3        mishandled?
4        MR. JAFFREE: The ticket --
5        MS. NELSON: That she engaged in improper
6        conduct for?
7        MR. JAFFREE: All right.
8        The ticket that we're --
9    Q. Do you know what ticket we're talking about?
10       MS. NELSON: The ticket that had been
11       sworn to --
12   Q. The ticket, do you know which ticket I'm
13       talking about?
14       MS. NELSON: Do you, Judge?
15       THE WITNESS: I assume he's talking about
16       the ticket that the officer swore to
17       and then they -- they voided it
18       without talking to him.
19   Q. You keep on saying "swore to," but fine.
20       Okay.
21       Mary Beth said that when she did these
22       numbers, the ticket was missing. She also
23       testified that she contacted the police

Page 479

1    officer.
2        Do you have any evidence that she did not
3        contact the police officer?
4    A. I think the police officer said she did
5        not -- he did not talk to Mary Beth. He
6        talked to Mary Turner.
7    Q. All right. Did anybody ask him if he talked
8        to Mary Beth?
9    A. I --
10       MS. NELSON: If you know.
11   A. I don't know.
12   Q. Okay. Do you have any evidence as to who
13       retrieved the ticket and sent it back to the
14       police officer?
15   A. Any evidence other than the fact that Mary
16       Beth swore that she received the ticket?
17   Q. I'm not talking about who received it. Who
18       retrieved the ticket --
19   A. No. Mary Beth --
20   Q. -- and sent it back?
21   A. Mary Beth as far as I know.
22   Q. Mary Beth sent it to the police officer?
23   A. She had it. I don't know.

Page 480

1    Q. Do you have any evidence that Mary Beth knew
2        that the police officer wanted the ticket
3        returned to him?
4    A. I don't know.
5    Q. You don't know.
6    A. You said she talked to him and he told her
7        that.
8    Q. Well, also, she testified that he told her --
9    A. Right.
10   Q. -- to send the ticket back to him. Do you
11       have any evidence to dispute that?
12   A. No. She should have said, no, you swore to
13       it, it's got to be nolle prossed by the judge,
14       we can't send it back.
15   Q. But there is no policy on that?
16   A. There's state law that says that.
17   Q. But there's no policy from your office on
18       that?
19       MS. NELSON: You're being argumentative.
20       State law I think would supercede
21       policy.
22   A. And that's what the Court of Criminal Appeals
23       said, that it didn't matter whether or not we

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 481

1  had a policy because the state law superceded
2  it.
3  Q.  Court of Criminal Appeals?
4      MS. NELSON:  What she did was a violation
5      to state law.
6  Q.  State Law.  She didn't get charged with
7      violating state law, did she?  I mean, that
8      was not on your termination notice, that she
9      violated state law?
10     MS. NELSON:  Object to the form.
11 Q.  Was it?
12 A.  I don't remember.
13 Q.  You think your termination of her told her she
14     violated state law?
15 A.  I think it said she was negligent in the
16     handling of it.
17 Q.  Of the ticket.  I'm through.
18 A.  Okay.
19     EXAMINATION
20 BY MS. NELSON:
21 Q.  A couple of quick questions.  I'm sorry.
22 A.  That's okay.
23 Q.  On Plaintiffs' Exhibit 13, did Mary Beth

Page 482

1      Brackin engage in improper conduct by striking
2      "void" through this transmittal sheet?
3  A.  After the officer had sworn to it, yes.  It
4      had been turned in to her.
5  Q.  I'm going to show you what's been marked as
6      Plaintiffs' 5, which was a drawing of the
7      offices.  Is this drawing -- do you know who
8      did this drawing?
9  A.  No.
10 Q.  Are the offices drawn to scale --
11 A.  No.
12 Q.  -- as they are accurately?
13 A.  We just needed to number them so that when
14     each magistrate was packing up her office, she
15     knew what number to put on her boxes.
16 Q.  So according to this picture, office seven
17     looks like about -- it's about one-tenth the
18     size of office one.  That's not a true --
19 A.  No.
20 Q.  -- proportion to scale, is it?
21 A.  No.  And office seven ended up being the most
22     beautiful, biggest office, and everybody
23     wanted it after I did that.

Page 483

1  Q.  Just to clarify some testimony earlier, I'm
2      referring to Plaintiffs' Exhibit Number 6
3      regarding this memo from A-Advantage Bonding.
4      And you know, remember when you were
5      questioned about this, and there's a note on
6      the front that says that this was "filed by
7      Rickey Stokes," and "Nancy called the judge to
8      discuss," "and what would happen."  "Judge
9      laughed and said, nothing would be done
10     because Rickey" Stokes "was always causing
11     trouble."
12     Did you state that to Nancy?
13 A.  I don't remember that or laughing on any of
14     that.  I don't remember seeing this.
15 Q.  You don't remember seeing Plaintiff's Exhibit
16     6?
17 A.  I don't remember, but I would have forwarded
18     it to her since she was -- it was about her
19     department, court docket procedures, things
20     that she was in control of.
21     I'm not saying I didn't, but I don't
22     remember seeing it.
23 Q.  I think earlier, just to clarify something,

Page 484

1      you were asked about some of the clubs that
2      you belong to.  And I think Mr. Jaffree was
3      trying to imply that you were only a member of
4      black organizations.
5      Did you remember any other social clubs
6      that you're a member of?
7  A.  Yes.
8  Q.  Can you tell me what those are?
9  A.  I'm on the board of directors of Girls' Inc.
10     I'm in the Inns of Court which is a social
11     organization of lawyers and judges that
12     preside for the Houston County Bar, which I'm
13     a member of; Junior League; Zonta, Inc.; Women
14     Build for Habitat for Humanity.
15 Q.  Junior League of what?
16 A.  Montgomery.
17 Q.  Is that a mostly white organization?
18 A.  99 percent.
19 Q.  Zonta, is that a white organization?
20 A.  99 percent white.  It's not white because I'm
21     in it, but 99 percent white.  Women Build
22     Habitat for Humanity.  And they just stated
23     this new thing, WIND, the women involved in

121  (Pages 481 to 484)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 485

1  the revitalization of Downtown Dothan. And
2  they asked me to chair that committee.
3      MS. NELSON: I would like to again state
4      for the Record two things.
5          One, I observe the right to
6      question Nancy Martin on the documents
7      that you produced today and did not
8      produce yesterday.
9          I would also ask you to remind
10     Nancy Martin that she's under a
11     protective order in this case not to
12     discuss any of the testimony,
13     documents in this case.
14         And also we'd remind you just for
15     the Record today, that, you know, the
16     evidence and documents produced in
17     this case are under a protective
18     order.
19     MR. JAFFREE: I don't have to remind
20     Ms. Brackin of that?
21     MS. NELSON: No. Well, I think we went
22     over that with Ms. Brackin.
23     MR. JAFFREE: Well, as you know, I didn't

Page 486

1      even cover some of the evidence that I
2      have because I have no intentions of
3      embarrassing anybody. I didn't go
4      over stuff that I benefited from in
5      having access to the judge's file. As
6      a matter of fact, my clients don't
7      even know about it because it's not
8      relevant, so I have no intentions of
9      telling anybody anything.
10     MS. NELSON: Give me two seconds.
11         (Deposition concluded at 6:25 p.m.)
12     * * * * * * * * * *
13     FURTHER DEPONENT SAITH NOT
14     * * * * * * * * * *
15
16
17
18
19
20
21
22
23

122 (Pages 485 to 486)