# FREEDOM COURT REPORTING

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3               SOUTHERN DIVISION
 4
 5
   NANCY MARTIN and
 6 MARY BETH BRACKIN,
 7      Plaintiffs,
 8 vs.        CASE NO. 1:05-CV-1172-MEF
 9 CITY OF DOTHAN and
   JUDGE ROSE EVANS-GORDON,
10
        Defendants.
11
12
13
14        * * * * * * * * * * *
15      DEPOSITION OF IVAN KEITH GRAY, taken
16 pursuant to stipulation and agreement before Sherry
17 McCaskey, Certified Court Reporter and Commissioner
18 for the State of Alabama at Large, in the Dothan
19 Civic Center, 126 N. Andrews Street, Dothan,
20 Alabama, on Wednesday, October 31, 2007, commencing
21 at approximately 1:55 p.m.
22        * * * * * * * * * * *
23
```

## Page 2

```
 1              APPEARANCES
 2 FOR THE PLAINTIFFS:
 3 ISHMAEL JAFFREE, ESQUIRE
   Jaffree Law
 4 951 Government Street
   Suite 415
 5 Mobile, Alabama 36604
 6 FOR THE DEFENDANTS:
 7 CAROL SUE NELSON, ESQUIRE
   Maynard, Cooper & Gayle
 8 Attorneys at Law
   2400 Amsouth/Harbert Plaza
 9 1901 Sixth Avenue North
   Birmingham, Alabama 35203
10
11        * * * * * * * * * * *
12            EXHIBIT INDEX
13 PLAINTIFFS' EXHIBIT NO.:
14 14 Interview transcript      40,41,35
15 15 Article from          84,93,102
   www.rickeystokesnews.com
16
17        * * * * * * * * * * *
18
19
20
21
22
23
```

## Page 3

```
 1               STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3 between counsel representing the parties that the
 4 deposition of IVAN KEITH GRAY is taken pursuant to
 5 the Federal Rules of Civil Procedure and that said
 6 deposition may be taken before Sherry McCaskey,
 7 Certified Court Reporter and Commissioner for the
 8 State of Alabama at Large, without the formality of
 9 a commission; that objections to questions other
10 than objections as to the form of the questions need
11 not be made at this time but may be reserved for a
12 ruling at such time as the deposition may be offered
13 in evidence or used for any other purpose as
14 provided for by the Federal Rules of Civil
15 Procedure.
16        It is further stipulated and agreed by and
17 between counsel representing the parties in this
18 case that said deposition may be introduced at the
19 trial of this case or used in any manner by either
20 party hereto provided for by the Federal Rules of
21 Civil Procedure.
22        * * * * * * * * * * *
23
```

## Page 4

```
 1        MS. NELSON:  On the Record, I'd like to
 2      say that this witness would like to
 3      read and sign his deposition.
 4              IVAN KEITH GRAY
 5      The witness, having first been duly sworn
 6 to speak the truth, the whole truth and nothing but
 7 the truth, testified as follows:
 8              EXAMINATION
 9 BY MR. JAFFREE:
10 Q.  Could you state your name for the Record?
11 A.  Ivan Keith Gray.
12 Q.  I understand that you want to exercise the
13      right that's given to you by the rules to read
14      and sign the deposition before it becomes an
15      official document?
16 A.  Yes, sir.
17 Q.  I understand that concern, and I've expressed
18      to counsel for the defendants my concern that
19      your deposition be available for use for a
20      dispositive motion that has a November 16th
21      deadline.
22        I will try to ask the court reporter to
23      expedite this and try to get it to you as soon
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1  as practical. And, hopefully, I will have it
2  back in time for you to sign it and for the
3  court reporter to certify it and for me to use
4  those portions that are necessary in order to
5  support any partial summary judgment motion I
6  may file.
7      If not, I am, on the Record, reserving the
8  right to submit the unverified portion with
9  leave to correct any errors subsequently. And
10  so to that extent, I'm asking the court
11  reporter to give me a copy of the unverified
12  deposition pretty much at the same time that
13  she provides you with a copy of the original
14  or at least the tentative original for your
15  review.
16      Now, having said that, let me ask you:
17  Have you sat for a deposition before?
18  A. Yes, sir.
19  Q. How frequently?
20  A. Maybe --
21      MS. NELSON: You mean how many times?
22      I'm sorry. Go ahead.
23  Q. Well, how many times then?

Page 6

1  A. Maybe twice.
2  Q. Do you recall those times that you sat for a
3  deposition?
4  A. On one of them I do.
5  Q. And what was that; what was the issue?
6  A. It was a case where a defendant was suing the
7  City of Dothan. I believe the defendant's
8  name was Stovall, and it had to with a officer
9  -- another office arresting him in this
10  building at the Civic Center.
11  Q. And the deposition took place in this
12  building?
13  A. No. The issue about the officers arresting
14  Mr. Stovall was in the Civic Center.
15  Q. I see.
16  A. It occurred here.
17  Q. And you were called as a deponent on behalf of
18  whom?
19  A. The City.
20  Q. So you became the City's witness?
21      MS. NELSON: Object to the form.
22      And when I say that, just ignore
23      me. Go ahead and answer.

Page 7

1  A. I'm assuming that I was the City's witness. I
2  just received notice to appear for a
3  deposition, and I was there. So I'm assuming
4  that the City was the one that asked me to
5  come to that. Now, I'm not 100 percent sure
6  if it wasn't the defendant -- or which would
7  have been the plaintiff. Excuse me.
8      MS. NELSON: You need to speak up because
9      she's got to hear what you're saying
10      to take it down.
11      THE WITNESS: Okay.
12  Q. And do you recall whether prior to your
13  sitting for that deposition, somebody prepared
14  you for that deposition?
15  A. I don't remember that.
16  Q. Have you been prepared for this deposition?
17      MS. NELSON: Again -- go ahead. You can
18      answer.
19      I would object to any discussions
20      that any counsel for the City would
21      have had with him.
22      MR. JAFFREE: I'm not sure --
23      MS. NELSON: He is a lieutenant and he

Page 8

1  is --
2      MR. JAFFREE: -- technically that you're
3      representing him. Just not quite sure
4      of that.
5      MS. NELSON: He is a lieutenant with the
6      City of Dothan and, therefore, is part
7      of the City.
8      MR. JAFFREE: I'm not going to ask what
9      you talked to him about, what strategy
10      sessions you two had. I'm still not
11      quite sure you technically represent
12      everybody that is employed in some
13      capacity with the City of Dothan
14      because you represent the City in a
15      single, narrowly focused litigation.
16  Q. But be that as it may, do you remember any of
17  the facts and circumstances surrounding the
18  second deposition that you sat for?
19  A. The one that I have mentioned would have been
20  the second one, and I'm just assuming -- I
21  don't remember any details or facts for the
22  first one. That's not -- that is an
23  approximate number. I've been employed with

2 (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 9

1 the City almost 23 years. So I remember one
2 specifically. And I may have sat for another
3 one prior, but I'm not 100 percent sure.
4 Q. Well, your response dovetails nicely into my
5 next question: When did you first become
6 employed with the City of Dothan?
7 A. In 1985.
8 Q. In what capacity?
9 A. I was a jail security officer.
10 Q. Was that in the old jail; did they have an old
11 jail?
12 A. Yes, sir.
13 Q. I think I know, but what is a jail security
14 officer?
15 A. More people would commonly be -- think of it
16 as a corrections officer. We actually
17 in-process prisoners as they come to the jail
18 facility, care to their needs and -- and
19 upkeep, book, fingerprint, process.
20 Q. Did you have to take any training for that?
21 A. No, sir, not at the time.
22 Q. So you didn't have to go to any kind of
23 academy to become that?

### Page 10

1 A. No, sir.
2 Q. So you weren't really with the police force at
3 that time?
4 A. I wasn't a sworn officer.
5 Q. But you were classified as an officer?
6 A. I was a jail -- I was not a police officer in
7 that capacity. I was actually a jail security
8 officer, which is an unsworn member of the
9 police department.
10 Q. And how long did you serve in the capacity of
11 jail security officer?
12 A. Approximately six months.
13 Q. And what happened after that?
14 A. I made application to become a police officer
15 and was hired as a police officer.
16 Q. Now, that's for the City of Dothan we're
17 talking about, right?
18 A. Yes, sir.
19 Q. Is the police department a separate agency or
20 a unit of the government? How is the police
21 force in the City of Dothan characterized?
22 What is it; is it a department or what?
23 MS. NELSON: Object to the form. You can

### Page 11

1 answer if you understand and know.
2 A. It's a department of the City of Dothan.
3 Q. Okay. Is it connected to any other department
4 with the City of Dothan as far as you know?
5 MS. NELSON: Object to the form.
6 A. Not that I know of.
7 Q. So it's an independent, separate department of
8 the City of Dothan?
9 A. To my knowledge.
10 Q. Are you aware of the organizational structure
11 of the police department? And when I
12 say "police department," I'm always referring
13 to the City of Dothan Police Department.
14 A. Yes, sir.
15 Q. What is that organizational structure?
16 A. The police chief is the department head.
17 There is a major that -- that's up under him.
18 There is presently one captain and one acting
19 captain. And one of those captains is over
20 the records division.
21 Q. Which one, the captain or the acting?
22 A. The captain, Captain Parrish. The acting
23 captain Larry Drone is over the field

### Page 12

1 operations division.
2 Q. Thank you. You have some more under the
3 structure?
4 A. Yes. There are several different branches
5 that come down from there. There's --
6 Q. How many branches?
7 A. Oh --
8 Q. Is there that many?
9 A. Yes.
10 Q. More than ten?
11 A. Close to if not more than. You have the
12 acting captain which is over five divisions of
13 patrol. God, there's -- I don't know
14 which -- I believe Captain Parrish is over all
15 administration that would include records. It
16 would include the clerks, the
17 secretary -- administrative secretaries, the
18 -- the --
19 MS. NELSON: Just the best you can
20 remember.
21 A. There is just so many branches. Unless I see
22 an organizational chart, I can give you
23 just -- we have a criminal investigations

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1   division, a juvenile division, and there's two
2   lieutenants that's over those divisions. We
3   have a docket division that has an
4   administrative assistant. We have police
5   communications that come from there. We have
6   police animal shelter or the animal shelter
7   which is up under the umbrella of the police
8   department. We have the radio maintenance
9   shop which is up under the umbrella of the
10  police department. There's training
11  division. There is school resources which
12  comes up under juvenile division. We've got
13  school crossing guards that's -- that's in
14  there.
15      But right off the top of my head, just
16  thinking right now, we have -- there's an
17  internal affairs division which answers up
18  under -- directly to the police chief.
19  Q.  So it is directly connected to the police
20      chief?
21  A.  Yes.
22  Q.  It bypasses the major and the two captains?
23  A.  Unless -- our major has only had that position

Page 14

1   for approximately a year. And unless they
2   have been somehow connected, I believe the IA
3   is still coming directly from the chief.
4   Q.  Okay. Let me get to the internal affairs
5       division. I would say that's the primary
6       purpose of your deposition.
7       So after six months, thereabouts, you
8       became a police officer. You took whatever
9       tests necessary?
10  A.  Yes, sir.
11  Q.  And then took whatever training was necessary?
12  A.  Yes, sir.
13  Q.  Went to the academy and -- is that the one
14      that's here in Dothan?
15  A.  No, sir. In Selma, Alabama.
16  Q.  I'm thinking about Mobile. I've got to
17      remember what city I'm in, Dothan.
18      The academy is in Selma for training for
19      the Dothan police officers?
20  A.  The one that I attended, yes, sir.
21  Q.  And so you matriculated through that and
22      became a police chief (sic). Did you have any
23      rank at the time?

Page 15

1   A.  No.
2   Q.  I'm ignorant as to the ranks of police
3       officers. I'm ignorant to the ranks of the
4       military because I managed to escape as 1D,
5       1F, something. I was a one something.
6       But anyway, be that as it may -- maybe I
7       should notice -- but I guess you start off as
8       a private or something?
9   A.  No. You're just an officer.
10  Q.  And the next rank is what?
11  A.  A corporal.
12  Q.  Is an officer the same thing as a private
13      would be in the --
14  A.  Yes, sir.
15  Q.  -- military?
16  A.  We -- it -- it isn't distinguished by that
17      but, yes, sir. Private is usually starting at
18      the bottom and then officer would be just --
19  Q.  So I'm assuming you started as just an
20      officer?
21  A.  Yes, sir.
22  Q.  And a gentleman?
23  A.  Yes, sir. Thank you.

Page 16

1   Q.  So you remained an officer until when?
2   A.  I'm thinking around 1990. No, that's
3       incorrect. I made the rank of corporal -- I
4       can't remember. I believe it was in the late
5       80s, but I'm not 100 percent sure.
6   Q.  Okay. And how long did you remain a corporal?
7   A.  Not that long. I'm -- then again I'm not
8       certain, but I'm going to have to guess, maybe
9       a few years. Then I was promoted to
10      sergeant. I believe that was in 1990, but I'm
11      not 100 percent on that.
12  Q.  Would it be correct to characterize you as on
13      the fast track? Or maybe everybody goes at
14      that speed.
15  A.  No, sir. Up until -- I stayed a sergeant for
16      a long time. And I was just recently promoted
17      to lieutenant approximately a year ago --
18      little bit over a year ago. Matter of fact,
19      it was a year last month.
20  Q.  Maybe you were on the fast track until you got
21      to sergeant?
22  A.  That's a total, different story. I'll tell
23      you about that one day.

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

```
1   Q.  Now, when you was promoted to sergeant, were
2       you in some particular division, or did you
3       float around from division to division?
4   A.  I think I was --
5           MS. NELSON:  Object to form.  Go ahead.
6           MR. JAFFREE:  You don't like the term
7               "float?"
8           MS. NELSON:  I don't but go ahead.
9   A.  I was just -- I was in patrol division until I
10      made the rank of sergeant.
11  Q.  And once you made that rank, what division
12      were you in?
13  A.  Back then, the first line of being a
14      supervisor, you went back to the docket
15      detention which is the jail.  So I was the
16      supervisor over one of the shifts in the jail
17      as a sergeant for about a year.
18  Q.  And then after that?
19  A.  I was transferred to the narcotics --
20      narcotics division where I worked there
21      about -- I'm going to guess about a year, year
22      and a half.
23  Q.  Okay.  And then after that?
```

Page 18

```
1   A.  I went back to the jail I believe -- I believe
2       this is right -- for a year.  Then I went to
3       criminal investigations after that.
4   Q.  Did you take any special training once you
5       went to the -- is that a criminal
6       investigations division?
7   A.  Not at the very onset.  It was just on-the-job
8       training with seasoned investigators.  And as
9       you're going through your career there, they
10      have different schools that they send you to
11      that you can attend for either specialized
12      training or --
13  Q.  Do you recall whether or not these schools had
14      an emphasis on objective factual analysis or
15      emphasis on making a case?
16          MS. NELSON:  Object to the form.  I have
17              no idea what you're talking about.
18          THE WITNESS:  I don't either.
19  A.  I can assume what you're saying, but if he --
20          MS. NELSON:  I would ask you not to assume
21              anything.
22          THE WITNESS:  Okay.
23  A.  Well, if you could explain a little bit more.
```

Page 19

```
1           MR. JAFFREE:  You're not in control over
2               this officer.  But fine.
3           MS. NELSON:  I just don't understand your
4               question.  I'm not going to ask -- if
5               he doesn't understand, he needs to let
6               you --
7   A.  Objective analysis --
8           MS. NELSON:  Just ask him -- maybe ask him
9               what he was trained to do.
10          MR. JAFFREE:  Let me -- I appreciate your
11              offer to help, but let me try to make
12              it a bit -- by the way, are we doing
13              the same thing again, talking --
14  Q.  When you started criminal investigation and
15      went to these trainings, were you trained just
16      to look at the facts objectively, you know,
17      like Sergeant Friday, "Just the facts,
18      ma'am?"  Were you trained in that manner?
19          MS. NELSON:  Object to the form.  I don't
20              know if he knows how Sergeant Friday
21              was trained, but to the extent you
22              understand him, you can answer.
23          MR. JAFFREE:  I wasn't talking about how
```

