# FREEDOM COURT REPORTING

### Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3           SOUTHERN DIVISION
 4
 5
      NANCY MARTIN and
 6    MARY BETH BRACKIN,
 7       Plaintiffs,
 8    vs.          CASE NO. 1:05-CV-1172-MEF
 9    CITY OF DOTHAN and
      JUDGE ROSE EVANS-GORDON,
10
         Defendants.
11
12
13
14           **********
15       DEPOSITION OF EUNICE KNIGHT, taken
16    pursuant to stipulation and agreement before Sherry
17    McCaskey, Certified Court Reporter and Commissioner
18    for the State of Alabama at Large, in the Dothan
19    Civic Center, 126 N. Andrews Street, Dothan,
20    Alabama, on Thursday, November 1, 2007, commencing
21    at approximately 9:10 a.m.
22           **********
23
```

### Page 2

```
 1           APPEARANCES
 2    FOR THE PLAINTIFFS:
 3    ISHMAEL JAFFREE, ESQUIRE
      Jaffree Law
 4    951 Government Street
      Suite 415
 5    Mobile, Alabama 36604
 6    FOR THE DEFENDANTS:
 7    CAROL SUE NELSON, ESQUIRE
      Maynard, Cooper & Gayle
 8    Attorneys at Law
      2400 Amsouth/Harbert Plaza
 9    1901 Sixth Avenue North
      Birmingham, Alabama 35203
10
11           **********
12       EXAMINATION INDEX
      EUNICE KNIGHT
13       BY MR. JAFFREE        4
14       BY MS. NELSON        62
         BY MR. JAFFREE       65
15
16           **********
17
18
19
20
21
22
23
```

### Page 3

```
 1           STIPULATIONS
 2       It is hereby stipulated and agreed by and
 3    between counsel representing the parties that the
 4    deposition of EUNICE KNIGHT is taken pursuant to the
 5    Federal Rules of Civil Procedure and that said
 6    deposition may be taken before Sherry McCaskey,
 7    Certified Court Reporter and Commissioner for the
 8    State of Alabama at Large, without the formality of
 9    a commission; that objections to questions other
10    than objections as to the form of the questions need
11    not be made at this time but may be reserved for a
12    ruling at such time as the deposition may be offered
13    in evidence or used for any other purpose as
14    provided for by the Federal Rules of Civil
15    Procedure.
16       It is further stipulated and agreed by and
17    between counsel representing the parties in this
18    case that said deposition may be introduced at the
19    trial of this case or used in any manner by either
20    party hereto provided for by the Federal Rules of
21    Civil Procedure.
22           **********
23
```

### Page 4

```
 1           EUNICE KNIGHT
 2       The witness, having first been duly sworn
 3    to speak the truth, the whole truth, and nothing but
 4    the truth, testified as follows:
 5           EXAMINATION
 6    BY MR. JAFFREE:
 7    Q. Would you state your name for the Record?
 8    A. Eunice Knight.
 9    Q. I met you before, right?
10    A. I don't think so.
11    Q. Oh, it must have been Lavera. I was going to
12       say, you sure do look different if I met you.
13           Did you employ an attorney to assist you
14       in the preparation of this deposition?
15    A. Did I employ?
16    Q. Uh-huh (positive response).
17    A. I did not.
18    Q. Do you perceive the city attorney to be your
19       attorney?
20    A. I do.
21    Q. Based on what? Have any claims been brought
22       against you?
23    A. No.
```

1 (Pages 1 to 4)



# FREEDOM COURT REPORTING

### Page 5

1  Q. Do you think the city attorney represents
2     every employee of the City of Dothan?
3  A. Do I think that?
4  Q. Uh-huh (positive response).
5     MS. NELSON: Object to the form as to what
6     she thinks.
7  Q. Well, if you can answer that.
8     MS. NELSON: If she knows.
9  A. I don't know that the city attorney does, but
10    I would assume that the city attorney does
11    represent the employees.
12 Q. It was suggested before we went on the Record
13    that you wanted to read and sign the
14    deposition.
15 A. That's correct.
16 Q. Did you know anything about reading and
17    signing the deposition before this week?
18 A. Did I know anything about it?
19 Q. Do you know what that meant?
20 A. It was -- no, not before this week, I didn't
21    know anything. But I was asked if I wanted to
22    read my deposition, and I stated I did.
23 Q. And why do you want it to be read?

### Page 6

1  A. I want to be sure that's what was -- what's
2     written in the deposition is what I said.
3  Q. So you think that the transcriber may make
4     mistakes?
5     MS. NELSON: I object to your questioning
6     her on this. She has that right. I
7     told her that five minutes ago.
8     MR. JAFFREE: Oh, five minutes ago. Okay.
9  Q. Just background. Of course, I have no
10    objection to your reading and signing the
11    deposition.
12       I'm going to ask you a question that I've
13    asked others who have also asked for that
14    privilege. In the interest of time, my people
15    didn't ask for that privilege. But if a
16    deposition in a draft form could be given to
17    you, let's say, within four days, how much
18    time do you think it would take for you to
19    read, sign it, and send it back to the person
20    from whom it was sent?
21    MS. NELSON: Object to form. I have no
22    idea how long we're going to be here
23    today nor does she. But if she can

### Page 7

1     answer that, she can certainly --
2     MR. JAFFREE: Well, I appreciate your
3     trying to help her out.
4  Q. But let me add to that hypothetical and say
5     the deposition is already in length and 50
6     pages. I'm just trying to get some idea of
7     how long you think it would take you to read
8     it and get it back to --
9  A. I cannot --
10 Q. -- the court reporting services?
11 A. I cannot answer that question.
12 Q. Do you think it would take more than a day?
13 A. I can't answer that question.
14 Q. More than a week?
15 A. I can't answer that question.
16 Q. Could you commit to getting it back within a
17    week?
18 A. I cannot commit to that because I do not know.
19 Q. I see. Where are you currently employed?
20 A. With the City of Dothan Judicial Department.
21 Q. And what is your official title?
22 A. Magistrate.
23 Q. And how long have you been a magistrate for

### Page 8

1     the City of Dothan?
2  A. Four years.
3  Q. Do you recall when you were first hired?
4  A. Repeat the question.
5  Q. Do you recall when you were first hired?
6  A. You mean the date?
7  Q. Uh-huh (positive response)?
8  A. Yes.
9  Q. When was that?
10 A. Mid December.
11 Q. December of what year?
12 A. Of 2004.
13 Q. You said mid December?
14 A. Yes.
15 Q. Do you know who was responsible for your hire?
16 A. I was interviewed by the judge and a
17    personnel --
18 Q. Pardon?
19 A. I was interviewed by the judge and a group of
20    other personnel people.
21 Q. The judge. Are you referring to Judge Gordon,
22    the defendant, at least one of the defendants
23    in this action?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  MS. NELSON: I didn't understand your
2  question.
3  Q. When you say the judge, are you referring to
4  Judge Gordon, the defendant in this case?
5  A. I am referring to Judge Gordon.
6  Q. Were you acquainted with Judge Gordon prior to
7  your interview?
8  A. No.
9  Q. Do you know who else was in the running for
10  the position when you first applied?
11  A. I do not.
12  Q. How did you learn that there was a position
13  available?
