# Statement

# Of

# Bradley Phelps

DOTHAN/Martin & Brackin 1453
CONFIDENTIAL Subject to
Protective Order

KG: THIS IS SGT. GRAY. THE DATE'S GOING TO BE MARCH THE 9TH OF 2005. THE TIME IS 4:17 P.M. THE PLACE OF STATEMENT IS GOING TO BE IN MY OFFICE IN THE POLICE DEPARTMENT. THE NAME OF PERSON GIVING STATEMENT IS BRADLEY THOMAS PHELPS. AH, THIS WILL BE IN REFERENCE TO AH A TRAFFIC CITATION THAT HE WAS ISSUED ON APRIL THE 14TH OF 2003. AH, BRAD, WOULD YOU STATE YOUR FULL NAME?

BP: BRADLEY THOMAS PHELPS.

KG: AND WHAT'S YOUR HOME ADDRESS, CURRENTLY?
BP: 1135 WEST COOK, DOTHAN, ALABAMA 36301.

KG: UMKAY. AND IS THAT LOCATED ACTUALLY IN TAYLOR?
BP: YES.

KG: OKAY. AH, IF YOU WOULD, TELL ME WHAT HAPPENED TO CAUSE YOU TO RECEIVE THIS TICKET.
BP: I, I WAS SPEEDING ON MONTGOMERY, NO THE, UH SOUTH OATES, AND HE PULLED ME OVER THERE IN FRONT OF DOTHAN HIGH SCHOOL AND HE GAVE ME THE TICKET.

KG: OKAY, AND THAT WAS ON THE DATE THAT WAS REFLECTED HERE ON THIS COPY OF THE TICKET, RIGHT?
BP: RIGHT.

KG: APRIL THE 14TH OF 2003?
BP: RIGHT.

KG: OKAY. WHAT IS THE NEXT THING THAT HAPPENED DEALING WITH THIS TICKET?
BP: WELL I WENT TO WORK, AH, AT THE TIME I WAS WORKING FOR HER HUSBAND

KG: WHOSE HUSBAND, GIVE FULL N'
BP: MARY TURNER'S HUSBAND.

KG: UMKAY, WHAT'S HIS NAME?
BP: KEVIN TURNER.

KG: UMKAY.
BP: AND HE SAID THAT SHE WOULD SEE IF SHE COULD TAKE CARE OF IT.

KG: SAY THAT AGAIN, YOU KINDA
BP: HE SAID THAT SHE WOULD TAKE CARE OF IT. AND HE ASKED, HE ASKED HER ABOUT IT AND THEN I TALKED TO HER AND SHE SAID THAT IT WAS, SHE WAS GONNA KEEP CONTINUING IT AND THEN SHE SAID SHE'D TAKE CARE OF IT AFTER SHE TOOK, AFTER SHE CONTINUED IT ONE TIME.

KG: UMKAY. NOW, LET'S GO BACK. YOU WERE WORKING FOR KEVIN TURNER?
BP: RIGHT.

KG: AH, WHAT'S THE NAME OF HIS COMPANY YOU WERE WORKING FOR?
BP: VITAL SIGNS.

KG: AND WHEN DID YOU STOP WORKING FOR HIM?
BP: APPROXIMATELY 3 YEARS AGO.

KG: OKAY, THREE YEARS FROM NOW?
BP: YEAH.

KG: UMKAY. SO THE TICKET OCCURRED ABOUT 2 YEARS AGO, NEXT MONTH WILL

DOTHAN/Martin & Brackin 1454
CONFIDENTIAL Subject to Protective Order

KG: BE TWO YEARS AGO. SO YOU WAS WORKING FOR HIM IN ABOUT APRIL OF 2002?
BP: UM, HM, YES, SIR.

KG: UMKAY, AND WHAT DID YOU DO FOR HIM?
BP: MANUFACTURED SIGNS AND INSTALLED SIGNS.

KG: OKAY. WHEN YOU WORKED FOR HIM DID YOU WORK STRICTLY FOR HIM, OR DID SHE HAVE ANYTHING TO DO WITH AH DAY-TO-DAY OPERATIONS?
BP: STRICTLY THROUGH HIM.

KG: UMKAY. AND WHERE IS THE OFFICE AT?
BP: ON 231 SOUTH.

KG: UMKAY. IS THAT THE SAME PLACE AS HIS HOME IS HIS OFFICE DIFFERENT?
BP: SAME PLACE AS HIS HOME.

KG: UMKAY. AH, AND, AND YOU WORKED FOR HIM UP UNTIL ABOUT WHEN?
BP: UNTIL HE WENT TO JAIL, WHICH

KG: IS APPROXIMATELY A YEAR AGO? HAS IT BEEN A YEAR?
BP: YEAH. PROBABLY A YEAR.

KG: MARCH
BP: MARCH, 2004.

KG: 2004?
BP: UM, HM.

KG: UMKAY. AND AH DID YOU KNOW ANYTHING ABOUT HIM GOING TO JAIL BEFOREHAND, OR ANYTHING?
BP: DIDN'T KNOW NOTHING ABOUT IT.

KG: SO THE DAY HE WENT TO JAIL IS THE DAY YOU STOPPED WORKING FOR HIM?
BP: THE DAY THEY CAME, THE DAY THEY TAKE HIM I DIDN'T KNOW NOTHING ABOUT IT.

