# Dothan Police Department

## M E M O R A N D U M

**FROM**     :     Sgt. I. Keith Gray

**TO**          :     Chief John C. White

**DATE**      :     December 20, 2001

**SUBJECT** :     **INTERNAL COMPLAINT**



This is to inform you of the results of the internal investigation regarding the matter of Magistrate Mary Beth Brackin.  The allegations specifically state that on September 25, 2001 a defendant, Kimberly Rapelje, was attending municipal court and informed Judge Rose Evans-Gordon that she went to the magistrate's office in order to obtain an appeal bond for her charge of D.U.I.  A magistrate, later determined to be Ms. Brackin, told her that she should ask for another lawyer because, "They have had many complaints about "Shaun," (referring her attorney Shaun McGhee) and the first thing she should do is get rid of Shaun.  Ms. Rapelje stated further that Ms. Brackin told her it was "dumb" of Mr. McGhee to allow her to plead guilty to a D.U.I when she only blew a .00."

Sergeant Gary Coleman and I conducted interviews with the following individuals in order to obtain the facts surrounding the allegations: Kimberly Rapelje, Mary Beth Brackin, Donna Nicholson, Billy Shaun McGee, Andrew Turner, Michelle Sellers, Donna Grumbach, Ashton Ott, and Mary Turner.

The following paragraphs will be an overview of the statements taken from the witnesses listed above.  See their attached transcribed statements for the complete details of the interview.

**Kimberly Rapelje** stated, she attended municipal court for her second D.U.I. case on September 25, 2001, and wanted to file an appeal bond on the first D.U.I. case.  When she appeared for court that day she was under the influence of alcohol as well, and proceeded to the magistrate's office to sign the bond.  During her first case her attorney, Shaun McGhee, worked out a plea agreement for her to plead guilty to the D.U.I. in exchange for 3 citations to be dismissed.  Ms. Rapelje was told by Ms. Brackin, "If her lawyer instructed her to plead guilty to D.U.I. the first time, and he advised her to appeal it, it does not seem like he is a very good lawyer."  When asked if anyone else was present with her during her discussion with Ms. Brackin,  Ms. Rapelje advised her sister Donna Grumbach and her bondsman Andrew Turner.

After signing the appeal bond, Ms. Rapelje returned to the courtroom and stood before Judge Gordon.  According to Ms. Rapelje, the judge and Mr. McGhee found out about the comments that were made by Ms. Brackin.  Ms. Rapelje did not remember specifically who apprised them, but stated it had to

DOTHAN/Martin & Brackin 1206
Confidential Subject to Protective
Order

have been her sister, Mr. Turner, or herself. Once hearing this information, Mr. McGhee told Ms. Rapelje that he did not feel comfortable representing her anymore because she might have doubts as to his expertise.

**Donna Grumbach** stated, she accompanied her sister Ms. Rapelje to municipal court, (not on the date in question), and they spoke with a private attorney outside of the courtroom. She advised this attorney of the situation concerning a D.U.I. case where Ms. Rapelje's blood alcohol content was .000. She further explained to the private attorney that Mr. McGhee, recommending she plead guilty to it in exchange for several other citations issued to her being dismissed.

Ms. Rapelje decided when she went to court on September 25, 2001, she would inquire about signing an appeal bond. On that day, they went to the magistrate's office in order to sign the appeal bond and discussed the case. Ms. Grumbach stated, the magistrate, "Just made a face," and told Ms. Rapelje that if she was not happy with the attorney that she had, ask for a different one, because she had a public defender. The magistrate did not know why he, Mr. McGhee, would advise her to go that route. "I don't know why he told you to do that because this would have been cheaper, going...", stated Ms. Brackin. Ms. Grumbach does not remember Ms. Brackin saying that her lawyer made a "dumb" move or anything of that nature. When asked if Ms. Brackin's comment made Ms. Rapelje loose confidence in Mr. McGhee, Ms. Grumbach stated, in her opinion her sister had already lost confidence in him after talking to the private attorney.

**Andrew Turner** stated, he works for Thompson's Bonding and he received a call to meet Ms. Rapelje and Ms. Grumbach at the magistrate's office. Once he arrived he spoke briefly to Ms. Ms. Brackin about the appeal bond and overheard Ms. Brackin asking Ms. Rapelje why she plead guilty to D.U.I. when she blew .000. Ms. Rapelje replied that her attorney advised her to plead guilty. Ms. Brackin then said, "I don't see why he told you to plead guilty to this charge you came up .000. That's stupid for your attorney to tell you to plead guilt, we need some better public defenders." Mr. Turner said she stated further, "That's messed up, because Shaun's there today and he gone have to be your lawyer again today. You should ask to get him put off your cases since he told you to plead guilty to a charge you shouldn't plead guilty to." In addition, Mr. Turner said that Ms. Brackin had a very sarcastic demeanor when talking about Shaun. He was of the impression that Ms. Brackin had bad feelings towards Mr. McGhee. "She made a statement that she had had problems with Shaun before in the past about doing stuff like this here. She said she has had problems and a lot of complaints about Shaun."

Mr. Turner, Ms. Rapelje, and Ms. Grumbach returned to municipal court where Ms. Rapelje talked to Judge Gordon about what was said by Ms. Brackin. The judge questioned her further and noticed that she was under the influence of alcohol. Judge Gordon asked Ms. Rapelje if anyone else had heard her conversation with Ms. Brackin and she advised her that the bondsman was present. Judge Gordon called Mr. Turner to the bench and then called Ms. Aston Ott, Mr. McGhee and Ms. Rapelje to her chambers for a conference.

Mr. Turner advised me that sometime later, Ms. Brackin called him at home and asked him what happened in court, and did he tell the judge what she said about Mr. McGhee. Mr. Turner advised Ms. Brackin that he did talk to the judge and she told him that she could loose her job. Ms. Brackin asked Mr. Turner if he would write a statement, recanting what he heard, and he refused.

DOTHAN/Martin & Brackin 1207
Confidential Subject to Protective
Order

**Ashton Ott**, Assistant City Attorney, stated that she was in the courtroom when Ms. Rapelje wanted to appeal her first D.U.I. conviction. Ms. Rapelje left to get an appeal bond signed at the magistrates office and returned advising the court that Ms. Brackin told her that she should not have plead guilty to the first D.U.I. because the blood alcohol content was .000. Ms. Brackin asked Ms. Rapelje who her lawyer was and she replied Mr. Shaun McGhee. Ms. Rapelje told the judge that Ms. Brackin replied, "Oh, no wonder," or something along those lines, Ms. Ott explained. Ms. Ott explained that Mr. McGhee is a contract Public Defender for the City of Dothan.

Due to Ms. Rapelje's intoxicated status, Ms. Ott and Judge Gordon had doubts that Ms. Brackin said those things to Ms. Rapelje. The judge called Mr. Turner to the bench, and as he stood there he appeared to glance at the magistrate sitting next to the judge, which was Ms. Mary Turner. He identified Ms. Brackin as the one who made the comments to Ms. Rapelje. Ms. Ott said the Mr. Turner told the judge that during Ms. Brackin and Ms. Rapelje's conversation, he was talking on his cellular phone and did not really hear everything. Ms. Ott noticed that Mr. Turner appeared to be acting very funny when talking to the judge. This is when the judge decided to take a break. Ms. Ott spoke with Mr. Turner in the hallway near the judge's chambers and accused him of withholding additional information about the incident. This is when he told Ms. Ott the same thing, even using some of the same verbiage that Ms. Rapelje told Judge Gordon Ms. Brackin said about Mr. McGhee. Ms. Ott stated that the allegations were "Extremely believable" stating, "When you quote somebody, you don't give the same words that somebody else gave unless you heard it. And he, Mr. Turner, had not been present when Ms. Rapelje was telling her story to the court." Ms. Ott told the judge what Mr. Turner revealed to her. Ms. Ott stated that Judge Gordon contacted Court Administrator, Donna Nicholson advising her of the incident. Ms. Nicholson and Ms. Ott had a meeting with the judge the next day. It had come to the judge's attention thay Ms. Brackin made contact with Michelle Sellers in order to contact Mr. McGhee so they could straighten the situation out.

Ms. Ott stated, she has had problems with Ms. Brackin in the past, and she (Brackin) has had very little to say to her (Ott). Ms. Ott believes that Ms. Brackin has some animosity towards her that has primarily arisen out of this incident as well as another unrelated incident. Ms. Ott stated that Ms. Brackin should not be giving out legal advice. When Ms. Ott confronted Ms. Brackin about the incident she denied making the statements that Ms. Rapelje and Mr. Turner said she made.

**Michelle Sellers**, Administrative Assistant to the Judicial Department, stated, Ms. Brackin came to her office and asked her to, "Get Shaun over here so that she could straighten out this mess with him and the bondsman." Ms. Brackin told Ms. Sellers that she (Brackin) had called Mr. Turner at home on the previous night and now she wanted to talk with both of them together. Ms. Sellers had reservations about the meeting and advised the judge of Ms. Brackin's request. Judge Gordon would not approve the meeting and wanted to get all of the parties involved in order to discuss the phone call Ms. Brackin made to Mr. Turner.

**Mary Turner** stated, on September 25, 2001 she was the magistrate assigned to work court and Ms. Rapelje was in court for D.U.I. and wanted to appeal her first D.U.I. conviction. Ms. Brackin called her (Ms. Turner) on the phone to let her know that Ms. Rapelje was in the magistrate's office signing an appeal bond. Ms. Rapelje returned to the courtroom and was confronted about the odor of alcohol coming from her. Ms. Rapelje was given a breath test and scored .19.

DOTHAN/Martin & Brackin 1208
Confidential Subject to Protective Order

Ms. Turner advised me that she really did not have any first hand information as to what Ms. Rapelje told the judge because she did not hear what Ms. Rapelje, nor Mr. Turner had to say. She only remembers the judge questioning them about something that occurred at the magistrate's office.

**Shaun McGhee** stated he was assigned as counsel for Ms. Rapelje on her D.U.I. case and they worked out a plea agreement without incarceration. She plead guilty and later wanted to appeal the conviction. He advised her to get a bondsman to meet her at the magistrate's office, and talk with the magistrate regarding how to fill out the paperwork. Approximately thirty minutes past and she came back seemingly distraught, and upset. When he asked her what was wrong she stated that the magistrate told her she needed another public defender, and that they had had a lot of complaints with Mr. McGhee due to ethical and professional reasons. Mr. McGhee advised Ms. Rapelje that he thought it was best for the to speak with the judge in order that he be taken off of the case. He felt that he did not want to represent a client who thinks he is incompetent. She did so and the judge began to look into the incident.

Mr. Turner approached Mr. McGhee and advised him that he heard Ms. Brackin telling his client that she needed another lawyer, and there were a lot of complaint on him. The next day both Mr. Turner and Mr. McGhee had yet another conversation, with Mr. Turner told him that Ms. Brackin called him that night at his residence and they discussed the incident further.

Mr. McGhee stated that Ms. Rapelje was arrested on the D.U.I. for controlled substance, not alcohol. He explained further, that during the trial, the officer was going to testify that his client was under the influence of pain medication of some kind. Based on his client's admission, and the pill bottle that was recovered he anticipated the officer would offer as evidence. Mr. McGhee stated Attorney Jennifer Atwell replaced himself due to the controversy. Mr. McGhee stated, he knows Mr. Turner to be an honest upstanding person and he (McGhee) does not have any doubt whatsoever in Andrew Turner's statements to him.

**Donna Nicholson** stated, she received a telephone call from Judge Gordon about the incident. She advised her of the allegations and directed her to talk with Ms. Brackin about it. As she looked into the incident, she found out that Ms. Rapelje was under the influence of alcohol at the time the allegations were made, and she (Nicholson) thought the incident was over. Ms. Nicholson spoke again with Ms. Brackin and advised her to go to the judge's office and see what was going on with the allegations. Ms. Brackin complied and returned telling Ms. Nicholson that everything was taken care of and reiterated that Ms. Rapelje was intoxicated.

Ms. Nicholson advised me that it is not the policy of the magistrate's office to discuss the credibility of lawyers nor bonding companies, however, she added it is their job to discuss options such as youthful offender qualifications etc... Ms. Nicholson wanted to make it clear that she was not a witness to any of the allegations. Ms. Nicholson spoke with Ms. Ott, and Mr. Turner about the incident as well.

A meeting was held in one of the witness rooms when it was discovered that Ms. Brackin had contacted Mr. Turner at home. At that meeting Ms. Nicholson and Ms. Ott were interviewing Mr. Turner and they were discussing what Ms. Brackin said to Ms. Rapelje. Ms. Nicholson she found that Thompson Bonding Company provided the phone number of Mr. Turner to Ms. Brackin.

DOTHAN/Martin & Brackin 1209
Confidential Subject to Protective
Order

Ms. Nicholson was asked how Ms. Brackin gets along with other people and she replied that Ms. Brackin was "Abrasive; She comes across a little sharp." She explained further that Ms. Brackin has her good days and bad days.

Ms. Nicholson discredits Ms. Rapelje's allegations due to her being under the influence of alcohol at the time the incident took place, and stated that it was not logical for any magistrate to make those statements due to the different types of D.U.I. Ms. Nicholson stated, when she talked with Mr. Turner she was comfortable what he said. She felt that his statements were true and she believes him, but she remembers Mr. Turner telling her that he was not paying close attention to the conversation between Ms. Brackin and Ms. Rapelje.

Ms. Nicholson was asked by Judge Gordon to take some kind of disciplinary action towards Ms. Brackin but she did not. When asked why she had not she stated she was unsure of what to write it up under, and she had questions to discuss with the personnel manager. At the end of our interview of Ms. Nicholson she advised me that "she was not trying to make a decision on "who's guilty and who did what, I'm just trying to deal with it from a supervisor's stand point...."

**Mary Beth Brackin** stated, she never made any remarks to Ms. Rapelje about Mr. McGhee's performance as a lawyer. She added that Ms. Rapelje, Mr. Turner and another woman came to the magistrate's office in order to sign an appeal bond and Ms. Rapelje was upset and crying because of the previous D.U.I. that she wanted to appeal due to her blood alcohol content being .000. She continued to say that she had another D.U.I. case that same day and she was going to have the same attorney. Ms. Brackin advised her that, "If you feel like you want a different public defender, I said, you can go talk to Judge Gordon and see if she can continue your case because we have two other Public Defenders and that's all I said to her." They all left to go back to the municipal court. A few hours later Ms. Nicholson confronted her with allegations of giving out legal advice to Ms. Rapelje and directed her to go to the judge's office and discuss the issue.

Ms. Brackin attended a meeting later with Ms. Ott, Mr. McGhee, and Judge Gordon. They confronted her with the allegations and she denied making any such statement. She added that she has a very good rapport with Mr. McGhee. Ms. Brackin stated, she just advises defendants of their rights as part of their duty. She did admit advising Ms. Rapelje that she had the right to appeal the case and have it heard by a jury, but she had to apply for a new attorney or public defender that would represent her in Circuit Court.

Ms. Brackin stated, she did speak with Mr. Turner about the allegations he shared with Ms. Ott and Mr. McGhee and she was very upset with what he accused her of saying. She said that Mr. Turner was on the phone about ninety percent of the time she and Ms. Rapelje were conversing. During Ms. Brackin's conversation with Mr. Turner he stated to her that he told the judge that he was unsure of who made the statement due to him being on the cellular phone. Ms. Brackin asked him to meet with her on the next day so that they can get the incident straightened out. On the next day Ms. Brackin approached Ms. Sellers and asked her to contact Mr. McGhee in order to meet with her and Mr. Turner in order to finally get things worked out. The meeting never occurred.

DOTHAN/Martin & Brackin 1210
Confidential Subject to Protective
Order

Ms. Brackin did admit contacting Mr. Turner by phone at his residence to discuss this incident further. She stated she, in no way attempted to get him to recant his statement, nor told him that she could lose her job.


Sergeant I. Keith Gray, MS
Internal Affairs Division

Captain Nicholas Monday
Bureau Commander

DOTHAN/Martin & Brackin 1211
Confidential Subject to Protective
Order

# ADMINISTRATIVE INVESTIGATION
## TELEPHONE CONVERSATION WITH
## MS. KIMBERLY RAPELJE
### DATE AND TIME: NOVEMBER 7, 2001, 4:49P.M.

KR:  FOX'S PIZZA, CAN I HELP YOU?

KG:  MAY I SPEAK TO KIM?
KR:  THIS IS HER.

KG:  HI KIM THIS IS SERGEANT GRAY, DOTHAN POLICE.
KR:  HI.

KG:  HOW ARE YOU?
KR:  FINE.

KG:  WE ARE INVESTIGATING THE INCIDENT REGARDING THE
     MAGISTRATE THAT AH, SPOKE TO YOU AS FAR AS YOUR
     APPEAL BOND IS CONCERNED.
KR:  UN HUH.

KG:  AND WE JUST WANT TO ASK YOU SOME QUESTIONS.
KR:  OK.

KG:  ARE YOU AVAILABLE TO ANSWER THEM NOW?
KR:  AH, YEAH.

KG:  OK.  AH, IT IS AH, LET ME GO AHEAD AND TELL YOU I'M
     RECORDING THE PHONE CONVERSATION AND AH, I'M GOING
     TO DO THAT INSTEAD OF HAVING TO COME OUT AND TALK TO
     YOU AND GET A RECORDER AND SIT YOU DOWN AND ALL
     THAT, IS THAT OK?
KR:  YEAH.

KG:  OK. LET ME GO AHEAD AND DO THIS.  TODAY'S DATE IS
     NOVEMBER 7, 2001, THE TIME IS 4:49P.M.  KIM STATE YOU FULL
     NAME PLEASE.
KR:  KIMBERLY ANN RAPELJE.

KG:  OK.  AND WHAT BASICALLY I WANT TO DO IS JUST ASK YOU
     SOMETHING THAT OCCURRED AND JUST GO AHEAD AND SAY
     WHAT YOU WANT TO SAY ABOUT IT OK?
KR:  OK.

DOTHAN/Martin & Brackin 1212
Confidential Subject to Protective
Order

1

KG:  AH, I UNDERSTAND YOU CAME TO AH, THE MUNICIPAL COURT WITH A CASE FOR DUI.

KR:  CORRECT.

KG:  AND YOU WANTED TO PLEAD GUILTY TO THAT AND ESTABLISH AN APPEAL BOND AND YOU WERE DIRECTED BY YOUR ATTORNEY, SHAWN MCGEE TO GO TO THE MAGISTRATES OFFICE IN ORDER TO SIGN THAT APPEAL BOND WITH A BONDSMAN?

KR:  CORRECT.

KG:  OK. DO YOU REMEMBER THE BONDSMAN NAME?

KR:  ANDREW.

KG:  OK. AND COULD YOU TELL ME ONCE YOU ARRIVED WITH ANDREW OVER THERE, WHAT WAS YOUR CONVERSATION WITH THE MAGISTRATE?

KR:  AH, OK FIRST LET ME TELL YOU THAT, THAT PARTICULAR DAY I WAS IN COURT.

KG:  UM HUM.

KR:  OK. I HAD BEEN DRANKING YOU KNOW, ABOUT ALL NIGHT AND WHEN I WAS AH, BREATHALYZED I BLEW A .19 AND I WENT TO JAIL FOR CONTEMPT FOR COURT FOR FIVE DAYS. SO I WAS UNDER THE INFLUENCE OF ALCOHOL WHEN I WENT OVER TO THE MAGISTRATES OFFICE.

KG:  OK.

KR:  THAT'S JUST ME BEING HONEST WITH YOU.

KG:  OK.

KR:  NOW AH, HE WAS ALSO MY ATTORNEY ON THE FIRST DUI I HAD.

KG:  OK.

KR:  AND HE INSTRUCTED ME THAT IT WAS A GOOD DEAL BECAUSE THE DISTRICT ATTORNEY WAS GOING TO KNOCK OFF THREE TICKETS, IF I PLEAD GUILTY TO THE DUI. OK. AND SO I THOUGHT, HEY LESS MONEY I'LL GO AHEAD AND DO THAT. WELL, I HAD A SECOND DUI PENDING.

KG:  RIGHT.

KR:  OK. SO, THEN THAT'S GOING TO CHARGE ME WITH THE SECOND DUI.

DOTHAN/Martin & Brackin 1213
Confidential Subject to Protective
Order

2

KG:   CORRECT.

KR:   OK. AH, I WAS NOT UNDER THE INFLUENCE OF ALCOHOL WHEN I WAS ARRESTED FOR MY FIRST DUI, I BLEW ZERO'S.

KG:   RIGHT.

KR:   SO I WAS GOING TO FIGHT THAT IN COURT, BUT I'M THINKING BECAUSE I'M POOR AND I DON'T HAVE ANY MONEY, I'M THINKING THE EASY OUT IS GOING TO BE, LET THIS LADY THROW OUT THESE THREE OTHER TICKETS AND THEN I GO AHEAD AND PLEAD TO THIS DUI.

KG:   RIGHT.

KR:   THEN I'M INSTRUCTED THAT THE SECOND DUI, THAT'S GONE BE ON MY RECORD AND IT'S GOING TO BE A SECOND DUI AND THE PENALTIES ARE GOING TO BE MORE SEVERE THAN IF I WOULD HAVE PLEADED GUILTY TO THE THREE THAT SHE KNOCKED OFF AND NOT GUILTY TO THE ONE.

KG:   RIGHT.

KR:   SO I GOT SCARED.

KG:   UM HUM.

KR:   OK.  THEN THE LAWYER SAID, WELL YOU CAN APPEAL THAT. GO TO THE MAGISTRATES OFFICE RIGHT NOW AND APPEAL IT. SO THAT'S WHAT I DID.

KG:   OK.

KR:   WHEN, GO AHEAD.

KG:   (?) WHEN YOU WALKED OVER THERE AND YOU SPOKE WITH THE MAGISTRATE WHAT, WHAT DID, WHAT WAS THE CONVERSATION BETWEEN YOU TWO?

KR:   AH, I'M NOT POSITIVE BECAUSE LIKE I SAID I WAS UNDER THE INFLUENCE, BUT I DON'T KNOW HER EXACT WORDS.

KG:   I MEAN, JUST AH, IF YOU WANT TO PARAPHRASE IT, PARAPHRASE IT, SAY THIS ISN'T THE EXACT WORDS BUT AS MUCH AS YOU CAN REMEMBER JUST.

KR:   OK. AH, SHE BASICALLY GAVE ME AN OPINION THAT IF HE TOLD, YOU KNOW, IF HE INSTRUCTED ME TO, YOU KNOW, PLEAD GUILTY THE FIRST TIME, AND THEN HERE IT IS A WEEK LATER AND NOW HE'S INSTRUCTING ME TO APPEAL IT, THAT DOESN'T SEEM LIKE HE'S A VERY GOOD LAWYER.

DOTHAN/Martin & Brackin 1214
Confidential Subject to Protective

3

KG:  UM HUM.

KR:  AND THEN WHEN I WENT BACK OVER THERE, MY NIECE HAD SAID SOMETHING TO SOMEBODY ABOUT WHAT SHE HAD SAID. AND THEN HE TOOK ME IN THE HALLWAY AND HE TOLD ME.

KG:  OK. BEFORE YOU GO THAT FAR, AH, LET'S GO BACK TO THE MAGISTRATE'S OFFICE.

KR:  OK.

KG:  AH, WAS, WHO WAS PRESENT DURING THIS CONVERSATION?

KR:  AH, MY NIECE DONNA, AND YOU'VE ALREADY TALKED TO HER I BELIEVE.

KG:  RIGHT.

KR:  AND ANDREW THE BONDSMAN.

KG:  OK.

KR:  AND HE IS WITH THOMPSON.

KG:  OK. NOW AH, WAS THERE ANY OTHER DISCUSSION THAT YOU TWO HAD AS FAR AS YOU AND THE MAGISTRATE, ANYTHING AT ALL? SOMETHING YOU MAY HAVE TOLD HER OR WORDS EXCHANGED OR ANYTHING?

KR:  NOT THAT I KNOW OF.

KG:  OK.

KR:  I MEAN, SHE WAS EXPLAINING TO ME HOW THE AH, APPEAL BOND WAS GOING TO WORK.

KG:  RIGHT.

KR:  CAUSE I HAD NO CLUE.

KG:  OK.

KR:  AND BASICALLY SHE, I SIGNED THE PAPER AND WENT ON BACK OVER TO COURT.

KG:  WHAT WAS ANDREW DOING DURING YOUR CONVERSATION?

KR:  HE WAS STANDING BEHIND ME.

KG:  OK. AH, WAS HE THERE THE MAJORITY OF THE TIME?

KR:  AH, SHE REALLY DIDN'T DO ANYTHING UNTIL HE HAD GOTTEN THERE.

KG:  OK.

KR:   WE JUST, YOU KNOW, SHE JUST TOLD ME I NEEDED A
      BONDSMAN AND MY NIECE SAID, "WHICH ONE DO YOU WANT"?
      AND I JUST SAID, CALL THOMPSON.

KG:   ALL RIGHT.  OK.  COULD HE HAVE OVER HEARD THE
      CONVERSATION?
KR:   HE COULD HAVE.

KG:   OK.  AND YOUR NIECE AS WELL?
KR:   OH MY NIECE WAS WITH ME.  SHE TOOK ME UP THERE.

KG:   OK.  BUT WAS SHE IN CLOSE PROXIMITY?
KR:   SHE WAS RIGHT NEXT TO ME.

KG:   OK.  AH, WAS THERE ANYTHING ELSE SAID BY THE
      MAGISTRATE ABOUT THIS ATTORNEY?
KR:   NOT THAT I KNOW OF.

KG:   WAS THERE ANYTHING MENTIONED ABOUT YOUR POINT ZERO,
      ZERO AH, ALCOHOL CONTENT BY HER?
KR:   BY HER?  I DON'T REMEMBER.  I THINK I VOLUNTEERED THAT
      INFORMATION TO HER, BUT I DON'T REALLY REMEMBER HER
      COMMENTING ON THAT AT ALL.

KG:   OK.  AH, AFTER YOU LEFT THERE AND CAME BACK TO THE
      COURT, WHAT HAPPENED THEN?
KR:   AH, I DON'T REMEMBER QUITE WHO TOLD MR. MCGEE WHAT
      BUT AH, MR. MCGEE GOT WORD OF WHAT HAD HAPPENED
      OVER AT THE MAGISTRATE'S OFFICE.

KG:   RIGHT.
KR:   AND HE BASICALLY TOLD ME THAT HE DIDN'T FEEL
      COMFORTABLE REPRESENTING ME ANYMORE BECAUSE HE
      THOUGHT THAT I MIGHT HAVE DOUBTS IN MY MIND ABOUT HIS
      EXPERTISE.

KG:   OK.  WHO SPOKE TO THE JUDGE AND TOLD THE JUDGE ABOUT
      THE CONVERSATION IN COURT?
KR:   I'M NOT SURE.  I KNOW IT WASN'T ANDREW.  IT WAS EITHER
      THE LAWYER AH, ME OR MY NIECE DONNA.  IT WAS ONE OF US
      THREE, BECAUSE NOBODY ELSE KNEW ABOUT IT OTHER THAN
      THE BONDSMAN AND THE MAGISTRATE.  BUT THE BONDSMAN
      WAS AT THE BACK OF THE COURTROOM.

DOTHAN/Martin & Brackin 1216
Confidential Subject to Protective
Order

KG:  OK.  AH, DID YOU KNOW IF YOU SAID ANYTHING TO HER ABOUT THE JUDGE ABOUT IT?

KR:  I DON'T REMEMBER, I MEAN BEING HONEST.

KG:  RIGHT.  DO YOU KNOW FOR SURE IF YOUR NIECE MAY OR MAY NOT HAVE SAID ANYTHING ABOUT IT?

KR:  OF THAT I'M NOT POSITIVE EITHER.

KG:  OK.  HOW DID, DO YOU KNOW HOW SHE WAS CONCERNED ABOUT THE ISSUE?

KR:  YOU MEAN THE JUDGE?

KG:  RIGHT.

KR:  WELL, I THINK SHE SAID SOMETHING ABOUT WELL WE'RE JUST NEED, WE NEED IF OUR MAGISTRATES ARE SAYING SOMETHING TO THAT EFFECT, THEN WE MIGHT NEED TO CALL OVER THERE AND CHECK IT OUT OR SEE WHAT WAS SAID OR IN OTHER WORDS THE JUDGE WAS NOT HAPPY.

KG:  RIGHT.

KR:  I HAD ALREADY MADE HER REAL MAD SO.

KG:  OK.  THERE'S A LITTLE STATIC IN YOUR PHONE. IS THERE ANYTHING YOU CAN DO TO ALLEVIATE THAT?

KR:  AH.

KG:  IT WASN'T AT THE VERY ONSET.  I DON'T KNOW IF YOU'RE STRETCHING THE CORD.

KR:  OH NO UN UN.

KG:  OK. IS IT A CORDLESS PHONE?

KR:  NO IT'S A, JUST A REGULAR PUSH BUTTON PHONE.

KG:  WELL I GUESS THAT'S IT.  IT'S GETTING WORSE.  I MAY HAVE TO GET WITH YOU WELL, IT'S GOING AWAY NOW.  I MAY HAVE TO GET WITH YOU TO GET ANOTHER STATEMENT BUT, AFTER THE JUDGE HAD THIS CONVERSATION, DID SHE CALL ANDREW UP TO THE FRONT, DO YOU REMEMBER?

KR:  AH, I DON'T REMEMBER.

