1

1              CITY OF DOTHAN PERSONNEL BOARD

2

3                 APPEAL HEARING

4                      of

5              MARY BETH BRACKIN

6

7

8           WEDNESDAY, JUNE 1, 2005

9               1:30 p.m.

10

11              Sakado Room

12             Second Floor

13         Dothan Civic Center

14

15   PERSONNEL BOARD:           CITY PERSONNEL:

16   Gary Griffin, Chairman    Kai Davis

17   Mary Davis               Tammy Clark

18   Barbara Spann           Len White, City Attorney

19                         Judge Rose Gordon

20                         Michelle Sellers

21   FOR THE APPELLANT:

22   Mr. Ishmael Jaffree, Attorney at Law

23   Mary Beth Brackin

24   John Brackin

25

120

1

2

3

4

5                    MARY BETH BRACKIN

6    having been first duly sworn, testified as follows,

7    to-wit:

8                      EXAMINATION

9    BY MR. WHITE:

10        Q    Would you state your name for the record?

11        A    Mary Elizabeth Brackin.

12        Q    Were you employed as a magistrate for the City

13    of Dothan?

14        A    Yes.

15        Q    How long were you so employed?

16        A    My employment started May 1st of 1992 and

17    ended May 3rd of 2005.

18        Q    Are you familiar with an investigation into

19    the disposition of a ticket for Bradley Phelps?

20        A    In the disposition?

21        Q    The investigation into what happened to a

22    ticket given to Bradley Phelps, not Stephen Phelps.

23              MR. JAFFREE:  Let me object.  That is too

24                 broad a question.  An investigation?

25                 What type of investigation?

121

```
 1              MR. WHITE:  Any investigation.
 2              MR. JAFFREE:  Does she know about an
 3                    investigation?
 4        A     Only what Officer Etress has told me, that
 5    there was a current investigation.
 6        Q     Who is Officer Etress?
 7        A  -- He is an investigator with CID.
 8        Q     And was there an investigation into a ticket
 9    given to Stephen Phelps?
10        A     Can you go to where I don't have to turn my
11    neck too hard?  I am sorry.  I have neck problems.
12        Q     You don't have to look at me.  That is fine.
13        Do you know whether or not there was an
14    investigation into a ticket given to Stephen Phelps?
15        A     Whether he received a ticket?
16        Q     Any investigation of a ticket given to Stephen
17    Phelps?
18        A     Not other than what Officer Etress asked me
19    about that day.  I think that is the first recollection
20    of it, was whenever he brought it to my attention.
21        Q     You know what you're charged with today?
22        A     Insubordination.
23        Q     What else?
24        A     By swearing to the transmittal.
25        Q     Transmittal of what ticket?
```



122

1      A      Of the Stephen Phelps' ticket.

2      Q      Stephen Phelps?

3      A      Right.

4      Q      Now, was there an investigation into that

5    Stephen Phelps' transmittal?

6      A      Other than what Officer Etress told me that

7    day.

8      Q      Did you talk to anybody in the police

9    department about the Stephen Phelps' case?

10      A      What do you mean?

11      Q      Did you talk to anybody in the police

12    department about the Stephen Phelps' case?

13      A      Other than Sergeant Gray.

14      Q      Sergeant Gray talked to you about the Stephen

15    Phelps' case?

16      A      Yes.

17      Q      He was investigating the Stephen Phelps' case?

18      A      Okay.

19      Q      Did he?

20      A      I assume.  He questioned me about it.

21      Q      He questioned you about the Stephen Phelps'

22    case?

23      A      Yes.

24      Q      Did he ask you whether you wrote "void" on the

25    transmittal?

123



```
 1          A    Yes.

 2          Q    What was your answer?

 3          A    I said, yes, I wrote the word "void."

 4          Q    And if you would, please, identify that

 5     document.

 6          A    This is a transmittal.

 7          Q    And is that the transmittal that contains

 8     Stephen Phelps' ticket?

 9          A    Yes.

10          Q    And is that your signature on there that says

11     "void"?

12          A    Yes.

13          Q    That's your signature at the bottom of the

14     page that said you received it?

15          A    Yes, I did.

16          Q    Did you do that after it was sworn to?

17          A    I don't recall.

18          Q    You mentioned Officer Etress asking you about

19     the Bradley Phelps ticket; is that right?

20          A    Uh-huh.

21          Q    So there was an investigation by Officer

22     Etress on Bradley Phelps and Officer Gray on Stephen

23     Phelps.  While that investigation was ongoing, was there

24     a meeting with the magistrates and the judge?

25          A    There was a meeting that took place on that
```

124

1  Thursday that Mary got put on leave, but the meeting was

2  before I was questioned by the investigators.

3       Q    Did you ever have a conversation with Mary

4  Turner after that meeting?

5       A    Yes.

6            MR. WHITE:  That's all.  Your witness.

7                       EXAMINATION

8  BY MR. JAFFREE:

9       Q    To avoid calling you back a second time, let

10  me just ask you and expand the series of questions to

11  make this go quicker.  When did you first start working

12  as a magistrate?

13       A    May 1st of 1992.

14       Q    Who was the appointing authority when you

15  first got the job?

16       A    Gayle Schwarz.  She was the court

17  administrator or the court clerk.

18       Q    And in your first year as a magistrate, did

19  you have any problems?

20       A    No.

21       Q    Did they give you an annual evaluation?

22       A    I believe I had a few, because when you are

23  new, you have so many before you are there a year.

24       Q    So you had internal evaluations before the

25  year was up?

125

```
1         A    Yes.

2         Q    Were those evaluations then generally

3    positive?

4         A    Yes, sir, to my knowledge.

5         Q    What year was this, you said?

6         A    1992.  So I don't know remember the exact

7    evaluations.  I don't have copies of those.

8         Q    After your first annual evaluation, did you

9    have anymore?

10        A    Yes.

11        Q    When did you leave the magistrates' office?

12        A    August of 1995.

13        Q    The evaluations that you had up to August of

14   1995, were they generally positive?

15        A    To my knowledge, yes.

16        Q    Did you ever get suspended for anything?

17        A    No.

18        Q    Did you enjoy working for the magistrates'

19   office?

20        A    Yes, I did.

21        Q    Did you need that income?

22        A    Of course, I had just had a new baby.

23        Q    Did your family count on that income?

24        A    Yes.

25        Q    Are you currently employed?
```

126

1      A      No.

2      Q      Are you familiar -- and I am not being linear,

3  because I want to cover something I intended to cover

4  first.  Are you familiar with a letter that I wrote,

5  hopefully, to the attention of the Board, telling them

6  about the effects of unemployment?

7      A      Yes.

8      Q      You received a notice that you were going to

9  be terminated?

10     A      Yes, sir.

11     Q      How did that impact you when you first got it?

12         MR. WHITE:  Object.  It is irrelevant to these

13             charges.

14         MR. CHAIRMAN:  She may answer.

15     Q      How did that impact you?

16     A      I was devastated.  I had never been fired from

17  a job before.

18     Q      Did you suffer any economic loss?

19     A      Of course.  I have lost about 45 percent of

20  our income monthly.

21     Q      Is that a trivial thing?

22     A      No.

23     Q      Do social problems come with the loss of

24  income?

25     A      Sure.

127

1    Q    Family problems have developed?

2    A    Yes.

3    Q    Arguments within the family?

4    A    Disagreements.

5    Q    Disagreements?

6    A    Yes, sir.

7    Q    Does it affect your general well-being?

8    A    Yes, sir.

9    Q    Can you do things like you used to do, like

10   take vacations and buy things on the spur of the moment?

11   A    No.

12   Q    You have to watch every penny?

13   A    Yes, sir.

14   Q    You have gone from a two-income household to a

15   one-income household?

16   A    Yes, sir.

17   Q    Has that affected everything you have had to

18   pay for, every debt you have, since this occurred?

19   A    Yes.

20   Q    Do you think you have done anything to warrant

21   your termination from this job?

22   A    No.

23   Q    Do you intend to make this job a career?

24   A    I had twelve more years until retirement.

25   Q    So being terminated, terminated that as well?

128

1    A    Yes, it did.

2    Q    When you first got employed, did you realize

3    this was merit system employment?

4    A    Yes.

5    Q    Did you know that you should be not terminated

6    for arbitrary or trivial reasons?

