**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NANCY MARTIN and,** | ) | |
| **MARY BETH BRACKIN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:05-CV-1172-MEF** |
| | ) | |
| **CITY OF DOTHAN and JUDGE** | ) | |
| **ROSE EVANS-GORDON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' RESPONSIVE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiffs' agree that this is a reverse discrimination action brought by two white former employees of the City of Dothan's Judicial Department. However, with respect to one of the Plaintiffs, Nancy Martin (Martin) this is a reverse discrimination with a twist. One of the participating events which contributed to, if not the cause in fact, of Martin's unlawful employment termination was a claim that she had been discriminating against two African-American employees of the City's judicial Department.

Plaintiff, Mary Beth Brackin (Brackin) was employed as a City Magistrate, and Plaintiff Martin was employed as the Municipal Court Administrator. In the case of

Brackin, this action is a straight reverse discrimination action coupled with free speech and free association claims. Cotemporaneous with Defendants filing their dispositive motion Brackin    filed a motion seeking partial summary disposition on some of her claims. To the extent that the issues overlap in the two pending motions they will be addressed below.

The Martin facts are somewhat unique but none-the-less credible. Her case will require a departure form the normal approach to analyzing employment discrimination issues. Martin, a white Administrator, was hired by a black Department Head (Gordon) to discipline and run roughshod over the white, but not the black, Judicial Department employees under her charge. When she demonstrated reluctance   to apply one set of rules for the white employees under her charge and a different set    for the black employees, she was summarily discharged.   The catalyst for this discharge was the merging of three events, Martin's changing two black employees job assignment; her discovery of their joint involvement in the wrongful arrest and subsequent cover-up of a defendant and her reporting the same to Gordon; and,  the two black  employees' decision, encouraged by Gordon,  to advance discrimination charges against her. All three events occurred within days of each other. Martin's discharge followed immediately thereafter. Indeed, as discussed below, each of the adverse administrative actions taken by Gordon against or involving Martin centered on her (Martin's) interaction

with two black Magistrates employed in the Judicial Department.

At a minimum, both Plaintiffs' claims create substantive factual issues which are not grist for the summary judgment mill.

## II. <u>STATEMENT OF DISPUTED FACTS</u>

A. <u>Nancy Martin's Facts</u>

In the fall of 2003, Martin noticed an advertisement and applied for a posted position of Administrator for the City of Dothan. (Martin's depo p. 68). The ad stated that the position would involve overseeing the Municipal Court's Magistrate's office, supervising Magistrates, Clerks, processing traffic tickets, collecting fines and other assorted administrative duties (id at 68-69).

In December, 2003 Martin attended the first of two formal interviews for the position. During the initial interview Municipal Judge Rose Evens-Gordon (Gordon), who is African-American, warned Martin that there were three Magistrates then employed with the City whom she would have to watch out for. They would attempt to sabotage her as they had attempted to sabotage her (Gordon). These Magistrates were not identified at the time but two of them were described as the principals and the third identified as a go alone follower. (Martin's depo pp. 85-87, Martin's Affidavit at ¶ 6 and 9; Gordon's depo pp. 169,171,177).

Because of the unsatisfactory pay arrangement and the threat warnings, Martin initially refused to accept the position after it was offered to her. However,

Gordon's administrative assistant contacted Martin and informed her that the City had agreed to raise the salary range for the position. Martin then reconsidered and accepted the position. (Martin's depo p. 100-104 Martin's Affidavit ¶ 10).

There was a one month lag between the time that Martin got placed on the payroll and the time that she actually started working on the job. This was necessary because Martin had to give notice to her then current employer. Gordon desired her to attend computer training which was to take place prior to her actual start date. This is why she got placed on the payroll before she actually started working. (Martin's Affidavit at ¶ 15; Martin's depo p.104-107).

After Martin accepted the position, she got a commitment that she would be permitted to do anything that was reasonable to get the Magistrate's office back in order, and that Gordon would back her 100%. That she (Gordon) would not interfere with her management of the office. (Martin's depo p. 87; Gordon's depo pp. 91-92,100).[1]. Gordon had given Martin predecessor, Betty King, African-American, complete discretion on how to run the  Magistrates office (Gordon depo p. 161).

        11    Q.  Well, when you have an administrator, do you
        12        sort of allows them discretion to make
        13        decisions as to what to do?
        14    A.  Yes.

---

[1] This would appear to not be a disputed fact (see |Gordon's depo pp 91-92, 100 ) but as reveled below Gordon control every meaningful aspect of Martin's office and Martin had to pre-clear all disciplinary action with Gordon.

```
15   Q.   Is that true independent of who happens to be
16        functioning as the administrator at any
17        particular time?
18   A.   Yes.
19   Q.   So you generally don't second guess what the
20        administrator is trying to do?
21   A.   No.
p102
5    Q.   Well, the decision with respect to discipline,
6         a subordinate employee, and you and the
7         administrator differ on what discipline should
8         be netted out, who would generally prevail in
9         those disagreements.
10   A.   I -- generally, absent any -- I would let them
11        do it, because they're over there with them,
12        they know the facts.  They know, you know,
13        what's going on.  And I can't imagine that I
14        would, you know, not defer if there was just a
15        -- if there wasn't a problem.
```

(Gordon's depo pp 100, 102)

Prior to her actual start date (on or about February 16) on  or about February 13, 2004 Martin had a private meeting with Brackin, who in addition to providing her general information about the Magistrate's office, also provided the following negative information on the white Magistrates then employed  in the Judicial Department:

```
4    Q.   Did she identify these three people at this
5         time?
6    A.   Yes.
7    Q.   And who were the three?
8    A.   Mary Turner, Mary Beth Brackin, and Sarah
9         Fowler.  But it was in a subsequent meeting
10        before I started that she went over -- the
11        Wednesday before I began work on, I believe,
12        February the 16th, the judge had asked me to
13        come in.  And we sat down, and she began to
```

14      tell me something about each magistrate.

15         And she started with Mary Turner.  And she

16      told me that Mary Turner was a big

17      troublemaker, that she kept something going in

18      the magistrates' office at -- all the time,

19      that she had had an incident with Kai Davis

20      recently, which is one of the reasons -- the

21      big reason that she didn't have an office.

22      She had a cubby hole, and it was punishment.

23         Then she went on to say that her

0096

1      counterpart was Mary Beth Brackin, who they

2      were friends.  She said that Mary Beth had

3      been -- recently created a situation for the

4      City; supposedly had advised a defendant that

5      if he had an issue with the City, that he

6      should take it to the city clerk.  Said that I

7      would have to review that material, that

8      incident, after I started and would have to

9      write her up disciplinary action.

10         Then she said Sarah Fowler is the one that

11      is the follower, that she would never

12      instigate anything on her own, that she wasn't

13      strong enough to stand up to Mary Beth and

14      Mary Turner, and she just went along with

15      them.

16         She told me about Mary -- I'm sorry --

17      Michelle Bryan.  She said she was very young,

18      very pretty, was divorced, socialized a lot on

19      the telephone, and had police officers in her

20      office a lot socializing, and was dating

21      several police officers, and that I would

22      really have to cut down on her socializing.

23         She then told me about Valarie Savage, a

0097

1      friend of Michelle Bryan's.  Said that Valarie

2      had a very poor attitude, was -- had

3      previously worked for Judge Steensland at the

4      Houston County Court, and had been let go

5      there.  She told me she had been sleeping with

6      prisoners while employed at Houston County and

7      could possibly be doing the same thing here at

8      Dothan.  She told me I would have to watch out

9      for her, that she, too, could cause me a lot

10      of problems, very outspoken.

```
11          She then told me about Ann Baxter who she
12      said was -- had a problem balancing her money,
13      that she had recently come up $500 short in
14      her money drawer.  And the judge said she
15      believed that Ann had stolen the money, and
16      she didn't know why because Ann had inherited
17      money; she was rich and owned a real estate
18      company.  And that was another incident that I
19      would have to be involved in the disciplinary
20      action.  And she would get those -- that
21      information to me at a later time.
22          And she identified -- excuse me -- she
23      identified all of these magistrates at a later
0098
 1      time.  I found out that they were all white.
```

(Martin's depo pp. 95-98, Martin's Affidavit at ¶¶ 22-30)

Gordon generally disputes that this conversation occurred, or if it occur, it was miscast by Martin. Gordon admitted, however, that if she told Martin anything, it would have been about all Magistrates (Gordon's depo p. 182). She denied that she told Martin that Ms. Michelle  Bryant had been dating several police officers, but added that it was common knowledge (id at 184-185) She expressly denied that she stated that Valerie Salvage had problems with her former Judge employer, or that she slept with prisoners (id at 189) However, Gordon stated "if I was trying to give her an overview of the office, I might have said some of those things" (id at 196).

Gordon had a different assessment about the two black Magistrates employed at the time:

```
 2      Then she told me about Eunice Knight and
 3      Lavera McClain.  She said that Eunice was very
```

```
4        quiet, basically stayed in her office and did
5        her work and didn't cause any problems.
6            And then Lavera McClain, she said that she
7        trusted Lavera, that -- to never -- that she
8        would never sabotage her as the others did.
9        She said Lavera worked very hard handling all
10       of her duties, and that Eunice and Lavera
11       would be very helpful to me and I should ask
12       for their help.
```

( Martin's Depo p. 98, Martin's Affidavit at ¶ 29-30)

Almost immediately upon Martin's hire, Gordon directed her to discipline two white Magistrates, Mary Brackin and Ann Baxter, both of whom had allegedly committed offenses prior to Martin's tenure.( Martin's depo pp. 178, 186 and 188; Martin's Affidavit ¶¶ 34-36). In addition to Mary and Ann, during Nancy's nine month employment, she was directed by Gordon to discipline Michelle Bryant, for misplaced files (Martin's depo p. 136; Martin's Affidavit ¶¶ 87-89), and after Nancy sent a disciplinary memo, Gordon directed her to do a follow-up more severe disciplinary notice (id at 138 id at 89); Mary Turner and Ann Baxter for raising their voices to loud in a hall-way ( id at 142). Despite the need to do so, Gordon never permitted Nancy, save one occasion[2], to discipline the black Magistrates. (Martin's depo p 161). Premised sole upon what the Plaintiffs now know, in a short five years Gordon has caused to be disciplined (in most cases the discipline resulted in termination) the following white members of the Judicial Department two (2) Administrators: Donna Nicholson and Nancy Martin; nine ( 9) Magistrates:  Kevin

---

[2] On one occasion to be discussed below Gordon reluctantly agreed to permit Martin to write up Eunice for insubordination but she (Gordon) cautioned her that the write-up would lead to a claim of racial discrimination.

Sorrels, Allison Davis, Patty Kindberg, Kim Phillips, Cheryl Moray, Mary Turner, Mary Beth Brackin, Ann Baxter, and Michelle Bryan; ; and**,** one (1) clerk Debbie Irby.( Martin's Affidavit at ¶ 40, Gordon's depo pp. 138,141,155, and156) During this same period Gordon has steadfastly refused to permit, or has strongly discouraged, the discipline of any black magistrate,  regardless of reasons ranging from rudeness to the public and  fellow staff members, insubordination to several  wrongful arrest of citizens. (Martin's Affidavit ¶) ¶) 70-80).

Tensions first surfaced during the latter part of May 2004 when Martin came to appreciate the lengths that Gordon would go to protect the minority Magistrates. It was time for Lavera McClain's, African-American, annual evaluation. Gordon approached Martin and instructed her to perform the evaluation. Martin was uncomfortable   with Gordon's demand because she had not had the opportunity to  observe McClain for the full year due to her ( Martin's ) limited tenure. However, she explained to Gordon that her evaluation would be based soley upon the observations that she had made from the onset of her employment. (Martin's depo pp. 195, 205 Martin's Affidavit ¶¶ 43).

After McClain's evaluation was completed, and given to Gordon, Gordon summoned Martin and insisted that the evaluation be redone. The rating scores needed to be raised   sufficiently to elevate the composite score so that McClain would receive a satisfactory rather than an unsatisfactory ratings ( id at 199-202, Martin's Affidavit ¶¶ 46-52). Gordon explained to her that the unsatisfactory rating

would not entitle Lavera to an annual raise. (id at 203-204). When Martin expressed dissatisfaction with redoing the evaluation Gordon reminded her, in no uncertain tones that she (Martin) was still on probation and subject to immediate dismissal. (id at 202, Martin's Affidavit at ¶ 50). This was perceived by Martin as a, "change it or else" threat. (id at   207, Martin's Affidavit at ¶ 50). On May 28, 2004, Martin changed Lavera's evaluation to reflect a satisfactory rating (id at 203, Exhibit "A"). The Judge signed this evaluation on June 8, 2007.[3]

    **208**
9    Q.   Can you tell from looking at Defendants'
10         Exhibit Number 16 which areas you changed?
11   A.   I changed Task 2.
12   Q.   And what is Task 2?
**209**
13   Q.   And Task 2 deals with?
14   A.   "Issuing warrants of arrest or summons by
15         determining probable cause, sets appropriate
16         bond amounts on warrants, and process the
17         warrant or summons to the computer and forward
18         to the police department for execution or
19         service."
20   Q.   What else did you change?
21   A.   In Section 2, I changed number four, Safety
22         Conscientiousness from non-applicable to a
23         two, to a three.  I changed --
**0210**
1    Q.   You felt like she was not safety
2         conscientious?
3    A.   Actually, that's something that's not ever
4         rated for some reason, so I had put
5         non-applicable.  And then changed it to a two
6         to add points as I was requested and then
7         changed it to a three to add enough points to
8         get her to the satisfactory level.
9    Q.   That was the safety issue?
10   A.   Yes.
11   Q.   Anything else you changed?

---

[3] Interestingly  this is the same date that Gordon purportedly sent a critical Employee counseling report to Kai Davis, Personnel Director (Exhibit "C"). More on this memo below.

> 12   A.   I changed number five, Quantity of Work, from
> 13        an unsatisfactory one to a satisfactory two.
> 14        And it -- I think just from looking at this
> 15        copy -- I can't tell for sure but I -- but it
> 16        is evident that I changed those.

(Martin depo pp. 208-210)

Things became progressively worst after the incident with the evaluation. A few days prior to Gordon instructing Martin to perform McClain's evaluation, Gordon conducted Martin's evaluation[4]. (id at 219, Exhibit "B"). This evaluation was greatly positive. Martin was rated "excellent" in five separate areas. The excellent ratings were in Task III: Issues warrants of arrest by determining probable cause, then processes the warrant and forwards to the Police Department for execution; Quality of work; Initiative; Cooperation, and Dependability. All other categories were rated satisfactory, such as observing Municipal court operations. Also marked satisfactory was Martin's dealing with the public. The special comment section recommended no area's where intervention was needed, but provided "Nancy has really hit the ground running and addresses all issues put before her quickly and decisively.

Yet approximately one month after this glowing evaluation, with nothing having transpired but the controversy involving Lavera, Gordon purportedly sent Kai Davis, Personnel Director, an "Employee Counseling Report". In this Report,

---

[4] Gordon and Martin discussed the contents of this evaluation and Martin signed it on April 21, 2004. (Exhibit "B").

(Exhibit "C")[5]  Gordon claims that on or about the same day of the report (June 8, 2004) she counsel Nancy regarding "several area's of concern"[6].  The alleged "area's of concern included " the work atmosphere in the Magistrates office, inability to interact professionally with employees of the City Attorney's office,  the refusal to permit attorneys to file motion in the Magistrates office, disobeyed her directive to withdraw a warrant of a person from Michigan[7], the attitudes of the

---

[5] Exhibit "C" provided to counsel by the Defendant's purport to be more than two pages but you will note form the Bates number Exhibit "C" ends at 0701 and Exhibit ___ starts at Bates number 0702.

[6] Martin emphatically deny that she had a counseling session with Gordon or in any other manner discussed performance problems with her> (Martin depo p.221).

[7] Such disobedience, if it occurred, most certainly would have been insubordination and perhaps grounds for termination. Martin denies that the incident happened (Martin depo pp. 222-223). Gordon couldn't remember any of the particulars including the name of the Defendant who wrongfully had to travel from Detroit and couldn't produce any discovery  related to this event as requested.

