## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA SOUTHERN DIVISION

| | |
|---|---|
| NANCY MARTIN and, ) | |
| MARY BETH BRACKIN, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| ) | |
| **v.** ) | **Case No. 1:05-CV-1172-MEF** |
| ) | |
| CITY OF DOTHAN and JUDGE | |
| ROSE EVANS-GORDON, ) | |
| ) | |
| **Defendants.** ) | |

### AFFIDAVIT OF NANCY MARTIN

1.    I first interviewed  for the position of Administrator of the Magistrates Office of the Judicial Department of the City of Dothan with Judge Gordon, Kai Davis and Cpt. Jim Smith sometime in late November or early December, 2003. They explained what my job duties would be, how many Magistrates, Clerk Typists, and temporaries I would be supervising (9 Magistrates, 2 Clerk/Typists, and at the time 2 temporaries). I was advised that they had gone to a new Court computer system during the first part of November and that they were having numerous problems with it. I[i] was also advised that if I was hired, I would not have the chance to have all the weeks of computer training that other magistrates had had, however, they would arrange some training for me.

1

2.    I was told that Michelle Sellers, the Judge's Assistant, would train the new Court Administrator on their duties and responsibilities, and she would be in the facility probably most of the first couple of weeks after hire to help with any problems which might arise. I was told that since I was not a certified Magistrate, I would be required to complete that certification by attending the courses during the first two years of my employment. I was assured that the fact that I was not a certified Magistrate did not matter; because they were looking for someone with supervisory and management skills and I would learn the duties of the Magistrates and Court Clerk, during the course of my employment and by attending the certification courses.

3.    Judge Gordon explained that since I had over 20 years legal experience that I would not have a problem learning the procedures of the Municipal Court. However, the Judge cautioned me that some of the Magistrates would probably give me a hard time because I was not a Magistrate and they were and was an outsider.

4.    The Judge informed me that they were in the process of moving the Magistrate's office from the white building right beside the Judicial Building to a building that had been bought and remodeled by the City for their office. The Judge would maintain her office, along with her Assistant's, in the Judicial Building.

5.    I was questioned extensively concerning my skills, experience and

2

work history,  I was questioned on why I wanted to change jobs, and whether I thought  that I  could handle all the problems in the Magistrates office. I was advised over and over that I could not imagine how horrible some of the Magistrates could be and was advised of some of the things they had done. The Judge told me that some of them were capable of actual physical attacks, and if hired, I was to really "watch my back" all of the time

6.   The Judge told me briefly about Mary Turner and Mary Beth Brackin, and that they are the ones to be very careful with, that no matter how nice they appeared, they would sabotage me and could possibility hurt me in their effort to get rid of me. However, the Judge assured me that I could trust Lavera and Eunice because they did their jobs and didn't cause any trouble. She told me that she trusted Lavera to help her do a lot of things because she knew Lavera would not sabotage her.

7.   The Judge explained that she didn't have the time to hold court sessions and supervise the Magistrates office, especially with all the problems it had. She promised me over and over that she wanted to hire someone who could "take" the office from her" and handle it and she would give her full support to that person and not interfere with their supervision or management of same. Some of the problems referenced was lost paperwork, excessive computer errors, back biting and dissention among the staff and a general lack of discipline. I was expected to be the disciplinarian foremost to bring some order to the office.

8.     Near the close of the interview Judge Gordon asked if I was still interested after all of the problems that she had related.  I informed her that I was very interested and knew that I could handle the position although I had some concerns about the threat level. The Judge told me that she would tike for me to come back another day so I could interview with a couple of other people. I agreed.

9.   I interviewed again with Judge Gordon and Kathleen Nemish and one other person a few days later. Again we went over my qualifications Again I was asked why wanted the position. The Judge then basically went through the same warnings of how bad the Magistrates office was and which Magistrates were the ones causing all the trouble. Judge Gordon reiterated the many problems I would face in taking this position, but also said she would be behind me with her full support; and would not interfere with my supervision of the staff.

10.     A few days later, I was called by the Judge's assistant, Michelle Sellers, and asked if I could come in for the physical, I had already decided that the salary which was posted in the job announcement was not high enough for all the responsibility this position held.  I asked Michelle if the starting salary could be increased. I told her that it would take a certain amount of money for me to accept the job given all the responsibilities and problems in the office. She promised to check on that and get back to me. However, she caution that the only way it could be increased would be for it to go before the City Commission for their approval

and such approval is rarely given. I declined the job offer at that time based on the salary and the articulated problems of the office.

11.   I was contacted again sometime around the first of January 2004, by Ms. Sellers and told that they didn't remember what salary I had stated I would have to be given in order to take the position. She requested that I provide her that information which I did.

12.   Ms. Sellers call me back either that afternoon or the next day and said dial they would get approval from the City Commission for the increased starting step and full range salary (in fact they  went above the amount I requested). I advised I would discuss it with my husband and call her back the next day.  Upon the mutual promises of the  Judge and Kai Davis, Personnel Director that they would  let me have full control of the Magistrates' Office,  with no interference, I agreed to accept the position.

13.    As an aside, I accepted the position thinking that the Magistrates I would have to watch out for, and who would cause me the most trouble, were Mary Beth and Mary Turner. That proved to be, far from the truth. Had I known the real trouble was that the Judge shows favoritism toward the minority Magistrates and sought to get rid of the white Magistrates, I would never have taken the position.  I gave up a job at legal Services Corporation of Alabama where I had been for 19 years. I had on numerous occasions over the years supervised black staff and been supervised by black staff and I never had the

problems which I would come to experienced working in the Magistrate's Office.

