0001
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5
  NANCY MARTIN and
6  MARY BETH BRACKIN,
7     Plaintiffs,
8  vs.        CASE NO. 1:05-CV-1172-MEF
9  CITY OF DOTHAN and
  JUDGE ROSE EVANS-GORDON,
10
     Defendants.
11
12
13
14      * * * * * * * * * * * *
15     DEPOSITION OF MARY ELIZABETH BRACKIN, taken
16  pursuant to stipulation and agreement before Sherry
17  McCaskey, Court Reporter and Commissioner for the
18  State of Alabama at Large, in the Dothan Civic
19  Center, 126 N. Andrews Street, Dothan, Alabama, on
20  Wednesday, October 10, 2007, commencing at
21  approximately 8:40 a.m.
22      * * * * * * * * * * * *
23
0002
1         APPEARANCES
2   FOR THE PLAINTIFFS:
3   ISHMAEL JAFFREE, ESQUIRE
   Jaffree Law
4   951 Government Street
   Suite 415
5   Mobile, Alabama 36604
6   FOR THE DEFENDANTS:
7   CAROL SUE NELSON, ESQUIRE
   Maynard, Cooper & Gayle
8   Attorneys at Law
   2400 Amsouth/Harbert Plaza
9   1901 Sixth Avenue North
   Birmingham, Alabama  35203
10
   ALSO PRESENT:
11
   Judge Rose Evans-Gordon

12    Ms. Michelle Sellers
13         * * * * * * * * * * *
14
15              EXAMINATION INDEX
16
   MARY ELIZABETH BRACKIN
17
       BY MS. NELSON          4
18     BY MR. JAFFREE         314
       BY MS. NELSON          356
19     BY MR. JAFFREE         373
       BY MS. NELSON          379
20     BY MR. JAFFREE         381
       BY MS. NELSON          382
21     BY MR. JAFFREE         383
22
23
0003
1              STIPULATIONS
2         It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of MARY ELIZABETH BRACKIN is taken
5    pursuant to the Federal Rules of Civil Procedure and
6    that said deposition may be taken before Sherry
7    McCaskey, Certified Court Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission; that objections to
10   questions other than objections as to the form of
11   the questions need not be made at this time but may
12   be reserved for a ruling at such time as the
13   deposition may be offered in evidence or used for
14   any other purpose as provided for by the Federal
15   Rules of Civil Procedure.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that said deposition may be introduced at the
19   trial of this case or used in any manner by either
20   party hereto provided for by the Federal Rules of
21   Civil Procedure.
22         * * * * * * * * * * *
23
0004
1         (Witness waived right to read and
2          sign.)
3              MARY ELIZABETH BRACKIN
4    The witness, having first been duly sworn to

5    speak the truth, the whole truth and nothing but the
6    truth, testified as follows:
7                    EXAMINATION
8     BY MS. NELSON:
9    Q.  Ms. Brackin, we met earlier off the Record,
10       but my name is Carol Sue Nelson.  I'm attorney
11       for the City of Dothan and also for Judge
12       Rose-Gordon.  I'm going to be asking you some
13       questions today about your claims against the
14       judge and the City.
15           If you do not understand me, please let me
16       know.  I'll be glad to rephrase.  Otherwise,
17       I'll assume that you do understand and are
18       answering truthfully.
19           Is that understood?
20   A.  Yes.
21   Q.  And we're both nodding our heads, but just
22       because the court reporter has to take
23       everything we say down, you need to speak up
0005
1        and answer as opposed to nodding or shaking
2        your head.  Or even an uh-huh or huh-uh is
3        sometimes not intelligible on the Record.  So
4        if you can say yes or no, I think we'll
5        understand each other.
6           Is that okay?
7    A.  Yes.
8    Q.  If you need to take a break, just let me
9        know.  We'll, you know, probably take most of
10       the day today, but we'll take a break for
11       lunch for sure.  But otherwise, if you need to
12       take a break, just let me know.
13           But if there's a question on the table,
14       meaning if I've posed you a question, I'd like
15       for you to answer before we take that break.
16   A.  Sure.
17   Q.  I'd also like to just, you know, remind
18       everybody here, and for the Record, that, you
19       know, there's a Protective Order in this case
20       by the judge of the court that we are not to
21       release or discuss any documents regarding any
22       personnel files or personnel matters or people
23       that we talk about.  And that's to any person
0006
1        not a party to this case.  And that's under
2        sanction of Court, so I just wanted to remind

```
 3      us all about that.
 4          Also, I'm going to be showing you some
 5      exhibits, and I'm going to mark Exhibit 1 here
 6      today, which is the document that I sent to
 7      your lawyer asking you to be here today.
 8              (Defendants' Exhibit 1 was marked
 9               for identification.)
10   Q.  We've had some difficulty scheduling this, and
11      through no one's fault.  I'm not saying that.
12      I don't know if you've seen this particular
13      document, but it's a notice of your
14      deposition.
15          Have you seen this or something similar to
16      this?
17   A.  Yes.
18   Q.  Okay.  And when I asked for you to be here
19      today, I also asked you if there were any
20      documents that you had in your possession that
21      you retained, that either were given to you by
22      the City of Dothan or Judge Gordon, or any
23      documents that might support your case or that
0007
 1      you reviewed to prepare or your tax returns.
 2      So let's just kind of take them -- did you
 3      bring any documents with you today?
 4   A.  Yes.
 5   Q.  Okay.  And do you have them with you, or does
 6      your attorney have them?
 7   A.  I have them.
 8   Q.  And, again, any and all documents provided to
 9      you by either the City or Judge Gordon, do you
10      have any of those documents with you?
11   A.  The documents that I have are letters that
12      were -- or evaluations -- the copies of
13      evaluations that I made for myself.
14              MR. JAFFREE:  Did you make me copies
15               of those documents?
16              THE WITNESS:  I didn't get to make
17               copies of these.
18              MS. NELSON:  Maybe at a break we can
19               get you copies of all of them.
20               If it's something I have a copy
21               of, I may --
22   A.  Yeah.  This should be in my personnel file.
23   Q.  May be in your personnel file.
0008
```

1  A.  Right.  And then a letter dated November 5th,
2     2001.
3  Q.  From whom is that?
4  A.  From Judge Gordon.
5  Q.  Would that be in your personnel file?
6  A.  I don't know.  I'm -- it should be.  But I'm
7     not -- I don't know what's in my personnel
8     file.
9            MR. JAFFREE:  Did she give you that
10              letter with coffee stains?
11           THE WITNESS:  I don't know.
12           MR. JAFFREE:  I don't know what kind
13              of stain that is.
14           THE WITNESS:  I don't know.
15  Q.  Okay.  Anything else?
16  A.  And then just copies of where I was served
17     with hearing notice.
18  Q.  Regarding your discipline or termination?
19  A.  Yes, ma'am.  And that should be in my
20     personnel file.  That is that.  That is just
21     my administrative leave memo that --
22  Q.  You were placed on leave?
23  A.  -- was given to me.
0009
1  Q.  Okay.  I may come back and ask you about
2     these.
3  A.  Okay.
4  Q.  I'm just trying to get a handle on what --
5  A.  And then my termination.  And then another
6     copy where it was dated March 22nd of '04.
7  Q.  This involves a claim of false arrest by
8     Theron Fondren?
9  A.  Yes.
10  Q.  Okay.  And the other letters from the judge --
11     I'll ask you about and identify more
12     completely for the Record -- was in November
13     of 2001, involved remarks made in the presence
14     of a bondsman --
15  A.  Right.
16  Q.  -- during the course of a defendant with an
17     appeal bond.  Was this the -- I may not be
18     pronouncing it right.  Was the Ralpeje
19     matter?  Does that name mean anything to you?
20  A.  It does.  But I mean, I'm not sure if that was
21     the exact name for this.  But --
22  Q.  Thank you.

23   A.  And then this was dated December 30th of '99.

0010

1     That is in my file.  I don't know if that's in
2     my personnel file.  That's something from
3     Captain Jim Smith when he was employed with
4     the Dothan Police Department when I was still
5     working with them whenever I applied for a
6     position.
7   Q.  Okay.
8   A.  I don't know.  That may be in my personnel
9     file.
10  Q.  Yeah.  I'll ask you more about that, and I may
11     need to get copies.
12  A.  And I've got --
13  Q.  Before we do that, then do you have any other
14     -- then I asked you for any notes, diaries,
15     calendars?
16  A.  I don't have a diary.
17  Q.  Anything like that.  You've got a -- I don't
18     know if that's a checkbook or calendar out
19     there.  Does that have anything to do with
20     this case or is that -- you were just
21     looking --
22  A.  No.  This is just my -- to write down --
23  Q.  2007?

0011

1   A.  Yeah.  That's just to write down my personal
2     stuff.  This -- now, I did make copies of the
3     notes that I had taken on pieces of paper that
4     I had that I've made copies for you already.
5     But this is just one copy.
6   Q.  And this is my copy --
7   A.  Yes, ma'am.
8   Q.  -- of the handwritten notes?
9   A.  And then this is the copy of -- some of my tax
10     forms, because we have moved since then, so --
11     but I have already requested those that are
12     missing.  I've got 2000 and -- State of '03;
13     2005, a 1040, 2006 1040 and State.  But the
14     others I have requested copies of.
15  Q.  I just ask that you provide that to me when
16     you get them.
17  A.  Yeah.  It's going to take a couple of weeks I
18     think.
19  Q.  And any other documents that you would have
20     that would support your case or that you've

21    reviewed to prepare for today?

22  A.  This is just a copy of my transcript hearing

23    that I had back in '05.  I don't --

0012

1  Q.  That was your transcript hearing from your

2    Personnel Board hearing --

3  A.  Yes, ma'am.

4  Q.  -- following your termination?

5  A.  I know the City has a copy of that.  So I'm

6    not sure --

7  Q.  Can I just flip through it?

8  A.  Sure.

9  Q.  And just kind of refresh myself what --

10        MR. JAFFREE:  Do you have any notes

11      in there?

12        THE WITNESS:  There's some notes

13      written on my transcript from

14      me.

15        MS. NELSON:  Well, I just --

16        MR. JAFFREE:  I mean, the City has a

17      copy of that.

18        MS. NELSON:  Well, I'm just

19      checking.

20  Q.  I'm not looking at your notes.

21  A.  I just put it in a binder because it's --

22    since it was so thick.

23  Q.  Okay.

0013

1  A.  And then this is just a tablet for me to write

2    on today if I need it.

3  Q.  The other notes you have there, is that

4    what --

5  A.  This is -- this is those copies.

6  Q.  That you made copies?

7  A.  Right.  That's this right here (indicating).

8        MS. NELSON:  We can go off a minute.

9  Q.  Just a few more preliminaries, Ms. Brackin.

10    Well, first of all, will you state your full

11    name for the Record, please?

12  A.  Mary Elizabeth Brackin.

13  Q.  You know, again, I stated I'm going to be

14    asking you questions about your claims against

15    the City.

16      Are you currently under any type of

17    medication or any other substance that would

18    prevent you from answering my questions

19    truthfully?
20    A.  No, ma'am.
21    Q.   Or from preventing you from understanding my
22        questions?
23    A.  No, ma'am.
0014
1    Q.   Are you under -- currently under the care of a
2        doctor?
3    A.  Not other than just the annual checkups that
4        women receive.
5    Q.   When you say -- kind of like your OB/GYN?
6    A.  Yes, ma'am.
7    Q.   Are you on any prescription medications?
8    A.  Yes.
9    Q.   Can you tell me what those are?
10   A.  Effexor.
11            MR. JAFFREE:  Let me object to that.
12                I'm not sure what, if anything,
13                has to do with your defense.
14                But just for the Record, I
15                object.
16                    You can go ahead and
17                answer.
18   Q.  Go ahead.
19   A.  Effexor.
20   Q.   And will you give me your Social Security
21        number, please?
22   A.  ██████████████.
23   Q.   And your date of birth?
0015
1    A.  Is ████████████
2    Q.   And do you have an Alabama driver's license?
3    A.  Yes, ma'am.
4    Q.   Do you know what number that is?
5    A.  Yes, ma'am.
6    Q.   Give me that.
7    A.  ████████
8    Q.   And what is your current address?
9    A.  695 Sandstone Drive, Dothan, Alabama, 36303.
10   Q.   And how long have you lived there?
11   A.  Approximately one year.
12   Q.   And where did you live prior to that?
13   A.  We lived at 105 Cricket Court, same city and
14        zip.  And we lived there for approximately two
15        years.
16   Q.   When you say "we," are you married?

17    A.  Oh, I'm -- yes.  I'm sorry.
18    Q.   And what is your husband's name?
19    A.   Joseph Allen Houston Brackin.
20    Q.   And how long have you been married to him?
21    A.   Nineteen-plus years.
22    Q.   Have you been married to anyone besides him?
23    A.   Yes.
0016
 1    Q.   And who were you married to prior to that?
 2    A.   Ronnie Allen Monday.
 3    Q.   And how long were you married to him?
 4    A.   Approximately one year.  Maybe a year and a
 5      few months.
 6    Q.   Any other marriages?
 7    A.   No, ma'am.
 8    Q.   Do you have any children?
 9    A.   Yes, I do.
10    Q.   And how many children do you have?
11    A.   Two.
12    Q.   And what ages are they?  Just give me their
13      names and ages.
14    A.   Michael, he's 21, and Matthew is 13.
15    Q.   Do they live with you?
16    A.   Matthew does.
17    Q.   And Michael's father is?
18    A.   Ronnie Allen Monday.
19    Q.   And Matthew's father is?
20    A.   Joseph Brackin.
21    Q.   And Mr. Monday, does he still live in the
22      city?
23    A.   Yes.
0017
 1    Q.   Is he employed?
 2    A.   I'm -- I'm not sure.  I don't have much -- I
 3      don't have any contact with him.
 4    Q.   And Mr. Brackin, is he employed?
 5    A.   Yes, he is.
 6    Q.   And where does he work?
 7    A.   City of Dothan.
 8    Q.   What does he do?
 9    A.   He is a firefighter.
10    Q.   Firefighter?
11    A.   Yes, ma'am.
12    Q.   And how long has he been with the City of
13      Dothan?
14    A.   Since August of '86.  I believe that's right.

15   Q.   Do you have any other relatives that live in
16        the city of Dothan or the southern part of
17        Alabama?
18   A.   (Nods head in the affirmative.)
19   Q.   How many?  You're shaking your head yeah.
20   A.   I have a huge family.
21   Q.   The reason I ask, this is a -- you've asked
22        for a jury trial.
23   A.   Right.  Right.

0018
1    Q.   And I'm entitled to know --
2    A.   I have --
3    Q.   -- relatives, so I'm trying to just --
4    A.   Yes.
5    Q.   Without being here all day --
6    A.   I have three sisters and one brother that live
7         in Dothan.
8    Q.   Are your parents living?
9    A.   Just my mother.  And my mother lives -- lives
10        here in Dothan, too.
11   Q.   What's your mother's name?
12   A.   Nell McKay Sizemore.
13   Q.   Your father is deceased?
14   A.   Yes, he is.
15   Q.   And your sisters are?
16   A.   Linda Collins.
17   Q.   Where is she employed?
18   A.   She's self-employed.
19   Q.   With?
20   A.   She does house cleaning.
21   Q.   Okay.  And your other sister?
22   A.   Mona Moore.
23   Q.   Is she employed?

0019
1    A.   She is.  She works at Budget cuts and also
2         Cloverdale United Methodist Church.
3    Q.   In Montgomery?
4    A.   No.  In Dothan.
5    Q.   That's in Dothan?
6    A.   Montgomery has one, too.
7    Q.   And do you have another sister?
8    A.   Yeah.  Debbie Batchelor.
9    Q.   Is she employed?
10   A.   Dothan Country Club in the golf shop.
11   Q.   Did you say you have a brother?
12   A.   I have a brother, Charles Sizemore, and he's

13      employed with Swedish Match.
14   Q.   And what is that?
15   A.   It's a cigar manufacturing company.
16   Q.   And you say -- I take it you've got cousins,
17      aunts, uncles?
18   A.   I've got several nieces and nephews, great
19      nieces, nephews.
20   Q.   Anybody over the age of probably 18 or 19?
21   A.   Oh, gosh.  Yeah.  Let's see.
22   Q.   What I may ask you to do, if you could make a
23      list --
0020
 1   A.   If I could make a list of them.  And that
 2      way -- because there are several.
 3   Q.   Yeah.  If you could make a list for me and
 4      provide it to your attorney, just their
 5      name -- by name, their relationship to you.
 6      And, again, I'm only looking for somebody over
 7      the age of 18, and just where they're
 8      employed, if they're employed.  And I think I
 9      said how they are related to you.
10   A.   Okay.
11   Q.   For example, I take it, you've got
12      brothers-in-law and sisters-in-law?
13   A.   In-laws included?
14   Q.   In-laws included.  I just don't want to put
15      your sister on the jury, you know.
16         Have you ever been arrested for anything?
17   A.   No.
18   Q.   Ever been convicted of anything?
19   A.   Of a traffic ticket.
20   Q.   What kind of traffic ticket?
21   A.   Speeding.
22   Q.   Was that here in the city of Dothan?
23   A.   No, ma'am.
0021
 1   Q.   Where was that?
 2   A.   Montgomery.
 3   Q.   Have you ever filed for bankruptcy?
 4   A.   No, ma'am.
 5   Q.   Have you ever filed for unemployment
 6      compensation?
 7   A.   Yes, ma'am.
 8   Q.   And how many times have you done that?
 9   A.   Let's see.  Approximately three times in my
10      course of years of employment.

11   Q.   Can you tell those?
12   A.   I'm not --
13   Q.   Which three times you remember, or roughly?
14   A.   Roughly, of course, would be May of '05 when I
15        was discharged from the city of Dothan.  And
16        approximately -- it was back in either the
17        late 80s or early 90s.  I'm just not quite
18        sure of the year.  Whenever --
19   Q.   Before you started for Dothan?
20   A.   Yes.  But you're talking since?
21   Q.   I'm talking about anytime.
22   A.   Oh, anytime.  And then September of '07.
23   Q.   Which was just last month?
0022
1    A.   Yes, ma'am.
2    Q.   And, well, I'll ask you about that.
3         Apparently, you went on to another job and
4         then left that job.  What job was that?
5                  MR. JAFFREE:  Excuse me.  Went on
6                  when?
7    Q.   From the city of Dothan?
8    A.   Yes.
9    Q.   I'll ask you more about that later.
10   A.   Okay.
11   Q.   Have you ever filed bankruptcy?
12   A.   No.
13   Q.   Has your husband ever filed bankruptcy?
14   A.   No.
15   Q.   Have you ever been in the military?
16   A.   No.
17   Q.   Have you ever been known by any other name
18        than the name you've given me?
19   A.   Well, Mary Monday from a previous marriage,
20        and then my maiden name is Sizemore.
21   Q.   Are you member of any type of social club or
22        civic organization?
23   A.   I am a member of the Daughters of the Nile
0023
1         Club here in Dothan.  It's a part of the
2         Masonic organization.
3    Q.   Daughters of the Nile?
4    A.   Yes, ma'am.
5    Q.   And how long have you been a member of that?
6    A.   Couple of years.
7    Q.   I'm somewhat --
8    A.   Maybe more.  I'm sorry.

```
 9  Q.  -- familiar with the Masons, but is this like
10      a group of women?
11  A.  Yes, ma'am, it is.
12  Q.  And what is your mission or purpose, or do you
13      do fundraisers or what?
14  A.  Yes.  We raise money for the Children's
15      Hospital for the Shriners Hospital, that sort
16      of thing.
17  Q.  Any other type of civic activities?
18  A.  No, ma'am.
19  Q.  Your children.  I guess Michael is grown.
20      Matthew, where does he go to school?
21  A.  Wicksburg High School.
22  Q.  And where is that?  Is that a city?
23  A.  It is -- no, ma'am.  It's a Dothan address,
0024
 1      but it's a county school.  It's not a city
 2      school, but it's in Houston County.
 3  Q.  Does he play ball or sports or anything?
 4  A.  Yes.
 5  Q.  Which sports does he play?
 6  A.  Football.  Are you talking about for the
 7      school?
 8  Q.  Yeah.
 9  A.  Or --
10  Q.  Just school.
11  A.  Okay.  Well, he started this school year, so
12      he doesn't play any right now.
13  Q.  Do you belong to a church?
14  A.  Yes, I do.
15  Q.  And what's the name of your church?
16  A.  Lafayette Street United Methodist Church.
17  Q.  And how long have you been going there?
18  A.  Since 1988.
19  Q.  Other than this lawsuit that you've filed
20      against the city of Dothan and Judge Gordon,
21      have you been involved as a named party or
22      plaintiff in any other lawsuit?
23  A.  No, ma'am.
0025
 1          MR. JAFFREE:  Let me ask if you
 2              could rephrase the question to
 3              include lawsuits against the
 4              city of Dothan because her
 5              response is incorrect as given
 6              since there was a administrative
```

```
 7          lawsuit.
 8          MS. NELSON:  Well, I will follow up.
 9   Q.  You're talking about the appeals hearing or
10      the --
11   A.  Oh, yes.
12          THE WITNESS:  Is that --
13          MR. JAFFREE:  Well --
14   A.  I'm not understanding the question.
15   Q.  Well, I mean, I'm just talking about -- I'm
16      just asking best you understand, have you
17      ever -- you filed also an appeal hearing with
18      the City; is that correct?
19   A.  Yes.
20   Q.  And then did you -- you appeared before the
21      Personnel Board contesting your termination
22      from the city of Dothan; is that correct?
23   A.  Correct.
0026
 1   Q.  And you've also filed an appeal to the Circuit
 2      Court of Houston County; is that correct?
 3   A.  Yes, ma'am.
 4   Q.  And that went all the way up to the Court of
 5      Civil Appeals; is that correct?
 6   A.  That's correct.
 7   Q.  And the Court of Civil Appeals ultimately
 8      upheld your termination; is that correct?
 9      Okay.
10   A.  Well --
11   Q.  Well, strike that.  You look puzzled.  The
12      Court of Civil Appeals' decision, I noticed
13      you had that in your notebook.
14          Do you understand what they decided about
15      your case?
16   A.  Yes.
17   Q.  And what was that?
18   A.  They overturned Judge White's decision from
19      the circuit court level and remanded it back
20      to the Personnel Board.
21   Q.  And that's your understanding of that; is that
22      correct?
23   A.  That's --
0027
 1   Q.  And the Personnel Board then upheld your
 2      termination?
 3   A.  Yes.
 4   Q.  Is that correct?
```

5   A.  Yes, they did.
6   Q.  And did you take any further action in that
7       matter before the Personnel Board, up through
8       the Court of Civil Appeals, back down to Judge
9       White, and back to the Personnel Board?
10      Bottom line, your termination stood through
11      that process; is that correct?
12          You're looking at your lawyer.
13  A.  Well, I'm just -- I guess --
14  Q.  You can answer me if you understand.
15  A.  Okay.
16  Q.  You filed with the Personnel Board --
17  A.  Correct.
18  Q.  -- and contested your termination.  The
19      Personnel Board upheld your termination; is
20      that correct?
21  A.  Correct.
22  Q.  You then filed a lawsuit or appealed that to
23      the Houston County Circuit Court?
0028
1   A.  Correct.
2   Q.  And Judge White was your judge?
3   A.  Yes, he was.
4   Q.  And what did you understand Judge White did?
5   A.  Judge White overturned the personnel board's
6       decision and directed me back at my job and
7       back pay.
8   Q.  And then Judge White's decision was appealed
9       to the Alabama Court of Civil Appeals; is that
10      correct?
11  A.  Yes, ma'am.
12  Q.  And I'm probably confusing this.  And then the
13      Court of Civil Appeals overturned Judge White;
14      is that correct?
15  A.  I believe that's correct.  They -- they
16      remanded it back to the Personnel Board
17      because there were things in there that should
18      not have been considered in the beginning.  So
19      they remanded it back to the Personnel Board
20      to -- to do -- to base it solely on this.
21  Q.  And that was based on whether a certain
22      discipline had -- the underlying action had
23      occurred within a two-year period of your
0029
1       termination?
2           I mean, do you understand what I'm talking

3    about?

4  A.  Yeah.

5        MR. JAFFREE:  Well, you're asking

6         her a legal conclusion.  And the

7         decision requires some

8         sophistication that she may not

9         can articulate.

10       MS. NELSON:  I'm just trying to get

11        her understanding of it.

12  Q.  So it was remanded to the Personnel Board; is

13    that correct?

14  A.  Yes.

15  Q.  And the Personnel Board upheld your

16    termination; is that correct?

17  A.  Yes, that's correct.

18  Q.  So we've talked about that.

19  A.  Okay.

20  Q.  If you want to call it, that lawsuit.  The

21    current lawsuit that I'm asking you questions

22    about that's in federal court --

23  A.  Correct.

0030

1  Q.  -- had you filed any other -- one other

2    thing:  You filed an EEOC charge against the

3    city of Dothan?

4  A.  Yes.

5  Q.  Are you aware of that?

6  A.  Yes.

7  Q.  Besides --

8  A.  I'm sorry.

9  Q.  -- any of that, have you filed any other

10    lawsuits where you were named a plaintiff or a

11    named party?

12  A.  No.

13  Q.  Now, we've talked about your divorce.  I mean,

14    that was a legal procedure.

15  A.  Right.  Yes.  But when you --

16  Q.  No other lawsuits that you're aware of that

17    you've been involved in?

18  A.  No, ma'am, not -- no, ma'am.

19  Q.  Have you ever been sued in a lawsuit where you

20    were named a defendant?

21  A.  No.

22  Q.  Automobile wreck or traffic incident, anything

23    like that?

0031

1   A.  No.  No, I haven't.  No.  No, ma'am.
2   Q.  Has a member of your family been sued?
3   A.  Not to my knowledge.  I don't -- I don't
4       know.  I mean, I can't speak for my -- my
5       family.  I don't know.
6   Q.  Well, I meant, your immediate family, your
7       husband.
8   A.  I mean, not my husband.  No.
9   Q.  Has your husband ever been a plaintiff in a
10      lawsuit?
11  A.  No, ma'am, not to my knowledge.
12  Q.  Have you ever given testimony besides your
13      Personnel Board hearing?  Have you ever given
14      testimony in a lawsuit?
15  A.  Lawsuit?  No, ma'am.
16  Q.  Have you ever had your deposition taken like
17      this before where a lawyer is asking you
18      questions about a lawsuit?
19  A.  Other than my appeal hearing?
20  Q.  Yes, other than your appeal hearing.
21  A.  Other than that appeal hearing.  No, not an
22      attorney, no.
23  Q.  When you say "not an attorney," who --
0032
1   A.  Well, you were asking me if -- if an -- based
2       on an attorney asked questions.  So I said,
3       no.
4   Q.  In a lawsuit?
5   A.  I'm just making sure that I'm understanding.
6   Q.  Well, have you ever given sworn testimony
7       before?
8   A.  Yes.
9   Q.  And where have you done that?
10  A.  I was actually a -- in my magistrate capacity
11      years ago when I issued a contempt complaint
12      for the judge.  But it was not Judge Gordon.
13      I had to, you know, testify to that, that
14      person did not show up in court.  And I have
15      sworn statements to the police department.
16  Q.  And those sworn statements would be regard to
17      what?
18  A.  In regards to some internal investigations
19      that were -- that -- that involved myself that
20      I had to give.  They asked me questions, and I
21      gave them answers to that.  But it was taped
22      and --

23    Q.  Were you under oath; is that your
0033
1        understanding?
2    A.  I'm not sure if I was under oath.  I do know
3        that I had to sign documentation to the effect
4        that, you know, if -- you know, if you lie or
5        whatever, you know, that's an ethics violation
6        to that sort or -- I'm not sure if I was
7        placed under oath.
8    Q.   And this was done, you said, an internal
9        investigation.  Are you familiar with the
10       Internal Affairs?
11   A.   Yes.
12   Q.   And Internal Affairs is a part of the police
13       department?
14   A.   Of the Dothan Police Department.
15   Q.   And you've worked in the police department,
16       haven't you?
17   A.   Yes.
18   Q.   What is your understanding of what Internal
19       Affairs does?
20   A.   I did not work in that division, so I'm not
21       sure as far as what their actual job duties
22       are or when --
23   Q.   You're not --
0034
1    A.   I was not affiliated with that section.
2    Q.   So you don't really know how they function?
3    A.   No, ma'am.
4    Q.   Or when they might do an investigation?
5    A.   No, ma'am.
6    Q.   I believe I asked you this:  Have you ever
7        filed an EEOC charge against anyone else
8        besides the city of Dothan?
9    A.   No, ma'am.
10   Q.   Now, did you grow up in this area?
11   A.   Yes, I did.
12   Q.   Where were you born?
13   A.   Ft. Benning, Georgia.
14   Q.   And how long have you lived in the Dothan
15       area?
16   A.   Approximately 35, 36 years.
17   Q.   Did you go to high school in this area?
18   A.   I did.
19   Q.   Where?
20   A.   Rehobeth High School.

21   Q.   And Rehobeth is where?
22   A.   It is -- it's Houston County.  It's a county
23        school.  It's not inside the city limits, but
0035
1         it does have a Dothan mailing address.
2    Q.   And Rehobeth High, is that where you --
3         Rehobeth High School?
4    A.   Yes.
5    Q.   And following your -- you graduated; is that
6         correct?
7    A.   Yes.
8    Q.   And following graduation, did you have an
9         opportunity to take any other educational
10        courses or whether college or vocational
11        school or junior college or anything like
12        that?
13   A.   Yes.
14   Q.   And where was that?
15   A.   I attended Riley Business College and their
16        computer program.
17   Q.   And when was that?
18   A.   Approximately '88, '89.
19   Q.   Did you get a degree of any sort?
20   A.   Just a Certificate of Completion.
21   Q.   And then following Riley Business College, any
22        other educational training?
23   A.   I was -- became a certified magistrate in June
0036
1         of '97.
2    Q.   And tell me what was involved in becoming a
3         certified magistrate?
4    A.   You attended four orientations on a day basis
5         up in Montgomery; and then after you completed
6         those and a test was involved, then you would
7         attend approximately four sessions at the
8         University of Alabama in Tuscaloosa at their
9         Continuing Education Building.
10   Q.   And how long did it take you to get this
11        certification?
12   A.   You have to do it in three years.  I started
13        in May of '92, but I didn't actually start
14        going to some classes until after that.  But
15        it's -- at that time, they actually -- I
16        believe you had four years to complete it.
17        I'm not sure.  It's change.
18   Q.   And does the City require this, or is this a

19       state law requirement?
20    A.   It is a state.  I mean, it's -- it's four.
21        You have to be a -- you have to be certified.
22        Yes.
23    Q.   To hold the magistrate's position?
0037
1    A.   Yes.  The capacity.
2    Q.   And do you know who did the training?
3    A.   Different -- we had judges.  We had court
4        clerks.  We had Eric Locke who's a staff
5        attorney at AOC.
6    Q.   That's Administrative Office of Courts?
7    A.   Yes, ma'am.
8    Q.   Did you receive any type of materials or
9        training materials or notebooks?
10   A.   Yes.
11   Q.   Do you still have those, or were they kept in
12       the magistrate's office?
13   A.   I don't -- I don't think I took -- I may have
14       some, but it was just over previous years.
15   Q.   Did the city of Dothan pay for that training?
16   A.   Yes.
17   Q.   And to your knowledge, are all the magistrates
18       required to be certified?
19   A.   To my knowledge.
20   Q.   And other than that training, any other type
21       of vocational, college, education?
22   A.   Well, during my years with the City, they
23       would send us to computer classes that would
0038
1        include Microsoft Word or Power Point, Excel,
2        that sort of thing.  But I don't recall the
3        dates or exactly when those happened.
4    Q.   Now, what was the first -- after you graduated
5        from high school , what was the first
6        full-time job that you held?
7    A.   Let's see.  Oh, I was employed with -- at
8        time, it was called General Cigar Company, but
9        it's now Swedish Match.
10   Q.   That's where your brother-in-law works?
11   A.   My brother.
12   Q.   Or your brother.  And what was your job there?
13   A.   I don't -- I don't remember what my actual
14       title was.  I -- I worked in different areas.
15       I worked, actually, in the final end of
16       production, and then I was in an office

17      setting.
18   Q.   How long did you work there?
19   A.   Approximately, maybe to '88 or '89.  I'm not
20      sure.
21   Q.   When did you start?
22   A.   I started, actually, full-time when I
23      graduated high school, but I actually had
0039
 1      worked there during the summer, between my
 2      junior and senior year in high school.
 3   Q.   And why did you leave there?
 4   A.   I got promoted -- well, it was a
 5      promotion-type position with Riley College in
 6      their accounting office.
 7   Q.   What was your job for Riley College?
 8   A.   I worked in accounts payable.
 9   Q.   Where is this located?  Is this in Dothan?
10   A.   Yes, ma'am.  But they're no longer in
11      business.  It's -- it -- their main office was
12      on Montgomery Highway.
13   Q.   And why did you leave there?
14   A.   I was laid off.  They were cutting back due to
15      the budget.
16   Q.   Who was your supervisor?
17   A.   Oh, goodness.  I can't remember my initial
18      supervisor that worked in the office with me.
19      I know that Peggy Rice was over, like,
20      the -- the administrative personnel.
21   Q.   After you left Riley Business College, where
22      did you go to work?
23   A.   Automated Control Systems.  It's an
0040
 1      engineering company.
 2   Q.   And what was your job there?
 3   A.   Office manager.
 4   Q.   And how long did you work there?
 5   A.   Approximately, a year maybe.  I'm not sure.
 6   Q.   And why did you leave there?
 7   A.   They were cutting back to part-time, and I
 8      needed full-time employment.
 9   Q.   Do you remember who your supervisor was there?
10   A.   Gary McGowan.
11   Q.   Did you ever work for a company called Whatley
12      White?
13   A.   Yes.
14   Q.   What did they do?

15   A.   It's a trucking company.
16   Q.   And what was your job there?
17   A.   Accounts payable, I believe.
18   Q.   And do you remember who your supervisor was?
19   A.   Melissa.  I'm not sure of her last name, but I
20        was -- my office was actually at Wallace
21        Supply Company.  But it was owned by the same
22        individual, both businesses.
23   Q.   Whatley Supply?
0041
 1   A.   Yes.
 2   Q.   Why did you leave there?
 3   A.   The company went out of business.  They filed
 4        Chapter 13 I believe.
 5   Q.   After you left Automated Controls --
 6   A.   Yes.
 7   Q.   -- where did you go to work?
 8   A.   I don't know -- I'm not sure if it was with
 9        the city of Dothan at that point.  I'm not
10        sure.  I believe it was, but I can't --
11        without looking at --
12   Q.   Sure.
13   A.   -- some of my prior records, I'm not sure.
14   Q.   Are you currently?
15   A.   No, ma'am.
16   Q.   And where were you last employed?
17   A.   The Town of Newton.
18   Q.   And what was job there?
19   A.   Court clerk.
20   Q.   And how long did you work there?
21   A.   From approximately March of '06 to September
22        of '07.
23   Q.   And why did you leave there?
0042
 1   A.   Laid off due to budget cuts.  The city clerk
 2        is doing her position plus the court clerk's
 3        position.
 4   Q.   Who was your supervisor there?
 5   A.   Jean Watson.
 6   Q.   Is she the court clerk?
 7   A.   She says the mayor.
 8   Q.   Excuse me.  The mayor?
 9   A.   Yes.
10   Q.   Jean Watson?  Okay.  And who's the city clerk?
11        Did you report to the city clerk?
12   A.   No.  I actually -- well, our municipal judge

13    was part-time.  But, mainly, I reported to
14    Jean.
15  Q.  Okay.  So it was after you left your job from
16    this Town of Newton that you filed for
17    unemployment compensation that I asked you
18    about the three --
19  A.  Yes.
20  Q.  You told me it was three times?
21  A.  Yes.
22  Q.  This was one of the --
23  A.  This was one.
0043
1  Q.  -- times when you filed?
2  A.  Yes.
3  Q.  Prior to the Town of Newton, were you
4    employed?
5  A.  With the City of Headland.
6  Q.  And what was your job with the City of
7    Headland?
8  A.  Same, court clerk/magistrate.
9  Q.  And who was your supervisor?
10  A.  Mayor Rueben Shelley.  I actually reported
11    more at that position to the municipal judge,
12    was Chris Capps.  He was pretty involved.
13  Q.  And why did you leave that job?
14  A.  Both Headland and Newton were both part-time
15    positions, and I was moving.  Newton, their
16    hours needed to upped to more hours, so I left
17    Headland.  Newton was closer to home where I
18    was moving to.  So I went to work for Newton
19    because it was going -- at that point, it was
20    going to either three or four days a week.
21    I'm not sure.
22  Q.  I'm a little confused.  You said you were
23    moving.  Were you moving addresses, or you're
0044
1    just --
2  A.  Yes.
3  Q.  You've recently moved?
4  A.  Well, I've been in my home now for
5    approximately a year.  Right.
6  Q.  And just to clarify to me, I know -- you moved
7    from where to where in this past year?
8  A.  We were living with my mother-in-law while the
9    house was being built, so I moved from there.
10  Q.  "There" being?  Where does your mother-in-law

11    live?

12  A.  2102 Hardwick Drive here in Dothan.

13  Q.  In Dothan?

14  A.  Yes.

15  Q.  Y'all were living with her, and you were

16    building as house?

17  A.  Yes.

18  Q.  And your new house is where?

19  A.  695 Sandstone.

20  Q.  In Dothan?

21  A.  Yes.

22  Q.  And you're saying Newton was closer?

23  A.  Newton was closer to driver than to Headland,

0045

1    and my hours -- Newton's hours were moved up.

2  Q.  Moved up to what it's?

3  A.  At first, they were -- I was only working

4    there two days a week.

5  Q.  And then that changed to?

6  A.  That changed to three days a week.

7  Q.  But then they totally laid you off?

8  A.  After -- after -- then I was -- I was going --

9    I was moving to fives days a week.  When that

10    job was opening up, the municipal judge at

11    that time, that asked me to come work there,

12    was advising me that that court would be

13    full-time.  They were hoping that would be a

14    full-time court soon.

15  Q.  Okay.

16  A.  So that did not happen, which that municipal

17    judge is no longer there.  They've had another

18    municipal judge come in.

19  Q.  But is there someone doing the magistrate

20    work?

21  A.  Yes.  That's the city clerk.  She's doing that

22    now.

23  Q.  There's no part-time magistrate?

0046

1  A.  No.  She actually -- she is a full-time

2    employee with Newton, so she is doing both

3    positions.

4  Q.  But if they were looking to go from a

5    two-to-three-day-a-week magistrate to a

6    full-time magistrate, I'm still confused as to

7    how you came to be laid off.

8  A.  I -- they -- it did not go to full-time.  I

9     guess with them being a small town, you know,
10     I was making good money.  So they just felt
11     like they needed to try to cut back.  So --
12  Q.  Were you ever disciplined in any way while you
13     were at Newton?
14  A.  No.  I mean, what do you mean "disciplined?"
15  Q.  I mean, for either your performance or
16     committing some work-rule violation?
17  A.  No.
18  Q.  Reprimanded?
19       I mean, you're looking at me like --
20  A.  Well, I'm just try to figure out what you're
21     talking -- what are you actually talking
22     about?  Written, as far as written up, that
23     sort of thing?
0047
1  Q.  Well, written up, verbal, talked to about your
2     job performance, or if you weren't getting the
3     job done.  Did that have any bearing on your
4     leaving the Town of Newton?
5  A.  The only thing I was told was that I was laid
6     off due to budget cuts, that the city clerk
7     would be doing both positions.
8  Q.  Had you been given any type of verbal
9     reprimand or discipline?
10  A.  The only thing, the mayor at some point in
11     time had asked me exactly what a court --
12     excuse me -- court clerk responsibilities are
13     because she was a part-time mayor.  She was
14     not familiar with exactly the full scope of a
15     magistrate and a court clerk.  So I explained
16     that to her.
17       And then she just -- she had a issue with
18     me making more money than the police chief
19     did, but that was, you know -- that was all
20     that was discussed verbally.  But nothing
21     about my -- you know, me not doing my job.
22  Q.  It's your understanding that in your part-time
23     position, you made more money than the police
0048
1     chief of the City of Newton?
2  A.  I did not know that when I was initially
3     hired, but she had brought that to my
4     attention.
5  Q.  What about the City of Headland; were you ever
6     disciplined, reprimanded, verbally or written?

7   A.  No.
8   Q.  Did you ever work for the City of Headland and
9       the City of Newton at the same time?
10  A.  Yes.  Yes.  They were both part-time
11      positions.
12  Q.  And I believe you've provided me some -- your
13      tax returns?
14          MR. JAFFREE:  I didn't get a copy of
15             stuff.
16          THE WITNESS:  I didn't make you a
17             copy of --
18          MR. JAFFREE:  No, no, no.  She had
19             asked.
20  Q.  Were you paid hourly for the City of Newton?
21  A.  Yes.
22  Q.  You were paid hourly for the City of Headland?
23  A.  Yes.
0049
1   Q.  Combined, the two jobs -- let me back up.
2           You worked for City of Headland for what
3       period of time?
4   A.  October of '05 to approximately November of
5       '06.
6   Q.  And what about the Town of Newton?
7   A.  I think I -- March of '06 to September of '07.
8   Q.  I'm sorry.
9   A.  Yes.
10  Q.  And what was your hourly rate of pay at the
11      City of Headland?
12  A.  Fourteen-fifty an hour.
13  Q.  About how many hours a week were you working
14      there?
15  A.  Twenty-one.
16  Q.  What was your hourly pay at the city -- you
17      call it the Town of Newton?
18  A.  Yes.  It's small.
19          It was $15 an hour.
20  Q.  And how many hours were you working there?
21  A.  To begin with, 16, and then it went up to 24.
22  Q.  And these earnings would be reflected in the
23      tax returns that you've--
0050
1   A.  Yes, ma'am.
2   Q.  -- provided to me?
3   A.  Those that I could find.
4   Q.  And you've been unemployed since September; is

5       that correct?
6   A.   September 13th.
7   Q.   Are you seeking employment?
8   A.   Yes, I am.
9   Q.   And are you seeking employment in this field
10       of a municipal employee or being a magistrate?
11  A.   If the position comes available, but I have
12       applied for a lot of things that I'm qualified
13       for.
14  Q.   Where have you applied?
15  A.   I've applied for -- I've gotten on the list
16       for state jobs, for City of Enterprise, city
17       of Dothan School System.  I'm trying to think
18       of some other none-government places.  I'm not
19       sure of the some of the other that -- but
20       I've -- I have applied for several state jobs
21       that I have taken tests for.  And I'm on the
22       list.
23  Q.   Would these be here in Dothan?
0051
1   A.   Yes.  Or surrounding.  For the state jobs, you
2       put surrounding counties, too, that you'd be
3       willing to work in.  So --
4   Q.   I'm going to show you what I've marked as
5       Defendants' Exhibit Number 2 which appears to
6       be a resume' prepared by you.
7               (Defendants' Exhibit Number 2 was
8                marked for identification.)
9   Q.   Have you had a chance to look at it?  Does
10       that appear to be your resume', Ms. Brackin?
11  A.   Yes.
12  Q.   And that goes through a period of time for
13       when you worked for Automated Control System;
14       is that correct?
15  A.   Yes.
16  Q.   Best of your knowledge, does that accurately
17       reflect the jobs that you held --
18  A.   Yes, if the -- yes.
19  Q.   -- up until that time which appears
20       to be -- to your knowledge, was that the
21       resume' you provided when you interviewed with
22       the city of Dothan?
23  A.   I'm -- to the best of my knowledge.
0052
1   Q.   After Automated Control, I believe you
2       testified that you thought you went to work

3     for the city of Dothan?
4  A.  Yes.
5  Q.  Do you remember filling out an application at
6     the City?
7  A.  I'm sure I did.  It was required.
8  Q.  Do you remember what job you were seeking?
9  A.  Magistrate, if I'm correct.
10  Q.  Do you remember who you interviewed with?
11  A.  Gayle Schwarz.
12  Q.  Who is Gayle Schwarz?
13  A.  She was the court clerk at the time.
14  Q.  Let me show you what I'll marked as
15     Defendants' Exhibit 3 which is an application
16     for the city of Dothan.  If you'd take a
17     minute just to look at that.
18          (Defendants' Exhibit 3 was marked
19           for identification.)
20          (Brief pause)
21  Q.  Ms. Brackin, that Exhibit 3, is that your
22     application --
23  A.  Yes.
0053
1  Q.  -- to the city of Dothan?
2  A.  Yes.
3  Q.  Do you recall when you first started working
4     there, what year that was?
5  A.  May of '92.
6  Q.  And do you know how you came to apply for a
7     job with the city of Dothan?
8  A.  I -- there was an opening, or it was announced
9     or -- I'm not sure.  So it must have been a
10     job that was posted.  I don't recall now.
11  Q.  Was your husband working at the time --
12  A.  Yes.
13  Q.  -- at the city of Dothan?
14  A.  Uh-huh (positive response).
15  Q.  In the fire department?
16  A.  Yes.
17  Q.  Has he always worked in the fire department?
18  A.  Yes.
19  Q.  I may have asked you this:  What is his rank?
20  A.  He's a fire sergeant.
21  Q.  Sergeant?
22  A.  Sergeant.
23  Q.  And then you said you interviewed with Gayle
0054

```
 1      Schwarz?
 2   A.   To the best of my knowledge.  I know she was
 3        my supervisor, so I'm -- I'm just not sure.  I
 4        don't remember back that far.
 5   Q.   You were hired; is that correct?
 6   A.   Yes.
 7   Q.   And how many other magistrates were there at
 8        that time?
 9   A.   There was Shirley Thomas and Kevin Sorrells.
10        And then Gayle, of course, was a
11        magistrate/court clerk.
12   Q.   Was there a municipal court judge at that
13        time?
14   A.   We had two part-time judges.
15   Q.   Do you remember who they where?
16   A.   Mike Brown and Doug Bates.
17   Q.   You say "part-time."  Did they do other
18        things?
19   A.   They were -- they had their own --
20   Q.   Did they practice law?
21   A.   Yes, ma'am.
22   Q.   Did they practice law?
23   A.   Yes, sir.
0055
 1   Q.   Doug Brown?
 2   A.   Doug Bates.
 3   Q.   Bates and --
 4   A.   And Mike Brown.
 5   Q.   Mike Brown.
 6   A.   Mike Brown was the presiding judge.
 7   Q.   Do you know if you've ever -- at that point,
 8        did you receive training, or was it on-the-job
 9        training to be a magistrate?
10   A.   It was basically on-the-job training.
11   Q.   Do you when you started your training through
12        the -- to get your certificate that we talked
13        about earlier?
14   A.   No, I don't recall the first actual time I
15        started going.
16   Q.   To you remember being given an employee
17        handbook of employee rules and regulations?
18   A.   I don't recall at that point.  No.
19              (Defendants' Exhibit 4 was marked
20               for identification.)
21   Q.   Do you ever recall being given one?  I'll show
22        you what I've marked as Defendants' Exhibit 4.
```

23          Is that your signature?
0056
1    A.  Yes.
2    Q.  This says, you received a copy of the
3         handbook?
4    A.  Yes.
5    Q.  Does that refresh your memory?
6    A.  Yes.  Well, I'm -- I'm sure, you know, I
7         received it if I signed that.
8    Q.  Are you aware that the City has policies and
9         procedures dealing with like, for example,
10        drug testing?
11   A.  Yes.
12   Q.  Do you recall receiving --
13   A.  Yes.
14   Q.  -- that?
15            (Defendants' Exhibit 5 was marked
16             for identification.)
17   Q.  And I'll show you Defendants' Exhibit 5.
18            Is that your signature?
19   A.  Yes, it is.
20   Q.  And that certifies that you have received a
21        copy of the City's Drug Testing Procedures?
22   A.  Correct.
23   Q.  Have you ever been drug tested?
0057
1    A.  With my initial employment, I believe, with
2         the City I was.  Yes.
3    Q.  Not since then?
4    A.  But not -- no, ma'am.
5             MR. JAFFREE:  Let me stop.  One of
6                those documents from '92; the
7                other one is from '96.  Your
8                question suggests that she
9                received both of those documents
10               at.
11            MS. NELSON:  My question doesn't
12               reflect anything like that.  I
13               mean, you can ask the questions.
14               I'm just asking her to identify
15               a document.  I mean, they speak
16               for themselves.
17            MR. JAFFREE:  I think the tenure of
18               your question suggests that got
19               both of those documents when she
20               became employed.

21            MS. NELSON:  You can refer that if
22                you want.
23    Q.  You said you first reported to Gayle Schwarz;
0058
1      is that correct?
2    A.   Yes.
3    Q.   What how long did you report to her?
4    A.   I was in that division until, approximately, I
5         believe August of '95.
6    Q.   And what position was that?
7    A.   That I was in prior to that or after?
8    Q.   Yeah.  You said you were in that position till
9         August.
10   A.   In that division.  I was in that division
11        until August of '95.
12   Q.   What division was that?  That's what I'm
13        trying to get an understanding.
14   A.   Well, it's -- we were under the -- we worked
15        under the city manager at that time, but we
16        were Municipal Court.  We did not have our
17        own.
18   Q.   Your own what?
19   A.   Like they do now.  The Judicial Department has
20        their own department.  At that particular
21        time, we were listed as administrative up
22        under the city manager.
23   Q.   Okay.  And you said that was until August of
0059
1      '95.
2    A.   Yes, ma'am.
3    Q.   What happened in August of '95?
4    A.   I went to work as a secretary with the Dothan
5         Police Department.
6    Q.   Let me back up.  What were your duties from
7         '92 to '95 when you worked under Gayle
8         Schwarz?
9    A.   Magistrate.
10   Q.   I know.  Give me some idea of what you did.
11   A.    That encompasses swearing the officers to
12        traffic tickets and on the arrest -- issuing
13        warrants of arrest on complaints by civilians
14        and officers, taking in moneys for fines and
15        costs, working in the courtroom, working in
16        the fines room, accepting bonds, approving
17        bonds, issuing subpoenas?
18   Q.   How often was court held when there were the

19     two part-time judges?
20   A.  Let's see.  We had Monday, Tuesday, and
21       Thursday.
22   Q.  Were you ever evaluated while you were
23       under -- like get an employee evaluation by
0060
1        Gayle Schwarz?
2    A.  Yes.  If it.  I'm not sure if she did them or
3        Judge Brown did them at the time.  I'm not
4        sure.
5    Q.   Did you consider yourself reporting to Gayle
6        Schwarz or to Judge Brown?
7    A.   Gayle Schwarz was our immediate supervisor.
8              (Brief pause)
9              (Defendants' Exhibit 6 was marked
10               for identification.)
11   Q.  I'm going to show you what I've marked as
12       Defendants' Exhibit 6, Ms. Brackin.  This is a
13       performance evaluation.
14           Is that the evaluation you received --
15   A.  Yes.
16   Q.  -- from Gayle Schwarz?
17   A.  Yes.
18   Q.   Do you have any reason to question anything
19       that she put in that evaluation?
20              MR. JAFFREE:  Before you answer
21                that, you need to examine
22                everything in there, in detail.
23   Q.  Did you have a chance to make a comment on
0061
1        that evaluation?
2    A.  Yes.
3    Q.   And what was your comment?
4    A.  "Concur."
5    Q.   Concur?
6    A.  Concur.  Uh-huh (positive response).
7              MR. JAFFREE:  So she doesn't have to
8                answer the prior question?
9              MS. NELSON:  Well, she can if she
10               wants to.
11             MR. JAFFREE:  So are you still
12               expecting her to answer, or are
13               you satisfied with the concur?
14             MS. NELSON:  Well, I'm satisfied
15               with the concur.  I'm just
16               trying to move along here.

17  Q.  Were you generally evaluated annually each
18      year?
19  A.  After -- I think when you're on probation,
20      it's -- you get evaluated more.  But after
21      you're off probation, I think it's once a
22      year.  I'm not sure.
23  Q.  And this was done in April of 1993; is that
0062
1      correct?
2  A.  Right.
3              (Defendants' Exhibit 7 was marked
4               for identification.)
5  Q.  And then let me show you one that you were
6      evaluated in about April -- well, looks like
7      May of 1994.  That's Defendants' Exhibit 7.
8      Just a take a minute to look at that.
9              (Brief pause)
10  Q.  That is your 1994 evaluation; is that correct?
11  A.  Yes.
12  Q.  Did you make a comment on that one?
13  A.  Yes.
14  Q.  And your comment was?
15  A.  "Concur."
16              (Defendants' Exhibit 8 was marked
17               for identification.)
18  Q.  And I'm going to show you what appears to be
19      your May of 1995 evaluation, which is
20      Defendants' Exhibit Number 8.  Take a moment
21      to look at that.
22              (Brief pause)
23  Q.  Is that your May of 1995 evaluation?
0063
1  A.  Yes.
2  Q.  Did you have an opportunity to make a comment
3      there?
4  A.  Yes.
5  Q.  And what was your comment?
6  A.  "Concur."
7  Q.  Those were fill out by whom?
8  A.  The evaluation?
9  Q.  Yes.  I'm sorry.  Who completed the
10      evaluation?
11  A.  Gayle.  It was Gayle Kellenberger, but it was
12      the same -- she was married at that time.
13  Q.  Did Gayle ever speak to you about problems
14      that you had communicating with the public and

15    other employees?
16  A.  The -- what was written in there.  You know,
17    she went over the evaluation with me.
18  Q.  Okay.  She states here that "she" -- and she's
19    referring to you -- "is currently showing some
20    problems in the area of communication with the
21    public and other employees along with a
22    sometime poor attitude."
23        MR. JAFFREE:  Is that a question or
0064
1            is that a statement?
2        MS. NELSON:  That's a quote from
3            Gayle, her supervisor.
4  Q.  I'm saying, did she discuss that with you?
5  A.  She went over the evaluation with me.  I don't
6    recall everything that was said in May of
7    '95.  But I mean, if it's -- you know, she
8    went over that with me.
9  Q.  And then she -- I'm quoting.  "I feel that
10    this is an area that needs to be worked on
11    before a major complaint is received."
12        Do you remember her mentioning that you
13    to?
14  A.  I don't recall.
15  Q.  Do you remember any complaints at that time
16    that had been made about you?
17  A.  No.
18  Q.  Do you remember any employees that you were
19    having difficulty in communicating with or
20    getting along with?
21  A.  No.
22  Q.  Do you remember having any complaints from the
23    public or attorneys or anybody in the
0065
1    courtroom, attending municipal court, that had
2    complaints about you?
3  A.  No.
4  Q.  Do you know what she was referring when she
5    said that you sometimes had a poor attitude?
6  A.  No.
7  Q.  Now, I believe you testified earlier that it
8    was in about '95 that you went to the police
9    department?
10  A.  Yes, ma'am.
11  Q.  Tell me the circumstances that you went to the
12    police department to work.

13  A.  Well, I had a -- a small child.  And we were
14      on call at that time.  Gayle was on call
15      during the week, and we would rotate
16      weekends.  And since there was few of us, that
17      meant our call was -- was quite often.  And
18      then our call went to where Gayle wasn't going
19      to be on call, so we had to be on call a week
20      at the time.  And with my --
21  Q.  Let me stop you and make sure.  I'm just
22      trying to understand.
23          It was you and Gayle, and who were the
0066
1       other magistrates in the office?
2   A.  Kevin and then in '95 at this point it was
3       Mary Turner.
4   Q.  Kevin Sorrell?
5   A.  Kevin Sorrells.
6   Q.  Sorrells?
7   A.  Yes.
8   Q.  And did all four of y'all rotate this call?
9   A.  We did, but it got to where Gayle would take
10      it during the week.  But then she got to where
11      she didn't take it at all.  So it was left
12      up -- oh, and Shirley.  I think Shirley Thomas
13      was still there.  I know that she retired, but
14      I'm not sure what year she retired in.  I'm
15      not sure.
16  Q.  Okay.  But did Kevin Sorrells, Mary Turner,
17      and Shirley take call also?
18  A.  Yes.
19  Q.  Anyway, you were telling me why you wanted to
20      go to the police department.
21  A.  And my husband is a shift worker.  He's on 24
22      and off 48.  So it was -- with a small child,
23      it was just hard to be on call.  So it would
0067
1       be to where I'd have to go spend the night
2       with my in-law in case I would get called out
3       because I couldn't take the baby with me.  So
4       it was just better for me to go to where I was
5       eight to five.  You know, if I worked court,
6       it would be to where sometimes I wouldn't get
7       out of there until six or seven at night.
8   Q.  Okay.
9   A.  So for my situation at the time with my
10      family, it was better for me to do that.

11   Q.   Back to what I was asking you about earlier,
12        the comments and evaluations, were some of the
13        communication issues or attitudes issues with
14        other employees.  Did you and Kevin Sorrells
15        have any disagreements or inability to get
16        along?
17   A.   No.
18   Q.   Did you and Mary Turner have disagreements or
19        inability to get along?
20   A.   No.
21   Q.   You mentioned Shirley Thomas?
22   A.   Uh-huh (positive response).
23   Q.   Did you and Shirley Thomas have any
0068
1         disagreements or --
2    A.   No.
3    Q.   -- inability to get along?
4    A.   No.
5    Q.   What about you and Gayle?
6    A.   No, not to my knowledge.
7    Q.   Do you know if Kevin Sorrells ever made any
8         complaints about you?
9    A.   Not to my knowledge.  I don't know.
10              MR. JAFFREE:  Let me --
11              MS. NELSON:  You can state your
12                 objection.  I have a right to
13                 question her.
14              MR. JAFFREE:  Well, I understand
15                 that, but your questions are not
16                 specific as to time, place, or
17                 circumstances.
18              MS. NELSON:  I'm talking about in --
19              MR. JAFFREE:  The rest of the world
20                 or just --
21              MS. NELSON:  I'm talking about
22                 within 1995, the time frame that
23                 she was noted in her evaluation
0069
1                  as having some issues with her
2                  employees.
3               MR. JAFFREE:  I'm not sure you made
4                  that clear.
5               MS. NELSON:  I think I did.  But
6                  thank you.  I'll try to do that
7                  in the future.
8    Q.   I'm talking about around the 1995 time frame

```
 9        when, in Exhibit l8, your supervisor Gayle
10        Schwarz had indicated some issues that are
11        written here in your evaluation.  That's the
12        time frame I'm talking about.
13            To your knowledge, were you and Kevin
14        Sorrells friends?
15   A.   We worked together.  We were co-workers.  I
16        mean, yes, we --
17   Q.   Did you know him outside of the work force?
18   A.   As far as doing things?  Is that what you're
19        talking about?
20   Q.   Yeah.
21   A.   I mean, I knew him outside the workforce.
22        But, I mean, did we?
23   Q.   Did y'all socialize; did y'all go to church
0070
 1        together?
 2   A.   No.  No.
 3   Q.   What about Mary Turner; did and you Mary get
 4        along?  Were y'all -- any reason that she
 5        would have complained about you?
 6   A.   Not to my knowledge.  I don't --
 7   Q.   Were y'all friends?
 8   A.   Yes.
 9   Q.   Were you friends outside of the work place?
10   A.   Yes.
11   Q.   Do you go to church together?
12   A.   We did.  She was a member of the church that I
13        went to.
14   Q.   And was this the Methodist church?
15   A.   Yes.
16   Q.   Cloverdale Methodist?
17   A.   Lafayette Street United Methodist.  My sister
18        worked at Cloverdale.
19   Q.   I'm sorry.  I'm getting my churches confused.
20        You go to Lafayette?
21   A.   Lafayette United Methodist Church, yes.
22   Q.   And how long have you known Mary Turner?
23   A.   Since she started -- well, let's see.  Our
0071
 1        church was very big.  I would say when she
 2        started with the City because she didn't
 3        attend church a whole lot whenever I was
 4        there.  Or if she did, I didn't see her
 5        because we're -- we had quite a bit in our
 6        congregation, so there would've been times
```

7       when I didn't see her.  But I actually met her
8       whenever she started working with us for the
9       City.
10   Q.   Besides church, did you and Mary socialize?
11   A.   Not -- not during that time, no.  Not in '95.
12        I mean, we -- you know, if things were going
13        on at church, of course.  But not --
14   Q.   But later did you become as friends --
15   A.   Yes.
16   Q.   -- and socialize?
17   A.   Sure.
18   Q.   And do you still go to Lafayette United
19        Methodist Church?
20   A.   Yes.
21   Q.   Does Mary still go there?
22   A.   Yes.
23   Q.   What about Shirley Thomas?  I'm talking about
0072
1        1995 now.
2    A.   Yeah.
3    Q.   Were you friends outside of the workplace?
4    A.   No.
5    Q.   Did you go to church with Shirley?
6    A.   No.
7    Q.   Ever become friends with Shirley?
8    A.   Yes.  My family knew her husband.
9    Q.   Ever socialize with her outside the workplace?
10   A.   Not -- no.  Not unless it was a work-related
11        function.
12   Q.   Okay.  How did you come to get your job in the
13        police department?
14   A.   It -- there was a job opening, and I applied
15        for it.
16   Q.   I mean, is it a posting process?
17   A.   Yes.  Yes, ma'am.
18   Q.   Did you have to take any kind of test or
19        anything like that?
20   A.   I'm not sure.  I know that that changed over
21        the course of the years that you didn't have
22        to take a test, but I'm not sure if I did.
23   Q.   You filled out an application?
0073
1    A.   Yes.
2            (Defendants' Exhibit 9 was marked
3              for identification.)
4    Q.   Let me show you what I've marked as

5     Defendants' Exhibit Number 9, and ask you if
6     you could identify that for me, please.  Is
7     that your application to the police
8     department?
9          MR. JAFFREE:  Can I see 8 for a
10        minute?
11          Thank you.
12  Q.  Ms. Brackin, Number 9, does that appear to be
13     your application to work in the police
14     department at the city of Dothan in 1995?
15  A.  Yes.
16  Q.  Do you remember interviewing for this job?
17  A.  I don't recall the interview.  I'm sure I was,
18     but I don't recall.
19  Q.  And the job you were applying for is
20     secretary?
21  A.  Yes.
22  Q.  And did you get this job?
23  A.  Yes.
0074
1  Q.  And did that result in any pay change for you?
2  A.  I'm not sure.  It may be listed on there.  I'm
3     not sure.
4  Q.  And you were more interested in -- I think you
5     said "stable work hours?"
6  A.  Right.  Right.
7  Q.  So you became a secretary in the police
8     department?
9  A.  Yes.
10  Q.  And what department were you working in?
11  A.  The records division.
12  Q.  And who was your supervisor?
13  A.  Well, we had different -- like immediate and
14     then we had a captain over our division.
15  Q.  Who was your immediate?
16  A.  Immediate?  When I first got hired, at the
17     time, it was Lieutenant Jim Smith.  But then
18     he got promoted to captain, but he was the
19     captain over our division.
20  Q.  And is he the one that evaluated you in the
21     police department?
22  A.  I don't -- I don't remember.  I mean, he might
23     have.  It could have been the -- a sergeant.
0075
1     I'm not sure.
2  Q.  Do you remember what sergeant you would have

3     reported to?
4   A.  I know we had a few.  We had a Ron Harden.  We
5       had Anthony Westbury.  I know at one point
6       when Lieutenant Smith made captain, we had
7       Lieutenant Roy Woodham was the supervisor.
8   Q.  Woodham?
9   A.  Yes, ma'am.
10  Q.  And what were your -- just generally, what
11      were your duties as a secretary in the records
12      division of the police department.
13  A.  Oh, we were responsible for, of course,
14      receiving phone calls from the public, and we
15      sold accident -- incident/offense reports to
16      the public.  We also were responsible for
17      keying in the arrests and incident/offense --
18      accident -- not accident reports, but other
19      types of reports into the computer.  And then
20      I also assisted Tonya Anderson who was the
21      payroll clerk for the police department with
22      payroll and accounts payable.
23  Q.  Did you continue to have any interaction with
0076
1       the magistrate's office while you worked --
2   A.  Well, their office was actually inside the
3       same area that ours was for -- I'm not sure
4       for how long.  And then they moved over to the
5       Civic Center.
6   Q.  So let me make sure I understand this.  The
7       police department is -- we're in the Civic
8       Center --
9   A.  Correct.
10  Q.  -- today?
11  A.  Correct.
12  Q.  And I may be turned around, but the police
13      department is across the street?
14  A.  Yes.
15  Q.  Housed in it's own building facility?
16  A.  Yes.
17  Q.  Is that correct?
18  A.  Yes.
19  Q.  And at that time the magistrate's office was
20      contained in the police department building;
21      is that correct?
22  A.  Yes, it was.
23  Q.  And is the actual municipal courtroom in the
0077

1      police department building?
2  A.  Yes, it is.
3  Q.  Was it at that time?
4  A.  Yes.
5  Q.  So when I asked the question, was there any
6      interaction, really, the police department and
7      the magistrate's office were right there
8      together --
9  A.  Yes.
10  Q.  -- in the same building?
11  A.  Yes.
12  Q.  How many stories is the building?
13  A.  It's, I believe, two.
14  Q.  Two stories.
15  A.  Well, actually just the -- it's not a full two
16      story, but it's got the jail and the patrol
17      room downstairs.
18  Q.  But your office and the magistrate's office
19      was upstairs?
20  A.  Yes.  But when you walk in the front door,
21      you're on that floor level.  I know, it's kind
22      of --
23  Q.  And you were -- how long did you stay in the
0078
1      police department?
2  A.  I believe I went back into the magistrate's
3      office in April of '01.
4  Q.  And I'm just asking you if you know from
5      memory, because I know you really weren't
6      working in the department, who the
7      magistrates -- did Kevin Sorrells stay over
8      there as a magistrate?
9  A.  He stayed in the magistrate's office.  But
10      like I said, I'm not sure how long after I
11      went to work in the police department; the
12      magistrate's office moved to the Civic Center.
13  Q.  Oh, okay.  You don't know when that was?
14  A.  No, ma'am, I don't.
15  Q.  And that's the building we're in?
16  A.  Yes.
17  Q.  Did the jail -- excuse me.  Did the courtroom
18      stay over there at the police department?
19  A.  Yes, it did.
20  Q.  Did Gayle Schwarz remain as the head of the
21      magistrate's office while you were gone, to
22      your knowledge?

23   A.   Yes.  And then I believe someone else -- when

0079

1         she left, there was another one that received

2         that position.

3   Q.   Do you know who that was?

4   A.   Donna Nicholson.

5   Q.   Did you ever work for Donna Nicholson?

6   A.   Yes.

7   Q.   So Donna -- when you went -- and I'll ask you

8        about that in a minute.  But Donna Nicholson

9        was the head of the magistrate's office when

10       you went back to the magistrate's office; is

11       that correct?

12   A.   Yes.

13   Q.   Now, why is it you applied to go back to the

14       magistrate's office?

15   A.   For -- I -- I kept up my certification even

16       while I was in the police department, so I

17       just enjoyed the work and wanted to be back in

18       that capacity.

19   Q.   Were you ever disciplined or reprimanded,

20       either verbally or in writing, while you were

21       at the police department?

22   A.   No, not to my.

23   Q.   So you had your magistrate certification as of

0080

1         1995?

2   A.   '97.

3   Q.   But you went to the -- I'm getting confused.

4        You went to the police department in '95?

5   A.   Yes, ma'am.

6   Q.   But you're saying, while you were at the

7        police department, you --

8   A.   I kept up my magistrate's --

9   Q.    -- had schooling?

10   A.   And I was certified in June of '97.

11   Q.   And the City paid for that?

12   A.   No.

13   Q.   Well, you weren't in the magistrate's office

14       at the time.

15   A.   Right.

16   Q.   You did it on your own?

17   A.   I paid for that myself.  Yes, ma'am.

18   Q.   And your schooling was -- I mean, did you take

19       it online, by --

20   A.   No.

21   Q.   -- correspondence; did you have to go
22        somewhere?
23   A.   I had to go.
0081
1    Q.   Go where?
2    A.   To Tuscaloosa.
3    Q.   Tuscaloosa.  But you became officially
4         certified in '97; is that correct?
5    A.   Yes.
6    Q.   Okay.  You said Gayle left.  Mary Turner, she
7         was still over there while you were at the
8         police department?
9    A.   Yes.
10   Q.   Mary Turner was still in the magistrate's
11        office --
12   A.   Yes.
13   Q.   -- while you were at the police department?
14   A.   Uh-huh (positive response).
15   Q.   Shirley Thompson, was still there while you
16        were at the police department?
17   A.   I'm not sure because she -- she retired.  I'm
18        not sure what year Shirley retired in.
19   Q.   Did Mary Turner, in any way, try to persuade
20        you to come back to the magistrate's office?
21   A.   Not to my -- I mean, no.  I did that myself.
22   Q.   And when you came back to the magistrate's
23        office, do you know what year that was?
0082
1    A.   2001
2    Q.   And at that time, had there been some changes,
3         to your knowledge, in the magistrate's office?
4    A.   What do you mean, "changes?"  As far as what?
5    Q.   Well, that's what I'm asking you.
6    A.   I mean, I don't --
7    Q.   Were Doug Bates and Mike Brown still part-time
8         municipal judges?
9    A.   No.  No.
10   Q.   You mentioned one time that the magistrate's
11        division was under the city manager.  I'm just
12        asking, were you aware of any changes that had
13        taken place in either the organization of the
14        magistrate's office or what department -- was
15        its own department; did it have its own judge?
16   A.   Yes.
17   Q.   Tell me what your understanding was about
18        that?

19  A.  It was known as the Judicial Department, and
20     they had a full-time judge.
21  Q.  And that's Judge Gordon?
22  A.  Yes.
23  Q.  Who is sitting here, whom you have sued in
0083
1      this case; is that correct?
2  A.  Yes.
3  Q.  Did you have to make an application to go back
4     to the magistrate's office?
5  A.  Yes.
6  Q.  Was there a vacancy posted?
7  A.  There was a job posted.
8  Q.  Do you know any other people that bid on this
9     job?
10  A.  Not to my -- I'm not sure.  I know -- I think
11     that the roster was for two years.  I'm not
12     sure.  I knew that Lavera had applied for the
13     job.
14  Q.  Talking about Lavera McClain?
15  A.  Yes.  And -- what was her name?  She was in
16     the magistrate's -- or used to be in the --
17     Wendy.  I'm not sure what Wendy's last name,
18     but she was -- she had worked in the
19     magistrate's office at one time.  I'm sure if
20     she went to dispatch during this time or not.
21     But I -- I know that she applied, but I'm not
22     sure if it was this time or not.  I know that
23     she had applied for the job.
0084
1  Q.  Do you remember interviewing for the
2     magistrate's job when you applied to go back?
3  A.  I interviewed, but I don't recall, you know,
4     what date or anything.
5  Q.  Who did you interview with?
6  A.  I believe it was Judge Gordon.  And I'm not
7     sure if Donna was there or not.  I'm -- I'm
8     not sure.
9  Q.  Donna Nicholson?
10  A.  Yes.
11          (Defendants' Exhibit 10 was marked
12             for identification.)
13  Q.  Let me show you Defendants' Exhibit Number 10,
14     and ask if you can -- it's entitled
15     Application for City of Dothan Employment.
16     And just ask if you can identify if that was

17    your application to go back to the
18    magistrate's office.
19        (Brief pause)
20  A.  Yes.
21  Q.  This may be a good time just to take a quick
22    break.
23  A.  Please.

0085

1        (Brief recess)
2  Q.  We're back on the Record, Ms. Brackin.  I was
3    asking you about Defendants' Exhibit 10, your
4    application to go back to the magistrate's
5    office.  And that's your signature; is that
6    correct, on the --
7  A.  Yes.
8  Q.  -- back, page 6?
9      And it's dated December 4th, 2000; is that
10    correct?
11  A.  Yes.
12  Q.  And do you know approximately when you went
13    back to the magistrate's office?
14  A.  I believe it was in April of 2001.
15  Q.  And Judge Gordon would have been the
16    individual selecting you to go back; is that
17    your understanding?
18  A.  That's my understanding.
19  Q.  Now, one of the documents you produced to me
20    today, I'm going to mark as Defendants'
21    Exhibit 11.
22        (Defendants' Exhibit 11 was marked
23         for identification.)

0086

1  Q.  And ask if you can -- it's a letter from
2    Captain Jim Smith to Judge Gordon.
3  A.  Yes.
4  Q.  Is that correct?
5  A.  Uh-huh (positive response).
6  Q.  And that's dated December 30th, 1999?
7  A.  Yes.
8  Q.  Can you tell me what this is?
9  A.  It's a letter of recommendation.
10  Q.  On your behalf -- I mean, recommending you for
11    the municipal court administrator?
12  A.  Yes.
13  Q.  Now, this was a year prior to your going back
14    to the magistrate's job; is that correct?

15  A.  Yes.
16  Q.  All right.  I'm looking at Defendants' Exhibit
17     11.
18        Were you seeking the job of municipal
19     court administrator?
20  A.  I think I had applied, yes.  I'm not sure.
21  Q.  And do you remember interviewing for that job?
22  A.  I don't -- I don't recall.  I mean, I -- I
23     don't remember.

0087
1  Q.  Do you know who got that job?
2  A.  I'm not sure if that's when Gayle had left and
3     Donna got that position.  I'm not -- I'm --
4     I'm just not sure.
5  Q.  But Donna Nicholson was the municipal court
6     administrator when you moved back over
7     there --
8  A.  Yes.
9  Q.  -- in 2001?
10  A.  Yes.
11  Q.  What made you choose to go back to the
12     magistrate's office?
13  A.  Just enjoyed being in that capacity and
14     enjoyed the work.
15  Q.  Did it result in any pay change for you?
16  A.  I believe it did.  I believe it was a pay
17     increase because it -- yeah.  It was a step up
18     as far as the classifications between a
19     secretary and a magistrate, were in different
20     classifications.
21  Q.  Higher grade or --
22  A.  Yes.
23  Q.  -- higher class?

0088
1        Now, when you went back to the
2     magistrate's office in 2001 -- I'm just trying
3     to understand -- at that point the
4     magistrate's office was here in the Civic
5     Center.
6  A.  Yes.
7  Q.  And things had changed from when you were
8     there before from the standpoint that there
9     was now a Judicial Department; is that
10     correct?
11  A.  Yes.
12  Q.  And Judge Gordon was head of that department;

13     is that correct?
14  A.  Correct, to my knowledge.
15  Q.  She was a full-time municipal court judge?
16  A.  Yes.
17  Q.  Judge Bates or Judge Brown, did they continue
18     in any capacity?
19  A.  At times, I think, whenever she was -- she had
20     to recuse herself, they would act -- they
21     would fill in.
22  Q.  And there was also a municipal court
23     administrator.  Was that a new function, or
0089
 1     was that what Gayle Schwarz had been?
 2  A.  That's -- that was pretty much -- the title
 3     had just changed.  But that was --
 4  Q.  Do you know that or just your understanding?
 5  A.  That's just my understanding.
 6  Q.  You don't really know for sure --
 7  A.  No.  I mean, I wouldn't --
 8  Q.  -- what changes were made?
 9  A.  Well, Gayle was the immediate supervisor.  And
10     then when Donna got the job she was the
11     immediate supervisor.  So -- but the titles
12     were different.
13  Q.  And I'm just saying, you don't personally know
14     if there were any changes in their duties or
15     responsibilities?
16  A.  No.
17  Q.  When you went back over to the -- that's my
18     phrase.  When you went back over, back to the
19     magistrate's office, the judicial office, who
20     were the magistrates at that time?
21  A.  Mary Turner, Sarah Fowler, Ann Baxter.
22     Valerie Savage, and Debbie Irby, I believe.
23  Q.  What were your job duties when you went back?
0090
 1  A.  I'm not -- I mean, I don't -- I don't remember
 2     specifically what I was doing.  I did a number
 3     of things.
 4  Q.  Can you tell me what they were?
 5  A.  Specifically, which function?  I mean, I -- we
 6     would all do, like, different -- I mean, we
 7     would all work the window.  We would take fine
 8     money.  We would swear, do warrants.  I mean,
 9     we all did.
10  Q.  You all did --

11   A.   We kind of.
12   Q.   -- similar duties?
13   A.   Yes.  Yes.
14   Q.   Did you rotate duties?
15   A.   Sometimes we did if we needed to help somebody
16        if they were behind or if we needed to -- you
17        know, if they were out, you know, we would --
18        we would pick up what they did or --
19   Q.   Did some magistrates focus more on one duty as
20        opposed to another?
21   A.   Yeah.  Some had specific areas that they were
22        given responsibility over.
23   Q.   Can you give me some examples there?  Did you
0091
1        have responsibility --
2    A.   Well --
3    Q.   -- over a certain area?
4    A.   At the time I was actually hired I don't
5        remember what my actual, main function was.
6        But I know that after that, like I would
7        have the -- at some point in time, I was
8        responsible for all the trials.  I was
9        responsible for the appeals, the daily
10       deposits of the moneys.  Gosh, let's see.
11   Q.   Did y'all have like a --
12   A.   Prisoners.  That sort of thing.
13   Q.   When you say "prisoners," what do you mean?
14   A.   We do -- we do the prisoners once a week.
15   Q.   What does that mean?
16   A.   The people that were still in jail that had
17       not made bond.  And Sarah Fowler was the main
18       person in charge of that, but I would help her
19       out and get the paperwork prepared.  And we
20       would go work to do the prisoner paperwork.
21       The judge would see the prisoners.
22   Q.   You and Sarah had not worked together before
23       at the magistrate's office; is that correct?
0092
1    A.   Yeah.  Now, she was -- she was hired I believe
2        before I left in '95.  I'm not sure.  I'm --
3        I'm just not -- I'm not sure if she was there
4        when I left in '95.
5    Q.   Did you have any issues with Sarah Fowler?
6    A.   No, not to my knowledge.
7    Q.   Did she ever make complaints about you?
8    A.   Not to knowledge.

```
 9   Q.  Were y'all friends outside of the workplace?
10   A.  Uh-huh (positive response).
11   Q.  Did y'all go to church together?
12   A.  No.
13   Q.  Did she go to the Daughters of the Nile?
14   A.  No.
15   Q.  What about Ann Baxter?
16          MR. JAFFREE:  Again, you may think
17              you're very clear in terms of
18              what time period you're talking
19              about, but you haven't been.
20              When you asked her about Sarah,
21              she said she may have started
22              working before she left.  I
23              mean, that would've be in
0093
 1              perhaps early '95.  And then you
 2              asked her about, ever have any
 3              issues.  So I don't know if
 4              you're talking about '95 or back
 5              in 2001 when she returned to
 6              work.  And the same with this
 7              other magistrate you just
 8              asked.  I'm not sure what time
 9              period you're talking about
10              unless you're talking about her
11              entire period of employment with
12              the City.
13   Q.  Do you know Ann Baxter?
14   A.  Yes.
15   Q.  Were you went back to the magistrate's office
16      in 2001, Ann Baxter was there; is that
17      correct?  You just gave me her name as being
18      there.
19   A.  Yes.
20   Q.  Did she have any areas that she was
21      responsible for?
22   A.  I'm sure she did.
23   Q.  Do you now what they were?
0094
 1   A.  No.
 2   Q.  Did you know Ann Baxter before that time
 3      frame?
 4   A.  No.
 5   Q.  And in 2001 when you went back, did you and
 6      Ann Baxter have any issues or any inability to
```

7       work together in the workplace?
8    A.  Well, we worked together.  I mean, I don't
9       know of anything that would have prevented us
10       from doing that.
11    Q.  Were you ever critical of her work?
12    A.  As far as to who?  I mean, by telling her
13       or --
14    Q.  Her or anybody about her work performance?
15    A.  Not that I can recall.  I mean, I don't --
16    Q.  Did you have any issues with Sarah -- at that
17       time in 2001, any issues with Sarah Fowler's
18       work?
19    A.  That I recall.  No.
20    Q.  What about Valerie Savage, any issues with her
21       work?
22    A.  Not that I recall.
23    Q.  Debbie Irby, any issues with her work
0095
1       performance?
2    A.  I believe Debbie worked -- I'm not sure if
3       Debbie worked nights or not.  I don't -- I
4       didn't work that close with Debbie.  I
5       don't -- I don't recall anything with Debbie.
6    Q.  But Mary Turner, did you have any issues with
7       her work performance?
8    A.  With her work performance?
9    Q.  Yes.
10    A.  I don't -- I mean, I don't know all of
11       everybody's work performance as far as -- you
12       know, I mean, if people -- if they made
13       errors, I brought it to their attention.  But
14       as far as their work performance, I didn't --
15       I didn't critique what their work performance
16       was.
17    Q.  That was not your job, was it?
18    A.  No.  I mean, I --
19    Q.  And you don't always know what these
20       individuals were doing on a given time period,
21       do you, as far as what work duties they were
22       doing, what work they were performing?
23    A.  Well, not during the day, but we all -- we had
0096
1       a schedule of who was responsible for certain
2       assigned tasks.  So like if I knew that I had
3       a question about an appeal, I knew that
4       Valerie at some point in time did appeals so I

5    could go ask her something, if that's what
6    you're referring to.
7  Q.  But you were not their supervisor, were you?
8  A.  No.  No.
9  Q.  Did the department have any type of computer
10    system that they worked with?
11  A.  We, at the time when I went back, we were
12    still using the same system that we had in '92
13    when we started.
14  Q.  What was that?
15  A.  It was a program that one of the city
16    programers came up with.  I mean, I don't --
17  Q.  Did it have a name?
18  A.  I don't know.  It was -- it was a
19    special -- nobody else had it.  It was our
20    special program for the municipal court.
21  Q.  I'm not a technology person?
22  A.  I know.
23  Q.  But what did it do for the department?
0097
1  A.  It held all the files as far as the computer
2    files of all the actions with the municipal
3    court.  I -- that's where we got our dockets
4    from and if you needed to look up cases.
5  Q.  Did that change at some point?
6  A.  Yes.
7  Q.  And when did that change?
8  A.  I'm not sure when we started to implement the
9    new computer system.  I'm not sure when that
10    date was.
11  Q.  Did the new system have a name?
12  A.  It was HTE.
13  Q.  Did you have any role in --
14  A.  Yes.
15  Q.  -- that new computer system?
16      MR. JAFFREE:  Let her finish her
17        question.
18      THE WITNESS:  Oh, okay.  I'm sorry.
19  Q.  Yeah.  Did you have any role in that new
20    computer system being put into effect?
21  A.  Yes.
22  Q.  And what was your role?
23  A.  I was actually asked by Tim Stewart to -- they
0098
1    needed a magistrate to kind of not -- well, I
2    guess to be the one to work with, to make sure

3      that the -- everything from the old system
4      transferred to the new system as far as asking
5      questions about magistrate duties and the
6      functions of what, you know, a case had in
7      tune of the new computer system and that sort
8      of thing and working with the programmers that
9      came from Washington and --
10  Q.  Now, who is Tim Stuart?
11  A.  He is the IT department head.
12  Q.  And the programmers were from Washington,
13      D.C.?
14  A.  State of Washington.
15  Q.  Washington state.
16          And I take, a lot of information has to be
17      keyed into the computer?
18  A.  Yes.
19  Q.  And who did that?
20  A.  What information?
21  Q.  Okay.  That's what I'm trying to -- lots of
22      information, obviously?
23  A.  Yes.  Yes.
0099
1   Q.  And different people had different
2       responsibilities in inputting information; is
3       that correct?
4   A.  Yes.
5   Q.  Did you have responsibilities to key in
6       information?
7   A.  Yes.
8   Q.  And just can you -- I'm trying to understand.
9       Tell the types of information you would've
10      keyed in.
11  A.  I would issue the subpoenas if cases were set
12      for trial.  If I was working the front window,
13      I took in fine money from people paying their
14      tickets or paying on a case that they owed
15      money on.
16  Q.  So was that more like a cashier function?
17  A.  No.  You had to be a magistrate to take --
18      because you're taking a guilty plea from a --
19      from a defendant.  You would have to actually
20      be in the magistrate capacity to take fine and
21      costs money.
22  Q.  I understand that.  But then they could
23      actually be paying -- if I got a speeding
0100

1      ticket, say, I could come to the magistrate
2      window --
3   A.  And if you wished to plead guilty --
4   Q.  -- and pay my fine?
5   A.  Plead guilty.
6   Q.  Well, just pay; I'm pleading guilty?
7   A.  Yes.  Yes.
8   Q.  You take my money?
9   A.  Yes.
10  Q.  I mean, that's what I'm asking.  Is there a
11     cash register there?  I mean, is there a --
12  A.  It was done on a computer, and there was a
13     receipt -- receipt printer that's attached to
14     the computer.
15  Q.  And you're keying that information in the
16     system also?
17  A.  Yes.
18  Q.  And could be making change?
19  A.  Yes.
20  Q.  And that's called the front window?
21  A.  Yes.  That's what we refer to it as.
22  Q.  Is that a place you generally worked?
23  A.  We would rotate.  We had different times that
0101
1      we would rotate and work the front window.
2   Q.  I was, again, trying to get ideas of
3      information that's keyed in the system.  It
4      could be anything from keying in the payment
5      of a fine to --
6   A.  Well, from the -- from the initial time
7      whenever the magistrate receives the ticket,
8      that ticket is keyed in.  We have a person
9      responsible for keying in the tickets, that
10     would assign them case numbers.  Then we have
11     somebody also keying in cases that if they
12     were arrested on.  So there was just different
13     processes that a case would take.  But,
14     initially, it started off with a complaint
15     that was keyed into the computer.  And then
16     the process would go from there.
17  Q.  And how long did it take for this new HTE
18     system to be implemented?
19  A.  To -- actually to where we were live on that
20     system from the old system?
21  Q.  Yes.
22  A.  Is that what you're talking about?  I'm not --

23          I'm not sure.  I would have to actually -- you
0102
1           know, we -- we would probably need to talk to
2           the IT department about that.  I'm not --
3       Q.  It could've been months or weeks or --
4       A.  I think it was months.  I'm not sure how
5           many.  I mean, it could've been two or three.
6           It could've been more than that.  I'm just not
7           sure.  I don't remember when we went live.
8       Q.  And you don't know the exact date the change
9           was made?
10      A.  No.
11      Q.  Was there training done?
12      A.  Yes.
13      Q.  And of training done?
14      A.  Yes.
15      Q.  Did it take some time to -- strike that.
16          Did you have any issues with this newt HTE
17          system?
18      A.  There was some -- some things that as far as
19          to where it would work better for our routine
20          with a case.  We had to get them to kind of
21          tweak a few things.
22      Q.  Any problems with the system or --
23      A.  We had some issues with some things, but they
0103
1           were eventually worked out.
2       Q.  You went back to the magistrate's office in
3           2001.  On Defendants' Exhibit 11, you told me
4           you had expressed interest in a municipal
5           court administrator job.
6           Are there any other jobs that you sought
7           after 1999?  Did you seek -- that's a bad
8           question.  Strike that.
9           After 2001 you moved back to the
10          magistrate's office.  Did you ever seek any
11          other job positions at the City of Dothan?
12      A.  I -- not -- I don't recall.  Not to my
13          knowledge.  I mean, if I did, I don't
14          remember.
15      Q.  You said Donna Nicholson was there when you
16          went back to the magistrate's office in 2001;
17          is that correct?
18      A.  Yes.
19      Q.  And there was a time that she left; is that
20          your understanding, that she left the

21      employment of the City of Dothan?
22   A.   Yes.
23   Q.   Do you know why she left?
0104
 1   A.   She was terminated.
 2   Q.   Do you know why, I mean?
 3   A.   From what I understand, it had something to do
 4        with allowing a magistrate to take leave and
 5        it was not on her -- I don't want to say time
 6        card but --
 7   Q.   But you don't really know, do you, why she
 8        left?  I mean, you said, it was your
 9        understanding, but do you have personal
10        knowledge as to why she was terminated?
11   A.   From what Donna told me.
12   Q.   What Donna herself told you?
13   A.   Yes.
14   Q.   But that's all you know, is what Donna told
15        you?
16   A.   Yes.
17   Q.   Did that leave a vacancy in her position as
18        municipal court administrator?
19   A.   Yes.
20   Q.   Did you ever seek that job --
21   A.   No.
22   Q.   -- again?
23   A.   No.
0105
 1   Q.   And who took her place?
 2   A.   Bettye King.
 3   Q.   And how long -- did you report to Bettye King?
 4   A.   Yes.
 5   Q.   And how long did you report to Bettye King?
 6   A.   I don't -- I'm not sure when Bettye left.  I
 7        don't -- I don't remember.
 8   Q.   Did --
 9   A.   I don't think she was there very long.
10              (Defendants' Exhibit 12 was marked
11               for identification.)
12   Q.   Switching gears just a moment here.
13          I'm going to show you what I've marked as
14        Defendants' Exhibit Number 12.  Is that your
15        signature, Ms. Brackin?
16   A.   Yes.
17   Q.   And can you tell me your understanding of what
18        that is?

19    A.  It's -- it's the Certification of
20        Understanding for the Position of Magistrate.
21    Q.  In essence, did you sign that when you applied
22        to go back to the magistrate's office?
23    A.  Yes.
0106
 1    Q.  In essence -- and I'm just trying to move
 2        things along, your understanding that you knew
 3        you had to get certified, or may be you were
 4        certified?
 5    A.  I was already certified.
 6    Q.  That's what I --
 7    A.  Right.  Right.
 8            (Defendants' Exhibit 13 was marked
 9             for identification.)
10    Q.  I'll show you Defendants' Exhibit Number 13.
11    A.  Right.
12    Q.  Is that your certification?
13    A.  Yes.
14    Q.  So I just wanted to -- this is your
15        certification that you are a certified
16        municipal court clerk/magistrate?
17    A.  Yes.
18    Q.  And you obtained that in June of '97?
19    A.  Yes.
20    Q.  I think you testified to that previously.  You
21        got that while you were at the police
22        department?
23    A.  Yes.
0107
 1    Q.  When you signed Defendants' Number 12, that
 2        you knew you had a certain time to get
 3        certified, you were actually certified?
 4    A.  Yes.  Yes.
 5    Q.  I just wanted to clarify that.
 6            Were you ever evaluated in a performance
 7        evaluation by Donna Nicholson?
 8    A.  Yes.
 9            (Defendants' Exhibit 14 was offered
10             and admitted into evidence.)
11    Q.  I'll mark, for the Record, Defendants' Exhibit
12        14 and ask if you can identify that for me,
13        please.
14            Brief pause)
15    Q.  Is that your signature on the last page of
16        that evaluation?

17    A.  Yes.
18    Q.   And that was -- excuse me for looking over
19          here.  Your evaluating supervisor is -- is
20          that Donna Nicholson's --
21    A.  Yes.
22    Q.   -- signature?
23    A.  Yes, it is.
0108
 1    Q.   And she completed that on about August 1 of
 2          2001; is that correct?
 3    A.  Yes.
 4    Q.   And you had been in the department at that
 5          time about four months?
 6    A.  Yes.
 7    Q.   And did you have a chance to comment on your
 8          performance review?
 9    A.  Yes.
10    Q.   And what did you write?
11    A.  "I concur."
12                MR. JAFFREE:  You like that word.
13    Q.   When you wrote, I guess -- I mean, had --
14          Donna Nicholson had signed up at the top page
15          in July 27th, 2001?
16    A.  Right.
17    Q.   And Judge Gordon had commented -- made some
18          written comments on August 1; is that correct?
19    A.  Yes.
20    Q.   Do you know about when Donna Nicholson left?
21    A.  No, I do not remember.
22    Q.   Do you know if she evaluated you on more than
23          one occasion?
0109
 1    A.  Yes.
 2                (Defendants' Exhibit 15 was marked
 3                 for identification.)
 4    Q.   I'm going to show you another evaluation,
 5          which I've marked as Defendants' Exhibit
 6          Number 15, and ask if you can identify that
 7          for me, please.
 8                (Brief pause)
 9    Q.   Is that your evaluation, Ms. Brackin,
10          for -- that was given to you in November of
11          2001?
12    A.  Yes.
13    Q.   And, again, I think you testified earlier
14          because you were deemed still -- you had just

15     gone back to the magistrate's office.  Is it
16     your understanding that because of that, you
17     were evaluated your first year more frequently
18     than after being in the position for a while?
19  A.  Yes.
20  Q.  I'm looking at number eight here.  It's called
21     Dealing with the Public, and the comment is,
22     "Recently there have been complaints from
23     attorneys regarding the way they were talked
0110
1     to by Mary Beth."  And you received a one,
2     which is unsatisfactory; is that correct?
3  A.  Yes.
4  Q.  Did Donna discuss that with you during this
5     evaluation?
6  A.  Nothing other than what she wrote on there, to
7     my knowledge.  That's -- that's all I recall.
8     I don't recall her mentioning any specific.
9  Q.  Did you ask her about that?
10  A.  No.
11  Q.  Were you not concerned that you had received
12     an unsatisfactory in that area?
13  A.  I know that that was after my first internal
14     investigation.
15  Q.  Okay.  And your first internal investigation
16     referring to the -- I'm calling the Ralpeje?
17  A.  Yes.
18  Q.  And that's R-A-L-P-E-J-E --
19  A.  Yes.
20  Q.  -- matter?
21     I mean, do you think that had something to
22     do with a complaint that had been received?
23  A.  I think giving me the unsatisfactory, that had
0111
1     an influence on it.
2  Q.  Are you aware of any attorneys that complained
3     about you?
4  A.  No.
5  Q.  Now, I'm looking on the third page of this
6     evaluation, and it's a typed page.  At the
7     top, it says, "November 14th, 2001."  It's
8     signed by Donna Nicholson and yourself; is
9     that correct?
10  A.  Yes.
11  Q.  And it says that Donna -- these have been
12     discussed with plans established for

13    improvement; is that correct?
14  A.  Yes.
15  Q.  One of the areas for improvement was
16    "interaction with co-workers and the public;"
17    is that correct?
18  A.  Yes.
19  Q.  Did Donna discuss that with you?
20  A.  It -- she discussed that with me, yes.
21  Q.  And to "know the limits of advising public of
22    their rights and giving them the information
23    they need to make decisions affecting their
0112
1    case;" is that correct?
2  A.  Yes.
3  Q.  And y'all discussed that?
4  A.  That's what she has on there.
5  Q.  Well, I mean, do you remember discussing that?
6  A.  I don't remember discussing it in detail with
7    her.  I know that -- I feel like because of
8    the outcome of the internal that that's --
9    that's what the reprimand was for.
10  Q.  And there were recommendations for
11    improvement.  And the first one is
12    "realization that tone of voice and attitude
13    are important in conveying messages?"
14  A.  Yes.
15  Q.  Do you remember her discussing your tone of
16    voice and your attitude?
17  A.  I don't remember her discussing it in detail.
18  Q.  Did you ever ask her what she meant?
19  A.  I don't recall if I did.  I don't -- I don't
20    remember.
21  Q.  And the second one was "develop the ability to
22    give defendants all necessary information
23    regarding the charges against them, the court
0113
1    processes, and their options without appearing
2    to make suggestions or helping to make
3    decisions for them."
4      Do you remember her discussing that with
5    you?
6  A.  She didn't -- I don't remember the detail, but
7    we were -- we did go over that.
8  Q.  And then I'm on the next-to-the-last page
9    where Donna has written that Mary Beth is a
10    good dependable worker who is very efficient.

11      She does need to realize that the manner in
12      which she sometimes talks to people can be
13      considered argumentative or abrasive.  She needs
14      to improve in this area.
15         You saw that on the evaluation; is that
16      correct?
17   A.  Yes.
18   Q.  And did you question her in any way about that
19      or what she meant?
20   A.  No, not -- not to my knowledge.  I don't
21      recall if -- you know, if I did.
22   Q.  Did you and Donna have any disagreement
23      between the two of you as to the inability to
0114
1      get along?
2   A.  Not to my knowledge.
3   Q.   And I think this is Judge Gordon's writing,
4      something to the same effect about
5      your -- "the manner in which she sometimes
6      talks to people can be considered
7      argumentative and abrasive.  With the
8      exception of this area, Mary Beth will make
9      one of the best of magistrates we have.
10      Unfortunately, this job requires constant
11      interaction with co-workers, the public, and
12      other.  This area is so important to what we
13      do that if Mary Beth does not improve in this
14      area, I would not be able to recommend
15      retention."
16         Do you remember writing that?
17   A.  I didn't write that.
18   Q.  I said, do you remember Judge Gordon writing
19      that?
20   A.  I don't -- Judge Gordon did not go over this
21      with me.  I don't -- I don't --
22   Q.  You don't remember seeing that?
23   A.  I mean, I saw that, but I don't remember her
0115
1      writing it.
2   Q.  Okay.  Her writing.  Okay.  And, again, I may
3      have asked you this.  You had a chance to
4      offer a comment, and what did you put?
5   A.  I put "concur."
6   Q.  Now, you just testified that before receiving
7      this evaluation, that I think one of the
8      internal investigations had taken place?

9   A.  Yes.
10  Q.  And I have used the name Ralpeje.  I keep
11      saying it the wrong way I think.  But do you
12      recognize that name?
13  A.  Yes.
14  Q.  And who is Ralpeje?
15  A.  She had some cases in the Municipal Court of
16      Dothan.
17  Q.  And did you ever have any interaction with
18      her?
19  A.  Yes.
20  Q.  And do you remember whether or not she was
21      represented by counsel when she was in
22      municipal court?
23  A.  When she was actually in court that day?
0116
1   Q.  Yeah.  Now, "that day."  I'm like your lawyer
2       now.
3   A.  I don't --
4   Q.  Let's talk about when we're talking about.  Do
5       you remember a time that she was in court that
6       led to an investigation regarding some
7       comments made by you?
8   A.  Yes.
9   Q.  Do you remember about when that was?
10  A.  It was the -- the actual incident, I think,
11      happened in September of '01.  The actual
12      incident was September 25th, 2001.
13  Q.  And what are you referring to -- you're
14      referring to a letter that you produced to me?
15  A.  Yes.
16  Q.  I'm going to mark that as Defendants' Exhibit
17      Number 16.
18          (Defendants' Exhibit 16 was marked
19           for identification.)
20  Q.  That's a letter that you produced to me.
21      That's to you from Judge Gordon; is that
22      correct?
23  A.  Yes.
0117
1   Q.  Tell me what you remember about that day.
2       Ms. Ralpeje was in court?
3   A.  I was working -- at this time, the offices had
4       moved to another location, and it was where
5       the magistrates' offices were upstairs.  And
6       our window that was opened to the public was

7       downstairs.
8           And on that particular day, I was working
9       downstairs at the window.  And she, along with
10      a bondsman and her mother came in, and the
11      bondsman was on his cellular phone.
12  Q.  The bondsman's name was Mr. Turner; is that
13      correct?
14  A.  Yes.
15  Q.  What bonding company was he with?
16  A.  I'm not sure.  I don't remember.
17          He was on the phone with his -- or was on
18      his cellular phone during our conversation --
19      my conversation with the defendant.  And her
20      mother was sitting down in one of our chairs
21      in the lobby.
22  Q.  And the defendant being?
23  A.  The defendant stated that she had just come --
0118
1   Q.  The defendant is Ms. Ralpeje?
2   A.  Yes.
3           She stated that she had just come from
4       court and she was not satisfied with her
5       public defender and how he represented her.
6       And I advised her that she needed to go back
7       to the courtroom and talk to the judge and ask
8       the judge if she can get other counsel, that
9       we have two other public defenders.
10  Q.  And you knew the public defender, didn't you?
11  A.  No, I -- we don't -- all we have in the
12      computer is public defender.  We don't know.
13      It could be any one of the three that's over
14      there.
15  Q.  It's your testimony you didn't know who her
16      public defender was?
17  A.  At the -- at the time she was speaking to me?
18  Q.  Yes.
19  A.  I don't if I -- if I knew his actual name or
20      not.
21  Q.  Do you know Shaun McGhee?
22  A.  Yes.
23  Q.  And you knew that Shaun McGhee was her lawyer
0119
1       at that time, didn't you?
2   A.  I don't recall if I knew for sure it was him
3       or if it was another public defender.
4               MR. JAFFREE:  Excuse me.  Is this

5          cross, or are you asking her
6          questions?
7      MS. NELSON:  I'm asking her
8          questions.  Yeah.  It's all
9          across if you ask me.
10     MR. JAFFREE:  Okay.  Because it
11         sounds like you were
12         cross-examining her.
13     MS. NELSON:  Well, I hope that's
14         what I'm doing.
15     MR. JAFFREE:  But she indicated that
16         she wasn't sure who the public
17         defender was.  You said you know
18         it was so-and-so.
19  Q.  Well, you made negative comments about Shaun
20      McGhee to Ms. Ralpeje, didn't you?
21  A.  No, I did not.
22  Q.   And Mr. Turner heard those comments, didn't
23      he?
0120
1   A.  He -- he claims he did, but I did not say
2       that.  I would not say --
3   Q.  Say what?
4   A.  Whatever she claimed I said.  I would not say
5       anything negative about a public defender.  I
6       would not do that.
7   Q.   And you didn't tell her that Shaun --
8       something to the effect that Shaun McGhee was
9       not a good lawyer, that he shouldn't have
10      entered a plea for her, or she should get a
11      new lawyer?
12  A.  No, ma'am.
13  Q.   Nothing of that nature?
14  A.  I did not -- I did not speak in critical
15      regard to him.
16  Q.   But you know for a fact that she made a
17      complaint or Mr. Turner reported that you had
18      made derogatory comments about Mr. McGhee?
19  A.   That's what was told to me whenever I went for
20      my internal.
21  Q.   How did you know that your comments were being
22      investigated?
23  A.   I got a phone call.  I'm not sure if it was
0121
1       that day or the next day or what.  I got a
2       phone call from Sergeant Gray that asked me

3      if -- let me look at my notes.
4    Q.   So I can be with you, what are you referring
5      to here, these notes you gave me?
6    A.   Yes.
7    Q.   Can you show me what you are referring to?
8    A.   It looks like this (indicating).
9              (Defendants' Exhibit 17 was marked
10               for identification.)
11   Q.   I'm going to mark this, what you're looking at
12      as Defendants' Exhibit 17.  And I've got two
13      pages?
14   A.   Yeah.  Front and back.  Yes.
15   Q.   So you're referring to some notes,
16      Ms. Brackin?
17   A.   Yes.
18   Q.   And when did you prepare these notes?
19   A.   I prepared them after this happened.
20   Q.   And what did you prepare them?
21   A.   Prepare them in?
22   Q.   It's a notebook?
23   A.   It's paper that I had or whatever I had
0122
1      available at home to write on.
2    Q.   So you just went home that night and wrote
3      this down?
4    A.   It might have been night.  It could've been
5      couple days later.
6    Q.   Okay.  Go ahead.
7    A.   So what was the question.
8    Q.   The question was, how did you -- how were you
9      advised that, you know, this incident was
10      being investigated.
11   A.   Sergeant Keith Gray called me.  I was working
12      in my office, and he said, I needed to come to
13      the chief's conference room for an internal
14      investigation.
15   Q.   Okay.  And what did you say?
16   A.   I asked him what it was about.
17   Q.   And what did he say?
18   A.   He said, "The judge didn't talk to you about
19      it?"
20          And I said, "No, she didn't."
21          And he then said he would call me back.
22   Q.   So just tell me what happened.
23   A.   I was called over to the judge's office, and
0123

1      she told me that I was being internally
2      investigated for this incident.
3    Q.   Now what incident did she tell you about?
4    A.   For the alleged complaint that -- the Ralpeje
5      incident.
6    Q.   Okay.  Do you know who made that complaint,
7      whether it was Ralpeje --
8    A.   No, I don't.
9    Q.   Or Mr. Turner, the bondsman?
10   A.   No, I do not.
11   Q.   Or if it was all of them?
12   A.   I don't know.
13   Q.   But you knew it was about that incident?
14   A.   Yes.
15   Q.   And if you'll continue.  You said the judge
16      said you were -- that incident was being
17      investigated.
18   A.   Internally investigated.  And then I went back
19      to my office, and Michelle Sellers brought
20      over a paper for me to sign, which is this one
21      (indicating), Exhibit 16.  And I -- I would
22      report to the chief's conference room on a
23      date and time, and I told her that I was not
0124
1      signing just yet until I glanced over it,
2      looked over it good.  And she told me that if
3      I didn't, I would be insubordinate.
4    Q.   Okay.  So did you go sign it?
5    A.   I signed it, yes.
6    Q.   Okay.  I'm going to look at your sheet here.
7    A.   Okay.
8    Q.   Now, the front page is -- you wrote "9/25/01;"
9      is that correct?
10   A.   Uh-huh (positive response).
11   Q.   But the back page has got November 2001?
12   A.   Right.
13   Q.   Now, I thought it was your testimony that you
14      went home after and filled this out?
15   A.   Well, it could've been -- it could've been
16      after.  I said it could've been after that.
17      It could have a few days the later.  It
18      could've been later.  I don't remember when I
19      actually wrote it.
20   Q.   But you wrote it after you were aware that the
21      matter was going to be investigated?
22   A.   Yes.  Internally investigated.

23   Q.   So on this date, 9/25/01, did you know you
0125
1        were being investigated?
2    A.   No.
3    Q.   You're saying that date represents --
4    A.   That's the date the incident happened.
5    Q.   It's your testimony you wrote this after you
6        knew about the investigation?
7    A.   The internal -- when I was going to be
8        internally investigated.
9    Q.   Okay.  And Number 16, which is the letter you
10       gave me, is the letter from Judge Gordon that
11       you were -- the matter was going to be
12       investigated, and you were supposed to report
13       to Sergeant Gray and Sergeant Coleman for
14       administrative interviews?
15   A.   Yes.
16   Q.   And you signed the bottom of it; is that
17       correct?
18   A.   Yes.
19   Q.   And were you interviewed?
20   A.   Yes, I was.
21   Q.   By whom?
22   A.   Sergeant Gray and Sergeant Coleman.
23   Q.   And did they ask you questions?
0126
1    A.   Yes.
2    Q.   Do you remember -- did it involve the Ralpeje
3        issue?
4    A.   Yes.
5    Q.   Did it involve making statements about Shaun
6        McGhee?
7    A.   Yes.
8    Q.   Did they, in any way, state that complaints
9        had been made about what you had said about
10       Shaun McGhee?
11   A.   I don't recall all of what was said in that.
12       I asked for copies of what happened during
13       that, and I never received anything.  I can
14       remember that they were questioning me and
15       pretty much trying to get me to agree with
16       what they had complained about.
17   Q.   Did you ever have any discussions with Shaun
18       McGhee about the complaint that had been made
19       against you?
20   A.   If I did, I don't recall.  I don't recall.

21    Q.  Did you ever have any discussions with
22         Mr. Turner about what he had overheard you
23         say?

0127

1    A.   I -- if I did, I don't remember.  I don't
2         remember.
3    Q.   Did you ever call him at home about the
4         investigation?
5    A.   I -- I don't remember.  I mean, if I did, I
6         don't remember.
7    Q.   Could have?
8    A.   I just don't -- I don't remember.  I mean, I
9         don't know -- probably know his home number.
10        If I -- you know, I don't know how I would
11        have gotten that.
12   Q.   Was any action taken against you, disciplinary
13        action, as a result of this?
14   A.   The only thing that I can say that I feel like
15        might have been was what my evaluation
16        resulted, in marking of my evaluation.
17   Q.   And that was the evaluation that we just
18        discussed, which was Defendants' 15?
19   A.   Yes.
20             (Brief pause)
21   Q.   Do you know if Shaun McGhee continued to
22        represent Ms. Ralpeje --
23   A.   I don't know.

0128

1    Q.   -- after they came to your window?
2    A.   I don't know.
3             (Defendants' Exhibit 18 was marked
4              for identification.)
5    Q.   I'm going to show what I marked as Defendants'
6        Exhibit 18 and ask you if you can identify
7        that, please, ma'am.
8             (Brief pause)
9    Q.   Ms. Brackin, do you recognize that document?
10   A.   Yes.
11   Q.   It's another performance evaluation on
12        yourself; is that correct?
13   A.   Yes.
14   Q.   And did you sign that one?
15   A.   Yes.
16   Q.   It is dated February of 2002; is that correct?
17   A.   That's correct.
18   Q.   And you signed it; is that correct?

19    A.  Yes.
20    Q.  And, again, you had a change to comment on it,
21        and you used what terms?
22    A.  "I concur."
23    Q.  I concur?
0129
1             Now, this one is not completed by Donna
2        Nicholson?
3    A.  Yes.
4    Q.  Had she left at that time?
5    A.  I assume.
6    Q.  Do you know, was it completed by Judge Gordon?
7    A.  Yes.
8    Q.  Do you remember Judge Gordon going over this
9        with you?
10    A.  She -- I assume she did.
11    Q.  Don't remember?
12    A.  I don't recall.
13    Q.  And it was a satisfactory review; is that
14        correct?
15    A.  Yes.
16    Q.  I'm trying to -- looks like "Mary Beth has had
17        some problems" -- anyone -- "adjusting to a
18        new job?"
19    A.  I don't know.  I couldn't make that out.
20             MR. JAFFREE:  Let me object to any
21                questions that you're going to
22                ask about that comment since
23                Ms. Brackin has said she doesn't
0130
1                understand it.  And counsel is
2                asking questions I don't
3                understand.
4             MS. NELSON:  Well, I'm just having a
5                hard time reading the -- it's
6                between the copy not being -- I
7                have the right to at least
8                question her once I can read
9                it.  She might can remember it.
10             MR. JAFFREE:  Well, she indicated
11                that she can't understand what
12                it is.
13             MS. NELSON:  But if I'm able to read
14                it, she might have --
15             MR. JAFFREE:  But she may not.
16             MS. NELSON:  Well, I have a right to

17          ask.  Your objection is noted.
18          MR. JAFFREE:  There's several people
19            reading this document, trying to
20            figure out what she said.
21              (Brief recess)
22          MR. JAFFREE:  Again, just for the
23            Record, I object to you asking
0131
1             her questions about that
2             notation after your conference
3             with several people to try to
4             figure out what it said.
5          MS. NELSON:  Well, I can try to get
6            you a better quality.  You're
7            right.  If it's legible, I can
8            still ask her what she
9            remembers, even though she can't
10            read the writing.
11          MR. JAFFREE:  You're asking her if
12            she remembers that statement,
13            which she said she didn't
14            understand.
15   Q.  Do you remember the judge telling you that she
16        was hopeful that your attitude would continue
17        to improve as you worked on the job?
18          MR. JAFFREE:  I think her testimony
19            was that she didn't remember
20            talking to the judge about that
21            evaluation.  I think that was
22            her earlier testimony.
23          MS. NELSON:  Well, I think she said
0132
1             she was sure the judge reviewed
2             it with her, but she, you know,
3             didn't remember specifically.
4   Q.  Is that what you said?
5   A.  Yes.
6   Q.  You were still in your probationary period at
7        this point, weren't you?
8   A.  I'm not sure.  What's the date.
9   Q.  February 22, 2002?
10   A.  I'm not sure if we six months or a year.  I'm
11        not sure.
12   Q.  If you it were a year, you were still in your
13        probationary period, weren't you?
14   A.  Yes.

15          (Defendants' Exhibit 19 was offered
16          and admitted into evidence.)
17   Q.  Let me show you what I've marked as
18       Defendants' Exhibit 19, which is another
19       performance evaluation.  Ms. Brackin, do you
20       recognize that?  Can you identify that?
21          (Brief pause)
22   Q.  Is that your signature on the last page?
23   A.  Yes.
0133
1   Q.  And this is your performance evaluation for
2       May of 2002; is that correct?
3   A.  Yes.
4   Q.  And at that point, you had been in the job
5       approximately a year; is that correct?
6   A.  Yes.
7   Q.  Back in that job.
8          And you received a satisfactory review; is
9       that correct?
10   A.  Yes.
11   Q.  And the review was completed by Judge Gordon;
12       is that correct?
13   A.  That is her signature there, but, now, that's
14       not her Xs on the boxes, I don't believe,
15       because her markings are different than that.
16       I mean, I'm just going by the way she's marked
17       prior to.  But I don't believe that's her --
18   Q.  Whose Xs do you believe they are?
19   A.  I don't know.
20   Q.  Do you remember this being discussed with you?
21   A.  I don't remember if was it.  I -- I don't
22       recall.
23   Q.  And, again, I'll ask you:  You had a chance to
0134
1       comment and you concurred?
2   A.  Yes.
3   Q.  And, actually, judge said some very positive
4       things:  I'm very pleased with Mary Beth's
5       progress is our group."
6          MR. JAFFREE:  Is that a question, or
7          is a narrative?
8          MS. NELSON:  If you'll let me ask my
9          question, I will.
10          MR. JAFFREE:  Okay.
11   Q.  Do you recall her stating that she was pleased
12       with your progress?

13   A.   I don't recall her stating that.
14   Q.   Do you recall reading that, that you were --
15   A.   I --
16   Q.   Reading that?
17   A.   Reading that, yes.
18   Q.   Did you have any issues with Judge Gordon at
19        this time?
20   A.   What issues?  What do you mean?
21   Q.   Well, I'm asking you.  Any disagreements with
22        her?
23   A.   There were situations where errors were being
0135
1        made by the magistrates and she was not
2        addressing.
3   Q.   And what errors are you talking about?
4   A.   There were errors that were made by Lavera
5        McClain that she did not -- she did not
6        address.
7   Q.   Well, I'm try to get -- what errors?
8   A.   They were just different clerical errors,
9        computer errors, paperwork errors.
10   Q.   And did you -- that she didn't address.  Did
11        she know about these errors?
12   A.   What date are we talking about?  What's the
13        date of that evaluation?
14   Q.   2002.
15   A.   I know that in a prior meeting, an open
16        meeting, where the Judicial Department
17        personnel director Kai Davis was present where
18        Lavera was speaking to me in a loud and
19        threatening manner.  And there was only one
20        person in between us, so there was no need for
21        her to be that loud.  And when I complained to
22        the judge about the way that Laver had spoke
23        to me and that I did not appreciate it,
0136
1        nothing was done about my verbal complaint.
2   Q.   Okay.  You're reading from your notes?
3   A.   Yes, ma'am.
4   Q.   And you're referring to your notes.  I'm going
5        to mark your note that you produced to me as
6        Defendants' Exhibit Number 20.
7             (Defendants' Exhibit 20 was marked
8              for identification.)
9   Q.   Is that correct?
10   A.   Yes.

11  Q.  And what does this have to do with errors
12      being made by --
13  A.  Well, that was just an example.  You were
14      asking me about --
15  Q.  I'm was asking you about errors being made.
16      You're talking about clerical errors made by
17      Lavera.
18  A.  Well, I mean, they were numerous.  I don't
19      remember.
20  Q.  Well, my question is, did you make -- how did
21      you know about these alleged errors?
22  A.  Because when you -- whenever you have things
23      in the computer, our names were out there
0137
1       besides whoever keyed that into the computer.
2   Q.  So this was like a keying error?
3   A.  There were -- there were data entry errors,
4       and there was also just different types
5       of -- of paperwork errors where maybe
6       something wasn't done right on the paperwork.
7   Q.  Like number not typed in correctly?
8   A.  No.  I'm talking about paperwork, the actual
9       paperwork.
10  Q.  I know.  But that's what I'm trying to
11      understand what you're talking about.  What
12      kind of paperwork.
13  A.  Cases, case paperwork.
14  Q.  What kind of paperwork?
15  A.  On a defendant.
16  Q.  Like what?
17  A.  It would be their case action summary, the
18      warrants.  It was just, you know -- I know
19      that there were -- there were several
20      different errors involving paperwork, so, I
21      mean, I can't be exact as far as which
22      particular incident.  I just know that there
23      were numerous.  And I know that the -- one of
0138
1       clerks in the office had -- had come across
2       several errors.
3   Q.  And what clerk was that?
4   A.  Cheryl Maray.
5   Q.  And what -- she's a clerk?
6   A.  Yes.
7   Q.  What kind of a clerk?
8   A.  That's just what her position was, a clerk in

```
 9      our office.  I think it's clerk typist or
10      judicial assistant.  I'm -- I'm not sure.
11   Q.   And you didn't supervise Lavera?
12   A.   No.
13   Q.   When you learned about these alleged errors,
14      did you report them to someone?
15   A.   Whoever was our supervisor at the time.
16   Q.   Who was that?
17   A.   I don't know.  I mean, I don't -- I don't
18      remember.  I know their that there
19      were -- there were -- I know that there were
20      complaints made to Donna.  And, also, even
21      after that, I knew that Bettye and Nancy had
22      complaints.
23   Q.   Bettye King would have been her supervisor?
0139
 1   A.   Yes.
 2   Q.   Do you know --
 3   A.   But I'm not sure who was there at time.
 4      That's what I'm saying.  But I do know the
 5      complaints were made them.
 6   Q.   By yourself?
 7   A.   Excuse me?
 8   Q.   By yourself?
 9   A.   Some were, yes.
10   Q.   But I'm asking -- that wasn't your own issue
11      or disagreement with Judge Gordon is that
12      Lavera was making errors and she didn't
13      address them?
14   A.   That -- which time frame are you talking
15      about?
16   Q.   Well, I was asking you about the document --
17      just in 2002.
18   A.   Just that there were -- there was
19      inconsistency within the department.
20   Q.   In what way?
21   A.   Of the -- of the disciplinary.
22   Q.   Okay.  Did you ever make any errors?
23   A.   I'm sure I did, but I mean, I wasn't aware
0140
 1      that -- they were not brought to my attention.
 2   Q.   Did Mary Turner make some errors?
 3   A.   I don't know.  I'm sure she did.
 4   Q.   Did Valarie Savage make some errors?
 5   A.   I don't know.  I mean, I don't know if anybody
 6      else did.  They -- they may have.
```

7  Q.  The only person that you knew made errors
8     was --
9  A.  I know Ann Baxter made some errors.
10  Q.  So you knew that Ann Baxter and Lavera McClain
11     made errors?
12  A.  At this particular date?
13  Q.  Yeah.
14  A.  I'm sure some other people did, but I don't
15     know.  It depended on if I dealt with
16     something that I was -- that I was dealing
17     with.  If I dealt with that paperwork and I
18     saw that there was an error, then I would know
19     if they made a mistake.
20  Q.  But the only ones you knew of that makes
21     mistakes were Lavera and Ann Baxter?
22  A.  I'm -- but like I said, I mean, I'm sure
23     others did.  But I don't know if it, you
0141
1     know --
2  Q.  Were others disciplined, to your knowledge,
3     for their errors?
4  A.  I don't know.  I don't know.
5  Q.  Were you ever disciplined for errors?
6  A.  For errors?
7  Q.  Yes, for errors.
8  A.  For clerical errors?
9  Q.  Yeah.
10  A.  Not to my knowledge.
11          MR. JAFFREE:  When you say "ever,"
12             are you talking about up until
13             the period of --
14          MS. NELSON:  Ever.
15          MR. JAFFREE:  -- of 2002?
16          MS. NELSON:  Ever.
17          MR. JAFFREE:  Because she was
18             terminated for an error.
19          THE WITNESS:  Right.
20  A.  I thought we were talking the -- during the
21     evaluation.
22  Q.  A clerical error?  You were terminated for a
23     clerical error?
0142
1  A.  I was -- I was terminated for making a major
2     violation within a two-year period.
3  Q.  But you were not terminated for a clerical
4     error, were you?

5          MR. JAFFREE:  For the data entry
6             error.  Have you looked at the
7             record?
8          MS. NELSON:  I know the record.  I'm
9             asking her.  I'll get into it.
10         MR. JAFFREE:  So-called negligent
11           data entry error.
12  Q.   While we're on this meeting, Number 20, that
13     you've made a note about -- Defendants'
14     Exhibit 20, the one about an open meeting
15     where Kai Davis was there?
16  A.   Right.
17  Q.   Kai Davis is the personnel director; is that
18     correct?
19  A.   Yes.
20  Q.   And do you know why this meeting was being
21     held?
22  A.   I don't recall.  I don't remember.
23  Q.   Did you have meetings with -- just one on one
0143
1     with Kai Davis?
2  A.   Not to my -- I don't -- I don't recall if I
3     did or not.  I don't think so, but I don't
4     recall.
5  Q.   Do you know if any complaints had been made
6     about you to Kai Davis?
7  A.   Not to my knowledge.
8         (Defendants' Exhibit 21 was marked
9           for identification.)
10  Q.   I'll show you what I've marked as Defendants'
11     Exhibit 21 and ask you to identify that.
12        (Brief pause)
13  Q.   Do you recall receiving this memorandum?
14  A.   I have seen it before, yes.
15  Q.   And it's a memo issued by Judge Gordon to the
16     Judicial Department personnel.  You were one
17     of those; is that correct?
18  A.   Yes.
19  Q.   And this was issued January 8th, 2003; is that
20     correct?
21  A.   Yes.
22  Q.   Do you remember getting one of these?
23  A.   I must have.  I remember seeing it.
0144
1  Q.   You remember seeing it?
2  A.   Yes.

3   Q.  And, of course, it's -- the subject is Public
4        Relations, but it was stressing the importance
5        of not commenting on the possibility of city
6        liability.  Do you remember that?
7   A.  Yes.
8   Q.  And it also cited to Mr. Rubin.  That was the
9        city manager; is that correct?
10  A.  Yes.
11  Q.  Do you remember why this came out, or was
12       there any kind of meeting held in conjunction
13       with the issuance of this memo?
14  A.  I don't recall what made that memo get issued.
15  Q.  You don't remember --
16  A.  I don't -- I don't --
17  Q.  -- any specific incident or concern to cause
18       this to be issued?
19  A.  I don't believe we were -- I was -- I was not
20       specifically told why it was issued.
21  Q.  Okay.  And there's reference to a Ms. King.
22       That's Bettye King that was your supervisor at
23       the time?
0145
1   A.  Yes.
2   Q.  She was the court administrator?
3   A.  Yeah, she was.
4   Q.  After Donna Nicholson?
5   A.  Yes.
6   Q.  Do you know why she left?
7   A.  I don't know.  I don't know what her reason
8        for leaving was.
9   Q.  And after she left, do you know who the court
10       administrator was?
11  A.  Nancy Martin.
12  Q.  And do you know if Bettye King ever had the
13       opportunity to evaluate your performance?
14  A.  I'm -- she -- I'm sure she did, but I -- I
15       don't recall.
16              (Defendants' Exhibit 22 was marked
17               for identification.)
18  Q.  I'll show you what I've marked as Defendants'
19       Exhibit 22.  Just ask if you can identify that
20       for me, please.
21              (Brief pause)
22  Q.  Do you recognize yes?
23  A.  Yes.
0146

1  Q.  And is that an evaluation given you by Bettye
2      King?
3  A.  Yes.
4  Q.  And you had the opportunity to comment; is
5      that correct.
6  A.  Yes.
7  Q.  And you put that --
8  A.  "I concur."
9  Q.  You concur.  And that was dated April of 2003;
10     is that correct?
11 A.  Yes.
12 Q.  And this is also signed off by Judge Gordon?
13 A.  Yes.
14 Q.  To your knowledge?  And I received a
15     satisfactory evaluation?
16 A.  Yes.
17 Q.  Do you have any issues or criticism of Bettye
18     King as a supervisor?
19 A.  Not -- not that I recall.
20 Q.  Did you ever -- these errors that you were
21     talking about that Lavera and Ann Baxter made,
22     and I guess you said others made, did you ever
23     bring those to the attention of Bettye King?
0147
1  A.  Yes.
2  Q.  Do you know what, if anything, she did when
3      you brought those to her?
4  A.  I don't -- I don't recall.  I mean, I don't
5      know if she talked with the people or she
6      passed it along to the judge.  I don't know.
7  Q.  There was a time in 2004 that you were
8      disciplined and suspended; is that correct?
9  A.  Yes.
10 Q.  Let me show you -- and that involves an
11     individual named Mr. Fondren; does that name
12     mean anything to you?
13 A.  Yes.
14 Q.  Did you know a Mr. Fondren?
15 A.  I -- I don't know of him personally.  I know
16     that he was a defendant.
17 Q.  A defendant in your municipal court?
18 A.  Yes.
19 Q.  And do you remember having any interaction or
20     conversations with him?
21 A.  Yes.
22 Q.  And tell me what you remember.

23    A.  He came -- I was working downstairs, and he
0148
1        came into the office and asked to speak to
2        Mary Beth Brackin.  And told him that I was
3        she.  And he said that he needed some
4        information and was sent because he was
5        falsely arrested.
6    Q.  And falsely arrested for what?
7    A.  I don't recall.  He just -- he just said that
8        he needed to know what to do about it, that
9        his vehicle was towed, and he wanted to know
10       what he needed to do.
11   Q.  And what did you tell him?
12   A.  I told him that he had to go to the city
13       clerk's office.
14   Q.  And was anyone present when this conversation
15       took place with Mr. Fondren?
16   A.  I understand that -- I believe Lavera was
17       working in the back at the warrant windows,
18       which is a pretty good distance from the front
19       window.
20   Q.  Anybody else present?
21   A.  I don't recall.  I don't remember.
22   Q.  Did you ever tell Mr. Fondren that he had been
23       falsely arrested?
0149
1    A.  No, I did not tell him he had been.  I told --
2    Q.  You told him what?
3    A.  I told him that if he wanted to file for that,
4        he needed to go to city clerk's office and
5        that's what he needed to tell them as to the
6        reason why he was there.
7    Q.  Were you aware that Mr. Fondren ever filed a
8        complaint or complained about you to the City?
9    A.  I don't know.
10            MR. JAFFREE:  I'm sorry.  Was your
11               question never or did?
12            MS. NELSON:  Ever.
13            MR. JAFFREE:  Oh, I'm sorry.
14   A.  I don't recall if he did.
15   Q.  And were you ever advised that he had filed a
16       complaint with the City?
17            MR. JAFFREE:  Against her?  I'm
18               trying to -- are you saying a
19               complaint against her?
20            MS. NELSON:  I just said a complaint

```
21              against the City.
22          MR. JAFFREE:  Oh, just general
23              complaint.
0150
 1   A.  Against the City?
 2   Q.  I said against the City?
 3   A.  Not to my knowledge.  I don't know.
 4   Q.  Were you ever told that he informed the city
 5       that you told him that he had been falsely
 6       arrested and he should sue the City?
 7   A.  No.  I don't recall saying that.
 8   Q.  Well, I understand.  But were you ever
 9       informed that he had made those statements to
10       the City about you?
11   A.  I don't recall specifically what was said.  I
12       do know that there was an internal
13       investigation done into that, but I don't
14       recall what all was said in there and who
15       filed for and for what reason.  It was just
16       about that particular incident that happened.
17   Q.  And, again, you were reprimanded; is that
18       correct?
19   A.  Yes I was.
20              (Defendants' Exhibit 23 was marked
21               for identification.)
22   Q.  I'm going to show you what I've marked as
23       Defendants' Exhibit Number 23.
0151
 1              (Brief pause)
 2   Q.  You were given notice of the charges against
 3       you; is that correct?
 4   A.  Yes.
 5   Q.  And that's what Defendants' Number 23 is?
 6   A.  Yes.
 7   Q.  And I guess it's -- have you seen this
 8       document before?
 9   A.  Yes.
10   Q.  And I'm talking about notice of the charges.
11       It describes -- I guess the document can speak
12       for itself -- the incident regarding
13       Mr. Theron Fondren.  And it points to the memo
14       that I showed you a moment ago about your
15       being directed not to comment on City
16       liability, which was Defendants' Exhibit
17       Number 21?
18   A.  Yes.
```

19          (Defendants' Exhibit 24 was marked
20            for identification.)
21   Q.  And then, ultimately, I'll show you
22     Defendants' Exhibit Number 24.  That's the
23     actual discipline form regarding that
0152
1     incident; is that correct?
2  A.  Yes.
3  Q.  And have you seen and received a copy of
4     that?
5  A.  Yes.
6          (Defendants' Exhibit 25 was marked
7            for identification.)
8  Q.  And then as a result thereof --let me show you
9     Defendants' Exhibit Number 25 -- you were
10     given a ten-day suspension; is that correct?
11  A.  Yes.
12  Q.  Now, did you grieve this or appeal this
13     suspension in any way?
14          MR. JAFFREE:  Excuse me.  Unless I'm
15           wrong, there's no right to
16           grieve that --
17          MS. NELSON:  I'm just asking --
18          MR. JAFFREE:  -- unless you can show
19           me some document.
20          MS. NELSON:  You're not being
21           deposed.  I'm asking her.
22          MR. JAFFREE:  Well, you may be
23           asking her something that she
0153
1           didn't have a right to do so.
2          MS. NELSON:  I'm asking her if she
3           did.
4          MR. JAFFREE:  Fine.
5  A.  No, I did not.
6  Q.  Did you challenge this in any way?
7  A.  No, I didn't.
8  Q.  Question it in any way?
9  A.  No.
10     Well, I questioned it in my internal.  I
11     mean, I -- I stated that I did not do that.
12  Q.  Your internal being?
13  A.  The investigation.
14  Q.  Okay.  Investigation --
15  A.  Prior to this.
16  Q.  There was an investigation into this incident

17      regarding Mr. Fondren?
18  A.  There was an internal investigation.
19  Q.  And who conducted the investigation?
20  A.  Sergeant Gary Coleman and Sergeant Ray Owens.
21  Q.  And you're look at something there.  What are
22      you looking at?
23          (Witness complied.)
0154
 1  Q.  Is this the document you've produced to me?
 2  A.  Yes.
 3          (Defendants' Exhibit 26 was marked
 4           for identification.)
 5  Q.  This is Defendants' Exhibit Number 26.  This
 6      is a letter to you, Ms. Brackin; is that
 7      correct?
 8  A.  Yes.
 9  Q.  Dated March 22, 2004?
10  A.  Yes.
11  Q.  From Judge Gordon, and it's notifying you of
12      an administrative investigation into a claim
13      of false arrest?
14  A.  Yes.
15  Q.  Brought by Theron Fondren which allegedly
16      occurred on January 1, 2004; is that correct?
17  A.  Yes.
18  Q.  And you were told to report to Sergeant
19      Coleman and Sergeant Owens for an
20      administrative interview, that you were
21      directed to cooperate; is that correct?
22  A.  Yes.
23  Q.  And so you did?
0155
 1  A.  Yes.
 2  Q.  You did report?
 3  A.  Yes.
 4  Q.  Did they ask you questions?
 5  A.  Yes, they did.
 6  Q.  Did they inform you of what the investigation
 7      was about?
 8  A.  I'm sure they did.  I don't recall everything
 9      that was said.
10  Q.  Do you know who else might have been
11      interviewed?
12  A.  No, I don't remember.
13  Q.  And do you remember the type questions they
14      asked you?

15  A.  They were asking me, you know, if I said this
16      and -- and why I said it and the -- the
17      circumstances surrounding it.  And I,
18      basically, you know -- I did not tell him that
19      this is what you should do.  I just was
20      directing him to the city clerk's office.
21  Q.  Did they as you whether or not you had told
22      the man that he had been falsely arrested or
23      wrongfully arrested?

0156

1   A.  I'm -- they could have.  I don't recall.  I
2       don't recall all the questions that were
3       asked.
4   Q.  That a lot of it stemmed on what --
5   A.  Yes.
6   Q.  -- you told him?
7   A.  Yes.
8   Q.  Did you tell him he had been falsely
9       arrested?  I'm not saying that you said it.  I
10      said the nature of the questions involved,
11      what you told him and whether or not you --
12  A.  Right.
13  Q.  -- told him --
14  A.  Correct.
15  Q.  -- he had been falsely arrested or wrongly
16      arrested.  And the questions stemmed around
17      whether or not you told him --
18  A.  Yes.
19  Q.  -- to go sue the City or file a lawsuit
20      against the City or a claim against the city;
21      is that correct?
22  A.  Yes.
23  Q.  And you're saying in the investigation, you

0157

1       denied saying that?
2   A.  I just told him that I did not tell him, you
3       should sue the city and that what you were
4       falsely arrested.  I said, this is what you
5       need to tell, as far as going to the city's
6       clerk office, this is the reason why you're
7       there, is that you were falsely arrested based
8       on his testimony, not that I said he was.
9   Q.  Do you have any reason to
10      believe that -- strike that.
11          Do you know why that investigation came
12      about?

13    A.  No, I do not.
14    Q.  Do you know if Judge Gordon had anything to do
15        with that investigation?
16    A.  I don't know.  I don't -- I don't recall I --
17        if I was told.
18    Q.  Do you know if Judge Gordon had anything to do
19        with the prior internal investigation that you
20        talked about involving that Ms. Ralpeje?
21    A.  I think she did.
22    Q.  And why do you think that?
23    A.  Well, she is my department head.  If there was
0158
1         a complaint made against me, I felt like as a
2         department head she should've handled that
3         within our department.
4     Q.  Handled it what way?
5     A.  She should have questioned me about it.
6     Q.  And not get anyone else involved?
7     A.  Well, I know the internal investigation was a
8         little bit harsh.  I was treated like a
9         criminal, but I felt like that as she being my
10        department head, that she could have handled
11        the situation.
12    Q.  And why do you think you were treated like a
13        criminal?
14    A.  Well, I mean, just by the way they were
15        questioning me.  It was very intimidating.
16    Q.  Do you know if any others were questioned?
17    A.  In the -- any others in that office?
18    Q.  In Ralpeje, do you know if anybody else was
19        questioned?
20    A.  I assume the others -- the people that were
21        involved in the incident were.  But I -- I
22        don't for sure.
23    Q.  Do you know if the Fondren situation if any
0159
1         others were questioned?
2     A.  I'm sure they were, but I don't for sure.  I
3         didn't never see any type of written
4         statements or any type of -- didn't get to
5         listen to any of the taped statements or
6         anything if they were.  So I -- I couldn't
7         tell you for sure.
8     Q.  Do you know the role of Internal Affairs and
9         when they get involved in investigations?
10    A.  No.

11    Q.  Do you know any other people who have been
12        interviewed by Internal Affairs?
13    A.  What do you mean?  In any division?
14    Q.  Yeah.
15    A.  I -- I don't know.  I assume police officers.
16        I don't -- I don't know that for sure.
17    Q.  So you don't know who Internal Affairs may
18        have ever talked to or investigated?
19    A.  No.  Not personal knowledge.  No.
20    Q.  It's just your opinion that Judge Gordon
21        should've handled the Ralpeje issue herself?
22    A.  I felt like that she should have.
23    Q.  Now, when you were investigated -- I mean,
0160
1        where did the interviews take place by -- I'm
2        sorry.  It was Sergeant Coleman and Sergeant
3        Owens?
4    A.  Second the time, yes.
5    Q.  Do you know those two men?
6    A.  Yes.
7    Q.  You probably worked with them over in the
8        police department, didn't you?
9    A.  I didn't work with them.  We were -- we see
10        each other during the day.  But --
11    Q.  But any agreements with them for any reason?
12    A.  Not to my knowledge, no.
13    Q.  To your knowledge, were they just doing their
14        job when they were asking questions?
15    A.  I assume they were, yes.
16            MR. JAFFREE:  Let me object to the
17                question.  She doesn't know
18                whether or not their job
19                involves investigating people in
20                the mayor's office or in any
21                department in the City or they
22                had a right to just interrogate
23                people in any division.  I mean,
0161
1                she doesn't know that.
2                    Do you?
3            MS. NELSON:  Well, I'm just asking
4                her knowledge --
5            MR. JAFFREE:  You said doing their
6                job.
7                    Do you know if their job
8                consists of interrogations of

9           all over the city --
10        THE WITNESS:  No.
11        MR. JAFFREE:  -- regardless of
12          criminal matters.
13        MS. NELSON:  It's my turn to her the
14          questions.
15  Q.  Do they wear uniforms?
16  A.  They -- I don't know if they do.  I mean,
17     there were times I have seen them in uniform,
18     but as to the time --
19  Q.  Well, you worked with the police department
20     for four years?
21  A.  Right.
22  Q.  Had you ever heard of Internal Affairs before?
23  A.  I'm not sure when Internal Affairs started.
0162
1     They had not always had an Internal Affairs
2     Division.
3  Q.  Was there Internal Affairs when you were
4     there?
5  A.  I'm not sure.  That I don't know because I
6     don't know when they started.
7  Q.  So you don't know for sure.
8      Where were you -- where was the interview?
9  A.  In the chief's conference room.
10  Q.  And about how long did it last?
11  A.  I don't know.  I can't tell you how long it
12     lasted.  I don't remember.
13  Q.  And do you know if Sergeant Owens and/or
14     Sergeant Coleman made any recommendation to
15     the Judicial Department about what they
16     learned following the investigation into the
17     Fondren matter?
18  A.  If they did, I don't recall.  They didn't tell
19     me.
20        MS. NELSON:  Okay.  We'll take a
21        lunch break and maybe be back
22        about 1:15.
23    (Lunch recess)
0163
1       (Defendants' Exhibits 27, 28, 29
2       were marked for identification.)
3     MS. NELSON:  I've marked for
4       identification, tax returns
5       Ms. Brackin brought.
6       Defendants' 27 is 2003 Alabama

```
 7                 return.  Defendants' 28 is 2005
 8                 U.S. Tax Return.  And
 9                 Defendants' Exhibit 29 is a 2006
10                   U.S. Tax Return.
11    Q.   And, Ms. Brackin, you're saying, you've
12         ordered your 2003 --
13    A.   I'm --
14    Q.   Wait a minute -- and 2004 U.S. tax returns?
15    A.   Yes.
16    Q.   And you'll provide those to me?
17    A.   Yes, I will.
18    Q.   And you did file those years?
19    A.   Yes, I did.
20    Q.   You'd be surprised people that don't
21         sometimes.
22    A.   Well, that's one thing I do.
23    Q.   Okay.  I think before the break we had
0164
 1         discussed to the Fondren matter and your
 2         suspension.  I think we've covered that.
 3             Do you recall when Nancy Martin became
 4         your supervisor?
 5    A.   Best of my knowledge, in the year 2004, I
 6         believe.
 7    Q.   To your knowledge, did she have any magistrate
 8         experience or court administration experience?
 9    A.   I knew that she had been with Legal Services
10         for a number of years, but as far as what her
11         experience was, I don't know.
12    Q.   You don't know what her job was at Legal
13         Services?
14    A.   No, ma'am.
15    Q.   Did you, in any shape, form, or fashion, have
16         to train her as to what the magistrate duties
17         required?
18    A.   She would ask me on occasion.  Yes.
19    Q.   Did she ever have an occasion to evaluate you?
20    A.   I'm sure she did.  I'm -- I'm -- I don't
21         remember.
22    Q.   Again, you don't know at what point in 2004
23         she came on board?
0165
 1    A.   No, ma'am.  It could have been maybe within
 2         the first quarter or first six months of
 3         2004.  I'm just not -- I'm not quite sure of
 4         the exact date.
```

5          (Defendants' Exhibit 30 was marked
6           for identification.)
7   Q.   Well, let me show you what I've marked as
8        Defendants' Exhibit Number 30, which is an
9        employee evaluation.  Is that something you
10        recognize?
11   A.   It looks an evaluation on myself.
12   Q.   Do you recognize that handwriting?
13   A.   Yes.
14   Q.   And whose is, to your knowledge?
15   A.   To my knowledge, it looks like Nancy's.
16   Q.   And I know you're flipping through it, but go
17        to the back page for me just to --
18           (Witness complied.)
19   Q.   Did you sign that, Ms. Brackin?
20   A.   Yes, I did.
21   Q.   And do you -- it's also signed by Nancy
22        Martin, I see, as your evaluating supervisor?
23   A.   Yes.
0166
1   Q.   And also by Judge Gordon; is that correct?
2   A.   Yes.
3   Q.   And that was in about May 17th of 2004; is
4        that correct?
5   A.   Yes.
6   Q.   And you got a chance to comment?
7   A.   Yes.
8   Q.   And you concurred; is that correct?
9   A.   Yes.
10   Q.   I'm not trying to testify for you.
11           Do you remember, now that you've seen
12        this, Nancy Martin reviewing this with you?
13   A.   I really don't recall my -- my going over
14        this.  I'm sure she did, but I don't recall
15        everything that was said.
16   Q.   Now, a couple places here you were rated
17        unsatisfactory.  Do you see that?  First page,
18        task number ten, that very last task dealing
19        with the public.  I mean, I'm just --
20   A.   Yes.
21   Q.   And it makes reference to your recent offense
22        that you were disciplined for regarding your
23        dealing with the defendant?
0167
1   A.   Yes.
2   Q.   And is it your understanding that that was the

3      Fondren incident that we recently just
4      discussed before the break?
5  A.  Yes.
6  Q.  To your knowledge, was Ms. Martin involved in
7     that in any way?
8  A.  She was not hired when that incident
9     occurred.  She was not employed.
10  Q.  Okay.  Now, when Ms. Martin became as your
11     supervisor, her title was court administrator;
12     am I saying that right?
13  A.  To my knowledge, yes.
14  Q.  Was she your immediate supervisor?
15  A.  Yes.
16  Q.  Do you know who hired her?
17  A.  I don't know exactly who hired her, no.
18  Q.  Did she, in turn, report to Judge Gordon?
19  A.  I'm -- to my knowledge.  I assume she was
20     since judge is our department head.
21  Q.  When she came on board, do you remember who
22     the other magistrates were in the office?
23  A.  Let's see.  Myself, Mary Turner, Ann Baxter,
0168
1      Lavera, Eunice, Sarah.  And we're talking
2      magistrates, right.
3  Q.  Yes.
4  A.  Valarie and Michelle Bryan.  And I believe
5     that's all of them.
6  Q.  Michelle Bryan?
7  A.  Yes, B-R-Y-A-N.
8  Q.  And do you know when Michelle was hired?
9  A.  No, I don't.
10  Q.  Do you know what her duties primarily were?
11  A.  Well, they changed because we would rotate
12     after so long.  So I'm -- we all had, you
13     know, the same duties eventually.  But I'm not
14     sure what her exact assignment was.
15  Q.  Do you know if she ever made errors in the
16     work that she did?
17  A.  Yes.
18  Q.  Now, you were telling me, physically, y'all
19     were located in the police department, and
20     then you moved here to the Civic Center.
21  A.  Yeah.
22  Q.  And then there was a time y'all moved again?
23  A.  Yes, ma'am.
0169

1  Q.  First of all, where did you move to after the
2      Civic Center?
3  A.  There is a two-story building on the corner
4      of -- I believe it's Troy and North
5      St. Andrews.  It's right between here and the
6      police department.
7  Q.  Okay.
8  A.  And we had offices on the upstairs floor, and
9      then the bottom floor, part of that, part of
10     that we had where the public would come in and
11     do their business.
12 Q.  Meaning come into the --
13 A.  Pay fines, if they wanted to take out a
14     warrant, that sort of thing.
15 Q.  Do you know how you came to get new office
16     space?
17 A.  Which location?
18 Q.  When you moved to Troy and North St. Andrews.
19         When you left the Civic Center, were you
20     needing additional office space?
21 A.  Yes.
22 Q.  Had you been trying to get additional office
23     space?
0170
1  A.  Yes.  And they got -- the City leased that
2      space for us, and it was remodeled to better
3      fit us.
4  Q.  Do you know if Judge Gordon was instrumental
5      in obtaining new office space for the
6      department?
7  A.  I'm not -- I don't know -- I don't have any
8      knowledge of that.  I don't know.
9  Q.  And do you know about when it was that the
10     magistrate's office moved?
11 A.  To that location?
12 Q.  To that location.
13 A.  No, ma'am I don't.  I don't -- I know it was
14     after -- I don't remember being -- I -- I
15     started back in April of '01, and I don't
16     believe we were here at the Civic Center that
17     long before we moved over there.  But I'm not
18     sure as to what date.
19 Q.  Okay.  Now, do you know an individual named
20     Stephen Phelps?
21 A.  I don't know him.
22 Q.  Do you know of him?

23    A.   Of him?
0171
1    Q.   Yes.
2    A.   I know the name, but I don't know him.
3    Q.   How do you know that name?
4    A.   It was brought up in a hearing with the
5         Personnel Board.
6    Q.   But you're saying you never knew of that name
7         before?  Strake that.
8             Well, what kind of hearing?  What kind of
9         hearing before the Personnel Board?
10   A.   It was my termination hearing.
11   Q.   You're not talking about your appeals
12        hearing.  When you were notified that you had
13        been terminated?
14   A.   The hearing that we had that I -- that I
15        appealed the judge's decision to the Personnel
16        Board.  And there was a hearing.
17   Q.   But before you appealed the judge's decision,
18        were you ever informed that you had committed
19        any type of major offense as it pertained to
20        Stephen Phelps?
21   A.   I don't know if his name was mentioned.  I
22        know that Officer Etress with the CID division
23        questioned me about a ticket that involved
0172
1         Mary Turner.  So I don't know if that's the
2         one or not.  I don't -- I don't remember if
3         the name was brought up.  I'm not sure.  It
4         could have been, but I'm not sure.
5    Q.   And to your knowledge, there was an
6         investigation going on as to certain activity
7         or conduct by Mary Turner; is that correct?
8    A.   When?
9    Q.   Well, you were just saying you were questioned
10        by -- I'm asking you.
11   A.   Yeah.  When Officer Etress -- that's the
12        first -- that's the first I knew about it,
13        when I called over there as to what it was all
14        about because I had not know.  I didn't know
15        beforehand.
16   Q.   And it's you understanding that you were
17        called over because they were investigating
18        Mary Turner?
19   A.   No.  All I was told was to come over and that
20        Officer Etress needed to question me about an

21      incident and that I was to cooperate with him.
22   Q.   And Etress, is he with the police department?
23   A.   Yes.
0173
1   Q.   Is he in Internal Affairs?
2   A.   No, he's not.
3   Q.   He's with CID?
4   A.   He was not then.  I don't know if he is now.
5   Q.   At the time?
6   A.   At the time, he was not.
7   Q.   Do you remember what he was questioning you
8        about?
9   A.   He was questioning me about a ticket that
10       involved Eric Duhaime and the voiding of that
11       ticket.
12   Q.   Do you know who that ticket had been written
13       to?
14   A.   I'm sure he might have said the name at the
15       time, but I don't remember the name that
16       was -- I mean, I do know now, but not at the
17       time that he was questioning me.
18   Q.   You know now it was Stephen Phelps?
19   A.   Yes.
20   Q.   Do you know Stephen Phelps' brother, Bradley
21       Phelps?
22   A.   I don't know him.  I don't recall that name
23       and my dealings with him.
0174
1   Q.   To your knowledge, did Mary Turner know them?
2   A.   After the fact --
3   Q.   You learned?
4   A.   -- I learned that she did.
5   Q.   And you've also learned after the fact that
6        Mary Turner was being investigated and charged
7        with a criminal offense involving those two
8        individuals, aren't you?
9            MR. JAFFREE:  Is that a question?
10   A.   I'm sorry.
11           MR. JAFFREE:  You asked her if she
12               also knew that Mary Turner --
13           MS. NELSON:  I asked her if she
14               knows that Mary Turner was
15               charged with a criminal offense
16               involving Stephen Phelps and
17               Bradley Phelps.
18   A.   I know that after the fact that -- I know now

19    that she was charged, but I don't know the
20    full extent of what it was.  I mean, I know
21    what the charge was, but I know that
22    that's -- I know that the grand jury changed
23    that.
0175
1    Q.   What was the charge?
2    A.   She was arrested for the extortion, but the
3         grand jury did not find cause for extortion.
4    Q.   And how do you know that?
5    A.   Because she told me.
6    Q.   Okay.  And what did she tell you?
7    A.   She told me that the grand jury didn't find
8         cause for extortion.
9    Q.   And she was free to go?
10   A.   No.  That they had found grounds for a
11        misdemeanor.
12   Q.   And when did she tell you this?
13   A.   It was not -- it was after the fact that it
14        had happened.  I don't remember when.
15   Q.   Now, when an officer writes a traffic ticket,
16        he brings it into the magistrate's office to
17        swear in your presence or a magistrate's
18        presence; is that correct?
19   A.   That's correct.
20   Q.   And that's one of the duties that you do from
21        time to time?
22   A.   Yes.
23   Q.   And when he brings -- he/she brings in the
0176
1         ticket to be sworn to, are you supposed to --
2         once the officer -- I mean, do you ask the
3         officer to raise their hand and swear to the
4         ticket?
5    A.   Yes.
6    Q.   And then tell me what transpires.  I don't
7         deal in this court law.
8    A.   We -- we go through the tickets, and we call
9         out the date and the name and the violation.
10        And we go through each one.  And then I always
11        say at the end, "These occurred on the public
12        streets of Dothan within this jurisdiction."
13        Then I sign the transmittal and give his copy
14        back to him, the officer.  He puts the ticks
15        on a transmittal form.
16   Q.   An officer may be out working on a shift?

17   A.   Right.
18   Q.   And he may write more than one ticket?
19   A.   Correct.
20   Q.   And, so, say, he writes ten tickets on his
21        shift.  And he has ten tickets that he's
22        supposed to bring to you; is that correct?
23   A.   Yes.
0177
 1   Q.   And then he also brings a transmittal sheet
 2        with the individual's he's given those
 3        tickets; is that correct?
 4   A.   Yes.
 5   Q.   I'm saying he; it could be a she.
 6             The officer fills out the transmittal
 7        sheet?
 8   A.   Yes.
 9   Q.   And then comes to you or a magistrate.  And
10        does he give a package, or does he give you
11        one ticket at a time?  Or does he give you a
12        transmittal sheet and ten tickets?
13   A.   He gives -- he gives them the transmittal
14        sheet with the tickets.
15   Q.   And then tell me what the magistrate
16        is -- then asks him to swear?
17   A.   Yes.
18   Q.   Okay.  My question is, do you take each ticket
19        at a time or do you --
20   A.   Yes.
21   Q.   I'm not trying to put words in your mouth.
22   A.   No.  That's it.  You take each ticket at the
23        time, and then you sign the transmittal form.
0178
 1        And you hope that those tickets match that
 2        transmittal form.  So, a lot of times,
 3        officers don't have time for you to sit
 4        there.  And if you've got, let's say, a whole
 5        transmittal full, which we've had before, of
 6        tick, especially if they were local impact,
 7        and you've got a stack of tickets, we, as
 8        magistrates and the officers also, a lot of
 9        times don't have time to sit there and make
10        sure that John Doe -- this ticket here is
11        listed as John Doe on this transmittal.  We
12        have faith and trust in that officer that what
13        they've given us is on this transmittal form.
14        So once they're sworn to, we give them their

15    copy of the transmittal and they're on their
16    way.
17  Q.  When do you actually sign the ticket?
18  A.  Sometimes it's after they leave.
19  Q.  But sometimes when they're there?
20  A.  It depends.  Because like I said, if we
21    don't -- because they've already got their
22    copy.  A lot of the officers did not keep
23    their -- they don't wait for the magistrate to
0179
1    sign to get their copy.  They've already torn
2    off their copies.  And you once you sign the
3    transmittal and give them their copy, they're
4    gone.
5  Q.  To you even bother to -- I mean, I take it,
6    you've done this a long time and you're pretty
7    meticulous about what you do.  Do you -- you
8    said you might not sign every ticket right
9    there and there, but do you at least see that
10    they match up?
11  A.  Sometimes and sometimes I don't.  It just
12    depends if we're -- if we're busy.  I've sworn
13    to tickets in the middle of a courtroom
14    before.  So if you've got court going on and
15    you're busy, I don't have time to sit there
16    and match them up.
17  Q.  What happens if they don't match up?
18  A.  I've actually had that happen before.  We've
19    had it to where I go -- if -- and that's --
20    there was a basket in what we call this huge
21    room upstairs, was like where we had our files
22    kept and where a lot of paperwork -- of
23    course, the case paperwork was kept.  And
0180
1    there was a basket where you put incoming
2    tickets with their transmittals that need to
3    be keyed in.  The clerks were supposed to do
4    them.
5    Sometimes they didn't get to them, because
6    there was a lot of tickets written.  If we, as
7    magistrates, had time, we would grab a stack
8    and key them in.  So when you go to key in
9    your tickets and you're keying them in, when
10    you get through keying them into the computer,
11    the computer assigns it a case number.
12    So you would take that case number and

13    transfer it to that transmittal sheet beside
14    the ticket information that the officer had
15    written down.  So when you finish keying your
16    tickets and you look at your transmittal sheet
17    and you say, Oh, well, I've got one here that
18    didn't have a case number, so where is it?
19        Sometimes it could be that it was a DUI
20    arrest, and the magistrate on call may have
21    sworn to that and keyed that in already; or
22    they were coming to make a bond for somebody
23    in jail and the ticket had to be already keyed
0181
1    and the magistrate might not have written it
2    on the transmittal.
3  Q.  You try to get to the bottom of it?
4  A.  Yes.
5  Q.  Try to track it down?
6  A.  And there have been times, when officer -- Oh,
7    that's from another ticket book; let me see if
8    I've left it in there.  And I have had some do
9    that.  But they say, okay, I'll bring it by to
10    you, I forgot it.  So that has happened.
11  Q.  Well, do you remember one of the major
12    offenses that you were charged with prior to
13    your termination involved your handling of one
14    of those transmittal forms; are you aware of
15    that?
16  A.  Yes.  But that's also when the Court of Civil
17    Appeals said they could not look at that when
18    it was remanded back.
19  Q.  I understand what the Court -- I've read the
20    Court's case, but I'm just asking you, you
21    were charged with that offense?
22  A.  Yes.
23  Q.  And it was a major offense?
0182
1  A.  Yes.
2  Q.  And --
3        MR. JAFFREE:  You told her that it
4        was a major offense.  You mean,
5        that she was charged with a
6        major offense or in terms of the
7        law is required is considered a
8        major offense.
9  Q.  Are you aware that the Personnel Department
10    has -- you said that you'd gotten the employee

11    handbook?
12  A.  Yes.
13  Q.  And they have a table of offenses and
14      penalties that are listed in that handbook.
15      Are you familiar with that?
16  A.  Yes.
17  Q.  And some of them are major and some of them
18      are minor, that sort of thing?
19  A.  Yes.
20          MR. JAFFREE:  There's nothing about
21            an error in the entry of a
22            ticket being a major offense.
23          MS. NELSON:  You'll have your chance
0183
1             to question.
2          MR. JAFFREE:  You're telling this
3            witness that it's a major
4            offense and get her to agree
5            with you.  And that's a legal
6            conclusion.
7          MS. NELSON:  You can call it a legal
8            conclusion all you want.  She's
9            charged with a major offense.
10          MR. JAFFREE:  Yeah.  You asked her
11            that, and that's fine.  But if
12            you ask her, it was a major
13            offense, she bantered and said
14            yes, it was a major offense.
15          MS. NELSON:  I'll ask that you not
16            testify for her.
17          MR. JAFFREE:  I just want you to be
18            clear on your questions that
19            you're asking her, was she
20            charged with a major offense or
21            was it a major offense.
22          MS. NELSON:  It was a major offense,
23            and the Court ruled it's a major
0184
1             offense.
2          MR. JAFFREE:  Well, okay.  I object
3            to you asking her a legal
4            conclusion.
5          (Defendants' Exhibit 31 was marked
6            for identification.)
7  Q.  I'm going to show you what's marked as
8      Defendants' Exhibit 31, which is part of the

```
 9      employee -- personnel rules and regulations.
10         Do you recognize that?
11   A.  I -- I mean -- I'm sure it's in the personnel
12         rules, but I'm not familiar with it.
13   Q.  Okay.  But you did receive a handbook?
14   A.  Yes.
15   Q.  You testified to that?
16   A.  Yes.
17   Q.  And what I'm show you is a chart that has a --
18         at the top, there are certain offenses that
19         are called major offenses; is that correct?
20   A.  Yes.
21   Q.  And it's not on here, but there are certain
22         minor offenses.  Are you familiar with that?
23   A.  I know that there are minor offenses, yes.
0185
 1   Q.  And you also know that there are some
 2         intolerable offenses --
 3   A.  Right.
 4   Q.  -- that the first time you commit them, you
 5         can be terminated?
 6   A.  Correct.
 7   Q.  And 31 is a listing -- a chart of major
 8         offenses?
 9   A.  Yes.
10              (Defendants' Exhibit 32 was marked
11                for identification.)
12   Q.  I'm go to show you what I've marked as
13         Defendants' Exhibit 32.
14              (Brief pause)
15   Q.  Have you seen that document?
16   A.  Yes.
17   Q.  It's actually --
18   A.  Yes.
19   Q.  -- several pages of the document?
20   A.  Yes.
21   Q.  And this document is a Notice of Determination
22         Hearing and Possible Disciplinary Action; is
23         that correct?
0186
 1   A.  Yes.
 2   Q.  And it has a notice of charges against you;
 3         and on the third page, one of the charges
 4         against you -- I'm looking at the second
 5         paragraph -- dealt with failing to account for
 6         a uniform traffic Citation.  Do you see that?
```

7   A.  I see that.
8   Q.  Do you recall being charged with that?
9   A.  I'm not sure what the actual charge was stated
10      as.  If that's what it -- if that's what's on
11      there.  I don't remember the actual charge,
12      how it was worded.
13  Q.  Well, were you ever questioned about that
14      charge in relation to the handling a ticket
15      which was issued to Stephen Phelps?
16  A.  Yes, I was.
17  Q.  And, in fact, you had -- were you questioned
18      about your handling of the transmittal form on
19      a ticket issued to Stephen Phelps?
20  A.  Yes.
21  Q.  And, in fact, you had struck through and
22      voided the ticket issued to Stephen Phelps on
23      that transmittal form, didn't you?
0187
1   A.  I did not --
2           MR. JAFFREE:  The question was,
3              "voided the ticket?"
4   A.  That is two different things.
5           MR. JAFFREE:  That's a correction.
6           THE WITNESS:  I know.
7           (Defendants' Exhibit 34 was marked
8              for identification.)
9   Q.  This was Exhibit 2 in your Personnel hearing,
10      but I'm this as Defendants' Exhibit 34.  I'm
11      show you what is a transmittal form which has
12      a signature on the bottom.  Is that your
13      signature, Mr. Brackin?
14  A.  Yes it is.
15  Q.  Now, this is a UTC transmittal form?
16  A.  Yes.
17  Q.  With approximately 12 tickets on it.  And this
18      was given to you by Officer Eric Duhaime.
19  A.  Yes, that's the name on it.
20  Q.  And on this particular transmittal form, a
21      Stephen Phelps -- the line that has Stephen
22      Phelps and the ticket number and the date
23      issued, it has been struck through and "void"
0188
1       has been written on that line.  Do you see
2       that?
3   A.  Yes.
4   Q.  And I believe you've testified previously in

5        your appeal hearing under oath that you struck
6        that line through there; is that correct?
7   A.  Yes.
8   Q.  And you're telling me here today, you did
9        strike that line through the?
10   A.  Based on the officer's --
11   Q.  I didn't ask you why yet.
12   A.  Okay.
13   Q.  And you wrote the word "void" --
14   A.  Yes, I did.
15   Q.  -- under Case Number?
16   A.  Yes, I did.
17   Q.  And you do not deny doing that?
18   A.  No.
19   Q.  Had Officer Duhaime brought you -- with this
20        transmittal form, did he bring you these 12
21        tickets that are listed on this form?
22   A.  I did not have that ticket.  No, ma'am.
23   Q.  How do you know you did not have that ticket?
0189
1   A.  Because when I went to key it into the
2        computer, I did not have it because I paged
3        him and asked him why it wasn't with the
4        transmittal.  And he said he voided it.
5   Q.  Now, when you signed it, you had -- at the
6        bottom that you signed this, were you
7        certifying that you had received all these
8        tickets, didn't you?
9   A.  Yes.  And I did not verify that at the time
10        the officer was there with the tickets that he
11        turned into me.
12   Q.  And once this is signed by you, you're
13        certifying that you had these tickets and they
14        had been sworn to and, therefore, they will be
15        processed in the system, so to speak?
16   A.  Yes.
17   Q.  And so when you struck through Mr. Phelps name
18        and wrote "void" on there, didn't that have
19        the effect of voiding the ticket against
20        Mr. Phelps?
21   A.  No.
22   Q.  And why is that?
23   A.  Because that's just a form that we keep to
0190
1        where we have what that officer did to put the
2        case on that.  The actual ticket was voided by

3      the officer.
4    Q.  And how do you know that?
5    A.  Because he told me that.
6    Q.  And being the thorough magistrate you are,
7         just took his word on that and you just
8         wrote --
9    A.  An officer has that right to do that.
10   Q.  Have you ever written void on a UTC
11        transmittal form before ever?
12   A.  I don't know.  I've been doing this for a
13        number of years.  It's possible.
14   Q.  You never have, have you?
15   A.  I don't know.  It's possible, because if I
16        don't have that ticket when I go to key it in
17        or if there's an item left without a case
18        number, I called that officer to find out what
19        happened.
20   Q.  And if he just says it void, it's void?
21   A.  I don't -- I don't care if he voids it or
22        nor.  That's not my duty to question him why
23        he voided it.  He has a right to void a
0191
1      traffic ticket.
2    Q.  And once he's voided it, it would never get to
3         your attention at this UTC level, would it?
4    A.  He might have forgotten to strike it off there
5         whenever he was swearing to the tickets.  I
6         don't know that.
7    Q.  Isn't it true that Mary Turner called you up
8         and told you to void that?
9    A.  No, ma'am.  No, ma'am.  No, ma'am, she did
10        not.  In fact, if you'll look at the ticket, I
11        didn't even sign it as swearing to it.
12   Q.  I thought the ticket had been voided.  If it's
13        been voided, where is the ticket?
14   A.  The officer has the ticket.
15   Q.  And if the officer voids the ticket, what's he
16        supposed to do to it?
17   A.  I don't know.  I don't know what their policy
18        is on their original tickets.
19   Q.  Would he not write "void" on the ticket?
20   A.  I don't know.  I don't -- each officer is
21        different.  I don't know if that's what their
22        policy and procedure is or not.  I don't know.
23   Q.  And did he tell you why he voided the ticket?
0192

1   A.  No, he did not.
2   Q.  Did Mary Turner ask him to void the ticket?
3   A.  That I can't -- I don't have any knowledge of.
4       I don't know.  All I I know is that I went to
5       key that ticket -- or I went to key the
6       tickets in, and that was left without a case
7       number.  And I paged that officer, and that's
8       what the officer told me he did with the
9       ticket.  So I just merely stated on the
10      transmittal what the officer said happened to
11      that particular ticket.
12  Q.  He didn't tell you that Mary Turner told him
13      to pull that ticket and turn them all back in?
14  A.  No, he did not.  I don't question officers why
15      they void something.  That's not up to me to
16      do.
17  Q.  So if they voided something, you'd never even
18      see it, would you?
19  A.  No.
20  Q.  So you saw this one, so it hadn't been voided?
21  A.  No, I didn't see that one.  I didn't see that
22      one.
23              MR. JAFFREE:  Let me object.  You're
0193
1                   turning this into
2                   cross-examination like --
3           MS. NELSON:  Well, it is
4                   cross-examination.  What do you
5                   think I'm doing here?
6           MR. JAFFREE:  It's a deposition to
7                   find out information, and you
8                   won't take your answer for it.
9                   You keep badgering her.  She's
10                  telling you the same answers,
11                  and you're trying to get an
12                  answer that you want.
13          MS. NELSON:  I'm just trying to get
14                  the truth.
15          MR. JAFFREE:  You're harassing the
16                  witness here.
17          THE WITNESS:  Ma'am, I am telling
18                  the truth.  I told it then, and
19                  I'm telling it now.
20          (Defendants' Exhibit 35 was marked
21                  for identification.)
22  Q.  I want to show you what's Defendants' Exhibit

23      Number 35.  This is a copy of the ticket to
0194
1       Stephen Phelps, written by Eric Duhaime.  Do
2       you "void" on there anywhere?
3   A.  No, ma'am.
4   Q.  Do you think that Officer Duhaime is going to
5       support your testimony, that he told you to
6       void the ticket -- that he had voided the
7       ticket?
8   A.  I don't know what Officer Duhaime would tell
9       you.  I believe he testified at my hearing
10      that he voided the ticket.
11              MR. JAFFREE:  I think that was
12                  testimony.  At best, you've got
13                  a fact issue here.  May be left
14                  to a jury to determine who is
15                  telling the truth.
16              MS. NELSON:  Well, according to you,
17                  we cant count this anyway.
18              MR. JAFFREE:  According to me or
19                  according to her testimony.
20              MS. NELSON:  According to you.
21              MR. JAFFREE:  I'm not quite sure the
22                  status of that, but I'm not --
23   Q. You were charged with this offense?  Excuse
0195
1       me.  You were charged with a major offense of
2       violating a Dothan personnel rule and
3       regulation in the handling of that ticket; is
4       that correct?
5   A.  Yes.
6   Q.  That you 3-42(6); is that correct?
7   A.  Yes.
8   Q.  And you talked several times about the
9       Appellate Court of Appeals.  I think I saw
10      you've got that opinion, but I've got it
11      here.  Have you read that opinion?
12  A.  Yes.  It's been awhile back, but I read
13      it.
14              (Defendants' Exhibit 36 was
15                  marked for identification.)
16   Q.  I've probably marked this one up but --
17              MR. JAFFREE:  Let me, for the
18                  Record --
19              MS. NELSON:  I'm just going to
20                  introduce this.

21          MR. JAFFREE:  I'm going to object to
22             any questions about that Court
23             of Appeal's opinion.  It's
0196
1             not relevant.  It's not even the
2             same parties to the case, and
3             it's simply legal conclusions
4             judicial record.
5          MS. NELSON:  It's very relevant.
6             It's the law of the case as it
7             pertains to --
8          MR. JAFFREE:  I don't think it's the
9             law of the case in the federal
10            court.
11            MS. NELSON:  Well, it as, at least,
12             as to the charges against her.
13             So I mean, I just like --
14   Q.  You have read this.  This is the Appellate
15       Court's ruling on --
16   A.  Yes.
17   Q.  -- on your appeal of your termination before
18       the Dothan Personnel Board up through the
19       circuit court; is that correct?
20   A.  Yes.
21   Q.  I may have marked on this a little bit.  I
22       would sort of like to give a clean copy.
23          But were you ever questioned by -- you
0197
1       mentioned Officer Etress.  Were you ever
2       questioned by the Department of Internal
3       Affairs as to the handling of the Stephen
4       Phelps ticket?
5   A.  I don't think so.  I mean, I don't -- I don't
6       recall that.  I think it was just Officer
7       Etress that questioned me.
8   Q.  Excuse me.  Were you aware that -- do you know
9       if Eric Duhaime was questioned?
10   A.  I don't know.
11   Q.  Do you know if he was disciplined in any way?
12   A.  I'm not sure.  I think there was something
13       about it mentioned in my hearing, but I'm not
14       sure what it was or if he was.  I don't know.
15   Q.  Were you ever questioned by Internal Affairs
16       about Mary Turner?
17   A.  About what?  About the ticket?
18   Q.  About --

19   A.   About this ticket?
20   Q.   About that ticket, abut any other issues
21        regarding Mary Turner?
22   A.   I haven't -- I don't believe I was internally
23        investigated about the Stephen Phelps ticket.
0198
1        But when was placed on administrative leave, I
2        don't know that Sergeant Keith Gray came over
3        to our office and said that Rickey Stokes or
4        somebody like that had found out about Mary's
5        suspension and had got -- I don't know if it
6        went to the media or where it was went.  But
7        he said it had to have been somebody from our
8        office.  So he started questioning us
9        individually, and that if we didn't cooperate,
10       that we could -- if he thought we were lying,
11       he could give us a lie detector.  And if we
12       refused, we could be guilty of
13       insubordination.
14   Q.   And who said this to you?
15   A.   Sergeant Keith Gray.
16   Q.   Within anybody else present?
17   A.   No.  Just he and I.
18   Q.   At that time, Mary Turner had been suspended?
19   A.   Yes.
20   Q.   Do you know what she had been suspended for?
21   A.   The only thing that we were told, Judge Gordon
22       told us that it had something to do with a
23       traffic ticket.  And the only time I knew
0199
1        exactly what it was whenever Officer Etress
2        interviewed or questioned me.  I didn't even
3        know who was assigned to her stuff.
4    Q.   Were you ever present in court when a Brady
5        (sic) Phelps was called to court and he
6        appeared with his lawyer; and they raised the
7        question as to whether Mary Turner was
8        supposed to have taken care of his ticket?
9    A.   I don't recall.
10   Q.   You've never heard that?
11            MR. JAFFREE:  The question was, were
12               you present in court?
13   A.   I don't recall if I was present in court at
14       the time.  I've worked court several times, so
15       I couldn't tell you.
16   Q.   Was that discussed with Mr. Phelps came to

17    court and he and his lawyer made that known?

18  A.  I don't have -- I don't have any recollection

19    of that.  I couldn't tell you if I was working

20    court or not.

21  Q.  I didn't say working court?

22  A.  You asked me if I was present in court when

23    that happened.

0200

1  Q.  Besides being present in court, was it

2    discussed among the magistrates that Brady

3    Phelps and come to court and raised that in

4    open court, whether Brady or his lawyer raised

5    it in open court that Mary Turner was supposed

6    to have taken care of his ticket?

7  A.  I don't recall that.  I didn't know much about

8    any of that until we started -- that stuff

9    started coming out in my hearing.

10  Q.  And you didn't know that that had anything to

11    do with the reason that Mary Turner had been

12    suspended and terminated?

13  A.  I did when Officer Etress questioned me.

14  Q.  But prior to that --

15  A.  No.

16  Q.  -- you had no knowledge --

17  A.  No, ma'am.

18  Q.  -- of the Brady Phelps issue?

19  A.  No.

20    The Bradley Phelps or Brady Phelps?

21  Q.  Bradley.  Bradley Phelps?

22  A.  No, I don't -- no.

23  Q.  If I've been saying Brady, I meant Bradley.

0201

1    So do you have any knowledge of Bradley

2    Phelps?

3  A.  Not prior to her suspension because I found

4    all of that whenever we were going through the

5    hearings and stuff.

6  Q.  Do you know Ashton Ott?

7  A.  Yes.

8  Q.  What's your relationship with Ashton Ott?

9  A.  My relationship?  I don't have a relationship

10    with her.

11  Q.  How do you know her?

12  A.  She was our city prosecutor for a while -- for

13    a time period.

14  Q.  Did you interact with her when you were a

15      magistrate?
16  A.   Yes.
17  Q.   And how did the two of you get along?
18  A.   Sometimes, we were okay.  And then there were
19      times where I think she overstepped her
20      boundaries with telling me how to do my job.
21  Q.   In what way?
22  A.   Well, there was instances when she told me
23      that I shouldn't have issued a warrant or, you
0202
1      know, how to do something and not subpoena
2      this person or not to subpoena that person if
3      a case was set for trial.
4  Q.   And you disagreed with her?
5  A.   Well, if a case is set to trial, I'm supposed
6      to subpoena the witnesses and make sure that
7      the victim and witnesses are in court.
8  Q.   So you did disagree with her?
9  A.   I disagreed with some of the things, but I
10      didn't -- not everything.
11  Q.   Did you report to her in any way?
12  A.   Did I report to her?
13  Q.   In a supervisory role?
14  A.   I don't know what you -- what you -- what do
15      you mean?
16  Q.   I mean, she was not your supervisor, was she?
17  A.   No.  No, no, no.  No.
18  Q.   Do you know if she ever made a complaint about
19      you to anyone?
20  A.   I don't know if she did.
21  Q.   Did you ever complain to anyone about her?
22  A.   I complained to a Donna about an incident that
23      happened in the court room.
0203
1  Q.   Donna Nicholson?
2  A.   Nicholson.
3  Q.   Anybody else?
4  A.   I don't -- not that I can recall.
5  Q.   Do you know how she and Nancy Martin got
6      along?
7  A.   I don't know.  I don't know.
8  Q.   How often were you in the courtroom on a
9      weekly basis?
10  A.   I wasn't in the courtroom that much because my
11      duties were more centered around working in
12      the office than working court.  I did do

13      prisoners with Sarah, but that was whenever,
14      you know, we didn't hardly have anybody in the
15      courtroom other than the prisoners.  Like we
16      had a public defender and a city prosecutor
17      and, of course, the judge.  But most of the
18      time --
19   Q.   Ashton Ott was the city prosecutor at one
20      time?
21   A.   She was one of them.  She was not the only
22      one, but she was one of them.
23   Q.   Who were the others?
0204
1   A.   Kevan Kelly was one.
2   Q.   The people with the city attorney's office?
3   A.   Yes.
4   Q.   I know I'm jumping around, but you said you
5      really wasn't in the courtroom that much.
6         Which magistrates would generally be in
7      the courtroom more than others?
8   A.   It depended on if they were assigned that.
9      Like I said, we kind of swapped around duties,
10      and part of that would be working court.  Of
11      course, if you -- the more you worked court,
12      the less actual job -- other job duties that
13      you had inside the office because you were in
14      court more.  So you wouldn't have that much
15      time to spend on working on your other
16      assigned duties.  If some did have other
17      things, there were small things.  But --
18   Q.   That's what I'm trying to get a handle on:
19      Who was in the courtroom more -- which
20      magistrates were in the courtroom more than
21      others?
22   A.   Well, we had Valarie Salvage, Michelle Bryan,
23      Eunice, Lavera, Sarah, and myself.  I didn't
0205
1      work court that much, but I did do -- I did do
2      some.
3   Q.   Some?
4   A.   And then the other person would be in the
5      fines room where they collected the moneys
6      from court, so it just depended.
7   Q.   But you're saying there was like a rotation
8      system that everybody would have an
9      opportunity to learn --
10   A.   I think everybody had --

11  Q.   -- work court?
12  A.   And was proficient working in the courtroom.
13  Q.   And some people, though, would rotate and work
14       these other non-courtroom duties that you're
15       talking about.
16  A.   Right.
17  Q.   Back to Mary Turner.  There was a time period
18       where she was placed on leave.  Were you aware
19       of that?
20  A.   Yes.
21  Q.   Administrative leave.  And she was ultimately
22       terminated; were you aware of that?
23  A.   Yes.
0206
1   Q.   And how were you aware of that?
2   A.   We all knew that she was fired, I mean, when
3        she didn't show up for work.  But she also
4        told me that she was fired.
5   Q.   And when did she tell you that?
6   A.   I'm sure it was shortly afterwards.  I'm
7        not -- I don't remember the exact date.
8   Q.   And you said, the two of you were friends,
9        went to church together; is that correct?
10  A.   Yes, we were close friends.
11  Q.   Are you still close friends?
12  A.   Yes, we are.
13  Q.   Did you ever -- I asked about testimony.  Did
14       you ever testify in any hearing that she was
15       involved in -- criminal proceeding that she
16       was involved in?
17  A.   I didn't -- I didn't testify in a criminal
18       proceeding.  I'm not -- I don't think I
19       testified in her personnel hearing.  I think I
20       was listed as a witness, but I don't think I
21       was ever called.  I don't recall that.
22  Q.   Do you anticipate her being a witness on your
23       behalf in this case -- your case?
0207
1   A.   No.
2   Q.   And why is that?
3   A.   I just --
4              MR. JAFFREE:  Well, she don't make
5                the decision.
6              MS. NELSON:  I'm just asking her
7                factually.
8   Q.   To your knowledge.

9          MR. JAFFREE:  You're talking about
10            legal strategy.
11    Q.  Does Mary Turner have knowledge about facts
12        that support your case?
13    A.  I don't know if she does or not.
14    Q.  Well, she's listed in your initial disclosure,
15        so I have a right to ask what you think Mary
16        Turner knows about --
17          MR. JAFFREE:  You're asking if she's
18            going to call her as a witness.
19            That's not her prerogative.
20    Q.  Well, what does Mary Turner -- what knowledge
21        does she have about the allegations in your
22        case, this case that I'm questioning you
23        about?
0208
1    A.  I don't know if she has any.  I don't know
2        what Mary knows about this.
3    Q.  You were telling me earlier that Officer
4        Etress came over to the magistrate's office
5        to -- maybe I'm getting two things confused.
6        You said there was someone came to the
7        magistrate's office because there was some
8        concern that some information had been
9        released about Mary Turner?
10    A.  Yes.
11    Q.  Tell me what you told --
12    A.  Sergeant Keith Gray.
13    Q.  Sergeant Gray?
14    A.  Yes.
15    Q.  And do you know how it was that Sergeant Gray
16        came to come talk to the group?
17    A.  I don't know who advised him.  No.
18    Q.  To your knowledge, did -- do you have any
19        knowledge that Judge Gordon was in any way
20        involved in that?
21    A.  Well, she was in on the -- whenever we had a
22        meeting with everybody.  She was the one
23        that -- that told us that Mary was placed on
0209
1        leave.
2    Q.  That was a different time than when Keith Gray
3        came?
4    A.  Yes.
5    Q.  And Judge Gordon is the department head; is
6        that correct?

7    A.  Yes.
8    Q.   And what did Judge Gordon say to you and to
9        the group when she made a statement about
10       Mary?
11   A.   She just said that Mary was on leave and she
12       didn't know all the particulars but she did
13       know it involved something with a traffic
14       ticket.
15   Q.   What else did she say?
16   A.   She just said that we were not supposed to go
17       in her office, and she assigned me Mary job
18       duties, to do the AWs.  And she said, we were
19       not to have any contact with Mary Turner.
20               MR. JAFFREE:  Can we go off the
21           Record?
22           (Brief recess)
23   Q.   You were instructed not to have any contact
0210
1        with Mary Turner; is that correct?
2    A.   That's correct.
3    Q.   And all the magistrates were present?
4    A.   Yes.
5    Q.   Did anybody ask any questions, what does this
6        mean?
7    A.  I don't -- I don't remember if they did.  They
8        might have, but I don't -- I don't know who it
9        was or what the question would have been.
10   Q.   And do you remember when that meeting was?
11   A.   No.  I don't -- I don't remember the date.
12   Q.   Did you have any conversations with Mary
13       Turner?
14   A.   Yes.
15   Q.   And how many conversations did you have with
16       her?
17   A.  I conversated with her at church.  I was given
18       her assigned duties.  And one particular duty
19       that she had was doing the show-cause
20       hearings.  And I needed the form that she used
21       because there was quite a few that needed to
22       be done.
23           And I asked Michelle Sellers if she could
0211
1        get that for me, that it was on her desktop on
2        her computer.  And she said, no, that we
3        couldn't go in her office.
4            And I said, well, can you get IT to

```
 5        retrieve it and send it to me on my computer.
 6              And she said, no.
 7              And I said, well, I need that form.
 8              And she said, well, you'll just have to
 9        find a case that has it.
10              And I explained to her, that's very
11        difficult to do.  It's kind of like finding a
12        needle in a haystack.  You'd have to go
13        through every single case.
14   Q.   And what form were you looking for?
15   A.   It's a show-cause letter, the form that we for
16        the show-cause hearings.
17   Q.   And so you picked up the phone and called?
18   A.   So I called her and I asked her.
19              And she said that that was something that
20        Bettye King had made up when she was there,
21        and the only -- the original was on her
22        desktop on her PC.
23              And I said, okay, thank you.  And that was
0212
 1        that.
 2   Q.   And did you ever go to the judge and ask her
 3        about whether it would be okay for you to call
 4        Mary Turner?
 5   A.   No, I didn't.
 6   Q.   Mary Turner -- excuse me -- Judge Gordon said
 7        nothing about calling Mary Turner if you
 8        needed her help on how to process something,
 9        did she?
10   A.   No.
11   Q.   She said, Do not talk to Mary Turner, period?
12   A.   Well, I don't -- I don't think Judge Gordon
13        could say whenever I could or could not talk
14        to her when I was not on duty.  So, you know,
15        I mean, I have Sunday School with this woman,
16        and I see her.  We associate together.  And
17        I -- you know, I spoke to her at church.
18   Q.   And how many times did you speak to her at
19        church while she was suspended?
20   A.   I don't know.  I don't know.  It -- you know,
21        we were there on Sunday and Wednesday.  So
22        I -- I couldn't tell you.
23   Q.   Does she go every Sunday and Wednesday?
0213
 1   A.   She tries to.
 2   Q.   Do you go every Sunday and Wednesday?
```

3    A.  I try to unless I'm sick or out of town.
4    Q.   And you earlier testified, you knew she was
5        terminated because she told you; is that
6        correct?
7    A.  Yes.
8    Q.   Did you talk to her about the reason she was
9        terminated?
10   A.  I'm sure we talked about it, but I don't
11       remember if she went into a lot of detail.  I
12       don't know.
13   Q.   And to your knowledge, did anyone else call
14       Mary Turner up and ask her about forms or how
15       to process something?
16   A.  Not to my knowledge.
17   Q.   I think you later said that subsequently --
18           Let me this:  Did you ever get your
19       show-cause letter?
20   A.  No.
21   Q.  Did you find the form?
22   A.  No.
23   Q.  Do you know Bettye King?
0214
1    A.  She was not there anymore.
2    Q.  I know.  But do you know how you could reach
3        her?
4    A.  I didn't know --
5    Q.  Did you ask Michelle?
6    A.  I asked -- I didn't ask Michelle how to reach
7        Bettye King.  Michelle didn't offer to call
8        Bettye King.
9    Q.  Did you ask the judge?
10   A.  No.
11   Q.   Did you ask the judge about the show-cause
12       letter?
13   A.  No.
14   Q.   You were earlier testifying that Sergeant Gray
15       came to the magistrate's office to inquire
16       about who had released some information about
17       Mary Turner?
18   A.  Yes.
19   Q.   That's my terms.
20           Did he talk to the group as a whole?
21   A.  I think he did.  I'm not -- I'm not positive
22       on that.  I kind of -- I -- if I remember
23       correctly, he did.  But I do know that he
0215

1     talked to each one of us individually or was
2     supposed to.  I know he talked to me.
3  Q.  To your knowledge, did he talk to others?
4  A.  I know that he talked to Sarah Fowler.
5  Q.  And how do you know that?
6  A.  Because I saw her going in there.
7  Q.  Do you know of anybody else he talked to?
8  A.  Not a personal knowledge, no.
9  Q.  But you had reason to believe he talked --
10 A.  I had reason to believe he talked to
11     everybody.
12 Q.  And what's your understanding of what he was
13     looking into?
14 A.  He was trying to find out who told the
15     information about Mary's investigation to the
16     public or to this -- I don't know if it was
17     Rickey Stokes or some other person.  But they
18     wanted to know.  They said that that
19     information had to come from our office, and
20     he was going to figure out which one of us did
21     it.
22 Q.  Who was Rickey Stokes?
23 A.  He is a bondsman.
0216
1  Q.  Does he do anything else?
2  A.  I don't know.
3  Q.  Do you ever listen to the radio?
4  A.  He doesn't --
5  Q.  Does he have any other kind of job?
6  A.  I don't know.  He doesn't have a radio
7     program.
8  Q.  Ever heard him on talk radio?
9  A.  I've heard him years ago on talk radio, but I
10     don't listen to that.  So I don't know.  I
11     mean, I couldn't tell you if he still does
12     that, if that's your question.  I know he did
13     years ago.
14 Q.  Does he have --
15 A.  But I don't know if he still does.
16 Q.  Excuse me.  Does he have any type of web site?
17 A.  Oh, he does.  He does have a web site.  That's
18     correct.
19 Q.  And what's his web site?
20 A.  It's Rickey Stokes News dot com.
21 Q.  Is this a job for him?
22 A.  I don't know.  I don't know if he -- I don't

23     know if it's anybody elses, and he just does

0217

1     it for them.  I don't know.

2  Q.  And he's a bondsman; is that what you said?

3  A.  Yes.

4  Q.  What's the name of his bonding company?

5  A.  I think it's A-Advantage bonding.

6  Q.  Did you know him as a bondsman?

7  A.  Yes.

8  Q.  Has he still got this bonding company?

9  A.  I assume.

10  Q.  Tell me what kind of interaction you have with

11     the bonding company as a magistrate?

12  A.  Oh, if there is question about a bond, if

13     they're going to make somebody's bond or how

14     much that person's bond is.  If they had

15     somebody on bond and they failed to show up in

16     court, they would call to maybe get or apply

17     for a bondsman's process.

18  Q.  A what process?

19  A.  Bondsman's process.

20     We work with them.  They'll be in the

21     courtroom to make sure their defendant show up

22     in court.

23  Q.  As a magistrate, do you have any say in who a

0218

1     defendant selects as a bondsman if they're

2     arrested?

3  A.  No.  We tell them to go to the phone book, or

4     there is a listing at the jail.

5  Q.  Does that occur with you or at the jail?

6  A.  Well, sometimes, it's like if you've got a

7     person that is trying to get a person out of

8     jail, they'll come to our office if we're

9     opened and find out, what does it take for

10     them to get out of jail.  And we'll tell them

11     what the bond is and that sort of thing, and

12     we'll tell them their options of making those

13     bonds.

14  Q.  Okay.  Now, to your knowledge, had -- when

15     Sergeant Gray was over there interviewing, he

16     was trying to determine who had revealed some

17     information about Mary Turner?

18  A.  Correct.

19  Q.  And, apparently, some information -- was the

20     information published through Rickey Stokes?

21    A.  I learned after the fact that it was on his
22         web site.  I know Ann Baxter had it pulled up
23         at her station, and she had asked if we had
0219
1         seen it.
2    Q.   And was this before Sergeant Gray came in?
3    A.  I don't know.  I couldn't tell you.  I did not
4         know that Sergeant Gray or anybody was
5         assigned to that until we had read that on
6         Rickey Stokes, and then we found -- I found
7         out what it was about whenever Officer Etress
8         questioned me.  So we did not know other than
9         what Judge Gordon had told us as to why Mary
10        was placed on suspension.
11   Q.   Did you release any information to the news or
12        Rickey Stokes about Mary Turner?
13   A.  No, I did not.
14   Q.   Do you know of anyone in the office that did?
15   A.  No, I do not.
16   Q.   You're saying that's what Sergeant Gray was
17        investigating?
18   A.   That's what he was asking me.
19   Q.   You don't know what he asked --
20   A.  I don't know what he asked everybody else.
21   Q.   In the course of that investigation, did he
22        ask you if you had released any information?
23   A.  I don't know.  He may have.  It was taped.  So
0220
1         you --
2    Q.   Did he ask you if you talked to Mary Turner?
3    A.   Not the first time he questioned me.  I
4         believe it was the second time he questioned
5         me he asked me.
6    Q.   I'm getting confused.  He's questioned you how
7         many times?
8    A.  Questioned me twice.
9    Q.   Twice.  And do you know the dates that he
10        questioned you?
11   A.  I know that it was -- I believe it was the
12        next day that he questioned me the second time
13        after the first time he questioned me, but I
14        don't remember the dates -- exact dates.
15   Q.   And was this done in your office or
16        magistrate's office?
17   A.  It was done in the magistrate's office.
18   Q.   Did you have an office?

19    A.   Yes, I did.
20    Q.   And he came to your office?
21    A.   No.  He was set up in the -- in a front room
22         that we had just used for general purposes.
23         It was not an office of anybody.
0221
1     Q.   Was anybody else present other than yourself
2          and Sergeant Gray?
3     A.   No.
4     Q.   And the first time he was over there, anybody
5          present besides yourself and Sergeant Gray?
6     A.   No.
7     Q.   To your knowledge, when he came back the
8          second time, did he talk to anybody else
9          besides yourself?
10    A.   I don't know.
11    Q.   You don't know?
12    A.   No.
13    Q.   And you're saying, you remember the second
14         time he asked you about --
15    A.   I believe that was when he asked me if I had
16         contacted Mary Turner.
17    Q.   And what did you tell him?
18    A.   I told him, yes.
19    Q.   And did you describe the circumstances that
20         you had talked to her?
21    A.   I probably it, but I don't remember exactly
22         everything that was said.
23    Q.   And do you remember when it was that you
0222
1          talked to Sergeant Gray the first and/or the
2          second time?
3     A.   I believe I've already told you, no, I don't.
4          I mean, I don't -- I don't remember the dates.
5     Q.   Do you know if he made any recommendation
6          about your employment or whether you had
7          violated any rule or protocol?
8     A.   He didn't tell me.
9     Q.   You don't know?
10    A.   I don't -- no.  I don't know.
11    Q.   And after that, were you charged with a major
12         offense for talking to Mary Turner when you
13         had been instructed not to?
14    A.   Yes.
15    Q.   And you were charged with insubordination; is
16         that correct?

17    A.   That's correct.
18    Q.   And I've showed you this Defendants' Exhibit
19         32 that we talked about with the Stephen
20         Phelps ticket.  Well, in addition to the
21         Stephen Phelps -- what I'm calling the Stephen
22         Phelps ticket we've just discussed, and the
23         writing through the transmittal sheet and
0223
1          writing "void" on there.  You were also, at
2          that same time, you were also charged with a
3          violation of Personnel Rule 3-42(14),
4          insubordination?
5     A.   That's not in addition to.  That is one of
6          two.  You had stated that first and then the
7          transmittal, and then you said, in addition to
8          this.
9     Q.   Well, I mean, I apologize.  Strike that.
10    A.   I'm sorry.
11    Q.   On the same date you were given notice of two
12         different charges against you?
13    A.   Correct.
14    Q.   Two different major offenses against you?
15    A.   Correct.
16    Q.   Maybe I said it confusingly.  One had to do
17         with the Stephen Phelps matter that we've
18         talked about?
19    A.   Correct.
20    Q.   The transmittal.  And then the second one had
21         to do with the insubordination?
22    A.   Correct.
23    Q.   And the charge was that you had willfully, by
0224
1          your own admission -- and I'm reading from the
2          charge now.
3     A.   Yes.
4     Q.   "That you willfully, by your own admission,
5          disobeyed a directive from your department
6          head to refrain from any contact with Mary
7          Turner during the police department
8          investigation of Mrs. Turner.  You admittedly
9          understood this directive and chose to
10         disregard it by calling Ms. Turner.  This is a
11         major offense."
12             That's what you were charged with?
13    A.   Correct.
14    Q.   Were you told by -- I'm backing up a little

15     bit.
16          When Judge Gordon met with the magistrates
17     and everybody was told to refrain from
18     contacting Mary Turner, were y'all told that a
19     police department investigation was going
20     on -- would be going on?
21   A.  I'm not sure.  I know that the judge said that
22     there was an investigation.
23   Q.  An investigation?
0225
1   A.  But I don't -- I mean, she could have used
2     "police," but I don't recall the exact words.
3          (Defendant's Exhibit 33 was marked
4           for identification.)
5   Q.  And I'm showing you Defendants' Exhibit 33.
6     You were placed on leave; is that contract?
7   A.  Yes.
8   Q.  As reflected on this document?
9   A.  Yes.
10          (Defendants' Exhibit 37 was marked
11           for identification.)
12   Q.  And then, Ms. Brackin, you were actually then
13     served with this Notice of Decision to
14     Terminate, which I've marked as Defendants'
15     Exhibit 37?
16   A.  Yes.
17   Q.  So you did receive a copy of it?
18   A.  Yes.
19   Q.  And you signed it; is that correct?
20   A.  Yes, I did.
21   Q.  And then you did file a -- you appealed your
22     termination; is that correct?
23   A.  Yes, I did.
0226
1   Q.  And we've talked a little bit about that.  You
2     had a hearing before the Personnel Board, and
3     they basically upheld your termination; is
4     that correct?
5   A.  Yes.
6          (Defendants' Exhibit 38 was marked
7           for identification.)
8   Q.  And I'm going to show you what I've marked as
9     Defendants' Exhibit 38.  Have you seen that?
10   A.  Yes.
11   Q.  A copy of the board's decision --
12   A.  Yes.

13   Q.   -- upholding termination?
14        It's dated August 19th, 2005?
15   A.   Yes.
16   Q.   And then you appealed again to the circuit
17        court?
18   A.   Yes, I did.
19   Q.   And Judge White reversed the decision?
20   A.   Yes, he did.
21   Q.   Did he issue an opinion or just --
22   A.   Yes, he did.
23   Q.   -- or a reversal?
0227
1    A.   He issued an opinion.
2    Q.   Do you have a copy of that?
3    A.   I don't know if I've got that with me or not.
4              THE WITNESS:  Did you bring it?
5              MR. JAFFREE:  I don't have a copy of
6              it with me.
7    Q.   That's okay.  And the case went up to the
8         Appellate Court.  It was remanded back down to
9         the Personnel Board; is that your
10        understanding?
11   A.   Yes.
12   Q.   And then the Personnel Board upheld your
13        termination again; is that correct?
14   A.   Yes.  But they had to look at different --
15        they could not look at the totality of the
16        charges.  They only had to look at a certain
17        part, was my interpretation.
18   Q.   For instance, they could not look at the --
19        again, I'm not trying to draw a legal
20        conclusion.  I'm just trying to get your
21        understanding.
22             A totality.  Do you know which part they
23        were not supposed to look at?
0228
1    A.   Yes, I do.
2    Q.   Which part was that?
3    A.   They were not supposed to take into
4         consideration the transmittal situation.
5    Q.   Okay.  What I'm calling the Stephen Phelps
6         transmittal form?
7    A.   Yes.
8              (Defendant's Exhibit 39 was marked
9              for identification.)
10   Q.   I'm showing you Defendants' 39, is another

11    board decision, dated January 8th, 2007.
12         Have you seen a copy of that?
13   A.  I don't know if I got a copy of that or not.
14         THE WITNESS:  Did you -- you might
15         not have sent me that.
16   A.  I'm sure I did.  I might have.  They probably
17       sent one to me and my attorney, but I'm not
18       sure.  But -- but I'm aware of it.
19   Q.  Now, we talked -- you've held two jobs since
20       you left the City; is that correct, the City
21       of Headland?
22   A.  Yes.
23   Q.  And the city of --
0229
1    A.  Newton.
2    Q.  The Town of Newton.
3         You filed a charge of discrimination with
4       the Equal Employment Opportunity Commission;
5       is that correct?
6    A.  Yes.
7             (Defendants' Exhibit 40 was marked
8             for identification.)
9    Q.  And let me show you a copy of what appears to
10       be the charges that you filed with the Equal
11       Employment Opportunity Commission.  Just take
12       a minute and see if you can just identify that
13       for me if that's what that document, Exhibit
14       40, is.
15         MR. JAFFREE:  Before you answer, let
16         me see.
17   Q.  Ms. Brackin, Defendants' Exhibit 40, that's
18       your Charge of Discrimination to the EEOC
19       against the City of Dothan and Judge Gordon;
20       is that correct?
21   A.  Yes.
22   Q.  And you have signed this; is that correct?
23   A.  Yes.
0230
1    Q.  I want to go over some of your allegations and
2       ask you some questions about.
3    A.  Okay.
4    Q.  You stated that when you returned as a
5       magistrate in April of 2001 -- excuse
6       me -- prior to your transfer to the
7       magistrate's job in 2001, that Judge Gordon
8       who is black had been appointed as municipal

9      judge.  So you knew she was in the office and
10      would be your supervisor, head of department,
11      when you applied for that job; is that
12      correct?
13  A.   That's correct.
14  Q.   And you said, "After her hire" -- talking
15      about Judge Gordon -- "she started to make
16      race-based decisions.  She bumped two
17      prospective black magistrates candidates over
18      white candidates that were higher than they on
19      the employment roster."
20          Is that your allegation?
21  A.   Yes.
22  Q.   Is it your contention that you were bumped off
23      the roster in any way?
0231
1  A.   No.
2  Q.   In fact, Judge Gordon was the person that
3      hired you; is that correct?
4  A.   That's correct.
5  Q.   Who are you referring to that you contend that
6      she bumped?
7  A.   Well, I know that Wendy Jones was one.  She
8      had actually work in that office since she had
9      applied for the job.  I think -- I think that
10      was Wendy's last name.  I'm not sure, but I
11      know -- I think she got married, though, since
12      then.  So I'm not sure what her married name
13      is.
14  Q.   Wendy Jones and who?
15  A.   I'm not sure.  I don't recall --
16  Q.   And how --
17  A.   -- who the other one was.  I know that there
18      were some dispatchers that applied, but I'm
19      not sure what their names were.
20  Q.   And how is it -- what facts do you have to
21      support that they were bumped?
22  A.   Just by what I was told as who made the
23      positions, that whenever I found out about the
0232
1      position rankings, they -- I know that Wendy
2      wasn't hired or the dispatchers weren't
3      hired.  So --
4  Q.   Who told you this?
5  A.   I don't -- I don't know if they -- they that
6      told me or if is was just talk amongst who all

7       made what on the score to the list and who was
8       where because I do know there was some city
9       employees that were already working with the
10      city that applied.  I think there was an
11      in-house register and an outside register.
12   Q.  And who do you contend are the two magistrates
13      that were bumped over the white candidates?
14   A.  Lavera McClain and Eunice Knight.
15   Q.  And your only knowledge of this is just people
16      talking?
17   A.  I did not see anything from Personnel.
18   Q.  You don't have any really hard facts to
19      support this?
20   A.  I don't have anything from Personnel to show
21      you.
22   Q.  You just have what Wendy told you, and you
23      don't even know the other people's names?
0233
1    A.  Well, I don't know -- I know that a couple of
2       them were dispatchers, but I don't remember
3       exactly who they were.  But I'm sure that
4       Personnel would have that roster.
5    Q.  You go on to say, "Regardless of their
6       shortcomings, Respondent Gordon refuses to
7       discipline or supervise or allow others to
8       supervise these black magistrates; is that
9       your contention?
10   A.  Yes, it is.
11   Q.  Now, how do you contend that she refused to
12      discipline them?
13   A.  Well, I know that I've made her known of some
14      of the mistakes, criticals errors that they
15      had made, and she didn't do anything about
16      them.
17   Q.  Is that what you've testified to earlier?
18          MR. JAFFREE:  Well, I'm not sure.
19             Your question was limited
20             earlier.
21   A.  I don't think you've asked me.
22   Q.  Well, I asked you about --
23   A.  You asked me during a specific time.
0234
1          MR. JAFFREE:  That's right.  You
2             limited to the time, but you
3             never went back to the question.
4    Q.  Well, tell me what the critical errors that

5       you contend they made.
6  A.  Well, I'll refer to my notes, which you have.
7        On March the 17th, 2004, I received a
8     phone call from Rickey Stokes, who is the
9     bondsman, and advised me of a defendant who we
10    had entered under the wrong information.
11 Q.  Let me stop you and try to see what you're
12    looking at here.
13 A.  That may be it right there (indicating).
14 Q.  Do you remember any of this short of reading
15    what you've written down?
16 A.  This is it right here (indicating).
17        Yeah, I can tell you without looking at
18    it.
19            MR. JAFFREE:  Are you insisting that
20              she --
21            MS. NELSON:  I'm just wondering if
22              she can remember without --
23            THE WITNESS:  Oh, yes.
0235
1            MS. NELSON:  -- reading it.
2            MR. JAFFREE:  Tell her as much as
3              you can without reading it, and
4              then if you need to refer to
5              your notes, go ahead.
6  A.  Rickey called me and said that he had a
7     process showing where a Michael D. McCord was
8     needed to for a warrant or that there was a
9     warrant issued, and that they were fixing to
10    go get him.  And they noticed that he was
11    employed with the nuclear plant, and they
12    started looking at the date of birth.  And he
13    said, this is the not the right Michael
14    McCord.
15        So he came to the office and tried to talk
16    to Lavera about it.  And my office is not that
17    far from the front that you can't hear if
18    people raise their voice.  And Rickey was
19    trying to talk to Lavera about the situation,
20    and she told him that she did not have time,
21    that she had other things to do and didn't
22    have time to deal with him.
23        So when he went back to his office, he
0236
1     called me and said he needed some help.  So I
2     looked in the computer, and I saw that,

3    clearly, she had the warrant issued up under
4    the wrong Michael McCord.  So the judge knew
5    about it.  I don't know if Rickey went over
6    there and told her.  I -- to my understanding,
7    he filed a complaint in writing.  I have not
8    seen that.  That's just based on after the
9    fact that -- of what he told me.
10        And the judge called me from the courtroom
11    and said that clerical errors will happen and
12    not to make a big deal out of it, and that I
13    needed to delete it before I left work that
14    day and to fix it.
15  Q.  Delete what?
16  A.  To delete the information that was issued up
17    under the wrong Michael -- under the wrong
18    person and to fix it.
19  Q.  I mean, was there more than one Michael Moore?
20  A.  Michael McCord.
21  Q.  Michael McCord?
22  A.  Yes, there was.
23  Q.  Had both been a defendant in the system?
0237
1   A.  I assume if they were in there.  I don't
2    know.  One of them could've been a victim.  I
3    don't know.
4   Q.  Same spelling and everything as far as you
5    know?
6   A.  They had a different middle name, different
7    date of birth.  The age difference was quite
8    different.
9   Q.  And, again, Rickey Stokes, his involvement
10    with this was because he --
11  A.  The posted bond.
12  Q.  -- had the bond on one of these Michael
13    McCords?
14  A.  Yes.
15  Q.  And you wrote something down that you were
16    reading from that you produced to me.  When
17    did you write this down?
18  A.  I'm sure it was not long after it happened.
19  Q.  Where did you keep this kind of stuff; did you
20    just --
21  A.  I had it at home.  I wrote it at home.
22  Q.  I know.  But did you keep the -- where, in a
23    book or a drawer or folder or file?
0238

1  A.  I had a folder that I kept some stuff in along
2      with my notices from my termination and that
3      sort of thing.
4  Q.  And just for the Record, you're referring to
5      your notes and I'm going to mark the Michael
6      McCord notes as Defendants' Exhibit 42.  Okay?
7  A.  Okay.
8              (Defendants' Exhibit 42 was marked
9                for identification.)
10  Q.  So did you delete it from the system?
11  A.  Yes, I did.
12          And then there was printout on the HT
13      system that prints out of deleted files, so it
14      should be on there, if they kept it.
15  Q.  And you contend some action should have been
16      taken against -- is this Lavera?
17  A.  Yes.
18  Q.  You contend some action should have been
19      taken?
20  A.  Yes.
21  Q.  And what action do you contend should have
22      been taken?
23  A.  I don't know.  I mean, that's not for me to
0239
1      decide, but I know she -- there should've been
2      some form of action taken.
3  Q.  Was Nancy Martin involved in this in any way?
4  A.  I paged her -- she was not there -- before I
5      did that to let her know since she was my
6      immediate supervisor.  And I believe she was
7      in Kai Davis's office at the time.  I'm not
8      sure.  And she told me that since the judge
9      advised me to do that, that I needed to do it.
10  Q.  And you say if -- do you know why Rickey
11      Stokes called you?
12  A.  Because he knew that I was very efficient and
13      I would handle it, because Lavera would not
14      help him.  And it needed to be done because if
15      the man arrested, he would've lost his job.
16  Q.  Did you see him interact with Lavera?
17  A.  No.  I heard them.
18  Q.  And what did you hear?
19  A.  I just heard that -- I could tell that they
20      were talking loud enough to where I could hear
21      that they were conversing.  And she just -- I
22      know I heard her say, I don't have time for

23     you; I've got other things to do Rickey.  And

0240

1     she just walked away.

2  Q.  Is Rickey in the office a lot --

3  A.  I don't know.

4  Q.  -- in the magistrate's office a lot?

5  A.  He comes in there some.

6  Q.  Does he --

7  A.  I mean, I don't know how many times he does

8     with -- I mean, we have bondsmen that come in

9     there a lot, or we did.  They would check on

10     cases.

11  Q.  Did you ever ask --

12        MR. JAFFREE:  Let me object to the

13        relevance of this line of

14        questions.  These designed to

15        explain away the facts that she

16        said.

17        MS. NELSON:  Just make your

18        objection.  I can ask my

19        question.

20        MR. JAFFREE:  All right.

21  Q.  Had you ever had a bondsman come to you where

22     you were busy in the middle of something else

23     and you couldn't help them?

0241

1  A.  Not to my knowledge.

2  Q.  How often would you say Rickey Stokes was in

3     the office -- the magistrate's office?

4  A.  I don't know, because I don't -- I didn't work

5     the front office every day, so I couldn't tell

6     you.

7  Q.  Any other errors that you contend that Lavera

8     comitted that the judge refused to discipline

9     her on?

10  A.  There was an incident in January of '05.

11     Well, we got also -- I'll go in order.  There

12     was the December of '04 where Lieutenant Cliff

13     Garrett, who was over the jail at the time,

14     issued memo a memo to Captain Givens regarding

15     a juvenile that had been arrested on a alias

16     warrant that the municipal court had issued.

17  Q.  I'm going to stop you one more and ask, are

18     you looking at some notes you've made?

19  A.  I'm -- I'm giving the dates, and then I'm -- I

20     haven't looked at it since I got the date and

21      what it was about.
22  Q.  Okay.  Go ahead.
23  A.   And the judge had -- the memo sent evidently
0242
 1      to the judge because she wrote on there for me
 2      to look into it.
 3          So I looked into it, and I found where
 4      Lavera had issued a warrant on a 17-year-old
 5      person for failure to appear.  And I then told
 6      the judge of what happened.
 7  Q.   And what happened?
 8  A.   That she issued the warrant on the juvenile
 9      and he was arrested.
10  Q.   You're not supposed to issue a warrant on a
11      juvenile?
12  A.   Not for a misdemeanor, not for a Title 13.
13      Now, we do issue for the traffic violations
14      for Title 32, 16 and 17 year olds.  But,
15      normally, we do a show-cause hearing before
16      they issue warrants.
17  Q.   Okay.
18  A.   But this was an actual -- it was an actual
19      city ordinance violation I believe it was.
20      But that was still a misdemeanor charge.
21  Q.   Judge asked you to look into it and you did?
22  A.   Yes.  And then I reported back to her.
23  Q.   What did you report?
0243
 1  A.   What I just stated, that Lavera had issued the
 2      warrant, and he was arrested.
 3  Q.   Okay.  What was he arrested for?
 4  A.   I guess failure to appear.  It was an alias
 5      warrant.  I'm not sure if it was for -- I
 6      think it was for failure to appear.  I'm not
 7      sure exactly.
 8  Q.   Is your testimony that you felt that action
 9      should have been taken against Lavera?
10  A.   Yes.
11  Q.   And why is that?
12  A.   Because she issued a warrant on a juvenile,
13      and it shouldn't have been.
14  Q.   Anything else?
15  A.   In January of '05, she issued -- on Emmanuel
16      Hooks.  She issued two alias warrants for the
17      same case, and he was arrested on both of
18      them.

19          MR. JAFFREE:  When you say "she,"
20            referring to who.
21          THE WITNESS:  Emmanuel was arrested
22            on both charges.
23          MR. JAFFREE:  No.  What she are you
0244
1            referring to?
2    A.  Lavera issues alias warrants -- two alias
3        warrants for the same case at the same time.
4        And, therefore, he was arrested for both
5        charges.  And I did a release order for one to
6        release him on one charge, and he posted a
7        bond -- I don't know if he posted the bond or
8        if he was a prisoner -- on the other.  But I
9        wrote a note to the judge, advising her of
10        what happened.  He could have been a prisoner
11        and -- I'm just not sure.  I don't remember.
12    Q.  There were two charges?
13    A.  No.  There was one -- she issued two alias
14        warrants for the same thing for the same case
15        at the same day, same time, everything.  She
16        duplicated the warrant, and he was arrested on
17        both.
18    Q.  Could the system somehow have duplicated it,
19        duplicated the warrant?
20    A.  Not without you telling it to.
21    Q.  And where do you have to -- is this a --
22    A.  You have to tell it to print.
23    Q.  Print?
0245
1    A.  Yes.
2    Q.  She could've hit print twice?
3    A.  She could have.  But you sit there, and when
4        you issue your alias warrants, you've got your
5        warrants in one stack and you've got your
6        paperwork that you just issued them from.  And
7        you have to write the alias warrant number and
8        the date on the paperwork.  So if you've got
9        one case, you should have one warrant if it's
10        done properly.
11    Q.  And he proceeded to be arrested --
12    A.  For one charge.
13    Q.  -- at least under one of them.
14        And you've made some notes on this; is
15        that correct?
16    A.  Yes.

17   Q.  Both on the December 1st, '04 and Emmanuel
18       Hooks you just told me about.
19              (Defendants' Exhibit 43 was marked
20               for identification.)
21   Q.  I've marked that as Defendants' 43 --
22   A.  Yes.
23   Q.  -- that you gave me.
0246
1          Anything else?
2   A.  I know that I was in Nancy's office.  I'm not
3       sure when it was.  I know that Valarie Savage
4       and Michelle Bryan has been complaining about
5       some clerical errors in the computer that they
6       had made, she and Eunice both.
7   Q.  Wait.  Let me make -- Valarie Savage and --
8   A.  And Michelle Bryan.
9   Q.  -- were complaining?
10   A.  Had complained -- made complaints about Lavera
11       and Eunice's clerical errors in the computer.
12       And at first, they were fixing them, but they
13       said, it was just getting to be too many and
14       they should fix them themselves so they
15       can -- they'll know what they're doing, that
16       hopefully they won't repeat themselves.
17   Q.  Now --
18   A.  And I was in Nancy's office when they did
19       that.
20   Q.  You just heard them complaining?
21   A.  They had cases in their hand that they were
22       giving to Nancy at the time.
23   Q.  And what kind of clerical errors are you
0247
1       talking about?
2   A.  They had wrong codes key in the computer for
3       the trial type, wrong dates, that sort of
4       thing.
5   Q.  And these are like keying errors?
6   A.  Yes.
7   Q.  Are you aware of others having some keying
8       errors?
9   A.  I'm sure, but I was just present --
10   Q.  You were just present at the time?
11   A.  -- at that time.
12   Q.  Are you aware of any other magistrates that
13       may have issued two alias warrants for the
14       same case?

15  A.  I don't know.  I just happened to come across
16     that.  I don't -- I don't deal -- I don't go
17     around looking to see.  I'm not aware of any.
18     There may have been, but I did not aware -- I
19     was not aware.
20  Q.  Are you aware of any other warrants being
21     issued on a juvenile?
22  A.  We do have the ones that we issue for issue
23     citations on 16 and 17 year olds, but that's
0248
1     rare.  Like I said, we normally have a
2     show-cause hearing first.
3  Q.  Are you aware of any warrants being issued for
4     something that's not a traffic citation?
5  A.  Not to my knowledge, not that I've come across
6     or was asked to check into.
7  Q.  This was just one became aware of?
8  A.  Through the judge.
9  Q.  How many cases go through that office in a
10     given year?
11  A.  Oh, thousands.
12  Q.  Maybe like 20, over 20,000?
13  A.  Possible?
14  Q.  Thirty?
15  A.  I don't know.  I'm not sure of the
16     figures -- any of the figures.
17        Now, I was working in the courtroom at one
18     particular time, and there was a mistake on
19     the case that the judge had in front of her.
20     And she asked me, what was wrong with it and
21     who did it.
22        And I told her, it was Eunice.
23        And she said, well, just fix it for me.
0249
1        So she was aware of -- I don't -- I don't
2     know what that was, but I -- I do remember
3     that.
4  Q.  Was it a clerical-type mistake?
5  A.  Yes.
6  Q.  Any other situations you can think of?
7  A.  Not right now.
8  Q.  Any of these other things you've written down
9     didn't have anything to do with mistakes?
10  A.  No.  Oh, wait a minute.  Yes, I do.  I'm
11     sorry.
12        In March of '05, there was a defendant by

13      the name of Crystal Gray.
14              MR. JAFFREE:  Pause for a second.
15                She's looking for a document.
16              THE WITNESS:  Oh, I'm sorry.
17              MS. NELSON:  I'm trying to listen.
18   Q.  Go ahead and tell me about it.
19   A.  On -- Eunice recalled an alias warrant on
20      March the 5th that she did not insure that the
21      original came back from the jail.  And that's
22      one of the things that when you recall a
23      warrant, you make sure that you get that
0250
1       original warrant back from the jail.
2           And there have been times when we were
3       told, you go over there and you get the
4       original warrant, if you don't get it back.
5           She did not insure that, and that
6       defendant was arrested approximately a month
7       and a month and a half later on that AW.
8   Q.  Give me that persons' name.
9   A.  Excuse me?
10   Q.  Do you remember that person's name?
11   A.  Crystal Gray.
12          So I allowed her to sign her own bond.
13   Q.  Crystal Gray?
14   A.  Uh-huh (positive response)
15          So I let her sign her own bond, and the
16      judge was noticed.
17   Q.  That was on Defendants' Exhibit Number 20.
18          (Brief recess)
19   Q.  You were talking about Crystal Gray, and it
20      was contained on Defendants' Exhibit 20.
21          And when did you make that note?  You have
22      it on a sticky note.
23   A.  Yeah.  I don't know.  I can't tell you exactly
0251
1       when I wrote it, but it was after the fact.
2   Q.  You mean, after the lawsuit?
3   A.  No, not after the lawsuit.
4   Q.  After your termination?
5   A.  No.  I made notes pretty often whenever
6       something that, you know, that happened like
7       that.  And some of them, you know, we remember
8       just by the name.  If it's somebody that was
9       arrested wrongly, that's just something that
10       should not happen.

11   Q.   Anything else?  What's on this little sticky
12        note you gave me?
13   A.   That's just where I cited during my personnel
14        ruling -- my Personnel Hearing with the
15        Personnel Board, I had cited Section 3-10 in
16        the City of Dothan Personnel Rules that
17        disciplinary actions were not consistent in
18        our department, based on that being a
19        personnel rule.
20   Q.   What being a personnel rule?
21   A.   That discipline should be consistent within a
22        department for everybody.  And I was just
23        citing that that did not -- that was not.
0252
1   Q.   Are you aware of any other employee that had
2        committed insubordination?
3   A.   Insubordination?  Not to my -- I mean, you're
4        going to have to give me an example, because
5        insubordination is kind of broad, I think, as
6        far as what that means.
7   Q.   Are you aware of anyone else who had told an
8        individual that he had been falsely arrested
9        and to sue the City?
10   A.   Are you talking about the incident with me?
11        Is that what you're talking about?
12   Q.   Besides you?
13   A.   Oh, I don't know.
14             MR. JAFFREE:  Excuse my.
15   A.   I don't know how I would know that.
16             MR. JAFFREE:  You're asking her a
17             fact -- her testimony was that
18             she didn't tell him he was
19             falsely arrested and to sue the
20             City.  And you asked her, do you
21             know of a situation where
22             somebody else said they were
23             falsely arrested and sue the
0253
1             City.  That was not her
2             testimony.
3   Q.   Do you know of anyone who --
4   A.   Not to my knowledge.
5             MR. JAFFREE:  Wait a minute.  She
6             didn't ask the question.
7             THE WITNESS:  Well, I know what
8             she's talking about.  I mean,

9            she's going to ask it again.

10            MR. JAFFREE:  Well, hopefully,

11            she'll ask it the right way.

12  Q.  Do you know of anyone who told the defendant

13      they had been falsely arrest and then told

14      theme to file a claim or a suit against the

15      City?

16  A.  Not to my knowledge.

17  Q.  Do you know of anyone who has signed a uniform

18      ticket transmittal form swearing that they

19      received all the tickets and then struck a

20      line through and written "void" on a ticket?

21  A.  I haven't seen that personally, no.

22            (Defendants' Exhibit 44 was marked

23            for identification.)

0254

1  Q.  Just for the Record, I've marked that other

2      sticky note as Defendants' Exhibit 44 --

3  A.  Okay.

4  Q.  -- where you cited that --

5  A.  Yes.

6  Q.  -- rule to the Personnel Board.

7  A.  Yes.

8  Q.  And just following on these notes, I think

9      I've asked you about those.

10            I'm back to the EEOC charge.  You're

11      talking about the move to the new facilities.

12      I assume you're talking about the new

13      magistrate's office.

14            You alleged that "Judge Gordon permitted

15      black magistrates to assign themselves premium

16      offices, notwithstanding that other white

17      magistrates had more seniority."

18            Is that your contention?

19  A.  Yes.

20  Q.  And who do you contend was allowed to assign

21      themselves the premium offices?

22  A.  I believe Lavera McClain was the one that was

23      going around and assigning offices and telling

0255

1      us where our offices were.

2  Q.  And you say you believe that?

3  A.  That's what was -- that's how it was put to

4      me.  She said --

5  Q.  By whom?

6  A.  Lavera.

7    Q.  Do you know who actually made the decision to
8         assign offices?
9    A.  No, I do not.
10   Q.  That's just your perception or your --
11   A.  Well, if she said, this is where our offices
12        are, then I assume that's where she put it.
13   Q.  To your knowledge, was Lavera involved with
14        the actual physical move of the offices?
15   A.  Yes, she was.
16   Q.  Were you involved in the physical move of the
17        offices in any way?
18   A.  We all moved.  We all helped in moving, but
19        she was the one that was in charge of making
20        sure things were packed up and telling us
21        where our offices were and that sort of thing
22        and making sure that we had people to move us
23        and all that.
0256
1    Q.  Do you feel like this was an inappropriate
2         assignment to give that assignment to Lavera?
3    A.  I feel like that the offices should have been
4         assigned maybe in a seniority basis instead of
5         what she wanted people to have.
6    Q.  "She" being who?
7    A.  Lavera.
8    Q.  But you don't know for sure -- you don't know
9         that Lavera made the decision as to whose
10        office would be where, do you?
11   A.  Shy didn't say that somebody else did.
12   Q.  You just testified, you don't know who made
13        the decision.
14   A.  No.  She -- I said that based on what she told
15        and showed us, it was coming from her.
16   Q.  She was the messenger?
17   A.  She -- well, that's not -- that's not what she
18        said she was.  She did not say, I'm coming to
19        you as a messenger and somebody said this is
20        your office.  She was stating to us that this
21        is where your office is.  She didn't say she
22        was the messenger.
23   Q.  I'm just saying, you're just assuming that she
0257
1         made the decision; you don't have any facts --
2    A.  My testimony.
3    Q.  -- to support that, other than your perception
4         because she told you where the offices were

5     going to be?
6  A.  Well, it didn't come from Judge Gordon, and it
7     didn't come from our court administrator.
8  Q.  And how do you know that?  Did it come from
9     their mouths?
10  A.  That's right.
11  Q.  Okay.  Thank you.
12        And, again, you said, "This not-too-subtle
13     preference toward black magistrates would be
14     tolerable but for the rigid discipline imposed
15     by Judge Gordon against the white
16     magistrates."
17        What rigid discipline are you talking
18     about?
19  A.  Well, I think over the time that I was there,
20     that her discipline that she -- the things
21     that have happened to me and some mistakes
22     were made by other blacks.  And they did not
23     get -- they did not get disciplined at all.
0258
1  Q.  And you equate their mistakes to the mistakes
2     that you have made?
3        MR. JAFFREE:  Define "equate,"
4          because if you're saying, the
5          mistakes were more serious, then
6          I think she can acknowledge
7          that.
8        MS. NELSON:  No.  She understands my
9          question.  You can object to my
10          form.
11  A.  Reask the question.
12  Q.  I said, do you equate the conduct that you
13     claim the blacks were engaged in, do you
14     equate that to the offenses that you were
15     charged with and disciplined for?
16  A.  That I was allegedly charged with, that I was
17     charged with.  Yes.  Having somebody falsely
18     arrested, making the errors that were made, I
19     sure do.  That was negligence.
20  Q.  And you said white employees made errors and
21     mistakes?
22  A.  Yes.
23  Q.  Do you contend they should have been likewise
0259
1     disciplined?
2  A.  Sure.

3    Q.  Now, you mentioned Lavera and Eunice.  Were
4         there any other black magistrates at the time?
5    A.  Tonya Minifield had been hired.
6    Q.  Do you content that Tonya --
7    A.  I do not --
8    Q.  -- should have been disciplined?
9    A.  I did not come across anything that she had --
10        that she had made mistakes on.  I did not have
11        any incidents where she had had any mistakes.
12        I'm not saying she didn't, but I did not come
13        in contact with them.
14   Q.  You go on to say that "Judge Gordon terminated
15        or caused the resignation of no less of eight
16        white magistrates since her term of
17        employment."
18            What eight people are you talking about?
19   A.  I know that Donna Nicholson was fired.  Debbie
20        Irby quit because she was fixing to be fired.
21        Cheryl Maray quit.  Kim Phillips quit.  Kevin
22        Sorrells was fired.  Mary Turner and myself
23        and Nancy.  I don't know how many that is.
0260
1         Fran Bailey quit.
2    Q.  Do you know why each of the individuals -- I
3         mean, I know you know your own situation.  Do
4         you know why -- I've asked you this before --
5         why Donna Nicholson was terminated?
6             I've asked you that, haven't I?
7    A.  Yes.  And Donna told me --
8    Q.  Only what Donna told you?
9    A.  Right.
10   Q.  You don't really know the circumstances of
11        all --
12   A.  I did not see her paperwork.  No.  But based
13        on what she told me.
14   Q.  Or why Kevin Sorrells was terminated?
15   A.  No.
16   Q.  Do you know why Nancy Martin was terminated?
17   A.  I believe for not having proper supervision.
18        I'm not sure.
19   Q.  You don't really know, do you?
20   A.  I have seen it, but I don't recall what it
21        said.
22   Q.  Seen what?
23   A.  Her termination paperwork.
0261

1   Q.   Besides the paperwork, I'm talking about all
2        the facts and circumstances for which she was
3        terminated?
4   A.   No.
5   Q.   Debbie Irby, you know said, she was about to
6        be terminated.  Do you know why she was
7        terminated?
8   A.   It was involving the incident with Donna
9        Nicholson.
10  Q.   But you don't really know the facts and
11       circumstances regarding all that, do you?
12  A.   Well, she told me that she was going to quit
13       because she knew she was going to be fired
14       anyway.  I mean, I --
15  Q.   Other than what she told you.
16  A.   I'm trying to answering what you're asking me,
17       so I don't -- seeing any paperwork, no.  Just
18       based on her telling me what happened.
19  Q.   Well, I'm talking about your own personal
20       knowledge of the facts and the circumstances,
21       not what -- not hearsay, not what she told
22       you.
23  A.   Well, if she told me, that's -- I mean, that
0262
1        was --
2   Q.   That's the gospel, isn't it?
3   A.   No.  I'm just saying --
4              MR. JAFFREE:  I'm going to object.
5                  Argumentative.  And a charge of
6                  discrimination with the EEOC, it
7                  put down, prior to discovery,
8                  what they believe to be the
9                  facts.  And as soon as they can
10                 rely on a principal to tell
11                 those facts and state those
12                 facts.  They're not the
13                 employer.  They don't have
14                 access to all the information
15                 prior to discovery and even
16                 after discovery.  Well, you're
17                 asking her --
18             MS. NELSON:
19  Q.   You're just going by what Debbie Irby told
20       you?
21             MR. JAFFREE:  You're arguing with
22                 this witness about what she

```
23              knows.
0263
 1              MS. NELSON:  I do not mean to be
 2                  arguing with the witness.  I'm
 3                  trying to just understand what
 4                  factual basis she has, aside
 5                  from what a person told her
 6                  happened.
 7   Q.  Fran Bailey, do you know the circumstances of
 8       her leaving?
 9   A.  I know that she was going to school, but I
10       knew -- do know that she filed a memo with the
11       judge and with the personnel department before
12       she left about things that she observed and
13       how she felt things were in that office.  And
14       I do know that she was summoned over to the
15       judge's office as a result of that memo
16       because she told me.
17   Q.  But other than what she told you, you don't
18       have any independent knowledge of such memo
19       or --
20   A.  I did not see the memo, but I do know that
21       it's in her file.  It should be.  And she also
22       has a copy.
23   Q.  Have you seen that memo?
0264
 1   A.  I probably did, but I don't recall.  I
 2       don't -- I don't remember if she ever showed
 3       it to me or not.  She just was telling me.
 4   Q.  And what did it allegedly say?
 5   A.  Just about how she could tell people were
 6       getting treated differently in the office and
 7       that mistakes that were being made, and that
 8       sort of thing, from being a clerk.
 9   Q.  I wrote Donna, Kevin, Debbie.  Mary Turn,
10       we've talked about.  Nancy, Fran.  Anybody
11       else?  Yourself.
12   A.  Kim Phillips and Cheryl Maray.
13   Q.  Do you know the circumstances of Kim Phillips
14       leaving?
15   A.  Just tired of the mess going on, just certain
16       people not being accountable for their
17       mistakes.
18   Q.  Certain people, would that include Ann Baxter
19       or --
20   A.  I don't know.
```

21  Q.  -- white individuals?
22  A.  I don't know.
23  Q.  Could?
0265
1  A.  It could be.  Yes.  I don't know.
2  Q.  And Cheryl Maray, do you know the
3      circumstances of her leaving?
4  A.  The same.  Well, I know that -- I think that
5      she went to another job, but it was -- she
6      just couldn't do it anymore.  She said she
7      couldn't --
8  Q.  And it's based on what she told you?
9  A.  Yes.
10  Q.  Besides yourself, do you know any other whites
11      who have been disciplined?
12  A.  After -- since this has happened, I do believe
13      I've come to hear that Ann Baxter was
14      disciplined, I believe, for some money
15      situation with her moneys.
16  Q.  And how did you learn that?
17  A.  I think Nancy and I had talked about that
18      after the fact.  I'm not sure if she was or
19      not.
20  Q.  Anyone else?
21  A.  Well, other than Mary?
22  Q.  Well, Mary --
23  A.  Yeah.  Well, you're asking any other white.
0266
1      That's what I'm saying.  I don't know.  Not to
2      my knowledge, I don't know.  And myself.
3  Q.  You also contend that Judge Gordon
4      "manufactured reasons to terminate" you.  Is
5      that your contention?
6  A.  I believe that, like I testified earlier,
7      there were some things that she could have
8      handled internally instead of having the
9      internal investigations.  And, you know, I --
10  Q.  Like what?
11  A.  I think so.
12      Well, the first internal investigation.  I
13      testified earlier, she should have handled
14      that internally.
15  Q.  With Ralpeje?
16  A.  Yes.
17  Q.  Now, Judge Gordon is on the bench a good bit
18      of the time, isn't she?

19　A.　I assume.  I know that they have court certain
20　　　times of the day.
21　Q.　So your contention that Judge Gordon would
22　　　have the time to go out and conduct
23　　　investigations with bondsmen and defendants
0267
1　　　and individuals in the community and all the
2　　　people in the department?
3　A.　She didn't have court on Fridays, and she
4　　　didn't have court the last week of every
5　　　month.  So I would think that she would have
6　　　time.  Yes.  She had an assistant.
7　Q.　What about the -- other than that first
8　　　incident, you think she should have
9　　　investigated all that?
10　A.　I think that she should have let me know what
11　　　was going on prior to it just being thrown at
12　　　me.  I think that I would've at least -- I
13　　　deserved that much, that she should've let me
14　　　know what was going on.
15　　　　　And I think by her telling me when I made
16　　　her aware of mistakes that were happening with
17　　　Lavera and Eunice, just brushing it off like
18　　　they were -- everybody makes mistakes, and to
19　　　just fix it, and not make a big deal out of
20　　　it.
21　Q.　You said she "instructed Nancy Martin to keep
22　　　a close eye on" you?
23　A.　Yes.
0268
1　Q.　"And two other white magistrate."
2　A.　Yes.
3　Q.　Is that your testimony?
4　A.　Yes.
5　Q.　And what do you base that on?
6　A.　Nancy.
7　Q.　Nancy told you that?
8　A.　Yes.
9　Q.　"And at the same time, implying that she
10　　　should take a blind eye on what black
11　　　magistrates were doing."
12　　　　　What do you have to base that on?
13　A.　Nancy.
14　Q.　Nancy.  That was Nancy's comment?
15　A.　Yes.
16　Q.　Okay.  And then you state, "The black

17    magistrates have not been subject to
18    discipline, yet at least two have committed
19    offenses which would warrant discipline."
20      Is that the same thing that you were
21    talking about?
22  A.  Yes.  Yes.
23  Q.  Then you went on to say, despite "the

0269

1    directive from Judge Gordon not to speak to a
2    white employee," which is Mary Turner?
3  A.  Yes.
4  Q.  That you said, "Judge Gordon was unpersuaded
5    that there was an employment imperative that
6    required contact with this person."
7      But you never really talked to Judge
8    Gordon about your alleged need to talk to Mary
9    Turner, did you?
10  A.  No.  But I felt like, you know, why -- why did
11    she give me Mary Turner's job duties?  Why
12    would she even do that?  Why wouldn't she give
13    them to somebody else?
14  Q.  And because she gave you the job duties and
15    had specifically told you not to contact her,
16    you felt like it was okay to contact her?
17  A.  I assumed she meant about the investigation
18    because if I go to church with somebody or I'm
19    walking down the street and see her, I have
20    First Amendment rights to speak to someone and
21    not have to be told, no, you can't speak to
22    that person.
23  Q.  Even when that person has been charged with a

0270

1    criminal offense, is under criminal
2    investigation?
3  A.  Yes.
4  Q.  But you didn't contact her just to speak to
5    her or going to church or down the street; you
6    picked up the phone and called her --
7  A.  I did because I did not get any cooperation
8    out of Michelle Sellers.
9  Q.  Now, to your knowledge, did the submit any
10    information to the EEOC to support your
11    claims?
12  A.  I'm not sure.
13  Q.  Your lawyer -- I'm not going to ask you what
14    you and your has lawyer talked about or did.

15          You don't know that you did anything?
16   A.   Not to my knowledge.
17   Q.   To your knowledge, did the EEOC ever rule one
18        way or the other against you or you or --
19   A.   I'm not sure if they sent -- they could have.
20        I don't remember if I -- I haven't looked at
21        that.
22          (Defendants' Exhibit 41 was marked
23            for identification.)
0271
1   Q.   I'm showing you Defendants' Exhibit 41.  It's
2        a letter to your lawyer.  I was just going to
3        ask if you ever saw that?
4   A.   He probably sent me a copy of that.
5          MR. JAFFREE:  And I may not have.  I
6            don't know.
7   A.   Yeah.  I'm not sure.
8   Q.   Are you aware that your lawyer requested
9        what's called a Right to Sue move forward
10        without a decision being reached at the EEOC
11        level?
12   A.   I'm --
13   Q.   You don't know?
14   A.   I'm not sure.  He could have.
15   Q.   Now, you and Ms. Martin have filed this
16        lawsuit together; is that correct?
17   A.   That's correct.
18   Q.   Was she terminated before you were?
19   A.   Yes.
20   Q.   So she was not involved in your termination in
21        any way?
22   A.   She -- she was told to -- on my evaluation
23        that she did, she had to discipline me, but
0272
1        she wasn't here when the incident happened.
2        She didn't want to, but she was directed to do
3        that.
4   Q.   And she's told you this?
5   A.   Yes.  She didn't feel like that she since she
6        was not here for the incident, that it -- she
7        shouldn't handle it.
8   Q.   And we're talking now about the --
9   A.   The 2004.
10   Q.   The Fondren --
11   A.   Yes.
12   Q.   -- issue?

13   A.   Yes.
14   Q.   And you're saying she had to fill out your
15        evaluation alluding to that?
16   A.   She did my -- yes.  She showed me that
17        earlier.
18   Q.   And she just felt like she wasn't here --
19   A.   I think she notated on the evaluation that she
20        put she was not here during the incident.
21        So --
22   Q.   You're saying it probably took her -- she
23        probably did get here until, I think you said,
0273
1        the first quarter of 2004?
2    A.   I'm not sure when she started.  I believe
3        that -- I know that she was there whenever I
4        came back from my suspension because she and I
5        both were summoned to the judge's office.
6    Q.   And you're referring to another note --
7    A.   Yes.
8    Q.   -- you have here?
9    A.   Yes.
10   Q.   And I'm going mark this as Defendants' Exhibit
11        45.
12              (Defendants' Exhibit 45 was marked
13               for identification.)
14   Q.   And, so, your notes -- you were pointing to
15        your notes, and y'all were summoned to the
16        judge's office for what?
17   A.   The judge just -- the judge needed to speak to
18        me and was pretty much asking me if -- if I
19        wanted my job, if I wanted to work there, and
20        that, you know, if I didn't want to be there,
21        to let her know, and that I needed to take
22        responsibility for that incident.  And I was
23        very uneasy about that situation.  I almost
0274
1        felt like she wanted me to quit.
2    Q.   When you came back from your suspension, were
3        you threatening or uneasy to other people
4        there?
5    A.   No.  It was the day I came back.
6    Q.   Were you resentful toward the judge for
7        suspending you?
8    A.   No.  I didn't have any contact with the judge
9        when I got back until we had this meeting.
10   Q.   What about with Michelle Sellers; were you

11      resentful to her in any way?
12   A.   I don't know.  I don't recall if I was.
13   Q.   Could have been?
14   A.   I could have been.
15   Q.   And Michelle Sellers is sitting in here.
16   A.   Uh-huh (positive response).
17   Q.   She's the court administrator now.  She's
18      white; is that correct?
19   A.   Yes.
20   Q.   And why were you resentful to Ms. Sellers?
21   A.   I didn't say I was.
22            MR. JAFFREE:  She didn't say she
23               was.  She said she could've
0275
1            been.
2   Q.   You said you could've been?
3   A.   I could've been, but I don't recall.
4   Q.   Well, why do you think you could have been?
5   A.   I don't -- I don't know.  I could've been
6      short with her, but I don't know if I was or
7      not.  I mean, I don't -- I can't answer that
8      if I don't recall if I did.
9   Q.   If you don't remember but said, you could
10      have, you yourself could've been displaying
11      some uneasiness or ill-will toward others in
12      the office, resentment, so to speak, about
13      your suspension?
14   A.   I was probably silent.  I probably was not
15      real sociable.
16   Q.   And maybe not helpful to others in the office?
17   A.   I don't know about that.
18   Q.   Could that have been the reason perhaps Judge
19      wanted to talk to you?
20   A.   That was not -- that was not talked about in
21      this meeting.  That's not what she stressed to
22      me.
23   Q.   But you told her you wanted your job?
0276
1   A.   Sure.  I was very good at my job, very
2      efficient.
3   Q.   Did you ever complain to anybody about -- did
4      you ever come -- you said you never talked to
5      Kai Davis?
6   A.   I couldn't go to her.  If I went to her, I
7      would be going over -- stepping over
8      supervisors, and you can't -- from what I

9       understand, you cant do that.
10   Q.   It's your understanding, you can't go to
11        Personnel?
12   A.   Without going through your proper channels
13        first.  You have to advise your supervisors of
14        what you're doing.
15   Q.   And where did you get that from?
16   A.   I -- it's just what -- I don't know.  I guess
17        that's just the way it was -- I've always
18        perceived it to be.
19   Q.   So you've never reported to anyone that you
20        felt that the judge was treating your
21        differently because of your race?
22   A.   Nancy knew about it.  And she also can see by
23        the treatment that was being -- how it was
0277
1        treated in the office, and she said, she went
2        to Kai Davis.  As a supervisor, she could see
3        what was going on, so she advised Kai Davis of
4        what was going on.
5    Q.   But you weren't present?
6    A.   No.
7    Q.   And you don't know what conversation went on
8        between she and Kai Davis?
9    A.   Not a -- not.
10   Q.   And if Kai David said differently, would
11        you --
12   A.   That would be her testimony.
13   Q.   -- belive -- you just don't know what went on
14        with Kai Davis?
15   A.   Well, she's representing the City.  So I would
16        I think that, you know, she would -- she would
17        be on the City's side.
18   Q.   Well, you're just assuming that?
19   A.   Right.  Right.  Because you asked me.
20   Q.   Did you ever go to the EEO officer?
21   A.   No.  I don't even know if we had one at the
22        time.  I don't know if we did.
23   Q.   Just sort of as a cleanup thing, on this same
0278
1        Defendants' Exhibit 45 that you had written
2        that note about --
3    A.   Yes.
4    Q.   -- seeing the judge?
5    A.   Uh-huh (positive response.)
6    Q.   You had copied --

7   A.   Yeah.  I was just saving paper.
8   Q.   -- another note about January 2004.  "A
9       gentleman came and asked to speak to Mary Beth
10       Brackin.  Was this --
11   A.   Yes.  That was the --
12   Q.   That's the Fondren matter?
13   A.   Fondren, yes.
14   Q.   I was just trying to clarify that was.
15   A.   Yes.
16   Q.   But I think I've asked you about that.
17   A.   Yes, you did.
18           (Defendants' Exhibit 46 was marked
19             for identification.)
20   Q.   And just for the Record, since I've introduced
21       everything else under the sun, to your
22       knowledge, is this Number 46 a copy of Judge
23       White's order on appeal where you appealed
0279
1       your board decision?
2           (Brief pause)
3           MR. JAFFREE:  In the interest of
4             time, we'll stipulate that's
5             Judge White's decision.
6   Q.   Okay.  I'm not going to ask you about it.
7       Thank you.
8         Just on more question, and then we'll take
9       a break.  And maybe I can -- I'm going to ask
10       her about the complaint which is probably most
11       of the stuff we've got --
12           MR. JAFFREE:  That can take forever.
13           MS. NELSON:  Well, you're the one
14             that drafted a 39-page
15             complaint.
16           MR. JAFFREE:  I thought we were
17             going to go through the
18             complaint earlier.
19           MS. NELSON:  I'm going to be done in
20             the time I told you.  I told you
21             it would take about six hours.
22           (Off-the-Record discussion)
23   Q.   Just one other quick question.  You know,
0280
1       you've testified before the board hearing,
2       and, you know, you said you had to answer some
3       questions with the internal investigation.
4           Is it your testimony that you gave

5     truthful responses to the questions asked of
6     you in the Personnel Board Hearing and any
7     questions asked of you during the Internal
8     Affairs investigation?
9   A.  Yes.
10          MS. NELSON:  Why don't we take about
11              a 15-minute break?
12          (Brief recess)
13  Q.  Ms. Brackin, your lawyer, on your behalf, I
14      assumed he prepared a complaint that was filed
15      in federal court.  Have you seen that?
16  A.  The second amended complaint.
17  Q.  Seconded amended complaint?
18  A.  Yes.
19  Q.  I understand that's what's in effect at this
20      time.
21          I'm looking at Number 16 -- you may have
22      covered this -- on page five.  You claim you
23      received exemplary -- excuse me --
0281
1     satisfactory to exemplary annual evaluations.
2     We reviewed most of those.  There were, even
3     through Donna Nicholson's evaluations of you,
4     some issues regarding your attitude that we've
5     discussed; isn't that true?
6   A.  This is -- I think 16 relates to my first
7     tenure with the magistrate's office.
8   Q.  Your first tenure; is that right?
9          THE WITNESS:  Is that right?
10  A.  This is not --
11  Q.  Excuse me.  I'm sorry.
12  A.  Yeah.
13  Q.  Even your first tenure, Gayle Schwarz even
14      noted some issues of attitude and treatment
15      toward the public that we've covered?
16  A.  Yes.
17  Q.  And it's your testimony, you're not aware of
18      any discipline that you received in the police
19      department --
20  A.  No.
21  Q.  -- when you were there?
22          Again, we could be here all night.
23  A.  Yes.
0282
1   Q.  I think you've talked, Number 19, about the
2     issue with Shaun, the public defender; that's

3      Shaun McGhee --
4   A.  Yes.
5   Q.  -- we talked about.
6          What information do you have that -- do
7       you know for a fact that it was Judge Gordon
8       that instructed the police department to
9       conduct a closed-door, rigorous investigation?
10  A.  Well, she was the one that drew up the letter
11      that I was to report to them.
12  Q.  But all you know is what the letter stated --
13  A.  Yes.
14  Q.  -- asking you to --
15  A.  Yes.
16  Q.  -- cooperate with them?
17          Are you aware that Internal Affairs gives
18      something when they looked into something
19      called a Guaranty Instruction; does that mean
20      anything to you?
21  A.  No.
22  Q.  You never worked with Internal Affairs?
23  A.  No.
0283
1   Q.  You don't really know how they conduct
2       investigations?
3   A.  No.
4   Q.  And, again, by number 22, I think you
5       testified, you really don't know how Internal
6       Affairs operates or when they're used or for
7       all the things they're utilized for?
8   A.  No, I do not.
9   Q.  Number 24, 25 deals with the Fondren issue
10      which I think we've discussed in length.
11  A.  Yes.
12  Q.  So I don't need to revisit that.
13          You even cite the judge's memo that I
14      think I asked you about.
15          Paragraph 28, we're still talking about
16      the Fondren matter through here.  That 28, 29,
17      30, that deals with the matter we've looked
18      into about the claim that you had told a
19      defendant that he was wrong to be arrested.
20  A.  Yes.
21  Q.  And that was investigated.
22  A.  Yes.
23  Q.  You're stating that Judge Gordon asked you to
0284

1     sign the form to consent to interrogation?
2   A.   Yes.
3   Q.   Or was that Internal Affairs?
4   A.   Judge Gordon submitted the letter to me.
5   Q.   Asking you to report?
6   A.   Yes.
7   Q.   To report to them?
8   A.   Yes.
9   Q.   Now, when you say, you reported to an
10       interrogation room, where did you actually
11       report?
12  A.   Well, it was the chief's conference room, but
13       they used that for multiple --
14            MR. JAFFREE:  What -- nothing.
15  Q.   You said you got the results four and a half
16       months later; is that your testimony?
17  A.   Yes.
18  Q.   Do you know, during this time, was Internal
19       Affairs investigating this?
20  A.   I don't know.
21  Q.   Just know it took some time?
22  A.   Yes.
23  Q.   And you don't know the reason for the delay?
0285
1   A.   No.
2   Q.   And Number 32, that deals with the testimony
3       you've given, that, basically, Ms. Martin had
4       just come board, but she was still involved in
5       the administration of the discipline?
6   A.   Yes.
7   Q.   And I think I've talked to you about that.
8       I'm not trying -- I'm trying to move along and
9       not repeat everything we've gone over.
10           And it's your testimony under 35 that you
11       could not appeal that suspension or seek due
12       course of that suspension?
13  A.   Yes.
14  Q.   And Number 37, talking about Rickey Stokes --
15  A.   Yes.
16  Q.   -- lodging the complaint against Lavera.
17  A.   Yes.
18  Q.   Is this what you testified to earlier --
19  A.   Yes.
20  Q.   -- about Mr. McCord?
21  A.   Yes.
22            (Brief pause)

23   Q.   Now, in Number 43, you make allegations
0286
1        regarding a defendant appearing on a speeding
2        ticket, and that it was his opinion that it
3        was resolved by the intervention of Mary
4        Turner.  And you went on to state certain
5        things, that the Ticket -- basically, that she
6        put the ticket back on the trial docket
7        because he had failed to complete the repair
8        work on her roof at home.
9            Do you have personal knowledge of that?
10   A.   I don't recall.
11   Q.   You go on to say in 44, you really weren't
12        involved in that but --
13   A.   Right.  I don't --
14   Q.   You weren't accused of having involvement in
15        that.
16   A.   Right.  I don't -- I don't know.
17   Q.   Do you have knowledge that because of the
18        seriousness of all of that allegation against
19        Ms. Turner by this Defendant Phelps, that the
20        matter was turned over to the police
21        department?
22   A.   After the fact.  Yes.
23   Q.   And we've talked -- go on to Number 46,
0287
1        talking about the directive, the meeting with
2        Judge Gordon, not to have any contact with
3        Mary Turner.
4   A.   Yes.
5   Q.   And you testified about doing her job duties
6        and the Rickey Stokes store and the
7        investigation after that.  You just told the
8        investigator that you had talked to her.
9            Talked about Eric -- 52, 53, Corporal
10        Duhaime's involvement as you stated.  I think
11        we've talked about that.
12            Your appeal.
13            And then I wanted to ask you
14        about -- well, 65, you talk about testimony I
15        believe we've covered as far as Lavera McClain
16        and Eunice Knight being negligent, carrying
17        out their assignments but not disciplined.
18        You've given me those instances that you've
19        claimed.
20   A.   That's just -- yes, that's -- that's the ones

21    that I have personnel knowledge of that I can
22    remember.
23  Q.  Okay.  And then the rest goes on to -- just
0288
1    claims by Ms. Martin.
2    Do you have any -- strike that.
3    One of Ms. Martin's claims is that she
4    claimed that Get Out Bonding got preferential
5    treatment by Judge Gordon.  Do you have any --
6  A.  What number are you on?
7  Q.  I'm on number 92, something that's not
8    involved in yours?
9  A.  Oh.
10  Q.  But do you have any facts that would support
11    an allegation that Get Out Bonding got
12    preferential treatment?
13  A.  I don't have any facts personally.
14  Q.  Your contention is that you have been
15    disciplined and terminated because of your
16    race; is that correct?
17  A.  That's correct.
18  Q.  And are you making any other?  And that -- I
19    take it, you're claiming that -- are you
20    claiming that were retaliated against?
21  A.  Well, I was -- I was singled out I believe.
22  Q.  Because of your race?
23  A.  Yes.
0289
1  Q.  You never complained about race discrimination
2    to anyone, did you?
3  A.  I complained to Judge Gordon about the
4    mistakes about, but I did not complain to her
5    about her discriminating against me.
6  Q.  And you didn't go to Personnel or the EEO
7    officer?
8  A.  No.  I don't -- I -- I don't even know if we
9    had one at the time.  I know we did, but I
10    don't know if we did at that time.
11  Q.  And you didn't complain about retaliation in
12    your EEOC charge, did you?
13  A.  I don't remember.  We'd have to look at that
14    again.
15  Q.  I'll show you Defendants' Exhibit 40.  You
16    checked race discrimination.
17  A.  Right.
18  Q.  In the body of your complaint, you don't

19      complain about retaliation?
20  A.  No.
21              MR. JAFFREE:  I'm not sure there's
22              an EEOC -- let me see.  I'm not
23              sure there's an EEOC retaliation
0290
1              filed in the complaint.
2              (Off-the-Record discussion)
3              MS. NELSON:  I'm not sure that a
4              section 1981, 1983 claim exists
5              by law, but that's between you
6              and me to hash out.
7  Q.  And you further content that your
8      constitutional rights were violated; is that
9      one of your contentions?
10  A.  I believe so.  I was told not to speak with
11      someone, and I feel like that was a violation
12      of Freedom of Speech.
13              MR. JAFFREE:  Let me -- and I should
14              have done this earlier, but it's
15              better late than never.
16                  You're asking her to claim
17              her relief.  All of this is
18              legal stuff.  You're asking her
19              to comment on the law, and she's
20              not competent to do that.  She
21              doesn't even know all the legal
22              claims she has.  I probably
23              don't know all the legal claims
0291
1              she has.  And I'm going to
2              object to the question on the
3              basis that it covers a province
4              that she's not capable of
5              dealing with.
6              MS. NELSON:  So noted.  But I can,
7              at least, try to ask her facts
8              that would support what appear
9              to be her claims.
10              MR. JAFFREE:  Well, I think you've
11              already asked facts that tend to
12              support her claims or not,
13              depending on your perspective.
14  Q.  Do you now contend that -- one of your claims
15      appears to be false imprisonment.  Are you
16      aware that you're making a claim of false

17      imprisonment?
18   A.   Where are you at so I can --
19   Q.   I'm on page 29.
20           MS. NELSON:  Look at this.  Maybe
21              you and can clarify this.  She's
22              making a retaliation claim for
23              exercising in her free speech
0292
1              and association rights.  That's
2              your retaliation.
3           MR. JAFFREE:  I think so, yeah, not
4              based on Title VII.
5           MS. NELSON:  I understand.  Okay.
6              I'm with you.
7    Q.   Are you making a -- on page 29, your attorney,
8         on your behalf, makes a claim of false
9         imprisonment?
10   A.   Yes.
11   Q.   And, again, while you may not understand all
12        the elements of false imprisonment, you
13        basically stated that this is -- you
14        were -- this was based on the fact that you
15        were questioned by the police in these
16        Internal Affairs investigations; is that
17        correct?
18   A.   Yes.
19           MR. JAFFREE:  Paragraph 152 comes
20              from the case, so that's what
21              she's basing it on.
22           (Brief pause)
23   Q.   I'm on like paragraph 158.  I think you're
0293
1         stating multiple actions based on conduct
2         that --
3           MR. JAFFREE:  Which paragraph are
4              you on?
5           MS. NELSON:  I'm just reading
6              through here.
7           MR. JAFFREE:  Which paragraph are
8              you on?
9           (Off-the-Record discussion)
10   Q.   I think we've basically covered most of the
11        factual issues.
12          Tell me, how do you contend that you have
13        been damaged as a result of your termination?
14   A.   Well, I've been damaged financially.

15   Q.   You were earning -- approximately, what were
16        your wages?
17   A.   When I left the City?  I believe it was -- and
18        I'm not sure on this.  It might have been
19        right at $16 an hour.  I'm not sure if that's
20        right or not.  I believe so.
21   Q.   Did you have benefits?
22   A.   Yes.  I have not touched my RSA retirement.
23        It's still there.  I was vested with the City,
0294
1        been employed for 13 years.
2    Q.   Did you have health insurance?
3    A.   I have it with my husband.
4    Q.   Your husband?  You still have that through
5        your husband?
6    A.   But I had it with me, you know, and it was
7        paid for.  So now he's having to pay for that.
8    Q.   But you still have the benefit of it?
9    A.   I still have the health insurance.  Yes.
10   Q.   How much money were you paying, or was the
11        City paying --
12   A.   I think the employee part --
13            (Court reporter interrupted for
14             clarification.)
15   Q.   How much were you paying when you were
16        employed, and what's the premium now for your
17        coverage?
18   A.   I'm not sure what the employee part was, if
19        you were a city employee for yourself because
20        I was not listed under the family coverage.
21        It might have been $10 a pay period.  I'm not
22        sure.
23   Q.   You had coverage, and he had coverage?
0295
1    A.   Yes.
2    Q.   And now you're under his family coverage?
3    A.   Correct.
4    Q.   And you know what -- you have your wages when
5        you worked for Headland and Newton?
6    A.   Yes.
7    Q.   Did you have any benefits there?
8    A.   No.
9    Q.   And you said you didn't had not been under a
10        doctor's care, other than your regular OB/GYN?
11   A.   That's correct.
12   Q.   And you're on one medication?

13   A.   Yes.
14   Q.   And what is that?
15   A.   Effexor.
16   Q.   And what is that?
17   A.   It's a type of anxiety drug.
18   Q.   And how long have you been on that?
19   A.   I'm not sure.  I know it was during my time
20        that I went back to the magistrate's office, I
21        believe.
22   Q.   What's your doctor's name, the one that
23        prescribed that?
0296
1    A.   The one that prescribed that?
2    Q.   Yes.
3    A.   Robert Cleveland.
4    Q.   Is he your OB/GYN?
5    A.   He is.
6    Q.   Cleveland?
7    A.   Yes.
8    Q.   Is he really the only doctor you've seen in
9         the last five years?
10   A.   Other than if I was sick, I will go to medical
11        doctor.  Family is Rodney Beauchamp.
12   Q.   Beauchamp?
13   A.   B-E-A-U-C-H-A-M-P.
14   Q.   And what pharmacies do you trade with?
15   A.   Doctors Center Pharmacy.
16   Q.   Sorry?
17   A.   Doctors Center Pharmacy.
18   Q.   Doctors Center.  Anywhere else?
19   A.   No.
20   Q.   During the time you were employed in the
21        magistrate's office, were you ever going
22        around recording employees --
23   A.   No, I was not.
0297
1    Q.   -- with a tape recorder?  No?
2    A.   The only time I had a tape recorder is in that
3         meeting that we had.
4    Q.   What meeting, now, is this?
5    A.   That we -- that you have on exhibit -- I'm not
6         sure what number is where -- where personnel
7         director, Kai, was there and the judge when we
8         all had a meeting.  And Lavera was talking
9         very loud and rude.
10   Q.   Do you have a tape recording of that?

11   A.   No.  It was taken up.
12   Q.   Did someone take it away from you?
13   A.   Yes.
14   Q.   Who was that?
15   A.   Michelle Sellers.
16   Q.   Did the people know they were being recorded?
17   A.   Some did.
18   Q.   And who knew?
19   A.   I'm not sure who all knew.  I -- I don't
20        know.  I mean, there was -- there was a lot of
21        us in there.  I'm not sure.
22   Q.   And why were you recording it?
23   A.   I just wanted it on record as what was being
0298
1         said in there.
2    Q.   And why is there?
3    A.   So nothing could be -- well, in case something
4         happened that I needed, you know, to use it.
5         If it was involving something that -- just
6         like what happened where I was mistreated and
7         nothing was done.
8    Q.   And, again, I know we've been through a lot.
9         Y'all were meeting with Kai Davis as a group?
10   A.   And the judge --
11   Q.   In the judge's office?
12   A.   -- as a group.
13             No.  It was in our break room area over
14        here at this two-story building.
15   Q.   And what were you meeting over?
16   A.   I can't remember.  I don't know.  I don't know
17        if it was after the fact that Donna had left
18        and we didn't have a court administrator at
19        the time.  I'm not sure.  It was just --
20   Q.   There was friction in the office?
21   A.   Well, I'm sure.  The morale was not that good,
22        so I don't -- you know, I don't remember what
23        the actual gist of the meeting was about.  You
0299
1         know, we could've covered several things.
2    Q.   So it was shortly after you had been back?
3    A.   No.
4    Q.   What date --
5    A.   No.  This was --
6                 MR. JAFFREE:  Let me.  I tried to
7                   see where this was going, but
8                   I'm going to object to the

9       relevance.  I'm not going to
10       instruct you to answer.  This is
11       not --
12       MS. NELSON:  It's just discovery.
13       I'm trying to --
14       MR. JAFFREE:  But it's not part of
15       any defense that I know of, but
16       that was not the basis for a
17       decision.
18       MS. NELSON:  Well, she's going
19       around running a tape recorder
20       of people.  I'm just -- when
21       Donna Nicholson was there?  I'm
22       just trying to --
23   A.  No.  I don't think Donna was there.
0300
1    Q.  After she left?
2    A.  I think it was after she left.  And I wasn't
3       running around.  This was one incident, and it
4       was taken up.
5    Q.  And I'm trying to figure out what --
6    A.  So it's not something --
7    Q.  -- date this occurred.
8    A.  I don't know.  I don't remember.
9    Q.  Was Bettye King there?
10   A.  I don't know.  She could have been, but I
11      don't -- I don't think we had a court
12      administrator.  It might have been the time in
13      between Donna and Bettye.  I'm just not sure.
14   Q.  Have you ever reported to a black manager
15      before Judge Gordon?
16   A.  Before Judge Gordon?
17   Q.  Yeah.
18   A.  Trying to think.  I don't believe so.  I'm
19      trying to think of my past jobs.  I don't -- I
20      don't believe so.  And I know that we had some
21      in the police department that would get
22      promoted and we'd get a new sergeant, but I
23      don't think any of them were black.
0301
1    Q.  You didn't report to them, did you?  You
2       didn't report to a black manager?
3    A.  I don't believe so.
4    Q.  Did you resent having to report to a black
5       manger?
6    A.  No, I did not.

7   Q.  Did you resent having to work with black
8       employees?
9   A.  No.
10   Q.  Was any of the reason you were meeting with
11       Kai Davis -- that's why I'm just trying to
12       figure out why you were meeting.
13   A.  I don't know.  This meeting was called, I'm
14       assuming by the judge.  I don't know, and I
15       don't why Kai Davis was there.  I don't know.
16   Q.  But you felt compelled to tape record it?
17   A.  Well, I just wanted that whatever was going to
18       be said, you know, on file.  I mean, I -- I
19       just felt like that I -- I needed to do that.
20   Q.  And what has been your relationship with
21       Michelle Sellers or your relationship when you
22       worked there; did the two of you get along?
23   A.  Sometimes.
0302
1   Q.  But sometimes you didn't?
2   A.  No.  She was not in our chain of command, but
3       she, at times, was very belittling and also
4       instructing us to do things that we didn't
5       feel like were appropriate regarding cases,
6       our magistrate duties that she was not
7       experienced in.
8   Q.  Was she your supervisor at some point in time?
9   A.  Some point in time she was, but not -- not
10       most of the time.
11   Q.  And you resented having to take instruction
12       from her?
13   A.  No, I didn't resent that.  I didn't resent it,
14       no.
15   Q.  You didn't agree with what she was instructing
16       you to do?
17   A.  Well, at some -- not -- not during the
18       particular time that she was maybe our
19       supervisor.  I mean, I just know there were
20       times.  I don't know the dates or anything
21       or -- but I know that there were times that,
22       you know, because she wasn't experienced in
23       magistrate duties, that she would not
0303
1       understand by doing that to that or something
2       that it would not -- it's not the proper way
3       to do it.
4   Q.  Did you feel like you knew more than anybody

5     else in the office?
6   A.  I don't feel like I knew more than anybody
7        else, but I know that I've trained -- I
8        trained several of the people in that office.
9        And I knew that several people came to me when
10       they had questions, and I was given a little
11       bit more responsibility than others.  I didn't
12       feel like I knew more than they did.
13  Q.   You said sometimes she was belittling.  Do you
14       feel like your tone of voice and conduct was
15       often belittling to others?
16  A.   I don't know how they took it.  I mean, I
17       don't know how it was received or if it, you
18       know -- I don't know.
19  Q.   Now, we've been over a lot of stuff, and I'm
20       trying to wrap up.  But I'm just asking if
21       we've gone over all your claims that you're
22       making against the City and the judge and if
23       you've got any other evidence or information
0304
1        that would support your claims of race
2        discrimination?
3                MR. JAFFREE:  I'm not sure you've
4                    covered her claims of
5                    association, free association
6                    claim, did you?
7   Q.   Your association.  I assume you're talking
8        about with Mary Turner?
9   A.   He asked the question.  I'm not sure.
10  Q.   Do you know what -- are you claiming free
11       association?
12  A.   Yes.
13               MR. JAFFREE:  She may not know she
14                   is, but she is.
15  A.   I'm sorry.  I wasn't really paying attention
16       because I knew he was talking to you.  I'm not
17       sure.
18  Q.   And what facts do you have to support your
19       free association claim?
20  A.   What facts?
21  Q.   Yes.
22  A.   Well, I just don't -- I don't think that
23       someone has a right to tell you that you can't
0305
1        socialize with someone away from the job.
2        It -- you know, that's just -- that's just

3        hard for me to believe when you've got a First
4        Amendment Freedom of Speech, and I want to
5        associate with the Pope and, you know,
6        whoever.  I should be -- that's my prerogative
7        to do that.  I don't -- if -- if I'm going to
8        church that Sunday and she's in my Sunday
9        School class and we're discussing something,
10       I -- I'm going to be able to sit there and
11       talk to her or speak to her.  I don't --
12       nobody should be allowed to tell me that I'm
13       not allowed to speak to somebody.
14   Q.  Even if it's your supervisor at your job who's
15       asking you not to communicate with an
16       individual that's under police investigation
17       for a criminal offense?
18   A.   She should not have a right to tell me, away
19       from my job, whether I can socialize or speak
20       to someone.
21   Q.  Okay.
22            MR. JAFFREE:  Your supervisor is not
23            God?
0306
1            THE WITNESS:  That's correct.
2   Q.  And that's your freedom of association claim?
3   A.  That's --
4   Q.  Okay.  Do you have any other evidence that
5       would support your claims that you've been
6       discriminated against or treated differently
7       because of your race by Judge Gordon?
8   A.   Just that it's -- it's very blatant that I was
9       disciplined for any little thing and was
10       internally investigated at times that I
11       shouldn't have been.  And we've got Eunice and
12       Lavera who made just negligent errors with
13       people getting wrongfully arrested, which
14       violates their rights.  And they're put in
15       jail, and they shouldn't have been.  And
16       that's just something that when you first
17       become a magistrate, when I was up under Gayle
18       Schwarz, that was something that you just did
19       not allow to happen.  And they were not
20       disciplined?  So I -- I feel like that that's
21       just -- it's blatant.
22   Q.  Okay.  I think we've talked about that.
23       Anything else?
0307

1  A.  I -- I can't think of anything right now.
2          MS. NELSON:  Let me just have two
3            seconds outside with my client.
4  Q.  Before we do that, really, you know, you've
5      given me all the documents that you have in
6      your possession that would support your claim?
7  A.  Yes.
8  Q.  And you or your attorney has given me a list
9      of people that might have knowledge about your
10     case.  Most of them I think we've talked
11     about.  Donna Snell?
12 A.  That's Donna Nicholson.  She's a Snell now.
13 Q.  Thank you.
14         Gary -- we're have not talked about Gary
15     Shirah.  What knowledge would he have about
16     your claims and your case?
17 A.  I know he was a former magistrate.  I don't
18     think we mentioned him.  He now works in the
19     business license division.
20 Q.  And what knowledge would he have about --
21 A.  I'm not sure, other than that -- errors that
22     were made.
23 Q.  Jerry Corbin?  What knowledge would he have
0308
1      about your claims?
2          THE WITNESS:  I think he was for
3            Nancy, wasn't he, on Nancy's --
4  A.  I'm not sure.  I think he was the acting city
5      manager at some point in time.
6  Q.  You know if he had any involvement in any
7      matters or discipline affecting you?
8  A.  I'm not sure.  I think he -- I'm not sure if
9      he was acting city manager or not.  I -- I
10     don't know.
11 Q.  Mike West?  Would he have any knowledge about
12     the claims you're making against the City?
13 A.  I'm not sure.  He was -- he's just a city
14     manager.  I don't know.
15 Q.  Kalia Spears Lane, would she have any
16     knowledge about the claims you're making?
17 A.  I'm not sure.
18 Q.  I'm just asking.
19 A.  Well, I mean, I don't know because I don't
20     know if this is including Nancy's witnesses or
21     not.
22 Q.  I'm just asking --

23    A.   Oh, for me?
0309
1    Q.   I'm just asking for your case?
2    A.   Not to my knowledge.  No.
3    Q.   Mike Etress, we talked about him.
4    A.   Yes, we did.
5    Q.   Steve Parrish?
6    A.   I don't think so.  He might have been the
7        captain over CID.  I'm not sure.  I don't -- I
8        don't think he has anything to do -- he might
9        have been involved in Mary's criminal stuff.
10        I'm not sure.
11    Q.   Don Thompson?
12    A.   I think that's Nancy's witness.  I don't think
13        he has anything to do with mine.
14    Q.   Rickey Stokes?
15    A.   We talked about him.
16    Q.   I think you've told me everything that Rickey
17        Stokes may have knowledge about in your case?
18    A.   Yes.
19    Q.   Tim Dickerson?
20    A.   He's another bondsman.
21    Q.   Would he have any knowledge?
22    A.   I don't think about mine, no.
23    Q.   And then there's some municipal defendants
0310
1        listed here, Michael Rudnick?
2    A.   I don't know unless it was some that show
3        where errors were made.  I'm not sure.
4    Q.   Carmen Caster?
5    A.   I don't know.  We'll just have to pull the
6        file.  I mean, I'm not sure.
7    Q.   I'm just asking you if you know.
8    A.   I mean, the names are familiar.
9    Q.   Donald Earl Hauser?
10    A.   Hauser.
11    Q.   Hauser?  You don't know?
12    A.   I don't know.
13    Q.   Cecil Eubanks?
14    A.   I don't know.
15    Q.   James Richard Culver?
16    A.   That names rings a bell.  I mean, could be,
17        you know, some error that they made.  I'm not
18        sure.  We'd just have to pull the paperwork
19        and look at it.
20    Q.   Christopher Lee Carroll?

21   A.  It sounds familiar.
22   Q.  Malcolm Rescoe Davis?
23   A.  I'm not sure about that one.
0311
1    Q.  Jerry Jessie?
2    A.  I don't know.
3    Q.  You've got to speak up.
4    A.  I don't -- I'm sorry.  I don't know.  I don't
5         --
6    Q.  Well, your attorney must have gotten these
7         from somewhere.  I'm just --
8    A.  Well, I mean, it could be for Nancy's stuff,
9         too.  I don't know.
10   Q.  I'm just asking if you know.  Janasky Boykin?
11   A.  Boykin, that's sounds familiar.
12   Q.  But nothing that you can --
13   A.  Well, I mean, we'd have to -- those are just
14        names that stand out that we'd have to pull
15        the paperwork to see.  I mean, I couldn't
16        really tell you for sure.
17   Q.  "Stand out" that what?
18   A.  Well, I mean, they could've been falsely
19        arrested.  I'm not sure.
20   Q.  Tarael Steven?
21   A.  The name doesn't do anything.
22   Q.  Gregory Powe?
23   A.  I do believe he was falsely arrested.  I'm not
0312
1         sure if that's the one that was with the cash
2         bond incident or not.  I'm not sure.
3    Q.  What cash bond incident?
4             MR. JAFFREE:  Yeah, what cash bond
5               incident?
6    Q.  What cash bond incident?
7    A.  I think that's with Nancy's.
8             MR. JAFFREE:  That's Nancy's?
9             THE WITNESS:  I think so.
10   Q.  Well, do you have knowledge of it?
11   A.  Well, it's what they told me.  I mean, you
12        know.
13   Q.  Who told you what?
14   A.  I don't -- but I'm not going to say that
15        that's the person for sure because I know that
16        there was an incident with a cash bond that --
17        when Michelle Bryan was going into the
18        courtroom in the side door one day, she -- and

19      this is her telling me.
20  Q.  Okay.
21  A.  She said that Judge Gordon -- in her office
22      was Judge Gordon, Eunice, a grandmother I
23      think -- it may have been the mother.  And
0313
1       then the defendant had been arrested, and he
2       shouldn't have been.  And there was -- she
3       posted a cash bond for him to get out.  And
4       she wanted to know how to get her cash bond
5       money back.  So that -- I'm not sure if that's
6       the one, if it was Gregory Powe or not.  I
7       don't know.
8   Q.  And who do you -- you don't know really why
9       he's listed?
10  A.  He could be because of that.  I'm not sure.
11  Q.  And who are you claiming was involved in that
12      cash bond?
13  A.  Eunice Knight.
14  Q.  And other than what you've heard, you really
15      don't have any personal knowledge about it?
16  A.  Not other than what Michelle told me.
17  Q.  Michelle Bryan?
18  A.  Yes.
19  Q.  And Theron Fondren, we've talked about him?
20  A.  Yes.
21          MS. NELSON:  If you could give us
22             just a second, or we can step
23             out or y'all can step out.
0314
1           MR. JAFFREE:  We'll step out.
2           (Brief pause)
3           MS. NELSON:  Okay.  I believe that's
4             all I have right now.
5               EXAMINATION
6   BY MR. JAFFREE:
7   Q.  You testified on direct or from the questions
8       that counsel for the City asked you that you
9       and Mary Turner were friends; is that correct?
10  A.  Yes.
11  Q.  Would you characterize yourself as close
12      friends?
13  A.  Yes.
14  Q.  And what do you mean by that.
15  A.  Well, we not only went to church together,
16      we -- we'd go out to eat lunch together.  We

17    socialized away from work.  We -- we'd go to
18    each other's house for supper or dinner.  We'd
19    go to her sister's house.  She has a pool, and
20    we've had some parties or, you know, get
21    togethers over there.  So there's just, you
22    know -- we'd go shopping together.
23  Q.  Did y'all socialize on a regular basis?
0315
1  A.  Yes.
2  Q.  During the time you were employed with the
3    City?
4  A.  Yes.
5  Q.  Did you feel that a person acting as an
6    administrative supervisor had the right to
7    literally tell you not to make contract with
8    somebody who was a close friend?
9  A.  I don't think she has a right to.
10  Q.  To comply with her directive, do not contact
11    this person for an indefinite time, would that
12    have frustrated your rights to socialize with
13    this person?
14      Do you understand the question?
15  A.  No.  I'm sorry.  Repeat.
16  Q.  Listen carefully.
17  A.  It's been a long day.
18  Q.  For someone to tell you not to make any
19    contact with Mary Turner, would that have
20    frustrated your right to socialize with
21    Ms. Turner and have a relationship with her?
22  A.  Yes.
23  Q.  Did you interpret the no contact to be, don't
0316
1    contact her for any reason?
2  A.  I understood it to be while we were at work or
3    while I was working.
4  Q.  And did you think that contact was limited
5    just to any matter relating to the
6    investigation?
7  A.  Yes.  I thought it meant about the
8    investigation that was going on.
9  Q.  Were you in a position to notify Ms. Turner of
10    anything that could be useful to her with
11    respect to the investigation?
12  A.  No.
13      MS. NELSON:  Object to the form.
14      MR. JAFFREE:  Thanks.

15   Q.   Now, you stated earlier that the two black
16       magistrates, Lavera and --
17   A.   Eunice.
18   Q.   -- Eunice made mistakes.
19   A.   Yes.
20   Q.   Data entry mistakes and mistakes on forms.
21       And I think in response to the question, you
22       said, other people may have made mistakes.
23           Could you compare the mistakes that Eunice
0317
1    and Lavera made with respect to the other
2    magistrates' mistakes?
3    A.   Well, I don't know if they had mistakes where
4    people were falsely arrested, the other
5    magistrates.  I don't know.  But I know that,
6    you know, there might have been some clerical
7    data entry or -- I don't know that as far as
8    personal knowledge.  But --
9    Q.   Do you know whether or not Eunice and Lavera
10       made numerous mistakes?
11   A.   Yes, I do.
12   Q.   Were you present during the testimony of the
13       auditor with respect to the mistakes that she
14       discovered?
15   A.   Yes, I was.
16   Q.   And I think you testified earlier that at some
17       point the judge told you that anybody makes
18       errors?
19   A.   Yes.
20   Q.   When she terminated you for allegedly making a
21       data entry error, did she tell you that
22       everybody makes mistakes?
23           MS. NELSON:  Object to the form.
0318
1    A.   No.
2    Q.   On speaking about that data entry -- let me
3    see what exhibit that is.  I think Exhibit
4    34.  Now, I notice here on Exhibit 34 next to
5    Stephen Phelps' name, there is no case number
6    indicated; is that correct?
7    A.   That's correct.
8    Q.   Now, why was there no case number indicated?
9    A.   Because I didn't have the ticket.
10   Q.   All right.  And you said, sometimes because of
11       how busy magistrates are, you have the
12       officers swear to these transmittals before

13     you go through and compare the tickets with
14     the entries that the officer had made; is that
15     correct?
16  A.  Yes.
17  Q.  Would you say that's unique to you or other
18     magistrates did the same thing?
19  A.  I have -- I have witnessed other magistrates
20     do the same thing.
21  Q.  Were you ever given a directive of what to do
22     when you're busy and the police officers give
23     you these things with the tickets whether or
0319
1     not you should rely on what they say or stop
2     what you're doing and go through them ticket
3     by ticket?
4  A.  I don't think there's anything that states
5     that we must sit there and compare both the --
6     the transmittal to the tickets and vice versa.
7  Q.  All right.  Was it your testimony that when
8     you started matching the tickets with the
9     names on this transmittal, you found a ticket
10     missing?
11  A.  Yes.
12  Q.  And I think it was your testimony that prior
13     to putting "void" in, you made a contact with
14     Officer Duhaime, is it?
15  A.  Duhaime.
16  Q.  And asked him, what's with this ticket?
17        MS. NELSON:  Object to the form.
18  A.  Yes.
19  Q.  And the officer stated --
20  A.  That he voided the ticket.
21  Q.  Now, did you have any reason to believe at
22     that time -- this was back in 2002 -- that a
23     police officer didn't have a right to void a
0320
1     ticket?
2  A.  Ask that again, please.
3  Q.  Did you have any reason to believe in 2002
4     that a police officer didn't have a right to
5     void a ticket?
6  A.  No.
7  Q.  Now, when you said, voided, you didn't see the
8     ticket, did you?
9  A.  No, I did not.
10  Q.  You know if he wrote "void" on it or not?

11   A.  No.
12   Q.  If he voided the ticket but didn't write
13       "void" on it, you would have no way of
14       knowing?
15   A.  That's right.
16   Q.  So this entry that you made was based purely
17       on what he said?
18   A.  Correct.
19           MS. NELSON:  Object to the form.
20   Q.  Now, you were shown Exhibit Number 31 for
21       category of major offenses, and you were
22       accused of committing a major offense because
23       you put void in this column to reflect what
0321
1        the officer told you, correct?
2    A.  Correct.
3    Q.  Do you see anything on Exhibit 31 that
4        suggests that if you negligently or carelessly
5        put a data entry in, that you have committed a
6        major offense?
7            MS. NELSON:  Object to the form.
8            (Brief pause)
9    A.  No.
10   Q.  Let me ask you this:  Your putting void on
11       this transmittal form, would that be
12       considered a data entry?
13           Do you understand?  Is void an indication
14       of a status?
15           MS. NELSON:  Object to the form.
16   Q.  Do you understand the question?
17   A.  No, I'm sorry.
18   Q.  All these items on here, on this form, is that
19       considered data entries?
20           Do you understand what a data entry is?
21   A.  My keying it into the computer?  Is that --
22   Q.  Well, not necessarily keyed into the
23       computer.
0322
1    A.  I'm sorry.
2    Q.  But do you know what data is?
3    A.  Yes.  It's information.
4    Q.  Information?
5    A.  Right.
6    Q.  Do all these numbers represent information?
7    A.  Yes.
8    Q.  Does this voided represent information?

9   A.  Yes.
10  Q.  So these entries represent information,
11      correct?
12  A.  Correct.
13  Q.  Data, correct?
14  A.  Correct.
15  Q.  They are entered on something, right?
16  A.  Correct.
17  Q.  So these would've been considered data
18      entries?
19          MS. NELSON:  Object to the form.
20  A.  Correct.
21  Q.  Correct?  Okay.  So this is a representation
22      of a data entry?
23  A.  Yes.
0323
1   Q.  And you got accused of negligently putting
2       that data entry in?
3   A.  Yes.
4   Q.  And you said that you don't see on Exhibit 31
5       where any of these things for negligently
6       putting any data entry in is a major offense?
7   A.  That's correct.
8   Q.  But let's assume that it is.  Do you know for
9       a fact that Lavera put in negligent data
10      entries on anything, a computer or form or
11      anything?
12  A.  Yes.
13  Q.  Do you know for a fact whether Eunice has ever
14      committed a data entry error?
15  A.  Yes.
16  Q.  Do you know if the judge -- the defendant, the
17      judge here, was aware that Eunice had
18      committed a data entry error?
19  A.  Yes.
20  Q.  Do you know for a fact whether the judge was
21      aware that Lavera had committed a data entry
22      error?
23  A.  Yes.
0324
1   Q.  Okay.  Do you know whether or not Lavera has
2       ever been suspended for ten days?
3   A.  No.
4   Q.  Do you know for a fact whether Eunice has ever
5       been suspended for ten days?
6   A.  No.

7   Q.   You don't or they were not?
8   A.   To my knowledge, they were not.
9   Q.   You mean, from the time you were there?
10  A.   Right.
11  Q.   Would you have known it if they were suspended
12       for ten days?
13  A.   Sure I would have.
14  Q.   So to your knowledge, neither one of them were
15       suspended for ten days?
16  A.   That's correct.
17  Q.   All right.  During the time you were there,
18       were either of them terminated for putting in
19       a negligent data entry?
20  A.   No.
21  Q.   As far as you know, were either of them
22       disciplined in any manner for putting in a
23       negligent data entry?
0325
1   A.   No.
2   Q.   If you were terminated for putting in a
3        negligent data entry and if they didn't
4        receive any discipline at all for putting in a
5        negligent data entry, would you say that you
6        were treated differently than they?
7   A.   Yes.
8   Q.   Were you, Eunice, and Lavera all magistrates?
9   A.   Yes.
10  Q.   With the same status?
11  A.   Yes.
12  Q.   Same job duties --
13  A.   Yes.
14  Q.   -- responsibilities?
15           Were they of the same racial group as you?
16           Do you understand about racial?
17           Were they of a different race?
18  A.   Yes.
19  Q.   So these two were black individuals or
20       African-American?
21  A.   Yes.
22  Q.   These same African-Americans committed the
23       same category of offense that you did,
0326
1        correct?
2   A.   Yes.
3            MS. NELSON:  Object to the form.
4   Q.   Well, did they -- as far as you know, did each

5       commit a data entry error?
6   A.  Yes.
7           MS. NELSON:  Object to the form.
8   Q.  And they were treated differently; is that
9       correct?
10  A.  Yes.
11  Q.  Is that discrimination in your mind?
12  A.  Yes, it is.
13  Q.  Now, do you know for a fact whether or not the
14      two of them were treated differently than
15      other whites that worked in that department?
16          Do you understand the question?
17  A.  I'm sorry.
18  Q.  Maybe I need to rephrase my questions.  Do you
19      know if Lavera and Eunice were treated
20      differently than other white magistrates?
21  A.  Yes.
22          MS. NELSON:  Object to the form.
23  Q.  Are you aware of another black magistrate that
0327
1       got hired?
2   A.  Yes.
3   Q.  Are you familiar with any incidents where the
4       Defendant Judge Gordon went out of her way to
5       benefit this black magistrate that got hired?
6           MS. NELSON:  I'm sorry.  Say that
7               again.
8   Q.  Do you know of any incident where the
9       defendant judge went out of her way to benefit
10      this black magistrate that was hired?
11  A.  All I know is from what Nancy has talked to me
12      about since we've been terminated from the
13      City.
14  Q.  And what magistrate are you referring to?
15  A.  Tonya Minifield.
16  Q.  Do you know anything with respect to finding
17      Tonya an office when she first got hired?
18  A.  Yes.
19  Q.  And what do you know?
20  A.  Well, I know that they -- they moved some
21      magistrates around, and we actually asked the
22      city manger from what I -- or, well, I say
23      we.  I say judge; I guess the department
0328
1       head -- asked to -- because the building that
2       they're currently in, we only had so much

3       office space out of that building.  So in
4       order to acquire additional room, it had to be
5       approved through the city manager.  And I
6       understand that Valarie was moved to that
7       office, and I'm not sure if Michelle Bryan was
8       moved to Valarie's old office of if Tonya got
9       Valarie's old office.  But I do know that they
10      made an office for her.
11   Q.  Was she high on the seniority roster, Tonya?
12      Do you understand the question?
13   A.  That I'm not sure of.
14   Q.  We're talking about Tonya?
15   A.  Yes.
16   Q.  Do you understand what I mean by, high on the
17      seniority roster?  I'm talking about between
18      the magistrates that were currently working --
19   A.  Oh, okay.  I'm sorry.
20   Q.  -- do you know if she was higher on the
21      seniority?
22   A.  No.  She was -- she was on the bottom.
23   Q.  She was the lowest thing on the totem pole?
0329
1    A.  Yes.
2    Q.  And efforts were made to get her a nice
3       office?
4              MS. NELSON:  Object to the form.
5    A.  Yes.
6    Q.  You're quite sure of that?
7    A.  Yes.
8    Q.  Can you think of any reason, other than she
9       was a minority, that efforts were made to get
10      her a good office?
11   A.  Not to my knowledge.  I know that Mary Turner
12      asked for an office, and she was told she
13      didn't need one.
14   Q.  Mary Turner is what color?
15   A.  White.
16             MS. NELSON:  Object to the form.
17              Hearsay.
18             MR. JAFFREE:  Mary Turner being
19              white is hearsay?
20   Q.  Okay.  All right.
21             MS. NELSON:  No.  That's not why I
22              was objecting.
23   Q.  Y'all implemented a new commuter system; is
0330

1     that correct?
2   A.  Correct.
3   Q.  And, so, when the system was just starting,
4     errors in data entry could be expected, right?
5   A.  Sure.
6   Q.  When did the system, you think, get
7     implemented?
8   A.  I don't remember.  I don't --
9   Q.  Do you recall what year?
10   A.  I know that we were over here at the two-story
11     building on the corner.  But I'm not -- I know
12     that -- I'm not sure if Donna was here or
13     not.
14   Q.  Let me ask you this:  After the system had
15     been implemented and the people had an
16     opportunity to get familiar with the system,
17     were Eunice and Lavera still making data entry
18     errors?
19   A.  Yes.
20        (Brief pause)
21   Q.  Now, I noticed on Exhibit 15 and all other
22     exhibits dealing with employee job performance
23     evaluations, you indicated "concur" or "I
0331
1     concur" and some variant of those terms on
2     every single one.  Why did you do that?
3   A.  I just -- that's just the word I used.  I
4     didn't -- you know, I used that on all of
5     them.
6   Q.  Did you intend by the use of that word to
7     agree with every entry that was on this
8     document?
9   A.  No, not everything.  And I felt like if I
10     wrote something that I didn't agree with,
11     I -- you know, it would be used against me.
12   Q.  For instance, on Exhibit 15, on page 2, number
13     8, dealing with the public, it says, "Recently
14     there have been complaints from attorneys
15     regarding the way they were talked to by Mary
16     Beth."
17        Did you agree with that?
18   A.  No, because I didn't never -- it wasn't
19     brought to my attention or who was
20     complaining.
21   Q.  Did any attorney ever tell you that they
22     disliked the way you were speaking with them?

23   A.  No.
0332
1   Q.   And in your opinion, did you ever speak in an
2        unprofessional to an attorney?
3   A.   Not to my knowledge.
4   Q.   Do you recall whoever was the evaluator, Donna
5        Nicholson, providing you with specificity as
6        to what attorneys had complained?
7   A.   No.
8   Q.   Did anybody ever show you a memo or letter
9        from an attorney, indicating a complaint?
10  A.   No.
11  Q.   So when you said you -- and all you said here
12       is "concur," you did not intend to concur with
13       this item here on page 2, item number eight?
14            MS. NELSON:  Object to the form.
15  A.   That's correct.
16            (Brief pause)
17  Q.   Now, on Exhibit Number 7, you also -- did I
18       mention -- this is 7 I just mentioned --
19       concur.  And it states here in Section 3 that
20       "she has corrected some problems she has had
21       in communication skills with dealing with the
22       public."
23            Did you concur that you had problems in
0333
1        your communication skills in dealing with the
2        public?
3   A.   No.
4   Q.   So when you concurred, you did not intend to
5        concur that you had problems --
6            MS. NELSON:  Object to the form.
7   Q.   -- in dealing with the public?
8   A.   That's correct.
9   Q.   Did anybody explain to you what they meant by
10       problems with communication skills in dealing
11       with the public?
12  A.   No.
13  Q.   So you don't know what they were referring to?
14  A.   No.
15  Q.   And the same thing was mentioned in
16       Defendants' Exhibit Number 8.  You said, "I
17       concur."  And there's an entry here that "she
18       is currently showing some problems in the area
19       of communication with the public and other
20       employees along with some poor attitude."

21         Did you intend to concur with that
22      comment?
23   A.  Well, I didn't -- no.  I mean, I disputed
0334
1       the -- you know, I didn't agree with her -- I
2       mean, with what she said.
3    Q.  Okay.  Well, did she indicate to you in detail
4       what kind of poor attitude you have?
5    A.  No, not that I recall.
6    Q.  What type of communications with the public
7       that you had?
8    A.  Not that recall.
9    Q.  Was there ever a performance plan drafted for
10      you to tell you how you should approach the
11      public versus the way you were approaching the
12      public?
13   A.  I'm not sure if there was.  I don't know.
14   Q.  Was it ever given to you?
15   A.  I don't -- I don't recall one given to me.
16   Q.  Try to stay awake a few more minutes.
17   A.  Let me get some water.
18           (Brief interruption)
19   Q.  Let me show you what's been marked by the
20      Defendant as Exhibit 16, this document right
21      here (indicating).
22          I think on direct testimony, you stated
23      that Ms. Sellers had informed you that if you
0335
1       didn't sign that document, you would be
2       considered insubordinate?
3    A.  That's correct.
4    Q.  Did Ms. Sellers present herself as an agent
5       for the Defendant Gordon?
6          Do you understand the question?
7    A.  Yes.
8              MS. NELSON:  Object to the form.
9    Q.  Did you think that Ms. Sellers was providing
10      you this document on behalf of Judge Gordon?
11   A.  Yes.
12   Q.  Do you have reason to believe that Ms. Sellers
13      drafted this document and forged Judge
14      Gordon's name and submitted that on her own
15      behalf?
16   A.  No.
17   Q.  Do you think Ms. Sellers would have told you
18      that if you didn't sign that, you'd be

19     insubordinate without getting prior clearance
20     from Defendant Gordon to tell you that?
21   A.  I would hope not.  I don't know.
22   Q.   So was it your opinion at the time that you
23     were required to sign that in order to keep
0336
1     your job?
2   A.  Yes.
3   Q.   Now, do you remember the first police
4     interrogation that you had?
5          MS. NELSON:  Object to the form.
6   A.  Yes.
7   Q.   Or what the defense has referred to as, I
8     guess an investigation, but it was something
9     you were required to attend, correct?
10   A.  Yes.
11   Q.   And were one or two police officers present
12     when you first -- at the first one you had?
13   A.  Two.
14   Q.   Do you remember when that was?
15   A.  It was in November of 2001.
16   Q.   And that was involving the alleged claim that
17     you referred to somebody as incompetent?
18          MR. JAFFREE:  Object to the form.
19   A.  I don't know about incompetent.
20   Q.   Well, some public defender --
21   A.  Yes.
22   Q.   -- as being incompetent or not knowing what
23     they were doing or something.
0337
1   A.  Yes.
2   Q.   There was an accusation made to that effect?
3   A.  Yes.
4   Q.   And during this police interrogation, did you
5     get the impression that officers involved were
6     attempting to get you to admit --
7   A.  Yes.
8   Q.   -- that you had accused a public defender of
9     being incompetent?
10   A.  Yes.
11   Q.   And told the defendant to obtain the services
12     of somebody else?
13   A.  Yes.
14   Q.   Do you know if they presented the results of
15     their interrogation to Defendant Gordon?
16          MS. NELSON:  Object to the form.

17    A.  I'm not sure if they did or not.  I mean, it
18        was -- I know that it was on my evaluation.  I
19        don't know what the outcome of that was.  I
20        don't know if -- you know, I don't know.
21    Q.   Other than that police interrogation, did the
22        evaluator who placed that information on your
23        evaluation ask you for your side of the story?
0338
 1                MS. NELSON:  I'm confused.  You're
 2                   asking her about what now?
 3    Q.   We're talking about this first incident --
 4    A.   Right.
 5    Q.   -- of police interrogation.
 6    A.   Right.
 7    Q.   And you provided the police with your side of
 8        the story; is that correct?
 9    A.   That's correct.
10    Q.   Then you subsequently saw that incident on an
11        evaluation?
12    A.   Correct.
13    Q.   And my question was, did the evaluator give
14        you an opportunity to give your side of the
15        story before they put that entry in the
16        evaluation?
17    A.   I don't know if Donna did or not.  She's the
18        one that evaluated me.  I'm not sure if she
19        asked me.
20    Q.   Do they generally have -- the evaluators have
21        the evaluations done prior to talking to you?
22    A.   Yes.
23    Q.   So most of the entries are already in there
0339
 1        when they talk to you?
 2    A.   Yes.
 3    Q.   So this entry concerning that event may have
 4        already been placed on your evaluation form --
 5    A.   Yes.
 6    Q.   -- before you got spoken to?
 7    A.   Correct.
 8    Q.   Okay.  And had Donna talked to you or whoever
 9        was the evaluator -- I don't want to go back
10        and try to retrieve that exhibit.  But had
11        Donna and whoever the evaluator had spoken to
12        you and got your version, your version doesn't
13        appear on the evaluation form, does it?
14    A.   No, it does not.

15  Q.  And there's no star indicating that you

16      dispute these facts?

17  A.  That's correct.

18  Q.  And I think you testified earlier that your

19      concurrence did not mean that you agreed with

20      those facts?

21  A.  That's correct.

22  Q.  The next police interrogation, do you know

23      what that was about?

0340

1  A.  Yes, I do.

2  Q.  What was that about?

3        MS. NELSON:  Object to the form.

4  A.  That was the Theron Fondren incident with --

5      an investigation with Sergeant Gary Coleman

6      and Sergeant Ray Owens.

7  Q.  Were you instructed by Defendant Gordon or her

8      agent or servant or employee to attend that

9      interrogation?

10  A.  Yes.

11  Q.  Were you required to -- I'm not sure you

12      signed the form, but they gave you a form

13      telling you that you had to --

14  A.  Yes.

15  Q.  -- attend that interrogation?

16  A.  Well, I signed the forms, too, at the

17      beginning of the interrogation for the police

18      department.

19  Q.  But you don't have access of those?

20  A.  I asked for copies of those, and I was never

21      presented with them.

22  Q.  Okay.  Did you feel, at that interrogation,

23      you were free to leave at any time without the

0341

1      loss of your job?

2  A.  No.

3  Q.  What about the first interrogation that you

4      testified to earlier; did you feel you were

5      free to leave there?

6  A.  No.

7  Q.  So you felt that if you left, there would be a

8      consequence?

9  A.  Sure.

10  Q.  So did you feel you were free to not answer

11      their questions?

12  A.  No.  I was told that I had to cooperate fully.

13  Q.  And if you didn't cooperate fully, what did
14      you think would happen?
15  A.  I would be fired.
16  Q.  Now, did the judge have any time in her busy
17      week in which to talk to you to ask you the
18      same questions that the police officers asked
19      you?
20  A.  She did not.
21  Q.  Did she have the time?
22  A.  I feel like she did, yes.
23  Q.  You said she's off on Fridays?
0342
1  A.  Yes.
2  Q.  So she could have taken the time to ask you
3      your version of events?
4  A.  Yes.
5          MS. NELSON:  Object to the form.
6  Q.  How long do think it would have taken for you
7      to tell her your version of events?
8          MS. NELSON:  Object to the form.
9  A.  Not long.
10  Q.  Like how long?
11  A.  I -- I don't know.  I mean, I don't --
12      depending on how she would ask me if she would
13      ask me questions or if I were just to tell to
14      her what happened.  I don't know how long it
15      would take.  It wouldn't take long.
16  Q.  This is the Fondren, right, the Fondren case,
17      the Fondren matter, the second interrogation?
18  A.  Yes.  Yes.
19  Q.  Now, did Mr. Fondren come to you on that day?
20  A.  Yes, he did.
21  Q.  Did you know Mr. Fondren prior to his coming
22      to you?
23  A.  No, I did not.
0343
1  Q.  Do you have any idea why he picked you out to
2      come visit?
3  A.  I don't know.
4  Q.  Did he mention you by name?
5  A.  Yes, he did.
6  Q.  Did you tell him at the time he mentioned you
7      by name, Mr. Fondren, guess what --
8          MS. NELSON:  Object to the leading.
9  Q.  Did you suggest to Mr. Fondren in any way that
10      he had been falsely arrested?

11   A.  No.
12   Q.  Did you know he had been falsely arrested?
13   A.  I don't remember.  I'm sure I --
14   Q.  Prior to his coming to you?
15   A.  Prior to?  No.  No.
16   Q.  How would you know?
17   A.  I didn't even know -- no.  He just came up to
18        me and asked me.
19   Q.  Prior to his coming to you, did you make a
20        telephone call to him and tell him you wanted
21        to see him?
22   A.  No.
23   Q.  So if the City's version of events is to
0344
1        believe Mr. Fondren came to you and you just
2        told him that he had been falsely arrested?
3              MS. NELSON:  Object to the form.
4   Q.  Correct?
5   A.  That's what they said, yes.
6   Q.  But your testimony was that he told you that
7        he was falsely arrested?
8   A.  Yes.
9   Q.  And did you tell this to the police officers
10        doing the investigations?
11   A.  Yes, I did.
12   Q.  Did you tell this to the judge?
13   A.  I'm not sure if we discussed -- I don't think
14        she went over that with me.  I'm not sure.
15   Q.  But four months later, you suddenly got notice
16        that you were being suspended?
17   A.  Correct.
18   Q.  And during the interim, you don't have any
19        recollection of anybody talking to you, other
20        than the police?  The police talked to you
21        during this interrogation?
22   A.  Correct.
23   Q.  And then four months later, you got a notice
0345
1        telling you that you had been terminated?
2   A.  That's correct.
3              MS. NELSON:  Object to the term
4                  "terminated."
5   Q.  I'm sorry.  Suspended.
6        Did you lose income during the time you
7        were suspended?
8   A.  Yes, I did.

9   Q.  Were you humiliated during the time you were
10       suspended?
11              MS. NELSON:  Object to leading.
12   A.  I was upset.
13   Q.  Did other people in your department know that
14       you were suspended?
15   A.  I'm -- I'm sure they were.  I mean, I'm sure
16       they did.  I don't know.  I mean, I don't know
17       what the judge told them or if anybody told
18       them anything.
19   Q.  Now, after you returned back from your
20       suspension, did you immediately start working
21       or did you have to talk to the judge first?
22   A.  I'm not sure if Nancy and I were told to go
23       there first thing or if it was during the
0346
1        course of the day.  I'm not sure.
2    Q.  It would either have been the first thing or
3        the course of the day?
4    A.  Yes.
5    Q.  Did the judge tell you that somebody was
6        dissatisfied with your attitude?
7    A.  No.
8    Q.  Did the judge initiate the conversation about
9        whether you wanted your job, or did you
10       initiate it?
11   A.  She did.
12              (Brief pause)
13   Q.  Okay.  I'll direct your attention to
14       Defendants' Exhibit 30.  Nancy Martin
15       completed this evaluation; is that correct?
16   A.  That's correct.
17   Q.  December 30?
18   A.  Yes, sir.
19   Q.  And she indicates here on the bottom of the
20       first page that this major offense that you
21       allegedly committed was not during her tenure?
22   A.  Right.
23   Q.  Is that correct?
0347
1    A.  That's correct.
2    Q.  So this marking that she gave you was not
3        something based on her direct knowledge?
4    A.  That's correct.
5    Q.  And on this next page, this item number eight,
6        dealing with the public, was based on that

7    same incident; is that correct?
8  A.  I -- I assume that is.  That's what I
9    understood.
10  Q.  Well, I'll tell you what she said.  "Mary Beth
11    deals with the public satisfactory from my
12    observation.  She was determined to have
13    committed a major offense recently with regard
14    to dealing with dealing with a defendant and
15    what was said to him."
16      So she gave you a bad marking, again,
17    based on something that did not occur during
18    her tenure?
19  A.  That's correct.
20  Q.  So this would be a marking that somebody
21    instructed her to make?
22  A.  I would think so because she -- she didn't
23    know about it.
0348
1  Q.  Who would be in a position to instruct Nancy
2    to put anything on your evaluation?
3  A.  I assumed it would be the department head.
4  Q.  And who would that be?
5  A.  Judge Gordon.
6  Q.  Can you think of anyone else within the
7    magistrate's office of being in a position to
8    instruct Nancy to put some markings on your
9    evaluation?
10  A.  No.
11  Q.  So either she did it on her initiative or she
12    did it at the request of somebody in the
13    position to make that request, right?
14  A.  Yes.
15  Q.  And the only person that could have been was
16    the Defendant Gordon; is that correct?
17  A.  That's correct.
18  Q.  Now, you indicated an Officer Etress -- how do
19    you pronounce his name?
20  A.  Which --
21  Q.  He talked to you about this ticket, this --
22  A.  Etress.
23  Q.  Yeah, Etress.  Did he talk to you in his
0349
1    office or what?
2  A.  Yes, in his office.
3  Q.  Who instructed you to go and talk to him?
4  A.  I don't -- I'm not sure.  I believe he called

5    and asked me to come to his office. I'm not
6    sure if he did or if Judge Gordon did. I'm
7    not sure. I don't remember.
8  Q.  Did you consider that a form of interrogation?
9  A.  Yes.
10  Q.  Did Officer Etress tell you to answer his
11    questions?
12  A.  I believe so.
13  Q.  Did you feel you were free to leave at anytime
14    and not --
15  A.  No.
16  Q.  -- answer his questions?
17  A.  No.
18  Q.  Do you have an opinion as to the consequences
19    of what would happen had you left --
20  A.  I --
21  Q.  -- without his permission?
22  A.  I would've been probably written up or
23    something else happen. I mean, I felt like I
0350
1    had to stay and do what he instructed.
2  Q.  The ticket that he talked to you about, did
3    you have anything to do with that ticket?
4  A.  No.
5  Q.  That was the ticket that you had no knowledge
6    of, correct?
7  A.  Correct.
8  Q.  And you haven't been charged with anything
9    related to that ticket; is that correct?
10  A.  That's correct.
11  Q.  Now, sometime later, the police officers again
12    had you in for interrogation?
13  A.  Yes.
14       MS. NELSON: Object to the form.
15  Q.  And I think you testified about a lie
16    detector?
17  A.  Yes.
18  Q.  Exactly how did that come up?
19  A.  I'm not -- you know, the only thing I know is
20    that Sergeant Gray was adamant that the leak
21    about Mary's investigation came from someone
22    in our office, and that his comment was that
23    if he felt like somebody was lying, he would
0351
1    administer a lie detector test and we could
2    not refuse.

3   Q.  I see.  And did he ask you during that
4       conversation about your -- any contact you had
5       had with Mary?
6   A.  I don't remember if it was the first incident
7       or the second time.  I think it was the second
8       time he questioned me that he asked me about
9       if I had any contact with Mary.
10  Q.  You mentioned that he interrogated you a
11      second time the very next day?
12  A.  I believe it was the next day.
13  Q.  Was the purpose of this interrogation?
14  A.  He asked me if I had any contact with Mary.
15  Q.  Do you have any idea what would have motivated
16      him to ask you about Mary the very next day?
17  A.  I don't know.
18  Q.  Do you know if he asked anyone else about
19      Mary?
20  A.  I don't know.
21  Q.  Okay.
22  A.  I don't know.
23  Q.  And were you honest with him about your
0352
1       contacts with Mary?
2   A.  Yes.
3   Q.  And did you tell him the nature of the
4       contact?
5   A.  Yes.
6   Q.  Did your feel you had done anything wrong?
7   A.  No.
8   Q.  Subsequent to that conversation with -- was it
9       Officer Gray?
10  A.  Yes.
11  Q.  Did you talk with Defendant Gordon subsequent
12      to your conversation with Officer Gray?
13  A.  Other than just that meeting that she had with
14      all of us.
15  Q.  Well, that was prior to --
16  A.  That was prior to that.
17  Q.  But subsequent --
18  A.  No.  Well, other than -- other than putting me
19      on administrative leave.
20  Q.  Did she have a discussion with you when she
21      put you on administrative leave?
22  A.  She just told me -- handed me the memo and
23      told me to hand over my keys.
0353

1   Q.  She didn't ask you your version of events?
2   A.  No.  No.
3   Q.  She didn't ask you, why did you feel the need
4       to talk to Mary?
5   A.  No.
6   Q.  She didn't ask you anything about the nature
7       of your conversation with Mary?
8   A.  No.
9   Q.  So she just said, you're summarily on
10      administrative leave?
11  A.  Yes.
12  Q.  Okay.  And were you subsequently notified that
13      you were terminated?
14  A.  Yes.
15  Q.  You were asked earlier about whether or not
16      you felt the white employees that commit
17      errors should be disciplined, and you said
18      yeah.  But as far as you know, white employees
19      that committed any kind of misconduct, have
20      they been disciplined?
21          MS. NELSON:  Object to the form.
22  A.  I'm sorry?
23  Q.  Are you aware of white employees who were
0354
1       accused of any kind of misconduct being
2       disciplined?
3   A.  Other than just what --
4   Q.  Do you understand the question?
5   A.  Ask me again.
6   Q.  Are you aware of any white employees who were
7       accused of misconduct being disciplined by
8       Defendant Gordon?
9   A.  No, not --
10  Q.  Listen to the question.
11          MS. NELSON:  You don't like her
12              answer.  Let her answer.
13          MR. JAFFREE:  Well, she's not
14              listening to the question.
15  Q.  Listen to the question.
16          MS. NELSON:  No.  You don't like her
17              answer, so you're trying to get
18              her to change it.
19          MR. JAFFREE:  Because, come on,
20              obviously she was disciplined,
21              so she's got to be aware.
22  A.  Oh, I'm sorry.

23           MS. NELSON:  If we're staying here
0355
1               at this late date to determine
2               she was disciplined, I think
3               we're beyond that.
4  Q.  Listen to the question.  Are you aware of any
5      white employees, any white magistrates or
6      other employees who were accused of misconduct
7      being disciplined by the defendant?
8  A.  Yes.
9  Q.  Are you aware of any blacks who were accused
10      of misconduct or errors being disciplined?
11  A.  No.
12           MR. JAFFREE:  And I'm through with
13              her.  I don't have any other
14              questions.  She's exhausted.
15  Q.  Your mind is drifting away from my questions.
16  A.  I thought you were talking about other than
17      me.  I'm sorry.
18  Q.  Or even other than you.
19  A.  Well, I knew --
20           MS. NELSON:  That's all you have?
21           MR. JAFFREE:  Yeah.
22              Not that that's all I
23              have.  It's all I'm going to get
0356
1               because I don't know what I'm
2               going to get out of her, if
3               she'd answer my question.
4           EXAMINATION
5  BY MS. NELSON:
6  Q.  He kept asking you about data entry errors
7      that Eunice and Lavera committed but were not
8      disciplined for.  Tell me all of the data
9      entry errors that they made.
10  A.  Well, I don't -- I mean, I've shared some of
11      them with you today.  I know that there were
12      other magistrates that complained.  I can't
13      tell you specifically which cases they were,
14      but I know that there were numerous mistakes.
15      I know that we had mistakes with the money
16      situation because Valarie Harris, the city
17      auditor, and I talked about that.  She made
18      the judge aware of some of those errors.
19  Q.  Were these like keying errors or entry errors?
20  A.  Both.  Yes.

21  Q.  Now, he showed you this transmittal form.  Why
22     do you void on a transmittal form; it's not a
23     keying error, is it?
0357
1  A.  A keying error?
2  Q.  A keying error, a data entry error?
3  A.  A data entry error?
4  Q.  Yeah, into a computer system?
5  A.  Well, it's -- I mean, I'm sorry.  I don't
6     understand the question.
7  Q.  You handwrote "void" on that transmittal sheet
8     and drew a line through it?
9  A.  Correct.
10  Q.  That was your -- with a pen or pencil with
11     your own handwriting?
12  A.  With a pen.
13  Q.  You were not keying into any type of data
14     entry system or computer or typewriter, were
15     you?
16  A.  I did not key that into -- that one into the
17     computer, no, because I did not have it.
18  Q.  And your attorney -- through your attorney's I
19     guess, more testimony than yours, tried to get
20     you to say that that is a data -- I'm pointing
21     to Defendants' 34 -- your striking through and
22     writing "void" by Stephen Phelps' name as a
23     data error.  Is that your -- you call that a
0358
1     data entry error?
2  A.  That's states what happened to that ticket.
3  Q.  And are you aware that your testimony today is
4     different than the testimony that you gave at
5     the Appeals Board Hearing before the Personnel
6     Board?
7  A.  No.
8         MR. JAFFREE:  Object.  You didn't
9          tell her how it's different,
10          other than stating it's
11          different.
12         MS. NELSON:  I don't have to tell
13          her anything.
14         MR. JAFFREE:  Well, you told her, it
15          was different.
16         MS. NELSON:  Well, I'm just asking
17          her if she's aware it's
18          different.

19   Q.   Are you aware of what Officer Duhaime's
20        testimony was in that hearing?
21   A.   I don't recall his testimony.
22   Q.   Do you have any reason to believe that he was
23        not being truthful at that hearing?
0359
1    A.   I don't know.  I mean, I don't -- I can't
2         testify as to whether he was truthful or not.
3         I can only testify as to what I know.
4    Q.   Would you say that hearing was a year or so
5         ago?
6    A.   It was in 2005.
7    Q.   Would you say your memory was better then than
8         it is now?
9    A.   I don't know.  I mean, I -- about this
10        particular incident?  It could be, and it
11        couldn't be.  I mean --
12   Q.   Are you aware that Eunice or Lavera ever
13        voided -- excuse me, ever struck through a UTC
14        transmittal form indicating that a ticket
15        should be void?
16   A.   No.
17   Q.   And the effect of writing "void" on this
18        transmittal form was that ticket was not
19        entered into the system and it's almost as if
20        that ticket did not exist; isn't that the
21        result of --
22   A.   Well, voided tickets do not get key in the
23        computer.  They don't get assigned a case
0360
1         number.
2                   MR. JAFFREE:  Her testimony was the
3                   ticket was not presented to be
4                   keyed into the computer anyway.
5    Q.   And if Officer Duhaime testified that he gave
6         you the ticket, it's your testimony that he's
7         not being truthful?
8    A.   I did not have that ticket when -- when I
9         swore to this.
10   Q.   When did you remember, you did not have that
11        ticket?  You didn't remember that at the
12        Personnel Board hearing, did you?
13   A.   I don't know.  I don't -- I'd have to look
14        over --
15   Q.   Did you just remember that today?
16   A.   Do what now?

17   Q.  Did you just remember today that you didn't

18      have that ticket when you voided this

19      transmittal form?

20   A.  When I -- when I wrote "void" through there, I

21      did not have that ticket at that time when I

22      keyed them into the computer.

23   Q.  Because you'd given -- you had it and you had

0361

 1      even sworn to it, hadn't you, and then you

 2      gave it back to Duhaime, didn't you?

 3   A.  No, ma'am.

 4   Q.  Did you ever see that ticket?

 5   A.  No, ma'am.  I didn't even sign the ticket, but

 6      I'd sworn to it.  I mean, I didn't even have

 7      it.

 8   Q.  How do you know you didn't sign it?

 9   A.  Because you showed it to me.  I mean, I was

10      showed (sic) it.  I showed -- it was shown to

11      me during the Personnel Board hearing.

12   Q.  And you don't know what Officer Duhaime's

13      testimony was in that regard?

14   A.  I don't recall.  I'd have to go back and read

15      it.  I don't recall.

16   Q.  Do you have any reason to believe he would not

17      be truthful?

18   A.  I don't know unless he was covering for

19      himself to where he didn't get in trouble.  I

20      don't know.

21   Q.  Do you know what contact Mary Turner may have

22      had with him about this ticket?

23   A.  Not other than what was presented at -- at my

0362

 1      hearing.

 2   Q.  Do you remember that part?

 3   A.  No.  I'd have to go back and read it.  I mean,

 4      I don't remember the whole -- the whole

 5      story.

 6   Q.  Now, you said -- and I asked you and your

 7      attorney asked you that on all your

 8      evaluations that I went through with you, you

 9      concurred on the statements that were put in

10      there; is that correct?

11   A.  Yes.

12   Q.  And you did this whether it was Gayle Schwarz

13      or Donna Nicholson or Bettye King or Judge

14      Gordon; isn't that true?

15   A.   Yes.
16   Q.   And you had every opportunity to write down if
17        you disagreed or if you agreed or if you had a
18        question about it, didn't you?
19   A.   I had an opportunity to do that, yes.
20   Q.   And you chose to concur with what was written?
21   A.   Yes.  But that -- that doesn't mean I did not
22        dispute it verbally at the time.
23   Q.   "Dispute it verbally" meaning what?
0363
1    A.   When they were going over that with me as far
2         as maybe stating, you know, or by reading me
3         it, they didn't --
4    Q.   You're saying, you verbally disagreed with
5         them?
6    A.   I -- I could have.  I'm sure I did.  I
7         don't -- I wasn't told or shown anything that
8         if an attorney complained, I wasn't shown
9         anything where a attorney had complained.
10             I'm not going to sit there and say that,
11        yes, I agree with you stating that about that
12        attorney whenever I don't -- I -- I would've
13        said, no, I didn't agree.
14   Q.   Didn't you have an opportunity to ask Donna
15        about it, Gayle about it, Bettye about it, if
16        there was a negative remark on your
17        evaluation?
18   A.   I -- I could have.  I don't remember each and
19        every evaluation, what was said.
20   Q.   Well, you seem to be somebody that has strong
21        convictions or strong will, and if somebody
22        had put down something that was not true or
23        you disagree with, that you would let them
0364
1         know about it.
2    A.   Well, I -- I could have verbally, but I didn't
3         write it down on the actual evaluation.
4    Q.   And it wasn't true and it affected your
5         evaluation, you're telling me it wasn't
6         important enough to you to make more of an
7         issue of it?
8    A.   Well, it wouldn't change it.
9    Q.   How do you know?
10   A.   They can't change the evaluations.
11   Q.   How do you know?
12   A.   I don't -- I don't know of any being able.

13  Q.  You don't know.  Have you ever been a manager
14      for the City of Dothan?
15  A.  No.
16  Q.  So you don't know for a fact that they
17      couldn't change an evaluation, do you?
18  A.  I don't know.
19  Q.  When Officer Etress was talking to you about
20      a -- you were talking about a ticket.  Was
21      this a ticket involving Mary Turner and
22      Bradley Phelps?
23  A.  I don't -- I don't think it was him.  I think
0365
1      it was involving Stephen Phelps, if I'm -- if
2      I'm correct on it.
3  Q.  Etress talked to you about Stephen Phelps?
4  A.  I believe so, yes.
5  Q.  And did that ticket -- I'm sorry.  I thought
6      you said -- did he ask you about your
7      involvement with the Stephen Phelps' ticket;
8      was he talking to you about --
9  A.  Yes.
10  Q.  -- Defendants' 34?
11  A.  Yes.
12  Q.  Was he in any way asking you about Mary
13      Turner's involvement with the --
14  A.  Yes.
15  Q.  -- Stephen Phelps' ticket?
16  A.  From what recall.  I don't -- I mean, I don't
17      know of everything that was said.  But I'm --
18      I'm sure he did.  But I don't recall anything
19      that was said about that.  But I do know it
20      was about this incident.
21  Q.  And you're talking about Stephen Phelps?
22  A.  Yes.
23  Q.  Were you ever questioned about -- and I'm
0366
1      sorry.  I'm either saying it's Bradley Phelps
2      or Brady Phelps.  Were you ever questioned
3      about that?
4  A.  I don't believe I was.
5  Q.  And to your knowledge -- I mean, it was the
6      police department conducting an investigation
7      into some alleged criminal activity by Mary
8      Turner, is what started all this?
9  A.  When I went to Officer Etress, that's when I
10      learned that at that time.

11   Q.   And as an employee of the City who worked in
12        the magistrate's office who, I guess, had some
13        involvement with the Stephen Phelps' ticket
14        who knew Mary Turner and worked with Mary
15        Turner, did you have any reason to question
16        the City's ability or rationale or reason for
17        investigating a serious accusation like that?
18   A.   I'm sorry.  I don't understand.
19   Q.   Did you have any reason as an employee of the
20        city magistrate's office to question the City
21        looking into criminal activity -- alleged
22        criminal activity by your co-employee?
23   A.   Did I have any right to do that?
0367
1    Q.   Did you have any reason to question their
2         rationale for doing that?
3    A.   Well, I didn't question them on that.  I
4         don't -- I don't understand what you're
5         saying.
6    Q.   Well, according to your attorney, you were
7         held hostage and kept in a room and
8         interrogated and --
9    A.   Well, I wasn't allowed to leave.
10   Q.   Well, were you not expected as an employee of
11        the City who might have knowledge of either of
12        a crime being committed or some wrongdoing in
13        your department to cooperate and tell them
14        what you knew?
15   A.   Well, I did cooperate.
16   Q.   Okay.
17   A.   Yes.
18   Q.   I mean, you did have an option of leaving;
19        your option may have been lack of cooperation
20        and you might have lost your job.  Is that
21        what you're saying?
22   A.   Well, I -- that's what -- yes.  Because I was
23        told if I didn't cooperate with them or if I
0368
1         didn't sign something, I would be guilty of
2         insubordination.  So I knew that, you know, I
3         didn't want to lose my job.
4    Q.   In your mind, is that an unreasonable request?
5    A.   I think so.  I think it --
6    Q.   You felt like as an employee you should not
7         have to cooperate?
8    A.   No, not --

```
 9   Q.   You didn't have to tell them what you knew?
10   A.   No.
11   Q.   You were free to leave?
12   A.   Yeah, if I wanted to lose my job.
13   Q.   Yeah.  But --
14   A.   I didn't want to lose my job.
15   Q.   Well, they weren't going to throw you in jail;
16        they weren't going to handcuff you, were they?
17   A.   They -- on the questioning and the way that
18        they were presenting themselves, it was as if
19        I was a criminal sitting in a chair and they
20        were just -- not badgering, but they were very
21        harsh with their tone and the way that they
22        were questioning me.
23             And, no, I could not leave because I had
0369
 1        to answer and cooperate with them.  So I felt
 2        like I had to stay there --
 3   Q.   Did you feel like that was an unreasonable --
 4   A.   -- for my job.
 5   Q.   -- request?
 6   A.   The way that it went about, that first one,
 7        yes, I do.  I feel like that Judge Gordon
 8        should have handled that.
 9   Q.   The first one?
10   A.   I believe that she --
11   Q.   The one in 2001?
12   A.   Yes.  But I also believe on the other one,
13        that it should have -- my department head
14        should've been able to call me in as her
15        employee and talk to me about a situation and
16        give --
17   Q.   I understand that you don't agree with the way
18        that it was handled, but are you aware that
19        other people were questioned?
20   A.   I assume some others were questioned.
21   Q.   And do you know how they were questioned?
22   A.   No.
23   Q.   If the same questions were asked, if they were
0370
 1        called in, if they were told they had to
 2        cooperate?
 3   A.   I don't have any idea because I asked for
 4        copies of things, but I was not given them.
 5   Q.   Are you aware the City has a drug testing
 6        policy, and if you're suspected of using
```

```
 7      drugs, that you're expected to cooperate and
 8      give a drug test or you're going to be fired?
 9      Do you know that's the policy?
10   A.  I'm not sure if that's the policy, but I do
11      know that they can drug test you.
12   Q.  Well, do you think that's unreasonable?
13   A.  No.
14   Q.  They can send you for a drug test and tell you
15      to cooperate or you're going to be fired?
16           MR. JAFFREE:  Let me object.  This
17              is entirely argumentative.
18           MS. NELSON:  No, it's not.
19           MR. JAFFREE:  She's telling you that
20              she thought it was unreasonable,
21              and you're trying to give her
22              some hypotheticals of what --
23           MS. NELSON:  That's not a
0371
 1              hypothetical.  That's a policy
 2              of the City.
 3   Q.  Do you think the City can ask certain things
 4      of its employees --
 5           MR. JAFFREE:  Anyway.
 6   Q.  -- to cooperate?
 7           MR. JAFFREE:  I object to the
 8              badgering of this witness,
 9              trying to make her think like
10              you think, that there was
11              nothing wrong with the police
12              interrogating her by every time
13              a judge decides that they want
14              some information.
15           MS. NELSON:  Well, you have no
16              evidence that it was the judge
17              that wanted that information,
18              number one, or who started the
19              investigations in the first
20              place.
21           MR. JAFFREE:  Well, I think I do.
22           MS. NELSON:  And, you know, your
23              view of the world is that nobody
0372
 1              has to cooperate and a city
 2              cannot have any rules.
 3           MR. JAFFREE:  That's not quite my
 4              view of the world.
```

```
 5              MS. NELSON:  And she can ignore them
 6                all she wants.
 7              MR. JAFFREE:  That's not quite my
 8                view, but I'm just objecting for
 9                the Record.  Okay?
10              MS. NELSON:  Okay.  I believe that's
11                all I have.
12              MR. JAFFREE:  I've got to cover this
13                one area that you just covered.
14                In cross-examination --
15              MS. NELSON:  You don't get to
16                cross-examine your own witness
17                and you can't lead her.
18              MR. JAFFREE:  But you said something
19                that's going to leave a
20                misleading impression, that she
21                gave a different statement than
22                she gave before.
23              MS. NELSON:  She did.
0373
 1              MR. JAFFREE:  And I'm going to cover
 2                that.
 3                EXAMINATION
 4   BY MR. JAFFREE:
 5   Q.   Is it possible that the -- that a police
 6        officer could have left tickets, and before
 7        you got them and examined them, one of the
 8        tickets could have been retrieved by anybody
 9        and given back to the police officer?
10              MS. NELSON:  Object to the form.
11                That's so hypothetical.
12              MR. JAFFREE:  That's hypothetical
13                and it may be likely what
14                happened her.
15   Q.   If a police officer says that he left the
16        tickets, but at the time you examined them,
17        the ticket wasn't present, can those two
18        things both exist?
19              MS. NELSON:  Object to the form.
20                There's no evidence that
21                occurred.  That's totally
22                speculative.
23              MR. JAFFREE:  Well, the evidence is
0374
 1                that Mary Turner retrieved the
 2                ticket and sent it back to the
```

3            police officer in an envelope.

4            That's the evidence.  But the

5            question is whether she --

6       MS. NELSON:  No, it's not the

7          evidence.

8       MR. JAFFREE:  That is the evidence.

9          The evidence is Mary Turner sent

10          the tickets back to the police

11          officer in an envelope.

12       MS. NELSON:  I object to your

13          testifying.  That's not the

14          evidence.

15       MR. JAFFREE:  Well, that's the

16          evidence that I know about in

17          this case.  There's no evidence

18          that she sent the tickets back

19          to the police officer or he came

20          and got them back from her

21          physically.

22       MS. NELSON:  But there is the

23          evidence that she had the

0375

1            ticket.

2       MR. JAFFREE:  Well, there's no

3          evidence that she had the ticket

4          at the time she made this data

5          entry, and I contend that

6          putting any kind of entry on

7          this form is data.

8       MS. NELSON:  You're not here

9          testifying today.

10       MR. JAFFREE:  But my question is to

11          her:

12  Q.  Are those two inconsistent, that he could've

13     left the ticket, but at the time you did these

14     entries, the ticket was no longer there?

15        MS. NELSON:  Object to the form.

16  A.  Yes.

17  Q.  Are these tickets kept in a safe at all

18     times?  So from the time an officer gives them

19     to you until the time you look at them and put

20     in the computer, they're in a safe and nobody

21     else can touch them?

22  A.  No.

23  Q.  Are they where other people who are employed

0376

1    with the magistrate's office can obtain access
2    to these tickets?
3  A.  Yes.
4  Q.  So if some magistrate wanted to come and rifle
5    through some tickets and pull one out, would
6    they have been able to do it?
7        MS. NELSON:  Object to the form.
8  Q.  You understand the question?
9  A.  Yes.
10  Q.  That could've happened, right?
11  A.  Yes.
12  Q.  And you testified earlier that not all the
13    times you're putting the data entry in at the
14    same time he hands you the ticket.  If that
15    had happened, when you went to put this data
16    entry in, this ticket would've been present,
17    correct?
18  A.  Correct.
19        MS. NELSON:  Object to the form.
20  Q.  So if you called him and asked him and he says
21    that he got the ticket or he had voided it
22    out, then your putting "void" is consistent
23    with what he said, right?
0377
1  A.  Yes.
2  Q.  So that could be consistent with his
3    testimony, that he left the tickets and
4    somebody sent them back to him, but you never
5    had the ticket when you put this entry in?
6        MS. NELSON:  Object to form.
7  Q.  You understand that?
8  A.  Yes.
9  Q.  And you understand how that could happen?
10  A.  Yes.
11  Q.  Would that be a difference in your testimony
12    from before?
13  A.  No.  Because at the time I had written that on
14    there, I did not have the ticket.
15  Q.  If you had the ticket and the police officer
16    had not talked to you, would there have been
17    any reason for you to not go ahead and put it
18    in, and on the original, is there any
19    indication that the original was whited out?
20  A.  No.
21  Q.  So you're putting these numbers in, right?
22  A.  Right.

23   Q.   You know, you've got --

0378

1   A.   Well, the tickets are not immediately keyed in
2        the system when an officer turns them in to
3        us.
4   Q.   Yeah.  Well, I understand that.  But if you
5        keyed in these and if the officer -- nobody
6        had told you that they wanted the ticket back,
7        would there be any reason for you not to key
8        in that ticket if you had it?
9            Are you following me?
10  A.   Right.
11  Q.   So, now, you could have keyed it in and
12        whited out, but is there any evidence that was
13        presented to you that this entry had been
14        whited out and voided, written over it?
15  A.   No.
16  Q.   And can you generally tell if something is
17        whited out and you write "void" over it --
18        over Wite-Out?
19  A.   If -- yeah, I mean, I would think so.
20  Q.   I mean, most people can tell because the
21        Wite-Out distorts the words, right?
22  A.   Yes.
23  Q.   So absent of Wite-Out, at the time you put

0379

1        these entries in, there was no ticket?
2   A.   That's correct.
3   Q.   Because there would've been no reason for you
4        not to put the entry in, correct?
5   A.   That's correct.
6   Q.   Is that your testimony?
7   A.   Yes.
8   Q.   Are you comfortable with that testimony?
9   A.   Yes.
10           MS. NELSON:  Object to the form.
11           All that's hypothetical.
12               EXAMINATION
13  BY MS. NELSON:
14  Q.   Do you have any evidence that you left the
15        tickets in a stack and somebody filtered
16        through them and took it out and wasn't there
17        when you did this?
18  A.   There is a basket in the main area where we
19        put tickets that have to be keyed in, that we
20        put those in there.

21   Q.   And it's your testimony that somebody rifled
22        through there and pulled that out, and that's
23        why you didn't have it?
0380
1    A.   It could happen.  I mean, I could've --
2    Q.   But do you have any evidence that it did
3         happen?
4              MR. JAFFREE:  It --
5              MS. NELSON:  No.  I'm asking her
6                 questions now.
7    Q.   You don't have any evidence that that happened
8         do you?
9    A.   I -- I don't understand.
10   Q.   It's just as possible that Mary Turner called
11        you and said, void that ticket --
12   A.   No, ma'am.
13   Q.   -- on Stephen Phelps?
14   A.   No, ma'am.
15             MR. JAFFREE:  That didn't happen.
16   A.   No, that didn't happen.
17             MR. JAFFREE:  Now, you're
18                speculating.
19   Q.   How many times in your career as magistrate
20        have you ever, ever done this before?
21   A.   I don't recall.
22   Q.   And you're under oath.  You've never done it
23        before, have you?
0381
1    A.   I don't know.  I -- I've -- I had -- I've
2         testified to the fact that if tickets are
3         missing when you're keying them in and you
4         don't have it, either the officer --
5    Q.   You track that officer down, you find that
6         ticket, and you get to the bottom of this.
7         You've never voided -- there is never -- there
8         is not a transmittal form on record that
9         you've ever done this to, is there?
10   A.   Not to my knowledge.
11                  EXAMINATION
12   BY MR. JAFFREE:
13   Q.   Have you seen all the transmittal forms?
14   A.   No.
15             MS. NELSON:  I said that she had
16                filled out, and she said, not to
17                her knowledge.
18   Q.   Have you seen all the transmittal forms that

19      you have filled out?
20   A.  No.
21   Q.  Could you have possibly filled out one and
22        wrote "void" on it?
23   A.  It could be possible.  I mean, I'm don't --
0382
1        I'm not saying that it hasn't happened, but
2        I'm not seen that it has.
3                    EXAMINATION
4    BY MS. NELSON:
5    Q.  What do you mean, you've not seen every
6        transmittal form you filled out; you have to
7        sign them, don't you?
8    A.  Ma'am, I have signed a lot of transmittal
9        forms over my years that I was employed.  I'm
10        not --
11   Q.  When do you sign this, when the officer gives
12        it to you -- gives you the ticket?
13   A.  Yes.
14   Q.  And you're certifying that you had all of
15        these tickets when you signed that, didn't
16        you?
17   A.  I did not verify -- I know I signed that, but
18        I did not verify that I had the ticket which
19        matched the transmittal.  That's something
20        that all magistrates -- I know that they have
21        not done.
22              MR. JAFFREE:  Let me ask you this.
23              MS. NELSON:  I'm still asking her
0383
1              questions.
2              MR. JAFFREE:  Oh, okay.
3              MS. NELSON:  I have no questions.
4                    EXAMINATION
5    BY MR. JAFFREE:
6    Q.  All right.  Just one final question.  Are you
7        required to sign the ticket when you put it in
8        the computer?
9    A.  It should be signed when it's put in the
10        computer.
11   Q.  Should it be signed by you if you put it in?
12   A.  Yes.  Well, not if you put it in.  I mean, I
13        can key in other tickets that need to be keyed
14        in the system, but they were sworn to by other
15        magistrates.
16   Q.  But the ticket is supposed to be signed by a

17    magistrate, right?
18    A.  Yes.
19    Q.  Was that ticket signed by a magistrate?
20    A.  No.
21    Q.  Which meant what?
22    A.  That it was wasn't sworn to.  I mean, I
23    don't --
0384
 1    Q.  So when a ticket is signed by a magistrate,
 2    that's when it's sworn to, right?
 3        Is this the ticket here, Defendants'
 4    Exhibit 35?
 5    A.  Yes.
 6    Q.  Where on Defendants' Exhibit 35 should a
 7    magistrate sign?
 8    A.  There (indicating.)
 9    Q.  Where it says, "verified and acknowledged
10    before me this date," judge, and a magistrate,
11    right?
12    A.  Yes.
13    Q.  And so for the ticket to be put into the
14    system, it's got to be signed by a magistrate?
15    A.  Well, there were times that it's happened.
16    If -- if a -- if the magistrate forgets to
17    sign it, we'll get them to sign it, you know,
18    if we pulled the transmittal and found out who
19    swore to it.  It should be signed.
20    Q.  So there's no dispute this ticket was never
21    put into the system?
22    A.  No, it was not.
23    Q.  And you don't know whether or not the ticket
0385
 1    was ever provided by Officer Duhaime or not,
 2    do you?
 3    A.  No, I don't.
 4    Q.  Prior to your hearing, do you recall ever
 5    seeing this ticket?
 6    A.  No.  I mean, I don't recall seeing it.  For my
 7    hearing?  Oh, well, during the investigation
 8    part.
 9    Q.  Yeah.
10    A.  Yeah.
11    Q.  Prior to your administrative hearing, do you
12    recall seeing that ticket?
13        I mean, is there anything about that
14    ticket that stands out, caused you to remember

15      it over the thousands of tickets --
16   A.   No.
17   Q.   -- that you processed?
18   A.   No.
19   Q.   But your signature is not on it?
20   A.   That's correct.
21              MR. JAFFREE:  I have nothing
22                further.
23
0386
1               MS. NELSON:  I have nothing.  Thank
2                 you.
3               (Deposition concluded at 5:55 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23