0001
1         IN THE UNITED STATES DISTRICT COURT
2         FOR THE MIDDLE DISTRICT OF ALABAMA
3               SOUTHERN DIVISION
4
5
   NANCY MARTIN and
6  MARY BETH BRACKIN,
7       Plaintiffs,
8  vs.          CASE NO. 1:05-CV-1172-MEF
9  City of Dothan and
   JUDGE ROSE EVANS-GORDON,
10
       Defendants.
11
12
13
14           * * * * * * * * * * *
15         DEPOSITION OF ROSE EVANS-GORDON, taken
16  pursuant to stipulation and agreement before Sherry
17  McCaskey, Certified Court Reporter and Commissioner
18  for the State of Alabama at Large, in the Dothan
19  Civic Center, 126 N. Andrews Street, Dothan,
20  Alabama, on Tuesday, October 30, 2007, commencing at
21  approximately 9:00 a.m.
22           * * * * * * * * * * *
23
0002
1               APPEARANCES
2   FOR THE PLAINTIFFS:
3   ISHMAEL JAFFREE, ESQUIRE
    Jaffree Law
4   951 Government Street
    Suite 415
5   Mobile, Alabama 36604
6   FOR THE DEFENDANTS:
7   CAROL SUE NELSON, ESQUIRE
    Maynard, Cooper & Gayle
8   Attorneys at Law
    2400 Amsouth/Harbert Plaza
9   1901 Sixth Avenue North
    Birmingham, Alabama  35203
10
11           * * * * * * * * * * *
12           EXAMINATINON INDEX
13   ROSE EVANS-GORDON

14    BY MR. JAFFREE                   4
      BY MS. NELSON                  481
15
16          * * * * * * * * * * *
17              STIPULATIONS
18        It is hereby stipulated and agreed by and
19    between counsel representing the parties that the
20    deposition of ROSE EVANS-GORDON is taken pursuant to
21    the Federal Rules of Civil Procedure and that said
22    deposition may be taken before Sherry McCaskey,
23    Certified Court Reporter and Commissioner for the
0003
1     State of Alabama at Large, without the formality of
2     a commission; that objections to questions other
3     than objections as to the form of the questions need
4     not be made at this time but may be reserved for a
5     ruling at such time as the deposition may be offered
6     in evidence or used for any other purpose as
7     provided for by the Federal Rules of Civil
8     Procedure.
9         It is further stipulated and agreed by and
10    between counsel representing the parties in this
11    case that said deposition may be introduced at the
12    trial of this case or used in any manner by either
13    party hereto provided for by the Federal Rules of
14    Civil Procedure.
15          * * * * * * * * * * *
16
17
18
19
20
21
22
23
0004
1            (Witness waived right to read and
2             sign.)
3              ROSE EVANS-GORDON
4         The witness, having first been duly sworn
5     to speak the truth, the whole truth and nothing but
6     the truth, testified as follows:
7              EXAMINATION
8     BY MR. JAFFREE:
9     Q.   Could you state your full name for the
10         Record?

11   A.   Rose Evans-Gordon.
12   Q.   Have you ever been known by any other name?
13   A.   No.
14   Q.   Do you have a maiden name?
15   A.   Evans.
16   Q.   Oh, okay.  Have you ever --
17        MR. JAFFREE:  By the way, do we agree on
18          the normal stipulations?
19        MS. NELSON:  Yes.
20   Q.   Have you ever sat for a deposition before?
21   A.   Not as a witness, no.
22   Q.   Have you ever administered a deposition
23      before?
0005
1    A.   Yes.
2    Q.   Are you familiar with the purposes of a
3       deposition?
4    A.   Yes.
5    Q.   You understand, of course, that if I say
6       anything that you don't understand or that's
7       not clear, you can ask me to restate it or
8       rephrase it, and I'll do my best to do so.
9    A.   Yes.
10   Q.   Where are you currently employed?
11   A.   City of Dothan.
12   Q.   In what capacity?
13   A.   Presiding judge of the City of Dothan's
14       Municipal Court.
15   Q.   And how long have you held that position?
16   A.   I think this will be my eighth year.
17   Q.   When were you initially hired into that
18       position?
19   A.   December of 1999?
20   Q.   You're not sure?
21   A.   Not sure.  December or November of 1999.
22   Q.   Prior to ascending or getting appointed to the
23       position of judge of municipal court, did you
0006
1       occupy any other positions?
2    A.   I did.
3    Q.   And what was your most recent position that
4       you occupied prior to becoming a judge?
5    A.   Prior to becoming a judge, I was an assistant
6       attorney general in the Attorney General's
7       Office in Montgomery, Alabama.
8    Q.   And from when to when did you occupy that

9     position?
10   A.   From approximately October 1987.  And that's
11       an approximation.
12   Q.   And until you got hired?
13   A.   I did.
14   Q.   And what was your principal job
15       responsibilities as assistant attorney
16       general?
17   A.   It varied.
18   Q.   Well, can you give me some examples of what
19       you did?
20   A.   For example, for a couple of years, I was
21       assigned to the Public Service Commission to
22       represent the using and consuming public's
23       interest at the commission.  I -- I wrote
0007
1       briefs.  I represented state officials sued in
2       their official capacities.  It -- it varied.
3       It depended on what division I was assigned
4       to.  I did a lot of administrative work for
5       boards and agencies.
6    Q.   And did you do any civil work?
7    A.   It was all civil.
8    Q.   Okay.  Did you appear in court --
9    A.   I did.
10   Q.   -- as opposed to administrative bodies?
11   A.   Yes.
12   Q.   What type of court cases did you handle?
13   A.   Primarily, any case against a state official
14       sued in his official capacity, that I was
15       assigned to.  That's what the Attorney
16       General's Office is, the -- the State's
17       attorney.  So any official that was sued in
18       his official capacity, I represented them if
19       that case was assigned to me.
20   Q.   Can you think of any case in particular that
21       you represented a public official?
22   A.   Innumerable.  Prison wardens.  I can't
23       possibly because I was there almost 13 years,
0008
1       I think.  So over the course of that 13 years,
2       I -- I went from department -- I mean, just
3       depended on what I was assigned.  I had no
4       control over my assignments.
5    Q.   So would you say that you was well-grounded in
6       public service jurisprudence?

7    MS. NELSON:  Object to the form.  I don't
8      know if I understand it but you can
9      answer.
10    MR. JAFFREE:  You found some problem with
11      the form?
12    MS. NELSON:  Yes.
13  Q.  Do you know what well-versed means?
14  A.  I do.
15  Q.  Do you know what public service means?
16  A.  Public service, I think, is up to
17      interpretation.
18  Q.  How do you interpret it?
19  A.  Public service is the work of the public good,
20      basically.
21  Q.  Okay.  In case there was some ambiguity, are
22      you well-versed in government employment
23      litigation?
0009
1  A.  No.
2  Q.  Well, you said you represented public
3      officials.
4  A.  They were not necessarily employment issues of
5      a government official.  There might have been
6      liability issues or policy, procedure, not
7      necessarily employment issues.
8  Q.  Did you handle any cases --
9  A.  No.
10  Q.   -- involving employment issues?
11  A.  None that I can remember specifically.
12  Q.  So if a governmental official was sued in his
13      official capacity and it was an employment
14      action or civil rights action dealing with
15      employment, you wouldn't have represented that
16      person?
17  A.  They had in-house lawyers.  For example, the
18      Alabama Department of Corrections, they had
19      in-house lawyers who represented the
20      commissioner specifically.  So, no, is the
21      answer.  I mean, none that I can think of
22      specifically.
23  Q.  Okay.  Well, you said you occupied that
0010
1      position 13 years.
2  A.  I did.
3  Q.  From when to when?
4  A.  Approximately 13 years.  It's from September

5    or October of 1987 until November or December,
6    1999.
7  Q.  In addition to representing governmental
8    officials on the civil side, did you do
9    anything on the criminal side?
10  A.  No.
11  Q.  So you have no criminal law experience at all?
12  A.  Well, I mean, I do but I don't -- I didn't
13    represent criminal defendants.  I -- I've
14    written briefs.
15  Q.  On behalf of who?
16  A.  The State of Alabama.
17  Q.  In criminal cases?
18  A.  No, not -- I mean, not specifically criminal
19    cases.  I guess appeals, criminal appeals.
20    But I never went to court.
21  Q.  You've written criminal appellate briefs?
22  A.  Right.
23  Q.  Many, few?
0011
1  A.  Few, very few.
2  Q.  Do you recall any that you've written?
3  A.  No.  Very early in my tenure there, I was
4    assigned to criminal appeals.
5  Q.  Well, during your 13 years with the Attorney
6    General's Office, did you engage in any
7    private practice?
8  A.  No.
9  Q.  Now, prior to your appointment as an assistant
10    attorney general -- is it appropriate to refer
11    to that as an appointment?
12  A.  It was not an appointment.  It was an
13    employment.  I was not a -- it was not an
14    appointment.
15  Q.  Was it a competitive position?
16  A.  I applied.
17  Q.  Was it a merit system --
18  A.  It was.
19  Q.  So then you was a merit system employee?
20  A.  I was.
21  Q.  Did you have certain rights and
22    responsibilities as a merit system employee?
23      MS. NELSON:  Object to the form.
0012
1  A.  As a -- as an -- as an employee I -- I
2    assume.  Whatever was --

3   Q.  You want me to be a little bit more specific?
4   A.  Well, whatever was given, you know, to
5       employees.  I'm not -- I'm not -- I don't
6       know.
7   Q.  Well, in your view as a merit system employee,
8       would you have the right to continue
9       employment absent good cause shown?
10          MS. NELSON:  Object to the form.
11  A.  I'm not sure I understand the question.
12  Q.  Okay.  Did you feel that, as a merit system
13      employee, you could only be terminated for
14      cause?
15  A.  Did I feel --
16  Q.  Did you feel --
17  A.  -- as a merit system employee?
18  Q.  -- as a merit system employee that you're
19      going to be terminated for cause?
20  A.  Did I feel that?  No.  I -- I mean, I always
21      thought Alabama was an at-will state.  So I
22      never -- I never thought about it, so I never
23      felt about it.  I don't know.
0013
1   Q.  You did say you was a merit system employee?
2   A.  Yes.
3   Q.  And you felt that you could be terminated at
4       will?
5   A.  I always thought -- you know, I've always
6       heard Alabama is an at-will employment state.
7       I mean, that's just --
8   Q.  Did you think that term to be absolute?
9   A.  I didn't -- I didn't care.
10          MS. NELSON:  Object to the form.
11  A.  I mean, I don't know.  I never thought about
12      it.  I always heard, Alabama is an at-will
13      employment state.  And that's just -- I never
14      thought about it.
15  Q.  Did you think when you was an assistant
16      attorney general that if your appointing
17      authority or your superior decided to
18      terminate your services, they had to give you
19      any notice?
20  A.  I never thought about it.  I mean, I -- I
21      assumed.
22  Q.  Did you think you had a right to some kind of
23      hearing?
0014

1          MS. NELSON:  I object to the form, what
2             she thinks.
3    A.  Yeah.  And I never thought about it.  I
4       never -- I never thought about it.
5          MR. JAFFREE:  Well, I shouldn't ask her
6             what she thinks?
7          MS. NELSON:  That's right.  You can ask
8             her what she knows.
9    Q.  Are you capable of thinking?
10   A.  No.
11          MS. NELSON:  Object to the form.
12   A.  Let's put some levity in here as you said
13       yesterday.
14   Q.  Well, did you know that you had a right to a
15       hearing if your superior decided to take some
16       adverse action against you?
17   A.  If I say no, I didn't know that.  I never
18       thought about it.  I was never put in that
19       situation.  I never looked into what my rights
20       were as a merit system employee.  I never
21       looked into it.
22   Q.  So for the 13 years of --
23   A.  I never thought about it.
0015
1    Q.  -- your employment, you never knew that you
2       had any rights?
3    A.  I never thought about it.
4    Q.  Well, did you get any kind of operations
5       manual or employee handbook or --
6    A.  Probably 13 years -- I mean, in 1999 when I
7       was hired, I probably did.
8    Q.  I'm not talking 1999; we're talking about
9       1987.
10   A.  1987, even longer, I probably did.
11   Q.  Okay.  Do you know that merit system employees
12       have a property right interest in continued
13       employment?
14   A.  No.
15          MS. NELSON:  Object to the form.
16   Q.  You don't know that?
17   A.  I don't know that for a fact.  I'd have to
18       research it.  But, no, I don't know that.
19   Q.  Do you know that as a legal scholar?
20   A.  No, I don't know that.
21   Q.  Well, let's talk about your educational
22       background.

23   A.  Please.
0016
1    Q.  Excluding primary and secondary school, did
2        you go to college anywhere?
3    A.  I did.
4    Q.  Where?
5    A.  Fisk University in Nashville, Tennessee.
6    Q.  What did you major in?
7    A.  Political science and public administration.
8    Q.  You majored in both --
9    A.  I did.
10   Q.  -- courses?
11           Were you proficient in your public
12       administration courses?
13   A.  I assume; I graduated.
14   Q.  You passed your public administration courses?
15   A.  I did.
16   Q.  Did you do fairly well in those courses?
17   A.  I assume.  I was salutatorian of my class.
18   Q.  Was that course of study rigorous?
19   A.  I assume.  I didn't have anything to compare
20       it to.
21   Q.  Public administration, does that relate at all
22       to the rights of public officials?
23   A.  I -- I'm sure that's some of the course of
0017
1        study.
2    Q.  And did you discuss the role of public
3        officials in the government square?
4    A.  If it did, it was 28 years ago.
5    Q.  So you have no recollection of what you may
6        have learned in that course?
7    A.  Not specifically, no.
8    Q.  Okay.  Now, after you successfully or rather
9        poorly matriculated through Fisk, having
10       majored in public administration and political
11       science, did you go anywhere else?
12   A.  I did.
13   Q.  And where did you go after you left Fisk?
14   A.  Tulane University School of Law, New Orleans,
15       Louisiana.
16   Q.  And did you matriculate through Tulane?
17   A.  I did.
18   Q.  And did you get a JD?
19   A.  I did.
20   Q.  Did you get any advanced degree beyond a JD?

21   A.  I did.
22   Q.   What advanced degree did you get?
23   A.   I did a major course of study at Ely Broad
0018
 1       School of Management at the University of
 2       Michigan, public policies and procedures
 3       toward my master's.
 4   Q.   And did you obtain a master's in that?
 5   A.   I did not.
 6   Q.   How many years did you spend at Tulane Law
 7       School?
 8   A.   Three or four.  I graduated in 1984 -- '87,
 9       three years.
10   Q.   Was that in New Orleans?
11   A.   It was.  It is.
12   Q.   Well, I just wanted to make sure it was?
13   A.   No.  I'm glad it still is because of the
14       storm.
15   Q.   Well, I understand.
16   A.   I wasn't being sarcastic.
17   Q.   I guess, if it was in New Orleans at the time
18       you went, I guess that's the critical part of
19       this question.  I'm glad, as well, that it
20       still is.
21           Did you take and successfully pass the
22       Louisiana Bar?
23   A.   I did not take the Louisiana Bar.
0019
 1   Q.   Well, let's get back to your law school
 2       career.  Do you recall any of the courses that
 3       you took in law school?
 4   A.   Contracts.  What you take in law school:
 5       criminal procedure, criminal law, contracts.
 6   Q.   Did you take any public administration law?
 7   A.   Constitutional law.  Public administration
 8       law?
 9   Q.   Yes.
10   A.   No, I -- there was -- I worked at -- no.
11   Q.   Any law --
12   A.   I don't -- I don't remember.
13   Q.   Any law dealing with government service?
14   A.   I don't -- no.  If I did, I don't remember
15       specifically.
16   Q.   But you did take constitutional law?
17   A.   I'm sure as part of my core classes I did.
18   Q.   And was that perhaps a year course -- a

19      year-long course?
20   A.  I don't remember whether it was a year or
21      semester.
22   Q.  And did your constitutional law course have a
23      both criminal and civil component?
0020
 1   A.  I don't remember.  Criminal law,
 2      constitution -- I don't remember.
 3   Q.  You don't remember?
 4   A.  Huh-uh (negative response).
 5        MS. NELSON:  Say yes or no.
 6   A.  Yes -- no, I don't remember.
 7   Q.  You don't recall taking any courses or
 8      studying any cases dealing with constitutional
 9      law on the criminal side?
10   A.  Not specifically, no.
11   Q.  All right.  Do you remember studying any First
12      Amendment jurisprudence?
13   A.  Not specifically.
14        MS. NELSON:  Again, I'm going to object to
15           this line of questioning.  If you're
16           trying to question her about courses
17           that she took in 1987 about
18           constitutional law -- the law is what
19           it is -- to try to get her to say that
20           she can, you know, interpret questions
21           of law in this case, I'm going to
22           object to.
23        MR. JAFFREE:  Okay.  I took -- I was in
0021
 1           law school in 1970, and I sort of
 2           remember my constitutional law
 3           question.  But if you don't, fine.
 4        MS. NELSON:  The Constitution, as I
 5           understand it, the Supreme Court
 6           interprets that.  And it -- their
 7           interpretation changes from year to
 8           year as to what the law is.  So you
 9           know, I'm objecting to this line of
10           questioning.
11        MR. JAFFREE:  Sometimes they even go back.
12        MS. NELSON:  Yeah.
13        MR. JAFFREE:  And go back to what it was
14           before.
15        MS. NELSON:  They do.
16        MR. JAFFREE:  Back to --

17          MS. NELSON:  It's ever changing and
18            evolving, isn't it?
19          MR. JAFFREE:  Well, that's a nice
20            theological --
21          MS. NELSON:  It is.  We could debate this
22            all day.
23          MR. JAFFREE:  Maybe philosophical debate
0022
1            between us, but this is my witness
2            here.  And I'd like to ask her some
3            questions along this line.
4    Q.  Did you realize from your constitutional law
5        course that people have first amendment rights
6        to allow them to engage in certain protected
7        speech?
8          MS. NELSON:  Object to the form.
9    A.  And, you know, again I have to say, no.
10   Q.  No?
11   A.  Not from my constitutional law course, I
12        wouldn't -- I don't remember that.
13   Q.  You don't recall any constitutional law
14        courses dealing with protected speech?
15   A.  Not specifically.
16   Q.  Okay.  Did your constitutional law cover the
17        Constitution?  Did it cover, let's say, the
18        First Amendment of the Constitution?
19   A.  I can only assume, and you want me to say yes
20        or no.  So --
21   Q.  Your best guess.
22   A.  I don't remember.
23   Q.  As your best guess, do you think your
0023
1        constitutional law class covered the First
2        Amendment?
3    A.  I'd hate to guess.  You know, I don't --
4    Q.  You'd hate to guess?
5    A.  I don't remember specifically.
6    Q.  Do you remember specifically whether or not
7        your constitutional law course covered the
8        freedom of association?
9    A.  No, I don't remember specifically.
10   Q.  Well, irrespective of what you remember about
11        your constitutional law class that may have
12        been -- you said in 1980 -- have your fairly
13        life-long experience working in the legal
14        profession taught you anything about First

15      Amendment jurisprudence?
16   A.   No.
17   Q.   All right.  Do you know that there is a right
18        to free speech?
19   A.   Yes.
20   Q.   Do you know that this is a right that
21        government-sector employees have?
22           MS. NELSON:  Object to the form.
23   A.   And not specifically.  I know it's right
0024
1         that -- that's in the Bill of Rights as a part
2         of the Constitution.  But, no.
3    Q.   And do you --
4    A.   I don't know what rights government-sector
5         employees have.
6    Q.   And do you know that the rights of free speech
7         includes the right to speak about matters of
8         public concern?
9            MS. NELSON:  Object to the form.  And
10               you're asking her a legal question.
11           MR. JAFFREE:  Should I apologize for that.
12           MS. NELSON:  I said, I just object.  It's
13               a --
14   Q.   Well, let me ask you this.
15           MS. NELSON:  I mean, you're trying to
16               quote her the law --
17   Q.   Let me ask you this.
18           MS. NELSON:  -- without any
19               qualifications.  I just object to the
20               form.  You can ask her if she knows.
21           MR. JAFFREE:  Well, I thought she said
22               that --
23   Q.   Did you finish law school?
0025
1    A.   I did.
2    Q.   Did you obtain a degree, a juris doctorate in
3         law?
4    A.   I did.
5            MS. NELSON:  You've asked her that.
6            MR. JAFFREE:  You said no qualifications.
7                I just wanted to make sure that I
8                understood her qualification.
9    Q.   Did you subsequently take and pass some state
10        bar examination?
11   A.   I did.  Yes.
12   Q.   Were you required as part of passing that

13     examination to be schooled in at least some
14     state's body of law?
15  A.  Yes.
16  Q.  And you did pass, right?
17  A.  Yes.
18  Q.  And whose bar did you pass?
19  A.  Alabama.
20  Q.  Did you take any other bar from any other
21     state?
22  A.  I did not.  No.  No.
23  Q.  So you've only been licensed to practice in
0026
1     Alabama?
2  A.  Yes.  I've only been in Alabama.
3  Q.  Well, that's not totally true.  You at least
4     spent some time in New Orleans.
5  A.  I mean, not after I passed --
6  Q.  I'm just commenting.
7  A.  -- to take the bar.
8  Q.  Yeah, I'm just commenting.
9  A.  I've only lived in Alabama since I finished
10     law school.
11  Q.  Have you at any time from the time you -- by
12     the way, when did you pass the bar exam?
13  A.  If I graduated in May of '87, then June, July,
14     August.  I guess I would have gotten the
15     results in September of '87.
16  Q.  So --
17  A.  No, no, no.  Because I started work in
18     October.  Yeah, September or October '87.  I
19     don't know.
20  Q.  So you may have been a licensed attorney for
21     the last 20 years?
22  A.  Approximately.
23  Q.  Have you lost that license for any reason?
0027
1  A.  No.
2  Q.  So as far as you know, you're still a licensed
3     attorney?
4  A.  Yes.
5  Q.  And as a licensed attorney, are you instructed
6     to know some law?
7  A.  By whom?
8  Q.  By you.
9  A.  I mean, am I expected by whom to know some
10     law?  I don't understand the question.  I'm

11     sorry.
12  Q.  Well, let's just say, if the general public
13     was aware that you had passed the bar exam and
14     you had practiced law for 20 years, that the
15     general public would expect you to know some
16     law?
17        MS. NELSON:  Object to the form.  You can
18           answer.
19  A.  Yeah.  I don't know what he's going for.  I
20     don't under the question.
21  Q.  Well, let me ask you --
22  A.  I mean, I don't -- okay.  I don't remember the
23     specific courses I took in law school nor the
0028
1     specifics.  So I would -- I would lie if I
2     said I did.
3  Q.  You have a judicial position?
4  A.  I do.
5  Q.  And in that position, are you required to
6     dispense law?
7  A.  Dispense law?
8        MS. NELSON:  Object to the form.
9  A.  Okay.  Yes.
10  Q.  Okay.  So is it correct to assume --
11  A.  I don't dispense law.
12  Q.  -- that you should know some law as a judge?
13  A.  Yes.
14  Q.  Okay.  Now, let me ask you this:  Would you
15     agree that since you are an attorney and have
16     been so in good standing for a long time and,
17     further, since you are a judge who, as part of
18     your responsibilities, is dispensing law, that
19     you should not be judged like a layperson
20     appointing authority who is not schooled in
21     the law, that you should be judged by a higher
22     standard?  Would you agree with that?
23        MS. NELSON:  Object to the form.  Judged
0029
1           by whom?
2  A.  And/or what?  No.  Because there are certain
3     areas of the law, for example, property law,
4     that I've never practiced, never researched,
5     never -- copyright law, never practiced, never
6     researched, never -- so it would be unfair to
7     judge me on those, even though I've been to
8     law school.  Intellectual property law, I've

9    never practiced.
10        So no, I don't think I should be judged by
11    a higher standard if I've never studied that
12    body of law just because I went to law school.
13  Q.  However, you have the capacity to understand
14    certain areas of the law that you don't
15    specialize in; is that correct?
16        MS. NELSON:  Object to the form.
17  A.  Do I have the capacity to understand it?  I --
18    I don't know.  I don't know.  I've never
19    tried.
20  Q.  You don't know whether you have the capacity
21    to understand certain areas of the law?
22  A.  Certain areas.  I think all areas if I have
23    opportunity to learn it and research it.
0030
1   Q.  So in First Amendment jurisprudence you should
2     be considered a neophyte?
3   A.  Yes.
4         MS. NELSON:  Object to the form.
5         THE WITNESS:  I'm sorry, Carol Sue.
6         MS. NELSON:  I'm just objecting to form.
7         You can answer.
8   A.  Yes, I would be a neophyte because I've never
9     dealt with it.
10  Q.  And in public service litigation, you should
11    be considered a neophyte?
12        MS. NELSON:  Object to the form.
13  A.  Yes.  Because I don't know what public service
14    litigation is.
15        MS. NELSON:  Nor do I.
16  Q.  And civil rights litigation, you should also
17    be considered a neophyte?
18        MS. NELSON:  Object to the form.  She's a
19        municipal court judge.  She said
20        she -- I don't know that she ever said
21        she's a civil rights lawyer.
22        MR. JAFFREE:  Well, I'm asking her.
23  Q.  Do you know any civil rights law?
0031
1   A.  It's -- yeah.
2   Q.  Would you consider yourself a neophyte?
3         MS. NELSON:  Object to the form.
4   A.  A neophyte?
5         MS. NELSON:  What do you mean by that?
6         THE WITNESS:  New to the law of -- new I

```
 7        guess.
 8        MR. JAFFREE:  What does a neophyte mean to
 9          you?
10        MS. NELSON:  Well, you asked the
11          question.  What do you -- what are you
12          asking her, is she a neophyte?
13        MR. JAFFREE:  Well, is this witness unable
14          to understand what that term is?
15   A.  I am.  Could you define it for me, please.
16   Q.  Some person with no knowledge, no skills, just
17       a babe in the woods as far as the subject is
18       concerned.
19          Would you like a clearer definition?
20        MS. NELSON:  And what -- your question is
21          what?  Is she -- with that -- with
22          your definition, is she a neophyte as
23          to what?
0032
 1          THE WITNESS:  Civil rights.  I'm sorry.
 2        MS. NELSON:  Civil Rights law?
 3        MR. JAFFREE:  Yeah, that's my question.
 4        MS. NELSON:  What kind of Civil Rights?
 5        MR. JAFFREE:  Do you want to be the
 6          witness?
 7        MS. NELSON:  Well, I mean, there are a lot
 8          of civil rights out there.  I'm trying
 9          to get you -- to understand what your
10          asking her and why.
11   Q.  Title VII litigation.  Would you be a neophyte
12       in Title VII litigation?
13   A.  Yes.
14   Q.  Would you be a neophyte in 1981, 1983
15       litigation?
16   A.  I hate to say I'm neophyte.  I mean, I've --
17       I've, of course, represent -- yes, I will be a
18       neophyte in that, yes.
19   Q.  All right.  How did you learn about the
20       judgeship opening?
21   A.  A lady named Carol Jean Smith.
22   Q.  Who is she?
23   A.  She was an assistant attorney general in the
0033
 1       Attorney General's office in 19 -- for several
 2       years, I'm sure, but in 1998 or '99 when I
 3       heard about it.
 4   Q.  She told you about there was a position
```

5      available?
6   A.  She did.
7   Q.  Was this --
8   A.  Yes.  I'm sorry.
9   Q.  What was I getting ready to ask you?
10  A.  No.  They told me to say yes or no, and I said
11      she did.
12      MS. NELSON:  That's fine.
13  Q.  Okay.  I thought you was anticipating my
14      question.
15          Do you know who was in the running for
16      this position prior to you're being hired in
17      that position?
18  A.  No.
19  Q.  Was it another black female that was
20      considered as far as you know?
21  A.  As far as I know now.  I didn't know then who
22      was in the running.
23  Q.  But you do know now.  Do you know what her
0034
1       name was?
2   A.  Yes.
3   Q.  What's her name?
4   A.  Kalia Lane.
5   Q.  Kalia Lane?
6   A.  Yes.
7   Q.  And she was considered for the position?
8   A.  That's my understanding.
9   Q.  Now, did you learn about it at the time she
10      was being considered or after she had been
11      rejected?
12      MS. NELSON:  She just answered that.  You
13          can answer again.
14  A.  Did I -- did I learn about her?
15  Q.  Yeah.  Now that you know that she was applying
16      for the position and --
17  A.  Right.
18  Q.  -- was seriously considered, at the time you
19      learned about it, was it during the time she
20      was being considered or subsequent to her
21      consideration?  If you know.
22  A.  Yeah, I don't know.
23  Q.  All right.  So this -- I forgot what you said
0035
1       her name was -- this person that works in your
2       same department told you about a job opening?

```
 3   A.   Carol Jean Smith.  Yes, she did.  She wasn't
 4         in my department.  But, yes, she did tell me
 5         about the --
 6   Q.   And then you applied for it?
 7   A.   I did.
 8   Q.   How?
 9   A.   I don't remember.  When you say "how," I
10         think -- I assume I sent a resume.  I don't
11         remember.  I really don't.  I've thought about
12         it several times, and I don't remember.
13   Q.   In response to my request for production, did
14         you have to look back through your documents
15         and see if you sent a resume or an application
16         or anything?
17   A.   I mean, I don't -- I don't know.  I don't -- I
18         wouldn't have kept it.  If I sent them a
19         resume, I would have just sent them a standard
20         copy of my resume at the time and a cover
21         letter.
22   Q.   So you don't know how the City learned about
23         your interest in the job?
0036
 1   A.   No, I don't know specifically how.  I assume
 2         they got my letter and my resume.
 3   Q.   Okay.  Well, do you know when you sent that
 4         letter or resume or other document?
 5   A.   No, not specific dates, I don't.
 6   Q.   Is it possible that you didn't send anything?
 7   A.   I don't think that's possible, but I --
 8   Q.   But you don't know?
 9         MS. NELSON:  I think she's asked and
10             answered.
11   A.   Yeah.  I don't think -- how would they know me
12         if I didn't send a resume?
13   Q.   Well, you could have sent a letter.
14   A.   Well, you said that I didn't send anything.
15         So no, I don't think that's possible.
16   Q.   You could have made a phone call.
17   A.   No, I don't think that's possible.
18   Q.   Somebody could have selected you as opposed to
19         you selecting them?
20         MS. NELSON:  Object to the form.  Is that
21             a question?
22         MR. JAFFREE:  She asked me a question.
23             I'm responding.  I'm giving her
0037
```

```
 1         hypotheticals.
 2   A.  I don't know how they would know me.  I didn't
 3       live here.
 4   Q.  Okay.  Well, so somehow you submitted
 5       something --
 6   A.  Right.
 7   Q.  -- I guess for they --
 8   A.  I know I did.  I don't know what.
 9   Q.  -- learned about you somehow.
10         And then what happened?
11   A.  I was interviewed and --
12   Q.  I mean, you submitted something; you was
13       interviewed.  Did anybody contact you?
14   A.  Yes, somebody contacted me, I'm sure.
15   Q.  Who contacted you?
16   A.  I don't remember.
17   Q.  Was it a male, female?
18   A.  I don't remember.
19   Q.  Was it the mayor of the city?
20   A.  I don't remember who contacted me to meet.
21   Q.  Or was it somebody who was in a position to
22       contact you and talk to you about this
23       position?
0038
 1         MS. NELSON:  She said she didn't remember.
 2   A.  Yeah, I don't remember who I -- I really don't
 3       remember who I talked to.
 4         MR. JAFFREE:  Well, maybe she remember the
 5           status of the person.
 6   Q.  Or somebody contacted you?
 7   A.  I don't remember them so I can't remember
 8       their status.  Somebody contacted --
 9   Q.  You're quite sure that it wasn't a maintenance
10       worker that contacted you?
11   A.  I don't know.
12   Q.  All right.  Well, what did they tell you when
13       they contacted you?
14   A.  I don't remember.  I -- I don't remember.  I
15       mean, I just assume it's just set up an
16       interview, like when you apply for a job and
17       people call and say, we have you scheduled for
18       interview.
19   Q.  Do you generally have difficulty with your
20       memory?
21         MR. JAFFREE:  Object to the form.
22   A.  Yes, as I get older, Mr. Jaffree.
```

23    Q.  Let me ask you the question that your counsel
0039
1        has been asking my clients.  I try to avoid
2        some of the preliminary stuff.
3            But are you on any medication that would
4        affect your memory?
5   A.  Not that I'm aware.
6   Q.  Do you have any disability that would affect
7        your memory?
8   A.  Age.
9   Q.  Or affect your ability to answer truthfully to
10       the questions I'm going to ask you?
11  A.  Age is the only thing.
12  Q.  Are you on any kind of drugs or alcohol or
13       anything would affect your answering
14       truthfully to the questions I'm going to ask
15       you?
16  A.  No.
17  Q.  So other than age, you don't think there's
18       anything else that would affect your memory
19       that would cause you not to be able to respond
20       to the questions I'm going to ask you?
21  A.  Stress.
22  Q.  Are you under stress, now?
23  A.  Yes.
0040
1   Q.  Why are you under stress?
2   A.  Because I don't understand your questions.
3   Q.  Okay.  I'm sorry.  Well, I'm probably older
4        than you.
5            Anyway, so somebody called you.  And did
6        they ask you to come in for an interview?
7   A.  Yes.
8   Q.  And do you remember when you came in for the
9        interview?
10  A.  Not the specific date, no, sir, I don't.
11  Q.  Do you remember what month it was?
12  A.  No, sir, I don't.
13  Q.  Do you remember what year it was?
14  A.  1999.
15  Q.  Good.  Now, do you remember what season of the
16       year it was?
17  A.  No, sir, I don't.
18  Q.  Spring, fall, winter?
19  A.  I feel bad, but I really don't.
20  Q.  Let me see if I can help you.  You think you

21    may have started sometime in November of 1999.
22  A.  Right.  Yes.
23  Q.  How many months was it before you started?
0041
1  A.  That what?
2  Q.  That you came in for an interview.
3  A.  How many months before?  I mean, if -- if I
4    say two or three, I would be lying because
5    I -- I mean, I wouldn't be lying.  I don't
6    know.
7  Q.  I'm not going to consider you're lying.
8      MS. NELSON:  If you remember.
9  Q.  Give me your best guess.
10  A.  I don't remember.  I -- I sent in a resume.
11    They called me and said you have an
12    interview.  And I came.
13  Q.  All right.  Do you remember who you
14    interviewed before?
15  A.  I interviewed -- no.  I interviewed -- no.
16    Now, I can tell you, they were employees of
17    the City of Dothan.  I don't specifically
18    remember who they were now, like, you know --
19  Q.  Do you know how long the interview process
20    took?
21  A.  The entire interview process or each
22    interview?
23  Q.  How many interviews did you submit to?
0042
1  A.  I think about three.
2  Q.  Well, what about the first one, any idea how
3    long it took?
4  A.  No idea how long it took.
5  Q.  Any idea what questions they asked you?
6  A.  They asked -- they had my resume.  They asked
7    me about stuff that was on my resume, and they
8    just asked me questions about my legal
9    experience and, you know, what I -- why did I
10    want the job.
11  Q.  But did you tell them that you were a neophyte
12    in municipal law?
13  A.  I don't remember.
14  Q.  How many of these people that you don't
15    remember were there that were asking you the
16    questions on the first interview?
17  A.  Approximately three or four.
18  Q.  Okay.  How long after the first interview did

19     you submit to a second interview?
20  A.  Very shortly thereafter, within a matter of
21     weeks.  I don't -- no, I don't remember
22     specifically.
23  Q.  Do you remember, was it different people on
0043
1     the second interview committee or the same
2     people or --
3  A.  I think it was a combination of people that I
4     had met and maybe some new people that --
5  Q.  How many --
6  A.  I don't remember.
7  Q.  How many on the second interview committee,
8     any idea?
9  A.  I saw three or four people.
10  Q.  Did they ask you any different questions?
11  A.  No.  And in fact --
12  Q.  Same questions?
13  A.  Well, yeah.  I think that some of the people
14     that I met the second time, I had not met in
15     the first interview.  So I'm sure we did go
16     back over the -- and the all questions were
17     about my resume and why did I want the job and
18     that type stuff.
19  Q.  Did you think you submitted to a third
20     interview?
21  A.  Yes, I do.
22  Q.  And how long was that after the second
23     interview?
0044
1  A.  Very shortly thereafter.  I mean, it -- they
2     all went very quickly.
3  Q.  So all three of the interviews were very close
4     together, compressed?
5  A.  Yes.
6  Q.  To the best of your recollection?
7  A.  Yes.  Thank you.
8  Q.  And do you remember who it was that
9     administered the third interview?
10        MS. NELSON:  Object to the form.
11        "Administered?"
12  Q.  Do you understand what I mean by administered?
13     It's not a term of art.  If it will be
14     helpful, I will say, who participated in the
15     third?  I'm not trying to use words to trick
16     you.  Who participated in the third

17     interview?
18  A.  Me and about three or four other people.
19  Q.  Same people?
20  A.  I don't remember.
21  Q.  Same questions?
22  A.  I think so.
23  Q.  So pretty much three times you submitted to
0045
1     interviews, it was some of the same people and
2     they kept repeating the questions that they
3     asked you?
4  A.  To the best of my memory.
5  Q.  Does that seem odd to you?
6  A.  No.
7  Q.  Does it seem redundant?
8  A.  No.  I mean, all --
9  Q.  Does that seem meaningless?
10  A.  -- basically the same thing.  No.
11  Q.  Well, when did you discover that you had the
12     position?
13  A.  When somebody called me or sent me a letter.
14     I don't -- I mean, I was notified that I had
15     it -- that I had it.  I don't remember how.
16  Q.  All right.  Let me shift gears here, and I'll
17     get back to that, because I don't want to go
18     too far afield before I -- let me see if I
19     could give the court reporter more work to do.
20       MR. JAFFREE:  And I'm apologizing on the
21       Record for the lack of professionalism
22       in my Notice of a Deposition.  When
23       you're rushing and doing three things
0046
1       at the same time and don't have a
2       secretary, sometimes you have to
3       improvise and compromise on your time.
4       But anyway, be that as it may.
5  Q.  Did anyone give you a copy or tell you about a
6     notice of this deposition?
7  A.  Yes.  Why?
8  Q.  And did they indicate that there was a series
9     of documents that you were supposed to bring
10     with you?
11  A.  Yes.
12  Q.  Well, let's go over them.  Number one on this
13     notice was a memo dated somewhere around
14     December the 1st from Lieutenant Cliff

15        Garrett.  Did you bring that?
16   A.  No.
17        MS. NELSON:  If I could state for the
18        Record, you did send me an e-mail
19        notice.  I did provide it to the
20        judge, ask her to look for these
21        documents.  I did want to serve you
22        with just some general objections.
23        But you can ask her about each one.
0047
1         But, you know, I do have documents
2         that she was able to locate that you
3         asked for that was -- but they're not
4         otherwise objectionable.  But with
5         that, we'll go forward.
6    Q.  Was there a reason you didn't bring with you
7         this memo dated December the 1st from
8         Lieutenant Garrett?
9    A.  We couldn't find one.
10   Q.  You couldn't find one?
11   A.  No.
12   Q.  Did you contact Lieutenant Garrett and ask him
13        if he had a copy of his memo?
14   A.  No.
15   Q.  Did you contact Captain John Gardner --
16        MS. BRACKIN:  Givens.
17        MR. JAFFREE:  Givens?  It's not Gardner?
18        MS. BRACKIN:  Captain Givens.
19   Q.  It that the reason because there was no letter
20        to John Gardner?
21   A.  We couldn't find a memo from Lieutenant Cliff
22        Garrett to a Captain John Gordon -- Gardner.
23   Q.  So it may have been a misprint on a name
0048
1         there.  Okay.
2         What about letters sent to you by Fran
3         Bailey when she resigned?
4    A.  I didn't -- I didn't have one.
5    Q.  Do you remember Nancy discussing that letter
6         yesterday during her deposition?  Nancy said
7         she looked at it and Ms. Bailey shared her a
8         copy?
9         MS. NELSON:  There was one in her
10        personnel file that I produced to you,
11        but I don't know that Judge Gordon had
12        a copy of it.

13   Q.   You want to look at it, Judge?
14              (Witness looked at document.)
15   Q.   Did you -- did you have a copy of this letter
16        that she said that she addressed to Nancy
17        concerning her resignation plans?
18   A.   No.
19   Q.   Well, if Nancy testified yesterday that
20        Ms. Bailey said part of the reason why she was
21        resigning was because of the disparate
22        treatment between magistrates, would you be in
23        a position to dispute that testimony?
0049
 1              MS. NELSON:  Object to the form.  And I
 2         don't believe that was her testimony.
 3              But you can answer.
 4   Q.   Well, if that was her testimony, would you be
 5        in a position to dispute that?
 6   A.   Do I dispute it?  Is that your question?
 7   Q.   Yeah.
 8   A.   Would I be in a position to --
 9   Q.   One of the reasons that Fran Bailey indicated
10        that she was resigning was because of
11        disparate treatment that she was --
12   A.   That she was subjected to, or somebody else
13        was subjected to?
14   Q.   Well, that she experienced?
15              MS. NELSON:  Object to the form.
16   A.   That I treated her differently than another
17        similarly situated typist clerk?
18   Q.   No.  The disparate treatment of magistrates?
19   A.   She wasn't a magistrate.
20   Q.   Well, maybe she observed magistrates?
21   A.   I don't --
22   Q.   Was she in a position to observe magistrate
23        treatment?
0050
 1   A.   I don't -- I don't -- she was a clerk typist.
 2        She was a file clerk.
 3   Q.   And my question, was she in a position to
 4        observe magistrates?
 5   A.   Physically or assigned to a position or --
 6   Q.   Well, I mean, did she work along with them;
 7        did they work in the same physical --
 8   A.   Location?
 9   Q.   -- place?
10   A.   Yes.

11    Q.  Were they working in close proximity to each
12        other?
13    A.  They were all in the same office.
14    Q.  Could they observe each other on a regular
15        basis?
16    A.  Yes.
17    Q.  Okay.  So you think that Ms. Bailey may not
18        have been in a position to observe magistrates
19        being treated differently?
20        MS. NELSON:  Object to the form.
21    A.  I do -- yes.  I do object to that or dispute
22        that she could observe them treating
23        differently because I didn't treat them
0051
1    differently.
2        MR. JAFFREE:  Is this the defendants'
3          response to request number two?  Is
4          that submitted as defendants'
5          response?
6        MS. NELSON:  Well, you asked for a letter
7          sent to Judge Gordon by Fran Bailey
8          and -- upon her resignation.  And to
9          my knowledge, that is a letter to
10          Judge Gordon.
11        MR. JAFFREE:  Can you mark this as
12          Plaintiffs' Exhibit 1?  I guess I
13          should mark it, shouldn't I?
14        MS. NELSON:  I think it will go faster if
15          you marked it.
16            (Plaintiffs' Exhibit 1 was marked
17              for identification.)
18        MR. JAFFREE:  And at least for the Record,
19          Plaintiffs' Exhibit 1 is a letter
20          dated July 15th, '07, from Fran Bailey
21          to Defendant Judge Gordon.
22    Q.  Item number three, I asked for, was all memos
23        issued by you to the Judicial Department
0052
1        and/or staff during the period of April the
2        1st, 2001, until December the 31st, 2005.
3            Did you produce the memos that were
4        sent to -- well, were there any missing, memos
5        that you could have --
6        MS. NELSON:  Well, I'm about to provide to
7          you --
8        MR. JAFFREE:  Well, while you were doing

9      that, I was just trying to ask this

10     witness --

11     MS. NELSON:  Oh, excuse me.

12     MR. JAFFREE:  -- if she recalls whether or

13     not some was missing from the group

14     that's she's given me.

15  A.  Not specifically.

16     MS. NELSON:  I'll object to the form.

17     Missing from what?  You don't even

18     know what's she's giving you.

19     MR. JAFFREE:  Well, I'm asking her, is the

20     memo -- what she's giving me complete,

21     or if there's some memos that she

22     issued to the staff that she don't

23     have anymore.

0053

1     MS. NELSON:  And how do you -- you're

2     assuming --

3     MR. JAFFREE:  I'm not assuming anything.

4     I'm asking.  I mean, maybe she would

5     know that there are some memos that

6     somehow got destroyed or that she

7     can't find or don't have.  I'm asking

8     her the question.  I mean, she's

9     competent to the extent that she knows

10     whether or not any of the memos that

11     she issued to the staff are not

12     included in this group she's giving

13     me.

14  Q.  You are competent to answer that, aren't you?

15     MS. NELSON:  Well, and I'm -- and if I

16     could just state for the Record, some

17     memos have been provided in the

18     documents I've previously given to

19     you.  I mean, she made search of

20     other --

21     MR. JAFFREE:  Not many.

22     MS. NELSON:  -- memos but --

23     MR. JAFFREE:  I mean, those boxes of

0054

1     documents that took me forever to go

2     through doesn't have very many memos.

3     MS. NELSON:  Well, within personnel files,

4     there are memos.  There are memos.  I

5     mean, she made a diligent search of

6     memos that she could locate or could

```
7            be located.  Now, whether it covers
8            every --
9        MR. JAFFREE:  Can I get her to testify to
10           that?
11       MS. NELSON:  You can.  If you're asking --
12       MR. JAFFREE:  I mean, your attorney is
13           trying --
14       MS. NELSON:  -- it a way that assumes
15           she --
16       MR. JAFFREE:  I have so many -- I have to
17           admire your attorney.
18           (Court reporter interrupted for
19               clarification.)
20       MR. JAFFREE:  We're ignoring your
21           difficulty, and I apologize for that,
22           at least on my part.
23   Q.  I appreciate your attorney trying to be very
0055
1        diligent and doing a very good job in helping
2        you.  But if I could get a response to my
3        question:
4            Are you aware of any memos that you have
5        submitted to the staff that's not included
6        with this group that you've given me?
7    A.  No.
8    Q.  Okay.
9            (Plaintiffs' Exhibit 2 was marked
10               for identification.)
11   Q.  So now, in item number four, I asked for a
12       series of documents.  And I may have asked for
13       these same documents in our request for
14       production.  If I can get to item number four
15       since we're talking about request for
16       production, Judge Gordon, were you aware that
17       on or about December the 25th, I forwarded to
18       your attorney a request for production of
19       documents?
20       MS. NELSON:  I'm not sure what you're
21           showing her.
22           (Brief pause)
23       MS. NELSON:  You're showing her a request
0056
1            of documents propounded to the
2            Defendant City of Dothan?
3        MR. JAFFREE:  Yes.  I'm asking her, was
4            she aware that I propounded a request
```

5        for those documents.
6      MS. NELSON:  Again, I don't know.  It's to
7       the City.  I don't know if she -- do
8       you know?
9     MR. JAFFREE:  I'm --
10    MS. NELSON:  Yeah.
11  Q.  The City doesn't have any fingers and arms, so
12    the City asked somebody.  So I'm going to ask
13    you some questions about that.
14     MS. NELSON:  Well, number one, I don't
15      know -- you didn't get an answer from
16      her if she was aware that that had
17      been propounded to the City.
18  Q.  Well, were you?
19  A.  No.
20  Q.  You never saw that document before?
21  A.  No.
22  Q.  Do you know from your own knowledge who with
23    the City responded to that?
0057
1  A.  No.
2  Q.  I know they responded through the attorney.
3    Well, do you know who the appointed authority
4    is for the magistrates' office?
5  A.  Point of authority for the --
6  Q.  The appointing authority.  Who is the
7    appointing authority for the magistrates'
8    office?
9  A.  I don't understand the question.
10     MS. NELSON:  The appointing authority?
11     MR. JAFFREE:  Yeah, the appointing
12      authority.
13  Q.  Are you familiar with that term, "appointing
14    authority?"
15  A.  Magistrates aren't appointed.  They're
16    employed.
17  Q.  Who is the appointing authority?  Are you the
18    appointing authority?  Is that a title you
19    occupy, appointing authority?
20  A.  No.
21  Q.  You don't occupy that title?
22  A.  I don't -- we don't appoint magistrates.
23    They're employed.  It's not an appointment.
0058
1  Q.  Do the personnel rules refer to an appointing
2    authority?

3        MS. NELSON:  If you know.
4    A.  I don't know.  I don't know if -- if the
5        personnel rules refer to an appointing
6        authority, no.
7    Q.  You don't.
8            (Brief pause)
9    Q.  Are you're familiar with the City of Dothan
10       Civil Service Act?
11   A.  No.
12   Q.  Huh?
13   A.  No.
14   Q.  You're not familiar with this Civil Service
15       Act?
16   A.  No.  I mean, I'm familiar with the name, Civil
17       Service Act, but not the -- what it -- I'm not
18       familiar with the specifics of the City of
19       Dothan's Civil Service Act.
20   Q.  Let me show you what it says about Section 21
21       of the Civil Service Act.  And can you read
22       the first sentence of that section?
23   A.  First sentence of Section 21, Discharges?
0059
1    Q.  Yeah.
2    A.  "The appointing authority may discharge an
3        employee in the classified service whenever he
4        considers the good of the service and the
5        welfare of the City will be best served,
6        thereby, by making" --
7    Q.  Can you stop right there?
8    A.  I didn't finish the sentence.
9    Q.  Well, go ahead.  I'm sorry.
10   A.  "Thereby, by making and filing in his office
11       an order to that effect, together with the
12       reason defined for the discharge.  However,
13       the power to discharge shall not be
14       capriciously or arbitrarily exercised in any
15       case."
16   Q.  Okay.  Can you stop now, or are you still
17       reading the sentence.
18   A.  Well, you asked me to read the first sentence
19       and --
20   Q.  Well, I'm --
21   A.  -- I've not finished the sentence.
22   Q.  But I'm empowering you to not have to read the
23       whole sentence?
0060

1   A.  Okay.
2   Q.  Okay?  Now, if I could have the document
3       back.
4       MS. NELSON:  Can I see just what you're
5           showing her here?
6           (Brief recess)
7       MR. JAFFREE:  I don't have time for
8           counsel to read the whole document.
9       MS. NELSON:  Well, I mean, you're showing
10          her a document that I'm not sure what
11          is.  It says Civil Service Act, but I
12          have no idea if it's --
13      MR. JAFFREE:  Are you not familiar with
14          that act --
15      MS. NELSON:  Well, I don't know if --
16      MR. JAFFREE:  -- that's been part of this
17          case the whole time?
18      MS. NELSON:  I don't know that you've ever
19          asked me to produce it.  I don't know
20          if this is the one -- if this is the
21          most current one.
22      MR. JAFFREE:  Well, I mean, sanction me --
23      MS. NELSON:  Or the one in effect nor or
0061
1           at the time.
2       MR. JAFFREE:  Well, sanction me if somehow
3           I'm misleading -- giving people wrong
4           information.
5       MS. NELSON:  Well, I have a right to look
6           to see what you're showing her.
7   Q.  But let me ask you this:  Having read that,
8       are you now familiar with the term "appointing
9       authority?"
10  A.  No.
11  Q.  You're still not familiar with that term?
12  A.  I -- I didn't read it in context.
13  Q.  Well, are you familiar with Ms. Mary Brackin?
14  A.  Familiar?
15  Q.  Are you familiar with Ms. Mary Brackin, the
16      plaintiff here next to me?
17  A.  No.
18  Q.  Excuse me.  You didn't mean to say no.  Do you
19      know Mary Brackin, the plaintiff, next to me?
20  A.  Do I know her?
21  Q.  Have you ever heard of her?
22  A.  Yes.

23   Q.  Okay.  And you know that she was a civil

0062

1     service employee in the classified service?

2  A.  Yes.

3  Q.  And you did have some role in bringing about

4     the termination of Ms. Brackin's employment

5     with the City of Dothan?

6  A.  Yes.  And her hiring.

7  Q.  Pardon?

8  A.  And her hiring, also.

9  Q.  Well, I didn't ask you that, but thanks for

10    that information.

11  A.  Okay.

12  Q.  Now, this section says, appointing authority

13    is the one that should bring about the

14    discharge of a civil service employee.  So in

15    that context, would you agree that you are the

16    appointing authority?

17       MS. NELSON:  Object to the form.

18  A.  In that context, I always thought the city

19    manager was the ultimate authority.  But I'm a

20    department head and she was in my department,

21    so yes --

22  Q.  You mean, this is the first --

23  A.  -- in that context.

0063

1  Q.  As we sit here now, this is the first time

2    that you realized that you was considered an

3    appointing authority?

4  A.  No.  In this context.  I've never seen this

5    document before.

6  Q.  Well, on what context did you think you was an

7    appointing authority?

8  A.  I never -- I just always thought of myself as

9    a department head.  If that's another term

10    for -- is appointing authority another term

11    for department head?

12  Q.  Well, what do you think?

13  A.  I don't know.  Does it define it in here,

14    appointing authority?

15       MS. NELSON:  I don't think it does.

16  Q.  Well, take my -- Judge, take my word you are

17    appointing authority.

18       MS. NELSON:  Take your word that she's the

19      appointing authority?

20       MR. JAFFREE:  Yeah.  I think there's no

21      dispute on this.
22      MS. NELSON:  Well, I think --
23      MR. JAFFREE:  I think your counsel can

0064

1      stipulate to this.
2      MS. NELSON:  Well, in the act --
3      MR. JAFFREE:  Otherwise, the --
4      MS. NELSON:  -- you're showing us does
5      define the appointing authority as
6      department head, but you're just
7      picking out one --
8      MR. JAFFREE:  Well, because I didn't think
9      we was going to get stuck on that
10      word.  I just thought we all knew that
11      she was appointing authority.  I mean,
12      I hope we don't have to go down this
13      road for everything.
14  Q.  So now let me get back to the question I was
15      asking you about appointing authority.  As the
16      appointing authority, would you be in charge
17      of the magistrates' office?
18  A.  Yes.  As department head.
19  Q.  Okay.  Would these documents that I asked for
20      in my request for production be under your
21      department?
22      MS. NELSON:  She doesn't even know what
23      you asked for.  And many of them deal

0065

1      with personnel files.  And no, they're
2      not in her department.
3      MR. JAFFREE:  Well, can she say that, or
4      do you want change seats?
5      MS. NELSON:  Well, she said she had not
6      seen this.  You can take one by one
7      and ask her.
8      MR. JAFFREE:  Let me -- if --
9  Q.  Let me ask you this:  Were you made aware,
10      either by your attorney or someone else by --
11      MS. NELSON:  And I'm going to object to
12      any discussion that she may have had
13      with her attorney.
14      MR. JAFFREE:  Well, you can object to any
15      discussions.  Some discussions are
16      relevant.
17  Q.  Were you aware from anyone that, as part of my
18      request for production, I asked for production

19         of resumes and applications for the employment
20         and acceptance/rejection notices of all other
21         associated -- and all other associated
22         documents of persons considered for the
23         position currently occupied by Defendant Judge
0066
1         Gordon during the period that Defendant Gordon
2         was considered for the position?
3    A.   No, I was not aware of that.
4    Q.   Do you know who I should hold responsible for
5         that -- not giving me those documents?
6    A.   No, I don't.
7    Q.   So somebody else with the City was responsible
8         for producing that information that didn't,
9         but somebody should be held accountable,
10        right, because I don't have these documents?
11             MS. NELSON:  I objected to them, and she
12                 doesn't have those documents.
13   Q.   All right.  Now, I asked for the resumes of
14        other applicants for employment and acceptance
15        and rejection notices and all other associated
16        documents of all persons considered for the
17        position of municipal judge for the City of
18        Dothan during the period that Kalia Spears
19        Lane was considered for the position.
20             Did anybody tell you that I wanted those
21        documents?
22   A.   No.
23   Q.   Do you know who is responsible for producing
0067
1         those documents and didn't?
2              MS. NELSON:  Object to the form.
3    A.   No.
4              (Brief pause)
5    Q.   Number four, I asked for -- to produce the
6         complete personnel file of Defendant Judge
7         Gordon.  That's you, correct?
8    A.   Yes.
9    Q.   In reference to personnel files, include
10        application for employment, any rating system
11        employed by the City, any term where she's
12        placed on the list of persons eligible for
13        consideration, and all performance evaluations
14        and all job-related memos, notes given to her
15        and/or prepared in reference to some aspects
16        of her employment, personnel action notices,

17  disciplinary notices, termination notices,
18  promotion notices, rate of pay notices, et
19  cetera.
20   Now, do you -- were you --
21  MS. NELSON:  That has been produced.
22  MR. JAFFREE:  Well, some of it.  I don't
23   have any list of -- I don't have any

0068
1   rating system of the people that was
2   considered and placed on that list.
3  MS. NELSON:  Well, we produced all we had.
4  MR. JAFFREE:  Okay.  Fine.
5 Q. Number five, I said, produce complete
6  personnel files of all employees who Defendant
7  Gordon recommended for employment termination
8  regardless of whether or not they were
9  actually terminated during inclusive period
10  beginning with the date of Defendant Gordon's
11  hire as a municipal judge up to and including
12  the dates that these requests are being
13  answered.
14   MS. NELSON:  We have produced you every
15   magistrates' file.
16 Q. Was that production request presented to your
17  attention?
18 A. To my --
19 Q. To your attention, this number five?
20 A. I wouldn't have their personnel files.  No.
21 Q. Your office doesn't maintain the personnel
22  files?
23 A. No.

0069
1 Q. Number nine.  It says, produce all written
2  documents regardless of whether these
3  documents were given to the City of Dothan
4  employees -- City of Dothan employees which
5  informed and/or referenced the informing of
6  such employees that the restrictions on
7  contacting former Magistrate Mary Turner has
8  been lifted.
9   Did you produce those documents?
10  MS. NELSON:  I have responded to all of
11   that that that was, again, given to
12   the City.
13  MR. JAFFREE:  I didn't get a response to
14   number nine.

15          MS. NELSON:  Yes, you -- well, I didn't
16             know we were going to go over this
17             today.  If we can take a break and I
18             can go get my file.  I did respond to
19             all of that.  Do you have my
20             responses?
21          MR. JAFFREE:  For this request for
22             production?  No, I don't think so.
23                You want to -- can we do this at
0070
1             lunchtime; you get your files and
2             we'll talk about this?
3          MS. NELSON:  Well, it's just ridiculous to
4             go over this witness -- you're reading
5             document requests which were
6             propounded to the City, which I have
7             either answered or filed objections.
8             And I couldn't even hear -- understand
9             what you were asking her.
10          MR. JAFFREE:  Here's my problem.  I just
11             got these documents, I think, last
12             Friday.  And it took me until Sunday
13             night to finish them.  And all kind of
14             documents are missing.  And I'm trying
15             to see if this witness have these
16             documents.  I mean these
17             are -- well --
18          MS. NELSON:  I don't understand.  You say
19             documents are missing.  They've either
20             been produced or objected to or don't
21             exist.  I mean, you may be asking --
22          MR. JAFFREE:  Well, I'm going to find out
23             from this witness whether or not they
0071
1             exist.
2     Q.  Let me ask you this with respect to nine.
3          MS. NELSON:  She doesn't even know what
4             nine is.
5     Q.  All right.  Look at nine.
6          MS. NELSON:  Well, let me look at it
7             first.  Again, I'd like to have my
8             objections in front of me.
9          MR. JAFFREE:  Well, I'll suspend this, and
10             we'll resume this at lunchtime when
11             you have your objections.  Okay?
12          MS. NELSON:  To my knowledge, we have

13        answered that.
14        MR. JAFFREE:  Well, let me ask the judge
15           about this.
16   Q.  Did you submit a letter telling people that
17        the restrictions for contacting Ms. Turner had
18        been lifted?
19        MS. NELSON:  No.  You're just -- without
20           any context.
21   Q.  Do you need context for that, Judge?
22        MS. NELSON:  I would like to have the
23           benefit of my responses but -- which
0072
1           you're not --
2        MR. JAFFREE:  Well, I've agreed to resume
3           this after lunch so you can have the
4           benefit of your responses.
5        MS. NELSON:  That's fine.
6        MR. JAFFREE:  Okay?
7   Q.  Let me go back to this request for production
8        of documents.  Did you bring with you all
9        documents pertaining to Crystal Gray?
10        MS. NELSON:  We do.  I have them here.
11   Q.  Emmanuel Hooker?
12        MS. NELSON:  We do.
13   Q.  Michael McCord?  There's two Michael McCords,
14        one B. and one D.
15        MS. NELSON:  We brought all dealing with
16           Michael McCord that we had -- Michael
17           D. McCord.
18        MR. JAFFREE:  Well, I also asked for
19           Michael B. McCord.
20        MS. NELSON:  There were none.
21   Q.  Do you know what happened to the documents
22        dealing with Michael B. McCord?
23        MS. NELSON:  There were none.
0073
1        MR. JAFFREE:  What do mean, "there were
2           none?"
3        MS. NELSON:  I'm telling you, there were
4           none.  There are no documents.
5        MR. JAFFREE:  Okay.
6   Q.  What about Albert Christopher Walker?
7        MS. NELSON:  I have objected, and I would
8           ask that we strike and seal his name.
9           He is youthful offender status, and
10           we're not going to produce or discuss

```
11          him.  And I've asked that --
12      MR. JAFFREE:  Well, excuse me.  But this
13          is one that we claim that somebody
14          caused arrest of I believe.
15      MS. NELSON:  I don't care.  He's youthful
16          offender.
17      MR. JAFFREE:  And shouldn't have been.
18          Are you going to stipulate that there
19          was a wrongful arrest of this
20          individual?
21      MS. NELSON:  No, I am not.
22      MR. JAFFREE:  Then I would like to see his
23          file.
0074
1       MS. NELSON:  Well, I'm sorry.  I've
2           objected, and you'll have to take it
3           up with the judge.
4    Q.  All right.  What about Shaun McGhee?
5       MS. NELSON:  Shaun McGhee is a public
6           defender.
7       MR. JAFFREE:  And your point is what?
8       MS. NELSON:  And we're not producing all
9           files on a public -- all files on a
10          public defender.  No.
11   Q.  All right.  Otha Lee June?
12      MS. NELSON:  There is no -- we could not
13          find an Otha Lee June.
14   Q.  What about Mark Cromer?
15      MS. NELSON:  Yes, we have Mark Cromer.
16   Q.  And Christopher Candl?
17      MS. NELSON:  We could not locate a
18          Christopher Candl, C-A-N-D-L.
19      MR. JAFFREE:  Could you locate anyone with
20          a name similar to that?  You don't
21          have to answer that.
22   Q.  What about Thomas Blunt?
23      MS. NELSON:  Could not locate any files on
0075
1           Thomas Blunt.
2    Q.  Okay.  And John Powe?
3       MR. JAFFREE:  I think y'all submitted some
4           Powe file.
5       MS. NELSON:  We have submitted a Powe
6           file.  I think it was Ronald Powe.
7    Q.  Okay.  Now, number five.  All documents
8       received by Judge Gordon and/or anyone acting
```

9      on -- on or for her behalf from each of the
10      Dothan city police officers who questioned,
11      interviewed staff concerning any matter that
12      Ms. Brackin was disciplined about or otherwise
13      Ms. Brackin was question by a Dothan police
14      officer while she was a Dothan city employee.
15          MS. NELSON:  We have produced all of that
16          previously.
17          MR. JAFFREE:  Is that from the production
18          that you gave me, that --
19          MS. NELSON:  Yes.
20          MR. JAFFREE:  -- document?
21   Q.  I asked for your Attachment 1, 2, and 3.
22          MS. NELSON:  We have produced that.
23          MR. JAFFREE:  You produced that
0076
1          previously?
2          MS. NELSON:  Yes.
3   Q.  Okay.  Copies of the Dothan Personnel Rules
4      and Regulations that were in effect during the
5      employment of the plaintiffs.
6          MR. JAFFREE:  Now, you question whether or
7          not the rules that I gave was correct.
8          MS. NELSON:  Well, that was the Civil
9          Service Act.  I did make a -- I do
10          have a copy.  The personnel department
11          is the person who has custody and
12          control of these rules and
13          regulations.  Judge Gordon doesn't.
14          But I will provide you a copy of
15          that.  I believe your witnesses have
16          testified -- your plaintiffs have
17          testified that they have that -- had
18          those.
19          MR. JAFFREE:  Well, I'm not sure they
20          testified that they had them still
21          with them.
22          MS. NELSON:  Okay.
23          MR. JAFFREE:  You have that?
0077
1          MS. NELSON:  Yes, sir, we do.
2          MR. JAFFREE:  Let me do this.  Can you --
3          let me go back, and I should have did
4          this -- number four, to the extent you
5          have documents to number four, can I
6          bundle them and call -- mark them as

```
7           Plaintiffs' Exhibit 3?
8      MS. NELSON:  You can.
9          (Brief pause)
10     MR. JAFFREE:  You said you had the rules;
11       that's number seven?
12     MS. NELSON:  You're marking those?
13     MR. JAFFREE:  Yeah.
14     MS. NELSON:  What number?
15     MR. JAFFREE:  Number 4.  Number 3 was
16       this -- these defendants to the extent
17       that you produced them.
18  Q.  What about number eight, Judge Gordon's
19      January the 8th public relations memo sent to
20      the staff?
21     MS. NELSON:  That's been produced in
22       previous documents.
23     MR. JAFFREE:  I'm not sure I've seen
0078
1        that.  You mean that pile of
2        documents?  I'm sure I saw that.  Do
3        you have another copy of it?
4      MS. NELSON:  Not with me.  I'm pretty sure
5        it's attached to --
6      MR. JAFFREE:  I'm going to --
7      MS. NELSON:  I know it's attached to one
8        of Ms. --
9      MR. JAFFREE:  I'm going to --
10     MS. NELSON:  -- Brackin's disciplinary
11       actions.
12     MR. JAFFREE:  All right.  Okay.
13  Q.  Number nine, Judge Gordon's March the 17th
14      letter concerning no contact with Ms. Turner.
15     MS. NELSON:  That's also been produced.
16  Q.  What about A-Advantage Bonding, Inc., April
17      the 6th, 2004 letter?
18     MS. NELSON:  We could not find any such
19       letter.
20     MR. JAFFREE:  You couldn't find any such
21       letter?
22     MS. NELSON:  Correct.
23     MR. JAFFREE:  I found some stuff that
0079
1        Nancy had given to me probably two
2        years ago.
3      MS. NELSON:  Well, if you found stuff --
4        let me say this:  If you're going to
```

```
 5          use stuff that she gave to you that I
 6          didn't get to question her about, I'm
 7          going to keep her deposition open to
 8          reserve the right to question her.
 9       MR. JAFFREE:  Well, you can question her
10          about this, but this is -- you want to
11          look at this?  And this is the thing
12          that you said you couldn't find.
13       MS. NELSON:  Well, it looks like we
14          probably couldn't find it because she
15          took it with her.
16       MR. JAFFREE:  No, she did not.  That's her
17          copy.  Several people had a copy of
18          that if you notice.
19       MS. NELSON:  Well, it's interesting that I
20          asked her for any documents that she
21          had to support her claim and --
22       MR. JAFFREE:  Well, she -- hold up.
23       MS. NELSON:  I've made it clear --
0080
 1       MR. JAFFREE:  I forgot that I had that.
 2       MS. NELSON:  Well, I reserve the right
 3          to --
 4       MR. JAFFREE:  Because I've got -- I mean
 5          there's a whole "googobs" of stuff in
 6          this case.  And when I was going
 7          through this stuff last night --
 8          because I'd asked Nancy if she had
 9          that document because I thought I saw
10          it once.  And she didn't have it.  And
11          she remembered the date.  And I had
12          it.
13       MS. NELSON:  Well, you have it, and looks
14          like it's an original with original
15          signatures.  All I can tell you --
16       MR. JAFFREE:  Well, it's original to
17          Nancy.
18       MS. NELSON:  But we made an attempt -- an
19          effort to find this and did not have
20          it.  And she should've produced this
21          yesterday and --
22       MR. JAFFREE:  There was no intent to --
23          because we was clear on existence of
0081
 1          that document, and several people had
 2          copies of it.
```

3      MS. NELSON:  Well, you don't know that.
4         It has that several people are listed
5         on here, but you have no evidence
6         anybody else had a copy of it.
7      MR. JAFFREE:  You want to let the judge
8         see it to see if she'd recognize that
9         document?
10     MS. NELSON:  Sure.  I mean, that's your
11        right to ask her about it.  Are you
12        marking this or --
13     MR. JAFFREE:  Well, I will since y'all
14        couldn't find your copy.  And you
15        claimed you didn't --
16     MS. NELSON:  I don't have a copy.
17     MR. JAFFREE:  Well, okay.  Fine.
18        (Brief pause)
19     MR. JAFFREE:  If we could have somebody
20        make a copy of that, including Nancy's
21        note, I'd like to move on to these
22        other documents so that we could move
23        along.  And you could -- the judge
0082
1         could read that at her leisure.
2      MS. NELSON:  Okay.  I mean -- do you -- do
3         you --
4      THE WITNESS:  I don't know what to say.
5      MS. NELSON:  Well, do you --
6      MR. JAFFREE:  Well, I didn't ask you to
7         say anything.
8      MS. NELSON:  -- want to make a copy and
9         move on?
10     MR. JAFFREE:  Yeah.
11     MS. NELSON:  Okay.
12     MR. JAFFREE:  Y'all didn't have a copy of
13        that.  But -- okay.
14  Q.  What about number eleven?
15     MR. JAFFREE:  And I'm going to mark it --
16     MS. NELSON:  You want us to make a copy?
17     MR. JAFFREE:  If somebody could make a
18        copy and I'm going to mark -- I'll
19        stick that to the original to mark --
20  A.  But that's the original.
21  Q.  Well, that's Nancy's original.  There were
22     several originals.
23     MS. NELSON:  That's your testimony,
0083

1          Mr. Jaffree.  You don't know that.
2     A.   I'm trying to figure out --
3          MR. JAFFREE:  What now?
4          MS. NELSON:  I didn't have a chance to
5            question her about this.  You're
6            trying to testify that this is her
7            copy.
8          MR. JAFFREE:  Well, I see several --
9            copies sent to several people on the
10           document itself.
11         MS. NELSON:  I know, but that doesn't mean
12           it was actually done.  You're just
13           assuming that because it has -- it's
14           addressed to several people.  You
15           don't have any evidence that it went
16           to all these people.
17         MR. JAFFREE:  Well, I don't have any
18           evidence that it didn't.
19         MS. NELSON:  That's true.  And I haven't
20           had a chance to question Ms. Martin on
21           this, and so I do want to reopen her
22           deposition.  Now, we can get it copied
23           and just want to point for Record that
0084
1            that is the original that was stamped
2            in by Nancy Martin.
3          MR. JAFFREE:  Well, I don't know if it was
4            stamped in by Nancy Martin or stamped
5            in by somebody.
6          THE WITNESS:  She signed it.
7          MS. NELSON:  She signed it, it appears.
8            It had an "NM."
9          MR. JAFFREE:  Yeah.
10         THE WITNESS:  Can we get her back today to
11           --
12         MR. JAFFREE:  I don't know if we could get
13           her back today.
14    Q.   But let me go to number 11.  All written
15         reports to the personnel director concerning
16         any deficiencies in Nancy's job performance
17         during her working test period.
18         MS. NELSON:  And that's been provided.
19         MR. JAFFREE:  What documents are those?
20         MS. NELSON:  I'm sorry?
21         MR. JAFFREE:  What documents was those you
22           said had been provided?  I'm talking

23        about correspondence to the personnel

0085

1        director.  I mean, I got three, I

2        think, documents to the personnel

3        director.  Is that what you are

4        talking about?  The same things that

5        were part of her attachments,

6        Attachment 1, 2, and 3.  The same

7        thing was sort of reproduced and sent

8        to the personnel director.

9     MS. NELSON:  That we have produced her

10      file, that we produced it in the EEOC

11      documents we produced yesterday.

12      There are multiple documents to the

13      personnel director about Nancy's

14      deficiencies.

15     MR. JAFFREE:  All right.

16  Q.  What about number twelve, the civil service

17    rating list for these three individuals?

18     MS. NELSON:  Judge does not have that.

19      That's maintained by the personnel

20      office.

21  Q.  Okay.  All right.  What about -- by the way,

22    Judge, did you make any attempts to get this

23    from the personnel office?

0086

1     MS. NELSON:  She can't produce what she

2      does not have custody and control

3      over.

4  Q.  Is that your testimony, that you couldn't get

5    access to this?

6     MS. NELSON:  I'm telling you.  She doesn't

7      have custody and control over ratings,

8      do you, Judge --

9     THE WITNESS:  No.

10     MS. NELSON:  -- over the registers?

11     THE WITNESS:  I never even see them.  All

12      that's Personnel.

13  Q.  Number thirteen, Judge Gordon's November and

14    December of 2003 memos to the staff regarding

15    changing cash bonds.  Did you produce that?

16  A.  I -- I don't even know the memos.

17     MS. NELSON:  I don't know if we were -- if

18      there is a memo, we couldn't find any

19      such memo.

20     MR. JAFFREE:  Couldn't find such memos for

21          number thirteen.
22    Q.  All memos, notes, letters written by Judge
23          Gordon concerning Martin's job performance.
0087
1        Do I have everything you have there?
2            MS. NELSON:  Yes.
3            MR. JAFFREE:  There are no other memos
4              other than what y'all have provided to
5              me?
6            MS. NELSON:  Correct.
7    Q.   Okay.  All memos, notes, letters written by
8        Judge Gordon concerning Brackin's job
9        performance.  Do I have all of that?
10            MS. NELSON:  That would be in the
11              personnel file.  We've produced all of
12              that.
13    Q.  All memos, notes, letters received by Judge
14        Gordon concerning Plaintiff Martin's job
15        performance, anything that you received from
16        other third parties.
17            MS. NELSON:  That would be in her file.
18              We've produced all that we have -- all
19              we have on Nancy Martin.
20    Q.  Well, I didn't see any letters that you had
21        received from anybody else.  But, okay.  I got
22        all of my stuff with me.
23            All memos, letters, notes received,
0088
1        written by -- received -- but I'm not going to
2        hold you to number eighteen because there was
3        a repeat of a word that made that sentence not
4        legible.
5            All documents Judge Gordon submitted when
6        she applied for the position of municipal
7        judge for the City of Dothan.  That's the very
8        three notes we were discussing earlier.  What
9        did you submit when you applied for the
10        position?
11            MS. NELSON:  And she's testified to that,
12              and we've produced her personnel
13              file.  So that's all the documents we
14              have, is what we've produced.
15            MR. JAFFREE:  And number 20 is the one you
16              object to, the documents submitted by
17              other applicants?
18            MS. NELSON:  Correct.  And, certainly,

19          Judge Gordon doesn't have that.
20          MR. JAFFREE:  Well, you're doing a lot of
21             testifying for Judge Gordon.
22          MS. NELSON:  Well, why would she have
23             those?
0089
1          THE WITNESS:  Well, I wouldn't have the
2             documents of other applicants.
3          MS. NELSON:  Well, we're hashing out a
4             document request that I have filed
5             objections to and I'm just trying
6             to --
7          THE WITNESS:  I probably sent them to
8             Personnel if they applied.
9          MS. NELSON:  You can ask her does she have
10             copies of any applications submitted
11             by anybody else that applied for her
12             job after 1999.  I mean, you can ask
13             her that.
14    A.  They wouldn't have sent the applications to me
15       because I wouldn't have been even hired.  I
16       wasn't even here.  It would have gone to
17       Personnel.  I'm assuming.  I don't know where
18       it went.
19    Q.  Okay.  All right.  Now, let me get back to
20       where I left off at with questions.
21          Were you informed by anyone that these
22       interviews -- all right.  Were you informed by
23       anyone at the interview that you was taking
0090
1       was just pro forma and that you already had
2       the position?
3    A.  No, not to my knowledge.
4    Q.  Now, what is the scope of your administrative
5       duties when you're serving as the
6       administrator of the magistrates' office?
7          MS. NELSON:  Object to the form.
8    Q.  Do you understand the question?  Did you
9       understand the question?
10          MS. NELSON:  Are you asking what her
11             duties are?
12    Q.  Yeah.  The scope of your administrative -- I
13       assume you have a judicial hat and a
14       administrative hat.  Your judicial hat is when
15       you're sitting on the bench as the judge and
16       you have an administrative hat when you were

17     administrating over the magistrates'
18     department, what is the scope --
19       MS. NELSON:  Object to the form.
20  Q.  What is the scope of your administrative
21     duties?
22       MS. NELSON:  You can ask her if she wore
23       two hats, but to assume -- and you're

0091

1       assuming she wears two hats.
2  Q.  Do you wear two hats?
3  A.  When we have a court administrator, I -- I
4    mean, we have a court administrator position
5    whose job is administrate -- I'm making that
6    word up -- the magistrates' office.  But I
7    directly supervise the court administrator.
8    The court administrator supervises the
9    magistrates when we have that position
10    filled.  So on a day-to-day basis, I
11    do not -- I cannot literally physically
12    supervise the magistrates' office.
13  Q.  So it's your testimony when you have a person
14    functioning as the administrator of the
15    magistrates, then your only role is to
16    supervise the administrator?
17  A.  Not my only role, but my primary role as far
18    as -- you know, I don't -- I'm not over there
19    day to day.  The court administrator would be
20    over there.  So that's not my only role.  I --
21    I sign -- that's not my only role.
22  Q.  Well, what other role do you have when you
23    have a court administrator?

0092

1  A.  Well, I'm the department head, so there are
2    certain things that only I can approve,
3    certain purchases over a certain amount,
4    travel requests.  There are certain things
5    that only I can sign as a department head.
6    But the court administrator coordinates all
7    that.  They just submit the paperwork to me
8    for my ultimate signature as department head,
9    but it's under their recommendation.
10  Q.  Well, when you have a person serving as
11    administrator for the magistrate office, do
12    you get involved in the day-to-day activities
13    of the magistrates?
14  A.  No.

15   Q.  Do you get involved in the job assignments?
16   A.  No.
17   Q.  Do you get involved in time and attendance or
18       approving leave?
19          MS. NELSON:  I'm sorry.  Time and
20              attendance and what?
21          MR. JAFFREE:  Approving leave.
22   A.  I sign the payroll that they submit.  But as
23       far as their time cards, I never see their
0093
1        time cards.  I never see what they put on
2        their time cards.  I don't know if they're
3        there on a day-to-day basis or not because I'm
4        in another building.  But, now, I do sign the
5        ultimate payroll that goes over to -- or comes
6        over here for them to get paid, but it's just
7        a document.  I doesn't have any specifics on
8        it.
9    Q.  What is the scope of your judicial duties for
10       serving as municipal judge?
11   A.  I preside over the City of Dothan Municipal
12       Court which -- that's what I do.
13   Q.  And that consists of what?  What do you do,
14       other than preside?
15   A.  That's what I do.  I preside over the City of
16       Dothan's Municipal Court.
17   Q.  You couldn't break down what your job duties
18       are, other than just preside over the court?
19   A.  Well, I laugh --
20          MS. NELSON:  Tell him what you do.  I
21              mean --
22          THE WITNESS:  He's been there several
23              times.  He knows what I do.
0094
1    A.  I mean, you do.  What I --
2    Q.  I haven't been there several times.
3    A.  I mean, I -- I preside -- you've been there
4        before.  I mean, I preside over the City of
5        Dothan Municipal Court.  I hold court.  We
6        have trials.  We have arraignments.  We have
7        prisoners.  We do CRO revocations.  We do
8        everything that a court -- everything the name
9        entitles.  We have court.  We have full court
10       three and a half days a week.  We have
11       revocations, and we do bondsmen forfeitures
12       one day a month.  We do CRO revocations.  We

13      do prisoners.  We do determination hearings.
14      We do probation revocation hearings.  Just the
15      extent of what a municipal court does, I do.
16   Q.   Is the municipal court an adjunct of the city
17      police department?
18   A.   No.
19   Q.   Is the city police department an adjunct of
20      municipal court?
21   A.   No.
22   Q.   Are they two separate independent bodies?
23   A.   Yes.  By law they have to be separate.
0095
 1   Q.   Is part of the reason they're separate is
 2      because you're required to be an independent
 3      arbiter?
 4         MR. JAFFREE:  Object to the form.
 5   Q.   Do you understand my question?
 6   A.   I do but I don't -- no.  I don't know.
 7   Q.   I'm sorry?
 8   A.   I don't know.
 9   Q.   You don't know what?
10   A.   I don't know why the -- why they're -- I mean,
11      I guess on some level I know why.  But we're
12      just separate entity just like we're a
13      separate entity from the public utilities.
14      We're a separate entity from recreation.
15      We're just two separate departments.  We don't
16      have any of the same personnel in common.
17   Q.   Okay.  In your capacity as municipal judge, do
18      you have to be impartial and cannot show
19      deference to the police department?
20   A.   Yes.
21   Q.   Do the city police department have any role in
22      deciding discipline for the Judicial
23      Department's employees?
0096
 1   A.   No, not ultimately.
 2   Q.   Do they have any role?
 3   A.   No.
 4   Q.   These duties that you have as sort of the
 5      super administrator of the magistrate office,
 6      have these duties changed during the -- or
 7      since the time Ms. Martin and Ms. Brackin were
 8      employed?  Or are they pretty much the same
 9      now as they was then?
10   A.   I don't understand the question.

11   Q.  When you function as the -- as I call it, your
12       administrator hat being the super
13       administrator over the magistrates, the roles
14       that you just articulated that you have, did
15       you have those same roles when Ms. Martin and
16       Ms. Brackin were employed?
17   A.  Yes.
18   Q.  What percentage of your time do you think you
19       were spending on the administrative duties
20       during the tenure of Ms. Brackin and
21       Ms. Martin?
22       MR. JAFFREE:  Object to the form.  They
23           were there at different times, Martin
0097
1            and Brackin were.
2    Q.  Well, let's first talk about Ms. Martin.  What
3        percentage of your time was spent on
4        administrative duties during the tenure of
5        Ms. Martin?
6    A.  I -- I have no point of reference.
7    Q.  Is the bulk of your time during her tenure
8        spent wearing your judicial hat?
9    A.  Yes.
10   Q.  90 percent, would you say?
11   A.  95.
12   Q.  95 percent.
13           And what about during the tenure of
14       Ms. Brackin when you had an administrator
15       during that period of time -- when you had an
16       administrator during the time she was
17       working?  Same 95 percent, perhaps?
18       MS. NELSON:  Object to the form.
19   A.  I spend most of my time in court.  So if 95
20       percent of my time is spent in court, yes.
21   Q.  All right.  When you don't have an
22       administrator function as the two-layer head
23       of the magistrates, what percentage of your
0098
1        time do you spend with the administrative
2        function of your job?
3        MS. NELSON:  Object to the form.
4    Q.  Do you understand the question?
5    A.  Well, I'd still say about five.  Whether I
6        have an administrator or not, approximately 90
7        to 95 percent of my time is in court, court
8        hours, court scheduled hours.  So I'd still

9       say maybe 5 or 10 percent.  I mean, I --
10   Q.   So is it safe to assume that when you don't
11       have an administrator, the magistrates are
12       sort of running themselves?
13          MS. NELSON:  Object to the form.
14   Q.   You understand the question?
15   A.   I wouldn't agree with that, no.
16   Q.   Well, who is supervising them when they don't
17       have an administrator?
18   A.   I am.
19   Q.   You supervising them 5 percent of the time?
20   A.   I thought you meant over there in the office.
21       In their office.  I supervise them -- I mean,
22       100 percent of the time they can come -- you
23       know, I did everything I still did.  Nothing
0099
1       changed as far as my duties whether or not
2       they had an administrator.  I still would
3       ultimately, you know, have to sign the
4       payroll, have to work out, you know, anything
5       they had going on.
6   Q.   But didn't do any --
7   A.   I wasn't in their office, no.
8   Q.   In their office day to day?
9   A.   No.
10   Q.   So they sort of supervised themselves when
11       they don't have an administrator?
12   A.   I guess it depends on what you mean by
13       supervise.  They all had assigned duties.
14   Q.   Okay.  What is the organizational structure of
15       the Dothan Municipal Court?
16   A.   I guess it would be presiding judge, court
17       administrator, magistrates, clerks.
18   Q.   Okay.  Do you know what the statute or
19       ordinance is that authorized your position as
20       a municipal judge?
21          MS. NELSON:  I'm sorry.  I don't
22          understand what you said.
23   Q.   Do you know the statute or ordinance that
0100
1       authorized your position as municipal judge?
2   A.   I don't know the specific statute number.
3   Q.   Well, could you tell me --
4   A.   No.  I don't have an answer to that question.
5   Q.   When you have an administrator for the
6       magistrate office, what degree of

7    administrative discretion do you permit this
8    person to have?
9        MS. NELSON:  In general or as any
10            particular time?
11    Q.  Well, when you have an administrator, do you
12        sort of allows them discretion to make
13        decisions as to what to do?
14    A.  Yes.
15    Q.  Is that true independent of who happens to be
16        functioning as the administrator at any
17        particular time?
18    A.  Yes.
19    Q.  So you generally don't second guess what the
20        administrator is trying to do?
21    A.  No.
22    Q.  In your view, any administrator that you hire,
23        should they be an adjunct of you to do your
0101
1    bidding?
2        MS. NELSON:  Object to the form.  I have
3            no idea what you're talking about.
4    Q.  Do you know what I'm talking about?
5    A.  No.
6    Q.  Well, when you hire an administrator, do you
7        sort of see them to be your shadow person to
8        do whatever it is you want them to do, or do
9        you let them function independently?
10        MS. NELSON:  Object to the form.
11    A.  If I hire them to be the administrator, I
12        expect them to act independently.  I
13        mean -- yeah.  I don't expect them to do what
14        I want them to do.
15    Q.  If you and one of your hired administrators
16        disagrees on a substantive matter, who
17        prevails?
18    A.  It depends on what it is.
19    Q.  Can you give some examples of when you would
20        permit them to prevail and examples of when
21        you would make the decision?
22    A.  I can't think of any.
23    Q.  Just if you can, but you can't come up with an
0102
1    example.
2    A.  I don't know what that allow me to prevail
3        as -- somebody -- I don't know.  I don't
4        understand the question.

5  Q.  Well, the decision with respect to discipline,
6      a subordinate employee, and you and the
7      administrator differ on what discipline should
8      be netted out, who would generally prevail in
9      those disagreements.
10  A.  I -- generally, absent any -- I would let them
11      do it, because they're over there with them,
12      they know the facts.  They know, you know,
13      what's going on.  And I can't imagine that I
14      would, you know, not defer if there was just a
15      -- if there wasn't a problem.
16  Q.  Okay.
17  A.  I normally wouldn't even know unless they
18      brought it to me.
19  Q.  In your position as municipal judge, who do
20      you answer to?
21  A.  Administrative Office of Courts.
22  Q.  And who is that?
23  A.  Governing body of judicial systems in the
0103
1      state of Alabama.  I guess I would directly
2      answer to the City of Dothan Commission.  But
3      they don't -- I mean, as far as who does our
4      ultimate -- I guess that would be
5      Administrative Office of Courts.  It's who we
6      report to.  We report all our dispositions,
7      our case numbers, everything goes to them.
8  Q.  Is that in Montgomery?
9  A.  Yes.
10  Q.  Well, who supervises you locally?
11  A.  Supervises me?  I guess that would be the
12      Commission.
13  Q.  Who is responsible for your evaluation?
14  A.  The city manager does our annual review, I
15      guess, as a department head.
16  Q.  So he does your evaluation?
17  A.  Yes.  He does my annual review.
18  Q.  Is he in a position to know what you do?
19  A.  Is he in a position to know what I do?
20      MS. NELSON:  You're talking about the city
21        manager?
22      MR. JAFFREE:  Yeah.
23      MS. NELSON:  If you know.
0104
1  Q.  Well, you're pausing without an answer.  Do
2      you know the answer to that, whether he's in a

3    position or not?
4       MS. NELSON:  Well, obviously, she
5         confused.  Do you understand his
6         question?
7       THE WITNESS:  I don't.
8  A.  I mean, is he in a position to know what I do
9      physically, like every day what I do or what I
10     do --
11 Q.  On how well you do your job.  Is he in any
12     position to know?
13 A.  I would think so.
14 Q.  How often does he come over to your court to
15     observe you perform?
16 A.  Pretty often.  I mean, he'll pop in and pop
17     out.  But I don't think it's -- yeah.
18     He'll -- pretty often.  I don't have a number.
19 Q.  And what's his name?
20 A.  Mike West.  But now -- yeah, Mike West.
21 Q.  Well, what social organizations do you belong
22     to?
23 A.  Oh, Lord.  Delta Sigma Theta Sorority.
0105
1  Q.  Is that a female organization?
2  A.  It is.
3  Q.  Males are excluded?
4  A.  Yeah.
5  Q.  Black or white organization?
6  A.  I don't know that it's been characterized.  I
7      think it's multiethnic.
8  Q.  You are of the one -- the group that you
9      belong to is mostly black, mostly white, or
10     mixed?
11 A.  Mostly black.
12 Q.  Would you say 95 percent black?
13 A.  Yes.
14 Q.  Maybe 99 percent black?
15 A.  The one -- the Dothan chapter?
16 Q.  Yeah?
17 A.  100 percent black.
18 Q.  100 percent black.  What other organizations
19     do you belong to?
20 A.  Social organizations.  That would exclude
21     professional organizations.  That's about it
22     socially.
23 Q.  How do you feel about belonging to an
0106

1    exclusively black organization?
2      MS. NELSON:  Object to the form.
3  A.  How do I feel?  I've never thought about it.
4    I go to an exclusively black church.  It's not
5    something I chose.  It's just that's the
6    organization's makeup.
7  Q.  What about BASA; were you a member of BASA at
8    any time?
9  A.  I was.
10  Q.  Is that an exclusively black organization?
11  A.  No.
12  Q.  BASA permits non-blacks?
13  A.  At Tulane it did.
14  Q.  How many non-blacks did BASA have at Tulane
15    when you was there?
16  A.  I don't have a number but there were ethnic --
17    other ethnicities included.
18  Q.  Well, how many Caucasians?
19  A.  But they were called the Minority Law Students
20    Association.
21  Q.  How many Caucasians did BASA have when you was
22    at Tulane?
23  A.  I don't know.
0107
1  Q.  Isn't true they didn't have any Caucasian in
2    their membership?
3  A.  I don't know that to be true.
4  Q.  Well, doesn't BASA stand for Black American
5    Law Student Association?
6  A.  It does.  Well, we were MLSA, Minority Law
7    Students Association.
8  Q.  They changed from BASA to Minority?
9  A.  At Tulane.
10  Q.  Okay.  Do you view yourself as an American
11    first or an African-American?
12      MS. NELSON:  Object to the form.
13  A.  I never thought about it.
14  Q.  Well, if you think about it now, how do you
15    view yourself?
16  A.  American.
17  Q.  What about African-American; is that
18    secondary?
19  A.  I just -- I never I think about it.
20  Q.  Okay.  Would you say that you have a race
21    consciousness?
22      MS. NELSON:  Object to the form.

23    A.   A race -- a consciousness of what my race is?

0108

1    Q.   Yeah.  Race consciousness.  Are you familiar
2         with that term?
3    A.   I'd ask you to be more specific.  I'm very
4         conscious of what my race is, yes, that I am
5         black.  Yes, I'm conscious of that.  Yes, I'm
6         conscious of the fact that I'm black.
7    Q.   Were you aware when you first became the
8         magistrate for this city that there had not
9         been any prior black judges in the city?
10   A.   No.
11   Q.   Were you aware subsequent to your becoming a
12        magistrate that there's never been any black
13        judges in the city?
14   A.   I've never been a magistrate.
15   Q.   I'm sorry.  Let me rephrase my question.  Were
16        you aware when you became the municipal judge,
17        there had never been a black judge in this
18        city, is what I intended to say?
19   A.   Black judge in this whole city, was I aware of
20        that?  No.
21   Q.   Were you subsequently made aware of that?
22   A.   I mean, I've never asked.  No.
23   Q.   Okay.  Were you aware when you became

0109

1         municipal judge that there wasn't any
2         African-American magistrates employed in the
3         magistrate office?
4    A.   Once I started to --
5    Q.   Yeah.  Once you started working, were you
6         aware --
7    A.   I saw that there were none, yes.
8    Q.   You could visibly see that?
9    A.   Yes.
10   Q.   Were you aware that there had never been any?
11   A.   No.
12   Q.   Did you subsequently become aware that there
13        had never been any?
14   A.   No.  I don't know that there have never been
15        any before I came in life.  You know, I don't
16        know.
17   Q.   Do you remember testifying anywhere that there
18        had never been any African-American in the
19        City of Dothan; do you remember testifying to
20        that?

21  A.  No, not specifically.  I don't know through my
22     tenure.
23  Q.  Yeah.  Were you determined to change that
0110
1     result?
2  A.  No.
3  Q.  Did you change that result?
4  A.  The fact that there were never any
5     magistrates -- black magistrates?
6  Q.  The fact that there wasn't any.
7  A.  Did I change it?
8       MS. NELSON:  You mean, did she hire any?
9  A.  Right.  Did I hire any black people to be a
10     magistrate?
11  Q.  However you had to change it, did you change
12     the fact that wasn't any African-American
13     magistrates in the City of Dothan?
14  A.  I guess I did.
15  Q.  You're not sure?
16  A.  I mean, I hired people that -- you know, off
17     of a register that were black.  But it wasn't
18     an intentional I'm going to change the fact.
19     It's just people who are on a register.
20       Did I change that?  Yes.
21       MS. NELSON:  You're okay to say --
22       THE WITNESS:  I was just trying to say yes
23         or no.
0111
1       MS. NELSON:  As long as your answer is
2         understood.
3  Q.  You want to change an answer?
4  A.  (Witness shakes head in the negative.)
5  Q.  You testified earlier that you never had any
6     Title VII litigation -- I'm sorry -- Title VII
7     classes in school, right?
8  A.  No, I did not testify to that.
9  Q.  How would you define free speech?
10       MS. NELSON:  Object to the form.  Object
11         to this line of inquiry.
12       MR. JAFFREE:  How would --
13       MS. NELSON:  It calls for a legal
14         conclusion.
15  Q.  How would you define -- as an attorney, how
16     would you define free speech?
17       MS. NELSON:  Object to the form.
18  A.  I've never thought about it.  I mean, freedom

19          of speech.  I've never thought about it.  I
20          don't have a definition.
21     Q.   Well, do you think government employees should
22          be entitled to some free speech rights?
23              MS. NELSON:  Object to the form, what she
0112
1              thinks.
2      A.   And not just government employees.  I know
3          citizens have a right of free speech whether
4          they're government employees or not.  As a
5          citizen of the United States, you have a right
6          of speech.
7      Q.   You think do?  You think citizens have a right
8          to free speech?
9              MS. NELSON:  You asked her what she
10              thought; that's what she said.
11     Q.   I'm was just saying, do citizens generally
12          have a right to free speech?
13     A.   Yes.
14     Q.   And that's true in the private sector as well?
15              MS. NELSON:  Private sector of what?
16     A.   Citizens not employees.
17     Q.   Well, what about non-government employees; do
18          you think they have a right to free speech?
19              MS. NELSON:  Object to the form.
20     A.   And I've never thought about it.
21     Q.   Well, do you think that a government
22          employee's free speech rights, to the extent
23          they exist, should be broadly or narrowly
0113
1          construed?
2              MS. NELSON:  Object to the form, object to
3              what she thinks, and object to your
4              asking for a legal opinion.
5              MR. JAFFREE:  I'm asking for a legal
6              opinion from an attorney.
7              MS. NELSON:  Well, an attorney who does
8              not specialize or has testified that
9              she is not a constitutional law judge
10              or a constitutional law attorney.  So
11              I object to this line of inquiry.
12              You're seeking a legal conclusion from
13              the witness.
14              MR. JAFFREE:  I'm not sure you have to be
15              that sophisticated to know the answers
16              to those questions.  I'm just not

```
17          convinced that you have to be that
18          sophisticated or like grounded in
19          constitutional jurisprudence to answer
20          to those questions.
21     MS. NELSON:  That's your opinion.
22     MR. JAFFREE:  Well, that's your opinion.
23     MS. NELSON:  Can you cite the latest five
0114
1          Supreme Court cases issued by the
2          Roberts court on free speech?
3     MR. JAFFREE:  I don't know them or profess
4          to be able to.  But I'm not your
5          witness.
6       MS. NELSON:  You brought this case
7          alleging on constitutional rights, and
8          you don't know?
9     MR. JAFFREE:  I'm not your witness.
10   Q.  Do you think that free speech for government
11        employees should be narrowly or broadly
12        construed?
13       MS. NELSON:  Object to the form and object
14          to what she thinks.
15   A.  And I've never thought about it.
16   Q.  Well, if you take a moment to think about it,
17        what do you think?
18       MS. NELSON:  Object to what she thinks.
19   A.  I -- I -- it takes more than a moment for me
20        to think about it because I'm sure that there
21        are schools of thought on both sides, those
22        who think they should be narrowly construed
23        and those that think they should be broadly
0115
1        construed.  So I would like to know the nature
2        of the debate on both sides before I make a
3        decision as to which side I would choose.
4     Q.  Let me ask this:  Once a person become a
5        government employee, do you think they lose
6        their constitutional rights?
7        MS. NELSON:  Object to the form as to what
8          she thinks.
9     A.  The constitutional rights as a citizen of the
10        United States?
11   Q.  Yeah.
12   A.  No.
13   Q.  Once they become an employee.
14   A.  I don't think they lose their constitutional
```

15     rights.
16   Q.   Should their rights be limited because they
17       become a government employee?
18           MS. NELSON:  Object to the form.
19   A.   Their constitutional rights as citizens of the
20       United States?
21   Q.   Yeah.  Their constitutional rights as citizens
22       of the United States?
23   A.   No.  I don't think just because they're
0116
 1       employed that they should lose their rights as
 2       citizens of the United States.
 3   Q.   Do you think free speech liberties are
 4       fundamental in our society?
 5           MS. NELSON:  Object to the form.  It calls
 6               for legal conclusion.
 7   Q.   Do you think that free speech is a fundamental
 8       right?
 9           MS. NELSON:  Object to the form.  Same
10               objection.
11   Q.   Do you understand what I mean?
12   A.   A fundamental right?
13   Q.   Yeah.
14   A.   Is it a -- or the most fundamental right?
15   Q.   Well, one of the group of fundamental rights.
16   A.   Fundamental rights.
17   Q.   Do you think so?
18           MS. NELSON:  Object to the form.
19   A.   Yeah.  And I've had to think.  I would say
20       yes, I would think it would be.
21   Q.   Well, what about the freedom of association;
22       do you think that should be a fundamental
23       right as well?
0117
 1           MS. NELSON:  Object to the form.
 2   A.   Fundamental meaning incontrovertible, that you
 3       have this no matter what?
 4   Q.   Meaning those groups of rights that --
 5   A.   Are fundamental.
 6   Q.   -- those groups of rights that a civilized
 7       society should have and should observe, are
 8       those rights without which a civilized society
 9       could not long exist?
10           MS. NELSON:  Object to the form.
11   A.   Yeah.  I've never thought about it.
12   Q.   But when you think about it in that context,

13    do you think the right to free speech is
14    fundamental?
15        MS. NELSON:  Object to the form.
16  A.  To whom?
17  Q.  To the individual speaking.
18        MS. NELSON:  Object to the form.
19  A.  I guess it would depend on the individual.
20    You know, I've not thought about it.
21  Q.  Okay.  In your opinion, if an employee of the
22    City of Dothan tells a consumer or a defendant
23    that they can seek recourse with the City
0118
1    clerk if they have a claim, that that would be
2    a matter of public concern?
3        MS. NELSON:  Object to the form.
4  Q.  Do you understand the question?
5  A.  No.  Could you just repeat it.  I was thinking
6    about social organizations.  I'm sorry.
7  Q.  Do you think that if a government employee
8    tells a citizen that if they have a claim
9    against the City, they could seek recourse by
10    filing that claim with the City clerk, that
11    that's a matter of public concern?
12        MS. NELSON:  Object to the form.
13  A.  Do I think that if all they told them is that
14    you need to go to the City clerk's office?  Is
15    that your question?  If that's all they said
16    to the person, if you have a claim, you need
17    to go to the City clerk's office?
18        MS. NELSON:  That's not his --
19        THE WITNESS:  Right.  That wasn't his
20          question.
21  A.  So, no.
22  Q.  It's not a matter of public concern?
23  A.  No.
0119
1  Q.  Well, why not?  Why shouldn't the public know
2    that they have a right to seek recourse with
3    the City clerk?
4  A.  I think they should know they have a right to
5    seek recourse with the -- I think they have a
6    right to know they need to go -- if they have
7    a claim, they have to go to the City clerk's
8    office to file that claim.  Yeah, I think they
9    do have that right to know just that.  If you
10    have a claim, you need to go to the City

11      clerk's office and file it.
12   Q.  What about the right to know that something
13      wrong has been done to them by their
14      government?  Do they have a right to know
15      that?
16   A.  Well, who determines whether something wrong
17      has been done by their government?
18   Q.  Well, what if something wrong has been done,
19      do they have a right to know that something
20      wrong has been done to them by their
21      government?
22   A.  Generally?  I mean, like in the whole world?
23      I don't know.
0120
1   Q.  Well --
2   A.  Somebody has got to determine that there has
3      been a wrong.
4   Q.  Well, let's assume that there has been a wrong
5      and some government employee tells a consumer
6      citizen/defendant that there has been a wrong,
7      would that be something that that
8      citizen/consumer/defendant would have a right
9      to know or should have a right to know?
10        MS. NELSON:  Object to the form.  Right to
11           know by whom?
12   A.  And who said it was wrong, that person?
13   Q.  If they had been wronged, do they have a right
14      to know that they have been wronged?
15        MS. NELSON:  Object to the form.
16   Q.  Is that something that the consuming public
17      should know?  Do you have to wrestle with this
18      question?
19        MS. NELSON:  Well, you've got me confused
20           because I'm not sure what you're
21           talking about.  If you want to
22           specifically ask her about Mary Beth
23           Brackin's situation --
0121
1        MR. JAFFREE:  I'm asking her in general.
2        MS. NELSON:  You're asking her
3           hypothetical questions which I don't
4           even understand.
5   Q.  Well, do you understand the question?
6   A.  I mean, in the whole world?
7   Q.  Your attorney is trying to tell you that you
8      don't understand, but do you not understand

9       the question?
10  A.  No.  Because you're asking in the whole world
11      if a citizen has been wronged by the
12      government --
13  Q.  By his government.  Do you think --
14  A.  -- do they have a right to know?
15  Q.  As a general principle, is it a matter of
16      public concern to that citizen that his
17      government or her government has wronged them?
18          MS. NELSON:  Object to the form.
19  Q.  As a general principle.
20          MS. NELSON:  Right to know from whom?
21  Q.  Right to know from any member of government
22      telling that person that your government has
23      wronged you?
0122
1           MS. NELSON:  Object to the form.
2   Q.  The information of something they have a right
3       to know that the government has wronged them?
4           Now, the transcript is only going to show
5       a response.  The reality is that you're taking
6       a long time to respond.  And I'm asking
7       you -- I mean, you're taking a long time to
8       respond on most of these questions, a long
9       time.
10          But I'm asking you, is this something that
11      you're wrestling with in your own conscience?
12  A.  I just think it's a vague, hypothetical
13      question.
14  Q.  What's vague about that?
15          MS. NELSON:  I don't have a clue what
16          you're --
17  Q.  What's vague about the principle?  You think
18      the principle is vague?
19  A.  Whether or not a person had the right to know
20      that their government has wronged them.
21          MS. NELSON:  Object to the form. That is
22          so hypothetical, so not
23          understandable.
0123
1   A.  Wronged them how?
2   Q.  All right.  So let's be more specific as your
3       attorney suggested.
4   A.  Please.
5   Q.  What if a citizen had been wrongfully arrested
6       in the City of Dothan in the municipal court

7      or at least by process that was issued by the
8      municipal court, they were wrongfully arrested
9      by mistake, by error, no malice but just
10     wrongfully arrested?  Is that something that
11     is a matter of public concern, the fact that
12     they have been wrongfully arrested?
13        MS. NELSON:  Object to the form.
14  A.  I think it depends on --
15        THE WITNESS:  Do I answer?
16        MS. NELSON:  Yeah.
17  A.  I think it depends on how you define public
18     concern.  I mean, is it the concern of the
19     entire public that this person has been
20     wrongfully arrested and should this person go
21     out broadcasting to the entire world, hey,
22     this person has been wrongfully arrested?  I
23     don't know.  I don't know how what -- I don't
0124
1      know how you define public concern.
2   Q.  Let's assume --
3   A.  What is public concern, Mr. Jaffree?  How do
4      you define public concern?
5   Q.  Something the members of the public would have
6      a right to know, something that is of import
7      to members of the public.
8   A.  So every claim that's filed against the City
9      of Dothan by a citizen, an employee should go
10     tell everybody, hey, this person has been
11     wronged, they should have a right to do that?
12     Is that what you're asking me?
13  Q.  Well, that's not what I asked you.
14  A.  I don't know.  That's what I'm saying.  I
15     don't what you're asking me.
16  Q.  Let me see if this hypothetical one you're
17     going to have to wrestle with as well.
18        MS. NELSON:  Well, I'm going to --
19        THE WITNESS:  Do you have the Fondren
20           investigation stuff?  Can we see that?
21        MS. NELSON:  The Fondren stuff?
22        THE WITNESS:  Yes.
23        MR. JAFFREE:  We're going to get to the
0125
1           Fondren stuff in a minute.
2        MS. NELSON:  Well, you're engaging her --
3           I wish you would just get to the
4           Fondren stuff.  You're engaging her in

5      a dialect to try to show your claims,
6      to engage her into legal issues and
7      questions which you would not allow me
8      to question your plaintiffs on
9      about --
10    MR. JAFFREE:  My clients are neophytes.
11    MS. NELSON:  -- Constitution --
12    MR. JAFFREE:  I mean, they have no
13      schooling and -- the little smattering
14      of law they know is what they got from
15      the municipal office, which on --
16    MS. NELSON:  Well, the fact that the
17      judge --
18    MR. JAFFREE:  -- which on the total scheme
19      of things is not very much.
20    MS. NELSON:  Well, still doesn't mean you
21      can question her on all theories of
22      constitutional law.
23    MR. JAFFREE:  I suspect that a review in
0126
1      court would say that I could treat a
2      sitting judge who has several years of
3      law school who's been an attorney for
4      years is different.
5    MS. NELSON:  I disagree.  The facts are --
6      you can ask her the facts of this
7      case.  The facts are what they are.
8      You can argue all day wether it's
9      public concern, whether the City had
10      business reason -- justifiable reasons
11      for placing certain restraints in
12      effect.  And we can argue with the
13      courts all day long.  But to ask this
14      judge hypotheticals for the rest of
15      this morning is inappropriate, and I'm
16      going to continue to object.
17    MR. JAFFREE:  I'm moving.
18    MS. NELSON:  And we can be here until the
19      cows come home.
20    MR. JAFFREE:  Well, I'm not going to wait
21      until the cows come home because I'm
22      going to move on.
23      (Brief recess)
0127
1  Q.  What about informing a citizen that they could
2     request the municipal judge to appoint another

3    public defender; is that a matter of public
4    concern that defendants should know?
5  A.  That what?
6      MS. NELSON:  Object to the form.
7  Q.  That they can ask the judge to appoint another
8    public defender, is that something that a
9    defendant should know?
10      MS. NELSON:  Object to the form.
11  A.  If they can -- if they have a right to ask the
12    judge to use another public defender?
13  Q.  And if you tell them that is --
14  A.  And that's all they say?  You can ask the
15    judge to give you another public defender.
16    That's all.
17  Q.  If you tell them that, then that's okay?
18  A.  That's it, right.
19  Q.  So you're saying that that is a matter that
20    they should have a right to tell somebody?
21  A.  Yeah.
22  Q.  In your opinion, do employees give up their
23    right to free speech and association when they
0128
1    enter the public square?
2      MS. NELSON:  Object to the form.
3  A.  No.
4  Q.  How do you define due process?
5      MS. NELSON:  Object to the form.  It calls
6       for legal conclusion.
7  A.  Generally?
8  Q.  Yeah.  Generally, how do you define that?
9  A.  Due process.  Just a -- you know, a mechanism
10    by which a person is afforded a hearing on an
11    issue.
12  Q.  Are you familiar with substantive due process?
13  A.  Somewhat, yes.
14  Q.  How do you define substantive due process?
15      MS. NELSON:  Object to the form.  Calls
16       for legal conclusion.
17      MR. JAFFREE:  She said she's familiar.
18  Q.  How do you define it?
19      MS. NELSON:  Object to the form.  She said
20       generally.
21  A.  Yeah.  Generally, just due process, just the
22    ability of a person to have a -- to be heard
23    on an issue.
0129

1   Q.   Well, isn't substantive due process a little
2        bit something more than that?
3   A.   If that's how you define it.  I don't know.
4        That's what I think it is.
5   Q.   If I tell you that, in my view, substantive
6        due process means that there's some things
7        people shouldn't lose a property interest
8        regardless of what kind of procedure of
9        process is afforded them.
10            Would you agree that this --
11           MS. NELSON:  Object to the form.
12  A.   No.
13  Q.   You don't agree to that?  Okay.
14  A.   I would agree that that's your opinion.
15  Q.   Goodness.  My opinion.  Okay.
16           Do you agree that merit system employees
17       have a property interest in continued
18       employment?
19           MS. NELSON:  Object to the form.  It calls
20               for legal conclusion and an opinion.
21  Q.   Do you know whether or not they have a
22       property interest in continuing employment?
23       If you know.
0130
1   A.   I would agree, yes, that they do have a
2        property interest.
3   Q.   You agree.  Okay.  Good.
4            And this right can only be taken for good
5        cause shown?
6            MS. NELSON:  Object to the form.
7   A.   Do I agree that it can be only be taken with
8        good cause shown?
9   Q.   Yeah.
10  A.   Their property right -- their property
11       interest in employment can only been taken for
12       good cause shown.  I would agree with that.
13       Yes.
14  Q.   All right.  I also asked you about substantive
15       rights, and you sort of disagreed with the
16       substantive rights of municipal employees.
17  A.   No.
18           MS. NELSON:  I object.
19  A.   With your definition.
20           MS. NELSON:  I object to the
21               characterization of her comment.
22           MR. JAFFREE:  Well, I'm asking.

23   Q.   In addition to procedural rights that a merit
0131
1        system employee may have in challenging an
2        employment termination decision, does she or
3        he have any substantive rights?
4           MS. NELSON:  Object to the form.
5   A.   Anywhere in the world or in the city of
6        Dothan?
7   Q.   In the city of Dothan.
8           MS. NELSON:  Object to the form.
9   A.   Yeah.  I don't know.  I'm not familiar with
10       what rights are afforded.
11  Q.   Was Mary Brackin a merit system employee as
12       far as you know?
13  A.   Yes, as far as I know.
14          MS. NELSON:  Object.  When you say "merit
15             system," what do you mean?
16          MR. JAFFREE:  In the classified
17             system a --
18          MS. NELSON:  Classified, non-probationary
19             employee?
20          MR. JAFFREE:  Yeah, classified,
21             non-probationary employee.
22          MS. NELSON:  Okay.
23  A.   Yes.
0132
1           MS. NELSON:  That's what you mean by merit
2             employee?
3           MR. JAFFREE:  Well, yes.  But they
4             generally mean that the -- they are --
5           MS. NELSON:  Who is "they?"
6           MR. JAFFREE:  Courts.  They generally
7             classify merit system employees, are
8             employees that after they have gone
9             through their probationary period can
10            only be terminated for cause.
11          MS. NELSON:  Is that your -- that's
12            your --
13          MR. JAFFREE:  That's my opinion of the
14            law.
15          MS. NELSON:  -- opinion.
16          MR. JAFFREE:  Prove me wrong.
17  Q.   Anyway, starting with the first day of your
18       hire, ending with the last day of Mary
19       Brackin's employment, can you identify all the
20       employees that you have disciplined in any

21      manner?
22   A.  No.
23   Q.  You can't identify them?
0133
1   A.  No, I can't identify every employee that I've
2        disciplined since Mary Beth was hired till
3        today, because I don't know when Mary Beth was
4        hired and it covers along time span.
5   Q.  All right.  Well, let's say since she was
6        rehired in 2001, up to the time that she was
7        terminated, do you know all the employees that
8        you have terminated?
9   A.  Terminated?
10   Q.  I'm sorry.  You have disciplined.
11   A.  No.
12   Q.  Let's me ask you this:  Have you ever
13        disciplined a black employee?
14   A.  Specifically, a black employee?  I don't
15        remember.
16   Q.  Have you ever disciplined specifically a white
17        employee?
18   A.  It depends on what you mean by "discipline."
19        Do you mean a personnel writeup, a memo like
20        Nancy did, or e-mail.  She said that was
21        discipline when she e-mailed somebody.  So --
22   Q.  Well, how do you define discipline?
23   A.  No.  How do you define it?  Because I've got
0134
1        to answer your question.
2   Q.  I'm asking you the question:  How do you
3        define discipline?
4   A.  How do I define discipline?  When I whip my
5        children.  I'm sorry.  But that's what I think
6        of as discipline.
7   Q.  As far as a employee of the City of Dothan in
8        the Judicial Department, how do you define
9        discipline?
10   A.  How do I define discipline?  I mean, I guess
11        it could be any number of means:  verbal
12        counseling, writeup, e-mail.
13   Q.  Okay.
14   A.  Let me think of all the forms of discipline:
15        verbal counseling, write-ups, e-mails, memos.
16   Q.  So it's your testimony that Nancy's testimony
17        that she sent a memo to an employee is a form
18        of discipline?

19   A.   That was Nancy's testimony.  I agree with
20        that.
21   Q.   Is that your view, that that's a form of
22        discipline?
23   A.   It depends on what the memo says.  If it --if
0135
1         it counsels them on something they did and
2         punishes them in some way for their actions.
3         Yes.
4    Q.   The memo's got to punish them?
5    A.   For it to be discipline.
6    Q.   Have you ever sent a memo punishing some black
7         employee for something that they did?
8    A.   Have I ever sent a memo -- I'm not -- I might
9         have.
10   Q.   Do you know whether you have?
11   A.   No, I don't know whether I have or not
12        specifically.
13   Q.   Have you ever sent a memo or other written
14        document punishing some white employee for
15        something that they have done?
16   A.   I might have.  I -- I'm not -- I don't know.
17        I'm not --
18   Q.   You don't know whether you have or not?
19   A.   I don't remember every specific incident if I
20        did send a memo.
21   Q.   Do you remember any specific incident?
22   A.   No.
23   Q.   You don't remember any --
0136
1    A.   No.
2    Q.   -- specific incident?
3    A.   I don't remember any.
4    Q.   Okay.  Have you ever terminated a white
5         employee?
6    A.   Ever in life?
7    Q.   During the time that you was a municipal judge
8         with the City Of Dothan?
9    A.   Yes.
10   Q.   Do you know the names of the black employees
11        that you have terminated since you have been a
12        municipal judge with the City of Dothan?
13   A.   No, I don't.
14   Q.   You don't know the names of the employees that
15        you have terminated since you have been a
16        municipal judge with the City of Dothan?

17   A.  Do I know each and every name?
18   Q.  Well, first, do you know each and every name?
19        MS. NELSON:  Each and every name of what?
20        MR. JAFFREE:  Of the employees that she
21           has terminated since she's been a
22           municipal judge with the City of
23           Dothan.
0137
1         MS. NELSON:  Any names is what you're
2            asking?
3         MR. JAFFREE:  Well, first, she asked me
4            each and every name.
5         MS. NELSON:  Each and every name?
6         MR. JAFFREE:  So I'm asking her a
7            question.
8    Q.  Do you know each and every name?
9         MS. NELSON:  Just right here from memory?
10        MR. JAFFREE:  Well, from however.
11   Q.  Do you know each and every name?
12   A.  I'm not sure that if I gave you a list, it
13      would be all inclusive.
14   Q.  Well, can you give me a list?
15   A.   Of every employee that's been terminated by
16      the City of Dothan.
17   Q.  By you?
18   A.  By me.
19   Q.  By your hand, by your instigation?
20        MS. NELSON:  Object to the form.
21   A.  By my instigation?
22        MS. NELSON:  Object to the form.
23   Q.  That you had some involvement in the
0138
1      termination of this employee that was employed
2      with the Judicial Department during your
3      tenure for the City of Dothan?
4    A.  Well, there was one employee that was
5      terminated for testing positive for drugs.
6    Q.  Who was that?
7    A.  I don't remember her name.  Allison.  But I
8      don't remember her last name.
9         There was another employee who
10      falsified --
11   Q.  Well --
12   A.  No.  I've got to tell you why because I don't
13      --
14   Q.  Well, if you insist on telling me why, go

15      ahead.

16  A.   There was another employee who was terminated

17      for falsifying a time card, putting down time,

18      saying that she was here for a week when she

19      was not.

20  Q.   Who is that?

21  A.   I don't remember.  That would be Debbie Irby.

22      Then her supervisor --

23  Q.   Well, excuse me.  Let me stop you for a

0139

1       second.  Debbie Irby wasn't terminated, was

2       she?

3   A.   Well, she was allowed to resign, so strike her

4       through as a terminated employee.

5   Q.   But you was going to terminate her?

6   A.   I don't remember.  I -- I was just including

7       her in the list.

8   Q.   Okay.

9   A.   She resigned so I didn't -- that -- that

10      wasn't the question.  I guess if that's what

11      you're saying.

12  Q.   Anyone else associated with Debbie on this

13      time card thing?

14  A.   Well, maybe they didn't -- I can't give you a

15      list of people who were terminated, then,

16      because some of them might have resigned.

17  Q.   Anyone else associated with Debbie Irby

18      dealing with that time card?

19  A.   Whether they were terminated or resigned?  Is

20      that what you're asking me?

21  Q.   Yeah, terminated or resigned associated with

22      Debbie?

23  A.   So we're adjusting the question now to

0140

1       employees that were either terminated or

2       resigned?  I can include either category?

3   Q.   Well, that you caused to resign.

4           MS. NELSON:  Object to the form.

5   A.   I didn't -- no.

6   Q.   Well, then let's just limit it to terminated

7       then.  Okay?  Terminated.  You're the one that

8       gave me Debbie Irby's name.  But, fine, we'll

9       strike her.

10  A.   You said she resigned.

11  Q.   Well, I just wanted to clarify that because

12      the Record is going to suggest that she

13    resigned.
14  A.  Yeah.
15  Q.  But who were you involved with that was
16    terminated?
17  A.  I guess terminated would be the employee who
18    testified -- who tested positive for drugs.
19    Whether she was terminated or resigned, I
20    don't remember.
21  Q.  But Allison may have resigned?
22  A.   The employee who falsified her time card and
23    somebody turned it in to Personnel.  The
0141
1    supervisor who signed the time card that was
2    falsified might have been terminated or
3    resigned.  I'm not sure.
4  Q.  Who was that?
5  A.  Who?
6  Q.  Are we talking about Debbie Irby, or are we
7    talking about somebody else?
8        MS. NELSON:  You're asking who was Debbie
9        Irby's supervisor?  Is that who --
10  A.  Donna Nicholson was Debbie Irby's --
11  Q.  So you terminated Donna Nicholson?
12  A.  I'm not sure whether she was terminated or
13    resigned.
14  Q.  Can we stop at Donna Nicholson a minute?  And
15    let me ask you, Donna Nicholson is the one
16    that was involved in placing a adverse entry
17    in the evaluation of Mary Brackin I think in
18    2001; is that correct?
19  A.  I don't remember.
20  Q.  And do you remember the incident involving
21    Ms. Ralpeje?  Do you remember Ms. Ralpeje?
22  A.  I remember the name Ralpeje.
23  Q.  And do you remember initiating an internal
0142
1    affairs investigation of Ms. Ralpeje?
2        MS. NELSON:  Object to the form.
3  A.  Of allegations made by a bondsman and
4    Mrs. Ralpeje?
5  Q.  Well, let's back up.  Ms. Ralpeje didn't make
6    any accusation did she?
7        MS. NELSON:  Object to the form.
8  A.  Ralpeje?
9  Q.  Ms. Ralpeje did not make any allegation, did
10    she?

11   A.   She did about --
12   Q.   Well, the record says that she didn't make any
13        allegation.
14        MS. NELSON:  Well, I thought you were
15            asking this witness as to the Ralpeje
16            incident?
17        MR. JAFFREE:  We're getting to that.
18        MS. NELSON:  And you're not letting her
19            tell what happened.  You're trying to
20            tell her how to testify.
21        MR. JAFFREE:  Well, she's saying
22            something, I'm trying to get some
23            clarity.
0143
1    Q.   You're saying Ms. Ralpeje complained saying
2         what?
3    A.   She made allegations that she had been told by
4         a magistrate that we had had problems with a
5         public defender, that he wasn't any good, that
6         he should not have let her plead guilty to
7         that DUI.  And -- and she came back in the
8         open court in front of people, saying all
9         that.
10            And then we had a bondsman come up and
11        said that he felt threatened because
12        Ms. Brackin had called him at home the night
13        before and asked him to change his testimony
14        because she didn't say what he -- what --
15        anyway, he was upset because he wanted to know
16        how Ms. Brackin got his number at home to call
17        him.  And he wanted -- and he said that she
18        called him and asked him.  So those were
19        allegations that I asked for an investigator
20        to look into.
21            It also involved Ms. Ralpeje's mother or
22        her sister who was in the lobby also at the
23        time that Ms. Brackin talked to Ms. Ralpeje.
0144
1         And -- and I did ask for an investigator
2         because we needed their expertise in dealing
3         with witnessed who are not employees of the
4         City of Dothan.
5    Q.   We'll talk about this investigation later.
6    A.   That's the whole gist of it.
7    Q.   But did you get the results of the
8         investigation?

9   A.   I think her supervisor got the results of the
10       investigation.
11  Q.   Okay.  Did you have an opportunity to review
12       the results of the investigation?
13  A.   I'm sure I did, but I don't remember
14       specifically.
15  Q.   And the results of the investigation would
16       have included the transcript of the
17       investigators?
18  A.   I'm not sure what all it included.
19  Q.   But it could have included the transcript?
20  A.   It could have.
21  Q.   Now, the transcript says that Ms. Ralpeje did
22       not say that, did not make a complaint about
23       Ms. Brackin --
0145
1   A.   She did not make a complaint about
2        Ms. Brackin; she made a complaint about her
3        public defender.
4   Q.   Well, she didn't make a complaint that
5        Ms. Brackin had said anything bad about her
6        public defender.
7   A.   She did say that --
8   Q.   Well, the record --
9   A.   -- in open court.
10  Q.   The record says that she didn't say that.
11       MS. NELSON:  What record are you talking
12         about?
13       MR. JAFFREE:  The transcript.
14       MS. NELSON:  You're saying that
15         Ms. Brackin said she didn't say that.
16       MR. JAFFREE:  Ms. Brackin said she didn't
17         say that?  I'm saying that Ms. Ralpeje
18         said she didn't say that.
19       MS. NELSON:  Do you have the record you
20         could show the judge?
21       MR. JAFFREE:  Well, the record will be
22           produced.  But I'm trying to --
23  Q.   Did you have an opportunity to observe the
0146
1        record?
2   A.   I'm sure I did at some point.
3   Q.   Okay.  And if the record says that Ms. Ralpeje
4        did not say that, you're saying that she did?
5   A.   Yeah.  I was there.
6   Q.   And are you saying that Ms. Ralpeje's other

7       person who was with her said that as well?
8    A.   No, I didn't say what the other person said.
9       I said that the other person was in the -- the
10       bondsman and either her sister or her mother
11       were in the lobby with her.  And so because
12       they were -- the mother and the sister was
13       there, she was in -- she was part of the
14       investigation.  But I didn't do the
15       investigation.  No.  I asked for the
16       investigators to look into it.
17    Q.   Now, the person that was involved was
18       Shaun -- Shaun is it?  Is that his name,
19       Shaun?
20    A.   Which person?
21    Q.   The public defender.
22    A.   Was Shaun McGhee.
23    Q.   Shaun McGhee.
0147
1    A.   More than likely.
2    Q.   And at that time, Shaun McGhee was engaged to
3       Michelle Sellers?
4    A.   At some point.  I'm not sure that at that time
5       they were.
6    Q.   But he could have been engaged to Michelle?
7    A.   Could have.
8    Q.   And Michelle Sellers took an active role in
9       this case, didn't she?
10    A.   I don't think so.
11    Q.   You don't think so?
12    A.   No.
13    Q.   Do you think Michelle Sellers was trying to
14       come up with theories on how Mary Beth could
15       be punished?
16    A.   No.
17    Q.   She wasn't?
18    A.   The bondsman is what prompted the
19       investigation of Mary Beth because he -- he
20       was complaining about how did she get his
21       number as if she had used court documents to
22       get his number.
23          And Ms. Ott who was a prosecutor at that
0148
1       time said that we need to look into it in case
2       he brought some kind of action.  He was very
3       upset when he came in --
4    Q.   Is your testimony --

5   A.   -- because he said that Mary Beth called him
6        at home and threatened -- not threatened.  He
7        felt threatened because she asked him to
8        change his testimony.
9   Q.   And, you know, Mary Beth disagreed with --
10  A.   Yeah, I do.
11  Q.   -- with that statement?
12  A.   I know that.
13  Q.   All right.  As a matter of fact, the only one
14       that makes the statement about something that
15       Mary Beth may have said adverse to a --
16       concerning a public defender was the bondsman;
17       isn't that correct?
18  A.   No.  Ms. Ralpeje said that when she came back
19       to court.
20  Q.   And isn't it also correct that the public
21       defender had only been in court just one
22       previous time; and, therefore, Ms. Brackin
23       would have no knowledge of any bad performance
0149
1        of him.  Is that correct?
2   A.   No, I don't agree with that.  I think Shaun
3        had been there before.
4   Q.   Well, what if the record shows that he hasn't
5        been there before?
6   A.   I don't know.  But I just think -- I don't
7        remember him --
8   Q.   Here's the point I'm trying to get at:  Do you
9        recall having a debate on this issue with
10       Debbie -- Donna Nicholson and you wanted Donna
11       to strongly discipline Ms. Brackin?  Do you
12       remember that?
13  A.   No.
14  Q.   And she said no, she don't think that she
15       should discipline her, and you insisted pretty
16       much.  You don't remember that dialogue?
17  A.   No.  She was not disciplined for that, was
18       she?
19  Q.   Well --
20       MS. NELSON:  No, she wasn't.
21       THE WITNESS:  No, I didn't prevail if
22          that's what he's saying.
23  Q.   Well, no, you didn't prevail.
0150
1   A.   Well, you said, would I overrule her?
2   Q.   But shortly thereafter, Donna got fired.  Now,

3     let's talk about this firing.
4        Isn't it true that Donna got fired merely
5     because she was giving an employee comp time
6     but the employee had worked -- but hadn't
7     worked the week that she was claiming, but
8     giving her comp time for the next week?  Isn't
9     that true?
10  A.   That's not my understanding.
11  Q.   And isn't it also true that you told Donna
12       that had she asked you, you would have
13       approved it, but since she didn't ask you in
14       advance that she was being fired?
15  A.   No.  Can I answer your question, Mr. Jaffree.
16  Q.   This is not true?
17  A.   That is not true.
18        One of the employees in the magistrates'
19       office who did not like Donna and Debbie
20       copied the time cards where Debbie put that
21       she was here Monday, Tuesday, Wednesday,
22       Thursday, where she put eight hours.  She
23       didn't put comp time.  She put that she was
0151
1     there working.  She was gone to her brother's
2     wedding in Wisconsin or somewhere.
3        One of their friends sent it over to
4     Personnel.  It never came through me.
5     Personnel called and said, we've got a time
6     card for a woman saying she worked a week, her
7     supervisor signed it knowing she was not there
8     that week, and you need to address it.  And
9     they called me over.  I didn't know anything
10       about it.
11  Q.   And you're saying it didn't have anything to
12       do with comp time; is that your testimony?
13  A.   With what?
14  Q.   With comp time, that she was getting paid
15       for --
16  A.   Not that I --
17  Q.   comp time.
18  A.   If it did, I don't see --
19        MS. NELSON:  What is comp time.
20  A.   -- why they would've fired -- why they
21       fired -- comp time.
22        MR. JAFFREE:  What is comp time?
23        MS. NELSON:  Yes.
0152

1      MR. JAFFREE:  Are you familiar with the
2       word "comp time?"
3      MS. NELSON:  I want to know what you meant
4       by it.
5      MR. JAFFREE:  To compensate her for her
6       time that she had worked one week and
7       she's claiming it another week.
8  A.  Well, she should have put it on that week.
9    She shouldn't have put that she worked Monday,
10    January 28th, eight hours; Tuesday, January
11    29th, eight hours; Wednesday, January -- and
12    if -- that implies that she worked those three
13    days.  And her supervisor signed it saying she
14    was there those three days.  When they found
15    out that it wasn't, they said her time card
16    was falsified.
17  Q.  Okay.  But you summarily terminated her,
18    right?
19  A.  No.
20      MS. NELSON:  Object to the form.
21  A.  I did not summarily.  We had a hearing.  She
22    had a hearing.  She could have appealed it.  I
23    mean, they -- she had due process.
0153
1      Remember when you were asking me about due
2    process?  Remember you were asking me about
3    due process?  She had all the due process that
4    the civil rights thing you're -- everything
5    that Civil Service Act affords her, she had
6    it.  And she chose -- she did not appeal it.
7  Q.  But the bottom line is that --
8  A.  If she felt wronged, she should've appealed
9    it.  She had recourse.
10  Q.  You was angry with her because --
11  A.  No.
12  Q.  -- she did not discipline --
13  A.  No, I was not angry with her.
14  Q.  Well, let me finish the question.
15  A.  I've never been angry with her.
16  Q.  She did not discipline --
17  A.  No.
18  Q.  -- Ms. Brackin?
19  A.  No.  No.  Because if I -- I could have
20    disciplined her if I thought she needed it if
21    I wanted to overrule her.
22  Q.  Did you say Ms. Brackin's friend copied the

23    time card?
0154
1  A.  I said one of Donna and Debbie's friends in
2     the magistrates' office sent it over to
3     Personnel.  One of their friends who knew that
4     she wasn't there that week.  We had no way of
5     knowing that -- who was there.
6  Q.  Okay.  I sort of got stuck with Donna.
7        Can you think of any other employees?  And
8     then I'm going to break.  Any other employees
9     that you terminated?
10 A.  No.
11 Q.  So possibly Allison, may have resigned or may
12    have been terminated; Debbie Irby, who may
13    have resigned or may have been terminated; and
14    Donna is the only ones you can recall?
15 A.  And you said resigned or terminated.
16 Q.  Well, I think you said they may have
17    resigned.  But can you recall anybody else
18    that you caused to be to terminated?
19 A.  That I caused to be terminated?
20 Q.  Yeah.
21      MS. NELSON:  Object to the form.
22 Q.  Well, so far, you've given me one name.
23 A.  Employees who were terminated during my
0155
1     tenure?
2  Q.  Yeah.
3  A.  Kevin Sorrells was terminated.
4  Q.  Did you play a role in that?
5  A.  I'm sure I did as department head.  He was a
6     probational employee who other magistrates
7     told me they were afraid of because he threw
8     temper tantrums, threw files, threw a book and
9     hit the window.
10 Q.  If I asked you specifics about --
11 A.  Told me he was going to make me fire him.
12 Q.  Hold on.  Hold on.  If I asked you specifics
13    about these throwing books and temper
14    tantrums --
15 A.  I've seen him throw a fit.  Mary Beth has,
16    too.
17 Q.  You can't provide any specifics, could you?
18 A.  Yeah.  I've seen Kevin throw files when he got
19    mad and --
20 Q.  Were there any memos concerning his file

21     throwing?
22   A.  I don't know if there were or not.  He was on
23     probation.
0156
 1   Q.  But if there were, I should have them, right?
 2   A.  I don't know.  If it's in his personnel file.
 3   Q.  Then I should have it.
 4   A.  I don't know.
 5   Q.  Is that correct?
 6   A.  I don't maintain personnel files.
 7   Q.  All right.  Who else?
 8   A.  Who was terminated?  Nancy Martin was
 9     terminated.
10   Q.  And the two Marys, correct?
11   A.  Mary -- Mary Turner was terminated.  Mary Beth
12     Brackin.
13   Q.  Anyone else?
14   A.  Not that I can think of.  I'm sure there are
15     others, but I can't think of them right now.
16   Q.  Some others that you may have caused the
17     termination?
18   A.  There might have been.
19         They caused their own termination by their
20     actions.  Their actions caused their
21     termination.  I didn't do any of it.
22   Q.  How do I get a list of these people who was
23     terminated by you?
0157
 1   A.  I don't know.
 2   Q.  You don't know how I could get your list?
 3   A.  No.
 4   Q.  And you don't know how many there have been?
 5   A.  No.
 6   Q.  You have no way of finding out, let's say, at
 7     lunchtime how many people you have caused the
 8     termination of?
 9   A.  Not at lunchtime, no.
10   Q.  It would take you longer than that?
11   A.  Possibly.  Yes, it would take longer than
12     lunch.
13       MS. NELSON:  You've asked this question in
14         discovery, Mr. Jaffree.
15       MR. JAFFREE:  Yeah.  And what response did
16         I get?
17       MS. NELSON:  I've responded to it.
18       MR. JAFFREE:  Well, I'm not sure she have

```
19          given me all the names.  Well, she
20          don't recall.
21      MS. NELSON:  Well, you're asking her
22          cold.  I mean, she's been judge for a
23          number of years.  She's trying to give
0158
 1          you a best answer.  I've given you
 2          written responses.
 3  Q.  I don't have any other questions right now.
 4      We could break.  And I'll move on.  I
 5      apologize for getting into this dialogue with
 6      you about Ms. Nichols.  I just want to clarify
 7      the one point of comp time, and you're
 8      disputing that comp time?
 9  A.  I'm not -- no, I'm not disputing comp time as
10      a premise.  I'm just not --
11      MS. NELSON:  She's testified that she was
12          terminated for falsification on time
13          cards.
14  A.  And that she had all the due process afforded
15      her by the Civil Service Act.
16  Q.  One point.  Everybody that you have terminated
17      so far has been Caucasian; is that correct?
18  A.  I'm not sure.  Not -- they might have been.
19  Q.  Is there any possibility that somebody who was
20      not Caucasian was terminated by you?
21  A.  I've not thought about the ethnicity of the
22      people that were terminated.
23  Q.  You're not aware of their --
0159
 1  A.  I -- if I --
 2  Q.  -- ethnic identity?
 3  A.  I probably would be if I had a specific name,
 4      but I just -- I didn't -- I didn't base their
 5      employment on their ethnicity.  It didn't play
 6      any part in their termination.  It would have
 7      been solely based on some action by them which
 8      caused them to be terminated.  It was not
 9      initiated because of their race or sex.
10      MR. JAFFREE:  Can we break now?
11          (Lunch recess)
12  Q.  Michelle Bryan, you're familiar with her,
13      aren't you?
14  A.  Yes.
15  Q.  She resigned and then withdrew her
16      resignation, but she wasn't permitted to
```

17     withdraw her resignation.

18       Do you know the circumstances surrounding

19     that?

20     MS. NELSON:  Object to form.  Assumes

21      facts not in evidence.

22  A.  I know that Michelle Bryan gave --

23     MR. JAFFREE:  From facts based on

0160

1      documents you gave me.

2  A.  I know she gave her resignation.  And, you

3     know, at that time Personnel was probably

4     notified.  All that went through our court

5     administrator.

6  Q.  You had no role to do in the denial of her

7     attempt to withdraw her resignation?

8  A.  Well, she -- she was resigned.  She gave

9     notice and resigned.

10  Q.  Yeah.  But then she gave notice of her intent

11     to rescind that resignation.

12  A.  Yeah.  I don't know.  I mean, I don't know

13     whether -- you know if Personnel had already

14     been notified, and the position was opened,

15     you know, she couldn't just rescind, I

16     assume.  But, again, you know, all that went

17     through our court administrator.  But once a

18     person resigns -- gives their notice that

19     they're leaving and we send it to Personnel,

20     they close it out.  You know, there's nothing

21     we can do about it.

22  Q.  All right.  What amount of job performance

23     discretion did you permit Bettye King, the

0161

1     former administrator of the magistrates?

2  A.  What amount?

3  Q.  Yeah.

4  A.  In terms of percentages?  You said, what

5     amount?  A lot or little?

6  Q.  I don't mean amount in terms of percentage.  I

7     mean, what degree of job performance

8     discretion --

9  A.  I don't know.

10  Q.  -- you permitted Bettye King?

11  A.  Whatever degree of discretion she wanted.  I

12     mean, I -- you know, I try not to interfere

13     with the day-to-day -- the only way I knew

14     there was a problem over there is if somebody

15    came to me or it was brought to my attention.
16    I was not over there every day.  I did
17    not -- I could not physically be over there
18    every day.
19  Q.  How long was Bettye King the administrator of
20    the magistrates' office, do you know?
21  A.  I'm not sure.  About two years I think.
22  Q.  And she preceded Nancy; is that correct?
23  A.  Probably, yes.
0162
1  Q.  Did the magistrates' office have problems when
2    Bettye King was the administrator?
3      MS. NELSON:  Object to the form.
4  A.  Right.
5  Q.  Right what, right what she did or right that
6    you object to the form?
7      MS. NELSON:  Depending on what you meant
8        by problems.  But if she understands,
9        she can answer it.
10  A.  Yeah.  It depends on what you mean by
11    problems.
12  Q.  Did they have personnel problems in the
13    magistrate office when Bettye King was the
14    administrator?
15  A.  And if I -- it just depends on what you mean
16    by -- you'd have to ask Bettye King
17    specifically.
18  Q.  Were you aware of any problems in the
19    magistrate office when Bettye King was the
20    administrator?
21  A.  Not specific problems.  I mean, just a normal
22    course of business of running an office.
23  Q.  Was it running quite well when she was the
0163
1    administrator?
2  A.  As compared to what?  I mean, we're a
3    bureaucracy, so we're always -- something is
4    always going on.
5  Q.  Well, as compared to her predecessor?
6  A.  Her predecessor being Donna?
7  Q.  Was that her predecessor?
8  A.  The person immediately preceding her.  Yes, I
9    think Donna would be her predecessor.  Just
10    nothing specific stands out with problems.
11  Q.  Do you know why Ms. King left?
12  A.  She told me for a better job and because she

13    was driving from Auburn to Dothan, three hours
14    each way every day, five days a week.
15  Q.  Was Ms. King black or white?
16  A.  She was black.
17  Q.  Can you identify any occasion when you
18    requested that Ms. King change a performance
19    evaluation or any of the subcategories within
20    an evaluation?
21      MS. NELSON:  Object to the form.  I don't
22      understand what you just asked.
23      MR. JAFFREE:  I cannot believe counsel is
0164
 1      having trouble understanding all these
 2      questions before --
 3      MS. NELSON:  I am having a very hard time
 4      understanding your questions.
 5  Q.  All right.  I'll try again.
 6      Can you identify any occasion where you
 7    requested that Ms. King change a performance
 8    evaluation or any subcategory within the
 9    evaluation?
10  A.  Can I remember a specific occasion?  No, I
11    cannot remember a specific occasion when I
12    informed -- asked Ms. Bettye King to change an
13    evaluation or a subcategory thereof.
14  Q.  Is that something that you would normally
15    remember?
16  A.  Not really because we have -- I mean, 12
17    evaluations three -- twice a year.  That's 24
18    evaluations a year for the -- you know, for
19    the past eight years.
20  Q.  A new non-tenured employee.  Do you know what
21    that means, non-tenured employee?
22  A.  No, I don't think so.
23      MS. NELSON:  There's no such thing.
0165
 1  Q.  A new non-permanent employee, non-merit system
 2    employee, non-classified employee, how
 3    frequently should they have evaluations done?
 4      MS. NELSON:  Object to the form.
 5  A.  Are you talking about probationary employees?
 6  Q.  Yeah.
 7  A.  Because I -- do we have a merit system here?
 8    You keep saying "merit."  I'm confused.
 9      MS. NELSON:  There is no merit.  That's
10      his term.

11  Q.  Or classified system.  Merit is a broad
12      category that covers people who have job
13      protection in the government sector.
14          MS. NELSON:  That's your term.
15  A.  I've never heard of --
16          MR. JAFFREE:  Do you dispute that term?
17              I'm doing the very thing I said I
18              wasn't going to do.
19  A.  I don't think the City of Dothan has a merit
20      system.
21  Q.  Regardless of whether you call it a merit
22      system or classified service system or a civil
23      service system.
0166
1  A.  Okay.
2  Q.  Whatever you call it, how frequently is a
3      probational employee evaluated?
4  A.  I don't think there's a set number of times.
5      And I don't think there is.  But I don't
6      know.  I'd have to refer to the Personnel
7      Rules and Regulations.
8  Q.  You not personally familiar with them?
9  A.  I'm familiar with them.  I'm just not familiar
10     with the specific number of times at this
11     point.
12  Q.  Nancy testified during her deposition that you
13      was present for, at least in part, yesterday
14      that during her initial or subsequent job
15      interview, you told her that there was
16      problems in the magistrate office.
17          Do you dispute that you told her that?
18  A.  No, I don't dispute that.
19  Q.  Have those problems been longstanding in the
20      magistrate office?
21  A.  It depends on which problems because I think I
22      was -- it depends on which problems.
23  Q.  Well, whatever problems you were referring
0167
1      to --
2  A.  When was I telling her?
3  Q.  -- when you told Nancy that?
4  A.  Well, we handle a large volume of paperwork,
5      approximately 15 to 17,000 tickets per year,
6      7,000 misdemeanors.  And there's a lot of
7      paperwork and a lot of loose paperwork, some
8      of it attached by gem clips.  And we were

```
 9        having problems with -- you know, keeping
10        everything together.  So I really wanted her
11        to work on the filing system, on keeping
12        paperwork together, and on cross-training
13        magistrates.  And that's something that was in
14        place when she came, which I told her that we
15        wanted to do.
16   Q.   What was something that was in place?
17   A.   That we -- we had already talked about
18        cross-training before Nancy got there.
19   Q.   Who put it in place?
20   A.   We -- well, we developed the idea --
21   Q.   Who were "we?"
22   A.    -- when I say "in place."
23   Q.   Who were "we?"
0168
 1   A.   The prior administrator and -- and I had
 2        agreed that everybody needed to be
 3        cross-trained because that was one of the
 4        problems, that if one person wasn't there,
 5        there was nobody trained to take her place.
 6   Q.   Well, there was one more than one prior
 7        administrator.  So are you talking about --
 8   A.   I don't know which.  We had -- we had already
 9        went --
10   Q.   You don't know if it was Bettye King or --
11   A.   I don't.
12   Q.   What's the other one's name?  I keep
13        forgetting her name.  What's the other
14        administrator prior to Bettye King; what's her
15        name?
16   A.   Prior to Bettye King would have been Donna
17        Nicholson.
18   Q.   So you don't know whether it was Donna that
19        started the policy of cross-training or
20        Bettye?
21   A.   No.  I don't -- I don't know under whose
22        tenure it actually started.  We had done it to
23        a limited extent, but not a formalized
0169
 1        written, you know, just let's-do-it-type
 2        thing.
 3   Q.   So the problem with these files, they had
 4        existed during Ms. King's administration?
 5   A.   It always exists just by the sheer volume of
 6        paperwork we handle on a daily basis.
```

7   Q.  So you thought it was a problem that would
8        always be there?
9   A.  It would -- yeah, I think it will always be
10       there, but it can be managed better.
11  Q.   She also testified that you had pointed out
12       three bad magistrates that she needed to watch
13       out for.
14            Do you remember that testimony?
15  A.  I remember her testimony.
16  Q.  Do you remember telling her that?
17  A.  No.  I don't remember specifically saying,
18       there are three bad magistrates that you have
19       to watch out for, and naming three people.
20  Q.  So that would be a disputed --
21  A.   That would be a lie, and it would be
22       unprofessional.  And I would never do that as
23       a personnel administrator.
0170
1   Q.  I don't understand what you mean by a lie.
2   A.  It would be a lie that I said, Nancy, there
3        are three bad magistrates in that office that
4        I want you to write up and their names are.  I
5        wouldn't do that.
6   Q.  So it's your testimony that Nancy is lying --
7   A.  Yes.
8   Q.  -- when she say that?
9   A.  It is my testimony that Nancy is lying when
10       she said that I told her that there were three
11       bad magistrates in the office and that I named
12       those three magistrates.
13  Q.  You would agree with me that Nancy's version
14       and your version cannot stand in the same
15       sphere in perfect harmony?
16       MS. NELSON:  Object to the form.  As to
17           that particular testimony?
18  A.  Nancy is lying.  I never told her that.
19  Q.   She also indicated that you told her one of
20       the three had assaulted a member of management
21       and that she better be careful because they
22       could assault her.
23            Do you dispute that you told her that?
0171
1        MS. NELSON:  Object to the form.
2   A.  Yes, that -- I deny that, that that -- telling
3        her that --
4        MS. NELSON:  Okay.  She'll pick it up.

5   Q.  Do you recall telling her anything at first
6      about any magistrate during that first
7      interview?
8   A.  I did not tell her anything adverse.  I might
9      have told her the -- some facts but nothing
10     adverse like just intentionally negative about
11     anybody.
12  Q.  Did you give her some negative facts during
13     that first interview about any magistrate?
14  A.  I -- I -- no, I would not say negative facts.
15     Facts, period.  It is what it is.
16  Q.  Well, facts that wasn't pleasant?
17  A.  I might have.
18  Q.  So you might have told her some bad facts
19     about a magistrate during that --
20        MS. NELSON:  Object to the form.
21  Q.  -- initial interview?
22  A.  No.
23        MS. NELSON:  That's not her testimony.
0172
1   A.  Right.  No, I don't.
2   Q.  What is her testimony?
3   A.  My testimony is that -- that her first
4      interview was with a panel consisting of a
5      public defender, Kathleen Nemish; a city
6      prosecutor, Kevan Kelley; myself; and a police
7      captain.
8         And that I would not have sat in that
9      first interview in front of those people and
10     said, Nancy, and said the things that she said
11     I said.
12  Q.  Let me stop --
13  A.  It was a professional interview, focus on
14     Nancy's qualifications for the job, which I
15     now see she -- which I later found out she
16     misrepresented.
17  Q.  I mean, you've certainly given me a lot of
18     unsolicited information right now.  But if I
19     could get you back --
20  A.  You only want to hear --
21  Q.  -- to some questions that I want to give to
22     you.
23        You indicated that a police captain was in
0173
1      on that interview?
2   A.  Uh-huh (positive response).

3      MS. NELSON:  You've got to say yes or no.
4  A.  Yes.
5  Q.  What role did the police captain play?
6  A.  Just sitting in on the interview process
7    because that was one of the departments with
8    which we work.
9  Q.  Well, didn't you testify earlier that the two
10    agencies were --
11  A.  Separate.
12  Q.  -- independent and separate --
13  A.  Yes.
14  Q.  -- because they needed to be?
15  A.  Yeah.  We also had a public defender who is a
16    separate entity, a city prosecutor that's a
17    separate entity --
18  Q.  Who's that --
19  A.  -- but we all have to interact with each
20    other.
21  Q.  Whose idea was it to have a --
22  A.  Panel?
23  Q.  -- police captain --
0174
1  A.  It was mine to have a panel.
2  Q.  -- in on a -- I'm sorry.  It was whose idea?
3  A.  Mine, to have a panel rather than just --
4  Q.  And whose idea was it to include in that panel
5    a police captain?
6  A.  Mine I'm sure.
7  Q.  Did anybody recommend that you do that?
8  A.  No.  Just like nobody recommended I get
9    somebody from Personnel or Legal.  Those are
10    just people we had -- departments we had to
11    deal with.
12  Q.  Is it safe to say, based on your testimony
13    that during this first interview, even though
14    it consisted of a panel, you may have given
15    some facts that was not favorable towards a
16    particular magistrate?
17  A.  It is not safe to say that, no.
18  Q.  But you may have given some facts about a
19    magistrate?
20      MS. NELSON:  Asked and answered.  That's
21      not her testimony.
22    MR. JAFFREE:  I'm asking.
23    MS. NELSON:  She said she gave some facts.
0175

1   Q.  Facts about a magistrate?
2   A.  About the magistrates' office.
3   Q.  Did you give any facts about a magistrate?
4       I'm just trying to get clear what your
5       testimony is.
6           MS. NELSON:  Asked and answered.
7   Q.  And in spite of your attorney's --
8   A.  And I continue to say, no.
9   Q.  Pardon?
10  A.  I continue to say no.  I just don't think I
11      would do that.
12  Q.  Well, let's talk about your second interview.
13      Did you tell her anything about three bad
14      magistrates during her second interview?
15  A.  I just -- no.  I just don't remember it being
16      as specific as Nancy would allege.  No.
17  Q.  Could it be that you told her that and you
18      just don't recall?
19  A.  I would have recalled that.
20  Q.  You would recall that?
21  A.  Yes.
22  Q.  Did you give her any facts about any
23      magistrate during that second interview?
0176
1   A.  A specific -- I would have -- no, not a
2       specific magistrate.  No.
3   Q.  You're very comfortable with your no position?
4   A.  Pretty much so.
5   Q.  Pretty much so.  Okay.
6   A.  Yes.  I am very comfortable because at all
7       interviews there were other people.
8   Q.  Okay.  Now, were you also present when Nancy
9       testified that you subsequently told her
10      specifics about certain magistrates before she
11      started but after she was hired?  Were you
12      present when she testified to that?
13  A.  I was.
14  Q.  And that she learned that it was Mary Turner
15      who had allegedly assaulted a person in
16      management.  Prior to Nancy's hire, did Mary
17      Turner assault anyone in management?
18          MS. NELSON:  Object to the form.  Is
19          that -- object to the form.  I'm not
20          sure that was in any testimony I heard
21          yesterday.
22  Q.  She also testified that Mary Brackin and Mary

23      Turner were the two magistrates that caused

0177

1       the most trouble?

2           Do you recall that testimony?

3   A.  That she testified that they were the two that

4       caused the most trouble?

5   Q.  Yeah.

6   A.  That she said that?

7   Q.  That she said that you told her that?

8   A.  Do I recall her saying that?

9   Q.  Yeah.

10  A.  Is that what you're asking?

11  Q.  Well, forget about whether you recall her

12      saying that.  Do you agree that you told her

13      that --

14  A.  No.

15  Q.  -- at a subsequent meeting?

16          Do you agree or disagree that you told her

17      that these two magistrates was attempting to

18      sabotage you?

19  A.  I -- I just don't think -- no.  I just don't

20      think I would have told Nancy that.

21  Q.  You're not quite sure?

22  A.  I'm quite sure.  No, not at -- I'm hiring

23      somebody.  I wouldn't just sit there and tell

0178

1       them that.  That's somebody I've never met

2       before.  No.

3   Q.  So you're quite --

4   A.  No.

5   Q.  You're quite equivocal that you didn't tell

6       her that?

7   A.  I -- no -- I mean, yes, I'm sure that I did

8       not tell her that.

9   Q.  And that these two was also attempting to

10      sabotage prior administrators?

11  A.  Were attempting to?

12  Q.  Sure.  Had attempted to sabotage prior

13      administrators?

14  A.  They had attempted to sabotage prior

15      administrators.  I don't know.  No.

16  Q.  You didn't --

17  A.  I don't remember that.

18  Q.  -- tell her that?

19  A.  I don't remember saying that to her.

20  Q.  You could have said that?

21   A.  No.  I don't see why I would have in an
22      interview -- on a job interview.  No.
23   Q.  Do you have a recollection that you didn't say
0179
1      it, or you just think you probably didn't say
2      it?
3   A.  I don't -- I don't see where I would have said
4      it.
5   Q.  Okay.
6   A.  There were other people in the interview.
7   Q.  Were these two magistrates attempting to
8      sabotage you?
9       MS. NELSON:  Object to form.
10   A.  I don't know.
11   Q.  You don't know whether Mary Turner and Mary
12      Brackin was attempting to sabotage you?
13   A.  I have no specific knowledge of Mary Turner
14      and Mary attempting to sabotage me.
15   Q.  What about attempting to sabotage prior
16      administrators, do you have any knowledge of
17      that?
18   A.  Not Bettye King.
19   Q.  Well, what about the other administrator?
20   A.  Donna Nicholson?
21   Q.  Uh-huh (positive response).  Do you think
22      those two tried to sabotage her?
23   A.  I don't have any specific knowledge that they
0180
1      did.
2   Q.  Okay.  She also claims that you told her that
3      she had to be on the lookout for them, that
4      they would attempt bodily harm, and so she
5      needed to be careful?
6   A.  That is a lie.  I never told Mary -- Nancy
7      that Mary Turner and Mary Brackin would
8      attempt bodily harm on her.
9   Q.  She also testified that you told her that --
10   A.  I would never condone that.
11   Q.  Okay.  She also testified that you told her
12      that Mary Beth was under investigation for
13      something that she had told a defendant.
14       MS. NELSON:  Is that a question?
15       MR. JAFFREE:  Yeah.
16   Q.  Do you --
17   A.  I might have.
18   Q.  Do you dispute that you told her that?

19   A.   No, I don't dispute.
20   Q.   So you may have told her that Mary Beth was
21        under investigation?
22   A.   If she was at the time, yes.
23   Q.   Had that investigation been completed by the
0181
1         time Nancy was being interviewed?
2    A.   I don't remember.  I think the result -- no, I
3         don't remember.
4    Q.   If it had been completed, would you have told
5         her that she was under investigation?
6    A.   If it had been completed, would I have told
7         her that it was still under investigation?
8    Q.   Yeah.  Was this told to Nancy during the
9         interview, that she was under investigation?
10   A.   I don't know why I would if it had been
11        completed.
12   Q.   All right.  So you may have told her, or you
13        know that you did tell her that?
14   A.   Well, if it had completed, I wouldn't tell
15        it's still going on.  I would have no purpose
16        for doing that.
17   Q.   She also testified during this meeting that
18        you told her that Sarah Fowler wouldn't
19        instigate anything on her own but she was a
20        follower of Mary -- Mary Turner and Mary
21        Brackin.
22             Could you have told her that?
23   A.   I don't remember telling her that
0182
1         specifically, no.
2    Q.   Could you have told her that, perhaps in --
3         not in those words but similar content?
4    A.   Possibly.
5    Q.   So you may have told her that?
6    A.   Possibly.
7    Q.   So if you had told her that Sarah Fowler was a
8         follower of Mary Turner and Mary Brackin, then
9         you may have told her something about Mary
10        Turner and Mary Brackin; is that correct?
11   A.   I don't know.  I mean, what I would have told
12        her is what their job duties were, how they
13        interacted in the office, because I was trying
14        to give her a feel of the whole office.  I
15        would have told her about every magistrate.  I
16        wouldn't have just sat there and said

17    something about three people --
18    Q.   Well, no --
19    A.   -- out of a whole office to a person I'd never
20         met before.  No.
21    Q.   She didn't say it was just limited to three.
22         Now, with respect to Michelle Bryan, she
23    said you told her that she was in a hole with
0183
1     leave time, that she was out sick a lot, out
2     sick with her children.
3          Could you have told her that?
4     A.  Possibly.
5     Q.   Would Nancy have known about that prior to her
6          employment with the City?
7     A.  I don't know if she knew Michelle Bryan before
8          she came to the City or not.
9     Q.   She also testified you told her that Michelle
10         was very cute and divorced.
11         Could you have told her that?
12         MS. NELSON:  When she did she testify to
13         this?  Object to the form.
14         MR. JAFFREE:  Well, I mean, look at the
15         transcript.  She did testify to that.
16    A.   "Very cute and divorced."  I don't know.
17         MS. NELSON:  You said yesterday.
18         MR. JAFFREE:  Well, I recall the
19         testimony.
20    Q.   Well, did you tell her that she was cute and
21         divorced?
22    A.  I don't -- I don't remember specifically
23         telling her that.
0184
1     Q.   Well, was Michelle Bryan, in your view, cute?
2     A.  No.
3     Q.   In your view, was Michelle Bryan divorced?
4     A.  I never thought she was divorced.
5     Q.   She also testified that --
6     A.  I thought she had a husband.
7     Q.   -- she socialized a lot in the office and that
8          she talked on the phone with several police
9          officers, and was dating several.  This is her
10         testimony.
11         Did you tell her that?
12    A.  I don't -- that was kind of common knowledge
13         around the office.  I don't remember
14         specifically telling her that.

15   Q.  But it was so common, you knew about it,
16     right?
17   A.  Everybody knew about it.
18   Q.  Including you?
19   A.  Yes.
20   Q.  So you may have told her that?
21   A.  I don't remember -- I don't gossip like that
22     with somebody I've never met before.  No.
23   Q.  Well --
0185
1   A.  No.
2   Q.  If Nancy --
3   A.  No.
4   Q.  So you didn't tell her that?
5   A.  In her interview, Mr. Jaffree, I told her all
6     that in her job interview?
7   Q.  Well, I'm telling you what Nancy says.
8   A.  I'm asking.  No, I did not, in a job
9     interview.
10   Q.  No.  She didn't say interview.
11   A.  That's what you said.
12   Q.  She said in a subsequent meeting, she said she
13     came in two or more times subsequently --
14     subsequent to her being hired but before she
15     actually put boots in the ground to start
16     working physically in the facility, she said
17     she met with you and you told her this, one on
18     one, no committee, just you and her, mono to
19     mono.
20         Do you remember her testimony?
21   A.  No.
22   Q.  You don't remember her testimony?
23   A.  No, not specifically.
0186
1   Q.  She also testified that you would have to deal
2     with her dating and cut down on her
3     socialization -- socializing.
4         Could you have told her that?
5     MS. NELSON:  You're talking still in the
6       time before she was hired?
7     MR. JAFFREE:  Yeah.  She was hired but
8       before she started working.
9     MS. NELSON:  You said, before she "put
10       boots in the ground."  I have no idea
11       what that means.  You're saying,
12       before she was hired or after she --

13          MR. JAFFREE:  I said more than just boots
14             in the ground.  I said boots in the
15             ground and started working at the
16             facility.
17          MS. NELSON:  Before -- so you're asking
18             her, did she say -- we're talking
19             about a time frame before she started
20             working at the facility.
21          MR. JAFFREE:  Subsequent to her hire but
22             before her start date.
23    A.   So what was she doing?
0187
1    Q.   At any time, do you recall telling Nancy to
2          cut down on Michelle Bryan's socialization --
3          socializing with men?
4    A.   I don't specifically remember that, but I
5          remember that that was a problem during that
6          time.
7    Q.   Do you generally remember telling Nancy that?
8    A.   No, but I remember -- no.  I don't remember
9          saying, Nancy --
10    Q.   So it was a problem?
11    A.   Yes.
12    Q.   So you could have told Nancy that?
13    A.   Could I have told Nancy that, you need to stop
14          her from socializing?  I just don't remember
15          specifically.
16    Q.   Do you have any reason to believe that Nancy
17          would have had knowledge of Michelle's
18          socializing before she started working?
19    A.   You said she had started working.
20          MS. NELSON:  Well, if you're confused, ask
21             him to --
22    A.   Well, you said --
23    Q.   She was hired but hadn't started -- there was
0188
1          a month or more gap between the time she was
2          hired and the time she started.
3    A.   I don't know.  She said, she knew Valarie
4          Savage and her family, and Valarie and
5          Michelle Bryan were best friends.
6    Q.   So she could have gotten this information from
7          Valarie Savage?
8    A.   Right.  Or just -- I don't know.
9    Q.   Or she could have gotten it from you; you're
10          not sure?

11   A.   I don't know.
12   Q.   She could have gotten it from you?
13   A.   I don't -- I don't think so.
14   Q.   Well, but that part of her--
15   A.   I wouldn't gossip with Nancy.
16   Q.   Well, that part of her testimony could be
17        true?
18   A.   No.  No.
19   Q.   You want to say no now?
20   A.   Yeah, I want to say no.
21   Q.   You feel comfortable with no?
22   A.   Yeah.  Yes, I feel comfortable with no.  I
23        wouldn't sit there and gossip with an employee
0189
1         that I had just --
2    Q.   She also stated that you wanted her -- that
3         she needed to look out for Valarie Savage,
4         that she had many problems in her previous
5         employment as secretary to Judge Steensland.
6             Do you know if Valarie Savage formerly
7         worked for Judge Steensland?
8    A.   I know she worked for a circuit judge, and I
9         vehemently deny ever telling her that or that
10        Valarie slept with prisoners.  I vehemently
11        deny that.
12   Q.   Well, I haven't got to that yet.
13   A.   I heard her say that yesterday.
14   Q.   But you do remember that testimony?
15   A.   I vehemently deny all statements she made
16        about Valarie Savage.
17   Q.   That her attitude was bad and that you should
18        have fired her a long time ago?
19   A.   Valarie is one of our most prized employees.
20        And I value her.
21   Q.   Are you disputing that testimony?
22   A.   I dispute that.  And I'm appalled that Nancy
23        would say that, and I hope she's not told her
0190
1         that.
2    Q.   Okay.  And that she has slept with inmates
3         apparently when she worked at Judge
4         Steensland's office, and that was one of the
5         reasons why they had to let her go?
6    A.   Well, why did I hire her if I knew all that?
7    Q.   Well --
8    A.   If I told her all that, but I hired her

9      anyway?
10   Q.   I'm not in your head.
11   A.   Well, it's just ludicrous, is all I'm saying.
12       I deny telling that.
13   Q.   So you deny -- you dispute that testimony?
14   A.   Yes, I dispute telling Nancy that.
15   Q.   Do you know how Nancy would have known that
16       Valarie Savage worked for Judge Steensland?
17   A.   She said that she and Valarie's family were
18       friends and that Valarie's aunt was her best
19       friend's mother; she knew members of her
20       family.
21   Q.   So you think maybe --
22   A.   Do you remember that testimony yesterday?
23   Q.   Do you think that Valarie may have told her
0191
1       that --
2   A.   She might have.
3   Q.   -- that she slept with inmates?
4   A.   She -- I don't know.  She might have.  I -- I
5       love Valarie.
6   Q.   Did you caution her that she could be sleeping
7       with inmates here in the municipal court
8       system?
9   A.   No, I did not tell her that.  I did not tell
10       Nancy that about Valarie Savage.
11   Q.   You dispute that?
12   A.   I dispute that vehemently,
13       V-E-H-E-M-E-N-T-L-Y.  Vehemently deny that.
14   Q.   And then she went on to --
15   A.   I'm sorry.
16   Q.   And then she went on to Ann Baxter, and she
17       said you mentioned that she was nice and would
18       do anything for you, but she had problems
19       balancing money.
20           Now, could you have told her that Ann
21       Baxter, sweet person, but had problems
22       balancing money?  Could you have told her
23       that?
0192
1   A.   I'm not sure.
2   Q.   Did Ann Baxter have problems balancing money?
3   A.   She had problems with the computer system that
4       was in place at the time.  I don't know if
5       Nancy might have misunderstood.
6   Q.   So you could have said something --

7   A.   About the computer system.
8   Q.   -- and Nancy misunderstood?
9   A.   Shy might have.
10  Q.   Could she have misunderstood what you said
11       about Valarie?
12  A.   Valarie.  I -- I -- not only did she
13       misunderstand that, I never would have sat
14       there in a professional job interview and
15       gossip and malign people.
16  Q.   So it's your testimony that Nancy just made
17       all this up out of whole cloth?
18  A.   No.  I think Nancy heard that from gossiping
19       in the office with Mary Beth and Mary Turner
20       and Valarie, whoever else she gossiped with.
21  Q.   Upon what do you premise your remarks, that
22       Nancy heard that from Mary Beth and Mary
23       Turner?
0193
1   A.   I said whoever she gossiped with.
2   Q.   Well, you first said Mary Beth and Mary
3        Turner.
4   A.   I said Mary Beth or whoever she gossiped with.
5   Q.   Well, who all did Mary gossip with -- I'm
6        sorry -- Nancy gossip with?
7   A.   It looks like everybody from what you're
8        saying.
9   Q.   Well, based --
10  A.   Because you sure knew a lot.
11  Q.   Well, based on your personal knowledge, who
12       all does she gossip with?
13  A.   I have -- I don't have no personal knowledge
14       of whom Nancy gossiped with.
15  Q.   With respect to Ann Baxter, I think she also
16       said that she makes numerous mistakes in
17       computer entry.
18       Did you tell her that?
19       MS. NELSON:  Are we talking about Ann --
20       MR. JAFFREE:  Ann Baxter.
21       MS. NELSON:  Ann Baxter?  So your question
22       is, did the judge --
23  Q.   Tell Nancy that, that Ann Baxter makes
0194
1        numerous mistakes in computer entry?
2   A.   I don't know.  I remember telling her that
3        there were a lot of computer problems.  And
4        Ann -- because Ann was working the window, she

5       had to bear the brunt of it.
6   Q.   So you may have told her that part?
7   A.   That they had computer problems, yes.
8   Q.   So you may have told her that.
9   A.   That they had computer problems.
10  Q.   Do you recall telling her that, or you may
11       have told her that?
12  A.   I may have told her they had computer
13       problems.
14  Q.   So you can't dispute that?
15  A.   No, that they had -- were having computer
16       problems.  No.
17  Q.   So we're parsing out what you may have told
18       and not told her about Ann.
19           She also stated that you told her that Ann
20       was, at that time, being investigated by
21       Valerie Harris.
22           Are you familiar with Valerie Harris?
23  A.   I'm am.  She was an internal auditor doing the
0195
1        liaison between the computer system and us.
2        The city manager appointed her.  So Valarie
3        Savage might have been working on the computer
4        problem errors that Ann was having.
5   Q.   Is it conceivable that Valerie may have
6        been -- Valerie Harris, that is, may have been
7        investigating --
8   A.   Computer problems.
9   Q.   -- Ann Baxter?
10  A.   Computer problems.  Ann bore the brunt of it
11       because she worked the window.  She worked the
12       window, so she was the one entering.  And so
13       she had more computer errors.
14  Q.   Well, my question is, whatever Ms. Harris was
15       investigating, it could have involved Ann
16       Baxter?
17  A.   It could have.  Yes, it could have, and
18       computer errors.
19  Q.   So you could have -- and you may have told
20       Nancy that?
21  A.   Right.
22  Q.   Just like you have admitted that you told her
23       about this other investigation involving
0196
1        Ms. Brackin, you also could have told her
2        about the investigation involving Ann Baxter?

3   A.  But what I told you about the investigation,
4       if it was closed, I would never have told her
5       it was ongoing.  If it was closed, it was
6       over.
7   Q.  Well, maybe it wasn't closed.  I mean, this
8       was in December I guess or maybe in January.
9   A.  Yeah, I don't.
10  Q.  So maybe it wasn't closed?
11  A.  But if I was trying to give her an overview of
12      the office, I might have said some of those
13      things.
14  Q.  You might have said some of those things.
15  A.  But Nancy has taken them and distorted them
16      for the purposes of this lawsuit.  That's what
17      she's done.
18  Q.  That's what you think, she's distorted them?
19  A.  That's what I know.  I was there.
20  Q.  Haven't Nancy been consistent --
21  A.  No.
22  Q.  -- on what she saying?
23  A.  No.
0197
1   Q.  Even prior to this lawsuit?
2   A.  No.
3   Q.  Well, I read this little laundry list of stuff
4       that she had --
5   A.  Nancy had.
6   Q.  -- before this lawsuit.
7         MS. NELSON:  Well, just let him ask the
8            questions.  I don't understand the
9            question, consistent with -- I'm
10           not --
11        MR. JAFFREE:  You don't understand what
12           question?
13        MS. NELSON:  I don't understand the
14           question.
15        MR. JAFFREE:  Which question, none of
16           them?
17        MS. NELSON:  About her being consistent.
18           With what, I'm not sure.  You were
19           trying to ask her.
20        MR. JAFFREE:  I don't remember either now.
21           Let me move on.
22  Q.  Do you recall telling Nancy that Ann Baxter
23      had a lot of money?
0198

1   A.  I don't know how I would have known that.  No,
2       I don't recall telling her that.
3   Q.  Did you know that Ann Baxter had a lot of
4       money?
5   A.  No.
6   Q.  Did you know Ann Baxter owned a real estate
7       company?
8   A.  I know she had previously.
9   Q.  Did you tell Nancy that she had owned a real
10      estate company?
11  A.  I'm not sure.  I don't recall.
12  Q.  Did you know that Ann Baxter inherited land
13      from a family member?
14  A.  I don't -- I don't know.  No.  I don't --
15      didn't know Ann that well -- I mean, to know
16      all that.
17  Q.  Well, do you know that now?
18  A.  No.  I know that she owned a real estate
19      company before.
20  Q.  What about inherited money from a family
21      member; did you know that?
22  A.  No.
23  Q.  You don't know that now?  So you didn't tell
0199
1       Nancy that?
2   A.  I don't think so.
3   Q.  So you don't know how Nancy got this
4       information?
5   A.  No.
6   Q.  So if Nancy says you told her, you would
7       dispute that?
8   A.  Pretty much, yes.
9   Q.  Now --
10  A.  I would dispute all of the stuff that she
11      said.
12  Q.  All of the magistrates that I have mentioned
13      so far that Nancy said you told her some
14      things about, were they white or black?
15  A.  Probably white because the majority --
16  Q.  You're not sure?
17  A.  -- of the office is white.
18  Q.  You're not sure?
19  A.  I'd have to go back through each one, but
20      probably, more than likely white.
21  Q.  Well, how far would you have to go back to
22      know whether or not the people I just

23      mentioned are white or black?

0200

1  A.  To the beginning of your list.  You asked me

2     about -- who?  Mary Beth is white.  Mary

3     Turner is white.  Ann Baxter is white.  Who

4     else you asked me about?

5       MS. NELSON:  Sarah Fowler.

6  A.  Sarah Fowler is white.  The office was --

7       MS. NELSON:  Michelle Bryan.

8  A.  -- predominantly white.  Michelle Bryan.

9  Q.  All right.  Now, would you agree that if

10    Nancy's version is correct, then you said

11    something negative about each of those people?

12      MS. NELSON:  Object to the form.

13  A.  If Nancy's version were correct, yeah.

14  Q.  So you gave her sort of a negative picture of

15    each of these white --

16      MS. NELSON:  Object to the form.  She's

17       just denied most everything you've

18       asked her about.

19  Q.  My question is, if Nancy's version is correct,

20    you gave her a negative view of each of these

21    white magistrates.

22      MS. NELSON:  Object.

23  Q.  Is that correct?

0201

1      MS. NELSON:  That's totally not the

2       testimony and hypothetical.

3  A.  If Nancy's version were correct, but it's not

4    correct.

5  Q.  Now, do you remember what Nancy stated that

6    you told her about Lavera?

7  A.  No, I don't.

8  Q.  She said that you highly praised Lavera, that

9    she was a good magistrate.

10  A.  I thought Valarie is the best magistrate we've

11    ever had, and she didn't say I said that.

12  Q.  That she previously worked at the jail, very

13    well liked, knowledgeable.

14      Did you tell Nancy that about Lavera?

15  A.  I don't -- I don't remember what I would have

16    said.

17  Q.  Is that something that you thought about

18    Lavera at the time Nancy was employed?

19  A.  I wouldn't have said that she was most

20    knowledgeable because I think she was very new

21      then.
22   Q.  Well, I didn't say "most knowledgeable" but
23      very knowledgeable?
0202
1    A.  I don't think -- I wouldn't have said that.  I
2       mean, because she was new.  She was -- she had
3       just started.
4    Q.  How new is Lavera in January or February of
5       2004?
6    A.  I don't remember.  But --
7    Q.  She wasn't that new, was she?
8    A.  I don't -- she was one of the newer ones, one
9       of the newer magistrates.
10   Q.  She wasn't that new in --
11         MS. NELSON:  She said, she didn't know.
12   A.  And when I say "new" --
13         MR. JAFFREE:  Well, if she didn't know,
14            how can she say she was new?
15   Q.  What is the basis of that statement?
16   A.  She was one of the newer ones.  In terms of
17      all of the people you've named, she was one of
18      the newer ones.  Michelle Bryan was a newer
19      one.
20   Q.  Well, do know whether or not that is something
21      that you would have said about Lavera at the
22      time?
23         MS. NELSON:  Asked and answered.
0203
1    A.  That she worked in the jail.  Parts of it,
2       yes.  I think that --
3    Q.  So you may have told Nancy that?
4    A.  That she worked in the jail or --
5    Q.  Nancy couldn't think of anything negative you
6       said about Lavera.
7    A.  Nancy is trying to sue me for racial
8       discrimination.  She wouldn't tell you
9       anything negative I said about Lavera.
10   Q.  Well, then, you're trying to defend a race
11      case, so you may be prone to say anything that
12      would benefit your defense; isn't that
13      correct?
14   A.  You're trying to defend a liar.  I mean,
15      that's the reality of what we're dealing with,
16      Mr. Jaffree.
17   Q.  Yeah.  I mean, I wasn't present so I -- I
18      don't have a dog in this fight in terms of who

19      is telling the truth or not because I wasn't
20      there.  I'm only saying that you both have an
21      interest in trying to convey a certain point
22      of view.
23          You would agree with that, wouldn't you?
0204
1       MS. NELSON:  Object to the form.
2   A.  No.
3   Q.  No, you don't agree with that?  Okay.  Now,
4       she testified that you said that Eunice Knight
5       was very good, very quiet, an efficient and
6       knowledgeable magistrate that wouldn't cause
7       any problems.
8          Did you feel that way about Eunice Knight
9       at the time that Nancy was hired?
10  A.  I think possibly so.
11  Q.  She was quiet, good?
12  A.  Very quiet.
13  Q.  Very efficient and knowledgeable.  So that's
14      something that you could have told Nancy at
15      the time?
16  A.  I could have said, quiet and -- yes.
17  Q.  What hue would you say Lavera and Eunice are?
18          MS. NELSON:  What "hue?"  I mean, what do
19              you mean by that?
20  Q.  Well, what race are they?
21  A.  African-American.  Did I not say anything
22      about Tonya?
23          MS. NELSON:  Let him ask the questions.
0205
1          THE WITNESS:  I'm sorry.
2   Q.  Well, I think if I understand the
3       constellation of facts, Tonya wasn't employed
4       yet at that time.
5          Do you remember Nancy testifying that the
6       white employees was upset and complaining
7       about office assignments?
8   A.  Yes.
9   Q.  And they were upset and complaining about
10      office assignments; isn't that correct?
11  A.  Not that I was aware.
12  Q.  Do you remember how the office assignments
13      were configured?
14  A.  Yes.
15  Q.  Let me -- remember yesterday when Nancy
16      testified that Fran gave her something?

17          MS. NELSON:  Again, you're producing a
18              document that should have been
19              produced yesterday when I deposed.
20          MR. JAFFREE:  Well, Nancy said she didn't
21              have that document yesterday.  She had
22              it at home, but didn't have it with
23              her.
0206
1           MS. NELSON:  Okay.  Well, I again reserve
2               the right to question her not only on
3               some other things that have come up
4               but also as to Plaintiffs' Exhibit
5               Number 5.
6           MR. JAFFREE:  Talking about some other
7               thing that came up.  Because it's only
8               one thing other than that document
9               that came up.
10          MS. NELSON:  Well, the other documents you
11              continue to produce that she didn't
12              produce yesterday.
13          MR. JAFFREE:  Well, that's so funny.  The
14              second document.
15   Q.  But let me ask you to look at what is -- what
16       did I say -- Plaintiffs' Exhibit 5 and ask you
17       if you can identify that document.
18   A.  Yes.
19   Q.  You have seen that document before, haven't
20       you?
21   A.  Yes -- no, no, I've not seen this document
22       before.
23   Q.  Well, how can you identify it?
0207
1   A.  I mean, no.  You said -- I meant this.  Can I
2       identify these offices?  Yes.
3   Q.  Well, before I get to the offices, have you
4       ever seen that document before?
5   A.  Have I ever seen this document before?  Not
6       that -- I can't remember.
7   Q.  All right.  Your counsel, I'm sure, will stop
8       me if I'm incorrect.  But did you hear Nancy
9       testifying that that document was circulated
10      around the office so the people would know
11      where their offices were?
12   A.  No.  I -- I did hear her testify to that.
13   Q.  Are you in a position to dispute that
14      testimony that a document --

15  A.  No.
16  Q.  -- was circulated?
17  A.  No, I'm not.
18  Q.  So it could have been that document?
19  A.  It could have been, but I don't know.
20  Q.  Do you remember her testifying that Fran came
21      by after she had resigned, sometime later
22      perhaps even after Nancy had unceremoniously
23      had been separated from --
0208
1           MS. NELSON:  Object to the form.
2   Q.  -- her office and gave that to Nancy?
3   A.  Do I remember Nancy saying that?
4   Q.  Testifying.  Yeah.
5   A.  Yes, I do.
6   Q.  And you see Fran's name on there, right?
7   A.  Yes.
8   Q.  Okay.  Well, does that diagram depict, based
9       on information you have available to you, a
10      rough sketch of what that office looked like?
11  A.  As much as I can --
12  Q.  Now, let me draw your attention --
13          MS. NELSON:  Well, I'm not sure she
14              answered that.
15  A.  Yeah.  As much as I can determine, it's a
16      really rough draft.
17  Q.  I accept that as an answer.  Let me move on to
18      the next question.
19          Let me draw your attention to that little
20      cubicle that got at seven.  Do you see that?
21  A.  Yeah.
22  Q.  Do you see the seven?
23  A.  Yes.
0209
1   Q.  Wouldn't you agree that in relationship to
2       some other offices, that's a little tiny, tiny
3       cubicle?
4   A.  No.
5   Q.  Okay.  What about number six; would you agree
6       that number six in relationship to some other
7       offices is a tiny, tiny cubicle?
8   A.  No.  Their -- their offices -- I don't know
9       why they have them drawn like this other
10      than --
11  Q.  What about number five?
12  A.  No.  Valarie's office is huge.

13          MS. NELSON:  That's number five?
14          THE WITNESS:  Yeah, it's huge.
15   Q.   So you think that office is huge?
16   A.   It is huge.  You need to go over there.
17        Number seven, everybody in the office wanted
18        it because it's fully windowed --
19   Q.   Well, I appreciate --
20   A.   It's beautiful.
21   Q.    -- your gratuitous information, but I
22        didn't -- I'm not asking what everybody
23        wants.
0210
1    A.   This isn't drawn to scale.  It look -- just
2         because it's drawn like that doesn't mean --
3    Q.   Let me ask you this:  You see that North Oates
4         name down at the bottom?
5    A.   Yes.
6    Q.   Do you recognize that handwriting?
7    A.   No?
8    Q.   What about the E. Adams; do you recognize that
9         handwriting?
10   A.   No.
11   Q.   So you don't recognize the handwriting?
12   A.   No, just not off the top of my head.
13   Q.   Okay.  Let me ask you this:  Which office is
14        larger, office number one, that here seems to
15        be very large or office number six?
16   A.   I don't know as far as measurements go.  I've
17        not measured them, so I don't know.  Which
18        appears on here, six appears, but I don't
19        know.  I've never measured them.  I don't
20        know.
21   Q.   Well, if you had to guess --
22          MS. NELSON:  I would ask her not to
23            guess.
0211
1    Q.   Well, can you give your opinion?
2    A.   I just don't know.  I don't have any way of
3         knowing.  I didn't count them.
4    Q.   So do you think office number one and two to
5         be the same size as office number six and
6         five?
7    A.   I'm not sure.  I'd have to go over there and
8         see.  Sarah is number three.  It looks like
9         it's the same size as one and two.
10   Q.   Well, I haven't got to number three yet.

11   A.   You don't want to.
12   Q.   No, it's not that.  It's that -- you only had
13        so many minorities when this office got
14        selected.  And, therefore, somebody had to get
15        office number three or else I guess they
16        remain empty, huh?
17            Now, Nancy had testified that Lavera was
18        responsible for office assignments.  And I
19        think you have proclaimed to the high heavens
20        that that's simply not true.
21   A.   Right.  Yes, I have denied that.
22   Q.   So who was responsible for office assignments?
23   A.   I was.  Lavera was over the -- well, I was.
0212
1    Q.   Did you send Lavera out as your emissary to
2         tell other staff members that is the office
3         assignment?
4            MS. NELSON:  Object to the form.
5    Q.   Do you understand the question?
6    A.   Yes, I do.  But, no, I did not send her as my
7         emissary.  She was in charge of the physical
8         move.  Mary Beth, your client was in charge of
9         moving the files.
10   Q.   So are you saying that because she was in
11        charge of the --
12   A.   Mary Beth --
13   Q.   -- physical move, she had to tell people where
14        their offices are going to be located?
15   A.   She had to tell them -- yes.  So they would
16        know where to -- to take -- to put their
17        stuff.
18   Q.   So how did she know where --
19   A.   Because we walked around with the -- the guy
20        that was doing the renovations.  And I said,
21        let's put -- Mary Beth is up here --
22   Q.   I need to stop you.  When you say "we," who
23        all are you referring to?
0213
1    A.   It would have been my friend Rhonda, Michelle,
2         Lavera, Johnny, the guy that was doing the
3         renovations.  We were picking out paint
4         colors.  We were doing everything.  I mean, we
5         were renovating the office.
6    Q.   So in terms of the magistrate office, it was
7         just simply Lavera that was with you?
8    A.   Well, Michelle.  I guess -- yes, in terms of

9      the magistrates' office.
10   Q.   And do you consider Michelle part of the
11        magistrates' office?
12   A.   Well, I consider myself a part of it, too.
13        So, yes.
14   Q.   So you and Michelle and Lavera was the only
15        ones associated with the magistrates' office
16        that was going around picking offices?
17   A.   Or -- yeah, I was showing them where stuff
18        needed to go.  Lavera did not assign offices.
19   Q.   Upon what did you base your decision to give
20        Eunice office number one?
21   A.   It was not based on -- I didn't base it on
22        ethnicity or --
23   Q.   Well, upon what did you base it on?
0214
1    A.   -- acoustics.  I mean, just --
2    Q.   I'm not asking you what didn't you base it on.
3            MS. NELSON:  He's just saying how did you
4                determine.
5    A.   I just -- I don't know.  I just said, we need
6        -- this is --
7    Q.   Just arbitrary?
8    A.   It was very just --
9    Q.   And the same thing --
10   A.   Not designed.
11   Q.   -- for office number two?  What about number
12        two; that was arbitrary, too?
13            MS. NELSON:  Object to the form.  She
14                never said it was arbitrary.  That was
15                your word.
16            MR. JAFFREE:  Well, she said number one
17                was arbitrary.
18   A.   Random.  Random is a better word than
19        arbitrary.
20   Q.   Office number one was random.  Was office
21        number two random?
22   A.   Yes.
23   Q.   And it just so happens that Lavera and
0215
1        Eunice's office was next to each other
2        randomly?
3    A.   Yes.
4    Q.   And upon what basis was office number three
5        selected?
6    A.   I was just -- I was going around.  I didn't

7      give it any thought as to --
8   Q.   No thought.
9   A.   -- seniority or logistics or anything.
10   Q.   Well, what about Mary Turner's lack of an
11      office; was that random?
12   A.   Well, she did not have an office.  She was
13      assigned to the front window, so that whole
14      area -- she had a rocking chair up there.  She
15      had all kind of stuff but she didn't --
16   Q.   That was suitable --
17   A.   -- go into an office.
18   Q.   Because she had a rocking chair, that would
19      make up for --
20   A.   No.  I mean, she made that little area --
21   Q.   -- not having an office?  I'm sorry.  Because
22      she had a rocking chair, that would make up
23      for her not having an office?
0216
1   A.   No.  No.
2   Q.   Was there a reason you mentioned a rocking
3      chair?
4   A.   No.  She -- she made her -- put all her stuff
5      up there.  She was assigned to the front
6      window.  That was her eight to five
7      assignment.  So I mean, where would she have
8      gone to her office?  She had every -- a desk
9      there.
10   Q.   She didn't need an office; your statement was
11      that Mary Turner didn't need an office?
12   A.   My statement was that she had an office, but
13      she had space.
14   Q.   Do you remember Nancy's testimony that you was
15      punishing Mary Turner for some altercation she
16      had had with Kai Davis at some meeting?  Do
17      you remember Nancy's testimony to that?
18   A.   Yes.
19   Q.   She testified that you told her that?
20   A.   Yes.
21   Q.   Did you tell Nancy that you was punishing Mary
22      Turner by not giving her an office in
23      retaliation for what she may have done or not
0217
1      done with respect to Kai Davis?
2   A.   No.
3   Q.   Didn't tell Nancy that?
4   A.   No.

5   Q.  She made that up out of thin air?
6   A.  I don't know where she got it from,
7       Mr. Jaffree.
8   Q.  Polluted air perhaps?
9       MS. NELSON:  Object to the form, comment.
10  Q.  Now, do you remember Nancy also testifying
11      that you had it as one of your priorities to
12      insure that the new person, Tonya Minifield --
13      is that her last name -- get a nice office?
14          Now you'd had an administrator on board
15      that, according to you, have discretion and a
16      whole host of things.  Did you direct Nancy to
17      give Tonya Minifield a nice office?
18      MS. NELSON:  Object.  Not so much to that
19          question but to all the prior
20          commentary before.
21  A.  I guess my point is, we gave Valarie a bigger
22      office.
23  Q.  Do you understand the question?
0218
1       MS. NELSON:  He asked about Tonya.  Ask
2           the direct question about Tonya.  Did
3           you direct Tonya -- what was the
4           question?
5   A.  No, I did not direct Nancy to give --
6       MR. JAFFREE:  Do you want to take over my
7           chair now and ask her?
8       MS. NELSON:  No.  But you just go into
9           this long commentary, which I don't
10          agree with and that is not a
11          question.  But it finally led to a
12          question which was, did she direct
13          Tonya and something.
14  Q.  Did you recommend Tonya for any particular
15      office?
16  A.  No.
17  Q.  Did you tell Nancy that you wanted Tonya to
18      have an office?
19  A.  An office?
20  Q.  Yeah, any office?
21  A.  Any office?
22  Q.  Any office.
23  A.  Yes, I'm sure did.  I don't know.
0219
1   Q.  Did you recommend an office --
2   A.  No.

3   Q.   -- for Tonya?
4        Did you suggest that you wanted her to
5     have an office to which she would be pleased?
6   A.   No.
7   Q.   Well, what exactly did you tell Nancy with
8     respect to Tonya's office, to the best of your
9     recollection?
10   A.   I don't remember anything specific about
11     Tonya's -- giving Tonya a special office or an
12     office.  There were office -- there was office
13     space back by the kitchen that was not being
14     used.  It's a huge office.  I think
15     Valarie has -- so I said, you know, you
16     wouldn't have put -- if I had brought Tonya in
17     and put her in that huge office, then they
18     would have really complained.  So we put
19     Valarie in the huge office in the back and
20     gave her Valarie's other office.
21   Q.   Why did you busy yourself with what kind of
22     office Tonya got?
23   A.   Because we were renovating -- the offices
0220
1     weren't complete.  The building was in the
2     process of being renovated.  We had to go back
3     to the commission and ask them to let us
4     continue on with the building.  You see, we
5     had run out of space.  We had to go back to
6     them and ask them to let us continue on
7     renovating.
8   Q.   Well, didn't you have an office that was sort
9     of unoccupied at the time?
10   A.   Where?
11   Q.   Well, I don't know.  Nancy testified
12     about -- let's see.  Oh, what about this area
13     designated as ten; could that be an office?
14        (Brief pause)
15   Q.   Well, just so I'm clear, you did not dispute
16     that you had a discussion with Nancy about
17     where Tonya should be placed.
18   A.   I dispute specifically about Tonya.  The big
19     thing was getting additional renovations done
20     to the office.  I don't see that I would have
21     taken time to go up there and say, give Tonya
22     a special office.
23   Q.   Now, was --
0221

1   A.   No, I -- yes, I dispute that.  I'm sorry.
2   Q.   Well, was Tonya white or black?
3   A.   Black.
4   Q.   And she was new; is that correct?
5   A.   New in terms of -- I don't understand the
6        question.
7             MS. NELSON:  Clarify your question.  New
8               in terms of what?
9   Q.   In terms of her seniority with respect to
10       other magistrates?
11  A.   She was a newer employee, yes.
12  Q.   Was it your policy that if any staff member
13       have a complaint against Nancy, they could
14       come directly to you?
15  A.   No.
16  Q.   What was the proper protocol?
17  A.   I don't know that there was one.  They try to
18       work it out with -- with their supervisor, I
19       would hope, before they would come to me.
20  Q.   But you didn't have a protocol?
21  A.   I asked that complaints be put in writing to
22       cut down on the ying-yang.
23  Q.   You do acknowledge that you asked that
0222
1        complaints be put in writing?
2   A.   I told -- yes, I said that they need to be in
3        writing.
4   Q.   Do you also acknowledge that you said
5        complaints that's not in writing wouldn't be
6        given any serious consideration?
7   A.   I don't remember saying that.
8   Q.   Could you have said that?
9   A.   To whom?
10  Q.   To Nancy.
11  A.   I don't remember specifically saying that, but
12       I would have preferred that they be in
13       writing.
14  Q.   You'd have preferred that they be in writing?
15  A.   Yeah.  If they gave me a serious complaint, of
16       course.  But, yeah, needed to be -- I would
17       prefer in writing.
18  Q.   But the protocol is that they should go to
19       Nancy first?
20  A.   Or whomever their supervisor was unless she
21       was in court.
22  Q.   Now, Nancy had been hired but didn't start at

23      the time that you was interviewing Tonya,

0223

1      right?

2   A.  No.

3   Q.  No what?

4   A.  Tonya had been interviewed before we ever

5      hired Nancy.

6   Q.  So you dispute Nancy's contention that she

7      wanted to sit in on the interview with Tonya?

8   A.  I dispute that Nancy ever asked me could she

9      sit in on an interview with Tonya, and I said,

10     no, you can't.

11  Q.  Well, I guess if Tonya was already hired

12     before you interviewed Nancy --

13  A.  She was already interviewed.

14  Q.  Interviewed.  Did you have any subsequent

15     interviews with Tonya?

16  A.  I don't -- I don't think so.  We had

17     interviewed her, and she was on the list.

18     She -- we interviewed more than one person

19     from that list.

20  Q.  So Nancy is making up this business about

21     wanting to be in on the interview with Tonya?

22  A.  Nancy is lying if she said that I told her,

23     no, you cannot sit in on this interview.  I

0224

1      never said that.

2   Q.  Do you recall responding to anything saying

3      that Nancy had not just started and that's why

4      she was not in on an interview; do you recall

5      whether you responded --

6   A.  No, I think --

7   Q.  -- anywhere saying that?

8   A.  No.  What I think I -- my testimony was --

9      what I remember thinking was that Tonya had

10     been interviewed before Nancy was hired or

11     before she was -- she might have been hired to

12     do the weekend stuff when she would come in

13     on -- she was still full-time with Legal

14     Services Monday through Friday.

15        So she was working on the weekends with

16     HTE, who was coming down from Kentucky to meet

17     with her.  And we had -- we had already

18     interviewed the candidates for magistrate

19     before she came on board full time is my

20     under -- is my recall.

21　Q.　Well, could you be mistaken when you say that
22　　　there was no interviews of Tonya subsequent to
23　　　Nancy's interview?
0225
1　A.　That I did not interview Tonya after Nancy was
2　　　hired?
3　Q.　After Nancy was interviewed.
4　A.　I don't recall that.
5　　　　MS. NELSON:　After she was interviewed?
6　Q.　I think your testimony was after Nancy was
7　　　interviewed.
8　A.　Maybe after Nancy was interviewed but not
9　　　hired?
10　Q.　Well, I'm trying to see what your testimony
11　　　is.
12　A.　I'm confused about your question.
13　Q.　I don't want you to be confused.
14　A.　I am.
15　Q.　I'm not trying to lead you down a primrose
16　　　path.  I just want to see what your testimony
17　　　is.
18　A.　My testimony is that we'd already interviewed
19　　　Tonya before Nancy was hired or came on board
20　　　full-time.
21　Q.　But not necessarily before Nancy got
22　　　interviewed?
23　　　　MS. NELSON:　Do we know when Nancy got
0226
1　　　　　interviewed?
2　Q.　Well, let's just assume that Nancy got
3　　　interviewed in December.
4　　　　MS. NELSON:　Well, I don't want to assume
5　　　　anything.
6　Q.　Well, do you know whether or not she was
7　　　interviewed before Nancy was interviewed?
8　A.　I don't know.
9　Q.　Now, you don't know.
10　A.　Before she was interviewed or hired?
11　Q.　Before Nancy was interviewed.
12　A.　I -- no.
13　Q.　So Nancy submitted to these two interviews
14　　　before groups of people before she was hired?
15　　　I think Nancy said she rejected the job when
16　　　it was first offered.  Do you dispute that?
17　A.　I don't dispute that.  I remember there was
18　　　something about she wanted more money.

19  Q.  Now, you mentioned something that sort of went
20       past me at the time you mentioned it, but
21       suddenly is waving a red flag.
22            MR. JAFFREE:  Sorry for the commentary.
23  Q.  But you said Nancy was not honest about her
0227
1        background or experience or something.  What
2        was Nancy not honest about during the
3        interview process?
4   A.  Not the interview process.  I just understood
5        Nancy that she -- her supervisory experience
6        at Legal Services --
7   Q.  What supervisory experience did Nancy indicate
8        that she had?
9   A.  She told me that she did everything, that you
10       didn't do anything, that you wouldn't fire
11       anybody, that she had to do everything in that
12       office.
13  Q.  She fired people as well?
14  A.  And that's why she left because she was tired
15       of doing everything.
16  Q.  Okay.  So you're saying that maybe she
17       embellished --
18  A.  Yes.
19  Q.  -- her role, or maybe she's telling the truth?
20  A.  Maybe she is.  That she had to do --
21  Q.  So upon what do you base your --
22  A.  Well, then we found out there was one
23       receptionist in the office, and I don't -- I
0228
1        think she embellished the extent of her
2        management experience because she was not
3        office manager.  She was executive secretary
4        by her own testimony --
5   Q.  Well, did she tell you --
6   A.  -- yesterday.
7   Q.  -- that she was executive secretary; do you
8        have her resume?
9   A.  No.  She said she was the office manager, is
10       what she told me.
11  Q.  Okay.  But did you get her resume and it say
12       office manager or executive secretary?
13  A.  I have not looked.
14  Q.  But if she said executive secretary, then --
15  A.  It would have led me to believe that she was
16       not the office manager.  There's a

17    distinction.
18  Q.  Did you -- you know that she was a secretary
19    of sorts and --
20  A.  She told me she was an office manager.
21  Q.  -- not an attorney, correct?
22  A.  She told me she was over the attorneys, that
23    she managed them.

0229

1  Q.  You think a layperson can be over an office of
2    attorneys?
3  A.  She said she was the office manager, that she
4    managed the office.
5  Q.  Were you aware --
6  A.  That she assigned cases and that she fired
7    people.  That's what --
8  Q.  She told you that she assigned cases?
9  A.  Yes.  She said she fired people because you
10    wouldn't do it.  She had to go in there and do
11    it for you and that she had to do everything.
12  Q.  She told you that she fired people?
13  A.  Nancy told me all that.  She told me she
14    supervised the secretaries.  She supervised
15    the --
16  Q.  Well, did you consider --
17  A.  -- intake coordinator.
18  Q.  Did you consider contacting her current
19    employer and verifying what Nancy was saying?
20  A.  No, I believed her.
21  Q.  You believed that she was firing attorneys?
22  A.  No.  She had the hiring and firing of people.
23  Q.  Hiring and firing attorneys?

0230

1  A.  That what she said.
2  Q.  You believed that?
3  A.  Yeah.  Said she was an office manager.  She
4    said that you told her to do it because you
5    didn't want to do it.  She had to do
6    everything in that office.
7  Q.  Well, anyway, can we now move -- by the way,
8    can we get an identification?  Do we have one
9    on that A-Advantage Bonding Company Complaint?
10        (Brief pause)
11  Q.  I noticed that Nancy wasn't asked all of that
12    yesterday.  But I'm curious how she would
13    respond if she was asked.
14  A.  I am, too.

15      MS. NELSON:  What number are you marking
16        now?
17      MR. JAFFREE:  Number 6.  I'm sorry.
18        (Plaintiffs' Exhibit 6 was marked
19        for identification.)
20      THE WITNESS:  Can we take one second?
21      MR. JAFFREE:  Yeah.
22        (Brief recess)
23  Q.  Let me show you what is marked as Plaintiffs'
0231
1     Exhibit 6, and ask you, prior to today, have
2     you ever seen that document?
3  A.  I don't remember specifically seeing this
4     document, no.
5  Q.  But you could have seen it?
6  A.  It says on here that Nancy called me to
7     discuss the complaint.  And that might be
8     where my knowledge of it comes from.  I don't
9     remember specifically seeing this.  And it
10    looks like the original.  So I don't remember
11    seeing it.  No.  Specifically, no.
12  Q.  Well, if that was the original, who would it
13    come to first?  I mean, the envelope would
14    have been sent to who?
15  A.  I'm not sure.
16      MS. NELSON:  You assume there is an
17       envelope.  I object to the form.
18  A.  Yeah.  I really don't know.
19  Q.  Okay.  Well, did Nancy bring the facts of that
20    to your attention?
21  A.  She said she did.  I know that there was a
22    complaint by Advantage about bond -- about
23    bonding stuff.  But also he complained about
0232
1     the court docket, so it would have been
2     forwarded to her because all these were things
3     under her purview, the docket and -- you know,
4     she was their supervisor.  And he said -- it
5     says here he gave her a copy.
6  Q.  Do you remember Ms. Brackin's testimony that
7     she talked to you about that complaint as
8     well?
9  A.  I don't remember her testimony saying that,
10    and I don't know when she would have had
11    occasion to talk to me about it.
12  Q.  And because that somebody from A-1 had

13     contacted her since Lavera didn't have the
14     time to fool with it?
15       MS. NELSON:  Object to the form.
16  A.  Not specifically.
17  Q.  Do you dispute Nancy's note that's on there?
18  A.  That she called me?
19  Q.  Well, you want to read the entirety of the
20     note?
21       MS. NELSON:  Well, why don't you read the
22       note.
23  A.  "Complaint filed by Rickey Stokes.  Nancy
0233
1     called judge to discuss complaint.  What would
2     happen now?  Judge laughed and said nothing
3     would be done because Rickey was always
4     causing trouble.  She said I should just not
5     worry about the complaint."
6  Q.  Is that something that you would have
7     remembered had you said?
8  A.  Yeah.  I would have forwarded it to Nancy to
9     handle.  This was her department.  She's the
10     supervisor.
11  Q.  Did you recommend that Nancy -- well, let's
12     back up because maybe Nancy didn't have the
13     authority to do this.
14       Did you consider having the police
15     department internal affairs do an
16     investigation?
17  A.  Of?
18  Q.  Of Rickey's complaint.
19  A.  No.  I mean, I would have forwarded it to
20     Nancy who was the supervisor at that time to
21     handle.
22  Q.  Would you have made a recommendation?
23  A.  That what?
0234
1  Q.  That internal affairs do an investigation?
2  A.  I don't see where -- would I have made a -- if
3     I had gotten this letter -- if I had gotten
4     this complaint, would I have asked internal
5     affairs to investigate it?
6  Q.  Well, what if you had got a complaint that
7     says Lavera refused to act on it and didn't
8     care whether or not somebody was being
9     wrongfully arrested or not?
10       MS. NELSON:  Object to the form.

11  Q.  Would that have triggered --
12  A.  It's just hypothetical.
13  Q.  Would that have triggered an internal
14      investigation?  Well, it's not hypothetical
15      when somebody testifies to that.
16  A.  That somebody was wrongfully arrested and
17      Lavera said she didn't care?
18  Q.  Didn't have time to deal with it.
19  A.  I don't think that was her testimony.  She
20      said he could have been.  Somebody could have
21      been wrongfully arrested.
22  Q.  Okay.  Somebody could have been, but she
23      didn't -- she didn't want to intercede to
0235
1       prevent that from happening.  Apparently, the
2       only thing that prevented it from happening is
3       Mary Brackin's intervention, correct?
4           MS. NELSON:  Object to the form.
5   A.  Well, that's what Mary Brackin says.
6   Q.  But do you dispute what Mary Brackin said?
7   A.  That she's the only thing that prevented this
8       person from -- I have no personal knowledge of
9       this.
10  Q.  Do you dispute that Mary Brackin said she
11      talked to you about this and you said
12      something to the effect that --
13          MS. NELSON:  Talked to her about what,
14             now?  There are about five things on
15             this exhibit.
16  Q.  Talked to you about the fact that you came to
17      Lavera and she didn't want to bother with it?
18          MS. NELSON:  Wait.  That who came to
19             Lavera?
20          MR. JAFFREE:  Someone from A-1 came to
21             Lavera complaining, maybe Rickey
22             Stokes came to her directly.
23          MS. NELSON:  And what's your question; did
0236
1              the judge know about this?
2   Q.  Well, she testified that she talked to you
3       about that.  Do you dispute that?
4   A.  I don't remember specifically.
5   Q.  So she could have?
6   A.  I mean, yeah, she could have but --
7   Q.  And she's testified that you blew her off.
8   A.  Who?

9   Q.  Mary Brackin testified that you blew her off.
10        MS. NELSON:  Object to the form.  And the
11          testimony was not stated that way.
12   Q.  Could you have blown her off?
13        MS. NELSON:  Object to the form.
14   A.  Not if somebody was about to get wrongly
15      arrested.  I mean, I would have told her to
16      look into it, find out what's going on.
17   Q.  But you wouldn't --
18   A.  That's not something I would have encouraged.
19   Q.  You wouldn't care that --
20   A.  Yes, I would have cared.
21   Q.  -- Lavera didn't care about it?
22   A.  Yes, I would have cared.  If there was a
23      possibility that somebody could have got
0237
1      arrested, booked, charged, yes, I would have
2      cared.
3   Q.  Okay.  Do you recall Nancy testifying that you
4      told her you wasn't going to do anything about
5      it because this bonding company was always
6      causing problems?
7   A.  I remember her testifying to that.
8   Q.  Do you dispute you told her that?
9   A.  I -- yes.  Because I think I would have
10      forwarded it to her to handle --
11   Q.  And that --
12   A.  -- if I'd gotten it.
13   Q.  And that Lavera does a good job.  I'm sorry.
14      I'm talking over you.
15        Also, that Lavera does a good job handling
16      alias warrants and that this company wasn't
17      worth giving a second glance to?
18   A.  No, I dispute saying this company is not worth
19      giving a second glance to.
20   Q.  Do you remember Nancy's testimony with respect
21      to Don Thompson's complaint about Get Out
22      Bonding?
23   A.  I remember her testimony, yes.
0238
1   Q.  And her testimony was that you said that he
2      was lying and that she shouldn't believe half
3      of what he had to say?
4        MS. NELSON:  Object to the form.  I don't
5          understand the question.
6   A.  And I don't remember that being her

7    testimony.  She said that I called him, and I
8    said that's not what he -- he didn't tell me
9    what she said, he said.  But I don't remember,
10    but that wasn't her testimony yesterday.
11   Q.  So you don't dispute her testimony from
12    yesterday?
13   A.  You're mischaracterizing her testimony.
14    That's not what she testified to yesterday.  I
15    remember what she said because I was kind of
16    astonished at it.
17   Q.  Do you remember her testifying that she said
18    that Sarah complained that you would not
19    permit her to do final forfeitures against Get
20    Out Bonding?
21   A.  I deny that.  I don't -- I deny that.
22   Q.  You dispute that.
23   A.  I -- yes, I deny that.  Dispute and deny that.
0239
1    Q.  Well, isn't it true that Get Out Bonding was
2    allowed to ride on several possible bond
3    forfeitures?
4        MS. NELSON:  Object to the form.
5    A.  I deny -- ride on them?
6        MS. NELSON:  What do you mean by "ride."
7    Q.  Well, I meant that steps were not taken to try
8    to forfeit the bond from Get Out Bonding quite
9    frequently?
10   A.  The only time I -- no.  I deny -- I mean, not
11    for any -- I mean, if there was a reason, yes,
12    like any other bonding company.
13   Q.  Do you dispute that you treated Get Out
14    Bonding like a sacred cow?
15   A.  I do dispute that.  Yes, I dispute that.
16   Q.  But you didn't give them preferential
17    treatment?
18   A.  I deny giving Get Out Bonding preferential
19    treatment or any other bonding company in the
20    City of Dothan.
21   Q.  Your attorney will stop me if I'm wrong, but I
22    think she have stipulated that you agreed that
23    staff had complained to you about Get Out
0240
1    Bonding?
2    A.  That staff had complained to me?
3    Q.  That Nancy --
4        MS. NELSON:  I never stipulated to that.

5      MR. JAFFREE:  Well, I've got it in writing
6         something.  I'll show it to you.
7      MS. NELSON:  It's what Nancy --
8      MR. JAFFREE:  I sent you an e-mail, and
9         you said something like we agree to
10        stipulate that they made complaints
11        about Get Out Bonding, something to
12        that effect.
13      MS. NELSON:  I think I stipulated
14        something to the fact that Nancy
15        raised the question as to why so many
16        people in the jail were using Get Out
17        Bonding, something to that effect.
18           But you can ask the judge.  I
19        didn't say -- I didn't stipulate to
20        any characterization as you just put
21        it.
22   Q.  Was Get Out Bonding owned by a black person?
23   A.  I think the owner was black, yes.
0241
1    Q.  What was the owner's name?
2    A.  I don't remember the owner's name.
3    Q.  Do you know the owner?
4    A.  No, I never met the owner.
5    Q.  Is that the only black bonding company in the
6       City of Dothan as far as you know?
7    A.  As far I know, yes -- no.  No.
8    Q.  It's not the only one?
9    A.  No.  Jan Bouier has been in business for 50
10      years.  B-O-U-I-E-R.  And he has a -- he's
11      black.
12   Q.  Isn't it true that you have heard rumors that
13      you and Get Out Bonding was in cahoots?
14   A.  Only from Nancy.
15   Q.  You've heard rumors from Nancy?
16   A.  No.  I heard her yesterday say we were in
17      cahoots.
18   Q.  Did you ever deny Sarah Fowler the right to do
19      final forfeitures against Get Out Bonding?
20   A.  I never denied Sarah the right to do -- I did
21      final forfeitures if Sarah couldn't do them.
22   Q.  And -- or whatever role she played in that.
23         And if she testifies differently, you'd
0242
1      dispute that testimony?
2    A.  I do dispute that.

3   Q.   Do you remember Nancy's testimony with respect
4        to Sergeant Woodruff?
5   A.   Yes.
6   Q.   What is your recollection of the testimony?
7   A.   Something about problems with the warrants
8        having to be -- no.  I don't remember.
9        Something about warrants taken to the jail,
10       and then the jail couldn't find them or
11       something.
12  Q.   This problem concerning Lavera, do you
13       remember that?
14  A.   I thought she said Eunice took 30 warrants to
15       the jail.  But, no, I don't remember anything
16       specific other than that.
17  Q.   Well, if Nancy testified that Sergeant
18       Woodruff complained about alias warrants for
19       court referral defendants who were not
20       compliant and that she had discussed this with
21       Lavera who was responsible but the problems
22       continued, would you dispute that Sergeant
23       Woodruff ever complained about Lavera?
0243
1   A.   To me?
2   Q.   To Nancy or you?
3   A.   I -- I don't remember specifically, no.  I
4        would not know whether she complained to Nancy
5        or not.
6   Q.   Did Sergeant Woodruff ever complain to you?
7   A.   I know there was a computer problem with the
8        warrants.  I don't remember specifically
9        because she executes warrants.  And that's her
10       connection to them.
11  Q.   Do you remember at my request -- but I could
12       be wrong about how this came about -- Nancy
13       talked yesterday about who would take over
14       Lavera's job duties when she had be on leave
15       for a hysterectomy?
16  A.   Yes, I remember her testimony about that
17       yesterday.
18  Q.   And that she had selected Mary Turner, and
19       Lavera was very upset over that.  I'm sorry.
20       Nancy selected Mary Turner, and Lavera wanted
21       Eunice and Tonya to take over.
22  A.   I remember her testimony about that.
23  Q.   Now, Lavera came to you and complained about
0244

1    that, correct?
2    A.   I don't remember that.
3    Q.   Could that have happened?
4    A.   I don't remember it if she did.
5    Q.   Do you remember talking to Nancy about this?
6    A.   Not specifically, no.
7    Q.   You don't recall telling Nancy that she really
8        should let Eunice and Tonya take over?
9    A.   No.  I remember it was Nancy's policy that
10       each person had to get somebody to cover for
11       them.  If they did not, she -- they were to be
12       disciplined.
13   Q.   Yeah.
14   A.   So if she had gotten somebody to cover for her
15       in accordance with Nancy's policy, I might not
16       have understood why Nancy would then want to
17       say no, you can't do that because she wanted
18       to discipline them if they were off and did
19       not get somebody to cover for them.
20           Did you remember her saying that
21       yesterday?
22   Q.   Well --
23   A.   So it was kind of different treatment when it
0245
1        came to that.
2    Q.   Well, I don't recall any discipline.  I recall
3        her testimony was that she had selected Mary
4        Turner to do it.  And Lavera was --
5           MS. NELSON:  Well, Judge is right.
6             Nancy's testimony yesterday was that
7             if somebody was going to be out, she
8             expected that employee to arrange for
9             their own duties to be covered.
10          MR. JAFFREE:  I remember her testimony.
11   Q.   But that's not my question.  I remember your
12       counsel was just appalled that Nancy would do
13       that as opposed to make assignment herself.
14       But in this case, apparently, Nancy decided to
15       make the assignment herself.
16   A.   In this case, not in all the other ones, is
17       what you're saying.
18   Q.   Well, that's what I'm saying.
19   A.   So --
20   Q.   So Nancy shouldn't have done it in this case;
21       is that what you're saying?
22   A.   Did she do it in all other cases?  In all

23     other cases, the person had to get somebody to

0246

1     cover for them.

2  Q.  Well, what is --

3  A.  That's your client's testimony.

4  Q.  And you're going to hear this again, but what

5     is the mischief in Nancy assigning someone to

6     take over Lavera's job while she was out with

7     her procedure as opposed to Lavera selecting

8     somebody?  Well, what is the mischief in Nancy

9     doing that?

10     MS. NELSON:  I object to the form.  I have

11       no idea what you mean by "what is the

12       mischief."

13  Q.  Well, do you understand what I mean?

14  A.  Not as far as mischief, no.

15  Q.  Well, what do you think I mean?

16  A.  I don't know what you -- I don't know.

17     Nancy had a policy that if you were to be

18     out, you had to get somebody to cover your job

19     or --

20  Q.  I understand that.

21  A.  -- you will be disciplined.

22     Let me finish now because you asked.

23     That was her policy.  If you were out and

0247

1     you didn't get somebody to cover, you were

2     disciplined.  That was her policy, and I tried

3     to support her in that.  And Carol Sue asked

4     her about that yesterday.

5     Now, Lavera was going to be out.  She got

6     somebody to cover, whoever it was.  But Nancy

7     said, no, you -- I'm going to assign who

8     replaces you.  And so that -- everybody else

9     she -- I mean, it was a contradiction in her

10     policy.  But I don't remember the --

11  Q.  Well, could it be a modification in her

12     policy?  I mean, what point are you making

13     because of this --

14  A.  I'm not making -- I'm going by your client's

15     testimony.

16  Q.  Well, my client's testimony --

17  A.  I don't have any direct knowledge.

18  Q.  My client's testimony that her policy was

19     absolute, unequivocal, and never change,

20     immutable?  Was that her testimony?

21   A.  I don't remember.
22   Q.  I don't remember either.
23   A.  Me either.
0248
 1   Q.   But, certainly, was it her prerogative to
 2       alter her policy?
 3   A.   Yes, it was I guess.
 4   Q.   And was it your prerogative to alter your
 5       policy as well?
 6   A.   I didn't alter it.
 7   Q.   But if you had a policy, can you alter it?
 8   A.   If -- generally?
 9   Q.   Do you have the power to alter your own
10       policy?
11   A.   Anybody does, Mr. Jaffree.
12   Q.   Not quite anybody, but maybe their own policy
13       they did.
14   A.   Right.  That's what you asked me, did I
15       have --
16   Q.   So there was no mischief to be prevented in
17       having Nancy change her mind, was there?
18       MS. NELSON:  Object to the form.  I still
19         have no idea what you mean.
20       MR. JAFFREE:  You don't understand what
21         mischief mean?
22       MS. NELSON:  I don't.
23       MR. JAFFREE:  You don't have a clue?  All
0249
 1         right.
 2       MS. NELSON:  Well, I know maybe like
 3         tomorrow night for trick-or-treat
 4         there may be some mischief.  But --
 5   Q.   But do you remember Nancy bringing to your
 6       attention a complaint by Valarie Savage
 7       against Lavera; this complaint took place on
 8       or about April the 15th?
 9   A.   Not specifically.
10   Q.   And that you took Lavera's side in the
11       complaint?  It was dealing with some bonds --
12       changing bonds while Lavera was on call?
13   A.   While she was on call?  Is that a question?
14   Q.   Do you remember that's her testimony that she
15       had complained?  As a matter of fact, I think
16       Lavera did a memo objecting to the complaint,
17       but you subsequently took Lavera's side?
18   A.   I don't remember that specifically, no.

19  Q.  Would you dispute that that could have
20      happened?
21  A.  I don't think I would have taken sides.
22      MS. NELSON:  Object to the form.  I'm not
23          clear about the question.
0250
1  A.  I don't remember what happened.
2  Q.  Do you remember that sometime in July of 2004,
3      Nancy sent a memo to Eunice regarding a bond
4      changing procedure, that Eunice was very
5      angry, and she went to you?  Sorry.  Back up.
6      That she sent Nancy a memo saying that Nancy
7      didn't have the authority to change bond
8      procedure.  Nancy thought this memo was
9      insubordinate and discussed it with you, and
10     you felt that it was not insubordinate because
11     this was something new and Eunice was the
12     first one that she had sent a memo to.  So you
13     put a stop to any insubordination.
14     MS. NELSON:  I'll object to the form and
15         assumes facts not in evidence.
16  Q.  Well, do you remember that factual situation?
17  A.  No.  No.
18  Q.  But did it happen?
19  A.  I don't remember.  But she --
20  Q.  Could have happened?
21     MS. NELSON:  What happened?  I'm not sure
22         what you're asking.
23  Q.  Could it have happened that Nancy came to you
0251
1      about a memo that she received from Eunice
2      that she thought was insubordination because
3      Eunice had told Nancy that she don't have the
4      authority to do what Nancy was trying to do,
5      and Nancy consulted with you about whether or
6      not this memo was insubordinate.  And you said
7      no.
8      Could that have happened?
9  A.  That's not what she testified to yesterday.
10     She said I signed it.
11  Q.  Well, did that happen as a fact.
12  A.  I don't -- no.  I don't remember that.
13  Q.  So it could have happened?
14     MS. NELSON:  I object to what could have
15         happened.  She said she didn't
16         remember it happening.

17    Q.  Well, see, your attorney didn't ask her every
18        question.  Your attorney has left off some
19        stuff.  I deliberately because of the lateness
20        of the day didn't cover a whole bunch of
21        things I was going to cover.
22            But I'm asking you, could that have
23        happened?
0252
 1            MS. NELSON:  I want to object to a
 2            hypothetical question.
 3    Q.  But do you recall that; do you recall the
 4        incident?
 5    A.  No.  I heard her testify about it yesterday.
 6    Q.  All right.  But do you recall Nancy ever
 7        complaining to you about a memo that she
 8        received from Eunice?  Do you recall any
 9        complaint like that?
10    A.  Not specifically.
11    Q.  So she could have?
12    A.  Anything is possible.  I don't remember her
13        specifically discussing a memo with me about
14        Eunice being insubordinate.  But she said
15        yesterday that she did, and she that I upheld
16        her in it.  She did not say that I put an end
17        to it.  You said yesterday that I signed it.
18        I don't remember it, but that's what she said.
19    Q.  Well, okay.  Fine.
20            She also testified that she talked to you
21        about the numerous mistakes that Eunice and
22        Lavera makes, and I think she misspoke talking
23        about a hundred times more than.  But that was
0253
 1        sort of a term of emphasis as opposed to a
 2        term of fact.  But numerous times about the
 3        errors that they made, and you indicated that
 4        everybody makes mistakes.
 5            MS. NELSON:  Object to the form.
 6    Q.  Did you ever have that conversation with her
 7        about not wanting to hear about mistakes that
 8        Eunice and Lavera makes because everybody
 9        makes mistakes?
10    A.  I don't remember specifically.
11    Q.  Do you remember the discussion that she had
12        with you about she felt that Eunice and Lavera
13        were being insubordinate because she did a
14        memo telling them not to use a certain door

15      for security reasons and they continued to do
16      it; and she discussed this with you as
17      insubordinate and you thought it silly and
18      not insubordinate.
19          Did you have that discussion with her
20      about the use of the wrong door?  Did you have
21      that discussion?
22  A.  I want to answer truthfully.  Yes, I had a
23      discussion with her about the door.  And I
0254
1       told her to write them up if they continued to
2       go out the door, but she also had to write all
3       the other magistrates up that were going out
4       the door.
5   Q.  You didn't tell her that you thought --
6   A.  No.
7   Q.  -- this was silly?
8   A.  I -- I thought it was silly, but I supported
9       her in it.  No, I did not tell her that.
10  Q.  Well, you didn't tell her it was silly but you
11      thought it was silly?
12  A.  I supported her in her rule about not going
13      out the back door.
14  Q.  Isn't it true that during this conversation it
15      was just more than you and Ms. Martin present
16      but also Kai Davis was present?  And Kai Davis
17      disagreed with you; she thought it was not
18      silly but as a practical reason for having one
19      door secured for security reasons, and that
20      you shouldn't have a policy of people going in
21      and out that door because there may be a
22      safety factor with other staff.  So Kai didn't
23      agree with you at all that this was silly.
0255
1           Do you remember that discussion?
2           MS. NELSON:  Object to the form.
3   A.  I don't remember it.
4   Q.  Do you remember Kai being present during this
5       discussion?
6   A.  No, I don't.
7   Q.  If Nancy stated that Kai was present, would
8       you be in a position to dispute that?
9   A.  I don't remember.
10  Q.  So they didn't get written up for
11      insubordination because of your intervention;
12      is that correct?

13   A.   That's not correct.  No.
14   Q.   Let's back up for a second.  And I'm sure you
15        remember this.  Nancy was instructed to do an
16        evaluation of Lavera, and you expressed
17        displeasure with the markings and comments
18        that Nancy had made on the evaluation,
19        correct?
20   A.   Displeasure.  I don't -- I don't know that it
21        was displeasure.  I was concerned.
22   Q.   You was happy?
23   A.   I was -- I was reticent.  I was concerned.
0256
1    Q.   Concerned.  Is that the word you feel
2         comfortable with, concerned?
3    A.   Yes.
4    Q.   And that before you would sign off on this,
5         you went to two other people?  Who did you go
6         to?
7    A.   Three people.
8    Q.   Who did you go to?
9    A.   The personnel department.
10   Q.   Let me stop you.  Who in the personnel
11        department did you go to?
12   A.   We were all together.
13   Q.   Oh, all three of you together?
14   A.   I asked them to help me look over it.
15   Q.   You asked them as a committee to help you look
16        over --
17   A.   No.  We always go to Personnel about personnel
18        issues.  Any issue, we go to Personnel.
19   Q.   Who is "we" you're referring to?
20   A.   I say "we."  I can't say for all department
21        heads, but I do.
22   Q.   On this occasion, who did you go to first?
23   A.   Personnel.
0257
1    Q.   I don't know what that means.
2    A.   The personnel department.
3    Q.   I don't know what that means.
4    A.   I can't be clearer.
5    Q.   Yes, you can.
6         MS. NELSON:  There's a personnel
7             department for the City of Dothan.
8             How much clearer --
9    Q.   Who?  The personnel department is a who?
10        MS. NELSON:  Who in the personnel

11          department?
12    Q.   The personnel department is a who.  Okay.
13          What individual in the "who" personnel
14          department did you go to?
15    A.   If I remember correctly, it was Martha
16          McClain.
17    Q.   Who is she?
18    A.   She is in the personnel department.
19    Q.   In what capacity?
20    A.   I'm not sure her title.
21    Q.   Now, what day-to-day responsibility does
22          Martha McCain have over -- what is Eunice's
23          last name -- I mean, Lavera's last -- Lavera
0258
1          McCain?  I'm suddenly drawing a blank.  Well,
2          what day-to-day responsibility does Ms. McCain
3          have on Lavera's job?
4    A.   None.
5    Q.   What day-to-day observation does Ms. McCain
6          have on Lavera's job performance?
7    A.   None.
8    Q.   Well, what was is the rationale of going to
9          Ms. McCain --
10         MS. NELSON:  It's McClain, isn't it?
11   Q.   Ms. McClain.  I'm sorry.  Ms. McClain to get
12         an assessment of an evaluation of something
13         that she would have no role in evaluating and
14         no ability to observe?
15         MS. NELSON:  I object to the form.  It
16             assumes facts not in evidence.  And
17             she's never testified or you haven't
18             let her testify as to why she went to
19             Personnel.
20   Q.   Well, you want to testify as to why you went
21         to McCain?
22         MS. NELSON:  McClain.
23   Q.   Ms. McClain.
0259
1    A.   Are you asking me to?
2    Q.   Well, yeah.
3    A.   Because it was a personnel issue.  And any
4          time we have issues of personnel matters that
5          we don't understand -- and I say "we" as a
6          totality, as the department head.  And anytime
7          with personnel -- I have a personnel issue,
8          then I go to Personnel to try to get an answer

```
 9      as to form, as to whether it's the correct way
10      to do things, anything involving a personnel
11      issue.
12  Q.  What was the personnel issue at play here?
13  A.  Well, there was several.  It seemed that
14      Nancy -- a lot of her comments were based on
15      third-party stuff that happened before she
16      came.
17  Q.  Which comments?
18  A.  Well, I asked her about the computer errors.
19      And she said, well, I understand Lavera chose
20      to take vacation instead of getting computer
21      training.
22          And I said, well, Nancy, how would you
23      know that?  You weren't here.
0260
 1          That was before she was hired.
 2  Q.  Well, that's --
 3  A.  Hearsay.
 4  Q.  -- a process question.
 5      MS. NELSON:  You're asking her what she
 6          disputed, and she's trying to tell you
 7          from what she --
 8      MR. JAFFREE:  Well, please let me finish.
 9          We're talking about apples and oranges
10          here.  One thing is that she commented
11          about some errors, and then she
12          commented that maybe the errors came
13          about because of lack of computer
14          training.  But she don't need to know
15          that Lavera didn't have computer
16          training in order to observe computer
17          errors.
18  Q.  Is that correct?
19  A.  I don't know.
20      MS. NELSON:  You asked her to explain why
21          she took issue with some of the marks
22          on the evaluation, and she's trying to
23          tell you.
0261
 1      MR. JAFFREE:  No.  She's telling me things
 2          that --
 3      MS. NELSON:  You don't like what she's
 4          telling you, so you're trying to
 5          change her testimony and put words in
 6          her mouth.
```

7      MR. JAFFREE:  I don't have anything
8         against what she is telling me except
9         that the question on the floor was,
10        what is it that she didn't know that
11        resulted in the markings.  The
12        markings of errors is something that
13        she could have known without having
14        knowledge that Lavera went to computer
15        training.
16  A.  Well, Nancy didn't -- she wasn't proficient.
17      She didn't know what they did.  I didn't
18      understand how she could grade someone on
19      something she did not know how to do herself.
20      And I asked her about that.
21          And she said, well, Mary Beth said that
22      this is the way you're supposed to do it.
23          And I said, Nancy, you cannot base an
0262
1       evaluation on hearsay.
2   Q.  Well --
3   A.  You cannot do that.  And I told -- I asked
4       her, I said, have you looked at her other
5       evaluations?  Have you -- you know, she graded
6       her so far down that she would not have gotten
7       a promotional raise.  And I knew that it was
8       appealable.  I knew that anything based on
9       hearsay would be appealed.  And to me, that
10      was a personnel issue.  I really was trying to
11      guide her, you know, just talk to her and say,
12      how do you do that.
13  Q.  I'm a little confused on the hearsay part with
14      respect to --
15  A.  She kept saying what Mary Beth and --
16  Q.  Well, hold on.  With respect to a -- for
17      instance, if something was supposed to be done
18      a certain way and Nancy feels that the way
19      that's been told to her makes sense but Lavera
20      was not doing it that way, I don't know how
21      that's a hearsay question.
22          But at the time you assigned Nancy to do
23      this task, you were aware, were you not, of
0263
1       limitations that Nancy had?
2   A.  I mean, she implied that she -- no.  I
3       was -- I was not aware of all the limitations
4       that Nancy had when I hired her.

5  Q.  Well, I mean, what prior magistrate experience
6      did Nancy have at the time you hired her?
7  A.  I don't know.  She implied that she'd been to
8      court, that she'd done all this stuff for
9      Legal Services and that she had all this
10     experience with court and -- and, you know --
11 Q.  Well, how --
12 A.  She implied that she --
13 Q.  What does Legal Services have to do with
14     municipal court?
15 A.  I don't know.
16 Q.  I mean, do you have any reason to think that
17     Legal Services get involved in municipal
18     court?
19 A.  I had no reason to think she would lie.  Not
20     specifically municipal court.  She just said
21     court.
22 Q.  Well, let's be practical here.  By that time,
23     you had been the judge of municipal court for
0264
1      a few years; is that correct?
2  A.  Yes.
3  Q.  And for all practical purposes, you're the
4      only judge of municipal court; is that
5      correct?
6  A.  No.
7  Q.  For all practical purposes, you're the
8      principal judge?
9  A.  There are others.
10 Q.  Well, you're the only full-time judge --
11 A.  Yes.
12 Q.  -- of municipal court?
13 A.  Yes.
14 Q.  You have an opportunity to observe what
15     attorneys come over to municipal court?
16 A.  Yes.
17 Q.  You have an opportunity to observe what
18     support staff come over to municipal court?
19 A.  I don't know them all.  No.
20 Q.  Other than for their own personal complaint or
21     ticket or misdemeanor, have you observed any
22     attorneys associated with Legal Services
23     litigating in municipal court?
0265
1  A.  I wouldn't know if they worked for --
2  Q.  You wouldn't know.  You wouldn't know if they

3     was with Legal Services or not?

4  A.  Right.

5  Q.  Did you have any reason to believe that Legal

6     Services attorneys are over there litigating

7     in municipal court?

8  A.  I didn't know one way or the other.

9  Q.  Had you observed Nancy coming over to

10    municipal court doing anything?

11  A.  I don't remember.

12  Q.  Upon what would you base your belief on that

13    Nancy had experience in municipal court?

14  A.  Nancy said that she had extensive court

15    experience.  She didn't necessarily say

16    municipal court.

17  Q.  I see.

18  A.  She said she went to court routinely and did

19    all this stuff for Legal Services.

20  Q.  Well, could that be true and yet she lacked

21    the intimate knowledge of what goes on in a

22    day-to-day world of municipal court?

23      MS. NELSON:  Object to the form.

0266

1  A.  I guess the answer is yes.

2  Q.  Are you now, just so we're clear on the

3    Record, trying to change issues and say Nancy

4    was dishonest in her application and that can

5    be a legitimate basis for the separation?  Are

6    you trying to advance that theory.

7  A.  No -- I'm -- I'm -- yeah.  I am, yeah.

8  Q.  Oh, now you're trying --

9  A.  No.  I'm saying she was misleading in her

10    experience and that it showed after she'd been

11    there for about a month, that she just wasn't

12    proficient in what she was doing.

13  Q.  So after she'd been there a month, you're

14    quite --

15  A.  Approximately.

16  Q.  Approximately a month.  You're quite certain

17    of this?

18  A.  Approximately.  No, I'm not certain of the

19    time.

20  Q.  But it was quite evident quite early?

21  A.  No, at first she --

22  Q.  So now it wasn't evident quite early, it just

23    blossomed later?

0267

```
 1          MS. NELSON:  She's trying to answer your
 2            question.  She said she didn't know
 3            the approximate time.
 4   Q.  I mean, was it within the first two months
 5        somehow you was able to tell?
 6   A.  She never did grasp it.
 7   Q.  Or the first three months?
 8   A.  Never grasped it.  But basically --
 9   Q.  So you was able to tell the deficiencies
10        immediately?
11   A.  No, not immediately.
12          MS. NELSON:  Object to the form.
13   Q.  Well, how long does it take you to grasp the
14        deficiencies if you couldn't do it within the
15        first three months?
16          MS. NELSON:  Object to the form.
17   A.  I don't remember how long it took to notice
18        that she was not proficient.
19   Q.  Well, pretty much from day one she wasn't
20        efficient.
21   A.  Is that your statement or --
22   Q.  Is that your statement?
23   A.  No, that's not my statement.
0268
 1   Q.  What's your statement?
 2          MS. NELSON:  Y'all are just sort of
 3            talking among each other.  Ask her
 4            questions.  Ask her a question,
 5            please.
 6          MR. JAFFREE:  I'm asking her a question.
 7   Q.  Was she deficient from day one or not?
 8   A.  No.
 9   Q.  So she --
10   A.  She might have been.  I just didn't notice it.
11   Q.  So she blossomed into a deficiency.  Can you
12        live with that statement?
13   A.  No.
14          MS. NELSON:  Object to form.
15   A.  Her deficiencies were revealed as time went
16        on.
17   Q.  I see.  It took you awhile to notice it.  Is
18        that your testimony?
19   A.  They were revealed over time.
20   Q.  It took you awhile to notice it?
21   A.  No, they were revealed over time.
22   Q.  But until they was revealed, they were
```

23     concealed?
0269
1          MS. NELSON:  Object to the form.
2          MR. JAFFREE:  I'm trying to find out what
3            this witness is saying.
4   A.  Yes.  Or hidden.
5   Q.  Hidden.  Hidden deficiencies.  Okay.
6          So you went to personnel to ask them for
7      input in the evaluation.  And who else did you
8      invite in for input?
9          MS. NELSON:  Object to the form.  Who
10           else -- I object to -- you know, I
11           don't know what you mean by "invite
12           in."  Who did she go to besides
13           personnel?
14  Q.  Would you like that question better; who did
15      you go to besides personnel?
16  A.  Well, it's kind of a mischaracterization.
17  Q.  I can borrow that question.
18  A.  We were in the city manager's conference room,
19      and I asked for help, that I didn't know how
20      to address this personnel issue.  I had a
21      supervisor that I thought was using hearsay
22      evidence in an evaluation who had not had a
23      long period of time to observe the person, who
0270
1      had no experience in what the person was
2      doing.
3   Q.  Did you realize this before you went to these
4      people or after you met these people?
5   A.  What?
6   Q.  That you had a supervisor who was relying on
7      hearsay and was not in a position to give --
8   A.  She told me.
9   Q.  -- an evaluation?
10  A.  I knew that before I went.  I asked her why
11      did she grade them -- grade her like that.
12  Q.  Well, if that's the case, help me here.  Help
13      me see clearly.  Why didn't you just take the
14      evaluation from her entirely and do it
15      yourself?
16  A.  Because she was her supervisor.
17  Q.  Well, she was her supervisor when you went to
18      these people seeking input.
19  A.  On how to guide her into doing an evaluation
20      that was not based on hearsay using

21    her own -- using other tools.
22  Q.  I'm a little bit confused because I know you
23    keep using the term "hearsay," but if she
0271
1    grabbed some old evaluations and looked at
2    them to somehow get some kind of direction,
3    would these old evaluations, based on your
4    experience as an attorney and a judge, be
5    hearsay?
6      MS. NELSON:  Object to the form.  There's
7        never been any testimony that --
8      MR. JAFFREE:  That she asked her to go
9        look at old evaluations?
10  Q.  You didn't testify to that?
11      MS. NELSON:  Well, the judge never
12        testified that that was the hearsay,
13        that she went and looked at old
14        evaluations.
15  Q.  I'm asking you, is that hearsay?
16  A.  No.  Well --
17  Q.  You encouraged her to go look at old --
18  A.  I found the totality of the circumstances --
19  Q.  You was complaining about hearsay that she
20    relied on.
21  A.  From people in the office.
22  Q.  But you told her to go look at some hearsay.
23  A.  From people in the office.
0272
1  Q.  I see.  So the old evaluations would be old
2    people that's not in the office anymore.
3  A.  No.  But they'll be written, documentary
4    evidence of that employee.  I mean, she's
5    listening to what -- she said they told her
6    that Lavera chose to take vacation instead of
7    going to computer training.  She had no
8    first-hand knowledge of that.  She wasn't
9    employed there.  She said that they told her
10    that Lavera left the office and was on the
11    phone all the time when she was gone.  And I
12    said, Nancy, you can't use that.
13  Q.  Did those comments come out in the evaluation,
14    that you're on the phone all the time?  Was
15    part of evaluation?  I didn't get a copy of
16    that evaluation.
17  A.  I just remember her saying that they told her
18    that when she was gone --

19          MS. NELSON:  Well, just a minute, now.
20            For the Record, Mr. Jaffree, you do
21            have that evaluation.  And that
22            evaluation, I questioned your client
23            about yesterday.
0273
1          MR. JAFFREE:  Well, let me look.  It is
2            conceivable that I have -- I got so
3            much stuff.
4          MS. NELSON:  Well, I just wanted to make
5            it very clear; you do have that
6            evaluation.  Don't say that I didn't
7            provide it to you.
8          MR. JAFFREE:  I will dig through this
9            stuff to see.  I certainly didn't spot
10           that one because I was trying to look
11           for it.
12   Q.  But be that as it may, who else did you talk
13        to in addition to the person at personnel?
14          MS. NELSON:  Would you like to see the
15           evaluation?  Would that help you?  It
16           seems like you have memory enough to
17           tell.
18   A.  Yeah.  Yeah, I remember that it was -- we were
19        in -- it was after department -- it was a
20        department head meeting.  I don't know why we
21        were all in there together.  But the
22        acting -- it was the city manager at the time,
23        Jerry Corbin was there.  Martha McClain from
0274
1        personnel and John White who was the chief of
2        police.
3            And I was asking, how do you handle this
4        evaluation where the employee -- what I told
5        you.  I was really trying to give guidance
6        on -- you know, I really was looking at it
7        more like helping her because I knew it would
8        be appealed if it was all based on third-hand
9        knowledge.
10   Q.  And you knew this based on Lavera's prior
11        propensity for appealing?
12   A.  No.  I just knew that that was --
13   Q.  You speculated or was it based on your
14        friendship with Lavera?
15   A.  No.  I just knew that she couldn't base an
16        evaluation on -- on what somebody told her

17       happened before she got employed.
18   Q.  How would Lavera, independent of talking to
19       you, know that she had based that evaluation
20       on what other people have said?
21          MS. NELSON:  Object to the form.
22   A.  Because Nancy was clear that that's what she
23       was basing it on.  She was not in charge --
0275
1        when she left somebody in charge, they were
2        doing this.  And, you know, she -- she was
3        clear about that.
4    Q.  But how would Lavera know that?
5    A.  She said it -- I think, in the evaluation, she
6        said that they told her.  She would have had
7        to go over the evaluation with Lavera.
8    Q.  So that's what the said --
9    A.  Yeah.  I think on there it says something
10       about she -- they told her that she was making
11       personal phone calls.  I don't know how it
12       came up in conversation.  But I said --
13   Q.  Well, I need --
14   A.  -- you cannot base --
15   Q.  I'd like to --
16   A.  -- you cannot base it on -- on that.
17   Q.  Well, okay.  I'm going to try to get off of
18       this.  But this committee that you went to,
19       did they --
20          MS. NELSON:  Object to the form.
21   A.  It was not a committee.
22   Q.  Well, this group that you went to consisting
23       of the personnel director and who else?
0276
1    A.  Personnel director was not there.  I don't --
2        I don't remember her being there.
3    Q.  Somebody in personnel.  Who else?
4          MS. NELSON:  She's testified who it was.
5          MR. JAFFREE:  Well, I don't remember her
6             testimony.
7    Q.  Can you tell me who else was there?
8          MS. NELSON:  The city manager and the
9             chief of police.
10   Q.  Okay.  The chief of police was there?  What
11       was the rationale for the chief of police
12       being --
13   A.  He was a department head and he evaluated
14       people.

15   Q.   I see.  And he had a role in evaluating
16        Lavera?
17   A.   No.  It was his -- I was asking him a
18        general -- I was asking them, how you handle
19        a -- the situation.  I didn't want to change
20        her evaluation.  That was her evaluation of
21        Lavera, but I wanted to give her guidance on
22        what she could and could not use.  And I
23        didn't know how to do that.
0277
1    Q.   You was determined that that evaluation not
2         stand; is that correct?
3    A.   No.  Because I could have just not signed it.
4         I could have not agreed with it.  I had that
5         liberty to do that.
6    Q.   Well, why didn't you just not sign it?
7    A.   Well, because I wanted -- Nancy was her
8         supervisor.  I didn't want to overrule her.  I
9         just wanted to give her guidance on what she
10        could and could not use as an exact -- Nancy
11        was new to evaluating people.
12   Q.   Okay.  Now, were you satisfied with Nancy's
13        modification of the evaluation?
14   A.   I -- I must have been.  I don't remember.
15   Q.   Now, which part of it -- the modified version
16        was not based on hearsay?
17   A.   I don't remember.
18   Q.   So even the modified version could have been
19        tainted with hearsay; is that your testimony?
20   A.   I don't -- I don't remember.  I don't know.
21   Q.   You don't know.  But you was satisfied with
22        the modified evaluation and you signed it
23        correctly; is that correct?
0278
1         MS. NELSON:  She's looking at it.  And if
2              you'd give her a chance to read over
3              it.
4              She's looking at Defendants'
5         Exhibit 16 to Nancy Martin's
6         deposition.
7              (Brief pause)
8    A.   Now, what was your question, Mr. Jaffree?
9    Q.   That you apparently was satisfied with the
10        changes that she made and you signed off on
11        it?
12   A.   Yes, I assume.

13  Q.  You were satisfied with the revisions and you
14      signed off on it?
15  A.  I -- I don't know with the revisions.  I just
16      signed off on what she told me she had
17      reviewed and could come up with, you know,
18      points to give her so that she wouldn't lose
19      her --
20  Q.  You wanted some points, right?  You wanted
21      Nancy to increase the points?
22  A.  No.  I wanted her to review the evaluation and
23      base it on her knowledge.  Lavera had been out
0279
1       for surgery for eight weeks.  Nancy had only
2       been employed a month before Lavera went out
3       or two months before.  I mean, it just was a
4       lot of different things.
5           I wanted her to have a solid evaluation in
6       her hands to when she did it.  And I would
7       have done that with any employee if I thought
8       that, you know, there was a problem with it.
9       It wasn't because it was Lavera or because of
10      her race.
11  Q.  Didn't Nancy do other people's evaluation on
12      or about the same time?
13  A.  I don't know.  If she did, we went over those,
14      too.  I had to sign those, too.
15  Q.  Sign, but did you go to a group with those?
16  A.  I don't know if she had -- if I had problems
17      with it.
18  Q.  And let's talk about this hearsay again
19      because was Nancy present when Ms. Brackin was
20      investigated for an incident of telling a
21      consumer something?
22          MS. NELSON:  Object to the form.
23  A.  Which --
0280
1   Q.  Pardon?
2   A.  Which time?
3   Q.  The Fountain -- Fondren -- Founder, whatever
4       the name is?
5   A.  I don't know that she was present.  She was a
6       supervisor when the investigation was done --
7       was completed.  She got the results of the
8       investigation as Nancy's supervisor -- I mean
9       as Mary Beth's supervisor.
10  Q.  And so Nancy wasn't present when this incident

11    happened, so what Nancy put in was hearsay in
12    that evaluation; is that correct?
13        MS. NELSON:  Object to the form.
14  Q.  Ms. Brackin's evaluation.
15        MS. NELSON:  She never -- we're not
16            talking about evaluation.  We're
17            talking about a disciplinary action of
18            Mary Beth Brackin as opposed to an
19            evaluation for Lavera McClain over a
20            prior year's time period when she
21            hardly had the opportunity to evaluate
22            her.
23        MR. JAFFREE:  We're also talking about she
0281
1            did an evaluation of Ms. Brackin, and
2            there was a entry put in about this
3            incident that she was wasn't present
4            for.  Now, that incident was hearsay
5            because she was wasn't there when it
6            happened.  And yet she put it in as if
7            somehow she knew about it.
8   A.  She got the results of the investigation.  I
9       don't -- the incident might have happened.
10          But she -- as her supervisor, the results of
11          the investigation went to her.
12  Q.  Well, but she didn't interview anyone?
13        MS. NELSON:  The discipline had taken
14            place.  She was merely recording the
15            discipline.
16        MR. JAFFREE:  Well, no, she was making a
17            statement of policy in that
18            evaluation.  If you look at
19            Ms. Brackin's evaluation, she makes a
20            statement, positive statement.  She
21            don't say as a result of an
22            investigation.  She makes a positive
23            statement of a wrong that allegedly
0282
1            was committed.
2        MS. NELSON:  I have no idea what you're
3            talking about.
4        MR. JAFFREE:  I'm talking about
5            Ms. Brackin's evaluation.
6            Ms. Brackin's evaluation was done
7            fairly similar to the time that the
8            evaluation of -- matter of fact --

9          MS. NELSON:  I would ask that you show
10            this witness the evaluation instead of
11            you sitting here testifying as to what
12            it purports to be.
13   Q.   Well, do you remember that evaluation; do you
14        remember a evaluation that she did --
15   A.   Not specifically.
16   Q.   -- of Ms. Brackin?
17   A.   Not specifically.  I remember you mentioning
18        it.
19   Q.   All right.  Well --
20   A.   Could you show it to me?
21   Q.   Well, not at this moment.  But is it not true
22        that Ms. Martin did other people's
23        evaluations while -- while she was employed as
0283
1        the administrator?
2   A.   During her entire tenure or the first two
3        months she was employed?
4   Q.   Well, during her tenure?
5   A.   I'm sure she did.
6   Q.   But you did not intervene on any of these
7        other evaluations?
8   A.   I wouldn't say did I intervene.  We -- we had
9        to go over each evaluation before she -- I
10        have to sign it as the reviewing authority.
11   Q.   You did not criticize her markings on any
12        other evaluation?
13   A.   I can't say that I did not.  Not criticize.
14        But I might have asked her questions if she
15        graded really low.  They like for us to give
16        specific examples of -- if you're going to
17        give somebody a one.  Then you need to justify
18        why.  So I might have asked her why did she
19        get one, did she have specific examples.  I
20        was really trying to help Nancy be --
21   Q.   If she testifies that you didn't get her to
22        change any other evaluation from any other
23        magistrate, would you be in a position to
0284
1        dispute that?
2   A.   I don't think I got her to change this.  I
3        just asked her to review it and use her
4        knowledge, not just what somebody -- not use
5        what somebody told her.
6   Q.   Do you remember her testimony that you said,

7      this is not a threat, but you are still
8      probationary?
9   A.  I don't -- I heard her say that yesterday.
10  Q.  Now, you see if you could go home, study this,
11      and bring me back something different.
12          MS. NELSON:  Is your question, does she
13              remember Ms. Martin making that
14              statement?
15  Q.  Well, did you tell her that?
16  A.  No.
17  Q.  Did you tell anything closely approximated to
18      that?
19  A.  No.  I -- I had a memo saying could you review
20      this or -- could you review this --
21  Q.  So her memory of that conversation and your
22      memory of that conversations differs?
23  A.  I never threatened her, if that's what she
0285
1      says, I threaten her with her job.  That's
2      what she said yesterday.
3   Q.  Well, you told her that this is not a threat
4      but --
5   A.  That's what she says.
6   Q.  Do you dispute that?
7   A.  I do.
8   Q.  You didn't say that?  Didn't say anything like
9      that?
10  A.  I could -- yeah.  I dispute threatening her
11      with her job if she did not change Lavera
12      McClain's evaluation.
13  Q.  And she changed that evaluation, didn't she?
14  A.  Yeah, she did.
15  Q.  And felt bad about it in the process, didn't
16      she?
17  A.  I'm --
18          MS. NELSON:  Object to the form.
19  A.  I'm not aware that she felt bad about it.
20  Q.  Well, according to you, did she not talk to
21      Lavera about it afterwards?
22  A.  No.  She told Lavera that she was threatened
23      if she didn't change it.
0286
1   Q.  She told Lavera that?
2   A.  And I objected to her telling another
3      employee --
4   Q.  That she'd been threatened?

5   A.  Yes.
6   Q.  I see.
7   A.  I thought it was unprofessional.
8   Q.  Even if true?
9   A.  Unprofessional.  It wasn't true.  I never
10       threatened her with her job.
11   Q.  Well, did you bring an action against Nancy
12       for insubordination for telling another
13       employee a lie that allegedly you had
14       threatened her when, in fact, you hadn't
15       threatened?
16          MS. NELSON:  Object to form.
17   A.  I don't know if it was insubordination, but
18       I -- I remember being upset about her lying
19       about that.
20   Q.  Well, what do you call that when some employee
21       tells another employee that you threatened
22       them of termination unless they
23       changed evaluation.
0287
1   A.  I don't think that's insubordination.
2   Q.  Well, what do you call it?
3   A.  Lying.  She lied.  I never threatened her with
4       her job if she didn't change the evaluation.
5       As the reviewing authority, if I had not
6       signed the evaluation, she would have had
7       to -- it wouldn't have gone through anyway.
8       So I wouldn't have to threatened her with her
9       job.
10   Q.  Let me try to move away from that evaluation.
11          THE WITNESS:  Can we take a break?
12             (Brief recess)
13          MS. NELSON:  If I could say one thing.
14             Please let my client answer the
15             question that's on the table before
16             her before you jump into another
17             question.  I feel that the court
18             reporter is not being able to get down
19             her testimony accurately and
20             completely.
21          MR. JAFFREE:  I'll try to be more careful
22             on that score.
23                All right.  If we could resume.
0288
1   Q.  Before I move on to another category, let me
2       ask, what role did Mr. Corbin have with city

3    magistrates?
4    A.  He's the city manager.  Nothing with the
5       day-to-day.  He's our city -- the city manager
6       at the time.
7    Q.  What other magistrate evaluation did you
8       permit either Mr. Corbin or the city manager
9       or anybody else to ever comment upon?
10   A.  Anybody else.  I don't -- none that I
11      remember.
12   Q.  And Mary, she's in personnel; she's the one
13      that you said that you went to?
14   A.  No.
15   Q.  Is wasn't Mary?
16   A.  No.
17   Q.  What was the name?
18      MS. NELSON:  Martha McClain.
19   Q.  Martha.  Have you ever sought Martha's
20      guidance on any other magistrate's evaluation?
21   A.  On personnel issues.  I -- I can't
22      specifically say evaluations.  But anytime I
23      have a personnel issue -- not just Martha but
0289
1       personnel in general, Kai, anyone in personnel
2       if we have a question.
3          I had never had a supervisor use stuff
4       that they learned before they were hired in an
5       evaluation, and I didn't know how to handle
6       it.
7    Q.  All right.  So this is the first for you,
8       right?
9    A.  For a supervisor to use what somebody told her
10      when she was not there or not hired.  Yes, I
11      had never encountered that before.
12   Q.  Okay.
13   A.  And I didn't know how to handle it.  And it
14      would have been the same if it was anybody's
15      evaluation.
16   Q.  In your response to interrogatory number one,
17      you deny that you ever mentioned to Ms. Martin
18      that because you was black that city officials
19      would not do anything to you.
20         Could you have said something that
21      Ms. Martin could have misinterpreted to be
22      that kind of comment?
23   A.  No.
0290

1   Q.  Did you ever have a conversation with
2       Ms. Martin where you told her that because you
3       are black and a woman that the City wouldn't
4       take any action against you?
5   A.  No.
6   Q.  You do know that Ms. Martin have said that,
7       correct?
8   A.  Yes.
9   Q.  Ms. Martin also testified that she was
10      instructed that whenever a white magistrate
11      would do something to cause somebody to be
12      wrongfully arrested, you insisted that she
13      have a meeting with them but you made light of
14      it when people were wrongfully arrested by
15      black magistrates.
16          Do you dispute that?
17  A.  Yes.
18  Q.  That's not true?
19  A.  No, that is not true.
20  Q.  You did not put her on or instruct her to look
21      out for white magistrates making errors that
22      could result in somebody's wrongful arrest?
23      Is that a yes or no?
0291
1   A.  I did not tell Nancy Martin to only look at
2       the white people.
3   Q.  Well, had you made such a comment, would that
4       reflect a race consciousness, evidence in a
5       premium on being black?
6          MS. NELSON:  Object to the form.
7   A.  No.  That would be ignorant.  I would never
8       say that.
9   Q.  Be ignorant?
10  A.  Ever say that.
11  Q.  Do you feel that black people have a duty to
12      defend each other since blacks for years are
13      sort of kept out of -- of certain professions
14      and certain fields, and once they get there,
15      blacks have a duty to look out for each other?
16          MS. NELSON:  Object to the form.
17  A.  No, I don't feel that.
18  Q.  Well, if you don't feel that, then to what
19      were you referring when you mentioned in Sarah
20      Fowler's presence that I was being a traitor?
21  A.  That was a mischaracterization.
22          MS. NELSON:  Object to the form.

23   Q.   A mischaracterization of what?
0292
1    A.   Of a statement.
2    Q.   Well, what was her statement?
3    A.   Hers or mine?
4    Q.   What was her statement?
5    A.   I don't know.
6         MS. NELSON:  Sarah Fowler's statement?
7    Q.   Yeah.  What was Sarah Fowler's statement?
8    A.   You just said she said I said that you were a
9         traitor.
10   Q.   Yeah.  But you said she misunderstood you.
11   A.   She -- I wasn't talking about you.
12   Q.   You weren't talking about me at all?
13   A.   No.
14   Q.   You was talking about somebody else being a
15       traitor?
16   A.   I was.
17   Q.   I see.  And so she just assumed you was
18       talking about me?
19   A.   Yes.
20   Q.   However, the discussion on the table was about
21       me?
22   A.   It was not about you.
23   Q.   Well, isn't it true that one of the
0293
1        attorneys -- and it could have been Shaun --
2        told you that he had seen me in Judge
3        Anderson's courtroom or office, somewhere, and
4        at that time, you made the statement so the
5        way when he said that he seen me --
6    A.   Do you want me to tell you what happened?
7         MS. NELSON:  I'm not sure if he's got a
8            question on the table or not.
9    Q.   Well, isn't that when the statement was made,
10       when he mentioned that?
11   A.   No.
12   Q.   So Sarah Fowler was lying about you?
13   A.   I don't know about what part.  I -- I can tell
14       you what happened but --
15   Q.   Accusing me of being the traitor.
16   A.   Yes.  She -- yes.  I never accused you of
17       being a traitor, never.
18   Q.   Okay.  I'm willing to allow you to tell me now
19       since you didn't try to clear that up before
20       you could --

21      MS. NELSON: I don't know that she's had
22        any other time to clear it up before.
23        I'm not sure what the question is.
0294
1      MR. JAFFREE: Well, you may have had
2        opportunities to clear this up. You
3        had opportunities to clear it up in
4        your interrogatory response to
5        question number one.
6      MS. NELSON: She respond -- if you asked
7        the question, she responded.
8  Q.  Well, would you like to clear up how --
9    somehow she mischaracterized your statement of
10    the traitor?
11      MS. NELSON: I object to the form. You
12        can ask her what she said.
13  Q.  Well, what did you say?
14  A.  I was talking to -- we were in court and --
15    well, we weren't in court. We were in the
16    courtroom. It was after court. And Derrick
17    Yarbrough came in and said that he had seen
18    you and Judge Anderson talking and laughing at
19    the courthouse.
20      And I said, let me call him and tell him
21    something. And I called Judge Anderson's
22    secretary, Amanda, and she answered the phone
23    and said Judge was out.
0295
1      And I said, well, you tell him the next
2    time that woman is out there marching around
3    with that sign about Judge Anderson hates old
4    people, I'm going to be out there with her
5    because he's a traitor.
6  Q.  See, I --
7  A.  And Sarah took that and told you what Mary
8    Beth or somebody -- and then you took it and
9    put it in all the writings that I called you a
10    traitor. And that never happened.
11  Q.  So Ms. Fowler just sort of --
12  A.  Heard one end of a conversation.
13  Q.  One end of a conversation and just assumed
14    that I was a traitor?
15  A.  No. Well, I don't know what she assumed.
16  Q.  Did you consider me a traitor for representing
17    them?
18  A.  No. That's your prerogative to do.

19  Q.  Well, what about an Oreo?
20      MS. NELSON:  A what?
21  Q.  An Oreo?
22  A.  What is that?  Spell it.
23  Q.  Well, I'll use it in a Native-American
0296
1       pollyins.  What about an Apple Indian; do you
2       consider me that?
3   A.  I've never heard the term before.
4   Q.  Oreo cookie is where there's brown on the
5       outside and white on the inside.  It's an
6       expression.
7   A.  I've never thought of that.
8   Q.  A non-endearing expression that's used for
9       black people.
10  A.  No, I've never thought of that.
11  Q.  Who have lost their moral compass and stopped
12      being black for all practical purposes.
13      You've never considered --
14      MS. NELSON:  Is this your testimony?
15  A.  No.
16      MR. JAFFREE:  Well, the question was
17          asked, what is it.  I'm trying to
18          explain especially if you're not
19          familiar with the jargon and what I
20          thought was so standard in the black
21          community that I'm surprised the judge
22          didn't understand what I was saying.
23      MS. NELSON:  Well, is your question, does
0297
1           the judge think that you're an Oreo?
2       MR. JAFFREE:  Yeah.
3   Q.  Well, do you?
4       MS. NELSON:  I object to that.  She can
5           answer.  But what in the world does
6           that have to do with this case --
7       MR. JAFFREE:  It has --
8       MS. NELSON:  -- what she thinks of you?
9       MR. JAFFREE:  It has everything to do with
10          her mindset.
11      MS. NELSON:  With what?
12      MR. JAFFREE:  Her mindset.
13      MS. NELSON:  You know, Mr. Jaffree, she is
14          being sued personally by you and your
15          clients and is upset about it.  So
16          if -- her mindset about you really is

17          irrelevant to this case.  But I'm sure
18          y'all are not best friends.  Is that a
19          fair statement?
20      MR. JAFFREE:  I never knew it before this
21          case, and I guess I don't know it now.
22          But if, in fact --
23      MS. NELSON:  And you want to know if she
0298
1          thinks that you're an Oreo.  I just
2          think that's a question that's beyond
3          the scope of this lawsuit --
4      MR. JAFFREE:  Well, it's not beyond the
5          scope.
6      MS. NELSON:  -- and inappropriate to ask.
7      MR. JAFFREE:  If, in fact, she perceives
8          me as a traitor --
9      MS. NELSON:  She's already testified that
10          she didn't say that.
11      MR. JAFFREE:  Yeah.  I mean -- yeah.  But
12          somebody else testified that she did
13          say that.  But if, in fact, I have a
14          duty to follow up because it has an
15          impact on --
16      MS. NELSON:  On what?
17      MR. JAFFREE:  -- on evading the psyche.
18      MS. NELSON:  Whose psyche?
19      MR. JAFFREE:  Her psyche.
20      MS. NELSON:  That doesn't have anything to
21          do with this case.
22      MR. JAFFREE:  Oh, I disagree.  I mean, I
23          just simply disagree.  You must know
0299
1          how much a role --
2      MS. NELSON:  If somebody personally sued
3          me, I might not have this fond, warm,
4          fuzzy feeling about them.
5      MR. JAFFREE:  You must know what a role
6          motive plays in these cases.  You must
7          know that.  That requires evading the
8          psyche to determine motive.
9          Anyway, let me get to
10          interrogatory number seven.
11      MS. NELSON:  Do you want to show her these
12          interrogatories.
13      MR. JAFFREE:  I was looking for them, and
14          I can't find them.  I don't have them

15          with me.
16          MS. NELSON:  Well, what is it and I'll --
17          MR. JAFFREE:  But the question would be
18              reflective of what she said in
19              interrogatory number seven.
20    Q.  You denied in your response to interrogatory
21          number seven that you was made aware that
22          Magistrate McClain had made error entries
23          associated with process of writ of arrest.
0300
1    A.  I said, no.
2    Q.  Do you still dispute that you was made aware
3          of that?
4    A.  "Errors associated with the processing of writ
5          of arrest."
6    Q.  Do you know what writ of arrest are or alias
7          warrants or whatever?
8    A.  That she had errors in processing?
9    Q.  That she had made errors associated with
10          processing them.  And you said that you was
11          not aware of that.  Is that still your
12          testimony that you was not aware that
13          Ms. McCain had made errors?
14    A.  Yeah.  Not specifically that errors for the
15          processing of writ of arrest.
16    Q.  Are you saying now you didn't understand the
17          question?
18    A.  Well, I just -- I'm not aware of her errors
19          associated with processing of Writs of
20          Arrest.
21    Q.  And nobody had told you about these errors?
22    A.  Not processing Writs of Arrest.
23          Those -- well --
0301
1    Q.  Well, how would you define a writ of arrest?
2    A.  A writ of arrest is when I stamp a warrant for
3          failure to appear, and then I send it over to
4          the magistrates' office.  I sign it and then
5          they execute it.
6    Q.  Well, that's part of the processing, right,
7          the execution?
8    A.  Right.
9    Q.  That's part of the processing?
10    A.  Right.
11    Q.  Nobody never told you that Ms. McCain had
12          made -- strike that.  Either Mary Brackin or

13      Nancy Martin never told you that Ms. McCain
14      made errors in processing these writs?  They
15      never mentioned that to you?
16  A.  Not -- not -- I -- not specifically.  I mean,
17      processing Writs of Arrest, I stamp them.
18      If -- she wouldn't know whether the person was
19      there or not.  If I called the docket, a
20      person wasn't there, I stamped it, signed it,
21      she executed it over in the office.  She would
22      have no way of knowing whether I was right or
23      wrong about the person --
0302
 1  Q.  Well, we're not talking about your errors.
 2  A.  No.  Well, I don't know how she could
 3      have -- what errors she could have made other
 4      than executing --
 5  Q.  Well, so you're saying nobody else told you.
 6      Okay.  Fine.
 7          Ms. McCain is black; is that correct?
 8  A.  Miss who?
 9  Q.  Ms. McCain is black, Lavera?
10  A.  McClain?
11  Q.  McClain.  I'm sorry.
12  A.  Yes.
13  Q.  All right.  The same question was asked in
14      interrogatory number ten with respect to
15      Ms. Knight.  And I guess the same answer,
16      right?
17  A.  It is the way I interpret it because I don't
18      -- yeah, that same answer.  Yes.
19  Q.  Okay.  Now, Ms. Knight is black as well,
20      right?
21  A.  Yes.
22  Q.  What is your practice on reviewing alias
23      warrants of arrest processed by magistrates?
0303
 1  A.  I don't know.
 2          MS. NELSON:  What do you mean by
 3           "processed?"
 4          MR. JAFFREE:  Well, handled, whatever they
 5           do to them.
 6  Q.  Do you ever review them?  Do you have a policy
 7      on reviewing these writs that somehow the
 8      magistrates have to do something to?
 9          MS. NELSON:  Well, let's clarify for the
10           Record what we're talking about, "do

11          something to."  I don't know what
12          you're talking about.  She testified
13          that -- the judge said she will stamp
14          or execute the warrant.
15     MR. JAFFREE:  And then send them to the
16          magistrate office.
17     MS. NELSON:  And then let's talk about
18          what happens there.
19  Q.  Do you review any of these warrants after they
20      have gone to magistrate office?
21  A.  No.
22  Q.  Okay.  Had Mary Brackin ever told you anything
23      about data entry errors on the computer made
0304
1      by Ms. Knight?
2   A.  "On a computer.  I was informed by
3       Ms. Knight" --
4   Q.  Well, we're not on the interrogatory anymore.
5       I'm asking you just a question off the
6       interrogatories.
7           I'm asking you have Mary ever told you
8       anything about data entry errors that was made
9       on the computer by Ms. Knight?
10          MS. NELSON:  Well, that looks like an
11              interrogatory to me.
12  A.  I said I was informed of it by Ms. Knight
13      during a time period the department was
14      changing computer systems.
15  Q.  Well, what did she tell you -- what did
16      Ms. Knight tell you that Mary -- I'm sorry.
17      What did Mary tell you that Ms. Knight had
18      done?
19  A.  Well, it wasn't just Ms. Knight.  Those were
20      the -- the reversals.  Mary Beth was the
21      cashier.  She did all the reversals.  And
22      every time she did a reversal, she would fill
23      out a form and -- on every magistrate and send
0305
1      it over.
2   Q.  So are you saying that Mary never told you
3       anything specific about Ms. Knight?
4   A.  She might have but also specific to other
5       magistrates.
6   Q.  I wasn't asking you about --
7   A.  Not in a vacuum.
8   Q.  I wasn't asking you about other magistrates.

9     I was just talking about Ms. Knight.
10  A.  Well, I -- I would still have to say -- if I
11       said, no, I might be lying because she told me
12       about everybody's reversals.
13  Q.  So you don't remember what she may have told
14       you -- you don't remember what she may have
15       told you about Ms. Knight; is that correct?
16       MS. NELSON:  What was your question?
17  Q.  Well, what did she tell you, and you said she
18       tell you about everybody.
19       Do you remember anything specific that she
20       told you about Ms. Knight making data entry
21       errors on the computer?
22  A.  Not specifically, no.
23  Q.  What about Nancy; did Nancy ever tell you
0306
1       about data entry errors made by Ms. Knight on
2       the computer?
3       MS. NELSON:  I thought you just asked her
4        that.
5       MR. JAFFREE:  Well, the first one was
6        Mary, what did Mary tell her.  The
7        next one was, what did Nancy tell you.
8       MS. NELSON:  Well, you're assuming she
9        told her something.  Did you ask her
10        if Nancy told her anything?  Based on
11        my questioning of Nancy yesterday, I'm
12        not sure she would know what a
13        computer error was.
14  Q.  Did Nancy tell you anything about computer
15       errors that Ms. Knight was making?
16  A.  Not that she had personal knowledge of.  She
17       might have said that Mary Beth said they were
18       making errors.
19  Q.  But she didn't tell you anything about her own
20       personal knowledge.  All right.
21       Did Mary ever tell you anything about
22       computer errors being made by Ms. McCain?
23       MS. NELSON:  McClain?
0307
1  Q.  McClain.
2  A.  She might have.
3  Q.  Do you remember what it was she told you?
4  A.  No.
5  Q.  What about Nancy; have she ever told you
6       anything about computer errors made by

7      Ms. McClain?
8   A.   She might have.  I don't -- I don't -- not
9        specifically.
10   Q.   You don't recall specifically.
11          Now, what did Mary tell you about data
12        entry errors on paperwork made by Ms. Knight?
13        I'm not talking about the computer now.  I'm
14        talking about paperwork that she worked on,
15        the errors that Ms. Knight makes on
16        paperwork.
17          MS. NELSON:  Again, assumes --
18   Q.   That Mary told you.
19          MS. NELSON:  You've not laid a proper
20             foundation.
21   Q.   Well, has Mary ever told you about any errors
22        that Ms. Knight made dealing with the
23        paperwork you have to deal with?  Mary ever
0308
1        mention it to you?
2   A.   Over all the years she might have.
3   Q.   But you don't remember anything specific?
4   A.   I mean, not -- no, not just specific.
5   Q.   And the same question with respect to Nancy.
6          MS. NELSON:  Meaning did -- will you ask
7             the question, did Nancy make her
8             aware?
9   Q.   Did Nancy make you aware of data entry errors
10        on paperwork that was made by Ms. Knight?
11   A.   She might have over the years.
12          MS. NELSON:  Nancy was only there nine
13             months.
14   Q.   In your testimony on page 15 of Mary Beth's
15        hearing, you stated that you never said
16        everyone made errors.  Is that still your
17        position, that you've never said that?
18   A.   In response to a specific question by her?
19   Q.   No.  On page 15 during my questioning of you,
20        you stated that you never -- that you never
21        said that everyone makes errors.  Is that your
22        position, that you never said that?
23   A.   In life I've never said that or just in
0309
1        response to Mary Beth specifically?
2   Q.   With respect to --
3          MS. NELSON:  Could you show her the
4             testimony, please?

5          (Brief pause)
6      MR. JAFFREE:  I'm not sure where I got
7        that page 15 from, page 15 of
8        something.  But it may not be this
9        transcript here because I don't think
10       you was on page 15.
11  Q.  Well, let me ask the question in general.  Do
12     you recall telling Nancy when she was
13     complaining about errors made by either Eunice
14     or Lavera that everyone makes errors?
15      MS. NELSON:  Again, object to form.  I'm
16        not sure there's any testimony that
17        Nancy made complaints about them
18        making errors.
19      MR. JAFFREE:  Well, there was complaints.
20        There was a lot of testimony to that.
21      MS. NELSON:  Well, the judge --
22      MR. JAFFREE:  The judge can answer whether
23        or not she --
0310
1       MS. NELSON:  -- does not recall.
2       MR. JAFFREE:  -- ever told her that.
3  Q.  Do you know whether you told her that everyone
4     makes errors?
5  A.  I don't remember saying it in regard to a
6     specific matter.
7  Q.  In defense of either Eunice or Lavera --
8  A.  Or anyone.
9  Q.  -- but you said everybody make errors.
10  A.  I just -- not in relation to a specific thing.
11  Q.  I have a series of questions relating to
12     pages.  I don't know where I got this from.
13     And in benefit to you, I'm not asking you
14     these questions that I've got pages numbers on
15     because I don't know what that relates to.
16       Now, let me ask you this:  On or about
17     March the 10th of 2004 -- or was it 2005?  I
18     think -- it may have been 2005.  Did you tell
19     the staff to make no contact with Mary Turner?
20      MS. NELSON:  Again I would -- you're
21        asking 2004, 2005?  Would you put this
22        in some context?
23  Q.  Let me see here.  It was in 2005, on or about
0311
1     March 10th, 2005, did you have a meeting with
2     your staff where you told them to make no

3      contact with Mary Turner?
4   A.  I don't remember the specific date.
5   Q.  All right.  Well, do you recall ever having a
6      meeting with the staff where you told them to
7      make no contact -- have no contact with Mary
8      Turner?
9   A.  I remember the investigators going up to the
10     office with us and telling us to inform them
11     to not mess with the computer, not contact her
12     for a short period of time because they were
13     trying to control the computer system and
14     access to her office.
15  Q.  Did you do anything to suggest that this was
16     limited to a short period of time?
17  A.  Well, I told them that they were right in
18     the -- we were investigating -- I don't know
19     because I was trying to be protective.  I
20     don't know what I told them, but it was
21     certainly for a short period of time, to not
22     contact her, not touch the computer until we
23     let them know.  They were trying to get in
0312
1      touch with Tim Stewart to freeze her computer
2      so that they couldn't change anything.
3   Q.  Let me show you this.  Let me -- this is not
4      necessarily the best copy, but we'll call this
5      Plaintiffs' Exhibit 5 --
6         MS. NELSON:  Well, don't put it -- you're
7           putting it over my sticker.  That was
8           my -- also -- I'm sorry.  I already
9           had that sticker on it.
10        MR. JAFFREE:  I done forgot where this
11          came from.  This came from somewhere.
12             (Plaintiffs' Exhibit 7 was marked
13               for identification.)
14  Q.  Let me show you what's been marked as
15     Plaintiffs' 7 and see if you can recognize
16     that document.
17        COURT REPORTER:  Mr. Jaffree, was that 7?
18        MR. JAFFREE:  Yes, 7.
19        COURT REPORTER:  Because you said 5 first,
20          and then you said 7.
21        MR. JAFFREE:  Well, I'm sorry.  Yeah, it
22          said 5 on there, but it was 7.
23  Q.  Do you recognize that document?
0313

1  A.  Yes.
2  Q.  Is there anywhere on that document where you
3      make reference to a short period of time?
4  A.  No.  But I think -- that was my understanding,
5      that it was just until they could get control
6      of the computer system in her office.
7  Q.  Control of the computer system.
8  A.  Of the -- of her computer so nobody could go
9      in and change anything.
10  Q.  So they should limit their contact for the
11      time it took them to get the control of the
12      computer?
13      MS. NELSON:  Well, I think Number 7 can
14          speak for itself.  It says "while the
15          internal investigation conducted by
16          the Dothan Police Department was
17          underway."
18  Q.  So it was broader that just simply control of
19      the computer?
20  A.  Among other things, the investigation.  They
21      wanted to -- they wanted to freeze her
22      computer.  They're trying to get in touch with
23      Tim Stewart to freeze the computer.  They were
0314
1      investigating these complaints, and they
2      didn't want anybody calling her or colluding
3      with her, is my understanding.  So they just
4      said, no exact.  It was the -- the internal --
5      the investigators told us to go tell them to
6      not contact her.
7  Q.  But by what authority did the investigators
8      have to tell you to tell your staff not to
9      contact Ms. Martin?
10      MS. NELSON:  If you know.
11  Q.  If you know, by what authority?
12  A.  Yeah.  I don't know.  They were investigators,
13      and I didn't question their investigation at
14      that point.
15  Q.  Did these people control your office?
16  A.  No.
17  Q.  Okay.  Can I see that document back again for
18      a minute?  Now --
19      MS. NELSON:  If I can state for the
20          Record, I mean, there was a police
21          department investigation --
22      MR. JAFFREE:  I could care less --

23      MS. NELSON: -- of criminal activity going
0315
1       on.
2         You could care less?
3      MR. JAFFREE: I care less about that. I
4       care less about that. Let me -- these
5       people -- these police don't have any
6       authority to go in there and just
7       dictate who could talk to people.
8      MS. NELSON: When an employee of the City
9       of Dothan is under a criminal
10     investigation --
11     MR. JAFFREE: Yeah, yeah.
12     MS. NELSON: -- it's your position that
13      they cannot do that?
14     MR. JAFFREE: That's my position,
15      absolutely.
16  Q. All right. You also indicate -- by the way,
17    who did you write this for? Who were you
18    giving this to? By this, for the Record, I'm
19    talking about Plaintiffs' Exhibit Number 7?
20  A. I don't remember.
21  Q. Why did you write -- were you writing that for
22    yourself? Who was that intended for?
23  A. I don't remember why I did it.
0316
1  Q. Why the seven-day gap between the date that
2    that notation is done from the date that you
3    allegedly told the staff not to do this?
4  A. I don't remember.
5  Q. You don't know about that seven-day gap and
6    you don't know who this was for?
7  A. No.
8  Q. Did you give this to anybody?
9  A. I don't remember, honestly.
10  Q. Did you give this to staff? All right.
11    You also said that you instructed them
12    that "no discussion with anyone regarding this
13    matter was to take place."
14    Do you remember telling them that as well,
15    no discussion with anybody?
16  A. I don't remember specifically but possibly, if
17    that's what the memo said.
18  Q. Now, you remember, I told you, you were going
19    to hear this word again. And so I'm going to
20    say it now.

21          Could you identify with me in detail what
22      mischief you thought to prevent with your
23      directive that the staff was not to contact
0317
1       Mary Turner?
2          MS. NELSON:  Object to the form.  She's
3             already answered the question.  I
4             object to the term.
5          MR. JAFFREE:  She's not answered that
6             question.
7          MS. NELSON:  Yes, she has.  She said the
8             investigators instructed --
9          MR. JAFFREE:  Can you let her --
10         MS. NELSON:  She's answered the question.
11         MR. JAFFREE:  She haven't answered the
12            question.
13         MS. NELSON:  If you would listen, she has
14            answered the question.
15   Q.  Let me ask you this:  Other than some
16       investigator, who was it that told you this?
17   A.  I don't remember specifically.  There were two
18       investigators I think at the time.  And I
19       don't remember which of them said it.
20   Q.  Some investigator told you -- came out and
21       told you, instruct the staff -- instruct your
22       staff to have no contact with Mary Turner?
23   A.  Yes.  I was in the courtroom, and they came in
0318
1       and said, we need to get control of the
2       office --
3          MS. NELSON:  Say who "they" is.
4   A.  The investigators.  It was either Keith
5       Gray --
6          MS. NELSON:  From the police department.
7   A.  From the police department.  Keith Gray, Ray
8       Owens or one of those two.
9   Q.  What limitation did they put on this no
10      contact?
11   A.  Just that what -- well, it was my
12      understanding -- and I think I conveyed
13      that -- that it was until they could get
14      control of the computer system because I put
15      in there, nobody was to go in her office.
16      They were investigating the allegation that
17      there had been ticket fixing in the office,
18      and they didn't want anybody colluding with

19    anyone else.
20  Q.  Well, when did they get control of the
21    computer system?
22  A.  I don't know at what point.
23  Q.  Well, let's --
0319
1  A.  But it wasn't just the computer system.  They
2    were investigating.  It was a criminal
3    investigation.
4  Q.  Well, you just said it was until they could
5    get control of the computer system.  You want
6    to back away from that testimony?
7      MS. NELSON:  She said that and other
8        things.
9  A.  Yeah, other -- it was other --
10  Q.  Well, what other things?  Tell me the whole
11    host of other things that they was concerned
12    about?
13  A.  I wasn't a part of criminal investigation.
14    They were concerned that a crime had been
15    committed.  There were allegations --
16      MS. NELSON:  You let her answer.
17  A.  There were allegations that a magistrate had
18    extorted a defendant in our court, and they
19    wanted to -- they were investigating that.
20    And so they wanted me to tell them not to
21    contact Mary, not to go in her office and mess
22    with the computer.
23      I knew that one of the things they were
0320
1    doing was trying to get the computer.  They
2    kept saying, we're trying to get the computer
3    so nobody can go in and change anything.  They
4    were investigating.  So it was my -- I didn't
5    think it was forever, just as long as they
6    were investigating.
7  Q.  Well, when did they tell you that the
8    investigation was complete?
9  A.  I don't remember, but I even told them that
10    day that if they wanted to talk with Mary
11    after hours to let me know, and I would ask
12    the investigators how to handle that.  I
13    didn't know.  I wasn't trying to tell them not
14    to ever associate with her, just while the --
15    the criminal was going on.
16  Q.  You haven't answered my question.  When did

17    they tell you their investigation was
18    complete?
19  A.  I don't remember the date.
20  Q.  Did they ever tell you their investigation was
21    complete?
22  A.  I'm sure at some point they said, it's okay.
23  Q.  Did you have a meeting with the staff telling

0321

1    them that the investigation is complete and
2    now you can contact Mary?
3  A.  I don't remember.
4  Q.  Well, how would the staff know when it's okay
5    to contact Mary?
6  A.  Well, it would have been communicated to them
7    in some way.
8  Q.  Well, did you communicate it to them in some
9    way?
10  A.  I'm sure -- I don't remember because Mary was
11    eventually charged with criminal charges and
12    everything else transpired.
13  Q.  If somebody says you never communicated to
14    them in some way that the investigation was
15    over, would you be in a position to dispute
16    that?
17  A.  That I never communicated --
18  Q.  You never communicated to them that the
19    investigation was over.
20  A.  I would dispute that.  I mean, I -- nobody
21    ever came and asked me, could they contact
22    Mary and I said, no, you're -- no.  So I would
23    dispute that.

0322

1  Q.  So you did tell them at some point the
2    investigation was over?
3  A.  I just don't remember specifically how it
4    happened.
5  Q.  Well, is that something you would remember?
6  A.  There was so much going on that -- during that
7    time, and we were trying to be protective of
8    Mary because they were simply allegations at
9    that point.
10  Q.  Protective of Mary?
11  A.  Yeah.  Because there was a lot of rumor and
12    allegation.  And I just asked them not to talk
13    about it.
14  Q.  How would Mary be placed in jeopardy by

15       somebody talking to Mary?
16   A.  No.  The rumors and the allegations.  Nobody
17       knew for sure, and it was just allegation.
18   Q.  Answer my question.
19   A.  I just asked them to stop talking about it.
20   Q.  Answer my question:  How would Mary be harmed
21       by somebody talking to Mary?
22   A.  How would she be harmed?
23   Q.  You said you wanted to protect Mary.  Are we
0323
1        talking about Mary Turner?
2    A.  I wanted to protect her reputation and her
3        character.  At that point, it was just simply
4        allegations.  We didn't know if they were true
5        or not, and I didn't think they should be
6        running around talking about it.
7    Q.  So that's why you didn't want staff to talk
8        to --
9    A.  No.  I did that at the behest of the
10       investigators.
11   Q.  Did you not want staff to talk to each other
12       as well?
13   A.  No.  I think I said other -- talking about it.
14       I meant generally.
15   Q.  All right.  But were you trying to protect
16       Mary by telling staff, have no contact with
17       her?
18   A.  No.  I was following the directive of
19       the criminal investigators who were handling
20       that case.
21   Q.  Well, what specifics in this Defendants' 7 was
22       designed to protect Mary?
23          MS. NELSON:  I don't know that she ever
0324
1           testified to that.
2           MR. JAFFREE:  She said she was trying to
3           protect Mary.
4    A.  Well, I -- I was in my mind trying to tell
5        them to stop talking about -- it was just
6        simply allegations going around.
7    Q.  I'm a little bit confused.  How many people in
8        addition to yourself knew that there was a
9        criminal investigation going on?
10   A.  How many people?  I have no way of knowing
11       because once I met with Personnel, the legal
12       department, and the police chief, that was the

13      extent of my -- I never got back involved with
14      it.
15   Q.  Well, do you know whether --
16   A.  So I don't know who they told.
17   Q.  Do you know whether Mary knew that there was a
18        criminal investigation going -- Mary Turner
19        knew that there was a criminal investigation
20        going on concerning her?
21   A.  No, I don't know.
22   Q.  Do you know if any of the other magistrates
23        knew that there was a criminal investigation
0325
1      going on concerning Mary?
2   A.  Do I have personal knowledge that they knew?
3   Q.  Yeah, personal knowledge.
4   A.  I have no personal knowledge that they knew.
5   Q.  Well, if they didn't know a criminal
6        investigation was going on, what could they
7        possibly tell Mary in contacting Mary that
8        would interfere with the criminal
9        investigation?
10   A.  You want me to answer it?
11   Q.  Well, if you can.
12   A.  Well, there was a lot of allegations, rumors
13        just going around that Mary Turner was in
14        trouble because this guy had come in, talking
15        about fixing tickets.  Just -- I guess it was
16        just a normal leak, but nothing had been
17        substantiated.  I never told them about the
18        allegations, but I knew there was a lot of
19        whispering and rumors going on.  And for that
20        reason, I asked them to not to --
21        MS. NELSON:  Let her answer.
22        MR. JAFFREE:  Well, I'm stopping her
23            because she's not answering my
0326
1            questions.
2        MS. NELSON:  You don't like what she has
3            to say.  That's the reason you're
4            stopping her.
5        MR. JAFFREE:  But she's not answering my
6            question.  I asked her, what could
7            they tell Mary that would interfere
8            with the investigation.  I'm trying to
9            find out.  If they didn't know
10            anything and if Mary --

11          MS. NELSON:  She didn't know what they
12              knew.  They could do a lot.
13          MR. JAFFREE:  Well, tell -- I want her to
14              tell me a lot of what they could do
15              that interfered with the
16              investigation.
17  A.   Well, if they contacted Mary, she could tell
18          them to go in the computer and delete the
19          files of the other Phelps boy's tickets who --
20          that had been --
21  Q.   She didn't know what the investigation was
22          about.
23  A.   I don't know whether --
0327
1          MS. NELSON:  How do you know that?
2  A.   -- she knew.
3          MS. NELSON:  There's no testimony to that.
4          MR. JAFFREE:  Do you have your records?
5          MS. NELSON:  You're trying to testify on
6              her behalf.  There's absolutely no
7              evidence in this proceeding that she
8              didn't know what was going on.
9          MR. JAFFREE:  Assuming --
10         MS. NELSON:  She knew full well what she
11              was being suspended for.
12         MR. JAFFREE:  Assuming these documents are
13              true--
14         MS. NELSON:  What documents, Mr. Jaffree?
15         MR. JAFFREE:  The documents that I'm
16              looking at.  Let me move on because I
17              don't want to --
18         MS. NELSON:  Mary Turner was ultimately
19              indicted of a criminal offense.  And
20              as I understand it, entered a -- had
21              some kind of deferred prosecution or
22              something.  But she was under criminal
23              investigation for a very serious
0328
1              charge.
2          MR. JAFFREE:  It's in the record that she
3              was charged with a misdemeanor and not
4              found guilty of any misdemeanor.  But
5              be that as it may, we're talking about
6              a single ticket.
7          MS. NELSON:  This all your
8              characterization.

```
 9        MR. JAFFREE:  Well, how many tickets are
10          we talking about.  I thought we was
11          talking about a single traffic ticket.
12          We're not talking about any espionage
13          or forgery or whatever she was charged
14          with that --
15        THE WITNESS:  Extortion.
16        MS. NELSON:  She was charged with
17          extortion.
18        MR. JAFFREE:  Yeah.  But she wasn't
19          charged with extortion.  She just
20          simply wasn't.  That's not true.
21          That's not part of the record.  You
22          can't find a record where she was
23          charged with extortion.  She wasn't.
0329
 1          And if I have to prove -- present a
 2          document to establish that, I will.
 3          Since I represented her, I know.
 4              But, anyway, be that as it may, I
 5          want to go on.
 6   Q.  Did you explain to the staff why this
 7        no-contact directive was important?
 8          MS. NELSON:  I think asked and answered.
 9   Q.  Can you answer the question, yes or no?
10   A.  Why I thought it was important or why it was
11        important?
12   Q.  Why the no-contact directive was important?
13        Did you explain to them why it was important?
14   A.  It was important -- no, I didn't -- I don't
15        know if I said why it was important.  I just
16        told them that we were not to contact Mary
17        pending this investigation.
18   Q.  So you didn't tell them why it was important.
19   A.  And if they wanted to talk with her after
20        hours to let me know, and I would ask how they
21        needed to do that.
22   Q.  Did you place any limits on this prohibition?
23   A.  Limits such as?
0330
 1          MS. NELSON:  Asked and answered.
 2          MR. JAFFREE:  That's not asked --
 3   Q.  Did you place any limits on the prohibition,
 4        no contact?  Were there any limits to it, or
 5        was it absolute, don't contact her in church,
 6        don't say hello?
```

7   A.  I told --
8        MS. NELSON:  Asked and answered.
9   A.  I told them if they wanted to talk
10       with -- contact her -- no.  I didn't tell them
11       not to go to church or after hours.  I told
12       them they could talk with her after hours, let
13       me know, and I'd find out -- you know, tell
14       the investigators, they go to church with them
15       or whatever.
16  Q.  Well, you'd have to consult with the
17       investigators before they would be permitted
18       to talk to them after hours?
19  A.  No.  I -- I just told them to let me know if
20       they wanted to talk with her after hours.  I
21       didn't know how to handle that.
22  Q.  I read everybody's transcript.  I don't
23       remember anybody saying that you told them
0331
1        that they could talk to her after hours if
2        they contact you and get clearance.  I don't
3        recall --
4          MS. NELSON:  I don't know whose transcript
5             you are even talking about.
6          MR. JAFFREE:  All the magistrates'.
7          MS. NELSON:  There's no testimony in this
8             case about any magistrates.
9          MR. JAFFREE:  All the magistrates'.
10            There's nothing to that effect.  So --
11         MS. NELSON:  That's your statement,
12            Mr. Jaffree.
13         MR. JAFFREE:  Well, fine.
14         MS. NELSON:  And I move to strike it.
15         MR. JAFFREE:  Fine.  Fine.  Fine.
16  Q.  Were you acting in your administrative or
17       judicial capacity when you issued your
18       no-contact directive?
19  A.  I'm reticent about saying it was my no-contact
20       directive.  I didn't -- you know, it wasn't at
21       my behest or my initiation.  I simply did what
22       the investigators told me was necessary at the
23       time.  So I don't --
0332
1   Q.  Well, you adopted that no-contact directive,
2        didn't you?
3          MS. NELSON:  Object to the
4             characterization.  She said she --

5          adopt, she never said she adopted it.
6          MR. JAFFREE:  I'm asking her.
7          MS. NELSON:  She said she communicated it.
8          MR. JAFFREE:  I'm asking her.
9    A.  I communicated it.
10   Q.  Did you adopt their no-contact directive to
11       you as your no-contact directive?
12          MS. NELSON:  Object to the form.  She's
13             testified as to what she did.
14          THE WITNESS:  Right.
15   Q.  There's -- no, no.  Right?  Yes or no, did you
16       adopt their no-contact directive --
17          MS. NELSON:  Object to the form.
18   Q.  -- as your no-contact directive?
19   A.  I wouldn't say I adopted it.  But, you know,
20       they're criminal investigators.  If they come
21       in there and say, go tell them not to talk to
22       Mary, not to come to that computer, I wouldn't
23       have said, no, I'm not going to do that.
0333
1    Q.  Did you --
2    A.  So I did not adopt it.  I'd simply
3        communicated the no-contact order that was
4        communicated to me by the criminal
5        investigators.
6    Q.  Did you initiate --
7    A.  I did not.
8    Q.  Well, can I finish my question?
9          Did you initiate any disciplinary action
10       because your no-contact directive was
11       breached?
12   A.  Did I initiate any disciplinary action because
13       "the" no-contact order was breached?
14   Q.  Yeah, because the no-contact order was
15       breached?
16   A.  I don't remember.
17   Q.  Did you charge somebody with insubordination
18       because the no-contact order was breached?
19   A.  Yes.
20   Q.  Was it because of your no-contact order was
21       breached or the police department's no-contact
22       order was breached?
23          MS. NELSON:  I object to the form.
0334
1    A.  And I think they're one in the same.  There
2        was a no-contact order in place.

3    Q.  So you adopted it?
4         MS. NELSON:  Object to the form.
5    Q.  So you adopted it?
6         MS. NELSON:  That's your characterization?
7         MR. JAFFREE:  Well, she said "one in the
8           same."  What does that mean?  What
9           does "one in the same" mean to you?
10        MS. NELSON:  It's one in the same.  Accept
11          her testimony.  And she's not saying
12          she adopted it.  Just ask her
13          factually what happened.  You don't
14          like what she says, and you just get
15          hung up on your version of the way you
16          want to hear it.
17   Q.  If you didn't --
18        MS. NELSON:  You can ask her factually
19          what happened.
20        MR. JAFFREE:  Wait a minute.  I'm asking
21          her.
22   Q.  If you didn't adopt it, why did you discipline
23      somebody for its breach?
0335
1    A.  Because it was in place at the time.  I
2       communicated it.  And I told them, you know,
3       do not contact Mary.  And I told them that the
4       investigators said, you know, not to contact
5       Mary, it was an investigation.
6          And your client, Mary Beth Brackin, said,
7       why are you looking at me?
8          I said, because I know that you and she
9       are friends, and if you want to contact her,
10      let me know.  I told Mary Beth that in front
11      of every magistrate.  And every one of them
12      will tell you that I told her that because she
13      was the only one that spoke out and said, why
14      are you looking at me.
15         I said, because I know you and Mary are
16      friends.  And if you want to contact her, let
17      me know.
18         And she didn't say a word.
19   Q.  Did you expect staff, including Ms. Brackin,
20      to use their own discretion on what contacts
21      with Ms. --
22   A.  No.
23   Q.  -- Turner was permissible?
0336

1    A.  No.  It was clear that they were not to
2        contact her or go in her office.
3    Q.  Did you intend your directive to be all
4        inclusive, sweeping, and cover the universe of
5        possible contacts?
6    A.  No.  That's why I gave her the option of
7        contacting her after hours.
8    Q.  Did you say, no, that she was free to contact
9        her after hours?
10   A.  She never asked.
11   Q.  Was she free to contact her after hours?
12   A.  If she had asked, possibly.
13   Q.  Well, had she contacted --
14   A.  She said she didn't have any reason to.
15   Q.  Had she contacted you to contact her after
16       hours, would you have granted that contact?
17   A.  I don't know.  I mean, I -- I -- just --
18       supposition.
19       MS. NELSON:  Ms. Brackin was disciplined
20          for insubordination for a phone call
21          that she made during office hours,
22          which she's admitted to.  And the
23          judge has already dismissed that count
0337
1           in your case.  And so --
2       MR. JAFFREE:  Can I continue?
3       MS. NELSON:  -- we're beating a dead
4          horse.
5       MR. JAFFREE:  I appreciate your giving a
6          closing and an ultimate statement or
7          whatever kind of statement.
8       MS. NELSON:  I'm just telling you --
9       MR. JAFFREE:  But if I could go on.
10   Q.  Were there any time or date or circumstances,
11       exceptions to your directive?
12   A.  If they wanted to contact her after hours.
13       MS. NELSON:  Asked and answered.
14   Q.  Were you aware that Ms. Turner and Ms. Brackin
15       were close friends?
16       MS. NELSON:  Asked and answered or at
17          least answered.
18   Q.  Were you?
19   A.  I thought they were.
20   Q.  Okay.  Did you know that they visit each
21       other's homes?
22   A.  No, I didn't know that.

23   Q.   That they attended the same church?
0338
1    A.   No.  I thought Mary Beth went to a different
2         church.
3    Q.   They went out socially together?  Were you
4         aware of that?
5    A.   Mary Beth told me that Mary Turner's husband
6         had been having improper sexual advances with
7         a nephew --
8    Q.   I didn't ask you about any --
9    A.   -- and she wasn't comfortable being around
10        him.
11   Q.   I didn't ask you that.
12   A.   That's what I'm telling you.
13            MS. NELSON:  Well, you did.  You asked
14            her.
15   A.   That's why I laughed when you said --
16   Q.   I didn't ask you anything about her husband.
17        I asked you --
18   A.   No.  You said did they have social -- I'm
19        sorry -- did they have social contact.  So I
20        wouldn't think they would because Mary Beth
21        told me that Mary Turner's husband performed
22        fellatio on his 18-month-old nephew, and she
23        wasn't comfortable with her son being around
0339
1         him.
2    Q.   All right.
3    A.   That's what Mary Beth Brackin said.  So I
4         wouldn't think they would socialize.  But,
5         now, I don't know.
6    Q.   Were you aware that they frequently spoke to
7         each other on the phone when not at work?
8    A.   No, I was not aware of that.
9    Q.   Were you aware that they enjoyed the presence
10        of each other's company?
11            MS. NELSON:  Asked and answered.
12   A.   She told me she didn't like him around her
13        child since he liked to have sex with boys.
14   Q.   I wasn't talking about him.  I'm talking about
15        the two of them.
16   A.   I don't know.  I would think she wouldn't have
17        been comfortable with them around.
18   Q.   Would your knowledge of a close relationship
19        and a frequent non-work-related contact
20        between the two of them have made a difference

21    in your directive or how you would implement
22    it?
23  A.  I wasn't aware that there was one.
0340
1  Q.  But if you were aware that they had a close
2    relationship, would that have made
3    a difference in your directive?
4  A.  Well, that's why I gave her the option of
5    talking to her after hours.  I told her that
6    if she wanted to talk with them after hours,
7    let me know.
8  Q.  Given your understanding of the prohibition of
9    the state and understanding with the right
10    that all free citizens have to associate with
11    each other, do you think in hindsight that
12    your directive was overbroad?
13      MS. NELSON:  Object to the form.  Calls
14        for legal conclusions.
15  Q.  Do you understand what overbroad means?
16  A.  Yes.
17  Q.  Do you think that maybe in hindsight your
18    directive was overbroad?
19      MS. NELSON:  Object to the form.
20  A.  And it was not -- and I say it was not my
21    directive.  It was not -- I would have not
22    thought to just go up there and say, y'all
23    don't do this or y'all don't speak to
0341
1    anybody.  I was directed there was a criminal
2    investigation going and they didn't want them
3    colluding or tampering with evidence.  And
4    that's what I communicated to them.
5  Q.  Now, did you testify already how you learned
6    that the police investigation was completed?
7  A.  I'm sure just I got the results -- no, I did
8    not testify to that.  I don't remember.
9  Q.  Don't remember.  So you don't know how you
10    learned that it was completed.  When was it
11    completed?
12  A.  I don't remember specific dates.
13  Q.  You don't know who told it was completed?
14      MS. NELSON:  Asked and answered.
15  A.  I think -- I think Mary Turner's husband wrote
16    me, telling me about other defendants to look
17    into that she might have fixed their tickets
18    for, and could we reopen it.  And that's when

19    I knew that it was closed.
20  Q.  Now, did you say you did or did not
21      communicate to staff after the investigation
22      was completed?
23        MS. NELSON:  Object to the form.
0342
1   A.  I don't remember specifically.
2   Q.  Don't remember.  Okay.  Was the no-contact
3      prohibition expected to last indefinitely?
4   A.  No.
5        MS. NELSON:  Asked and answered.
6   Q.  How was the staff to know when it was okay to
7      resume contact with Ms. Turner?
8   A.  I guess that they would have been told.  I
9      don't remember how it happened.
10  Q.  They were expected to know by being told,
11      huh?  Okay.  But you don't know whether they
12      was told or not.
13        Now, do you know pursuant to what
14      authority the police officers interviewed the
15      staff concerning your no-contact directive?
16  A.  No, I don't.
17  Q.  I understand that there was some posting on a
18      web site of the fact that Ms. Turner was under
19      investigation; is that correct?
20  A.  I have no personal knowledge.  I didn't see it
21      on the web site.
22  Q.  Is that posting the trigger for the decision
23      of police officers to interview your staff?
0343
1        MS. NELSON:  If you know.
2   A.  I don't remember.  I was not a part -- I was
3      not involved in that.
4   Q.  Was Officer Gray involved in that
5      interrogation of your staff?
6        MS. NELSON:  Object to the form.
7   A.  Was Officer Gray involved in the investigation
8      of Mary Turner's criminal complaint?
9   Q.  Well, you prefer that word rather than
10      interrogation?
11  A.  I don't know specifically which investigator
12      was -- there were two I think at the time.
13      I'm not sure which.
14  Q.  Did one of the police officers give you a
15      recommendation of what rule or regulation of
16      the personnel board that Ms. Turner -- I'm

17      sorry, strike that -- Ms. Brackin may have
18      violated by contacting Ms. Turner?
19  A.  It might have been a part of their findings
20      that -- in their investigation that these were
21      the Personnel Rules and Regulations that were
22      broken.
23  Q.  Do you know upon what authority does the

0344
1       police department have in informing you what
2       personnel rules have been broken by an
3       employee under your charge?
4   A.  I think that was just the result of their
5       investigation, that the results of their
6       investigation revealed that those rules had
7       been broken.  They did not dictate those
8       disciplinary charges to me.  They just
9       probably mentioned them in their investigative
10      report.
11  Q.  Did the police report that you received
12      recommend that you terminate Ms. Brackin?
13  A.  I don't remember specifically.
14  Q.  Did you do any further or make any further
15      inquiry after you received the police report
16      to make an independent assessment of whether
17      or not Ms. Brackin should be terminated?
18  A.  Which -- Ms. Brackin's termination?  No, I did
19      not do any further investigation of the facts
20      of any investigation.  I didn't go behind them
21      and investigate any more.  No.
22  Q.  So if they recommended termination, you
23      adopted their recommendation?

0345
1   A.  No.
2           MS. NELSON:  Object to the form.  That was
3               not the testimony.
4   Q.  You didn't adopt their recommendation?
5   A.  No.  I mean, I would have -- I would have
6       looked at their report, but I would not
7       necessarily have adopted the recommendation
8       that she be terminated.
9   Q.  Well, do you know for a fact whatever contact
10      Ms. Brackin had with Ms. Turner, whether or
11      not that interfered with the police
12      investigation?
13  A.  Do I know for a fact?
14  Q.  Uh-huh (positive response).

15  A.  No.  I don't know what she communicated to
16      Ms. Turner.
17  Q.  Did the police share with you the results of
18      their complete investigation?
19  A.  I'm sure they did.
20  Q.  Okay.  Were you aware -- by the way, before I
21      ask you that question, let me back up.
22          You have a directive here that says, there
23      should be no contact with Ms. Turner.  You
0346
1       have another directive that says, there should
2       be no discussion with anyone regarding this
3       matter.  Is that correct?
4          MS. NELSON:  Again, the documents can
5           speak for themselves.
6          MR. JAFFREE:  But there's at --
7          MS. NELSON:  You only read parts of it.
8          MR. JAFFREE:  -- least two directives
9           there of the staff.
10              (Brief pause)
11  A.  That's what it says.  Yes, sir.
12  Q.  Were they both of equal weight or which one
13      was greater weight?
14          MS. NELSON:  This is so ridiculous.
15          MR. JAFFREE:  Excuse me.
16  Q.  Even though it's ridiculous, if you could
17      answer my question.
18  A.  I didn't weigh them.  I just simply, you know,
19      communicated what was told to me and asked
20      them to not do it.
21  Q.  When you got the police report, did you learn
22      that Eunice had communicated with a friend
23      about the investigation of Ms. Turner?
0347
1   A.  I don't remember that specifically.
2   Q.  Well, do you remember the police officer
3       asking all of them had they communicated with
4       someone about that investigation?
5   A.  I wasn't present when they talked with them.
6   Q.  But you got the report.  You said that, you
7       got their report.
8   A.  Well, I got the report of the investigation of
9       Mary Beth -- I mean, Mary's criminal charges.
10      This is the investigation of -- I was aware
11      there was a separate investigation by the
12      police department of the leak.

13   Q.  Well, now, I'm not necessarily limiting it to
14       Mary's criminal investigation.  They was
15       investigating to determine who had contacted
16       Rickey Stokes and caused that --
17       MS. NELSON:  Are you testifying or is this
18         a question?
19       MR. JAFFREE:  She asked me a question and
20         I'm telling her.
21       MS. NELSON:  You're telling her -- you're
22         supposed to be asking her questions
23         and not telling her --
0348
1        MR. JAFFREE:  Well, I'm telling her what
2          investigation I'm talking about.
3    A.  Do you have it, a copy of it?
4    Q.  A copy of what?
5    A.  Of what you're talking about.  You said
6        they --
7    Q.  There's a massive amount of documents.  But do
8        you know from your experience whether or not
9        the police department was investigating who
10       could have told Rickey Stokes that there was
11       an internal investigation going on?
12   A.  I remember there was an investigation by the
13       police department of --
14   Q.  And as part of that investigation --
15       MS. NELSON:  Just let her answer.
16   A.  I remember there was an investigation of that
17       by the police department.  Yes.
18   Q.  And as part of that investigation, they asked
19       each of them, who have they communicated with?
20       MS. NELSON:  Each of whom?
21   Q.  Each of your magistrates --
22       MS. NELSON:  If you know.
23   Q.  -- who they communicated with.
0349
1    A.  I don't -- no.  I mean, I remember vaguely
2        that there was an investigation, but I don't
3        -- I wasn't a part of it.  I wasn't there when
4        they talked with them or --
5    Q.  And Eunice said that she had told a friend in
6        addition to her daughter the details of the
7        investigation as part of their report?
8        MS. NELSON:  Object to the form.  Do you
9          know that?
10       THE WITNESS:  No.

11  Q.  In fairness, other ones said that they told
12      their husband or told their wife, but Eunice
13      is the only one that told some friend of hers
14      about the investigation.
15          MS. NELSON:  Object to the form.
16  Q.  It's in the record.  Do you dispute that's in
17      the record?
18          MS. NELSON:  What record?
19          MR. JAFFREE:  It's in the police
20              interrogation record.
21  Q.  Do you want me to pull the Eunice one out to
22      show you?
23  A.  I just don't know that specifically, but you
0350
1       say other people told other -- I don't know.
2       Did anybody else contact Mary Turner?
3   Q.  Well, we're not talking about Mary Turner
4       now.  We'll talking about whether or not they
5       told anyone about the investigation.  Your
6       directive says to talk to nobody about the
7       investigation.  And they talked to other
8       people about this investigation.  At least the
9       rest of them kept it within the family.
10      Eunice didn't keep it within the family?
11          MS. NELSON:  Object to the form.
12  Q.  She talked to other people.
13          MS. NELSON:  Object to the form.
14  Q.  Now, assuming that happened, would that have
15      been insubordination?
16  A.  Assuming that happened?
17          MS. NELSON:  Object to the form.
18  Q.  Assuming that Eunice as she admitted in her
19      statement under oath --
20          MS. NELSON:  Object to the form.
21  Q.  Assuming that Eunice had talked to --
22  A.  I think all of them, not just Eunice.  You
23      said all of them admitted to talking to
0351
1       somebody.
2   Q.  Well, would that have been insubordination?
3   A.  That all of them talked with someone?
4   Q.  Uh-huh (positive response).
5   A.  I think it would have been in violation of the
6       spirit of the order.  Yeah.
7   Q.  Yeah.  And none of them was terminated, were
8       they?

9   A.  Not -- no, not terminated.
10  Q.  None of them was warned that they had
11       committed a violation of a directive, were
12       they?
13  A.  Not that -- I don't -- I didn't know that.
14  Q.  Whatever police -- Sergeant Gray, the same one
15       who sort of was used as a reference for
16       Lavera, that same Sergeant Gray --
17       MS. NELSON:  Object to the form.  Object
18         to your testimony.  Objection to your
19         interjection of opinion.
20       MR. JAFFREE:  Am I wrong about it?
21  Q.  Have you looked at Lavera's application for
22       employment and who she put down as her
23       reference?
0352
1   A.  No, I haven't.
2   Q.  Well, it's Sergeant Gray.  You're familiar
3       with Sergeant Gray --
4       MS. NELSON:  I object to your continuing
5         testifying.
6   Q.  -- are you not?
7   A.  He worked for the City of Dothan.
8   Q.  You're quite familiar with him; is that not
9       correct?
10  A.  No.  He works for the City of Dothan.  We're
11       not --
12  Q.  The two of you are friends?
13  A.  No, we're not friends.
14  Q.  All right.
15  A.  We don't socialize.  We don't go to the same
16       church.  We don't know the same people.
17  Q.  Sergeant Gray who did this internal
18       investigation was aware that people had
19       violated your directive, specifically Eunice?
20  A.  Now, you said everybody.
21  Q.  Yeah.  But Eunice violated by bringing in a
22       stranger.
23       MS. NELSON:  Object to the form.  Do you
0353
1         know what he's talking about?
2       THE WITNESS:  I -- just from what he's
3         talking about, no.
4   Q.  Do you dispute what I'm talking about?
5   A.  I don't remember saying that.
6   Q.  Do you dispute what I'm talking about?

```
 7   A.  I don't dispute that she -- I have no way to
 8       dispute that.  I don't know.  Do you have a
 9       copy of it that I can see?
10   Q.  Yeah, I have a copy of it.
11   A.  Okay.  Can I -- did I sign it or --
12   Q.  Did you sign it?  No.  We're talking about her
13       testimony, who she admitted talking to.
14           MR. JAFFREE:  I guess we can take a break
15             and I'll find this for you.
16             (Brief recess)
17             (Plaintiffs' Exhibit 8 was marked
18               for identification.)
19   Q.  All right.  I'll point to you what I've marked
20       for identification purposes as Plaintiffs'
21       Exhibit 8 in response to the question about
22       Eunice.  And Officer Keith Gray made this
23       statement to Eunice.  I'll give you his
0354
 1       statement and Eunice's response.
 2           "Okay.  Um, since the judge gave everyone
 3       the directive not to talk about it to anyone,
 4       um, have you mentioned it, the investigation
 5       to anyone?"
 6           "I did mention it to a family member."
 7       That's Eunice speaking.  I'm sorry.  Yeah,
 8       Eunice speaking.
 9           Officer Gray:  "Okay.  Who is that
10       member?"
11           Eunice:  "Ah, Melissa White."
12           Officer Gray:  "Who?"
13           Eunice:  "Melissa White."
14           Officer Gray:  "How is she related to
15       you?"
16           Eunice:  "Just a friend."
17           Officer Gray:  "Okay.  What contact, what
18       did you say?"
19           Eunice:  "Ah, I said that, ah, there was
20       an investigation going on, and it's about Mary
21       Turner in our office because she had did
22       something.  We wasn't sure what was it yet."
23           Officer Gray:  "Does Ms. White know
0355
 1       Ms. Turner?"
 2           Officer Gray (sic):  "No."
 3           Officer Gray:  "Okay.  Did you" --
 4           MS. NELSON:  Wait.  You're
```

5          mischaracterizing that.  You said
6          officer --
7       MR. JAFFREE:  This is Officer Gray: "Does
8          Ms. White know Ms. Turner?"
9             Eunice:  "No."
10      MS. NELSON:  Okay.  Eunice said no.
11      MR. JAFFREE:  I'm sorry.
12   Q.  Officer Gray:  "Okay.  Did you say anything to
13       anybody else?"
14          "I think I mentioned it to my daughter."
15          Officer Gray:  "How old is your daughter?"
16          Eunice:  "How old?  30."
17          And then it goes on.
18          Officer Gray:  "What is your daughter's
19       name."
20             Eunice:  "Claudette" --
21   A.  Can I not see it and read it myself?  It's for
22       me to --
23   Q.  -- "Hawthorne."
0356
1    A.  Read the rest of it.
2    Q.  Officer Gray:  "And just what did you tell
3       her?"
4          Eunice:  "I just told her that we were
5       having some problems in the office.  I didn't
6       mention any name."
7          Officer Gray:  "Okay.  Anyone else?"
8          Eunice:  "That's it."
9          Like I said, numerous employees discussed
10      this with people that could have discussed
11      this with people that could have led to Rickey
12      Stokes having information about this
13      investigation.  And that was the purpose of
14      this investigation, to find out how did Rickey
15      Stokes find out.  That was the sole purpose of
16      this internal affairs investigation.
17      MS. NELSON:  Object to the form.  Is that
18         a statement or --
19      MR. JAFFREE:  Well, there's all kind of
20         statements we can go through.  I'm
21         just saying that's the purpose.  Every
22         time they would give people their
23         yearly rules, they would say it's an
0357
1          investigation on who told.
2       MS. NELSON:  Object to the form and

3        statement.
4    Q.   My question is, would you agree that purely
5         based on your directive, the Exhibit 7 I
6         believe, that Eunice committed
7         insubordination?
8    A.   Based on what you're showing me today that I
9         don't remember seeing.  But I -- I guess I
10        made distinction -- I make the distinction
11        between contacting Mary Turner, the defendant
12        or the object of the investigation and
13        discussing having problems at the office with
14        a friend and a family member.
15   Q.   Well, I thought it was a little bit more than
16        a problem, it was saying that she was under
17        investigation, the very thing that you didn't
18        want people to know.  But if you want to say
19        that's a distinction, fine.
20   A.   Well, I mean, that's the distinction I will
21        make today.  I didn't make it at that time
22        because in the report -- where is the -- on
23        the report of the Mary Turner and Mary Beth
0358
1         investigation, I don't think it mentioned
2         that, that Eunice had talked -- said -- or
3         numerous people.
4    Q.   But the report submitted all of these
5         documents.  I mean, that was part of the
6         report.
7          MS. NELSON:  Well, you can ask her that,
8            if the report submitted these
9            documents.
10   Q.   Well, are you soliciting that the report just
11        had a narrative of the police and no
12        documents?
13   A.   Let me be honest with you.  I don't remember
14        seeing this.  I thought there were like --
15          MS. NELSON:  This is being Plaintiffs'
16            Exhibit 8?
17   A.   -- disks or something but not this.
18          MS. NELSON:  Have you not seen --
19   A.   If there was, I didn't look at it.  I'm
20        sorry.  I just looked at the report.  I didn't
21        read the individual interviews or anything
22        like that.
23   Q.   So you just took the police officer's word and
0359

1     made a decision on the basis of what the
2     police officer told you without reading any
3     testimony itself?
4   A.  Well, the results of their investigation
5     revealed that -- whatever.  Yes.  I just
6     looked at that.  I didn't go back and look any
7     further at the investigation.
8   Q.  Would you agree that the results of that
9     investigation would reveal insubordination?
10        MS. NELSON:  Object to the form.  Could
11          you show her the report?
12  A.  And the other people's statements.
13  Q.  Well --
14  A.  That's kind of taken out of context.
15  Q.  That's taken out of context?
16  A.  I mean, where's the rest of it?
17  Q.  Well, your counsel have the rest of it.  I'm
18     not going to go through all of that because I
19     need to try to get out of here.  But, fine,
20     just say that there's a distinction.  And
21     that's fine.  And you didn't look at -- or
22     don't know if you looked at it or whatever.
23     That's fine.
0360
1   A.  Mary -- Mary Beth was the only person that
2     said she contacted Mary Turner, is my
3     understanding.
4   Q.  Well, that's not true either.
5   A.  Somebody else said they contacted her?
6   Q.  Do you remember Sarah Fowler saying that she
7     took Mary Turner out to lunch for her
8     birthday?  Do you remember that being in the
9     report?
10  A.  After the directive?
11  Q.  Yeah, after the directive.
12  A.  I didn't look at that.
13  Q.  Well, that's contacting Mary Turner.  That's
14     in the report as well.  But let's forget about
15     that right now.  Let's talk about this traffic
16     ticket right quick.
17        MS. NELSON:  Talk about what?
18        MR. JAFFREE:  The traffic ticket.
19  Q.  Ms. Turner was investigated for her alleged
20     handling of a traffic ticket; is that correct?
21  A.  Ms. Turner --
22  Q.  Yeah, Ms. Turner.

23    A.   -- was terminated when she was criminally
0361
1        indicted I think for -- for the traffic
2        ticket.
3    Q.   Do you know if Ms. Turner was ultimately
4        charged with mishandling a traffic ticket, a
5        misdemeanor?
6    A.   I don't know what she was ultimately charged
7        with.
8    Q.   So you don't know.  At the time Ms. Turner was
9        investigated for that ticket, she had not been
10        charged with anything; is that correct?
11    A.   At the time she was investigated for it?
12    Q.   Yeah.  The investigation that you mentioned in
13        Exhibit 7, Ms. Turner hadn't been charged with
14        anything?
15            MS. NELSON:  Number 7 being?
16            THE WITNESS:  The memo about no contact.
17            MR. JAFFREE:  The memo that you no
18                contact.
19    A.   She hadn't been charged?
20    Q.   At that time, she hadn't been charged with
21        anything, formally charged.
22            MS. NELSON:  Criminally charged?
23            MR. JAFFREE:  Criminally charged.
0362
1    Q.   They was just doing an investigation,
2    A.   That was the date of the investigation.  So
3        no.  That was the day the investigation
4        started.
5    Q.   Was Ms. Turner clothed with a presumption of
6        innocence during that investigation as far as
7        you know in your capacity as a judge?
8    A.   Was she clothed with a presumption of
9        innocence during the investigation?
10    Q.   Yeah.
11    A.   I -- I don't have any comment one way or the
12        other.
13    Q.   So you don't know whether or not when people
14        are being investigated, they are presumed
15        innocent; you don't know that?
16    A.   By whom?
17    Q.   If that's your testimony, that's fine.
18        Well, is the term "innocent until proven
19        guilty" a two-penny catch phrase to you?
20            MS. NELSON:  Object to the form.  A

21          "two-penny catch phrase," I have no
22          idea what that means.
23   Q.  Do you know what that means?
0363
1   A.   Worth two pennies.  I don't know, Mr. Jaffree.
2   Q.   It's just a little simple expression that
3          means nothing.
4   A.   I don't know.
5   Q.   Let me ask you this:  In your opinion in your
6          capacity as a judge and you handle criminal
7          cases, would police officers of internal
8          affairs division have a right to tell a
9          criminal suspect not to contact a particular
10         person?
11              MS. NELSON:  If you know.
12   Q.   If you know.
13   A.   I don't know.
14   Q.   You don't know.
15              Do you know, in your opinion, if a police
16         officer of internal affairs would have a right
17         to tell a witness not to contact a criminal
18         suspect?
19   A.   Do I know if they have a right to do that?
20   Q.   Police officer of internal affairs would tell
21         a witness, don't contact this criminal
22         suspect?
23   A.   I don't know whether they have a right to do
0364
1          that or not.
2   Q.   Don't know.  Do government employees lose
3          these rights, assuming they do have rights,
4          when they accept government employment?
5              MS. NELSON:  Object to the form.
6   Q.   If you know.
7              MS. NELSON:  Calls for a legal conclusion.
8   Q.   If you know.
9   A.   Whether government employees lose what right?
10         The right to --
11   Q.   The right to either contact somebody when
12         they're being investigated or to be contacted
13         when somebody else is being investigated?
14   A.   Do they lose that right?  I don't know.
15   Q.   Did Ms. Brackin have the right to contact
16         somebody who was being investigated on
17         criminal charges or be contacted by that
18         person who is being investigated on criminal

19     charges, as far as you know?
20       MS. NELSON:  Object to the form.
21  A.  A right?
22      MS. NELSON:  Someone in her -- a co-worker
23       in her office?
0365
1  Q.  Yeah.  Well, co-worker in her office.
2    Co-worker in her office.  It doesn't matter,
3    unless you think it does matter.
4      MS. NELSON:  Object to the form.  If you
5      know.
6  Q.  Well, do you have an answer to that?
7  A.  I don't know.  I think that in -- in a
8    criminal investigation, they might have the
9    ability to say, don't do this while the
10    investigation is pending.
11  Q.  Fine, fine, fine.  Okay.
12     As a potential defendant, did Ms. Turner
13    have a right to contact potential witnesses on
14    her own behalf even if these witnesses were
15    co-workers?
16  A.  Did Ms. Turner have that right?
17  Q.  Yeah.  Does Ms. Turner have the right to
18    contact a potential witness, even if they were
19    co-workers, as far as you're concerned?
20  A.  A constitutional right?
21  Q.  Well, any kind of right?
22  A.  I don't know.
23  Q.  You don't know.  All right.  Well, if, in
0366
1    fact, they had a right, wouldn't you agree
2    that your directive as reflected in
3    Plaintiffs' Exhibit Number 7 frustrates this
4    cherished constitutional right?
5      MS. NELSON:  Object to the form.  It calls
6      for a legal conclusion.
7  A.  As the directive, I -- I don't -- I
8    don't -- no, I don't think it frustrates it.
9  Q.  Okay.  Fine.
10  A.  I think it was for a very limited period of
11    time for a specific purpose.
12  Q.  If an employee had been asked by Ms. Turner to
13    assist them or to speak out in their behalf
14    because she was being investigated for a
15    criminal charge and you had your directive in
16    place, would that employee have a choice of

17      putting that job in jeopardy or denying
18      assistance to Ms. Turner, that they do one or
19      the other?
20         MS. NELSON:  Object to the form.
21            Speculative.  Assumes facts not in
22            evidence.
23   Q.  Well, yes or no?
0367
 1   A.  If they want to speak out on her behalf during
 2      the investigation?
 3   Q.  During your directive.
 4   A.  I think they could have talked to the
 5      investigators.
 6   Q.  Well, I'm asking you, could they have talked
 7      to Ms. Turner without subject -- subjecting
 8      their employment and their livelihood to the
 9      risk of loss based on your directive?
10   A.  After hours they could have talked with her.
11   Q.  After hours they could have talked with her.
12      So you had an after-hour exception.  Okay.
13         MS. NELSON:  Well, she's already testified
14            to that several times, that after
15            hours they could contact her and she
16            could then, in turn, check with the
17            investigators to determine the
18            parameters there.
19   Q.  All right.  Contact the investigators.  Did
20      you give them the names of the investigators?
21   A.  I told them to contact me.
22   Q.  Oh, contact you, not the investigators.
23         MS. NELSON:  Yeah, she's testified to that
0368
 1            about three times.
 2   Q.  Okay.  Should any public employee have to make
 3      this choice or choose in between your
 4      directive and coming to the assistance of a
 5      person charged with a criminal offense?
 6         MS. NELSON:  Object to the form.  Assumes
 7            facts not in evidence.  She has not
 8            been charged yet.  Calls for a legal
 9            conclusion.
10   Q.  Well, should they?
11   A.  Can you ask that again?
12   Q.  Should any public employee have to make this
13      choice of coming to the assistance of a friend
14      being made the subject of investigation or

15    running the risk of losing their job by doing
16    so?
17      MS. NELSON:  Same objection.
18  Q.  Should a government employee have to face that
19    kind of choice?
20      MS. NELSON:  Same objection.
21  A.  Generally or specifically about this case?
22    That wasn't the choice about losing their
23    jobs.  I just asked them not to contact --

0369

1  Q.  So they wouldn't have lost their job for
2    contacting her?
3  A.  Well, I'm not saying they wouldn't have.  But
4    I said, generally or specifically, in the
5    world or specifically about Mary Turner?
6  Q.  Did you --
7  A.  You said should any -- said any employee.  I
8    don't know.
9  Q.  But did you consider the sanction for
10    violating your directive can be the loss of a
11    job?
12  A.  No.  Insubordination is a major disciplinary
13    infraction.  The only reason Mary Beth was
14    terminated was because she had had two.  They
15    might have gotten a disciplinary infraction,
16    but not necessarily terminated if they didn't
17    have a prior.
18  Q.  So had she not had any prior, she wouldn't
19    have been terminated?
20  A.  I don't know that, but she did.  So she was.
21  Q.  Oh, so she may have still been terminated?
22  A.  I don't know.
23  Q.  Don't know.

0370

1  A.  I didn't -- I didn't --
2  Q.  Okay.  Well, did you consider these value
3    choices that employees have to make when you
4    issued your directive?
5      MS. NELSON:  Object to the form of the
6      question.
7  Q.  Do you understand the question?
8  A.  She said she contacted her solely about work.
9      MS. NELSON:  And the judge has dismissed
10      this claim.
11  A.  So I don't think it was a value choice.  She
12    didn't -- she said, she didn't say anything

13  about contacting her personally. She said it
14  was solely about where -- about work.
15   MR. JAFFREE: I think it was the other
16   claim that got dismissed.
17   MS. NELSON: No. Well, you maybe need to
18   read the order.
19   MR. JAFFREE: What order?
20   MS. NELSON: The judge's order.
21   MR. JAFFREE: Which claim that got
22   dismissed that you're claiming?
23   MS. NELSON: Mary Brackin's claim
0371
1   regarding her contact with Mary
2   Turner.
3   MR. JAFFREE: Well, I'm not sure the
4   association claim has been dismissed.
5   I don't think so at all.
6 Q. Anyway, now that you've had time to think
7  about it, do you think that an employee should
8  be required to make those choices?
9   MS. NELSON: When has she had time to
10   think about it?
11   MR. JAFFREE: The last few years.
12   MS. NELSON: What choices? Whether to
13   comply with the work-related directive
14   while a criminal investigation is
15   ongoing?
16 Q. Do you understand the question?
17 A. No.
18 Q. I'll pass it.
19   Do you know who was assigned to conduct an
20  investigation of Ms. Turner?
21 A. Not specifically.
22 Q. Did you play any role in the initiation of
23  this investigation?
0372
1 A. Other than calling them and telling them, no.
2 Q. Do you remember who said what to you in
3  respect to no one having any contact with
4  Ms. Turner? Remember the names of who told
5  you anything?
6 A. One of the investigators said we needed to
7  tell them not to contact her, not to go into
8  her office, or touch her computer.
9 Q. Could you consult with your attorney and find
10  out who told you that?

11          THE WITNESS:  Do you know who told me
12          that?
13          MS. NELSON:  I think the witness needs to
14          testify from her own recollection.
15  Q.   So you don't know who told you?
16  A.   I just don't remember which investigator.  One
17       of the assigned investigators told me.
18  Q.   To your knowledge, did any of your staff have
19       any contact with Ms. Turner in a way that
20       interfered with the investigation?
21  A.   To my knowledge -- direct knowledge, I don't
22       have any knowledge of any of my staff
23       contacting Mary Turner, other than Mary Beth
0373
1        Brackin.
2   Q.   And do you know that in view of the
3        investigation?
4   A.   I don't know.
5   Q.   Don't know.
6           Would a salutary hello in passing
7        Ms. Turner in the street been in violation of
8        your directive?
9           MS. NELSON:  I'm sorry.  I didn't
10          understand your question.
11          THE WITNESS:  A salutary --
12  Q.   Salutary hello when passing Ms. Turner on the
13       street been violative of your directive?
14          MS. NELSON:  Object to the form.
15  A.   Can I say or did I say, you can't speak to her
16       or -- may I see Exhibit 7.
17  Q.   No contact.
18          I don't have it.  It's up there somewhere.
19  A.   No, I don't think that would have of the
20       directive.
21  Q.   So that wouldn't have violated it.  Okay.
22       That's good.
23          Did the staff know that such limited
0374
1        contact was acceptable?
2           MS. NELSON:  Object to the form.
3   A.   I don't know what they knew.
4   Q.   Would participating with Ms. Turner in a Bible
5        study class during the prescriptive time have
6        been a violation of your no-contact directive?
7   A.   No, because it was after hours.
8   Q.   After hours was okay.

9       What about sending Ms. Turner an e-mail?
10      Dependent upon the e-mail?
11   A.  I don't know.
12   Q.  You don't know?
13   A.  If they had sent her an e-mail --
14   Q.  Sent her an e-mail, would that have been
15      sufficient contact to violate your directive?
16      MS. NELSON:  Again, object to the form.
17   A.  Right, and my directive.  It was a directive
18      of the investigators that they not -- I think
19      that needs to be clarified on the Record.  It
20      was not my directive.
21      MS. NELSON:  You've clarified.  He keeps
22           --
23   A.  I communicated it to them through the
0375
1       investigators.
2    Q.  But it became your directive when you enforced
3       it, didn't it?
4       MS. NELSON:  Object to form.
5    A.  I communicated it to them.
6    Q.  But it became yours when you enforced it,
7       correct?
8    A.  I didn't -- I'm not saying I adopted or
9       initiated it.  I communicated it.
10   Q.  Somebody lost their livelihood as a result of
11      you enforcing that directive; is that correct?
12   A.  Somebody lost their livelihood as a result of
13      violating that directive, a choice they made.
14   Q.  Okay.  A choice.  All right.
15      What about non-verbal communications such
16      as a hand wave or a handshake; would that have
17      been in violation--
18      MS. NELSON:  Object to the form.
19   Q.  -- of your directive?
20   A.  I don't know how I would have known about it.
21   Q.  Well, if you had known about it, would that
22      have violated your directive?
23      MS. NELSON:  Object to the form,
0376
1       hypothetical.  Speculative.
2    A.  I don't know.
3    Q.  You don't know if that would've violated your
4       directive?  Don't know?  Okay.
5       Sarah admitted that she spoke to Mary
6       Brackin about the investigation.  Was that a

7      violation of your no-contact -- I'm sorry --
8      no-communication directive?
9          MS. NELSON:  Object to the form.  Assumes
10            facts not in evidence.
11  Q.  Would it?
12          MS. NELSON:  Object to the form.
13  A.  I think when I asked her not to talk with
14      anybody about it, I was trying to be
15      protective of Mary.  And I kind of meant,
16      gossiping with other people outside the
17      office.  But I tried to convey that as best I
18      could that -- and I told them that I was being
19      protective of Mary.  There was a lot of
20      allegations and rumors; let's not talk about
21      it.  And I meant, add fuel to the fire.  You
22      know, I really was trying to be protective of
23      her because there were merely allegations and
0377
1      no substantiated evidence of any wrongdoing by
2      her.
3  Q.  Melanie Wise spoke to her husband.  Was that a
4      violation of your directive?
5          MS. NELSON:  Object to the form.
6  A.  I -- no.  I think it's reasonable that they
7      would tell their spouses that something was
8      going on at work.
9  Q.  And so they should have just realized that
10      that was reasonable?
11          MS. NELSON:  Object to form.
12  A.  I think it's expected that they'll talk to
13      their husbands.  If they're -- if they're
14      down, their husband say, what's going on.  Oh,
15      we got an investigation at work.  I don't
16      think that violates the spirit of the order.
17      No, I don't.
18  Q.  And Ann spoke to her husband, so that didn't
19      violate it either?
20          MS. NELSON:  Object to the form.
21  A.  Do we know what she told her husband, or if
22      she said, we're having problems at work or
23      there's an investigation at work or one of my
0378
1      co-workers is in trouble?  We don't know what
2      she told them.  And I think it's expected that
3      they would to talk to something -- to their
4      spouses.

5   Q.  Let me just check these off.  Melissa Woods
6       talked to her husband; that's okay as well,
7       right?
8           MS. NELSON:  Object to the form.
9   A.  I'm not saying it's okay, but we don't -- do
10      we know what they told her?  She talked to
11      them --
12  Q.  About the investigation.
13          MS. NELSON:  Object to the form.  Do you
14            know if she talked to her husband?
15          THE WITNESS:  No.  No, I don't know that
16            she talked to her husband.
17  Q.  Now, let me discuss this case with Melissa.
18      You have a problem with that -- discussed the
19      investigation?
20          MS. NELSON:  Who's Melanie and who's
21            Melissa?
22  Q.  Do you know Melanie?
23  A.  Do I know Melanie?
0379
1   Q.  And Melissa Woods?
2   A.  Or Melissa Woods?
3   Q.  Well, Melanie discussed it with Melissa.  Was
4       that okay?
5   A.  I don't know that she did.
6   Q.  Okay.  But it's all in the police report?
7   A.  I don't know.  It might be in that stuff that
8       you have.
9   Q.  Well, either I'm making this up, or it's on
10      the police report.
11          Michelle Bryan discussed this with her
12      husband.  The same response?
13          MS. NELSON:  Object to the form.
14  A.  I don't know that she did.
15  Q.  Well, if she did, same response, it's okay to
16      discuss with your husband?
17  A.  I didn't say it was okay.  I said it's
18      expected that if something unusual --
19  Q.  Expected.
20  A.  -- is going on at the office for them to tell
21      their spouses.  Now, whether they went into
22      specific allegations, we don't know.
23  Q.  Well --
0380
1   A.  If they --
2   Q.  I'm sorry.  Go ahead.

3  A.  Well, you said discuss this.  So if said, our
4     office is in an uproar, then that's expected.
5     We don't know what they said.  So it depends
6     on what they communicated, if it was about the
7     investigation.  We don't know.  I had to work
8     over somebody else I had to do somebody else's
9     duties because she's out on investigation.  We
10    don't know, Mr. Jaffree, so it would depend on
11    what I knew about the facts of that particular
12    incident.
13 Q.  Do you have any idea why Officer Gray, who was
14    conducting the investigation to see who may
15    have leaked this information to Rickey Stokes,
16    would not have questioned these people
17    thoroughly as to who they had talked to and
18    perhaps even talked to the people that they
19    talked to, to see if he could get to the
20    bottom of it of it?
21        MS. NELSON:  Object to form.
22 A.  No, I don't have any idea what he asked or --
23 Q.  Okay.  What exception does Eunice discussing
0381
1     with Melissa White -- by the way, are you
2     familiar with Melissa White?
3  A.  No.
4  Q.  So you don't know who she is?
5  A.  No.
6  Q.  What exception does Eunice discussing this
7     with her friend Melissa White does that fit
8     in?
9  A.  I don't - I don't make an exception.
10        MS. NELSON:  Object to the form.
11 Q.  No exception.
12 A.  I don't know what she told her friend.
13 Q.  Well, I read to you what she told her friend.
14 A.  I don't know what all she told her friend, and
15    I didn't know about it.  I didn't make an
16    exception.
17 Q.  Now, as you may know, Section 10 of the Dothan
18    Civil Rights Act requires that a civil service
19    rating list for rating job applicants be
20    maintained.
21        Do you know pursuant to that list what
22    place Lavera or Eunice -- what place they
23    occupied on that list, if you know?
0382

1   A.   No, I don't.
2   Q.   Did you report to the personnel director in
3        writing any deficiencies in Nancy's job
4        performance during her working test period as
5        required by Section 18 of the Dothan Civil
6        Service Act?
7   A.   Yes, I did.
8   Q.   How many times did you report to them?
9   A.   I'm not sure.  I spoke with Nancy in the
10       presence of Kai Davis.  I went over each
11       perceived deficiency in her performance, each
12       allegation that was made against her.  We
13       discussed in depth the problems, that I was
14       not pleased with the way the office was going,
15       that I felt the office was deteriorating under
16       her supervision, that there was a lot of
17       ying-yang and talking.
18           And she was very well aware that we --
19       that I was not happy with the way things were
20       going after our first counseling session in my
21       office and then my second one in Kai Davis's
22       office.
23  Q.   Can I --
0383
1   A.   And we did talk about those.
2   Q.   Can I interrupt you for a second?
3           I guess the question was in writing, not
4        verbally.  Did you communicate to the
5        personnel director in writing, as required by
6        Section 18, Nancy's deficiencies?
7   A.   I remember doing a memo to Kai after our
8        second counseling session.
9   Q.   Memo to Kai?
10  A.   Kai, Jerry Corbin, the acting city manager.
11  Q.   So if Nancy testified she didn't have any
12       verbal counseling sessions, she'd be lying
13       again, right?
14  A.   Yes.  We discussed the problems that we were
15       having that were exacerbated under her
16       supervision.
17  Q.   Did you reduce these counseling sessions to
18       memos that you gave to Nancy?
19  A.   I did -- no.  I did not give them the second
20       time.  I wrote a memo because I was advised
21       that I should write a memo, keeping track with
22       what I told her, in which Kai Davis was

23     present for the second, was not for the first.

0384

1  Q.  You said you did not give Nancy a memo; is

2      that correct?  That you didn't give her a memo

3      explaining to her --

4  A.  No.  I talked with her.

5  Q.  -- the fruits of your discussion?

6  A.  No.  We talked in depth about everything that

7     I perceived that was wrong with the office and

8     that would've been in my chambers.  Okay.

9     June 8th.  Counseled her regarding several

10     areas of concern.

11  Q.  If I could get you just to focus on my

12     question, have you seen this document here,

13     Attachment 1?

14  A.  I'm sure I have.

15       (Brief pause)

16  Q.  Is it necessary for you to read that entire

17     document in order for you to know whether

18     you've seen it?

19  A.  If you're going to ask me about it, I'd like

20     to read it.

21  Q.  Well, I'm going to ask you questions that

22     you're not going to need to read it for me to

23     ask you initially.

0385

1     MS. NELSON:  Well, again, I think she has

2      the right to read it.  This is about

3      events that happened over three years

4      ago.

5  Q.  Your counsel haven't shown you these documents

6     recently?

7     MS. NELSON:  I would object to her

8      testifying to anything as to what

9      she's communicated or done with her

10      counsel.

11     MR. JAFFREE:  Well, if counsel showed her

12      a document, that's not communicating

13      with counsel.

14     MS. NELSON:  That is a communication.

15     MR. JAFFREE:  Counsel, if you say so.

16      (Brief pause)

17     MR. JAFFREE:  Well, if she's going to read

18      the whole document, maybe I should

19      just let her read all three of them.

20  A.  I read Attachment 1.  And go ahead and read

21      the other two?
22   Q.   Well, not yet.  When was Attachment 1 drafted?
23        MS. NELSON:  Is that a question?
0386
 1   Q.   When was Attachment 1 drafted?
 2        MS. NELSON:  Well, you didn't give her the
 3           complete copy.  It belongs to -- it
 4           was an attachment to another document
 5           that it was attached to.
 6              I mean, if you know --
 7   A.   It's not dated.  I don't remember what date.
 8   Q.   What document was that attached to?
 9        MS. NELSON:  Well, obviously, you
10           separated it from what it was attached
11           to.
12        MR. JAFFREE:  I saw the EEOC charge that
13           it was attached to -- I mean, EEOC
14           response.  It was part of the EEO
15           package.
16   Q.   If you know, do you have any idea of -- first,
17           when was the documented drafted, do you know?
18        MS. NELSON:  If you know.
19   A.   I don't know because it's not dated.  I'd be
20           lying if I tried to tell him a date.  But I
21           think it was attached to her last evaluation
22           or --
23   Q.   Well, last evaluation was when she was
0387
 1           terminated.
 2   A.   Right.  "It is with the utmost disappointment
 3           I must decline to recommend Ms. Martin for
 4           continued employment with the City of
 5           Dothan."
 6   Q.   So that's Attachment 1, so I guess that would
 7           come first over Attachment 2, maybe not.  But
 8           do you have any idea whether or not you
 9           drafted that along with your evaluation or did
10           you draft that before?
11   A.   Where is that -- it implied that it was
12           contemporaneous because "It is with utmost
13           disappointment that I must decline to
14           recommend her for continued employment with
15           the City of Dothan."  So it implies it was
16           contemporaneous with my decision to not
17           recommend her for continued employment.
18   Q.   Okay.

19   A.   "I had fervently hoped that Ms. Martin would
20         be able to correct the shortcomings in her
21         supervisor style and rise to the difficult
22         task before her.  However, it has become
23         painfully obvious that she cannot, and the
0388
1          reasons for this decision are as follows."
2              So it implies that it was either attached
3          to her termination or some other -- it's
4          Attachment 1.
5    Q.   Do you know who you gave that to?
6    A.   No.  I think it was attached to her
7          termination -- her evaluation paperwork.
8    Q.   All right.  Let me show what is identified as
9          Attachment 2.
10   A.   Okay.  What about that?  Do you want me to
11         read it?
12   Q.   When was Attachment 2 drafted?
13   A.   Looks like July -- yeah.  That was the memo of
14         July 8th.
15   Q.   If it was drafted, was it drafted on July 8th?
16   A.   It says "as of this date, July 8th, my concern
17         is on the state of affairs at the" -- looks
18         like it was.  I don't know.
19             "On or about June 8th, I met with her in
20         my chambers.  I was sadly disappointed.
21         Further additional problems have become
22         apparent."
23   Q.   What are you reading?  Are you reading
0389
1          Attachment 2?
2    A.   Yes, sir.
3    Q.   So you're saying this was done on what day, on
4          July the 8th?
5    A.   I don't know.
6    Q.   Although it mentions July the 8th, doesn't it?
7              MS. NELSON:  Well, we've already provided
8              you with a memo that she did on July
9              8th about Ms. Martin's deficiencies.
10             MR. JAFFREE:  What -- you're talking about
11             the memo to -- which memo are you
12             referring to?
13             MS. NELSON:  To Kai Davis.  So it just
14             seems -- I mean, I'm not going to
15             testify.  I know it's getting late in
16             the day.  I'm trying to move things

17          along.  It just seems to be a recap of
18          all the deficiencies that she had
19          incurred over her employment.
20    Q.   Well, let me ask you this:  Did you give
21          Attachment 1 in any written form to Ms. Martin
22          at any time?
23    A.   If it was a part of her evaluation, she had to
0390
1          sign, is what I assume.
2     Q.   Well, she says that the attachment wasn't part
3          of her evaluation, just wasn't.
4     A.   I don't know.  I would have -- this -- I think
5          that's what it was attached to.
6     Q.   Now, what about Attachment 2; did you give
7          Attachment 2 to -- to Ms. Martin?
8     A.   I think it -- I don't know.  It would have
9          been attached to her evaluation -- her final
10          evaluation.
11    Q.   But Attachment 2 was done before her final
12          evaluation.  You said that it was dated July
13          the 8th.  So on or about July 8th, did you
14          give Ms. Martin a copy of this Attachment 2?
15          MS. NELSON:  Object to the form.
16    A.   Right.  No.  It was a memo to Kai Davis.
17    Q.   Was the memo to Kai Davis sort of identical to
18          this Attachment 2?
19    A.   I think so.  I don't know.  I haven't read
20          it.  I haven't compared the two.
21    Q.   Well, can you tell me, when did you do the
22          memo to Kai Davis?
23    A.   I did one to Ms. Kai Davis June 8th, and then
0391
1          I did one a month later, July 8th, it looks
2          like.
3     Q.   Well, did you draft a letter to Kai Davis and
4          this attachment on the same day?
5     A.   I don't know if this was attached to -- I
6          think I just made this Attachment 2, thinking
7          that this was the memo of July 8th.  I think
8          this is -- "Ms. Martin took it upon herself to
9          inform the employee."
10          And I think it's probably the same thing,
11          just a recap of what was in the -- all this
12          was attached to her final evaluation, just
13          recapping the memo of June 8th and July 8th of
14          2004.  These are my attachments to her final

15      evaluation.
16   Q.  Do you know why the font is different on your
17      attachment versus a memo to --
18   A.  Why the what is different?
19   Q.  The font.
20   A.  Because I probably just printed this one off
21      the computer, is what I'm thinking, when I was
22      doing it.  I had already sent her that memo,
23      and I'm assuming that when I did this, I just
0392
1      printed it off the computer.  It doesn't look
2      like the font is different to me.  Oh, yeah.
3      I think -- well, I think I just printed this
4      off the computer when I was doing her final
5      evaluation.
6          I had already sent these memos to Kai,
7      saying that I did counsel her, showing that I
8      had counseled.  And then when I got ready to
9      terminate her, I just made an attachment.
10   Q.  Well, let's talk about this June the 8th memo
11      to Kai -- that you said you did to Kai.  You
12      didn't send this June 8th memo to Ms. Brackin,
13      did you?
14   A.  No.
15         MS. NELSON:  You're talking about June
16            8th, the June 8th memo.
17         MR. JAFFREE:  Yeah, June 8th.
18   Q.  Now, you say in that June the 8th, on or
19      about --
20   A.  Why would I have sent it to Ms. Brackin?
21   Q.  I'm sorry.  Ms. Martin.  I'm sorry.  I'm
22      getting my clients mixed up.
23         You didn't send this to Ms. Martin, did
0393
1      you, this memo dated June the 8th?
2   A.  It says, to Kai Davis.
3         MS. NELSON:  Can we get these marked so we
4            at least know what we're talking about
5            here?
6         MR. JAFFREE:  Okay.  Sure we can do that.
7         MS. NELSON:  I mean, I'll mark them if you
8            want me to.
9         MR. JAFFREE:  Yeah.
10         MS. NELSON:  Okay.  I'm going to mark the
11            June 8th memo as Plaintiffs' Exhibit
12            10.

13          (Plaintiffs' Exhibit 10 was marked
14            for identification.)
15   A.   That's June 8th memo to Kai Davis.
16   Q.   If you look at the June the 8th memo, you say,
17       "On or about the 8th of June, I called Nancy
18       Martin."
19          Were you not certain what date you called
20       Nancy?
21   A.   I just always say "on or about."  I mean,
22       that's just kind of something I do.
23   Q.   I mean, but if the memo is dated the 8th and
0394
1       you talked to Nancy on the 8th, why would you
2       say on or about June the 8th?
3   A.   I just said that.
4   Q.   Why not, "Today I talked to Nancy Martin?"
5          (Brief pause)
6   Q.   Now, if you look at that exhibit, you indicate
7       a complaint from Ms. Ott.  Was that complaint
8       in writing?
9   A.   No.  I said, "As you are aware from your
10       conversations with Ms. Ott."  I knew that
11       Ms. Ott had been over to Personnel to complain
12       about Ms. Martin's "sad inability to interact
13       professionally with personnel from that office
14       as well the" -- I knew that Ms. Ott had been
15       over to the -- to talk with her.  There
16       was -- saying there was a complaint.
17   Q.   So there wasn't a complaint?
18   A.   Well, I mean -- no, I didn't say there was one
19       in here.  I said, "As you are aware from your
20       conversations with Ms. Ott, Ms. Martin
21       exhibits a sad inability to interact
22       professionally with personnel from that office
23       as well as defense attorneys which has carried
0395
1       over to the attitudes of personnel under
2       Ms. Martin's supervision."
3   Q.   Let's me stop you.  What did Ms. Ott say to
4       Kai Davis?
5   A.   I -- I -- it would be hearsay whatever she
6       said to her, but I knew that she had talked
7       with her about problems she was having with
8       Nancy.
9   Q.   All right.  I want you to define with
10       specificity the problems.

11   A.  That I observed?
12   Q.  The problems that Ms. Ott was having with
13        Nancy and the dates that these problems
14        occurred.
15   A.  Well, I don't know all the problems that they
16        had personally with each other.  That I
17        observed was several problems, that Nancy was
18        just very --
19   Q.  Give me the date that you first observed the
20        problem between Nancy and Ott.
21   A.  I don't know the date specifically.
22   Q.  Tell me the nature of the problem that you
23        first observed.
0396
1    A.  I don't know that it was the first, but I
2        witnessed Nancy coming over there and
3        screaming about the magistrates being
4        attacked, about an incident that never
5        happened.
6    Q.  And so you're talking about -- is that a
7        single incident that you remember now?
8    A.  You asked me -- I don't know -- I don't know
9        the first.  I can't put them in sequence, but
10        there were several.
11   Q.  Well, tell me, other than the screaming
12        incident about magistrates being
13        attacked -- and when did that happen?
14   A.  I don't know the date.
15   Q.  Can we assume that it was before June the 8th?
16   A.  I don't know if it had happened yet.  I don't
17        know.
18   Q.  All right.  So if we're not talking about that
19        incident because it may not have happened,
20        what incident are we talking about --
21   A.  Not because it may not have happened, because
22        we don't remember the specific date it
23        happened.
0397
1    Q.  All right.  You understand what I want.  I
2        have to establish that stuff that you say is
3        not true.  In order to establish that, I need
4        to know what happened.
5            MS. NELSON:  Object to the form.  To say
6             that stuff she's saying is not true?
7            MR. JAFFREE:  I have to establish that as
8             a matter of law.

9           MS. NELSON:  Why do you have to establish
10             that?  Your goal is to get the facts.
11           MR. JAFFREE:  No, no.  I have to establish
12             that as a matter of law.
13    Q.   I have to establish that you --
14           MS. NELSON:  Well, I resent that comment.
15             You have no basis --
16           MR. JAFFREE:  You can resent it.
17           MS. NELSON:  -- that this witness is not
18             telling the truth.
19           MR. JAFFREE:  I'm only telling you what
20             the law requires me to establish.
21           MS. NELSON:  The law established -- caused
22             you to establish --
23           MR. JAFFREE:  A pretext.  But I don't want
0398
1             to argue with you.  I'm trying to get
2             some --
3    Q.   Tell me, other than this unspecified date that
4        Ms. Martin was complaining about how Ms. Ott
5        was treating magistrates, what other specifics
6        you have observed?
7    A.   Between Ms. Ott and --
8    Q.   Ms. Martin.
9    A.   -- Ms. Martin.  Just inability to get along.
10        You know, Ashton would call for cases.  Nancy
11        wouldn't let the magistrates bring them over.
12        Ashton was the prosecutor.  It was just a --
13    Q.   You said --
14           MS. NELSON:  Let her testify.  You asked
15             her.  Let her testify.
16           MR. JAFFREE:  I don't want her to get out
17             --
18           MS. NELSON:  You don't want to hear what
19             she has to say.
20           MR. JAFFREE:  I want to ask her
21             specifics.
22    A.   I didn't write the dates down.  I was in
23        court.
0399
1    Q.   Tell me the facts beyond --
2           MS. NELSON:  She's trying to.  You keep
3             interrupting her and won't let her.
4    Q.   I want to do these one at a time.  Okay?  The
5        first I want to know is, when did Ms. Ott call
6        for cases and Nancy wouldn't let cases come

7      down?  When did that happen?
8   A.   The date?
9   Q.   Yeah.
10   A.   I don't know.
11   Q.   What did you do when that happened?
12   A.   I more than likely called and said, this is
13      the prosecutor; if she wants a case, let's
14      just bring it over and get it taken care of.
15   Q.   What case was it that the prosecutor was
16      asking for?
17   A.   More than one.
18   Q.   What month did this happen in?
19   A.   February.  I don't know.
20   Q.   February.
21   A.   I don't know, honestly.
22   Q.   So you don't know.  Was it prior to June -- I
23      mean -- I'm sorry.  Yeah, June.  Prior to June
0400
1      8th?
2   A.   It must have been, some of the problems.  But
3      I don't know specifically which.
4   Q.   So --
5   A.   I didn't stop during court to write down the
6      fact that Ashton called for a case, she was
7      the city attorney, and Nancy wouldn't let them
8      send it.  I did not do that.  I do not know
9      the dates.  I just know that it was a
10      continuous problem with Nancy and --
11   Q.   Well, you see --
12         MS. NELSON:  Please let her continue.
13   A.   -- and the prosecutor's office.  It was.
14   Q.   I don't know what "continuous" mean.  I need
15      some more definition.
16   A.   Well, your client said yesterday there were
17      numerous things she -- there were too many
18      cases.  She didn't know the names or dates or
19      anything, and you accepted that.
20   Q.   I'm not -- hold on.
21   A.   So I'm saying the same thing, it was too
22      numerous.
23   Q.   Well, maybe your attorney accepted that.
0401
1   A.   No, you did, too.
2   Q.   I had no role in accepting or not accepting.
3   A.   Well --
4   Q.   I'm trying to --

5   A.  I don't know.
6   Q.  -- get some specificity.
7   A.  I don't know.
8   Q.  You tell me "numerous."
9   A.  Numerous.
10  Q.  As a --
11      MS. NELSON:  She said continuous and
12          numerous.
13  Q.  As a judge, if somebody appears before your
14      court and they testified there had been
15      numerous problems with this person -- let's
16      say it's a spouse abuse case.  Numerous --
17  A.  I wouldn't make them tell me the dates.
18  Q.  Numerous problems and they couldn't be
19      specific about anything --
20  A.  Well, they can be --
21  Q.  -- would you accept that?
22  A.  -- specific about the incident if they just
23      said, I don't know the date, but I know he
0402
1       beat the hell out of me and I had a black eye
2       and had a broken arm, I would give that some
3       credibility.
4   Q.  I will give that some credibility.  I'm trying
5       to find out, what did you do when Nancy told
6       somebody that they're not going to bring some
7       files down, what did you do?
8       MS. NELSON:  Asked and answered.  She said
9           what she'd do.
10      MR. JAFFREE:  What did she do.
11  A.  Called the clerk's office and said, Ashton is
12      a prosecutor.  Let's just get the cases
13      brought over and get them handled.
14  Q.  All right.  This happened sometime but you
15      don't when, sometime --
16  A.  I don't know the specific date.
17      MS. NELSON:  Asked and answered.
18  Q.  All right.  Now, that's one incident.  What's
19      another incident?
20  A.  Another incident is when she flew over into
21      the courtroom, saying that one of the
22      magistrates had called her and told her that
23      Ashton had threw a fit and disparaged the
0403
1       magistrates during court.  And I told her,
2       that never happened.  I was there.  Now, if

3      she did it outside of court, no, but it did

4      not happen in court as they told her.

5   Q.  Do you know when that happened?

6   A.  And she -- she just threw a fit.

7   Q.  Do you know when that happened?

8   A.  No.  Does she know?

9   Q.  Did you do a memo to Nancy about that?

10  A.  No.

11  Q.  Did you do a memo to Nancy about the first

12     one?

13  A.  No.

14  Q.  All right.  Now let's go the third one.

15  A.  Only with Ms. Ott or with the other

16     attorneys?

17  Q.  Ms. Ott.  Right now with Ms. Ott?

18  A.  Ms. Ott.  Well, she was just very

19     unprofessional.  She was mad with Ms. Ott I

20     guess because -- I don't know.  I'm just

21     assuming.  But it was just an inability to

22     work -- anything Ms. Ott called for, she just

23     resisted giving.  And I tried to explain to

0404

1      her that these are the City's cases, if they

2      want to -- whatever they want to do with their

3      cases, you know, these are their cases to

4      prosecute or not.

5   Q.  Other than this first incident --

6   A.  The first three or four.

7   Q.  Other than this incident, when did Ms. Ott

8      call for something and Nancy didn't give it to

9      her?

10        MS. NELSON:  Object to the form.

11  A.  Several times.

12  Q.  How many times?

13        MS. NELSON:  It's mischaracterizing her

14           testimony.

15  Q.  How many times?

16  A.  Numerous times.

17        MS. NELSON:  Asked and answered.

18  Q.  How many times that you're aware of?

19        MS. NELSON:  Asked and answered.

20  A.  I can't give you a number.

21  Q.  More than ten?

22  A.  I can't give you an answer.

23  Q.  More than 15?

0405

1    A.   If I say ten, and it was nine, I'd be lying.
2         So I can't give you an answer.
3    Q.   Well, what does numerous mean to you?
4    A.   A lot.
5    Q.   What does a lot mean to you?
6    A.   Many.
7    Q.   More than five?
8    A.   More than once.
9    Q.   More than once but less than five?
10          (Brief pause)
11   Q.   Aren't you just making this up out of whole
12       cloth?
13   A.   No.
14   Q.   All right.  Well, what did you do --
15   A.   Your clients are making all that up out of
16       whole cloth --
17   Q.   What did you do --
18   A.   -- trying to get a lawsuit.
19   Q.   What did you do --
20         MS. NELSON:  Object.  Asked and answered.
21   Q.   What did you do when Nancy just numerous times
22       denied response to Ms. Ott's request for
23       information?
0406
1    A.   I told her the same thing the attorney at
2        Legal Services told her, that she wasn't a
3        lawyer and she couldn't tell them how to try
4        their cases.
5    Q.   Are you not the appointing authority?
6    A.   I'm the department head.
7    Q.   All right.  The appointing authority.  Didn't
8        we agree to that earlier?
9         MS. NELSON:  She's a department head.  Go
10          ahead, please.
11   Q.   You want a court to believe -- another
12       court -- that you observed numerous occasions
13       Ms. Martin, who's not a lawyer, telling
14       another lawyer that's assistant prosecutor
15       that I'm not going to give you documents that
16       you want and you did nothing but just talk to
17       her on the phone?  Numerous occasions?
18   A.   Well, she wouldn't say, I'm not going to give
19       them to you.  The magistrate -- she would say,
20       well, it's not on the docket or, you know,
21       just -- it wasn't set for today.  She just
22       didn't help us.  Nancy never facilitated the

23      process.  You know, once she came, it just --
0407
1       it deteriorated even more --
2    Q.  When did you first --
3    A.   -- because of her lack of knowledge and her
4        inflexibility and her reliance on people to
5        tell her what to do.
6    Q.  When did --
7    A.   She couldn't look up things in the computer.
8        She didn't know what they were doing.  She
9        argued with lawyers.  She -- you know, it was
10       just a constant source of problems.  She was a
11       probationary employee.  And I couldn't allow
12       it to go on.
13   Q.  I understand what you're saying.  I understand
14       your position on this.
15   A.  I know, but you want me to know dates and
16       write -- stop court.  You've been in court
17       when there were 300 people -- stop court and
18       write Nancy a memo every time I had to call up
19       there and ask for a ticket.
20   Q.  Did any of this --
21   A.  It's impractical.  And I think a court would
22       understand that.
23   Q.  Did any of this happen before you did Nancy's
0408
1       first evaluation?
2    A.  I don't know.
3    Q.  Could any of this -- could this attitude have
4        reflected itself when you did Nancy's first
5        evaluation?
6    A.  I don't think so.
7    Q.  So she changed?
8    A.  I don't know.
9    Q.  Well, either she changed or she didn't?
10   A.  I don't remember.
11   Q.  You don't remember whether she changed.  Okay.
12       Now, do you remember any other incidents
13       involving Ms. Ott in addition to --
14   A.  Not specifically.
15   Q.  Nothing specific?
16   A.  Ms. Ott does, though.
17   Q.  Ms. Ott does but you don't.  Okay.  Fine.  All
18       right.
19           Now, let's talk about these other
20       attorneys.  Were there numerous attorneys that

21      have complaints of Nancy?
22   A.   Not numerous.  One, two, three, four.
23      Everybody was complaining that she wouldn't
0409
1      let them file stuff, and she wanted them to
2      wait in line until their names were called and
3      she wouldn't give them a ticket.
4   Q.   All right.  I don't want to just generalize.
5      Let's talk about the name of the first
6      attorney that complained.
7   A.   I -- I can't put them in sequence.  I didn't
8      write down number one.
9   Q.   Then name me any attorney that complained.
10   A.   Any attorney that complained would be --
11         MS. NELSON:  Besides Ashton Ott?
12   A.   -- Ashton Ott.
13   Q.   Well, we've covered her.
14   A.   Write that down, though.  She's one.
15   Q.   I've got that down.
16   A.   Ashton Ott, one.  Derek Yarbrough.
17   Q.   Stop with Derrick.  Hold up.  Stop.
18      Yarbrough?
19   A.   Yes.
20   Q.   How do you spell that last name?
21   A.   I don't know.
22   Q.   Now, what did Derek Yarbrough complain about?
23   A.   That he went over there to file a motion and
0410
1      that she wouldn't let him file it.  And that
2      he told her, she had -- she should let him
3      file it and let me rule on it as to whether it
4      was timely or not.  And that -- they had just
5      complained, all of them.
6   Q.   Is this the one that she said she was
7      following your policy, the one that she talked
8      about yesterday?
9   A.   I don't know.
10         MS. NELSON:  Object to the form.
11   Q.   Okay.  When did Derek Yarbrough complain to
12      you?
13   A.   I don't remember the date.
14   Q.   Did he put this complaint in writing?
15   A.   No.  None of them wanted to put it in writing
16      because they had to continue to work.
17   Q.   All right.
18         MS. NELSON:  Just let her answer, please.

19  A.  Yeah.  I mean, it was difficult because they
20      would all say, well, you know, they got to
21      continue working with them, so they don't want
22      to make a complaint.
23  Q.  Give me the name of another one.
0411
 1  A.  Tom Brantley.
 2  Q.  What did he complain about?
 3  A.  Let me give you another one.  Kathleen Nemish.
 4  Q.  No, no, before you --
 5  A.  I don't remember.  Kathleen Nemish.
 6  Q.  Hold on.
 7      MS. NELSON:  Well, let -- while she's
 8          thinking, let her give them to you.
 9      MR. JAFFREE:  I don't want them that way.
10          I want to know what Tom Brantley
11          complained about.
12  A.  And I can't give them sequential.
13  Q.  What did he complain about?
14  A.  Just about her -- just about her office
15      policies, just her inflexibility.  I don't
16      remember specifically.
17  Q.  You don't remember specifically.  Don't
18      remember.  Okay.
19  A.  I -- don't say don't remember specifically,
20      but about her office policies or --
21  Q.  I don't know what that means.  I don't know
22      what office policy mean.  I mean, that's not
23      telling me anything useful.
0412
 1      Brantley complaining about her office
 2      policies tell me nothing.  You don't remember
 3      anything specific he complained about?
 4  A.  Specifically about Nancy's attitude and her
 5      office policies.
 6  Q.  What about her attitude?
 7  A.  That her attitude was one of inflexibility,
 8      that she didn't know what she was doing, and
 9      that the office was not operating as smoothly
10      as it was before she came, that the lawyers
11      were complaining, and that it just was
12      deteriorating, that the attitudes of the
13      magistrates was bad.
14  Q.  Let me stop you.  Did Thomas complain before
15      her first evaluation?
16  A.  I don't remember specifically.

17   Q.  Did Dennis -- Derek Yarbrough complain
18       before --
19   A.  I don't remember the dates.
20   Q.  What other attorney complained?
21   A.  Kathleen Nemish.
22   Q.  What did Kathleen complain about?
23   A.  Just the same thing, that -- well, we had a
0413
1        specific incident where Kathleen had a client
2        who had sent in a completion of CRO, and he
3        was from Michigan.  And the paperwork had
4        gotten separated from the file, similarly
5        to what -- well, I won't bring that up now.
6        The paperwork had got separated from the file,
7        but they knew that -- she knew that she had
8        turned it in.
9            So I took the case into the courtroom or
10       into my chambers to avoid a warrant being
11       issued.  He called in.  She told him they
12       hadn't received it and that he would have to
13       drive back here for court or get a warrant.
14       And I had specifically told Mary Turner not to
15       issue the warrant for him because we were
16       looking for his paperwork.  Nancy instructed
17       Mary Turner, go ahead and issue the warrant.
18       Kathleen was trying to work it out for him.
19       And he ended up sending her roses in
20       gratitude.  But, no, I don't know his name.
21   Q.  Did you --
22   A.  I did not write down the --
23   Q.  Let's me ask you this:  Did you hear Nancy
0414
1        tell Mary Turner not to -- to go ahead and
2        issue the warrant?
3    A.  She -- I think she wrote it on there.
4    Q.  She wrote it down where?
5    A.  Yeah, we knew that she did that.
6    Q.  No.  I asked you did you --
7    A.  On the case action summary, we saw that.
8    Q.  How did you know that?
9    A.  We saw it.  We saw it somewhere.  We knew she
10       did it.
11   Q.  You saw where she said, issue the warrant?
12   A.  Well, she didn't even have the paperwork.  I
13       put that on there because the paperwork was in
14       the courtroom, so she issued the warrant

15        without the paperwork.
16   Q.   And when was this?
17   A.   I don't know.
18   Q.   Well, since you got the -- you got documents
19        to support that.  You could --
20   A.   We didn't -- we can't remember his name.
21   Q.   So you just --
22   A.   Again, 17,000 cases.
23   Q.   Let me ask you this:  Do you have a statement
0415
1        from Kathleen Nemish on this incident?
2    A.   No.
3    Q.   Do you know if your attorney have a statement
4        from Kathleen --
5    A.   No.
6    Q.   -- on this incident?
7    A.   They just complained.
8    Q.   Do you know if Thomas Brantley have a
9        statement --
10   A.   No.
11   Q.   -- concerning this incident?
12            What about Doug (sic) Yarbrough?
13   A.   No.
14   Q.   You got a statement from Doug Yarbrough?
15   A.   No.
16   Q.   Do you anticipate getting a statement from
17        Derek?
18   A.   I haven't thought about it.  I didn't write
19        her up for that.  I didn't discipline her for
20        that.
21   Q.   What about Thomas Brantley?
22   A.   I didn't discipline her for any of these
23        infractions because I could not remember the
0416
1        names of them.
2    Q.   And did you talk to her about --
3    A.   I recommended her termination for a totality
4        of circumstances.  So if you want to strike
5        these out, we've got other incidents.
6    Q.   I don't want to scratch these out.
7            Give me your names of other attorneys who
8        have complained.
9    A.   I can't remember.  I think Cliff Mendheim
10        complained one day about having to stand in
11        court and wait until -- she wanted them to
12        only file their responses in alphabetical

13      order.
14   Q.  When did that happen?
15   A.  All the lawyers were complaining during court.
16   Q.  I'm not talking about all the lawyers.  When
17      did Cliff complain?
18   A.  I didn't write it down.
19   Q.  Well, were you in court when she did this?
20      MS. NELSON:  Did what?
21   A.  Yeah.
22   Q.  Have him stand --
23      MS. NELSON:  In alphabetical order?
0417
1   Q.  -- for a long period of time in
2      alphabetical --
3   A.  Yeah, she wanted all of them to do that.
4   Q.  All right.  Did you tell her to stop and not
5      have them stand in alphabetical order when
6      Cliff was in there?
7   A.  Well, she would say it's a policy that -- she
8      kept referring to the policy of filing it
9      seven days before or they had to come to
10      court.  And what I told her that was
11      impractical to have them stand there and wait
12      until their next client was called; let's just
13      file them all at one time.  And she felt that
14      I was overruling her policy.  I wasn't.  I
15      still said they had to be filed seven days or
16      come to court.  I'm just saying, if you had a
17      Client Abernathy, you should not have to stand
18      there until your Client Zenith came up to file
19      both motions.  Let's just get them -- you
20      know, we handle a lot of cases.
21   Q.  But you could stop that?
22   A.  And we're trying to get it facilitated.
23   Q.  Did you do --
0418
1   A.  Well, she felt like it was a violation of
2      her -- I wasn't trying to fire Nancy.  If I
3      had been trying to, I would have written
4      everything up, wrote everything down.  I was
5      trying to work with her and teach her because
6      I knew she didn't know.
7   Q.  Well, I mean --
8   A.  But Nancy didn't want to learn.  She wanted to
9      enforce these crazy rules and, you know,
10      and --

11　Q.　Well, did you do a memo telling her that the
12　　　rules were crazy?
13　A.　No.
14　Q.　No memos.  All right.  So do you have a
15　　　statement from Cliff Mendheim?
16　A.　No.  I'll ask them if they remember.
17　Q.　All right.  So you don't have statements from
18　　　these people.  You coming up -- you don't have
19　　　the dates.  You didn't do memos, but we should
20　　　just believe you.  Nancy said, believe me.  I
21　　　mean --
22　　　　MS. NELSON:  Nancy would have no way to
23　　　　　know if these people complained if she
0419
1　　　　　was not present.
2　　　　MR. JAFFREE:  Nancy would say, nobody
3　　　　　never told me.  This didn't happen.
4　　　　　Didn't happen.  And I didn't make
5　　　　　anybody stand in line.  I didn't have
6　　　　　anybody come from Mississippi or
7　　　　　Michigan because I issued -- she said
8　　　　　that yesterday.
9　A.　Nancy will say that she didn't talk about you
10　　　like a dog, but she did.  I mean, she will say
11　　　that.
12　Q.　Well, I'm assuming that that's not --
13　A.　She's just lying.
14　Q.　-- at issue here, her talking about me.
15　A.　I know.
16　Q.　And that's not going to affect my
17　　　representation of Nancy.
18　A.　It shouldn't.
19　Q.　Well, I mean, it's not.  So can you think of
20　　　any other attorneys --
21　A.　No.
22　Q.　-- that complained?
23　A.　Not off the top of my head, but I am sure
0420
1　　　there are others.
2　Q.　Now, in addition to attorneys --
3　　　　THE WITNESS:  Can we reserve the right to
4　　　　　supplement?
5　　　　MS. NELSON:  Sure.
6　Q.　What other complaints did you have about
7　　　Nancy?
8　A.　Anytime I tried to talk to Nancy about stuff

```
 9      that I thought that she needed -- about just
10      trying to help her, Nancy just -- she didn't
11      want to hear it.  Nancy, she just knew it all
12      and --
13   Q.  Can you give me some specifics?
14   A.  Specifically --
15   Q.  What did you want to talk to her about and how
16      did Nancy respond?
17   A.  About -- well, and the black magistrates
18      complained that they thought that they were
19      being racially discriminated against.  I never
20      had a white magistrate come to me and say, I
21      feel like I'm being discriminated against
22      ever.  I had a -- well, and then the
23      magistrates came to me, complaining about
0421
 1      Nancy.  Let's put that in there.  Valarie
 2      Savage, Michelle Bryan came to my office.
 3   Q.  What did Valarie Savage complain about?
 4   A.  They said that Mary -- Nancy was letting Mary
 5      Beth run the office, that Nancy didn't know
 6      what she was doing, she was implementing all
 7      Mary Beth's policies, that Mary -- they knew
 8      for a fact that Mary Beth was writing the
 9      memos about policies and procedures and Nancy
10      was merely signing them.
11   Q.  When did Valarie tell you this?
12   A.  What day was that on her calendar?  June
13      something?  She had it on her calendar that
14      Valarie complained that things weren't going
15      Mary Beth's way.
16   Q.  Well, since you was told that Mary Beth is
17      writing policy, I'm sure, especially since
18      Nancy was getting paid for being the
19      administrator, you did a memo to Nancy about
20      that?
21   A.  No.  I called Nancy in my office, and that's
22      why she said about the racial discrimination.
23      I said, Nancy, everybody is complaining.  You
0422
 1      know, every -- this office is deteriorating.
 2      You know, I wasn't trying to write Nancy up.
 3      I guess I should have.  I was trying to help
 4      Nancy.  I needed a court administrator.
 5   Q.  Now, earlier you said you wanted people to put
 6      their complaints in writing?
```

7  A.  I did.  And that's why I didn't write her up
8     for it because they wouldn't put it in
9     writing.  And if they had put it in writing, I
10    would have.  But that's why I didn't.
11 Q.  But you're using it now.  You wouldn't
12    consider it then because --
13 A.  I didn't consider it.
14 Q.  But now you're going to use it --
15 A.  As a totality of the circumstances --
16 Q.  As a totality?
17 A.  -- of why I was not recommending her for
18    rehire.  But I never disciplined her for any
19    of these incidents.  I never wrote her up.
20 Q.  You said "everyone."  Name me everybody who
21    complained --
22 A.  Me.  I'm complaining.
23 Q.  One moment.  Excuse me.
0423
1  A.  The attorneys complained.  The police officers
2     complained.
3  Q.  We'll get to the police --
4     MS. NELSON:  Well, she's telling you.
5  A.  Write that down.
6     MS. NELSON:  Let her tell you.
7  Q.  But I want to talk about the staff.
8     MS. NELSON:  Then you can come back to it.
9  Q.  You said the -- I guess you was talking about
10    everybody in the staff complained.
11 A.  Uh-huh (positive response).
12 Q.  Give me the names of who in the staff
13    complained.
14 A.  Ann Baxter, Valarie Savage.
15 Q.  I want you to pause.
16 A.  Ann Baxter is white.
17 Q.  Yeah, I understand that.
18 A.  Write that down.
19 Q.  I know that.
20 A.  Valarie Savage is white.
21 Q.  Please.  Hold on.  All right.  Well, I'll put
22    them all down.  Valarie.
23 A.  Valarie Savage is white.  Ann Baxter is
0424
1     white.  Michelle Bryan, her best friend,
2     complained with Valarie.  Lavera and Eunice
3     claimed that they were being treated
4     differently because of their race, and they

5    went to Personnel and made a formal complaint
6    about being -- that they felt that they were
7    being treated differently.
8  Q.  I never got a copy --
9  A.  Tonya complained.
10  Q.  Stop for a second.  I never got a copy of
11    their formal complaint from Personnel.
12  A.  Okay.  Tonya complained.
13  Q.  Hold on.
14  A.  I don't know if it was in writing or not.
15  Q.  A formal complaint that wasn't in writing?
16  A.  Oh, I don't know.  I don't know.  Check.
17    Tonya complained that she was attacked by
18    Nancy because of something that she didn't
19    know.  And Nancy told her she should know, and
20    she felt attacked.  So that's all your
21    magistrates except Mary Beth and Mary Turner.
22  Q.  They didn't complain.
23  A.  And Sarah.
0425
1  Q.  And Sarah didn't complain.
2  A.  They never came to me and complained.
3  Q.  So they -- all right.  Now let's talk about
4    Ann Baxter.  When did she complain?
5  A.  Oh, over the course of -- they felt that Mary
6    Beth through -- Nancy through Mary Beth --
7    Nancy didn't know anything about the computer
8    system.  She didn't know how to go on the
9    computer system.  She never learned.  She
10    couldn't help me in court.
11    We were in sitting in court one day.  We
12    didn't have anybody to work court.  She had
13    been there months.  You asked when that
14    happened.  That was after the first
15    evaluation, but she never picked up.  She
16    never learned.  So I needed somebody to work
17    court.  She had been there six or seven
18    months.  She expected magistrates to be
19    proficient in the computer system, but she had
20    seven or eight months.  And she never even
21    learned how to log on.
22  Q.  All right.  But --
23  A.  So when she tells you --
0426
1  Q.  Over and above Nancy learning the computer
2    system, what did Ann Baxter complain about?

3  A.  That she was pointing out errors that Mary
4      Beth was giving her, those reversals, because
5      Mary Beth was the cashier.  And she had to
6      make the reversals.  And, also, Mary Beth had
7      the ability to go into the computer under
8      anybody's password and change things.
9  Q.  All right.
10  A.  And they were alleging that Mary Beth was
11      changing things in the computer under their
12      password.
13  Q.  Is Ann still an employee?
14  A.  Yes.
15  Q.  Do you have a statement from Ann?
16  A.  No.  Do you want me to get one?
17  Q.  Do you anticipate getting a statement from
18      Ann?
19  A.  I don't know what my lawyer anticipates.
20  Q.  You don't know what your lawyer anticipates?
21      And you've tried to get a statement from her.
22      Okay.
23          Now Valarie, what did she complain about?
0427
1      By the way, did Ann complain about anything
2      else?
3  A.  Not that -- specifically.  I reserve the right
4      to supplement as I think of it.
5  Q.  All right.  What did Valarie complain about?
6      By the way, do you know when Ann made her
7      complaint?
8  A.  Huh-uh (negative response).
9  Q.  Don't know.
10  A.  Valarie complained that --
11          MS. NELSON:  You've already testified some
12              about Valarie.
13          THE WITNESS:  Yeah.
14  A.  Well, she came over to my office and said that
15      they knew that Mary -- that Nancy was not
16      doing -- that Mary Beth was telling Nancy what
17      to do, that Mary -- Nancy was doing everything
18      Mary Beth told her, that Nancy had written --
19      Mary Beth had written a memo and that Nancy
20      had just signed it, that she was allowing Mary
21      Beth -- because she didn't know, she was being
22      held hostage by Mary Beth's knowledge and Mary
23      Turner's knowledge.
0428

1      They would put in here, the black
2    magistrates complained that even though they
3    were not allowed to go out the back door, that
4    Michelle Bryan -- you want to write that
5    down -- Valarie were putting a bucket in
6    another side door and going outside and
7    smoking to the point that the city manager
8    asked, why were they smoking so much.  And,
9    so, that -- they were being written up and
10    disciplined for going out the back door, but
11    there was another side door that was not the
12    front door.  But they weren't being --
13  Q.  Well, was the side door off limits as well?
14  A.  It was not the main door.  Yes.
15  Q.  And it was off limits as well?
16  A.  It was a security risk.  It has a fire thing
17    on it.  They would go out there and put a
18    bucket in it.  But, again, I wasn't up there.
19    Just like I didn't see Lavera and Eunice going
20    out the back door, I didn't see them doing
21    that.
22  Q.  All right.  So the two blacks complained about
23    these whites --
0429
1  A.  All kinds of stuff.
2  Q.  All kinds of stuff.
3  A.  A white magistrate being granted leave when
4    she did not have any.
5  Q.  Well, I understand about the leave.
6  A.  And -- well, let's write that down.  You asked
7    about who complained.
8      Lavera and Eunice complained that Michelle
9    Bryan was granted leave when she did not have
10    any in contravention of personnel rules and
11    regulations to go to a distant niece's
12    hospital when Eunice, who had leave, was
13    denied leave to go to the doctor and the
14    hospital --
15  Q.  I know about that incident.
16  A.  -- with her daughter.
17  Q.  All right.
18  A.  Okay.  Then there was another incident where
19    Lavera changed a cash bond, and she was
20    reprimanded or Nancy wanted to reprimand her.
21    But Sarah Fowler, who is white, changed a bond
22    the same day under the same circumstances when

23      Valarie was off -- out of work.  And Nancy --
0430
1       and she was not reprimanded.  Sarah Fowler was
2       not counseled about it.
3   Q.  So it's your position that Nancy was
4       discriminating against the black employees?
5   A.  No, I'm --that was their allegation.  That's
6       not my position.
7           MS. NELSON:  You were asking about what
8               magistrates complained about.
9           THE WITNESS:  Right.
10          MS. NELSON:  And she's telling you.
11  Q.  All right.  Well, I'm trying to hear -- is
12      that your position.
13  A.  That was not my position.  That was their
14      allegations.  That was not my position.
15  Q.  Do you think that allegation had merit?
16  A.  I didn't know.  I didn't -- I didn't want to
17      think that it did.
18  Q.  Did you look into it to see if it had merit?
19  A.  I referred them to Personnel because I didn't
20      to want to appear biased.
21  Q.  Well, did they file a formal complaint, or you
22      don't know if they filed a formal complaint?
23  A.  I don't know.  I know they did come over here
0431
1       and talk with Kai about it.
2   Q.  All right.  Now, what did Michelle Bryan
3       complain about?
4   A.  The same thing that Valarie did.  They were
5       together.
6   Q.  The two of them were together, came to your
7       office and complained?
8   A.  Uh-huh (positive response).
9   Q.  About that?
10  A.  What I said Valarie complained about.
11  Q.  So she didn't have an independent complaint,
12      just whatever Valarie -- and Valarie
13      complained about --
14  A.  Well, they felt that -- that Nancy didn't know
15      what she was doing, so she was allowing the
16      magistrates to -- to tell her what to do.
17  Q.  Now, did Tonya provide any specifics on this
18      attack that you talked about?
19  A.  Not -- well, she said that there was something
20      that Nancy gave her to do that she did not

21    know how to do, and when she attempted to tell
22    Nancy that, Nancy attacked -- she felt jumped
23    all over her, and it wasn't fair.

0432

1  Q.  Let me ask you this:  Did any of these
2    complaints occur prior to Nancy's first
3    evaluation?
4  A.  I don't think so.  I don't know.  I might have
5    just tried to work them out with her and
6    not -- because they weren't -- you know, I was
7    trying to work it out.  I wasn't trying to
8    write her.  I was trying to keep her.
9      MS. NELSON:  Just answer as best you can.
10    THE WITNESS:  I'm sorry.
11  Q.  You said police officers had complained as
12    well?
13       (Brief pause)
14    MS. NELSON:  He's asking about police
15      evaluations -- I mean, police
16      officer or police --
17  Q.  The police also complained?
18    MS. NELSON:  Police officer or police
19      chief?
20  Q.  Both police chief and police officers or just
21    police chief?
22  A.  I know there was one incident with a
23    lieutenant.

0433

1  Q.  What's his name?
2  A.  Martin, about the dockets not being posted.
3  Q.  What's his name?
4  A.  I don't know.  I think it's Lieutenant Martin.
5  Q.  What about the dockets not being posted?
6  A.  Well, it wasn't that.  Well, I'm not going to
7    say it wasn't that.  Mary Beth always said she
8    did post them.  It was a continuous --
9  Q.  Well, what did --
10  A.  That the -- that the dockets weren't being
11    posted, so the officers didn't know to be in
12    court.  And, also, that the magistrates were
13    refusing to give warrants.  It was generally
14    just about the way that the attitude at the
15    magistrates' office had deteriorated.
16  Q.  Deteriorated from how bad you told Nancy it
17    was when she came?
18  A.  No.  Not -- it wasn't bad as far as their

19      relationship, but their attitude toward --
20      toward the police department.
21  Q.  Did Officer Martin ever give a written
22      complaint?
23  A.  I don't think so.  I think I just talked to
0434
1       Mary.
2   Q.  Have you gotten a statement from him?
3   A.  It was Lieutenant Martin I think.  I don't
4       remember specifically which it was.
5   Q.  Now, you mentioned --
6   A.  Again, I didn't discipline her for any of
7       those.
8   Q.  Your attorney said yesterday there was
9       something about White -- suggested that
10      White -- Chief White had did a complaint?
11  A.  If I remember, he was just recounting some of
12      the problems his officers had had with
13      warrants.
14  Q.  Just recounting problems with warrants.
15  A.  Right.
16  Q.  What was the problem with warrants?
17  A.  I say with "warrants."  With the magistrates'
18      refusal to assist them or -- you know, not say
19      complained.  It was -- I don't know if it was
20      just specifically about attitude and -- and,
21      like I said, the attitude of magistrates just
22      kind of deteriorated under her.
23  Q.  So some vague magistrates not assist on the
0435
1       warrants.
2   A.  No.  I'm sure he was specific at the time.
3   Q.  But you don't remember any specifics?
4   A.  I remember it was about officers' complaints
5       about the magistrates' attitudes.
6   Q.  And you didn't write any of this up, did you?
7   A.  I didn't -- no.  I did not discipline her for
8       any of that because she was new, and I knew
9       that she was learning.  I tried to give her
10      the benefit of the doubt because of her
11      newness.  And I tried to give her the benefit
12      of the doubt because she did not have prior
13      magisterial knowledge.  I tried to work with
14      her.  I tried to help her.
15  Q.  Now, I'm sorry.  The reason that you never
16      gave Nancy any written notices of any of this

17      was what now?
18   A.   Any written notices of any of this?
19   Q.   Yeah.
20   A.   Well, we had two verbal counselings leading up
21      to her last evaluation.  Well, she was only
22      there nine months.  So it was -- we had two
23      verbal counselings, one in June, then a month
0436
1      later in July because I had given her a
2      month.  And then I don't know what happened.
3      And then August, September -- I don't
4      remember.
5   Q.   You know, in one of your statements, you said
6      that the defendants came to court, many of
7      them had to miss work and was unable to have
8      their trial.  And they had to have the trials
9      delayed.
10         Can you give me any names of defendants
11      whose trials was delayed?
12   A.   No.  We'd have to pull the docket.  When was
13      that, two thousand and something?  We'd have
14      to pull -- try to find those dockets.
15   Q.   Now, can you e-mail me or have your attorney
16      e-mail me the names of those defendants
17      whose --
18   A.   If we can find them.
19   Q.   -- trials was delayed?
20         MS. NELSON:  We'll discuss that, if she
21         has any recollection of it.
22         MR. JAFFREE:  So if I don't get anything,
23         can I assume that you couldn't find
0437
1         them; is that what I should assume?
2         MS. NELSON:  Well, you've made no formal
3         request for such, and I'm not going to
4         commit here now to go pull that
5         information.
6         MR. JAFFREE:  She has mentioned them here
7         for the first time.
8         MS. NELSON:  Well, a lot of things have
9         been mentioned for the first time.
10         Doesn't mean it's necessarily
11         something that we have to produce to
12         you.
13   Q.   You indicated that Ms. Martin applied
14      discipline and personnel rules in a arbitrary

15    and capricious manner.
16        Were there anything other than what you've
17    told me that you're referring to?
18  A.  Excuse me.  Where are you reading from,
19    Mr. Jaffree?
20  Q.  I'm not quite sure.  On one of your things
21    here, you said Martin -- probably on your July
22    8th memo -- "Ms. Martin continues to apply
23    discipline and personnel rules in an arbitrary
0438
1    and capricious manner."
2        MS. NELSON:  Well, where are you reading
3          from?
4        THE WITNESS:  He just said, he didn't
5          know.
6        MR. JAFFREE:  I sort of incorporated this
7          in my notes.  So my guess is it's on
8          the June -- I mean, July the 8th memo.
9  A.  Well, I mentioned the one where the employee
10    was granted leave that did not have any in
11    violation of personnel rules and regulations.
12        MS. NELSON:  The July memo that you're
13          looking at is dated -- is Plaintiff's
14          Exhibit Number 9.
15  A.  And I did not write her up for that at that
16    time even though she did it in contravention
17    of personnel rules and regulations.  She
18    should not have granted a magistrate who did
19    not have leave, leave without department head
20    approval.  But what was more -- worse than
21    that was that the employee had no leave and it
22    was her husband's niece; but she had a
23    magistrate with a daughter who had leave and
0439
1    she denied it.
2  Q.  All right.  Now, what magistrate didn't have
3    any leave?
4  A.  Michelle Bryan.
5        MS. NELSON:  We've already been over this.
6  Q.  And I need to go back and cover -- got one
7    area to cover.
8        MS. NELSON:  Are we getting close to being
9          done?  It's almost --
10        MR. JAFFREE:  I'm trying to -- almost
11          what?
12        MS. NELSON:  It's almost six o'clock.

13        MR. JAFFREE:  Are you serious, that late?
14        MS. NELSON:  A quarter till six.
15   Q.   I need to go back to this ticket.
16        Part of your reason for the termination of
17   Ms. Brackin was her allegedly not accounting
18   for a ticket by putting "void" on the
19   transmittal form within two years from being
20   placed on probation.
21        Do you agree that this ticket incident did
22   not happen within two years of her being
23   placed on probation?
0440
1        MS. NELSON:  I'm not sure what you're
2        talking about.  I think you --
3   A.   Well, we discovered --
4   Q.   The transmittal issue, that did not occur
5   within two years of her being placed on
6   probation?
7   A.   We discovered it within two years.  We would
8   not have known if it hadn't come up in the
9   course of an investigation.
10  Q.   But it didn't happen within two years, right?
11  A.   It didn't, the conduct?
12  Q.   The conduct didn't happen within two years?
13  A.   That's my understanding.
14       MS. NELSON:  Two years of her --
15       MR. JAFFREE:  Being placed on probation.
16  Q.   Well, isn't it true, that not only did you add
17   it, that that ticket thing was to try to find
18   some vehicle to justify terminating
19   Ms. Brackin?
20       MS. NELSON:  Object to the form.
21  A.   I didn't even know about the ticket.  It was
22   discovered during an investigation of another
23   complaint.  I didn't -- I didn't invent it.
0441
1   It was not a pretext for anything.  It was
2   discovered by an independent investigator.
3   Q.   Isn't it true that but for Mary's discipline
4   before allegedly informing a defendant he had
5   been wrongfully arrested, the insubordinate
6   incident would not have been enough to
7   terminate her?
8       MS. NELSON:  Object to the form.
9   Q.   Yes or no?  Is that true or not?
10      MS. NELSON:  I don't know what you're --

11   Q.  If it wasn't for that prior incident, the
12       insubordinate incident --
13         MS. NELSON:  The Fondren incident.  Can't
14           we just -- instead of reading your
15           notes, can't you just ask your
16           question?  There was a Fondren
17           insubordination in two thousand --
18         MR. JAFFREE:  Fondren.  I don't know if
19           that was insubordination but the
20           Fondren incident --
21         MS. NELSON:  That was an insubordination.
22   Q.  The Fondren incident, but for that, there
23       wouldn't have been a basis to terminate her
0442
1        because of her contact with Mary.  Do you
2        agree with that?  Or are you saying the Mary
3        incident alone is enough to terminate
4        Ms. Brackin's employment?
5    A.  It was a major violation.  I don't know if it
6        was enough alone to violate -- to terminate
7        her.
8    Q.  Well, let me ask you this:  With respect to
9        the Fondren incident, would you agree --
10   A.  I didn't initiate the Fondren investigation.
11         MR. JAFFREE:  I'm rushing and I'm trying
12           to get everything done.  I'm really
13           trying to rush out of here.
14   Q.  You stated before that Mary Beth told
15       Mr. Fondren that he had been wrongfully
16       arrested and that Mr. Fondren admitted that
17       Mary Beth told him that.
18         You haven't stated that?  I've got some
19       records that --
20   A.  Well, that's what the -- the letter from
21       Mr. Fondren said.
22   Q.  Well, it doesn't say that, does it?
23   A.  Well, it says, On June 1st I was wrongfully
0443
1        arrested.  Mary Beth can confirm this.  "She
2        also said I should see you about getting my
3        towing fee."  And this went to City's clerk's
4        office, and they sent it to an investigator.
5    Q.  I mean, does that say that Mary Beth told him
6        that he was wrongfully arrested?
7    A.  No.  I think the investigation revealed that
8        she told them that.

9  Q.  Revealed that from Mary Beth's mouth?
10  A.  Well, Mary Beth, of course, said she didn't,
11     but everybody said she did.
12  Q.  Well, Mr. Fondren said she didn't; isn't that
13     correct?
14  A.  I don't remember.
15  Q.  If I stated that the record says that
16     Mr. Fondren said that she didn't tell him
17     that, would you agree that's what the record
18     says?
19       MS. NELSON:  Object to the form.  I think
20          the investigation itself reveals what
21          occurred.  The investigation will
22          speak for itself.
23  Q.  Did you read that entire investigative report?
0444
1  A.  I'm sure I did.
2  Q.  If Mr. Fondren said that Mary Beth didn't tell
3     him that he had been wrongfully arrested and
4     then she says she didn't tell him, then upon
5     what basis are you making a claim that she
6     told him he was wrongfully arrested?
7       MS. NELSON:  Object to the form.  Object
8          that it's speculative.  Assumes facts
9          not in evidence.
10  Q.  Well, I mean, if, in fact, the two of them --
11       MS. NELSON:  Calls for -- it's a
12          hypothetical.
13  Q.  -- said that he was not wrongfully arrested?
14     And he certainly don't say it on this document
15     that she told me I was wrongfully arrested.
16  A.  That she can confirm that he was wrongfully
17     arrested.
18  Q.  But does it also say that --
19       MS. NELSON:  The document can speak for
20          itself.
21  Q.  All right.  Well, let's talk about this
22     document.
23       MS. NELSON:  You can try to interpret it
0445
1          the way you want to.
2  Q.  Do you know who Harrison Far is?
3  A.  I think --
4  Q.  Do you know that name Harrison Far, F-A-R?
5  A.  I think he -- I could say, but I don't know
6     Harrison's last name.

7   Q.  Well, what is the CRO; what does that stand
8       for?
9   A.  Court referral officer.
10  Q.  Is that part of the City of Dothan?
11  A.  No.
12  Q.  Who are they associated with?
13  A.  There's a -- what is it -- Mandatory Treatment
14      Act that requires that any crime involving
15      drugs, alcohol, or domestic violence has to go
16      through a court-ordered --
17  Q.  Is he saying that Mr. Far told him that he was
18      wrongfully arrested, according to your
19      interpretation of that letter?
20  A.  It said, "Mary Beth at the magistrates' office
21      can confirm this.  She also said that I should
22      see you about my towing fee."
23  Q.  And he also said Mr. Far can confirm that?
0446
1   A.  My CRO -- he can confirm this.
2   Q.  So what are they talking about?
3   A.  I don't know.
4   Q.  Well, you know what he was talking about with
5       Mary Beth but you don't know what he's talking
6       about with Mr. Far?
7   A.  Well, he says, "I was wrongfully arrested on a
8       false warrant.  Mary Beth at the magistrates'
9       office can confirm this."
10          So she must have told him.  She had to
11      tell him he had a false arrest.
12  Q.  Well, maybe she confirmed that he was
13      wrongfully arrested.
14          MS. NELSON:  I would object to you arguing
15          with the witness.  You're not showing
16          her -- you're showing her a letter
17          that can speak for itself.  You've got
18          a full investigative report that was
19          done by internal affairs at the
20          direction of the City's legal
21          department.
22  Q.  Did internal affairs give you a copy of their
23      internal investigation?
0447
1   A.  I don't know that they gave me a copy or that
2       they gave it -- we forwarded it to her -- she
3       had a supervisor -- direct supervisor at that
4       time, did she not?  Was not Donna Nicholson

5      her direct supervisor?  So she would have
6      gotten the results of the investigation.
7   Q.  Let me ask:  Did Mary Beth have a right to
8      tell Mr. Fondren that he was wrongfully
9      arrested if, in fact, he was?
10  A.  Did she have a right to tell him he was
11     wrongfully -- I don't think Mary Beth could
12     determine what was wrongfully or not.  I mean,
13     how -- who is she to determine --
14  Q.  But if she could and she told him he was
15     wrongfully arrested, she has a right to do
16     it?
17        MS. NELSON:  Object to the form.
18  A.  I don't -- I don't think it's -- I don't think
19     she should comment on liability issues.
20  Q.  Did he say anything about her commenting on
21     liability issues?
22        MS. NELSON:  Object to the form.  The
23         letter can speak for itself.
0448
1   Q.  Does the letter say anything about her telling
2      him anything about a liability issue?
3   A.  It says, she can -- "I was arrested wrongfully
4      on a false warrant.  She said I should see you
5      about getting my towing fee reimbursed,
6      158.90."  Mary Beth -- I don't know.
7   Q.  You call that a liability issue?
8   A.  I -- I took -- I looked at the totality of the
9      investigation report and made -- well,
10     actually, I think her supervisor did.
11  Q.  Her supervisor did?
12  A.  Uh-huh (positive response).
13  Q.  Who was her supervisor at the time?
14  A.  I don't remember.  Did she have a direct
15     supervisor, Donna Nicholson, at the time?
16        MS. NELSON:  Do we have a date?
17  Q.  I don't think so.
18        MR. JAFFREE:  Yeah.  1/7/04.
19  Q.  Remember?  This is the one that you had Nancy
20     write up?
21  A.  Well, that she would have gotten the report
22     because she was her supervisor at the time.
23        The results didn't come in until Nancy was
0449
1      hired.  She was her supervisor at the time.
2   Q.  So if Nancy told you -- testified that you

3    told her to discipline her, Nancy would be

4    lying?  You didn't tell her?

5  A.  Well, I say that I gave -- sent it to Nancy

6    to -- for her actions, just like I did

7    anything else that came in, a complaint.  She

8    was their supervisor.

9  Q.  Did you instruct Nancy to discipline this

10    person?

11  A.  I don't think -- I told her to review it for

12    her action.  I'm not saying I would say,

13    Nancy, you write up her for that.  She would

14    have gotten the results of the investigation.

15    It would have been her decision whether or not

16    to write her up.

17  Q.  Well, would you agree that the results of the

18    investigation is, Mary Beth denied that she

19    told him that the City is liable, he didn't

20    mention anything about Mary Beth telling him

21    the City is liable?

22      MS. NELSON:  Object to the form.

23  A.  She didn't appeal it.

0450

1      MS. NELSON:  Object to the form.  Don't

2      argue with him.  We're getting late in

3      the day.  Why don't we take a --

4  Q.  Nancy got terminated in part because she was

5    negligent and cannot assign tasks; is that

6    correct?

7      MS. NELSON:  You're talking about Nancy?

8  Q.  I'm sorry.  Ms. Brackin.

9      MS. NELSON:  I think the record -- I think

10      asked and answered.  She had two

11      insubordinations within a two-year

12      period of time.

13  Q.  One was negligent; is that right?  She was

14    accused of being negligent?

15  A.  No.  I mean, she was accused, but she was

16    terminated because she had two major

17    disciplinaries for insubordination within a

18    two-year period.

19  Q.  And one of them was being negligent --

20  A.  And under the personnel rules and regulations,

21    if you have two major violations in a two-year

22    period, it's grounds for termination.

23  Q.  All right.  We're talking about negligence

0451

1    here. Was she accused of being negligent, yes
2    or no?
3  A.  At some point?
4  Q.  And isn't it true that, again -- get to
5    Officer Gray, who recommended what category of
6    offense she may have committed?
7  A.  I -- I don't remember what investigator, but
8    they always said, we found grounds to believe
9    that personnel rule da-da-da has been
10   violated. That's just the basis of their
11   report, but it doesn't dictate.
12 Q.  At the risk of hurting my case because of
13   time, I'm going to greatly shorten this, where
14   I need to go. And I've got "googobs" of
15   stuff, but I'm not going to go on with it.
16   But I just want to clarify certain things.
17     Upon what authority do you have city
18   police initiate internal affairs investigation
19   of your employees? Upon what authority?
20 A.  There is --
21     MS. NELSON:  Again, I object to the form.
22       I don't know that there is testimony
23       that she did that, other than perhaps
0452
1       the Ralpeje case.
2  Q.  Upon what authority?
3     MS. NELSON:  If you know.
4  A.  Well, I don't know the authority. There --
5    when we need their expertise, when it involves
6    outside complainants. You know, they're
7    investigators. They're trained
8    investigators. And as a department head, I
9    was under the understanding that we could
10   utilize their expertise --
11 Q.  Let's me --
12     MS. NELSON:  Well, she's trying to answer.
13 A.  But, again, I didn't instigate the Fondren.
14   That was instigated from another -- that was
15   not -- I did not use the police to initiate an
16   investigation of Theron Fondren.
17 Q.  Who initiated the Fondren investigation?
18     MS. NELSON:  If you know.
19 A.  I don't know. I think it -- I don't know.
20     MS. NELSON:  If you know.
21 A.  Right. I don't know.
22 Q.  Somebody under -- interrogated members of your

23     staff, and you don't know who started it?
0453
1    A.  No.  I --
2         MS. NELSON:  I think the report would
3            speak to that, if you'd show it to
4            her.
5    Q.  Well, I'm asking you if you know.
6         MS. NELSON:  If you remember.
7    A.  I mean, I know, but I don't remember.
8    Q.  You know but you don't remember.  Okay.
9    A.  I think it came from the city clerk's Office,
10       did it not?
11   Q.   City clerk.  Okay.
12   A.  I don't remember, Mr. Jaffree.
13   Q.   With respect to the Ralpeje matter?
14        MS. NELSON:  The what?
15        MR. JAFFREE:  Ralpeje.
16        MS. NELSON:  Ralpeje.
17        MR. JAFFREE:  I'm torturing that name.
18   Q.   Was there any criminal charges contemplated
19       that would trigger the garrity notice as far
20       as you know?
21        MS. NELSON:  Again, object to the form.
22            There's no foundation as to her
23            knowledge of garrity.
0454
1    Q.   Do you understand the question?
2         MS. NELSON:  Object to the form.
3    Q.   Ms. Martin was given a garrity notice when the
4       Ralpeje interrogation took place.  Do you know
5       if --
6         MS. NELSON:  Ms. Martin was not employed
7            when the Ralpeje case took place.
8         MR. JAFFREE:  I'm sorry.  Boy, I'm getting
9            my names mixed.  Thanks for clearing
10           it up for the Record.
11   Q.   Ms. Brackin was given a garrity notice when
12       the Ralpeje --
13        MS. NELSON:  You can ask the witness if
14           she knows whether that happened.  I'd
15           appreciate your not testifying as to
16           whether that happened or not.
17   Q.   Do you know whether or not she was given a
18       garrity notice during that investigation?
19   A.  I think I've seen one.  I don't remember.
20   Q.   Do you know any criminal charges that were

21      contemplated when she was given that notice?
22          MS. NELSON:  If you know.
23  A.  Well, we had a witness who was saying that he
0455
1      felt threatened because Mary Beth had called
2      him at home, and he didn't know how she got
3      her (sic) number.  And he was concerned, you
4      know, about how Mary Beth might act
5      because -- you know, might treat him because
6      he had to work with her.  And he didn't want
7      to get involved.
8          So I don't know.  He could have said that,
9      you know, he felt threatened.  It involved an
10      outside complainant coming in saying
11      some -- one of your city employees has gotten
12      my phone number.  And -- well, he felt
13      threatened that she wanted him to say that he
14      didn't hear what she said or that's not what
15      she said.
16          And I thought that because he was making
17      those kinds of allegations that we should have
18      an outside, independent investigator who could
19      go talk to Ralpeje's mother, who could go out
20      and talk to this bondsman, you know, who could
21      talk to Mary Beth and be independent and
22      neutral.
23  Q.  So you thought that there was a possibility of
0456
1      criminal charges against --
2  A.  I didn't know.  I didn't know what he might
3      say.
4  Q.  Well, let's talk about --
5  A.  He might bring charges against the City for
6      revealing his information --
7  Q.  I'm talking about criminal charges.
8  A.  -- that she used City sources --
9  Q.  I'm talking about criminal --
10          MS. NELSON:  She said, she didn't know.
11  A.  I didn't know.
12  Q.  All right.  The Fondren matter, do you know
13      what criminal charges was contemplated or
14      likely with respect to the Fondren --
15          MS. NELSON:  Object to the form.
16  Q.  -- the Fondren --
17  A.  I didn't --
18  Q.  -- internal affairs?

19   A.  I didn't initiate the Fondren investigation.
20   Q.  Yeah.  But you don't know about any likely
21       criminal charges?
22   A.  No.  I wasn't involved -- I mean, it went
23       through me.
0457
1    Q.  Now let's talk about the investigation with
2        Mr. Gray and who disclosed information to
3        Rickey Stokes.
4            Do you know of any criminal charges that
5        was contemplated because somebody disclosed
6        information to Rickey Stokes?
7            MS. NELSON:  If you know.
8    A.  I don't know, and I didn't initiate that
9        investigation.
10   Q.  You didn't initiate that investigation?
11   A.  No.
12   Q.  Who initiated that investigation with respect
13       to --
14   A.  I don't remember.  It would be in the report.
15   Q.  -- determine -- so whatever it says in the
16       report, that's the person who initiated the
17       investigation?
18   A.  More than likely.  Once I talk -- well, yeah,
19       more than likely.
20   Q.  But they gave the report to you after the
21       investigation was completed, the police
22       officers involved?
23   A.  I'm sure because there was not a court
0458
1        administrator at the time.
2    Q.  So it was done from some other department's
3        initiation but they gave their report to you?
4    A.  Because she was in my department.
5    Q.  I see.
6            MR. JAFFREE:  Let me see if there's some
7                question that I've just got to ask.
8    Q.  Did you receive any input from any third party
9        with your evaluation of Nancy?
10           MS. NELSON:  Which evaluation?
11   Q.  The final evaluation.
12           MS. NELSON:  Other than the complaints
13               that she's talked about and her
14               conversations with Kai Davis?
15   Q.  Yeah, other than that, any --
16           MS. NELSON:  What third party?

17  Q.   -- input in the evaluation?
18  A.   I would have shown it to Personnel, but that's
19       about it.
20            (Brief pause)
21  Q.   By the way, just for the Record, I want to see
22       if you dispute this.  This is part of
23       Fondren's transcript, page 8.
0459
 1        Mr. Coleman -- Officer Coleman asked
 2       Mr. Fondren, "Did Ms. Brackin say anything to
 3       you about being falsely arrested or being
 4       arrested in error or anything of that nature
 5       that you were" --
 6        His response, "I can't remember now.
 7       Harrison said it was just a computer problem
 8       or something like that.  The record didn't get
 9       back to the police department or in the
10       computer, something like that."
11        Mr. Coleman:  "Right.  Okay.  But
12       Ms. Brackin never said anything about you
13       being falsely arrested -- say that you were
14       arrested in error?  She ever say that to you?"
15        "I don't know if she said that, but that
16       was -- that was understood through my
17       conversation with Mr. Harrison Far."
18        Going on.
19        Mr. Coleman:  "Did she give you any
20       information as far as how to go about turning
21       this in or filing this claim?"
22        Mr. Fondren:  "I think she said go to city
23       clerk's office."
0460
 1        Coleman:  "In any event, how did -- after
 2       you talked with Ms. Brackin, what did she tell
 3       you?"
 4        Fondren:  "I believe she told me to go to
 5       the city clerk's office.  Somebody told me to
 6       go the city clerk's office."
 7        Do you dispute that that's his testimony
 8       at his --
 9        MS. NELSON:  Object to the form.  I think
10            she testified that she didn't
11            interview him.
12  Q.   Did you have an opportunity to read His
13       testimony?
14  A.   I -- I don't remember.

15   Q.  He didn't say --
16   A.   I think -- I don't remember.
17   Q.    -- distinctly that she told him that he had
18        been falsely arrested, did he, based on that
19        testimony?
20   A.   Well, he kept saying, he didn't remember.  And
21        I thought the investigator said that he
22        thought that he was not being truthful or was
23        hesitant about being truthful.
0461
1    Q.  I see.  So the investigator --
2    A.   Do you have the beginning of that
3         investigation?
4    Q.   But the investigator made an assumption that
5         he wasn't being truthful?
6    A.   No, not that he made the assumption that he
7         said that he wasn't.
8    Q.   Ms. Martin -- sorry -- Ms. Brackin said she
9         didn't tell them that and the investigator
10        just reached his own conclusion?
11            MS. NELSON:  Object to the form.
12   Q.    And you accepted the investigator's
13        conclusion?
14   A.   No.  I just looked at the results of the
15        investigation in it's totality.  I'm sure I
16        looked at everything.
17   Q.   But do you know what totality suggested
18        that --
19   A.   I'd have to read it.
20   Q.    -- in spite of his testimony, in spite of
21        Ms. Brackin's testimony, she told him he was
22        falsely arrested?
23   A.   I'd have to read it.
0462
1             MS. NELSON:  Object to the form.
2    Q.   You'd have to read and get the totality of
3         evidence that suggested that?
4    A.   Right.  And also give the investigator, you
5         know, some credibility for his investigative
6         technique.  And I just looked at everything.
7         I wasn't trying to write Mary Beth up.
8    Q.   So why not just let the investigator make the
9         decision; why not take yourself out of the
10        decision-making role altogether?
11            MS. NELSON:  Object to the form.
12   A.   Well --

13   Q.   Can you answer that?
14   A.   Because I was the department head.
15   Q.   I see.
16   A.   And the supervisor I assume.  Well, no, I
17        wasn't.
18            Didn't Nancy write her up on Fondren?  I
19        don't think I did -- I did the writeup.
20   Q.   Just so I'm clear, if Nancy said that whatever
21        she wrote was at your direction, would you
22        dispute that?
23            MS. NELSON:  I'd ask that you show her
0463
1            the -- I think it's getting late in
2            the day.  We're all tired.
3            MR. JAFFREE:  You could say that again.
4            MS. NELSON:  I would ask if you would show
5            her the writeup.  My recollection was
6            that it was a time frame in early 2004
7            perhaps that there was -- Nancy was
8            new.
9            MR. JAFFREE:  Maybe I'm finished going
10            over these, these productions.
11   Q.   Let me see if there's anything I need to ask
12        you about that I can't consult with your
13        attorney about.
14            Can I ask you:  Do you currently have a
15        affidavit or a declaration from anybody
16        concerning the facts of this case?
17   A.   No.
18   Q.   Well, if you don't currently have it, do you
19        contemplate receiving one from somebody within
20        the next two weeks concerning the facts of
21        this case?
22            MS. NELSON:  Object to the form.
23   A.   If -- if I -- if my lawyer asked me to.  I
0464
1        don't know.  I don't anticipate getting an
2        affidavit from anybody.
3   Q.   But you wouldn't be the one that would get it,
4        would you?  It would be your lawyer?
5            MS. NELSON:  I object to any
6            discussions or any attorney/client
7            privilege here.
8            MR. JAFFREE:  She said that she don't
9            anticipate getting it.  I'm just
10            trying to clarify that she is probably

11          not the one who would be getting it.
12    Q.  You stated before in your testimony that there
13        were no internal memo discussing how
14        transmittals are supposed to be handled once a
15        police officer calls and says, send back the
16        ticket.  And you said, no, there aren't any.
17            Is that still your position?
18    A.  I didn't -- I kind of got it.  About the
19        transmittals?
20    Q.  You stated in your testimony -- and that is
21        240.  Maybe I left off the two in these
22        numbers.  I was --
23    A.  My testimony where?
0465
1    Q.  At the administrative hearing.
2        MS. NELSON:  For who?
3        MR. JAFFREE:  Pardon?
4        MS. NELSON:  What administrative hearing?
5        MR. JAFFREE:  For Ms. Brackin.
6    Q.  I asked you on page 244:  "Is there an
7        internal memorandum discussing how the
8        transmittals are supposed to be handled once a
9        police officer calls and says, send back the
10        ticket?"
11            And you said, "not specifically."
12            Is that still your position?
13    A.  That there are -- do I have any memos about
14        how transmittals to the State of Alabama are
15        to be handled when a police officer calls back
16        and says, send back the ticket?
17    Q.  Uh-huh (positive response).
18        MS. NELSON:  Object to the form.  A ticket
19            that's already been sworn to?
20        MR. JAFFREE:  Well, I'm glad you mentioned
21            the "sworn to."
22    Q.  What does a ticket being sworn to mean to you?
23    A.  Well, once they swear to, it's a complaint.
0466
1        It has to go through the court system.
2    Q.  Does a magistrate have to sign this ticket?
3    A.  Does he have to sign the ticket?
4    Q.  Uh-huh (positive response).  You see this --
5        MS. NELSON:  Well, let her answer.  Does
6            she have to sign it?  What's your
7            question?
8    Q.  That's a interesting legal question and maybe

9      you could shed some light on it.
10         MS. NELSON:  Are we leaving this other
11            question on the table here.  I mean,
12            you're switching gears.
13         MR. JAFFREE:  Which question?
14         MS. NELSON:  The question you'd asked
15            about two minutes ago.
16         MR. JAFFREE:  About what?  Because I done
17            forgot.  What question are we talking
18            about?  Because I'm now on the
19            ticket.  So what question --
20         MS. NELSON:  You were asking the judge
21            about her policy about -- on what is a
22            person or magistrate supposed to do
23            with a ticket --
0467
1          MR. JAFFREE:  I didn't ask her that.
2          MS. NELSON:  -- once the police officer
3            says to send them back.
4          MR. JAFFREE:  I didn't ask her that.  I
5            asked her if -- if I read her
6            response.
7          MS. NELSON:  I think the court reporter
8            could read back the statement but --
9          MR. JAFFREE:  I know exactly what I said
10            because I read it right here.  I asked
11            her is that still her answer, that
12            they don't have any internal
13            memorandum talking about what she
14            should do in situations like that.
15               But since you mentioned that --
16         MS. NELSON:  And the situation -- and
17            that's when I asked, once the ticket
18            is turned into the magistrates'
19            office; is that correct?
20         MR. JAFFREE:  Yeah.  And then you changed
21            the subject.
22         MS. NELSON:  No.  I said, at that point
23            when it's sworn -- it's sworn to when
0468
1            it's turned in to the magistrates'
2            office.  Is that what you're asking?
3          MR. JAFFREE:  Yeah.  That triggered the
4            change of direction here.
5    Q.  Let me ask this and then I'm going to get to
6        that.  Do you know of any other situation ever

7     when a police officer called a magistrate and
8     said, send me back the ticket?  That's a
9     unique occurrence, isn't it, as far as you
10    know?
11      MS. NELSON:  Can I object to the form?  I
12       don't know that there's any testimony
13       that the police officer called the
14       magistrate and said, send back the
15       ticket.  I think the testimony was
16       kind of to the contrary, that Mary
17       Turner called the police officer
18       and --
19      MR. JAFFREE:  You're right.
20  Q.  Do you know of any situation where a
21     magistrate have called a police officer and
22     the police officer said, send me back the
23     ticket, any other situation like that?
0469
1      MS. NELSON:  Object to the form.  There's
2       not any.  You say "any other."
3       There's not one.  The testimony in
4       this case -- you're misrepresenting
5       the testimony in the case.
6      MR. JAFFREE:  Well, what do you think is
7       the testimony in the case?  You just
8       said Mary Turner called this officer,
9       right?  And the officer said, okay,
10       just send me the ticket.  And that's
11       the record.
12  Q.  Assuming that that's the record, that the
13     office told a magistrate, okay --
14  A.  After he had been in and sworn to the ticket
15     and left?
16  Q.  After he had been in, do you know of any
17     situation where that have happened before?
18  A.  Once he swore to the ticket --
19  Q.  Yeah.
20  A.  -- a magistrate called him and said, can you
21     get rid of this ticket?  He said, yeah, just
22     send it to me?
23  Q.  Yeah.  Did --
0470
1  A.  No, I don't.
2  Q.  You don't.  So this is a first time as far as
3     you know?
4  A.  Those specific facts, yes.

5    Q.  And that's probably why there's no policy on
6        this because it just haven't happened before,
7        right?
8    A.  Well, no.  The -- the -- there's state law and
9        state regulations -- AOC regulation that says
10       once a complaint is sworn to -- a ticket is
11       sworn to, it becomes a complaint.  So we
12       didn't -- any internal policy we would have
13       had would have been superceded by state law
14       anyway.
15   Q.  But you haven't trained your magistrates on
16       any state law dealing with that, have you?
17   A.  AOC does.  It's in their -- in their rule
18       book.  They learn it.
19   Q.  Do you know if Ms. Brackin had been trained on
20       that law?
21   A.  Yes.
22   Q.  She was trained in 2001?
23   A.  In 2001?
0471
1    Q.  Yeah.  When this incident occurred.
2    A.  I don't know specifically.
3                (Plaintiffs' Exhibit 12 was marked
4                 for identification.)
5    Q.  All right.  Well, here, let me show you
6        Plaintiff's Exhibit 12 and ask you, verified
7        and acknowledged, that judge or magistrate,
8        what is that part for?  You see that?
9    A.  Judge or magistrate?  Where is that, judge or
10       magistrate?
11           Oh, that's where they swear to it.
12   Q.  No, she didn't swear to --
13               (Brief interruption)
14           MS. NELSON:  We're about to get out of our
15           time limit here, Mr. Jaffree.
16           MR. JAFFREE:  Well, as soon as I cover
17           this, I'm out of here.
18           MS. NELSON:  I may have a couple of
19           questions just to clarify, but I'm
20           just saying, we need to move it on in
21           here.
22   Q.  Now, did you have a chance --
23   A.  She didn't sign it.
0472
1    Q.  My question is -- and maybe you can shed some
2        light -- is the magistrate's signature or a

3    judge's signature necessary on that ticket?
4      MS. NELSON:  Necessary for what?
5  Q.  Necessary to put that ticket into the court
6    system?
7  A.  If he swore to the ticket like she said he did
8    and like he said he did.  I don't know that
9    that's a fatal error that she didn't sign it.
10  Q.  But it could be?
11  A.  I don't know that it is, no.
12  Q.  And you don't know that it's not?
13  A.  No.  His testimony was I think that he swore
14    to it, he knew it was there, and he left
15    and --
16       (Plaintiffs' Exhibit 13 was marked
17        for identification.)
18  Q.  Okay.  All right.  And in this Plaintiffs' --
19    what number is that, 12, 13 -- Plaintiffs'
20    Exhibit 13, this is not the original of that
21    transmittal sheet, but do you know if the
22    original had any Wite-Outs in it?
23  A.  No, I don't know.
0473
1  Q.  Do you know for a fact at the time she
2    wrote -- Mary Brackin wrote "void," that she
3    had the ticket in front of her?
4  A.  Do I know that for a fact?
5  Q.  Yeah.
6  A.  No, I don't know it for a fact.
7  Q.  So if she testifies that she didn't have the
8    ticket in front of her when she wrote that
9    void in, that could have been correct
10    testimony?
11      MS. NELSON:  Object to the form.  I'm not
12       sure what you're asking.
13  Q.  Well, let me just see what we can agree on
14    since you're hesitating answering that
15    question.
16  A.  No, she signed that she -- that she had it.  I
17    mean, I don't know if she changed her mind.
18  Q.  Well, I'm asking you if you know for a fact
19    that she had the ticket --
20  A.  Only that she signed --
21  Q.  -- at the time --
22  A.  -- that she did.
23  Q.  -- at the time she wrote "void" in?  Do you
0474

1    know for a fact that at the time she wrote
2    that void in that she had the ticket?
3        MS. NELSON:  Asked and answered.  She said
4            she signed it --
5        MR. JAFFREE:  I didn't ask her had she
6            signed it.  I asked her if she knew
7            for a fact she had the ticket.
8    Q.  Well, I mean, you're talking to counsel, but
9        you're not answering my question.
10   A.  Well, yes, I think she had it because it had a
11       number.
12   Q.  My question is, at the time she wrote "void,"
13       do you know for a fact that she had the
14       ticket?
15   A.  Do I know for a fact that she had the ticket?
16       I don't know for a -- I wasn't there.  No.
17   Q.  All right.  Okay.  Then let me help you out a
18       little bit here.
19           Do you know if the officer giving her
20       these tickets and their being placed -- these
21       numbers then placed in the computer occurred
22       within the same five-minute span?
23   A.  No, I don't know.
0475
1    Q.  You don't.
2    A.  She wasn't terminated for that.
3    Q.  Okay.  This was part of the reason she was
4        terminated.
5    A.  She was not terminated for that.  She was
6        terminated for the two insubordinations within
7        a two-year period.
8    Q.  This was part of the reason she was
9        terminated.
10       MS. NELSON:  Well, if you add that one,
11           then that would have been --
12       THE WITNESS:  Three.
13       MS. NELSON:  -- three majors in a two-year
14           period.
15       MR. JAFFREE:  Okay.  If you call this a
16           major within, fine.  I mean, if you're
17           going to somehow twist logic to that
18           extent.
19       MS. NELSON:  Object to your statements
20           that --
21   Q.  Here's my question.  See if we can agree.
22       Mary Turner, according to the evidence we

23      have, contacted the officer, and the officer

0476

1      said, you can send the tickets back.

2       MS. NELSON:  You know you can ask this --

3        I'd appreciate your not testifying.

4        Ask this witness what she knows

5        instead of you testifying --

6  Q.  Do you know --

7       MS. NELSON:  -- and giving all these

8        hypotheticals --

9  Q.  Do you know --

10       MS. NELSON:  -- of what the evidence --

11  Q.  Do you know whether or not or do you have

12     reason to believe that Mary Turner contacted

13     the officer about this ticket?

14  A.  Only what -- what I've gleaned from the

15     investigation.

16  Q.  All right.  From the investigation --

17  A.  No first-hand knowledge.

18  Q.  From the investigation, does it appear that

19     Mary Turner asked the officer for the

20     ticket -- from the investigation, asked the

21     officer could he void the ticket?  Based on

22     your review of the investigation, does it

23     appear that Mary Turner asked the officer

0477

1     could he void the ticket?

2      MS. NELSON:  If you know.

3  A.  It appeared that that's what the investigator

4     found, just like in Fondren he found that --

5  Q.  I'm not asking about Fondren.  Does it appear

6     that the investigator found that the officer

7     told Mary Turner that she could send the

8     ticket back to him?

9  A.  I mean, that was Mary's testimony I guess.

10  Q.  Was that the officer's testimony as well?

11  A.  That he told her, yeah, she could send it

12     back?  I think -- yeah.  Because I think he

13     was disciplined for that.  He got a major

14     violation, too, for that.

15  Q.  Does it appear from the investigation that the

16     ticket was returned to the officer?

17      MS. NELSON:  What ticket?

18  Q.  This ticket that was missing here, this ticket

19     of Steven Phelps?

20      MS. NELSON:  What missing ticket are you

21       talking about?

22       MR. JAFFREE:  The Steven Phelps speeding

23        ticket.

0478

1       MS. NELSON:  You're talking about the

2        voided ticket that Mary Brackin

3        mishandled?

4       MR. JAFFREE:  The ticket --

5       MS. NELSON:  That she engaged in improper

6        conduct for?

7       MR. JAFFREE:  All right.

8         The ticket that we're --

9   Q.  Do you know what ticket we're talking about?

10       MS. NELSON:  The ticket that had been

11        sworn to --

12   Q.  The ticket, do you know which ticket I'm

13     talking about?

14       MS. NELSON:  Do you, Judge?

15       THE WITNESS:  I assume he's talking about

16        the ticket that the officer swore to

17        and then they -- they voided it

18        without talking to him.

19   Q.  You keep on saying "swore to," but fine.

20     Okay.

21       Mary Beth said that when she did these

22     numbers, the ticket was missing.  She also

23     testified that she contacted the police

0479

1     officer.

2       Do you have any evidence that she did not

3     contact the police officer?

4   A.  I think the police officer said she did

5     not -- he did not talk to Mary Beth.  He

6     talked to Mary Turner.

7   Q.  All right.  Did anybody ask him if he talked

8     to Mary Beth?

9   A.  I --

10       MS. NELSON:  If you know.

11   A.  I don't know.

12   Q.  Okay.  Do you have any evidence as to who

13     retrieved the ticket and sent it back to the

14     police officer?

15   A.  Any evidence other than the fact that Mary

16     Beth swore that she received the ticket?

17   Q.  I'm not talking about who received it.  Who

18     retrieved the ticket --

19  A.  No.  Mary Beth --
20  Q.  -- and sent it back?
21  A.  Mary Beth as far as I know.
22  Q.  Mary Beth sent it to the police officer?
23  A.  She had it.  I don't know.

0480
1  Q.  Do you have any evidence that Mary Beth knew
2      that the police officer wanted the ticket
3      returned to him?
4  A.  I don't know.
5  Q.  You don't know.
6  A.  You said she talked to him and he told her
7      that.
8  Q.  Well, also, she testified that he told her --
9  A.  Right.
10  Q.  -- to send the ticket back to him.  Do you
11      have any evidence to dispute that?
12  A.  No.  She should have said, no, you swore to
13      it, it's got to be nolle prossed by the judge,
14      we can't send it back.
15  Q.  But there is no policy on that?
16  A.  There's state law that says that.
17  Q.  But there's no policy from your office on
18      that?
19      MS. NELSON:  You're being argumentative.
20          State law I think would supercede
21          policy.
22  A.  And that's what the Court of Criminal Appeals
23      said, that it didn't matter whether or not we

0481
1      had a policy because the state law superceded
2      it.
3  Q.  Court of Criminal Appeals?
4      MS. NELSON:  What she did was a violation
5          to state law.
6  Q.  State Law.  She didn't get charged with
7      violating state law, did she?  I mean, that
8      was not on your termination notice, that she
9      violated state law?
10      MS. NELSON:  Object to the form.
11  Q.  Was it?
12  A.  I don't remember.
13  Q.  You think your termination of her told her she
14      violated state law?
15  A.  I think it said she was negligent in the
16      handling of it.

17   Q.   Of the ticket.  I'm through.
18   A.   Okay.
19                EXAMINATION
20   BY MS. NELSON:
21   Q.   A couple of quick questions.  I'm sorry.
22   A.   That's okay.
23   Q.   On Plaintiffs' Exhibit 13, did Mary Beth
0482
1        Brackin engage in improper conduct by striking
2        "void" through this transmittal sheet?
3    A.   After the officer had sworn to it, yes.  It
4        had been turned in to her.
5    Q.   I'm going to show you what's been marked as
6        Plaintiffs' 5, which was a drawing of the
7        offices.  Is this drawing -- do you know who
8        did this drawing?
9    A.   No.
10   Q.   Are the offices drawn to scale --
11   A.   No.
12   Q.   -- as they are accurately?
13   A.   We just needed to number them so that when
14        each magistrate was packing up her office, she
15        knew what number to put on her boxes.
16   Q.   So according to this picture, office seven
17        looks like about -- it's about one-tenth the
18        size of office one.  That's not a true --
19   A.   No.
20   Q.   -- proportion to scale, is it?
21   A.   No.  And office seven ended up being the most
22        beautiful, biggest office, and everybody
23        wanted it after I did that.
0483
1    Q.   Just to clarify some testimony earlier, I'm
2        referring to Plaintiffs' Exhibit Number 6
3        regarding this memo from A-Advantage Bonding.
4        And you know, remember when you were
5        questioned about this, and there's a note on
6        the front that says that this was "filed by
7        Rickey Stokes," and "Nancy called the judge to
8        discuss," "and what would happen."  "Judge
9        laughed and said, nothing would be done
10        because Rickey" Stokes "was always causing
11        trouble."
12            Did you state that to Nancy?
13   A.   I don't remember that or laughing on any of
14        that.  I don't remember seeing this.

15    Q.   You don't remember seeing Plaintiff's Exhibit
16         6?
17    A.   I don't remember, but I would have forwarded
18         it to her since she was -- it was about her
19         department, court docket procedures, things
20         that she was in control of.
21              I'm not saying I didn't, but I don't
22         remember seeing it.
23    Q.   I think earlier, just to clarify something,
0484
1          you were asked about some of the clubs that
2          you belong to.  And I think Mr. Jaffree was
3          trying to imply that you were only a member of
4          black organizations.
5               Did you remember any other social clubs
6          that you're a member of?
7     A.   Yes.
8     Q.   Can you tell me what those are?
9     A.   I'm on the board of directors of Girls' Inc.
10         I'm in the Inns of Court which is a social
11         organization of lawyers and judges that
12         preside for the Houston County Bar, which I'm
13         a member of; Junior League; Zonta, Inc.; Women
14         Build for Habitat for Humanity.
15    Q.   Junior League of what?
16    A.   Montgomery.
17    Q.   Is that a mostly white organization?
18    A.   99 percent.
19    Q.   Zonta, is that a white organization?
20    A.   99 percent white.  It's not white because I'm
21         in it, but 99 percent white.  Women Build
22         Habitat for Humanity.  And they just stated
23         this new thing, WIND, the women involved in
0485
1          the revitalization of Downtown Dothan.  And
2          they asked me to chair that committee.
3            MS. NELSON:  I would like to again state
4              for the Record two things.
5                 One, I observe the right to
6              question Nancy Martin on the documents
7              that you produced today and did not
8              produce yesterday.
9                 I would also ask you to remind
10             Nancy Martin that she's under a
11             protective order in this case not to
12             discuss any of the testimony,

13          documents in this case.
14              And also we'd remind you just for
15          the Record today, that, you know, the
16          evidence and documents produced in
17          this case are under a protective
18          order.
19      MR. JAFFREE:  I don't have to remind
20          Ms. Brackin of that?
21      MS. NELSON:  No.  Well, I think we went
22          over that with Ms. Brackin.
23      MR. JAFFREE:  Well, as you know, I didn't
0486
1       even cover some of the evidence that I
2       have because I have no intentions of
3       embarrassing anybody.  I didn't go
4       over stuff that I benefited from in
5       having access to the judge's file.  As
6       a matter of fact, my clients don't
7       even know about it because it's not
8       relevant, so I have no intentions of
9       telling anybody anything.
10      MS. NELSON:  Give me two seconds.
11          (Deposition concluded at 6:25 p.m.)
12          * * * * * * * * * * *
13          FURTHER DEPONENT SAITH NOT
14          * * * * * * * * * * *
15
16
17
18
19
20
21
22
23