0001
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3          SOUTHERN DIVISION
4
5
  NANCY MARTIN and
6  MARY BETH BRACKIN,
7     Plaintiffs,
8  vs.        CASE NO. 1:05-CV-1172-MEF
9  CITY OF DOTHAN and
  JUDGE ROSE EVANS-GORDON,
10
    Defendants.
11
12
13
        * * * * * * * * * * *
14
       DEPOSITION OF NANCY MARTIN, taken pursuant
15
  to stipulation and agreement before Sherry McCaskey,
16
  Certified Court Reporter and Commissioner for the
17
  State of Alabama at Large, in the Dothan Civic
18
  Center, 126 N. Andrews Street, Dothan, Alabama, on
19
  Monday, October 29, 2007, commencing at
20
  approximately 9:05 a.m.
21
        * * * * * * * * * * *
22
23
0002
1          APPEARANCES
2  FOR THE PLAINTIFFS:
3  ISHMAEL JAFFREE, ESQUIRE
    Jaffree Law
4  951 Government Street
    Suite 415
5  Mobile, Alabama 36604
6  FOR THE DEFENDANTS:
7  CAROL SUE NELSON, ESQUIRE

Maynard, Cooper & Gayle
8    Attorneys at Law
2400 Amsouth/Harbert Plaza
9    1901 Sixth Avenue North
Birmingham, Alabama  35203
10
11        * * * * * * * * * * *
12
13              EXAMINATION INDEX
14   NANCY MARTIN
15     BY MS. NELSON                4
       BY MR. JAFFREE              335
16     BY MS. NELSON              345
       BY MR. JAFFREE            346
17
18        * * * * * * * * * * *
19
20
21
22
23
0003
1              STIPULATIONS
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of NANCY MARTIN is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Sherry McCaskey,
7    Certified Court Reporter and Commissioner for the
8    State of Alabama at Large, without the formality of
9    a commission; that objections to questions other
10   than objections as to the form of the questions need
11   not be made at this time but may be reserved for a
12   ruling at such time as the deposition may be offered
13   in evidence or used for any other purpose as
14   provided for by the Federal Rules of Civil
15   Procedure.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that said deposition may be introduced at the
19   trial of this case or used in any manner by either
20   party hereto provided for by the Federal Rules of
21   Civil Procedure.
22
23

0004
1              NANCY MARTIN
2        The witness, having first been duly sworn
3    to speak the truth, the whole truth, and nothing but
4    the truth, testified as follows:
5              EXAMINATION
6    BY MS. NELSON:
7    Q.  Ms. Martin, my name is Carol Sue Nelson.  We
8        met earlier, but just for the Record, I want
9        to introduce myself.
10   A.  Okay.
11   Q.  I'm going to be asking you some questions
12       today about your claims against the City and
13       Judge Gordon.  Have you ever had your
14       deposition taken before?
15   A.  No.
16   Q.  As you know, you've been placed under oath.
17       If you do not understand a question, please
18       let me know and I'll try to rephrase it.  And,
19       otherwise, I'll assume that you do understand
20       me and will be answering truthfully.  Is that
21       understood?
22   A.  That's understood.
23   Q.  And as you know, the court reporter here is
0005
1        taking everything down, so instead of nodding
2        or uh-huh and huh-uh, if you'll just speak up
3        and say yes or no or answer the question so
4        she can take down what your testimony is.
5    A.  Okay.
6    Q.  If you need a break at any time, let me know.
7        If there is a question on the table, though, I
8        would ask you to answer that.  We'll be taking
9        a lunch break, if we need to go into the
10       afternoon.  But, otherwise, just let me know
11       if you need a break, and we can certainly do
12       that.
13          Now, are you currently taking any
14       medications that would prohibit you from
15       truthfully answering questions today?
16   A.  Not that I'm aware of.  No.
17   Q.  Are you under -- are you taking any -- are you
18       on any medications right now?
19   A.  Yes.
20   Q.  Can you tell me what that is?
21   A.  I'm taking a half of a pain pill for my foot

22      injury for the pain of my foot injury.
23   Q.   Is this the injury you sustained at --
0006
1   A.   Two weeks ago at Georgia Pacific.
2   Q.   And I may ask you a little bit about that in a
3      minute.  But this was a work-related injury --
4   A.   Yes, it was.
5   Q.   -- at work?  And you hurt your foot?
6   A.   I fractured the top of my foot, fractured the
7      bridge of my nose.  And my knee is -- it
8      didn't break it or bust it.  It's just all --
9      pulled the skin off of it.  And I have a --
10      had a contusion of my head.
11   Q.   I'm sorry.  Were you hospitalized for this?
12   A.   I was taken to the emergency room and treated
13      and released.
14   Q.   And I gather this resulted from some type of
15      fall at work?
16   A.   From a fall at Georgia Pacific's guesthouse
17      that I oversee.
18   Q.   Georgia Pacific is where you currently work?
19   A.   That's right.
20   Q.   And where is that located?
21   A.   Cedar Springs, Georgia.
22   Q.   How far is that from Dothan?
23   A.   About 29 miles from where I live.
0007
1   Q.   And where do you live?
2   A.   408 Christopher Drive in Dothan.
3   Q.   I'm sorry.  You said you were on some pain
4      medication?
5   A.   Not continually.  Just when I -- when I -- I
6      was on it for days, but that -- I stopped
7      taking it full-time about a week ago, just
8      occasionally.
9   Q.   Okay.  And do you know the name of that
10      medication?
11   A.   Lortab.
12   Q.   Any other medications that you are on?
13   A.   No.
14   Q.   The emergency room that you went to, where was
15      that?
16   A.   Southeast Alabama Medical Center.
17          I'm sorry.  I am on high blood pressure
18      medicine.  I have high blood pressure.
19   Q.   And how long have you been on that?

20   A.   Probably for two or three years.
21   Q.   Are you under the care of a doctor --
22   A.   Yes.
23   Q.   -- with that?
0008
1   A.   Yes.
2   Q.   And who is that?
3   A.   Dr. Wes Nelson.
4   Q.   Is he here in Dothan?
5   A.   Yes.  West Main Street.
6   Q.   And what about, did you see a doctor for your
7       fall or --
8   A.   Yes.  I was referred to an orthopedic doctor
9       at Southern Bone and Joint here in Dothan.
10   Q.   And who was that?
11   A.   Dr. Bret Simpson.
12   Q.   Any other doctors that you see?
13   A.   Only the emergency room doctor.
14   Q.   Okay.  Do you remember who that was?
15   A.   I think his name was Dr. Michael -- well,
16       actually, he's a physician's assistant,
17       Dr. Michael Shivers or Michael Shivers I
18       believe.
19   Q.   And do you trade at one particular pharmacy?
20   A.   Usually, Rite-Aid.  Most of all mine are done
21       at Rite-Aid or through mail order through my
22       prescription drug company.
23   Q.   And who is your prescription drug company?
0009
1   A.   Caremark.
2   Q.   Caremart?
3   A.   Caremark.
4   Q.   Caremark?  I'm sorry.  And is that through
5       your company?
6   A.   Yes.
7   Q.   Any particular Rite-Aid that you go to?
8   A.   It's on West Main.  It's beside Bruno's or
9       behind Bruno -- Southern Market.
10           (Defendants' Exhibit 1 was marked
11               for identification.)
12   Q.   I'm going to show you what I have marked as
13       Defendants' Exhibit 1.
14           MR. JAFFREE:  I don't think she got that.
15           I got it yesterday.  I was going to
16           say, I don't think she got it, but she
17           knows about it.

18    Q.   Ms. Martin, that is -- that's not even a
19      signed copy. I just -- I sent that notice
20      of -- it's called a Notice of Deposition that
21      I did send to your lawyer.
22    A.   Okay.
23    Q.   Have you seen that or something similar to
0010
1      that before?
2    A.   I haven't seen this one. I did see the one
3      that you sent for I believe --
4    Q.   A prior occasion --
5    A.   Right.
6    Q.   -- when we had to reschedule?
7    A.   Right.
8    Q.   And in that particular notice, I asked if you
9      could bring some documents with you. And I
10      just wanted to go over that request. First of
11      all, I asked if you had any documents that
12      either the City provided to you or Judge
13      Gordon provided to you that you had. Do you
14      have anything like that with you here today?
15    A.   You're talking about just the first --
16    Q.   The first one. The first --
17    A.   I --
18    Q.   Well, let me ask you. You've got a stack of
19      documents; is that correct?
20    A.   Right.
21    Q.   And I also asked you if you had any writings,
22      notes, diaries, calendars?
23    A.   Yeah.
0011
1    Q.   Do --
2    A.   This is what I have.
3    Q.   Everything you have in response to this
4      request is before you?
5       MR. JAFFREE: You have a calendar?
6       THE WITNESS: Yeah. I do right here.
7    A.   Well, there's more than that if she wants all
8      this because I didn't have a copier that would
9      copy. But basically this is -- I mean, you
10      already have. I prepared from our Complaint
11      and from the Second Amended Complaint by
12      reviewing those for this deposition.
13    Q.   And right here, you --
14    A.   Right. I reviewed those.
15    Q.   I don't need that then.

16  A.  This was given to me by the judge sometime --
17  Q.  I'm going to mark that as Defendants'
18      Exhibit --
19  A.  But I don't have a copy of that.
20          MR. JAFFREE:  Can you identify what judge
21              you're referring to for the Record?
22  A.  Judge Gordon.
23          MR. JAFFREE:  Are we on the Record or not?
0012
1           MS. NELSON:  Yes, we're on the Record, but
2               I'm going to ask her --
3   Q.  I'll get you copies but right now, so we can
4       identify what we're talking about, or if you
5       want me to, I can pencil it in and substitute
6       it.
7   A.  Oh, no.  That's fine.  I just don't have
8       another copy of that.
9           (Defendants' Exhibit 2 marked for
10              identification.)
11  Q.  So you gave me what I've marked as Defendants'
12      Exhibit 2.
13  A.  Yes, ma'am.
14  Q.  It's called -- and upon it, it says, "Rating
15      Guides-Judicial Department."  And it's a
16      seven-page document.  And can you tell me what
17      this is?
18  A.  It's a guide of job duties, responsibilities
19      of each -- or some of the positions in the
20      magistrates' office.  The position that I was
21      hired for, municipal court administrator,
22      it -- they did not have the tasks list.  It
23      had never been done.  And the judge, when we
0013
1       were doing my first evaluation in April, she
2       requested that maybe I could come up with a
3       draft of the responsibilities because that's
4       really the job position I was supposed to be
5       rated on.
6   Q.  I'm sorry.  What job position were you
7       supposed to be rated on?
8   A.  Municipal court administrator.
9   Q.  Did you come up with such?
10  A.  Well, this writing is what -- some of the
11      notes that I had jotted down.  And then I
12      did -- I don't know the date, but I did in a
13      memo form or e-mail form did submit a draft to

14    her of what I thought was the basic task list
15    for court administrator.
16  Q.  I may ask you more about this in a moment.
17        What other documents did you bring?
18  A.  I have this that I do have a copy of.  This is
19    actually the original that Fran Bailey, a
20    clerk typist that was in the municipal
21    magistrates' office, after she -- she resigned
22    in July.  After my termination, she brought
23    this by my house, said she found it in her
0014
1    notes.  It's a record of where Eunice Knight
2    mostly, Lavera McClain mostly, one time Mary
3    Turner, and a couple of times Tonya Minifield
4    continued to go in and out a door that they
5    were -- they had been told not to go in and
6    out of for security and safety reasons.
7        And I had done a memo about that.  And I
8    had discussed it after the memo with Eunice
9    and Lavera and Tonya, and I did talk to Mary
10    Turner and tell her I didn't want that to
11    happen again because it was a safety issue.
12    But they continued to go in and out, and that
13    just details a certain time period when Fran
14    kept up with it.  But Fran typed that herself.
15  Q.  I'm going to mark this as Exhibit 3.
16        (Defendants' Exhibit 3 was marked
17        for identification.)
18        And I may ask you more about it, but
19    you're saying Fran gave this to you at your
20    home after you left --
21  A.  After I was terminated.  Yeah.
22  Q.  -- or were terminated from the City.
23        And you were terminated in --
0015
1  A.  October.
2  Q.  -- near or about October of 2004; is that
3    correct?
4  A.  Right.
5  Q.  Do you know when she would have brought this
6    to you?
7  A.  We had lunch probably about two months
8    after -- a month or two after I left the
9    City.  And she came to my house.
10  Q.  Well, had you asked her to keep track of --
11  A.  No, I hadn't.

12   Q.   -- the door usage?
13   A.   No, I hadn't.
14   Q.   And she's got dates ranging from June 28th '04
15        through July 15th '04; is that correct?
16   A.   Right.
17   Q.   And do you know how she recorded or kept track
18        of these dates?
19   A.   By -- she could see the entrance and exit to
20        the doors.
21   Q.   I mean, this is what she told you?
22   A.   Right.
23   Q.   Did you ask her to do this?
0016
 1   A.   No, I didn't.  You've already asked me that
 2        question.
 3   Q.   And do you know why she did this?
 4   A.   Because she knew that I was having a problem
 5        getting Lavera and Eunice to obey the rules
 6        and policies that I had for the magistrates'
 7        office.
 8   Q.   And what else do you have?
 9   A.   Just -- I had prepared for this deposition
10        from your answer to my EEOC charge, which I
11        assume you have a copy of.  And I have
12        prepared for my deposition with my response to
13        the City of Dothan Employee Disciplinary
14        Action that I had attached that I had
15        submitted the day I had my due process hearing
16        after my termination.
17   Q.   You're right.  I do have a copy of the
18        position statement -- the letter to the EEOC,
19        but I'm going to mark --
20           MR. JAFFREE:  I don't know if this is the
21             appropriate time or --
22   A.   I don't --
23           MR. JAFFREE:  -- wait --
0017
 1   A.   Yeah, I do have a copy of that.
 2           MR. JAFFREE:  -- until later.  But she
 3             also has notes from where we prepared
 4             her for this deposition.  And we
 5             consider that our work product.
 6           (Defendants' Exhibit 4 was marked
 7             for identification.)
 8   Q.   Well, first of all, I'm just identifying
 9        these -- Exhibit 4, the response to the City

10      during your due process hearing; is that
11      correct?
12   A.   That's it.
13         MS. NELSON:  Mr. Jaffree, you're saying
14            she made notes while you talked or she
15            brought you notes.
16         MR. JAFFREE:  She made notes.
17         THE WITNESS:  I made notes.
18         MR. JAFFREE:  That's what she's looking at
19            now.
20         MS. NELSON:  Well, I would ask her to
21            testify from memory.  I mean, if she's
22            relying on those to testify, I mean, I
23            would want to see them.  I'm not
0018
1          trying to --
2          MR. JAFFREE:  She can testify from memory,
3            but she may need to refer to those
4            notes to refresh her recollection.
5            After her recollection had been
6            refreshed, then she could speak from
7            her memory.
8          MS. NELSON:  Well, again, I'm not trying
9            to invade on attorney/client privilege
10           but if --
11         MR. JAFFREE:  Well, you seem to be
12           knocking around the door.
13         MS. NELSON:  Well, you're the one that
14           told me about these notes.  And if
15           she's going to sit there and look at
16           them, I feel like I'm entitled to see
17           them.
18         MR. JAFFREE:  I don't know of any rule
19           that suggests that you're entitled to
20           do that.  I mean, these are notes from
21           her thoughts as we were talking and
22           trying to recollect what happened.
23           And these notes may very well include
0019
1          some of my trial strategy, so I don't
2          see how you can invade that.
3          MS. NELSON:  Well, I'm just trying to get
4            the facts, and if she's looking at
5            notes -- we'll cross that path --
6          MR. JAFFREE:  These are not my facts.  I
7            wasn't there.  So it's not that I have

8         put ideas in her head.  I wouldn't do

9         that, ethically or morally.  But these

10        notes may include litigation

11        strategies.  I don't think she's going

12        to have to refer to these notes very

13        often.  She's got scribbles and

14        everything else stuck in there.

15  Q.  How many pages of notes do you have,

16    Ms. Martin?

17  A.  One.

18  Q.  Do you feel like you have to refer to those

19    notes to answer my questions?

20  A.  Not all of them, no.

21  Q.  And you have like -- I'm not trying to get

22    your attorney's advice or any discussion with

23    your attorney.  Do you have dates or names on

0020

1    that pad?

2  A.  I have two or three dates -- couple of dates,

3    yes.

4  Q.  Names?

5  A.  I have two or three names, yes.

6  Q.  Do you have any trial strategies written down

7    on that document?

8    MR. JAFFREE:  Look, I'm going to object to

9      what's on that document.  These are

10    her notes written after the fact, was

11    not drafted while she was employed,

12    part of our discussion.  And I told

13    her, this is something you need to

14    remember so you need to write it

15    down.  That's how some of these notes

16    occurred.  This is all part of the

17    attorney/client privilege

18    communication.  I don't see how this

19    is relevant to anything.  You can ask

20    her questions related to facts of this

21    case, I have no problem with that.  If

22    you want to examine some of the --

23    MS. NELSON:  Well, I assure you, I'm going

0021

1    to ask her --

2    MR. JAFFREE:  -- with respect to --

3    MS. NELSON:  I'm going to spend all day

4    asking her about this case, but I just

5    feel like I'm entitled --

6      MR. JAFFREE:  So you've gone from a half a

7        day now to all day?  I'm just trying

8        to provide some levity.

9      MS. NELSON:  Well, I'm going to reserve

10      the right to continue to ask about her

11      notes.

12  Q.  And would ask that you testify from your

13    memory, Ms. Martin.

14     I also asked if you had any tape

15    recordings or video recordings of any time you

16    worked for the City or about this case.  Do

17    you have anything like that in your

18    possession?

19  A.  No, I didn't.

20  Q.  I'm sorry?

21  A.  No, I don't.

22  Q.  Do you have calendars or diaries?

23  A.  I do have one calendar that there are a few

0022

1    notes in before August.  But mostly the things

2    start August on when Kai Davis advised me to

3    start keeping notes on that.  And I would need

4    you to copy that.

5  Q.  This will be Defendants' Exhibit Number 5.

6    And I will get copies and mark it maybe

7    perhaps -- get copies at a break.

8     And also tax returns.  Did you bring any

9    tax returns?

10  A.  I brought W2 forms, and I brought the last pay

11    stub I could find from this year.

12     MR. JAFFREE:  Let me, for the Record, say

13     that this may be a contentious area as

14     well.  Her husband absolutely refused

15     to have his income -- his employment

16     history brought into this litigation.

17     He said, he's not a party and didn't

18     feel that it was relevant.  And I

19     question the relevance of any income

20     related to her husband.

21  A.  Except -- can I --

22     MR. JAFFREE:  Go ahead.

23  A.  -- interrupt?

0023

1     Except for one year that I could not find

2    just W2 forms on.  And my only choice was to

3    have him to agree to submit the income tax

4      return for that one year.  But the others are
5      my W-2s.
6          MR. JAFFREE:  Well, I told you, you may
7             can black out his information.  You
8             didn't do that on that one?
9          THE WITNESS:  I couldn't black his out
10            because it was a joint return.
11   Q.   Did you file a return for --
12   A.   We haven't filed a return for 2006 yet.
13   Q.   And why is that?
14   A.   Because we just haven't filed a return for
15      2006 yet.
16   Q.   Have you requested an extension?
17   A.   Of course.
18   Q.   And --
19          MR. JAFFREE:  Is her return for 2006
20            relevant to this inquiry?
21          THE WITNESS:  My W-2s are in there for
22            2006.
23   Q.   Well, again I would --
0024
1          MS. NELSON:  Yes, they're relevant.
2    Q.   I don't mind you striking out your husband's
3       income, but I would ask that -- I mean, I have
4       a W2 from 2005 from Movie Gallery, but I don't
5       know that that's the extent of your earnings.
6       I'd like to see the tax returns and --
7    A.   Well, I can't strike out my husband's income
8       because our accountant uses a computer program
9       that totals in wages and earnings column.  I
10      think you'll see on that one that it totals
11      both of ours together.  It doesn't list them
12      separately.
13   Q.   Well, again, I mean, I'm not going to stop the
14      deposition for it, and I'm going to ask you
15      about this down the road, but I feel like I
16      have the right to obtain that.
17          I'm going to mark --
18          MR. JAFFREE:  You, of course, can ask her
19            questions about her income.
20          MS. NELSON:  And I will.
21   Q.   I'm going to mark as Defendants' Exhibit 6
22      which is --
23          MR. JAFFREE:  She is under oath.
0025
1    Q.    -- a W-2 from Legal Services for 2002, a 2003

2       form 1040 income tax return for Jim Martin and
3       Nancy Martin, a 2004 W-2 from the City of
4       Dothan for Nancy Martin, a State of Alabama
5       Department of Industrial Relations form for
6       unemployment compensation for 2004 for Nancy
7       Martin, a 2005 W-2 for Nancy Martin from Movie
8       Gallery, a State of Alabama Unemployment
9       Compensation form for Nancy Martin for 2005,
10      2006 W-2 from Movie Gallery for Nancy Martin,
11      a 2006 W2 for Nancy Martin from Manpower
12      International, 2006 W-2 for Nancy Martin from
13      Belk, Inc., and appears to be a
14      Georgia-Pacific printout of earnings.
15             (Defendants' Exhibit 6 was marked
16             for identification.)
17  Q.  Would this be your earnings for --
18  A.  No.  It's --
19  Q.  From what year?
20  A.  This year, last pay stub or the last one that
21      I could find.
22  Q.  That would reflect your earnings to date --
23  A.  Right.
0026
1   Q.  -- for 2007, Georgia-Pacific?
2           Which year-to-date is approximately
3       $40,522?  Does that sound right?
4   A.  Yes.
5   Q.  And what is your salary at Georgia-Pacific,
6       your annual salary?
7   A.  42,000.
8   Q.  And we'll come back to these.  Those are all
9       the documents you have in your possession that
10      respond to my --
11  A.  That's correct.
12  Q.  Just for the Record, will you give your full
13      name, please?
14  A.  Nancy Carol Martin.
15  Q.  And your Social Security number?
16  A.  ██████████
17          Excuse me just a minute.
18             (Witness conferred with her
19             counsel.)
20  Q.  Your date of birth?
21  A.  ████████████.
22  Q.  And do you have a driver's license?
23  A.  Yes, I do.

0027
1    Q.   Alabama driver's license?
2    A.   Yes.
3    Q.   Do you know your driver's license number?
4    A.   No, I don't.
5    Q.   And you gave me your address a moment ago, but
6         can you tell me that again?
7    A.   408 Christopher Drive, Dothan, Alabama.
8    Q.   And how long have you lived there?
9    A.   Oh, maybe about 11 years.
10   Q.   And do you reside there with anyone?
11   A.   My husband.
12   Q.   What's his name?
13   A.   Jim Reeves Martin, II.
14   Q.   All right.
15   A.   My daughter also resides there with me.
16   Q.   What's her name?
17   A.   Dawn, D-A-W-N, Fernandez.
18   Q.   And how old is she?
19   A.   She's 32.  It's a temporary arrangement.
20   Q.   Anyone else live there?
21   A.   My granddaughter, Chloe Smith.  She's 9.
22   Q.   Is she Dawn's daughter?
23   A.   Yes.  I'm sorry.
0028
1    Q.   Anyone else?
2    A.   That's it.
3    Q.   And prior to your 408 Christopher address,
4         where did you live?
5    A.   I lived in Carriage House Apartments on Daniel
6         Circle in Dothan.
7    Q.   And how long did you live there?
8    A.   Probably two to three years.
9    Q.   Prior to that?
10   A.   I lived on Aberdeen Drive in Dothan.
11   Q.   How long did you live there?
12   A.   Probably a year.
13   Q.   Are you from Dothan?
14   A.   Yes.
15   Q.   Born here?
16   A.   Yes.
17   Q.   And went to school here?
18   A.   Went to school at Midland City, Dale County
19         High School.
20   Q.   Now, other than Jim Martin, have you been
21         married to anyone else?

22   A.   Yes.
23   Q.   And how many times have you been married?
0029
1           MR. JAFFREE:  Well, I know all this is
2              irrelevant to this litigation, but you
3              can go ahead and answer the question.
4    A.   My first husband of 14 and a half years was
5         Roy Hurst, H-U-R-S-T.
6    Q.   Roy Hurst?
7    A.   Uh-huh (positive response).  And I was married
8         very briefly to John Faison, F-A-I-S-O-N.
9    Q.   Okay.  And then to Jim Martin?
10   A.   Yes.
11   Q.   And your marriage to Roy Hurst, how did that
12        end?
13   A.   Divorce.
14   Q.   Did you have any children?
15   A.   Three.
16   Q.   What are their ages now?
17   A.   Dawn is 32.  Chanda is 20 -- 28.
18   Q.   I'm sorry.  What is her name?
19   A.   Chanda, C-H-A-N-D-A.
20   Q.   What's her last name?
21   A.   Le, L-E.
22   Q.   L-E?
23   A.   Uh-huh (positive response).  And Brandon Hurst
0030
1         is 23.
2    Q.   And, approximately, when did you divorce Roy
3         Hurst?
4    A.   In 1989.
5    Q.   And you married John Faison?
6    A.   Yes.
7    Q.   When did you marry him?
8    A.   Maybe around 1994.
9    Q.   And how long were you married to him?
10   A.   Seven months.
11   Q.   And why did that marriage end?
12   A.   Divorce.
13   Q.   You need to speak up.
14   A.   I'm sorry.
15   Q.   Do you have any children --
16   A.   No.
17   Q.   -- with John Faison?
18        Jim Martin, when did you marry him?
19   A.   In 1998.  No, I'm sorry.  1997.

20   Q.   Any children with him?
21   A.   No.
22   Q.   This Roy Hurst, does he live in the Dothan
23        area?
0031
1    A.   He lives in Midland City.
2    Q.   And where is he employed?
3    A.   He's not.  He's on disability.
4    Q.   Was he employed?
5    A.   Yes.
6    Q.   Where was he employed?
7    A.   For 30 years at Pemco Aerospace in Napier
8        Field.
9    Q.   John Faison, does he still live in the area?
10   A.   Yes.
11   Q.   Is he employed?
12   A.   With the City of Dothan.
13   Q.   And what is his job?
14   A.   I think he works in the body shop.
15   Q.   And Jim Martin, is he employed?
16   A.   He is self-employed.
17   Q.   And what does he do?
18   A.   He owns Martin Environmental Services here in
19        Dothan.
20   Q.   Your daughter Dawn, is she employed?
21   A.   Yes.
22   Q.   And where does she work?
23   A.   She's a pharmacy tech at Rite-Aid pharmacy.
0032
1        She's also a student.
2    Q.   Is she married?
3    A.   No.
4    Q.   Is she divorced?
5    A.   Yes.
6    Q.   Does her husband live here in the Dothan area?
7    A.   I'm not sure.  No.
8    Q.   What's his name?
9    A.   Patrick Fernandez.
10   Q.   And Chanda Le, does she work?
11   A.   Yes.
12   Q.   Where does she work?
13   A.   At Southeast Alabama Medical Center.
14   Q.   What's her job?
15   A.   Radiology technician.
16   Q.   Okay.  Is she married?
17   A.   Yes.

18   Q.   And what's her husband's name?
19   A.   Bill Le.
20   Q.   What does he do?
21   A.   He is -- he works with Toyota in Dothan as a
22        parts -- he works in the parts department.
23        That's all I know.
0033
 1   Q.   And Brandon, does he work?
 2   A.   He's in the Army.
 3   Q.   Is he in the area?
 4   A.   No.  He's in Iraq.
 5   Q.   Is he married?
 6   A.   No.
 7   Q.   Are your parents living?
 8   A.   Yes.
 9   Q.   What are their names?
10   A.   H. B. Green is my father.  Evelyn Green is my
11        mother.
12   Q.   And they live in this area?
13   A.   They live in Midland City.
14   Q.   Does your dad work?
15   A.   They are both retired.
16   Q.   Did your dad work?
17   A.   Yes.
18   Q.   Where did he work?
19   A.   Michelin.
20   Q.   For most of his career?
21   A.   For 20 years he worked at Stephenson-Smith IGA
22        as the meat market manager and for the -- for
23        the last 20 at Michelin.
0034
 1   Q.   Okay.  Did your mom work?
 2   A.   Only the last few years before she retired.
 3        She worked at the Midland City Elementary
 4        School in the lunchroom.
 5   Q.   Do you have any brothers or sisters?
 6   A.   I have a sister named Gail Besecker,
 7        B-E-S-E-C-K-E-R.
 8   Q.   Does she live in the area?
 9   A.   In Kinsey.
10   Q.   Is that near here?
11   A.   Yes.  It's just a small town.
12   Q.   Does she work?
13   A.   She works at the Southeast Alabama Medical
14        Center.
15   Q.   Is she married?

16   A.   No.
17   Q.   Do you have any other brothers or sisters?
18   A.   Yes.  I have two brothers.  One is Wesley
19        Green.
20   Q.   And what's the other one's name?
21   A.   Larry Green.
22   Q.   Do they both live in this area?
23   A.   Larry lives in Wicksburg, and Wesley is in the
0035
1         process of moving to Tifton, Georgia.  Both
2         lives in the Slocomb area right now.
3    Q.  Is Wesley employed?
4    A.  Yes.
5    Q.  Where does he work?
6    A.  I'm not sure of the name of the company
7         because he just changed jobs to take a job
8         with a -- I'm not sure if it's a chemical
9         company or -- I'm not real sure.
10   Q.  Larry, is he married?
11   A.  Yes.  Wesley?
12   Q.  Yes.
13   A.  Yes.
14   Q.  And what's his wife's name?
15   A.  Lorie Green.
16   Q.  Does she work?
17   A.  She just resigned her job to move, but she did
18        work.
19   Q.  Larry, where does he work?
20   A.  He owns Chapman Green Salon.
21   Q.  Is that like a --
22   A.  It's a hair salon.
23   Q.   And is he married?
0036
1    A.  Yes.  Casey Green.
2    Q.  What does she do?
3    A.  She owns the hair salon with him.
4    Q.  Did you have another sister?
5    A.  Yes, I did.  Her name is Connie Green -- or
6         Connie Williams.
7    Q.  Is she deceased?
8    A.  Yes, she is.
9    Q.  And when did she pass away?
10            MR. JAFFREE:  Is that question relevant to
11               the jury voir dire?
12            MS. NELSON:  You can make your objection.
13            MR. JAFFREE:  Let me object.  I'm not

14          going to instruct her not to answer.
15          It's just that this has really gone
16          way up field.
17      MS. NELSON:  You can make your objection.
18  A.  I believe she passed away around 1990, 1992.
19  Q.  And what were the circumstances?
20  A.  I really don't know what this has to do with
21      this case, but she was murdered.
22  Q.  And by whom?
23  A.  By her boyfriend -- or ex-boyfriend.
0037
1   Q.  Do you know what his name was?
2   A.  Victor Newman.
3   Q.  Newland?
4   A.  Newman.
5   Q.  Newman.  Was he charged with murder or
6       convicted of anything?
7   A.  Yes.  Convicted of --
8   Q.  Convicted of what?
9   A.  I assume murder.  I can't remember.  He's
10      serving a life sentence without parole.
11  Q.  Does he have family in the area?
12  A.  I'm not -- I think maybe there is some family
13      in Midland City.  I'm not sure.
14  Q.  Do you know where he worked or what he did?
15  A.  No.
16  Q.  Did your sister Connie have any children?
17  A.  Yes.  She had two.
18  Q.  And how old are the children?
19  A.  Now?
20  Q.  Now.
21  A.  One is probably -- the little girl -- the girl
22      is probably 19, 20.
23  Q.  What's her name?
0038
1   A.  Tamara Newman.
2   Q.  Is she employed?
3   A.  She's in the Air Force.
4   Q.  And the other child?
5   A.  Victor Newman, Jr.
6   Q.  And is he employed?
7   A.  I don't know.  I don't have any contact with
8       him.
9   Q.  Do you have contact with Tamara?
10  A.  Occasionally, not very often.
11  Q.  Any other relatives in the Dothan area?  Do

12     you have cousins?
13        You're smiling like you've got a lot of
14     relatives?
15   A.  I have lots.
16        MR. JAFFREE:  Did I ever give you that
17           list from --
18        MS. NELSON:  You sent me some names, yes.
19        MR. JAFFREE:  Mary's --
20        MS. NELSON:  Mary Brackin's relatives.
21   Q.  Well, let me ask you this:  Do you have -- I'm
22     trying not to stay here all day, but I'm just
23     trying to determine who's --
0039
1        MR. JAFFREE:  Well, I was thinking maybe I
2           can send you list of hers as well.
3   Q.  Well, just give me an idea.  Other than your
4     mom and dad, do they have brothers and sisters
5     here?
6   A.  Yes.
7   Q.  You're saying yes.  So, like, how many cousins
8     I assume you have here in town, in the area?
9     When I say "area," South Alabama, Dothan.
10   A.  I have many.
11   Q.  Okay.  Well, I may make the same request then
12     if you could provide your attorney with the
13     names of your cousins and their spouses and
14     where they work.
15        MS. NELSON:  I don't think you gave me
16           anything about their employment on the
17           other.
18   A.  Just cousins?
19        MR. JAFFREE:  I was going to ask her to
20           supplement -- Mary Brackin to
21           supplement the information that she's
22           already provided to counsel.
23   Q.  I'm really looking for anybody that's over the
0040
1     age of 18 that lives in the South Alabama
2     area, the names and over the age of 18?
3        MR. JAFFREE:  Whether they're dead or
4           not?
5        MS. NELSON:  Well --
6        MR. JAFFREE:  You don't have to answer
7           that.
8        MS. NELSON:  I have the right to know who
9           her relatives are and who may know her

```
10              or contact with her one way or the
11              other for jury purposes.
12   A.   You said a list and where they work.  Is that
13        what you asked for?
14   Q.   Yes.
15              Maybe you can identify them as your cousin
16        and aunts -- I mean, would your aunts and
17        uncles -- you could add aunts and uncles.
18        Their names were either -- your maiden name
19        was?  I'm sorry.
20   A.   Green.
21   Q.   Green?
22   A.   Yes.
23   Q.   But if you could give me aunts, uncles,
0041
1         cousins, where they worked, I'd appreciate it;
2         and, again, I guess to the extent that nieces
3         and nephews are over the age of 19.  You have
4         quite a -- how many are we talking about?  Are
5         we talking about 20 -- 10, 20?
6    A.   Nieces and nephews?
7    Q.   No.  Relatives.
8    A.   Overall?  No.  We're talking about more than
9         20.
10   Q.   Okay.  My goodness.  If you can do your best
11        to give me a list.
12   A.   Okay.
13   Q.   Have you ever been arrested for anything?
14   A.   No, ma'am.
15   Q.   Have you ever had a traffic ticket or anything
16        like that?
17   A.   Yes, I have.
18   Q.   Have you ever been convicted of any crime?
19   A.   No.
20   Q.   Have you ever filed for bankruptcy?
21   A.   Yes.
22   Q.   And when was that?
23   A.   Probably around 1990.
0042
1    Q.   You said you filed for bankruptcy in 1990?
2    A.   1990 or 1991.  I'm not sure of the exact
3         date.
4    Q.   And you know there are several types of
5         bankruptcy.  Do you know what --
6    A.   Chapter 7.
7    Q.   Chapter 7?
```

8    A.   Yes.
9    Q.   And where was that where you filed?
10   A.   Here in Dothan.
11   Q.   And what was your name at the time?
12   A.   Nancy Hurst.
13   Q.   And have you filed for bankruptcy at any time
14        since then?
15   A.   No, ma'am.
16   Q.   And has that case been closed or --
17   A.   Yes, many years ago.
18   Q.   Have you ever served in the military?
19   A.   No.
20   Q.   How long has your son been in the military?
21   A.   Four years.
22   Q.   Other than this deposition that we're here
23        today -- I think I asked you this -- have you
0043
1         ever had a deposition taken?
2    A.   I've never had a deposition taken.  I have
3         taken depositions by non-stenographic means
4         before in my employment with Legal Services.
5    Q.   When you say you've taken them, you mean, like
6         as a court reporter?
7    A.   Right.  Our clients could not afford court
8         reporters, so I videotaped their depositions
9         and recorded on audio also and transcribed
10        them.
11   Q.   But I'm asking -- and I may ask you about that
12        later -- but right now asking about yourself
13        giving sworn testimony in a deposition.
14        You've never done that; is that correct?
15   A.   No, ma'am.
16   Q.   Have you ever been in a lawsuit before, other
17        than this one?
18   A.   I did file just a small claims action over a
19        car accident to get the other party to pay for
20        the damages to my vehicle.
21   Q.   Do you know the name of that person that you
22        filed against?
23   A.   No, I don't.
0044
1    Q.   Do you know when that was?
2    A.   No.
3    Q.   What was the outcome?
4    A.   He was found guilty and a garnishment was --
5             MR. JAFFREE:  I'm not sure he was found

6        guilty, probably more like liable.
7  A.  Well, liable.  Sorry.  Liable.  And there was
8      a garnishment issued on his wages.
9  Q.  Has anyone ever sued you before?
10  A.  No.
11  Q.  Of course, when you were involved in your
12     divorces, there was legal action there; is
13     that correct?
14  A.  They were uncontested.  Yes.
15  Q.  Did you file or --
16  A.  I filed both times.
17  Q.  Did you ever offer any testimony in those
18     cases?
19  A.  No.
20  Q.  Have you ever been a witness in a case where
21     you offered testimony?
22  A.  In a lawsuit?
23  Q.  Well, a lawsuit or any -- have you ever -- or
0045
1     a complaint against somebody or criminal
2     action or misdemeanor action?
3  A.  No.  The only testimony I've ever offered was
4     in a personnel board hearing.
5  Q.  What did that involve?
6  A.  It involved when Mary Beth Brackin had her
7     personnel board hearing.
8  Q.  And you testified there?
9  A.  Very briefly.
10  Q.  What was the nature of your testimony?
11     MR. JAFFREE:  Can you just, for my
12      purposes, explain what are you asking
13      her, the nature of her testimony?
14  Q.  What were you asked to testify about?
15  A.  My knowledge of the discriminatory action
16     being taken -- being done by Judge Gordon in
17     the magistrates' office.
18  Q.  And who questioned you about that?
19  A.  Ishmael Jaffree and Len White.
20  Q.  And were you under oath at that time?
21  A.  Yes, I was.
22  Q.  Have you ever filed criminal charges against
23     anyone?
0046
1  A.  No.
2  Q.  Have you ever made a complaint against anyone
3     with the police department?

