0001
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3               SOUTHERN DIVISION
4
5
  NANCY MARTIN and
6 MARY BETH BRACKIN,
7        Plaintiffs,
8 vs.          CASE NO. 1:05-CV-1172-MEF
9 CITY OF DOTHAN and
  JUDGE ROSE EVANS-GORDON,
10
       Defendants.
11
12
13
14          * * * * * * * * * * *
15          DEPOSITION OF IVAN KEITH GRAY, taken
16 pursuant to stipulation and agreement before Sherry
17 McCaskey, Certified Court Reporter and Commissioner
18 for the State of Alabama at Large, in the Dothan
19 Civic Center, 126 N. Andrews Street, Dothan,
20 Alabama, on Wednesday, October 31, 2007, commencing
21 at approximately 1:55 p.m.
22          * * * * * * * * * * *
23
0002
1               APPEARANCES
2   FOR THE PLAINTIFFS:
3   ISHMAEL JAFFREE, ESQUIRE
    Jaffree Law
4   951 Government Street
    Suite 415
5   Mobile, Alabama 36604
6   FOR THE DEFENDANTS:
7   CAROL SUE NELSON, ESQUIRE
    Maynard, Cooper & Gayle
8   Attorneys at Law
    2400 Amsouth/Harbert Plaza
9   1901 Sixth Avenue North
    Birmingham, Alabama  35203
10
11          * * * * * * * * * * *
12             EXHIBIT INDEX
13    PLAINTIFFS' EXHIBIT NO.:

14    14  Interview transcript          40,41,35
15    15  Article from                84,93,102
         www.rickeystokesnews.com
16
17              * * * * * * * * * * *
18
19
20
21
22
23
0003
1                   STIPULATIONS
2          It is hereby stipulated and agreed by and
3     between counsel representing the parties that the
4     deposition of IVAN KEITH GRAY is taken pursuant to
5     the Federal Rules of Civil Procedure and that said
6     deposition may be taken before Sherry McCaskey,
7     Certified Court Reporter and Commissioner for the
8     State of Alabama at Large, without the formality of
9     a commission; that objections to questions other
10     than objections as to the form of the questions need
11     not be made at this time but may be reserved for a
12     ruling at such time as the deposition may be offered
13     in evidence or used for any other purpose as
14     provided for by the Federal Rules of Civil
15     Procedure.
16          It is further stipulated and agreed by and
17     between counsel representing the parties in this
18     case that said deposition may be introduced at the
19     trial of this case or used in any manner by either
20     party hereto provided for by the Federal Rules of
21     Civil Procedure.
22              * * * * * * * * * * *
23
0004
1          MS. NELSON:  On the Record, I'd like to
2             say that this witness would like to
3             read and sign his deposition.
4              IVAN KEITH GRAY
5          The witness, having first been duly sworn
6     to speak the truth, the whole truth and nothing but
7     the truth, testified as follows:
8                 EXAMINATION
9     BY MR. JAFFREE:
10     Q.  Could you state your name for the Record?

11   A.   Ivan Keith Gray.
12   Q.   I understand that you want to exercise the
13        right that's given to you by the rules to read
14        and sign the deposition before it becomes an
15        official document?
16   A.   Yes, sir.
17   Q.   I understand that concern, and I've expressed
18        to counsel for the defendants my concern that
19        your deposition be available for use for a
20        dispositive motion that has a November 16th
21        deadline.
22           I will try to ask the court reporter to
23        expedite this and try to get it to you as soon
0005
1         as practical.  And, hopefully, I will have it
2         back in time for you to sign it and for the
3         court reporter to certify it and for me to use
4         those portions that are necessary in order to
5         support any partial summary judgment motion I
6         may file.
7            If not, I am, on the Record, reserving the
8         right to submit the unverified portion with
9         leave to correct any errors subsequently.  And
10        so to that extent, I'm asking the court
11        reporter to give me a copy of the unverified
12        deposition pretty much at the same time that
13        she provides you with a copy of the original
14        or at least the tentative original for your
15        review.
16           Now, having said that, let me ask you:
17        Have you sat for a deposition before?
18   A.   Yes, sir.
19   Q.   How frequently?
20   A.   Maybe --
21        MS. NELSON:  You mean how many times?
22            I'm sorry.  Go ahead.
23   Q.   Well, how many times then?
0006
1    A.   Maybe twice.
2    Q.   Do you recall those times that you sat for a
3         deposition?
4    A.   On one of them I do.
5    Q.   And what was that; what was the issue?
6    A.   It was a case where a defendant was suing the
7         City of Dothan.  I believe the defendant's
8         name was Stovall, and it had to with a officer

9      -- another office arresting him in this
10      building at the Civic Center.
11   Q.  And the deposition took place in this
12      building?
13   A.  No.  The issue about the officers arresting
14      Mr. Stovall was in the Civic Center.
15   Q.  I see.
16   A.  It occurred here.
17   Q.  And you were called as a deponent on behalf of
18      whom?
19   A.  The City.
20   Q.  So you became the City's witness?
21      MS. NELSON:  Object to the form.
22         And when I say that, just ignore
23         me.  Go ahead and answer.
0007
1   A.  I'm assuming that I was the City's witness.  I
2      just received notice to appear for a
3      deposition, and I was there.  So I'm assuming
4      that the City was the one that asked me to
5      come to that.  Now, I'm not 100 percent sure
6      if it wasn't the defendant -- or which would
7      have been the plaintiff.  Excuse me.
8      MS. NELSON:  You need to speak up because
9         she's got to hear what you're saying
10         to take it down.
11      THE WITNESS:  Okay.
12   Q.  And do you recall whether prior to your
13      sitting for that deposition, somebody prepared
14      you for that deposition?
15   A.  I don't remember that.
16   Q.  Have you been prepared for this deposition?
17      MS. NELSON:  Again -- go ahead.  You can
18         answer.
19         I would object to any discussions
20         that any counsel for the City would
21         have had with him.
22      MR. JAFFREE:  I'm not sure --
23      MS. NELSON:  He is a lieutenant and he
0008
1         is --
2      MR. JAFFREE:  -- technically that you're
3         representing him.  Just not quite sure
4         of that.
5      MS. NELSON:  He is a lieutenant with the
6         City of Dothan and, therefore, is part

```
 7         of the City.
 8      MR. JAFFREE:  I'm not going to ask what
 9         you talked to him about, what strategy
10         sessions you two had.  I'm still not
11         quite sure you technically represent
12         everybody that is employed in some
13         capacity with the City of Dothan
14         because you represent the City in a
15         single, narrowly focused litigation.
16   Q.  But be that as it may, do you remember any of
17         the facts and circumstances surrounding the
18         second deposition that you sat for?
19   A.  The one that I have mentioned would have been
20         the second one, and I'm just assuming -- I
21         don't remember any details or facts for the
22         first one.  That's not -- that is an
23         approximate number.  I've been employed with
0009
 1         the City almost 23 years.  So I remember one
 2         specifically.  And I may have sat for another
 3         one prior, but I'm not 100 percent sure.
 4   Q.  Well, your response dovetails nicely into my
 5         next question:  When did you first become
 6         employed with the City of Dothan?
 7   A.  In 1985.
 8   Q.  In what capacity?
 9   A.  I was a jail security officer.
10   Q.  Was that in the old jail; did they have an old
11         jail?
12   A.  Yes, sir.
13   Q.  I think I know, but what is a jail security
14         officer?
15   A.  More people would commonly be -- think of it
16         as a corrections officer.  We actually
17         in-process prisoners as they come to the jail
18         facility, care to their needs and -- and
19         upkeep, book, fingerprint, process.
20   Q.  Did you have to take any training for that?
21   A.  No, sir, not at the time.
22   Q.  So you didn't have to go to any kind of
23         academy to become that?
0010
 1   A.  No, sir.
 2   Q.  So you weren't really with the police force at
 3         that time?
 4   A.  I wasn't a sworn officer.
```

5   Q.  But you were classified as an officer?
6   A.  I was a jail -- I was not a police officer in
7        that capacity.  I was actually a jail security
8        officer, which is an unsworn member of the
9        police department.
10  Q.  And how long did you serve in the capacity of
11       jail security officer?
12  A.  Approximately six months.
13  Q.  And what happened after that?
14  A.  I made application to become a police officer
15       and was hired as a police officer.
16  Q.  Now, that's for the City of Dothan we're
17       talking about, right?
18  A.  Yes, sir.
19  Q.  Is the police department a separate agency or
20       a unit of the government?  How is the police
21       force in the City of Dothan characterized?
22       What is it; is it a department or what?
23           MS. NELSON:  Object to the form.  You can
0011
1            answer if you understand and know.
2   A.  It's a department of the City of Dothan.
3   Q.  Okay.  Is it connected to any other department
4        with the City of Dothan as far as you know?
5            MS. NELSON:  Object to the form.
6   A.  Not that I know of.
7   Q.  So it's an independent, separate department of
8        the City of Dothan?
9   A.  To my knowledge.
10  Q.  Are you aware of the organizational structure
11       of the police department?  And when I
12       say "police department," I'm always referring
13       to the City of Dothan Police Department.
14  A.  Yes, sir.
15  Q.  What is that organizational structure?
16  A.  The police chief is the department head.
17       There is a major that -- that's up under him.
18       There is presently one captain and one acting
19       captain.  And one of those captains is over
20       the records division.
21  Q.  Which one, the captain or the acting?
22  A.  The captain, Captain Parrish.  The acting
23       captain Larry Drone is over the field
0012
1        operations division.
2   Q.  Thank you.  You have some more under the

3    structure?
4    A.  Yes.  There are several different branches
5        that come down from there.  There's --
6    Q.  How many branches?
7    A.  Oh --
8    Q.  Is there that many?
9    A.  Yes.
10   Q.  More than ten?
11   A.  Close to if not more than.  You have the
12       acting captain which is over five divisions of
13       patrol.  God, there's -- I don't know
14       which -- I believe Captain Parrish is over all
15       administration that would include records.  It
16       would include the clerks, the
17       secretary -- administrative secretaries, the
18       -- the --
19           MS. NELSON:  Just the best you can
20              remember.
21   A.  There is just so many branches.  Unless I see
22       an organizational chart, I can give you
23       just -- we have a criminal investigations
0013
1        division, a juvenile division, and there's two
2        lieutenants that's over those divisions.  We
3        have a docket division that has an
4        administrative assistant.  We have police
5        communications that come from there.  We have
6        police animal shelter or the animal shelter
7        which is up under the umbrella of the police
8        department.  We have the radio maintenance
9        shop which is up under the umbrella of the
10       police department.  There's training
11       division.  There is school resources which
12       comes up under juvenile division.  We've got
13       school crossing guards that's -- that's in
14       there.
15           But right off the top of my head, just
16       thinking right now, we have -- there's an
17       internal affairs division which answers up
18       under -- directly to the police chief.
19   Q.  So it is directly connected to the police
20       chief?
21   A.  Yes.
22   Q.  It bypasses the major and the two captains?
23   A.  Unless -- our major has only had that position
0014

1    for approximately a year.  And unless they
2    have been somehow connected, I believe the IA
3    is still coming directly from the chief.
4  Q.  Okay.  Let me get to the internal affairs
5    division.  I would say that's the primary
6    purpose of your deposition.
7        So after six months, thereabouts, you
8    became a police officer.  You took whatever
9    tests necessary?
10  A.  Yes, sir.
11  Q.  And then took whatever training was necessary?
12  A.  Yes, sir.
13  Q.  Went to the academy and -- is that the one
14    that's here in Dothan?
15  A.  No, sir.  In Selma, Alabama.
16  Q.  I'm thinking about Mobile.  I've got to
17    remember what city I'm in, Dothan.
18        The academy is in Selma for training for
19    the Dothan police officers?
20  A.  The one that I attended, yes, sir.
21  Q.  And so you matriculated through that and
22    became a police chief (sic).  Did you have any
23    rank at the time?
0015
1  A.  No.
2  Q.  I'm ignorant as to the ranks of police
3    officers.  I'm ignorant to the ranks of the
4    military because I managed to escape as 1D,
5    1F, something.  I was a one something.
6        But anyway, be that as it may -- maybe I
7    should notice -- but I guess you start off as
8    a private or something?
9  A.  No.  You're just an officer.
10  Q.  And the next rank is what?
11  A.  A corporal.
12  Q.  Is an officer the same thing as a private
13    would be in the --
14  A.  Yes, sir.
15  Q.  -- military?
16  A.  We -- it -- it isn't distinguished by that
17    but, yes, sir.  Private is usually starting at
18    the bottom and then officer would be just --
19  Q.  So I'm assuming you started as just an
20    officer?
21  A.  Yes, sir.
22  Q.  And a gentleman?

23 A. Yes, sir.  Thank you.

0016

1 Q. So you remained an officer until when?

2 A. I'm thinking around 1990.  No, that's

3  incorrect.  I made the rank of corporal -- I

4  can't remember.  I believe it was in the late

5  80s, but I'm not 100 percent sure.

6 Q. Okay.  And how long did you remain a corporal?

7 A. Not that long.  I'm -- then again I'm not

8  certain, but I'm going to have to guess, maybe

9  a few years.  Then I was promoted to

10  sergeant.  I believe that was in 1990, but I'm

11  not 100 percent on that.

12 Q. Would it be correct to characterize you as on

13  the fast track?  Or maybe everybody goes at

14  that speed.

15 A. No, sir.  Up until -- I stayed a sergeant for

16  a long time.  And I was just recently promoted

17  to lieutenant approximately a year ago --

18  little bit over a year ago.  Matter of fact,

19  it was a year last month.

20 Q. Maybe you were on the fast track until you got

21  to sergeant?

22 A. That's a total, different story.  I'll tell

23  you about that one day.

0017

1 Q. Now, when you was promoted to sergeant, were

2  you in some particular division, or did you

3  float around from division to division?

4 A. I think I was --

5   MS. NELSON:  Object to form.  Go ahead.

6   MR. JAFFREE:  You don't like the term

7    "float?"

8   MS. NELSON:  I don't but go ahead.

9 A. I was just -- I was in patrol division until I

10  made the rank of sergeant.

11 Q. And once you made that rank, what division

12  were you in?

13 A. Back then, the first line of being a

14  supervisor, you went back to the docket

15  detention which is the jail.  So I was the

16  supervisor over one of the shifts in the jail

17  as a sergeant for about a year.

