

CITY OF DOTHAN PERSONNEL BOARD

APPEAL HEARING

Of MARY BETH BRACKIN

WEDNESDAY,

JUNE 1, 2005

1:30 p.m.

Sakado Room
Second Floor
Dothan Civic Center

Tammy Clark
Barbara Spann

PERSONNEL BOARD:

Gary Griffin, Chairman    Kai Davis

Mary Davis

Gordon Michelle Sellers

FOR THR APPF.T.IiANT:

Mr. Ishmael Jaffree, Attorney at Law Mary Beth Brackin
John Brackin

**HTTY**

```
 1    procedure of doing it.
 2        Q    Were you aware when Ms. Martin got hired that
 3    you were targeted as a person that she needed to keep an
 4    eye on?
 5        A    I found out later, but not at the time she was
 6    hired.
 7        Q    Were you aware that Ms. Tuasaer was targeted as
 8    a person she needed to keep an eye on?
 9        A    Yes, later.
10'       Q.   .Do you know there was another white employee
11    that was targeted as a person she needed to keep an eye
12    on?
13        A    Later, yes.
14             Do you know Kevin Sorrels?
15             Yes, I do.
16             What color is he?
17             White.
18             Did he get
```

```
        terminated?
19         A    Yes, he did.
20         Q    Who was responsible for that?
21         A    I don't know.  I assume Judge Gordon.
She was
22    the department head at the?
23         Q    Donna Nicholson, did you know her?
24         A    She was white.
25         Q    What happened to her?
```

                                                            153

```
      A    She got terminated.
      Q    Do you know who was responsible for that?
      A    Judge Gordon.
      Q    Nancy Martin, what color was she?
      A    White.
      Q    What happened to her?
      A    She got terminated.
      Q    Who was responsible for that?
      A    Judge Gordon.
      Q    Patty Kindberg, what color?
      A    White.
      Q    What happened to her?
      A    I don't know.  I was not an employee at the
time.
```

Q What about a list on Davis? A

    She was fired?

  Q   Do you know who was responsible for that?

  A   Judge Gordon. She was the department head. I just assumed she was responsible.

  Q   Okay.- And you have been terminated by Judge Gordon?

  A   Yes.

  Q   And Ms. Turner has been terminated by Judge Gordon?

  A   Yes.

154

  Q   Are you aware of any disciplinary action that has ever been taken against any black employee there?

  A   No, not to my knowledge.

  Q So if I tell you that seven white employees were terminated by Judge Gordon, you wouldn't be in a position to dispute that?

  A   No. '        ,W- '

  Q   Do you know anybody who has resigned as a result of Judge Gordon?

  A . Yes.

  Q   Who has resigned?

  A   Kim Phillips and Cheryl Moray.

[Right margin vertical text:] Q Any one else? A I am trying t

o think.

Q   Any idea about Debbie Irby?

A   Debbie resigned about the same time that Donna got terminated.

Q .  So, so far, that is ten people that under Judge Gordon's tenure were either fired or resigned?

A   Right.

Q   And all of them are white?

A   Yes.

Q   Do those numbers trouble you?

A   Yes, they do..

Q   Did something happen to cause you to get

A   No, I was not.

Q   But you have never imposed any discipline on . either one of those two?

A   I had no grounds given --if there was a court administrator at the time, it would have been deferred to her for disciplinary action.  If there were allegations -- what Ms. Brackin has glossed over, in every investigation of her, ah individual citizen walked into court or into an office and made a complaint, and that initiated each of the investigations against her. Not one of them was initiated in-house.

Charged 215

Every one of them, somebody walked in and made a complaint.

    Q   The most recent incident was not a complaint made by a citizen against Ms. Brackin?

    A   Well, but that is when she became implicated when they were investigating the citizen complaint regarding the first ticket, and then somebody said, well, wait, there is another ticket. Then we went looking for the ticket, and there was no ticket entered in the system. Yet, Ms. Brackin had signed a UTTC transmittal saying she had the ticket. The police brought that to me. And based on the facts given to me -- well, I didn't even have any determination in that investigation. That was all the police investigation.

    Q   Let me back up. If the record shows that not to discipline her. So she suffered no repercussions other than, the investigation.

    Q   Wasn't it shortly after that that you took her off courtroom duty?

    A   Not that I recall that there was any connection to her being -- I can say, no, because I have not assigned any magistrate a work assignment.

I have not done that. I have let the court administrator do that. And when we have not had court administrators,

22
2

A   I have not changed their job assignments just to avoid these allegations of bias.

Q   Now, you have heard the testimony about the incident that took place at the end of 2003, or the beginning of 2004, involving Ms. Brackin?

A   Which was that?

