IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MARTIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CASE NO. 1:05-cv-1172-MEF |
| | ) | |
| CITY OF DOTHAN, *et al.*, | ) | (WO) |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Nancy Martin and Mary Beth Brackin (collectively "Plaintiffs") bring this action against the City of Dothan and Judge Rose Evans-Gordon (collectively "Defendants"). Plaintiffs assert claims under 42 U.S.C. § 1983 alleging violations of their constitutional rights to freedom of speech, freedom of association, and due process. Plaintiffs also bring claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for unlawful termination based on Plaintiffs' race and for retaliation. This cause is before the Court on Defendants' Motion for Summary Judgment and Motion for Attorneys' Fees (Doc. # 70), Plaintiff Brackin's Motion for Partial Summary Judgment (Doc. # 69), Defendants' Motion to Seal Evidentiary Submissions in Support of Summary Judgment (Doc. # 76), Defendants' Motion to Strike Portions of Plaintiff Mary Beth Brackin's Affidavit (Doc. # 81), Defendants' Motion to Strike Portions of Plaintiff Nancy Martin's Affidavit (Doc. # 94), Defendants' Motion to Strike (Doc. # 95), Plaintiffs' First Motion to Strike (Doc. # 96), and Defendants' Motion to Sever (Doc. # 106).

## I. JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 (federal question), 1343(4) (civil rights), and 1367 (supplemental). The parties contest neither personal jurisdiction nor venue, and the Court finds an adequate factual basis for each.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.   An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks and citations omitted)).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

3

### III.  FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to the non-moving parties, establish the following relevant facts:

**A.    Background**

In December of 1999, Judge Rose Evans-Gordon ("Judge Gordon") was appointed Municipal Court Judge for the City of Dothan.  The Municipal Court has jurisdiction over offenses such as traffic violations, domestic violence, driving under the influence, driving without insurance, and certain drug offenses.  As the presiding Municipal Court Judge, Judge Gordon was the Department Head of the Judicial Department.  The Judicial Department consists of the Municipal Court and the Magistrate's Office.   The Municipal Court Administrator reports directly to the presiding Municipal Court Judge (Judge Gordon) and supervises the Magistrates.  Judge Gordon is African-American.

Judge Gordon hired Mary Beth Brackin ("Brackin") as a Magistrate in April 2001.  Judge Gordon hired Nancy Martin ("Martin") as the Municipal Court Administrator in January 2004.  Therefore, at the time that the events giving rise to this suit occurred, Brackin reported to Martin, who in turn reported to Judge Gordon.  Both Brackin and Martin are Caucasian.

Since her appointment to the Municipal Court, Judge Gordon has hired fourteen Magistrates. Ten have been Caucasian and four have been African-American. Judge Gordon has also hired or promoted three individuals to Municipal Court Administrator, all of which have been Caucasian.

4

The City of Dothan has promulgated Personnel Rules and Regulations that all Judicial Department employees are required to abide by.[1]  These Personnel Rules establish three different levels of offenses: minor, major, and intolerable.  If an employee commits a "major" offense, that employee receives a "final warning" and a suspension without pay for one to twenty days.  This "final warning" means that if the employee commits another major offense within two years, that "shall be grounds for discharge." (Personnel Rules, § 3-20(2)(a)).  The Personnel Rules identify various types of infractions that fall under the different classifications of offenses.  Examples of major offenses are infractions that "could endanger the life or health of self or others," "could cause undue financial loss to the City," "negligence in carrying out assigned tasks or duties or responsibilities of one's position," and insubordination.  The Personnel Rules also establish a grievance procedure for disciplined employees to challenge their punishment.

**B.    Mary Beth Brackin**

**1.    First Internal Affairs Investigation**

On January 8, 2003, Judge Gordon issued a memo to all Judicial Department Personnel, including Brackin, that stated:

> The City Manager has stressed the significance of <u>diplomatically</u> referring those citizens making allegations of liability on the part of the City to the City Clerk's Office <u>without commenting on the possibility of liability</u>.

(Brackin Dep., Def. Ex. 21) (emphasis in original).  On January 7, 2004, a municipal court defendant named Theron Fondren filed a claim with the City Clerk alleging a false arrest.

---

[1]    The Personnel Rules can be found in the record as Plaintiff's Exhibit 4 to Judge Gordon's Deposition.

The claim stated that "Mary Beth [Brackin] at the magistrates office can confirm this, she also said I should see you about getting my towing fee reimbursed $158.90." (Gordon Aff. Ex. A, at 1300).  After receiving Fondren's letter from the City Clerk, the City Attorney asked the Police Chief to investigate Fondren's claims.  (*Id.* at 1298).  Internal Affairs conducted the investigation and issued a memorandum concluding that Brackin had "possibly violated a Major Offense" pursuant to the prohibitions against actions that could cause undue financial loss to the City and negligence in carrying out assigned tasks or duties or responsibilities of one's position.  (*Id.* at 1294).

In response to the results of the Internal Affairs investigation, Judge Gordon initiated a Determination Hearing to determine whether disciplinary action against Brackin was warranted.  Brackin received written notice of this hearing on April 21, 2004.  The notice stated that she faced a charge of having committed a Major Offense, which could result in a final warning and one to twenty day suspension.  The notice stated that the basis for the charge was that Brackin had told Fondren "that he was wrongly arrested and that another employee was negligent regarding his case."  The notice informed Brackin of the date and time of the hearing and further stated, "At the time of the Determination Hearing you will have the opportunity to respond to the above charge(s) orally and/or in writing if you so desire." (Brackin Dep., Def. Ex. 23).  The notice also stated that in the event of an adverse decision, the Personnel Rules and/or Civil Service Act provide procedures for review and appeal.  Brackin elected not to respond to the charges against her and on April 22, 2004, she was found to have committed a Major Offense.  For this violation, Brackin received a final warning and a ten day suspension.  On the written notice of the Decision of Determination

Hearing, Brackin certified with her signature that

> I understand that should I wish to appeal my department head's disciplinary decision I must file a written notice with my department head and the Personnel Board within the time period specified in the Personnel Rules and Regulations, Section 3-50, Appeal of Disciplinary Action.  Personnel Form #152 - City of Dothan Appeal Form may be used to initiate an appeal of disciplinary action.

(Brackin Dep. Def. Ex. 25).  Brackin did not appeal this determination.

### 2.      Second Internal Affairs Investigation

In March 2005, a defendant named Bradley Phelps appeared in court before Judge Gordon on an arrest warrant.  Bradley Phelps alleged that Mary Turner ("Turner"), another Magistrate in the Judicial Department, had "fixed" a ticket for him and in return expected Bradley Phelps to do repair work for Turner.  When Bradley Phelps failed to complete the repairs, Turner reinstated the ticket and issued an arrest warrant for Bradley Phelps.  Internal Affairs conducted an investigation into these allegations.