Page 20

```
1       he was trained.  I was talking about,
2       he always tells people, "Just the
3       facts, ma'am."
4   A.  My training to be a criminal investigator, as
5       I said, was from experienced investigators.
6       So I did not -- I want to make sure you
7       understand.  I did not attend a school for
8       that.
9           The individual schools that I would have
10      attended during that tenure would be like
11      photography, how to take statements.  I went
12      to a forensic hypnosis school.  I went to a
13      polygraph school.
14          So as far as a structured setting that
15      says, this is how you do an investigation,
16      being objective from -- and whatever, that
17      never came in as a point of being taught.
18      It's just what you learned as a police officer
19      in being objective and the looking at facts
20      and basing everything off of the totality of
21      the circumstances and things of that nature.
22          I hope I answered your question.
23  Q.  Yeah.  So let's get to this police officer
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1  that trained you. Do you remember who it was
2  that you first got trained by?
3      MS. NELSON: Again, I object to the form.
4      I'm not sure he said it was one police
5      officer. I think he said seasoned
6      officers or something of that nature.
7  A.  Seasoned investigators.
8  Q.  Well, so more than one seasoned investigator
9      when you first started?
10 A.  Oh, yes. I believe one of our -- one of the
11     guys that helped me out that I think was my
12     first training -- I can't call him a training
13     officer, but the first seasoned investigator
14     that I was put with, I believe, is -- I
15     believe. I'm not 100 percent sure, but it was
16     Robert Sorrells.
17 Q.  And you probably told me this and I didn't
18     write it. What year was this that you started
19     working as a criminal investigator, if you
20     recall?
21 A.  I'm going to guess around 1993, 1994,
22     somewhere in there. But that's just guessing.
23 Q.  Now, from your experience when you first

Page 22

1  started working with these seasoned criminal
2  investigators, do you know if they approached
3  each investigation with a point of view?
4  A.  That I don't know.
5  Q.  Do you know what I'm referring to?
6  A.  If they're looking at a specific investigation
7      in one particular way, is what I interpret
8      that you're saying.
9  Q.  Well, that's part of it, and maybe they are
10     trying to make facts fit a hypothesis.
11     MS. NELSON: Object to the form, if that's
12     a question.
13     MR. JAFFREE: Well, that's my
14     explanation.
15 Q.  Do you know what I'm talking about, making the
16     facts fit a hypothesis?
17 A.  I know what you're saying. I can't say that
18     they have. No, I can't say that that's the
19     way they did it.
20 Q.  So how long did you remain in the criminal
21     investigation unit?
22 A.  Approximately eight to ten years.
23 Q.  Well, you weren't in the criminal

Page 23

1  investigation unit in 2001, were you?
2  A.  No. I started in internal affairs -- I think
3      it was in 1999. And before I went to internal
4      affairs, I was in criminal investigations.
5  Q.  What is internal affairs?
6  A.  It's an administrative portion of part of the
7      police department -- division of the police
8      department that deals with allegations -- or
9      they investigate allegations of police
10     misconduct. They also work with applicant
11     screening, applicant backgrounds for the
12     department.
13 Q.  What department?
14 A.  For the police department.
15     And conducts investigations at the
16     pleasure of the police chief -- at the
17     direction of the police chief.
18 Q.  Is there, as far as you know, any statute or
19     regulation that set up the internal affairs
20     department for the City of Dothan?
21 A.  What do you mean by "statute?"
22 Q.  Or any kind of code or law that brought it
23     into existence.

Page 24

1      MS. NELSON: If you know.
2  A.  I don't know.
3  Q.  But was there a handbook given to you when you
4      became a member of the internal affairs
5      division that spoke either specifically or in
6      a vague way of a charter of the division?
7  A.  No, sir.
8  Q.  Do you know how many different departments
9      there are associated with the City of Dothan?
10 A.  No, sir, not specifically.
11 Q.  Is there a maintenance department as far as
12     you know? It's not called maintenance. Maybe
13     you call them environmental services
14     department.
15 A.  There's an environmental services department,
16     but I've heard of a maintenance department.
17 Q.  I'm dating my age. They use politically
18     correct words now.
19     I guess they have a fire department for
20     the city?
21 A.  Yes, sir.
22 Q.  Health department maybe for the City?
23 A.  I don't know if the employee health clinic is

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  a department.
2  **Q. But is it a unit of the City government?**
3      MS. NELSON: He said he didn't know.
4      MR. JAFFREE: Well, he didn't know if it
5      was a department, but maybe he knows
6      what it's characterized as.
7      MS. NELSON: Object to the form.
8  A. I know that the employees with the employee
9     heath clinic are employed by the City of
10    Dothan. I don't know the status. I don't
11    know if it's a department. I don't know if
12    they have a department head. I don't know.
13 **Q. Well, let me jump further into the chase.**
14    **Now, have you ever done an internal affairs**
15    **investigation for the environmental service**
16    **department for the City of Dothan for one of**
17    **their employees?**
18 A. Not that I can recall.
19 **Q. What about the fire department for the City?**
20 A. Yes.
21 **Q. You did? You investigated one of the**
22    **employees in the fire department?**
23 A. It wasn't just one employee, I don't believe.

Page 26

1  **Q. A number of employees?**
2  A. The investigation --
3      MS. NELSON: Best you can, if you can
4      answer.
5      THE WITNESS: Yeah, I know.
6  A. It wasn't -- the investigation wasn't directed
7     as an -- at an employee. It was directed
8     at -- at a possibility of misconduct as it
9     relates to that department. So it wasn't an
10    employee.
11 **Q. The misconduct that the investigation was**
12    **directed towards, did it have a criminal**
13    **element?**
14 A. No.
15 **Q. Misconduct that didn't relate to any crime but**
16    **concerned a department?**
17 A. Correct.
18 **Q. Okay. Have y'all -- let's leave aside for a**
19    **minute the judicial department. Have y'all --**
20    **when I say "y'all," I'm talking about internal**
21    **affairs -- conducted internal affairs**
22    **investigations of any other departments of the**
23    **City of Dothan, other than the police**

Page 27

1  **department?**
2  A. Would you say that again?
3  **Q. Has internal affairs division conducted**
4     **investigations of any other city departments,**
5     **excluding the police department and the**
6     **magistrate or the judicial department?**
7  A. That I was a party to?
8  **Q. Or that you are aware of.**
9      MS. NELSON: And besides the fire
10     department, besides what he's already
11     testified to.
12 A. Right. I'm not 100 percent certain. But they
13    could -- there was an investigation dealing
14    with the Dothan Utilities where there was a
15    theft of some money I believe. And as I said,
16    I'm not certain if it was the internal affairs
17    or the criminal investigations division that
18    investigated that.
19 **Q. So they may have done -- I'm sorry. What**
20    **department was that?**
21 A. Utilities.
22 **Q. So there may have been one with utilities, but**
23    **you're not positive?**

Page 28

1  A. Right.
2  **Q. But if there was, you think it involved some**
3     **type of criminal activity, theft activity?**
4  A. Correct.
5  **Q. Were you involved in a investigation with --**
6     **on a personal level with the fire department?**
7     **I think you said you were, but I want to be**
8     **clear on that. Were you personally involved?**
9  A. Yes.
10 **Q. Do you have any idea pursuant to what**
11    **authority police internal affairs investigated**
12    **the fire department for a non-criminal**
13    **activity?**
14 A. My police chief assigned that investigation to
15    me and Corporal Frank Reeves, so that's pretty
16    much the authority that I followed.
17 **Q. So the authority -- whatever the police chief**
18    **decides to assign you, that's the authority?**
19 A. That's -- that's the -- whose -- under whose
20    authority I investigated that case.
21 **Q. Did you give the people that you investigated**
22    **at the fire department the garrity notice?**
23 A. I don't remember. I didn't review that case

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  before coming here.
2  Q.  Well, do you think you would have?  Is that
3     standard operating procedure?
4  A.  It is.  That was early on in internal
5     affairs.  I'm not sure if that was before I
6     went to the internal affairs school or not.
7     So I don't remember.
8  Q.  So y'all might not had been given that notice?
9     MS. NELSON:  Object to form.
10 A.  I don't remember.
11    MS. NELSON:  He said he didn't remember.
12 A.  I don't remember.
13    MR. JAFFREE:  Well, I'm just clarifying
14    what's he saying.  It sounds like
15    y'all may not have been given the
16    notice at that time.
17    MS. NELSON:  Again, I think the Record
18    will speak to what his answer is.
19 A.  I don't remember.
20    MR. JAFFREE:  Well, I guess if that was
21    the case, then the Record would have
22    taken the place of your comment.
23 Q.  But be that as it may, do you know from any

Page 30

1     document that you have ever read that
2     authorizes internal affairs -- the Dothan
3     Internal Affairs Division to investigate
4     non-criminal matters involving civilians?
5  A.  For clarity, what are you calling a civilian?
6  Q.  A non-police officer or somebody that's not
7     associated with the police division.
8  A.  Okay.  So anyone outside of the umbrella of
9     the police department you're calling just a
10    citizen, not necessarily that they're a City
11    employee?
12 Q.  Well, first -- yeah, let's make it that
13    broad.  Anybody.  Don't have to be a City
14    employee, just outside the umbrella of the
15    police department.
16 A.  The internal affairs division has done
17    investigations which include; by your
18    definition, citizens as witnesses; subjects of
19    complaints of -- because they complain on
20    police officers.  So citizens complaining on
21    police officers.  So, yes, we have.
22 Q.  As far as you know, have y'all did an internal
23    affairs investigation of a privately owned

Page 31

1     business to investigate the employees for
2     administrative misconduct?
3  A.  No.
4     MS. NELSON:  Object to the form.
5  Q.  But do you understand what I mean by
6     "administrative misconduct?"
7     MS. NELSON:  Object to the form.  I don't.
8     MR. JAFFREE:  Okay.
9     MS. NELSON:  Are you talking about a
10    business that has no association with
11    the City?
12    MR. JAFFREE:  I'm talking about a business
13    having no association with the City.
14 Q.  Like, for instance, McDonald's.  McDonald's
15    thinks their employee was goofing off and not
16    putting in eight-hours work for eight-hours
17    pay.
18    Is that something you think that internal
19    affairs would investigate?
20    MS. NELSON:  Object to the form.
21 A.  No.
22 Q.  You don't think that's part of your charter?
23    MS. NELSON:  Object to what he thinks.

Page 32

1     But --
2  Q.  If the chief assigned you to investigate it,
3     you would perhaps do it?
4  A.  I'd do exactly what my boss said do.
5  Q.  You know which side your bread is buttered on,
6     huh?
7     MS. NELSON:  Object to the form.
8     MR. JAFFREE:  I'm putting some levity in
9     here so I can stay awake.
10 Q.  Do you know, from your own experience, how
11    many times you have initiated an investigation
12    on behalf of the judicial department?
13    MS. NELSON:  Object the form.  What do you
14    be mean, "on behalf of?"
15    MR. JAFFREE:  Well, let me limit my
16    question.
17    MS. NELSON:  Involving?
18    MR. JAFFREE:  Let me limit my question
19    to -- I'm sure counsel is going to
20    object no sooner than I move my mouth.
21 Q.  Let me limit my question.  Do you recall how
22    many times you have conducted an investigation
23    where employees of the judicial department was

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1    involved in an investigation? Let me put it
2    more bluntly, the target of an investigation.
3        MS. NELSON: Object to the form.
4    A. I've been involved in two investigations, to
5        my knowledge, as it relates to the City of
6        Dothan Judicial Department.
7    Q. Prior --
8    A. Clarify. Within the two, there were new
9        issues that came out in one particular, so I'm
10       considering that as one event dealing with
11       that investigation. And then there was a separate
12       department. And then there was a separate
13       one. So two to my knowledge, two different
14       investigations.
15   Q. So one became pregnant and the other one did
16       not?
17   A. Yes, sir.
18   Q. And you investigated the baby as well?
19       MS. NELSON: Object to the form.
20       MR. JAFFREE: What was wrong with that
21       form?
22   Q. Let me go back again. Do you recall ever
23       being involved in an internal affairs

Page 34

1    investigation of any employee of the judicial
2    department prior to the installation of Judge
3    Gordon?
4        MS. NELSON: Prior to the installation?
5        MR. JAFFREE: That's the term for her
6        getting her position.
7        MS. NELSON: Okay.
8    A. No, sir, I don't believe I did.
9        MR. JAFFREE: Somehow, I think you don't
10       like my vocabulary.
11       MS. NELSON: Well, I'm just trying to make
12       sure I understand what you were
13       saying. I think -- just for the
14       Record, I think perhaps he went into
15       internal affairs about the time Judge
16       Gordon went on the bench.
17       MR. JAFFREE: Perhaps slightly ahead of
18       her, perhaps not. But, thanks, you
19       helped me with another question.
20   Q. Did you have any knowledge of anyone employed
21       by internal affairs conducting an
22       investigation? Knowledge. Now, I don't care
23       if it's hearsay knowledge for my purposes. Do

Page 35

1    you have any knowledge of anyone, other than
2    yourself, conducting an investigation of an
3    employee of the judicial department prior to
4    Judge Gordon becoming a municipal judge?
5        MS. NELSON: I'm going to state an
6        objection. There was no judicial
7        department before Judge Gordon came to
8        the City.
9        MR. JAFFREE: Well, I guess his response
10       would be, no.
11       MS. NELSON: Well, I'm just making that
12       point, but he can answer as he --
13       MR. JAFFREE: And then you can indicate
14       that my question was too limited.
15   A. I don't have any knowledge of that.
16   Q. All right. Let me -- counsel is always being
17       helpful.
18       So do you have any knowledge of anybody
19       being involved in an internal affairs
20       investigation of any city magistrate prior to
21       Judge Gordon becoming municipal judge, any
22       city magistrate, whether or not they were
23       called city magistrates or city clerks?

Page 36

1        I don't know what that place was called if
2    it wasn't judicial. I mean, it just may have
3    been called clerk division, whatever, or
4    whatever.
5        MS. NELSON: Object to the form,
6        statement, but you can answer to the
7        extent you know.
8        MR. JAFFREE: If you want to give me some
9        help, do you know what it was called?
10       You probably do.
11       MS. NELSON: I'm not here to testify.
12       MR. JAFFREE: It's probably here in some
13       of this junk I've got.
14   A. I don't have any knowledge of any prior
15       internal affairs investigator investigating
16       any municipal court magistrate.
17   Q. Okay. Now, in 1991 were you involved in an
18       investigation of any magistrate with the
19       judicial department of the City of Dothan?
20   A. No, sir.
21   Q. I'm sorry. What year did I say?
22   A. No, sir. Mr. Gray.
23   Q. If I said 1991, I'm sorry.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  A.  You did.
2  Q.  And I'm going to get stuck with these wrong
3      words coming out of my mouth.
4          So let's make that 2001.  In 2001, were
5      you involved in an investigation of any
6      magistrate employed with the judicial
7      department of the City of Dothan?
8  A.  Yes, sir.
9          MR. JAFFREE:  I've got to remember the
10         deponent is clever and intelligent,
11         and I don't need to be half focused
12         today.  I just don't.
13 Q.  But do you recall upon whose request you were
14     involved in that investigation?
15         MS. NELSON:  Can we clarify the
16         investigation and --
17 Q.  Was there more than one investigation you was
18     involved in, in 2001?
19 A.  Well, there's a lot of investigations here
20     that you're going to depose me on I guess.
21     So --
22 Q.  Were there a lot of them that existed in 2001?
23 A.  It depends on what you mean "a lot of." But

Page 38

1      there are several investigations every year,
2      dealing with internal affairs.
3  Q.  Well, I'm talking about involving an
4      employee -- a magistrate employee of the
5      judicial department of the City of Dothan?
6  A.  I don't think there was a lot of them in 2001.
7  Q.  Well, how many do you recall you've been
8      involved in, in 2001 involving a magistrate of
9      the judicial department?
10 A.  I believe you're referring to the Kimberly
11     Ralpeje case.
12 Q.  Yeah, that one.  Let's settle upon that one.
13 A.  Yes, sir, I was involved in that.
14 Q.  Do you recall upon whose request you was
15     involved in that investigation?
16         MS. NELSON:  And, again, I would state for
17         the Record, if he can -- to the extent
18         that he can remember.  But if he needs
19         to look at documents, I would ask you
20         to put the documents before him.
21 Q.  If you can, I will provide you with some
22     assistance.  I could let you read your own
23     words, if you'd like.

Page 39

1  A.  Yes, if you have that --
2  Q.  But if you remember on your own
3      independently.
4  A.  If you have that, it was either -- either one
5      of two people, but if you can provide the
6      document --
7  Q.  Who do you think would be the two people?
8  A.  Either it was Chief White or either Captain
9      Parrish.  But --
10 Q.  It could have been a third person?
11         MS. NELSON:  I'll show him my document,
12         but if you have a certain one you want
13         to show him.
14 Q.  Well, let me --
15 A.  It was Chief White.
16 Q.  I don't think so.  I believe it was -- Chief
17     White is not the person I had in mind.
18         MS. NELSON:  Well, you're asking the
19         witness who is under oath who is
20         sitting here looking at this memo from
21         Chief White to him, directing the
22         investigation.
23 Q.  This is a transcript of a statement of Mary

Page 40

1      Brackin that was done in 2001, and the
2      relevant part of the statement can be found on
3      page three.
4          Do you have it in front of you?
5  A.  Captain Monday was the bureau commander which
6      he was over internal affairs as well.  So
7      it --
8  Q.  Well, that's not who I had in mind either.
9  A.  But you ask if there was any other third
10     person.  Chief White.  It would have come from
11     either Chief White, Captain Monday, or
12     possibly Captain Parrish.
13 Q.  That's unfair.  I probably didn't ask the
14     question correctly.  And I think your response
15     is correct as far as it goes, based on the way
16     I asked the question.
17         But let me show you --
18         MR. JAFFREE:  Let me mark this.  I guess
19         I -- I don't have another copy so
20         maybe I can get this back between
21         today and tomorrow morning.
22         MS. NELSON:  Could you show me what you're
23         about to ask him.  I'm not sure I have

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1    the Bates stamp on here.
2    MR. JAFFREE: The Bates stamp is 1278.
3    MS. NELSON: You're at Mary Beth Brackin's
4    testimony.
5    MR. JAFFREE: Uh-huh (positive response).
6    (Plaintiff's Exhibit 14 was marked
7    for identification.)
8  Q. Look at the bottom of what has been marked as
9    Plaintiffs' Exhibit Number 14.
10 A. Yes, sir.
11 Q. Now, I have highlighted that. The highlight
12   was not on the original, but I highlighted it
13   for my own purposes. And I don't want to
14   imply that it was given to me that way by the
15   City's counsel.
16   MR. JAFFREE: If I could have found more
17   time, I would have made copies of
18   this, but I'm just having trouble
19   finding time in my day.
20 Q. If you look at Exhibit 14, it does appear that
21   Judge Gordon is the one that called for this
22   investigation; is that correct?
23   MS. NELSON: Object to the form.

Page 42

1  A. If I remember correctly, your question is who
2    assigned me to the investigation. And Judge
3    Gordon did not assign me to the investigation.
4  Q. Okay. But it says that she initiated the
5    investigation; is that correct?
6    MS. NELSON: Object to the form. The
7    testimony will speak for itself.
8    MR. JAFFREE: Well, I'm asking for the
9    testimony.
10 A. The judge is not my department head. I get my
11   orders and directions from my department head
12   or my supervisors. Judge Gordon did not come
13   directly to me and ask me to investigate.
14 Q. Can you read what you said there?
15 A. "The judge asked for an investigation from the
16   chief because he has the investigators that
17   can actually look into something and has time