14  A. I just applied. I didn't know a position was
15  available, but I applied.
16  Q. When did you apply?
17  A. Probably in 2002 or 2003. And you get put on
18  a register.
19  Q. Did somebody contact you and tell you that
20  there was a position available?
21  A. No, they did not.
22  Q. So how many months was it between the time you
23  applied and the time you were called in for a

Page 10

1  interview?
2  A. I do not recall.
3  Q. Your best guess?
4  A. I do not recall.
5  Q. Well, let's see. You first applied when?
6  MS. NELSON: Asked and answered.
7  Q. Well, could you answer it again? You first
8  applied when?
9  A. I said I do not recall, but I think it was in
10  2002 or 3.
11  Q. And you don't know what month you applied?
12  A. No, I do not.
13  Q. Okay. Are you familiar with a person by the
14  name of Melissa White?
15  A. Yes, I am.
16  Q. Is she related to you?
17  A. No, she is not.
18  Q. Who is she?
19  A. She's a very friend -- close friend of mine,
20  church member, ball team member, good friend.
21  Q. Were you made aware in 2005 that there was an
22  investigation being conducted by internal
23  affairs, concerning Ms. Turner?

Page 11

1  A. If it was in 2005, I was aware of that.
2  Q. How did you first become aware of that?
3  A. There was a meeting that was called by the
4  judge to inform the magistrates that there was
5  an investigation going on.
6  Q. Were you aware of the investigation prior to
7  that meeting?
8  A. No.
9  Q. Do you know on what date that meeting
10  occurred?
11  A. I do not recall.
12  Q. If I suggested it occurred on March the 10th,
13  2005, does that date sound like it could have
14  been correct?
15  A. I do not recall the date.
16  Q. Did you prepare for this deposition in
17  advance?
18  A. No.
19  Q. Okay. You didn't talk to anyone about your
20  deposition?
21  A. What do you mean, talk to anyone?
22  Q. What do I mean? What do you think I mean,
23  talk to anyone?

Page 12

1  A. I have no idea. That's why I asked.
2  Q. Did you speak to anyone about the fact that
3  you had --
4  MS. NELSON: I told --
5  Q. -- come here for a deposition?
6  MR. JAFFREE: If I can get -- I know you
7  like to testify.
8  Q. But if I could just get some testimony from
9  you.
10  A. I just want to be sure to clarify what you're
11  asking me.
12  Q. I'm not trying to be opaque. I'm just trying
13  to ask questions the best I can.
14  Did you discuss the fact that you were
15  going to sit for a deposition with anyone?
16  A. I was advised that I was going to have a
17  deposition.
18  Q. Did you discuss your testimony --
19  A. No.
20  Q. -- of the deposition with anyone?
21  A. No.
22  Q. You didn't prepare for the deposition in any
23  way other than being advised that you were

3 (Pages 9 to 12)



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 13

1  going to have one?
2  A. That's correct.
3  Q. Prior to the judge telling the staff that
4     there was an investigation of Mary Turner, had
5     you spoken with any police officers concerning
6     any ticket that Mary Turner may have been
7     involved in?
8        MS. NELSON: Object to the form. I'm not
9        sure what you're asking.
10 Q. Can I get an audible response from you?
11 A. Could you repeat it?
12 Q. Judge Gordon spoke with the entire staff at
13    some point and informed them that there was an
14    investigation of Mary Turner.
15 A. Okay.
16 Q. My question to you, prior to the judge having
17    this meeting, did you talk to any police
18    officer concerning Mary Turner's involvement
19    with a traffic ticket?
20 A. No.
21 Q. Did you have any independent idea what the
22    investigation was about that the judge
23    mentioned to the group?

Page 14

1  A. No, I did not.
2  Q. Do you recall whether or not the judge
3     instructed the group to not discuss the
4     investigation with anyone?
5  A. At the meeting?
6  Q. Yeah.
7  A. She did.
8  Q. I may destroy this man's name, but do you know
9     a Mr. Fondren?
10 A. No, I do not know him.
11 Q. Had you heard of him?
12 A. What do you mean, heard of him?
13 Q. The name Fondren. Let me find his full name.
14       (Brief pause)
15 Q. Theron Fondren. Theron Fondren, are you
16    familiar with him?
17 A. I have heard of him.
18 Q. Okay. Were you present when he visited the
19    magistrates' office on or about February the
20    20th of '04?
21 A. Not to my knowledge.
22 Q. You don't think you were present?
23 A. Not to my knowledge.

Page 15

1  Q. Were you present when he spoke with Mary
2     Brackin?
3  A. No.
4  Q. Are you quite certain of that?
5  A. I don't recall talking to anyone, so I don't
6     know.
7  Q. Do you know what he wanted when he came there?
8  A. No, because I didn't talk to him.
9  Q. Pardon?
10 A. No.
11 Q. You don't have a clue as to what he wanted?
12 A. No.
13 Q. Did you subsequently learn what he wanted?
14 A. No.
15 Q. Okay. From the date of your hire until June
16    the 1st, had you received any disciplinary
17    notices from Judge Gordon?
18 A. No.
19 Q. From the date of your hire until June the 1st,
20    2005, did you file any formal complaints
21    against Nancy with Kai Davis?
22 A. I have not filed a formal complaint, but I
23    spoke with Kai Davis.

Page 16

1  Q. When did you speak with Kai Davis?
2  A. I do not recall the date.
3  Q. What month did you speak?
4  A. I do not recall.
5  Q. What year did you speak with Kai Davis?
6  A. I do not recall the date.
7  Q. You don't recall the year?
8  A. No.
9  Q. You have no best guess as to what year it was?
10 A. I do not want to guess, but I do not recall
11    the exact date.
12 Q. Do you not trust your memory on any questions
13    that I'm asking you?
14 A. That's not the point, whether I trust my
15    memory. I do not recall the exact date.
16 Q. Who was present when you had this discussion
17    with Kai Davis?
18 A. Ms. McClain.
19 Q. You and Ms. McClain?
20 A. Yes.
21 Q. Upon whose initiative was it to go visit
22    Ms. Davis?
23 A. Judge Gordon.

4 (Pages 13 to 16)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  Q. Judge Gordon's initiative?
2  A. Yes.
3  Q. So you previously met with Judge Gordon?
4  A. Correct.
5  Q. Do you recall the date that you met with Judge
6     Gordon?
7  A. I do not.
8  Q. Do you recall the nature of the discussion
9     that you had with Judge Gordon?
10 A. The discussion was the treatment that Nancy
11    Martin was giving myself and Ms. McClain.
12 Q. You complained about treatment that you were
13    receiving from Nancy Martin?
14 A. Correct.
15 Q. Okay. Did you provide the judge with any
16    specificity, or did you just say treatment?
17 A. We discussed some issues.
18 Q. What issues did you discuss?
19 A. Issues concerning the magistrate duties.
20 Q. The magistrate duties?
21 A. That I had. And that's basically what it was,
22    the magistrate duties.
23 Q. Were these some new duties that you were

Page 18

1     given?
2  A. I do not recall the exact -- if it was the new
3     duties or old duties. I am not sure. But
4     some of them was new duties, probably.
5  Q. Do you recall how frequently Ms. Martin had
6     given you different duties to do?