KG: UMKAY. AH, DID YOU HAVE ANY OTHER AGREEMENT WITH HIM IN REFERENCE TO AH A BLAZER THAT YOU NOW HAVE?
BP: YES, SIR, I, WHEN WE WENT AND GOT THE BLAZER, OR I HAD, HAD HIM HELP ME CO-SIGN TO GET THE BLAZER.

KG: UMKAY, SO YOU SAW A BLAZER SOMEWHERE THAT YOU WANTED TO BUY?
BP: YEAH.

KG: AND WHERE WAS THAT AT?
BP: AT CAR CITY?

KG: WHERE'S CAR CITY AT?
BP: NORTH SIDE OF TOWN ON THE CIRCLE.

KG: IN DOTHAN?
BP: RIGHT.

KG: AND YOU TALKED TO HIM ABOUT HELPING YOU TO AH PAY FOR THE BLAZER?
BP: RIGHT.

KG: AND TELL ME WHAT HE SAID AND WHAT WAS DONE?

DOTHAN/Martin & Brackin 1455
CONFIDENTIAL Subject to Protective Order

BP: HE SAID HE WENT AND SEEN IF HE COULD BORROW THE MONEY FOR IT, AND HE GOT THE MONEY.

KG: WHERE FROM?
BP: WELLS FARGO.

KG: UMKAY.
BP: AND WE WENT OVER TO THE CAR LOT AND WE TALKED TO 'EM AND WE ENDED UP GETTING THE BLAZER.

KG: AND WHEN WAS THAT, DO YOU KNOW ABOUT?
BP: I HAVE NO CLUE WHEN THAT WAS.

KG: HOW LONG HAVE YOU HAD IT?
BP: PROBABLY ABOUT 2 YEARS.

KG: UMKAY, SO TWO YEARS AGO HE HELPED YOU AH TO OBTAIN THIS AH BLAZER AND WAS THERE SOME TYPE OF AH AGREEMENT AHM ABOUT THE BLAZER?
BP: YES, SIR, I PAID A PAYMENT EVERY MONTH.

KG: UMKAY. AND HOW MUCH WAS IT?
BP: ONE HUNDRED AND SEVENTY FIVE.

KG: UMKAY AND DID YOU PAY IT FOR TWO YEARS?
BP: I PAID IT UNTIL ALL THIS HAPPENED.

KG: UMKAY. AND AH WAS IT ALWAYS THE, WAS IT AN AGREEMENT THAT YOU PAID ON LIKE THE FIRST OR THE LAST OF THE MONTH OR WHATEVER?
BP: THE FIRST, YES.

KG: THE FIRST OF THE MONTH? UMKAY WAS THAT EVER TAKEN OUT OF YOUR PAY CHECK AHEAD OF TIME OR DID HE GIVE YOU YOUR CHECK AND THEN YOU PAID HIM FOR THE BLAZER?
BP: SOMETIMES HE'D TAKE IT OUT AND SOMETIMES I'D HAND IT TO HIM.

KG: UMKAY. WELL WHENEVER HE TOOK IT OUT IT WAS IN AGREEMENT WITH YOU THAT HE WOULD
BP: RIGHT, HE WOULD ASK ME FIRST.

KG: UMKAY. AND WHEN HE WAS AH TAKEN TO JAIL, WAS, WERE YOU STILL PAYING FOR THE BLAZER?
BP: YES.

KG: DO YOU KNOW HOW MANY MORE PAYMENTS YOU HAVE BEFORE IT'S PAID OFF?
BP: I HAVE NO CLUE, I DON'T E', I OWED LIKE 12 HUNDRED DOLLARS WAS WHAT WAS OWED ON IT.

KG: UMKAY. SO YOU KNOW ABOUT 12 HUNDRED DOLLARS IS WHAT YOU OWED ON IT?
BP: YES.

KG: OKAY. AH, HAVE YOU, SINCE HE HAS BEEN IN JAIL, HAVE YOU MADE ANY PAYMENTS ON IT?
BP: YES, I HAVE, BUT NOT AFTER THAT INCIDENT.

KG: WHAT INCIDENT?
BP: AFTER JULY 4TH.

DOTHAN/Martin & Brackin 1456
CONFIDENTIAL Subject to
Protective Order

KG: OF 2004?
BP: RIGHT.

KG: UMKAY. AND WHEN YOU SAY THAT INCIDENT, WE'RE GONNA BR', TALK ABOUT EVERYTHING AGAIN, BECAUSE THE TAPE DOESN'T KNOW WHAT WE'RE TALKING ABOUT, OKAY? SO, AH, TELL ME EXACTLY WHAT YOU MEAN ABOUT NOT AFTER THAT INCIDENT?
BP: WELL MARY CALLED THE HOUSE AND SHE TALKED TO MY DAD. AND SHE SAID THAT SHE WAS GONNA MAKE MY TICKET RE-APPEAR BECAUSE I DIDN'T GO AND FINISH THE ROOF THAT SHE WANTED ME TO FINISH.

KG: OKAY. NOW LET'S STOP. LET'S BACK UP AND START AT THE BEGINNING NOW. BECAUSE AH, IN ORDER, WHAT YOU'RE SAYING IN ORDER TO ANSWER THAT QUESTION YOU NEED TO BRING IN THE, A DIFFERENT PART OF AHM THIS INVESTIGATION, WHAT WE'RE TALKING ABOUT, SPECIFICALLY THE TICKET AND WHAT HAPPENED TO IT. SO, YOU SAID AFTER YOU RECEIVED THIS TICKET ON APRIL THE 14TH, 2003, AH THERE WAS SOME TYPE OF AN, OF AN AGREEMENT REGARDING THE PAYMENT OF THE TICKET. IS THAT CORRECT?
BP: NO, THERE WAS NO

KG: OKAY. WELL, TELL ME WHAT HAPPENED?
BP: SHE SAID SHE WOULD TAKE CARE OF IT AND I ASSUMING SHE PAID FOR IT.