KG:  OK.  AT WHAT POINT WERE YOU ASKED TO LEAVE THE COURTROOM?

KR:  AH, I WASN'T ASKED TO LEAVE THE COURTROOM, I WAS ASKED TO GO WITH THE AH, THE AH, AH, THE POLICE OFFICER THAT SITS IN THE COURTROOM.

KG:  RIGHT.

KR:  I WAS TOLD, YOU KNOW, THAT I NEEDED TO GO DOWN STAIRS AND TAKE A BREATHALYZER.

KG:  OK.

KR:  WENDY, OK GO AHEAD.

KG:  AH, HAVE YOU HAD ANY CONVERSATION WITH ANYONE ABOUT THIS INCIDENT SINCE THEN? I THINK YOU SAID YOU SPOKE TO YOUR NIECE ABOUT IT BECAUSE WE TALKED TO HER YESTERDAY.

KR:  RIGHT. AH, NO, OTHER THAN MY BEST FRIEND BUT.

KG:  OK. AH, ALL RIGHT. IS THERE ANOTHER TIME MAYBE THAT, IS THERE A PLACE WHERE WE CAN TALK TO YOU IF WE NEED ANOTHER RECORDED STATEMENT OR SOMETHING LIKE MAYBE TOMORROW?

KR:  AH, I CAN GIVE YOU A CALL IN THE MORNING. I HAVE TO WORK TOMORROW MORNING.

KG:  OK. YOU HAVE TO WORK HAVE TO WORK THE DAY OF TOMORROW MORNING?

KR:  UN HUH.

KG:  OK. WHAT TIME DO YOU COME IN?

KR:  SEVEN.

KG:  OK. WELL WE MAY JUST COME OUT THERE AND GET ANOTHER STATEMENT SINCE THE PHONE MESSED UP FOR A MINUTE.

KR:  OK.

KG:  ALL RIGHT THANK YOU VERY MUCH.

KR:  THANKS.

KG:  BYE BYE. THAT'S GOING TO BE THE END OF THIS CONVERSATION. THE TIME IS 4:48P.M.


PRJOHNSON

DOTHAN/Martin & Brackin 1218
Confidential Subject to Protective Order

# ADMINISTRATIVE INVESTIGATION

## PHONE CONVERSATION WITH:  DONNA GRUMBACH

## TIME:  10:25

## STATEMENT TAKEN BY:  SGT. GARY COLEMAN

GC:  OK.  IF YOU WILL, AH, STATE YOUR NAME FOR ME PLEASE.
DG:  DONNA GRUMBACH.

GC:  OK.  MS. GRUMBACH AH, ON 9/25/01, AH, DID YOU HAVE AN OCCASION TO BE AT THE DOTHAN MUNICIPAL COURT?
DG:  YES.

GC:  OK.  AND WERE YOU THERE WITH KIMBERLY RAPELJE?
DG:  YES I WAS.

GC:  ALL RIGHT.  AND WERE YOU, DID YOU GO TO COURT WITH HER?
DG:  YES I DID.

GC:  ALL RIGHT.  AND TODAY, LET ME ADD THIS, TODAY'S DATE IS NOVEMBER 6, 2001.  AH, WHEN MS. RAPELJE WAS IN COURT, DID YOU AN OCCASION TO GO TO THE MAGISTRATE'S OFFICE?
DG:  YES WE DID.

GC:  ALL RIGHT.  AND TELL ME WHAT HAPPENED THERE?
DG:  OK.  CAN I GO BACK A LITTLE BEFORE THAT?

GC:  YES MA'AM.
DG:  TO AND HELP CLARIFY THINGS A LITTLE BIT.

GC:  YES MA'AM.
DG:  KIM HAD TALKED TO AN ATTORNEY OUTSIDE OF THE COURTROOM, IT WAS BEFORE COURT DATE AND SHE ASKED HIM WHY SHE PLEAD GUILTY TO A DUI WHERE SHE BLEW ZERO, ZERO, ZEROS ACROSS THE BOARD.

DOTHAN/Martin & Brackin 1219
Confidential Subject to Protective
Order

GC:  RIGHT.
DG:  AND KIM SAID THAT BECAUSE THE ATTORNEY SHE HAD IN COURT FOR THAT PARTICULAR TIME TOLD HER THAT SHE WOULD BE BETTER OFF DOING THAT EVEN THOUGH SHE HAD AH, SOME OTHER TICKETS THAT WOULDN'T HAVE COST HER AS

MUCH. IT WOULD HAVE COST HER MORE OR NOT AS MUCH, ANYWAY. SO WHEN WE WENT TO, BACK TO COURT ON THAT PARTICULAR DAY, KIM TOLD THEM THAT SHE WANTED TO AH, DO AN APPEAL ON THAT, SO WE HAD TO GO TO THE MAGISTRATE'S OFFICE AND FILE AN APPEAL BOND. AND I DON'T KNOW HOW THE SUBJECT CAME UP, I DON'T REMEMBER, BUT THE LADY THAT WE TALKED TO THERE TOLD KIM IF SHE WASN'T HAPPY WITH THE ATTORNEY THAT SHE HAD BEFORE, TO ASK FOR A DIFFERENT ONE, BECAUSE SHE HAD A PUBLIC DEFENDER.

GC:  OK DESCRIBE THE LADY, THE MAGISTRATE THAT YOU WERE DEALING WITH?

DG:  HUM, I'M NOT GOOD WITH HEIGHTS. SHE WAS I'D SAY ABOUT FIVE TWO, FIVE THREE MAYBE, SHE HAD SHORT HAIR, IT WAS DARK BROWN, I DON'T REMEMBER, SHE WAS A REAL NICE LADY. I DON'T REMEMBER HER NAME OR ANYTHING LIKE THAT.

GC:  OK. AND AH, TELL ME WHILE YA'LL WERE THERE AND TELL ME WHAT SHE SAID IN REGARDS TO THE LAWYER.

DG:  WE HAD WENT OVER TO THE MAGISTRATE'S OFFICE TO AH, DO THE APPEAL BOND.

GC:  UN HUH.

DG:  FOR THE PREVIOUS CASE.

GC:  OK.

DG:  AND THE OTHER LAWYER THAT SHE HAD TALKED TO THAT I WAS TELLING YOU ABOUT, SHE HAD NOTHING TO DO WITH, SHE'S JUST A PRIVATE ATTORNEY THAT KIM HAD TALKED TO AND I DON'T REMEMBER HER NAME RIGHT OFF.

GC:  OK AND WHAT DID THE MAGISTRATE SAY ABOUT THE ATTORNEY THAT SHE HAD DEALT WITH THAT DAY?

DG:  I DON'T REMEMBER, SHE JUST MADE A FACE AND THAT WAS ABOUT IT THAT I CAN REMEMBER. BY THAT TIME THE BONDSMAN HAD SHOWN UP AND I WAS TALKING TO HIM.

GC:  OK. AND DID SHE, DID YOU HEAR THE CONVERSATION BETWEEN MS. RAPELJE AND THIS MAGISTRATE?

DG:  PARTS OF IT.

DOTHAN/Martin & Brackin 1220
Confidential Subject to Protective Order

GC: ALL RIGHT. DID SHE EVER MENTION ANYTHING ABOUT THE LAWYER, THAT IT WAS A DUMB MOVE ARE ANYTHING OF THAT NATURE?

DG: SHE JUST SAID SHE DIDN'T KNOW WHY HE WOULD ADVISE HER TO GO THAT ROUTE. I REMEMBER HER SAYING THAT. THAT SHE SAID I DON'T KNOW WHY HE TOLD YOU TO DO THAT BECAUSE THIS WOULD HAVE BEEN CHEAPER, GOING.

GC: ALL RIGHT. DO YOU KNOW IF THIS CAUSED MS. RAPELJE TO BE, AH, TO LOSE CONFIDENCE IN THAT LAWYER?

DG: SHE HAD, NO BECAUSE SHE HAD ALREADY LOST CONFIDENCE IN THAT LAWYER AFTER SHE TALKED TO THE PRIVATE ATTORNEY.

GC: OK. AND SO SHE WAS THERE APPEALING THE SECOND CASE IS THAT CORRECT?

DG: THE FIRST ONE.

GC: THE FIRST ONE. OK. ALL RIGHT.

DG: THE FIRST ONE, WHERE SHE BLEW THE ZEROS AND SHE WAS ADVISED TO PLEAD GUILTY TO IT ANYWAYS.

GC: OK.

DG: WHICH I ASKED HER MYSELF, WHY DID YOU DO THAT, SO.

GC: OK.

DG: PLEAD GUILTY TO SOMETHING THAT YOU ARE NOT GUILTY OF?

GC: UM HUM.

DG: JEEPERS, BUT THEN KIM'S AN ALCOHOLIC.

GC: RIGHT.

DG: SO.

GC: OK. AH.

DG: SHE NEEDS A BABYSITTER OF HER OWN.

GC: IS THERE AH, IS THERE ANYTHING ELSE THAT JUST AS FAR AS THE CONVERSATION BETWEEN THE MAGISTRATE AND THE AH, MS. RAPELJE THAT STICKS OUT IN YOUR MIND?

DG: NO, I REMEMBER ASKING THE MAGISTRATE HOW SHE WOULD GO ABOUT ASKING FOR A NEW ATTORNEY, BUT THAT WAS, THAT WAS ABOUT IT.

GC: HOW DO YOU KNOW KIM?

DOTHAN/Martin & Brackin 1221
Confidential Subject to Protective Order

DG:  SHE'S MY AUNT.

GC:  SHE'S YOUR AUNT OK.
DG:  YES.

GC:  AH, OK. SGT. GRAY, WHO IS MY PARTNER IN THE INTERNAL
     AFFAIRS DIVISION.
DG:  UM HUM.

GC:  MAY HAVE A COUPLE OF QUESTIONS IF YOU CAN JUST HANG ON
     JUST A SECOND.
DG:  OH NOT A PROBLEM.

KG:  I JUST HAVE ONE QUESTION.  DID YOU FEEL THAT BECAUSE OF
     THE INFORMATION THAT WAS GIVEN TO KIM FROM THE
     MAGISTRATE, DO YOU FEEL THAT THAT ATTORNEY MAY NOT BE
     THE BEST ONE FOR HER?
DG:  YEAH.

KG:  OK AND AH.
DG:  I, WELL LET ME TAKE THAT BACK.  I, I DIDN'T THINK THAT
     AFTER SHE SAID THAT, I WAS THINKING THAT BEFORE HAND
     ANYWAY.

KG:  OK.  AND WHY WAS THAT?
DG:  BECAUSE OF THE PRIVATE ATTORNEY THAT KIM HAD TALKED
     TO AND THE FACT THAT SHE WAS TOLD TO PLEAD GUILTY TO A
     DUI THAT SHE BLEW ZEROS ON.

KG:  UM HUM.
DG:  THAT, THAT IN IT SELF IT TO ME WAS LIKE WHY WOULD YOU
     PLEAD GUILTY TO SOMETHING YOU WERE NOT GUILTY OF.

KG:  DID YOU HAVE ANY KNOWLEDGE THAT THE OFFICER DID NOT
     QUOTE THE DUI LAW THAT WAS ALCOHOL BUT WAS SOME
     OTHER DRUG, THAT WAS ACTUALLY DRUGS?
DG:  NO I DON'T KNOW ANYTHING ABOUT THAT, I JUST KNOW THAT
     SHE DID A BREATHALIZER AND SHE PLEAD GUILTY TO A DUI
     THAT SHE WAS BLOWING ZEROS ON.

KG:  OK.  WELL I GUESS FOR YOUR INFORMATION FOR THE DUI
     STATUTES YOU CAN BE DUI WITH OTHER THAN ALCOHOL IF YOU
     TAKE SOME TYPE OF MEDICATION THAT WILL IMPAIR YOU AND
     MAKE YOU DRIVE IN THAT WAY AS WELL?

DOTHAN/Martin & Brackin 1222
Confidential Subject to Protective

DG:  I, OK THAT'S FINE, I DON'T KNOW ANYTHING ABOUT THAT STUFF I JUST WAS THINKING IF WHY WOULD YOU DO THIS YOU KNOW AND I WAS GOING BY WHAT WAS ON PAPER, SO.

KG:  RIGHT.  OK. THAT'S ALL I HAVE HERE IS SGT. COLEMAN.
DG:  OK.

GC:  OK WERE YOU IN THE COURTROOM WITH HER WHEN SHE WAS AH, TALKING WITH THE JUDGE, DID YOU HAPPEN TO BE WITH HER THEN?
DG:  ON THAT DAY?

GC:  UM HUM.
DG:  YEAH I WAS IN THE COURTROOM THAT DAY.

GC:  OK.  DID YOU HEAR HER STATEMENT TO THE JUDGE?
DG:  NO.

GC:  ALL RIGHT.  DID YOU AH, DID YOU HAVE ANY CONVERSATION WITH THE BONDSMAN THAT WAS WITH YOU?
DG:  YEAH I TALKED TO HIM MORE THAN SHE DID.

GC:  OK.  AND CAN YOU TELL ME WHAT THAT CONVERSATION PERTAINED TO?
DG:  BASICALLY JUST THAT DAY THAT WE, THAT PARTICULAR DAY SHE WAS DRUNK WE WAS TALKING ABOUT THAT AND HOW MUCH TROUBLE SHE WAS IN FOR THAT AND HOW STUPID SHE WAS.

GC:  OK DID HE MAKE ANY COMMENTS OR DID YOU MAKE ANY COMMENTS TO HIM ABOUT THE LAWYER?
DG:  I MIGHT HAVE.

GC:  OK. AND.
DG:  I JUST WANTED TO SEE HER GET A DIFFERENT ATTORNEY.  YOU KNOW THAT WAS BASICALLY IT.  I DON'T KNOW THIS MAN, THE FIRST ATTORNEY SHE HAD, NEVER SPOKE TO HIM OR ANYTHING, SO, I, I'M JUST GOING BY WHAT WAS ON PAPER AND WHAT WAS YOU KNOW, I WAS LIKE WHY DID YOU DO THIS, I WAS ASKING HER WHY DID YOU DO THIS TO BEGAN WITH. THAT WAS MY BIGGEST CONCERN AND THEN WHEN, THEN I HEARD YOUR DUMB BUTT GOING IN DRUNK. AND I WAS TALKING ABOUT THAT MORE THAN ANYTHING.  I CAN'T BELIEVE SHE WAS THAT STUPID.

DOTHAN/Martin & Brackin 1223
Confidential Subject to Protective
Order

DG:  IF I GIVE YOU SOME INFORMATION CAN YOU PASS IT ON TO HELP HER OUT?

GC:  AH, JUST A MOMENT LET ME CLEAR THIS TAPE AND WE WILL BE OFF ALL RIGHT?

DG:  OK.

GC:  OK.  THIS IS THE END OF THE STATEMENT AT AH, 1035.


PRJOHNSON

DOTHAN/Martin & Brackin 1224
Confidential Subject to Protective
Order

# ADMINISTRATIVE INVESTIGATION

## INTERVIEW WITH: MR. ANDREW TURNER

## PERSONS PRESENT:  SGT KEITH GRAY, SGT GARY COLEMAN

## DATE AND TIME: OCTOBER 29, 2001, 1:22P.M.

## LOCATION: THOMPSONS BONDING NORTH OATES STREET

KG:   ANDREW STATE YOUR FULL NAME FOR ME.
AT:   ANDREW BERNARD TURNER.

KG:   AH, AND GIVE ME YOUR DATE OF BIRTH.
AT:   ███████

KG:   AND YOUR SOCIAL SECURITY NUMBER.
AT:   ███████

KG:   OK.  I WANT TO TALK TO YOU ABOUT A CLIENT OF YOURS, AH, NAME KIM
      RAPELJE.
AT:   YES.

KG:   OK.  DID YOU HAVE AN OCCASION TO ESCORT OR TAKE HER TO THE
      MAGISTRATE'S OFFICE IN AN ATTEMPT TO SIGN AN APPEAL BOND?
AT:   I DIDN'T TAKE HER AH, I MET HER DOWN THERE AT THE MAGISTRATE'S
      OFFICE.  I GOT A CALL TO COME DOWN THERE BECAUSE I HAD DEALT
      WITH HER BEFORE IN THE PAST.

KG:   OK.  SHE'S A CLIENT, HAS SHE BEEN A CLIENT OF THOMPSON'S?
AT:   YES I THINK TWO TIMES BEFORE IN THE PAST.

KG:   OK.  AND ABOUT WHAT TIME, WHAT WAS THAT DATE THAT YOU MET
      HER?
AT:   SEPTEMBER 25, 2001 WAS THE LAST ONE I DID.

KG:   YOU REMEMBER ABOUT WHAT TIME YOU ARRIVED DOWN THERE WITH
      HER?
AT:   IT WAS ABOUT TEN, TEN O'CLOCK OR ELEVEN O'CLOCK IT WAS AH, CITY
      COURT WAS STILL GOING ON.
KG:   OK.  A.M.?
AT:   YEAH.

DOTHAN/Martin & Brackin 1225     1
Confidential Subject to Protective
Order

KG:  OK. AND WHEN YOU MET HER DOWN THERE, WHO SPECIFICALLY DID YOU TALK TO?

T:  I CAME IN AH, I TALKED TO MARY, MS. BRACKIN, I CALL HER MARY BETH.

KG:  OK. WHERE WERE YOU AT, WERE YOU IN COURT OR WERE YOU AT THE MAGISTRATE'S OFFICE?

AT:  AT THE MAGISTRATE'S OFFICE.

KG:  OK. AND MARY BETH BRACKIN?

AT:  YES.

KG:  AND AH, WHAT, DID YOU HAVE THE INITIAL CONVERSATION WITH HER OR DID KIM?

AT:  I HAD, I ASKED HER ABOUT THE APPEAL BOND AND SHE AH, THEN START TALKING TO KIM ABOUT SOMETHING ELSE.

KG:  OK. AH, DID YOU OVER HEAR ANYTHING THAT SHE WAS TALKING TO KIM ABOUT?

AT:  YEAH I HAD, SHE SAID SOMETHING AH, THEY WAS TALKING ABOUT AH, WHY DID SHE BLOW, WHEN SHE BLOWED A POINT ZERO, ZERO, WHY DID SHE PLEAD GUILTY TO THAT CHARGE.

KG:  AND WHO SAID THAT?

AT:  AH, MARY BETH.

KG:  OK AND WHAT DID KIM SAY?

AT:  SHE SAID AH, SHAWN TOLD HER TO AH, SHE SHOULD PLEAD GUILTY TO IT.

KG:  OK. AND SHAWN BEING WHO?

AT:  AH, CITY PROSECUTOR.

KG:  OK. HER ATTORNEY?

AT:  HER ATTORNEY THAT DAY IN COURT.

KG:  OK. AH, WHAT IF ANYTHING, DID MS. BRACKING SAY?

AT:  SHE SAID THAT AH, SHE SAID I DON'T SEE WHY HE TOLD YOU TO PLEAD GUILTY TO THIS CHARGE YOU CAME UP POINT ZERO, ZERO THAT'S STUPID FOR YOUR ATTORNEY TO TELL YOU TO PLEAD GUILTY. THAT WE NEED SOME BETTER PUBLIC DEFENDERS.

KG:  OK. AH, WHAT ELSE IF ANYTHING, DID MS. BRACKING SAY THAT YOU CAN REMEMBER?

DOTHAN/Martin & Brackin 1226
Confidential Subject to Protective Order

2

AT:  I HEARD HER SAYING THAT AH, THAT THAT'S MESSED UP BECAUSE AH, SHAWN'S THERE TODAY AND HE GONE HAVE TO AH, BE YOUR LAWYER AGAIN TODAY.  YOU SHOULD ASK TO GET HIM PUT OFF YOUR CASES SINCE HE DID WHAT YOU DID LAST, SINCE HE TOLD YOU TO PLEAD GUILTY TO A CHARGE YOU SHOULDN'T PLEAD GUILTY OF.

KG:  OK.  WHAT IF ANYTHING DID KIM SAY IN RESPONSE TO MS. BRACKIN?

AT:  SHE SAID, SHE WAS CRYING BECAUSE SHE WAS SCARED SHE HAD TO GO TO AH, SHE WAS GOING TO JAIL THAT DAY ANYWAY. AND AH, SHE WAS SAYING, SHE SAID I DON'T KNOW WHY SHE SAID AH, SHAWN TOLD HER TO PLEAD GUILTY SHE JUST WOUNDERING MOSTLY ASKING HER ABOUT AH, ASKING MARY BETH ABOUT HER CHARGES, WHAT, WHAT SHE THINK SHE SHOULD DO AND AH, THE CHARGES ON HER.

KG:  ALL RIGHT.  DID MS. BRACKING TRY TO AH, REFER KIM TO ANY OTHER ATTORNEY OR ANYTHING?

AT:  SHE TOLD HER, ALL I HEARD HER SHE SAID THAT AH, IF HE'S THERE TODAY THAT SHE SHOULDN'T USE HIM TODAY, SHE SAID CAUSE AH, SHE (?) OH MY GOD HE'S THERE TODAY TO.

KG:  OK.  WHAT WAS MS. BRACKIN DEMEANOR? HOW DID SHE ACT WHEN SHE WAS TALKING ABOUT SHAWN?

AT:  VERY SARCASTIC ABOUT SHAWN, I MEAN IN FACT.  WELL I GOT THE AH, IMPRESSION THAT I GUESS SHE HAD SOME BAD FEELINGS TOWARD SHAWN (?).

KG:  SOME BAD WHAT?

AT:  SOME BAD FEELINGS AH, TOWARD SHAWN CAUSE SHE, SHE MADE A STATEMENT THAT AH, THAT SHE HAD HAD PROBLEMS WITH SHAWN BEFORE IN THE PAST ABOUT DOING STUFF LIKE THIS HERE.  TELLING CLIENTS TO PLEAD AND TELLING US NOT TO DO THIS.  SHE SAID SHE DONE HAD PROBLEMS WITH THAT, THEY DONE HAD A LOT OF COMPLAINTS ABOUT SHAWN.

KG:  AND THAT'S WHAT MS. BRACKIN SAID?

AT:  YEAH.

KG:  AND YOU HEARD ALL THIS FIRST HAND?

AT:  FIRST HAND, I WAS STANDING RIGHT THERE.

:  OK.  AH, IS THERE, DID SHE PROVIDE YOU WITH THE PROPER INSTRUCTIONS OR PAPERWORK FOR THE REASON THAT YOU INTENDED ON BEING THERE THAT DAY?

DOTHAN/Martin & Brackin 1227
Confidential Subject to Protective Order

3

AT:   YEAH, IT TOOK A WHILE, THEN YOU KNOW MORE THAN IT REALLY TAKES
      USUALLY WE CAN JUST GO IN THERE AND ASK FOR THE APPEAL AND
      HAVE THE APPEAL SIGN.  I SIGN A PART AND THE DEFENDANT SIGN A
      PART.  THEY WAS TALKING, SHE WAS TALKING TO HER ABOUT HER CASE.
      SHE STOOD THERE AT THE WINDOW FOR AND EXTRA FIVE MINUTES
      TRYING TO TALK TO HER ABOUT HER CASES ABOUT SHAWN.

KG:   OK AND YOU ARE AN AUTHORIZED BOND AGENT TO SIGN BONDS?
AT:   YES SIR.

KG:   AND THE PAPERWORK THAT AH, YOU'RE SHOWING ME NOW IS
      PAPERWORK YOU RECEIVED ON THAT SAME DAY?
AT:   YES SIR.

KG:   OK.  AH, DID, IS THERE ANYTHING THAT YOU WANT TO ADD AS FAR AS
      THIS PART RIGHT HERE BEFORE WE FALL INTO THE NEXT PART?

GC:   DID YOU FEEL LIKE MS. BRACKING WAS TRYING TO GET MS. RAPELJE TO
      CHANGE WHAT SHE WAS DOING OR TO MAKE A DIFFERENT DECISION
      THAN WHAT HER LAWYER HAD TOLD HER?
AT:   IN A WAY I THOUGHT, CAUSE I KNOWN SHAWN FOR ALMOST TWO YEARS,
      AND I, REALLY I WAS SURPRISED AND EVERYBODY ELSE WAS SURPRISED
      TO HERE THAT SHE WAS BAD MOUTHING SHAWN LIKE THAT, AND I
      THANK THAT AH, SHE WAS JUST SAYING THAT JUST TO GET HER TO USE
      AH, SOMEBODY ELSE BECAUSE SHAWN WAS THERE THAT DAY THAT SHE
      TOLD HER THAT CONFLICT OF INTEREST TO USE SHAWN AGAIN.

GC:   HAVE YOU EVER HEARD MS. BRACKIN   DO ANYTHING LIKE THIS
      BEFORE?
AT:   NO.  USUALY WHEN I GO IN THERE TO THE MAGISTRATE TO DO AN
      APPEAL BOND, VALARIE BE THERE AND SHE WOULD TAKE CARE OF IT
      THAT'S WHO WAS DOWN THERE BUT THAT DAY I THINK MARY BETY AH I
      MEAN VALARIE WAS ON VACATION OR SOMETHING LIKE THAT.

KG:   OK.  AFTER YOU LEFT THE MAGISTRATE'S OFFICE, WHERE DID YOU AND
      KIM GO?
AT:   WE WENT BACK, AH, WE WENT UP TO AH, THE CITY COURT ROOM TO LET
      THE JUDGE KNOW THAT SHE HAD GOT AN APPEAL BOND AND PLUS
      KIMBERLY HAD ANOTHER COURT DATE THAT SAME DAY AND SHE HAD
      TO GET AN APPEAL, I THANK THAT DAY SHE, I'M NOT FOR SURE. (?) SHE
      HAS FOURTEEN DAYS TO GET AN APPEAL BOND, I THANK THAT WAS THE
      LAST DAY SHE COULD HAVE GOT THIS APPEAL BOND DONE AND SHE HAD
      ANOTHER COURT DATE THAT SAME DAY AND I HAD TO GO BACK TO
      COURT WITH HER AGAIN.

DOTHAN/Martin & Brackin 1228
Confidential Subject to Protective
Order

4

KG:  OK.  DID YOU GO TO COURT WITH HER THEN?

AT:  YES SIR.

KG:  DO YOU KNOW IF KIM SPOKE WITH THE JUDGE ABOUT ANY CONVERSATION THAT SHE HAD HAD WITH MS. BRACKIN ABOUT SHAWN?

AT:  I, I KNOW FOR, IT LEAD UP, IT LEAD UP TO THE OCCASION CAUSE THEY AH, TALKED ABOUT IT BACK IN THE BACK I THANK WITH MS. OTT AND SHAWN AND KIMBERLY TALKED ABOUT IT AND SHE WAS TELLING.

KG:  OK HOLD UP.  SHE WAS THERE FOR A.

AT:  ANOTHER DUI.

KG:  OK AND DURING THAT COURSE OF GOING THROUGH HER CASE WITH THE JUDGE, DID THIS CONVERSATION COME UP ABOUT SHAWN AND WHAT MS. BRACKIN HAD SAID ABOUT SHAWN'S REPRESENTATION?

AT:  YES SIR.

KG:  AH, WERE YOU IN THE COURTROOM AT THAT TIME?

AT:  YEAH THEY CALLED ME TO THE FRONT AGAIN AND SAID, AH, CAUSE THEY WAS GONE, THEY WANTED TO TEST HER BECAUSE SHE SMELLED ALCOHOL ON HER BREATH AND THEY SAID AH, THE JUDGE THEN SAID THAT SHE CAN'T AH, TAKE HER WORD FOR WHAT HAPPENED BECAUSE SHE DRUNK. THEY WANTED TO KNOW WHAT AH, ASKED ME WHAT I HAD HEARD DOWN IN THE AH, MAGISTRATE'S OFFICE.

KG:  OK.  SO LET'S STOP RIGHT THERE.  DID YOU HEAR KIM TELL THE JUDGE THIS INFORMATION WHICH CAUSED HER TO CALL YOU UP THERE?  DID YOU ACTUALLY HEAR KIM TELLING THE JUDGE ALL THIS THAT YOU JUST TOLD ME?

AT:  YEAH, CAUSE AH, WHEN AH, SHE WAS TELLING THE JUDGE THAT, THE JUDGE SAID AH, ASKED ME WHO WAS SHE DOWN THERE WITH, SHE SAID THE BONDSMAN AND SHE SAID ANDREW AND I WAS SITTING BACK IN THE BACK AND SHE CALLED ME UP TO THE FRONT WHEN THEY WAS DISCUSSING THAT MATTER.

KG:  OK. AND THE JUDGE ASKED YOU QUESTIONS ABOUT WHAT HAD BEEN SAID.

AT:  RIGHT, THEN SHE HAD (?) WHO WE ARE AND WE WENT TO SHE HAD EXCUSED HERSELF OUT OF THE COURTROOM AND WENT TO HER CHAMBERS AND TALKED ABOUT IT.

KG:  WAS SHAWN MCGEE THERE?

AT:  HE WAS STANDING RIGHT THERE.  ME, MS. OTT AND KIMBERLY AND AH, THE JUDGE.

DOTHAN/Martin & Brackin 1229
Confidential Subject to Protective
Order

5

KG:  OK AND JUDGE CALLED YOU IN HER CHAMBERS.

AT:  YES.

KG:  AND ASKED YOU ABOUT THIS?

AT:  RIGHT.

KG:  OK. AH, AFTER, WAS MR. MCGEE IN THE CHAMBERS, WERE ALL THOSE PEOPLE YOU JUST NAMED WERE IN HER CHAMBER OR WAS IT JUST?