7    A    Yes.

8    Q    Do you also understand that people can use

9    terms like "insubordination" to apply for anything no

10   matter how trivial?

11   A    Yes.

12   Q    Now, let me go back to your service with the

13   police department in August of '95 when you left the

14   magistrates' office.

15   A    Yes, sir.

16   Q    Why did you leave?

17   A    Well, we were on-call quite a bit, because

18   there was only approximately four magistrates at the

19   time.  We were on-call, and my husband is a fireman.  So

20   he has shift work.  And with me being on-call, I had a

21   child, a baby, so I would have to pretty much pack all

22   of us up and go stay with my in-laws in case I got

23   called out while my husband was working.

24        The money was the same.  So at the time, I just

25   transferred over to the police department, but I still

129

1    kept up my certification and paid to go to the schools
2    to keep up with the current laws that were going on.
3         Q    So as a necessity, you had to leave?
4         A    Yes.
5         Q    By on-call, you mean they could call you
6    anytime?
7         A    Yes.  And at that time, we were actually
8    getting called out for theft of property, charges of
9    which at the time were under the amount of $25.00, which
10   was quite a few times.
11        Q    How did you work out with the police?
12        A    Very well.
13        Q    Did you have any disciplinary problems?
14        A    No, not to my knowledge.
15        Q    Did Jerry consider you a good employee?
16        A    Yes.
17        Q    Did you have positive evaluations?
18        A    Yes.
19        Q    Will your file reflect those positive
20   evaluations?
21        A    Yes, it will.
22        Q    How long did you work for the police?
23        A    From August of '95 until, I believe it was, in
24   April of 2001.  April, I think, is when I left.
25        Q    So from '92 until 2001, you had never had any

130

1    problems with your appointed authority?

2        A    No, sir.  Not to my knowledge, not that I can

3    recall.

4        Q    Never got suspended?

5        A    No, never suspended.

6        Q    Were you on a list?  How did you get the job

7    back?  When you came back in 2001, how did you get the

8    job back as a magistrate?

9        A    I believe I was Number 1 on the roster.  I

10   believe there is an in-house and an outside roster.

11       Q    A register?

12       A    Yes.

13       Q    That is supplied?

14       A    Right.  And you are categorized based on the

15   grading that, I believe, the personnel department does

16   based upon your experience and qualifications that meet

17   that job.

18       Q    I see.  And it is supposed to be competitive;

19   correct?

20       A    Yes.

21       Q    And it is supposed to be based on merit and

22   experience?

23       A    I believe your evaluations come into play.  I

24   believe that is right.

25       Q    You mean if you previously had the job?

1     A     Right.

2     Q     But in general, this register that is kept,

3   whatever criteria is used, you are placed either first,

4   second or third?

5     A     In numerical order, correct.

6     Q     Is race a criteria?  Do you get so many points

7   because of your race?

8     A     I don't know.

9     Q     But it could be?

10    A     I don't know.  It could be, but I don't know.

11    Q     If you could, then it would be reflected by

12  your position?  If race factored in, you get some points

13  because of your race, then you would be up higher in a

14  position because of those points?

15        MR. WHITE:  Objection.  She said she doesn't

16            know.

17    Q     They had a register list; right?

18    A     Right.

19    Q     Do you know or have reason to know what

20  position Lavera had on that list?

21    A     I know she was down the roster some.

22    Q     Do you know if she was second place?

23    A     No.

24    Q     Third place?

25    A     No.

132

1     Q    Fourth place?

2     A    No.

3     Q    Fifth place?

4     A    She could be.  I don't know.  I don't think

5  she was in the top three.

6     Q    Whatever place she was, she wasn't near the

7  top?

8     A    Not to my knowledge.

9     Q    She got appointed?

10     A    Yes.

11     Q    She got appointed into her position?

12     A    Yes.

13     Q    Do you know who was responsible for appointing

14  her to her position?

15     A    At the time, Judge Gordon was the department

16  head, and Donna Nicholson was the court administrator.

17     Q    Do you understand the term "affirmative

18  action"?

19     A    Somewhat.

20     Q    Prior to Lavera getting that position, was the

21  magistrates' office sort of lily white?

22     A    Yes.

23     Q    So you weren't opposed to a black being bumped

24  up so they could have some diversity in the office?

25     A    Well, I would hope it would be based upon

133

1    experience that they would be put in the office.

2         Q    But bumping up could, in fact, be unlawful?

3         A    Yes.

4         Q    Because you may be putting somebody in a

5    higher position than a better qualified white person,

6    but it was with a good heart, but it still may be

7    unlawful; do you understand that?

8         A    Yes.

9         Q    Are you quite certain that Lavera was down

10   below some other people who didn't get offered the

11   position?

12        A    I don't know if they were offered the position

13   or not.

14        Q    Do you remember when they first decided to

15   make the position of judge of municipal court a

16   full-time position?

17        A    Yes.

18        Q    Do you remember the controversy that was

19   surrounding, I think, a Ms. Lane?

20        A    Yes.

21        Q    Do you know or have reason to believe that the

22   City at a very early time decided that that would be a

23   position designated for a black person?

24        A    I believe it was a minority female.

25        Q    They wanted a minority female.  And, again,

134

1    there may be a lot of women hired by the City, if the

2    City had that as a policy, but even that, to exclude

3    white people, may be unlawful.

4        Now, Ms. Lane didn't get the position?

5        A    No, she didn't.

6        Q    Ms. Evans-Gordon did?

7        A    Yes.

8        Q    So the City had its first black mayor -- I am

9    sorry, not yet -- its first black City judge?

10       A    Yes.

11       Q    You had gone without any problems.  Did you

12   start having problems associated with your job once you

13   came back to work?

14       A    Yes.

15       Q    And who was the judge at the time?

16       A    Judge Gordon.

17       Q    Can you identify some of the problems that you

18   had?

19       A    Yes.

20       Q    Can you tell us?

21       A    In approximately 2001, I got notified on a day

22   that the following day I was to report to the police

23   chief's conference room to be internally investigated

24   for an administrative problem with a comment that was

25   allegedly made and that I was to cooperate with them

135

1    fully.  And I was told by Ms. Sellers that if I did not

2    sign it and do that, I would be found guilty of

3    insubordination.

4        Q    You said that there was a comment that you

5    allegedly made?

6        A    Yes.

7        Q    What date was this?

8        A    Oh, gosh.  I can't remember the exact date.  I

9    want to say it happened in September, but I didn't know

10   that anything --

11       Q    Of what year?

12       A    2001.

13       Q    Was there an internal investigation as a

14   result of this comment?

15       A    Yes.

16       Q    Did someone from internal affairs come and

17   talk to you?

18       A    Sergeant Keith Gray called me on the phone

19   and told me he needed to speak with me and could I come

20   over to their office the next day at three o'clock.  And

21   I asked him, What for?  He said, Has Judge Gordon not

22   talked with you?  I said, No, sir.  He said, I will get

23   back with you.  The next thing I know, I get called in

24   -- I get that letter and get told to cooperate.

25            So I had no idea it was internally being



136

1  investigated until I got notified to report to them the

2  next day.

3      Q    Is it a pleasant thing to be interrogated?

4      A    No, it is not.  They treated me like I was a

5  criminal.

6      Q    The City police?

7      A    Yes.

8      Q    Had you been accused of a criminal offense?

9      A    No.

10     Q    Does it have a chilling effect to somehow be

11  investigated?

12     A    Yes, it does.

13     Q    Now, you were investigated for allegedly

14  making a comment?

15     A    Yes.

16     Q    Well, most certainly you told this person to

17  commit a crime?

18     A    No.

19     Q    What comment did you make or allegedly make?

20     A    There was a white female who had been in court

21  that particular morning.  She had come to the office

22  that was located on North Saint Andrews at the time.  We

23  were in the Miracle Finance Building next to the police

24  department.  There was a black bondsman with her at the

25  time.  His name was Andrew Turner.  They came into the

137

1    office.  At the time, Mr. Turner, the bondsman, was on

2    the telephone.  The defendant came up and was telling me

3    that she had just been in court and that she was not

4    satisfied with the treatment the public defender -- she

5    was not satisfied with the way the public defender

6    handled her case.  She didn't feel like he was for her.

7    I advised her she needed to go back into the courtroom

8    and speak with the judge and ask the judge if there is a

9    way the case could be put on a separate docket, that

10   there were three public defenders, two others that could

11   represent her.  That is all that was said.