    Q.  You saw where she said, issue the warrant?
12  A.  Well, she didn't even have the paperwork.  I
13       put that on there because the paperwork was in
14       the courtroom, so she issued the warrant
15       without the paperwork.
16  Q.  And when was this?
17  A.  I don't know.
18  Q.  Well, since you got the -- you got documents
19       to support that.  You could --
20  A.  We didn't -- we can't remember his name.
21  Q.  So you just --
22  A.  Again, 17,000 cases.
23  Q.  Let me ask you this:  Do you have a statement
0415
1       from Kathleen Nemish on this incident?
2  A.  No.
3  Q.  Do you know if your attorney have a statement
4       from Kathleen --
5  A.  No.
6  Q.  -- on this incident?
7  A.  They just complained.
8  Q.  Do you know if Thomas Brantley have a
9       statement --
10  A.  No.
11  Q.  -- concerning this incident?
12       What about Doug (sic) Yarbrough?
13  A.  No.
14  Q.  You got a statement from Doug Yarbrough?
15  A.  No.

employees toward each other, no dockets issued during the time that Mary Beth was out of the office, and the negative performance evaluation of Lavera ( which incidentally was signed off on  by Gordon on the same date that she drafted  the "Employee Counseling" memo).

Though mostly conclusionary, the "Employee Counseling" doesn't pass the credibility test nor does it make recommendations for improvement as required by the regulations.[8]   Martin signed Lavera's  evaluation on May 28, 2004, the day after she met with Gordon to discuss revision of the evaluation. ( See Exhibit "A" and  ).  Gordon remembers her meeting with Nancy to discuss the revision of

---

16   Q.  Do you anticipate getting a statement from
17        Derek?
18   A.  I haven't thought about it.  I didn't write
19        her up for that.  I didn't discipline her for
20        that.
21   Q.  What about Thomas Brantley?
22   A.  I didn't discipline her for any of these
23        infractions because I could not remember the
0416
1        names of them.
2    Q.  And did you talk to her about --
3    A.  I recommended her termination for a totality
4        of circumstances.  So if you want to strike
5        these out, we've got other incidents.
(Gordon's depo pp. 414-416)

[8] Dothan's Personnel Rules and Regulations at Sec. 2-80(1) provides **:**  Appointed or promoted employees: Every employee appointed or promoted to a position in the Classified Service or to a common laborer position, shall automatically be placed under probationary status and required to serve a working test period of not less than six (6) months nor more than twelve (12) months. The length of the working test period or probationary status shall be determined by the class of position and training period established for the position. During this working test period, periodic performance and other job related evaluations showing employee progress shall be made, and the employee shall be kept informed of individual progress. Employees who prove unsatisfactory during the working test period may be removed from the position by the Appointing Authority at any time during this period, subject to the approval of the Personnel Director; however, **inadequate job progress and/or deficiencies must be pointed out to the employee and the employee must be given the opportunity to improve and/or correct the inadequacies and/or deficiencies before being removed from the position.** The Personnel Director may remove an employee during a working test period if the employee was appointed, promoted or demoted without prejudice as the result of fraud or error. The removal action is usually final. (emphasis added).

McClain's evaluation but she doesn't recall when any of the events referenced in the "Counseling memo "occurred or whether they occurred before or after Martin's evaluation. (Gordon's depo  pp. 390-399). More strikingly Gordon admitted that none to the charges that she made on June 8 memo , or the July 8 memo which followed  warranted discipline. (Gordon depo p.415).

```
23   Q.  Did any of this happen before you did Nancy's
0408
 1       first evaluation?
 2   A.  I don't know.
 3   Q.  Could any of this -- could this attitude have
 4       reflected itself when you did Nancy's first
 5       evaluation?
 6   A.  I don't think so.
 7   Q.  So she changed?
 8   A.  I don't know.
 9   Q.  Well, either she changed or she didn't?
10   A.  I don't remember.
11   Q.  You don't remember whether she changed.
Okay.
12       Now, do you remember any other incidents
13       involving Ms. Ott in addition to --
14   A.  Not specifically.
15   Q.  Nothing specific?
16   A.  Ms. Ott does, though.
17   Q.  Ms. Ott does but you don't.  Okay.  Fine.  All
18       right.
19          Now, let's talk about these other
20       attorneys.  Were there numerous attorneys that
21       have complaints of Nancy?
22   A.  Not numerous.  One, two, three, four.
23       Everybody was complaining that she wouldn't
0409
 1       let them file stuff, and she wanted them to
 2       wait in line until their names were called and
 3       she wouldn't give them a ticket.
`
(Gordon's depo pp. 407-409)
```

Gordon did not share a copy of the "Employee Counseling" with Martin. None of its contents warranted either a disciplinary or written warning. This in spite

of Gordon's own admission that she wouldn't accept complaints not in writing—it cuts down on the ying yang (Gordon's depo pp 221-222).    None of the few principals named in the report filed a complaint. ((Gordon's depo pp.383-384 390, 392, 394, and 403).  Except for giving low marks to Lavera, Martin disputes, all of items in the report (Martin depo pp, 149, 154-155, 166, 176, 221,-223, Martin's Affidavit at ¶ 53). The following litany between Martin and counsel during her deposition goes far in explaining Martin's low markings on Lavera's evaluation:

```
22    Q.   So you were new to the job, learning the job,
23          and you had a chance to evaluate her less than
0195
 1          two months, and you gave her an unsatisfactory
 2          evaluation?
 3    A.   Right.
 4    Q.   And can you tell me why you did that?
 5    A.   Because she wasn't performing satisfactorily.
 6          And, actually, first, I told judge that I
 7          didn't feel I should be evaluating her because
 8          I had not been there the full year that she
 9          was being evaluated for.  The judge insisted
10          that I do the evaluation, and I told her that
11          I would evaluate Lavera on my experience and
12          observation of her work.  And that's what I
13          did.
14    Q.   Okay.  And then once you filled that out, who
15          did you give that to?  Did you give that to
16          the judge or --
17    A.   Yes.  I took it to the judge because she has
18          to sign it.
19    Q.   And did you -- do you remember what areas you
20          found her to be unsatisfactory in?
21    A.   Number of errors, quality of work, how she
22          dealt with, I believe, the public.  She was
23          kind of short, at times rude.
0196
 1    Q.   Tell me the times you've seen her interact
 2          with the public?
 3    A.   I can't give you specifics.  She interacted
 4          with the public when she was in the fines
 5          room, in court, at the front window, as a
```

6     backup working the front window, doing
7     warrants at the warrant window.
8  Q.  Had you ever seen any other magistrate be
9     short or rude to anyone --
10  A.  We're not talking -- we're talking about
11     Lavera's evaluation.
12  Q.  That's right.
13  A.  That doesn't include -- I wasn't --
14  Q.  Ma'am, I'm asking you the questions.  I'm not
15     asking you to sit here and argue with me.  I'm
16     asking you --
17  A.  I'm not arguing with you.  I'm just saying
18     that -- we're talking.  You asked me about
19     Lavera's evaluation.
20  Q.  That's right.  And I'm now asking you the
21     question, have you seen any other magistrate
22     be short or rude with the public?
23  A.  Maybe short.  Lavera herself admitted to me
**0197**
1     that she had a tendency to be short at times.
2  Q.  So are you referring --
3  A.  And she has a gruff voice.
4  Q.  Are you retracting the rude or just saying --
5  A.  No.  She didn't admit rude.  I said rude.
6  Q.  Who else have you seen be short with the
7     public?
8  A.  On a really busy day, I've seen Ann Baxter be
9     a little short working the front window.
10  Q.  How about Mary Beth Brackin?
11  A.  Yes, I've seen her on a busy day be short.
12     It's not uncommon sometimes, depending on the
13     circumstances.
14  Q.  Did you give her an unsatisfactory?
15  A.  I don't know.  If I had been provided the
16     documents, I could read it and tell you.
17  Q.  I'm just asking what you remember.
18  A.  I don't remember.  I don't have it in front of
19     me.
20  Q.  What other areas do you contend that Lavera
21     McClain was unsatisfactory in?
22  A.  In handling the bondsmen and bondsmen
23     processes.
**0198**
1  Q.  What had she done to be unsatisfactory in
2     handling bondsmen?
3  A.  She was rude.  I had a complaint filed against
4     her by Rickey Stokes, in writing.  Actually
5     was sent to me, the judge, I believe Jerry
6     Corbin, that she would not assist him with a

```
 7        defendant that was going -- would have been
 8        wrongly arrested had he not have gone to Mary
 9        Beth when Lavera wouldn't assist him --
10         refused to assist him and Mary Beth
11         straightened the matter out.
12   Q.   Assist him in what?
13   A.   Assist him in getting the documents corrected
14         or the right person.  The guy had -- two
15         people had the same name except for the middle
16         name was different and their birth dates were
17         wrong.  And Lavera had issued a warrant
18         against the wrong person.  And she refused to
19         assist Rickey Stokes in figuring it out,
20         getting it right, getting the right person
21         arrested, and the other dropped against the
22         one that she had wrongly issued a warrant
23         against.  She refused to, so he called Mary
0199
 1        Beth and asked her to look up the paperwork.
 2   Q.   Did you witness all of this?
 3   A.   Did I witness all of it?
 4   Q.   Yes.
 5   A.   No.  I had the complaint from him in writing
```

(Martin's depo pp. 194-199).

Most of the entries in the "Counseling memo" were vague and opaque; such as "work atmosphere in the Magistrates office", "inability to interact professionally with employees of the City Attorney's office"; and, "the attitudes of the employees toward each other". The only person identified in the City Attorney's office was Ms. Ott, and no specifics are provided as to how Martin failed to interact with her. Importantly, no performance goals are listed to improve performance.

The claimed failure of Martin to provide a court docket for the two weeks during which Brackin was suspended[9] is hotly disputed. (Martin's depo p. 176) and there is no indication in the record that this was discussed during the conference

---

[9] Brackin's suspension was effective from April 26-May 10, 2004. (See Exhibit "D")

between the two concerning Lavera's evaluation. There was no contemporaneous memorization of this incident, adverse write-up, memorandum, note, or discipline for these alleged failures. Defendants have offered no other evidence, other than Gordon's memory[10], that this failure to schedule cases for two weeks even occurred.

On July 6, 2004 Martin met with Lavera and went over her evaluation. During the discussion Martin informed her that the final evaluation was a do-over:

```
9    A. I told her that that was not the original
10      evaluation that I had done on her, that the
11      judge had requested that I change the original
12      evaluation. And I told her that it was
13      against what I believed in doing, and that I
14      wouldn't do it again. And we went over the
15      whole evaluation. (Martin's depo p. 211).
```

Lavera related the above conversation to Gordon and within two days Gordon shot another memorandum to Kai Davis, this one referred to as a follow-up to her June 8, "Employee Counseling Memo". (Exhibit "D"). This memo doesn't suggest that she had counseled Martin, only that she was disappointed in her progress. Without defining how Martin had not met performance standards alia the June 8, memo, Gordon addressed three new areas of concern.

Without naming names, dates, or suggesting that she solicited from Martin her versions of events, Gordon noted two instances where two Magistrates requesting leave were treated differently. From this singular example Gordon reached the conclusion that Martin treats Magistrates differently when it comes to

---

[10] Gordon admits to having a bad memory (Gordon's depo p. 38)

leave. Gordon next reference a City Prosecutor who had a disagreement with a Magistrate and Martin "took her to task for her remark" Again no time dates or circumstances are stated. This hardly places the Personnel Office on notice of the specifics of the charge.

Finally, Gordon relates that Martin informed a Magistrate (Lavera) that she had been forced to change her evaluation markings. Again there is no mentioned that Martin response was solicited or desired. No improvement criteria were mentioned. Gordon claims that she discussed these issues with Martin. Martin disputes this. (Martin's Affidavit ¶ 54-55).

The bottom portion of Martin's evaluation (Exhibit "B") required her next evaluation be conducted by July 26, 2007.  She was a Type "D" Probation employee whose second evaluation was required to take place within 6 months of the onset of her employment ( See Exhibit "B" which evaluation schedule is mandated by  the  Civil Service Act, Section 9.  Martin's second evaluation occurred two and a half months after it was due and rather than inform her of performance corrections needed it served as notice of her termination.

Martin learned, after her termination and long after the filing of this lawsuit, that Gordon drafted a memo on September 30, 2007 advising that she was terminating Martin.   On September 23, Martin sent a memo to the staff suggesting minor changes she was implementing. (Exhibit "E").  One day later the two black Magistrates, Lavera and Eunice sent a memo dated September 24

and 25 respectively to Martin protesting their job changes. These memos were copied to Gordon. (Exhibit "F" and "G"). On September 27, Martin sent them back a memo explaining the change. ( Exhibit "H").  On September 28, Gordon, without first discussing it with Martin, sent her a memo telling her to make no changes.  (Exhibit "I")  Sometime between September 27, and 30 Lavera and Eunice met privately with Gordon and raised discrimination complaints centered on the job duty change. Gordon instructed them to meet with Kai Davis and share their complaints (Eunice's  Depo p.p. 23-29). On September 29,  Brackin met with Gordon, told her about job assignments, again complained about her (Gordon's ) disparate treatment among staff members, and  also attempted to tell her about the  Ronald Powe case where Lavera and Eunice caused the false arrest. (Exhibit "J"; Martin's Affidavit  at ¶ 94).  Gordon drafted her termination memo the following day. (Exhibit "K").

## B. Mary Brackin's Facts

Some of Brackin's disputed facts are interspersed in the sections which follow.  This  bifurcated  disputed  fact  structure  resulted  from  Brackin incorporating the arguments she advances supporting  her motion for partial summary judgment with her response to Defendant's brief in support of their motion for summary judgment. Though out of chronological order Brackin adds the following additional facts:

Lavera's errors, which could potentially cause the City the greatest liability exposure, was her Warrant of Arrest errors. These errors can be classified in three categories;  (1) not inputting Court Referral Program completions, (2) causing a wrongful, or potential wrongful arrest;  and (3) , Issuing duplicate alias warrants of arrest. (See  Brackin's Affidavit generally ).

Approximately two weeks after Bracken's return to the Magistrate's office in 2001, Lavera McClain was hired.  Brackin had reservations about Lavera's hire because she had a reputation while working at the City Jail for making numerous filing and data entry errors.  These errors are attested by a disciplinary "Notice" that she received just prior to her being hired by Gordon. ( See Exhibit "L").

Further, when Brackin worked as a secretary for the City Police Department she had to input into the computer Lavera's arrest reports and noted a large number of errors. This propensity for inattentive errors continued after Lavera's employment in the Judicial Department. ( Brackin Affidavit at  ¶ 6).

During the    month of December, 2001, Eunice Knight, another African-American, was hired as a Magistrate.  Knight and McClain immediately became fast friends. This friendship extended to Judge Gordon and before long the three were frequently going out to lunch together, or at least leaving together at lunch time and returning together after the time set for lunch ( Brackin Affidavit at ¶ 7, and Eunice depo at  pp. 36-40).

From time to time the Magistrates office functioned without an administrator. During these times Brackin would frequently bring the above referenced errors to the attention of Judge Gordon but she refused to take any administrative action. Specifically on December 1, 2004, it was brought to Brackin's attention that Lt. Cliff Jarrett issued a memo to Capt. Givens in reference to a juvenile being arrested on an alias warrant issued by Gordon. Givens requested Brackin to look into the matter and let her know who was responsible. After researching the incident Brackin informed Gordon that Lavera had issued the warrant on Albert Christopher Walker MC03-2379 on February 2, 2004. Because Albert was a minor, the arrest writ should have never been issued. Gordon lost interest when she learned who was responsible and suggest that it wasn't very important. (id at ¶ ¶ 15-16).

On one occasion where the judicial staff had a open meeting with Gordon, and with Personnel Director Kai Davis present, Lavera spoke to Brackin in a loud, offensive and threatening manner. There was only one person between Lavera and Brackin and the very loud boisterous tone of her conversation was not necessary for her to be heard. Gordon permitted her to continue to speak to Brackin in this rude manner and did nothing. When Brackin complained to the Gordon about the manner in which Lavera was speaking to her Gordon ignored the complaint. (id at ¶ 17)

On March 17, 2004 Ricky Stokes, a local bondsman and owner of A-Advantage Bonding, called Brackin on the telephone and advised her that the Judicial Department had a defendant who it had listed under the wrong information. If let uncorrected this could have, and would have resulted in a wrongful arrest. Stokes stated that he had attempted to discuss the case with Lavera who blew him off, telling him that she didn't have time to discuss the matter with him. Brackin looked into the matter and discovered that Lavera had issued an arrest warrant for a Michael D. McCord and not Michael W. McCord. Lavera had made the wrongful entry and that is the reason that Stokes contacted her first. Only the name was similar. Nothing else in their respective profile was similar. Brackin recalled the writ.

Gordon later called Brackin, apparently having received word from Stokes, and told her that clerical errors will happen and not to make a big deal out of it. She then instructed Brackin to "delete" the file before she left for the day and fix it. Brackin paged Martin and told her what had happen. Martin instructed her to do as Gordon had instructed and destroy the record. (id at ¶19).