14.    I worked for over 10 years for black Managing Attorney, black paralegals and other black attorneys and there had never been issues about race. I never received anything but exemplary evaluations while there. I have never been fired or suspended.

15.    Resuming back to the narrative, in somewhat chronological order, I met all the requirements for the position and the Commission approved my hiring at the increased step and salary demanded, and I was "officially" employed as of January 16, 2004. Judge Gordon wanted me to start right away but I could not take over control of the office until February 16, 2004. Protocol required that I provide my current employer, Legal Services Corporation of Alabama, at least 30 days written notice.

16.    Prior to my actual start date I had occasion to visit the facility and meet with Judge Gordon for a walk through. This occurred on February 13, 2004.  I was to begin work the following Monday, February 16. On that prior Friday, I went to the   Magistrates office and met with a few of the employees on duty that day. Additionally, I met with Judge Gordon who showed me the office that she had selected for me.  My office was in the middle of the whole complex and close to the main entrance where I could observe who was coming and going from the office.

17.    She showed me around the office and I noticed that one of the

Magistrates. Mary Turner didn't have an enclosed office, but kind of a cubbyhole with a small desk and her computer/printer on it. I also noticed that on one side of the building, the offices were smaller than the side I noticed that the two Magistrates who were black had larger offices. The other bank of offices on the other side was occupied by the white Magistrates.

18.   During our walk through, the Judge told me that the white Magistrates had been complaining and were very upset about the office assignments. She said that she didn't assign the offices that Lavera had and she didn't see anything wrong with the assignments. She didn't know what they were complaining about because the offices Lavera and Eunice had were no larger than the others.   In fact they were larger.

19.   I was to learn after I officially started working at the office that the manner of office assignments had caused some very big problems and resentment from the white Magistrates because the Judge had appointed Lavera to handle the whole move and office assignments. It was not based upon seniority, the drawing of lots, or any other fair method of office assignment but appeared to be preferentially assigned.

20.   The Judge later told me that Mary Turner wasn't given an office because she was being punished for an incident that had happened recently between her (Turner) and Kai Davis at a group staff meeting called to discuss offices concerns. The Judge justified Turner's lack of an office by stating that

Mary works the front window and therefore didn't need an office.

21.    Mary Turner would later send me a memo requesting that she be given an office. There was always office space available for Turner. Every time I approached the Judge about providing Turner an office, the Judge would tell me that Turner didn't need an office, but if she ever did decide to let her have one it would be the small offices across the hall from me so I could keep an eye on her.

22.    During my walk around the Judge gave me a head's up on each of the staff. Mary Turner (white) was identified as a trouble maker whom I should watch out for. I was told that she had assaulted Kai Davis and I should watch my back. The Judge stated that she should have gotten rid of her a long time ago. I was told that Mary Beth Brackin (white) is also a trouble maker who along with Turner keeps trouble going on in the office and that Mary was currently under an Internal Affairs investigation for encouraging a defendant to sue the City. Mary Beth also was described a person that the Judge should have gotten rid of a long time ago.

23.    I was cautioned not to worry because both Turner and Beth will do something to permit me to fire them. I should keep my eyes open. With respect to Mary Beth, the Judge said that I would have to review material from Internal Affairs after I start officially, and would have to write her up for a disciplinary infraction.

24.    I was informed that Sarah Fowler (white) was a follower of Mary Beth and Mary Turner. She wouldn't initiate anything herself but that she would go

alone with Beth and Turner. That she wasn't strong enough to stand up to Mary Beth and Mary Turner, and she just went along with them.

25.   Michelle Bryan (white) was described she was very young and very pretty, was divorced, socialized a lot on the telephone, and had police officers in her office a lot socializing. She was dating several police officers at the same time, and that I would really have to cut down on her socializing.

26.   Valerie Savage (white) was described as a friend of Michelle Bryan. The Judge said that Valerie, though a pretty good Magistrate,   had a very poor attitude, was very outspoken, had previously worked for Judge Steensland at the Houston County Court, and had been let go there.  The Judge informed me she had been sleeping with prisoners while employed at Houston County and could possibly be doing the same thing here at the city Jail. She told me I would have to watch out for her, that she, too, could cause me a lot of problems. The Judge told me that a lot of people who knew Valerie had encouraged her not to hire her. Valerie was very hard to get along with and they had had many bad incidents. She said that she should have fired Valerie, but she knew she needed the job: since she was a single Mom.

27.   Ann Baxter (white) was said to be very, very nice and would do anything for me, but she had problems balancing her money several times a week, and it was suspected that she was stealing money. She had recently come up $500 short in her money drawer.  I was told that a problem with Ann's handling

of money was being investigated by Valerie Harris, the Internal Auditor Ms. Harris wanted the Judge to fire Ann, but Gordon just couldn't do it because Ann was the nicest person in that office The Judge also advised me that Ann made numerous mistakes in computer entry. I was told that Aim didn't have to work because she had a lot of money because she owned a real estate company and had inherited money and land from a family member.

28.    Fran Bailey (white) was considered a good Clerk/Typist that would help me with anything I needed. Fran had been with the City for about a year and a half.  Melissa Woods was described as a Clerk had only been there since December 2003 and was well thought of so far.

29.   Lavera McClain (black) was highly praised as a very good Magistrate who had previously worked at the jail and was very well liked, was very knowledgeable, and the Judge could "trust" her to do things for her and not sabotage her. I was advised that Lavera was in charge of the move to new building because no one else would do it.