4   A.  Not that I can recall.
5   Q.  Would you recall -- I mean, if you had to go
6      to the police and make a complaint, would you
7      not remember that?
8   A.  I may have -- I think I made -- yes, I did.
9      Many years ago, I made a complaint with the
10      police about harassing phone calls, harassing
11      communication.
12   Q.  And who was making these harassing phone
13      calls?
14   A.  Paul Shiver.
15   Q.  Who is that?
16   A.  I don't know.
17   Q.  Okay.  How did that -- did the police
18      investigate that?
19   A.  There was a trace put on my line -- phone
20      line.
21   Q.  Did they stop?
22   A.  Only after they traced the call and the
23      police -- as I remember, the police went to
0047
1      his house.  I can't recall -- I believe he was
2      arrested.  I'm not sure, it was so long ago.
3   Q.  Ever made any complaints against Roy Hurst?
4   A.  Yes, I did have a TRO against him.
5   Q.  What was that for?
6   A.  He had -- was after we separated before we
7      divorced, I believe.  I'm not sure if it was
8      before or after.  He was, what I call,
9      stalking me and the children and had attempted
10      to run me and the children off the road while
11      we were driving, continued to call me and call
12      me and threaten to kill his self and just kept
13      me and the kids upset all the tame.
14   Q.  And you had a restraining order against him?
15   A.  Yes.
16   Q.  Did you have to go to court and offer any
17      testimony for that?
18   A.  I don't remember having to do that.
19   Q.  Did you file any complaints or charges against
20      John Faison?
21   A.  No.
22   Q.  Have you filed any charges or complaints
23      against Jim Martin?
0048
1   A.  Yes.

2    Q.  I thought I just asked you that a minute ago.
3         What did you --
4    A.  I just couldn't -- I just couldn't remember.
5    Q.  What kind of complaints have you filed against
6         Jim Martin?
7    A.  Domestic violence.
8    Q.  And when was this that you filed a complaint
9         against him?
10   A.  I believe it was in 2006, maybe end of May.
11   Q.  And what type of domestic violence did you
12        complain about?
13            MR. JAFFREE:  Again, let me object to the
14               relevance.  I'm not going to instruct
15               you not to answer, but this seems to
16               be so far removed from this case.
17            MS. NELSON:  Your objection is noted.
18   Q.  What type of domestic violence?
19            MR. JAFFREE:  Well, I'm not sure what
20               she's asking for, what type.
21   Q.  What had he done that caused you to file a
22        compliant against him?
23   A.  He had gotten extremely angry and had tried to
0049
1         choke me and had thrown me across the room and
2         I hit the chest of drawers.
3    Q.  Did you call the police, file a complaint?
4    A.  I called the police.
5    Q.  Did that end up going to court?
6    A.  Yes, it did.
7    Q.  Did you have to testify there?
8    A.  No, I didn't.  It was eventually dismissed.
9    Q.  Did he have to go to court?
10   A.  He went several times because it kept being
11        continued.
12   Q.  Did you testify against him?
13   A.  I never had to testify against him.
14   Q.  And why is that?
15   A.  Because there never was court.
16            MR. JAFFREE:  She said the case got
17               dismissed.
18   Q.  Do you know why it was dismissed?
19   A.  No, I don't.
20   Q.  Did it have anything to do with that you
21        didn't testify?
22   A.  I think it had more to do with the police
23        officer didn't show up, I think.

0050
1   Q.  Any other complaints against Jim Martin?
2   A.  No.
3   Q.  Have you two ever separated?
4   A.  Yes, we have.
5   Q.  Are you currently separated?
6   A.  No.
7   Q.  And when were you separated?
8   A.  We were separated from the end of May till
9       February of this year.
10  Q.  Is there any other police reports or
11      complaints or charges that you've made against
12      anyone?
13  A.  I don't think so.
14  Q.  Are you a member of any --
15          MR. JAFFREE:  You can ask your question.
16              And then can we take a five minute
17              break?
18          MS. NELSON:  We can break.
19              (Brief recess)
20  Q.  Are you a member of a church --
21  A.  Yes.
22  Q.  -- in the area?  Where do you go to church?
23  A.  I'm a member of Bethlehem Baptist Church.
0051
1   Q.  And where is that?
2   A.  I believe it has a Dothan address, but I'm not
3       sure what that is.  Bethlehem Road I believe.
4   Q.  Are you a member of any -- is it in Dothan?
5   A.  It's out -- well, it's -- a little bit out of
6       Dothan, towards Midland City.
7   Q.  How far is Midland City from Dothan?
8   A.  About 15, 20 minutes I guess.
9   Q.  How about do you -- are you a member of any
10      type of civic organizations or social clubs?
11  A.  No.
12  Q.  What do you do in your spare time when you are
13      not working?
14  A.  My husband and I ride motorcycles.  I read a
15      lot.  And I spend time with my grandchildren.
16  Q.  Do you have your own motorcycle?
17  A.  My husband.
18  Q.  Speak up a little bit.
19          Are you a member of any type of motorcycle
20      riding club?
21  A.  No.

22   Q.   When you ride, you ride with him?
23   A.   Yes.
0052
1    Q.   You don't have your own motorcycle; is that
2         correct?
3    A.   No.
4    Q.   You said grandchildren; how many grandchildren
5         do you have?
6    A.   Three.
7    Q.   I'm sorry.  I think I registered one.  Your
8         other two are -- was Chloe --
9    A.   Chloe is the one that lives with me with her
10        mother.  My other daughter Chanda has two
11        children.
12   Q.   And where do they live?
13   A.   With Chanda in Dothan.
14   Q.   How old are they?
15   A.   3 and 9.
16   Q.   But as far as other activities -- I mean, as
17        far as going to a gym or anything like that,
18        do you belong to anything like that?
19   A.   No.
20   Q.   Other than the EEOC charge that you filed in
21        the case against the City that we are here for
22        today, have you filed any other EEOC charges?
23   A.   No.
0053
1    Q.   Tell me where you went to high school.
2    A.   Dale County High in Midland City.
3    Q.   And did you graduate?
4    A.   Yes.
5    Q.   What year was that?
6    A.   1974.
7    Q.   And following graduation from high school, did
8         you go on to take any other courses or college
9         or training?
10   A.   Not right following high school.  I married.
11        Later I went back and got my B.S. degree in
12        business administration at Troy State in
13        Dothan.  It's Troy University now.
14   Q.   What year was that?
15   A.   I think I graduated from there in 1999 I
16        believe.
17   Q.   And that was a B.S.?
18   A.   Yes, it was.
19   Q.   Four years?

20   A.  Four years.
21   Q.  In business administration?
22   A.  Right.
23   Q.  Is that correct?  Okay.
0054
1   A.  I also had -- completed a certification
2      program for paralegal at Troy Continuing
3      Education.
4   Q.  And when was that?
5   A.  I believe that was -- year I completed was
6      1994.
7   Q.  All right.  Any other training or
8      certifications that you have?
9   A.  Well, I've had tons of trainings but not
10     certifications.  No.
11   Q.  Trainings like on-the-job training or --
12   A.  Well, you know, just like SkillPath seminars,
13     training, things like that.
14   Q.  What is SkillPath?
15   A.  It's a company that puts on trainings and
16     seminars for anyone to attend.
17   Q.  So you said right after you graduated from
18     high school, then what was the first -- you
19     said you married?
20   A.  Right.
21   Q.  What was the first job you held, full-time
22     job?
23   A.  Full-time would have been with Legal Services.
0055
1   Q.  Okay.  And when did you go to work for Legal
2     Services?
3   A.  No, no, that's not right.  Full-time would
4     have been First Alabama Bank, which is now
5     Regions Bank.
6   Q.  Well, let me back up.  I mean, when you were
7     in high school, did you work some part-time
8     jobs?
9   A.  Yes, I did.
10   Q.  Just briefly, where did you work?
11   A.  I worked at Hardee's.  I worked at Davis
12     Theaters.  And then after -- after I married,
13     I worked part-time at Penney's.
14   Q.  And what was your job there?
15   A.  I worked in advertising department as an
16     assistant.
17   Q.  Was that here in Dothan?

18   A.   Yes.
19   Q.   And how long did you work there?
20   A.   Maybe a year and then was laid off.
21   Q.   Laid off?
22   A.   Yes.
23   Q.   And after Penney's, where did you work?
0056
 1   A.   I believe First Alabama Bank was next.
 2   Q.   Do you know about what year this was?
 3   A.   Probably -- maybe 1976, around that time.
 4   Q.   And what was your job at First Alabama Bank?
 5   A.   I began as a teller; ended up as the secretary
 6        to the director of marketing and personnel.
 7   Q.   And how long did you work there?
 8   A.   Five years.
 9   Q.   And who was the head of marketing and
10        personnel?
11   A.   Betty Elsworth, E-L-S-W-O-R-T-H.
12   Q.   And was that here in Dothan?
13   A.   Yes.
14   Q.   And why did you leave First Alabama Bank?
15   A.   Betty Elsworth left, and I just wasn't happy
16        with the direction.  I guess we were kind of
17        in limbo with no director.  And a friend of
18        mine told me about a legal secretary job
19        available with a private attorney in Dothan,
20        and I applied for it.
21   Q.   Did you leave voluntarily?
22   A.   Yes.
23   Q.   You were saying when Betty Elsworth left,
0057
 1        nobody replaced her?
 2   A.   Not for some time, no.
 3   Q.   Who did you report to after she left?
 4   A.   I don't recall.
 5   Q.   Do you know how long you stayed after she
 6        left?
 7   A.   Maybe a couple of months, two or three
 8        months.  I'm not sure.
 9   Q.   Were you ever disciplined or reprimanded when
10        you worked for First Alabama Bank?
11   A.   Not to my knowledge.
12   Q.   You said you heard about a job at a private
13        law firm?
14   A.   Uh-huh (positive response).
15   Q.   And what was the name of the firm?

16    A.   Hardwick, Hause, and Segrest.
17    Q.   And did you go to work there?
18    A.   Yes, I did.
19    Q.   And what year was this?
20    A.   I'm not sure.
21    Q.   And what was your job there?
22    A.   Legal secretary.
23    Q.   And did you work for a particular lawyer?
0058
1    A.   Yes.  I worked for Jerry Segrest.
2    Q.   Anyone else?
3    A.   No.
4    Q.   Okay.  What types of duties did you have?
5    A.   Making appointments, typing letters, legal
6         documents, billing clients, receiving payments
7         from clients, filing documents with court.
8    Q.   How long did you work there?
9    A.   A year.
10    Q.   And why did you leave?
11    A.   I was pregnant and didn't want to be under
12         that kind of pressure.
13    Q.   What type of pressure were you under?
14    A.   It was just very stressful.
15         MS. NELSON:  Off the Record.
16         (Off-the-Record discussion)
17         MS. NELSON:  Back on the Record.
18    Q.   So getting pregnant with which child?
19    A.   My son.
20    Q.   So what year was that?  Give me a reference
21         anyway.
22    A.   He was born in February of '84.
23    Q.   So this was around '83?
0059
1    A.   Yes, I believe.  No -- yes.
2    Q.   So you left because you were pregnant.  You
3         had a child.  Did you go back to work after
4         that?
5    A.   I actually went back to work part-time before
6         I had the child, and it was less stressful.  I
7         went to work part-time for SouthTrust Bank.
8    Q.   Here in Dothan?
9    A.   Yes.
10    Q.   And what was your job there?
11    A.   I was a secretary/teller.
12    Q.   And who was your supervisor?
13    A.   Ronnie Owens.

14  Q.  Owen?
15  A.  Owens.
16  Q.  Okay.  And what was his job?
17  A.  He was the branch manager.
18  Q.  What branch was this?
19  A.  The West Main branch.
20  Q.  And how long did you stay there?
21  A.  A year and a half.
22  Q.  Did your job change any?
23  A.  I actually did both.  I was a teller two days
0060
 1      and a secretary one day.
 2  Q.  Were you ever disciplined or reprimanded while
 3      you were there?
 4  A.  No.
 5  Q.  And why did you leave?
 6  A.  Because I wanted to work full-time again, and
 7      I was offered a job by Legal Services.
 8  Q.  When did you go to work for Legal Services?
 9  A.  November of '84.
10  Q.  Was that here in Dothan?
11  A.  Yes, it was.
12  Q.  Do they still have an office here?
13  A.  Yes, they do.
14  Q.  And how long did you work for Legal Services?
15  A.  For almost 20 years.
16  Q.  What was your job there?
17  A.  I was executive secretary.
18  Q.  The entire time?
19  A.  No.  I started as a legal secretary, was
20      promoted to executive.
21  Q.  And when were you promoted?
22  A.  I don't recall the year.  After I had been
23      there about nine or ten years.
0061
 1  Q.  What is the difference between a legal
 2      secretary and an executive secretary?
 3  A.  A legal secretary, I typed letters and court
 4      documents and drafted legal documents.  As an
 5      executive secretary, it was somewhat like an
 6      officer manager.  I was over other
 7      administrative staff and --
 8  Q.  How many -- I'm sorry.  Go ahead.  I was going
 9      to say how -- you said you were over
10      administrative staff?
11  A.  Uh-huh (positive response).  It varied from

12      year to year.
13   Q.  The other staff would include what type of
14      employees?
15   A.  Legal secretaries, receptionists.
16   Q.  How many legal secretaries were there besides
17      yourself?
18   A.  When I first took over -- well, I
19      oversaw -- we had the Dothan office and we had
20      a Troy satellite office.  Also there was a
21      legal secretary and receptionist there.  And
22      there was a receptionist in Dothan and
23      three -- three maybe legal secretaries in
0062
1       Dothan.
2    Q.  And who did you report to when you
3       first -- who hired you?
4    A.  Steve Caley.
5    Q.  Spell that?
6    A.  C-A-L-E-Y.
7    Q.  Was he a lawyer?
8    A.  Yes.
9    Q.  Is that who you reported to?
10   A.  Yes.
11   Q.  And how long did you report to Steve Caley?
12   A.  Till he left, but I don't know how many years
13      that was.  I don't recall.
14   Q.  Approximately?
15   A.  Maybe -- I don't know.  Six years.
16   Q.  Who did you report to after he left?
17   A.  In the interim, I reported to Mike Miskowic,
18      M-I-S-K-O-W-I-C.
19   Q.  Was he a lawyer there?
20   A.  Yes.
21   Q.  And how long did you report to Mike Miskowic?
22   A.  A few months maybe.
23   Q.  And then who did you report to?
0063
1    A.  Ishmael Jaffree.
2    Q.  That's your attorney here today; is that
3       correct?
4    A.  Yes, it is.
5    Q.  And what was Mr. Jaffree's title?
6    A.  Managing attorney.
7    Q.  And how long did you report to him?
8    A.  Till I left in 2004.
9    Q.  So approximately how long did you report to

10      him?
11          MR. JAFFREE:  Let's stipulate that it was
12             14 years.  Okay?
13          MS. NELSON:  Well, I'm asking her to
14             testify, please.
15          MR. JAFFREE:  She doesn't recall.
16    A.   No, I do recall.  Probably at least 12, 13,
17          something like that.
18    Q.   And this was -- the whole time, you worked in
19          the Dothan office?
20    A.   Yes.
21    Q.   And besides Mr. Jaffree, how many other
22          attorneys where there in the office?
23    A.   At what point?  I mean, when I first started
0064
1          there, there was a lot more attorneys there
2          then.  Then over the years, there became less
3          attorneys because of budget cuts.
4    Q.   Well, I don't -- not having worked there,
5          that's what I was trying to understand.
6    A.   There might have been -- when I started there,
7          there was probably seven or eight attorneys.
8    Q.   And so within the last five years that you
9          worked there, how many attorneys were there?
10    A.   Four or five.
11    Q.   And did Legal Services -- did you in any way
12          report to somebody in Montgomery or --
13    A.   Not directly, no.  The managing attorney
14          reported to the central office.
15    Q.   Was the central office in Montgomery?
16    A.   Yes, it was.
17    Q.   Are there offices around the state?
18    A.   Around the country.  Yes.
19    Q.   Alabama --
20    A.   Yes.
21    Q.   Is there like Alabama Legal Services?
22    A.   Yes.
23    Q.   Is that correct?  And are there a number of
0065
1          offices around the state of Alabama that
2          report to Alabama Legal Services?
3    A.   Yes.
4    Q.   Do you know how many offices there are?
5    A.   No, I don't.
6    Q.   I mean, did you ever have any interaction with
7          any other offices in the state of Legal

8     Services?
9  A.  At trainings.
10  Q.  Okay.
11  A.  Very, very little otherwise.
12  Q.  Did you go to Montgomery for training?
13  A.  I went -- yes, I did go sometimes, yes.
14  Q.  While you worked at Legal Services, were you
15     ever reprimanded or disciplined in any way?
16  A.  I remember being reprimanded one time.  We had
17     a new attorney there that was having problems
18     preparing a certain legal document.  And I had
19     been there for quite awhile.  And I thought I
20     was assisting him in preparing it by showing
21     him ones we had done before and, you know,
22     suggesting.  But he went to the senior staff
23     attorney and told him that I was trying to
0066
1     tell him how to practice law, and the senior
2     staff attorney wrote me up.
3  Q.  Who was that?
4  A.  Mike Miskowic.  Oh, you mean, the person that
5     wrote me up?
6  Q.  Yes, the person who wrote you up.
7  A.  Mike Miskowic.
8  Q.  Did you disagree with that writeup?
9  A.  Yes, I did.
10  Q.  And why is that?
11  A.  Because I was only assisting.  I wasn't trying
12     to tell him how to practice law.
13  Q.  What types of cases did Legal Services handle?
14  A.  Social Security disability, unemployment,
15     housing, family law.
16  Q.  When you say "family law" --
17  A.  Uncontested divorces, custody.
18  Q.  And why did you leave Legal Services?
19  A.  For what I thought was a great career move to
20     the City of Dothan.
21  Q.  And so you left Legal Services and went to
22     work for the City of Dothan; is that correct?
23  A.  Yes, I did.
0067
1  Q.  And what job did you accept at the City of
2     Dothan?
3  A.  Municipal court administrator.
4  Q.  And tell me how you learned about that job.
5  A.  In the newspaper.

6   Q.  And was it just an ad in the --
7   A.  Yes.
8   Q.  -- classified --
9   A.  It was in the Dothan Eagle.
10  Q.  -- section?
11  A.  Classified employment ad.
12  Q.  And I gather you applied for that job; is that
13      correct?
14  A.  Yes, I did.
15  Q.  I'm going to give you your calendar back.
16  A.  Thank you.
17  Q.  We tried to make copies best we could.  I'm
18      marking as Exhibit 5, which I think I may have
19      already done, just what you've given me.  And
20      I may reserve the right to have to refer to
21      your actual original calendar because I don't
22      know how well it copied after, you know,
23      having to open the spiral pages.  That was
0068
1       just one of the housekeeping notes.
2                   (Defendants' Exhibit 5 was marked
3                    for identification.)
4   Q.  Now, when you saw the ad in the paper -- in
5       the Dothan Eagle about the job at the City,
6       what -- for court administrator; is that
7       correct?
8   A.  Uh-huh (positive response).
9   Q.  What did you do?  I mean, did you come down
10      here to the Civic Center?  Did you come down
11      here?  Did you call anybody?
12  A.  I came down here and picked up the application
13      to complete.
14  Q.  In the personnel office?
15  A.  Yes, I believe so.
16  Q.  And did you complete that and turn it back in?
17  A.  Yes, I did.
18  Q.  Do you know who you turned it back in to?
19  A.  No, I don't.  In the personnel office.
20  Q.  Do you remember when you saw the ad in the
21      paper what was in that ad?
22  A.  I believe -- I believe it had something in it
23      about you would be overseeing the municipal
0069
1       court's magistrates' office, supervising
2       magistrates and clerks, be responsible for the
3       traffic tickets that came in, for the fines

4    that were collected, administrative duties.  I
5    can't recall everything that it said.
6  Q.  Okay.
7  A.  I believe it said something about education
8    you had to have and experience.
9  Q.  When you turned your application in, did you
10    talk to anyone or they said they would set up
11    an interview?
12  A.  I don't recall being told that.
13  Q.  Okay.  I'll mark that as Defendants' Exhibit 7
14    and ask you if you can look at that, please,
15    and tell me if you can identify that as your
16    application to the City.
17        (Defendants' Exhibit 7 was marked
18         for identification.)
19  A.  Yes.
20  Q.  You indicated under your education that you
21    had been to Wallace Community College?
22  A.  I did my general studies there and transferred
23    to Troy to complete my degree.
0070
1  Q.  When you say "general studies," the --
2  A.  The first couple of years.  I didn't get a
3    degree there.  My intention was not to get a
4    two-year degree.  It was to get a four-year
5    degree.
6  Q.  So you're saying that transferred --
7  A.  Right.
8  Q.  -- to Troy State --
9  A.  Right.
10  Q.  -- to get your degree?
11  A.  Yes.
12  Q.  I had asked you about some other employment.
13    You also listed that you have worked at Ramsey
14    Youth Services?
15  A.  That was part-time while I was employed with
16    Legal Services.  I answered the phone in
17    addition to my full-time job.
18  Q.  Did you work -- what hours of the day did you
19    work for Ramsey Youth Services?
20  A.  I usually worked the weekends, sometimes one
21    or two nights a week after my -- from about
22    5:30 till 9, 9:30.
23  Q.  What was your salary at Legal Services -- your
0071
1    annual salary?

2   A.   When I left?
3   Q.   Yes.
4   A.   I believe it was 27,000.
5   Q.   I'm also looking on your application that you
6        worked for Charter Woods Behavioral Health?
7   A.   Part-time in addition to my full-time.
8        Actually, Charter Woods was what -- was what
9        it was called before it was Ramsey.
10  Q.   I see.  So this was part-time receptionist?
11  A.   Right.
12  Q.   On the weekends primarily?
13  A.   Right.
14  Q.   And you've also listed McRae's --
15  A.   Part-time.
16  Q.   -- where you worked.  That was part-time work?
17  A.   Right.  During Christmas.
18            (Brief pause)
19  Q.   You listed references as Linda Lund; is that
20       correct?
21  A.   Yes.
22  Q.   Who is Linda?
23  A.   She was an attorney at Legal Services at one
0072
1        time.
2   Q.   Daphne Rudicell?
3   A.   She was also an attorney at Legal Services but
4        is in private practice now.
5   Q.   And Ted Gashaw?
6   A.   He was my supervisor when I worked for First
7        Alabama Bank.
8   Q.   And Mary Jarrett?
9   A.   She's a personal friend of mine that owns
10       Print Services of Dothan.
11            (Defendants' Exhibit 8 was marked
12             for identification.)
13  Q.   Let me show you what I've marked as
14       Defendants' Exhibit 8 and ask if you can
15       identify that for me, please.
16            What are you laughing about?
17  A.   That he almost fell.
18  Q.   Oh.
19            That first page is a job announcement for
20       the court administrator in September of 2003.
21       Is that the job you applied for?
22  A.   It could be.  I don't remember it saying three
23       years to complete the Alabama Court Clerks and

0073
1       Magistrates Association Certification
2       Program.  I thought it said two years, but
3       other than that, it could be.
4    Q.   Was it your understanding that you were
5       supposed to complete a certification program?
6    A.   Yes.
7    Q.   And did you work toward completing that
8       certification program once you were hired?
9    A.   I had only been able to do -- there were four
10       orientation sessions before I was terminated.
11    Q.   And how many orientation sessions had you
12       done?
13    A.   There was only four, and I had completed the
14       four.
15    Q.   Did you obtain an interview for consideration
16       for the job of court administrator?
17    A.   Yes, I did.
18         MR. JAFFREE:  Point of clarification.  Is
19          that an exhibit that you're
20          introducing as a document she
21          received?
22         MS. NELSON:  No.  It's a document that I
23          asked her about.
0074
1         MR. JAFFREE:  Okay.
2         MS. NELSON:  It's my deposition.  You can
3          ask your questions later on.
4         MR. JAFFREE:  Well, no, I'm asking you the
5          question.  I was trying to get a point
6          of information as to if that was a
7          document that she allegedly received.
8    Q.   Well, your attorney, apparently, is trying to
9       testify for you.  Did you ever receive a
10       document --
11         MR. JAFFREE:  I'm not.
12    Q.   -- called a position announcement?
13    A.   Not --
14    Q.   But you saw this --
15    A.   Not that one.
16    Q.   But you saw a position announcement, did you?
17    A.   Yes.
18    Q.   And you also saw the job description of what
19       the --
20    A.   Yes.
21    Q.   -- job entailed?

22   And where did you receive that, through
23   your interview?  Was it posted on the
0075
1   personnel department?  Did Personnel give it
2   to you?
3 A.  It was in the newspaper or -- no.  It was on
4   the web site.
5 Q.  So you could go on www.dothan.org or something
6   of that nature and pull up the job posting?
7 A.  Yes, I believe.
8 Q.  And what the job entailed?
9 A.  Yes, ma'am.
10 Q.  And while you may not have seen this actual
11   Exhibit 8 that's in my hand, what I've showed
12   you was virtually what you saw on the
13   Internet; is that correct, the posting?
14   MR. JAFFREE:  If you know.
15 A.  I don't know.  I -- I would have to read that
16   whole thing to know.
17 Q.  Okay.
18   MR. JAFFREE:  I think it would be more
19    than that.  She'd have to recall
20    everything she saw on the Internet
21    site.
22 A.  I'm not sure.  I know I couldn't recall
23   everything that was listed on that.
0076
1   MR. JAFFREE:  I mean, other than match it
2    up.  And seems like she'd have to do
3    that.
4 Q.  Well, I'm not asking you to match up every
5   single -- but for the most part, you had
6   access to the posting and to the definition of
7   the job and examples of work and what the
8   experience and qualifications were; is that
9   correct?
10 A.  I have knowledge -- some knowledge -- memory
11   of what was posted on the web site on that
12   date.  Not saying that that is what was
13   posted.
14 Q.  "That" being Exhibit 8?
15 A.  Right.
16   MR. JAFFREE:  Would you like to read that
17    to see --
18   THE WITNESS:  I still wouldn't recall all
19    of it.

20          MR. JAFFREE:  -- the contents in case
21              somehow they're going to use something
22              that's in there in some mysterious way
23              as to you're assenting to something.
0077
1              I mean, if you want to read that --
2              she would have the opportunity to read
3              that, correct?  You don't have a
4              problem with this witness reading that
5              document?
6          MS. NELSON:  I don't have a problem with
7              her reading it.  She said she saw
8              something on the web site.  She
9              doesn't know if she got this
10              particular document.
11          MR. JAFFREE:  Well, I think if you're
12              going to ask her questions about that
13              document, she should have an
14              opportunity to examine it since she
15              acknowledged having not receiving it.
16          MS. NELSON:  I did give it to her and
17              asked her to look at it.
18          MR. JAFFREE:  But you asked her to look at
19              it like you were asking her to look at
20              a funny page.  I mean, this is a
21              substantive document here.
22          MS. NELSON:  She can look at it all day.
23              I'm just asking what she remembers.
0078
1              She's telling me she remembers.  She
2              got on the web site.  She saw the
3              posting.  She can't remember
4              everything that she saw.
5     Q.  Ms. Martin --
6          MR. JAFFREE:  Let me ask you.
7          MS. NELSON:  It's my deposition.
8          MR. JAFFREE:  Yeah.  I understand that.
9          MS. NELSON:  You can state your
10              objections.
11          MR. JAFFREE:  Well, this is a bit more
12              than an objection.  If you're going to
13              ask her some specific questions about
14              this document or something that's
15              contained in this document, I'd like
16              for her to have an opportunity to read
17              this.  If you are not, then I guess

18          you won't have to.  But there are
19          several pages here, substantive
20          information, a lot of different
21          provisions and --
22      MS. NELSON:  And I think you're trying to
23          testify for your client.  You can ask
0079
1          her questions.  I have asked her --
2      MR. JAFFREE:  I'm not trying to be
3          clever.  I'm just trying to say,
4          there's a lot here.  And if you're
5          going to ask her specific questions
6          about this, I think she should be
7          given opportunity to review it.  Is
8          that unreasonable?
9      MS. NELSON:  She's had every opportunity
10          to review it.
11      THE WITNESS:  No, I have not.
12      MS. NELSON:  Well, we can sit here and
13          look through it.
14      MR. JAFFREE:  That's not necessary unless
15          you're going to ask her specific
16          questions about it.
17  Q.  When you got on the Internet and looked at the
18      job, tell me what you remember seeing.
19  A.  I can't tell you word for word what I
20      remembered seeing, and this document may not
21      have what I saw.
22  Q.  But it could; you just don't know?
23  A.  But this was printed probably recently.
0080
1  Q.  Do you know what -- when you say it was
2      printed recently, why do you say that?
3  A.  Because it looks like -- it looks new.
4  Q.  Do you --
5  A.  I do -- I don't believe this was in blue print
6      when I saw it on the Internet.  This is a new,
7      printed document.  It might be the same -- it
8      might be --
9  Q.  It might be the same thing you saw --
10  A.  Might be, but I can't say that it is.
11  Q.  All right.  Do you have any reason to believe
12      that that date of the court administrator on
13      September 15, 2003, is erroneous as the
14      closing date for that job?
15  A.  It could be correct.

16   Q.   Do you have any reason to believe that the job
17        announcement that you were seeking interest in
18        was Job Number 013-03-01?
19   A.   I'm not sure that that was the position
20        number.  I can't say.
21   Q.   But do you have any reason to say that it's
22        not?
23   A.   Other than --
0081
1         MR. JAFFREE:  She has no reason to say
2            either way.  That's what she's
3            saying.  She don't remember that.
4    Q.   Would you --
5         MS. NELSON:  Well, she's trying to point
6            out that it's a newly printed
7            document.
8    Q.   Would you have any reason to believe that the
9         personnel office would not keep an accurate
10        file of the documents they had on their system
11        regarding this particular posting?
12        MR. JAFFREE:  That's beyond her
13           providence.
14        MS. NELSON:  I'm asking --
15        MR. JAFFREE:  She doesn't know anything
16           about the personnel office.
17   Q.   Well, I'm asking, do you have any reason to
18        believe that they would not keep accurate
19        records of that particular job and that job
20        posting?
21   A.   Given my experience with the friendship of Kai
22        Davis and Judge Gordon, yes, I do have
23        suspicion that it could've been doctored or
0082
1         whatever.
2    Q.   So it's your testimony that this document I'm
3         showing you regarding the job posting and the
4         job description could have been doctored,
5         based on a friendship between Judge Gordon and
6         Kai Davis; is that your testimony?
7    A.   It could have been.
8    Q.   But you don't have any proof of that?
9    A.   You don't have any proof it wasn't.
10   Q.   I'm asking you the questions here.  This
11        document was not altered, number one.  And I'm
12        asking you, if you're making a serious
13        allegation, what proof you have to support

14     that?
15          MR. JAFFREE:  What allegation?  She didn't
16             make an allegation.
17  A.  I didn't make an allegation.
18          MR. JAFFREE:  She said she doesn't know.
19  A.  That was my answer to your question.
20  Q.  And I'm asking you, what proof do you have?
21  A.  That it was altered?
22  Q.  Yes.
23  A.  I don't have any.  I didn't say I had proof.
0083
1          MR. JAFFREE:  You're arguing with this
2             witness.  You asked her to verify the
3             authenticity of a document that's
4             she's in no position to verify.
5          MS. NELSON:  No, I'm not asking her.  I'm
6             asking her if she can remember when
7             she looked on the Internet
8             seeing -- I'm on page two of this
9             particular document -- examples of
10             work being performed.
11  Q.  Do you recall any of those items being there?
12          MR. JAFFREE:  Let the Record reflect that
13             the witness is reading the document.
14          THE WITNESS:  The second page of the
15             document.
16             (Brief pause)
17  Q.  Do you recognize those?
18  A.  A few of them.  I'm not sure about all of
19     them.
20  Q.  Okay.  Thank you.  And when you filled out
21     your application, Defendants' Exhibit Number
22     7, do you know if any other documents would
23     have been given to you at that time about the
0084
1  job you were seeking?
2  A.  There could have been a -- I guess the copy of
3     the ad or the job description given to me.
4     I'm not sure.
5  Q.  I was asking about the interview.  You said
6     you interviewed; is that correct?
7  A.  Yes.
8  Q.  How many interviews did you have?
9  A.  I recall two.
10  Q.  Okay.  The first one, do you recall when that
11     was?

12  A.  I think sometime in December of '03.
13  Q.  Okay.  You actually applied -- let me show you
14      here.
15  A.  I saw it.  I believe in September.
16  Q.  September of '03.  Okay.  Do you remember who
17      you interviewed with that first time?
18  A.  Judge Gordon, Kai Davis, and I believe Jim
19      Smith.
20  Q.  Okay.  And where did this interview occur?
21  A.  I believe in some office here in the Civic
22      Center.  I'm not positive.
23  Q.  Do you know how long the interview lasted?
0085
1  A.  Forty-five minutes to an hour maybe.
2  Q.  Do you know -- can you remember what occurred
3      in the interview?  Describe for me the
4      interview that you can remember.
5  A.  I remember the judge going over the duties.  I
6      remember her questioning me about my
7      education, my employment, why I wanted to
8      leave Legal Services to take the job at the
9      City.  And I well remember her telling me
10      three magistrates that I would have to look
11      out for that could actually do physical harm
12      to me.
13  Q.  And she said that in the presence of yourself
14      and Kai Davis and Jim Smith?
15  A.  Yes.  She was telling me about all the
16      problems in the magistrates' office.
17  Q.  What problems did she tell you?
18  A.  Well, basically that there were three problem
19      employees.  One would cause me all kind of
20      problems -- or two would cause me all kind of
21      problems.  And the other one was just a
22      follower.  She didn't really instigate
23      anything.  She was a follower.
0086
1  Q.  And who were the two that you claim would
2      cause all kind of problems?
3      MR. JAFFREE:  Are you asking her from this
4          interview?
5      MS. NELSON:  Yeah.  From the interview.
6          We were talking about the interview.
7          Yes.
8  Q.  I'm asking, what two people were you told
9      would cause you problems?

10  A.  They were not named at that first interview.
11  Q.  Did you not ask questions about that?
12  A.  About the problems?
13  Q.  Yes.
14  A.  Yeah, I'm sure I did.
15  Q.  But you don't remember?
16  A.  I basically listened a lot because Kai and the
17      judge were talking and must have reminded me
18      ten times that I would have to able to stand
19      up to these three and that I'd have to watch
20      my back the whole time, that they would appear
21      to be my friends, but then would sabotage me
22      afterwards as they had done to her.
23  Q.  Done to who?
0087
1  A.  To the judge, Judge Gordon.
2  Q.  And she said that?
3  A.  Yeah.
4  Q.  What did Kai Davis say?
5  A.  Kai agreed with her.  Said that she -- said
6      that they were problems.  They'd had problems
7      for a while with these and that they hoped
8      that hiring someone from the outside as
9      myself, that I could come in, not being
10      involved in the problems could take control
11      and supervise everyone.  And the Judge pledged
12      me 100 percent support, that she would not
13      interfere with my management of the
14      magistrates' office, that she did not have
15      time to hold court sessions and manage that
16      office.  And she would turn it completely over
17      to me.
18  Q.  Had you ever had any experience working with
19      magistrates before?
20  A.  No, I had not.
21  Q.  Had you had any experience working in
22      municipal court before?
23  A.  No, I hadn't.
0088
1  Q.  And it's your testimony, that first interview,
2      three people were mentioned but no names; is
3      that correct?
4  A.  Right.
5  Q.  Did Kai Davis or Judge Gordon make any
6      comments about any concerns or problems in the
7      magistrates' office just in general without

8    identifying any people?
9  A.  In general?
10  Q.  Yes.
11  A.  Yes.
12  Q.  Do you remember what was said there?
13  A.  Not as much about that as the three that I
14     should look out for.  But, yes, that there had
15     been a history of paperwork missing, a lot of
16     errors being made.  They did tell me they had
17     just gone to a new court system, but I
18     wouldn't be -- I wouldn't have as much
19     training on it as the others had had because
20     they had been trained by the -- the company
21     HTE.
22  Q.  You said, "new court system."  New computer --
23  A.  New computer system.  I'm sorry.
0089
1  Q.  I'm sorry.  The new computer system was HTE?
2  A.  Yes.
3  Q.  And I'm sorry.  I was writing down court
4     system.  But, anyway, we were talking about a
5     new computer system and that something was --
6     you were telling me something about training.
7  A.  That I would not receive as much training as
8     the magistrates had on it because they had
9     gone through two, three weeks of training, but
10     she would try to get me some training on it.
11  Q.  Was it your understanding that they were
12     having some problems or issues with this new
13     computer system?
14  A.  Yes.
15  Q.  Did Jim Smith say anything in the interview?
16  A.  I -- he didn't say a whole lot.  He did make
17     some comment when I left the interview because
18     he kind of walked out the same time I did.  If
19     I understood right, he said, run while you
20     can.
21  Q.  Did you ask him what he meant by that?
22  A.  No, because I was walking out the door.  And
23     he was just saying, bye, have a good day.  And
0090
1     then he said, you know, run while -- I think
2     he said, run while you can.  That's the best I
3     understood it.  He was walking, I guess, back
4     wherever, and I was leaving.
5  Q.  Did you know Jim Smith?