18 Q. And then after that?

19 A. I was transferred to the narcotics --

20  narcotics division where I worked there

21    about -- I'm going to guess about a year, year
22    and a half.
23  Q.  Okay.  And then after that?
0018
1  A.  I went back to the jail I believe -- I believe
2    this is right -- for a year.  Then I went to
3    criminal investigations after that.
4  Q.  Did you take any special training once you
5    went to the -- is that a criminal
6    investigations division?
7  A.  Not at the very onset.  It was just on-the-job
8    training with seasoned investigators.  And as
9    you're going through your career there, they
10    have different schools that they send you to
11    that you can attend for either specialized
12    training or --
13  Q.  Do you recall whether or not these schools had
14    an emphasis on objective factual analysis or
15    emphasis on making a case?
16      MS. NELSON:  Object to the form.  I have
17        no idea what you're talking about.
18      THE WITNESS:  I don't either.
19  A.  I can assume what you're saying, but if he --
20      MS. NELSON:  I would ask you not to assume
21        anything.
22      THE WITNESS:  Okay.
23  A.  Well, if you could explain a little bit more.
0019
1      MR. JAFFREE:  You're not in control over
2        this officer.  But fine.
3      MS. NELSON:  I just don't understand your
4        question.  I'm not going to ask -- if
5        he doesn't understand, he needs to let
6        you --
7  A.  Objective analysis --
8      MS. NELSON:  Just ask him -- maybe ask him
9        what he was trained to do.
10      MR. JAFFREE:  Let me -- I appreciate your
11        offer to help, but let me try to make
12        it a bit -- by the way, are we doing
13        the same thing again, talking --
14  Q.  When you started criminal investigation and
15    went to these trainings, were you trained just
16    to look at the facts objectively, you know,
17    like Sergeant Friday, "Just the facts,
18    ma'am?"  Were you trained in that manner?

19          MS. NELSON:  Object to the form.  I don't
20             know if he knows how Sergeant Friday
21             was trained, but to the extent you
22             understand him, you can answer.
23          MR. JAFFREE:  I wasn't talking about how
0020
1              he was trained.  I was talking about,
2              he always tells people, "Just the
3              facts, ma'am."
4    A.   My training to be a criminal investigator, as
5          I said, was from experienced investigators.
6          So I did not -- I want to make sure you
7          understand.  I did not attend a school for
8          that.
9              The individual schools that I would have
10         attended during that tenure would be like
11         photography, how to take statements.  I went
12         to a forensic hypnosis school.  I went to a
13         polygraph school.
14             So as far as a structured setting that
15         says, this is how you do an investigation,
16         being objective from -- and whatever, that
17         never came in as a point of being taught.
18         It's just what you learned as a police officer
19         in being objective and the looking at facts
20         and basing everything off of the totality of
21         the circumstances and things of that nature.
22             I hope I answered your question.
23   Q.   Yeah.  So let's get to this police officer
0021
1          that trained you.  Do you remember who it was
2          that you first got trained by?
3          MS. NELSON:  Again, I object to the form.
4             I'm not sure he said it was one police
5             officer.  I think he said seasoned
6             officers or something of that nature.
7    A.   Seasoned investigators.
8    Q.   Well, so more than one seasoned investigator
9          when you first started?
10   A.   Oh, yes.  I believe one of our -- one of the
11         guys that helped me out that I think was my
12         first training -- I can't call him a training
13         officer, but the first seasoned investigator
14         that I was put with, I believe, is -- I
15         believe.  I'm not 100 percent sure, but it was
16         Robert Sorrells.

17  Q.  And you probably told me this and I didn't
18     write it.  What year was this that you started
19     working as a criminal investigator, if you
20     recall?
21  A.  I'm going to guess around 1993, 1994,
22     somewhere in there.  But that's just guessing.
23  Q.  Now, from your experience when you first
0022
1     started working with these seasoned criminal
2     investigators, do you know if they approached
3     each investigation with a point of view?
4  A.  That I don't know.
5  Q.  Do you know what I'm referring to?
6  A.  If they're looking at a specific investigation
7     in one particular way, is what I interpret
8     that you're saying.
9  Q.  Well, that's part of it, and maybe they are
10     trying to make facts fit a hypothesis.
11     MS. NELSON:  Object to the form, if that's
12       a question.
13     MR. JAFFREE:  Well, that's my
14       explanation.
15  Q.  Do you know what I'm talking about, making the
16     facts fit a hypothesis?
17  A.  I know what you're saying.  I can't say that
18     they have.  No, I can't say that that's the
19     way they did it.
20  Q.  So how long did you remain in the criminal
21     investigation unit?
22  A.  Approximately eight to ten years.
23  Q.  Well, you weren't in the criminal
0023
1     investigation unit in 2001, were you?
2  A.  No.  I started in internal affairs -- I think
3     it was in 1999.  And before I went to internal
4     affairs, I was in criminal investigations.
5  Q.  What is internal affairs?
6  A.  It's an administrative portion of part of the
7     police department -- division of the police
8     department that deals with allegations -- or
9     they investigate allegations of police
10     misconduct.  They also work with applicant
11     screening, applicant backgrounds for the
12     department.
13  Q.  What department?
14  A.  For the police department.

15          And conducts investigations at the
16      pleasure of the police chief -- at the
17      direction of the police chief.
18  Q.  Is there, as far as you know, any statute or
19      regulation that set up the internal affairs
20      department for the City of Dothan?
21  A.  What do you mean by "statute?"
22  Q.  Or any kind of code or law that brought it
23      into existence.
0024
1           MS. NELSON:  If you know.
2   A.  I don't know.
3   Q.  But was there a handbook given to you when you
4       became a member of the internal affairs
5       division that spoke either specifically or in
6       a vague way of a charter of the division?
7   A.  No, sir.
8   Q.  Do you know how many different departments
9       there are associated with the City of Dothan?
10  A.  No, sir, not specifically.
11  Q.  Is there a maintenance department as far as
12      you know?  It's not called maintenance.  Maybe
13      you call them environmental services
14      department.
15  A.  There's an environmental services department,
16      but I've heard of a maintenance department.
17  Q.  I'm dating my age.  They use politically
18      correct words now.
19          I guess they have a fire department for
20      the city?
21  A.  Yes, sir.
22  Q.  Health department maybe for the City?
23  A.  I don't know if the employee health clinic is
0025
1       a department.
2   Q.  But is it a unit of the City government?
3           MS. NELSON:  He said he didn't know.
4           MR. JAFFREE:  Well, he didn't know if it
5               was a department, but maybe he knows
6               what it's characterized as.
7           MS. NELSON:  Object to the form.
8   A.  I know that the employees with the employee
9       heath clinic are employed by the City of
10      Dothan.  I don't know the status.  I don't
11      know if it's a department.  I don't know if
12      they have a department head.  I don't know.

13   Q.   Well, let me jump further into the chase.
14        Now, have you ever done an internal affairs
15        investigation for the environmental service
16        department for the City of Dothan for one of
17        their employees?
18   A.   Not that I can recall.
19   Q.   What about the fire department for the City?
20   A.   Yes.
21   Q.   You did?  You investigated one of the
22        employees in the fire department?
23   A.   It wasn't just one employee, I don't believe.
0026
 1   Q.   A number of employees?
 2   A.   The investigation --
 3        MS. NELSON:  Best you can, if you can
 4           answer.
 5        THE WITNESS:  Yeah, I know.
 6   A.   It wasn't -- the investigation wasn't directed
 7        as an -- at an employee.  It was directed
 8        at -- at a possibility of misconduct as it
 9        relates to that department.  So it wasn't an
10        employee.
11   Q.   The misconduct that the investigation was
12        directed towards, did it have a criminal
13        element?
14   A.   No.
15   Q.   Misconduct that didn't relate to any crime but
16        concerned a department?
17   A.   Correct.
18   Q.   Okay.  Have y'all -- let's leave aside for a
19        minute the judicial department.  Have y'all --
20        when I say "y'all," I'm talking about internal
21        affairs -- conducted internal affairs
22        investigations of any other departments of the
23        City of Dothan, other than the police
0027
 1        department?
 2   A.   Would you say that again?
 3   Q.   Has internal affairs division conducted
 4        investigations of any other city departments,
 5        excluding the police department and the
 6        magistrate or the judicial department?
 7   A.   That I was a party to?
 8   Q.   Or that you are aware of.
 9        MS. NELSON:  And besides the fire
10           department, besides what he's already

11     testified to.

12  A.  Right.  I'm not 100 percent certain.  But they

13     could -- there was an investigation dealing

14     with the Dothan Utilities where there was a

15     theft of some money I believe.  And as I said,

16     I'm not certain if it was the internal affairs

17     or the criminal investigations division that

18     investigated that.

19  Q.  So they may have done -- I'm sorry.  What

20     department was that?

21  A.  Utilities.

22  Q.  So there may have been one with utilities, but

23     you're not positive?

0028

1  A.  Right.

2  Q.  But if there was, you think it involved some

3     type of criminal activity, theft activity?

4  A.  Correct.

5  Q.  Were you involved in a investigation with --

6     on a personal level with the fire department?

7     I think you said you were, but I want to be

8     clear on that.  Were you personally involved?

9  A.  Yes.

10  Q.  Do you have any idea pursuant to what

11     authority police internal affairs investigated

12     the fire department for a non-criminal

13     activity?

14  A.  My police chief assigned that investigation to

15     me and Corporal Frank Reeves, so that's pretty

16     much the authority that I followed.

17  Q.  So the authority -- whatever the police chief

18     decides to assign you, that's the authority?

19  A.  That's -- that's the -- whose -- under whose

20     authority I investigated that case.

21  Q.  Did you give the people that you investigated

22     at the fire department the garrity notice?

23  A.  I don't remember.  I didn't review that case

0029

1     before coming here.

2  Q.  Well, do you think you would have?  Is that

3     standard operating procedure?

4  A.  It is.  That was early on in internal

5     affairs.  I'm not sure if that was before I

6     went to the internal affairs school or not.

7     So I don't remember.

8  Q.  So y'all might not had been given that notice?

9       MS. NELSON:  Object to form.

10  A.  I don't remember.

11       MS. NELSON:  He said he didn't remember.

12  A.  I don't remember.

13      MR. JAFFREE:  Well, I'm just clarifying

14       what's he saying.  It sounds like

15       y'all may not have been given the

16       notice at that time.

17      MS. NELSON:  Again, I think the Record

18       will speak to what his answer is.

19  A.  I don't remember.

20      MR. JAFFREE:  Well, I guess if that was

21       the case, then the Record would have

22       taken the place of your comment.

23  Q.  But be that as it may, do you know from any

0030

1    document that you have ever read that

2    authorizes internal affairs -- the Dothan

3    Internal Affairs Division to investigate

4    non-criminal matters involving civilians?

5  A.  For clarity, what are you calling a civilian?

6  Q.  A non-police officer or somebody that's not

7    associated with the police division.

8  A.  Okay.  So anyone outside of the umbrella of

9    the police department you're calling just a

10    citizen, not necessarily that they're a City

11    employee?

12  Q.  Well, first -- yeah, let's make it that

13    broad.  Anybody.  Don't have to be a City

14    employee, just outside the umbrella of the

15    police department.

16  A.  The internal affairs division has done

17    investigations which include; by your

18    definition, citizens as witnesses; subjects of

19    complaints of -- because they complain on

20    police officers.  So citizens complaining on

21    police officers.  So, yes, we have.

22  Q.  As far as you know, have y'all did an internal

23    affairs investigation of a privately owned

0031

1    business to investigate the employees for

2    administrative misconduct?

3  A.  No.

4      MS. NELSON:  Object to the form.

5  Q.  But do you understand what I mean by

6    "administrative misconduct?"

```
7        MS. NELSON:  Object to the form.  I don't.
8        MR. JAFFREE:  Okay.
9        MS. NELSON:  Are you talking about a
10           business that has no association with
11           the City?
12        MR. JAFFREE:  I'm talking about a business
13           having no association with the City.
14   Q.  Like, for instance, McDonald's.  McDonald's
15        thinks their employee was goofing off and not
16        putting in eight-hours work for eight-hours
17        pay.
18           Is that something you think that internal
19        affairs would investigate?
20        MS. NELSON:  Object to the form.
21   A.  No.
22   Q.  You don't think that's part of your charter?
23        MS. NELSON:  Object to what he thinks.
0032
1           But --
2   Q.  If the chief assigned you to investigate it,
3        you would perhaps do it?
4   A.  I'd do exactly what my boss said do.
5   Q.  You know which side your bread is buttered on,
6        huh?
7        MS. NELSON:  Object to the form.
8        MR. JAFFREE:  I'm putting some levity in
9           here so I can stay awake.
10   Q.  Do you know, from your own experience, how
11        many times you have initiated an investigation
12        on behalf of the judicial department?
13        MS. NELSON:  Object the form.  What do you
14           be mean, "on behalf of?"
15        MR. JAFFREE:  Well, let me limit my
16           question.
17        MS. NELSON:  Involving?
18        MR. JAFFREE:  Let me limit my question
19           to -- I'm sure counsel is going to
20           object no sooner than I move my mouth.
21   Q.  Let me limit my question.  Do you recall how
22        many times you have conducted an investigation
23        where employees of the judicial department was
0033
1        involved in an investigation?  Let me put it
2        more bluntly, the target of an investigation.
3        MS. NELSON:  Object to the form.
4   A.  I've been involved in two investigations, to
```

5       my knowledge, as it relates to the City of
6       Dothan Judicial Department.
7    Q.  Prior --
8    A.  Clarify.  Within the two, there were new
9       issues that came out in one particular, so I'm
10      considering that as one event dealing with
11      that investigation with the judicial
12      department.  And then there was a separate
13      one.  So two to my knowledge, two different
14      investigations.
15   Q.  So one became pregnant and the other one did
16      not?
17   A.  Yes, sir.
18   Q.  And you investigated the baby as well?
19         MS. NELSON:  Object to the form.
20         MR. JAFFREE:  What was wrong with that
21            form?
22   Q.  Let me go back again.  Do you recall ever
23      being involved in an internal affairs
0034
1       investigation of any employee of the judicial
2       department prior to the installation of Judge
3       Gordon?
4          MS. NELSON:  Prior to the installation?
5          MR. JAFFREE:  That's the term for her
6            getting her position.
7          MS. NELSON:  Okay.
8    A.  No, sir, I don't believe I did.
9          MR. JAFFREE:  Somehow, I think you don't
10           like my vocabulary.
11         MS. NELSON:  Well, I'm just trying to make
12           sure I understand what you were
13           saying.  I think -- just for the
14           Record, I think perhaps he went into
15           internal affairs about the time Judge
16           Gordon went on the bench.
17         MR. JAFFREE:  Perhaps slightly ahead of
18           her, perhaps not.  But, thanks, you
19           helped me with another question.
20   Q.  Did you have any knowledge of anyone employed
21      by internal affairs conducting an
22      investigation?  Knowledge.  Now, I don't care
23      if it's hearsay knowledge for my purposes.  Do
0035
1       you have any knowledge of anyone, other than
2       yourself, conducting an investigation of an