Q   Involving Fondren and that he was wrongfully arrested?

A   Yes.

Q   Are you familiar with the details of that?

A   Yes, sir, I am.

Q   That was another internal police investigation; correct?

A   It was. At the request of Larry Muench -- I have no idea why the letter went to Mr. Muench's office. Mr. Fondren wrote a letter requesting payment and put in

223

his letter that Mary Beth Brackin told him -- the letter said, Mary Beth Brackin told me I was wrongly arrested and that I should get my money back.

Q   Was he wrongly arrested?

A   I don't think he was. I don't remember.

Q   Did he get his money back?

A   I don't remember.

Q   So you don't know whether he

was wrongfully arrested or not?

A    I don't remember the outcome.

Q    If he was wrongfully arrested and she told him he was wrongfully arrested, she merely told him the truth; correct?

A    It was the implication of liability, if he was wrongfully arrested and she told him that.

Q    If he was wrongfully arrested and put up a cash bond, then he was entitled to get his money back; correct?

A    Yes.

Q    So if he was wrongfully arrested, she told him the truth; if he was entitled to get his money back, she told him the truth, and she was suspended for telling him the truth, she was suspended for telling him the truth; is that your testimony?

A    No.

Q    She was suspended for telling him a lie?

A    She was suspended for -- I don't remember. I don't remember the statute. It was conduct unbecoming --it implicated liability to the City. We were asked to investigate it. I don't remember because she didn't appeal it. So I guess I assumed she agreed with the decision, because there- was never any

224

appeal of the decision.  If she thought she was wrongfully suspended and she disagreed with my decision, she had a mechanism to address that.  And since she chose not to utilize the mechanism available to her, it just didn't seem important to me to remember.

    Q   How long have you been the judge?

    A   Six years -- five and a half years.

    Q   In your six years, have you ever known the Board to reverse a suspension?

    A   I don't follow you.  I don't keep up with that.

    Q   Would you be surprised if the answer is no?

    A   I haven't kept up with it.

    Q   Are you familiar that there is nothing in the rules where they even allow you to appeal before the Board?

    A   No.. I have not kept up with it.

    Q   So that means there is no mechanism for

226

    A   There had to be more to it.

    Q   What's the more?

>            the investigation --
>
>                MR. WHITE: I object now. She has answered
>            that she doesn't remember. MR.
>        JAFFREE: She has also said there must
>            have been more. I am trying to find
>            out what was the more.
>    Q    Are you just assuming there was more?
>    A    I know there was more than just Mary Beth
> telling somebody their rights and then I suspended her
> for ten days.
>    Q    Since you know there is more, can you please
> tell us the more?
>    A    Theron Fondren wrote a letter to the City,
> saying, Mary Beth Brackin told me that I had been
> arrested wrongly and I want to be reimbursed for that.
>        Larry Muench's office sent it to us to
> investigate. They said, investigate this claim, as
> they do. We called in the investigators and said,
> look, can you investigate this claim for us. The
> investigator/ who we put on-call, went out, he talked
> with Mr. Fondren; he talked with Ms. Brackin. He did
> an investigation, which is what they do. They
> presented the results of the investigation to me. Based on the results of that investigation, I agreed and made the determination that it was more

227

likely than not that Ms. Brackin had, in fact, done what she was accused of.  And then she had a disciplinary action.  Unfortunately for Ms. Brackin, this was her second one in two years.

   Q   This is not the second one we are talking about here.

   Ms. Brackin testified when she came back, if I am not mistaken, you called her in the office and asked her if she wanted to continue working there.  Do you recall that conversation?

   • A   I recall the conversation.  I don't recall the specific words that she used, that I was trying to make her quit.  I did not.

   Q   You told her that; right?

   A   But --

   Q   You may have told her those words, that is, do you want to continue working here?

   A   *I might have.*

   Q   That is something you would have probably said?

   A   Depending on the circumstances.

   Q   Now, that was near the time y'all were looking for a new administrator; correct?

A Lord, I guess that would have been 2002 or 2003. I can't specifically say.

240

When did Michelle Grimes' dad die? If we can find that out, it was all around that same time.

Q   Do you remember when Nancy came to you and told you she was having problems with Lavera and Eunice?

A-   Not specifically when she told me that, no.>

Q   And you told her that everybody makes mistakes and you didn't want to hear it?

A   I do not remember saying that to Nancy.

Q   Do you remember Nancy complaining to you about Lavera and Eunice did not seem to be doing their fair share of the work?

A   If she did, I don't assign work. It was work that was assigned by her. She made the work assignments.

Q   Was Nancy given authority in her position to make the work assignments?

A   Yes. I never made a work assignment.