During this investigation, Turner was placed on administrative leave, and investigators recommended to Judge Gordon that no one in the office contact Turner while the investigation was pending.  On March 10, 2005, Judge Gordan told the Judicial Department staff not to contact Turner while the investigation was being conducted.  She also said that if anyone wanted to contact Turner after hours, they could make a request.  Furthermore, Judge Gordon said that no discussion with anyone regarding the investigation was to take place.  This investigation of Turner was not completed until May 2004.  Judge Gordon does not recall whether she ever notified the staff that the no contact directive had been lifted.

During the investigation into Bradley Phelps' allegations against Turner, investigators

learned that his brother, Stephen Phelps also had a ticket "fixed" by Turner. Consequently, Internal Affairs expanded the investigation to include any impropriety involving Stephen Phelps' ticket as well. Investigators discovered that the Uniform Traffic Citation ("UTC") listing Stephen Phelps' ticket had been received and certified by Brackin that she had received all of the tickets identified on the form from the police officer.[2] Sometime after receiving the tickets and certifying the UTC form, Brackin drew a line through Stephen Phelps' ticket and wrote "VOID" over it. This was a violation of state law, which requires that a ticket be *nolle prossed* by the judge once it has been sworn to. Based on this information, Internal Affairs produced a memorandum dated May 2, 2005 concluding that Brackin had committed a Major Offense: "Negligence in carrying out assigned tasks or duties or responsibilities of one's position." (Gordon Aff. Ex. C, at 1379).

### 3.   Third Internal Affairs Investigation

On March 16, 2005, officials became aware that information regarding the Internal Affairs investigation of Mary Turner's involvement with the Bradley Phelps ticket had been released to the public, despite Judge Gordon's order not to discuss the investigation with the public. Internal Affairs launched an investigation into how this information was released.

When investigators interviewed Brackin, she admitted to having contacted Turner after Judge Gordon had issued her March 10, 2005 no-contact order. Brackin explained that

---

[2]     A UTC transmittal form is a form that the police officer fills out and gives to a Magistrate when he swears to the tickets he has issued. The UTC lists all of the tickets the officer is presenting to the Magistrate and includes each ticket's UTC number and the name of the person the ticket was issued to. The Magistrate receiving the tickets signs the bottom of the form certifying that they have received all of the tickets identified on the form.

she had been given an assignment that Turner usually handled regarding a "Show Cause" letter. Brackin said that she contacted Turner to ask her about the procedure for handling the Show Cause letter. When investigators interviewed Turner, she said that she had "a couple" of conversations with Brackin since being placed on administrative leave, and that the conversations were not work-related.

Based on its investigation, Internal Affairs issued a memorandum dated April 27, 2005 that concluded Brackin had committed the Major Offense of Insubordination for violating Judge Gordon's March 10, 2005 order not to contact Turner.

### 4.    Brackin's Termination and Appeal

Based on the results of the second two Internal Affairs Investigations, Judge Gordan scheduled a second Determination Hearing for Brackin to determine whether Disciplinary Action was warranted. A Notice of Determination Hearing was issued to Brackin on April 29, 2005, which indicated that she was charged with two offenses: (1) insubordination for contacting Turner in contradiction of Judge Gordon's order, and (2) negligence in carrying out assigned tasks or duties or responsibilities of one's position for her handling of Stephen Phelps' traffic ticket. (Brackin Dep., Def. Ex. 32). The Determination Hearing was conducted on May 2, 2005. On May 3, 2005, Brackin was issued a Decision of Determination Hearing that notified her "Effective at the close of business May 3, 2005, your employment with the City of Dothan is terminated." (Brackin Dep., Def. Ex. 37).

Brackin appealed her termination to the City's Personnel Board, which upheld her termination. Brackin then appealed to the Circuit Court of Houston County. The Circuit Court reversed the Personnel Board's ruling. With respect to the charge of negligence in

handling the Stephen Phelps ticket, the Circuit Court held that there was insufficient evidence of negligence to support the Personnel Board's ruling.  With respect to the charge of insubordination, the Circuit Court reversed due to the fact that Brackin had not violated the spirit of Judge Gordon's no-contact order, because there was no evidence she had contacted Turner in an effort to undermine the Internal Affairs investigation.

The City of Dothan appealed this ruling to the Alabama Court of Civil Appeals.  *See City of Dothan v. Brackin*, 959 So. 2d 678 (Ala. Civ. App. 2006).  The Court of Civil Appeals held that the charge of negligence in handling the Stephen Phelps ticket could not form the basis of a dismissal because the offense was not *committed* within 24 months of a prior major offense.  Brackin was disciplined for the Fondren incident on April 22, 2004. The court noted that, while Brackin was *disciplined* for her negligence on May 3, 2005, this offense was *committed* on December 4, 2002—the date she actually voided the ticket—which was not "within 24 months after having been disciplined for a previous major offense," as required by the Personnel Regulations for termination.  *City of Dothan*, 959 So. 2d at 691.

The court also stated that the Personnel Board's ruling was not clear as to whether it would have upheld Brackin's termination on the basis of the insubordination charge alone. Therefore, it remanded the case back to the Personnel Board to determine whether (1) the insubordination was committed within 24 months of being disciplined for a prior major offense, and (2) whether that offense was sufficient to warrant dismissal.  *Id.*  On remand, the Personnel Board found sufficient evidence to support the charge of insubordination, that the offense was committed within 24 months of being disciplined for a prior major offense (the April 22, 2004 discipline for the Fondren incident, which was the result of the first

Internal Affairs investigation), and that this offense was sufficient grounds to warrant termination.  (Brackin Dep., Def. Ex. 39).

## C.   Nancy Martin

Martin applied for the position of Municipal Court Administrator in the fall of 2003. The Administrator is responsible for supervising the preparation and scheduling of cases to be tried in the Municipal Court.  She is also responsible for the issuance of warrants and collection of revenues from fines and court costs.  The Administrator supervises the Magistrates.  Martin participated in two interviews with Judge Gordon for the Administrator position.  Martin has testified that, during the initial interview, Judge Gordon warned Martin—with Kai Davis ("Davis"), the Personnel Director present—that there were three magistrates then employed in the Magistrates' Office whom Martin would have to watch out for.  Judge Gordon said that these magistrates would attempt to sabotage Martin as they had attempted to sabotage Judge Gordon.  These magistrates were not identified by name at the time.  According to Martin, Davis agreed with Judge Gordon that these magistrates were a problem, and that they hoped Martin could take control and supervise everyone.  Because of these warnings, Martin initially refused to accept the position when it was offered to her. However, when the City agreed to increase the salary Martin would receive, she accepted the position.

Martin was hired by Judge Gordon to be the Municipal Court Administrator on January 16, 2004, but did not actually begin to work in the office until February 16, 2004. Just prior to her first day of work, Martin had a meeting with Judge Gordon where the judge gave Martin an overview of the office and the employees.  According to Martin, during this

meeting, Judge Gordon identified the three troublesome magistrates by name as Mary Turner,
Mary Beth Brackin, and Sarah Fowler, all of whom are Caucasian.[3]  Martin further alleges
that Judge Gordon described the African-American magistrates in a much different light.
Judge Gordon noted that Eunice Knight ("Knight") was quiet, did her work, and didn't cause
any problems, and stated that Lavera McClain ("McClain") would never sabotage Martin as
the others would.