18   to actually look into it."
19 Q. Now, can I assume from your statement that
20   somebody communicated to you that the judge
21   had asked the chief to conduct an
22   investigation?
23 A. Yes.

Page 43

1  Q. Who told you that?
2    MS. NELSON: If you know.
3  A. I'm -- it had to have been from the chief.
4  Q. Okay. Now, I know it's going back a long
5    time.
6  A. That it is.
7  Q. However, can I assume that one of the
8    hallmarks of a good investigator is a good
9    memory?
10   MS. NELSON: Object to the form as to any
11   assumption.
12 Q. Is that a presumption?
13   MS. NELSON: Object to the form.
14 Q. Or is that a standard presumption that has
15   some merit?
16   MS. NELSON: Object to the form.
17 A. Well, I guess with anything, it would come
18   with the passage of time. So in order to
19   refresh and reflect over things over the
20   passage of time, there could be a lot more
21   memory recall to answer your question.
22 Q. Well, even though for the Record I do not
23   acknowledge the City's counsel as functioning

Page 44

1    as your counsel, I will not invade whatever
2    province she had in preparing you. But did
3    you review any records in preparation for this
4    deposition?
5  A. Yes.
6  Q. Did you --
7    (Brief interruption)
8    MR. JAFFREE: I was just talking about
9    memory, and mine has gone blank as to
10   where I was.
11   MS. NELSON: You asked him if he had
12   reviewed any records.
13   MR. JAFFREE: I'm not an investigator and
14   I'm getting old in the tooth, long in
15   the tooth or somewhere. I've got you
16   by a few years.
17   Where was I at?
18   Do you want to read back where I
19   was at? What was the last thing I
20   said?
21   (Court reporter read from the
22   Record.)
23 Q. Did you review some transcripts of the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  testimony that you had gathered during your
2  investigations?
3  A.  Some of them.
4  Q.  But not necessarily this transcript?
5     MS. NELSON:  This one being --
6  Q.  The one that you're reviewing now, the
7  transcript of --
8     MS. NELSON:  Your Plaintiffs' Exhibit 14?
9     MR. JAFFREE:  Yeah.
10    MS. NELSON:  That page?
11    MR. JAFFREE:  Yeah, that page.
12 A.  No, I didn't.
13 Q.  All right.  Do you know pursuant to what
14 authority Judge Gordon may have
15 instructed -- help me with the right word --
16 suggested, encouraged, ordered your chief to
17 appoint you to do this investigation?
18 A.  No.
19 Q.  Which was the correct word, "suggested,"
20 "ordered?"
21    MS. NELSON:  Object to the form.
22 Q.  "Instructed?"
23    MS. NELSON:  If he doesn't know -- object

Page 46

1  to the form.
2     MR. JAFFREE:  Well, the question --
3     MS. NELSON:  If you know.  That's fine.
4     MR. JAFFREE:  There's two parts to that
5  question.  One was, pursuant to what
6  authority, and the other part is which
7  is the correct verb.
8     MS. NELSON:  Well, I'm not trying to take
9  the deposition.  I'm trying to speed
10 things along.
11    Object to form.  If you want to
12 ask him if he has any knowledge of how
13 the investigation came about, other
14 than the chief giving him --
15    MR. JAFFREE:  Well, no.  I want to ask
16 him:
17 Q.  Do you know pursuant to what authority the
18 judge initiated this investigation?
19    MS. NELSON:  Object to the form.
20 A.  No.
21    MS. NELSON:  I'm not sure if he testified
22 that he knows for certain that the
23 judge initiated it.

Page 47

1  Q.  Would you feel comfortable in my suggestion
2  that the judge initiated this investigation?
3     MS. NELSON:  Object to the form.  I don't
4  know if he can feel comfortable with
5  you or not.
6  A.  No, sir.
7     MR. JAFFREE:  I don't know as from -- if
8  he needs to banter with everything
9  that you -- he may feel comfortable.
10    MS. NELSON:  Well, ask him a question, not
11 if he will feel comfortable with or --
12    MR. JAFFREE:  To move this along --
13    MS. NELSON:  Ask him if he has knowledge.
14 Q.  Do you know whether or not the judge, based on
15 hearsay or whatever, the judge initiated this
16 investigation?
17    MS. NELSON:  If you know.
18 A.  No, I don't 100 percent positively know.
19 Q.  Did you intend from that statement that you
20 just read to be an empty statement, or was it
21 based on facts at the time?
22 A.  Whenever -- and to clarify me saying, no, I
23 don't work for the judge.  I don't know who

Page 48

1  the judge sends.  I -- I don't -- I'm not a
2  part of her department.  So when it came to
3  me, it came to me through the chief.
4     Now, whatever channels happened between
5  the chief and the judge, that's what I'm
6  saying that I don't know.  How -- how it got
7  from the judge to the chief, how she made up
8  her mind to do that and all that, I was not a
9  party of.  How it was assigned to me, I wasn't
10 a party of.  When I'm told to do an
11 investigation by the chief, I do it.
12 Q.  All right.  Let me ask you this:  Do you know
13 for a fact -- I'm sorry.  Let me back up.
14    What chief told you to conduct this
15 investigation; what was the name of that
16 chief?
17 A.  John White.
18 Q.  All right.  Do you know what independent facts
19 that Judge White (sic) had concerning the
20 incident that you was investigating prior to
21 your initiating the investigation?
22 A.  No, I don't know the facts that he had.  He
23 did direct me to talk to the judge about the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  investigation. He directed me.
2  Q. So you did, at some point, talk to the judge?
3  A. Yes.
4  Q. Did you make a transcript of that discussion?
5  A. No.
6  Q. Why not?
7  A. I just didn't.
8  Q. All right. Do you recall what the judge may
9      have said to you?
10 A. Yes. That when it had come to her attention
11     that Mary Beth Brackin possibly made
12     statements to a defendant in a criminal case
13     in her court, that her attorney that was
14     representing her was basically incompetent --
15     and those aren't the words that she used.
16     Those are what I'm paraphrasing.
17 Q. Well, don't paraphrase. What were the words
18     she used?
19 A. I can't -- I don't remember the exact words.
20 Q. Oh, okay.
21 A. Just that there was some possible misconduct
22     from Mary Beth Brackin, insinuating that
23     Ms. Ralpeje may want to seek another attorney

Page 50

1  because of her attorney giving her some
2  information that she thought wasn't good.
3  Q. So in essence, your investigation was to see
4      if Mary Brackin had bad mouthed another
5      attorney -- I'm sorry -- an attorney, not
6      another attorney, an attorney?
7     MS. NELSON: Object to the form.
8  A. Giving legal advice to a defendant of a case
9      when her job description didn't reflect that
10     that was one of her duties.
11 Q. What was the legal advice she had given?
12 A. Now, you said that's what the allegations
13     were, and that's what I was told to
14     investigate. So --
15 Q. But what was the legal advice that she had
16     allegedly gave to Ms. Ralpeje?
17 A. Just a second.
18     MS. NELSON: He's reviewing --
19     MR. JAFFREE: Sure.
20     MS. NELSON: -- a memo he did like six
21     years ago.
22     MR. JAFFREE: But he indicated he had
23     reviewed some of this record.

Page 51

1     MS. NELSON: But he said not necessarily
2      this one.
3     MR. JAFFREE: Well, he said not
4      necessarily the transcript.
5     MS. NELSON: Well, you didn't ask him
6      about the memo. Anyway, he can --
7     MR. JAFFREE: Well, I didn't know his
8      review was limited because I thought
9      that --
10    MS. NELSON: Well, you didn't ask him.
11    MR. JAFFREE: If he was prepared, he would
12     be reviewing what I may cover.
13    MS. NELSON: You know, he can sit here and
14     review it all day if he needs to.
15 A. Specifically, that a magistrate which was to
16     be Mary Brackin told Ms. Ralpeje that she
17     should ask for another lawyer because they had
18     many complaints about Shaun, referring to
19     Attorney Shaun McGhee, and the first thing she
20     should do is get rid of Shaun.
21 Q. That the first thing who should do is get rid
22     of Shaun?
23 A. Ms. McGhee -- excuse me. Ms. Ralpeje.

Page 52

1  Q. Ms. Ralpeje --
2  A. Yes.
3  Q. -- should get rid of Shaun.
4      So the judge told you that she had heard
5      that?
6  A. The judge advised me that -- that her
7      employee, Ms. Brackin, made -- there were
8      allegations that she made statements to
9      Ms. Ralpeje that Mr. McGhee gave her some --
10     pretty much bad advice. And that's not -- I'm
11     paraphrasing the words, that the allegations
12     were that Ms. Brackin overstepped her
13     authority as a magistrate by providing -- by
14     telling a defendant in a case that her counsel
15     was inadequate.
16 Q. But that constitutes pretty much the bulk of
17     the discussion you had with Judge Gordon?
18 A. That was the gist of it.
19 Q. Can you think of anything else that she may
20     have said at the time?
21 A. Yes. There were some parties -- there were
22     some other people that may have been a party
23     to that discussion which was a bondsman by the

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  name -- last name of Turner. Also -- and I
2  don't -- yeah, I believe that was it. There
3  was another party to the -- to that statement,
4  and it was the bondsman by -- by the name of
5  Turner.
6  **Q. Okay. When you talked to the judge, did you**
7  **view your role as, "Just the facts, ma'am?"**
8      MS. NELSON: Object to the form.
9  **A. Can you clarify what you mean?**
10 **Q. That's fair enough.**
11     **Did you view your role as just soliciting**
12 **facts to see whether or not the allegation was**
13 **true?**
14 A. Yes, sir.
15 **Q. Do you think you ultimately did more than just**
16 **solicit the facts to see if the allegation was**
17 **true?**
18 A. In what way?
19 **Q. That you became an advocate?**
20 A. For who, just an advocate in general?
21 **Q. An advocate recommending punishment,**
22 **recommending sanction?**
23     MS. NELSON: Object to the form.

Page 54

1  A. No, sir.
2  **Q. You don't think so?**
3  A. No.
4  **Q. Well, we'll get into that in a minute, but let**
5  **me go back again.**
6      **Based on what the judge told you, as you**
7  **have just stated, from your experience, which**
8  **is quite lengthy as a member of the police**
9  **force, is there a potential crime in any of**
10 **that allegation, a criminal activity in any of**
11 **that allegation?**
12 A. Not that I know of. And that wasn't -- I
13 wasn't investigating it as a criminal
14 investigator. I was investigating it as an
15 administrative investigator.
16 **Q. Do you know if prior to your discussion with**
17 **Ms. Brackin you gave her a garrity notice?**
18 A. I wouldn't have.
19 **Q. You wouldn't have?**
20 A. No.
21 **Q. Do you know if anyone gave her the garrity**
22 **notice?**
23 A. You're saying prior to an interview?

Page 55

1  **Q. Yeah. Just prior to your --**
2  A. Prior to even talking to her?
3  **Q. Prior to taking her statement, yeah.**
4  A. Hold on.
5  **Q. I'm not trying to trap you. You did give her**
6  **a garrity notice.**
7  A. I would have.
8      MS. NELSON: Well, again, I'd object to
9      the form. Do you know you did?
10     MR. JAFFREE: Yeah. It's part of the --
11     MS. NELSON: It is? Where?
12     MR. JAFFREE: Right here (indicating).
13 **Q. I'm not saying this to try to trap you, I'm**
14 **just simply trying to get to a point.**
15     MS. NELSON: Okay.
16 **Q. This is both aside for the Record, that I'm**
17 **not as -- well, I don't want to have to call**
18 **it clever, but there's a propensity for**
19 **investigators to say: I'm not trying to trap**
20 **you, I'm not trying to -- not trying to be**
21 **slick or anything, I'm just trying to get some**
22 **facts.**
23     **But it seems like the intent is to trap.**

Page 56

1  But --
2      MS. NELSON: Object to the form. Object
3      to your statement. Object to your
4      speculations.
5      MR. JAFFREE: Well, I mean, it's all part
6      of the record.
7  **Q. But be that as it may, why did you give her a**
8  **garrity warning if there was no possibility of**
9  **any criminal charges coming from this?**
10     MS. NELSON: Object to the form. I don't
11     know that he ever testified that there
12     was no possibility of any criminal
13     activity coming from it.
14 **Q. Based on the information that you had gathered**
15 **from the judge during your interview,**
16 **unrecorded with the judge, what possible**
17 **criminal charges could be brought against**
18 **Ms. Brackin, based on the facts that was**
19 **before you at the time?**
20     MS. NELSON: Object to the form.
21 A. If -- if I were assigned to it initially,
22 there -- to my knowledge, there wouldn't have
23 been any criminal activity that I know of

14 (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1 afoot for me to even have received that
2 investigation. That would've gone to the
3 criminal investigations division.
4 Q. Well, do you know the purpose of the garrity
5 notice or the garrity warning?
6 A. Yes.
7 Q. What do you think is the purpose?
8 A. I think the purpose is to advise a
9 governmental employee, which Ms. Mary Brackin
10 was a part of the City of Dothan government,
11 that they are compelled to answer truthfully
12 questions as it relates to an administrative
13 investigation only, and that anything that
14 they say in regards to that administrative
15 investigation is not and will not be used in a
16 subsequent criminal investigation.
17 Q. Do you know why the garrity rule was required?
18     MS. NELSON: Object to the form. That
19         calls for a conclusion of law. But to
20         the extent he knows --
21 Q. Yeah, if he knows. I mean, are you familiar
22 with the garrity --
23     (Court reporter interrupted for

Page 58

1     clarification.)
2     MS. NELSON: Object that it calls for a
3         legal conclusion.
4 A. What was your question again?
5 Q. Were you familiar with the garrity case from
6 which the rule, the policy, the notice
7 derived?
8 A. I'm not an attorney. I could give you a
9 ballpark, but I can't give you any -- I can't
10 just state specifically as -- as you probably
11 could. I don't know the entire history. I
12 think I've read it, but I haven't reduced it
13 to memory.
14 Q. Do you understand that garrity is designed to,
15 on one hand, protect somebody's Fifth
16 Amendment rights and, on the other hand, allow
17 information to be gathered that can be useful
18 in administrative cases? But the purpose is
19 to avoid somebody from being -- having to make
20 the Hobson's Choice of sacrificing Fifth
21 Amendment rights or sacrificing their job and,
22 therefore, compelling testimony from people
23 that can be used in a subsequent criminal

Page 59

1 investigation. And so you shield that
2 information from any subsequent criminal
3 investigation.
4     MS. NELSON: Object to your formal
5         statement, but if you understand.
6 Q. Do you think -- do you agree that that's sort
7 of part of it?
8 A. Sir, actually, what I stated earlier was
9 basically the same thing you said but in a
10 different form, in my opinion.
11 Q. Now, isn't it true that during your
12 investigation or during your -- do you call it
13 interrogation or do you call investigation?
14 When you do your internal affairs
15 investigation, do you consider yourself
16 interrogating the witness?
17     MS. NELSON: Object to the form.
18 A. I'm investigating the allegations, and
19 witnesses are questioned as it relates to
20 information that I obtained during the
21 investigation.
22 Q. Would you be comfortable with term that you
23 also interrogate the witnesses?

Page 60

1     MS. NELSON: Object to the form.
2 A. No, sir.
3 Q. You wouldn't be comfortable with that?
4 A. No, sir.
5 Q. You understand, of course, that some of the
6 witnesses are apprehensive?
7 A. They could be.
8 Q. Do you remember what Ms. Brackin's position
9 was with respect to the allegation that she
10 had accused an attorney of literally being
11 incompetent, and there's been several
12 complaints against this attorney?
13 A. Yes.
14 Q. She did deny the allegation, correct?
15 A. Correct.
16 Q. She also indicated that she hardly knew that
17 attorney, correct?
18 A. No, that's incorrect.
19 Q. That's not correct?
20 A. No, sir. She said that she thought that they
21 had a -- a very -- quote, unquote, had a very
22 good rapport with Mr. McGhee.
23 Q. But she also said, quote, I'd only worked with

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1  him one time in court, unquote.
2      MS. NELSON: What are you reading from?
3      MR. JAFFREE: Number 1281, page 6.
4      MS. NELSON: Page 6.
5  Q.  Matter of fact, I did my statement a
6      injustice. To read the complete paragraph of
7      what she said, that's even an injustice. Let
8      me read you a question of hers.
9      "Okay. And -- but do you know Shaun
10     McGhee?"
11         Answer: "Yes."
12     That's Mary Beth's answer.
13         Here's your question -- I'm not -- not
14     your question. This is Mr Coleman's question,
15     but you was there when Coleman was asking
16     these questions, correct?
17 A. Yes, sir.
18 Q. Mr. Coleman said, "Well, how long have you
19     known Shaun McGhee?"
20     Her response: "I don't really -- I think
21     I was introduced to him, you know. It was
22     either while we were in court and he -- right
23     before he became the public defender. But as

1  far as -- I'd only worked with him one time in
2  court."
3      So based on --
4      MS. NELSON: Well, you're not going on
5      to -- if you'd go on.
6      MR. JAFFREE: Well, I don't want to go on.
7      MS. NELSON: You don't want to go on?
8      Okay. Well, I'd ask that the Record
9      be complete as to the rest of the
10     statement, that she had a good rapport
11     from him -- with him.
12     MR. JAFFREE: Well, okay. Since you
13     insist.
14 Q. Mr. Coleman said, "Okay."
15     And Ms. Brackin said, "and I had a very
16     good rapport with him. And, in fact, I told
17     Donna that, you know, he was going to be a --
18     be good for us, that he had done a real good
19     job."
20     Now, you understand, she's referring to
21     the one time she saw him, correct?
22     MS. NELSON: Object to the form.
23 A. Not to twist everything up, but according to

1  what you just read, it says that when she met
2  him, it was in court. This document doesn't
3  say how long they may have known each other,
4  and it doesn't give a specific date on when
5  they were in court when they met. So I cannot
6  assume just by this document that this is the
7  first time they met because that's not what it
8  says as far as how long they've known each
9  other.
10 Q. Well, do you generally get introduced to
11     people that you have known for a long time?
12     MS. NELSON: Object to the form.
13 Q. As far as you know, the term, I was introduced
14     to him?
15 A. To answer your question, no.
16 Q. Let me just see if I can speed this along.
17     You agree that she denied the
18     allegations. Would you also agree that
19     Ms. Rapaport did not confirm the allegations?
20     MS. NELSON: Ms. Ralpeje.
21 A. Ms. Ralpeje?
22 Q. Sorry. Ms. Ralpeje did not confirm the
23     allegations. If you recall. I got the record

1  here, so if you don't recall, then that's
2  fine.
3      MS. NELSON: Well, he hadn't had a chance
4      to look at it, but the report can
5      speak for itself I believe --
6      MR. JAFFREE: Well, the report can.
7      MS. NELSON: -- if he can't recall. If
8      you can recall, please take your time.
9      THE WITNESS: Okay.
10 A. Based on my interview with Ms. Ralpeje, in
11     regards to what was said, Ms. Ralpeje told
12     Ms. Mary Beth that if her lawyer instructed
13     her to plead guilty to DUI the first time and
14     he advised her to appeal it, it does not seem
15     like he's a very good lawyer. This came from
16     Mr. -- Ms. Ralpeje.
17 Q. I'm talking about -- I'm not talking about
18     your summarization. I mean, Ms. Ralpeje's
19     statement itself.
20 A. This was -- come from what Ms. Ralpeje told
21     me.
22 Q. Well, Ms. Ralpeje did not indicate that
23     Ms. Brackin had told her that the lawyer was

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  incompetent or that there were numerous
2  complaints against him.
3  A. Can I review her -- the statement I took with
4  her?
5       MS. NELSON: Again, I -- because, yeah. I
6  object to your testifying as to what
7  Ms. Ralpeje said.
8       (Brief pause)
9  A. Confirming what I said just a minute ago, in
10  Ms. Ralpeje's statement I've got, quote, what
11  I read to her and what I said to her and what
12  she responded back.
13       My statement was, "I mean, just if you
14  want to paraphrase it, paraphrase it. Say,
15  this isn't the exact words, but as much you
16  can remember, just" --
17       Ms. Rapelje's reply was, "Okay. She" --
18  she, meaning Ms. Brackin. "She basically gave
19  me an option -- an opinion that if he told
20  you, you know, if he instructed me to, you
21  know, plead guilty the first time and then
22  there -- and then here it is a week later and
23  now he's instructing me to appeal it, that

Page 66

1  doesn't seem like he's a very good lawyer."
2  Q. Now -- go ahead.
3       (Brief pause)
4       MS. NELSON: Did that not respond to your
5  question?
6       MR. JAFFREE: Not really because
7  she -- she was saying, if what you've
8  told me is true -- and the first part
9  of Ms. Rapelje's statement was that
10  she was drunk at the time and can't
11  rely on her memory.
12  Q. But, also, the part of my question dealt with
13  her saying that Ms. Brackin had said, we had
14  numerous complaints against him. You won't
15  find that at all in her testimony.
16  A. That's correct.
17  Q. There's Donna Grumbach was right next to her
18  who didn't confirm any of that either.
19       MS. NELSON: Are you testifying,
20  Mr. Jaffree?
21       MR. JAFFREE: Well, I'm asking him if --
22       MS. NELSON: Is that a question?
23  Q. Do you agree that Donna Grumbach did not

Page 67

1  confirm any of that allegation about the
2  incompetence or numerous complaints?
3  A. She did not.
4  Q. So what you have is a probation officer saying