7        MS. NELSON: Object to the form.
8  Q. Do you recall?
9  A. As far as our magistrate duties, we were in
10    line to change, I think, three to six
11    months -- every 90 days. Every 90 days, I
12    think we were changing duties. All the
13    magistrates.
14 Q. I think you may be in a position to help me a
15    little bit to narrow down the time.
16       Was this on or about the time that
17    Ms. Martin had given you some new duties that
18    you went and discussed this with Judge Gordon?
19 A. I'm not sure.
20 Q. You're not sure?
21 A. I'm not sure of the date.
22 Q. Who was present when you went to discuss this
23    matter with Judge Gordon?

Page 19

1  A. The matter of --
2  Q. Of the compliant against Nancy that we're
3     getting ready to get into about.
4  A. Ms. McClain.
5  Q. Ms. McClain. Was anyone present with the
6     judge?
7  A. No.
8  Q. Was Michelle Sellers present?
9  A. No.
10 Q. Where did this meeting occur?
11 A. In the courtroom.
12 Q. Was it an open courtroom?
13 A. No.
14 Q. Was it in her chambers?
15 A. No.
16 Q. Was it on a normal workday?
17 A. It was on a normal workday after court.
18 Q. After court?
19 A. Yes.
20 Q. So and you Ms. McClain went to discuss with
21    Judge Gordon complaints you had about Nancy?
22 A. We were in court.
23 Q. You were in court that day?

Page 20

1  A. Uh-huh (positive response).
2  Q. And after court was over, y'all stayed to
3     discuss Nancy Martin with Judge Gordon?
4  A. We did.
5  Q. Do you recall how long this conversation may
6     have taken?
7  A. I do not recall the length.
8  Q. Is it likely that this discussion occurred in
9     September when your duties were changed?
10 A. I do not recall the date.
11 Q. All right. Exactly what did you discuss with
12    Judge Gordon?
13 A. I answered that question before.
14 Q. You started by saying duties?
15 A. I said magistrate duties.
16 Q. Well, what about magistrate duties?
17 A. We discussed different magistrate duties.
18 Q. All right. Pretend like I'm Judge Gordon,
19    however difficult that may be, and you're here
20    with me discussing a problem that you had with
21    Ms. Martin. What are you telling me?
22 A. Do you have something specific that you want
23    to know.

5 (Pages 17 to 20)



FREEDOM COURT REPORTING

Page 21

1  Q. Yeah. I want to know what you told me with
2     respect to your problem with Nancy Martin.
3        MS. NELSON: He just wants you to tell the
4        best that you can remember, if you can
5        remember, what you said about Nancy or
6        complained about.
7  A. There was discussion about magistrate duties
8     as far as the amount of time that I had to
9     process paperwork, the amount of time I had in
10    my office.
11 Q. Yes.
12 A. And that was all we discussed about the
13    magistrate duties.
14 Q. So your complaint was principally about
15    magistrate duties?
16 A. There was another complaint.
17 Q. What was the other complaint?
18 A. About her not allowing me to be off with my
19    daughter.
20 Q. When did that occur?
21 A. I can't remember the exact date on that.
22 Q. Was that some historic event that had taken
23    place earlier?

Page 22

1  A. It was not a historical event, but my daughter
2     had a problem.
3  Q. Do you understand what I mean by "historic
4     event?"
5        MS. NELSON: I don't.
6  Q. But do you?
7  A. Explain.
8  Q. Well, on some day that you're not certain of,
9     you went to speak with Judge Gordon. And one
10    of the things you talked about was your
11    concern about the duties that you had been
12    given. And then you mentioned about not being
13    allowed time off with my daughter.
14       And my question is, did this daughter
15    incident happen on or about the same time that
16    you were visiting Judge Gordon, or had it
17    happened sometime prior?
18 A. It was prior to that, but I don't know the
19    exact date. It was prior to that.
20 Q. Could have been more than a month?
21 A. I'm -- I'm not sure.
22 Q. Well, were you able to take off with your
23    daughter?

Page 23

1  A. I didn't take off because of the criteria she
2     put on me.
3  Q. What criteria did she put on you?
4  A. That I had to -- when I was off, I had to get
5     signed documentation saying the time I left
6     the hospital. And I had to be back on the
7     next day with no questions about it.
8     Otherwise, I was going to get wrote up.
9  Q. Did you discuss this daughter incident with
10    Nancy Martin at the time it was occurring?
11 A. I did.
12 Q. Did she give you a satisfactory response?
13 A. No, she did not.
14 Q. Did you talk to anybody else about this after
15    you talked to Nancy when you didn't get a
16    satisfactory response?
17       MS. NELSON: Other than the judge, what
18       she's testified to?
19 Q. Well, I'm talking about during the time this
20    was occurring.
21 A. No.
22 Q. You didn't speak to the judge about this
23    during that time?

Page 24

1  A. No. It was after that.
2  Q. So in addition to the office problem and the
3     problem of your daughter, did you discuss
4     anything else with Judge Gordon?
5  A. No.
6  Q. Did Lavera have any discussion with Judge
7     Gordon during the time you were at this
8     meeting?
9  A. The meeting that we had?
10 Q. Yeah.
11 A. She did have some concerns.
12 Q. Do you recall what concerns she voiced?
13 A. No.
14 Q. You don't recall any of them?
15 A. I can't recall what she said, no.
16 Q. None of them stand out in your mind?
17 A. No. I -- I can only recall what I said.
18 Q. These concerns that you expressed to Judge
19    Gordon at this meeting, but no one else
20    attended but the three of you, did you
21    previously voice these concerns to Ms. Martin?
22 A. I did.
23 Q. Did you previously voice these concerns in

6 (Pages 21 to 24)

367 VALLEY AVENUE

(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 25

1  writing to Ms. Martin?
2  A. I did send her a memo. I'm not sure what date
3     that was. If it was before or after, I'm not
4     sure.
5  Q. Memo concerning the very things that you're
6     discussing now?
7  A. About my duties.
8  Q. Okay. Did you bring that memo with you?
9  A. No, I did not.
10 Q. Did you get a deposition notice asking you to
11    bring some documents with you?
12 A. I did not.
13 Q. Did you know that you were supposed to bring
14    documents with you?
15 A. I did not know.
16 Q. You did not know?
17 A. No.
18 Q. Do you have access to the memo that you're
19    referring to?
20    MS. NELSON: You have that memo.
21 Q. Do you have access to it?
22 A. I don't have it.
23 Q. Do you recall upon what date that you sent

Page 26

1     that memo?
2  A. No, sir, I do not.
3  Q. Did you copy that memo to Judge Gordon?
4  A. I did.
5  Q. So that memo that counsel says I have a copy
6     of contains some matter that you discussed
7     with Judge Gordon?
8     MS. NELSON: Object to the form. That's
9        not what she testified to.
10 Q. But I'm asking you, does it? Does it contain
11    at least some of the matter that you discussed
12    with Judge Gordon?
13 A. It contains some of the matter.
14 Q. All right. Then using a linear progression,
15    is it safe to assume -- and if it's not, stop
16    me -- but is it safe to assume that your
17    conversation with Judge Gordon occurred after
18    your memo to Nancy?
19 A. I do not recall the date.
20 Q. But do you understand the question?
21 A. I did. But I did not recall the dates. I
22    don't want to assume.