KG: UMKAY. AND DID SHE TELL YOU THAT DIRECTLY?
BP: NO, SHE JUST SAID SHE'D TAKE CARE OF IT.

KG: UMKAY. DID SHE TELL YOU THAT?
BP: YES, SHE TOLD ME THAT.

KG: DID SHE SAY THAT IN PERSON OR ON THE PHONE?
BP: IN PERSON.

KG: UMKAY. TELL ME WHAT HAPPENED THAT LED UP TO HER SAYING THAT?
BP: I ASKED IF SH', WHAT HAD SHE DONE ABOUT THE TICKET AND SHE SAID SHE TOOK CARE OF IT.

KG: BACK UP, BEFORE THEN. YOU RECEIVED THE TICKET. IT HAS A COURT DATE THAT YOU'RE SUPPOSED TO APPEAR IN COURT OR EITHER PAY THE TICKET BY JUNE THE 3RD OF 2003. UMKAY.
BP: RIGHT.

KG: NOW. WHAT HAPPENED WITH THE TICKET? WHAT, WHAT WAS THE NEXT THING THAT HAPPENED? YOU WERE ISSUED A TICKET AND THEN WHAT HAPPENED?
BP: THEN I WENT BACK TO THE SHOP WHERE KEVIN TURNER WORKS, OR WHERE HE OWNED THE SHOP, AND I WAS WORKING FOR HIM. AND I SHOWED HIM THE TICKET AND HE ASKED MARY IF SHE WOULD TAKE CARE OF IT.

KG: DID HE TELL YOU THAT OR WERE YOU THERE WHEN HE TOLD HER THAT?
BP: I WAS THERE.

KG: UMKAY. YOU WERE AT THE SHOP?
BP: RIGHT.

KG: YOU SHOWED HIM THE TICKET.
BP: RIGHT.

KG: WHERE WAS MARY AT?

DOTHAN/Martin & Brackin 1457
CONFIDENTIAL Subject to
Protective Order

BP: AT THE HOUSE.

KG: UMKAY. DID HE HAVE TO CALL HER OR WAS SHE RIGHT THERE WHEN YOU PULLED THE TICKET OUT?
BP: HE CALLED HER AT THE HOUSE.

KG: UMKAY. AND THEN SHE CAME OVER AND WHAT WAS SAID?
BP: SHE TOLD ME SHE'S SEE WHAT SHE COULD DO ABOUT IT. SEE IF SHE COULD TALK TO THE SERGEANT OR WHATEVER, THE POLICE OFFICER AND SEE IF HE'D, LET, LET HER CLEAR IT.

KG: UMKAY. AND THEN WHAT? WAS THERE ANYTHING ELSE SAID RIGHT THEN ABOUT THE TICKET?
BP: NO, NOT THEN.

KG: UMKAY. WHAT, WHAT NEXT?
BP: AND THEN HER HUSBAND GOT ARRESTED AND, AND SHE WANTED ME TO DO SOME WORK FOR HER.

KG: UMKAY. LET'S TALK ABOUT THAT. HOW, HOW DID YOU, HOW WERE YOU TOLD THAT SHE WANTED YOU TO DO SOME WORK FOR HER?
BP: SHE TOLD ME HERSELF.

KG: UMKAY. DID SHE CALL YOU?
BP: SHE CALLED ME.

KG: OKAY. SHE CALLED YOU. WHERE, WHERE WERE YOU AT WHEN SHE CALLED YOU?
BP: AT MY MOM'S HOUSE.

KG: UMKAY. AND TELL ME WHAT SHE ASKED OF YOU.
BP: SHE ASKED ME IF I COULD COME DOWN AND BUSH HOG AND FIX THE ROOM ON THAT TRAILER AND I TOLD HER I'D BUSH HOG AND I'D FIX THE ROOF ON THAT TRAILER AND I WENT, WE WENT DOWN THERE, UH, THE WEEKEND BEFORE THE 4TH OF JULY, AND CLEANED HER ROOF OFF AND EVERYTHING, ME AND MY DAD, AND I MEAN WE HAD TO SWEEP IT, RAKE IT, EVERYTHING.

KG: UM, HM.
BP: AND

KG: WAS THERE ANY, DID YOU TWO TALK ABOUT HOW SHE WAS GOING TO PAY YOU FOR
BP: WELL ME AND HER HAD ALREADY TALKED ABOUT SHE WAS GONE KNOCK SOME OFF THE BLAZER.

KG: UMKAY.
BP: HER

KG: WELL, JUST GO BACK AND TELL ME ABOUT THAT. WHERE WERE Y'ALL AT WHEN YOU TALKED ABOUT HOW SHE WAS GONNA PAY YOU FOR DOING THE WORK?
BP: AT HER HOUSE.

KG: UMKAY. AH, DO YOU REMEMBER WHEN THAT WAS?
BP: PROBABLY THE WEEKEND BEFORE WE PUT THE TARP ON THE ROOF.

KG: UMKAY. WHICH WAS ABOUT TWO WEEKS BEFORE THE 4TH OF JULY?
BP: RIGHT.

KG: OKAY, SO THAT WAS SOMETIME AROUND THE THIRD OR FOURTH WEEK OF JUNE?