AT:  NAW I TALKED TO THE JUDGE AFTER WE WENT TO BREAK, WE WENT OUTSIDE IN HER HALLWAY INTO HER CHAMBERS AND AH, WE TALKED WITH ME, HER AND MS. OTT.

KG:  OK. AH, DID ANYTHING ELSE COME OUT OF THAT CONVERSATION ABOUT WHAT YOU OVER HEARD MS. BRACKIN TELL?

AT:  ONLY THANG (?) WHAT THAT SHE SHOULDN'T HAVE STATED THAT EVEN IF SHE HAD, IF SHE THOUGHT THAT SHE COULD NOT TELL CLIENTS THINGS LIKE THAT ABOUT ANOTHER PERSON AND THAT THEY AIN'T SUPPOSE TO ASK THE AH, COURT ANYTHING ABOUT THE LAW CAUSE THEY'RE NOT LAWYERS, THEY'RE NOT A JUDGE, LIKE THAT.

KG:  OK. YOU HAVE ANYTHING TO ASK?

GC:  DID, WAS THERE EVER ANY A POINT AND TIME THAT MS. BRACKIN AH, CONTACTED YOU?

AT:  YES SIR.

GC:  OK. AH, TELL ME ABOUT THAT.

AT:  I WAS AT HOME AND AH, I THANK IT WAS.

KG:  I WANT TO WAIT BEFORE WE GET TO THAT PART. AND I'LL LET YOU START THAT PART OUT. AH, I HAVE INFORMATION FROM THE JUDGE STATING THAT AH, SUPPOSEDLY AH, MARY BETH TOLD KIM THAT AH, IT WAS DUMB FOR MR. MCGEE, AND I'M QUOTING THE WORD DUMB, FOR MR. MCGEE TO ALLOW HER TO PLEAD GUILTY TO THE DUI WHEN SHE ONLY BLOW POINT ZERO ZERO. AH, IS THAT (?).

AT:  RIGHT.

KG:  OK. GO AHEAD, GO AHEAD WITH WHAT YOU WERE.

GC:  OK. AH, AS I WAS SAYING, AT ANY POINT AND TIME AFTER ALL THIS SITUATION HAPPENED, WERE YOU EVER CONTACTED BY MS. BRACKIN?

AT:  YES I WAS.

GC:  OK AND TELL ME ABOUT THAT.

DOTHAN/Martin & Brackin 1230    6
Confidential Subject to Protective
Order

AT:   IT'S ABOUT ON THE SAME DAY ABOUT I'LL SAY 6:30 0R 7:00.

C:   PM?

AT:   YES. I GOT CALLED ON MY CELL PHONE AND I WAS AT HOME AND AH, SHE TOLD ME WHO SHE WAS AND WANTED TO KNOW WHAT HAPPENED AT COURT AH, TODAY AND I, AH, SHE ASKED ME DID I TELL THE JUDGE THAT SHE SAID SOMETHING ABOUT SHAWN AND I TOLD HER I DID. I SAID AH, SHE SAID WHY? SHE SAID I SHOULD, I NEED TO WRITE A STATEMENT BECAUSE SHE COULD LOOSE HER JOB BECAUSE SHE BEEN WORKING THERE FOR LIKE A COUPLE OF YEAR WHATEVER AND SHE DIDN'T WANT TO LOOSE HER JOB BECAUSE WHATEVER SHE SAID IT WASN'T MEANT TO BE TAKEN LIKE THE WAY WE TOOK IT. AND THAT SHE, SHE SAID I KNEW HER HUSBAND, HER HUSBAND COACHED ME WHEN I WAS PLAYING BASKETBALL LIKE FIVE YEARS AGO. SO SHE SAID WE BEEN KNOWING YOU FOR A LONG TIME AND I CAN'T BELIEVE YOU'D SAY ANYTHING LIKE THAT OR GO TELL JUDGE THAT I SAID THAT.

KG:   OK. DID SHE INDICATE THAT YOU WERE TELLING A LIE WHEN YOU TALKED TO THE JUDGE?

AT:   NO. SHE DIDN'T SAY, SHE DIDN'T SOUND LIKE I WAS LYING CAUSE I TOLD HER I WAS NOT GOING TO LIE FOR YOU AND YOU WAS AH, CAUSE YOU SAID THAT ABOUT SHAWN AND SHAWN TOLD THAT ABOUT YOU I WOULDN'T LIE FOR HIM EITHER. I SAID YOU SAID IT AND AH, THEY ASKED ME DID I AH, HEAR YOU SAID IT AND I SAID YES. AND SHE LIKE I NEED TO RIGHT A STATEMENT SAYING THAT SHE DID NOT SAY THAT.

KG:   OK THAT'S WHAT SHE TOLD YOU TO DO?

AT:   YEAH. CAUSE SHE SAY SHE COULD LOOSE HER JOB BECAUSE SHE BEEN WORKING ON THAT JOB FOR ELEVEN YEARS OR SO.

KG:   AFTER SHE ASKED YOU TO WRITE A STATEMENT, RECANTING WHAT YOU HEARD.

AT:   RIGHT.

KG:   WHAT DID YOU SAY TO HER?

AT:   I SAID I TOLD HER I SAID WELL I JUST SAID THAT I WOULDN'T TELL A LIE FOR HER THAT THAT'S WHAT SHE ASKING ME TO DO SHE SAID CAUSE SHE SAID THAT ABOUT SHAWN I WOULDN'T LIE FOR SHAW IF HE SAID THAT ABOUT HER AND SHE I SAID IF I WRITE A STATEMENT I'M GONE TELL THE TRUTH ON THE STATEMENT BECAUSE MY, I DON'T WANT TO MESS UP MY CREDIBILITY BY LYING TO THE JUDGE OR ANYTHING ABOUT ANYBODY DOWN THERE.

KG: SO SHE TOLD YOU TO INTENTIONALLY LIE ABOUT WHAT YOU HAD SAID TO THE JUDGE?

AT: YEAH CAUSE SHE SAID SOMETHING BOUT I BEEN KNOWING HER HUSBAND FOR A LONG TIME AND SHE AND AH, THAT SHE FEEL LIKE I SHOULDN'T HAVE SAID THAT WHAT SHE SAID DOWN AT THE MAGISTRATE'S OFFICE, I STATED AT THE MAGISTRATE'S OFFICE AND THAT SHE COULD LOOSE HER JOB BECAUSE SHE BEEN WORKING THAT JOB FOR NINE YEAR. SHE WOULD HATE TO LOOSE HER JOB FOR SOMETHING THAT AH, COULD HAVE BEEN AVOIDED.

KG: AH, DID IT MAKE YOU FEEL ANY OTHER WAY BECAUSE HER ASKING YOU TO DO THAT AND WHAT POSITION SHE HOLDS?

AT: NO BECAUSE AH, LIKE I TOLD HER I WASN'T GONE LIE FOR HER AND THE NEXT DAY AH, DONNA HAD FOUND OUT SOME KIND OF WAY THAT SHE HAD CALLED ME HOME. I THANK DONNA MUST BE THE SUPERVISOR UP THERE AND AH, MS. OTT AND HER AND ME AND WANTED ME TO SPEAK TO DONNA ABOUT WHAT HAPPENED AND I TOLD DONNA THE SAME THANG THAT I WAS TELLING THE WHOLE TIME, I'M NOT GONE CHANGE THE STORY FOR NOBODY.

KG: DID SHE TRY, DID MS. BRACKIN TRY TO AH, PRESSURE YOU INTO CHANGING YOUR STORY OR DID SHE, SHE DO ANYTHING THAT LEAD YOU TO BELIEVE THAT SHE WAS TRYING TO COERCE YOU INTO DOING THAT?

AT: NAW I SAY THE ONLY THANG I CAN SAY WAS SHE WAS SAYING I BEEN KNOWING HER HUSBAND FOR SO LONG THAT WE, THAT WE, THAT I PLAYED ON HIS BASKETBALL TEAM AND SHE COULDN'T BELIEVE I WOULD DO SOMETHING, SAY, TELL THE JUDGE SOMETHING LIKE THAT, I MEAN, THAT'S THE ONLY THING I CAN SAY TRY TO COERCE ME TO CHANGE MY STORY.

KG: DID SHE TRY TO DENY THAT SHE SAID THAT AND WAS JUST TRYING TO TELL YOU WHAT SHE THOUGHT SHE SAID?

AT: NAW SHE, LIKE I SAID (?) I DIDN'T, I DIDN'T HEAR ANYTHING SAYING THAT SHE WAS DENYING IT.

KG: OK.

AT: IT WAS LIKE SHE WAS JUST SAYING THAT SHE, THAT AH, THAT SHE, THAT SHE AH, WISH THAT I WOULD MAKE A STATEMENT SAYING THAT SHE DIDN'T THAT AH, TELLING THEM WHAT REALLY HAPPENED THAT SHE DID NOT SAY THAT CAUSE SHE CAN LOOSE HER JOB THAT SHE BEEN HAD FOR ELEVEN YEARS.

KG: OK.

DOTHAN/Martin & Brackin 1232
Confidential Subject to Protective
Order

GC: SO YOU WERE UNDER THE IMPRESSION THAT SHE KNEW SHE HAD MADE A MISTAKE?

T: YEAH, YEAH.

GC: AND SHE WAS INTENTIONALLY TRYING TO GET YOU TO CHANGE YOUR STORY.

AT: RIGHT WHEN SHE WAS, I TOLD HER I BELIEVE BUT I, LIKE I TOLD HER I WOULDN'T DO IT.

KG: HAVE YOU HAD ANY OTHER CONVERSATION WITH MS. BRACKIN?

AT: NO BECAUSE AFTER THAT DAY I TALKED TO DONNA SHE SAID SHE SHOULDN'T HAVE BEEN TALKING AND CALLING ME AT HOME AND I THANK MS. DONNA PROBABLY SPOKE WITH HER ABOUT CALLING ME AT TALKING ABOUT THIS CONVERSATION.

KG: HAS HER HUSBAND TRIED TO TALK TO YOU?

AT: NO SIR.

GC: HAVE YOU HAD ANY CONTACT WITH MS. BRACKIN AT ALL IN AN OFFICIAL CAPACITY SINCE THIS?

T: I MEAN I SEEN HER, SHE JUST WALKS BY, I WALK BY AND NO CONVERSATION, NO HEY HOW YOU DOING, NOTHING JUST PASSING.

GC: HER ATTITUDE HAS CHANGED?

AT: YEAH.

KG: SHE HAVEN'T TREATED YOU ANY OTHER WAY?

AT: NO SHE USE TO SPEAKS TO ME WHEN SHE SEE ME, CAUSE LIKE I SAY WE PLAYED, I PLAYED BALL ON HER AH, HUSBAND'S TEAM.  SHE DON'T SPEAK SHE JUST, AND I WALK BY AND I SEE HER IN COURT OR I SEE HER DOWN IN THE OFFICE SHE JUST WALK BY OR WHATEVER.

KG: OK.  DO YOU SPEAK TO HER?

AT: NO.

KG: OK.  YOU FEEL SOME FRICTION BETWEEN YOU TWO BECAUSE OF THIS?

AT: I MEAN PROBABLY FROM ON HER BEHALF BUT NOT FROM ME.

KG: OK. IS EVERYTHING YOU SAID TODAY THE TRUTH?

T: YES SIR.

KG: THIS GOING TO BE THE END OF THIS CONVERSATION.  THE TIME IS 1:37P.M.

DOTHAN/Martin & Brackin 1233
Confidential Subject to Protective
Order

9

## ADMINISTRATIVE INVESTIGATION

## STATEMENT OF: ASHTON OTT, ASSISTANT CITY ATTORNEY

## DATE AND TIME:  NOVEMBER 5, 2001

## STATEMENT TAKEN BY:  SGT GARY COLEMAN

## PERSONS PRESENT:  SGT KEITH GRAY

GC:  FOR THE RECORD WOULD YOU STATE YOUR NAME PLEASE?
AO:  ASHTON OTT.

GC:  ALL RIGHT AND WHERE ARE YOU EMPLOYED PLEASE?
AO:  I'M ASSISTANT CITY ATTORNEY FOR THE CITY OF DOTHAN.

GC:  OUR INTERVIEW TODAY IS IN REGARDS TO AN INCIDENT THAT
     HAPPENED ON 9/25/01 AH, IN THE DOTHAN CITY COURT WITH MARY
     BETH BRACKIN.  ARE YOU FAMILIAR WITH THIS INCIDENT?
AO:  YES I AM.

GC:  OK.  CAN YOU TELL ME WHAT HAPPENED THAT DAY?
AO:  THAT DAY WE HAD AN INDIVIDUAL NAME KIM RAPELJE, THAT WAS IN
     THERE.  IT WAS HER SECOND DUI WITH THE CITY IN A SPAN OF JUST A
     COUPLE OF WEEKS, AH, POSSIBLY EVEN JUST ONE WEEK.  AH, SHE CAME
     INN WANTED TO APPEAL THE PREVIOUS CONVICTION SO THAT SHE
     WOULD BE IN A POSITION TO BE SENTENCED ON A FIRST DUI RATHER
     THAN A SECOND.  AH, SHE LEFT COURT TO GO TO THE MAGISTRATES
     OFFICE TO APPEAL HER CHARGES AND I WAS AWARE THAT THIS WAS
     GOING ON.  WHEN SHE CAME BACK, WE WERE IN THE PROCESS OF I
     BELIEVE GETTING READY TO ACTUALLY DO THE PLEA AND SHE BEGAN
     TELLING, I DON'T KNOW IF IT WAS ME AND THE JUDGE AT FIRST OR SHE
     JUST SAID IT TO ME AND I SAID WAIT A MINUTE STOP AND THEN
     BROUGHT THE JUDGE IN ON THE CONVERSATION BUT SHE STARTED
     TELLING ABOUT AN INCIDENT THAT HAD OCCURRED WHILE SHE WAS
     AT THE MAGISTRATES OFFICE.  AH, WHERE IN THE MAGISTRATE HAD
     TOLD HER THAT SHE SHOULDN'T HAVE PLEAD GUILTY TO THE FIRST
     DUI BECAUSE IT WAS A POINT ZERO, ZERO.  AH, AND THAT AND ASKED
     HER WHO THE LAWYER WAS, SOMETHING ALONG THOSE LINES.  SHE
     HAD SAID SHAWN MCGEE AND THE MAGISTRATE THEN SAID, OH, NO
     WONDER, SOMETHING ALONG THOSE LINES AH, WE'VE HAD A LOT OF
     COMPLAINTS ABOUT HIM.

DOTHAN/Martin & Brackin 1234          1
Confidential Subject to Protective
Order

GC: SHAWN MCGEE IS ACTING IN A, WHAT ROLL IN THIS?
D: HE'S A PUBLIC DEFENDER WITH THE, HE'S A CONTRACT PUBLIC DEFENDER WITH THE CITY OF DOTHAN.

GC: DID SHE IDENTIFY THE MAGISTRATE THAT SAID THIS TO HER?
AO: AT THIS POINT IN TIME SHE DID NOT.

GC: OK.
AO: AH, THERE WAS AN ADDITIONAL PROBLEM IN THAT MS. RAPELJE AH, HAD A STRONG ODOR OF ALCOHOL ABOUT HERSELF. IT WAS LATER DETERMINED THAT SHE WAS INTOXICATED. SHE BLEW A POINT ONE NINE I BELIEVE. THERE WAS, I WOULD SAY A LOOK OF DOUBT ON MY FACE AS WELL AS THE JUDGES FACE THAT THIS HAD HAPPENED. AH, NO ONE ACTUALLY SAID THAT THEY DIDN'T BELIEVE HER BUT BEFORE ANYBODY, ANYTHING COULD BE SAID SHE SAID, IF YOU DON'T BELIEVE ME THE BONDSMAN WAS THERE. AT THAT TIME AH, ANDREW TURNER WAS, I BELIEVE THAT'S HIS NAME, HE WORKS FOR THOMPSON BONDING, HE A YOUNG BLACK MALE, A VERY NICE YOUNG MAN, WAS SUMMON TO THE FRONT OF THE COURTROOM. HE KEPT GIVING SIDE WAYS GLANCES AT THE MAGISTRATE WHO WAS SITTING UP AT THE BENCH AT THAT TIME. I BELIEVE IT WAS MARY TURNER AND HE SAID AH, HE IDENTIFIED THE MAGISTRATE IN QUESTION REGARDING THE RAPELJE INCIDENT AS MARY BETH BRACKIN AND HE SAID, WELL I WAS ON MY CELL PHONE I DIDN'T REALLY HEAR EVERYTHING, BUT HE WAS ACTING VERY FUNNY. SO WE BROKE, STOP TAKING THE PLEA OBVIOUSLY BECAUSE WE WERE CONCERNED ABOUT HER INTOXICATION. AH, AND I SPOKE WITH HIM IN THE BLACK, IN THE BACK HALL THERE DOWN THE SIDE OF THE COURT ROOM AND I SAID, YOU KNOW, YOU WEREN'T TELLING EVERYTHING WERE YOU. HE GOES, MAN I GOT TO WORK HERE. HE SAID YOU KNOW, THOSE WOMEN WILL GIVE ME FITS, I COULDN'T STAND UP THERE IN FRONT OF HER AND TELL WHAT HAPPENED. SO I THEN AH, ASKED HIM WHAT HAD HAPPENED. HE INFORMED, HE BASICALLY GAVE THE EXACT SAME STORY AS MS. RAPELJE. EVEN USED, I CAN'T REMEMBER WHAT THE WORDS WERE, BUT THERE WERE A COUPLE OF WORDS THAT WERE THE SAME WHEN HE WAS SAYING WHAT HAD BEEN SAID BY MARY BETH, WHICH MADE THAT EXTREMELY BELIEVABLE TO ME, I MEAN YOU DON'T JUST, WHEN YOU QUOTING SOMEBODY YOU DON'T GIVE THE SAME WORDS THAT SOMEBODY ELSE GAVE UNLESS YOU HEARD IT. AND HE HAD NOT BEEN PRESENT WHEN MS. RAPELJE WAS TELLING HER STORY TO THE COURT. HE HAD BEEN AT THE BACK OF THE COURTROOM AND SHE, YOU KNOW WE WERE CONDUCTING BUSINESS AT THE BENCH. IT WAS NOT

DOTHAN/Martin & Brackin 1235
Confidential Subject to Protective
Order

2

SOMETHING THAT THE WHOLE COURTROOM WOULD HAVE HEARD. SO AT THAT POINT AND TIME I WENT AND TOLD THE JUDGE WHAT WAS GOING ON. SHE GOT IN TOUCH WITH DONNA AND I BELIEVE IT WAS THE FOLLOWING MORNING DONNA NICHOLSON CAME OVER THERE, TALKED TO ME AND THE JUDGE BOTH ABOUT THE INCIDENT AND WAS ASKING ABOUT THE BONDSMAN. AH, ALSO BY THIS POINT AND TIME IT HAD COME TO OUR ATTENTION THROUGH MICHELL SELLERS THAT MARY BETH HAD CONTACTED SHAWN MCGEE AND TOLD HIM TO BE AT THE COURT HOUSE AT A CERTAIN TIME ON THIS DATE THAT THEY WAS GOING TO GET THIS MESS, MESS STRAIGHTEN OUT.

GC:  DO YOU KNOW IF SHE EVER TALKED DIRECTLY TO HIM OR DID SHE?

AO:  NO. IT'S MY UNDERSTANDING THAT SHE CALLED MICHELL SELLERS AND SAID, GET IN TOUCH WITH SHAWN AND TELL HIM TO BE HERE AT SUCH AND SUCH A TIME. WHICH TO ME IN OF IT SELF IS A PROBLEM, BUT AH, I, I WAS TOLD THIS BY MICHELL SELLERS WHO HAD TAKEN THE PHONE CALL FROM MARY BETH. AH, JUDGE AND I HAD BOTH TALKED TO DONNA AND AH, THEN IT WAS DETERMINED THAT THE BONDSMAN IN QUESTION WAS IN THE COURTROOM. HE WENT INTO MY OFFICE IN THAT BACK HALLWAY WITH ME AND DONNA NICHOLSON AND IN THERE HE TOLD DONNA AH, I CAN'T REMEMBER IF HE EVER ACTUALLY TOLD DONNA WHAT HAD HAPPENED ON THE 25TH OR IF WE JUST ADDRESSED THE LATEST INCIDENT WHERE IN HE TOLD US THAT MARY BETH HAD CALLED HIM AT HIS HOME THE NIGHT BEFORE, HAD AH, MADE SOME STATEMENTS ALONG THE LINES OF, I'VE KNOW YOU SINCE YOU WERE IN TENTH GRADE, MY HUSBAND US TO COACH YOU, I DON'T REMEMBER IF IT WAS AT BASKETBALL OR FOOTBALL, YOU KNOW, YOU HOLD MY JOB IN MY, IN YOUR HANDS, WHY ARE YOU DOING THIS TO ME. AH, I DON'T REMEMBER THE EXACT WORDS, I REMEMBER HIM SAYING THAT HE HAD TOLD HER HE WASN'T GONE LIE FOR ANYBODY.

GC:  OK. THAT WAS MY NEXT QUESTION. DO YOU KNOW IF SHE TRIED AH, STEER HIM AS FAR AS HIS STATEMENT DID YOU EVER.

AO:  SOMETHING ALONG THAT LINE MUST HAVE BEEN SAID BECAUSE I DEFINITELY REMEMBER HIM MAKING THE STATEMENT TO ME AND TO DONNA AND AFTER HE SAID THAT OR DURING THIS PHONE CALL I TOLD HER I WASN'T GONE LIE FOR ANYBODY. AND THAT WAS THE EXTENT OF MY INVOLVEMENT.

GC:  ALL RIGHT. AH, YOU HAD ANYMORE CONTACT WITH MARY BETH BRACKING SINCE THIS SITUATION?

AO:  YES, I HAVE FREQUENT CONTACT WITH MARY BETH.

DOTHAN/Martin & Brackin 1236
Confidential Subject to Protective Order

GC: OK. YOU KNOW ANYTHING ABOUT THIS INCIDENT BEEN SAID?

AO: NOTHING BEEN SAID ABOUT THIS INCIDENT. AH, QUITE FRANKLY SHE SAYS VERY LITTLE TO ME. YOU KNOW WE'VE HAD OTHER PROBLEMS SINCE THEN. I CAN'T GET MY PAPERWORK AT COURT, THINGS OF THAT NATURE. AH, THERE IS DEFINITE ANIMOSITY TOWARDS ME I BELIEVE THAT IT ARISES PRIMARILY OUT OF THIS SITUATION AND POSSIBLEY OUT OF ANOTHER ONE AS WELL. AH, YOU KNOW, IT'S MY POSITION THAT, YOU KNOW, WE NEED THE MAGISTRATES TO DO THEIR JOBS AND I, I NEED, I CAN'T DO MY JOB IF THEY DON'T DO THEIR JOBS AND I MUST BE COMPLAINING ABOUT IT MORE THAN OTHERS BECAUSE I'M DEFINITELY CATCHING THE BLOUNT OF THEIR UNHAPPINESS. SO BUT NO, SHE HASN'T SAID ANYTHING ELSE ABOUT THIS SITUATION. AH, I BELIEVE SHE MADE A STATEMENT TO THE JUDGE THAT THE JUDGE TOLD ME ABOUT. AH, JUST WHEN THE JUDGE TOLD HER SHE WAS UNDER INVESTIGATION SHE MADE SOME COMMENT ABOUT I WOULD NEVER DO ANYTHING LIKE THIS, AH, THIS IS MY JOB, I LOVE MY JOB, I WOULD NEVER DO ANYTHING TO PUT IT IN JEOPARDY, BUT THAT'S, THAT'S THE ONLY THING I KNOW OF AT ALL AND I WASN'T THERE FOR THAT.

KG: DID MS. BRACKING TELL YOU THAT SHE HAD IN FACT MADE THE STATEMENTS OR HAD NOT MADE THE STATEMENTS?

AO: AT SOME POINT IN TIME I BELIEVE SHE TOLD ME THAT SHE HAD NEVER SAID ANYTHING LIKE THAT, THAT SHE WOULD NOT DO THAT. I CAN NOT REMEMBER IF THAT WAS ON THE DAY THAT IT HAPPENED OR THE FOLLOWING DAY THAT SHE SAID THAT. BECAUSE WE HAD A DISCUSSION, IT WAS MY POSITION AND I TOLD HER I SAID I'M NOT LEN, I'M NOT MAKING AN OFFICIAL POLICY DECISION HERE BUT I CAN'T, I CANNOT SEE ANY SITUATION IN WHICH A MAGISTRATE SHOULD BE GIVING LEGAL ADVISE. YOU KNOW, THERE WAS NO REASON FOR ANY DISCUSSION ABOUT ANYTHING TO HAVE OCCURRED HERE. YOU SHOULD HAVE LET HER FILL OUT HER APPEAL PAPERWORK AND THAT SHOULD HAVE BEEN THE END OF IT. THERE SHOULD NOT HAVE BEEN ANY CONVERSATION PERIOD. AND DURING THAT CONVERSATION SHE SAID YOU KNOW I DIDN'T SAY THAT, TALKING ABOUT SHAWN AH, AND DENIED MAKING THE STATEMENTS THAT MS. RAPELJE AND MR. TURNER SAID SHE MADE.

KG: HAVE YOU EVER HEARD HER MADE ANY OR MAKE ANY OTHER STATEMENTS ABOUT SHAWN'S ABILITY TO CONDUCT HIS JOB EVEN ON A DIFFERENT, SEPARATE INCIDENT?

AO: NO.

DOTHAN/Martin & Brackin 1237
Confidential Subject to Protective
Order

4

KG: HAS MARY BETH FILED ANY COMPLAINTS AGAINST YOU?

AO: NOT THAT I'M AWARE OF.  NOW I KNOW THAT HER SUPERVISOR HAS BEEN TO SEE MY SUPERVISOR SAYING THAT I WAS RUDE TO HER IN THE COURTROOM ONE DAY WHEN I INSRUCTED HER TO GET SOME PAPERWORK THERE, BUT THERE'S NO FORMAL COMPLAINT OF WHICH I'M AWARE, NOW THAT DOSEN'T MEAN THERE'S NOT ONE OUT THERE BUT NOT OF WHICH I'M AWARE.

KG: WHEN YOU TALK TO A COUNSELOR IN ANYWAY ABOUT THE RESULTS OF THAT COMPLAINT.

AO: OH, NO LEN AND I DISCUSSED IT BUT I WASN'T.

KG: FOUND TO BE.

AO: NO HE JUST SAID, HE CAME IN AND SAID, WHAT HAPPENED YESTERDAY AND WE DISCUSSED IT AND AH, NO I MEAN I WASN'T REPRIMANDED AT ALL, I DIDN'T TAKE IT AS A REPRIMAND I MEAN,  WE HAD A CONVERSATION AND WE HAVE DISCUSSED HOW TO DEAL WITH THE SITUATION OVER THERE BUT THERE WASN'T, I MEAN I DIDN'T FEEL LIKE THERE WERE ANY NEGATIVE REPERCUSSIONS AT ALL.

KG: OK.

GC: IS THERE ANYTHING ELSE YOU WOULD LIKE TO ADD TO THIS THAT AH, YOU THINK WOULD HELP US IN OUR INVESTIGATION.

AO: AH, I DON'T THINK SO.  NOT THAT I CAN THINK OF.

GC: OK.  THIS IS THE END OF THE STATEMENT AT 1:22.

PRJOHNSON

DOTHAN/Martin & Brackin 1238
Confidential Subject to Protective Order

## ADMINISTRATIVE INVESTIGATION

## STATEMENT OF: MICHELL SELLERS, ADMINISTRATIVE ASSISTANT TO JUDICIAL DEPARTMENT CITY OF DOTHAN

## STATEMENT TAKEN BY: SGT. GARY COLEMAN

## DATE AND TIME: NOVEMBER 5, 2001, 2:51

## PERSONS PRESENT: SGT. KEITH GRAY

GC: WOULD YOU STATE YOUR NAME FOR ME PLEASE?
MS: MICHELL SELLERS.

GC: AND WHERE ARE YOU EMPLOYED?
MS: THE CITY OF DOTHAN JUDICIAL DEPARTMENT.

GC: AND YOUR TITLE THERE?
MS: JUDICIAL ASSISTANT.

GC: AH, WE'RE HERE TO DISCUSS AN INCIDENT THAT OCCURRED ON 9/25/2001 REGARDING MARY BETH BRACKIN. ARE YOU FAMILIAR WITH THAT?
MS: YES I AM.

GC: OK TELL ME WHAT YOU KNOW ABOUT THAT.
MS: OK. I WAS NOT DIRECTLY INVOLVED IN THE ORIGINAL INCIDENT. THE FIRST REAL INVOLVEMENT THAT I HAD CAME ON THE NEXT DAY. AS I RECALL THAT WOULD HAVE BEEN A THURSDAY. WHEN MS. BRACKING CAME TO MY OFFICE AND ASKED ME TO GET SHAWN OVER HERE SO THAT SHE COULD STRAIGHTEN OUT THIS MESS WITH HIM AND THE BONDSMAN. SHE SAID THAT SHE HAD CALLED THE BONDSMAN AT HOME ON THE PREVIOUS NIGHT AND THAT NOW SHE WANTED TO TALK WITH THEM TOGETHER.