12        Q    Were you giving this citizen fair comment

13   about what their rights are?

14        A    Yes.

15        Q    Do you think that is a matter of public

16   concern?

17        A    Sure.

18        Q    Do you know what I mean by "public concern"?

19        A    Yes.

20        Q    Do you think you were doing anything to

21   violate anything?

22        A    No.

23        Q    And as a result of these comments, you were

24   interrogated by the police?

25        A    She went over to the courtroom and said that I



138

1    had told her that the public defender, Mr. Shaun McGhee,

2    was not a good attorney and he didn't know what he was

3    doing. I had been in that job since 1992. I know that

4    is a statement that should not be made. I would not

5    make that statement.

6        Q    Let's assume for the sake of this question

7    that you made that statement. Is that a criminal matter

8    to say a person doesn't know what they are doing?

9        A    Not to my knowledge, no.

10       Q    So early on, the judge used the police as an

11   enforcement into their investigation to try to get

12   information from employees?

13       A    Yes.

14       Q    Did anything happen as a result of this

15   internal investigation?

16       A    I do not know. I kept asking. Several weeks,

17   I would see Sergeant Gray, and I said, well, do you know

18   what is going on or what has happened. He said, that

19   has been turned over to the Chief. That is all we do is

20   take statements. We turn over our information, and it

21   is up to the Chief to get up with the judge. I did not

22   hear anything.

23       Q    Did this get written up in the evaluation?

24       A    Yes, it did.

25       Q    Are there consequences associated with having

139

```
1    things written in your evaluation?
2         A    Yes, there is.
3         Q    Are there economic consequences?
4         A    Yes.
5         Q    Are there consequences with respect to
6    promotions?
7         A    Sure.
8         Q    And transfers to jobs?
9         A    Yes.
10        Q    So an investigation was done about a comment
11   that you made that you felt was consistent with free
12   speech rights and it got put in your evaluation?
13        A    Yes, it did.
14        Q    You certainly didn't think that race had
15   anything to do with that?
16        A    No.
17        Q    Was Lavera and Eunice working there during
18   this time?
19        A    Yes.
20        Q    Did you have an opportunity to observe their
21   job performance?
22        A    Yes.
23        Q    Do you know whether or not they were making
24   mistakes with doing their job performance?
25        A    Yes, they were.
```

1      Q    How would you know?  One witness said she

2   would have no way of knowing.

3      A    Well, there were several times -- well, for

4   one thing, I did the daily deposits.  There were times

5   when I didn't have their money and should have had.

6   There were memos done to that effect, that their money

7   would be balanced that day before they left work.  When

8   I would come in the next day and do the deposit for the

9   City, I would have this money sitting out, and, of

10  course, I couldn't get up and leave it.  If I didn't

11  balance, then I would have to go through and figure out

12  why the money did not balance for the preceding day.

13  Well, when I recounted the money, I thought, well, I am

14  off.  So when I would go through to make sure, well, I

15  would find out that I wouldn't have some of their money.

16      On more than one occasion it was Lavera and

17  Eunice.

18      Q    Would you say it happened frequently?

19      A    It happened a couple of times, yes.

20      Q    Do you know if this continued throughout your

21  tenure up until the time you got terminated?

22      A    Yes.

23      Q    Do you have any direct knowledge whether or

24  not Lavera ever made mistakes that caused people to get

25  falsely arrested?

141

1    A    Yes.

2    Q    If people get falsely arrested, is that

3    considered a serious matter?

4    A    Yes, it is.

5    Q    Do you know if Lavera was ever disciplined?

6    A    Not to my knowledge, she was not.

7    Q    I guess her personnel file would reflect this

8    discipline?

9    A    Yes.

10    Q    Do you know if Eunice ever made mistakes that

11    caused people to get falsely arrested?

12    A    Yes, she did.

13    Q    Do you know if she ever got any discipline?

14    A    No, she did not.   Not to my knowledge.

15    Q    Now, how is bond money supposed to be treated?

16    A    Cash bond money?

17    Q    Cash bond money.

18    A    If it is between the hours of eight to five,

19    Monday through Friday, the sureties should come into the

20    magistrates' office and the monies will be posted and

21    ran through the computer.  A receipt will be given to

22    the surety, and they must sign the bond and also a cash

23    bond sheet authorizing whether the court may use the

24    money if they are found guilty for fines and costs or,

25    no, they cannot use it and all of the money is to be

142

1    refunded to the surety.

2        Q    Was that process ever reduced to writing?

3        A    Was it ever reduced?

4        Q    Yes.  Was it ever part of a written memo?

5        A    As to the nature?

6        Q    As to what you are supposed to be doing?

7        A    Yes, sir.

8        Q    Do you have any direct knowledge whether or

9    not Lavera followed that policy all the time?

10       A    Not to my knowledge for her, no.

11       Q    What about Eunice?

12       A    I know a particular incident where this person

13   was falsely arrested and the monies was given back to

14   the defendant.

15       Q    As cash?

16       A    Yes.

17       Q    Do you know if the defendant is the one who

18   posted the bond?

19       A    I don't believe he was, no.

20       Q    Is giving cash money to the defendant part of

21   the procedure?

22       A    No.

23       Q    Is there a way to do an audit trail if you

24   refund a defendant in cash?

25       A    No.

143

1      Q    Do you know if Eunice was ever disciplined
2   because of this?
3      A    No, not to my knowledge.
4      Q    Was there anything that happened in addition
5   to what you just said that made you feel that maybe
6   Eunice and Lavera were given preferential treatment?
7      A    Yes.
8      Q    Think back, and you can put the details in if
9   necessary, but tell me the best you can all of the ways
10  you feel they have been given preferential treatment and
11  that it should have been obvious to almost anyone.
12     A    Well, I mean, the most obvious were the
13  mistakes that were made, and I had brought a few of
14  those to the judge's attention.  I was told, well,
15  everybody makes mistakes.
16     Q    Do you know whether or not these mistakes were
17  reflected in their evaluations?
18     A    I don't know.  I don't see the evaluations, so
19  I don't know.
20     Q    These are the types of things that would
21  generally be reflected in their evaluations?
22     A    It should, yes.
23     Q    Is it a part of your job performance?
24     A    Yes.
25     Q    So you felt the judge was taking up for them,



144

1    saying, everybody makes mistakes?

2        A    Yes.

3        Q    Go ahead.

4        A    There were times when I would see the judge

5    and them leaving.  They would go to lunch together.

6    There were times when --

7        Q    Let me stop you.  I am assuming the judge went

8    to lunch with you as well?

9        A    We had lunch with her at Chili's, the whole

10   office did, for her birthday.  I believe it was last

11   year or the year before.  And then we had lunch this

12   year at the office in the courtroom.

13       Q    Maybe the judge and them are just close

14   friends; there is nothing wrong with that, is there?

15       A    It didn't look right.

16       Q    Do you think it is an appearance problem, the

17   judge going to lunch with two black magistrates and not

18   the others?

19       A    I would assume that, yes.

20       Q    Maybe they felt comfortable together?

21       A    They might have.

22       Q    Go ahead.

23       A    When we moved from the office -- well, before

24   we moved from the office, there was an incident where we

25   did not have a court administrator, and the morale in

145

1    our office was very low.  We had people talk about they

2    were going to quit.  There were comments even made,

3    well, why don't they get punished with all the mistakes

4    that happen, and they were referring to Lavera and

5    Eunice.  On this particular day, I believe it was a

6    Sunday, I had went by the judge's home, because we just

7    live right around the street from one another.  And I

8    had knocked on the door.  I was going to speak with her

9    and ask her if she could maybe have a meeting with us so

10   we could air out some issues and boost the morale a

11   little bit and just try to fix things and mend them to

12   where we could go on and the office would run smooth.

13       When I reached her home, I knocked on the door or

14   rang the doorbell.  I don't know whichever one.  I

15   believe it was her husband that came to the door, but he

16   did not open it.  He asked who it was.  I stated my

17   name, and I asked to speak with the judge.  He said,

18   just a moment.

19       I waited what seemed like a few minutes, but was

20   probably only maybe a couple of minutes.  He came back

21   and still did not open up the door.  He said, well, she

22   is in the shower.

23       I said, Okay.  I said, Can she call me back?  And

24   he said, yes.  What is your phone number?  I gave him my

25   phone number, and I didn't hear from her.