During the course of her employment in the Judicial Department Brackin and Turner became very close friends. This friendship extended beyond the work place. They attended the same church. They spoke to each other almost daily over the telephone. They visited each other's homes. Their families met each other. They attended social events together. They shopped together. They faxed

23

and sent email messages to each other. They enjoyed each others company. Gordon was aware of the close relationship, as were the other members of the Judicial Department.(id at ¶ 27, 32; See also Gordon's depo p. 335).

Every adverse administrative action taken against Brackin was the direct, though not sole, result of a coercive Internal Affairs investigation. These investigations were either initiated by or ratified by Gordon. Further, Gordon has disciplined Brackin, and other white Judicial staff members for alleged infractions while providing special protection and refusing to discipline and/or permit others to discipline black members who has committed similar offenses as those claimed to have been committed by Brackin.

### Second Internal Affairs Investigation.[11]

On January 7, 2004 while Brackin was manning the front intake desk, Mr., Theron Fondren, a defendant arrested for allegedly failing to comply with a Court Referral Program, approached Brackin with Harrison Farr his Court Referral Officer (CRO) in toe, Fondren requested to speak with Mary Beth. Brackin acknowledged that she was the person he was seeking. (Brackin's Affidavit at ¶¶ 11-12, Exhibit 1 (Brackin's Internal Affairs transcript p. 6-7). Brackin had no prior

---

[11] The first Internal Affairs investigation directed towards  Brackin occurred in November 2001 involved an allegation that she discussed  a Public Defender's skill and judgment and advised her that she could get another attorney. There was no formal disciplinary action as a result of this investigation and  the event is not made a part of Mrs. Brackin's Complaint.

acquaintance with Fondren. ( Brackin's Affidavit at ¶ 11,   Brackin's Deposition p. 342)

Fondren had with him an invoice from a towing company which exhibited a bill of $158.90. (Exhibit 3).  Fondren proceeded to explained to Brackin that he had been wrongfully arrested. He sought advise from her how he may proceed or who he should speak with to get reimburse for his towing fee. (Brackin's Affidavit at ¶ )

As stated above Fondren's arrest was due to an outstanding alias warrant issued for his failure to complete CRP.  Foundren had been previously found guilty in 2001 of a Public Intoxication charge and as part of his probation he was required to successfully complete the City's Court Referral Program. . Though he had completed all of the required classes, one of the city's magistrates had issued an alas warrant of arrest prior to his returning the Certificate of Completion. When he submitted the Certificate, the warrant was never recalled and the warrant remained in the system notwithstanding  Fondren's compliance. When he was stopped several years later for improper lights and seat belt violation, the officer discovered the warrant and arrested him. (Exhibit 1 Fondren's  February 20, 2004 I A[12] transcript pp 2-4)].

 Fondren wanted to be reimbursed from the city for his towing fee. He asked Brackin who he should speak with.  She told him to just tell the City Clerk

---

[12] The designation "IA" stands for Internal Affairs

that he had been wrongfully arrested, as he had just informed her, and present to her the billing invoice. Brackin's Affidavit at ¶ 11, Exhibit 4 (Brackin's March 22, 2004 Internal Affairs transcript pp 2-4)

Fondren on January 7, 2004 presented his bill to the City Clerk with a note stating that he had been wrongfully arrested and that she could ask Mrs. Brackin and Mr. Farr for confirmation. (Exhibit 5, Exhibit 1 (Fondren's Internal affairs transcript p. 7).  When the City Attorney's office received Fondren's claim, D. Kevan Kelly, City Attorney, sent a Memo to John White, Police Chief, directing that he investigate Fondren's damage claim. (Exhibit 6). Judge Gordon was contacted by Internal Affairs,  gave her consent to the investigation, and issued a letter dated March 22, 2004 directing Brackin to cooperate fully in the investigation (Exhibit 7).

While Fondren admitted that Brackin had directed him to the City Clerk's office for the processing of his claim[13], he would not affirm whether she had informed him that he was wrongfully arrested:

> GC     Did Ms. Brackin say anything to you about being falsely arrested or being arrested in error or anything of that nature? That you were?
>
> TF     I can't remember. Now Harrison said that it was just a computer problem or something like that. The records didn't get back to the police department or in the computer something like that.

---

[13]  Defendant Gordon in her deposition admitted that such limited advice was permissible. See Exhibit 75 Gordon's  Depo at 119, . See also Exhibit 69 Personnel Board Hearing Transcript at 223.

GC      Right, ok and but Ms. Brackin never said anything about your being falsely arrested? Say that there was, that you were arrested in error? She ever say that to you?

TF   I don't know if she said that but that was, that was understood from her conversation with Harrison Farr

GC:  Um, Ok Ms. Brackin ever say anything to you about ah, filing this claim?

TF:  Other than I thing she referred me to the City Clerk's Office. Somebody at the City Clerk's Office gave me the number of, of the Kevin Kelly.

GC: OK

TF:  And I talked to Kevin Kelly and he referred me to Nick Monday.

GC:    Right. OK but Ms. Brackin never said anything about you being falsely arrested? Say that there was, that you were arrested in error? She ever say that to you?

TF:  I don't know if she said that but that was, that was understood from her conversation with Harrison Farr.

GC:  Un Huh. OK. Ah did she ever say anything to you about filing a suit against the city?

TF:  No.

Exhibit 1 (Foundren's I A transcript pp. 7-8)

Brackin affirmatively denied that she told Fondren that he had been wrongfully arrested or that the City was liable. ( Brackin's Deposition pp. 147-149, 156-157, Brackin's Affidavit at ¶ ¶ 11-12). Mr. Farr was never interviewed.

Notwithstanding that neither of the people who were positioned to know confirmed that  Brackin commented on the city's liability for a wrongful arrest,  Sergeant Coleman issued a "Report" on April 8, 2004 finding:

> It appears Ms. Brackin used poor judgment when instructing Mr. Fondren on how to file his reimbursement claim with the City of Dothan after a written directive was issued. She also admitted her actions to fellow co-workers, McClain and Knight. Based on the evidence, Mary Beth Brackin has possibly violated a Major Offense under the Personnel Rules and Regulations, Section 3-42. (6). <u>Actions or lack of actions that could cause undue financial loss to the City. Negligence in carrying out assigned tasks or duties or responsibilities of one's position.</u>
> Upon these findings it is believed that Personnel Rule Section 3-42. (6) was violated and this complaint is sustained.[14]

A copy of this Report and its attached statements was delivered to Gordon. Gordon directed Martin to draft a disciplinary report against Brackin referring to matters which predated her employment. (Exhibit 10) On April 23, 2004 Judge Gordon issued a "Determination" resulting in Mrs. Brackin ten day suspension, without pay, and being placed on two year probation. ( Exhibit 11).[15]

**Third Internal Affairs Investigation**

On or about March 3, 2005  Gordon caused the Internal Affairs Division to conduct  a  third  investigation   this  one  was  concerning  whether  Magistrate  Mary

---

[14] Exhibit 24.
[15]  Mr. Turner was never formally charged with ticket fixing but improperly handling a record, a misdemeanors offense.

Turner had fixed  a traffic defendant, Bradley Phelps''s  traffic ticket in return for work done on her home. During the investigation Bradley's brother Stephen informed the investigator that Turner had once helped him with a ticket. This resulted in a collateral investigation regarding the processing of his brother's, Stephen Phelps, traffic ticket..(Exhibit 12). It was subsequently discovered that Stephen's ticket was never processed administratively. (Id).

The following history of this ticket is provided as background in support of Brackin's procedural due process claim and not to advance an arbitrary or capricious claim though premising Brackin's job loss on the processing of this ticket was, under the facts of this case, both arbitrary and capricious. Among Brackin's, and other administrative staff, responsibilities included the processing of traffic tickets, several thousand each year. (Gordon's Deposition 167.) In the normal course of processing traffic tickets, this presents few problems. There is, however, the occasional case where normal protocol is unavailing. Stephen's ticket was one such case.

The history of this traffic citation rests, in large measure, upon the memory of several people, each of whom had a hand in the processing this ticket. Memories fade after the passing of time especially when processing of thousands of tickets and complaints.   Brackin admitted that she didn't recall the specifics of this ticket since it had no particular import to her. ( Exhibit 4 (Internal Affairs transcript p 11).

On November 4, 2002 Officer Eric Duhaime, then employed by the City of Dothan Police Department, issued a citation for a speeding violation ( Exhibit 9 Personnel Board Hearing Transcript at  60.). Subsequent to issuing this ticket, Officer Duhaime delivered copies of this and other tickets to  Brackin. (Id at 62). After turning over his tickets, Officer Duhaine remembered receiving a telephone call from another Magistrate, Mary Turner. Mrs. Turner inquired whether he would be willing to void the ticket. Officer Duhaine's response to this Magistrate was "I don't care" (Id. at 64).

According to Officer Duhaime, the Magistrate who asked him to void the ticket also inquired whether he would come back to pick up the copies of the tickets that he had left at the Magistrate's office.  His response was to "just to send them to me in an office mail, that way I would have all of the copies, to include his." (R. at 65). He subsequently received the copies in the mail. (id).

Officer Duhaine in November 2002 was unaware that he lacked the discretion to void tickets or that he was violating any law. (Id. at 74-75). The Officer expected that the entire process would be voided when he requested the return of the tickets.

> Q.  When you told her it was okay, send me the ticket back, mail them back, this is your testimony, you in essence, said it was okay to just void that because the ticket was going to be voided out?

> A. Right.

30

Q.   Basically, that notation of void reflects the reality that exists at the time correct.

A. Right.

(Id. at 75).

The record is silent on who retrieved the ticket, and/or who mailed the ticket to Officer Duhaine.  The only evidence which tie Brackin to the ticket is that they were turned in to her and she printed "void" on the transmittal sheet. However, in spite of the fact that this ticket was processed in November 2002, and there was no evidence that Brackin did any thing to the ticket, the Internal Affairs investigator, Sgt. Keith Gray, after a vigorous interrogation of . Brackin, on May 2, 2005 issued a "Report"  (Exhibit 13)  which found that it was more likely than not that . Brackin had violated Section 3-42 (6) Negligence in carrying out assigned task. Without further review, Judge Gordon accepted this determination and listed it as a Major Offense occurring within two years of the time that Brackin was placed on probation and therefore warranted termination. The Alabama Court of Civil Appeals subsequently threw out this offense finding that it did not occur within two years of the time that Brackin was placed on probation.

**Fourth Internal Affairs Investigation**

Shortly after Internal Affair started its investigation of Turner, the officer assigned to the investigation, Sergeant Gray met with the Judge and suggested that she instruct the staff not to discuss the investigation with anyone. He also told her that no one was to contact Mrs. Turner during the investigation   The Judge so

instructed the staff and later memorized her statement to them. In this memorization she claimed that she gave the staff the following directive:

> On or about March 10, 2005 at approximately 1100 hours I met with the staff of the Magistrates office in the presence of Michelle Sellers. All employees ere present except Ms. Mary Turner who was on administrative leave at the time. I instructed these employees to strictly refrain from any contact with Ms. Turner while the internal investigation conducted by the Dothan Police Department was underway. I further instructed that no discussion with anyone regarding this matt was to take place. I made no mention of what the allegations might be, nor did I mention any investigator by name, saying merely that investigators from the police Department would be conducting the inquiry and that the employees of my department were to respond truthfully to any question put to them by the investigating officer(s)[16].

When asked during his deposition whether there were any exceptions to this "no contact "directive, he thought that it was all inclusive. ( Gray's deposition at 122). Further, any exceptions would be up to the Judge and must be pre-cleared through her. (Id at 123-124). He was aware at the time that Mary Brackin and Mary Turner were close friends. (Id at 123).

Subsequent to the onset of Sergeant Gray's criminal investigation of the alleged "fixed ticket" the following article appeared on Rickey Stokes', a local bondsman's, web site:

---

[16] Exhibit 15

**Dothan Police Internal Affairs Conducting Investigation**

**DOTHAN:** Unconfirmed - the Dothan Police Department is currently conducting internal affairs investigation into the Judicial Department of the City of Dothan. Unconfirmed information is that Sgt. Keith Gray is conducting the investigation.

**NOTE**: Gray recently made racial discrimination allegations against the City of Dothan. Confidential sources have indicated some reverse racial discrimination might be on going within the Judicial Department.

Sources have said the investigation is concerning allegations that a ticket was dismissed in exchange for some work to be done on a municipal court employee's residence. When the work was not performed, warrants were issued and the person arrested.

Judge Gordon nor the employee which is under investigation has been asked about this. Dothan Police Chief John Powell was just sworn in on Tuesday afternoon and we have not spoken with him concerning the investigation. Dothan City Manager Mike West is in Washington D.C. this week and we have not contacted him concerning this investigation. However, unnamed sources have confirmed that the investigation is on-going.

The Judicial Department is under the supervision and control of Dothan Municipal Judge Rose Gordon. The department has been the center of problems over the past couple of years. The department has been unable to keep someone as the Municipal Court Administrator for any period of time.

The most recent Municipal Court Administrator was Dothan resident Nancy Martin. She came to the magistrate office from Legal Services. Martin remained in her position for six months and, according to sources, was making very significant progress in the Dothan Magistrate's Office. The office was becoming efficient and organized. When the six months was up, Gordon gave Martin a unsuccessful review and Martin's employment was terminated. Sources have said Gordon's review was that Martin made decisions without consultation and input from Gordon. Some sources say that Martin was putting Gordon's pet employees to work and they were constantly complaining to the Judge, and that is the reason for the bad review and termination.

Keep watching for more articles as the information develops.

Date of this item added :

2005-03-16

Immediately after this article was published, Internal Affairs open up a new investigation to get to the bottom of who leaked this information to Rickey Stokes. There is no evidence that anyone authorized this investigation and the lack of such evidence suggests that Officer Gray initiated it on his own.

Officer Gray interviewed each member of the judicial staff save Judge Gordon and Michelle Sellers. Each of the staff members was provided some variant of the following statement by Sergeant Gray:

> This investigation is being conducted solely to identify who may have released any information regarding the investigation of Mary Turner.

Sergeant Gray acknowledged that any employee who spoke about the investigation among themselves or to other third parties had violated Gordon's directive. (Id at 99 and 111). Many of the judicial staff violated the non disclosure directive and Officer Gray so informed Gordon. (Id. at 96, 100, Gordon's Deposition 346-358). Though the exclusive purpose of this investigation was to learn who had violated Gordon's  non disclosure directive, and several of the staff did, Sergeant Gray did not acknowledge, in his Investigative Report, that these employees had committed insubordination. (Id at 100).

When Sergeant Gray spoke with Brackin she admitted that she had contacted Mary Turner for the purpose of obtaining a template for contacting

defendants.  Mary  had  inherited  most  of  Mary  Turner's  duties  during  her administrative  leave  of  absence.  This  contact  had  nothing  to  do  with  the  criminal investigation  or  the  leak  of  information  concerning  the  investigation.  (Brackin Affidavit a at ¶ 16).  To Sergeant Gray in the first instance, and  Gordon later, it didn't  matter why or for what reason Brackin had contact Turner. Indeed as late as October  30,  2007  when  Gordon  sat  for  her  deposition  she  did  not  know  what Brackin communicated to Turner, nor did she ask her:

```
0345
 1   A.  No.
 2        MS. NELSON:  Object to the form.  That was
 3           not the testimony.
 4   Q.  You didn't adopt their recommendation?
 5   A.  No.  I mean, I would have -- I would have
 6        looked at their report, but I would not
 7        necessarily have adopted the recommendation
 8        that she be terminated.
 9   Q.  Well, do you know for a fact whatever contact
10        Ms. Brackin had with Ms. Turner, whether or
11        not that interfered with the police
12        investigation?
13   A.  Do I know for a fact?
14   Q.  Uh-huh (positive response).
15   A.  No.  I don't know what she communicated to
16        Ms. Turner.
17   Q.  Did the police share with you the results of
18        their complete investigation?
19   A.  I'm sure they did.
```

( Gordon's Deposition p. 345)

Gordon adopted Sergeant Gray's findings that Brackin had violated her  no contact  directive[17]  with  no  further  review  or  an  examination  of  the  record  to

---

[17] Of course  Gordon  vociferously  disputed that she adopted Sergeant Gray's no contact suggestion:

19  A.  I'm reticent about saying it was my no-contact
20      directive.  I didn't -- you know, it wasn't at
21      my behest or my initiation.  I simply did what
22      the investigators told me was necessary at the
23      time.  So I don't --
0332
1   Q.  Well, you adopted that no-contact directive,
2       didn't you?
3           MS. NELSON:  Object to the
4               characterization.  She said she --
5               adopt, she never said she adopted it.
6           MR. JAFFREE:  I'm asking her.
7           MS. NELSON:  She said she communicated it.
8           MR. JAFFREE:  I'm asking her.
9   A.  I communicated it.
10  Q.  Did you adopt their no-contact directive to
11      you as your no-contact directive?
12          MS. NELSON:  Object to the form.  She's
13              testified as to what she did.
14          THE WITNESS:  Right.
15  Q.  There's -- no, no.  Right?  Yes or no, did you
16      adopt their no-contact directive --
17          MS. NELSON:  Object to the form.
18  Q.  -- as your no-contact directive?
19  A.  I wouldn't say I adopted it.  But, you know,
20      they're criminal investigators.  If they come
21      in there and say, go tell them not to talk to
22      Mary, not to come to that computer, I wouldn't
23      have said, no, I'm not going to do that.
0333
1   Q.  Did you --
2   A.  So I did not adopt it.  I'd simply
3       communicated the no-contact order that was
4       communicated to me by the criminal
5       investigators.
6   Q.  Did you initiate --
7   A.  I did not.
8   Q.  Well, can I finish my question?
9       Did you initiate any disciplinary action
10      because your no-contact directive was
11      breached?
12  A.  Did I initiate any disciplinary action because
13      "the" no-contact order was breached?
14  Q.  Yeah, because the no-contact order was
15      breached?
16  A.  I don't remember.
17  Q.  Did you charge somebody with insubordination
18      because the no-contact order was breached?
19  A.  Yes.