30.    Eunice Knight (black) was also said to be a very good Magistrate, very quiet, very efficient and knowledgeable and would cause no problems. I was told she just stays in her office and does her work.

31.    During the time between my hiring and my starting date, I began thinking about the Magistrate's position that was opened and thought I should participate in the interviews and hiring of this Magistrate. I called Michelle Sellers

and told her that I would really like to sit in on the interviews for the Magistrate's position. She said she would call the Judge and call me back. She did, and advised me that the Judge said that wasn't necessary that she would handle this hiring herself.

32.    When Tonja, Minnifield, the new black Magistrate (whose interview I was not allowed to participate), was hired, the Judge immediately began to come over to our office for the purpose of finding a suitable office for her. I suggested to the Judge  why  couldn't Tonja  be given the small office that Michelle Sellers had set up a desk in  (this was supposedly where Michelle was going to work while she was helping me get adjusted and trained into  the job, however., Michelle very seldom came to our office and trained me  very little). The Judge told me that she did not want to give that office to Tonja because it was "too small". After a lot of back and forth the Judge said that we would put Tonja in the small office after she first start and then we would move her to a larger office when we could decide what would be best. In spite of pledges of complete control the Judge was starting to exercise, as was her right, control.

33.    Tonja appeared to have no problem with the office she was placed in, however, the Judge was adamant that Tonja needed a larger office, I reminded her that Mary Turner didn't even have an office and that I thought we should put Mary in an office if we were going to make any changes to the office to give Tonja a larger office.  After many weeks of the Judge and I discussing  many options,

having the Interim City Manager, the General Services Supervisor, and another department head, meeting with us, the Judge finally decided that we would make the back office available for Valerie and Tonja would move in Valerie's vacated office. The Judge also allowed Mary Turner to move into the small office that Tonja had been in,-- but only temporarily while Lavera was out on extended sick leave, and Mary was doing Lavera's job duties and needed more space However, I managed to keep Mary in that office after Lavera returned.

34.   As promised during the February 13, walk-through, within one month of my employment Judge Gordon provided me with investigative reports and other documents and instructed me to write a disciplinary report on two Magistrates, Mary Beth and Ann Baxter. I was instructed not to discuss this with them but use the information in the reports. She instructed me to find that Mary had committed a major infraction and to suspend her for 10 days with a warning that the next major infraction within two years may result in termination.

35.   I had no independent knowledge of the charges against Mary and was uncomfortable writing the disciplinary action. I felt that this would certainly chill any working relations I would have with her, me being a newly arrived outsider. However, I didn't desire to be insubordinate and not obey a superior.

36.   Judge Gordon instructed me to only give Ann a written formal counseling notice and advise her that future violations will result in more severe disciplinary measures. As in the case of Mary Beth, I felt uncomfortable writing

a disciplinary report on matters which occurred prior to my tenure and without giving the employee an opportunity to explain or otherwise defend.

37.    When I first started at the City, the Judge gave me everything I asked for. She insisted I order new furniture, any kind I wanted. She then told me that I could decorate my office and the City would pay for it. She told me to go to any place I wanted and purchase pictures, lamps, mirrors, whatnots, etc. I kept telling the Judge and her assistant that I didn't need all of that because there was already a very nice set of furniture in the office, but they insisted. I began feeling that I was being bought.

38.    The Judge and I were getting along great, I got along with all the Magistrates, some better than others, but I made a point not to get very close to any of them or it would cloud my judgment. I also did not want anyone to accuse me of showing favoritism. I found out right away that the Judge was very good friends with one of the black Magistrates and pretty good friends with the other one. I also found out pretty quick that anything I did or said in the Magistrates office went very quickly from Lavera  over to the Judge. I felt I was constantly spied on.

40.    I later learned that Judge Gordon had hired all three of the black Magistrates and was very protective of them. She also hired my predecessor, Betty King, also black. While she had a history of disciplining and even terminating white Magistrates and Administrators [ in the course of five years

she had fired or forced to resign five white magistrates,(Kevin Sorrels, Allison Davis, Patty Kindberg, Kim Phillips, Cheryl Moray) one white clerk(Debbie Irby) and a white Administrator( Donna Nicholson) prior to my tenure and two white magistrates( Mary Turner, Mary Brackin and one white Administrator(Nancy Martin) subsequent to my hire] while never disciplining or permitting the discipline of any of the black magistrates. I do not suggest that disciplinary action was not warranted in some of these cases. It is just to demonstrate Judge Gordon's propensity to discipline white staff members for the slightest provocation yet providing a protective shield around the black staff members.

41.   The problems in that office were enormous when I began there, but it wasn't from the Magistrates that the Judge had told me were the trouble makers. It was from the Judge's showing favoritism to the black Magistrates. There was resentment from several of the white Magistrates because the Judge had allowed Lavera to coordinate the recent move of the Magistrates office from the building they were in right beside the Police Department to two blocks away. The Judge had also allowed Lavera to assign the offices in the new building and Lavera had assigned herself and her friend Eunice the best available offices.

42.   On April 21, 2004, while I was still on good terms with the Judge, she performed my evaluation. My ratings were a healthy mix between "satisfactory" and "exceptional". Indeed she could find no area needing

14

improvement. There was not one unsatisfactory marking. During our sit down face to face she praised my ability to address problems, assist the public and get along with Municipal Court Attorneys. She rated the quality of my work, initiative, corporation and dependability as exceptional. She told me that since my employ I had hit the ground running and was an asset to the Judicial Department.