6   A.  Only had heard of him.  Didn't know him.
7   Q.  Did you ask questions during the interview?
8   A.  Did I ask questions?
9   Q.  Yes.
10  A.   I'm sure I asked about benefits and salary and
11      probably about the setup of the office and
12      things like that.
13  Q.   Did you have any concerns since you had no
14      experience or training with magistrates or
15      municipal court as to your ability to do the
16      job?
17  A.   Not really.  I had legal experience.  I had
18      supervisory experience.  And that is what the
19      judge stressed to me, that I just needed to
20      be -- supervise, that I didn't have to work
21      court.  She didn't even want me worrying about
22      that.  All she wanted me to worry about was
23      overseeing the magistrates and the clerks and
0091
1       getting the office back basically in one
2       accord.  There was a lot of dissension.
3          MR. JAFFREE:  I think this witness made a
4           misstatement.
5          MS. NELSON:  You know, you have the chance
6           to question her.
7          MR. JAFFREE:  Well, write down something
8           that she didn't intend.  But fine.
9   Q.  Do you know Kai Davis?
10  A.  Yes.
11  Q.  And how do you know Kai Davis?
12  A.  We went to school together.
13  Q.  At?
14  A.  Dale County.
15  Q.  Are you and Kai Davis friends?
16  A.  We were not great friends, no.  Not close
17      friends.
18  Q.  Do you know if other people were interviewing
19      for the job?
20  A.  I assume so.
21  Q.  You do not know any of them?
22  A.  I don't know for a fact.
23  Q.  Do you know who had held the job prior to you?
0092
1   A.  Bettye King.
2   Q.  Did you know Bettye King?
3   A.  No.

4   Q.  Did you know who held the job prior to Bettye
5       King?
6   A.  Donna Nicholson.
7   Q.  Do you know Donna Nicholson?
8   A.  I do -- I do now.  I didn't then.
9   Q.  You do now?
10  A.  Right.  Well, Donna called me while -- not
11      long after I was employed with the City, and
12      she worked for an attorney that I was really
13      good friends with.
14  Q.  What did she call you about?
15  A.  She called to see how I was doing and said
16      that she'd help me if she could.
17  Q.  And who was she working for?
18  A.  She was working for Will Matthews.
19  Q.  Did you need her help?
20  A.  No.
21  Q.  Do you know why she left?
22  A.  Only hearsay.
23  Q.  And what did you hear?
0093
1   A.  I heard she was terminated; something about
2       somebody took a vacation or something and
3       didn't report the hours right.  I'm not sure.
4   Q.  I mean, other than what she told you, you
5       don't have any personal knowledge --
6   A.  She didn't tell me that.
7   Q.  -- of what actually occurred?
8   A.  She didn't tell me that.  I heard it.
9   Q.  Well, even what you heard, who did you hear it
10      from?
11  A.  From Sarah Fowler.
12  Q.  Okay.  You said you had a second interview; is
13      that correct?
14  A.  Uh-huh (positive response).
15  Q.  Do you know when that was?
16  A.  No, I don't.  I believe it was sometime also
17      in December.
18  Q.  And who was present at the second interview?
19  A.  Judge Gordon, Kathleen Nemish.
20  Q.  And yourself?
21  A.  Yes.
22  Q.  Who was Kathleen Nemish?
23  A.  She was a -- I'm not sure if she was just a
0094
1       court-appointed attorney, or if she was

```
 2      a -- I'm not sure.  I don't recall right now.
 3   Q.  Had you ever worked with her?
 4   A.  Had I ever worked with her?  No.
 5   Q.  Did you work with her after you were hired?
 6   A.  I had conversed with her maybe on the phone or
 7       in court.  I'm not sure.
 8   Q.  But you don't know what her job was or role
 9       was?
10   A.  No.
11   Q.  Tell me where the second interview occurred.
12   A.  I believe it was in the same office as before.
13   Q.  And do you know about how long this interview
14       lasted?
15   A.  I don't recall.
16   Q.  Do you remember what was discussed in this
17       interview?
18   A.  Some of the same things that was discussed in
19       the first, just not as much.
20   Q.  "Some of the same things," meaning?
21   A.  Of duties.  I remember the judge going over
22       with Kathleen what I told her about my
23       experience, education.  The judge brought up
0095
 1       again the three that caused the trouble, all
 2       the problems that had been in the magistrates'
 3       office for some time.
 4   Q.  Did she identify these three people at this
 5       time?
 6   A.  Yes.
 7   Q.  And who were the three?
 8   A.  Mary Turner, Mary Beth Brackin, and Sarah
 9       Fowler.  But it was in a subsequent meeting
10       before I started that she went over -- the
11       Wednesday before I began work on, I believe,
12       February the 16th, the judge had asked me to
13       come in.  And we sat down, and she began to
14       tell me something about each magistrate.
15           And she started with Mary Turner.  And she
16       told me that Mary Turner was a big
17       troublemaker, that she kept something going in
18       the magistrates' office at -- all the time,
19       that she had had an incident with Kai Davis
20       recently, which is one of the reasons -- the
21       big reason that she didn't have an office.
22       She had a cubby hole, and it was punishment.
23           Then she went on to say that her
```

0096
1      counterpart was Mary Beth Brackin, who they
2      were friends.  She said that Mary Beth had
3      been -- recently created a situation for the
4      City; supposedly had advised a defendant that
5      if he had an issue with the City, that he
6      should take it to the city clerk.  Said that I
7      would have to review that material, that
8      incident, after I started and would have to
9      write her up disciplinary action.
10          Then she said Sarah Fowler is the one that
11     is the follower, that she would never
12     instigate anything on her own, that she wasn't
13     strong enough to stand up to Mary Beth and
14     Mary Turner, and she just went along with
15     them.
16          She told me about Mary -- I'm sorry --
17     Michelle Bryan.  She said she was very young,
18     very pretty, was divorced, socialized a lot on
19     the telephone, and had police officers in her
20     office a lot socializing, and was dating
21     several police officers, and that I would
22     really have to cut down on her socializing.
23          She then told me about Valarie Savage, a
0097
1      friend of Michelle Bryan's.  Said that Valarie
2      had a very poor attitude, was -- had
3      previously worked for Judge Steensland at the
4      Houston County Court, and had been let go
5      there.  She told me she had been sleeping with
6      prisoners while employed at Houston County and
7      could possibly be doing the same thing here at
8      Dothan.  She told me I would have to watch out
9      for her, that she, too, could cause me a lot
10     of problems, very outspoken.
11          She then told me about Ann Baxter who she
12     said was -- had a problem balancing her money,
13     that she had recently come up $500 short in
14     her money drawer.  And the judge said she
15     believed that Ann had stolen the money, and
16     she didn't know why because Ann had inherited
17     money; she was rich and owned a real estate
18     company.  And that was another incident that I
19     would have to be involved in the disciplinary
20     action.  And she would get those -- that
21     information to me at a later time.

22          And she identified -- excuse me -- she
23      identified all of these magistrates at a later
0098
1       time.  I found out that they were all white.
2       Then she told me about Eunice Knight and
3       Lavera McClain.  She said that Eunice was very
4       quiet, basically stayed in her office and did
5       her work and didn't cause any problems.
6          And then Lavera McClain, she said that she
7       trusted Lavera, that -- to never -- that she
8       would never sabotage her as the others did.
9       She said Lavera worked very hard handling all
10       of her duties, and that Eunice and Lavera
11       would be very helpful to me and I should ask
12       for their help.
13          She told me about -- of course, in the
14       interview, she'd already gone over that they
15       were in the process of a move.  I believe on
16       either this date or the date I came in for my
17       drug test, TB test, et cetera, either one of
18       those, that she took me over to the old office
19       that they were moving from and showed me.  And
20       there was only a couple of magistrates over
21       there at the time.  She told me that they were
22       -- would be -- they had -- were in the process
23       of moving, would be in the new office -- were
0099
1       in the new office at this meeting by that
2       time.  She put Lavera in charge of the move.
3       The offices, Lavera had assigned.
4          And, basically, told me about, you know,
5       the court sessions, what days.  Said that, you
6       know, that I would help her with court, but I
7       would not work court.  I would not actually do
8       the computer, that magistrates were assigned
9       to do that.  But I just came over to see that
10       everything was going smoothly or to get things
11       for her and make sure the fines room was quiet
12       and check with the magistrate in the fines
13       room occasionally.
14   Q.   I'm sorry.  The fines room?
15   A.   Uh-huh (positive response).
16   Q.   What is a fines room?
17   A.   Where the fines were paid by defendants.
18   Q.   Let me back up.  I was asking you about the
19       second interview, and you started telling me a

20          story about things said after -- on February
21          16th.  I was going back through that second
22          interview with Judge Gordon, Kathleen Nemish,
23          and yourself.
0100
1               Do you remember anything else that
2          occurred in that interview before you were
3          hired?
4     A.   Only thing I remember is, it really bothered
5          me that she just kept on warning me about the
6          damage that could be done to me.  And I've
7          just never been afraid of anybody, and I just
8          wasn't afraid -- you know, I just didn't know
9          why that just kept being stressed.  I couldn't
10         believe that -- that two, three ladies could
11         do me physical harm.  But, in fact, that is --
12         the talk of all of that, when I weighed it
13         against the money that was being offered, that
14         is, in fact, why I turned the position down
15         the first time it was offered.
16    Q.   When were you -- when did you first turn it
17         down?
18    A.   Sometime after the second interview, sometime
19         in December.
20    Q.   And who actually offered you the job?
21    A.   I believe -- I'm pretty sure it was Michelle
22         Sellers that made the phone call to me.
23    Q.   And do you remember what was said?
0101
1     A.   She said that they'd like to offer me the
2          position for municipal court administrator.
3          She told me the salary.
4     Q.   What was the salary?
5     A.   Seems like maybe 29,000 or something like
6          that.
7     Q.   And this was after the second interview; is
8          that correct?
9     A.   I believe so, yes.
10    Q.   And what did you tell her?
11    A.   I told her that I had thought about it.  I had
12         also -- I just told her I'd thought about it
13         and I wanted a certain amount of money.  I
14         believe I told her an amount, 32, 33,000, that
15         I would take it for, that that just wasn't
16         enough money at 29 or whatever the figure was
17         considering all the problems that there seemed

18          to be.
19     Q.   Okay.  And do you remember what Michelle
20          Sellers said to you?
21     A.   Yeah.  She said that she would check with the
22          judge, but the only time they went above that
23          salary, it had to be approved by the
0102
1           commission in special circumstances.
2      Q.   Okay.  So was there a time they came back to
3           you or did you come back to them?
4      A.   No.  I had actually forgotten about it.  And I
5           got a call, I believe, first of January from
6           Michelle Sellers.  And she said -- told me who
7           she was, and she said that -- that I had given
8           them a figure before of what I would come to
9           work at the City for but they couldn't
10          remember that figure, and was I still
11          interested, and if so, would I give her that
12          figure again for the salary.
13     Q.   Did you?
14     A.   Yes, I did.
15     Q.   And was that 32,000?
16     A.   I think it was 33.
17     Q.   32 or 33?
18     A.   32 or 33.  Yes.
19     Q.   And then what happened?
20     A.   She said, I'll get back with you.
21          And I did get a call back from her saying
22          that they were going to put it before the
23          commission, and they would like me to take the
0103
1           job if they could get the salary approved.
2           And I told her I would.
3      Q.   You told them you would if they could get it
4           approved?
5      A.   Right.
6      Q.   Were you still working for Legal Services?
7      A.   Yes, I was.
8      Q.   And do you know if they got that salary
9           approved?
10     A.   Yes.
11     Q.   Now, did you know Michelle Sellers?
12     A.   No.
13     Q.   Did you ever meet her during this interview
14          process?
15     A.   I know I met her in subsequent meetings

16        after -- after these conversations.  I don't
17        recall meeting her before in the interviews.
18    Q.   And so your initial contact with her was by
19        telephone?
20    A.   Right.
21    Q.   Do you know what her job duties were at that
22        time?
23    A.   At that time, I believe she was an
0104
1        administrative assistant to the judge.
2    Q.   So after you told them that you would take the
3        job if the commission would approve that
4        salary increase, what happened then?
5    A.   I was told to come take a drug test, fill out
6        paperwork, do a TB test.  Did all that.  I
7        gave -- told them I'd have to give Legal
8        Services a month's notice because I had been
9        there a length of time.  And we agreed on a
10        start date.
11            However, the judge wanted me to take part
12        in a weekend training that she said HTE was
13        coming here to do some training.  And she
14        wanted to put me on payroll as of January the
15        16th, I believe, so I could be paid for coming
16        to that training.  But then my actual start
17        date wouldn't be till February the 16th.
18    Q.   Did you go to that HTE training?
19    A.   I did.
20    Q.   Did you get paid for that?
21    A.   Yes.
22    Q.   So it was like in January that to get you on
23        the payroll, you had to come in and fill out
0105
1        some more paperwork and get your drug test --
2    A.   Right.
3    Q.   -- and stuff like that?
4    A.   Right.
5    Q.   And you think that was like January 16th?
6    A.   It was before -- I mean, when I was put on
7        payroll I believe was January 16th.
8    Q.   Okay.
9            (Defendants' Exhibit 9 was marked
10                for identification.)
11    Q.   I'm going to show you what I've marked as
12        Defendants' Exhibit 9.  Is that your
13        signature, Ms. Martin?

14    A.   Yes, it is.
15    Q.   And is that just a -- did you receive an
16         employee handbook?
17    A.   Yes, I did.
18    Q.   And you signed that, indeed, on January the
19         16th of 2004; is that correct?
20    A.   Yes.
21                (Defendants' Exhibit 10 was marked
22                 for identification.)
23    Q.   And I'm just showing you another document,
0106
1          looks like, signed on that same date,
2          Defendants' 10.  Is that your signature?
3     A.   Yes, it is.
4     Q.   And that's just an acknowledgment of receiving
5          some computer policies and procedures; is that
6          correct?
7     A.   Yes, ma'am.
8     Q.   Okay.  And was it on this -- about the same
9          date that you got your drug test -- did your
10         drug test?
11    A.   I'm not sure.  I think that was -- I'm not
12         sure if it was that day or before.
13    Q.   That day or around that time?
14    A.   Could have been before.
15    Q.   Okay.
16    A.   Somewhere in there.
17    Q.   And I'm sorry.  Just to clarify, the
18         HTE -- the computer training was like on a
19         weekend following January 16th, 2004; is that
20         what you testified?
21    A.   It was on a Saturday, Sunday, and a Monday.
22    Q.   Do you remember the dates?
23    A.   It had -- I assume it was the 17th, 18th, and
0107
1          19th maybe.  I'm not positive.
2     Q.   And then it was actually the -- around
3          February the 16th that you started?
4     A.   Right.
5     Q.   Is that correct?
6     A.   Physically started, yes.
7     Q.   Now, I'm a little confused about what you were
8          telling me earlier.  When you started on
9          February the 16th, had the magistrates'
10         office -- was in the process of moving or had
11         moved?

12    A.   It had moved.
13    Q.   So you did not get involved in the moving
14         process?
15    A.   No.
16    Q.   At all?
17    A.   No.
18    Q.   And do you have any personal knowledge of or
19         about the move, or did you witness the move in
20         any shape, form, or fashion?
21    A.   The only thing I saw was when the judge took
22         me to the old office, there was a couple --
23         well, there was a clerk typist there packing
0108
1          up boxes.  It was like they were in the
2          process of packing to move and all.
3     Q.   Was this before the 16th or on the 16th.
4     A.   Of February?
5     Q.   Of February, yes.
6     A.   It was before.  It was before I started.
7     Q.   That's where I got a little confused.  You
8          stopped by before you started or --
9     A.   The judge -- the judge and I met a couple of
10         times before I started work.  I came to do --
11         some reason February the 10th sticks in my
12         mind that maybe that's when I came and had the
13         drug test or the TB test.  And then I had to
14         come back and have the TB test read, and the
15         judge had asked me to stop by her office when
16         I did this and we talked.
17    Q.   And you're saying at one of those times you
18         saw -- this was at the old --
19    A.   Right.  Right.
20    Q.   -- office and some people were still packing
21         up some boxes?
22    A.   Yeah.
23    Q.   Did you ever see the new office before you
0109
1          actually started?
2     A.   From the outside.
3     Q.   And as I understand it, they moved literally
4          from the -- the magistrates' office was in the
5          police department where the courthouse is; is
6          that the municipal court?
7     A.   It was in a building beside the municipal
8          building.  It was in a, like, a white
9          office -- white building beside it.  It wasn't

10        in the police department.
11    Q.   Was it part of the courtroom?
12    A.   No.
13    Q.   But right -- but near there?
14    A.   Yeah.  But it wasn't attached to the courtroom
15        in any way.
16    Q.   Gotcha.  Okay.  And your statement earlier
17        that you said Lavera was -- I assume you're
18        talking about Lavera McClain?
19    A.   McClain.
20    Q.   I think you testified was over the move?
21    A.   That's what the judge said.  She had put her
22        in charge of the move.
23    Q.   And you made some statement about Lavera
0110
1        assigning offices?
2    A.   That's what Fran Bailey told me, that she
3        assigned offices.  I believe the judge also
4        told me that.
5    Q.   And now, Fran Bailey is?
6    A.   She was a clerk typist.  She resigned in July
7        of '04.
8    Q.   Okay.  So you're saying Fran Bailey told you
9        that, that Lavera was assigning offices?
10    A.   Right.  She's also the one that later brought
11        me the diagram of the offices that Lavera had
12        given each of them a copy -- each of the --
13        the personnel a copy.
14    Q.   And when did she bring you this diagram?
15    A.   I've already answered that.
16    Q.   I don't remember.
17        MR. JAFFREE:  Answer it again.
18    A.   After I was terminated, we had lunch about a
19        couple of months afterwards, and she brought
20        me the diagram.  She had shown it to me while
21        I was employed.
22    Q.   Well, I'm sorry.  Either I didn't understand
23        that part of it -- I mean, you gave me a
0111
1        document --
2    A.   That's the one she brought to me.  No --
3    Q.   Defendants' Exhibit 3, which is sort of a time
4        line that --
5    A.   No, not that.  I'm sorry.  She did bring
6        me -- and I didn't bring it with me, but she
7        did bring me a diagram of the offices along

```
 8       with this.
 9   Q.   With Defendants' Exhibit 3?
10   A.   Right.  She brought me that document and the
11        diagram of the offices that she had shown me
12        while I was employed.  It was, according to
13        her, a diagram that Lavera McClain had drawn
14        out assigning offices.
15   Q.   I mean, all you know was what Fran told you
16        that that diagram represented?
17   A.   All I know -- no.
18   Q.   All you know is what Fran told you.  I mean,
19        do you know who prepared that diagram?
20   A.   I -- Fran told me that Lavera did.  Mary Beth
21        Brackin told me that each -- that she had
22        received one also, that each of the -- each of
23        the personnel had received a copy of it
0112
 1        because the offices were numbered and labeled
 2        where they would be.
 3   Q.   Okay.  Other than what you've heard through
 4        Fran or the other magistrates, do you have
 5        personal knowledge as to who assigned the
 6        offices?
 7   A.   Other than the judge telling me that Lavera
 8        assigned the offices.
 9   Q.   And the judge told you this when?
10   A.   During one of our conversations before I
11        started.
12   Q.   Now, did you have an office?
13   A.   Yes.
14   Q.   And where was your office?
15   A.   Kind of -- kind of in the middle.  The office
16        was kind of -- had a hallway going -- like a
17        square with my office was kind of in the
18        middle.  The clerk typist area was in the
19        middle.
20   Q.   Did you have any complaints about your office?
21   A.   No.  Except for wanting a window, and it
22        didn't have a window.
23   Q.   Did you also have the opportunity to obtain
0113
 1        some new furniture?
 2   A.   Yes, I did, at the insistence of the judge.
 3   Q.   Did you not want new furniture?
 4   A.   It wasn't necessary, and I continued to tell
 5        her it wasn't necessary.  There was almost new
```

6  furniture in there.
7 Q. Did you feel like she was going out of her way
8  to get you some new furniture?
9 A. I felt like I was being bought.
10 Q. That you were being bought?
11 A. Uh-huh (positive response), basically.
12 Q. Because you got new furniture?
13 A. Uh-huh (positive response).
14 Q. You have to say yes or no.
15 A. Yes.
16 Q. Did you ever -- did you get any type of
17  computer or laptop?
18 A. I got a computer like everyone else did.  I
19  requested a laptop but was denied one.
20 Q. And why did you want a laptop?
21 A. Because I was working a lot of overtime hours
22  and wanted to be able to spend some time at --
23  more time at home.  And I could do some work
0114
1  at home and at least be there with my husband.
2 Q. Do you know of anybody else that had a laptop
3  issued by the City in that office?
4 A. In the -- in that office -- in my office?  No.
5 Q. What would you have been allowed -- I'm not
6  sure I understand.  If you had a laptop, what
7  would you be able to do at home that you
8  couldn't do at work?
9 A. Well, I would be connected -- networked to the
10  City main frame and all.  I could look at
11  dockets to see that they were all together.  I
12  could do reports.  I could do correspondence.
13 Q. Did you do dockets?  I mean, that was part of
14  your job, was doing dockets?
15 A. No, I didn't do them.  I did print them
16  sometimes, though.  And I did check to see
17  that the cases were on the correct docket,
18  were set for the right day.
19 Q. Were you given -- were there any security
20  issues involved in allowing you to have access
21  to the City's main frame on a laptop at your
22  house?
23 A. Not that I was aware of.
0115
1 Q. Do you know what this computer you requested
2  cost?
3 A. No, I didn't.

4   Q.   Do you know why you were denied this computer?
5   A.   No, I don't.
6   Q.   Well -- and who did you make the request of?
7   A.   To Judge Gordon.
8   Q.   Well, if she was trying to buy you, why didn't
9        she buy you this computer that you wanted so
10       badly?
11  A.   I didn't request a computer right away.
12  Q.   Do you know when you requested it?
13  A.   I don't remember.
14  Q.   How many magistrates -- when you started on
15       February 16, how many magistrates did you
16       supervise?
17  A.   There was eight magistrates, two clerk
18       typists, and two temporaries at the time.
19       There was a vacancy for another magistrate
20       that the judge told me about during either one
21       of my interviews or a subsequent meeting.  I
22       asked to be allowed to participate in the
23       interviews.  And she said, no, that since I
0116
1        hadn't started yet, that she would handle
2        that.
3   Q.   Okay.
4   A.   I do believe that she already had someone
5        picked out for that position.
6   Q.   Okay.  Do you know when the interviews were
7        conducted?
8   A.   In -- end of January, first of February I
9        believe.
10  Q.   Do you know who all was considered for that
11       position?
12  A.   No, I don't.
13  Q.   Do you know who all were interviewed?
14  A.   No, I don't.
15  Q.   And do you know who was hired?
16  A.   Yes, I do.
17  Q.   Who was hired?
18  A.   Tonya Minifield who was black.
19  Q.   Do you have a problem with black employees
20       being hired?
21  A.   I sure don't.  I have supervised black
22       employees before then, and I'm still
23       supervising them right now.
0117
1   Q.   Do you know how Tonya Minifield did in her

2 interview?
3 A. No, I don't.  I know she was a friend of
4  Eunice and Lavera.
5 Q. And how do you know that?
6 A. Because I was told that by her, that she knew
7  them.
8 Q. She knew them?
9 A. She was acquaintances with them.
10 Q. And, again, you don't know who else was
11  interviewed, who else was considered, how
12  Tonya did on the interview, how anybody else
13  did on the interview, do you?
14 A. No.
15 Q. So it's your -- did you -- and this all
16  occurred before you actually started, that she
17  was hired?
18 A. I was already an employee.
19 Q. Were you receiving a paycheck?
20 A. I believe I was an employee.  I believe I had
21  already -- I believe these -- these people
22  were interviewed after I had become a City
23  employee, not started the job.
0118
1 Q. Okay.
2 A. And I did request -- since I would be
3  supervising this position also, I did request
4  to be in on the interviews and have some input
5  into that.
6 Q. Okay.  Do you know where Tonya -- are you
7  familiar with a register?
8 A. Yes, I am.
9 Q. Do you know where Tonya was on the register?
10 A. No, I don't.  All I know is what the judge
11  told me, that Tonya was hired because she was
12  already a magistrate working for Midland
13  City.  However, Tonya had very little
14  experience, except for entering tickets.  And
15  that was it.
16 Q. Do you feel like Tonya should not have been
17  hired?
18 A. I -- there -- I don't know.  I don't know
19  if -- there -- if there were more qualified
20  applicants, she shouldn't have been hired.
21 Q. But you don't know, do you?
22 A. No.  I wasn't provided the list or had -- I
23  wasn't allowed to take part in any of it.

0119
1    Q.   Other than attending the HTE training, were
2          you expected to do anything for the City until
3          you started on February the 16th of 2004?
4    A.   No.
5    Q.   Once you started working, where was -- excuse
6          me.  Strike that.
7                What were your initial duties when you
8          started working as court administrator?
9    A.   Supervising.
10   Q.   And what does that mean?
11   A.   It means assessing, by my own observation, the
12          employees; learning their strengths and their
13          weaknesses; providing constructive criticism;
14          meeting with them about what they need to
15          improve on.  It means --
16   Q.   Well, let me stop and ask you, what were you
17          observing?
18   A.   Their work.
19   Q.   And tell me what their work consisted of.
20   A.   Each magistrate supposedly had assigned
21          duties.  The judge had given me a list of the
22          assigned duties.  And I say "supposedly"
23          because when I first began, I met with all of
0120
1          the employees as a group and then asked them
2          to make an appointment with me to meet
3          individually.  I gave them a list -- a copy of
4          the list judge had provided me of the duties,
5          and most of them told me they were shocked
6          because they didn't know that that -- some of
7          the duties were their assigned duties.  They
8          had never seen that list before.
9    Q.   What duties had they never seen before?
10   A.   I don't recall.  Each magistrate had a list of
11          duties.
12   Q.   Well, that's what I'm trying to get an idea.
13          What type of duties?
14   A.   Well, I can't state specifically each one.  I
15          can remember some of what some of them did.  I
16          know that Mary Turner worked the front window
17          and had a little desk around the corner from
18          there with no office.
19   Q.   What does that mean, working the front window?
20   A.   It means that she took -- we had a front
21          window that two magistrates worked taking

22       payments for tickets.
23    Q.   Who was the other person that worked --
0121
1    A.   Ann Baxter.
2    Q.   Is that pretty much what they did?
3    A.   Pretty much.  Well, they did some other minor
4         duties, but pretty much their main
5         responsibility was manning the front window.
6    Q.   And that meant, like for example, if I had a
7         speeding ticket and I was going to pay my
8         fine?
9    A.   Well, if it was a fine that you could pay
10        without going to court, they took it.
11   Q.   So literally, I mean, like -- it was like a
12        payment window and I give them either a check
13        or money?
14   A.   Right.
15   Q.   And they would give me a receipt?
16   A.   Right.
17   Q.   They'd have to account for the money?
18   A.   Right.
19   Q.   It was like a cashier --
20   A.   Right.
21   Q.   -- type position?
22   A.   Right.  They also did warrants.
23   Q.   And what does that mean?
0122
1    A.   They worked the warrant window when people
2         came in and had a complaint for harassment,
3         harassing communication, domestic violence,
4         they had -- they had to sit down with this
5         person and take their statement under oath and
6         get all the details about the occurrence and
7         determine probable cause; and if there was
8         probable cause, issue a warrant for an arrest
9         of the person that committed the incident.
10   Q.   So Mary Turner and Ann Baxter did a lot of
11        this?
12   A.   A lot of it.  Actually, all the magistrates --
13        magistrates could do the warrant window.
14   Q.   Is the warrant window the same as the front
15        window?
16   A.   It was a side window.  There was a hallway
17        beside the front window that they could go in,
18        and there was two little windows there that
19        the person could actually sit down in the

20      hallway.  There was a window there that the
21      magistrate could talk to them from the other
22      side.
23   Q.   Now, what are some other duties that
0123
1      magistrates do?
2    A.   Michelle Bryan worked court.
3    Q.   What does that mean?
4    A.    She entered -- as the judge heard cases, she
5      entered the orders that the judge issued into
6      the computer system.  She looked up cases that
7      a defendant may had -- have had previously
8      when the judge was hearing their plea.  They
9      set hearings -- she set hearings in court for
10      later dates.  She did the 6A and 6B notices
11      which is when someone doesn't show up for
12      court, they send a 6A notice resetting it
13      again.  And a 6B is a warrant.
14   Q.   Did anybody besides Michelle do this?
15   A.   Yes.  Valarie Savage worked court.
16   Q.    Anybody else?
17   A.    Well, at some time, Mary Beth and Mary Turner
18      weren't working court when I started.  I think
19      they had been banished by the judge from the
20      courtroom, so Michelle and Valarie were
21      watching -- were working court.  Eunice worked
22      court.
23   Q.   What's Michelle's race?
0124
1    A.   I'm sorry?
2    Q.   What's Michelle's race?
3    A.   White.
4    Q.   What's Valarie Savage's race?
5    A.   White.
6    Q.   Why do you -- you said you think they had been
7      banned from court?
8    A.   Mary Beth and Mary Turner because --
9    Q.   You said you think they had been banned from
10      court.  You gave some testimony a minute ago
11      that they had been banned from court.
12   A.   Mary Turner and Mary Beth.  That's why -- they
13      had worked court, but they had been -- the
14      judge didn't like them working court I believe
15      because they questioned things about
16      defendants or there was some -- they didn't
17      get along with the judge, something.  The

18    judge was always writing them up for stuff.
19    This is what Mary Beth and Mary Turner told
20    me.  So --
21  Q.  But you don't know that, do you; you just know
22    what they told you?
23  A.  No.  I do know that the judge told me that she
0125
1    had put them out of working court.  She didn't
2    want them in the courtroom working.  However,
3    they did work it later.
4  Q.  And when did the judge tell you that she
5    didn't want them working court?
6  A.  I believe the first interview or a subsequent
7    meeting.  I can't remember.
8  Q.  But you're saying they went back in the
9    courtroom?
10  A.  Mary Beth and -- did assist Sarah with
11    prisoners because we -- I was trying to do
12    cross-training, and people's job duties
13    changed during my tenure there to cross-train.
14  Q.  There was cross-training going on?
15  A.  Not at the time I got there.  When I got
16    there, each magistrate only knew their
17    particular job duty.  If somebody was out,
18    nobody knew what to do.
19  Q.  And you're saying -- so when had this
20    cross-training idea come up?
21  A.  When I got there.
22  Q.  And what was the plan for cross-training?
23  A.  I asked the judge if we could -- if I could
0126
1    change the duties and let them be trained in
2    other duties so if someone was out that
3    another person would know how to do their
4    job.  And the judge agreed that that would be
5    a good idea.  But she asked me not to change
6    them right to begin with, for me to get in
7    there and kind of get used to the procedures
8    and the people and observe.  And then in
9    April, I was allowed to change the job
10    duties.  Well, actually, I changed them a
11    little bit because Lavera McClain had to be
12    out for surgery.  And I temporarily shifted
13    her duties to Mary Turner.
14  Q.  Let me back up.  When was Lavera out for
15    surgery?

16   A.   Sometime during April.
17   Q.   Do you know how long she was out?
18   A.   About six weeks.
19   Q.   What were her duties at that time, Lavera?
20   A.   I believe she was doing the bondsman
21        processes, forfeitures.  She did a -- put
22        together a docket for one of the court -- one
23        week of court.  She did alias warrants.
0127
1    Q.   Did other people do those things?
2    A.   Those job duties?
3    Q.   Yes.
4    A.   No, not at that time.
5    Q.   Nobody else did alias warrants?
6    A.   Not the kind she did, not for the particular
7        situations that she did.
8    Q.   And what situation was that?
9    A.   That she had particular types of cases that
10        she did.  Like when the judge ordered a alias
11        warrant in court, she would stamp it with that
12        and sign it, and those would go, I believe, to
13        Lavera, and she would enter the alias warrant
14        in the system to be printed out to take.
15   Q.   And you're saying no one else did that?
16   A.   They did it on other cases.
17   Q.   I'm not following you, though.  What kind of
18        other cases?
19   A.   Well, Michelle -- Valarie did -- some of
20        them -- Michelle, Valarie, Eunice did some,
21        but it was pertaining to the cases of the
22        court that they worked.
23   Q.   And you said Lavera did dockets and nobody
0128
1        else did that?
2    A.   Yeah.  They had their own dockets to do, yes.
3    Q.   So other people did dockets?
4    A.   Right.
5    Q.   And if somebody was going to be out, was it
6        your responsibility to get those duties
7        covered?
8    A.   It was their responsibility to get those
9        duties covered.  I issued a memo to that
10        effect.
11   Q.   Is that not something a manager should do, is
12        to make sure work tasks are covered or
13        reassigned?

14    A.   If I've issued a directive that, if you're
15          going be out, to have your duties covered,
16          then they are directed to have their duties
17          covered.  And I -- when I did a memo, I said,
18          if you have a problem with getting someone to
19          cover your duties, please let me know.
20    Q.   And what if somebody was unexpectedly ill;
21          would you cover their duties?
22    A.   I would have someone cover it.  I did have to
23          find someone, a volunteer to work court one
0129
 1          day because someone called in sick at the last
 2          minute.
 3    Q.   As a supervisor, it was your philosophy to
 4          say, if somebody is going to be out, they got
 5          to find somebody else to do their job?
 6    A.   They were -- they were grown people.  Yes.  I
 7          oversaw them, but they had a directive to do
 8          it.
 9    Q.   Who was going to -- if they asked Jane Doe to
10          do their job, who was going to do Jane Doe's
11          job?
12    A.   She did both, or they asked somebody, usually,
13          that -- if it was working court that day and
14          they were supposed to be in court, they would
15          ask somebody that wasn't working court that
16          day.  And if there was a problem with getting
17          somebody, then I would have to assign someone.
18    Q.   Did anybody have a problem in getting somebody
19          to cover their assignments?
20    A.   I don't recall there being a problem.  I take
21          that back.  There was one situation.  Michelle
22          Bryan either called in sick or was going to a
23          training, and she did not get somebody to
0130
 1          cover court.  So that morning, I asked for
 2          volunteers.  And no one seemed to want to work
 3          court.  Michelle had not gotten someone to
 4          cover.  And so I just told them that if
 5          somebody didn't volunteer, I would appoint
 6          someone.  And then someone did volunteer.
 7              Michelle wrote me an e-mail saying she
 8          didn't know she had to cover her -- if she was
 9          going to a training, she assumed that one of
10          the others would just cover it.  And I let her
11          know that, again, that she is responsible, and

12      if she couldn't get anybody, to let me know,
13      that I didn't want to be in that situation
14      again.
15   Q.   Did you write her up for this?
16   A.   No.  I had a -- I talked to her about it.  I
17      did an e-mail back to her.
18         MS. NELSON:  Do y'all want to take a lunch
19            break?
20         MR. JAFFREE:  Yeah, if we could.
21            (Lunch recess)
22   Q.   Ms. Martin, do you remember that line of
23      questioning about Michelle?
0131
1   A.   Uh-huh (positive response).
2   Q.   When you said you had talked to her and
3      e-mailed her, do you remember what you
4      e-mailed her?
5   A.   Yes.  She had -- I e-mailed her
6      that -- because she had said something in her
7      e-mail about she thought we were friends.  And
8      I explained to her the difference in my
9      position, that I could be friends but it
10      couldn't go to the point that I couldn't
11      supervise people.  And I tried to explain that
12      to her, that that was totally separate from
13      being friends.  And I told her that she had --
14      as I had instructed, she had to cover her
15      duties.
16   Q.   And her primary duties at that time were what?
17   A.   I believe, at that time, it was mostly working
18      court all day on Tuesday, half a day on
19      Wednesday maybe, and a half a day on Thursday.
20   Q.   And was this before you went to the
21      cross-training process that we talked about
22      earlier?
23   A.   I don't recall the date.
0132
1   Q.   Okay.  Were you and Michelle Bryan friends?
2   A.   Not great friends.  She had a lot of interests
3      that I had, as did some of the other ones.
4   Q.   Those interests being motorcycles?
5   A.   No.  We both had children.  We talked about
6      that.  She had -- her mother had some health
7      problems that she shared with me.  Just --
8   Q.   Did y'all socialize together?
9   A.   I went to lunch with her and Valarie Savage

10    two or three times while I was there.
11  Q.  Even after work, did you socialize with her?
12  A.  Not that I recall.
13  Q.  You said she and some others had some similar
14    interests that you did.  What others had
15    similar interests to you?
16  A.  I had some similar interests with Eunice.  We
17    both had played softball for years and had
18    actually played on opposing teams at times.  I
19    had similar -- some similar interests with
20    Mary Beth Brackin.  Her --
21  Q.  I'm sorry.  Go ahead.
22  A.  Because she had children, basically.  I had
23    some similar interests with Valarie Savage.
0133
1    We had -- one of my best friends is -- was --
2    is a cousin of hers.  And I knew some of her
3    family, like her aunt and my -- well, my
4    friend's mother was her aunt.  And she had
5    children.
6  Q.  Did you ever socialize with Mary Beth or
7    Valarie or Eunice outside of the
8    office -- outside of work -- after work?
9  A.  After work?
10  Q.  After work.
11  A.  Not that I recall.
12  Q.  Okay.  Did you go to lunch with Mary Beth or
13    Valarie?
14  A.  Yes.
15  Q.  Back to this idea of cross-training, were you
16    aware that there had been discussions about
17    cross-training before you ever started working
18    for the City of Dothan?
19  A.  No, I wasn't.  It was never mentioned to me.
20  Q.  Okay.  Did you ever provide any assistance in
21    the way of money or clothing to Michelle
22    Bryan?
23  A.  Money or clothing?
0134
1  Q.  Yes.
2  A.  It -- I don't really recall.  It's possible
3    that I did give her some hand-me-downs, some
4    clothes that I had that I had outgrown or
5    whatever.  I don't -- I could have done that.
6    I --
7  Q.  Did you ever loan her money?