3      employee of the judicial department prior to
4      Judge Gordon becoming a municipal judge?
5        MS. NELSON:  I'm going to state an
6          objection.  There was no judicial
7          department before Judge Gordon came to
8          the City.
9        MR. JAFFREE:  Well, I guess his response
10         would be, no.
11       MS. NELSON:  Well, I'm just making that
12         point, but he can answer as he --
13       MR. JAFFREE:  And then you can indicate
14         that my question was too limited.
15  A.  I don't have any knowledge of that.
16  Q.  All right.  Let me -- counsel is always being
17      helpful.
18         So do you have any knowledge of anybody
19      being involved in an internal affairs
20      investigation of any city magistrate prior to
21      Judge Gordon becoming municipal judge, any
22      city magistrate, whether or not they were
23      called city magistrates or city clerks?
0036
1          I don't know what that place was called if
2      it wasn't judicial.  I mean, it just may have
3      been called clerk division, whatever, or
4      whatever.
5        MS. NELSON:  Object to the form,
6          statement, but you can answer to the
7          extent you know.
8        MR. JAFFREE:  If you want to give me some
9          help, do you know what it was called?
10         You probably do.
11       MS. NELSON:  I'm not here to testify.
12       MR. JAFFREE:  It's probably here in some
13         of this junk I've got.
14  A.  I don't have any knowledge of any prior
15      internal affairs investigator investigating
16      any municipal court magistrate.
17  Q.  Okay.  Now, in 1991 were you involved in an
18      investigation of any magistrate with the
19      judicial department of the City of Dothan?
20  A.  No, sir.
21  Q.  I'm sorry.  What year did I say?
22  A.  No, sir.  Mr. Gray.
23  Q.  If I said 1991, I'm sorry.
0037

1    A.   You did.
2    Q.   And I'm going to get stuck with these wrong
3         words coming out of my mouth.
4              So let's make that 2001.  In 2001, were
5         you involved in an investigation of any
6         magistrate employed with the judicial
7         department of the City of Dothan?
8    A.   Yes, sir.
9              MR. JAFFREE:  I've got to remember the
10                deponent is clever and intelligent,
11                and I don't need to be half focused
12                today.  I just don't.
13   Q.   But do you recall upon whose request you were
14        involved in that investigation?
15             MS. NELSON:  Can we clarify the
16                investigation and --
17   Q.   Was there more than one investigation you was
18        involved in, in 2001?
19   A.   Well, there's a lot of investigations here
20        that you're going to depose me on I guess.
21        So --
22   Q.   Were there a lot of them that existed in 2001?
23   A.   It depends on what you mean "a lot of."  But
0038
1         there are several investigations every year,
2         dealing with internal affairs.
3    Q.   Well, I'm talking about involving an
4         employee -- a magistrate employee of the
5         judicial department of the City of Dothan?
6    A.   I don't think there was a lot of them in 2001.
7    Q.   Well, how many do you recall you've been
8         involved in, in 2001 involving a magistrate of
9         the judicial department?
10   A.   I believe you're referring to the Kimberly
11        Ralpeje case.
12   Q.   Yeah, that one.  Let's settle upon that one.
13   A.   Yes, sir, I was involved in that.
14   Q.   Do you recall upon whose request you was
15        involved in that investigation?
16             MS. NELSON:  And, again, I would state for
17                the Record, if he can -- to the extent
18                that he can remember.  But if he needs
19                to look at documents, I would ask you
20                to put the documents before him.
21   Q.   If you can.  I will provide you with some
22        assistance.  I could let you read your own

23      words, if you'd like.
0039
1    A.   Yes, if you have that --
2    Q.   But if you remember on your own
3         independently.
4    A.   If you have that, it was either -- either one
5         of two people, but if you can provide the
6         document --
7    Q.   Who do you think would be the two people?
8    A.   Either it was Chief White or either Captain
9         Parrish.  But --
10   Q.   It could have been a third person?
11        MS. NELSON:  I'll show him my document,
12           but if you have a certain one you want
13           to show him.
14   Q.   Well, let me --
15   A.   It was Chief White.
16   Q.   I don't think so.  I believe it was -- Chief
17        White is not the person I had in mind.
18        MS. NELSON:  Well, you're asking the
19           witness who is under oath who is
20           sitting here looking at this memo from
21           Chief White to him, directing the
22           investigation.
23   Q.   This is a transcript of a statement of Mary
0040
1         Brackin that was done in 2001, and the
2         relevant part of the statement can be found on
3         page three.
4            Do you have it in front of you?
5    A.   Captain Monday was the bureau commander which
6         he was over internal affairs as well.  So
7         it --
8    Q.   Well, that's not who I had in mind either.
9    A.   But you ask if there was any other third
10        person.  Chief White.  It would have come from
11        either Chief White, Captain Monday, or
12        possibly Captain Parrish.
13   Q.   That's unfair.  I probably didn't ask the
14        question correctly.  And I think your response
15        is correct as far as it goes, based on the way
16        I asked the question.
17           But let me show you --
18        MR. JAFFREE:  Let me mark this.  I guess
19           I -- I don't have another copy so
20           maybe I can get this back between

21          today and tomorrow morning.
22          MS. NELSON:  Could you show me what you're
23            about to ask him.  I'm not sure I have
0041
1            the Bates stamp on here.
2          MR. JAFFREE:  The Bates stamp is 1278.
3          MS. NELSON:  You're at Mary Beth Brackin's
4            testimony.
5          MR. JAFFREE:  Uh-huh (positive response).
6            (Plaintiff's Exhibit 14 was marked
7              for identification.)
8    Q.  Look at the bottom of what has been marked as
9        Plaintiffs' Exhibit Number 14.
10   A.  Yes, sir.
11   Q.  Now, I have highlighted that.  The highlight
12       was not on the original, but I highlighted it
13       for my own purposes.  And I don't want to
14       imply that it was given to me that way by the
15       City's counsel.
16          MR. JAFFREE:  If I could have found more
17            time, I would have made copies of
18            this, but I'm just having trouble
19            finding time in my day.
20   Q.  If you look at Exhibit 14, it does appear that
21       Judge Gordon is the one that called for this
22       investigation; is that correct?
23          MS. NELSON:  Object to the form.
0042
1    A.  If I remember correctly, your question is who
2        assigned me to the investigation.  And Judge
3        Gordon did not assign me to the investigation.
4    Q.  Okay.  But it says that she initiated the
5        investigation; is that correct?
6          MS. NELSON:  Object to the form.  The
7            testimony will speak for itself.
8          MR. JAFFREE:  Well, I'm asking for the
9            testimony.
10   A.  The judge is not my department head.  I get my
11       orders and directions from my department head
12       or my supervisors.  Judge Gordon did not come
13       directly to me and ask me to investigate.
14   Q.  Can you read what you said there?
15   A.  "The judge asked for an investigation from the
16       chief because he has the investigators that
17       can actually look into something and has time
18       to actually look into it."

19   Q.   Now, can I assume from your statement that
20        somebody communicated to you that the judge
21        had asked the chief to conduct an
22        investigation?
23   A.   Yes.
0043
 1   Q.   Who told you that?
 2           MS. NELSON:  If you know.
 3   A.   I'm -- it had to have been from the chief.
 4   Q.   Okay.  Now, I know it's going back a long
 5        time.
 6   A.   That it is.
 7   Q.   However, can I assume that one of the
 8        hallmarks of a good investigator is a good
 9        memory?
10           MS. NELSON:  Object to the form as to any
11              assumption.
12   Q.   Is that a presumption?
13           MS. NELSON:  Object to the form.
14   Q.   Or is that a standard presumption that has
15        some merit?
16           MS. NELSON:  Object to the form.
17   A.   Well, I guess with anything, it would come
18        with the passage of time.  So in order to
19        refresh and reflect over things over the
20        passage of time, there could be a lot more
21        memory recall to answer your question.
22   Q.   Well, even though for the Record I do not
23        acknowledge the City's counsel as functioning
0044
 1        as your counsel, I will not invade whatever
 2        province she had in preparing you.  But did
 3        you review any records in preparation for this
 4        deposition?
 5   A.   Yes.
 6   Q.   Did you --
 7           (Brief interruption)
 8           MR. JAFFREE:  I was just talking about
 9              memory, and mine has gone blank as to
10              where I was.
11           MS. NELSON:  You asked him if he had
12              reviewed any records.
13           MR. JAFFREE:  I'm not an investigator and
14              I'm getting old in the tooth, long in
15              the tooth or somewhere.  I've got you
16              by a few years.

17            Where was I at?
18            Do you want to read back where I
19        was at?  What was the last thing I
20        said?
21            (Court reporter read from the
22            Record.)
23    Q.  Did you review some transcripts of the
0045
1        testimony that you had gathered during your
2        investigations?
3    A.  Some of them.
4    Q.  But not necessarily this transcript?
5            MS. NELSON:  This one being --
6    Q.  The one that you're reviewing now, the
7        transcript of --
8            MS. NELSON:  Your Plaintiffs' Exhibit 14?
9            MR. JAFFREE:  Yeah.
10            MS. NELSON:  That page?
11            MR. JAFFREE:  Yeah, that page.
12    A.  No, I didn't.
13    Q.  All right.  Do you know pursuant to what
14        authority Judge Gordon may have
15        instructed -- help me with the right word --
16        suggested, encouraged, ordered your chief to
17        appoint you to do this investigation?
18    A.  No.
19    Q.  Which was the correct word, "suggested,"
20        "ordered?"
21            MS. NELSON:  Object to the form.
22    Q.  "Instructed?"
23            MS. NELSON:  If he doesn't know -- object
0046
1            to the form.
2            MR. JAFFREE:  Well, the question --
3            MS. NELSON:  If you know.  That's fine.
4            MR. JAFFREE:  There's two parts to that
5            question.  One was, pursuant to what
6            authority, and the other part is which
7            is the correct verb.
8            MS. NELSON:  Well, I'm not trying to take
9            the deposition.  I'm trying to speed
10            things along.
11            Object to form.  If you want to
12            ask him if he has any knowledge of how
13            the investigation came about, other
14            than the chief giving him --

15      MR. JAFFREE:  Well, no.  I want to ask
16        him:
17   Q.  Do you know pursuant to what authority the
18        judge initiated this investigation?
19      MS. NELSON:  Object to the form.
20   A.  No.
21      MS. NELSON:  I'm not sure if he testified
22        that he knows for certain that the
23        judge initiated it.
0047
1   Q.  Would you feel comfortable in my suggestion
2        that the judge initiated this investigation?
3      MS. NELSON:  Object to the form.  I don't
4        know if he can feel comfortable with
5        you or not.
6   A.  No, sir.
7      MR. JAFFREE:  I don't know as from -- if
8        he needs to banter with everything
9        that you -- he may feel comfortable.
10      MS. NELSON:  Well, ask him a question, not
11        if he will feel comfortable with or --
12      MR. JAFFREE:  To move this along --
13      MS. NELSON:  Ask him if he has knowledge.
14   Q.  Do you know whether or not the judge, based on
15        hearsay or whatever, the judge initiated this
16        investigation?
17      MS. NELSON:  If you know.
18   A.  No, I don't 100 percent positively know.
19   Q.  Did you intend from that statement that you
20        just read to be an empty statement, or was it
21        based on facts at the time?
22   A.  Whenever -- and to clarify me saying, no, I
23        don't work for the judge.  I don't know who
0048
1        the judge sends.  I -- I don't -- I'm not a
2        part of her department.  So when it came to
3        me, it came to me through the chief.
4          Now, whatever channels happened between
5        the chief and the judge, that's what I'm
6        saying that I don't know.  How -- how it got
7        from the judge to the chief, how she made up
8        her mind to do that and all that, I was not a
9        party of.  How it was assigned to me, I wasn't
10        a party of.  When I'm told to do an
11        investigation by the chief, I do it.
12   Q.  All right.  Let me ask you this:  Do you know

13      for a fact -- I'm sorry.  Let me back up.
14          What chief told you to conduct this
15      investigation; what was the name of that
16      chief?
17   A.   John White.
18   Q.   All right.  Do you know what independent facts
19      that Judge White (sic) had concerning the
20      incident that you was investigating prior to
21      your initiating the investigation?
22   A.   No, I don't know the facts that he had.  He
23      did direct me to talk to the judge about the
0049
1      investigation.  He directed me.
2   Q.   So you did, at some point, talk to the judge?
3   A.   Yes.
4   Q.   Did you make a transcript of that discussion?
5   A.   No.
6   Q.   Why not?
7   A.   I just didn't.
8   Q.   All right.  Do you recall what the judge may
9      have said to you?
10   A.   Yes.  That when it had come to her attention
11      that Mary Beth Brackin possibly made
12      statements to a defendant in a criminal case
13      in her court, that her attorney that was
14      representing her was basically incompetent --
15      and those aren't the words that she used.
16      Those are what I'm paraphrasing.
17   Q.   Well, don't paraphrase.  What were the words
18      she used?
19   A.   I can't -- I don't remember the exact words.
20   Q.   Oh, okay.
21   A.   Just that there was some possible misconduct
22      from Mary Beth Brackin, insinuating that
23      Ms. Ralpeje may want to seek another attorney
0050
1      because of her attorney giving her some
2      information that she thought wasn't good.
3   Q.   So in essence, your investigation was to see
4      if Mary Brackin had bad mouthed another
5      attorney -- I'm sorry -- an attorney, not
6      another attorney, an attorney?
7          MS. NELSON:  Object to the form.
8   A.   Giving legal advice to a defendant of a case
9      when her job description didn't reflect that
10      that was one of her duties.