Q   Do you remember Nancy making a work assignment and giving Lavera and Eunice some additional assignments?

A   Yes, I do.

Q   And do you remember both of them coming up complaining to you?

ain.  They wrote Nancy a memo and brought it over there.

 Q They didn't send you a copy of that memo?

 A They might have.  I think it went to Michelle.

 Q Do you remember, without consulting with Nancy, that you sent her a memo telling her not to make any assignments without consulting you?

 A No.  I said, Nancy, we said that we would change job assignments every ninety days.  One of the biggest goals was to cross-train, because what we had prior to this, Mr. Jaffree, whoever did prisoners, if they weren't there that day, we couldn't do prisoners.  Everybody knew how to do one thing.  So Nancy and I agreed that every ninety days all magistrates would change jobs.  On the eighty-ninth or ninetieth day, I calculated it yesterday, she only assigned more work to the thee black new magistrates, nobody else.  By that point, the black magistrates had been to Kai complaining that they thought Nancy was discriminating against them. They didn't come to me -- they came to me and asked me could they go to human resources, because they thought Nancy -- so in order to -- I was trying to protect Nancy, by saying, let's change them all at one time, like we said; why wait until the ninetieth day and only change three people.

 Q Do you know the circumstances surrounding how "void" got written on that transmittal?

    A   Only as a result of the investigation, what the police investigator had to say.

    Q   Did the investigation reveal pursuant to whose request or authority *Ms.* Brackin put "void" on there?

    A   I didn't know it had been established that she had put "void" on there.

    Q   So you didn't know that she had put "void" there?

    A   *I* knew she did, but I didn't know you-all had admitted it.  I can look.

    Q   My question is:  Do you know pursuant to whose or what authority she put "void" on there, based upon the police investigation?

    A   Once it is sworn to, it can only be done under my authority.  Once it is in, nobody else could have given her that authority to void that ticket, once it was sworn.

    Q   Now, we are not talking about a ticket.  That is a transmittal.  That is not the ticket.  The transmittal had "void" written on it.  That is not a ticket being voided, that is the transmittal.

    A   But for Ms. Brackin's action, that ticket would have been entered into the system.  It would have become a ticket.  By writing "void" on it, it was never entered into the system.  It ceased to

exist.

Q   It wouldn't have been entered into the system if the police officer said, return that ticket?

A   Not once it had been sworn to, if it had been handled properly.

Q   You are positive?

A   That is what the magistrates have testified or said: Once it is sworn, it becomes a complaint and it has to go through the process.

Q   So you rely on just the testimony of one magistrate?

A   No, that has just been the practice for the last five and a half years. I have not seen any magistrate, once it was sworn, unilaterally, on their own authority or anybody else's, just void it; just take it out of the system and get rid of it. I haven't seen it. ,

Q   My question is: You do not know why she put "void" on it? -

A   No, I don't.

Q   You do know the ticket was never processed?

A   Right.

Q   And you do know the police officer said, it is okay, send them back to me?

EXAMINATION BY MR. TAPFERT

CF.i

Q   Can you state your name for the record?

A   Sarah Fowler.

Q   Were you present when Shaun McGhee came into the courtroom and made a statement in circuit court that I was in Judge Anderson *'s office?

A   I was present when Shaun McGhee mentioned you one time. *I* don't remember the date.

Q   It could have been a Tuesday?

A   Or a Monday.

Q   Or Monday?

A   If I was in court, it may have been a Monday.

Q   When he indicated that I was in Judge Anderson's chambers, do you recall him mentioning that?

A   I recall him mentioning having seen you, yes.

Q   And do you recall the judge making comment with respect to that?

A   They talked about it.

Q   What do you recall being said?

A   Well, he just said something about having seen someone, and she said, who, and he said who it was.

Q   And do you recall anything else?

A   She said something like, That traitor, or something like that. I don't remember the exact words.

Q 'V That I was a traitor, it was something along those e

lines?
.A     Yes.

MR. CHAIRMAN: Let me get this straight. Who was this you heard say this? THE WITNESS: Shaun McGhee was speaking with the

MR. JAFFREE: I~ have no further questions.

MR. CHAIRMAN: Do you have any questions?

MR. WHITE: No. sir

MR. CHAIRMAN: Okay.' Thank you very much. Both sides will have an opportunity to make a brief statement. Do you want to go first?

MR. JAFFREE: I could' appreciate the Board not wanting to review a'race case. I am sorry the Board takes that position. As an attorney, anytime we can -- it seems, to me there is sufficient evidence there, by the judge/'perhaps "well-meaning, to make decisions on "a 'racial basis, and these decisions influenced her judgment. I think she ha's been "loyal to the black employees\ supportive of the black employees, hired the black employees, and