On April 21, 2004, Martin received her first job evaluation.  Martin received a rating
of either "satisfactory" or "exceptional" in every job performance category on the evaluation.
However, according to Judge Gordan's deposition testimony, significant problems with
Martin's performance arose quickly.  In a memorandum dated June 8, 2004, four months
after Martin began her tenure as Administrator, Judge Gordon memorialized an "employee
counseling" meeting she had with Martin to discuss Martin's job performance.   (Gordon
Dep., Pl. Ex. 10).  The memo noted very serious areas of concern in how Martin was
performing as Administrator.  Specifically, the memo noted that Martin exhibited a "sad
inability" to interact with the City Attorney's Office and defense attorneys, and that this
attitude had carried over to the attitude of the personnel under Martin's supervision.  The
memo also noted several specific incidents of particular concern:

1. Personnel from the City Attorney's Office, public defenders, and contract
   personnel routinely called Judge Gordon's office to avoid having to call the

---

[3]    Judge Gordon has admitted that "[I]f I was trying to give her an overview of
the office, I might have said some of those things. . . . But Nancy has taken them and
distorted them for the purposes of this lawsuit."

Magistrates' Office with the reason given being that the Magistrates' Office was "incredibly nasty to deal with."

2.  Ms. Martin refused to allow an attorney to file a motion with the Magistrates' Office that was untimely until the attorney threatened further action.

3.  Judge Gordon instructed Martin to ensure that a warrant would not be issued for a Michigan defendant's arrest pursuant to an agreement between the defendant and the City Prosecutor, but Martin directed the warrant be issued anyway.

4.  Martin failed to reassign the duties of Brackin when Brackin was on administrative leave, which caused the City Court to be unable to have trials for two weeks.

5.  Martin completed a performance evaluation for McClain that was so negative, it would have prevented her from receiving a pay increase.  According to Gordon, this evaluation raised flags for several reasons: (1) At the time of the evaluation, Martin had only been Administrator for a short period of time, and McClain was out for six weeks of that time for surgery; (2) There was a disparity between Martin's evaluation and prior evaluations of McClain; and (3) Martin based the evaluation on unsubstantiated and unsupported allegations of things that allegedly occurred before she became Administrator, which could not have been based on first hand knowledge.[4]  Judge Gordon

_____

[4]     Martin disputes this fact and claims that her evaluation was based upon events that occurred during her tenure.

asked Martin to redo the evaluation.  When Martin objected to redoing the evaluation, Judge Gordon informed her that she was still on probation and was subject to immediate dismissal.  Martin then agreed to redo the evaluation, but told McClain that she had been "forced" to redo the evaluation, did not appreciate having to redo it, and that it would not happen again.

(Gordon Dep., Pl. Ex. 10).

Judge Gordon prepared a second memo evaluating Martin's performance on July 8, 2004.  In the memo, Judge Gordon noted that despite the fact that she had made Martin aware of her concerns about her performance as Administrator, Martin's performance had not improved.  This memo recounted additional examples of Martin's "arbitrary and capricious" supervision of the Magistrate's Office.  The memo notes that one employee requested time off of work because her daughter had to undergo surgery to take a biopsy of a cancerous growth.  Martin advised the employee that she would have to return to work immediately upon her daughter leaving the surgical facility and would be required to bring a note from the surgeon advising the length of the procedure.  Martin further advised that if the employee did not return to work immediately after the surgery, she would be written up.  Martin's actions in this case violated Personnel Regulations.  In contrast, a second employee notified Martin that her husband's niece had been diagnosed with toxic shock syndrome and would need to seek treatment in Birmingham.  Martin allowed this employee four days of leave to care for the niece.[5]

---

[5]     While the memo does not address these facts, the evidence before the Court indicates that the employee denied leave by Martin was African-American, and the employee

Another incident involved a remark made by the City Prosecutor during a trial that offended one of the magistrates. That magistrate called Martin to complain about the remark. Without any further investigation, Martin called the City Prosecutor and rebuked him, and from that point on refused to speak to the City Prosecutor in the Courtroom or elsewhere.[6]

On September 23, 2004, Martin sent a memo to the staff notifying them of a change to the assigned duties. McClain and Knight each responded to these changes with written memos complaining about the additional duties that had been assigned to them. On September 27, 2004, Martin responded with a memo explaining that they had plenty of time to complete the additional duties because "I have observed many times, and the Magistrates I have left in charge on different occasions when I am out of the office have observed, that you seem to have a lot of free time to surf the internet, stay on the phone for long periods of time, run errands without prior approval from me, take long lunch 'hours', etc." Judge Gordon ordered Martin to refrain from making the changes because there was already a plan in place to reevaluate the courtroom duty assignments, which changes would affect all magistrates' duty assignments.

Martin's next performance evaluation, completed October 17, 2004, noted the above

that was granted leave was Caucasian.

[6]   Martin denies that these specific "employee counseling" sessions occurred, but did admit in her deposition that Judge Gordon discussed many of the instances contained in the memos with her. Specifically, Martin admitted that Judge Gordon had spoken with her about: (1) the fact that Police Chief John White had complained about her, (2) the incident between Martin and Ashton Ott, the City Prosecutor, and (3) her improper handling of medical leave. Furthermore, regarding a meeting between Davis, Judge Gordon, and Martin on July 19, 2004, Martin testified that Davis said that both Martin and Judge Gordon had complained of problems during Martin's tenure as Administrator, and that during this meeting, Judge Gordon told Martin "her side of things." (Martin Dep. at 239).

incidents and declined to recommend further employment.  Because Martin had only been

employed for a short amount of time, she was still in her probationary period and could be

terminated for unsatisfactory work performance during this probationary period.  Martin was

terminated as of October 18, 2004.  Martin's termination was approved by Kai Davis, the

Personnel Director for the City of Dothan.[7]

## D.    Procedural History

Plaintiffs filed a complaint with this Court on December 9, 2005 against the City of

Dothan and Judge Rose Evans-Gordon.  Plaintiffs have brought their claims under 42 U.S.C.

§ 1983 alleging violations of freedom of speech, freedom of association, and due process.

Plaintiffs have also brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.*, for unlawful termination based on Plaintiffs' race and for retaliation.

Plaintiffs have also brought state law tort claims against Defendants.

## IV.  DISCUSSION

Plaintiffs have claims pursuant to federal law as well as state law.  This Court will

address Plaintiffs' federal law claims first.

## A.    Qualified Immunity of Judge Gordon

Judge Gordon argues that she is entitled to summary judgment on the § 1983 claims

against her because of the affirmative defense of qualified immunity.  "Qualified immunity

offers complete protection for government officials sued in their individual capacities if their

conduct 'does not violate clearly established statutory or constitutional rights of which a

---

[7]        Davis is Caucasian.

reasonable person would have known.'"   *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.