5  one thing, who was on the phone most of the
6  time by eyewitness accounts and was spending
7  time talking as opposed to listening, and you
8  have the people that was intimately involved
9  that didn't confirm it.
10       MS. NELSON: Object to your
11  characterization.
12  Q. Well, I'm mentioning this because I'm going to
13  ask you a question.
14       And would you agree that for some reason
15  you interviewed Donna -- what's Donna's last
16  name?
17  A. The same person we're talking back?
18  Grumbach?
19  Q. No, no. Not her. Is it Donna? I think
20  it's -- yeah. Donna Nicholson. Do you agree
21  that you interviewed Donna Nicholson?
22       (Brief pause)
23  Q. Do you remember whether you interviewed Donna

Page 68

1  Nicholson?
2  A. Yes.
3  Q. Do you recall attempting "every which way but
4  loose" to get Ms. Nicholson to agree to
5  discipline Ms. Brackin?
6       MS. NELSON: Object to the form.
7  A. No.
8  Q. Do you agree discussing with her all the
9  different types of theories that she could
10  discipline Ms. Brackin with?
11       MS. NELSON: Object to the form.
12  A. No.
13  Q. You don't remember that, huh? Okay.
14  A. If you can show me something specifically,
15  I'll be glad to --
16  Q. There's so much of it in here, but I won't
17  take the time. I mean, if you don't know,
18  that's fine.
19       What was your purpose of interviewing
20  Ms. Nicholson in the first place?
21  A. She was one of the employees over there at the
22  magistrates' office. She was I think acting
23  in the capacity of -- as the supervisor at

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1    this time.
2    Q. Wasn't she more than that? Wasn't she
3        administrator of the department?
4    A. Could have been, but, like, she supervises the
5        magistrates.
6    Q. She was in charge of the department, and, yet
7        the judge instigated this investigation.
8        Now, if the judge has said that she don't
9        have the time to investigate and that's why
10       she used the police department --
11       MS. NELSON: Object to the form. That's
12       your testimony. That was not her
13       testimony or all of her testimony.
14       MR. JAFFREE: That's been her testimony a
15       lot.
16   Q. Do you have an opinion as to why Donna
17       Nicholson could not have initiated this
18       investigation?
19       MS. NELSON: Object to his opinion.
20   A. No, I don't have anything.
21   Q. You don't recall discussing with Donna some of
22       the -- asking her, why is it she just want to
23       put this in the personnel file, why not bring

Page 70

1    some strong action against her. You don't
2    recall that at all?
3    A. No, sir.
4        MS. NELSON: And I'd also ask for the
5        Record to indicate that the witness is
6        so bewildered by that, he's laughing
7        and scoffing at such a suggestion.
8    Q. I will take a break, if you like, and I'll let
9        you read your interview with Ms. Nicholson.
10       Would you like to do that?
11   A. If that's what you want.
12   Q. And if you -- after you read that, I will ask
13       you if you still agree that you wasn't
14       attempting to encourage Ms. Nicholson to come
15       up with a much stronger sanction that just an
16       entry in a personnel file, that that just
17       won't do.
18       But tell me if I'm wrong after you read it
19       that --
20       MS. NELSON: This is your testimony,
21       Mr. Jaffree. Do you want him to sit
22       here and read it? He's obviously
23       disagreeing with you without the --

Page 71

1    the necessity of reading it.
2        MR. JAFFREE: I just want to make sure I'm
3        not getting him confused with
4        Mr. Coleman because they both
5        interviewed her.
6    Q. I mean, because your names are interspersed
7        here. But let me let you read it. And if
8        it's Coleman, then I apologize.
9    A. You want me to read it?
10   Q. Yeah.
11   A. Want me to read it aloud?
12   Q. Well, no, I don't want you to read it aloud.
13       MS. NELSON: It's like ten pages.
14       MR. JAFFREE: Yeah, it's a lot of pages.
15       MS. NELSON: I mean, how could you be
16       getting it confused with Mr. Coleman?
17       MR. JAFFREE: Because I think he --
18       Coleman was here and he said a few
19       things. Coleman said a few things
20       here. I don't want to --
21       MS. NELSON: Well --
22       MR. JAFFREE: -- confuse Coleman's --
23       MS. NELSON: You know, it's 3:30. We've

Page 72

1    been here two hours.
2    Q. Well, then you don't have to read it. All
3    right.
4        MS. NELSON: I'm just asking you. Do you
5        have a specific --
6        MR. JAFFREE: Okay. Well --
7        MS. NELSON: He's disagreed with you.
8        MR. JAFFREE: He disagreed. Fine.
9        MS. NELSON: If you want to point to a --
10       MR. JAFFREE: That's fine --
11       MS. NELSON: -- particular piece of
12       testimony or transcript --
13       (Court reporter interrupted for
14       clarification.)
15       MS. NELSON: I said, if you want to point
16       to a particular part of this
17       transcript to question him about,
18       because he's otherwise denied doing
19       what you asked him about.
20       MR. JAFFREE: Now, I will only suggest
21       that when we're no longer on the
22       Record if he wants to read your copy
23       of the transcript, he can, so that he

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1    can be satisfied that I'm not making
2    this up.
3  Q. Now, after your investigation of this
4    incident, did you have an occasion to speak
5    back with Judge Gordon?
6  A. Speak or report -- give a report?
7  Q. Give a report to Judge Gordon?
8  A. Yes. There was a report that I submitted to
9    the police chief that was then sent to the
10   judge.
11 Q. Do you know if this report included the
12   statements of the parties?
13 A. No, I don't recall if it had a copy of the
14   statements of the parties.
15 Q. Well, if it didn't have the statements, then
16   it just had your summary; is that correct?
17 A. I said I didn't recall it having the
18   transcripts. It could have, but I don't
19   recall it having the transcripts.
20 Q. You're not sure. All right. Believe it or
21   not, I'm almost through with you.
22       Let me ask you if you can recall the
23   second time you did an investigation involving

Page 74

1    Ms. Brackin -- well, let me back it up. Not
2    necessarily involving Ms. Brackin. Involving
3    someone associated with the judicial
4    department back in -- let's just say 2005?
5  A. Yes, sir.
6  Q. Do you remember doing an investigation because
7    there was a statement on Rickey Stokes' web
8    site indicating that an internal affairs --
9    some type of investigation was being conducted
10   on Mary Turner?
11 A. Yes.
12 Q. Who initiated that investigation that you were
13   involved in?
14 A. That would have came -- as I said, our
15   investigations, if it came from a different
16   department, would come from the department
17   head or his designee. I believe this one came
18   from --
19       MS. NELSON: He's referring to his memo to
20       chief of police regarding this
21       investigation.
22 A. Chief Powell was the one that advised me to
23   begin the investigation as it relates to the

Page 75

1    unlawful or -- or the unauthorized release of
2    information and involving Mary Turner, the
3    same thing -- same thing you're talking about.
4  Q. What supposedly was the scope of that
5    investigation?
6      MS. NELSON: Which investigation are we
7      talking about?
8      MR. JAFFREE: The investigation we were
9      just talking about, the one
10     involving --
11     MS. NELSON: Mary Turner?
12     MR. JAFFREE: Well, no. I'm talking about
13     the one involving the release of
14     information concerning Mary Turner.
15     MS. NELSON: Well, it's hard, you know,
16     just to make a gigantic leap -- as you
17     call the being pregnant and having the
18     baby, it's hard to make a leap to like
19     the second baby, what you're asking
20     him to do.
21     MR. JAFFREE: With the --
22     MS. NELSON: I mean, I know you're trying
23     to speed things along.

Page 76

1  Q. The release of information concerning
2    Ms. Turner, what was supposed to be the scope
3    of that investigation?
4  A. The magistrates' office had been advised by
5    Judge Gordon to not release any information to
6    anyone regarding the Mary Turner investigation
7    where she was put on administrative leave.
8    After the judge advised her employees of that,
9    there was, indeed, a leak of that
10   investigation to a -- the media which was
11   known as Rickey Stokes or The Houston, which I
12   think is the name of his paper, but it goes
13   through -- Rickey Stokes is the -- I think the
14   principal in that business.
15 Q. Okay. So what was supposed to be the scope of
16   that investigation?
17 A. The -- who released the information as far as
18   the investigation on Mary Turner was the scope
19   because the judge -- the judge had already
20   directed the employees not to --
21 Q. So you were trying to --
22     MS. NELSON: Well, you're cutting him
23     off. Not to --

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  MR. JAFFREE: I'm sorry.
2  MS. NELSON: Let him finish what her
3     directives were.
4  A.  Not to release information, not to talk about
5     the investigation of Mary Turner. And after
6     that directive was given by the judge, someone
7     evidently did, which was on Rickey Stokes' web
8     site.
9  Q.  So the mischief thought to be pursued in that
10     that investigation was, who released the
11     information?
12     MS. NELSON: Object to your form, again,
13     as -- with your mischief. I don't
14     know what you mean by "mischief."
15     MR. JAFFREE: Well, I like that word.
16     MS. NELSON: Well, you must because you
17     used it many times yesterday. But, I
18     mean, if you could say like --
19     MR. JAFFREE: I used it twice.
20     MS. NELSON: -- what was the --
21     MR. JAFFREE: What's wrong with --
22     MS. NELSON: -- purpose of the
23     investigation. I mean, mischief

Page 78

1     connotes some --
2     MR. JAFFREE: Well, let me ask this
3     witness --
4     MS. NELSON: I'll ask that you use another
5     word besides mischief.
6     MR. JAFFREE: I will if the witness
7     doesn't understand what I mean by the
8     word.
9  A.  Specifically, what are you talking about as
10     far as mischief is concerned?
11  Q.  Well, I'll --
12     MS. NELSON: Reason, purpose, why did you
13     do this, you know. Let's just talk on
14     plain words.
15  Q.  The purpose of this --
16     MR. JAFFREE: Well, it's plain English to
17     me.
18  Q.  But the purpose of this investigation was to
19     find out who released information; is that
20     correct?
21  A.  Yes, sir.
22  Q.  And that was supposed to be the scope of the
23     investigation?

Page 79

1  A.  Of this investigation? Yes, sir.
2  Q.  That was your charge?
3  A.  Yes, sir.
4  Q.  What, if any, criminal statutes may have been
5     implicated by the release of this investigation?
6  A.  I don't know of any that would have been
7     criminal.
8  Q.  This wasn't criminal at all?
9     MS. NELSON: Object to the form. He
10     didn't say that.
11     MR. JAFFREE: Well, he sort of said
12     something like that. That's what I
13     heard.
14     MS. NELSON: Well, I'll ask that his
15     testimony stand instead of your
16     paraphrasing what he said. He said he
17     didn't know of any.
18  Q.  I'll live with your response. I have a
19     feeling if it was up to opposing counsel, I
20     wouldn't get a chance to ask you anything.
21  A.  I enjoy talking to you.
22  Q.  Thank you.
23     So did you talk to people to find out who

Page 80

1     exposed the very information that the judge
2     warned them not to disclose?
3  A.  Yes, sir.
4  Q.  Prior to talking to people, did you talk to
5     the judge?
6  A.  Yes, sir.
7  Q.  Was that discussion recorded?
8  A.  No, sir.
9  Q.  Why did you care who released information to
10     the media?
11     MS. NELSON: Object to the form. I don't
12     know that he ever testified that he
13     did care.
14  Q.  Well, did you care?
15     MS. NELSON: He was doing his job.
16     MR. JAFFREE: Well, he didn't indicate
17     that he didn't care.
18  Q.  I mean, did you care?
19     MS. NELSON: Care in what --
20  A.  I don't -- I don't have any -- I didn't have
21     any personal feelings. And if that's what you
22     mean by "care," I didn't have any personal
23     feelings on who did it. It was a directive

20 (Pages 77 to 80)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| | |
|---|---|
| Page 81 | Page 83 |

**Page 81**

1  that wasn't followed that I was told to
2  investigate, and that was it.
3  Q. Well, how did y'all reach the conclusion that
4     it was a directive that was not followed; was
5     this directive given to Mary Turner?
6  A. She was wasn't present during that time --
7  Q. In that case --
8  A. -- to my knowledge.
9  Q. In that case, Mary Turner could have released
10    the information to Rickey Stokes, correct?
11    MS. NELSON: Object to --
12 A. You're saying could have?
13    MS. NELSON: This calls for speculation.
14 Q. Well, I mean, could she have?
15    MS. NELSON: Well, I'd ask him to review
16    Rickey Stokes -- I'd ask him to review
17    what was on the web site. Based on
18    what was on the web site, I don't know
19    how Mary Turner could have knowledge
20    of what was in the web site -- in
21    Rickey Stokes' web site.
22 Q. Well, what was in there that Mary Turner could
23    not have had knowledge of, since counsel has

**Page 82**

1     quickened your response? Help us out here.
2  A. Okay. Just a second.
3     (Brief pause)
4     MS. NELSON: See if you can answer.
5     That's my objection but I don't --
6     He's calling for -- what's the last
7     question on the table? I forgot.
8  Q. What is it that was on that web site that Mary
9     Turner could not have had knowledge of?
10    MS. NELSON: And that was my objection.
11 A. Speculating --
12    MS. NELSON: Yeah.
13 A. This is all speculatory. Mary could have had
14    knowledge of this information, so could
15    have -- so could, you know, the people that
16    was in the office during the investigation.
17    It depends on if someone leaked information to
18    Mary Turner. So she could have done this if
19    someone leaked information from inside the
20    office, and she could have told Rickey Stokes.
21 Q. Well, what information could -- she would not
22    have had independent knowledge of?
23 A. She wouldn't have known that there was a -- I

**Page 83**

1  don't think she would have known that there
2  was an investigation from me about this
3  particular additional -- this investigation
4  came after she was already on administrative
5  leave for something else. So she -- she
6  wouldn't have known that there was a separate
7  investigation dealing with the release of
8  information because she wasn't in the office,
9  as you stated earlier. So she wasn't at the
10 office whenever I --
11    MR. JAFFREE: I have to hunt for mine. Do
12    you have an objection to me making
13    this part of the record, to make a
14    copy and make this as an exhibit?
15    MS. NELSON: You're talking about the
16    entire investigation.
17    MR. JAFFREE: No. Just that one --
18    MS. NELSON: No. If you're going to make
19    the -- I'd ask that we make the
20    entire -- or at least the report.
21    MR. JAFFREE: I don't want to have this
22    deposition costing an arm and a leg
23    and your nose and your head as well.

**Page 84**

1     So if --
2     MS. NELSON: Well, no, I --
3     MR. JAFFREE: -- I could just get that one
4     page.
5     MS. NELSON: I am going to object to the
6     one page if we can't do it all.
7     MR. JAFFREE: I'll have to hunt for mine.
8     Can I ask you what page number is
9     that?
10    MS. NELSON: The Bates --
11    MR. JAFFREE: Since you're looking at it.
12    MS. NELSON: I don't have the
13    Bates-stamped pages. I'm sorry.
14    MR. JAFFREE: Well, do you have a
15    Bates-stamped page in front of it.
16    MS. NELSON: No, I don't.
17    MR. JAFFREE: Well, you don't have any of
18    them.
19    MS. NELSON: The copy I've brought with me
20    is not Bates-stamped.
21    MR. JAFFREE: Well, since you looked at it
22    can I --
23    THE WITNESS: That's it.

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1    MR. JAFFREE: This is it, right here.
2    Since you won't assist me, I will
3    assist myself and mark this as
4    Plaintiffs' Exhibit 15 and show you.
5    (Plaintiffs' Exhibit 15 was marked
6    for identification.)
7  Q. Are you suggesting that Ms. Turner would not
8    have known if there was some allegation that a
9    ticket was dismissed and exchanged for some
10    work done on a residence?
11 A. No, sir, I'm not arguing that point.
12 Q. Well, what is it you think that Ms. Turner
13    would not have known independently?
14    (Brief pause)
15 A. There's not a date on -- I was referring to
16    the exhibit you're looking at. I was looking
17    for a date that it was actually published on
18    the web site to get a point of reference.
19    (Brief pause)
20 A. I don't -- I don't know that she could have
21    knowledge of what was printed on the web site
22    in question or not.
23 Q. Just so we're clear, is the publication of

Page 86

1    this information on the web site that
2    triggered this investigation, the
3    investigation we was talking about, that
4    caused you to go out and interview other
5    members of the judicial department?
6  A. That's correct.
7  Q. Did you interview any members of the police
8    force?
9  A. As a part of that release of information?
10 Q. Yeah.
11 A. I don't think that I did.
12 Q. Did you interview under oath Judge Gordon?
13 A. No.
14 Q. Did you read Judge Gordon the garrity rights?
15 A. No.
16 Q. Could Judge Gordon have released this
17    information?
18    MS. NELSON: Object to the form.
19 A. Speculating, I would -- I can't give --
20    MS. NELSON: I'd ask you not to speculate.
21 A. -- you an accurate answer. I can't give you
22    an accurate answer. It would be speculating.
23 Q. You don't know whether she could have or not?

Page 87

1  A. No, I don't know whether she could have or
2    not.
3  Q. Well, what about Michelle Sellers; do you
4    think she knew about the investigation?
5    MS. NELSON: Again, I object.
6  Q. Do you know whether she knew about the
7    investigation?
8    MS. NELSON: I think everybody in the
9    magistrates' office knew about the
10    investigation. They had been
11    instructed not --
12 A. Michelle Sellers did know.
13    MS. NELSON: -- not to talk about and not
14    to talk to Mary Turner.
15 Q. Did you interview Michelle?
16 A. Yes.
17 Q. Under oath. Under oath?
18 A. Sir?
19 Q. Under oath?
20 A. I didn't put anybody under any kind of oath.
21 Q. But did you give Michelle the garrity notice?
22 A. Just a second and I'll tell you.
23    (Brief pause)

Page 88

1    MR. JAFFREE: Off the Record.
2    (Off-the-Record discussion)
3  A. I don't believe interviewed Michelle Sellers
4    as a part of this investigation. Michelle
5    Sellers, her office was located in -- in
6    this -- excuse me -- in the municipal
7    courtroom. At the time, it wasn't located
8    over at the magistrates' office. She was in a
9    different capacity. I -- she was the judge's
10    assistant -- administrative assistant, so she
11    wasn't in with the magistrates over there
12    during -- during this time.
13 Q. How did you know exactly what the judge had
14    instructed the staff not to do; did she give
15    you something in writing?
16 A. I'm -- I'm not clear what you're asking.
17    MS. NELSON: What time frame are you
18    talking about?
19 Q. Well, during the time that you was initiating
20    your investigation of who leaked information?
21    When I use the term "who leaked information,"
22    do you understand that?
23 A. I understand that.

22 (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1 **Q. Did the judge give you any kind of statement**
2 **as to what she had instructed her staff, or**
3 **she just verbally told you?**
4 A. I was there when the judge instructed the
5 staff not to release any information. Is that
6 what you're talking about?
7 **Q. Were you there?**
8 MS. NELSON: That's what he's talking
9 about, yes.
10 **Q. You were present when she --**
11 A. Yes.
12 **Q. -- instructed her staff?**
13 A. Uh-huh (positive response).
14 **Q. Why were you present over there?**
15 A. Because I was the one doing the
16 investigation.
17 **Q. Doing which investigation?**
18 A. The one that you're questioning me about.
19 **Q. Well, no. When she instructed her staff, that**
20 **was before this investigation.**
21 MS. NELSON: Well, he's talking about the
22 whole Mary Turner investigation, I
23 believe.

Page 90

1 **Q. Well, which -- were you involved in the other**
2 **Mary Turner investigation?**
3 A. What do you mean, the other? I need you to be
4 specific. There's been so many different
5 things.
6 **Q. There was investigation of a ticket.**
7 A. Yes.
8 **Q. And then there was something that appeared on**
9 **Rickey Stokes.**
10 A. Yes.
11 **Q. And then there was an investigation of who**
12 **leaked information to Rickey Stokes. Now,**
13 **after the investigation of the ticket was**
14 **initiated, the judge addressed the staff.**
15 **That was before this investigation of who**
16 **leaked information because information hadn't**
17 **been leaked at that time.**
18 **Are you following me?**
19 MS. NELSON: You know, maybe if you'd just
20 ask him what occurred and what
21 involvement he had, he'll tell you.
22 MR. JAFFREE: Well, maybe I can just ask
23 him the way that I'm asking him.

Page 91

1 MS. NELSON: Well, I think you're
2 confusing -- completely confusing the
3 issue.
4 MR. JAFFREE: Well, that's not --
5 MS. NELSON: And you're confused yourself
6 because you're asking, what
7 investigation was he involved in.
8 MR. JAFFREE: Well --
9 MS. NELSON: Let him testify.
10 MR. JAFFREE: Well, your confused if you
11 think I'm confused because I'm not
12 confused.
13 MS. NELSON: Well, I think --
14 MR. JAFFREE: And, therefore, you must be