23 Q. Well, I'm not asking you the date. I'm asking

Page 27

1     you --
2     MS. NELSON: But you are asking her to
3        assume.
4  Q. Well, I'm asking you to assume which came
5     first. Tell me --
6     MS. NELSON: And she said, she was not
7        going to assume.
8  Q. Well, I'm not asking you to assume.
9     MS. NELSON: She's not --
10    MR. JAFFREE: Excuse. If I could get
11       testimony -- boy, you're notorious for
12       testifying for your clients.
13    MS. NELSON: I'm not testifying. I'm
14       trying to keep the Record straight.
15    MR. JAFFREE: I mean, this is not your
16       client.
17    MS. NELSON: You're badgering the witness,
18       and I have the right to keep the
19       Record straight and you to question
20       her on facts and not assumptions.
21 Q. Ma'am, I'm only going by your appearance. You
22    don't look badgered. Do you feel badgered?
23 A. I resent that statement.

Page 28

1  Q. You resent which statement?
2  A. What you just said.
3  Q. Badgered?
4  A. My appearance.
5  Q. I said, you don't look badgered. Is that an
6     offensive statement? If so, I apologize.
7  A. Okay.
8  Q. You don't look like a person who's been
9     badgered. And I'm asking you, are you
10    badgered?
11    MS. NELSON: By you? Is that your
12       question?
13    MR. JAFFREE: Well, by anyone here in this
14       room.
15 A. I answered your question by saying I do not
16    recall.
17 Q. Okay. Now, did you receive a response from
18    Nancy once you sent this memo to her?
19 A. I did.
20 Q. Was that response satisfactory to you?
21 A. It was satisfactory as far as her not changing
22    my duties. There was nothing else I could do
23    about it.

7 (Pages 25 to 28)



367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 29

1  Q. Do you have a copy of that response?
2  A. No, I do not.
3  Q. Do you think one would be contained in your
4     file?
5  A. I do not know.
6  Q. Do you remember what her response was, other
7     than she's not going to change your duties?
8  A. That's all I remember.
9  Q. Okay. After that response, did you do
10    anything?
11 A. My duties.
12 Q. Okay. Now, let's get back to this meeting
13    that you don't recall whether it was before or
14    after these correspondence, don't recall where
15    that meeting fell into the flow of events.
16    You and Lavera were discussing matters with
17    the judge. And did y'all tell the judge that
18    y'all felt that y'all were being treated
19    differently because of your race?
20 A. We did.
21 Q. And upon what did you reach that conclusion?
22 A. As far as me being off with my daughter? I
23    was not allowed without bringing documentation

Page 30

1     saying that I could be off, and I didn't know
2     whether or not my daughter was going to have
3     cancer or not. That was what the test was
4     about. But there was another magistrate in
5     the office who had a niece that had a problem,
6     and she was allowed to be off without
7     documentation.
8  Q. All right. Had you communicated to Ms. Martin
9     that your daughter was having medical
10    problems?
11 A. I did.
12 Q. And it's your testimony that in spite of that
13    communication, she insisted that you work
14    anyway?
15 A. She said that I could be off with bringing the
16    proper documentations from the hospital,
17    saying what time I left and that I had to be
18    there the next day no matter what happened.
19 Q. So she wanted verification?
20 A. As to the exact time that I left the hospital.
21 Q. Okay. Were there any other incidences upon
22    which you relied in support of your assumption
23    that you were being treated differently

Page 31

1     because of your race?
2  A. Yes.
3  Q. What other incidences were those?
4  A. One of my duties as far as arraignments. I
5     was off one Friday, and documentation came in
6     on a case having to be in court on Monday. I
7     was not there on Friday, so there's no way I
8     could have the case entered.
9        When I returned to work on Monday morning,
10    the case was on my desk. I entered it and had
11    it ready for court.
12       And in the meantime, Ms. Martin called me
13    in her office and suggested that she was going
14    to write me up because my paperwork was not
15    entered.
16       Even though my shelf was entered up for
17    three months -- for three weeks, everything on
18    my shelf was entered for three weeks. And
19    then one case that came in when I was not
20    there was not entered. And I was advised that
21    I should have someone to handle my duties
22    while I was out. And that was not advised to
23    anyone else.

Page 32

1  Q. You weren't advised. Did she write you up for
2     that?
3  A. She did not write me up -- let's see. She did
4     write me up, but later she changed it and said
5     that she was not going to put it in my file.
6  Q. Do you have a copy of that writeup?
7  A. No, I do not.
8  Q. Would the writeup be in your file?
9  A. She said she was not going to put it in there,
10    so it should not be in there.
11 Q. What did that writeup say?
12 A. That I did not do my duties --
13 Q. Well, after this --
14 A. -- that was assigned.
15 Q. -- suggestion that she was going to write you
16    up, did you have a discussion with Judge
17    Gordon?
18 A. No, I did not, about that situation.
19 Q. You didn't? Did you have a discussion with
20    Lavera?
21 A. No.
22 Q. Did you discuss that situation with anyone?
23 A. After that fact when I went to judge to --

8 (Pages 29 to 32)



## Page 33

1  Q. So that's another incident you brought up
2     to --
3  A. That's with magistrate duties.
4  Q. -- the judge's attention?
5  A. Yes.
6  Q. Can you think of any other incident that you
7     may have brought up with the judge?
8  A. That's the only two that really stands out in
9     my mind at this time.
10 Q. I know you said you don't recall what Lavera
11    said to Judge Gordon. But do you know if the
12    subject matter concerning Nancy treating her
13    differently than she treated other people?
14 A. Well, I'm sure she said that.
15 Q. Sure she said that.
16 A. That the treatment that Nancy was giving us
17    because that was our concerns.
18 Q. Okay. This meeting that you had with Judge
19    Gordon, was it later memorialized?
20 A. Repeat that.
21 Q. This meet that you're talking about, that
22    you're testifying to now that you had with
23    Judge Gordon, was it was later memorialized?

## Page 34

1     MS. NELSON: Object to the form. You can
2        answer if you understand. What do you
3        mean by "memorialized?"
4  Q. Do you understand what that term means?
5  A. No, I don't understand that.
6  Q. Was it reduced to writing?
7  A. Repeat that.
8  Q. The meeting that you and Lavera had with Judge
9     Gordon, did you summarize that meeting in
10    written form?
11 A. No.
12 Q. Have you prepared a written statement
13    concerning the facts of this case?
14 A. This case?
15 Q. Yeah.
16 A. No.
17 Q. This case.
18 A. No.
19 Q. All right. Do you recall anything else that
20    you may have said to Judge Gordon during this
21    meeting?
22 A. No.
23 Q. So you gave three examples of incidences where

## Page 35

1     you felt you were being treated differently
2     because of your race?
3  A. Uh-huh (positive response).
4     MS. NELSON: You have to say yes.
5  A. Yes.
6  Q. And I think you gave one white comparator in
7     another employee who was allowed to have
8     leave, correct?
9  A. Correct.
10 Q. Did you provide any other white comparators?
11 A. No, I didn't.
12 Q. Do you recall if Lavera provided any white
13    comparators to whatever claim she had?