DOTHAN/Martin & Brackin 1458
CONFIDENTIAL Subject to
Protective Order

BP: YEAH.

KG: UMKAY. AND YOU, YOU WHEN SHE TOLD YOU ABOUT THE WORK YOU WERE, SHE CALLED YOU AT HOME, RIGHT?
BP: UM, HM.

KG: AT YOUR MOTHER'S HOUSE?
BP: UM, HM.

KG: THEN WHEN DID YOU OVER TO HER HOUSE IN ORDER FOR HER TO DISCUSS HOW YOU WERE GONNA, SHE WAS GONNA PAY YOU FOR IT?
BP: WHEN I WENT AND DONE THE BUSH HOG.

KG: UMKAY SO
BP: WHICH WAS ON A WEEKEND DAY IS WHEN I DONE THE BUSH HOGGING.

KG: UMKAY. AND DID SHE PAY YOU FOR THAT?
BP: NO, SHE DIDN'T PAY ME FOR THE BUSH HOGGING.

KG: UMKAY. TELL ME ABOUT THE ARRANGEMENT THEN.
BP: WELL SHE TOLD ME SHE'D KNOCK SOME OFF, KNOCK EITHER THE WHOLE THING OFF THE BLAZER, YEAH, SHE SAID SHE'D TAKE THE BLAZER PAYMENT AWAY AND THEN PAY ME SOMETHING.

KG: UMKAY.
BP: FOR THE WORK THAT I'D DONE, BECAUSE SHE WAS GONE PAY ME.

KG: UMKAY.
BP: WELL, I MEAN SHE DIDN'T PAY ME FOR THE BUSH HOG, OR YEAH, SHE DIDN'T PAY ME FOR THE BUSH HOGGING AND THEN ME AND DAD WENT OVER THERE, CAUSE SHE WAS GONE KNOCK THE BUSH HOGGING OFF THE (UNINT) BLAZER. WELL ME AND DAD WENT TO DO THE ROOF AND WE DONE, WE DONE EVERYTHING THAT WE COULD THAT DAY AND WE WAS GONE COME BACK THE NEXT WEEKEND.

KG: WHAT NEEDED TO BE DONE TO THE ROOF?
BP: NEEDED TO BE PATCHED.

KG: UMKAY.
BP: SO WE WENT OVER THERE AND WE RAKED IT OFF, SWEPT IT OFF, WASHED IT OFF, AND EVERYTHING SO WE, WE COULD FIX IT THE NEXT WEEKEND WHENEVER WE COME BACK FROM FLORIDA BECAUSE IT WAS THE 4TH OF JULY.

KG: UMKAY.
BP: AND THEN

KG: SO THE WEEK BEFORE THE 4TH OF JULY WAS WHEN YOU AND YOUR FATHER WENT OVER AND DID THE REPAIRS, START WORKING ON THE ROOF?
BP: RIGHT.

KG: UMKAY. BUT THE WEEK BEFORE THEN IS WHEN YOU DID THE BUSH HOGGING?
BP: IT WAS THE WEEK, YEAH.

KG: PARDON ME.
BP: THE WEEK.

KG: DURING THAT WEEK?
BP: DURING THE WEEK.

DOTHAN/Martin & Brackin 1459
CONFIDENTIAL Subject to
Protective Order

KG: UMKAY.
BP: AND THEN I MEAN WE'D DONE ALL THAT WORK TO, TO PREPARE OURSELVES TO TOWARD FINISHING THE JOB AND THEN THE WEEKEND AFTER THE 4TH OF JULY

KG: LET'S STOP RIGHT THERE. WHILE YOU WERE DOING THE REPAIRS, AH, WHERE DID YOU GET, DID YOU HAVE TO BUY MATERIAL FOR THE REPAIR?
BP: YES, I HAD BOUGHT A TARP.

KG: OKAY. AND WHERE'D YOU BUY THAT FROM?
BP: LOWE'S.

KG: AND DO YOU KNOW HOW MUCH IT COST?
BP: IT WAS 32 DOLLARS AND SOME ODD CHANGE.

KG: OKAY. AH, SO DID YOU AND YOUR FATHER IN FACT START WORKING ON THE REPAIRS OF THE ROOF?
BP: YES, ER, WE PUT THE TARP ON IT AND STUCK BRICK ALL ON THE TARP SO THE TARP WOULDN'T BLOW AWAY. AND THEN WE WAS GONE DO THE FULL REPAIR THE WEEKEND AFTER WE COME BACK, WHICH WE HAD FORGOTTEN ABOUT MY NIECE'S BIRTHDAY PARTY.

KG: UM, HM.
BP: SO, WE CALLED, OR SHE CALLED BEFORE WE EVEN HAD TIME TO CALL AND SHE SAID THAT

KG: WAS THIS ON THE 4TH OF JULY?
BP: NO, THIS IS THE WEEKEND AFTER THE 4TH OF JULY.

KG: OKAY. GO AHEAD.
BP: AND SHE SAID THAT SHE WAS GONNA MAKE THE TICKET REPAIR, I MEAN

KG: SAY THAT AGAIN.
BP: SHE SAID SHE WAS GONNA MAKE THE TICKET REAPPEAR AND

KG: SO FROM THE LAST, FROM THE TIME THAT SHE PUT THE TARP ON THERE, UNTIL TWO WEEKS LATER
BP: SHE SAID THAT.

KG: THAT'S THE ONLY TIME YOU TALKED TO HER?
BP: RIGHT.