GC: OK DO YOU KNOW THIS, WHEN YOU SAY THIS BONDSMAN DO YOU KNOW WHO WE, WHO YOU ARE REFERRING TO?
MS: I'M SORRY I DO NOT KNOW HIS NAME. I KNOW THAT AH, HE'S A BONDSMAN THAT WORKS HERE AT THE CITY AND I KNOW THAT HE HAD BEEN IN COURT BEFORE, BUT.

GC: OK. DO YOU KNOW THE BONDING COMPANY BY ANY CHANCE HE WORKS FOR?
MS: I'M NOT SURE OF IT.

DOTHAN/Martin & Brackin 1239
Confidential Subject to Protective
Order

GC:   OK.
MS:   I WOULD HAVE TO, I WOULD HAVE TO CHECK THAT I HAVEN'T.

GC:   WHEN SHE SAID TO GET SHAWN OVER HERE AH.
MS:   SHE MEAN SHAWN MCGEE, THE PUBLIC DEFENDER.

GC:   OK.
MS:   THAT WAS HERE THE DAY BEFORE.

GC:   AND HE IS A PRACTICING ATTORNEY HERE IN DOTHAN?
MS:   YES HE IS.

GC:   ALL RIGHT.  AND WHAT IF ANYTHING ELSE WAS SAID THAT DAY
      WHEN SHE WAS?
MS:   I DIDN'T FEEL LIKE IT WAS PROBABLY THE BEST IDEA TO DO
      SOMETHING LIKE THAT WITHOUT THE JUDGES KNOWLEDGE AND
      SO I WENT TO THE JUDGE AND LET HER KNOW WHAT REQUEST
      HAD BEEN MADE OF ME AND AH, SHE VETOED THAT IDEA AND
      SAID THAT SHE WISH TO TALK WITH THE BONDSMAN OR TO
      HAVE MS. DONNA NICHOLSON, THE COURT ADMINISTRATOR AND
      MS. ASHTON OTT, THE ASSISTANT CITY ATTORNEY TO TALK
      WITH THIS BONDSMAN AND FIND OUT WHAT INFORMATION HE
      HAD AND WHAT HAD TAKEN PLACE THE NIGHT BEFORE AS FAR
      AS THE PHONE CALL WAS CONCERNED.

GC:   OK.
MS:   AND THEN THEY DID INTERVIEW THAT PERSON.

GC:   WERE YOU PRESENT WHEN THEY INTERVIEWED HIM?
MS:   NO I WAS NOT PRESENT IN THE INTERVIEW, NO.

GC:   OK.  DO YOU KNOW WHERE THE INTERVIEW TOOK PLACE?
MS:   I BELIEVE THAT WOULD HAVE BEEN IN MS. OTT'S OFFICE HERE IN
      THE MUNICIPLE COURT BUILDING, NOT ACROSS THE STREET IN
      THE CIVIC CENTER.

GC:   OK.  AH, DID YOU EVER KNOW MS. BRACKIN   TO MAKE ANY
      STATEMENT DENYING THE ALLEGATIONS THAT YOU ARE AWARE
      OF?
MS:   I BELIEVE ON THE MORNING THAT SHE ASKED ME TO CALL MR.
      MCGEE TO COME IN THAT DAY, I BELIEVE THAT SHE SAID,
      WORDS TO THE EFFECT OF THAT, SHE HAD NOT SAID WHAT THAT
      BONDSMAN HAD SAID SHE SAID.

DOTHAN/Martin & Brackin 1240
Confidential Subject to Protective
Order

GC:   OK. DO YOU HAVE ANY IDEA HOW SHE GOT A HOLD OF THE
      TELEPHONE NUMBER TO GET IN TOUCH WITH HIM?

MS:   I HAVE NO IDEA.

GC:   DO YOU KNOW IF SHE MADE ANY ATTEMP TO CALL MR. MCGEE
      AT HOME?

MS:   I DON'T KNOW, HE HAS NOT MENTIONED ANYTHING ABOUT IT TO
      ME.

GC:   OK.  IS THERE ANYTHING THAT YOU WOULD LIKE TO ADD TO
      THIS STATEMENT THAT WOULD ASSIST US IN OUR
      INVESTIGATION OR YOU THINK, THAT YOU THINK IS PERTINENT
      THAT WE HAVEN'T TALKED ABOUT?

MS:   I DON'T THINK OF ANYTHING.

GC:   OK.  THIS IS THE END OF THE STATEMENT.  THE TIME IS 2:55.


PRJOHNSON

DOTHAN/Martin & Brackin 1241
Confidential Subject to Protective
Order

# ADMINISTRATIVE INVESTIGATION

## WITH MARY TURNER

### DATE AND TIME: NOVEMBER 15, 2001 AT 3:10P.M.

KG:   I NEED TO ADVISE YOU THAT YOU ARE JUST A WITNESS IN THIS INVESTIGATION.  THIS IS AN ADMINISTRATIVE INVESTIGATION. WERE YOU SERVED A NOTICE OF WHAT THE INVESTIGATION IS PERTAINING TO?

MT:   YES.

KG:   OK AND THAT WAS YESTERDAY?

MT:   YES.

KG:   OK. ARE YOU FAMILIAR WITH THE SUBJECT MATTER OF THE INVESTIGATION, THE SUBJECT OF THE INTERVIEW?

MT:   YES.

KG:   WHAT I WANT TO DO IS READ YOUR GARITY NOTICE TO YOU WHICH STATES: THAT I WISH TO ADVISE YOU THAT YOU ARE BEING QUESTIONED AS PART OF AN OFFICIAL INVESTIGATION. AND LET ME PREFERENCE THIS.  THIS NOTICE IS ACTUALLY EXTENDED FROM JUDGE GORDON OK.  SHE GAVE US THE AUTHORITY TO QUESTION YOU UNDER THIS INVESTIGATION OK.  I WISH TO ADVISE YOU THAT YOU ARE BEING QUESTIONED AS PART OF AN OFFICIAL INVESTIGATION.  YOU WILL BE ASKED QUESTIONS SPECIFICALLY, DIRECTLY AND NARROWLY RELATED TO THE PERFORMANCE OF YOUR OFFICE, EXCUSE ME, OF YOUR OFFICIAL DUTIES OR YOUR FITNESS FOR OFFICE.  YOU ARE ENTITLED TO ALL THE RIGHTS AND PRIVILEGES GRANTED BY THE LAWS AND THE CONSTITUTION OF THE STATE OF ALABAMA AND THE CONSTITUTION OF THE UNITED STATES INCLUDING THE RIGHT NOT TO BE COMPELLED TO INCRIMINATE YOURSELF.  I FURTHER WISH TO ADVISE YOU THAT IF YOU REFUSE TO TESTIFY OR TO ANSWER QUESTIONS RELATED TO YOUR OFFICIAL DUTIES OR FITNESS FOR DUTY, YOU WILL BE SUBJECT TO DISCIPLINARY ACTION WHICH COULD RESULT IN YOUR DISMISSAL FROM THE CITY OF DOTHAN.  IF YOU DO ANSWER QUESTIONS, NEITHER YOUR STATEMENT NOR THE INFORMATION OR EVIDENCE WHICH IS GAINED BY REASON OF SUCH STATEMENTS CAN BE USED AGAINST YOU IN ANY SUBSEQUENT CRIMINAL PROCEEDING

DOTHAN/Martin & Brackin 1242
Confidential Subject to Protective
Order

1

EXCEPT FOR PERJURY OR OBSTRUCTION OF JUSTICE CHARGES. HOWEVER, THESE STATEMENTS MAY BE USED AGAINST YOU IN RELATIONS TO SUBSEQUENT DEPARTMENTAL CHARGES. WHAT I'M GOING TO DO IS JUST LET YOU READ AGAIN. YOU MAY OR MAY NOT UNDERSTAND IT. AND AH, ONCE YOU UNDERSTAND IT, SIGN IT WHERE IT SAYS MEMBER SIGNATURE.

MT: YOU WANT ME TO PUT ON, THE REST OF THIS STUFF ON HERE.

KG: NO, JUST THE DATE AND TIME RIGHT NOW.
MT: OK.

KG: STATE YOUR FULL NAME FOR THE RECORD.
MT: MARY LEON TURNER.

KG: WHAT IS YOUR CURRENT POSITION?
MT: MAGISTRATE.

KG: AND WHAT IS YOUR CURRENT ASSIGNMENT? ADMINISTRATIVE COURT OR?
MT: I JUST WORK IN THE OFFICE, I'M NOT IN COURT RIGHT NOW.

KG: OK. THE DATE AND TIME OF THIS COMPLAINT WAS ON OR ABOUT SEPTEMBER 25, 2001. I'M SERGEANT KEITH GRAY ASSIGNED TO THE INTERNAL AFFAIRS DIVISION. FOR THE PURPOSE OF THIS RECORDING, NO OTHER PERSONS ARE PRESENT. UM, AS I STATED EARLIER, YOU ARE A WITNESS IN REGARDS TO THIS INVESTIGATION AND IT'S REGARDING THE ALLEGATIONS OF MS. BRACKIN MAKING COMMENTS TO A DEFENDANT WHICH QUESTIONED THE COMPETENCY OF THE DEFENDANT'S ATTORNEY. THE COMPLAINANT IS ACTUALLY JUDGE GORDON. ARE YOU UNDER THE INFLUENCE OF ANY ALCOHOL OR DRUGS INCLUDING PRESCRIPTION DRUGS?
MT: NO.

KG: ARE YOU CURRENTLY UNDER DOCTORS CARE OR TAKING ANY MEDICATION FOR ANY ILLNESSES OR DISEASES OR DISORDERS?
MT: NO.

KG: WERE YOU ISSUED A PERSONNEL RULES AND REGULATIONS MANUAL? CITY OF DOTHAN PERSONNEL.
MT: YES, UN HUH.

KG: ARE YOU RESPONSIBLE FOR KNOWING WHAT IT CONTAINS?
MT: YES.

DOTHAN/Martin & Brackin 1243
Confidential Subject to Protective Order

2

KG: OK. BRIEFLY I JUST WANT TO ASK YOU IF YOU WERE IN COURT ON SEPTEMBER 25TH, DO YOU REMEMBER A DEFENDANT BY THE NAME OF KIMBERLY RAPELJE?

MT: YES.

KG: AH, IF YOU REMEMBER, TO THE BEST OF YOUR ABILITY, EXPLAIN WHY SHE WAS IN COURT?

MT: OK. SHE IS, BEST I CAN REMEMBER, SHE WAS THERE FOR A DUI CHARGE AND WELL, I MEAN THAT'S ALL I KNOW, SHE WAS THERE FOR THAT.

KG: OK. WHAT HAPPENED IN REGARDS TO HER CASE, IF YOU CAN REMEMBER?

MT: WELL, AS BEST I REMEMBER, I WAS IN THE COURTROOM THAT DAY AND I REMEMBER THAT MARY BETH CALLED OVER THERE BECAUSE COURT HAD ALREADY STARTED AND SHE CALLED TO LET ME KNOW THAT THIS GIRL WAS OVER THERE SIGNING AN APPEAL BOND AND SHE WANTED TO LET ME KNOW YOU KNOW, SO WE DIDN'T ISSUE A WARRANT. AND THAT SHE JUST WANT TO TELL US THAT SHE WOULD BE COMING OVER THERE WHEN SHE GOT THROUGH, WHICH LATER ON SHE DID COME ON OVER THERE.

KG: OK. DID MS. AH, DID MARY BETH MAKE ANY OTHER COMMENTS WHATSOEVER ABOUT THE CASE, HER OR HER ATTORNEY OR ANY OTHER PROCEEDINGS?

MT: HUM, NO I DON'T RECALL ANYTHING, SHE JUST SAID THAT SHE WAS OVER THERE, SHE WAS APPEALING IT AND SHE WAS WITH HER BONDSMAN AND SHE WOULD BE OVER THERE TO COURT AS SOON AS THEY GOT THROUGH?

KG: OK. DID SHE COME TO COURT?

MT: YES.

KG: OK. WHAT HAPPENED IF ANYTHING?

MT: SHE CAME OVER THERE AND OF COURSE THERE'S SO MUCH GOING ON I DON'T REMEMBER EXACTLY WHEN SHE GOT THERE, BUT I DO REMEMBER HEARING SOMEBODY SAY, AND I DON'T, I DON'T EVEN KNOW WHO IT WAS, BUT I REMEMBER SOMEBODY SAYING SOMETHING ABOUT SHE NEEDS TO BE TESTED. AND SO, THEN EVENTUALLY, I THINK IT WAS SERGEANT HARDEN, TOOK HER DOWN AND THEY HAD HER TESTED AND THEN AFTER A WHILE SHE CAME BACK UP AND I

DOTHAN/Martin & Brackin 1244
Confidential Subject to Protective Order

3

BELIEVE THEY SAID THAT SHE BLEW LIKE POINT ONE NINE, WHERE IT IS YOU KNOW THAT'S PRETTY, WELL IT'S OVER TWICE THE LIMIT.

KG:    OK. JUST FOR A POINT OF CLARIFICATION, WHEN YOU'RE SAYING SHE, YOU'RE TALKING ABOUT MS. RAPELJE?

MT:    RIGHT.

KG:    AND NEED TO BE TESTED BECAUSE SHE SMELLED OF ALCOHOL WHILE SHE WAS IN COURT THAT DAY?

MT:    RIGHT, UM HUM.

KG:    AND SHE WAS TAKEN DOWN FOR A BREATH ANALYSER?

MT:    RIGHT.

KG:    AND CAME BACK WITH A POINT ONE NINE RESULT?

MT:    YEAH, OK. I DIDN'T SAY ALL THAT?

KG:    WELL.

MT:    OK. I'LL TRY AND BE MORE SPECIFIC.

KG:    OK. ONCE SHE CAME BACK, WHAT FROM THERE HAPPENED?

MT:    AH, I DON'T REALLY KNOW A WHOLE LOT MORE. I DO REMEMBER SEEING HER TALK TO SHAWN MCGEE WHO WAS THE PUBLIC DEFENDER THAT DAY AND I KNOW I KIND OF WONDERED WHY SHE WAS ALLOWED, I KNOW THEY SAID THAT SHE BLEW POINT ONE NINE AND I KIND OF WONDERED WHY SHE WASN'T MADE TO SIT ON THE BENCH OR SOMETHING LIKE THAT. I KNOW SHE HAD SOME PEOPLE OUT THERE IN THE AUDIENCE AND I, SHE WOULD BE OUT THERE WITH THEM AND THEN YOU KNOW, BUT I KNOW SHE WAS YOU KNOW, SHE WASN'T IN CUSTODY OR ANYTHING LIKE THAT. I REMEMBER WONDERING WHY SHE WAS OUT THERE WANDERING AROUND IF SHE CAME TO COURT INTOXICATED OBVIOUSLY AND FOR A DUI TRIAL, BUT AH, I DON'T REALLY KNOW, I DO KNOW THAT AT SOME POINT SHE WAS TALKING TO SHAWN AND THEN I REMEMBER, I THINK MAYBE HE CAME UP THERE AND HE WAS TALKING TO THE JUDGE OR SOMETHING LIKE THAT AND OF COURSE THERE WAS SO MUCH GOING ON SO I DIDN'T REALLY HEAR A WHOLE LOT OF IF, BUT I KNOW THAT AH, THE JUDGE STARTED ASKING QUESTIONS AND I HEARD HER SAY SOMETHING LIKE, "WHO SAID THAT" AND THEY WERE TALKING ABOUT, IT WAS LIKE THEY WERE TALKING ABOUT SOMETHING THAT HAD HAPPENED WHEN SHE WAS OVER, WHEN MS.

DOTHAN/Martin & Brackin 1245
Confidential Subject to Protective

4

RAPELJE WAS OVER AT THE MAGISTRATES OFFICE AND I REMEMBER SHAW SAYING SOMETHING ABOUT MY CHARACTER, OR MY NAME OR SOMETHING LIKE THAT YOU KNOW, AND THEN THE JUDGE SAID SOMETHING ABOUT, WELL "THAT'S SLANDER, WELL WHO, WELL WHO SAID THAT", WELL WHO DID THEY TALK TO AND OF COURSE NOBODY SAID ANYTING AND I DIDN'T NEVER HEAR A NAME OR ANYTHING. BUT I, THAT'S REALLY ABOUT ALL THAT I REMEMBER, BUT I KNOW THAT THE JUDGE WAS ASKING SOMETHING ABOUT IT AND SHE WAS SAYING SOMETHING ABOUT WHO SAID THAT AND SAYING WELL THAT'S SLANDER AND WELL WE NEED, WELL CALL OVER THERE TO THE MAGISTRATE OFFICE AND FIND OUT WHO THEY WERE TALKING TO AND STUFF LIKE THAT WHICH I MEAN, I KNEW THAT IT MUST HAVE BEEN MARY BETH BECAUSE SHE WAS THE ONE THAT CALLED ME TO TELL ME THAT THEY WERE OVER THERE DOING THE APPEAL, BUT I MEAN, THAT'S REALLY ABOUT ALL I KNOW.

KG:  AT ANY POINT DID YOU SEE ANDREW TURNER THE BONDSMAN, COME UP TO THE BENCH OR APPROACH THE BENCH?
MT:  I DON'T THINK SO, I DON'T REMEMBER SEEING HIM.

KG:  OK. DO YOU REMEMBER HEARING HIM HAVE ANY CONVERSATION WITH THE JUDGE OR ANYONE ELSE?
MT:  I DON'T, I DON'T REMEMBER.

KG:  DID AH, ARE YOU AWARE OF A RECESS OR ANYTHING THEY TOOK SHORTLY THEREAFTER AND ALL OF THOSE PEOPLE WALKED TO THE JUDGES CHAMBERS?
MT:  NOW, WELL, I DO, I DON'T REMEMBER SPECIFICALLY A RECESS YOU KNOW, PER SE BUT I DO KNOW THAT I WAS LOOKING FOR THE JUDGE BECAUSE I THINK THERE WAS SOMETHING THAT DIDN'T GET COMPLETED ON SOME PAPERWORK, SO I WENT LOOKING FOR HER AND WHEN I WENT OUT IN THE HALL WAY, I COULD, I THINK I WENT TO MICHELL AND I ASKED HER WHERE THE JUDGE WAS AND SHE SAID THAT SHE WAS IN THAT LITTLE CONFERENCE ROOM NEXT DOOR. WELL I LOOKED IN THERE AND I REMEMBER SEEING SHAWN WAS IN THERE AND ASHTON AND I THINK, I THINK MARY BETH WAS IN THERE BUT I DIDN'T SEE THE JUDGE YOU KNOW, AND SO I JUST WENT BACK IN THE COURTROOM AND THEN IT WAS SOMETHING THAT THEY WERE WAITING ON FOR A DEFENDANT AND SO THAT'S WHY I CAME BACK YOU KNOW, IT WAS SOMETHING I HAD TO GET COMPLETED BEFORE I COULD SEND THE PAPERWORK DOWN.

DOTHAN/Martin & Brackin 1246
Confidential Subject to Protective Order

5

SO I CAME BACK AND I ASKED HER WHERE THE JUDGE WAS SHE SAID, SHE IN THAT ROOM AND I SAID WELL I LOOKED AND I DIDN'T SEE HER WELL, SHE WAS BACK UP AGAINST THE WALL AND I DIDN'T SEE HER SO THEN YOU KNOW, THAT'S WHEN I LOOKED IN THERE BUT I MEAN IT LOOKED LIKE A SERIOUS DISCUSSION, SO I DIDN'T WANT TO GET INTO THAT.

KG: OK.

MT: AND I DON'T KNOW WHAT THEY WERE TALKING ABOUT, I JUST KNOW THAT IT WAS SERIOUS, IT LOOKED SERIOUS.

KG: OK. IS THERE ANYTHING ELSE ABOUT THE INCIDENT THAT YOU HAVE FIRST HAND KNOWLEDGE ABOUT?

MT: NO.

KG: HAVE YOU SINCE THAT DATE, HEARD BASICALLY WHAT WAS GOING ON WITH THE ALLEGATIONS AND WHAT WAS SAID?

MT: WELL I JUST KNOW THAT DONNA AND MARY BETH OF COURSE, HAD SAID THAT THEY WERE OVER HERE AND THAT THERE WERE SOME KIND OF ALLEGATIONS THAT MARY BETH HAD SUPPOSEDLY SAID SOMETHING ABOUT SHAW OR HIS ABILITY OR SOMETHING LIKE THAT BUT I MEAN, YOU KNOW, THAT'S JUST PEOPLE TALKING ABOUT THAT.

KG: HEAR SAY.

MT: RIGHT, HEAR SAY AND WHAT HAD SUPPOSEDLY HAPPENED BUT I MEAN, I DIDN'T HEAR ANYTING LIKE THAT.

KG: OK. IS THERE ANYTHING YOU NEED TO ADD TO THE STATEMENT THAT I MAY NOT HAVE ASKED YOU REGARDING THIS INCIDENT?

MT: I DON'T THINK SO, I CAN'T THINK OF ANYTHING.

KG: OK. THIS IS GOING TO BE THE END OF THE STATEMENT. THE TIME 3:22P.M.


PRJOHNSON

6

# ADMINISTRATAIVE INVESTIGATION

## STATEMENT OF: SHAWN MCGEE

## STATEMENT TAKEN BY: SGT. KEITH GRAY

## DATE AND TIME: NOVEMBER 6, 2001, 9:55A.M.

## PERSONS PRESENT: SGT. GARY COLEMAN

KG:  STATE YOUR FULL NAME FOR ME PLEASE.
SM:  BILLY SHAWN MCGEE.

KG:  OK. MR. MCGEE, BASICALLY WE JUST SPOKE ABOUT AN INCIDENT
THAT WE ARE INVESTIGATING REGARDING ALLEGATIONS OF
PROPER, IMPROPER CONDUCT ON THE BEHALF OF ONE OF THE
MAGISTRATES, MARY BETY BRACKIN AND YOU WERE ACTUALLY
THE SUBJECT OF THIS AH, INVESTIGATION AND THE JUDGE, AS
WELL AS THE POLICE CHIEF, ASKED US TO LOOK INTO IT.
BASICALLY I WANT TO ASK YOU AH, ANY KNOWLEDGE YOU HAVE
WITH IT LESS PREFERENCE THAT BY LETTING ME ASK YOU, DO
YOU HAVE, ARE YOU REPRESENTING OR HAVE YOU REPRESENTED
A CLIENT BY THE NAME OF KIMBERLY RAPELJE?
SM:  YES SIR.

KG:  OK. AND ARE YOU STILL REPRESENTING HER?
SM:  NO SIR, I BELIEVE THAT SHE STILL MAY, SHE MAY STILL HAVE
SOME PENDING CASES I'M NOT FOR SURE, BUT I'M NO LONGER
PUBLIC DEFENDER ON HER CASES.

KG:  OK. DO YOU REMEMBER ABOUT OR WHEN YOU HAD, LET ME
REPHRASE THAT. ON SEPTEMBER 25, 2001, I UNDERSTAND THAT
MS. RAPELJE WAS HERE IN COURT IN REFERENCE TO A DUI CASE?
SM:  YES SIR.

KG:  WERE YOU HER ATTORNEY THEN?
SM:  YES SIR.

KG:  OK. AT SOME POINT AND TIME TELL US WHEN YOU CAME IN
CONTACT WITH HER THAT DAY. THE PURPOSE OF IT AND
ANYTHING THAT MAY, SHE MAY HAVE TOLD YOU ABOUT

DOTHAN/Martin & Brackin 1247
Confidential Subject to Protective
Order

1

ALLEGATIONS OF YOU BEING, MAYBE INCOMPETENT OR WHAT HAVE YOU.

SM: AH, I CAME IN CONTACT WITH MS. RAPELJE I BELIEVE THAT AFTERNOON IN COURT. SHE HAD A DUI CHARGE ALONG WITH I BELIEVE THREE OTHER MISDEMEANOR CHARGES. ONE OF THEM WAS ATTEMPTING TO ALLUDE AH, MAYBE SPEEDING AND RUNNING A RED LIGHT OR STOP SIGN OR SOMETHING. SHE HAD ABOUT FOUR CHARGES. AH, I SPOKE WITH THE PROSECUTOR MS. ASHTON OTT IN REFERENCE TO TRYING HER CASES OR PLEADING HER CASES OR SOME WAY OF DISPOSING OF HER CASES. AH, MS. RAPELJE'S MAIN CONCERN WAS TO NOT GO TO JAIL WHICH IS A LOT OF PEOPLE CONCERNS EXPECIALLY DUI'S. I TOLD HER THE RIGHTS AS TO TRYING THE CASE, YOU KNOW, THAT SHE HAS A RIGHT TO TRY THE CASE, SHE HAS A RIGHT TO ENTER A PLEA OF GUILTY, BUT SHE WOULD BE GIVING UP CERTAIN RIGHTS. WENT THROUGH ALL OF HER CONSTITUTIONAL RIGHTS ON PLEADING AND GOING TO TRIAL. I SPOKE WITH MS. OTT ABOUT AN OFFER AND I BELIEVE THE OFFER WAS THAT SHE WOULD PLEAD TO THE DUI AND THE OTHER THREE CHARGES WOULD ALL BE DISMISSED. AND ON THE DUI SHE WOULD RECEIVE A SUSPENDED SENTENCE, A TWELVE MONTH SUSPENDED SENTENCE, A SIX HUNDRED DOLLAR FINE, COURT COST AND IT WOULD BE ULTIMATELY WHAT SHE WANTED AND THAT WAS NOT TO GO TO JAIL BUT ALSO IT SAVED HER COURT COST IN THREE OTHER CASES. SO I SPOKE TO HER AND AGAIN WENT OVER THE RIGHTS OF EVERYTHING AND SHE HAD CONVEYED TO ME THAT SHE DID WANT TO ENTER A PLEA, SHE DID WANT TO DISPOSE OF THE OTHER THREE CASES AND THEY WOULD BE DISMISSED. SO WE DID THAT, WE ENTERED, SHE ENTERED A PLEA. AFTER THAT SHE HAD CONVEYED TO ME THAT SHE WANTED TO APPEAL THAT DECISION BASED ON THE FACT THAT SHE HAD ANOTHER PENDING DUI IN CITY COURT. I WAS NOT AWARE AT THE TIME WHEN SHE ENTERED THE PLEA TO THE DUI, BUT I WAS JUST TOLD THAT SHE HAD ANOTHER PENDING DUI IN CITY COURT. ANYWAY, SHE SAID SHE WANTED TO APPEAL IT, WHAT DID SHE NEED TO DO. I TOLD HER THAT SHE HAD A RIGHT TO APPEAL THE CASE LONG AS SHE DID IT WITHIN FOURTEEN DAYS. I TOLD HER SHE COULD, SHE ASKED ME WHAT WAS THE PROCESS TO APPEAL. I TOLD HER SHE NEED TO YOU KNOW GET AN APPEAL BOND AND SHE NEEDS TO GET A BONDSMAN TO MEET HER DOWN AT THE MAGISTRATE'S OFFICE AND SHE COULD TALK TO THE MAGISTRATE AND FILLL OUT THE PROPER PAPERWORK AND MAKE AN APPEAL BOND, SHE COULD APPEAL HER CASE. SHE SAID THAT SHE WOULD DO THAT. I SAID

DOTHAN/Martin & Brackin 1248
Confidential Subject to Protective Order

OK I'LL BE UP, I'M GONE STAY UP HERE IN COURT YOU GO ON DOWN THERE AND TAKE CARE OF THAT. ABOUT THIRTY MINUTES PASSED AND MS. RAPELJE CAME BACK. SHE SEEMED DISTRAUGHT, UPSET. I ASKED HER WHAT WAS WRONG. SHE SAID THAT SHE WENT DOWN THERE TO APPEAL THE CASE. THE BONDSMAN WAS DOWN THERE, MR. ANDREW TURNER FROM THOMPSON BONDING. I DIDN'T KNOW THAT AT THE TIME BUT SHE SAID THAT SHE HAD HAD SOME CONVERSATION WITH THE MAGISTRATE. I ASKED HER WHICH ONE, SHE DIDN'T KNOW HER NAME, SHE DESCRIBED HER SAID SHE WAS A WHITE FEMALE WITH SHORT HAIR. I ASKED HER DID SHE CATCH HER NAME, DID SHE KNOW HER NAME, SHE SAID NO. I ASKED HER WHAT WAS WRONG. SHE SAID THAT IN THE PROCESS OF APPEALING THE CASE THAT WE HAD JUST DISPOSED OF THAT THE MAGISTRATE HAD CONVEYED TO HER THAT SHE NEEDED ANOTHER PUBLIC DEFENDER, THAT THEY HAD HAD A LOT OF COMPLAINTS WITH ME. AT THAT TIME, DUE TO A ETHICAL REASON AND PROFESSIONAL REASONS, I TOLD MS. RAPELJE THAT I THOUGHT IT WAS BEST THAT WE SPEAK WITH THE JUDGE AND FOR ME TO BE TAKEN OFF OF HER CASE FOR HER INTEREST AND MINE. I TOLD HER I DON'T THINK THAT ANYBODY NEEDS TO HAVE A LAWYER THAT THEY BELIEVE MAY BE INCOMPETENT OR DON'T KNOW WHAT THEY ARE DOING.

KG:   CAN I STOP YOU RIGHT THERE FOR A SECOND?
SM:   YEAH SURE.

KG:   IN HER EXPLAINING THAT MS. BRACKING TOLD HER THAT THEY HAD HAD PROBLEMS WITH YOU, DID MS. RAPELJE EXPLAIN FURTHER ANY OTHER COMMENTS THAT MS. BRACKIN MADE?
SM:   SHE DIDN'T MAKE ANY OTHER SPECIFIC INSTANCES, SHE JUST MADE A GENERAL STATEMENT OF THE MAGISTRATE SAID THAT THEY'VE HAD A LOT OF COMPLAINTS WITH YOU, AND THAT WAS THE.