146

1    The next day, I didn't say anything.  She called me
2  and apologized.  She said that her brother was there and
3  she was having problems with her brother.  I said, well,
4  that is okay.  But I just felt like it was odd that he
5  at least couldn't open up the door.
6    But that day, we had a meeting.  I believe Kai
7  Davis was present at this particular meeting.  The judge
8  was pretty much, we are going to air everything out and
9  lay everything out on the table.  Mary Turner was
10 standing in between myself and Lavera McLain.  There
11 were comments made about several different things.  I
12 really don't know all that was said.
13    During the discussion, Lavera had raised her voice
14 and talked to me very rude in a tone, and I verbally
15 complained to the judge and nothing was done then.
16    Q    Hold on.  One employee was talking rudely to
17 another employee?
18    A    To me.
19    Q    And you brought this to the attention of the
20 judge?
21    A    The judge was there.
22    Q    You brought it to the attention of the judge?
23    A    I told the judge I did not appreciate the tone
24 that she talked to me.
25    Q    Do you know whether or not the judge did a

147

1    memo and placed it in her file?

2        A    I don't know.

3        Q    So there could be one in the files?

4        A    Could be.

5        Q    All right.  Let me pause you for a second.  I

6    asked you before about whether or not Lavera had been

7    bumped up ahead of other people who were higher on the

8    roster, but just happened to be white.  Do you know if

9    Eunice got bumped up ahead of people, when she got her

10    job, who were white and happened to be higher on the

11    roster?

12        A    I know she was down lower.  I don't know if

13    the other people above them refused the job.  I don't

14    know that.

15        Q    So they may have refused the job?

16        A    They may have.

17        Q    You wouldn't have any knowledge of that?

18        A    No.

19        Q    I am sorry I cut you off on that.  Go ahead.

20        A    There was the time when we had moved from the

21    office on North Saint Andrews to the current location of

22    the magistrates' office.  Lavera was in charge of the

23    move.

24        Q    Let me stop you.  Who put Lavera in charge of

25    the move?

148

1      A    I assume the judge did.  She was the
2  department head.  We did not have a court administrator
3  at the time.
4      Q    Was she in charge because of her seniority?
5      A    No.  She didn't have seniority.
6      Q    But somehow she became in charge of the move?
7      A    Yes.
8      Q    She had almost equal seniority as you did?
9      A    They said we were hired on the same day, but I
10 actually started before she did.
11     Q    But if you count your prior experience, you
12 had more experience?
13     A    Right.
14     Q    So she was in charge of the move.  So what is
15 wrong with that?
16     A    To me, the way the offices were distributed.
17     Q    Well, it was going to be based on seniority?
18     A    No.
19     Q    Well, it must have been distributed based on
20 seniority, that is only fair?
21     A    It would have been fair, but that is not the
22 way they were done.
23     Q    Well, then they were based on the job
24 requirements; correct?  I mean, different people had
25 different job functions so they had to have an office to

149

1    reflect that?

2        A    Yes, we all had different job requirements,

3    but we all did not get an office, no.

4        Q    Who got the best offices?

5        A    Eunice and Lavera and Sarah got offices on one

6    side of the office with windows.  Valerie and Michelle

7    Bryan got offices with windows.  Then, in the end, Ann

8    Baxter actually got the biggest office.  But I had

9    mentioned to Lavera, I said, well, Mary and I will be

10   glad to share that office, because Mary was not assigned

11   an office.

12       Q    Let me stop you.

13       The fact that Lavera and Eunice got an office with

14   a window, that didn't make the office better than

15   anybody else's, did it?

16       A    Well, an office with a window is nice.

17       Q    But you said other people got offices with a

18   window as well?

19       A    Yes.

20       Q    So there was nothing special about their

21   offices?

22       A    Well, it was a good size.

23       Q    So they had large offices with a window?

24       A    I believe Lavera's was the largest.  I could

25   be wrong.  I believe hers was the largest with the

150

1    window.  Ann's was actually the biggest, but in the

2    beginning, Ann was not given that office until toward

3    the end of the move.

4         Q    But it wasn't based on seniority?

5         A    No.

6         Q    And Lavera just took charge?

7         A    Yes.

8         Q    Did she indicate who gave her the authority to

9    take charge?

10        A    She did not tell me, but I found out later it

11   was Judge Gordon.

12        Q    Did the person with the most seniority,

13   Ms. Turner, did she get a large office?

14        A    She didn't get an office at all.

15        Q    The one with the most seniority didn't get an

16   office at all?

17        A    No.

18        Q    What color was she?

19        A    White.

20        Q    Well, there was a reason she didn't get an

21   office?

22        A    I don't know why, if there was.

23        Q    Okay.  Continue.

24        A    With what?  I am sorry.

25        Q    Any other ways you think that somehow blacks

151

1    were treated better than whites in the magistrates'

2    office?

3         A    Well, I know there were several things, as far

4    as we had problems with, when you are on-call, when a

5    magistrate is on-call, there were memos to the effect

6    that they had the authority, that you had to go through

7    the magistrate on-call if a cash bond was issued for a

8    defendant and they got arrested and a bonding company or

9    the defendant wanted it changed from cash to regular,

10   they should go through the magistrate on-call.  There

11   were memos to that effect.  There were several times

12   where Ms. McLain would change bonds from cash to

13   regular, and she would not be on-call.

14        Now, to my knowledge, I don't know if she was

15   disciplined or not.

16        I found several clerical errors even after they

17   were doing their job and trained to do that job and

18   trained on the new system.  There were still errors that

19   were being made.  I forwarded them to Nancy after Nancy

20   Martin came as court administrator.

21        I also fixed a lot of errors and, yes, everybody

22   makes mistakes, but they made a lot.  I also fixed some

23   of them.  But it got to the point to where it was taking

24   some of my time to do that, and if they are not aware of

25   their errors, they evidently think that is the proper



152

1    procedure of doing it.

2         Q     Were you aware when Ms. Martin got hired that

3    you were targeted as a person that she needed to keep an

4    eye on?

5         A     I found out later, but not at the time she was

6    hired.

7         Q     Were you aware that Ms. Turner was targeted as

8    a person she needed to keep an eye on?

9         A     Yes, later.

10        Q     Do you know there was another white employee

11   that was targeted as a person she needed to keep an eye

12   on?

13        A     Later, yes.

14        Q     Do you know Kevin Sorrels?

15        A     Yes, I do.

16        Q     What color is he?

17        A     White.

18        Q     Did he get terminated?

19        A     Yes, he did.

20        Q     Who was responsible for that?

21        A     I don't know.  I assume Judge Gordon.  She was

22   the department head at the?

23        Q     Donna Nicholson, did you know her?

24        A     She was white.

25        Q     What happened to her?

153

| | | |
|---|---|---|
| 1 | A | She got terminated. |
| 2 | Q | Do you know who was responsible for that? |
| 3 | A | Judge Gordon. |
| 4 | Q | Nancy Martin, what color was she? |
| 5 | A | White. |
| 6 | Q | What happened to her? |
| 7 | A | She got terminated. |
| 8 | Q | Who was responsible for that? |
| 9 | A | Judge Gordon. |
| 10 | Q | Patty Kindberg, what color? |
| 11 | A | White. |
| 12 | Q | What happened to her? |
| 13 | A | I don't know.  I was not an employee at the |
| 14 | | time. |
| 15 | Q | What about Allison Davis? |
| 16 | A | She was fired? |
| 17 | Q | Do you know who was responsible for that? |
| 18 | A | Judge Gordon.  She was the department head.  I |
| 19 | | just assumed she was responsible. |
| 20 | Q | Okay.  And you have been terminated by Judge |
| 21 | | Gordon? |
| 22 | A | Yes. |
| 23 | Q | And Ms. Turner has been terminated by Judge |
| 24 | | Gordon? |
| 25 | A | Yes. |

154

1    Q    Are you aware of any disciplinary action that

2  has ever been taken against any black employee there?

3    A    No, not to my knowledge.

4    Q    So if I tell you that seven white employees

5  were terminated by Judge Gordon, you wouldn't be in a

6  position to dispute that?

7    A    No.

8    Q    Do you know anybody who has resigned as a

9  result of Judge Gordon?

10    A    Yes.

11    Q    Who has resigned?

12    A    Kim Phillips and Cheryl Moray.

13    Q    Anyone else?

14    A    I am trying to think.

15    Q    Any idea about Debbie Irby?

16    A    Debbie resigned about the same time that Donna

17  got terminated.