22  Q.  If you didn't adopt it, why did you discipline
23      somebody for its breach?
0335
1   A.  Because it was in place at the time.  I
2       communicated it.  And I told them, you know,

determine if the record supported his findings[18]. In essence she abdicated her

responsibility as Department Head;

---

```
3       do not contact Mary.  And I told them that the
4       investigators said, you know, not to contact
5       Mary, it was an investigation.
6           And your client, Mary Beth Brackin, said,
7       why are you looking at me?
8            I said, because I know that you and she
9       are friends, and if you want to contact her,
10      let me know.  I told Mary Beth that in front
11      of every magistrate.  And every one of them
12      will tell you that I told her that because she
13      was the only one that spoke out and said, why
14      are you looking at me.
15           I said, because I know you and Mary are
16      friends.  And if you want to contact her, let
17      me know.
18           And she didn't say a word.
19  Q.  Did you expect staff, including Ms. Brackin,
20      to use their own discretion on what contacts
21      with Ms. --
22  A.  No.
23  Q.  -- Turner was permissible?
0336
1   A.  No.  It was clear that they were not to
2       contact her or go in her office.
3   Q.  Did you intend your directive to be all
4       inclusive, sweeping, and cover the universe of
5       possible contacts?
6   A.  No.  That's why I gave her the option of
7       contacting her after hours.
8   Q.  Did you say, no, that she was free to contact
9       her after hours?
10  A.  She never asked.
11  Q.  Was she free to contact her after hours?
12  A.  If she had asked, possibly.
```

[18]Exhibit 75 Gordon's Deposition  at 344-45.

```
11  Q.  Did the police report that you received
12      recommend that you terminate Ms. Brackin?
13  A.  I don't remember specifically.
14  Q.  Did you do any further or make any further
15      inquiry after you received the police report
16      to make an independent assessment of whether
17      or not Ms. Brackin should be terminated?
18  A.  Which -- Ms. Brackin's termination?  No, I did
19      not do any further investigation of the facts
20      of any investigation.  I didn't go behind them
21      and investigate any more.  No.
22  Q.  So if they recommended termination, you
```

**PAGE 358**

10   Q.  Well, are you soliciting that the report just
11       had a narrative of the police and no
12       documents?
13   A.  Let me be honest with you.  I don't
.        remember
14       seeing this.  I thought there were like --
15       MS. NELSON:  This is being Plaintiffs'
16       Exhibit 8?
17   A.  -- disks or something but not this.
18           MS. NELSON:  Have you not seen --
19   A.  If there was, I didn't look at it.  I'm
20       sorry.  I just looked at the report.  I didn't
21       read the individual interviews or anything
22       like that.
23   Q.  So you just took the police officer's word
and
0359
1        made a decision on the basis of what the
2        police officer told you without reading any
3        testimony itself?
4    A.  Well, the results of their investigation
5        revealed that -- whatever.  Yes.  I just
6        looked at that.  I didn't go back and look any
7        further at the investigation.

---

23       adopted their recommendation?
0345
1    A.  No.
2            MS. NELSON:  Object to the form.  That was
3                not the testimony.
4    Q.  You didn't adopt their recommendation?
5    A.  No.  I mean, I would have -- I would have
6        looked at their report, but I would not
7        necessarily have adopted the recommendation
8        that she be terminated.
9    Q.  Well, do you know for a fact whatever contact
10       Ms. Brackin had with Ms. Turner, whether or
11       not that interfered with the police
12       investigation?
13   A.  Do I know for a fact?
14   Q.  Uh-huh (positive response).
15   A.  No.  I don't know what she communicated to
16       Ms. Turner.
17   Q.  Did the police share with you the results of
18       their complete investigation?
19   A.  I'm sure they did.

( Gordon's Deposition p. 358-59)

During her deposition, Gordon equivocated on whether the no contact mandate was all inclusive. She suggested that after hour contact may be permissible if pre-clearance is obtained. Gordon was of the opinion that the Internal Affairs investigators had to make the call on exceptions. Sergeant Gray on the other hand stated that any exception was the judge's call. The problem with this possible exception was that it was inconsistent with the stated purpose of the no contact—keeping Mary Turner from instructing staff to delete records from the computer. ( Gray's deposition pp. 112, 123-124,  Gordon's deposition at 318-326, 326, 329-330, 332-336). Sergeant Gray stated Gordon was notified in May that Turner's investigation was complete. In her deposition, Judge Gordon could not recall whether she ever notified staff that the no contact directive had been lifted. (Id at  340-342).

### III.  LEGAL ANALYSIS

### A.  PRELIMINARY STATEMENT

The discrimination claims in this  case are fairly complex  and may  include a  issue of first impression.  Plaintiff Nancy Martin (Martin) claims that she was terminated because she would not participate in Municipal Judge Rose Evens Gordon's (Gordon) pattern and practice of showing preferential treatment to the black Magistrates under her management. When she assigned the black, as well

as white, Magistrates additional and/or different job duties, as was within her discretion, the black Magistrates bellowed "discrimination", Gordon listened and Martin was immediately terminated. Hence you have a case where a person who refused to discriminate after being required to do so, herself being charge with discrimination resulting from this refusal.

The reasons stated by Gordon are *post hoc* justification, a pretext for a discriminatory motive. Most, if not all, of the stated reasons, if they exist at all, are remote from the actual removal decision. The facts are exhaustive, hotly disputed, require scores of pages of argument and are not suitable for summary disposition.

Plaintiff, in the interest of clarity given the numerous issues involved in this case, will closely follow the structure provided in Defendants' Memorandum in support of their motion for Summary Judgment. There will be areas where Plaintiffs will vary from Defendants' format, especially in the section involving Title VII. Because Brackin has incorporated herein her brief in support of her Motion For Partial Summery Judgment, for some of the subcategories she will reference that incorporated portion to avoid redundancy.

### 1. Summary Judgment Standard

A party seeking summary judgment must demonstrate that "there (are) no genuine issue(s) as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion and of identifying

those materials that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986).

In response to a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party. See *Celotex*, 477 U.S. at 323,  In determining whether genuine issues of material fact exist, the court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. See Anderson *v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986).

More importantly, no matter how compelling the moving party's assertion of the facts are, the non moving party's statement of the facts, for summary judgment purposes, must be accepted as true. *Kingsland v. City of Miami*, 382 F.3d 1220, 1228 (11th Cir. 2004). See also *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n9 (11th Cir. 2002) (stating that a district court must accept the non-movant's version of disputed facts as **true** for purposes of summary judgment).

### A. Defendant Gordon is not entitled to qualified immunity.

### (1.)  Qualified Immunity: Affirmative Defense

Gordon seeks to evade review under the doctrine of "qualified immunity".

Qualified immunity is an affirmative defense which must be plead and proven. Generally the availability of the defense should be tested "at the earliest possible stage in litigation because the defense is immunity from suit and not from damages only**."** *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001) (en banc). It was only after a rudimentary pleading notice of the possibility of a immunity defense, the expiration of two years, and the filing two dismissal motions that Gordon finally gets around to testing her immunity defense by summary judgment. Thought such delay is not fatal, the Court**,** in its discretion, can consider such delay dilatory, unfair on the opposing party and treat such as a waiver of the defense. See *English v. Dyke*, 23 F.3d 1086, 1089-1090 (6th Cir. 1994**)** (failure to raise qualified immunity in pre-answer motion to dismiss did not constitute a waiver of the right to raise the defense in a second post-answer motion to dismiss under Fed.R.Civ.Proc. 12(h)(2) although the " trial court has discretion to find waiver if a defendant fails to assert the defense within time limits set by the court or if the court otherwise finds that a defendant has failed to exercise due diligence or has asserted the defense for dilatory purposes.").

## (2.) Discretionary Authority

To obtain success, in the first instance, Gordon must prove that at the time of the alleged unlawful act she was acting within the scope of her discretionary duties. *Hartley v. Parnell*, 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiffs concede that Gordon was acting, at

least, within her discretionary duties when she suspended Brackin's employment and placed her on two year administrative probation. However, Gordon was acting clearly outside her "discretionary duties" when she terminated Brackin for engaging in outside the "work environment" contact with Mary Turner.

There is no dispute that Officer Gray instructed Gordon to inform her staff that they were to have no contact with Turner. Also undisputed is the fact that this instruction to Brackin was made by Officer Gray with no official authority to make such request, nor had such request been pre-cleared by his superiors. Gordon admitted that the City Police Department and the Judicial Department are two independent departments with no administrative overlap.

Absent the authority to order her staff to suppress all contact, whether work related or otherwise, with a suspended employee, and by taking her "no contact" orders from one not in a position to make them, Gordon acted outside the scope of her discretionary responsibilities and these acts are not entitled to the shield of immunity.

> 'To establish [that a defendant is acting within the scope of his discretionary authority, there must be more than a bold assertion by the defendant that the complained of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority; there must be a showing by competent summary judgment materials of objective circumstances that would compel that Conclusion.... Exactly what will suffice to establish such objective circumstances will ...

vary in proportion to the degree of discretion inherent in the defendant's office. Such objective circumstances necessarily must encompass the factual context within which the complained-of conduct took place. But also appropriate is a showing by the defendant of facts relating to the scope of his official duties-e.g., a showing of the circumstances through which he initially came to believe that his lawful authority included within its scope actions of the type that are complained of by the plaintiff.'

*Harbert International Inc. v. James,* 157 F.3d 1271 (11th Cir. 1998) quoting *Barker v. Norman,* 651 F.2d 1107, 1124-25 (5th Cir. Unit A July 1981)

To establish that the challenged actions were within the scope of her discretionary authority, Gordon was required to show that her actions were (1) undertaken pursuant to the performance of her duties, and (2) within the scope of her authority "t]aken in the light most favorable to the party asserting the injury", The further inquiry must be considered whether  the facts alleged show the officer's conduct violated a constitutional right?" *Harbert International Inc supra* quoting favorably from *Saucier v. Katz,* 533 U. S. 194, 201 (2001). With respect to Gordon's "no contact" directive, even if it could pass, in some rudimentary manner, the first prong of the two-part test, if fails to satisfy the latter, and therefore does not evade constitutional scrutiny.

### (3.)  Qualified Immunity Standard

Should Gordon prevail in satisfying the Court that she has met her initial

burden of proving that she was acting within the scope of her discretionary authority with respect to both the suspension and th**e** subsequent termination, then the burden of persuasion shifts to the Plaintiffs. The courts, in determining the merits of a  defendant's claim of qualified immunity defense, first determines whether the plaintiff has alleged a deprivation of a constitutional right and if so, determine whether that right was clearly established at the time the alleged violation occurred. *Anderson v. Burke County* 239 F.3d 1216, 1219 (11th Cir. 2001). See also See *Wilson v. Layne* 526 U.S. 603, 608  (1999).

Gordon suggest that she is a neophyte on first amendment law and was unawares of the scope of the first amendment coverage or the principles of "matters of public concern. However, she successfully matriculated through law school, worked for the state's attorney general's office for 20 plus years and was a sitting judge in the Municipal Court and Department Head for the Judicial Department for five years. Whether Gordon knew or should have known of Brackin's constitutional rights must be judge on an objective standard premised upo**n** what would a similar sitting judge have known or should have known. Gordon's knowledge will be premised upon what **a** reasonable government official, in her position, (attorney/judge) would have believed the law requires the Gonzales *v. Lee County Housing Authority*, 161 F.3d 1290, 1209 (11th Cir. 1998).

The qualified immunity defense "embodies an 'objective reasonableness' standard, giving a government agent the benefit of the doubt," provided that the

conduct was not "so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed" the acts. *GJR Invs., Inc. v. County of Escambia* 132 F.3d 1359**,** 1366 (11th Cir.1998). Because the courts " have 'rejected the inquiry into [an official's] state of mind in favor of a wholly objective standard,' " the government actor's intent and motivation are insignificant in determining qualified immunity. *Flores v. Satz* __137 F.3d 1275__**,** 1277 n. 4 (11th Cir.1998) (per curiam**).**

## (a)  *Brackin's Free Speech Claims*

The inquiry next shifts to whether Brackin's right to free speech, in the context in which it was delivered, and her rights of association, as exercised by her,  were  clearly established, such that a reasonable attorney  would have known that his conduct was unlawful.  The Supreme Court has never established a bright-line test for determining when a public employee may be disciplined in response to that employee's speech**.** *Dartland v. Metropolitan Dade County***,** 866 F.2d 1321, 1323 (11th Cir.1989**),** Instead, *Pickering* established a case-by-case balancing of interests test.  Although "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," *Connick v. Myers*, 461 U.S. 138,, 142 (1983), an employee's interest as a citizen in commenting on matters of public concern must be balanced against the state's interest as an employer "in promoting the efficiency of the public services it performs through its employees." *Pickering v.*

*Board of Educati*on, 391 U.S. 563, 568 (1963).

In this circuit the touchstone issue is whether the public utterances" explicitly purport to advance any citizen's interest." *Anderson v. Burke County*, 239 F.3d 1216, 1220 (11th Cir. 2001).  Additionally relevant is whether the speech effects the "public perception" of the institution *Maples v. Martin***,** 858 F.2d 1546, 1553  (11th Cir.1988), As noted *in Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989**)** "a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption". The Supreme Court has held that a teacher's criticism of his superiors on matters of public concern is protected by the First Amendment and may therefore be an impermissible basis for termination of his employment**.** *Perry v. Sindermann***,** 408 U.S. 593, (1972); *Pickering v. Board of Education***,** 391 U.S. 563, 88  (1968).

There should be little question that Brackin was acting as  a private citizen who just happen to be a public official giving a private citizen information  of particular benefit to that citizen and not to herself when she was engaging in speech activity.   The Defendants recognize that it was not part of her job responsibility to tell a citizen that they could sue the City[19]. In fact questions of potential municipal liability were strictly forbidden.   It is the City's position that Brackin was disciplined and suspended for 10 days because she advised  Fondren

---

[19] As the Defendants' acknowledge, Brackin's suspension informed her that she informed a defendant  that he was wrongly arrested and that another employee was negligent regarding his case. This is directly insubordinate to a memorandum dated January 8, 2003 from Judge Gordon directing all Judicial Department Personnel that any citizen wishing to file suit against the City should be directed to the City Clerk's Office without comment upon possible liability**.**

that he had been wrongfully arrested and that the city official who caused his arrest was negligent. If true, or believed true, at the time it was made, this speech falls within those groups of public utterances long recognized as matters of public concern. Gordon knew or reasonably should have known that such speech was protected.

It is no defense that only Fondren was made aware of, and could benefit from the content of Brackin's speech. The Court noted specifically in *Peterson v. Atlanta Hous. Auth.,* 998 F.2d 904, 916 ( 11th Cir. 1993), that public awareness of the problem was not necessary to satisfy the public concern requirement. See also *Morgan v. Ford,* 6 F.3d 750, 754 n.5 (11th Cir. 1993) ("[A] court cannot determine that an utterance is not a matter of public concern solely because the employee does not air the concerns to the public."); and, *Deremo v. Watkins,* 939 F.2d 908, 911 n.3 (11th Cir. 1991) (stating that an employee's effort to communicate her concerns to the public is a relevant, but not dispositive, element in the public concern analysis).