43.   I believe there was several things that led the Judge to believe that I was no longer on her team (ie. would not promote her favoritism of certain employees over others). One example is when in late April when I was given Lavera's annual performance evaluation to complete. Her evaluation came due while she was on extended medical leave. The Personnel Department told me to go ahead and do her evaluation, sign it, have the Judge sign it and return it to them and then when Lavera returned to work they would send it back for me to go over it with her, obtain her signature and send it back. I discussed this with Judge Gordon and informed her that I didn't want to be responsible for doing Lavera's evaluation because I had not been able to evaluate her for the whole year since I was  new,  I could only rate her from my observations during my time there. The Judge insisted that I go ahead and conduct the evaluation.

44.   I had told the Judge before I began work there that I would evaluate each employee based on what I observed, not on past evaluations or what I

had heard. It would be on my own knowledge. It took me several weeks to do Lavera's evaluation because I felt I could not be truthful about her performance because of her relationship with the Judge.

45.    I felt I was expected to give her a good evaluation. I went over and over the evaluation for weeks. One day I would rate her according to what I knew to be true myself and then the next day I would rate her according to what I knew the Judge would expect me to do. In the end, I just couldn't, with a clear conscience, rate her any way but from what I knew to be true, regardless of the consequences (the end of my honeymoon period with the Judge).

46.    When I presented my completed evaluation to the Judge, I told her that we would probably need to discuss it because it probably wasn't what she would expect. She said she would go over it and then we would discuss it later. She kept it for many days and in fact, Personnel had called me to ask where it was since it was due in their office. I told the Judge that day that Personnel had called and needed the evaluation. She said she would discuss it with me later. A few days later, the Judge called me to come over to her office. When I arrived, she pointed to the evaluation and said "you know we have to discuss this". I told her I would be glad to discuss it with her and explain why I rated each section the way I did.

47.    The Judge told me that she had taken the evaluation and met with Jerry Corbin (the Interim City Manager, and also a very good friend of hers),

Mary (black employee from Personnel and her good friend), and someone else who I believe was a department head, She told me that they suggested that she ask me to take another look at it to be sure I had rated her fairly, especially since Lavera had never received an unsatisfactory rating.

48.    I was a little upset that the Judge had gone and discussed the evaluation with others who had no knowledge of the court system, the Magistrates duties, or their performance, however, I told her that I had spent weeks agonizing over Lavera's evaluation and I just couldn't rate her any differently. The Judge talked on and on about how good Lavera was, how she would do anything you wanted her to do, and how knowledgeable she was and how no other Court Administrator had rated her anything but satisfactory.

49.    The Judge asked me if I had looked at the past evaluations to go by to do this evaluation. I told the Judge that I had in fact reviewed the past evaluations and it appeared to me that they had just been copied from one year to the next because the rating and comments were pretty much the same. The Judge seemed to get little angry about that and said that she didn't believe it. I told her I would be glad to bring her the copies from past years that I had in my office and we could go over them. She said no, please just take this evaluation home with you tonight and see if there's anywhere you could have maybe rated Lavera wrong. She said I'm just asking you to go over it again tonight and give it back to me tomorrow.

50.    She said if you can't find anywhere that you can change the rating then okay, but I think if you look at it again, you will see that maybe you rated some parts wrong. The she said, "This is not a threat, but remember you are still on probation". I was shocked and didn't know what to say. Although she said "this is not a threat", I took it as a threat and that's exactly what it was.

51.    I went home with the evaluation agonizing over what I should do. I spent all night reviewing and reviewing the evaluation, but I had already spent a week on it before and in all honestly could not find where I could rate her any differently, however, because I knew I would lose my job if I didn't, I changed two or three ratings just enough to make it a satisfactory evaluation. Of course, I was sick about this and promised myself I would never do that again. I gave it to the Judge the next morning and told her that I had changed it a little and I thought she could sign off on it now.

52.    She was just overjoyed and told me she knew I needed to look over it again. I just asked her to be sure her assistant got it over to Personnel and I went back to my office. I had already been feeling that the Judge was not as happy with me as she had been when I first started work there, primarily because I had brought up the Rickey Stokes affair discussed below. This incident only made it worse. Things were never the same between the Judge and I after that.

53.    I was to learn only after I filed this lawsuit that a few days after I had

this discussion (a little more than a week later) the Judge sent a Counseling Memo to Kai Davis, Personnel Director stating that I didn't get along with the City attorney's, other attorneys who appear before her Court and had given a bad evaluation to Lavera. Except for initially giving Lavera a bad but fair evaluation the rest of the Judge's memo to Davis was untrue. Near the same time that I performed Lavera's evaluation I did one on Mary Beth and included, at the Judge's demand, an unsatisfactory rating due to her dealing with the public based on the Fondren incident. Judge Gordon did not raise any issues with Mary's evaluation, nor any other white staff member's evaluation that I conducted during my tenure. .  <u>The Judge's  memo to Kai Davis is  dated June 8, 2004, the same day that the Judge signed Lavera's revised evaluation.</u>

54.   I also was to learn, after the lawsuit was filed, that Judge Gordon, on July 8, 2004, sent Kai Davis another memo, this one principally accusing me of treating two unidentified magistrates differently with respect to their leave request. (This was two days after I discussed Lavera's evaluation with Lavera and expressed my concern that it did not reflect her actual performance).  My first evaluation required a follow-up evaluation to be completed by July 26, 2007. This second evaluation never occurred in spite of my continuing reminders to the Judge that it was past time for my evaluation. If true, the matters raised in both memos could have been raised in the second scheduled evaluation. They were not.