8   A.  I never loaned her any money.  I might --
9   Q.  Did you give her money?
10  A.  I might have not -- I might have given her
11      some to give to her family or something when
12      her niece died.  I don't know.  I don't really
13      recall.
14  Q.  What were your normal hours of work?
15  A.  They were supposed to be from eight to five I
16      believe, but I ended up working late a lot of
17      days, came in on the weekend some.
18  Q.  When you worked late, what were you doing?
19  A.  What was I doing?
20  Q.  Yes.
21  A.  Some of my duties like some reports or --
22  Q.  What kind of reports?
23  A.  I had to do the -- I -- I didn't to begin
0135
1       with, but I did -- I had to do the state
2       treasurer's report.  I --
3   Q.  And what is that?
4   A.  It's a report that goes once a month to the
5       state treasurer for the amount of fines and
6       costs collected by the municipal court.
7   Q.  Okay.
8   A.  I had cases -- we had lost paperwork that I
9       stayed to search for sometimes.  Others stayed
10      also with me to search for it.
11  Q.  Like?
12  A.  Lost cases that were set for court hearing on
13      a docket.
14  Q.  And how often did you have to stay doing that?
15  A.  Well, we were missing cases about every week.
16  Q.  When you say, "missing cases," the paperwork
17      was lost?
18  A.  Paperwork was misplaced.  It was either
19      misfiled or laying in somebody's office.
20      And --
21  Q.  But you're saying that happened periodically?
22  A.  Well, about once a week when there was court
23      being -- the weeks court was held.
0136
1   Q.  How many cases go through a court a year?
2   A.  I think the previous year there had been
3       12,000 tickets maybe and -- I don't know --
4       three, four, 5,000 other types.
5   Q.  What would the other types be; were they

6     misdemeanor-type, non-traffic?

7  A.  Right, non-traffic.

8  Q.  How many magistrates were -- strike that.

9     Was there lost paperwork by a person that

10    was responsible for it or something just

11    didn't get in a file or was anybody written up

12    for this?

13  A.  Are you talking about a specific -- I mean, a

14    lot of people had paperwork in their office

15    that they might -- might have forgot was

16    there, might have got buried.  I did do a memo

17    to Michelle Bryan when she realized that some

18    cases that she had in her possession got

19    buried, lost during a move from the original

20    office to the new one.

21  Q.  Did that result in some cases having to be

22    dismissed?

23  A.  I don't know that for a fact.

0137

1  Q.  You said you sent her a memo.  Did you --

2  A.  I brought the --

3  Q.  -- reprimand her, or was it a --

4  A.  Not -- I --

5  Q.  -- disciplinary action?

6  A.  Well, it was a -- I think it was a

7    disciplinary action, but it was a memo that

8    went in her file to begin with because I

9    brought this to the attention of the judge and

10    showed her a list of the cases.  And to begin

11    with, it just -- I guess the judge just

12    glanced at it or whatever.  It wasn't a real

13    big deal.  And the judge and I discussed what

14    to do, and we agreed that I would do a memo to

15    her and let her know, you know, that -- not --

16    to know where the files are at all times.  So

17    I did a memo to her, explaining that I was

18    putting it in her file and all and told her

19    she had to be a lot more careful with cases.

20     And then sometime later, Ashton Ott, the

21    city prosecutor found out about these cases

22    and said I -- said something about some of

23    them would have been companion cases, felonies

0138

1    that they lost the opportunity to prosecute.

2    I never was given any paperwork proving that

3    or anything.

4   Q.  Proving what?
5   A.  That those cases, in fact, were lost -- I
6       mean, they couldn't prosecute them for a
7       felony.  She didn't identify which ones or
8       whatever.
9   Q.  "She" being Ashton?
10  A.  Ashton.
11          And at that point, the judge contacted me
12      and told me I needed to write Michelle Bryan
13      up a disciplinary action.  And I was
14      uncomfortable doing that because I had already
15      done the memo to her that the judge and I had
16      agreed on.  And, you know, I brought that to
17      the judge's attention that I had already done
18      the memo.  And she said because Ashton was
19      really upset about it and because they'd found
20      out that it was connected to some felony
21      cases, companion cases, whatever, that I had
22      to do a disciplinary action on her.  And I did
23      that.
0139
1           But right before I left, I was working on
2       three disciplinary actions that I had been
3       instructed to do by the judge.  And
4       Michelle --
5   Q.  Let's stick with just this one right now.
6   A.  Okay.  Well, Michelle was one of them.  And a
7       week before I was terminated, I had personally
8       taken the writeup over to the judge for her
9       review.  She was not there.  I laid it on her
10      desk, and that's the last I saw of it or the
11      last I heard of it till -- never mind.
12  Q.  Until what?
13  A.  Till I read in some of the -- or heard in the
14      personnel hearing of Mary Beth that I had
15      never done the writeup, refused to do it,
16      which is totally a lie.
17  Q.  You're saying, Mary Beth -- who --
18  A.  It was either during --
19  Q.  Mary Beth Brackin said --
20  A.  Mary Beth Brackin's personnel -- no.  Mary
21      Beth didn't say.
22  Q.  Who said?
23  A.  Judge, Judge Gordon, either testifying during
0140
1       Mary Beth Brackin's personnel board hearing or

2      in some responsive pleading that was filed by
3      you or Len White or whoever, the judge said in
4      there that I refused or never did the
5      disciplinary writeup.
6   Q.  On Michelle?
7   A.  On Michelle.
8   Q.  But you're not sure where that comes from;
9      it's something you read or saw.
10   A.  Well, I'm sure it's in some of the --
11   Q.  Court paperwork?
12   A.  Yes.  Don't know which one, but it -- it is in
13      there.
14   Q.  And when you did the memo to Michelle before
15      Ashton Ott -- let me back up.  Ashton Ott, at
16      the time, was with the City's attorney's
17      office; is that correct?
18   A.  Right.
19   Q.  And she was a City prosecutor; is that
20      correct?
21   A.  Right.
22   Q.  When you first did that memo before Ashton Ott
23      got involved, is it fair to say you didn't
0141
1      know all the facts or the seriousness of what
2      Michelle had done; is that correct?
3   A.  I don't think anybody knew the seriousness at
4      that time.
5   Q.  And then once Ashton got involved in her role
6      as City attorney and prosecutor, it came to
7      everyone's attention how serious the situation
8      was, that Michelle had kept all of those files
9      in her office or had left all that in her
10      office; is that correct?
11   A.  She didn't keep those in her office.  She
12      wasn't aware they were in there.
13   Q.  Well, that's your terminology.  They were in
14      her office.  What were they -- is that
15      correct?
16   A.  I don't know if they were in her office.  She
17      told me that they were buried in the move, and
18      while looking for other missing paperwork, she
19      found them, and let me know about it.
20   Q.  And then once she let you know, what did you
21      do with them?
22   A.  I took them to the judge and explained the
23      situation.

0142
1    Q.   Now, you said, there were two other situations
2         that you were in the process of doing a
3         disciplinary action on someone.
4    A.   Right.
5    Q.   Is that correct?
6    A.   Yes.
7    Q.   Who were the other two?
8    A.   Mary Turner and Ann Baxter.
9    Q.   Okay.  Why were you doing a disciplinary
10        action on Mary Turner?
11   A.   That's a good question.  There was a -- loud
12        voices kind of -- I don't even call it a
13        confrontation.  I was there in the hallway
14        between Mary Turner and Ann Baxter about some
15        case -- don't know what case, don't recall --
16        where they raised their voices at each other
17        and I went -- I was sitting in my office and
18        saw them and heard it, went out there to see
19        what was going on.  And by that time, some of
20        the other magistrates had gathered there.  And
21        I told them -- I asked them what the problem
22        was.  And both of them said, nothing, we do
23        this all the time.  You know, we raise our
0143
1         voice at each other.  Mary says something.  I
2         say something back.
3              And I said, well, I don't want it
4         happening out here in the hallway or anything,
5         and y'all just need to cool it.
6              Then to be sure that there really wasn't
7         something going on, when they got back to
8         their offices, I went and talked to Ann Baxter
9         privately and asked her if I -- if she needed
10        me to take it up with the judge, if she needed
11        me to -- if she thought it was worth
12        disciplinary action of Mary, was it more than
13        what they had told me in the hallway.  I
14        wanted it from her one on one.
15             And she just laughed and said, no, Mary
16        and I have been doing this for years.
17   Q.   And as their supervisor, you thought that was
18        appropriate conduct?
19   A.   I didn't see it as a big deal because others
20        in the office raise their voices, too.
21   Q.   Did you ever see Mary Turner throw or become

22    angry and throw a stack of warrants all over
23    the floor?
0144
1  A.  I don't recall that.
2  Q.  Isn't that something you might remember if you
3    saw it?
4  A.  Yes, if I saw it.  I guess I didn't see it.
5  Q.  You've never heard of her doing that?
6  A.  No.
7  Q.  Do you think that would warrant disciplinary
8    action?
9  A.  Not necessarily.
10  Q.  Have you ever supervised anybody before?
11  A.  I think I've answered that already.
12  Q.  Who --
13  A.  And I still supervise to this day.
14  Q.  Who did you supervise at Legal Services, how
15    many people?
16  A.  Like I said, at different times, I supervised
17    different numbers of people.
18  Q.  Like two secretaries and a receptionist?
19  A.  To begin with, I supervised a legal secretary
20    in Troy, a receptionist in Troy, a
21    receptionist in Dothan, and three or four
22    legal secretaries.
23  Q.  Did you fill out their evaluations?
0145
1  A.  Yes, I did.
2  Q.  Could you hire and fire them?
3  A.  I could recommend.
4  Q.  And you thought it was normal conduct for
5    people to be yelling and screaming in the
6    office?
7  A.  It wasn't quite like that.
8  Q.  Does the public come in the magistrates'
9    office?
10  A.  Not in that particular place.
11  Q.  And where did this take place?
12  A.  In the hallway.
13  Q.  Did the public see it or hear it?
14  A.  They couldn't see it.
15  Q.  Could they hear it?
16  A.  I don't know.  Undoubtedly, according to the
17    judge, a trustee heard it because that's who
18    she claims told her about it.  But I don't
19    recall seeing a trustee there at that time.

20    Q.   So the two other instances -- was Mary
21         Turner and -- the situation you described
22         involved two other people?
23    A.   Right.  And I was made to write Mary Turner up
0146
1          and that -- and that disciplinary action, I
2          did against -- I mean, I -- the judge told me
3          to and I did it.  And that's the second one
4          that I laid on her desk about a week before I
5          was terminated.  And I never heard anything
6          else about it.  And the judge disputes -- also
7          makes mention that I refused to do the
8          disciplinary action.
9     Q.   And your --
10    A.   Which those would be on my computer -- you
11         know, should still be on there.
12    Q.   The judge's disputing it, your reference point
13         there comes from what?
14    A.   From the same thing as the other I told you.
15    Q.   Either the hearing or --
16    A.   Hearing or --
17    Q.   -- something you read in --
18    A.   -- reading somewhere in some of these
19         documents.  Yes.
20    Q.   -- court documents?
21         Now, did you know Ashton Ott before this
22         issue with Michelle Bryan and the documents
23         came up?
0147
1     A.   Did I know her?  I had met her over in court.
2     Q.   Or interacted with her?
3          How frequently was she in court?
4     A.   Quite frequently.
5     Q.   Quite frequently?
6     A.   Uh-huh (positive response).
7     Q.   And how often were you in the courtroom?
8     A.   To begin with, not a whole lot.  I mean, maybe
9          once a week.
10    Q.   And did that become more frequent?
11    A.   When we -- when I changed job duties of some
12         of the magistrates and the -- and two new ones
13         started working court, I was over there more
14         in case they needed assistance or I could
15         get -- so I could get someone to assist them.
16         And I ended up -- there were a lot of -- some
17         days there were a lot more cases on the

18      docket.  If there was going to be 600 people,
19      meant there were going to be a lot of people
20      in the fines room.  And I would stay over
21      there to make sure -- help the magistrate keep
22      that in order.
23   Q.   Who were the two new ones?
0148
1   A.   Lavera McClain and Eunice Knight.  Well, not
2      really -- Eunice had worked one part of court,
3      but she hadn't worked with traffic court.
4   Q.   Newton court?
5   A.   Right.
6   Q.   And was this part of this cross-training?
7   A.   Yes.
8   Q.   And isn't it true that y'all were actually
9      rotating duties periodically for everybody to
10      learn all aspects of the magistrates' job?
11   A.   Right.
12   Q.   And was it like a 90 day or --
13   A.   No, it wasn't.  There was no agreed-upon time
14      period.  We said every two to three months.
15   Q.   Every two to three months.  Okay.  And who is
16      "we?"
17   A.   Me and the judge, Judge Gordon.
18   Q.   And, now, when the two of them were in court,
19      would you assist them if they needed help?
20   A.   I took things to the fines room for them.
21      But, no, I wasn't trained to work the court
22      system in court.
23   Q.   Did you ever make any decisions in the
0149
1      courtroom as to how attorneys could proceed or
2      how they had to conduct themselves in court?
3   A.   I'm not sure I understand your question.
4   Q.   Well, did you make any rules or policies or
5      procedures that affected attorneys filing
6      motions?
7   A.   I didn't make the policy.  Judge Gordon made
8      the policy, and I did the memo.  No, let me
9      take that back.  Judge Gordon did the memo.
10   Q.   What policy memo are you talking about?
11   A.   I'm talking about the one where -- there was
12      one where if the attorneys did not enter
13      appearance or if they wanted -- or if they
14      wanted to enter a plea or any motions, if that
15      was not done I believe seven days before the

16     court time, they had to bring it
17     over -- appear in court and bring it before
18     the judge after she convened court.
19  Q.  Did you ever refuse to let attorneys file
20     motions?
21  A.  No.
22  Q.  Did you ever get involved in attorneys
23     appearing and instruct them as to what order
0150
1     they could handle a particular case or submit
2     filings in a particular case that may have
3     been on the docket that day?
4  A.  No.  The memo directed that.
5  Q.  And what memo are you talking about?
6  A.  I'm talking about the same memo.
7  Q.  And what did it direct?
8  A.  Just what I told you, that attorneys are to go
9     before the judge after she convened court to
10     file those if they weren't filed in a timely
11     manner.  Actually, that wasn't a new memo.
12     That was a policy before I came.  It just
13     wasn't being enforced, as were many others not
14     enforced.
15  Q.  I'm still not sure I'm following you or that
16     we're on the same wavelength here.  Explain
17     this memo to me.
18  A.  Well, if -- if y'all had provided what we
19     asked for in documents, you could show it to
20     me, and I could tell you.  But you didn't.
21  Q.  Well --
22  A.  But there is a memo.
23  Q.  Well, I'm asking you to describe that memo.
0151
1  A.  I just -- I've already answered that
2     question.  I told you it was from the judge.
3  Q.  Well, I don't understand it, so I want you to
4     expand on it.
5  A.  The judge did a memo to all magistrates,
6     clerks, everyone in the magistrates' office.
7     Actually, I believe the memo -- no, it didn't
8     just say magistrates.  It said to all
9     concerned parties.  And these were given
10     out -- this memo was given out when an
11     attorney appeared with a motion that was not
12     being timely filed and they were given this
13     document, letting them know that they either

14    have to be timely filed because it affects the
15    docket or -- and I believe it -- I'm pretty
16    sure it said, seven days before.  And if not,
17    they or someone from their office would have
18    to appear at their allotted court time for the
19    case and present the documents to the judge at
20    that time.
21  Q.  Okay.  And are you aware of any attorney being
22    affected by this memo?
23  A.  An attorney being affected?
0152
1   Q.  Yeah.
2     MR. JAFFREE:  I'm not sure the question is
3       clear.  It's too opaque.  Affected
4       how?  Because the memo wasn't
5       addressed to the attorney.
6   Q.  Well, did you interpret this memo -- well,
7     what if a motion was not timely filed, what
8     would happen?
9   A.  Just what I said.  They're supposed to go over
10    to the court and file it with the judge and
11    let her decide.  If they filed them timely,
12    they could be attached to the court paperwork,
13    entered in the computer system, and sent over
14    to the judge if there was time before the
15    court date.  If not, they were attached to the
16    paperwork and sent over with the court
17    docket.  If they weren't timely filed, they
18    had to go to court.
19  Q.  If it was not, in your eyes, timely filed,
20    would you refuse to take it?
21  A.  I would not take it in the magistrates'
22    office, no, because I was directed to send
23    them to court.
0153
1   Q.  Did you ever in court refuse to take a filing?
2   A.  Did I?
3   Q.  Yes.
4   A.  No.
5   Q.  Do --
6   A.  If one was presented to me in court, that
7     was -- the court date, they were to go before
8     the judge.
9   Q.  So you would not file it; you would tell them
10    to take it up with the judge?
11  A.  I didn't file things in the courtroom.

12    Q.   When you were in the courtroom, what were you
13        doing?
14    A.   Sometimes I was observing the magistrates work
15        in court.  Sometimes I was observing the
16        magistrate in the fines room.  Sometimes I was
17        in the fines room, keeping the loud talk and
18        laughter and everything down.  Sometimes I was
19        talking to attorneys that I knew.
20    Q.   You were, in essence, trying to learn the job;
21        is that correct?
22    A.   I was trying to learn the job, and I was also
23        observing the people that I supervised.  I was
0154
1        not learning to work court because that was
2        not my job duty.
3    Q.   But if you had to supervise those that worked
4        court and handle all the other things
5        magistrates do, weren't you expected to know
6        or learn what the job entails?
7    A.   I was learning, but I wasn't expected to sit
8        down there and do it.
9    Q.   Were you ever expected to interact with the
10        public?
11    A.   Yes.
12    Q.   And did you?
13    A.   Many times.
14    Q.   Were you expected to interact with the public
15        defender and the City attorney's office?
16    A.   Sure.
17    Q.   What was your relationship with Ashton Ott?
18    A.   I thought it was pretty good until I asked her
19        not to demean, degrade the magistrates in open
20        court.  I very nicely called and asked her not
21        to do that, to please call me and let me know
22        about the situation, and we could work out a
23        solution.  And she ended up throwing a fit
0155
1        over the phone and hanging up on me, which was
2        very unprofessional.
3    Q.   Who do you contend she was demeaning in open
4        court?
5    A.   That particular time was Michelle Bryan and
6        Valarie Savage.
7    Q.   Did you see this happen?
8    A.   No, I didn't.
9    Q.   And how do you know that this occurred?

10  A.  They told me it did.
11  Q.  What did they tell you?
12  A.  They told me that she was -- she had an
13      outburst and said that the magistrates were so
14      stupid, that they had made error again, and
15      they couldn't do anything right.
16  Q.  And this was just coming from Michelle and
17      Valarie; is that correct?
18  A.  No.  One of the police officers in court told
19      me also.
20  Q.  Who was that?
21  A.  Brad Baum.
22  Q.  Who?
23  A.  Brad Baum.
0156
 1  Q.  And what did he tell you?
 2  A.  He told me that there was outburst by her but
 3      that there had been many degrading
 4      magistrates.
 5  Q.  When you learned this, what did you do?
 6  A.  I told you.  I picked up the phone, and I
 7      called Ashton.  And I asked her what happened,
 8      and she said that she didn't do that.  But I
 9      asked her, I said, if you have a problem with
10      the magistrates, please call me and let's work
11      something out about it, instead of degrading
12      them in front of hundreds of defendants and
13      other attorneys and all.
14  Q.  And your testimony is that she then hung up on
15      you?
16  A.  She did hung up on me.  She did hang up on me.
17  Q.  And if Ashton's recollection of that event is
18      different, you would say she was not being
19      truthful?
20  A.  I would say she's lying.
21  Q.  Do you know if she's made complaints about
22      you?
23  A.  Not to my knowledge.
0157
 1  Q.  Ashton is white; is that correct?
 2  A.  Right.
 3  Q.  What about the public defenders; what's your
 4      relationship with the public defenders?
 5  A.  Specific --
 6      MR. JAFFREE:  Well, are there more than
 7          one?

8    A.  Give me names.
9    Q.  How many public defenders do you know?
10   A.  Give me names of what you're asking.
11   Q.  I'm asking you, do you know the public
12       defenders for the City of Dothan?
13           MR. JAFFREE:  Let me object to the form of
14               the question.  It doesn't indicate at
15               what point in time does she know the
16               name of the public defenders, now,
17               then?
18           MS. NELSON:  Then when she worked with the
19               City of Dothan as court
20               administrator.
21   A.  I believe Shaun McGhee was one.
22   Q.  Anybody else?
23   A.  I think Ginger Emfinger or Scarborough or
0158
1        whatever.  She went by two different names.
2    Q.  You seem hesitant.  Did you not work with them
3        very often?
4    A.  I was over in court.  I didn't -- I mean, I
5        socialize with them.
6    Q.  Socialized meaning?
7    A.  I mean in court, talking to them.
8    Q.  What would you say your relationship with
9        Shaun McGhee was?
10   A.  I had a good relationship with Shaun McGhee.
11   Q.  What about Ginger?
12   A.  I thought I had a good relationship with
13       Ginger.
14   Q.  Are you aware of any complaints that they have
15       made against you?
16   A.  No.  I would love to see the written
17       complaints that were made against me, though.
18   Q.  Do you contend that every complaint has to be
19       in writing?
20   A.  I contend that the judge had a policy that
21       every complaint to her had to be in writing,
22       or she wouldn't entertain it.
23   Q.  And what do you base this on -- that statement
0159
1        on?
2    A.  The judge's telling me that.  And she advised
3        me that -- not to entertain complaints made to
4        me or she would prefer I didn't unless they
5        were made in writing.

6  Q.  Did the magistrates come and complain to you?
7  A.  Yeah, I have some written complaints.
8  Q.  I mean, did anybody ever complain to you
9      that's not in writing?
10  A.  Sure.
11  Q.  What did they complain to you about?
12  A.  About all the errors that they were having to
13      correct for Eunice and Lavera.
14  Q.  Is it your contention that only Eunice and
15      Lavera made errors?
16  A.  No, it's not my contention.  They certainly
17      weren't the only one that made errors.  They
18      just made a hundred times more than anybody
19      else did.
20  Q.  And how do you -- what do you base that on?
21  A.  Because I saw paperwork.  I pulled the
22      paperwork to look at it.  I looked it up in
23      the court system.  I checked everybody's,
0160
1      behind everybody.
2  Q.  And your testimony is they have a hundred
3      times more errors than anyone else?
4  A.  Right.
5  Q.  Did you keep documents of errors that were
6      made?
7  A.  At the time I was employed, yes.  Most of the
8      time, I would -- I wanted to ask them to
9      correct it, but the judge had told me that if
10      it's just simple errors and the person
11      complaining could make it as quick as they
12      could, they should just correct it.
13  Q.  What type of errors are we talking about?
14  A.  Not recalling -- well, recalling warrants in
15      the computer system.  Or these are the worst
16      ones, the very bad ones:  Recalling warrants
17      in the computer system but not getting the
18      warrant secured from the police department,
19      jail.  And people would be wrongly arrested
20      then because there would still be a warrant
21      out.  Errors such as no disposition code in
22      many cases where they'd worked court and just
23      hadn't followed up and done the paperwork.
0161
1      They filed them away unfinished.  Court dates
2      set that should have been an arraignment was
3      set on traffic days.

4    Q.  Was the computer responsible for any of these
5         errors?  Could the computer have been
6         responsible for any of these errors?
7    A.  Yes, it was responsible for a few.
8    Q.  Did Ann Baxter commit errors?
9    A.  Sure she did.  I said all of them did.
10   Q.  Were hers a hundred times worse than anybody
11        else?
12   A.  Hers were -- no, not that much.  She was the
13        next one that committed errors.
14   Q.  Did you ever write her up?
15   A.  No, I didn't.  I didn't write Eunice and
16        Lavera up.  I wasn't allowed to.  They were
17        untouchable.
18   Q.  What did you want to write them up for?
19   A.  For all the errors that they were making.
20        They weren't -- it wasn't changing.  You
21        expect over time the errors to lessen.
22   Q.  Well, you just told me about three.  Are you
23        aware of anybody else that recalled a warrant
0162
1         in the computer system that somehow didn't get
2         communicated to the jail?
3    A.  Yeah.
4    Q.  Who?
5    A.  Ann.  But she didn't do it near as many times
6         as Lavera and Eunice did it.
7    Q.  How many times did Lavera do it?
8    A.  I don't have a specific count.
9    Q.  How many times did Eunice do it?
10   A.  I don't have a specific count.
11   Q.  Did Valarie or Mary Beth or Mary Turner or
12        Michelle, did they recall any warrants in the
13        system that didn't get communicated to the
14        jail?
15   A.  I'm sure they -- maybe ever -- occasionally.
16        I don't know if they did it -- I don't
17        remember or recall if they did it while I was
18        there.
19   Q.  But feel like they did?
20   A.  They could have.
21   Q.  Did you write them up or try to write them up?
22   A.  No, because they didn't do it.  They were --
23        why would I write one person up and not be
0163
1         allowed to write others up?  That was unfair.

2   Q.  What about any other magistrate fail to enter
3        a disposition code besides Eunice or Lavera?
4   A.  I don't recall ever seeing one.
5   Q.  How many dispositions code errors did Eunice
6        make?
7   A.  I don't have a count.  I don't have the
8        documents.
9   Q.  What about Lavera?
10  A.  Many.
11  Q.  What about setting the court date for -- I
12       think you said, setting a court date for a
13       time that something else was going on.  I'm
14       sorry.  You said there was another error that
15       they set a court --
16  A.  They would set court dates.  They were not
17       paying attention or checking their work.  They
18       had court dates -- people would print out on a
19       docket that their court date should actually
20       be on a traffic court.  They would be on an
21       arraignment day, or vice versa.
22  Q.  Arraignment day.  That's what I --
23  A.  Yeah.
0164
1   Q.  How many times did Lavera do this?
2   A.  Many.
3   Q.  How many is "many?"
4   A.  In fact their -- I did an -- I did an e-mail
5        to Lavera and Eunice because it kept happening
6        and kept happening.  I did an e-mail to them,
7        advising that Valarie and I were having to
8        continually correct these dates and that they
9        should pay better attention and get them set
10       on the right court dates.  And from then on, I
11       was going to be taking it back to them to
12       correct instead of us correcting them.
13  Q.  They were setting these dates because they
14       were the two people working court; is that
15       correct?
16  A.  Not always.
17  Q.  Who else was working court?
18  A.  The errors didn't always happen from working
19       court.
20  Q.  Did anybody else besides Eunice or Lavera make
21       a court date entry for a time when it was
22       arraignment day, for example?
23  A.  Could have, not -- not in the quantity that

0165
1          Eunice and Lavera were doing.
2     Q.   But I think just a little while ago when I was
3          asking about who was working court, it was
4          primarily Eunice and Lavera when you were
5          there?
6     A.   At that particular time.
7     Q.   Is that correct?
8     A.   At that particular time, yes.  They started
9          working court the end of June.  Until that
10         time, the major court was worked by Valarie
11         Savage and Michelle Bryan.
12    Q.   Do you know how many errors they made?
13    A.   Very few during my tenure.
14    Q.   Are you aware that any attorneys or members of
15         the Bar in Dothan made complaints against you
16         or about you?
17    A.   No, I was never given any complaints that were
18         made against me.  And if there were any made,
19         I was never provided anything.  But if they
20         were made, it was because I was enforcing
21         policies that had not been enforced before.
22    Q.   And what policies were those?  I know we've
23         talked about the memo -- I mean, about the
0166
1          motions not being timely filed.  What other
2          policies are you talking about?
3     A.   Well, that was the main one.  And then there
4          was a memo -- because the attorneys were bad
5          about coming up to the court magistrates
6          working court, wanting to get court documents
7          before court started.  And that was put a stop
8          to.  There was a memo directing them or
9          bondsmen not to come up and take paperwork --
10         case paperwork from the magistrate working
11         court, and they weren't happy about that
12         either.
13    Q.   Are these policies that you put out?
14    A.   Well, the first one we talked about was under
15         the judge's signature.
16    Q.   I'm talking about the memos regarding the
17         bondsmen and attorneys.
18    A.   It might have been under my signature, but it
19         was discussed with the judge and agreed to by
20         the judge.  And it was copied to the judge.
21    Q.   When did you discuss this with the judge?

22    A.   Before I did the memo.
23    Q.   Was anybody else present?
0167
1    A.   I don't know.  Can't recall.  That was also --
2         part of that was also a policy before I came
3         there that just wasn't being enforced.
4    Q.   What part was that?
5    A.    The attorneys getting paperwork before court
6         started -- I mean, from the magistrates.
7    Q.    Did you ever keep any records regarding errors
8         made on -- where there may be -- where you're
9         posting moneys and needs to be a reversal or
10         improper handling of the moneys?
11    A.   Say that again.
12    Q.    Did you ever keep any records of magistrates
13         who were involved in, like, posting moneys
14         paid that were, say, wrongfully posted and
15         moneys had to be -- or the entry had to be
16         reversed?
17    A.    There was a lot of -- several things brought
18         to my attention on that, and I had to have
19         Valerie Harris, the city auditor, had to --
20         her with Accounting got involved with doing
21         some of those reversals because they were not
22         being done right.
23    Q.    Was this before you got there or after you got
0168
1         there?
2    A.   This was after I got there.
3    Q.   Well, I'm going to show you, for example --
4             (Defendants' Exhibit 11 was marked
5              for identification.)
6    Q.   I'm just going to show you what I've marked as
7         Defendants' Exhibit 11.  Is that something you
8         can identify for me?  Is that your writing?
9    A.   Where?
10    Q.   On that first page.
11    A.   No, it's not.
12    Q.   Do you know who did that?
13    A.   No, I don't.  It's not my writing.
14    Q.   Do you know what that document is?
15    A.   Yeah.  It's where a reversal was done.  Could
16         have been --
17    Q.   You need to speak up.  It's where a what is
18         done?
19    A.   A reversal.

20  Q.   And what is a reversal?
21  A.   When something is posted to the wrong account
22       or posted wrongly.
23  Q.   Did you keep -- have you ever seen this one
0169
1        before?
2   A.   No, I haven't.
3   Q.   And you don't know who did that?
4   A.   Kind of looks like Mary Beth Brackin's
5        writing, but I couldn't swear to that.  Don't
6        recognize the name at all.
7             (Defendants' Exhibit 12 was marked
8              for identification.)
9   Q.   Let me show you one that's marked Defendants'
10       Exhibit 12.  That's also a reversal; is that
11       correct?
12  A.   Yes.
13  Q.   Is any of that your writing?
14  A.   No, it's not.
15  Q.   Do you recognize whose that might be?
16  A.   I can just guess.  Could be Mary Beth
17       Brackin's, but I've never seen it.
18            (Defendants' Exhibit 13 was marked
19             for identification.)
20  Q.   Another one, Defendants' 13, is that a
21       reversal?
22  A.   Yes, it is.
23  Q.   Do you recognize that writing?
0170
1   A.   Can't say for sure.  It's not my writing.
2        MR. JAFFREE:  Let me, for the Record,
3             object to Defendants' 11, 12, or 13
4             being attached to the deposition for
5             any purpose.  The plaintiff/witness
6             cannot identify them.  She said that
7             they're not her writing and she don't
8             know when these was generated.  She
9             can't attest to the veracity of any of
10            these documents.
11            (Defendants' Exhibit 14 was marked
12             for identification.)
13  Q.   Let's me show you Defendants' Exhibit Number
14       14.  Is that also a reversal?
15  A.   Yes.
16  Q.   Do you recognize any writing on that document?
17  A.   No.  I wasn't even there that day, and it's

18      not my writing.  And I don't really know whose
19      it is.  I believe I was off that day.
20   Q.  Well, as manager of -- or as court
21      administrator, were you responsible for --
22      supervising the magistrates, we've established
23      that.  Are you charged with knowing if
0171
1      reversals take place in the office?
2        MR. JAFFREE:  Let me object to the form of
3          the question, the relevance of the
4          question, and the implication from the
5          question that these are reversals that
6          she should have known about.  This
7          witness don't know anything about
8          these reversals, whether or not they
9          was manufactured yesterday, at the
10         time of the report to have been
11         manufactured, who drafted them, or
12         anything.  So if you're going to
13         criticize her for --
14       MS. NELSON:  You stated your objection.
15         I'd ask you not to testify for her.
16       MR. JAFFREE:  Well, I'm not testifying.
17         I'm only --
18   Q.  As court administrator, it's your testimony
19      that you've never seen one of these documents?
20   A.  That's right.
21   Q.  You've never seen the form itself?
22   A.  Yeah, I've seen the form.
23   Q.  Are you charged with keeping track of how many
0172
1      reversals that somebody has been charged with
2      or made?
3   A.  Say that again.
4   Q.  Are you responsible for knowing if a
5      particular magistrate has posted -- wrongly
6      posted money that had to be reversed?
7   A.  I -- I can't say that I always knew, no.  And,
8      especially, the last one, I was on vacation at
9      the time and had appointed a magistrate in
10     charge in my absence.
11   Q.  Well, when you come back, isn't it your duty
12      to know what's going on in the office?
13   A.  Well, I really didn't have time when I came
14      back because I was pretty much terminated
15      after that time.

16  Q.  Well, I think one of those was dated in July.
17      You weren't terminated right after that, were
18      you?
19  A.  I never saw the document, though.  I can't do
20      anything about things I didn't see.
21  Q.  And why is it that you did not see it?
22  A.  I don't know.
23  Q.  Are you not responsible -- did you make an
0173
1       attempt to find out who had reversals and who
2       didn't?
3   A.  Mostly if Accounting or Valerie Harris called
4       to let me know, yes.
5   Q.  You said, you've seen this form.  Tell me your
6       understanding of how this form is used?
7   A.  I believe Mary Beth -- no.  I don't know who
8       did -- whoever did the reversal had to fill
9       out a form that I believe went in with their
10      balancing sheet.
11  Q.  And as court administrator, you don't know who
12      was responsible for doing reversals or keeping
13      up with that?
14  A.  The -- each magistrate that did the wrong
15      would reverse it, unless it was so wrong that
16      Accounting or Valerie Harris had to get
17      involved as she did many times.
18  Q.  But you're saying -- you said earlier a couple
19      times that Mary Beth might have, Mary Beth
20      might have.  Was Mary Beth responsible for
21      keeping track of reversals?
22  A.  She did the balancing of all the moneys.
23  Q.  Best of your knowledge -- I know you're saying
0174
1       you don't recognize this, you think it might
2       be Mary Beth.  Are these forms something that
3       Mary Beth worked with or was responsible for?
4   A.  I don't know that that's Mary Beth's writing.
5   Q.  I'm not --
6   A.  And I --
7   Q.  I'm asking you, who's responsible for that?
8   A.  I don't know.  I -- I've never seen these
9       (indicating) particular documents.  I've seen
10      a blank document.  These could have been
11      generated, as my attorney said, at any time.
12  Q.  Do you have reason to believe that Mary Beth
13      would not accurately fill one of those forms

14     out?
15     A.  I can't testify to that because I don't know
16       that Mary Beth did that.
17     Q.  Do you know what was done with these forms?
18       You said you've seen a blank one.  Have you
19       ever filled one out?
20     A.  Can't say I have or hadn't.
21     Q.  Would you know how to fill one out?
22     A.  Yeah.  Looks pretty simple.
23     Q.  Then what would you do with it?
0175
1     A.  I would think it -- it would go in with the
2       balancing paperwork for the fines and costs
3       that were accepted during the day on the
4       report.
5     Q.  You would think, but that's what you don't
6       know?
7     A.  I was only training to do that when I left.  I
8       had done it a few times.  Mary Beth was the
9       one that did the balance -- the overall office
10       balancing for most of the time that I was
11       there.
12     Q.  How many dockets did you prepare when you were
13       there?
14     A.  I didn't prepare dockets.
15     Q.  Who did?
16     A.  Valarie Savage and Mary Beth Brackin.
17     Q.  And if Mary Beth was out, who would prepare
18       the docket?
19     A.  Are you talking about a specific incident or
20       just in general?
21     Q.  In general.
22     A.  She usually had them posted before she was
23       out.  They were usually posted two weeks in
0176
1     advance.
2     Q.  And if they weren't?
3     A.  There never was a time that they weren't.
4     Q.  It's your testimony that there was not a time
5       period when Mary Beth was out for two weeks
6       and court couldn't be held for two weeks
7       because --
8     A.  That is my testimony.
9     Q.  -- dockets weren't posted?
10     A.  And anything else is a lie.
11       Now, do you want to ask me about the

12     specific incident when Mary Beth was out?
13     Because the last week of the month, court is
14     not held.  So one of the weeks Mary Beth was
15     out, there was no court.  So there was no
16     docket.  And before she left, she had posted
17     the next two weeks' dockets.  And I'm sure if
18     they haven't been destroyed, those dockets are
19     still in the magistrates' office.
20  Q.  Ms. Martin, we're going to be here for a
21     while.
22  A.  Yeah.
23  Q.  And you can continue this sarcastic tone with
0177
1     me and accusations of lying, and we'll just
2     stay here --
3         MR. JAFFREE:  Hold it.
4  A.  I want you to give me names and --
5         MR. JAFFREE:  One moment.  You're arguing
6         --
7  Q.  It's my place to ask you questions.  I can ask
8     my question any way I want to.
9         MR. JAFFREE:  You're arguing with the
10        witness.
11        MS. NELSON:  I am because she's arguing
12        with me.
13        MR. JAFFREE:  She's not giving a --
14        MS. NELSON:  She's arguing with me and
15        she's accusing --
16        THE WITNESS:  No, I'm not.
17        MR. JAFFREE:  She's not giving a sarcastic
18        tone.  She's just simply explaining to
19        you what --
20        MS. NELSON:  She is not, and you know it.
21        MR. JAFFREE:  Well, no, I don't know it.
22        I mean, she says she have answered the
23        questions, and she have answered the
0178
1         question.  I mean, you can --
2         MS. NELSON:  That's not what she said.
3  Q.  Okay.  Tell me about this time that
4     Ms. Brackin posted documents -- the docket
5     sheet?
6  A.  I just told you.  What else do you want to
7     know.
8  Q.  Well, when did this occur?
9  A.  Before she was suspended.