11  Q.  What was the legal advice she had given?
12  A.  Now, you said that's what the allegations
13     were, and that's what I was told to
14     investigate.  So --
15  Q.  But what was the legal advice that she had
16     allegedly gave to Ms. Ralpeje?
17  A.  Just a second.
18        MS. NELSON:  He's reviewing --
19        MR. JAFFREE:  Sure.
20        MS. NELSON:  -- a memo he did like six
21         years ago.
22        MR. JAFFREE:  But he indicated he had
23         reviewed some of this record.
0051
1        MS. NELSON:  But he said not necessarily
2         this one.
3        MR. JAFFREE:  Well, he said not
4         necessarily the transcript.
5        MS. NELSON:  Well, you didn't ask him
6         about the memo.  Anyway, he can --
7        MR. JAFFREE:  Well, I didn't know his
8         review was limited because I thought
9         that --
10        MS. NELSON:  Well, you didn't ask him.
11        MR. JAFFREE:  If he was prepared, he would
12         be reviewing what I may cover.
13        MS. NELSON:  You know, he can sit here and
14         review it all day if he needs to.
15  A.  Specifically, that a magistrate which was to
16     be Mary Brackin told Ms. Ralpeje that she
17     should ask for another lawyer because they had
18     many complaints about Shaun, referring to
19     Attorney Shaun McGhee, and the first thing she
20     should do is get rid of Shaun.
21  Q.  That the first thing who should do is get rid
22     of Shaun?
23  A.  Ms. McGhee -- excuse me.  Ms. Ralpeje.
0052
1  Q.  Ms. Ralpeje --
2  A.  Yes.
3  Q.  -- should get rid of Shaun.
4        So the judge told you that she had heard
5     that?
6  A.  The judge advised me that -- that her
7     employee, Ms. Brackin, made -- there were
8     allegations that she made statements to

9       Ms. Ralpeje that Mr. McGhee gave her some --
10      pretty much bad advice.  And that's not -- I'm
11      paraphrasing the words, that the allegations
12      were that Ms. Brackin overstepped her
13      authority as a magistrate by providing -- by
14      telling a defendant in a case that her counsel
15      was inadequate.
16   Q.  But that constitutes pretty much the bulk of
17      the discussion you had with Judge Gordon?
18   A.  That was the gist of it.
19   Q.  Can you think of anything else that she may
20      have said at the time?
21   A.  Yes.  There were some parties -- there were
22      some other people that may have been a party
23      to that discussion which was a bondsman by the
0053
1       name -- last name of Turner.  Also -- and I
2       don't -- yeah, I believe that was it.  There
3       was another party to the -- to that statement,
4       and it was the bondsman by -- by the name of
5       Turner.
6    Q.  Okay.  When you talked to the judge, did you
7       view your role as, "Just the facts, ma'am?"
8          MS. NELSON:  Object to the form.
9    A.  Can you clarify what you mean?
10   Q.  That's fair enough.
11         Did you view your role as just soliciting
12      facts to see whether or not the allegation was
13      true?
14   A.  Yes, sir.
15   Q.  Do you think you ultimately did more than just
16      solicit the facts to see if the allegation was
17      true?
18   A.  In what way?
19   Q.  That you became an advocate?
20   A.  For who, just an advocate in general?
21   Q.  An advocate recommending punishment,
22      recommending sanction?
23         MS. NELSON:  Object to the form.
0054
1    A.  No, sir.
2    Q.  You don't think so?
3    A.  No.
4    Q.  Well, we'll get into that in a minute, but let
5       me go back again.
6          Based on what the judge told you, as you

7       have just stated, from your experience, which
8       is quite lengthy as a member of the police
9       force, is there a potential crime in any of
10      that allegation, a criminal activity in any of
11      that allegation?
12  A.  Not that I know of.  And that wasn't -- I
13      wasn't investigating it as a criminal
14      investigator.  I was investigating it as an
15      administrative investigator.
16  Q.  Do you know if prior to your discussion with
17      Ms. Brackin you gave her a garrity notice?
18  A.  I wouldn't have.
19  Q.  You wouldn't have?
20  A.  No.
21  Q.  Do you know if anyone gave her the garrity
22      notice?
23  A.  You're saying prior to an interview?
0055
1   Q.  Yeah.  Just prior to your --
2   A.  Prior to even talking to her?
3   Q.  Prior to taking her statement, yeah.
4   A.  Hold on.
5   Q.  I'm not trying to trap you.  You did give her
6       a garrity notice.
7   A.  I would have.
8           MS. NELSON:  Well, again, I'd object to
9               the form.  Do you know you did?
10          MR. JAFFREE:  Yeah.  It's part of the --
11          MS. NELSON:  It is?  Where?
12          MR. JAFFREE:  Right here (indicating).
13  Q.  I'm not saying this to try to trap you, I'm
14      just simply trying to get to a point.
15          MS. NELSON:  Okay.
16  Q.  This is both aside for the Record, that I'm
17      not as -- well, I don't want to have to call
18      it clever, but there's a propensity for
19      investigators to say:  I'm not trying to trap
20      you, I'm not trying to -- not trying to be
21      slick or anything, I'm just trying to get some
22      facts.
23          But it seems like the intent is to trap.
0056
1       But --
2           MS. NELSON:  Object to the form.  Object
3               to your statement.  Object to your
4               speculations.

5          MR. JAFFREE:  Well, I mean, it's all part
6             of the record.
7   Q.  But be that as it may, why did you give her a
8        garrity warning if there was no possibility of
9        any criminal charges coming from this?
10         MS. NELSON:  Object to the form.  I don't
11            know that he ever testified that there
12            was no possibility of any criminal
13            activity coming from it.
14   Q.   Based on the information that you had gathered
15        from the judge during your interview,
16        unrecorded with the judge, what possible
17        criminal charges could be brought against
18        Ms. Brackin, based on the facts that was
19        before you at the time?
20         MS. NELSON:  Object to the form.
21   A.  If -- if I were assigned to it initially,
22        there -- to my knowledge, there wouldn't have
23        been any criminal activity that I know of
0057
1        afoot for me to even have received that
2        investigation.  That would've gone to the
3        criminal investigations division.
4   Q.  Well, do you know the purpose of the garrity
5        notice or the garrity warning?
6   A.  Yes.
7   Q.  What do you think is the purpose?
8   A.  I think the purpose is to advise a
9        governmental employee, which Ms. Mary Brackin
10        was a part of the City of Dothan government,
11        that they are compelled to answer truthfully
12        questions as it relates to an administrative
13        investigation only, and that anything that
14        they say in regards to that administrative
15        investigation is not and will not be used in a
16        subsequent criminal investigation.
17   Q.  Do you know why the garrity rule was required?
18         MS. NELSON:  Object to the form.  That
19            calls for a conclusion of law.  But to
20            the extent he knows --
21   Q.  Yeah, if he knows.  I mean, are you familiar
22        with the garrity --
23            (Court reporter interrupted for
0058
1                clarification.)
2         MS. NELSON:  Object that it calls for a

```
 3        legal conclusion.
 4   A.  What was your question again?
 5   Q.  Were you familiar with the garrity case from
 6        which the rule, the policy, the notice
 7        derived?
 8   A.  I'm not an attorney.  I could give you a
 9        ballpark, but I can't give you any -- I can't
10        just state specifically as -- as you probably
11        could.  I don't know the entire history.  I
12        think I've read it, but I haven't reduced it
13        to memory.
14   Q.  Do you understand that garrity is designed to,
15        on one hand, protect somebody's Fifth
16        Amendment rights and, on the other hand, allow
17        information to be gathered that can be useful
18        in administrative cases?  But the purpose is
19        to avoid somebody from being -- having to make
20        the Hobson's Choice of sacrificing Fifth
21        Amendment rights or sacrificing their job and,
22        therefore, compelling testimony from people
23        that can be used in a subsequent criminal
0059
 1        investigation.  And so you shield that
 2        information from any subsequent criminal
 3        investigation.
 4           MS. NELSON:  Object to your formal
 5             statement, but if you understand.
 6   Q.  Do you think -- do you agree that that's sort
 7        of part of it?
 8   A.  Sir, actually, what I stated earlier was
 9        basically the same thing you said but in a
10        different form, in my opinion.
11   Q.  Now, isn't it true that during your
12        investigation or during your -- do you call it
13        interrogation or do you call investigation?
14        When you do your internal affairs
15        investigation, do you consider yourself
16        interrogating the witness?
17           MS. NELSON:  Object to the form.
18   A.  I'm investigating the allegations, and
19        witnesses are questioned as it relates to
20        information that I obtained during the
21        investigation.
22   Q.  Would you be comfortable with term that you
23        also interrogate the witnesses?
0060
```

1        MS. NELSON:  Object to the form.
2  A.  No, sir.
3  Q.  You wouldn't be comfortable with that?
4  A.  No, sir.
5  Q.  You understand, of course, that some of the
6       witnesses are apprehensive?
7  A.  They could be.
8  Q.  Do you remember what Ms. Brackin's position
9       was with respect to the allegation that she
10      had accused an attorney of literally being
11      incompetent, and there's been several
12      complaints against this attorney?
13  A.  Yes.
14  Q.  She did deny the allegation, correct?
15  A.  Correct.
16  Q.  She also indicated that she hardly knew that
17      attorney, correct?
18  A.  No, that's incorrect.
19  Q.  That's not correct?
20  A.  No, sir.  She said that she thought that they
21      had a -- a very -- quote, unquote, had a very
22      good rapport with Mr. McGhee.
23  Q.  But she also said, quote, I'd only worked with
0061
1       him one time in court, unquote.
2        MS. NELSON:  What are you reading from?
3        MR. JAFFREE:  Number 1281, page 6.
4        MS. NELSON:  Page 6.
5  Q.  Matter of fact, I did my statement a
6       injustice.  To read the complete paragraph of
7       what she said, that's even an injustice.  Let
8       me read you a question of hers.
9        "Okay.  And -- but do you know Shaun
10       McGhee?"
11        Answer:  "Yes."
12        That's Mary Beth's answer.
13        Here's your question -- I'm not -- not
14       your question.  This is Mr Coleman's question,
15       but you was there when Coleman was asking
16       these questions, correct?
17  A.  Yes, sir.
18  Q.  Mr. Coleman said, "Well, how long have you
19       known Shaun McGhee?"
20        Her response:  "I don't really -- I think
21       I was introduced to him, you know.  It was
22       either while we were in court and he -- right

23  before he became the public defender.  But as

0062

1  far as -- I'd only worked with him one time in

2  court."

3   So based on --

4  MS. NELSON:  Well, you're not going on

5   to -- if you'd go on.

6  MR. JAFFREE:  Well, I don't want to go on.

7  MS. NELSON:  You don't want to go on?

8   Okay.  Well, I'd ask that the Record

9   be complete as to the rest of the

10   statement, that she had a good rapport

11   from him -- with him.

12  MR. JAFFREE:  Well, okay.  Since you

13   insist.

14 Q.  Mr. Coleman said, "Okay."

15   And Ms. Brackin said, "and I had a very

16  good rapport with him.  And, in fact, I told

17  Donna that, you know, he was going to be a --

18  be good for us, that he had done a real good

19  job."

20   Now, you understand, she's referring to

21  the one time she saw him, correct?

22  MS. NELSON:  Object to the form.

23 A.  Not to twist everything up, but according to

0063

1  what you just read, it says that when she met

2  him, it was in court.  This document doesn't

3  say how long they may have known each other,

4  and it doesn't give a specific date on when

5  they were in court when they met.  So I cannot

6  assume just by this document that this is the

7  first time they met because that's not what it

8  says as far as how long they've known each

9  other.

10 Q.  Well, do you generally get introduced to

11  people that you have known for a long time?

12  MS. NELSON:  Object to the form.

13 Q.  As far as you know, the term, I was introduced

14  to him?

15 A.  To answer your question, no.

16 Q.  Let me just see if I can speed this along.

17   You agree that she denied the

18  allegations.  Would you also agree that

19  Ms. Rapaport did not confirm the allegations?

20  MS. NELSON:  Ms. Ralpeje.

21    A.   Ms. Ralpeje?
22    Q.   Sorry.  Ms. Ralpeje did not confirm the
23         allegations.  If you recall.  I got the record
0064
1          here, so if you don't recall, then that's
2          fine.
3             MS. NELSON:  Well, he hadn't had a chance
4                to look at it, but the report can
5                speak for itself I believe --
6          MR. JAFFREE:  Well, the report can.
7             MS. NELSON:  -- if he can't recall.  If
8                you can recall, please take your time.
9             THE WITNESS:  Okay.
10    A.   Based on my interview with Ms. Ralpeje, in
11         regards to what was said, Ms. Ralpeje told
12         Ms. Mary Beth that if her lawyer instructed
13         her to plead guilty to DUI the first time and
14         he advised her to appeal it, it does not seem
15         like he's a very good lawyer.  This came from
16         Mr. -- Ms. Ralpeje.
17    Q.   I'm talking about -- I'm not talking about
18         your summarization.  I mean, Ms. Ralpeje's
19         statement itself.
20    A.   This was -- come from what Ms. Ralpeje told
21         me.
22    Q.   Well, Ms. Ralpeje did not indicate that
23         Ms. Brackin had told her that the lawyer was
0065
1          incompetent or that there were numerous
2          complaints against him.
3     A.   Can I review her -- the statement I took with
4          her?
5             MS. NELSON:  Again, I -- because, yeah.  I
6                object to your testifying as to what
7                Ms. Ralpeje said.
8             (Brief pause)
9     A.   Confirming what I said just a minute ago, in
10         Ms. Ralpeje's statement I've got, quote, what
11         I read to her and what I said to her and what
12         she responded back.
13            My statement was, "I mean, just if you
14         want to paraphrase it, paraphrase it.  Say,
15         this isn't the exact words, but as much you
16         can remember, just" --
17            Ms. Rapelje's reply was, "Okay.  She" --
18         she, meaning Ms. Brackin.  "She basically gave

19     me an option -- an opinion that if he told
20     you, you know, if he instructed me to, you
21     know, plead guilty the first time and then
22     there -- and then here it is a week later and
23     now he's instructing me to appeal it, that
0066
1      doesn't seem like he's a very good lawyer."
2    Q.  Now -- go ahead.
3          (Brief pause)
4          MS. NELSON:  Did that not respond to your
5            question?
6          MR. JAFFREE:  Not really because
7            she -- she was saying, if what you've
8            told me is true -- and the first part
9            of Ms. Rapelje's statement was that
10           she was drunk at the time and can't
11           rely on her memory.
12   Q.   But, also, the part of my question dealt with
13        her saying that Ms. Brackin had said, we had
14        numerous complaints against him.  You won't
15        find that at all in her testimony.
16   A.   That's correct.
17   Q.   There's Donna Grumbach was right next to her
18        who didn't confirm any of that either.
19          MS. NELSON:  Are you testifying,
20            Mr. Jaffree?
21          MR. JAFFREE:  Well, I'm asking him if --
22          MS. NELSON:  Is that a question?
23   Q.   Do you agree that Donna Grumbach did not
0067
1        confirm any of that allegation about the
2        incompetence or numerous complaints?
3    A.   She did not.
4    Q.   So what you have is a probation officer saying
5        one thing, who was on the phone most of the
6        time by eyewitness accounts and was spending
7        time talking as opposed to listening, and you
8        have the people that was intimately involved
9        that didn't confirm it.
10         MS. NELSON:  Object to your
11           characterization.
12   Q.   Well, I'm mentioning this because I'm going to
13        ask you a question.
14          And would you agree that for some reason
15        you interviewed Donna -- what's Donna's last
16        name?