2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The analysis for qualified

immunity follows a three-step process.  In the first step, the burden is on the defendant to

show that she was performing a "discretionary function" at the time the alleged violation of

federal law occurred.  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

Once the defendant has satisfied this test, the burden shifts to the plaintiff to demonstrate:

(1) that the defendant has committed a constitutional violation; and (2) that the constitutional

right at issue was "clearly established" at the time the violation occurred.  *Id.*

Plaintiffs argue that Judge Gordon was not engaged in a discretionary function

because her conduct violated the Plaintiffs' constitutional rights.  The Eleventh Circuit has

articulated a two-part test: (1) whether the employee was performing a legitimate job-related

function or pursuing a job-related goal, (2) through means that were within his power to

utilize.  *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004); *see

also Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 (11th Cir. 1994) ("A

government official acts within his or her discretionary authority if objective circumstances

compel the conclusion that challenged actions occurred in the performance of the official's

duties and within the scope of this authority.").  Moreover, the circuit has elaborated that:

> [T]he inquiry is not whether it was within the defendant's authority to commit the
> allegedly illegal act.  Framed that way, the inquiry is no more than an untenable
> tautology.  In applying each prong of this test, we look to the general nature of the
> defendant's action, temporarily putting aside the fact that it may have been committed
> for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional
> extent, or under constitutionally inappropriate circumstances.

*Holloman*, 370 F.3d at 1265 (internal quotation marks omitted).

Accordingly, the Eleventh Circuit has specifically rejected Plaintiffs' argument.  It is this Court's duty to examine the defendant's actions at the lowest possible level of generality necessary to remove the constitutional taint.  *Holloman*, 370 F.3d at 1266.  Therefore, the issue that must be decided is whether disciplining employees is a discretionary function.  This Court holds that Judge Gordon has met her burden to show that she was engaged in a discretionary function.  *See Cooper v. Smith*, 89 F.3d 761, 763-64 (11th Cir. 1996) (terminating employee is a discretionary function).

Once the defendant has established she was engaged in a discretionary function, the burden shifts to the plaintiff to demonstrate that the defendant's actions constitute a constitutional violation.  *Crosby*, 394 F.3d at 1332.  If the court concludes as a matter of law that the defendant's actions did not violate the Constitution, that ends the inquiry and the claim must be dismissed.  *See Powell v. Barrett*, 496 F.3d 1288, 1312 (11th Cir. 2007).  As discussed below, all of Plaintiffs' § 1983 claims fail to state actual constitutional violations.

**B.    Brackin's Claims**

**1.    Freedom of Speech Claims**

**a.    Fondren Incident**

Brackin alleges that Judge Gordon violated her First Amendment right to freedom of speech because she was disciplined and ultimately terminated based upon statements she made to Theron Fondren ("Fondren") regarding his wrongful arrest claim against the City of Dothan.  Judge Gordon's position is that punishing Brackin based upon statements she made to Fondren did not violate her freedom of speech because the speech she was engaged in was not constitutionally protected.

18

On January 8, 2003, Judge Gordon issued a memo to all Judicial Department Personnel, including Brackin, that notified them that when confronted with a citizen making allegations of liability on the part of the City, they should refer the citizen to the City Clerk's Office, without commenting on the merits of their claim.  On January 7, 2004, a municipal court defendant named Theron Fondren filed a claim with the City Clerk alleging a false arrest.  The claim stated that "Mary Beth [Brackin] at the magistrates office can confirm this, she also said I should see you about getting my towing fee reimbursed $158.90."  Internal Affairs investigated the matter and concluded that Brackin had "possibly violated a Major Offense" pursuant to the prohibitions against actions that could cause undue financial loss to the City and negligence in carrying out assigned tasks or duties or responsibilities of one's position.  Based upon the findings of the investigation, Brackin was found to have committed a major offense and received a ten day suspension.  This was also one of the two major offenses that formed the basis for her termination in May 2005.  While Brackin denies ever having told Fondren that he was falsely arrested, she asserts that if she had, her speech would have been protected because she would have been speaking on a matter of public concern.

"Public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1957 (2006).  In order to state a first amendment retaliation claim, a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on

19

speech.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).  The Supreme Court has articulated a two prong test to determine whether a public employee's speech is constitutionally protected.  *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

The first prong of the *Pickering* test is whether the employee spoke as a citizen on a matter of public concern.  *Garcetti*, 126 S. Ct. at 1958.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.  *Id.*  If the answer is yes, then the court must ask whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.  *Id.*  "This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."  *Id.*

With respect to the first prong of the analysis, the public employee's speech is only subject to constitutional protection if the speech is made "as a citizen," rather than pursuant to the employee's official duties.  *Id.* at 1960.  This inquiry "is a practical one," and courts should consider "the duties an employee actually is expected to perform."  *Id.* at 1961-62.

In *Garcetti*, the plaintiff, Richard Ceballos, was a deputy district attorney for the Los Angeles County District Attorney's Office.  Ceballos alleged that he had been the victim of retaliatory employment actions based upon a memo he had written.  The memo addressed an affidavit that was the basis for a search warrant in a criminal case.  Ceballos wrote in the memo that he had significant concerns about the veracity of the affidavit and recommended that the case be dismissed.  *Id.* at 1955-56.  The Supreme Court held that Ceballos' speech

was not protected because he was speaking pursuant to his official duties as a deputy. *Id.* at

1960. Specifically, the Court held:

> Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Id.*

In her brief, Brackin devotes precious little attention to this significant hurdle to her

claim. Brackin asserts that she was speaking as a private citizen, rather than pursuant to her

official duties as a magistrate, because informing a citizen that they could sue the city was

not part of her "job responsibility." The only evidence offered by Brackin that her speech

was outside of her job responsibilities is the fact that questions of potential municipal liability

were forbidden. However, the mere fact that the speech was contrary to the Magistrates'

Office policy does not transform Brackin's role as speaker from magistrate to private citizen.

*See Curran v. Cousins*, 509 F.3d 36, 45-46 (1st Cir. 2007) (holding that threats made by

public employee against others were made "in the course of his duties within the

Department" and therefore had no First Amendment protection). Indeed, the fact that

Brackin's statements violated the policy is the very reason she was disciplined in the first

place. Like the plaintiff in *Garcetti*, Brackin was speaking as a government employee. The

only reason Brackin answered Fondren's question was because she was employed by the City

of Dothan as a magistrate.

Accordingly, because Brackin was not speaking as a private citizen, her speech is not constitutionally protected.   Therefore, there is no genuine issue of material fact, and Defendants are entitled to summary judgment on this claim.

### b.   No-contact Order

Brackin also challenges Judge Gordon's March 10, 2004 order prohibiting any contact with Mary Turner without prior approval.   Brackin asserts that this order is unconstitutional on its face and constituted a prior restraint on speech.   As noted above, the Eleventh Circuit has announced the elements for a first amendment retaliation claim: the plaintiff has the burden of proving (1) that his speech or act was constitutionally protected; (2) that the defendant's retaliatory conduct adversely affected the protected speech; and (3) that there is a causal connection between the retaliatory actions and the adverse effect on speech.   *See Bennett*, 423 F.3d at 1250.