15 confused.
16 MS. NELSON: Well, I think the witness is
17 confused.
18 **Q. Let's take this a linear way. There was an**
19 **investigation of ticket fixing allegedly.**
20 MS. NELSON: Involving -- say involving
21 who. Let's just be clear what we're
22 talk about.
23 **Q. Involving Ms. Turner.**

Page 92

1 A. Okay.
2 **Q. An allegation of ticket fixing involving**
3 **Ms. Turner.**
4 MS. NELSON: Is that a question?
5 **Q. See if you can follow this track, and stop me**
6 **when I'm saying something incorrect.**
7 **That investigation led to the suspension**
8 **of Ms. Turner. Around the same time that**
9 **Ms. Turner was suspended, the judge made a**
10 **statement to the staff: Do not disclose this**
11 **information. Do not disclose. Ms. Turner's**
12 **gone temporarily. There is an investigation.**
13 **Do not talk about this. That came next.**
14 **Suddenly --**
15 MS. NELSON: Just for the Record, that's
16 not all that was said during that
17 meeting.
18 MR. JAFFREE: Well, for this purpose of
19 this dialogue, it's all I want to
20 point out that was said.
21 MS. NELSON: Okay. It's not accurate but
22 okay. Go ahead.
23 And that's the meeting he's

23 (Pages 89 to 92)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1   trying to tell you, he was there.
2   Q.   You was at that meeting?
3   A.   You're putting two things together.  If I
4        understand right, when Ms. Turner was put on
5        some type of administrative leave -- and I
6        think the judge had a meeting with them and
7        told them that she was on administrative
8        leave.  That is totally different from this
9        meeting that we're talking about, the
10       investigation due to the release of
11       information.
12  Q.   I'm talking about the earlier meeting.
13  A.   I wasn't there.
14  Q.   So you wasn't at the earlier meeting?
15  A.   I had nothing to do with --
16       MR. JAFFREE:  I think counsel --
17  A.   -- when she told her -- when she told her
18       staff that she was on --
19  Q.   Okay.  All right.
20  A.   So you've merged both things together, and
21       they're not.  I believe they're two separate
22       --
23  Q.   I was hoping not to, but now I think we are on

Page 94

1        the right track.  Now --
2   A.   To my knowledge, I wasn't there.
3   Q.   Okay.  This appeared on the web site.
4        MS. NELSON:  What?  Let's talk about what
5        we're talking about.
6   Q.   The information that's on Plaintiffs' Exhibit
7        15 appeared on the web site, correct?  This
8        information appeared on the web site?
9   A.   Yes, sir.
10  Q.   Did you personally see it on the web site?
11  A.   I can't say that I did.  I don't remember.
12  Q.   You may have been subsequently informed that
13       it was on the web site?
14  A.   Yes, sir.
15  Q.   And the new investigation was to find out who
16       leaked it?
17  A.   Yes.
18  Q.   That was your charge?
19  A.   Yes, sir.
20  Q.   And you told the people that you was
21       investigating it, and this was your charge?
22  A.   Uh-huh (positive response).
23       MS. NELSON:  You need to say yes or no so

Page 95

1        she can pick it up.
2   A.   I'm sorry.  I'm sorry.  Yes, sir.
3   Q.   Now, in order for this to get on a web site,
4        somebody must have told somebody about
5        information concerning the investigation.
6        Are you following me?
7   A.   Yes, sir.
8   Q.   Is that correct?
9   A.   I'm following you.
10  Q.   Somebody must have told somebody.  When you
11       interviewed people, did you ask them if they
12       talked to anybody about what the judge had
13       told them not to talk about?
14  A.   Yes.
15  Q.   Because if they talked to somebody about what
16       the judge had told them not to talk about,
17       then they did something in violation of the
18       judge's directive; is that correct?
19  A.   The judge directed them not to talk about the
20       case.
21  Q.   Did you --
22       MS. NELSON:  Are you finished?
23  A.   That's correct.

Page 96

1   Q.   Did you discover, in talking to members of the
2        judicial department staff that some members
3        had, in fact, talked to people?
4   A.   Yes.
5   Q.   Did you interview these people that they said
6        they had talked to, to see if they had, in
7        turn, talked to any people?
8   A.   Did I interview the people that were alleged
9        to have received the information?
10  Q.   Yeah.
11  A.   Then, no.
12  Q.   Well, if you was trying to track down who gave
13       information to Rickey Stokes and anybody who
14       had the information, either firsthand,
15       secondhand, or thirdhand, could have given
16       that information to Rickey Stokes, did you not
17       feel the need to talk to the people that they
18       had talked to?
19  A.   No.
20  Q.   Didn't find any need?
21  A.   No.
22  Q.   Why not?
23  A.   If an employee told me that they spoke to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1  someone else about the investigation, that
2  individual is not the focus of the directive
3  that the judge gave or the investigation.
4  That's someone that's on the outside that was
5  told by a magistrate something -- something
6  that was going on.
7  Q.  So you didn't care that Rickey Stokes had the
8      information; you were only concerned with
9      whether or not somebody from the magistrates'
10     office gave that information?
11         MS. NELSON:  Object to whether he cared or
12         not --
13  Q.  Is that correct?
14         MS. NELSON:  -- as to his -- your
15         interpretation of your question about
16         whether or not he cared.  It's an
17         improper question.
18  Q.  Is that correct?
19  A.  I don't have any personal feelings about that
20     -- the release of that information.  My charge
21     was to investigate who may have leaked the
22     information as it came out of the magistrates'
23     office.

Page 98

1  Q.  So your concern was not whoever gave the
2      information to Rickey Stokes; your concern was
3      whether or not somebody from the magistrates'
4      office gave the information to Rickey Stokes?
5  A.  My investigation was to who leaked the
6      information, and it was dealing with the
7      magistrates that were under -- that had
8      asked -- been asked questions by internal
9      affairs in regards to the release of that --
10     that information.  So the information that was
11     on the web site was being I guess -- I was I
12     directed to investigate the persons out of the
13     magistrates' office who could have possibly
14     leaked that information to the web site.
15  Q.  Well, in your opinion, anyone from the
16      magistrates' office that talked to anyone
17      about the investigation, would they be in
18      violation of the judge's direction not to talk
19      to anyone?
20  A.  If the judge -- the judge directed them not to
21     speak to anybody about that investigation,
22     then that's correct.  It -- that was her
23     directive?

Page 99

1  Q.  So everyone who spoke to someone was in
2      violation of the judge's directive?
3  A.  The judge's directive was clear.  And --
4  Q.  Well, did you realize at the time you was
5      talking to the members of the judge's staff,
6      or if there's any ambiguity, the members of
7      the judicial department who admitted that they
8      had spoken to someone, that they had violated
9      the judge's directive?
10  A.  Yes, I knew at the time.
11  Q.  Did you recommend any kind of disciplinary
12      action because these people had violated the
13      judge's directive?
14  A.  I don't recommend discipline in this -- I did
15     not recommend discipline in this case.
16  Q.  Did you point out any type of the personnel
17      policy rules that may have been violated with
18      respect to the people who had communicated
19      information to someone about an investigation
20      was ongoing?
21  A.  That was a mouthful.  Could you say that
22     again, please?
23  Q.  Did you recommend in your report what

Page 100

1  personnel rules may have been violated by the
2  people who provided information to third
3  parties in violation of the judge's directive?
4      (Brief pause)
5  A.  I told the judge that employees had spoke
6     about this case to spouses, things of that
7     nature; I did tell her that had occurred.
8  Q.  Did you tell her that an employee had spoken
9      about this case to a friend?
10  A.  I can't say that I recall going specifically
11     down line with each -- each individual that I
12     interviewed and told who they released the
13     information to.  I did tell her that they had,
14     in fact, spoken to other people such as
15     spouses and things of that nature.
16  Q.  Did you recommend or did you point out some
17      kind of major offense that Mary Brackin may
18      have committed?
19  A.  I did quote the personnel rules and
20     regulations of insubordination as it relates
21     to Mary Beth Brackin to the judge in my
22     report.
23  Q.  Why did you report personnel rules and

25 (Pages 97 to 100)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1     regulations violations with respect to
2     Ms. Brackin and not report the personnel rules
3     and regulations violation with respect to any
4     of the other employees?
5 A.   Because within this investigation, Mary Beth
6     Brackin was the only employee that spoke to
7     the person that they were directed not to have
8     contact with. The judge directed them not to
9     have contact, not to speak with Mary Turner,
10     involving this investigation. Mary
11     Brackin -- Mary Beth Brackin did talk to
12     Ms. Turner which was the subject of the
13     investigation. And none of the other
14     employees talked to Ms. Turner that was the
15     subject of the investigation.
16 Q.   Well, I thought you just said earlier that the
17     subject of this investigation was who leaked
18     information to Rickey Stokes.
19     MS. NELSON: Object to the form. And
20     you're distorting his testimony.
21     MR. JAFFREE: I'm not distorting anything.
22 Q.   The subject of this investigation was who
23     leaked information to Rickey Stokes. Do we

Page 102

1     need to look at the exhibit?
2     MS. NELSON: You're terribly confusing the
3     facts of this case.
4     MR. JAFFREE: I'm not confusing anything.
5     I'm not confusing anything.
6     MS. NELSON: Well, you are confused.
7     MR. JAFFREE: I'm not. Then you're
8     confused. Okay?
9 Q.   I suspect if you look at your testimony,
10     you'll say that the subject of this
11     investigation that you're on now was who
12     leaked information to Rickey Stokes, not
13     whether or not somebody had talked to
14     Ms. Turner, but who leaked information to
15     Rickey Stokes.
16 A.   There are two things going on here. The judge
17     direct -- the judge's directive to their
18     employees not to have contact with Ms. Turner,
19     that was violated by Ms. Brackin. The web
20     site, your Exhibit 15, that has to do with
21     some of the contents of -- or with the
22     investigation itself. So you have the judge
23     directing all the employees not to have any

Page 103

1     contact with Ms. Brackin, not to go in her
2     office.
3     MS. NELSON: Ms. Turner.
4 A.   Excuse me. With Ms. Turner. Not to go in her
5     office, not to have any contact -- verbal
6     contact, any contact with her as a result of
7     the ongoing investigation. And then there's a
8     release of information here that went to
9     Rickey Stokes as far as the investigation was
10     concerned.
11 Q.   Did the judge --
12     MS. NELSON: The investigation of what?
13     Let's get that straight because we --
14 A.   The investigation of the release of
15     information is one thing, and then the
16     directive that the judge gave for no one to
17     talk, have contact with Mary Beth Turner is --
18 Q.   Did she --
19     MS. NELSON: Mary Turner. I know there's
20     a lot of Marys.
21     MR. JAFFREE: Well, if I was somebody, I
22     would say, leave the record the way it
23     is, but you can correct the Record.

Page 104

1 A.   Yes. Of the investigation of Mary Turner.
2     But I'm confused now. For clarification --
3     MS. NELSON: Well, it might help if he
4     would just ask you what occurred
5     instead of --
6     MR. JAFFREE: I don't want to just --
7     MS. NELSON: You don't want to get to the
8     truth. You don't want to get to the
9     facts of the case. You want to just
10     jump around and confuse and --
11     MR. JAFFREE: I think I know the facts of
12     case as well as you do or maybe not.
13     MS. NELSON: I don't think so.
14     MR. JAFFREE: I mean, you may have some
15     documents that I don't have.
16 Q.   Just a few more questions.
17 A.   Okay.
18 Q.   Do you know if the judge made these two
19     demands at different times, don't discuss this
20     investigation and don't contact Mary Turner?
21     Do you know if they were made at two different
22     times?
23     (Brief pause)

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1    MS. NELSON: If you know.
2  **Q. If you know.**
3  A.  Okay. It was on March 15th that the judge
4       advised -- excuse me -- March 10th, 2005, that
5       the judge advised the employees that
6       Ms. Turner was on administrative leave and
7       that there was an internal affairs
8       investigation being conducted. This is where
9       she also directed employees to refrain from
10      any contact with Ms. Turner while the internal
11      affairs investigation was underway.
12 **Q. So are you saying these happened on different**
13     **days or the same day?**
14 A.  This was on March the 10th that the judge gave
15     those directions.
16 **Q. Did she give both directions on the same day?**
17 A.  What I just read was under the same day.
18 **Q. Do you know if she sort of gave those**
19     **directions at the same time?**
20 A.  I'm not sure.
21 **Q. Did she indicate to you that she considered**
22     **one direction more important than the other,**
23     **if you recall?**

Page 106

1  A.  No, she didn't.
2  **Q. Upon what authority, since you was just there**
3      **to gather facts, did you recommend a major**
4      **offense violation?**
5  A.  That wasn't a recommendation. That was stated
6       in the personnel rules for the City of
7       Dothan. I didn't -- I didn't recommend that.
8       That's what it fall -- fell up under. That
9       violation is what it fell up under.
10 **Q. Was it part of your charge to find out what**
11     **any violation you found fell under; is that**
12     **part of your charge?**
13 A.  Yes. Not only this investigation, but
14      others. It's a -- if there's a violation of a
15      policy or whatever, you write what the
16      violation is after you find the -- after you
17      complete your investigation.
18 **Q. But you've only -- with the exception of the**
19     **one involving the fire department, you've**
20     **really only done these sort of administrative**
21     **things with respect to the judicial**
22     **department, right?**
23     MS. NELSON: Object to the form.

Page 107

1  A.  To my knowledge, the fire department and the
2       judicial department.
3  **Q. Well, with respect to your investigation in**
4      **2001, did you list major offenses that you**
5      **found?**
6          **(Brief pause)**
7  A.  No, I didn't.
8  **Q. Did you not find any major offenses during**
9      **your 2001 investigation?**
10 A.  With regards to this investigation, the judge,
11      basically, told me during the allegation what
12      the offense was and -- which I explained to
13      you earlier, which was Ms. Brackin giving what
14      she termed to be legal advice to Ms. Ralpeje.
15 **Q. Well, what major offense was that?**
16 A.  And so that was -- that was just -- that was
17      the charge to -- to find out. So there was
18      already -- I was told what the allegations
19      were. So after I just found the facts, I
20      didn't have to rewrite what her --
21 **Q. Oh, she'd given you a personnel rule violation**
22     **in that case? And we're talking about the**
23     **2001 case, right? She had already given you a**

Page 108

1      **personnel violation?**
2          MS. NELSON: Object to form. That's not
3          what he testified to.
4          MR. JAFFREE: Well, I'm trying to find
5          out.
6  **Q. What are you testifying to? What did she give**
7      **you?**
8  A.  As I've just stated, she said that I needed to
9       look into allegations that Mary Beth Brackin
10      was giving legal advice to Ms. Ralpeje, a
11      defendant in a criminal case. So I just
12      investigated the allegations and gave her the
13      facts of the allegations.
14 **Q. But, here, you felt you needed to do more?**
15         MS. NELSON: "Here," you're referring to
16         the --
17 A.  This is a release of --
18         MS. NELSON: Insubordination by Mary Beth
19         Brackin.
20 **Q. I'm a little -- excuse me. If you was**
21     **investigating the release of information, what**
22     **does Mary Beth talking to Mary Turner have to**
23     **do with the release of information? Because**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | Page 109 |
|---|---|
| 1 | that was your investigation. What |
| 2 | does -- you're looking at the release of |
| 3 | information, and then you talk about some |
| 4 | contact. What does that have to do with |
| 5 | release of information? |
| 6 | MS. NELSON: Again, object to the form. |
| 7 | He stated that the release of |
| 8 | information started the investigation. |
| 9 | MR. JAFFREE: Can I ask him? |
| 10 | MS. NELSON: Yes, you can. |
| 11 | MR. JAFFREE: Now, I know how bad you want |
| 12 | to infiltrate this Record with your |
| 13 | comments, but if I could just hear |
| 14 | from him. |
| 15 | MS. NELSON: I'm just trying to keep a |
| 16 | clean record, and you're inferences |
| 17 | and testimony and confusion -- |
| 18 | MR. JAFFREE: Well, I'm asking him. |
| 19 | MS. NELSON: -- have done nothing to allow |
| 20 | the Record to be clear. |
| 21 | Q. If your charge was who leaked information, |
| 22 | does Mary Beth Brackin speaking to Mary Turner |
| 23 | have anything to do with who leaked |

| | Page 110 |
|---|---|
| 1 | information? |
| 2 | A. I would consider that leaking information. |
| 3 | Q. Oh, you would? |
| 4 | A. Mary Beth Brackin was interviewed like |
| 5 | everybody else was. She released information, |
| 6 | talking to Mary Turner about the investigation |
| 7 | when she was directed not to by the judge. |
| 8 | Q. Well, what about all these other people who |
| 9 | released information? Well let's not -- let's |
| 10 | not worry about them. |
| 11 | Have you -- and I guess you have answered |
| 12 | this, but since the departure of Mary Brackin, |
| 13 | have you been called upon to investigate any |
| 14 | other employee of the judicial department? |
| 15 | A. Not to my knowledge. |
| 16 | Q. Now, can you tell me pursuant to what |
| 17 | authority -- but, first, two questions then |
| 18 | I'm through. |
| 19 | Do you know who instructed the judge to |
| 20 | tell her employees to have no contact with |
| 21 | Mary Turner? |
| 22 | A. I had a conversation with her about that. |
| 23 | Q. Okay. Can you tell me pursuant to what |

| | Page 111 |
|---|---|
| 1 | authority can the internal affairs department |
| 2 | instruct a citizen not to contact another |
| 3 | citizen? What authority? |
| 4 | MS. NELSON: Object to the form. It |
| 5 | was -- |
| 6 | Q. You said you did it, so I'm trying to find out |
| 7 | what authority. |
| 8 | MS. NELSON: Object to form. It was not |
| 9 | citizen to citizen. |
| 10 | MR. JAFFREE: Excuse me. |
| 11 | Q. Is Mary Brackin a citizen? |
| 12 | A. Yes. And she's also employed by the City of |
| 13 | Dothan which would make her a governmental |
| 14 | employee up under the City of Dothan's |
| 15 | umbrella. And under that is why they were |
| 16 | directed to not speak to one another during an |
| 17 | ongoing investigation. |
| 18 | Q. Well, I'm trying to find out by what authority |
| 19 | do you have to tell one employee to make no |
| 20 | contact with another employee? |
| 21 | A. And I don't quite understand your word or your |
| 22 | definition of what authority, but my police -- |
| 23 | I was working under the authority of the |

| | Page 112 |
|---|---|
| 1 | police chief at the time. |
| 2 | Q. So other than the police chief, can you point |
| 3 | to me anything that gives the police chief the |
| 4 | authority to tell somebody from another |
| 5 | department not to communicate or not to make |
| 6 | contact with a person in that department? |
| 7 | A. The judge is actually who told them that. |
| 8 | Q. The judge told them that. |
| 9 | A. I talked to the judge about having the |
| 10 | employees not make contact with Ms. Turner in |
| 11 | reference to this ongoing investigation that |
| 12 | we had. The judge directed her people in her |
| 13 | department -- |
| 14 | Q. I see. |
| 15 | A. -- to do that. |
| 16 | Q. Well, the judge tries to put it on you, but |
| 17 | that's fine. All right. |
| 18 | MS. NELSON: Well, I'm -- |
| 19 | Q. Did the chief instruct you to tell the judge |
| 20 | to have her people make no contact with |
| 21 | Ms. Turner? |
| 22 | A. No. |
| 23 | Q. You did this on your own initiative? |

28  (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1    A. Yes.
2    Q. Well, since this on your own initiative,
3        pursuant to what authority did you do this?
4    A. It's an investigative practice. Kind of like
5        invoking the rule in court, which you'd be
6        familiar with, you do not want subjects of the
7        investigation talking with witnesses as you're
8        trying to conduct an investigation.
9    Q. So is this discretionary just something that
10       you prefer, or was this under the penalty of
11       job loss?
12       MS. NELSON: Object to the form. He's
13           trying to explain.
14       MR. JAFFREE: Well, I'm asking him.
15       MS. NELSON: He didn't say anything about
16           job loss. He's talking about
17           investigative practices.
18   Q. Well, I mean -- but the result is a job was
19       lost because your directive was violated. I'm