14 A. I do not.
15 Q. So what was Judge Gordon's response when the
16    two of you, after court in this private
17    meeting, had a discussion with her? What was
18    her response?
19 A. She advised us to go speak with Kai Davis.
20 Q. Why did you speak with Judge Gordon in the
21    first place?
22 A. She is our supervisor.
23 Q. But isn't Nancy your supervisor?

## Page 36

1  A. She was our immediate supervisor.
2  Q. What did you hope Judge Gordon would do about
3     this situation?
4  A. We wanted to inform her of our concerns.
5  Q. Had you previously informed Judge Gordon of
6     your concerns?
7  A. No.
8  Q. Prior to this meeting, did you ever meet with
9     Judge Gordon socially?
10 A. What do you mean?
11 Q. Did you ever meet with Judge Gordon after
12    hours when you were not at work?
13 A. No.
14 Q. Did you ever go to lunch with Judge Gordon?
15 A. Sometimes.
16 Q. Between February of 2005 and October -- wait a
17    minute. Between February 2004 and October of
18    2004, how frequently do you think you went to
19    lunch with Judge Gordon?
20 A. Do not recall.
21 Q. Let's me ask you this: Did you and Lavera
22    ever go to lunch with Judge Gordon, just the
23    two of you alone with Judge Gordon?

9 (Pages 33 to 36)



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 37

1    A.  That occasionally has happened.
2    Q.  So, occasionally, the three of you would go to
3        lunch together?
4    A.  That has happened.
5    Q.  And did y'all have discussions while you were
6        at lunch?
7    A.  Discussion?
8    Q.  Yeah, discussions.
9    A.  Clarify.
10   Q.  Did you talk about anything?
11   A.  We talk about the weather. We talk about our
12       hair. We talk about clothes, just regular
13       women conversation.
14   Q.  Did you ever talk about the office?
15   A.  We were at lunch.
16   Q.  Did you ever talk about the office?
17   A.  I do not recall.
18   Q.  You could have?
19   A.  I do not recall.
20   Q.  Do you recall not talking about the office?
21   A.  I do not recall the exact conversation.
22   Q.  Give me a ballpark guess. How frequently do
23       you think that the three of you went to lunch

Page 38

1        together?
2    A.  Not frequently.
3    Q.  More than ten times?
4    A.  Not frequently. I do not have a number.
5    Q.  Can you tell me that it's more than ten times?
6        MS. NELSON: She's asked and answered.
7        MR. JAFFREE: I'm asking her a specific
8        question.
9    A.  I do not have a number.
10   Q.  Can you tell me whether you think it's been
11       more than ten times?
12       MS. NELSON: Asked and answered.
13       MR. JAFFREE: It hasn't been answered.
14       It's been avoided.
15       MS. NELSON: She says, she does not
16       remember. And you are badgering.
17   A.  I don't know.
18   Q.  Well, do you realize the difficulty in this
19       line of inquiry when you won't give me some
20       idea of how frequently the three of you went
21       to lunch together?
22       MS. NELSON: She's answered your question.
23   Q.  Do you understand my question now, the

Page 39

1        difficulty?
2    A.  It's not difficult.
3    Q.  It's not?
4    A.  I answered your question by saying, I do not
5        know.
6    Q.  Do you understand that I'm trying to narrow
7        the range so that we could get some idea?
8        MS. NELSON: You're trying to get her to
9        testify to something that she does not
10       remember.
11   Q.  I'm trying to get you to come up with a
12       range. Do you understand that?
13       MS. NELSON: And I'd ask her not to guess
14       if she does not know.
15   A.  I'm not going to guess.
16   Q.  You're not going to guess; you're not going to
17       share with us, the court that may read your
18       testimony, a range of times that the three of
19       you have gone to lunch together?
20   A.  I do not recall the number of times we went to
21       lunch. That's not important to me.
22   Q.  It's not important to you?
23   A.  (Witness nods head in the affirmative).

Page 40

1        MS. NELSON: She can't pick up a nod.
2    A.  Yes.
3    Q.  Can you tell me how many times you, Lavera,
4        and Nancy have gone to lunch together?
5    A.  No, I can't say the number of times.
6    Q.  Have you ever gone to lunch the two of you
7        with just Nancy by herself?
8    A.  No.
9    Q.  So when you said, you can't think of the
10       number of times, you meant, there's never been
11       any time; is that correct?
12   A.  No, that's not correct.
13   Q.  Well, have you ever gone to lunch with just
14       Nancy and Lavera?
15   A.  No.
16   Q.  So the answer is, you have never gone to
17       lunch?
18   A.  No. We went to lunch with more than just
19       Nancy and Lavera and myself.
20   Q.  Yeah. Well, I understand that.
21       What race is Lavera?
22   A.  She's black.
23   Q.  What race is Judge Gordon?

10 (Pages 37 to 40)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



**FREEDOM COURT REPORTING**

Page 41

1  A. She's black.
2  Q. And what race are you?
3  A. I'm black.
4  Q. Now, Judge Gordon told you to go speak to
5      somebody when you came to her with this
6      complaint; is that correct?
7  A. And the complaint, you mean?
8  Q. The complaint that we're talking about that
9      you and Lavera made against Nancy.
10 A. She did.
11 Q. And who did you go speak with?
12 A. Kai Davis. I answered that question before.
13 Q. Do you recall when you went to speak to Kai
14     Davis?
15 A. I do not recall the date.
16 Q. Okay. Can I assume that you went to Kai Davis
17     after you spoke with Judge Gordon?
18     MS. NELSON: Object to the form.
19 Q. Or do you want to say you don't recall in that
20     as well?
21     MS. NELSON: Object to your badgering
22     her.
23     MR. JAFFREE: I'm asking her a question.

Page 42

1      How can you get in this witness's mind
2      and tell me whether or not she feels
3      that I'm badgering her.
4  MS. NELSON: Object to --
5  MR. JAFFREE: Is that your impression?
6  MS. NELSON: Is he trying to --
7  MR. JAFFREE: Are you being badgered?
8  MS. NELSON: I feel I am. Yes.
9  MR. JAFFREE: You're being badgered.
10 MS. NELSON: Yes. Your questions -- if
11     you could ask her what occurred
12     instead of trying to -- I've asked her
13     not to assume.
14 MR. JAFFREE: You cannot frame my
15     questions for me. The questions are
16     very straightforward and simple. If
17     these questions --
18 MS. NELSON: Ask her what she --
19 MR. JAFFREE: I'll ask her what I want to
20     ask her.
21 MS. NELSON: I wish you would just ask her
22     to tell you the facts.
23 Q. Do you know whether or not you went to Kai

Page 43

1      Davis after you talked to the judge?
2  A. I did.
3  Q. Thank you. That wasn't difficult, was it?
4      MS. NELSON: Because you asked a straight
5      question.
6  Q. What did you tell Kai Davis?
7  A. The concerns we had about the office and the
8      treatment that we were getting.
9  Q. Pretty much the same thing that you told the
10     judge; is that correct?
11 A. Correct. Correct.
12 Q. Were you the only one who spoke with Kai
13     Davis?
14 A. Lavera and myself with Kai Davis -- went to
15     Kai Davis.
16 Q. Okay. The two of you went to Kai Davis and
17     complained. And did y'all put your complaint
18     in writing to Kai Davis?