KG: OKAY. AND WHEN WAS THE PARTY?
BP: IT WAS ON A SATURDAY.

KG: WAS THAT ON THE 4TH OF JULY WEEKEND?
BP: NO, IT WAS THE WEEKEND AFTER 4TH OF JULY.

KG: OKAY. GO AHEAD.
BP: AND SHE TOLD MY DAD IT WAS GONE REAPPEAR AND SO I WENT DOWN TO TALK TO HER.

KG: AND THAT'S WHAT YOUR FATHER TOLD YOU?
BP: RIGHT.

KG: UMKAY. BUT YOU DIDN'T TALK TO HER DIRECTLY THAT WEEKEND AFTER THE

DOTHAN/Martin & Brackin 1460
CONFIDENTIAL Subject to Protective Order

KG: 4TH?
BP: YEAH, I WENT DOWN THERE AND TALKED TO HER, AFTER SHE, AFTER MY DAD HAD TOLD ME THAT I WENT DOWN THERE AND TALKED TO HER.

KG: UMKAY.
BP: AND UH, WENT DOWN THERE AND TALKED TO HER AND SHE TOLD ME THAT IT WAS GONNA REAPPEAR. AND THAT SHE WANTED FULL PAY' FULL PAYMENT FOR THE BLAZER. AND I, I TOLD HER I SAID WELL, MARY, MY, MY LABOR AIN'T FREE.

KG: UM, HM.
BP: AND SHE SAID WELL I DON'T THINK IT WAS WORTH WHAT YOU'RE GONNA CHARGE ME. I SAID WELL I MEAN THAT'S, THAT'S WHAT I'M GONNA CHARGE AND I MEAN IF YOU WASN'T AWARE OF IT I MEAN, THAT'S WHAT I'M CHARGING.

KG: RIGHT.
BP: SO SHE DIDN'T AGREE WITH IT AND SHE TOLD ME MY TICKET WAS GONE REAPPEAR. SHE SAID JUST LOOK FORWARD TO IT.

KG: UMKAY. GO BACK AND LOOK AT THE DATES HERE. AH, JULY THE 4TH OF 2004 WAS ON A
BP: SATURDAY.

KG: SUNDAY.
BP: OKAY, SUNDAY.

KG: OKAY. AH, SO THE LAST WEEKEND IN JUNE WOULD BE HERE. WHEN DID YOU, ABOUT WHEN DID YOU GO AND DO THE BUSH HOGGING?
BP: JUST ABOUT BETWEEN HERE.

KG: THIS IS JUNE
BP: UM, HM.

KG: AND THIS STARTS JULY.
BP: IT WAS ABOUT THURSDAY, WEDNESDAY OR THURSDAY.

KG: WHAT, WHAT DATE?
BP: THE 23RD.

KG: OKAY AROUND THE 23RD OF JUNE IS WHEN YOU DID THE BUSH HOGGING?
BP: UM, HM.

KG: OKAY. WHEN DID YOU DO THE TARP REPAIR? WHEN'D YOU PUT THE TARP ON THERE?
BP: THE,

KG: THAT'S JULY RIGHT HERE.
BP: I DON'T KNOW EXACTLY WHAT.

KG: THAT'S JULY.
BP: OKAY, SO IT WAS ON THE WEEKEND THAT WE PUT THE TARP ON THERE, SO

KG: OKAY, THAT'S THE 3RD OF JULY, AND THAT'S THE SATURDAY
BP: IT THAT'S THE WEEKEND BEFORE, THE 4TH OR THE 3RD.

KG: UMKAY, OKAY, SO THAT WOULD'VE BEEN THE WEEKEND OF THE 10TH AND THE 11TH?

DOTHAN/Martin & Brackin 1461
CONFIDENTIAL Subject to
Protective Order

BP: RIGHT.

KG: OKAY. AND YOU DID THE BUSH HOGGING THE WEEKEND BEFORE THAT, WELL DURING THE WEEK.

BP: RIGHT.

KG: BEFORE THAT.

BP: RIGHT.

KG: OKAY. PUT THE TARP ON AROUND THE 10TH OR THE 11TH OF, EXCUSE ME, THE 10TH OR THE 11TH OF JULY?

BP: NO, NOT JULY.

KG: UMKAY. HELP ME OUT HERE.

BP: IT'S THE 26TH OR 27TH.

KG: OKAY. OKAY. THE 26TH AND 27TH OF JULY.

BP: UM, HM.

KG: I'VE GOT YOU NOW, I, I'VE, SO AH AFTER YOU PUT THE TARP ON THE 4TH OF JULY WEEKEND YOU DIDN'T DO ANYTHING FOR HER

BP: RIGHT.

KG: AND THE WEEKEND AFTER THAT AROUND 10TH TO 11TH IS WHEN

BP: EVERYTHING OCCURRED.

KG: OKAY. NOW WHEN SHE WAS HAVING THIS CONVERSATION WITH YOU AFTER SHE TOLD YOUR FATHER THAT THE TICKET WAS GONNA REAPPEAR, YOU DIDN'T HEAR THAT CONVERSATION?

BP: NO.

KG: HE TOLD YOU THAT, THAT WAS WHAT SHE SAID.

BP: RIGHT.

KG: HAD YOUR MOTHER TALKED TO HER THAT YOU KNOW OF?

BP: I DIDN'T KNOW IF SHE, I WAS OUTSIDE SO I DON'T KNOW IF SHE DID OR WHO DID.