KG:   OK. GO AHEAD.
SM:   SPOKE WITH JUDGE GORDON ABOUT AH, ABOUT BEING TAKEN OFF AS HER LAWYER, AS A PUBLIC DEFENDER THAT THERE WERE TWO OTHER PUBLIC DEFENDERS AND ONE THAT COULD BE APPOINTED ON IT AND THAT WAS FOR HER INTEREST AND ALSO MINE, AS FAR AS COMPLAINTS AND. SO WE SPOKE WITH JUDGE GORDON. JUDGE GORDON I'M ASSUMING THIS, MUST HAVE CALLED DOWN, WELL FIRST AS ME AND JUDGE GORDON AND MS.

DOTHAN/Martin & Brackin 1249
Confidential Subject to Protective
Order

3

RAPELJE WERE PRESENT AH, MS. RAPELJE EXPLAINED THE SITUATION TO JUDGE GORDON, JUDGE GORDON ASKED HER WHICH MAGISTRATE WAS IT AGAIN, SHE DIDN'T KNOW, I DON'T BELIEVE SHE KNEW THE NAME, SHE DESCRIBED HER SO I'M ASSUMING THAT JUDGE GORDON CALLED DOWN THE MAGISTRATE'S OFFICE AND FOUND OUT WHICH ONE WAS DEALING WITH MS. RAPELJE OR ASSISTING HER. AH, FEW MINUTES LATER MARY BETH CAME UP TO THE COURTROOM AND WE WERE TALKING IN THE OTHER ROOM, I BELIEVE IT WAS ME, JUDGE GORDON, MS. ASHTON OTT, AND MS. RAPELJE, MS. RAPELJE WAS NOT PRESENT, IT WAS ME, ASHTON OTT, AND JUDGE GORDON AND MARY BETH. AH, WE HAD, IT WAS INQUIRED ABOUT YOU KNOW, MARY BETH WHAT HAD TAKEN PLACE WHEN MS. RAPELJE HAD GONE IN TO APPEAL THE CASE. JUDGE GORDON HAD I BELIEVE SHE TOLD HER THAT SHE HAD HEARD THROUGH MS. RAPELJE THAT THERE WAS SOME COMMENTS THAT WERE SAID, THE ONES THAT I JUST MENTION ABOUT THERE WAS SOME PRIOR COMPLAINTS AND THAT I, THAT SHE NEEDED ANOTHER LAWYER. MARY BETH SAID THAT SHE DID NOT SAY THAT. THAT I THANK SHE SAID THAT SHE HAD BEEN WORKING FOR TWELVE YEARS AND SHE KNEW HOW TO TALK TO PEOPLE AND NOT TALK ABOUT OTHER PEOPLE THAT SHE WORKS WITH. AH, SHE DENIED SAYING IT. AH, AT THAT TIME, I BELIVE JUDGE GORDON LEFT THE ROOM, ASHTON OTT LEFT THE ROOM AND WE WAS, ME AND MS. MARY BETH WAS IN THE PROCESS OF LEAVING AND I TOLD MARY BETH I SAID YOU KNOW, I DON'T WANT TO, I DON'T WANT TO FIGHT WITH YA'LL YOU KNOW, I'M UP HERE JUST TO DO MY JOB, I DON'T YOU KNOW, I DON'T WANT TO GET IN ANY ARGUMENTS WITH YA'LL. I SAID AS FAR AS I'M CONCERNED YOU KNOW, MARY BETH I KIND OF DISCOUNT HER STORY BEING MS. RAPELJE BECAUSE WE REALIZE THAT SHE HAS A BLOOD ALCOHOL LEVEL OF POINT TWO FOUR HERE IN COURT. SHE WAS INTOXICATED SO I KIND OF DISCOUNTED HER STORY. YOU KNOW, MARY BETH IF YOU TELL ME THAT YOU DIDN'T SAY IT YOU KNOW THAT'S FINE, BUT IF YOU KNOW, ANYTHING IS BEING SAID JUST FOR FUTURE PURPOSES I'D RATHER NO COMMENTS, PERSONAL COMMENTS ABOUT ME IN PROFESSIONAL COMMENTS ABOUT BE NOT BE VOICED TO CLIENTS OR AROUND BONDSMEN CAUSE THAT COULD HURT MY PRACTICE WITH THOMAS SMITH. AH, SHE SAID WELL SHAWN IT DIDN'T HAPPEN, I DIDN'T SAY IT. I SAID FINE, AS FAR AS I'M CONCERNED IT'S OVER WITH YOU KNOW, I DON'T WANT ANYBODY TO GET INTO ANY TROUBLE. YOU KNOW I'M NOT, I'M NOT ON SOME MISSION HERE IT JUST IT CAME UP AND JUDGE

DOTHAN/Martin & Brackin 1250
Confidential Subject to Protective
Order

GORDON WANTED TO INQUIRE ABOUT IT AND IT SEEMS THAT I'M THE SUBJECT OF IT BUT, SO THAT TIME IT WAS DROPPED. SHE LEFT, I LEFT AH, RIGHT AFTER THAT IN THE HALLWAY, ANDREW WALKED UP TO ME AND SAID, SHAWN I HEARD THAT YOU KNOW, SOMETHING HAPPENED DOWN AT THE MAGISTRATE'S OFFICE, THESE AREN'T HIS WORDS EXACTLY, BUT SOMETHING HAPPENED DOWN AT THE MAGISTRATE'S OFFICE. I SAID, I KNOW WE'VE SPOKEN WITH MARY BETH. I SAID, ANDREW WHAT EXACTLY DID HAPPEN. HE SAID, WEEL MS. RAPELJE WAS THERE GETTING HER, GETTING HER APPEAL BOND AND MARY BETH MADE SOME COMMENTS THAT SHE NEEDED ANOTHER LAWYER AND THERE WERE A LOT OF COMPLAINTS ON YOU AND ANDREW SAID THAT I KIND OF LOOK AT MYSELF AND TALKED TO MYSELF AND QUESTION YOU KNOW SHAWN MCGEE, ARE YOU TALKING ABOUT THE SAME SHAW MCGEE THAT I KNOW AND HE DIDN'T I DON'T THINK HE SAID THAT OUT LOUD I THINK HE WAS THINKING THAT TO HIMSELF AND AH, HE COULDN'T BELIEVE WHAT MARY BETH JUST HAD TOLD HIM. I TOLD HIM THAT WE'D TALKED TO MARY BETH AND HE SAID HE COULDN'T BELIEVE IT. WELL, FINISH THE JOB FOR THE DAY AND I SPOKE TO ANDREW THE NEXT DAY AND ANDREW AH, TOLD ME THAT MARY BETH HAD CALLED HIM THAT NIGHT AT HOME. AND HE SAID THAT MARY BETH HAD CONVEYED SOME INFORMATION THAT THEY HAD BEEN FRIENDS FOR A LONG TIME THAT THEY HAD KNOWN EACH OTHER FOR A LONG TIME AND WANTED TO KNOW WHY, WHY ANDREW TOLD JUDGE GORDON WHAT SHE HAD SAID. ANDREW SAID I KNOW SHAWN TO BE A NICE LAWYER, HE'S A GOOD LAWYER. THEY'VE HAD A LOT OF DEALINGS WITH ME AT THE COUNTY AND THAT THAT WAS TOTALLY AGAINST ANYTHING THAT I'VE EVER SEEN OF SHAWN. I'VE NEVER KNOWN, HE'S NEVER KNOWN ANYBODY TO COMPLAIN ON ME. AND THAT WAS ALL HE TOLD ME OF WHAT WAS SAID. AND THAT'S REALLY ALL I KNOW ABOUT, REALLY KNOW ABOUT IT, UNLESS YA'LL HAVE SOME OTHER QUESTIONS.

KG:    OK. SO BASICALLY TO YOUR KNOWLEDGE ALL THAT WAS SAID WAS BASICALLY THAT AH, THEY HAD BEEN HAVING PROBLEMS WITH YOU IN THE PAST AND SHE MAY WANT TO GET ANOTHER ATTORNEY?

SM:    THAT SHE'D HAD A LOT OF COMPLAINTS WITH ME IN THE PAST AND MS. RAPELJE TOLD ME AND ANDREW TOLD ME THAT SHE SAID THAT SHE NEEDED ANOTHER LAWYER.

DOTHAN/Martin & Brackin 1251
Confidential Subject to Protective Order

KG:  OK. WERE THERE ANY SPECIFIC AH, ACCOUNTS OF HER MAYBE SAYING SOMETHING LIKE, SHE WAS PLEADING, YOU WERE PLEADING HER TO A CASE WHERE SHE WAS POINT ZERO, ZERO TO A DUI CASE AND YOUR WERE REFERENCE TO THAT?

SM:  YES THAT CASE IT WAS A DUI CASE, IT WAS A POINT ZERO, ZERO. HOWEVER, UNDER DUI LAWS THERE'S, YOU HAVE ALCOHOL AND YOU ALSO HAVE CONTROL SUBSTANCES. THIS CASE WAS A CASE IN WHICH THE OFFICER WAS NOT CHARGING HER WITH ALCOHOL, IT WAS A CASE IN WHICH HE WAS CHARGING HER WITH DRIVING UNDER A CONTROL SUBSTANCE WHICH ALSO FALLS UNDER THE DUI STATUTES. THE OFFICER WAS GONE TESTIFY DURING TRIAL AND I TOLD MS. RAPELJE THIS THAT THERE WAS AN ADMISSION BY HER THAT SHE HAD TAKEN SOME, I BELIEVE SOME PAIN MEDICINE, I DON'T KNOW IF IT WAS LORATAB, SOME CONTROL SUBSTANCE AND ACTUALLY STILL HAD THE CONTAINER IN THE CAR WITH HER. BASED ON THE FACT THAT THE OFFICER HAD CROSSED HIS T'S AND DOTTED HIS I'S BY CHARGING HER UNDER THE RIGHT STATUTE AND HER ADMISSION AND THE OFFICER SEEING THE PILL BOTTLE, I BELIEVE THAT THEY COULD HAVE PROVEN THE CASE. MAYBE NOT YOU KNOW, IT WAS MY BELIEFE THAT IF SHE TRIED IT BASED ON THEM CIRCUMSTANCE THAT YOU KNOW SHE WOULD LOSE THE DUI TRIAL BUT AGAIN I.

KG:  WITH THAT KNOWLEDGE IN MIND, DID YOU HEAR THAT THIS WAS A PART OF BRACKIN'S COMMENTS OR WAS THIS JUST YOU JUST KNOW THE FACTS OF YOUR CASE?

SM:  NOW THAT YOU SAY THAT, IT SEEM LIKE SOMETHING DOES COME TO MINE ABOUT I DON'T KNOW IF MS. RAPELJE HAD SAID THIS OR IF ANDREW HAD SAID THIS ABOUT MARY BETH HAD MADE SOME, HAD ALLUDED SOME HOW TO PLEADING YOU OUT TO A DUI WHERE SHE BLEW A POINT ZERO, IT SEEM LIKE THERE WAS SOMETHING SAID ABOUT THAT BUT I DON'T WANT TO QUOTE WHO SAID, LIKE I SAID I CAN'T REMEMBER IF IT WAS MS. RAPELJE OR IF IT WAS ANDREW, BUT ONE OF THEM HEARD MARY BETH SAYING SOMETHING IN REFERENCE TO THE CASE THAT I JUST HAD PLEAD HER OUT TO AND IT CENTERED AROUND THE FACT THAT I, AS HER ATTORNEY, HAD PLEAD HER OUT TO A DUI IN WHICH SHE HAD BLOWN A POINT ZERO, ZERO AND THEY COULDN'T SEE HOW A LAWYER COULD DO THAT AND I DID DISCUSS TO MS. RAPELJE THE BASIS OF THE CITY'S CASE ON WHAT THEY WOULD PROVE. I WENT IN DETAIL WITH HER ABOUT THE DUI STATUTES AND THAT THE OFFICER HAD MARKED A

CONTROLLED SUBSTANCE NOT ALCOHOL SO IT WAS EXPECTED THAT SHE WOULD BLOW A POINT ZERO, ZERO.

KG: RIGHT.

SM: AND BASED ON HER ADMISSION AND THE PILL BOTTLE THAT I ANTICIPATED YOU KNOW, THAT THE CITY WOULD HAVE A GOOD CASE AGAINST HER. BUT AGAIN I WENT THROUGH HER RIGHTS AND TOLD HER WHAT HER RIGHTS WERE AND SHE SAID THAT HER MAIN CONCERN WAS NOT TO GO TO JAIL.

KG: RIGHT. AH, SINCE THE COMMENTS THAT WERE MADE AND YOU SPOKE WITH HER ABOUT MAYBE SEEKING ANOTHER PUBLIC DEFENDER, WOULD YOU HAVE STILL BE ASSIGNED TO HER AS A PUBLIC DEFENDER HAD THE COMMENTS NOT BEEN MADE OR WOULD SHE BE AH, WORKING UNDER.

SM: WELL, THAT'S HARD TO SAY. THERE'S THREE PUBLIC DEFENDERS. THERE'S ME, THERE'S CATHELINE NEMISH AND JENNIFER ATWELL ON THIS DAY, I'M ASSUMING IT WAS A TUESDAY BECAUSE THAT'S MY SET DAY HERE, I WAS HER ATTORNEY. I'VE GONE THROUGH THEM CASES, THEM FOUR CASES WITH HER. NOW SHE APPEALED THEM CASES, WHICH MEAN THEY WOULD HAVE GONE TO COUNTY. SO NONE OF US BEING THE PUBLIC DEFENDENTS WOULD HAVE BEEN HER ATRORNEY ON THEM CASES IN THAT CAPACITY.

KG: SHE WOULD HAVE HAD TO HIRE HER OWN ATTORNEY.

SM: SHE WOULD HAVE HAD ANOTHER ATTORNEY. NOW ON HER OTHER CASE IN THE CITY THAT CAME UP LIKE A WEEK LATER WHICH WAS AS DUI WHICH SHE DIDN'T TELL ME ABOUT THAT SHE HAD ANOTHER PENDING DUI IN THE CITY.

KG: RIGHT.

SM: OR IF I HAD KNOW IT I COULD HAVE WORKED SOMETHING OUT PROBABLY WITH MS. OTT WITH BOTH DUI'S YOU KNOW, BEING DISPOSED OF AT THE SAME TIME. BUT POSSIBLY, WELL ACTUALLY IT WAS BECAUSE, I BELIEVE A FEW WEEKS LATER I LOOK AT THE DOCKET AND MS. RAPELJE IS ON THE DOCKET AND I TALKED TO MS. OTT ABOUT IT. I SAID MS. RAPELJE IS ON THE DOCKET TODAY. WE NEED TO SEE ABOUT GETTING AH, SEE IF JENNIFER ATWELL CAN COME OVER AND HELP HER WITH HER CASES BECAUSE OF THE OBVIOUS CONFLICT WITH US. SO AT THAT TIME THEORETICALLY I WAS HER PUBLIC DEFENDER ON THAT DAY UNTIL MS. ATWELL CAME IN AND REPLACED ME, BUT ALSO

DOTHAN/Martin & Brackin 1253
Confidential Subject to Protective
Order

7

SHE REPLACED ME THE DAY OF THIS INCIDENT BECAUSE THEY HAD TO GO BACK BEFORE THE JUDGE AND APPEAL HER CASE AND MS. ATWELL CAME OVER AT THAT TIME AND WENT BACK BEFORE THE JUDGE TO APPEAL THE CASE.

KG: OK. DO YOU HAVE ANY REASON TO BELIEVE THAT ANDREW TURNER WOULD NOT BE TELLING YOU THE TRUTH?

SM: I DON'T HAVE ANY, I DON'T HAVE ANY DOUBT WHATSOEVER IN ANDREW TURNER'S STATEMENT TO ME. I KNOW HIM TO BE AN UPSTANDING, HONEST YOUNG MAN. HE DOSEN'T HAVE ANY REASON TO LIE. I'VE ALWAYS KNOWN HIM TO YOU KNOW, ANDREW TELLS ME THAT THE SKY WAS ORANGE, I DON'T HAVE ANY REASON TO LOOK UP BECAUSE IT'S PROBABLY ORANGE.

GC: DID YOU AH, DID MS. RAPELJE, WAS SHE SATISFIED WITH WHAT YOU TOLD HER AND ALL PRIOR TO GOING DOWN TO THE MAGISTRATE'S OFFICE. DID SHE DISPLAY ANY TYPE OF DISPLEASURE WITH WHAT YOU'D TOLD HER OR ANYTHING WHERE SHE FELT LIKE SHE DIDN'T YOU DIDN'T THAT YOU FELT LIKE SHE DIDN'T HAVE ANY CONFIDENCE IN YOU?

SM: NO SIR. I. SHE SEEMED HAPPY WHEN I EXPLAINED TO HER ABOUT THE PLEA OFFER, WHEN I EXPLAINED TO HER HER RIGHTS TO A TRIAL OR TO PLEA. SHE SAID THAT IF SHE COULD DISPOSE OF THE THREE OTHER CASES AND PLEAD TO THE DUI AND NOT GET ANY JAIL TIME, THAT IS WHAT, THAT'S WHAT SHE WANTED TO DO. AND UP UNTIL THE TIME SHE WENT DOWN TO APPEAL THE CASE SHE SEEMED SATISFIED WITH EVERYTHING THAT HAD GONE, THAT HAD GONE ON THAT DAY.

GC: AND THAT'S THE ONLY TIME THAT THERE WAS ANY LOSE OF CONFIDENCE IS AFTER SHE RETURNED?

SM: YES SIR.

KG: HAVE YOU HAD ANY PRIOR PROBLEMS WITH MS. BRACKIN?

SM: NO SIR.

KG: ANY OF THE OTHER MAGISTRATES?

SM: NO SIR.

GC: HAVE YOU HAD ANY TROUBLE GETTING PAPERWORK FROM MS. BRACKIN?

SM: NO SIR. BUT LIKE I SAY I'VE ONLY BEEN HERE, I WAS HIRED SEPTEMBER 1ST WAS MY FIRST DAY AND I HAVEN'T HAD ANY

DOTHAN/Martin & Brackin 1254    8
Confidential Subject to Protective

PROBLEMS WITH ANY OF THE MAGISTRATES. THIS INCIDENT HAPPENED AND SINCE THIS HAPPENED I HAVEN'T HAD ANY PROBLEMS WITH THE MAGISTRATES, INCLUDING MARY BETH.

KG: WOULD HAVE ANY PROBLEMS, ANY OBJECTS WITH US TALKING WITH MS. RAPELJE ABOUT THIS INCIDENT?

SM: I DON'T HAVE ANY PROBLEMS WITH THAT AS LONG, FAR AS AH, ATTORNEY CLIENT PRIVILEGE AS LONG AS IT YOU KNOW IT WEIGHED WITH HER AS LONG AS SHE'S OK WITH THAT AH, I DON'T HAVE ANY OBJECTIONS TO IT.

KG: OK. EVERYTHING YOU TOLD US THE TRUTH?

SM: YES SIR.

KG: IS THERE ANYTHING THAT WE DIDN'T ASK YOU THAT YOU HAVE KNOWLEDGE ABOUT THIS INCIDENT THAT YOU MIGHT COULD SHARE WITH US.

SM: NO SIR.

KG: OK. THIS GONNA BE THE END OF THE STATEMENT. TIME IS 10:16A.M.


PRJOHNSON

DOTHAN/Martin & Brackin 1255      9
Confidential Subject to Protective

DOTHAN/Martin & Brackin 1256
Confidential Subject to Protective
Order

## ADMINISTRATIVE INVESTIGATION

### STATEMENT OF DONNA NICHOLSON

KG:  OK. WANT TO ADVISE YOU MS. NICHOLSON THAT THIS IS GONNA BE AN
ADMINISTRATIVE INVESTIGATION. AH, WHAT I WOULD LIKE FOR YOU
TO DO IS TAKE A LOOK AT THAT MEMO WHICH THE JUDGE SENT TO
YOU.

DN:  I HAVE ONE.

KG:  OK. WELL, THAT IS THE NOTICE OF THE ALLEGATIONS IN, WHICH WE
ARE HERE FOR THIS INVESTIGATION TODAY. WHAT I WOULD LIKE TO
DO IS GIVE YOU A COPY OF THIS INTERNAL AFFAIRS GARITY NOTICE
AND I'LL READ IT. IT SAYS, I WISH TO ADVISE YOU THAT YOU ARE
BEING QUESTIONED AS PART OF AN OFFICIAL INVESTIGATION BY THE
DOTHAN POLICE DEPARTMENT. YOU WILL BE ASKED QUESTIONS
SPECIFICALLY, DIRECTLY AND NARROWLY RELATED TO THE
PERFORMANCE OF YOUR OFFICIAL DUTIES OR FITNESS FOR OFFICE.
YOU ARE ENTITLED TO ALL THE RIGHTS AND PRIVILEGES
GUARANTEED BY THE LAWS OF THE CONSTITUTION UNDER THE STATE
OF ALABAMA AND THE CONSTITUTIONS OF THE UNITED STATES
INCLUDING THE RIGHT NOT TO BE COMPELLED TO INCRIMINATE
YOURSELF. I FURTHER WISH TO ADVISE YOU THAT IF YOU REFUSE TO
TESTIFY OR ANSWER QUESTIONS RELATING TO YOUR OFFICIAL DUTIES
OR FITNESS FOR DUTY, YOU WILL BE SUBJECT TO DEPARTMENTAL
CHARGES WHICH COULD RESULT IN YOUR DISMISSAL FROM THE
DOTHAN POLICE DEPARTMENT. IF YOU DO NOT ANSWER NEITHER THE
STATEMENT.

DN:  WAIT NOW IT SAY IF YOU DO ANSWER.

KG:  EXCUSE ME, IF YOU DO ANSWER, NEITHER YOUR STATEMENT NOR ANY
INFORMATION OR EVIDENCE WHICH IS GAINED BY REASON OF SUCH
STATEMENT CAN BE USED AGAINST YOU IN ANY SUBSEQUENT
CRIMINAL PROCEEDINGS EXCEPT FOR PERJURY OR OBSTRUCTION OF
JUSTICE CHARGES. HOWEVER, THESE STATEMENTS MAY BE USED
AGAINST YOU IN RELATION TO SUBSEQUENT DEPARTMENTAL
CHARGES. NOW WHAT I'D LIKE TO CLARIFY IS THAT YOU WORK FOR
THE CITY OF DOTHAN COURT SYSTEM NOT THE DOTHAN POLICE
DEPARTMENT PER SE. OK. THE GARITY NOTICE IS BASICALLY TO AH,
CITY OF DOTHAN EMPLOYEES PERIOD, NO MATTER WHICH BRANCH OF
THE DEPARTMENT OR THE CITY OF DOTHAN YOU WORK. SO
BASICALLY THE QUESTIONS HERE ARE ADMINISTRATIVE, NOT
CRIMINAL IN PROCEDURE. THERE IS NO CRIMINAL PENALTIES

DOTHAN/Martin & Brackin 1257
Confidential Subject to Protective
Order

1

WHATSOEVER.  WHAT WE ARE QUESTIONING IS THINGS RELATED TO THE DUTIES AND OFFICIAL DUTIES FOR THE CITY OF DOTHAN.

DN: UM HUM.

KG: OK.  AND AH, IF YOU UNDERSTAND THAT, WHERE IT SAY MEMBER SIGNATURE, THAT'S WHERE YOU NEED TO SIGN IT.

DN: I'VE GOT SOME QUESTIONS FIRST.  HOW, HOW AM I FITTING IN THIS INVESTIGATION?  AM I MEARLY A WITNESS OR AM I A PARTY TO THE INVESTIGATION?

KG: OK. I'M GOING TO GO DOWN, I HAVE A LIST HERE AND I'LL ANSWER THAT QUESTION ACCORDING TO THE LIST I'M GOING DOWN.

DN: OK.

KG: THIS, YOUR SIGNATURE ON HERE JUST SAYS THAT YOU UNDERSTAND WHAT THE GARITY NOTICE STATES.

DN: OK.  BUT THIS SAYS IF I UNDERSTAND IT, SAID IF I DO ANSWER YOUR QUESTIONS IT COULD COST ME MY JOB.

KG: IT SAYS IF YOU DON'T COOPERATE IN THE INVESTIGATION.  THAT IS WHAT YOU ARE INTERPURTING IT'S NOT IF YOU DO.

DN: BUT IT SAYS IF YOU DO ANSWER THEN IT CAN BE USED, ANY STATEMENTS MAYBE USED AGAINST YOU IN RELATION TO YOUR JOB.

KG: THAT'S RIGHT, BUT IF YOU NOTICE HERE THAT GOES ON TO SAY YOU, CAN BE USED AGAINST YOU IN ANY SUBSEQUENT CRIMINAL PROCEEDING FOR EXCEPTION OF PERJURY.  OK.

DN: I UNDERSTAND THAT CRIMINAL IS NOT ENTERING INTO IT.

KG: RIGHT.

DN: BUT, I WANT YOU TO TELL ME IF I SIT HERE AND WE TALK ABOUT THIS, IS IT GOING TO AFFECT MY JOB, CAN IT AFFECT MY JOB?

KG: THAT IS GOING TO BE UP TO THE DECISION OF YOUR BOSS.  WE'RE SIMPLY ON A FACT FIDING MISSION.

DN: I KNOW IT'S HER DECISION.

KG: OK.

DN: BUT CAN IT?

KG: I CAN'T ACTUALLY SAY WHETHER IT WILL OR WON'T.  YOU'RE NOT THE SUBJECT OF THE INVESTIGATION.

DOTHAN/Martin & Brackin 1258
Confidential Subject to Protective Order

2

DN: I KNOW, I'M NOT ASKING YOU WILL IT, I'M NOT ASKING YOU WANT IT, I'M ASKING YOU IS IT POSSIBLE?

KG: THAT I COULDN'T ANSWER UNLESS I TALKED TO THE JUDGE. I DON'T KNOW WHAT HER INTENTIONS ARE REGARDING YOU. I KNOW YOU'RE NOT THE SUBJECT OF IT.

DN: I'M NOT THE SUBJECT OF THE INVESTIGATION, I'M WITNESSING THIS.

KG: EXACTLY.

DN: DO YOU UNDERSTAND WHAT I'M TRYING TO ASK YOU?

KG: I UNDERSTAND ALL YOUR CONCERNS AS WELL.

DN: OK. ALL RIGHT CAUSE, GO AHEAD.

KG: IF YOU UNDERSTAND IT, JUST SIGN IT WHERE IT SAYS MEMBER SIGNATURE.

DN: YOU'RE GONE GIVE ME A COPY?

KG: YES.

DN: MEMBER? WHAT DOES MEMBER MEAN?

KG: YOU'RE A MEMBER OF THE CITY OF DOTHAN.

DN: YOU HAVE TO EXCUSE ME, I'M A MAGISTRATE AND WE BREAK DOWN THE DETAILS.

KG: WE DO TOO, NO PROBLEM. OK. COULD YOU PLEASE STATE YOUR NAME FOR THE RECORD?

DN: DONNA NICHOLSON.

KG: WHAT IS YOUR CURRENT POSITION?

DN: COURT ADMINISTRATOR, MUNICIPLE COURT ADMINSTRATOR.

KG: DOES THAT ENCOMPASS YOUR ASSIGNMENT AS WELL? YOUR ASSIGNMENT?

DN: THAT IS MY ASSIGNMENT.

KG: OK. THAT'S WHAT I'M ASKING IF THAT.

DN: UN HUH.

KG: OK. I'M SERGEANT KEITH GRAY ASSIGNED TO THE INTERNAL AFFAIRS DIVISION FOR THE PURPOSE OF THIS RECORDING, SERGEANT GARY COLEMAN IS ALSO PRESENT, MEMBER OF THE INTERNAL AFFAIRS DIVISION. MS. NICHOLSON, BE ADVISED THAT YOU ARE THE WITNESS

DOTHAN/Martin & Brackin 1259
Confidential Subject to Protective Order

IN THIS INVESTIGATION. THE NATURE OF THE INVESTIGATION INVOLVES ALLEGATIONS THAT MS. BRACKIN MADE COMMENTS TO A DEFENDANT WHICH QUESTIONS THE COMPETENCY OF THE DEFENDANT'S ATTORNEY. IN REFERENCE TO THE PERSON THAT IS THE COMPLAINANT ON THIS, IT IS GOING TO BE JUDGE GORDON. ARE YOU UNDER THE INFLUENCE OF ALCOHOL OR DRUGS, INCLUDING PRESCRIPTION DRUGS?

DN: NO.

KG: ARE YOU CURRENTLY UNDER DOCTOR'S CARE TAKING MEDICATION FOR ANY ILLNESSES, DISEASES OR DISORDERS?

DN: NO.

GC: OK. DONNA AH, WHEN WERE YOU FIRST AWARE OF THE PROBLEM WITH MS. BRACKIN AND MR. MCGEE?