18    Q    So, so far, that is ten people that under

19  Judge Gordon's tenure were either fired or resigned?

20    A    Right.

21    Q    And all of them are white?

22    A    Yes.

23    Q    Do those numbers trouble you?

24    A    Yes, they do.

25    Q    Did something happen to cause you to get

155

1    suspended for ten days?

2          A     Yes, it did.

3          Q     Can you tell us about that?

4          A     The alleged incident occurred -- we were still

5    in the old office, which is the Miracle Finance

6    Building.  So I am not sure if it was late December of

7    2003, or if it was early January of 2004.  I was working

8    downstairs at the front window.  A gentleman came in, a

9    defendant, and asked to speak with me in particular.  I

10   didn't know him from Adam.  I told him that he was

11   speaking with Mary Beth.  I told him that was myself.

12   He said, Well, I need to go about getting my tow money

13   and bond money back.  I said, for what?  He said, well,

14   I was falsely arrested.  I looked him up in the

15   computer.  And I told him, instructed him, that he

16   needed to go to the City Clerk's office and advise them

17   that he was falsely arrested and that he needed to file

18   a claim.  That is all I did.

19         And then Lavera McLain at the time was working

20   downstairs.

21         Q     Somebody said they were falsely arrested and

22   you told him where to go and that is all you did?

23         A     Yes.

24         Q     You are under oath?

25         A     Yes.

156

1      Q     You got suspended as a result of that?

2      A     Yes.

3      Q     Did you get investigated as a result of that?

4      A     Yes, I did.

5      Q     Was there an internal investigation?

6      A     Yes, there was.

7      Q     Police officers called you?

8      A     I got another letter to report over there to

9    internal investigation.

10     Q     Because you allegedly told somebody where to

11   go because of a false arrest?

12     A     Yes.  They said I violated a memo.

13     Q     Is that a criminal matter?

14     A     No.

15     Q     Do you know why the police officers do all of

16   these internal investigations of staff for noncriminal

17   matters?

18     A     I didn't know they did all of this.  If it is

19   City policy, I am not aware of it.

20     Q     I could understand a relationship between the

21   City police and a judge because they work together very

22   closely on the criminal docket and the traffic docket,

23   but why are they used to interrogate internal staff of

24   noncriminal matters?

25     A     I don't know.  I would think that Judge

157

1    Gordon, as the department head, would be able to.

2        Q    Did you tell these police officers anything

3    different than what you just told me and told the Board,

4    when they investigated this?

5        A    Which time?

6        Q    You just told them what happened, that he had

7    been falsely arrested.  Did you tell the police officers

8    anything different?

9        A    I am not sure.  That was back in 2004.  I am

10   not sure of the whole detail to that.

11       Q    When did this incident happen?  Was it in

12   2003?

13       A    I am not for sure.  I do know it was right

14   before we moved into the current location.  So I am not

15   sure if it was right at the end of 2003 or the very

16   beginning of 2004, but we did not have a court

17   administrator at the time.

18       Q    So there was a big gap between you talking to

19   this person and --

20       A    I didn't get investigated until April of 2004.

21       Q    And as a result of this, you got suspended?

22       A    I got suspended for ten days without pay and I

23   got put on probation for two years.

24       Q    Do you think you did anything worth getting

25   suspended for?



158

1      A    No.

2      Q    Are you not permitted to tell a citizen what

3   their rights are?

4      A    I thought I could advise them and instruct

5   them on how to go about doing something.

6      Q    Should they have a right to try to get their

7   bond money back if they are falsely arrested?

8      A    Sure.

9      Q    Who do they go to?  Do they have to hire an

10  attorney for that?

11     A    I don't know.  We just have to send them, I

12  believe, to the City Clerk's office.

13     Q    You know you should have appealed that to the

14  Board, shouldn't you?

15          MR. WHITE:  Objection.  It is a little late

16              for him to be giving legal advice on a

17              charge he didn't even --

18     Q    Did you appeal that to the Board?

19     A    No, I did not.

20     Q    So you just took it?

21     A    Yes.

22     Q    And did you try to be very careful for the

23  next two years?

24     A    Yes, I did.  I would like to say, though, the

25  day I came back from my suspension, about, I think it

159

1  was midmorning of that day, I was called and Nancy

2  Martin, our court administrator at the time, we were

3  both called over to Judge Gordon's office.  I thought,

4  what now, because that has just been the progression.

5  It just seems like it is always something picky or

6  piddley.

7      And she said she just wanted to make sure I still

8  wanted to be employed.  I said, what are you talking

9  about.  She said, now, if you want to quit, you just

10 let me know now.  I said, I am not quitting.  I love my

11 job.  And I told her, excuse my language, I was damn

12 good at it.  And I said, I am not quitting.  She said,

13 You are sure?  You know, if you want to quit, we will

14 just take care of it right now.  But Nancy Martin was in

15 on that.  I felt like she actually wanted me to quit.

16     Q    Knowing what you knew about Lavera and Eunice

17 and nothing happened, do you feel that you have been

18 treated unfairly?

19     A    Yes.  Sure.

20     Q    Did you think there was a double standard?

21     A    Yes.  I also cited, whenever I was in my

22 determination for the April 2004, I cited -- I have got

23 it written down.  I cited a rule out of the personnel

24 rules that talked about practice.  I think it is Section

25 3-10.



1    Q    You cited that?

2    A    I cited that section that talked about

3   practice as far as -- The way I read it is, if there are

4   certain rules and policies and procedures that you have

5   to go by, every City employee should have to follow

6   those.  If you have got some that are not disciplined

7   for things, it would be the assumption to other

8   employees, well, if they can do it and not get written

9   up, then we shouldn't either.

10    Q    Would it be difficult to establish a

11   comparatory if somebody is doing something and not

12   getting written up and somebody else does something and

13   gets written up?  It is not like somehow they got

14   written up and the second time this didn't happen.  They

15   are not getting written up in the first place.  It is

16   difficult to look at a personnel file and establish a

17   comparative, isn't it?

18    A    Yes.

19    Q    But it doesn't mean that somehow race is not a

20   factor in the decision-making process, does it?

21    A    No.

22    Q    So you were trying to be careful.  So what

23   happened with the incident involving the judge's

24   admonition not to talk to a certain person?

25    A    I want to go back.  After I came back from my

161

1   suspension -- I believe it happened after, but it might

2   have been before.  I'm not sure.  I had put in a lot of

3   overtime trying to get the new court system going, and I

4   had worked a lot on that.  I was working the front

5   window.  I had paged a police officer that he needed to

6   be in the courtroom with certain documents ASAP, per the

7   judge.  That afternoon, I believe it was, that officer

8   came into our office, and yes, I raised my voice.  But I

9   advised he should not be here; he should be in the

10  courtroom.

11      Well, when we he got over there, he made the

12  comment about me raising my voice.  Well, Ms. Sellers,

13  said, well, you need to fill this complaint out.  That

14  is what he told me.

15      Q    So he was advised to fill a complaint out on

16  you?

17      A    Yes.

18      Q    This was shortly after you got back?

19      A    I can't remember if it was after I got back or

20  before I left.

21      Q    So you felt that maybe the judge was out to

22  get you?

23      A    Yes.

24      Q    Is that what you are trying to tell the Board?

25      A    Yes.  And I actually spoke -- I asked Nancy, I

162

1    said, do you mind if I page that officer to apologize,

2    because I didn't know that I had done anything.  And I

3    paged him after hours.  I was at home.  I paged him, and

4    he said, Mary Beth, what are you talking about?  He

5    didn't even remember.  I told him what happened.  He

6    said, if I had known that was going to get you in

7    trouble, I wouldn't have filled that out.  But Michelle

8    Sellers handed it to me and said, if you want us to do

9    anything, you have to fill this out.

10        Q    So you have been very careful?

11        A    Yes.

12        Q    The judge made the statement that she had

13   about speaking to a certain employee --

14        A    Yes, she did.

15        Q    -- because of a criminal investigation --

16        A    No.  She said Mary has been put on

17   administrative leave.  She said she didn't know what it

18   was about, but that it had something to do with a

19   ticket.  That is what she told us.  And we were not to

20   have any contact with her.

21        Q    Did you know what it was about?

22        A    No.  I knew from what I read on the computer

23   on one of Ricky Stokes' websites.