Similarly, the public ( Fondren ) had an interest in knowing that because of defective procedures and/or malfeasance on the part of City employees there is a heighten risk that citizens will be falsely or otherwise wrongfully arrested. This is true even if the risk assessment is a matter of opinion or speculation. As the Court noted in *Stanley v. City of Dalton, Georgia,* 219 F.3d 1280, 1289 (11th Cir. 2000) the fact that the speech may be speculation does not rob it of the protection. If the

speech was sincerely believed, when made, it still receives the benefit of the protection. Id.

### (b) *Brackin's Association Claims*

Gordon devotes but a single sentence discussing why she is entitled to immunity on Brackin's association claims. This sentence is " Brackin's act of insubordination in "willfully, by [her] own admission, disobey[ing] a directive from [her] department head to refrain from any contact with Mary Turner during the police department investigation of Mrs. Turner.". Yet Gordon spent a sizable amount of her deposition disclaiming that it was her order/directive that Brackin breached. She also claims that she did not ratify the directive.

More importantly, Gordon claims that she was only the conduit for Sgt. Gray's "no contact" directive. Sgt. admitted that he couldn't divine the authority for the directive and it was not given to him by any of his superiors.  It was intended to be all inclusive and include contact outside the confines of the workplace. Indeed Gordon could not state by what authority the directive was given. However, without reading Sgt. Gray's report, or knowing the particulars of Brackin's willful disobedience, she terminated Brackin for willfully violating the directive. As stated above, under these set of facts, this directive was hardly within Gordon's discretionary authority.

Unlike free speech interest, there is no need for Brackin to establish a reasonable inference that her association claims implicated matters of public

concern.  Associational activity need not relate to matters of public concern for First Amendment protection to apply. *Hatcher v. Board of Public Education and Orphanage*, 809 F.2d 1546, 1558 (11th Cir. 1987) (holding Connick inapplicable to freedom of association claims).

The Constitution accords protection to two different forms of association, "intimate association" and "expressive association."  *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18, (1984); *City of Dallas v. Stanglin*, 490 U.S. 19, 23-25, 109 (1989). *Roberts* teaches that the right of intimate association--the freedom to choose to enter into and maintain certain intimate human relationships--is protected from undue governmental intrusion as a fundamental aspect of personal liberty. *Roberts*, 468 U.S. at 617-20,

The right of expressive association--the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion--is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms. Id. at 617-18, 622.

The concept of "liberty," embodied in the Constitution, includes a right to freedom of association.  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the `liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces

freedom of speech."). As such, this constitutional right may be limited only when "a compelling state interest in the regulation of a subject within the State's constitutional power to regulate exists." *NAACP v. Button*, 371 U.S. 415, 438, (1963). Generally, when a governmental action burdens fundamental constitutional rights, the action is subjected to the strictest of scrutiny and is therefore deemed to infringe those rights unless shown to be narrowly tailored to serve a compelling government interest. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 666, (1990); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

Gordon adopted "have no contacts with" instruction was as broad as it was definitive. If the purpose was to prevent file tampering, as claimed, then it was not narrowly tailored. If there was an articulated or unarticulated after-hours exception then such exception swallowed the purpose. Gordon, acting in her administrative capacity, had no power to order Brackin to cease contact with her friend under the penalty of job loss.

The right to association protects the close ties between individuals from inappropriate interference by the power of the state. *Roberts* supra at 619. The right to intimate association "reflects the realization that individuals draw much of their emotional enrichment from close ties with others," ties that allow for the cultivation and transmittal of shared beliefs. Id. at 619.

It is no defense that Brackin's relationship with Turner was not that of a

spouse or family member. The Supreme Court has declined to restrict the right to intimate association to the family context. Instead of adopting a categorical approach, the Court has instructed that relationships must be "locate[d] . . . on a spectrum from the most intimate to the most attenuated of personal attachments." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987). Criteria used to measure the strength of an association's interest in intimacy include "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." Id.

Restrictions, if any, upon Bracken's right to associate with Turner, should have been closely drawn in order to avoid unnecessary abridgement of associational freedoms. *Elrod v. Burns*, 427 U.S. 347, 362-63 (1976). The restriction here was not closely drawn to effectuate a legitimate governmental purpose.

This body of law was well known at the time that Gordon issued her (the officer's) no contact directive. As an attorney of long standing, and as a Municipal Judge, she should have known that her restricting Brackin from associating with her close friend, with or without prior approval, for an indefinite period time (the actual time lasted approximately two months) , violated her rights of association. Gordon is not entitled to qualified immunity with respect to this claim.

### (c) Brackin's Procedural Due Process Claims:

Gordon makes no mention in her brief why she should be shielded from

liability for Brackin's procedure due process claims, or in what way the law was not clear on these claims at the time that she was suspended and then terminated. However, because immunity jurisprudence requires that the law and the facts relating to that law be spelled out, we have included the arguments advanced in Brackin's brief in support of her motion for partial summary judgment.

In order to prevail on her procedural due process claims, Brackin must first establish that she had a property right entitlement to continued employment. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S. Ct. 2701, 2706 (1972). "State law determines whether a public employee has a property interest in his or her job." *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir.1991). Under Alabama law, a public employee generally has no protected property interest unless he or she is employed under a civil service system, which allows termination only for cause. *Brock v. DeBray* 679 So.2d 673, 676; (Ala. 1996). ); See also *Ross v. Clayton County, Ga.*, 173 F.3d 1305, 1307 (11th Cir. 1999) ("Generally, a public employee has a property interest in continued employment if state law or local ordinance in any way limits the power of the appointing body to dismiss an employee." (Citation and internal quotation omitted)[20].

There is no dispute here that Brackin was in the City's classified service at the time of her termination, and, as such, she was entitled to some measure of

---

[20] In her October 30, 2007 deposition, Judge Gordon admitted that Mrs. Brackin was a merit system employee in the classified service and as such had a property right in continued employment (See Exhibit 75 Gordon's Deposition at 61, 129 and 131).

due process prior to her loss of a job related benefit. The question then becomes, what process was due? Gordon has admitted that Brackin was a merit system employee entitled to a property right interest in continued employment absent good cause.

Similar to the reasoning in *Goss v. Lopez*, 419 U.S. 565, 574 (1975), an employee facing a deprivation of his property rights must be afforded due process.(fn19) Id. at 579,  A fair hearing in a fair tribunal is a basic requirement of due process. *In re Murchison*, 349 U.S. 133, 136, (1955). The decision-maker who presides over the hearing must be impartial.(fn20)   *Withrow v. Larkin*, 421 U.S. 35, 46,  (1975); *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir.1994) (en banc).  Indeed an impartial decision-maker is a basic constituent of minimum due process. *Burney v. Polk Community College*, 728 F.2d 1374_____ (11th Cir.1984).

Sergeant Gary S. Coleman, Internal Affairs Division, conducted the interrogation of Brackin, interviewed all other witnesses, and, gave his report and recommendations to his police Chief who provided the "complete report" to Judge Gordon[21]. Sergeant Colman wrote in his report:

> It appears Ms. Brackin used poor judgment when instructing Mr. Fondren on how to file his reimbursement claim with the City of Dothan after a written directive was issued. She also admitted her actions to fellow co-workers, McClain and Knight. Based on the evidence, Mary Beth Brackin

---

[21] Exhibit 39.

has possibly violated a Major Offense under the Personnel Rules and Regulations, Section 3-42. (6). <u>Actions or lack of actions that could cause undue financial loss to the City. Negligence in carrying out assigned tasks or duties or responsibilities of one's position.</u>
Upon these findings it is believed that Personnel Rule Section 3-42. (6) was violated and this complaint is sustained.[22]

Sergeant Coleman was given the sole responsibility for determining whether Brackin informed a citizen that he had been wrongfully arrested. It was this same police officer who identified which "Major Infraction", occurred. Sergeant Coleman's articulated rule violation was adopted unquestionably and without further review by Gordon[23]. In essence it was Sergeant Coleman  who was the fault finding decision-maker  whose  decision let to the suspension of  Brackin's and  her two year probation. Sergeant Coleman became not only an instrument in the administrative disciplinary procedure, but the ultimate fact-finder and decision-maker.    This is not a *Nash v. Auburn University*, 812 F.2d 655 (11th Cir. 1987) type case where the decision-maker only had "some knowledge" of the facts based upon his participation in the investigation. Since the City provided  Brackin

---

[22] Exhibit 24.

[23] Judge Gordon's "notice of Charges" delivered to Mrs. Brackin stated, in part, that "you (Brackin) advised Mr. Theron Fondren … that he was wrongly arrested and that another employee was negligent regarding his case….This is in violation of City of Dothan Personnel Rules and Regulations Section 3-42(6) action(s) or lack of action(s) that couold cause undue financial loss to the City, and Section 3-42(14), insubordination." Exhibit 36.

no further meaningful review beyond the Appointing Authority stage,[24] the procedure offered Brackin, prior to placing her on 10 day suspension and two year probation, was woefully inadequate.   Brackin was not provided the "(b)asic fairness and integrity of the fact-finding process (which ) are the guiding stars". *Boykins v. Fairfield Board of Education,* 492 F.2d 697, 701 (5th Cir. 1974), cert. denied, 420 U.S. 962, 95 S. Ct. 1350, 43 L. Ed. 2d 438 (1975);

### (*d). Failure to Follow City's Regulations*

Shortly after her appointment, Gordon implemented a policy to use the city's police investigative unit as part of her office's disciplinary procedure. This in spite of her recognition that there is no formal role between the city police and the Judicial Department. ( Gordon's deposition p. 94).   The reason that she provided was to insolate her from charges of bias. However, she decided when and if an investigation was needed, the target of the investigation and whether to accept the investigative findings. Further, as the Appointing Authority (Department Head) she had the sole right and responsibility to make the ultimate call on whether and how

---

[24] Section 22 of the Civil Services Act of the City of Dothan, which doesn't permits personal advocacy,  provides:

> Section 22. SUSPENSIONS. An appointing Authority may, from time to time, suspend an employee without pay or other compensation, as punishment for improper behavior, but no employee may be suspended for a period or periods within the aggregate of more that [sic] 30 days in any year's service. A Suspension may be effected by serving written notice upon the employee together with a statement clearly setting forth the causes thereof; a copy of which must be forthwith mailed or delivered to the Director. The suspended employee may file with the Board and the Appointing Authority a written answer or explanation of the assigned charges and such answer shall be preserved as a part of the Public Record and the Board may, for cause shown, set aside such suspension order.

discipline should be administered[25] The regulations Bork no role for  Internal Affairs in   determining   whether   employees   of   another   department   has   violated administrative rules.

The  lack  of  authority  for  Judge  Gordon  to  use  the  city  police  as  her investigating force for prospective administrative discipline cases is apparent in the

---

[25] Dothan's Civil Service Act Section 21  and Section 22 (footnote 4, above) vest in the Appointing  Authority  the  sole  discretion  whether  to  administer  discipline.  Section  21 provides:

> Section 21. DISCHARGES. (I) The Appointing Authority may discharge an employee in the Classified Service, whenever he considers the good of the service and the welfare of the city will be best served     \ thereby, by making and filing in his office an order to that effect together with the reasons assigned for the discharge, however, the power to discharge shall not be capriciously or arbitrarily exercised in any case; a copy of such order and the reasons assigned shall be served upon each the employee and the Director before the effective date thereof; and a copy served upon the Director shall be filed and retained in this office as a Public Record. The discharged employee may, within ten days after receipt of the discharge notice, appeal the action of the Appointing Authority to the Board, by filing a written answer to the chairman with a demand for a hearing. It shall be the duty of the Board to fix a time and place for hearing on the appeal, and to give notice thereof to the employee and the Appointing Authority, which appeal shall be heard by the Board on a date not later than thirty days from the date the appeal is taken. The Personnel Board shall have the authority, after an appropriate hearing, and based upon a finding of the facts and applicable law involved, to reduce the severity of the disciplinary action taken by the Appointing Authority, and issue such orders and decrees with reference thereto as may be just and reasonable, and for the best interest of the City. The findings of fact by the Board, based upon its records, and the testimony taken before it, shall be conclusive if supported by substantial evidence. If the Appointing Authority is sustained by the Board, the discharge shall be final as of the date thereof; if the discharge is not sustained; the employee shall continue in the service of the City and shall be entitled to full compensation. (II) A person in the Classified Service may also be removed or disciplined in the following manner: Charges may be fifed with the Director by any officer, citizen, or taxpayer of the city and the Director shall,  after  an  investigation,  certify  the  charges  filed,  together  with  the  results  of  his investigation, to the Personnel Board and said Board shall set a day for a public hearing on such charges. The Board shall on the date fixed receive testimony offered in support of and in denial of such charges     v and from such testimony make a finding of the facts and applicable law involved, in writing, and make such orders and decrees with reference thereto as may be just and reasonable and for the best interest of the city. The findings of fact by the Board, based upon its records and the testimony taken before it, shall be conclusive if supported by substantial evidence. (Ill) If a person in the Classified Service relies upon a direct order by a superior; (a) as a defense or excuse for the violation of any of the provisions of this Act or the Rules and Regulations adopted thereunder, or (b) an omission to observe the provisions of this Act or Rules and Regulations adopted thereunder, he must establish such direct order of a superior to the reasonable satisfaction of the Board.

Civil Service Act of the City of Dothan and its' implementing Rules and Regulations.

Initially, the Act vest in the Personnel Department the power to govern, supervise and control all individuals in the Classified Service[26].  Section 8 of the Act further empowers the Personnel Board to    (b) adopt rules and regulations for the administration of the provisions of this act and (j) to conduct hearings and render decisions, on charges preferred against persons in the classified service. Finally, the Act provides for discharges and suspensions by the Appointing Authority (here Judge Gordon), however such discharges, and obstensively suspensions, can not be arbitrarily or capriciously exercised. See Sections 21 and 22[27].

The Personnel Board Rules and Regulations provide the use of the Internal Affairs Division to conduct investigations of Departments other than the Police Department but in very limited circumstances and only upon approval of the highest authority.  Section 11-60 of the Regulations provides:

> Reporting Illegal or Suspected Activity Involving City Employees:
>
> .Sec. 11-60.   (1)   Any City employee becoming aware of or having any information regarding illegal activity in any City department shall immediately notify his/her respective department Head.
> Sec. 11-60. (2) The Department Head receiving such information shall:
> …. (If the information is of a non-criminal nature,

---

[26] Section 5 provides: PURPOSES OF PERSONNEL DEPARTMENT> Said Personnel Department shall to the extent hereinafter provided, govern, supervise and control all individuals of the Classified Service, by Civil Service Rules and Regulations.

[27] See Footnotes 4 and  5 above.

the Department Head shall notify the City Manager
and the Personnel Director, who shall evaluate the
information and order or conduct an investigation if
deemed necessary.  The City Manager shall have
the prerogative of utilizing the Police Department
to assist with or conduct the investigation. In any
event, a report shall be compiled by the
investigating department and submitted to the City
Manager and Personnel Director.

The term "Suspected Activity" is not defined in the act. However, any
reasonable reading in context suggest that it is intended to modify "Illegal" and
cover those offenses thought (or suspected) to be criminal. Certainly the statute
was intended to neither create a work force of whistle blowers for every
conceivable personnel rule violation, nor employ the offices of City Manager and
Internal Affairs for such violations. In any event, the City Manager must authorize
every police investigation not involving criminal activity which involves departments
other than the police department. This was not done here.

Every document made available to the Plaintiffs' counsel and all testimony
elicited in this case, establish that the police investigations of Brackin were done
either at the request of or with the support of Judge Brackin. The Chief of Police
was merely an adjunct since he was the local police Department Head and it was
through him that the Internal Affairs officers took their orders. The City Manager's
hand was nowhere to be found in any of these investigations. There is no evidence
that the City Manager authorized any of investigations made subject of Brackin's

Complaint.