55.    Though the Judge never met with me to discuss the items mentioned in her June 8, and July 8 memo's, (I never had a one on one counseling session concerning my performance) I did request a meeting with her and Kai Davis. This meeting was eventually held on Monday, July 19. On that day I received a call from Kai Davis that she had received my messages and was sorry she had not gotten back in touch with me. I told her I thought she, the judge, and I needed to meet concerning several things, Kai asked if I would contact the Judge to see if and when she -would meet with us.  I contacted the Judge, who said we could meet me when she was finished with a special trial set at 11:00 am. She said she would call me when she was ready to go over to Kai's office and we would go together.

56.    However, about 12:30 p.m., the Judge   called me from Kai's office to tell me she was already over in Kai's office and had forgot to call me first. I began the meeting by discussing the memo that Eunice had sent to me as well as her response to my memo to her concerning why she changed some bonds. (I was reviewing all Magistrates' changing bonds to see if they were following policy and procedures set forth. Because I decided to start putting in memo form the questions I had about bonds being changed and Eunice was the Magistrate on-call at the time, she was the first to receive such memo).

57.    Eunice had been angry that I questioned her concerning the bonds and had done a memo to me pretty much stating that I didn't have the authority

to question her.  I had previously discussed this with the, Judge and advised her that I considered Eunice's statements in her Memo to me as, as well as her addressing me in a staff meeting stating pretty much the same thing about me not having the authority, and that she would do it the way that she had always done it, to be insubordination and that I was going to write her up on. At that time, the Judge told me that since I had never done a memo to any of the other Magistrates concerning changing bonds, Eunice feels that I was singling her out. I explained to the Judge again, that I had just recently decided that I would put any questions I had in writing instead of orally because of having to have documentation of every little thing that goes on in our office. The Judge told me that if I proceeded to write up Eunice for insubordination, that she could file a discrimination complaint against me.  It was obvious from all the Judge said that she was not going to back me up on the insubordination and she was once again taking up for Eunice so I decided it was senseless to pursue disciplinary action against Eunice and run the risk of charges being brought against me.

58.    I reminded Kai that I had spoken to her at least once, if not two, times previously concerning Eunice's insubordination to me. Kai in fact had told me to write Eunice up for insubordination before this incident and had again told me that with respect to this particular incident that I should write her up, Kai acknowledged that yes, we had spoken and that she had told me that I should write Eunice up for insubordination on more than on occasion.

59.    I then told the Judge of the numerous things that she had refused to back me up on concerning Lavera and Eunice, including the many mistakes they make on the computer system that others have to correct; their lack of knowledge of entering correct entries on the computer and not asking for help, about the problem. The problem that I have with them entering and exiting a door in the office although I had done two or three memo's forbidding anyone from using that entrance/exit. The Judge butted in and I couldn't finish. She said that Eunice and Lavera didn't receive the training that the other Magistrates did and the others wouldn't show them how to make the correct entries; that she thought them using the door that I had forbidden was silly and not insubordinate (however, Kai and I both pointed out that it was a security and safety issue); She then said that Tonja had complained about me to her (although she had never told me);  I told her that I could work with her but I had to be able to supervise all staff, not just the white staff. I told her that I don't want Lavera having special powers or privileges.

60.    The Judge said she doesn't come over to our office much so there was no way she can be giving preferential treatment to anyone. The Judge just kind of got tired of the talking and she just said she was leaving the meeting.  At no time during this meeting did the Judge tell me that I was not performing up to standards or that I couldn't get along with people in other departments.

61.    After this meeting, the Judge would hardly ever meet with me or

return my phone calls after that day. She would have Michelle Sellers tell me most things she wanted me to know. There are always many issues and cases that needed to be discussed between the Judge and I, however, I ended up having to do memos to her to ask her opinion or advice on how to handle something because she would not sit down and talk to me. I might catch her in her office every now and then for 2 to 3 minutes before court arid she would have no choice but to look at what I had questions about and advise me. She ignored most of my memos asking for her advise or answer on how to handle a certain situation.

62.     The two unidentified Magistrates referenced in the Judge's July 8, 2004 memo to Kai Davis were Eunice and Michelle Bryan and their situation was totally different. Eunice had been off a half day on February 19; a half day on February 20; a half day on March 1; and all day on March 2 and March 3, refereeing basketball games that I understood had been time off approved by the judge before my hire.

63.     Eunice then asked off a short while after these days off.  I had already approved leave for four other employees in the office.  Knowing that I had to have enough magistrates there to cover court on Thursday and the windows, etc. on Friday, I explained to Eunice the others that were going to be off and why I needed her at work.  She became very defensive and confrontational to me and stated that she needed to go to the doctor with her

daughter.  I asked her if she could come in after the doctor's appointment and she said no.

64.    Never did Eunice tell me that her daughter was having a biopsy for cancer detection. Nor did she advise that this was anything other than a regular doctor's checkup for her daughter.  I first put on the leave request that she needed to submit a doctor's note from her daughter's doctor and the leave was being approved conditionally, that if she could come in to work after the doctor's appointment she was to do so and if she wasn't needed to stay with her daughter's children she would come to work on Friday if possible.   However, I did mark off the doctor's note sentence and gave Eunice a corrected copy. Eunice was insubordinate the whole time and stated she would be off.  She never said another word to me about the leave time and she showed up to work on Thursday and Friday. I asked how her daughter was on Thursday, thinking she had gone with her that morning and then come to work, and she stated she didn't know how she was.