10  Q.  And you suspended her; is that correct?
11  A.  No.  The judge suspended her.  I was made to
12      do the writeup.
13  Q.  Do you know what offense she had committed?
14  A.  Don't know for a fact.
15  Q.  It involved conduct that occurred before you
16      got there; is that correct?
17  A.  Yes, it was.
18  Q.  Did you feel like it was inappropriate to
19      write her up for something that occurred when
20      you weren't there?
21  A.  Yes, I felt it was inappropriate.  I wasn't
22      there, was not employed at that time, and it
23      was totally appropriate for the judge to do
0179
1       that since she was supervising at that time.
2   Q.  You don't disagree with the writeup; you just
3       disagree with the fact you had to sign off on
4       it?
5   A.  I disagree with the writeup.
6   Q.  And why did you disagree with it if you
7       weren't even there?
8   A.  Because the judge gave me the material to
9       review, and I reviewed it.
10  Q.  What did you review?
11  A.  Documents.
12  Q.  What documents?
13  A.  Of what -- I believe what the defendant says
14      happened, what Mary Beth says happened.  I was
15      told by the judge that there was -- or maybe I
16      was there when they did the -- I can't
17      remember -- the investigation.  I'm not sure.
18      Mary Beth had a few investigations.
19  Q.  Do you know anything about this investigation
20      or who ordered it or prompted it?
21  A.  Only what I heard -- was told to me.
22  Q.  And you don't know personally for a fact, do
23      you, what happened?
0180
1   A.  I know what I read in the documents and what I
2       was told.
3   Q.  And what were you told?
4   A.  That -- I don't even remember which one this
5       is, whether it's --
6   Q.  If you don't know which one is it, how do you
7       know whether you agree with it or not or think

8      it was inappropriate or not?
9   A.   Because I confused -- she had -- she was
10         investigated more than once.
11   Q.   When you were working there, how many times
12         was she investigated?
13   A.   One -- see, I don't remember if she was
14         investigated for this before I got there or
15         after.  I know that I was in on one, which I
16         think is this one where I had to actually be
17         in to serve a -- be in there for her to sign a
18         document in the investigation.  And then I
19         was -- then I left.
20   Q.   So that's the only one that you were even
21         involved in, this one particular one; and that
22         would have been in 2004 when you worked for
23         the City.  Is that correct?
0181
1   A.   That I would have been there?
2   Q.   Yes, employed by City?
3   A.   Yes, I believe so.
4   Q.   And she was suspended for ten days at that
5         time; is that correct?
6   A.   That's right.
7   Q.   And it's your testimony that she had prepared
8         dockets, which covered the time for which she
9         had been suspended?
10   A.   Right.  There wasn't court one of those weeks.
11   Q.   And what week was that?
12   A.   That was the week of April the 26th.
13   Q.   And how do you recall so vividly that there
14         was no court the week of April 26 of 2004?
15   A.   Because it's one of those things that I
16         remember because the judge told me on May the
17         10th to have Mary Beth post dockets down in
18         the police room or something.  And when I went
19         to Mary Beth and told her to post the docket,
20         she said, I already posted those before I left
21         on suspension.  She posted the ones for that
22         week and the week before.
23   Q.   So May 10th -- the week before May 10th would
0182
1         be May 3rd?
2   A.   May 3rd.  Yeah, May 3rd.
3   Q.   I don't understand -- what happened the week
4         of April the 26th?
5   A.   There was no court.  It was the last week of

6       the month.  They didn't hold court the last
7       week of the month.  There were no dockets.
8   Q.   What about the docket for May the 3rd?
9   A.   I told you, she had already posted it.
10  Q.   And May 10th?
11  A.   And May 10th.
12  Q.   So normally, how far out does she post a
13      docket?
14  A.   Usually two weeks.
15          (Brief pause)
16  Q.   Let me show you what has been marked as
17      Defendants' Exhibit Number 24 to Ms. Brackin's
18      deposition and ask if you can identify this
19      for me, please, ma'am.  I think maybe this
20      should be attached to it, also.  Do you
21      recognize your signature on that, Ms. Martin?
22  A.   Yes, I do.
23          MS. NELSON:  And I would ask that y'all
0183
1           not talk while I'm questioning.
2           MR. JAFFREE:  Well, you wasn't
3           questioning.  That was a pregnant
4           pause.
5   Q.   If I could see that for a second.  I
6       apologize.  That's the only copy I have.
7           This is a disciplinary action report
8       administered to Ms. Brackin; is that correct?
9   A.   Yes.
10  Q.   And were you present when this disciplinary
11      action was administered to her?
12          MR. JAFFREE:  I'm not sure I understand
13          the question, "administered to her."
14          What does that mean?
15  Q.   When that document was given to her, were you
16      present?
17  A.   I don't recall because I don't have my
18      calendar from that far back.
19  Q.   Well, I'm just asking from your memory.  Were
20      you --
21          MR. JAFFREE:  If you remember.
22  Q.   Either you remember or you don't.  I mean, do
23      you remember if you were there?
0184
1   A.   I don't recall.
2   Q.   You don't recall?
3   A.   I don't recall.

4  Q.  Do you know -- well, I'll put it this way:
5      You signed it on April 22nd.  Judge Gordon
6      signed it on April 22nd.  And Mary Beth
7      Brackin signed it on April 22nd, according to
8      this document.
9          Do you remember Mary Beth Brackin
10     discussing this disciplinary action with you?
11         MR. JAFFREE:  Again, object to the form of
12             the question.  There's no specifics as
13             to time.  The two of them could have
14             discussed that document yesterday.
15 Q.  Well, have you discussed this with Mary Beth
16     Brackin, whether it was in April of 2004 or
17     yesterday?
18 A.  Yes.
19 Q.  And when did y'all discuss it?
20 A.  I don't recall.
21 Q.  Did you discuss it while you worked at the
22     city and you were her supervisor?
23 A.  Not that I recall.
0185
1  Q.  Do you know if she ever grieved or appealed
2      her disciplinary action?
3  A.  I don't recall.
4          MR. JAFFREE:  For the Record, there is no
5             grievance or appeal available.
6             There's only an ability to make a
7             statement.
8          MS. NELSON:  Well, that's your statement.
9             It's not testimony.
10         MR. JAFFREE:  That's the rules.
11         MS. NELSON:  No.  There's --
12         MR. JAFFREE:  Well, we'll show you the
13             rules tomorrow.
14         MS. NELSON:  That's what I'm saying.
15             That's your statement.  Is that an
16             objection?
17         MR. JAFFREE:  We'll read the rules
18             tomorrow and see what it says.
19 Q.  Did you ever discipline Ann Baxter?
20 A.  I was in the middle of writing it up, her
21     disciplinary action, at the time I was
22     terminated; had not completed it.
23 Q.  And what was this discipline for?
0186
1  A.  It was for her drawer being short money, an

2      incident that happened before I began.
3   Q.  And you're saying you were in the process of
4      writing her up when you were terminated?
5   A.  Yes.
6   Q.  And you were terminated when?
7   A.  I was given the notice on 10/12 I believe.  I
8      was officially terminated on 10/18.
9   Q.  Of 2004?
10  A.  Yes.
11          (Brief pause)
12          (Defendants' Exhibit 15 was marked
13             for identification.)
14  Q.  I want to show you what I've marked as
15      Defendants' Exhibit Number 15 and ask if that
16      is not a disciplinary action that you gave to
17      Ann Baxter or that you completed on Ann
18      Baxter.
19         Is that your signature?
20  A.  Yes.
21  Q.  Does that refresh your recollection of giving
22      her a disciplinary action in March of 2004?
23  A.  Yes.  I was mistaken.  I thought I was doing
0187
1      this one before I left.
2   Q.  Was there another one when you left or that
3      was the one, you were just confused about the
4      time?
5   A.  I believe there must -- I think there was
6      another one that I was working on but not -- I
7      know I was doing three.  I had given two the
8      week before, and I was working on another one,
9      which I believe -- recall being on Ann Baxter
10      but not for certain.
11  Q.  Was that based on something that occurred
12      while you were actually her supervisor?
13  A.  I'm sorry?
14  Q.  Was that writeup that you gave her based --
15      MS. NELSON:  And I'd appreciate -- just
16         let her look at it without pointing
17         to --
18      MR. JAFFREE:  I was pointing to the date.
19  Q.  Did that occur at a time frame -- the conduct
20      for which she was written up, did that occur
21      at a time frame where you were not her
22      supervisor?
23  A.  Yes, I was not her supervisor.

0188
1   Q.  And was that based on an audit report done by
2       either the City Finance Department or some
3       type of financial audit?
4   A.  I believe so.
5   Q.  And do you know that -- by the time the audit
6       was completed, at that time, you had come on
7       board and was her supervisor.  And is that the
8       reason you were involved in the writeup or the
9       disciplinary action?
10  A.  I had come on board what?  I didn't
11      understand.
12  Q.  You had joined the City -- by the time the
13      results of that investigation took place or
14      the audit had taken place, you then had become
15      Ms. Baxter's supervisor; is that correct?
16  A.  No.  This is dated February the 4th.  I
17      started February the 16th.
18  Q.  And I'm saying, by the time she was
19      disciplined, you were her supervisor at that
20      time; is that correct?
21  A.  Yes.  I was made to write her up by the judge,
22      even though I wasn't there when it happened.
23  Q.  But you were her supervisor at the time she
0189
1       was written up; is that correct?
2   A.  Yes.
3   Q.  And you say it in a tone as if you did not
4       agree with the disciplinary action?
5           MR. JAFFREE:  Well, excuse me.  That's
6             your characterization.  She just said
7             she wasn't her supervisor.  So I
8             object to the form of the question
9             about her tone.
10          MS. NELSON:  You can object to the form.
11            Okay.  Thank you.
12          MR. JAFFREE:  I mean, the question is just
13            not correct.  You can't just interpret
14            her tone and then --
15          MS. NELSON:  I can interpret the tone all
16            I want to.
17          MR. JAFFREE:  -- say that she disagrees
18            with something because of her tone.
19  Q.  Well, I detect you disagree with it,
20      Ms. Martin.  Do I detect correctly?
21  A.  That I disagree with what?

22   Q.   This disciplinary action to Ann Baxter.
23   A.   What I most disagreed with was having to do it
0190
1        when I wasn't there when it happened.  It
2        should have been the current supervisor at the
3        time that -- when it happened.
4    Q.   And who was that?
5    A.   Judge Gordon.
6    Q.   Sorry?
7    A.   Judge Gordon.
8    Q.   And did Judge Gordon also sign off on this
9        disciplinary action?
10   A.   Yes.
11   Q.   So again, you felt like it was not appropriate
12       to discipline someone based on conduct that
13       maybe -- that had occurred prior to your
14       getting there, so to speak; is that correct?
15   A.   For something that I was not involved in, yes.
16   Q.   And what --
17   A.   For which I could only read what had happened.
18   Q.   So you don't know really what occurred and
19       what Valerie Harris, the internal analyst, was
20       reviewing; you don't have personal knowledge
21       of what had occurred that led to this?
22   A.   I didn't have personal knowledge.  All I had
23       was the judge gave me the documents to review,
0191
1        and I was told, I would have to prepare the
2        disciplinary action.
3    Q.   Okay.  Now --
4          MR. JAFFREE:  Hold on a second.
5    Q.   As court administrator, was one of your duties
6        to complete performance evaluations on
7        employees you supervised?
8    A.   Yes, it was.
9    Q.   Do you know -- as I understand at the City,
10       everybody gets evaluated, roughly, around
11       their job anniversary date?
12   A.   Unless you're probationary.
13   Q.   Unless your probationary?
14   A.   Yes.
15   Q.   It wasn't like December 20th everybody got
16       evaluated?
17   A.   No.
18   Q.   It rotated?
19   A.   Right.

20   Q.   So do you know approximately how many
21        employees you've completed employee
22        evaluations on when you were court
23        administrator?  How many -- you supervised
0192
1        magistrates and --
2    A.  Clerks.
3    Q.   Clerks.  Do you know approximately how -- I
4         may have asked this before.  I'm sorry if I
5         have.  About how many magistrates were there
6         at the time when you were there?
7    A.  When I was hired, there was eight.  Come -- on
8         March 1st, we had an additional one, Tonya.
9         There was two clerk typists when I started,
10        and there were two temporaries when I began.
11        We eventually lost the use of the
12        temporaries.
13   Q.   So we are talking about seven magistrates
14        and --
15   A.  Eight magistrates.
16   Q.   Eight magistrates.
17            Of those, do you know how many you
18        actually completed a performance evaluation on
19        while you were court administrator?
20   A.  I remember three.  Not positive.  More -- I
21        believe there was three.
22   Q.   Do you know who -- what three people that
23        would be?
0193
1    A.  I believe one was Mary Beth Brackin.  One was
2         Lavera McClain.  Not sure about the other
3         one.  For some reason, I'm thinking Mary
4         Turner or Sarah Fowler, one of them maybe.
5         Not positive.  I do think there was a third
6         one, though.  Could have been a fourth one.  I
7         just don't remember.
8    Q.   Okay.  Do you know how you rated Mary Beth
9         Brackin on her performance evaluation?
10   A.  Yeah.
11   Q.   Did she receive satisfactory or --
12   A.  I believe so.
13   Q.   And what about Lavera McClain?
14   A.  The original evaluation was unsatisfactory.
15   Q.   And do you know when you filled that out on
16        Lavera, that evaluation?  I'm sorry.  Do you
17        know when you filled out the performance

18    evaluation on Lavera McClain?
19    MR. JAFFREE:  Which one are you talking
20      about, the original one or the
21      subsequent one?
22    MS. NELSON:  The original one.
23  A.  Well, first, let me say --
0194
1  Q.  Well, I'll just ask you to answer my
2    question.
3  A.  I'm going to answer.
4    MR. JAFFREE:  I think she was trying to
5      answer.
6  Q.  I'm asking when did you fill --
7  A.  In April.
8  Q.  In April?
9  A.  I believe so.
10  Q.  Okay.  April 2004?
11  A.  Right.
12  Q.  And, at that time, you had been there two
13    months?
14  A.  Yes.
15  Q.  And I think you testified earlier that Lavera
16    had been out on sick leave for about six to
17    eight weeks?
18  A.  That was --
19  Q.  In April?
20  A.  -- end of April.  She had her surgery on the
21    27th or 28th of April, dealing with that.
22  Q.  So you were new to the job, learning the job,
23    and you had a chance to evaluate her less than
0195
1    two months, and you gave her an unsatisfactory
2    evaluation?
3  A.  Right.
4  Q.  And can you tell me why you did that?
5  A.  Because she wasn't performing satisfactorily.
6    And, actually, first, I told judge that I
7    didn't feel I should be evaluating her because
8    I had not been there the full year that she
9    was being evaluated for.  The judge insisted
10    that I do the evaluation, and I told her that
11    I would evaluate Lavera on my experience and
12    observation of her work.  And that's what I
13    did.
14  Q.  Okay.  And then once you filled that out, who
15    did you give that to?  Did you give that to

16     the judge or --
17   A.   Yes.  I took it to the judge because she has
18       to sign it.
19   Q.   And did you -- do you remember what areas you
20       found her to be unsatisfactory in?
21   A.   Number of errors, quality of work, how she
22       dealt with, I believe, the public.  She was
23       kind of short, at times rude.
0196
1    Q.   Tell me the times you've seen her interact
2        with the public?
3    A.   I can't give you specifics.  She interacted
4        with the public when she was in the fines
5        room, in court, at the front window, as a
6        backup working the front window, doing
7        warrants at the warrant window.
8    Q.   Had you ever seen any other magistrate be
9        short or rude to anyone --
10   A.   We're not talking -- we're talking about
11       Lavera's evaluation.
12   Q.   That's right.
13   A.   That doesn't include -- I wasn't --
14   Q.   Ma'am, I'm asking you the questions.  I'm not
15       asking you to sit here and argue with me.  I'm
16       asking you --
17   A.   I'm not arguing with you.  I'm just saying
18       that -- we're talking.  You asked me about
19       Lavera's evaluation.
20   Q.   That's right.  And I'm now asking you the
21       question, have you seen any other magistrate
22       be short or rude with the public?
23   A.   Maybe short.  Lavera herself admitted to me
0197
1        that she had a tendency to be short at times.
2    Q.   So are you referring --
3    A.   And she has a gruff voice.
4    Q.   Are you retracting the rude or just saying --
5    A.   No.  She didn't admit rude.  I said rude.
6    Q.   Who else have you seen be short with the
7        public?
8    A.   On a really busy day, I've seen Ann Baxter be
9        a little short working the front window.
10   Q.   How about Mary Beth Brackin?
11   A.   Yes, I've seen her on a busy day be short.
12       It's not uncommon sometimes, depending on the
13       circumstances.

14   Q.   Did you give her an unsatisfactory?
15   A.   I don't know.  If I had been provided the
16        documents, I could read it and tell you.
17   Q.   I'm just asking what you remember.
18   A.   I don't remember.  I don't have it in front of
19        me.
20   Q.   What other areas do you contend that Lavera
21        McClain was unsatisfactory in?
22   A.   In handling the bondsmen and bondsmen
23        processes.
0198
 1   Q.   What had she done to be unsatisfactory in
 2        handling bondsmen?
 3   A.   She was rude.  I had a complaint filed against
 4        her by Rickey Stokes, in writing.  Actually
 5        was sent to me, the judge, I believe Jerry
 6        Corbin, that she would not assist him with a
 7        defendant that was going -- would have been
 8        wrongly arrested had he not have gone to Mary
 9        Beth when Lavera wouldn't assist him --
10        refused to assist him and Mary Beth
11        straightened the matter out.
12   Q.   Assist him in what?
13   A.   Assist him in getting the documents corrected
14        or the right person.  The guy had -- two
15        people had the same name except for the middle
16        name was different and their birth dates were
17        wrong.  And Lavera had issued a warrant
18        against the wrong person.  And she refused to
19        assist Rickey Stokes in figuring it out,
20        getting it right, getting the right person
21        arrested, and the other dropped against the
22        one that she had wrongly issued a warrant
23        against.  She refused to, so he called Mary
0199
 1        Beth and asked her to look up the paperwork.
 2   Q.   Did you witness all of this?
 3   A.   Did I witness all of it?
 4   Q.   Yes.
 5   A.   No.  I had the complaint from him in writing.
 6   Q.   You didn't witness any of it, did you?
 7   A.   No.
 8   Q.   Can you think of any other areas that you
 9        found her to be unsatisfactory?
10   A.   Without looking at the document, I can't
11        recall word for word.

12    Q.   When you presented this evaluation to Judge
13        Gordon, what occurred?  Did she agree with
14        it?  Did she sign off on it?
15          MR. JAFFREE:  Are we talking about the
16            first or second evaluation?
17          MS. NELSON:  The first one.  We haven't
18            gotten to a second evaluation.
19          MR. JAFFREE:  I just want to be clear.
20          MS. NELSON:  So I'd ask --
21    A.   When I gave it to her, to the best of my
22        recollection, it was -- I gave it to her, and
23        I told her that I knew we would need to
0200
1        discuss it because there were some low marks
2        on it.  We -- to the best of my recollection,
3        we didn't discuss it at that time in depth.  I
4        just told her that I was sure she would want
5        to discuss it with me after she had a chance
6        to review it.
7    Q.   And then did she discuss it with you?
8    A.   After she discussed it with two or three other
9        people, yes.
10    Q.   And when she discussed it with you, what was
11        said?
12          Let me ask you this:  Did she come to you
13        and ask if you could talk about it?  Tell
14        me what -- I mean, what happened, what she
15        said, where you were, who was present?
16    A.   It was just me and her in her office as I
17        recall it.
18    Q.   Okay.
19    A.   And she wanted to know why I had rated her the
20        way I did.  And I tried to explain again that
21        I was rating her just on the time that I had
22        been there, what I had seen, and had dealings
23        with her, and reminded her that I didn't want
0201
1        to do the evaluation to begin with because I
2        hadn't been there the whole year.
3          And she said, well -- she told me Lavera
4        had never gotten a bad evaluation, and she
5        asked me if I had reviewed the previous couple
6        of years.
7          And I told her that I had and they
8        appeared to be almost carbon copies of each
9        other; same comments almost, same markings and

10       everything.
11          But that wasn't -- I didn't observe the
12       behavior or the work product during that time,
13       but I did review them because she had asked me
14       to.
15          She said that she had talked to some other
16       people, and they had recommended that she ask
17       me to reconsider what I had put on the
18       evaluation.
19    Q.   Did she tell you who she had talked to?
20    A.   Not at that time.
21    Q.   And when she asked you to reconsider, what did
22       you say?
23    A.   I told her that for days I had agonized over
0202
1       doing that evaluation.  I had put an awful lot
2       of time in it, was not -- I don't -- I didn't
3       like to do evaluations on people that were
4       low, unsatisfactory, but that's how I saw the
5       work that she was doing.  And I had to rate
6       her the way I saw it.
7          And she again kept, well, just take it
8       home overnight and just review it again and,
9       you know, see if there isn't some area that
10       you could reconsider and -- and all, just take
11       it home with you.
12          And then she said, this is not a threat,
13       but I'm reminding you that you are still on
14       probation.
15    Q.   And was anybody present when she allegedly
16       made that comment?
17    A.   I told you before that it was just she and I.
18          MR. JAFFREE:  Well, it's not an allegation
19            on her part; it's a fact on her part.
20    Q.   Okay.  So did you take it home?
21    A.   Yes, I did.
22    Q.   Did she ever tell you who she had talked to?
23    A.   At a later date.
0203
1    Q.   When you took it home, did you -- strike that.
2          Did you ever reconsider the evaluation?
3    A.   I did.
4    Q.   Did the judge ever tell you the implications
5       it could have on Lavera?
6    A.   She did during that conversation that we had
7       when she asked me to take it home and

8        reconsider.  I was not aware of that when I
9        did the evaluation.  I did not know that it
10       was time for a raise for Lavera until she said
11       that.  That didn't have anything to do
12       with -- it was not a consideration when I did
13       her evaluation because I didn't know about it.
14           I took it home and agonized some more over
15       it.  But because my job had been threatened
16       and I needed to work, I changed enough to make
17       it a satisfactory evaluation because I felt
18       forced to, to keep my job.
19   Q.  You testified you didn't know that it was time
20       for a raise for Lavera.  What do you think the
21       purpose of an evaluation is if a raise or
22       something --
23   A.  You don't always get a raise with an
0204
1        evaluation.
2    Q.  You're a brand-new supervisor --
3           MR. JAFFREE:  Are you arguing with the
4              witness again?
5           MS. NELSON:  I'm not arguing with the
6              witness.
7           MR. JAFFREE:  She said she didn't know.
8           MS. NELSON:  And I'm asking her.
9    Q.  You were a brand-new supervisor and you didn't
10       even take the time to learn enough about an
11       evaluation that could have a tremendous impact
12       on somebody's job and affect their pay?
13   A.  That doesn't change how they're performing.
14   Q.  Would it --
15          MR. JAFFREE:  Well, maybe in some circles
16             it does.
17   Q.  Would it have affected your decision if you
18       had known the pay implications?
19   A.  No.  Because my evaluation was based on her
20       performance.
21   Q.  That you'd observed for --
22   A.  And I didn't see --
23   Q.  -- a few weeks or months?
0205
1    A.  That was not my fault.  I was made to do the
2        evaluation.
3    Q.  When did you learn who the other people that
4        had been involved in the decision to ask you
5        to reconsider this evaluation?

6   A.   The names were --
7   Q.   I said when did you learn?
8   A.   Oh.  Around July the 19th when I called a
9        meeting or asked Kai if she and I and the
10       judge could meet because there was so many
11       problems going on.
12          MR. JAFFREE:  Can we take a break?
13          MS. NELSON:  Yeah, we can.
14             (Brief recess)
15             (Defendants' Exhibit 16 was marked
16              for identification.)
17  Q.   Let me show you Defendants' Exhibit 16 and ask
18       you if that's a copy of Ms. Lavera McClain's
19       2004 evaluation that we've been discussing.
20          MR. JAFFREE:  This is not the first one.
21          MS. NELSON:  Just let her answer.
22  A.   No.  It's not the first one.
23          MR. JAFFREE:  Excuse me.  You're
0206
1              saying, that we've been discussing.
2              We've been discussing the first one.
3              Now, this is the first one.
4          MS. NELSON:  You don't know what it is.
5              You haven't seen it.  Let her say what
6              it is.
7          MR. JAFFREE:  Well, you said, there's been
8              two evaluations.  I'm trying to --
9          MS. NELSON:  No.  We've talked about the
10             first one.  Just let me ask her
11             questions, Mr. Jaffree.
12  Q.   Tell me what that is?
13  A.   Well, it --
14  Q.   Is it the first and the second one?
15  A.   Yes, it is.
16  Q.   Okay.  Thank you.
17  A.   Yes, it is.
18  Q.   It is.
19  A.   Is that what you asked me?
20  Q.   Just trying to ask you to help me identify.
21       You filled it out; is that correct?
22  A.   Right.
23          MR. JAFFREE:  First and the second.
0207
1   A.   The first and the second time.
2   Q.   That is the first and the second?
3   A.   Right.  Right.  It is the first and the

4       second.
5   Q.  Thank you.
6           So apparently, there are some blocks on
7       there that look like they've been scratched
8       out and an X mark put in another place?
9   A.  Right.
10  Q.  So basically, when you did -- you testified
11      that you reconsidered and changed some marks.
12      You did it on the first one you filled
13      out -- when I say -- you took the evaluation,
14      and took that same evaluation, marked through
15      it on some places and made a new mark or new X
16      or something.  Is that correct?
17          I'm not trying to put words in your
18      mouth.  You used the same form, so to speak,
19      or --
20  A.  I didn't --
21  Q.  When you revised it?
22  A.  Something you said about reconsidered.  I was
23      made to change it on threat of losing my job.
0208
1           MR. JAFFREE:  I never got this document.
2   Q.  And that's your perception of what had
3       occurred.
4           Could the judge just have not have
5       overridden your recommendation and changed it
6       herself?
7   A.  I don't know.  If she could have, looks like
8       she would have instead of threatening me.
9   Q.  Can you tell from looking at Defendants'
10      Exhibit Number 16 which areas you changed?
11  A.  I changed Task 2.
12  Q.  And what is Task 2?
13  A.  Occasionally does -- well, my comments are --
14      I don't have the -- there's a separate sheet
15      that actually has the -- what I was --
16  Q.  Is that what you gave me earlier?
17  A.  -- the rating.  It's another sheet that goes
18      to this I think.
19  Q.  Would this be the rating guide that you gave
20      me in Defendants' Exhibit 2?
21  A.  It's that -- it's actually another sheet.
22      Like this part right here (indicating),
23      section two, this gives what you're actually
0209
1       rating.  But on the first part, I seem to

2     recall there was another sheet that you went
3     by because where it just said Task 1 at the
4     comments?  But let me see that.
5   Q.  I'm showing you what you gave to me,
6     Defendants' Exhibit 2.
7   A.  Yes, this could be it, there's ten tasks.  So
8     you --
9   Q.  I'm just trying to understand what you
10     changed.
11   A.  Okay.  I changed Task 2 from a one to a two
12     rating, from unsatisfactory to satisfactory.
13   Q.   And Task 2 deals with?
14   A.   "Issuing warrants of arrest or summons by
15     determining probable cause, sets appropriate
16     bond amounts on warrants, and process the
17     warrant or summons to the computer and forward
18     to the police department for execution or
19     service."
20   Q.   What else did you change?
21   A.   In Section 2, I changed number four, Safety
22     Conscientiousness from non-applicable to a
23     two, to a three.  I changed --
0210
1   Q.   You felt like she was not safety
2     conscientious?
3   A.   Actually, that's something that's not ever
4     rated for some reason, so I had put
5     non-applicable.  And then changed it to a two
6     to add points as I was requested and then
7     changed it to a three to add enough points to
8     get her to the satisfactory level.
9   Q.   That was the safety issue?
10   A.   Yes.
11   Q.   Anything else you changed?
12   A.   I changed number five, Quantity of Work, from
13     an unsatisfactory one to a satisfactory two.
14     And it -- I think just from looking at this
15     copy -- I can't tell for sure but I -- but it
16     is evident that I changed those.
17   Q.   All right.  Then did you ever discuss this
18     Defendants' 16 with Lavera McClain?
19   A.   I was told by Personnel to discuss it with her
20     after she returned and after they sent it back
21     to me.
22   Q.   When did she return -- return from leave?
23   A.   Yes.

0211
1    Q.   Do you know when she returned?
2    A.   Maybe end of May, first of June.
3    Q.   Did you tell her any of the conversations
4         between you and Judge Gordon?
5    A.   The conversation between us?  No.  What
6         I -- no, I didn't tell her the whole
7         conversation, no.
8    Q.   What did you tell her?
9    A.   I told her that that was not the original
10        evaluation that I had done on her, that the
11        judge had requested that I change the original
12        evaluation.  And I told her that it was
13        against what I believed in doing, and that I
14        wouldn't do it again.  And we went over the
15        whole evaluation.
16   Q.   Did she ask you questions or disagree with the
17        evaluation?
18   A.   Oh, yes.  Yes, she did.  She said that she'd
19        always received high evaluations, and I told
20        her that I had, in fact, reviewed a couple.
21        And they seemed to be almost carbon copies of
22        each other and that I was rating -- had rated
23        her on what I had observed.
0212
1    Q.   Did she comment that she had been on a leave a
2         good portion of that time?
3    A.   Good portion of what time?
4    Q.   That you had supervised her.
5    A.   The period for which I was evaluating her --
6             MR. JAFFREE:  Well, wait a minute.  Let me
7                 -- let me object --
8    A.   -- was not during that period.
9             MR. JAFFREE:  -- because you keep -- I'm
10                sorry.  I'm going to object.  They
11                keep distorting the Record, but she
12                came back on July.  And the period
13                that she was evaluated was on April
14                the 28th.  And so the six weeks was
15                sort of more after than before.  And
16                you keep indicating that --
17            MS. NELSON:  I object to your testimony.
18                You don't know when she came back.
19            MR. JAFFREE:  Well, I know when she signed
20                this.
21            MS. NELSON:  Well, that's not when she

22           came back.  I mean, you don't know
23           that's when she came back.
0213
1   A.  No.  She signed that when Personnel sent it
2      over to me to review with her.
3   Q.  My question is, did Lavera McClain express any
4      concern to you that your evaluation of her was
5      based on a very limited time frame in which
6      you had personally worked with her or observed
7      her work?
8   A.  I don't recall those comments because that
9      leave time was not included in this particular
10     evaluation time.
11  Q.  Did you get involved in approving her leave of
12     absence?  I'm talking about Lavera McClain.
13  A.  I'm not sure.
14  Q.  Did you ever take a leave of absence or time
15     off from work?
16  A.  Yes, I did.  It wasn't a leave of absence.
17  Q.  Did you take time off from work?
18  A.  Yes.
19  Q.  And do you know how much time you took off?
20  A.  Not specifically, no.  Not in total number,
21     no.
22  Q.  Do you know if you ever took time off that you
23     had not worked there long enough to earn?
0214
1   A.  The only time off I could take was with
2      judge's approval.  And she approved it, I took
3      it.
4   Q.  And she approved your time off, didn't she?
5   A.  Yes, she did.
6   Q.  Back to this desk and furniture for your
7      office, did you pick that out?
8   A.  Yes, I did.
9   Q.  And did you make certain requests to have that
10     approved to furnish your office?
11  A.  I'm sorry?
12  Q.  That's a bad question.  Strike that.  Did you
13     select your furniture and furnishings for your
14     office and then request to have it approved?
15  A.  I still don't understand your question.
16  Q.  Did you just go out and go shopping for
17     furniture one day and tell the judge, this is
18     what you wanted to buy?
19  A.  No.  The judge insisted that I have new

20       furniture, even though I told her that the
21       furniture that was in there was perfectly
22       fine.
23   Q.   But then you went out on your own and --
0215
1    A.   No, I did not.  Michelle Sellers got a book
2        from Houston -- Hudson Supply Company where
3        they had -- where they usually ordered
4        furniture from.  She gave the book to me and
5        she said look through this and see if there's
6        any furniture that you like in there.
7    Q.   And did you pick some out?
8    A.   Yes, I did.  And she ordered it.
9    Q.   Okay.  Did you have a budget?
10   A.   Nobody gave me a budget.  They told me what I
11       wanted.  They also -- Judge told me that if I
12       wanted wall hangings, whatnots, that they
13       would reimburse me for that.  She gave me no
14       amount.
15   Q.   And did you go shopping for accessories, I'll
16       call them?
17   A.   Yes, I did.
18   Q.   And do know how much money you spent on
19       furnishing your office?
20   A.   No, I don't.
21   Q.   Michelle Sellers, did she ever sit in on any
22       of your job interviews when you were first
23       interviewing for your job as court
0216
1        administrator?
2    A.   She -- I don't recall whether she was or not.
3    Q.   She could have?
4    A.   Possible.
5    Q.   Okay.  What about Kevan Kelly; do you remember
6        him sitting in?
7    A.   No, I don't.
8    Q.   Do you know Kevan Kelly?
9    A.   Yes, I do.
10   Q.   And what's your relationship with Kevan Kelly?
11   A.   Just met him when I started working in court.
12   Q.   And he's the city attorney; is that correct?
13   A.   Yes.
14   Q.   Do you know if Kevan Kelly has made any
15       complaints about you?
16   A.   Can't imagine that he did.  We talked all the
17       time, every time I was over at the court.  He

18      never mentioned to me he had a complaint.  I
19      was never provided a complaint.
20   Q.   You mentioned earlier, as you said, you were a
21      probationary employee for the first 12 months
22      of your employment, though I realize you
23      didn't work the full 12 months.  But you were
0217
1      a probationary employee during the time you
2      worked --
3   A.   Right.
4   Q.   -- for the City; is that correct?
5   A.   That's correct.
6           (Defendants' Exhibit 17 was marked
7            for identification.)
8   Q.   And I'm going to show you what's Defendants'
9      Exhibit Number 17.  And did Judge Gordon
10      evaluate your performance while you were there
11      the first three months?
12   A.   Yes, she did.
13   Q.   And I'm going to show what I've marked as
14      Defendants' Exhibit 17.  Is that the
15      evaluation you received?
16           (Brief pause)
17   Q.   Do you recognize that?
18   A.   Let me finish reading it, please.
19   Q.   Okay.
20           (Brief pause)
21   A.   Yes.
22   Q.   And I'm sorry.  You signed -- did Judge Gordon
23      review that with you?
0218
1   A.   Yes, she did.
2   Q.   And you signed it on April 24 -- excuse me --
3      April 21st, 2004?
4   A.   Yes.
5   Q.   Now, going back to something earlier you
6      testified to, you said you did not know the
7      individuals that Judge Gordon had discussed
8      Ms. McClain's evaluation with until you and
9      the judge and Kai Davis met.  Was that your
10      testimony?
11   A.   Yes.
12   Q.   And when did that occur?
13   A.   I think July the 19th, 2004.
14   Q.   And how is it that you remember that date so
15      specifically; is that one of the dates on your

16      calendar or --
17   A.  Not sure.  Because I had such a hard time
18      getting that meeting.
19   Q.  Hard time doing what now?
20   A.  Getting the meeting.
21   Q.  Getting the meeting?
22   A.  Yes.
23   Q.  Okay.  And what do you mean by having a "hard
0219
1       time" getting the meeting set up?
2    A.  Well, I had tried to contact Kai Davis in
3       personnel to talk to her about I thought that
4       because of all the problems that were going on
5       that I was going to see if she would meet with
6       the judge and I to see if we could work some
7       of them out.
8    Q.  Let me stop you right there.  Tell me, what
9       problems were going on?
10   A.  Well, things went downhill with me and the
11      judge after I did the unsatisfactory
12      evaluation with Lavera.  Things were never the
13      same after that.
14   Q.  Again, I just -- the date -- just so we can
15      clarify the time frame we're talking about.
16      The date that the evaluation on Lavera was
17      first done by you was when?
18   A.  About a week or two I believe after mine was
19      done.
20   Q.  It was in April I believe you testified
21      earlier, April of 2004?
22   A.  Yes, I believe so.
23   Q.  Okay.  You testified there were -- what
0220
1       problems were going on?
2    A.  Well, there were numerous errors being
3       committed still by Eunice and Lavera, that
4       every time I would try to talk to the judge
5       about them, bring them to her attention, she
6       say -- she'd say, everybody makes mistakes.
7           And I told her that I understood that
8       everybody made mistakes, but there were
9       numerous, numerous mistakes being made, and
10      that at some point, these should start slowing
11      down, that the other magistrates were not
12      making all -- near as many mistakes.
13          And I had tried to talk to the judge about

14      this.  She just always made excuses.  Valerie
15      Harris, the city auditor, had called me and
16      said that she was so tired of the mistakes
17      that Lavera and Eunice were making, and that
18      she had approached the judge before I began
19      work -- I don't know a date -- and asked her
20      to terminate them because of all the
21      continuing errors.  And she didn't get
22      anywhere with the judge; Judge wouldn't hear
23      it.  And Valerie Harris asked me to approach
0221
1       the judge and ask her to terminate them.  And
2       I just told Valerie that I didn't think it
3       would do any good for me to approach the
4       judge.
5    Q.   Was anybody present when you had this
6       conversation?
7    A.   It was a phone conversation.
8    Q.   Okay.
9    A.   With Valerie Harris.
10   Q.   Had the judge talked to you about your
11      performance and some of your deficiencies?
12   A.   As -- when?
13   Q.   Before this meeting with Kai Davis?
14   A.   No.  We never had a counseling session other
15      -- and the only directive --
16   Q.   Did she ever call you in her office and talk
17      to you about your job?
18   A.   No.  If I was over in court, we talked about
19      specific things.  I had a lot of questions for
20      her about cases, but she never called me to
21      her office for a counseling session.
22   Q.   Did she ever talk to you about your
23      interaction with Ashton Ott?
0222
1    A.   She took up for Ashton when I -- I actually
2       called the judge after Ashton and I -- after
3       Ashton hung the phone up on me rudely.  And I
4       called the judge all upset because that had
5       happened and pretty much told the judge what
6       I'd said to her and thought the judge would
7       maybe mend things or whatever, you know, see
8       it from my side.  But she just said that
9       situation never happened in court anyway.
10   Q.   Did the judge ever talk to you about any
11      complaints from the Bar of other lawyers?