17  A.  The same person we're talking back?
18       Grumbach?
19  Q.  No, no.  Not her.  Is it Donna?  I think
20       it's -- yeah.  Donna Nicholson.  Do you agree
21       that you interviewed Donna Nicholson?
22          (Brief pause)
23  Q.  Do you remember whether you interviewed Donna
0068
 1      Nicholson?
 2  A.  Yes.
 3  Q.  Do you recall attempting "every which way but
 4       loose" to get Ms. Nicholson to agree to
 5       discipline Ms. Brackin?
 6          MS. NELSON:  Object to the form.
 7  A.  No.
 8  Q.  Do you agree discussing with her all the
 9       different types of theories that she could
10        discipline Ms. Brackin with?
11          MS. NELSON:  Object to the form.
12  A.  No.
13  Q.  You don't remember that, huh?  Okay.
14  A.  If you can show me something specifically,
15       I'll be glad to --
16  Q.  There's so much of it in here, but I won't
17       take the time.  I mean, if you don't know,
18       that's fine.
19          What was your purpose of interviewing
20       Ms. Nicholson in the first place?
21  A.  She was one of the employees over there at the
22       magistrates' office.  She was I think acting
23       in the capacity of -- as the supervisor at
0069
 1      this time.
 2  Q.  Wasn't she more than that?  Wasn't she
 3       administrator of the department?
 4  A.  Could have been, but, like, she supervises the
 5       magistrates.
 6  Q.  She was in charge of the department, and, yet
 7       the judge instigated this investigation.
 8          Now, if the judge has said that she don't
 9       have the time to investigate and that's why
10        she used the police department --
11          MS. NELSON:  Object to the form.  That's
12            your testimony.  That was not her
13            testimony or all of her testimony.
14          MR. JAFFREE:  That's been her testimony a

15            lot.
16    Q.  Do you have an opinion as to why Donna
17        Nicholson could not have initiated this
18        investigation?
19            MS. NELSON:  Object to his opinion.
20    A.  No, I don't have anything.
21    Q.  You don't recall discussing with Donna some of
22        the -- asking her, why is it she just want to
23        put this in the personnel file, why not bring
0070
1        some strong action against her.  You don't
2        recall that at all?
3    A.  No, sir.
4            MS. NELSON:  And I'd also ask for the
5                Record to indicate that the witness is
6                so bewildered by that, he's laughing
7                and scoffing at such a suggestion.
8    Q.  I will take a break, if you like, and I'll let
9        you read your interview with Ms. Nicholson.
10        Would you like to do that?
11    A.  If that's what you want.
12    Q.   And if you -- after you read that, I will ask
13        you if you still agree that you wasn't
14        attempting to encourage Ms. Nicholson to come
15        up with a much stronger sanction that just an
16        entry in a personnel file, that that just
17        won't do.
18            But tell me if I'm wrong after you read it
19        that --
20            MS. NELSON:  This is your testimony,
21                Mr. Jaffree.  Do you want him to sit
22                here and read it?  He's obviously
23                disagreeing with you without the --
0071
1                the necessity of reading it.
2            MR. JAFFREE:  I just want to make sure I'm
3                not getting him confused with
4                Mr. Coleman because they both
5                interviewed her.
6    Q.  I mean, because your names are interspersed
7        here.  But let me let you read it.  And if
8        it's Coleman, then I apologize.
9    A.  You want me to read it?
10    Q.  Yeah.
11    A.  Want me to read it aloud?
12    Q.  Well, no, I don't want you to read it aloud.

13          MS. NELSON:  It's like ten pages.
14          MR. JAFFREE:  Yeah, it's a lot of pages.
15          MS. NELSON:  I mean, how could you be
16             getting it confused with Mr. Coleman?
17          MR. JAFFREE:  Because I think he --
18             Coleman was here and he said a few
19             things.  Coleman said a few things
20             here.  I don't want to --
21          MS. NELSON:  Well --
22          MR. JAFFREE:  -- confuse Coleman's --
23          MS. NELSON:  You know, it's 3:30.  We've
0072
1              been here two hours.
2     Q.  Well, then you don't have to read it.  All
3     right.
4          MS. NELSON:  I'm just asking you.  Do you
5             have a specific --
6          MR. JAFFREE:  Okay.  Well --
7          MS. NELSON:  He's disagreed with you.
8          MR. JAFFREE:  He disagreed.  Fine.
9          MS. NELSON:  If you want to point to a --
10         MR. JAFFREE:  That's fine --
11         MS. NELSON:  -- particular piece of
12            testimony or transcript --
13            (Court reporter interrupted for
14               clarification.)
15         MS. NELSON:  I said, if you want to point
16            to a particular part of this
17            transcript to question him about,
18            because he's otherwise denied doing
19            what you asked him about.
20         MR. JAFFREE:  Now, I will only suggest
21            that when we're no longer on the
22            Record if he wants to read your copy
23            of the transcript, he can, so that he
0073
1              can be satisfied that I'm not making
2              this up.
3     Q.  Now, after your investigation of this
4     incident, did you have an occasion to speak
5     back with Judge Gordon?
6     A.  Speak or report -- give a report?
7     Q.  Give a report to Judge Gordon?
8     A.  Yes.  There was a report that I submitted to
9     the police chief that was then sent to the
10    judge.

11    Q.   Do you know if this report included the
12          statements of the parties?
13    A.   No, I don't recall if it had a copy of the
14          statements of the parties.
15    Q.   Well, if it didn't have the statements, then
16          it just had your summary; is that correct?
17    A.   I said I didn't recall it having the
18          transcripts.  It could have, but I don't
19          recall it having the transcripts.
20    Q.   You're not sure.  All right.  Believe it or
21          not, I'm almost through with you.
22              Let me ask you if you can recall the
23          second time you did an investigation involving
0074
1          Ms. Brackin -- well, let me back it up.  Not
2          necessarily involving Ms. Brackin.  Involving
3          someone associated with the judicial
4          department back in -- let's just say 2005?
5    A.   Yes, sir.
6    Q.   Do you remember doing an investigation because
7          there was a statement on Rickey Stokes' web
8          site indicating that an internal affairs --
9          some type of investigation was being conducted
10          on Mary Turner?
11    A.   Yes.
12    Q.   Who initiated that investigation that you were
13          involved in?
14    A.   That would have came -- as I said, our
15          investigations, if it came from a different
16          department, would come from the department
17          head or his designee.  I believe this one came
18          from --
19              MS. NELSON:  He's referring to his memo to
20                  chief of police regarding this
21                  investigation.
22    A.   Chief Powell was the one that advised me to
23          begin the investigation as it relates to the
0075
1          unlawful or -- or the unauthorized release of
2          information and involving Mary Turner, the
3          same thing -- same thing you're talking about.
4    Q.   What supposedly was the scope of that
5          investigation?
6              MS. NELSON:  Which investigation are we
7                  talking about?
8              MR. JAFFREE:  The investigation we were

9        just talking about, the one
10       involving --
11    MS. NELSON:  Mary Turner?
12    MR. JAFFREE:  Well, no.  I'm talking about
13       the one involving the release of
14       information concerning Mary Turner.
15    MS. NELSON:  Well, it's hard, you know,
16       just to make a gigantic leap -- as you
17       call the being pregnant and having the
18       baby, it's hard to make a leap to like
19       the second baby, what you're asking
20       him to do.
21    MR. JAFFREE:  With the --
22    MS. NELSON:  I mean, I know you're trying
23       to speed things along.
0076
1    Q.  The release of information concerning
2       Ms. Turner, what was supposed to be the scope
3       of that investigation?
4    A.  The magistrates' office had been advised by
5       Judge Gordon to not release any information to
6       anyone regarding the Mary Turner investigation
7       where she was put on administrative leave.
8       After the judge advised her employees of that,
9       there was, indeed, a leak of that
10      investigation to a -- the media which was
11      known as Rickey Stokes or The Houston, which I
12      think is the name of his paper, but it goes
13      through -- Rickey Stokes is the -- I think the
14      principal in that business.
15   Q.  Okay.  So what was supposed to be the scope of
16      that investigation?
17   A.  The -- who released the information as far as
18      the investigation on Mary Turner was the scope
19      because the judge -- the judge had already
20      directed the employees not to --
21   Q.  So you were trying to --
22      MS. NELSON:  Well, you're cutting him
23         off.  Not to --
0077
1       MR. JAFFREE:  I'm sorry.
2       MS. NELSON:  Let him finish what her
3          directives were.
4    A.  Not to release information, not to talk about
5       the investigation of Mary Turner.  And after
6       that directive was given by the judge, someone

7    evidently did, which was on Rickey Stokes' web
8    site.
9  Q.  So the mischief thought to be pursued in that
10    that investigation was, who released the
11    information?
12      MS. NELSON:  Object to your form, again,
13      as -- with your mischief.  I don't
14      know what you mean by "mischief."
15    MR. JAFFREE:  Well, I like that word.
16    MS. NELSON:  Well, you must because you
17      used it many times yesterday.  But, I
18      mean, if you could say like --
19    MR. JAFFREE:  I used it twice.
20    MS. NELSON:  -- what was the --
21    MR. JAFFREE:  What's wrong with --
22    MS. NELSON:  -- purpose of the
23      investigation.  I mean, mischief
0078
1      connotes some --
2    MR. JAFFREE:  Well, let me ask this
3      witness --
4    MS. NELSON:  I'll ask that you use another
5      word besides mischief.
6    MR. JAFFREE:  I will if the witness
7      doesn't understand what I mean by the
8      word.
9  A.  Specifically, what are you talking about as
10    far as mischief is concerned?
11  Q.  Well, I'll --
12    MS. NELSON:  Reason, purpose, why did you
13      do this, you know.  Let's just talk on
14      plain words.
15  Q.  The purpose of this --
16    MR. JAFFREE:  Well, it's plain English to
17      me.
18  Q.  But the purpose of this investigation was to
19    find out who released information; is that
20    correct?
21  A.  Yes, sir.
22  Q.  And that was supposed to be the scope of the
23    investigation?
0079
1  A.  Of this investigation?  Yes, sir.
2  Q.  That was your charge?
3  A.  Yes, sir.
4  Q.  What, if any, criminal statutes may have been

5      implicated by the release of this information?
6  A.  I don't know of any that would have been
7      criminal.
8  Q.  This wasn't criminal at all?
9         MS. NELSON:  Object to the form.  He
10           didn't say that.
11        MR. JAFFREE:  Well, he sort of said
12           something like that.  That's what I
13           heard.
14        MS. NELSON:  Well, I'll ask that his
15           testimony stand instead of your
16           paraphrasing what he said.  He said he
17           didn't know of any.
18  Q.  I'll live with your response.  I have a
19      feeling if it was up to opposing counsel, I
20      wouldn't get a chance to ask you anything.
21  A.  I enjoy talking to you.
22  Q.  Thank you.
23         So did you talk to people to find out who
0080
1      exposed the very information that the judge
2      warned them not to disclose?
3  A.  Yes, sir.
4  Q.  Prior to talking to people, did you talk to
5      the judge?
6  A.  Yes, sir.
7  Q.  Was that discussion recorded?
8  A.  No, sir.
9  Q.  Why did you care who released information to
10      the media?
11        MS. NELSON:  Object to the form.  I don't
12           know that he ever testified that he
13           did care.
14  Q.  Well, did you care?
15        MS. NELSON:  He was doing his job.
16        MR. JAFFREE:  Well, he didn't indicate
17           that he didn't care.
18  Q.  I mean, did you care?
19        MS. NELSON:  Care in what --
20  A.  I don't -- I don't have any -- I didn't have
21      any personal feelings.  And if that's what you
22      mean by "care," I didn't have any personal
23      feelings on who did it.  It was a directive
0081
1      that wasn't followed that I was told to
2      investigate, and that was it.