Applying  the *Pickering* analysis to Brackin's free speech retaliation claim, in order for Brackin to state a valid retaliation claim under the first amendment, the speech for which she suffered the adverse employment action must be constitutionally protected.   *See Bennett*, 423 F.3d at 1250.   Brackin admitted to violating the no contact order by communicating with Turner during a phone call made during work hours, which, according to Brackin, was a work-related call.   However, the prohibition against contact with Turner was not restricted to contact during work hours, and the Internal Affairs investigation uncovered evidence that Brackin had contacted Turner outside of work.   The Alabama Court of Civil Appeals held that the contact with Turner during work standing alone was a sufficient basis to sustain Brackin's termination. *City of Dothan*, 959 So. 2d at 688. However, this Court must view the

22

evidence in the light most favorable to Brackin.  Therefore, the fact that Judge Gordon was aware through the Internal Affairs report that Brackin had violated the No Contact order through contacts with Turner during her personal time outside of work hours, which could have been the cause in fact of Brackin's termination, creates a genuine issue of material fact on this claim.  Consequently, summary judgment on this issue must be denied.

### 2.      Freedom of Association Claim

Brackin also challenges her termination in on the grounds that the no contact order violated her freedom of association with Turner.  A public employee may assert a valid retaliation claim if they can prove that they suffered an adverse employment action because of the exercise of their constitutional right of freedom of association.  *See McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994).  The Supreme Court has recognized that the First Amendment protects certain intimate associations such as marriage and other familial relationships.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 619-20 (1984).  While the Supreme Court has not delineated the exact contours of the freedom of association, it has noted that relationships that would be afforded constitutional protection "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship."  *Id.* at 620.  The Court also stated that there is "a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State" and that the determination of whether a relationship should receive constitutional protection "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of

personal attachments." *Id.* The relevant factors courts are to consider in making this assessment include, but are not limited to, size, purpose, policies, selectivity, and congeniality. *Id.*

Because, as discussed above, there is a genuine issue of material fact surrounding whether Brackin was fired for her personal communications and associations with Turner outside of work, summary judgment on this issue must be denied.

**3.     Procedural Due Process Claim**

Brackin has asserted a claim that her discipline for the Fondren incident and her later termination for insubordination both violated her right to procedural Due Process.[8] Defendants argue that they are entitled to summary judgment because she did not have a property right in her employment, and the Judicial Department's disciplinary process afforded her adequate procedure.[9]

In order to prove a violation of procedural due process, Brackin must demonstrate: (1)

---

[8]     With respect to the Stephen Phelps ticket fixing incident, because Brackin was not terminated on the basis of this alleged infraction, this Court need not address any of the issues raised with respect to this incident.

[9]     In addition to arguing that the procedures themselves were inadequate, Brackin appears to argue in her briefs that the information that Defendants relied upon in making their determinations regarding whether to discipline Brackin was obtained during investigations conducted by the city's Internal Affairs organization within the police department, and that this fact itself violates Due Process, because these investigations were contrary to the city's regulations. Brackin cites a number of cases for the proposition that procedural Due Process is violated when the government fails to follow its own regulations, which she claims support this argument. However, all of the cases she cites address violations of government regulations prescribing procedures for affording notice and opportunity to be heard. None of the cases she cites stand for the proposition that procedural Due Process is relevant to government investigations, which it is not.

that she was deprived of a property interest by state action; and (2) that the state did not afford her adequate process regarding the deprivation. *See Ross v. Clayton County*, 173 F.3d 1305, 1307 (11th Cir. 1999). Public employees have a property interest in employment if "existing rules or understandings that stem from an independent source such as state law create a legitimate claim of entitlement." *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577-78 (1972)). State law can create an entitlement to a job through explicit contractual provisions or through "rules or mutually explicit understandings." *Brown v. Georgia Dep't of Revenue*, 881 F.2d 1018, 1026 (11th Cir. 1989) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). Personnel rules and regulations may create a property interest if they impose requirements or procedures regarding dismissals which are analogous to requiring cause. *Brown*, 881 F.2d at 1026.

The City of Dothan Personnel Rules ("Personnel Rules") establish regulations for employee discipline. Personnel Rule § 3-20(2)(a) provides:

> The first "Major" offense committed shall result in a "final warning" and a one (1) to twenty-(20) day suspension without pay. Exempt employees can only be suspended for violation of major safety related disciplinary infractions. Violation of any subsequent "Major" offense within two years shall be grounds for discharge.

(internal citation omitted). Personnel Rule § 3-30(4) further provides:

> **Final Warning and One to Twenty Days Suspension Without Pay**. This is the disciplinary action that follows violation of any offense classified as "Major." A due process hearing (Determination Hearing) is conducted with the employee prior to making a decision to implement this disciplinary action (Personnel Regulation IV). The supervisor will meet in a formal discussion with the employee explaining the exact offense(s) the employee violated and the seriousness and consequences of the offense(s). The supervisor shall instruct the employee how he/she may correct his/her performance and/or behavioral problem. The supervisor shall explain to the employee that the violation of any further 'Major Offense' within two years from the date of

record of this offense is grounds for discharge.

Lastly, Personnel Rule § 3-30(5) provides:

> Discharge is the most severe disciplinary action that may be taken against an employee. A due process hearing (Determination Hearing) must be conducted with an employee prior to making a decision to discharge an employee (Personnel Regulation IV). An employee who does not correct performance and/or behavioral problems after the progressive discipline process for 'Minor' and/or 'Major Offenses' or an employee who commits an 'Intolerable Offense' is indicating an inability or unwillingness to correct his/her behavior. By utilizing progressive discipline, it is hoped that many employee problems can be corrected at an early stage, thereby benefitting both employees and the City by eliminating an employee's discharge from his/her position with the City of Dothan.

Consequently, the city's Personnel Rules specifically require, prior to any disciplinary action against a public employee, that the employer provide the employee with notice of the charges against her prior to the decision whether to implement disciplinary action based on those charges.  Furthermore, the rules require an employee to commit two major offenses within a twenty-four month period before being subject to discharge.   Under these circumstances, Brackin would have a property interest in continued employment.  *See Fowler v. Johnson*, 961 So. 2d 122, 132 (Ala. 2006) (holding public employee had property right in continued employment because he could be dismissed only for cause); *Brown*, 881 F.2d at 1027 (holding that personnel rules created property right in continued employment because "the discretion of the state to dismiss an employee is circumcribed" and "the rules explicitly grant the employee a hearing at which to dispute the facts").

Now that Brackin has established that she was deprived of a property interest, the analysis shifts to whether the city afforded her adequate procedure regarding the deprivation of her property interest. *Ross*, 173 F.3d at 1307.  If Brackin did receive adequate procedure,

there is no constitutional violation and Defendants will be entitled to summary judgment.