20       trying to get some idea, where do you get the
21       power to do that?
22       MS. NELSON: He said he didn't understand
23           your question. He didn't know. He's

Page 114

1        trying to explain to you why --
2        MR. JAFFREE: Can I get an answer from
3            him?
4        MS. NELSON: Asked and answered.
5    A. What's your question?
6    Q. Where do you get the power to do that? You
7        said, chief didn't tell you to do it.
8    A. That's correct.
9    Q. So we can't go back to the chief.
10   A. That's correct.
11   Q. And that's what your answer was first. So if
12       the chief didn't tell you to do it, where did
13       you get the power to suggest or to instruct
14       the judge to have her people not contact Mary
15       Turner?
16       MS. NELSON: Object to the form. You can
17           answer.
18       THE WITNESS: Okay.
19           (Brief pause)
20       MS. NELSON: You can you answer if you
21           know. But --
22       THE WITNESS: I'm just thinking about
23           something.

Page 115

1        MS. NELSON: Gotcha. Okay.
2            (Brief pause)
3        MR. JAFFREE: Let the Record reflect that
4            the witness is in thoughtful
5            deliberation.
6    A. I guess at the present time, the correct
7        response would -- would be, I'm uncertain
8        pending going back and reviewing some -- some
9        other information.
10   Q. All right. I accept that.
11       Did you indicate to the judge how long
12       this no-contact directive should stay in
13       place?
14   A. I just said during the investigation, while it
15       was ongoing.
16   Q. Did you advise the judge when the
17       investigation had been completed?
18   A. She did receive a report.
19   Q. From whom?
20   A. It would have come from the chief of police,
21       I'm assuming.
22       Which investigation are you referring to?
23   Q. Well, we're talking about the investigation of

Page 116

1        the ticket, the investigation that the judge
2        had told them to make no contact, during that
3        investigation.
4    A. Oh, the release of information?
5    Q. No, not the release of information
6        investigation. We're talking about the ticket
7        investigation.
8        MS. NELSON: Let's make the Record clear.
9            The Mary Turner ticket-fixing
10           investigation.
11       MR. JAFFREE: Well, yeah, but --
12       MS. NELSON: After which Mary Turner was
13           suspended.
14       MR. JAFFREE: And after which it turned
15           out there was no ticket fixing.
16       MS. NELSON: And she was indicted.
17       MR. JAFFREE: And she was not indicted for
18           any ticket fixing. It was a
19           misdemeanor.
20       MS. NELSON: Well, she was charged with
21           extortion.
22       MR. JAFFREE: She was not charged with
23           extortion. She was charged with

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 117

1  something dealing with misapplying
2  records. She was not charged with
3  extortion.
4  MS. NELSON: She was charged with a
5  criminal offense.
6  MR. JAFFREE: She was charged with a
7  misdemeanor.
8  MS. NELSON: Well, we could sit here and
9  banter back all day.
10 MR. JAFFREE: I can prove my point.
11 MS. NELSON: Let's make the Record clear,
12 that the question on the table was
13 what?
14 MR. JAFFREE: The question on the table
15 was --
16 MS. NELSON: How long --
17 Q. Did you inform her that the investigation was
18 complete?
19 MS. NELSON: The investigation into the
20 Mary Turner ticket fixing.
21 Q. The investigation involving Mary Turner and
22 the ticket. Did you inform the judge when
23 that investigation was complete?

## Page 118

1  A. I prepared the report, and I submitted it to
2  Chief John Powell. And it was subsequently
3  given to the judge.
4  Q. What was -- and this was involving the ticket?
5  A. That's what you -- you asked me about.
6  Q. Is that what you're talking about, is the one
7  involving?
8  MS. NELSON: The Mary Turner ticket with
9  Bradley Phelps?
10 Q. You prepared that report?
11 A. Yes.
12 Q. And did you tell her then that the
13 investigation was complete?
14 A. I don't know if I told her it was complete. I
15 submitted a report upon the completion of the
16 investigation.
17 Q. Well, what date did you submit that report?
18 A. On or about May the 2nd of 2005.
19 Q. So there should have been no contact with
20 Ms. Turner from March the 10th until May the
21 2nd; is that correct?
22 MS. NELSON: Object to the form. He just
23 said that's when he turned in the

## Page 119

1  report.
2  A. I don't think that's correct.
3  Q. Well, that's what you implied, that she was
4  notified that the investigation was complete
5  when you turned in the report. You turned in
6  the report in May. So it was your
7  understanding, there should be no contact with
8  Mary Turner until May?
9  A. The directive not to talk to Ms. Turner I
10 don't -- I'm not certain, but I don't believe
11 it came at the same time that this report
12 was --
13 MS. NELSON: No. We're confusing things.
14 Q. Follow me carefully. Do not talk to her
15 during investigation of the ticket.
16 A. Pardon me?
17 Q. The mandate was to not talk to Ms. Turner
18 during the investigation involving, as counsel
19 would say, ticket fixing?
20 MR. JAFFREE: Did you like that? I'll go
21 along with the ticket fixing.
22 MS. NELSON: I'll say ticket. I just want
23 to make sure what ticket and what

## Page 120

1  investigation we're talking about.
2  And I think we've established that
3  took place on or about May the 10th.
4  THE WITNESS: Yeah, that's correct.
5  MS. NELSON: Of 2005.
6  THE WITNESS: That's correct.
7  MS. NELSON: Just trying to move things
8  along.
9  A. That's correct.
10 Q. So the first word that the judge would have
11 had that the investigation was complete would
12 have been in May of 2005?
13 MS. NELSON: Object to the form. The
14 internal affairs investigation?
15 Q. Internal affairs, May of 2005?
16 A. That's correct, when my report was finished.
17 Q. So your mandate would have been, nobody have
18 any contact with Mary Turner for two months?
19 A. As it relates to the criminal -- excuse me,
20 not the criminal investigation, as it relates
21 to the investigation.
22 Q. Well, do you know whether or not Mary Beth had
23 any contact with Mary Turner involving the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1    criminal investigation?
2    A. I don't know whether they had contact
3      involving a criminal investigation or not.
4    Q. Well, there was --
5    A. They had contact during the administrative
6      investigation.
7    Q. All right. During the administrative. Do you
8      know if they -- do you know if Mary Beth
9      contacted Mary Turner about the ticket
10     investigation?
11   A. I know that Mary -- could you rephrase -- say
12     that again?
13   Q. Let me ask it a different way: Based on
14     information that you got from Mary Brackin,
15     what was the nature of her contact with Mary
16     Turner?
17   A. She stated that she needed to obtain a
18     show-cause letter and get the, quote, unquote,
19     setup on it -- I believe were her words she
20     used -- in reference to a show-cause letter.
21   Q. If that statement is true, then did that have
22     anything to do with contacting Mary Turner
23     about the investigation?

Page 122

1      MS. NELSON: Object to the form.
2    A. It doesn't have anything to do with contacting
3      her about the investigation, but she wasn't
4      supposed to contact with her.
5    Q. Well, did you expect your directive to be all
6      inclusive to no-contact at any time for any
7      reason?
8    A. During the course of the ongoing
9      investigation -- let me refer back to the
10     directive that was given.
11       (Brief pause)
12   A. Yes. The directive was to strictly refrain
13     from any contact with Ms. Turner while the
14     internal affairs investigation was underway
15     and not to discuss with anyone the matter --
16     the matter of the investigation.
17   Q. So that was all contact of any nature,
18     correct?
19   A. It says, any contact.
20   Q. Did you think through the consequences of your
21     suggestion when you made it to the judge?
22       MS. NELSON: Object to the form.
23   A. Was that a question? I'm sorry.

Page 123

1    Q. Yeah. Did you think through the consequences?
2    A. Through --
3      MS. NELSON: Object to the form.
4    A. What do you mean?
5    Q. Well, that you was -- wait a minute. Let
6      me -- since you haven't answered that yet, let
7      me --
8      MS. NELSON: He doesn't understand you.
9      He says, what do you mean. I've
10     objected.
11   Q. I'm going to replace it with another question
12     that may make it easier for you to understand.
13       Were you aware that Mary Beth and Mary
14     Turner were close friends?
15   A. Yes.
16   Q. That they socialized with each other?
17   A. That, I don't know.
18   Q. Did you expect that for the period of time it
19     took for the investigation to be completed,
20     Mary Beth and Mary Turner should cease having
21     any kind of social relationship with each
22     other?
23   A. Well, if I recall right, the judge told them

Page 124

1      that any contact with Mary Turner should go
2      through her -- should go through her and would
3      be approved by her. So to me, with that
4      stipulation there, that doesn't mean 100
5      percent that it's no possibility whatsoever.
6      She just needed to approve it as the
7      investigation was ongoing.
8    Q. So every contact had to be precleared through
9      the judge?
10   A. Yes, if there was to be contact during this
11     investigation.
12   Q. Even contact after hours?
13   A. I'd have to make an assumption. The directive
14     was for them not to have contact. If they had
15     to do -- to have contact with her, contact the
16     judge pretty much for direction.
17   Q. And if they were going to meet in church,
18     contact the judge?
19   A. I'm not reading between any lines. That was
20     just what was said. And the interpretation of
21     that is, I guess, what you're asking for?
22   Q. Uh-huh (positive response).
23       Now, have you ever given a non-police

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 125

1     officer employee of the City of Dothan that
2     type of directive before?
3        MS. NELSON: What -- not to --
4   Q. To not contact their friends?
5        MS. NELSON: Object to the form. Not to
6        discuss an ongoing criminal
7        investigation, not to contact somebody
8        under suspicion?
9        MR. JAFFREE: Forget about the --
10       MS. NELSON: No. I think you need to ask
11       him --
12   Q. Don't contact their friends?
13       MS. NELSON: Object to the form. That's
14       totally --
15   Q. You bifurcated these statements that the judge
16     made. You said, don't discuss the criminal
17     investigation. No contact. You made them two
18     separates things.
19       MS. NELSON: The directive was not to have
20       contact with your friends; it was to
21       have contact with an employee who was
22       under investigation.
23   Q. But if the employee was their friend, no

Page 126

1     contact would mean don't contact your friend.
2       MS. NELSON: Object to the form, if that's
3       a question.
4   A. As it relates to their friendship, I testified
5     earlier that I don't have any knowledge
6     whether they're close friends or just
7     co-workers.
8   Q. Let me give you a hypothetical and see if you
9     think the directive would apply to this.
10       MS. NELSON: Object to any hypotheticals.
11       When I raise my hand, that will mean I
12       object to the form.
13   Q. What if Mary Turner's name was Mr. Turner and
14     Mary Brackin's name was Mary Turner, and they
15     happened to live together. They both worked
16     at the same place. Mr. Turner was on
17     administrative leave, under investigation.
18     Mary Turner was among a group of people that
19     was told, make no contact with Mr. Turner.
20       Do you think that directive would still
21     apply?
22       MS. NELSON: Object to form, to the
23       hypothetical.

Page 127

1   A. I would need for you to repeat that again.
2     You've lost me.
3   Q. Let's assume that it was Ms. Brackin's husband
4     that we're talking about, and her husband had
5     worked with her in the magistrates' office.
6     And her husband was on administrative leave
7     while they were doing an investigation. Do
8     you think this no-contact directive could have
9     effectively kept them from associating with
10     each other?
11       MS. NELSON: Object to the form. Object
12       to the hypothetical situation.
13   A. Hypothetically, that's up to both of them.
14   Q. Up to them?
15   A. Whether they --
16   Q. They don't --
17   A. -- have talked or not but directive was -- was
18     clear.
19   Q. It would apply to them as well?
20   A. The directive was clear. Now, whether they
21     did it or not, I don't know whether they would
22     or wouldn't.
23   Q. At first blush, that type of directive seems

Page 128

1     reasonable, doesn't it?
2       MS. NELSON: Object to the form.
3   A. What do you mean?
4       MS. NELSON: To a hypothetical husband and
5       wife?
6       MR. JAFFREE: Well, no.
7   Q. The directive that you suggested that the
8     judge give and the judge gave seemed
9     reasonable at first blush, doesn't it?
10   A. It's reasonable now.
11   Q. Reasonable now.
12   A. Just like invoking the rule, it's reasonable
13     then.
14   Q. So would it be reasonable if these two were
15     married to each other to have no contact;
16     would it still be reasonable?
17       MS. NELSON: Object to the form.
18   A. Your hypothetical is if both of them worked
19     out of the same office --
20   Q. That's right.
21   A. -- so both of them would be aware of the
22     investigation going on, especially if they're
23     married. So the directive was clear. And

# FREEDOM COURT REPORTING

Page 129

1   whether they spoke about it or not, I don't
2   have --
3  Q. You're not speaking about the investigation.
4    If they made contact with each other.  You did
5    not say that Mary Beth talked to Mary Turner
6    about the investigation.  You said she talked
7    to her about trying to get some information
8    that she needed, not about the investigation.
9    So forget about the investigation part.
10    Would it be reasonable to tell a wife not
11    to contact her husband because her husband was
12    under investigation?
13     MS. NELSON:  Object to the form.  Object
14     to the hypothetical question.
15  Q. Do you think that's reasonable?
16     MS. NELSON:  Not the facts in this case.
17  Q. Do you think that's reasonable, those facts?
18  A. I don't know.
19  Q. So if you change the status of the people,
20    then the directive is no longer reasonable?
21     MS. NELSON:  Object to the form.
22  Q. Yes or no?
23  A. If I change the status of the people, the

Page 130

1   directive --
2  Q. Directive is no longer reasonable?
3     MS. NELSON:  Object to the form.
4  Q. Well, are you saying it is reasonable to apply
5    to a husband and wife, no contact with each
6    other?
7  A. I'm --
8     MS. NELSON:  Object to the form.  It's
9     hypothetical.
10  A. I'm saying that your hypothetical question is
11    not what happened.
12  Q. Well --
13  A. And what happened was, Mary Beth Brackin was
14    given a directive not to talk, not to
15    associate, not to have anything to do -- and
16    I'm just paraphrase -- trying to paraphrase
17    what I read already -- with Ms. Turner during
18    the ongoing investigation.
19    The major offense of insubordination had
20    to do with Mary Brackin talking to Ms. Turner
21    after she was told not to.  It didn't have to
22    do with them coming together, meeting, not
23    meeting.  In this report, it had to do with

Page 131

1   them, Ms. Turner -- Ms. Brackin calling
2   Ms. Turner after being told not to by the
3   judge and making some type of inquiry that
4   Ms. Brackin claims that she made.
5    And for the Record, Ms. Turner didn't say
6   the same thing that Ms. Brackin said in her
7   statement.
8  Q. I've read Ms. Turner's statement.  Ms. Turner
9    didn't recall certain things.  You won't get a
10    specific from Ms. Turner as to what the nature
11    of the contact was.  I mean, you can look, but
12    you won't get it.
13     MS. NELSON:  Can we go off the Record for
14     a minute?
15     (Off-the-Record discussion.)
16  Q. I don't have any more questions of you.  If
17    counsel wants to ask you some questions, she
18    can.
19     MS. NELSON:  I'm just saying --
20     MR. JAFFREE:  I don't have any more
21     questions.
22     MS. NELSON:  I don't either.  I don't have
23     any questions.

Page 132

1  Q. I appreciate your being here.  And we shall
2    remains friends.  Okay?
3  A. Oh, yeah.
4     (Deposition concluded at 4:40 p.m.)
5    * * * * * * * * * *
6    FURTHER DEPONENT SAITH NOT
7    * * * * * * * * * *

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**A**

academy 9:23
14:13,18
accept 115:10
accounts 67:6
accurate 86:21
86:22 92:21
accused 60:10
acknowledge
43:23
acting 11:18,21
11:22 12:12
68:22
action 70:1
99:12
activity 28:3,3
28:13 54:10
56:13,23
additional 83:3
addressed 90:14
administration
12:15
administrative
12:17 13:4
23:6 31:2,6
54:15 57:12,14
58:18 76:7
83:4 88:10
93:5,7 105:6
106:20 121:5,7
126:17 127:6
administrator
69:3
admitted 99:7
advice 50:8,11
50:15 52:10
107:14 108:10
advise 57:8
115:16
advised 52:6
64:14 74:22
76:4,8 105:4,5
advocate 53:19
53:20,21

affairs 13:17
14:4 23:2,4,5
23:19 24:4
25:14 26:21,21
27:3,16 28:11
29:5,6 30:2,3
30:16,23 31:19
33:23 34:15,21
35:19 36:15
38:2 40:6
59:14 74:8
98:9 105:7,11
111:1 120:14
120:15 122:14
afoot 57:1
age 24:17
agency 10:19
ago 16:17,18
50:21 65:9
agree 59:6 63:17
63:18 66:23
67:14,20 68:4
68:8 70:13
agreed 3:2,16
agreement 1:16
ahead 5:22 6:23
7:17 17:5,8
34:17 66:2
92:22
Alabama 1:2,18
1:20 2:5,9 3:8
14:15
allegation 53:12
53:16 54:10,11
60:9,14 67:1
85:8 92:2
107:11
allegations 23:8
23:9 50:12
52:8,11 59:18
63:18,19,23
107:18 108:9
108:12,13
alleged 96:8

allegedly 50:16
91:19
allow 58:16
109:19
aloud 71:11,12
ambiguity 99:6
Amendment
58:16,21
Amsouth/Har...
2:8
analysis 18:14
19:7
Andrews 1:19
animal 13:6,6
answer 6:23
7:18 11:1
19:22 26:4
29:18 35:12
36:6 43:21
57:11 61:11,12
63:15 82:4
86:21,22 114:2
114:11,17,20
answered 20:22
110:11 114:4
123:6
answers 13:17
anybody 30:13
35:18 87:20
95:12 96:13
98:21
anyway 15:6
51:6
apologize 71:8
appeal 64:14
65:23
appear 7:2
41:20
APPEARAN...
2:1
appeared 90:8
94:3,7,8
applicant 23:10
23:11

application
10:14
apply 126:9,21
127:19 130:4
appoint 45:17
appreciate
19:10 132:1
apprehensive
60:6
approached
22:2
approve 124:6
approved 124:3
approximate
8:23
approximately
1:21 10:12
14:1 16:17
22:22
arguing 85:11
arm 83:22
arresting 6:9,13
Article 2:15
aside 26:18
55:16
asked 7:4 40:16
42:15,21 44:11
72:19 98:8,8
114:4 118:5
asking 5:10
39:18 42:8
61:15 66:21
69:22 72:4
75:19 88:16
90:23 91:6
109:18 113:14
124:21
assign 28:18
42:3
assigned 28:14
32:2 42:2 48:9
56:21
assist 85:2,3
assistance 38:22

assistant 13:4
88:10,10
associate 130:15
associated 24:9
30:7 74:3
associating
127:9
association
31:10,13
assume 18:19,20
42:19 43:7
63:6 127:3
assuming 7:1,3
8:20 15:19
115:21
assumption
43:11 124:13
attempting 68:3
70:14
attend 18:11
20:7
attended 14:20
20:10
attention 49:10
attorney 49:13
49:23 50:1,5,5
50:6,6 51:19
58:8 60:10,12
60:17
Attorneys 2:8
authority 28:11
28:16,17,18,20
45:14 46:6,17
52:13 106:2
110:17 111:1,3
111:7,18,22,23
112:4 113:3
authorizes 30:2
available 4:19
Avenue 2:9
avoid 58:19
awake 32:9
aware 11:10
27:8 123:13

# FREEDOM COURT REPORTING

128:21

**B**

baby 33:18
75:18,19
back 5:2 17:13
17:14 18:1
33:22 40:20
43:4 44:18
48:13 54:5
65:12 67:17
73:5 74:1,4
114:9 115:8
117:9 122:9
backgrounds
23:11
bad 50:4 52:10
109:11
ballpark 58:9
banter 47:8
117:9
based 40:15
47:14,21 54:6
56:14,18 62:3
64:10 81:17
121:13
basically 49:14
59:9 65:18
107:11
basing 20:20
Bates 41:1,2
84:10
Bates-stamped
84:13,15,20
becoming 35:4
35:21
behalf 6:17
32:12,14
believe 6:7
12:14 14:2
16:4,10 18:1,1
21:10,14,15
25:23 27:15
34:8 38:10

39:16 53:2
64:5 73:20
74:17 88:3
89:23 93:21
119:10 121:19
bench 34:16
best 12:19 26:3
Beth 1:6 41:3
49:11,22 64:12
100:21 101:5
101:11 103:17
108:9,18,22
109:22 110:4
120:22 121:8
123:13,20
129:5 130:13
Beth's 61:12
bewildered 70:6
bifurcated
125:15
Birmingham 2:9
bit 16:18 18:23
19:12
blank 44:9
bluntly 33:2
blush 127:23
128:9
bondsman 52:23
53:4
book 9:19
boss 32:4
bottom 15:18
41:8
Brackin 1:6
40:1 49:11,22
50:4 51:16
52:7,12 54:17
56:18 57:9
62:15 64:23
65:18 66:13
68:5,10 74:1,2
100:17,21
101:2,6,11,11
102:19 103:1

107:13 108:9
108:19 109:22
110:4,12
111:11 121:14
130:13,20
131:1,4,6
Brackin's 41:3
60:8 126:14
127:3
Bradley 118:9
branches 12:4,6
12:21
bread 32:5
break 70:8
Brief 44:7 65:8
66:3 67:22
82:3 85:14,15
87:23 100:4
104:23 107:6
114:19 115:2
122:11
bring 69:23
broad 30:13
brought 23:22
56:17 84:19
building 6:10,12
bulk 52:16
bureau 40:5
business 31:1,10
31:12 76:14
buttered 32:5
bypasses 13:22

**C**

call 21:12 24:13
55:17 59:12,13
75:17
called 6:17
24:12 35:23
36:1,3,9 41:21
110:13
calling 30:5,9
82:6 131:1
calls 57:19 58:2

81:13
capacity 8:13
9:8 10:7,10
68:23 88:9
captain 11:18,19
11:21,22,22,23
12:12,14 39:8
40:5,11,12
captains 11:19
13:22
care 9:18 34:22
80:9,13,14,17
80:18,19,22
97:7
cared 97:11,16
career 18:9
carefully 119:14
CAROL 2:7
case 1:8 3:18,19
6:6 18:15
28:20,23 29:21
38:11 49:12
50:8 52:14
58:5 81:7,9
95:20 99:15
100:6,9 102:3
104:9,12
107:22,23
108:11 129:16
cases 58:18
caused 86:4
cease 123:20
Center 1:19
6:10,14
certain 16:8
27:12,16 39:12
46:22 119:10
131:9
Certified 1:17
3:7
certify 5:3
chance 64:3
79:20
change 129:19

129:23
channels 48:4
characterizati...
67:11
characterize
16:12
characterized
10:21 25:6
charge 69:6 79:2
94:18,21 97:20
106:10,12
107:17 109:21
charged 116:20
116:22,23
117:2,4,6
charges 56:9,17
chart 12:22
charter 24:6
31:22
chase 25:13
chief 11:16
13:18,20 14:3
14:22 23:16,17
28:14,17 32:2
39:8,15,16,21
40:10,11 42:16
42:21 43:3
45:16 46:14
48:3,5,7,11,14
48:16 73:9
74:20,22 112:1
112:2,3,19
114:7,9,12
115:20 118:2
Choice 58:20
church 124:17
circumstances
8:17 20:21
citizen 30:10