19 A. We did not.
20 Q. And what did Kai Davis do after you went to
21     her to complain?
22 A. She advised us we need to have documentation
23     about our concerns.

Page 44

1  Q. Documents. You didn't have any documentation?
2  A. We didn't.
3  Q. Did she indicate what kind of documentation
4      she was looking for?
5  A. No, she didn't. She just told us that we need
6      documentation about what were coming to her
7      for.
8  Q. And did y'all commit to getting some
9      documentation?
10 A. We didn't. We didn't go back and give her
11     any.
12 Q. Why not?
13 A. We just did not.
14 Q. Isn't it true that shortly after you went to
15     Kai Davis, Nancy was terminated?
16 A. I'm not sure about that.
17 Q. Not sure about that?
18 A. I don't recall the date. I don't recall the
19     date.
20 Q. Do you know when Nancy was terminated?
21 A. I do not recall that date.
22 Q. Well, if I tell you that the decision was made
23     at least by October the 5th to terminate

11 (Pages 41 to 44)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 45

1  Nancy, would you be in a position to dispute
2  that?
3  A. I do not recall the date, so I don't know.
4  Q. Well, okay. See if you agree with this:
5  Sometime between the time that you went to the
6  judge with your complaints and the time that
7  you went to Kai Davis with your
8  complaints -- and can I assume that your
9  complaints with Kai Davis was, Nancy was
10  discriminating against you, correct?
11  A. Correct.
12  Q. So from the time you went to the judge about
13  your discrimination complaints and the time
14  you went to Kai Davis, between that time and
15  the time that Nancy was terminated, she was
16  terminated. Are you following the question?
17  MS. NELSON: Object to the form.
18  Q. All right. That's a bad question, and I admit
19  it. And so I'm going to ask a slightly better
20  question.
21  Would you agree that Nancy was terminated
22  after you went to Kai Davis?
23  A. Yes.

Page 46

1  Q. Do you know whether or not there was any
2  connection between your going to Judge Gordon
3  with a race discrimination complaint and
4  Nancy's termination? Do you know?
5  A. No.
6  Q. Were you disappointed that Nancy was
7  terminated?
8  A. No.
9  Q. No? Was that a no?
10  A. No, I was not disappointed.
11  Q. Do you know if Nancy had the authority as the
12  administrator of the magistrates' office to
13  change job schedules?
14  A. I didn't understand what you said in any of
15  that question.
16  Q. Do you know if Nancy had the authority as
17  administrator of the magistrates' office to
18  change job duties? Do you know?
19  A. I don't know for sure, but if she did, then,
20  you know, that's fine.
21  Q. Isn't it true that that was not the first time
22  you had complained about a job assignment that
23  Nancy had given you?

Page 47

1  A. I never complained about job assignment. I
2  complained about the amount of duties.
3  Q. Well, do you know Tonya Minifield?
4  A. I do.
5  Q. How long have you known her?
6  A. Just when she started.
7  Q. You didn't know her prior to her --
8  A. No.
9  Q. -- coming to work.
10  Is the name Ronald Powe familiar to you?
11  A. It is.
12  Q. In what way is that name familiar to you?
13  A. What do you mean, "what way?"
14  Q. Well, how do you know him?
15  A. He was a defendant in our court.
16  Q. Do you know if you executed or signed an alias
17  writ of arrest for Mr. Powe?
18  MS. NELSON: I'd ask that you show her the
19  documents.
20  MR. JAFFREE: Well, I'm not going to show
21  her the documents at this time.
22  Q. Do you know if you executed an alias writ of a
23  warrant of arrest?

Page 48

1  A. Well, I executed several warrants of arrest
2  and I do not remember every name that I
3  signed.
4  Q. Do you know if you issued a writ of arrest in
5  error on Mr. Powe?
6  A. No, I did not.
7  Q. You did not?
8  A. No, not to my knowledge of any error that I
9  issued anyone.
10  Q. Did you ever submit to Mr. Powe -- strike
11  that. Did you ever submit to the Department
12  of Public Safety a letter indicating that an
13  FTA was issued in error concerning Mr. Powe?
14  A. We have several letters that we do write to
15  the Department of Public Safety, but to say a
16  specific person, I need the documentation
17  shown to me first.
18  Q. Did you ever give Mr. Powe a $300 cash bond
19  back?
20  A. I do recall something about a cash bond, yes.
21  Q. Was that the policy, to give people cash bonds
22  back as cash?
23  A. On that case, it was a direct order.

12 (Pages 45 to 48)



Page 49

1  Q. Direct order from who?
2  A. From the prosecutor who was Ms. Ott and the
3     judge.
4  Q. The judge gave you an order to give Mr. Powe
5     back cash?
6  A. Ms. Ott, the prosecutor.
7  Q. Well, you said, and the judge. So which one
8     of them gave you the order?
9  A. Ms. Ott called me first.
10 Q. Okay. And then what?
11 A. And then the judge.
12 Q. The judge called you after Ms. Ott?
13 A. Somewhere in that -- yes.
14 Q. They both called you about the same matter?
15 A. Yes.
16 Q. Well, if Ms. Ott had called you and told you
17    to give Mr. Powe back cash, why did the judge
18    follow up that phone call?
19 A. The judge is over our department.
20 Q. I see. You remember when the judge called you
21    and told you to give Mr. Powe cash back?
22 A. I do not recall the date, but Mr. Powe was in
23    the courtroom.

Page 50

1  Q. I may be through with you.
2     MR. JAFFREE: But I asked for a series of
3        documents from this witness in her
4        deposition. She didn't bring any.
5        When can I receive those documents?
6     MS. NELSON: What documents did you ask
7        for? This witness does not have
8        custody and control of documents.
9     MR. JAFFREE: Well --
10 Q. Do you have custody and control of memorandums
11    that was issued to you by Judge Gordon?
12 A. I do not have.
13    (Brief interruption)
14 Q. I'm sorry. What was your answer?
15 A. No, I do not have.
16 Q. So if Judge Gordon sends you a memo, you no
17    longer have control over that memo?
18 A. No, we don't keep them all.
19 Q. Do you keep any of them?
20 A. I am not sure I would have.
21 Q. Would you have some of them?
22 A. I am not sure.
23 Q. You're not sure whether you have any memo from

Page 51

1     Judge Gordon?
2  A. No, sir, I'm not sure.
3  Q. About anything?
4  A. No, I'm not sure.
5  Q. What is your normal practice when you get a
6     memo from Judge Gordon?
7  A. We read the memo.
8  Q. And then what do you do with it?
9  A. Well, sometimes I keep them and sometimes I
10    don't.
11 Q. Well, what would make you decide whether to
12    keep it or not?
13    (Brief pause)
14 Q. Did you hear the question?
15 A. Yeah. But what you do mean, make me decide?
16 Q. Well, you said, sometimes you keep them and
17    sometimes you don't. Upon what criteria do
18    you use do you decide which ones to keep and
19    which ones not to keep?
20 A. There is no criteria to that.
21 Q. And as you sit here today, you don't know
22    whether or not you have any memos that Judge
23    Gordon have sent?

Page 52

1  A. I'm not sure.
2  Q. Not sure?
3  A. Right.
4  Q. Well, the ones you keep, where do you keep
5     them at?