KG: UMKAY. SO AFTER YOUR FATHER TOLD YOU THAT, DID YOU GO TO HER HOUSE THE SAME DAY?

BP: YEAH, I WENT THERE THAT AFTERNOON AND TALKED TO HER.

KG: YOU WERE ARRIVING AT THE HOUSE, KNOCKED ON THE DOOR, RANG THE DOORBELL, WHAT'S SAID?

BP: I SHOWED HER THE RECEIPT AND I TOLD HER I SAID SINCE YOU DON'T WANT ME TO DO THE WORK, I SAID WELL HERE'S YOUR RECEIPT AND THIS IS WHAT I'M GONE CHARGE YOU. AND SHE, AH, OFF OF THE BLAZER PAYMENT.

KG: UM, HM.

BP: AND SHE SAID WELL CAUSE I GAVE HER 80 OR 90 DOLLARS AND THAT WAS TAKEN FROM THE BLAZER PAYMENT WHICH WAS $175.00.

KG: SO, THE BLAZER PAYMENT'S 175 BUT YOU GAVE HER $90 FOR THE PAYMENT AND THE REMAINING BALANCE IS WHAT YOU CHARGED HER FOR THE

BP: RIGHT.

KG: WHAT, FOR WHAT YOU ALREADY HAD DONE FOR THE BUSH HOGGING AND PUTTING

DOTHAN/Martin & Brackin 1462
CONFIDENTIAL Subject to Protective Order

```
            THE TARP AND SWEEPING OFF THE TOP OF THE TRAILER.
    BP:     RIGHT. WELL PRETTY MUCH I HAD ALREADY FORGOTTEN ABOUT THE BUSH HOGGING
            SO I WAS JUST PRETTY MUCH CHARGING HER FOR THE LABOR ON THE ROOF.

    KG:     OKAY, AND THAT WAS YOU AND YOUR FATHER?
    BP:     RIGHT.

    KG:     UMKAY. AH, THEN WHAT DID SHE SAY TO THAT ONCE YOU GAVE HER THE $90
            AND SAID THAT?
    BP:     SHE SAID WELL I WANT MORE. SHE SAID THAT WASN'T GONE WORK. I SAID,
            WELL, MARY THAT'S WHAT I WAS CHARGING. I SAID MY LABOR'S NOT FREE.

    KG:     UM, HM.
    BP:     AND SHE SAID WELL IT, THAT'S JUST NOT ENOUGH. AND SHE SAID, WELL, SHE
            STARTED GETTING AGGRAVATED AND EVERYTHING AND I SHOWED HER THE RECEIPT
            FROM LOWE'S ABOUT THE TARP AND EVERYTHING AND SHE TRIED TO KEEP THAT
            RECEIPT. AND I, SHE WALKED BACK INSIDE AND, THEN SHE COME BACK OUTSIDE
            AND I FORGOT ALL ABOUT THE RECEIPT THEN CAUSE SHE HAD ALREADY PUT IT IN
            THE HOUSE, OR SHE SAID WELL JUST BE LOOKING FORWARD FOR THAT TICKET TO
            REAPPEAR. I SAID OKAY. I SAID WELL DO WHAT YOU GOTTA DO, MARY. SO I
            GOT IN THE TRUCK AND ONE OF MY BUDDIES WAS IN THE TRUCK AND HE SAID GET
            THAT RECEIPT.

    KG:     UM, HM.
    BP:     SO I WENT BACK TO THE DOOR AND I KNOCKED ON THE DOOR AGAIN.

    KG:     JUST A SECOND (PHONE) I'M GONE STOP THE RECORDING. CONTINUE THE
            AH INTERVIEW. TIME IS 4:36 P.M. I'M SORRY. GO AHEAD.
    BP:     WHERE WAS I AT?

    KG:     WHENEVER AH, YOU WERE, YOUR BUDDY TOLD YOU TO GO BACK
    BP:     YEAH, HE TOLD ME TO GO BACK AND GET THE RECEIPT. WELL I WENT BACK UP
            TO THE DOOR AND KNOCKED ON THE DOOR AND ASKED HER FOR THE RECEIPT AND
            SHE SAID WELL I'LL MAKE YOU A COPY OF IT. I SAID NO I DON'T WANT A
            COPY, I WANT THE REAL RECEIPT.

    KG:     UM, HM.
    BP:     SO THAT WAY JUST IN CASE I NEED IT I'LL HAVE IT. AND SHE SAID WELL I
            WANT THE REAL RECEIPT, I SAID N', I SAID I'LL MAKE YOU A COPY AND THEN
            I'LL BRING YOU BACK A COPY WHICH I NEVER DID.

    KG:     UM, HM.
    BP:     BUT AH, AND THEN WE LEFT. AND THAT, THAT'S ALL I HEARD FROM HER.

    KG:     UMKAY. SO
    BP:     AND I NEVER GOT ANYTHING ABOUT COURT OR ANYTHING TO THIS TICKET.

    KG:     FROM THE DAY THAT YOU WERE GIVEN THE TICKET UNTIL AFTER THE 4TH OF JULY
            OF THE FOLLOWING YEAR?
    BP:     WHEN I GOT ARRESTED, OR WHEN I DIDN'T APPEAR IN COURT, WHICH I NEVER
            GOT A THING FOR TO GO TO COURT, I GOT ARRESTED BECAUSE I DIDN'T GO TO
            COURT.

    KG:     OKAY. HAVE YOU RECEIVED ANY LETTERS OR ANYTHING FROM THE MAGISTRATE'S
            OFFICE SAYING THAT YOU HAD A COURT DATE?
    BP:     NO.
```

DOTHAN/Martin & Brackin 1463
CONFIDENTIAL Subject to
Protective Order

KG: OKAY. YOU WERE JUST ARRESTED AH
BP: WENT TO JAIL AND THEN I, THEY TOLD ME, GAVE ME A COURT DATE AND ALL.