DN: I WAS WORKING IN MY OFFICE UPSTAIRS, IN MY OFFICE. GOT A PHONE CALL FROM JUDGE GORDON. SHE SOUNDED LIKE SHE WAS CALLING ME FROM THE BENCH, SHE HAD HER HAND OVER THE RECEIVER SO THAT I COULD HEAR HER BUT NO ONE ELSE COULD. SHE TOLD ME THAT I NEEDED TO GO DOWN AND TALK TO MARY BETH, THAT SOMEONE HAD COME IN THE COURTROOM AND SAID THAT, I'M, NOW YOU WILL HAVE TO FORGIVE ME, I HAVE A TERRIBLE MEMORY, BUT I, SOMETHING TO THE EFFECT THAT SHE SHOULD FIRE HER ATTORNEY.

GC: UM HUM.

DN: THAT KIND OF THING. SO.

GC: OK. AND WHAT DID YOU DO TO INVESTIGATE THIS INCIDENT?

DN: I'M NOT AN INVESTIGATOR, I WANT TO MAKE THAT CLEAR. IT'S NOT MY JOB TO INVESTIGATE AND I'M NOT, I'M NOT TRAINED IN THAT. I WENT DOWNSTAIRS WHERE MS. BRACKIN WAS WORKING. I TOLD HER THAT JUDGE HAD CALLED ME AND THAT SOMEBODY HAD SAID THAT SOMETHING THAT SHE HAD SAID SOMETHING ABOUT THEM GETTING ANOTHER ATTORNEY OR FIRING THEIR ATTORNEY OR SOMETHING LIKE THAT.

GC: OK. LET ME CLARIFY SOMETHING. ARE YOU MARY BETH BRACKIN'S SUPERVISOR?

DN: I AM HER IMMEDIATE SUPERVISOR.

GC: OK. AND IS THAT IN YOUR SCOPE OF DUTY FOR YOU TO MAKE SURE THAT HER JOB IS DONE IN A PARTICULAR MANNER?

DN: YES.

DOTHAN/Martin & Brackin 1260
Confidential Subject to Protective Order

4

GC: OK. AND AH, BUT YOU DID MAKE AN ATTEMPT TO TALK WITH MS. BRACKIN AND THAT TYPE OF THING RIGHT?

DN: WELL I WENT DOWNSTAIRS WHERE SHE WAS WORKING. SHE WAS THE ONLY PERSON WORKING AT THAT TIME THERE WITH THE PUBLIC. OK. I TOLD HER WHAT JUDGE HAD SAID AND THE FIRST THING SHE SAID WAS, THAT'S NOT WHAT I SAID. SO I, I SAID, GO OVER THERE, FIND OUT WHAT'S GOING ON AND I'LL STAY HERE AND WORK. I COULDN'T JUST SEND HER BECAUSE THAT, I HAD NO ONE TO WORK THERE AT THE TIME. SO I SAID YOU GO, SEE WHAT'S GOING ON FIND OUT ABOUT IT AND I'LL JUST STAY HERE AND I STAYED THERE AND RELEAVED HER BASICALLY AND WAITED ON THE PUBLIC WHEN SHE WAS GONE.

GC: OK. AND AH, WHAT WERE THE FINDING? WHAT WERE YOUR FINDINGS AFTER SHE HAD GONE OVER?

DN: WELL WHEN SHE CAME BACK, SHE SAID THAT AH, I PRETTY MUCH THOUGHT SHE HAD GOTTEN IT STRAIGHT. SHE SAID THAT, AT THAT POINT IT WASN'T A BIG ISSUE. OK. EVERYDAY SOMEBODY WILL TELL US A POLICE OFFICER SAID SO AND SO OR ONE OF THE MAGISTRATES TOLD ME SO AND SO AND IT'S INCORRECT INFORMATION, THEY DON'T GET THINGS STRAIGHT, YOU KNOW WHAT I'M SAYING, IT'S AN EVERYDAY THING FOR US. SO, WHEN SHE CAME BACK, I THOUGHT MARY BETH HAD TAKEN CARE OF IT. SHE SAID THAT AH, THIS KIMBERLY RAPELJE WAS OVER THERE AND HAD SAID THAT SHE SHOULD FIRE SHAWN AND THAT KIND OF THING AND THAT SHE WENT OVER THERE AND TALKED WITH THEM ABOUT IT AND I DON'T KNOW IF AT THAT TIME OR NOT THAT SHE FOUND OUT THAT THE WOMAN WAS UNDER THE INFLUENCE OF ALCOHOL OR WHAT, BUT I PRETTY MUCH THOUGHT THAT WAS THE END OF IT. IT DID NOT SEEM TO BE A BIG ISSUE AT THAT POINT. SHE WENT BACK TO WORK AND I WENT BACK TO WORK.

GC: OK. AND AH, HAVE YOU EVER HAD AN OCCASION TO MEET WITH LYNN WHITE ABOUT THIS OR ANY OTHER PROBLEMS WITH MS. BRACKIN?

DN: NO.

GC: OK.

DN: NOT THAT I RECALL.

GC: OK. YOU EVER HAD A MEETING WITH HIM IN HIS OFFICE?

DN: ABOUT MARY BETH? NOT THAT I RECALL.

DOTHAN/Martin & Brackin 1261
Confidential Subject to Protective Order

5

GC: WHAT'S YOUR POLICY IN REGARDS TO YOUR EMPLOYEES
RECOMMENDING COUNSEL FOR DEFENDANTS?
DN: RECOMMENDING COUNSEL.

GC: LAWYERS AND THAT KIND OF STUFF. DO YOU HAVE A POLICY FOR
THAT?
DN: NO. WE, OUR POSITION IN ANYTHING LIKE THAT WOULD BE TO TRY TO
GIVE THEM AS MUCH INFORMATION. IF, LET'S SAY YOU COME AND
YOU'RE UNDER TWENTY ONE, WE TRY TO ADVISE YOU, SINCE YOU'RE
UNDER TWENTY ONE YOU'RE ELGIBLE FOR YOUTHFUL OFFENDER
STATUS, WE GIVE THEM INFORMATION ALONG THAT LINE. YOU HAVE
TO GO TO COURT TO GET IT, IT WILL KEEP THINGS OFF YOUR RECORD.
WE WOULD DO THE SAME ABOUT AN ATTORNEY. IF YOU WANT AN
ATTORNEY, YOU CAN HIRE ONE, IF YOU CAN'T AFFORD ONE, YOU
COME TO COURT AND FILL OUT THE PROPER FORMS AND ONE WILL BE
APPOINTED TO YOU. THAT WOULD BE BASICALLY WHAT WE WOULD
DO.

GC: BUT DO YOU EVER DISCUSS THE CREDIBILITY OF LAWYERS THAT
ONE'S BETTER THAN THE OTHER OR ANYTHING LIKE THAT?
DN: NO. NEITHER ATTORNEYS NOR BAIL BONDSMEN.

GC: OK.
DN: WE'RE OFTEN ASKED FOR BAIL BONDSMEN RECOMMENDATIONS,
SOMETIME FOR ATTORNEY, AND WE, UN UN WE DON'T.

GC: DO YOU HAVE ANY POLICY IN WRITING SUCH AS THAT?
DN: UN UN.

GC: OK. AH, WITH WHAT WENT ON, DO YOU FEEL MS. BRACKIN MIGHT
HAVE VIOLATED YOUR VERBAL POLICY THAT YOU HAVE?
DN: YOU UNDERSTAND THAT I'M NOT A WITNESS TO ANYTHING THAT WAS
SAID. THE ONLY INFORMATION I HAVE IS WHAT THIS ONES TOLD ME
AND THAT ONES TOLD ME AND THAT KIND OF THING.

GC: OK. DID YOU EVER DISCUSS THIS INCIDENT WITH AH, MS. BRACKIN ON
A ONE TO ONE BASIS?
DN: YEAH, WE'VE TALKED ABOUT IT SEVERAL TIMES.

GC: OK. AND WHAT WAS DISCUSSED?
DN: WELL, BASICALLY I, SHE WOULD COME TO ME AND SAY YOU KNOW,
THIS IS COME UP ABOUT IT AND YOU KNOW, I DIDN'T SAY IT AND I
DON'T KNOW WHY IT'S GETTING BLOWN UP. JUDGE GORDON GOT ME

DOTHAN/Martin & Brackin 1262
Confidential Subject to Protective

BACK IN IT A TIME OR TWO WITH THE BAIL BONDSMAN. AH, YEAH I TALKED TO MARY BETH ABOUT IT YOU KNOW.

GC: OK. HOW BOUT MR. MCGEE, YOU EVER TALKED TO HIM ONE ON ONE ABOUT IT?

DN: NO.

GC: HOW BOUT MS. OTT?

DN: YEAH, SHE AND I TALKED ABOUT IT BECAUSE SHE WANTED ME TO TALK TO THE BAIL BONDSMAN THAT DAY WE TALKED TO HIM ALL TOGETHER.

GC: OK. AND THAT'S ANDREW TURNER?

DN: YEAH, UM HUM, THAT'S RIGHT.

GC: IS HE WITH?

DN: THOMPSON I BELIEVE, YEAH.

GC: AND DID YOU HAVE AN OPPORTUNITY TO TALK TO HIM?

DN: I DID. AH, MS. OTT ARRANGED IT. I WAS IN THE COURTROOM THAT DAY AND HE CAME IN AND SHE POINTED HIM OUT THAT THAT WAS HIM. SHE WENT OVER AND TALKED TO HIM AND I LEFT THE COURTROOM AND WENT TO A WITNESS ROOM AND AFTER A FEW MINUTES SHE BROUGHT HIM IN THERE WHERE I WAS. AND AH, I THINK THE JUDGE WANTED ME TO TALK TO HIM IS HOW I WIND UP TALKING TO HIM ABOUT THE PHONE CALL HE GOT FROM MARY BETH.

GC: OK. TELL ME ABOUT THAT PHONE CALL.

DN: I CAN TELL YOU WHAT HE TOLD ME. AH, I TRIED, WE WENT IN THE ROOM THERE TO TALK, I TRIED TO PUT HIM AT EASE YOU KNOW, THIS IS NOT A CRIMINAL INVESTIGATION, I'M JUST TRYING TO FIGURE OUT WHAT HAPPENED AND YOU TELL ME WHAT AH, WHAT HAPPENED YOU KNOW, AND HE SAID THAT JUDGE GORDON WAS CONCERNED ABOUT HOW SHE GOT HIS PHONE NUMBER. JUDGE GORDON WAS AFRAID THAT SHE HAD GONE THROUGH THE COMPUTER SYSTEM TO TAKE HIS PHONE YOU KNOW WHAT I'M SAYING? BUT AH, HE SAID SHE CALLED HIM ON HIS CELL PHONE. I SAID WELL DO YOU KNOW HOW SHE GOT YOUR NUMBER? HE SAID, WELL PROBABLY FROM THE OFFICE YOU KNOW, JUST CALL THOMPSON AND HE SAID EVERYBODY'S GOT MY NUMBER THEY GIVE IT OUT. SAID SHE CALLED HIM AND HE WAS ASLEEP IS WHAT HE SAID. SHE CALLED HIM ON HIS CELL PHONE. AH, ASKED HIM WHY HE HAD SAID THAT HE HEARD HER SAY SOMETHING BAD ABOUT MCGEE AND THAT AH, SHE TOLD, HE SAID SHE SAID SOMETHING

DOTHAN/Martin & Brackin 1263
Confidential Subject to Protective Order

7

ABOUT HIM JEOPARDIZING HER JOB AND THAT KIND OF THING.  AND THERE AGAIN I TRIED TO PUT HIM AT EASE AND TOLD HIM YOU KNOW, SHE DOESN'T HOLD THE KEY TO YOUR JOB, OR YOU DON'T HOLD THE KEY TO HER JOB, THAT KIND OF THING, SO.

GC:    OK.
DN:    BUT I HAD NO, YOU KNOW, I FELT CONFIDENT THAT SHE DID CALL HIM. I BELIEVED HIM.

GC:    HAS ANY DISCIPLINARY ACTION EVER BEEN ADMINISTERED TO MS. BRACKIN?
DN:    NO, IT'S KIND OF BEEN BOUNCED AROUND.

GC:    CAN YOU TELL ME WHY?
DN:    YEAH, WELL I DON'T KNOW IF I CAN TELL YOU WHY, I CAN TELL YOU WHAT HAPPENED.

GC:    OK.
DN:    AH, THE FIRST THING THAT HAPPENED, I WAS WORKING IN THE COURTROOM AND TRYING TO TALK TO THE JUDGE ABOUT YOU UNDERSTAND THAT WE ARE TRYING TO DO COURT AND I'M SITTING BESIDE HER AND WE'RE TALKING ABOUT HIS KIND OF THING AND GOING ON AND I'VE GOT MY EMPLOYEE MANUAL HERE OK.  SO I HAD TOLD HER EARLIER AFTER TALKING WITH ASHTON AND TURNER AH, ANDREW TURNER, THAT IT WAS NOT SOMETHING JUST CUT AND DRIED THAT YOU CAN JUST GO DOWN THE LIST AND PICK OUT SOMETHING AN EMPLOYEE THING THAT WOULD FIT IT.  I SAID WELL, I'M GONE NEED SOME HELP WITH THIS.  I SAID WE PROBABLY GONNA HAVE TO WRITE IT OUT UNDER OTHER AND DECIDE WHAT WENT, WHAT HAPPENED.  SO THAT DAY I WAS WORKING IN THE COURTROOM, HAD MY MANUAL THERE, WE WERE TRYING TO TALK ABOUT IT AND SHE HAD MICHELL SELLERS TO CALL ME AND MICHELL SAID THAT SHE HAD TALKED TO CAPTAIN SMITH AND THAT HE HAD SELECTED SOMETHING IN HERE THAT WOULD FIT.  SO I DIDN'T WRITE THE NUMBER RIGHT, I GOT IT WRONG AND I HAD TO CALL MICHELL BACK.  WELL SHE COMES IN THE COURTROOM AND POINTS IT OUT TO ME IN HERE WHAT WILL APPLY. RIGHT THERE IS MY NOTE.  IT'S A MAJOR OFFENSE OK.  I DON'T MIND TELLING YOU THAT I'M VERY UNCOMFORTABLE WITH MICHELL BEING INVOLVED IN THIS.  YOU KNOW HER RELATIONSHIP WITH SHAWN MCGEE.  SO, I'M UNCOMFORTABLE THAT SHE'S COME IN THE COURTROOM AND TOLD ME THAT I NEED TO WRITE IT UP UNDER THIS. SO, I SAID I'M NOT GOING TO DO ANYTHING UNTIL I TALK TO THE JUDGE OK.  SO I TALKED TO HER ABOUT IT BEING A MAJOR OFFENSE.

DOTHAN/Martin & Brackin 1264
Confidential Subject to Protective Order

8

SHE SAID OK WRITE IT UP. SO I GO SIT DOWN TO WORK ON IT. WELL WHEN IT'S A MAJOR OFFENSE LIKE THIS THE FIRST OFFENSE CARRIES A SUSPENSION WITH IT. SO I LOOK AND IT SAYS THAT IF YOU DO THIS IT HAS TO BE DONE BY THE DEPARTMENT HEAD OK. I CAN'T DO IT. AS SOON AS I PUT MY HAND TO IT AND MARY BETH OBJECTS TO IT AND THE PERSONNEL BOARD AND SHE'S WON BECAUSE IT SAYS IN HERE THAT THE DEPARTMENT HEAD HAS TO DO IT.

GC: WERE YOU INSTRUCTED BY THE JUDGE TO DO THAT?

DN: I SENT HER A MEMO BACK AND I SAID THIS IS WHAT THE RULES SAY. I HAD GOTTEN THAT MEMO YOU HAVE THERE FROM HER. I GOT A NOTE ON IT FROM MICHELL SELLERS. THERE AGAIN I DON'T MIND TELLING YOU I'M UNCOMFORTABLE WITH THAT. THE NOTE SAYS THAT I'M TO CALL KAY DAVIS AND ASK HER WHAT TO DO WITH IT. WELL I DID NOT CALL KAY. I SAT DOWN WITH THIS THING AND IT TELLS YOU RIGHT HERE, I'VE GOT IT HIGHLIGHTED THAT THE DEPARTMENT HEAD HAS TO DO THIS. IT'S A DUE PROCESS HEARING. WE'VE DONE THIS BEFORE. WE DID THIS WITH KEVIN SORRELLS. WE ALMOST GOT TO THE POINT THAT WE DID IT WITH PATTIE KIMBRO BEFORE SHE TURNED IN HER RESIGNATION BECAUSE WE THOUGHT THAT SHE WAS TAKING MONEY. THIS IS NOT NEW, THIS IS YOU KNOW, THIS IS A PROBATIONARY EMPLOYEE WE'RE TALKING ABOUT THAT BASICALLY SERVES AT WILL. JUDGES HAS GOT IT ALL WRITTEN OUT RIGHT THERE WITH THAT THING SHE GAVE ME. I TOLD HER I SAID ALL YOU GOT TO DO IS CIRCLE THESE THINGS ON HERE BUT IF I DO IT, IF I PUT MY HAND TO IT, THEN IT'S, MARY BETH GONE GET IT THROWN OUT OK. SO NOTHING GETS DONE. ON OCTOBER 26TH I BELIEVE IT WAS IF THAT'S FRIDAY, I HAVE TO LOOK AT MY DATES, SHE WAS IN OUR OFFICE, YEAP, WORKING ON SOME STUFF. AND I SAID JUDGE LET'S DO THIS. WHATEVER WE'RE GOING TO DO WITH IT I WANT TO GET IT BEHIND ME. LET'S JUST DO IT. IF WE'RE GOING TO WRITE IT UP AS A MINOR OFFENSE, THEN SIT DOWN HERE WITH ME YOU KNOW, AND LETS GET IT ON PAPER AND GET IT BEHIND. WELL SHE DIDN'T HAVE TIME RIGHT THEN. SO, IT WAS HER SUGGESTION, HER IDEA, JUST DO IT IN THE EVALUATION. HER EVALUATION IS COMING UP. I'VE GOT THE BLANK FORM STILL IN MY OFFICE. SO, I THAT'S FINE WE'LL WRITE IT UP AND WE'LL GIVE HER YOU KNOW, WE'LL DO THIS UNSATISFACTORY ON EVALUATION, WE'LL ATTACH THE JUDGES WRITE UP AND WE'LL DO IT THAT WAY. THE NEXT THING I KNOW YOU CALLED ME AND TELL ME WE'ER HAVING THIS. SO NO, NOTHINGS BEEN DONE ABOUT IT. WE'RE JUST BOUNCING IT BACK AND FORTH.

DOTHAN/Martin & Brackin 1265
Confidential Subject to Protective
Order

GC: OK. ALL RIGHT. AH, ARE YOU AWARE OF A MEETING THAT MARY BETH HAD WITH MR. MCGEE WHERE SHE WAS CALLING TO HAVE HIM CALLED UP AND MORE LESS BROUGHT TO THE JUDGES CHAMBERS OR BROUGHT TO THE COURT SO THAT SHE COULD DISCUSS THIS MATTER?

DN: YEAH, THAT, SHE, THAT WAS SAID IN COURT AND I TAKE SOME OF THE BLAME FOR THAT. MY SUGGESTION AT ONE POINT WAS WHY DON'T WE GET EVERYBODY TOGETHER AND TALK ABOUT IT AND FIND OUT WHAT HAPPENED. NOW IT WAS NOT TO BE ACCUSATORY BUT YOU KNOW, JUST LET'S SIT DOWN AND DO IT. I THINK THAT'S WHAT YOU'RE TALKING ABOUT. CAUSE SHE DID SAY TO THE JUDGE IN THE COURTROOM I BELIEVE WHEN SHE WAS WORKING ON THERE, LET'S GET EVERYBODY IN HERE AND DO SOMETHING WITH IT.

GC: IN REGARDS TO THE PHONE CALL TO MR. TURNER, DID YOU EVER INSTRUCT HER TO MAKE THAT PHONE CALL?

DN: NO.

GC: ALL RIGHT. SHE TOOK THAT UPON HERSELF?

DN: AS FAR AS I KNOW. THERE AGAIN I, YOU KNOW IT WAS MY IDEA THAT EVERBODY TALK ABOUT IT BUT.

GC: ALL RIGHT. AND HAVE YOU EVER HAD AN OPPORTUNITY TO TALK TO THE DEFENDANT IN THIS CASE, KIMBERLY RAPELJE?

DN: I WOULDN'T KNOW HER IF I SAW HER. I KNOW SHE WAS UNDER THE INFLUENCE OF ALCOHOL THAT DAY AND SHE WENT TO JAIL BECAUSE WE HAD TO DO A COVER LETTER WITH THE APPEAL THAT WE'RE TALKING ABOUT IN THIS, TO THE CITY ATTORNEY THAT WE KNOW THAT AT THE TIME SHE SIGNED THE NOTICE AND THE PAPERWORK THAT SHE WAS UNDER THE INFLUENCE OF ALCOHOL.

GC: OK. SERGEANT GRAY.

DN: WOULD YOU LIKE TO HAVE A COPY OF MY MEMO TO THE JUDGE ABOUT THAT? I MADE THAT FOR YOU.

KG: THANK YOU. IN YOUR INQUIRY OF WHAT HAPPENED AH, WHEN YOU WERE QUESTIONING MARY BETH OR YOU WERE DIRECTED AS A RESULT OF THIS MEMO FROM THE JUDGE TO LOOK INTO IT. UNDERSTAND THAT YOU ARE NOT AN ADMINISTRATOR BUT YOU ARE A MEMBER OF MANAGEMENT OVER YOUR DIVISION. OK. DID YOU ACTUALLY INQUIRE AND TRY TO COME TO A RESOLVE THAT MARY BETH EITHER SAID IT OR SHE DIDN'T SAY IT? DID YOU ACTIVELY LOOK FOR THAT OR DID YOU JUST SEND HER TO TRY TO SMOOTH THINGS OVER?

DOTHAN/Martin & Brackin 1266
Confidential Subject to Protective Order

DN:  I SENT HER TO SMOOTH THINGS OVER AT THE BEGINNING, BUT YES I HAVE TALKED WITH HER AND TRY, YOU HAVE TO UNDERSTAND THAT MAGISTRATES DO THINGS BASED ON PROBABLE CAUSE, THAT'S OUR DECISION MAKING PROCESS, DO THIS MAKE SENSE, DID IT PROBABLY HAPPEN AND DID THAT PERSON PROBABLY DO IT, AND THAT'S KIND OF THE TRAIN OF THOUGHT I DO, I DID WITH HER. I TALKED TO HER, I ASKED HER QUESTIONS ABOUT YOU KNOW, THINGS LIKE THAT. I TRIED TO DETERMINE IF SHE PROBABLY SAID IT. I HAVE NO DOUBT THAT SHE HAS THE CAPABILITY OF SAYING IT OK. BUT, LET, THE REASON I DON'T THINK THAT SHE PROBABLY SAID ANYTHING DETRIMENTAL TO SHAWN FOR TWO REASONS. NUMBER ONE, HE'D ONLY BEEN WORKING WITH US PROBABLY A WEEK, MAYBE EVEN LESS THAN A WEEK. MARY BETH HAD WORKED WITH HIM THE FIRST DAY THAT HE WAS THERE AND WHEN SHE CAME BACK FROM COURT, I ASKED HER HOW DID COURT GO, DID PAPERWORK FLOW OK AND THAT KIND OF THING YOU KNOW, AS USUAL AND SHE SAID WITH OUT ANY OUTCOME FROM ME, CAUSE I DIDN" EVEN KNOW SHAWN WAS THERE THAT DAY. THAT HE WAS THERE AND THAT SHE'D ENJOYED WORKING WITH HIM AND THAT SHE THOUGHT HE WAS GOING TO DO REALLY GOOD. THIS WAS TOTALLY UNSOLICITED OK.

KG:  UM HUM.

DN:  AND THEN THE NEXT DAY OR TWO, AFTER HE'D ONLY BEEN WORKING THERE JUST A FEW DAYS, WHY WOULD SHE TELL SOMEONE THAT WE HAD HAD PROBLEMS WITH HIM YOU KNOW, LOTS OF PROBLEMS, ALL KINDS OF COMPLAINTS AGAINST HIM AND THAT YOU JUST NEED TO FIRE HIM AND GET YOU SOMEBODY ELSE, IT JUST DIDN'T ADD UP, I'M SORRY, IT JUST DIDN'T ADD UP.

KG:  IN YOUR OPINION, DOES IT ADD UP IF MS. RAPELJE COMES DIRECTLY OVER AND TELLS THE JUDGE THAT AND THEN WITHOUT THE BONDSMAN HEARING THAT SHE ASK THE BONDSMAN INTO HER CHAMBERS AND THEN HE SAYS EXACTLY WHAT SHE SAID AH, AND ALSO THERE WAS A THIRD PERSON THERE AH, MS. RAPELJE'S NEICE.

DN:  IS THAT RIGHT? I DIDN'T, I DIDN'T KNOW ABOUT HER NOW. BUT I KNEW THAT THE BONDSMAN CAME ACCORDING TO ASHTON, CAME FROM THE BACK OF THE ROOM TO THE FRONT AFERWARD, AFTER KIMBERLY HAD BEEN UP THERE AND THEN TOLD THEM BASICALLY THE SAME THING, YEAH. THERE WAS ONE MORE THING I FORGOT TO TELL YOU. AH, THE BONDSMAN TOLD ME THAT HE WAS ON THE TELEPHONE IN THE FRONT UP THERE WHEN MARY BETH WAS TALKING TO MS. KIMBERLY AND THAT HE DIDN'T HEAR EVERYTHING THAT HIS PHONE RANG AND THAT HE STAYED ON THE PHONE FOR A GOOD

DOTHAN/Martin & Brackin 1267    11
Confidential Subject to Protective
Order

WHILE. SO, HE WAS DISTRACTED AND HE WAS TALKING ON THE TELEPHONE. HE TOLD ME THAT, I'M SORRY I FORGOT THAT.

KG:  OK. DID YA'LL MEET WITH, OR DID YOU EVER HAVE ANY OTHER CONVERSATION WITH THE BONDSMAN ABOUT THAT?

DN:  UN UN.

KG:  OK. DID YOU FIND OUT LATER THAT WHEN HE WAS TAKEN INTO THE JUDGES CHAMBERS AND ASKED DID HE REALLY HAVE MORE INFORMATION THAT HE WAS KIND OF HESITANT BECAUSE HE DIDN'T WANT TO CAUSE ANY CONFLICT BETWEEN THE BONDING COMPANY AND THE MAGISTRATES OFFICE?

DN:  JUDGE SAID SOMETHING ABOUT HIM NOT WANTING, EXCUSE ME, SAY ANYTHING IN FRONT OF MARY TURNER, BUT MARY TURNER WAS WORKING BESIDE HER THERE AND THAT HE, HE TOLD HER SOMETHING DIFFERENT IN CONFIDENCE THAN HE WOULD SAY IN THE COURTROOM.

KG:  OK. HE TOLD MARY?

DN:  HE TOLD JUDGE GORDON.

G:  OK.

DN:  UN HUH.

KG:  AND AH, GO AHEAD AND TELL ME WHAT THAT WAS THAT YOU UNDERSTAND.

DN:  JUST GENERALITIES, THAT HE WAS MORE WILLING TO TALK TO HER AND DID NOT WANT TO TALK TO HER OUT THERE IN THE COURTROOM IN FRONT OF EVERYONE. NOW THAT'S JUST SOMETHING THAT JUDGE GORDON TOLD ME.

KG:  OK. DID YOU FOLLOW UP WITH HIM AT ANY OTHER TIMES SINCE HEARING THAT INFORMATION?

DN:  UN UN. I HAD THIS MEMO FROM JUDGE AND IT WAS PRETTY DETAILED AND SHE WAS THERE AND I WASN'T SO I WAS GOING ON THAT.

KG:  RIGHT. OK. SO, HAVING THIS MEMO FROM THE JUDGE ACCORDING TO WHAT THE BONDSMAN SAID AFTERWARDS AND ALSO AH, TALKING TO MARY BETH ABOUT THE INCIDENT, DO YOU BASICALLY FEEL THAT THERE IS NO SUBSTANCE TO IT WITH THE WEIGHT OF BOTH?

N:  I TRIED TO DO WHAT THE JUDGE TOLD ME. IF WE'RE GOING TO DO IT AS A MAJOR OFFENSE, LET'S DO IT, BUT I CAN'T, I CAN'T WRITE IT UP. I'VE TRIED TO DO IT AS A MINOR OFFENSE, IF WE'RE GOING TO DO IT AS A MINOR OFFENSE, LET'S PLEASE DO IT NOW AND LET'S GET THIS

DOTHAN/Martin & Brackin 1268   12
Confidential Subject to Protective Order

DONE. IF WE'RE GOING TO DO IT AS A DIS... YOU KNOW, AH, EVALUATION PROCESS, I'M PREPARED TO DO THAT, BUT YOU KNOW, REALLY WHAT I THINK ABOUT IT IS NOT REALLY ENTERING INTO IT. I'M TRYING TO DO WHAT I'M SUPPOSE TO BE DOING AND LAYING AH, YOU KNOW, I'VE HAD PROBLEMS WITH MARY BETH IN THE PAST. SHE AND I HAD A PROBLEM AND AT ONE POINT SHE DIDN'T SPEAK TO ME FOR ABOUT THREE YEARS AND I HAD SOME REAL RESERVATIONS. I'M NOT, I'M NOT KIDDING.

KG: I HEARD ABOUT IT.