24        Q    So you did read that?

25        A    Yes.

163

1      Q    Had you been funneling information to Ricky

2  Stokes?

3      A    No.  We didn't even know who the internal

4  investigator was until we read that.  That told us who

5  it was.  We didn't even know.

6      Q    When the judge made that statement, did you

7  tell the judge, I understand that includes at home and

8  at church and everywhere else?

9      A    Actually, when the statement was made, her and

10 Michelle Sellers both looked at me when they said it.  I

11 asked her why they were both looking at me when

12 everybody else was in the room.  She said, I know that

13 y'all are friends, and I made the comment that everybody

14 in there was friends with Mary.

15     Q    Did you immediately get on the phone with

16 Mary?

17     A    Not immediately, no.  But during this meeting,

18 I was advised by Judge Gordon that I would be

19 responsible for doing her work while she was off.

20     Q    What work was that?

21     A    Issuing alias warrants for people who failed

22 to appear in court.

23     Q    And did you have a need for some critical

24 information?

25     A    Yes, I did.

1      Q    What information was that?

2      A    There is a letter that she does for youthful

3  offenders or for juveniles.  We try not to issue

4  warrants on those, because if they are under-age, we try

5  to do what we call a "show cause letter" to set up a

6  show cause hearing for them to appear in court rather

7  than issue a warrant.  That particular letter was on

8  Ms. Turner's desktop, on her PC, and I didn't have

9  access to that.  And we were told that we could not go

10  in Ms. Turner's office.

11      So when the meeting was over, I asked Ms. Sellers,

12  I said is there a way maybe we can go through IT to get

13  them to retrieve that and put it on my desktop.  She

14  said, Oh, no, we can't go in there.  I said, I am not

15  talking about going in there.  I am talking about

16  letting the computer department retrieve that letter and

17  put it on mine so I can do that.  She said, No, you will

18  just have to find that letter in a case to use.  I said,

19  Michelle, there is no way I can do that.  You would have

20  to know exactly what case would have that document

21  attached to it.  And that is like searching for a needle

22  in a haystack.

23      I advised her, also, that I did not have the time

24  to look for a case on there.  She then walked back up to

25  the front.  I don't know what she did.

1    Q    Let me stop you.  Given some of Ms. Turner's

2    duties, as well as your own, did that put a burden on

3    you?

4    A    Yes.  In fact, in that meeting, I told Sarah

5    Fowler, I helped her with the prisoners every week, I

6    told Sarah, I said, Sarah, there is no way I can help

7    you with the prisoners anymore.  She said, Well, that is

8    okay.  I said, no, you need help.  And the judge advised

9    her to ask somebody to help her.

10    Q    So the letter that would help you process the

11    stuff that you had do by taking over her job would help

12    make it easier in light of how hard your burden was?

13    A    To do that letter.

14    Q    Did anyone else in the office know how to do

15    it or where it was or anything?

16    A    The only way -- well, Mary had it on her

17    desktop.  But as far as anybody else wanting -- When

18    Michelle came back into my office, she advised me that

19    some ladies graciously said they would find a case with

20    that letter.  I knew that was just about impossible,

21    unless you knew for certain which case or defendant had

22    that letter attached to the case.

23    Q    Did you contact Ms. Turner?

24    A    A couple of hours later, I called Mary and I

25    asked her specifically, do you know where that format --

166

1    because I actually pulled up Microsoft Word and I looked

2    in there to see if I could find this particular format

3    to do this letter.  She said, no, Betty King did that

4    back when she was court administrator.

5        Q    Let me stop you.  Did you feel at the time

6    that you were violating the policy that was stated?

7        A    Not to ask her a business question.

8        Q    Did you think you were being insubordinate?

9        A    No.

10       Q    Did you want to do something to get yourself

11   terminated?

12       A    No, I would not.

13       Q    So it was a business-related question that you

14   asked her?

15       A    Right.

16       Q    So you meant to communicate with her for a

17   business-related question?

18       A    Yes.  Yes.  And that was the extent of the

19   conversation.

20       Q    If you hadn't told the police officer about

21   this, they wouldn't have known about this, would they?

22       A    That's right.

23       Q    So you said, I did make one contact for a

24   business-related thing?

25       A    Keith Gray asked me specifically, have you had

167

1    any contact with Mary Turner.

2        Q    And you said yes?

3        A    I said, yes.

4        Q    You could have lied?

5        A    Sure, I could have.

6        Q    But you didn't?

7        A    But I didn't.

8        Q    Did you think that somehow this little minimal

9    contact would warrant you being terminated?

10       A    No.

11       Q    Do you feel that insubordination is a word

12   that is so broad and shouldn't there be intent

13   associated with that insubordination?

14       A    I believe so, yes.

15       Q    Intent to willfully defy someone?

16       A    Yes.

17       Q    Now, I guess when they decided to terminate

18   you for that, there was some investigation going on

19   about this other ticket; correct?

20       A    Yes.

21       Q    Now, you don't dispute that you put "void" on

22   that ticket, do you?

23       A    No, I don't.

24       Q    Now, do you remember?  This was several years

25   ago?

168

1      A      Right.

2      Q      After several years, would that ticket,

3  whatever you put on the transmittal, have any meaning to

4  you or anything that would cause you to remember that?

5  Did it have any special anything?

6      A      No.  I told Officer Etress at the time that I

7  couldn't remember what happened two and a half years

8  ago.  I swear to a lot of tickets and complaints.  I

9  don't remember specifically what happened to that.

10     Q      If the officer said that he gave the okay for

11  the ticket to be retrieved, that could be a basis for

12  triggering that void?

13     A      Yes.

14     Q      Did you intend to fix somebody's ticket at the

15  time you did that?

16     A      No.

17     Q      Did you think anything of it at the time?

18     A      No.

19     Q      This was several years earlier?

20     A      Right.

21     Q      And it somehow is just getting discovered?

22     A      Right.

23     Q      Were you and Ms. Turner involved in deciding

24  to fix tickets?

25     A      No.

169

1       Q       You are under oath.

2       A       I understand.  I would not do that.

3       Q       Literally, you don't remember all of the

4    circumstances surrounding that ticket, do you?

5       A       No, I do not.

6       Q       Do you know if you ever saw the ticket itself?

7       A       Gosh, no.  I don't recall.  My signature was

8    not on that ticket, so I didn't even have it to sign.

9       Q       And, yet, if the ticket was recalled by the

10   police, the system should indicate that it is void;

11   correct?

12      A       Voided tickets are not keyed in the system.

13      Q       So it shouldn't be in the system?

14      A       No.

15      Q       And I guess it wasn't in the system?

16      A       No, it was not.

17      Q       So the void only reflects the reality, that

18   the ticket was no longer in the system?

19      A       Right.

20      Q       So there is no lying with the void, it just

21   reflects reality?

22      A       Right.

23      Q       And you weren't part of the process to bring

24   that ticket out of the system?

25      A       No.

170

1       Q    If anything, you reflected the reality?

2       A    Right.

3       Q    Did you think at the time you did that that

4   two and a half years later, you would be getting into

5   trouble for that?

6       A    No.

7       Q    Have you been fixing tickets for anybody?

8       A    No.

9       Q    Did you know the police officers have the

10  discretion of giving tickets or not?

11       A    Yes, they do.

12      Q    Unfettered discretion?

13      A    Yes, they do.

14      Q    Based on friendship?

15      A    Yes.

16      Q    How they feel that morning?

17      A    Yes.

18      Q    It is not fair that people who don't get their

19  tickets fixed by the police officer's discretion has to

20  pay?

21      A    Right.

22      Q    Others don't?

23      A    Right.

24      Q    Police officers, perhaps, shouldn't have that

25  discretion; right?

171

1      A      Right.

2      Q      But they do?

3      A      Yes.

4      Q      And judge's are allowed discretion to, aren't

5    they?

6      A      Yes, they are.

7      Q      They can treat similarly situation criminal

8    defendants differently?

9      A      Yes.

10      Q      For all sorts of reasons?

11      A      Yes.

12      Q      And it happens, doesn't it?

13      A      Yes.

14      Q      Two people could appear before her, same

15    charge, one could go to jail, the other one doesn't?

16      A      That's right.

17      Q      A lot of discretion; there is a lot of

18    unfairness in the world, but it happens?