Procedural due process requires governmental agencies to follow its own rules. *Yesler Terrace Community Counsel v. Cisneros* 37 F.3d 442, 448 (9th Cir 1994) (citing *Morton v. Ruiz* 415 U.S. 199, 235 (1974). Courts often reverse or remand administrative decisions due to the Board's failure to follow its own regulations. See, e.g. *Hudson v. Heckler,* 755 F.2d 781 (11th Cir. 1985), *Abdulai v. INS* , 239 F.3d 542 (3d Cir. 2001) (reversing where Board's lack of explanation raised a serious question about whether its own rules were applied); *Reid v. INS* , 949 F.2d 287 (9th Cir. 1991) (reversing Board where it failed to follow its own regulations and provide notice of its decision to the parties); *Vargas v. INS* , 938 F.2d 358, 361 (2d Cir. 1991) (remanding where, inter alia , the Board acted inconsistently with the regulations); *Naderpour v. INS* , 52 F.3d 731 (8th Cir. 1995) (court reversed where Board misread its own regulation); *Andrasian v. INS* , 180 F.3d 1033, 1046 (9th Cir. 1999) (BIA's failure to follow its own regulations rendered its decision contrary to law); Saakian v. INS , 252 F.3d 21 (1st Cir. 2001) (remanding case where Board failed to apply its own rules to a claim of ineffective assistance of counsel).

There is not much Eleventh Circuit law on when an administrative agency must follow its own rules and regulations. However, *Port of Jacksonville Maritime AC Hoc Committee Inc. v. United States Coast Guard and Jacksonville Transportation Authority,* 788 F.2d 705, 708 (11th Cir.1986) attempted to answer

the question:

> As a general rule of administrative law "agencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as 'internal'." U.S. v. Caceres, 440 U.S. 741, 754 n. 18, 99 S. Ct. 1465, 1472 n. 18, 59 L. Ed. 2d 733 (1979), citing American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538-39, 90 S. Ct. 1288, 1292-93, 25 L. Ed. 2d 547 (1970). A framework governing review of an agency's deviation from its own regulations is given in American Farm Lines, 397 U.S. at 538-39, 90 S. Ct. at 1292-93: determine whether the regulation was intended 1) to require the agency to exercise its independent discretion, or 2) to confer a procedural benefit to a class to which complainant belongs, or 3) to be a "mere aid" to guide the exercise of agency discretion. If the first or second,(fn2) invalidate the action; if the third, a further determination must be made whether the complainant has been substantially prejudiced. If he has, invalidate the action; if not, affirm. See Alamo Express, Inc. v. U.S., 613 F.2d 96, 97-98 (5th Cir.1980); Barnes Freight Line, Inc. v. ICC, 569 F.2d 912, 921 (5th Cir.1978); EEOC v. Airguide Corp., 539 F.2d 1038, 1042 & n. 6 (5th Cir.1976).

That the courts owe some deference to executive policy does not mean that the executive branch has unbridled discretion in creating and in implementing policy. Executive agencies must comply with the procedural requirements imposed by statute. See *Morton v. Ruiz*, 415 U.S. 199, (1974). Agencies must respect their own procedural rules and regulations. See id. at 1074; see also *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981). And the policy selected by the agency must be a

reasonable one in the light of the statutory scheme. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc Chevron*, 467 U.S. 837, 845 (1984). To this end, the courts retain the authority to check agency policymaking for procedural compliance and for arbitrariness.

Because Brackin first suffered the loss of two weeks pay, was placed on probation, and ultimately terminated because of the City's Judicial Department failure to follow its own rules governing who may authorize a police investigation, the third prong of *Port of Jacksonville* is clearly met. This body of law was clearly established during Gordon's acts complained herein and she is deemed to have been aware of it. She is not entitled to immunity with respect to this claim.

### (e) Substantive Due Process

Again Gordon does not explain why she should be immune from suit with respect to Gordon's substantive due process claims. Brackin's summary judgment brief as to this claim is incorporated also.

Counts Five and Seven alleges substantive due process violations. Count Five references the numerous police interrogations suffered by  Brackin, one of which resulted in a suspension and probation for the exercise of free speech rights, another resulted in the loss of employment for her violating a do not contact mandate which frustrated her rights of association. Count Seven also independently challenges the City's chill on her rights of association.

Due process provides two distinct guarantees: substantive due process

procedural due process and substantive due process. *Zinermon v. Burch,* 494 U.S. 113, 125,  (1990). Substantive due process includes both the protections of most of the Bill of Rights, as incorporated through the Fourteenth Amendment, and also the more general protection against "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." Id. (quoting *Daniels v. Williams,* 474 U.S. 327, 331, (1986)); see also *Collins v. City of Harker Height*s, 503 U.S. 115, 125, (1992). "Substantive due process rights are created by the Constitution, and 'no amount of process can justify [their] infringement.*' Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002).

Brackin's claims that her free speech rights and her association rights are fundamental, and, as such, are 'implicit in the concept of ordered liberty" *Vinyard* supra, at 1356. "(A)lthough a retaliatory discharge claim by a state employee involves the denial of the state-created benefit of employment, the right upon which a retaliatory government employment decision infringes is the [fundamental] right to free speech, not the right to a job." *Beckwith v. City of Daytona Beach* Shores,  58 F.3d 1554, 1563 (11th Cir. 1995). Similarly, freedom of association is a fundamental right that encompasses two forms,   "intimate association" and "expressive association." *Gary v. City of Warner Robins*, *Georgia*, 311 F.3d 1334 (11th Cir. 2002). Gordon is not entitled to immunity on this claim.

.    1. **Brackin's Was Engaging In Protected
Speech As Alleged In Count one**

Gordon believed during the time, and believes to day that Brackin informed a

citizen that he had been wrongfully arrested and further told him that a city

employee had wrongfully caused his arrest. These are the reasons advanced in the

City's Notice of Discipline given to her. As stated by the Defendants' in their brief,

the precise reason for the discipline was:

> On or about the 7[th] day of January, you advised
> Mr. Theron Fondren . . . that he was wrongly
> arrested and that another employee was negligent
> regarding his case. This is directly insubordinate
> to a memorandum dated January 8, 2003 from
> Judge Gordon directing all Judicial Department
> Personnel that any citizen wishing to file suit
> against the City should be directed to the City
> Clerk's Office without comment upon possible
> liability. You acknowledged the receipt of this
> memorandum during the investigation of this
> incident. This is in violation of City of Dothan
> Personnel Rules and Regulations Section 3-42(6)
> action(s) or lack of action(s), that could cause
> undue financial loss to the City, and Section 3-
> 42(14), insubordination. As you are aware, this is
> not the first instance of allegations of this nature
> against you, although no disciplinary action was
> taken regarding that incident. . . These violations
> constitute a major category offense which
> imposes a one to twenty day suspension without
> pay. Further, any other major violation occurring
> within two (2) years of this date, shall result in
> discharge.
>
> ( Def. Ex. 24).

As a result of this determination, Brackin was placed on 10 day unpaid leave and placed on probation for two years. It is undisputed that Defendants did not view Brackin's providing such information to a citizen as part of her job duties or that she received some personal benefit from providing the information. The Defendants, in a footnote,  claim that Fondren was not wrongfully arrested but he disputes that and further dispute that he did not  received a payment form the City to compensate him for the towing charge. (See Fondren's Internal Affairs statement at pp 4-7)

Defendants resort to *Maggio v. Sipple*, 211 F.3d 1346, (11th Cir. 2000) is misspent because unlike the present case, Brackin's speech had a public not a private purpose. They also cite *Garcetti v. Ceballos* 126 S.Ct. 1951, 1958 (2006) as standing for the proposition that an employee does not get first amendment protections when they are speaking out as part of their job.   *Ceballos*, doesn't control the present case. The Plaintiff in *Ceballos* did not dispute "that he prepared the memo "pursuant to his duties as a calendar deputy". However, here, if, as alleged that Brackin told a citizen that he had been wrongfully arrested and that he could seek recompense from the City, then unquestionably this was not part of her "official duties". It is not fatal that Brackin was a city employee when she spoke. The question is whether, as part of her duties, she could advise citizens that they had been wrongfully arrested and that they could seek recovery from the City. The City own argument disputes that she had such duty, authority or responsibility.

The Supreme Court concluded that Ceballos "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case," because Ceballos did not dispute that he prepared the memo "pursuant to his duties as a calendar deputy." Id. at 1960. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. The Court never considered whether Ceballos's speech was on a matter of public concern.

After *Garcetti*, the Eleventh Circuit refined its analysis of the first step of the *Pickering* test. In *Battle v. Board of Regents*, the Court described the threshold legal question as whether "'the employee's speech is on a matter of public concern.'" 468 F.3d 755, 760 (11th Cir. 2006) (quoting Anderson, 239 F.3d at 1219). They then quoted *Garcetti* and restated that threshold question: "(the Court) must first ask 'whether the employee spoke as a citizen on a matter of public concern.'" Id. at 760 (quoting *Garcetti*, 126 S. Ct. at 1958) (emphasis added).

## 2. The City's "Do Not Contact" Directive Was An Overbroad Prior Restraint

Defendants argue that if a statute or command is "readily susceptible" to a narrowing construction which would make it constitutional, it will be upheld." *American Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990)(citing

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Nothing in Gordon's no contact directive was subject to a "narrowing construction". Had there been, Brackin wouldn't have brought this action for she would presumably still be employed with the City. After all Brackin was fired for a single innocuous telephone call that had no impermissible purpose other than the fact that it was made. Gordon didn't desire to know any of the details of the call. She didn't need to. Therefore any "narrowing construction" certainly was not made by Gordon.

Missing in Defendants' brief is how this call (when viewed through the prism of a "narrowing construction") warranted dismissal. The mandate tolerated no breach. Even the slightest breach resulted in the ultimate sanction-unemployment and its' attendant economic hardships. Officer Gray, who proposed the mandate, recognized no exception. The personnel Director likewise recognized no exception. (See Exhibit "M" ,  Transcript of the Due Process hearing at ____).

The Appointing Authority prohibited all speech with no time, date or content exceptions. The challenge to this restraint is its' overbreath and potential chill on protected speech.  The speech restriction was principally designed to protect the integrity of a police investigation. However, even if the speech was limited to matters involving the police investigation, its sweep was still overbroad. The subject of the investigation might have needed to discuss matters related to their defense which likely would have been a matter of public concern. Further, the

Appointing Authority's prohibition also restricted contact with the press. This restriction was also overbroad.

The court in *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756 (11th Cir. 01/30/1991) observed

> To establish that a facial challenge to a governmental act presents a real and substantial controversy, a plaintiff must show he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that act.. The injury requirement is most loosely applied -- particularly in terms of how directly the injury must result from the challenged governmental action -- where first amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced.( internal and external citations omitted).

> Id. at 760

In *Bourgeois v. Peters*, 387 F.3d 1302 (11th Cir.2004) the City of Fort Benning, Georgia executed a policy requiring everyone wishing to protest in a political protest to submit to a magnetometer search for metal objects.  In finding this non intrusive search a prior restrain on speech, the Court noted five problems, four of which are implicated in the present case

> The City's search policy also violates the First Amendment in five ways. First, it is a burden on free speech and association imposed through the exercise of a government official's unbridled discretion; restrictions on First Amendment rights may not be left to an executive agent's uncabined judgment. Second, the searches were a form of

> prior restraint on speech and assembly; to participate in the protest, individuals had to receive the prior permission of officers manning the checkpoints. Third, the search policy was implemented based on the content of the protestors' speech. Fourth, even assuming the searches were implemented exclusively for content-neutral reasons, they were impermissible because they did not constitute reasonable time, place, and manner limitations, which are the only permissible content-neutral burdens that may be placed upon free speech and association. Finally, even putting aside First Amendment analysis, the search policy constitutes an "unconstitutional condition;" protestors were required to surrender their Fourth Amendment rights (as discussed in Part II) in order to exercise their First Amendment rights.

Id at 1316.

The Defendants have cited no authority suggesting that a government employer who subjects his/her employees to a total band on speech can do so with impunity. . Brackin has stated a claim in Count Two of her Complaint. The strength of this claim will be measured, in part, by the four–stage Pickering/Connick test *Pickering v. Board of Educ.*, 391 U.S. 563 (1968) Connick v. Myers, 461 U.S. 138 (1983).

As a defense to Brackin's association claim, Gordon testified repeatedly that she advised Brackin that if she wanted to socialize with Turner outside of work to simply let Judge Gordon know, and Judge Gordon would clear it through the

investigators[28]. (Gordon depo p 330) However, they omit that she could not attest that if the request for after-hours contact was made that it would have been granted. (Gordon's depo p. 336). Indeed, if such request would be granted then Gordon was   free to say that all after-hour contact would be permitted.

Defendants argue that there was a significant governmental interest –the prevention of collusion[29]- to trump any association interest that Brackin may have had. The prevention of collusion and the allowance of after-hour contact are internally inconsistent. If collusion prevention was the goal then the directive could have been narrowly drawn to limit the prohibition to only collusive contact. In all seriousness, we are discussing a single speeding ticket. The Realm would no fall less all social contact ceased.

The government can't just articulate the collusion rubric and deny governmental employee cherished constitutional rights.  Government employees do not relinquish all of their constitutional rights when they accept employment in the public square. *Pickering v. Board of Education*, 391 U.S. 563, 568, (1968).   If collusion was the mischief sought to be avoided, and none having been shown in Brackin's contact with Turner, then what justified the draconian sanction of job

---

[28] The Defendants appear to be talking out of both sides of their mouths, in their brief in Section 2-the overbroad section, they assert: ". Obviously, in light of the fact that others in the office might be involved in Turner's scheme, the City had a legitimate reason to prohibit them from speaking with Turner during the course of the investigation" How is this objective reached by permitting after contact. Is not coercion equally available after hours? I suspect that this after hour exception is an after the fact attempt to soften the effects of a sweeping prior restraint of contact and speech.

[29] Nowhere do they explain how policing contact, as opposed to commandeering computers, records, files ect, would prevent collusion. The act which Turner was accused had long passed and prohibiting contact would not un-ring that bell. The restriction was simply overreaching with no discernable reasonable governmental objective in mind.

loss?

The City didn't nefariously learn that Brackin contacted Turner. She volunteered that information. If collusion was her aim in making contact, it is doubtful that she would have been so forthcoming with this information.

**3.    Brackin's Relationship with Turner was Protected by the Constitution, Therefore, Her First Amendment Freedom of Association Claim (Count Three) Remains Viable**

Brackin and Turner were best of friends both at office and away. They attended church together, socialized together and shared intimacies. There relationship was hardly causal or similar to the generalized right of `social association, which includes chance encounters in dance halls, referenced in *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

Defendants are correct that among these association rights protected by the first amendment is the right to expressive association. They are wrong in suggesting that Gordon's sweeping prohibition did not chill Brackin's expressive association rights. The right of expressive association includes the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion. *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). Gordon's mandate forbade all contact, including contact at church. Brackin and Turner attended the same church and engaged in worship together.

Of course Gordon's no contact order was overbroad. It not only had a chilling effect upon Brackin but also effectively kept Turner from meaningful contact with her friend.  "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society . . ." *Sec'y of State of Md. v. Joseph H. Munson.* Co., 467 U.S. 947, 958, (1984).

**4.    Brackin's Procedural Due Process Claim (Count Four) Is Valid  as a Matter of Law Because the Internal Affairs Investigations Did   Result in a Deprivation of a Property Interest**

In the   initial portion of Section 4 of Defendants' brief, they assert that Brackin's procedural due process claims must fail because she lacked a property right entitlement to continued employment absent good cause. This argument is effectively addressed in Section  A (3) ( c )  above,  and will not be repeated here. However, *Berryman v. Civil Service Bd. Of Muscle Shoals*, 571 So.2d 1122,1124 (Ala. Civ. App. 1990) affirms Brackin's property right:

> The law is clear that "an employee who has established the right to permanent employment pursuant to a civil service statute . . . has as 'property right' in his job which may not be taken away or altered without due process of law." Peseau v. Civil Service Board, 385 So.2d 1310 (Ala.Civ.App.1980), cert. denied, 385 So.2d 1316 (Ala.1980) (citations omitted). Consequently, Berryman has a "property right" in his job, and that right may not be taken from him absent due process.[30]

---

[30]  Even an arbitrary and capricious prohibition takes the employment relationship out of the realm of "employment at will" for at will employment permits job loss for any reason even an arbitrary and/or capricious one. Brackin had a property right in continued employment.

Defendants' next claim that Brackin's due process claim must fail because she had a right to bring it in state court. They, therefore, claim that this Court lacks subject matter jurisdiction over Brackin's "federal due process violations by a municipality where the aggrieved persons have the right to bring their grievance to the state's circuit court" citing in support: *Gainer v. City of Winter Haven, Fla*. 170 F.Supp.2d 1225, 1234 (M.D.Fla.,2001) who in turn cited *Boatman v. Town of Oakland*, 76 F.3d 341, 346 (11th Cir.1996) [*Boatmen* relied on *McKinney v. Pate*, 20 F.3d 1550, 1555-60 (11th Cir.1994) (en banc)], which found there that Plaintiff's claim failed because the state provided all of the process that Boatman was due.