65.    Sometime in July, I believe, is when the other situation happened with Michelle  who called in I believe one Monday morning stating that she was in Birmingham with her niece that had been rushed to the children's hospital and was not expected to live.  Michelle was very close to the niece because her daughter and the niece were the same age and spent a lot of time together. Michelle also advised that her grandmother was in bad medical condition in

another city and was not expected to live and she would be going to be with her grandmother as soon as they knew more about her niece's condition.

66.   I knew Michelle had a couple of days of leave left and just told her to let me know of the condition of her grandmother and niece as she found out. Ii assumed Michelle would be back in a couple of days.  Michelle called in every day, and her grandmother's condition didn't improve for several days, and her niece passed away a few days later.  Michelle's grandmother improved some several days later; however, passed away a couple of weeks later.

67.   I had no idea that I was suppose to tell Michelle to come back to work during this time when she had two family members near death and she was helping sit with them, nor did the judge advise me to do so although the judge was well aware of Michelle calling in daily and that I did not have the authority to approve leave she didn't have.

68.   If the Judge was the only person who had the authority to approve this leave, she should have immediately told me to have Michelle return to work.  The judge never said one word to me either about me not having the authority to approve her leave or to have her return to work.  The Judge was very sympathetic to Michelle's family situation each time I spoke with her.

69.   Eunice situation had nothing to do with this situation.  These events happened about four months apart and had nothing to do with the

other.  it wasn't about who had leave and who didn't, it was about Eunice not advising why she needed to be off – the seriousness of the request and her insubordinate attitude to me when I tried to assess her situation against having enough magistrates to cover the court/magistrates' office duties when I had four others off during that same time period.  It also had to do with Eunice having been off for several days' right before that.

70.    There are numerous incidents that happened during the period of May through September that only added fuel to the fire between the Judge and I. She always made sure I knew if a white Magistrate was responsible for a person being arrested wrongly and insisted I have a meeting with them and if it happened again to write them up. However, she always made light of persons arrested wrongly by the black Magistrates. Only after I insisted that I should talk to them about it, did she agree that I could do that.

71.    There was a major incident where a person was arrested wrongly because of Lavera not completing paperwork on the case and issuing a warrant that should not have been issued. Eunice was on call and caught the mistake. The man had already bonded out before Eunice caught the error by having another person post his cash bond. Cash bonds are always receipted at the jail by jail personnel, and then the Magistrate on call verifies and initials the bond sheet when she takes the bond money over to the Magistrates office to be posted and deposited in the bond account. When cash bond

money is to be refunded, it is refunded according to the instructions of the person bonding the bond. In this case, the bond stated specifically that the money was to be refunded "only" to the person who posted the bond (this was a friend of the Defendant). Eunice, trying to cover up the mistake Lavera had made in issuing the warrant and the man being arrested, released the Defendant and gave him the cash money. Eunice never had the money run through the Magistrates office and a check issued to the person posting the cash as is a mandated policy of the City. I found out about it accidentally and did some research into it and found out what had happened.  The Judge refused to discuss this incident with me when I approached her about it.

72.    I  attempted  to  discipline  Eunice  on  two  occasions  for insubordination, but was strongly encouraged by the Judge not to do so. In fact, I discussed the insubordination problems with the Personnel Director on two occasions at least, and she was angered that I was having this problem with Eunice and said that I should definitely write her up for insubordination. Of course, since the Judge encouraged me not to write her up and for fear of losing my job, I did not pursue it and Eunice continued to be insubordinate.

73.    I talked to Kai Davis, privately , several times after I started work at the City, number one because I felt I could trust her because she and I had known each other for many years, having gone to school together at Dale County and I knew her family, etc. I also believed Kai was a professional and

handled all things no matter who they involved in a professional manner. When Kai and I talked about the problems between the Magistrates and the Judge

74.    Kai admitted that she had talked to the Judge concerning this and the Judge swore that she only asked Lavera to do things for her because she felt she could trust her. However, after about the third time Kai and I had met to discuss these same problems, I just came right out and told Kai that I had been trying to make light of the problems by saying they may not have been racially motivated, however, they in fact were and the Judge was very guilty of discriminating against the white Magistrates. Kai did then admit that she knew it was racial because she had been told by other people besides me about it.

75.    Kai told me that she was going to check into it herself. Kai also told me to always keep a notebook and make notes everyday of what happened and to always keep the notebook with me so no one else could have access to it. I never heard anything from Kai concerning whether she investigated the discrimination or not.

76.    Another incident which could have resulted in liability to the City and most certainly would have warranted discipline of Lavera was brought to my attention by bondsman, Rickey Stokes. On April 12, I received a formal written Complaint from A-Advantage Bonding Company owned by Mr. Stokes. This was a specific complaint against Lavera for her "Court Docket

Procedures, Bond Forfeiture Procedures; Bond Processing Procedures and Warrant Recall Procedures. Mr. Stokes had contacted Lavera because she had written a warrant of arrest against the wrong man whose bond A-Advantage was holding.  Mr. Stokes had contacted Lavera in an attempt to get her to recall the bond. She told him that she did not have time to discuss this with him and to get out of her office.

77.    Mr. Stokes followed up by contacting Mary Beth who looked into the matter and realized the mistake. Mary contacted Judge Gordon and told her the entire story. The Judge didn't want to listen to any complaints about Lavera and told her to erase the record on the computer. Mary, fearful that the Judge had requested her to do something illegal, contacted me and related to me her conversation with both Stokes and the Judge. I instructed her to do as the Judge request.