12  A.  No, she did not.
13  Q.  Did she ever talk to you about your not
14      allowing attorneys to file motions in the
15      magistrates' office?
16  A.  No, she did not.
17  Q.  Did she ever talk to you about an issue where
18      a man had to drive all the way from Michigan?
19  A.  No, she did not.
20  Q.  Do you know what I'm talking about?
21  A.  You're reading from a document that I had
22      never seen and never knew anything about.
23  Q.  I'm talking about, do you recall a
0223
1       defendant --
2   A.  No, I don't.  I said, no, I didn't.
3   Q.  No.  You're saying --
4           MR. JAFFREE:  Let her finish the question.
5   Q.  Do you recall any incident about a defendant
6       having to drive from Michigan to Dothan,
7       regarding a case that he did not need to make
8       the trip for?
9   A.  No, I do not.
10  Q.  Did she ever talk to you about your lack of
11      knowledge of procedures in the magistrates'
12      office?
13  A.  No, she did not.
14  Q.  She didn't talk to you about your lack of
15      judgment or lack of supervisory skills?
16  A.  No, she did not.
17  Q.  Did she ever talk to you about the fact that
18      your evaluation of Lavera McClain was based on
19      information that you were getting from other
20      magistrates?
21  A.  No, she did not.
22  Q.  Was, in fact, some of the -- was the
23      evaluation you gave to Lavera McClain based on
0224
1       what Mary Brackin and Mary Turner had told you
2       about Lavera?
3   A.  No, it was not.  I've answered that question
4       before.
5   Q.  Did you --
6   A.  I based it on my observation.
7   Q.  -- rely on Mary -- did you rely on Mary Beth
8       Brackin and Mary Turner to do your job?
9   A.  I sure did not.

10  Q.  Who did you rely on to do your job?
11  A.  Me.
12  Q.  And how did you know what to do?
13  A.  I know how to be a supervisor, and that's what
14      I was hired to do.  However, I was not allowed
15      to supervise all of them.  I was never allowed
16      to supervise Lavera or Eunice because they
17      were untouchable.  But I was highly encouraged
18      to discipline the white magistrates.
19  Q.  Did you ever discipline the white magistrates
20      on your own?
21  A.  I wrote a memo to Michelle Bryan when the
22      cases were found, but I did discuss it with
23      the judge first to see what she thought about
0225
1      it.
2  Q.  Did you ever discipline Mary Beth Brackin,
3      other than for the incident that I asked you
4      about earlier regarding something that
5      occurred before you were here?
6  A.  No.
7  Q.  Did you ever --
8          MR. JAFFREE:  Let me object.  The question
9              suggests that there was a basis to
10             discipline her.
11  Q.  Did you ever feel there was a basis to
12      discipline Mary Beth Brackin?
13  A.  No, I didn't.
14          (Brief pause)
15  Q.  Were you aware of any complaints filed against
16      Mary Beth Brackin?
17  A.  Specific?  Do you have a name?
18  Q.  I'm asking you if you have a memory of any
19      complaints against her?
20  A.  I'm not sure.
21  Q.  Not sure?
22  A.  I kind of remember -- I believe there was -- I
23      believe this was -- not sure if this was
0226
1      during -- I believe it was during my tenure
2      that a police officer was encouraged by
3      Michelle Sellers to fill out a complaint
4      against Mary Beth.  The police officer told --
5      what Mary Beth told me was that the police
6      officer told her that he was encouraged to
7      complete it by Michelle Sellers.

8   Q.   And why do you think Michelle Sellers would
9        encourage a police officer to do that?
10  A.   Because she is on the same vendetta that the
11       judge was, to get rid of Mary Beth Brackin and
12       Mary Turner.
13  Q.   And what basis -- and what facts do you have
14       to support that the judge was -- and Michelle
15       were on such a vendetta?
16  A.   Well, from day one, interview one, I was told
17       about them.  That was -- that was not true.
18       They -- I never saw physical harm at all, was
19       never afraid of them.  They -- they're the
20       reason that I learned what I did as far as the
21       court system was concerned.  And
22       one -- Michelle made comments more than once
23       that -- that they -- that if they did
0227
1        something else, that we could terminate them.
2        And the judge --
3   Q.   She made this comment to you?
4   A.   Yes.  And the judge, in one of the interviews
5        or maybe subsequent meetings, said that she
6        should have already terminated Mary Beth and
7        Mary Turner and she was sure that they would
8        do something during my tenure so that I would
9        be able to terminate them.
10  Q.   And who was present when she said this?
11  A.   I'm not sure which meeting it was, so I
12       wouldn't know.  Me and the judge, possibly
13       Michelle Sellers, or if it was during an
14       interview.  I don't know which one.
15  Q.   Michelle Sellers is white; is that correct?
16  A.   Yes, it is.
17  Q.   Do you have any reason to think that Michelle
18       Sellers would have any racial animus toward
19       Mary Turner or Mary Beth Brackin --
20  A.   I know she --
21  Q.   -- or yourself?
22  A.   Or me?
23  Q.   Yes.
0228
1   A.   Just that she goes along with the judge with
2        everything.
3            (Defendants' Exhibit 18 was marked
4              for identification.)
5   Q.   I'm going to show you what I've marked as

6     Defendants' Exhibit 18.  Is that the memo you
7     wrote to Mary Beth Brackin about the officer's
8     complaint about her?
9         (Brief pause)
10  A.  I believe, number one, this complaint was done
11    before I began work.
12  Q.  I'm asking, is that the memo that you wrote to
13    Mary Beth Brackin?
14  A.  At the instruction of the judge.  And I
15    believe that was the same complaint that
16    Michelle Sellers encouraged the police officer
17    to complete.
18  Q.  Isn't it true that when Mary Beth or Mary
19    Turner did something, you're the one that
20    didn't want to write them up; isn't that
21    correct?
22  A.  No, it is not.
23  Q.  So you do agree, they should have been written
0229
1    up for that?
2  A.  No, I didn't say that.  I wasn't there when it
3    happened.  I shouldn't have had anything to do
4    with the writeup.
5  Q.  Is it your testimony that Mary Beth Brackin
6    and Mary Turner, Sarah Fowler, Ann Baxter,
7    Valarie Savage never did anything that
8    warranted counseling or reprimand?
9  A.  That's not my testimony.
10  Q.  But the only time you would write them up is
11    only if the judge told you to write them up?
12  A.  No, the judge didn't make me write up Michelle
13    Bryan.  I conferred with her, but she did not
14    make me.  I am in agreement that anytime I
15    tried to discipline Ms. McClain and Ms. Knight
16    that it was put a stop to by the judge.
17  Q.  And when did you try to discipline them?
18  A.  Well, Eunice was insubordinate to me a couple
19    of times.  And I had actually written her up
20    for insubordination, took it over to the
21    judge.  And the judge said, I'll sign it.  And
22    I believe, in fact, she did sign it, however,
23    warned me that Eunice would probably see that
0230
1    as discriminatory treatment and would probably
2    file a claim of discrimination against me.
3  Q.  When was she insubordinate to you?

4   A.  She was insubordinate to me in court one day
5        when a defendant -- a person approached her
6        before court started and asked her to continue
7        a court date.  And those things were only
8        supposed to be done on a court date after
9        George -- Judge convened court.
10            And I said something to her.  And she
11       snapped back at me and said that I didn't have
12       the right to interfere, basically.  That
13       wasn't her exact words.  I don't remember her
14       exact records.  And then when I did a memo to
15       her about many warrants that she had changed
16       the bond on without documentation and while
17       someone else was the magistrate on call for
18       which there was a policy for, she told me that
19       I didn't have the authority -- to my face she
20       told me that -- to say anything to her about
21       changing warrants.  And then in a subsequent
22       staff meeting in front of the whole staff, she
23       told me I didn't have the authority.
0231
1   Q.  The authority to do what?
2   A.  To tell -- to tell her what to do with a bond.
3   Q.  And who was present at that meeting?
4   A.  The staff meeting?
5   Q.  Yes.
6   A.  I don't have a list but the majority of the
7        magistrates, clerks -- and clerks.
8   Q.  Do you remember her writing you a memo about
9        that issue?
10  A.  About that issue?
11  Q.  Yes.
12  A.  She may have.  Not sure.
13  Q.  Are you aware that Lavera and -- Lavera
14       McClain and Eunice Knight felt that you were
15       discriminating against them based on their
16       race?
17  A.  Was I aware of it?
18  Q.  Yes.
19  A.  No.
20            (Defendants' Exhibit 19 was marked
21             for identification.)
22  Q.  I'm going you show you what I've marked as
23       Defendants' Exhibit Number 19 and ask if you
0232
1        can recognize or identify that for me.

2          (Brief pause)
3   A.   Yes.
4   Q.   Is that memo about that particular testimony
5        you just gave me, or is this in relation to
6        anything else?  Tell me what this memo is
7        about?
8   A.   This memo is about Lavera not Eunice.
9   Q.   Oh, I'm sorry.  Okay.  Do you know -- well,
10       tell me while I'm showing you that -- I
11       apologize.  That is from Lavera?
12  A.   Right.
13  Q.   You're saying Eunice was the one you claim was
14       insubordinate.
15  A.   Insubordinate.
16           So what was your question?
17  Q.   My question is, tell me -- you've read this --
18       have you had a chance to read this memo from
19       Lavera?
20  A.   Yes.
21  Q.   And that's Defendants' Exhibit Number --
22  A.   19.
23  Q.   -- 19?
0233
1            Can you tell me the circumstances
2        surrounding that memo?
3   A.   Yes.  Valarie Savage had provided me a
4        complaint in writing, and this is what Lavera
5        is responding to.  Valarie Savage did a
6        complaint that Lavera had changed a bond while
7        Valarie was on call.  Valarie was not at work
8        that day.  However, she had advised me that
9        she was still -- would be -- was the
10       magistrate on call and would be handling her
11       own call.  And Valarie complained about Lavera
12       changing this because there was a memo.  There
13       was a policy that only the magistrate on call
14       could change a bond.  And it -- if it was
15       changed by anyone, there had to be
16       documentation of the reason why.
17  Q.   Are you aware of any white magistrates who
18       changed a bond when they were not on call?
19  A.   I am aware of the one she lists here, Sarah
20       Fowler, that changed one.  However, Sarah
21       Fowler had contacted Valarie Savage and asked
22       her could she change it, because I talked to
23       Sarah myself.

0234
1    Q.   And if a magistrate is on call, they're not in
2         the office; is that correct?
3    A.   They could be in the office.  Most of the time
4         they are in the office except for on the
5         weekend.
6    Q.   Do you know when this occurred, this
7         incident --
8    A.   It was during the week.  Valarie was off, but
9         had let me know that as stated on the
10        schedule, she was the -- she was still the
11        magistrate on call.  That had not been
12        changed.  There was no substitute.
13   Q.   And based on that memo that Lavera wrote to
14        you, she felt like you were holding her to a
15        different standard.
16   A.   I don't know what she felt.
17   Q.   I guess the memo can speak for itself.
18             Did you --
19   A.   I guess that -- you know, Valarie Savage filed
20        a complaint, but I don't see a copy of her
21        complaint here.  I just see the one that
22        you're putting in from Lavera.
23   Q.   Was any disciplinary action taken?
0235
1    A.   Against who?
2    Q.   Toward anybody regarding this incident in
3         Defendants' 19?
4    A.   I did a -- I don't remember if I did a memo to
5         Lavera or just talked to her, reminding her of
6         the policy.
7    Q.   Did you ever deny Eunice Knight the right to
8         be off when her daughter was sick?
9    A.   She didn't tell me it was her daughter having
10        a biopsy.  And, no, I did not deny her.
11   Q.   Did you require her to provide different
12        documentation than you did other white
13        magistrates?
14   A.   No.  I originally said -- because she was so
15        rude and insubordinate to me when I was trying
16        to discuss this with her to figure out why she
17        couldn't come in after the doctor's
18        appointment and why she couldn't work the next
19        day, I try -- I first said, well, you'll need
20        to bring me a doctor's excuse, and then later
21        changed it, and put it on her leave form that

22    I changed it.  I marked that out.  Did not
23    require it.
0236
1  Q.  Now, how was she rude and insubordinate to
2    you?
3  A.  Because I was trying -- Eunice had been out a
4    lot on leave that I thought had been approved
5    previous to my coming there.  She had told me
6    that she was going to be out several
7    afternoons, several whole days over a several
8    weeks' period because she refereed basketball
9    games for playoffs for high school.  It was
10    already set up, so I assumed the judge had
11    approved it.  However, at a subsequent time
12    talking to the judge, the judge told me she
13    knew nothing about it.
14       Anyway, so -- and I had three magistrates
15    that were going to be off that Thursday and
16    Friday already, vacation.  And I told Eunice,
17    I said, this is a very bad time for you to be
18    off because of manning court on Thursday.  And
19    I needed her there.  And I asked her if she
20    could come in after the doctor's appointment.
21    And she said, no, that she might need to stay
22    with her daughter.  And then I asked her could
23    she come in on Friday because of the shortage,
0237
1    and she said, no, I may have to keep the
2    children.
3       But she never, at that time, never told me
4    the extent, what the appointment was for.  If
5    she had told me it was a biopsy, it was a
6    serious matter with her daughter, I would have
7    approved the request.  And we would have made
8    do with the people we had.
9  Q.  Have you allowed white employees to take off
10    without requiring a doctor's note?
11  A.  Michelle Bryan had a niece that was in
12    Children's Hospital in Birmingham.  She called
13    me from there and said that her niece was not
14    expected -- might not live, and she and the
15    family were up there.  And, also, her
16    grandmother in another town, which she was
17    going at some point to be by, was on her death
18    bed, expecting her not to live either.
19       She did have, I believe, a little bit of

20       leave.  And I told her to keep me updated.
21       Every day that she called, I went over or
22       called and told the judge and Michelle.  I was
23       not aware -- had not memorized the operations
0238
1        manual that said that I did not have the
2        authority to authorize leave that they -- that
3        someone didn't have.
4            And the judge -- Judge never, during those
5        days that I was notifying her that Michelle
6        had called and the niece was still bad and the
7        grandmother was still in bad shape, never once
8        did the judge tell me I didn't have the
9        authority to keep letting her be off.  Only
10       after the fact did she tell me.
11   Q.   Go back to July 19th.  You and the judge and
12       Kai Davis met; is that correct?
13   A.   Right.
14   Q.   Was anyone else present?
15   A.   I don't recall anyone else being present.
16   Q.   What occurred in that meeting?
17   A.   Well, I had previously talked to Kai about all
18       the problems.  And I just wanted her to kind
19       of be a mediator I guess.  I wanted to
20       work -- I mean, I could still work with the
21       judge, but I needed her to give me what she
22       had promised me when I started.  And that's
23       100 percent backing and let me supervise
0239
1        everyone in the office fairly.
2            So we got together.  The judge had been
3        over at Kai's office before they let me know
4        that she -- to come over.  And so Kai said
5        that she knew there was -- we'd both said
6        there were problems.  So she asked me to
7        start.  And I just did a laundry list of the
8        issues that I had and asked the judge to give
9        me her cooperation.
10           Before I could get through my part, the
11       judge interrupted and started going on about
12       her side of things and just eventually threw
13       up her hands and said, I'm just tired of all
14       this, and walked out.
15   Q.   When she interrupted and gave her side, did
16       she let you know that she was having some
17       issues with you and your performance?

18  A.  She was answering what I was saying.  It was
19      not a counseling session.
20  Q.  And that was also letting you know that she
21      had some issues with your performance; isn't
22      that true?
23  A.  I don't know --
0240
 1  Q.  I don't care --
 2  A.  -- about issues with performance.
 3  Q.  -- what you call it.
 4  A.  Well, I care what you call it because I never
 5      had a counseling session.  This was a talking
 6      session that I requested, not the judge.  And
 7      we were just supposed to be talking things out
 8      and come to some solution.
 9          The judge said she didn't know if she
10      could go forward from that point.  And I told
11      her that I could, that I could put the
12      differences behind us and work with her.  But
13      I needed to be allowed to supervise, and I was
14      not being allowed to do so.
15  Q.  Again, the judge expressed that she had some
16      concern with your ability to run and manage
17      the office; is that true?
18  A.  No, that's not true.  No.
19  Q.  The judge was completely pleased with
20      everything you were doing; is that true?
21  A.  We didn't talk about pleased or not pleased.
22          MR. JAFFREE:  What answer are you trying
23              to solicit from this witness?
0241
 1          MS. NELSON:  I'm trying to get her to tell
 2              me what occurred in the meeting.
 3  A.  That's what I've done.
 4  Q.  Well, you told me your side.  I'm just trying
 5      to get your understanding of what the judge
 6      expressed to you or what Kai expressed to you.
 7          Surely if the judge said she didn't know
 8      if she could continue or interrupted and gave
 9      her side, you had different sides to the
10      story, didn't you?
11  A.  That's always more than one side.  Kai
12      interjected at times, too.
13  Q.  If Kai Davis is a witness in this case, do you
14      have any reason to think that she would
15      anything but truthful?

16  A.  Say that again.
17  Q.  Do you have any reason to believe that Kai
18      Davis would not tell the truth as to what
19      occurred at that meeting?
20  A.  I --
21          MR. JAFFREE:  Well, I mean, that's a --
22          MS. NELSON:  She can answer that.
23          MR. JAFFREE:  I guess it depends on what
0242
1           Kai says.
2           MS. NELSON:  Make your objection.
3  Q.  I'm asking, do you have any reason to believe
4      that Kai would not be truthful?
5  A.  I believe Kai would not be truthful.
6  Q.  And what do you base that on?
7  A.  I don't have facts.  I have feelings.
8  Q.  Because you know she's going to testify
9      opposite from what you're saying; isn't that
10     true?
11         MR. JAFFREE:  How would she know that?
12  A.  How would I know that?
13  Q.  Well, if you think she's going to say exactly
14      what you're saying, why would you question her
15      veracity?
16  A.  You're trying to confuse me.  I've answered
17      your question.
18  Q.  You think Michelle Sellers would not be
19      truthful?
20  A.  Absolutely would not be truthful.
21  Q.  You think Judge Gordon would not be truthful?
22  A.  Absolutely would not be truthful.
23  Q.  You think Ashton Ott would not be truthful?
0243
1  A.  Absolutely not.
2          MR. JAFFREE:  There's some people having
3              adjustment on both sides.
4  Q.  Ashton no longer works for the City, does she?
5  A.  I don't know.  Yeah -- no, she doesn't.
6  Q.  You don't know?
7  A.  She doesn't.  She works at --
8  Q.  Didn't you work with her at Movie Gallery?
9  A.  That's what I just said.  Yes, she doesn't.
10  Q.  Well, after I questioned you about it.
11  A.  I forgot.
12          MR. JAFFREE:  She corrected herself before
13              you questioned her about it.

14    A.  I don't keep up with people like that.
15    Q.  Did you have any part in Fran Bailey leaving
16       the employment of the City of Dothan?
17    A.  No, I did not.
18    Q.  Do you know why she left?
19    A.  Yes, I do.
20    Q.  And how do you know?
21    A.  She submitted her resignation in writing and
22       stated why.
23    Q.  And what did it say?
0244
1    A.  I don't know it word for word.  I do know --
2    Q.  Just tell me your understanding of why Fran
3       Bailey left.
4    A.  My understanding of it is because she was
5       tired of the favoritism shown to certain
6       magistrates, and she was tired of dealing with
7       the same defendants over and over again.
8    Q.  The same criminal defendants?
9    A.  Yes.
10    Q.  Did you ever hear her make the statement that
11       she felt like she didn't have to be courteous
12       to a criminal defendant?
13    A.  No, I did not.  Can't imagine Fran saying
14       that.
15    Q.  What defendants did she feel like she had to
16       deal with over and over again?
17    A.  The ones that were continually -- she told me
18       that were let go by the judge and continually
19       repeated the same charges or cases were reset
20       and reset or pay-bys were extended and
21       extended.
22    Q.  And who are you talking about?
23    A.  She did not give me names.  You would have to
0245
1       ask her.
2    Q.  And she's a clerk; is that correct?
3    A.  She was a clerk typist.
4    Q.  And what was her interaction with the criminal
5       defendants?
6    A.  Mostly by phone.
7    Q.  Had she been reprimanded or counseled in any
8       way?
9    A.  Not that I can recall.
10    Q.  Do you know who took her place?
11    A.  Actually, Melissa Woods took her place, and

12     then a new clerk typist was hired, Melanie
13     Walsh.
14  Q.  Did you hire Melanie?
15  A.  I recommended that she be hired.
16  Q.  And you can only make recommendations as to
17     hiring and firing?
18  A.  Yes.
19  Q.  Was she white or black?
20  A.  She was white.
21  Q.  And was she -- had she worked for the City or
22     did she apply from the outside?
23  A.  She was a city employee at the time.  She was
0246
1     a city dispatcher.
2  Q.  Did you sit in on the interview?
3  A.  I did the interview.
4  Q.  You did?  Did you interview some others?
5  A.  Yes.
6  Q.  Do you remember how many people you
7     interviewed?
8  A.  Maybe five or six.
9  Q.  Were any of them black?
10  A.  I don't recall.  I interviewed people that
11     their application was sent to me from the
12     personnel department that had the
13     qualifications.
14  Q.  Other than Melanie Walsh, did you hire any
15     other employees or recommend the hiring of any
16     other employees when you were at the City?
17  A.  I think that's the only one.
18     MR. JAFFREE:  I'm beginning to wonder
19       whose race case is it.
20  Q.  Did you ever become aware of an issue
21     regarding a gift that was passed around the
22     office that was a black angel?
23  A.  A what?
0247
1  Q.  A black angel.  Does that mean anything to
2     you?
3  A.  No, it doesn't.
4  Q.  Nobody has told you about that?
5  A.  No.  That's first I've heard of it.
6  Q.  Did you ever make a comment to the judge about
7     Get Out Bonding and why so many defendants
8     used Get Out Bonding?
9  A.  Yes, I did.

10   Q.   Tell me what you said.  First of all, is this
11        a conversation you had with Judge Gordon?
12   A.   Yes.
13   Q.   And was anyone else present?
14   A.   I don't recall.
15   Q.   Do you know when this was?
16   A.   I believe -- I'm pretty sure it was when Don
17        Thompson from Thompson Bonding met me at the
18        front door one morning to tell me about a
19        situation with Get Out Bonding and his
20        brother-in-law that had occurred the night
21        before.  But I don't recall the date.
22   Q.   I'm sorry.  Who was this now, Mr. Thompson?
23   A.   Don Thompson.
0248
1    Q.   And who is he with?
2    A.   He owned Thompson Bonding.
3    Q.   And he made a comment to you about his
4         brother-in-law.
5    A.   Right, that had been arrested.
6    Q.   Okay.  And what did he say to you about his
7         brother-in-law?
8    A.   He said his brother-in-law had called him,
9         wanting him to bond him out of jail, but he
10        had a cash bond.  And his brother-in-law
11        was -- Don was going to go over and pay the
12        bond.
13            But before he could, the brother-in-law
14        called him back and said that someone had
15        changed the bond to a regular bond, and that
16        one of the personnel from Get Out Bonding was
17        hanging around the jail that night, and that
18        they -- this person told the brother-in-law
19        that he could only use them to be bonded out.
20        If he didn't use them, that he could stay in
21        jail.  And Don Thompson wanted me to check
22        into that.
23   Q.   Okay.  And are you friends with Don Thompson?
0249
1    A.   No.
2    Q.   Do you know Don Thompson?
3    A.   Didn't till that day.
4    Q.   Why did he come to you as opposed to going to
5         the jail?
6    A.   I don't know.
7    Q.   Does the magistrates' office have anything to

8    do with who a person that's been arrested and
9    that's in the jail uses as a bonding company?
10  A.  We're -- we know of them, yes, because they
11    bond out the defendants.
12  Q.  I'm talking about if it's Friday night and
13    somebody is arrested and they're down in the
14    jail and need a bonding company, the
15    magistrates' office doesn't have anything to
16    do with who they call, do they?
17  A.  They have to do for -- with changing a bond if
18    their bond is changed from a cash to a
19    regular.
20  Q.  And what did you tell Don -- what did you do
21    after you talked to Don Thompson?
22  A.  I told him that I would have to let the judge
23    know about the situation and let her look into
0250
1    it and get back --
2  Q.  So help me make sure I understand.  His
3    brother-in-law had been arrested that night;
4    is that -- I mean, the night before he came --
5  A.  Right.
6  Q.  -- to see you?  And some guy was hanging
7    around the jail from Get Out?
8  A.  Right.
9  Q.  Do you know who that was?
10  A.  No, I don't the know the name.
11  Q.  And there at the jail, he persuaded him --
12  A.  No.  He just told him that Get Out was his
13    only choice.
14  Q.  You don't know who that person was?
15  A.  No.
16  Q.  And did he switch to Get Out?
17  A.  Did he switch?  He didn't have a choice if he
18    wanted to get out of jail.
19  Q.  And why didn't he have a choice?
20  A.  I've already answered that.
21  Q.  Well, I'm sorry.  I don't understand.
22  A.  The personnel that was at the jail with Get
23    Out Bonding told him that he could not call
0251
1    another bonding company, that if he wanted to
2    be released from jail, that he would have to
3    use their company.
4  Q.  Did you look into that?
5  A.  I called the judge when I got into my office,

6    told her what was told me to me.  She got
7    angry and said that she didn't believe
8    anything and that she would call Don Thompson
9    herself and straighten it out.
10   Q.   To your knowledge, did she call Don Thompson?
11   A.   She called me back later and told me that what
12       I said Don Thompson told me, that's not what
13       he told her, that he told her a completely
14       different story, and why did I lie.
15   Q.   Do you know if he told her a different story?
16   A.   I never talked to him again.
17   Q.   You don't know?
18   A.   No.
19   Q.   Did you ever do anything to investigate Don
20       Thompson's complaint --
21   A.   I --
22   Q.   -- other than talk to the judge?
23   A.   No, I didn't.  Don't believe I did.
0252
1        (Brief pause)
2    Q.   Any other issues about Get Out Bonding besides
3        that incident with Don Thompson and telling
4        the judge and you said the judge got angry?
5    A.   Just that Sarah Fowler told me that she always
6        had problems getting the judge to do final
7        forfeitures on Get Out Bonding.
8            And also Mendheim -- and I can't remember
9        his first name -- that owned Mendheim Bonding
10       came into the magistrates' office one day to
11       find how much he owed for his defendants that
12       hadn't appeared.  And he told me that he would
13       not pay that until the judge made Get Out
14       Bonding pay theirs, because in the past,
15       they -- the other bonding -- he had been made
16       to pay his, but Get Out Bonding had not been
17       made, and they were not closed down.
18   Q.   And this was like double hearsay from Sarah
19       Fowler?
20   A.   No.  That was two separate things.  I said,
21       first, that Sarah Fowler told me that she had
22       a problem getting the judge to close down Get
23       Out Bonding for non-payment of the defendants
0253
1        that didn't show up for the bond.
2    Q.   But you had no independent, direct personal
3        knowledge of any of that, do you?

4   A.   No.  Because I wasn't allowed to do the
5        clerk's Revocation of Surety.
6   Q.   And who did that?
7   A.   Michelle Sellers, although the clerk of the
8        court is supposed to do it.
9            And then the other incident that I said
10       was when Mr. Mendheim -- and I can't remember
11       his first name, probably will come to me later
12       because I knew him before I started at the
13       City -- came to me to find out.  And he just
14       said -- told me the previous problems.  And he
15       says, I'm not paying my money until they do.
16           And I told him, I could not tell him what
17       other bonding companies paid or didn't pay.
18  Q.   Did you know what other bonding companies paid
19       or didn't pay?
20  A.   I was given the information.  I -- it was
21       done -- it was a report.
22  Q.   Other bonding companies had final forfeitures,
23       didn't they?
0254
1   A.   Yeah.
2   Q.   Other bonding companies have gone out of
3        business, haven't they?
4   A.   Not -- not -- the only one that couldn't do
5        bonds when I was there was when Get Out
6        Bonding didn't pay theirs, and they were
7        finally -- bonds were not taken from them.
8   Q.   You're saying, that's the only one that you
9        know of that --
10  A.   Right.
11  Q.   -- went out of business?
12  A.   Right.  I -- to my knowledge.
13  Q.   Did Mendheim have -- do you -- Mendheim?
14  A.   Mendheim, M-E-N-D-H-E-I-M, I believe.
15  Q.   Are they still in -- did they remain in
16       business while you were there?
17  A.   Yes.
18  Q.   Did they owe money or have final -- have
19       forfeitures?
20  A.   They were never closed down.  They eventually
21       paid or had the defendant show up.
22  Q.   Do you know A Advantage Bonding?
23  A.   A Advantage?  Yes.
0255
1   Q.   Have they ever been shut down?

2   A.  I don't know.
3           (Brief interruption)
4   Q.  The only conversation you had with Judge
5       Gordon about Get Out was the incident that you
6       mentioned or just testified to regarding Don
7       Thompson; is that correct?
8   A.  No.
9   Q.  Okay.  I'm sorry.  I thought -- what other
10      conversations --
11   A.  The other was that I had been told by Valarie
12      Savage that Get Out Bonding bonded out more
13      defendants than any other bonding company
14      because they hung around the jail a lot.  So I
15      ran a report giving the bonding companies and
16      how many they bonded out.
17   Q.  How did you run a report?
18   A.  From the court system.
19   Q.  Okay.
20   A.  And it was significantly higher, the number,
21      for Get Out Bonding than the other bonding
22      companies.
23   Q.  Okay.
0256
1   A.  And when I asked the judge about Get Out
2       Bonding and why they bonded out more
3       defendants, she got very angry and said she
4       was tired of hearing about Get Out Bonding.
5   Q.  When did this occur in relationship to the
6       incident regarding Don Thompson?
7   A.  After.
8   Q.  Like how much after?
9   A.  I don't remember.
10   Q.  You don't know whether it was a week or a
11      month?
12   A.  No.
13   Q.  Don't know if is was April or May?
14   A.  No.  I believe it was later than those months.
15      Can't be sure.
16   Q.  It was your understanding that Get Out Bonding
17      got more bonds because they hung around the
18      jail?
19   A.  I didn't observe it.  I was told that.  I
20      didn't hang out at the jail.
21   Q.  Did Judge Gordon have anything to do with what
22      bonding company a criminal defendant who was
23      in jail selected to issue a right to bond?

0257
1   A.  I don't know.  Did she?  Maybe.  That would be
2       a question for her.
3   Q.  Well, do you have any reason to think that she
4       did?
5   A.  She could have.
6   Q.  But you don't know.  You don't have facts to
7       support that, do you?
8   A.  No.  And she doesn't have the facts to say she
9       didn't.
10  Q.  The jail is -- she is not over the jail, is
11      she?
12  A.  No.  But she has a connection with the jail.
13  Q.  Well, what is her --
14  A.  Well, the defendants --
15  Q.  Her connection to the jail is what?
16  A.  -- from her courtroom are in that jail.  She
17      is great friends with the warden -- at the
18      time, the warden at the jail, one of them.
19      And Lavera had previously worked at the jail,
20      and they were great friends, the judge and
21      Lavera.  And she was great friends with the
22      owners of Get Out Bonding.
23  Q.  Who?
0258
1   A.  I can't remember their name.
2   Q.  And who was great friends?
3   A.  The judge.
4   Q.  And how do you know that?
5   A.  Because I observed it in court.
6   Q.  And what did you observe?
7   A.  I observed that Get Out Bonding personnel was
8       allowed to sit at a front table where, really,
9       bondsmen were not supposed to be sitting and
10      that they were in conversation with the judge
11      a lot.
12  Q.  Do you have any other facts that support your
13      testimony that the judge has absolutely
14      anything to do --
15  A.  No.
16  Q.  -- with what bonds are written in the jail?
17  A.  No.
18  Q.  It's all supposition, assumption; isn't that
19      correct?
20          MR. JAFFREE:  I think --
21          MS. NELSON:  Let me ask my question.  You

22       can state your objection.
23  A.  No, it's not.
0259
1      MR. JAFFREE:  Well --
2  A.  No.
3  Q.  Well, then, what's it based on besides what
4    you just testified to?
5  A.  What I testified to?
6  Q.  You're looking at your --
7  A.  I'm not looking at my notes.  I hadn't hardly
8    looked at them the whole time.
9  Q.  You're saying because Lavera used to work in
10    the jail, because the judge knows the warden,
11    because the judge let a bondsman at Get Out
12    sit on the front row.  Those are the three
13    things I heard.
14      MR. JAFFREE:  Well, you also heard, the
15      judge getting very upset when she
16      mentioned anything adverse about Get
17      Out Bonding.  You want to throw that
18      in?
19  Q.  And the judge got upset and said, she didn't
20    have any control over that, didn't she?
21    Didn't the judge tell you, she didn't have
22    control over --
23  A.  No.  She did not.
0260
1      MR. JAFFREE:  I thought her testimony was
2      --
3  A.  I didn't testify to that.  No, she didn't.
4  Q.  So those four things.  Anything else that you
5    have that would support the judge had anything
6    to do with a defendant in jail using Get Out
7    Bonding?
8  A.  No.  Well, there is one other incident that I
9    can't prove because there's nothing in
10    writing.  It's just something that I
11    overheard.  And, basically, I can figure out
12    what happened, but I can't prove it.
13  Q.  And what is that?
14  A.  That I questioned -- I called Warden Grubbs to
15    question why -- who had changed a bond because
16    it only said, "per Judge Gordon."  Didn't say
17    why.  And I called and asked her who had
18    called to have the bond changed.  And she said
19    she didn't know, that all -- all she had

```
20        was -- she believed the judge called because
21        it had "per Judge Gordon."
22           And I walked from my office after that
23        conversation into Lavera's office to discuss
0261
1        something with her, and she was on the phone
2        with someone.  And her cell phone started
3        ringing.  And when she picked the cell phone
4        up, the person at the other end, who of course
5        I can't identify, on the phone was talking
6        very loud and said, I overheard, court
7        administrator, go talk to the judge.
8           And Lavera on her end said, I was on my
9        way over there anyway, I'll tell the judge,
10        which led me to believe there was -- when I
11        questioned the bond, the warden called
12        Lavera.  Lavera went to Judge, told her I was
13        questioning why bonds were being changed.
14  Q.  Again, this is just your supposition of what
15        had occurred?
16  A.  Makes a lot of sense.
17  Q.  But it is your supposition?
18           MR. JAFFREE:  It's a term --
19  A.  It's not supposition.
20           MR. JAFFREE:  It's a term of inference.
21  A.  I overheard.
22           MR. JAFFREE:  An inference on facts, not a
23           supposition.
0262
1  Q.  And who was this bond -- what defendant was
2        this bond on?
3  A.  I don't remember.  There were so many bonds
4        changed.
5  Q.  You're making some very serious allegations
6        here.
7  A.  I know I am.  If you -- if y'all had provided
8        what we asked for in documents, maybe I could
9        tell you.
10  Q.  When did you talk to Warden Grubbs about this
11        issue?
12  A.  I can't possibly remember the date.
13  Q.  What kind of bond had she changed?
14  A.  Who?
15  Q.  You said you talked to Warden Grubbs?
16  A.  She didn't change -- I didn't say she changed
17        a bond.  I was trying to find out from her if
```

18      she knew who had called, if it was a
19      magistrate, if it was Judge Gordon.
20   Q.   The bond had been changed from what to what?
21   A.   I don't know.  I mean, cash to regular,
22      regular to cash.  It's been -- I can't -- in
23      any imagination, me or anyone else, remember
0263
1      every bond, every date.
2   Q.   And --
3         MR. JAFFREE:  Let me --
4   Q.   -- the bond had been changed from --
5         MR. JAFFREE:  Let me object to this line
6            of questioning.  She said it was her
7            supposition and she couldn't prove
8            it.  You insisted on asking her what
9            was it.  She didn't want to talk about
10           it.  She talks about it, and then you
11           accuse her of making some serious
12           accusations.
13        MS. NELSON:  Well, they are serious
14           accusations.
15        MR. JAFFREE:  Well, they're --
16        MS. NELSON:  And I have a right to stay
17           here to midnight if I want to and ask
18           her about them.  She can't back them
19           for anything.
20        MR. JAFFREE:  She didn't make accusation.
21           She's just simply saying there are
22           some dots that could be connected.
23        MS. NELSON:  She's making serious
0264
1            accusations not only here, but I've
2            read -- and I haven't even gotten to
3            that yet.  And I mean very serious
4            accusations.  She can't back them up.
5            I think she's opening up herself for
6            exposure.
7   Q.   I want to know --
8         MR. JAFFREE:  Right here in this
9            deposition?
10        THE WITNESS:  Yeah.  That's what it
11           sounded like to me.
12   Q.   I want to know who -- what criminal defendant
13      this bond was changed on that you remembered
14      this so well, but you can't even remember who
15      it was.