3    Q.  Well, how did y'all reach the conclusion that
4        it was a directive that was not followed; was
5        this directive given to Mary Turner?
6    A.  She was wasn't present during that time --
7    Q.  In that case --
8    A.  -- to my knowledge.
9    Q.  In that case, Mary Turner could have released
10       the information to Rickey Stokes, correct?
11           MS. NELSON:  Object to --
12   A.  You're saying could have?
13           MS. NELSON:  This calls for speculation.
14   Q.  Well, I mean, could she have?
15           MS. NELSON:  Well, I'd ask him to review
16           Rickey Stokes -- I'd ask him to review
17           what was on the web site.  Based on
18           what was on the web site, I don't know
19           how Mary Turner could have knowledge
20           of what was in the web site -- in
21           Rickey Stokes' web site.
22   Q.  Well, what was in there that Mary Turner could
23       not have had knowledge of, since counsel has
0082
1        quickened your response?  Help us out here.
2    A.  Okay.  Just a second.
3           (Brief pause)
4           MS. NELSON:  See if you can answer.
5           That's my objection but I don't --
6           He's calling for -- what's the last
7           question on the table?  I forgot.
8    Q.  What is it that was on that web site that Mary
9        Turner could not have had knowledge of?
10          MS. NELSON:  And that was my objection.
11   A.  Speculating --
12          MS. NELSON:  Yeah.
13   A.  This is all speculatory.  Mary could have had
14       knowledge of this information, so could
15       have -- so could, you know, the people that
16       was in the office during the investigation.
17       It depends on if someone leaked information to
18       Mary Turner.  So she could have done this if
19       someone leaked information from inside the
20       office, and she could have told Rickey Stokes.
21   Q.  Well, what information could -- she would not
22       have had independent knowledge of?
23   A.  She wouldn't have known that there was a -- I
0083

1  don't think she would have known that there
2  was an investigation from me about this
3  particular additional -- this investigation
4  came after she was already on administrative
5  leave for something else.  So she -- she
6  wouldn't have known that there was a separate
7  investigation dealing with the release of
8  information because she wasn't in the office,
9  as you stated earlier.  So she wasn't at the
10  office whenever I --
11      MR. JAFFREE:  I have to hunt for mine.  Do
12        you have an objection to me making
13        this part of the record, to make a
14        copy and make this as an exhibit?
15      MS. NELSON:  You're talking about the
16        entire investigation.
17      MR. JAFFREE:  No.  Just that one --
18      MS. NELSON:  No.  If you're going to make
19        the -- I'd ask that we make the
20        entire -- or at least the report.
21      MR. JAFFREE:  I don't want to have this
22        deposition costing an arm and a leg
23        and your nose and your head as well.
0084
1      So if --
2      MS. NELSON:  Well, no, I --
3      MR. JAFFREE:  -- I could just get that one
4        page.
5      MS. NELSON:  I am going to object to the
6        one page if we can't do it all.
7      MR. JAFFREE:  I'll have to hunt for mine.
8        Can I ask you what page number is
9        that?
10      MS. NELSON:  The Bates --
11      MR. JAFFREE:  Since you're looking at it.
12      MS. NELSON:  I don't have the
13        Bates-stamped pages.  I'm sorry.
14      MR. JAFFREE:  Well, do you have a
15        Bates-stamped page in front of it.
16      MS. NELSON:  No, I don't.
17      MR. JAFFREE:  Well, you don't have any of
18        them.
19      MS. NELSON:  The copy I've brought with me
20        is not Bates-stamped.
21      MR. JAFFREE:  Well, since you looked at it
22        can I --

23          THE WITNESS:  That's it.

0085

1          MR. JAFFREE:  This is it, right here.

2             Since you won't assist me, I will

3             assist myself and mark this as

4          Plaintiffs' Exhibit 15 and show you.

5              (Plaintiffs' Exhibit 15 was marked

6                for identification.)

7    Q.  Are you suggesting that Ms. Turner would not

8        have some known if there was some allegation that a

9        ticket was dismissed and exchanged for some

10       work done on a residence?

11   A.  No, sir, I'm not arguing that point.

12   Q.  Well, what is it you think that Ms. Turner

13       would not have known independently?

14          (Brief pause)

15   A.  There's not a date on -- I was referring to

16       the exhibit you're looking at.  I was looking

17       for a date that it was actually published on

18       the web site to get a point of reference.

19          (Brief pause)

20   A.  I don't -- I don't know that she could have

21       knowledge of what was printed on the web site

22       in question or not.

23   Q.  Just so we're clear, is the publication of

0086

1        this information on the web site that

2        triggered this investigation, the

3        investigation we was talking about, that

4        caused you to go out and interview other

5        members of the judicial department?

6    A.  That's correct.

7    Q.  Did you interview any members of the police

8        force?

9    A.  As a part of that release of information?

10   Q.  Yeah.

11   A.  I don't think that I did.

12   Q.  Did you interview under oath Judge Gordon?

13   A.  No.

14   Q.  Did you read Judge Gordon the garrity rights?

15   A.  No.

16   Q.  Could Judge Gordon have released this

17       information?

18          MS. NELSON:  Object to the form.

19   A.  Speculating, I would -- I can't give --

20          MS. NELSON:  I'd ask you not to speculate.

21   A.  -- you an accurate answer.  I can't give you
22      an accurate answer.  It would be speculating.
23   Q.  You don't know whether she could have or not?
0087
1   A.  No, I don't know whether she could have or
2     not.
3   Q.  Well, what about Michelle Sellers; do you
4     think she knew about the investigation?
5       MS. NELSON:  Again, I object.
6   Q.  Do you know whether she knew about the
7     investigation?
8       MS. NELSON:  I think everybody in the
9         magistrates' office knew about the
10         investigation.  They had been
11         instructed not --
12   A.  Michelle Sellers did know.
13       MS. NELSON:  -- not to talk about and not
14         to talk to Mary Turner.
15   Q.  Did you interview Michelle?
16   A.  Yes.
17   Q.  Under oath.  Under oath?
18   A.  Sir?
19   Q.  Under oath?
20   A.  I didn't put anybody under any kind of oath.
21   Q.  But did you give Michelle the garrity notice?
22   A.  Just a second and I'll tell you.
23       (Brief pause)
0088
1       MR. JAFFREE:  Off the Record.
2         (Off-the-Record discussion)
3  A.  I don't believe interviewed Michelle Sellers
4     as a part of this investigation.  Michelle
5     Sellers, her office was located in -- in
6     this -- excuse me -- in the municipal
7     courtroom.  At the time, it wasn't located
8     over at the magistrates' office.  She was in a
9     different capacity.  I -- she was the judge's
10     assistant -- administrative assistant, so she
11     wasn't in with the magistrates over there
12     during -- during this time.
13   Q.  How did you know exactly what the judge had
14     instructed the staff not to do; did she give
15     you something in writing?
16   A.  I'm -- I'm not clear what you're asking.
17       MS. NELSON:  What time frame are you
18         talking about?

19  Q.  Well, during the time that you was initiating
20      your investigation of who leaked information?
21      When I use the term "who leaked information,"
22      do you understand that?
23  A.  I understand that.
0089
1   Q.  Did the judge give you any kind of statement
2       as to what she had instructed her staff, or
3       she just verbally told you?
4   A.  I was there when the judge instructed the
5       staff not to release any information.  Is that
6       what you're talking about?
7   Q.  Were you there?
8          MS. NELSON:  That's what he's talking
9             about, yes.
10  Q.  You were present when she --
11  A.  Yes.
12  Q.  -- instructed her staff?
13  A.  Uh-huh (positive response).
14  Q.  Why were you present over there?
15  A.  Because I was the one doing the
16      investigation.
17  Q.  Doing which investigation?
18  A.  The one that you're questioning me about.
19  Q.  Well, no.  When she instructed her staff, that
20      was before this investigation.
21          MS. NELSON:  Well, he's talking about the
22             whole Mary Turner investigation, I
23             believe.
0090
1   Q.  Well, which -- were you involved in the other
2       Mary Turner investigation?
3   A.  What do you mean, the other?  I need you to be
4       specific.  There's been so many different
5       things.
6   Q.  There was investigation of a ticket.
7   A.  Yes.
8   Q.  And then there was something that appeared on
9       Rickey Stokes.
10  A.  Yes.
11  Q.  And then there was an investigation of who
12      leaked information to Rickey Stokes.  Now,
13      after the investigation of the ticket was
14      initiated, the judge addressed the staff.
15      That was before this investigation of who
16      leaked information because information hadn't

17    been leaked at that time.

18      Are you following me?

19    MS. NELSON:  You know, maybe if you'd just

20      ask him what occurred and what

21      involvement he had, he'll tell you.

22    MR. JAFFREE:  Well, maybe I can just ask

23      him the way that I'm asking him.

0091

1    MS. NELSON:  Well, I think you're

2      confusing -- completely confusing the

3      issue.

4    MR. JAFFREE:  Well, that's not --

5    MS. NELSON:  And you're confused yourself

6      because you're asking, what

7      investigation was he involved in.

8    MR. JAFFREE:  Well --

9    MS. NELSON:  Let him testify.

10    MR. JAFFREE:  Well, your confused if you

11      think I'm confused because I'm not

12      confused.

13    MS. NELSON:  Well, I think --

14    MR. JAFFREE:  And, therefore, you must be

15      confused.

16    MS. NELSON:  Well, I think the witness is

17      confused.

18  Q.  Let's take this a linear way.  There was an

19    investigation of ticket fixing allegedly.

20    MS. NELSON:  Involving -- say involving

21      who.  Let's just be clear what we're

22      talk about.

23  Q.  Involving Ms. Turner.

0092

1  A.  Okay.

2  Q.  An allegation of ticket fixing involving

3    Ms. Turner.

4    MS. NELSON:  Is that a question?

5  Q.  See if you can follow this track, and stop me

6    when I'm saying something incorrect.

7    That investigation led to the suspension

8    of Ms. Turner.  Around the same time that

9    Ms. Turner was suspended, the judge made a

10    statement to the staff: Do not disclose this

11    information.  Do not disclose.  Ms. Turner's

12    gone temporarily.  There is an investigation.

13    Do not talk about this.  That came next.

14    Suddenly --

15          MS. NELSON:  Just for the Record, that's
16            not all that was said during that
17            meeting.
18          MR. JAFFREE:  Well, for this purpose of
19            this dialogue, it's all I want to
20            point out that was said.
21          MS. NELSON:  Okay.  It's not accurate but
22            okay.  Go ahead.
23            And that's the meeting he's
0093
1            trying to tell you, he was there.
2    Q.  You was at that meeting?
3    A.  You're putting two things together.  If I
4        understand right, when Ms. Turner was put on
5        some type of administrative leave -- and I
6        think the judge had a meeting with them and
7        told them that she was on administrative
8        leave.  That is totally different from this
9        meeting that we're talking about, the
10        investigation due to the release of
11        information.
12    Q.  I'm talking about the earlier meeting.
13    A.  I wasn't there.
14    Q.  So you wasn't at the earlier meeting?
15    A.  I had nothing to do with --
16          MR. JAFFREE:  I think counsel --
17    A.  -- when she told her -- when she told her
18        staff that she was on --
19    Q.  Okay.  All right.
20    A.  So you've merged both things together, and
21        they're not.  I believe they're two separate
22        --
23    Q.  I was hoping not to, but now I think we are on
0094
1        the right track.  Now --
2    A.  To my knowledge, I wasn't there.
3    Q.  Okay.  This appeared on the web site.
4          MS. NELSON:  What?  Let's talk about what
5            we're talking about.
6    Q.  The information that's on Plaintiffs' Exhibit
7        15 appeared on the web site, correct?  This
8        information appeared on the web site?
9    A.  Yes, sir.
10    Q.  Did you personally see it on the web site?
11    A.  I can't say that I did.  I don't remember.
12    Q.  You may have been subsequently informed that

13     it was on the web site?
14   A.  Yes, sir.
15   Q.  And the new investigation was to find out who
16     leaked it?
17   A.  Yes.
18   Q.  That was your charge?
19   A.  Yes, sir.
20   Q.  And you told the people that you was
21     investigating it, and this was your charge?
22   A.  Uh-huh (positive response).
23          MS. NELSON:  You need to say yes or no so
0095
1            she can pick it up.
2   A.  I'm sorry.  I'm sorry.  Yes, sir.
3   Q.  Now, in order for this to get on a web site,
4     somebody must have told somebody about
5     information concerning the investigation.
6          Are you following me?
7   A.  Yes, sir.
8   Q.  Is that correct?
9   A.  I'm following you.
10   Q.  Somebody must have told somebody.  When you
11     interviewed people, did you ask them if they
12     talked to anybody about what the judge had
13     told them not to talk about?
14   A.  Yes.
15   Q.  Because if they talked to somebody about what
16     the judge had told them not to talk about,
17     then they did something in violation of the
18     judge's directive; is that correct?
19   A.  The judge directed them not to talk about the
20     case.
21   Q.  Did you --
22          MS. NELSON:  Are you finished?
23   A.  That's correct.
0096
1   Q.  Did you discover, in talking to members of the
2     judicial department staff that some members
3     had, in fact, talked to people?
4   A.  Yes.
5   Q.  Did you interview these people that they said
6     they had talked to, to see if they had, in
7     turn, talked to any people?
8   A.  Did I interview the people that were alleged
9     to have received the information?
10   Q.  Yeah.

11    A.  Then, no.
12    Q.   Well, if you was trying to track down who gave
13         information to Rickey Stokes and anybody who
14         had the information, either firsthand,
15         secondhand, or thirdhand, could have given
16         that information to Rickey Stokes, did you not
17         feel the need to talk to the people that they
18         had talked to?
19    A.  No.
20    Q.  Didn't find any need?
21    A.  No.
22    Q.  Why not?
23    A.   If an employee told me that they spoke to
0097
1          someone else about the investigation, that
2          individual is not the focus of the directive
3          that the judge gave or the investigation.
4          That's someone that's on the outside that was
5          told by a magistrate something -- something
6          that was going on.
7     Q.   So you didn't care that Rickey Stokes had the
8          information; you were only concerned with
9          whether or not somebody in the magistrates'
10         office gave that information?
11            MS. NELSON:  Object to whether he cared or
12               not --
13    Q.   Is that correct?
14            MS. NELSON:  -- as to his -- your
15               interpretation of your question about
16               whether or not he cared.  It's an
17               improper question.
18    Q.   Is that correct?
19    A.   I don't have any personal feelings about that
20         -- the release of that information.  My charge
21         was to investigate who may have leaked the
22         information as it came out of the magistrates'
23         office.
0098
1     Q.   So your concern was not whoever gave the
2          information to Rickey Stokes; your concern was
3          whether or not somebody from the magistrates'
4          office gave the information to Rickey Stokes?
5     A.   My investigation was to who leaked the
6          information, and it was dealing with the
7          magistrates that were under -- that had
8          asked -- been asked questions by internal

9      affairs in regards to the release of that --
10     that information.  So the information that was
11     on the web site was being I guess -- I was I
12     directed to investigate the persons out of the
13     magistrates' office who could have possibly
14     leaked that information to the web site.
15  Q.  Well, in your opinion, anyone from the
16     magistrates' office that talked to anyone
17     about the investigation, would they be in
18     violation of the judge's direction not to talk
19     to anyone?
20  A.  If the judge -- the judge directed them not to
21     speak to anybody about that investigation,
22     then that's correct.  It -- that was her
23     directive?
0099
1   Q.  So everyone who spoke to someone was in
2      violation of the judge's directive?
3   A.  The judge's directive was clear.  And --
4   Q.  Well, did you realize at the time you was
5      talking to the members of the judge's staff,
6      or if there's any ambiguity, the members of
7      the judicial department who admitted that they
8      had spoken to someone, that they had violated
9      the judge's directive?
10  A.  Yes, I knew at the time.
11  Q.  Did you recommend any kind of disciplinary
12     action because these people had violated the
13     judge's directive?
14  A.  I don't recommend discipline in this -- I did
15     not recommend discipline in this case.
16  Q.  Did you point out any type of the personnel
17     policy rules that may have been violated with
18     respect to the people who had communicated
19     information to someone about an investigation
20     was ongoing?
21  A.  That was a mouthful.  Could you say that
22     again, please?
23  Q.  Did you recommend in your report what
0100
1      personnel rules may have been violated by the
2      people who provided information to third
3      parties in violation of the judge's directive?
4          (Brief pause)
5   A.  I told the judge that employees had spoke
6      about this case to spouses, things of that