In order for the state to deprive a public employee of a property interest in continued employment, where the state affords post-termination procedures, the Due Process clause of the Constitution requires "some kind of hearing" prior to the employee's termination. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-47 (1985); *Harrison v. Wille*, 132 F.3d 679, 684 (11th Cir. 1998). Because termination of employment is a severe deprivation, this hearing must be provided prior to termination and it must include "notice and an opportunity to be heard." *See Harrison*, 132 F.3d at 684. Notice is sufficient if it notified the plaintiff of the charges and was timely, and it can be oral or written. *Id.* In this case, there is ample evidence that Brackin was notified of the charges against her prior to each disciplinary action taken against her. Therefore, this Court finds that Brackin received adequate pretermination notice.

With respect to the opportunity to be heard, a "full evidentiary hearing is not required." *Id.* All that is required by Due Process is that the employee be given an opportunity to present her side of the story. *Id.* In this case, Brackin had an opportunity to present her side of the story prior to the final disciplinary decision at each Determination Hearing.[10] At these hearings, Brackin had the opportunity to respond to the charges against

---

[10]   Brackin argues that the actual decision maker was Sergeant Gary S. Coleman, Internal Affairs Division, who conducted the interrogation of Brackin and prepared the report and recommendation that was ultimately presented to Judge Gordon. Brackin alleges that Coleman was the decision maker because of the conclusory allegation that his recommendation was "adopted unquestionably and without further review." Brackin has presented no evidence that Judge Gordon adopted Coleman's recommendations "without further review." Indeed, the evidence before this Court is that the decision to discipline Brackin was made at the Determination Hearings, as required by the Personnel Rules.

her orally or in writing, and was allowed to submit sworn affidavits.[11]   Based on this evidence, the Court finds that Brackin was given adequate opportunity to be heard. Consequently, because there is no genuine issue of material fact as to whether the disciplinary actions taken against Brackin comported with Due Process, Defendants are entitled to summary judgement on this issue.

### 4.    Substantive Due Process Claims

Brackin argues that her substantive Due Process rights were violated in two ways: (1) by being subjected to interrogation by Internal Affairs investigators though she had not committed a crime or been accused of committing a crime; and (2) by being terminated based upon a single telephone call to her friend and coworker.

Brackin's argument that the Internal Affairs investigation violated her substantive Due Process rights are without merit.   The fact that she was subjected to questioning by investigators, even upon threat of loss of employment, is not a constitutional violation.   *See Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 284 (1968) (holding that public employees may be questioned regarding the performance of their official duties on pain of dismissal from public employment).   Accordingly, no genuine issue of material

---

[11]   Brackin argues in Count Six that she was denied procedural due process because the City's attorney had access to transcripts of Brackin's statements to investigators at the hearing before the Personnel Board, which Brackin alleges she was denied access to despite written requests.   The evidence before this Court is that Brackin was provided with copies of all of the information that the city provided to the Personnel Board.   Moreover, Brackin has failed to establish that she was entitled under the Personnel Board's regulations to have access to these transcripts, or that the failure to make her so entitled constitutes a violation of Due Process.   *See P.S.C. Resources, Inc. v. NLRB*, 576 F.2d 380, 386 (1st Cir. 1978) (no due process right to the "full panoply of pretrial discovery weapons available to litigants in federal court").

fact exists, and Defendants are entitled to summary judgment with respect to this claim.

In addition, Brackin's argument that her termination based upon her contact during work hours with Turner violates her substantive Due Process rights is likewise without merit. This is because public employees do not have substantive due process rights with regard to their employment. *See Bussinger v. City of New Smyrna Beach*, 50 F.3d 922, 925 (11th Cir. 1995) ("[A]n employee with a protected interest in his job may not maintain a substantive due process claim arising out of his termination.").[12]  Therefore, no genuine issue of material fact exists, and Defendants are entitled to summary judgment on this claim as well.

### 5.    Title VII Claims

Brackin also claims that her termination was based on her race in violation of Title VII of the Civil Rights Act of 1964.[13]   In order to establish a prima facie case of discrimination under Title VII, the plaintiff must present either (1) statistical proof of a pattern of discrimination; (2) direct evidence of discrimination, which consists of evidence which, if believed, would prove the existence of discrimination without inference or presumption; or (3) circumstantial evidence of discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See*

---

[12]    To the extent that Brackin's substantive Due Process claims arise out of alleged violations of her First Amendment rights, those arguments have been addressed *supra* Parts IV.B.1-2.

[13]    Brackin brought her discrimination claim under § 1983.  However, this Court analyzes the claim as though it were brought under Title VII. *See Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982) (when § 1983 used as parallel remedy for Title VII violation, elements of the two causes of action are the same).  Furthermore, while Brackin brought her claim against both Judge Gordon and the City, Brackin conceded in her brief that her discrimination claim against the City was without merit.

*Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997).  In this case, Brackin attempts to establish her prima facie case using the *McDonnell Douglas* framework..

Under *McDonnell Douglas*, a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a protected class; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job.  *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *see also McDonnell Douglas Corp.*, 411 U.S. at 802; *Vessels v. Atlanta Indep. School Sys.*, 408 F.3d 763, 768 (11th Cir. 2005); *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1102-04 (11th Cir. 2001). The burden to establish a prima facie case is not intended to be "onerous;" it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Holifield*, 115 F.3d at 15.

The only *McDonnell Douglas* factor in dispute in this case is whether Brackin has successfully demonstrated that similarly situated employees outside of her classification were treated more favorably.  In this regard, Brackin attempts to use two black Magistrates, McClain and Knight, as comparators.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia*, 171 F.3d at 1368.  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.*  In order to prevent courts from second-guessing employers' reasonable decisions by comparing apples to oranges, the quantity and quality of the comparator's misconduct must be "nearly identical"

to the employee raising a discrimination claim. *Id.*

In *Maniccia*, a female plaintiff was terminated for violating four different policies. The Eleventh Circuit found that, despite the fact that each of those policies had been violated by male employees that had not been terminated, none of the male employees had violated *all four* of the policies as the plaintiff had. *Maniccia*, 171 F.3d at 1368-69. In *Abel v. Dubberly*, 210 F.3d 1334 (11th Cir. 2000), the plaintiff was an employee terminated for taking $10.00 from a register and leaving an IOU note. The plaintiff identified a comparator that had been accused of taking money but was not terminated. The court held that the two employees were not similarly situated because the plaintiff had admitted taking the money for personal use, and the comparator had never confessed and, at worst, had only admitted to temporarily misplacing the funds. *See id.* at 1339. Also, in *Silvera v. Orange County School Bd.*, 244 F.3d 1253 (11th Cir. 2001), the Circuit held that the plaintiff, who was terminated for having four previous arrests, was not similarly situated to a fellow employee who had two previous arrests and was not terminated, even though both employees had been arrested for lewd assault on a child. *See id.* at 1259.

It is undisputed that Brackin was terminated for violating two major offenses within a twenty-four month period. It is also undisputed that the two major offenses were: (1) insubordination, and (2) taking action that could cause undue financial loss to the City and negligence in carrying out assigned tasks or duties or responsibilities of one's position. In addition, Brackin had committed a third major offense arising out of the ticket-fixing incident in 2002 for which she could not have been terminated because it was outside the 24 month

timeframe in which any other major offense was committed.