111:2,3,9,9,11
citizens 30:18,20
city 1:9 6:7,19
7:4,20 8:6,7,13
8:14 9:1,6

# FREEDOM COURT REPORTING

Page 135

10:16,21 11:2
11:4,8,13
14:17 23:20
24:9,20,22
25:2,9,16,19
26:23 27:4
30:10,13 31:11
31:13 33:5
35:8,20,22,23
35:23 36:19
37:7 38:5
57:10 106:6
111:12,14
125:1
**City's** 6:20 7:1
41:15 43:23
**Civic** 1:19 6:10
6:14
**Civil** 3:5,14,21
**civilian** 30:5
**civilians** 30:4
**claims** 131:4
**clarification**
58:1 72:14
104:2
**clarify** 33:8
37:15 47:22
53:9
**clarifying** 29:13
**clarity** 30:5
**classified** 10:5
**clean** 109:16
**clear** 28:8 85:23
88:16 91:21
99:3 109:20
116:8 117:11
127:18,20
128:23
**clerk** 36:3
**clerks** 12:16
35:23
**clever** 37:10
55:18
**clinic** 24:23 25:9

**close** 12:11
123:14 126:6
**code** 23:22
**Coleman** 61:15
61:18 62:14
71:4,8,16,18
71:19
**Coleman's**
61:14 71:22
**come** 7:5 9:17
12:5 13:5
40:10 42:12
43:17 49:10
64:20 70:14
74:16 115:20
**comes** 13:12
**comfortable**
47:1,4,9,11
59:22 60:3
**coming** 14:3
29:1 37:3 56:9
56:13 130:22
**commander**
40:5
**commencing**
1:20
**comment** 29:22
**comments**
109:13
**commission** 3:9
**Commissioner**
1:17 3:7
**committed**
100:18
**commonly** 9:15
**communicate**
112:5
**communicated**
42:20 99:18
**communicatio...**
13:5
**compelled** 57:11
**compelling**
58:22

**complain** 30:19
**complaining**
30:20
**complaints**
30:19 51:18
60:12 65:2
66:14 67:2
**complete** 61:6
62:9 106:17
117:18,23
118:13,14
119:4 120:11
**completed**
115:17 123:19
**completely** 91:2
**completion**
118:15
**concern** 4:17,18
98:1,2
**concerned** 26:16
78:10 97:8
103:10
**concerning**
48:19 75:14
76:1 95:5
**concluded** 132:4
**conclusion**
57:19 58:3
81:3
**conduct** 42:21
48:14 113:8
**conducted** 26:21
27:3 32:22
74:9 105:8
**conducting**
34:21 35:2
**conducts** 23:15
**confirm** 63:19
63:22 66:18
67:1,9
**Confirming**
65:9
**confuse** 71:22
104:10

**confused** 71:3
71:16 91:5,10
91:11,12,15,17
102:6,8 104:2
**confusing** 91:2,2
102:2,4,5
119:13
**confusion**
109:17
**connected** 11:3
13:19 14:2
**connotes** 78:1
**consequences**
122:20 123:1
**consider** 59:15
110:2
**considered**
105:21
**considering**
33:10
**constitutes**
52:16
**contact** 101:8,9
102:18 103:1,5
103:6,6,17
104:20 105:10
109:4 110:20
111:2,20 112:6
112:10,20
114:14 116:2
118:19 119:7
120:18,23
121:2,5,15
122:4,13,17,19
124:1,8,10,12
124:14,15,15
124:18 125:4,7
125:12,17,20
125:21 126:1,1
126:19 128:15
129:4,11 130:5
131:11
**contacted** 121:9
**contacting**

121:22 122:2
**contents** 102:21
**control** 19:1
**conversation**
110:22
**Cooper** 2:7
**copies** 41:17
**copy** 5:11,13
40:19 72:22
73:13 83:14
84:19
**corporal** 15:11
16:3,6 28:15
**correct** 5:9
16:12 24:18
26:17 28:4
40:15 41:22
42:5 45:19
46:7 60:14,15
60:17,19 61:16
62:21 66:16
73:16 78:20
81:10 86:6
94:7 95:8,18
95:23 97:13,18
98:22 103:23
114:8,10 115:6
118:21 119:2
120:4,6,9,16
122:18
**corrections** 9:16
**correctly** 40:14
42:1
**costing** 83:22
**counsel** 3:3,17
4:18 7:20
32:19 35:16
41:15 43:23
44:1 52:14
79:19 81:23
93:16 119:18
131:17
**course** 60:5
122:8

# FREEDOM COURT REPORTING

court 1:1,17 3:7
  4:22 5:3,10
  36:16 44:21
  49:13 57:23
  61:1,22 62:2
  63:2,5 72:13
  113:5
courtroom 88:7
cover 51:12
co-workers
  126:7
crime 26:15 54:9
criminal 12:23
  18:3,5 19:14
  20:4 21:19
  22:1,20,23
  23:4 26:12
  27:17 28:3
  49:12 54:10,13
  56:9,12,17,23
  57:3,16 58:23
  59:2 79:4,7,8
  108:11 117:5
  120:19,20
  121:1,3 125:6
  125:16
crossing 13:13
cutting 76:22

_____ D _____

date 63:4 85:15
  85:17 118:17
dating 24:17
day 16:23 41:19
  51:14 105:13
  105:16,17
  117:9
days 105:13
deadline 4:21
dealing 27:13
  33:10 38:2
  83:7 98:6
  117:1
deals 23:8

dealt 66:12
decides 28:18
defendant 6:6
  7:6 49:12 50:8
  52:14 108:11
defendants 1:10
  2:6 4:18
defendant's 6:7
defender 61:23
definition 30:18
  111:22
deliberation
  115:5
demands 104:19
denied 63:17
  72:18
deny 60:14
department
  10:9,19,22
  11:2,3,7,11,12
  11:13,16 13:8
  13:10 23:7,8
  23:12,13,14,20
  24:11,14,15,16
  24:19,22 25:1
  25:5,11,12,16
  25:19,22 26:9
  26:16,19 27:1
  27:5,6,10,20
  28:6,12,22
  30:9,15 32:12
  32:23 33:6,12
  34:2 35:3,7
  36:19 37:7
  38:5,9 42:10
  42:11 48:2
  69:3,6,10 74:4
  74:16,16 86:5
  96:2 99:7
  106:19,22
  107:1,2 110:14
  111:1 112:5,6
  112:13
departments

24:8 26:22
  27:4
departure
  110:12
depends 37:23
  82:17
deponent 6:17
  37:10 132:6
depose 37:20
deposition 1:15
  3:4,6,12,18 4:3
  4:14,19 5:12
  5:17 6:3,11 7:3
  7:13,14,16
  8:18 14:6 44:4
  46:9 83:22
  132:4
derived 58:7
description 50:9
designed 58:14
designee 74:17
details 8:21
detention 17:15
dialogue 92:19
different 12:4
  16:22 18:10
  24:8 33:13
  59:10 68:9
  74:15 88:9
  90:4 93:8
  104:19,21
  105:12 121:13
direct 48:23
  102:17
directed 26:6,7
  26:12 49:1
  76:20 95:19
  98:12,20 101:7
  101:8 105:9
  110:7 111:16
  112:12
directing 39:21
  102:23
direction 23:17

98:18 105:22
  124:16
directions 42:11
  105:15,16,19
directive 77:6
  80:23 81:4,5
  95:18 97:2
  98:23 99:2,3,9
  99:13 100:3
  102:17 103:16
  113:19 115:12
  119:9 122:5,10
  122:12 124:13
  125:2,19 126:9
  126:20 127:8
  127:17,20,23
  128:7,23
  129:20 130:1,2
  130:14
directives 77:3
directly 13:18
  13:19 14:3
  42:13
disagreed 72:7,8
disagreeing
  70:23
disciplinary
  99:11
discipline 68:5
  68:10 99:14,15
disclose 80:2
  92:10,11
discover 96:1
discretionary
  113:9
discuss 104:19
  122:15 125:6
  125:16
discussing 68:8
  69:21
discussion 49:4
  52:17,23 54:16
  80:7 88:2
  131:15

discussions 7:19
dismissed 85:9
dispositive 4:20
distinguished
  15:16
distorting
  101:20,21
DISTRICT 1:1
  1:2
division 1:3
  11:20 12:1
  13:1,1,3,11,12
  13:17 14:5
  17:2,3,3,9,11
  17:20 18:6
  23:7 24:5,6
  27:3,17 30:3,7
  30:16 36:3
  57:3
divisions 12:12
  13:2
docket 13:3
  17:14
document 4:15
  30:1 39:6,11
  63:2,6
documents
  38:19,20
  104:15
doing 19:12
  72:18 74:6
  80:15 89:15,17
  127:7
Donna 62:17
  66:17,23 67:15
  67:19,20,21,23
  69:16,21
Donna's 67:15
Dothan 1:9,18
  1:19 6:7 8:6,13
  9:6 10:16,21
  11:2,4,8,13
  14:14,17,19
  23:20 24:9

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

25:10,16 26:23
27:14 30:2
33:6 36:19
37:7 38:5
57:10 106:7
111:13 125:1
**Dothan's** 111:14
**dovetails** 9:4
**Drone** 11:23
**drunk** 66:10
**due** 93:10
**DUI** 64:13
**duly** 4:5
**duties** 50:10

_____
**E**
**earlier** 59:8 83:9
93:12,14
101:16 107:13
126:5
**early** 29:4
**easier** 123:12
**effectively** 127:9
**eight** 22:22
**eight-hours**
31:16,16
**either** 3:19
18:11,18 24:5
39:4,4,8,8 40:8
40:11 61:22
66:18 96:14
131:22
**element** 26:13
**emphasis** 18:14
18:15
**employed** 8:12
8:23 9:6 25:9
34:20 37:6
111:12
**employee** 24:23
25:8,23 26:7
26:10 30:11,14
31:15 34:1
35:3 38:4,4

52:7 57:9
96:23 100:8
101:6 110:14
111:14,19,20
125:1,21,23
**employees** 25:8
25:17,22 26:1
31:1 32:23
68:21 76:8,20
100:5 101:4,14
102:18,23
105:5,9 110:20
112:10
**empty** 47:20
**encourage** 70:14
**encouraged**
45:16
**English** 78:16
**enjoy** 79:21
**entire** 58:11
83:16,20
**entry** 70:16
**environmental**
24:13,15 25:15
**errors** 5:9
**escape** 15:4
**especially**
128:22
**ESQUIRE** 2:3,7
**essence** 50:3
**established**
120:2
**EVANS-GOR...**
1:9
**event** 33:10
**everybody** 8:12
16:13 87:8
110:5
**evidence** 3:13
**evidently** 77:7
**exact** 49:19
65:15
**exactly** 32:4
88:13

**EXAMINATI...**
4:8
**exception**
106:11
**exchanged** 85:9
**excluding** 27:5
**excuse** 7:7 51:23
88:6 103:4
105:4 108:20
111:10 120:19
**exercise** 4:12
**exhibit** 2:12,13
41:6,9,20 45:8
83:14 85:4,5
85:16 94:6
102:1,20
**existed** 37:22
**existence** 23:23
**expect** 122:5
123:18
**expedite** 4:23
**experience**
21:23 32:10
54:7
**experienced**
20:5
**explain** 18:23
113:13 114:1
**explained**
107:12
**explanation**
22:14
**exposed** 80:1
**expressed** 4:17
**extent** 5:10
19:21 36:7
38:17 57:20
**extortion** 116:21
116:23 117:3
**eyewitness** 67:6

_____
**F**
**facility** 9:18
**fact** 16:18 48:13

61:5 62:16
96:3 100:14
**facts** 8:17,21
19:16,17 20:3
20:19 22:10,16
47:21 48:18,22
53:7,12,16
55:22 56:18
102:3 104:9,11
106:3 107:19
108:13 129:16
129:17
**factual** 18:14
**fair** 53:10
**fall** 106:8
**familiar** 57:21
58:5 113:6
**far** 11:4 20:14
23:18 24:11
30:22 40:15
62:1 63:8,13
76:17 78:10
103:9
**fast** 16:13,20
**Federal** 3:5,14
3:20
**feel** 47:1,4,9,11
96:17
**feeling** 79:19
**feelings** 80:21
80:23 97:19
**fell** 106:8,9,11
**felt** 108:14
**field** 11:23
**Fifth** 58:15,20
**file** 5:6 69:23
70:16
**find** 66:15 78:19
79:23 94:15
96:20 106:10
106:16 107:8
107:17 108:4
111:6,18
**finding** 41:19

**fine** 19:2 46:3
64:2 68:18
72:8,10 112:17
**fingerprint** 9:19
**finish** 77:2
**finished** 95:22
120:16
**fire** 24:19 25:19
25:22 27:9
28:6,12,22
106:19 107:1
**first** 4:5 8:22 9:5
17:13 21:2,9
21:12,13,23
30:12 51:19,21
63:7 64:13
65:21 66:8
68:20 110:17
114:11 120:10
127:23 128:9
**firsthand** 96:14
**fit** 22:10,16
**five** 12:12
**fixing** 91:19
92:2 116:15,18
117:20 119:19
119:21
**float** 17:3,7
**focus** 97:2
**focused** 8:15
37:11
**follow** 92:5
119:14
**followed** 28:16
81:1,4
**following** 90:18
95:6,9
**follows** 4:7
**force** 10:2,21
54:9 86:8
**forensic** 20:12
**forget** 125:9
129:9
**forgot** 82:7

# FREEDOM COURT REPORTING

Page 138

**form** 3:10 6:21
10:23 11:5
17:5 18:16
19:19 21:3
22:11 25:7
29:3 31:4,7,20
32:7,13 33:3
33:19,21 36:5
41:23 42:6
43:10,13,16
45:21 46:1,11
46:19 47:3
50:7 53:8,23
55:9 56:2,10
56:20 57:18
59:10,17 60:1
62:22 63:12
68:6,11 69:11
77:12 79:9
80:11 86:18
101:19 106:23
108:2 109:6
111:4,8 113:12
114:16 118:22
120:13 122:1
122:22 123:3
125:5,13 126:2
126:12,22
127:11 128:2
128:17 129:13
129:21 130:3,8
**formal** 59:4
**formality** 3:8
**found** 40:2
41:16 106:11
107:5,19
**frame** 88:17
**Frank** 28:15
**frequently** 5:19
**Friday** 19:17,20
**friend** 100:9
125:23 126:1
**friends** 123:14
125:4,12,20

126:6 132:2
**friendship** 126:4
**front** 40:4 84:15
**functioning**
43:23
**further** 3:16
25:13 132:6

—— **G** ——
**garrity** 28:22
54:17,21 55:6
56:8 57:4,5,17
57:22 58:5,14
86:14 87:21
**gather** 106:3
**gathered** 45:1
56:14 58:17
**Gayle** 2:7
**general** 53:20
**generally** 63:10
**gentleman** 15:22
**getting** 34:6
44:14 71:3,16
**gigantic** 75:16
**gist** 52:18
**give** 5:11 12:22
28:21 36:8
55:5 56:7 58:8
58:9 63:4 73:6
73:7 86:19,21
87:21 88:14
89:1 105:16
108:6 126:8
128:8
**given** 4:13 24:3
29:8,15 41:14
50:11 77:6
81:5 96:15
107:21,23
118:3 122:10
124:23 130:14
**gives** 112:3
**giving** 46:14
50:1,8 107:13

108:10
**glad** 68:15
**go** 5:22 6:23
7:17 9:22 17:5
17:8 33:22
54:5 62:5,6,7
66:2 86:4
92:22 103:1,4
114:9 119:20
124:1,2 131:13
**God** 12:13
**goes** 16:13 40:15
76:12
**going** 8:8 16:8
17:21 18:9
19:4 21:21
32:19 35:5
37:2,20 43:4
62:4,17 67:12
83:18 84:5
97:6 100:10
102:16 115:8
123:11 124:17
128:22
**good** 43:8,8 50:2
60:22 62:10,16
62:18,18 64:15
66:1
**goofing** 31:15
**Gordon** 34:3,16
35:4,7,21
41:21 42:3,12
45:14 52:17
73:5,7 76:5
86:12,14,16
**Gotcha** 115:1
**government** 2:4
10:20 25:2
57:10
**governmental**
57:9 111:13
**Gray** 1:15 3:4
4:4,11 36:22
**group** 126:18

**Grumbach**
66:17,23 67:18
**guards** 13:13
**guess** 15:7 16:8
17:21 21:21
24:19 29:20
35:9 37:20
40:18 43:17
98:11 110:11
115:6 124:21
**guessing** 21:22
**guilty** 64:13
65:21
**guys** 21:11

—— **H** ——
**half** 17:22 37:11
**hallmarks** 43:8
**hand** 58:15,16
126:11
**handbook** 24:3
**happened** 10:13
48:4 105:12
126:15 130:11
130:13
**hard** 75:15,18
**head** 11:16
13:15 25:12
42:10,11 74:17
83:23
**health** 24:22,23
**hear** 7:9 109:13
**heard** 24:16
52:4 79:13
**hearsay** 34:23
47:15
**heath** 25:9
**help** 19:11 36:9
45:15 82:1
104:3
**helped** 21:11
34:19
**helpful** 35:17
**hereto** 3:20

**he'll** 90:21
**highlight** 41:11
**highlighted**
41:11,12
**hired** 10:15
**history** 58:11
**Hobson's** 58:20
**Hold** 55:4
**hope** 20:22
**hopefully** 5:1
**hoping** 93:23
**hours** 72:1
124:12
**Houston** 76:11
**huh** 32:6 68:13
**hunt** 83:11 84:7
**husband** 127:3,4
127:6 128:4
129:11,11
130:5
**hypnosis** 20:12
**hypothesis**
22:10,16
**hypothetical**
126:8,23
127:12 128:4
128:18 129:14
130:9,10
**Hypothetically**
127:13
**hypotheticals**
126:10

—— **I** ——
**IA** 14:2
**idea** 18:17 28:10
113:20
**identification**
41:7 85:6
**ignorant** 15:2,3
**ignore** 6:22
**implicated** 79:5
**implied** 119:3
**imply** 41:14

# FREEDOM COURT REPORTING

**important** 105:22
**improper** 97:17
**inadequate** 52:15
**incident** 48:20 73:4
**include** 12:15,16 30:17
**included** 73:11
**inclusive** 122:6
**incompetence** 67:2
**incompetent** 49:14 60:11 65:1
**incorrect** 16:3 60:18 92:6
**independent** 11:7 48:18 82:22
**independently** 39:3 85:13
**INDEX** 2:12
**indicate** 35:13 64:22 70:5 80:16 105:21 115:11
**indicated** 50:22 60:16
**indicating** 55:12 74:8
**indicted** 116:16 116:17
**individual** 20:9 97:2 100:11
**inferences** 109:16
**infiltrate** 109:12
**inform** 117:17 117:22
**information** 50:2 56:14 58:17 59:2,20

75:2,14 76:1,5 76:17 77:4,11 78:19 79:5 80:1,9 81:10 82:14,17,19,21 83:8 86:1,9,17 88:20,21 89:5 90:12,16,16 92:11 93:11 94:6,8 95:5 96:9,13,14,16 97:8,10,20,22 98:2,4,6,10,10 98:14 99:19 100:2,13 101:18,23 102:12,14 103:8,15 108:21,23 109:3,5,8,21 110:1,2,5,9 115:9 116:4,5 121:14 129:7
**informed** 94:12
**initially** 56:21
**initiated** 32:11 42:4 46:18,23 47:2,15 69:17 74:12 90:14
**initiating** 48:21 88:19
**initiative** 112:23 113:2
**injustice** 61:6,7
**inquiry** 131:3
**inside** 82:19
**insinuating** 49:22
**insist** 62:13
**installation** 34:2 34:4
**instance** 31:14
**instigated** 69:7
**instruct** 111:2

112:19 114:13
**instructed** 45:15 45:22 64:12 65:20 87:11 88:14 89:2,4 89:12,19 110:19
**instructing** 65:23
**insubordination** 100:20 108:18 130:19
**intelligent** 37:10
**intend** 47:19
**intent** 55:23
**internal** 13:17 14:4 23:2,3,5 23:19 24:4 25:14 26:20,21 27:3,16 28:11 29:4,6 30:2,3 30:16,22 31:18 33:23 34:15,21 35:19 36:15 38:2 40:6 59:14 74:8 98:8 105:7,10 111:1 120:14 120:15 122:14
**interpret** 22:7
**interpretation** 97:15 124:20
**interrogate** 59:23
**interrogating** 59:16
**interrogation** 59:13
**interrupted** 57:23 72:13
**interruption** 44:7
**interspersed** 71:6

**interview** 2:14 54:23 56:15 64:10 70:9 86:4,7,12 87:15 96:5,8
**interviewed** 67:15,21,23 71:5 88:3 95:11 100:12 110:4
**interviewing** 68:19
**intimately** 67:8
**introduced** 3:18 61:21 63:10,13
**invade** 44:1
**investigate** 23:9 30:3 31:1,19 32:2 42:13 50:14 69:9 81:2 97:21 98:12 110:13
**investigated** 25:21 27:18 28:11,20,21 33:18 108:12
**investigating** 36:15 48:20 54:13,14 59:18 94:21 108:21
**investigation** 19:14 20:15 22:3,6,21 23:1 25:15 26:2,6 26:11 27:13 28:5,14 30:23 32:11,22 33:1 33:2,11 34:1 34:22 35:2,20 36:18 37:5,14 37:16,17 38:15 39:22 41:22 42:2,3,5,15,22 45:17 46:13,18

47:2,16 48:11 48:15,21 49:1 50:3 57:2,13 57:15,16 59:1 59:3,12,13,15 59:21 69:7,18 73:3,23 74:6,9 74:12,21,23 75:5,6,8 76:3,6 76:10,16,18 77:5,10,23 78:18,23 79:1 82:16 83:2,3,7 83:16 86:2,3 87:4,7,10 88:4 88:20 89:16,17 89:20,22 90:2 90:6,11,13,15 91:7,19 92:7 92:12 93:10 94:15 95:5 97:1,3 98:5,17 98:21 99:19 101:5,10,13,15 101:17,22 102:11,22 103:7,9,12,14 104:1,20 105:8 105:11 106:13 106:17 107:3,9 107:10 109:1,8 110:6 111:17 112:11 113:7,8 115:14,17,22 115:23 116:1,3 116:6,7,10 117:17,19,21 117:23 118:13 118:16 119:4 119:15,18 120:1,11,14,15 120:20,21 121:1,3,6,10 121:23 122:3,9

# FREEDOM COURT REPORTING

Page 140

122:14,16
123:19 124:7
124:11 125:7
125:17,22
126:17 127:7
128:22 129:3,6
129:8,9,12
130:18
**investigations**
12:23 18:3,6
23:4,15 26:22
27:4,17 30:17
33:4,14 37:19
38:1 45:2 57:3
74:15
**investigative**
113:4,17
**investigator**
20:4 21:8,13
21:19 36:15
43:8 44:13
54:14,15
**investigators**
18:8 20:5 21:7
22:2 42:16
55:19
**invoking** 113:5
128:12
**involved** 28:2,5
28:8 33:1,4,23
35:19 36:17
37:5,14,18
38:8,13,15
67:8 74:13
90:1 91:7
**involvement**
90:21
**involving** 30:4
32:17 38:3,8
73:23 74:2,2
75:2,10,13
91:20,20,23
92:2 101:10
106:19 117:21

118:4,7 119:18
120:23 121:3
**in-process** 9:17
**ISHMAEL** 2:3
**issue** 6:5,13 91:3
**issues** 33:9
**Ivan** 1:15 3:4
4:4,11

_____
**J**
**Jaffree** 2:3,3 4:9
7:22 8:2,8 17:6
19:1,10,23
22:13 25:4
29:13,20 31:8
31:12 32:8,15
32:18 33:20
34:5,9,17 35:9
35:13 36:8,12
37:9 40:18
41:2,5,16 42:8
44:8,13 45:9
45:11 46:2,4
46:15 47:7,12
50:19,22 51:3
51:7,11 55:10
55:12 56:5
61:3 62:6,12
64:6 66:6,20
66:21 69:14
70:21 71:2,14
71:17,22 72:6
72:8,10,20
75:8,12,21
77:1,15,19,21
78:2,6,16
79:11 80:16
83:11,17,21
84:3,7,11,14
84:17,21 85:1
88:1 90:22
91:4,8,10,14
92:18 93:16
101:21 102:4,7

103:21 104:6
104:11,14
108:4 109:9,11
109:18 111:10
113:14 114:2
115:3 116:11
116:14,17,22
117:6,10,14
119:20 125:9
128:6 131:20
**jail** 9:9,10,11,13
9:17 10:6,7,11
17:15,16 18:1
**job** 50:9 58:21
62:19 80:15
113:11,16,18
**John** 48:17
118:2
**judge** 1:9 34:2
34:15 35:4,4,7
35:21,21 41:21
42:2,10,12,15
42:20 45:14
46:18,23 47:2
47:14,15,23
48:1,5,7,19,23
49:2,8 52:4,6
52:17 53:6
54:6 56:15,16
69:7,8 73:5,7
73:10 76:5,8
76:19,19 77:6
80:1,5 86:12
86:14,16 88:13
89:1,4 90:14
92:9 93:6
95:12,16,19
97:3 98:20,20
100:5,21 101:8
102:16,22
103:11,16
104:18 105:3,5
105:14 107:10
110:7,19 112:7

112:8,9,12,16
112:19 114:14
115:11,16
116:1 117:22
118:3 120:10
122:21 123:23
124:9,16,18
125:15 128:8,8
131:3
**judge's** 88:9
95:18 98:18
99:2,3,5,9,13
100:3 102:17
**judgment** 5:5
**judicial** 26:19
27:6 32:12,23
33:6,11 34:1
35:3,6 36:2,19
37:6 38:5,9
74:3 86:5 96:2
99:7 106:21
107:2 110:14
**jump** 25:13
104:10
**junk** 36:13
**juvenile** 13:1,12

_____
**K**
**keep** 109:15
**Keith** 1:15 3:4
4:4,11
**kept** 127:9
**Kimberly** 38:10
**kind** 9:22 23:22
87:20 89:1
99:11 100:17
113:4 123:21
**knew** 60:16 87:4
87:6,9 99:10
**know** 9:13 11:1
11:4,6 12:13
19:16,20 22:2
22:4,5,15,17
23:18 24:1,2,8

24:12,23 25:3
25:4,8,10,11
25:11,12 26:5
29:23 30:22
32:5,10 36:1,7
36:9 43:2,4
45:13,23 46:3
46:17 47:4,7
47:14,17,18,23
48:6,12,18,22
51:7,13 54:12
54:16,21 55:9
56:11,23 57:4
57:17 58:11
61:9,21 62:17
63:13 65:20,21
68:17 71:23
73:11 75:15,22
77:14 78:13
79:6,17 80:12
81:18 82:15
85:20 86:23
87:1,6,12
88:13 90:19
103:19 104:11
104:18,21
105:1,2,18
109:11 110:19
113:23 114:21
118:14 120:22
121:2,8,8,11
123:17 127:21
129:18
**knowledge** 11:9
33:5,13 34:20
34:22,23 35:1
35:15,18 36:14
46:12 47:13
56:22 81:8,19
81:23 82:9,14
82:22 85:21
94:2 107:1
110:15 126:5
**known** 61:19

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

63:3,8,11
76:11 82:23
83:1,6 85:8,13
knows 19:20
25:5 46:22
57:20,21

**L**

Large 1:18 3:8
Larry 11:23
late 16:4
laughing 70:6
law 2:3,8 23:22
57:19
lawyer 51:17
64:12,15,23
66:1
leak 76:9
leaked 82:17,19
88:20,21 90:12
90:16,17 94:16
97:21 98:5,14
101:17,23
102:12,14
109:21,23
leaking 110:2
leap 75:16,18
learned 20:18
leave 5:9 26:18
76:7 83:5 93:5
93:8 103:22
105:6 126:17
127:6
led 92:7
leg 83:22
legal 50:8,11,15
58:3 107:14
108:10
lengthy 54:8
letter 121:18,20
let's 20:23 26:18
30:12 37:4
38:12 74:4
78:13 91:18,21

94:4 103:13
110:9,9 116:8
117:11 127:3
level 28:6
levity 32:8
lieutenant 7:23
8:5 16:17
lieutenants 13:2
limit 32:15,18
32:21
limited 35:14
51:8
line 17:13
100:11
linear 91:18
lines 124:19
list 107:4
listening 67:7
literally 60:10
litigation 8:15
little 16:18
18:23 108:20
live 79:18
126:15
located 88:5,7
long 10:10 16:6
16:7,16 22:20
43:4 44:14
61:18 63:3,8
63:11 115:11
117:16
longer 72:21
129:20 130:2
look 19:16 38:19
41:8,20 42:17
42:18 64:4
102:1,9 108:9
131:11
looked 84:21
looking 20:19
22:6 39:20
84:11 85:16,16
109:2
loose 68:4

loss 113:11,16
lost 113:19
127:2
lot 37:19,22,23
38:6 43:20
69:15 71:14
103:20

**M**

magistrate 27:6
35:20,22 36:16
36:18 37:6
38:4,8 51:15
52:13 97:5
magistrates
35:23 68:22
69:5 76:4 87:9
88:8,11 97:9
97:22 98:3,7
98:13,16 127:5
maintenance
13:8 24:11,12
24:16
major 11:17
13:22,23
100:17 106:3
107:4,8,15
130:19
making 18:15
22:15 35:11
73:1 83:12
131:3
managed 15:4
mandate 119:17
120:17
manner 3:19
19:18
March 105:3,4
105:14 118:20
mark 40:18 85:3
marked 41:6,8
85:5
married 128:15
128:23

MARTIN 1:5
Mary 1:6 39:23
41:3 49:11,22
50:4 51:16
57:9 61:12
64:12 74:10
75:2,11,14
76:6,18 77:5
81:5,9,19,22
82:8,13,18
87:14 89:22
90:2 100:17,21
101:5,9,10,11
103:17,19
104:1,20 108:9
108:18,22,22
109:22,22
110:4,6,12,21
111:11 114:14
116:9,12
117:20,21
118:8 119:8
120:18,22,23
121:8,9,11,14
121:15,22
123:13,13,20
123:20 124:1
126:13,14,14
126:18 129:5,5
130:13,20
Marys 103:20
matriculated
14:21
matter 16:18
61:5 122:15,16
matters 30:4
Maynard 2:7
ma'am 19:18
20:3 53:7
McCaskey 1:17
3:6
McDonald's
31:14,14
McGhee 51:19

51:23 52:9
60:22 61:10,19
mean 5:21 23:21
31:5 32:14
36:2 37:23
53:9 56:5
57:21 64:18
65:13 68:17
71:6,15 75:22
77:14,18,23
78:7 80:18,22
81:14 90:3
104:14 113:18
123:4,9 124:4
126:1,11 128:3
131:11
meaning 65:18
media 76:10
80:10
meet 124:17
meeting 92:17
92:23 93:2,6,9
93:12,14
130:22,23
member 10:8
24:4 54:8
members 86:5,7
96:1,2 99:5,6
memo 39:20
50:20 51:6
74:19
memory 43:9,21
44:9 58:13
66:11
mentioned 8:19
mentioning
67:12
merged 93:20
merit 43:15
met 63:1,5,7
Michelle 87:3,12
87:15,21 88:3
88:4
MIDDLE 1:2

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **military** 15:4,15 | **names** 71:6 | 42:6 43:2,10 | 111:4,8 112:18 | 84:8 |
| **mind** 39:17 40:8 | **NANCY** 1:5 | 43:13,16 44:11 | 113:12,15,22 | **numerous** 65:1 |
| 48:8 | **narcotics** 17:19 | 45:5,8,10,21 | 114:4,16,20 | 66:14 67:2 |
| **mine** 44:9 83:11 | 17:20 | 45:23 46:3,8 | 115:1 116:8,12 | |
| 84:7 | **narrowly** 8:15 | 46:19,21 47:3 | 116:16,20 | **O** |
| **minute** 26:19 | **nature** 20:21 | 47:10,13,17 | 117:4,8,11,16 | **oath** 39:19 86:12 |
| 54:4 65:9 | 21:6 100:7,15 | 50:7,18,20 | 117:19 118:8 | 87:17,17,19,20 |
| 123:5 131:14 | 121:15 122:17 | 51:1,5,10,13 | 118:22 119:13 | **object** 6:21 7:19 |
| **misapplying** | 131:10 | 53:8,23 55:8 | 119:22 120:5,7 | 10:23 11:5 |
| 117:1 | **necessarily** | 55:11,15 56:2 | 120:13 122:1 | 17:5 18:16 |
| **mischief** 77:9,13 | 30:10 45:4 | 56:10,20 57:18 | 122:22 123:3,8 | 19:19 21:3 |
| 77:14,23 78:5 | 51:1,4 74:2 | 58:2 59:4,17 | 125:3,5,10,13 | 22:11 25:7 |
| 78:10 | **necessary** 5:4 | 60:1 61:2,4 | 125:19 126:2 | 29:9 31:4,7,20 |
| **misconduct** | 14:9,11 | 62:4,7,22 | 126:10,22 | 31:23 32:7,13 |
| 23:10 26:8,11 | **necessity** 71:1 | 63:12,20 64:3 | 127:11 128:2,4 | 32:20 33:3,19 |
| 26:15 31:2,6 | **need** 3:10 7:8 | 64:7 65:5 66:4 | 128:17 129:13 | 36:5 41:23 |
| 49:21 | 37:11 90:3 | 66:19,22 67:10 | 129:16,21 | 42:6 43:10,13 |
| **misdemeanor** | 94:23 96:17,20 | 68:6,11 69:11 | 130:3,8 131:13 | 43:16 45:21,23 |
| 116:19 117:7 | 102:1 125:10 | 69:19 70:4,20 | 131:19,22 | 46:11,19 47:3 |
| **Mobile** 2:5 | 127:1 | 71:13,15,21,23 | **never** 20:17 | 50:7 53:8,23 |
| 14:16 | **needed** 108:8,14 | 72:4,7,9,11,15 | **new** 33:8 94:15 | 55:8 56:2,2,3 |