6  A. Some are on the e-mail that we get, and some
7     are in my office, if I have any still there.
8  Q. Do you have a -- I can't even think of the
9     right term for it -- a process of storing
10    e-mail messages that you receive?
11 A. No.
12 Q. You don't have any stored e-mail messages?
13 A. On my computer?
14 Q. Well, on some computer in a form that you can
15    gain access to.
16 A. There are some on my computer, yes. But I
17    don't know how many would be there.
18 Q. Do you know if there are any e-mails from
19    Judge Gordon on your computer?
20 A. I'm not sure how many I have.
21 Q. Well, do you know if you have any?
22 A. I'm not sure.
23 Q. You're not sure if there's any?

13 (Pages 49 to 52)



**FREEDOM COURT REPORTING**

Page 53

1  A. No, I'm not sure.
2  Q. Well, I asked for copies of all disciplinary
3     notices you have received. Can I assume that
4     you haven't received any?
5  A. I've been working for 25-plus years. I have
6     never in my employment received a disciplinary
7     notice about not doing my duties.
8  Q. Okay. So I guess the answer is, no, you don't
9     have any of those.
10        And just so I'm clear, copy of all memos,
11    notes, letters, e-mails, and other forms of
12    written communication which you have received
13    from Judge Gordon from the onset of your
14    employment as a magistrate until May the 30th
15    of 2005.
16        Do you know if you have any of those
17    things: memos, notes, letters, e-mails, and
18    other forms of written communication which you
19    have received from Judge Gordon?
20 A. No, I do not.
21 Q. As you sit here now, you don't know if you
22    have any of those?
23 A. Right. I do not know.

Page 54

1  Q. Well, can you look and see, and if you do have
2     some, can you provide them to the City's
3     counsel so that I have them as I requested?
4  A. I can look and see, yes.
5  Q. In addition to looking and seeing, if you find
6     any, will you provide them to the City's
7     counsel?
8  A. And what specific memo are you looking for?
9  Q. All of them that you have received from Judge
10    Gordon for that time period, from the onset of
11    your employment as a magistrate until May the
12    30th, 2005.
13 A. I will look.
14 Q. My question is not whether you will look.
15    You've already --
16       MS. NELSON: She said she would look.
17 Q. -- addressed me with you would look. That's
18    not my question. My question is --
19 A. You asked me if I would look and see if I have
20    any, I said, yes.
21 Q. That was one question. My question on the
22    floor now is, if you discover that you have
23    them, will you give them to the City's

Page 55

1     attorney so she can give them to?
2  A. I said, yes, I will look.
3  Q. You'll what?
4  A. I will look to see if I have any.
5  Q. Let me see if I can make this crystal clear
6     and let me know if it's crystal: If you find
7     any, will you turn them over to the City's
8     attorney so she, in turn, can give them to
9     me? Can I get a yes or no?
10 A. Yes.
11 Q. Yes what?
12 A. I will.
13 Q. You will what?
14 A. If I find a memo, I will give it to the City's
15    attorney.
16 Q. Will you give all of your memos to the City
17    attorney?
18 A. And the purpose of all of my memos?
19 Q. Regardless of the purpose, will you give all
20    of your memos that you find --
21       MS. NELSON: From the judge.
22 Q. -- from the judge to the City attorney?
23 A. Yes.

Page 56

1  Q. Thank you. Will you give all your e-mails
2     that you find from the judge to the City
3     attorney?
4        MS. NELSON: I'm going to object to that.
5        She operates off of a city computer
6        that's not in her custody and control.
7  Q. Can you get access to the e-mails that you
8     have from the judge?
9  A. I have access to my e-mail, yes.
10 Q. And so you can pull things off of that e-mail
11    access -- from that e-mail access, can't you?
12 A. If I have anything, yes.
13 Q. Can I get a commitment from you that you will
14    look for your e-mail messages from Judge
15    Gordon and submit them to the attorney?
16 A. I previously stated that if I did have an
17    e-mail from the judge, I would do that.
18 Q. Same question with respect to other forms of
19    written communication.
20 A. Memo from the judge?
21 Q. Sure.
22 A. Yes.
23 Q. Now, that we've settled that, can you give me

14 (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 57

1  some idea of what time period you would take
2  to look for these things?
3  A. No, I cannot.
4  Q. Can you commit to looking for them for the
5  next week?
6  A. I cannot commit to that.
7  Q. Can you commit to looking for them during the
8  next two weeks?
9  A. I cannot commit to a time frame, but I will
10  look.
11  Q. Well, that's not very never helpful. You
12  understand that, don't you?
13    MS. NELSON: She said she would look.
14  Q. Do you realize how unhelpful that is? If you
15  look ten years from now, you have fulfilled
16  your obligation to look, wouldn't you?
17  A. Repeat that.
18  Q. If you look ten years from now, you would
19  fulfill your obligation to look?
20  A. If I -- if I said I would look.
21  Q. Yeah. So your telling me you will look with
22  no time frame is not helpful, is it?
23  A. Well, I told you previously, I don't know if I

Page 58

1  have any at all.
2  Q. Well, how long would it take you to find out
3  if you have any?
4    MS. NELSON: Again, you're badgering this
5    witness. She said she'd look.
6    MR. JAFFREE: Would you --
7    MS. NELSON: We produced this witness; you
8    did not subpoena her. I could have
9    made you subpoena her. She is not a
10    management employee.
11    MR. JAFFREE: Well, then pursuant to what
12    authority are you representing her
13    then?
14    MS. NELSON: I've produced her because you
15    asked. I'm making this convenient for
16    you.
17    MR. JAFFREE: Excuse me. You told me that
18    you represent this woman and she told
19    --
20    MS. NELSON: I never said that.
21    MR. JAFFREE: And she claims that you are
22    her attorney.
23    MS. NELSON: Well, she may misunderstand.

Page 59

1    I never said I'm representing her.
2    MR. JAFFREE: I see.
3    MS. NELSON: I have tried to assist you by
4    making her available.
5    MR. JAFFREE: Sure. I mean, she's here.
6    I asked for information from her.
7    MS. NELSON: And you're asking for
8    information that she may say she
9    can -- well, just strike that. I'll
10    make my appropriate objections down
11    the road. You're asking for
12    information that may be --
13    MR. JAFFREE: I think your appropriate
14    objections may be a little late.
15    However --
16    MS. NELSON: You didn't even properly
17    serve your notice right. I don't even
18    know if I got one. You sent it on
19    some kind of e-mail. You never
20    properly even served me.
21    MR. JAFFREE: Well, she appeared here,
22    whether or not it was properly served
23    or not.

Page 60

1    MS. NELSON: Because we were trying to
2    cooperate. And I said you didn't have
3    to subpoena --
4    MR. JAFFREE: You're not trying to
5    cooperate now.
6    MS. NELSON: You're right because you're
7    badgering her, and she does not have
8    any documents.
9  Q. Ma'am, I'm trying to get some date as when you
10  would look.
11  A. I don't have a date. I will say, I will look
12  at my earliest convenience.
13  Q. Can you commit to looking within the next two
14  weeks?
15  A. At my earliest convenience I will look.
16  Q. Okay. You will not commit to looking within
17  the next two weeks?