KG: UMKAY. SO GO BACK AGAIN ONCE, ONCE MORE FOR ME. WHEN DID MARY TELL YOU OR HOW DID MARY TELL YOU ABOUT AH TAKING CARE OF THE TICKET AGAIN. I WANTA MAKE SURE I HAVE IT ABSOLUTELY CLEAR.
BP: SHE JUST TOLD ME SHE WAS GONE TAKE CARE OF IT.

KG: SHE DIDN'T TELL YOU HOW?
BP: NO.

KG: WELL I THINK YOU SAID THAT SHE SAID THAT SHE WAS GONNA TALK TO THE SERGEANT?
BP: TALK TO THE SERGEANT AND SEE WHAT SHE COULD DO WITH IT.

KG: OKAY.
BP: SO I MEAN WHAT, I MEAN I DON'T, I DON'T KNOW WHAT SHE DONE WITH IT.

KG: OKAY. WHERE'S THE, THE COPY OF THAT TICKET?
BP: IT'S AT MY MOTHER'S HOUSE.

KG: OKAY, SO YOU NEVER DID GIVE HER THE TICKET?
BP: NO.

KG: UMKAY. HOW WERE YOU SUPPOSED TO KNOW IF THE TICKET WAS TAKEN CARE OF?
BP: SHE TOLD ME IT WAS TAKEN CARE OF.

KG: UMKAY. WHEN WAS THAT?
BP: I DON'T KNOW THE EXACT DATE.

KG: UMKAY. TELL ME ABOUT THAT.
BP: I MEAN SHE JUST TOLD ME THAT IT WAS TAKEN CARE OF AND I MEAN I DIDN'T, I JUST DIDN'T THINK NOTHING ELSE ABOUT IT.

KG: I MEAN DURING EVERYTHING YOU JUST TOLD ME WHERE DOES THAT FIT IN AT?
BP: WHERE DID WHAT FIT IN?

KG: WHEN SHE TOLD YOU THE TICKET WAS TAKEN CARE OF?
BP: AFTERWARDS. I MEAN AFTER SHE, AFTER SHE HAD TOLD, TOLD ME THAT SHE'D TALK TO A SERGEANT OR WHATEVER.

KG: UMKAY. YOU DIDN'T, YOU DIDN'T SAY THAT DURING THE STORY. FROM WHAT I UNDERSTOOD YOU SAID THAT WHEN YOU WENT TO HER HOUSE TO SHOW HER HUSBAND THE TICKET, HER HUSBAND CALLED HER, AND SHE SAID SHE'LL TALK TO THE SERGEANT ABOUT THE TICKET. AND THAT'S IT. YOU NEVER SAID ANYTHING ABOUT HER TALKING, BRINGING THE TICKET UP AGAIN. SO THAT'S WHAT I'M SAYING. WHEN DID SHE COME BACK AGAIN AND TELL YOU THAT IT WAS TAKEN CARE OF?
BP: A FEW DAYS LATER SHE TOLD ME THAT IT'D BE TAKEN CARE OF, NOT TO WORRY ABOUT IT.

KG: UMKAY. BUT JUST A SECOND AGO YOU SAID SHE TOLD YOU IT WAS TAKEN CARE OF.
BP: UM, HM. THAT'S WHAT SHE SAID, IT WAS TAKEN CARE OF.