DN: IT WAS LONGER THAN THAT I THINK. I HAD SOME RESERVATIONS ABOUT HER COMING TO WORK WITH ME. HOW IS THIS GOING TO WORK OUT, IS IT GOING TO BE NOTHING BUT PROBLEMS FOR ME. BUT SHE CAME TO WORK AND SHE REALLY WAS DELIGHTED TO BE THERE AND SHE'S REALLY TURNED OUT TO BE A GOOD WORKER AND SHE'S NOT CAUSED ANY YOU KNOW, PROBLEMS INTERNALLY AND SHE SEEMS TO REALLY ENJOY HER JOB. AND ALL THE RESERVATIONS THAT I HAVE I GIVE HER THAT. SHE'S BUCKLED DOWN AND WORKED HARD AND I'VE TRIED TO BE NEUTRAL, I'VE REALLY TRIED TO BE NEUTRAL AND DO MY JOB YOU KNOW.

KG: AND I THINK YOU HAVE AS A MANAGER.

DN: YEAH, WELL, IT SUPPOSE TO BE AS OUR JOB YOU KNOW, AS A MAGISTRATE IS SUPPOSE TO BE NEUTRAL BUT IT'S TOUGH.

GC: OTHER THAN THIS INCIDENT, AH, HOW WOULD YOU SAY SHE GETS ALONG WITH THE OTHER PEOPLE?

DN: MARY BETH IS A LITTLE BIS..., BER.. SAY IT FOR ME, BRISK, YOU KNOW WHAT I'M SAYING?

GC: CORRECT.

DN: SHE'S A LITTLE, WE ALL ARE MAGISTRATES ARE LIKE THAT.

GC: ABRASIVE?

DN: THERE YOU GO, SANDPAPER. SHE GETS ALONG FINE WITH OTHER WORKERS. AH, SHE COMES ACROSS A LITTLE SHARP I THINK TO PEOPLE THAT DON'T KNOW HER YOU KNOW WHAT I'M SAYING? IF YOU JUST, YOU KNOW MARY BETH AS GOOD AS I DO, BUT AH, I THINK WE ALL DO. WE HAVE GOOD DAYS AND BAD DAYS AND MAGISTRATES ARE A TOUGH BUNCH. DO YOU KNOW WHAT IT'S LIKE TO WORK WITH ELEVEN WOMEN?

GC: YEAH I DO.

DOTHAN/Martin & Brackin 1269    13
Confidential Subject to Protective
Order

J:   HAVE YOU FOUND THAT ANY OF MICHELL'S DIRECTIONS FROM THE JUDGE WERE NOT ACTUALLY ORDERED FROM THE JUDGE?

DN:  NO I HAVEN'T FOUND THAT OUT BUT I, I, TELL YOU AGAIN THAT I'M UNCOMFORTABLE WITH HER BEING ANY PART OF IT. JUST LIKE YESTERDAY WHEN SHE BROUGHT US THIS THING TO SIGN YOU KNOW AND SHE WAS GONE STAND THERE AND WATCH US READ IT AND NOT EVEN LET US CONSIDER IT AND TALK ABOUT IT AND YOU KNOW, TALK TO YOU. I WAS VERY UNCOMFORTABLE WITH THAT. I FINALLY SHUT THE DOOR AND SHUT HER OUT OF MY OFFICE. THAT MAY BE WRONG BUT I.

KG:  BUT YOU'VE NOT FOUND THAT SHE'S PLAYED ANY TYPE OF FAVORITISM TO YOUR KNOWLEDGE, YOU JUST HAVE THAT OPINION BASICALLY?

DN:  RIGHT, I'M JUST UNCOMFORTABLE WITH THE FACT THAT SHE HAS SUCH A CLOSE RELATIONSHIP TO HIM AND SHE SEEMS TO BE RIGHT IN THE MIDDLE OF IT.

KG:  OK. ARE YOU AWARE OF A COMPLAINT FROM AH, ATTORNEY HALL?

N:   YEAH I HAVE THAT.

KG:  OK.

DN:  JUDGE GORDON TOLD ME THAT SHE TOLD HIM TO WRITE IT UP AND GIVE IT TO ME. NOW I JUST GOT THIS SO, YOU KNOW, I'M AT, AT THE POINT THAT WE DECIDED THAT WE WERE GONE DO A EVALUATION THAT WAY, I HAD JUST, I JUST GOT THIS SO I WAS JUST GOING TO ADD THAT TO IT.

KG:  RIGHT. OK. AH, IN READING THAT COMPLAINT AND COMPARING IT TO THE ALLEGATIONS HERE, DO YOU SEE ANY SIMILARITIES? DOES IT SWAY YOU EITHER ONE WAY OR THE OTHER WHETHER YOU?

DN:  THIS I WAS A LITTLE MORE INVOLVED IN. I KNOW A LITTLE MORE ABOUT THIS DIRECTLY.

KG:  OK. THE ONE ABOUT HALL?

DN:  UN HUH.

KG:  OK.

J:   I WASN'T STANDING THERE OR HEARD ANYTHING THAT WAS SAID, BUT YEAH, RELATED, IS THAT WHAT YOU'RE SAYING?

KG:  UM HUM.

DOTHAN/Martin & Brackin 1270     14
Confidential Subject to Protective Order

DN:   AS FAR AS THE WAY IT WAS HANDLED?

KG:   YEAH.

DN:   YEAH, BUT THIS RIGHT HERE IS A PROBLEM THAT WE HAVE IN OUR
      OFFICE, THAT BASICALLY SHE'S ADDRESSING THE PROBLEM THAT
      WE'ER HAVING. WE GOT WRITTEN UP, SOMEBODY WROTE A LETTER TO
      THE EDITOR BECAUSE THEY CAME TO COURT AS A WITNESS AND RODE
      LIKE FOUR HUNDRED MILES TO GET HERE AND WHEN THEY GOT HERE
      THE CASE WASN'T ON THE DOCKET. SO, WE'RE KIND OF SENSITIVE
      ABOUT THAT. THIS CASE I THINK HAD FOUR WITNESSES IN IT. AND
      ANOTHER THING WAS THAT JUDGE BATES WAS ON THE BENCH. HE
      WASN'T EVEN THE FULL TIME JUDGE. THEY WENT AND GOT THIS FILE
      THAT WAS NOT ON THE DOCKET AND BROUGHT IT TO COURT AND
      DISMISSED IT AND JUST SENT IT BACK. YOU KNOW WHAT I'M SAYING?

KG:   UM HUM.

DN:   AND YOU KNOW WHERE JUDGE BATES IS IN THIS LAW SUITE WITH THE
      CITY ABOUT A CASE THAT'S BEING DISMISSED. AND THIS RIGHT HERE
      IS JUST MADE EVERYBODY UNCOMFORTABLE THAT WAS INVOLVED IN
      THE WAY IT WAS HANDLED AND SHE PROBABLY SAID WHAT SHE SAID
      YOU KNOW, BUT AH, I DON'T KNOW IF I WOULDN'T HAVE BEEN PRETTY
      MUCH THE SAME WAY. WHY DO YOU WANT THIS PAPERWORK AND
      WHY ARE YOU TAKING THIS CASE TO A JUDGE THAT'S NOT OUR
      REGULAR JUDGE AND YOU KNOW, THAT KIND OF THING.

GC:   SO YOU FEEL LIKE THERE'S SOME VALIDITY TO THIS COMPLAINT?

DN:   AH, I DON'T KNOW THE TONE THAT SHE USED WITH HIM OR HOW SHE
      TREATED HIM, PROBABLY NOT, BUT AH, YOU KNOW, I THINK I WOULD
      HAVE ASKED.

TAPE STOPPED

KG:   SO AH, WITH BOTH OF THESE INCIDENTS REGARDING MS. BRACKIN'S
      DEMEANOR OR HER AGGRESSIVE HANDLING OR TALKING WITH
      SUBJECTS REGARDING PROCEDURES WITH COURT AND THINGS. AH,
      YOU BASICALLY, AND CORRECT ME IF I'M WRONG, ARE TRYING TO
      SMOOTH THE SITUATION OVER TO ENSURE THAT EVERYONES HAPPY
      OR ARE YOU LOOKING AT IT FROM AN, A PROBLEM?

DN:   I'M TRYING TO DO WHAT THE JUDGE WANTS ME TO DO AND
      BASICALLY WHERE I THOUGHT WE WERE WAS TO GIVE HER A BAD
      EVALUATION WRITE UP IN THE AREAS OF COOPERATING WITH OTHERS
      AND DEALING WITH THE PUBLIC AND THAT KIND OF THING, GIVE
      UNSATISFACTORY AND GIVE SOME YOU KNOW, DETAIL INTO THAT,

DOTHAN/Martin & Brackin 1271
Confidential Subject to Protective
Order

TALK WITH HER, THAT'S WHAT THE EVALUATION PROCESS IS ABOUT AS FAR AS I UNDERSTAND IT. YOU SIT DOWN AND YOU EXPLAIN TO PEOPLE WHAT THEY'RE DOING WRONG, HOW THEY CAN CORRECT IT, THAT IT'S NOT GOING TO BE TOLERATED ANY MORE, YOU SEE WHAT I'M SAYING? THEN YOU GO TO THE DISCIPLINARY ACTION YOU KNOW, AND DISMISSAL IF YOU HAVE TO. THAT'S WHERE I'M AT. WE UNDERSTAND THERE'S A PROBLEM, WE NEED TO SIT DOWN AND DO WHATEVER WE'RE GOING TO DO AND DEAL WITH IT. WHETHER WE'RE GOING TO START WITH A SUSPENSION OR WE GONE START WITH A BAD EVALUATION.

KG: OK. SO.

DN: I DON'T THINK I'M TRYING TO SMOOTH IT OVER. I DON'T WANT YOU TO SAY THAT OK. I WANT TO DEAL WITH IT, BUT I WANT TO DEAL WITH IT THE PROPER WAY SO THAT WHATEVER WE DO IS RIGHT AND WE KEEP A GOOD EMPLOYEE BUT WE GET THEM IN LINE TO DO THE RIGHT THING.

KG: ALL RIGHT. OK. SO, LET'S JUST SAY THAT THE ALLEGATIONS WERE TRUE. I'M JUST GOING TO QUOTE A COUPLE OF THINGS THAT WERE SAID HERE AND I WANT TO GET YOUR OPINION ON IT AS MARY BETH'S SUPERVISOR. AH, THE QUOTES WERE THAT AH, FIRST THING THE DEFENDANT SHOULD DO IS GET RID OF SHAWN AH, THERE HAVE BEEN MANY COMPLAINTS ABOUT SHAWN, AH, THE DEFENDANT PLEADING GUILTY UPON SHAWN'S RECOMMENDATION BECAUSE THE DEFENDANT BLEW A .OO SHE SHOULD, THE DEFENDANT SHOULD GET ANOTHER LAWYER. IF THOSE COMMENTS WERE MADE, WERE THEY PROPER COMMENTS THAT SHOULD HAVE COME FROM ONE OF YOUR EMPLOYEES?

DN: IF THOSE, IF THOSE QUOTES WERE MADE, THEN NO THEY WERE NOT PROPER.

KG: OK.

DN: BUT, DO YOU WANT MY BUTS?

KG: I'M JUST SAYING IF, AND I KNOW THAT IF MEANS THAT IT MAY OR MAY NOT. I'M JUST WANTING TO SEE WHERE YOUR.

DN: OK. YEAH, I'M JUST TELLING YOU THAT THEY'ER NOT LOGICAL FOR ANY OF US TO SAY IT. FIRST OF ALL IF IT .OO YOU KNOW IT'S GOT DRUGS IN IT, I MEAN THAT WOULD BE YOUR FIRST THOUGHT.

KG: UM HUM.

DOTHAN/Martin & Brackin 1272
Confidential Subject to Protective Order

DN:  SO, YOU KNOW YOU GOT A REASONABLE THING THERE TO THINK WHY
AN ATTORNEY WOULD STILL GO AHEAD AND PLEAD SOMEBODY EVEN
THOUGH THEY WERE A .00 BECAUSE YOU KNOW IN YOUR MIND THAT
THERE'S PROBABLY SOMETHING ELSE TO IT.  SO YOU WOULDN'T TELL
THEM THAT WE HAD A LOT OF COMPLAINTS WITH SOMEBODY THAT
HAD ONLY WORKED A FEW DAYS AND YOU WOULDN'T TELL THEM
YOU KNOW, WHY IN THE WORLD WOULD SOMEBODY PLEAD YOU A .00
CAUSE YOU'D KNOW WHY.

KG:  RIGHT.  IF, IN INTERVIEWING MR. TURNER, THE BONDSMAN, HE TOLD
US THAT THE CONVERSATION BETWEEN HE AND MS. BRACKIN ON THE
PHONE WHEN HE WAS AT HOME WAS ONE THAT SHE WAS TRYING TO
CONVINCE HIM TO CHANGE HIS STORY AND HE SAID THAT HE ADVISED
HER THAT HE WASN'T GOING TO LIE FOR ANYONE HE WAS JUST GOING
TO TELL THE TRUTH.

DN:  YEAH HE SAID THAT TO ME TOO, THAT HE WASN'T GOING TO LIE FOR
ANYBODY, I REMEMBER HIM SAYING THAT.

KG:  OK.  AH, WITH THAT SAID, DO YOU FEEL THAT THE BONDSMAN WOULD
HAVE ANYTHING TO GAIN BY NOT BEING TRUTHFUL OR?

N:  NO I DON'T THINK HE WOULD HAVE ANYTHING TO GAIN.

KG:  OK.

DN:  I, WHEN I TALKED TO HIM I WAS COMFORTABLE WHAT HE SAID THAT
IT WAS TRUE.

GC:  DID YOU BELIEVE HIM?

DN:  YEAH I BELIEVE HIM.

KG:  AS FAR AS THE CREDIBILITY OF MS. RAPELJE, BECAUSE SHE WAS
UNDER THE INFLUENCE, DO YOU GIVE HER LESS CREDIBILITY OF WHAT
THE ALLEGATIONS WERE DUE TO THE FACT THAT SHE WAS UNDER THE
INFLUENCE.

DN:  CERTAINLY, I THINK SHE WENT A .19 AND SHE WAS THERE FOR COURT
FOR HER SECOND DUI, SHE'S OBVIOUSLY AN ALCOHOLIC.  I WOULDN'T
GIVE HER ANY CREDIBILITY, I'M SORRY.

KG:  OK. BUT AND IS YOUR POSITION THE SAME EVEN IF IT IS
CORROBORATED BY THE BONDSMAN?

N:  IF HE HAD BEEN PAYING COMPLETE ATTENTION, IT MIGHT BE
DIFFERENT BUT HE SAID HE WAS ON THE TELEPHONE, THAT HE DID
GET A CALL AND THAT HE DIDN'T HEAR EVERYTHING THAT WAS SAID.

DOTHAN/Martin & Brackin 1273
Confidential Subject to Protective
Order

GC:  WHAT IF THE THIRD WITNESS DISCOUNTS THE FACT THAT HE WAS ON THE PHONE?

DN:  WELL HE TOLD ME HE WAS ON THE PHONE. THAT'S WHERE I GOT THAT FROM THE BAIL BONDSMAN. I DON'T KNOW. AH, IT JUST DOESN'T, I'M SORRY, IT JUST DOESN'T ADD UP TO ME AND HOW THE PROBABILITY THERE THAT SHE SAID THOSE THINGS AND HE SAID THAT HE HEARD IT SAID BUT HE DIDN'T KNOW WHO SAID IT. OK. NOW IT DOESN'T MAKE ANY SENSE THAT KIMBERLY SAID IT BUT HE CAN'T SAY THAT MARY BETH SAID IT EITHER YOU KNOW. I DON'T KNOW WHAT TO SAY ABOUT THAT. I'M SORRY.

GC:  YOU FEEL LIKE HE WAS TALKING TO YOU UNDER ANY TYPE OF DURESS, LIKE HE WAS AFRAID OF THE MAGISTRATE SITTING NEXT TO THE JUDGE. DO YOU FEEL LIKE THAT HE MAY HAVE BEEN?

DN:  NO HE AND I WAS TALKING IN THE OFFICE. NO BODY IN THERE BUT ME AND HIM AND ASHTON. HE WAS, I'M SURE HE WAS, I TRIED TO MAKE HIM AT EASE. HE WAS COMFORTABLE WITH WHAT HE WAS TELLING ME AND I THE OFFICE.

KG:  OK. WHEN ASHTON WAS THERE HE SAID THAT HE DIDN'T HEAR THE ENTIRE THING AS WELL?

DN:  YEAH, I, YEAH. HE SAID HE WAS ON THE PHONE AND HE DIDN'T HEAR EVERYTHING THAT WAS SAID AND THAT HE DIDN'T, HE COULDN'T TELL ME WHO SAID, YOU NEED TO GET YOU ANOTHER ATTORNEY, BUT HE DID HEAR IT SAID BUT AH, MS. MARY BETH HAD TOLD ME THAT THE WOMAN WAS CRYING, THAT SHE WAS UPSET AND SHE WAS CRYING SO, SOUNDS LIKE THERE WAS A LOT GOING ON. BUT I'M NOT TRYING TO MAKE A DECISION ON WHO'S GUILTY AND WHO DID WHAT, I'M JUST TRYING TO DEAL WITH IT YOU KNOW, FROM A SUPERVISOR'S STAND POINT AND GET JUDGE GORDON TO TELL ME WHAT WE'RE GOING TO DO AND LET'S GO FORWARD AND LET'S DO IT BECAUSE IT'S NOT HELPING ANYBODY AND I PERSONALLY THINK THAT THIS INVESTIGATION IS TOTALLY UNCALLED FOR FOR A PROBATIONARY EMPLOYEE YOU KNOW, ALL YOU GOT TO DO IS DO THE PAPERWORK AND THEIR GONE.

KG:  THAT'S ALL I HAVE.

GC:  THAT'S ALL I GOT.

KG:  GO AHEAD AND END IT.

GC:  ALL RIGHT. THIS IS THE END OF THE STATEMENT AT 2:41.

DOTHAN/Martin & Brackin 1274
Confidential Subject to Protective
Order

PRJOHNSON

DOTHAN/Martin & Brackin 1275
Confidential Subject to Protective
Order

## ADMINISTRATIVE INVESTIGATION
### STATEMENT OF: MARY BETH BRACKIN

MB:  WHERE DO YOU WANT ME TO SIT?  RIGHT HERE?  AT THE HEAD OF THE TABLE.

GC:  HOW YOU DOING?
MB:  HUH?

GC:  HOW YOU DOING?
MB:  I'M FINE.  HOW YA'LL DOING?

KG:  OK.  WE'VE BEEN CALLED TO DO AN INVESTIGATION OF WHATEVER TRANSPIRED OVER THERE AND ALL THE ALLEGATIONS AND STUFF. WE'RE GOING TO GO BY THAT A FORMAL SETTING HERE.
MB:  OK.

KG:  AH, NEED TO ADVISE YOU THAT THIS IS AN ADMINISTRATIVE INVESTIGATION, NON CRIMINAL OK.
MB:  OK.

KG:  AH, WHAT I NEED YOU TO DO IS FOLLOW YOUR GARITY WARNING AND I'M GOING TO READ IT AS WELL.  I WISH TO ADVISE YOU THAT YOU ARE BEING QUESTIONED AS PART AS AN OFFICIAL INVESTIGATION OF THE DOTHAN POLICE DEPARTMENT.  YOU WILL BE ASKED QUESTIONS SPECIFICALLY, DIRECTLY AND NARROWLY RELATED TO THE PERFORMANCE OF YOUR OFFICIAL DUTIES OR FITNESS FOR OFFICE.  YOU ARE ENTITLED TO ALL THE RIGHTS AND PRIVILEGE GUARANTEED BY THE LAWS OF THE CONSTITUTION UNDER THE STATE OF ALABAMA AND THE CONSTITUTIONS OF THE UNITED STATES INCLUDING THE RIGHT NOT TO BE COMPELLED TO INCRIMINATE YOURSELF.  I FURTHER WISH TO ADVISE YOU THAT IF YOU REFUSE TO TESTIFY OR ANSWER QUESTIONS RELATING TO YOUR OFFICIAL DUTIES OR FITNESS FOR DUTY, YOU WILL BE SUBJECT TO DISCIPLINARY ACTIONS WHICH COULD RESULT IN YOUR DISMISSAL FROM THE CITY OF DOTHAN.  IF YOU DO ANSWER QUESTIONS, NEITHER YOUR STATEMENT NOR ANY INFORMATION OR EVIDENCE WHICH IS GAINED BY REASON OF SUCH STATEMENT CAN BE USED AGAINST YOU IN ANY SUBSEQUENT CRIMINAL PROCEEDING EXCEPT FOR PERJURY OR OBSTRUCTION OF JUSTICE CHARGES. HOWEVER, THESE STATEMENTS MAY BE USED AGAINST YOU IN RELATION TO SUBSEQUENT DEPARTMENTAL CHARGES.  BASICALLY CITY OF DOTHAN PERSONNEL CHARGES.
MB:  UM HUM.  OK.

DOTHAN/Martin & Brackin 1276
Confidential Subject to Protective Order

1

KG: YOU UNDERSTAND IT?
MG: YES SIR.

KG: OK. MEMBERS SIGNATURE WHERE YOU NEED TO SIGN PLEASE MA'AM.
MB: SIGN IT MARY BETH OR MARY E?

KG: HOWEVER YOU SIGN YOUR CHECKS.
MB: WHAT TIME IS IT?

KG: I GOT 3:17.
MB: OK.

KG: OK. PLEASE STATE YOUR FULL NAME FOR THE RECORD.
MB: MARY ELIZABETH BRACKIN.

KG: WHAT IS YOUR CURRENT POSITION?
MB: MAGISTRATE.

KG: WHAT'S YOUR CURRENT ASSIGNMENT? IS THAT ONE IN THE SAME FOR YOU?
MB: YES, I MEAN.

KG: YOU MAY BE A MAGISTRATE ASSIGNED TO THIS PARTICULAR DIVISION OR THAT PARTICULAR THING.
MB: OH, NO JUST THE.

KG: CITY OF DOTHAN COURT MAGISTRATE?
MB: CITY JUDICIAL DEPARTMENT I GUESS.

KG: OK. I'M SERGEANT KEITH GRAY ASSIGNED TO THE INTERNAL AFFAIRS DIVISION FOR THE PURPOSE OF THIS RECORDING. SERGEANT GARY COLEMAN, ALSO ASSIGNED TO INTERNAL AFFAIRS IS PRESENT. I NEED TO ADVISE YOU THAT YOU ARE THE SUBJECT OF THE INVESTIGATION. THE NATURE OF THE INVESTIGATION SURROUND ALLEGATIONS THAT YOU MADE COMMENTS TO A DEFENDANT WHICH QUESTIONS THE COMPETENCY OF HER ATTORNEY. AH, WHAT I WOULD LIKE FOR YOU TO DO, I'D LIKE TO SHOW YOU A MEMORANDUM, WHICH I BELIEVE, MS. NICHOLSON TOLD ME THAT YOU MAY HAVE SEEN. IT CAME FROM JUDGE GORDON TO HER RELATING TO THIS ENTIRE INCIDENT.
MB: UN UN, I HAVEN'T SEEN THIS.

DOTHAN/Martin & Brackin 1277
Confidential Subject to Protective Order

2

KG: OK. GO AHEAD AND READ IT. I WANT YOU TO BE AWARE OF EVERYTHING THAT WE ARE GOING TO ASK YOU QUESTIONS ABOUT. ALL RIGHT. AND THAT'S WHAT WE ARE BASICALLY HERE QUESTIONING.

MB: OK.

KG: AH, THE JUDGE WILL BE THE ONE THAT IS THE COMPLAINANT IN THIS MATTER.

MB: OK.

KG: ARE YOU UNDER THE INFLUENCE OF ALCOHOL OR DRUGS INCLUDING PRESCRIPTION DRUGS?

MB: AH, PRESCRIPTION?

KG: UM HUM.

MB: YES, UM HUM.

KG: OK. THE NAME?

MB: OF THE PRESCRIPTION DRUGS? AH, EXFECEREXON, AH, ESTROTEST.

KG: GO AHEAD I CAN'T SPELL THEM, JUST GO AHEAD AND SAY IT OUT.

MB: OH OK.

KG: WAS THOSE THE ONLY TWO?

MB: YEAH.

KG: OK. ARE YOU CURRENTLY UNDER THE.

MB: NEVER MIND.

KG: OK. ARE YOU CURRENTLY UNDER ANY DOCTOR'S CARE TAKING ANY MEDICATION FOR ANY ILLNESS OR DIESEASE OR DISORDERS?

MB: UM UM, NO.

KG: OK. BASICALLY FROM MY UNDERSTANDING AND THIS IS MY UNDERSTANDING.

MB: OK.

KG: THE JUDGE ASKED FOR AN INVESTIGATION FROM THE CHIEF BECAUSE HE HEADS THE INVESTIGATORS THAT CAN ACTUALLY LOOK INTO SOMETHING AND HAS TIME TO ACTUALLY LOOK INTO IT.

MB: UM HUM, OK.

DOTHAN/Martin & Brackin 1278
Confidential Subject to Protective Order

KG:  AH, DONNA SAID THAT SHE'S NOT AN INVESTIGATOR AND SHE
      BASICALLY WAS NOT IN THE CAPACITY TO CONDUCT AN
      INVESTIGATION AS WELL AS WE COULD.

MB:  UM HUM.

KG:  SO FROM MY UNDERSTANDING, THE JUDGE ASKED THE CHIEF AND
      THEY BOTH TALKED ABOUT IT AND WE ARE BEING USED JUST TO
      FIND OUT FACTS OK.

MB:  OK.  ALL RIGHT.

KG:  SO AH, SERGEANT COLEMAN IS GOING TO START OFF WITH.

MB:  OK.

GC:  OK.  DO YOU NEED TO ADDRESS THAT DATE AND CHANGE?

KG:  YES I'M SORRY.

MB:  OH IT IS THE 6TH ISN'T IT.  I'M SORRY.  DO I NEED TO INITIAL THAT?

GC:  PROBABLY, IT WOULDN'T HURT.  OK.  AH, YOU'VE SEEN THE
      COMPLAINT OF 9/25/2001, DO YOU REMEMBER WHERE YOU WERE
      WORKING?

MB:  YES, DOWNSTAIRS AT THE MAGISTRATE'S OFFICE.

GC:  ALL RIGHT.  AND WHAT WERE YOUR DUTIES THERE?

MB:  I WAS WORKING THE DOWNSTAIRS OFFICE THAT DAY.  AH, WE ARE
      ASSIGNED DIFFERENT DAYS DOWN THERE AND THAT'S FOR THE
      PUBLIC TO COME UP AND PAY TRAFFIC TICKETS OR TAKE OUT
      WARRANTS OR ANYTHING THAT THE PUBLIC NEED ASSISTANCE
      WITH, IF THEY COME IN THERE, WE ARE TO ASSIST THEM WITH
      WHATEVER THEY NEED.

GC:  OK.  DO YOU KNOW A KIMBERLY RAPELJE?

MB:  I KNOW OF HER.

GC:  OK.  HOW DO YOU KNOW HER?

MB:  AH, WHEN SHE CAME INTO THE POLICE, AH, I'M SORRY NOT THE
      POLICE DEPARTMENT, WHEN SHE CAME INTO THE OFFICE THAT DAY,
      I WAS WORKING THE WINDOW AND I ASKED IF I COULD HELP HER
      AND SHE SAID THAT SHE WANTED TO APPEAL HER DUI CONVICTION.
      SO I LOOKED HER NAME UP AND I HAD ASKED HER WHAT HER NAME
      WAS CAUSE I DIDN'T KNOW HER AND SHE TOLD ME HER NAME.  AND
      THAT'S JUST HOW I KNOW OF HER.

GC:  OK.

DOTHAN/Martin & Brackin 1279
Confidential Subject to Protective
Order

4

KG:  EXCUSE ME, LET ME INTERRUPT OK.  JUST FOR MY OWN CLARIFICATION, WERE YOU OVER AT THE MAGISTRATE'S OFFICE OR OVER HERE IN THE COURT AT THE WINDOW?

MB:  UN UN, AT THE MAGISTRATE'S OFFICE.

KG:  OK.

MB:  200 NORTH SAINT ANDREWS SUITE THREE.

KG:  OK GO AHEAD.

GC:  AND WHO WAS WITH MS. RAPELJE?

MB:  AT THE TIME WHEN SHE FIRST CAME IN?

GC:  UM HUM. THE WHOLE, JUST WHEN THE TIME.

MB:  NOW WHEN SHE FIRST, WHEN SHE FIRST CAME IN, I DON'T KNOW, THERE WAS ANOTHER LADY WITH HER I DON'T KNOW WHO SHE WAS. SHE WAS AN OLDER WOMAN, IT COULD HAVE BEEN HER MOM OR WHATEVER, BUT I BELIEVE SHE HAD A CHILD WITH HER, I'M NOT SURE.

GC:  OK AND WHO ELSE WAS WITH HER?

MB:  AT THAT TIME NOBODY.

GC:  ALL RIGHT.  AFTER THAT?

MB:  AFTER THAT?

GC:  DURING THE TIME THAT SHE WAS IN THERE IN YOUR PRESENCE, WHO ALL WAS WITH HER?

MB:  THE SECOND TIME?

GC:  UM HUM.

MB:  ANDREW TURNER.

GC:  OK. AND ANDREW TURNER WORKS FOR WHO?

MB:  I BELIEVE THOMPSON BONDING.

GC:  OK.  HE'S A BONDSMAN?

MB:  UM HUM.

GC:  ALL RIGHT.  AH, DO YOU KNOW A DONNA GRUMBACH?

MB:  UN UN.