19      A      Correct.

20      Q      Do you think you did anything to warrant you

21    losing your job and going through the pain that you have

22    gone through?

23      A      No.  In fact, I felt like if I knew -- I felt

24    like they knew that I was busy and had a lot of work

25    anyway.  And with the addition of Mary's work, I felt

172

1    they were either maybe trying to see if could do the

2    work and maybe catch me on not doing it, but I kept it

3    caught up.  I knew I needed all means to be able to do

4    the job.

5         Q    As you sit there in the hot seat, can you

6    think of when you became a bad employee?

7         A    I didn't start having problems until I went to

8    work for Judge Gordon.

9         Q    Did you consider yourself a bad employee?

10        A    No.

11        Q    Can you think of anything you have done to

12   warrant you losing your job?

13        A    No.

14        Q    Do you want this Board when they look at this

15   case to consider that?

16        A    Yes, I do.

17        Q    You don't have a vendetta against the judge,

18   do you?

19        A    No, I don't.

20        Q    You don't want her to lose her job, do you?

21        A    No.

22        Q    You are not advocating that?

23        A    No.

24        Q    You want some fairness?

25        A    Exactly.

1  MR. JAFFREE:  I have nothing further of this
2  witness.
3  EXAMINATION
4  FURTHER BY MR. WHITE:
5  Q  Ms. Brackin, is it a fair assessment of all
6  your testimony up to this point, that the decision to
7  terminate you didn't have anything to do with what you
8  did, it was motivated by racial discrimination by Judge
9  Gordon?
10  A  Rephrase that.
11  Q  Are you saying that this had to do with your
12  race rather than your conduct?
13  A  I am not disputing that I did not call her.  I
14  am just saying that for the reason why I called her, I
15  don't feel like should --
16  Q  Let me ask you one more time.  What I am
17  asking you is:  Do you believe the decision to
18  discipline you was motivated out of race rather than
19  what you did?
20  A  Out of race, no.
21  Q  Do you think it was out of anything other than
22  the fact that you disobeyed deliberately?
23  A  I didn't deliberately do it.  I did it to the
24  fact that I needed help to be able to do that job.
25  Q  You accidently did it?

174

1      A      No.   I knew that she was the only one that did

2  that particular job and had that letter.

3      Q      So you deliberately called her?

4      A      Yes.   To find out where the letter was so that

5  I could do it.

6      Q      And are you saying that Judge Gordon made an

7  exception to you and everybody else in that room for

8  when you saw fit to follow her instructions and when you

9  didn't?

10      A      No.

11      Q      Did she tell you when you thought it was okay,

12  go ahead?  Did she say that?

13      A      When she did what now?

14      Q      When she told you not to have contact with

15  Mary Turner, did she say, except when you think you need

16  to?

17      A      No.

18      Q      Did you go ask her if you could?

19      A      No.

20      Q      Why not?

21      A      I didn't think there would be any harm in

22  asking a business question.

23      Q      She told you not to and you had all of this

24  discussion with all of these other people about it, but

25  you didn't go to her?

175

1       A    With all the other people?  What do you mean?

2       Q    About what you needed and where it was and

3    Michelle and how impossible it was to go look through

4    files?

5       A    Right.

6       Q    But you didn't go ask the judge, Judge, can I

7    go call her because it is impossible and nobody else can

8    help you?  Did you ask her?

9       A    No, I didn't.

10      Q    You did not?

11      A    No.

12      Q    Isn't it true or are you aware that Mary

13   Turner disputes your testimony as far as how many times

14   you talked to her?

15      A    I have seen Mary at Lafayette Street Church,

16   yes.

17      Q    And do you know she says it was more than one

18   time that you called her?

19      A    If it was, it was after hours.

20      Q    After hours you talked to her.  Tell us about

21   the other times you have called Mary Turner.

22      A    What do you mean?

23      Q    I mean, you talked about one time?

24      A    I talk to her, yes.

25      Q    Tell us about the other times that you talked

176

1    to Mary Turner that you didn't answer before?

2        A    What are you talking about?

3        Q    Tell us any other time you talked to Mary

4    Turner that you didn't tell us about.

5        A    I don't know the result or recall the

6    conversation.

7        Q    Don't recall?

8        A    No.

9        Q    Now, you have also said, when you were talking

10   about all of this racial preference, I think you said

11   Mr. Jaffree testified, I believe that there were ten

12   white employees that left employment since Judge Gordon

13   has been there; is that right?

14       A    I assume.  I don't know for sure, because some

15   people, I was not employed at the time.

16       Q    So that was not your testimony; that was

17   Mr. Jaffree's testimony?

18       A    I believe I had said I did not know of some of

19   it because I was not there.

20       Q    How many --

21       A    I just assumed, because Judge Gordon was the

22   department head.

23       Q    How many white employees have left employment

24   since Judge Gordon came?

25       A    That just quit?

177

1    Q     That quit, got fired, or whatever?  Do you
2    know?
3    A     Approximately nine to ten, that I can think of
4    off the top of my head.
5    Q     Do you know how many white employees she has
6    hired?
7    A     About six that I can remember while I was
8    there.
9    Q     Do you know how many that she has hired?
10   A     I just told you that approximately six or
11   seven that I know of.
12   Q     That you know of.  My question is:  Do you
13   know how many she has hired?
14   A     No, I don't know that she personally hired
15   them.  I just assume that since she is the department
16   head.
17   Q     Do you dispute that she has hired fourteen?
18   A     No.  I don't know.
19   Q     You don't know and you didn't know that she
20   has hired fourteen white employees?
21   A     No.
22   Q     Has she hired fourteen black employees?
23   A     No.
24   Q     Who hired you?
25   A     Judge Gordon.

178

1        Q    Now, do you remember Theron Fondren?  Do you

2  remember that name?

3        A    Yes.

4        Q    How do you remember that name?

5        A    I believe that was the one that was associated

6  with the 2004 incident, I believe.

7        Q    Which incident was that?

8        A    I think 2004.

9        Q    About what?

10       A    I believe he is the one that came in and asked

11  about -- he asked for me, and then he asked about how he

12  would go get his bond.

13       Q    That is the one that wound up, you say,

14  wrongly, but it resulted in a ten-day suspension for

15  you?

16       A    I did not tell him that he was wrongly

17  arrested.

18       Q    I am talking about, you are saying you were

19  wrongly suspended, you were wrongly disciplined?

20       A    Right.

21       Q    And that is the case you were talking about;

22  is that right?

23       A    That is the one I got suspended for, yes.

24       Q    Right.  And you got suspended for ten days on

25  that?

1     A    Yes.

2     Q    Major offense?

3     A    Yes.

4     Q    And you talked about what you say happened?

5     A    Yes.

6     Q    Now, you understand, of course, that there

7 were other witnesses in that case, including

8 Mr. Fondren, who wrote a letter?

9     A    I don't know.

10    Q    You don't know or you did not know that

11 Mr. Fondren wrote a letter saying what you told him?

12          MR. JAFFREE:  Let me object to this.

13               Again, I believe it is --

14          MR. WHITE:  I listened to all of your --

15          MR. JAFFREE:  Show her these documents so that

16               she could testify on them.  You refused

17               to give them to me, and now you are

18               asking her about some documents that you

19               may have access to.

20         MR. WHITE:  It's about her testimony.  I am

21               not asking her about documents.  I am

22               asking about her testimony.

23         MR. JAFFREE:  You are asking her about

24               documents, about a letter that somebody

25               wrote.  I am objecting again for the same

180

1      reason.

2           MR. WHITE:  Are you instructing her not to

3              answer?

4           MR. JAFFREE:  I am objecting for the record.

5           MR. CHAIRMAN:  Duly noted in the record.  It

6              is being recorded.

7      Q    Are you aware --

8      A    I don't recall the testimony that that

9  happened.

10     Q    So you don't dispute the fact that your

11  version of the facts don't match the complaint made by

12  Mr. Fondren?

13     A    I don't dispute it.

14     Q    Now, you say it was wrong, you didn't do

15  anything wrong.  You didn't tell him he was falsely

16  arrested.  Did you tell him that Ann had issued a

17  warrant wrongly?

18     A    I don't recall that, no.

19     Q    You don't dispute that?

20     A    I don't recall that I said that.

21     Q    Are you aware that you told him that Ann had

22  issued a warrant wrongly, and it turned out it was Mary

23  Turner you were talking about that you said it was

24  wrong?