Even *McKinney* recognized that resort to the federal courts might be proper when the state refuses to provide a process sufficient to remedy the procedural deprivation of a constitutional right. *McKinney* supra at 1557.

As noted in Greenbriar *Village, L.L.C. v. Mountain Book, City,* 345 F.3d 1258, 1264 (11th Cir. 2003) when courts analyze a procedural due process claim they variously examine three things: (1) whether there is enough of a property interest at stake to be deemed "protectable" ; (2) the amount of process that should be due for that protectable right; and (3) the process actually provided, be it before or after the deprivation.

In the present case there was woefully inadequate procedures offered by the state to protect Brackin's procedural due process rights. With respect to her

suspension, after Gordon's initial decision, she had no right to further advocacy review. She had no means of obtaining the discovery necessary to advance her claims that Internal Affairs (utilized as part of Gordon's administrative procedure) violated her rights by not following the procedure required by regulation. Absent discovery, there was no way to determine that the City Manager had not authorized the investigations as requires by the City's Personnel Regulations. Further, the reviewing court could only review whether there was "substantial evidence" (the lowest level of inquiry) supporting the Personnel Board's decision. As the Appellate Court stated in *City of Dothan v Brackin* 959 So.2d 678, 680:

> Standard of Review
>
> "The trial court's review of the Board's decision is limited to `the record made before the Board and to questions of law presented, and that court must affirm the judgment of the Board if there is substantial evidence to support its findings.' City of Mobile v. Seals, <u>471 So.2d 431</u>, 433 (Ala.Civ.App.1985). If there is substantial evidence to support the Board's determination, the trial court must affirm the Board's decision and may not substitute its judgment for that of the Board. Id. The trial court is not permitted to judge the wisdom of the decision of the Board. Creagh v. City of Mobile Police Dep't, <u>543 So.2d 698</u> (Ala.Civ.App.1989)."

**5.    Brackin's Substantive Due Process Claim (Count Five)  Remains Valid  as a Matter of Law Because the Internal Affairs Investigations Did  Invade Upon A Fundamental Right**

.

In this section of Defendants' brief they challenge Brackin's substantive

due process claims. Brackin has addressed these arguments in Section A (3) (e) above and will not repeated the arguments here. However, Brackin is not claiming that her government employment is a fundamental right but only that her right to have the government not infringes her speech and association is fundamental. It is the excessive entanglement between the police interrogations and Gordon, which made the infringement possible, is what is at issue here. The police investigations were coercive, aggressive involuntary and not pursuant to any legitimate police interest.  These investigations let directly to the punishment of Brackin's for her exercise of these fundamental rights.[31]

### 6.    Brackin's Procedural Due Process Claim in Count Six of Her Complaint Must Proceed To Trial

Defendants' challenge to count Six of Brackin's Complaint is premised upon her lack of substantive due process rights in her job. This argument also has been addressed in Section A (3) (e) above. Brackin would add that her overreach first amendment speech prohibitions and overreach in the restrictions of her rights of association states a claim of substantive due process.

### 8.    Both Plaintiffs' Title VII Claims Are Not Subject To Summary Dismissal for Slightly Different Reasons.[17]

*Title VII Analytical Framework*

As a threshold matter, the Defendants suggest that since Gordon was the

---

[31] In a foot note Defendants notice that the City Police Department. These same defendants moved to remove the Police Department as a party to this action claiming redundancy.

one who hired both Plaintiffs, it is illogical to surmise that she terminated their employment for discriminatory reasons. With all due respect,   the analysis is not that simple. There is a reason that mutuality of the hiring and firing decision-maker is not an element in McDonald Douglas, or any other *prima facie* case standard (McDonnell Douglas instructs only that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally).

Defendants' theory doesn't hold because people can change over time. Also, some people retain racial stereotypes which they hid (either in plain sight or otherwise). These stereotypes can play a role in the decision-making process. Still another reason for the apparent paradox is the protection of ones own syndrome. It is not unusual or remarkable for a member of a group who had been excluded to become very protective of their membership (embrace them in a protective cocoon) once they achieve a position of authority.  This is precisely the charge against Gordon. In the interest of protecting minorities, which she hired, she lashed out against any one whom she perceived as a threat to them.

It is generally recognized that a  plaintiff in an employment discrimination case may establish a *prima facie* case of discrimination (1) through direct evidence of discriminatory intent, *Alpin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991), (2) by offering statistical proof of a pattern and practice of discrimination, *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989), or (3) by offering circumstantial evidence as articulated by the Supreme Court in

*McDonald Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 668 (1973).. The Eleventh Circuit has often employed the analytical framework established in McDonnell Douglas.

The Eleventh circuit had recently affirmed the McDonnell Douglas method of review in determining the existence a *prima facie* case in *Sumerlin v. Amsouth* 242 Fed. Appx 687 ( 11th Cir. 2007):

> To establish a prima facie case of discrimination regarding a termination, an employee may prove that "she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). See id. at 1087. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

> Id at 689

The establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case   *Combs v. Plantation Patterns*, 106 F.3d 1519,1528 (11th Cir.1997) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S.

248, 254 (1981),

### (a) Martin's Challenge to Summary Judgment on Her Title VII Claims

Martin's facts in a nut shell. This case presents a unique but none-the-less credible set of facts. A white Administrator (Martin) was hired by a black Department Head (Gordon) to discipline and run roughshod over the white, but not black, employees under her charge. When she refused to do this she was discharged. The catalyst of this discharge was the merging of three events, Martin's changing two black employee's job assignment, her discovery of their joint involvement in the wrongful arrest of a defendant and reporting the same to Gordon, and these employees decision to advance discrimination charges against Martin. All three of these events occurred within a single week (indeed within days). Martin's discharge followed immediately thereafter[32]. At a minimum, the case creates substantial factual issues which are not grist for the summary judgment mill.

### (i) Martin's Prima Facie Case

---

[32] In their brief, Defendants attempt to gain much traction in their claim that Martin did not raise to specter of discrimination until the last minute. Of course Martin disputes this. She claims that she sounded the alarms at a meeting on July 17. As repeated elsewhere, recognition of discrimination is not an overwhelming characteristic of non minorities. Gordon causes the termination of no less than 10 white employees during her brief tenure as Municipal Judge. Yet there has not been a whisper raised from the white community in the Dothan and surrounding communities. Now juxtaposition the racial dynamics and query whether there would have been a human cry from the African-American community. We are hard tuned to suspect discrimination, especially when racially tinged adversity affects large numbers of our membership.

As stated above  *Sumerlin v. Amsouth Ba*nk 242 Fed. Appx 687, 690 ( 11th Cir. 2007): permits Martin to  establish a *prima facie* case of discrimination regarding a termination, by  proving that "she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." Even if there are no similarly situated employees she may still prove her discrimination case by other evidence" of discrimination" *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

There is no dispute that Martin, as a white employee, is subject to the protection of Title VII. She suffered an adverse event--she was fired from her position. Despite Defendants' assertion to the contrary, she was qualified for the position which she held. Her first evaluation established her bonifides. Indeed, the claims against her do not question her overall qualifications, only her management style. At worse, this is a factual issue not suitable for summary disposition. The only debatable question was whether there were other similar situated employees treated differently for similar offenses or other evidence of discrimination.  Other evidence of discrimination is overwhelming.

Though Martin was the Administrator, and there is only one Administrator serving at a time, she does not concede that there are no other similar situated individuals to whom she can refer to establish desperate treatment. Martin was implicitly but undeniablely   instructed to apply personnel rules differently depending

upon the race of the employee under her charge. Because of the implementation of this policy several white employees, Ann Baxter, Michelle Bryan and , Mary Brackin were subject to discipline where black employees Lavera  Mcclain and Eunice Knight were not  for similar or greater offenses.  White employees were denied other privileges and benefits of employment that these black employees enjoyed.[33]

It is Martin's position that she can, under the facts of this case, identify both Lavera and Eunice as similar situated employees treated differently. This is especially true here where her attempts to treat them equally resulted in her termination. Finally, Martin claim of discrimination is premised upon disparate treatment when her complaints of discrimination by Gordon in favor of the two black employees were ignored, while their complaint of discrimination against her resulted in job loss.

Even if Martin could not establish comparables, she could prove discrimination by other evidence. See for example Bass v. Board of County Commissioners 256 F.3d 1095, 1108 (11th Cir. 2001); Schoenfeld v. Babbitt, 168 F.3d 1257, 1264 (11th Cir. 1999) and; Dawson v. Henry County Police Dept., Henry County; 238 Fed. Appx 545 (11th Cir. 2007). These cases do not define what meant by "other evidence". However, if the term means anything it means evidence that the employer uses race as a proxy in his/her decision-making processes and that

---

[33] Examples of this are the disparate office arrangement with the blacks receiving the best offices despite having less seniority and, black employees being permitted to carry a less strenuous work load than the whites.

the plaintiff has suffered injury as a direct result of the employer's racially based employment decisions.

Here, prior to her first day on the job, Gordon made disparaging comments about the white employees of whom Martin was expected to manage. Gordon cautioned her to look out for some. Gordon's comments at the same time were laudatory about the black employees. Gordon directly interceded to ensure that a newly hired black employee get one to the best offices available, even if it required relocation a more senior white employee. She either permitted a black employee to assign, or she assigned, the black employees the better offices. Under the threat of job termination, Gordon compelled Martin to change a thoughtful evaluation of one black employee and make it more positive, to insure that this employee got a raise.

At every stage, Gordon would not permit Martin to discipline black employees but made her discipline white employees even in some cases where she (Martin) was not familiar with the facts supporting the discipline. Finally, Gordon summarily fired Martin after she made job assignment changes affecting both white and black employees after the latter complained about the changes. There is certainly enough here that a reasonable jury might believe that race consciousness motivated Gordon's behavior making summary judgment inappropriate.

Martin has stated that Gordon once told her that City officials would take no action against her because she was black and female. (Martin's Affidavit at 85).

This seems a rather odd statement for a black Judge to make to a white Administrator. Upon hearing it, immediately there is a suspension of disbelief. How does one account for it. Perhaps hubris provides an answer, or maybe the fact that Kalia Lane, a black attorney who once had the inside track for the position, filed suit when she didn't get it. (Gordon's depo p. 34-34) Maybe Gordon felt empowered. The statement is not too far removed from another statement attributed to Gordon, that Plaintiffs' counsel, who is black, was a traitor for representing them. (See Exibit "N" , June 1, Hearing Transcript at 268-269).

### (ii) Gordon's Articulated Reasons Are Pretexual

A plaintiff may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256. See also *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). A method of determining unworthiness is to demonstrate that the employer's proffered "legitimate" reason(s) for his decision suffers from "such weaknesses, implausibility, inconsistencies, incoherencies, or contradictions that a reasonable fact-finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). In accord is." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), cert. denied, 126 S.Ct. 478 (2005).

From documents provided to counsel and to the Equal Employment Opportunity Commission, we know that Gordon made the decision to terminate Martin at least by September 30, 2004. (See Exhibit "K"-Attachment 3)[34]. This date is tenuous because even though "Attachment 3, drafted by Gordon bears the September 30 date, it refers to two other documents, one of which was drafted June 8, 2002, (Exhibit "O-Attachment 2) and is nearly a carbon copy of the Memo provided to Kai Davis on the same date (Exhibit "C"), and the other, which is undated, makes reference to Gordon's decision to terminate the employment of Brackin ( Exhibit "P"-Attachment 1)[35]. So the decision to terminate her could have been reached slightly prior to September. The date is important when one considers what was happening around that date.

Exhibit "K" references some tag-on incidents occurring on or around September 30. These will be addressed below. However, not withstanding the laundry list of purported reasons referenced in Defendants' brief, the stated reasons were contained in Gordon's Attachment 1. This Attachment notes four reasons (there are others stated within the categories) for the decision to terminate the employment of Martin. Summarized these reasons are as follows: First, Martin's ability to interact with both private and governmental attorneys, her refusal to permit an attorney to file an untimely motion, and the disobedience of Gordon's

---

[34] This is not the date when the Decision was communicated to Martin. Martin received her evaluation, which recommended job termination, on October 12, after she had returned from her vacation.
[35] Each of the "Attachments" was drafted by Gordon.

order to withdraw an outstanding warrant of arrest. There are no specifics provided and these charges are a restatement of the identical charges mentioned in Gordon's June 8, memo to Kai Davis (See Exhibit "C"). Keep in mind that these alleged deficiencies occurred little more than a month from Gordon giving Martin a mostly outstanding evaluation, and within days of Gordon's anger over the evaluation Martin gave to Lavera.

Though the references in Attachment 1 are vague and indistinct, Brackin disputed that the events depicted ever occurred. Gordon, in her deposition, could not recall any specifics or the name of the person for whom she recalled the warrant. There were no formal complaints. Gordon acknowledges in her deposition that she wouldn't seriously consider a complaint not put in writing. In her own words she wanted to "cut down on the ying-yang" (Gordon's depo p. 227).

Since Martin and Gordon provided inconsistent statements concerning these charges, and there is no other corroborating evidence in support, for summary judgment purposes, Martin's version of these events must be believed. Further, a reasonable jury could conclude, after a review of all of the evidence, that Gordon's version is "implausible, inconsistent, incoherent" and not worthy of belief. This is especially true since Martin was never provided with written notice of these events (if Gordon and Martin are to be believed) or any other l notice (if Martin is to be believed).

It is undisputed that Martin was not disciplined for any of the performance problems referenced in Attachment 1. Finally, since the referenced events occurred before June the 8, one month after a Gordon's evaluation of her, a reasonable jury could conclude that these events did not form the basis of a decision to terminate her four months later.

The next reason mentioned in Gordon's "Attachment 1" can be summed up as back-biting among the judicial department staff. This, too, is a restatement of charges raised in Gordon's June 8 memo. The charges are vague as to time, incidents or participants. Further, it makes no reference to how Gordon, who is housed in another facility, would be in a position to know.

Martin disputes this vague accusation as well, and, there was never a written notice provided to her detailing the specifics. This is especially important for the Personnel Rules and Regulation contemplates that probationary employees will be provided notice of their deficiencies and provided an opportunity to improve their performance. As written, Martin would not have received notice of what was occurring in her office that needed correction.

A reasonable jury might not find this proffered reason not credible in light of the positive evaluation of Martin in late April, and the Gordon's inconsistent claims in her deposition that within the first month of Martin employ, she (Gordon) could tell that she (Martin) was ill prepared for her position, and the later statement, that she didn't know whether Martin's bad performance referenced in the June 8 memo

occurred before or after her evaluation. There is no evidence that the office back-biting if it occurred at all, continued after June 8 and therefore a jury could conclude that it did not form the basis of the October termination decision.

The next issued raised in Attachment 1 was Martin's alleged failure to insure that the Court docket was covered during the period that Brackin was out on suspension. Brackin was suspended April 26 for ten days. Martin disputed that the docket was not covered, and to-date Gordon has offered no documented evidence to support her assertion. However, since this is a rehash of a single event which occurred, if at all, during late April or early May, and didn't result in any written notice, it hardly provides the basis of an October termination decision. Similar to the reasons discussed above a reasonable jury could conclude that this is a post hoc rationale advanced by Gordon, which is not credible and unworthy of belief.

Finally, Gordon in "Attachment 1" references Martin's unsatisfactory evaluation of Lavera as the basis of her decision to terminate Martin. This evaluation was conducted in May at the request of Gordon. Not satisfied with the results of Martin's independent evaluation, Gordon insisted, under the penalty of job loss, that she (Martin) redo the evaluation. Under protest this was done. This too was referenced in the June 8 memo.

A jury could not only conclude that this reason as well is a *post hoc* pretexual excuse for the real reason of her decision—reverse discrimination. They could also conclude that it establishes as fact Gordon makes race based

decisions. Gordon committed to, by her own admission, a "hands off" on how Martin would manage the Magistrate's office.  She has been nothing if not a "hands on" Department Head, especially as it relates to disciplining white staff and disallowing the discipline of black staff.

The reasons advanced in Attachment 1 are pretexual and not worthy of belief either because, as stated by Martin, they are untrue or they did not form the true basis of Gordon's decision to terminate her.  At a minimum, the stated reasons raise disputed issues of fact which must be decided by the fact-finder.

Attachment 3, which by expressed reference was done after the decision was made to terminate the employ of Martin, raises other issues which also lacks credibility. It first references a subordinate of Martin's "stock-piling" files in her office and Martin doing nothing more than issuing a memo. Gordon claims that she instructed Martin to take unspecified further action but that Martin had not. Martin expressly disputes this and states that an additional disciplinary memo was placed upon her desk prior to her termination.