78.    I contacted the Judge to inquire what should be done about Lavera in light of her refusal to assist Mr. Stokes. The Judge told me to do nothing. She continued that Ricky Stokes and his bonding company are always trying to cause trouble. She went on to say that Lavera does a good job  issuing alias warrants, bondsmen processes,   and warrant recalls (which I knew wasn't true), and that this Complaint wasn't worth giving a second glance.  This was my clue to take no administrative action.

79.    Although Rickey Stokes later asked me about the status of his

Complaint I just informed him that it was being handled by Lavera's superiors. To this he said, "Yeah, just like all the other complaints we've filed nothing will be done to Lavera because of her relationship to the Judge".

80.    I also received another memo from Rickey Stokes dated April 13,2004  that he sent to Lavera  listing the  forfeitures on the May docket that he had never received bondsmen processes on and could not pick up the defendants because of this. I immediately went to Lavera about this and asked her if she had done them. Lavera said that Rickey was just causing trouble yet again and site was working on those. I told her that she needed to make those a priority because he was supposed to already have had them Lavera confirmed that she was working on them.

81.    There was another incident with a bondsman. Don Thompson, with Thompson Bonding Company, that met me at the door to the office early one morning probably sometime in August. He said he wanted to talk to me about a situation with this brother-in-law being arrested and how his bonding was handled.  I was always very cautious with bondsmen because they don't always state the truth and they were always trying to get me to change a bond on a prisoner for them.

82.  I told him I would meet him up at the front window and talk to him but I could not let him in my office. He agreed. Don told me that his brother -in law had been arrested the night   before (1 can't remember the charge). He said that he

was going to call Don to bond him out, but his bond was a cash bond. He did call Don and tell him about the cash bond and how much it was. Don was going to pay the cash bond and get him out. Somehow before Don got over to the jail to pay the cash bond, the bond was changed to a regular bond and Get Out Bonding bondsman just happened to be at the jail and told him that he would bond him out for an amount of money that was way over what bondsmen usually charge a prisoner. The man didn't understand why the bond had been changed from a cash bond to a regular bond since he had not requested it be done. He questioned the bondsman about the change to a regular bond and asked him why the amount for him to bond .him out was so high because he knew that it was supposed to be a lower amount. The bondsman gave him some off the wall explanation and told him that either Get Out Bonding would bond him or he could sit in jail. Get Out bonding is a black owned bonding company.

83.    The man explained that his brother-in-law had Thompson Bonding and he would bond him out.  The Get Out Bondsman told him that the only way he could bond was to let Get Out bond him out. Don wanted to know what was going on with Get Out Bonding and why they were always hanging around the jail waiting to bond people out and why the Defendants were being told by jail personnel to call Get Out Bonding and not to call the other ones. (All the bonding companies are listed with their phone numbers on the wall at the jail for the prisoners to be able to choose which one they want). This was not the first time I had heard

that prisoners were being told to choose Get Out Bonding and not the others. I knew that this was a matter that i would have to speak to the Judge about. I called her r and told her what Don Thompson had told me and I told her that he was upset about the situation. She got very angry and told me she didn't know what he was talking about Get Out hanging around. She didn't want to hear anymore and told me that there was nothing to it but she would look into it

84.   The Judge frequently got angry if I questioned anything about Get Out Bonding such as why they were bonding a lot more defendants than any other bonding company, and also if I questioned why the Judge delayed the final forfeitures when Get Out Bonding had not paid their money or turned in the Defendants.

85.   Over the course of my employment the following are matters involving Lavera  and/or Eunice which  I have brought to Judge Gordon's attention only to have her tell me that every one makes mistakes; Changing bonds while other magistrate on call in violation of the Judge's own policy: [Lavera - Amanda Fulford (Valarie Savage On-Call);  [Lavera- Willie Turner  (Mary Beth Brackin On-Call); [ Lavera- Laura Warrick (Ann Baxter On-Call) – [ Lavera -Johnny Jackson (Mary Turner On-Call); Defendants Wrongfully Arrested Because of Lavera, Christopher Carroll - bond recalled in system, Lavera didn't get the bond from jail/police. ;Michael McCord - Lavera would not assist Rickey Stokes when he advised that she had issued a warrant on the wrong Michael McCord - Rickey filed complaint

(gave me, Judge, and Jerry Corbin the complaint) - Rickey contacted Mary Beth to help him get the warrant pulled because issued on wrong Michael McCord - Mary Beth advised Judge - Judge made Mary Beth destroy paperwork and delete case from court system.  When I asked Judge if she was going to respond to complaint, she laughed and said Rickey was always causing trouble and she wasn't afraid of any complaint he filed, and City wasn't going to do anything to her because she was black, female judge Gregory Powe -  This incident occurred  on or about September 9, 2004, just prior to my termination Lavera didn't attach CRO certificate to case when submitted; on a later day Lavera issued an alias warrant for his arrest for failure to submit CRO certificate; he was arrested while Eunice was on call.  Cash bond money $300.00 was posted by Larry Pike and bond document marked by him that money only to be returned to him - Eunice didn't run cash money through court system as was mandatory - Eunice released Gregory Powe and gave him the $300 cash bond money.  Mary Turner reported to me a receipt from jail of $300 cash bond, but there was no money with it.  I spoke to Judge - Judge Eunice had taken care of it and not to worry about it.  I looked for case paperwork days later and found it in the "closed cases file" with no disposition code and money still owing on it.  Case had not been finalized in computer.  Put sticky note on it and instructed Eunice to complete paperwork before filing it away again. I learned later from the Judge deposition that she was aware of this incident and had authorized Eunice to violate procedures and pay