16   A.   As I stated before, there is no way, as many
17        court documents, as many defendants, as many
18        bonds.  And I told you that I could not -- I
19        didn't have documentation to prove it.
20   Q.   Why did you call Warden Grubbs?
21   A.   Because there was -- had been a habit of a lot
22        of bonds being changed that just had on them
23        "per Judge Gordon."  And they -- if the
0265
1         judge -- I even asked the judge then.  I asked
2         her, I said, did you call and change a warrant
3         on so-and-so date, which I knew the date at
4         the time because it had just happened.
5              And she said, no, I did not call.
6              And I said, well, it's my understanding
7         that if it has your signature, it should only
8         be called in by you.
9              And she said, that's correct.
10             However, there was numerous bonds that had
11        been changed that had "per Judge Gordon" that
12        I didn't believe were being changed per Judge
13        Gordon.
14   Q.   You're saying it would say "per Judge Gordon"
15        but not have her signature?
16   A.   Right.  Right.  It was written by -- in by a
17        warden or whoever was there at the time.  And
18        there would be no documentation as to why it
19        was changed.
20   Q.   So best of your knowledge, the "per Judge
21        Gordon" would be written by the jail or the
22        warden, not anybody in the magistrates'
23        office?
0266
1    A.   Yes.  But it would be written there when they
2         were told to put "per Judge Gordon."
3    Q.   When who was told?
4    A.   When the warden was told by someone to change
5         it.  And I was just trying to find out.  If
6         the judge didn't call and have them change it
7         to "per Judge Gordon," who did?
8    Q.   Now, do you know Warden Grubbs?
9    A.   Only -- I met her when I started working
10        there.
11   Q.   Now, are you making an accusation that she had
12        a relationship with Get Out Bonding?
13   A.   That's not what I said.

14  Q.  I'm just asking.
15  A.  That's not what I said.
16  Q.  Okay.  After that, was there any more
17       discussion about Get Out Bonding?
18  A.  Only when the final forfeitures were supposed
19       to be done.  And I had read the Alabama Code
20       or something that stated that the court --
21       clerk of the court was supposed to do the
22       Revocation of Surety.  And I got the -- Sarah
23       Fowler sent me the list of the two companies
0267
1        that hadn't paid.  And that was Mendheim
2        Bonding and Get Out.
3            Michelle Sellers asked me to send that
4        list to her and on -- with the list, I wrote
5        Michelle Sellers a note that said something
6        like, am I -- aren't I supposed to be doing
7        this process, please let me know if I am.
8   Q.  You thought you were supposed to be doing it?
9   A.  Yes.  That's the statutes or code says, that
10       it's to be done by the clerk of the court.
11  Q.  And you're the clerk of the court?
12  A.  Yeah, I was.
13  Q.  Would you have known what to do?
14  A.  Sure.
15  Q.  And how would you know?  Would you ask --
16  A.  It's a form.
17  Q.  -- Mary Beth or Mary Turner?
18  A.  No.  I probably would have asked Sarah who
19       knows all about it.
20  Q.  Was, to your knowledge, Michelle Sellers ever
21       the clerk of the court?
22  A.  I'm sorry?
23  Q.  Was Michelle Sellers ever the clerk of the
0268
1        court?
2   A.  Yes.  But she wasn't at that time.
3   Q.  Following your meeting with the judge and Kai
4        Davis, did the three of y'all ever have any
5        other meetings?
6   A.  No.
7   Q.  Did the judge ever meet with you after that
8        meeting to discuss your job duties or how you
9        were running the office?
10  A.  No.  I talked --
11       THE WITNESS:  Well, yeah.  She said all

12          three of us, though.
13          MR. JAFFREE:  Oh, okay.
14    A.   I met with Kai after that another time.
15    Q.   Your attorney was showing you your calendar.
16          And when did you meet with Kai Davis after
17       that?  You're referring to Defendants' Exhibit
18       5?
19    A.   Yes, I am.
20          On September the 29th.
21    Q.   And I've tried to copy this.  But, again, I'm
22       on a page that -- the 29th falls in the middle
23       of the calendar.
0269
 1          You have a note --
 2          MR. JAFFREE:  Well, you need to get a good
 3          copy.  Do you want to do this again or
 4          something?
 5          MS. NELSON:  Well, I'm trying to see if I
 6          can read it.
 7    Q.   Talked to Kai Davis -- you're right.  Tell me
 8       what it says.  I may need to get a better
 9       copy, like the 29th of September.
10    A.   Well, first it says, "talked to Judge about
11       memo she did to me.  Talked to Kai about
12       favoritism" --
13    Q.   Let me stop you.  The memo the judge did to
14       you, did she give you a memo?
15    A.   Yes.  It was about me changing the job
16       duties.  And when I did, Eunice and Lavera
17       sent me a memo and copied the judge, saying
18       they were protesting the additional job
19       duty -- minor job duties I had added to their
20       list.
21    Q.   Okay.  So you talked to the judge before you
22       went to see Kai?
23          (Brief pause)
0270
 1    Q.   Do you remember what you did first, talked to
 2       the judge or talked to Kai?
 3    A.   Talked to the judge.
 4    Q.   And then you went to see Kai?
 5    A.   Yes.
 6    Q.   And why did you go see Kai?
 7    A.   And then it says, "Talked to Kai about
 8       favoritism, cases not properly done, wrongful
 9       arrests, cash bond not handled right.  Kai

10     said to first let Judge know about Gregory
11     Powe case.  And she told me to keep a
12     calendar.  She will do some looking into the
13     favoritism shown."
14  Q.  That's what I can't read.  "She will do some
15     looking" --
16  A.  In -- "She will do some looking into" -- "she
17     will do some looking into things," is what it
18     says.
19  Q.  "Looking into things?"  Okay.
20          And then the next day, on the 30th, can
21     you tell me what those entries say?
22  A.  "Called to request Judge to call me.  Never
23     returned call.  Called Michelle and asked her
0271
1     if I could come over and talk to her tomorrow
2     about some things I need help on.  Said yes.
3     Eunice told me her cousin was killed and might
4     be out Tuesday."
5          And in parentheses, I've got "Michelle and
6     Mary."  But I don't know what that's about.  I
7     don't recall that.
8  Q.  So based on -- back on the 29th, you said, Kai
9     said to let Judge know about the Powe case --
10  A.  Yes.
11  Q.  -- and to keep a calendar?
12          You had been keeping a calendar, hadn't
13     you, or did you --
14  A.  A little bit.  And then I went --
15  Q.  You went back and started writing in things?
16  A.  I had -- on this -- on this month, I did.
17  Q.  Month of September?
18  A.  Yes.
19  Q.  Did you talk to the judge about the Powe case?
20  A.  Yes, I did.
21  Q.  And when did you do that?
22  A.  After I talked to Kai sometime.
23  Q.  Well, you said you talked to Kai about that on
0272
1     the 29th, so you're saying it would be after
2     the 29th?
3  A.  Yes.
4  Q.  And what did you tell the judge about the Powe
5     case?
6  A.  I told her that I had understood that there
7     had been a wrongful arrest and that Mary

8      Turner had brought it to my attention because
9      she got the money from the jail for bonds Powe
10     paid -- posted.  And she had a receipt for
11     bond money on a Gregory Powe posted by Larry
12     Pike, but there was no money there.
13  Q.  Okay.
14  A.  So we looked for the paperwork; couldn't find
15     it.
16  Q.  And then what happened?
17  A.  I started searching and investigating.  And
18     Mary called the jail to find out why there was
19     a receipt and no money and found out the
20     defendant was released.  And then I asked
21     Eunice, I believe, for the paperwork because
22     she was the magistrate on call.  And in the
23     paperwork it stated that Eunice had released
0273
1      because Lavera had not attached a CRO
2      certificate to his case and closed it out some
3      months previously.  So he was wrongfully
4      arrested.  And she --
5  Q.  Let me stop you.  How do you know Lavera
6     didn't attach it?
7  A.  Because there's case notes in the court
8     system.
9  Q.  And do you have any knowledge that Lavera
10     didn't attach it?
11  A.  It wasn't attached.  They faxed it over again.
12  Q.  Do you have any facts that support that
13     Lavera -- I'm sorry -- Eunice did anything --
14     strike that.
15        Is your testimony that Eunice or Lavera
16     should have attached that paperwork?
17  A.  It's my testimony that Lavera should attach
18     the CRO certificate to keep from an alias
19     warrant being issued for his arrest.  In --
20  Q.  My question is, how do you know Lavera was
21     supposed to do that and didn't do that?
22  A.  In the case notes on the court system, there
23     were notes that one of the magistrates -- I
0274
1      think Lavera, I'm not positive -- had put in
2      there that said, LM -- for Lavera McClain --
3      failed to attach CRO certificate to paperwork
4      when received.
5  Q.  But you're not sure about that?

6  A.  I -- I didn't say I wasn't sure.  I said that
7     that's what the case notes said.
8  Q.  And the case notes are what now?
9  A.  They're in the court system.  They're entered
10     in a case on a court system.
11  Q.  On a docket?
12  A.  On the case.  When you go to the screen and
13     you pull up a case, there is places you can
14     enter case notes on.
15  Q.  Okay.  And I believe in your -- I'm looking
16     for the document that you submitted to me
17     earlier as part of your -- did you attach the
18     Powe documentation as part of your --
19        MR. JAFFREE:  I don't think so.
20  A.  No, I don't have the Powe documentation.
21        MR. JAFFREE:  Well, I have some Powe
22          documentation that came in discovery
23          requests.  I think that's the only
0275
1          documentation that I have, even though
2          I've requested it and a lot of other
3          documentation for defendants.  But I
4          will address that later.
5  Q.  Did you submit any of that to the City in your
6     response to your termination?
7  A.  I don't -- what do you mean?  Submit what?
8  Q.  Did you respond to the City when you were
9     terminated, or did your --
10  A.  Yes, I did.
11  Q.  -- attorney do that?
12  A.  I did that.
13  Q.  And did you submit any documentation about the
14     Powe issue in that case?
15  A.  I didn't have the documentation.  I stated
16     what happened.
17  Q.  Do you know if the City reviewed that or --
18  A.  Reviewed what?
19  Q.  The Powe issue.
20        MR. JAFFREE:  How would she be in the
21          position to know that?
22        MS. NELSON:  I'm just asking.
23  Q.  Do you know?
0276
1  A.  No.  I do know that before I was terminated
2     and after I brought it to the attention of the
3     judge and she basically said that wasn't my

4      concern, that at a later date, I looked for
5      the paperwork to see how it had been handled
6      after it was none of my -- none of my
7      concern.
8         And it had been filed away incomplete.  No
9      disposition had been entered.  Money had
10     not -- there was still money owed on the court
11     costs or something was still showing
12     outstanding.  And it had been filed away in
13     closed files.  And I got it and wrote a note
14     to Eunice and asked her to finalize the case.
15  Q.  All right.  And when did you write her a note
16     to finalize the case?
17  A.  The -- whenever I pulled it from the closed
18     files.  What Eunice had done wrong was she had
19     returned -- she had not run the bond money
20     through the court system.  And she returned
21     cash money to the Surety who had specifically
22     marked on the form that the money was only to
23     be returned to him.
0277
1   Q.  And it's your understanding that Eunice gave
2      the money to Mr. Powe?
3   A.  Yes.
4   Q.  And do you know why she did that?
5   A.  I don't know.
6   Q.  You don't know?
7   A.  Huh-uh (negative response).  I just know it
8      wasn't run through the court system as is
9      every amount money for a bond is supposed to
10     be.  And she should not have given the money
11     back to the defendant when there was a Surety
12     that marked only return to him.
13  Q.  Again, you don't know the circumstances --
14  A.  I know that there --
15  Q.  -- under which that happened?
16  A.  -- is a form that states, and that is a policy
17     and procedure.  And if it says return only to
18     defendant -- I mean, to the Surety, that is
19     who you return it to.
20        And so if it was none of my concern, no
21     one ever explained to me.
22  Q.  So you're saying when you talked to the judge
23     about it, that was her reply, that it was not
0278
1      your concern?

2   A.   That it had already -- it had been taken care
3        of and it was not really any of my concern.
4   Q.   Now, you also testified earlier that there had
5        been some changes in the job duties of Eunice
6        and Lavera; is that correct?
7   A.   There had been job -- minor job changes done
8        in the majority of the magistrates at the same
9        time.
10  Q.   And did you send them a notification of that?
11  A.   Did I send who a notification?
12  Q.   The magistrates that you had changed their job
13       duties?
14  A.   Yes, I did.  There was very minor job duty
15       changes.
16  Q.   What were the changes in their job duties?
17  A.   I had --
18         MR. JAFFREE:  If you can recall without
19           looking at your -- the memo.
20  A.   I don't have the memo.
21         MS. NELSON:  Well, I'm just remembering
22           from -- I have the right to ask her if
23           she remembers it before showing her
0279
1            the document.
2          MR. JAFFREE:  Well, I'm asking if she
3            could recall without looking at it.
4          MS. NELSON:  Oh, okay.  Yeah.
5          MR. JAFFREE:  Would you prefer to look at
6            it first?
7          THE WITNESS:  Yeah, I'd prefer to.
8          MS. NELSON:  Well, I'm asking her if she
9            can recall before looking at it.
10         MR. JAFFREE:  The document is going to
11           speak for itself for changes.  I mean,
12           what does it say, I gotcha?  If you've
13           got the document, show her the
14           document.
15         MS. NELSON:  I'm asking her to tell me
16           what she remembers.
17  A.   I remember adding a docket one day I believe
18       to Lavera.  I added -- it was -- Mary Beth had
19       been doing it.  It wasn't an assigned job
20       duty, but I made it an assigned job duty to
21       Mary Beth to review the obituaries and close
22       cases accordingly.  I added to Mary Turner I
23       believe posting cash bonds.  I believe I

0280
1    added --
2   Q.  I'm listening.  I'm sorry.
3   A.  I believe I added something to Tonya.  Not
4    sure -- I'm not sure what, but I do believe I
5    added some minor job change to her.
6   Q.  Anybody else that you remember changing; any
7    other magistrates that you changed their job
8    duties?
9   A.  I think I changed -- I think I did some
10    adjustment to probably just about every one of
11    the magistrates.  I took a duty away from
12    Sarah and away from Valarie because they were
13    overloaded and Eunice and Lavera seemed to
14    have extra time.  And I think I -- I might
15    have changed, like, backup -- from a secondary
16    person to a backup on a warrant window or a
17    front window for Ann, and maybe I did that on
18    Tonya also.
19   Q.  Do you have a copy of the memo that you sent
20    to them; is that something you've produced to
21    me?
22   A.  No.
23   Q.  Do you have a copy of it anywhere?
0281
1   A.  No.
2         (Defendants' Exhibit 20 was marked
3          for identification.)
4   Q.  I'm going to show you what I've marked as
5    Defendants' Exhibit Number 20.  Is that a
6    memorandum to you from Lavera?
7   A.  Yes.
8   Q.  And that's Defendants' Exhibit 20; is that
9    correct?
10   A.  Yes.
11   Q.  And that was in response to your job changes?
12   A.  Yes.
13         (Defendants' Exhibit 21 was marked
14          for identification.)
15   Q.  And then I'm showing you Defendants' Exhibit
16    Number 21, which is a personal memo to you
17    from Eunice Knight; is that correct?
18   A.  Yes.
19   Q.  And that was in response to your memo
20    regarding job changes?
21   A.  Yes.

22            (Defendants' Exhibit 22 was marked
23              for identification.)
0282
1    Q.   And then Defendants' Exhibit 22, is that your
2         memo back to -- so is that to Eunice about the
3         job changes?
4    A.   Yes.
5                 (Defendants' Exhibit 23 was marked
6                  for identification.)
7    Q.   And I'll show you Defendants' Exhibit Number
8         23, which appears to be your memo back to
9         Lavera about the job changes; is that correct?
10   A.   Yes.
11               (Brief pause)
12               (Defendants' Exhibit 24 was marked
13                  for identification.)
14   Q.   Let me show you Defendants' Exhibit Number
15        24.  Do you recognize that?
16   A.   Yes, I do.
17   Q.   Is that a memo you prepared?
18   A.   It was an e-mail.
19   Q.   That's an e-mail?
20   A.   Yes.
21   Q.   To the judge?
22   A.   Yes.
23   Q.   Had she asked you to explain why you were
0283
1         making changes or --
2    A.   Actually, because Eunice and Lavera copied her
3         on their complaints instead of just coming to
4         me with it, just sending the memo to me as
5         their direct supervisor, I thought I should
6         explain to the judge after I received theirs.
7         I was doing this e-mail.  And instead of
8         sending an e-mail, I printed it out and took
9         it over with a note I believe and -- but I
10        finished this.  The judge had already done a
11        memo to me before I could give this to her.
12        But I still gave it to her.
13   Q.   And the memo to you from the judge, what did
14        it say?
15   A.   Please refrain from making additional job duty
16        changes without consulting me, something to
17        that effect.
18            MS. NELSON:  Is that 24?
19            MR. JAFFREE:  Yeah.

20           (Defendants' Exhibit 25 was marked
21             for identification.)
22   Q.  And I'm going to show you Defendants' Exhibit
23      25.  Is that the memo the judge gave to you?
0284
1   A.  Yes.
2   Q.  Did she talk to you about any of this, the
3      judge, that is?
4   A.  What do you mean, talk to me?
5   Q.  Well, did she just hand you the memo, or did
6      y'all talk about this whole issue about the
7      reassignment of duties?
8   A.  We talked.  I believe we talked.  I'm not -- I
9      don't know when.  I -- I know that she gave me
10     this.  I was working on my e-mail to her,
11     explaining it since they copied her.  And,
12     basically, if we talked, it would have been
13     the same thing that I put in there.
14   Q.  Do you remember y'all discussing the fact that
15     you were going to rotate duties every 90 days
16     or every three months?
17   A.  We never had that agreement of a specific time
18     period that I recall.
19   Q.  You say you didn't have an agreement, but
20     y'all had talked about --
21   A.  We had talked about --
22   Q.  -- rotating?
23   A.  -- rotating duties every two to three months,
0285
1      no specific 90 days.  And besides the fact,
2      these were minor job changes.  I had done
3      minor job changes before, and nothing had ever
4      been said about it.  And I didn't consult the
5      judge at that time because I was the
6      supervisor.  And it was how many days short of
7      90 days anyway?
8   Q.  I don't know.
9   A.  Two or three.
10   Q.  How many was it?
11   A.  Two or three.
12   Q.  How do you know that?
13   A.  Because I know when I made the last.
14   Q.  And when was that?
15   A.  The --
16   Q.  And you're referring back to Number 5.
17   A.  The June 28th, July, August, September.

18  Q.  But you were looking on June 28th on your
19      calendar?
20  A.  The major -- no.  I was trying to see a date
21      of June, but it's not on there.  My
22      calendar -- I do not have that on my
23      calendar.  I -- well, I do, too.
0286
1   Q.  What are you looking at now?
2   A.  I sent a memo out on the 10th.
3   Q.  Of what?
4   A.  June.  Advising of the change of job duties,
5       of the cross-training, and that several
6       magistrates were being changed all around and
7       attached the job duties, and told them it
8       would go into effect June the 28th.
9   Q.  And do you have that memo?
10  A.  No, I don't.
11  Q.  And this was one of the entries you went back
12      in and wrote after you met with Kai Davis?
13  A.  No, I don't think so.  I think I had already
14      written that.
15  Q.  You could have?
16  A.  I said no.
17  Q.  You said, no, you think you could have written
18      that?
19  A.  Most of these in the front of the calendar, I
20      had already written in when I did the memos.
21      But the memo I did for the magistrates with
22      the attached job duties you should have.
23      MR. JAFFREE:  Shouldn't the magistrates
0287
1       have these memos?
2       THE WITNESS:  Yes, each one of them.
3       MR. JAFFREE:  I didn't get any of these
4         memos in the submissions that I got.
5       THE WITNESS:  Each magistrate had a book
6         of memos.
7   Q.  And then after you received the memo from the
8       judge, asking you to refrain from reassigning
9       job duties, what did you do?
10  A.  I was upset.
11  Q.  Well, did you go see her?  Did you go to talk
12      to her about it?
13  A.  At that time, the judge was not really talking
14      to me a whole lot, so I don't know.  She
15      wasn't returning phone calls.  She was having

16    Michelle Sellers call me.  I do have notation
17    on the 29th that I talked to the judge about
18    the memo she did to me.  So I guess I did.
19  Q.  I'm looking at September 30th now, and then
20    next to it, which is a blank block and another
21    blank block.  Did that happen on October 1st
22    and 2nd, or did all of your entries here apply
23    to September 30th?
0288
1  A.  I'm sorry?
2  Q.  Do you see what I'm talking about?  I'm
3    looking at September 30th, and then the month
4    ends.  And then you've got two blocks filled
5    in, which normally would be October 1st,
6    October 2nd.  But all that writing is next to
7    September 30th.
8      My question is, did you make that entry,
9    or you're saying all this occurred on
10    September 30th?
11  A.  Yes.
12  Q.  Look with me.  It says you --
13  A.  Wait a minute.  No.
14  Q.  No?
15    MR. JAFFREE:  If you recall.
16      (Brief pause)
17  A.  I don't recall.
18  Q.  There is an entry that says, "Talk to Judge
19    and Michelle about whether to write Michelle
20    B. up for paperwork and Mary for shouting at
21    Ann."  You brought that to the judge's
22    attention?
23  A.  What?
0289
1  Q.  About whether to write Michelle B. up for
2    paperwork and Mary for shouting.
3  A.  No, I didn't bring that to the judge's
4    attention.  She had already told -- she had
5    told me about the shouting, and I had
6    explained to her that it wasn't as she heard
7    it.  But she insisted that I write Mary up.
8  Q.  Then why did you say, I talked to her about
9    whether to write them up and --
10  A.  Because I went --
11  Q.  -- the judge said yes.
12  A.  -- back to talk to her about Michelle Bryan
13    because I was still having a problem with

14  having already done a memo and -- and Mary for
15  shouting. I wanted to get some assistance in
16  what I was supposed to be writing up.
17 Q. Then next block, "Valarie said she would file
18  a complaint if she has to do things Mary
19  Beth's way. I told her we're going to do
20  it" --
21 A. "The way it was when I came. She is not
22  happy."
23 Q. So Valarie and Mary Beth were having
0290
1  disagreements?
2 A. Valarie and others had disagreements quite
3  often.
4 Q. And what kind of complaint was she going to
5  file if she had to do it --
6 A. I don't know.
7 Q. -- Mary Beth's way?
8 A. I don't know.
9 Q. She didn't agree with Mary Beth, did she?
10 A. Sometimes she didn't. Sometimes they worked
11  together well.
12 Q. Did you write her up?
13 A. For what?
14 Q. Not doing it Mary Beth's way when you told her
15  she was going to have to.
16 A. She did after I told her she was going to.
17  She did do it Mary Beth's way.
18 Q. What was she complaining about the way Mary
19  Beth -- what was Mary Beth's way?
20 A. I -- I don't recall.
21 Q. Well, I'm looking at the 7th about a leave
22  request. Is that your leave request?
23 A. Yes.
0291
1 Q. You had plans to go to --
2 A. I had called for days because I had submitted
3  a leave request, and the judge never would
4  rule on it, would never approve it, disapprove
5  it, would never call me about it to my
6  knowledge. And I finally took a copy of the
7  leave to the judge and asked her to sign it if
8  she was going to approve it.
9 Q. Did she approve it?
10 A. Yes.
11 Q. You said -- I'm looking on, like, the 3rd of

12    October.  "Valarie came in mad and stayed mad
13    that way."  Was she still mad at Mary Beth?
14    A.  No, she had her days.
15    Q.  On the 5th, "Talked to Martha in Personnel,
16    Kai was out, whether to write MB" -- I assume
17    that's Mary Beth?
18    A.  Michelle Bryan.
19    Q.  Michelle.  I'm sorry.  Michelle Bryan for lost
20    paperwork.
21    A.  Yes.
22    Q.  "Said would do it because Judge said to?"
23    A.  Uh-huh (positive response).
0292
1     Q.  You were asking Personnel to do it?
2     A.  No.  I was going to talk to Kai about it
3     because I still -- even after talking with the
4     judge, I just didn't think it was right to
5     write her up in a disciplinary action when I
6     had told her and written up the memo on her.
7     So I asked -- talked to Martha McClain in
8     Kai's absence, explained the situation, and
9     asked her what should I do.  And she told me
10    that I should do what the judge said do.  And
11    that's what I did.
12    Q.  You also say that "Ann screwed up on warrant
13    from complaint and put" --
14    A.  Complainant.
15    Q.  -- "complainant" -- excuse me -- "in for
16    suspect.  The complainant was arrested.  Told
17    Judge.  She didn't know what to do."
18    A.  Told Judge and the judge said she didn't know
19    what to do about it.
20    Q.  Did the judge tell you to write Ann up, or did
21    she leave that up to you?
22    A.  When she answered -- said she didn't know what
23    to do.  She was the judge.  If she didn't know
0293
1     what to do, I certainly didn't.  Besides, I
2     didn't have time to write her up after that
3     anyway.  I was gone, terminated.
4     Q.  That was on the 5th; is that correct?
5     A.  Yes.
6     Q.  You learned on the 12th about your
7     Determination Hearing?
8     A.  I was given the notice on the 12th, yes.
9     Q.  And then you had a Determination Hearing on

10      the 13th?
11   A.   Right.
12   Q.   And your notes say that "me, Elston, Jim, MS,
13        Judge."  Tell me who all was there.
14   A.   Elston Jones was EEOC officer -- EEO officer.
15        Me, Jim, my husband, Michelle Sellers, Judge,
16        and Martha McClain.
17   Q.   And then you were actually terminated on the
18        18th; is that correct?  I mean, excuse me, of
19        October?
20   A.   Right.
21   Q.   Let me ask you a little bit about that in a
22        minute.  While we've got the calendar out --
23           MR. JAFFREE:  Before you -- I promise you
0294
1            two minutes.
2            MS. NELSON:  We can take a quick break.
3               (Brief recess)
4               (Defendants' Exhibit 27 was marked
5                 for identification.)
6    Q.   Defendants' Exhibit 27, is that -- we talked
7         about your getting notice on October 12th of
8         your Determination Hearing.  Did you receive
9         that memo?
10   A.   Yes.
11               (Defendants' Exhibit 28 was marked
12                 for identification.)
13   Q.   And this may have been attached.  I'm going to
14        show you Defendants' Exhibit 28, which I guess
15        also more specifically notifies you of the
16        hearing -- the Determination Hearing?
17   A.   Yes.
18               (Defendants' Exhibit 29 was marked
19                 for identification.)
20   Q.   Defendants' Exhibit 29, again, basically just
21        stating that your work performance was
22        unsatisfactory during your probationary
23        period.  Was that provided to you and that's
0295
1         your signature?
2    A.   I'm not sure why it says "refused to sign."
3    Q.   Have you seen that, though?
4    A.   Yes.  Is this all of this document?  I guess
5         it is.
6               (Defendants' Exhibit 30 was marked
7                 for identification.)

8  Q.  I'm showing you Defendants' Exhibit 30, which
9      is your -- called "Due Process Interview
10      Questions."
11          MR. JAFFREE:  Did you sign this, or did
12            you refuse to sign it.
13          THE WITNESS:  I thought I refused to sign
14            it, but I might have signed it.
15          MS. NELSON:  It's my turn to ask
16            questions.
17          MR. JAFFREE:  Well, I'm just trying to get
18            some clarity.
19          MS. NELSON:  Well, you'll have that
20            chance.
21  Q.  Have you seen Defendants' Exhibit 30,
22      Ms. Martin?
23  A.  I don't recall seeing it.  It might have been
0296
1      read to me.
2  Q.  Just to clarify, I'm going back to 29.  It
3      looks like it says -- there's a place that has
4      a signature and then it says "refused to
5      sign."  Did you sign it, Defendants' Exhibit
6      29 or --
7  A.  That is my signature.  I believe I -- I think
8      I refused to sign it to begin with.  Not
9      positive.  But then I think it was explained
10      that it just basically said that I --
11  Q.  You didn't necessarily agree with it but --
12  A.  No, no, no.
13  Q.  -- you did get it?
14  A.  Right.  Right.
15          (Defendants' Exhibit 31 was marked
16            for identification.)
17  Q.  And then Defendants' Exhibit 31 is the actual
18      decision to terminate your employment?
19  A.  Yes.
20          (Defendants' Exhibit 26 was marked
21            for identification.)
22  Q.  Let me show you Defendants' Exhibit 26 and ask
23      you if you have seen that document.
0297
1  A.  No.  These were not attached to the document
2      that I received.
3  Q.  I mean, you have seen the performance
4      evaluation?
5  A.  Yes.  But I have not -- I was not given those.

6   Q.  The attachments --
7   A.  Were not there.
8            (Defendants' Exhibit 32 was marked
9              for identification.)
10  Q.  And this may be a more complete copy, but this
11      is Defendants' Exhibit 32.  It's basically the
12      same evaluation as 26, but it's also signed by
13      Kai Davis and -- did you have an opportunity
14      to sign that but refused to sign?
15  A.  Yes.
16  Q.  And then after that, you filed a response,
17      which I believe you provided to me which is
18      marked as Defendants' 4; is that correct?
19  A.  I filed this during my Due Process Hearing
20      instead of orally telling this -- my response.
21  Q.  Did you prepare all of that?
22  A.  I -- under the direction of my attorney, I
23      did.  Not my attorney now.
0298
1   Q.  Who was your attorney at the time?
2   A.  The attorney that told me what to put in there
3       was Charles Decker, D-E-C-K-E-R.
4            MR. JAFFREE:  I would have kept some of
5              that out.
6   Q.  Is Mr. Decker currently practicing?
7   A.  Now?
8   Q.  Yes.
9   A.  I'm not sure.  He was suspended.
10  Q.  And I believe -- I didn't want to --
11           MR. JAFFREE:  He was?
12  Q.  But his license has been suspended?
13  A.  Yeah.  I read a notice that he was suspended.
14           MR. JAFFREE:  Do you know for what?  I
15             would remember him.
16  Q.  And we could take an hour going over this.
17  A.  But, basically, it's all been gone over.
18  Q.  Did Mr. Decker prepare this?
19  A.  No.  He told me what to put in it.  I prepared
20      it.
21  Q.  Is there anything in here that's not truthful?
22  A.  No.
23  Q.  Well, did he -- well, I don't want to get in
0299
1       the attorney/client privilege?
2            MR. JAFFREE:  Well, he's not quite the
3              attorney now.  I would have

4          discouraged her from putting some of
5          that stuff in there.
6      MS. NELSON:  The part where she accuses
7          the judge of illegal activity?
8      MR. JAFFREE:  It's not relevant to her
9          claim.  I wouldn't have put that in.
10         But I've talked to her about that.
11             I'm only making that clear for
12         the Record since she said it was under
13         advice of counsel that she --
14     THE WITNESS:  I made that clear.  I said
15         not my attorney now.
16             (Brief pause)
17 Q.  I'll come back to this.  I think I've asked --
18         gone over most of this.
19             You also filed a charge of discrimination
20         with the EEOC; is that correct?
21 A.  Yes.
22 Q.  Were you represented by Mr. Decker at the
23         time?
0300
1  A.  No.
2          MR. JAFFREE:  Let me object for the
3          Record.  The charge is not relevant
4          evidence to these proceedings and
5          pending relevant matter in court.
6      MS. NELSON:  Well, then are you dropping
7          all of your discrimination claims.
8      MR. JAFFREE:  No, I'm not.  I'm just
9          simply saying the charge itself has
10         got to be a right to sue.  But the
11         charge itself is not relevant and not
12         evidence.
13     MS. NELSON:  You stated your objection.
14     MR. JAFFREE:  Nor is the EEOC findings.
15     MS. NELSON:  Make your objection.
16     MR. JAFFREE:  You don't dispute that, do
17         you?
18     MS. NELSON:  I dispute that.
19     MR. JAFFREE:  Oh, the EEOC findings are
20         relevant?  Okay.  I don't think the
21         Court will even permit them to be
22         introduced as evidence.
23             (Defendants' Exhibit 33 was marked
0301
1              for identification.)

2  Q.  Ms. Martin, is this a copy of -- Defendants'
3      Exhibit 33, is that a copy of your EEOC charge
4      that you filed against the City?
5  A.  That appears to be a copy of it.
6  Q.  Is that your signature on the charge?
7  A.  Yes.
8  Q.  And was that statement in your charge made
9      under oath?
10 A.  Yes.
11         MR. JAFFREE:  Wait a minute.  I'm not sure
12            these charges were done under oath,
13            but they could be.
14         MS. NELSON:  Let the witness answer,
15            please.
16 Q.  The answer is yes, it is under oath, isn't
17     it?  You were swearing to --
18 A.  Yes.
19 Q.  -- the statements made therein?
20         MR. JAFFREE:  Some is under penalty of
21            perjury.  I don't know if it's under
22            oath.
23         MS. NELSON:  It is signed under penalty of
0302
1            perjury --
2         MR. JAFFREE:  Yes.
3         MS. NELSON:  -- as opposed to under oath.
4            Okay.
5         MR. JAFFREE:  She's -- so I guess --
6         MS. NELSON:  Well, what does the document
7            say?
8         MR. JAFFREE:  Well, the document says that
9            she signed both of these under oath.
10           She has to do that.
11        THE WITNESS:  Who is that notary?  I don't
12           recognize it.
13        MR. JAFFREE:  I don't know.  It wasn't me.
14        THE WITNESS:  There's not a seal and
15           that's not this person's handwriting,
16           so I don't know if I swore to it or
17           not.
18        MR. JAFFREE:  Do you think after the fact
19           somebody notarized it?
20 Q.  Well, you did say, "I swear and affirm that I
21     have read the above-referenced charge, and it
22     is true to the best of my knowledge,
23     information, and belief."  Is that correct?