7       nature; I did tell her that had occurred.
8    Q.   Did you tell her that an employee had spoken
9       about this case to a friend?
10   A.   I can't say that I recall going specifically
11       down line with each -- each individual that I
12       interviewed and told who they released the
13       information to.  I did tell her that they had,
14       in fact, spoken to other people such as
15       spouses and things of that nature.
16   Q.   Did you recommend or did you point out some
17       kind of major offense that Mary Brackin may
18       have committed?
19   A.   I did quote the personnel rules and
20       regulations of insubordination as it relates
21       to Mary Beth Brackin to the judge in my
22       report.
23   Q.   Why did you report personnel rules and
0101
1       regulations violations with respect to
2       Ms. Brackin and not report the personnel rules
3       and regulations violation with respect to any
4       of the other employees?
5    A.   Because within this investigation, Mary Beth
6       Brackin was the only employee that spoke to
7       the person that they were directed not to have
8       contact with.  The judge directed them not to
9       have contact, not to speak with Mary Turner,
10       involving this investigation.  Mary
11       Brackin -- Mary Beth Brackin did talk to
12       Ms. Turner which was the subject of the
13       investigation.  And none of the other
14       employees talked to Ms. Turner that was the
15       subject of the investigation.
16   Q.   Well, I thought you just said earlier that the
17       subject of this investigation was who leaked
18       information to Rickey Stokes.
19         MS. NELSON:  Object to the form.  And
20            you're distorting his testimony.
21         MR. JAFFREE:  I'm not distorting anything.
22   Q.   The subject of this investigation was who
23       leaked information to Rickey Stokes.  Do we
0102
1       need to look at the exhibit?
2         MS. NELSON:  You're terribly confusing the
3            facts of this case.
4         MR. JAFFREE:  I'm not confusing anything.

```
 5          I'm not confusing anything.
 6       MS. NELSON:  Well, you are confused.
 7       MR. JAFFREE:  I'm not.  Then you're
 8          confused.  Okay?
 9    Q.  I suspect if you look at your testimony,
10        you'll say that the subject of this
11        investigation that you're on now was who
12        leaked information to Rickey Stokes, not
13        whether or not somebody had talked to
14        Ms. Turner, but who leaked information to
15        Rickey Stokes.
16    A.  There are two things going on here.  The judge
17        direct -- the judge's directive to their
18        employees not to have contact with Ms. Turner,
19        that was violated by Ms. Brackin.  The web
20        site, your Exhibit 15, that has to do with
21        some of the contents of -- or with the
22        investigation itself.  So you have the judge
23        directing all the employees not to have any
0103
 1        contact with Ms. Brackin, not to go in her
 2        office.
 3          MS. NELSON:  Ms. Turner.
 4    A.  Excuse me.  With Ms. Turner.  Not to go in her
 5        office, not to have any contact -- verbal
 6        contact, any contact with her as a result of
 7        the ongoing investigation.  And then there's a
 8        release of information here that went to
 9        Rickey Stokes as far as the investigation was
10        concerned.
11    Q.  Did the judge --
12          MS. NELSON:  The investigation of what?
13            Let's get that straight because we --
14    A.  The investigation of the release of
15        information is one thing, and then the
16        directive that the judge gave for no one to
17        talk, have contact with Mary Beth Turner is --
18    Q.  Did she --
19          MS. NELSON:  Mary Turner.  I know there's
20            a lot of Marys.
21          MR. JAFFREE:  Well, if I was somebody, I
22            would say, leave the record the way it
23            is, but you can correct the Record.
0104
 1    A.  Yes.  Of the investigation of Mary Turner.
 2        But I'm confused now.  For clarification --
```

3          MS. NELSON:  Well, it might help if he
4              would just ask you what occurred
5              instead of --
6          MR. JAFFREE:  I don't want to just --
7          MS. NELSON:  You don't want to get to the
8              truth.  You don't want to get to the
9              facts of the case.  You want to just
10             jump around and confuse and --
11         MR. JAFFREE:  I think I know the facts of
12             case as well as you do or maybe not.
13         MS. NELSON:  I don't think so.
14         MR. JAFFREE:  I mean, you may have some
15             documents that I don't have.
16   Q.  Just a few more questions.
17   A.  Okay.
18   Q.  Do you know if the judge made these two
19       demands at different times, don't discuss this
20       investigation and don't contact Mary Turner?
21       Do you know if they were made at two different
22       times?
23             (Brief pause)
0105
1          MS. NELSON:  If you know.
2    Q.  If you know.
3    A.  Okay.  It was on March 15th that the judge
4        advised -- excuse me -- March 10th, 2005, that
5        the judge advised the employees that
6        Ms. Turner was on administrative leave and
7        that there was an internal affairs
8        investigation being conducted.  This is where
9        she also directed employees to refrain from
10       any contact with Ms. Turner while the internal
11       affairs investigation was underway.
12   Q.  So are you saying these happened on different
13       days or the same day?
14   A.  This was on March the 10th that the judge gave
15       those directions.
16   Q.  Did she give both directions on the same day?
17   A.  What I just read was under the same day.
18   Q.  Do you know if she sort of gave those
19       directions at the same time?
20   A.  I'm not sure.
21   Q.  Did she indicate to you that she considered
22       one direction more important than the other,
23       if you recall?
0106

1  A.  No, she didn't.
2  Q.  Upon what authority, since you was just there
3      to gather facts, did you recommend a major
4      offense violation?
5  A.  That wasn't a recommendation.  That was stated
6      in the personnel rules for the City of
7      Dothan.  I didn't -- I didn't recommend that.
8      That's what it fall -- fell up under.  That
9      violation is what it fell up under.
10 Q.  Was it part of your charge to find out what
11     any violation you found fell under; is that
12     part of your charge?
13 A.  Yes.  Not only this investigation, but
14     others.  It's a -- if there's a violation of a
15     policy or whatever, you write what the
16     violation is after you find the -- after you
17     complete your investigation.
18 Q.  But you've only -- with the exception of the
19     one involving the fire department, you've
20     really only done these sort of administrative
21     things with respect to the judicial
22     department, right?
23         MS. NELSON:  Object to the form.
0107
1  A.  To my knowledge, the fire department and the
2      judicial department.
3  Q.  Well, with respect to your investigation in
4      2001, did you list major offenses that you
5      found?
6          (Brief pause)
7  A.  No, I didn't.
8  Q.  Did you not find any major offenses during
9      your 2001 investigation?
10 A.  With regards to this investigation, the judge,
11     basically, told me during the allegation what
12     the offense was and -- which I explained to
13     you earlier, which was Ms. Brackin giving what
14     she termed to be legal advice to Ms. Ralpeje.
15 Q.  Well, what major offense was that?
16 A.  And so that was -- that was just -- that was
17     the charge to -- to find out.  So there was
18     already -- I was told what the allegations
19     were.  So after I just found the facts, I
20     didn't have to rewrite what her --
21 Q.  Oh, she'd given you a personnel rule violation
22     in that case?  And we're talking about the

23     2001 case, right?  She had already given you a
0108
1     personnel violation?
2        MS. NELSON:  Object to form.  That's not
3           what he testified to.
4        MR. JAFFREE:  Well, I'm trying to find
5           out.
6   Q.   What are you testifying to?  What did she give
7     you?
8   A.   As I've just stated, she said that I needed to
9     look into allegations that Mary Beth Brackin
10    was giving legal advice to Ms. Ralpeje, a
11    defendant in a criminal case.  So I just
12    investigated the allegations and gave her the
13    facts of the allegations.
14  Q.   But, here, you felt you needed to do more?
15       MS. NELSON:  "Here," you're referring to
16          the --
17  A.   This is a release of --
18       MS. NELSON:  Insubordination by Mary Beth
19          Brackin.
20  Q.   I'm a little -- excuse me.  If you was
21    investigating the release of information, what
22    does Mary Beth talking to Mary Turner have to
23    do with the release of information?  Because
0109
1     that was your investigation.  What
2     does -- you're looking at the release of
3     information, and then you talk about some
4     contact.  What does that have to do with
5     release of information?
6        MS. NELSON:  Again, object to the form.
7           He stated that the release of
8           information started the investigation.
9        MR. JAFFREE:  Can I ask him?
10       MS. NELSON:  Yes, you can.
11       MR. JAFFREE:  Now, I know how bad you want
12          to infiltrate this Record with your
13          comments, but if I could just hear
14          from him.
15       MS. NELSON:  I'm just trying to keep a
16          clean record, and you're inferences
17          and testimony and confusion --
18       MR. JAFFREE:  Well, I'm asking him.
19       MS. NELSON:  -- have done nothing to allow
20          the Record to be clear.

21   Q.  If your charge was who leaked information,
22        does Mary Beth Brackin speaking to Mary Turner
23        have anything to do with who leaked
0110
1        information?
2   A.  I would consider that leaking information.
3   Q.  Oh, you would?
4   A.  Mary Beth Brackin was interviewed like
5        everybody else was.  She released information,
6        talking to Mary Turner about the investigation
7        when she was directed not to by the judge.
8   Q.  Well, what about all these other people who
9        released information?  Well let's not -- let's
10       not worry about them.
11            Have you -- and I guess you have answered
12       this, but since the departure of Mary Brackin,
13       have you been called upon to investigate any
14       other employee of the judicial department?
15   A.  Not to my knowledge.
16   Q.  Now, can you tell me pursuant to what
17       authority -- but, first, two questions then
18       I'm through.
19            Do you know who instructed the judge to
20       tell her employees to have no contact with
21       Mary Turner?
22   A.  I had a conversation with her about that.
23   Q.  Okay.  Can you tell me pursuant to what
0111
1        authority can the internal affairs department
2        instruct a citizen not to contact another
3        citizen?  What authority?
4            MS. NELSON:  Object to the form.  It
5                 was --
6   Q.  You said you did it, so I'm trying to find out
7        what authority.
8            MS. NELSON:  Object to form.  It was not
9                 citizen to citizen.
10           MR. JAFFREE:  Excuse me.
11   Q.  Is Mary Brackin a citizen?
12   A.  Yes.  And she's also employed by the City of
13       Dothan which would make her a governmental
14       employee up under the City of Dothan's
15       umbrella.  And under that is why they were
16       directed to not speak to one another during an
17       ongoing investigation.
18   Q.  Well, I'm trying to find out by what authority

19     do you have to tell one employee to make no
20     contact with another employee?
21  A.  And I don't quite understand your word or your
22     definition of what authority, but my police --
23     I was working under the authority of the
0112
1     police chief at the time.
2  Q.  So other than the police chief, can you point
3     to me anything that gives the police chief the
4     authority to tell somebody from another
5     department not to communicate or not to make
6     contact with a person in that department?
7  A.  The judge is actually who told them that.
8  Q.  The judge told them that.
9  A.  I talked to the judge about having the
10     employees not make contact with Ms. Turner in
11     reference to this ongoing investigation that
12     we had.  The judge directed her people in her
13     department --
14  Q.  I see.
15  A.  -- to do that.
16  Q.  Well, the judge tries to put it on you, but
17     that's fine.  All right.
18     MS. NELSON:  Well, I'm --
19  Q.  Did the chief instruct you to tell the judge
20     to have her people make no contact with
21     Ms. Turner?
22  A.  No.
23  Q.  You did this on your own initiative?
0113
1  A.  Yes.
2  Q.  Well, since this on your own initiative,
3     pursuant to what authority did you do this?
4  A.  It's an investigative practice.  Kind of like
5     invoking the rule in court, which you'd be
6     familiar with, you do not want subjects of the
7     investigation talking with witnesses as you're
8     trying to conduct an investigation.
9  Q.  So is this discretionary just something that
10     you prefer, or was this under the penalty of
11     job loss?
12     MS. NELSON:  Object to the form.  He's
13      trying to explain.
14     MR. JAFFREE:  Well, I'm asking him.
15     MS. NELSON:  He didn't say anything about
16      job loss.  He's talking about

17      investigative practices.
18  Q.  Well, I mean -- but the result is a job was
19    lost because your directive was violated.  I'm
20    trying to get some idea, where do you get the
21    power to do that?
22      MS. NELSON:  He said he didn't understand
23      your question.  He didn't know.  He's
0114
1      trying to explain to you why --
2      MR. JAFFREE:  Can I get an answer from
3      him?
4      MS. NELSON:  Asked and answered.
5  A.  What's your question?
6  Q.  Where do you get the power to do that?  You
7    said, chief didn't tell you to do it.
8  A.  That's correct.
9  Q.  So we can't go back to the chief.
10  A.  That's correct.
11  Q.  And that's what your answer was first.  So if
12    the chief didn't tell you to do it, where did
13    you get the power to suggest or to instruct
14    the judge to have her people not contact Mary
15    Turner?
16      MS. NELSON:  Object to the form.  You can
17      answer.
18      THE WITNESS:  Okay.
19      (Brief pause)
20      MS. NELSON:  You can you answer if you
21      know.  But --
22      THE WITNESS:  I'm just thinking about
23      something.
0115
1      MS. NELSON:  Gotcha.  Okay.
2      (Brief pause)
3      MR. JAFFREE:  Let the Record reflect that
4      the witness is in thoughtful
5      deliberation.
6  A.  I guess at the present time, the correct
7    response would -- would be, I'm uncertain
8    pending going back and reviewing some -- some
9    other information.
10  Q.  All right.  I accept that.
11    Did you indicate to the judge how long
12    this no-contact directive should stay in
13    place?
14  A.  I just said during the investigation, while it

15     was ongoing.
16  Q.  Did you advise the judge when the
17      investigation had been completed?
18  A.  She did receive a report.
19  Q.  From whom?
20  A.  It would have come from the chief of police,
21      I'm assuming.
22          Which investigation are you referring to?
23  Q.  Well, we're talking about the investigation of