With regard to her comparators, Brackin alleges that McClain potentially caused a wrongful arrest by issuing an arrest warrant for the wrong "Michael McCord" when there were two people named Michael McCord in the computer system.  In addition, Brackin alleges that McClain failed to input that a defendant had completed a Defensive Driving Course, which resulted in a warrant for his arrest that should never have been issued. Brackin also alleges that several complaints had been made by the police department about missing warrants and other clerical errors due to mistakes made by both McClain and Knight. This Court is not sure that these incidents, by themselves, would be sufficient to make McClain and Knight similarly situated to Brackin.  However, it is undisputed that other magistrates, including McClain and Knight, also violated Judge Gordon's No Contact order in that they had discussed the pending investigation with people outside of the office.  None of these people, including McClain and Knight were disciplined for violating the very same order that Brackin was terminated for.  Accordingly, this Court feels that Brackin has presented evidence sufficient to make a prima facie case of race discrimination.

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to present legitimate, non-discriminatory reasons for the employment action.  *Holifield*, 115 F.3d at 1564.  Defendants point to the major offenses Brackin has committed as the non-discriminatory reasons for her termination.  However, Brackin could not be terminated for the ticket-fixing incident because that occurred outside of the 24-month period in which she committed another major offense.  Moreover, Brackin could not be terminated for the Fondren incident alone because that would constitute only one major offense in a 24 month

period. Indeed, Brackin could only be terminated for *both* the Fondren incident and the No Contact violation. However, it has already been established that there is a genuine issue of material fact as to whether termination for the No Contact violation, when other black employees violated the same order and were not terminated, was based upon illegal discrimination. Accordingly, Defendants have failed to meet their burden and their motion for summary judgment on this issue must be denied.

### 6.  State Law Claim - False Imprisonment

In addition to her federal claims, Brackin has brought a claim against Judge Gordon for false imprisonment. Brackin alleges that she was "forced" to participate in Internal Affairs interrogations, which constituted an unlawful detention. Notably, it does not appear that Judge Gordon has raised the affirmative defense of official immunity under Alabama law to the state law claims, as she did for the federal claims. Nevertheless, because Brackin fails to establish a prima facie case of false imprisonment, Judge Gordon is entitled to summary judgment on this claim. *See Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538, 1542-43 (11th Cir. 1990) (plaintiff's failure to present a prima facie case entitles defendant to summary judgment). Brackin's claim fails simply because compelling a public employee to answer questions related to her official duties under the threat of job loss is not improper. *See, e.g., Gardner v. Broderick*, 392 U.S. 273, 278 (1968) (public employee may be terminated for refusing to answer questions specifically, directly, and narrowly relating to the performance of his official duties); *Faniel v. Chesapeake and Potomac Tel. Co. of Maryland*, 404 A.2d 147, 152 (D.C. 1979) ("[F]ear of losing one's job, although a powerful incentive, does not render involuntary the behavior induced."); *Moen v. Las Vegas Int'l Hotel, Inc.*, 521 P.2d 370, 371 (Nev. 1974).

C.    **Martin's Claims**

Martin has abandoned her claims under the First Amendment.  Therefore, all that remains of her claims against Defendants are her Title VII racial discrimination claims and pendant state law claims.

1.    **Title VII Claims**

Martin makes two distinct discrimination claims.  The first is that Martin was terminated because of racial discrimination.  The second is that Judge Gordon retaliated against Martin after Martin accused her of racial discrimination.  This Court will address each argument in turn.

a.    **Martin's Termination**

As was the case in regard to Brackin's Title VII claim, Defendants argue that Martin has failed to establish a prima facie case because she can not produce similarly situated employees that were treated differently.  *See Maniccia*, 171 F.3d at 1368.  The only two employees Martin presents as comparators are Knight and McClain, the same two employees put forward for Brackin.  However, it is clear that Knight and McClain are not similarly situated to Martin.  First, Martin was in her probationary period, whereas Knight and McClain were not.  Second, Martin was a supervisor, but Knight and McClain were magistrates. *See Beaver v. Rayonier, Inc.*, 200 F.3d 723, 728-29 (11th Cir. 1999) (supervisor positions not "similarly situated" to hourly employees in maintenance department).  Obviously, it would be comparing "apples to oranges" to attempt to compare an employer's decision to terminate an Administrator during her probationary period, with that employer's disciplinary decisions regarding clerical errors made by lower-level employees who could only be terminated for serious or repeated offenses.  *See Maniccia*, 171 F.3d at 1368

### b.      Retaliation

Title VII prohibits retaliation by an employer against an employee because the employee has opposed an unlawful employment practice or made a charge of discrimination. 42 U.S.C. § 2000e-3(a).  In order to establish a prima facie case of retaliation, the plaintiff has the burden to establish: (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was some causal relation between the two events.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1265-66 (11th Cir. 2001).

Martin's claim fails because she can not establish a causal relation between her complaint and the adverse action.  In her complaint, Martin alleges that the adverse action was that she was "not allowed to perform her duties as Administrator . . . or permitted to make assignments effecting [*sic*] the black magistrates."  *See* Second Amended Complaint (Doc. # 38) at ¶ 181.  Effectively, Martin is asserting that the adverse action was Judge Gordon's order that Martin refrain from making new job assignments to magistrates without first obtaining clearance from her.  Even assuming arguendo that such an action qualifies as "adverse," Martin can not show a causal connection by virtue of the fact that this action was taken *prior to* the date Martin claims to have complained about the racial discrimination.

Apparently recognizing this paradox, Martin attempts to effectively amend her complaint in her response to Defendants' Motion for Summary Judgment, by alleging that her *termination* was the retaliation for her race discrimination charges.  However, Martin's complaint clearly limits her retaliation claim to "not allow[ing her] to perform her duties as Administrator" and makes no mention of her termination.  *See* Second Amended Complaint (Doc. # 38) at ¶ 181.  A plaintiff may not amend their complaint through argument in a brief opposing summary judgment.  *See, e.g., Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439

F.3d 1286, 1297 (11th Cir. 2006); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004).[14]

### 2.    State Law Claims

Because all of the federal law claims against Martin have been dismissed, this Court has discretion to dismiss the state law claim against her as well.[15]  28 U.S.C. § 1367(c)(3); *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999).  In making this determination, this Court will "take into account concerns of comity, judicial economy, convenience, fairness, and the like."  *Crosby*, 187 F.3d at 1352 (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996)).  This decision is "pragmatic and case-specific."  *Roche*, 81 F.3d at 257.  Under the circumstances of this case, the Court determines that the appropriate course of action in this case is to decline to exercise supplemental jurisdiction