| **Monday** 40:5,11 | 121:17 124:6 | 74:19 75:6,11 | **nicely** 9:4 | 56:10,20 57:18 |
| **money** 27:15 | 129:8 | 75:15,22 76:22 | **Nicholson** 67:20 | 58:2 59:4,17 |
| **month** 16:19 | **needs** 9:18 19:5 | 77:2,12,16,20 | 67:21 68:1,4 | 60:1 62:22 |
| **months** 10:12 | 38:18 47:8 | 77:22 78:4,12 | 68:20 69:17 | 63:12 65:6 |
| 14:7 120:18 | 51:14 | 79:9,14 80:11 | 70:9,14 | 67:10 68:6,11 |
| **morning** 40:21 | **NELSON** 2:7 | 80:15,19 81:11 | **non-criminal** | 69:11,19 77:12 |
| **motion** 4:20 5:5 | 4:1 5:21 6:21 | 81:13,15 82:4 | 28:12 30:4 | 79:9 80:11 |
| **mouth** 32:20 | 7:8,17,23 8:5 | 82:10,12 83:15 | **non-police** 30:6 | 81:11 84:5 |
| 37:3 | 10:23 11:5 | 83:18 84:2,5 | 124:23 | 86:18 87:5 |
| **mouthed** 50:4 | 12:19 17:5,8 | 84:10,12,16,19 | **North** 2:9 | 97:11 101:19 |
| **mouthful** 99:21 | 18:16,20 19:3 | 86:18,20 87:5 | **nose** 83:23 | 106:23 108:2 |
| **move** 32:20 | 19:8,19 21:3 | 87:8,13 88:17 | **notice** 7:2 15:7 | 109:6 111:4,8 |
| 47:12 120:7 | 22:11 24:1 | 89:8,21 90:19 | 28:22 29:8,16 | 113:12 114:16 |
| **municipal** 35:4 | 25:3,7 26:3 | 91:1,5,9,13,16 | 54:17,22 55:6 | 118:22 120:13 |
| 35:21 36:16 | 27:9 29:9,11 | 91:20 92:4,15 | 57:5 58:6 | 122:1,22 123:3 |
| 88:6 | 29:17 31:4,7,9 | 92:21 94:4,23 | 87:21 | 125:5,13 126:2 |
| | 31:20,23 32:7 | 95:22 97:11,14 | **notified** 119:4 | 126:10,12,22 |
| **N** | 32:13,17 33:3 | 101:19 102:2,6 | **November** 4:20 | 127:11,11 |
| **N** 1:19 | 33:19 34:4,7 | 103:3,12,19 | **no-contact** | 128:2,17 |
| **name** 4:10 6:8 | 34:11 35:5,11 | 104:3,7,13 | 115:12 122:6 | 129:13,13,21 |
| 48:15 53:1,1,4 | 36:5,11 37:15 | 105:1 106:23 | 127:8 | 130:3,8 |
| 67:16 76:12 | 38:16 39:11,18 | 108:2,15,18 | **number** 8:23 | **objected** 123:10 |
| 126:13,14 | 40:22 41:3,23 | 109:6,10,15,19 | 26:1 41:9 61:3 | **objection** 35:6 |

# FREEDOM COURT REPORTING

82:5,10 83:12
**objections** 3:9
   3:10
**objective** 18:14
   19:7 20:16,19
**objectively**
   19:16
**obtain** 121:17
**obtained** 59:20
**obviously** 70:22
**occasion** 73:4
**occurred** 6:16
   90:20 100:7
   104:4
**October** 1:20
**offense** 100:17
   106:4 107:12
   107:15 117:5
   130:19
**offenses** 107:4,8
**offer** 19:11
**offered** 3:12
**office** 6:9 68:22
   76:4 82:16,20
   83:8,10 87:9
   88:5,8 97:10
   97:23 98:4,13
   98:16 103:2,5
   127:5 128:19
**officer** 6:8 9:9
   9:14,16 10:4,5
   10:6,8,11,14
   10:15 14:8
   15:9,12,18,20
   16:1 19:2
   20:18,23 21:5
   21:13 30:6
   67:4 125:1
**officers** 6:13
   14:19 15:3
   21:6 30:20,21
**official** 4:15
**Off-the-Record**
   88:2 131:15

**Oh** 12:7 21:10
   49:20 107:21
   110:3 116:4
   132:3
**okay** 7:11 11:3
   14:4 16:6
   17:23 18:22
   26:18 30:8
   31:8 34:7
   36:17 42:4
   43:4 49:20
   53:6 55:15
   61:9 62:8,12
   62:14 64:9
   65:17 68:13
   72:6 76:15
   82:2 92:1,21
   92:22 93:19
   94:3 102:8
   104:17 105:3
   110:23 114:18
   115:1 132:2
**old** 9:10,10
   44:14
**once** 17:11 18:4
**ongoing** 99:20
   103:7 111:17
   112:11 115:15
   122:8 124:7
   125:6 130:18
**onset** 18:7
**on-the-job** 18:7
**operating** 29:3
**operations** 12:1
**opinion** 59:10
   65:19 69:16,19
   98:15
**opposed** 67:7
**opposing** 79:19
**option** 65:19
**order** 5:4 43:18
   95:3
**ordered** 45:16
   45:20

**orders** 42:11
**organizational**
   11:10,15 12:22
**original** 5:13,14
   41:12
**outside** 30:8,14
   97:4
**overstepped**
   52:12
**owned** 30:23

### P
**page** 40:3 45:10
   45:11 61:3,4
   84:4,6,8,15
**pages** 71:13,14
   84:13
**paper** 76:12
**paragraph** 61:6
**paraphrase**
   49:17 65:14,14
   130:16,16
**paraphrasing**
   49:16 52:11
   79:16
**Pardon** 119:16
**Parrish** 11:22
   12:14 39:9
   40:12
**part** 8:6 22:9
   23:6 31:22
   40:2 46:6 48:2
   55:10 56:5
   57:10 59:7
   66:8,12 72:16
   83:13 86:9
   88:4 106:10,12
   129:9
**partial** 5:5
**particular** 17:2
   22:7 33:9
   72:11,16 83:3
**parties** 3:3,17
   52:21 73:12,14

100:3
**parts** 46:4
**party** 3:20 27:7
   48:9,10 52:22
   53:3
**passage** 43:18
   43:20
**patrol** 12:13
   17:9
**pause** 65:8 66:3
   67:22 82:3
   85:14,19 87:23
   100:4 104:23
   107:6 114:19
   115:2 122:11
**pay** 31:17
**penalty** 113:10
**pending** 115:8
**people** 9:15 20:2
   28:21 39:5,7
   52:22 58:22
   63:11 67:8
   79:23 80:4
   82:15 94:20
   95:11 96:3,5,7
   96:8,17 99:12
   99:18 100:2,14
   110:8 112:12
   112:20 114:14
   126:18 129:19
   129:23
**percent** 7:5 9:3
   16:5,11 21:15
   27:12 47:18
   124:5
**period** 123:18
**person** 39:10,17
   40:10 67:17
   101:7 112:6
**personal** 28:6
   80:21,22 97:19
**personally** 28:8
   94:10
**personnel** 69:23

70:16 99:16
   100:1,19,23
   101:2 106:6
   107:21 108:1
**persons** 98:12
**Phelps** 118:9
**phone** 67:5
**photography**
   20:11
**pick** 95:1
**piece** 72:11
**place** 6:11 29:22
   36:1 68:20
   115:13 120:3
   126:16
**plain** 78:14,16
**plaintiff** 7:7
**Plaintiffs** 1:7 2:2
   2:13 41:9 45:8
   85:4,5 94:6
**Plaintiff's** 41:6
**Plaza** 2:8
**plead** 64:13
   65:21
**please** 64:8
   99:22
**pleasure** 23:16
**point** 20:17 22:3
   35:12 49:2
   55:14 72:9,15
   85:11,18 92:20
   99:16 100:16
   112:2 117:10
**police** 10:2,6,9
   10:14,15,19,20
   11:11,12,13,16
   13:4,6,7,10,18
   13:19 14:8,19
   14:22 15:2
   20:18,23 21:4
   23:7,7,9,14,16
   23:17 26:23
   27:5 28:11,14
   28:17 30:7,9

# FREEDOM COURT REPORTING

30:15,20,21
54:8 69:10
73:9 74:20
86:7 111:22
112:1,2,3
115:20
policy 58:6
99:17 106:15
politically 24:17
polygraph 20:13
portion 5:8 23:6
portions 5:4
position 13:23
34:6 60:8
positive 27:23
41:5 89:13
94:22 124:22
positively 47:18
possibility 26:8
56:8,12 124:5
possible 49:21
56:16
possibly 40:12
49:11 98:13
potential 54:9
Powell 74:22
118:2
power 113:21
114:6,13
practical 5:1
practice 113:4
practices 113:17
precleared
124:8
prefer 113:10
pregnant 33:15
75:17
preparation
44:3
prepared 7:13
7:16 51:11
118:1,10
preparing 44:2
present 81:6

89:10,14 115:6
presently 11:18
presumption
43:12,14
pretty 5:12
28:15 52:10,16
124:16
primary 14:5
principal 76:14
printed 85:21
prior 7:12 9:3
33:7 34:2,4
35:3,20 36:14
48:20 54:16,23
55:1,2,3 80:4
prisoners 9:17
private 15:8,12
15:17
privately 30:23
probably 21:17
36:10,12 40:13
58:10
probation 67:4
procedure 3:5
3:15,21 29:3
process 9:19
promoted 16:9
16:16 17:1
propensity
55:18
protect 58:15
prove 117:10
provide 38:21
39:5
provided 3:14
3:20 100:2
provides 5:13
providing 52:13
province 44:2
public 61:23
publication
85:23
published 85:17
punishment

53:21
purpose 3:13
14:6 57:4,7,8
58:18 68:19
77:22 78:12,15
78:18 92:18
purposes 34:23
41:13
pursuant 1:16
3:4 28:10
45:13 46:5,17
110:16,23
113:3
pursued 77:9
put 21:14 33:1
38:20 69:23
76:7 87:20
93:4 112:16
putting 31:16
32:8 93:3
p.m 1:21 132:4

——— Q ———
question 9:5
19:4 20:22
22:12 32:16,18
32:21 34:19
35:14 40:14,16
42:1 43:21
46:2,5 47:10
58:4 61:8,13
61:14,14 63:15
66:5,12,22
67:13 72:17
82:7 85:22
92:4 97:15,17
113:23 114:5
117:12,14
122:23 123:11
126:3 129:14
130:10
questioned
59:19
questioning

89:18
questions 3:9,10
57:12 61:16
98:8 104:16
110:17 131:16
131:17,21,23
quickened 82:1
quite 8:3,11 54:8
111:21
quote 60:21,23
65:10 100:19
121:18

——— R ———
radio 13:8
raise 126:11
Ralpeje 38:11
49:23 50:16
51:16,23 52:1
52:9 63:20,21
63:22 64:10,11
64:16,20,22
65:7 107:14
108:10
Ralpeje's 64:18
65:10
rank 14:23
15:10 16:3
17:10,11
ranks 15:2,3
Rapaport 63:19
Rapelje's 65:17
66:9
rapport 60:22
62:10,16
reach 81:3
read 4:3,13 30:1
38:22 42:14
44:18,21 47:20
58:12 61:6,8
63:1 65:11
70:9,12,18,22
71:7,9,11,12
72:2,22 86:14

105:17 130:17
131:8
reading 61:2
71:1 124:19
real 62:18
realize 99:4
really 10:2
61:20 66:6
106:20
reason 67:14
78:12 122:7
reasonable
128:1,9,10,11
128:12,14,16
129:10,15,17
129:20 130:2,4
recall 6:2 7:12
18:13 21:20
25:18 32:21
33:22 37:13
38:7,14 43:21
49:8 63:23
64:1,7,8 68:3
69:21 70:2
73:13,17,19,22
100:10 105:23
123:23 131:9
receive 115:18
received 7:2
57:1 96:9
recommend
99:11,14,15,23
100:16 106:3,7
recommendati...
106:5
recommending
53:21,22
record 4:1,10
5:7 29:17,21
34:14 38:17
43:22 44:22
50:23 55:16
56:6 62:8
63:23 70:5

# FREEDOM COURT REPORTING

Page 145

72:22 83:13
88:1 92:15
103:22,23
109:12,16,20
115:3 116:8
117:11 131:5
131:13
**recorded** 80:7
**records** 11:20
12:15 44:3,12
117:2
**reduced** 58:12
**Reeves** 28:15
**refer** 122:9
**reference** 85:18
112:11 121:20
**referring** 11:12
22:5 38:10
51:18 62:20
74:19 85:15
108:15 115:22
**reflect** 43:19
50:9 115:3
**refrain** 105:9
122:12
**refresh** 43:19
**regarding** 74:20
76:6
**regards** 57:14
64:11 98:9
107:10
**regulation** 23:19
**regulations**
100:20 101:1,3
**relate** 26:15
**relates** 26:9 33:5
57:12 59:19
74:23 100:20
120:19,20
126:4
**relationship**
123:21
**release** 75:1,13
76:1,5 77:4

79:5 83:7 86:9
89:5 93:10
97:20 98:9
103:8,14
108:17,21,23
109:2,5,7
116:4,5
**released** 76:17
77:10 78:19
80:9 81:9
86:16 100:12
110:5,9
**relevant** 40:2
**rely** 66:11
**remain** 16:6
22:20
**remained** 16:1
**remains** 132:2
**remember** 7:15
8:16,21 9:1
12:20 14:17
16:4 21:1
28:23 29:7,10
29:11,12,19
37:9 38:18
39:2 42:1
49:19 60:8
65:16 67:23
68:13 74:6
94:11
**repeat** 127:1
**rephrase** 121:11
**replace** 123:11
**reply** 65:17
**report** 64:4,6
73:6,6,7,8,11
83:20 99:23
100:22,23
101:2 115:18
118:1,10,15,17
119:1,5,6,11
120:16 130:23
**reporter** 1:17
3:7 4:22 5:3,11

44:21 57:23
72:13
**represent** 8:11
8:14
**representing** 3:3
3:17 8:3 49:14
**request** 37:13
38:14
**required** 57:17
**reserved** 3:11
**reserving** 5:7
**residence** 85:10
**resources** 13:11
**respect** 60:9
99:18 101:1,3
106:21 107:3
**respond** 66:4
**responded** 65:12
**response** 9:4
35:9 40:14
41:5 61:20
79:18 82:1
89:13 94:22
115:7 124:22
**rest** 62:9
**result** 103:6
113:18
**review** 5:15
28:23 44:3,23
51:8,14 65:3
81:15,16
**reviewed** 44:12
50:23
**reviewing** 45:6
50:18 51:12
115:8
**rewrite** 107:20
**Rickey** 74:7
76:11,13 77:7
81:10,16,21
82:20 90:9,12
96:13,16 97:7
98:2,4 101:18
101:23 102:12

102:15 103:9
**rid** 51:20,21
52:3
**right** 4:13 5:8
10:17 13:15,16
18:2 27:12
28:1 35:16
45:13,15 48:12
48:18 49:8
55:12 61:22
66:17 72:3
73:20 85:1
93:4,19 94:1
106:22 107:23
112:17 115:10
121:7 123:23
128:20
**rights** 58:16,21
86:14
**Robert** 21:16
**role** 53:7,11
**ROSE** 1:9
**rule** 57:17 58:6
107:21 113:5
128:12
**rules** 3:5,14,20
4:13 99:17
100:1,19,23
101:2 106:6
**ruling** 3:12

─────────
**S**
**sacrificing** 58:20
58:21
**SAITH** 132:6
**sanction** 53:22
70:15
**sat** 5:17 6:2 8:18
9:2
**satisfied** 73:1
**saw** 62:21
**saying** 7:9 18:19
22:8,17 29:14
34:13 47:22

48:6 54:23
55:13 66:7,13
67:4 81:12
92:6 105:12
130:4,10
131:19
**says** 20:15 42:4
63:1,8 122:19
123:9
**school** 13:11,13
20:7,12,13
29:6
**schools** 18:10,13
20:9
**scoffing** 70:7
**scope** 75:4 76:2
76:15,18 78:22
**screening** 23:11
**seasoned** 18:8
21:5,7,8,13
22:1
**second** 8:18,20
50:17 73:23
75:19 82:2
87:22
**secondhand**
96:15
**secretaries**
12:17
**secretary** 12:17
**security** 9:9,13
10:7,11
**see** 6:15 12:21
50:3 53:12,16
63:16 82:4
92:5 94:10
96:6 112:14
**seek** 49:23
**Sellers** 87:3,12
88:3,5
**Selma** 14:15,18
**send** 18:10
**sends** 48:1

# FREEDOM COURT REPORTING

sent 73:9
separate 10:19
    11:7 33:12
    83:6 93:21
separates
    125:18
sergeant 16:10
    16:15,21 17:1
    17:10,17 19:17
    19:20
serve 10:10
service 25:15
services 24:13
    24:15
sessions 8:10
set 23:19
setting 20:14
settle 38:12
setup 121:19
Shaun 51:18,19
    51:20,22 52:3
    61:9,19
shelter 13:6,6
Sherry 1:16 3:6
she'd 107:21
shield 59:1
shifts 17:16
shop 13:9
show 39:11,13
    40:17,22 68:14
    85:4
show-cause
    121:18,20
sic 14:22 48:19
side 32:5
sign 4:3,14 5:2
simply 55:14
single 8:15
sir 4:16 5:18
    9:12,21 10:1
    10:18 11:14
    14:10,12,15,20
    15:14,17,21,23
    16:15 24:7,10

24:21 33:17
34:8 36:20,22
37:8 38:13
41:10 47:6
53:14 54:1
59:8 60:2,4,20
61:17 70:3
74:5 78:21
79:1,3 80:3,6,8
85:11 87:18
94:9,14,19
95:2,7
sit 51:13 70:21
    117:8
site 74:8 77:8
    81:17,18,20,21
    82:8 85:18,21
    86:1 94:3,7,8
    94:10,13 95:3
    98:11,14
    102:20
sitting 7:13
    39:20
situation 127:12
six 10:12 14:7
    50:20
Sixth 2:9
slick 55:21
slightly 34:17
social 123:21
socialized
    123:16
solicit 53:16
soliciting 53:11
somebody 7:13
    30:6 42:20
    58:19 95:4,4
    95:10,10,15
    97:9 98:3
    102:13 103:21
    112:4 125:7
somebody's
    58:15
soon 4:23

sooner 32:20
Sorrells 21:16
sorry 5:22 27:19
    36:21,23 48:13
    50:5 63:22
    77:1 84:13
    95:2,2 122:23
sort 59:6 79:11
    105:18 106:20
sounds 29:14
SOUTHERN
    1:3
speak 4:6 7:8
    29:18 42:7
    64:5 73:4,6
    98:21 101:9
    111:16
speaking 109:22
    129:3
special 18:4
specialized
    18:11
specific 22:6
    63:4 72:5 90:4
    131:10
specifically 9:2
    24:5,10 51:15
    58:10 68:14
    78:9 100:10
speculate 86:20
speculating
    82:11 86:19,22
speculation
    81:13
speculations
    56:4
speculatory
    82:13
speed 16:14 46:9
    63:16 75:23
spending 67:6
spoke 24:5
    96:23 99:1
    100:5 101:6

129:1
spoken 99:8
    100:8,14
spouses 100:6
    100:15
staff 88:14 89:2
    89:5,12,19
    90:14 92:10
    93:18 96:2
    99:5
stamp 41:1,2
stand 79:15
standard 29:3
    43:14
start 15:7
started 15:19
    19:14 21:9,18
    22:1 23:2
    109:8
starting 15:17
state 1:18 3:8
    4:10 35:5
    38:16 58:10
stated 54:7 59:8
    83:9 106:5
    108:8 109:7
    121:17
statement 36:6
    39:23 40:2
    42:19 47:19,20
    53:3 55:3 56:3
    59:5 61:5
    62:10 64:19
    65:3,10,13
    66:9 74:7 89:1
    92:10 121:21
    131:7,8
statements
    20:11 49:12
    52:8 73:12,14
    73:15 125:15
STATES 1:1
status 25:10
    129:19,23

statute 23:18,21
statutes 79:4
stay 32:9 115:12
stayed 16:15
stipulated 3:2
    3:16
stipulation 1:16
    124:4
STIPULATI...
    3:1
Stokes 74:7
    76:11,13 77:7
    81:10,16,21
    82:20 90:9,12
    96:13,16 97:7
    98:2,4 101:18
    101:23 102:12
    102:15 103:9
stop 92:5
story 16:22
Stovall 6:8,14
straight 103:13
strategy 8:9
Street 1:19 2:4
strictly 122:12
strong 70:1
stronger 70:15
structure 11:10
    11:15 12:3
structured
    20:14
stuck 37:2
subject 101:12
    101:15,17,22
    102:10
subjects 30:18
    113:6
submit 5:8
    118:17
submitted 73:8
    118:1,15
subsequent
    57:16 58:23
    59:2

# FREEDOM COURT REPORTING

subsequently
5:9 94:12
118:2
**Suddenly** 92:14
**SUE** 2:7
**suggest** 72:20
114:13
**suggested** 45:16
45:19 128:7
**suggesting** 85:7
**suggestion** 47:1
70:7 122:21
**suing** 6:6
**Suite** 2:4
**summarization**
64:18
**summary** 5:5
73:16
**supervises** 69:4
**supervisor**
17:14,16 68:23
**supervisors**
42:12
**support** 5:5
**supposed** 76:2
76:15 78:22
122:4
**supposedly** 75:4
**sure** 7:5,22 8:3
8:11 9:3 16:5
20:6 21:4,15
29:5 32:19
34:12 40:23
46:21 50:19
71:2 73:20
105:20 119:23
**surrounding**
8:17
**suspect** 102:9
**suspended** 92:9
116:13
**suspension** 92:7
**suspicion** 125:8
**sworn** 4:5 10:4

**T**
**table** 82:7
117:12,14
**take** 7:10 9:20
18:4 20:11
46:8 64:8
68:17 70:8
91:18
**taken** 1:15 3:4,6
29:22
**talk** 48:23 49:2
77:4 78:13
79:23 80:4
87:13,14 91:22
92:13 94:4
95:13,16,19
96:17 98:18
101:11 103:17
109:3 119:9,14
119:17 130:14
**talked** 8:9 53:6
95:12,15 96:3
96:6,7,18
98:16 101:14
102:13 112:9
127:17 129:5,6
**talking** 10:17
18:17 19:13,23
20:1 22:15
26:20 31:9,12
38:3 44:8 55:2
64:17,17 67:7
67:17 75:3,7,9
75:12 78:9
79:21 80:4
83:15 86:3
88:18 89:6,8
89:21 93:9,12
94:5 96:1 99:5
107:22 108:22
110:6 113:7,16
115:23 116:6
118:6 120:1
127:4 130:20

**target** 33:2
**taught** 20:17
**technically** 8:2
8:11
**tell** 16:22 70:18
87:22 90:21
93:1 100:7,8
100:13 110:16
110:20,23
111:19 112:4
112:19 114:7
114:12 118:12
129:10
**telling** 52:14
**tells** 20:2
**temporarily**
92:12
**ten** 12:10 22:22
71:13
**tentative** 5:14
**tenure** 20:10
**term** 17:6 34:5
59:22 63:13
88:21
**termed** 107:14
**terribly** 102:2
**testified** 4:7
27:11 46:21
56:11 80:12
108:3 126:4
**testify** 36:11
91:9
**testifying** 65:6
66:19 108:6
**testimony** 41:4
42:7,9 45:1
58:22 66:15
69:12,13,13,14
70:20 72:12
79:15 101:20
102:9 109:17
**tests** 14:9
**Thank** 12:2
15:23 79:22

**thanks** 34:18
**theft** 27:15 28:3
**theories** 68:9
**thereabouts**
14:7
**thing** 15:12
19:13 44:19
51:19,21 59:9
67:5 75:3,3
103:15 131:6
**things** 20:21
43:19 46:10
71:19,19 75:23
90:5 93:3,20
100:6,15
102:16 106:21
119:13 120:7
125:18 131:9
**think** 9:13,15
17:4 21:5,11
23:2 28:2,7
29:2,17 31:18
31:22 34:9,13
34:14 38:6
39:7,16 40:14
52:19 53:15
54:2 57:7,8
58:12 59:6
61:20 67:19
68:22 71:17
76:12,13 83:1
85:12 86:11
87:4,8 91:1,11
91:13,16 93:6
93:16,23
104:11,13
119:2 120:2
122:20 123:1
125:10 126:9
126:20 127:8
129:15,17
**thinking** 13:16
14:16 16:2
114:22

**thinks** 31:15,23
**third** 39:10 40:9
100:2
**thirdhand** 96:15
**thought** 50:2
51:8 60:20
77:9 101:16
**thoughtful**
115:4
**three** 40:3
**ticket** 85:9 90:6
90:13 91:19
92:2 116:1,6
116:15,18
117:20,22
118:4,8 119:15
119:19,21,22
119:23 121:9
**ticket-fixing**
116:9
**time** 3:11,12 5:2
5:12 9:21 10:3
14:23 16:16
29:16 34:15
41:17,19 42:17
43:5,18,20
47:21 52:20
56:19 61:1
62:1,21 63:7
63:11 64:8,13
65:21 66:10
67:6,7 68:17
69:1,9 73:23
81:6 88:7,12
88:17,19 90:17
92:8 99:4,10
105:19 112:1
115:6 119:11
122:6 123:18
**times** 5:21,23
6:2 32:11,22
77:17 104:19
104:22
**today** 37:12

# 367 VALLEY AVENUE
# (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 148

| | | | | |
|---|---|---|---|---|
| 40:21 | trap 55:5,13,19 | 110:21 112:10 | 4:17 11:1 19:3 | violation 95:17 |
| told 21:17 43:1 | 55:23 | 112:21 114:15 | 19:5,22 20:7 | 98:18 99:2 |
| 48:10,14 50:13 | trial 3:19 | 116:9,12 | 31:5 34:12 | 100:3 101:3 |
| 51:16 52:4 | tries 112:16 | 117:20,21 | 58:14 59:5 | 106:4,9,11,14 |
| 54:6 62:16 | triggered 86:2 | 118:8,20 119:8 | 60:5 62:20 | 106:16 107:21 |
| 64:11,20,23 | trouble 41:18 | 119:9,17 | 78:7 88:22,23 | 108:1 |
| 65:19 66:8 | true 53:13,17 | 120:18,23 | 93:4 111:21 | violations 101:1 |
| 81:1 82:20 | 59:11 66:8 | 121:9,16,22 | 113:22 123:8 | vocabulary |
| 89:3 93:7,17 | 121:21 | 122:13 123:14 | 123:12 | 34:10 |
| 93:17 94:20 | truth 4:6,6,7 | 123:20 124:1 | understanding | vs 1:8 |
| 95:4,10,13,16 | 104:8 | 126:13,14,16 | 119:7 | |
| 96:23 97:5 | truthfully 57:11 | 126:18,19 | underway | **W** |
| 100:5,12 | try 4:22,23 | 129:5 130:17 | 105:11 122:14 | wait 123:5 |
| 107:11,18 | 19:11 55:13 | 130:20 131:1,2 | unfair 40:13 | want 4:12 20:6 |
| 112:7,8 116:2 | trying 22:10 | 131:5,8,10 | unit 10:20 22:21 | 28:7 36:8 |
| 118:14 123:23 | 34:11 46:8,9 | Turner's 92:11 | 23:1 25:2 | 39:12 41:13 |
| 126:19 130:21 | 55:5,14,19,20 | 126:13 131:8 | UNITED 1:1 | 44:18 46:11,15 |
| 131:2 | 55:20,21 75:22 | twice 6:1 77:19 | unlawful 75:1 | 49:23 55:17 |
| tomorrow 40:21 | 76:21 93:1 | twist 62:23 | unquote 60:21 | 62:6,7 65:14 |
| tooth 44:14,15 | 96:12 108:4 | two 8:10 13:1,22 | 61:1 121:18 | 69:22 70:11,21 |
| top 13:15 | 109:15 111:6 | 33:4,8,13,13 | unrecorded | 71:2,9,11,12 |
| total 16:22 | 111:18 113:8 | 39:5,7 46:4 | 56:16 | 71:20 72:9,15 |
| totality 20:20 | 113:13,20 | 72:1 93:3,21 | unsworn 10:8 | 83:21 92:19 |
| totally 93:8 | 114:1 120:7 | 102:16 104:18 | unverified 5:8 | 104:6,7,8,9 |
| 125:14 | 129:7 130:16 | 104:21 110:17 | 5:11 | 109:11 113:6 |
| track 16:13,20 | turn 96:7 | 120:18 125:17 | upkeep 9:19 | 119:22 |
| 92:5 94:1 | turned 116:14 | 128:14 | use 4:19 5:3 | wants 72:22 |
| 96:12 | 118:23 119:5,5 | type 28:3 74:9 | 24:17 78:4 | 131:17 |
| trained 19:9,15 | Turner 53:1,5 | 93:5 99:16 | 88:21 | warned 80:2 |
| 19:18,21 20:1 | 74:10 75:2,11 | 125:2 127:23 | useful 58:17 | warning 56:8 |
| 21:1,2 | 75:14 76:2,6 | 131:3 | usually 15:17 | 57:5 |
| training 9:20 | 76:18 77:5 | types 68:9 | utilities 27:14,21 | wasn't 7:6 10:4 |
| 13:10 14:11,18 | 81:5,9,19,22 | | 27:22 | 19:23 25:23 |
| 18:4,8,12 20:4 | 82:9,18 85:7 | **U** | | 26:6,6,9 36:2 |
| 21:12,12 | 85:12 87:14 | Uh-huh 41:5 | **V** | 48:9 50:2 |
| trainings 19:15 | 89:22 90:2 | 89:13 94:22 | vague 24:6 | 54:12,13 69:2 |
| transcript 2:14 | 91:23 92:3,8,9 | 124:22 | verb 46:7 | 69:2 70:13 |
| 39:23 45:4,7 | 93:4 101:9,12 | ultimately 53:15 | verbal 103:5 | 79:8 81:1,6 |
| 49:4 51:4 | 101:14 102:14 | umbrella 13:7,9 | verbally 89:3 | 83:8,9 88:7,11 |
| 72:12,17,23 | 102:18 103:3,4 | 30:8,14 111:15 | view 22:3 53:7 | 93:13,14 94:2 |
| transcripts | 103:17,19 | unauthorized | 53:11 | 106:5 122:3 |
| 44:23 73:18,19 | 104:1,20 105:6 | 75:1 | violated 99:8,12 | way 19:12 22:7 |
| transferred | 105:10 108:22 | uncertain 115:7 | 99:17 100:1 | 22:19 24:6 |
| 17:19 | 109:22 110:6 | understand 4:12 | 102:19 113:19 | 40:15 41:14 |

# FREEDOM COURT REPORTING

53:18 68:3
90:23 91:18
103:22 121:13
**web** 74:7 77:7
81:17,18,20,21
82:8 85:18,21
86:1 94:3,7,8
94:10,13 95:3
98:11,14
102:19
**Wednesday** 1:20
**week** 65:22
**went** 14:13
17:14 18:1,2,5
19:15 20:11,12
23:3 29:6
34:14,16 103:8
**weren't** 10:2
22:23
**we'll** 54:4
**we're** 10:16
67:17 72:21
85:23 91:21
93:9 94:5
107:22 115:23
116:6 119:13
120:1 127:4
**we've** 13:12
71:23 120:2
**whatsoever**
124:5
**White** 39:8,15
39:17,21 40:10
40:11 48:17,19
**wife** 128:5
129:10 130:5
**witness** 4:2,5
6:20 7:1,11
18:18,22 26:5
39:19 59:16
64:9 70:5 78:3
78:6 84:23
91:16 114:18
114:22 115:4

120:4,6
**witnesses** 30:18
59:19,23 60:6
113:7
**word** 45:15,19
77:15 78:5,8
111:21 120:10
**words** 24:18
37:3 38:23
49:15,17,19
52:11 65:15
78:14 121:19
**work** 23:10
31:16 47:23
85:10
**worked** 17:20
60:23 62:1
126:15 127:5
128:18
**working** 21:19
22:1 111:23
**worry** 110:10
**wouldn't** 54:18
54:19 56:22
60:3 79:20
82:23 83:6
127:22
**would've** 57:2
**write** 21:18
106:15
**writing** 88:15
**wrong** 33:20
37:2 70:18
77:21
**www.rickeyst...**
2:15

___ **Y** ___

**yeah** 20:23 26:5
30:12 38:12
45:9,11 53:2
55:1,3,10
57:21 65:5
67:20 71:10,14

82:12 86:10
96:10 116:11
120:4 123:1
132:3
**year** 14:1 16:17
16:18,19 17:17
17:21,21 18:2
21:18 36:21
38:1
**years** 9:1 16:9
22:22 44:16
50:21
**yesterday** 77:17
**y'all** 26:18,19,20
29:8,15 30:22
81:3

___ **1** ___

**1D** 15:4
**1F** 15:5
**1:05-CV-1172...**
1:8
**1:55** 1:21
**10th** 105:4,14
118:20 120:3
**100** 7:5 9:3 16:5
16:11 21:15
27:12 47:18
124:4
**126** 1:19
**1278** 41:2
**1281** 61:3
**14** 2:14 41:6,9
41:20 45:8
**15** 2:15 85:4,5
94:7 102:20
**15th** 105:3
**16th** 4:20
**1901** 2:9
**1985** 9:7
**1990** 16:2,10
**1991** 36:17,23
**1993** 21:21
**1994** 21:21

**1999** 23:3

___ **2** ___

**2nd** 118:18,21
**2001** 23:1 37:4,4
37:18,22 38:6
38:8 40:1
107:4,9,23
**2005** 74:4 105:4
118:18 120:5
120:12,15
**2007** 1:20
**23** 9:1
**2400** 2:8

___ **3** ___

**3:30** 71:23
**31** 1:20
**35203** 2:9
**36604** 2:5

___ **4** ___

**4:40** 132:4
**40,41,35** 2:14
**415** 2:4

___ **6** ___

**6** 61:3,4

___ **8** ___

**80s** 16:5
**84,93,102** 2:15

___ **9** ___

**951** 2:4