18    MS. NELSON: She said she will commit to
19    her earliest convenience.
20  Q. If you gave a subordinate a task -- listen
21  carefully -- and that subordinate told you
22  that they will perform that task at their
23  earliest convenience, would that response be

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 61

1  satisfactory to you?
2       MS. NELSON: She is not your subordinate,
3       and I object to the form.
4  Q. Would it?
5       MS. NELSON: Object to the form.
6  Q. Yes or no. I just want to know, yes or no?
7       Yes, without looking at the attorney, can
8       you just answer yes or no?
9       MS. NELSON: And I would instruct her not
10      to answer. You're badgering this
11      witness.
12      MR. JAFFREE: You don't have any authority
13      to instruct her not to answer. You're
14      not her attorney. You just said it.
15      You have no authority.
16 Q. Can you answer the question?
17      MS. NELSON: And I say we disband this
18      deposition right now.
19      MR. JAFFREE: You don't have authority to
20      do that either.
21 Q. Can you answer the question yes or no, or do
22      you --
23 A. Well, I have answered your question. I asked

Page 62

1  you, what do you want with a memo.
2  Q. Do you refuse to answer that question?
3  A. If I had a memo, I said I would get it for you
4     at my earliest convenience. That's my answer.
5       MR. JAFFREE: I have no further questions
6       of this witness.
7                EXAMINATION
8  BY MS. NELSON:
9  Q. I just have one quick one.
10     Ms. Knight, earlier on in this deposition,
11     he asked you if you know of a Mr. -- I think
12     his name is Theron Fondren, and you said you
13     had heard his name. He asked you were you
14     present when he perhaps was in the
15     magistrates' office, having a discussion with
16     Mary Beth Brackin. Do you remember him asking
17     you those type questions?
18 A. I do.
19 Q. And I believe you said you were not; is that
20     correct?
21 A. That's correct.
22 Q. Do you ever remember later hearing Mary Beth
23     Brackin make statements in the courtroom about

Page 63

1   Mr. Fondren and what she may have told him?
2  A. Mr. --
3       MR. JAFFREE: Let me object. This is not
4       in any way related to my direct.
5       MS. NELSON: It is. I have the right --
6       MR. JAFFREE: I didn't go up that channel
7       but --
8       MS. NELSON: Well, make your objection for
9       the Record.
10      MR. JAFFREE: Fine. If you're going to
11      ask her, I'm going to ask her a
12      followup question on that same line.
13 Q. Well, I'm just asking, did you hear
14     Ms. Brackin make any statement about -- do you
15     recall the Fondren situation? Are you aware
16     he was --
17      MR. JAFFREE: Well, without --
18 Q. -- involved in a claim of false arrest?
19      MR. JAFFREE: Without milking --
20 A. I do.
21      MR. JAFFREE: Without milking the claim
22      and telling her what the Fondren --
23      just ask her what she remembers about

Page 64

1   Fondren?
2  Q. Do you remember the claim that Mr. Fondren was
3     making?
4  A. I do.
5  Q. And do you remember what it involved?
6  A. Him being arrested.
7  Q. Do you remember Mary Beth Brackin coming into
8     the courtroom making statements --
9       MR. JAFFREE: Let me object to your
10      leading this witness as to what Mary
11      Beth may have said.
12      MS. NELSON: Well, you just said, she's
13      not my witness, so I can lead her if I
14      want to.
15      MR. JAFFREE: And I object to your leading
16      her.
17      MS. NELSON: Objection noted.
18      MR. JAFFREE: Okay.
19 Q. Do you remember Mary Beth Brackin making any
20     statements in the courtroom about Mr. Fondren?
21 A. Not in the courtroom. At the office.
22 Q. At the office, what do you remember her
23     stating?

**FREEDOM COURT REPORTING**

Page 65

```
 1   A. She advised Mr. Fondren that he needed to sue
 2      the City, that he had been arrested wrong --
 3      wrongfully.
 4   Q. And she was making that statement --
 5   A. She was --
 6   Q. -- in the magistrates' office?
 7   A. In the magistrate office.
 8   Q. To the other magistrates?
 9   A. Yes.
10      MR. JAFFREE: Are you through?
11   Q. One other question. Did Nancy Martin ever
12      invite you and Lavera to go to lunch with her?
13   A. No.
14      MS. NELSON: That's all I have.
15                EXAMINATION
16   BY MR. JAFFREE:
17   Q. What all magistrates were present when
18      Ms. Brackin allegedly made this statement?
19   A. Myself and Ms. McClain.
20   Q. So it's not just magistrates. It's the two
21      black magistrates, correct?
22   A. Those two magistrates, they are, yes.
23   Q. Now, you indicated that she said to you that
```

Page 66

```
 1      Mr. Fondren should sue the City.
 2   A. Yes.
 3   Q. Do you know what kind of claim Mr. Fondren
 4      made against the City?
 5   A. I do not know specifically.
 6   Q. Do you know if his claim was limited to just
 7      his towing fee?
 8   A. I do not know.
 9   Q. Did she indicate to you that she told him to
10      sue the City for his towing fee?
11   A. I don't know what specific she said sue for.
12      She said, sue the City.
13   Q. Sue the City?
14   A. Yes.
15   Q. Sue the City?
16   A. Yes, that's what she said.
17   Q. And do you know if he sued the City?
18   A. I am not sure what he done.
19   Q. So she came in and said, I told Mr. Fondren to
20      sue the City?
21   A. She discussed that, and that's what she said.
22   Q. Did she --
23   A. We didn't ask her. She came up and just went
```

Page 67

```
 1      to talking.
 2   Q. She went to talking.
 3   A. Uh-huh (positive response). And we were the
 4      only people that were there.
 5   Q. Okay. And she said, sue the City?
 6   A. That's what she said.
 7   Q. And do you know if Mr. Fondren sued the City?
 8   A. I do not know.
 9   Q. So the best of your recollection is, her words
10      were, sue the City?
11   A. Yes.
12   Q. But you didn't hear her talk to Mr. Fondren?
13   A. No.
14   Q. You don't know what she said?
15   A. To Mr. Fondren?
16   Q. Yeah.
17   A. No, I do not.
18   Q. So she could have been just embellishing her
19      conversation with Mr. Fondren?
20   A. Well, we didn't ask her for it. She just told
21      us.
22   Q. Just sue the City?
23   A. Yes.
```

Page 68

```
 1   Q. That's all you remember?
 2   A. That's all I remember.
 3   Q. And you don't know why Mr. Fondren's claim
 4      against the City was narrowed to just a towing
 5      fee, do you?
 6      MS. NELSON: Object to the form.
 7   Q. You don't know why that is?
 8      MS. NELSON: Object to the form. Assumes
 9      facts not in evidence.
10   Q. You don't know, do you?
11   A. I don't know why he was suing the City.
12   Q. But you don't know if he did sue the City?
13   A. I don't know if he did.
14   Q. All right. Do you know if the City paid him
15      any money?
16   A. I have no idea.
17   Q. All right. Okay.
18      MR. JAFFREE: I have no further questions.
19      (Deposition concluded at 10:20 a.m.)
20      * * * * * * * * * *
21      FURTHER DEPONENT SAITH NOT
22      * * * * * * * * * *
23
```



**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**