KG: UMKAY. EVIDENTLY YOU'RE NOT FOLLOWING WHAT I'M SAYING. UH, YOU'RE

DOTHAN/Martin & Brackin 1464
CONFIDENTIAL Subject to Protective Order

|    |    |
|----|----|
|    | SAYING THAT SHE SAID IT WOULD BE TAKEN CARE OF AND YOU'RE SAYING THAT SHE'S SAYING THAT IT WAS TAKEN CARE OF AT THE SAME TIME. WHICH ONE IS IT? |
| BP: | SHE JUST TOLD ME IT, NOT TO WORRY ABOUT IT IS WHAT SHE TOLD ME, IT'D BE TAKEN CARE OF. |
| KG: | AND THAT WAS THE FIRST DAY YOU SHOWED IT TO HER? |
| BP: | NO, SHE SAID, THE FIRST DAY I SHOWED IT TO HER SHE SAID LET HER TALK TO A SERGEANT. |
| KG: | OKAY. |
| BP: | OR WHATEVER HE IS. |
| KG: | OKAY. |
| BP: | AND A FEW DAYS LATER SHE COME BACK AND SHE TOLD ME NOT TO WORRY ABOUT IT, IT'D BE TAKEN CARE OF. |
| KG: | UMKAY. WHAT INCIDENT, WHAT WAS HAPPENING FOR YOU TO BE THERE A FEW DAYS LATER FOR HER TO SAY THAT? |
| BP: | OH, I WAS WORKING. SHE COME DOWN TO THE SHOP. |
| KG: | OKAY. UMKAY. AND ABOUT WHEN WAS THAT IN RELATION TO WHEN YOU SHOWED HER THE TICKET? HOW MUCH TIME HAD PASSED? |
| BP: | ABOUT TWO WEEKS. SOMEWHERE IN THAT VICINITY. |
| KG: | UMKAY. AND SHE'D TOLD YOU IT WAS ALREADY TAKEN CARE OF TWO WEEKS AFTER YOU GOT THE TICKET. |
| BP: | SHE TOLD ME NOT TO WORRY ABOUT IT NO MORE. |
| KG: | UMKAY. BUT DID SHE SAY IT WAS (UNINT)? |
| BP: | YEAH, SHE SAID DON'T WORRY ABOUT IT, IT WOULD BE TAKEN CARE OF. |
| KG: | IT WOULD BE TAKEN CARE OF. |
| BP: | IT WOULD BE TAKEN CARE OF, LIKE EITHER SHE HAD ALREADY DONE SOMETHING WITH IT OR SHE WAS GONNA DO SOMETHING WITH IT. I DON'T KNOW. |
| KG: | OKAY. |
| BP: | SO I MEAN IT WAS TAKEN CARE OF IN MY BOOK. |
| KG: | OKAY. AH, WHAT, DID YOU SPEAK TO ANYONE ELSE AT THE MAGISTRATES OFFICE AFTER YOU WAS ARRESTED? OR HAVE YOU TALKED TO HER AGAIN SINCE? |
| BP: | NO, I HAVEN'T TALKED TO HER. I WENT UP THERE AND TALKED TO THE LADY AT THE DESK, TO TRY TO PAY THE FINE. AND SHE SAID NO YOU GOT TO GO TO COURT NOW BEING AS YOU'VE ALREADY BEEN ARRESTED. |
| KG: | OKAY? WHO IS IT YOU TALKED TO? |
| BP: | BIG BLACK LADY AT THE FRONT. |
| KG: | MRS. MCCLAIN? |
| BP: | YEAH. |
| KG: | OKAY. |
| BP: | THE ONE THAT'S USUALLY IN COURT. |
| KG: | UMKAY. |
| BP: | YEAH. |

DOTHAN/Martin & Brackin 1465
CONFIDENTIAL Subject to
Protective Order

KG: AND WHAT DID YOU TELL HER?
BP: I ASKED HER IF COULD PAY THE TICKET.

KG: UM, HM.
BP: AND SHE TOLD ME NO, YOU GOTTA GO TO COURT. I, I TOLD HER I SAID WELL MY BONDSMAN SAID I COULD COME UP HERE AND PAY IT. AND SHE SAID NO YOU GOTTA GO TO COURT. I SAID OKAY. WELL I LEFT. I WENT DOWN TO MY BONDSMAN AND I TALKED TO HIM, AND AH I SAID I THOUGHT YOU SAID I COULD GO TO THE, UH, MAGISTRATES OFFICE AND PAY THIS. AND HE SAID WELL YOU CAN. I SAID WELL I JUST COME FROM THERE. HE SAID ALL RIGHT, WELL LET ME CALL UP THERE. THEN I GUESS THAT HE CALLED UP THERE AND THEY TOLD HIM I HAD TO GO TO COURT CAUSE I HAD ALREADY BEEN ARRESTED.

KG: UM, HM.
BP: SO I HAD TO GO TO COURT OVER (UNINT)

KG: UMKAY. AND SO YOU DID GO TO COURT.
BP: I WENT TO COURT.

KG: AND WHAT HAPPENED IN COURT?
BP: IT GOT POSTPONED.

KG: OKAY. WHY?
BP: BECAUSE MY LAWYER WANTED TO LOOK INTO IT.

KG: UMKAY. DID YOU TELL ANYBODY ELSE WHAT HAPPENED?
BP: NO.

KG: DID YOU TELL ANYBODY IN COURT OR DID YOU TELL THE LADY, MRS. MCCLAIN?
BP: UH, YEAH I TOLD HER WHAT HAPPENED IN THE MAGISTRATES OFFICE.

KG: UMKAY, SO YOU TALKED TO HER TWICE?
BP: ONCE.

KG: UMKAY YOU TOLD HER WHAT HAPPENED AT THE MAGISTRATES OFFICE?
BP: AT THE MAGISTRATES OFFICE.

KG: AND THEN YOU SAW HER IN COURT AND ASKED TO PAY FOR IT?
BP: NO, I ASKED TO PAY FOR IT AT THE MAGISTRATES OFFICE.

KG: OKAY.
BP: SO I DIDN'T REALLY TALK TO HER AT COURT.

KG: UMKAY. HAVE YOU, WHEN WAS THE LAST TIME YOU HAD A CONVERSATION WITH MRS. AH TURNER?
BP: THAT WEEKEND.

KG: WHAT WEEKEND?
BP: THE WEEKEND AFTER THE 4TH.

KG: OKAY. AROUND THE 10TH, I BELIEVE WE SAID AROUND THE 10TH OR 11TH?
BP: RIGHT.

KG: AND THAT WAS ABOUT THE, THE REPAIRS OF THE TRAILER?
BP: RIGHT. RIGHT.

DOTHAN/Martin & Brackin 1466
CONFIDENTIAL Subject to Protective Order

KG: UMKAY. IS THERE ANYTHING ELSE THAT YOU'D LIKE TO ADD THAT I HAVEN'T ASKED YOU ABOUT?
BP: NO.

KG: UMKAY. BUT EVERYTHING YOU TOLD ME IS TRUE?
BP: YES.

KG: IT'S GONNA BE THE END OF STATEMENT. TIME IS 4:44 P.M.

DOTHAN/Martin & Brackin 1467
CONFIDENTIAL Subject to
Protective Order