GC:  COULD MS. GRUMBACH BE THE OTHER LADY THAT WAS WITH MS. RAPELJE?

DOTHAN/Martin & Brackin 1280    i    5
Confidential Subject to Protective
Order

MB: SHE, I DON'T, SHE COULD, I MEAN I DON'T KNOW, SHE WAS SITTING DOWN, I MEAN, I DON'T KNOW, I DIDN'T, WE DIDN'T SPEAK AT ALL.

GC: OK. ALL RIGHT. AND AH, HAVE YOU EVER MADE ANY REMARKS TO MS. RAPELJE ABOUT AH, SHAWN MCGEE, ABOUT HIS PERFORMANCE AS A LAWYER?

MB: NOT HIS PERFORMANCE AS A LAWYER AS FAR AS THE ALLEGATIONS THAT ARE IN THE COMPLAINT. THE ONLY THING, SHE WAS VERY UPSET, SHE WAS CRYING, AND SHE STATED THAT SHE DID NOT FEEL LIKE, SHE WAS UPSET AT THE TIME AND SHE SAID THAT SHE ON THE PREVIOUS DUI THE CONVICTION THAT SHE WAS THERE TO APPEAL. SHE SAID THAT SHE WAS POINT ZERO, ZERO, ZERO AND THEY SAID, WELL IF YOU WILL JUST PLEAD TO THIS, WE WILL DROP THE OTHER ONES AND SHE WAS KIND OF UPSET BECAUSE SHE HAD PLEAD GUILTY TO THAT ONE. AND I SAID, WELL I SAID, YOU KNOW, SHE SAID WELL I'VE GOT ANOTHER CASE SET THIS AFTERNOON IN CITY COURT AND I'M GOING TO HAVE THE SAME ATTORNEY THAT I DID THEN. AND I SAID IF YOU FEEL LIKE THAT YOU WANT A DIFFERENT PUBLIC DEFENDER, I SAID, YOU CAN GO TALK TO JUDGE GORDON AND SEE IF SHE CAN CONTINUE YOUR CASE BECAUSE WE HAVE TWO OTHER PUBLIC DEFENDERS AND THAT'S ALL THAT I SAID TO HER.

GC: OK AND BUT YOU DO KNOW SHAWN MCGEE?
MB: YES.

GC: OK. HOW LONG HAVE YOU KNOW SHAWN MCGEE?
MB: I DON'T REALLY, I THINK I WAS INTRODUCED TO HIM YOU KNOW, IT WAS EITHER WHILE WE WERE IN COURT AND HE, RIGHT BEFORE HE BACAME THE PUBLIC DEFENDER, BUT AS FAR AS, I'D ONLY WORKED WITH HIM ONE TIME IN COURT.

GC: OK.
MB: AND HAD A VERY GOOD RAPPORT WITH HIM. AND IN FACT TOLD DONNA THAT YOU KNOW, HE WAS GOING TO BE GOOD FOR US, THAT HE HAD DONE A REAL GOOD JOB.

GC: OK. WHEN WERE YOU FIRST AWARE OF, THAT THERE WAS TYPE OF A PROBLEM WITH AH, MR. MCGEE AND THE JUDGE. WHEN WERE YOU FIRST AWARE OF SOME OF THESE THINGS?
MB: WELL IT WAS ABOUT I GUESS MAYBE A COUPLE OF HOURS LATER AFTER I TALKED WITH HER AT THE OFFICE AND SHE MADE HER APPEAL AND I WAS, DONNA CAME DOWN THERE AND TOLD ME THAT I NEEDED TO GO SEE THE JUDGE AND I WENT OVER THERE AND HER AND ASHTON OTT AND SHAWN MCGEE WERE IN THE BREAKROOM.

DOTHAN/Martin & Brackin 1281
Confidential Subject to Protective

6

AND THAT'S WHEN THEY APPROACHED ME WITH IT THEN, I MEAN I WAS NOT AWARE.

GC: WHAT WAS SAID TO YOU?

MB: THE JUDGE JUST YOU KNOW, BASICALLY SHE TOLD ME WHAT KIMBERLY AND THE BONDSMAN HAD SAID AND I TOLD HER THAT NO, THAT'S NOT WHAT I SAID.

GC: OK AH.

MB: I WOULD NOT MAKE A REMARK SUCH AS THAT.

GC: HOW LONG HAVE YOU KNOW MR. TURNER?

MB: MR. TURNER?

GC: ANDREW TURNER.

MB: I THINK MY HUSBAND COACHED HIM BASKETBALL YEARS AGO, BUT I DON'T, YOU KNOW, I DON'T, I DIDN'T FORMALLY MEET THE BOYS I MEAN, I JUST, WHENEVER HE SAW ME IN COURT ONE DAY HE SAID, AREN'T YOU COACH BRACKIN'S WIFE OR SOMETHING LIKE THAT SO.

GC: OK. AND WHAT, WHEN YOU WENT OVER TO THE COURTROOM WHAT WAS YOUR PURPOSE FOR BEING THERE?

MB: I WAS TOLD TO GO OVER THERE.

GC: OK. DONNA TOLD YOU TO GO OVER THERE?

MB: DONNA SAID THE JUDGE NEEDED TO SEE ME, UN HUM.

GC: AND YOU AH.

MB: I, WHENEVER I WALKED IN OVER THERE I SAW THE JUDGE IN THE BREAKROOM AND THAT'S WHERE I WENT.

GC: SO WAS IT ONE ON ONE WITH YOU AND THE JUDGE?

MB: NO.

GC: WAS IT ASHTON OTT.

MB: ASHTON OTT AND SHAWN MCGEE WERE IN THERE.

GC: OK. AND WHAT, IF ANYTHING, WAS SAID?

MB: WELL, I TOLD THE JUDGE BASICALLY WHAT I TOLD YOU A FEW MINUTES AGO AND ASHTON SAID WELL AH, THAT'S GIVING OUT LEGAL ADVISE AND I SAID WELL, NO NOT REALLY I SAID WE, WE TALK TO DEFENDANTS YOU KNOW, AND WE ARE SUPPOSE TO ADVISE THEM OF THEIR RIGHTS. I MEAN THAT'S PART OF OUR DUTY AND YOU KNOW I DIDN'T FEEL LIKE THAT I DID ANYTHING OR SAID

DOTHAN/Martin & Brackin 1282
Confidential Subject to Protective
Order

7

ANYTHING WRONG. AH, I SURELY DIDN'T SAY ANYTHING THAT
WOULD DISCREDIT SHAWN AS AN ATTORNEY. AH, AND THEN I
BELIEVE THE JUDGE AND ASHTON WALKED OUT. COURT WAS STILL
GOING ON AND SHAWN, I TOLD SHAWN I SAID, YOU KNOW, I SAID, I
WOULD NEVER EVER SAY ANYTHING LIKE THAT. AND I MADE A
COMMENT ABOUT HOW I HAD TOLD DONNA YOU KNOW, JUST THE
OTHER DAY BEFORE THAT HE DID SO WELL IN COURT AND THAT I
ENJOYED WORKING WITH HIM. THAT I THOUGHT HE WAS GOING TO
DO REAL GOOD, THAT HE DID GOOD HIS FIRST DAY IN COURT AND
YOU KNOW, I TOLD HIM I SAID, YOU KNOW, I SAID, I DON'T
UNDERSTAND WHAT'S GOING ON AND HE SAID, WELL HE SAID, I JUST
YOU KNOW, I DON'T WANT TO GET ANYBODY IN TROUBLE BUT YOU
KNOW, I SAID, WELL I'M TELLING YOU WHAT WAS SAID AND WHAT
WASN'T SAID SO. AND THAT SEEMED TO END IT YOU KNOW, I JUST
LEFT.

GC:  DID YOU HAVE AN OCCASION TO TALK TO MR. TURNER?
MB:  I TALKED TO HIM, I WAS VERY UPSET AS FAR AS THE ALLEGATIONS
AND I FELT LIKE FROM THE WAY THAT IT WAS, THE WAY THAT I WAS
ASKED ABOUT WHAT MY SIDE OF THE STORY WAS. I FELT LIKE THAT
I WAS NOT TREATED, I THOUGHT MAYBE I SHOULD HAVE TALKED TO
THE JUDGE ONE ON ONE. AND I WAS VERY UPSET THAT THEY
WOULD, THE BONDSMAN WOULD HAVE SAID THAT I DID SAY THAT
WHEN I DIDN'T. BECAUSE NOW ANDREW WAS ON THE PHONE, ON HIS
CELLULAR PHONE PROBABLY NINETY PERCENT OF THE TIME THAT
WE WERE AT THE OFFICE FILING THE APPEAL NOTICE AND I WAS
WALKING BACK, A FEW TIMES MYSELF, GETTING PAPERWORK AND
ANSWERING THE PHONE DURING THIS TIME AND AT SOME POINT HE
EVEN WALKED AWAY FROM THE FRONT WINDOW AND WALKED
TOWARD THE DOOR WITH HIS BACK TO US. AND THE GLASS IS THERE
AND I'M KIND OF SHORT, SO UP TOP WHERE THE OPENING, WHERE
THE, I DON'T KNOW WHAT YOU CALL IT, WHERE THE METAL PART IN
THE GLASS WINDOW YOU THAT HAS THE I GUESS WHERE YOU CAN
SPEAK THROUGH OR WHATEVER, IT SOMETIMES IT'S DIFFICULT TO
HEAR FOR ME ANYWAY BECAUSE I'M NOT UP TO THAT LEVEL AND I
HAVE TO YOU KNOW DO LIKE THAT, BUT I DON'T, I DIDN'T EVEN
HEAR ANYBODY SAY ANYTHING, I KNOW THAT MS. RAPELJE WAS
UPSET BUT AFTER THE FACT I FOUND OUT THAT SHE WAS POINT ONE
NINE, YOU KNOW I THOUGHT WELL, I DIDN'T KNOW IF IT WAS THE
ALCOHOL MAKING HER UPSET OR WHAT BUT AH, ANYWAY AT THAT
POINT AH, I CALLED HIM, NO I CALLED THOMPSON BONDING
WHENEVER I GOT HOME BECAUSE I WAS VERY UPSET. I MEAN I WAS I
DIDN'T LIKE ACCUSATIONS BEING MADE ABOUT SOMETHING LIKE
THAT WHEN I KNOW THAT THAT CAN BE VERY DAMAGING FOR

SOMEONE AND FOR MYSELF. SO I CALLED THOMPSON BONDING, I LOOKED UP THEIR NUMBER IN THE PHONE BOOK, CALLED THEM AND I ASKED IF I COULD GET ANDREW'S CELL PHONE NUMBER AND THEY GAVE IT TO ME. AND I CALLED HIM AND I ASKED HIM IF HE MINDED TALKING WITH ME ABOUT WHAT HAD HAPPEN AND HE SAID NO. AND I SAID, CAN YOU TELL ME WHAT WAS SAID IN THE COURTROOM BECAUSE I DON'T KNOW WHAT WAS SAID IN THE COURTROOM. AND HE SAID THAT KIMBERLY WENT UP THERE AND SHE WAS LIKE APPROACHING THE BENCH AND SHE SHOULDN'T HAVE AT THE TIME. AND SHE DEMANDED AND STARTED MAKING ALL THESE ACCUSATIONS THAT I SAID AND SAYING THAT SHE COULD GET A NEW PUBLIC DEFENDER AND WANT A NEW TRAIL AND ALL THIS AND WHEN SHE STATED WHAT I SAID, SHE SAID ASK THE BONDSMAN HE HEARD ME. WELL, ANDREW, HE SAID I DIDN'T EVEN WANT TO SAY. AND THIS IS WHAT HE TELL, TOLD ME NOW ON THE PHONE. SO, I SAID WELL I SAID WHAT DID YOU TELL THEM. HE SAID, WELL I TOLD THEM THAT SOMEONE SAID IT, BUT I'M NOT SURE WHO SAID IT BECAUSE I WAS ON THE PHONE. AND I SAID WELL WOULD YOU PLEASE, YOU KNOW, COME DOWN WITH ME IF I COME DOWN TOMORROW AND WE CAN GET THIS STRAIGHT. AND HE SAID SURE AND THAT WAS THE END OF THE CONVERSATION.

GC: OK. DID HE EVER COME DOWN?

MB: NO BECAUSE WHENEVER I WENT INTO, I CAME TO COURT THE NEXT DAY AND I WAS SUPPOSE TO WORK COURT AND I WENT TO MICHELL'S OFFICE AND WANTED TO FIND OUT IF SHAWN CAUSE I KNEW THAT THEY WERE ENGAGED AND I SAID CAN YOU FIND OUT, I SAID IS SHAWN WORKING TODAY AND SHE SAID YEAH. AND I SAID WELL DO YOU THINK THAT HE COULD COME OVER HERE AND MEET WITH US BECAUSE I WANT TO GET THE BONDSMAN DOWN HERE SO WE CAN TRY TO FIGURE OUT WHAT'S GOING ON. WELL, THE NEXT THING I'M TOLD IS TO LEAVE IT ALONE AND NOT MENTION IT. SO.

GC: WHO TOLD YOU THAT?

MB: AH, DONNA.

GC: OK.

MB: SO, I DIDN'T SAY ANYTHING ELSE YOU KNOW, I DIDN'T THINK ANYTHING ELSE OF IT. BUT I GUESS I JUST WANTED TO MAKE SURE THEY KNEW YOU KNOW, MY SIDE OF IT BECAUSE I WOULD NEVER EVER SAY ANYTHING LIKE THAT TO DISCREDIT HIM. I KNOW WHAT TYPE OF RAMIFICATIONS, I MEAN I ENJOY MY JOB AND I DO IT TO THE BEST OF MY ABILITY. AND I WOULD NEVER EVER, I KNOW THAT THAT CAN BE VERY DAMAGING.

DOTHAN/Martin & Brackin 1284
Confidential Subject to Protective Order

GC: HOW DO YOU GET ALONG WITH THE OTHER PEOPLE OVER THERE?
MB: THE MAGISTRATES?

GC: EVERYBODY YEAH?
MB: I GET ALONG WITH EVERYBODY PRETTY WELL. I MEAN YOU KNOW, WE HAVE, YOU KNOW, PEOPLE HAVE THEIR MOMENTS.

KG: OK. AT THE WINDOW DID YOU COMMENT IN ANYWAY ABOUT MS. RAPELJE'S POINT ZERO, ZERO DUI RESULTS?
MB: I TOLD, WELL SHE SAID THAT SHE KNEW SHE HAD BLEW POINT ZERO, ZERO, ZERO. AND I SAID WELL, I SAID YOU KNOW, I SAID, I, YOU CAN APPEAL IT. AND I SAID THAT WAY IT WILL START ALL OVER AGAIN IN TRIAL AND YOU CAN HAVE A TRIAL BY JURY. NOW THAT'S ALL THAT WAS SAID ON THAT. I MEAN, I DID NOT IN ANY KIND OF WAY SAY THAT THEY SHOULD HAVE DEFENDED HER, I DO NOT DO THAT, THAT IS NOT MY PLACE TO DO THAT.

KG: OK. SO THE COMMENTS FROM, AS FAR AS, THERE'S BEEN MANY COMPLAINTS ABOUT SHAWN, YOU NEVER SAID THAT?
MB: NO I NEVER SAID THAT.

KG: OK.
MB: I MEAN, I HADN'T EVEN WORKED WITH THE MAN BUT ONE TIME IN COURT AND DIDN'T EVEN REALLY KNOW HIM OTHER THAN THAT YOU KNOW, THAT'S, THAT'S WHAT I WAS, THAT'S WHAT WAS MAKING ME HARD TO UNDERSTAND WHY THEY WOULD SAY I SAID THAT BECAUSE I HADN'T EVEN, I HAD NOTHING BUT GOOD THINGS TO SAY ABOUT SHAWN WHENEVER I TOLD DONNA JUST THAT ABOUT THE WEEK BEFORE.

KG: OK. THE COMMENT INCLUDING, IT WAS DUMB OF MR. MCGEE TO ALLOW HER TO PLEAD GUILTY TO A DUI WHEN SHE ONLY BLEW A POINT ZERO, ZERO AND SHE COULD GET ANOTHER LAWYER.
MB: NO SIR, I DIDN'T NOT SAY THAT. THE ONLY THING I MENTIONED ABOUT THE POINT ZERO, ZERO, ZERO IS THAT WHEN SHE APPEALS IT, IT WILL START ALL OVER AGAIN IN CIRCUIT COURT. AND SHE, NOW AT THAT POINT YOU KNOW, I MIGHT HAVE TOLD HER THAT SHE HAD TO APPLY FOR A NEW ATTORNEY OR PUBLIC DEFENDER THAT HE WOULD NOT BE THE ONE TO REPRESENT HER UP THERE BECAUSE HE WOULDN'T, HE'S NOT A PUBLIC DEFENDER FOR THE CIRCUIT COURT. BUT I DON'T EVEN KNOW IF I TOLD HER THAT, I DON'T REMEMBER THAT.

DOTHAN/Martin & Brackin 1285
Confidential Subject to Protective
Order

KG:  OK.  WAS THE COMMENT MADE, AS FAR AS THE BONDSMAN SAYING THAT WHEN YOU CALLED HIM AT HOME AH, YOU ASKED HIM WHY WOULD HE SAY THOSE THINGS, AH, AS FAR AS THE REMARKS THAT HE MADE WHENEVER HE WAS IN THE JUDGES CHAMBERS TO THE COURT THAT HE VERIFIED THAT YOU DID SAY THESE THINGS THAT YOU JUST DENIED.  OK.  LET ME, LET ME REPHRASE.

MB:  YEAH.

KG:  HE SAID THAT THOSE COMMENTS WERE MADE BY YOU, MR. TURNER HE SPOKE TO THE JUDGE ABOUT IT ABOUT WHAT YOU SAID.

MB:  ABOUT WHAT I SAID TO KIMBERLY OK.

KG:  AND HE SAID YOU CALLED HIM AT HOME AND YOU ASKED HIM WHY HE MADE THOSE STATEMENTS AS IF THE STATEMENTS WEREN'T MADE.  DID YOU ASK HIM WHY DID YOU SAY THAT?

MB:  NO WHAT I HAD ASKED HIM WAS WHAT DID YOU SAY IN COURT. AND THAT'S WHEN HE TOLD ME HE SAID, THAT HE DIDN'T, HE HEARD, HE THOUGHT HE HEARD SOMEBODY SAY IT BUT HE WASN'T SURE WHO SAID IT.

KG:  OK.

MB:  THAT'S THE ONLY THING THAT OUR CONVERSATION WAS ABOUT AND THAT'S WHENEVER I SAID DO YOU MIND TALKING TO THE JUDGE WITH MYSELF IN THERE AND LET'S GET THIS STRAITHT BECAUSE I DON'T WANT SOMETHING TO HAPPEN YOU KNOW, THAT BECAUSE.

KG:  RIGHT. OK. AH, IF YOU WOULD BEAR WITH ME I WANT TO READ A PORTION OF A TRANSCRIBED STATEMENT FROM MR. TURNER.

MB:  OK.

KG:  AH, QUESTION WAS ASKED, WERE YOU CONTACTED, WERE YOU EVER CONTACTED BY MS. BRACKIN? HE SAID YES I WAS.  OK AND TELL ME ABOUT THAT.  ABOUT THE SAME DAY ABOUT SIX THIRTY OR SEVEN P.M. I GOT A CALL ON MY CELL PHONE, I WAS AT HOME, SHE TOLD ME WHO SHE WAS AND SHE WANTED TO KNOW WHAT HAPPENED IN COURT TODAY AND I ASKED, EXCUSE ME, AND SHE ASKED ME DID I TELL THE JUDGE THAT SHE SAID SOMETHING ABOUT SHAWN AND I TOLD HER I DID. I SAID AH, SHE SAID WHY. SHE SAID I SHOULD, I NEED TO WRITE A STATEMENT BECAUSE SHE COULD LOSE HER JOB. DID YOU ASK HIM TO WRITE A STATEMENT?

MB:  I DON'T REMEMBER THAT. UN UN. I DON'T REMEMBER SAYING THAT.

DOTHAN/Martin & Brackin 1286
Confidential Subject to Protective
Order

KB: OK. AND SHE SAID BECAUSE SHE HAS BEEN WORKING THERE AH, FOR LIKE A COUPLE OF YEARS OR WHATEVER AND SHE DIDN'T WANT TO LOSE HER JOB BECAUSE AH, OF WHAT THE JOB MENT TO YOU BASICALLY AND AH, HE GOES FURTHER TO SAY THAT YOU MENTIONED AH, THAT YOUR HUSBAND USE TO BE HIS COACH WHEN HE WAS PLAYING BASKETBALL LIKE FIVE YEARS AGO AND AH, HE ALSO WENT TO SAY THAT HE AH, I'M GOING TO GO AHEAD AND QUOTE HIM, DID SHE INDICATE TO YOU AH, DID SHE INDICATED TO YOU THAT YOU WERE TELLING A LIE WHEN YOU TALKED TO THE JUDGE. AND HE SAID, NO BASICALLY THAT AH, IT SOUNDED LIKE AH, HE WANTED, YOU WANTED HIM TO LIE FOR YOU FOR THE STATEMENT THAT HE HEARD.

MB: UN UN.

KG: OK. DID HE EVER SAY THAT, DID HE EVER MAKE THE STATEMENT TO YOU THAT, I'M NOT GOING TO LIE FOR ANYBODY?

MB: UN UN, I DON'T REMEMBER THAT IF HE DID. LIKE I SAID, THE ONLY THING OUR CONVERSATION WAS ABOUT WAS, THAT'S SEE THAT'S WHY I'M CONFUSSED BECAUSE HE SAID HE'S TELLING THE JUDGE HE SAID ONE THING BUT HE TOLD ME ON THE PHONE THAT HE DIDN'T SAY THAT. THE ONLY THING THAT HE SAID WAS, I HEARD SOMEBODY SAY IT BUT I DON'T KNOW WHO. AND THAT'S WHY I WAS WANTING TO GET DOWN TO, SOMEBODY'S LYING HERE AND I SAID I'M NOT GONE HAVE MY NAME DRAWN THROUGH THE MUD WHEN SOMEBODY'S LYING. BUT NOW I KNOW THAT MARY TURNER WAS WORKING COURT THAT DAY. SO YOU KNOW SHE.

KG: AND YOU SUPPOSEDLY MADE THE STATEMENT THAT HE WAS ON THE PHONE AND DIDN'T HEAR THE STATEMENT OR SOMETHING LIKE THAT?

MB: DO WHAT NOW, I'M SORRY?

KG: WAS MARY TURNER WORKING IN COURT, THE JUDGE ASKED HIM TO COME UP AND TALK TO HER BEFORE THE BENCH?

MB: OH NOW I DON'T KNOW ABOUT THAT, I DON'T KNOW ABOUT THAT UN, UN. I KNOW MARY JUST SAID THERE WAS SOME COMMENTS MADE YOU KNOW, YA'LL MIGHT WANT TO QUESTION HER.

GC: WHY WOULD YOU THINK THAT THE GENTLEMAN WOULD MAKE ANY, THE BONDSMAN, WHY WOULD YOU THINK HE WOULD, HE WOULD TELL ANYTHING UNTRUE AGAINST YOU?

MB: I DON'T KNOW.

DOTHAN/Martin & Brackin 1287
Confidential Subject to Protective Order

GC: HAVE YA'LL EVER HAD ANY PROBLEMS ANY REASON TO BELIEVE THAT.

MB: UN UN, I HAVEN'T EVEN I DON'T EVEN THINK I'VE I MAY HAVE DEALT WITH ANDREW ONE, I DON'T DEAL A LOT WITH THE BONDSMAN, IN FACT I'M NOT EVEN SURE ON SOME OF THEM WHAT COMPANY THEY WORK FOR BECAUSE I JUST HAVEN'T DEALT WITH THEM THAT MUCH.

GC: SO THERE'S NO HISTORY WITH HIM.

MB: UN UN, WELL LIKE I SAID, I'VE NEVER REALLY EVEN PERSONALLY MET HIM, YOU KNOW WHAT I'M SAYING? THE ONLY THING HE DO IS HE RECOGNIZ ME AS ME BEING ALLAN'S WIFE AND THAT'S THE ONLY THING I REMEMBER HIM SAYING THAT IN COURT ONE DAY AND THAT'S ALL.

KG: HAVE YOU HAD, EVER HAD ANY PROBLEMS WITH ANY OTHER PERSON ACCUSING YOU OF BEING AH, BOISTEROUS TO THEM WHILE YOU WERE OPERATING IN YOUR OFFICIAL CAPACITY?

MB: AS FAR AS WHO? EMPLOYEES OR PUBLIC OR.

KG: ANYONE SAYING THAT YOU TREATED THEM ROUGH, YOU TALKED LOUDLY, DISRESPECTFUL OR ANYTHING LIKE THAT.

MB: I HAVEN'T HAD COM, I HAVEN'T HAD ANYBODY COME TO ME AND YOU KNOW AS FAR AS, NOT THAT I CAN RECALL KEITH. I MEAN, YOU KNOW YOU CAN HAVE PEOPLE THAT COME UP AND SAY WELL, YOU KNOW, SO AND SO I DIDN'T LIKE WHAT THEY HAD TO SAY OR SOMETHING LIKE THAT BUT I MEAN I DON'T KNOW OF ANYBODY THAT.

KG: HAVE FILED ANY COMPLAINTS AGAINST YOU AT ALL FOR THAT.

MB: NO, UN UN. NOW I DON'T KNOW OF ANYBODY THAT'S FILED ANY COMPLAINTS AGAINST ME. IS THERE SOMETHING I DON'T KNOW? ALL RIGHT NOW.

KG: I'M GOING TO LEAVE IT OUT. BUT YOU'RE NOT AWARE OF ANY?

MB: I THINK I KNOW, THERE WAS AN INCIDENT WITH ASHTON OTT IN COURT ONE DAY, BUT NOW IT WAS NOTHING THAT, SHE GOT LOUD WITH ME AND I FEEL LIKE I HANDLED IT IN A PROPER WAY. I CALLED DONNA AND GOT HER TO COME OVER.

KG: OK. YOU TWO HAVE ANY PROBLEMS?

MB: I DON'T HAVE A PROBLEM WITH ASHTON. I KNOW THAT AH, IT JUST, IT SEEM LIKE SHE HAS A PROBLEM WITH SOME OF US. A COUPLE OF OTHERS HAVE YOU KNOW, MADE COMMENTS THAT SHE'S REAL

DIRECT TO US IN OUR CAPACITY AND IT KIND OF MAKES US FEEL LIKE WE'RE BELITTLED A LITTLE BIT BUT YOU KNOW, I'VE NEVER.

GC: HOW ABOUT WITH ANY OF THE BAILIFFS OR ANYBODY LIKE THAT?
MB: THE BONDSMAN?

GC: NO THE BAILIFFS, POLICE OFFICES.
MB: THE BAILIFFS?

GC: UM HUM, ANY OF THE WARRANT OFFICERS OR ANYBODY THAT WORKS COURT?
MB: OH YOU TALKING ABOUT CARMICHAEL?

GC: NO I'M TALKING ABOUT ANYBODY.
MB: NOT OTHER THAN CARMICHAEL COMING IN THERE ONE DAY AND WASN'T LETTING PEOPLE IN. BUT THE JUDGE AND I ADDRESSED THAT WITH HIM THERE, I MEAN, YOU KNOW.

GC: WHEN YOU SAY YOU ADDRESSED IT, WHAT BECAME OF IT?
MB: WELL, I MEAN HE CAME UP TO ME AND WAS SAYING SOME THINGS AND THEN I TOLD HIM THAT PEOPLE THAT NEEDED TO BE IN COURT NEEDED TO BE IN THERE AND HE JUST KIND OF GOT LOUD WITH ME AND YOU KNOW.

KG: HE WASN'T ALLOWING PEOPLE IN THE COURT OR SOMETHING LIKE THAT?
MB: THERE WAS, HE WAS TELLING PEOPLE THAT IF THEY DIDN'T HAVE A TICKET THEY DIDN'T HAVE TO COME TO COURT AND I TRIED TO TELL CARMICHAEL THAT SOME OF THEM DO HAVE TO BE IN THERE AT NINE O'CLOCK FOR TRAFFIC TICKETS. THAT WE SCHEDULE THE COURT AND SOMETIMES NOT ONLY DO THEY HAVE TO BE HERE AT TEN, THERE ARE SOME PEOPLE THAT HAVE CASES DUE AT NINE AND HE WAS SAYING THAT IF THEY HAD A TRAFFIC TICKET THEY COULDN'T COME IN UNTIL TEN AND WE WAS JUST HAVING A PROBLEM WITH PEOPLE SAYING, WELL I WAS OUT THERE BUT THEY WOULDN'T LET US IN AND SO IT WAS A PROBLEM FOR US BECAUSE THE JUDGE WOULD HAVE ALREADY HAVE STAMPED IT FOR A WARRANT OR SOMETHING LIKE THAT, BUT IT'S SOMETHING THAT I MEAN, I, YOU KNOW, I DON'T LOOK AT IT AS A PROBLEM BECAUSE CARMICHAEL AND I TALK AND YOU KNOW, I'VE NEVER HAD ANYTHING WRITTEN, A FORMAL COMPLAINT.

KG: THAT'S ALL I HAVE.

DOTHAN/Martin & Brackin 1289
Confidential Subject to Protective Order

GC:   THIS IS THE END OF THE STATEMENT AT 3:43.

PRJOHNSON

DOTHAN/Martin & Brackin 1290     15
Confidential Subject to Protective
Order