25     A    No.

181

1      Q    You don't dispute that either?

2      A    No.

3      Q    And despite the fact of all this terrible

4  treatment you received, did you appeal the decision?

5      A    No, I did not.

6      Q    Did you make a statement to Gary Coleman

7  during that investigation?

8      A    I believe it was he and Ray Owens that did the

9  investigation.

10     Q    Did you make a statement to Mr. Coleman?

11     A    Yes.

12     Q    Did you tell him you had had no problem with

13  Judge Gordon?

14     A    I don't recall that.

15          MR. JAFFREE: Wait a second. It appears that

16               counsel for the City has documents that

17               he is relying on that I asked for and

18               didn't get copies of and he is

19               cross-examining this witness on these

20               documents. That is an internal

21               unfairness. He has records and he is

22               looking at notes and investigative

23               reports. I asked for the same thing.

24          MR. WHITE: It was handed to me by Judge

25               Gordon. Let the record reflect, the note



182

1              he is referring to was a handwritten

2              note, and I will put it in evidence.

3         MR. JAFFREE:  I don't care who handed it to

4              you.

5         MR. WHITE:  I didn't have it.

6         MR. JAFFREE:  Judge Gordon had it.

7         MR. WHITE:  She just wrote it.

8         MR. JAFFREE:  She had access to this record,

9              this document that exists.

10        MR. WHITE:  And you don't.

11        MR. JAFFREE:  That's right, I don't.

12        MR. WHITE:  That's right.

13        MR. JAFFREE:  That's wrong.

14        MR. WHITE:  It is correct.

15        MR. CHAIRMAN:  Hold up.  I am listening to

16             your objection, Mr. Jaffree.

17        MR. JAFFREE:  See, I haven't had the chance to

18             review these documents.  She is being

19             cross-examined on documents she hasn't

20             seen.  They know these records; I asked

21             for them so that I could go over them

22             with her.  She has never seen these

23             records.

24        MR. WHITE:  And they were refused.

25        MR. JAFFREE:  That's right.  They were

183

1           refused.

2           MR. WHITE:  You have no right to them.

3           MR. JAFFREE:  Never seen these documents, and

4                now she is being cross-examined on stuff

5                she has never seen before.

6           MR. WHITE:  You didn't subpoena them.

7           MR. JAFFREE:  I sent you a letter.

8           MR. WHITE:  You didn't subpoena anything.

9           MR. JAFFREE:  I can't subpoena what I don't

10               know exists.

11          MR. WHITE:  You don't know how to subpoena,

12               okay.

13          MR. JAFFREE:  Fine.  I am sure you would honor

14               the subpoena.

15          MR. WHITE:  I am going to follow the rules.  I

16               know the rules.  It's not my fault that

17               you don't.

18          MR. CHAIRMAN:  Your objection is in the

19               record.  Let's move on, gentlemen.

20     Q    Do you dispute that you told Gary Coleman in

21     April of 2004 that you had no problem with Judge Gordon?

22     A    I believe it was -- in April of 2004, I don't

23     know.

24     Q    During the investigation of the Theron Fondren

25     matter where you were disciplined?

184

1     A    I don't know.   I don't recall what all was

2   said in that interrogation.

3     Q    Did you ever make a complaint about any

4   treatment that you received from Judge Gordon?

5     A    Complaint to whom?

6     Q    Any complaint?

7     A    No.

8     Q    Do you know how many magistrates have keys to

9   the judge's office?

10    A    No.

11    Q    Do you know that there is one?

12    A    I don't know.

13    Q    Do you know who that is?

14    A    No.

15    Q    Do you know that it is Sarah Fowler?

16    A    No, I don't.

17    Q    Do you know that Sarah Fowler is white?

18    A    Yes, I do.

19    Q    How many of those people that you talked about

20   Judge Gordon firing have had drug raids at their house?

21    A    I believe Allison Davis was the one that

22   people had said something about drugs.

23    Q    You didn't mention that when you were asked a

24   while ago about these racial reasons for firing white

25   employees, did you?

185

1        MR. JAFFREE:  Let me object.  She wasn't asked

2            that.

3    A    I wasn't asked.

4    Q    You didn't volunteer it either, did you?

5    A    No.

6    Q    All you talked about was all the white people?

7    A    That is what I was asked.

8    Q    Right.  And you don't know why -- you knew

9 there was a drug raid on -- who was it?

10        MR. JAFFREE:  Object.  She didn't know.  She

11            said she just heard.

12    A    Allison.

13    Q    You heard?

14    A    Yes.

15    Q    Do you have any reason to dispute that that

16 was why she got fired?

17    A    No.

18    Q    Do you know of any employee that was fired

19 wrongfully?

20    A    Not to my knowledge.

21        MR. WHITE:  That's all.

22            EXAMINATION

23 FURTHER BY MR. JAFFREE:

24    Q    Excuse me, were you fired wrongfully?

25    A    Yes.  I am sorry.

186

1       Q    Do you think Nancy Martin was fired
2   wrongfully?
3       A    Yes, I do.
4       Q    Do you know the details surrounding all of
5   those people who got terminated?
6       A    Not all of them, no.
7       Q    Are you familiar that, until recently, white
8   people didn't think they were subject to discrimination?
9   Were you aware of that?  You know, most white people
10  don't think, I am being discriminated against by black
11  people?  It is sort of a new venture that came about
12  basically with --
13          MR. WHITE:  I am going to object.
14          MR. JAFFREE:  I am trying to find out what she
15              knows.
16          MR. WHITE:  No, you are not.
17          MR. JAFFREE:  I am trying to find out what she
18              knows.
19          MR. WHITE:  I want you to do that.
20          MR. CHAIRMAN:  One moment.  Mr. Jaffree, if
21              you want to ask her what she knows, you
22              may ask her that, but don't put words in
23              her mouth.
24      Q    Do you know that basically that blacks have
25  been admitted into schools over better qualified whites?

187

1  The concept of somehow reverse discrimination didn't

2  exist; did you know that?

3      A    No.

4      Q    If, in fact, there is preference shown to

5  black employees on a whole host of levels and this

6  preference is not shown to white employees, do you know

7  that that is discrimination?

8      A    No.

9      Q    When you are asked if you think you have been

10  discriminated against, has preference been shown to you?

11      A    No.

12      Q    Has preference been shown to black employees,

13  as far as you know?

14      A    Yes.

15      Q    Do you realize that is discrimination?

16      A    I do now.

17      Q    So whether you realize you can be

18  discriminated against is beside the fact --

19          MR. WHITE:  You have got somebody out here

20              recording the proceedings.

21          MR. CHAIRMAN:  You cannot record, gentlemen.

22          MR. STOKES:  I am not recording.  I am

23              dialing --

24          MR. WHITE:  He is sticking a camera phone in

25              the door.  I am going to ask that a



188

1              uniformed police officer instruct him to

2              stay out of here with his camera.

3      MR. STOKES:  I am not taking pictures, boy.

4      MR. WHITE:  You are not anymore.

5      MR. CHAIRMAN:  Lenn.  Lenn.  Let's go on,

6              gentlemen.  If we have to close the

7              hearing, I will close it.

8      MR. WHITE:  Please, sir.  He is standing there

9              with a video phone taking pictures right

10             there.

11     MR. STOKES:  I am hitting redial to use a --

12     MR. CHAIRMAN:  Let's close the door.

13     MR. WHITE:  We are stopping you, buddy.

14             (Thereupon, Mr. White closes the door.)

15     MR. CHAIRMAN:  Lenn.  Lenn.

16     MR. JAFFREE:  Let me, for the record, object

17             to closing the doors to the press.

18     MR. CHAIRMAN:  I am not closing the doors to

19             the press.

20     MR. WHITE:  The press is here.

21     MR. CHAIRMAN:  They can come in, but I am not

22             going to have anyone standing --

23     MR. JAFFREE:  I understood this was a public

24             hearing, open to the public.

25     MR. CHAIRMAN:  It is open.  Go ahead, Mr.

190

1          but you shouldn't tell her how she feels.

2     Q    There is a provision in the law that deals

3   with arbitrary treatment.  Do you feel you have been

4   treated arbitrary?

5     A    Yes.

6     Q    Unfairly?

7     A    Yes.

8     Q    And in a petty manner?

9     A    Yes.

10         MR. JAFFREE:  No further questions.

11         MR. WHITE:  No questions.