Martin's version of this disputed incident must be believed at this stage. However, there is no reference concerning the amount of time during which Martin was to prepare this additional disciplinary document. This omission is important when the length of time that the Internal Affairs determined that Brackin had

committed a rule violation and the actual notice of discipline given to her.[36] Consider also the several months gap between the items referenced in Attachment 1 and the discipline afforded Martin.[37]

### (b)  Brackin's Challenge to Summary Judgment on Her Title VII Claims

### (i) Brackin's 's Prima Facie Case

Brackin suffered two adverse employment actions, suspension coupled with a two year probation, and termination. She is a member of a protected class. She was qualified for the job having held the job for a combined period of eight years. She was subject to disparate treatment on account of her race, white and was disciplined for alleged infractions which were similar to, and lesser in degree than,  that committed by black employees similar situated.

### (ii)  Gordon's Articulated  Reasons Are Pretexual

Defendants seek to convince this Court that Brackin can not establish an essential prong of a *prima facie* case – she cannot show that the City treated similarly situated employees outside her protected category more favorably. They next assert that even if she could meet this threshold burden, the City had a legitimate reason for her termination. The suspension coupled with two subsequent violations:   (1)  writing VOID on a transmittal sheet and (2)

---

[36] The Internal Affairs issued their report on April 8, Brackin was not informed of the discipline until April 23, 2004.
[37] In Martin's termination notice she was accused of committing an intolerable offense which arguable consisted of the matters raised in the June 8 memo. (See Exhibit "F")

insubordination, in that she "willfully, by [her] own admission, disobeyed a directive from (her) department head.

Both adverse administrative actions taken against Brackin began from an Internal Affairs investigation initiated by, or permitted by, Gordon. All of the Internal Affairs investigations were the special tool utilized by Gordon to investigate supposed wrongdoing by white employees. Though she could have, Gordon has not sought investigations by Internal Affairs for possible rule violations of black staff members.

Gordon explains this disparity by stating that each of Brackin's investigations was initiated by complaints of citizens:

> Q    But you have never imposed any discipline on either one of those two?
>
> A    I had no grounds given -- if there was a court administrator at the time, it would have been deferred to her for disciplinary action.  If there were allegations -- what Ms. Brackin has glossed over, in every investigation of her, ah individual citizen walked into court or into an office and made a complaint, and that initiated each of the investigations against her. Not one of them was initiated in-house.  Every one of them, somebody walked in and made a complaint.
>
> (June 1 Hearing transcript at 215.

However, there can be no clearer case of disparate treatment than Gordon's treatment of Rickey Stokes' complaint about Lavera ( Exhibit "R") which was submitted to her on or about April 8, 2004,  the same day that Internal Affairs submitted its report   concerning Brackin to Gordon. Mr. Stokes not only complained about Lavera giving him the brush-off when he was trying to protect his client from getting wrongfully arrested, but ha had several other specific complaints about Lavera.

Not only did Gordon not initiate an Internal Affairs investigation, she would not permit Martin to take any disciplinary action and demanded that all record of the wrongful arrest be expunged. A similar rally around the troops occurred in the Ronald Powe (Exhibit "Q")[38] case when Martin's attempt to discipline both Eunice and Lavera' for their involvement the result was a brush off and subsequent termination.

There was also a complaint against Eunice from Sergeant Woodruff concerning numerous missing and incorrect warrants. Not only did Gordon not initiate an internal investigation she refused to permit Martin to take any action. (Martin depo p. 340-340).

Brackin in her Notice of Determination for the Fondren charge was told that she violated a January 7th memorandum, and this constituted insubordination. Martin has accused Eunice of insubordination for her refusal to follow rules. But for Gordon's refusal to permit Martin to discipline Eunice, she would have been disciplined for a similar offense--insubordination. Brackin was also accused of committing an act which could have resulted in an undue financial loss to the

---

[38] Powe's arrest resulted from Laver's failure to input in the computer that he had successfully completed his Defensive Driving Course and turned in his certificate. He was subsequently arrested for violating a term of his probation. A relative posted a cash bond. This bond was suppose to run through the system but Eunice discovered the wrongful arrest had him released and returned to him the cash bond amount in violation of the rules.

City. Lavera's and Eunice's wrongful arrest also could have resulted in undue financial losses to the City. Yet Gordon refused to allow these employees to be disciplined.

The fact that the decision-maker will not permit discipline of similar situated black employees, who have committed comparable offenses or at the very lease violated the same rule, creates the comparator class. A near exact case of disparate treatment can be observed in the events which lead to Brackin's termination. She was terminated for insubordination because she failed to obey a March 10, 2005 "do not contact" directive issued by Gordon. However, at the same time Gordon issued this directive she issued an equally sweeping directive that the staff was not to discuss the fact that there was an Internal Affairs investigation involving Mary Turner.

During a companion Internal Affairs investigation, it was discovered that Eunice, in direct violation of this directive, and by her own admission, had disclosed the nature of the Internal Affairs investigation to a friend. The Internal Affairs investigator shared this information with Gordon.. Their report containing this information was turned over to Gordon. However, no action was or has been taken against Eunice. There are no discernable substantive difference between their non compliance.

The Defendants' repeatedly refer to Brackin having had two "major Infractions" since her suspension. If left unanswered, the wrongful impression is left that Brackin committed two offenses since her suspension. Defendants are well aware that the transmittal incident occurred on December 4, 2002 nearly a year and a half before Brackin's suspension. Defendants' also know that VOID was placed on the transmittal form because at his request, the traffic ticket had

been sent back to the officer who issued it. "Void" was only reflecting that the ticket was no longer available.

The Defendants in their brief, alerts the Court that" The UTC Form on which Phelps ticket was listed was received by Brackin. (UTC Form, Brackin Depo., Def. Ex. 34). Brackin signed the form, certifying that she has received all the tickets listed on the form. (Brackin depo., p. 189:12-16)". What Defendants don't reveal is that Brackin is not the only one who has written "VOID" on a transmittal form to reflect the current status of a ticket.

In a document Plaintiffs counsel received from the Defendants a few days prior to  the first round of depositions, "VOID" was written on a transmittal form signed by Lavera. (Exhibit "S"). This is a transmittal which included to ticket of Bradley Phelps. The ticket unaccounted for is ticket number 5532103. No internal Affairs investigation was convened to investigate this ticket.

**9.     Plaintiffs' § 1983 Discrimination Claim (Count Nine) Against the City May Not Be Sustainable Under Current Law**

Both plaintiffs concede that under the auspices of *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978), which held that municipalities were "persons" for purposes of 42 U.S.C. **§** 1983, and that municipalities could be liable for constitutional torts when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, municipal liability under 1983 may be difficult to establish. In the nearly twenty years since the *Monell* decision, cases have

refined the standards for determining who is a municipal policy-maker, *what* is municipal policy, what is municipal custom and the degree of proof necessary to meet these standards to such a fine point that some say the standard is no longer understandable. See, *Board of County Commissioners of Bryan County, Oklahoma v. Brown,* 117 S. Ct. 1382, reh'g den. 117 S. Ct. 2472 (1997) (Breyer, J., joined by Ginsberg and Stevens, JJ. dissenting) ("But a basic *legal* principle that requires so many such distinctions to maintain its legal life may not deserve such longevity") and (Souter, J., joined by Stevens and Breyer, J.J., dissenting) ("I had not previously thought that there was sufficient reason to unsettle the precedent of Monell. Now it turns out, however, that *Monell* is hardly settled. That being so, Justice Breyer's powerful call to reexamine 1983 municipal liability afresh finds support in the Court's own readiness to rethink the matter."). However, a revisit of *Monnell* will have to wait another day for Plaintiffs' are abandoning their 1983 discrimination claims against the City, but not against Gordon.

### 10.    Brackin's Retaliation Claim Under 42 U.S.C. § 1983 (Count Ten) Is Valid For She Was Subjected to An Adverse Employment Action

For Brackin to prevail on her retaliation claims she must show show by a preponderance of the evidence that: (1) the her speech was on a matter of public

concern; (2) her First Amendment interest in engaging in the speech outweighed the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) her speech played a "substantial part" in the employer's decision to demote or discharge her *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir.1989). Once she succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that "it would have reached the same decision...even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

[18] The first two factors are questions of law designed to determine whether the First Amendment protects the employee's speech. See *Beckwith v. City of Daytona Beach Shores,* Fla., 58 F.3d 1554, 1564 (11th Cir.1995). The second two factors are questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech. See id. Therefore, if Brackin can prove her free speech claims, she can make out a case for retaliation. If her first amendment claims survive, or either of them, then her retaliation claims based upon them survives.

### 11.    Brackin's False Imprisonment Claim (Count Eleven) Survives Because Her Liberty and Movement Was Restrained Under The Threat For Force.

Brackin was ordered to submit to a police interrogation, not once but on four separate occasions. None of these interrogations were authorized by law. Brackin was never informed that she could leave nor did she feel that she was free to leave. In her words I felt like a criminal. (Brackin's depo. P. 158)

"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." *In Crown Central Petroleum Corp. v. Williams,* 679 So. 2d 651, 653 (Ala. 1996), citing *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala. 1993), the Court held:

> "For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."

Brackin have at least established a jury question on whether she reasonable believed that she was being restrained against her wishes and whether the Defendants were responsible for the restraint.

### 1.    Martin Abandons Her First Amendment Freedom of Speech Claim (Count Twelve)

The fairly recent case of *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958

(2006) may well preclude Martin from advancing a claim premised upon any adverse action that was taken against her for opposing, within the confines of her employment, the discriminatory treatment the white owned bonding companies viv-a-vis the favorable treatment received by Get Out Bonding, a black owned bonding company. Therefore she is abandoning this claim.

**3.     Neither Plaintiff  Is  Prepared To Argue Their  42 U.S.C. § 1983   Discrimination Claims (Count Fourteen) Against The City But Maintain This Claim Against Gordon**

Plaintiffs' acknowledge that generally municipalities cannot be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). However, municipalities may be held liable for the execution of a governmental policy or custom. See id. at 694. Municipal liability may arise with regards to an employment decision, such as a termination, provided that the decision-maker "possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986) (majority opinion) (emphasis added) (footnote omitted). What is "final authority to establish municipal is tricky. With respect to the suspension of Brackin, Gordon for all practical purposes had " final authority to set policy with respect to the action ordered—Brackin suspension. The only review available for Brackin is to send a letter to the Board.

The Eleventh Circuit "has interpreted *Monell* 's policy or custom requirement to preclude § 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decision-making discretion to the subordinate, but retains the power to review the exercise of that discretion." *Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir. 1997). Thus, "[f]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." Id. at 1401; see *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633 (11th Cir. 1991) (holding that mayor was not the final policymaker with respect to zoning decisions where the city charter provided that the city council could override the mayor's veto of zoning ordinances); cf. *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) (accepting concession that city police chief was not final policymaker with respect to employment decisions where police chief's decisions could be reversed by the city manager); *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713-15 (11th Cir. 1992) (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review")

It would take more discovery than either time or resources permit to flesh out the parameters of Gordon's policymaking authority, therefore this against the City is being abandoned.

### 4.    Martin's § 1983 Retaliation Claim (Count Fifteen) Survives Because She Can  Establish a *Prima Facie* Case And Further Establish Pretext.

Martin accepts Defendants' statement of the law with respect to 1983 retaliation claims. Martin indeed must establish that she engaged (1) in statutorily protected activity; (2) that she was subject to an adverse employment action, and (3) that the adverse action was causally related to her protected activity. *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); cert. denied, 532 U.S. 1076 (2001).

Each of these conditions has been met. Martin's protected activity was her opposition to Gordon's reverse discrimination against white magistrates and the demonstrated favoritism toward the black magistrates. If Martin's statements of the facts are true, and for summary judgment purposes the Court must accept them as such, then Gordon has set up a racial preference classification. To this end, this case is not dissimilar to *Johnson v. Board of Regents* 263 F.3d 1234 (11th Cir. 2001). To meet muster, Gordon's racial preference must pass "strict scrutiny" " a racial classification must be held unlawful unless (1) the racial classification serves a compelling governmental interest, and (2) it is narrowly tailored to further that interest" Id at 1244. Here, Gordon is making no such claim for she is disputing that she has demonstrated a racial bias. Whether she has or not is for the trier of the facts.

As for the second *Gupta* condition, this case is a living testament that Martin has suffered "an adverse employment action". The only question yet to be

answered is whether the adverse action was causally related to her protected activity. The facts suggest an affirmative answer.

Things remained uneventful and Martin was in Gordon good graces while she was disciplining Brackin, Baxter, and assisting in finding Tonja a larger working quarters. Martin was offered whatever adornments that she wished for her office and was giving a magnificent employment rating. However, after Martin gave a black magistrate an unfavorable rating, Gordon suddenly found disfavor with her performance. When Martin complained about the rule infractions, and insubordinate behavior of the black magistrates, Gordon's disparate disciplinary treatment and attempted to change the black magistrate's job assignments, Martin was summarily terminated.

It raises a fact question whether there was a casual relationship between Martin's complaints of unlawful activity and her loss of employment. Notwithstanding Defendants' assertion to the contrary, Martin did complaint to Gordon about the racial preference shown to Lavera and Eunice. The very purpose of the July 17, 2004 meeting with Kai Davis and Gordon was to raise these concerns.[39]

### 5.    Martin's  States A Valid Negligence Claim (Count Sixteen)

---

[39] As stated in an earlier footnote, it is not at all remarkable that non minorities do not raise the specter of racism at the slightest provocation. .

Martin has stated a claim of negligence *per se*. Using Defendants' own stated standard, Martin satisfies each of its preconditions. That both Gordon and the City have violated the expressed provisions of the City's Personnel Rules and Regulations can not be seriously denied. As stated by *Parker Bldg. Services Co., Inc. v. Lightsey ex rel. Lightsey*, 925 So.2d 927, 931 (Ala. 2005) Martin only has to establish that (1) The statute must have been enacted to protect a class of persons, of which the plaintiff is a member; (2) the injury must be of the type contemplated by the statute; (3) the defendant must have violated the statute; and (4) the defendant's statutory violation must have proximately caused the injury." *Parker Bldg. Services Co., Inc. v. Lightsey ex rel. Lightsey*, 925 So.2d 927, 931 (Ala. 2005)(citing *Fox v. Bartholf*, 374 So.2d 294, 295 (Ala.1979)).

Assuming arguendo that Gordon didn't have a racial motive for her decision-making  then her failure to comply with the terms of the Regulation was either intentional or negligent. Gordon haven't forwarded an argument that her failure to comply was intentional, therefore, we assume if was premised upon the absence of care. The statute was designed to prevent the arbitrary loss of jobs and to provide those in the City's civil service some job protection. A working test period is provided and the Appointing Authority is to provide feedback to the employee so that they can cure any job related deficiencies. There is a scheduled period of evaluations (in Martin's case every three months).

These evaluations provide a means to provide feedback and offer the Appointing Authority a basis of assessment of job performance. Salary compensation is based on these evaluations.

Gordon did not provide Martin feedback and she did not perform the evaluations as scheduled. For Gordon to state otherwise raises a fact question. By Gordon's own statement, Martin was not performing as expected, therefore, she was released before her anniversary. Had there been meaningful feedback, Martin could have been successful. Hence the failure to provide this feedback, as required by the Regulations, was the direct cause of Martin's injury.

Defendants point to fragments of Martin's testimony to try to demonstrate compliance with the Regulation. The regulation does not contemplate causal conversations at unscheduled times discussing matters piecemeal. Gordon never had a meeting with Martin designed to discuss performance problems. One simple memo direct to and provided to Martin from Gordon, directed to job related performance problems would put to lie Martin's claims that no such discussion ever occurred. There is no such memo.

### 6. Plaintiff's Breach of Contract Claim (Count Seventeen)

Martin's withdraws her breach of contract claim.

### D. Plaintiffs' Punitive Damage Claim

Plaintiffs request the privilege to respond to the punitive damage section after the substantive issues have been decided.

CONCLUSION

For the above stated reasons Defendants' Summary Judgment Motion is due to be denied.

Respectfully submitted, this 13th day of December 2007..

s/Ishmael Jaffree_____
ISHMAEL JAFFREE ( IXJ 1791)
800 Downtowner Blvd. Ste 106 B
Mobile Alabama 36609
251-694-9090 ishjaff@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Theodore P. Bell
Carol Sue Nelson
Audrey Dupont
Maynard Cooper & Gale
1901 Sixth Avenue North
Birmingham Alabama 35203-2618

/s/Ishmael Jaffree
Ishmael Jaffree