Mr. Powe cash. <u>Charles Allen Hyatt</u> - Lavera recalled warrant in computer, but didn't recall it from police/jail - Mr. Hyatt wrongfully arrested - Valarie Savage was Magistrate on call and realized he had been wrongfully arrested and released him. Valarie Savage advised me and gave me copy of case paperwork. I brought it to the Judge's attention - she said everybody makes mistakes. <u>Otha Lee</u> - Lavera recalled warrant in computer, but didn't receive it from the police/jail - Defendant wrongly arrested. 6/04   (Everybody makes mistakes); <u>Thomas Blunt</u> - Lavera issued 2 warrants on Mr. Blunt for the same charge - he was arrested on both warrants and had to post 2 bonds. (Should have only been one warrant). (Just a mistake)

86.    I received a copy of the memo to Eunice from Sgt. Woodriff. This memo concerned 40 warrants which were put on the wrong desk and became lost. When Sgt. Woodriff requested that these be issued again since the original ones could not be found, Eunice issued some that were not on the original list and left off some that were on the original list. Eunice was not very helpful in trying to locate the missing warrants or in correcting the problem. I brought the warrants problem to the judge's attention. She made excuses for Eunice and told me that this is nothing to write her up for.

87.    Michelle Bryan represents yet another case where Judge Gordon instructed me to discipline a white Magistrate. Ms. Bryan had inadvertently buried and misplaced a number of cases during the relocation of the Magistrate's Office

to its current location. The lost files were discovered in late August or September by Michelle who brought their discovery to my attention. I in turn informed the Judge. Judge Gordon recommended that I send her a disciplinary memo. Even though, under the circumstances, there wasn't any intentional wrong doing, I agreed with the recommendation and wrote and delivered the disciplinary memo.

88.    Subsequent to my sending Michelle the memo, Judge Gordon had a conversation with City Prosecutor, Ashton Ott, who informed her that as a result of the lost files, some cases had to be dismissed. Judge Gordon insisted that I send Michelle a formal disciplinary notice. I disagreed since I had already sent a disciplinary memo on the same offense. The Judge insisted that we didn't know all of the facts and ordered me to send the follow-up disciplinary. I had placed the disciplinary on her desk just prior to my termination.

89.    Still another disciplinary ordered by Judge Gordon prior to my termination involved Mary Turner (white) and Ann Baxter (white). Mary and Ann had been involved in a heated exchanged that became rather loud. I wouldn't call it a confrontation. I was in my room when it happened but could see the participants. I went out there to see what was going on and by that time, some of the other magistrates had gathered there. I asked them what the problem was. Both said, nothing, we do this all the time. You know, we raise our voice at each other. Mary says something. I say something back. I informed them that I didn't want it happening out here in the hallway or anything, and y'all just need to cool it.

90.   To be sure that there really wasn't something going on, when they got back to their offices, I went and talked to Ann Baxter privately and asked her if she needed  me to take it up with the judge, I asked whether  she thought it was worth  disciplinary action of Mary, was it more than  what they had told me in the hallway.  I wanted to here it from her, one on one. She just laughed and said, no, Mary and I have been doing this for years

91.   Judge Gordon learned about the hallway shouting incident and insisted that I write a disciplinary report on both of them. I had prepared the report and given it to the Judge prior to my termination.

93.   The triggering event which contributed to my termination was initiated my staff memo I circulated on September 23, 2004. Realizing that there was an imbalance in the job responsibilities among the magistrates, I notified them there would be minor adjustments to their job responsibilities.  It was clear that Eunice and Lavera had a lot of non busy time, socialized with each and the Judge and frequently spending a lot of time on the phone, on non business related calls.

94.   Other Magistrates who were busy all the time started to resent this and started to complain to me about the unfairness of it all. This was expressly the case since both were unwilling to help others when they got backed up. Upon receipt of my memo others was causing a lot of problems. Lavera and Eunice both did a memo to me dated September 23 and 24 respectively expressing their anger at what I had done and copied their memo's to the Judge. I attempted to discuss

this with the Judge before I did a response to Lavera and Eunice; however, the Judge dodged my calls and my visits to her office. On September 27, I did a memo to both Eunice and Lavera explaining why I had made the changes. The Judge on September 28 sent me a memo requesting that I not change any job duties without speaking with her first. On the following day September 29,  I met with   the Judge to discuss this with her and explain why I had made these very minor changes and also to tell her that I had never had to speak with her before I made minor changes to the job duties and that I had made minor changes a couple of months before without any problems. I told her it seemed whenever I did something that Lavera or Eunice didn't like that they ran to her and she rescued them.  She informed me that they viewed my changes as discriminatory. I also attempted to speak to her about the Powe case. She stated that she didn't want to here it.

95.   I **was** to Leam from Eunice's deposition that between September 28, and 29, both Eunice and Lavera met privately with the Judge and accused me of discriminating against them. The Judge told them to take their complaint to Kai Davis. They did speak with Kai. I also was to leam later that the Judge had prepared my termination on September 30, but did not give it to me until after my vacation on October 12, when I was put on administrative suspension.

96.   My termination went full circle. I wouldn't show favoritism as expected by the Judge. I attempted to treat all of the employees under my charge equally.

The black employees had a willing ear with the Judge in their claims of discrimination. Upon their complaint of discrimination, I am summarily discharged. In other words, frustrated with my refusal to treat the black employees disparately. the Judge used the black employee claims of disparate treatment as a basis to terminate me.

Nancy Martn

Done this /2-dav of December 2007. Sworn to before me this  ^dav of

MY COMMISSION EXPIRES JANUARY 5, 2009

jMy Commission expires