0303
1   A.  Yes.
2   Q.  And you also signed that "I declare under
3       penalty of perjury that the foregoing is true
4       and correct."  Is that true?  Is that where
5       you signed there?
6   A.  Yes.
7   Q.  Again, I know the hour is getting late, and
8       I've asked you about a lot of this.  And I'm
9       trying not to be repetitive.  A lot of this I
10      think we've talked about.
11          I'm not sure we talked about this:  You
12      claim that a new black magistrate was offered
13      a position with the office and Judge Gordon
14      pressured you to assign this new employee one
15      of the better offices.
16          Are you talking about Tonya Minifield?
17  A.  Yes.
18  Q.  And what office was she assigned?
19  A.  She -- we had to -- we kind of renovated one
20      of the offices further down the hall and moved
21      Valarie Savage in that office and moved Tonya
22      Minifield in Valarie's office.
23  Q.  Do you contend that's a better office?
0304
1   A.  It's a better office than the one that I would
2       have put her in, yes.
3   Q.  And where would you have put her?
4   A.  In the office that Mary -- the smaller office
5       that Mary Turner was in.
6           (Brief pause)
7   Q.  In this charge, you claim when you met with
8       Kai Davis that you believe the problems in the
9       magistrates' office were racially motivated.
10          Did you tell her that?
11  A.  Did I tell who?
12  Q.  Kai Davis.
13  A.  Yes, I did.
14  Q.  You didn't write that on your calendar, did
15      you?
16          MR. JAFFREE:  Wait.  Yes, she did.
17          MS. NELSON:  Please let me question the
18          witness and refrain from testifying
19          for her.
20          MR. JAFFREE:  But you said she didn't.
21  Q.  Did you use the term "racially motivated" in

22      your calendar?
23   A.  I'd have to look at it.
0305
 1        MS. NELSON:  Mr. Jaffree, please --
 2   A.  It doesn't matter.  I don't have to write
 3      everything in the calendar like I wrote it in
 4      there.  I didn't write everything I told Kai.
 5   Q.  You're saying, that's the first time you ever
 6      made a claim that the actions in the
 7      magistrates' office were racially motivated?
 8   A.  That's the first time I made a claim to Kai
 9      Davis.
10   Q.  Did you make the claim to Judge Gordon?
11   A.  Huh?
12   Q.  Did you make such a claim to Judge Gordon --
13   A.  I don't recall --
14   Q.  -- that her conduct was racially motivated?
15   A.  I don't recall making that comment to Judge
16      Gordon.  I do recall making comment to Judge
17      Gordon about her showing favoritism.
18        (Brief pause)
19   Q.  And did you receive a notice from the EEOC
20      dismissing your EEOC charge?
21   A.  I received a right-to-sue letter.
22   Q.  Well, did that right to sue, as you call it,
23      basically state that the EEOC was -- could
0306
 1      find no violation of the statute and dismissed
 2      your charge, Defendants' Exhibit 34.
 3        MR. JAFFREE:  You don't have to use that
 4        term "dismissed."
 5   Q.  Did you get a copy of that, Ms. Martin,
 6      Exhibit 34?
 7   A.  I believe I did.  My attorney got it.  I
 8      assume I got it, too.
 9   Q.  Where you filed a lawsuit in federal court; is
10      that correct?
11   A.  That's correct.
12   Q.  When did you and Mary Beth Brackin -- did
13      y'all get together and decide this was
14      something y'all were going to pursue against
15      the City?
16   A.  After she was terminated.
17   Q.  Did she approach you about suing the City?
18   A.  I don't recall.
19   Q.  Do you know when she was terminated?

20    A.   No.
21    Q.   Did you ever monitor a case in Birmingham that
22          involves a black judge being sued for
23          discrimination?
0307
1    A.   Monitor a case?
2    Q.   Did you ever read on the Internet or the
3          newspaper or become aware of a case in
4          Birmingham?
5    A.   Yes.
6    Q.   And how did you become aware of that case?
7    A.   I don't recall.  I did a lot of searches,
8          Internet searches.
9    Q.   And that was while you were still working for
10         the City, wasn't it?
11    A.   Not that I recall.
12    Q.   And if some -- a copy of some information was
13         left in your office that you had copied some
14         information about the black judge in
15         Birmingham, would that have been done by you?
16    A.   I can't say that it was.
17    Q.   But it could have been?
18    A.   I don't think so, no.
19    Q.   So were you thinking about suing the City
20         while you were still working?
21    A.   No, I wasn't.  I had hoped very much to keep
22         my job, even to -- during the so-called Due
23         Process Hearing, was hoping for a miracle.
0308
1    Q.   And what kind of miracle were you hoping for?
2    A.   That the judge would realize that all she was
3          saying was a bunch of lies and that she had
4          not done my evaluations as she should have
5          done.  She had skipped one.  And that as long
6          as I was performing the way she wanted me to,
7          to write up the white magistrates and favor
8          the black ones and not do -- be able to
9          supervise them at all, then I was fine.
10             But after that -- when I start enforcing
11         things and disciplining consistently, or try
12         to, then she had tried to -- was on the course
13         of termination of me.
14             In fact, I believe that she had planned to
15         terminate me before I ever went on vacation
16         and just didn't follow through.
17    Q.   And this is the same judge that had hired you

18    just nine months earlier; is that correct?
19    A.  That's right.
20    Q.  And did you think that Judge Gordon was a good
21    judge?
22    A.  No, I didn't.
23    Q.  Well, why did you want to keep working for
0309
1    her?
2    A.  I needed to work.  It was a good job.  I liked
3    my job.  It was very interesting.  I was
4    learning a lot, wanted to learn more.
5        I quit a job at Legal Services after being
6    there 20 years because I wanted more
7    supervisory, more management responsibility
8    and couldn't obtain that there.  And I left
9    and came to the City and virtually did my job
10    but had it -- had my life destroyed by Judge
11    Gordon because I wouldn't show favoritism.
12    Q.  When you left the City, whether to go on
13    vacation or at the time you were terminated,
14    did you leave stacks and stacks of tickets in
15    your office where balances were still due
16    and --
17    A.  I can't imagine that I did.  But if I did,
18    there was a reason for it being there.  I must
19    have been working on them.
20    Q.  Now, after you left the City, did you
21    go -- did you get unemployment?
22    A.  Yes, I did.
23    Q.  And do you know approximately how much you
0310
1    got?
2    A.  I think I got the max of -- maybe it was 290 a
3    week but tax -- I had tax -- federal taxes
4    taken out.
5    Q.  Did you obtain other employment after you left
6    the City?
7    A.  Not for about ten months or so, no.
8    Q.  Did you seek other employment?
9    A.  Yes, I did.
10    Q.  And where did you seek employment?
11    A.  I would have to give you a list.  Probably 50
12    or 60 places.
13    Q.  Were people in Dothan hiring?
14    A.  Not at what I was making.
15    Q.  Well, I would ask if you could provide your

16        attorney a list of where you looked for
17        employment.
18            What employment did you obtain after you
19        left the City?
20    A.   With Movie Gallery as an HR coordinator.
21    Q.   And when did you go to work for Movie Gallery?
22    A.   I believe it was in August of --
23    Q.   2005?
0311
1     A.   -- 2005.
2     Q.   And how long did you work there?
3     A.   I worked there till, I believe, October,
4          November of 2006.
5     Q.   And why did you leave?
6     A.   My position was eliminated because of the
7          merger -- positions were being eliminated --
8          mine was one -- because of the merger or the
9          purchase of Hollywood Video by Movie Gallery.
10    Q.   Who was your supervisor?
11    A.   Emily Bush.
12    Q.   And after you left Movie Gallery -- what was
13        your salary at Movie Gallery?
14    A.   I believe it was $14 an hour.
15    Q.   And did you obtain employment after Movie
16        Gallery?
17    A.   Yes, I did.
18    Q.   And where was that?
19    A.   At Georgia-Pacific through Manpower temporary
20        services.
21    Q.   Is that where you work now?
22    A.   Yes.  Except for I'm a permanent employee now
23        of Georgia-Pacific.
0312
1     Q.   When did you go to work for Georgia-Pacific
2          through Manpower?
3     A.   The end of November 2006.
4     Q.   And how long did you work there through
5          Manpower?
6     A.   Until February the 5th of this year, 2007.
7     Q.   And you're now full-time with Georgia-Pacific?
8     A.   Yes.
9     Q.   And what is your job title there?
10    A.   Human Resources Coordinator.
11    Q.   And what are your duties?
12    A.   I do salary administration.  I set up and sit
13        in on some salaried interviews.  I do the

14    setup of hourly employment ads and set up
15    interviews and sit on a selection interview
16    team for interviewing hourly employees and
17    recommending hire -- people to hire.  I input
18    into our computer system all new hires,
19    salaried and hourly.  I oversee the contracted
20    janitorial service for the whole mill.  I
21    oversee Georgia-Pacific's guest house and --
22  Q.  What is that; is that where you fell?
23  A.  Yes.
0313
1  Q.  What's the guest house?
2  A.  It's just a huge house, lodge-like, that's on
3    several acres where we have employee events,
4    training.  There's a picnic pavilion.  There's
5    a smaller house on the grounds.
6  Q.  And how did you fall?
7  A.  I was down at the guest house with three other
8    people.  There's a large room that was made
9    into a conference room where we hold big
10    events and trainings.  There's a back door.
11    We were all three walking out the back door to
12    go to the shed to look for some more tables
13    and chairs.
14       When you walk out the back door, there's a
15    flat -- well, it's not flat.  It's a flagstone
16    patio.  And then there's a concrete handicap
17    ramp that's -- declines right beside it.
18    However, there was -- there's never been rails
19    put up.  And when I walked out, I glanced back
20    over my shoulder to see if the door closed,
21    and my foot twisted off the flat below to the
22    incline.  And I fell on my right knee and my
23    face.
0314
1  Q.  And I trust they're processing it as a
2    workers' comp claim?
3  A.  Yes, it is.
4  Q.  And how many employees does Georgia-Pacific
5    have at that plant?
6  A.  About 576.
7  Q.  And I may have asked this:  Who do you report
8    to?
9  A.  Right now, our new HR leader is Carl, C-A-R-L,
10    Schreier, S-C-H-R-E-I-E-R.
11  Q.  And your current salary, I believe you said,

12        is $42,000?
13    A.   Right.
14    Q.   And in light of that, do you desire to work
15        for the City of Dothan?
16    A.   Yes.
17    Q.   And why is that?
18    A.   Because most of my career is in legal.  And I
19        believe that given -- if I'd been given the
20        proper chance and evaluations, supervision,
21        that I would be a great court administrator
22        and court clerk.
23            And when I took the job, I planned to stay
0315
1         there and retire there.  I had no intentions
2         of leaving.
3     Q.   So you would take a $10,000 cut in pay?
4     A.   There wouldn't be a $10,000 cut in pay.  The
5         salary is actually higher now than it was when
6         I was the court administrator because the
7         position was upgraded sometime after I left.
8     Q.   And how do you know that?
9     A.   Because it was in the Dothan Eagle.
10    Q.   But other than that, you don't have any
11        personal knowledge of that; is that correct,
12        other than the reading it in the paper?
13    A.   Yeah, in print.
14    Q.   How do you contend you've been damaged as a
15        result of losing your job at the City?
16    A.   I have suffered emotional stress, stress on my
17        marriage, income loss, embarrassment, had to
18        give up certain things I was used to with my
19        salary.
20    Q.   What was that?
21    A.   Had to cut off my cell phone, couldn't afford
22        it.  And my husband had to take over -- well,
23        virtually all the bills.  We had -- before
0316
1         that I had shared the burden of the bills with
2         him.  I was unable on unemployment to pay our
3         household bills.  It was very hard for me to
4         get a job again.  I spent countless hours
5         doing resumes, cover letters, sitting for
6         interviews.  Was offered a job once
7         until -- well, I told him about the
8         leaving -- how I left the City.  He asked me.
9         I told him.  But he talked to someone -- I

10    don't know who -- and called me back later and
11    said, he'd offered the position to someone
12    else.
13  Q.  Did you try to go back to Legal Services?
14  A.  I did interview with them.  The pay was much,
15    much lower.  I could not live off of the pay.
16  Q.  So you turned them down?
17  A.  Yes.
18  Q.  Your husband, who does he work for?
19  A.  He's self-employed.
20       I lost my insurance.  We had to pay $600 a
21    month for COBRA coverage.
22  Q.  Do you have insurance now?
23  A.  Yes, I do.
0317
1   Q.  Were you hospitalized during the time period
2     that you were unemployed?
3   A.  No, I wasn't.
4   Q.  Did you incur any medical bills during the
5     time you were not employed?
6   A.  I -- I would have to look at my medical
7     records at home.
8   Q.  Now, in your -- you've said you read or
9     reviewed your Second Amended Complaint; is
10    that correct?
11  A.  Yes.
12  Q.  I'm going through, but I think a good bit of
13    this I have already asked you about.  Just
14    bear with me.
15         (Brief pause)
16  Q.  I'm on number 83, page 16.  You make the
17    contention that Get Out Bonding appeared to
18    get preferential treatment from Defendant
19    Gordon.  Defendants bonded by this outfit
20    appeared to get lesser sentences and have
21    their charges dropped with more frequency than
22    other bonders.
23       Do you have any evidence to support that
0318
1     allegation or appearance?
2   A.  Just from what I've already told you.
3   Q.  Or that Get Out was frequently not required to
4     pay their forfeitures.  Do you have any
5     evidence or facts, other than what you've
6     testified to?
7   A.  No.

8           (Brief pause)
9   Q.   You were making claims of race discrimination
10       and constitutional claims.  Do you understand
11       what claims you are making --
12  A.   Yes.
13  Q.   -- in this case?
14           And how do you feel your constitutional
15       rights have been violated?
16           MR. JAFFREE:  You're asking her for a
17           legal conclusion.
18           MS. NELSON:  Well, I realize it borders on
19           that but I just want her understanding
20           of that.
21           MR. JAFFREE:  Well, I think it's a little
22           bit more than border.  She's not an
23           attorney, but if you know the answer.
0319
1   A.   As listed.
2   Q.   As listed?  What does that mean?  You don't
3       really understand the --
4   A.   I didn't say that.  I said as listed in here.
5   Q.   Well, I'm asking you to give me some
6       understanding, if you do have an
7       understanding, other than what's on paper.
8           MR. JAFFREE:  It is highly unlikely that
9           she has a sophistication to understand
10          constitutional law and how the facts
11          of her case may intertwine with that
12          law.  So if --
13          THE WITNESS:  That's why I have an
14          attorney.
15          MR. JAFFREE:  It you don't know just --
16  A.   I understand basic.
17  Q.   You are claiming that you were terminated
18       because of your race, white?
19  A.   Yes.
20  Q.   Do you know who replaced you in your job?
21  A.   Yes, I do.
22  Q.   And who is that?
23  A.   Michelle Sellers.
0320
1   Q.   And her race is white.  I think we've
2       established that; is that correct?
3   A.   Yes.
4   Q.   Can you name any employee -- white employee
5       who you contend was treated differently than

6      you were?
7          MR. JAFFREE:  You mean white employee?
8   Q.  Excuse me.  Black employee who was treated
9      differently than you?
10  A.  My position was that I was the only one.
11  Q.  You also have a claim of retaliation.  Do you
12     understand that claim?
13  A.  Retaliation?
14  Q.  Yes.
15         MR. JAFFREE:  What are you looking at?
16  A.  Where are you at?
17  Q.  I'm on page 35.
18         MR. JAFFREE:  I mean, her response to that
19            one may suffer from the same thing as
20            the constitutional response.
21         MS. NELSON:  The retaliation claim, can I
22            just confirm with you, Ishmael, that
23            under 40 -- it's under 42, 1983
0321
1             through 19 -- I'm just not sure that I
2             understand your claim.  I'm on page
3             35.
4          MR. JAFFREE:  I'd have to look and read
5             this whole thing in context.  It may
6             be because she protested something as
7             made unlawful.  And as a result of
8             that, she was terminated, even under
9             1983.
10         MS. NELSON:  1981 and 1983.
11         MR. JAFFREE:  Yeah.
12         MS. NELSON:  I'm just trying to make sure
13            I understand your claim.
14  Q.  Are you aware you have a claim of negligence,
15     Ms. Martin?  Can you tell me how --
16  A.  Yes.  I understand that.
17  Q.  -- that the -- or Judge Gordon or the City has
18     been negligent towards you?
19  A.  You're talking about actually Count 16.  It
20     says Count 14 starts on page 35.
21  Q.  Yeah.
22  A.  And 36.
23  Q.  What's Count 14?
0322
1   A.  I think it --
2          MR. JAFFREE:  Do I have these things
3             numbered wrong?

4    A.  I think it was numbered wrong.  But it says --
5         I renumbered mine, anyway.
6             That as a probationary employee, it's set
7         out that I was supposed to be evaluated every
8         three months, four times in the 12-month
9         period.
10   Q.   And where does it say that?
11   A.   You would have to get the --
12   Q.   I'm just saying, what's your understanding of
13        where it says that?
14   A.   It's in the City's Personnel Rules and
15        Regulations, Section 2-80.
16            And she had a duty to point out my
17        deficiencies and provide me with a reasonable
18        opportunity to cure those deficiencies.  She
19        didn't do that.  If she had have done my
20        evaluations as she should have, she might
21        could have done that.  But she didn't.
22            She did not do one that was due on 7/26 I
23        believe.  And I asked about when it was going
0323
1         to be done.  I even asked Kai in Personnel had
2         it been submitted without me knowing it, and
3         she said no, it had never been turned in.
4    Q.   But you knew from your meeting with the judge
5         and your meeting with Kai that there were
6         concerns about your ability to --
7    A.   No.
8             MR. JAFFREE:  That's your statement.
9    A.   That's your statement, not mine.  I was not
10        made aware of deficiencies.  There were no
11        counseling sessions, and I was not made aware
12        of deficiencies.  And if -- like I say, if the
13        judge wanted to do it the right way, she
14        would've done an evaluation on the date that
15        she was supposed to.
16   Q.   And that's your testimony -- that's your
17        understanding of the rule?
18   A.   And then I suffered injury from that because I
19        lost the job.
20   Q.   Well, we've been over this testimony in -- can
21        you at least agree that you and the judge were
22        not seeing eye to eye when you met with Kai
23        Davis?
0324
1             MR. JAFFREE:  That's a broad question.

2       MS. NELSON:  State your objection.
3       MR. JAFFREE:  I mean, it's too broad for
4          her to answer.  I mean --
5   Q.  You understand that, don't you?
6       MR. JAFFREE:  Eye to eye on what?
7   Q.  That y'all were --
8       MR. JAFFREE:  It could mean job
9          performance.  Eye to eye on how she
10         sees black employees versus white
11         employees.  Eye to eye on whether or
12         not polices of administrator's office
13         should be followed.
14  Q.  You knew the judge was not satisfied with your
15     performance, didn't you, when you met with Kai
16     Davis --
17  A.  No, I didn't.
18  Q.  -- in the summer?
19  A.  No, I didn't.
20      MR. JAFFREE:  Well, I mean, for her to say
21         yes, eye and eye and you interpret it
22         that way, that's not what she meant.
23  Q.  You thought you were doing a great job as far
0325
1      as you knew?
2   A.  Yes.  I thought I was doing a great job.
3   Q.   And how did you get that impression?
4   A.   It was limited to the great job I could do by
5      restraining.
6   Q.  You didn't know what you were doing, did you?
7   A.  Yes, I did know what I was doing.  I knew what
8      I was doing about the supervision.
9   Q.  How can you supervise a group of people if you
10     don't even know what it is they're doing to
11     supervise?
12  A.  I did know what they were doing.
13  Q.  And how did you what they were doing?
14  A.  I was learning.  The judge hired me, knowing
15     that I was not a magistrate.  She hired me,
16     knowing my background totally, my work
17     experience, everything.  She wouldn't have
18     hired me if, in fact, she made that decision
19     if she didn't think I could do the job.
20  Q.  Do you feel like you misrepresented anything
21     to her in the interview process?
22  A.  No, I don't.  But I feel she misrepresented
23     things to me.

0326
1    Q.  And if she feels that you misrepresented
2        things to her, y'all, in essence weren't
3        seeing eye to eye, were you?
4    A.  What she promised me in the interview and
5        after that was 100 percent support and I had
6        total supervision and management rights.
7        That's not what I got.  And we also talked
8        about that we might not always see eye to eye
9        and we might not always agree, but she stated
10       she would back me 100 percent.
11   Q.  No matter what you did?
12   A.  I'm not -- you're putting words in my mouth.
13       I said she would back me and she would not
14       interfere with my management.
15   Q.  You have a breach of contract.  What contract
16       do you contend has been breached?
17           MR. JAFFREE:  Again --
18           MS. NELSON:  I'm just asking her.
19           MR. JAFFREE:  -- requires a legal
20               conclusion based on state law and
21               state court interpretations of that
22               law.
23   Q.  Other than your lawyer's testifying for you --
0327
1    A.  I believe it's stated right here in
2        writing that the --
3    Q.  What contract did you have?
4    A.  -- defendant owed me.  Yes, breach of
5        contract.  State claim?
6    Q.  Did you have a contract with the City?
7    A.  Yes.  I was hired, and I was told I would have
8        evaluations every three months and
9        deficiencies would be pointed out to me on
10       those evaluations.
11   Q.  And who told you that?
12   A.  And this -- City's Personnel Rules and
13       Regulations, Section 280, and Judge Gordon and
14       Kai Davis.
15           MR. JAFFREE:  The defense had an
16               opportunity to attack some of these
17               claims early on, and I guess they did.
18           MS. NELSON:  You're talking about a Motion
19               to Dismiss?
20           MR. JAFFREE:  Well --
21           MS. NELSON:  They will be dealt with in a

22        summary judgment, I assure you.
23        MR. JAFFREE:  Well, I'm sure they're going
0328
1         to revisit it again.  But I said, the
2         City has not clearly attacked some of
3         these claims as they could.
4       MS. NELSON:  If you can give me a minute.
5         Y'all want to take a quick break?  I
6         think I'm about done.
7           (Brief recess)
8   Q.  Ms. Martin, I know it's been a long day.  I
9       know we've been over a lot of testimony and
10      I've asked you a lot of questions.  But based
11      on your claims of discrimination and
12      retaliation against the City or Judge Gordon,
13      are there any other claims or facts to support
14      your claim that I have not asked you about?
15  A.  I would have to read through everything I've
16      got.
17        MR. JAFFREE:  There may be.
18  A.  There could be.  But I'd have to spend hours
19      reading through my complaint.
20  Q.  I'm talking about the things I've asked you
21      and the things you know that you're
22      complaining about, is there anything that --
23        MR. JAFFREE:  Can I help?
0329
1       MS. NELSON:  No.
2   Q.  Are there facts that you are aware of that we
3       have not reviewed that would support your
4       claim of discrimination or retaliation
5       against --
6       MR. JAFFREE:  I can help her refresh her
7         recollection if you would like.  I
8         mean, do you want to know the facts or
9         do you want just to play gotcha?
10      MS. NELSON:  Well, I want to know her
11        answer as opposed to yours.  And then,
12        yeah, if you want to enlighten me that
13        you're making a claim that I hadn't
14        covered, I would like to know about
15        it.
16      MR. JAFFREE:  I think she made a claim in
17        the complaint if I'm not mistaken that
18        the judge told her told her that since
19        she was black, nothing could be done

```
20          to her.
21              Is that in the complaint?
22          THE WITNESS:  Yes.
23          MR. JAFFREE:  It should be in your writeup
0330
 1          there, you haven't covered that.
 2          MS. NELSON:  This is in her -- your
 3            seconded amended complaint?
 4          THE WITNESS:  I'm not sure.
 5          MR. JAFFREE:  It's --
 6  Q.  It's your contention that the judge made such
 7        a statement to you?
 8  A.  Yes.
 9  Q.  And what did she say?
10  A.  She said -- I don't know word for word.
11        Basically, it was the City --
12  Q.  Can I stop you?  Mr. Jaffree fusses at me
13        about this all the time.  When are we talking
14        about that this comment was said?
15  A.  Was after Rickey Stokes filed his complaint
16        against Lavera.
17  Q.  This had to with what you testified, that two
18        defendants with the same name --
19  A.  Among other things, yes.
20  Q.  And so this was after Rickey Stokes had
21        complained?
22  A.  Right.  We were discussing it.  She
23        brushed -- I thought that -- that she got --
0331
 1          she got a copy of that.  Jerry Corbin did.  I
 2          was waiting for one of them really to do
 3          something about the complaint.  And I called
 4          the judge and asked her what -- you know, had
 5          she read it, what were we going to do about
 6          it.  And she just kind of laughed it off and
 7          said, we're not going to do anything.  Rickey
 8          Stokes causes problems all the time, files
 9          complaints with the City all the time.
10            And then later -- it could have been that
11          same day, might have been the next day -- I
12          discussed it with her again because Rickey
13          asked me -- called me and asked me had I --
14          had the judge read the complaint.  I told him,
15          yes, and I would leave it up to her.
16            And he told me -- she -- when she and I
17          were talking then, she said that there was no
```

18     way the City was going to get rid of her
19     because she was a female, black judge and they
20     wouldn't be stupid enough to let her go.
21   Q.  And who was present when she --
22   A.  Me and the judge.
23   Q.  -- supposedly said that?
0332
1   A.  Me and Judge.
2   Q.  And where were you?
3   A.  In her office.
4   Q.  And this was talking about the Rickey Stokes
5    complaint?
6   A.  Right.
7   Q.  Why would she be talking about her job being
8    in jeopardy over the Rickey Stokes' complaint?
9   A.  Because Rickey Stokes is a bone of contention
10    for everybody -- for the judge and all.
11   Q.  For everybody?
12   A.  Not for everybody.  For the judge.
13   Q.  Well, first you said "everybody."
14     MR. JAFFREE:  She said the judge and all,
15      not everybody.
16   Q.  Do you know Rickey Stokes?
17   A.  I know him.
18   Q.  Do you know him outside of working for the
19    City of Dothan?
20   A.  I had met him before.
21   Q.  In what way?
22   A.  Socially.  We were -- I just knew -- met him
23    one time, I believe, talked to him.
0333
1     The judge had told me about some things
2    that he done before in the magistrates'
3    office, that he'd bring a recorder in and try
4    to record conversations he had.  So when he
5    came over to introduce his self when I first
6    started working there, he walked in.  And the
7    first thing I did was maybe ask him if he had
8    a recorder.
9     And he said no.
10     And I said don't ever bring one in here.
11    If you do, you'll being leaving.  I won't be
12    talking to you.
13   Q.  Okay.  To your knowledge, was the judge's job
14    in jeopardy in any way over the Rickey Stokes'
15    letter or memo that you are talking about?

16    A.  I don't know.  I suppose from issues with
17        Rickey Stokes in the past, maybe she felt
18        threatened in some way.  I don't know.  I
19        wasn't there in the past.
20    Q.  Do you know Rickey Stokes -- the number of
21        cases or claims or lawsuits he's been involved
22        in or the number of times he's been sued?
23    A.  No.
0334
1    Q.  Any other fact that you're aware of or that's
2        in your complaint that we haven't talked about
3        that would support your claim of
4        discrimination?
5            MR. JAFFREE:  That you can think of right
6            now.
7    A.  None I can I think of right now.
8    Q.  Well, do you want to think about it a little
9        bit more, then, while I'm getting my documents
10        together?
11    A.  I really want to go home.  My foot is
12        swollen.  It's killing me.  I'm only supposed
13        to be working half days.  I'm supposed to be
14        propping it up.
15    Q.  Well, I believe that's all I have then, right
16        now.
17            MR. JAFFREE:  Just a few bullet points.
18            Just a few.  And I may supplement.
19            MS. NELSON:  And I am going to object if
20            you start leading her like you did
21            before, but with that, I'm ready to go
22            here myself.
23            MR. JAFFREE:  I want that with a
0335
1            declaration later.
2                    EXAMINATION
3    BY MR. JAFFREE:
4    Q.  Get Out Bonding, as far as you know, what
5        ethnic identity does the owner of that
6        operation have?
7            That's an awkward way of asking you that
8        question.  Do you understand the question?
9    A.  Say it again.
10    Q.  Get Out Bonding, do you know if it's black or
11        white owned?
12    A.  Black.
13    Q.  Pardon?

14   A.   Black.
15   Q.   You stated earlier that the judge told you
16        that Mary Beth and Mary Turner, she should
17        have fired them a long time ago.  Do you
18        recall when she made this statement?
19   A.   I believe it was during an interview -- one of
20        the interviews.
21   Q.   Well, let me see if I can help you.  Do you
22        know if she made this statement concerning
23        anybody else that should have been fired?
0336
 1   A.   Valarie Savage.
 2   Q.   Again, think about the three people.  Do you
 3        remember when she could have made the
 4        statement?  You said she made it with respect
 5        to three people.
 6   A.   The -- the statement of, she should have fired
 7        them long ago?
 8   Q.   Yeah.
 9   A.   She made that during the -- about those three
10        during the subsequent meeting that we had
11        before I started working.
12   Q.   You have already told me that.
13            At one time, I was going to go through
14        those exhibits and ask you questions, but I'm
15        not going to do it now in the interest of
16        time.
17            (Brief pause)
18   Q.   This memo here to Kai Davis, dated June the
19        8th, dealing with employee counseling, did you
20        ever get this?
21   A.   No, I didn't.
22   Q.   What about this memo, again, interoffice memo
23        dated July the 8th to, again, Kai Davis?  Did
0337
 1        you ever get this?
 2   A.   No, I didn't.
 3   Q.   Those Attachments 1, 2, and 3, that were shown
 4        to you in one of the exhibits, did you ever
 5        get any of those attachments?
 6   A.   No, I didn't.
 7   Q.   Did the judge ever give you any memo
 8        concerning negative aspects of your job?
 9   A.   No, she didn't.
10   Q.   Did she previously call you in for a
11        counseling session about any negative aspects

12     of your job?
13   A.   No, she didn't.
14   Q.   And she made any number of some very serious
15     charges, such as you having somebody come from
16     out of state even though the matter had been
17     resolved.
18         Did she write you up for that?
19   A.   No.
20   Q.   Do you know anything about that?
21   A.   No.  Just generalizations.  There's no names
22     provided, no facts.
23   Q.   Did she ever give you written notice of any
0338
1     attorneys that had complained about you?
2   A.   No.
3   Q.   Any other staff member of your office that
4     have complained about you?
5   A.   No.
6   Q.   Did she ever tell you that Lavera and/or
7     Eunice had filed a discrimination complaint
8     with the personnel office, concerning you?
9   A.   No.
10   Q.   Did the judge ever personally accuse you of
11     discriminating against the black employees of
12     the office?
13   A.   No.
14   Q.   Have you ever previously been supervisor over
15     any black employees?
16   A.   Yes.
17   Q.   Has any black employee ever filed any charges
18     of discrimination against you?
19   A.   No.
20   Q.   Are you currently supervising any employees?
21   A.   Yes.
22   Q.   Have they filed any charges of discrimination
23     against you?
0339
1   A.   No.
2   Q.   Did the judge indicate to you in a very casual
3     and cavalier way that she wanted Tonya to have
4     a good office or --
5         MS. NELSON:  Object to the form.
6   Q.   Well, how did the judge tell you about her
7     interest in getting Tonya an office?
8         MS. NELSON:  Object to the form.
9   Q.   Well, did the judge tell you anything about

10      her interest in getting Tonya an office?
11   A.   Yes.
12   Q.   Exactly what did she tell you and how vigorous
13      was her discussion?
14   A.   She was very intent on giving Tonya a nice
15      office, even to the point of doing some
16      remodeling, if need be.
17   Q.   Did she follow up this conversation with any
18      other comments about Tonya getting an office?
19   A.   She continued to check with me about
20      what -- what I had come up with.  And I
21      expressed to her that I didn't think it would
22      be a good idea.  I wasn't in agreement of
23      giving her an office when Mary Turner didn't
0340
1      have an office at all until she took over
2      Lavera's duties.
3   Q.   Well, how much in the position of seniority
4      did Tonya have in the time that the judge was
5      interested in getting her a nice office?
6   A.   Say that again.
7         MS. NELSON:  Object to the form.
8   Q.   How much in the position seniority did Tonya
9      have at the time the judge expressed interest
10      in getting Tonya an office?
11   A.   She hadn't even started work at the City.
12   Q.   Did you ever receive a complaint from a
13      Sergeant Woodruff about the preparation of
14      alias warrants?
15   A.   Yes, I did.
16   Q.   Do you remember that complaint?
17   A.   Yes.  It was that 40 warrants were missing
18      that Eunice had taken over.  And Sergeant
19      Woodruff wasn't there, but the magistrates
20      were supposed to put warrants in her box.  And
21      Eunice had given them to Sergeant Tolbert.
22      And when I talked to Sergeant Tolbert -- well,
23      I talked to Eunice, and she talked to Sergeant
0341
1      Tolbert.  And he said he didn't know anything
2      about warrants, couldn't find them.  They
3      looked for them.
4         I talked to him, and he said that they
5      could not find the warrants, didn't know where
6      they were.  And Sergeant Woodruff did a memo
7      -- either in that memo or another one, asked

8      that they be either found or reprinted for

9      her.

10   Q.  Did he express any complaints that he had had

11      about Lavera?

12   A.  Who?

13   Q.  Sergeant Woodruff.

14   A.  That's a she.

15   Q.  I'm sorry.  She.  Did she complain?

16   A.  About Lavera?

17   Q.  Yeah.

18   A.  Lavera or Eunice?  Lavera?

19   Q.  Lavera?

20   A.  She said that -- she brought to my

21      attention -- she brought me a stack of

22      warrants that Lavera had done that contained

23      numerous errors, and we went through them.  I

0342

1      went through them, and some of them were court

2      system errors, the HTE system.  However, if

3      Eunice -- I mean, Lavera had have proofread

4      those, those could have been corrected.  Some

5      of the information was not the court system

6      error.

7   Q.  Did she make any statement about how long she

8      had been complaining about Lavera's errors?

9   A.  Said she'd been complaining about them for

10      a -- previous to my being made court

11      administrator, for some time.

12   Q.  Did she indicate the results of those

13      complaints?

14   A.  They were ignored by the judge.

15   Q.  Did you ever have an occasion to ask Mary

16      Turner to take over Lavera's job when she was

17      to leave out on extended sick leave?

18   A.  Yes.  I assigned temporarily to Mary Turner

19      Lavera's job duties while she was out on

20      leave.

21   Q.  How did Lavera feel about this?

22   A.  Lavera had actually let me -- she let me know

23      that she had actually asked Eunice and Tonya

0343

1      to cover her job duties during that time.  And

2      I told her that, no, I was going to let Mary

3      Turner take over, that Eunice -- I didn't want

4      Eunice and Tonya doing it, that Mary had done

5      some of this before.  And she kept insisting

6      that she would rather Eunice and Tonya do it.
7      And I told her that I would make the
8      assignment and I'd made it to Mary Turner.
9  Q.  How would you describe her affect when she
10      kept insisting?  Do you understand what mean
11      by "affect?"
12        MS. NELSON:  Object to the form.  I sure
13          don't.
14  Q.  Was she pleased that you --
15  A.  Oh, no, she was not pleased at all.
16  Q.  How would you describe her affect?
17  A.  Very upset, angry.
18  Q.  Do you know if any of this was mentioned to
19      the judge about your decision to let Mary do
20      it rather than Lavera and Tonya?
21  A.  I don't recall.
22  Q.  Do you remember sometime in July sending a
23      memo to Eunice regarding bond changing
0344
1      procedure?
2  A.  Yes, I do.
3  Q.  Do you know how Eunice responded to that memo?
4  A.  She took it to the judge.
5  Q.  Did she say anything about your authority to
6      tell her what to do?
7  A.  Yes.  She was very insubordinate, told me I
8      didn't have the authority.  And then in a
9      staff meeting, also, told in front of everyone
10      that I didn't have the authority to question
11      her changing bonds.
12  Q.  Did you talk to the judge about this?
13  A.  Yes, I did.
14  Q.  Did you explain to the judge about whether you
15      thought it was insubordinate?
16  A.  Yes, I did.
17  Q.  And what was the judge's response?
18  A.  That it wouldn't be good to write her up for
19      insubordination because she could file a claim
20      of discrimination against me.
21  Q.  Was there ever any occasion where Judge Gordon
22      expressed concern about white employees
23      causing someone to get arrested wrongfully?
0345
1  A.  That was always brought to my attention.
2  Q.  Were there any occasions when either Lavera
3      and Eunice had caused somebody to be

4     wrongfully arrested?
5   A.  Yes.
6   Q.  Do you know the names of any of the people
7       that she caused to be wrongfully arrested?
8   A.  Gregory Powe.
9   Q.  Anyone else?
10   A.  Christopher Carroll.
11   Q.  Anybody else that you remember off the top of
12       your head?
13   A.  Not at this time.
14   Q.  Okay.  I'm going to stop it there.  I could
15       have a thousand questions to ask you, but I'm
16       not.
17                    EXAMINATION
18   BY MS. NELSON:
19   Q.  Did the judge ever tell you that the Police
20       Chief John White had complained about you?
21   A.  She did tell me that.  However, it was right
22       after I'd had a conversation with Chief White,
23       had gone over to introduce myself again to him
0346
1       because I had met him previously and we had a
2       mutual friend.  And we had a great
3       conversation.  I offered all my support, and
4       we talked.  And he said he would help me any
5       way he could.  And I told him that I -- just
6       to let me know if I could help any way.  I was
7       never provided a written complaint.
8         MS. NELSON:  That's all I have.
9                    EXAMINATION
10   BY MR. JAFFREE:
11   Q.  What did she say was the nature of Chief
12       White's complaint?
13   A.  She didn't give me details.  She just said
14       that he complained.
15   Q.  Do you recall whether you asked for details?
16   A.  I was astounded that there was a complaint,
17       considering just days before I had had a
18       conversation with him that went very well.
19   Q.  Maybe we can find out tomorrow what the nature
20       of the complaint was.  All right.  That's all
21       I have.
22              (Deposition concluded at 6:40 p.m.)
23