0116
1      the ticket, the investigation that the judge
2      had told them to make no contact, during that
3      investigation.
4   A.  Oh, the release of information?
5   Q.  No, not the release of information
6      investigation.  We're talking about the ticket
7      investigation.
8          MS. NELSON:  Let's make the Record clear.
9            The Mary Turner ticket-fixing
10           investigation.
11         MR. JAFFREE:  Well, yeah, but --
12         MS. NELSON:  After which Mary Turner was
13           suspended.
14         MR. JAFFREE:  And after which it turned
15           out there was no ticket fixing.
16         MS. NELSON:  And she was indicted.
17         MR. JAFFREE:  And she was not indicted for
18           any ticket fixing.  It was a
19           misdemeanor.
20         MS. NELSON:  Well, she was charged with
21           extortion.
22         MR. JAFFREE:  She was not charged with
23           extortion.  She was charged with

0117
1           something dealing with misapplying
2           records.  She was not charged with
3           extortion.
4         MS. NELSON:  She was charged with a
5           criminal offense.
6         MR. JAFFREE:  She was charged with a
7           misdemeanor.
8         MS. NELSON:  Well, we could sit here and
9           banter back all day.
10        MR. JAFFREE:  I can prove my point.
11        MS. NELSON:  Let's make the Record clear,
12           that the question on the table was

13          what?
14          MR. JAFFREE:  The question on the table
15          was --
16          MS. NELSON:  How long --
17   Q.   Did you inform her that the investigation was
18        complete?
19          MS. NELSON:  The investigation into the
20              Mary Turner ticket fixing.
21   Q.   The investigation involving Mary Turner and
22        the ticket.  Did you inform the judge when
23        that investigation was complete?
0118
1    A.   I prepared the report, and I submitted it to
2         Chief John Powell.  And it was subsequently
3         given to the judge.
4    Q.   What was -- and this was involving the ticket?
5    A.   That's what you -- you asked me about.
6    Q.   Is that what you're talking about, is the one
7         involving?
8          MS. NELSON:  The Mary Turner ticket with
9              Bradley Phelps?
10   Q.   You prepared that report?
11   A.   Yes.
12   Q.   And did you tell her then that the
13        investigation was complete?
14   A.   I don't know if I told her it was complete.  I
15        submitted a report upon the completion of the
16        investigation.
17   Q.   Well, what date did you submit that report?
18   A.   On or about May the 2nd of 2005.
19   Q.   So there should have been no contact with
20        Ms. Turner from March the 10th until May the
21        2nd; is that correct?
22          MS. NELSON:  Object to the form.  He just
23              said that's when he turned in the
0119
1              report.
2    A.   I don't think that's correct.
3    Q.   Well, that's what you implied, that she was
4         notified that the investigation was complete
5         when you turned in the report.  You turned in
6         the report in May.  So it was your
7         understanding, there should be no contact with
8         Mary Turner until May?
9    A.   The directive not to talk to Ms. Turner I
10        don't -- I'm not certain, but I don't believe

11     it came at the same time that this report
12     was --
13      MS. NELSON:  No.  We're confusing things.
14  Q.  Follow me carefully.  Do not talk to her
15     during investigation of the ticket.
16  A.  Pardon me?
17  Q.  The mandate was to not talk to Ms. Turner
18     during the investigation involving, as counsel
19     would say, ticket fixing?
20      MR. JAFFREE:  Did you like that?  I'll go
21      along with the ticket fixing.
22      MS. NELSON:  I'll say ticket.  I just want
23      to make sure what ticket and what

0120

1      investigation we're talking about.
2      And I think we've established that
3      took place on or about May the 10th.
4      THE WITNESS:  Yeah, that's correct.
5      MS. NELSON:  Of 2005.
6      THE WITNESS:  That's correct.
7      MS. NELSON:  Just trying to move things
8      along.
9  A.  That's correct.
10  Q.  So the first word that the judge would have
11     had that the investigation was complete would
12     have been in May of 2005?
13      MS. NELSON:  Object to the form.  The
14      internal affairs investigation?
15  Q.  Internal affairs investigation, May of 2005?
16  A.  That's correct, when my report was finished.
17  Q.  So your mandate would have been, nobody have
18     any contact with Mary Turner for two months?
19  A.  As it relates to the criminal -- excuse me,
20     not the criminal investigation, as it relates
21     to the investigation.
22  Q.  Well, do you know whether or not Mary Beth had
23     any contact with Mary Turner involving the

0121

1     criminal investigation?
2  A.  I don't know whether they had contact
3     involving a criminal investigation or not.
4  Q.  Well, there was --
5  A.  They had contact during the administrative
6     investigation.
7  Q.  All right.  During the administrative.  Do you
8     know if they -- do you know if Mary Beth

9       contacted Mary Turner about the ticket
10       investigation?
11   A.   I know that Mary -- could you rephrase -- say
12       that again?
13   Q.   Let me ask it a different way:  Based on
14       information that you got from Mary Brackin,
15       what was the nature of her contact with Mary
16       Turner?
17   A.   She stated that she needed to obtain a
18       show-cause letter and get the, quote, unquote,
19       setup on it -- I believe were her words she
20       used -- in reference to a show-cause letter.
21   Q.   If that statement is true, then did that have
22       anything to do with contacting Mary Turner
23       about the investigation?
0122
1         MS. NELSON:  Object to the form.
2   A.   It doesn't have anything to do with contacting
3       her about the investigation, but she wasn't
4       supposed to contact with her.
5   Q.   Well, did you expect your directive to be all
6       inclusive to no-contact at any time for any
7       reason?
8   A.   During the course of the ongoing
9       investigation -- let me refer back to the
10       directive that was given.
11         (Brief pause)
12   A.   Yes.  The directive was to strictly refrain
13       from any contact with Ms. Turner while the
14       internal affairs investigation was underway
15       and not to discuss with anyone the matter --
16       the matter of the investigation.
17   Q.   So that was all contact of any nature,
18       correct?
19   A.   It says, any contact.
20   Q.   Did you think through the consequences of your
21       suggestion when you made it to the judge?
22         MS. NELSON:  Object to the form.
23   A.   Was that a question?  I'm sorry.
0123
1   Q.   Yeah.  Did you think through the consequences?
2   A.   Through --
3         MS. NELSON:  Object to the form.
4   A.   What do you mean?
5   Q.   Well, that you was -- wait a minute.  Let
6       me -- since you haven't answered that yet, let

7    me --
8       MS. NELSON:  He doesn't understand you.
9        He says, what do you mean.  I've
10       objected.
11  Q.  I'm going to replace it with another question
12    that may make it easier for you to understand.
13      Were you aware that Mary Beth and Mary
14    Turner were close friends?
15  A.  Yes.
16  Q.  That they socialized with each other?
17  A.  That, I don't know.
18  Q.  Did you expect that for the period of time it
19    took for the investigation to be completed,
20    Mary Beth and Mary Turner should cease having
21    any kind of social relationship with each
22    other?
23  A.  Well, if I recall right, the judge told them
0124
1    that any contact with Mary Turner should go
2    through her -- should go through her and would
3    be approved by her.  So to me, with that
4    stipulation there, that doesn't mean 100
5    percent that it's no possibility whatsoever.
6    She just needed to approve it as the
7    investigation was ongoing.
8  Q.  So every contact had to be precleared through
9    the judge?
10  A.  Yes, if there was to be contact during this
11    investigation.
12  Q.  Even contact after hours?
13  A.  I'd have to make an assumption.  The directive
14    was for them not to have contact.  If they had
15    to do -- to have contact with her, contact the
16    judge pretty much for direction.
17  Q.  And if they were going to meet in church,
18    contact the judge?
19  A.  I'm not reading between any lines.  That was
20    just what was said.  And the interpretation of
21    that is, I guess, what you're asking for?
22  Q.  Uh-huh (positive response).
23      Now, have you ever given a non-police
0125
1    officer employee of the City of Dothan that
2    type of directive before?
3     MS. NELSON:  What -- not to --
4  Q.  To not contact their friends?

```
 5          MS. NELSON:  Object to the form.  Not to
 6             discuss an ongoing criminal
 7             investigation, not to contact somebody
 8             under suspicion?
 9          MR. JAFFREE:  Forget about the --
10          MS. NELSON:  No.  I think you need to ask
11             him --
12   Q.  Don't contact their friends?
13          MS. NELSON:  Object to the form.  That's
14             totally --
15   Q.  You bifurcated these statements that the judge
16        made.  You said, don't discuss the criminal
17        investigation.  No contact.  You made them two
18        separates things.
19          MS. NELSON:  The directive was not to have
20             contact with your friends; it was to
21             have contact with an employee who was
22             under investigation.
23   Q.  But if the employee was their friend, no
0126
 1        contact would mean don't contact your friend.
 2          MS. NELSON:  Object to the form, if that's
 3             a question.
 4   A.  As it relates to their friendship, I testified
 5        earlier that I don't have any knowledge
 6        whether they're close friends or just
 7        co-workers.
 8   Q.  Let me give you a hypothetical and see if you
 9        think the directive would apply to this.
10          MS. NELSON:  Object to any hypotheticals.
11             When I raise my hand, that will mean I
12             object to the form.
13   Q.  What if Mary Turner's name was Mr. Turner and
14        Mary Brackin's name was Mary Turner, and they
15        happened to live together.  They both worked
16        at the same place.  Mr. Turner was on
17        administrative leave, under investigation.
18        Mary Turner was among a group of people that
19        was told, make no contact with Mr. Turner.
20             Do you think that directive would still
21        apply?
22          MS. NELSON:  Object to form, to the
23             hypothetical.
0127
 1   A.  I would need for you to repeat that again.
 2        You've lost me.
```

3   Q.  Let's assume that it was Ms. Brackin's husband
4       that we're talking about, and her husband had
5       worked with her in the magistrates' office.
6       And her husband was on administrative leave
7       while they were doing an investigation.  Do
8       you think this no-contact directive could have
9       effectively kept them from associating with
10      each other?
11          MS. NELSON:  Object to the form.  Object
12            to the hypothetical situation.
13  A.  Hypothetically, that's up to both of them.
14  Q.  Up to them?
15  A.  Whether they --
16  Q.  They don't --
17  A.  -- have talked or not but directive was -- was
18      clear.
19  Q.  It would apply to them as well?
20  A.  The directive was clear.  Now, whether they
21      did it or not, I don't know whether they would
22      or wouldn't.
23  Q.  At first blush, that type of directive seems
0128
1       reasonable, doesn't it?
2           MS. NELSON:  Object to the form.
3   A.  What do you mean?
4           MS. NELSON:  To a hypothetical husband and
5             wife?
6           MR. JAFFREE:  Well, no.
7   Q.  The directive that you suggested that the
8       judge give and the judge gave seemed
9       reasonable at first blush, doesn't it?
10  A.  It's reasonable now.
11  Q.  Reasonable now.
12  A.  Just like invoking the rule, it's reasonable
13      then.
14  Q.  So would it be reasonable if these two were
15      married to each other to have no contact;
16      would it still be reasonable?
17          MS. NELSON:  Object to the form.
18  A.  Your hypothetical is if both of them worked
19      out of the same office --
20  Q.  That's right.
21  A.  -- so both of them would be aware of the
22      investigation going on, especially if they're
23      married.  So the directive was clear.  And
0129

1     whether they spoke about it or not, I don't
2     have --
3   Q.  You're not speaking about the investigation.
4     If they made contact with each other.  You did
5     not say that Mary Beth talked to Mary Turner
6     about the investigation.  You said she talked
7     to her about trying to get some information
8     that she needed, not about the investigation.
9     So forget about the investigation part.
10        Would it be reasonable to tell a wife not
11    to contact her husband because her husband was
12    under investigation?
13        MS. NELSON:  Object to the form.  Object
14        to the hypothetical question.
15  Q.  Do you think that's reasonable?
16        MS. NELSON:  Not the facts in this case.
17  Q.  Do you think that's reasonable, those facts?
18  A.  I don't know.
19  Q.  So if you change the status of the people,
20    then the directive is no longer reasonable?
21        MS. NELSON:  Object to the form.
22  Q.  Yes or no?
23  A.  If I change the status of the people, the
0130
1     directive --
2   Q.  Directive is no longer reasonable?
3        MS. NELSON:  Object to the form.
4   Q.  Well, are you saying it is reasonable to apply
5     to a husband and wife, no contact with each
6     other?
7   A.  I'm --
8        MS. NELSON:  Object to the form.  It's
9        hypothetical.
10  A.  I'm saying that your hypothetical question is
11    not what happened.
12  Q.  Well --
13  A.  And what happened was, Mary Beth Brackin was
14    given a directive not to talk, not to
15    associate, not to have anything to do -- and
16    I'm just paraphrase -- trying to paraphrase
17    what I read already -- with Ms. Turner during
18    the ongoing investigation.
19        The major offense of insubordination had
20    to do with Mary Brackin talking to Ms. Turner
21    after she was told not to.  It didn't have to
22    do with them coming together, meeting, not

23  meeting.  In this report, it had to do with
0131
1  them, Ms. Turner -- Ms. Brackin calling
2  Ms. Turner after being told not to by the
3  judge and making some type of inquiry that
4  Ms. Brackin claims that she made.
5   And for the Record, Ms. Turner didn't say
6  the same thing that Ms. Brackin said in her
7  statement.
8 Q. I've read Ms. Turner's statement.  Ms. Turner
9  didn't recall certain things.  You won't get a
10  specific from Ms. Turner as to what the nature
11  of the contact was.  I mean, you can look, but
12  you won't get it.
13   MS. NELSON:  Can we go off the Record for
14   a minute?
15    (Off-the-Record discussion.)
16 Q. I don't have any more questions of you.  If
17  counsel wants to ask you some questions, she
18  can.
19   MS. NELSON:  I'm just saying --
20  MR. JAFFREE:  I don't have any more
21   questions.
22  MS. NELSON:  I don't either.  I don't have
23   any questions.
0132
1 Q. I appreciate your being here.  And we shall
2  remains friends.  Okay?
3 A. Oh, yeah.
4   (Deposition concluded at 4:40 p.m.)
5   * * * * * * * * * *
6   FURTHER DEPONENT SAITH NOT
7   * * * * * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20

21
22
23