---

[14]    Even if this Court were to entertain the merits of Martin's arguments that her termination was in retaliation for her claim of race discrimination, this Court would still grant Defendants' motion for summary judgment on the grounds that Martin failed to establish a prima facie case of retaliation, because she could not show a causal relationship between her termination and the protected activity.  *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).  Martin alleges in her opposition brief that she raised concerns of race discrimination in the July 17, 2004 meeting with Davis, Judge Gordon, and herself, but fails to cite to any evidence in the record, and this Court's review of her deposition reveals no indication that she made any accusation of race discrimination in that meeting. Martin does allege that she raised these concerns *with Davis* on September 29, 2004, which was prior to October 12, 2004, the date Judge Gordon notified Martin that she was recommending her termination.  However, there is no evidence in the record that Judge Gordon was made aware of Martin's accusations prior to Martin's termination.  *See Farley*, 197 F.3d at 1337 (plaintiff must present evidence that decision-maker was aware of the protected conduct prior to the adverse action).  Moreover, this Court holds in the alternative that even if Martin could show a prima facie case, that Defendants have proffered legitimate nondiscriminatory reasons for the adverse employment action, which Martin has failed to present sufficient evidence that a reasonable jury could find are pretextual.  These nondiscriminatory reasons are explained in great detail in the attachments to Martin's final evaluation.  (Martin Dep., Def. Ex. 26, at 1089-96).

[15]    While Martin initially brought both state law claims for both negligence and breach of contract, she withdrew her breach of contract claim in her response to Defendants' Motion for Summary Judgment.

and dismiss Martin's state law claims without prejudice.

## E.    Other Motions

### 1.    Defendants' Motion for Attorney's Fees (Doc. # 70)

Defendants have moved for an award of attorney's fees on the grounds that Plaintiffs' claims in this case are groundless, frivolous, and brought in bad faith.    Under the circumstances, this Court does not believe the Plaintiffs' claims were frivolous or brought in bad faith. *See Anderson v. Smithfield Foods, Inc.*, 353 F.3d 912, 915-16 (11th Cir. 2003). Consequently, Defendants' Motion for Attorney's Fees is due to be DENIED.

### 2.    Defendants' Motion to Seal Evidentiary Submissions in Support of Summary Judgment (Doc. # 76)

Defendants have moved to place certain evidence submitted in support if their summary judgment motion under seal.  The documents that Defendants have moved to place under seal are records relating to the Internal Affairs investigations, as well as Defendants' tax returns and W-2 forms.

The public has a right of access to inspect judicial records. *See Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304 (11th Cir. 2001).  The nature and scope of this right depends upon the nature of the documents at issue. *See id.* at 1310-15 (discussing various sources of public right of access).   Unlike documents exchanged in discovery, documents filed in connection with a dispositive motion are subject to the common law right of access. *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007).   A party opposing public access must show good cause for why the information should be kept confidential. *Id.*  The Court must balance the interest in keeping the information confidential against the public interest in accessing the information. *Id.*  The Court should consider the following factors:

whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.

*Id*.

With respect to the documents related to Internal Affairs police investigations, these documents were central to this Court's resolution of the merits of the case, which weighs in favor of public access. Moreover, the countervailing interests are insufficient to overcome the strong weight afforded this presumption. This Court does not believe that public access to police reports of investigation will hinder future investigations or impair court functions. *See, e.g.*, *Covington v. Semones*, 2007 WL 1170644, at *4 (W.D. Va. April 17, 2007) (denying motion to seal police reports because public's interest in access to documents outweigh the "unpersuasive" argument that police officers will not be able to fulfill their official duties if they know their notes and reports will become public). Consequently, this Court finds that Defendants' motion to seal these exhibits is due to be DENIED.

Turning to the documents that are tax returns and W-2s for the Defendants (Martin Dep., Def. Ex. 6; Brackin Dep., Def. Exs. 27, 28, 29), these documents contain information protected by this Court's General Order Implementing the Requirements of the E-Government Act, Misc. Order No. 3228, entered December 16, 2004 ("the Order"). The Order requires any document filed with this court to have redacted: social security numbers, names of minor children, dates of birth, financial account numbers, and addresses of individuals. Accordingly, Defendants shall redact from these exhibits any information that is required to be redacted by the Order. Once these documents have been redacted, the public right of access to these documents will outweigh any countervailing privacy interest in

protecting them. Therefore this Court finds that Defendants' motion to seal these exhibits is due to be GRANTED IN PART AND DENIED IN PART. It will be granted to the extent that the exhibits contain information protected by the Order, but denied in all other respects.

Defendants' Exhibits 11-14 to Martin's deposition also contain information protected by the Order, and they must be redacted as well. Therefore this Court finds that Defendants' motion to seal these exhibits is due to be GRANTED IN PART AND DENIED IN PART. It will be granted to the extent that the exhibits contain information protected by the Order, but denied in all other respects.

Defendants' Exhibit 4 to Martin's Deposition is her written response to the City of Dothan's Disciplinary Action Report Form. The only interest put forward by Defendants to justify sealing these records is that they "contain[] outrageous and spurious allegations against Defendants which are totally unsupported by any evidence." This is not a sufficient interest to outweigh the presumption in favor of the public's right of access. Therefore, Defendants motion to seal this exhibit is due to be DENIED.

### 3. Motions to Strike

All of the motions to strike presently before this Court are due to be DENIED AS MOOT due to the fact that whether or not any of the evidence at issue was stricken would not alter this Court's ruling.

### 4. Motion to Sever

Because all of Martin's claims have been dismissed, this motion can be DENIED AS MOOT.

### V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

(1) Defendants' Motion for Summary Judgment (Doc # 70) is GRANTED IN PART AND DENIED IN PART.  The motion is DENIED with respect to Counts Two, Three, Eight, Nine, Ten, and GRANTED with respect to all remaining counts.

(2) Plaintiff Brackin's Motion for Partial Summary Judgment (Doc. # 69) is DENIED.

(3) Defendants' Motion for Attorney's Fees (Doc. # 70) is DENIED.

(4) Defendants' Motion to Seal Evidentiary Submissions in Support of Summary Judgment (Doc. # 76) is GRANTED IN PART AND DENIED IN PART.  Specifically, the motion is:

      (a) GRANTED with respect to Defendants' Exhibits 6, 11-14 to the Martin Deposition, and Defendants' Exhibits 27-29 to the Brackin Deposition.

      (b) DENIED in all other respects.

      (c) Defendants shall file redacted exhibits with this Court on or before March 10, 2008.

(5) Defendants' Motions to Strike (Doc. ## 81, 94, 95) are DENIED AS MOOT.

(6) Plaintiffs' First Motion to Strike (Doc. # 96) is DENIED AS MOOT.

(7) Defendants' Motion to Sever (Doc. # 106) is DENIED AS MOOT.

(8) The following claims are DISMISSED WITH PREJUDICE:

      (a) Brackin's Claims: Counts One, Four, Five, Six, Seven, Eleven.

      (b) All of Martin's federal claims.

(9) Martin's state law claims are DISMISSED WITHOUT PREJUDICE.

DONE this the 25th day of February, 2008.

                        /s/ Mark E. Fuller
            CHIEF UNITED STATES DISTRICT JUDGE